## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| IMERYS TALC AMERICA, INC., *et al.*,[1] | : | Case No. 19-_____ (_____) |
| | : | |
| Debtors. | : | (Joint Administration Requested) |
| | : | |

---------------------------------------------------------- x

**DEBTORS' MOTION FOR ENTRY OF ORDERS UNDER 11 U.S.C. §§ 105(a), 362(d), 363(b), 363(c), 506(a), 507(a), 541, 553, 1107(a), AND 1108 AND FED. R. BANKR. P. 6003 (I) AUTHORIZING PAYMENT OF CERTAIN PREPETITION WORKFORCE OBLIGATIONS, INCLUDING COMPENSATION, EXPENSE REIMBURSEMENTS, BENEFITS, AND RELATED OBLIGATIONS, (II) CONFIRMING RIGHT TO CONTINUE WORKFORCE PROGRAMS ON POSTPETITION BASIS, (III) AUTHORIZING PAYMENT OF WITHHOLDING AND PAYROLL-RELATED TAXES, (IV) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING TO ADMINISTRATORS OF, OR THIRD PARTY PROVIDERS UNDER, WORKFORCE PROGRAMS, AND (V) AUTHORIZING BANKS TO HONOR PREPETITION CHECKS AND FUND TRANSFERS FOR AUTHORIZED PAYMENTS**

The debtors and debtors-in-possession in the above-captioned cases (collectively, the "**Debtors**") hereby file this motion (the "**Motion**") for entry of interim and final orders, substantially in the forms attached hereto as Exhibit A and Exhibit B (respectively, the "**Interim Order**" and the "**Final Order**"), under sections 105(a), 362(d), 363(b), 363(c), 506(a), 507(a), 541, 553, 1107(a), and 1108 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), (i) authorizing the Debtors to pay certain prepetition amounts owing to or for the benefit of employees and independent contractors for compensation, reimbursable expenses, and benefits;

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748).  The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

(ii) confirming the Debtors' right to continue postpetition, in the ordinary course of business, the workforce-related plans, programs, and policies in effect immediately prior to the filing of these cases; (iii) authorizing the Debtors to pay any and all local, state, federal, and foreign withholding and payroll-related or similar taxes relating to prepetition periods; (iv) confirming the Debtors' right to continue to deduct and to transmit deductions from payroll checks as authorized by employees, as required under any workforce-related plan, program, or policy, or as required by law; (v) authorizing the Debtors to pay any prepetition claims owing to the administrators of, or third party providers under, their workforce-related plans, programs, and policies as necessary to ensure the delivery of compensation, benefits, and expense reimbursements to their employees and independent contractors; and (vi) authorizing all banks to receive, process, honor, and pay all of the Debtors' prepetition checks and fund transfers on account of any obligations authorized to be paid pursuant hereto.  In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Alexandra Picard, Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings*, filed with the Court concurrently herewith (the "**Picard Declaration**").  In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

### JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a), 362(d), 363(b), 363(c), 506(a), 507(a), 541, 553, 1107(a), and 1108 of the Bankruptcy Code and Bankruptcy Rule 6003.

2

## BACKGROUND

2.      On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court commencing cases (the "**Chapter 11 Cases**") for relief under chapter 11 of the Bankruptcy Code.  The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the Picard Declaration and is fully incorporated herein by reference.

3.      The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been requested in the Chapter 11 Cases, and no committees have yet been appointed.

4.      Simultaneously with the filing of this Motion, the Debtors have filed a motion with this Court pursuant to Bankruptcy Rule 1015(b) seeking joint administration of the Chapter 11 Cases.

## RELIEF REQUESTED

5.      By this Motion, the Debtors request entry of the Interim Order and Final Order, substantially in the forms attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u>, respectively, authorizing them, in their discretion, to pay, continue, or otherwise honor various prepetition workforce-related obligations (collectively, the "**Prepetition Workforce Obligations**") to or for the benefit of their employees (the "**Employees**"), temporary workers (the "**Temporary Workers**"), and independent contractors (the "**Independent Contractors**" and, together with the Employees and Temporary Workers, the "**Workforce**") for compensation, expense reimbursements, and benefits under all plans, programs, policies, and agreements maintained by or for the benefit of, or contributed to or entered into by, the Debtors prior to the Petition Date (as described below, the "**Workforce Programs**").  In addition, the Debtors request that the Court confirm their right to

continue each of the Workforce Programs in the ordinary course of business during the pendency of these Chapter 11 Cases in the manner and to the extent that such Workforce Programs were in effect immediately prior to the filing of such cases and to make payments in connection with expenses incurred in the postpetition administration of any Workforce Program.[2]  The Debtors request authority to either (i) pay amounts due on account of Prepetition Workforce Obligations directly to the applicable member of the Workforce or third party administrator, consultant, agent or provider, or (ii) pay to the Debtors' non-debtor, indirect parent entity, Imerys USA, Inc. ("**Imerys USA**") (either directly or indirectly through non-debtor Imerys Clays, Inc. ("**Imerys Clays**"), a wholly-owned subsidiary of Imerys USA), or set off against amounts owed by Imerys USA or the other Debtors, as reimbursement for amounts paid by Imerys USA or the other Debtors on behalf of the applicable Debtor in connection with the Prepetition Workforce Obligations.

6.     The Workforce Programs under which the Prepetition Workforce Obligations arise are described more fully herein and include, without limitation, plans, programs, policies, and agreements providing for: (a) wages, salaries, holiday pay, paid time off, incentive plans, and other accrued compensation; (b) reimbursement of business, travel, and other reimbursable expenses; and (c) benefits in the form of (i) medical and dental coverage, basic term life insurance, accidental death and dismemberment insurance, short-term disability coverage, long-term disability coverage, workers' compensation, and miscellaneous other benefits provided to

---

[2]     By this Motion, the Debtors do not seek to assume or reject any Workforce Program to the extent that such Workforce Program is deemed to be an executory contract within the meaning of section 365 of the Bankruptcy Code.  Moreover, the Debtors do not waive their right to modify or terminate any Workforce Program to the extent that such right exists under the terms of the Workforce Program or as may be authorized by applicable law.

US-DOCS\105945547.1

the Workforce in the ordinary course of business, and (ii) prepetition contributions to, and benefits under 401(k) plans and pension plans, as described herein.[3]

7.      The Debtors also request authorization to pay any and all local, state, federal, and foreign withholding and payroll-related or similar taxes relating to the Prepetition Workforce Obligations including, but not limited to, all withholding taxes, social security taxes, Medicare taxes, and employment insurance taxes and premiums.[4]  In addition, the Debtors request authorization to pay to third parties any and all amounts deducted from Employee paychecks for payments on behalf of Employees for savings programs, benefit plans, insurance programs, and other similar programs.

8.      The Debtors also request that, with respect to any Workforce Programs that are administered, insured, or paid through a third party administrator or provider, the Debtors be expressly authorized, in their discretion, to pay any prepetition claims of such administrator or provider in the ordinary course of business to insure the uninterrupted delivery of payments or other benefits to the Workforce.

9.      In support of the Motion, the Debtors request that the Court authorize and direct all banks and financial institutions to receive, process, honor, pay, and, if necessary, reissue all

---

[3]      The Debtors may separately request authorization to implement new postpetition incentive, retention, severance or similar employment protection programs designed to preserve employee morale, encourage continuing employment and otherwise ameliorate the effects on employees of these Chapter 11 Cases.  Pending approval of any such postpetition programs, the prepetition programs will continue in the ordinary course, subject to the provisions of section 503(c) of the Bankruptcy Code.

[4]      The Debtors have concurrently sought relief with respect to their Employment Practices Liability (EPL) insurance through the *Debtors' Motion for Order Under 11 U.S.C. §§ 105(a), 362(d), 363(b), and 503(b) Authorizing Debtors to (I) Pay Their Prepetition Insurance Obligations, (II) Pay Their Prepetition Bonding Obligations, (III) Maintain Their Postpetition Insurance Coverage, and (IV) Maintain Their Bonding Program*.  References in this Motion to employment insurance are to government-mandated employment insurance payments in the US and Canada, and are not meant to incorporate the Debtors' EPL insurance.

prepetition and postpetition checks and fund transfers, including prepetition checks and electronic payment and transfer requests that the Debtors reissue or re-request postpetition, drawn on the bank accounts used by the Debtors to satisfy their obligations in connection with Prepetition Workforce Obligations, upon receipt by each bank or financial institution of notice of such authorization, provided that sufficient funds are on deposit in the applicable accounts to cover such payments. The Debtors additionally request that the Court authorize them to issue new postpetition checks to replace any checks that may nevertheless be dishonored and to reimburse any expenses that holders of claims in connection with Prepetition Workforce Obligations may incur as a result of any bank's failure to honor a prepetition check.

## BASIS FOR RELIEF

10.      As of the Petition Date, the Debtors' Workforce consists of approximately 281 Employees, of whom 184 are employed by Debtor Imerys Talc America, Inc. ("**ITA**" and such Employees, the "**ITA Employees**"), 30 are employed by Debtor Imerys Talc Vermont, Inc. ("**ITV**" and together with ITA, the "**US Debtors**"; and such Employees, the "**ITV Employees**" and together with the ITA Employees, the "**US Employees**"), and 67 are employed by Debtor Imerys Talc Canada Inc. ("**ITC**" and such Employees, the "**Canadian Employees**"). The Debtors' Employees are located at the Debtors' offices in San Jose, California, and the Debtors' talc mines, plants, and distribution facilities located in: Montana (Yellowstone, Sappington, and Three Forks); Vermont (Argonaut and Ludlow); Texas (Houston); and Ontario, Canada (Timmins, Penhorwood, and Foleyet).   Approximately 97 of the Employees are salaried employees (the "**Salaried Employees**") and approximately 184 of the Employees are hourly employees (the "**Hourly Employees**").  In addition to the Employees, the Debtors' Workforce also includes approximately 23 part-time, Temporary Workers, and approximately 30 Independent Contractors.

11.    Included in the Hourly Employee headcount are approximately 108 Employees (the "**Union Employees**") who are covered by collective bargaining agreements: approximately 43 ITA Employees at the Three Forks facility (the "**Three Forks Union Employees**") are covered by a labor agreement between ITA and the United Cement, Lime, Gypsum and Allied Workers, Division of the Brotherhood of Boilermakers International, AFL-CIO and Local Union No. D-239, which expires on October 31, 2021 (the "**Three Forks CBA**"); approximately 16 ITV Employees at the Ludlow facility (the "**Ludlow Union Employees**") are covered by a labor agreement between ITA[5] and the Cement, Lime, Gypsum and Allied Workers, Division of the Brotherhood of Boilermakers International, AFL-CIO and its Local Lodge No. DNCL, which expires on September 30, 2020 (the "**Ludlow CBA**"); approximately 23 ITC Employees at the Timmins facility (the "**Timmins Union Employees**") are covered by a labor agreement between ITC and the USW, Local 7580-01, which expires on June 30, 2021 (the "**Timmins CBA**"); and approximately 26 ITC Employees at the Penhorwood and Foleyet facility (the "**Penhorwood Union Employees**") are covered by a labor agreement between ITC and the USW, Local 7580-02, which expires on June 30, 2020 (the "**Penhorwood CBA**" and, together with the Three Forks CBA, the Ludlow CBA and the Timmins CBA, the "**CBAs**").  The Union Employees are all Hourly Employees, whereas the Employees not covered by collective bargaining agreements (the "**Non-Union Employees**") include both Salaried Employees and Hourly Employees.

---

[5]    Although ITA is a party to the Ludlow CBA, and the ITV Employees (including the Ludlow Union Employees) are paid through ITA, the Debtors consider the ITV Employees (including the Ludlow Union Employees) to be Employees of ITV.

12.     ITA Employees and ITV Employees are both paid by ITA because ITV does not have a bank account.  As described in the Cash Management Motion,[6] to account for obligations paid by ITA on behalf of its subsidiary ITV, ITA records any such amounts on its books as an intercompany receivable from ITV, and ITV records such amounts on its books as an intercompany payable to ITA.  ITC Employees are paid directly by ITC.  In addition, employees of affiliates of the Debtors occasionally perform work for the benefit of the Debtors.  By the Cash Management Motion, the Debtors seek authority for ITA (on behalf of itself and ITV) to satisfy intercompany obligations as they come due in cash, and non-debtor affiliates similarly intend to satisfy obligations to ITA and ITV as they come due in cash.  Thus, if the relief sought in the Cash Management Motion is granted, when employees of an affiliate of the Debtors perform work for the benefit of the Debtors, the applicable Debtor will incur an obligation to the affiliate on account of such services and satisfy such obligation when it comes due directly in cash.[7]

13.     With respect to some Workforce Programs, the Debtors pay the applicable third party administrator, consultant, agent or provider directly on account of the Debtors' Prepetition Workforce Obligations.  With respect to other Workforce Programs, Imerys USA pays the applicable third party on account of the collective Workforce Programs of the Debtors and certain of their non-debtor affiliates.  In such latter instances, the USA Shared Service Center

---

[6]     The "**Cash Management Motion**" means the *Debtors' Motion for Orders Under 11 U.S.C. §§ 105(a), 345, 363, 503(b), and 507(a), Fed. R. Bankr. P. 6003 and 6004, and Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing Continuation of Existing Deposit Practices, (III) Approving the Continuation of Intercompany Transactions, and (IV) Granting Superpriority Administrative Expense Status to Certain Postpetition Intercompany Claims* filed concurrently herewith.

[7]     Certain of each of the Debtors' officers and directors are employed by a different Debtor entity or by non-debtor affiliates.  Services provided by such officers and directors are charged to the Debtors pursuant to the shared services expenses described in the Cash Management Motion.

