IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x
In re:                                            :   Chapter 11
                                                  :
IMERYS TALC AMERICA, INC., *et al.*,              :   Case No. 19-10289 (LSS)
                                                  :
       Debtors.                             :   (Jointly Administered)
                                                  :
                                                  :   **Hearing Date: March 20, 2019 at 2:00**
                                                  :   **p.m. (ET) Objection Deadline: March 13,**
                                                  :   **2019 at 4:00 p.m. (ET)**
----------------------------------------------------------x

**CERTAIN EXCESS INSURERS' LIMITED OBJECTION TO
(1) DEBTORS PROPOSED FINAL ORDER (DKT. 68-1) AND
(2) DEBTORS' MOTION FOR ORDERS UNDER 11 U.S.C. §§ 105(a), 362(d), 363(b), AND
503(b) AUTHORIZING DEBTORS TO (I) PAY THEIR PREPETITION INSURANCE
OBLIGATIONS, (II) PAY THEIR PRE-PETITION BONDING OBLIGATIONS, (III)
MAINTAIN THEIR POST-PETITION INSURANCE COVERAGE, AND (IV)
MAINTAIN THEIR BONDING PROGRAM (DKT. 68-1).**

Certain Excess Insurers[1] hereby submit this limited objection to (1) *Debtors Proposed Final Order* ("**Proposed Final Order**") (Dkt. 68-1[2]) And (2) *Debtors' Motion For Orders Under 11 U.S.C. §§ 105(A), 362(D), 363(B), And 503(B) Authorizing Debtors To (I) Pay Their Prepetition Insurance Obligations, (II) Pay Their Pre-Petition Bonding Obligations, (III) Maintain Their Post-Petition Insurance Coverage, And (IV) Maintain Their Bonding Program.*[3]

---

[1] "Certain Insurers" as the term is used herein means Columbia Casualty Company, Continental Casualty Company, the Continental Insurance Company, as successor to CNA Casualty of California and as successor in interest to certain insurance policies issued by Harbor Insurance Company, Lamorak Insurance Company (formerly known as OneBeacon America Insurance Company), as successor to Employers' Surplus Lines Insurance Company, and Stonewall Insurance Company (now known as Berkshire Hathaway Specialty Insurance Company to the extent that they issued policies to Cyprus Mines Corporation prior to 1981).

[2] Exhibit B to Dkt. 68-1 is Debtors' Proposed Final Order.

[3] Debtors' "Proposed Final Order" is also filed at Dkt. 68-3, "Final Order Under 11 U.S.C. §§ 105(A), 362(D), 363(B), And 503(B), Authorizing Debtors To (i) Pay Their Prepetition Insurance Obligations, (ii) Pay Their Prepetition Bonding Obligations, (iii) Maintain Their Postpetition Insurance Coverage, And (iv) Maintain Their Bonding Program."  Dkt. 68-2 (Exhibit B to Dkt. 68) is the "Interim Order Under 11 U.S.C. §§ 105(A), 362(D), 363(B), And 503(B), Authorizing Debtors To (i) Pay Their

**ARGUMENT**

Certain Excess Insurers do not object to those provisions of the Proposed Final Order that are intended to allow the Debtors to maintain their current insurance policies, but rather object to Paragraphs 12 and 13 of the Proposed Final Order that apply to "Historical Policies."[4]  The text to which this objection is directed is text that the Debtors slipped into the proposed order to call for payments to be made to it under certain Historical Policies the rights to which are disputed and subject to a stay pending adjudication of the parties' rights in the adversary proceeding.  This relief embodied in this text is not properly before the Court on this kind of motion and is procedurally improper.   For several reasons, the Court should strike or modify Paragraphs 12 and 13 from the Final Order.

**I.  Paragraphs 12 And 13 Of The Proposed Order Conflict With The Debtors' Position On The Automatic Stay, Would Cause The Immediate Dissipation Of Insurance Assets, And Should Therefore Be Struck.**

Debtors have moved this Court for an Order that provides that the insurers identified in footnote 5 above "shall not pay or reimburse any postpetition separate, non-Debtor defense or indemnification costs to, or on behalf of, Cyprus Mines Corporation or its affiliates, except as provided by further order of the Court."  *See* Dkt. 3 at pp. 39-40 (proposed Final Order), and Debtors' current Proposed Final Order only provides for those insurers to make payment of defense costs to or on behalf of the Debtors.  *See* Dkt. 68-3, ¶¶ 12-13.

---

Prepetition Insurance Obligations, (ii) Pay Their Prepetition Bonding Obligations, (iii) Maintain Their Postpetition Insurance Coverage, And (iv) Maintain Their Bonding Program," originally filed as Dkt. 49.

