# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| **In re** | Chapter 11 |
| **IMERYS TALC AMERICA, INC.,** *et al.*[1] | Case No. 19–10289 (LSS) |
| **Debtors.** | Jointly Administered |
| | **Objection Deadline: April 22, 2020 at 4:00 p.m. ET**<br>**Hearing Date: May 6, 2020 at 11:00 a.m. ET** |

## JOHNSON & JOHNSON'S MOTION PURSUANT TO 11 U.S.C. § 362(d)(1), FED. R. BANKR. P. 4001, AND LOCAL BANKRUPTCY RULE 4001-1 FOR ENTRY OF ORDER MODIFYING AUTOMATIC STAY TO PERMIT J&J TO SEND NOTICE ASSUMING DEFENSE OF CERTAIN TALC CLAIMS AND TO IMPLEMENT TALC LITIGATION PROTOCOL

Johnson & Johnson and Johnson & Johnson Consumer Inc. (collectively, "**J&J**") file this motion (the "**Motion**") for entry of an order under section 362(d)(1) of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 4001 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"), and Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") modifying the automatic stay: (i) to permit holders of J&J Talc Claims (as defined below) (the "**J&J Talc Claimants**") to pursue those claims against the Debtors nominally; (ii) for J&J to send notice of J&J's assumption of the defense of all claims against the Debtors alleging harm caused by the Debtors' talc based on the alleged use of J&J product prior to January 1, 2020 that have not reached a final resolution (the "**J&J Talc Claims**"); and (iii) to take certain other actions set forth in the Talc Litigation Protocol (defined below) to assume the defense of and indemnify

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

the Debtors for the J&J Talc Claims.  In support of this Motion, J&J, by and through its

undersigned counsel, represents:

## PRELIMINARY STATEMENT

1.      The Debtors' chapter 11 cases have stalled for a year, while J&J has made repeated

proposals to the Debtors to allow J&J to exercise its contractual right and defend lawsuits against

the Debtors alleging personal injuries arising from the use of J&J products containing talc.  That

contractual right lives in indemnity provisions that have long been part of the agreements between

the Debtors and J&J.

2.      Instead of including J&J in the plan negotiation process with the talc claimants'

advisors to fashion a resolution that affords the Debtors and their creditors access to a credit-

worthy J&J indemnity and relieves the estates of most of their claims, the Debtors, the Tort

Claimants' Committee (the "**TCC**"), and future claimants' representative (the "**FCR**") have

chosen a different, and perverse path.  The construct, as J&J understands it, would have the Debtors

and the talc claimants, present and future, agree on claim amounts as a key part of a chapter 11

plan.

3.      Once agreed, the arrangement would preempt any litigation over what caused the

harm, and arguably obligate J&J to make good on its indemnity without any opportunity to actually

defend the cases.  Divested of its contractual right to assume the defense of and control these

thousands of litigations, J&J will suffer tremendous harm as a result of losing the opportunity to

litigate causation or value related to any claim.  The Debtors and the claimants seek to achieve an

outcome impossible outside of chapter 11, and also flatly impermissible in these chapter 11 cases

if the agreements with J&J are to be assumed under section 365 or any chapter 11 plan—namely,

a free hand to fix the amount they will then assert J&J is obligated to pay on the purported

2

indemnity, while stripping J&J of its contractual right to litigate causation or value on such purportedly indemnified claims.

4.     J&J, of course, has the financial wherewithal to defend these claims and satisfy any successful talc claim in full, and sets forth below a clear process—in the form of the Talc Litigation Protocol—which honors the talc claimants' full trial rights while removing any obligation for the estates to pay the overwhelming majority of talc claims against them, including talc claims falling outside of J&J's existing indemnity obligations.  As an aside, J&J has been denied discovery regarding the number and amount of these claims, and seeks it in connection with this submission. The stay relief sought herein also includes J&J agreeing to waive strong defenses to its indemnity obligations.

5.     The facts clearly demonstrate that "cause" exists under section 362(d)(1) of the Bankruptcy Code and the traditional *Rexene* factors to lift the stay and permit J&J to implement the Talc Litigation Protocol.   Absent stay relief, the Debtors and the talc claimants, who commenced litigations asserting claims in trial courts across the nation, will waste more time subverting this process.  While chapter 11 is frequently used to channel litigation into one forum and foster settlement between a debtor and its litigants, it is not a vehicle to deprive a credit-worthy indemnitor of its contractual rights; therefore, in balancing the equities, this Motion should be granted.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware,* dated February 29, 2012.  Venue of this proceeding and this Motion in this

WEIL:\97367400\36\54966.0222

district is proper under 28 U.S.C. §§ 1408 and 1409.  The authority for the relief requested includes section 362(d)(1) of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-1.

## BACKGROUND

### A.    The Talc Claims

7.    On February 13, 2019 (the **"Petition Date"**), Imerys Talc America, Inc. and two affiliates (collectively, the "**Debtors**") filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), commencing cases for relief under chapter 11 the Bankruptcy Code.  The Debtors filed these cases because of litigation and settlement costs associated with tens of thousands of lawsuits (the "**Lawsuits**") alleging personal injury arising from exposure to the Debtors' talc—predominantly through use of products J&J manufactured and sold.[2]

8.    A majority of the Lawsuits name the Debtors and J&J as co-defendants, blaming the Debtors' talc contained in J&J products for causing various illnesses, including mesothelioma and ovarian cancer.[3]  The Debtors also face similar litigation arising from products manufactured and sold by other parties that contain the Debtors' talc.

9.    On the Petition Date, the J&J Talc Claims, including over fourteen thousand Lawsuits, were halted against the Debtors in forums across the country by operation of the automatic stay under section 362(a) of the Bankruptcy Code.  In all or nearly all cases, the Debtors filed notices of suggestion of bankruptcy to apprise applicable forums and parties of the imposition of the automatic stay.  Litigation continued, in most cases, against J&J and other co-defendants.

---

[2] *Declaration of Alexandra Picard, Chief Financial Officer of the Debtors, in Supports of Chapter 11 Petitions and First Day Pleadings*, Case No. 19-10289 (LSS) (Feb. 13, 2019) [D.I. 10] (the "**First Day Declaration**"), ¶¶ 9–10 .

[3] *See, e.g.*, First Day Declaration, ¶ 18.

WEIL:\97367400\36\54966.0222

In certain cases, plaintiffs dismissed the Debtors as defendants to ensure the cases would proceed against other co-defendants notwithstanding the automatic stay afforded the Debtors.

**B.     The Supply Agreements and Indemnity Provisions**

10.     Up until 1989, a subsidiary of J&J produced the cosmetic talcum powder used in J&J products.  In 1989, J&J sold the subsidiary and thereafter sourced talc from the Debtors or their predecessors for use in certain J&J products.  The parties' historical talc supply relationship was memorialized in a serious of agreements between the Debtors and J&J or their respective predecessors.

11.     Certain of these agreements include provisions requiring J&J to indemnify the Debtors for certain losses and provide J&J the right to assume the defense and decision-making with respect to resolution of claims against the Debtors that are potentially indemnified under those agreements.  These agreements are as follows: (a) the 1989 Talc Supply Agreement between Windsor Minerals, Inc. ("**Windsor**") and J&J (the "**1989 SA**"),[4] (b) the 1989 Stock Purchase Agreement between Cyprus Mines Corp. ("**Cyprus**") and J&J (the "**1989 SPA**"),[5] and (c) the 2011 Supply Agreement between Luzenac America, Inc. ("**Luzenac**") and J&J (the "**2011 SA**").[6]

12.     Under the 1989 SPA and the 1989 SA, J&J agreed to defend and indemnify Cyprus and any affiliated companies (*e.g.*, ITA and ITV) from, among other things, (i) claims alleging

---

[4] The 1989 SA is annexed hereto as **Exhibit B**.  Windsor is the operating entity that historically supplied talc to J&J for its cosmetic products, and is now known as Imerys Talc Vermont, Inc. ("**ITV**"), a debtor in these chapter 11 cases. The 1989 SA was executed contemporaneously with the 1989 SPA (as defined herein).  Under Section 8.5 of the 1989 SPA, Cyprus could not purchase the Windsor stock from J&J until the 1989 SA had been executed.  Ex. C, § 8.5.

