**<u>Exhibit A</u>**

**Proposed Order**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| **In re** | Chapter 11 |
| **IMERYS TALC AMERICA, INC.,** *et al.*[1] | Case No. 19–10289 (LSS) |
| **Debtors.** | Jointly Administered |
|  | **Ref. Dkt. No. __** |

### ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 362(d), FED. R. BANKR. P. 4001, AND LOCAL RULE 4001-1 MODIFYING AUTOMATIC STAY TO PERMIT J&J TO SEND NOTICE ASSUMING DEFENSE OF CERTAIN TALC CLAIMS AND TO IMPLEMENT TALC LITIGATION PROTOCOL

Upon consideration of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s *Motion Pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order Modifying Automatic Stay to Permit J&J to Send Notice Assuming Defense of Certain Talc Claims and Implement Talc Litigation Protocol* (the "**Motion**"),[2] dated March 20, 2020, pursuant to which Johnson & Johnson and Johnson & Johnson Consumer Inc. (collectively, "**J&J**") sought entry of an order pursuant to section 362(d)(1) of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") modifying the automatic stay: (i) to permit J&J Talc Claimants to pursue J&J Talc Claims against the Debtors nominally; (ii) for J&J to send notice of J&J's assumption of the defense of all J&J Talc Claims; and (iii) to take certain other actions set forth in

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

the Talc Litigation Protocol to assume the defense of and indemnify the Debtors for the J&J Talc Claims, as more fully detailed in the Motion; and this Court having jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor:

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as set forth herein.

2.      The automatic stay imposed by section 362(a) of the Bankruptcy Code shall be modified as of the date hereof so that (a) the J&J Talc Claimants may pursue their J&J Talc Claims against the Debtors solely outside of these chapter 11 cases and (b) J&J may assume the defense of the J&J Talc Claims and to exclusively control the resolution of the J&J Talc Claims.

3.      J&J is authorized to implement the Talc Litigation Protocol and the Debtors are directed to cooperate in the implementation thereof.  The J&J Indemnity Claims and Defense Waiver is effective, subject to the reservations in the Motion.  J&J is authorized to take any other actions necessary to effectuate the relief granted pursuant to this Order.

WEIL:\97367400\36\54966.0222

4.      The Debtors waive their rights to assert indemnification under the J&J Indemnity Provisions against J&J with respect to such any J&J Talc Claim the Debtors resolved without J&J's participation.

5.      J&J's rights to seek reimbursement from the Debtors' insurance carriers to the extent of coverage that would otherwise be available to pay the Debtors' legal costs and liability for J&J Talc Claims are reserved.

6.      J&J shall have "party in interest" standing in the Debtors' chapter 11 cases to the extent that any proceedings in these cases affect J&J or its litigation and defense of the J&J Talc Claims.

7.      Nothing herein shall alter or affect any parties' obligations to preserve and maintain all books and record relevant or potentially relevant to the J&J Talc Claims in a manner consistent with the applicable provisions of Rules 26 and 34 of the Federal Rules of Civil Procedure.

8.      This Order shall be fully effective and enforceable immediately upon its entry.

9.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

WEIL:\97367400\36\54966.0222

**<u>EXHIBIT B</u>**

CONFIDENTIAL

TALC SUPPLY AGREEMENT

BETWEEN

WINDSOR MINERALS INC.

AND

JOHNSON & JOHNSON BABY PRODUCTS COMPANY,
A DIVISION OF
JOHNSON & JOHNSON CONSUMER PRODUCTS, INC.

DATED

CONFIDENTIAL

JANUARY 6, 1989

Protected Document--Subject to Protective Order

JNJ 000066674

## TABLE OF CONTENTS

| Section | | | | Page |
|---|---|---|---|---|
| 1. | Seller's Covenants | | | 3 |
| 2. | Term of Agreement | | | 4 |
| | (a) | Initial Term | | 4 |
| | (b) | Additional Terms | | 4 |
| 3. | Exclusivity; Minimum Purchases | | | 5 |
| | (a) | Buyer's Requirements | | 5 |
| | (b) | Shear Disc | | 6 |
| | (c) | Minimum Purchases | | 10 |
| | | (i) | Initial Term-First Five Years | 10 |
| | | (ii) | Initial Term-Second Five Years | 11 |
| 4. | Price | | | 11 |
| | (a) | Base Price | | 11 |
| | (b) | Annual Price Adjustment | | 12 |
| | | (i) | Definitions | 13 |
| | | | (A) Adjusted Price | 13 |
| | | | (B) Base Deflator | 13 |
| | | | (C) New Deflator | 14 |
| | | | (D) Base Market Basket Price | 14 |
| | | | (E) New Market Basket Price | 14 |
| | | | (F) Market Basket Price Determination | 14 |
| | | (ii) | Price Adjustment Factors | 15 |
| | | | (A) GNP Factor | 15 |
| | | | (B) Market Basket Factor | 15 |
| | | (iii) | Adjustment Formula | 15 |
| | | (iv) | Substitute Deflators | 16 |
| | | (v) | Resetting Deflators, Prices | 16 |
| | (c) | Additional Price Adjustment | | 17 |
| | (d) | Price Reopeners | | 17 |
| | (e) | Hardship | | 18 |
| | | (i) | Buyer's Hardship | 20 |
| | | (ii) | Seller's Hardship | 23 |
| 5. | Orders; Payment | | | 23 |
| | (a) | Purchase Estimates | | 23 |
| | (b) | Orders | | 24 |
| | (c) | Cooperation; Priority | | 24 |
| | (d) | Title; Risk; Mode of Delivery | | 25 |
| | (e) | Payment | | 25 |

Protected Document--subject to Protective Order                    JNJ 000066675

| Section | | | Page |
|---|---|---|---|
| 6. | Specifications; Quality.............................. | | 25 |
| | (a) | Source ............................................ | 25 |
| | (b) | Quality Standards................................. | 27 |
| | (c) | Good Manufacturing Procedures and Standard Operating Procedures............................... | 28 |
| | (d) | Price Adjustments................................. | 28 |
| | | (i) Final Product Specifications............. | 28 |
| | | (ii) Mining Regulations...................... | 29 |
| | | (iii) Cost Savings........................... | 30 |
| | | (iv) Column Flotation....................... | 32 |
| | (e) | Ship-to-Stock Certification Requirements......... | 32 |
| | (f) | Inspection, Acceptance............................ | 33 |
| | | (i) Non-Microbiological Specifications...... | 33 |
| | | (ii) Microbiological Specifications.......... | 34 |
| | | (iii) Event of Non-Conformance.............. | 35 |
| | (g) | Buyer's Remedies for Non-Conformance............. | 36 |
| | (h) | Future Collaboration.............................. | 37 |
| 7. | Secrecy ................................................ | | 37 |
| 8. | Termination ........................................... | | 38 |
| | (a) | Bankruptcy......................................... | 38 |
| | (b) | Breach ............................................ | 39 |
| | (c) | Sale of Assets or Business....................... | 39 |
| 9. | Force Majeure.......................................... | | 41 |
| | (a) | Events of Force Majeure........................... | 41 |
| | (b) | Buyer's Force Majeure............................. | 42 |
| | (c) | Seller's Force Majeure............................ | 43 |
| | (d) | Limitation......................................... | 44 |
| 10. | Seller's Indemnity.................................... | | 44 |
| 11. | Buyer's Indemnity..................................... | | 45 |
| 12. | Promotion ............................................. | | 46 |
| 13. | Warranty; Apportionment .............................. | | 47 |
| | (a) | Warranty........................................... | 47 |
| | (b) | Apportionment...................................... | 47 |
| 14. | Product Development................................... | | 49 |
| 15. | Miscellaneous......................................... | | 51 |
| | (a) | Parties in Interest; Assignment................... | 51 |
| | (b) | Notices............................................ | 51 |
| | (c) | Entire Agreement.................................. | 52 |
| | (d) | Modification....................................... | 53 |
| | (e) | Waiver ............................................ | 53 |
| | (f) | Governing Law...................................... | 53 |

(ii)

JNJ 000066676

| (g) | Severability | 53 |
| (h) | Headings | 54 |
| (i) | Mutual Negotiation | 54 |
| (j) | Obligations of Buyer | 54 |

## EXHIBITS

**Exhibit A**  Good Manufacturing Procedures; Standard Operating
             Procedures
**Exhibit B**  Arbitration
**Exhibit C**  Sample Hardship Calculation
**Exhibit D**  Argonaut and Hammondsville Ore Bodies
**Exhibit E**  Quality Standards
**Exhibit F**  Ship-to-Stock Certification Requirements

Protected Document--Subject to Protective Order

JNJ 000066677

## TALC SUPPLY AGREEMENT

THIS TALC SUPPLY AGREEMENT, is made and entered into this sixth day of January, 1989 (the "Agreement"), between WINDSOR MINERALS INC., a Vermont corporation ("Seller"), and JOHNSON & JOHNSON BABY PRODUCTS COMPANY, a division of JOHNSON & JOHNSON CONSUMER PRODUCTS, INC., a New Jersey corporation ("Buyer").

## W I T N E S S E T H

WHEREAS, Johnson & Johnson, a New Jersey corporation (the parent of Buyer), has agreed to sell, and Cyprus Mines Corporation, a Delaware corporation, (the parent of Seller, referred to herein as "Cyprus") has agreed to purchase, all the capital stock of Seller, pursuant to an Agreement dated January 6, 1989 (the "Windsor Agreement");

WHEREAS, Seller, to date, has sold to Buyer and its corporate affiliates, all of Buyer's United States cosmetic talc requirements;

WHEREAS, Buyer sells cosmetic grade talc products in the consumer market which are manufactured from the talc Buyer purchases from Seller;



-2-

TC-29178

Protected Document--subject to Protective Order

JNJ 000066678

WHEREAS, Buyer desires to maintain the quality of the cosmetic talc products it produces, and therefore desires to continue to receive high quality talc from ore sources which it has qualified, or from new sources which are owned or controlled by Seller or its affiliates and approved by Buyer, which high quality talc is used by Buyer for cosmetic applications, as the term "cosmetic" is defined in the Food, Drug and Cosmetic Act, 21 U.S.C.A. § 321 (1972) (the "Talc").

WHEREAS, Seller desires to continue to sell and deliver, and Buyer desires to continue to purchase, pay for and receive Buyer's domestic requirements for Talc on the terms and conditions herein set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Seller's Covenants.  Seller covenants to Buyer that, during the term of this Agreement, Seller shall:  (a) keep proper books of record and account relating to Buyer's purchases of Talc from Seller in which true entries shall be made of its transactions in accordance with generally accepted accounting principles and the provisions of this Agreement; and (b) maintain its mining properties and processing facilities in good repair, working

— 3 —

75AC6808

   JNJ 000066679

order and condition to the extent necessary to perform Seller's obligations hereunder.

2. Term of Agreement.

(a) Initial Term. The initial term of this Agreement (the "Initial Term") shall commence on the later of the date first above written or the Closing Date specified in the Windsor Agreement (the "Commencement Date"), and, unless sooner terminated pursuant to the terms of Agreement, shall expire at the close of business on December 31, 1998. For the purposes of this Agreement, the term "Calendar Year" shall mean the twelve (12) month period commencing on any January 1 and ending on the subsequent December 31.

(b) Additional Terms. Prior to March 31, 1998, or such later date as the parties may agree, Buyer and Seller shall conclude good faith negotiations concerning amendments or modifications to this Agreement, if any, which shall apply to an additional term of five (5) years from and after January 1, 1999 (the "Additional Term"). In the event that the parties shall agree to enter into an Additional Term, the term of this Agreement may be extended for such Additional Term on the terms and conditions set forth in this Agreement, as modified by any valid amendment hereto. In the event that Buyer and Seller fail to execute a valid amendment extending this Agreement for the Additional Term on or before March 31, 1998, Buyer shall have the

- 4 -

TSAGSRUS

PROTECTED Document--subject to Protective Order

JNJ 000066680

right to solicit bids from, and to negotiate (before July 31, 1998) a talc supply agreement to be effective from and after January 1, 1999, with any third party; provided, however, that prior to entering into a talc supply agreement with such third party, Seller shall have the right, on or before October 1, 1998, to meet the terms and conditions which Buyer has reached with such third party. In the event that Seller's offer is substantially equivalent to or is more favorable than such third party's terms and conditions, Buyer shall enter into a talc supply agreement with Seller commencing January 1. 1999.

## 3.   Exclusivity; Minimum Purchases.

(a) _ Buyer's Requirements. Subject to the provisions of Section 3(c) hereof, Buyer shall purchase from Seller, and Buyer shall cause all of its United States Affiliates (as such term is defined in Section 8(c) hereof) to purchase from Seller/ one hundred percent (100%) of the Talc requirements of Buyer and Buyer's Affiliates for products manufactured by Buyer and Buyer's Affiliates in the United States during the first five (5) years of the Initial Term, and not less than ninety-eight percent (98%) of the Talc requirements of Buyer and Buyer's Affiliates for products manufactured by Buyer and Buyer's Affiliates in the United States during the second five (5) years of the Initial Term. (For the purposes of this Agreement, the term "Buyer" shall include Buyer's Affiliates; and the phrase "manufactured by Buyer" shall include, without limitation, the production or

- 5 -

TSACSRDS

JMJ 000066081

manufacture by, for, or on behalf of, or by license or other authority of, Buyer or Buyer's Affiliates.)   The assignment of this Agreement to a third party purchaser shall be a precondition to any sale of Buyer's business or assets, or the business or assets of any of Buyer's Affiliates utilizing Talc in the manufacture of consumer products, or the sale of any line of consumer products belonging to Buyer or Buyer's Affiliates. Seller shall not unreasonably Withhold its consent to the assignment of this Agreement by Buyer to a third party purchaser.   Provided that Buyer is not in default under the provisions of Section 5(b) hereof, Seller agrees to use its best reasonable commercial efforts to ensure Seller's ability to fill purchase orders submitted by Buyer pursuant to Section 5(b) hereof prior to committing to fill orders for third party purchasers of floated talc products from Seller's West Windsor Mill.   Buyer agrees to make available to Price Waterhouse, on a confidential basis, such documentation as may be necessary in order to permit such third party to verify Buyer's compliance with Buyer's purchase requirements pursuant to this Section 3(a).

    (b)    Shear Disc.   The Talc heretofore sold by Seller to Buyer has been manufactured using a process referred to herein as the "Shear Disc Process".   That certain piece of equipment used to manufacture the Talc heretofore sold by Seller to Buyer is referred to herein as the "Shear Disc Device".   Title to the Shear Disc Process and the Shear Disc Device remained in Buyer pursuant to the Windsor Agreement, and Buyer hereby agrees to

- 6 -

Protected Document--subject to Protective Order

JNJ 000066682

license the Shear Disc Process and the Shear Disc Device to Seller without fee, cost or royalty. The parties recognize that affiliates of Seller own equipment utilizing technology similar to that utilized by the Shear Disc Process. Notwithstanding the continued or future use of such similar equipment and technology by affiliates of Seller, Seller has agreed that during the Initial Term or any Additional Term hereof, Seller shall utilize Buyer's Shear Disc Device only in the manufacture of cosmetic tale products for sale to Buyer and Buyer's affiliates; provided, however, that Seller may use the Shear Disc Process or the Shear Disc Device at Seller's West Windsor Mill to produce talc products for any customer utilizing such products in non-cosmetic tale applications; and provided, further, that nothing contained herein shall preclude the use by Seller of any proprietary technology or intellectual property owned by Seller or Seller's Affiliates (as such term is defined in Section 8(c) hereof) for any purpose, whether such technology or intellectual property is similar or dissimilar to the Shear Disc Process or the Shear Disc Device. In addition, nothing contained in this Section 3(b) shall in any way restrict or impair Seller's right to use, disclose, or otherwise deal with any trade secret, information, data or other intellectual property proprietary to Buyer which: (a) at the time of the disclosure is generally available to the public or thereafter becomes generally available to the public, by publication or otherwise, through no act of Seller; or (b) Seller can show was in its possession prior to the time of the disclosure to it and was not acquired, directly or indirectly,

- 7 -

75AC8808

Protected Document--subject to Protective Order

from Buyer or any other source bound by a confidentiality agreement with Buyer; or (c) Seller can show was received by it as a matter of lawful right after the time of disclosure from a third party who did not acquire it from Buyer or any of its parent, affiliate or subsidiary companies under an obligation of confidentiality.

During the Initial Term and any Additional Term hereof, Seller agrees to: (i) service, repair and maintain the Shear Disc Device as necessary to maintain it in good working order for the benefit of Buyer, to keep it free of all claims, pledges, liens, encumbrances, levies, attachments, security interests, or other claims affecting title thereto; and (ii) operate the Shear Disc Device in accordance with the Good Manufacturing Procedures and Standard Operating Procedures developed and practiced by Seller prior to the Commencement Date, a copy of which is attached hereto as Exhibit "A" and is by this reference incorporated herein. Such procedures may be amended from time to time as Buyer and Seller may mutually agree in writing in accordance with Sections 6(c) and 15(d) hereof.

Seller recognizes that the Shear Disc Device and its use are confidential and proprietary to Johnson & Johnson, and constitute a valuable trade secret of Johnson & Johnson. In accordance with the provisions of Section 7 hereof, but subject to the pre-existing availability of similar technology, equipment and processes, Seller agrees to take reasonable precautions during

- 8 -

75AG8808

the Initial Term hereof: (A) to maintain such trade secret status; (B) not to license or disclose the Shear Disc Device or the Shear Disc Process to any third party; and (C) not to duplicate in whole or in part any portion of the Shear Disc Device except as may be required for the repair or maintenance of the same of the benefit of Buyer. Buyer agrees that during the Initial Term hereof, it shall not license or disclose the Shear Disc Device or the Shear Disc Process to any third party. In the event that the parties are unable before March 31, 1998 to extend/ this Agreement for an Additional Term. Buyer shall have the right to disclose to third parties the existence of the Shear Disc Device and the Shear Disc Process from and after April 1, 1998. In the event that Buyer concludes an agreement for the supply of Talc from a third party, Buyer shall grant Seller a perpetual license to use the Shear Disc Device and the Shear Disc Process for the purpose of continuing to produce talc products for non-cosmetic talc applications. The consideration for such license shall be One Dollar ($1.00).

Buyer shall indemnify, defend and hold harmless Seller from and against all claims, actions, damages, costs and expenses (including attorneys' fees) arising out of any cause of action or proceeding against Seller claiming infringement, violation or other interference with any patent, trademark, trade name, trade secret or other intellectual property belonging to any third party.

- 9 -

(5AGB6C8

JMJ 000006685

(c)    Minimum Purchases.

(i)    Initial Term - First Five Years.  Seller recognizes
Buyer's difficulty in predicting its Talc requirements
scheduling more than six (6) months in advance. However, so
long as Seller is not in default hereunder, Buyer shall
purchase one hundred percent (100%) of Buyer's United States
requirements for cosmetic talc.  In no event shall Buyer
purchase and receive less than fifty thousand (50,000) tons
of Talc pursuant to this Agreement during the first five (5)
years of the Initial Term.  In the event that Buyer shall
fail to purchase and receive such minimum quantity within
said period, then:    (A)  Seller shall be relieved of its
obligation to give priority to Buyer's requirements as
provided in Section 3(a) hereof; and (B) Buyer shall pay to
Seller within thirty (30) days following the end of the fifth
year of the Initial Term an amount of damages equal to the
product of:  (1) the Base Price (as such term is defined in
Section 4(b) hereof) applicable to purchases of less than ten
thousand (10,000) tons of Talc per year during the fifth year
of the Initial Term, multiplied by (2) the amount by which
Buyer's minimum purchase obligation during the first five (5)
years of the Initial Term (50,000 tons) exceeds the actual
amount of Talc purchased by Buyer during the first five (5)
years of the Initial Term, multiplied by (3) a factor of zero
point six nine four (0.694).  The following mathematical
equation describes the amount of the foregoing damages:

- 10 -

75AC8808

Protected Document--subject to Protective Order

JNJ 000066686

Payment = Base Price in Year Five x (50,000 tons - Actual Total Purchases in Years One through Five) $0.694.

However, in the event that Buyer shall notify Seller of Buyer's intent to cancel or terminate this Agreement during the first five (5) years of the Initial Term, the foregoing damages shall be payable upon the effective date of such cancellation or termination, and the Base Price applicable to the foregoing formula shall be the Base Price in effect upon the effective date of cancellation or termination.

(ii) **Initial Term - Second Five Years.** During the second five (5) years of the Initial Term, Buyer shall have the right to purchase up to two percent (2%) of Buyer's United States cosmetic talc requirements from a supplier other than Seller, which supplier has qualified its ore source with Buyer in accordance with the provisions of Section 6(a) hereof.

4. **Price.**

' (a) **Base Price.** The price which Buyer shall pay to Seller for the first ten thousand (10,000) tons of Talc purchased by Buyer during the first year of the Initial Term shall be Four Hundred Dollars ($400) per ton (the "Base Price"). In any Calendar Year during the Initial Term, Buyer

- 11 -

TSAGA608

Protected Document--subject to Protective Order          JMJ 000006687

shall receive a discount from the Base Price of five percent (5%) per ton for each ton of Talc purchased in excess of ten thousand (10,000) tons per Calendar Year, but less than twelve thousand (12,000) tons per Calendar Year; and a discount from the Base Price of ten percent (10%) per ton for each ton of Talc purchased in excess of Twelve Thousand (12,000) tons per Calendar Year. The following table illustrates the Base Price in effect during the first Calendar Year of the Initial Term, and the discounts applicable thereto:

| Tons Per Year | 1989 Price |
|---|---|
| 0-10,000 | $400 |
| 10,001-12,000 | $400 less 5% (for incremental tons) |
| 12,000+ | $400 less 10% (for incremental tons) |

Any discount to which Buyer may be entitled shall be reflected in Seller's invoices given in accordance with Section 5 (e) hereof.

(b)  **Annual Price Adjustment.**  Except as set forth in Section 8(d) hereof, the price to be paid by Buyer shall be increased or decreased as of the first day of each Calendar Year from and after January 1, 1990 (each such date to be referred to herein as an "Anniversary Date"), from the price paid by Buyer in the immediately preceding Calendar Year in accordance with a formula giving equal weight to:  (a) the proportionate increase or decrease in the published Gross National Product Implicit

- 12 -

Protected Document--subject to Protective Order

JNJ 000066688

Price Deflator (the "Deflator"), as most recently published for the third quarter of each Calendar Year in the Survey of Current Business by the United States Department of Labor, Bureau of Labor Statistics; and (b) the proportionate increase or decrease in the average price of those cosmetic, non-pharmaceutical talcs sold by Cyprus during the last six (6) months of any Calendar Year, excluding sales to Buyer, which products are represented by industry code "Z" in Cyprus' sales and accounting system (the "Market Basket"). Seller and Cyprus shall be responsible for calculating the annual price adjustment as of the Anniversary Date as soon after such Anniversary Date as possible, but in no event later than March 1 of each Calendar Year. The formula to be used to make the annual adjustment is set forth in Section 4(b)(iii) hereof.

(i)    Definitions. For the purposes of this Agreement, the following terms shall have the following meaning:

(A)    Adjusted Price. The "Adjusted Price" shall mean the price which results from the annual adjustment of the Base Price. The Adjusted Price shall be reset annually in accordance with Section 4(b)(iii) hereof.

(B)    Base Deflator. The "Base Deflator" shall mean the Deflator most recently published for the third

75AG8808

Protected Document--subject to Protective Order

JNJ 000066689

quarter of 1988 to be 122.3, using the base figure 1982 = 100.   The Base Deflator shall be reset annually in accordance with Section 4(b)(v) hereof.

(C)   New Deflator.  The "New Deflator" is defined for the purpose of this Agreement to be the Deflator most recently published for the third quarter of the Calendar Year immediately preceding the Anniversary Date.

(D)   Base Market Basket Price.  The "Base Market Basket Price" shall be the average price of those products qualifying for inclusion in the Market Basket during the last six (6) months of the 1988 Calendar Year.  The Base Market Basket Price shall be reset annually in accordance with Section 4(b)(v) hereof.

(E)   New Market Basket Price.  The "New Market Basket Price" shall be the average price of those products qualifying for inclusion in the Market Basket during the last six (6) months of the Calendar Year immediately preceding the Anniversary Date.

(F)   Market Basket Price Determination.  The Base Market Basket Price and the New Market Basket Price shall be determined by dividing the gross sales revenue derived from Seller's shipments of products qualifying for inclusion in the Market Basket during the last six (6) months of the

- 14 -

TSAG6808

Protected Document--subject to Protective Order

JNJ 000066690

applicable Calendar Year by the total tonnage of such shipments. Such gross sales revenue shall exclude freight charges from Seller's plant or warehouse to customers. However, no deduction from gross sales revenue shall be made for sales commissions and distributor discounts. Seller shall be responsible for determining the Base Market Basket Price and New Market Basket Price; provided, however, that Buyer may request an audit of Seller's determinations. If requested by Buyer, Seller shall retain Price Waterhouse to perform such an audit, and all expenses thereof shall be borne equally by Seller and Buyer.

(ii)  Price Adjustment Factors.

(A)  GNP Factor. The "GNP Factor" shall be determined by dividing the New Deflator by the Base Deflator.

(B)  Market Basket Factor. The "Market Basket Factor" shall be determined by dividing the New Market Basket Price by the Base Market Basket Price.

(iii) Adjustment Formula. As of each Anniversary Date, subject to the exceptions set forth in Section 4(d) hereof, the Base Price shall be made equal to the product of: (a) the Base Price, multiplied by (b) one-half (1/2) of the arithmetic sum of the GNP Factor and the Market Basket

- 15 -

11AG5808

Protected Document--subject to Protective Order

JNJ 000066691

Factor.   The following mathematical equation describes the foregoing annual price adjustment:

Adjusted Price = Base Price x [(Market Basket Factor + GNP Factor) x 0.50];

Immediately after the annual price adjustment has been made as of the Anniversary Date in accordance with the foregoing equation, the Base Price shall be made equal to the Adjusted Price just determined.

(iv) Substitute Deflators.   If any Deflator is not reasonably susceptible to the application described in this Section 4, or if any Deflator is discontinued entirely, then the parties shall in good faith agree upon a suitable substitute Deflator which provides a substantially equivalent standard for annual price adjustment purposes.

(v)  Resetting Deflators, Prices.   Immediately after the annual price adjustment has been made as of the Anniversary Date in accordance with Sections 4(b)(i) - (iv) hereof, the Base Deflator shall be made equal to the New Deflator which was in effect on such Anniversary Date; and the Base Market Basket Price shall be made equal to the New Market Basket Price which was in effect on such Anniversary Date.   Thus, the yearly increase or decrease in the GNP Factor shall always reflect the proportionate annual increase or decrease

- 16 -

TSAG8808

Protected Document--subject to Protective Order

JNJ 000066692

in the Gross National Product Implicit Price Deflator during
the preceding twelve (12) month period ending at the end of
the the third quarter of the Calendar Year just ending; and
the yearly increase or decrease in the Market Basket Factor
shall always reflect the proportionate increase or decrease
in the average price of the Market Basket during the last six
(6) months of the Calendar Year just ending, as compared to
the average price of the Market Basket during the last six
(6) months of the previous Calendar Year.

(c)    Additional Price Adjustment  Seller intends to close
its Hammondsville Mine during the term hereof. Upon the date on
which Hammondsville ore ceases to comprise at least twenty
percent (20%) of the Talc sold to Buyer, the Base Price shall be
reduced by the amount of Eight Dollars and Fifty Cents ($8.50)
per ton. If Hammondsville ore is subsequently re-introduced to
Talc sold to Buyer such that it comprises at least twenty percent
(20%) of the Talc sold to Buyer, and such re-introduction is made
at Buyer's request or in order for Seller to maintain the quality
of Talc sold to Buyer, then the Base Price shall be increased by
the amount of Eight Dollars and Fifty Cents ($8.50) per ton on
the effective date of such re-introduction.

(d)    Price Reopeners.  On the Anniversary Date in 1992,
1995 and 1998, the annual price adjustment procedure set forth in
Section 4(b) hereof shall be superseded by the reopener
provisions of this Section 4(d). On each such Anniversary Date,

- 17 -

75AG880N

Protected Document--subject to Protective Order

JNJ 000066693

the Base Price effective on the Commencement Date shall be increased or decreased by the same ratio as the New Market Basket Price determined on such Anniversary Date bears to the Base Market Basket Price effective as of the Commencement Date. The new Base Price determined in accordance with the foregoing sentence shall be referred to herein as the "Reopener Price." In no event shall the Reopener Price determined pursuant to this Section 4(d) in 1992, 1995 and 1998 exceed or fall below the Base Price applicable in 1991, 1994 and 1997, respectively, by more than twenty percent (20%). The following mathematical equation describes the foregoing price reopener formula:

Reopener Price = Base Price at Commencement Date x (New Market Basket Price at Anniversary Date/Base Market Basket Price at Commencement Date), subject to 20% limitation.

Immediately after the Reopener Price has been determined on the Anniversary Date in accordance with the foregoing equation, the Base Price shall be made equal to the Reopener Price just determined.

(e)  Hardship.  Buyer and Seller recognize that market and industry conditions change, and that the price adjustment formulae set forth in this Section 4 may inadvertently create substantial hardship for either party.  If, at any time during the first calendar quarter of any Calendar Year from and after January 1, 1995, in the reasonable business judgment of one

- 18 -

75AG8808

Protected Document--subject to Protective Order

JNJ 000066694

party, continued performance pursuant to such price adjustment formulae would cause substantial economic hardship to such party's business or operations, then the affected party shall give notice to the other party of such hardship. (For the purposes of this Section 4(e), the phrase "substantial economic hardship" shall mean, in the case of Seller, that the Base Price resulting from any adjustment required herein results in a price to Buyer which is less than the sum of: (a) Seller's fully-allocated operating cost to produce Talc at Seller's West Windsor mill facility, which cost shall include depreciation but exclude corporate overhead allocations from affiliates of Seller (the "Cost"), plus (b) fifteen percent (15%) of such Cost. Notice of hardship may be given only once by each party during the Initial Term of this Agreement, unless an arbitrator shall have determined that no hardship existed at the time of such party's previous notice. The provisions of this Section 4(e) shall not apply to the Additional Term, unless the parties shall so agree in accordance with Section 2(b) hereof.

Each party shall continue to abide by the price adjustment formulae set forth in this Section 4 for a period of one (1) year following such notice of hardship. During such one (1) year period, Buyer and Seller may investigate potential purchases and sales of talc from and to third parties; provided, however, that no firm contractual obligations are entered into therefor. In addition, during such one (1) year period, Buyer and Seller shall enter into good faith negotiations to determine a mutually

- 19 -

75AG0806

JNJ 000066695

agreeable Base Price and adjustment formulae to be effective from and after the conclusion of such negotiations. In the event of dispute between Buyer and Seller as to the existence of the hardship claimed by the other party, the parties shall submit such question for arbitration in accordance with the terms and conditions set forth in Exhibit "B" attached hereto and by this reference incorporated herein. Such submission shall be made within thirty (30) days following the date of notice of hardship given by the affected party. The only issue which the arbitrator shall determine shall be the existence or non-existence of the hardship claimed by the affected party.

(i).    Buyer's Hardship.    In the event that mutually acceptable price adjustments and adjustment formulae have not been determined within six (6) months from the date of Buyer's notice of hardship, Buyer, at its sole option, shall give notice of its intent to: (A) continue to perform in accordance with the Base Price and the price adjustment formulae as re-negotiated by the parties; or (B) terminate this Agreement on the first anniversary of Buyer's notice of hardship. In the event that Buyer gives notice of its intent to continue to perform in accordance with the Base Price and the price adjustment formulae as re-negotiated by the parties, then the Base Price and price adjustment formulae as re-negotiated shall be effective retroactively to the date of Buyer's notice of hardship, and Seller shall issue a credit

TSAQNEON

Protected Document--subject to Protective Order

JNJ 000066696

to Buyer in the form mutually agreed to by Buyer and Seller
as part of their negotiations.

In the event that Buyer elects to terminate this Agreement,
it shall pay to Seller a lump sum amount equivalent to
seventy percent (70%) of Seller's discounted lost profits
through the expiration of the Initial Term. Seller's annual
lost profits shall be discounted by a factor of fifteen
percent (15%) per annum (the "Discount Factor").  Such
payment shall be made within thirty (30) days following the
effective date of termination, and shall be equivalent to
seventy percent (70%) of:   (I) the product of (a) the
proposed  Base  Price  last  offered  by  Seller  during
negotiations with Buyer which is applicable to purchases of
nine thousand eight hundred (9,800) tons of Talc per Calendar
Year (the "Offer Price") escalated by a factor of four
percent (4%) multiplied by (b) the amount by which Buyer's
purchases of Talc in the Calendar Year in which Buyer's
termination of this Agreement is effective falls below nine
thousand eight hundred (9,800) tons multiplied by a factor of
0.694 (the "Lost Profit Factor"); plus (II) for each Calendar
Year remaining in the Initial Term, the product of (y) the
Offer Price escalated by a factor of four percent (4%) per
annum multiplied by (z) nine thousand eight hundred (9,800)
tons multiplied by the Lost Profit Factor multiplied by the
Discount Factor.  The Discount Factors applicable to the
foregoing formula shall be 0.85 as of the second anniversary

- 21 -

75AG8808

Protected Document--subject to Protective Order

JNJ 000066697

of Buyer's notice of hardship, and 0.6775 as of the third anniversary of Buyer's notice of hardship. The following mathematical equation describes the amount payable to Seller by Buyer within thirty (30) days following the effective date of termination:

(A) Payment = 0.70 x ([(Offer Price x $1.04^1$) x (9,800 tons – Actual Total Purchases in Calendar Year of Termination) x 0.694]), in the event that Buyer's notice of termination is given during the first calendar quarter of 1997;

(B) Payment = 0.70 x ([(Offer Price x $1.04^1$) x (9,800 tons – Actual Total Purchases in Calendar Year of Termination) x 0.694] + [(Offer Price x $1.04^2$) x 9,800 tons x 0.694 x 0.85]), in the event that Buyer's notice of termination is given during the first calendar quarter of 1996; and

(C) Payment = 0.70 x ([(Offer Price x $1.04^1$) x (9,800 tons – Actual Total Purchases in Calendar Year of Termination) x 0.694] + [(Offer Price x $1.04^2$) x 9,800 tons x 0.694 x 0.85] + [(Offer Price x $1.04^3$) x 9,800 tons x 0.694 x 0.675]), in the event that Buyer's notice of termination is given during the first calendar quarter of 1995.

Two sample calculations of the amount payable to Seller by Buyer in the event of Buyer's termination of this Agreement pursuant to

75AG8808

Protected Document--subject to Protective Order

JNJ 000066698

this Section 4(e)(1) are set forth on Exhibit "C" attached hereto and by this reference incorporated herein.

(ii) **Seller's Hardship.** In the event that mutually acceptable price adjustments and adjustment formulae have not been determined within six (6) months from the date of Seller's notice of hardship hereunder, Seller, at its sole option, shall give notice of its intent to: (a) terminate this Agreement on the first anniversary of Seller's notice of hardship; or (b) continue to perform in accordance with the Base Price and the price adjustment formulae as re-negotiated by the parties. In the event that Seller shall give notice of its intent to continue to perform in accordance with the Base Price and the price adjustment formulae as negotiated by the parties, then the Base Price and price adjustment formulae as re-negotiated shall be effective retroactively to the date of Seller's notice of hardship, and Buyer shall issue a credit to Seller in the form mutually agreed to by the parties as part of their negotiations.

5. **Orders; Payment.**

(a) **Purchase Estimates.** In order to assist Seller in its production planning, prior to the first day of each calendar quarter, Buyer shall provide Seller with a non-binding good faith estimate of Buyer's talc requirements for the subsequent twelve month period.

