**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------- x

In re:                           :    Chapter 11

                                     :

IMERYS TALC AMERICA, INC., *et al.*,[1]   :    Case No. 19-10289 (LSS)

                                     :

          Debtors.             :    (Jointly Administered)

                                     :

                                     :    **Objection Deadline: May 19, 2020 at 4:00 p.m. ET**

                                     :    **Hearing Date: June 2, 2020 at 10:00 a.m. ET**

                                     :

------------------------------------------------------------- x

**DEBTORS' OBJECTION TO JOHNSON & JOHNSON'S AND JOHNSON & JOHNSON**
**CONSUMER INC.'S MOTION PURSUANT TO 11 U.S.C. § 362(d)(1),**
**FED. R. BANKR. P. 4001, AND LOCAL BANKRUPTCY RULE 4001-1**
**FOR ENTRY OF ORDER MODIFYING AUTOMATIC STAY TO PERMIT**
**J&J TO SEND NOTICE ASSUMING DEFENSE OF CERTAIN TALC CLAIMS**
**AND TO IMPLEMENT TALC LITIGATION PROTOCOL**

Imerys Talc America, Inc., Imerys Talc Vermont, Inc., and Imerys Talc Canada Inc.

(collectively, the "**Debtors**"), as debtors and debtors-in-possession in the above-captioned chapter

11 cases (the "**Chapter 11 Cases**"), hereby submit this Objection (the "**Objection**") to Johnson &

Johnson's and Johnson & Johnson Consumer Inc.'s (collectively, "**J&J**") *Motion Pursuant to 11*

*U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order*

*Modifying Automatic Stay to Permit J&J to Send Notice Assuming Defense of Certain Talc Claims*

*and to Implement Talc Litigation Protocol* [Docket No. 1567] (the "**Motion**"). In support of the

Objection, by and through their undersigned counsel, the Debtors respectfully state as follows:

**PRELIMINARY STATEMENT**

    1.      J&J seeks to use a lift stay motion in an unprecedented manner—to unilaterally

obtain expansive relief in furtherance of J&J's own litigation-related strategy and to the detriment

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

of the Debtors.  Not only is this relief unsupported by section 362(d)(1) of the Bankruptcy Code, but lifting the automatic stay and imposing the Talc Litigation Protocol as J&J seeks would adversely impact the Debtors, their estates, and ultimately, their stakeholders.[2]  Most significantly, despite ongoing discussions between J&J, the Debtors, the Official Committee of Tort Claimants (the "**TCC**"), and the Future Claimants' Representative (the "**FCR**"), J&J seeks to unilaterally take control of the defense of a significant portion of the tort lawsuits against the Debtors, compel the Debtors to cooperate in J&J's litigation efforts, and access the Debtors' insurance proceeds to pay for the defense of those claims.  Such a radical shift in the landscape of these Chapter 11 Cases is not appropriately sought as stay relief.  To the extent J&J has concerns with the proposed plan of reorganization, it should raise those issues in the context of the plan confirmation process.  However, J&J cannot use a motion to lift the automatic stay to submit a premature plan objection, nor, more radically, to seize control of the Chapter 11 Cases by forcing the Debtors to settle a major asset of the Debtors' estates on J&J's terms.  Granting J&J's requested relief at this juncture would wreak havoc on these Chapter 11 Cases and undermine the purpose and function of the automatic stay.

2.      J&J's current attempt to obtain relief for itself without consideration of other stakeholders' interests is consistent with its pattern of behavior leading up to and even following the commencement of the Debtors' Chapter 11 Cases.  At least as early as June 2015, the Debtors made repeated efforts to engage with J&J regarding the indemnification obligations J&J indisputably owes to the Debtors.  However, instead of honoring its contractual obligations and substantially alleviating the massive talc liabilities facing the Debtors—which were the ultimate impetus for the filing of the Chapter 11 Cases—J&J ignored and rebuffed the Debtors' overtures

---

[2]      Unless otherwise indicated, statutory references are to the U.S. Bankruptcy Code, 11 U.S.C. §§ 101-1532  ("**Bankruptcy Code**").

at nearly every turn.  Indeed, for years, and continuing for months following the filing of these Chapter 11 Cases in February 2019, J&J refused to even acknowledge its indemnification obligations to the Debtors.

3.      Following the filing of these bankruptcy proceedings, and while J&J persisted in shirking its contractual obligations, the Debtors promptly commenced negotiations with key parties-in-interest, including the TCC and the FCR.  Such negotiations were and are a critical component of these Chapter 11 Cases, as any confirmable plan of reorganization that can provide a global resolution of the Debtors' talc liabilities necessarily requires the support of representatives of current and future talc claimants pursuant to section 524(g).

4.      Over the many months since the commencement of the Chapter 11 Cases, the Debtors, the TCC, and the FCR have worked diligently to negotiate a consensual plan that includes the channeling injunction and trust mechanism necessary to resolve all talc-related claims against the Debtors on a final and equitable basis.  As a result of these extensive efforts, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 1714] (the "**Plan**") on May 15, 2020.  The Plan is supported by the TCC, the FCR, and the Debtors' non-Debtor affiliates.[3]

5.      By contrast, J&J did not approach the Debtors with any proposal purporting to address its indemnity obligations until November 1, 2019 (the "**November Proposal**"), nearly

---

[3]      Concurrently with the filing of the Plan, the Debtors filed the *Debtors' Motion for Entry of Orders (I)(A) Establishing Bidding Procedures, Assumption and Assignment Procedures, and Stalking Horse Procedures for Sale of Substantially All Assets, (B) Scheduling Auction and Sale Hearing, and (C) Approving Form and Manner of Notice Thereof, (II) Approving Sale of Substantially All Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (III) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 1718] (the "**Sale Motion**"), pursuant to which the Debtors seek the Court's approval to sell substantially all of their assets, the proceeds of which will be used to fund a trust for the benefit of the holders of Talc Claims (as defined below).

nine months following the commencement of the Chapter 11 Cases—when negotiations with the TCC and the FCR were already well underway.  Moreover, each proposal J&J has put forward, including its November Proposal, its subsequent February 2020 offer (the "**February Offer**"), and the litigation protocol proposed now (the "**Talc Litigation Protocol**"), suffers from a common defect:  none proposes a global resolution of all of the issues at stake in these Chapter 11 Cases.  Indeed, adopting the Talc Litigation Protocol would, unlike the carefully crafted Plan, provide only a piecemeal resolution and leave a number of critical issues unresolved.  For example, the Talc Litigation Protocol:

- does not address talc claims unrelated to J&J products ("**Non-J&J Talc Claims**");

- does not address the erosion or exhaustion of the Debtors' insurance assets as a result of continued litigation of claims in the tort system stemming from the purported use of J&J's products ("**J&J Talc Claims**");[4]

- does not determine how the Debtors' insurance assets should be allocated among the defense or indemnity of J&J Talc Claims or the payment of Non-J&J Talc Claims, nor does it address how disputes should be adjudicated among those parties over those assets;

- does not address whether a claimant who used both J&J and non-J&J products would be able to seek recovery from the non-J&J manufacturer or the Debtors after recovering from J&J;

- does not address whether the Debtors' non-debtor affiliates will receive third-party releases in connection with the J&J Talc Claims comparable to those available under sections 105 and 524(g);

- does not address the treatment of claims asserted against the Debtors by third parties in the same stream of liability;

- does not address whether J&J would indemnify the Debtors for the millions of dollars in settlement, defense, and bankruptcy-related costs and expenses already paid out by the Debtors; and

---

[4]     This aspect of the Talc Litigation Protocol is particularly problematic, as J&J has not established that it, as an indemnitor, is entitled to the proceeds of insurance policies that are property of the Debtors' estates.

