**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| **In re** | Chapter 11 |
| **IMERYS TALC AMERICA, INC.,** *et al.*[1] | Case No. 19–10289 (LSS) |
| **Debtors.** | Jointly Administered |

**JOHNSON & JOHNSON'S OMNIBUS REPLY IN SUPPORT**
**OF J&J'S MOTION FOR ENTRY OF ORDER MODIFYING**
**AUTOMATIC STAY TO IMPLEMENT TALC LITIGATION PROTOCOL**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748).  The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

SUMMARY OF ARGUMENT ON *REXENE* FACTORS ...........................................10

SUMMARY OF PLAN FILED MAY 15, 2020...........................................................13

J&J REPLY...................................................................................................................15

I.      The Debtors Have Failed to Meet Their Burden of Demonstrating Why the Court
        Should Not Modify the Automatic Stay to Authorize the Requested Relief....................15

        A.      Lifting the Stay Will Benefit the Debtors and Their Estates, Not
                Prejudice Them ......................................................................................16

        B.      The Ongoing Harm Suffered by J&J Significantly Outweighs Any Alleged
                Prejudice to the Debtors, as Further Evidenced by the Debtors' Plan.................24

        C.      The Third *Rexene* Prong Is Inapplicable ...............................................28

        D.      The Talc Litigation Protocol Does Not Threaten the Integrity of the
                Automatic Stay........................................................................................29

II.     Any Concerns Raised in the TCC Response Are Either Unfounded or Adequately
        Addressed by the Talc Litigation Protocol. ....................................................30

III.    The FCR Joinder Fails for Similar Reasons as the TCC Response. ................36

IV.     Cyprus Cannot Enforce a Fictional Indemnity Obligation on J&J...................37

CONCLUSION..............................................................................................................42

WEIL:\97492140\24\54966.0222

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 15375 Mem'l Corp.*,
589 F.3d 605 (3d Cir. 2009)..................................................................................23

*In re Abeinsa Holding, Inc.*,
Case No. 16-10790, 2016 Bankr. LEXIS 3641 (Bankr. D. Del. Oct. 6, 2016).......................15

*In re Armstrong World Indus.*,
348 B.R. 111 (D. Del. 2006)..................................................................................7

*Ass'n of St. Croix Condominium Owners v. St. Croix Hotel Corp.*,
682 F.2d (3rd Cir. 1982)......................................................................................30

*Baldino v. Wilson (In re Wilson)*,
116 F.3d 87 (3d Cir. 1997)....................................................................................29

*Besaw v. Giroux*,
2018 VT 138 (2018)..............................................................................................40

*Borman v. Raymark Indus., Inc.*,
946 F.2d 1031 (3d Cir. 1991).................................................................................30

*Butner v. United States*,
440 U.S. 48 (1979)................................................................................................9

*In re Congoleum Corp.*,
362 B.R. 167 (Bankr. D.N.J. 2007) .......................................................................19

*In re Coughlin*,
48 B.R. 191 (Bankr. E.D. Pa. 1985) .......................................................................38

*Fultz & Son, Inc. v. Browning-Ferris Indus. of Ohio*,
2017 U.S. Dist. LEXIS 84055 (N.D. Ohio 2017) ...................................................41

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Prods. Litig.*,
MDL No. 2738, Civil Action No. 16-2738 (FLW) (D.N.J. April 27, 2020) .......................8, 9

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009), *appeal dismissed*, 449 B.R. 14 (S.D.N.Y. 2011),
*aff'd*, 691 F.3d 476 (2d Cir. 2012)........................................................................9

*Knapp v. Seligson (In re Ira Haupt & Co.)*,
361 F.2d 164 (2d Cir. 1966)..................................................................................10

ii

*Meridian Eng'g Co. v. United States*,
122 Fed. Cl. 381 (Fed. Cl. 2015), *aff'd in part, vacated in part, remanded*, 885 F.3d 1351 (Fed. Cir. 2018)................................................................................................21

*In re Mirant Corp.*,
440 F.3d 238 (5th Cir. 2006) ......................................................................................29

*In re MSCP Holdings, Inc.*,
316 B.R. 51 (Bankr. D. Del. 2004) ..............................................................................41

*Nix v. Whiteside*,
475 U.S. 157 (1986)....................................................................................................35

*In re Rexene Prods. Co.*,
141 B.R. 574 (Bankr. D. Del. 1992) ................................................................... *passim*

*Richards* v. *Jefferson County*,
517 U.S. 793 (1996)....................................................................................................16

*Taylor* v. *Sturgell*,
553 U.S. 880 (2008)....................................................................................................16

*United Paperworks Int'l Union v. Boise Cascade Corp.*,
758 F. Supp. 954 (D. Vt. 1991)...................................................................................39

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012) .........................................................................................19

*Wing v. Cooper*,
37 Vt. 169 (Vt. 1864) .................................................................................................40

**Statutes**

11 U.S.C. § 362(g) ......................................................................................................15

18 U.S.C. § 1621 .........................................................................................................35

Bankruptcy Code Chapter 11 ................................................................................ *passim*

11 U.S.C. § 105(a) ................................................................................................14, 19

11 U.S.C. § 524(g) .........................................................................................7, 11, 14, 19

11 U.S.C. § 362(a) ..................................................................................................412

11 U.S.C. § 362(d) ....................................................................................................1, 29

11 U.S.C. § 365..........................................................................................................11

11 U.S.C. § 502(e)(1)(B) ...........................................................................................40

11 U.S.C. § 1123(a)(4)...............................................................................................19

**Other Authorities**

58 Am. Jur. 2d, Novation, § 19 (1971) .....................................................................39

Jef Feeley, *Talc Miner Imerys Strikes Deal to Resolve 14,000 Cancer Lawsuits*,
    BLOOMBERG QUINT (May 15, 2020), https://www.bloombergquint.com/onweb/talc-
    miner-imerys-stikes-deal-to-resolve-talc-litigation ..................................................6

FED. R. BANKR. P. 4001(a)...................................................................................1, 41

FED. R. BANKR. P. 9014(a)............................................................................................41

H.R. Rep. No. 95-595, 95th Cong., 1st Sess., 343–44 (1977) ......................................29

Local Bankruptcy Rule 4001-1 ....................................................................................1

WEIL:\97492140\24\54966.0222

Johnson & Johnson and Johnson & Johnson Consumer Inc. (collectively, "**J&J**") submit this reply (the "**Reply**") to the objections and responses (the "**Responses**") to *Johnson & Johnson's Motion Pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order Modifying Automatic Stay to Permit J&J to Send Notice Assuming Defense of Certain Talc Claims and to Implement Talc Litigation Protocol* [D.I. 1567] (the "**Motion**")[2] and in further support of the Motion.  The Responses include:

- *Debtors' Objection to Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion Pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order Modifying Automatic Stay to Permit J&J to Send Notice Assuming Defense of Certain Talc Claims and to Implement Talc Litigation Protocol* [D.I. 1731] (the "**Debtors' Objection**");

- *Response of the Official Committee of Tort Claimants to Johnson & Johnson's Motion to Modify the Automatic Stay to Implement Talc Litigation Protocol* [D.I. 1732] (the "**TCC Response**");

- *James L. Patton, Jr.'s, the Legal Representative for Future Talc Personal Injury Claimants Against the Debtors, (I) Joinder to the Response of the Official Committee of Tort Claimants to Johnson & Johnson's Motion to Modify the Automatic Stay to Implement Talc Litigation Protocol and (II) Limited Objection to Johnson & Johnson's Motion* [D.I. 1734] (the "**FCR Joinder**"); and

- *Cyprus Mines Corporation's and Cyprus Amax Minerals Company's Response to Johnson & Johnson's Motion to Modify the Automatic Stay and Implement a Litigation Protocol* [D.I. 1730] (the "**Cyprus Response**").

All of the objections raised in the Responses are without merit and J&J responds as follows:

## PRELIMINARY STATEMENT

1.      Over the years, J&J and Debtor Imerys Talc America, Inc. (or its predecessors) ("**Imerys**") entered into a series of contracts for the supply of cosmetic talc.  In these contracts, J&J expressly specified that the talc supplied to it must not contain asbestos.  Extensive testing

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion or the *Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [D.I. 1714] (the "**Plan**").

conducted by both Imerys and J&J, as well as by independent experts, demonstrated the talc did not contain asbestos.  Yet, as the TCC Response makes clear, the tort claimants' theory of liability rests largely on the false allegation that there was asbestos in the talc supplied by Imerys.  Under this theory of liability, blame would be placed squarely on the shoulders of Imerys—the supplier contractually required to provide J&J talc without asbestos.  Moreover, J&J would have strong defenses to the Debtors' claim for indemnity under these unproven allegations, and a contractual indemnity claim against Imerys.

2.      Given the strength of the evidence that the talc used by J&J did not contain asbestos, J&J filed this motion because it prefers to defend the safety of its products (and the core causation issues) in open court.  This is also J&J's contractual right under its indemnity agreements with Imerys and a standard protection for an indemnitor.  The Debtors, the TCC, and the FCR, however, apparently seek to deprive J&J of this opportunity by ignoring the evidence and attempting to "settle" this liability for inflated amounts, established by the plaintiffs themselves, and then offload liability for the settlement onto J&J without its consent.  Tellingly, nowhere in their objections do the Debtors, the TCC, or the FCR deny that this is their goal.

3.      There is no sound basis for denying the Motion and keeping the J&J Talc Claims in chapter 11 under these circumstances.  There is already litigation ongoing against J&J by the same claimants for the same injury caused by the same product, and the indemnity relationship between the Debtors and J&J is merely a way to allocate the satisfaction of these claims between the companies.  The Plan will purport to assign an assumed allocation for the J&J Talc Claims to Imerys, but those claimants can still proceed against J&J in the tort system for the same claim. J&J's proposal, where one proceeding in the tort system will decide each claim's entire value, is more efficient than one where two separate assessments in two separate processes are made for the

same claim—one as to Imerys and another in the tort system as to J&J—potentially leading to inconsistent results and overcompensation of the claims.  If the Motion is not granted, J&J could prevail against a particular plaintiff after a fair and lengthy trial and yet still have to pay that same plaintiff's claims under the Imerys Plan.  That is not fair.  Or J&J could theoretically lose at trial and pay the plaintiff's full claim and then still have to pay the plaintiff again under the Imerys TDPs, an unjustifiable double recovery.[3]

4.       Through the Motion, to avoid these results, J&J makes an *extraordinary offer*:  to take over liability for, and thereby remove from the Debtors' bankruptcy estates, most of the Debtors' liabilities—approximately 90% of the current and future claims against the Debtors.  The holders of these claims (the J&J Talc Claims), the very claims that precipitated the Debtors' filing of these Chapter 11 Cases, will be treated as if the Debtors' Chapter 11 Cases were never filed.  They will keep their day in court and be assured a full recovery of any judgment or settlement, backed by the credit of one of the world's largest companies, J&J.  In the revised proposed order approving the Motion, attached hereto as **Exhibit A** (the "**Revised Proposed Order**"), J&J has also now agreed to pick up **full indemnity** for J&J Talc Claims for **all years**, regardless of the timing of exposure, beyond J&J's alleged obligations even under the most expansive reading of the indemnity agreements.[4]  This eliminates one major "issue" raised by the objectors to the Motion.  In addition, J&J would waive its claims against the Debtors **and** most of its defenses to indemnity.  This will resolve the Unresolved Indemnity Issues, as described in the Motion,

---

[3] While J&J would have rights to set off, this right varies by jurisdiction and the circumstances and timing of the Trust's payments.  J&J reserves all rights to assert any claims it may have against the Debtors, the Reorganized Debtors, and/or the Trust, including claims for contribution or set-off, if the Motion is denied.

