## Exhibit B

**Van Meter Deposition**

Page 1

```
 1
 2   IN THE UNITED STATES DISTRICT COURT
 3   FOR THE DISTRICT OF DELAWARE
 4   -----------------------------------x
 5   In re:
 6
 7   IMERYS TALC AMERICA, INC., et al.,
 8                        Debtors.
 9   Chapter 13
     Case No. 19-10289(LSS)
10
     -----------------------------------x
11
     IMERYS TALC AMERICA, INC., IMERYS TALC
12   VERMONT, INC., and IMERYS TALC CANADA,
     INC.,
13              Plaintiffs,
14   THE OFFICIAL COMMITTEE OF TORT CLAIMANTS
     and JAMES L. PATTON, JR., as Future
15   Claims Representative,
16              Plaintiff Intervenors,
17       -against-          Adv. Pro. No.
                            19-50115(LSS)
18   CYPRUS AMAX MINERALS COMPANY
     and CYPRUS MINES CORPORATION,
19
                         Defendants.
20
     -----------------------------------x
21
22       DEPOSITION OF RYAN J. VAN METER
                   May 1, 2020
23
24   Reported By:
     ERIC J. FINZ
25
```

Page 2

1

2                          May 1, 2020

                          2:04 p.m.

3

4         Remote Deposition of RYAN J. VAN

5    METER, taken pursuant to notice, before

6    ERIC J. FINZ, a Shorthand Reporter and

7    Notary Public within and for the State of

8    New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                     RYAN J. VAN METER

2                 E X H I B I T S

3    DESCRIPTION                              PAGE

4       (Imerys Exhibit 1 for              15

5       identification, declaration of

6       Ryan J. Van Meter.)

7       (Imerys Exhibit 2 for              24

8       identification, Debtors' motion

9       for an order further extending

10      the exclusive periods within

11      which to file a Chapter 11 plan

12      and solicit acceptances

13      thereof.)

14      (Imerys Exhibit 3 for              66

15      identification, Johnson &

16      Johnson's objection to debtors'

17      motion pursuant to 11 U.S.C.

18      Section 1121(d).)

19      (Imerys Exhibit 4 for              95

20      identification, Declaration of

21      Alexandra Picard.)

22

23

24

25

Page 4

1              RYAN  J.  VAN  METER

2           DIRECTIONS  NOT  TO  ANSWER

3                                    PAGE

4      (Direction  not  to  answer.)      21

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2    A P P E A R A N C E S: (All Via Video)
 3    WEIL GOTSHAL & MANGES LLP
      Attorneys for Johnson & Johnson
 4         767 Fifth Avenue
           New York, New York 10153
 5
      BY:   THEODORE E. TSEKERIDES, ESQ.
 6          theodore.tsekerides@weil.com
           JED P. WINER, ESQ.
 7          jed.winer@weil.com
           CASSIE LOVE, ESQ.
 8          cassie.love@weil.com
 9          -AND-
10    FAEGRE DRINKER BIDDLE & REATH LLP
           222 Delaware Avenue
11         Wilmington, Delaware 19801
12    BY:   PATRICK A. JACKSON, ESQ.
           patrick.jackson@faegredrinker.com
13
14
      WACHTELL LIPTON ROSEN & KATZ
15    Attorneys for Cyprus Amax Minerals
      Company
16         51 West 52nd Street
           New York, New York 10019
17
      BY:   JOSEPH C. CELENTINO, ESQ.
18          jccelentino@wlrk.com
19
20    VINSON & ELKINS LLP
      Attorneys for Cyprus Amax Minerals
21    Company and Cyprus Mines Corporation
           2001 Ross Avenue
22         Dallas, Texas 75201
23    BY:   KATIE DRELL GRISSEL, ESQ.
           kgrissel@velaw.com
24
25
```

Page 6

```
 1
 2   A P P E A R A N C E S: (Continued)
 3   ROBINSON & COLE LLP
     Attorneys for Official Committee of Tort
 4   Claimants
          280 Trumbull Street
 5        Hartford, Connecticut 06103
 6   BY:  MICHAEL R. ENRIGHT, ESQ.
          menright@rc.com
 7
 8
     LATHAM & WATKINS LLP
 9   Attorneys for Debtors and the Witness
          355 South Grand Avenue
10        Los Angeles, California 90071
11   BY:  AMY C. QUARTAROLO, ESQ.
          amy.quartarolo@lw.com
12
          -AND-
13
     RICHARDS LAYTON & FINGER
14        One Rodney Square
          920 North King Street
15        Wilmington, Delaware 19801
16   BY:  MARCOS A. RAMOS, ESQ.
          ramos@rlf.com
17
18
     CROWELL & MORING LLP
19   Attorneys for Zurich American Insurance
     Company
20        Three Embarcadero Center
          San Francisco, California 94111
21
     BY:  MARK D. PLEVIN, ESQ.
22        mplevin@crowell.com
23
24
25
```

```
 1
 2   A P P E A R A N C E S: (Continued)
 3   O'MELVENY & MYERS LLP
     Attorneys for Cyprus Historical Excess
 4   Insurers
          Times Square Tower
 5        7 Times Square
          New York, New York 10036
 6
     BY:  JANINE PANCHOK-BERRY, ESQ.
 7        jpanchok-berry@omm.com
 8
     WILLKIE FARR & GALLAGHER LLP
 9   Attorneys for Tort Claimant Committee
          787 Seventh Avenue
10        New York, New York 10019
11   BY:  JEFFREY B. KORN, ESQ.
          jkorn@willkie.com
12
13   U.S. DEPARTMENT OF JUSTICE
     OFFICE OF THE UNITED STATES TRUSTEE
14        1 Caleb Boggs Federal Building
          844 King Street
15        Lockbox 35
          Wilmington, Delaware 19801
16
     BY:  LINDA RICHENDERFER, ESQ.
17        linda.richenderfer@usdoj.gov
18
19   SQUIRE PATTON BOGGS (US) LLP
     Attorneys for American Insurance Company
20        2550 M Street, NW
          Washington, D.C. 20037
21
     BY:  ELLEN M. FARRELL, ESQ.
22        ellen.farrell@squirepb.com
23
24
25
```

Page 8

1

2    A P P E A R A N C E S: (Continued)

3    YOUNG CONAWAY STARGATT & TAYLOR LLP

     Attorneys for Future Claimants'

4    Representative

          1000 North King Street

5          Wilmington, Delaware 19801

6    BY:   SHARON M. ZIEG, ESQ.

          szieg@ycst.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 9

1                    RYAN J. VAN METER

2                    THE COURT REPORTER:  Does

3          counsel agree to have the witness

4          sworn in remotely?

5                    MR. TSEKERIDES:  Yes.

6                    MS. QUARTAROLO:  Yes.

7     RYAN J. VAN METER,

8     having been first duly sworn by the

9     Notary Public (Eric J. Finz), was

10    examined and testified as follows:

11                   EXAMINATION BY

12                   MR. TSEKERIDES:

13         Q.    Hi, Mr. Van Meter.  I'm Ted

14      Tsekerides from Weil Gotshal.

15                   MS. QUARTAROLO:  Ted, I

16         apologize for interrupting.  Before

17         you get started --

18                   MR. TSEKERIDES:  I just wanted

19         to say hi to him and then turn it

20         over to you.

21                   Ted Tsekerides from Weil

22         Gotshal on behalf of Johnson &

23         Johnson.  I'm going to take your

24         deposition today for a couple of

25         hours.  But I know your counsel

1              RYAN J. VAN METER

2         wanted to put a statement on the

3         record, so I'll let her do that

4         now.

5              MS. QUARTAROLO:  Yes.  Thank

6         you.

7              We were not notified that

8         other individuals and parties

9         intended to attend this deposition.

10        We object and we think that their

11        attendance is not appropriate under

12        the applicable local rules.  In the

13        interest of proceeding today and

14        getting this wrapped up, we will go

15        forward, but we object to the

16        participation of any other

17        attendees at the deposition who

18        might be on the line.

19             MR. TSEKERIDES:  Okay.  Thank

20        you.

21   BY MR. TSEKERIDES:

22        Q.   Mr. Van Meter, I know you've

23     been deposed before, but just some quick

24     ground rules especially since we're doing

25     this remotely.  We'll have to both very

1                RYAN J. VAN METER

2       work very hard to make sure we don't

3       speak over each other, so let me finish

4       my statement or my question and then I'll

5       let you finish your answer.  People might

6       object.  We all need to be even more

7       patient than normally in this situation.

8       Okay?

9            A.    Okay.

10           Q.    And if at any time for

11      whatever reason you don't understand my

12      question, I spoke too fast, whatever, let

13      me know, and I'll try to rephrase it for

14      you.  Otherwise I'm going to assume that

15      the answer you're giving you understood

16      the question to.  Okay?

17           A.    Sure.

18           Q.    Now, you're the general

19      counsel of Imerys in North America.  Is

20      that right?

21           A.    That's correct.

22           Q.    Is there a particular entity

23      that you're the general counsel of?

24           A.    I don't quite know what you

25      mean.  I'm general counsel for the

Page 12

1        RYAN J. VAN METER

2   business, the overall Imerys business as

3   it relates to North American matters.

4        Q.    Okay.  I saw -- the reason I

5   ask is I saw a chart in the First Day

6   declaration that referenced Imerys SA as

7   parent, then it had Imerys U.S.A., Imerys

8   Mineral Holding Limited U.S., Imerys

9   South America, Inc.  Is it one of those

10  or is it something different that sort of

11  sits above North America?

12       A.    So Imerys is made up of over

13  300 legal entities around the world.  To

14  the extent that any of them have

15  questions or need legal advice related to

16  North American matters, I, I and my team

17  are the people who are going to answer

18  those questions.

19       Q.    Okay, understood.

20             You understand that you're

21  here today to give testimony on behalf of

22  the Imerys debtors in connection with the

23  facts relating to the motion to extend

24  exclusivity.  Right?

25       A.    That's correct.

1                    RYAN J. VAN METER

2          Q.     And just very briefly, what

3     did you do to prepare to become

4     knowledgeable about those facts?

5          A.     I had some meetings with

6     counsel, and I reviewed some documents

7     that they provided.

8          Q.     Could you tell me what

9     documents those were?

10         A.     Sure.  I reviewed the

11    pleadings related to this particular

12    objection, and the motion.  I reviewed

13    correspondence between Imerys and Johnson

14    & Johnson.  I reviewed some fee

15    applications made by counsel or other

16    representatives of the parties in the

17    case.  And I reviewed the declaration

18    that was provided to you today, and that

19    forms the basis of my testimony.  I'm

20    trying to think if there is anything

21    else.  I reviewed portions of the

22    transcript of the hearing that

23    essentially established this deposition.

24         Q.     Other than your attorneys --

25    are you referring to Latham & Watkins

1                 RYAN J. VAN METER
2      when you said you met with attorneys?
3          A.    That is correct.
4          Q.    Were there attorneys for any
5      other party during your prep sessions?
6          A.    No.
7          Q.    Have you personally been
8      involved in the negotiations of a
9      proposed plan in this case?
10         A.    Yes.
11         Q.    How would you describe your
12     involvement?
13         A.    I'm attending a number --
14     attended all the in-person meetings
15     that -- not all.  I would say all the
16     plenary sessions of the discussions among
17     a number of the key participants.  And
18     I've been routinely kept apprised by
19     counsel on the progress of the
20     negotiations.  I provided the debtors'
21     perspective on, you know, what our
22     interests are and how we wanted to be
23     represented in those negotiations.  I'd
24     say that's probably a good summary.
25         Q.    Okay.  We're going to try

1                    RYAN J. VAN METER

2     something, I hope it works.  You

3     mentioned a declaration that was provided

4     earlier.  I appreciate that.  We're going

5     to try to mark that as Imerys 1.  So I

6     think you probably have a copy.

7     Hopefully our associates can get that up

8     on the screen.

9           A.    Ted, I need to apologize to

10    you.  In my effort to make sure I had no

11    distractions, I accidentally cancelled

12    out of the exhibit share platform.  Let

13    me go ahead and do this if you don't

14    mind.

15                MR. TSEKERIDES:  That's fine.

16          In the meantime we'll try to put it

17          up.

18                THE WITNESS:  Thank you.

19                (Imerys Exhibit 1 for

20          identification, declaration of Ryan

21          J. Van Meter.)

22                MS. QUARTAROLO:  Ted, just

23          apologies.  Are you actually doing

24          a screen share or are you

25          introducing it as a marked exhibit?

```
 1                 RYAN  J.  VAN  METER
 2          Because  I  don't  see  it  in  the
 3          marked  exhibit  folder.
 4                 MR.  TSEKERIDES:   It  should  --
 5          well,  I  was  going  to  have  it  as  a
 6          marked  exhibit.   But  I  don't  know
 7          if  that  --  so  I  think  first
 8          Cassie  --
 9                 MS.  LOVE:   I  am  also  marking
10          it  as  an  exhibit.
11                 THE  WITNESS:   I  do  see  it  on
12          the  screen,  by  the  way.
13                 MR.  TSEKERIDES:   Cassie  --  so
14          this  is  a  version  that  you  can  go
15          through,  right,  Cassie?   Can  you
16          just  scroll  down  so  Mr.  Van  Meter
17          can  see?   I  really  just  want  to  get
18          his  eyeballs  on  it  and  then  ask  him
19          a  foundational  question.
20   BY  MR.  TSEKERIDES:
21          Q.    Is  that  the  declaration  that
22      was  provided?
23          A.    There  is  limitations  of
24      technology  for  speed  reading  and  all  the
25      others  things,  yes,  that  appears  to  be
```

Page 17

```
 1                  RYAN J. VAN METER
 2      the declaration that was provided.
 3           Q.    And you're prepared to submit
 4      that to the court on the debtors' reply.
 5      Correct?
 6           A.    Again, you know, we'll submit
 7      the version that Amy sent you.  I'm of
 8      course not able to verify.
 9           Q.    I'll represent that this is
10      the version that Amy sent me.  I didn't
11      change anything.
12           A.    Of course.  It would be really
13      creative on your part if you had.
14           Q.    And to the best of your
15      knowledge, the information this there is
16      true and accurate?
17           A.    Yes.
18                 MR. TSEKERIDES:  You can take
19           that down for now, Cassie.  We may
20           come back to it, but I just wanted
21           to get it in.
22                 MS. LOVE:  It should be in
23           everybody's marked exhibits now.
24                 MR. TSEKERIDES:  There might
25           be a couple of documents, folks,
```

1                   RYAN J. VAN METER

2           that we're going to mark.  If there

3           are any issues, we'll get them to

4           you.  This is the first time we've

5           used this platform.

6           Q.    Mr. Van Meter, let me just get

7      right to some of the meatier issues.

8      Have the debtors reached an agreement

9      with anyone on a plan of reorganization

10     yet?

11          A.    No agreement's been reached.

12          Q.    And I should have mentioned,

13     from time to time this afternoon I may

14     use acronyms like TCC for the tort

15     claimants' committee or FCR for the

16     future claims rep.  You'll understand

17     what I'm talking to when I refer to those

18     acronyms.  Correct?

19          A.    I do.  And if you use any I

20     don't understand I'll let you know.

21          Q.    Appreciate it.

22                So no agreement reached yet

23     with the TCC.  Is that fair to say?

24          A.    That's correct.

25          Q.    And no agreement with the FCR?

Page 19

```
1                    RYAN J. VAN METER
2           A.      No.
3                   MS. QUARTAROLO:   Objection to
4           form.
5           A.      We've made substantial
6      progress towards both.
7           Q.      Just to maybe try to deal with
8      the objection.   There is no final term
9      sheet signed by the parties in connection
10     with a proposed plan of reorganization as
11     we sit here right now.   Correct?
12          A.      Nothing has been signed
13     between the parties.
14          Q.      Okay.  Have the debtors
15     reached any agreement with Imerys SA, the
16     parent, with respect to a plan of
17     reorganization?
18          A.      Again --
19                  MS. QUARTAROLO:   Objection;
20          form.
21          A.      We made substantial progress
22     towards that, but no agreement, final
23     agreement has been reached.
24          Q.      Okay.  Have the debtors shared
25     any proposed plan or term sheet with the
```

Page 20

1              RYAN J. VAN METER

2    U.S. Trustee's Office?

3         A.    Not to my knowledge.

4         Q.    Now, I notice that you did

5    reference in your declaration your

6    thoughts on a plan timing.  But let me

7    just ask you the question directly.  When

8    do the debtors expect to file a claim?

9         A.    Sometime within the next

10   month.

11        Q.    Just sometime in May or into

12   June?

13        A.    Well, this being May 1st, it

14   must be sometime in the next month.  So

15   presumably in the month of May.

16        Q.    Okay.  And how would you

17   describe the status of the negotiations

18   right now?

19        A.    I think we've made --

20              MS. QUARTAROLO:  Objection;

21        form.

22        A.    I think we've made substantial

23   progress towards achieving a consensual

24   plan of reorganization that would resolve

25   the historical alleged liabilities