(the "**SSC**"), a unit of non-debtor Imerys USA, then allocates the appropriate portion of the costs and expenses incurred in connection with the Workforce Programs to the Debtors, who then reimburse Imerys USA, either directly or indirectly through Imerys Clays, in the ordinary course of business.[8]  As described in the Cash Management Motion, ITA historically reimbursed Imerys USA for payments made on account of ITA and ITV by setting off those amounts against an outstanding loan payable owed by Imerys USA to ITA pursuant to the terms of an intercompany loan agreement.   Such intercompany transactions were recorded in ITA's and Imerys USA's books and records.  Following the Petition Date, however, ITA intends to pay amounts owed to Imerys USA on account of the Workforce Programs directly in cash rather than by setting off such amounts against intercompany receivables.  Nevertheless, out of an abundance of caution, ITA retains the option to apply such setoffs.

14.    To account for payments made in connection with the Workforce Programs by ITA on behalf of its subsidiary ITV, ITA records ITV's portion of the payment as an intercompany receivable on ITA's books and ITV records such amount as an intercompany payable on its books.  Following the Petition Date, ITV and ITA intend to continue this practice.

15.    For the avoidance of doubt, by this Motion, the Debtors seek authority to (i) make payments directly to the Workforce and third parties on account of the Prepetition Workforce Obligations and the Workforce Programs and (ii) make payments to, or set off amounts owed from, Imerys USA (either directly or indirectly through Imerys Clays) or the other Debtors, on account of the Prepetition Workforce Obligations and the Workforce Programs.

---

[8]     In some instances, Imerys Clays, a non-debtor subsidiary of Imerys USA, acts as an intermediary with respect to amounts due from the Debtors to Imerys USA on account of the Workforce Programs. References in this Motion to the Debtors' payment or reimbursement of amounts due to Imerys USA are meant to include both instances in which Imerys USA is paid or reimbursed directly by the Debtors as well as instances in which the Debtors pay or reimburse Imerys USA indirectly through Imerys Clays.

16.     The Debtors' ability to preserve their businesses and successfully reorganize is dependent on the expertise and continued enthusiasm and service of their Workforce.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the Debtors believe that the morale and, thus, the performance of their Workforce may be adversely affected.

17.     If the Debtors fail to pay the Prepetition Workforce Obligations in the ordinary course, their Workforce will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  Such a result would have a highly negative impact on Workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtors and their estates.  The Debtors have determined that continuation of the Workforce Programs is vital to preserving and rebuilding Workforce morale during the pendency of these Chapter 11 Cases and to reducing the level of attrition that might otherwise occur.

A.     **Prepetition Workforce Compensation**

i.     Employee Payroll and Payroll Deductions

18.     The Employees are typically paid bi-weekly on Thursdays or Fridays (or on the preceding business day if these dates fall on a holiday).  The next payroll date is February 14, 2019 for ITC Employees and February 15, 2019 for ITA Employees and ITV Employees.[9]  The average payroll each two-week pay period is approximately $1,000,000 in the aggregate.[10]  The Debtors utilize Automatic Data Processing, Inc. ("**ADP**") for the administration of payroll for the

---

[9]     In order to avoid any potential delay in payment of the Workforce as a result of their Chapter 11 Cases, the Debtors pre-paid February 15, 2019 payroll for ITA Employees and ITV Employees prior to the Petition Date.

[10]     ITC's Prepetition Workforce Obligations are generally paid with Canadian Dollars.  All dollar amounts listed in this Motion are US Dollars; amounts paid with Canadian Dollars have been converted to US Dollars for purposes of this Motion.

US-DOCS\105945547.1

Employees.[11]  Employees are paid one week in arrears, so that they receive their bi-weekly earnings one week after the last day of a pay period.

19.     In the ordinary course of their businesses, the Debtors make deductions from Employees' paychecks for payments to third parties on behalf of Employees for various federal, state, local, and foreign, income, FICA, employment insurance and other taxes, as well as for court ordered garnishments, union dues, savings programs, repayments for loans taken against the savings programs, benefit plans, insurance and other similar programs (collectively, the "**Deductions**").   The Debtors' average bi-weekly Deductions for Employees aggregate approximately $286,000.

20.     Employees are owed certain prepetition amounts on account of regular compensation earned through the Petition Date.  As such, the applicable Deductions have not yet been taken.  Additionally, even where Deductions have been withheld from the applicable Employee's paycheck, the Debtors may not yet have forwarded the Deductions to the various third parties to which the Deductions are required to be distributed.

21.     As noted above, the Debtors pay their Employees in arrears for work performed two or more weeks prior to the Debtors' normal bi-weekly payroll.  As a result, such Employees often have a significant amount of unpaid wages and other compensation that has accrued, but is unpaid.   The Debtors estimate that, as of the Petition Date, accrued but unpaid wages and Deductions total approximately $714,000 (comprised of $522,000 owed to the Employees on account of unpaid wages and $192,000 attributable to the Deductions).

---

[11]     Some Employees elect to receive their bi-weekly pay in the form of an ALINE Card, a reloadable prepaid debit card.  Each pay period, the Debtors, through ADP, automatically load pay for such an Employee onto the Employee's ALINE Card.  Each time such an Employee uses his or her ALINE Card, the purchase amount is deducted from the amount of money available on the ALINE Card.

ii.     Temporary Workers

22.     In addition to the Employees, the Debtors currently retain approximately 23 Temporary Workers to perform a variety of tasks related to the Debtors' mining operations in the ordinary course of business.  The Debtors utilize the services of various employment agencies to engage the Temporary Workers.  The Debtors do not pay wages, withhold taxes or provide benefits or paid time off for the Temporary Workers.  Instead, the Debtors make payments to the Temporary Workers' employment agencies.  The Temporary Workers generally earn hourly rates and the employment agencies provide the Debtors with invoices for the Temporary Workers' services (and generally are paid) on a bi-weekly basis.  As of the Petition Date, the Debtors have approximately $135,000 of accrued but unpaid liability with respect to the Temporary Workers.

iii.    Independent Contractors

23.     In addition to the Employees and Temporary Workers, the Debtors currently retain approximately 30 Independent Contractors to perform a variety of tasks related to the Debtors' mining operations in the ordinary course of business.  The Independent Contractors may provide services to the Debtors directly, or the Debtors may utilize the services of various employment agencies to engage the Independent Contractors.  The Debtors do not pay wages, withhold taxes or provide benefits or paid time off for the Independent Contractors.  Instead, the Debtors make payments to the Independent Contractors or their contracting agency pursuant to certain agreements.  The Independent Contractors generally earn hourly rates and the Independent Contractors or their contracting agency, if applicable, provide the Debtors with invoices for the Independent Contractors' services (and generally are paid) on either a monthly or bi-weekly basis.  As of the Petition Date, the Debtors have approximately $62,000 of accrued but unpaid liability with respect to the Independent Contractors.

US-DOCS\105945547.1

iv.     <u>Vacation Days, Holidays, and Sick Leave</u>

24.     As part of their overall compensation, Employees are eligible, in certain circumstances, to receive paid time off ("**PTO**") for, among other things, vacation, personal days, and holidays.  The specifics of the Debtors' PTO policies vary based upon whether the Employee is a Salaried Employee, Non-Union Hourly Employee, Three Forks Union Employee, Ludlow Union Employee, Timmins Union Employee or Penhorwood Union Employee.   In addition, the rate at which Employees earn paid vacation varies depending upon how long an Employee has been employed and the segment of the Debtor's business in which the Employee works.

25.     US Non-Union Salaried Employees and Canadian Non-Union Employees with at least one year of service are entitled to between ten and twenty days of PTO per year, depending on length of service, plus an additional eleven paid holidays per year (consisting of eight scheduled holidays and three personal holidays). [12]   US Non-Union Hourly Employees are entitled to between five and twenty-five days of PTO plus an additional eleven paid holidays per year.   The Debtors' Non-Union Employees (both US and Canadian, and both Hourly and Salaried) may not carry over accrued but unused PTO time to the following year, with the exception of the Debtors' California-based Employees.   Upon termination or retirement, Non-Union Employees receive payment on account of any accrued and unused PTO days, subject to the applicable carry-over restrictions.   The US Non-Union Hourly Employees are also entitled to bereavement leave, jury duty, reporting pay and, in some circumstances, emergency response

---

[12]     Approximately ten ITC Employees who were formerly employed by a company acquired by ITC receive up to five weeks of PTO per year in order to maintain consistency with the PTO policy of the acquired company.

US-DOCS\105945547.1

service and military duty.  US Non-Union Hourly Employees are also entitled to two paid sick days per year.

26.    The US Union Employees, subject to certain exceptions and requirements set forth in the CBAs, are entitled to between one and five weeks of paid vacation per year, based on length of service, plus an additional ten paid holidays per year.  Subject to limits set forth in the CBAs, the US Union Employees may request payment in lieu of time off.  In addition, on or before February 28 of each year, each US Union Employee may receive an additional "vacation" payout based upon the Employee's prior year's overtime earnings and the number of weeks of vacation for which such Employee is eligible.  The US Union Employees are also entitled under the CBAs to PTO with respect to bereavement leave, jury duty, reporting pay and, in some circumstances, emergency response service and military duty.  US Union Employees covered by the Three Forks CBA are also entitled to two paid sick days per year.

27.    The Canadian Union Employees, subject to certain exceptions and requirements set forth in the CBAs, are entitled to between two and five weeks of paid vacation per year, based on length of service, plus an additional thirteen paid holidays per year (eleven statutory holidays and two floaters).  In some circumstances, unused vacation will be paid out to Canadian Union Employees at the end of the year.  The Canadian Union Employees are also entitled under the CBAs to PTO with respect to bereavement leave, jury or crown witness duty, reporting pay, and personal emergency leave.  If a Canadian Union Employee does not use either of his or her two paid personal emergency leave days during the calendar year, such Employee is paid out for such unused days at a flat daily rate.

28.    The Debtors estimate that, as of the Petition Date, total accrued but unpaid PTO liability for all Employees is approximately $21,000.  Although the Debtors request authority to

pay such accrued but unpaid PTO liability in the ordinary course of business as necessary, no amounts will be due or owing to any Employee unless and until such Employee is no longer employed by the Debtors (assuming the Employee does not use his or her PTO).

v.    Employee Incentive Programs

29.    In the ordinary course of business, in order to encourage and reward outstanding performance, the Debtors offer eligible Employees the opportunity to earn bonuses under various bonus and incentive programs (collectively, the "**Employee Incentive Programs**"), under which the Employees are eligible to earn awards based on individual and business targets.[13]  Payments with respect to the Employee Incentive Programs are made by the Debtors directly to the applicable Employees.   The Employee Incentive Programs applicable to Employees of the Debtors include the following:

> a.    *Continuous Improvement Incentive Program*.   Non-insider, Hourly Employees of ITA are eligible to participate in the Continuous Improvement Incentive Program ("**CIIP**").   The purpose of the CIIP is to motivate, recognize and reward Hourly Employees' performance based on individual contributions to "Continuous Improvement Activities" at their facilities and toward the achievement of facility and company performance goals.   Based on facility cost performance, site specific goals, personal safety activities and personal goals, as well as site-specific "Key Performance Indicators," eligible full-time Hourly Employees may receive a quarterly bonus of up to 10% of eligible earnings. Payments under the CIIP are made within two months following the end of the

---

[13]    In the interest of full disclosure, Imerys S.A., a non-debtor parent of the Debtors, offers certain eligible Employees of the Debtors the opportunity to participate in the Imerys S.A. Long-Term Incentive Plan (the "**LTIP**").  Historically, participation in the LTIP has been limited to Employees with the title of General Manager, Employees who report directly to the Executive Committee, or high performers at positions in mid- to upper-management.   The Imerys S.A. board of directors reviews worldwide recommendations and approves specific grants of Imerys S.A. shares at the board's discretion.   Shares granted under the LTIP are generally issued by Imerys S.A. in the Spring and correspond to performance during the prior year.   Shares are deemed earned on the date of issuance and vest three years from the date of issuance.   The Debtors expect that approximately one Employee will receive shares under the LTIP subsequent to the Petition Date on account of 2018 performance.   The amount and value of such shares is to be determined in the discretion of the Imerys S.A. board of directors.   No payments or transfers of shares are made to Employees by the Debtors under the LTIP, and thus by this Motion the Debtors do not seek approval or authorization from the Court or any other relief with respect to the LTIP.

applicable quarter.  Over the twelve month period prior to the Petition Date, the Debtors have paid an aggregate of approximately $470,000 on account of the CIIP.  As of the Petition Date, the Debtors estimate that their accrued but unpaid liability relating to the CIIP is approximately $65,000.

b. *Perform to Transform Plan*.  Non-insider, Hourly Employees of ITC are eligible to participate in the Imerys Talc Perform to Transform Plan (the "**PTP**"). The purpose of the PTP is to provide an opportunity for higher levels of incentive reward through employee contributions that positively impact plant performance while maintaining a safe and productive work environment.  Based on metrics set forth in the PTP, eligible Hourly Employees of ITC can earn a quarterly bonus of up to 7% of their eligible earnings, and payments are made during the month following the applicable quarter.  Over the twelve month period prior to the Petition Date, the Debtors have paid an aggregate of approximately $110,000 on account of the PTP.  As of the Petition Date, the Debtors estimate that their accrued but unpaid liability relating to the PTP is approximately $16,000.

c. *Sales Incentive Plan*.  The Debtors, along with certain of their non-Debtor affiliates, are part of the North American Performance Additives Division of the larger Imerys corporate group.  Non-insider ITA Employees who are sales managers within the North American Performance Additives Division (each of which is a Salaried Employee) are eligible to participate in the Sales Incentive Plan ("**SIP**").  Bonus criteria and conditions are defined unilaterally by non-Debtor affiliate Imerys USA and communicated to Employees each year.  The SIP plan year is the calendar year and SIP bonuses are generally paid in the first quarter of the year following the year in which such bonuses are earned. SIP bonuses earned in 2018 were paid in January 2019.  SIP bonuses for 2018 were determined based on certain financial objectives and personal objectives, and the maximum bonus was 30% of an Employee's base salary.  The Debtors pay approximately $293,000 annually on account of the SIP.  As of the Petition Date, the Debtors have no accrued but unpaid liability relating to the SIP.