[4]     As described in Dkt. 68-1, Debtors' Motion For Orders Under 11 U.S.C. §§ 105(A), 362(D), 363(B), And 503(B) Authorizing Debtors To (i) Pay Their Prepetition Insurance Obligations, (ii) Pay Their Prepetition Bonding Obligations, (iii) Maintain Their Postpetition Insurance Coverage, And (iv) Maintain Their Bonding Program.

The insurance policies that Imerys Talc America, Inc. ("Imerys") claims as putative successor to or assignee of Cyprus Mines Corporation include policies that only reimburse defense expenses as "ultimate net loss." Under the terms of these "ultimate net loss" policies, any payment of defense costs by these policies erode their policy limits. 4 Alan S. Rutkin & Robert Tugander & John W. Egan, *New Appleman Insurance Law Practice Guide* 39.15 (2018) (defense costs erode the limits of an ultimate net loss policy).

Before Imerys filed for bankruptcy, the Certain Excess Insurers that issued liability policies to Cyprus Mines Corporation shared defense and indemnity costs among the policies implicated by the underlying asbestos claims. That arrangement contemplates contribution for defense costs from insurers whose policies reimburse defense expenses as "ultimate net loss" where a claim implicates more than one policy, and that such payments will erode the policy limits of those policies. Thus, any defense costs paid by Certain Excess Insurers *will* affect the total limits available under Certain Excess Insurers Policies and other insurers' policies. This, in turn, will impair what is claimed by the Debtors to be property of the estate.

If the Court enters the proposed order with paragraphs 12 and 13 as proposed by the Debtor, any payment by Certain Excess Insurers will impair the policy limits and thus impair what is claimed by the Debtors and Cyprus Mines before there has been an adjudication of their respective rights to property that is claimed by the estate. This directly conflicts with the position that the Debtors have taken with regard to the application of the automatic stay.

**II.     Paragraphs 12 and 13 Conflict with the Insurers' Contractual Obligations by Compelling Coverage to Potentially Uninsured Parties.**

Paragraphs 12 and 13 of the Proposed Final Order refer in undefined terms to "Historical Policies," and state that certain insurers "shall be, and hereby are, authorized to promptly pay and otherwise honor their obligation to pay defense costs for the Debtors as set forth in their Historical

3

Policies."[5]  Without assurance that the payments made are going to the proper party, from the proper policy and impair the corresponding limits, Certain Excess Insurers will be prejudiced and possible assets of the estate irreparably dissipated.

The Debtors acknowledge that there is a dispute over who is entitled to the proceeds of the policies and have initiated an adversary proceeding to address that issue.  Separately, Certain Excess Insurers have sought declaratory relief on the terms of the policies in *Columbia Casualty Company, et al. v. Cyprus Mines Corporation, et al.*, (Sup. Ct. Cal. County of San Francisco).  Prior to resolution of this fundamental question, it is premature to authorize the disposition of the proceeds of the policies.  If an insurer makes payments pursuant to Paragraphs 12 and 13 and this Court later holds that Imerys or Cyprus Mines were not entitled to the insurance proceeds, insurers may have paid defense costs to ***uninsured parties*** and may be unable to seek reimbursement for those costs.  Debtors have threatened that if any insurer pays Cyprus Mines, it is a voluntary payment.  And Cyprus Mines takes the same position with regard to any payment to Imerys.

There is no legally permissible way to authorize Certain Excess Insurers to pay defense costs, as ostensibly required by Paragraphs 12 and 13, without imposing conflicting obligations on insurers—that they either comply with the contractual policy language or the Proposed Final Order.  Even if the Court were to enter an order authorizing the payment of defense costs only with respect to certain policies that pay defense outside limits, as Paragraphs 12 and 13 may suggest, albeit vaguely, any demand for payment of claims by such policies would immediately

---

[5]    Those insurers are listed in Paragraph 13 of the Proposed Final Order and are the following: (1) American Insurance Company, (2) Truck Insurance Exchange, (3) National Union Fire Insurance Company of Pittsburgh, PA, (4) Zurich American Insurance Company, (5) Zurich Insurance Company, and (6) XL Insurance America, Inc.

trigger contribution claims against policies for which the payment of defense erodes their limits. And any effort to artificially cabin all the defense costs in a single policy would create arguments and litigation over whether coverage had been nullified in the process.