[5] The 1989 SPA is annexed hereto as **Exhibit C**.  Under the 1989 SPA, J&J sold Windsor's stock to Cyprus, which transferred the stock to a subsidiary, Cyprus Talc Corp., which was later renamed Luzenac and is now known as Imerys Talc America, Inc. ("**ITA**"), a debtor in these chapter 11 cases.  *See* First Day Declaration, ¶¶ 12–14.  In 1992, Cyprus later transferred all talc assets (including ITA and ITV) to RTZ America, Inc. (later known as Rio Tinto America, Inc.), which, through a series of subsequent transactions, transferred the talc assets (including ITA and ITV) to the Imerys Group (as defined in the First Day Declaration) in 1992.  *Id.*

[6] The 2011 SA is annexed hereto as **Exhibit D**.

WEIL:\97367400\36\54966.0222

injury arising from use of J&J products with **talc supplied to J&J prior to the closing of the sale**[7] and (ii) claims alleging injury arising from use of J&J products with talc **supplied by ITA/ITV pursuant to the 1989 SA**,[8] covering all time periods prior to December 31, 2000 (the "**J&J-Covered Years**").

13.    The 1989 SPA grants J&J, as indemnitor, the right to participate in, assume the defense of, and control decisions to try or settle the claims arising in J&J-Covered Years that J&J indemnifies.[9]  Under the 2011 SA, J&J agreed to defend and indemnify ITA for claims brought against ITA arising from talc supplied by ITA to J&J during 2011.[10]  The foregoing indemnity obligations are referred to hereinafter as the "**J&J Indemnity Provisions**."

14.    By contrast (and as discussed below), under agreements covering other time periods, the Debtors owe J&J indemnity obligations for liability arising from talc supplied in certain periods (such liquidated and unliquidated obligations, the "**J&J Indemnity Claims**").[11]

---

[7] The 1989 SPA provides that J&J must defend and indemnify Cyprus and/or ITA "from and against, any and all claims, demands, penalties, suits, proceedings, judgments . . . of every kind and nature . . . imposed upon or incurred by Cyprus [and/or ITA] as a result of or in connection with or arising out of . . . any product liability-claim, suit, demand or cause of action  . . . arising out of talc or talc-containing products manufactured by . . . J&J . . . prior to Closing."  Ex. C, § 11.2.

[8] Section 11 of the 1989 SA provides that "[J&J] shall indemnify, defend and hold harmless [Windsor/ITV], and its affiliates, . . . from and against all liabilities arising out of any product liability-based claim . . . arising out of the sale of cosmetic talc products to consumer markets, which products were manufactured by [J&J] prior to [January 6, 1989]; or for which [J&J] is directly or indirectly responsible as a result of [J&J's] possession, use or processing of [t]alc delivered to [J&J] pursuant to [the 1989 SA], or as a result of [J&J's] manufacture, shipment and sale of [t]alc-containing product . . .".  Ex. B, § 11.

[9] Section 11.4 of the 1989 SPA provides that "In case any [action involving the subject matter of the indemnity provisions] is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, *the indemnifying party shall have the right to participate therein*, and to the extent that *it may elect by written notice* delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, *to assume the defense thereof*, with counsel reasonably satisfactory to such indemnified party . . . *In the event that the indemnifying party shall assume the defense of a lawsuit as provided herein, the indemnifying party, after consultation with the indemnified party, shall have reasonable control over the decision to try, settle, compromise or otherwise terminate such lawsuit*."  Ex. C, § 11.4 (emphasis added).

[10] *See* Ex. D, Attachment D, § 6 ("[J&J] shall indemnify, defend and hold harmless [ITA] for any third party claims brought against [ITA] based on the use of [talc] by J&J.").

[11] J&J has filed proofs of claims in these chapter 11 cases for its liquidated claims under the 2001 SA.  *See* Claim Nos. 915, 922, and 926.

WEIL:\97367400\36\54966.0222

Namely, under a 2001 Supply Agreement with J&J (the "**2001 SA**"),[12] the Debtors are required to indemnify J&J for losses relating to talc supplied under the 2001 SA between and including the years 2001 and 2006 (the "**Debtor-Covered Years**"), including for the Debtors' predecessors' failure to (a) meet specifications for talc in the 2001 SA, (b) sample and test the talc sufficiently before providing it to J&J; and (c) comply with any law, ordinance, regulation, or rule.[13]

15.     Certain periods are not covered by any supply agreement between J&J and the Debtors (*e.g.*, the years between and including 2007 and 2010, and from 2012 through the commencement of these chapter 11 cases) (collectively, the "**Gap Years**").  The liability for J&J Talc Claims attributable to Gap Years would likely be addressed under state common or statutory law of indemnity and contribution.

16.     As a consequence of the indemnity provisions in J&J's and the Debtors' agreements, the Debtors, J&J, and the J&J Talc Claimants must resolve the following legal and factual issues (the "**Unresolved Indemnity Issues**") before the Debtors can establish, apply, and liquidate indemnification claims against J&J to :

(a)    **Distribution of talc liability across multiple supply periods**.  Nearly all of the J&J Talc Claims allege multiple years of use of the product(s) purportedly causing the J&J Talc Claimants' injury, spanning periods covering J&J-Covered Years and Debtor-Covered Years or Gap Years.  Determining the degree to which each period of use allegedly caused a claimant's injuries likely will be time-consuming and costly.  That determination is necessary, however, because each supply agreement throughout the Debtors' and J&J's relationship is unique, with obligations varying significantly and even running in the opposite direction from obligations in other periods.

(b)    **Gap Year Issues**.  Any attribution of talc liability based on alleged use of products supplied in Gap Years likely requires resolution of complex, fact-intensive issues of state law.

---

[12] The 2001 SA is annexed hereto as **Exhibit E**.

[13] *See* Ex. E, § 7(a)(iv).  Certain Debtors are successors to J&J's counterparties under the 2001 SA, and are bound to the same indemnity obligations as such counterparties.

WEIL:\97367400\36\54966.0222

(c)     **J&J's defenses against duty to indemnify**.  J&J has numerous potential defenses (the "**J&J Indemnity Defenses**") to indemnification of J&J Talc Claims, including that:

    (i)     by rejecting J&J's offers to assume liability for the J&J Talc Claims and ignoring J&J's rights under the J&J Indemnity Provisions to assume the defense of the Debtors and to control settlement decisions involving the J&J Talc Claims, the Debtors breached their obligations under the J&J Indemnity Provisions, relinquishing J&J of any duty to indemnify the Debtors for J&J Talc Claims settled without J&J's participation, and resulting in incurable defaults by the Debtors that render the supply agreements unassumable by the Debtors;

    (ii)     if a settlement, judgment, or recovery from a trust is procured by bad faith, collusion, or fraud, it is not subject to indemnity under the applicable agreement and other principles of indemnity law;

    (iii)     the claimant did not actually use a J&J product;

    (iv)     the products of a company other than J&J to which the Debtors also supplied talc caused the claimant's injury or some other factor or exposure caused the J&J Talc Claimant's injury;

    (v)     settlements of J&J Talc Claims for large dollar amounts are not subject to indemnity by J&J given the lack of reliable scientific evidence of causation of the applicable injury;

    (vi)     While J&J denies that the applicable J&J products contained asbestos, if the Debtors are responsible for providing J&J with contaminated talc in a manner not conforming to J&J's specifications per the supply agreements, J&J would not owe contractual indemnification;[14] and

    (vii)     Allegations of other acts or omissions of the Debtors in production, testing, and delivery of the talc resulted in the injury.