- 23 -

TLAGB808

Protected Document--subject to Protective Order

JNJ 000066699

(b)    -Orders.    Not less than five (5) calendar days prior to the first business day of each calendar month, Buyer shall submit to Seller binding purchase orders covering the next succeeding six (6) months. Orders for the first three (3) months of such six (6) month period may not be cancelled or modified by Buyer; provided, however, that Buyer and Seller may agree to minor scheduling or delivery modifications. Buyer may modify any of such six (6) month orders with respect to only the last three (3) months of such six (6) month period by delaying acceptance of Seller's Talc deliveries by not more than forty-five (45) days. The parties intend for the procedure set forth in this Section 5(b) to provide a rolling six month order schedule.    To the extent possible, consistent with Buyer's production requirements, Buyer's six (6) month purchase orders shall specify deliveries by Seller representing approximately equal monthly shipments over such six (6) month period.

(c)    Cooperation; Priority.    Seller shall use its best reasonable commercial efforts to provide Buyer with priority in Seller's production scheduling from Seller's West Windsor Mill in accordance with Section 3(a) so long as Buyer is not in default hereunder and has satisfied its order requirements as set forth in this Section 5, and its minimum purchase requirements as set forth in Section 3(c) hereof.

- 24 -

TSAG8406

Protected Document--subject to Protective Order

JMJ 000066700

(d)  **Title; Risk; Mode of Delivery.**  Title to and risk of loss of Talc shall pass from Seller to Buyer upon loading of Talc into rail cars F.O.B. Ludlow, Vermont, or into Bulk trucks F.O.B. West Windsor, Vermont.  Buyer may, at its election, take delivery of Talc in flexible intermediate bulk bags at an additional price to be negotiated by the parties; provided, however, that Seller has available both the equipment and the capacity necessary to supply Talc in flexible intermediate bulk bags.  Any increase in the price which results from Buyer's acceptance of Talc in flexible intermediate bulk bags shall be realized by Buyer as a direct addition to the Base Price for Talc sold to Buyer in flexible intermediate bulk bags.  Buyer shall be solely responsible for the quality and cleanliness of any transportation vessel supplied to Seller by Buyer at Ludlow, Vermont or elsewhere for loading and transportation of Talc purchased by Buyer.

(e)  **Payment.**  Seller shall invoice Buyer on the date of each shipment of Talc from Ludlow, Vermont or West Windsor, Vermont.  Buyer shall pay Seller the purchase price for all Talc purchased by it not later than thirty (30) days following the date of Seller's invoice.

6.  **Specifications; Quality.**

(a)  **Source.**  Seller covenants that all Talc sold to Buyer hereunder shall be produced solely from the Argonaut or

- 25 -

75AG8E06

Protected Document--subject to Protective Order

JMJ 00000670J

Hammondsville ore bodies (as the same are described in Exhibit "D" attached hereto and by this reference incorporated herein), or from such other deposits as may be approved by Buyer, in all cases employing selective mining techniques carefully designed to avoid ore contaminants. Buyer and Seller acknowledge that the Argonaut and Hammondsville ore bodies are qualified and approved by Buyer for Buyer's cosmetic talc applications, subject to such selective mining techniques. Ore bodies or ore sources which may in the future become qualified and approved by Buyer shall be shown on a revised Exhibit "D" hereto. Buyer and Seller agree to cooperate in the qualification and approval of new ore sources suitable for the production of Buyer's consumer talc products. Seller shall provide Buyer with samples and laboratory test data showing that ore from one or more new sources meets Buyer's specifications, and Buyer shall use its best reasonable efforts to verify and confirm such data and to qualify and approve such new ore sources as may meet Buyer's requirements, including, without limitation, Buyer's organoleptic requirements. Buyer shall grant such qualification or approval as expeditiously as possible, and in no event shall any such approval or qualification be unreasonably withheld. All testing by Buyer in the qualification of new ore sources shall be performed in good faith in accordance with those methods and procedures heretofore developed by Buyer to identify desirable attributes of talc ore bodies, which methods and procedures shall not be changed by Buyer without Seller's prior written consent, which consent shall not be unreasonably withheld. Seller shall have the right to

- 26 -

75AC88D8

Protected Document--Subject to Protective Order

JMJ 000006702

request that testing for qualification of any new ore source be repeated. Notwithstanding the foregoing, Buyer shall have the right to test talc product samples supplied by Seller's competitors at any time during the term of this Agreement, and to qualify the ore source from which such sample derives; provided, however, that in the event Buyer qualifies an ore source owned or controlled by a third party, Buyer shall inform Seller of such event within thirty (30) days thereof. Nothing set forth in this Section 6(a) shall limit: (a) Seller's right to attempt to qualify ore sources owned or controlled by Seller; or (b) Buyer's obligations to purchase Talc pursuant to the terms of this Agreement.

(b)   **Quality Standards.**   Seller covenants that all Talc sold to Buyer shall conform to the quality standards set forth in Exhibit "E" attached hereto and by this reference incorporated herein, including without limitation the specifications set forth in SPC specification #8-006, a copy of which is included in Exhibit "E". Buyer and Seller recognize that the standards set forth in Exhibit "E" may require modification from time to time to conform to applicable governmental regulations.    Such specifications may also be modified by the mutual agreement of the parties as evidenced by a writing made and entered into in accordance with Section 15(d) hereof.

TS*G8806

Protected Document--subject to Protective Order

JMJ 000006701

(c)    **Good Manufacturing Procedures and Standard Operating Procedures.** Seller covenants that all Talc sold to Buyer shall have been manufactured in conformance with the Good Manufacturing Procedures and Standard Operating Procedures set forth in Exhibit "A", as the same are required to be modified from time to time to conform to applicable governmental regulations. Such specifications may also be modified to meet the reasonable needs of Buyer or Seller, which modifications shall be determined by the mutual agreement of the parties as evidenced by a writing made and entered into in accordance with Section 15(d) hereof.

(d)    **Price Adjustments.**    Buyer and Seller have agreed that certain costs of meeting and complying with changes in Buyer's specifications shall be allocated to the parties as follows:

(i)    **Final Product Specifications.** All costs incurred by Seller in meeting and complying with changes in Buyer's final product specifications, which changes are required by rules or regulations promulgated by federal, state or local governmental agencies or bodies having the authority to do so, shall be for Buyer's account in the form of price increases sufficient to offset Seller's annual increased out-of-pocket expenses, or higher unit costs from lost productivity, plus additional depreciation. Buyer and Seller agree to negotiate in good faith price adjustments to compensate Seller for additional costs incurred by Seller in

- 28 -

TSAG8808

Protected Document--subject to Protective Order

JMJ 000000704

meeting and complying with changes in Buyer's final product specifications, which changes are required or requested by Buyer for reasons other than that such changes are required by governmental agencies. Any price adjustment made pursuant to this Section .6(d)(i) shall be in the form of a permanent increase to the Base Price; and the amount of any such increase shall be included in the Base Price for escalation or reopener purposes pursuant to Sections 4(b) and 4(d) hereof.

(ii) Mining Regulations. All costs incurred by Seller in meeting and complying with any newly-promulgated regulations pertaining directly and solely to mining, mine safety and health practices and procedures, shall be for Seller's account. However, Buyer and Seller shall share equally, on a case-by-case basis, all costs incurred by Seller in meeting and complying with any rule or regulation promulgated by federal, state or local governmental agencies or bodies having the authority to do so, which requires Seller to conduct more difficult or more expensive mining, milling or other beneficiation methods, procedures or practices in order to meet Buyer's specifications; provided, however, that Buyer shall have no obligation to share such costs until such costs exceed, on a cumulative basis, Ten Dollars ($10) per ton of beneficiated talc; and provided, further, that Buyer shall have no obligation to share such costs once Buyer's portion

- 29 -

15408808

of such costs exceed, on a cumulative basis, Forty Dollars ($40) per ton of beneficiated talc. Buyer shall realize its portion of such costs in the form of a permanent increase to the Base Price, and the amount of Buyer's portion of such costs shall be included in the Base Price for escalation and reopener purposes pursuant to Sections 4(b) and 4(d) hereof. Within sixty (60) days following the effective date of an increase to the Base Price pursuant to this Section 6(d)(ii), Buyer may request that Price Waterhouse verify that the sum of Buyer's and Seller's portions of such increase reasonably reflects the cost of complying with any such newly-promulgated rule or regulation.

(iii) Cost Savings. One Hundred Percent (100%) of any cost savings realized as a result of operating efficiencies or productivity gains made by Seller after the Commencement Date, or as a result of any other operating changes instituted by Seller which do not require Buyer's prior approval hereunder, shall be for Seller's sole account. However, in the event that Seller realizes cost savings by virtue of Seller's utilization of ore sources qualified pursuant this Section 6 but not located in Vermont, or by virtue of its implementation of changes in the Good Manufacturing Procedures and Standard Operating Procedures set forth in Exhibit "A", or in the BPC specification #8-006, which changes were suggested by either party and accepted by

- 30 -

TIAGA608

JMJ 000066706

both parties, then such cost savings shall be allocated as follows on a case-by-case basis:

(A)    Where no capital investment is necessary to implement a particular cost-saving change, or where the capital investment necessary to implement such change is less than Ten Thousand Dollars ($10,000), Seller shall realize one hundred percent (100%) of such cost savings for the first twelve (12) months following that date which the parties agree to have been the date of permanent implementation of such cost-saving change. After such initial twelve (12) month period, or after Seller has recovered the full cost of such capital investment, whichever is later, Buyer and Seller shall share equally in such cost savings, with Buyer realizing such cost savings through a permanent reduction in the Base Price.

≤ 10,000

(B)    Where the capital investment necessary to implement a particular cost-saving change exceeds Ten Thousand Dollars ($10,000), Buyer and Seller agree to negotiate in good faith an equitable sharing of the realized cost savings, recognizing that the party or parties making such capital investment must recover the investment made.

710,000 Captl

The amount of any cost savings which permanently reduces the Base Price pursuant to this Section 6(d)(iii) shall be included in the

- 31 -

†SAG8808

Protected Document--subject to Protective Order

JMJ 000006707

Base Price for escalation and reopener purposes pursuant to Sections 4(b) and 4(d) hereof.

(iv)   Column Flotation.   As of the date first above written, Seller is installing and/or testing a flotation system at its West Windsor grinding facility which is different from that historically utilized by Seller, which flotation system may result in quantifiable cost savings to Seller. Notwithstanding any other provision of this Section 6(d), after Seller, in its reasonable judgment, shall have recovered the full cost of the design, construction, installation and testing of such flotation system (assuming Seller's cost of capital to be ten percent (10%) per annum), then Seller shall share such cost savings with Buyer. After Seller shall have recovered such costs, Buyer shall realize such cost savings through a one time, permanent reduction in the Base Price equivalent to thirty-three percent (33%) of the realized unit cost savings as reasonably determined by Seller.

(e)   Ship-to-Stock Certification Requirements.   Seller shall comply with the ship-to-stock certification requirements attached hereto as Exhibit "F", and by this reference incorporated herein.

- 32 -

TS*G6808

Protected Document--subject to Protective Order

JNJ 000066708

(f)   Inspection, Acceptance.

(1)   Non-microbiological Specifications.   Seller
shall take and prepare a composite sample from those silos at
Seller's West Windsor milling facility which are or which will be
dedicated to the storage of Talc prior to final shipment of such
to Buyer (the "Certification Sample"), in accordance with the
methods and procedures practiced by Seller on the date of this
Agreement, or as refined or codified pursuant to Section 6(h)
hereof.  The Certification Sample shall be split into three (3)
sealed portions and retained for use in the event of dispute
concerning the conformity of any shipment to Buyer's non-
microbiological specifications.  Two (2) sealed portions of the
Certification Sample shall be retained by Seller, and one sealed
portion shall be forwarded immediately to Buyer.  Buyer shall
test each sample for contamination immediately upon receipt of
the same in accordance with Buyer's practices on the date of this
Agreement, as such practices may be modified from time to time by
the mutual agreement of the parties.  Such testing shall be at
Buyer's sole expense.  All sealed portions of the Certification
Sample shall be retained by Buyer and Seller in accordance with
their respective established practices.

In the event that Buyer conducts analytical testing on the
Certification Sample for non-microbiological parameters, Buyer
shall forward the results of such tests to Seller as soon as
possible.  In the event of dispute between the parties concerning

− 33 −

TTAQ8808

Protected Document--subject to Protective Order

JMJ 000006709

conformance to any of Buyer's non-microbiological specifications as described on Exhibit "E", Buyer shall give written notice of such dispute to Seller as soon as possible. Immediately after such notice, each party agrees to submit its sealed portion of the Certification Sample to a mutually satisfactory third party laboratory. Seller shall also submit to the laboratory a third untested, sealed portion of the Certification Sample. Such laboratory shall determine, in its judgment, whether the shipment conforms with Buyer's specifications as evidenced by the Certification Sample. The decision of the third party laboratory shall be final, and all costs and expenses pertaining to such testing by the third party laboratory shall be shared equally.

(ii)     Microbiological Specifications. On a daily basis, Seller shall take and prepare for microbiological examination samples from each production shift at Seller's West Windsor milling facility (the "Shift Sample"), in accordance with the methods and procedures practiced by Seller on the date of this Agreement, or as refined or codified pursuant to Section 6(h) hereof, and shall send a portion of the Shift Sample to Buyer. Buyer shall give written notice of any non-conformance of the Shift Samples to any of Buyer's microbiological specifications as described on Exhibit "E" as soon as possible, but in no event later than fourteen (14) calendar days following shipment of each Shift Sample to Buyer, or shall waive its right to claim any non-conformance of Seller's Talc with Buyer's microbiological specifications. Seller shall not release for

- 34 -

75AD56CB

Protected Document--subject to Protective Order

JMJ 00006671D

shipment to Buyer any Talc contained within a silo for which Seller has not received Buyer's approval for all Shift Samples relating to such silo.

(iii) Event of Non-Conformance. Seller, within a reasonable period of time after the final determination of a non-conformance, shall: (i) arrange for return to Seller or an Affiliate of Seller (as such term is defined in Section 8(c) hereof), at Seller's sole cost and expense, such Talc as is finally determined to be out of conformance with Buyer's specifications; (ii) replace such Talc as is finally determined to be out of conformance with Buyer's specifications; and (iii) compensate Buyer for the freight costs of any truckload or carload rejected for non-conformance in accordance with this Section 6(f). Upon return of non-conforming Talc to Seller or Seller's Affiliates, Seller or Seller's Affiliates may: (a) sell such non-conforming Talc to any third party utilizing talc in non-cosmetic applications) or (b) re-process such non-conforming Talc, or blend such non-conforming Talc with other talcs manufactured by Seller or Seller's Affiliates, and sell such re-processed or blended talc to any third party customer, including those customers utilizing talc in cosmetic applications; provided, however, that in either of the foregoing cases, such resold, reprocessed or blended talc no longer shall be: (i) identifiable as talc once supplied to Buyer; or (ii) otherwise associated with the name of Buyer or Buyer's Affiliates. No Talc rejected by Buyer shall be resold to

- 35 -

TSAG8R08

.Buyer. Upon the resale or other disposal of non-conforming Talc to a third party, Seller shall provide written verification to Buyer that such sale or other disposal was made in accordance with this Section 6(f).

(g)   **Buyer's Remedies for Non-Conformance.**   In the event that Talc sold by Seller fails to conform to the quantity or quality requirements set forth in Section 5 hereof and this Section 6, and said non-conformity is not corrected within forty-five (45) days following notice by Buyer, Seller may elect, if commercially practicable, to substitute product from those other approved sources described in Exhibit "D", whether or not such sources are owned or leased by Seller or Seller's affiliates, at a delivered price equal to Buyer's delivered cost for Talc from Seller's West Windsor Mill. Such substitution shall be made with Buyer's prior written consent, which consent shall not be unreasonably withheld. In the event that Seller is unable to supply an acceptable substitute Talc: (a) Buyer may be relieved of its obligations under Section 3(a) hereof to buy Talc exclusively from Seller; (b) Buyer's minimum purchase obligations pursuant to Section 3(c) hereof shall be reduced by the amount of Talc thereafter bought from third parties during such period of non-conformance; and (c) Seller may, at Seller's sole option terminate this Agreement without liability for such termination. Except in the case of Seller's fraud, willful misconduct or gross negligence, and except as otherwise provided in Section 13(b) hereof, Buyer's remedies for non-conformance of goods as set

75ccc82c

Protected Document--subject to Protective Order                    JNJ 000000712

forth in this Section 6(g) shall be the sole and exclusive remedy for non-conformance available to Buyer.

(h)   Future Collaboration.   The parties recognize that the operation of Seller as a business entity no longer under common ownership with Buyer may necessitate adjustments in the methods used to assure the quality of Talc delivered hereunder. Accordingly, Buyer and Seller agree that for a two-year period after the Commencement Date, they will collaborate to refine and codify current methods and practices such that the quality standards described on Exhibit "E" in effect from time to time may be reliably achieved and verified.  Any such refinements and codifications shall be made by the mutual agreement of Buyer and Seller in accordance with Sections 6(c) and 15(d) hereof.

7.   Secrecy.   Except as otherwise provided in this Agreement or as otherwise required by law, each party shall hold as confidential, and shall neither use for its own benefit nor disclose, directly or indirectly, to third parties any information disclosed by or received from the other party and pertaining to the other party's business and affairs, including without limitation:   raw materials and finished product specifications, standards and tests; procedures, methods and costs involved in mining and manufacture; prices and quantities of product purchased; quantities of raw materials and quantities of finished product held in inventory at any location; manufacturing schedules; quantity of unfilled purchase orders on

- 37 -

TSAG8808

JMJ 00006671J

hand from time to time; purchase volume forecasts and/or plans; new or proposed products; and experience data on product and manufacturing performance.. The provisions of this Section 7 shall survive the termination or expiration of this Agreement for a period of five (5) years following such termination or expiration. Nothing contained in this Section 7 shall in any way restrict or impair the right of either party to use, disclose, or otherwise deal with any information or data which: (a) at the time of the disclosure is generally available to the public or thereafter becomes generally available to the public, by publication or otherwise, through no act of either party; or (b) the party can show was in its possession prior to the time of the disclosure to it and was not acquired, directly or indirectly, from the other party or any other source bound by a confidentiality agreement with the other party; or (c) the party can show was received by it as a matter of lawful right after the time of disclosure from a third party who did not acquire it from the other party or any of its parent, affiliate or subsidiary companies under an obligation, the party is free to disclose it to other.

8. **Termination.**    This Agreement may be terminated by either party in the following circumstances:

(a)    **Bankruptcy.**    Termination shall be effective immediately upon notice to the terminated party if the terminated party:  (i) files or has filed against it a petition under the

- 38 -

TSAG8608

Federal Bankruptcy Code or any other comparable law which is not dismissed or stayed within thirty (30) days; (ii) makes an assignment for the benefit of creditors or has a receiver appointed for it; or (iii) otherwise takes advantage of laws designed for the relief of debtors.

(b)    **Breach.**    In the event that one party materially breaches any representation, warranty, covenant or agreement in this Agreement (except for the minimum purchase requirements set forth in Section 3(c) hereof) or fails to conform to the quantity and quality requirements set forth in Sections 5 and 6 hereof, the non-breaching party may give notice of its intent to terminate, stating therein the grounds therefor.    The party receiving the notice shall have ninety (90) days from the date of receipt thereof to cure said breach.  In the event such breach is cured, such notice of termination shall be of no force or effect.  In the event such breach is not cured, and is not the result of an Event of Force Majeure (as such term is defined in Section 9 hereof), and does not give rise to remedies available to the parties elsewhere in this Agreement, this Agreement shall, without more, terminate at the end of said ninety (90) day period.

(c)    **Sale of Assets or Business.**  For the purpose of this Agreement, the term "Parent" shall mean Johnson & Johnson, a New Jersey corporation, or Cyprus Minerals Company, a Delaware corporation; and the term "Affiliate" shall mean any entity which

- 39 -

15AG8808

is fifty percent (50%) or more owned by a Parent, any entity which is fifty-percent (50%) or more owned by an Affiliate, or any operating division of any Parent or Affiliate.

This Agreement may be terminated by Buyer in the event that Cyprus Minerals Company or any of its Affiliates, shall transfer or sell all or a substantial portion of the assets of, or the business of, its United States Talc business to a third party who is not a Parent or an Affiliate; provided, however, that Buyer's notice of termination therefor must be given at least one (1) year prior to the effective date of such termination, and must be given within one (1) year from the date on which such transfer or sale shall close; and provided, further, that Buyer shall not terminate this Agreement unless and until it shall have determined, in the good faith exercise of its reasonable and prudent business judgment that such transfer or sale would create a substantial possibility of a material and adverse affect on the security and quality of Buyer's long term talc supply.  The factors which Buyer may consider in the good faith exercise of its reasonable and prudent business judgment shall include, without limitation: the quality of maintenance of, and level of continued capital investment in, Seller's mines and mills; the quality of cosmetic Talc sold by Seller; the quality and experience of Seller's key management, including production and quality assurance personnel; and the effect of such sale or transfer upon the public's perception of Johnson & Johnson, the

- 40 -

754G8808

Protected Document--subject to Protective Order

JNJ 000000716

Affiliates of Johnson & Johnson, or the end-use products of such entities.

9. Force Majeure.

(a) Events of Force Majeure. If either party shall be prevented by any Event of Force Majeure (as defined below) from the timely performance of any of its obligations hereunder, save and except the making of payments as provided herein, the obligation of performance shall be excused and shall not be a ground for cancellation or termination or default. The party suffering the Event of Force Majeure shall use reasonable diligence to remedy such, but shall not be required to contest the validity of any law or regulation or any action or inaction of civil or military authority, or to prevent or settle any strike or labor dispute. As used herein, the term "Event of Force Majeure" shall mean any cause, act or occurrence beyond a party's reasonable control, including, without limitation: laws or regulations, action or inaction of civil or military authority; inability to obtain any license, permit or other authorization that may be required; unusually severe weather; mining casualty; unavoidable mine or mill shutdown; damage to, or destruction of mine or mill, plant or facility; fire, explosion, or flood; insurrection; riot; labor disputes; delay in transportation; and acts of God. Should any of these events occur to Seller, Seller may reduce the quantities of Talc it is obligated to deliver hereunder and allocate the reduced supply,

– 41 –

TS4C8608

Protected Document--Subject to Protective Order

JMJ 000066717

whenever practical on a pro rata basis, among all of its cosmetic talc customers as Seller in its sole discretion deems appropriate, or cease deliveries entirely without any liability whatsoever for any such delivery of reduced amounts of Talc or no delivery of Talc; provided, however, that Buyer may purchase, from any third party sources approved by Buyer, such portion of Buyer's normal requirements as may be unfulfilled as a result of Seller's pro rata allocation and Seller's inability to supply Talc from alternate sources pursuant to Section 9(c) hereof. Such purchases shall reduce Buyer's minimum purchase obligations pursuant to Section 3(a) and 3(c) hereof by the amount of such purchases.

(b)  **Buyer's Force Majeure.**  Should Buyer suffer an Event of Force Majeure thereby affecting Buyer's ability to accept deliveries of Talc, Buyer may reduce the quantities of Talc it orders or accepts.  In the event Buyer reduces the quantity of Talc it accepts for a period of greater than sixty (60) days, Seller may reduce the quantities of Talc it is obligated to deliver hereunder or cease deliveries entirely in an amount equal to such reduction by Buyer without any liability for such delivery of reduced amounts of Talc or no delivery of Talc.  In the event that Buyer reduces the quantity of Talc it accepts for a period of greater than one hundred and eighty (180) days, Seller, at its option, may terminate this Agreement.  Buyer's minimum purchase obligation pursuant to Section 3(a) hereof shall not be reduced by the quantity of Talc not accepted by Buyer

- 42 -

TS4C8808

Protected Document--subject to Protective Order

JNJ 000066718

during an Event of Force Majeure; provided, however, that the Initial Term of this Agreement shall be extended for a period equal to the duration of Buyer's Event of Force Majeure, if necessary, to enable Buyer to meet such minimum purchase obligations.

    (c)   Seller's Force Majeure. Should Seller suffer an Event of Force Majeure thereby affecting Seller's ability to make deliveries of Talc from Seller's West Windsor Mill, Seller shall use reasonable efforts to supply Buyer with Talc for Buyer's domestic talc requirements from another source qualified by Buyer in accordance with Section 6(a) hereof, whether or not owned or controlled by Seller; provided, however, that in the event that more than one such source of Talc has been qualified by Buyer, Buyer may prioritize such sources and accept deliveries of alternate Talc from such sources in accordance with such prioritization; and provided, further, that Seller shall have no liability in the event of its inability, by reason of unavailability, to supply Talc from an alternate source with a priority higher than that from which Seller is able to supply alternate Talc.    Seller's obligation to supply Talc from alternate sources shall be limited to the extent to which Talc is commercially available from qualified sources in quantities sufficient to meet Buyer's requirements.  For a period of one hundred and twenty (120) days, the price of alternate Talc to be delivered to Buyer shall be the same as the delivered price to Buyer of Talc delivered from Seller's West Windsor Mill on the

- 43 -

TSAGR608

Protected Document--subject to Protective Order

JMJ 000066719

calendar day preceding the cessation or reduction of deliveries therefrom. On or before the expiration of such one hundred and twenty (120) day period, Seller shall notify Buyer of: (i) its intent to continue supplying Buyer with alternate Talc at the delivered price for Talc delivered from the West Windsor Mill, or (ii) its intent to declare an Event of Force Majeure and indicate Seller's permanent inability to supply Talc. In the event that Seller shall declare an Event of Force Majeure in accordance with this Section 9(c): (A) Seller shall continue to supply alternate Talc to Buyer at the price in effect during the preceding one hundred and twenty (120) day period for an additional sixty (60) days; (B) this Agreement shall then terminate at the close of business on such sixtieth (60th) day; and (C) Seller shall have no further obligation or liability whatsoever pursuant to this Agreement.

(d)    Limitation.   The provisions of this Section 9 shall not be invoked merely to delay or suspend deliveries of Talc to Buyer, or to delay or suspend acceptance of, or payment for, Talc delivered to Buyer, absent, in the good faith estimation of the party invoking such provisions, an Event of Force Majeure.

10. Seller's Indemnity.  Seller shall indemnify, defend and hold harmless Buyer, and its affiliates, and each of their respective directors, officers, employees, and agents from and against all liabilities arising out of any violation by Seller of any law, ordinance, regulation or rule or the order of any court or

- 14 -

TSAC8808

Protected Document--subject to Protective Order

JMJ 000006720

administrative agency, and from and against all liabilities
arising out of any claim by an employee, agent, or contractor of
Seller arising in connection with this Agreement; provided,
however, that Seller shall not indemnify Buyer for any such
liabilities to the extent that such liabilities arise from: (i)
the acts or omissions of Buyer; or (ii) the acts or omissions of
Seller which were directed by Buyer.  The provisions of this
Section 10 shall survive the termination or expiration of this
Agreement.

11. Buyer's Indemnity.  Buyer shall indemnify, defend and hold
harmless Seller, and its affiliates, and each of their respective
directors, officers, employees, and agents from and against all
liabilities arising out of any violation by Buyer of any law,
ordinance, regulation or rule or the order of any court or
administrative agency, and from and against all liabilities
arising out of any claim by an employee, agent, or contractor of
Buyer arising in connection with this Agreement; provided,
however, that Buyer shall not indemnify Seller for any such
liabilities to the extent that such liabilities arise from: (a)
the acts or omissions of Seller; or (b) the acts or omissions of
Buyer which were directed by Seller.  In addition, Buyer shall
indemnify, defend and hold harmless Seller, and its affiliates,
and each of their respective directors, officers, employees and
agents from and against all liabilities arising out of any
product liability-based claim, suit, demand or cause of action
directed against Seller or any of Seller's affiliates;  (i)

— 45 —

TSCC8808

Protected Document--subject to Protective Order                JMJ 000066721

arising out of the sale of cosmetic talc products to consumer markets, which products were manufactured by Seller prior to the date first above written; or (ii) for which Buyer is directly or indirectly responsible as a result of Buyer's possession, use or processing of Talc delivered to Buyer pursuant to this Agreement, or as a result of Buyer's manufacture, shipment and sale of Talc-containing product (including without limitation, baby powder and adult powder) derived from Talc delivered to Buyer pursuant to this Agreement; provided, however, that Buyer shall have no obligation of indemnification pursuant to this Section 11 in the event that the Talc delivered to Buyer hereunder did not conform to the specifications for such Talc then in effect, and such variance from such specifications was a material contributing factor in the claim, suit, demand or cause of action being asserted. For the purposes of this Section 11, the term "Buyer" shall include Buyer and Buyer's Parent and Affiliates as such terms are defined in Section 8(c). The provisions of this Section 11 shall survive the termination or expiration of this Agreement.

12. Promotion. Each party hereby warrants that it will not use any trademark, trade name or representation of the products or services of the other party or its affiliates, or refer directly or indirectly to the other party, its affiliates, or the products or services of the other party or its affiliates, without in any case obtaining the prior written permission of the other party.

- 46 -

T5A08808

Protected Document--subject to Protective Order

The provisions of this Section 12 shall survive the termination or expiration of this Agreement.

## 13. Warranty; Apportionment.

(a) **Warranty.** Seller represents and warrants that all Talc sold by Seller shall conform to the quality standards set forth in Exhibit "B." SELLER MAKES NO OTHER WARRANTY OF ANY KIND, EITHER EXPRESSED OR IMPLIED, IN FACT OR BY LAW, WHETHER OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE OR OTHERWISE. Buyer represents and warrants, based on its expertise in the industry and its intimate familiarity with selective mining techniques of qualified ore bodies, the Good Manufacturing Procedures and Standard Operating Procedures described on Exhibit "A", and the sampling and testing methods described therein, as the same may be modified by the mutual agreement of the parties pursuant to Section 6(c) hereof, that such mining practices, processing procedures and testing methods, if practiced by Seller in the manner practiced by Seller on the date of this Agreement, are adequate to produce talc products meeting the specifications for Talc set forth in Exhibit "B".

(b) **Apportionment.** Buyer and Seller agree that liability for damages alleged to have been suffered by Buyer and Seller arising out of an alleged breach of the foregoing warranty shall be apportioned as follows:

- 47 -

TSACB808

Protected Document--subject to Protective Order

JNJ 000066721

(i)   Seller shall indemnify Buyer for any cost, loss, damage or expense suffered by Buyer in the event that Buyer can demonstrate that either: (A) the Certification Sample proves that Seller's Talc did not meet the specifications therefor as described on Exhibit "E" except for the microbiological specifications set forth therein, before title to such Talc passed to Buyer, and the variance from such specifications was a material contributing factor in the claim, suit, demand or cause of action being asserted; or (B) that Seller failed to sample and test Talc in accordance with the sampling and testing methods described on Exhibit "A" in the manner practiced by Seller on the date of this Agreement or as modified by the mutual agreement of the parties pursuant to Section 6(c) hereof, and that Seller's failure to so sample and test Talc was a material contributing factor in the claim, suit, demand or cause of action being asserted; provided, however, that Seller's obligation to indemnify Buyer shall not exceed Twenty Million Dollars ($20,000,000) in the absence of Seller's gross negligence or willful misconduct, and Forty Million Dollars ($40,000,000) in the event of Seller's gross negligence or willful misconduct;

(ii)  Seller shall be solely liable in the event that Buyer can demonstrate a shipment of Seller's Talc failed to conform,' as evidenced by the Shift Sample, to the microbiological quality standards set forth in Exhibit "E" before title to such Talc passed from Seller to Buyer;

- 48 -

SAG88U8

Protected Document--subject to Protective Order                    JNJ 000066724

provided, however, that Seller's liability pursuant to this Section 13(b)(ii) shall be limited to replacement of Talc and reimbursement of certain of Buyer's freight costs in accordance with Sections 6(f) and 6(g) hereof;——

(iii) Buyer shall be solely liable for, and shall indemnify Seller for, any cost, loss, damage or expense suffered by Buyer or Seller arising out of the failure of Buyer's finished products to conform to the microbiological quality standards established therefor, as the same may be amended from time to time; and

(iv) Buyer shall indemnify Seller for any cost, loss, damage or expense suffered by Seller in the event that the Certification Sample proves that Seller's Talc met the specifications therefor, as described on Exhibit "E", before title to such Talc passed to Buyer.

Nothing contained in this Section 13(b) shall be construed to limit or conflict with the terms and conditions set forth in Sections 10 and 11 hereof, which shall be construed consistently with or in addition to the obligations set forth in this Section 13(b).

14. **Product Development**.    Buyer and Seller acknowledge that Buyer's talc marketing expertise and Seller's technical expertise may be used to the mutual benefit of the parties.    Therefore,

- 49 -

TSAGR508

Protected Document--subject to Protective Order

JNJ 000066723

Buyer and Seller may agree to collaborate in the development of new body powders, toiletries or other talc-containing consumer products.    In the event that Seller shall develop a new, proprietary, talc-containing body powder or toiletry, Seller shall provide to Buyer under mutually satisfactory obligations of confidentiality, sufficient information concerning such application to permit Buyer to determine Buyer's interest in further collaboration therein. Buyer shall have ninety (90) days following the date of Seller's disclosure to determine Buyer's interest in such collaboration. In the event Buyer and Seller collaborate in the development of a new application, Buyer shall have the exclusive right to market the same, and Seller shall be the exclusive supplier of talc therefore pursuant to the terms and conditions set forth herein. Any additional terms which may be required by the parties but which are not addressed herein shall be negotiated to the mutual satisfaction of Buyer and Seller. In the event that Buyer and Seller fail to agree upon any material additional term, Buyer and Seller may proceed independently with the development, marketing and sale of the new product in question, subject to any patent, trade mark, trade secret or other intellectual property rights or interests of Seller in such new product, and subject further to any obligation of confidentiality between the parties.

TSAO880N

Protected Document--subject to Protective Order

JMJ 000000726

15. **Miscellaneous**

(a)    **Parties in Interest; Assignment**. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and permitted assigns. This Agreement is not made for the benefit of any person, firm, corporation or other entity not a party hereto, and nothing in this Agreement shall be construed to give any person, firm, corporation or other entity, other than the parties hereto and their respective successors and permitted assigns, any right, remedy or claim under or in respect of this Agreement or any provision hereof.    This Agreement may not be assigned or transferred in whole or in part by any party hereto without the prior written consent of the other party, and any attempt to assign or transfer this Agreement or any part thereof in violation of this Section 15(a) shall render such attempted assignment or transfer void and of no effect. Notwithstanding the foregoing, Seller may assign this Agreement to any of its Affiliates upon giving notice of such assignment to Buyer.

(b)    **Notices**.    Any notice, request, consent, waiver or other communication required or permitted to be given hereunder shall be effective only if made or given in writing and shall be deemed sufficiently given only if delivered in person or sent by telegram, cable, telecopier, or by certified or registered mail, postage prepaid, return receipt requested, addressed as follows:

- 51 -

TSAG8808

Protected Document—subject to Protective Order

JNJ 000066727

If to Seller:

> Windsor Minerals Inc.
> c/o Cyprus Mines Corporation
> 9100 East Mineral Circle
> Englewood, Colorado   80112
> Attn:  Vice President - Industrial Minerals

With concurrent copy to:

> Cyprus Mines Corporation
> 9100 East Mineral Circle
> Englewood, Colorado  80112
> Attn:  General Counsel

If to Buyer:

> J & J Baby Products Company
> c/o Johnson & Johnson Consumer Products, Inc.
> 501 George Street
> New Brunswick, New Jersey  08903
> Attn:  Director of Procurement

With concurrent copy to:

> Johnson & Johnson
> One Johnson & Johnson Plaza
> New Brunswick, New Jersey 08933
> Attn:  General Counsel

or to such other person or address as such party may have specified in a notice duly given as provided herein.  Such notice or communication shall be deemed to have been given as of the date of delivery or transmission.

(c)  **Entire Agreement.**  This Agreement (including the Exhibits attached hereto and incorporated herein) constitutes the entire agreement and understanding of the parties relating to the subject matter hereof, and the same shall supersede all prior and

- 52 -

Protected Document--subject to Protective Order

contemporaneous agreements and understandings, representations and warranties, whether oral or written, relating to the subject matter hereof.

(d)   Modification.   This Agreement cannot be changed and no performance, term or condition may be waived in whole or in part except by a writing executed by a duly authorized officer of Buyer and Seller.