- contemplates that the Debtors would be obligated to fully "cooperate" in the litigation of thousands of J&J Talc Claims in the tort system, without reasonable restrictions or guidelines and without any agreement by J&J to assume costs related to such cooperation, while proceeding with the administration of the Chapter 11 Cases and following the Debtors' emergence from bankruptcy.

6.      Simply put, J&J's Motion is a disguised and premature plan objection and an attempt to force the Debtors to accept J&J's preferred settlement structure.  Even though no plan had been proposed at the time J&J filed its Motion, J&J's Motion is filled with speculation about how J&J would or would not be treated under a hypothetical plan, and offers the Talc Litigation Protocol to rebut presumed deficiencies in such plan.  (*See* Motion at 2 ("The construct, as J&J understands it, would have the Debtors and the talc claimants, present and future, agree on claim amounts as part of a chapter 11 plan.").)  A lift stay motion is neither the proper vehicle to address concerns regarding a plan yet to be proposed nor about the Debtors' Plan, specifically.[5]  Moreover, J&J's proposal, if adopted, would gravely disrupt these Chapter 11 Cases and dump tens of thousands of lawsuits back into the tort system without any viable solution to address the numerous other obstacles that the Debtors face.

7.      Even beyond seeking premature and piecemeal relief, the Motion does not meet the basic standard to lift the automatic stay for cause pursuant to section 362(d)(1).  J&J has not made even a *prima facie* case that the hardship to J&J if the Motion is denied considerably outweighs the hardship to the Debtors if the Motion is granted, or that there is a probability that J&J will prevail "on the merits" (whatever that means in this context).

8.      First and foremost, the Motion, if granted, would significantly prejudice the Debtors and their estates at a critical juncture in their Chapter 11 Cases.  The sudden shifting of

---

[5]      In fact, J&J's speculative Motion failed to accurately predict the Debtors' Plan in key respects, making the Debtors' point that the relief sought was both premature and unnecessary.

RLF1 23450701v.1

thousands of claims against the Debtors back into the tort system would disrupt the months of progress the stakeholders have made in proposing a consensual, section 524(g)-compliant plan, which the Debtors have consistently identified as their central goal in the Chapter 11 Cases. Moreover, by upending that progress and returning thousands of J&J Talc Claims to the tort system, the Talc Litigation Protocol could prolong the duration of the Chapter 11 Cases and make confirming the Plan (or any other plan) substantially more complicated and difficult.

9.    The Talc Litigation Protocol would also lead to significant logistical difficulties and could have a substantial and detrimental financial impact on the Debtors and their estates. For example, requiring the Debtors to "cooperate" "in the defense of J&J Talc Claims" (Motion at 14), without any reasonable limitations on such a requirement, would undoubtedly distract the Debtors from their goal of achieving a global resolution in the Chapter 11 Cases, requiring them to dedicate personnel and resources to cooperate in the defense of thousands of lawsuits across the country. In addition, J&J purports to reserve the "right" to seek reimbursement from the Debtors' insurance assets, but it has failed to establish that it has any such "right" in the first instance, and any use of the Debtors' insurance assets for ongoing defense costs, settlements and satisfaction of judgments in connection with claims in the tort system would deplete valuable assets of the Debtors' estates. Lastly, J&J has not presented evidence sufficient to demonstrate its financial wherewithal to litigate to conclusion or otherwise resolve all of the J&J Talc Claims.[6]

10.    In comparison to the significant harm the Debtors will suffer if J&J is granted the relief sought, J&J has not demonstrated that it will suffer any actual harm if the Motion is denied and the status quo is preserved (as it has been since the Chapter 11 Cases commenced). Rather,

---

[6]    In addition, even if J&J can financially shoulder the burden of the J&J Talc Claims, J&J previously refused to honor its indemnification obligations. There is no guarantee that J&J will not simply renege on its promises under the Talc Litigation Protocol if J&J later deems such a breach to be in its best interests.

J&J speculates regarding potential harm under a hypothetical plan that was a creature of J&J's own imagination. In reality, J&J's purported right to control the Debtors' defense of the J&J Talc Claims remains unaffected while the automatic stay is in place. Indeed, it is notable that this supposed harm was not considered significant at all by J&J when it firmly refused to defend or indemnify the Debtors for years prior to the filing of these Chapter 11 Cases—obligations it casually acknowledges at the outset of its Motion. Moreover, J&J retains all rights to object to the confirmation of the Plan to the extent it believes the Plan does not comply with the Bankruptcy Code or is otherwise objectionable. The balance of harms thus weighs firmly in the Debtors' favor.

11.    Finally, the third factor typically relevant to the analysis of whether to lift the automatic stay—the moving party's likelihood of success on the merits—is simply not applicable here. J&J is not seeking to resume litigation between itself and the Debtors. Rather, J&J is instead attempting to lift the automatic stay to force thousands of lawsuits between the Debtors and third parties to continue. The ill-fit between this third factor and the relief sought in the Motion highlights the fact that J&J's requested relief is procedurally improper and better addressed in connection with consideration of the Plan. Indeed, it would be a perversion of the chapter 11 process to allow a debtor's indemnitor to force a debtor back into litigation against thousands of other parties merely because it suits the indemnitor's own litigation strategy.

12.    The Debtors certainly are motivated to resolve the indemnification obligations J&J now concedes that it owes to the Debtors, and there have been continuing negotiations amongst the parties toward that end. However, it is not appropriate for J&J to attempt to use the threat of relief from the automatic stay as a way to exert negotiation leverage and in order to pressure all stakeholders to accept a half-baked proposal, particularly where lifting the stay in the manner J&J proposes could undermine the progress already made in the Chapter 11 Cases. Any issues J&J

RLF1 23450701v.1

may have with the proposed Plan should be raised and resolved during the plan confirmation process, rather than through the radical and disruptive step of granting the relief sought in the Motion and pre-determining the treatment of the J&J Talc Claims.  The Debtors thus respectfully request that the Court deny the Motion.