[4] J&J would indemnify for all years in which the Debtors supplied J&J talc, not merely the years in which it could potentially be owed.  Importantly, under the contracts, J&J's indemnity obligations only cover exposure from years up through the year 2000.  And, while the 2011 MPA provided that J&J would indemnify Debtors for that calendar year – there was no survival language, thus terminating J&J's obligations upon expiration of the Agreement.

3

avoiding continuation of the complicated indemnity coverage and allocation disputes that kept the parties mired in mediation for years prepetition.[5]

5.      In return for these substantial benefits, J&J requests no consideration, no unreasonable conditions, and no substantive relief.  It seeks to retain only basic rights that J&J as an indemnitor would be entitled to under applicable law.[6]  Committed to the safety of its talcum powder products, and supported by the overwhelming science as well as conclusions by major health organization and government agencies, J&J just wants the opportunity to defend the safety of its products in court, as is its right.  It asks only that the Debtors cooperate with J&J's efforts to defend the claims, as an indemnitee is required to do, rather than obstruct or impede them.

6.      The Debtors nonetheless object—without addressing the myriad benefits of J&J's offer.  Instead, they contend that J&J's offer comes at an inopportune time, is not a "complete" solution, and that J&J may not have the financial wherewithal to pay talc claims in the future.  But those objections ring hollow and are fundamentally misplaced.  J&J has offered to remove, by the Debtors' numbers, over 90% of the talc claims from the estates—their largest liabilities, the ones that the Debtors claim caused this bankruptcy—and pay successful claimants in full.  The J&J Talc Claims are *liabilities*—not assets.

7.      The Debtors' objection about timing is contrary to the facts and lacks merit.  After trying for months to get the Debtors to work with J&J to negotiate a different path, J&J first made an offer to indemnify the J&J Talc Claims—in October 2019 and in writing on November 1, 2019.  The Debtors refused to negotiate the proposal with J&J, however, asserting that it was premature

---

[5] If the Motion is not granted, in addition to raising generic defenses to indemnity, J&J would necessarily fight each and every indemnity claim against it on the merits.  This is because the valuation of each claim is different and would require consideration of disease, and cell type, exposure vector, and intensity, claimant risk factors, as well as time period or exposure to assess the validity of the indemnity.

[6] The Debtors' Objection, the TCC Response, and the FCR Joinder incorrectly assert that J&J attempts to expand the conditions to its indemnity obligation and its related rights under the Motion.

WEIL:\97492140\24\54966.0222

to discuss any such proposal—in November, in December, in February, and in March.  The Debtors cannot now complain that J&J's proposal came *too late* so should be rejected because it would disrupt their negotiated Plan.  In any event, J&J's Motion is pending now, when there is ample time to see that J&J's offer is better for the estates than leaving the stay (and the Debtors' largest liabilities) in place.

8.     Similarly, the Debtors' argument that granting the Motion would destroy months of progress rings hollow, as the Plan on file is far from the complete solution the Debtors suggest and leaves unresolved almost all the major issues in these Chapter 11 Cases.  There is no deal with any insurance company (notwithstanding that many are involved here), no deal with the Cyprus parties, no deal with the Rio Tinto parties, and no deal with J&J.  Key exhibits to the Plan have yet to be filed.  And the Plan may not confirmable for the reasons described below.  But even if it were, the Debtors have not shown how the Motion and their Plan structure are in any way incompatible.  If the Motion is granted, the Debtors still could use the existing plan structure, negotiate a revised contribution from Imerys S.A., and settle the much smaller pool of Claims remaining in their estates after J&J assumes the defense of the J&J Talc Claims.

9.     Instead of making any effort to limit or control the value of the talc claims asserted against them—the most important issue in this case—the Debtors have apparently spent the many months since the Petition Date focused on one overriding goal:  a complete release and channeling injunction for their parent, Imerys S.A. (the "**Parent**"), and their non-Debtor affiliates (collectively with Imerys S.A., the "**Imerys S.A. Group**").  And the unfinished Plan that they filed a few days before the objection deadline to the Motion only accomplishes that one goal—establishing the size of the contribution by the Imerys S.A. Group.[7]  It can only be because this primary goal is at risk

---

[7] If J&J's Motion is denied, J&J is prepared to seek to pursue alter ego claims against the Parent regarding indemnification owed to J&J by Imerys, and tortious interference claims for directing the Debtors not to allow J&J to

that the Debtors would push back on completely offloading 90%+ of their potential tort liability to a third party.[8] But whatever interest they have in protecting affiliates cannot override the benefit to *the Debtors* themselves, to thousands of ordinary claimants who will have their day in court and potential for full recovery if the Motion is granted, as well as to J&J's interests in defending its products.

10.    To be clear, should the Court not grant the Motion, J&J will necessarily press its strong defenses to any indemnity obligation and to any liability amount the TCC and FCR may seek to impose on J&J through their "negotiations."  By choosing to ignore, delay, rebuff, and oppose every single attempt that J&J has made to participate in the negotiations relating to, or assume the defense of, the J&J Talc Claims, the Debtors materially breached the indemnity agreements and the Debtors' common law duties, nullifying J&J's obligations to indemnify the talc claims.  Indeed, at least two months before the Debtors filed the Plan, the Debtors entered into an unusual agreement with the TCC and FCR that forbade the Debtors' counsel from speaking with J&J's counsel about the indemnity proposals without the presence of the TCC and FCR or those parties' permission (*see* Motion, Ex. J).  The Debtors have also refused to allow J&J to obtain any information, even basic information, that was shared with the TCC and FCR (parties adverse to *both* J&J and the Debtors with respect to J&J Talc Claims).  These actions are inconsistent with an indemnitee's duties, including the duties to minimize exposure and cooperate with an indemnitor, and are sufficient to breach the indemnity agreements and the duty of good faith and

---

participate in the defense and settlement of the J&J Talc Claims as is their right under the relevant agreements.

[8] If the Court grants the Motion and authorizes J&J to take the J&J Talc Claims out of the estates, the Imerys S.A. Group might still be exposed to liability in the tort system for liability relating to J&J products and its shareholders might lose that bump the value of the Imerys S.A. stock received on the announcement of the Plan.  The price of Imerys SA shares rose 8.1% after the Debtors' Plan was announced.  *See* Jef Feeley, *Talc Miner Imerys Strikes Deal to Resolve 14,000 Cancer Lawsuits*, BLOOMBERG QUINT (May 15, 2020), https://www.bloombergquint.com/onweb/talc-miner-imerys-stikes-deal-to-resolve-talc-litigation.

fair dealing.  The Debtors' agreement to a plan based on a section 524(g) injunction (available only for asbestos-based claims) provides J&J yet another defense to the obligations under the indemnification agreements.  Under some of the agreements, J&J does not have to indemnify the Debtors if the talc they supplied failed to meet specifications (*e.g.*, contained asbestos) and in fact, if there is asbestos in the talc—an unproven allegation—J&J would have an indemnification claim back against Imerys.

11.    The Debtors have not merely excluded the indemnitor from settlement negotiations, but also have abdicated the determination of the claim values, and any eligibility criteria, to the claimants' representatives.  It appears that those will be set forth in the as-yet-to-be-filed trust distribution procedures ("**TDPs**") that the TCC and the FCR are negotiating—and over which the Debtors did not even retain consent rights (but merely "consultation" rights).  That is particularly egregious when causation is hotly disputed, as here.  This case thus reeks of **moral hazard**, which creates incentives for debtors to settle with the plaintiffs' representatives at whatever inflated number the plaintiffs demand (numbers the debtors would never have agreed to prior to bankruptcy when they were footing the bill), and then attempt to dump the exposure on insurance companies and indemnitors.  And the TCC's and FCR's refusal to provide any discovery on their discussions leading to the Plan and the yet-to-be-disclosed TDPs only heightens the suspicions of such abuse in this case.

12.    Several aspects of these Chapter 11 Cases make these issues especially problematic. For one, this case is devoid of the typical checks and balances on claim values, because there is no other organized creditor group or shareholder group pushing back against the TCC and FCR in plan negotiations.[9]  In addition, the Plan does not even provide standard "insurance neutrality"-

---

[9] *See, e.g.*, *In re Armstrong World Indus.*, 348 B.R. 111 (D. Del. 2006) (resolving an objection from the unsecured creditors' committee that a debtor's plan unfairly discriminated against general unsecured creditors in favor of asbestos

type protection to J&J with respect to the indemnity (in contrast to insurance companies, which at least have some insurance neutrality language).

13.    Moreover, this is not the usual mass tort bankruptcy case where causation is clear and only the amount of damages remains at issue.  Causation is hotly disputed, and the scientific evidence does not support a causal link.  Indeed, in their Disclosure Statement (pp. 20–21), the Debtors admitted that the Talc Personal Injury Claims lack merit:

> **The Debtors maintain that their talc is safe, that the Talc Personal Injury Claims are without medical or scientific merit, and that exposure to their talc products has not caused personal injuries.**  The Debtors also contend that the safety of their talc has been confirmed by dozens of peer-reviewed studies and multiple regulatory and scientific bodies, including five of the largest real world studies ever conducted. . . . As described in the First Day Declaration, **it is the Debtors' view that they have had significant success defending against Talc Personal Injury Claims in the tort system and no final, unappealable verdict has been issued against any Debtor in any lawsuit asserting talc related claims**. The Debtors assert that they have been and continue to be committed to the quality and safety of their products above all else.

14.    The strength of the defense against the Talc Claims is further demonstrated by the fact that J&J has received numerous defense verdicts, and every single verdict against J&J thus far has been reversed on appeal.  J&J's and Imerys's causation defenses were further enhanced by the recent *Daubert* decision in the Multi-District Litigation pending in the District of New Jersey where U.S. District Judge Freda L. Wolfson discredited several of the so-called experts the plaintiffs' counsel have been relying on and fully denied the plaintiffs' request to limit any of J&J's expert testimony.[10]  Nonetheless, the Debtors are conceding the key causal link without any effort to control or limit claim values.

---

personal injury claimants).

[10] After thousands of individual consumer plaintiffs brought product liability actions against defendants Johnson & Johnson and the Debtors alleging that the perineal use of J&J's talcum powder products caused their ovarian cancer, the United States Judicial Panel on Multidistrict Litigation (the "**MDL Panel**") transferred all of the federal court cases against J&J to the United States District Court for the District of New Jersey for the purposes of pretrial coordination.  *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Prods. Litig.*, MDL No.

15. Under these circumstances, perhaps it should come as no surprise that the TCC and FCR object to going back to the tort system, apparently seeking for the tort claimants a higher and more certain payout in these Chapter 11 Cases (where they can inflate values, settle claim amounts for numbers of their own choosing without proving causation, and establish their own eligibility criteria) than they would potentially receive outside of chapter 11. But, as the United States Supreme Court has cautioned, this is an illegitimate expectation. *See Butner v. United States*, 440 U.S. 48, 55 (1979) (a creditor should not obtain a "windfall merely by reason of the happenstance of bankruptcy"); *see also JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 224 (Bankr. S.D.N.Y. 2009), *appeal dismissed*, 449 B.R. 14 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 476 (2d Cir. 2012) ("It is an axiomatic principle of chapter 11 practice that creditors cannot be elevated to a better position than their pre-petition legal entitlements.") (citing *Butner*). Even if estimation of mass tort claims and settlement through a trust may be appropriate in other chapter 11 cases, they are not appropriate when a credit-worthy

---

2738, Civil Action No. 16-2738 (FLW) (D.N.J. April 27, 2020) [D.I. 13186]. The purposes of this transfer and "centralization" process is to avoid duplication of discovery, to prevent inconsistent pretrial rulings, and to conserve the resources of the parties, their counsel, and the judiciary. Thereafter, plaintiffs and J&J filed motions challenging the scientific reliability of the opinions of each side's causation experts. In August of 2019, the Chief Judge of the U.S. District Court for the District of New Jersey, Honorable Freda L. Wolfson, conducted a *Daubert* hearing to determine the admissibility of eight of the challenged experts' opinions. The Debtors did not participate in this hearing because of the automatic stay.