```
 1                 RYAN J. VAN METER
 2      against the debtors and establish a
 3      channeling injunction along lines of what
 4      we've always sought.
 5           Q.    As we sit here right now, what
 6      are the open items left?
 7                (Direction not to answer.)
 8                MS. QUARTAROLO:  I'm going to
 9           object to that.  I don't think that
10           that's appropriate.  I think that
11           goes to substance, which is beyond
12           the scope of today's deposition.
13           And I will instruct the witness not
14           to answer.
15                MR. TSEKERIDES:  I think the
16           judge did -- I'll pull out the
17           transcript.  She did say if there
18           were any issues on impasse, I
19           remember her using those phrases.
20      BY MR. TSEKERIDES:
21           Q.    Are you going to follow your
22      counsel's direction on that?
23           A.    I am.
24           Q.    Are there any --
25                MS. QUARTAROLO:  To be clear.
```

Page 22

RYAN J. VAN METER

1

2          To be clear, counsel, I don't think

3          that that's what you asked.  I

4          think that your question as framed

5          is objectionable.  And I've

6          instructed the witness not to

7          answer.  If you want to ask a

8          different question, go ahead.

9          Q.    Mr. Van Meter, are there any

10   issues at which the parties have reached

11   an impasse?

12          A.    Not to my knowledge.

13          Q.    So why isn't a plan signed

14   yet?

15              MS. QUARTAROLO:  Objection;

16          form.

17          A.    So I guess --

18              MS. QUARTAROLO:  Objection;

19          calls for privileged information.

20          You can answer to the extent you're

21          not revealing anything privileged.

22          A.    My understanding of the word

23   "impasse" is that we, the parties agree

24   that nothing can be done on a particular

25   point.  We've attempted very hard to

1                    RYAN J. VAN METER

2     reach an agreement, we haven't done so.

3     If your formulation of that question, and

4     its subsequent question is true, that

5     would mean that if we hadn't signed a

6     term sheet on day one of the filing, we

7     would have to call that an impasse.  And

8     we have not done that.  That doesn't make

9     any sense to me.

10          Q.    I appreciate your comment.

11                Since your counsel won't tell

12     me what the open issues are.  Are there

13     open issues, yes or no?

14                MS. QUARTAROLO:  Objection;

15          form.

16          A.    The entire plan is open for

17     discussion.

18          Q.    Are there any particular

19     issues that are still open?

20                MS. QUARTAROLO:  Objection;

21          form.

22          Q.    What I mean by that, some are

23     resolved, some are open.  Is that fair?

24                MS. QUARTAROLO:  Objection;

25          form.

1                    RYAN J. VAN METER

2          A.    Certainly it's true that on

3     certain issues the parties have reached

4     an agreement, or -- not reached an

5     agreement, but have made more progress

6     than other issues.  But to characterize

7     which of those are would necessarily

8     cover substance.

9          Q.    You said all of the plan was

10    still open.  What did you mean by that?

11         A.    Meaning nothing has been -- no

12    final agreement has been reached.  A

13    matter that is as complex as this one,

14    pretty much all the elements depend on

15    each other.

16         Q.    Now, in the motion -- why

17    don't we go ahead and mark that motion as

18    Imerys 2.

19              (Imerys Exhibit 2 for

20         identification, Debtors' motion for

21         an order further extending the

22         exclusive periods within which to

23         file a Chapter 11 plan and solicit

24         acceptances thereof.)

25              MR. TSEKERIDES:  If you can

 1                    RYAN J. VAN METER
 2          pull that up, Cassie.
 3                I'm going to have my associate
 4          pull it up so you can see it,
 5          Mr. Van Meter.
 6                THE WITNESS:  Okay.
 7                MS. QUARTAROLO:  Counsel, I
 8          would prefer if we used the exhibit
 9          share, because the constraints that
10          we have is if it's just brought up
11          on the screen share is that we only
12          get see that portion that you have
13          on the screen, and we cannot
14          independently scroll through the
15          body of the document.
16                MR. TSEKERIDES:  She's also
17          going -- she's going to do the
18          other one.  You can feel free to go
19          through it once she's put it up
20          there.  I don't have to use the
21          exhibit share.  It's available to
22          you.  I get to use this if I want.
23          You have it.  I would agree if you
24          don't have any other access to it
25          than this, but you have access to

1                    RYAN J. VAN METER

2          it.  I mean, you should anywhere.

3                    THE WITNESS:  I've got it open

4          in the exhibit share platform.

5     BY MR. TSEKERIDES:

6          Q.    Why don't you turn to page 8.

7     And I'm going to direct your attention to

8     paragraph 14.  And the first sentence

9     there, "Since the third exclusivity

10    motion, the debtors have continued to

11    advance productive discussions and

12    negotiations with the TCC, the FCR, and

13    other key parties in these Chapter 11

14    cases."

15                    Do you see that?

16         A.    I do.

17         Q.    Can you identify for me who

18    the other key parties are that are

19    referenced in the debtors' motion?

20         A.    Sure.  Of course I did not

21    write this.  But I certainly was part of

22    the process of drafting it, and I can't

23    speak to all the other parties that my

24    counsel might have intended to reference.

25    But I can indicate that some of those

1               RYAN J. VAN METER

2    parties are the Cyprus group of

3    businesses, Rio Tinto, we've had

4    conversations with insurers.  And of

5    course we've had conversations with

6    Johnson & Johnson.

7        Q.    Can you be more specific on

8    the insurers, if you know which insurers?

9        A.    You want me to just give you

10   an encyclopaedic list?

11       Q.    If you can remember.

12       A.    I think we all know who the

13   insurers are in the case.  Of course it

14   would be the Zurich insurers on -- that

15   are related to the Rio Tinto business; it

16   would be the Cyprus insurers, of which

17   there are many, and many of you know who

18   those are.  So those are the ones I would

19   immediately characterize.

20       Q.    Okay.  So Cyprus, the entity,

21   not the insurers, Rio Tinto, and then the

22   list of insurers you just gave me, and

23   then my client.

24       A.    That sounds right.

25       Q.    Okay.

                     RYAN J. VAN METER
1
2          A.     And Zurich, right, did you say
3     Zurich?
4          Q.     Well, there I would include
5     them in the definition of insurers.
6     Correct?
7          A.     Fair enough.  Yes, of course.
8                 MR. TSEKERIDES:  You can take
9          that down, Cassie, so I can see him
10         again.
11         Q.     Who would you say, if anyone,
12    has taken the lead on behalf of the
13    debtors in negotiating the plan?
14         A.     Latham & Watkins.
15                MS. QUARTAROLO:  Objection;
16         form.
17         Q.     And how about -- and who from
18    the actual company?  Would it be you?
19         A.     I'd say -- I mean, I don't
20    necessarily know that there is a
21    particular me.  But to the person that's
22    been most involved, I'd say it's me.
23         Q.     And who from Latham?
24         A.     It's, you know, a very big
25    matter, so we've got a lot of people

Page 29

1                RYAN J. VAN METER

2    involved.  So it would be highly

3    dependent on what we were talking about.

4         Q.    Fair enough.

5               So depending on the issue

6    there might be a different lawyer

7    involved?

8         A.    That's right.

9         Q.    Okay.  Who for the FCR has

10   been involved in the negotiations?

11        A.    Young Conaway and Mr. Patton

12   himself.

13        Q.    And how about for the TCC?

14        A.    Both Willkie and Robinson Cole

15   primarily, but also the Gilbert firm.

16   And of course certain members of the TCC

17   themselves.

18        Q.    Is there anyone from -- let me

19   just withdraw that.

20              The parent of the debtors is

21   Imerys SA.  Correct?

22        A.    The ultimate parent, the

23   publicly traded company.

24        Q.    Okay.  Has anyone on behalf of

25   the parent -- and if I say "parent," can

Page 30

1                  RYAN J. VAN METER

2       we just agree that's Imerys SA?

3            A.    Sure.

4            Q.    Has anyone from the parent

5       been involved in the negotiations of the

6       plan?

7            A.    Yes.

8            Q.    Who has that been?

9            A.    Hughes Hubbard & Reed are

10      counsel.

11           Q.    Now, I did note that you

12      mentioned some dates in your declaration.

13      Do you have a copy of that with you there

14      or you don't have a copy?

15           A.    I do, right here.

16           Q.    Okay, great.

17                 If you could turn to paragraph

18      3 of that, you have some dates there.

19      Where you identify some in-person

20      negotiation, or I guess you call it

21      negotiating sessions.  Other than the

22      dates that are listed there, have there

23      been any other negotiation sessions as

24      relates to a plan?

25           A.    Yes.

Page 31

1              RYAN J. VAN METER

2              MS. QUARTAROLO:  Objection;

3         form.

4         Q.    Okay.  Because the last one

5    here is March 3rd.  Let me ask the

6    question.

7              Since March 3rd there have

8    been other meetings to discuss

9    negotiations of the plan.  Correct?

10             MS. QUARTAROLO:  Objection;

11        form.

12        A.    What do you mean by

13   "meetings"?

14        Q.    Okay.  Well, you wrote here,

15   "in-person negotiating sessions on the

16   following dates, April 16th," the dates

17   you have written here.  Let me break the

18   question down for you.

19             Since March 3rd, have there

20   been any other negotiating sessions

21   relating to the plan?

22        A.    Not to my knowledge.  You're

23   talking about among all these parties,

24   the debtors and certain nondebtor

25   affiliates?  I mean, of course this is,

1              RYAN J. VAN METER

2     start from the beginning.  Counsel and

3     other -- so counsel and other

4     representatives of the debtors and

5     certain nondebtor affiliates met with

6     counsel and other representatives of the

7     committee and/or the FCR.  And then to

8     pick up where Mr., or Ted, apologize,

9     Ted, I probably can't say your name, for

10    in-person negotiating sessions on the

11    following dates.

12             So I think all of that

13    together is really what -- what that's

14    intending to describe is those in-person

15    meetings.

16             So if you're asking have there

17    been any in person meetings that would

18    fit that bill since March 3rd, the answer

19    is no.

20        Q.    So that paragraph only talks

21    about the committee, and here that's

22    defined as the TCC or the FCR.  Were

23    there in-person negotiating sessions with

24    entities other than the TCC or the FCR?

25             MS. QUARTAROLO:  Objection;

1                RYAN J. VAN METER

2        form.

3        A.    Since when?

4        Q.    At any time.  They're not

5    referenced in this paragraph, right?

6    This just says committee or FCR.  I'm

7    asking about people other than the

8    committee.

9        A.    Well, elsewhere in this

10   declaration there is a section talking

11   about our conversations with Cyprus and

12   Rio Tinto.  So I would include those as

13   among those.  Is that what you're getting

14   at?

15       Q.    No, I'm asking you based on

16   what you wrote here in number 3.

17       A.    Then I'm sorry, I don't

18   understand.  Can you try again?

19       Q.    So other than the committee or

20   the FCR, did you have in-person

21   negotiations with anybody else?

22       A.    Yes.

23       Q.    Okay.  Because I didn't see

24   dates listed for these other entities.

25   Unless you're talking about your

                    RYAN J. VAN METER

1

2      mediation sessions.  Is that what you're

3      referring?

4           A.    That's what was in my head,

5      yes.

6           Q.    So the mediation sessions that

7      are referenced in here, you consider

8      those part of the plan negotiations?

9                 MS. QUARTAROLO:  Objection;

10          form.

11          A.    The words "plan negotiations"

12     doesn't appear in paragraph 3.

13          Q.    Well, when you say negotiating

14     sessions.  What are you referring to

15     there, sir?

16          A.    All the many interests that

17     are involved in trying to resolve the

18     Chapter 11 cases.

19          Q.    So other than negotiating the

20     terms of a plan, what else were you

21     negotiating?

22          A.    The other interests, like the

23     question of whether or not Cyprus or Rio

24     Tinto are going to make contributions,

25     whether or not the insurers are going to

                    RYAN J. VAN METER

 1

 2    make contributions --

 3                MS. QUARTAROLO:  Hold on.  I'm

 4          going to caution you not to reveal

 5          the substance of any discussions

 6          with any particular parties, to the

 7          extent that that's what the

 8          question is getting at.  You're

 9          certainly free to talk about who

10          was involved in what discussions or

11          when they happened.

12                MR. TSEKERIDES:  Just so we're

13          clear.

14          Q.    In paragraph number 3, you

15    wrote, I didn't write this, you wrote

16    this, "in-person negotiating sessions."

17          A.    Right.

18          Q.    We're talking about the TCC

19    and the FCR.  Right?

20          A.    That's right.

21          Q.    Okay.  Were those in-person

22    negotiating sessions all about

23    negotiating a plan of reorganization?

24                MS. QUARTAROLO:  Objection;

25          form.

1                    RYAN J. VAN METER

2          A.     These particular negotiation

3     sessions were attempting to resolve the

4     Chapter 11 cases through the negotiation

5     of a plan.

6          Q.    Okay.  Now, let's flip to

7     page, or paragraph 7 of your declaration.

8          A.    Okay.  And that's -- okay, got

9     it.

10         Q.    And the heading here is

11    "efforts to resolve issues with other

12    parties."

13               Do you see that?

14         A.    I do.

15         Q.    And in paragraph 7, there is a

16    reference to Zurich and also to Rio

17    Tinto.  Correct?

18         A.    Yes.

19         Q.    Okay.  And there is some

20    discussion, I don't want to know about

21    the substance, there is a discussion here

22    about a two-day mediation.

23               Do you see that?

24         A.    Two-day mediation?

25         Q.    Third line down.

Page 37

1                    RYAN J. VAN METER

2          A.     Yes.

3          Q.     Okay.  In your mind, I just

4     want your views on this, did you consider

5     that mediation a part of plan

6     negotiations?

7                 MS. QUARTAROLO:  Objection;

8          form.

9          A.     This may just be my ignorance

10    about bankruptcy law.  But from my

11    personal perspective, all the different

12    conversations we were having with all the

13    stakeholders, whether debtors, creditors,

14    whatever, are all aimed at the same

15    thing, which is exit from bankruptcy

16    subject to confirmable, consensual plan.

17    So I may not be the best person to ask

18    about where these lines are because I may

19    not see those lines.

20         Q.     Okay.  Is there a term sheet

21    between the debtors and any other party

22    in relation to resolving the Chapter 11

23    case as you just said?

24                MS. QUARTAROLO:  Objection;

25         form.

1              RYAN J. VAN METER
2         A.    Is there a term sheet?
3    Meaning like an agreement?  There are no
4    agreements.
5         Q.    Well, in paragraph 4, if you
6    can pull your declaration back up.
7         A.    Sure.
8         Q.    It says, "Between August 2019
9    and March 2020, the debtors, their
10   nondebtor affiliates, the committee and
11   the FCR exchanged more than ten draft
12   term sheets in furtherance of their
13   plan-related negotiations."
14              Do you see that?
15        A.    I do.
16        Q.    Okay.  So at least ten drafts
17   of a term sheet exist that relate to
18   furtherance of plan-related negotiations.
19   Right?
20        A.    That's right.
21        Q.    Okay.  In your mind, and I'm
22   not asking about the substance, those
23   term sheets are intended to lead to an
24   agreed upon plan.  Correct?
25        A.    Of course.

1                    RYAN J. VAN METER

2          Q.     Okay.   Other than the

3     committee and the FCR, have the debtors

4     exchanged any draft term sheets with

5     other parties?

6                MS. QUARTAROLO:   Are you

7          excluding Johnson & Johnson?

8                MR. TSEKERIDES:   No.   Anybody

9          else besides the FCR and the TCC.

10         A.     I mean, Johnson & Johnson was

11    certainly the one that would have jumped

12    to mind.   I'm trying to think about

13    whether or not I would characterize

14    anything else as a term sheet.

15                I don't -- yeah, I think it's

16    fair to say nothing else as formal as

17    what in my mind is a term sheet would

18    have been passed between those parties.

19         Q.     Fair enough.   Look, I only

20    want the best of your ability.

21         A.     Sure.

22         Q.     Now, this references between

23    August 2019 and March 2020.   Have there

24    been any -- I guess, had there been any

25    draft term sheets exchanged between the

1                    RYAN J. VAN METER

2      debtors, the committee and the FCR in

3      April?

4           A.    I don't believe so.  I don't

5      recall that that's the case.  I think the

6      first time we put pen to paper on a term

7      sheet was in August.  That was the

8      mindful date.

9           Q.    I'm asking you sort of at the

10     end now.  Since March, because this ends

11     in March, right, and we had a month of

12     April --

13          A.    I'm sorry, I thought you meant

14     April of 2019.

15          Q.    No, no, no.

16          A.    I'm glad you asked.

17          Q.    Since March of 2020, has there

18     been an exchange of a draft term sheet?

19          A.    Not that I recall.

20          Q.    When is the most recent draft

21     term sheet that you've seen?

22          A.    It was in March of 2020.

23          Q.    Sitting here today right now

24     there is no signed term sheet.  Correct?

25          A.    That's correct.

Page 41

1                    RYAN J. VAN METER

2          Q.    Sitting here right now would

3    you characterize the term sheet as final?

4                MS. QUARTAROLO:   Objection;

5        form.

6          A.    I guess the way I characterize

7    it is there was a point of negotiations,

8    and I say this in the declaration, in

9    March of 2020, where the exchange of term

10   sheets shifted away from term sheets and

11   instead started negotiating plan-related

12   documents.  And so I don't necessarily

13   know there was ever a moment where we

14   said we achieved a final term sheet,

15   instead we just sort of said we achieved

16   enough progress that makes sense for us

17   to start talking about plan documents.

18         Q.    I'm going to paraphrase back

19   to you and you tell me if this is

20   correct.  So even though a term sheet is

21   not signed, you felt you had made enough

22   progress on it to then start drafting the

23   actual plan documents themselves.  Fair?

24               MS. QUARTAROLO:   Objection;

25       form.

Page 42

1                 RYAN J. VAN METER
2           A.    That's close.
3           Q.    Okay.
4           A.    That's close.  I don't think I
5      would say exactly what you said.  Instead
6      I'd say that we, meaning the debtors,
7      have been working on potential plan
8      documents for quite some time.  And we
9      decided did made sense following a March
10     2020 meeting -- I'm sorry, yeah, the
11     March 2020 meeting, sorry, to then sort
12     of essentially put those documents
13     forward and start talking about those
14     instead of talking about a term sheet.
15          Q.    Okay.  So the debtors had been
16     working on plan-related documents
17     beforehand, but just hadn't shared them
18     with the TCC and the FCR.
19          A.    That's correct.
20          Q.    Okay.  And then at some point
21     at or around March 3rd of 2020, the
22     debtors felt they've gotten far enough on
23     the term sheet to then start sharing the
24     plan documents with the FCR and the TCC.
25          A.    That's correct.

1              RYAN J. VAN METER

2              MS. QUARTAROLO:  Objection;

3         form.

4         Q.    What's your involvement, if

5    you have any, on the actual plan-related

6    documents?

7         A.    I've reviewed documents and

8    I've commented on them.  And had meetings

9    about the progress up towards them.

10        Q.    So since March of 2020, have

11   there been any meetings either in person,

12   over the phone, with Zoom, whatever, any

13   conversations of any kind, communications

14   by email, between the debtors, the TCC

15   and the FCR on the plan documents?

16        A.    I have not participated --

17              MS. QUARTAROLO:  Objection;

18        form.

19        A.    I have not participated in

20   those.  And the substance or details of

21   those meetings or conversations are

22   between myself and my counsel.  But my

23   counsel have attended meetings with TCC

24   and the FCR along the lines you're

25   talking about.

Page 44

1                    RYAN J. VAN METER

2        Q.    Okay.  About the plan

3    documents?

4        A.    Yes.

5        Q.    Okay.  Do you know -- I know

6    you weren't there, but if you happen to

7    know from seeing an email or something,

8    who attended on behalf of the TCC and the

9    FCR, was it the same law firm entities

10   that you mentioned earlier, or were there

11   any different people that you can recall?

12       A.    Yeah, again --

13            MS. QUARTAROLO:  Objection,

14       hold on.  One second.

15            THE WITNESS:  Sorry, go ahead.

16            MS. QUARTAROLO:  Counsel, I

17       just want to object to form and

18       also caution the witness not to

19       reveal anything that is privileged

20       in nature.

21       A.    Yeah, where I was headed is

22   like obviously all the information I have

23   about those meetings I've gathered from

24   counsel.  So I don't know anything

25   specific.  But I certainly have not heard

1                    RYAN J. VAN METER

2          anything that would suggest that people

3          were involved.

4               Q.    The term sheets that are

5          referenced in the declaration at

6          paragraph 4, who are the parties to that

7          term sheet?

8                    MS. QUARTAROLO:   Objection;

9               form.

10              A.    Again, it's been a while since

11         I've looked at that term sheet so I can't

12         speak to what it says, you know, on every

13         one of the ten that we're talking about.

14         If you're asking the question about who

15         is participating in the conversation

16         around it, it was the same people we were

17         talking about before.

18              Q.    No, I'm asking a different

19         question.  Presumably the term sheet is

20         something that at the end of the day

21         would be signed by people.  Correct?

22                   MS. QUARTAROLO:   Objection;

23              form.

24              A.    I don't know whether that

25         would occur or not.

                    RYAN J. VAN METER

1

2       Q.    Is the parent a party to the

3    term sheet?

4       A.    Yeah, again, I don't quite

5    understand what you mean by "party to the

6    term sheet."  The way I've tried to

7    answer your question earlier, the people

8    who were participating in these meetings

9    were obviously, quote/unquote, parties to

10   the term sheet in the sense that they

11   were contributing to its drafting.  But I

12   don't quite know what you mean beyond

13   that.

14      Q.    Okay.  I'll break it down for

15   you.

16            Was the parent participating

17   in those meetings?

18      A.    Yes.

19      Q.    Is the parent --

20      A.    When you say "those meetings,"

21   you mean the ones that are described in

22   paragraph 3?

23      Q.    Correct.

24      A.    Yes.

25      Q.    Is the parent -- have you