US-DOCS\105945547.1

d.      *Imerys Annual Incentive Plan.*  Each of the Debtors participates in the Imerys Annual Incentive Plan (the "**AIP**"), through which both insider[14] and non-insider Non-Union Employees are eligible to receive awards, up to a cap, based on the financial performance of the business as well as their individual performance.  Each participating Employee's payout is calculated based on the gross margin of the business, as well as the Employee's personal and safety objective achievements.  The AIP plan year is the calendar year and historically awards under the AIP have been paid annually.  The AIP has been adjusted for the 2019 plan year and beginning with the 2019 plan year awards under the AIP will be paid semi-annually.  AIP awards will be paid in the third quarter based on performance during the first six months of the year, and awards will be paid in the first quarter of the year following the applicable plan year based on performance during the entirety of the applicable plan year.  AIP awards earned in 2018 were paid in January 2019.  As of the Petition Date, the Debtors have no accrued but unpaid liability relating to the AIP.[15]

e.      *Quarterly Safety Programs.*  Eligible non-insider Hourly Employees of ITA and ITV participate in the Debtors' Safety Quarterly Bonus Program, which rewards Employees for maintaining a safe workplace.  Similarly, eligible Employees of ITC participate in the Canadian Operations Safety Incentive Plan (together with the Safety Quarterly Bonus Program, the "**Quarterly Safety Programs**").  Participants in the Quarterly Safety Programs may receive a maximum of $150 quarterly (paid as gift cards) for completion of specified individual performance activities combined with group performance in minimizing worker's compensation and property damage costs.  Over the twelve month period prior to the Petition Date, the Debtors have paid an aggregate of approximately $76,000 on account of the Quarterly Safety Programs.  As of the Petition Date, the Debtors estimate that their accrued but unpaid liability relating to the Quarterly Safety Programs is approximately $13,000.

30.      The Debtors paid approximately $4,757,000 on account of the Employee Incentive Programs during the twelve month period prior to the Petition Date, of which approximately $3,200,000 was earned during the 2017 calendar year and approximately

---

[14]      Two "insiders" of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code, both Employees of Debtor ITA, have historically been eligible to receive awards under the AIP.  The Debtors do not seek authority to pay any prepetition AIP awards to such Employees.  The Debtors seek authority pursuant to the Final Order to continue the AIP in the ordinary course of business with respect to such "insider" Employees.  For the avoidance of doubt, the Debtors seek authority pursuant to the Interim Order to continue the AIP, along with the other Employee Incentive Programs, with respect to non-insider Employees.

[15]      The Debtors reserve the right to modify or amend the AIP or to implement new incentive programs in the future.  Any such request will be pursuant to notice and hearing with this Court.

$1,557,000 was earned during the 2018 calendar year.  As of the Petition Date, the Debtors estimate that accrued and unpaid amounts under the Employee Incentive Programs total approximately $94,000.  Given the large percentage of the Employees covered by the Employee Incentive Programs, the Debtors believe that any interruption in payments pursuant to the Employee Incentive Programs could upset Employee morale or cause attrition, which could lead to severe disruptions to the Debtors' operations.  The Employee Incentive Programs are not retention or severance plans as contemplated by Section 503(c) of the Bankruptcy Code.[16]

31.    The Debtors believe that their total prepetition obligations owed in respect of Workforce compensation described in this Section A will not exceed $1,005,000 as of the Petition Date (the "**Workforce Compensation Obligations**").

## B.    Prepetition Employee Reimbursements

### i.    Business Expenses

32.    The Debtors, in the ordinary course of their business, reimburse Employees for a variety of ordinary, necessary, and reasonable business-related expenses that Employees incur within the scope of their job duties.  These include expenses for business travel (including airfare, lodging, taxi costs, automobile rentals, meals, and internet charges), and other general business-related expenses.  Employees are expected to use sound judgment and good business sense when incurring the expenses.  In order to be reimbursed, an Employee must submit his or her receipts through the Debtors' expense reporting software program.  If expenses are approved by an ITC Employee's supervisor then ITC reimburses the Employee.  If expenses are approved

---

[16]    In the interest of full disclosure, separate from and unrelated to the Employee Incentive Programs described herein, the Debtors and certain of their non-debtor affiliates paid retention bonuses – which must be repaid if the recipient does not continue working for the applicable entity for the specified retention period – to certain insider and non-insider employees on or about January 25, 2019.  By this Motion, the Debtors do not seek approval or authorization from the Court or any other relief with respect to such payments, which were made prior to the Petition Date.

by an ITA or ITV Employee's supervisor then ITA reimburses the Employee, with the SSC processing the release of funds.

33.     Certain Employees chosen by the Debtors are issued a company credit card (a "**Credit Card**") through MUFG Union Bank, N.A. ("**MUFG**") to be utilized for business-related expenses.  The US Employees make all Credit Card payments themselves and, if the applicable expenses are approved, Employees are reimbursed by ITA through the same process applicable for reimbursement of expenses paid by Employees through other methods.  ITC makes payments directly to MUFG with respect to Credit Cards used by Canadian Employees.  The average monthly amount of business expenses reimbursed, directly or indirectly, by the Debtors is approximately $242,000, inclusive of amounts that are owed on the Credit Cards.  The Debtors estimate that there are accrued but unpaid amounts owing to Employees or to Imerys USA (either directly or indirectly through Imerys Clays), for reimbursements on account of Employees' business expenses totaling approximately $438,000 as of the Petition Date.

ii.     Vehicle Programs

34.     ITA and ITV offer certain US Employees the ability to participate in a vehicle program (the "**US Vehicle Program**") through which eligible US Employees who use vehicles in the ordinary course of their work, and maintain a vehicle meeting certain standards and conditions, are provided a monthly vehicle allowance.  Employees that participate in the US Vehicle Program receive an allowance of $600 each month, plus a $0.30 per mile allowance for business-related travel.  In order to be reimbursed for mileage, an eligible US Employee must submit his or her receipts through the Debtors' expense reporting system.

35.     In addition, due to the distance between ITC's Penhorwood mine and the nearest town, ITC provides a vehicle allowance (the "**Canadian Vehicle Program**" and together with the US Vehicle Program, the "**Vehicle Programs**") to all ITC Employees that work at the

Penhorwood mine.  Penhorwood Union Employees receive CAD $2,800 annually, with bi-annual payments in January and July of each year relating to the prior six month period. Canadian Salaried Employees at the Penhorwood mine receive CAD $650 monthly, paid in arrears for the prior month.

36.     As of the Petition Date, approximately 39 Employees participate in the Vehicle Programs.  The Debtors estimate that there are accrued but unpaid amounts under the Vehicle Programs of approximately $4,000 as of the Petition Date.

iii.    Relocation Expenses

37.     In the ordinary course of business, the Debtors cover relocation expenses if an Employee relocates at the request of the Debtors (the "**Relocation Expenses**").  As of the Petition Date, the Debtors have no accrued but unpaid liability with respect to Relocation Expenses, but the Debtors seek to continue to pay Relocation Expenses as they arise in the ordinary course of business.

iv.    Miscellaneous Expenses

38.     The Debtors also reimburse their Employees for certain other miscellaneous programs and benefits (the "**Miscellaneous Reimbursement Programs**").  For example, the Debtors, at the discretion of an Employee's applicable business unit, may reimburse (or pay directly for) certain professional expenses, such as required continuing education expenses, professional license fees or dues, and subscriptions.  In particular, the Ontario Ministry of Labour has mandated required training for employees in the mining sector to remain current with standard practices, and ITC reimburses the Canadian Employees for such training upon receipt of an invoice.  In addition, ITC reimburses the Canadian Union Employees, up to certain annual limits, for the purchase of safety equipment, work boots and in some cases tools.  Penhorwood Union Employees may also receive clothing from a local store, Soucie Salo Safety, for which

ITC reimburses the store.  The total amount of reimbursements paid by the Debtors under these Miscellaneous Reimbursement Programs average approximately $6,000 per month.  As of the Petition Date, the Debtors estimate that accrued and unpaid amounts under the Miscellaneous Reimbursement Programs total approximately $9,000.

39.    The Debtors believe that their total prepetition obligations in respect of Workforce reimbursements described in this Section B will not exceed $451,000 as of the Petition Date (the "**Employee Reimbursement Obligations**").

**C.    Employee Benefits[17]**

40.    Prior to the Petition Date, the Debtors offered Employees and their eligible spouses and dependents various standard employee benefits, including, without limitation, (a) medical insurance (b) dental insurance, (c) basic term life and accidental death and dismemberment insurance, (d) long-term and short-term disability insurance, (e) savings and related types of benefits, (f) workers' compensation, (g) severance benefits, and (h) miscellaneous other benefits provided to the Employees in the ordinary course of business (collectively, the "**Employee Benefits**").  As of the Petition Date, the Debtors were obligated to pay certain contributions to or provide benefits under such plans, programs, and policies.

i.    US Employee Benefits

41.    The Debtors offer numerous Employee Benefits to their US Employees.  Many of these Employee Benefits are offered to Employees of ITA and ITV through benefits programs that are offered by Imerys USA to various US subsidiaries of Imerys USA.  As a result, the Debtors may remit payment (via wire or by setoff) on account of these Employee Benefits to

---

[17]    The Debtors' Temporary Workers and Independent Contractors are not eligible for the benefits described in this section.

Imerys USA (either directly or indirectly through Imerys Clays) rather than directly to the third party administrators, consultants, agents or providers. In such instances, ITA remits payment to Imerys USA (either directly or indirectly through Imerys Clays) on account of Employee Benefits covering ITA and ITV Employees on a monthly basis in arrears.[18]

        a.    *US Medical and Dental Insurance*

42.    The US Debtors offer all Employees the opportunity to obtain basic medical, prescription drug, and dental coverage, and related benefits (the "**US Medical and Dental Benefits**"). The Debtors' US Employees, including Union Employees, are provided US Medical and Dental Benefits through Imerys USA. US Medical and Dental Benefits are provided to US Employees through self-insured programs administered by third parties, such as Blue Cross and Blue Shield of Georgia ("**BCBS**"), which administers the medical and dental programs, and Express Scripts Holding Company ("**Express Scripts**"), which administers the prescription drug coverage.

43.    The US Employees may choose from among three high deductible health plans with health savings accounts ("**HSAs**"). The three health plan choices are Consumer Choice 90, Consumer Choice 80, and Consumer Choice 60, with the number corresponding to the percentage of certain medical or prescription drug costs that are covered after the applicable annual deductible has been met. Participating US Employees pay bi-weekly premiums through payroll deductions remitted to Imerys USA (either directly or indirectly through Imerys Clays) totaling approximately $49,000 per month.

---

[18]    As noted in paragraph 14 above, to account for payments by ITA on behalf of ITV, ITA records ITV's portion of the payment as an intercompany receivable on ITA's books and ITV records such amount as an intercompany payable on its books.

US-DOCS\105945547.1

44.     The Debtors are self-insured for US Medical and Dental Benefits, including prescription drug coverage.  Accordingly, after BCBS or Express Scripts provides a discount to invoices received from providers and determines the eligibility of expenses, the participating Employee pays any required deductibles or co-pays, and the Debtors are then responsible for paying all eligible remaining costs.  On a weekly basis, Imerys USA remits approved amounts to BCBS or Express Scripts, which distribute the payments to medical service or prescription drug providers.  ITA then reimburses Imerys USA via wire or setoff (either directly or indirectly through Imerys Clays) monthly in arrears for amounts paid on behalf of ITA Employees and ITV Employees.

45.     The obligations that the Debtors incur on behalf of the Employees on account of the US Medical and Dental Benefits fluctuate based on the medical needs of the Employees, but average approximately $231,000 per month, inclusive of stop-loss premiums.  As of the Petition Date, the Debtors estimate that they owe approximately $320,000 to Imerys USA (either directly or indirectly through Imerys Clays) on account of the US Medical and Dental Benefits, including $14,000 on account of stop-loss premiums.

        b.     *Pre-Tax Contribution Health Savings Accounts and Flexible Spending Accounts*

46.     The Debtors offer all of their US Employees that elect to receive US Medical and Dental Benefits the opportunity to contribute, through pre-tax compensation deductions, to HSAs to be used for healthcare related expenses.  Imerys USA annually, on January 1, contributes between $500 and $1,000 per Employee to the HSAs of Employees who choose the Consumer Choice 90 or Consumer Choice 80 plan, with the amount contributed by Imerys USA determined based on whether the Employee's plan covers family members or just the Employee.  Each participating Employee may then contribute a portion of his or her eligible earnings each year on

a pre-tax basis to his or her HSA, subject to limits imposed by federal law. A participating Employee may only use his or her HSA for eligible medical expenses. The HSAs are administered by HealthEquity, Inc. ("**HealthEquity**"). Participating US Employees contribute a total of approximately $19,000 per month to HSAs. On behalf of such participating US Employees, Imerys USA contributes into HSAs created by, and held in the name of, each participating US Employee on a monthly basis, and Imerys USA is reimbursed through payroll deductions which are remitted to Imerys USA (either directly or indirectly through Imerys Clays). As of the Petition Date, the Debtors estimate that approximately $29,000 is owed to Imerys USA (either directly or indirectly through Imerys Clays) on account of contributions made by Imerys USA to US Employees' HSAs. Administrative fees of HealthEquity in connection with HSAs are paid by Imerys USA on behalf of the Debtors and then reimbursed by the Debtors as described above in paragraphs 13-15.

47.    The Debtors additionally offer any of their US Employees who are not enrolled for US Medical and Dental Benefits the opportunity to contribute, through pre-tax compensation deductions, to flexible spending accounts ("**FSAs**") to be used for healthcare related expenses and dependent care expenses, subject to limits imposed by federal law.[19] FSA deductions are made from Employees' paychecks. In order to be reimbursed for these expenses, Employees must submit eligible claims to HealthEquity, which administers the claims under the FSAs and remits reimbursements to the Employees. As of the Petition Date, the Debtors estimate that they are holding FSA deductions to be remitted to HealthEquity of approximately $28,000.

---

[19]    Employees electing to receive Medical and Dental Benefits are not eligible to contribute to a health care FSA; such Employees, however, are eligible to contribute to a dependent care FSA.