And even if Paragraph 12 only applies to those limited insurers listed in Paragraph 13, it further conflicts with contractual policy language because it compels certain insurers listed in Paragraph 13 to pay defense costs for claims that are unlikely to be covered at all, another clear contractual breach.  Insurers cannot be forced to pay defense costs for non-covered claims.[6]

---

[6] Where underlying claims against an insured do not arise out of an "occurrence," and thus are not covered under excess policies, the underlying claims are not covered and the excess insurers need not reimburse the insured for its defense costs.  Courts applying the laws of California, Florida, Illinois, Indiana, Missouri, New Jersey, North Carolina, Ohio, Pennsylvania, and Vermont have reached this result.  *See FMC Corp. v. Plaisted & Cos.*, 72 Cal. Rptr. 2d 467, 509 (Cal. Ct. App. 1998), *as modified on denial of reh'g* (Mar. 27, 1998), *disapproved of on other grounds by State v. Cont'l Ins. Co.*, 55 Cal. 4th 186, 281 P.3d 1000 (Cal. 2012) ("ultimate net loss" language defined to mean amounts "paid as a consequence of any occurrence *covered hereunder*" and held that this language did not require the insurer to pay defense costs for numerous pollution claims across the country "before coverage has been established by judgment or settlement."); *Certain Underwriters at Lloyd's of London v. Superior Court*, 24 Cal. 4th 945, 960 (Cal. 2001) (*Powerine I*); *Ass'n of Cal. Water Agencies Joint Powers Ins. Auth. v. Ins. Co. of the State of Pa.*, No. SACV 11–01124–CJC (RNBx), 2013 WL 12126018, at *8 (C.D. Cal. Aug. 9, 2013), *order clarified on other grounds*, No. SACV 11–01124–CJC (RNBx), 2013 WL 12131734 (C.D. Cal. Oct. 9, 2013); *Big 5 Corp. v. Gulf Underwriters Ins. Co.*, No. CV 02–3320WJR (SHX), 2003 WL 22127029, at *5 (C.D. Cal. July 14, 2003).*Cinergy Corp. v. St. Paul Surplus Lines Ins. Co.*, 873 N.E.2d 105, 114–16 (Ind. Ct. App. 2007); *Matter of Celotex Corp.*, 152 B.R. 661 (Bankr. M.D. Fla. 1993) (applying Florida, Ohio, and Illinois law when analyzing whether several insurance policies covered numerous asbestos claims and concluding that excess insurers need not pay defense costs if the insured was not found liable on any of the underlying asbestos claims because the "ultimate net loss" policy language only required coverage for "defense costs paid as a consequence of any *covered occurrence or covered hazard*."); *Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348, 1364 (M.D. Fla. 2001) (applying Florida, North Carolina, and Pennsylvania law); *Certain Underwriters at Lloyd's of London v. Superior Court*, 24 Cal. 4th 945, 960 (Cal. 2001) (*Powerine I*); *Central Illinois Light Co. v. Home Insurance Co.*, 342 Ill. App. 3d 940, 963–64 (2003) (applying Illinois law) the court applied Illinois law when concluding similarly that where an excess policy covered "sum[s] actually paid in cash in the settlement or satisfaction of losses for which the insured is liable, either by adjudication or compromise with the written consent of [the insurer]," where the underlying claim was dismissed, the insurer need not pay defense costs because the insured was not liable for indemnity.); *Uniroyal, Inc. v. American Re-Insurance Co.*, 2005 N.J. Super. Unpub., No. L-8172-94, 2005 WL 4934215 (N.J. App. Sept. 13, 2005). For instance, in the *Garlock* bankruptcy, it was revealed that many claims brought in the tort system prior to bankruptcy were ultimately dismissed without payment due to the plaintiff bar's propensity to file suit first and determine if there is a basis for a claim later.  Because litigation is so costly to all parties, the bankruptcy court observed:  "Many cases ultimately were simply dismissed".  *In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 87 (Bankr. W.D.N.C. 2014).

### III. This Court Should Abstain From Entering An Order That Prematurely Decides the Rights of the Parties Under the Insurance Contracts.

Under the guise of seeking authority to maintain an ordinarily course obligation, the Debtors slipped into paragraph 12 and 13 text which can be read as directing insurers to make payments. This Court should abstain from deciding purely state law issues of insurance coverage let alone do so in response to a first day motion addressing the ordinary course obligations of the Debtors.

The Supreme Court has held that federal laws are presumed not to preempt state laws, especially in areas—such as insurance—that have long been subject to state regulation: "[I]n all pre-emption cases, and particularly in those in which Congress has legislated. . . . in a field which the States have traditionally occupied . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 129 S. Ct. 1187, 1194–95 (2009; *see also Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008); *Comm. of Dental Amalgam Mfrs. & Distribs. v. Stratton*, 92 F.3d 807, 811 (9th Cir. 1996). Accordingly, if a court has "any doubt about congressional intent" to preempt state law, the court must "err on the side of caution, finding no preemption." *Malabed v. N. Slope Borough*, 335 F.3d 864, 869 (9th Cir. 2003)**Error! Bookmark not defined.**.