(d)     **J&J's indemnification claims against the Debtors**.  The Debtors owe J&J for the J&J Indemnity Claims.[15]  The amounts liquidated under these obligations would offset the liquidated amounts of any indemnity obligation owed by J&J to the Debtors under theories of setoff and recoupment.  The Debtors' indemnity claims against J&J would likely cause J&J to assert its indemnity claims against the

---

[14] The 1989 SA contains a carve-out for J&J's indemnity obligations if the talc provided by Windsor/ITV did not conform to specifications.  *See* Ex. B, § 11 ("[J&J] shall have no obligation of indemnification pursuant to this Section 11 in the event that the Talc delivered to [J&J] hereunder did not conform to the specifications for such Talc then in effect . . .").

[15] J&J has filed proofs of claim in these chapter 11 cases for the liquidated amounts of these indemnity obligations of the Debtors.  *See* Claim Nos. 915, 922, and 926.

Debtors as counterclaims, increasing the morass of litigation issues that would need to be resolved before indemnity could be realized.

(e) **Forum selection, jurisdiction, and other procedural issues**. Several of the supply agreements between J&J and the Debtors require that issues thereunder be arbitrated or decided by courts within a particular state, or are governed by the laws of a particular state.[16] Before any substantive issues of indemnity obligations could be decided, J&J, the Debtors, and/or the J&J Talc Claimants would likely need to determine the appropriate forum (whether bankruptcy or non-bankruptcy, state or federal, arbitration, or other litigation forum) and choice of law to litigate these issues. Most J&J Talc Claims apply across multiple time periods that are covered by agreements containing conflicting forum and choice of law requirements.

17.     Complicating these matters further, most of these indemnity issues likely will not apply uniformly across identifiable groups of underlying J&J Talc Claims. Factual distinctions between any two J&J Talc Claims affect the application of the indemnities, including: (a) the time at which a claimant started and finished using the products allegedly causing the injury; (b) which product(s) (including products made by companies other than J&J) a claimant used across the duration; and (c) the alleged injury (*i.e.*, one that allegedly results from talc contaminated with asbestos or from talc itself). In other words, resolution of any particular issue must be conducted across thousands of J&J Talc Claims, absent a settlement among J&J and the Debtors and/or the J&J Talc Claimants. Needless to say, one universally applicable threshold issue that must be proven before J&J Talc Claimants should be entitled to recovery from defendants of the J&J Talc Claims is the issue of whether talc actually causes the illnesses suffered by claimants, which J&J— and the Debtors, at least historically—deny.

C.     **J&J Indemnity Proposals**

18.     Long before the Petition Date, J&J sought to resolve disputes with the Debtors related to indemnification rights and obligations under the J&J Indemnity Provisions and the 2001

---

[16] *See, e.g.*, Ex. B, § 15(f) (Vermont choice of law provision); Ex. C, § 13.9 (requiring any issues to be heard in Vermont courts); Ex. D, Attachment D, § 14 (clause requiring arbitration in Colorado); Ex. E, § 15 (clause requiring arbitration in New Jersey).

SA.  J&J and the Debtors met several times, exchanged correspondence, and participated in two mediations.  J&J believed the parties were continuing to work toward resolving the scope and application of the indemnity.  Instead, the Debtors filed their chapter 11 petitions.  In the one year since the Debtors commenced these cases, and despite several attempts by J&J to engage, the Debtors have not sought an earnest dialogue with J&J with respect to J&J's and the Debtors' indemnity rights and obligations or J&J's proposals.

19.    On November 1, 2019, J&J proposed indemnification principles in yet another effort to resolve the indemnity issues (the "**November Proposal**").[17]  To convince the Debtors to engage with J&J on the November Proposal, J&J proposed to fully indemnify and assume the defense of all J&J Talc Claims in which J&J Talc Claimants allege any exposure to talc from the use of J&J products in J&J-Covered Years,[18] even if Claimants also allege exposure in Debtor-Covered Years.

20.    In the November Proposal, J&J also offered to waive its rights to indemnification for any J&J Talc Claim that a court determines arose from alleged use in Debtor-Covered Years or Gap Years.  Not only did the November Proposal represent a "bright line rule" that avoided issues of attribution across years, but J&J would assume more liability than required under the agreements.  Specifically, J&J proposed to fully indemnify claims alleging use across J&J-Covered Years as well as Debtor-Covered Years and Gap Years, rather than apportioning liability to the Debtors for the Debtor-Covered Years or Gap Years in the claimant's period of use.  The proposal would also settle any issue of the Gap Years by dividing all J&J Talc Claims into two

---

[17] The November 1, 2019 letter is annexed hereto as **Exhibit F**.

[18] Although the J&J-Covered Years only extend through December 31, 2000 under the agreements, under the November Proposal, J&J offered indemnity for claims alleging use of J&J products through April 15, 2001, due to an ambiguity in when the J&J-Covered Years end and the Debtor-Covered Years began in the agreements.

categories (based on whether or not the claimant alleged any use prior to a certain date), and each would have clear contractual indemnity obligations.  J&J did not receive a formal response to the November Proposal.

21.     On December 3, 2019, J&J again offered to negotiate, reiterating the terms of the November Proposal.[19]  Nine days later, the Debtors responded in a phone call with J&J, stating they intended to complete negotiations with Imerys, S.A., the Debtors' parent company, and the TCC and FCR appointed in these chapter 11 cases, before engaging with J&J.

22.     In an effort to jumpstart an otherwise stalled process, and as a further enhancement of the November Proposal and the December 3, 2019 letter, on February 7, 2020, J&J made a formal offer (the "**February Offer**"), in the form of a term sheet, to assume the defense of and indemnify the Debtors for all J&J Talc Claims—any and all claims against the Debtors involving J&J product.[20]  Under the February Offer, J&J would indemnify the Debtors for J&J Talc Claims regardless of whether any exposure was alleged in J&J-Covered Years or only in Debtor-Covered Years.  This, even though for the Debtor-Covered Years, J&J owes no duty to indemnify, and in fact, may be entitled to indemnity from the Debtors.[21]

23.     The February Offer was conditioned on Bankruptcy Court approval and modification of the automatic stay with respect to the J&J Talc Claims.  J&J published the

---

[19] The December 3, 2019 letter is annexed hereto as **Exhibit G**.

[20] The February Offer is annexed hereto as **Exhibit H**.

[21] The February Offer provides that J&J will "agree[] to indemnify [the Debtors] fully for, and assume the defense of, and assume all costs of litigation for [t]alc [c]laims where plaintiffs allege use of J&J/talcum powder products prior to January 1, 2020, . . . and where [the Debtors have] not reached a final resolution (*e.g.*, a settlement has been entered or a non-appealable final judgment has been entered against [the Debtors] in a court of competent jurisdiction) as to such [t]alc [c]laim . . .".

WEIL:\97367400\36\54966.0222

February Offer for all parties to see in its most recent annual report.[22]  On March 4, 2020, the

Debtors sent J&J a letter further deferring consideration and negotiation of the February Offer.[23]

Prior to filing this Motion, J&J reached out the Debtors in an effort to move negotiations forward

and resolve disputes related to indemnification rights and obligations under the J&J Indemnity

Provisions and the 2001 SA.  At which point, the Debtors informed J&J (through counsel) that the

Debtors need, and are unable to get, permission from the TCC and FCR for the Debtors to hold

one-on-one discussions with J&J.[24]  In light of the Debtors' inability to engage in productive

discussions with J&J, J&J is seeking the relief outlined in this Motion, which is necessary for J&J

to alleviate the prejudice that results from the Debtors' inability to negotiate with J&J with regard

to the indemnity issues, including cooperating in certain defenses.