(e)   Waiver.   Except as specifically set forth herein, failure or delay by either party hereto to require performance of any provision of this Agreement shall not affect its right to require full performance thereof at any time thereafter, and the waiver of a breach of any provision shall not constitute a waiver of any breach of any other provision or of the same provision at any time thereafter.

(f)   Governing Law.   The terms and conditions of this Agreement shall be interpreted in accordance with and construed pursuant to the Uniform Commercial Code as from time to time in effect in the State of Vermont.

(g)   Severability.   The unenforceability or invalidity of any Section or provision of this Agreement shall not affect the enforceability or validity of the balance of this Agreement.

— 53 —

TS408808

Protected Document--subject to Protective Order

JMJ 000006729

(h)     **Headings.**    All headings of this Agreement have been inserted for convenience of reference only, and are not to be considered a part of this Agreement, and shall in no way affect the interpretation of any of the provisions of this Agreement.

(i)     **Mutual Negotiation.**    This Agreement and the language contained herein have been arrived at by the mutual negotiation of the parties.    Accordingly, no provision hereof shall be construed against one party or in favor of another party merely, by reason of draftsmanship.

(j)     **Obligations of Buyer.**    With respect to any covenant, obligation or agreement to be performed hereunder by Buyer, Buyer shall perform, or cause an affiliate of Buyer to perform, the same.

IN WITNESS, WHEREOF, the parties have caused this Agreement to be executed effective as of the day and year first set forth above.

WINDSOR MINERALS INC.,
a Vermont corporation

By: _____

Title: Executive Vice President

JOHNSON & JOHNSON BABY PRODUCTS
COMPANY, a division of
JOHNSON & JOHNSON CONSUMER
PRODUCTS, INC., a New Jersey
corporation

By: _____

Title: President

- 56 -

Protected Document--subject to Protective Order

JMJ 000066730

"EXHIBIT A"

AG8801281

Protected Document--Subject to Protective Order

WINDSOR MINERALS, INC.

Current

Good Manufacturing Procedures

and

Standard Operating Procedures

November 25, 1987

Good Manufacturing Procedures — Bagging

Bagging Procedures                                              001
Decontamination of Pallets                                     002
Cosmetic Bulk Loading                                          003
Transfers of Bagged Product                                    005
Fuller Kenyon Microbiologic                                    006
Cleaning the Inline Magnet (Cosmetic Grade Bag/Bulk
  Conveying Line                                               007
Cleaning Bag Machine Air Pads                                  008
Export Container Capacities                                    009
Silo Change Procedures                                         010

Good Manufacturing Procedures - Clerk

Bagging and Shipping Orders                                    002
Sample Requests                                                016
Shipping                                                       018
Silo Book and Silos                                            019
Silo Clearance Forms                                           020
Talc Transfer Slips                                            021

Good Manufacturing Procedures — Crusher

Argonaut Ore Blending with Hammondsville ore                   001

Good Manufacturing Procedures — Flotation

Flotation Start-up                                             001
Flash Dryers                                                   002
Additional Cleaning Responsibilities for Flotation
  Operators                                                    004
Shut-Down Chlorination                                         006
Start-up Chlorination                                          009

Good Manufacturing Procedures — General

Handling of Confidential Information                           005
Accidents — First-Aid                                          010
Foreign Material in 66 Product                                 011
Control of Foreign Material in 66 Product                      012

A-1

Protected Document--subject to Protective Order

## Good Manufacturing Procedures — Maintenance

| | |
|---|---|
| Start-up of Repaired Equipment | 005 |
| Handling of Chlorine Tanks and Related Equipment | 006 |
| Handling Procedures for Chlorine Leakage | 007 |
| Microbial Filter Inspection and Maintenance | 009 |
| Microbial Control for Flash Dryer Dust Collector | 011 |
| Maintenance for 1 and 2 Dust Collector | 012 |
| Maintenance of Ultraviolet Units | 015 |

## Good Manufacturing Procedures — Quality Control & Mill

| | |
|---|---|
| Changing Existing Mill and Quality Control Assurance Policies and Procedures | 001 |

## Good Manufacturing Procedures — Supervision

| | |
|---|---|
| Supervisor's Responsibilities | 001 |
| Operations for Supervisors | 002 |
| Production Quality Control — Grade 66 — Color | 007 |
| Samples — Missing | 008 |
| Operational Checks Dust Collectors | 009 |
| Production Quality Control — Grade 66 — Insols | 010 |
| Filling and Emptying Grade 66 Silos | 011 |
| Production Quality Control — Grade 96 — Color | 012 |
| Production Quality Control — Grade 96 — Insols | 013 |
| Silo Conditions | 017 |
| Overseas Container Inspection | 018 |

## Good Manufacturing Procedures — Warehousing

| | |
|---|---|
| Inventory Parts and Supplies — Need | 001 |
| Inventory Parts and Supplies — Withdrawal | 002 |
| Inventory Parts and Supplies — Control | 003 |
| Material Requisition | 008 |

## Good Manufacturing Procedures — Wet Mill

| | |
|---|---|
| Wet Mill Chlorination | 001 |
| Wet Mill Start-up procedure | 002 |
| Cleaning AB & CD Third Stage Cleaner Concentrate Magnet | 005 |
| Shut-down Chlorination | 008 |
| Start-up Chlorination | 009 |

## Standard Operating Procedures

| | |
|---|---|
| Arsenic Testing | QA-001 |
| Chlorine | QA-002 |
| Washing and Care of SPEC 20 CUVETS | QA-003 |
| Shift End Lab Clean-up | QA-004 |
| Orion Analog pH Meter Electrode | QA-005 |
| Water Still Cleaning | QA-006 |

Protected Document--subject to Protective Order

JMJ 000006733

| | |
|---|---|
| Filter Cake Color | QA-007 |
| Color (Reflectance) | QA-008 |
| Lab Printouts and Distribution | QA-009 |
| Laboratory Supervisor | QA-010 |
| Laboratory Technician | QA-011 |
| Laboratory Personnel Training | QA-012 |
| Lab Notebook Use | QA-013 |
| Quality Assurance Department | QA-014 |
| Reporting Test Analysis Results | QA-015 |
| Silo "C" of "A" Batch File | QA-016 |
| Acid Insols - Tails and Ore | QA-017 |
| Insol, MgC)3 - Leco Determinator | QA-018 |
| Water Soluble Iron | QA-019 |
| Brainweigh Electronic Balance - PM | QA-020 |
| LABCONCO Fume Hood - PM | QA-021 |
| LECO Routine Maintenance | QA-022 |
| Calibration of pH Meter | QA-023 |
| Sartorius Analytical Balance - PM | QA-024 |
| Alpine Air Jet Sieve - PM | Qa-025 |
| Ro-Tap Testing Sieve Shaker - PM | QA-026 |
| Sub-Sieve Sizer - Calibration and Maintenance | QA-027 |
| Bausch and Lomb Spectronic 20 - PM | QA-028 |
| Scott Volumeter - PM | QA-029 |
| Monitek Trubidimeter Maintenance | QA-030 |
| Filter Cake Moisture | QA-031 |
| Ore Moisture | QA-032 |
| pH of Talc | QA-033 |
| Daily 66 Preparation and Testing | QA-034 |
| Bagged Shipments - 66 and 96 Grade | QA-035 |
| Sample Collection | QA-037 |
| MSHA Parallel Samples for Fiber | QA-038 |
| Microbial Samples for Royston | QA-039 |
| Railcar Shipments | QA-040 |
| Silo Composites | QA-041 |
| Asbestos - Transmission Electron Microscopy | QA-042 |
| NPDES Water Quality Monitoring | QA-043 |
| Asbestos - X-Ray Diffraction Samples | QA-044 |
| Frequency of Analysis - Cosmetic | QA-045 |
| Ro-Tap Sieve Analysis | QA-048 |
| Oil Absorption of Pigments | QA-049 |
| pH - Water Sample | QA-050 |
| Total Suspended Solids | QA-051 |
| Turbidity | QA-052 |
| Master Equipment List | QA-053 |

Protected Document--subject to Protective Order

JNJ 000066734

"EXHIBIT B"

AG6801281

Protected Document--Subject to Protective Order

JNJ 000066735

TALC SUPPLY AGREEMENT
EXHIBIT B - 3 Pages

### ARBITRATION

All matters submitted for arbitration in accordance with Section
4(e) of the Agreement to which this Exhibit B is attached (the
"Agreement") shall be determined as follows:

1. **Notice.** The party desiring arbitration shall give written
notice of its desire to the other party.  The parties shall
promptly exchange all documents and information relevant to the
dispute and the issue presented.  Except as otherwise provided
herein, arbitration shall be held under the commercial Rules of
the American Arbitration Association then in effect.

2. **Appointment of Arbitrator.** Within fifteen (15) calendar days
following the expiration of the aforementioned thirty (30) day
period, Buyer and Seller shall agree on a single arbitrator (the
"Arbitrator").    The  arbitrator  shall  be  impartial  and
disinterested and qualified by training and experience in the
particular matter which is the subject of arbitration.   In the
event Buyer and Seller do not agree upon the Arbitrator within
such fifteen (15) calendar days, the parties shall jointly
request, immediately upon expiration of such fifteen (15)
calendar day period, that the Arbitrator be appointed by a Judge
of the United States District Court for the District of Vermont.

B-1

75408808

Protected Document--subject to Protective Order

JMJ 000000736

3. <u>Rules of Procedure</u>.  Upon appointment the Arbitrator shall promptly proceed to investigate, hear, and arbitrate the issues raised by the parties under Section 4(a) of the Agreement, completing the same within sixty (60) calendar days after appointment.  The Arbitrator may follow any rules of procedure which he deems appropriate, including the rules for discovery, pleadings and briefs.  The Arbitrator may order reasonable discovery, including presentation of evidence and testimony by independent experts or witnesses, or establish any other procedure which will aid in the expedited resolution of the dispute.

4. <u>Hearing and Award</u>.  The Arbitrator may, on reasonable notice to the parties, hold hearings of witnesses or arguments and copies of all documents to be considered by the Arbitrator shall be furnished to each party; provided, however, that the other party may request that documents designated as confidential be viewed <u>in camera</u> by the Arbitrator and disclosed only as necessary to allow the other party full opportunity to respond. The Arbitrator may conduct the hearing or hearings in such manner as he deems necessary to hear and understand the dispute, and to ensure that each party is given equal opportunity to present evidence on the dispute.  The Arbitrator may hear any witnesses and consider any exhibits presented by either of the parties or may call his own witnesses.  A stenographic record of the hearing will be taken; and the Arbitrator shall base his decision upon

3-2

*SAC8806

Protected Document--subject to Protective Order

the terms of the Agreement, applicable law, and the testimony, briefs and documentation supplied by the parties. Each party shall, within twenty (20) calendar days following receipt of the stenographic record, submit its post-hearing brief setting forth its proposed findings of fact and conclusion. The Arbitrator shall make a written determination of the existence of hardship within fifteen (15) calendar days after receipt of such briefs, setting forth in reasonable detail the Arbitrator's basis for his determination. The decision of the Arbitrator shall be conclusive and binding on each party and may be enforced by any court having jurisdiction thereof.

5.  Expense of Arbitration.    All expenses incurred by the Arbitrator, including reasonable compensation to the Arbitrator, and the fees and expenses of attorneys or experts who may be retained by the Arbitrator, and any investigation which may be made by the Arbitrator, shall be borne equally by the parties hereto.

6.  Continuation of Agreement.    The pendency of any such arbitration shall not in any manner or to any extent affect or abridge the respective rights and obligations of the parties under the Agreement, including but not limited to the continued performance thereof.

3-3

154G8808

"EXHIBIT C"

AG8801281

Protected Document--Subject to Protective Order

JNJ 000066739

TALC SUPPLY AGREEMENT
EXHIBIT C — 2 PAGES

## SAMPLE HARDSHIP CALCULATION

(For use in the event of termination of the Agreement
pursuant to Section 4(e)(i) thereof.)

### Example No. 1.

1. Assume notice of hardship is given on January 1, 1995, and is followed by notice of termination.  Termination is effective on January 1, 1996.

2. Assume the Offer Price is $400.00 per ton, and no deliveries of Talc are made on January 1, 1996.

3. Buyer's payment to Seller, due within thirty days following January 1, 1996, shall be:

$$0.70 \times [[(\$400 \times 1.04^1) \times (9,800 - 0) \times 0.694) + ((\$400 \times 1.04^2) \times 9,800 \times 0.694 \times 0.85] + [(\$400 \times 1.04^3) \times 9,800 \times 0.694 \times 0.6775]] = \underline{\$5,182,564}$$

C-1

TC-5940a

Protected Document--Subject to Protective Order

JNJ 000066740

Example No. 2.

1. Assume notice of hardship is given on March 31, 1996, and is followed by notice of termination.  Termination is effective on March 31, 1997.

2. Assume the Offer Price is $400.00 per ton, and Buyer purchases 2500 tons of Talc between January 1, 1997 and March 31, 1997.

3. Buyer's payment to Seller, due within thirty days following March 31, 1997, shall be:

$$0.70 \times \{[(\$400 \times 1.04^1) \times (9,800 - 2500) \times 0.694] + [(\$400 \times 1.04^2) \times 9,800 \times 0.694 \times 0.85]\} = \$3,326,048$$

C-2

Protected Document--Subject to Protective Order

JNJ 000066741

"EXHIBIT D"

AG880'281

Protected Document--Subject to Protective Order

Talc Supply Agreement
Exhibit D - 1 page

## WINDSOR MINERALS, INC.
## ARGONAUT AND HAMMONDSVILLE ORE BODIES

| MINING PROPERTY | M-Tons - As of Nov. 25, 1987 | | |
| --- | --- | --- | --- |
| | PROVEN | PROBABLE | POSSIBLE |
| Argonaut | | | |
| Smith Lease | | | |
| West | 500 | 500 | - |
| East | 1100 | 500 | 400 |
| Hammondsville | | | |
| Fee | 1744 | 2535 | - |
| Gallowhur Lease | 500 | - | - |
| TOTAL | 3844 | 3535 | 400 |

D-1

Protected Document--Subject to Protective Order

JNJ 000066743

"EXHIBIT E"

AG8BD12B1

Protected Document--Subject to Protective Order

JNJ 000066744

WINDSOR MINERALS, INC.

Requirements Regarding Production and Testing of Grade 66 Talc

### QUALITY STANDARDS

The agreement of the Johnson & Johnson Baby Products Company (BPC) to purchase Grade 66 is additionally conditioned on the following requirements:

1. It is important to recognize that Grade 66 Talc as provided to BPC faces some uniquely restrictive limits which affect the methods and chemicals used in its preparation. In addition, restrictive Vermont water quality standards impinge on the use of processing aids in the beneficiation process.

   Johnson & Johnson cosmetic talc is currently and must continue to be asbestos free as defined from time to time by appropriate governmental agencies and the Cosmetic Toiletries Fragrance Association (CTFA) and

   No experimentation in reagentry, Ph modifiers, flocculants de-foamers, etc. may be conducted which leads to contamination of certified product in the least degree.

2. All of the talc is to be produced via the methods and process currently used by Windsor Minerals including the avoidance of contaminating materials by means of carefully controlled selective mining of qualified ore bodies and the proprietary methodology known as the shear disc. The Good Manufacturing Procedures (GMP's) and the Standard Operating Procedures (SOP's) developed and in use by Windsor Minerals at the time this Agreement is concluded must continue to be followed and the necessary records of proof must be maintained and made immediately available on request to an appropriate representative of the BPC.

3. All of the talc is to be produced solely from ore bodies which have been approved by the BPC. Currently, the Hammondsville and Argonaut ore bodies are approved for carefully controlled selective mining for ore for use in the preparation of Grade 66 Talc.

4. All talc shipments are to be handled in the manner and utilizing the dedicated silos, trailers, and transfer systems currently used at Windsor Minerals. The Standard Operating Procedures as to microbiological safety must be followed and certification of compliance provided. The silos and bulk trailers may not be used for storage or transport of any other material and are to be carefully protected against water and or microbiological contamination.

E-1

Protected Document--Subject to Protective Order

JNJ 000086745

5.  Shipments may only be made from silos whose contents:

  a.  Strictly conform to the physical, chemical, microbiological standards expressed in BPC Raw Material Specification #21005, Windsor V-86 Talc, which may be revised from time to time as conditions require.

  b.  Have been tested for conformance to specifications through the use of test methods (TM'S) and techniques provided in detail by the BPC as referenced in the talc specification above. Records of all tests and results are to be compiled in bound notebooks and retained as the GMP'S and SOP'S require.

  c.  Have been held in impound pending the receipt of all relevant approvals and the release of the material via a silo release form signed by any appropriate representative of the producing company.

      The details of analytical and microbiological assays and tests for each examination made during the course of production shall be cross-referenced to silo numbers and retained for not less than 36 months.

6.  Representative samples of the ground ore feeding the process and finished product produced therein shall be taken on a continuous composite basis, accumulated as monthly samples and a split of these samples, retained and the balance appropriately marked and coded, sent to:

      McCrone Environmental Services, Inc.
      1412 Oakbrook Drive, Suite 100
      Norcross, GA. 30093
      Attention of James R. Millette, Ph.D.

    McCrone Services is to conduct examination for the presence of deleterious minerals species via Transmission Electron Microscopy.

    The testing to follow the practice as conducted for Windsor Minerals in the past. A copy of the resulting McCrone report is to be provided directly from the McCrone organization to the Manager of Quality Assurance, Johnson & Johnson Baby Products, Royston, Georgia.

E-2

Protected Document--subject to Protective Order

JNJ 000000746

7. If State or Federal regulations or anticipated regulations in the judgement of the BPC require testing for additional or different mineral species, the appropriate tests will be added to the above requirement upon request of the BPC.

8. If in the judgement of the BPC new or different tests or examinations become necessary to insure the safety and quality of Grade 66 Talc, the BPC and the seller will meet together to determine the methods and reporting requirements.

9. Changes in water supplies or fuels may not be made without thorough examinations relative to microbiological and chemical factors and prior approval of the BPC.

10. Grade 66 Talc when supplied in bags must be handled following the methods established and in use by Windsor Minerals for bacteriacidal treatment of pallets, papers, and containers or trucks.

E-3

Protected Document--Subject to Protective Order

JNJ 000066747

$U^{|} \quad - \; u \; \hat{U}^{|||||| = |||}$  PAGE  1A of 4

MATERIAL SPECIFICATION          BABY PRODUCTS COMPANY

S·.ECT:  WINDSOR 66 TALC

LICABLE PRODUCT(S):   See Below    ~ .          LOCATION:   Royston, PCA,
                                                            Kolmar

INTERIM(S) AFFECTED:

| REVISION DATE | DESCRIPTION OF CHANGE | AUTHORIZATION |
|---|---|---|
| 1/29/87 | Page 2, Section 13, Packaging and Q.A. page 2 updated. Johnson's Baby Lotion with Baby Powder added as an applicable product. | BCR DD9656 |
| 6/10/87 | Page 2, Section 12, Microbial Requirement revised. | BCR C09822 |
| 6/16/87 | Page 2, Section 12, Microbial Requirement Test Method updated. | BCR D09987 |
| 3/1/88 | Q.A. page 1 of 2, Section 2A, updated. | BCR C10629 |
| 10/14/88 | Specification updated. | BCR D1108D |
| 11/2/88 | Specification updated.  MSDS added.  Q.A. page added. | BCR D11111 |

APPLICABLE PRODUCTS

Baby Lotion w/Baby Powder
Baby Powder
Shower to Shower

z-4

Protected Document--subject to Protective Order          JNJ 000000748

*Johnson-Johnson*

**BABY PRODUCTS COMPANY**

M̲'̲ ̲T̲I̲A̲L̲ ̲S̲P̲E̲C̲I̲F̲I̲C̲A̲T̲I̲O̲N̲

" ECT: WINDSOR 66 TALC

## DESCRIPTION / PROPERTIES & REQUIREMENTS

1. A hydrous magnesium silicate (also called magnesium acid metasilicate), a fine white lustrous powder, slippery, adherent to skin with no foreign odor or grittiness.

2. ASBESTOS (CTFA/J4-1)(TM 7024)........   None detected. Asbestos is defined to be the fibrous serpentine, chrysotile and the fibrous forms of the amphibole group as represented by amosite, anthophyllite, crocidolite, tremolite and actinolite.

3. MOISTURE (TM 7164) ..................   NMT 0.15%

4. SOLUBILITY BY ACID (TM 7165) ........   NMT 2.0%

5. MAGNESITE (MgCO₃)% ..................   NMT 1.10% $MgCO_3$
   (TM 7171 or TM 7077)

6. BULK DENSITY (TM 7166) .............   20.5 to 25.5 lb./cu. ft. or metric equivalent at Windsor Minerals.

   COLOR (TM 7170 or TM 7071)...........   White as compared to a previously accepted lot or minimum of 85.5 reflectance reading.

   FINENESS (TM 7070 or TM 7167).......   Through 60 mesh, 100%. Through 100 mesh, at least 99.7%, through 200 mesh, at least 98.5%.

9. HEAVY METALS (TM 7168) .............   NMT 10 ppm

10. ARSENIC (TM 7169) ..................   NMT 2 ppm

11. WATER SOLUBLE IRON (USP) ...........   Pass Test

12. MICROBIAL REQUIREMENT (TM 7807) .....   Samples taken from Windsor trucks or bags shall contain no detectable harmful microorganisms and the total count shall be no greater than 50 microorganisms per gram of product.

13. PACKAGING ..........................   In suitable bags to protect contents from loss, contamination and deterioration in normal shipment and storage. Pallets of bagged material must be either stretch wrapped or covered with corrugated and secured with straps. Each bag shall contain 50 lbs. or metric equivalent. Bulk shipments will be made in BPC approved railcars and trailers.

E-5

Protected Document--subject to Protective Order

JNJ 000066749

PAGE 3

MATERIAL SPECIFICATION        BABY PRODUCTS COMPANY

S.. .JECT:  WINDSOR 66 TALC

---

..  MARKING ............................... Each bag shall be marked with:

Contents Name, Supplier Name, Supplier Lot No.
Net Weights
Purchaser's Code

Bulk shipments are identified by the individual
number of the particular trailer or railcar..

15.  STORAGE ............................. If stored in bags, keep in dry area. Suitable
bulk silos (for BPC): Buttler electro-fused
polymer utilizing white flint-flex powder
#531-7010 manufactured by DuPont.

16.  RAILCAR LOADING & SAMPLING .......... Railcar loading, unloading and sampling shall be
in accordance with the approved Baby Products
Procedure BQCP #85..

17.  CERTIFICATE OF ANALYSIS ............. A silo source analytical certificate will provide
numerical analytical results required in Items 3,
4, 5, 6, 7, 8 and 10 of this specification.
Items # 9 and 11 will be reported as pass/fail.
These results are obtained from a silo composite
sample which is comprised from samples taken at
eight hour intervals during the filling of the
silo.  The silo source analytical certificate
will reference the railcar or trailer number(if a
trailer is used to ship directly to Royston).

The certificate of analysis and the railcar/ or
trailer seal log required as per BQCP #85 will
accompany the preshipment samples to Royston and
will be sent to the Royston Microbiology
Laboratory.

E-6

Protected Document--Subject to Protective Order

JNJ 000066750

Johnson-Johnson

**BABY PRODUCTS COMPANY**

SPEC. NO. 66-101
PAGE  4

4A    GAL SPECIFICATION

3    JCT:  WINDSOR 66 TALC

## 18. FREQUENCY OF CHARACTERISTICS TO BE TESTED

| No. | Characteristic | T.M. | Frequency |
|-----|----------------|------|-----------|
| 2A. | Asbestos(a) | ETFA/J4-1 | Per Note 1A |
| 2B. | (b) | TM 7024 | Per Note 1B |
| 3. | Moisture | 7164 | Certified per 2 |
| 4. | Solubility by Acid | 7165 | Certified per 2 |
| 5. | Magnesite (MgCO₃)% | 7171 or 7077 | Certified per 2 |
| 6. | Bulk Density | 7166 | Certified per 2 |
| 7. | Color | 7170 or 7071 | Certified per 2 |
| 8. | Fineness | 7167 or 7070 | Certified per 2 |
| 9. | Heavy Metals | 7168 | Certified per 2 |
| 10. | Arsenic | 7169 | Certified per 2 |
| 11. | Water Soluble Iron | USP | Certified per 2 |
| 12. | Microbial Requirement | 7807 | Every lot-See 3 |

NOTE:

1A. A composite sample is made from every two completed silos, labeled with silo numbers and production dates and forwarded to J & J Baby Products for x-ray diffraction.  Results are reported to Windsor Minerals.

1B. Quarterly composite samples of above silo samples will be evaluated by TM 7024 by BPC and data reported to Windsor Minerals.

2. Certificates of Analysis are received from Windsor Minerals with each pre-shipment microbial sample.  Analytical testing frequencies.

   Tested on silo composite after each silo is filled.

3. Microbial

   a. Microbial testing performed on flash dried sample every 8 hrs. ( Royston is used as the testing lab.)

   b. Microbial testing will be conducted on the pre-shipment composite sample of each railcar taken as per BQCP #85.

19.  ACCEPTANCE .................    There shall be no change in the supplier's process or composition of the material without prior notification to and approval of JOHNSON & JOHNSON. Any non-conformance to the specified Description / Properties & Requirements, shall be cause for rejection.

E-7

Protected Document--Subject to Protective Order

JNJ 000066751



P.O. Box 550 Windsor, Vermont 05089
Phone (802) 484-7763

# MATERIAL SAFETY DATA SHEET

| CODE 29 CFR | DATE ISSUED | ISSUED BY |
|---|---|---|
| Per OSHA 1910.1200 | 9/13/85 | R.N. Miller |

## SECTION I - IDENTIFICATION OF MATERIAL

| CHEMICAL NAME OR COMPOSITION | HAZARD RATING |
|---|---|

CHEMICAL NAME OR COMPOSITION

Beneficiated Grade Talc Product

TRADE NAME & SYNONYMS

**GRADE 66 TALC**

| CHEMICAL FAMILY | MOLECULAR FORMULA |
|---|---|
| Hydrous Magnesium Silicate<br>Magnesium Carbonate | $H_2O.3MgO.4SiO_2$<br>$Mg CO_3$ |

HAZARD RATING
PER H.M.I.S OF N.P.C.A

| | 1 |
| | 0 |
| REACTIVITY | 0 |
| PERSONAL PROTECTION | E |
| *AVOID MASSIVE INHALATION | |

## SECTION II - SIGNIFICANT COMPONENTS AND CONTAMINANTS

| COMPONENTS | WEIGHT PERCENT | EXPOSURE LIMITS TWA (8 HOUR) |
|---|---|---|
| COMPOUND NAME<br><br>N/A | | TLV |
| COMPOSITION AND CONTAMINANTS<br><br>Talc - Non fibrous CAS# - 14807-96-6 | ± 98.0 | 20MPPCF - OSHA<br>2mg/M³ - ACGIH |
| Magnesite CAS #-546-90-0 | ± 2.0 | 5mg/M³ - OSHA<br>5mg/M³ - ACGIH as<br>Nuisance Dust |
| NOTE: Does not contain asbestiform minerals and contains less than 1% Crystalline Silica. | | |

## SECTION III - PHYSICAL DATA

APPEARANCE AND ODOR

Fine White Powder - Slight Earthy Odor

| BOILING POINT | FREEZING POINT | SPECIFIC GRAVITY | ODOR THRESHOLD |
|---|---|---|---|
| N/A | N/A | ± 2.8 | Not Known |

| VAPOR PRESSURE (MM OF MERCURY) | PH | EVAPORATION RATE |
|---|---|---|
| N/A | ± 8.4 | N/A |

| VAPOR DENSITY (AIR = 1) | SOLUBILITY IN WATER |
|---|---|
| | Insoluble |

## SECTION IV - FIRE AND EXPLOSION HAZARD DATA

| FLASH POINT (SPECIFY METHOD) | FLAMMABILITY CLASS | FLAMABLE (EXPLOSIVE) LIMITS (PERCENT BY VOLUME) | |
|---|---|---|---|
| | | LOWER LIMIT | UPPER LIMIT |
| N/A | Nonflammable | N/A | N/A |

FIRE EXTINGUISHING MEDIA

Will not burn.

SPECIAL FIRE FIGHTING PROCEDURES

N/A

UNUSUAL FIRE AND EXPLOSION HAZARDS

None.

Σ-8

Protected Document--subject to Protective Order

## SECTION V - HEALTH HAZARD DATA

TOXICITY

Acute oral toxicity (rat) produced no toxic effects at maximum gavage levels of 40 ml/kg of 15% suspension

| HEALTH EFFECTS/ FIRST AID PROCEDURES | EYES — As particulate can cause irritation if introduced into the eye — flush eyes with water or normal saline — if irritation persists, see physician. |
| | SKIN — No adverse effects from contact during use — may have drying effect. As with any mineral, should not be in contact with broken skin. |
| | INHALATION — Massive accidental powder aspiration has been treated with parenteral cortico steroids and antibiotics with supportive therapy sympathiometic drugs and oxygen. Get prompt medical attention. |
| | INGESTION<br><br>Non-Toxic |

## SECTION VI - REACTIVITY DATA

GENERAL REACTIVITY

Inert/Stable

INCOMPATABILITY (MATERIALS TO AVOID)

None

HAZARDOUS DECOMPOSITION PRODUCTS

Does Not Decompose

| HAZARDOUS POLYMERIZATION | CONDITIONS TO AVOID |
| ☐ WILL OCCUR  ☒ WILL NOT OCCUR | None Known |

## SECTION VII - SPILL PROCEDURES DISPOSAL REQUIREMENTS

STEPS TO BE TAKEN IN CASE MATERIAL IS RELEASED OR SPILLED

Dry vacuuming is preferred. Sweeping should be done so as to avoid excessive dust generation.

WASTE AND CONTAINER DISPOSAL METHODS

Wet down, store with other non-hazardous waste. Dispose in accordance with prevailing regulations.

## SECTION VIII - SPECIAL PROTECTION INFORMATION (SPECIFY IN DETAIL)

| | EYE PROTECTION | RESPIRATORY PROTECTION | GLOVES | VENTILATION | OTHER |
|---|---|---|---|---|---|
| ROUTINE | Safety Glasses | Not Required | Not Required | Maintain Use Area Below TLV Standard | |
| NON-ROUTINE OR EMERGENCY | Sealed Safety Glasses | OSHA or NIOSH Approved NOSP Mouth Respirator | Not Required | Avoid Massive Inhalation Use Respirator | |

## SECTION IX - SPECIAL REQUIREMENTS

STORAGE REQUIREMENTS / LABELING / MEDICAL AND ENVIRONMENTAL SURVEILLANCE

No Special Requirements

## SECTION X - NOTES

| MANUFACTURERS NAME<br><br>Windsor Minerals, Inc.<br>P.O. Box 680<br>Windsor, VT 05089          E-9 | EMERGENCY PHONE NUMBER<br>(802) 484-7763<br><br>INFORMATION PHONE NUMBER<br>(802) 484-7761 |

Protected Document--subject to Protective Order

JMJ 000066751

Johnson-Johnson

PAGE 1 of 1

**BABY PRODUCTS COMPANY**

Q    TY ASSURANCE PAGE - RESTRICTED FOR J & J USE ONLY

ECT: WINDSOR 66 TALC

1. FREQUENCY OF CHARACTERISTICS TO BE TESTED

| No. | Characteristic | T.M. | Frequency |
|-----|----------------|------|-----------|
| 2A. | Asbestos(a) | CTFA/J4-1 | Per Note 1A |
| 2B. | (b) | TM 7024 | Per Note 1B |
| 3. | Moisture | 7164 | Certified per 2 |
| 4. | Solubility by Acid | 7165 | Certified per 2 |
| 5. | Magnesite ($MgCO_3$)% | 7171 or 7077 | Certified per 2 |
| 6. | Bulk Density | 7166 | Certified per 2 |
| 7. | Color | 7170 or 7071 | Certified per 2 |
| 8. | Fineness | 7167 or 7070 | Certified per 2 |
| 9. | Heavy Metals | 7168 | Certified per 2 |
| 10. | Arsenic | 7169 | Certified per 2 |
| 11. | Water Soluble Iron | USP | Certified per 2 |
| 12. | Microbial Requirement | 7807 | Every lot-See 3b |

NOTE:

1A. A composite sample is made from every two completed silos, labeled with silo numbers and production dates and forwarded to J & J Baby Products for x-ray diffraction. Results are reported to Windsor Minerals.

1B. Quarterly composite samples of above silo samples will be evaluated by TM 7024 by BPC and data reported to Windsor Minerals.

2. Certificates of Analysis are received from Windsor Minerals with each pre-shipment microbial sample. Analytical testing frequencies.

    Tested on silo composite after each silo is filled.

3. Microbial

    a. Microbial testing performed on flash dried sample every 8 hrs.( Royston is used as the testing lab.)

    b. Microbial testing will be conducted on the pre-shipment composite sample of each railcar taken as per BQCP #85.

4. Baby Products acceptable limit on samples taken from railcars or trucks at the receiving point is between 20.5 to 27.0 lb./cu. ft.

5. The microbial requirements on page 2, item 12 are not an accept/reject criteria for talc received in bags at PCA for use in Johnson's Baby Lotion with Baby Powder.

E-10

JNJ 000066794

"EXHIBIT F"

AC8801281

Protected Document--Subject to Protective Order

WINDSOR MINERALS, INC.
Johnson & Johnson Ship To Stock Certification Requirements

## I. Partnership

The most important requirement for a successful Ship to
Stock Program is the establishment of a quality partnership
between the two companies.  The establishment of close
interface and mutual trust must be created.

In this partnership, the Supplier must accept total
responsibility for the material he is supplying.  Both
parties must demonstrate a willingness to work together.
Also they must understand that sound, strictly enforced
management systems combined with team attitude can be the
prime contributor to product acceptance and use.

As part of this partnership, STS representatives at both
locations will be selected to manage the program.

## II. Access

Customer access to the Supplier's plant is an absolute for
Ship to Stock.  A definition of total access is that the
customer be given complete access to any part of the
Supplier's operations which pertains to the manufacture,
control, and distribution of the material being supplied.

Agreement must be reached that with reasonable
notification, customer representatives will be allowed
access to conduct applicable audits, surveys, inspections,
etc. that are necessary to determine if the systems are in
place to support the receipt of material without inspection.

Areas covered include:

- The Physical Plant
- The Manufacturing/Quality Systems
     SOP's
     Quality Procedures and Testing
     Control Procedures
     Proprietary Information (Subject to Secrecy
          Agreements)
- Internal Audits
- Documentation Systems

F-1

Protected Document--subject to Protective Order

JMJ 000000796

Ship to Stock Certification Requirements

### III. Manufacturing/Quality Systems

A Ship to Stock Supplier must be able to demonstrate having the control systems in place to consistently supply acceptable material on every lot such that incoming inspection is not necessary.

During the Supplier Survey, the Survey Team will review each component of the control system and determine if the systems are adequate.

Examples of the systems surveyed are:

- Specification control
- Raw Material control
- Processing control
- Product acceptance control
- Material storage control
- Shipping procedures
- Documentation retention/retrieval
- Lot traceability
- Quality program management
- Testing capability
- GMPS
- Personnel training and certification

### IV. Corrective Action Systems

The Supplier shall have a corrective action system for responding to problems. Corrections to problems are to be documented. Operating procedures are to be designed to activate corrective action.

### V. Supplier Responsiveness

The Supplier shall have an excellent history for responsiveness to problems. He must have an organized system for responding to problems and he must have the technical expertise to provide the proper support.

### VI. Systems Design

An indicator of what constitutes a Ship to Stock Supplier is how his systems are designed.

Systems must be preventative to become a Certified Supplier. Statistical process control and process validation will be used where applicable. Internal audits are to be conducted to verify the systems.

F-2

Protected Document--subject to Protective Order

JMJ 000060757

Ship to Stock Certification Requirements

## VII. Certificate of Analysis

The Supplier must supply all pertinent material characteristic data currently used to release the product at the customers facility.  This includes all analytical and microbial data.