## FACTUAL BACKGROUND

**A.**      **The J&J Talc Claims Asserted Against the Debtors Triggered J&J's Indemnification Obligations**

13.      Since at least 2011, one or more of the Debtors has been named in what are now tens of thousands of actions in various jurisdictions in which underlying claimants allege bodily injury as a result of long-term use of certain talc-based body powders manufactured by J&J with talc provided by the Debtors or their predecessors.  The vast majority of these J&J Talc Claims named Debtor Imerys Talc America, Inc. ("**ITA**") as a successor to Luzenac America, Inc. ("**Luzenac**"), Cyprus Talc Corporation, Cyprus Mines Corporation ("**Cyprus Mines**"), or Windsor Minerals, Inc. ("**Windsor**").  The vast majority of the claimants in the J&J Talc Claims also allege use of a J&J body powder product during a time period covered by one or more of the various indemnification agreements between the Debtors and J&J.

14.      J&J owes one or more of the Debtors indemnification obligations for the J&J Talc Claims pursuant to several agreements, including, but not limited to:  a 1989 stock purchase agreement; a 1989 talc supply agreement; and a 2011 material purchase agreement.

15.      Prior to 1989, J&J obtained nearly all of its talc for use in its cosmetic body powders from its wholly-owned subsidiary, Windsor.  In 1989, Cyprus Mines purchased 100% of the stock of Windsor from J&J pursuant to the terms of that certain stock purchase agreement dated January

6, 1989 (the "**1989 SPA**" (Motion at Ex. C)).[7]  The 1989 SPA requires J&J to indemnify and hold harmless one or more of the Debtors for "any and all claims, demands, penalties, suits, proceedings, judgments, losses, liabilities, damages, costs and expenses of every kind and nature" imposed upon or incurred by one or more of the Debtors arising out of "any product liability-based claim, suit, demand or cause of action . . . arising out of the sale of talc or talc-containing products manufactured by Windsor, Western, J&J or the affiliates of Windsor, Western or J&J, prior to Closing."  (1989 SPA at § 11.2.)[8]

16.     Also in 1989, Windsor and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc. ("**JJCP**"), entered into a Talc Supply Agreement ("**1989 Supply Agreement**" (Motion at Ex. B)).  The 1989 Supply Agreement states that JJCP and its affiliates:

> shall indemnify, defend and hold harmless [Windsor], and its affiliates, and each of their respective directors, officers, employees, and agents from and against all liabilities arising out of any product liability-based claim, suit, demand or cause of action directed against [Windsor] or any of [Windsor's] affiliates:  (i) arising out of the sale of cosmetic talc products to consumer markets, which products were manufactured by [Windsor] prior to [January 6, 1989]; or (ii) for which [JJCP] is directly or indirectly responsible as a result of [JJCP's] possession, use or processing of Talc delivered to [JJCP] pursuant to this Agreement, or as a result of [JJCP's] manufacture, shipment and sale of Talc-containing product (including without limitation, baby powder and adult powder) derived from Talc delivered to [JJCP] pursuant to this Agreement . . .  The provisions of this Section 11 survive termination or expiration of this Agreement.

---

[7]     In 1992, Cyprus Mines transferred and assigned its then-existing talc assets, including 100% of the stock of Windsor, to Cyprus Talc Corporation, which is now known as ITA.  Windsor, now known as Imerys Talc Vermont, Inc., remains a wholly-owned subsidiary of ITA and is a debtor in these Chapter 11 Cases.

[8]     The 1989 SPA also requires J&J "to use its best efforts to make [J&J insurance] coverages and policies (including excess coverage policies) available to Cyprus, Windsor and Western, and their affiliates, up to the limits specified in such policies, and to cooperate with Cyprus and its affiliates in making claims against such policies."  (1989 SPA at § 5.9.)

(1989 Supply Agreement at § 11.)  The 1989 Supply Agreement was in effect until at least December 31, 2000.[9]

17.    On January 1, 2011, JJCP and Luzenac (now known as ITA) entered into a Material Purchase Agreement for the supply of talc (the "**2011 Purchase Agreement**" (Motion at Ex. D)). The 2011 Purchase Agreement provides that J&J "shall indemnify, defend and hold harmless [ITA] for any third party claims brought against [ITA] based on the use of Materials by [JJCP]." (2011 Purchase Agreement at ¶ 6.)

18.    While J&J suggests that there may be "gap years" in its indemnification obligations, these "gap years" apply only when a claimant in a J&J Talc Claim used a J&J body powder product solely during a time period not covered by one of the several agreements requiring J&J to indemnify the Debtors.  For example, if a claimant alleges injury due to use of a J&J product prior to January 1989, then J&J has an obligation to provide indemnification for the entire claim and ***all*** losses, liabilities, damages, costs and expenses, regardless of whether the claimant also used a J&J product between 2001 and 2010 or after 2012.  (*See* 1989 SPA at § 11.2.)  Likewise, if a claimant alleges injury due to use of a J&J body powder product between January 6, 1989, and December 31, 2000, then J&J has an obligation to provide indemnification for "all liabilities arising out of any product liability-based claim," notwithstanding use during a purported "gap period" as well. (*See* 1989 Supply Agreement at § 11.)  And, if a claimant alleges injury due to the use of a J&J body powder product between January 1, 2011, and December 31, 2011, J&J is obligated to provide indemnification for the entire "third party claim[]," even if the claimant also used the product after 2011.  (*See* 2011 Purchase Agreement at ¶ 6.)

---

[9]    Exhibit 1 (June 15, 2000 Letter).

**B.**    **J&J Refused to Acknowledge and Uphold Its Indemnification Obligations to the Debtors**

19.    On June 23, 2015, the Debtors made a formal indemnification demand on J&J with respect to numerous J&J Talc Claims.[10]   On July 10, 2015, J&J responded to the Debtors' indemnification demand and advised the Debtors that it did "not believe that the indemnity demand is appropriate."[11]   Between September and November of 2015, the Debtors demanded that J&J reconsider its refusal, but J&J ignored the Debtors' demand altogether.   Thus, rather than accept its obligations, assume defense responsibilities, and provide indemnification to the Debtors in 2015, J&J simply refused to acknowledge any obligations.

20.    On March 24, 2017, the Debtors made another demand on J&J with respect to additional J&J Talc Claims.[12]   Although J&J again refused to acknowledge its obligations, the Debtors nevertheless continued to tender additional J&J Talc Claims to J&J and continued to demand that J&J provide indemnification.

21.    In mid-2017, J&J finally agreed to meet with the Debtors to discuss their repeated indemnification demands.  Following a few in-person meetings and phone calls in 2017 and 2018, however, J&J still refused to acknowledge its obligations, even though the Debtors advised J&J that such refusal would force them to consider seeking bankruptcy protection.  At no time prior to the commencement of these Chapter 11 Cases did J&J even acknowledge that it had indemnification obligations for any of the J&J Talc Claims.[13]

---

[10]    Exhibit 2 (June 23, 2015 letter).