On April 27, 2020, the court issued a ruling significantly limiting the testimony of two of plaintiffs' key expert witnesses: asbestos testing expert, Dr. William Longo, and biology expert, Dr. Ghassen Saed, finding that these witnesses did not present scientifically sound evidence to support key aspects of their opinions. Specifically, Judge Wolfson excluded the testimony of plaintiffs' asbestos testing expert, Dr. William Longo regarding the results of his polarized light microscopy (PLM) testing due, in part, to his own prior statements that it was not a reliable methodology. *Id.* at 56. Further, and significantly, Judge Wolfson barred Dr. Longo from testifying in any fashion that women who used talcum powder were exposed to any level of asbestos, let alone a level significant enough to cause ovarian cancer because he "fail[ed] to offer any scientific support for his opinion that the use of Defendants' talc products causes exposure, let alone significant exposure, to asbestos." *Id.* at 59. Finally, the Court also excluded plaintiffs' theory that inhalation of talc can cause ovarian cancer, citing the "scant" support offered by plaintiffs' experts for that theory. *Id.* at 96–97. In addition, Judge Wolfson excluded plaintiff's expert biologist Dr. Saed from testifying that his experiments showed that talc could cause ovarian cancer because the Court found that his opinion that "the use of talc causes ovarian cancer" was "unsupported by the findings of his study" and was an "unreliable" conclusion. *Id.* Notably, in the same ruling, Judge Wolfson denied plaintiffs' motion to exclude or limit the opinions and testimony of any of defendants' experts.

WEIL:\97492140\24\54966.0222

party is standing ready to take over the claims and pay proven claims in full.  None of the objectors cite to a single case in which claims were estimated and settled under such circumstances.

16.     Granting J&J's requested relief is thus necessary to protect J&J from hardship.  It will not only eliminate the moral hazard problem, it will ensure that these Chapter 11 Cases are conducted consistently with the fundamental tenet that bankruptcy cannot be used for improper purposes.  "The conduct of bankruptcy proceedings not only should be right but must seem right." *Knapp v. Seligson (In re Ira Haupt & Co.)*, 361 F.2d 164, 168 (2d Cir. 1966).  And the right thing to do in these cases is to grant the Motion to permit J&J take over the defense to the claims.

## SUMMARY OF ARGUMENT ON *REXENE* FACTORS

17.     Application of the *Rexene* factors and their underlying principles points in favor of granting the motion, lifting the stay, and permitting J&J to implement the Talc Litigation Protocol. Unlike a case where a court must compare a burden to the estate against a hardship to the party seeking to lift the stay, in this case, granting the relief will both lead to benefits to the estate *and* alleviate hardship to J&J, all without prejudice to individual tort claimants' right to have their day in court.  That is, all the relevant factors point in the same direction:  to lifting the stay.  And even if the Court were to find that that there are burdens to the estate, they are incidental and insignificant, and easily outweighed by the direct and concrete hardship to J&J.

18.     Below is a summary of the main facts supporting application of the *Rexene* factors.

19.     <u>First</u>, the Debtors will benefit from and are not harmed by the relief sought in the Motion:

> 1)  <u>Payment in Full of Most Claims and Higher Recoveries for Other Claims.</u>  J&J's proposal essentially guarantees payment in full to holders of J&J Talc Claims who have successful claims, without the Debtors having to use their assets to pay those claims.  This also benefits the holders of non-J&J Talc Claims, as a greater percentage of the Debtors' assets will be available to pay those claims.

10

2) <u>Financial Certainty for Future Claims.</u>  For future claimants especially, J&J's offer presents a far superior deal.  J&J as a source of recovery for future claimants who can prove their claims is undoubtedly a more certain bet than the standard bankruptcy claims trust.

3) <u>Preservation of Indemnity Rights.</u>  Without the requested relief, there is a good chance that the holders of talc claims against the Debtors allegedly arising from use of J&J products will lose the benefit of any value of J&J's indemnity agreement with respect to the Debtors' liability given J&J's strong defenses based on the Debtors' actions and the section 524(g) settlement.  Moreover, J&J submits that the Debtors cannot assume the J&J indemnity agreements, which are executory contracts, under section 365 of the Bankruptcy Code because they cannot cure the Debtors' breach of the provision permitting J&J to assume the defense of the claims unless they actually let J&J assume the defense of claims (or their failure to abide by the cooperation provisions or the defense based on non-conforming talc).

4) <u>Waiver of J&J's Indemnity Claims</u>.  The Responses fail to mention J&J's indemnification claims under the 2001 agreement for which J&J filed a proof of claim.  Without the relief requested, J&J will continue to pursue these claims against the Debtors (and will pursue its objections that the Plan does not treat these claims properly).

5) <u>Avoidance of the Unresolved Indemnity Issues</u>.  Granting the Motion resolves complicated litigation that will otherwise be necessary not only to resolve J&J's defenses to the Debtors' indemnity claims, but also the complicated allocation issues relating to J&J's own indemnity claims and gap years.

6) <u>Preservation of Insurance</u>.  Granting the relief will increase the chances that the Debtors' insurance will be available to satisfy Talc Claims.  In contrast, without the requested relief, and to the extent the Debtors are found to have breached their obligations as indemnitees under agreements with J&J, then the Debtors' insurers may argue that the Debtors' actions impairing the indemnification claims against J&J have vitiated the Debtors' claims to insurance with respect to future payouts by the Debtors' insurers.

20.    <u>Second</u>, the issues raised (and exaggerated) in the Responses do not outweigh the foregoing benefits:

1) J&J now agrees to expand the dates in its proposal to cover all time periods of alleged exposure to J&J products, eliminating one of the issues raised in several Responses.

2) The cooperation provisions are standard and necessary to defend the claims and J&J commits to work with the Debtors to ensure that its requests are reasonable.  In addition, J&J has modified the cooperation provisions in the Revised Proposed Order to eliminate some of the language the objectors criticized.

11

3)  J&J understandably needs to preserve certain existing defenses to ensure that the unusual relationship between its indemnitee/co-defendant and the plaintiffs does not impair its ability to defend the claims it is agreeing to defend. J&J is not seeking through these defenses to renege on its offer to defend the claims. By seeking to have the Court enforce the indemnity agreement, J&J only seeks to deter the Debtors from crossing a line where J&J might actually be hurt. It is also for this reason that J&J seeks confirmation of party-in-interest standing. Moreover, it is entirely within the Debtors' control to avoid such a breach.

4)  The Debtors have not provided J&J with information on amounts they already paid, despite numerous requests. In addition, it appears insurance carriers have already paid much of these past costs. But if there are any such claims, the requested relief does not impact those claims.

5)  J&J is not taking away the Debtors' insurance to resolve remaining claims. J&J is not creating rights against any insurance company and has added language to the Revised Proposed Order to make that clear. Notably, a group of insurance carriers separately reached out to J&J, and J&J was able to resolve the carriers' concerns by agreeing to changes to the language of the Revised Proposed Order clarifying that J&J is only reserving rights it might have against the insurance companies, not creating any additional rights through the order. In addition, the Objectors ignore that the Plan itself implicates similar insurance allocation issues that would exist absent the relief requested in the Motion.[11]

21.  <u>Third</u>, the <u>prejudice</u> to J&J from not granting the relief, in contrast, is substantial:

1)  <u>Moral Hazard</u>. As described above and below, without the requested relief, J&J would remain vulnerable to the moral hazard inherent in this process. The plaintiffs' representatives have the discretion and clear incentive to put highly inflated numbers into the TDPs and then try to seek payment from J&J and the insurance companies based on those numbers. The Debtors, with no skin in the game, have little incentive to push back against those numbers if doing so would upset the partners they need to support the channeling injunction or delay the release of the Imerys S.A. Group.

2)  <u>Inability to Defend its Products and Potential for Double Recovery.</u> Not only could J&J potentially be called upon to pay the Trust on the faulty indemnity claims, it would also face additional liability in the tort system for the <u>same plaintiffs'</u> claims

---

[11] The Trust will need to evaluate each talc claim to determine which, if any, insurance policies of the Debtors cover it, and to take action or commence proceedings to obtain access to the applicable insurance policies. J&J's proposal eliminates this need for the Trust by agreeing to pay the "first dollars" of all successful J&J Talc Claims, and reserving until subsequent proceedings (in which the Trust will not be party) insurance allocation issues. In addition, the Plan preserves co-defendants' rights to the Debtors' talc insurance policies anyway. *See* Plan § 12.3.2. This provision would apply to J&J absent the relief requested in the Motion, adding significant complexity by requiring the Trust to investigate, and potentially litigate, issues with respect to J&J's access to insurance proceeds.

against J&J <u>for the same products and same injuries</u>.  In addition, as noted above, J&J could be subject to a double recovery.

### SUMMARY OF PLAN FILED MAY 15, 2020

22.     For the Court's convenience, below is a summary of the provisions of the Plan most relevant to consideration of the Motion.

23.     On May 15, 2015, only four days before the objection deadline for this Motion, the Debtors filed the Plan.[12]  Proponents of the Plan include the Debtors, the Parent, the Imerys S.A. Group, the TCC and the FCR (collectively, the "**Plan Proponents**").  Plan § 1.1.124.  The Plan purports to incorporate a "global" settlement (the "**Imerys Settlement**") among the proponents over the treatment of Talc Personal Injury Claims whereby such Claims will be resolved by a trust (the "**Talc Personal Injury Trust**" or "**Trust**") in accordance with TDPs.  *Id*. § 10.9; Disclosure Statement § 2.1.

24.     The Plan classifies the standard personal injury claims and Indirect Talc Personal Injury Claims, which are claims for contribution, reimbursement, subrogation, or indemnity, together as "Talc Personal Injury Claims" in Class 4.  *See* Plan §§ 1.1.84, 1.1.167.  J&J's claims against the Debtors, for which it filed proofs of claim in these Chapter 11 Cases, are, therefore, treated as Talc Personal Injury Claims.  The Talc Personal Injury Claims are the only impaired class entitled to vote on the Plan.  *Id*. § 3.3.[13]

25.     Although the Plan describes the Imerys Settlement as a "comprehensive settlement" (*id*. § 1.1.81), it provides no details as to the actual treatment of Talc Personal Injury Claims, except

---

[12] The Debtors' filed a disclosure statement contemporaneously with the Plan (the "**Disclosure Statement**") [D.I. 1715].

[13] The other two impaired classes, Non-Debtor Intercompany Claims and Equity Interests of the Debtors, will not receive any property on account of their claims and interests, and therefore, will not be entitled to vote on the Plan. The other six classes (including subclasses) of claims and interests, including general unsecured claims, will be paid in full, reinstated, or otherwise have their allowed claims satisfied in full on the effective date of the Plan.  *See generally* Plan § 3.

to provide that they will be channeled to the Talc Personal Injury Trust and "resolved in accordance with the terms and procedures of the Talc Persona Injury Trust and [TDPs]." *See* Plan § 3.3.5. The TDPs, which are stated to be an exhibit to the Plan, have not yet been filed (notwithstanding that the Plan was filed almost two weeks ago and objections to the Disclosure Statement are due in less than three weeks).[14]  As explained more fully herein, the TDPs are being drafted by the TCC and FCR with the Debtors only retaining "consultation rights as to the form and substance of such documents . . ." *Id*. 1.1.173.