```
 1                  RYAN J. VAN METER
 2      actually seen a copy of these draft term
 3      sheets?
 4           A.    Yes.
 5           Q.    Okay.  Is the parent
 6      referenced in those draft term sheets?
 7                 MS. QUARTAROLO:  And I'm just
 8           going to caution the witness not to
 9           reveal anything about the
10           substance.  You can reveal, you
11           know, party level information, but
12           nothing in terms of substance.
13           A.    Yeah, I guess when you say
14      referenced in the term sheets, like I
15      said, could you help me understand what
16      you mean by that?
17           Q.    Does their name appear
18      anywhere in the term sheet?
19           A.    Yes.
20           Q.    Okay.  As far as you know,
21      were the draft term sheets provided to
22      the parent?
23           A.    Yes.
24           Q.    Do you know if the Zurich or
25      Rio Tinto entities were provided a draft
```

1                    RYAN J. VAN METER

2      of the term sheet that's referenced in

3      paragraph 4?

4           A.    I have no reason to believe

5      that they have.

6           Q.    You have no reason to believe

7      that they have, is that what you said?

8           A.    Correct.

9           Q.    How about you mentioned an

10     entity called Cyprus.

11          A.    Yes.

12          Q.    Do you know if they were

13     provided a copy of the draft term sheet?

14          A.    Same answer, I have no reason

15     to believe that they have.

16          Q.    Okay.  Do the debtors have --

17     strike that.

18                Have the debtors exchanged

19     draft term sheets with Cyprus?

20          A.    Again, going back to our

21     conversation with Rio, as far as what you

22     mean by term sheet, no, I don't believe

23     there is anything that would be

24     classified as a term sheet between us and

25     Cyprus.

1                    RYAN J. VAN METER

2          Q.     How about Zurich?

3          A.     Same answer.

4          Q.     Okay.  Rio Tinto?

5          A.     Again, it's all about what you

6     mean by "term sheet," but nothing that

7     would be similar to the document No. 3.

8          Q.     That's not what I mean by

9     "term sheet," it's what you mean by "term

10    sheet."

11         A.     I'm trying to answer your

12    question.

13         Q.     I hear you.  We're going to

14    get there.

15                You use the word "term sheet"

16    in paragraph 4.  Right?

17         A.     Yes.

18         Q.     So using that as a frame of

19    reference.

20         A.     Sure.

21         Q.     I'm not talking about the

22    contents, but that type of document.

23    That's, when I say "term sheet," that's

24    what I mean, what you referred to here in

25    paragraph 4.

Page 50

1                    RYAN J. VAN METER

2          A.     Okay.

3          Q.     So do you have something like

4     that, like that term sheet, with Cyprus

5     or Rio Tinto or the insurers?

6          A.     When you say "you," you mean?

7          Q.     The debtors.

8          A.     The debtors.  I don't recall

9     that we've done anything that I would

10    characterize as a term sheet, no.

11         Q.     Are you aware if the parent

12    has done anything that you would

13    characterize as a term sheet with those

14    entities?

15         A.     Cyprus, Rio and Zurich?

16         Q.     Correct.

17         A.     No.

18         Q.     When was the most recent --

19    well, let me put in front of you, again,

20    your declaration.  And I mean that -- I'm

21    not going to put it in front of you, but

22    you have it there.

23               Paragraph 7 and paragraph 8

24    refer to mediations.  And again, I'm not

25    interested at all in the substance.  I

                    RYAN J. VAN METER

1      mean, I am, but I can't ask you that.

2                    There is some dates referenced

3      there.  Let's start with number 7.  It

4      says that the initial mediation session

5      took place on January 28 to 29, 2020.

6                    Do you see that?

7          A.    I do.

8          Q.    Have there been any mediation

9      sessions since then?

10                   MS. QUARTAROLO:  Objection;

11         form.

12         A.    I guess to some degree it

13     depends on what you mean by mediation

14     session.  My understanding, I have not

15     been party to these particular

16     conversations, that there's been ongoing

17     exchanges of information in furtherance

18     of that conversation.  But again, I've

19     not been party to that, so I can't speak

20     to how that took place.

21         Q.    And are you referring to when

22     you say here the parties have continued

23     to engage in discussions, is that what

24     you're referring to?

1                 RYAN J. VAN METER

2        A.    That's right.

3        Q.    Okay.  And that's fine.  I

4   mean, "mediation session" is words that

5   you used.  There hasn't been an actual

6   session with a mediator since January.

7             But the parties, to your

8   knowledge, are still having discussions?

9        A.    I honestly don't -- I honestly

10   don't know whether the mediator has

11   participated in any of those discussions.

12        Q.    Okay.  Do you know what the

13   status of those discussions are?  Again,

14   not the detail, just the status.

15             MS. QUARTAROLO:  Objection;

16        form.

17        A.    Can you --

18             MS. QUARTAROLO:  You can, just

19        for the record, you can answer to

20        the extent you're not revealing

21        anything of substance.

22        Q.    We're getting -- okay.

23        A.    Go ahead, Ted, you are

24   probably going to do what I was going to

25   ask you to do.

                    RYAN J. VAN METER
1
2          Q.     What I was getting at, are
3     people still talking, did they stop
4     talking, are there other meetings
5     planned?  That's what I'm getting at on
6     status.
7          A.     On status, I have no reason to
8     believe that those talks have reached an
9     impasse, to use your word.
10         Q.     But you're not involved
11    yourself?
12         A.     Personally, no.
13         Q.     And on number 8, there is a
14    reference to Cyprus Amax and Cyprus Mines
15    and a mediation session on March 3rd.
16              As far as you know, was that
17    the last mediation session?  And I'm
18    using that word as it appears here in
19    your declaration.
20         A.     I'm using the word "mediation
21    session" to describe a formal meeting
22    among the parties where a mediator is
23    sort of say acting as a broker among
24    those parties in an active sort of
25    dedicated day-long way.  Using that as

1                    RYAN J. VAN METER

2        the definition, I'm not aware of any

3        other mediations that have occurred since

4        that time.

5             Q.    Okay.  And as it relates to

6        discussions between the debtors and

7        Cyprus, the Cyprus entities, as far as

8        you know, are there still ongoing

9        discussions?

10            A.    Certainly the conversation has

11       not ended, yeah.

12            Q.    Okay.  Have there been -- you

13       know, I forgot to tell you, this, even

14       though it's a relatively short

15       deposition, if you do need a break for

16       any reason, grab a glass of water or

17       anything, please let me know.

18            A.    I appreciate it.

19            Q.    Have there been any meetings

20       of debtors' boards of directors where any

21       proposed plan of reorganization was

22       discussed?  Just yes or no on that.

23            A.    Have there been any meetings

24       of the board where a plan of

25       reorganization has been discussed?  I

1                    RYAN J. VAN METER

2       want to give you an accurate answer and

3       yes or no isn't going to cut that.

4            Q.    Okay.  Can you give me an

5       accurate answer without divulging

6       privileged information?

7            A.    Sure.

8            Q.    Okay.  Go ahead.

9            A.    The status of the negotiations

10      that were described in paragraph 3 and 4

11      has been the topic of ongoing discussion

12      with the members of the board.  And the

13      fact that we have transitioned away from

14      discussions around term sheets to

15      discussions around plan documents was a

16      topic of board meetings.

17           Q.    If you know -- do you attend

18      those board meetings?

19           A.    Not all, but usually.

20           Q.    Okay.  When was the most

21      recent meeting where a plan was

22      discussed?

23                 MS. QUARTAROLO:  Objection;

24           form.

25           A.    I'm not going to be able to

Page 56

                    RYAN J. VAN METER

1

2       give you that date.  But we're having

3       meetings roughly every two weeks.  And so

4       sometime within the last two weeks.

5            Q.    Okay.  And this next question

6       is really only if you know, I'm not

7       asking you to give me a legal opinion.

8       But do you know if the -- do the boards

9       have to approve a plan of reorganization?

10                 MS. QUARTAROLO:  Objection;

11           form.

12           A.    I don't know about the have

13      to.  But I believe the board is going to

14      expect to have the opportunity to review

15      and act upon any proposed plan of

16      reorganization.

17           Q.    Fair enough.

18                 And sitting here today, has

19      the board been presented with a final

20      plan to be voted on?

21                 MS. QUARTAROLO:  Objection;

22           form.

23           A.    No.

24           Q.    How would you describe the

25      parent's involvement in the negotiations?

1                RYAN J. VAN METER

2                MS. QUARTAROLO:  Objection;

3        form.

4        A.    Can you tell me how I can

5    answer that without being substantive?

6    What are you looking for?

7        Q.    Well, you can say they're

8    taking a back seat, they're running the

9    show.  I mean, how were they involved?

10       A.    I'd say they're just a partner

11   in those negotiations as any of the other

12   people.

13       Q.    Are they directing the

14   debtors' actions?

15       A.    Definitely not.

16                MS. QUARTAROLO:  Objection;

17       form.

18       Q.    Do the debtors need the

19   approval of the parent to move forward

20   with a proposed plan?

21                MS. QUARTAROLO:  Objection;

22       form.

23       A.    Can you repeat that?

24       Q.    Sure.

25                Do the debtors need the

```
 1                  RYAN J. VAN METER
 2      approval of the parent to move forward
 3      with a proposed plan?
 4           A.    I guess you're asking that
 5      question in the abstract, you know, do
 6      they need it to move forward with a
 7      proposed plan.  Certainly we can all
 8      imagine plans that could be conceived of
 9      that wouldn't involve necessarily the
10      parent's involvement.  As we've all said,
11      both the parent and the debtor in public
12      statements, we do want a consensual plan
13      that resolves these historic liabilities
14      involving all stakeholders; parent,
15      debtor, everybody.  So necessarily since
16      they're going to be a part of that likely
17      plan of reorganization, then yes, I would
18      think they would need to have independent
19      action to make sure that they can
20      participate to the degree that a plan
21      might require them to.
22                  But if you're asking if the
23      parent's -- the parent is going to tell
24      the debtor to do X, Y or Z plan, no,
25      they're independent actors.
```

1              RYAN J. VAN METER
2       Q.    Okay.  To your knowledge, and
3    this is only if you know, is the parent
4    having separate negotiations with the TCC
5    or FCR, separate from the debtors?
6             MS. QUARTAROLO:  Objection;
7       form.
8       A.    I -- I know that conversations
9    have occurred between the FCR and the TCC
10   and the parent, yes.
11      Q.    Or the debtor.  Sorry, go
12   ahead.
13      A.    Yeah, or the debtor, of
14   course.
15      Q.    No, where the debtor was not
16   present?
17      A.    Yes.
18      Q.    Okay.  So not from a lawyer
19   perspective, and what I mean by that is
20   not their lawyer firm, but do you know if
21   there is a person from the parent who's
22   been involved in the negotiations?
23      A.    Yes.
24      Q.    And who would that be?
25      A.    Denis Musson.  You want me to

1                    RYAN J. VAN METER
2      spell it?
3           Q.    It's not Tsekerides.
4           A.    Exactly.  D-e-n-i-s, like
5      Dennis.  M-u-s-s-o-n.
6           Q.    Musson, is that what you said?
7           A.    Denis Musson, um-hum.
8           Q.    And we touched on this a
9      little bit.  But we talked about J&J.
10     And I think you mentioned a term sheet.
11     I'm going to direct your attention to
12     something different.
13               You're aware of proposals that
14     J&J made to the debtors with respect to
15     indemnity back in November of 2019.
16     Right?
17          A.    I am.
18               MS. QUARTAROLO:  Objection;
19          form.
20          Q.    And did you review those when
21     they came in?
22          A.    I did.
23          Q.    And again, I'm not asking
24     about the substance.  Did the debtors
25     have discussions with the TCC or FCR

Page 61

RYAN J. VAN METER

1

2    about those proposals?

3         A.    I didn't.

4              MS. QUARTAROLO:  Objection;

5         form.

6         A.    I did not personally really

7    participate in any discussions about

8    that.  That I can immediately recall.

9    But I know counsel had conversations.

10        Q.    How about with the parent,

11   were those proposals discussed with the

12   parent and the debtor?

13        A.    Yes.

14        Q.    Okay.  Were you involved in

15   those discussions?

16        A.    Yes.

17        Q.    Did they take place around the

18   time of the proposals?

19             MS. QUARTAROLO:  Objection;

20        form.

21        A.    Meaning did we discuss the J&J

22   proposals around the time that the J&J

23   proposals were presented to us?

24        Q.    Perfect.  Exactly right.

25        A.    Yes.  Yes.

1              RYAN J. VAN METER

2       Q.    And you're familiar with the

3    content of the proposals, more or less?

4       A.    I am.

5       Q.    Okay.  Wouldn't those

6    proposals have a material impact on the

7    path of these Chapter 11 cases if an

8    agreement was reached with J&J?

9             MS. QUARTAROLO:  Objection;

10       form.  Calls for speculation.

11       A.    Yeah, when you say a material

12    impact on the course of, of what

13    negotiations?  I guess I'm

14    misunderstanding.

15       Q.    On the path of the case.  I'll

16    break it down for you.

17             So hypothetically, if you did

18    a deal with J&J as outlined in those

19    proposals where J&J would be indemnifying

20    the debtors for those talc claims, you

21    wouldn't, you the debtors, would not then

22    need to deal with those claims in your

23    bankruptcy.  Right?

24             MS. QUARTAROLO:  Objection;

25       misstates the documents.