US-DOCS\105945547.1

Administrative fees of HealthEquity in connection with FSAs are paid by Imerys USA on behalf of the Debtors and then reimbursed by the Debtors as described above in paragraphs 13-15.

   c. *Vision Insurance*

48. The Debtors provide all US Employees with the option to enroll in a vision insurance plan through Imerys USA (the "**US Vision Plan**") which is administered by Superior Vision Services, Inc. ("**Superior Vision**") and is fully insured through National Guardian Life Insurance Company.  The US Vision Plan covers US Employees' routine eye exams, eyeglass frames and lenses, and contact lenses, to varying degrees depending on the service and whether the provider is within Superior Vision's network or is outside the network (the latter option being subject to higher costs to the Employee).  Participating Employees pay premiums through payroll deductions remitted to Imerys USA (either directly or indirectly through Imerys Clays).  On average, the Debtors remit approximately $3,000 of employee-paid premiums to Imerys USA per month on account of the US Vision Plan.  As of the Petition Date, the Debtors estimate that they owe approximately $4,000 to Imerys USA (either directly or indirectly through Imerys Clays) on account of the US Vision Plan.  Administrative fees of Superior Vision in connection with US Vision Plan are paid by Imerys USA on behalf of the Debtors and then reimbursed by the Debtors as described above in paragraphs 13-15.

   d. *Life and Accidental Death and Dismemberment Insurance, Short-Term Disability Program, and Long-Term Disability Program*

49. US Employees receive, at the Debtors' cost, short-term disability ("**STD**") insurance, long-term disability ("**LTD**") insurance, accidental death and dismemberment ("**AD&D**") insurance, and life insurance under plans (the "**US Health Benefits Programs**") administered by The Prudential Insurance Company of America ("**Prudential**") under which Imerys USA is the insured party.  The US Health Benefits Programs are fully insured.

50.     The US Debtors' STD insurance programs vary based on whether an Employee is a Three Forks Union Employee, Ludlow Union Employee, or Non-Union Employee.[20]  The US Debtors' Union Employees are eligible to receive STD benefits beginning on the first day of an accident, in-hospital stay, or disability procedure, or the third day of a sickness, with a Three Forks Union Employee receiving 70% of regular pay for up to 26 weeks, and a Ludlow Union Employee receiving 60% of regular pay for up to 52 weeks.  The US Non-Union Employees receive STD benefits beginning on the sixth day of a disability or illness, and such Employees receive benefits for up to 26 weeks, with an Employee receiving 100% of regular pay for between four (4) and 26 weeks, depending on length of service, and receiving 60% of pay for any remaining number of weeks.

51.     The US Debtors' LTD insurance programs vary based on whether an Employee is a Union Employee (Three Forks or Ludlow) or Non-Union Employee.  The US Debtors' Union Employees are eligible to receive LTD benefits after STD benefits end, with an eligible Union Employee receiving 50% of regular pay up to a maximum monthly benefit of $7,500.  The US Debtors' Non-Union Employees are automatically enrolled in an employer-paid LTD program with benefits starting after 180 days of disability and paying 60% of regular pay up to a maximum monthly benefit of $9,000.  Non-Union Employees, however, have the option of enrolling in an LTD program in which the Employee makes after-tax contributions and the Employee, if eligible for LTD benefits, would instead receive 66 2/3% of regular pay up to a maximum monthly benefit of $10,000.

---

[20]     Employees in the state of California have California Short-Term Disability through the state, which may impact such Employees' eligibility to receive STD benefits.

52.    The US Debtors also provide their Employees with basic life insurance and AD&D insurance in an amount equal to an Employee's annual base pay (not less than $35,000 for Ludlow Union Employees), up to a maximum of $200,000, at no charge to the Employee. US Employees may also purchase additional voluntary supplemental life and AD&D insurance for themselves and their dependents at their own cost up to maximum coverage levels of the lesser of six times annual base pay or $1,000,000 for the Employee, $50,000 for an Employee's spouse, or $10,000 for a dependent child.

53.    Imerys USA pays the premiums for the US Health Benefits Programs to Prudential and is then reimbursed by the Debtors each month (via wire or setoff) as described above in paragraphs 13-15.  The premiums for any voluntary term life and AD&D insurance purchased by US Employees are then deducted from the applicable Employee's paychecks and reimbursed to the Debtors.   As of the Petition Date, the Debtors estimate that they owe approximately $73,000 to Imerys USA (either directly or indirectly through Imerys Clays) on account of premiums under the US Health Benefits Programs.

       e.    *401(k) Plan*

54.    Imerys USA sponsors a 401(k) retirement savings plan (the "**401(k) Plan**") for the Debtors' US Employees.  The 401(k) Plan is administered by the Imerys USA Retirement Committee (the "**Retirement Committee**").   Under the 401(k) Plan, an Employee may contribute between 1% and 75% of his or her eligible earnings each year through either pre-tax contributions, Roth contributions, or a combination thereof, to the 401(k) Plan, subject to limits imposed by federal law.  These contributions are deducted from the paychecks of participating Employees and held in trust on the Employees' behalf until such amounts are paid to Charles Schwab Trust Company (in such capacity, the "**401(k) Trustee**") to be held in an account maintained by the 401(k) Trustee on the Employee's behalf.  In addition, the 401(k) Plan permits

Employees to take loans against their individual 401(k) account, and the Debtors deduct loan payments from such Employee's paycheck and remit such amounts to the 401(k) Trustee. The Retirement Committee oversees the 401(k) Plan and receives advice for investment decisions from Mercer LLC ("**Mercer**"). The 401(k) Trustee's administrative fees are deducted from 401(k) Plan assets. Currently, 207 US Employees participate in the 401(k) Plan.

55.     The Debtors match Employee contributions up to 4% of the participating Employee's eligible compensation, and match 50% of Employee contributions up to the next 2% of the participating Employee's eligible compensation. Matching contributions with respect to the 401(k) Plan are made by Imerys USA, which is then reimbursed by the Debtors as described above in paragraphs 13-15. Matching contributions made on behalf of the Debtors' Employees during the twelve months prior to the Petition Date to the 401(k) Plan were approximately $1,040,000. As of the Petition Date, the Debtors estimate that they owe approximately $120,000 to Imerys USA on account of prepetition matching contributions related to the 401(k) Plan. By this Motion, the Debtors seek authority to pay all amounts owed to Imerys USA (either directly or indirectly through Imerys Clays) related to the 401(k) Plan and to continue to perform its obligations under the 401(k) Plan. The Debtors' matching 401(k) contribution is a critical component of the Employees' compensation. Failure to make such payments would negatively impact morale and place undue hardship on Employees that could result in losses of Employees during these Chapter 11 Cases. Accordingly, the Debtors request authority to continue to reimburse Imerys USA (either directly or indirectly through Imerys Clays) with respect to matching contributions under the 401(k) Plan.

f.     *US Pension Plan*

56.     In addition to the 401(k) Plan, the US Union Employees are eligible to participate in the Imerys USA Pension Plan (the "**US Pension Plan**"). On an annual basis, Imerys USA

evaluates whether and to what extent the US Pension Plan is required to be funded with employer contributions. Contributions with respect to the US Pension Plan are made by Imerys USA to UBS Financial Services Inc., as custodian for the US Pension Plan, and then reimbursed by the Debtors as described above in paragraphs 13-15. The Debtors do not anticipate contributions for the 2019 plan year, and the Debtors estimate that as of the Petition Date they have no outstanding obligations with respect to funding the US Pension Plan. Through this Motion, the Debtors seek authority, but not direction, to continue to perform their obligations under the US Pension Plan, including, but not limited to, the payment of any employer contributions to the US Pension Plan in the ordinary course of business.

g. *US Retiree Medical Benefits*

57. Certain of the US Debtors' Union Employees are eligible to receive medical benefits after retirement pursuant to the Imerys USA Group Insurance Plan for Bargaining Employees (the "**US Union Retiree Medical Benefits**"), while certain of the US Debtors' Non-Union Employees are eligible to receive medical benefits after retirement pursuant to the Imerys USA Group Insurance Plan (the "**US Non-Union Retiree Medical Benefits**" and together with the US Union Retiree Medical Benefits, the "**US Retiree Medical Benefits**"). As of the Petition Date, approximately 70 former US Employees receive US Retiree Medical Benefits for which the Debtors contribute payment. US Retiree Medical Benefits are paid by Imerys USA and reimbursed by the applicable Debtor monthly in arrears. On average, the Debtors remit approximately $41,000 to Imerys USA per month on account of the US Retiree Medical Benefits. As of the Petition Date, the Debtors estimate they owe approximately $58,000 to Imerys USA on account of the US Retiree Medical Benefits. By this Motion, the Debtors seek to continue to reimburse Imerys USA (either directly or indirectly through Imerys Clays) on account of US Retiree Medical Benefits in the ordinary course of business and to pay accrued

prepetition amounts on account of US Retiree Medical Benefits to Imerys USA (either directly or indirectly through Imerys Clays) as they become due.

        h.    *Deferred Compensation Benefits*

58.    Imerys USA offers certain employees of Imerys USA and its subsidiaries and affiliates with the opportunity to participate in tax deferred savings opportunities through the Imerys USA, Inc. Supplemental Deferred Compensation Plan (the "**Deferred Compensation Plan**"). The Deferred Compensation Plan provides a select group of management or highly compensated employees within the meaning of Sections 201(2), 301(a)(3) and 401(a)(1) of the Employee Retirement Income Security Act of 1974, as amended (ERISA) with the opportunity to elect to defer receipt of specified portions of compensation, and to have those deferred amounts treated as if invested in specified hypothetical investment benchmarks.[21]

59.    One former ITA Employee currently participates in the Deferred Compensation Plan, and has elected to receive deferred compensation, to be paid in five annual installments of $15,000 each. Such annual payments are made by Debtor ITA each January. As of the Petition Date, two annual installments, totaling $30,000, remain unpaid.

60.    By this Motion, the Debtors seek to continue participating in the Deferred Compensation Plan and to continue making payments on account of the Deferred Compensation Plan as they become due in the ordinary course of business.

        i.    *Severance Pay Plan*

61.    The US Debtors participate in the Imerys USA Inc. Severance Pay Plan (the "**Severance Pay Plan**") which is applicable to US Salaried Employees who are involuntarily

---

[21]    The Debtors, through Imerys USA, pay *de minimis* quarterly fees to Charles Schwab Trust Company in connection with the Deferred Compensation Plan. Imerys USA is reimbursed by the Debtors for such fees (either directly or indirectly through Imerys Clays).

terminated by action of the employer due to a job elimination, restructuring, merger, acquisition, divestiture, unit shutdown, departmental consolidation, technological change or similar business reason.  Eligible Employees may receive two weeks' base pay plus an additional week of base pay for every completed year of service after the first year of service, capped at 52 weeks' base pay.  These severance benefits are typically provided in exchange for a release in liability for the Debtors.  Accordingly, the Debtors believe that it is important that they have the flexibility to maintain their current practice of honoring their severance program for Employee retention and morale.  As of the Petition Date, the Debtors have no accrued but unpaid liability on account of the Severance Pay Plan.  The Debtors seek to continue providing such benefits in the ordinary course of business to US Salaried Employees, subject to section 503(c) of the Bankruptcy Code.[22]

j.      *Miscellaneous US Benefit Programs*

62.    The Debtors provide all US Employees with the opportunity to participate in several miscellaneous benefit programs (the "**Miscellaneous US Benefits Programs**").  The Miscellaneous US Benefits Programs include the following, each of which is provided through Imerys USA:

- Voluntary accident insurance, supplemental hospitalization insurance, and critical illness insurance, each of which is administered by American Heritage Life Insurance Company;

- Voluntary pet insurance and home and auto insurance, each of which is administered by the Metropolitan Life Insurance Company;

- The MetLaw Legal Plan through Hyatt Legal Services; and

---

[22]    Separate and apart from the Severance Pay Plan, certain "insiders" of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code may have employment contracts providing for severance.  The Debtors reserve the right to seek authority to pay such severance in the future pursuant to notice and hearing with this Court.

- Virgin Pulse, through which US Employees are eligible for annual rewards for making healthier choices.

In addition, US Employees may elect to receive their pay in the form of an ADP ALINE Card, and may elect to purchase goods through Purchasing Power, with periodic payments for such goods then being deducted from a participating Employee's paycheck and remitted to Purchasing Power.

63.     Imerys USA pays the premiums for many of the Miscellaneous US Benefits Programs and is then reimbursed by the Debtors each month (via wire or setoff) as described above in paragraphs 13-15.  The premiums for any voluntary insurance purchased by US Employees are then deducted from the applicable Employee's paychecks and reimbursed to the Debtors.  As of the Petition Date, the Debtors estimate that they owe approximately $38,000 to Imerys USA (either directly or indirectly through Imerys Clays) on account of the Miscellaneous US Benefits Programs.

k.      *US Workers' Compensation*

64.     Under the laws of the various US states in which they operate, the Debtors are required to maintain workers' compensation policies and programs, or participate in workers' compensation programs administered by state governments, to provide their US Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors. [23]  Historically, the Debtors' US Employees have been covered under a workers' compensation policy issued by The Insurance Company of the State of Pennsylvania, under which Imerys USA is the insured party (the "**Legacy Workers' Compensation Policy**").  Premiums in connection with the Legacy Workers' Compensation Policy are paid by Imerys

---

[23]     Employees in the state of California have California Short-Term Disability through the state, which may impact such Employees' eligibility to receive workers' compensation benefits.

USA in an annual advance lump sum payment each January.  The SSC, a unit of Imerys USA, then allocates the appropriate portion of the premiums to the Debtors, who reimburse Imerys USA as described above in paragraphs 13-15.  The Debtors have been charged approximately $59,000 by Imerys USA on account of the Debtors' 2019 allocation for the Legacy Workers' Compensation Policy, which remains unpaid as of the Petition Date.  At the end of each calendar year, an audit of the workforce of Imerys USA and its covered affiliates is undertaken to evaluate the size of each covered affiliate's workforce relative to its premium contributions, and covered affiliates of Imerys USA are charged or refunded, as applicable.