"[T]he presumption against displacing state law by federal bankruptcy law is just as strong in bankruptcy as in other areas of federal legislative power." *Pacific Gas & Elec. Co. v. California*, 350 F.3d 932, 943 (9th Cir. 2003) ("*PG&E*"). Bankruptcy, unlike many other federal regulatory regimes, is built on a state-law foundation, and "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Butner v. United States*, 440 U.S. 48, 54 (1979), *superseded by statute*, 11 U.S.C. § 541. Thus, absent a

"clear and manifest" purpose to the contrary, "the Bankruptcy Code will be construed to adopt, rather than to displace, pre-existing state law." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544–45 (1994).

This is true even where a decision to override state law would make reorganization easier. "Congress's purpose in enacting the Bankruptcy Act was not to mandate that every company be reorganized at all costs, but rather to establish a preference for reorganizations, where they are legally feasible and economically practical." *Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev.*, 35 F.3d 1348, 1354 (9th Cir. 1994). So "[s]imply making a reorganization more difficult for a particular debtor . . . does not rise to the level of standing as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id*. Preempting state law under the Code is "an extraordinary exemption from nonbankruptcy law" that must be "clearly expressed" in the Code, and cannot be "collected or inferred from disputable considerations of convenience in administering the estate of the bankrupt." *Midatl. Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986).

These principles mean that, while the Code preempts state-law rights where it clearly and specifically expresses such preemption, courts do not otherwise have license to rework the debtor's contractual relationships with non-creditor third parties simply to facilitate reorganization. Just the opposite: "[a] trustee . . . succeeds only to such rights as the bankrupt possessed . . . . [and] stands in the shoes of the bankrupt." *In re Destro*, 675 F.2d 1037, 1040 (9th Cir. 1982). And since the debtor's rights are "created and defined by state law," *In re Worcester*, 811 F.2d 1224, 1228 (9th Cir. 1987), a trustee's right to, and use of, debtors' property is similarly circumscribed. *In re Coupon Clearing Serv., Inc.*, 113 F.3d 1091, 1099 (9th Cir. 1997) ("The nature and extent of a debtor's interest in property is determined by state law, with

7

the estate having no greater rights in property than those held by the debtor prior to bankruptcy."); *Wyle v. R.J. Reynolds Indus. Inc.*, 709 F.2d 585, 592 (9th Cir. 1983) (trustee in bankruptcy possesses only "derivative rights that are not superior to those of the bankrupt"). Bankruptcy preserves—rather than overrides—state law rights, to prevent debtors from obtaining "a windfall merely by reason of the happenstance of bankruptcy." *Butner*, 440 U.S. at 55.

Further, the policy terms and California law give Certain Excess Insurers contractual policy rights regarding defense coverage. This Court cannot override these explicit policy terms. *See Pruyn v. Agric. Ins. Co.*, 36 Cal. App. 4th 500, 516 (Cal. Ct. App. 1995) (breach of duty to cooperate in defending and settling claims, including settlement without the insurer's consent, precludes recovery); *Andrade v. Jennings*, 54 Cal. App. 4th 307, 327 (Cal. Ct. App. 1997) (collusive settlement between insured and claimant without insurer's participation violated the cooperation clause); *see also Belz v. Clarendon Am. Ins. Co.*, 158 Cal. App. 4th 615, 628 (Cal. Ct. App. 2007) (defense, settlement, cooperation and "no-voluntary-payment" provisions of insurance policies are intended to "protect[] against coverage by *fait accompli*").

This Court should abstain from making a decision on insurance coverage pending adjudication of the parties' rights.

Dated:  March 13, 2019                                Respectfully Submitted,


                                                      By: */s/ Stamatios Stamoulis*
                                                          Stamatios Stamoulis (#4606)
                                                          stamoulis@swdelaw.com

                                                      STAMOULIS & WEINBLATT LLC
                                                      800 N. West Street, Third Floor
                                                      Wilmington, Delaware  19801
                                                      Telephone:   +1 302 999 1540
                                                      Facsimile:    +1 302 762 1688

                                                      and

                                                      O'MELVENY & MYERS LLP
                                                      Times Square Tower
                                                      7 Times Square
                                                      New York, New York  10036-6537
                                                      Telephone:   +1 212 326 2000
                                                      Facsimile:    +1 212 326 2061

                                                      Tancred Schiavoni (*pro hac vice* pending)
                                                      tschiavoni@omm.com
                                                      Janine Panchok-Berry (*pro hac vice* pending)
                                                      jpanchok-berry@omm.com

                                                      *Counsel for Certain Excess Insurers*

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2019, I electronically filed the above document with the Clerk of Court using CM/ECF which will send electronic notification of such filing(s) to all registered counsel.

*/s/ Stamatios Stamoulis*
Stamatios Stamoulis

OMM_US:76674025.3