### D.    Talc Litigation Protocol

24.    Having tried unsuccessfully to negotiate a consensual resolution of the treatment of

J&J Talc Claims with the Debtors' counsel, J&J proposes to assume the defense of, and indemnify

the Debtors with respect to, the J&J Talc Claims through the following protocol (the "**Talc**

**Litigation Protocol**"):

(a)    **Notice to Debtors**.  Within three (3) days of the Court entering an order granting
this Motion (the "**Lift Stay Order**"), J&J will give formal notice of J&J's
assumption of the defense of the J&J Talc Claims to the Debtors (the "**Assumption**

---

[22] J&J stated "[t]he Company formally proposed to resolve Imerys' and the Company's obligations arising out of the Talc Claims by agreeing to assume the defense of litigation of all Talc Claims involving the Company's products, lifting the automatic stay to enable the Talc Claims to proceed outside the bankruptcy forum with the Company agreeing to settle or pay any judgment against Imerys, and waiving the Company's indemnification claims against Imerys."  Johnson & Johnson, Annual Report (Form 10-K 2019), at 86 (February 18, 2020).

[23] The March 4, 2020 letter is annexed hereto as **Exhibit I**.

[24] In an email dated March 17, 2020, counsel for the Debtors stated "We have agreed with the FCR and the TC that we would not have separate discussions with you without their participation or consent."  A copy of this email exchange is attached as **Exhibit J**.  A further email from the Debtors' counsel, dated March 18, 2020, stated that they are not allowed to have a phone call with J&J without the FCR and TCC present.  A copy of this email exchange is attached as **Exhibit K**.  J&J was likewise unsuccessful in asking TCC's counsel to provide permission for its counsel to speak to the Debtors' counsel on the telephone without TCC/FCR participation.

WEIL:\97367400\36\54966.0222

Notice"), as contemplated by the 1989 SPA and 1989 SA, and its exclusive right to defend and resolve the J&J Talc Claims on behalf of the Debtors.

(b) **Notice to Parties in Interest**.  Within fourteen (14) days of entry of the Lift Stay Order, the Debtors, in consultation with J&J, will file and serve upon all parties in interest, the United States Trustee for the District of Delaware, and any other party requesting notice pursuant to Bankruptcy Rule 2002 (i) a copy of the Lift Stay Order; (ii) the Assumption Notice; and (iii) lists of each action or proceeding (including any litigation, arbitration, mediation, negotiation, or other adversarial process) that is a J&J Talc Claim (A) that has been stayed as against the Debtors by application of the automatic stay (each, a "**Stayed Proceeding**"), including proceedings in which the Debtors filed a notice of suggestion of bankruptcy to put parties on notice of the stay of litigation with respect to the Debtors, but in which the Debtors were not removed as defendants; (B) in which a Debtor was dismissed as a defendant, or the proceeding was dismissed as against a Debtor, without prejudice (each, a "**Debtor-Dismissed Proceeding**"); and (C) that commenced after the Petition Date (or that will be commenced in the future) against J&J in which J&J believes the Debtors are appropriate co-defendants, whether or not the automatic stay would preclude the Debtors' being named as co-defendants absent the relief requested herein (each, a "**Postpetition Proceeding**" and together with any Stayed Proceeding or Debtor-Dismissed Proceedings, a "**Proceeding**").

(c) **Right to Appoint Counsel**.  J&J will be authorized to identify, appoint, and/or designate counsel ("**Appointed Counsel**") to represent the Debtors with respect to the Stayed Proceedings (and each Debtor-Dismissed Proceeding and Postpetition Proceeding, as may become necessary) in conformance with Section 11.4 of the 1989 SPA and will notify the Debtors of such designation.  The Debtors will have seven (7) days after receiving notice of J&J's proposed counsel to notify J&J in writing if the Debtors believe there is any conflict of interest in connection with or otherwise object to J&J's designated counsel, which conflict will be resolved in conformance with Section 11.4 of the 1989 SPA.  Upon the appointment or designation of counsel, the Debtors will cooperate in the defense and resolution of such Proceedings, and will within a reasonable time provide Appointed Counsel with all pleadings, correspondence, discovery, and existing attorney work product related to such proceedings.

(d) **Notices in Proceedings**.  Appointed Counsel in any Proceeding will serve a copy of the Lift Stay Order upon all parties to the Proceeding, file a notice of appearance in the applicable Proceeding, and file a notice on the applicable docket providing that the automatic stay of the Proceeding against the Debtors has been modified and the proceeding will continue as against the Debtors.  Appointed Counsel, at J&J's direction, will be authorized to (i) conduct the defense of the Debtors in the Proceeding, and/or (ii) settle J&J Talc Claims on behalf of the Debtors without prior Bankruptcy Court approval; *provided*, *however*, that such settlements will be covered by the J&J Indemnity Proposal and paid by J&J.

(e)  **Communication with Claimants' Counsel**.  Appointed Counsel will inform claimants' counsel of the impact of the Lift Stay Order on the J&J Talc Claims, including that (i) plaintiffs' exclusive means of recovery on their J&J Talc Claims are through commencement of a lawsuit or other non-bankruptcy proceeding against the Debtors and defended by J&J or Appointed Counsel on behalf of the Debtors, or through settlement with J&J or Appointed Counsel on behalf of the Debtors, and (ii) J&J is fully indemnifying the Debtors for the J&J Talc Claims, and confer with the claimants' counsel, if necessary, to determine a course of action to advance the Proceeding in light of the Lift Stay Order and the Debtors' participation in the Proceeding.  In any Debtor-Dismissed Proceeding in which the Debtors had been dismissed without prejudice as a co-defendant, or any Postpetition Proceeding in which the Debtors are not named co-defendants, J&J will make reasonable efforts, where feasible and if desired by claimants' counsel, to facilitate the addition or joinder of the applicable Debtor(s) as co-defendants in accordance with local procedural rules; *provided*, *however*, that if the Proceeding is beyond the discovery stage and claimants' counsel determines not to include the Debtors as co-defendants, J&J will not seek to add them.

(f)  **Proofs of J&J Talc Claims**.  J&J will notify any J&J Talc Claimant that files a proof of clam for its J&J Talc Claim in these chapter 11 cases that the defense and any resolution of such Claim will be conducted by J&J in the applicable non-bankruptcy forum and, if the J&J Talc Claimant is not already party to a Proceeding, that the J&J Talc Claimant must commence or join a Proceeding to recover on account of such Claim.  The Debtors will use reasonable best efforts to notify J&J of any proof of claim filed for a J&J Talc Claim.

(g)  **Debtors' Cooperation**.  The Debtors shall cooperate in good faith in the defense of J&J Talc Claims, including maintaining their attorney-client, attorney work product, and joint defense privilege claims vis a vis any talc claimant and making the Debtors' discoverable documents, witnesses, and experts available to J&J in the defense of the J&J Talc Claims or in any insurance coverage litigation relating to the J&J Talc Claims to the extent necessary.  Such witnesses and experts will provide truthful testimony consistent with testimony provided by the Debtors' witnesses and experts in past talc litigation.  In addition, the Debtors shall abide by the obligations of the agreements between J&J and the Debtors, including the obligations of good faith and fair dealing.

25.  As part of the Talc Litigation Protocol, if (and only if) this Motion is granted, J&J will waive the J&J Indemnity Claims and the J&J Indemnity Defenses (such waiver, the "**J&J Indemnity Claims and Defense Waiver**"), while settling numerous challenges to indemnity, as a condition to assuming the defense of and indemnifying the J&J Talc Claims; *provided*, *however*, that J&J reserves its rights to assert any defenses to indemnity based on actions or conduct of the

Debtors occurring after the Petition Date or taken in connection with these chapter 11 cases.[25]  In addition, as part of the Talc Litigation Protocol, J&J also reserves its rights to seek reimbursement from the Debtors' insurance carriers to the extent of coverage that would otherwise be available to pay the Debtors' legal costs and liability for J&J Talc Claims.