The Certificate of Analysis must arrive prior to or with the shipment of material and must have lot traceability.

## VIII. Quality Improvement Process

For a company to be certified, an organized system for quality improvement will be in evidence.

## IX. Training

The ability to show evidence of a trained work force is another requirement to become certified as a STS Supplier.

Individuals in critical decision-making positions must be trained and qualified for those functions.  Personnel must undergo a formal training program and be certified.  Personnel should also be recertified at set intervals.  Certification must be documented.

## X. Audits

As part of the program maintenance requirements, the customer must be allowed to conduct review audits of the procedures and systems agreed upon during qualification.  (Ex:  release procedures, documentation procedures, manufacturing quality plan, etc.)

F-3

Protected Document--Subject to Protective Order

JNJ 000066758

## CONSENT, ASSIGNMENT, AND ASSUMPTION

Reference is made to the Talc Supply Agreement between Cyprus Windsor Minerals Corporation, a Vermont corporation ("Assignor"), and Johnson & Johnson Baby Products Company, dated January 6, 1989 (the "Agreement"). Assignor hereby assigns its rights and delegates the performance of its duties under the Agreement to RTZ America, Inc., a Delaware corporation ("Assignee"). Johnson & Johnson Consumer Products, Inc., a New Jersey corporation ("CPI"), as successor in interest to Johnson & Johnson Baby Products Company, hereby consents to the assignment of rights and the delegation of performance of duties under the Agreement by Assignor to Assignee.

The consent of CPI granted hereby shall not release Assignor from any liability or responsibility under the Agreement and does not constitute a waiver or an estoppel with respect to any rights that CPI may have by reason of Assignor's past performance or failure to perform. The consent of CPI granted hereby is granted subject to the condition that Assignee has agreed, and hereby agrees, to assume and perform all of the obligations, covenants and agreements of Assignor in the Agreement and to comply with all the terms and conditions of the Agreement.

No provision of this consent, assignment, and assumption shall be deemed to alter or modify any term or condition of the Agreement.

In witness whereof, the parties have caused this consent, assignment, and assumption to be executed effective as of the __31__ th day of June, 1992.

JOHNSON & JOHNSON
PRODUCTS, INC.                                    RTZ AMERICA, INC.

By: _____          By: _____

Name: Brian T. McGrath                        Name: Arthur C Glass
Title: Director of Purchasing &               Title: Purchasing
       Package Engineering

CYPRUS WINDSOR MINERALS CORPORATION

By: _____

Name: Philip C. Wolf
Title: President

0623.DEH

Protected Document--Subject to Protective Order

JNJ 000066759

**EXHIBIT C**

AGREEMENT

BETWEEN

CYPRUS MINES CORPORATION

AND

JOHNSON & JOHNSON

DATED

JANUARY 6, 1989

AG8805B07

TABLE OF CONTENTS

| Section | | | Page |
|---|---|---|---|
| 1. | | Sale of Stock | 2 |
| 2. | | Purchase Price and Payment | 2 |
| | 2.1 | Base Purchase Price | 2 |
| | 2.2 | Adjustment of Base Purchase Price | 3 |
| 3. | | Representations and Warranties of J & J, Windsor and Western | 5 |
| | 3.1 | Organization and Existence | 5 |
| | 3.2 | Articles and Bylaws | 6 |
| | 3.3 | Minute Books and Stock Certificate Books and Records | 6 |
| | 3.4 | Capitalization | 7 |
| | 3.5 | Authority and No Violations | 8 |
| | 3.6 | Interest in Other Entities | 9 |
| | 3.7 | Financial Statements of Windsor and Western | 10 |
| | 3.8 | Undisclosed Liabilities | 11 |
| | 3.9 | Tangible Personal Property | 11 |
| | 3.10 | Real Property | 13 |
| | 3.11 | Transfers of Real and Personal Property | 14 |
| | 3.12 | Environmental Matters | 14 |
| | 3.13 | Permits and Compliance with Other Laws | 15 |
| | 3.14 | Litigation and Proceedings | 16 |
| | 3.15 | Contracts | 17 |
| | 3.16 | Customers | 17 |
| | 3.17 | Taxes | 18 |
| | 3.18 | Insurance and Bonds | 18 |
| | 3.19 | Banking and Personnel Matters | 19 |
| | 3.20 | Events Since Balance Sheet Date | 20 |
| | 3.21 | Brokers | 21 |
| | 3.22 | Disclosures | 22 |
| | 3.23 | Underground Storage Tanks; PCB's | 23 |
| | 3.24 | Pension and Benefit Matters | 23 |
| | 3.25 | Intellectual Property | 29 |
| 4. | | Representations and Warranties of Cyprus | 30 |
| | 4.1 | Organization and Existence | 30 |
| | 4.2 | Authority and No Violations | 30 |
| | 4.3 | Brokers | 31 |
| | 4.4 | Purchase for Investment | 31 |
| | 4.5 | Salaried Pension Plan | 31 |
| 5. | | Covenants | 32 |
| | 5.1 | Assumption of Obligations | 32 |
| | 5.2 | Windsor and Western Obligations | 32 |
| | 5.3 | Due and Uncollected Receivables; Petty Cash | 33 |
| | 5.4 | Change of Ownership | 33 |
| | 5.5 | Corporate Records | 33 |
| | 5.6 | Employee Matters | 33 |

AG8805B07

TABLE OF CONTENTS (Continued)

| Section | | | Page |
|---|---|---|---|
| | 5.7 | Tax Matters Agreement | 41 |
| | 5.8 | Tax Liabilities and Refunds | 41 |
| | 5.9 | Insurance | 42 |
| | 5.10 | Articles and Bylaws | 43 |
| | 5.11 | Financial Statements of Windsor and Western | 43 |
| | 5.12 | Sale of Real Property and Personal Property | 44 |
| | 5.13 | Permits | 44 |
| | 5.14 | Banking and Personnel Matters | 44 |
| | 5.15 | Additional Permits | 45 |
| | 5.16 | Railroad Right-of-Way | 48 |
| 6. | Access to Records | | 50 |
| | 6.1 | Cyprus' Access | 50 |
| | 6.2 | J & J's Access | 51 |
| 7. | Closing | | 52 |
| 8. | Mutual Conditions Precedent to Closing | | 52 |
| | 8.1 | No Injunctions | 53 |
| | 8.2 | Approvals; Consents | 53 |
| | 8.3 | Board Approval | 53 |
| | 8.4 | Due Diligence | 54 |
| | 8.5 | Talc Supply Agreement | 54 |
| | 8.6 | Tax Matters Agreement | 55 |
| | 8.7 | Roger Miller Agreement | 55 |
| 9. | Conditions to Obligations of Cyprus | | 55 |
| | 9.1 | Representations and Warranties True | 55 |
| | 9.2 | No Adverse Change | 56 |
| | 9.3 | No Loss | 56 |
| | 9.4 | Certificates | 56 |
| | 9.5 | Opinion of Counsel | 56 |
| | 9.6 | Resignations | 57 |
| | 9.7 | Stock Certificates | 57 |
| | 9.8 | J & J Certificate of Good Standing | 58 |
| | 9.9 | Windsor Certificate of Good Standing | 58 |
| | 9.10 | Western Certificate of Good Standing | 58 |
| | 9.11 | Release of Escrowed Funds | 58 |
| 10. | Conditions to Obligations of J & J | | 58 |
| | 10.1 | Payment | 59 |
| | 10.2 | Representations and Warranties True | 59 |
| | 10.3 | Certificate | 59 |
| | 10.4 | Opinion of Counsel | 59 |
| 11. | Survival and Indemnification | | 60 |
| | 11.1 | Survival | 60 |
| | 11.2 | Indemnification by J & J | 61 |

AG8805B07

TABLE OF CONTENTS (Continued)

| Section | | | Page |
|---|---|---|---|
| | 11.3 | Indemnification by Cyprus | 62 |
| | 11.4 | Indemnification Procedure; Defense | 63 |
| | 11.5 | Exclusive Remedy | 64 |
| 12. | Operation of Business | | 64 |
| 13. | Miscellaneous | | 65 |
| | 13.1 | Parties in Interest; Assignment | 65 |
| | 13.2 | Expenses | 66 |
| | 13.3 | Confidentiality | 66 |
| | 13.4 | Notices | 67 |
| | 13.5 | Further Assurances | 68 |
| | 13.6 | Entire Agreement | 68 |
| | 13.7 | Modification | 68 |
| | 13.8 | Delay | 69 |
| | 13.9 | Governing Law | 69 |
| | 13.10 | Severability | 69 |
| | 13.11 | No Merger | 69 |
| | 13.12 | Obligations of Windsor and Western | 70 |
| | 13.13 | Headings | 70 |
| | 13.14 | Mutual Negotiation | 71 |

**EXHIBITS**

| Exhibit A | 1987 Balance Sheet |
|---|---|
| Exhibit B | Debt Instruments |
| Exhibit C | Undisclosed Liabilities |
| Exhibit D | Personal Property |
| Exhibit E | Real Property |
| Exhibit F | Transfers of Real Property and Personal Property |
| Exhibit G | Environmental Matters |
| Exhibit H | Permits |
| Exhibit I | Litigation |
| Exhibit J | Contracts |
| Exhibit K | Customers |
| Exhibit L | Insurance and Bonds |
| Exhibit M | Banking and Personnel Matters |
| Exhibit N | Encumbrances |
| Exhibit O | Transfers |
| Exhibit P | Underground Storage Tanks; PCB's |
| Exhibit Q | Employee Matters |
| Exhibit R | Patents, Trademarks, Trade Names and Licenses |
| Exhibit S | License Agreements |
| Exhibit T | Tax Matters Agreement |
| Exhibit U | Letter of Intent |
| Exhibit V | Talc Supply Agreement |
| Exhibit W | Release of Escrow Instructions |
| Exhibit X | Escrow Agreement |
| Exhibit Y | Confidentiality Agreement |

AG8805B07

## AGREEMENT

**THIS AGREEMENT** is made this sixth day of January, 1989 (the "Agreement") by and between Cyprus Mines Corporation, a Delaware corporation ("Cyprus"), and Johnson & Johnson, a New Jersey corporation ("J & J").

## W I T N E S S E T H:

**WHEREAS,** J & J is the owner of all of the issued and outstanding shares of the capital stock of Windsor Minerals Inc., a Vermont corporation ("Windsor")(which capital stock shall hereinafter be referred to as the "Windsor Stock");

**WHEREAS,** Windsor is the owner of all of the issued and outstanding shares of the capital stock of Western Source Inc., a California corporation ("Western")(which capital stock shall hereinafter be referred to as the "Western Stock");

**WHEREAS,** J & J desires to sell and deliver all of the Windsor Stock to Cyprus, and Cyprus desires to purchase and receive all of said Windsor Stock from J & J, upon the terms and conditions provided herein; and

**WHEREAS,** J & J and Cyprus desire to enter into a Talc Supply Agreement (as such term is defined in Section 8.5 hereof), wherein Windsor agrees to sell and deliver, and J & J agrees to purchase and receive, talc pursuant to the terms and conditions set forth in the Talc Supply Agreement.

-1-

AG8805B07

NOW, THEREFORE, IN CONSIDERATION of the rights, obligations and covenants set forth herein, the parties hereby agree as follows:

1.    <u>Sale of Stock</u>.    At the Closing (as such term is defined in Section 7 hereof), J&J shall sell, assign and transfer to Cyprus, and Cyprus shall purchase, receive and accept, the Windsor Stock.    In addition, J & J and Cyprus, or affiliates of J & J and Cyprus, shall enter into a Talc Supply Agreement (as such term is defined in Section 8.5 hereof) as of the Closing Date (as such term is defined in Section 7 hereof).

2.    <u>Purchase Price and Payment</u>.

2.1    <u>Base Purchase Price</u>.    Subject to adjustment as provided in Section 2.2 hereof, as consideration for the execution of the Talc Supply Agreement by J&J or affiliates of J&J, and the exchange of all of the issued and outstanding shares of Windsor Stock, Cyprus agrees to pay to J&J the amount of Thirty-Seven Million Five Hundred Thousand Dollars ($37,500,000) (the "Base Purchase Price").    Payment of the Base Purchase Price shall be made at the Closing by Cyprus to J&J by wire transfer of immediately available funds to J&J's Account Number 910-4-00640 at Chase Manhattan Bank N.A., 1 Chase Manhattan Plaza, New York, NY 10081 (A.B.A. Number 021000021).

AG8805807

2.2    Adjustment of Base Purchase Price. If, at the Closing Date (as such term is defined in Section 7 hereof), the Net Worth (as such term is defined in this Section 2.2) of Windsor and Western, as determined by the agreement of the parties hereto, and as represented on the adjusted balance sheet dated as of the Closing Date (the "Closing Balance Sheet"), is less than or greater than the Net Worth represented in the adjusted balance sheet dated December 31, 1987, attached hereto as Exhibit "A" and by this reference incorporated herein (the "1987 Balance Sheet"), then, on a date not later than sixty (60) days following the Closing Date (the "Settlement Date"), the Base Purchase Price likewise shall be reduced (or increased, as may be applicable) on a dollar-for-dollar basis by the amount of such difference; provided, however, that the adjustment for gross property, plant, and equipment capital expenditures (as represented in the line item entitled "Fixed Assets - Property Plant - Equipment" in Exhibit "A") during the period from December 31, 1987 to the Closing Date shall be limited to One Million Six Hundred Thousand Dollars ($1,600,000). The amount of any net increase in Net Worth as of the Closing Date shall be paid by Cyprus to J&J on the Settlement Date by wire transfer in immediately available funds in accordance with the provisions of Section 2.1 hereof, and the amount of any net decrease in Net Worth as of the Closing Date shall be paid by J & J to Cyprus on the Settlement Date by wire transfer of immediately available funds to Cyprus Minerals Company's Account Number 2-024604 at

-3-

Pittsburgh National Bank, Pittsburgh, Pennsylvania (A.B.A. Number 043000096).  The foregoing adjustment, if any, shall be made as of the Closing Date and shall include interest from the Closing Date to the Settlement Date at the prime interest rate quoted by Chemical Bank, New York, New York on the Closing Date.

Cyprus shall have the right to audit the Closing Balance Sheet and recent profit and loss statements to ensure their conformity with generally accepted accounting principles applied on a consistent basis.  A draft of the Closing Balance Sheet will be provided by J&J to Cyprus no later than January 31, 1989 to use as a basis for such audit.  If the parties are unable to agree on the Net Worth as of the Closing Date, then the matter shall be submitted to a mutually agreeable national certified public accounting firm, and the parties shall be bound by such firm's determination, with costs to be shared equally between the parties.

As used in this Agreement, the term "Net Worth" shall mean reported assets of Windsor and Western, excluding cash and temporary investments (except for petty cash accounts as noted in Exhibit "A") which shall be transferred to J&J at the Closing, less all of Windsor's and Western's reported liabilities (excluding certain liabilities as noted in Exhibit "A").

-4-

3.    <u>Representations and Warranties of J & J</u>.    J&J hereby represents and warrants to Cyprus as set forth in this Section 3, which representations and warranties shall be true and correct as of the Closing Date.    Any disclosure contained in this Agreement or in any Exhibit attached hereto and incorporated herein shall suffice for disclosure of the same information required to be disclosed in any other Exhibit attached hereto and incorporated herein.

3.1    <u>Organization and Existence</u>.

(a)    <u>J&J</u>.    J&J is a corporation duly organized, validly existing and in good standing under the laws of the State of New Jersey, and has the corporate power to own its property and to carry on its business as presently conducted by it.

(b)    <u>Windsor</u>.    Windsor is a corporation duly organized, validly existing and in good standing under the laws of the State of Vermont, and has the corporate power to own its property and to carry on its business as presently conducted by it.    Windsor is duly qualified and in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary.

AG8805B07

(c)    __Western__.    Western is a corporation duly organized, validly existing and in good standing under the laws of the State of California, and has the corporate power to own its property and to carry on its business as presently conducted by it.    Western is duly qualified and in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it make such qualification necessary.

3.2    __Articles and Bylaws__.    The copies of the Articles of Association and Bylaws of Windsor, and the Articles of Incorporation and Bylaws of Western, which have heretofore been furnished by J&J to Cyprus, are true, correct and complete copies thereof and include all amendments to the date hereof.

3.3    __Minute Books and Stock Certificate Books and Records__.    The minute books of Windsor and Western contain a true and correct record of all material corporate action taken at the meetings of shareholders and directors and committees thereof. The stock certificate books and records of Windsor and Western accurately reflect the ownership of the Windsor Stock and the Western Stock by J&J and Windsor, respectively, and in the amounts set forth in Section 3.4 hereof.

AG8805B07

3.4    **Capitalization.**    Windsor has authorized capital stock consisting of fifty thousand (50,000) shares of capital stock, par value One Hundred Dollars ($100) per share, of which forty thousand seven hundred and fifty (40,750) shares are issued and outstanding.  Western has authorized capital stock consisting of two million (2,000,000) shares of capital stock, without par value, of which one million (1,000,000) are issued and outstanding.  J&J and Windsor own and hold beneficially and of record, the entire right, title and interest in and to the shares of Windsor Stock and Western Stock, respectively, set forth above, free and clear of any claim, suit, proceedings, call, commitment, voting trust, proxy, restriction, limitation, security interest, pledge, lien or encumbrance of any kind or nature whatsoever, and J&J and Windsor have full power and authority to transfer and dispose of the Windsor Stock and Western Stock, respectively, to Cyprus, such stock now and on the Closing Date constituting, in the aggregate, all of the issued and outstanding shares of capital stock of Windsor and Western.  All of such issued and outstanding shares of Windsor Stock and Western Stock have been duly authorized and validly issued, and are fully paid and non-assessable.  There are no outstanding options, warrants, rights, calls, commitments, conversion rights or other agreements of any character providing for the purchase or issuance of any additional shares of capital stock of Windsor

AG8805807

or Western.    There are no liens or encumbrances upon any shares of Windsor Stock or Western Stock, and there are no limitations or restrictions of any kind on the right of J&J or Windsor to sell the Windsor Stock or Western Stock, respectively, in accordance with the terms of this Agreement.

3.5    **Authority and No Violations**.    J&J has full power, corporate or otherwise, to enter into, deliver and perform this Agreement and to consummate the transaction contemplated herein.    The execution, delivery, and performance of this Agreement by J&J has been duly authorized by all requisite corporate action.    This Agreement has been duly executed and delivered by J&J; and, assuming due authorization, execution, and delivery by Cyprus, constitutes the legal, valid and binding obligation of J&J.    The execution and delivery of this Agreement does not, and the consummation of the transaction contemplated herein shall not:  (i) violate any provision of the charters or Bylaws of J&J, Windsor or Western; (ii) to the knowledge of J&J, Windsor and Western, require the approval, consent or authorization of or notice to any federal, state or local governmental authority other than the approval required by the Hart-Scott-Rodino Antitrust Improvements Act of 1976; or (iii) materially violate, breach, terminate, constitute a default under, or accelerate the maturity of, or result in the creation of any lien upon any material properties or assets of J&J,

AG8805B07

Windsor or Western pursuant to, any loan or similar agreement, contract, mortgage, deed of trust, note, lien, license, permit, lease, instrument, order, judgment, decree, statute, law, or regulation to which J&J, Windsor or Western, or any of them, are a party, or by which J&J, Windsor or Western, or any of them, are bound or to which any of the property utilized by Windsor or Western is subject. Except as described on Exhibit "B", attached hereto and by this reference incorporated herein, neither J&J, nor Windsor, nor Western is a party to, or otherwise subject to any provision contained in any instrument evidencing indebtedness of Windsor or Western, any agreement relating thereto or any other contract or agreement (including their charters) which restricts or otherwise limits the incurring of debt.

     3.6    <u>Interest in Other Entities</u>. Other than Western, Windsor has no subsidiaries and no equity interest in any other corporation, joint venture, partnership or other entity. Western has no subsidiaries and no equity interest in any corporation, joint venture, partnership or other entity. Windsor and Western have not contracted, nor are they otherwise under any obligation by operation of law or otherwise, to purchase or subscribe for any interest in, loan monies to, or in any way make investments in any other person or entity.

3.7    <u>Financial Statements of Windsor and Western.</u>
The 1987 Balance Sheet fairly presents the combined financial position of Windsor and Western as of the date of the 1987 Balance Sheet, and has been prepared from financial statements which were prepared in conformity with generally accepted accounting principles consistently applied. All financial obligations, including without limitation, tax liabilities of Windsor and Western, have been paid or provided for in the 1987 Balance Sheet, subject to audit by the appropriate taxing authorities. There has been no material adverse change in the financial condition, assets or liabilities of Windsor or Western from the date of the 1987 Balance Sheet to the date hereof. Since the date of the 1987 Balance Sheet, Windsor and Western have conducted their businesses in a normal and customary manner, except as required to consummate the transaction contemplated herein, and except as requested by Cyprus. Since April 24, 1968, in the case of Windsor, and since June 25, 1979, in the case of Western, neither Windsor nor Western has issued any shares, warrants or options respecting its stock, or distributed any dividend, capital, surplus or profit with respect to its shares, except in the ordinary course of the business of J & J, Windsor and Western. The books and records of Windsor and Western from which the 1987 Balance Sheet was prepared properly and accurately record the transactions and activities which they purport to record.

AG8805B07

3.8    Undisclosed Liabilities.    Neither Windsor nor Western have any liabilities, debts, obligations or claims against them of any kind, whether accrued, absolute, contingent or otherwise which are known or which should be known to Windsor and/or Western as a result of its or their operation of their business in the ordinary and prudent course, and which exceed Fifty Thousand Dollars ($50,000) in the aggregate, except: (i) as and to the extent reflected in the 1987 Balance Sheet; (ii) as specifically disclosed in Exhibit "C" attached hereto and by this reference incorporated herein, or as otherwise described or disclosed in this Agreement; and (iii) as incurred, consistent with past practices, in the ordinary course of their businesses since the date of the 1987 Balance Sheet. Except as disclosed herein, including any Exhibits hereto, neither Windsor nor Western, nor J&J on behalf of Windsor or Western, has guaranteed or become surety for or assumed any debt, obligation or dividend of any person or entity (other than by endorsements made in the ordinary course of business in connection with the deposit of an item for collection, or in connection with any intercompany agreements between Windsor and Western).

3.9    Tangible Personal Property. Windsor and Western have good title to all of the tangible personal property owned by Windsor or Western reflected on their books and records, as more

AG8805B07

specifically described in Exhibit "D" attached hereto and by this reference incorporated herein, and Windsor and Western own or lease such tangible personal property (the "Personal Property") free and clear of all liens and encumbrances, except for liens for ad valorem and property taxes not yet due and payable, purchase money security interests arising in the ordinary course of the business of Windsor and Western, and liens and encumbrances which are not materially adverse or do not materially interfere with the present and continued use of such tangible personal property in the ordinary course of the business of Windsor and Western.  Windsor and Western are entitled to possession of their material leased tangible personal property, with all such leases being valid and in full force and effect, and such leases are not in default as to payment of rent, royalty or otherwise.  True, correct and complete copies of such leases have heretofore been delivered by Windsor and Western to Cyprus.  With respect to certain equipment owned by Windsor known as the "Shear Disc," such equipment is: (i) in good condition and repair; and (ii) suitable for use in the processing of talc products meeting those specifications more specifically described in Section 6 of the Talc Supply Agreement (as such term is defined in Section 8.5 hereof) in quantities sufficient to meet Windsor's obligation to supply the talc requirements of Buyer (as such term is defined in the Talc Supply Agreement) described in Sections 3(a) and 3(c) of the Talc Supply Agreement.

AG8805B07

3.10  <u>Real Property</u>.  Windsor and Western own or lease certain real property or interests as more specifically described in Exhibit "E" attached hereto and by this reference incorporated herein, subject only to those liens, encumbrances, limitations, exceptions and reservations set forth in Exhibit "E" (the "Real Property").  Windsor and Western warrant that no material failings, defects or infirmities of title to the Real Property have been created by Windsor or Western since the Real Property was conveyed or leased to Windsor or Western, and that Windsor and Western, respectively, have good and marketable title thereto.  True, correct and complete copies of the deeds and leases to the Real Property have heretofore been delivered by Windsor and Western to Cyprus.  Said leases are valid and binding and in full force and effect and are not in default as to the payment of rents and royalties, and are not in material default of other obligations thereof.  Except as noted in Exhibit "E", none of the Real Property is so-called "Glebe Land", and no payment of rent, royalty or otherwise is in default as to any such "Glebe Land".  The leased and owned real property and interests of Windsor and Western are without any material latent adverse conditions or characteristics which are known or which should be known to Windsor or Western as a result of its or their operation of their business in the ordinary and prudent course, and constitute all of the leased and owned real property required to operate the business of Windsor and Western.

AG8805B07

3.11  **Transfers of Real and Personal Property**. Except as set forth on Exhibit "F" attached hereto and by this reference incorporated herein, none of the Real Property or Personal Property, nor any interest therein, necessary to the conduct of the present business of Windsor and Western has been sold, conveyed, leased, subleased or otherwise transferred to any third party since the date of the 1987 Balance Sheet.

3.12  **Environmental Matters**. Except as disclosed in Section 5.15 and in Exhibit "G", attached hereto and by this reference incorporated herein, Windsor and Western: (i) are currently in compliance with all applicable environmental laws, and have obtained all permits and other authorizations needed to operate their facilities; (ii) have not violated any applicable environmental law; and (iii) are unaware of any present requirements of any applicable environmental law which is due to be imposed upon either of them which will materially increase their cost of complying with the environmental laws. In addition: (a) all past on-site generation, treatment, storage and disposal of waste, including hazardous waste, by Windsor and Western was done in compliance with the then- or currently-applicable environmental laws, or is grandfathered in the event that no law or regulation was applicable to Windsor or Western at the time of such activities; and (b) all past off-site treatment, storage and disposal of waste, including hazardous waste, generated by Windsor and Western was done in compliance with the then- or currently-applicable environmental laws. As used in

-14-

this Agreement, the term "environmental laws" include but are not limited to any federal, state or local law, statute, charter or ordinance, and any rule, regulation, binding interpretation, binding policy, permit, order, court order or consent decree issued pursuant to any of the foregoing, which pertains to, governs or otherwise regulates any of the following activities, including without limitation:   (a) the emission, discharge, release or spilling of any substance into the air, surface water, groundwater, soil or substrata; and (b) the manufacturing, processing, sale, generation, treatment, storage, disposal, labeling or other management of any waste, hazardous substance or hazardous waste; and the terms "Waste," "Hazardous Substance," and "Hazardous Waste" include any substance defined as such by any applicable environmental law.

3.13  <u>Permits and Compliance with Other Laws</u>.  Except as described in Sections 5.15 and 5.16 and as described on Exhibit "H" attached hereto and by this reference incorporated herein, Windsor and Western are and have been in compliance in all respects with all laws, statutes, rules, regulations, orders and engineering standards of, and have secured or applied for all necessary permits, franchises, authorizations and licenses issued by, federal, state, local and foreign agencies and authorities, including all required "Act 250" permits and licenses (collectively, the "Permits"), free from burdensome restrictions threatening the ability of Windsor or Western to operate their businesses as presently conducted, applicable to their

-15-

businesses, properties and operations (including, but not limited to, those concerned with control of foreign exchange, energy, environmental protection and pollution control, franchising and other distribution arrangements, antitrust and trade regulation, civil rights, labor and discrimination, safety and health, zoning and land use), the violation of which (or, in the case of necessary permits, authorizations or licenses, the failure to secure) could have a material adverse effect on the business of Windsor or Western. With respect to Permits applied for as of the Closing Date, J&J, Windsor and Western are unaware of any fact, circumstance or reason why such Permit applied for is not likely to be issued. A complete list of all such Permits, is included in Exhibit "H". Such list constitutes all of the Permits required to operate the business of Windsor and Western, as currently conducted. All of the Permits listed on Exhibit "H" are valid and are in full force and effect. Exhibit "H" further includes a schedule of all notices of violation received within the past five (5) years with respect to each permit, license or other authorization listed on Exhibit "H". True, correct and complete copies of the permits, authorizations and licenses, or the applications therefor, have heretofore been delivered by J&J to Cyprus.

3.14  Litigation  and  Proceedings.  Except  as specifically described in Exhibit "I", attached hereto and by this reference incorporated herein, there are no claims or investigations, actions at law or equity, arbitrations or

-16-

judicial or administrative proceedings pending or, to the knowledge of J&J, threatened against or which would materially and adversely affect Windsor and/or Western, or their operations or assets, by or before any court, governmental department, agency, mediator, arbitrator or other person or instrumentality; and except as more specifically described in Exhibit "I", Windsor and Western are not subject to, or in default under, any court or administrative order, writ, injunction or decree applicable to Windsor or Western.

3.15 **Contracts.** All material contracts and agreements, oral and written, to which Windsor and/or Western are a party or are parties, or by which either or both are bound, are more specifically described in Exhibit "J", attached hereto and by this reference incorporated herein. Windsor and Western are not in material breach or default under any of such contracts. J&J has heretofore delivered to Cyprus: (a) true, correct and complete copies of each written contract and agreement listed in Exhibit "J", including all amendments or modifications thereto; and (b) a written summary of all oral contracts described in Exhibit "J".

3.16 **Customers.** Attached hereto and by this reference incorporated herein as Exhibit "K" is a true and correct list setting forth each customer of Windsor and Western, the purchases of which from Windsor or Western equaled or

-17-

exceeded five percent (5%) of the revenues of Windsor or Western, respectively, for the calendar year ended December 31, 1987.

3.17  <u>Taxes</u>.  Windsor and Western have timely and properly filed all federal, state, local, foreign and other tax returns which they are or were required to file, including but not limited to, income, profits, franchise, sales, use, occupation, property, excise, ad valorem and payroll (including employee taxes withheld), and have paid or provided for the payment in full of all taxes, including penalties and interest, if any, and neither the Internal Revenue Service nor any other taxing authority is asserting against Windsor or Western, or, to the best knowledge of J&J, threatening to assert against Windsor or Western, any deficiency or a claim for additional taxes, interest or penalties, subject to audit by any appropriate taxing authority.  The Internal Revenue Service has examined Windsor's and Western's federal income tax returns for all years up to and including the year ended December 31, 1982, and has finally determined all taxes, penalties and interest due thereon, all of which have been paid.

3.18  <u>Insurance and Bonds</u>.  Exhibit "L", attached hereto and by this reference incorporated herein, is a true and correct schedule listing all surety and other bonds to which Windsor and/or Western are a party, or to which J & J is a party on behalf of Windsor and/or Western, and all policies of liability (excluding excess coverage policies) and workers'

-18-

compensation insurance, from which coverage has been extended to Windsor and/or Western.  Exhibit "L" also includes a true and correct schedule listing all non-product liability retentions which potentially could become the responsibility of Windsor and/or Western, and a true and correct schedule listing all claims made during the past five (5) years against any captive insurance underwritten or reinsured in whole or in part by J&J or its affiliates, which claim relates to the business or employees of Windsor or Western.  All policies and bonds have included Windsor and Western as additional insureds since the date of J&J's acquisition or incorporation thereof.  To the best knowledge of J&J, Windsor and Western, no claim has been made, or notice given, and there exists no ground other than as a matter of law, to cancel or avoid any of said policies or bonds or to reduce the coverage provided thereby.  All of said insurance policies and bonds which are now in effect shall continue to remain in full force and effect to and including the Closing Date.  Copies and summaries of all such insurance policies, sureties and other bonds have been made available to Cyprus prior to the Closing.

3.19  **Banking and Personnel Matters.**  Exhibit "M", attached hereto and by this reference incorporated herein, is a true and correct schedule setting forth as of the date hereof: (i) a list of all banks and other financial institutions (with draft and account numbers) in which Windsor or Western has an account or safe deposit box, and of all brokerage firms and other

-19-

AG8805807

entities and persons holding funds or investments of Windsor or Western and the names of all persons authorized to draw thereon or have access thereto; (ii) the names of all incumbent directors and officers of Windsor and Western; (iii) the names, job designations, and locations of all consultants, distributors, sales agents, freight or product brokers, or lobbyists of Windsor or Western, or any other agent of Windsor or Western receiving an annual remuneration (including, without limitation, cash, fringe benefits, bonuses, fees or other non-cash compensation of any kind) of at least Thirty Thousand Dollars ($30,000), the current remuneration of each, including fringe benefits, and the basis for determining such remuneration if other than a fixed salary rate; and (iv) the names of all persons holding powers of attorney from Windsor and Western and a summary statement of the terms thereof.

3.20   Events Since 1987 Balance Sheet Date. Since the date of the 1987 Balance Sheet, to the date hereof, except as otherwise disclosed in any Exhibit attached to this Agreement or otherwise described, provided for or permitted under this Agreement, neither Windsor nor Western, nor J&J on behalf of Windsor or Western, has: (i) issued or authorized the issuance of any stock, bonds or other corporate securities or authorized any split or any other recapitalization; (ii) discharged or satisfied any lien or encumbrance or paid any obligation or liability (absolute or contingent) other than the current liabilities shown on the 1987 Balance Sheet, and current

AG8805907

liabilities incurred since the date of the 1987 Balance Sheet in the ordinary course of business; (iii) declared or made any payment or distribution, or purchased or redeemed any of the stock of Windsor or Western; (iv) mortgaged, pledged or subjected to any lien or other encumbrance any of their assets or properties, tangible or intangible, except in the ordinary course of business and set forth on Exhibit "N" attached hereto and by this reference incorporated herein; (v) sold, transferred, assigned, removed or granted any rights with respect to any of its manufacturing assets, properties, tangible or intangible, or its business, or cancelled or compromised any of its debts or claims, except in the ordinary course of business and set forth on Exhibit "O" attached hereto and by this reference incorporated herein; (vi) suffered any extraordinary loss or waived any rights of material value; (vii) entered into any transaction not in the ordinary course of business; or (viii) agreed to do any of the foregoing.

3.21 **Brokers**.  Neither J&J, nor Windsor, nor Western has engaged or used the services of a broker, finder, or other similar person in connection with the transaction contemplated herein; and no person shall be entitled to a brokerage commission, finder's fee, or like payment in connection with this Agreement or in connection with the consummation of the transaction contemplated herein, based upon the actions of J&J, Windsor or Western, or any of them, or the actions of their

AG8805807

employees,    officers,    directors,    agents,    contractors    or
affiliates.

3.22  **Disclosures**.  J&J  has  made  available  to  Cyprus
during  Cyprus'  due  diligence  investigation,  or  has  disclosed  in
this  Agreement  and  the  Exhibits  attached  hereto,  all  matters
involving  Windsor  and  Western  which  J&J  reasonably  believes  have
or  in  the  future  will  have  an  adverse  effect  on  Windsor  and
Western,  or  the  businesses,  conditions  or  prospects  of  either,  or
which  is  necessary  for  a  full  understanding  of  the  financial
condition  and  operations  of  Windsor  and  Western.   Neither  this
Agreement  nor  any  document,  certificate  or  statement  furnished  or
to  be  furnished  to  Cyprus  by  or  on  behalf  of  J  &  J,  Windsor  and
Western  in  connection  with  the  transactions  provided  for  herein
contains  or  will  contain  any  untrue  statement  of  material  fact  or
omits  or  will  omit  to  state  a  material  fact  necessary  in  order  to
make  the  statements  contained  herein  or  therein  not  misleading.
With  respect  to  the  representation  made  in  the  immediately
preceding  sentence,  Cyprus  and  J  &  J  recognize  that  certain  of
the  representations  set  forth  in  this  Section  3  are  limited  to
the  best  knowledge  of  the  party  making  the  representation,  or  to
that  information  which  is  known  or  which  should  have  been  known
to  the  party  making  the  representation;  and,  accordingly,  Cyprus
and  J  &  J  agree  that  in  the  event  of  conflict  between  such
representations  and  the  representation  given  in  the  preceding
sentence,  the  more  limited  representation  shall  govern.