[11]    Exhibit 3 (July 10, 2015 letter).

[12]    Exhibit 4 (March 24, 2017 letter).

[13]    While J&J claims that it "believed the parties were continuing to work toward resolving the scope and application of the indemnity" prior to the Debtor's bankruptcy filing (Motion at 10), J&J fails to note that it withdrew a proposal to the Debtors in mid-2018, leaving negotiations between the Debtors and J&J dead in the water.

22.     By refusing to acknowledge and accept its indemnification obligations, J&J abandoned the Debtors and forced them to defend the J&J Talc Claims on their own, at least until the Debtors sought bankruptcy protection on February 13, 2019, and the automatic stay was imposed staying further prosecution of such actions.[14]

**C.      J&J's Belated Settlement Proposal and the Talc Litigation Protocol**

23.     Even after the Debtors' bankruptcy filing, J&J continued to avoid recognizing its indemnification obligations.  J&J's first post-filing correspondence with the Debtors, for instance, was a May 15, 2019 letter seeking not to engage with the Debtors in plan negotiations, but to chastise and threaten the Debtors in an attempt to garner support for J&J's venue motions filed in the United States District Court for the District of Delaware.  Far from attempting to engage constructively with the Debtors, J&J instead characterized the Debtors' ongoing plan negotiations with the TCC and the FCR as an act of "bad faith" and a "breach of fiduciary duties" which "absolv[ed] J&J of any indemnification obligations."[15]  J&J's letter further threatened that, if the Debtors did not acquiesce to J&J's demand for cooperation with its proposed litigation strategy, J&J would "take all actions necessary to bring to light . . . the clandestine settlement dealings among Debtors, . . . the plaintiffs, and the FCR," and initiate discovery "into the actions of and communications between these parties."  Nowhere in this letter did J&J express a desire to be a party to the discussions it characterized as "clandestine," nor did it make any proposals of its own for how such discussions should proceed.

---

[14]     J&J's long history of refusing to honor its indemnification obligations and the resulting costs and damage to the Debtors highlight one of the many flaws of the Talc Litigation Protocol:  J&J has not committed to indemnify the Debtors' costs incurred to date, including their pre-petition defense costs and the costs incurred in connection with the Chapter 11 Cases – both of which arise out of the Talc Claims (as defined below).

[15]     Exhibit 5 (May 15, 2019 Letter at 2).

12

24.     In the following months, during which the Debtors continued to make progress towards a plan proposal, J&J at no point requested involvement in plan negotiations or acknowledged its indemnity obligations.  Indeed, it was not until November 2019, nearly nine months after the Debtors filed for bankruptcy, that J&J first advanced a proposal that would at least partially acknowledge J&J's indemnification of the Debtors.  Contrary to J&J's assertion, the Debtors engaged J&J regarding that proposal, including through conversations and a December 12, 2019 letter, which explained to J&J the deficiencies of the November Proposal and reiterated the Debtors' goal to achieve a global resolution rather than pursue piecemeal measures.[16]

25.     Similarly, since receiving J&J's February Offer, the Debtors have made significant efforts to engage with J&J.  For example, the Debtors' counsel participated in a teleconference with J&J's counsel to discuss the February Offer.  And, on March 4, 2020, the Debtors' counsel sent a letter to J&J explaining, "we are continuing to discuss the additional information presented in your February 7 letter and the proposed term sheet attached thereto . . . .  We will respond further when we are in a position to do so, and remain open to engaging in further discussions with J&J, including with the involvement of the Committee and FCR."  (Motion at Ex. I.)

26.     As stated in the Debtors' March 4, 2020 letter, the Debtors continued to evaluate J&J's February Offer in connection with their efforts to negotiate and reach a consensual section 105/524(g) plan.  Notwithstanding the Debtors' ongoing evaluation, however, J&J filed its Motion on March 20, 2020, asking this Court's permission to restart tens of thousands of cases against the Debtors and take control over the Debtors' litigation through the Talc Litigation Protocol.[17]

---

[16]     Exhibit 6 (December 12, 2019 Letter).

[17]     Even following the filing of the Motion, the Debtors, the TCC, and the FCR have continued to engage in substantive discussions with J&J regarding the J&J Talc Claims.

RLF1 23450701v.1

27.     Under J&J's proposed Talc Litigation Protocol, J&J would provide notice of its assumption of the J&J Talc Claims to the Debtors and other interested parties and designate counsel to represent the Debtors.  (Motion at 12.)  J&J's proposed Talc Litigation Protocol also requires that the Debtors make their witnesses, experts, and documents available to J&J.  Finally, J&J reserves the right to assert defenses to its indemnification obligations and to seek reimbursement from the Debtors' insurance assets.  (*Id.* at 15.)  As set forth below, this proposed Talc Litigation Protocol is not an adequate substitute for a consensual plan of reorganization, and would impose significant harm on the Debtors.

## **ARGUMENT**

### **A.     Cause Does Not Exist to Grant J&J Relief from the Automatic Stay**

28.     To support lifting the automatic stay pursuant to section 362(d)(1), J&J must demonstrate a *prima facie* case that there is cause to lift the automatic stay, including that the balance of hardships from not obtaining relief tips significantly in its favor.  *See In re DBSI, Inc.*, 432 B.R. 126, 132-35 (Bankr. D. Del. 2010) (denying relief from stay where movant failed to demonstrate *prima facie* case to lift stay); *In re Am. Voyages, Co.*, 298 B.R. 222, 225 (D. Del. 2003) ("To establish cause, the party seeking relief from the stay must show that 'the balance of hardships from not obtaining relief tips significantly in [its] favor.'") (citation omitted).

29.     "The term 'cause' as used in § 362(d)(1) is undefined; courts have ruled that whether there is cause to lift the automatic stay must be determined on a case-by-case basis."  *In re DBSI, Inc.*, 407 B.R. 159, 166 (Bankr. D. Del. 2009).  Courts in the Third Circuit apply a three-part balancing test to assess whether cause exists to lift the automatic stay in any given case:  (a) "'[w]hether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit;'" (b) "'[w]hether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor;'" and (c) "'[t]he

14

probability of the creditor prevailing on the merits.'" *Id.* (quoting *In re SCO Group, Inc.*, 395 B.R. 852, 857 (Bankr. D. Del. 2007)); *see also In re Telegroup, Inc.*, 237 B.R. 87, 91 (Bankr. D.N.J. 1999) ("'In determining whether or not cause exists, the bankruptcy court must balance the inherent hardships on all parties and base its decision on the degree of hardship and the overall goals of the Bankruptcy Code.'") (citation omitted). Beyond the three-part test, courts also consider whether lifting the automatic stay would "impede[] the orderly administration of the debtor's estate." *In re DBSI, Inc.* 407 B.R. at 167; *see also Borman v. Raymark Indus., Inc.*, 946 F.2d 1031, 1036 (3rd Cir. 1991) ("The automatic stay was designed 'to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.'") (quoting *St. Croix Condominium Owners v. St. Croix Hotel*, 682 F.2d 446, 448 (3d Cir. 1982)).