26.    The Plan provides very specific details on the Parent's contribution to the Trust.[15] In exchange for this contribution, Talc Personal Injury Claims and Demands against the Debtors, the Parent, the Imerys S.A. Group, and certain other parties (collectively, the "**Protected Parties**")[16] will be channeled to the Trust and forever enjoined against the Protected Parties, pursuant to sections 105(a) and 524(g) of the Bankruptcy Code. *Id*. § 12.3.1.

27.    The Trust will also be funded with certain causes of action owned by the Debtors, *id*. § 1.1.172, and the Debtors' rights to insurance proceeds, *id*. §§ 1.1.160, 1.1.161.  It appears from the Plan that the Debtors will transfer their indemnity claims against J&J to the Trust.[17]  The Plan includes "insurance neutrality" language for Talc Insurance Companies, providing generally that the Plan and related documents, including the valuation of Talc Personal Injury Claims, shall

---

[14] *See* Plan, Ex. A (stating that the TDPs will be "filed at a later date").

[15] Under the Plan, the Trust will be funded, among other things, by at least $177.5 million, consisting of $75 million in cash, a $500,000 note issued by the Parent and guaranteed by the stock of one of the Parent's indirect subsidiaries (Imerys Talc Italy S.p.A.), and the proceeds from a potential sale of substantially all of the Debtors' assets. *Id*. § 1.1.82.  Further, the Parent has agreed to contribute additional funds, depending on the purchase price of the Debtors' assets.  *See* Disclosure Statement § 6.2(b) (describing the purchase price enhancement).

[16] The term Protected Parties is defined in Section 1.1.131 of the Plan.

[17] Plan § 1.1.172 (Talc Personal Injury Causes of Action means any Estate Cause of Action attributable to "with respect to any Talc Personal Injury Claim, all rights of setoff, recoupment, contribution, reimbursement, subrogation or **indemnity** . . . and any other indirect claim of any kind whatsoever" and "any claim, cause of action, or right of the Debtors . . . for reimbursement, **indemnity**, contribution . . . arising from or relating to any payments made by the Debtors on account of Talc Personal Injury Claims prior to the Petition Date." (emphasis added)).

14

not impact the rights or Obligations of Talc Insurance Companies or constitute a determination or acceleration of obligations of any Talc Insurance Company.  *Id*. § 11.4.1.  These provisions do not appear to apply to J&J's indemnification obligations.

## J&J'S REPLY

### I.    The Debtors Have Failed to Meet Their Burden of Demonstrating Why the Court Should Not Modify the Automatic Stay to Authorize the Requested Relief.

28.    The Debtors contend that J&J has not made a *prima facie* case that there is cause to lift the automatic stay.  *See* Debtors' Objection ¶ 28.  But the burden here is on the Debtors, not J&J.  *See* Motion ¶ 33.  In the context of a motion for relief from the stay, the movant has "the burden of proof on the issue of the debtor's equity in property" but "the party opposing such relief has the burden of proof on *all other issues*."  11 U.S.C. § 362(g) (emphasis added).  The "debtor's equity in property" is inapplicable here as J&J has demonstrated that the Debtors lack equity in the property at stake (*i.e.*, the power to unilaterally defend and settle the J&J Talc Claims).  Accordingly, "the burden to resist lifting of the stay rests entirely with the Debtor[s]."  *In re Abeinsa Holding, Inc.*, Case No. 16-10790, 2016 Bankr. LEXIS 3641, *7–8 (Bankr. D. Del. Oct. 6, 2016).  As Judge Carey aptly remarked in *Abeinsa*, the question is not "[w]hy should the court lift the stay?" but rather "why *shouldn't* the stay be lifted?"  *Id*. at *8.  The Debtors' Objection does not have an adequate answer.  Indeed, even if the burden were on J&J, J&J would have carried it here.

29.    Unable to satisfy their burden, the Debtors seek to cast doubt upon the procedural mechanism J&J is using to obtain its relief and argue that J&J should simply assert its position as an objection to the Plan at the confirmation hearing (currently scheduled for October 2020).  But the Debtors have long been advocating for a "wait until later" approach in response to J&J's efforts to engage since early on in the cases only to change their message to "too late" as soon as they

15

filed their Plan.  Deferring the issue of J&J assuming the defense of the claims until confirmation

will potentially result in a great waste of estate resources soliciting a Plan that is not appropriate

in light of J&J's offer and prejudice J&J, as the Debtors will beat the "too late" drum even harder

when they are on the brink of emerging from chapter 11 and have gone through the cost and time

of solicitation.  For this reason, now is the best time for the Court to grant the Motion.

### A.    Lifting the Stay Will Benefit the Debtors and Their Estates, Not Prejudice Them.

30.    J&J has proposed something that any normal debtor would surely welcome:  to take

away and pay (in accordance with applicable non-bankruptcy law) the vast majority of the Debtors'

largest liabilities.  J&J has offered to assume the defense and indemnify Imerys for *all* J&J Talc

Claims, encompassing (by the Debtors' calculations) 99.8% of the total ovarian cancer claims and

80.1% of the total mesothelioma claims against Debtors.[18]  *See* Disclosure Statement 4.1(a).  By

assuming those liabilities, J&J's proposal would expand the assets available to the Debtors' estates,

benefitting other creditors.  The individual tort claimants who hold J&J Talc Claims would

particularly benefit by taking their claims out of the bankruptcy and restoring to each full due

process rights to "have h[er or his] own day in court."  *Taylor* v. *Sturgell*, 553 U.S. 880, 892 (2008)

(quoting *Richards* v. *Jefferson County*, 517 U.S. 793, 798 (1996)).

31.    The benefits do not end there.  Many other benefits are apparent and detailed in

both the Motion and the summary of the *Rexene* factors section above, but in brief summary, they

include:

---

[18] J&J has not verified these numbers, but notes that to the extent any claimant asserts a claim based on exposure both to a J&J product and a product not manufactured by J&J, J&J will only assume the defense of and pay for liability associated with J&J products.  Thus, some claimants may continue to assert a claim against the Trust relating to other products (assuming they can satisfy the Trust's eligibility criteria for those products) while simultaneously proceeding against J&J in the tort system with respect to claims based on J&J products.  This bifurcation, which may only apply to a small percentage of the claims, is not all that different than the bifurcation that would exist under the Plan for all the J&J Talc Claims—for the same injury caused by the same product, a plaintiff would simultaneously collect from the Trust and sue J&J and other manufacturing defendants in the tort system.  J&J's proposal consolidates all alleged liability resulting from a single product.

16

(i)     Financial certainty for future claims;

(ii)    Expansion of years covered by J&J's indemnity;[19]

(iii)   Preservation of indemnity rights against J&J;

(iv)   Waiver of J&J's indemnity claims and claims that the Debtors' conduct has breached the indemnity agreements;

(v)    Avoidance of uncertainty and complicated litigation relating to the unresolved indemnity issues; and

(vi)   Preservation of insurance for talc claims.

32.     The Debtors do not acknowledge these significant benefits and instead nitpick to manufacture alleged flaws in J&J's proposal. In reality, the alleged forms of prejudice are either (a) preexisting circumstances inherent in these Chapter 11 Cases (and not a creation of or exacerbated by J&J's proposal), (b) at most, minor incidental costs relative to the substantial benefits J&J offers, or (c) unsupported by the facts.

33.     *First*, the Debtors argue that modifying the stay to allow the J&J Talc Claims to proceed in the tort system, with J&J covering all resulting costs and liabilities, would harm the Debtors by failing to provide a "global resolution" of the talc claims. Debtors' Objection ¶ 32. The Debtors seem to be suggesting that J&J's proposal would not be attractive unless J&J were to assume all of the Debtors' talc liability, including that which has nothing to do with J&J's products. But that is a bridge too far; the Debtors point to no legal or equitable basis (because there is none) upon which they could foist all of their talc liability on J&J. They are also setting up a false standard of comparison: removing 90%+ of liabilities is clearly better than removing 0%. It is hard to imagine another case where a white knight would come along and offer to take 90% of the

---

[19] Including 2011, where J&J no longer owes an indemnity obligation. That agreement expired on December 31, 2011, and the indemnification provision in that agreement, unlike the 1989 SPA and 1989 SA, did not contain any language to effectuate a survival of that provision past termination or expiration of the agreement. Thus, especially after 2000, Debtors are receiving a maximum benefit—for claims arising in every year after 2000, where J&J clearly does not owe any indemnification, it is still offering to fully indemnify the Debtors for such claims.

17

debtor's claims out of the estates and pay them in full (to the extent such claims are successful), and the debtors respond by saying "thank you but no thank you; that does not offer a complete solution." It raises questions about what is really going on here.

34.     J&J's proposal actually facilitates a global resolution by eliminating the Debtors' liability for (and its need to address) myriad claims against the estates, as well as the Unresolved Indemnity Issues. J&J's proposal would leave the Debtors free to negotiate a resolution of any of their remaining liabilities, including through a channeling injunction as to Non-J&J Talc Claims. In fact, almost all aspects of the existing Plan could remain intact. Under the Plan, the Talc Personal Injury Claims and specific assets, both cash and non-cash, are funneled into the Talc Personal Injury Trust. *See* Plan § 1.1.171. All J&J's Talc Litigation Proposal does is take J&J Talc Claims—a liability—out of that Trust, leaving more assets for the Non-J&J Talc Claimants to recover.

35.     *Second*, the Debtors argue that granting the Motion will impede their consensual Plan with the TCC and FCR. Debtors' Objection ¶ 32. However, if the Motion is granted, the Debtors and their sophisticated professionals could still finalize a plan with the TCC and FCR to address the remaining liabilities and exit chapter 11, including a plan that channels Non-J&J Talc Claims to a trust, consistent with the current Plan. Combining a channeling injunction of Non-J&J Talc Claims with the Talc Litigation Protocol would allow the Debtors to obtain the comprehensive and global resolution of Talc Claims that they desire. It would result in a better outcome for the Debtors' estates than the proposed Plan, which leaves open the Unresolved Indemnity Issues that would likely keep the Trust mired in litigation for years, put the J&J Talc Claimants' ability to recover anything from J&J at risk, and leave the J&J Talc Claimants with a potential partial recovery from J&J, at best. And the current Plan is a long way from final. Even

18

a cursory review of the Plan reveals that it is missing key components—namely, the Trust Agreement and TDPs that address how Talc Claims will be treated and resolved.[20]

36.     The Debtors' arguments on this point also assume the Plan will be confirmed, but the Plan may not be confirmable for several reasons.  For example, the Plan contains a channeling injunction for the benefit of the Debtors and the Imerys S.A. Group.  It is not clear whether the standards under sections 524(g) and 105(a) for a channeling injunction can be satisfied at this time while J&J's proposal, as set forth in the Motion, is pending.  Given that the channeling injunction (including for the Parent) is the linchpin of the Plan, the Debtors will continue to waste estate resources on this potentially non-confirmable Plan if the Motion is not granted.[21]

37.     Another problem with the Plan is that it places direct Talc Personal Injury Claims and Indirect Talc Personal Injury Claims (such as J&J's indemnification claim against the Debtors) into the same class.[22]  But the TDPs are being drafted by the TCC and FCR, who have a stake only in the direct claims, and not the Indirect Talc Personal Injury Claims.  As a result, it is likely that the treatment of those disparate claims within the TDPs will not satisfy section 1123(a)(4) of the Bankruptcy Code, which requires that all claims in a class be treated equally.  The Debtors will also have to demonstrate that they proposed their Plan in good faith under section 1129(a)(3) even

---

[20] The irony of the Debtors calling J&J's indemnity proposal "half-baked" (Debtors' Objection ¶ 12) is that the Debtors' Plan does not provide any detail as to how Talc Claims will actually be resolved, other than channeling those claims to a trust.