```
 1                    RYAN J. VAN METER
 2          A.    I mean, I guess I would say
 3     that we would be dealing with those
 4     claims by making that deal.
 5          Q.    But once the deal would be
 6     struck, all you'd have to deal with in
 7     the Chapter 11 are the nonJ&J claims.
 8     Right?
 9               MS. QUARTAROLO:  Objection;
10          form.
11          A.    Again, that's so dependent --
12     first of all, there has been several
13     different proposals from J&J that deal
14     with these claims in different ways.
15          Q.    Okay.
16          A.    And the degree to which those
17     claims would resolve those liabilities
18     and historic, you know, in comprehensive
19     or not so comprehensive ways, you know,
20     is pretty variable.  Also, my
21     understanding of those proposals or at
22     least the more recent proposals is they
23     would impact the availability of
24     insurance and other potential sources of
25     recovery from a potential trust.  And
```

1                    RYAN J. VAN METER

2        therefore that would have a complicated

3        relationship with any remaining plan that

4        might be arrived at regarding the

5        remaining claims.

6                    So I think it certainly would

7        be a significant moment in the case, but

8        it would be a disruptive one.

9            Q.    Why would it be disruptive?

10           A.    Disruptive to a potential

11       resolution of a, you know, sort of a

12       comprehensive negotiation.  So in other

13       words, if you've been talking about

14       things down a particularly long way, and

15       something comes in to address a number of

16       those, that disrupts the flow of that

17       negotiation.

18           Q.    What if that disruptive thing

19       is better for the debtors, wouldn't that

20       be something worth pursuing?

21                 MS. QUARTAROLO:  Objection;

22           form.

23           A.    Again, we're all talking about

24       hypotheticals here.  But disruptive

25       doesn't necessarily mean good or bad,

1                    RYAN J. VAN METER

2       right, it just means disruptive.  I'm not

3       -- so that's not a value judgment, per

4       se, it's just a statement of how those

5       things happen.

6            Q.    Fair enough.  I was reacting

7       to your word "disruptive."

8            A.    I understand.

9            Q.    And I appreciate the

10      clarification.

11           A.    Um-hum.

12           Q.    Now, are you aware that in the

13      context of some of those discussions

14      between the counsel for J&J and counsel

15      for the debtors, that counsel for the

16      debtors had informed J&J's counsel that

17      they were precluded from having

18      discussions with J&J without someone from

19      the FCR or the TCC present?  Did you know

20      that?

21                 MS. QUARTAROLO:  Objection;

22           form.

23           A.    I read the documents that you

24      referenced in your original objection.

25           Q.    So you saw that email chain?

Page 66

1                    RYAN J. VAN METER

2          A.     I did.

3          Q.     Okay.  Why was that -- why did

4     the debtors enter into an agreement that

5     would not allow them to speak with J&J

6     without someone from the TCC or FCR

7     present?

8              MS. QUARTAROLO:  Objection;

9          misstates documents, misstates

10          prior testimony.

11         A.     Yeah, I would not characterize

12     it as that we entered into any agreement

13     with the FCC or -- FCR, excuse me, or TCC

14     along those lines.  Instead I'd say that

15     the people participating in the

16     negotiations around achieving a

17     consensual plan agreed that it would be

18     in the best interests of the negotiation

19     that a broader group of stakeholders

20     participate in these conversations.

21              (Imerys Exhibit 3 for

22          identification, Johnson & Johnson's

23          objection to debtors' motion

24          pursuant to 11 U.S.C. Section

25          1121(d).)

1              RYAN J. VAN METER

2              MR. TSEKERIDES:  Why don't we

3         pull up and mark as Exhibit 3, the

4         J&J objection.  And put it through

5         the exhibit --

6              THE WITNESS:  Doohickey.

7              MR. TSEKERIDES:  Yeah, share

8         file, whatever.  And it's going to

9         be -- so using -- there should be

10        an exhibit, so I think the document

11        number at the top, Mr. Van Meter.

12             THE WITNESS:  Got it.

13             MR. TSEKERIDES:  Go all the

14        way down to what will be the --

15        there you go.  It's the 42s.  And

16        go to 30 of 42.  Actually, if you

17        go to 31 of 42 is where the bottom

18        of the email starts.

19             THE WITNESS:  Exhibit G?

20             MR. TSEKERIDES:  That's a good

21        -- I don't have that printout.

22             THE WITNESS:  The previous

23        page, 29, says Exhibit G.  It's the

24        thing that says at the top, page 30

25        of 42.

1                  RYAN J. VAN METER

2                  MR. TSEKERIDES:  Right there.

3     BY MR. TSEKERIDES:

4          Q.    So the bottom email is from

5     Ronit Berkovich of my firm to a couple of

6     folks at Latham, looking to set up a

7     meeting.  And then the response from

8     Latham says, "hi Ronit and Gary.  We have

9     agreed with the FCR and the TC that we

10    would not have separate discussions with

11    you without their participation or

12    consent."

13                  Do you see that?

14         A.    I do.

15         Q.    Okay.  So why did they agree

16    with the FCR and TCC not to have separate

17    discussions without the presence of the

18    FCR or the TCC?

19                  MS. QUARTAROLO:  Objection;

20         asked and answered.

21         A.    I'm just going to go back to

22    what I said a minute ago, that we all

23    agreed that it's in the best interests of

24    the negotiations, and to the degree we've

25    gotten as far as we have, that it doesn't

1                   RYAN J. VAN METER

2     make much sense for parties who are

3     trying to reach an agreement to have

4     separate discussions with people and with

5     parties who separately might be viewed as

6     disruptive.

7          Q.    Well, what would be the harm

8     in having a discussion with just lawyers

9     from -- representing J&J?  How was it

10    disruptive to talk to somebody?

11              MS. QUARTAROLO:  Objection;

12         misstates testimony.  And I'll just

13         caution the witness not to answer

14         anything that would reveal

15         attorney-client privilege.

16         A.    Certainly I'm not going to

17    share, you know, my lawyer's views on

18    that.  I'm -- having been present for the

19    discussion among the parties, that --

20    where this topic came up, I feel like

21    that would be a substantive question as

22    well, about, you know, what the substance

23    of that concern was.

24         Q.    That's a little different.  I

25    mean, I'm not getting into what your plan

Page 70

1           RYAN J. VAN METER

2    says.

3         A.    Sure.

4         Q.    I'm getting into why the

5    debtor agreed that it would not have a

6    conversation with J&J's counsel without

7    the FCR or the TCC present.  That's what

8    I'm getting at.

9              MS. QUARTAROLO:  And same

10         objection.  To the extent the

11         witness can answer without

12         revealing attorney-client

13         communications or attorney-client

14         privileged information, you can do

15         so.

16         A.    I guess I'd say that the

17    decision made to pursue negotiations in

18    this particular way was informed by

19    counsel, and my counsel's advice to us as

20    to why this was the right path.  And it

21    would be impossible for me to reveal why

22    without that -- giving you that legal

23    advice.

24         Q.    Who made the decision?  Was

25    that you?

Page 71

1                    RYAN J. VAN METER

2            A.    Are the decision was made by

3       the debtor.

4            Q.    Okay.  Did you personally have

5       any input into that decision?

6            A.    I would say I was part of the

7       conversation, but I'm not going to go

8       into any greater detail because that

9       would reveal communications among myself

10      and my clients.

11           Q.    Okay.  Did the TCC ask the

12      debtor not to have these conversations

13      with J&J?

14                 MS. QUARTAROLO:  Objection.  I

15           think that gets into substance.

16           I'm not exactly sure what we're

17           getting at.

18                 MR. TSEKERIDES:  Well, it's

19           not a plan discussion.  This is

20           directly relevant to the

21           exclusivity.

22           Q.    Did they ask you -- you can

23      answer yes or no.  Did the TCC ask the

24      debtors not to have these discussions

25      with J&J without the TCC present?

1           RYAN J. VAN METER

2              MS. QUARTAROLO:  Objection to

3         form.

4              You can answer if you're not

5         revealing anything privileged.

6         A.    Certainly this discussion --

7    there was a discussion between the TCC,

8    the FCR and the -- and the debtor about

9    how these conversations might be had.

10   And that -- their perspective was we all

11   agreed that it would be a good idea not

12   have it.

13        Q.    Did the idea come from the TCC

14   and the FCR, or did it come from the

15   debtor?

16        A.    The idea to?

17        Q.    To not meet with J&J

18   separately.

19        A.    I would say it probably came

20   from the TCC and the FCR.

21        Q.    Do you know what the status

22   is -- well, let me ask this question:  Do

23   you know what a disclosure statement is?

24              MR. TSEKERIDES:  You can take

25         that document down so I can see

1                    RYAN J. VAN METER

2          him.

3          A.    I do.

4          Q.    And what is the status of the

5     disclosure statement?

6          A.    I would say it's in active

7     revision and drafting.

8          Q.    Okay.  Have the debtors

9     exchanged a draft of the disclosure

10    statement with any party?

11         A.    Yes.

12         Q.    With who?

13         A.    With the TCC and the FCR.

14         Q.    How about with the parent?

15         A.    Yes.

16               Well, let me think about that.

17         Q.    Sure.

18         A.    I honestly don't remember.

19         Q.    Okay.

20         A.    I think the answer is yes, but

21    I just honestly don't remember.

22         Q.    That's fair.

23               When was the most recent draft

24    exchanged?

25         A.    That I do not know.  I've been

1                   RYAN J. VAN METER

2      having, you know, so many different

3      documents going back and forth, it would

4      just be wrong to say.

5           Q.    In your mind, as far as --

6      when is the last -- strike that.

7                 When is the most recent draft

8      that you saw?

9           A.    I'm going to just flat out say

10     it's guessing.  I would say within the

11     last two weeks.  But probably further

12     out.  The furthest extent of those two

13     weeks, not within the last week.  If that

14     sort of makes sense.

15          Q.    Yes, I understand what you

16     mean.

17                When do the debtors anticipate

18     filing a motion for approval of a

19     disclosure statement?

20          A.    I refer you to what we said

21     with --

22          Q.    It's the same, within the

23     month?

24          A.    Within the month.

25          Q.    Have, if you know, have the

1              RYAN J. VAN METER
2      debtors drafted documents related to
3      solicitation of a plan?  Do you know what
4      that means?
5           A.    I think so.
6           Q.    Okay.
7           A.    Just the question around
8      getting votes for it.
9           Q.    Exactly.
10          A.    Yes.
11          Q.    Okay.  Do you remember when
12     the most recent documents you've seen
13     with respect to solicitation was?
14          A.    Again, I'd say about the same
15     time frame.
16          Q.    Same time frame, okay.
17                Is the -- I noted that you had
18     referenced a channelling injunction in
19     your declaration.  Is the valuation of
20     the current talc claims completed?
21          A.    Valuation?
22                MS. QUARTAROLO:  Objection.
23          Q.    Yes, valuation.
24                MS. QUARTAROLO:  I'm sorry,
25          objection; form.

Page 76

1                     RYAN J. VAN METER

2          Q.    Like the estimate of the talc

3     claims.

4          A.    I don't know what you mean by

5     "completed."  And --

6          Q.    So is there a number that has

7     been reached that ascribes a value to the

8     current talc claims?

9          A.    I've certainly seen no number

10    like that.

11         Q.    Okay.  How about for future

12    talc claims?

13         A.    Same answer, I'm not aware of

14    any number like that.  Certainly nothing

15    that would be considered final.

16         Q.    Okay.  Are you aware -- strike

17    that.

18               The FCR hired an entity called

19    Ancora.  Correct?

20         A.    Ancora, um-hum.

21         Q.    Ancora.

22               And do you know what they do?

23         A.    I think they're a financial

24    adviser in some way.

25         Q.    Okay.  Have you seen any

1                  RYAN J. VAN METER

2      materials from Ancora that analyzes the

3      amount of the current or future talc

4      claims?

5           A.    Certainly nothing memorable.

6      There was a meeting quite some time ago,

7      one of the meetings we're describing, I

8      think it was the one in -- let me go back

9      to my declaration here.  I want to say it

10     was the one in July, although that's just

11     off the top of my head, where Ancora

12     threw a couple of slides up on the wall.

13     But I wouldn't say anything in that

14     process was memorable or certainly would

15     be substantive if it was.  But no, I

16     certainly wouldn't say there is anything

17     like that.

18          Q.    Have you seen a draft of the

19     channelling injunction and its supporting

20     materials?

21               MS. QUARTAROLO:  Objection;

22          form.

23          A.    It may be that I wouldn't know

24     what I was looking at, honestly.  I

25     haven't seen anything that's called out

1                  RYAN J. VAN METER

2      as a draft channelling injunction.

3           Q.    Okay.  Have you seen anything

4      that might be called a trust distribution

5      procedure or a TDP, have you heard that

6      before?

7           A.    I know the term.  And no, I've

8      not seen that.

9           Q.    Okay.  So you know the term

10     but not necessarily from just this case.

11     Is that what you mean?

12          A.    Well, no, I mean -- I've

13     learned everything I needed to learn

14     about bankruptcy from this case.

15          Q.    Let me ask the question a

16     different way.

17                Have you seen a TDP in

18     connection with this case?

19          A.    I have not.

20          Q.    Do you know if one is being

21     prepared?

22                MS. QUARTAROLO:  Objection;

23          form.

24          A.    I do believe so, but I

25     honestly don't know.

1             RYAN J. VAN METER

2             (Reporter clarification.)

3        A.    I said I do believe so, but I

4    have not seen one.

5        Q.    Okay.  Do the debtors have an

6    expert that is analyzing the talc claims,

7    in terms of their number or valuation?

8             MS. QUARTAROLO:  Objection;

9        form.  You can answer to the extent

10        you don't reveal the substance.

11        A.    We engaged a third-party prior

12    to the petition date to evaluate those

13    issues.  We've engaged them through

14    counsel.  So the substance would be

15    privileged.

16        Q.    I'm not asking you the

17    substance.

18             Is that entity working on a

19    claims analysis in connection with the

20    plan?

21        A.    I don't know --

22             MS. QUARTAROLO:  I think

23        that's substantive.  Hold on.

24             THE WITNESS:  Sure.

25             MS. QUARTAROLO:  I'm going to

```
 1                    RYAN J. VAN METER
 2            object for the record.  I think
 3            that's substantive.  You can answer
 4            to the extent you can answer
 5            without revealing the substance of
 6            any discussions related to the plan
 7            or the terms or proposed terms of
 8            any plan.
 9            A.    It's going to be even simpler
10       than that.  I have not heard anything
11       like that.
12            Q.    Okay.  Well, in your
13       declaration you referenced, this is on
14       paragraph 12.  It says, "in connection
15       with the Chapter 11 cases, the debtors
16       have engaged the services of three law
17       firms, a claims analyst, a financial
18       adviser and an investment banker."
19                  Do you see that?
20            A.    I do.
21            Q.    Who is the claims analyst?
22            A.    It is KCIC.
23            Q.    And without giving me the
24       substance of their work, what is your
25       understanding that they're doing?
```

1                    RYAN J. VAN METER

2                    MS. QUARTAROLO:  I think that

3             reveals the substance of their

4             work.  You can answer, if you can

5             answer, without revealing the

6             substance.

7         A.    Yeah, again, I don't actually

8    know what they're doing right now anyway.

9         Q.    Okay.  Fair enough.

10                   Well, were they engaged before

11   or after the Chapter 11 case?

12        A.    Prior to.

13        Q.    Okay.  Are they being paid by

14   the debtor through estate assets in the

15   Chapter 11 case?

16        A.    They are.

17        Q.    Okay.  So, and I disagree that

18   it was a substantive request.  I'm just

19   asking, if you know what their -- what

20   are they supposed to be doing in

21   connection with this Chapter 11 case,

22   that they're being paid for?

23                   MS. QUARTAROLO:  Again, object

24            for the record.  You can answer to

25            the extent that you don't reveal

1               RYAN J. VAN METER

2          substance.  And also for the

3          record, the KCIC fee applications

4          have been submitted, you can see

5          what they've been doing.

6               MR. TSEKERIDES:  I'm asking

7          the witness, who is here to tell me

8          the facts.  If he knows them.

9          A.    Yeah, again, I can't speak to

10    what they're being asked to do at the

11    moment.  Historically they've been asked

12    to assist us with knowing the number, the

13    potential scope of, all that kind of

14    thing, related to the claims.  I mean,

15    it's been a pretty consistent ask.  I

16    don't know what they're doing right now.

17         Q.    Okay.  And in connection with

18    a plan of reorganization or the

19    channelling injunction documents, or any

20    documents relating to the plan, do you

21    know if the parties are in agreement with

22    respect to the potential scope of the

23    claims?

24               MS. QUARTAROLO:  I'm going to

25          object.  I think that does go to

1           RYAN J. VAN METER

2      the substance.  If you can answer

3      without revealing the substance, I

4      invite you to do so.  But you're

5      not to reveal the substance of any

6      plan negotiations or terms of a

7      plan or proposed plan.

8           MR. TSEKERIDES:  I'm not

9      asking for the terms.  I'm asking

10     if the parties are in agreement on

11     it.

12          MS. QUARTAROLO:  I understand.

13     Just for the record, I think that

14     while you're carefully crafting

15     your questions, I think that your

16     question necessarily calls for

17     revealing of substance.  And so

18     again, same objection, and the

19     witness can answer if he can do so.

20     A.    As I said at the outset, there

21  are no substantive agreements between the

22  parties anyway.

23     Q.    Okay.  On any issue yet?

24     A.    Nothing that would --

25          MS. QUARTAROLO:  Objection;

1                    RYAN J. VAN METER

2         form.

3         A.    Again, you know, substantive

4    agreements, there is nothing, there is no

5    final substantive agreement.

6         Q.    Okay.  When you say that, what

7    do you mean?  There is no substantive

8    final agreement, what does that mean to

9    you?

10        A.    Meaning that we're actively

11   discussing a number of documents, the

12   ones we've just gone through, on a

13   line-by-line basis.  And each one of

14   those -- none of those documents are in a

15   final form.

16        Q.    Okay, thank you.

17              And who is the financial

18   adviser that's referenced in paragraph

19   12?

20        A.    Oh, Alvarez & Marsal.

21        Q.    So I may have asked you this.

22   We talked a little about the TDPs.  Have

23   you seen a channelling injunction

24   document, or is this what you told me you

25   weren't sure if you were looking at

Page 85

1                    RYAN J. VAN METER
2      something was actually a channelling
3      injunction?
4           A.    That's correct.
5           Q.    Let me ask the question.
6                 Have you seen any document
7      that's a channelling injunction document?
8           A.    And like I said before, I
9      don't know if I would know it if I saw