65.     Under the Legacy Workers' Compensation Policy, upon the filing of a verified claim by an eligible Employee (collectively, the "**<u>Legacy Workers' Compensation Claims</u>**"), the insurer pays the claim amount directly to the Employee and the insurer then invoices Imerys USA, which would subsequently seek reimbursement from the applicable Debtor.  As of the Petition Date, there were approximately five open Legacy Workers' Compensation Claims against the Debtors under the Legacy Workers' Compensation Policy arising out of alleged injuries or death incurred by Employees during the course of their employment with the Debtors, which the Debtors expect to continue to resolve in the ordinary course of business.  The Debtors estimate that the Legacy Workers' Compensation Claims have an outstanding balance as of the Petition Date of approximately $94,000.

66.     Effective February 1, 2019, the Debtors' US Employees are covered under a workers' compensation policy issued by Starr Indemnity & Liability Company, under which ITA is the insured party (the "**<u>ITA Workers' Compensation Policy</u>**" and together with the Legacy Workers' Compensation Policy, the "**<u>US Workers' Compensation Policies</u>**").  Premiums in connection with the ITA Workers' Compensation Policy were paid by ITA in an advance lump

sum payment prior to the Petition Date for the policy year beginning February 1, 2019.  Under the ITA Workers' Compensation Policy, ITA and ITV are fully insured and any workers' compensation claims (the "**ITA Workers' Compensation Claims**" and together with the Legacy Workers' Compensation Claims, the "**US Workers' Compensation Claims**") brought against ITA or ITV will be fully paid by the insurer.  As of the Petition Date, there are no pending ITA Workers' Compensation Claims and the Debtors have no outstanding liability with respect to the ITA Workers' Compensation Policy.  Because their Employees are covered by the ITA Workers' Compensation Policy effective February 1, 2019, ITA and ITV expect to receive a reimbursement from Imerys USA at the end of 2019 on account of premiums paid with respect to the Legacy Workers' Compensation Policy.

67.    It is critical that the Debtors be permitted to continue their workers' compensation program and to pay outstanding prepetition claims, taxes, charges, assessments, premiums, and third party administrator fees in the ordinary course of business because alternative arrangements for workers' compensation coverage would most certainly be more costly, and the failure to provide coverage may subject the Debtors and/or their officers to severe penalties.  To facilitate the ordinary course handling of US Workers' Compensation Claims, the Debtors further request authority, in their sole discretion, to lift the automatic stay of section 362 of the Bankruptcy Code to allow US Workers' Compensation Claims to proceed under the applicable US Workers' Compensation Policy and to allow the Debtors, their affiliates, their insurance providers and/or their third party administrators to negotiate, settle and/or litigate US Workers' Compensation Claims, and pay resulting amounts, whether such claims arose before or after the Petition Date.

ii.    Canadian Employee Benefits

68.    ITC contracts with HealthSource Plus Inc. ("**HealthSource Plus**") for consulting services relating to the Canadian Employee Benefits.  HealthSource Plus assists ITC on an

ongoing basis by, among other things, developing strategies to manage and optimize the Employee Benefits, and by providing information about trends in the employee benefits marketplace.    HealthSource Plus also acts as a liaison between ITC and its benefits administrators and insurers and serves as an administrative agent through which ITC indirectly remits payment to many of the third party plan administrators and insurers for the Canadian Employee Benefits.

a.    *Canadian Medical and Dental Insurance*

69.    All of the Canadian Employees receive government-funded basic health care pursuant to the Canada Health Act of 1984.  ITC offers all Canadian Employees the opportunity to obtain extended medical care, prescription drug, vision and dental coverage, and related benefits (the "**Canadian Medical and Dental Benefits**").  The Canadian Medical and Dental Benefits are provided to Canadian Employees through programs administered by third parties, such as ClaimSecure Inc. ("**ClaimSecure**"), which administers the medical and dental programs, and RBC Insurance Services Inc. ("**RBC**"), which administers the prescription drug coverage.

70.    ITC is self-insured for Canadian Medical and Dental Benefits.  Accordingly, after ClaimSecure or RBC determines the eligibility of expenses and provides an invoice, the participating Employee pays any required co-insurance or out of pocket costs, and ITC is then responsible to pay all eligible remaining costs.  ITC remits approved amounts directly to HealthSource, which distributes the payments to the medical service or prescription drug providers.  As is common in these types of arrangements, ITC has purchased stop-loss coverage to limit its exposure under its self-insured medical program.

71.    The obligations that ITC incurs on behalf of the Canadian Employees on account of the Canadian Medical and Dental Benefits fluctuate based on the medical needs of the Canadian Employees, but average approximately $18,000 per month, inclusive of stop-loss

premiums.  ITC pays such obligations to HealthSource Plus monthly in arrears.  As of the Petition Date, ITC estimates that it owes approximately $28,000 to HealthSource Plus on account of the Canadian Medical and Dental Benefits, including $5,000 on account of stop-loss premiums.

> b. *Life and Accidental Death and Dismemberment Insurance, and Long-Term Disability Program*

72.    Canadian Employees receive, at ITC's cost, LTD insurance, AD&D insurance, and life insurance under plans (the "**Canadian Health Benefits Programs**") administered by RBC and AIG Insurance Company of Canada ("**AIG Canada**").  The Canadian Health Benefits Programs are fully insured.

73.    Under ITC's LTD insurance program, if a Canadian Employee becomes disabled for at least 119 days, RBC pays benefits equal to two-thirds (66.67%) of the Employee's monthly base salary, up to a maximum of $6,000 per month for a period of up to two years (but terminating at age 65).

74.    ITC also provides Canadian Employees with basic life insurance and AD&D insurance in amounts equal to one times the Canadian Employee's annual salary, up to a maximum of $300,000.  Such benefits reduce by 50% at age 65 and terminate at age 70. Canadian Employees may also purchase additional optional life insurance for themselves and their dependents at their own cost.  Canadian Employees may purchase additional optional life insurance in units of $10,000 up to a maximum of $200,000 for themselves, terminating at age of 65. Canadian Employees may purchase dependent life insurance for their spouses or children in the amount of $10,000 per spouse or child, with termination when the Canadian Employee reaches age 70.

75.     ITC pays the premiums for the Canadian Health Benefits Programs to HealthSource Plus who subsequently remits payment to RBC and AIG Canada each month.  The premiums for any optional life and AD&D insurance purchased by Canadian Employees are then deducted from the applicable Canadian Employee's paychecks and reimbursed to ITC.  As of the Petition Date, ITC estimates that it owes approximately $20,000 to HealthSource Plus on account of premiums under the Canadian Health Benefits Programs.

c.     *Canadian Pension Plans*

76.     The Canadian Non-Union Employees are eligible to participate in The Pension Plan for Employees of Imerys Talc Canada Inc. (the "**Canadian Non-Union Pension Plan**") and the Canadian Union Employees are eligible to participate in The Pension Plan for the Bargaining Unit Employees of Imerys Talc Canada Inc. (the "**Canadian Union Pension Plan**" and together with the Canadian Non-Union Pension Plan, the "**Canadian Pension Plans**").  The Canadian Pension Plans are both registered defined benefit pension plans.  Participants in the Canadian Pension Plans are required to contribute 3.5% of their earnings up to the Yearly Maximum Pensionable Earnings ("**YMPE**")[24] plus 5% of earnings over the YMPE, if any.  Canadian Employees are also permitted to make voluntary contributions in addition to their required contributions, subject to statutory limits.  ITC is responsible for ensuring that the Canadian Pension Plans have sufficient assets to provide participating Canadian Employees, including former Canadian Employees, with their pension benefit, based on formulas set forth in the Canadian Pension Plans, as determined in accordance with the advice of a qualified independent actuary and in compliance with government laws and regulations.  ITC is administrator of the

---

[24]     YMPE is set each year by the Canadian government to determine the maximum earnings amount in which contributions can be made to the government administered Canada Pension Plan and Quebec Pension Plan.

Canadian Pension Plans and Mercer (Canada) Limited ("**Mercer Canada**") is retained by ITC to assist with administering the plans. ITC makes monthly contributions to CIBC Mellon, as custodian of the Canadian Pension Plans, averaging approximately $24,000 per month. In addition, Canadian Employees contribute approximately $16,000 per month to the Canadian Pension Plans through payroll deductions remitted to CIBC Mellon. As of the Petition Date, ITC owes approximately $21,000 with respect to the Canadian Pension Plans.

77.    In addition to the Canadian Pension Plans, ITC Employees have the option of participating in the government administered Canada Pension Plan ("**CPP**"). ITC Employees contribute approximately $5,000 per month to the CPP. Such contributions are remitted to ADP by ITC with the applicable Employee's payroll and ADP subsequently contributes such amounts to the CPP. As of the Petition Date, ITC estimates that it holds approximately $1,000 which, when remitted to ADP, will be contributed to the CPP.

78.    Through this Motion, ITC seeks authority, but not direction, to continue to perform its obligations under the Canadian Pension Plans, including, but not limited to, the payment of any employer contributions to the Canadian Pension Plans in the ordinary course of business. In addition, ITC seeks authority to continue to perform its obligations with respect to Employee contributions to the CPP.

d.    *Canadian Retiree Medical Benefits*

79.    Certain of ITC's Union Employees are eligible to receive medical benefits after retirement pursuant to the applicable CBAs (the "**Canadian Retiree Medical Benefits**"). As of the Petition Date, approximately 3 former ITC Union Employees receive Canadian Retiree Medical Benefits for which ITC contributes payment. Payments made by ITC on account of such Canadian Retiree Medical Benefits are prepaid semiannually in May (for the period June 1 through November 30) and November (for the period December 1 through May 1). Semiannual

payments made by ITC on account of Canadian Retiree Medical Benefits average approximately $2,400.  As of the Petition Date, the Debtors have no accrued but unpaid liability with respect to the Canadian Retiree Medical Benefits.  By this Motion, ITC seeks to continue making payments on account of Canadian Retiree Medical Benefits in the ordinary course of business.

e.    *Miscellaneous Canadian Benefit Programs*

80.    ITC provides all Canadian Employees with the opportunity to participate in several miscellaneous benefit programs (the "**Miscellaneous Canadian Benefits Programs**"). The Miscellaneous Canadian Benefits Programs include a company doctor, which is retained for pre-employment screenings, physical limitation assessments, and to confirm Employees' ability to perform required tasks, as well as comprehensive pre-employment drug screening.  Canadian Employees also have the option of purchasing additional medical coverage on a daily or annual basis in order to provide coverage when such Canadian Employee is traveling outside of his or her domiciled Canadian province.  In addition, certain Canadian Salaried Employees receive a cell phone for use in connection with their employment for which ITC makes monthly payments to Bell Mobility Inc.  ITC incurs monthly costs of approximately $4,000 in connection with the Miscellaneous Canadian Benefits Programs.  As of the Petition Date, ITC estimates that it owes approximately $7,000 on account of the Miscellaneous Canadian Benefits Programs.

f.    *Canadian Workers' Compensation*

81.    Under the laws of the Canadian province in which they operate, ITC is required to maintain a workers' compensation policy administered by Ontario's Workplace Safety & Insurance Board (the "**WSIB**") to provide its Canadian Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors (the "**Canadian Workers' Compensation Program**").  Injured workers residing in the province of Ontario, similar to the rest of Canada, are statutorily barred from suing their employers for work

related injuries or diseases.  Instead they must file for workers' compensation benefits with the WSIB.  ITC pays monthly non-negotiable premiums calculated based on its gross payroll, and can either receive a rebate or be required to pay an adjustment, based on expected versus actual claim costs, at the end of the year after filing a reconciliation form.  ITC pays approximately $24,000 per month in arrears to the WSIB on account of non-negotiable premiums.  As of the Petition Date, approximately $115,000 is owed to WSIB, consisting of accrued and unpaid workers' compensation premiums as well as a year-end adjustment with respect to 2018 of approximately $74,000.  It is critical that the Debtors be permitted to continue the Canadian Workers' Compensation Program and to pay outstanding premiums because the failure to provide coverage may subject the Debtors and/or their officers to severe penalties.

g.    *Timmins Union Severance Program*

82.    In the event of plant closure, or any permanent layoff as a result of plant relocation outside of the City of Timmins, or if a Timmins Union Employee is permanently laid off and chooses not to accept a job opportunity at a new location outside of the City of Timmins, that Timmins Union Employee is entitled to receive severance benefit of twenty hours pay at such Timmins Union Employee's straight-time rate for each full year of service in addition to benefits provided under the Ontario *Employment Standards Act* (the "**Timmins Union Severance Program**").  As of the Petition Date, ITC does not owe any severance obligations to any Timmins Union Employee under the Timmins Union Severance Program.  By this Motion, ITC seeks to continue providing benefits under the Timmins Union Severance Program, if

US-DOCS\105945547.1

applicable, in the ordinary course of business to Timmins Union Employees, subject to section 503(c) of the Bankruptcy Code.[25]

      iii.    <u>Honoring of Prepetition Benefits</u>

83.    Certain of the Employee Benefits remained unpaid or unprovided as of the Petition Date because certain obligations of the Debtors under the applicable plan, program, or policy accrued either in whole or in part prior to the commencement of these Chapter 11 Cases, but will not be required to be paid or provided in the ordinary course of the Debtors' business until a later date.   The Debtors request authority to pay or provide as they become due all prepetition Employee Benefits that have already accrued and that are described above in this Section C.

84.    The Debtors estimate that the aggregate accrued amount of such prepetition Employee Benefits described in this Section C is approximately $1,064,000 (the "**Employee Benefits Obligations**").

**D.    Continuation of Workforce Programs Postpetition**

85.    The Debtors also request confirmation of their right to continue to perform their obligations with respect to all Workforce Programs, except as otherwise indicated herein.   The Workforce Programs are essential to the Debtors' efforts to maintain Workforce morale and minimize attrition.   The Debtors believe that the expenses associated with the Workforce Programs are reasonable and cost-efficient in light of the potential attrition, loss of morale, and loss of productivity that would occur if the Workforce Programs were discontinued.