## RELIEF REQUESTED

26.     Under section 362(d)(1) of the Bankruptcy Code, J&J seeks entry of the Lift Stay Order, substantially in the form annexed hereto as **Exhibit A**, modifying the automatic stay to authorize (a) J&J to implement the Talc Litigation Protocol; (b) J&J Talc Claimants to pursue their J&J Talc Claims against the Debtors solely outside of the chapter 11 cases; and (c) J&J to enforce its rights to assume the defense of, and make decisions with respect to, resolution of the J&J Talc Claims and to have the exclusive right to resolve them; *provided*, *however*, that payment of any costs or recoveries and enforcement of any settlements or judgments with respect to the J&J Talc Claims obtained by the J&J Talc Claimants against the Debtors are recoverable only against J&J.[26]

27.     J&J will have "party in interest" standing in bankruptcy court proceedings to the extent they affect J&J or its litigation and defense of the J&J Talc Claims.

## BASIS FOR RELIEF REQUESTED

28.     The J&J Indemnity Provisions entitle J&J to control decisions as to whether to try or settle the J&J Talc Claims with respect to the J&J-Covered Years.[27]  If the Lift Stay Order is entered, J&J would be permitted to exercise its rights to assume the defense of and control

---

[25] J&J is not waiving any argument under the applicable agreements and/or applicable law that relate to any claims to indemnify for punitive damages liability.

[26] J&J believes it could ultimately obtain similar relief as requested in this Motion by filing a motion to compel assumption (or rejection) of the contracts containing the J&J Indemnity Provisions under section 365(a) of the Bankruptcy Code.  J&J reserves the right to file such a motion.

[27] *See* Ex. C, § 11.4.

WEIL:\97367400\36\54966.0222

decisions as to whether to resolve any J&J Talc Claims, and in connection therewith, would fully indemnify the Debtors for all J&J Talc Claims liability, offer the J&J Indemnity Claim and Defense Waiver, and implement the Talc Litigation Protocol.  Not only will J&J Talc Claimants receive a full recovery from J&J if they prevail in litigation of the J&J Talc Claims, but J&J's offer to defend and indemnify all J&J Talc Claims, regardless of whether any exposure was alleged in J&J-Covered Years, Debtor-Covered Years, or Gap Years, is a significant expansion of the J&J Indemnity Provisions.  J&J's February Offer thus confers significant benefits on the Debtors, the J&J Talc Claimants, and the Debtors' estates.  There is no conceivable harm that could result to the Debtors or their estates from the relief requested.

29.     J&J, on the other hand, would suffer prejudice if this Motion is denied.  Should the status quo continue, J&J will be prohibited from exercising its contractual rights to assume the defense of the Debtors in the J&J Talc Claims and to control settlement decisions, while presumably the Debtors will seek payment from J&J on the indemnity with respect to the J&J Talc Claims for the J&J-Covered Years.  The automatic stay should not permit the Debtors to realize the benefits of the J&J Indemnity Provisions without acknowledging the corresponding obligation to allow J&J to assume the defense of and authority to decide whether to resolve any of the underlying claims.  The potential harms to J&J far outweigh any potential prejudice to the Debtors, which as discussed above, is non-existent.  As a result, and for the reasons stated herein, cause exists to enter the Lift Stay Order and the enforcement of J&J's rights under the J&J Indemnity Provisions is in the best interests of the Debtors, their creditors, and their estates.

### A.     Cause Exists to Modify the Automatic Stay for Non-Bankruptcy Litigation of the J&J Talc Claims.

30.     Cause exists to modify the automatic stay for J&J to exercise its rights to assume the defense of the J&J Talc Claims—the very same claims that the Debtors allege precipitated

WEIL:\97367400\36\54966.0222

these chapter 11 cases—and indemnify the Debtors by implementing the Talc Litigation Protocol.

Section 362(d)(1) of the Bankruptcy Code provides, in relevant part, that:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or condition such stay—
>
> (1) for cause . . .

11 U.S.C. § 362(d).

31.     Courts generally consider three factors (the "*Rexene* Factors") to determine whether "cause" exists to permit the continuation of prepetition litigation outside the bankruptcy court:

> (a) whether any great prejudice would be suffered by the debtor or its estate by the continuation of such litigation;
>
> (b) whether the hardship to the movant caused by maintenance of the stay outweighs the hardship to the debtor from its modification; and
>
> (c) the probability of success by the movant on the merits of such litigation if the stay is lifted.

*See*, *e.g.*, *In re Cont'l Airlines, Inc.*, 152 B.R. 420, 424 (D. Del. 1993); *In re Pro Football Weekly*, 60 B.R. 824, 826 (N.D. Ill. 1986); *In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 718 (Bankr. D. Del. 1996); *In re Rexene Products. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992); *In re Namazi*, 106 B.R. 93, 94 (Bankr. E.D. Va. 1989).  As shown in more detail below, application of the *Rexene* factors to these chapter 11 cases demonstrates convincingly that "cause" exists to grant the relief requested by J&J.

32.     The Bankruptcy Code's policy underlying imposition of the automatic stay supports permitting the Lawsuits to continue in their original forums.  Notably, Congress designed the automatic stay to relieve a debtor of "the financial pressures that drove [it] into bankruptcy" and to protect a debtor and its estate from being whittled away by creditors' lawsuits.  *Borman v. Raymark Indus., Inc.*, 946 F.2d 1031, 1033 (3d Cir. 1991) (quoting H. Rep. No. 95-595, 95th

Cong., 1st Sess., 340 (1977)).  Where proceedings will neither interfere with the debtor's pending

bankruptcy case nor result in any great prejudice to the debtor's bankruptcy estate, however, these

policies are not implicated, and "cause" exists to terminate or otherwise modify the stay.

33.    Because the relief requested does not impinge upon the Debtors' equity in property

of the estate, the burden of proof rests squarely on any non-movant to demonstrate that no cause

exists to lift the automatic stay.  *See* 11 U.S.C. 362(g) ("In any hearing under subsection (d) . . .

concerning relief from the [automatic] stay . . . (1) the party requesting such relief has the burden

of proof on the issue of the debtor's equity in property; and (2) the party opposing such relief has

the burden of proof on all other issues."); *see also In re Abeinsa Holding, Inc.*, Case No. 16-10790

(KJC), 2016 WL 5867039, at *3 ("Since the Debtors' equity in property is not at issue here, the

burden to resist lifting of the stay rests entirely with the Debtor . . . [section 362 of the Bankruptcy

Code], by its burden shifting, seems almost [] to ask, 'why shouldn't the stay be lifted?'").

1.    *Lifting the Automatic Stay Will Not Prejudice the Debtors or their Estates and Will Not Impact Property of the Estate (Other than Property that Otherwise May Be Used to Pay J&J Talc Claims).*

34.    Neither the Debtors nor their estates will be prejudiced if the automatic stay is

modified, as requested by J&J.  To the contrary, the relief requested provides a substantial benefit

to the Debtors' estates by (i) removing the J&J Talc Claims from the claims that must be resolved

in these chapter 11 cases and guaranteeing their payment in full to the extent they prove

meritorious, (ii) offering to defend and indemnify J&J Talc Claims for Debtor-Covered Years and

the Gap Years that would not be covered by the J&J Indemnity Provisions, and (iii) J&J waiving

its indemnity claims against the Debtors in the Debtor-Covered Years.

35.    The first benefit to the Debtors is the elimination from the Debtors' estates of over

ten thousand claims, leaving more assets to cover any remaining claims against the Debtors.  The

only claims that would be left encumbering the Debtors' estates are claims that will receive a better

recovery from the value of the business. The Debtors contend that they "lack the financial wherewithal to litigate against the mounting Talc Claims . . . asserted against them in the tort system." First Day Declaration, ¶ 9. A vast majority of these claims are J&J Talc Claims that are covered by J&J's offer to defend and indemnify the Debtors. The relief requested in this Motion, therefore, provides a substantial benefit to the Debtors by relieving them of the financial burdens of J&J Talc Claim liabilities and defense costs that allegedly led to their bankruptcy filings. It cannot be credibly argued that this financial boon to the Debtors (and as a result, their creditors) in any way prejudices the Debtors or their estates.