AG8805807

3.23  Underground Storage Tanks; PCB's.  Exhibit "P" attached hereto and by this reference incorporated herein, constitutes a complete list of underground storage tanks owned by Windsor and Western.  Such tanks are described by location, serial or identification number, if any, volume and depth. Exhibit "P" further includes a complete list of all transformers or other containers containing polychlorinated biphenyls ("PCB's"), which transformers or other containers are described by location, serial or identification number, if any, volume and depth.  Prior to Closing, J&J has provided to Cyprus a copy of all notifications, permits, applications, authorizations or licenses required for the ownership, use, repair, maintenance or removal of such tanks, transformers or containers.  The ownership, use, repair, maintenance or removal of such tanks, transformers or containers by Windsor and Western has at all times complied with all federal, state and local laws and regulations, as the same have been modified from time to time.

3.24  Pension and Benefit Matters.  (a)  Exhibit Q lists each "employee benefit plan," as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), which (i) is subject to any provision of ERISA, and (ii) is entered into, maintained, administered or contributed to by Windsor or Western, covers any employee or former employee of Windsor or Western, or is a plan under which Windsor or Western has any liability.  Such plans are hereinafter referred to collectively as the "Employee Plans."  Each Employee Plan has been maintained

-23-

and administered in substantial compliance with its terms and with the requirements prescribed by any and all statutes, orders, rules, and regulations that are applicable to such Employee Plans. No prohibited transaction or other action or inaction has occurred with regard to such Employee Plans involving an amount in excess of Twenty Thousand Dollars ($20,000.00) which will give rise to liability of Windsor or Western or any officer or director thereof under Title I of ERISA. Each Employee Plan which constitutes an "employee pension benefit plan" as defined in Section 3(2) of ERISA (the "Retirement Plans") is identified as such in Exhibit Q. Each Employee Plan which constitutes a retirement plan subject to Title IV of ERISA (the "Pension Plans") is identified as such on Exhibit Q;

(b) Exhibit Q lists (i) each employment, severance or other similar contract, policy or plan, whether written or oral; and (ii) each contract, policy or plan, whether written or oral, under which Windsor or Western has or may have obligations or liability in excess of Five Thousand Dollars ($5,000.00) providing for insurance coverage (including any self-insured arrangements), disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, deferred compensation, profit-sharing, bonuses, stock options, stock appreciation, or other forms of incentive compensation or post-retirement insurance, compensation, or benefits (other than state or federally mandated benefits of general applicability to all similarly situated employers); which contract, policy or plan in

-24-

each case, (x) is not an Employee Plan, and (y) is entered into, maintained, administered or contributed to by Windsor or Western, covers any employee or former employee of Windsor or Western, or is a contract, policy or plan under which Windsor or Western has any liability.  Such contracts, policies and plans as are described above are hereinafter referred to collectively as the "Benefit Arrangements."  Each Benefit Arrangement has been maintained and administered in substantial compliance with its terms and with the requirements prescribed by any and all statutes, orders, rules and regulations that are applicable to such Benefit Arrangement.  Except as set forth in Exhibit Q and except as provided by law, by the Collective Bargaining Agreement between Windsor and the Cement, Lime, Gypsum and Allied Workers Division of the Brotherhood of Boilermakers International, AFL-CIO Local and Lodge D449, which expires May 11, 1990 (the "Collective Bargaining Agreement") or by any employment contract identified on Exhibit Q, the employment of all persons presently employed or retained by Windsor or Western is terminable at will;

(c) No Employee Plan is a "multiemployer pension plan" subject to Title IV of ERISA;

(d) Except as otherwise identified in Exhibit Q, no Employee Plan is maintained in connection with any trust described in Section 501(c)(9) of the Code;

(e) As of the Closing Date, no "accumulated funding

-25-

deficiency," as defined in Section 412 of the Code, has been incurred with respect to The Johnson & Johnson Retirement Plan for Hourly Employees of Windsor Minerals, Inc. (the "Windsor Hourly Plan") whether or not waived. J & J, Windsor and Western know of no "reportable event" with respect to said plan within the meaning of Section 4043 of ERISA, other than a "reportable event" for which the 30-day notice requirement has been waived under regulations published by the PBGC or announcements of general applicability made by appropriate governmental authorities.    Neither Windsor nor Western has incurred any liability under Title IV of ERISA arising in connection with the termination of any plan covered or previously covered by Title IV of ERISA;

(f)  J & J, Windsor and Western have no reason to believe that any Retirement Plan that is intended to be qualified under Section 401(a) of the Code is not so qualified, except as administratively permitted by the IRS.    Each of the Retirement Plans that is intended to be qualified under Section 401(a) of the Code is the subject of an unrevoked, currently effective favorable determination letter issued by the Internal Revenue Service (the "IRS") as to its tax-qualified status upon which there can be continued reliance, and each such Plan has been administered in a manner that would not adversely affect its qualified status.    J & J, Windsor and Western have no reason to believe that the Johnson & Johnson Master Trust (the "J&J Master Trust") maintained under that certain Agreement between J&J and Banker's Trust Company dated March 26, 1981, as amended, the

AG8805B07

trust forming a part of each Retirement Plan, is not exempt from tax pursuant to Section 501(a) of the Code.  The J&J Master Trust has been determined by the IRS to be exempt from tax.

(g) Not used;

(h) Any Employee Plan that is a group health plan as defined in Code Section 213(d) has been administered in accordance with the requirements of Code Section 162(k);

(i) Windsor and Western have made on or before the Closing Date all required contributions on behalf of Windsor and Western employees to each Retirement Plan, excluding the Windsor Hourly Plan, the funding of which is provided for separately in Section 5.6(e), Employee Plan, and Benefit Arrangement for all completed fiscal years including contributions that may not by law have otherwise been required to be made until the due date for filing the tax return for any completed fiscal year.

The employer and employee contributions to the Johnson & Johnson Savings Plan (the "J&J Savings Plan") for all payroll periods completed on or before the Closing Date have been made on or before the Closing Date, or will be transferred thereto in accordance with the usual procedures with respect to the Plan and the terms of the Plan.

Except as disclosed in Exhibit Q, there has been and with respect to Windsor or Western employees, will be, as of the Closing Date,

-27-

AG8805807

no commitment or amendment by J&J, Windsor or Western, whether or not written, that would increase materially the expense of maintaining any Employee Plan or Benefit Arrangement above the level of the expense incurred in respect thereof for the fiscal year ended on December 31, 1987;

(j) J&J has or shall, or has caused or shall cause Windsor and Western to, maintain, hold, and provide Cyprus with true and complete copies of the governing instruments of the Employee Plans and the Benefit Arrangements. J&J has or shall, or has caused or shall cause Windsor and Western to, maintain, hold and make available to Cyprus true and complete copies of all currently existing or applicable (i) governmental filings, (ii) reports, opinions, determinations, and interpretations pertaining thereto, (iii) disclosure documents and notices to participants and beneficiaries thereof, including without limitation summary plan descriptions, (iv) statements and reports of assets, liabilities, or costs thereunder, and (v) other documents or records necessary to the orderly administration of the Employee Plans or Benefit Arrangements. J&J has provided or will provide, or has caused or will cause Windsor and Western to provide, Cyprus with complete age, salary, service and related data as of the Closing Date for employees and former employees of Windsor covered under the Windsor Hourly Plan and for employees of Windsor and Western on the Closing Date covered under the J&J Salaried Plan.

-28-

3.25  Intellectual Property.  Exhibit "R", attached hereto and by this reference incorporated herein, contains a complete list of all patents, trademarks, tradenames and licenses owned by or licensed to Windsor and Western.  Except as set forth in Exhibit "R":  (a) Windsor and/or Western own all such patents, trademarks or tradenames free and clear of all liens, claims and encumbrances of any type whatsoever; (b) none of the patents, trademarks or tradenames are licensed to any third party; and (c) to J&J's knowledge, there are no infringements by third parties of any of such patents, trademarks or tradenames.  Except as set forth in Exhibit "R", there is no claim, demand or proceeding instituted, pending or, to J&J's knowledge, threatened alleging infringement by Western or Windsor of any patent, trademark or tradename owned by any other party other than Windsor or Western; and to J&J's knowledge, neither Windsor nor Western is infringing any such patent.  Prior to the date hereof, J&J has provided to Cyprus true and correct copies of all patents, trademarks, tradenames and licenses listed in Exhibit "R".  Windsor is not conducting its operations under any tradename not registered with the Vermont Secretary of State.

Exhibit "S", attached hereto and by this reference incorporated herein, contains a complete list of all license agreements whereby Windsor and Western license patents, trademarks, tradenames or other trade secrets or intellectual property of third parties.  Except as described in Exhibit "S", Windsor and Western have the right to use all such patents, trademarks, tradenames or other trade secrets or intellectual

-29-

AG8805807

property, subject only to the royalties or other payments set forth on Exhibit "S". The agreements listed on Exhibit "S" are all of the license agreements necessary to operate the businesses of Windsor and Western, as currently conducted. Prior to the Closing Date, J&J has provided to Cyprus true and correct copies of all license agreements described on Exhibit "S".

4. <u>Representations and Warranties of Cyprus</u>. Cyprus represents and warrants to J&J as follows, which representations and warranties shall be true and correct as of the Closing Date:

4.1 <u>Organization and Existence</u>. Cyprus is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the corporate power to carry on its business as presently conducted by it.

4.2 <u>Authority and No Violations</u>. Cyprus has full corporate power to enter into, deliver and perform this Agreement and to consummate the transaction contemplated herein. Cyprus' execution, delivery and performance of this Agreement has been duly authorized by all requisite corporate action. This Agreement has been duly executed and delivered by Cyprus; and, assuming due authorization, execution and delivery by the other parties hereto, constitutes Cyprus' legal, valid and binding obligation. The execution and delivery of this Agreement does not, and consummation of the transaction contemplated herein will not: (i) violate any provision of the Articles of Incorporation or Bylaws of Cyprus; or (ii) require, to the best of Cyprus'

-30-

AG8805B07

knowledge, the approval, consent or authorization of any federal, state or local governmental authority other than the approval required by the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

4.3    <u>Brokers</u>.    Cyprus has not engaged or used the services of a broker, finder, or similar person in connection with the transaction contemplated herein; and no person shall be entitled to a brokerage commission, finder's fee or like payment in connection with this Agreement or in connection with the consummation of the transaction contemplated herein, based upon the actions of Cyprus or Cyprus' employees, officers, directors, agents, contractors or affiliates.

4.4    <u>Purchase for Investment</u>.    Cyprus is acquiring the Windsor Stock for its own account for investment and not with a view toward any resale or distribution thereof, and Cyprus agrees that it will not sell the Windsor Stock in contravention of Section 5 of the Securities Act of 1933, as amended.

4.5.    <u>Salaried Pension Plan</u>.    Cyprus has no reason to believe that the Retirement Plan for Salaried Employees of Cyprus Minerals Company (the "Cyprus Salaried Plan") is not qualified under Section 401(a) of the Code, except as administratively permitted by the IRS. The Cyprus Salaried Plan is the subject of an unrevoked, currently effective favorable determination letter issued by the IRS as to its tax-qualified status upon which there can be continued reliance, and such Plan has been administered in

-31-

a manner that would not adversely affect its qualified status. Cyprus has no reason to believe that the Master Trust (the "Cyprus Master Trust") maintained under the Agreement of Master Trust between Cyprus Minerals Company and Boston Safe Deposit and Trust Company dated August 1, 1988 is not exempt from tax pursuant to Section 501(a) of the Code. The Cyprus Master Trust has been determined by the IRS to be exempt from tax.

5.    **Covenants**.

5.1    **Assumption of Obligations**.    On the Settlement Date, Cyprus and J&J shall agree upon the Closing Balance Sheet.  All liabilities determined to remain with J & J hereunder shall be the sole responsibility and liability of J & J, and J&J shall promptly pay and discharge all such liabilities as they become due.  Except as otherwise set forth in this Agreement, all other liabilities of Windsor and Western shall remain with Windsor and Western from and after the Closing.

5.2    **Windsor and Western Obligations**.    Prior to the Closing Date, J & J shall cause Windsor and Western to perform the obligations of Windsor and Western hereunder, and shall be solely responsible and liable for each representation made, and each warranty granted, by Windsor and Western, as if J & J had made such representation or granted such warranty itself.

AG8805B07

5.3   **Due and Uncollected Receivables; Petty Cash**. Accounts and notes receivable of Windsor and Western which are more than one hundred and eighty (180) days old as of the Closing Date shall become the responsibility of J&J and shall be removed from the Closing Balance Sheet.   Accounts and notes receivable that are current on the Closing Date, but which become due and uncollected after one hundred and eighty (180) days following the Closing Date, shall be sold to J&J for cash at face value, provided that such amounts exceed Five Thousand Dollars ($5,000) in the aggregate.   Accounts receivable owed from affiliates of J&J to Windsor shall be included in the Closing Balance Sheet. Petty cash accounts existing at the operations of Windsor and Western shall be included in the Closing Balance Sheet.

5.4   **Change of Ownership**.   Within thirty (30) days following the Closing Date, Cyprus shall take all steps reasonably necessary to notify the customers of Windsor and Western of the change in ownership of Windsor and Western.

5.5   **Corporate Records**.   At Closing, J&J shall provide Cyprus with all of the original corporate records of Windsor and Western.

5.6   **Employee Matters**.   (a) Cyprus agrees that Windsor and Western will accept on the Closing all salaried employees employed by Windsor or Western respectively upon the Closing, in the positions held immediately prior to the Closing, on terms and conditions of employment, including benefit plans,

-33-

which will be consistent with the terms and conditions of employment of Cyprus salaried employees, which the parties understand to be such terms and conditions as Cyprus deems appropriate. Cyprus agrees that Windsor will accept on the Closing all hourly employees employed by Windsor on the Closing in the positions held immediately prior to Closing, on the then current terms and conditions of employment and the obligations attendant thereto. Cyprus agrees that Windsor will assume or retain the existing Collective Bargaining Agreement of Windsor with the Cement, Lime, Gypsum and Allied Workers Division of the Brotherhood of Boilermakers International, AFL-CIO Local and Lodge D449, which expires May 11, 1990 (the "Collective Bargaining Agreement");

(b) Cyprus agrees that Windsor and Western will retain or assume all liabilities and obligations relating to all hourly and salaried employees of Windsor and Western respectively (whether active, inactive, former or retired), their dependents and beneficiaries, including those relating to the Collective Bargaining Agreement, Employee Plans and Benefit Arrangements; provided, however, that, not withstanding the foregoing, after the Closing, J&J, and not Cyprus, Windsor or Western shall be solely liable for and shall pay or provide: (i) pension benefits under the Retirement Plan of Johnson & Johnson and Affiliated Companies (the "J&J Salaried Plan") for all salaried employees of Windsor and Western (whether active, inactive, former or retired) their dependents and beneficiaries; (ii) benefits under the J&J Savings Plan for all active, inactive, former or retired salaried

-34-

employees of Windsor and Western, their dependents and beneficiaries; (iii) pension benefits, life insurance, medical benefits, supplemental pension benefits, short- and long-term disability benefits and all other benefits for those individuals listed on Exhibit Q hereto; (iv) any and all health care continuation coverage to which any current or former Windsor or Western salaried employee (or a dependent of such) is or becomes entitled in connection with a "qualifying event" (as defined in Code Section 162(k)(3)) occurring on or before the Closing Date; and (v) any and all stock options, stock appreciation, incentive compensation or other such benefits for Windsor and Western employees for periods prior to the Closing. Nothing stated in this Section 5.6(b) shall modify or alter the obligations of Cyprus and J&J to each other contained elsewhere in this Agreement.

In respect of all life insurance, medical, supplemental pension and other benefits (except benefits under the J&J Salaried Plan) for all salaried employees of Windsor and Western who have retired on or before the Closing Date, J&J shall pay or provide such benefits and Cyprus shall fully and promptly reimburse J&J the actual out of pocket identified cost of such benefits on a quarterly basis, in each case following receipt of a statement from J&J specifying such actual cost in reasonable detail. In respect of life insurance, Cyprus shall reimburse J&J for only the amount of any premiums paid by J&J in respect of such salaried retiree. In respect of medical benefits, Cyprus shall reimburse J&J for ASO fees and medical expenses covered under the

AG8805B07

Johnson & Johnson Salaried Health Care Plan. In respect of supplemental pension benefits, Cyprus shall reimburse J&J for benefits paid pursuant to the J & J Supplemental Pension Plan. In respect of all of the above, Cyprus also shall reimburse J&J for the actual cost to J&J of performing the services described above. Cyprus shall have the right to review, during normal office hours and upon reasonable notice, such records of J&J as may be necessary to verify any charges imposed upon Cyprus under this Section. Upon 30 days notice to J&J, Cyprus shall have the right to assume the obligations of any or all of such benefits directly, and to provide or cause an affiliate to provide any or all of such benefits, at which time J&J shall be relieved of its obligations hereunder in respect of such benefit.

J&J shall assist Cyprus by continuing to be responsible for pension payments under and administration of the Windsor Hourly Plan until such time as the related assets and liabilities are transferred to the Cyprus Master Trust.

J&J will keep confidential, and will not disclose to any other person, all confidential information given to J&J by Cyprus, Windsor or Western, or their employees, in order to allow J&J to provide the services contemplated under this Agreement. J&J shall use or disclose such confidential information only as may be necessary in order to provide services hereunder, as otherwise provided by law or required by any government agency, or with the written consent of Cyprus.

AG8805807

All liabilities of Windsor and Western for medical, dental and life insurance benefiits incurred prior to the Closing Date and presented to J&J or the appropriate agent of J&J for payment on or before the Settlement Date shall be paid by J&J.    Such liabilities not presented to J&J for payment on or before the Settlement Date shall remain the obligations of Windsor and Western;

(c) Effective as of the Closing, Cyprus will amend or cause to be amended the Cyprus Salaried Plan to include as eligible employees all salaried employees of Windsor and Western who continue as employees of Windsor and Western after the Closing. For each such salaried employee, the accrued benefits attributable to the period of service of such employee with J&J or a subsidiary of J&J on and prior to the Closing Date shall be determined under the terms of the J&J Salaried Plan as in effect on the Closing Date, on the basis of the compensation of such employee on and before the Closing Date and service of such employee through the last day of the calendar month in which the Closing Date occurs, and without regard to any compensation of such employee after the Closing Date and service of such employee after the last day of the calendar month in which the Closing Date occurs.    For each such salaried employee, the accrued benefits attributable to the period of service of such employee with Cyprus or a subsidiary of Cyprus following the Closing shall be determined under the terms of the Cyprus Salaried Plan or a

-37-

successor plan, if any, on the basis of the compensation of such employee after the Closing Date and service after the last day of the calendar month in which the Closing Date occurs and without regard to any compensation and service of such employee on or before the Closing Date; provided, however that each such employee shall receive credit under the Cyprus Salaried Plan or a successor plan, if any, for purposes of vesting and determination of eligibility to participate and to receive benefits, but not for purposes of benefit accrual, for all service of such employee on or before the Closing in the employment of J&J or any affiliated company of J&J that was credited for such purposes under the J&J Salaried Plan;

(d) effective as of the Closing Date, Cyprus agrees to amend the Cyprus Minerals Company Savings Plan and Trust (the "Cyprus Savings Plan") to include as eligible employees all active salaried employees of Windsor and Western on the Closing Date and to credit, only for purposes of vesting and determination of eligibility to participate in the Cyprus Savings Plan, all service of such employees before the Closing Date in the employment of J&J and any affiliated company of J&J that was credited for such purposes under the J&J Savings Plan.

J&J shall cause the account balances in the J&J Savings Plan of all active salaried employees of Windsor and Western on the Closing Date to be distributed in accordance with the terms of that Plan, the provisions of applicable law and the election of

-38-

the participant or beneficiary. J&J shall provide such individuals with the required 402(f) notice;

(e) Cyprus agrees that Windsor will assume or retain the assets, liabilities and sponsorship of the Windsor Hourly Plan as of the Closing Date. J&J agrees that within 60 days of the Closing Date, J&J will transfer in cash from the J & J Master Trust to the Cyprus Master Trust all assets of the Windsor Hourly Plan, determined in accordance with the usual procedures used under the Johnson & Johnson Master Trust for the determination of the separate shares of a single plan thereunder. Until the date of any segregation of the assets of the Windsor Hourly Plan pursuant to the transfer, such assets shall share pro rata in the investment experience, including expenses, of the J&J Master Trust. Upon segregation, such assets shall be liquidated to cash, and from the date of such liquidation to the date of transfer of possession of the assets will be invested in the Bankers Trust Commingled Short-Term Investment Fund, a qualified fund for qualified plans for which Bankers Trust Company acts as Trustee.

J&J shall cause Windsor and Western to make on or before the Closing Date all required contributions under the Windsor Hourly Plan for all completed fiscal years, including contributions that may not by law have otherwise been required to be made until the due date for filing the tax return for any completed fiscal year. All contributions and payments accrued under the Windsor

-39-

Hourly Plan, determined in accordance with prior funding and accrual practices, as adjusted to the extent required to include proportional accruals for service for periods prior to the Closing Date, will be discharged and paid by Windsor to the Plan on or prior to the Closing Date.

In addition, J&J, and not Windsor or Western, shall pay to the Windsor Hourly Plan, on or before the date of the actual transfer of the assets, any amount necessary so that, as of the date of the actual transfer of the assets, the fair market value of the assets of the Windsor Hourly Plan (including for these purposes any accrued but unpaid contributions) equalled or exceeded the present value of all "benefit liabilities" (as defined in ERISA Section 4001(a)(16)) under the Windsor Hourly Plan determined on a termination basis using the assumptions used for reporting purposes in Note 13 to the 1987 corporate financial statements of Windsor and J&J, including without limitation an assumed interest rate of 8.75 percent.

(f) J&J shall be solely liable and responsible for all claims made by employees of Windsor and Western pursuant to applicable workmen's compensation laws, if such claims arise out of any act, event or occurrence occurring prior to the Closing Date and such claims are filed prior to the Settlement Date. J&J's liability pursuant to the foregoing sentence shall include, without limitation, all costs, damages, expenses and settlements payable after the Closing. Windsor and Western shall retain all

-40-

AG8805807

liability and responsibility for all claims made by their respective employees pursuant to applicable workman's compensation laws if such claims: (i) arise out of any act, event or occurrence occurring on or after the Closing Date; or (ii) arise out of any act, event or occurrence occurring prior to the Closing Date, but were not properly filed on or prior to the Settlement Date.

5.7    **Tax Matters Agreement.**    On or before the Closing Date, Cyprus and J&J shall enter into a Tax Matters Agreement substantially in the form of Exhibit "T", attached hereto and by this reference incorporated herein (the "Tax Matters Agreement"). Cyprus and J&J each acknowledge and confirm the content of the Tax Matters Agreement, and agree to perform all obligations required thereunder.

5.8    **Tax Liabilities and Refunds.**    Any tax liability determined to be due and owing on behalf of Windsor and/or Western, or any tax refund determined to be due and owing Windsor and/or Western, for periods prior to the Closing Date as a result of an audit performed by any taxing authority after the Closing Date, shall be the sole responsibility and liability of, or shall be paid over to, J & J, as the case may be. All Land Gains Tax determined to be due to the Vermont Tax Department as a result of the transaction contemplated herein shall be the sole liability and responsibility of J & J. Prior to the Closing Date, Cyprus and J & J shall negotiate in good faith to determine J & J's

-41-

basis in such Real Property, and the amount of the Base Purchase Price allocable to each parcel of Real Property. Cyprus shall be responsible for performing an appraisal of the Real Property prior to any negotiations between Cyprus and J & J concerning the foregoing.

     5.9    **Insurance**.    Windsor and Western have been included, since the acquisition or incorporation thereof by J&J, as additional insureds on all general liability, employee liability, workers' compensation, and other insurance policies held by J&J. On and after the Closing Date, J&J agrees to use its best efforts to make such coverages and policies (including excess coverage policies) available to Cyprus, Windsor and Western, and their affiliates, up to the limits specified in such policies, and to cooperate with Cyprus and its affiliates in making claims against such policies. In the event of a claim, Windsor and Western shall be responsible for the balance of any applicable deductibles and retentions, and for the amount of any claim or claims made against Windsor or Western in excess of applicable coverage limits, and for the costs of defending any claim or claims made against Windsor or Western to the extent to which such insurance coverages do not cover such costs or do not apply. For the purposes of this Section 5.9, the term "deductibles" shall include the amount of any captive insurance underwritten or reinsured in whole or in part by J&J or its affiliates. To the extent that the amount of any proposed insurance settlement given serious consideration by Cyprus or its

AG8805B07

affiliates, or to the extent that a potential trial judgment, would exhaust the coverage available to J&J, Cyprus and its affiliates agree to permit J&J to participate in such settlement negotiations, or in the defense of such litigation, as the case may be.  Cyprus shall have the final authority in the event of any dispute between J&J and Cyprus concerning the foregoing matters; provided, however, that Cyprus and J&J shall cooperate in the event of litigation against J&J's insurance carriers to establish coverage.  J&J shall be solely liable for its cost in any such litigation to establish coverage.

5.10  **Articles and Bylaws.**  From the date hereof through the Closing Date, Windsor shall not amend its Articles of Association or Bylaws, and Western shall not amend its Articles of Incorporation or Bylaws without the prior written consent of Cyprus.

5.11  **Financial Statements of Windsor and Western.**  On the Settlement Date, the Closing Balance Sheet shall fairly present the combined financial position of Windsor and Western as of the Closing Date, and shall be prepared in conformity with generally accepted accounting principles consistently applied, subject to the adjustments described in Section 2.2 hereof. Between the date hereof and the Closing Date, neither J & J, nor Windsor nor Western shall do or perform any act, or shall omit to act, which act or omission will result in a material adverse change in the financial condition, assets, or liabilities of

-43-

Windsor and Western, and Windsor and Western shall conduct their businesses in the normal, customary manner, except as required to consummate the transaction contemplated herein, and except as requested by Cyprus. In addition, from the date hereof through the Closing Date, neither Windsor nor Western shall issue any shares, warrants, or options respecting its stock, or distribute any dividend, capital, surplus, or profit with respect to its shares, except that Windsor and Western may continue to issue dividends to J&J as is or has been customary in the ordinary course of the business of J&J, Windsor and Western, and as may be necessary or required to eliminate cash and cash equivalents balances above normal petty cash balances existing at Windsor's and Western's operations.

5.12 **Sale of Real Property or Personal Property.** Neither the Real Property or Personal Property, nor any part thereof, nor any interest therein, shall be sold, conveyed, leased, subleased, or otherwise transferred to any third party prior to the Closing Date.

5.13 **Permits.** All Permits which are issued from the date hereof through the Closing Date shall be delivered on the Closing Date by J&J to Cyprus.

5.14 **Banking and Personnel Matters.** There shall be no change in the information set forth in Exhibit "M" from the

-44-

AG8805B07

date hereof through the Closing Date without the prior written consent of Cyprus.

### 5.15  Additional Permits.

(a)    Air Permit.    Windsor discloses that it has not received an amendment (the "Amendment") to its State of Vermont air quality permit (the "State Permit"), which Amendment may be required to operate the most recently constructed talc processing mill at Windsor's Columbia milling facility located in Ludlow, Vermont (hereinafter referred to as the "Gamma Mill"). Shortly after the Closing, Windsor anticipates filing an application with the United States Environmental Protection Agency (the "U. S. EPA") for a federal air quality permit covering the entire Columbia milling facility (the "U. S. Permit"), which Windsor presently believes would supersede or replace the State Permit, and therefore would eliminate the necessity of obtaining the Amendment. Windsor has no reason to believe that the U. S. Permit will not be issued within a reasonable period following application therefor. After the Closing Date, J&J agrees to provide Windsor with all required or necessary assistance to secure the U. S. Permit, or in the event that such effort is unsuccessful, the Amendment. Windsor shall use its best reasonable efforts to minimize the costs and expenses incurred in securing the same, and agrees to pay for the first Ten Thousand Dollars ($10,000) of any such costs and expenses associated therewith incurred following the Closing

-45-

Date.   Windsor and J&J agree to share equally all costs and expenses incurred in securing the U. S. Permit or the Amendment in excess of the first Ten Thousand Dollars ($10,000), until J&J shall have contributed Five Hundred Thousand Dollars ($500,000).   Such costs and expenses shall include, without limitation, all ordinary costs and expenses associated with securing a U. S. Permit or an Amendment, attorneys' and consultants' fees, and all consequential damages attributable to Windsor's failure to secure the same, or attributable to the closure of the Gamma Mill by an appropriate state or federal agency as a result thereof.   After J&J has contributed Five Hundred Thousand Dollars ($500,000), any further costs and expenses shall be the sole responsibility of Windsor.   J&J's obligation of contribution pursuant to this Section 5.15(a) shall survive the Closing for a period of one (1) year; provided, however, that if good faith negotiations between Windsor and the U. S. EPA or the appropriate agency of the State of Vermont shall be ongoing at such time, J&J's obligation of contribution shall continue until the earlier of six (6) months after such good faith negotiations have ceased, or the date upon which the U. S. Permit or the Amendment has issued; and provided, further, that in no event shall J&J's obligation of contribution survive the Closing for a period in excess of three (3) years following the Closing Date.

AG8805807

(b)    **Building Permit**.  Windsor discloses that the building permit or amendment thereto issued to Windsor dated June 28, 1988 (the "Building Permit") conditions Windsor's operations at its milling facility located at Ludlow, Vermont (hereinafter referred to as the "Columbia Mill"), upon the employment of not more than twelve (12) employees at the Columbia Mill, and the entrance to and exit from the Columbia Mill of not more than thirteen (13) trucks per day.  Windsor, after the date of the Building Permit and prior to the date of this Agreement, has:  (i) regularly employed more than twelve (12) employees at the Columbia Mill; (ii) from time to time permitted the entrance and exit of more than thirteen (13) trucks per day; and (iii) notified the appropriate agency of the State of Vermont of its expectation that the number of employed persons at, and the number of trucks entering and exiting, the Columbia Mill will exceed twelve (12) and thirteen (13), respectively.  Windsor has no reason to believe that any amendment to the Building Permit allowing such increase, if required and applied for, would not be issued, or that any other appropriate administrative action required by the Town of Ludlow will not be forthcoming.  After the Closing Date, J&J agrees to provide Windsor with all required or necessary assistance to secure the Building Permit, in the event that Windsor shall deem the application therefor to be advisable or required.  Windsor shall use its best efforts to minimize the costs and expenses incurred in securing the Building Permit, and agrees to pay for the first Ten Thousand Dollars ($10,000) of any such costs and expenses incurred following the

AG8805B07

Closing Date.  Windsor and J&J agree to share equally all costs
and expenses incurred in securing the same in excess of the first
Ten Thousand Dollars ($10,000), until J&J shall have contributed
Five Hundred Thousand Dollars ($500,000).  Such costs and
expenses shall include, without limitation, all ordinary costs
and expenses associated with securing a Building Permit or other
required administrative action, attorneys' and consultants' fees,
and all consequential damages attributable to Windsor's failure
to secure the same, or attributable to the closure of the
Columbia Mill by an appropriate state or federal agency as a
result thereof.  After J&J has contributed Five Hundred Thousand
Dollars ($500,000), any further costs and expenses shall be the
sole responsibility of Windsor.  J&J's obligation of contribution
pursuant to this Section 5.15(b) shall survive the Closing for a
period of one (1) year; provided, however, that if good faith
negotiations between Windsor and the appropriate agency of the
State of Vermont shall be ongoing at such time, J&J's obligation
of contribution shall continue until the earlier of six (6)
months after such good faith negotiations have ceased or the date
upon which such Building Permit has issued; and provided,
further, that in no event shall J&J's obligation of contribution
survive the Closing for a period in excess of three (3) years
following the Closing Date.

5.16  Railroad Right-of-Way.  In 1974, Windsor, at its
Columbia Mill, constructed a private railroad siding and a
portion of two talc storage silos and a portion of the shipping

-48-

center upon a portion of a railroad right-of-way presently owned
by the State of Vermont, which right-of-way adjoins the Columbia
Mill.    Although Windsor believes that it had the consent and
authority of the Green Mountain Railroad acting under the
authority of the State of Vermont to so construct such siding,
silos and shipping center, no written side track agreement or
other written instrument was obtained from the Green Mountain
Railroad or the State of Vermont expressly granting Windsor such
rights.    After the Closing Date, J&J agrees to provide Windsor
with all required or necessary assistance to secure such side
track agreement or other written instrument.    Windsor shall use
its best reasonable efforts to minimize the cost and expense
incurred in securing such side track agreement or other written
instrument, and to avoid the necessity of physically moving the
existing silos or other structures from the right-of-way.    The
annual fee or lump sum payment given by Windsor as consideration
for the rights granted in such side track agreement or other
written instrument shall be the sole responsibility of Windsor so
long as such annual fee does not exceed Five Thousand Dollars
($5,000) per annum, or so long as such lump sum payment does not
exceed Ten Thousand Dollars ($10,000).    J&J agrees to share
equally in any consideration payable by Windsor in excess of the
foregoing amounts, and further agrees to share equally any cost,
loss or damage, including attorneys' fees, consequential damages
and the cost of any survey, removal, reclamation or
reconstruction, suffered by Windsor as a result of any survey,
removal, reclamation or reconstruction required by the State of

-49-

Vermont, or as a result of litigation with the appropriate agency of the State of Vermont; provided, however, that the total of the foregoing contributions by J & J shall not exceed Five Hundred Thousand Dollars ($500,000); and after J & J has contributed a total of Five Hundred Thousand Dollars ($500,000) in accordance with this sentence, any further costs and expenses shall be the sole responsibility of Windsor.    J&J's obligations of contribution and indemnification pursuant to this Section 5.16 shall survive the Closing for a period of one (1) year; provided, however, that if good faith negotiations between Windsor and the appropriate agency of the State of Vermont shall be ongoing at such time, or if Windsor shall be diligently conducting any survey, removal, reclamation or reconstruction required by the State of Vermont at such time, J&J's obligations of contribution and/or indemnification shall continue until this matter is resolved to the mutual satisfaction of Windsor and the appropriate agency of the State of Vermont; and provided, further, that in no event shall J&J's obligations of contribution and/or indemnification survive the Closing for a period in excess of three (3) years following the Closing Date.


6.    Access to Records.


6.1    Cyprus' Access.    During the period from the August 31, 1988 Letter of Intent, a true and correct copy of which is attached hereto as Exhibit "U" and by this reference is

AG8805B07

incorporated herein, to the Closing, J&J shall afford representatives of Cyprus free access to J&J's, Windsor's and Western's offices, records, files, books of account and tax returns and the records of J&J, Windsor and Western that relate to Windsor's and Western's business and operations (the "Records"). Access to the Records shall be made during normal business hours and upon reasonable advance request from Cyprus. All examinations and inspections shall be subject to the provisions of the Confidentiality Agreement between Cyprus and J & J dated December 18, 1987 (the "Confidentiality Agreement"). No such visit, inspection, examination, excerpting or receipt of information shall affect in any manner any of the representations, warranties, covenants, agreements or stipulations of J&J under this Agreement or constitute any waiver thereof by Cyprus.

6.2  **J & J's Access**.  Within sixty (60) days following the Closing Date, J&J shall deliver to Cyprus the originals or copies, as the parties may agree in each case, of the Records.  J&J shall deliver to Cyprus, in lieu of originals of the records of J&J that relate to the Windsor and Western operations, copies thereof.  J&J shall have the right to make and retain copies of those Records necessary to support the tax returns of Windsor and Western for tax years prior to the Closing Date (the "Tax Records"), and Cyprus shall retain the Tax Records for a period of at least three (3) years after the Closing Date; provided, however, that in the event Cyprus desires not to retain

-51-

the Tax Records for more than three (3) years, Cyprus shall deliver the Tax Records to J & J. After the Closing, Cyprus shall provide J&J with access to the assets and operations of Windsor and Western and to persons knowledgeable therewith, and shall give J&J access to those Records retained by Cyprus, and permit J&J to make copies thereof at all reasonable times and upon reasonable prior notice to Cyprus, in order to permit J&J to prepare its tax returns and financial statements, to investigate or defend any indemnity claim under Section 11 hereof and for any other reasonable purpose.