30.    Here, because the Debtors would suffer significant prejudice if J&J's Motion were granted and because J&J has not demonstrated that it would suffer *any* harm if its Motion were denied, J&J has failed to establish even a *prima facie* case of cause to lift the automatic stay— namely that "the hardship to the non-bankrupt party [J&J] by maintenance of the stay considerably outweighs the hardship to the Debtor." *In re DBSI, Inc.*, 407 B.R. at 166. Accordingly, J&J is not entitled to relief from the automatic stay.

**B.    The Debtors Will Suffer Significant Prejudice if J&J's Litigation Protocol Is Ordered and Implemented**

31.    Any superficial benefit that J&J's Talc Litigation Protocol might seem to offer to the Debtors is vastly overshadowed by the harm it will impose on the Debtors and their estates, especially with respect to the likelihood of successfully and consensually resolving the Chapter 11 Cases in the near term.

32.     If the Motion is granted, implementation of J&J's Talc Litigation Protocol, with its piecemeal and disjointed approach, would significantly impede the Debtors' ability to achieve a global resolution of the entirety of the J&J Talc Claims and Non-J&J Talc Claims (collectively, the "**Talc Claims**") through a trust and channeling injunction pursuant to sections 105 and 524(g) to be implemented through the Plan, which the Debtors have consistently identified as their goal in the Chapter 11 Cases.  *See In re R.J. Groover Const., LLC*, 411 B.R. 473, 479 (Bankr. S.D. Ga. 2008) (denying motion to lift automatic stay where lifting the stay would "not afford a complete resolution on the issues and could delay Debtor's reorganization efforts").  The Debtors, the TCC, and the FCR have been diligently working toward a consensual plan for many months.[18]  As a result of these substantial efforts, the Debtors have been able to propose the Plan, which would achieve the fundamental goals of these Chapter 11 Cases.  The sudden reentry of all J&J Talc Claims back into the tort system, without full protections for the Debtors, would drastically disrupt the consensual Plan that the Debtors have proposed with the full support of the FCR, the TCC and the Debtors' non-debtor affiliates.[19]

33.     In addition, J&J's proposal would impose major logistical and financial burdens on the Debtors, impairing their efforts to resolve the Chapter 11 Cases.  In particular, the Talc Litigation Protocol would unilaterally require, without any restrictions, guidelines, or input from the Debtors, that the Debtors "cooperate in good faith in the defense of J&J Talc Claims, including . . . making the Debtors' discoverable documents, witnesses, and experts available to J&J in the

---

[18]     *See, e.g.*, Docket No. 1565 at 8 (reflecting efforts of the Debtors' counsel regarding negotiation and development of plan of reorganization); *see also* Docket No. 1580 at 14 (reflecting efforts of the TCC's counsel regarding negotiation of plan of reorganization); Docket No. 1557 at 4, Ex. A at 5-10 (reflecting efforts of the FCR's counsel regarding negotiation of plan of reorganization).

[19]     To the extent the implantation of the Talc Litigation Protocol would make the timely confirmation of the Plan substantially more difficult, the Debtors would also face additional administrative expenses to continue these Chapter 11 Cases.  J&J has not indicated it would compensate the Debtors for such costs.

RLF1 23450701v.1

defense of the J&J Talc Claims or in any insurance coverage litigation relating to the J&J Talc Claims to the extent necessary."  (Motion at 14.)  Requiring the Debtors to cooperate with respect to thousands of lawsuits across the country—an obligation that the automatic stay has relieved them from during the pendency of the Chapter 11 Cases—would deplete the Debtors' resources and make it more difficult for the Debtors and their personnel to focus on confirmation of the Plan and the sale of their assets through a Court-approved sale process, particularly if this cooperation obligation has no reasonable limitations whatsoever.[20]  *See In re W.R. Grace & Co.*, Nos. 01-01139 (JFK), 2007 WL 1129170, at *3 (Bankr. D. Del. Apr. 13, 2007) (denying motion to lift automatic stay, in part, because litigating actions outside of bankruptcy "would require the time and commitment of a number of Debtors' key personnel, most of whom are crucial to the reorganization process"); *see also In re SunEdison, Inc.*, 557 B.R. 303, 308 (Bankr. S.D.N.Y. 2016) (denying motion to lift automatic stay where lifting stay would divert the "Debtors' resources and personnel at a critical time in the case"); *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 998 (4th Cir. 1986) (describing one of the purposes of automatic stay to be "to provide the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportuning to formulate a plan of reorganization for the debtor.").  Distracting the Debtors and their personnel at this key time in the Chapter 11 Cases could impede their ability to consummate a successful sale of their assets and to confirm the Plan, both of which the Debtors

---

[20]     Moreover, J&J has not indicated whether it would compensate the Debtors and their witnesses for the time and expense of supporting J&J's litigation efforts.  As such, the cooperation obligation could serve as a further drain on the Debtors' estates.

believe are in the best interests of their constituents, as the Plan will provide a full recovery to all creditors other than holders of Talc Claims, all of which will be channeled to a trust.[21]

34.     Beyond the aforementioned impact on the Debtors' efforts to resolve these Chapter 11 Cases in a consensual fashion, the Talc Litigation Protocol would also impair assets of the Debtors' estates.[22]  For example, under the Talc Litigation Protocol, J&J explicitly "reserves its right to seek reimbursement from the Debtors' insurance carriers."[23]  (Motion at 15.)  Even if J&J were to litigate cases on the Debtors' behalf, J&J could exhaust insurance assets that are the property of the Debtors' estates (and that would otherwise be channeled to the trust pursuant to the terms of the Plan) through defense costs, settlements, and potential adverse judgments without the

---

[21]     J&J suggests that the Talc Litigation Protocol will promote "orderly reconciliation" by returning a number of cases to their places of origin.  (Motion at 19.)  However, J&J's support for this contention, *In re Glunk*, 342 B.R. 717, 741-42 (Bankr. E.D. Pa. 2006), is entirely distinguishable.  *Glunk* involved a single malpractice case that had been pending before a state court for four years.  *Id.* at 742.  J&J's plan would wreak havoc by suddenly restarting tens of thousands of lawsuits in multiple different jurisdictions and at varying stages.