[21] It is not clear whether the Parent has made a sufficient contribution of value of any sort to justify a channeling injunction for its benefit.  *See, e.g.*, *In re Congoleum Corp.*, 362 B.R. 167, 179-80 (Bankr. D.N.J. 2007) ("A review of case law suggests that finding that an injunction is fair and equitable is closely tied to the value being contributed to the plan."); *see also In re W.R. Grace & Co.,* 475 B.R. 34, 106 (D. Del. 2012) ("This determination . . . should identify a clear relationship between the benefits received and the contributions made by a third party that receives injunctive protection.").  The non-Debtor Parent's interest in obtaining a third-party release provides no basis for entering a channeling injunction binding thousands of claimants, particularly when J&J has offered to indemnify all those claims and thus eliminate the risk to the Debtor.

[22] *See* Plan § 1.1.167 (defining a "Talc Personal Injury Claims" as including "Indirect Talc Personal Injury Claim"); *id.* § 3.3.5 (classifying all Talc Personal Injury Claims in Class 4 under the Plan).

19

though they gave the claimants (or at least one segment of the claimants, those representing "direct" claims) control over the most important issues—valuation and proofs required for such claims—and even though they refused to engage or communicate with J&J on the indemnity outside the presence of the TCC and FCR, despite repeated attempts by J&J to commence a dialogue.  *See* Motion ¶¶ 19–23. These are just a few examples of issues with the Debtors' Plan, and the Court need not decide those issues now.  But the Debtors' suggestion that the case is effectively over because they filed something called a "Chapter 11 Plan" ignores the burdens and evidence the law requires.

38.    *Third,* the Debtors object to merely having to *cooperate* with J&J's efforts to defend its products.  Debtors' Objection ¶ 33.  All J&J is asking is that the Debtors cooperate in good faith in the defense of the J&J Talc Claims by making documents and witnesses available to J&J in defending the talc claims.  Cooperating to provide the occasional witness or document would, according to this argument, so distract the Debtors that they will no longer be able to negotiate a Plan with the TCC or FCR or focus on the sales process.  The Debtors have provided no evidence for this exaggerated claim.  Far from an obligation having "no reasonable limitation whatsoever," J&J is asking only for reasonable and customary cooperation and is willing to work with the Debtors to ensure that such cooperation obligations do not interfere with the Debtors' reorganization efforts.  This issue is manageable, and if the Debtors believe J&J is being unreasonable, which J&J doubts will happen, the Debtors can seek the involvement of this Court.  Indeed, the Plan itself reserve all duties under applicable law to cooperate in defense and/or settlement of any claim with respect to which insurance coverage is sought.[23]  It also provides for

---

[23] *See* Plan § 14.15 ("Nothing in the Plan, the other Plan Documents or the Confirmation Order shall relieve . . . any Entity that is or claims to be entitled to indemnity under a Talc Insurance Policy from any duty to cooperate that may be required by any such insurance policy or under applicable law with respect to the defense and/or settlement of any Claim for which coverage is sought under such Talc Insurance Policy.").

a "Cooperation Agreement" among the Debtors, Imerys S.A., and the Talc Personal Injury Trust, pursuant to which certain documents will be transferred to the Trust, presumably to assist in the resolution of Talc Personal Injury Claims.  *See* Plan § 4.11.  The precise nature of the other obligations under the Cooperation Agreement are unclear, because the Cooperation Agreement will be filed with the Plan Supplement, which could be many months from now, but at a minimum J&J could get benefits under the Cooperation Agreement.

39.    A duty to cooperate with an indemnitor is also not a creation of J&J's Motion, but is a requirement of the existing indemnity agreements, as well as the applicable law of indemnity. J&J is merely asking the Debtors to live up to their existing commitment under the indemnity agreements, which, as is standard, require that the indemnitee cooperate with the indemnitor's efforts to defend the cases.[24]  Without such cooperation, the indemnitor would be left in an impossible position, forced to defend without having access, for example, to witnesses or documents that are necessary for providing a defense.  As discussed herein, J&J's indemnification obligations will be broader under its proposal, not narrower, and it is asking merely for this basic protection in return; a protection that already is embodied in the agreements themselves and is fairly standard in bankruptcy claims trusts (and will likely exist in these cases once the Trust Documents are filed).

40.    *Fourth*, the Debtors argue that the Talc Litigation Protocol would "impair assets of the Debtors' estates" by J&J reserving rights to insurance proceeds.  Debtors' Objection ¶ 34.  But J&J's reservation of rights is just that—a reservation.  Contrary to the contentions made in several of the Responses, J&J is not seeking a ruling that enhances its coverage compared to whatever

---

[24] *See, e.g.*, *Meridian Eng'g Co. v. United States*, 122 Fed. Cl. 381, 400 (Fed. Cl. 2015) (noting that implied in every contract is the duty of good faith and fair dealing, which includes both "the duty not to hinder and the duty to cooperate."), aff'd in part, vacated in part, remanded, 885 F.3d 1351 (Fed. Cir. 2018).  .

WEIL:\97492140\24\54966.0222

rights J&J possesses under insurance and indemnity law upon assuming the indemnitee's defense. Certain insurance carriers negotiated agreed language in J&J's Revised Proposed Order, and their consent to J&J's requested relief confirms that J&J's proposal merely maintains the status quo (*i.e.*, that J&J is not waiving any rights it might have under applicable law to those insurance policies), not increasing any rights J&J might have to insurance policies.  In addition, this argument completely ignores that (i) these insurance allocation issues already exist in the Plan (*see, e.g.*, Plan § 11.4.1) and (ii) if avoiding complicated allocation issues is a goal, then granting the Motion would further it, because, as explained in the Motion, this would resolve the complicated Unresolved Indemnity Issues relating to the competing indemnity agreements.

41.    *Fifth*, the Debtors contend, in four full paragraphs, that J&J may lack the financial wherewithal to meet its obligations.  Debtors' Objection ¶¶ 33–38.  This is the most absurd argument the Debtors make (and the one that most demonstrates that they are grasping at straws).  As of the date hereof, J&J has a market capitalization of <u>over $385 billion</u> and extensive insurance coverage of its own.  It is one of the top 10 companies in the United States by market value.[25]  J&J can provide the claimants far greater protection than the Debtors or the bankruptcy claims trust ever could (as discussed above).  More fundamentally, the Debtors' *own plan* relies on J&J's ability to pay individual claims.  Even if the risk that the Debtors identified were realistic rather than fanciful, it thus would provide no reason to deny J&J's motion because the same risk is also present under the Debtors' own Plan.

42.    Those five arguments lack merit.  But more concerning, and more broadly, the Debtors' failure to even acknowledge the obvious countervailing *benefits* suggests that the

---

[25]    *See*  Bloomberg,  JNJ  company  information  and  market  quotes,  available  at https://www.bloomberg.com/quote/JNJ:US.

Debtors' views on what is best for the estates are colored by their principal focus on obtaining a release and channeling injunction for their Parent and non-Debtor affiliates.[26] Indeed, the Debtors barely try to hide this focus, as they complain early in their Objection that the Talc Litigation Protocol "does not address whether the Debtors' non-Debtor affiliates will receive third-party releases in connection with the J&J Talc Claims . . ." Debtors' Objection ¶ 5. However, any impact to the Imerys S.A. Group is irrelevant to this Motion.[27] *Rexene* focuses on the prejudice to a debtors and their estates. The Talc Litigation Protocol does not prejudice the Debtors or their estates; it materially benefits them by eliminating the liability that pushed them into bankruptcy in the first place. Resolution of the Motion depends on the benefits to *the Debtors* and claimholders—not the interests of the non-Debtor Imerys S.A. Group in buying the benefits of a channeling injunction.

43.     Viewed objectively, the benefits to the estates that would result from granting the Motion clearly outweigh any burdens. If the Court agrees with J&J, then it should grant the Motion, because *Rexene* would be satisfied. But even if the Court were to agree with the Debtors that the Motion created a net burden on the estates, that would not be the end of the inquiry. *Rexene* requires the Court to determine whether the hardship to J&J from not granting the Motion would outweigh any such benefits. J&J submits that this factor is easily satisfied.

---

[26] The fact that the size of the Parent's contribution is the only amount actually quantified in the current Plan supports the inference that the Debtors' chief priority is the release and channeling injunction for the Imerys S.A. Group. During the 15-plus-month pendency of these Chapter 11 Cases, the Parent became directly involved in ongoing negotiations with the TCC and the FCR, even without the presence of the Debtors, to negotiate a contribution amount that the Parent would contribute to the Trust and to which the TCC and the FCR would agree. *See* Disclosure Statement § 3.3(b); Van Meter Dep. 59:2-17, May 1, 2020. This is so despite the fact that neither the Debtors nor the Parent have performed any estimation of the Talc Claims, which is normally a predicate to settling those claims. And the Debtors have still not filed (or even seen (*see infra* n.30, 31)) the TDPs.

[27] This raises issues as to the Debtors' good faith in prioritizing mitigation of potential claims against their Parent over management of liabilities and maximizing recoveries to other creditors and stakeholders of the estates themselves. *See In re 15375 Mem'l Corp.*, 589 F.3d 605, 624–25 (3d Cir. 2009) (finding a lack of good faith where a debtor's bankruptcy was primarily concerned with protecting the debtor's parent from litigation).

23

**B.  The Ongoing Harm Suffered by J&J Significantly Outweighs Any Alleged Prejudice to the Debtors, as Further Evidenced by the Debtors' Plan.**

44.  The Debtors' Objection glosses over the harm J&J suffers while the automatic stay prevents it from assuming the defense of the J&J Talc Claims.

45.  The Debtors' statements that J&J has not demonstrated harm of its own, that the harm is "speculative" and that J&J is concerned about a "hypothetical plan that was a creature of J&J's own imagination" (Debtors' Objection ¶¶ 10, 41) are incorrect.  J&J's Motion explains in significant detail the significant hardships that it will experience if the Court does not modify the automatic stay and authorize the Talc Litigation Protocol.  And the filing of the Debtors' Plan confirms and exacerbates those hardships.  The Debtors have proposed exactly the kind of structure that is the basis of J&J's concerns.  It purports to transfer the Debtors' indemnification rights against J&J to a trust that will use its assets to compensate J&J Talc Claimants in unspecified and undisclosed amounts determined by the plaintiffs' representatives—amounts the Debtors have apparently taken no action to limit—with the Trust then attempting to pursue J&J for those inflated amounts.[28]  That process abrogates J&J's contract rights not only to assume the defense of the Debtors in the J&J Talc Claims, but also to control decisions to litigate or to settle the Claims.  *See* Motion ¶ 13.  Without preservation of J&J's contractual and other defenses under the supply agreements and applicable law, J&J's ability to assert defenses to the merits of the underlying talc claims (for which the Trust will try to seek reimbursement from J&J) and defend its products may be undermined after the Trust settles the J&J Talc Claims.