10     it, but I don't recall that.
11          Q.    Okay.  And I know you just
12     told me that on the substantive points,
13     they're still open, but let me ask this
14     question anyway, maybe you'll give me the
15     same answer:  But do you know if the
16     parties have finalized any matrix for the
17     channelling injunction?
18          A.    I don't know what that means.
19                MS. QUARTAROLO:  Objection;
20          form.
21          Q.    You don't know what that
22     means?
23                MS. QUARTAROLO:  Objection;
24          misstates testimony.
25                MR. TSEKERIDES:  I don't think

1                  RYAN J. VAN METER

2          it misstated your testimony, I'm

3          just asking a question.

4          Q.    But you don't know what a

5     matrix is for a channelling injunction?

6     Which is fine, I don't mean it in a

7     negative way, I'm just asking if you know

8     that or not.

9          A.    It's Greek to me.

10         Q.    Don't say that, because I

11    understand Greek.

12              What is -- there is a

13    reference to an investment banker in 12.

14    Is that PJT?

15         A.    That's correct.

16         Q.    Are the debtors currently

17    marketing their assets for sale?

18              MS. QUARTAROLO:  Objection.  I

19         think that that's getting into

20         substance.  I think it's beyond the

21         scope of today's deposition.

22              MR. TSEKERIDES:  I completely

23         disagree.  PJT is referenced in the

24         exclusivity motion as one of the

25         reasons why the motion should be

1                    RYAN J. VAN METER

2           granted.  And it's in the

3           declaration.

4                MS. QUARTAROLO:  I agree.  If

5           you want to ask a question about

6           the declaration, you can do so.

7                MR. TSEKERIDES:  I'm not

8           limited to the declaration.  But I

9           think if you mention PJT in a

10          declaration I can ask you a

11          question about them.  I'm going to

12          just put it on the record and you

13          can direct him not to answer.

14   BY MR. TSEKERIDES:

15          Q.    Are the debtors currently

16      marketing their assets for sale?

17          A.    Can you describe for me --

18               MS. QUARTAROLO:  I'll object.

19          Hold on just a second.

20               THE WITNESS:  Sure.

21               MS. QUARTAROLO:  I'll object

22          for the record to the extent that I

23          think it's beyond the scope.  You

24          can answer to the extent you can

25          without revealing substance.

1                    RYAN J. VAN METER

2          A.    Ted, can you describe for me

3    what you mean by "marketing"?

4          Q.    Sure.

5                Let's turn to paragraph 10 of

6    your declaration.  And it says, this is

7    the second sentence, "The debtor sought

8    to retain PJT to, among other things,

9    evaluate a potential sale, merger or

10   other disposition of all or a portion of

11   the debtors or their assets."

12               Do you see that?

13         A.    I do.

14         Q.    And in connection with that

15   work that PJT was retained for, are the

16   debtors right now marketing the sale of

17   those -- of themselves or their assets?

18         A.    Yeah, you just --

19               MS. QUARTAROLO:  Same

20         objection.

21         A.    I really need you to unpack

22   that word for me, please.

23         Q.    Which word is that?

24         A.    "Marketing," what do you mean

25   by "marketing"?

Page 89

1              RYAN J. VAN METER

2        Q.      Is PJT right now out there

3    soliciting buyers?

4        A.      Not to my knowledge.  I mean,

5    we -- I mean, certainly if a buyer

6    contacted the debtor, that buyer would be

7    referred to PJT.  But there is no, to my

8    knowledge, any active marketing.

9    Certainly the debtors have not directed

10    PJT to initiate any kind of marketing or

11    sale process.

12        Q.      Okay.  So -- interesting.

13              So in paragraph 10, it says,

14    "Over the last several months, the

15    debtors have worked closely with PJT to

16    explore the possibility of such a

17    transaction in the Chapter 11 cases."

18              Do you see that?

19        A.      Yes.

20        Q.      Okay.  So what have the

21    debtors worked closely with PJT to

22    explore?  What does that sentence mean?

23    What have the debtors done?

24        A.      What have the debtors done?  I

25    mean, the debtors have real honest, what

1                 RYAN J. VAN METER

2       one of the possible elements of any plan,

3       not any particular plan, but any plan,

4       could involve the sale of some or all of

5       their assets.  In order to be prepared to

6       do that, in the event that becomes

7       necessary as part of a consensual plan,

8       we wanted to have PJT prepared to do so.

9       In order to know whether or not it's in

10      the debtors' interests to potentially

11      explore that option, we did this

12      exploration.

13           Q.    And is it safe to say at this

14      point all of that is internal to the

15      debtors and PJT?

16           A.    Internal as opposed to what?

17           Q.    As opposed to -- well, you

18      would appreciate if you're trying to sell

19      something you have to let people know

20      it's for sale.  Right?

21           A.    Sure, yes.

22           Q.    Would you agree with that?

23           A.    Yes.

24           Q.    Is PJT out there letting

25      potential buyers know that any part of

1                    RYAN J. VAN METER

2      the debtors or their assets are for sale?

3           A.    If they're doing that it's not

4      because we told them to.

5           Q.    Okay.  So what in your mind is

6      PJT supposed to be doing right now as it

7      relates to the debtors and their assets?

8           A.    I would say, again, the

9      relationship between debtors and PJT is

10     essentially call it a holding pattern

11     relationship.  That there is a

12     possibility that that will take place.

13                And prior to -- you know,

14     prior to engaging PJT, the debtors would

15     occasionally receive unsolicited calls

16     from third parties saying hey, are you

17     guys thinking about this.  It got to a

18     point that we realized that was

19     distracting the business, it was

20     important for us to essentially have a

21     place for those places, things to go.

22     And that for them to help us explore that

23     possibility if it was ever to become

24     necessary.

25           Q.    Okay.  So right now you don't

1                    RYAN J. VAN METER
2    need PJT to sell or help you sell any
3    part of the debtors' assets in order to
4    have a plan of reorganization.  Is that
5    fair?
6              MS. QUARTAROLO:  Objection.
7         Objection; form.
8         Q.    Is that right?
9              MS. QUARTAROLO:  Objection;
10        form.
11             You can answer to the extent
12        you don't reveal the substance of
13        anything.
14        A.    Ted, I'm sorry, your question
15   was a little convoluted for me.
16        Q.    I'm trying not to upset Amy.
17        A.    That's a good plan.
18        Q.    Do you need -- do the debtors
19   need PJT to sell any part of the debtors'
20   assets in order to have a confirmable
21   plan of reorganization?
22             MS. QUARTAROLO:  Same
23        objection.
24        A.    I mean, the word "need" there
25   suggests that we have made some kind of a

1                    RYAN J. VAN METER

2      decision that the only way we'll ever

3      reach a consensual plan is to sell the

4      business.  And that is not a decision

5      that the debtors have made.

6           Q.    Okay.  Yeah, I'm trying to get

7      at that.

8                    Because the judge did say to

9      find out sort of status.  And if you

10     needed to sell something in order to have

11     a plan go forward, that would be

12     important to know because if there has

13     been no sale process, then you're not

14     going to do it, you're not going to meet

15     your goal.

16                    But, if -- and let me ask the

17     question.  So the -- as we sit here

18     today, to your knowledge, there is no

19     requirement that the debtors sell any

20     part of their assets in order to have a

21     plan be filed within the next 30 days,

22     like you said, or the next month?

23                    MS. QUARTAROLO:  Objection;

24          form.  You can answer to the extent

25          you don't reveal the substance of

1                    RYAN J. VAN METER

2          any plan negotiations or any plan

3          of reorganization or proposed plan.

4          A.     When you say there is no

5     requirement, no one is requiring anything

6     like that.

7          Q.     Okay.  That's what I'm asking.

8     Thank you.

9                 Have you read Ms. Picard's

10    First Day declaration?

11         A.     Quite some time ago.

12         Q.     Okay.  And to the best of your

13    knowledge, and I appreciate there is a

14    lot in there, as far as you know was

15    there anything in there that was not

16    accurate?

17         A.     I'm certainly not presently

18    aware of anything that's not accurate.

19         Q.     Okay.  Now, the debtors hired

20    Latham in June of 2018.  Correct?

21         A.     That sounds right.

22         Q.     Okay.  When did the debtors

23    first reach out to Mr. Patton to discuss

24    him serving as the FCR?

25         A.     Good question.  I want to say

Page 95

1                    RYAN J. VAN METER
2      that was in October of 2018.
3           Q.    Sometime in the fall of 2018?
4           A.    Yes, definitely in the fall of
5      2018.
6           Q.    Okay.  And the debtors
7      provided him and his advisors with access
8      to diligence material back then.  Right?
9           A.    Yes.
10                MR. TSEKERIDES:  And if it
11           helps you, why don't we go ahead
12           and mark as Imerys 4, the First Day
13           declaration.  Cassie, go ahead and
14           load that on the exhibit platform
15           for everyone.
16                MS. LOVE:  It's marked.
17                (Imerys Exhibit 4 for
18           identification, Declaration of
19           Alexandra Picard.)
20      BY MR. TSEKERIDES:
21           Q.    And we're going to go to page
22      21.
23           A.    Okay.
24           Q.    Which will be paragraph 47.
25           A.    Um-hum.

Page 96

1                    RYAN J. VAN METER
2          Q.    So it's September 25, 2018, it
3     says that the debtors entered into an
4     engagement letter with Mr. Patton.
5                Do you see that?
6          A.    I do.
7          Q.    Again, at the bottom of 21 it
8     says, "together with his advisors, the
9     proposed FCR initiated an extensive
10    diligence process into the debtors'
11    businesses and the pending talc
12    litigation, subject to a confidentiality
13    agreement."
14               Do you see that?
15         A.    I do.
16         Q.    And that's right as far as you
17    know.  Correct?
18         A.    Correct.
19         Q.    Okay.  And then it goes on to
20    say, "the debtors have worked
21    constructively with the proposed FCR and
22    his advisors throughout this process by
23    providing access to a fulsome data room
24    and responses to numerous information
25    requests, as well as by attending

1                    RYAN J. VAN METER

2    multiple in-person diligence meetings,

3    among other things."

4              Do you see that?

5         A.    I do.

6         Q.    And as far as you know that's

7    correct as well?

8         A.    Yes.

9         Q.    So this access to the fulsome

10   data room and responses, that took place

11   back in 2018.  Right?

12        A.    You know, from the time of

13   2018 through the period of the filing.

14        Q.    When did the debtors first

15   begin negotiations with any plaintiff's

16   firms?

17        A.    Not until after the filing.

18        Q.    Okay.

19        A.    And by negotiations with any

20   plaintiff's firms, you mean --

21        Q.    About a plan.

22        A.    You don't mean about

23   individual lawsuits?

24        Q.    Right.

25        A.    Right.

1                RYAN J. VAN METER
2        Q.     About a plan.
3               So your answer was meant to be
4    about a plan.  Right?
5        A.     Correct.  No -- there was no
6    engagement between us and any plaintiff's
7    firms prior to the petition.
8        Q.     Okay.  When did the debtors
9    begin negotiations with the TCC regarding
10   a potential plan?
11              MS. QUARTAROLO:  Objection;
12        asked and answered.
13       A.     I mean, certainly once we --
14   once the TCC was formed and counsel was
15   appointed and we had a point of contact,
16   we reached out to them quite soon
17   thereafter.
18       Q.     So if you pull up --
19              MR. TSEKERIDES:  You can take
20        that down, Cassie, so I can see his
21        face again.
22       Q.     Your declaration, the first
23   date listed in paragraph 3 of your
24   declaration is April 16, 2019.
25       A.     Um-hum.  That's right, sorry.

1              RYAN J. VAN METER

2      Q.     That's okay.

3             That's for the first in-person

4      session.  Do you know, sitting here, if

5      there were over-the-phone sessions prior

6      to April 16th or do you feel that the

7      April 16th date is roughly when there was

8      first contact between the debtors and the

9      committee?

10            MS. QUARTAROLO:  Objection;

11        form.

12      A.     I have every reason to believe

13     that counsel for the debtors, the TCC and

14     the FCR, were having phone conversations

15     before that meeting.  But that meeting

16     constituted something like a kickoff.

17      Q.     Would you agree with the

18     characterization of this case as being a

19     small case that should be resolved

20     quickly?

21            MS. QUARTAROLO:  Objection;

22        form.

23      A.     Of course I have no frame of

24     reference.  But everything I've heard

25     from all the professionals involved is it

Page 100

1                   RYAN J. VAN METER

2       is an extremely complex case that

3       deserves a lot of time to cover all the

4       issues.

5             Q.    Do you know who an individual

6       named Jeffrey Bjork is?

7             A.    I do.

8             Q.    Would it surprise you to know

9       that over a year ago, Mr. Bjork

10      represented to the court that this is a

11      small case and that the debtors had to

12      move quickly to get to a plan?  Would

13      that surprise you?

14            A.    No.  Because I think everybody

15      had an interest from the very beginning

16      in trying to act fast.  We wanted to get

17      in, resolve these issues as soon as we

18      could, and get out.  I think everybody on

19      the debtors' side would have wished we

20      could have resolved this many months ago.

21                  But a number of things have

22      occurred in the course of the plan.

23      Excuse me, in the course of the case,

24      that have complicated things.  Things

25      that some of you might anticipate, some

                    RYAN J. VAN METER

1

2     you say might not have.  And we've worked

3     as expeditiously as possible in light of

4     those points.

5          Q.    The case was filed in?

6          A.    February of 2018.

7          Q.    So why has it taken between

8     February and now to get to the point

9     where you need even another month to file

10    a plan?

11              MS. QUARTAROLO:  Objection;

12        form.

13         A.    I think our filing is to this

14    point have done a pretty good job of

15    explaining that.  But high level.

16         Q.    Please.

17         A.    First of all, the tort

18    claimants' committee involves a larger

19    group of stakeholders than is ordinarily

20    the case, as I understand it from talking

21    to those who are around this case.  It

22    involves two different groups of

23    claimants, with two different kinds of

24    claims.  Some of which are more common in

25    a 524(g) context, some of which are not.

1               RYAN J. VAN METER

2                    We have an adversary

3       proceeding with Cyprus around the

4       question of whether or not we have access

5       to the insurance, which has complicated

6       things and distracted the parties and

7       their ability to focus on the

8       negotiations.

9                    And the complexity of a

10      company making a product today that it

11      does not believe contains the

12      contaminants or the alleged hazards that

13      the claimants say it does, and the intent

14      for that company to emerge from Chapter

15      11 making the same products has always

16      introduced a certain level of complexity

17      compared to some other cases like it,

18      where a company, say, resolving historic

19      asbestos liability from the '70s could

20      easily walk away not worried about

21      whether or not they were going to

22      continue to face those issues going

23      forward.  Those are just a few of the

24      complexities.

25                    MR. TSEKERIDES:  Why don't we

1                    RYAN J. VAN METER
2           do this.  I know I still have a
3           little time, but let me -- I'm
4           through with my prepared remarks.
5           No, I think I'm done, but I want to
6           go over my notes.
7                 THE WITNESS:  Actually it will
8           give me an opportunity to he to
9           take a bathroom break.
10                MR. TSEKERIDES:  What we'll
11          do, because it's harder for us to
12          all go back to a conference room,
13          according to my computer it's 3:25.
14          Why don't we go back on at 3:35, so
15          in ten minutes.  And I just remind
16          everybody if your mics are on you
17          should turn them off and turn your
18          video off.  We'll be back in ten
19          minutes.  Thank you.
20                THE WITNESS:  Thank you.
21                (A recess was taken.)
22                MR. TSEKERIDES:  We're back on
23          the record.
24    BY MR. TSEKERIDES:
25          Q.    You know you're still under

Page 104

1                    RYAN J. VAN METER

2      oath.  Just a last question for you,

3      Mr. Van Meter.

4                You had mentioned a meeting

5      that Ancora attended, and I think you

6      said they put some slides on the wall

7      relating to some claims analysis in July

8      of 2019.  Since then, have you seen any

9      presentations from Ancora where they

10     analyzed the talc claims?

11         A.    Not to my knowledge.

12             MR. TSEKERIDES:  All right.  I

13         thank you very much.  I appreciate

14         the circumstances are not ideal,

15         but I appreciate you making

16         yourself available for the

17         deposition.

18             I don't have any further

19         questions for the witness.  And

20         thank you again for providing the

21         declaration earlier, that helped a

22         lot.

23             THE WITNESS:  Good.  Thank

24         you, Ted.

25             MR. TSEKERIDES:  Thank you.

1                        RYAN  J.  VAN  METER

2            Bye-bye.   Off  the  record.

3                  (Time  noted:   3:37  p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 106

1                    RYAN J. VAN METER

2   STATE OF _____    )

3                            ss:

4   COUNTY OF _____     )

5

6        I, RYAN J. VAN METER, the witness

7   herein, having read the foregoing

8   testimony of the pages of this

9   deposition, do hereby certify it to be a

10  true and correct transcript, subject to

11  the corrections, if any, shown on the

12  attached page.

13

14

15

16        RYAN J. VAN METER

17

18  Subscribed and sworn to before me

19

20  This _____ day of _____, 2020.

21

22

23

24  _____

25           Notary Public

Page 107

1              RYAN J. VAN METER

2            C E R T I F I C A T E

3    STATE OF NEW YORK    )

                         : ss.

4    COUNTY OF NEW YORK    )

5

6        I, ERIC J. FINZ, a Shorthand

7    Reporter and Notary Public within and for

8    the State of New York, do hereby certify:

9        That RYAN J. VAN METER, the witness

10   whose deposition is hereinbefore set

11   forth, was duly sworn by me and that such

12   deposition is a true record of the

13   testimony given by the witness.

14       I further certify that I am not

15   related to any of the parties to this

16   action by blood or marriage, and that I

17   am in no way interested in the outcome of

18   this matter.

19       IN WITNESS WHEREOF, I have hereunto

20   set my hand this 4th day of May, 2020.

21

22

23

24              ERIC J. FINZ

25

1                   RYAN J. VAN METER

2            INSTRUCTIONS TO WITNESS

3

4                   Please read your deposition

5    over carefully and make any necessary

6    corrections.  You should state the reason

7    in the appropriate space on the errata

8    sheet for any corrections that are made.

9                   After doing so, please sign

10   the errata and date it.

11                  You are signing same subject

12   to the changes you have noted on the

13   errata sheet, which will be attached to

14   your deposition.

15                  It is imperative that you

16   return the original errata sheet to the

17   deposing attorney within thirty (30) days

18   of receipt of the deposition transcript

19   by you.  If you fail to do so, the

20   deposition transcript may be deemed to be

21   accurate and may be used in court.

22

23

24

25