---

[25]    For the avoidance of doubt, by this Motion, the Debtors are not requesting authority to make any postpetition severance payments not permitted under section 503(c) of the Bankruptcy Code.   The Debtors reserve the right to request authority to make such payments in the future.   Any such request will be pursuant to notice and hearing with this Court.

US-DOCS\105945547.1

86.     Notwithstanding the foregoing, the Debtors reserve the right to evaluate all Workforce Programs and to make such modifications, including terminating any particular plan, program, or policy, as may be necessary or appropriate during the pendency of these cases.

**E.      Payments to Independent Directors**

87.     Each of the Debtors' board of directors includes a non-Employee independent director, Kevin Collins (the "**Independent Director**").    The Independent Director is paid quarterly fees within thirty (30) days after the end of each fiscal quarter, in the amount of $16,666.67 from ITV, $16,666.67 from ITA, and $16,666.67 from ITC.    Beginning with the quarter starting on April 2, 2019, the Independent Director will receive quarterly fees of $6,666.67 from ITV, $6,666.67 from ITA, and $6,666.67 from ITC.    The Independent Director's service is necessary for the continued management of the Debtors and, accordingly, it is essential that the Debtors be authorized to pay all prepetition amounts accrued as of the Petition Date to the Independent Director.    As of the Petition Date, there are no accrued but unpaid monthly fees owed to the Independent Director.    By this Motion, the Debtors seek the authority to reimburse any unpaid expenses incurred by the Independent Director prior to the Petition Date not to exceed $5,000 without further order of the Court.    Out of an abundance of caution, the Debtors request authority to continue to pay monthly fees and reimburse expenses to the Independent Director on a postpetition basis in the ordinary course of business.

**F.      Payments to Administrators**

88.     With respect to the Employee compensation and benefits described above in Section C, the Debtors, directly or indirectly, contract with several vendors to administer and deliver payments or other benefits to their Employees (the "**Administrators**").    For example, the Debtors, in the ordinary course of business, pay average monthly fees of approximately $9,000 in arrears directly to ADP in connection with payroll administration.    As of the Petition Date, the

Debtors estimate that they owe approximately $13,000 to ADP.  The Debtors pay additional Administrators' fees and expenses indirectly through Imerys USA (either directly or indirectly through Imerys Clays), one of Imerys USA's employee benefits consultants Morneau Shepell Ltd. ("**Morneau Shepell**"), or HealthSource Plus.

89.    In conjunction with the Debtors' payment of Prepetition Workforce Obligations and continued performance under Workforce Programs, the Debtors believe that it is necessary to obtain specific authorization to pay any claims of the Administrators on a postpetition basis, including prepetition claims to the extent necessary, to ensure uninterrupted delivery of certain benefits to the Workforce.  The Debtors believe that the Administrators may fail to adequately and timely perform or may terminate their services to the Debtors unless the Debtors pay the Administrators' prepetition claims for administrative services rendered and expenses incurred.  If the Debtors were required to replace the Administrators postpetition, it likely would cause significant disruption to the payment of benefits and other obligations to the Workforce. Accordingly, the Debtors submit that the payment of claims owed to the Administrators is in the best interest of the Debtors' estates.

**G.    Payments to Employee Benefits Consultants**

90.    With respect to the Employee Benefits described above in Section C, the Debtors contract with several consultants (the "**Employee Benefits Consultants**") to provide strategic advice and to act as liaisons and administrative agents between the Debtors and the third party insurers, administrators and providers of the Employee Benefits.

91.    Imerys USA contracts with Morneau Shepell for consulting services relating to the Employee Benefits.  Morneau Shepell assists the Debtors and Imerys USA on an ongoing basis by, among other things, developing strategies to manage and optimize the Employee Benefits, and by providing information about trends in the employee benefits marketplace.

Morneau Shepell also acts as a liaison between Imerys USA and the Debtors' benefits administrators and insurers and serves as an administrative agent through which Imerys USA indirectly remits payment to  many of the third party plan administrators and insurers for the US Employee Benefits.  Thus, for many of the Employee Benefits, Imerys USA remits payment to Morneau Shepell, and Morneau Shepell in turn remits payment to the applicable plan administrators and insurers.  Specifically, Imerys USA remits payment to Morneau Shepell for the following Employee Benefits:  US Medical and Dental Benefits, including medical stop-loss premiums, the US Vision Plan, and US Health Benefits Programs.  Imerys USA pays fees to Morneau Shepell in connection with providing such services on a monthly basis in arrears, of which approximately $16,000 is allocated to the US Debtors.  As of the Petition Date, the Debtors estimate that ITA and ITV owe approximately $25,000 to Imerys USA (either directly or indirectly through Imerys Clays) on account of fees paid to Morneau Shepell.

92.    Similarly, ITC contracts with HealthSource Plus to provide consulting services and to act as a liaison between ITC and its administrators and insurers and serves as an administrative agent through which ITC remits payment to many of the third party plan administrators and insurers for the Canadian Employee Benefits.  ITC pays fees to HealthSource Plus in connection with providing such services on a monthly basis in arrears in the amount of $2,000.  In addition, ITC remits payment to HealthSource Plus for many of the Employee Benefits, and HealthSource Plus in turn remits payment to the applicable plan administrators and insurers.  Specifically, ITC remits payment to HealthSource Plus for the following Employee Benefits:  Canadian Medical and Dental Benefits, including medical stop-loss premiums, Canadian Health Benefits Programs.  As of the Petition Date, the Debtors estimate that ITC owes approximately $4,000 to HealthSource Plus for accrued and unpaid fees.

US-DOCS\105945547.1

93.    In addition, Imerys USA is party to contracts with Mercer, pursuant to which Mercer advises Imerys USA and the Debtors on issues relating to the 401(k) Plan, the US Severance Plan and workers' compensation.  Imerys USA pays Mercer monthly fees, of which approximately $8,000 per month is attributed to ITA and ITV and paid by ITA (via wire or setoff) to Imerys USA as described above in paragraphs 13-15.  ITC is also party to a contract with Mercer Canada, pursuant to which Mercer Canada advises ITC on issues relating to the Canadian Pension Plans.  ITC pays Mercer Canada annual fees (billed in quarterly installments) as well as transactional fees (billed each quarter).  ITC pays Mercer Canada approximately $12,000 per quarter on average.  As of the Petition Date, ITA and ITV estimate that they owe approximately $13,000 to Imerys USA (either directly or indirectly through Imerys Clays) on account of Mercer's fees, and ITC estimates that it owes approximately $7,000 to Mercer Canada on account of fees.

94.    In conjunction with the Debtors' payment of Prepetition Workforce Obligations and continued performance under the Workforce Programs, the Debtors believe that it is necessary to obtain specific authorization to pay any claims of the Employee Benefits Consultants on a postpetition basis, including prepetition claims to the extent necessary, to ensure uninterrupted delivery of certain benefits to the Workforce.  Unless the prepetition claims owed to the Employee Benefits Consultants are paid, the Debtors believe that the Employee Benefits Consultants may fail to perform adequately and timely or may terminate their services to the Debtors, which would likely cause significant disruption to the payment of benefits and other obligations to or for the benefit of the Workforce.  Accordingly, the Debtors submit that the payment of claims owed to the Employee Benefits Consultants is in the best interest of the Debtors' estates.

US-DOCS\105945547.1

**H.       Honoring of Prepetition Checks**

95.       Prior to the Petition Date, the Debtors paid certain of their Prepetition Workforce Obligations with checks that had not been presented for payment as of the Petition Date.   In order to ensure the orderly payment of the Prepetition Workforce Obligations, the Debtors request that the Court enter an order requiring the Debtors' banks to honor any such checks that are drawn on the Debtors' accounts, and authorizing the banks to rely on the representations of the Debtors as to which checks are subject to this Motion.   To the extent that any such checks are nevertheless refused payment, the Debtors additionally request authority to replace any checks or electronic fund transfers that may be dishonored and to reimburse any related expenses that may be incurred as a result of any bank's failure to honor a prepetition check or electronic fund transfer.

## APPLICABLE AUTHORITY

**A.       Payment of the Priority Portion of Prepetition Workforce Obligations Should be Authorized under Section 507(a) of the Bankruptcy Code**

96.       Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code require that certain claims for prepetition wages, salaries, and vacation pay be accorded priority in payment in an amount not to exceed $12,850 for each individual.   In chapter 11, priority claims must be paid in full.   Accordingly, granting the relief requested with respect to the priority portion of the Prepetition Workforce Obligations will not adversely affect the Debtors' other unsecured creditors.

97.       The Debtors do not believe that any individual Employee is owed prepetition amounts in excess of the priority cap.   Some Employee Benefit amounts, however, are unknown pending submission of claims.   Therefore, the Debtors do not know the exact amount due on account of each Employee for the prepetition period.   To the extent that Employees are owed

aggregate amounts in excess of the priority cap, or amounts that are otherwise not entitled to priority status, the Debtors submit that payment of the Prepetition Workforce Obligations in such higher amounts or otherwise non-priority amounts is nonetheless justified under the authority discussed below.

**B.    Certain Claims on Account of the Workforce Programs Are Entitled to Payment Prior to Prepetition, Non-Priority Unsecured Claims**

98.    Imerys USA makes payments on behalf of the Debtors on account of certain of the Workforce Programs.  The SSC, a unit of Imerys USA, then allocates the appropriate portion of the amounts paid on account of the Workforce Programs to the Debtors and ITA reimburses Imerys USA (either directly or indirectly through Imerys Clays) for payments made on account of ITA and ITV either directly in cash or by setting off those amounts against the loan payable owed by Imerys USA to ITA pursuant to the terms of an intercompany loan agreement.  To account for payments made in connection with the Workforce Programs by ITA on behalf of ITV, ITA records ITV's portion of the payment as an intercompany receivable on ITA's books and ITV records such amount as an intercompany payable on its books.

99.    Imerys USA's right to set off amounts owed to it by the Debtors, and ITA's right to set off amounts owed to it by ITV, on account of the Prepetition Workforce Obligations are expressly preserved under Section 553(a) of the Bankruptcy Code, which provides, in pertinent part, that the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor that arose before the commencement of the case."  11 U.S.C. § 553(a). Moreover, any claims by Imerys USA or the Debtors for amounts that are subject to setoff are secured under section 506(a) of the Bankruptcy Code, which provides, in pertinent part, that "[a]n allowed claim of a creditor . . . that is subject to setoff under Section 553 of this title, is a

secured claim . . . to the extent of the amount subject to setoff." 11 U.S.C. § 506(a)(1). Thus, because the Prepetition Workforce Obligations owed to Imerys USA and the Debtors constitute secured claims under section 506(a) of the Bankruptcy Code, the Debtors' payment of the Prepetition Workforce Obligations now, in all likelihood, will affect only the timing of the payments and not the amounts to be paid. Other creditors and parties in interest will not be prejudiced if the relief sought herein is granted by this Court.

**C.      The Proposed Payments are Appropriate under Section 363 of the Bankruptcy Code**

100.    Under section 363 of the Bankruptcy Code, a bankruptcy court is empowered to authorize a chapter 11 debtor to expend funds in the bankruptcy court's discretion outside the ordinary course of business. *See* 11 U.S.C. § 363. In order to obtain approval for the use of estate assets outside the ordinary course of business, the debtor must articulate a valid business justification for the requested use. *See In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007). To the extent the payment of prepetition wages, expenses and benefits are deemed to be outside the ordinary course of business, the preservation and protection of a debtor's business, the retention of a debtor's currently working employees, and the maintenance of positive employee morale provide a sufficient business justification for such payment. *See Id.*

101.    Accordingly, this Court should grant the requested relief under section 363 of the Bankruptcy Code.

**D.      Payment of Certain of the Prepetition Workforce Obligations is Appropriate under Section 541 of the Bankruptcy Code**

102.    The payment of the Employee contribution component of the 401(k) Plan, US Pension Plan and Canadian Pension Plans or payment of other Deductions will not prejudice the Debtors' estates because such withholdings are derived from Employee funds and held in trust for the benefit of the related payees and, thus, do not constitute property of the Debtors' estates

US-DOCS\105945547.1

under section 541 of the Bankruptcy Code.  *See Begier v. IRS*, 496 U.S. 53, 58-59 (1990).  *See also In re Columbia Gas Sys., Inc.*, 997 F.2d 1039, 1059 (3d Cir. 1993) (concluding that property that debtor holds in trust – either express or constructive – for another does not become property of the estate when the debtor files for bankruptcy, and stating that "Congress clearly intended the exclusion by section 541(d) to include not only funds held in express trust, but also funds held in constructive trust."); *EBS Pension L.L.C. v. Edison Bros. Stores, Inc. (In re Edison Bros., Inc.)*, 243 B.R. 231 (Bankr. D. Del. 2000) (same).  Moreover, payments that are critical to the retention and morale of the Debtors' Workforce actually add value to the estates because an unplanned reduction in Employee retention or productivity could have disastrous effects on any potential recoveries to unsecured creditors.

### E.    Payment of the Prepetition Workforce Obligations is Authorized under Sections 1107(a) and 1108 of the Bankruptcy Code

103.    The Debtors, operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value."  *Id.*

104.    According to the *CoServ* court, there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim."  *See Id*. The *CoServ* court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate."  *Id*.   The court provided a three-pronged test for

determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id*. at 498.

105.     Payment of the Prepetition Workforce Obligations meets each element of the *CoServ* court's standard. Any failure by the Debtors to pay the Prepetition Workforce Obligations would have a severe negative impact on the morale of the Debtors' Workforce at a critical time for the Debtors and their businesses. Moreover, as described above in Section B, the Employees likely maintain priority claims against the Debtors for all, or the vast majority of, the Prepetition Workforce Obligations.

106.     Second, the potential harm and economic disadvantage that would stem from the failure to pay the Prepetition Workforce Obligations is grossly disproportionate to the amount of any prepetition claim that may be paid. Absent payment of the Prepetition Workforce Obligations, Workforce morale would decrease dramatically, likely leading to the loss of key personnel and other severe business disruptions costing far in excess of the amount of such obligations.