36.    Far from "interfer[ing] with the orderly liquidation or rehabilitation of the debtor," *In re Tribune Co.*, 418 B.R. at 127 (quoting *Rexene*, 141 B.R. at 576), modifying the stay to allow J&J to assume the defense of and indemnify the J&J Talc Claims would promote the orderly reconciliation of the much fewer remaining claims against the Debtors and the Debtors' reorganization while simultaneously reducing the burden on this Court's docket. *See In re Glunk*, 342 B.R. 717, 741-42 (Bankr. E.D. Pa. 2006) ("In enacting § 362(d)(1), Congress recognized that 'it will often be more appropriate to permit proceedings to continue in their place of origin . . . to relieve the bankruptcy court from many duties that may be handled elsewhere.'" (internal citations omitted)). The Debtors' estates will have more resources to pay other creditors because J&J's indemnity of the J&J Talc Claims will reduce the Debtors' liabilities to a mere fraction of their current level and eliminate most of the transaction costs the Debtors would otherwise incur in administering the J&J Talc Claims.

37.    The second benefit to the Debtors' estates is the elimination of litigation and uncertainty regarding the Unresolved Indemnity Issues, which would be replaced by J&J's guarantee of indemnifying all J&J Talc Claims if liability is established. Without the relief

requested in this Motion, the Unresolved Indemnity Issues likely will be hotly disputed and litigated among the parties, and parties would litigate numerous complex issues before the J&J Indemnity Provisions would be applied to individual J&J Talc Claims.[28]  Specifically, absent entry of the Lift Stay Order, and assuming the Debtors can assume (and potentially, assign to a trust) the J&J Indemnity Provisions under section 365(a) of the Bankruptcy Code (which is highly doubtful),[29] if the Debtors, the trustee of a section 524(g) trust or other trust, or the J&J Talc Claimants pursue indemnification claims against J&J, litigation costs will not end with the establishment of a trust.  Quite to the contrary, to the extent any chapter 11 plan seeks to pursue indemnification claims against J&J post-confirmation, J&J intends to raise and pursue— vigorously—each and every one of the J&J Indemnity Defenses.

38.    Under the Talc Litigation Protocol, on the other hand, J&J will provide the J&J Indemnity Claim and Defense Waiver, obviating the need for such litigation.  Thus, although J&J reserves its rights to defend against any indemnity should this Motion be denied (and believes it has meritorious defenses), as a part of the Talc Litigation Protocol, J&J proposes to indemnify the Debtors beyond J&J's contractual obligations for all J&J Talc Claims and waive its indemnity claims against the Debtors.  That is, J&J's voluntary assumption of the defense and offer of

---

[28] The 1989 SA contains a carve-out for J&J's indemnity obligations if the talc provided by Windsor/ITV did not conform to specifications.  *See* Ex. B, § 11 ("[J&J] shall have no obligation of indemnification pursuant to this Section 11 in the event that the Talc delivered to [J&J] hereunder did not conform to the specifications for such Talc then in effect . . .").

[29] The Debtors believe the agreements that contain the J&J Indemnity Provisions, like the 1989 SA and 1989 SPA, are "executory contracts" within the meaning of section 365(a) of the Bankruptcy Code.  To the extent the Debtors can still cure their defaults under these agreements (which J&J suspects is not the case), the Debtors would need to do so to enforce their indemnity rights against J&J.  The agreements would be assumed *cum onere*—that is, if the Debtors seek to take advantage of their rights to indemnity in the J&J Indemnity Provisions, they must also permit J&J to exercise its own rights under the agreements—the right to assume the defense.  Regardless, if the Debtors seek to assume the J&J Indemnity Provisions after negotiating and settling with the J&J Talc Claimants without sufficient incentives to resist the J&J Talc Claimants' overreaching, the Debtors' breach will likely be incurable to the extent J&J was excluded from negotiations to its detriment, and the J&J Indemnity Provisions would not be able to be assumed and enforceable against J&J.

WEIL:\97367400\36\54966.0222

indemnity with respect to the J&J Talc Claims will eliminate the Debtors' transactional and litigation costs with respect to such claims and improve recoveries on any meritorious claims.

39.    The third benefit to the Debtors' estates is the elimination of J&J's indemnity claims against the Debtors.  As explained above, depending on the timeframe of the plaintiffs' claimed product use, if the Motion is denied, the Debtors will also owe J&J indemnity for a portion of the J&J Talc Claims.  If (and only if) this Motion is granted, J&J agrees to waive its right to seek compensation on its otherwise valid and enforceable contractual indemnity rights against the Debtors and to withdraw J&J's proofs of claims with prejudice.  These waivers provide substantial benefits to the Debtors and their estates and creditors, making it even more compelling that "cause" exists to lift the stay.

40.    Courts have acknowledged in other contexts that the stay should be lifted to allow plaintiffs to pursue tort claims where a third party will bear in full the costs of defense and pay any judgments, because in those circumstances the impact on the debtor and its estate is minimal—the debtor does not incur defense costs with respect to the claims, and any judgment against the debtor would be paid by the third party.  *See, e.g.*, *In re Armstrong World Indus.*, 106 F. App'x 785, 787 (3d Cir. 2004) (affirming the district court's order lifting the automatic stay to allow plaintiffs to pursue their claims against the debtor outside the bankruptcy forum but only for the purpose of collecting from the debtor's insurance policies).[30]

---

[30] *See also IBM v. Fernstrom Storage & Van Co. (In re Fernstrom Storage & Van Co.)*, 938 F.2d 731 (7th Cir. 1991) (lifting the automatic stay to allow civil litigation against the debtor to proceed so that a liability determination could be made in order for a claimant to collect form the debtor's insurer); *In re Downey Fin. Corp.*, 428 B.R. 595, 611 (Bankr. D. Del. 2010) (finding "cause" existed to lift the automatic stay because claims were being made only against the debtor's insurance policies); *In re Desa Holdings Corp.*, 353 B.R. 419, 422 (Bankr. D. Del. 2006) (noting that the automatic stay was lifted to allow a plaintiff to pursue a personal injury claim against a debtor but limiting the plaintiffs' recovery to applicable insurance coverage); *In re Desoto*, 2006 Bankr. LEXIS 4115, at *16–17 (Bankr. D.N.J. Apr. 20, 2006) (lifting the automatic stay to permit a legal malpractice action against a debtor to proceed in state court but only permitting recovery from the debtor's insurance and not the debtor's personal assets); *In re Winterland*, 101 B.R. 547, 549 (Bankr. C.D. Ill. 1988) (finding "cause" existed to lift the automatic stay because the movant only sought to lift the stay to the extent insurance coverage was available, resulting in a lack of prejudice to

41.    Such is the case here.  If the Motion is granted, J&J will indemnify the Debtors for losses related to the J&J Talc Claims—uncapped and irrespective of the ultimate allowed amount of J&J Talc Claims (as determined in the tort system).  Moreover, J&J has agreed to defend the Debtors against the J&J Talc Claims.  Therefore, there is no concern of depletion of estate assets or unfair treatment to other creditors.    Accordingly, the Debtors would experience no great prejudice if the J&J Talc Claims proceed in the tort system as provided for in this Motion.

2.    _The Balance of the Hardships Weighs in Favor of J&J Because J&J Will Suffer Significant Hardship if the Stay Is Not Lifted._

42.    Absent relief from the stay to implement the Talc Litigation Protocol, J&J will suffer significant hardship, as compared to the lack of any hardship to the Debtors (and indeed a benefit to the Debtors) if the stay is modified.