7.    **Closing**.  The closing of the transaction contemplated in this Agreement (the "Closing") shall take place at 9:00 a.m. on January 6, 1989 (the "Closing Date"), at the offices of Cyprus in Englewood, Colorado; provided, however, that the parties may, by mutual prior written agreement, accelerate or extend the Closing Date beyond January 6, 1989, in order to obtain such governmental approvals or third party consents as may be reasonably required to consummate the transaction contemplated herein, or for such other good cause as the parties may mutually determine (such date shall also be a "Closing Date").

8.    **Mutual Conditions Precedent to Closing**.  The obligations of Cyprus and of J&J pursuant to this Agreement are subject to the satisfaction, at or before the Closing, of all the conditions set forth in this Section 8; provided, however, that

-52-

Cyprus or J&J may waive any or all of such conditions, in whole or in part, at such party's sole discretion.

8.1    **No Injunctions**.    On the Closing Date, no action or proceeding shall have been instituted or threatened to set aside the transactions provided for herein, and there shall be no effective injunction, writ or temporary restraining order or any order of any nature issued by a court or governmental agency of competent jurisdiction, directing the transaction provided for herein not be consummated as herein provided.

8.2    **Approvals; Consents**.    Any and all approvals and authorizations of, filings and registrations with, and notifications to any governmental or regulatory authority, and any and all approvals or consents by any third party, required for the execution, delivery and performance of this Agreement by both parties, and the consummation of the transactions contemplated herein, shall have been duly obtained or made and shall be in full force and effect.

8.3    **Board Approval**.    This Agreement and the transaction contemplated herein shall have been approved by the Board of Directors of Cyprus Mines Corporation and by the Executive Committee of J&J, which Board and which Committee may decline such approval at the sole and exclusive discretion of such Board or Committee, as the case may be, for any reason whatsoever.

-53-

8.4    **Due Diligence.**  Cyprus shall have completed its due diligence investigation prior to the Closing Date, and shall have verified to its satisfaction:  (i) the quantity, quality and recoverability of the talc reserves owned and operated by Windsor and Western; (ii) the satisfactory physical and operating condition of the Personal Property; (iii) the satisfactory state of title to Personal Property and Real Property; (iv) the risk associated with any actual or threatened litigation to which J&J or any of its affiliates may be a party concerning exposure to talc is, in Cyprus' sole opinion, an acceptable risk; and (v) the talc inventories of Windsor and Western are, in Cyprus' sole opinion, saleable and recoverable and shall be stated on the Closing Balance Sheet at the lower of cost or market.

8.5    **Talc Supply Agreement.**  Cyprus shall not acquire or purchase the Windsor Stock pursuant to this Agreement, and the transaction contemplated herein shall not close, unless, on or before Closing, Cyprus and J&J, or affiliates of Cyprus and J&J, shall have executed a mutually satisfactory Talc Supply Agreement, wherein Cyprus agrees or affiliates of Cyprus agree to supply, and J&J or affiliates of J&J agree to purchase, cosmetic grade talc pursuant to the terms and conditions set forth therein (the "Talc Supply Agreement").  The Talc Supply Agreement shall be in substantially the form attached as Exhibit "V" hereto and by this reference incorporated herein.

AG8805B07

8.6    **Tax Matters Agreement.**  Cyprus shall not acquire or purchase the Windsor Stock pursuant to this Agreement, and the transaction contemplated herein shall not close, unless Cyprus and J&J shall have executed the Tax Matters Agreement on or before the Closing Date.

8.7  **Roger Miller Agreement.**    Cyprus shall not acquire or purchase the Windsor Stock pursuant to this Agreement, and the transaction contemplated herein shall not close, unless Windsor and Mr. Roger N. Miller shall have executed an Employment Agreement providing for Mr. Miller's continued employment by Windsor.

9.    **Conditions to Obligations of Cyprus.**  The obligations of Cyprus hereunder shall be subject to the following conditions, any or all of which may be waived in writing by Cyprus:

9.1    **Representations and Warranties True.**  That each of the representations and warranties of J&J set forth in Section 3 hereof shall be true and correct on and as of the Closing Date with the same effect as if made at such time; and that J&J shall have in all respects performed and complied with each of the agreements, covenants, stipulations, terms and conditions hereof applicable to J&J, including the covenants and agreements set forth in Section 3 hereof.

AG8805B07

9.2   **No Adverse Change**.   That since the date of the 1987 Balance Sheet, and on or prior to the Closing Date there shall have been no material adverse change in the financial condition, assets or liabilities of Windsor or Western, except for changes in the ordinary course of business.

9.3   **No Loss**.   That since the date of the 1987 Balance Sheet, and on or prior to the Closing Date, neither Windsor nor Western shall have suffered any loss on account of fire, flood, accident, strike or other calamity which has a material adverse effect upon the combined financial condition or the assets of Windsor and Western, whether or not such loss shall have been covered by insurance.

9.4   **Certificates**.   That J&J shall have executed and delivered to Cyprus on the Closing Date a certificate, dated the Closing Date, to the effect of each of the provisions of Sections 9.1, 9.2 and 9.3 hereof, and that the President of Windsor and Western shall have executed and delivered to Cyprus on the Closing Date a certificate confirming to the best knowledge, information and belief of such person that such certificate of J&J is true and correct in every respect.

9.5   **Opinion of Counsel**.   That J&J shall have furnished to Cyprus on the Closing Date an opinion of J&J's General Counsel in form and substance reasonably satisfactory to

AG8805807

Cyprus, to the effect stated in Sections 3.1, 3.2, 3.3, 3.4, 3.5, and 3.6.

9.6    **Resignations**.    That J&J shall cause to be delivered at the Closing the resignations of all of the officers and directors of Windsor and Western, except for those officers and directors continuing to perform services for Windsor and Western after the Closing. With respect to the employees, if any, of J&J performing services for Windsor and/or Western, who are directly compensated for such services by Windsor and/or Western, J&J shall deliver at Closing and in accordance with Section 5.6 hereof, a relinquishment of all remuneration and benefits accruing to them on and after the Closing Date, and waivers of all rights which they may have against Windsor and Western.

9.7    **Stock Certificates**.    That the certificate or certificates representing the Windsor Stock shall be in transferable form, duly endorsed in blank or accompanied by appropriate stock powers duly executed in blank, by J&J, with signatures guaranteed by a domestic commercial bank or trust company, with all necessary sales or stock transfer taxes or other similar revenue stamps, acquired at J&J's expense, affixed and cancelled.

AG8805B07

9.8    **J&J Certificate of Good Standing**.  That the certificate of good standing for J&J for the State of New Jersey shall be furnished to Cyprus.  Such certificate shall be dated not more than two (2) days prior to the Closing Date.

9.9    **Windsor Certificate of Good Standing**.  That the certificates of good standing for Windsor for the State of Vermont shall be furnished to Cyprus.  Such certificate shall be dated not more than two (2) days prior to the Closing Date.

9.10   **Western Certificate of Good Standing**.  That the certificates of good standing for Western for the State of California shall be furnished to Cyprus.  Such certificate shall be dated not more than two (2) days prior to the Closing Date.

9.11   **Release of Escrowed Funds**.  That J & J has executed a document substantially in the form of Exhibit "W" attached hereto and by this reference incorporated herein, requesting that the United Bank of Denver release the Escrowed Funds, as such term is defined in the Escrow Agreement between J&J, Cyprus and the United Bank of Denver dated as of September 7, 1988, a true and correct copy of which is attached hereto as Exhibit "X" and is by this reference incorporated herein.

10.    **Conditions to Obligations of J&J**.  The obligations of J&J hereunder shall be subject to the following conditions, any or all of which may be waived in writing by J&J:

-58-

AG8805B07

10.1  **Payment.**  That on the Closing Date, Cyprus shall deliver the Base Purchase Price in the amount and in the manner provided for in Section 2.1 of this Agreement.

10.2  **Representations and Warranties True.**  That each of the representations and warranties of Cyprus set forth in Section 4 hereof shall be true and correct on and as of the Closing Date with the same effect as if made at such time; and that Cyprus shall have in all respects performed and complied with each of the agreements, covenants, stipulations, terms and conditions hereof applicable to Cyprus, including the covenants and agreements set forth in Section 4 hereof.

10.3  **Certificate.**  That Cyprus shall have executed and delivered to J&J on the Closing Date a certificate of an executive officer of Cyprus, dated the Closing Date, to the effect of the provisions of Section 10.2 hereof.

10.4  **Opinion of Counsel.**  That Cyprus shall have furnished to J&J on the Closing Date an opinion of Cyprus' General Counsel in form and substance reasonably satisfactory to J&J, to the effect stated in Sections 4.1 and 4.2 hereof.

AG8805B07

11.    <u>Survival and Indemnification</u>

11.1  <u>Survival</u>.    To    the    extent    that    the
representations and warranties set forth in Section 3.24 hereof
relate  to  ERISA,  such  representations  and  warranties  shall
survive the Closing for a period of two (2) years following the
Closing  Date.    The  representations  and  warranties  set  forth  in
Section 3.24(h) shall survive the Closing for a period of two (2)
years   following   the   Closing   Date.   The   representations   and
warranties set forth in Section 3.9 hereof relating to the "Shear
Disc" shall survive until the termination or expiration of the
Talc Supply Agreement.    All other representations and warranties
contained in Sections 3 and 4 hereof shall survive the Closing
for a period of one year following the Closing Date.    With
respect to the obligations, covenants and agreements contained in
Sections 2.2, 3.24(j), 5.2, 5.3, 5.4, 5.6, 5.7, 5.8, and 5.11,
such obligations, covenants or agreements shall survive until the
same  shall  have  been  duly  performed.    With  respect  to  the
obligations, covenants and agreements contained in Sections 5.15
and 5.16, such obligations, covenants and agreements, as between
Windsor and J&J, shall survive the Closing for the periods set
forth therein.    With respect to the obligations, covenants and
agreements contained in Sections 5.1, 5.9, 11.2(v) and 11.2(vi)
hereof, such obligations, covenants and agreements, as between
Cyprus  and  J&J,  shall  survive  the  Closing  forever.    Any
representation, warranty, covenant or obligation contained in
this Agreement relating to taxes shall survive the Closing for

-60-

the period of the applicable Statute of Limitations, including all extensions thereof.

11.2 <u>Indemnification by J&J</u>.  Consistent with the provisions of Section 11.1 hereof, J&J hereby agrees to indemnify and hold harmless Cyprus from and against any and all claims, demands, penalties, suits, proceedings, judgments, losses, liabilities, damages, costs and expenses of every kind and nature (including, but not limited to, reasonable attorneys' fees and any and all related litigation costs and expenses arising after Closing from or as a consequence of any such proceeding described in this Section 11.2, including such attorneys' fees and costs incurred in connection with pursuing claims under this Section 11.2) (collectively referred to in this Section 11.2 as "Costs") imposed upon or incurred by Cyprus or its affiliates as a result of or in connection with or arising out of:  (i) any and all inaccurate representations or material breaches of covenants, warranties, stipulations, agreements and certifications made by or on behalf of J&J, Windsor or Western in this Agreement or in any document delivered hereunder; (ii) any material breach of or material default in the performance by J&J of any covenant, agreement or obligation contained in this Agreement; (iii) any tax liability or obligation determined in accordance with Sections 3.17 and 5.8 hereof to be due and owing on behalf of Windsor and/or Western for periods prior to the Closing Date; (iv) any liabilities related to the J & J Salaried Plan; (v) any debt, liability or other financial obligation not consistent with

-61-

the business of Windsor or Western which: (A) is the legal obligation of Windsor or Western; (B) was undertaken on behalf of or at the request or direction of J&J; and (C) creates or gives rise to any liability which Cyprus would not assume but for the consummation of the transaction contemplated herein; and (vi) any product liability-based claim, suit, demand or cause of action directed against Cyprus, Windsor or Western or any of their affiliates arising out of the sale of talc or talc-containing products manufactured by Windsor, Western, J&J or the affiliates of Windsor, Western or J&J, prior to Closing. J&J's obligation of indemnification pursuant to Sections 11.2(v) and 11.2(vi) shall survive the Closing forever.

11.3    **Indemnification by Cyprus.** Cyprus hereby agrees to indemnify and hold J&J harmless from and against any and all claims, demands, penalties, suits, proceedings, judgments, losses, liabilities, damages, costs and expenses of every kind and nature (including, but not limited to, reasonable attorneys' fees and all related litigation costs and expenses arising after Closing from or as a consequence of any such proceeding described in this Section 11.3, including such attorneys' fees and costs incurred in connection with pursuing claims under this Section 11.3) (collectively referred to in this Section 11.3 as "Costs") imposed upon or incurred by J&J or its affiliates as a result of or in connection with or arising from: (i) any and all inaccurate representations or material breaches of covenants, warranties, stipulations, agreements and certifications made by

-62-

AG8805B07

or on behalf of Cyprus in this Agreement or in any document delivered hereunder; (ii) any material breach of or material default in the performance by Cyprus of any covenant, agreement or obligation contained in this Agreement; and (iii) any tax refund obligation determined in accordance with Section 5.8 hereof to be due and owing J&J for periods prior to the Closing Date.

11.4  **Indemnification Procedure; Defense.**    In the event that any indemnified party determines that it is entitled to indemnification under this Agreement, it shall promptly thereafter so notify the indemnifying party in writing, which writing shall set forth in detail the amount of and the basis for such claim.  Promptly after receipt by the indemnified party of notice of the commencement of any action involving the subject matter of the foregoing indemnity provisions, such indemnified party shall, if any claim in respect thereof is to be made against the indemnifying party under Section 11.2 or 11.3, notify the indemnifying party in writing of the commencement thereof. In case any such action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party shall have the right to participate therein, and to the extent that it may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof, with counsel reasonably satisfactory to such indemnified party; provided, however, that if the

-63-

defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and other indemnified parties which are different or are in addition to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert, at the cost and expense of the indemnified party or parties, such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties, subject to reimbursement of such costs and expenses to the indemnified party or parties upon a final determination that such defense is within the indemnification obligations set forth in this Section 11.  In the event that the indemnifying party shall assume the defense of a lawsuit as provided herein, the indemnifying party, after consultation with the indemnified party, shall have reasonable control over the decision to try, settle, compromise or otherwise terminate such lawsuit.

11.5  **Exclusive Remedy**.  J&J and Cyprus acknowledge and agree that the indemnity provisions of this Section 11 shall be the exclusive remedy for either party for any matter for which either party may be indemnified.

12.  **Operation of Business**.  Between the date hereof and the Closing Date, J&J shall cause Windsor and Western to operate their businesses in the ordinary course.  Neither Windsor nor

-64-

Western shall enter into or amend any material contract, or otherwise adversely affect in any material respect the financial conditions, ownership or operations of Windsor and Western without the prior written consent of Cyprus, which consent shall not be unreasonably withheld.   With respect to capital investments and expenditures, and the ongoing operation of Windsor and Western facilities, J&J shall cause Windsor and Western to operate the business and facilities in the ordinary course, and shall make such capital investments and expenditures as may be required therefor; provided, however, that no capital investment or expenditure in excess of One Hundred Thousand Dollars ($100,000) shall be made or approved without the prior written consent of Cyprus, which consent or approval shall not be unreasonably withheld.  After the Closing, Windsor shall have the right to manage its business and all aspects of it, and J & J shall have no right, except as set forth in the Talc Supply Agreement, to manage Windsor's business or any aspect of it.


13.   **Miscellaneous**.


13.1   **Parties in Interest; Assignment**.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and permitted assigns.   This Agreement is not made for the benefit of any person, firm, corporation or other entity not a party hereto, and nothing in this Agreement shall be construed to give any person,

-65-

firm, corporation or other entity, other than the parties hereto and their respective successors and permitted assigns, any right, remedy or claim under or in respect of this Agreement or any provision hereof.  Without limiting the foregoing, no provision of this Agreement shall be construed to affect Cyprus' right or the right of Windsor or Western to change the terms and conditions of employment, as permitted by law.  This Agreement may not be assigned or transferred in whole or in part by any party hereto without the prior written consent of the other party, and any attempt to assign or transfer this Agreement or any part thereof in violation of this Section 13.1 shall render such attempted assignment or transfer void and of no effect.

13.2  **Expenses**.  Each of the parties hereto shall be responsible for and shall pay all of its own expenses incurred in connection with this Agreement and the transaction contemplated herein, including without limitation, all legal fees and other expenses incident to the negotiation and preparation of this Agreement.

13.3  **Confidentiality**.  Prior to and after the Closing Date, the parties shall maintain this Agreement and the terms and conditions hereof confidential, and neither party shall disclose the same without the prior written consent of the other party, except as may be contemplated by this Agreement or required by court orders, applicable federal, state, and local laws, rules or regulations or the rules of any stock exchange.  Notwithstanding

-66-

the foregoing, the parties may disclose the terms and conditions of this Agreement to their respective lenders or other financial institutions under conditions of confidentiality similar to those contained in the Confidentiality Agreement between Cyprus and J & J dated December 18, 1987, a true and correct copy of which is attached hereto as Exhibit "Y" and by this reference incorporated herein.

13.4 **Notices.** Any notice, request, consent, waiver or other communication required or permitted to be given hereunder shall be effective only if made or given in writing and shall be deemed sufficiently given only if delivered in person or sent by telegram, cable, telecopier, or by certified or registered mail, postage prepaid, return receipt requested, addressed as follows:

If to Cyprus:

        Cyprus Mines Corporation
        9100 East Mineral Circle
        Englewood, Colorado  80112
        Attn: Vice President - Industrial Minerals

With concurrent copy to:

        Cyprus Mines Corporation
        9100 East Mineral Circle
        Englewood, Colorado  80112
        Attn: General Counsel

If to J&J:

        Johnson & Johnson Consumer Products Inc.
        501 George Street
        New Brunswick, New Jersey 08903
        Attn:  Vice President - Finance

AG9805B07

<u>With concurrent copy to</u>:

> Johnson & Johnson
> One Johnson & Johnson Plaza
> New Brunswick, New Jersey  08933
> Attn:  General Counsel

or to such other person or address as such party may have specified in a notice duly given as provided herein.  Such notice or communication shall be deemed to have been given as of the date of delivery or transmission.


13.5  **Further Assurances**.  Cyprus and J & J agree to do all things and to take all actions, including the execution of any other documents, reasonably necessary or appropriate to carry out the purposes of this Agreement and to consummate the transactions contemplated herein.


13.6  **Entire Agreement**.  This Agreement (including the Exhibits attached hereto and incorporated herein) and the documents referred to herein as having been or to be entered into by any of the parties hereto, or delivered or to be delivered by a party hereto to another party hereto, constitute the entire agreement and understanding of the parties relating to the subject matter hereof, and the same shall supersede all prior and contemporaneous agreements and understandings, representations and warranties, whether oral or written, relating to the subject matter hereof.


13.7  **Modification**.  This Agreement cannot be changed and no performance, term or condition may be waived in whole or

-68-

AG8805B07

in part except by a writing executed by a duly authorized officer of the party against whom enforcement of the change or waiver is sought. Any term or condition of this Agreement may be waived at any time by the party hereto entitled to the benefit thereof, and any such term or condition may be modified at any time, by an Agreement in writing executed by a duly authorized officer of each of the parties hereto.

13.8 **Delay**. No delay or failure on the part of any party in exercising any rights hereunder, and no partial or single exercise thereof, shall constitute a waiver of such rights or of any other rights hereunder.

13.9 **Governing Law**. The terms and conditions of this Agreement shall be interpreted in accordance with and construed pursuant to the laws of the State of Vermont, and any dispute of fact or law hereunder shall be resolved in the appropriate state court of Vermont or the United States District Court for the District of Vermont.

13.10 **Severability**. The unenforceability or invalidity of any Section or provision of this Agreement shall not affect the enforceability or validity of the balance of this Agreement.

13.11 **No Merger**. Except as otherwise stated herein, all covenants, agreements and obligations contained in this

AC8805807

Agreement shall survive the Closing and there shall be no merger of the terms and conditions of this Agreement into any instrument of conveyance or transfer.

13.12 _Obligations of Windsor and Western._    With respect to any covenant, obligation or agreement to be performed hereunder by Windsor or Western prior to the Closing, Windsor or Western shall perform or J&J shall cause Windsor or Western to perform, the same.  With respect to any covenant, obligation or agreement to be performed hereunder by Windsor or Western following the Closing, Windsor or Western shall perform, or Cyprus shall cause Windsor, Western, or affiliates of Windsor or Western to perform, the same.

13.13 _Headings._  All headings of this Agreement have been inserted for convenience of reference only, and are not to be considered a part of this Agreement, and shall in no way

\*

\*

\*

\*

\*         THIS SPACE INTENTIONALLY LEFT BLANK

\*

\*

\*

\*

-70-

AG8805B07

affect the interpretation of any of the provisions of this Agreement.

13.13 **Mutual Negotiation**. This Agreement and the language contained herein have been arrived at by the mutual negotiation of the parties. Accordingly, no provision hereof shall be construed against one party or in favor of another party merely by reason of draftsmanship.

IN WITNESS, WHEREOF, the parties have caused this Agreement to be executed effective as of the day and year first set forth above.

CYPRUS MINES CORPORATION,
a Delaware corporation

By: _____

Title: Vice PRESIDENT

JOHNSON & JOHNSON,
a New Jersey corporation

By: _____

Title: _____

**EXHIBIT D**

## MATERIAL PURCHASE AGREEMENT
### COVER SHEET

Johnson & Johnson Consumer Companies, Inc. a New Jersey Corporation ("BUYER"), and Luzenac America, Inc., a Delaware corporation ("SELLER"), intending to be legally bound, hereby covenant and agree to purchase and sell, respectively, the Material, on the following terms and conditions:

MATERIAL: The Material covered by this Agreement shall be the material (the "Material") set forth in Attachment A, attached hereto and incorporated herein by this reference.

QUANTITY: During the Term of this Agreement, BUYER shall purchase from SELLER one hundred percent (100%) of BUYER's talc requirements by purchasing the Material with respect to the location listed in Attachment C (the "Facility"). The percentage of BUYER's total requirements of the Material purchased from SELLER during the Term may be confirmed by SELLER as set forth in Attachment A. Notwithstanding the foregoing, SELLER acknowledges and agrees that during the Term BUYER may qualify alternate materials and shall be permitted to purchase qualification batches of material solely for the purposes of material qualification. SELLER is not obligated to supply Material to BUYER in any quarter in excess of 1/4 x the maximum annual quantity shown for such Material in Attachment A

CONTRACT TERM: January 1, 2011 through December 31, 2011, unless extended through December 31, 2012 pursuant to the "Other Considerations" Section below (the "Term").

PRICE AND TERMS OF PAYMENT: The prices for the Material covered by this Agreement shall be as set forth in Attachment B, attached hereto and incorporated herein by this reference.

DELIVERY TERMS: The delivery terms for the Material shall be as set forth in Attachment C, attached hereto and incorporated herein by this reference.

BUYER'S LOCATION AND DELIVERY POINT: The Material covered by this Agreement shall be delivered to the Facility specified in Attachment C pursuant to the Shipment Schedule described therein.

OTHER CONSIDERATIONS: BUYER will use commercially reasonable efforts to qualify SELLER's Australian ore as an alternate Material to be supplied under this Agreement by June 30, 2011. BUYER may shift such efforts to qualification of other ores (including third party sources) if BUYER reasonably determines after consultation with SELLER, that SELLER's Australian ore will not meet BUYER's specifications as provided on Attachment A.

**IN THE EVENT BUYER SUCCESSFULLY QUALIFIES AUSTRALIAN ORE:**
No later than June 30, 2011, BUYER and SELLER will discuss current costs and competitive pricing for such ore supply. Provided BUYER and SELLER can come to terms on acceptable pricing by June 30, 2011, SELLER will provide solely the Australian ore to BUYER through December 31, 2012 beginning on a date to be agreed to between the parties, which date shall represent a reasonable date to allow the parties to begin supplying and taking supply of the Australian ore. The supply of Australian ore shall be under the terms and conditions of this Agreement as a written amendment hereto that incorporates the pricing terms for the Australian ore as mutually agreed by the parties. If Buyer and SELLER cannot come to terms on pricing for Australian ore supply by June 30, 2011, SELLER agrees to supply Chinese ore through December 31, 2011, or until an alternate source is qualified, whichever is earlier, at which point the contract for supply will terminate unless otherwise agreed to in writing by the parties.

**IN THE EVENT BUYER DOES NOT SUCCESSFULLY QUALIFY AUSTRALIAN ORE:**
If BUYER is unable to qualify SELLER's Australian ore by June 30, 2011 due to the ore not meeting BUYER's specifications as provided on Attachment A, SELLER agrees to supply Chinese ore through December 31, 2011, or until an alternate source is qualified, whichever is earlier, at which point the contract for supply will terminate unless otherwise agreed to in writing by the parties.

GENERAL TERMS AND CONDITIONS OF SALE; AGREEMENT: The General Terms and Conditions of Sale, attached hereto as Attachment D, are incorporated herein and made a part hereof by this reference. This Cover Sheet, the General Terms and Conditions of Sale, as modified or expanded by the terms of this Cover Sheet (including all Attachments hereto), are collectively referred to herein as the "Agreement". The Agreement shall constitute the agreed terms and conditions upon which BUYER is obligated to purchase and SELLER is obligated to sell the Material. In the event BUYER uses its own

Protected Document – Subject to Protective Order

order acknowledgment form or any other form to accept this Agreement, such form shall be used for convenience only and any terms and conditions contained therein which are inconsistent with or in addition to those contained in this Agreement shall be and are rejected and shall be and are of no force and effect whatsoever between the parties unless expressly assented to in writing by the SELLER.  For clarity, the parties acknowledge and agree that the Material Purchase Agreement between them, which was effective January 1, 2010, was terminated as of December 31, 2010 and is no longer in force or effect.

IN WITNESS WHEREOF, the parties to this Agreement have executed the same as of the commencement date of the Term first above written.

**SELLER PRE APPROVAL**

Legal

Sales

Marketing

CCO

| **SELLER** | **BUYER** |
|---|---|
| Luzenac America, Inc. | Johnson & Johnson Consumer Companies, Inc. |
| By _____ | By _WALTER CHARLES III_ |
| Name:   Gary Goldberg | Name _Walter Charles III_ |
| Title     CEO | Title _Vice President Consumer Direct_ |

Protected Document – Subject to Protective Order

<u>Attachment A</u>

<u>MATERIAL SPECIFICATIONS</u>

| Material | Grade | Maximum Purchase Quantity Metric Tons Per Year |
|---|---|---|
| *Grade 25* Talc* | As per J&J specification no. RM-008967, current revision | 5,500 |

\* Manufactured from Guangxi Chinese Ore. Alternatively, the Material may be SELLER's Australian ore if the conditions in the "Other Considerations" Section of the Cover Sheet are met.

SELLER will consider filling orders in excess of the maximum purchase quantity on a case by case basis.

<u>CONFIRMATION PROCEDURES</u>

BUYER shall keep full and complete records and books of account with respect to all purchases of Material covered by the Agreement for a period of one (1) year after the close of the calendar year to which such records and books of account pertain. The SELLER may, at any time or times during or after the Term of the Agreement, request an independent audit of such records and books of account for the sole purpose of verifying that the total amount of each Material required to be purchased by BUYER from SELLER pursuant to the terms of the Agreement has been met. Any nationally recognized firm of independent certified public accountants designated by the SELLER and accepted by the BUYER shall, at any reasonable time or times and at the SELLER's expense, have the right to examine and audit such records and books of account maintained by the BUYER.

Protected Document – Subject to Protective Order

**Attachment B**

PURCHASE PRICE

Talc, Grade 25 (J&J Specification no RM-008967):   $690/mt  FCA Houston plant plus freight.

Price above for Material is based on SELLER's costs to purchase Chinese Guangxi Ore.  Price shall be automatically increased on July 1, 2011 based on a commensurate increase in SELLER's cost of Chinese ore over the period from January 1, 2011 to June 30, 2011.

Freight will be arranged by SELLER and added to the invoice at prevailing rate. BUYER has the right to book freight carriers on request.

Payment Terms:  Net 30 days from invoice date

**THE PRICE SET FORTH IN THIS ATTACHMENT B IS BASED ON DELIVERY OF THE MATERIAL FCA (INCOTERMS 2000) SELLER'S HOUSTON, TX. FACILITY IN BULK RAILCARS.  ORDERS OF MATERIAL UNDER THE AGREEMENT SHALL BE FOR MINIMUM QUANTITIES OF NOT LESS THAN 99 TONS.**

Protected Document – Subject to Protective Order

**Attachment C**

DELIVERY TERMS

Terms of Sale:                          FCA (Incoterms 2000) SELLER's Houston, TX facility

Delivery Points:                        Royston, GA

SHIPMENT SCHEDULE

No later than ten (10) days before the beginning of each month during the Term, BUYER shall furnish to SELLER a schedule (the "Schedule") indicating the dates and quantities to be delivered to each of BUYER's Facility for the next three (3) succeeding months. The first month of each Schedule shall represent a firm purchase order, subject to change or withdrawal only as provided herein. The remaining portion of the Schedule (second and third months) shall represent forecasts of BUYER's anticipated quantities and dates of delivery, which shall be used by SELLER for planning purposes only and does not represent a commitment by BUYER to purchase the Material on the dates or in the quantities indicated.

BUYER may reschedule or cancel the delivery dates of Material on order without charge upon the SELLER receiving seventy-two (72) hours notice prior to the scheduled delivery date set forth in BUYER's Schedule. Any originally scheduled delivery date may be rescheduled only once, for a delay of no more than thirty (30) days beyond the originally scheduled delivery date.

IMERYS 205621

## Attachment D

### General Terms And Conditions Of Sale (2009)

1. **Price; Taxes and Customs Duties; Conditions of Payment.** The price for the Material is as set forth on the face hereof and shall be paid in the currency as set forth on the face hereof. All prices are quoted, orders accepted and delivered, and billings rendered FCA Seller's facility (Incoterms 2000) and are exclusive of all federal, state and local excise, sales, use, value added, general services and similar taxes, and all import, export or customs duties, tariffs, or like charges, all of which shall be the responsibility of Buyer. Payment for Material shipped on approved credit is due net 30 days, or as stated on the face hereof, from date of invoice. Past due balances are subject to a late payment charge of 1.5% per month, or the maximum amount permitted by applicable law, whichever is less. Buyer shall pay all charges, costs and legal fees incurred in collecting amounts owed. Seller has the right to reschedule or cancel any order with Buyer if accounts are delinquent. If in the judgment of Seller the financial condition of Buyer at any time does not justify delivery upon the payment terms specified, Seller may amend such payment terms or require full or partial payment in advance. For export sales, Seller, in its sole discretion, may require Buyer, at its cost and expense, to obtain an irrevocable standby letter of credit in favor of Seller issued or confirmed by a U.S. bank acceptable to Seller, in a form acceptable to Seller, and in an amount acceptable to Seller, and Seller shall have the right to draw against all or any portion of the letter of credit amount on sight.

2. **Delivery and Risk of Loss.** Title shall pass to Buyer, and Buyer assumes all risk of loss, from the time the Material is loaded by Seller onto railcar or truck for shipment to Buyer at Seller's facility. In the absence of specific written instructions, Seller may exercise in its discretion the method of shipment. Unless otherwise agreed by the parties in writing, Seller shall have the exclusive right to arrange and book all freight for the transportation of the Material to Buyer. Delivery dates are the dates the Material is shipped from Seller's facility. Buyer shall be responsible for payment of all freight and transportation charges from Seller's point of loading to the delivery address specified by Buyer. Delivery dates are approximate and are predicated on the prompt receipt by Seller of all necessary information and documentation from Buyer.

3. **Quantity.** Actual weight of individual bags and other packaging may vary due to variations in the manufacturing process and packing equipment tolerances. Any claim for shortage must be made in writing to Seller within 30 days after Buyer's receipt of the Material. If specified on the face hereof, or on any Cover Sheet or contract into which these General Terms are incorporated, Seller is not obligated to deliver in any month more than a proportionate part of the maximum quantity specified, determined by dividing such maximum quantity by the total number of months included in the period of performance. When, in the opinion of Seller, there is a period of shortage of supply of said Material for any reason, Seller may allocate its available supply among any or all of its various customers upon such basis as it shall deem fair and practicable, with no liability on its part for failure to deliver the quantity or any portion therein specified.

4. **Quality and Warranties.** Seller warrants that (1) when shipped, the Material meets both Seller's general, published specifications and any additional specifications set forth on the face hereof or on any Cover Sheet or contract into which these General Terms are incorporated; (2) Seller has good and sufficient title to the Material; and (3) the Material, as manufactured by Seller according to Seller's specifications, does not infringe any U.S. patent. Buyer has determined that Material with the quality characteristics conforming to such specifications will satisfy its contemplated use of the Material. Upon Buyer's request, Seller shall prepare for Buyer for each shipment of Material a certificate of analysis describing the quality characteristics of such shipment pursuant to the sampling procedures specified in Section 5. Buyer agrees that packaging material, including pallets ("Packaging Material") shall only be used for shipment of Material from Seller to Buyer and that such Packaging Material shall be disposed of by Buyer in a manner that complies with all applicable laws. Material on pallets in transport or in storage must be stored on a flat, load-bearing surface and bound to prevent shifting of the load. Pallets are not suitable for and are not to be used for edge racking or stacking. Buyer acknowledges that Material and Packaging Material must be protected from damage, moisture, excessive heat and ignition sources, and that personnel must be kept out of the path of any bags or pallets which may fall or shift during handling. Buyer assumes all risk of handling the Material at the point of delivery and Buyer agrees to indemnify Seller for claims by it or by third parties arising from such handling.

SELLER HEREBY EXPRESSLY DISCLAIMS (AND THEREFORE IS HEREBY EXCLUDED FROM THIS AGREEMENT) ANY OTHER WARRANTY, EXPRESS OR IMPLIED, AS TO THE MATERIAL AND PACKAGING MATERIAL, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SELLER SHALL NOT BE LIABLE FOR ANY DAMAGE, LOSS, COST OR EXPENSE, OR BREACH OF WARRANTY, EXCEPT AS SET FORTH IN THIS SECTION 4. BUYER HEREBY WAIVES ALL CLAIMS FOR INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE, OR SPECIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, DOWNTIME COSTS, OR COSTS OF SUBSTITUTE GOODS, AND AGREES THAT SELLER'S TOTAL LIABILITY, AND BUYER'S EXCLUSIVE REMEDY, ARE EXPRESSLY LIMITED TO REPLACEMENT OF ANY MATERIAL AND PACKAGING MATERIAL WHICH DOES NOT MEET THE WARRANTY SET FORTH IN THIS SECTION 4. IN NO EVENT SHALL SELLER'S AGGREGATE LIABILITY HEREUNDER, WHETHER FOR CLAIMS IN CONTRACT, TORT OR OTHERWISE, EXCEED THE PURCHASE PRICE PAID FOR THE MATERIAL AND PACKAGING MATERIAL; PROVIDED THAT, NOTHING IN THIS PARAGRAPH SHALL BE DEEMED TO EXCLUDE OR LIMIT ANY LIABILITY UNDER ANY APPLICABLE LAW OR STATUTE WHICH, UNDER SUCH LAW OR STATUTE, CANNOT BE EXCLUDED OR LIMITED.

5. **Sampling and Analysis.** At the time the Material is loaded or packaged by Seller, whichever is earlier, Seller, at its expense, shall sample the Material in accordance with its normal sampling procedures. The results of sampling and analysis by Seller shall be final and conclusive for all purposes. In the event delivered Material does not meet the quality standards set forth in Section 4, Buyer shall promptly contact Seller and afford the Seller the opportunity to inspect and sample the Material. If Seller agrees that the Material is nonconforming, Seller shall give instructions as to where to send the Material, at Seller's expense, and Buyer shall receive replacement Material in like quantities in lieu thereof. Rejection of such nonconforming Material shall be made not later than thirty (30) days after receipt by Buyer.