[22]     J&J's assertion to the contrary relies on a string of inapposite cases in which plaintiffs sought relief from automatic stays to allow them to pursue recovery against the debtors' insurance *on their own behalf.* (*See* Motion at 21.)  J&J cites no cases in which a *co-defendant* sought relief from an automatic stay to allow a subset of claims brought by third parties to proceed against the debtors.  *See, e.g., In re Armstrong World Indus.*, 106 F. App'x 785 (3d Cir. 2004) (asbestos plaintiff reached a prepetition settlement agreement and sought to collect from debtor's insurer).  Even *In re Downey Fin. Corp.*, 428 B.R. 595 (Bankr. D. Del. 2010), misses the mark.  In that case, the debtor's former officers and directors who had been sued in their individual capacities sought coverage of legal expenses from the debtor's Directors and Officers Insurance policy.  The court held that the debtor would not suffer "great prejudice" if the stay were lifted because (i) there were no other pending claims against that policy, (ii) the recovery sought was finite because claims against the officers and directors had already been dismissed, and (iii) the directors and officers sought to recover less than ten percent of the policy's limit.  *Id.* at 609-11.  Here, by contrast, there are a substantial number of J&J Talc Claims, many of those claims are in the beginning stages of litigation so the costs are highly uncertain, and J&J's potential recovery from Debtors' insurance assets could significantly deplete the assets available to satisfy Non-J&J Talc Claims.

[23]     Moreover, in the proposed order accompanying the Motion ("**Proposed Order**"), J&J purports to reserve "rights to seek reimbursement from the Debtors' insurance carriers to the extent of coverage that would otherwise be available to pay the Debtors' legal costs and liability for J&J Talc Claims."  (Proposed Order at 3.)  Not only does this presuppose that J&J has rights that it has not demonstrated it possesses, but it also suggests that J&J is only willing to own up to its indemnification obligations by paying for it out of the Debtors' own insurance assets.

18

Debtors' approval or involvement.  *See Matter of Gatke Corp.*, 117 B.R. 406, 409-10 (Bankr. N.D. Ind. 1989) (denying motion to lift stay where there was a risk that insurance would be exhausted or reduced by the moving party's continued litigation); *see also In re Sunland, Inc.*, 508 B.R. 739, 744 (Bankr. D. N.M. 2014) (denying motion to lift automatic stay due to potential impacts to debtor's available insurance coverage).  Moreover, reducing the Debtors' insurance assets through the litigation of J&J Talc Claims could deprive the Debtor's remaining creditors of the potential benefit of those insurance assets.  *See In re SN Liquidation, Inc.*, 388 B.R. 579, 585-86 (Bankr. D. Del. 2008) ("Where, as here, there are finite insurance proceeds available to multiple litigation claimants, one of the salutary benefits the automatic stay affords is preventing a litigant from gaining any advantage by having its case heard first or compelling an early settlement.").  Finally, the bare assertion that J&J be given access to the Debtors' insurance policies belies the immense complexity of such a claim.  The Debtors' remaining creditors, co-insureds, putative insureds, and the insurers themselves could challenge such access, tying up the Debtors in a multifaceted dispute that itself would deplete the Debtors' resources.  Thus, J&J's potential diminishment of one the Debtors' key assets—the proceeds of insurance policies[24]—militates against lifting the automatic stay and allowing J&J to continue litigation actions against the Debtors.

35.    Finally, J&J's proposal creates potential future financial risk for the Debtors and other stakeholders.  Although J&J is a large, international corporation, its resources are not unlimited and the potential scope of liability stemming from litigation of the J&J Talc Claims in the tort system remains unknown.  Moreover, as explained below, J&J itself has significant talcum powder litigation exposure separate and apart from its indemnification obligations to the Debtors,

---

[24]    *See Declaration of Alexandra Picard, Chief Financial Officer of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 10] at ¶¶ 38-43.

as well as substantial products liability exposure unrelated to talcum powder.  Despite the potential scope of liabilities at issue and J&J's responsibility to demonstrate a *prima facie* case that the balance of harm significantly tips in its favor, J&J presented absolutely no evidence of its analysis of the Debtors' or its own liabilities or J&J's ability to fully satisfy all such liabilities.  *See In re DBSI, Inc.*, 432 B.R. at 132-35.

36.     Regarding J&J's talcum powder liabilities, J&J's SEC filings reflect that the number of suits J&J faces "continues to increase" even as some have already resulted in significant judgments against J&J.[25]  Indeed, according to the standalone website J&J maintains regarding its talc litigation, in the sixteen months since its first adverse judgment in a talcum powder case, J&J has faced at least eleven significant, adverse judgments.[26]  For example, in December 2018, a Missouri court of appeals upheld a $4,690,000,000 verdict in favor of 22 plaintiffs that included $4,140,000,000 in punitive damages;[27] a California jury awarded a single plaintiff $40,300,000 in a September 2019 verdict that included no punitive damages;[28] and, in February 2020, J&J was

---

[25]     February 18, 2020 J&J 10-K ("**February 2020 10-K**"), at 86, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/200406/000020040620000010/form10-k20191229.htm.

[26]     *See* https://www.factsabouttalc.com/news.

[27]     *See* J&J Press Release, December 19, 2018, *available at* https://www.factsabouttalc.com/_document/official-company-statement-regarding-todays-post-trial-motion-ruling-in-st-louis?id=0000016c-62c7-d982-a9ef-eff7cff80000; *see also* https://www.nytimes.com/2018/12/19/business/johnson-johnson-baby-powder-verdict.html.

[28]     *See* J&J Press Release, September 27, 2019, *available at* https://www.factsabouttalc.com/_document/johnson-johnson-issues-statement-on-september-27-verdict-in-california?id=0000016d-754f-d4fc-adfd-f77fc23f0000; *see also* https://www.bloomberg.com/press-releases/2019-09-30/california-jury-returns-40-million-talc-verdict-against-johnson-johnson.

ordered to pay $223,700,000 as part of a talcum powder judgment in favor of four plaintiffs in New Jersey.[29]

37.    In addition, J&J is actively involved in other large product liability lawsuits, including thousands of suits involving opioids, an anti-psychotic drug, and pelvic mesh.  J&J's most recent 10-K contains four full pages of disclosures related to product liability claims facing the company, which commentators have collectively estimated at $15 billion in potential liability.[30]  J&J's existing litigation burden is significant; yet, in the Motion, J&J presents no evidence of its ability to litigate to conclusion and satisfy all potential judgments stemming from the thousands of J&J Talc Claims alongside its own substantial litigation burden.[31]

38.    J&J has presented no "back-up plan" if it is ultimately unable or unwilling to continue to bear the expense of the J&J Talc Claims.[32]  In such a scenario, the Debtors (as reorganized in whatever form) might be left suddenly to assume responsibility for an unknown

---

[29]    This sum reflects the court's reduction of the jury's original punitive damages award of $750 million.  As New Jersey law restricts punitive damages to five times compensatory damages, which were determined to be $37,200,000, this represented the largest possible punitive damages figure the court could allow.  *See* J&J Press Release, February 6, 2020, *available at* https://www.factsabouttalc.com/_document/ johnson-johnson-issues-statement-on-february-6-punitive-decision-in-new-jersey?id=00000170-1c43- d3dc-adfb-9e63cdf80000; *see also* https://www.bloomberg.com/news/articles/2020-02-06/j-j-ordered-to- pay-750-million-in-punitive-damages-over-talc.