---

[28] *See, e.g.*, Plan §§ 1.1.171, 1.1.172 (the Talc Personal Injury Trust Assets include Talc Personal Injury Causes of Action, which include any claim, cause of action or right of the Debtors for indemnity).  The Trust will be responsible for resolving all Talc Personal Injury Claims, and use the Trust's Assets to make distributions on such claims.  *See id.* § 4.2.1.  The Trust will then seek reimbursement from J&J for amounts paid to talc claimants.

As of the date of this filing, the TDPs and other trust documents remain outstanding.  Under the timelines proposed by the Debtors, the Debtors do not have to file the TDPs until seven days prior to the voting deadline for solicitation of the Plan.  *See* Plan § 1.1.125.

46.    Alarmingly, the Debtors have ceded control of the TDPs to the TCC and FCR. Beyond the plain language in the Plan, this is also evidenced by recent discovery, fee applications filed on the docket,[29] and the deposition of Ryan Van Meter, general counsel of the Debtors, attached hereto as **Exhibit B** (the "**Van Meter Deposition**"),[30] which all confirm that the TCC and FCR are taking the lead on the TDPs and related Trust Documents.  Section 1.1.173 of the Plan provides that the Debtors will merely have "consultation rights as to the form and substance of" the TDPs.  By doing so, the Debtors are, in essence, allowing the talc claimants (or more precisely, their lawyers) to decide how much their own claims are worth and what proof is needed to assert a claim.  That is starkly at odds with the Debtors' own statements that they "believe that the Talc Claims are entirely without merit" (First Day Declaration ¶ 8), and a powerful illustration of the moral hazard J&J identified in its Motion.  *See* Motion ¶ 43.

47.    The Debtors respond to J&J's argument that they "may not be incentivized to defend and reconcile the J&J Talc Claims diligently" not by denying it, but by skirting the point. They state only that "J&J fails to explain how the Debtors' efforts to reach a consensual plan with the TCC and the FCR somehow demonstrate that the Debtors have mishandled or overvalued the J&J Talc Claims."  Debtors' Objection ¶ 42.  If J&J's concerns were unfounded, the Debtors' Objection to the Motion or the Plan itself, which was filed after the Motion, could have made clear that the object of the Plan is not for the representatives of the direct Talc Personal Injury Claims

---

[29] The fee applications of Robinson & Cole LLP and Young Conaway Stargatt & Taylor, LLP indicate that the firms began working on the TDPs as early as August 2019.  Young Conaway's fee application for March states that the TCC and FCR were communicating and reviewing a draft of the TDPs during that monthly billing cycle.  Robinson and Cole's March fee application reflects that it was drafting, reviewing, and revising the trust documents as such time.  Relevant excerpts of the fee applications (with highlights) are attached hereto as **Exhibit C**.

[30] As recently as May 1, 2020, the Debtors had not yet reviewed a draft of the TDPs.  *See* Van Meter Dep. 78:15-19, May 1, 2020 (When asked whether he had seen TDPs in connection with this case, Imerys's general counsel replied: "I have not.").  The Debtors confirmed as recently as May 1, 2020 that they have performed no valuation of the Talc Claims.  *See* Van Meter Dep. 75:16-76:15, 79:5-80:11, May 1, 2020 (Imerys's general counsel stating that to his knowledge, no valuation of claims is even in process by the Debtors).

to come up with their own settlement numbers and then seek to impose those values on J&J. But they did not do that. Just the opposite. They have instead ceded the determination of the talc claim valuations / matrices to the TCC and FCR.[31] And the Debtors do not (and likely cannot) point to *any* language in the Plan that remedies, mitigates, or even addresses the hardship J&J would face.

48.     The Debtors allege that J&J does not suffer any hardship "with respect to its alleged right to control the Debtors' defense, because no defense-related activities are necessary or permitted" while the automatic stay is in place. Debtors' Objection ¶ 41. That hyper-technical argument fails to consider all of J&J's contractual rights and oversimplifies the impact of the automatic stay. The whole question at issue is whether the stay should be lifted. This point also ignores the reality that if the cases proceed according to the Plan, at the time the automatic stay is lifted, the defense of the J&J Talc Claims will be vested in the Talc Personal Injury Trust.

49.     Under normal circumstances, the relief requested in the Motion would not be necessary to avoid prejudice. Indemnitees are normally motivated to mitigate their liability and defend their product, consistent with their duty to do so, and an indemnitor would expect an indemnitee to carry out an appropriately vigorous defense. And if the indemnitee acts inconsistently with its standard motivations and duties, the indemnitor could step in and take over the defense, or if shut out from doing so, has assurance that the indemnitee's breach of its obligations would negate the indemnitor's obligations.

50.     The circumstances here, however, are anything but normal: There are strong indicia of an indemnitee that is indifferent to its and its co-obligors' exposure and plaintiff representatives with a controlling influence over the determination of their claims—are not,

---

[31] *See* Van Meter Dep. 78:15-19, May 1, 2020 (acknowledging that the Debtors had not seen a draft of the TDPs); *see also* Plan § 1.1.173 (granting the Debtors "consultation rights" as to the form and substance of the TDPs).

WEIL:\97492140\24\54966.0222

however, normal circumstances.  Giving the plaintiffs' attorneys (most of whom work on contingency fee arrangements) the right to control the claim settlement amounts and eligibility criteria was apparently the price the Debtors were and are willing to pay for the Imerys S.A. Group channeling injunction.[32]  At the end of the day, the Debtors have no skin in the game on the most important issue in these cases—their potential liability to tort claimants.  And, unfortunately, because this case does not involve another organized creditor group or shareholder group involved in the plan negotiations, this case is devoid of the standard checks and balances in the system to ensure that the claim values assigned to the Talc Personal Injury Claims are reasonable.  Against this backdrop, it should come as no surprise if the TDPs proposed by the Plan Proponents contain overinflated claim values and overly lenient eligibility criteria (not the results one would expect from true arms'-length negotiations).

51.    The Debtors' argument that J&J's proposal attempts to address its asserted prejudice came too late is both irrelevant to the determination of the issue here (which is whether the stay should be lifted now) and not unsupported by the facts.  The issue here is whether the stay should be lifted now.  And, J&J implored the Debtors more than a year ago that capitulating to the plaintiffs would not be a prudent path and that there were other paths they should explore in connection with their Chapter 11 Cases, including negotiations with J&J (*see* Marcia Goldstein's letter to Richard Levy, dated May 15, 2019, attached as Exhibit 5 to the Debtors' Objection).[33]  Yet, the Debtors refused to engage meaningfully in negotiations with J&J over any alternatives.[34]

---

[32] *See* Plan § 1.1.173 (stating that the Debtors will have "consultation rights as to the form and substance of" the TDPs).

[33] It was clear then—a year before the Plan was filed, and has been proven correct, that, as Ms. Goldstein warned, "the Debtors should recognize the critical juncture at which they find themselves.  Although the current path of a hurried settlement with the plaintiffs and FCR may appear to be the most expeditious, in reality, this path would be long, arduous, and uncertain for the Debtors and their corporate parents."

[34] J&J warned the Debtors that "if the Debtors . . . continue to take actions contrary to the parties' shared interest in minimizing their liability to plaintiffs, J&J will take all actions necessary to bring to light for the Bankruptcy Court

J&J continued to reach out to the Debtors, but while the Debtors would "take the call," the only message that ever came back was that they did not want to engage with J&J in substantive discussions until they reached a deal with the TCC, the FCR, and the Imerys S.A. Group.

52.    After much deliberation on how to handle the continued rebuffs, J&J concluded that offering to take over the defense of the claims for J&J products would provide a mutually beneficial solution.   J&J suggested that solution orally in October 2019 and in writing on November 1, 2019.  However, the Debtors refused to negotiate with J&J on this path either.

53.    The Debtors continued to assert that it was premature to discuss any such proposal – in November, in December, in February, and in March.  And now that they finally have their Plan on file, the Debtors are saying J&J's proposal came too late and should be rejected because it would disrupt their negotiated plan.  This "too early; actually, too late" approach does not evidence an intent to negotiate in good faith.

54.    Although J&J believes it can prevail on its indemnity defenses, it does not want to be subjected to an unreasonable and perverse risk in abrogation of its contractual rights.  Therefore, J&J prefers to exercise its right to take over the defense of the claims and litigate those claims in the tort system (even offering to do more than it is contractually required to do to minimize any impact on the Debtors' estates and creditors).

## C.    The Third *Rexene* Prong Is Inapplicable.

55.    The Debtors agree with J&J that the third *Rexene* factor—the movant's probability of success on the merits—is inapplicable here.   They nonetheless contend that this factor "highlights" the impropriety of J&J's proposal because of the "ill-fit between this factor and J&J's

---

and the general public the clandestine settlement dealings among the Debtors, their corporate parents (including Imerys S.A.), the plaintiffs, and the FCR."

28

motion." Debtors' Objection ¶ 47.  Not so.  Section 362(d)(1) allows for lifting of the automatic stay "for cause."  *See* 11 U.S.C. § 362(d)(1).  Here, there is ample cause for lifting the stay because J&J's offer would provide a tremendous benefit to the estate (removing 90% of its liabilities) and its major creditors (leaving them unimpaired and preserving their right to have a day in court), while avoiding potentially grave prejudice to J&J (eliminating its ability to defend those claims in the tort system).  The likelihood of success is inapplicable because allowing that proposal to move forward is enough to allow its success:  J&J and the tort claimants will each have their respective days in court.

56.     Bankruptcy courts have flexibility in deciding whether to grant relief from the stay. *See In re Mirant Corp.*, 440 F.3d 238, 253 (5th Cir. 2006).  The Third Circuit has held that courts should consider "the totality of the circumstances in each particular case" to determine whether cause exists for relief from the stay.  *Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997).  Moreover, cause may be established by a single factor such as a lack of any connection to or interference with a bankruptcy case.  *See In re Rexene Prods. Co.*, 141 B.R. 574, 576–77 (Bankr. D. Del. 1992) (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess., 343–44 (1977)).  The Debtors' rigid view of the type of relief the Court may grant under section 362(d) of the Bankruptcy Code is unsupported in the jurisprudence.  The Court's focus thus is appropriately on the substantial benefit J&J's offer provides to the estates and to the individual tort claimants, the ongoing harm to J&J, and balancing the equities of the requested relief.  Together, they provide ample cause to lift the stay.

### D.     The Talc Litigation Protocol Does Not Threaten the Integrity of the Automatic Stay.

57.     Contrary to the Debtors' assertions, the Talc Litigation Protocol does not conflict with the general principles underlying the automatic stay.  As the Debtors correctly note, "the

29

automatic stay was designed 'to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.'" *Borman v. Raymark Indus., Inc.*, 946 F.2d 1031, 1036 (3d Cir. 1991) (citing *Ass'n of St. Croix Condominium Owners v. St. Croix Hotel Corp.,* 682 F.2d at 446, 448 (3rd Cir. 1982)).

58.     As the Talc Litigation Protocol clearly does not undermine the first two principles, the Debtors' Objection focuses on the third principle—interference with the orderly rehabilitation of the debtor.  Debtors' Objection ¶ 49.  This is merely a repackaging of the Debtors' other arguments addressed above.  The Debtors have provided no evidence that they suddenly will be unable to operate in chapter 11 or reach an agreement with the TCC and FCR on the remaining claims if the J&J Talc Claims were to be removed from the estates.  The Protocol will help streamline these Chapter 11 Cases by allowing the Debtors to offload their largest liabilities.  In turn, the Debtors will have the opportunity to propose a much simpler, and confirmable, chapter 11 plan that provides the best possible result for the Debtors and their creditors.