```
 1                RYAN  J.  VAN  METER
 2            ERRATA
 3   I  wish  to  make  the  following  changes  for
 4   the  following  reasons:
 5   PAGE  LINE
 6   ____  ____   CHANGE  _____
              REASON:_____
 7
          ____  ____   CHANGE  _____
 8              REASON:_____
 9   ____  ____   CHANGE  _____
              REASON:_____
10
          ____  ____   CHANGE  _____
11              REASON:_____
12   ____  ____   CHANGE  _____
              REASON:_____
13
          ____  ____   CHANGE  _____
14              REASON:_____
15   ____  ____   CHANGE  _____
              REASON:_____
16
          ____  ____   CHANGE  _____
17              REASON:_____
18   ____  ____   CHANGE  _____
              REASON:_____
19
          ____  ____   CHANGE  _____
20              REASON:_____
21
     _____
22        RYAN  J.  VAN  METER
     Subscribed  and  sworn  to  before  me
23   this  _____  day  of  _____,  2020.
24
25   _____
```

| & |
| --- |
| **&**   3:15 5:3,3,10,14 5:20 6:3,8,13,18 7:3,8 8:3 9:22 13:14,25 27:6 28:14 30:9 39:7 39:10 66:22 84:20 |

| 0 |
| --- |
| **06103**   6:5 |

| 1 |
| --- |
| **1**   1:22 2:2 3:4 7:14 15:5,19 |
| **10**   88:5 89:13 |
| **1000**   8:4 |
| **10019**   5:16 7:10 |
| **10036**   7:5 |
| **10153**   5:4 |
| **11**   3:11,17 24:23 26:13 34:18 36:4 37:22 62:7 63:7 66:24 80:15 81:11 81:15,21 89:17 102:15 |
| **1121**   3:18 66:25 |
| **12**   80:14 84:19 86:13 |
| **13**   1:9 |
| **14**   26:8 |
| **15**   3:4 |
| **16**   98:24 |
| **16975**   107:23 |
| **16th**   31:16 99:6,7 |
| **19-10289**   1:9 |
| **19-50115**   1:17 |
| **19801**   5:11 6:15 7:15 8:5 |
| **1st**   20:13 |

| 2 |
| --- |
| **2**   3:7 24:18,19 |
| **2001**   5:21 |
| **20037**   7:20 |
| **2018**   94:20 95:2,3 95:5 96:2 97:11 97:13 101:6 |
| **2019**   38:8 39:23 40:14 60:15 98:24 104:8 |
| **2020**   1:22 2:2 38:9 39:23 40:17,22 41:9 42:10,11,21 43:10 51:6 106:20 107:20 109:23 |
| **21**   4:4 95:22 96:7 |
| **222**   5:10 |
| **24**   3:7 |
| **25**   96:2 |
| **2550**   7:20 |
| **28**   51:6 |
| **280**   6:4 |
| **29**   51:6 67:23 |
| **2:04**   2:2 |

| 3 |
| --- |
| **3**   3:14 30:18 33:16 34:12 35:14 46:22 49:7 55:10 66:21 67:3 98:23 |
| **30**   67:16,24 93:21 108:17 |
| **300**   12:13 |
| **31**   67:17 |
| **35**   7:15 |
| **355**   6:9 |
| **3:25**   103:13 |
| **3:35**   103:14 |
| **3:37**   105:3 |
| **3rd**   31:5,7,19 32:18 42:21 53:15 |

| 4 |
| --- |
| **4**   3:19 38:5 45:6 48:3 49:16,25 55:10 95:12,17 |
| **42**   67:16,17,25 |
| **42s**   67:15 |
| **47**   95:24 |
| **4th**   107:20 |

| 5 |
| --- |
| **51**   5:16 |
| **524**   101:25 |
| **52nd**   5:16 |

| 6 |
| --- |
| **66**   3:14 |

| 7 |
| --- |
| **7**   7:5 36:7,15 50:23 51:4 |
| **70s**   102:19 |
| **75201**   5:22 |
| **767**   5:4 |
| **787**   7:9 |

| 8 |
| --- |
| **8**   26:6 50:23 53:13 |
| **844**   7:14 |

| 9 |
| --- |
| **90071**   6:10 |
| **920**   6:14 |
| **94111**   6:20 |
| **95**   3:19 |

| a |
| --- |
| **ability**   39:20 102:7 |
| **able**   17:8 55:25 |
| **abstract**   58:5 |
| **acceptances**   3:12 24:24 |
| **access**   25:24,25 95:7 96:23 97:9 102:4 |

| accidentally |
| --- |
| **accidentally**   15:11 |
| **accurate**   17:16 55:2,5 94:16,18 108:21 |
| **achieved**   41:14,15 |
| **achieving**   20:23 66:16 |
| **acronyms**   18:14 18:18 |
| **act**   56:15 100:16 |
| **acting**   53:23 |
| **action**   58:19 107:16 |
| **actions**   57:14 |
| **active**   53:24 73:6 89:8 |
| **actively**   84:10 |
| **actors**   58:25 |
| **actual**   28:18 41:23 43:5 52:5 |
| **address**   64:15 |
| **adv**   1:17 |
| **advance**   26:11 |
| **adversary**   102:2 |
| **advice**   12:15 70:19 70:23 |
| **adviser**   76:24 80:18 84:18 |
| **advisors**   95:7 96:8 96:22 |
| **affiliates**   31:25 32:5 38:10 |
| **afternoon**   18:13 |
| **ago**   68:22 77:6 94:11 100:9,20 |
| **agree**   9:3 22:23 25:23 30:2 68:15 87:4 90:22 99:17 |
| **agreed**   38:24 66:17 68:9,23 70:5 72:11 |

**agreement** 18:8,22
18:25 19:15,22,23
23:2 24:4,5,12
38:3 62:8 66:4,12
69:3 82:21 83:10
84:5,8 96:13
**agreement's** 18:11
**agreements** 38:4
83:21 84:4
**ahead** 15:13 22:8
24:17 44:15 52:23
55:8 59:12 95:11
95:13
**aimed** 37:14
**al** 1:7
**alexandra** 3:21
95:19
**alleged** 20:25
102:12
**allow** 66:5
**alvarez** 84:20
**amax** 1:18 5:15,20
53:14
**america** 1:7,11
11:19 12:9,11
**american** 6:19
7:19 12:3,16
**amount** 77:3
**amy** 6:11 17:7,10
92:16
**amy.quartarolo**
6:11
**analysis** 79:19
104:7
**analyst** 80:17,21
**analyzed** 104:10
**analyzes** 77:2
**analyzing** 79:6
**ancora** 76:19,20
76:21 77:2,11
104:5,9

**angeles** 6:10
**answer** 4:2,4 11:5
11:15 12:17 21:7
21:14 22:7,20
32:18 46:7 48:14
49:3,11 52:19
55:2,5 57:5 69:13
70:11 71:23 72:4
73:20 76:13 79:9
80:3,4 81:4,5,24
83:2,19 85:15
87:13,24 92:11
93:24 98:3
**answered** 68:20
98:12
**anticipate** 74:17
100:25
**anybody** 33:21
39:8
**anyway** 81:8
83:22 85:14
**apologies** 15:23
**apologize** 9:16
15:9 32:8
**appear** 34:12
47:17
**appears** 16:25
53:18
**applicable** 10:12
**applications** 13:15
82:3
**appointed** 98:15
**appreciate** 15:4
18:21 23:10 54:18
65:9 90:18 94:13
104:13,15
**apprised** 14:18
**appropriate** 10:11
21:10 108:7
**approval** 57:19
58:2 74:18

**approve** 56:9
**april** 31:16 40:3
40:12,14 98:24
99:6,7
**arrived** 64:4
**asbestos** 102:19
**ascribes** 76:7
**asked** 22:3 40:16
68:20 82:10,11
84:21 98:12
**asking** 32:16 33:7
33:15 38:22 40:9
45:14,18 56:7
58:4,22 60:23
79:16 81:19 82:6
83:9,9 86:3,7 94:7
**assets** 81:14 86:17
87:16 88:11,17
90:5 91:2,7 92:3
92:20 93:20
**assist** 82:12
**associate** 25:3
**associates** 15:7
**assume** 11:14
**attached** 106:12
108:13
**attempted** 22:25
**attempting** 36:3
**attend** 10:9 55:17
**attendance** 10:11
**attended** 14:14
43:23 44:8 104:5
**attendees** 10:17
**attending** 14:13
96:25
**attention** 26:7
60:11
**attorney** 69:15
70:12,13 108:17
**attorneys** 5:3,15
5:20 6:3,9,19 7:3

7:9,19 8:3 13:24
14:2,4
**august** 38:8 39:23
40:7
**availability** 63:23
**available** 25:21
104:16
**avenue** 5:4,10,21
6:9 7:9
**aware** 50:11 54:2
60:13 65:12 76:13
76:16 94:18

**b**

**b** 3:2 7:11
**back** 17:20 38:6
41:18 48:20 57:8
60:15 68:21 74:3
77:8 95:8 97:11
103:12,14,18,22
**bad** 64:25
**banker** 80:18
86:13
**bankruptcy** 37:10
37:15 62:23 78:14
**based** 33:15
**basis** 13:19 84:13
**bathroom** 103:9
**beginning** 32:2
100:15
**behalf** 9:22 12:21
28:12 29:24 44:8
**believe** 40:4 48:4,6
48:15,22 53:8
56:13 78:24 79:3
99:12 102:11
**berkovich** 68:5
**berry** 7:6,7
**best** 17:14 37:17
39:20 66:18 68:23
94:12

better  64:19
beyond  21:11
  46:12 86:20 87:23
biddle  5:10
big  28:24
bill  32:18
bit  60:9
bjork  100:6,9
blood  107:16
board  54:24 55:12
  55:16,18 56:13,19
boards  54:20 56:8
body  25:15
boggs  7:14,19
bottom  67:17 68:4
  96:7
break  31:17 46:14
  54:15 62:16 103:9
briefly  13:2
broader  66:19
broker  53:23
brought  25:10
building  7:14
business  12:2,2
  27:15 91:19 93:4
businesses  27:3
  96:11
buyer  89:5,6
buyers  89:3 90:25
bye  105:2,2

**c**

c  5:2,17 6:2,11 7:2
  8:2 107:2,2
caleb  7:14
california  6:10,20
call  23:7 30:20
  91:10
called  48:10 76:18
  77:25 78:4
calls  22:19 62:10
  83:16 91:15

canada  1:12
cancelled  15:11
carefully  83:14
  108:5
case  1:9 13:17
  14:9 27:13 37:23
  40:5 62:15 64:7
  78:10,14,18 81:11
  81:15,21 99:18,19
  100:2,11,23 101:5
  101:20,21
cases  26:14 34:18
  36:4 62:7 80:15
  89:17 102:17
cassie  5:7 16:8,13
  16:15 17:19 25:2
  28:9 95:13 98:20
cassie.love  5:8
caution  35:4 44:18
  47:8 69:13
celentino  5:17
center  6:20
certain  24:3 29:16
  31:24 32:5 102:16
certainly  24:2
  26:21 35:9 39:11
  44:25 54:10 58:7
  64:6 69:16 72:6
  76:9,14 77:5,14,16
  89:5,9 94:17
  98:13
certify  106:9
  107:8,14
chain  65:25
change  17:11
  109:6,7,9,10,12,13
  109:15,16,18,19
changes  108:12
  109:3
channeling  21:3

channelling  75:18
  77:19 78:2 82:19
  84:23 85:2,7,17
  86:5
chapter  1:9 3:11
  24:23 26:13 34:18
  36:4 37:22 62:7
  63:7 80:15 81:11
  81:15,21 89:17
  102:14
characterization
  99:18
characterize  24:6
  27:19 39:13 41:3
  41:6 50:10,13
  66:11
chart  12:5
circumstances
  104:14
claim  20:8
claimant  7:9
claimants  1:14 6:4
  8:3 18:15 101:18
  101:23 102:13
claims  1:15 18:16
  62:20,22 63:4,7,14
  63:17 64:5 75:20
  76:3,8,12 77:4
  79:6,19 80:17,21
  82:14,23 101:24
  104:7,10
clarification  65:10
  79:2
classified  48:24
clear  21:25 22:2
  35:13
client  27:23 69:15
  70:12,13
clients  71:10
close  42:2,4

closely  89:15,21
cole  6:3 29:14
come  17:20 72:13
  72:14
comes  64:15
comment  23:10
commented  43:8
committee  1:14
  6:3 7:9 18:15 32:7
  32:21 33:6,8,19
  38:10 39:3 40:2
  99:9 101:18
common  101:24
communications
  43:13 70:13 71:9
company  1:18
  5:15,21 6:19 7:19
  28:18 29:23
  102:10,14,18
compared  102:17
completed  75:20
  76:5
completely  86:22
complex  24:13
  100:2
complexities
  102:24
complexity  102:9
  102:16
complicated  64:2
  100:24 102:5
comprehensive
  63:18,19 64:12
computer  103:13
conaway  8:3 29:11
conceived  58:8
concern  69:23
conference  103:12
confidentiality
  96:12

**confirmable** 37:16
92:20
**connecticut** 6:5
**connection** 12:22
19:9 78:18 79:19
80:14 81:21 82:17
88:14
**consensual** 20:23
37:16 58:12 66:17
90:7 93:3
**consent** 68:12
**consider** 34:7 37:4
**considered** 76:15
**consistent** 82:15
**constituted** 99:16
**constraints** 25:9
**constructively**
96:21
**contact** 98:15 99:8
**contacted** 89:6
**contains** 102:11
**contaminants**
102:12
**content** 62:3
**contents** 49:22
**context** 65:13
101:25
**continue** 102:22
**continued** 6:2 7:2
8:2 26:10 51:23
**contributing**
46:11
**contributions**
34:24 35:2
**conversation**
45:15 48:21 51:19
54:10 70:6 71:7
**conversations**
27:4,5 33:11
37:12 43:13,21
51:17 59:8 61:9

66:20 71:12 72:9
99:14
**convoluted** 92:15
**copy** 15:6 30:13
30:14 47:2 48:13
**corporation** 1:18
5:21
**correct** 11:21
12:25 14:3 17:5
18:18,24 19:11
28:6 29:21 31:9
36:17 38:24 40:24
40:25 41:20 42:19
42:25 45:21 46:23
48:8 50:16 76:19
85:4 86:15 94:20
96:17,18 97:7
98:5 106:10
**corrections** 106:11
108:6,8
**correspondence**
13:13
**counsel** 9:3,25
11:19,23,25 13:6
13:15 14:19 22:2
23:11 25:7 26:24
30:10 32:2,3,6
43:22,23 44:16,24
61:9 65:14,14,15
65:16 70:6,19
79:14 98:14 99:13
**counsel's** 21:22
70:19
**county** 106:4
107:4
**couple** 9:24 17:25
68:5 77:12
**course** 17:8,12
26:20 27:5,13
28:7 29:16 31:25
38:25 59:14 62:12

99:23 100:22,23
**court** 1:2 9:2 17:4
100:10 108:21
**cover** 24:8 100:3
**crafting** 83:14
**creative** 17:13
**creditors** 37:13
**crowell** 6:18
**crowell.com** 6:22
**current** 75:20 76:8
77:3
**currently** 86:16
87:15
**cut** 55:3
**cyprus** 1:18,18
5:15,20,21 7:3
27:2,16,20 33:11
34:23 48:10,19,25
50:4,15 53:14,14
54:7,7 102:3

**d**

**d** 3:18 6:21 60:4
66:25
**d.c.** 7:20
**dallas** 5:22
**data** 96:23 97:10
**date** 40:8 56:2
79:12 98:23 99:7
108:10
**dates** 30:12,18,22
31:16,16 32:11
33:24 51:3
**day** 12:5 23:6
36:22,24 45:20
53:25 94:10 95:12
106:20 107:20
109:23
**days** 93:21 108:17
**deal** 19:7 62:18,22
63:4,5,6,13

**dealing** 63:3
**debtor** 58:11,15
58:24 59:11,13,15
61:12 70:5 71:3
71:12 72:8,15
81:14 88:7 89:6
**debtors** 1:8 3:8,16
6:9 12:22 14:20
17:4 18:8 19:14
19:24 20:8 21:2
24:20 26:10,19
28:13 29:20 31:24
32:4 37:13,21
38:9 39:3 40:2
42:6,15,22 43:14
48:16,18 50:7,8
54:6,20 57:14,18
57:25 59:5 60:14
60:24 62:20,21
64:19 65:15,16
66:4,23 71:24
73:8 74:17 75:2
79:5 80:15 86:16
87:15 88:11,16
89:9,15,21,23,24
89:25 90:10,15
91:2,7,9,14 92:3
92:18,19 93:5,19
94:19,22 95:6
96:3,10,20 97:14
98:8 99:8,13
100:11,19
**decided** 42:9
**decision** 70:17,24
71:2,5 93:2,4
**declaration** 3:5,20
12:6 13:17 15:3
15:20 16:21 17:2
20:5 30:12 33:10
36:7 38:6 41:8
45:5 50:20 53:19

75:19 77:9 80:13
87:3,6,8,10 88:6
94:10 95:13,18
98:22,24 104:21
**dedicated** 53:25
**deemed** 108:20
**defendants** 1:19
**defined** 32:22
**definitely** 57:15
95:4
**definition** 28:5
54:2
**degree** 51:13
58:20 63:16 68:24
**delaware** 1:3 5:10
5:11 6:15 7:15 8:5
**denis** 59:25 60:7
**dennis** 60:5
**department** 7:13
**depend** 24:14
**dependent** 29:3
63:11
**depending** 29:5
**depends** 51:14
**deposed** 10:23
**deposing** 108:17
**deposition** 1:22
2:4 9:24 10:9,17
13:23 21:12 54:15
86:21 104:17
106:9 107:10,12
108:4,14,18,20
**describe** 14:11
20:17 32:14 53:21
56:24 87:17 88:2
**described** 46:21
55:10
**describing** 77:7
**description** 3:3
**deserves** 100:3

**detail** 52:14 71:8
**details** 43:20
**different** 12:10
22:8 29:6 37:11
44:11 45:18 60:12
63:13,14 69:24
74:2 78:16 101:22
101:23
**diligence** 95:8
96:10 97:2
**direct** 26:7 60:11
87:13
**directed** 89:9
**directing** 57:13
**direction** 4:4 21:7
21:22
**directions** 4:2
**directly** 20:7
71:20
**directors** 54:20
**disagree** 81:17
86:23
**disclosure** 72:23
73:5,9 74:19
**discuss** 31:8 61:21
94:23
**discussed** 54:22,25
55:22 61:11
**discussing** 84:11
**discussion** 23:17
36:20,21 55:11
69:8,19 71:19
72:6,7
**discussions** 14:16
26:11 35:5,10
51:24 52:8,11,13
54:6,9 55:14,15
60:25 61:7,15
65:13,18 68:10,17
69:4 71:24 80:6

**disposition** 88:10
**disruptive** 64:8,9
64:10,18,24 65:2,7
69:6,10
**disrupts** 64:16
**distracted** 102:6
**distracting** 91:19
**distractions** 15:11
**distribution** 78:4
**district** 1:2,3
**divulging** 55:5
**document** 25:15
49:7,22 67:10
72:25 84:24 85:6
85:7
**documents** 13:6,9
17:25 41:12,17,23
42:8,12,16,24 43:6
43:7,15 44:3
55:15 62:25 65:23
66:9 74:3 75:2,12
82:19,20 84:11,14
**doing** 10:24 15:23
80:25 81:8,20
82:5,16 91:3,6
108:9
**doohickey** 67:6
**draft** 38:11 39:4
39:25 40:18,20
47:2,6,21,25 48:13
48:19 73:9,23
74:7 77:18 78:2
**drafted** 75:2
**drafting** 26:22
41:22 46:11 73:7
**drafts** 38:16
**drell** 5:23
**drinker** 5:10
**duly** 9:8 107:11

| e |
|---|
| **e** 3:2 5:2,2,5 6:2,2 7:2,2 8:2,2 60:4 107:2,2 |

**earlier** 15:4 44:10
46:7 104:21
**easily** 102:20
**effort** 15:10
**efforts** 36:11
**either** 43:11
**elements** 24:14
90:2
**elkins** 5:20
**ellen** 7:21
**ellen.farrell** 7:22
**email** 43:14 44:7
65:25 67:18 68:4
**embarcadero** 6:20
**emerge** 102:14
**encyclopaedic**
27:10
**ended** 54:11
**ends** 40:10
**engage** 51:24
**engaged** 79:11,13
80:16 81:10
**engagement** 96:4
98:6
**engaging** 91:14
**enright** 6:6
**enter** 66:4
**entered** 66:12 96:3
**entire** 23:16
**entities** 12:13
32:24 33:24 44:9
47:25 50:14 54:7
**entity** 11:22 27:20
48:10 76:18 79:18
**eric** 1:24 2:6 9:9
107:6,24

errata 108:7,10,13
  108:16 109:2
especially 10:24
esq 5:5,6,7,12,17
  5:23 6:6,11,16,21
  7:6,11,16,21 8:6
essentially 13:23
  42:12 91:10,20
establish 21:2
established 13:23
estate 81:14
estimate 76:2
et 1:7
evaluate 79:12
  88:9
event 90:6
everybody 58:15
  100:14,18 103:16
everybody's 17:23
exactly 42:5 60:4
  61:24 71:16 75:9
examination 9:11
examined 9:10
excess 7:3
exchange 40:18
  41:9
exchanged 38:11
  39:4,25 48:18
  73:9,24
exchanges 51:18
excluding 39:7
exclusive 3:10
  24:22
exclusivity 12:24
  26:9 71:21 86:24
excuse 66:13
  100:23
exhibit 3:4,7,14,19
  15:12,19,25 16:3,6
  16:10 24:19 25:8
  25:21 26:4 66:21

67:3,5,10,19,23
  95:14,17
exhibits 17:23
exist 38:17
exit 37:15
expect 20:8 56:14
expeditiously
  101:3
expert 79:6
explaining 101:15
exploration 90:12
explore 89:16,22