107.     Third, the Debtors have examined other options short of payment of the Prepetition Workforce Obligations and have determined that to avoid significant disruption of the Debtors' business operations there exists no practical or legal alternative to payment of such obligations.

US-DOCS\105945547.1

108.     Therefore, the Debtors can only meet their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code by payment of the Prepetition Workforce Obligations.

**F.     Section 105 of the Bankruptcy Code and the Doctrine of Necessity Support Payment of the Prepetition Workforce Obligations**

109.     The proposed payments of the Prepetition Workforce Obligations should be authorized pursuant to section 105 of the Bankruptcy Code, which authorizes this Court "to issue any order . . . necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105.  For the reasons set forth herein, and in light of the critical need for the Debtors to preserve the going concern value of their businesses in order to effect a successful reorganization through, among other things, preservation of the Debtors' Workforce and its morale and productivity, payment of the Prepetition Workforce Obligations as requested herein is proper in accordance with section 105 of the Bankruptcy Code.

110.     Payment of the Prepetition Workforce Obligations is further supported by the doctrine of necessity.  The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize payment of certain prepetition claims prior to the completion of the reorganization process where the payment of such claims is necessary to the reorganization.  *See In re Just for Feet, Inc.*, 242 B.R. 821, 826 (Bankr. D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment);[26] *see also In re Wehrenberg, Inc.*, 260 B.R. 468, 469 (Bankr.

---

[26]     The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  The United States Supreme Court first articulated the doctrine of necessity over a century ago, in *Miltenberger v. Logansport C & Sw. Ry. Co.*, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors and suppliers,
(cont'd)

E.D. Mo. 2001) ("Pursuant to 11 U.S.C. § 105(a) the Court may authorize the payment of prepetition claims when such payments are necessary to the continued operation of the Debtor."); *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor.").

111.    The doctrine of necessity is a widely accepted component of modern bankruptcy jurisprudence.  *See Just For Feet*, 242 B.R. at 826 (approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy debtor's business by refusing to deliver new inventory on eve of debtor's key sales season); *In re Payless Cashways, Inc.*, 268 B.R. 543, 546-47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when such suppliers agree to provide postpetition trade credit); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175-76 (Bankr. S.D.N.Y. 1989).

112.    For the reasons discussed herein, it is evident that payment of the Prepetition Workforce Obligations is necessary to the achievement of the Debtors' chapter 11 objectives.  In particular, without payment of the Prepetition Workforce Obligations, the Debtors' businesses and operations will be detrimentally impacted through the reduction in Workforce morale and the potential loss of key personnel during a critical time for the Debtors and their businesses. Hence, this Court should exercise its equitable powers to grant the relief requested in this Motion.

---

(cont'd from previous page)

among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership.  *See id.* at 309-14.  The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in *Miltenberger*.  *See In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581-82 (3d Cir. 1981) ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the [debtor's] continued operation . . . in serious, jeopardy.")

US-DOCS\105945547.1

G.     **Precedent Cases Support the Requested Relief**

113.     Numerous courts, including this Court, have permitted the payment of prepetition compensation, benefits, and reimbursable expenses on the first day or in the early stages of chapter 11 bankruptcy cases.  *See, e.g.*, *In re Samuels Jewelers, Inc.*, Case No. 18-11818 (KJC) (Bankr. D. Del. Sept. 14, 2018); *In re J & M Sales Inc.*, Case No. 18-11801 (LLS); (Bankr. D. Del. Aug. 27, 2018); *In re Enduro Resource Partners LLC*, Case No. 18-11174 (KG) (Bankr. D. Del. Jun. 8, 2018); *In re Claire's Stores, Inc.*, Case No. 18-10584 (MFW) (Bankr. D. Del. Apr. 17, 2018); *In re TK Holdings, Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. July 26, 2017); *In re Chaparral Energy LLC*, Case No. 16-11444 (LSS) (Bankr. D. Del. June 7, 2016).

## BANKRUPTCY RULE 6003 HAS BEEN SATISFIED AND BANKRUPTCY RULE 6004 SHOULD BE WAIVED

114.     Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within twenty one (21) days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm.  *See* Fed. R. Bankr. P. 6003(b). Based on the foregoing, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003(b) because the relief set forth in <u>Exhibit A</u> is necessary to avoid immediate and irreparable harm.

115.     To the extent that any aspect of the relief sought herein constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors request in this Motion is immediately necessary in order for the Debtors to be able to continue to operate their businesses and preserve the value of their estates.  The Debtors respectfully request that the Court waive the notice requirements imposed by Bankruptcy Rule 6004(a) and the fourteen (14) day stay

imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

116.    Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against any Debtor or the existence of any lien against the Debtors' properties; (b) a waiver of the Debtors' rights to dispute any claim or lien on any grounds; (c) a promise to pay any claim; (d) an implication or admission that any particular claim would constitute an allowed claim; (e) an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; or (f) a limitation on the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to the proposed Interim Order and Final Order once entered. Nothing contained in the Interim Order or the Final Order shall be deemed to increase, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

## CONSENT TO JURISDICTION

117.    Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## NOTICE

118.    Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) the United States Attorney for the District of Delaware; (c) the Internal Revenue Service; (d) the firms listed on the Debtors' consolidated list of the top thirty law firms with the most significant representations of parties asserting talc claims against the

Debtors; (e) the creditors listed on the Debtors' consolidated list of thirty creditors holding the largest unsecured claims (excluding talc claims); (f) counsel to the prepetition representative for future talc claimants; (g) the United Cement, Lime, Gypsum and Allied Workers, Division of the Brotherhood of Boilermakers International, AFL-CIO and Local Union No. D-239; (h) the Cement, Lime, Gypsum and Allied Workers, Division of the Brotherhood of Boilermakers International, AFL-CIO and its Local Lodge No. DNCL; (i) the USW, Local 7580-01; (j) the USW, Local 7580-02; (k) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (l) all parties entitled to notice pursuant to Local Rule 9013-1(m) (collectively, the "**Initial Notice Parties**").  The Debtors submit that, under the circumstances, no other or further notice is required.

119.    In the event the Court enters an Interim Order granting this Motion, within forty-eight hours thereafter, the Debtors propose to serve notice of such entry on the Initial Notice Parties.  The notice will provide that any objections to the relief granted in the Interim Order must be filed with the Court and served upon counsel for the Debtors no later than seven days prior to the final hearing to be held on the Motion (the "**Objection Deadline**").  If an objection is timely filed and served prior to the Objection Deadline, such objection will be heard at the final hearing on the Motion.  If no objections are timely filed and served, the Debtors' counsel will file a certification of counsel to that effect attaching a final form of order.

120.    A copy of this Motion is available on (a) the Court's website: www.deb.uscourts.gov, and (b) the website maintained by the Debtors' proposed Claims and Noticing Agent, Prime Clerk, LLC, at https://cases.primeclerk.com/imerystalc.

**NO PRIOR REQUEST**

121.    No previous request for the relief sought herein has been made to this Court or any other court.

*[remainder of page intentionally left blank]*

US-DOCS\105945547.1

**WHEREFORE**, the Debtors respectfully request that the Court enter Interim and Final Orders, substantially in the forms attached hereto as <u>Exhibits A</u> and <u>B</u>, respectively, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: February 13, 2019        */s/ Mark D. Collins*
      Wilmington, Delaware

                                   **RICHARDS, LAYTON & FINGER, P.A.**

                                   Mark D. Collins (No. 2981)
    Michael J. Merchant (No. 3854)
    Amanda R. Steele (No. 5530)
    One Rodney Square
    920 North King Street
    Wilmington, DE  19801
    Telephone:  (302) 651-7700
    Facsimile:  (302) 651-7701
    E-mail:  collins@rlf.com
               merchant@rlf.com
               steele@rlf.com

    - and -

**LATHAM & WATKINS LLP**

    Jeffrey E. Bjork (*pro hac vice* admission pending)
    Helena G. Tseregounis (*pro hac vice* admission pending)
    355 South Grand Avenue, Suite 100
    Los Angeles, California 90071-1560
    Telephone:  (213) 485-1234
    Facsimile:  (213) 891-8763
    E-mail:  jeff.bjork@lw.com
               helena.tseregounis@lw.com

    - and -

Richard A. Levy (*pro hac vice* admission pending)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  richard.levy@lw.com

- and -

George A. Davis (*pro hac vice* admission pending)
Keith A. Simon (*pro hac vice* admission pending)
Annemarie V. Reilly (*pro hac vice* admission pending)
885 Third Avenue
New York, New York 10022
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
E-mail:  george.davis@lw.com
              keith.simon@lw.com
              annemarie.reilly@lw.com

*Proposed Counsel for Debtors and Debtors-in-Possession*

US-DOCS\105945547.1

**EXHIBIT A**

Proposed Interim Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------- x

In re:        :    Chapter 11

       :

IMERYS TALC AMERICA, INC., *et al.*,[1]    :    Case No. 19-_____ (_____)

       :

Debtors.        :    (Joint Administration Requested)

       :

--------------------------------------------------------- x

### INTERIM ORDER (I) AUTHORIZING PAYMENT OF CERTAIN PREPETITION WORKFORCE OBLIGATIONS, INCLUDING COMPENSATION, EXPENSE REIMBURSEMENTS, BENEFITS, AND RELATED OBLIGATIONS, (II) CONFIRMING RIGHT TO CONTINUE WORKFORCE PROGRAMS ON POSTPETITION BASIS, (III) AUTHORIZING PAYMENT OF WITHHOLDING AND PAYROLL-RELATED TAXES, (IV) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING TO ADMINISTRATORS OF, OR THIRD PARTY PROVIDERS UNDER, WORKFORCE PROGRAMS, AND (V) AUTHORIZING BANKS TO HONOR PREPETITION CHECKS AND FUND TRANSFERS FOR AUTHORIZED PAYMENTS

Upon the motion (the "**Motion**")[2] of the Debtors for entry of an Interim Order under sections 105(a), 362(d), 363(b), 363(c), 506(a), 507(a), 541, 553, 1107(a), and 1108 of the Bankruptcy Code, and Bankruptcy Rule 6003 (i) authorizing the Debtors to pay certain prepetition amounts owing to or for the benefit of the Workforce for compensation, reimbursable expenses, and benefits; (ii) confirming the Debtors' right to continue postpetition, in the ordinary course of business, the workforce-related plans, programs, and policies in effect immediately prior to the filing of these cases; (iii) authorizing the Debtors to pay any and all local, state, federal, and foreign withholding and payroll-related or similar taxes relating to prepetition periods; (iv) confirming the Debtors' right to continue to deduct and to transmit deductions from

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

payroll checks as authorized by employees or required under any workforce-related plan, program, or policy or as required by law; (v) authorizing the Debtors to pay any prepetition claims owing to the administrators of, or third party providers under, such plans, programs, and policies as necessary to ensure the delivery of compensation, benefits, and expense reimbursements to their Workforce; and (vi) authorizing all banks to receive, process, honor, pay and, if necessary, reissue all prepetition and postpetition checks and fund transfers, including prepetition checks and electronic payment and transfer requests that the Debtors reissue or re-request postpetition, on account of any obligations authorized to be paid hereunder; and the Court having reviewed the Motion and the Picard Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary, except as set forth in the Motion with respect to entry of this Order and notice of the final hearing; and upon the record herein; and after due deliberation thereon; and the Court having determined that there is good and sufficient cause for the relief granted in this order, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1.       The Motion is GRANTED on an interim basis, as set forth herein.

2.      The Debtors are authorized to pay, set off against amounts owed by Imerys USA, Imerys Clays or the other Debtors, or otherwise honor the Prepetition Workforce Obligations described in the Motion, to, or for the benefit of, the Workforce, under the Workforce Programs.  Notwithstanding any other provision of this Interim Order, such payments and setoffs on account of each category of prepetition claims corresponding to claims discussed in the section of the Motion noted in brackets shall not exceed the amounts specified in the chart below or $1,914,000 in the aggregate without further order of the Court:

| Relief Sought | Interim Amount Requested |
|---|---|
| Prepetition Workforce Compensation [Section A] | $830,000 |
| Employee Reimbursement Obligations [Section B] | $316,000 |
| Employee Benefits Obligations [Section C] | $719,000 |
| Payments to Independent Director [Section E] | $5,000 |
| Payments to Administrators [Section F] | $9,000 |
| Payments to Employee Benefits Consultants [Section G] | $35,000 |

3.      Notwithstanding the foregoing, nothing in this Interim Order authorizes the Debtors to reimburse Imerys USA, Imerys Clays, or the other Debtors for amounts paid by such entities on behalf of the Debtors prior to the Petition Date.  Notwithstanding the foregoing, the rights of Imerys USA, Imerys Clays, and the other Debtors to set off any amounts owed by the Debtors are hereby preserved.

4.      The Debtors are authorized to (a) continue each of the Workforce Programs, including but not limited to maintaining the Employee Benefits described in the

Motion, in the ordinary course of business during the pendency of these cases in the manner and to the extent that such Workforce Programs were in effect immediately prior to the filing of these cases, and (b) continue to fund and to make payments or set offs in connection with the costs of and the expenses incurred in the administration of any Workforce Program.

5.      The Debtors are authorized to "cash out" or set off unpaid PTO upon termination of an employee to the extent required by applicable non-bankruptcy law.

6.      Subject to the following proviso, the Debtors are authorized to continue the Employee Incentive Programs, the Severance Pay Plan, and the Timmins Union Severance Program on a postpetition basis in the ordinary course of business, and in each case to pay any accrued amounts thereunder as they become due; provided that (i) no payments with respect to any Employee Incentive Program, the Severance Pay Plan, or the Timmins Union Severance Program shall be made pursuant to this Interim Order to any individual Employee who is an "insider" as defined in the Bankruptcy Code and (ii) nothing in this Interim Order shall be deemed to authorize the payment of any amounts in satisfaction of retention bonus or severance obligations that are prohibited by section 503(c) of the Bankruptcy Code.