43.    If the stay is not modified, J&J will be deprived of a fundamental benefit of its bargain to indemnify the Debtors—the right to control the defense of the Debtors and decision as to whether to settle any of the J&J Talc Claims (that J&J may have a duty to indemnify).  J&J is the party that is most willing, able, and motivated to defend the J&J Talc Claims because of the J&J Indemnity Provisions.  In contrast, the Debtors may not be incentivized to defend and reconcile the J&J Talc Claims diligently in light of the numerous statements made by the Debtors that they seek to settle with the TCC and FCR to the exclusion of J&J and seek indemnity from J&J for the J&J Talc Claims.[31]  It is the classic case of moral hazard.  The mismatch of motivations

---

the debtor); _cf. Royal Ins. Co. of Am. v. McCrory Corp._, 1996 U.S. Dist. LEXIS 5552, at *2 (S.D.N.Y. Apr. 23, 1996) (reversing a bankruptcy court order denying relief from the automatic stay when a creditor only sought relief from the stay to proceed nominally against the debtor in order to obtain proceeds of the debtor's insurance policy).

[31] To date, the Debtors have excluded J&J from settlement discussions with the TCC and the FCR, even in connection with the J&J Talc Claims.  In fact, in an email dated March 17, 2020, annexed hereto as **Exhibit J**, the Debtors' counsel informed J&J's counsel that the Debtors agreed with the TCC and FCR to not have any discussions with J&J without the participation or consent of the TCC and FCR.  The Debtors are apparently agreeing to such extreme measures to reach a deal with the TCC, the FCR, and the Debtors' parent but at the potential sacrifice of vigorously

of the indemnified party versus the party who ultimately may be on the hook for actually paying the claims, as exemplified here, is the reason why potential indemnitors negotiate for the right to assume the defense and control the litigation, like J&J did through the indemnity provisions in the 1989 SPA and the 1989 SA.[32]  The hardship J&J will suffer if the stay is not modified far outweighs any potential hardship to the Debtor if the Court modifies the stay (which, as explained above, is none at all).

44.     The relief requested herein will allow J&J to argue defenses to the J&J Talc Claims, resolve J&J Talc Claims, and satisfy any judgments on the Debtors' behalf (to the extent such claims prevail in the applicable forum) outside of the chapter 11 cases without affecting the assets of the estates.   It will also settle the Unresolved Indemnity Issues without complex post-confirmation litigation in this Court or, more likely, other non-bankruptcy forums.

45.     Moreover, the potential benefits to all creditors weigh in favor of granting this Motion. The J&J Talc Claimants will benefit from the requested modification of the automatic stay because, if such claimants prevail on the merits of their claims, they will obtain a full recovery from J&J, a highly solvent co-defendant, for the Debtors' portions of the liability (in addition to whatever recovery they would get from J&J on behalf of its apportionment of fault).  Because this treatment of the J&J Talc Claims essentially would take them out of the chapter 11 cases and render them unimpaired under section 1124(1) of the Bankruptcy Code, the J&J Talc Claimants would fare far better than they would under any plan the Debtors could propose, which would likely impair such Claims and limit their recovery to a discrete pool of funds.[33]  For both current

---

pursuing the Debtors' available defenses to the J&J Talc Claims.  The Debtors' refusal of the J&J Indemnity Proposals raises doubts as to whether the Debtors are engaging in good faith negotiations.

[32] *See, e.g.*, 1989 SPA § 11.4.

[33] *See, e.g.*, Debtors' *Motion for an Order Further Extending the Exclusive Periods within which to File a Chapter 11 Plan and Solicit Acceptances Thereof*, Case No. 19-10289 (LSS) (Dec. 6, 2019) [D.I. 1292], ¶ 12 ("the Debtors' goal in the Chapter 11 Cases is to efficiently negotiate a plan of reorganization resolving their talc-related personal injury

and future J&J Talc Claimants, J&J offers the potential of full recovery (with respect to legitimate claims), which is a remarkable and highly favorable outcome for such Claimants.

46.    In addition, many of the existing J&J Talc Claimants are already actively suing J&J (or would almost certainly do so in addition to seeking any recovery from the Debtors), so there is no significant administrative burden upon those J&J Talc Claimants to include the Debtors as defendants in the litigation against J&J and other co-defendants.  In fact, the J&J Talc Claimants avoid the cost of having to simultaneously negotiate their claims in the Debtors' chapter 11 cases and split their resources between multiple forums, because as previously discussed, a trust that is assigned the rights under the J&J Indemnity Provisions (to the extent possible) would need to litigate the J&J Indemnity Defenses before a recovery can be obtained from J&J.

47.    Lifting the automatic stay also benefits all other creditors that are not J&J Talc Claimants.  By removing the lion's share of the claims against the Debtors, J&J's proposed relief frees up assets of the Debtors to provide greater distributions to such other unsecured creditors.

48.    In light of the foregoing, no creditor of the Debtors will be prejudiced by the relief sought herein and it is implausible that any party could legitimately oppose this Motion with the best interests of creditors in mind.  The proposed relief treats the J&J Talc Claims exactly as they would be treated outside of bankruptcy, as if the Debtors never filed for chapter 11, other than replacing a potentially insolvent defendant with a highly solvent one.[34]  The J&J Talc Claimants would have their day in court in their chosen forums and be afforded the opportunity to be paid in

---

claims by establishing a funded trust and channeling injunction pursuant to sections 524(g) and 105(a) of the Bankruptcy Code").  For numerous reasons, including the potential need to reserve funds to satisfy future claims, distribution procedures for trusts under section 524(g) typically involve paying only a percentage of allowed claim amounts determined pursuant to those procedures—unlike the indemnity offered by J&J, which will result in final determinations of claim amounts in the tort system (potentially including through settlements) and, if necessary, full payment thereof.

[34] As of the date hereof, J&J has a market capitalization in excess of $326.6 billion.  *See* Bloomberg, JNJ company information and market quotes, available at https://www.bloomberg.com/quote/JNJ:US.

full to the extent the J&J Talc Claims are adjudicated to have merit or are otherwise settled.  The only conceivable reason claimants might oppose the requested relief is that they believe their claims will be treated better in these chapter 11 cases than being fully unimpaired and adjudicated outside of bankruptcy on their merits.  For example, claimants might seek to negotiate inflated claim estimates or a less-than-rigorous claim scrutiny process, which a debtor (and potentially its non-debtor parent and affiliates seeking to benefit from a channeling injunction) may be pressured to accept absent sufficient financial incentives to challenge them.  However, obtaining a recovery in bankruptcy more favorable to a claimant's entitlement outside of bankruptcy is inconsistent with the objectives and purposes of the Bankruptcy Code and is a result the United States Supreme Court has cautioned against.  *See Butner v. United States*, 440 U.S. 48, 55 (1979) ("It is an axiomatic principle of chapter 11 practice that creditors cannot be elevated to a better position than their pre-petition legal entitlements.").

49.     J&J attempted to accomplish the relief requested herein consensually with the Debtors through the November Offer and the February Offer.  Relief from the automatic stay through this Motion is a result of the Debtors' refusal of those offers.  And the Debtors and the J&J Talc Claimants alike benefit from the relief requested in this Motion because the Debtors' failure to accept the J&J Indemnity Proposals may provide J&J with a defense to any claim under the J&J Indemnity Provisions.  The J&J Indemnity Claim and Defense Waiver allows prevailing J&J Talc Claimants access to indemnity notwithstanding the Debtors' refusal as a means of offering a comprehensive resolution of the J&J Talc Claims and to assume the defense thereof.

50.     The relief requested by this Motion will also allow the most knowledgeable forums to determine the tort issues in these cases.  That is, determinations of various tort issues will require consideration of various state laws, which the multi-district litigation and other state courts may

WEIL:\97367400\36\54966.0222

be better suited—and, in fact, are designed—to do.  *See In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*, 401 F.3d 143, 146 (3d Cir. 2005) (discussing that the purpose of a multi-district litigation is to facilitate coordination among numerous state and federal suits which purport to concern the underlying conduct); *see also Matter of Royston Dev. Corp.*, 25 B.R. 715, 717 (Bankr. M.D. Fla. 1982) (holding that the most appropriate forum for the resolution of a dispute was the state court because issues presented must be decided solely on the basis of state law).  Moreover, modification of the automatic stay will promote judicial economy by resolving claims against the Debtor in the forum that is most familiar with the law associated with a resolution of such claims.  *In re Peterson*, 116 B.R. 247, 250 (D. Colo. 1990) ("[O]ne of the primary purposes in granting relief from the stay to permit claim liquidation is to economize judicial resources.").