6. **Defaults and Remedies.** If Buyer defaults in any of its obligations hereunder, Seller's remedies shall include suspension of performance together with all other rights and remedies at law or in equity which Seller may have as a result of Buyers default. If, despite any default by Buyer,

Seller elects to continue to make deliveries, its action shall not constitute a waiver of any default by Buyer or in any way affect Seller's legal remedies for any such default. If Buyer defaults under this Agreement and the matter is placed in the hands of an attorney for collection, or suit is brought at law or in equity to enforce the provisions herein, Buyer agrees to pay reasonable attorneys' fees together with costs in addition to the amounts due hereunder. Buyer shall indemnify, defend and hold harmless Seller for any third party claims brought against Seller based on the use of Materials by Buyer.

7. **Force Majeure.** All obligations of either party hereunder (except the payment of money) shall be suspended while, but only so long as and to the extent that, such party is prevented from complying with such obligations in whole or in part by acts of God or of the public enemy, strikes, lockouts and other labor disputes, fire, flood, accidents, epidemics, quarantine restrictions, freight embargoes, earthquake, unusually severe weather, acts of war, terrorism, insurrection or mob violence, unforeseen shutdown or unavailability of major sources of supply, breakage of machinery or apparatus, laws, requirements, regulations or action of or the failure to act of any state, federal or local government, or any other matters beyond the reasonable control of said party which cannot be overcome by said party by means normally employed in the performance of this Agreement, whether similar to the matters herein specifically enumerated or otherwise. In the event of Seller's inability due to any of the above circumstances to supply all of the Material provided for hereunder, Seller reserves the right to allocate its available supply of Material among its purchasers, or any of them, as Seller, in its sole discretion, elects without liability to Buyer for any failure of performance which may result therefrom. The party affected by force majeure shall promptly and timely notify the other of the existence thereof, the expected delays, and the estimated effect upon its performance hereunder.

8. **Product Safety and Product Stewardship Program.** Buyer understands and acknowledges that as part of Seller's product stewardship program, Seller from time to time will issue notices regarding the safe use of Seller's products, including appropriate and inappropriate end uses of Seller's products. Seller has the right to refuse to sell Material to unlawful or inappropriate end-uses as determined by Seller. Buyer agrees to comply with such safety policies and end use restrictions in its use and sale of Seller's products. Buyer further agrees upon written request from Seller to confirm in writing that Buyer is complying with Seller's safety policies and end use restrictions. In no event shall Seller be responsible for any damage, injury or loss occasioned by the misuse of Material or Buyer's negligence.

9. **Buyer as End User; No Assignment.** Unless Buyer is duly authorized to distribute the Material pursuant to a written distribution agreement with Seller, the Material is being purchased by Buyer for its internal use and, without the express written authorization of Seller, Buyer may not repackage, resell, or otherwise distribute the Material to third parties. In addition, Buyer shall have no right to assign or transfer (whether by operation, by law or otherwise) all or any part of its rights or obligations under this Agreement except with the prior written consent of the Seller, and no delegation of any obligation of Buyer shall be made without the prior written consent of Seller. Any attempted assignment or delegation of Buyer shall be void and ineffective for all purposes unless made in conformity with this paragraph. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

10. **Compliance with Laws; Export.** Both parties shall comply with all applicable laws and regulations in connection with their performance hereunder. Buyer shall not sell, ship, import, export, re-export or allow trans-shipment of any Material in any manner contrary to any applicable export laws, including without limitation, to any prohibited individual, firm or entity appearing in Denied Party Lists published by the U.S. government, such as the list of Specially Designated Nationals published by the U.S. Department of Treasury OFAC, or to any country subject to economic or trade sanctions imposed by the U.S., except as otherwise authorized by U.S. law. Buyer shall also comply with all applicable laws and regulations of any destination country. Buyer shall indemnify, defend and hold harmless Seller from and against any breach by Buyer of its obligations under this paragraph.

11. **Notices.** Any notices, payments, or other information herein contemplated to be given, made or delivered to Seller or Buyer hereunder shall be sufficient if personally delivered, mailed, or sent by electronic facsimile at the address of such party set forth on the face hereof or to such other address as such party may from time to time designate to the other in writing.

12. **Incorporation By Reference.** Terms appearing on the face hereof, or on any cover sheet or contract into which these General Terms and Conditions are incorporated, that in any way alter, condition or explain these General Terms and Conditions are incorporated herein by this reference. All terms so incorporated shall supersede any conflicting or contrary provision contained in these printed General Terms and Conditions.

13. **Entire Agreement; Interpretation; Amendment.** Unless the parties have entered into a written contract that is intended to supersede these General Terms and Conditions, these General Terms and Conditions, together with any terms appearing on the face hereof or on any cover sheet or contract into which these General Terms and Conditions are incorporated, contain the entire agreement between the parties, and there are no oral understandings, representations or agreements relative to this Agreement which are not fully expressed herein. Any terms appearing on any Order or other form used by Buyer which would modify or conflict with the terms and conditions set forth herein are expressly rejected, and Buyer hereby specifically accepts any terms contained herein that are different or additional to those contained in any such Order. Except for the purpose of negating implied warranties, no course of prior dealings between the parties and no usage of the trade shall be relevant to supplement or explain any term used in this Agreement. If any provision of this Agreement, or the application thereof to any person, place, or circumstance, shall be held by a court of competent jurisdiction to be invalid, unenforceable, or void, the remainder of this Agreement and such provisions as applied to other persons, places, and circumstances shall remain in full force and effect. No amendment, modification, or waiver of any provision of this Agreement shall be effective unless in writing and signed by the parties hereto. English shall be the governing language hereof.

14. **Governing Law and Dispute Resolution.** This Agreement shall be governed by the laws of the State of Colorado, without regard to its conflicts of laws. The parties hereby exclude from any application to the purchase and sale of the Material the United Nations Convention on Contracts for the International Sale of Goods 1980 (Vienna Convention). Any disputes arising out of or in connection with this Agreement shall be finally settled by binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association ("AAA") in effect on the date hereof (the "Rules"), except as such Rules are modified herein. Arbitration shall be conducted in Denver,

IMERYS 205622

Colorado and shall be in English. The arbitration shall be before a single arbitrator mutually agreed from a list provided by the AAA; *provided* if Seller and Buyer fail to agree on an arbitrator within 30 days after the claim for arbitration is made, then the arbitrator shall be selected by the AAA. Not less than 30 days prior to the arbitration, each party will submit to the other party the documents, in English, and a list of witnesses it intends to use in the arbitration. In any arbitration proceeding, each party will have the opportunity to examine its witnesses and to cross-examine the witnesses of the other party. The arbitrator shall issue a written opinion stating the findings of fact and the conclusions of law on which the decision is based. The decision of the arbitrator shall be final and binding, and may be enforced in any court of competent jurisdiction. Each party to the arbitration shall bear its respective costs in the preparation and presentation of the dispute, and shall bear equally in the administrative costs of the arbitration.

Protected Document – Subject to Protective Order

IMERYS 205623

**EXHIBIT E**

CONFIDENTIAL
08/09/01

## SUPPLY AGREEMENT

This Agreement (the "Agreement") is made as of the 15th day of April 2001, by and between Johnson & Johnson Consumer Companies, Inc. ("Buyer"), and Luzenac America, Inc. ("Seller").

**WHEREAS**, Seller is in the business of making the product described in Annex A to the Agreement (the "Products") and Buyer would like to purchase Products from Seller pursuant to the terms of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual promises, covenants and agreements hereinafter set forth, the parties hereto agree as follows:

1.    **Purchase and Sale of Products.**

(a)    During the term of this Agreement, Seller shall supply Buyer with those quantities of Products as ordered by Buyer pursuant to this Agreement and Buyer shall purchase from Seller 100% of Buyer's requirements for Products containing cosmetic grade talc to be manufactured in Royston, Georgia. Nothing set forth in this Agreement shall obligate Buyer to purchase any specific minimum quantity of Products from Seller.

(b)    The Products shall conform to, and shall be manufactured in accordance with, the specifications as set forth in Annex A attached to this Agreement, and as the same may subsequently be mutually agreed to in writing by the parties hereto or prescribed by any local, state or federal regulatory agency (collectively, the "Product Specifications"). From time to time during the term of this Agreement, either party may submit written proposals for the adoption or development of improvements relating to the Products. If the parties mutually determine to pursue such improvements they shall mutually agree upon modifications to the Product Specifications to reflect such improvements as well as revisions to the price to be charged for the Products.

(c)    The initial price for Products ordered by Buyer during the first twelve months of this Agreement shall be as set forth in Annex B attached to this Agreement. On April 15, 2002 and April 15, 2003, the price for Products prevailing during the Contract Year (as such term is defined in Section 22 (b) below) just ended shall be increased or decreased for the Contract Year commencing on such dates in accordance with the proportionate increase or decrease in the Producer Price Index for Nonmetallic Mineral Products, Minerals and earths ground or treated, Series ID PCU3295#1 (the "Index"), published by the United States Department of Labor, Bureau of Labor Statistics (the "BLS"). In the event that this series

CONFIDENTIAL
08/09/01

is no longer published or is otherwise unavailable, then Series ID PCU3295# shall be used. The proportionate increase or decrease in the Index shall be determined by comparing the average of the final or preliminary Index data for the most recent January, February and March obtained from the BLS website during the second week of April to the average of the final Index data for January, February and March of the year prior to the Contract Year just ended. Index data used for the purposes of this Section 1(c) shall not be seasonally adjusted. For greater certainty, but by way of illustration only, a sample calculation for adjustment of the purchase price is set forth in Annex B attached to this agreement.

(d)    The prices charged by Seller to Buyer as set forth in Annex B, or as may subsequently be determined, shall include all costs for F.O.B. Ludlow, Vermont (the "Shipping Point"). The risk of loss with respect to Products shall pass to Buyer upon notification to Seller by Buyer of acceptable microbiological testing results from Product samples obtained during railcar loading, and Seller's release of said railcar to the rail carrier.

(e)    In addition to any price increases or decreases determined pursuant to this Agreement, Seller shall actively investigate and present to Buyer, cost savings opportunities having the potential to reduce either prices charged by Seller to Buyer or Buyer's processing costs by 4% per year. Nothing set forth herein shall obligate either party to implement any cost savings opportunity presented to Buyer.

**2.    Forecasts; Orders.**

(a)    Buyer shall provide Seller electronic access to a non-binding forecast of Buyer's expected requirements for Products during the following quarter. Buyer shall place binding orders for Products by written or electronic purchase order (or by any means agreed to by the parties) to Seller, which shall be placed at least 18 calendar days prior to the desired date of shipment.

(b)    To the extent of any conflict or inconsistency between this Agreement and any purchase order, purchase order release, confirmation, acceptance of any similar document, the terms of this Agreement shall govern.

**3.    Shipment; Inventory; Invoices; Payment.**

(a)    All charges for packing, hauling, storage, bar coding, transportation to and loading at the Shipping Point are included in the purchase price unless otherwise agreed to by the parties. All shipments must

CONFIDENTIAL
08/09/01

be accompanied by a packing slip which describes the Products, states the item number, purchase order number and shows the shipment's destination.

(b) Seller shall invoice Buyer within 48 hours following shipment of Products to Buyer.  Buyer shall pay Seller the purchase price set forth on such invoices not later than thirty (30) calendar days following the date of Seller's invoice.

(c) Seller will maintain inventory of Products on a first-in, first-out basis. At all times during the term of this Agreement, Seller shall maintain an adequate number of dedicated silos to ensure timely shipment of all Products ordered by Buyer hereunder.  Seller and Buyer agree to cooperate to improve the process for ordering Products with the mutual objectives of expediting the supply process to a Lean Supply process and reducing inventory costs.

(d) In the event that Seller shall be unable or unwilling or shall fail to supply such Products in such quantities as Buyer shall request and in compliance with the shipping  periods set forth herein or as otherwise requested by Buyer (other than as a result of a force majeure event as described in Section 9), then Buyer shall be permitted (with no obligation or liability to Seller) to obtain Products from another source and such inability, unwillingness or failure to supply Products shall be deemed a material breach of this Agreement, *provided, however,* that Seller shall have no liability to Buyer in the event that Buyer shall fail to make sufficient railcars available to Seller for loading of any order or any portion thereof.

## 4.    Product Acceptance; Corrective Actions; Assistance.

(a) Shipment of Products by Seller to Buyer shall constitute a certification by Seller that Products have been tested, and been found to conform fully to the Product Specifications and are free from defects.  In the event that Buyer conducts testing on the Products for non-microbiological parameters, Buyer shall forward the results of such tests to Seller as soon as possible.  In the event of dispute between the parties concerning conformance to any of Buyer's non-microbiological specifications as described in Annex A, Buyer shall give written notice of such dispute to Seller as soon as possible.  Immediately after such notice, each party shall submit a sample of the Product to a mutually satisfactory third party laboratory.  Seller shall also submit to the laboratory a third untested, sealed portion of Product sample.  Such laboratory shall determine, in its judgment, whether the shipment conforms with the Product Specifications as evidenced by the Product sample.  The decision of the third party laboratory shall be final, and all costs and

CONFIDENTIAL
08/09/01

expenses pertaining to such testing by the third party laboratory shall be shared equally.

(b)     Buyer shall be responsible for conducting any microbiological testing with respect to the Product.  Such testing shall be conducted in such manner as Buyer shall determine.  Buyer acknowledges that Seller shall not be conducting any microbiological testing.  Within 90 calendar days of execution of this Agreement and biannually during the term of this Agreement, a review of Product Specifications shall be completed jointly by Buyer and Seller to ensure conformity.

(c)     In the event of any non-conformance, Seller within a reasonable period of time shall:  (i)  arrange for return to Seller or an Affiliate of Seller, at Seller's sole cost and expense, such Products as are finally determined to be out of conformance with the Product Specifications; (ii) replace such Products as are finally determined to be out of conformance with the Product Specifications; and (iii) compensate Buyer for the freight costs, including cleaning and sanitization as required of any carload rejected for nonconformance in accordance with this Section 4.

(d)     Any shipment of Products for which Buyer shall not submit a Claim within sixty (60) calendar days of receipt shall be deemed accepted.  Upon acceptance, Buyer shall release Seller from all Claims for non-conformity or defects except Claims for latent defects which are not reasonably detectable at the time of acceptance.

(e)     In the event any governmental agency having jurisdiction shall request or order, or if Buyer shall determine to undertake, any corrective action with respect to Products supplied hereunder, including any Product recall, customer notice, restriction, change, corrective action or market action or any Product change, and the cause or basis of such corrective action is attributable to a breach by Seller of any of its warranties, guarantees, representations, obligations or covenants contained herein, then Seller shall be liable, and shall reimburse Buyer for the reasonable costs of such action including the cost of any Product affected thereby whether or not such particular Product shall be established to be in breach of any warranty by Seller hereunder *provided, however,* that Seller's obligation to indemnify Buyer hereunder shall not exceed Twenty Million Dollars ($20,000,000) in the absence of Seller's gross negligence or willful misconduct, and Forty Million Dollars ($40,000,000) in the event of Seller's gross negligence or willful misconduct.

CONFIDENTIAL
08/09/01

(f)     Seller will provide Buyer with all such technical assistance and training as may be required by Buyer to maintain satisfactory Product performance.

## 5.    Inspection.

Buyer shall have the right, upon reasonable notice to Seller and during regular business hours, to inspect and audit the facilities being used by Seller for production of the Products to assure compliance by Seller with applicable rules and regulations and with other provisions of this Agreement and to determine Seller's raw materials and manufacturing costs in connection with the Products to the extent these costs are passed on to Buyer.  Seller shall within seven calendar days remedy any deficiencies which may be noted in any such audit, and the failure by Seller to remedy any such deficiencies within such seven day period shall be deemed to be a material breach of this Agreement; provided, however, that if such deficiency is not capable of being remedied within such seven (7) day period, then so long as Seller is pursuing in diligent fashion a commercially acceptable remedy to such deficiency it shall not be deemed to be a material breach.  Seller acknowledges that the provisions of this Article granting Buyer certain audit rights shall in no way relieve Seller of its obligations under this Agreement, nor shall such provisions require Buyer to conduct any such audits.

## 6.    Warranty.

(a)     Seller represents and warrants to Buyer that all Products sold by Seller shall (i) conform to the quality standards set forth in Annex A and (ii) be in compliance with all applicable federal, state or municipal statutes, laws, rules or regulations, including those relating to the environment, food or drugs and occupational health and safety.  Without limiting the foregoing, Seller represents and warrants that it shall comply with all present and future statutes, laws, ordinances and regulations relating to the manufacture, assembly and supply of the Products being provided hereunder, including without limitation, those enforced by the United States Food and Drug Administration (including compliance with good manufacturing practices) and International Standards Organization Rules 9,00 et. seq.   Seller further represents and warrants to Buyer that the performance of its obligations under this Agreement will not result in a violation or breach of, and will not conflict with or constitute a default under its Certificate of Incorporation or corporate bylaws or any agreement, contract, commitment or obligation to which Seller or any of its Affiliates is a party or by which it is bound. **EXCEPT FOR THE WARRANTIES CONTAINED IN THIS AGREEMENT, SELLER MAKES NO OTHER**

CONFIDENTIAL
08/09/01

WARRANTY OF ANY KIND, EXPRESSED OR IMPLIED, IN FACT OR BY LAW, WHETHER OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE OR OTHERWISE.

(b)     Seller has read and understands the Johnson & Johnson Policy on the Employment of Young Persons (the "Policy"). In the manufacture of the Products, Seller shall employ young persons only as permitted by the Policy. Seller shall permit representatives of Buyer to enter Seller's premises at any reasonable time to inspect relevant employment, health and safety records and to observe the manufacturing process. Seller shall maintain the records necessary to demonstrate compliance with the Policy and shall provide to Seller a written certification of such compliance annually during the term of this agreement. If Seller shall fail to comply with this provision, then Buyer shall have the right to terminate this agreement forthwith and without penalty.

## 7.     Indemnification.

(a)     Buyer and Seller agree that liability for damages alleged to have been suffered by Buyer and Seller arising out of an alleged breach of Section 6(a) or otherwise under this Agreement shall be handled as follows:

(i)     Seller shall indemnify Buyer for any cost, loss, damage or expense suffered by Buyer which arises from: (A) the Product not meeting the specifications therefor as described in Annex A at the time title for such Product passed to Buyer, except for the microbiological specifications set forth therein; or (B) Seller failing to sample and test Products in accordance with the sampling and testing methods described in Annex A in the manner practiced by Seller on the date of this Agreement or as modified by the mutual agreement of the parties pursuant to Section 1 (b) above; *provided, however,* that Seller's obligation to indemnify Buyer shall not exceed Twenty Million Dollars ($20,000,000) in the absence of Seller's gross negligence or willful misconduct, and Forty Million Dollars ($40,000,000) in the event of Seller's gross negligence or willful misconduct.

(ii)    Seller shall be solely liable in the event that the Product failed to conform to the microbiological quality standards as set forth in Annex A before title to such Products passed from Seller to Buyer; *provided, however,* that Seller's liability pursuant to this Section 7 (a) (ii) shall be limited to replacement of Products and reimbursement of certain of

CONFIDENTIAL
08/09/01

Buyer's freight costs, including railcar cleaning and sanitization, in accordance with Sections 4 (c) above.

(iii)    Buyer shall be solely liable for, and shall indemnify Seller for any cost, loss, damage or expense suffered by Seller arising out of the failure of the Products to conform to the microbiological quality standards established therefor, as the same may be amended from time to time.

(iv)    Excluding those matters set out in the preceding clauses (i), (ii) and (iii), Seller shall indemnify, defend and hold harmless Buyer and its Affiliates, and each of their respective officers, directors, agents and employees from and against all liabilities arising out of any violation by Seller of any law, ordinance, regulation or rule or the order of any court or administrative agency, and from and against all liabilities arising out of any claim by an employee, agent, or contractor of Seller arising in connection with this Agreement, *provided however,* that Seller shall not indemnify Buyer for any such liabilities to the extent that such liabilities arise from: (i) the acts or omissions of Buyer; or (ii) the acts or omissions of Seller which were directed by Buyer.

(b)    The provisions of this Section 7 shall survive any termination or expiration of this Agreement.

## 8.    Term; Termination.

(a)    The term of this Agreement shall be for a period of 3 years beginning on April 15, 2001, unless sooner terminated pursuant to this Agreement.

(b)    Either party may terminate this Agreement for any reason by giving notice to the other party of its intent to terminate at least 365 calendar days prior to the date on which it seeks to terminate this Agreement.

(c)    This Agreement may be terminated, prior to the expiration of its term, upon fifteen (15) calendar days written notice by either party: (i) in the event that the other party hereto shall (A) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property, (B) make a general assignment for the benefit of its creditors, (C) commence a voluntary case under the United States Bankruptcy Code, as now or hereafter in effect (the "Bankruptcy Code"), (D) file a petition seeking to take advantage of any law (the "Bankruptcy Laws") relating to

Case 19-10289-LSS    Doc 1567-1    Filed 03/20/20    Page 184 of 219

CONFIDENTIAL
08/09/01

bankruptcy, insolvency, reorganization, winding-up, or composition or readjustment of debts, (E) fail to controvert in a timely and appropriate manner, or acquiesce in writing to, any petition filed against it in any involuntary case under the Bankruptcy Code, or (F) take any corporate action for the purpose of effecting any of the foregoing; or (ii) if a proceeding or case shall be commenced against the other party hereto in any court of competent jurisdiction, seeking (A) its liquidation, reorganization, dissolution or winding-up, or the composition or readjustment of its debts, (B) the appointment of a trustee, receiver, custodian, liquidator or the like of the party or of all or any substantial part of its assets, or (C) similar relief under any Bankruptcy Laws, or an order, judgment or decree approving any of the foregoing shall be entered and continue unstayed for a period of 60 calendar days; or an order for relief against the other party hereto shall be entered in an involuntary case under the Bankruptcy Code.

(d)     This Agreement may be terminated, prior to the expiration of its term, by either party by giving written notice of its intent to terminate and stating the grounds therefor if the other party shall materially breach or materially fail in the observance or performance of any representations, warranty, guarantee, covenant or obligation under this Agreement, and such breach or failure is not the result of an Event of Force Majeure (as such term is defined in Section 9 below). The party receiving the notice shall have thirty (30) calendar days from the date of receipt thereof to cure the breach or failure; or, in the event that such breach or failure is not reasonably susceptible to cure within such time, to commence and diligently pursue good faith efforts to cure such breach within such time as may be reasonable in the circumstance. In the event such breach or failure is cured, the notice shall be of no effect.

(e)     Notwithstanding the termination of this Agreement for any reason, each party hereto shall be entitled to recover any and all damages which such party shall have sustained by reason of the breach by the other party hereto of any of the terms of this Agreement. Termination of this Agreement for any reason shall not release either party hereto from any liability which at such time has already accrued or which thereafter accrues from a breach or default prior to such expiration or termination, nor affect in any way the survival of any other right, duty or obligation of either party hereto which is expressly stated elsewhere in this Agreement to survive such termination. In the case of a termination under Section 8 (d) above, the non-defaulting party may pursue any remedy available in law or in equity with respect to such breach, subject to Section 15 hereof.

9.    **Force Majeure.**

CONFIDENTIAL
08/09/01

(a)    If either party is prevented from performing any of its obligations hereunder due to any cause which is beyond the non-performing party's reasonable control, including fire, explosion, flood, or other acts of God; acts, regulations, or laws of any government; war or civil commotion; strike, lock-out or labor disturbances; or failure of public utilities or common carriers (a "Force Majeure Event"), such non-performing party shall not be liable for breach of this Agreement with respect to such non-performance to the extent any such non-performance is due to a Force Majeure Event. Such non-performance will be excused for three months or as long as such event shall be continuing (whichever occurs sooner), provided that the non-performing party give immediate written notice to the other party of the Force Majeure Event. Such non-performing party shall exercise all reasonable efforts to eliminate the Force Majeure Event and to resume performance of its affected obligations as soon as practicable.

(b)    Notwithstanding the provisions of Section 9 (a) above, in the event that due to the occurrence of an Event of Force Majeure, Seller shall be unable to supply Products in such quantities as Buyer shall request and in compliance with the delivery periods set forth in this Agreement, Buyer shall be permitted (with no obligation to Seller) to obtain Products from another source, and Buyer shall thereafter have no obligation to purchase Products from Seller until any contractual obligations that Buyer has assumed in connection with obtaining a substitute supply of Products shall have terminated. Buyer shall have no obligation to affirmatively terminate any such contractual arrangements.

(c)    In the event that such an alternative supplier is established, Seller shall use its best efforts to give Buyer access to any proprietary technical materials, information and techniques necessary or helpful for Buyer to arrange an alternative supplier of Product, and to provide advice and consultation in connection therewith. The provision of any proprietary information by Seller shall be subject to the recipient entering into reasonable confidentiality obligations with Seller as well as a commitment by the recipient that such proprietary information shall only be used for purposes of providing substitute Product to Buyer.

## 10.    Confidentiality.

As used herein, "Confidential Information" shall include all information given to, or otherwise acquired by a party hereto, relating to the other party's business or affairs, including without limitation: (i) information regarding any of the products of a party  or the design or manufacture of

CONFIDENTIAL
08/09/01

such products or the packaging thereof; (ii) information regarding advertising, distribution, marketing or strategic plans; (iii) information regarding costs, productivity or technological advances; (iv) any designs, specifications, blueprints or patterns ;or (v) the terms and conditions of this Agreement; or (vi) any other information received by a party in connection with its performance of the obligations contemplated under this Agreement. Neither party shall use or disclose, but shall insure that its employees, officers and agents shall not use or disclose (except, in either case, to comply with a party's obligations under this Agreement or the rules of any stock exchange), any Confidential Information to third parties. Upon the termination or expiration of this Agreement each party shall return to the other party all Confidential Information in written form. This Section 10 shall survive the termination or expiration of this Agreement for a period of five (5) years. Confidential Information shall not include information that (vii) was already known to the other party at the time of its receipt thereof, as evidenced by competent evidence, (viii) is disclosed after its receipt thereof by a third party who has a right to make such disclosure without violating any obligation of confidentiality, (ix) is independently developed by a party or (x) is or becomes part of the public domain through no fault of any party hereto. For purposes of this Section 10, a reference to a "party" or to Buyer or Seller shall include Affiliates of the referenced party.

## 11.   Compliance with Certain Laws.

Seller agrees to comply with the applicable provisions of any federal (United States or otherwise) or state law and all executive orders, rules and regulations issued thereunder, whether now or hereafter in force, including Executive Order 11246, as amended; Chapter 60 of Title 41 of the Code of Federal Regulations, as amended, prohibiting discrimination against any employee or applicant for employment because of race, color, religion, sex or national origin; Section 60-741.1 of Chapter 60 of Title 41 of the Code of Federal Regulations, as amended, prohibiting discrimination against any employee or applicant for employment because of physical or mental handicap; Section 60.250.4 of Chapter 60 of Title 41 of the Code of Federal Regulations, as amended, providing for the employment of disabled veterans and veterans of the Vietnam era; Chapter 1 of Title 48 of the Code of Federal Regulations, as amended, pertaining to the Federal Acquisition Regulations; Sections 6, 7 and 12 of the Fair Labor Standards Act, as amended, and the regulations and orders of the United States Department of Labor promulgated in connection therewith; and any provisions, representations or agreements required thereby to be included in this Agreement are hereby incorporated by reference. If any Products are ordered by Buyer under U.S. government contracts, Seller agrees that all applicable federal statutes and regulations

CONFIDENTIAL
08/09/01

applying to Buyer as contractors are accepted and binding upon Seller insofar as Seller may be deemed a subcontractor.

12. **Insurance.**

Seller agrees to procure and maintain in full force and effect during the term of this Agreement valid and collectible insurance policies in connection with its activities as contemplated hereby which policies shall provide for the type of insurance and amount of coverage described in Annex C. Upon Buyer's request, Seller shall provide to Buyer a certificate of coverage or other written evidence reasonably satisfactory to Buyer of such insurance coverage.

13. **Relationship of the Parties.**

The relationship of Buyer and Seller established by this Agreement is that of independent contractors, and nothing contained herein shall be construed to: (i) give either party any right or authority to create or assume any obligation of any kind on behalf of the other or; (ii) constitute the parties as partners, joint ventures, co-owners or otherwise as participants in a joint or common undertaking.

14. **Publicity.**

Neither party shall originate any publicity, news release, or other announcement, written or oral, whether to the public, the press, the trade, Buyer's or Seller's customers or otherwise, relating to this Agreement, or to performance hereunder, or to the existence of an arrangement between the parties, without the prior written approval of the other party. Neither party shall use the name of the other party for advertising or promotional purposes without the prior written consent of such party.

15. **Construction.**

This Agreement shall be governed by, and shall be construed in accordance with, the laws of the State of New Jersey. Any controversy or claim arising out of or relating to this Agreement, or the parties' decision to enter into this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The arbitration shall be held in New Jersey and arbitrators shall apply the substantive law of New Jersey except that the interpretation and enforcement of this arbitration provision shall be governed by the Federal Arbitration Act. The arbitrators shall not award any of the parties punitive damages and the parties shall be deemed to have waived any right to

CONFIDENTIAL
08/09/01

such damages.  This Section 15 shall survive any termination of this Agreement.

## 16.    Entire Agreement.

It is the mutual desire and intent of the parties to provide certainty as to their respective future rights and remedies against each other by defining the extent of their mutual undertakings as provided herein.  The parties have, in this Agreement, incorporated all representations, warranties, covenants, commitments and understandings on which they have relied in entering into this Agreement, and, except as provided for herein, neither party makes any covenant or other commitment to the other concerning its future action.  Accordingly, this Agreement and the Annexes attached hereto, which are by this reference incorporated herein: (i) constitute the entire agreement and understanding between the parties with respect to the subject matter hereof and there are no promises, representations, conditions, provision or terms related thereto other than those set forth in this Agreement, and (ii) supersede all previous understandings, agreements and representations between the parties, whether written or oral.  No modification, change or amendment to this Agreement shall be effective unless in writing signed by each of the parties hereto. Notwithstanding the foregoing and for clarification purposes, to the extent that any of the provisions of the previous supply agreement between Buyer and Seller for the Product survive the expiration and/or termination of such earlier supply agreement, then those surviving terms or provisions shall continue in effect as provided for in such earlier supply agreement.

## 17.    Headings.

The headings used herein have been inserted for convenience only and shall not affect the interpretation of this Agreement.

## 18.    Notices.

All notices and other communications hereunder shall be in writing, and shall be: (i) delivered personally; (ii) mailed by certified or registered U.S. mail, return receipt requested, postage prepaid; or (iii) sent by Federal Express or another nationally recognized courier service (billed to sender), to the parties at the following addresses:

If to Seller:    President
Luzenac America, Inc.
9000 East Nichols Avenue
Englewood, Colorado 80112

CONFIDENTIAL
08/09/01

If to Buyer:    Purchasing Manager
               Johnson & Johnson
               Consumer Products Companies
               Shared Services Purchasing
               P. O. Box 587
               545 Old Elbert Road
               Royston, Georgia  30662

or to such other place as either party may designate by written notice to the other.  Such notices shall be deemed given (i) upon personal delivery; (ii)  three business days after such deposit in the U.S. mail; or (iii) upon delivery by such courier service.

### 19.    Failure to Exercise.

The failure of either party to enforce at any time for any period any provision hereof shall not be construed to be a waiver of such provision or of the right of such party thereafter to enforce each such provision, nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy.  Remedies provided herein are cumulative and not exclusive of any remedies provided at law.

### 20.    Assignment.

This Agreement may not be assigned by either party without the prior written consent of the other, except that Buyer and Seller may assign their rights and/or obligations hereunder to any of their respective Affiliates, and except that Buyer may assign its rights and/or obligations hereunder  to any successor to all or substantially all of Buyer's assets which relate to the Product.  Subject to the foregoing sentence, this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

### 21.    Severability.

Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, to the extent the economic benefits conferred by this Agreement to both parties remain substantially unimpaired, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.

### 22.    Definitions.

CONFIDENTIAL
08/09/01

(a)   For purposes of this agreement, an "Affiliate" of a party to this Agreement shall mean any corporation or partnership or other entity which directly or indirectly controls, is controlled by or is under common control with such party.  "Control" shall mean the legal power to direct or cause the direction of the general management or partners of such entity whether through the ownership of voting securities, by contract or otherwise.  "Affiliate" shall also include any party manufacturing talc-containing body powders for, on behalf of, or under license or other authority of Buyer or Buyer's Affiliates.

(b)   "Contract Year" shall mean the twelve-month period commencing on April 15th of any year during the term of this Agreement and concluding on April 14th of the next succeeding year.

## 23.   Equipment.

(a)   Buyer has made and may make available certain equipment, such as railcars (the "Equipment") for Seller to use in manufacturing the Products or otherwise preparing the Products for delivery.  Seller shall have no ownership or leasehold interest of any nature in the Equipment and all right, title and interest in the Equipment shall remain with the Buyer.  From time to time at the request of the Buyer and in connection with the Equipment, Seller will execute one or more financing statements, information statements and/or continuation statements pursuant to the Uniform Commercial Code in such form or forms as Buyer may request for filing in such public offices as Buyer shall determine.

(b)   Buyer shall have the right to enter Seller's facilities in order to (i) inspect the Equipment, (ii) inspect and copy all records relating to the repair, maintenance and servicing by Seller of the Equipment and (iii) affix tags, stickers or other items to the Equipment indicating Buyer's status as owner thereof.  Buyer shall be given access to such facilities, on reasonable notice, during normal business hours and at any other time when work is performed pursuant to this Agreement.

(c)   During the term of this Agreement, Seller shall (i) be responsible for any damage to the Equipment, (ii) keep the attachments, security interests or other claims that could affect title to the Equipment of Buyer's interest therein, (iii) not modify or alter the Equipment in any way, (iv) not remove, conceal or deface any tags, sticker or other items affixed to the Equipment that indicate Buyer's status as owner thereof, (v) operate the Equipment in accordance with good business practice and in compliance with all written and verbal instructions provided to Seller and (vi) not use the Equipment for

CONFIDENTIAL
08/09/01

any purpose except to provide Products to Buyer pursuant to this Agreement.

(d)     During the term of this agreement Buyer shall service, repair and maintain (collectively, "Service") the Equipment as may be necessary to keep the Equipment in good working order.

(e)     Seller shall be responsible for training its employees to operate properly the Equipment and shall supervise all operations thereof. Seller shall be responsible for all personal damages or injuries and for any damage to property or Equipment resulting from (i) Seller's operation of the Equipment, (ii) Seller's failure to arrange with Buyer for required Service of the Equipment or (iii) Seller's use of the Equipment for any purpose other than as specifically contemplated in this Agreement.

(f)     In the event that this Agreement is terminated for any reason, Buyer shall have the right to enter, upon reasonable notice and during regular business hours, and shall be given access to, Seller's facilities so that Buyer may retrieve the Equipment and all records maintained in connection with the Equipment. Seller agrees to cooperate with Buyer to ensure the timely and safe return of the Equipment to Buyer after termination of this Agreement. Seller's obligations under this Section shall survive the termination of this Agreement until the Equipment is returned to Buyer.

(g)     Seller shall maintain insurance coverage in connection with its operation of the Equipment as described in Annex C.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized respective representatives as of the day and year first above written.

**LUZENAC AMERICA, INC.**

By: _____
Name: _DANIEL D HARRIS_
Title: _PRESIDENT_

**JOHNSON & JOHNSON CONSUMER COMPANIES, INC.**

By: _____
Name: _Robert E. Kirby_
Title: _Vice President_

**<u>EXHIBIT F</u>**

# Weil, Gotshal & Manges LLP

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

BY EMAIL

November 1, 2019

**PRIVILEGED & CONFIDENTIAL**
**SUBJECT TO FRE 408 AND ALL STATE LAW ANALOGUES**

Richard A. Levy, Esq.
Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
richard.levy@lw.com

Jeff Bjork, Esq.
Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
jeff.bjork@lw.com

**Re: Johnson & Johnson and Johnson & Johnson Consumer, Inc. ("J&J") Indemnification**
    **Discussion Points to Imerys Talc America and its Affiliates ("Imerys")**

Dear Rick and Jeff:

We appreciate your taking the time to meet with us last week, and we look forward to continuing a dialogue regarding the terms of an agreement among our clients. As requested, attached at **Exhibit 1** are the guiding principles we discussed with you last week regarding J&J's preliminary thoughts on an indemnification proposal in connection with potential liabilities associated with current and future claims against Imerys alleging personal injuries caused by exposure to J&J products utilizing talc supplied by Imerys (the "Talc Claims"). Please note that these principles are being provided on a confidential basis and as a starting point for further negotiations with you and your clients. Neither the contents of this letter nor of **Exhibit 1** shall constitute a binding offer, agreement, or agreement to negotiate further, and J&J reserves all rights in connection with the proposed principles, including the right to subsequently modify any of the material terms of these principles.