[30]    February 2020 10-K, at 84-87; *see also see also* https://law.stanford.edu/2019/10/14/stanford-law- experts-on-johnson-johnsons-product-liability-exposure/; https://www.bloomberg.com/news/articles/2019 -10-14/j-j-s-legal-losses-may-get-worse-with-100-000-more-damage-claims.

[31]    J&J's statement of its market capitalization as of the time of the filing of its brief (Motion at 24 n.34) does not provide sufficient information about J&J's ability to shoulder its present litigation burden and then some.  For example, J&J's market capitalization does not provide any information about J&J's projected litigation costs or the potential for adverse judgments.  Similarly, J&J has not identified its liquid assets that could be made available to pay litigation expenses as they come due.  J&J's market capitalization also fails to reflect J&J's current debt burden.

[32]    J&J cryptically "reserves its rights to assert any defenses to indemnity based on actions or conduct of the Debtors occurring after the Petition Date or taken in connection with these chapter 11 cases."  (Motion at 14-15.)  It is unclear what "defenses" J&J is purporting to reserve or why J&J believes this reservation of rights is necessary.  However, this aspect of its proposal alone threatens to undermine any benefit superficially presented by the Talc Litigation Protocol.

quantity of litigation that will have proceeded through the tort system entirely outside of the oversight of this Court or the bankruptcy process.  Such a scenario is inimical to the goals of the Chapter 11 Cases.

39.     In sum, the Talc Litigation Protocol, which J&J declined to propose until it suspected substantial progress had been made toward a plan, would undercut the progress the Debtors have made to date in negotiating a global resolution of the Talc Claims with their key stakeholders.  Moreover, by drastically changing the negotiating landscape and diverting the Debtors' resources and personnel, the Talc Litigation Protocol would make the Debtors' sale process and reorganization substantially more difficult.  J&J's proposed reliance on the Debtors' insurance assets and the lack of evidence regarding J&J's financial ability to litigate all of the J&J Talc Claims to conclusion create both present and future threats to the Debtors' estates. Accordingly, any claimed benefits to the Debtors by way of the Talc Litigation Protocol are significantly outweighed by the numerous harms that would follow from its implementation.

**C.     J&J Has Failed to Make an Initial Showing of Harm and Cannot Demonstrate that Any Harm It Might Suffer Considerably Outweighs the Harm to the Debtors**

40.     In contrast to the harm that will befall the Debtors if the automatic stay is lifted and J&J is permitted to proceed with the Talc Litigation Protocol, J&J has failed to demonstrate it will suffer prejudice if the Motion is denied.  As a result, because J&J has not demonstrated any concrete harm that would flow from the denial of the Motion, J&J cannot satisfy the second element of the test for "cause," which requires that J&J demonstrate that the harm it would suffer from the denial of the Motion *considerably* outweighs the harm to the Debtors if the Motion were granted.  *In re DBSI, Inc.*, 407 B.R. at 166; *see also In re Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (cited by J&J, *see* Motion at 17) (listing second factor as, "the hardship to

the [non-bankrupt party] by maintenance of the stay considerably outweighs the hardship to the debtor").

41.     First and foremost, J&J's assertion of harm is speculative at best.  J&J argues that, if its Motion is denied, it will be deprived of the "right to control the defense of the Debtors and decision [*sic*] as to whether to settle any of the J&J Talc Claims." (Motion at 22.)  However, J&J has never before sought to participate in the Debtors' defense of Talc Claims despite the Debtors' repeated requests that it do so prior to the filing of these Chapter 11 Cases.  Moreover, J&J waited nine months following the Petition Date to make any such proposal.  In light of this substantial delay, J&J cannot now claim prejudice if it is not immediately permitted to take over the defense of all J&J Talc Claims pending against the Debtors, which are currently stayed.  In fact, while the automatic stay remains in place, J&J will not suffer any prejudice with respect to its alleged right to control the Debtors' defense, because no defense-related activities are necessary or permitted. *See* 11 U.S.C. § 362(a).

42.     J&J also argues that "the Debtors may not be incentivized to defend and reconcile the J&J Talc Claims diligently." (Motion at 22.)  J&J attempts to support this claim by pointing to the Debtors' negotiations with the TCC and the FCR.  (*Id.*)  Yet, J&J fails to explain how the Debtors' efforts to reach a consensual plan with the TCC and the FCR somehow demonstrate that the Debtors have mishandled or overvalued the J&J Talc Claims.  Such unsubstantiated speculation is not evidence of harm.  *See In re Mixson*, No. 98-18569 SR, 2002 WL 34561635, *2 (Bankr. E.D. Penn. Sept. 27, 2002) (noting that the "moving party must introduce some evidence to establish that the balance of hardships tips in his favor") (citation and internal quotations omitted); *see also In re RNI Wind Down Corp.*, 348 B.R. 286, 299-300 (Bankr. D. Del. 2006)

(moving party failed to submit evidence sufficient to "establish a *prima facie* case that cause exists to lift the automatic stay").

43.     In addition and contrary to J&J's suggestion (*see* Motion at 26), judicial economy is best served by globally resolving all talc claims through the procedures and provisions of the Plan.  *See, e.g.,* Douglas G. Smith, *Resolution of Mass Tort Claims in the Bankruptcy System*, 41 George Mason L. Rev. 1613 (2008) (discussing bankruptcy courts as the most efficient forums for resolving mass tort litigations); *see also A.H. Robins*, 788 F.2d at 1011 (4th Cir. 1986) (noting that a key reason bankruptcy courts possess broad jurisdiction is "to centralize the administration of the estate and to eliminate the multiplicity of forums for the adjudication of parts of a bankruptcy case.") (citation omitted); *In re John Q. Hammons Fall 2006 LLC*, 2017 WL 4620872, at *4 (Bankr. D. Kan. Oct. 13, 2017) (holding that judicial economy weighed in favor of denying lift of stay because 4,000 other creditors could not participate in the underlying litigation, but could lodge an objection to the claim in bankruptcy court).[33]

44.     In sum, the highly speculative and unsupported nature of the purported harm to J&J does not come close to outweighing the real prejudice the Debtors will suffer if the Talc Litigation