59.     In addition to the *Rexene* factors, the Court should also determine the relief J&J is requesting by considering the broader policy goals of integrity in the bankruptcy process.

## II.    <u>Any Concerns Raised in the TCC Response are Either Unfounded or Adequately Addressed by the Talc Litigation Protocol.</u>

60.     The TCC's only argument against granting J&J's motion is that additional "safeguards" should be added to J&J's proposal.  TCC Response ¶ 7.  J&J agrees that Talc Claimants "should not be subject to prejudicial conditions and limitations," *id.*, but the Talc Litigation Protocol already addresses the TCC's concerns.  In fact, the TCC's suggested additional

30

"safeguards" would prejudice J&J and strip it of its rights, eliminating the benefits of lifting the automatic stay and assuming the defense.

61.    *First*, the TCC argues that J&J's reservation of defenses based on the Debtors' possible future breach renders the proposal "illusory."  TCC Response ¶¶ 6, 9–12.  That concern is unfounded.  J&J believes in the safety of its products and understandably does not want to face potential liability based on an inflated settlement entered into by one party (the Debtors) with little incentive to control the numbers and the other parties (the TCC and FCR) with every incentive to inflate them.  J&J is already defending its own products in the tort system in the litigation where it is a defendant and can defend the claims against Imerys in the same cases.  J&J made this Motion because it views the Talc Litigation Protocol as the best path forward for all parties, and if the Motion is granted, J&J intends to assume the defense of the J&J Talc Claims and would be bound by a court order to do so.

62.    But J&J cannot take on all of this liability and be in a worse position defending the claims than it would have been absent the Chapter 11 Cases.  When indemnifying and assuming the defense of these claims outside bankruptcy, J&J would be entitled to the Debtors' cooperation.  *See supra* ¶ 39.  J&J is merely asking for the same basic protections, so that the Debtors cannot take steps that would obstruct or impede J&J's ability to defend the J&J Talc Claims in the tort system.  For example, without a duty to cooperate, as a condition to getting to an agreement on a chapter 11 plan, plaintiffs' counsel could demand that the Debtors' personnel provide some sort of "admissions" that would be helpful to the plaintiffs' cases on the J&J Talc Claims, even though they are unnecessary to the Chapter 11 Cases and would be inconsistent with extensive testimony under oath from the Debtors' corporate witnesses that talc sold to J&J was safe and asbestos-free.

Although J&J wishes to believe this is not a possibility, it cannot give up its right to protect itself against any creative attempts to hurt J&J's defense of the J&J Talc Claims.

63.     A reservation of defenses is similarly consistent with the regular course of conduct in indemnity agreements, and J&J is not willing to waive the duty of good faith and fair dealing its indemnitee must satisfy.  That is a minimal request, particularly when J&J is going above and beyond its contractual obligations by waiving breaches that the Debtors have already committed and agreeing to indemnify for years in which it does not even arguably owe any indemnity. Similarly, for the reasons discussed above, there is nothing nefarious or onerous about J&J's cooperation requirement.  *See supra* ¶¶ 38–39.  J&J is simply reserving what the contracts and law already provide.

64.     Contrary to the TCC's assertion, J&J's proposal provides the J&J Talc Claims with everything to which they would be entitled to had these Chapter 11 Cases never been filed, except they get a more credit-worthy defendant.  The claimants will be able to litigate outside of bankruptcy, with the same legal rights as if the bankruptcy had never been filed (in lawsuits they already have ongoing against or will commence against J&J).  In fact, J&J took great care in designing the Talc Litigation Protocol to ensure minimal confusion or disruption to any claimant. If a claimant succeeds, she or he will be paid the full value of her or his claim.  Thus, J&J's proposal gives back to claimants what the Debtors' bankruptcies and proposed channeling injunction would take away from them:  each claimant's right to her or his day in court and potential for full recovery.

65.     The TCC's allegation that the claimants would be left without recourse if J&J decides that the Debtors breached their duty to cooperate is much overstated.  *See* TCC Response ¶ 11.  The duty to cooperate is limited and, so long as the Debtors act in good faith, a cooperation

issue is unlikely to ever arise.  What is most important about this issue is that the ability to satisfy the duty of cooperation lies in the Debtors' complete control.  If the Debtors (or the Trust as their successors) cooperate with J&J as indemnitor in J&J's defense of the J&J Talc Claims, as all indemnitees are required to do, there will be no issue of breach, and the TCC and the FCR will remain unaffected.

66.     Even if the Debtors breach, however, J&J still could not unilaterally refuse to indemnity; rather J&J agrees that the Bankruptcy Court would determine whether there has been a breach, and in turn provide approval before J&J could deny indemnification.  J&J is hopeful that the Debtors could and would easily cure any breach J&J identifies.  If the Debtors do so or if the Bankruptcy Court (or any court on appeal) finds that the Debtors adequately cooperated, then J&J will be obligated to pay and the claimant will be satisfied by J&J.  If, however, the Court determines by Final Order that the Debtor breached the covenant of good faith and fair dealing or through non-cooperation, J&J could then withdraw from the defense of the affected claims and will would be under no obligation to indemnify the Debtors.  The claimant can then seek recourse against the Reorganized Debtors or the Trust.  The concerns are also overblown because it is clear that by filing this Motion J&J does not want that result; it wants to defend the J&J Talc Claims in the same litigations in which it is already defending its products.  J&J's party-in-interest status in the Chapter 11 Cases being confirmed will minimize the likelihood of breach as J&J will have the right to be heard on issues that might impact its ability to defend the J&J Talc Claims.

67.     *Second*, the TCC argues that J&J's proposal creates "gaps" by not providing any treatment for (i) claims that allege first exposure to J&J products after December 31, 2019, (ii) claims that have already reached a final resolution, and (iii) claims for which non-Debtors in

the same corporate family as the Debtors are alleged to have liability.  TCC Response ¶¶ 14–18.  This argument reflects a misapprehension of the Talc Litigation Proposal and is without merit.

68.     Regarding the first of these points, J&J agrees to include those claims arising from plaintiffs' use of J&J products after December 31, 2019 in the Talc Litigation Protocol.  *See* Revised Proposed Order n.3 (definition of "J&J Talc Claims").  This eliminates the TCC's argument that the delineation of covered claims is "arbitrary" and would lead to complicated and costly coverage disputes.  J&J would defend *any* claim against Imerys based on exposure to J&J products.  J&J is already defending these claims against J&J, so claimants know exactly which claims are implicated.  And, for purposes of whether a claim implicates J&J's duty to defend, the Debtors will, under the Protocol, submit a list of J&J Talc Claims that have been stayed by application of the automatic stay.  Additionally, for purposes of assuming the defense of any given claim, J&J will look at the plaintiff's own complaint to see if it alleges exposure from a J&J product within the covered period.  If it does, J&J will assume the defense of that claim.

69.     Regarding J&J Talc Claims that have reached a final resolution (TCC Response ¶ 17), J&J merely intended to clarify in the definition of "J&J Talc Claims" that J&J is not obligated to indemnify the Debtors with respect to claimants whose settlements or judgments have already been paid in full or who have been finally determined not to have a valid claim against the Debtors.  With respect to claims that have reached final resolution but have yet been paid, the TCC has provided no proof of the existence of any such claims.  Indeed, J&J has requested such information from the Debtors in the past but has yet to receive any such information.  Thus, the TCC's speculation provides no support for its Response.  J&J reserves all the Debtors' rights to appeal unpaid verdicts.

WEIL:\97492140\24\54966.0222

70.     The TCC also contends that J&J's proposal creates gaps by not providing any treatment for claims against the Debtors' non-Debtor affiliates.  TCC Response ¶ 18.  But that concern is both exaggerated and irrelevant.  Very few claims have been brought against non-Debtor affiliates—approximately 130 out of the many thousands of total talc claims (according to J&J's records, although the Debtors would have the best record of this).  It is also beside the point because any impact on non-Debtor affiliates is irrelevant to deciding a motion to lift the stay. *Rexene* focuses on prejudice to the debtor.  *See supra* ¶ 42.

71.     *Third*, the TCC objects to the proposal that the Debtors and their officers must testify truthfully and consistently.  TCC Response ¶¶ 19–21.  In the Revised Proposed Order, J&J has removed the requirement that any testimony must be consistent with prior testimony.  What is left should not be controversial, because *all* testimony must be truthful.  *See* 18 U.S.C. § 1621; *Nix v. Whiteside*, 475 U.S. 157–59 (1986) ("Whatever the scope of a constitutional right to testify, it is elementary that such a right does not extend to testifying falsely, and the right to counsel includes no right to have a lawyer who will cooperate with planned perjury.").  J&J's only request is that the testimony offered by the Debtors or their officers in future litigation be truthful—the same demand the court makes each time a witness is sworn in.  Such a demand is a common provision in any cooperation agreement, plea deal, or settlement.

72.     *Fourth*, like the Debtors, the TCC argues that J&J's "reservation of rights" demands insurance proceeds of the Debtors' to which J&J has no rights.  TCC Response ¶¶ 22–25.  As explained above, J&J merely reserves any rights to insurance it may have as an indemnitor of the Debtors, but seeks no expansion of its rights pursuant to the Motion.  If the TCC is correct that J&J has no rights to the insurance, then this provision will be irrelevant.  Further, J&J only reserves

35

its rights to access the insurance that would otherwise be available for J&J Talc Claims.  As a result, J&J's reservation will not prejudice the estates.

73.     *Fifth*, the TCC asserts that any order must provide that no rights of the Debtors, the TCC, or the Talc Claimants are waived against J&J.  TCC Response ¶¶ 26–28.  The Talc Litigation Protocol does not seek any such waiver.  In fact, J&J is agreeing to take on liability beyond anything it could be contractually obligated to do.  J&J is seeking party-in-interest status for the limited purpose of avoiding any negative impact to its right to defend the J&J Talc Claims in the tort system.  The TCC and other parties in the case should *prefer* that J&J bring its issues before the Bankruptcy Court, given their purported concern that J&J would simply terminate the indemnity if the Debtors breach.  Moreover, the TCC and the FCR have no rights as against J&J— they are not a party to the indemnity agreements, and the agreements are clear that there are no third-party beneficiaries.  *See* 1989 SPA § 13.1; 1989 SA § 15(a).  Rather, the agreements are for the benefits of the parties thereto.  Thus, the TCC and the FCR are losing no rights under the Talc Litigation Protocol.

74.     The TCC's attempts to pull at heartstrings are inapposite.  J&J acknowledges that the individual plaintiffs have a terrible disease and are indeed suffering, but J&J firmly believes, and the science demonstrates, that J&J's products did not cause or contribute to those illnesses and instead are safe.  More importantly, J&J is offering each of those plaintiffs her or his own day in court to attempt to prove her/his allegations—against the Debtors and against J&J.  Because each holder of a current J&J Talc Claim is already suing J&J (and those in the future would similarly sue J&J), granting the Motion does not require any plaintiff to pursue a court case that she or he is not already pursuing.  There will be no "dumping" of thousands of cases into the court system.

The suits are already there.[35]  J&J, in agreeing to defend the claims, is not taking away anyone's claims or rights.  It is J&J's rights that are being denied under the status quo.

## III.    The FCR Joinder Fails for Similar Reasons as the TCC Response.

75.    The FCR joined the TCC's response and filed a limited objection to J&J's motion, argues that the Motion should be denied unless the modifications outlined in the TCC Response are adopted.  The FCR Joinder lack merit, largely for reasons discussed above.