  90:11 91:22
extend 12:23
extending 3:9
  24:21
extensive 96:9
extent 12:14 22:20
  35:7 52:20 70:10
  74:12 79:9 80:4
  81:25 87:22,24
  92:11 93:24
extremely 100:2
eyeballs 16:18

**f**

f 107:2
face 98:21 102:22
fact 55:13
facts 12:23 13:4
  82:8
faegre 5:10
faegredrinker.com
  5:12
fail 108:19
fair 18:23 23:23
  28:7 29:4 39:16
  39:19 41:23 56:17
  65:6 73:22 81:9
  92:5
fall 95:3,4

familiar 62:2
far 42:22 47:20
  48:21 53:16 54:7
  68:25 74:5 94:14
  96:16 97:6
farr 7:8
farrell 7:21
fast 11:12 100:16
fcc 66:13
fcr 18:15,25 26:12
  29:9 32:7,22,24
  33:6,20 35:19
  38:11 39:3,9 40:2
  42:18,24 43:15,24
  44:9 59:5,9 60:25
  65:19 66:6,13
  68:9,16,18 70:7
  72:8,14,20 73:13
  76:18 94:24 96:9
  96:21 99:14
february 101:6,8
federal 7:14
fee 13:14 82:3
feel 25:18 69:20
  99:6
felt 41:21 42:22
fifth 5:4
file 3:11 20:8
  24:23 67:8 101:9
filed 93:21 101:5
filing 23:6 74:18
  97:13,17 101:13
final 19:8,22 24:12
  41:3,14 56:19
  76:15 84:5,8,15
finalized 85:16
financial 76:23
  80:17 84:17
find 93:9
fine 15:15 52:3
  86:6

finger 6:13
finish 11:3,5
finz 1:24 2:6 9:9
  107:6,24
firm 29:15 44:9
  59:20 68:5
firms 80:17 97:16
  97:20 98:7
first 9:8 12:5 16:7
  18:4 26:8 40:6
  63:12 94:10,23
  95:12 97:14 98:22
  99:3,8 101:17
fit 32:18
flat 74:9
flip 36:6
flow 64:16
focus 102:7
folder 16:3
folks 17:25 68:6
follow 21:21
following 31:16
  32:11 42:9 109:3
  109:4
follows 9:10
foregoing 106:7
forgot 54:13
form 19:4,20
  20:21 22:16 23:15
  23:21,25 28:16
  31:3,11 33:2
  34:10 35:25 37:8
  37:25 41:5,25
  43:3,18 44:17
  45:9,23 51:12
  52:16 55:24 56:11
  56:22 57:3,17,22
  59:7 60:19 61:5
  61:20 62:10 63:10
  64:22 65:22 72:3
  75:25 77:22 78:23

79:9 84:2,15
85:20 92:7,10
93:24 99:11,22
101:12
**formal** 39:16
53:21
**formed** 98:14
**forms** 13:19
**formulation** 23:3
**forth** 74:3 107:11
**forward** 10:15
42:13 57:19 58:2
58:6 93:11 102:23
**foundational**
16:19
**frame** 49:18 75:15
75:16 99:23
**framed** 22:4
**francisco** 6:20
**free** 25:18 35:9
**front** 50:19,21
**fulsome** 96:23
97:9
**further** 3:9 24:21
74:11 104:18
107:14
**furtherance** 38:12
38:18 51:18
**furthest** 74:12
**future** 1:14 8:3
18:16 76:11 77:3

**g**

**g** 67:19,23 101:25
**gallagher** 7:8
**gary** 68:8
**gathered** 44:23
**general** 11:18,23
11:25
**getting** 10:14
33:13 35:8 52:22
53:2,5 69:25 70:4

70:8 71:17 75:8
86:19
**gilbert** 29:15
**give** 12:21 27:9
55:2,4 56:2,7
85:14 103:8
**given** 107:13
**giving** 11:15 70:22
80:23
**glad** 40:16
**glass** 54:16
**go** 10:14 15:13
16:14 22:8 24:17
25:18 44:15 52:23
55:8 59:11 67:13
67:15,16,17 68:21
71:7 77:8 82:25
91:21 93:11 95:11
95:13,21 103:6,12
103:14
**goal** 93:15
**goes** 21:11 96:19
**going** 9:23 11:14
12:17 14:25 15:4
16:5 18:2 21:8,21
25:3,17,17 26:7
34:24,25 35:4
41:18 47:8 48:20
49:13 50:21 52:24
52:24 55:3,25
56:13 58:16,23
60:11 67:8 68:21
69:16 71:7 74:3,9
79:25 80:9 82:24
87:11 93:14,14
95:21 102:21,22
**good** 14:24 64:25
67:20 72:11 92:17
94:25 101:14
104:23

**gotshal** 5:3 9:14
9:22
**gotten** 42:22 68:25
**grab** 54:16
**grand** 6:9
**granted** 87:2
**great** 30:16
**greater** 71:8
**greek** 86:9,11
**grissel** 5:23
**ground** 10:24
**group** 27:2 66:19
101:19
**groups** 101:22
**guess** 22:17 30:20
39:24 41:6 47:13
51:13 58:4 62:13
63:2 70:16
**guessing** 74:10
**guys** 91:17

**h**

**h** 3:2
**hand** 107:20
**happen** 44:6 65:5
**happened** 35:11
**hard** 11:2 22:25
**harder** 103:11
**harm** 69:7
**hartford** 6:5
**hazards** 102:12
**head** 34:4 77:11
**headed** 44:21
**heading** 36:10
**hear** 49:13
**heard** 44:25 78:5
80:10 99:24
**hearing** 13:22
**help** 47:15 91:22
92:2
**helped** 104:21

**helps** 95:11
**hereinbefore**
107:10
**hereunto** 107:19
**hey** 91:16
**hi** 9:13,19 68:8
**high** 101:15
**highly** 29:2
**hired** 76:18 94:19
**historic** 58:13
63:18 102:18
**historical** 7:3
20:25
**historically** 82:11
**hold** 35:3 44:14
79:23 87:19
**holding** 12:8 91:10
**honest** 89:25
**honestly** 52:9,9
73:18,21 77:24
78:25
**hope** 15:2
**hopefully** 15:7
**hours** 9:25
**hubbard** 30:9
**hughes** 30:9
**hum** 60:7 65:11
76:20 95:25 98:25
**hypothetically**
62:17
**hypotheticals**
64:24

**i**

**idea** 72:11,13,16
**ideal** 104:14
**identification** 3:5
3:8,15,20 15:20
24:20 66:22 95:18
**identify** 26:17
30:19

ignorance 37:9
imagine 58:8
imerys 1:7,11,11
  1:12 3:4,7,14,19
  11:19 12:2,6,7,7,8
  12:12,22 13:13
  15:5,19 19:15
  24:18,19 29:21
  30:2 66:21 95:12
  95:17
immediately 27:19
  61:8
impact 62:6,12
  63:23
impasse 21:18
  22:11,23 23:7
  53:9
imperative 108:15
important 91:20
  93:12
impossible 70:21
include 28:4 33:12
indemnifying
  62:19
indemnity 60:15
independent 58:18
  58:25
independently
  25:14
indicate 26:25
individual 97:23
  100:5
individuals 10:8
information 17:15
  22:19 44:22 47:11
  51:18 55:6 70:14
  96:24
informed 65:16
  70:18
initial 51:5

initiate 89:10
initiated 96:9
injunction 21:3
  75:18 77:19 78:2
  82:19 84:23 85:3
  85:7,17 86:5
input 71:5
instruct 21:13
instructed 22:6
instructions 108:2
insurance 6:19
  7:19 63:24 102:5
insurers 7:4 27:4,8
  27:8,13,14,16,21
  27:22 28:5 34:25
  50:5
intended 10:9
  26:24 38:23
intending 32:14
intent 102:13
interest 10:13
  100:15
interested 50:25
  107:17
interesting 89:12
interests 14:22
  34:16,22 66:18
  68:23 90:10
internal 90:14,16
interrupting 9:16
intervenors 1:16
introduced 102:16
introducing 15:25
investment 80:18
  86:13
invite 83:4
involve 58:9 90:4
involved 14:8
  28:22 29:2,7,10
  30:5 34:17 35:10
  45:3 53:10 57:9

  59:22 61:14 99:25
involvement 14:12
  43:4 56:25 58:10
involves 101:18,22
involving 58:14
issue 29:5 83:23
issues 18:3,7 21:18
  22:10 23:12,13,19
  24:3,6 36:11
  79:13 100:4,17
  102:22
items 21:6

## j

j 1:22,24 2:4,6 3:1
  3:6 4:1 9:1,7,9
  10:1 11:1 12:1
  13:1 14:1 15:1,21
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1
  34:1 35:1 36:1
  37:1 38:1 39:1
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1 57:1
  58:1 59:1 60:1
  61:1 62:1 63:1
  64:1 65:1 66:1
  67:1 68:1 69:1
  70:1 71:1 72:1
  73:1 74:1 75:1
  76:1 77:1 78:1
  79:1 80:1 81:1
  82:1 83:1 84:1
  85:1 86:1 87:1

  88:1 89:1 90:1
  91:1 92:1 93:1
  94:1 95:1 96:1
  97:1 98:1 99:1
  100:1 101:1 102:1
  103:1 104:1 105:1
  106:1,6,16 107:1,6
  107:9,24 108:1
  109:1,22
j&j 60:9,14 61:21
  61:22 62:8,18,19
  63:13 65:14,18
  66:5 67:4 69:9
  71:13,25 72:17
j&j's 65:16 70:6
jackson 5:12
james 1:14
janine 7:6
january 51:6 52:6
jccelentino 5:18
jed 5:6
jed.winer 5:7
jeffrey 7:11 100:6
jkorn 7:11
job 101:14
johnson 3:15 5:3,3
  9:22,23 13:13,14
  27:6,6 39:7,7,10
  39:10 66:22
johnson's 3:16
  66:22
joseph 5:17
jpanchok 7:7
jr 1:14
judge 21:16 93:8
judgment 65:3
july 77:10 104:7
jumped 39:11
june 20:12 94:20
justice 7:13

| **k** | 52:8 59:2 89:4,8 | **line** 10:18 36:25 | 95:12 |
|---|---|---|---|

**k**

**katie** 5:23
**katz** 5:14
**kcic** 80:22 82:3
**kept** 14:18
**key** 14:17 26:13
  26:18
**kgrissel** 5:23
**kickoff** 99:16
**kind** 43:13 82:13
  89:10 92:25
**kinds** 101:23
**king** 6:14 7:14 8:4
**know** 9:25 10:22
  11:13,24 14:21
  16:6 17:6 18:20
  27:8,12,17 28:20
  28:24 36:20 41:13
  44:5,5,7,24 45:12
  45:24 46:12 47:11
  47:20,24 48:12
  52:10,12 53:16
  54:8,13,17 55:17
  56:6,8,12 58:5
  59:3,8,20 61:9
  63:18,19 64:11
  65:19 69:17,22
  72:21,23 73:25
  74:2,25 75:3 76:4
  76:22 77:23 78:7
  78:9,20,25 79:21
  81:8,19 82:16,21
  84:3 85:9,9,11,15
  85:18,21 86:4,7
  90:9,19,25 91:13
  93:12 94:14 96:17
  97:6,12 99:4
  100:5,8 103:2,25
**knowing** 82:12
**knowledge** 17:15
  20:3 22:12 31:22

52:8 59:2 89:4,8
93:18 94:13
104:11
**knowledgeable**
  13:4
**knows** 82:8
**korn** 7:11

**l**

**l** 1:14
**larger** 101:18
**latham** 6:8 13:25
  28:14,23 68:6,8
  94:20
**law** 37:10 44:9
  80:16
**lawsuits** 97:23
**lawyer** 29:6 59:18
  59:20
**lawyer's** 69:17
**lawyers** 69:8
**layton** 6:13
**lead** 28:12 38:23
**learn** 78:13
**learned** 78:13
**left** 21:6
**legal** 12:13,15 56:7
  70:22
**letter** 96:4
**letting** 90:24
**level** 47:11 101:15
  102:16
**liabilities** 20:25
  58:13 63:17
**liability** 102:19
**light** 101:3
**limitations** 16:23
**limited** 12:8 87:8
**linda** 7:16
**linda.richenderfer**
  7:17

**line** 10:18 36:25
  84:13,13 109:5
**lines** 21:3 37:18,19
  43:24 66:14
**lipton** 5:14
**list** 27:10,22
**listed** 30:22 33:24
  98:23
**litigation** 96:12
**little** 60:9 69:24
  84:22 92:15 103:3
**llp** 5:3,10,20 6:3,8
  6:18 7:3,8,19 8:3
**load** 95:14
**local** 10:12
**lockbox** 7:15
**long** 53:25 64:14
**look** 39:19
**looked** 45:11
**looking** 57:6 68:6
  77:24 84:25
**los** 6:10
**lot** 28:25 94:14
  100:3 104:22
**love** 5:7 16:9 17:22
  95:16
**lss** 1:9,17
**lw.com** 6:11

**m**

**m** 7:20,21 8:6 60:5
**making** 63:4
  102:10,15 104:15
**manges** 5:3
**march** 31:5,7,19
  32:18 38:9 39:23
  40:10,11,17,22
  41:9 42:9,11,21
  43:10 53:15
**marcos** 6:16
**mark** 6:21 15:5
  18:2 24:17 67:3

95:12
**marked** 15:25
  16:3,6 17:23
  95:16
**marketing** 86:17
  87:16 88:3,16,24
  88:25 89:8,10
**marking** 16:9
**marriage** 107:16
**marsal** 84:20
**material** 62:6,11
  95:8
**materials** 77:2,20
**matrix** 85:16 86:5
**matter** 24:13
  28:25 107:18
**matters** 12:3,16
**mean** 11:25 23:5
  23:22 24:10 26:2
  28:19 31:12,25
  39:10 46:5,12,21
  47:16 48:22 49:6
  49:8,9,24 50:6,20
  51:2,14 52:4 57:9
  59:19 63:2 64:25
  69:25 74:16 76:4
  78:11,12 82:14
  84:7,8 86:6 88:3
  88:24 89:4,5,22,25
  92:24 97:20,22
  98:13
**meaning** 24:11
  38:3 42:6 61:21
  84:10
**means** 65:2 75:4
  85:18,22
**meant** 40:13 98:3
**meatier** 18:7
**mediation** 34:2,6
  36:22,24 37:5
  51:5,9,14 52:4

53:15,17,20
**mediations** 50:24
54:3
**mediator** 52:6,10
53:22
**meet** 72:17 93:14
**meeting** 42:10,11
53:21 55:21 68:7
77:6 99:15,15
104:4
**meetings** 13:5
14:14 31:8,13
32:15,17 43:8,11
43:21,23 44:23
46:8,17,20 53:4
54:19,23 55:16,18
56:3 77:7 97:2
**members** 29:16
55:12
**memorable** 77:5
77:14
**menright** 6:6
**mention** 87:9
**mentioned** 15:3
18:12 30:12 44:10
48:9 60:10 104:4
**merger** 88:9
**met** 14:2 32:5
**meter** 1:22 2:5 3:1
3:6 4:1 9:1,7,13
10:1,22 11:1 12:1
13:1 14:1 15:1,21
16:1,16 17:1 18:1
18:6 19:1 20:1
21:1 22:1,9 23:1
24:1 25:1,5 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1

42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1,11 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
104:3 105:1 106:1
106:6,16 107:1,9
108:1 109:1,22
**michael** 6:6
**mics** 103:16
**mind** 15:14 37:3
38:21 39:12,17
74:5 91:5
**mindful** 40:8
**mineral** 12:8
**minerals** 1:18 5:15
5:20
**mines** 1:18 5:21
53:14
**minute** 68:22
**minutes** 103:15,19
**misstated** 86:2
**misstates** 62:25
66:9,9 69:12
85:24

**misunderstanding**
62:14
**moment** 41:13
64:7 82:11
**month** 20:10,14,15
40:11 74:23,24
93:22 101:9
**months** 89:14
100:20
**moring** 6:18
**motion** 3:8,17
12:23 13:12 24:16
24:17,20 26:10,19
66:23 74:18 86:24
86:25
**move** 57:19 58:2,6
100:12
**mplevin** 6:22
**multiple** 97:2
**musson** 59:25 60:6
60:7
**myers** 7:3

**n**

**n** 5:2 6:2 7:2 8:2
60:4,5
**name** 32:9 47:17
**named** 100:6
**nature** 44:20
**necessarily** 24:7
28:20 41:12 58:9
58:15 64:25 78:10
83:16
**necessary** 90:7
91:24 108:5
**need** 11:6 12:15
15:9 54:15 57:18
57:25 58:6,18
62:22 88:21 92:2
92:18,19,24 101:9
**needed** 78:13
93:10

**negative** 86:7
**negotiating** 28:13
30:21 31:15,20
32:10,23 34:13,19
34:21 35:16,22,23
41:11
**negotiation** 30:20
30:23 36:2,4
64:12,17 66:18
**negotiations** 14:8
14:20,23 20:17
26:12 29:10 30:5
31:9 33:21 34:8
34:11 37:6 38:13
38:18 41:7 55:9
56:25 57:11 59:4
59:22 62:13 66:16
68:24 70:17 83:6
94:2 97:15,19
98:9 102:8
**new** 2:8 5:4,4,16
5:16 7:5,5,10,10
107:3,4,8
**nondebtor** 31:24
32:5 38:10
**nonj&j** 63:7
**normally** 11:7
**north** 6:14 8:4
11:19 12:3,11,16
**notary** 2:7 9:9
106:25 107:7
**note** 30:11
**noted** 75:17 105:3
108:12
**notes** 103:6
**notice** 2:5 20:4
**notified** 10:7
**november** 60:15
**number** 14:13,17
33:16 35:14 51:4
53:13 64:15 67:11

76:6,9,14 79:7
82:12 84:11
100:21
**numerous** 96:24
**nw** 7:20

**o**

**o** 60:5
**o'melveny** 7:3
**oath** 104:2
**object** 10:10,15
11:6 21:9 44:17
80:2 81:23 82:25
87:18,21
**objection** 3:16
13:12 19:3,8,19
20:20 22:15,18
23:14,20,24 28:15
31:2,10 32:25
34:9 35:24 37:7
37:24 41:4,24
43:2,17 44:13
45:8,22 51:11
52:15 55:23 56:10
56:21 57:2,16,21
59:6 60:18 61:4
61:19 62:9,24
63:9 64:21 65:21
65:24 66:8,23
67:4 68:19 69:11
70:10 71:14 72:2
75:22,25 77:21
78:22 79:8 83:18
83:25 85:19,23
86:18 88:20 92:6
92:7,9,23 93:23
98:11 99:10,21
101:11
**objectionable** 22:5
**obviously** 44:22
46:9

**occasionally** 91:15
**occur** 45:25
**occurred** 54:3
59:9 100:22
**october** 95:2
**office** 7:13 20:2
**official** 1:14 6:3
**oh** 84:20
**okay** 10:19 11:8,9
11:16 12:4,19
14:25 19:14,24
20:16 25:6 27:20
27:25 29:9,24
30:16 31:4,14
33:23 35:21 36:6
36:8,8,19 37:3,20
38:16,21 39:2
42:3,15,20 44:2,5
46:14 47:5,20
48:16 49:4 50:2
52:3,12,22 54:5,12
55:4,8,20 56:5
59:2,18 61:14
62:5 63:15 66:3
68:15 71:4,11
73:8,19 75:6,11,16
76:11,16,25 78:3,9
79:5 80:12 81:9
81:13,17 82:17
83:23 84:6,16
85:11 89:12,20
91:5,25 93:6 94:7
94:12,19,22 95:6
95:23 96:19 97:18
98:8 99:2
**omm.com** 7:7
**once** 25:19 63:5
98:13,14
**ones** 27:18 46:21
84:12

**ongoing** 51:17
54:8 55:11
**open** 21:6 23:12
23:13,16,19,23
24:10 26:3 85:13
**opinion** 56:7
**opportunity** 56:14
103:8
**opposed** 90:16,17
**option** 90:11
**order** 3:9 24:21
90:5,9 92:3,20
93:10,20
**ordinarily** 101:19
**original** 65:24
108:16
**outcome** 107:17
**outlined** 62:18
**outset** 83:20
**overall** 12:2

**p**

**p** 5:2,2,6 6:2,2 7:2
7:2 8:2,2
**p.m.** 2:2 105:3
**page** 3:3 4:3 26:6
36:7 67:23,24
95:21 106:12
109:5
**pages** 106:8
**paid** 81:13,22
**panchok** 7:6
**paper** 40:6
**paragraph** 26:8
30:17 32:20 33:5
34:12 35:14 36:7
36:15 38:5 45:6
46:22 48:3 49:16
49:25 50:23,23
55:10 80:14 84:18
88:5 89:13 95:24
98:23

**paraphrase** 41:18
**parent** 12:7 19:16
29:20,22,25,25
30:4 46:2,16,19,25
47:5,22 50:11
57:19 58:2,11,14
58:23 59:3,10,21
61:10,12 73:14
**parent's** 56:25
58:10,23
**part** 17:13 26:21
34:8 37:5 58:16
71:6 90:7,25 92:3
92:19 93:20
**participants** 14:17
**participate** 58:20
61:7 66:20
**participated** 43:16
43:19 52:11
**participating**
45:15 46:8,16
66:15
**participation**
10:16 68:11
**particular** 11:22
13:11 22:24 23:18
28:21 35:6 36:2
51:16 70:18 90:3
**particularly** 64:14
**parties** 10:8 13:16
19:9,13 22:10,23
24:3 26:13,18,23
27:2 31:23 35:6
36:12 39:5,18
45:6 46:9 51:23
52:7 53:22,24
69:2,5,19 82:21
83:10,22 85:16
91:16 102:6
107:15

**partner** 57:10
**party** 14:5 37:21
  46:2,5 47:11
  51:16,20 73:10
  79:11
**passed** 39:18
**path** 62:7,15 70:20
**patient** 11:7
**patrick** 5:12
**patrick.jackson**
  5:12
**pattern** 91:10
**patton** 1:14 7:19
  29:11 94:23 96:4
**pen** 40:6
**pending** 96:11
**people** 11:5 12:17
  28:25 33:7 44:11
  45:2,16,21 46:7
  53:3 57:12 66:15
  69:4 90:19
**perfect** 61:24
**period** 97:13
**periods** 3:10 24:22
**person** 14:14
  28:21 30:19 31:15
  32:10,14,17,23
  33:20 35:16,21
  37:17 43:11 59:21
  97:2 99:3
**personal** 37:11
**personally** 14:7
  53:12 61:6 71:4
**perspective** 14:21
  37:11 59:19 72:10
**petition** 79:12
  98:7
**phone** 43:12 99:5
  99:14
**phrases** 21:19

**picard** 3:21 95:19
**picard's** 94:9
**pick** 32:8
**pjt** 86:14,23 87:9
  88:8,15 89:2,7,10