7.      The Debtors are authorized to reimburse the Employees for all Employee Reimbursement Obligations incurred prior to the Petition Date.  In addition, the Debtors are authorized to make direct payments to third parties, or set offs, on account of amounts owed in connection with the Employee Reimbursement Obligations.

8.      The Debtors shall continue to participate in the Deferred Compensation Plan.  Subject to entry of a final order, the Debtors are authorized to continue making payments on account of the Deferred Compensation Plan as they become due in the ordinary course of

business.  No payments with respect to the Deferred Compensation Plan shall be made pursuant to this Interim Order.

9.     The Debtors are authorized to continue their workers' compensation programs and to pay or set off any outstanding prepetition claims, taxes, charges, assessments, premiums, and third party administrator fees arising under the workers' compensation policies and or programs in which they participate.  In addition, the automatic stay of section 362 of the Bankruptcy Code is hereby lifted to allow US Workers' Compensation Claims to proceed under the applicable US Workers' Compensation Policy and to allow the Debtors' insurance providers and/or third party administrators to negotiate, settle, and/or litigate US Workers' Compensation Claims, and pay resulting amounts, whether such claims arose before or after the Petition Date.

10.    The Debtors are authorized to pay or set off any and all local, state, federal, and foreign withholding and payroll-related or similar taxes related to the Prepetition Workforce Obligations including, but not limited to, all withholding taxes, social security taxes, Medicare taxes, and employment insurance taxes and premiums, whether such taxes relate to the period before or after the Petition Date.

11.    The Debtors are authorized to pay, or set off amounts owed in connection with, claims of the Administrators and Employee Benefits Consultants in connection with administering and delivering payments or providing other services and benefits to the Workforce for prepetition services rendered and claims for reimbursement based on prepetition disbursements made by the Administrators or Employee Benefits Consultants.

12.    The Debtors are authorized to pay or set off prepetition expenses incurred by the Independent Director not to exceed $5,000.  The Debtors are authorized to continue to pay

or setoff the Independent Director's monthly fees and expense reimbursements on a postpetition basis in the ordinary course of business.

13.    The Debtors' banks and financial institutions shall be, and hereby are, authorized, when requested by the Debtors in their sole discretion, to process, honor, and pay any and all checks or electronic fund transfers drawn on the Debtors' bank accounts to pay all prepetition amounts owed to any party in connection with the Prepetition Workforce Obligations, whether those checks were presented prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments.  Further, the Debtors are authorized to issue new postpetition checks and initiate new postpetition electronic fund transfers to replace any checks or electronic fund transfers that may be dishonored and to reimburse any related expenses that may be incurred as a result of any bank's failure to honor a prepetition check or electronic fund transfer.

14.    The Debtors' banks and financial institutions may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Interim Order, and any such Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for in this Interim Order.

15.    Authorization to pay, and the payment or set off of, any amounts on account of Prepetition Workforce Obligations shall not affect the Debtors' right to contest the amount or validity of any Prepetition Workforce Obligation, including without limitation, any amounts that may be due to any taxing authority.

16.    Neither the provisions of this Interim Order, nor any payments or set offs made or not made by the Debtors pursuant to this Interim Order, shall be deemed an assumption

US-DOCS\105945547.1

or rejection of any Workforce Program, agreement or contract, or otherwise affect the Debtors'

rights under section 365 of the Bankruptcy Code to assume or reject any executory contract

between the Debtors and any member of the Workforce, or other person.

17.     Notwithstanding anything to the contrary in this Interim Order, the

Debtors retain their right to modify or terminate any Workforce Program to the extent that such

right exists under the terms of the Workforce Program or as may be required by applicable law.

18.     Notwithstanding the relief granted herein or any actions taken hereunder,

nothing contained in this Interim Order shall create any rights in favor of, or enhance the status

of any claim held by, any member of the Workforce, or other person.

19.     No payments to any individual Employee pursuant to this Interim Order

shall exceed the aggregate amounts set forth in 11 U.S.C. §§ 507(a)(4) and 507(a)(5).

20.     The contents of the Motion satisfy the requirements of Bankruptcy Rules

6003(b) and 6004(a).

21.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of

this Interim Order are immediately effective and enforceable upon its entry.

22.     The Debtors are authorized to take all actions necessary to effectuate the

relief granted in this Interim Order in accordance with the Motion.

23. The final hearing (the "**Final Hearing**") on the Motion shall be held on

[_____, 2019, at   :                .m], prevailing Eastern Time.  On or before [__:__ _.m.],

prevailing Eastern Time, on [_____, 2019], any objections or responses to entry of a final

order on the Motion shall be filed with the Court, and served on: (a) Imerys Talc America, Inc.,

100 Mansell Court East, Suite 300, Roswell, Georgia 30076 (Attn: Ryan J. Van Meter, Esq.

(email: ryan.vanmeter@imerys.com)); (b) Latham & Watkins LLP, 355 South Grand Avenue,

Suite 100, Los Angeles, California 90071-1560 (Attn: Jeffrey E. Bjork, Esq. and Helena G. Tseregounis, Esq. (emails: jeff.bjork@lw.com and helena.tseregounis@lw.com)); (c) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins, Esq. (email: collins@rlf.com)); (d) counsel to the prepetition representative for future talc claimants, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Edwin Harron, Esq. and Robert Brady, Esq. (emails: eharron@ycst.com and rbrady@ycst.com)); (e) counsel to any statutory committee appointed in these cases, if any; and (f) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, DE 19801 19801 (Attn: Juliet M. Sarkessian, Esq. and Linda Richenderfer, Esq. (emails: juliet.m.sarkessian@usdoj.gov and linda.richenderfer@usdoj.gov)).  In the event no objections to entry of the Final Order on the Motion are timely received, this Court may enter such Final Order without need for the Final Hearing.

24.      The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

Dated: _____, 2019
          Wilmington, Delaware

          _____
          UNITED STATES BANKRUPTCY JUDGE

US-DOCS\105945547.1

# **EXHIBIT B**

Proposed Final Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------- x
In re:                                    :    Chapter 11
                                          :
IMERYS TALC AMERICA, INC., et al.,[1]     :    Case No. 19-_____ (_____)
                                          :
            Debtors.                      :    (Jointly Administered)
                                          :
------------------------------------------------------- x
```

**FINAL ORDER (I) AUTHORIZING PAYMENT OF CERTAIN PREPETITION WORKFORCE OBLIGATIONS, INCLUDING COMPENSATION, EXPENSE REIMBURSEMENTS, BENEFITS, AND RELATED OBLIGATIONS, (II) CONFIRMING RIGHT TO CONTINUE WORKFORCE PROGRAMS ON POSTPETITION BASIS, (III) AUTHORIZING PAYMENT OF WITHHOLDING AND PAYROLL-RELATED TAXES, (IV) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING TO ADMINISTRATORS OF, OR THIRD PARTY PROVIDERS UNDER, WORKFORCE PROGRAMS, AND (V) AUTHORIZING BANKS TO HONOR PREPETITION CHECKS AND FUND TRANSFERS FOR AUTHORIZED PAYMENTS**

Upon the motion (the "**Motion**")[2] of the Debtors for entry of a Final Order under sections 105(a), 362(d), 363(b), 363(c), 506(a), 507(a), 541, 553, 1107(a), and 1108 of the Bankruptcy Code, and Bankruptcy Rule 6003 (i) authorizing the Debtors to pay certain prepetition amounts owing to or for the benefit of the Workforce for compensation, reimbursable expenses, and benefits; (ii) confirming the Debtors' right to continue postpetition, in the ordinary course of business, the workforce-related plans, programs, and policies in effect immediately prior to the filing of these cases; (iii) authorizing the Debtors to pay any and all local, state, federal, and foreign withholding and payroll-related or similar taxes relating to prepetition periods; (iv) confirming the Debtors' right to continue to deduct and to transmit deductions from payroll

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748).  The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

checks as authorized by employees or required under any workforce-related plan, program, or policy or as required by law; (v) authorizing the Debtors to pay any prepetition claims owing to the administrators of, or third party providers under, such plans, programs, and policies as necessary to ensure the delivery of compensation, benefits, and expense reimbursements to their Workforce; and (vi) authorizing all banks to receive, process, honor, pay and, if necessary, reissue all prepetition and postpetition checks and fund transfers, including prepetition checks and electronic payment and transfer requests that the Debtors reissue or re-request postpetition, on account of any obligations authorized to be paid hereunder; and the Court having reviewed the Motion and the Picard Declaration, and the Interim Order entered on _____, 2019; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and upon the record herein; and after due deliberation thereon; and the Court having determined that there is good and sufficient cause for the relief granted in this order, it is hereby

## ORDERED, ADJUDGED AND DECREED THAT:

1.      The Motion is GRANTED as set forth herein on a final basis.

2.      All objections to the entry of this Final Order, to the extent not withdrawn or settled, are overruled.

US-DOCS\105945547.1

3.      The Debtors are authorized to pay, set off against amounts owed by Imerys USA, Imerys Clays or the other Debtors, or otherwise honor the Prepetition Workforce Obligations described in the Motion, to, or for the benefit of, the Workforce, under the Workforce Programs.  Notwithstanding any other provision of this Final Order, such payments and setoffs shall not exceed $2,587,000 in the aggregate without further order of the Court.

4.      The Debtors are authorized to (a) continue each of the Workforce Programs, including but not limited to maintaining the Employee Benefits described in the Motion, in the ordinary course of business during the pendency of these cases in the manner and to the extent that such Workforce Programs were in effect immediately prior to the filing of these cases, and (b) continue to fund and to make payments or set offs in connection with the costs of and the expenses incurred in the administration of any Workforce Program.

5.      Subject to the following proviso, the Debtors are authorized to continue the Employee Incentive Programs, the Severance Pay Plan, and the Timmins Union Severance Program on a postpetition basis in the ordinary course of business, and in each case to pay any accrued amounts thereunder as they become due; provided that nothing in this Final Order shall be deemed to authorize the payment of any amounts in satisfaction of retention bonus or severance obligations that are prohibited by section 503(c) of the Bankruptcy Code.

6.      The Debtors are authorized to reimburse the Employees for all Employee Reimbursement Obligations incurred prior to the Petition Date.  In addition, the Debtors are authorized to make direct payments to third parties, or set offs, on account of amounts owed in connection with the Employee Reimbursement Obligations.

US-DOCS\105945547.1

7.      The Debtors shall continue to participate in the Deferred Compensation Plan.  The Debtors shall continue making payments on account of the Deferred Compensation Plan as they become due in the ordinary course of business.

8.      The Debtors are authorized to continue their workers' compensation programs and to pay or set off any outstanding prepetition claims, taxes, charges, assessments, premiums, and third party administrator fees arising under the workers' compensation policies and or programs in which they participate.  In addition, the automatic stay of section 362 of the Bankruptcy Code is hereby lifted to allow US Workers' Compensation Claims to proceed under the applicable US Workers' Compensation Policy and to allow the Debtors' insurance providers and/or third party administrators to negotiate, settle, and/or litigate US Workers' Compensation Claims, and pay resulting amounts, whether such claims arose before or after the Petition Date.

9.      The Debtors are authorized to pay or set off any and all local, state, federal, and foreign withholding and payroll-related or similar taxes related to the Prepetition Workforce Obligations including, but not limited to, all withholding taxes, social security taxes, Medicare taxes, and employment insurance taxes and premiums, whether such taxes relate to the period before or after the Petition Date.

10.      The Debtors are authorized to pay, or set off amounts owed in connection with, claims of the Administrators and Employee Benefits Consultants, in connection with administering and delivering payments or providing other services and benefits to the Workforce, for prepetition services rendered and claims for reimbursement based on prepetition disbursements made by the Administrators or Employee Benefits Consultants.

11.      The Debtors are authorized to pay or set off prepetition expenses incurred by the Independent Director not to exceed $5,000.  The Debtors are authorized to continue to pay

4

or setoff the Independent Director's monthly fees and expense reimbursements on a postpetition basis in the ordinary course of business.

12.     The Debtors' banks and financial institutions shall be, and hereby are, authorized, when requested by the Debtors in their sole discretion, to process, honor, and pay any and all checks or electronic fund transfers drawn on the Debtors' bank accounts to pay all prepetition amounts owed to  any party in connection with the Prepetition Workforce Obligations, whether those checks were presented prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments.  Further, the Debtors are authorized to issue new postpetition checks and initiate new postpetition electronic fund transfers to replace any checks or electronic fund transfers that may be dishonored and to reimburse any related expenses that may be incurred as a result of any bank's failure to honor a prepetition check or electronic fund transfer.

13.     The Debtors' banks and financial institutions may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Final Order, and any such Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for in this Final Order.

14.     Authorization to pay, and the payment or set off of, any amounts on account of Prepetition Workforce Obligations shall not affect the Debtors' right to contest the amount or validity of any Prepetition Workforce Obligation, including without limitation, any amounts that may be due to any taxing authority.

15.     Neither the provisions of this Final Order, nor any payments or set offs made or not made by the Debtors pursuant to this Final Order, shall be deemed an assumption or

5

rejection of any Workforce Program, agreement or contract, or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract between the Debtors and any member of the Workforce, or other person.

16.     Notwithstanding anything to the contrary in this Final Order, the Debtors retain their right to modify or terminate any Workforce Program to the extent that such right exists under the terms of the Workforce Program or as may be required by applicable law.

17.     Notwithstanding the relief granted herein or any actions taken hereunder, nothing contained in this Final Order shall create any rights in favor of, or enhance the status of any claim held by, any member of the Workforce, or other person.

18.     Neither the provisions contained herein, nor any actions or payments made by the Debtors pursuant to this Final Order, shall be deemed an admission as to the validity of any underlying obligation or a waiver of any rights the Debtors may have to dispute such obligation on any ground that applicable law permits.

19.     Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Final Order shall be effective and enforceable immediately upon entry hereof.

20.     The Debtors are hereby authorized to take such actions and to execute such documents as may be necessary to implement the relief granted by this Final Order.

21.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

Dated: _____, 2019
      Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

US-DOCS\105945547.1