51.     The likely benefits to the Debtors, their estates, and the J&J Talc Claimants if the relief requested herein is granted, versus the substantial prejudice likely to be suffered by J&J absent the relief requested herein, make the balancing test a lopsided affair in favor of modifying the stay.

> 3.     *The Success on the Merits Factor Should Not Be Weighed Heavily in Consideration of the Stay Relief Requested, But Still Weighs in Favor of Granting Such Relief.*

52.     Because J&J is agreeing to assume the Debtors' liability for the J&J Talc Claims, the ultimate outcome of the litigation is not relevant to the administration of the Debtors' estates. Therefore, J&J submits that this factor should not be considered by the Court.  Even assuming success on the merits is a relevant factor, however, J&J believes that it (and the Debtors as named parties) is likely to succeed on the merits of its defenses to the J&J Talc Claims.  The relief requested in this Motion allows J&J to pursue various meritorious defenses to the underlying claims to both J&J's and the Debtors' benefit.  Absent the relief requested in this Motion, while

26

J&J would preserve its J&J Indemnity Claims and J&J Indemnity Defenses, it may effectively be deprived of any means to argue its underlying defenses to J&J Talc Claims after they reach resolution as between the Debtors and the J&J Talc Claimants. Therefore, this factor weighs in favor of lifting the stay and allowing the J&J Talc Claims to proceed in the tort system.

**B.      Maintaining the Automatic Stay Will Not Further the Policies of and Purposes for the Automatic Stay.**

53.      As this Court has observed, in addition to considering the *prima facie* case for cause to lift the automatic stay, the Court should also consider the general policies underlying the automatic stay and whether they are furthered by denying the relief requested in a motion. *See In re Scarborough-St. James Corp.*, 535 B.R. 60 (Bankr. D. Del. 2015). The policies underlying the automatic stay do not favor enforcing the stay to prevent J&J's assumption of the defense and the indemnity of J&J Talc Claims.

54.      The Third Circuit has explained that the underlying purpose of the automatic stay is to "prevent certain creditors from gaining preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *In re W.R. Grace & Co.*, 2007 Bankr. LEXIS 1214, at *6-7 (Bankr. D. Del. Apr. 13, 2007) (citing *Borman v. Raymark Industries, Inc.,* 946 F.2d 1031, 1036 (3rd Cir. 1991)); *In re Tribune Co.*, 418 B.R. at 127. None of those purposes are furthered by continuing the application of the stay to the J&J Talc Claims in light of J&J's indemnity offer.

55.      *First*, no creditors would gain an unfair preference for their claims against the Debtors by lifting the stay. In fact, lifting the automatic stay would eliminate creditors of the Debtors' bankruptcy estates by removing the J&J Talc Claims, which would proceed in the tort system where the claimants could recover in full from J&J. The claims of other creditors in these

chapter 11 cases would remain stayed and be resolved through the bankruptcy process. Neither group of creditors would be skipping ahead of the other in preference. Therefore, no unfair advantage would occur by lifting the stay.

56.    *Second*, the Debtors' assets would not be depleted by allowing the J&J Talc Claims to proceed in the tort system. J&J is agreeing to indemnify and assume the defense and resolution of the J&J Talc Claims, relieving the Debtors of any go-forward defense costs for the J&J Talc Claims, and to indemnify the Debtors with respect to judgments against the Debtors. In addition, J&J would agree to waive any claims for indemnity, contribution, or reimbursement from the Debtors with respect to the J&J Talc Claims. The J&J Talc Claims are the vast majority of the Debtors' potential liabilities. Thus, there is no possibility that granting the relief requested will result in the Debtors' assets being depleted.

57.    *Third*, there would be no interference with the reorganization of the Debtors. Granting the Motion allows the Debtors to unload their largest liabilities—the liabilities that they assert drove them into bankruptcy. It will pave the wave for the Debtors to propose a much simpler plan of reorganization that allows them to emerge successfully from chapter 11 and provide the best possible result for the Debtors and their creditors.

58.    In addition, enforcing the stay in these circumstances would actually delay the administration of these chapter 11 cases because the J&J Talc Claims will presumably need to be liquidated or estimated by the Bankruptcy Court (whether for purposes of allowance, plan feasibility, or contributions to a trust). Allowing J&J to indemnify the Debtors for the J&J Talc Claims and assume the defense of such claims allows the chapter 11 cases to proceed without requiring any resolution or estimation of any of the J&J Talc Claims, which the Debtors claim precipitated the chapter 11 cases.

WEIL:\97367400\36\54966.0222

59.     Although not an enumerated policy underlying the automatic stay, the interests of judicial economy are also best served by the requested stay modification.  Lifting the stay would advance the orderly progress of the cases, rather than staying them as against the Debtors only, which creates discontinuities and inefficiencies between multiple forums, and skews participating parties' incentives.  Modifying the stay therefore minimizes the prejudice suffered by the non-debtor defendants like J&J, as well as the plaintiffs who may be litigating in two forums.  It is far more efficient for common issues raised in the talc litigation and claims against both the Debtors and J&J to be resolved once, in combined non-bankruptcy forum litigation (with J&J assuming the Debtors' defense and indemnifying the Debtors for losses).

60.     The stay, thus, should be lifted to allow J&J to indemnify and assume the defense of the J&J Talc Claims because J&J's indemnification offer will eliminate the very harms the automatic stay was intended to alleviate.

## CONSENT TO JURISDICTION

61.     Pursuant to Local Rule 9013-1(f), J&J consents to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties; *provided*, *however*, that J&J submits to the Court's jurisdiction for the limited purposes of the Court's determination as to the lifting of the automatic stay under section 362(a) of the Bankruptcy Code for J&J to assume the defense of the J&J Talc Claims from the Debtors and to indemnify the Debtors with respect thereto, and not in connection with any findings related to the scope of the J&J Indemnity Provisions, the merits of claims and defenses waived by the J&J Indemnity Claim and Defense Waiver, or any other issue.

WEIL:\97367400\36\54966.0222

## NOTICE

62.    Notice of this Motion will be given to: (a) counsel for the Debtors; (b) the Office of the United States Trustee for the District of Delaware; (c) counsel for the TCC; (d) counsel for the FCR; and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1.  J&J submits that, under the circumstances, no other further notice is required.

63.    A  copy  of  this  Motion  is  available  on  (a)  the  Court's  website: www.deb.uscourts.gov,  and  (b)  the  website  maintained  by  the  Debtors'  Claims  and  Noticing Agent, Prime Clerk LLC, at https://cases.primeclerk.com/imerystalc.

## CONCLUSION

64.    For the reasons stated herein, J&J asks this Court to enter an order substantially in the form attached hereto as **Exhibit A**, granting relief from the stay under Bankruptcy Code section 362(a) to allow J&J to assume the defense of the J&J Talc Claims and indemnify the Debtors with respect to any costs and judgments in respect thereof, and such other and further relief as the Court deems just and proper.

WEIL:\97367400\36\54966.0222

Dated:  March 20, 2020
        Wilmington, Delaware

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Patrick A. Jackson*
Patrick A. Jackson (Del. Bar No. 4976)
222 Delaware Ave., Ste. 1410
Wilmington, Delaware 19801
Telephone: (302) 467-4210
Facsimile: (302) 651-7701
Patrick.Jackson@faegredrinker.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
Diane P. Sullivan (admitted *pro hac vice*)
Gary T. Holtzer
Ronit J. Berkovich (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Johnson & Johnson and Johnson & Johnson Consumer Inc.*

WEIL:\97367400\36\54966.0222