These principles, which we anticipate will serve as the foundation for a formal term sheet and settlement or chapter 11 plan, lay the groundwork for a solution that will allow the Debtors to emerge from bankruptcy as a going concern while providing a fair and efficient mechanism for the resolution of the Talc Claims against Imerys. We believe that J&J's indemnification discussion points can lead to a proposal that is in the best interests of the Debtors, their estates, and all of their creditors, including the Talc Claims plaintiffs. The Debtors have asserted throughout the Chapter 11 Cases that (1) they sought bankruptcy protection because of mounting defense costs and potential liabilities arising from the Talc

Latham & Watkins LLP
November 1, 2019
Page 2

**Weil, Gotshal & Manges LLP**

Claims and (2) J&J's potential indemnification obligations to the Debtors are among the most important assets of the Debtors' estates. J&J's principles envision comprehensively and permanently resolving the Talc Claims against the Debtors and granting the Debtors access to indemnification from J&J (without a fight from J&J on the entitlement to and extent of the indemnity and at a greater amount than that to which they are arguably contractually entitled). An agreement along the lines proposed by J&J will also benefit the Debtors' estates by freeing up estate resources that would otherwise have been used to satisfy the Talc Claims, or litigate against J&J on the terms of the indemnity, and can now be used to provide a recovery to other creditors.

Such agreement will have no negative impact on any of the estate's creditors, and actualization of the proposal will not require the consent of plaintiffs in the Talc Claims. Nevertheless, J&J does not oppose your sharing this proposal with attorneys for the official committee of tort claimants and the future claims representative. The plaintiffs should be in favor of this proposal as it gives them their day in court and leaves them unimpaired, having a source for full recovery if they prevail.

From J&J's perspective, this proposal is consistent with J&J's position throughout these cases that the Talc Claims should be litigated as they have no merit and can be defeated in court (whether at trial or on appeal).

We look forward to receiving the Debtors' prompt response to these principles, and remain committed to reaching a mutually beneficial agreement. Please feel free to contact me directly with respect to any of the matters addressed by this letter.

Sincerely,

*/s/ Marcia L. Goldstein*

Marcia L. Goldstein, Esq.

cc:
Diane Sullivan, Esq.
Ronit J. Berkovich, Esq.
Debora A. Hoehne, Esq.

Latham & Watkins LLP
November 1, 2019
Page 3

**Weil, Gotshal & Manges LLP**

## **Exhibit 1**

## **GUIDING PRINCIPLES FOR INDEMNIFICATION NEGOTIATION**

The following are guiding principles for the negotiation of an agreement to settle all indemnification obligations between J&J and the Debtors in connection with the Talc Claims.  Any agreement pursuant to these principles will supersede any prior indemnity agreements between J&J and Imerys and will be subject to approval in the Chapter 11 Cases by the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").   These principles do not constitute a binding offer, agreement, or agreement to negotiate further.

- J&J agrees to assume the defense of litigation of all Talc Claims where plaintiffs allege exposure in any year prior to April 15, 2001 ("Covered Years," and the Talc Claims alleged in such years, the "Covered Claims"), even if plaintiffs also allege exposure in non-Covered Years.  In connection with the defense of Talc Claim litigation, J&J will assign counsel and otherwise control defense strategy and decisions in all respects.  Imerys will cooperate with J&J in the defense of the Talc Claims

- To accomplish the foregoing, either (i) the automatic stay will be lifted to enable the Covered Claims to proceed outside of the Bankruptcy Court (and any chapter 11 plan injunction would not cover the Covered Claims) or (ii) the chapter 11 cases will be dismissed

- If it is determined at trial that a plaintiff was exposed in a Covered Year and Imerys is liable on a Covered Claim at trial or J&J settles a Covered Claim, J&J will pay for Imerys's liability for such Covered Claim (including any portion of the Covered Claim that would otherwise be allocable to non-Covered Years)

- J&J has the right to settle any Covered Claim without Imerys's consent

- J&J waives all indemnification claims that it may have against Imerys in connection with Talc Claims and Imerys waives any rights to indemnification for all Talc Claims where it is determined at trial that a plaintiff's exposure was entirely within non-Covered Years, including 2011

- Imerys assigns to J&J its rights, if any, to access J&J's insurance policies to the extent J&J did not or does not already possess such rights

- Imerys shall cooperate with J&J in J&J's efforts to pursue and secure coverage under J&J insurance policies for the Talc Claims

Latham & Watkins LLP
November 1, 2019
Page 4

- For the avoidance of doubt, except for the expansion of indemnity to some non-Covered Years, any agreement pursuant to the foregoing principles is not intended to enlarge J&J's indemnification obligations under prior indemnification agreements

**<u>EXHIBIT G</u>**

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

BY EMAIL

December 3, 2019

**PRIVILEGED & CONFIDENTIAL**
**SUBJECT TO FRE 408 AND ALL STATE LAW ANALOGUES**

Richard A. Levy, Esq.
Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
richard.levy@lw.com

Jeff Bjork, Esq.
Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
jeff.bjork@lw.com

**Re: Johnson & Johnson and Johnson & Johnson Consumer, Inc. ("J&J") Indemnification**
**Discussion Points to Imerys Talc America and its Affiliates ("Imerys")**

Dear Rick and Jeff:

We write to follow up on our indemnification proposal in connection with potential liabilities associated with current and future claims against Imerys alleging injuries caused by exposure to J&J products utilizing talc supplied by Imerys (the "Talc Claims").  This proposal is reattached as **Exhibit 1.**

We reiterate our belief, set forth in our discussions and in our November 1, 2019 letter, that J&J has provided a strong foundation for a comprehensive term sheet and proposal that is fair and in the best interests of the Debtors, their estates, and all of their creditors, including the Talc Claims plaintiffs.  We are disappointed by the Debtors' failure to engage with J&J on a solution that will resolve Imerys's litigation liabilities arising from the Talc Claims, thus eliminating the financial burden that was the Debtors' sole stated basis for seeking bankruptcy protection.  We fail to see how refusing to engage with J&J on the terms of an indemnification proposal is in the financial interests of the Debtors or in line with the Debtors' purported desire to quickly emerge from these chapter 11 cases as a going concern.  The Debtors' complete and baffling silence in light of their stated goals raises questions as to whether the fiduciaries here are acting in good faith in the conduct of these chapter 11 cases or whether there are ulterior motives at play here designed to achieve objectives for the benefit of non-debtors such as Imerys S.A., plaintiffs or their lawyers.  *See, e.g., U.S. Chamber Institute for Legal Reform, Insights & Inconsistencies: Lessons from the Garlock Trust Claims (February 2016)* (describing the potential for abuse of channeling injunction trusts in mass tort chapter 11 cases).

Latham & Watkins LLP
December 3, 2019
Page 2

**Weil, Gotshal & Manges LLP**

We acknowledge the Debtors' ongoing focus on negotiations with the official tort claimants' committee (the "TCC") and the future claimants' representative (the "FCR"); however, there should be no legitimate reason for the TCC and/or the FCR to object to the proposed agreement between J&J and the Debtors as this proposed agreement protects their constituencies' abilities to fully recover on any meritorious claims. On the contrary, we expect the TCC and FCR to support an agreement in line with the principles we have provided to you, as such an agreement gives claimants their day in court and leaves them with a source for full recovery, if they prevail on the merits at trials. Indeed, all claimants will be at least as well off by an agreement consistent with J&J's principles as they would be otherwise. Such an agreement easily satisfies the standards of Bankruptcy Rule 9019 (and would allow the Debtors to propose a confirmable plan even absent consent of the Talc Claims plaintiffs), and will greatly streamline the plan confirmation process.

To the extent any stakeholder (including the TCC, FCR, or even the Debtors' corporate parent) is insisting on receiving rights or a recovery beyond what such stakeholder would receive in bankruptcy, such a position is improper and should not be supported. We would expect the Debtors instead to work with all interested parties to seek consensus, particularly a party as key to these cases as J&J. *See, e.g., Declaration of Alexandra Picard, Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings*, Case No. 19-10289 (LSS) (Doc. No. 10) (listing three reasons why, in summary, the Debtors elected to commence the Chapter 11 Cases, including both a specific verdict against J&J and "the increased unwillingness of the Debtors' third party contractual indemnitors [*i.e.,* J&J] to provide coverage for the Debtors' mounting defense costs and potential liability exposure", and alleging that the Debtors believe they have "uncapped indemnity rights against J&J").

While we remain committed to reaching a mutually beneficial agreement, and would prefer such an outcome, we remind you that the relevant Supply Agreements and Sales Purchase Agreements between the Debtors and J&J bestow J&J (as an indemnifying party) with control over the decision to settle any covered lawsuit. In other words, any settlement by the Debtors involving the Talc Claims requires J&J's consent. As such, given our offer to indemnify and defend the Debtors in the litigation of all Talc Claims, we would view the Debtors' pursuit of a settlement in the absence of J&J's approval as unreasonable, in bad faith, and as an action that would negate any obligation J&J might otherwise have to indemnify the Debtors or any assignee of the Debtors' purported indemnity rights. We reserve all rights, including the right to request that the Bankruptcy Court lift the automatic stay so that J&J may assume the defense of the Talc Claims and enforce its contracts with the Debtors.

Moreover, should the Debtors continue to refuse to engage in discussions with J&J and blindly pursue a settlement of the Talc Claims notwithstanding J&J's indemnification proposal and over J&J's objections, J&J is fully prepared to formally object to any such settlement, whether in the context of a chapter 11 plan or otherwise. This type of settlement is necessarily and improperly designed to inflate the value of the Talc Claims beyond what the plaintiffs would get in court for the purpose of obtaining a release of the Debtors' corporate parent to the detriment of J&J. J&J's valid objections to such chapter 11 plan will

Latham & Watkins LLP
December 3, 2019
Page 3

**Weil, Gotshal & Manges LLP**

increase the Debtors' execution risk for confirmation of any plan, rendering the Debtors' decision in this regard all the more questionable.  Should the Debtors take substantive issue with J&J's proposal, we request that you lay out the terms of a counter-proposal that adequately addresses J&J's role in the resolution of these cases as soon as possible.

J&J also reserves the right to renew its formal requests for discovery under Bankruptcy Rule 2004 if the Debtors continue to refuse to engage with J&J.  As you are aware, upon initial consideration of J&J's discovery request, the Court instructed that J&J would have the opportunity to seek discovery regarding the terms of any chapter 11 plan upon the proposal of a plan, including any settlements incorporated therein.  *See* Hr'g Transcript, dated July 24, 2019, Case No. 19-10289 (LSS) at ¶ 76-77.

Rather than waiting until the Debtors propose a disclosure statement, in the interest of serving the Debtors' purported desire to emerge quickly from chapter 11, we request that the Debtors now provide J&J access to the materials identified in J&J's June 26, 2019 Request for Documents [Docket No. 750]. Sharing pertinent information with significant parties prior to Court submission of a disclosure statement is customary in cases like these and promotes efficiency. This is particularly true here, as our experts have advised that it will take at least three months to reasonably and satisfactorily analyze any estimation of a settlement amount and proposed trust as part of a chapter 11 plan.

Pleases feel free to contact me directly with respect to any of the matters addressed by this letter and to advise whether you agree to now turn over to J&J the requested documents, most of which you have already produced to the TCC and/or FCR. Alternatively, please let us know when you can meet and confer about the terms of an indemnity agreement in the immediate future and on discovery issues in advance of a renewed 2004 motion.

Sincerely,

*/s/ Marcia Goldstein*

Marcia L. Goldstein, Esq.

cc:
Diane Sullivan, Esq.
Ronit J. Berkovich, Esq.
Theodore E. Tsekerides, Esq.
Debora A. Hoehne, Esq.

Latham & Watkins LLP
December 3, 2019
Page 4

**Weil, Gotshal & Manges LLP**

## Exhibit 1

## GUIDING PRINCIPLES FOR INDEMNIFICATION NEGOTIATION

The following are guiding principles for the negotiation of an agreement to settle all indemnification obligations between J&J and the Debtors in connection with the Talc Claims.  Any agreement pursuant to these principles will supersede any prior indemnity agreements between J&J and Imerys and will be subject to approval in the Chapter 11 Cases by the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").   These principles do not constitute a binding offer, agreement, or agreement to negotiate further.

- J&J agrees to assume the defense of litigation of all Talc Claims where plaintiffs allege exposure in any year prior to April 15, 2001 ("Covered Years," and the Talc Claims alleged in such years, the "Covered Claims"), even if plaintiffs also allege exposure in non-Covered Years.  In connection with the defense of Talc Claim litigation, J&J will assign counsel and otherwise control defense strategy and decisions in all respects.  Imerys will cooperate with J&J in the defense of the Talc Claims

- To accomplish the foregoing, either (i) the automatic stay will be lifted to enable the Covered Claims to proceed outside of the Bankruptcy Court (and any chapter 11 plan injunction would not cover the Covered Claims) or (ii) the chapter 11 cases will be dismissed

- If it is determined at trial that a plaintiff was exposed in a Covered Year and Imerys is liable on a Covered Claim at trial or J&J settles a Covered Claim, J&J will pay for Imerys's liability for such Covered Claim (including any portion of the Covered Claim that would otherwise be allocable to non-Covered Years)

- J&J has the right to settle any Covered Claim without Imerys's consent

- J&J waives all indemnification claims that it may have against Imerys in connection with Talc Claims and Imerys waives any rights to indemnification for all Talc Claims where it is determined at trial that a plaintiff's exposure was entirely within non-Covered Years, including 2011

- Imerys assigns to J&J its rights, if any, to access J&J's insurance policies to the extent J&J did not or does not already possess such rights

- Imerys shall cooperate with J&J in J&J's efforts to pursue and secure coverage under J&J insurance policies for the Talc Claims

Latham & Watkins LLP
December 3, 2019
Page 5

**Weil, Gotshal & Manges LLP**

- For the avoidance of doubt, except for the expansion of indemnity to some non-Covered Years, any agreement pursuant to the foregoing principles is not intended to enlarge J&J's indemnification obligations under prior indemnification agreements

**EXHIBIT H**

# Weil, Gotshal & Manges LLP

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Ronit J. Berkovich**
+1 (212) 310-8534
Ronit.Berkovich@weil.com

February 7, 2020

**CONFIDENTIAL**
**SUBJECT TO FRE 408 AND ALL STATE LAW ANALOGUES**

Richard A. Levy, Esq.
Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
richard.levy@lw.com

Jeff Bjork, Esq.
Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
jeff.bjork@lw.com

**Re:  Indemnification Proposal**

Dear Rick and Jeff:

I am writing to follow up on J&J's indemnification proposal in connection with potential liabilities associated with current and future claims against Imerys alleging injuries from the use of J&J products containing talc supplied by Imerys (the "Talc Claims").[1]

At the outset, I note that the Debtors have demonstrated almost no desire to cooperate with J&J with regard to the resolution of the Talc Claims and have excluded J&J from meaningful participation in the negotiation or defense of the Talc Claims. As you are aware, prior to Imerys filing for bankruptcy in February 2019, J&J engaged in good faith negotiations with the Debtors in an attempt to reach a resolution regarding potential indemnification obligations under the 1989 Stock Purchase Agreement.  Specifically, between June and December of 2017, J&J attended two meet and confers with Imerys to discuss the Debtors' indemnification demands.  In January 2018, J&J sent an indemnification proposal to the Debtors. Subsequently, in February 2018, during a telephone conference with the Debtors, J&J agreed to attend

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in our letter to you dated November 1, 2019.

**Weil, Gotshal & Manges LLP**

February 7, 2020
Page 2

mediation.  In July 2018, J&J participated in mediation with the Debtors, but the parties were unable to reach an agreement.  Subsequently, J&J attended yet another mediation with the Debtors in September 2018, but again, the parties did not reach an agreement.

Since the Debtors commenced their chapter 11 proceedings, the Debtors have (i) refused to cooperate with J&J's efforts to transfer venue of all underlying Talc Claims against Imerys and J&J to Delaware; (ii) rebuffed J&J's repeated requests for information regarding any analysis of the Debtors' exposure to liability from the Talc Claims; and (iii) ignored J&J's demand to be included in the Debtors' negotiations with the Parent, the TCC, the FCR, and other third parties.

Furthermore, the Debtors have failed to respond substantively to J&J's correspondence dated November 1, 2019, whereby J&J set forth principles for the negotiation of an agreement to settle all indemnification obligations between J&J and the Debtors in connection with the Talc Claims.  By letter dated December 3, 2019, J&J expressed its position that the relevant Supply Agreements and Sales Purchase Agreements between the Debtors and J&J bestow J&J (as an indemnifying party) with control over the decision to settle any covered lawsuit – *i.e,*, any settlement by the Debtors involving the Talc Claims requires J&J's consent.  At that time, J&J stated that in light of its offer to indemnify and defend the Debtors in the litigation of the Talc Claims, J&J would view the Debtors' pursuit of a settlement in the absence of J&J's approval as unreasonable, in bad faith, and as an action that would negate any obligation J&J might otherwise have to indemnify the Debtors or any assignee of the Debtors' purported indemnity rights.  Nevertheless, the Debtors have continued to pursue a settlement with their corporate Parent, the TCC, and the FCR, at the exclusion of J&J.

The conduct described above repudiates J&J's rights under Section 11.4 of the 1989 Stock Purchase Agreement.  Accordingly, with this letter, and without giving up any rights J&J might have as a result of the Debtors' actions to date, J&J demands that the Debtors permit J&J to participate in any settlement negotiations and discussions that may impact J&J's liability on account of Talc Claims, as well as allowing J&J access to the previously requested information about any prior discussions and negotiations with the TCC and the FCR.

Despite the Debtors' ongoing failure to engage with J&J's efforts to negotiate, J&J remains committed to achieving a global resolution of the indemnity dispute related to the Talc Claims. Regardless of what may have transpired in the recent or extended past, J&J believes that it can provide the Debtors with an exit from these chapter 11 cases by resolving what J&J understands to be the vast majority of the Debtors' liabilities that will preserve J&J's rights, as well as the rights of other parties in interest, including the TCC and the FCR.  To that end, J&J is attaching a term sheet as **<u>Exhibit 1</u>** hereto that substantially lays the groundwork for a resolution of *all* Talc Claims in which J&J is a co-defendant against the Debtors.

The Term Sheet represents a solution that should be even more appealing to the Debtors than J&J's principles set forth in November as (i) J&J will be indemnifying the Debtors for all Talc Claim liabilities that allege use of J&J's products and (ii) J&J will provide a full indemnity to Imerys S.A. for the same

**Weil, Gotshal & Manges LLP**

February 7, 2020
Page 3

liabilities.  This Term Sheet provides for a significant expansion of even the most generous interpretation of J&J's alleged contractual indemnification obligations to the Debtors while erasing all claims that J&J may have against the Debtors.  J&J is sharing the Term Sheet with counsel to Imerys S.A. concurrently.

 As the Debtors allegedly filed for chapter 11 protections because of overwhelming Talc Claim liability (and, according to the Debtors' own pleadings, due in large part to J&J's alleged refusal to indemnify the Debtors), immediate acceptance of J&J's proposal is the only reasonable response to J&J's offer to remove the circumstances causing the Debtors' financial distress.  J&J is hard-pressed to think of any good faith resolution that the Debtors could possibly reach at this stage in the chapter 11 cases that provides a better outcome to the Debtors and Talc Claimants than J&J's proposal, and J&J will closely scrutinize any attempt by the Debtors to skirt their fiduciary duties and act in a manner inconsistent with the goals of the Bankruptcy Code.[2]

While J&J wishes to advance this dialogue to a consensual resolution, if the Debtors fail to respond promptly to J&J's Term Sheet or refuse to agree to allow J&J to both participate in any negotiations or discussions that may resolve Talc Claims involving J&J, including with the TCC, the FCR, and the Parent in a material manner and to assume the defense of all claims, J&J will be forced to file a motion to lift the automatic stay, to the extent applicable, to assume the defense of the Talc Claims, as is its right under the 1989 Supply Agreement.

 Additionally, I would like to respond to the Debtors' suggestion that they require an even broader indemnity offer from J&J before they start negotiating such an offer in earnest (*i.e.,* that J&J foot the bill for all talc claims, including those that do not allege use of J&J's products).  This would significantly expand, without any contractual basis, J&J's obligations.  For J&J to begin to consider what the Debtors have suggested, J&J requires, at a bare minimum, certain information and documents from the Debtors, much of which the Debtors are already obligated to provide under the 1989 Agreements. Specifically, and without waiving J&J's rights to receive the documents requested in Exhibit B to the 2004 Motion, J&J requires the following information and documents immediately:[3]

---

[2]    Furthermore, while J&J is proposing to indemnify the Debtors substantially notwithstanding its firm belief that no J&J products were defective or contaminated in any way, were Imerys to take a contrary position in the bankruptcy by agreeing to pay any amounts on account of Talc Claims based on contrary allegations, this conduct would automatically vitiate any obligations on J&J's part to indemnify or otherwise contribute or expend resources to Imerys on account of the Talc Claims and would automatically trigger Imerys's contractual and equitable obligations to J&J.

[3]    Capitalized terms used but not otherwise defined in the following paragraphs shall have the meaning ascribed to such terms in *Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion for an Order Pursuant to Bankruptcy Rule 2004*, Case No. 19-10289 (LSS) (Bankr. D. Del. June 26, 2019) [ECF No. 750] (the "2004 Motion").

**Weil, Gotshal & Manges LLP**

February 7, 2020
Page 4

    1.  All Documents and Communications relating to any settlement history between the Debtors and any Talc claimants, including all settlement agreements, claim information sheets, and claim summaries.

    2.  Any and all Documents, Communications, Analyses, Models, estimates, or projections conducted by or on behalf of the Debtors relating to the Debtors' potential liability or exposure to Talc Claims where such claims are alleged to involve J&J products.

    3.  Any and all Documents, Communications, Analyses, Models, estimates, or projections conducted by or on behalf of the Debtors relating to the Debtors' potential liability or exposure to Talc Claims where such claims are not alleged to involve J&J products.

    4.  Any and all Documents or Communications relating to non-J&J related Talc Claims that have been brought against Imerys including number of claims, claim information sheets, claim summaries, demographic information of plaintiffs, plaintiff work histories, allegations, demands, and co-defendants.

Please contact me at your earliest convenience to respond to J&J's Term Sheet and document requests so that J&J can engage in discussions with the Debtors, the Parent, the TCC, and the FCR.

Sincerely,

*/s/ Ronit J. Berkovich*

Ronit J. Berkovich, Esq.

cc:
Gary T. Holtzer, Esq.
Diane Sullivan, Esq.
Theodore E. Tsekerides, Esq.
Konrad L. Cailteux, Esq.
Debora A. Hoehne, Esq.

**Weil, Gotshal & Manges LLP**

February 7, 2020
Page 5

## Exhibit 1

**Indemnification Term Sheet**

**CONFIDENTIAL SETTLEMENT PROPOSAL**
**SUBJECT TO FRE 408 AND STATE LAW EQUIVALENTS**

## JOHNSON & JOHNSON

### Summary of Term and Conditions for Global Resolution with Imerys S.A. and Imerys Talc, America and its Affiliates

### February 7, 2020

This Summary of Terms and Conditions (the "Term Sheet") has been prepared for negotiation purposes to settle all indemnification obligations between Johnson & Johnson (collectively with Johnson & Johnson Consumer, Inc. and its corporate predecessors, affiliates, and subsidiaries, "J&J"), Imerys S.A., and Imerys Talc America, Inc. and its debtor affiliates and subsidiaries (collectively, "Imerys" and, along with J&J and Imerys S.A., the "Parties") in connection with potential liabilities associated with current and future claims against Imerys alleging personal injuries caused by the use of J&J products utilizing talc supplied by Imerys (each, a "Talc Claim" and, collectively, the "Talc Claims"). This Term Sheet is subject to (i) formal documentation that will supersede any prior indemnity agreements between J&J and Imerys, (ii) approval by authorized representatives of J&J, Imerys S.A., and the Debtors, and (iii) approval by the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

| Indemnification Terms | |
|---|---|
| **Indemnified Claims** | J&J agrees to indemnify Imerys fully for, assume the defense of, and assume all costs of litigation for all Talc Claims where plaintiffs allege use of J&J/talcum powder products prior to January 1, 2020, (the "Covered Period") and where Imerys has not reached a final resolution (*e.g.,* a settlement has been entered or a non-appealable final judgment has been entered against Imerys in a court of competent jurisdiction) as to such Talc Claim by the Effective Date (as defined below) (such Talc Claims within the Covered Period, each an "Indemnified Claim" and, collectively, the "Indemnified Claims").<br><br>J&J will also fully indemnify Imerys S.A. to the same extent as it is indemnifying Imerys.<br><br>J&J shall not be responsible for any portion of any judgment rendered against a party other than Imerys, Imerys S.A., or J&J.<br><br>J&J shall not have liability to Imerys, Imerys S.A., any of their affiliates, or any plaintiff for any Talc Claims against Imerys or Imerys S.A. that are not Indemnified Claims. |

**CONFIDENTIAL SETTLEMENT PROPOSAL**
**SUBJECT TO FRE 408 AND STATE LAW EQUIVALENTS**

| | |
|---|---|
| **Implementation; Effective Date** | To accomplish the foregoing, the Parties shall enter into definitive documentation memorializing this Term Sheet (the "Indemnification Agreement"). |
| | As soon as reasonably practical following the execution of the Indemnification Agreement by the Parties, Imerys shall file a motion with the Bankruptcy Court (i) seeking approval of its entry into the Indemnification Agreement and (ii) lifting the automatic stay with respect to all Indemnified Claims (the "Motion"). |
| | The Indemnification Agreement shall not become effective until the entry by the Bankruptcy Court of an order (the terms and substance of which have received J&J's consent, with such consent not to be unreasonably withheld) granting the relief requested by the Motion (the "Approval Order" and the date upon which the Bankruptcy Court enters the Approval Order, the "Effective Date"). |
| **Assumption of the Defense** | J&J will assign counsel and otherwise effectuate complete control of strategy and decisions in all respects of the defense of the Indemnified Claims. |
| **Right to Settle** | J&J has the right to settle any Indemnified Claim without Imerys's consent. |
| | Imerys's liability for any individual Indemnified Claim or Indemnified Claims shall be determined solely by (i) a final adjudication of such Claim on the merits by a court of competent jurisdiction or (ii) by settlement in J&J's sole discretion; provided, however, that nothing in this Term Sheet shall be construed to waive any rights J&J may have to contest the appropriateness of a judicial forum on the grounds of lack of venue or subject matter or personal jurisdiction. |
| | Imerys shall not propose any chapter 11 plan of reorganization (a "Plan") that contemplates any treatment of any Indemnified Claim(s) other than as an unimpaired class pursuant to the terms of section 1124(1) of title 11 of the United States Code (the "Bankruptcy Code"); provided, however, that to the extent that Imerys has already filed a Plan prior to the execution of the Indemnification Agreement, such Plan providing for impaired treatment of any Indemnified Claim(s) will be stayed upon execution of the Indemnification Agreement and withdrawn immediately upon entry of the Approval Order and/or amended within three (3) days of entry of the Approval Order to provide that the Indemnified Claim(s) will be treated in accordance with |

CONFIDENTIAL SETTLEMENT PROPOSAL
SUBJECT TO FRE 408 AND STATE LAW EQUIVALENTS

| | |
|---|---|
| | section 1124(1) of the Bankruptcy Code.<br><br>Neither Imerys nor Imerys S.A. will settle any Indemnified Claims after the execution of the Indemnification Agreement. |
| **Waiver of Claims** | Imerys and Imerys S.A. agree to waive any remedy available to Imerys or to Imerys S.A. against J&J in the chapter 11 cases.<br><br>J&J agrees (i) to waive any claim, right to setoff, or other remedy it may have against Imerys or Imerys S.A. in respect of the Indemnified Claims and any indemnification claims against Imerys for Talc Claims, and (ii) to withdraw the proofs of claim it has filed in the chapter 11 cases. |
| **Cooperation** | Imerys and Imerys S.A. agree to fully cooperate with J&J in the defense of the Indemnified Claims, including by making relevant documents available to J&J (pursuant to common interest privilege), making employees and management of Imerys readily available to J&J, and promptly responding to any requests for information from J&J. |
| **J&J's Insurance Proceeds** | Imerys and Imerys S.A. agree to cooperate with J&J on making claims under any insurance policies held by J&J that may cover the Indemnified Claims.<br><br>Imerys assigns to J&J its rights, if any, to access J&J's insurance policies to the extent J&J did not or does not already possess such rights. |
| **Imerys's Insurance Proceeds** | To be discussed. |

**EXHIBIT I**

330 North Wabash Avenue
Suite 2800
Chicago, Illinois  60611
Tel: +1.312.876.7700  Fax: +1.312.993.9767
www.lw.com

**LATHAM&WATKINS** LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Beijing | Moscow |
| Boston | Munich |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

<u>**BY EMAIL**</u>

***SUBJECT TO FRE 408 AND STATE LAW ANALOGUES***

March 4, 2020

Ronit J. Berkovich, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

> Re:  Response to February 7, 2020 Letter Regarding Johnson & Johnson and Johnson
> <u>& Johnson Consumer, Inc.'s (together, "J&J") Indemnification Obligations</u>

Dear Ronit:

We are following up on our prior December 12, 2019 letter and responding to your further letter dated February 7, 2020.

As an initial matter, your February 7 letter erroneously alleges that the Debtors have "no desire to cooperate with J&J with regard to the resolution of the Talc Claims" and have somehow "excluded J&J from meaningful participation in the negotiation or defense of Talc Claims." As is reflected in the numerous letters exchanged between the parties before and during the pendency of the chapter 11 cases and the various in-person meetings and substantive telephonic discussions that have taken place to date, the Debtors have engaged with J&J, and have responded to and pointed out the significant issues with each of J&J's "proposals." And, without specifically addressing each of the inaccuracies in your February 7 letter, the Debtors dispute for the record that "J&J engaged in good faith negotiations with the Debtors" prior to the Debtors' filing for chapter 11 protection. If and when it becomes necessary to detail the complete and accurate history of the parties' interactions, the Debtors are prepared to do so.

As we have advised you orally, the Debtors are continuing to discuss the additional information presented in your February 7 letter and the proposed term sheet attached thereto both internally and with the Official Committee of Tort Claimants (the "<u>Committee</u>") and the Future Claimants' Representative ("<u>FCR</u>"). We will respond further when we are in a position to do so,

**March 4, 2020**
**Page 2**

LATHAM&WATKINS LLP

and remain open to engaging in further discussions with J&J, including with the involvement of the Committee and FCR.

Very truly yours,

/s/

Richard A. Levy

cc:  Diane Sullivan, Esq.
     Jeffery E. Bjork, Esq.

**EXHIBIT J**

On Mar 17, 2020, at 11:08 AM, "RICHARD.LEVY@lw.com" <RICHARD.LEVY@lw.com> wrote:

Hi Ronit and Gary. We have agreed with the FCR and the TC that we would not have separate discussions with you without their participation or consent. Happy to let them know you have reached out and see if they will let us speak separately with you. Just let us know.

**Richard A. Levy**

**LATHAM & WATKINS** LLP
330 North Wabash Avenue, Suite 2800 | Chicago, IL 60611
D: +1.312.876.7692 | M: +1.847.951.3899

**From:** Berkovich, Ronit <Ronit.Berkovich@weil.com>
**Sent:** Tuesday, March 17, 2020 10:02 AM
**To:** Levy, Richard (CH) <RICHARD.LEVY@lw.com>; Bjork, Jeff (LA) <Jeff.Bjork@lw.com>
**Cc:** Holtzer, Gary <gary.holtzer@weil.com>
**Subject:** JJ/Imerys--catch up

Rick/Jeff,
I hope you are holding up well in our strange new world. We caught up last week with Rachel and Steve, and wanted to circle back with you. When you are free in the next few days?
Thanks,
Ronit

Ronit J. Berkovich

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
ronit.berkovich@weil.com
+1 212 310 8534 Direct
+1 646 942 6272 Mobile

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

**<u>EXHIBIT K</u>**

**From:** RICHARD.LEVY@lw.com <RICHARD.LEVY@lw.com>
**Sent:** Wednesday, March 18, 2020 5:54 PM
**To:** Berkovich, Ronit <Ronit.Berkovich@weil.com>
**Cc:** Jeff.Bjork@lw.com; Holtzer, Gary <gary.holtzer@weil.com>
**Subject:** RE: JJ/Imerys--catch up

Unfortunately not.

**Richard A. Levy**

**LATHAM & WATKINS** LLP
330 North Wabash Avenue, Suite 2800 | Chicago, IL 60611
D: +1.312.876.7692 | M: +1.847.951.3899

---

**From:** Berkovich, Ronit <Ronit.Berkovich@weil.com>
**Sent:** Wednesday, March 18, 2020 4:53 PM
**To:** Levy, Richard (CH) <RICHARD.LEVY@lw.com>
**Cc:** Bjork, Jeff (LA) <Jeff.Bjork@lw.com>; Holtzer, Gary <gary.holtzer@weil.com>
**Subject:** RE: JJ/Imerys--catch up

We think it would be more productive to talk to you without them listening in. Are you able to do that?

---

**From:** RICHARD.LEVY@lw.com <RICHARD.LEVY@lw.com>
**Sent:** Wednesday, March 18, 2020 5:44 PM
**To:** Berkovich, Ronit <Ronit.Berkovich@weil.com>
**Cc:** Jeff.Bjork@lw.com; Holtzer, Gary <gary.holtzer@weil.com>
**Subject:** RE: JJ/Imerys--catch up

They have consented as long as they can listen in (and supposedly not say anything). Would a call be productive under those conditions?

**Richard A. Levy**

**LATHAM & WATKINS** LLP
330 North Wabash Avenue, Suite 2800 | Chicago, IL 60611
D: +1.312.876.7692 | M: +1.847.951.3899

---

**From:** Berkovich, Ronit <Ronit.Berkovich@weil.com>
**Sent:** Tuesday, March 17, 2020 10:54 AM
**To:** Levy, Richard (CH) <RICHARD.LEVY@lw.com>
**Cc:** Bjork, Jeff (LA) <Jeff.Bjork@lw.com>; Holtzer, Gary <gary.holtzer@weil.com>
**Subject:** Re: JJ/Imerys--catch up

Yes please seek permission if that's what you need to speak to us.

Sent from my iPhone

On Mar 17, 2020, at 11:08 AM, "RICHARD.LEVY@lw.com" <RICHARD.LEVY@lw.com> wrote:


Hi Ronit and Gary. We have agreed with the FCR and the TC that we would not have separate discussions with you without their participation or consent. Happy to let them know you have reached out and see if they will let us speak separately with you. Just let us know.

**Richard A. Levy**

**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800 | Chicago, IL 60611
D: +1.312.876.7692 | M: +1.847.951.3899

---

**From:** Berkovich, Ronit <Ronit.Berkovich@weil.com>
**Sent:** Tuesday, March 17, 2020 10:02 AM
**To:** Levy, Richard (CH) <RICHARD.LEVY@lw.com>; Bjork, Jeff (LA) <Jeff.Bjork@lw.com>
**Cc:** Holtzer, Gary <gary.holtzer@weil.com>
**Subject:** JJ/Imerys--catch up

Rick/Jeff,
I hope you are holding up well in our strange new world. We caught up last week with Rachel and Steve, and wanted to circle back with you. When you are free in the next few days?
Thanks,
Ronit


Ronit J. Berkovich

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
ronit.berkovich@weil.com
+1 212 310 8534 Direct
+1 646 942 6272 Mobile

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.