---

[33]     In support of its suggestion that the Talc Litigation Protocol promotes judicial economy, J&J relies on three inapposite case.  For example, *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.* involved an appeal from an award of attorneys' fees related to a class action settlement. 401 F.3d 143, 146 (3rd Cir. 2005).  The Third Circuit's holding had nothing to do with the lifting of an automatic stay, nor did it discuss the decision of whether to keep thousands of similar cases before a bankruptcy court or return them to their various jurisdictions to be separately adjudicated.  In addition, *Matter of Royston Dev. Corp.* involved a motion to lift the stay with respect to a single lawsuit dealing with a foreclosure sale.  25 B.R. 715, 717 (Bankr. M.D. Fla, 1982).  The stay in *Royston* was lifted not to pursue the claim to conclusion, but to allow the state court to decide one discrete issue—whether a judicial sale was valid. *Id.*  Finally, *In re Peterson*, similar to *Royston*, involved a motion to lift an automatic stay with respect to a single malpractice lawsuit.  116 B.R. 247, 248 (D. Colo. 1990).  In reviewing the bankruptcy court's opinion, the *Peterson* court affirmed, in part, because the "bankruptcy court's order was carefully tailored to prevent any judgement from effecting the debtor's resources." *Id.* at 251.  None of these three cases involved returning tens of thousands of lawsuits to active litigation across the country and allowing a debtor's key assets to be severely depleted or exhausted.

Protocol is imposed.  Moreover, the negative impacts to the stakeholders in the Chapter 11 Cases resulting from the threatened reduction of the Debtors' estates, as well as judicial economy generally, further support denying the Motion.

> **D.    The Likelihood of Prevailing on the Merits Prong Is Inapplicable and Merely Highlights the Fact that Stay Relief Is Not an Appropriate Remedy Here**

45.    The third factor courts in the Third Circuit consider when determining whether or not there is cause to lift the automatic stay is "[t]he probability of the creditor prevailing on the merits." *In re DBSI, Inc.*, 407 B.R. at 166.  As J&J's own cases demonstrate, this factor typically focuses on the merits of the claim(s) asserted in a lawsuit between the debtor and moving party. *See, e.g., In re Continental Airlines, Inc.*, 152 B.R. 420, 425-26 (D. Del. 1993) (assessing likelihood that moving party would prevail in its declaratory relief action against debtor relating to interpretation of settlement agreement between debtor and moving party); *Matter of Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 718-19 (Bankr. D. Del. 1996) (assessing likelihood of success with respect to state lawsuit between debtors and moving parties); *Rexene*, 141 B.R. at 575, 578 (Bankr. D. Del. 1992) (analyzing likelihood moving plaintiffs would prevail on claim against debtors).

46.    Here, however, J&J is not attempting to restart a lawsuit between J&J and the Debtors.  Indeed, while the Talc Litigation Protocol ostensibly seeks to resolve, at least in part, the Debtors' indemnification claims against J&J (and J&J's indemnification claims again the Debtors, which it has agreed to waive), the Motion does not seek to lift the stay to permit claims between the Debtors and J&J to be litigated to resolution.  Instead, the Motion focuses on thousands of third party lawsuits against the Debtors in which J&J is, at most, a co-defendant.  This factor of the stay

relief analysis thus is not relevant in the context of the pending Motion, and J&J concedes as much. (Motion at 26 ("J&J submits that this factor should not be considered by the Court.").[34])

47.     Nevertheless, the ill-fit between this factor and J&J's Motion highlights the improper nature of J&J's request.  J&J is attempting to hijack the proposed treatment of thousands of J&J Talc Claims, a major category of claims in the Chapter 11 Cases, without any input from other stakeholders.  J&J's efforts to impose a "solution" it offers as in its best interests without consideration of the interests of the Debtors or its stakeholders should be denied.  *See In re AMR Corp.*, 485 B.R. 279, 295-98 (Bankr. S.D.N.Y. 2013) (finding that lifting automatic stay was inappropriate because it would harm the estate and the debtors' other creditors and would only benefit the moving party).

### E.    J&J's Proposal Is Inconsistent with the Purposes of an Automatic Stay

48.     Beyond the three-factor test analyzed above, courts in the Third Circuit also consider the general policies underlying an automatic stay.  *See In re W.R. Grace & Co.*, 2007 WL 1129170, at *2-3.  The "automatic stay was designed 'to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *Borman,* 946 F.2d at 1036 (citing *St. Croix Condominium Owners*, 682 F.2d at 448).

49.     As explained above, J&J's proposal threatens to deplete the Debtors' assets by drawing down critical insurance proceeds.  The Talc Litigation Protocol would also severely

---

[34]     Despite conceding that this factor is irrelevant, J&J goes on to suggest that it "is likely to succeed on the merits of its defenses to the J&J Talc Claims." (Motion at 26.)  However, J&J cites to no cases indicating that the proper inquiry in this context is to examine the merits of the underlying tort claims between the Debtors and various third-party plaintiffs who are not the movants.

disrupt reorganization efforts by undermining many months of negotiations between the Debtors, the TCC, and the FCR and imposing major logistical burdens, including by requiring the Debtors' unlimited cooperation in the defense of thousands of lawsuits.  Moreover, unlike a typical lift stay motion, J&J does not just seek court approval to continue litigating one suit against the Debtors that has substantially proceeded in litigation preparation.  Instead, J&J requests that the Court drastically disrupt the progress that has been made in these Chapter 11 Cases and grant J&J relief to which it is not entitled.

50.    These impacts on the Chapter 11 Cases strongly militate against approval of J&J's Motion and implementation of the Talc Litigation Protocol.

## **CONCLUSION**

51.    J&J's proposed Talc Litigation Protocol would result in harm to the Debtors.  By contrast, J&J has presented only speculative assertions of harm that it might hypothetically suffer. Given the significant prejudice the Debtors would suffer, as compared to the lack of prejudice shown by J&J, the Court should deny the Motion.

RLF1 23450701v.1

Dated: May 19, 2020
     Wilmington, Delaware

Respectfully submitted,

*/s/ Marcos A. Ramos*

**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Marcos A. Ramos (No. 4450)
Amanda R. Steele (No. 5530)
Brett M. Haywood (No. 6166)
Sarah E. Silveira (No. 6580)
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:  collins@rlf.com
       merchant@rlf.com
       ramos@rlf.com
       steele@rlf.com
       haywood@rlf.com
       silveira@rlf.com

- and -

**LATHAM & WATKINS LLP**

Jeffrey E. Bjork (admitted *pro hac vice*)
Kimberly A. Posin (admitted *pro hac vice*)
Amy C. Quartarolo (admitted *pro hac vice*)
Helena G. Tseregounis (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
E-mail:  jeff.bjork@lw.com
       kim.posin@lw.com
       amy.quartarolo@lw.com
       helena.tseregounis@lw.com

- and -

Richard A. Levy (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  richard.levy@lw.com

*Counsel for Debtors and Debtors-in-Possession*