76.    *First*, the FCR argues that J&J is improperly seeking to force the Debtors to waive certain rights to assert indemnification and to reserve rights to the Debtors' insurance policies unilaterally.  J&J is doing no such thing, as previously discussed.  *See supra* ¶ 72.  *Second*, the FCR argues that J&J does not offer evidence satisfying the *Rexene* factors.  As summarized in paragraphs 17–21 hereof, J&J has satisfied the *Rexene* factors.  *See supra* ¶¶ 17–21, 30–56.  *Third*, the FCR argues that J&J should be required to indemnify all claims and demands against the Debtors and their affiliates for all years.  As explained above, J&J has agreed to cover all years, but there is no basis to require J&J to cover non-J&J Talc Claims or the Debtors' affiliates.

77.    *Fourth*, the FCR argues that J&J should not be afforded "party-in-interest" standing in these chapter 11 cases.  Specifically, the FCR asserts that J&J points to no actual or imminent injury that would afford it standing in these cases.  That is incorrect.  As discussed above, J&J will need to ensure that its ability to defend the claims is not prejudiced, and J&J ability to police this issue more closely and raise issues early will actually mitigate the concern raised by the parties that J&J will somehow seek to cease defending the claims.

---

[35] The tort claims that J&J seeks to assume the defense of all have something in common:  they involve J&J products and already exist in the tort system as against J&J.  J&J is unaware of even a single plaintiff who asserts a J&J Talc Claim against the Debtors while not also naming J&J as a co-defendant.  Thus, irrespective of this Court's decision on J&J's Motion, there will be the same exact number of J&J Talc Claims in the tort system.

78.     *Finally*, the FCR argues that the Talc Litigation Protocol fails to provide treatment for several categories of talc claimants, most importantly those with claims alleging first exposure to J&J products using the Debtors' talc after December 31, 2019.  In this regard, as discussed herein, J&J will expand the dates in its proposal to cover all time periods of alleged exposure to J&J products.  *See supra* ¶ 68.

## IV.    Cyprus Cannot Enforce a Fictional Indemnity Obligation on J&J.

79.     The Cyprus Response seeks to expand the Talc Litigation Protocol, and requests that the automatic stay be deemed modified to the extent necessary, to cover certain claims against Cyprus.  Cyprus is not a Debtor and thus is not a party whose rights, defenses, and liability for claims are actually the subjects of, and at issue in, the Motion.  J&J does not, and need not, seek or obtain relief with respect to the direct liability of any non-Debtor party.

80.     Contrary to Cyprus's allegation, J&J does not owe any indemnification obligation to Cyprus.  As Cyprus admits in its response to J&J's Motion, Cyprus sold its Talc Business, including all liabilities, obligations, assets, and rights to Rio Tinto in 1992.  Cyprus Response ¶¶ 1, 11 ("In June 1992, Cyprus Mines transferred the assets relating to its talc business, except non-assignable contract rights and certain 'Excluded Assets' *not relevant here*, to a newly formed subsidiary, Cyprus Talc Corp. [as well as]…liabilities resulting from litigation claims."  Then it "sold the stock of Cyprus Talc to RTZ America, Inc., [("**RTZ**")] a Rio Tinto PLC affiliate.").  This includes the indemnities in both the 1989 SPA and the 1989 SA under which Cyprus asserts it has rights.

81.     Once the agreements were assigned to RTZ, Cyprus Mines and CAMC lost any rights they may have had, because Cyprus no longer owned the indemnity agreement under which it purports to claim indemnity.  When an assignment of a contract occurs, the assignor gives up all rights under the contract and the assignee steps into the assignor's shoes for purposes of benefitting

38

from that contract. *See* Restatement (Second) of Contracts § 317 ("An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee requires a right to such performance"); *see also In re Coughlin*, 48 B.R. 191, 194 (Bankr. E.D. Pa. 1985) (holding that the purpose of an assignment is to divest the assignor of a right under the original contract).

82.     Cyprus's course of conduct after the assignment proves as much.  In the 27 years between Cyprus's sale of its talc business to the Petition Date, Cyprus never tendered any talc claim for indemnification to J&J until shortly before it filed its response.  Cyprus Response ¶ 17 n.12.  Rather, it always tendered those claims to the Debtors.  *Id.* ¶¶ 18–19.

83.     Cyprus notes that J&J consented to Cyprus's transfer of its talc business to Rio Tinto, in a Consent, Assignment, and Assumption Agreement.  *Id.* ¶ 7.  But that consent hurts rather than helps Cyprus because J&J's consent to the 1992 Transfer created a novation of the 1989 agreement.  That is, it ended the old contract between J&J and Cyprus and began a new one between J&J and RTZ (now Imerys Talc America Inc.).  *See United Paperworks Int'l Union v. Boise Cascade Corp.*, 758 F. Supp. 954, 960 (D. Vt. 1991) ("To constitute a novation there must be a valid existing contract which is extinguished by mutual agreement between the original obligors and obligees and the new party"); *see also* 58 Am. Jur. 2d, Novation, § 19 (1971) (A novation "acts to extinguish any claims that existed under the original contract and . . . precludes the assertion of any right under the original contract.").[36]

---

[36] Notably, in the adversary proceeding between Debtors and Cyprus where the parties dispute ownership of Cyprus's Historical Insurance policies, the Debtors take a similar stance to J&J.  Debtors assert that they have exclusive right to the insurance policies because under the 1992 Agreement of Transfer and Assumption, the Debtors took over all liabilities and assets related to the talc business whether known or unknown, including the insurance policies.  *See Imerys Talc America, Inc., Imerys Talc Vermont, Inc., Imerys Talc Canada, Inc. v. Cyprus Amax Minerals Company and Cyprus Mines Corporation, Adv. Pro. No. 19-ap-50115*, Debtors' Complaint for Injunctive and Declaratory Relief, [D.I. 1], March 7, 2019, ¶ 29.

84.    Cyprus also claims J&J must indemnify the claims that Cyprus tenders to the Debtors.  Cyprus Response ¶ 6.  That is an argument that Cyprus must resolve with the Debtors, because it is Imerys, not J&J, that arguably owes Cyprus indemnification.  Cyprus has already filed proofs of claims against the Debtors.  *See e.g.,* Claims 184 (asserting claims for liabilities in connection to the talc operations sold to Debtors in 1992 on behalf of Cyprus Mines Corp.), 185 (same), 193 (same), 870 (same as to Cyprus Amax Minerals Co.), 885 (same), 886 (same).  Those claims will be resolved during the course of the Debtors' bankruptcy and are not affected by this Motion.

85.    Further, Cyprus's argument ignores the fact that the Debtors may object to many of its indemnification claims against the Debtors as disallowable under section 502(e)(1)(B) of the Bankruptcy Code as unliquidated contingent claims.[37]  If the Debtors have valid objections, J&J should not be required to indemnify the Debtors for such claims because the Debtors would never be liable for them.

86.    *Second*, the Talc Litigation Protocol needs no further clarification with respect to the J&J Talc Claims that J&J will be indemnifying the Debtors for.  As the Protocol provides, the Debtors will be providing J&J a list of the J&J Talc Claims that it believes have been stayed due to the automatic stay.  J&J will then determine coverage of claims by the allegations in the claimants' complaints.  J&J is willing to share this list with Cyprus.

87.    *Third*, Cyprus is wrong when it claims that J&J only has the contractual right to control the defense of the J&J Talc Claims that arise under the 1989 Stock Purchase Agreement. J&J has that right under both 1989 agreements because under Vermont law, documents that are

---

[37] *See* Claim Nos. 184, 185, 193, 870, 885, 886 (all asserting contingent indemnity, contribution, and subrogation claims for "amounts yet to be determined" arising out of current and future talc lawsuits).  It is unclear if Cyprus has any non-contingent, liquidated claims.  If it does, the liquidated amounts were not included in its proofs of claim.  *See id.*

WEIL:\97492140\24\54966.0222

executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction are to be construed and read together as one contract. *Besaw v. Giroux,* 2018 VT 138, *25 (2018) (holding that "where parties execute multiple instruments at the same time for the same purpose . . . we read them together to discern the parties' intent"); *Wing v. Cooper*, 37 Vt. 169, 178 (Vt. 1864) (holding that "when several instruments are executed at one and the same time, between the same parties, and upon the same subject matter, they are to be treated as one instrument and construed together…"); *see also Fultz & Son, Inc. v. Browning-Ferris Indus. of Ohio*, 2017 U.S. Dist. LEXIS 84055, at *3 (N.D. Ohio 2017) (holding that in part the attachment of one agreement as an exhibit to another required the contracts be read together); *In re MSCP Holdings, Inc.*, 316 B.R. 51, 55 (Bankr. D. Del. 2004) (holding that one contract being attached as an exhibit to the other was evidence that the two contracts were to be construed together).  Here, both 1989 Agreements were entered into on the same date, by the same parties, and related to the same subject matter.  *See* Motion, Exhibit B, Exhibit C.  The 1989 SPA attached the 1989 SA as an exhibit.  *See id.*  And a prerequisite of the 1989 SPA was that the 1989 SA be executed before the SPA became effective.  *See* Introduction of the 1989 SA, Motion, Exhibit B; SPA § 8.5, Motion, Exhibit C.  Therefore, J&J has the right to assume the defense and appoint counsel under both of the 1989 agreements.[38]

88.  *Finally*, Cyprus's request for its own relief on J&J's Motion is improper.  *See* Cyprus Response ¶¶ 34–39.  If Cyprus wants to move this Court to lift the stay so it can assert its indemnity claims against the Debtors, the bankruptcy rules require that it file a motion.  *See* FED. R. BANKR. P. 4001(a) ("A motion for relief from an automatic stay . . . shall be made in accordance

---

[38] The 2011 MPA expired on December 31, 2011.  Unlike the 1989 SPA and 1989 SA that contain language that the indemnity provisions survived the termination or expiration of those agreements, the 2011 MPA contained no such survival language.  Therefore, it is doubtful the Debtors even have any indemnity right under that agreement, and therefore issue of J&J's right to control the defense is moot.

with Rule 9014 . . ."); FED. R. BANKR. P. 9014(a) ("In a contested matter not otherwise governed by these rules, relief shall be requested by motion . . ."). Moreover, Cyprus's claim that it would be prejudiced by J&J's Motion being lifted is without merit. Cyprus has already protected its rights against the Debtors through the proofs of claim it has filed.

## CONCLUSION

89.     For the reasons stated herein and in the Motion, J&J asks this Court to enter the Revised Proposed Order, overrule the Responses, and grant relief from the stay under section 362(a) of the Bankruptcy Code to allow J&J to assume the defense of the J&J Talc Claims and indemnify the Debtors with respect to any costs and judgments in respect thereof, and grant such other and further relief as the Court deems just and proper.

Dated: May 28, 2020
        Wilmington, Delaware

                          */s/ Patrick A. Jackson*
                          FAEGRE DRINKER BIDDLE & REATH LLP
                          Patrick A. Jackson (Del. Bar No. 4976)
                          222 Delaware Ave., Suite 1410
                          Wilmington, Delaware 19801
                          Telephone: (302) 467-4210
                          Email: patrick.jackson@faegredrinker.com

                          -and-

                          WEIL, GOTSHAL & MANGES LLP
                          Diane P. Sullivan (admitted *pro hac vice*)
                          Gary T. Holtzer
                          Ronit J. Berkovich (admitted *pro hac vice*)
                          Theodore Tsekerides (admitted *pro hac vice*)
                          767 Fifth Avenue
                          New York, New York 10153
                          Telephone: (212) 310-8000
                          Facsimile: (212) 310-8007

                          *Attorneys for Johnson & Johnson and*
                          *Johnson & Johnson Consumer Inc.*

42