  89:15,21 90:8,15
  90:24 91:6,9,14
  92:2,19
**place** 51:6,21
  61:17 91:12,21
  97:10
**places** 91:21
**plaintiff** 1:16
**plaintiff's** 97:15
  97:20 98:6
**plaintiffs** 1:13
**plan** 3:11 14:9
  18:9 19:10,16,25
  20:6,24 22:13
  23:16 24:9,23
  28:13 30:6,24
  31:9,21 34:8,11,20
  35:23 36:5 37:5
  37:16 38:13,18,24
  41:11,17,23 42:7
  42:16,24 43:5,15
  44:2 54:21,24
  55:15,21 56:9,15
  56:20 57:20 58:3
  58:7,12,17,20,24
  64:3 66:17 69:25
  71:19 75:3 79:20
  80:6,8 82:18,20
  83:6,7,7 90:2,3,3,7
  92:4,17,21 93:3,11
  93:21 94:2,2,3
  97:21 98:2,4,10
  100:12,22 101:10
**planned** 53:5
**plans** 58:8

**platform** 15:12
  18:5 26:4 95:14
**pleadings** 13:11
**please** 54:17 88:22
  101:16 108:4,9
**plenary** 14:16
**plevin** 6:21
**point** 22:25 41:7
  42:20 90:14 91:18
  98:15 101:8,14
**points** 85:12 101:4
**portion** 25:12
  88:10
**portions** 13:21
**possibility** 89:16
  91:12,23
**possible** 90:2
  101:3
**potential** 42:7
  63:24,25 64:10
  82:13,22 88:9
  90:25 98:10
**potentially** 90:10
**precluded** 65:17
**prefer** 25:8
**prep** 14:5
**prepare** 13:3
**prepared** 17:3
  78:21 90:5,8
  103:4
**presence** 68:17
**present** 59:16
  65:19 66:7 69:18
  70:7 71:25
**presentations**
  104:9
**presented** 56:19
  61:23
**presently** 94:17
**presumably** 20:15
  45:19

**pretty** 24:14 63:20
  82:15 101:14
**previous** 67:22
**primarily** 29:15
**printout** 67:21
**prior** 66:10 79:11
  81:12 91:13,14
  98:7 99:5
**privilege** 69:15
**privileged** 22:19
  22:21 44:19 55:6
  70:14 72:5 79:15
**pro** 1:17
**probably** 14:24
  15:6 32:9 52:24
  72:19 74:11
**procedure** 78:5
**proceeding** 10:13
  102:3
**process** 26:22
  77:14 89:11 93:13
  96:10,22
**product** 102:10
**productive** 26:11
**products** 102:15
**professionals**
  99:25
**progress** 14:19
  19:6,21 20:23
  24:5 41:16,22
  43:9
**proposals** 60:13
  61:2,11,18,22,23
  62:3,6,19 63:13,21
  63:22
**proposed** 14:9
  19:10,25 54:21
  56:15 57:20 58:3
  58:7 80:7 83:7
  94:3 96:9,21

**provided** 13:7,18
14:20 15:3 16:22
17:2 47:21,25
48:13 95:7
**providing** 96:23
104:20
**public** 2:7 9:9
58:11 106:25
107:7
**publicly** 29:23
**pull** 21:16 25:2,4
38:6 67:3 98:18
**pursuant** 2:5 3:17
66:24
**pursue** 70:17
**pursuing** 64:20
**put** 10:2 15:16
25:19 40:6 42:12
50:19,21 67:4
87:12 104:6

**q**

**quartarolo** 6:11
9:6,15 10:5 15:22
19:3,19 20:20
21:8,25 22:15,18
23:14,20,24 25:7
28:15 31:2,10
32:25 34:9 35:3
35:24 37:7,24
39:6 41:4,24 43:2
43:17 44:13,16
45:8,22 47:7
51:11 52:15,18
55:23 56:10,21
57:2,16,21 59:6
60:18 61:4,19
62:9,24 63:9
64:21 65:21 66:8
68:19 69:11 70:9
71:14 72:2 75:22
75:24 77:21 78:22

79:8,22,25 81:2,23
82:24 83:12,25
85:19,23 86:18
87:4,18,21 88:19
92:6,9,22 93:23
98:11 99:10,21
101:11
**question** 11:4,12
11:16 16:19 20:7
22:4,8 23:3,4 31:6
31:18 34:23 35:8
45:14,19 46:7
49:12 56:5 58:5
69:21 72:22 75:7
78:15 83:16 85:5
85:14 86:3 87:5
87:11 92:14 93:17
94:25 102:4 104:2
**questions** 12:15,18
83:15 104:19
**quick** 10:23
**quickly** 99:20
100:12
**quite** 11:24 42:8
46:4,12 77:6
94:11 98:16
**quote** 46:9

**r**

**r** 5:2 6:2,6 7:2 8:2
107:2
**ramos** 6:16,16
**rc.com** 6:6
**reach** 23:2 69:3
93:3 94:23
**reached** 18:8,11
18:22 19:15,23
22:10 24:3,4,12
53:8 62:8 76:7
98:16
**reacting** 65:6

**read** 65:23 94:9
106:7 108:4
**reading** 16:24
**real** 89:25
**realized** 91:18
**really** 16:17 17:12
32:13 56:6 61:6
88:21
**reason** 11:11 12:4
48:4,6,14 53:7
54:16 99:12 108:6
109:6,8,9,11,12,14
109:15,17,18,20
**reasons** 86:25
109:4
**reath** 5:10
**recall** 40:5,19
44:11 50:8 61:8
85:10
**receipt** 108:18
**receive** 91:15
**recess** 103:21
**record** 10:3 52:19
80:2 81:24 82:3
83:13 87:12,22
103:23 105:2
107:12
**recovery** 63:25
**reed** 30:9
**refer** 18:17 50:24
74:20
**reference** 20:5
26:24 36:16 49:19
53:14 86:13 99:24
**referenced** 12:6
26:19 33:5 34:7
45:5 47:6,14 48:2
51:3 65:24 75:18
80:13 84:18 86:23
**references** 39:22

**referred** 49:24
89:7
**referring** 13:25
34:3,14 51:22,25
**regarding** 64:4
98:9
**relate** 38:17
**related** 12:15
13:11 27:15 38:13
38:18 41:11 42:16
43:5 75:2 80:6
82:14 107:15
**relates** 12:3 30:24
54:5 91:7
**relating** 12:23
31:21 82:20 104:7
**relation** 37:22
**relationship** 64:3
91:9,11
**relatively** 54:14
**relevant** 71:20
**remaining** 64:3,5
**remarks** 103:4
**remember** 21:19
27:11 73:18,21
75:11
**remind** 103:15
**remote** 2:4
**remotely** 9:4
10:25
**reorganization**
18:9 19:10,17
20:24 35:23 54:21
54:25 56:9,16
58:17 82:18 92:4
92:21 94:3
**rep** 18:16
**repeat** 57:23
**rephrase** 11:13
**reply** 17:4

reported 1:24
reporter 2:6 9:2
  79:2 107:7
represent 17:9
representative
  1:15 8:4
representatives
  13:16 32:4,6
represented 14:23
  100:10
representing 69:9
request 81:18
requests 96:25
require 58:21
requirement
  93:19 94:5
requiring 94:5
resolution 64:11
resolve 20:24
  34:17 36:3,11
  63:17 100:17
resolved 23:23
  99:19 100:20
resolves 58:13
resolving 37:22
  102:18
respect 19:16
  60:14 75:13 82:22
response 68:7
responses 96:24
  97:10
retain 88:8
retained 88:15
return 108:16
reveal 35:4 44:19
  47:9,10 69:14
  70:21 71:9 79:10
  81:25 83:5 92:12
  93:25
revealing 22:21
  52:20 70:12 72:5

80:5 81:5 83:3,17
  87:25
reveals 81:3
review 56:14
  60:20
reviewed 13:6,10
  13:12,14,17,21
  43:7
revision 73:7
richards 6:13
richenderfer 7:16
right 11:20 12:24
  16:15 18:7 19:11
  20:18 21:5 27:24
  28:2 29:8 30:15
  33:5 35:17,19,20
  38:19,20 40:11,23
  41:2 49:16 52:2
  60:16 61:24 62:23
  63:8 65:2 68:2
  70:20 81:8 82:16
  88:16 89:2 90:20
  91:6,25 92:8
  94:21 95:8 96:16
  97:11,24,25 98:4
  98:25 104:12
rio 27:3,15,21
  33:12 34:23 36:16
  47:25 48:21 49:4
  50:5,15
rlf.com 6:16
robinson 6:3
  29:14
rodney 6:14
ronit 68:5,8
room 96:23 97:10
  103:12
rosen 5:14
ross 5:21
roughly 56:3 99:7

routinely 14:18
rules 10:12,24
running 57:8
ryan 1:22 2:4 3:1
  3:6 4:1 9:1,7 10:1
  11:1 12:1 13:1
  14:1 15:1,20 16:1
  17:1 18:1 19:1
  20:1 21:1 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  38:1 39:1 40:1
  41:1 42:1 43:1
  44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
  56:1 57:1 58:1
  59:1 60:1 61:1
  62:1 63:1 64:1
  65:1 66:1 67:1
  68:1 69:1 70:1
  71:1 72:1 73:1
  74:1 75:1 76:1
  77:1 78:1 79:1
  80:1 81:1 82:1
  83:1 84:1 85:1
  86:1 87:1 88:1
  89:1 90:1 91:1
  92:1 93:1 94:1
  95:1 96:1 97:1
  98:1 99:1 100:1
  101:1 102:1 103:1
  104:1 105:1 106:1
  106:6,16 107:1,9
  108:1 109:1,22

s

s 3:2 5:2 6:2 7:2
  8:2 60:4,5,5
sa 12:6 19:15
  29:21 30:2
safe 90:13
sale 86:17 87:16
  88:9,16 89:11
  90:4,20 91:2
  93:13
san 6:20
saw 12:4,5 65:25
  74:8 85:9
saying 91:16
says 33:6 38:8
  45:12 51:5 67:23
  67:24 68:8 70:2
  80:14 88:6 89:13
  96:3,8
scope 21:12 82:13
  82:22 86:21 87:23
screen 15:8,24
  16:12 25:11,13
scroll 16:16 25:14
se 65:4
seat 57:8
second 44:14
  87:19 88:7
section 3:18 33:10
  66:24
see 16:2,11,17
  25:4,12 26:15
  28:9 33:23 36:13
  36:23 37:19 38:14
  51:7 68:13 72:25
  80:19 82:4 88:12
  89:18 96:5,14
  97:4 98:20
seeing 44:7
seen 40:21 47:2
  75:12 76:9,25

77:18,25 78:3,8,17
79:4 84:23 85:6
104:8
**sell** 90:18 92:2,2
92:19 93:3,10,19
**sense** 23:9 41:16
42:9 46:10 69:2
74:14
**sent** 17:7,10
**sentence** 26:8 88:7
89:22
**separate** 59:4,5
68:10,16 69:4
**separately** 69:5
72:18
**september** 96:2
**services** 80:16
**serving** 94:24
**session** 51:5,15
52:4,6 53:15,17,21
99:4
**sessions** 14:5,16
30:21,23 31:15,20
32:10,23 34:2,6,14
35:16,22 36:3
51:10 99:5
**set** 68:6 107:10,20
**seventh** 7:9
**share** 15:12,24
25:9,11,21 26:4
67:7 69:17
**shared** 19:24
42:17
**sharing** 42:23
**sharon** 8:6
**sheet** 19:9,25 23:6
37:20 38:2,17
39:14,17 40:7,18
40:21,24 41:3,14
41:20 42:14,23
45:7,11,19 46:3,6

46:10 47:18 48:2
48:13,22,24 49:6,9
49:10,15,23 50:4
50:10,13 60:10
108:8,13,16
**sheets** 38:12,23
39:4,25 41:10,10
45:4 47:3,6,14,21
48:19 55:14
**shifted** 41:10
**short** 54:14
**shorthand** 2:6
107:6
**show** 57:9
**shown** 106:11
**side** 100:19
**sign** 108:9
**signature** 107:23
**signed** 19:9,12
22:13 23:5 40:24
41:21 45:21
**significant** 64:7
**signing** 108:11
**similar** 49:7
**simpler** 80:9
**sir** 34:15
**sit** 19:11 21:5
93:17
**sits** 12:11
**sitting** 40:23 41:2
56:18 99:4
**situation** 11:7
**slides** 77:12 104:6
**small** 99:19
100:11
**solicit** 3:12 24:23
**solicitation** 75:3
75:13
**soliciting** 89:3
**somebody** 69:10

**soon** 98:16 100:17
**sorry** 33:17 40:13
42:10,11 44:15
59:11 75:24 92:14
98:25
**sort** 12:10 40:9
41:15 42:11 53:23
53:24 64:11 74:14
93:9
**sought** 21:4 88:7
**sounds** 27:24
94:21
**sources** 63:24
**south** 6:9 12:9
**space** 108:7
**speak** 11:3 26:23
45:12 51:20 66:5
82:9
**specific** 27:7 44:25
**speculation** 62:10
**speed** 16:24
**spell** 60:2
**spoke** 11:12
**square** 6:14 7:4,5
**squire** 7:19
**squirepb.com**
7:22
**ss** 106:3 107:3
**stakeholders**
37:13 58:14 66:19
101:19
**stargatt** 8:3
**start** 32:2 41:17,22
42:13,23 51:4
**started** 9:17 41:11
**starts** 67:18
**state** 2:7 106:2
107:3,8 108:6
**statement** 10:2
11:4 65:4 72:23
73:5,10 74:19

**statements** 58:12
**states** 1:2 7:13
**status** 20:17 52:13
52:14 53:6,7 55:9
72:21 73:4 93:9
**stop** 53:3
**street** 5:16 6:4,14
7:14,20 8:4
**strike** 48:17 74:6
76:16
**struck** 63:6
**subject** 37:16
96:12 106:10
108:11
**submit** 17:3,6
**submitted** 82:4
**subscribed** 106:18
109:22
**subsequent** 23:4
**substance** 21:11
24:8 35:5 36:21
38:22 43:20 47:10
47:12 50:25 52:21
60:24 69:22 71:15
79:10,14,17 80:5
80:24 81:3,6 82:2
83:2,3,5,17 86:20
87:25 92:12 93:25
**substantial** 19:5
19:21 20:22
**substantive** 57:5
69:21 77:15 79:23
80:3 81:18 83:21
84:3,5,7 85:12
**suggest** 45:2
**suggests** 92:25
**summary** 14:24
**supporting** 77:19
**supposed** 81:20
91:6

sure 11:2,17 13:10
15:10 26:20 30:3
38:7 39:21 49:20
55:7 57:24 58:19
70:3 71:16 73:17
79:24 84:25 87:20
88:4 90:21
surprise 100:8,13
sworn 9:4,8
106:18 107:11
109:22
szieg 8:6

**t**

t 3:2 107:2,2
take 9:23 17:18
28:8 61:17 72:24
91:12 98:19 103:9
taken 2:5 28:12
101:7 103:21
talc 1:7,11,11,12
62:20 75:20 76:2
76:8,12 77:3 79:6
96:11 104:10
talk 35:9 69:10
talked 60:9 84:22
talking 18:17 29:3
31:23 33:10,25
35:18 41:17 42:13
42:14 43:25 45:13
45:17 49:21 53:3
53:4 64:13,23
101:20
talks 32:20 53:8
taylor 8:3
tc 68:9
tcc 18:14,23 26:12
29:13,16 32:22,24
35:18 39:9 42:18
42:24 43:14,23
44:8 59:4,9 60:25
65:19 66:6,13

68:16,18 70:7
71:11,23,25 72:7
72:13,20 73:13
98:9,14 99:13
tdp 78:5,17
tdps 84:22
team 12:16
technology 16:24
ted 9:13,15,21
15:9,22 32:8,9
52:23 88:2 92:14
104:24
tell 13:8 23:11
41:19 54:13 57:4
58:23 82:7
ten 38:11,16 45:13
103:15,18
term 19:8,25 23:6
37:20 38:2,12,17
38:23 39:4,14,17
39:25 40:6,18,21
40:24 41:3,9,10,14
41:20 42:14,23
45:4,7,11,19 46:3
46:6,10 47:2,6,14
47:18,21 48:2,13
48:19,22,24 49:6,9
49:9,15,23 50:4,10
50:13 55:14 60:10
78:7,9
terms 34:20 47:12
79:7 80:7,7 83:6,9
testified 9:10
testimony 12:21
13:19 66:10 69:12
85:24 86:2 106:8
107:13
texas 5:22
thank 10:5,19
15:18 84:16 94:8
103:19,20 104:13

104:20,23,25
theodore 5:5
theodore.tsekeri...
5:6
thereof 3:13 24:24
thing 37:15 64:18
67:24 82:14
things 16:25 64:14
65:5 88:8 91:21
97:3 100:21,24,24
102:6
think 10:10 13:20
15:6 16:7 20:19
20:22 21:9,10,15
22:2,4 27:12
32:12 39:12,15
40:5 42:4 58:18
60:10 64:6 67:10
71:15 73:16,20
75:5 76:23 77:8
79:22 80:2 81:2
82:25 83:13,15
85:25 86:19,20
87:9,23 100:14,18
101:13 103:5
104:5
thinking 91:17
third 26:9 36:25
79:11 91:16
thirty 108:17
thought 40:13
thoughts 20:6
three 6:20 80:16
threw 77:12
time 11:10 18:4,13
18:13 33:4 40:6
42:8 54:4 61:18
61:22 75:15,16
77:6 94:11 97:12
100:3 103:3 105:3

times 7:4,5
timing 20:6
tinto 27:3,15,21
33:12 34:24 36:17
47:25 49:4 50:5
today 9:24 10:13
12:21 13:18 40:23
56:18 93:18
102:10
today's 21:12
86:21
told 84:24 85:12
91:4
top 67:11,24 77:11
topic 55:11,16
69:20
tort 1:14 6:3 7:9
18:14 101:17
touched 60:8
tower 7:4
traded 29:23
transaction 89:17
transcript 13:22
21:17 106:10
108:18,20
transitioned 55:13
tried 46:6
true 17:16 23:4
24:2 106:10
107:12
trumbull 6:4
trust 63:25 78:4
trustee 7:13
trustee's 20:2
try 11:13 14:25
15:5,16 19:7
33:18
trying 13:20 34:17
39:12 49:11 69:3
90:18 92:16 93:6
100:16

**tsekerides** 5:5 9:5
9:12,14,18,21
10:19,21 15:15
16:4,13,20 17:18
17:24 21:15,20
24:25 25:16 26:5
28:8 35:12 39:8
60:3 67:2,7,13,20
68:2,3 71:18
72:24 82:6 83:8
85:25 86:22 87:7
87:14 95:10,20
98:19 102:25
103:10,22,24
104:12,25
**turn** 9:19 26:6
30:17 88:5 103:17
103:17
**two** 36:22,24 56:3
56:4 74:11,12
101:22,23
**type** 49:22

**u**

**u** 60:5
**u.s.** 7:13 12:8 20:2
**u.s.a.** 12:7
**u.s.c.** 3:17 66:24
**ultimate** 29:22
**um** 60:7 65:11
76:20 95:25 98:25
**understand** 11:11
12:20 18:16,20
33:18 46:5 47:15
65:8 74:15 83:12
86:11 101:20
**understanding**
22:22 51:15 63:21
80:25
**understood** 11:15
12:19

**united** 1:2 7:13
**unpack** 88:21
**unquote** 46:9
**unsolicited** 91:15
**upset** 92:16
**usdoj.gov** 7:17
**use** 18:14,19 25:20
25:22 49:15 53:9
**usually** 55:19

**v**

**valuation** 75:19,21
75:23 79:7
**value** 65:3 76:7
**van** 1:22 2:4 3:1,6
4:1 9:1,7,13 10:1
10:22 11:1 12:1
13:1 14:1 15:1,21
16:1,16 17:1 18:1
18:6 19:1 20:1
21:1 22:1,9 23:1
24:1 25:1,5 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1,11 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1

87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
104:3 105:1 106:1
106:6,16 107:1,9
108:1 109:1,22
**variable** 63:20
**velaw.com** 5:23
**verify** 17:8
**vermont** 1:12
**version** 16:14 17:7
17:10
**video** 5:2 103:18
**viewed** 69:5
**views** 37:4 69:17
**vinson** 5:20
**voted** 56:20
**votes** 75:8

**w**

**wachtell** 5:14
**walk** 102:20
**wall** 77:12 104:6
**want** 16:17 22:7
25:22 27:9 36:20
37:4 39:20 44:17
55:2 58:12 59:25
77:9 87:5 94:25
103:5
**wanted** 9:18 10:2
14:22 17:20 90:8
100:16
**washington** 7:20
**water** 54:16
**watkins** 6:8 13:25
28:14
**way** 16:12 41:6
46:6 53:25 64:14
67:14 70:18 76:24

78:16 86:7 93:2
107:17
**ways** 63:14,19
**we've** 18:4 19:5
20:19,22 21:4
22:25 27:3,5
28:25 50:9 58:10
68:24 79:13 84:12
101:2
**week** 74:13
**weeks** 56:3,4
74:11,13
**weil** 5:3 9:14,21
**weil.com** 5:6,7,8
**west** 5:16
**whereof** 107:19
**willkie** 7:8 29:14
**willkie.com** 7:11
**wilmington** 5:11
6:15 7:15 8:5
**winer** 5:6
**wish** 109:3
**wished** 100:19
**withdraw** 29:19
**witness** 6:9 9:3
15:18 16:11 21:13
22:6 25:6 26:3
44:15,18 47:8
67:6,12,19,22
69:13 70:11 79:24
82:7 83:19 87:20
103:7,20 104:19
104:23 106:6
107:9,13,19 108:2
**wlrk.com** 5:18
**word** 22:22 49:15
53:9,18,20 65:7
88:22,23 92:24
**words** 34:11 52:4
64:13

**work**  11:2 80:24
  81:4 88:15
**worked**  89:15,21
  96:20 101:2
**working**  42:7,16
  79:18
**works**  15:2
**world**  12:13
**worried**  102:20
**worth**  64:20
**wrapped**  10:14
**write**  26:21 35:15
**written**  31:17
**wrong**  74:4
**wrote**  31:14 33:16
  35:15,15

**x**

**x**  1:4,10,20 3:2
  58:24

**y**

**y**  58:24
**ycst.com**  8:6
**yeah**  39:15 42:10
  44:12,21 46:4
  47:13 54:11 59:13
  62:11 66:11 67:7
  81:7 82:9 88:18
  93:6
**year**  100:9
**york**  2:8 5:4,4,16
  5:16 7:5,5,10,10
  107:3,4,8
**young**  8:3 29:11

**z**

**z**  58:24
**zieg**  8:6
**zoom**  43:12
**zurich**  6:19 27:14
  28:2,3 36:16
  47:24 49:2 50:15

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.