**<u>Exhibit 2</u>**

**Disclosure Statement Blackline**

5

RLF1 24095145v.1

> **THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE. ACCORDINGLY, THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT APPROVES THIS DISCLOSURE STATEMENT.  IN ADDITION, THIS DISCLOSURE STATEMENT MAY BE REVISED TO REFLECT EVENTS THAT OCCUR AFTER THE DATE HEREOF BUT PRIOR TO THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ----------------------------------------------------------- x | | |
| In re: | : | Chapter 11 |
| | : | |
| IMERYS TALC AMERICA, INC., *et al.*,[1] | : | Case No. 19-10289 (LSS) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| ----------------------------------------------------------- : | | |
| In re: | : | Chapter 11 |
| | : | |
| IMERYS TALC ITALY S.P.A., | : | Case No. [Not yet filed] |
| | : | |
| Potential Debtor. | : | [Joint Administration To Be Requested] |
| | : | |
| ----------------------------------------------------------- x | | |

**DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF IMERYS TALC AMERICA, INC. AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050) and Imerys Talc Canada Inc. (6748).  The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.  This solicitation is also being conducted by Imerys Talc Italy S.p.A. pursuant to sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018.  If the Plan is accepted by the requisite number of claimants in Class 4, Imerys Talc Italy S.p.A. will commence a bankruptcy case that will be, pending entry of an order by the Bankruptcy Court, jointly administered under Case No. 19-10289 (LSS).

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins, Esq.
Michael J. Merchant, Esq.
Amanda R. Steele, Esq.
Brett M. Haywood, Esq.
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:  collins@rlf.com
          merchant@rlf.com
          steele@rlf.com
          haywood@rlf.com

**LATHAM & WATKINS LLP**
Jeffrey E. Bjork, Esq.
Kimberly A. Posin, Esq.
Helena G. Tseregounis, Esq.
Shawn P. Hansen, Esq.
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
E-mail:  jeff.bjork@lw.com
          kim.posin@lw.com
          helena.tseregounis@lw.com
          shawn.hansen@lw.com

- and -

Richard A. Levy, Esq.
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  richard.levy@lw.com

*Counsel for the Debtors and Debtors-in-Possession*

**ROBINSON & COLE LLP**
Natalie D. Ramsey, Esq.
Mark A. Fink, Esq.
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
E-mail:  nramsey@rc.com
          mfink@rc.com

- and -

Michael R. Enright, Esq.
280 Trumbull Street
Hartford, Connecticut 06103
Telephone: (860) 275-8290
Facsimile: (860) 275-8299
E-mail:  menright@rc.com

*Counsel for the Tort Claimants' Committee*

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Robert S. Brady, Esq.
Edwin J. Harron, Esq.
Sharon M. Zieg, Esq.
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
E-mail:  rbrady@ycst.com
          eharron@ycst.com
          szieg@ycst.com

*Counsel for the Future Claimants' Representative*

**HUGHES HUBBARD & REED LLP**
Christopher Kiplok, Esq.
Dustin P. Smith, Esq.
Erin Diers, Esq.
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
E-mail:  christopher.kiplok@hugheshubbard.com
        dustin.smith@hugheshubbard.com
        erin.diers@hugheshubbard.com

*Counsel for Imerys S.A. and the Persons Listed on Schedule II of the Plan*

**TABLE OF CONTENTS**

Page

**Article I. INTRODUCTION** ...................................................................................................1

    1.1    Voting and Confirmation. .........................................................................................2

**Article II. OVERVIEW OF THE PLAN** .............................................................................3

    2.1    General Overview ......................................................................................................3
    2.2    Summary Description of Classes and Treatment.............................................~~11~~10
    2.3    The Plan Supplement .............................................................................................14

**Article III. GENERAL INFORMATION**............................................................................15

    3.1    History and Business, Organizational Structure, and Assets of the North
        American Debtors ...................................................................................................15
    3.2    History and Business, Organizational Structure, and Assets of ITI ....................20
    3.3    Filing of the Chapter 11 Cases and Plan Discussions.........................................22

**Article IV. SUMMARY OF LIABILITIES AND RELATED INSURANCE OF THE
DEBTORS** ............................................................................................................25

    4.1    Description of Talc Personal Injury Liabilities....................................................25
    4.2    Description of Talc Insurance Coverage...............................................................27
    4.3    Description of Non-Talc Liabilities of the Debtors .............................................34

**Article V. EVENTS DURING THE CHAPTER 11 CASES** ...........................................35

    5.1    Commencement of the Chapter 11 Cases and First Day Motions .......................35
    5.2    Commencement of Canadian Proceeding.....................................................~~36~~35
    5.3    Appointment of the Tort Claimants' Committee .................................................36
    5.4    Appointment of the Legal Representative for Future Claimants ..........................37
    5.5    Retention of Debtors' Professionals ....................................................................38
    5.6    Administrative Matters in the Chapter 11 Cases .................................................38
    5.7    Litigation, Adversary Proceeding, Coverage Disputes, and Mediation...........~~43~~42
    5.8    Material Settlements and Resolutions...................................................................50
    5.9    Anticipated Developments Regarding ITI Before Confirmation.........................51

**Article VI. SETTLEMENTS, ~~THE J&J PROTOCOL,~~ AND THE SALE OF THE
NORTH AMERICAN DEBTORS' ASSETS** ......................................................~~52~~53

    6.1    The Imerys Settlement ....................................................................................~~52~~53
    6.2    Settlement with Rio Tinto and Zurich ..................................................................55
    ~~6.3~~    ~~J&J Protocol~~...................................................................................................~~57~~
    ~~6.4~~6.3    Sale of North American Debtors' Assets.........................................................~~60~~57

**Article VII. THE PLAN OF REORGANIZATION** ................................................ ~~62~~59

    7.1    Treatment of Administrative Claims, Fee Claims, and Priority Tax Claims .....~~63~~60
    7.2    Treatment of Classified Claims and Equity Interests ........................................ ~~65~~62
    7.3    Acceptance or Rejection of Plan ...................................................................... ~~68~~66
    7.4    Conditions Precedent to the Confirmation of the Plan ..................................... ~~69~~66
    7.5    Conditions Precedent to the Effective Date of the Plan ................................... ~~72~~70
    7.6    Means for Implementation of the Plan .............................................................. ~~73~~71
    7.7    Effect of Confirmation .................................................................................... ~~83~~80
    7.8    Releases, Injunctions and Exculpation ............................................................ ~~87~~85

**Article VIII. THE TALC PERSONAL INJURY TRUST AND  TRUST
          DISTRIBUTION PROCEDURES** ......................................................... ~~96~~94

**Article IX. CERTAIN FACTORS TO BE CONSIDERED** ................................ ~~97~~95

    9.1    Variance from Financial Projections ................................................................ ~~97~~95
    9.2    Failure to Confirm the Plan .............................................................................. ~~98~~95
    9.3    Non-Occurrence of the Effective Date .............................................................. ~~98~~96
    9.4    The Recovery to Holders of Allowed Claims and Equity Interests Cannot
          Be Stated with Absolute Certainty ................................................................... ~~98~~96
    9.5    The Allowed Amount of Claims May Differ From Current Estimates ............. ~~99~~97
    9.6    The Debtors May Object to the Amount or Classification of a Claim ............. ~~99~~97
    9.7    Parties in Interest May Object to the Debtors' Classification of Claims and
          Interests ........................................................................................................... ~~99~~97
    9.8    Appointment of Different Talc Trustees and/or Different Members of the
          Talc Trust Advisory Committee for the Talc Personal Injury Trust ................ ~~100~~97
    9.9    Distributions under the Trust Distribution Procedures .................................... ~~100~~98
    9.10   The Channeling Injunction ............................................................................... ~~100~~98
    9.11   Voting Requirements ........................................................................................ ~~101~~98
    9.12   The Debtors' Operations and Ability to Consummate a Sale May be
          Impacted by the Continuing COVID-19 Pandemic ........................................ ~~101~~99
    9.13   The Canadian Court May Not Enter an Order Recognizing the
          Confirmation Order .......................................................................................... ~~101~~99

**Article X. VOTING PROCEDURES AND REQUIREMENTS** ...................................... ~~101~~99

    10.1   Voting Procedures Summary ............................................................................ ~~101~~99
    10.2   Voting Deadline ................................................................................................ ~~104~~102
    10.3   Holders of Claims Entitled to Vote ................................................................. ~~104~~102
    10.4   Vote Required for Acceptance by a Class ........................................................ ~~105~~102
    10.5   Voting Procedures ............................................................................................ ~~105~~103

**Article XI. CONFIRMATION OF THE PLAN** .............................................................. ~~107~~105

    11.1   Confirmation Hearing ...................................................................................... ~~107~~105
    11.2   Requirements for Confirmation of the Plan ..................................................... ~~108~~105

~~US-DOCS\116915437~~US-DOCS\117855212RLF1 ~~23862506v.1~~24099353v.1

**Article XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**..........................................................................~~110~~108

    12.1    Alternative Plan of Reorganization.........................................................~~110~~108
    12.2    Liquidation under Chapter 7 .................................................................~~110~~108

**Article XIII. CERTAIN TAX CONSEQUENCES OF THE PLAN** ...........................~~111~~108

    13.1    Treatment of the Talc Personal Injury Trust........................................~~112~~109
    13.2    Tax Consequences to Holders of Talc Personal Injury Claims ..................~~112~~110

**Article XIV. CONCLUSION AND RECOMMENDATION** .........................................~~113~~111

**Exhibit A**:    Plan

**Exhibit B**:    Financial Projections – North American Debtors

**Exhibit C**:    Financial Projections – ITI

**Exhibit D**:    Liquidation Analysis

~~US-DOCS\116915437~~US-DOCS\117855212RLF1 ~~23862506v.1~~24099353v.1

**IMPORTANT DATES**

| Event[2] | Date |
|---|---|
| DS Hearing / Voting Record Date | ~~August 26~~October 8, 2020 |
| Deadline to Mail Solicitation Packages and Related Notices | ~~August 29~~October 13, 2020 |
| Deadline for Plaintiffs' Attorneys to Return Directive and Client List | ~~September 10~~October 26, 2020 |
| Deadline to File Plan Supplement | ~~September 14~~October 30, 2020 |
| Deadline for Cure Objections | The later of (a) ~~August 11, 2020~~ 14 days after receipt of a Sale Cure Notice (for North American Debtor counterparties only) or ~~September 22~~November 5, 2020 (for ITI counterparties only) and (b) ~~10~~14 days after (for all counterparties) (i) the Debtors serve a counterparty with notice of any amendment or modification to such counterparty's proposed cure cost or (ii) the Debtors serve a counterparty with notice of a supplement to the list of contracts to be assumed pursuant to the Plan |
| Deadline for Assumption Objections | The later of (a) ~~September 22~~November 5, 2020 and (b) ~~10~~14 days after the Debtors serve a counterparty with notice of a supplement to the list of contracts to be assumed |
| Deadline to File Rule 3018 Motions | ~~September 22~~November 5, 2020 at 4:00 p.m. (Prevailing Eastern Time) |
| Voting Deadline | ~~October 5~~November 20, ~~2020,~~ at 4:00 p.m. (Prevailing Eastern Time); *provided* that the Debtors are authorized to extend the Voting Deadline for any party entitled to vote on the Plan |
| Confirmation Objection Deadline | ~~October 5~~November 20, 2020, at 4:00 p.m. (Prevailing Eastern Time) |
| Deadline to File Voting Certification[3] | ~~October 13~~November 27, 2020, at 4:00 p.m. (Prevailing Eastern Time) |

---

[2]     Capitalized terms used in this summary of "Important Dates" and not otherwise defined herein or in the Plan shall have the meaning ascribed to them in the Voting Procedures (as defined below).

[3]     In addition to tabulating the votes from Class 4 to accept or reject the Plan, the Voting Certification shall also include a list of Class 4 creditors who opted out of the releases contained in the Plan, as well as those Class 4 creditors whose solicitation packages were returned as undeliverable, or who were not served with a solicitation package pursuant to paragraph 10 of the order of the Bankruptcy Court approving the Voting Procedures [Docket No. [___]].

| **Event**[2] | **Date** |
|---|---|
| Confirmation Reply Deadline and Deadline to File Form of Confirmation Order | ~~October 30~~December 12, 2020, at 4:00 p.m. (Prevailing Eastern Time) |
| Confirmation Hearing | ~~November 4~~December 17, 2020, at 10:00 a.m. (Prevailing Eastern Time) |

~~US-DOCS\116915437~~US-DOCS\117855212RLF1 ~~23862506v.1~~24099353v.1

**IMPORTANT ACRONYMS, ABBREVIATED NAMES, AND DEFINITIONS**

- "**FCR**" means James L. Patton (or any Bankruptcy Court-appointed successor), in his capacity as the legal representative for any and all persons who may assert Talc Personal Injury Demands.

- "**Imerys Non-Debtors**" means Imerys S.A. and its Affiliates, excluding the Debtors.

- "**Imerys Plan Proponents**" means Imerys S.A., on behalf of itself and all Persons listed on Schedule II attached to the Plan, each of which Imerys S.A. has direct or indirect ownership or other control over.

- "**Imerys S.A.**" means Imerys S.A., the Debtors' parent entity.  For the avoidance of doubt, Imerys S.A. is a non-debtor.

- "**Imerys USA**" means Imerys USA, Inc., a Non-Debtor Affiliate.  For the avoidance of doubt, Imerys USA is a non-debtor.

- "**ITA**" means Imerys Talc America, Inc., a Delaware corporation.

- "**ITC**" means Imerys Talc Canada Inc., a Canadian corporation.

- "**ITI**" means Imerys Talc Italy S.p.A., an Italian corporation.

- "**ITV**" means Imerys Talc Vermont, Inc., a Vermont corporation.

- "**Mircal**" means Mircal S.A., a Non-Debtor Affiliate.  For the avoidance of doubt, Mircal is a non-debtor.

- "**Mircal Italia**" means Mircal Italia S.p.A., a Non-Debtor Affiliate.  For the avoidance of doubt, Mircal Italia is a non-debtor.

- "**Plan Proponents**" means, collectively, the Debtors, the Tort Claimants' Committee, the FCR, and the Imerys Plan Proponents.

- "**Reorganized Debtors**" means the Reorganized North American Debtors and Reorganized ITI.

- "**Reorganized ITA**" means ITA, renamed Ivory America, Inc., on and after the Effective Date.

- "**Reorganized ITC**" means ITC, renamed Ivory Canada, Inc., on and after the Effective Date.

- "**Reorganized ITI**" means ITI, on and after the Effective Date.

- "**Reorganized ITV**" means ITV, renamed Ivory Vermont, Inc., on and after the Effective Date.

- "**Reorganized North American Debtors**" means Reorganized ITA, Reorganized ITV, and Reorganized ITC.

- "**Tort Claimants' Committee**" means the official committee of tort claimants in the Debtors' Chapter 11 Cases appointed by the United States Trustee, as such committee is reconstituted from time to time.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE.

THIS SOLICITATION IS BEING CONDUCTED NOT ONLY WITH RESPECT TO THE DEBTORS IN THE ABOVE-CAPTIONED BANKRUPTCY CASES, BUT ALSO BY **IMERYS TALC ITALY S.P.A.** PRIOR TO ITS FILING OF A VOLUNTARY PETITION UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE.  BECAUSE NO CHAPTER 11 CASE HAS YET BEEN COMMENCED FOR IMERYS TALC ITALY S.P.A., THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE WITH RESPECT TO IMERYS TALC ITALY S.P.A.  FOLLOWING COMMENCEMENT OF ITS CHAPTER 11 CASE, IMERYS TALC ITALY S.P.A. EXPECTS TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AND THE SOLICITATION OF VOTES.  THE ASSETS AND LIABILITIES OF IMERYS TALC ITALY S.P.A. ARE DESCRIBED IN DETAIL IN THIS DISCLOSURE STATEMENT.

ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS ATTACHED EXHIBITS INCLUDING THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ATTACHED TO THE PLAN AND THE PLAN SUPPLEMENT, WHICH CONTROL OVER THE DISCLOSURE STATEMENT IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THIS DATE.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.

PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS OR EQUITY INTERESTS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING LETTERS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  NO SOLICITATION OF VOTES MAY BE MADE EXCEPT AFTER DISTRIBUTION OF THIS DISCLOSURE STATEMENT.   NO PERSON HAS BEEN AUTHORIZED TO DISTRIBUTE ANY INFORMATION CONCERNING THE PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING LETTERS.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.  THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT," AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS.  THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN ARTICLE IX, "CERTAIN FACTORS TO BE CONSIDERED."   IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS.   THE DEBTORS AND THE REORGANIZED DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.   THE HISTORICAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN OBTAINED FROM SUCH REPORTS AND OTHER SOURCES OF INFORMATION AS ARE AVAILABLE TO THE DEBTORS.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, EITHER THE DEBTORS OR THE REORGANIZED DEBTORS.

# ARTICLE I.

# INTRODUCTION

This Disclosure Statement[4] is being furnished by the Plan Proponents[5] as co-proponents of the *Second Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated ~~May 15~~October 5, 2020, pursuant to section 1125 of the Bankruptcy Code, and in connection with the solicitation of votes for acceptance or rejection of the Plan.

ITA, ITV, and ITC are debtors in the Chapter 11 Cases[6] pending in the Bankruptcy Court. ITI, an affiliate of the North American Debtors,[7] may file (but has not yet filed) a chapter 11 case. If and when ITI files a chapter 11 case, the Debtors will ask the Bankruptcy Court to enter an order jointly administering ITI's chapter 11 case with the Chapter 11 Cases under lead case number 19-10289 (LSS).  The contemplated filing of ITI is designed to address the Talc Personal Injury Claims against ITI, and ITI's filing is contingent upon acceptance of the Plan by the holders of such Claims, as described more fully below.  As a result, certain holders of Claims against ITI are being solicited through this Disclosure Statement to vote on the Plan prior to ITI's contemplated chapter 11 filing.

This Disclosure Statement is being transmitted in order to provide adequate information to enable holders of Claims in Class 4 (Talc Personal Injury Claims) who are the sole Impaired Class entitled to vote on the Plan to make an informed judgment in exercising their right to vote to accept or reject the Plan.

By order dated [_____], 2020, the Bankruptcy Court approved this Disclosure Statement as to the North American Debtors in accordance with section 1125 of the Bankruptcy Code, and found that it contained "adequate information" sufficient to enable a hypothetical investor of the relevant class to make an informed judgment about the Plan, and authorized its use in connection with the solicitation of votes with respect to the Plan.  **Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the fairness or**

---

[4]    Capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to them in Article I of the Plan.  To the extent that a term is defined in this Disclosure Statement and is defined in the Plan, the definition contained in the Plan controls.

[5]    Each of the Debtors, the Tort Claimants' Committee, the FCR, and Imerys S.A., on behalf of itself and all Persons listed on Schedule II attached to the Plan, each of which Imerys S.A. has direct or indirect ownership or other control over (the "**Imerys Plan Proponents**") are Plan Proponents.  For the avoidance of doubt, ITI will be a Plan Proponent as a Debtor to the extent it commences a proceeding under the Bankruptcy Code, otherwise, ITI will be a Plan Proponent as an Imerys Plan Proponent.

[6]    As the context requires, Chapter 11 Cases includes the case to be commenced in the Bankruptcy Court under chapter 11 of the Bankruptcy Court for ITI.

[7]    The term "**Debtors**" refers to ITA, ITV, and ITC, and to the extent ITI commences a proceeding under the Bankruptcy Code, the term "Debtors" also refers to ITI.  The term "**North American Debtors**" refers to ITA, ITV, and ITC.

**merits of the Plan.**  No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.

Because no chapter 11 case has yet been commenced for ITI, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code with respect to ITI.  If the requisite votes are obtained, following commencement of its chapter 11 case, ITI expects to promptly seek an order of the Bankruptcy Court approving this Disclosure Statement and the solicitation of votes with respect to ITI.

1.1     <u>Voting and Confirmation</u>.

**Article X of this Disclosure Statement specifies the deadlines, procedures, and instructions for voting to accept or reject the Plan, as well as the applicable standards for tabulating Ballots (as defined below).  The following is an overview of certain information related to voting that is contained in Article X of this Disclosure Statement and elsewhere in this Disclosure Statement.**

Each holder of a Claim in Class 4 is entitled to vote to accept or reject the Plan.  Class 4 shall have accepted the Plan pursuant to the requirements of sections 1126(c) and 524(g) of the Bankruptcy Code if at least two-thirds (2/3) in amount and seventy-five percent (75%) in number of those voting Claims in Class 4 (Talc Personal Injury Claims) voted to accept the Plan.  Assuming the requisite acceptances are obtained, the Plan Proponents intend to seek confirmation of the Plan at the Confirmation Hearing scheduled for ~~November 4~~December 17, 2020, at 10:00 a.m. (Prevailing Eastern Time) before the Bankruptcy Court.  **For the avoidance of doubt, though proposed jointly, the Plan constitutes a separate Plan for each Debtor.  Accordingly, a vote cast either to accept or reject the Plan by holders of Claims in Class 4 will be applied in the same manner and in the same amount against each Debtor.**

The Debtors have engaged Prime Clerk LLC (the "**Solicitation Agent**" or "**Claims Agent**") to assist in the voting process.

The Solicitation Agent will provide additional copies of all materials and process and tabulate Ballots for Class 4.

**To be counted, your Ballot indicating acceptance or rejection of the Plan must be received by the Solicitation Agent no later than 4:00 p.m. (prevailing Eastern Time) on** ~~October 5~~**November 20, 2020** (the "**Voting Deadline**"), unless the Plan Proponents, in their sole discretion, extend the period during which votes will be accepted on the Plan, in which case the term "Voting Deadline" shall mean the last date on, and time by which, such period is extended. **Any executed Ballot that does not indicate either an acceptance or rejection of the Plan or indicates both an acceptance and rejection of the Plan will not be counted as an acceptance or rejection and will not count toward the tabulations required pursuant to either sections 524(g) or 1129 of the Bankruptcy Code.**

Prior to deciding whether and how to vote on the Plan, each holder of a Claim entitled to vote should consider carefully all of the information in this Disclosure Statement, including Article IX entitled "*Certain Factors to be Considered.*"  **You should read this Disclosure**

2

Statement and the Plan with care in evaluating how the Plan will affect your Claim(s) before voting to accept or reject the Plan.

The Plan Proponents are the Debtors, the Tort Claimants' Committee, the FCR, and the Imerys Plan Proponents. The Plan Proponents believe that the Plan is in the best interests of all creditors of the Debtors. The Plan Proponents recommend that all holders of Claims against the Debtors, whose votes are being solicited, submit Ballots to accept the Plan.

## ARTICLE II.

## OVERVIEW OF THE PLAN

The following is a general overview of how the Plan treats all holders of Claims against, and Equity Interests in, the Debtors. It is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, financial statements, and notes appearing elsewhere in this Disclosure Statement and in the Plan. For a more detailed description of the terms and provisions of the Plan, please refer to Article VII of this Disclosure Statement titled "*The Plan of Reorganization*."

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan does not contemplate the substantive consolidation of the Debtors' Estates. Instead, the Plan, although proposed jointly, constitutes a separate chapter 11 plan for each of ITA, ITV, ITC, and ITI (to the extent ITI commences a proceeding under the Bankruptcy Code).

In developing the Plan, the Debtors engaged in good-faith, arms'-length negotiations with Imerys S.A., the Tort Claimants' Committee, and the FCR. The Debtors are pleased to report that, subject to the terms of the letters accompanying this Disclosure Statement, both the Tort Claimants' Committee and the FCR support the Plan and are Plan Proponents.

2.1    General Overview

The North American Debtors commenced their Chapter 11 Cases in order to manage the significant potential liabilities arising from claims by plaintiffs alleging personal injuries caused by exposure to talc mined, processed and/or distributed by one or more of the North American Debtors. As of the Petition Date, one or more of the North American Debtors had been sued by approximately 14,650 claimants seeking damages for personal injuries allegedly caused by exposure to the North American Debtors' talc products, with the vast majority of such claims (approximately 98.6%) based on alleged exposure to cosmetic talc products.

The Debtors' stated purpose of the Chapter 11 Cases is to confirm a plan of reorganization that will maximize the value of the Debtors' assets for the benefit of all stakeholders and, pursuant to sections 524(g) and 105(a) of the Bankruptcy Code, will include a trust mechanism to address Talc Personal Injury Claims in a fair and equitable manner. The Plan Proponents believe that the Plan accomplishes these goals. Indeed, the Plan embodies a global settlement of issues (the "**Imerys Settlement**") among the Plan Proponents, and implements a comprehensive settlement among the Debtors, on the one hand, and Rio Tinto America Inc. ("**Rio Tinto**"), on behalf of itself and the Rio Tinto Captive Insurers (as defined below), and for the benefit of the

3

Rio Tinto Protected Parties, and Zurich American Insurance Company, in its own capacity and as successor-in-interest to Zurich Insurance Company, U.S. Branch ("**Zurich**"), on behalf of itself and for the benefit of the Zurich Protected Parties, on the other hand, and consented to by the Tort Claimants' Committee and the FCR (the "**Rio Tinto/Zurich Settlement**").  The Rio Tinto/Zurich Settlement finally resolves disputes over (i) alleged liabilities relating to the Rio Tinto Corporate Parties' (as defined below) prior ownership of the Debtors, (ii) alleged indemnification obligations of the Rio Tinto Corporate Parties, and (iii) the amount of coverage to which the Debtors claim to be entitled under the Talc Insurance Policies issued by the Zurich Corporate Parties and the Rio Tinto Captive Insurers.  The Imerys Settlement and the Rio Tinto/Zurich Settlement will generate substantial recoveries for the holders of Talc Personal Injury Claims.  ⁹  ~~The Plan also facilitates J&J's ⁸~~ ~~assumption of the defense of all J&J Talc Claims (as defined below) in accordance with the J&J Protocol Order and the J&J Protocol (each as defined below).~~

A Talc Personal Injury Trust will be established pursuant to the Plan that will comply in all respects with the requirements of section 524(g)(2)(B)(i) of the Bankruptcy Code, and assume all Talc Personal Injury Claims.  The Talc Personal Injury Trust will be funded with the Talc Personal Injury Trust Assets in order to resolve Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents.  The Plan also contemplates a section 363 sale process, by which the assets of the North American Debtors will be marketed to third parties pursuant to a court-approved sale process.  The net proceeds from the Sale (as defined below) will be used to fund the Talc Personal Injury Trust in accordance with the terms of the Plan.  As further described in this Disclosure Statement, the Talc Personal Injury Trust will manage the Talc Personal Injury Trust Assets, and liquidate such assets to enable it to resolve Talc Personal Injury Claims pursuant to the Trust Distribution Procedures ~~and the J&J Protocol Order~~.

Under the Plan, holders of Allowed Unsecured Claims against the North American Debtors that are not Talc Personal Injury Claims will be paid in full.

Although ITI is not currently in bankruptcy, ITI will solicit acceptance of the Plan as a "prepackaged plan of reorganization" and if the Plan is approved by the requisite number and amount of holders of Talc Personal Injury Claims, it would provide for the permanent settlement of Talc Personal Injury Claims against ITI contemporaneously with the Talc Personal Injury Claims against the North American Debtors.  Holders of Equity Interests in and Claims against ITI (other than holders of Talc Personal Injury Claims and Non-Debtor Intercompany Claims) will be Unimpaired, or otherwise "ride through," the Chapter 11 Cases.

---

⁹ ~~The J&J Protocol Order has not been entered to date.  This Disclosure Statement is intended to summarize (but not modify) the terms of the Revised Proposed J&J Order (as defined below) proposed in the Committee's Response (as defined below) to the J&J Reply (as defined below), which response is supported by the Debtors, as further described in Section 4.2(b) of this Disclosure Statement.  J&J has not filed a response to these filings made by the Tort Claimants' Committee, the FCR, or the Debtors.~~

⁸ ~~"**J&J**" means Johnson & Johnson, Johnson & Johnson Baby Products Company, Johnson & Johnson Consumer Companies, Inc., Johnson & Johnson Consumer Inc., and each of their past and present parents, subsidiaries and Affiliates, direct and indirect equity holders, and the successors and assigns of each, excluding the Debtors and the Imerys Non-Debtors.~~

~~US-DOCS\116915437~~US-DOCS\117855212RLF1 ~~23862506v.1~~24099353v.1

(a)    *The Channeling Injunction*

The Channeling Injunction to be issued as part of the Plan will permanently and forever stay, bar, and enjoin holders of Talc Personal Injury Claims from taking any action for the purpose of directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Talc Personal Injury Claim other than from the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures, or as otherwise set forth in the Trust Distribution Procedures.  Each holder of a Talc Personal Injury Claim will have no right whatsoever at any time to assert its Talc Personal Injury Claim against any Protected Party ~~(except nominally as set forth in the Trust Distribution Procedures solely with respect to J&J Talc Claims against the Debtors which shall be defended by J&J in accordance with the J&J Protocol Order after being channeled to the Talc Personal Injury Trust pursuant to the terms of the Plan)~~ or any property or interest in property of any Protected Party.  The Protected Parties include: (i) the Debtors and any Person who served as a director or officer of either Debtor at any time during the Chapter 11 Cases, but solely in such Person's capacity as such; (ii) the Reorganized Debtors; (iii) the Imerys Protected Parties; (iv) any Person, except for the Talc Personal Injury Trust, that, pursuant to the Plan or otherwise, after the Effective Date, becomes a direct or indirect transferee of, or successor to, the Debtors, the Reorganized Debtors, or any of their respective assets (but only to the extent that liability is asserted to exist as a result of its becoming such a transferee or successor); (v) the Buyer (as defined below) (but only to the extent that liability is asserted to exist as a result of its becoming a transferee or successor to the Debtors); (vi) the Settling Talc Insurance Companies; and (vii) the Rio Tinto Protected Parties.

The effect of "channeling" Talc Personal Injury Claims to the Talc Personal Injury Trust is that Talc Personal Injury Claims may only be pursued against, and resolved by, the Talc Personal Injury Trust and in connection with the Trust Distribution Procedures, or as otherwise set forth in the Trust Distribution Procedures.  Following the Effective Date of the Plan, Talc Personal Injury Claims may not be asserted against the Debtors, the Reorganized Debtors, or any other Protected Party~~; *provided, however*, that, pursuant to the Trust Distribution Procedures, holders of J&J Talc Claims will be permitted to pursue such claims in the tort system solely in accordance with the J&J Protocol Order and the J&J Protocol after such claims have been channeled to the Talc Personal Injury Trust~~.  For the avoidance of doubt, Talc Personal Injury Claims include Indirect Talc Personal Injury Claims and Talc Personal Injury Demands.

(b)    *Imerys Settlement*

To resolve the Debtors' Talc Personal Injury Claims the Plan incorporates a global settlement between the Plan Proponents that provides that, *inter alia*:

- the Debtors will commence a 363 sale process to sell substantially all assets of the North American Debtors (the "**Sale**") to one or more purchaser(s) (the "**Buyer**"), in which Imerys S.A. or its non-debtor affiliates (each, a "**Non-Debtor Affiliate**", and together with Imerys S.A., the "**Imerys Non-Debtors**") may participate in any auction as bidder, but will not be designated as a stalking horse purchaser (if any is selected);

5

- in the event the Plan is properly accepted by holders of Talc Personal Injury Claims, ITI will commence a chapter 11 bankruptcy proceeding to be jointly administered (subject to Bankruptcy Court approval) with the North American Debtors' Chapter 11 Cases prior to the Confirmation Hearing;

- the equity interests in the North American Debtors will be canceled, and on the Effective Date, equity interests in the Reorganized North American Debtors will be authorized and issued to the Talc Personal Injury Trust; and

- the equity interests in ITI will be reinstated following the Effective Date, with approximately 99.66% of such equity interests retained by Mircal Italia S.p.A. ("**Mircal Italia**"), a Non-Debtor Affiliate.

The Imerys Non-Debtors have agreed to make, or cause the Imerys Contribution to be made in exchange for the releases and channeling injunction benefiting the Imerys Protected Parties as contemplated pursuant to the Plan. As further described below, the Imerys Contribution consists of four components, which include (i) the Imerys Settlement Funds, (ii) the Imerys Cash Contribution, (iii) the Talc Trust Contribution, and (iv) the Additional Contribution (each as defined below).

*Imerys Settlement Funds*

On, prior to, or as soon as reasonably practicable after the Effective Date, the Imerys Non-Debtors will contribute, or cause to be contributed, the Imerys Settlement Funds to the Debtors or the Reorganized Debtors, as applicable, which the Debtors or the Reorganized Debtors, as applicable, will contribute to the Talc Personal Injury Trust upon the Effective Date receipt.

The Imerys Settlement Funds are comprised of at least $177.5 million, consisting [10] of: (i) $75 million, consisting of Cash and the Talc PI Note,[8] plus (ii) 100% of the Sale Proceeds, and plus (iii) a contingent purchase price enhancement of up to $102.5 million, subject to the value of the Sale Proceeds. The contingent purchase price enhancement is described in Section 6.4(b) of this Disclosure Statement. For the avoidance of doubt, the net proceeds from the Sale(s) less any related expenses will be paid by the Buyer to the North American Debtors, as applicable, upon the close of the Sale(s) and then contributed to the Talc Personal Injury Trust.

*Imerys Cash Contribution*

As provided in the Plan, on or prior to the Effective Date, the Imerys Non-Debtors have agreed to contribute, or cause to be contributed, the following to the Debtors or the Reorganized Debtors, as applicable (the "**Imerys Cash Contribution**"):

(1) the balance of the Intercompany Loan (as defined in Section 3.1(d)(2) of this Disclosure Statement) totaling approximately $18.6 14.1 million as of July August 31, 2020, for the purpose of funding administrative expenses

---

[10] The value of the Talc PI Note is $500,000.

[8] The value of the Talc PI Note is $500,000.

6

during the pendency of the Chapter 11 Cases, as well as certain of the Reserves;[119]

(2)     $5 million (less any amounts already paid and noted in an accounting to the Tort Claimants' Committee and the FCR) for payment of Allowed Claims in Class 3a through inclusion in the Reorganized North American Debtor Cash Reserve or the Disputed Claims Reserve, as applicable; and

(3)     up to $15 million, to the extent the Debtors do not have available Cash to pay all Administrative Claims in full on the Effective Date and would otherwise be administratively insolvent; *provided* that Imerys S.A. shall fund the Debtors' administrative expenses as follows: Imerys S.A. shall pay fifty percent (50%) of such expenses in Cash (in an amount not to exceed $15 million) and fifty percent (50%) shall be funded by a dollar-for-dollar reduction of the Imerys Settlement Funds (in an amount not to exceed $15 million) (the "**Contingent Contribution**").

### *Talc Trust Contribution*

In addition to the Imerys Cash Contribution, the Imerys Non-Debtors have agreed to contribute, or cause to be contributed, the following to the Talc Personal Injury Trust (the "**Talc Trust Contribution**") on or prior to the Effective Date:

(1)     rights and interests to the proceeds of the Shared Talc Insurance Policies, and all rights against third parties held by the Imerys Non-Debtors relating to Talc Personal Injury Claims, including any related indemnification rights, each of which is to be identified in the Plan Supplement (the "**Contributed Indemnity and Insurance Interests**"); and

(2)     a Pledge Agreement to be issued by Mircal Italia pursuant to which the Talc Personal Injury Trust will be granted an Encumbrance entitling the Talc Personal Injury Trust to fifty-one percent (51%) of the common stock of ITI in the event of a default under the Talc PI Note (the "**Talc PI Pledge Agreement**").

### *The Additional Contribution*

Finally, in addition to the Imerys Cash Contribution and the Talc Trust Contribution, on or prior to the Effective Date, the Imerys Non-Debtors have agreed to take the following actions (the "**Additional Contribution**"):

(1)     waive all Non-Debtor Intercompany Claims against the Debtors; and

---

[119]    In connection with the contribution of the balance of the Intercompany Loan, the Imerys Non-Debtors have agreed to waive certain setoff rights in the amount of $13,672,414.39.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

(2)    unless otherwise assumed by the Buyer, assume any Pension Liabilities of the North American Debtors through and after the Effective Date of the Plan.

The Imerys Settlement is further described in Articles VI and VII of this Disclosure Statement.

(c)    *Rio Tinto/Zurich Settlement*

The Plan incorporates the Rio Tinto/Zurich Settlement, a comprehensive settlement among the Debtors, on the one hand, and Rio Tinto, on behalf of itself and the Rio Tinto Captive Insurers, and for the benefit of the Rio Tinto Protected Parties, and Zurich, on behalf of itself and for the benefit of the Zurich Protected Parties, on the other hand, and consented to by the Tort Claimants' Committee and the FCR, to resolve Talc Personal Injury Claims and the Rio Tinto/Zurich Released Claims (as defined below) against the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties (as applicable, and subject to the limitations provided in the Plan). The Rio Tinto/Zurich Settlement provides, *inter alia*, that:

- Zurich will buy back any and all of the Debtors' rights under Talc Insurance Policies issued by the Zurich Corporate Parties, free and clear of any rights of third parties, pursuant to section 363 of the Bankruptcy Code, and Three Crowns Insurance Company Limited, Metals & Minerals Company Pte. Ltd., and Falcon Insurance Ltd. (collectively, or individually, as appropriate, the "**Rio Tinto Captive Insurers**") will buy back any and all of the Debtors' rights under Talc Insurance Policies issued by the Rio Tinto Captive Insurers, free and clear of any rights of third parties, pursuant to section 363 of the Bankruptcy Code, as set out in the Plan and in the Rio Tinto/Zurich Settlement Agreement that will be part of the Plan Supplement; and

- the Rio Tinto Protected Parties and the Zurich Protected Parties will be released from the Rio Tinto/Zurich Released Claims and the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties will receive the benefit of the Channeling Injunction and related injunctive protections under the Plan, which will be effective after the Rio Tinto/Zurich Contribution (as defined below) is made to the Talc Personal Injury Trust.

Rio Tinto (on behalf of itself and the Rio Tinto Captive Insurers and for the benefit of the Rio Tinto Protected Parties) and Zurich (on behalf of itself and for the benefit of the Zurich Protected Parties) will contribute $340 million in cash, along with certain rights of indemnification, contribution, and/or subrogation against third parties, to the Talc Personal Injury Trust, as follows:

8

- On or prior to the date that is thirty (30) days after the Rio Tinto/Zurich Trigger Date,[1210] Zurich will contribute, or cause to be contributed, $260 million in Cash to the Talc Personal Injury Trust.

- On or prior to the date that is fourteen (14) days after the Rio Tinto/Zurich Trigger Date, Rio Tinto will contribute $80 million in Cash to the Talc Personal Injury Trust.

- On the Rio Tinto/Zurich Trigger Date, or as soon as reasonably practicable thereafter (not to exceed three (3) Business Days), the appropriate Rio Tinto Corporate Parties and the appropriate Zurich Corporate Parties shall each execute and deliver to the Talc Personal Injury Trust, in a form reasonably acceptable to the Talc Personal Injury Trust, an assignment to the Talc Personal Injury Trust of (i) all of their rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to the payment or defense of any Talc Personal Injury Claim or any past talc-related claim against the Debtors prior to the Effective Date, and (ii) all of their other rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to any Talc Personal Injury Claim.

The Rio Tinto/Zurich Settlement is further described in Articles VI and VII of this Disclosure Statement.

(d)    *Talc Personal Injury Trust*

The Plan contemplates the establishment of a Talc Personal Injury Trust that will assume all Talc Personal Injury Claims and resolve Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents.  The Talc Personal Injury Trust Documents include the Talc Personal Injury Trust Agreement, the Trust Distribution Procedures, the Cooperation Agreement, and all other agreements, instruments, and documents governing the establishment, administration, and operation of the Talc Personal Injury Trust.  The Trust Distribution Procedures are attached to the Plan as Exhibit A, the Talc Personal Injury Trust Agreement is attached to the Plan as Exhibit B, and the Cooperation Agreement and other Talc Personal Injury Trust Documents will be included in the Plan Supplement.

On the Effective Date (unless otherwise noted below), the Talc Personal Injury Trust will receive the Talc Personal Injury Trust Assets, which include:

- the Imerys Settlement Funds;

---

[1210]    The "**Rio Tinto/Zurich Trigger Date**" is the date that the Tort Claimants' Committee or the Talc Personal Injury Trust provides Rio Tinto and/or Zurich (as applicable) with notice of the occurrence of the later of (a) the Effective Date, or (b) the date the Affirmation Order becomes a Final Order.

9

- the right to receive the Rio Tinto/Zurich Contribution pursuant to the Rio Tinto/Zurich Settlement;

- the balance of the Intercompany Loan not otherwise used to fund the Reserves or pay administrative expenses during the pendency of the Chapter 11 Cases;

- the balance of the $5 million used for the payment of Allowed Claims in Class 3a not otherwise used to fund the (i) Reorganized North American Debtor Cash Reserve or (ii) the Disputed Claims Reserve;

- all non-Cash assets included in the Imerys Contribution, including the Contributed Indemnity and Insurance Assets;

- all Cash held by the North American Debtors on the Effective Date, not including the Cash used to fund the Reserves;

- all Cash remaining in the Reserves to the extent required by the Plan, if any (to be distributed to the Talc Personal Injury Trust in accordance with the Plan), *provided that* any Cash remaining in the Fee Claim Reserve or the Administrative Claim Reserve after all Fee Claims and Administrative Claims have been satisfied pursuant to the Plan that is attributable to the Contingent Contribution, shall be disbursed with fifty percent (50%) distributed to the Talc Personal Injury Trust and fifty percent (50%) distributed to Imerys S.A;[~~13~~11]

- the Talc Personal Injury Trust Causes of Action[~~14~~12] and any and all proceeds thereof;

- the Talc Insurance Actions and the Talc Insurance Action Recoveries;

- the rights of the Debtors with respect to the Talc Insurance Policies, the Talc Insurance CIP Agreements, the Talc Insurance Settlement Agreements, and Claims thereunder;

- the Reorganized North American Debtor Stock;[~~15~~13] ~~and~~

- any and all other funds, proceeds, or other consideration otherwise contributed to the Talc Personal Injury Trust pursuant to the Plan and/or the Confirmation Order or other order of the Bankruptcy Court~~.~~;

---

[~~13~~11]    Subject to the foregoing, all excess Cash balances in the Reserves will be disbursed to the Talc Personal Injury Trust pursuant to the terms of the Plan.

[~~14~~12]    Talc Personal Injury Trust Causes of Action include certain claims and causes of action held or assertable by the Debtors that will be transferred to the Talc Personal Injury Trust pursuant to the Plan.

[~~15~~13]    The value of the Reorganized North American Debtor Stock will be dependent upon the value of the property held by the Reorganized North American Debtors following the Effective Date, which is anticipated to primarily consist of the post-Effective Date balances of the Reserves and the North American Debtor Causes of Action.  Furthermore, it is contemplated that certain of the North American Debtor Causes of Action may be included in the Sale.  For the avoidance of doubt, the North American Debtor Causes of Action do not include Talc Personal Injury Trust Causes of Action.  The Debtors do not believe that the North American Debtor Causes of Action have significant value.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

- the rights of the Debtors with respect to the J&J Indemnification Obligations; and

- the income or earnings realized or received in respect of the foregoing.

For the reasons detailed in this Disclosure Statement, the Plan Proponents believe that there will be substantially more assets available to resolve Talc Personal Injury Claims under the Plan than would be the case if there were a chapter 7 liquidation.  Pursuant to the Plan, the Imerys Non-Debtors, Rio Tinto, and Zurich are contributing substantial assets to the Talc Personal Injury Trust, which would not be otherwise available for holders of Talc Personal Injury Claims, as it is unlikely that any of those entities would proceed with the settlements set forth in the Plan and Disclosure Statement in the absence of the Injunctions.  Also, pursuing litigation with such entities would be costly and time consuming for the Debtors' Estates and would carry litigation risk.  In addition, the Plan anticipates a value-maximizing sale process that could result in additional proceeds being available for distribution to holders of Talc Personal Injury Claims.  The Plan Proponents also believe that conversion of the Chapter 11 Cases to chapter 7 liquidation proceedings would substantially impact the costs and efficiency of administering the Talc Personal Injury Claims compared to the Talc Personal Injury Trust.  For these and other reasons explained in detail herein, the Plan Proponents believe that all holders of Talc Personal Injury Claims, the only Class entitled to vote, should vote to accept the Plan.

(e)    *The J&J Protocol*

The Plan facilitates the J&J Protocol as approved by the Bankruptcy Court pursuant to the J&J Protocol Order.  Pursuant to the J&J Protocol, J&J will assume the defense and control the resolution of Direct Talc Personal Injury Claims against a Debtor that have been channeled to the Talc Personal Injury Trust where the plaintiff alleges use of talcum powder products distributed by J&J, provided the claims have not reached a final resolution (*e.g.*, no settlement has been reached and no non-appealable final judgment has been entered against a Debtor in a court of competent jurisdiction) (the "**J&J Talc Claims**") on the terms further described in Section 6.3 of this Disclosure Statement and the Trust Distribution Procedures.

2.2    The J&J Protocol takes into account J&J's indemnification obligations to the Debtors by requiring J&J to assume the defense of all J&J Talc Claims that are channeled to the Talc Personal Injury Trust on the Effective Date while maintaining the Debtors' claims against J&J for past indemnification obligations resulting from costs and expenses incurred by the Debtors prior to the Effective Date with respect to or resulting from J&J Talc Claims.  The J&J Protocol does not release J&J from any obligations that it may owe to another party and is subject to the terms of the Rio Tinto/Zurich Settlement.   Summary Description of Classes and Treatment

Except for Administrative Claims and Priority Tax Claims, which are not required to be classified, all Claims and Equity Interests are divided into classes under the Plan.  The following chart summarizes the treatment of such classified and unclassified Claims and Equity Interests under the Plan.  This chart is only a summary of such classification and treatment and reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.  The Plan Proponents reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

11

The summary of classification and treatment of Claims against and Equity Interests in the Debtors is as follow:

| Class | Designation[16][14] | Applicable Debtor(s) | Treatment | Impairment and Entitlement to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | North American Debtors and ITI | Each holder of an Allowed Priority Non-Tax Claim shall receive Cash equal to the Allowed Amount of such Priority Non-Tax Claim. | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | 100% |
| 2 | Secured Claims | North American Debtors and ITI | All Allowed Secured Claims in Class 2 shall be treated pursuant to one of the following alternatives on the Distribution Date: (i) payment in full in Cash in accordance with section 506(a) of the Bankruptcy Code; (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code; (iii) such other treatment as the Debtor and the holder shall agree; or (iv) such other treatment as may be necessary to render such Claim Unimpaired. | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | 100% |
| 3a | Unsecured Claims Against the North American Debtors | North American Debtors | Each holder of an Allowed Unsecured Claim against the North American Debtors shall be paid the Allowed Amount of its Unsecured Claim on the Distribution Date. Such payment shall be (i) in full, in Cash, plus post-petition interest at the federal judgment rate in effect on the Petition Date, or (ii) upon such other less favorable terms as may be mutually agreed upon between the holder of the Unsecured Claim and the applicable North American Debtor or Reorganized North American Debtor. | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | 100% |
| 3b | Unsecured Claims Against ITI | ITI | The legal, equitable, and contractual rights of the holders of Unsecured Claim against ITI are unaltered by the Plan. Except to the extent that a holder of an Unsecured Claim against ITI agrees to a different | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | 100% |

---

[16][14]    The Plan Proponents reserve the right to eliminate any Class of Claims in the event they determine that there are no Claims in such Class.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

| Class | Designation[16][14] | Applicable Debtor(s) | Treatment | Impairment and Entitlement to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| | | | treatment, on and after the Effective Date, Reorganized ITI will continue to pay or dispute each Unsecured Claim in the ordinary course of business in accordance with applicable law. | | |
| 4 | Talc Personal Injury Claims | North American Debtors and ITI | On the Effective Date, liability for all Talc Personal Injury Claims shall be channeled to and assumed by the Talc Personal Injury Trust without further act or deed and shall be resolved in accordance with the Trust Distribution Procedures. Pursuant to the Plan and the Trust Distribution Procedures, each holder of a Talc Personal Injury Claim shall have its Claim permanently channeled to the Talc Personal Injury Trust, and such Claim shall thereafter be ~~asserted exclusively against the Talc Personal Injury Trust and~~ resolved in accordance with the Trust Distribution Procedures. | Impaired (Entitled to Vote) | Unknown[17][15] |
| 5a | Non-Debtor Intercompany Claims | North American Debtors and ITI | On or after the Effective Date, all Non-Debtor Intercompany Claims (*i.e.*, a Claim held by a Non-Debtor Affiliate against a Debtor) shall be canceled, discharged, or eliminated. Although Non-Debtor Intercompany Claims are Impaired, each holder of an Allowed Claim in Class 5a has consented to its treatment under the Plan as a Plan Proponent and is therefore presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. | Impaired Not Entitled to Vote (Presumed to Accept) | 0% |

---

[17][15]    The Talc Personal Injury Claims will be resolved pursuant to the terms of the Trust Distribution Procedures.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

| Class | Designation[16][14] | Applicable Debtor(s) | Treatment | Impairment and Entitlement to Vote | Estimated Recovery |
|-------|---------------------|----------------------|-----------|-------------------------------------|--------------------|
| 5b | Debtor Intercompany Claims | North American Debtors and ITI | At the election of the applicable Debtor, each Debtor Intercompany Claim (*i.e.*, a Claim held by a Debtor against another Debtor) shall (i) be reinstated, (ii) remain in place, and/or (iii) with respect to certain Debtor Intercompany Claims in respect of goods, services, interest, and other amounts that would have been satisfied in Cash directly or indirectly in the ordinary course of business had they not been outstanding as of the Petition Date, be settled in Cash. | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | 100% |
| 6 | Equity Interests in the North American Debtors | North American Debtors | On the Effective Date, all Equity Interests in the North American Debtors shall be canceled, annulled, and extinguished.<br><br>Although Equity Interests in the North American Debtors are Impaired, each holder of an Allowed Equity Interest in Class 6 has consented to its treatment under the Plan as a Plan Proponent and is therefore presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. | Impaired<br><br>Not Entitled to Vote (Presumed to Accept) | Cancelled |
| 7 | Equity Interests in ITI | ITI | On the Effective Date, all Equity Interests in ITI shall be reinstated and the legal, equitable, and contractual rights to which holders of Equity Interests in ITI are entitled shall remain unaltered to the extent necessary to implement the Plan. | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | Reinstated |

2.3    The Plan Supplement

Unless otherwise ordered by the Bankruptcy Court, the Plan Proponents will file the Plan Supplement with the Bankruptcy Court no later than twenty-one (21) days prior to the earlier of (i) the deadline for submission of Ballots to vote to accept or reject the Plan, or (ii) the deadline to object to Confirmation of the Plan.  The Plan Supplement will include: (a) a list of Executory Contracts and Unexpired Leases to be assumed by the North American Debtors, together with the Cure Amount for each such contract or lease; (b) a list of Executory Contracts and Unexpired Leases to be assumed by ITI, together with the Cure Amount for each such contract or lease; (c) a list of Executory Contracts and Unexpired Leases to be rejected by ITI; (d) a list of the Settling

14

Talc Insurance Companies; (e) a list of the North American Debtor Causes of Action; (f) a list of the ITI Causes of Action; (g) a list of the Contributed Indemnity and Insurance Interests; (h) the Cooperation Agreement; (i) the Amended Charter Documents; (j) the list of the officers and directors of the Reorganized North American Debtors; (k) the Talc PI Note; (l) the Talc PI Pledge Agreement; (m) the identity of the initial Talc Trustees; (n) a list of the initial members of the Talc Trust Advisory Committee; (o) a list of the Talc Insurance Policies; and (p) the Rio Tinto/Zurich Settlement Agreement.

As provided in the Plan, certain documents included in the Plan Supplement may be revised prior to Confirmation.  For example, the list of Executory Contracts and Unexpired Leases to be assumed by the North American Debtors will be revised as needed to take into account additional Executory Contracts and Unexpired Leases to be assumed in advance of the Confirmation Hearing. On or before ~~September 14~~October 30, 2020, the Debtors shall serve copies of the lists of Executory Contracts and Unexpired Leases provided for in the Plan Supplement on the applicable counterparties.  Additionally, the Debtors will serve any revised Executory Contract and Unexpired Lease list on affected counterparties within two (2) days of filing such lists~~.  Each~~, *provided that* each counterparty to an Executory Contract or Unexpired Lease that is later added to the list and/or has its Cure Amount modified by the Debtors shall have until the date that is ~~ten (10~~fourteen (14) days after the Debtors serve such counterparty with notice thereof to object to the assumption of its Executory Contract or Unexpired Lease and, if the proposed Cure Amount has been modified, exclusively to the proposed Cure Amount.

## ARTICLE III.

## GENERAL INFORMATION

This Article III provides a general overview of the North American Debtors' and ITI's corporate history, business operations, organizational structures, and assets.  It also discusses the events leading to the filing of the Chapter 11 Cases.

3.1    History and Business, Organizational Structure, and Assets of the North American Debtors

(a)    *Corporate History*

The Debtors were acquired in 2011 (the "**2011 Purchase**") by an Imerys Group[~~18~~16] holding company, Mircal S.A. ("**Mircal**").  Mircal entered into an agreement with Rio Tinto to purchase the stock of the Rio Tinto Corporate Parties' talc operations,[~~19~~17] including the stock of Luzenac America, Inc. ("**Luzenac America**") and Windsor Minerals, Inc. ("**Windsor**").[~~20~~18]  The stock

---

[~~18~~16]    The Imerys Group is a French multinational corporation comprised of over 360 affiliated entities directly and indirectly owned by Imerys S.A.

[~~19~~17]    As used herein, "**Rio Tinto Corporate Parties**" means Rio Tinto plc, Rio Tinto Limited, and the Persons listed on Schedule IV attached to the Plan, each of which is directly or indirectly controlled by Rio Tinto plc and/or Rio Tinto Limited, and the future successors or assigns of Rio Tinto plc, Rio Tinto Limited, and/or the Persons listed on Schedule IV attached to the Plan, solely in their capacity as such.

[~~20~~18]    The Debtors have been owned by various entities over their 100-year history.  In 1989, Johnson & Johnson sold the stock of Windsor, which is now known as ITV, to Cyprus Mines Corporation

purchase agreement entitled Mircal to substitute other members of the Imerys Group to acquire individual talc-related entities from the Rio Tinto Corporate Parties, and Mircal exercised that right to cause Imerys Minerals Holding Limited (UK), an indirect, non-debtor subsidiary of Imerys S.A., to acquire the outstanding shares of Luzenac America.  At the same time, Mircal also acquired the stock of Luzenac, Inc. ("**Luzenac**"), which is now known as ITC, from another member of the Rio Tinto Corporate Parties, QIT Fer & Titane, Inc.  Mircal remains the direct parent entity of ITC. Luzenac America, Windsor, and Luzenac subsequently changed their names to ITA, ITV, and ITC, respectively.[21][19]

At the time of the 2011 Purchase there were only approximately eight Talc Personal Injury Claims pending against one or more of the Debtors, each of which was in the early stages of litigation.  Since then, the number of suits has increased significantly, with over 16,000 on or prior to Petition Date.

(b)    *North American Debtors' Operations*

The Debtors are in the business of mining, processing, selling, and/or distributing talc.  Talc is mined from talc deposits, which were geologically formed through the transformation of existing rocks under the effect of hydrothermal fluids carrying one or several of the components needed to form the mineral.  There are many types of talc and each ore body has its own features and geology. Accordingly, the mining and processing of talc requires highly-technical and specialized knowledge.  Talc is used in the manufacturing of dozens of products in a variety of sectors, including coatings, rubber, paper, polymers, cosmetics, food, and pharmaceuticals.

The operations of the North American Debtors include talc mines, plants, and distribution facilities located in: Montana (Yellowstone, Sappington, and Three Forks); Vermont (Argonaut and Ludlow); Texas (Houston); and Ontario, Canada (Timmins, Penhorwood, and Foleyet).  Talc sold by the North American Debtors is utilized in numerous products, including, but not limited to: polymers; paper; paints and coatings; specialties; rubber; personal care/cosmetics; building materials; and others.  ITA and ITV sell talc directly to their customers as well as to third party and affiliate distributors.  ITC exports the vast majority of its talc into the United States almost entirely on a direct basis to its customers.

As of the Petition Date, approximately 5% of the North American Debtors' revenues were from talc sales in the United States for personal care/cosmetic applications.  In addition, as of the Petition Date, the North American Debtors' top customers in the personal care/cosmetic sector were manufacturers of baby powder (50% of personal care sales), makeup (30% of personal care

---

("**Cyprus Mines**").  In 1992, Cyprus Mines and its affiliates transferred such stock and all of their other assets in the talc business to a newly formed subsidiary, Cyprus Talc Corporation ("**CTC**").  As a result of this transaction, Windsor became a wholly-owned subsidiary of CTC.  Contemporaneously with the 1992 transfer, RTZ America, Inc. purchased the outstanding shares of CTC.  Also in 1992, CTC was renamed Luzenac America, which is now known as ITA.  Windsor continued to remain a wholly-owned subsidiary of Luzenac America.

[21][19]    A timeline of the ownership history of each of the North American Debtors is included in the *Declaration of Alexandra Picard, Chief Financial Officer of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 10] (the "**First Day Declaration**").

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

sales), and soap (20% of personal care sales). Although there are other talc suppliers in the market, the North American Debtors were historically the sole supplier of cosmetic talc to J&J.[20]   The Debtors report that although personal care/cosmetic sales make up only a minor percentage of the North American Debtors' revenue, nearly all of the pending Talc Personal Injury Claims allege injuries based on use of cosmetic products containing talc, though some claims also allege injuries based on exposure to talc in an industrial setting.

Together, the North American Debtors are the market leader with respect to talc production in North America, representing nearly 50% of the market.   Their main competitors are the following companies: Mineral Technologies Inc., American Talc Company, Inc., IMI Fabi, and Cimbar.

(c)   *Existing Organizational Structure and Ongoing Businesses*

The North American Debtors continue to mine, process, and distribute talc, utilizing a core group of executives and staff personnel who are assisted by specialized outside professionals and consultants.

As of ~~June 30~~July 31, 2020, the North American Debtors employed approximately ~~281~~ 274 employees – ~~183~~ 175 by ITA, ~~28~~ 29 by ITV, and 70 by ITC.  These employees are located at the North American Debtors' offices in Roswell, Georgia, and talc mines, plants, and distribution facilities in Montana, Vermont, Texas, and Ontario, Canada.[~~22~~21]   Approximately 101 of the employees are salaried employees and approximately ~~180~~ 173 of the employees are hourly employees.  In addition, the North American Debtors' workforce also includes approximately ~~11~~ 8 part-time employees and approximately 29 independent contractors.[~~23~~22]  The North American Debtors also rely on services provided by Imerys S.A. and certain Non-Debtor Affiliates under various shared services arrangements, as further described in the First Day Declaration and the Cash Management Motion (as defined below).

The officers (with position) of each of the North American Debtors as appointed by their respective boards of directors are: Giorgio La Motta (President), Anthony Wilson (Treasurer), and Ryan J. Van Meter (Secretary).  In addition, the boards of directors of ITA and ITV consist of Kevin Collins, Giorgio La Motta, and Douglas Smith, and the board of directors of ITC consists of Kevin Collins, Giorgio La Motta, Douglas Smith, and Matthias Reisinger.

---

[20]    "**J&J**" means Johnson & Johnson, Johnson & Johnson Baby Products Company, Johnson & Johnson Consumer Companies, Inc., Johnson & Johnson Consumer Inc., Johnson & Johnson Consumer Products, Inc., and each of their past and present parents, subsidiaries and Affiliates, direct and indirect equity holders, and the successors and assigns of each, excluding the Debtors and the Imerys Non-Debtors.

[~~22~~21]    Certain of the North American Debtors' officers conduct operations from a rented office located in San Jose, California.

[~~23~~22]    Included as hourly employees are approximately 108 employees who are covered by various collective bargaining agreements.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

(d)    *Description of the North American Debtors' Assets*

The North American Debtors' assets consist primarily of cash on hand, parent loan receivables, insurance assets and indemnification rights, inventory, machinery and equipment, mineral reserves, land and buildings, and accounts receivable. Each of these asset categories is described below.

(1)    Cash and Investments

As of ~~June 30~~July 31, 2020, the North American Debtors held approximately $~~16.3~~ 14.4 million in Cash in the aggregate. The Cash is maintained, in part, in various accounts maintained by the North American Debtors. ITA maintains a lockbox account and an EFT account, as well as an adequate assurance account in accordance with the order approving the Utilities Motion [Docket No. 296] (as defined below), each of which are located at SunTrust Bank. ITC has two operating accounts (one for U.S. Dollars and one for Canadian Dollars) held at the Royal Bank of Canada and a deposit account held at SunTrust Bank. ITC's deposit account was opened post-petition at the request of the United States Trustee. ITA and ITC also maintain interest bearing savings accounts with Signature Bank that were opened in January 2020. ITV does not hold any bank accounts.

As of ~~June 30~~July 31, 2020, the North American Debtors also had an accounts receivable balance totaling approximately $~~20.6~~ 17.7 million. This balance primarily corresponds to receivables due from third party customers incurred in the ordinary course of sales.

(2)    Cash Management System and Intercompany Loans

The North American Debtors are not party to any secured financing arrangements or any third party credit facilities, and instead have relied on the positive cash flows generated by their operations to run their businesses and fund the Chapter 11 Cases.

Prior to the Petition Date, and as further described in the First Day Declaration, ITA and ITV participated in a zero balance accounting cash management system with their non-debtor, indirect parent, Imerys USA, Inc. ("**Imerys USA**").[~~24~~23] Under such system, at the end of each business day, funds remaining in certain of ITA's bank accounts were automatically swept to Imerys USA. The amount swept to Imerys USA less any payments made by Imerys USA on account of expenses incurred by ITA or ITV was recorded in ITA's and Imerys USA's books as an interest-bearing intercompany loan in favor of ITA pursuant to (i) that certain Intercompany Loan and Investment Agreement, dated as of June 2018, by and between ITA and Imerys USA (the "**ITA Loan Agreement**") and (ii) that certain Intercompany Loan and Investment Agreement, dated as of June 2018, by and between ITV and Imerys USA (the "**ITV Loan Agreement**" and,

---

[~~24~~23]    A description of the Debtors' cash management system, deposit practices, and intercompany transactions is found in *Debtors' Motion for Orders Under 11 U.S.C. §§ 105(a), 345, 363, 503(b), and 507(a), Fed. R. Bankr. P. 6003 and 6004, and Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing Continuation of Existing Deposit Practices, (III) Approving the Continuation of Intercompany Transactions, and (IV) Granting Superpriority Administrative Expense Status to Certain Postpetition Intercompany Claims* [Docket No. 11] (the "**Cash Management Motion**").

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

together with the ITA Loan Agreement, the "**Intercompany Loan Agreement**").[25][24] Prior to the Petition Date, ITA and ITV modified certain aspects of their cash management system and eliminated the practice of automatically sweeping funds to Imerys USA. As of the date hereof, (i) ITA has an outstanding loan receivable from Imerys USA in the amount of approximately $13,000,000 8,500,000 (the "**ITA Loan**") and (ii) ITV has an outstanding loan receivable from Imerys USA in the amount of approximately $3,000,000 (the "**ITV Loan**").

ITC operates under a separate cash management system from the other North American Debtors. Historically, excess cash generated by ITC's operations was periodically swept to Imerys S.A. at the discretion of ITC. All transfers of cash that were made to Imerys S.A. (net of any cash transfers made from Imerys S.A. to ITC) were recorded as an intercompany interest-bearing loan on the books of Imerys S.A. and ITC pursuant to (i) that certain Intra-Group Treasury Agreement (the "**Treasury Agreement**"), by and between Imerys S.A. and certain of its subsidiaries, including the North American Debtors, and (ii) that certain Intercompany Loan and Investment Agreement by and between Imerys S.A. and ITC. As of the date hereof, ITC holds an outstanding loan due and payable from Imerys S.A. in the amount of approximately $2,600,000 (the "**ITC Loan**" and, together with the ITA Loan and the ITV Loan, the "**Intercompany Loan**").

### (3)    Insurance Policies, Indemnity Rights, and Settlement Agreements

The North American Debtors are insureds, or otherwise have rights to coverage, under numerous Talc Insurance Policies covering, among other things, liability for Talc Personal Injury Claims. Although the Debtors estimate that the amount of the aggregate insurance available is material, the realizable value of such coverage is subject to any number of factors, including, without limitation, the solvency of the insurers and the outcome of existing and any future coverage disputes. As further described in Article V of this Disclosure Statement, prepetition, the North American Debtors were actively pursuing claims against certain insurers for substantial insurance coverage and collections against these insurers, and were engaged in disputes with certain of their predecessors in interest regarding who has the right to access certain Talc Insurance Policies.

In addition, the Debtors believe that (i) Talc Personal Injury Claims related to the North American Debtors' sale of talc to J&J are subject to uncapped indemnity rights against J&J under certain stock purchase and supply agreements and (ii) one or more of the North American Debtors (*e.g.*, ITV f/k/a Windsor Minerals, Inc.) have the rights to the proceeds of insurance policies issued to J&J. J&J has historically disputed the existence and extent of any indemnity obligations owed to the Debtors or the Imerys Non-Debtors, and has disputed that the North American Debtors have any rights to the proceeds of insurance policies issued to J&J.

As of the date hereof, the North American Debtors have identified various insurance and indemnity assets, including:

- certain amounts that are potentially collectible from insurers on account of unpaid billings for prepetition claims in an estimated amount up to $109,000;

---

[25][24]    The Intercompany Loan Agreements were amended by that certain Letter Agreement, dated as of February 11, 2019.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

- remaining aggregate limits under the Talc Insurance Policies with solvent insurers (not otherwise subject to a Bankruptcy Court-approved settlement agreement) having an estimated realizable value of approximately $830 million available to pay claims covered under such agreements, which estimate excludes any estimate for anticipated recoveries on account of the coverage provided by insurers who are subject to settlement agreements;

- the right to access certain shared insurance policies issued to J&J and its subsidiaries with estimated total aggregate limits of approximately $2 billion; *provided, however*, that J&J disputes that the Debtors are entitled to such proceeds;

- the right to seek the proceeds of policies issued to Standard Oil (Indiana) and its subsidiaries with total aggregate limits of approximately $1.2 billion; and

- indemnity rights against J&J~~, which are more fully described in the J&J Protocol.~~.

- As described in Articles IV, VI, and VII of this Disclosure Statement, the Debtors' ability to access certain of these insurance and indemnity assets is affected by the Rio Tinto/Zurich Settlement.

(4)    Other Assets

As of ~~June 30~~July 31, 2020, the North American Debtors also had the following core assets:

- Inventory with an approximate value of $~~29.7~~29.8 million. The inventory includes raw materials, finished goods, and other inventory or supplies. Raw materials represent the largest component of total inventory for ITA and ITV, totaling approximately $~~14.3~~14.1 million and $~~1.4~~1.7 million, respectively, and include, among other things, purchased crude ore and mined ore. Raw materials represent the largest component of total inventory for ITC, totaling approximately $~~3.7~~3.4 million, and include, among other things, mined ore.

- Machinery, fixtures, and equipment with an approximate value of $~~37.0~~36.4 million.

- Mining assets with a value of approximately $~~13.4~~13.5 million. Mineral reserves and overburden represent approximately $5.3 million and $~~8.0~~8.1 million of the mining assets, respectively. Moreover, the North American Debtors' mineral reserves are comprised of the unmined portion of the ore deposits at the North American Debtors' mines.

- Land and buildings with an approximate value of $~~7.3~~5.7 million (after accumulated depreciation), primarily consisting of industrial buildings and related improvements, including infrastructure, and the land under and surrounding the buildings and production facilities.

3.2     History and Business, Organizational Structure, and Assets of ITI

(a)     *Corporate History*

In 1895, the Società Talco e Grafite Val Chisone ("**Società**") was organized for the purpose of mining minerals, including talc, from the Val Chisone and Valle Germanasca valleys in the Piedmont region of Italy.  In July of 1907, Talco e Grafite Val Chisone S.V.C. ("**Talco e Grafite**") was incorporated in Pinerolo, Italy, and subsequently acquired all of the tangible and intangible assets of Società.  Thereafter, on April 5, 1990, Finanziaria Minerario Industriale was organized in the Piedmont region of Italy, and on August 31, 1990, Finanziaria Minerario Industriale was merged with Talco e Grafite and renamed Talco Val Chisone S.p.A.

Talco Val Chisone S.p.A. changed its name to Luzenac Val Chisone S.p.A. after it was acquired by Rio Tinto Talc Limited.  Then, as with the predecessor entities of the North American Debtors, Luzenac Val Chisone S.p.A. was acquired by the Imerys Group as part of the 2011 Purchase.  Luzenac Val Chisone S.p.A. was then renamed Imerys Talc Italy S.p.A.  ITI is a majority-owned subsidiary of Mircal Italia, which in turn is an indirect subsidiary of Imerys S.A.

(b)     *ITI's Operations*

Like the North American Debtors, ITI is in the business of mining, processing, selling, and/or distributing talc to a variety of end markets.  ITI's talc operations include a talc mine in Rodoretto, and a plant and office in Porte.  Talc that is mined in Rodoretto is sent to the plant in Porte where it is processed, refined into various talc products, and packaged for distribution.  The office in Porte houses ITI's general management administrative operations.

ITI sells its talc through internal sales channels as well as through third party distributors. Talc sold by ITI is utilized in numerous products, including, but not limited to: specialties (39%); polymers (23%); personal care (22%); paints and coatings (10%); and other (6%).[26][25]  ITI has a leading market share for its products in Europe, the Middle East, and Africa.  In addition, ITI also sells talc to purchasers in North America.  Approximately 4% of ITI's current revenues arise from talc sales to the United States for cosmetic/personal care applications.

(c)     *Existing Organizational Structure and Ongoing Businesses*

ITI continues to mine, process, and distribute talc, utilizing a core group of executives and personnel.  ITI currently employs 84 83 full-time employees and one part-time employee. Specifically, 48 49 of ITI's employees are located at the Rodoretto mine, 23 are located at the Malanaggio plant, and 14 12 are located at the Porte office.  ITI also benefits from certain shared services arrangements with Imerys S.A. and Imerys Talc Europe.  Specifically, ITI pays an aggregate annual fee to Imerys Talc Europe for services related to, among other things: information systems and technology, research and application, general management and communications, industrial production, geology, process engineering, marketing, finance, human resources, health, safety and environment, and logistics.  ITI also pays an annual fee to Imerys S.A. on account of certain group-level executive management, legal, and other corporate overhead services provided

---

[26][25]     The foregoing percentages are based on total sales in 2019.

by Imerys S.A. to ITI.  These services include, among other things: business administration, management, marketing and sales, legal, internal and external communications, accounting, finance, taxation, treasury, information technology, technology, transport, insurance, purchasing, and product safety and stewardship services.

The officers (with position) and Statutory Auditors of ITI are: Kosman Rivolti (CEO), Laura Campanini (Board of Statutory Auditors Chairman), Giorgio Monetti (Statutory Auditor), and Anna Angela De Benedittis (Statutory Auditor).  In addition, the board of directors of ITI consists of Vincenzo Walter Gentile, Kosman Rivolti, and Kevin Collins.

(d)    *Description of ITI's Assets*

(1)    Cash, Cash Management System and Intercompany Loan

ITI has relied on the positive cash flows generated by its operations to run its business.

As of ~~May~~ August 31, 2020, ITI held approximately $~~35,000~~8,000.  ITI has ~~a pooling account located at Société Generale and~~ an operating account located at Société Générale Italy and a tax disbursement account located at Intesa Sanpaolo S.p.A.  Each of these accounts are maintained in ITI's name.

ITI ~~has historically operated~~ operates under a separate cash management system from the North American Debtors.  ~~Excess~~ Historically, excess cash generated by ITI's operations ~~is periodically~~ was swept on a daily basis to a bank account in the name of Imerys ~~S.A. or Imerys Talc Europe (as applicable), at the discretion of ITI and pursuant to the Treasury Agreement and that certain SOGECASH International Pooling   Service Agreement, dated as of March 1, 1994. All transfers that are made to Imerys S.A. or~~ Talc Europe, where it was pooled in an operating account held by Imerys Talc Europe with funds from other European affiliates and eventually upstreamed to Imerys S.A.  ITI also periodically transferred funds to Imerys S.A. as compensation for intercompany transactions, which were historically consolidated and settled with Imerys S.A. pursuant to an intercompany netting system and recorded on the relevant entity's books as a payable or receivable, as applicable.  All transfers that were made to Imerys Talc Europe or Imerys S.A. (net of any cash transfers made from Imerys ~~S.A. or Imerys~~ Talc Europe or Imerys S.A. to, or on behalf of, ITI) ~~are~~ were recorded as an intercompany interest-bearing loan on the books of ITI and Imerys ~~S.A. or Imerys~~ Talc Europe or Imerys S.A., as applicable.

As of the date of this Disclosure Statement, excess funds are no longer swept from ITI to Imerys Talc Europe or Imerys S.A.  Instead, all funds generated from ITI's operations are retained in ITI's bank accounts.  Moreover, ITI now satisfies all intercompany obligations on account of intercompany purchases or services as they come due in cash.  Notwithstanding the foregoing, payables and receivables between ITI and the Debtors may continue to accumulate, with such obligations to be settled on a cash basis at the discretion of the Debtors and ITI.

~~hereof~~As of August 31, 2020, ITI holds an outstanding loan receivable (i) from Imerys ~~S.A.~~ Talc Europe in the amount of approximately $~~558,000 and an outstanding loan receivable 23.9 million and (ii)~~ from Imerys ~~Talc Europe~~ S.A. in the amount of approximately $~~21.7 million~~332,000.  ITI also had an accounts receivable balance totaling approximately

$~~3,500,000~~ 3,700,000 as of ~~May~~ August 31, 2020. This balance primarily corresponds to receivables due from third party customers incurred in the ordinary course of sales.

       (2)    Other Assets

As of ~~May~~ August 31, 2020, ITI maintained the following other core assets:

- Inventory with an approximate value of $~~1,750,000~~2,300,000. The inventory includes raw materials, spare parts, work in progress, and finished goods. Raw materials represent the largest component of total inventory, totaling approximately $~~1,200,000~~1,600,000, and include, among other things, crude ore, bag stops, and pallets.

- Mineral reserves with a value of approximately $~~900,000~~950,000. The mineral reserves represent the unmined portion of the ore deposits at the mine.

- Land and buildings with an approximate value of $~~3,400,000~~ 3,500,000 (after accumulated depreciation), primarily consisting of industrial buildings and related improvements, including infrastructure, and the land under and surrounding the buildings and production facilities.

### 3.3    Filing of the Chapter 11 Cases and Plan Discussions

       (a)    *Events Leading to the Chapter 11 Cases*

In June 2018, as a result of the increasing number of talc claims being asserted against the North American Debtors in the tort system and the unwillingness of the North American Debtors' insurers and indemnitors to provide coverage for the Debtors' mounting defense costs, the North American Debtors retained Latham & Watkins LLP ("**Latham**") to assist them in evaluating a number of strategic options to manage their talc-related liabilities. The North American Debtors and Latham worked with the North American Debtors' litigation defense counsel, Alston & Bird LLP ("**Alston**") and Gordon Rees Scully Mansukhani LLP, and insurance coverage counsel, Neal, Gerber & Eisenberg LLP ("**NGE**"), to identify and assess alternatives to resolve the North American Debtors' talc-related liabilities, including evaluating the costs and benefits associated with continuing to litigate talc-related claims in the tort system.

At the same time, the North American Debtors explored the viability of using a chapter 11 bankruptcy filing to address their talc liabilities by channeling them to a trust created under sections 105 and 524(g) of the Bankruptcy Code that would be structured to ensure the fair and equitable treatment of present and future claimants. As part of this exploratory effort and to facilitate the implementation of this potential chapter 11 strategy if and when authorized by their boards of directors, the North American Debtors entered into an engagement letter with James L. Patton, Jr. of Young Conaway Stargatt & Taylor, LLP ("**Young Conaway**") on September 25, 2018 to serve as a proposed future claims representative to represent the interests of individuals who may in the future assert talc-related demands against the Debtors. Mr. Patton retained Young Conaway as his legal counsel and Ankura Consulting Group, LLC ("**Ankura**") as his claims analyst to provide advice in connection with such representation. Together with his advisors,

Mr. Patton initiated an extensive diligence process into the North American Debtors' businesses and the pending talc litigation, subject to a confidentiality agreement.

The North American Debtors worked constructively with Mr. Patton and his advisors throughout the prepetition process by providing access to relevant documents and responses to numerous information requests, as well as by attending multiple in-person diligence meetings, among other things.  The North American Debtors hoped to engage with plaintiffs' firms prior to the commencement of the Chapter 11 Cases to determine if a pre-arranged chapter 11 plan could be achieved.  The North American Debtors did not have sufficient time, however, to conduct the diligence process that would be necessary for the parties to engage in meaningful discussions given the pending trial calendar (and risk of incurring a judgment for which the North American Debtors could not post an appeal bond) and the ever-increasing costs of settlement and defense. Nevertheless, the constructive discussions with Mr. Patton confirmed, from the Debtors' perspective, the viability of using chapter 11 to resolve the Talc Personal Injury Claims in a manner that would maximize the distributable value for all stakeholders and provide fair and equitable treatment of the Talc Personal Injury Claims.

      (b)     *Filing the Chapter 11 Cases, Continuation of Diligence, and Plan Discussions*

After extensive discussions with their advisors, the North American Debtors ultimately determined that, due to the increasing number of Talc Personal Injury Claims being asserted against them in the tort system and the prospect of diminishing readily accessible insurance/third party indemnitor coverage, continued litigation in the tort system was not a viable option and that the commencement of the Chapter 11 Cases was in the best interests of the North American Debtors, their Estates, and their stakeholders.  Accordingly, on February 13, 2019, the North American Debtors' boards of directors authorized the filing of these Chapter 11 Cases.

Following the Petition Date, as described more fully in Article V, the FCR and the Tort Claimants' Committee were each appointed in the Chapter 11 Cases.  Plan discussions between the Tort Claimants' Committee, the FCR, and the North American Debtors (and related due diligence) progressed after the bankruptcy filing.  The plan discussion process included, among other things, in-person meetings and conference calls between counsel to the North American Debtors and counsel to the Tort Claimants' Committee and the FCR, written responses to information requests from counsel to the Tort Claimants' Committee and the FCR, and a comprehensive document production, wherein the North American Debtors produced, and counsel to the Tort Claimants' Committee and the FCR reviewed, documents and electronic files relating to the Debtors, their affiliates, and predecessors.

As discussions matured and the diligence process reached advanced stages, the North American Debtors, the Tort Claimants' Committee, and the FCR focused on the possibility of a comprehensive settlement involving Imerys S.A., ITI, and the other Non-Debtor Affiliates.  In furtherance of such a settlement, Imerys S.A. provided certain information and documents related to diligence requests from the Tort Claimants' Committee and the FCR.  Such diligence informed the parties' views on a potential contribution that could be made to the Talc Personal Injury Trust by or on behalf of the Imerys Non-Debtors in return for protection under the Channeling Injunction.

24

In light of the foregoing developments, Imerys S.A. and its counsel became more directly involved in the plan negotiations in the months leading up to the filing of the Plan. Representatives of the North American Debtors, the Tort Claimants' Committee, the FCR, and Imerys S.A. spent considerable time negotiating over the terms of a framework for a plan of reorganization for the Debtors that would include a chapter 11 filing for ITI. In particular, the parties focused on the funding for the Talc Personal Injury Trust via the Imerys Contribution, and the terms of the Channeling Injunction. Ultimately, the parties reached an agreement on the key terms for a proposed plan of reorganization and global settlement, which are embodied in the Plan.

      (c)     *ITI*

The global settlement encompassed in the Plan contemplates that ITI will file a voluntary petition for relief under chapter 11, provided that the requisite number of votes to accept the Plan are received from the holders of Talc Personal Injury Claims against the Debtors (including, for the avoidance of doubt, ITI). Given the potential for ITI to face increasing talc-related litigation if it remains in the tort system, ITI has determined that the commencement of a chapter 11 case in order to similarly resolve its talc-related liabilities, pending a vote to accept the Plan by holders of Claims in Class 4, is in the best interests of ITI and its stakeholders.

      (d)     *J&J Negotiations*

During this period, the North American Debtors also engaged in a number of confidential discussions with J&J regarding the resolution of J&J's indemnification obligations with respect to the Talc Personal Injury Claims. These negotiations were premised on, among other things, J&J's agreement to assume the defense of litigation of the Talc Personal Injury Claims and J&J's waiver of indemnification and any other claims against the North American Debtors. As ~~further described herein, the J&J Protocol Order represents resolution of J&J's indemnification obligations to the Debtors with respect to the J&J Talc Claims.~~of the date of this Disclosure Statement, the Plan Proponents remain engaged in ongoing settlement discussions with J&J related to the Debtors' Chapter 11 Cases.

## ARTICLE IV.

## SUMMARY OF LIABILITIES AND RELATED INSURANCE OF THE DEBTORS

### 4.1   Description of Talc Personal Injury Liabilities

The Debtors' most significant liabilities are the numerous Talc Personal Injury Claims asserted against them, which are described in detail below. The Debtors maintain that their talc is safe, that the Talc Personal Injury Claims are without medical or scientific merit, and that exposure to their talc products has not caused personal injuries. The Debtors also contend that the safety of their talc has been confirmed by dozens of peer-reviewed studies and multiple regulatory and scientific bodies, including five of the largest real world studies ever conducted. The Tort Claimants' Committee and the FCR disagree with the Debtors' position, and dispute the validity of the studies relied upon by the Debtors. In support of their position, the Tort Claimants' Committee and the FCR assert, among other things, the relatively nascent development of this tort

and the existence of new or better testing methodologies than those cited in the studies on which the Debtors rely.

As described in the First Day Declaration, it is the Debtors' view that they have had significant success defending against Talc Personal Injury Claims in the tort system and no final, unappealable verdict has been issued against any Debtor in any lawsuit asserting talc related claims. The Debtors assert that they have been and continue to be committed to the quality and safety of their products above all else. Nevertheless, the substantial increase in alleged talc-related claims in the last few years, combined with the current state of the U.S. tort system, has led to overwhelming projected litigation costs (net of insurance) that the Debtors were unable to sustain over the long-term, leading to the chapter 11 filings.

To be clear, though they are each Plan Proponents, neither the Tort Claimants' Committee nor the FCR accept the Debtors' position regarding the safety of their talc or the safety of any products into which talc is incorporated.

(a)    *Overview*

As of the Petition Date, one or more of the Debtors were among the defendants in thousands of actions brought before various U.S. federal and state courts by multiple plaintiffs asserting Talc Personal Injury Claims. Plaintiffs have historically asserted two types of Talc Personal Injury Claims: (1) claims alleging ovarian cancer or other related gynecological diseases arising as a result of talc exposure (the "**OC Claims**") and (2) claims alleging respiratory cancers or other asbestos-related diseases arising as a result of talc exposure ("**Mesothelioma Claims**"). As of the Petition Date, there were approximately 13,800 pending lawsuits asserting OC Claims and approximately 850 pending lawsuits asserting Mesothelioma Claims against one or more of the North American Debtors. ITI has also been named as a defendant in litigation asserting Talc Personal Injury Claims. As of the date hereof, ITI has been named in eight pending lawsuits asserting Mesothelioma Claims,[2726] and it is possible that ITI may presently be a named defendant in other cases in which it has not been served or otherwise been made aware of such proceedings.

Approximately 98.6% of the pending lawsuits asserting Talc Personal Injury Claims allege injuries based on the use of cosmetic products containing talc. As described above, personal care/cosmetic sales into the United States make up approximately 5% of the North American Debtors' annual revenues and 2% of ITI's annual revenues. In addition, the Debtors historically supplied and at times were the sole supplier of, talc to J&J, and have been routinely named as a co-defendant with J&J in litigation related to the Talc Personal Injury Claims. Approximately 99.8% of the pending and closed lawsuits asserting OC Claims against the Debtors named J&J as a co-defendant, and approximately 80.1% of the pending lawsuits asserting Mesothelioma Claims against the Debtors named J&J as a co-defendant.

---

[2726]    All of these suits have been filed by the same firm, the Lanier Law Firm. As of the filing date of this Disclosure Statement, and in light of the potential chapter 11 filing of ITI contemplated under the proposed Plan, these cases have been dismissed, without prejudice, as to ITI pursuant to an agreement between ITI and the plaintiffs in those suits.

(b)    *Proliferation of Talc Claims*

At the time of the Imerys Group's acquisition of the Debtors, there was only one OC Claim pending against ITA, which was in the early stages of litigation.[27]  In 2014, following a judgment against J&J, the number of suits filed involving OC Claims began to increase.  Approximately 16,500 OC Claims have been filed since 2014 and, as of the Petition Date, approximately 13,800 OC Claims were pending against one or more of the Debtors.

Similarly, when the Debtors were acquired in 2011, there were only approximately seven pending Mesothelioma Claims, which were all in the early stages of litigation.  As with OC Claims, however, plaintiffs began filing Mesothelioma Claims at an increasing pace in 2014, and in early 2016, one of the Mesothelioma Claims reached trial.  Since 2014, approximately 1,200 Mesothelioma Claims have been filed against one or more of the Debtors, of which approximately 850 were still pending as of the Petition Date.[28]

(c)    *OC Claims*

Plaintiffs asserting OC Claims generally allege that they have developed ovarian cancer or other related gynecological cancers as a result of their use of certain cosmetic products, primarily J&J body powders (which were historically comprised almost entirely of talc) for feminine hygiene purposes.  Historically, plaintiffs have asserted that talc itself causes ovarian cancer and have not asserted that talc contained in the body powder was contaminated with trace amounts of asbestos.  In 2017, however, some plaintiffs asserting OC Claims began to allege that their personal injuries may also have been caused by trace asbestos contamination of the talc.  The Debtors dispute all of these allegations.

(d)    *Mesothelioma Claims*

Plaintiffs asserting Mesothelioma Claims generally allege they have developed non-ovarian cancer personal injuries based on some form of asbestos exposure.  Some of these plaintiffs assert that they were only exposed to talc that was contaminated with trace amounts of asbestos, while others allege additional non-talc exposure to asbestos.  It is the Debtors' view that in many cases plaintiffs have made insufficient allegations for the Debtors to determine whether the Mesothelioma Claims are based on cosmetic talc exposure, industrial talc exposure, or both.  For those pending cases where the plaintiff's exposure to talc has been identified with specificity, approximately 63% percent of plaintiffs allege exposure to asbestos through the use of cosmetics, while approximately 24% of plaintiffs allege exposure in industrial occupational settings (the approximately remaining 13% of plaintiffs allege both cosmetic and industrial exposure).

---

[27]    ITA subsequently obtained summary judgment in its favor in that case.

[28]    The Debtors do not intend to seek a formal estimation of the Debtors' total liability for Talc Personal Injury Claims, but they reserve the right to seek such a formal estimation in the future.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

4.2     Description of Talc Insurance Coverage

(a)     *Talc Insurance Coverage*

The North American Debtors have access to, and rights under, various Talc Insurance Policies with Talc Insurance Companies that cover, among other things, certain talc-related personal injury liabilities and related litigation costs (including, in certain instances, defense costs).[30][29]  Specifically, one or more of the North American Debtors have the right to the proceeds of insurance policies for both the OC Claims and the Mesothelioma Claims.[31][30]  As further discussed below, the Debtors are informed and believe that the total amount of insurance available for the OC Claims and the Mesothelioma Claims is at least $670 million and $160 million, respectively.[32][31]  Notwithstanding the foregoing, the amounts available for OC Claims that the Debtors believe are attributable to the Zurich Policies (as defined below) (in excess of $630 million) will be released pursuant to the Rio Tinto/Zurich Settlement in exchange for the Rio Tinto/Zurich Contribution.  Moreover, the Debtors also believe that ITA has rights to seek the proceeds from certain other insurance policies with total aggregate limits of approximately $1.2 billion to resolve Mesothelioma Claims.

The Debtors have reviewed each of the available Talc Insurance Policies referred to herein, as well as secondary evidence.  Based on the Debtors' review, the Debtors believe that each of the Talc Insurance Policies provides coverage for bodily injury allegedly caused by exposure to talc or talc-containing products during the applicable policy period.  Based on the Debtors' review and communications with certain Talc Insurance Companies, the Debtors understand that each of the Talc Insurance Companies that issued the Talc Insurance Policies included within the available limits (as further described below) is solvent and able to pay covered claims.  The Debtors base their belief that the Talc Insurance Policies have realizable value as stated herein on their review of the Talc Insurance Policies, review of secondary evidence, and communications with certain Talc Insurance Companies.[33][32]

Several Talc Insurance Companies have asserted coverage defenses, including but not limited to defenses based on exclusions and other limitations contained in the policies.  The

---

[30][29]     ITI has not identified any insurance coverage for Talc Personal Injury Claims asserted against it and has been paying the defense costs of talc-related personal injury litigation directly.

[31][30]     The payment of defense costs by certain of the Talc Insurance Companies under certain Talc Insurance Policies does not erode the limits of liability available to satisfy talc-related liabilities.

[32][31]     ITA currently is involved in coverage litigation in California state court regarding the scope and amount of available coverage for Mesothelioma Claims under certain Talc Insurance Policies.  This coverage dispute is further discussed below.

[33][32]     For example, a review of the Zurich Policies shows that the total limits are in excess of $650 million, and communications with Zurich confirmed that there is in excess of $630 million in remaining limits.  Likewise, a review of available Cyprus Historical Policies (as defined below) showed that the total limits were approximately $175 million, and communications with certain insurers that issued certain Cyprus Historical Policies confirmed approximately $160 million in remaining limits.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

Debtors have evaluated these purported defenses and believe that such defenses do not preclude insurance coverage, but may impact the scope of available coverage on a claim by claim basis.

        (1)      Insurance Coverage Containing Asbestos Exclusions

***Zurich and Rio Tinto Captive Insurer Policies***.  One or more of the North American Debtors has asserted the right to insurance coverage under certain primary liability policies issued by a Zurich Corporate Party (the "**Zurich Policies**").[33]  Zurich issued primary liability policies to Luzenac America from May 1997 to May 2001 with total aggregate limits of liability of $20 million.  Zurich also issued primary liability policies to certain of the Rio Tinto Corporate Parties from May 2001 to May 2012 with total aggregate limits of $630 million.  The Debtors are informed and believe that the Zurich Policies have been eroded by at least $17 million, resulting in remaining limits of in excess of $630 million.  Pursuant to various agreements with Zurich and certain of the Rio Tinto Corporate Parties, the North American Debtors owe no further deductibles on the Zurich Policies.  The Debtors are unaware of any excess policies issued to the Rio Tinto Corporate Parties or to the North American Debtors above the Zurich Policies.  Each of the Zurich Policies contains an endorsement that purports to exclude coverage for injuries caused by exposure to asbestos.[34]

Zurich and the Rio Tinto Corporate Parties have disputed the North American Debtors' rights to the proceeds of the Zurich Policies on several grounds, including that (1) there is a lack of scientific evidence to support the theory that talc exposure, in and of itself, causes ovarian cancer, thus rendering the Debtors' liability for ovarian-cancer claims uncertain and speculative; (2) the Zurich Policies contain exclusions for asbestos-related liabilities; (3) there is a lack of relevant settlement history; (4) the Debtors have successfully asserted defenses to liability in the tort system; (5) the Debtors have substantial insurance assets other than the Zurich Policies that are available to them; and (6) under the terms of the 2011 Purchase, the Debtors are not entitled to access any Zurich Policies other than ten policies issued by Zurich between May 31, 2001 and May 31, 2011, under which Luzenac America was an insured.

In addition, the Rio Tinto Captive Insurers issued certain policies (the "**Rio Tinto Captive Insurer Policies**") that originally named Luzenac America and certain Rio Tinto Corporate Parties as insureds, and afforded difference-in-limits coverage for sums that exceeded the limits of the Zurich Policies, up to the policy limits of the Rio Tinto Captive Insurer Policies, and the Rio Tinto Corporate Parties purchased certain excess policies above those limits.[35]  Each of these policies contains an exclusion for injuries caused by exposure to asbestos.  Rio Tinto contends that, under

---

[33]      The Zurich Policies include any and all Talc Insurance Policies issued by the Zurich Corporate Parties, including but not limited to the Talc Insurance Policies listed on <u>Schedule VI</u> to the Plan.  For the avoidance of doubt, the Zurich Policies shall not include any policy to the extent such policy provides reinsurance to any Rio Tinto Captive Insurer.

[34]      J&J contends that it qualifies as an additional insured under certain of the Zurich Policies.

[35]      The Rio Tinto Captive Insurance Policies include any and all Talc Insurance Policies issued by the Rio Tinto Captive Insurers, including, but not limited to the Talc Insurance Policies listed on <u>Schedule III</u> attached to the Plan.  For the avoidance of doubt, the Rio Tinto Captive Insurer Policies shall not include any policy to the extent such policy provides reinsurance to any Zurich Protected Party.

29

the terms of the 2011 Purchase, the Debtors no longer have access to coverage under any of these policies.

The Rio Tinto/Zurich Settlement, including the Rio Tinto/Zurich Settlement Agreement, finally resolves all disputes regarding the Debtors' alleged rights to coverage under the above policies and releases the Zurich Protected Parties and the Rio Tinto Protected Parties from any claims directly or indirectly arising out of or related to those policies, in return for the substantial contributions to be made by Zurich and Rio Tinto to the Talc Personal Injury Trust.

*XL Policies*.  One or more of the North American Debtors have the right to insurance coverage under four primary general liability policies and four umbrella polices issued by XL Insurance America, Inc. ("**XL**") to Imerys USA and its subsidiaries.  XL issued primary general liability policies for the period of January 2011 to February 2015 with total aggregate limits of $4 million (the "**XL Primary Policies**").  XL also issued umbrella liability policies for the period of January 2011 to February 2015 with total aggregate limits of $34 million (the "**XL Umbrella Policies**," and together with the XL Primary Policies, the "**XL Policies**").  The Debtors are informed and believe that the XL Policies have total remaining limits of approximately $37 million.  Each of the XL Policies contains an endorsement that purports to exclude coverage for injuries caused by exposure to asbestos.

The Debtors intend to participate in mediation with XL to resolve certain disputes regarding the Debtors' rights to coverage under the XL Policies.

(2)     Insurance Coverage Not Containing Asbestos Exclusions

As a result of the various transactions involving the talc business of Cyprus Mines (as discussed in Article V below), ITA believes it has the right to seek proceeds from insurance policies that provide coverage for liabilities arising out of the talc business of Cyprus Mines and/or its affiliates or predecessors (the "**Cyprus Historical Policies**").  Specifically, the Cyprus Historical Policies consist of numerous primary, excess, and umbrella comprehensive general liability insurance policies issued, or otherwise providing coverage, to Cyprus Mines and/or its affiliates or predecessors between 1961 and 1986.  The policies provide coverage for bodily injury that occurs during the respective policy periods.  The Debtors are informed and believe that all of the primary liability policies that could provide coverage for asbestos-related liabilities arising out of the talc business of Cyprus Mines and/or its affiliates or predecessors have been exhausted, except four primary liability policies issued by The American Insurance Company from May 1961 to October 1964.  The remaining coverage consists of umbrella and excess policies issued by various insurers from April 1962 to July 1986 with total aggregate limits of approximately $160 million.  In addition, the Debtors are informed and believe that ITA also has rights to seek the proceeds from insurance policies issued to Standard Oil (Indiana) from 1980 to 1985 with total aggregate limits of approximately $1.2 billion.  As further discussed below, the North American Debtors are presently litigating their rights to these policies in the Cyprus Insurance Adversary Proceeding (as defined below).

(b)     *J&J*

(1)    J&J Insurance and Indemnity Obligations

*J&J Insurance.*  The Debtors have asserted that one or more of the Debtors have the right to insurance coverage from various insurance policies issued to J&J with total aggregate limits of approximately $2 billion.  For example, ITV (f/k/a Windsor Minerals, Inc.) was a wholly-owned J&J subsidiary during the applicable policy periods of the J&J insurance policies and therefore entitled to coverage.  The Debtors presently are unaware of the total remaining and available limits of the insurance policies issued to J&J.  J&J disputes that the Debtors or any third parties are entitled to the proceeds of any insurance coverage from various insurance policies issued to J&J.

*J&J Indemnification Obligations*.  The Debtors also have asserted that one or more of the Debtors, the Protected Parties, and the Imerys Non-Debtors also have certain, uncapped indemnity rights against J&J for J&J Talc Claims arising under the following agreements: (i) that certain Agreement, between Cyprus Mines Corporation and Johnson & Johnson, dated as of January 6, 1989 (the "**1989 SPA**"); (ii) that certain Talc Supply Agreement, between Windsor Minerals Inc. and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc., dated as of January 6, 1989 (the "**1989 Supply Agreement**"); (iii) that certain Supply Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of April 15, 2001; (iv) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2010; and (v) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2011.~~37~~36

J&J has previously disputed that the indemnification obligations arising out of these agreements in favor of the Debtors are uncapped or that they relate to future claimants.  J&J has also previously disputed that it has any indemnification obligations under the 1989 Supply Agreement to the extent any Talc Personal Injury Claims allege exposure to talc used by J&J that did not conform to J&J's specifications, and has contended that certain periods of time are not covered by any supply agreement between the Debtors and J&J.

More recently, J&J has acknowledged that indemnification obligations exist, but it has contested the scope of its obligations to the Debtors and has asserted that it has claims against the Debtors for indemnity.~~38~~37  While neither J&J nor the Debtors have initiated litigation relating to these indemnity obligations, on June 6, 2019, a lawsuit was brought by National Union Fire Insurance Company of Pittsburgh, Pa. ("**National Union**") against Johnson & Johnson Consumer Companies, Inc., Johnson & Johnson Baby Products Company, and Johnson & Johnson

---

~~37~~36    For the avoidance of doubt, these indemnification obligations include any and all indemnity rights of the Debtors, the Protected Parties, and the Imerys Non-Debtors against J&J for ~~J&J~~ Talc Personal Injury Claims pursuant to ~~the J&J Protocol Order and/or~~ any other applicable, agreement, order, or law.

~~38~~37    *See generally Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion [For] An Order Pursuant to Bankruptcy Rule 2004* [Docket No. 750]; *Memorandum of Law in Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b)*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket No. 2]; *Reply Memorandum of Law in Further Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b)*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket No. 81].

~~US-DOCS\116915437~~US-DOCS\117855212RLF1 ~~23862506v.1~~24099353v.1

(collectively, the "**J&J Defendants**") in the Superior Court of the State of Vermont, Chittenden Unit, styled as *National Union Fire Insurance Company of Pittsburgh, PA. as Subrogee of Cyprus Mines Corporation v. Johnson & Johnson Consumer Companies, Inc. et al.*, Case No. 495-6-19-CNEV (the "**Subrogation Proceeding**").  In the Subrogation Proceeding, National Union sought, among other things, to recover from the J&J Defendants, as the putative subrogee of ITA and Cyprus Mines, the amounts National Union allegedly incurred defending ITA and Cyprus Mines in various asbestos-related bodily injury product liability lawsuits.  In response, on October 8, 2019, the Debtors filed a motion to enforce the automatic stay in the Bankruptcy Court in order to enjoin National Union from continuing the Subrogation Proceeding (the "**Motion to Enforce**") [Docket No. 1117].  Prior to the filing of the Motion to Enforce, the J&J Defendants also filed an answer to National Union's complaint in the Subrogation Proceeding.  On October 18, 2019, shortly after the North American Debtors filed the Motion to Enforce, National Union agreed to dismiss the Subrogation Proceeding without prejudice, and the Debtors withdrew the Motion to Enforce.

In addition, as further discussed below, the North American Debtors are presently litigating their rights to certain of these indemnification obligations in the Cyprus Indemnity Adversary Proceeding (as defined below).

(2)    J&J Removal Attempt

~~*J&J Removal Attempt.*~~  In addition to the foregoing, on April 18, 2019, Johnson & Johnson and Johnson & Johnson Consumer Inc. (collectively, the "**J&J Removal Parties**") commenced a civil action in the U.S. District Court for the District of Delaware (the "**District Court**") and moved to fix venue in the District Court for all pending talc-related personal injury and wrongful death claims (the "**Venue Motion**").[~~39~~38]  The Venue Motion sought to transfer the 2,400 lawsuits under 28 U.S.C. §§ 157(b)(5) and 1334(b), which authorize the federal district court in which a bankruptcy case is pending to hear claims "related to" a debtor's bankruptcy case. Contemporaneously with that filing, the J&J Removal Parties began filing notices of removal in state court actions in order to remove such actions to federal court where they would be subject to transfer under the Venue Motion.  On May 3, 2019, the J&J Removal Parties filed a motion in the Bankruptcy Court to extend the deadline to file such notices of removal in state court actions [Docket No. 486].  On June 27, 2019, the Bankruptcy Court granted the J&J Removal Parties' request to extend the removal deadline [Docket No. 755].

Numerous parties, including the Tort Claimants' Committee, the FCR, and a myriad of plaintiffs' personal injury counsel around the country, filed oppositions in response to the J&J Removal Parties' Venue Motion in the District Court.[~~40~~39]  On July 19, 2019, the District Court denied the J&J Removal Parties' Venue Motion,[~~41~~40] finding that (i) any potential indemnification

---

[~~39~~38]    *Johnson & Johnson and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b)*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket No. 1].

[~~40~~39]    *See* Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket Nos. 37, 45, 46, 48, 49, 50, 53, 55, 56, 57, and 58].

[~~41~~40]    *See Memorandum Opinion*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket No. 96].

~~US-DOCS\116915437~~US-DOCS\117855212RLF1 ~~23862506v.1~~24099353v.1

obligations the Debtors owed to the J&J Removal Parties were not clearly established or vested at the onset and could not serve as a basis for jurisdiction, and (ii) the J&J Removal Parties did not submit clear evidence demonstrating how the pending lawsuits would implicate or impact the North American Debtors' Estates.  Upon entry of the order, the District Court closed the civil case.[42][41]

   (3) J&J Motion to Modify the Automatic Stay

   *J&J Motion to Modify the Automatic Stay.* On March 27, 2020, J&J filed the *Motion Pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order Modifying Automatic Stay to Permit J&J to Send Notice Assuming Defense of Certain Talc Claims and to Implement Talc Litigation Protocol* [Docket No. 1567] (the "**J&J Stay Motion**").  Pursuant to the J&J Stay Motion, J&J sought to modify the automatic stay to (i) permit holders of certain J&J Talc Claims to pursue those claims against the Debtors, (ii) permit J&J to send notices of assumption of the defense of certain J&J Talc Claims, and (iii) take certain other actions set forth in a prior version of the J&J Protocol (the "**Initial J&J Protocol**") to assume the defense of and indemnify the Debtors for certain J&J Talc Claims.

   The Debtors, the Tort Claimants' Committee, and the FCR each opposed the J&J Stay Motion [Docket Nos. 1731, 1732, and 1734], and on May 28, 2020, J&J filed *Johnson & Johnson's Omnibus Reply in Support of J&J's Motion for Entry of Order Modifying Automatic Stay to Implement Talc Litigation Protocol* [Docket No. 1769] (the "**J&J Reply**").  In the J&J Reply, J&J agreed to certain modifications to the Initial J&J Protocol in an attempt to partially resolve certain deficiencies highlighted by the Debtors, the Tort Claimants' Committee, and the FCR in their objections to the J&J Stay Motion.  On July 10, 2020, the Tort Claimants' Committee and the FCR filed the *Joint Response of the Official Committee of Tort Claimants and Future Claimants' Representative to Johnson & Johnson's Omnibus Reply in Support of J&J's Motion for Entry of Order Modifying Automatic Stay to Implement Talc Litigation Protocol* [Docket No. 1976] (the "**Committee's Response**") and the Debtors filed the *Debtors' Response to the Joint Response of the Official Committee of Tort Claimants and Future Claimants' Representative to Johnson & Johnson's Omnibus Reply in Support of J&J's Motion for Entry of Order Modifying Automatic Stay to Implement Talc Litigation Protocol* [Docket No. 1978].  Attached as Exhibit A to the Committee's Response was a revised proposed order seeking approval of certain revisions to the Initial J&J Protocol, as amended by the J&J Reply (the "**Revised Proposed J&J Order**").

   The Revised Proposed J&J Order permits holders of current and future J&J Talc Claims to pursue J&J Talc Claims against the Debtors nominally, permits J&J to send notice of J&J's assumption of the defense of all J&J Talc Claims to holders of such claims, permits J&J to take certain other actions set forth in the J&J Protocol to assume the defense of and indemnify the Debtors for the J&J Talc Claims, and requires J&J to indemnify the Debtors fully for all J&J Talc Claims.  The Revised Proposed J&J Order provides, among other things: (i) that J&J shall have no claims or causes of action against the Debtors, any Reorganized Debtor, any buyer of substantially all of the Debtors' assets or the Talc Personal Injury Trust on account of the J&J Talc Claims or J&J's defense of those claims; (ii) for the effectiveness of the J&J Indemnity Claims and Defense Waiver (as defined on Exhibit 2 to the Revised Proposed J&J Order) and that any

---

[42][41] *See Order*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket No. 97].

claims J&J filed in the Chapter 11 Cases shall be deemed to be withdrawn with prejudice, provided, however, that all arguments under contracts and applicable law that relate to any claims to indemnify the Debtors for punitive damages are preserved; (iii) that the Debtors' rights to assert indemnification claims against J&J with respect to any J&J Talc Claim the Debtors resolved prior to the date of the J&J Protocol Order are preserved; and (iv) that the order does not create any rights in favor of J&J or reduce any rights of the Debtors under any insurance policies.

The Revised Proposed J&J Order provides for the mechanism by which, on the Effective Date, J&J shall assume the defense of the J&J Talc Claims, including with respect to the provision of notices, the selection of defense counsel, and communications with counsel for holders of J&J Talc Claims. The Revised Proposed J&J Order permits holders of J&J Talc Claims to litigate the claims they have asserted, or would assert in the future, against the Debtors in the tort system as they would have been able to do in the absence of the Chapter 11 Cases. Should the holders of J&J Talc Claims succeed on their claims against the Debtors in the tort system, J&J will pay any final judgement entered against the Debtors, subject to J&J's right to dispute its liability for any punitive damage award. J&J will also be authorized to settle J&J Talc Claims on behalf of the Debtors with J&J assuming the obligation to pay any agreed upon settlement amount. The Revised Proposed J&J Order, therefore, will give holders of J&J Talc Claims the ability to recover in full on their non-punitive damage claims if they prevail in litigation as if the Debtors' Chapter 11 Cases were never filed. A full description of the Revised Proposed J&J Order is described in Section 6.3 of this Disclosure Statement.

On September 10, 2020, J&J filed *Johnson & Johnson's Reply to (I) the Joint Response of the Official Committee of Tort Claimants and Future Claimants' Representative to Johnson & Johnson's Omnibus Reply in Support of Johnson & Johnson's Motion for Entry of Order Modifying Automatic Stay to Implement Talc Litigation Protocol and (II) the Debtors' Response Thereto* [Docket No. 2181] in response to the Revised Proposed J&J Order. J&J also filed a further modified proposed order granting the relief requested in the J&J Stay Motion [Docket No. 2247].

On September 25, 2020, the Bankruptcy Court entered the *Order Denying Motion for Order Modifying Automatic Stay* [Docket No. 2253], which denied the relief requested in the J&J Stay Motion.

After several continuances, a hearing with respect to the J&J Stay Motion is currently scheduled for August 26, 2020. Any order that the Bankruptcy Court enters with respect to the J&J Stay Motion or J&J's indemnification obligations to the Debtors more generally, including the Confirmation Order or the Revised Proposed J&J Order, are collectively defined as the "**J&J Protocol Order**." Any protocol by which J&J will assume the defense of and indemnify the Debtors for the J&J Talc Claims will be set forth in the J&J Protocol Order (the "**J&J Protocol**").

(c)    *Status of Insurance Assets*

(1)    Prepetition Claims Cost Receivables

Prior to and after the Petition Date, the North American Debtors (or their counsel and vendors) sent regular billings to various insurers for reimbursement of costs and expenses paid by the Debtors prior to the Petition Date on account of Talc Personal Injury Claims ("**Prepetition**

**Claims Cost Receivables**"). As of the date of this Disclosure Statement, the Debtors are in the process of reconciling the amounts to be collected in respect of unpaid Prepetition Claims Cost Receivables.

(2)     Insurance Settlement Agreements and Coverage Disputes

The Bankruptcy Court approved two post-petition settlement agreements by and between the North American Debtors and certain Talc Insurance Companies. These settlements, which are described in Article V of this Disclosure Statement, provide for payments to certain of the North American Debtors' defense counsel and their vendors and experts (as applicable under the respective agreements) for prepetition claims in the aggregate amount of $9,695,159.20. Moreover, as discussed above and further discussed in Articles VI and VII of this Disclosure Statement, the Plan incorporates the Rio Tinto/Zurich Settlement, which resolves all Talc Personal Injury Claims against the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties, and provides for a full release of all Rio Tinto/Zurich Released Claims against the Rio Tinto Protected Parties and the Zurich Protected Parties, in exchange for the Rio Tinto/Zurich Contribution.

The North American Debtors are also party to coverage disputes with certain Talc Insurance Companies and Cyprus (as defined below), which are further described in Article V of this Disclosure Statement. As discussed herein, these disputes may impact the North American Debtors' ability to utilize certain insurance proceeds, which will reduce the value of total assets available to holders of Talc Personal Injury Claims. Past experience indicates that certain insurers that entered into the Talc Insurance Policies may still raise objections, contract issues, and otherwise dispute their obligation to pay claims in the future. The North American Debtors are attempting to determine the existence, nature, and scope of any such disputes and, if possible and as appropriate, resolve certain disputes before the Effective Date through negotiation and/or litigation.

4.3     Description of Non-Talc Liabilities of the Debtors

(a)     *Claims Filed Against or Scheduled By the North American Debtors*

The North American Debtors believe that they were generally current on their known prepetition trade payables as of the Petition Date. In addition, the North American Debtors are not party to any secured financing arrangements, they did not seek debtor-in-possession financing during the Chapter 11 Cases, and they do not have outstanding public debt.

As described in Article V of this Disclosure Statement, on July 25, 2019, the Bankruptcy Court entered the General Bar Date Order (as defined below), establishing October 15, 2019 as the General Bar Date (as defined below). The General Bar Date did not apply to "Talc Claims" (as defined in the General Bar Date Order). On November 22, 2019, the Bankruptcy Court entered an order establishing January 9, 2019 as the Indirect Talc Claim Bar Date (as defined below), which solely applied to Indirect Talc Claims (as defined below).

The Non-Talc Claims filed against the North American Debtors include, without limitation, (i) trade claims; (ii) employee/pension claims; (iii) intercompany claims (asserted by Non-Debtor Affiliates); (iv) claims for professional fees that are not Fee Claims; (v) tax claims; (vi) insurance

35

claims; and (vii) surety bond claims.  In addition, numerous Non-Talc Claims were included in the North American Debtors' Schedules (as defined below).  The scheduled claims fall into categories, including, but not limited to, contract claims, customer claims, trade claims, and intercompany claims.

The Debtors continue to review and analyze the proofs of claim filed to date, and reconcile these proofs of claim with the North American Debtors' scheduled claims.  To this end, the Debtors or the Reorganized Debtors, as applicable, have filed and will file objections and seek stipulations with respect to certain Claims.  Moreover, certain parties may attempt to file additional Claims notwithstanding the passage of the General Bar Date and the Indirect Talc Claim Bar Date and seek allowance of such Claims by the Bankruptcy Court.  In addition, certain existing Claims may be amended to seek increased amounts.  Accordingly, the Debtors do not presently know and cannot reasonably determine the actual number and aggregate amount of the Claims that will ultimately be Allowed against the North American Debtors.

(b)  *Claims Against and Equity Interests in ITI*

As contemplated by the Plan, all holders of Equity Interests in and Claims against ITI other than holders of Talc Personal Injury Claims and Non-Debtor Intercompany Claims will be Unimpaired (in other words, unaffected) by ITI's reorganization process.  Generally, this means that all holders of such Claims against ITI will be paid in full in the ordinary course of business or otherwise permitted to pass through the reorganization process without their rights being affected.  Similarly, the rights of holders of Equity Interests in ITI will be left unaltered by the implementation of the Plan.

## ARTICLE V.

## EVENTS DURING THE CHAPTER 11 CASES

The following is a general description of the major events occurring during the course of these Chapter 11 Cases.  Because ITI has not filed for bankruptcy protection, the following discussion and the use of the term "Debtors" does not apply to ITI.

5.1  Commencement of the Chapter 11 Cases and First Day Motions

The Debtors have continued to operate their businesses and manage their affairs as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code since the commencement of the Chapter 11 Cases on February 13, 2019.

On the Petition Date, the Debtors filed a number of motions seeking typical "first-day" relief in chapter 11 cases (the "**First Day Motions**").  The Debtors' stated purpose of the First Day Motions was to ensure that the Debtors were able to transition into the chapter 11 process and maintain their operations in the ordinary course so as to function smoothly while their cases were progressing.

The First Day Motions sought authority to: (i) pay prepetition wages and other benefits to employees; (ii) pay prepetition insurance obligations and maintain post-petition insurance coverage; (iii) pay prepetition claims of critical vendors, foreign vendors, and certain lienholders;

(iv) approve certain notice procedures for holders of Talc Personal Injury Claims; (v) authorize ITC to act as foreign representative of the Debtors in any judicial or other proceeding in Canada; (vi) pay prepetition taxes and fees; (vii) continue use of the existing cash management system and bank accounts and waive the requirements of section 345 of the Bankruptcy Code; (viii) retain a claims agent to assist in the Chapter 11 Cases; (ix) honor prepetition obligations to customers under certain customer programs; (x) prohibit utility companies from altering or discontinuing service on account of prepetition invoices (the "**Utilities Motion**"); and (xi) enforce the protections of the automatic stay.  A description of the First Day Motions is set forth in the First Day Declaration.

On the Petition Date, the Bankruptcy Court entered an order jointly administering the Debtors' Chapter 11 Cases.  The Debtors have not sought substantive consolidation of their respective Estates and no substantive consolidation is sought in the Plan.

5.2    Commencement of Canadian Proceeding

The Chapter 11 Cases have been recognized in Canada in a proceeding commenced before the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") pursuant to the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "**CCAA**"). Recognition of the Chapter 11 Cases was sought to provide for a stay of proceedings against the Debtors, to keep Canadian creditors informed regarding the Chapter 11 Cases, and to seek to bind Canadian creditors to orders issued in the Chapter 11 Cases for which recognition is sought in Canada.  Recognition of the Chapter 11 Cases was sought and obtained from the Canadian Court on February 20, 2019.[4342]

The orders issued by the Canadian Court on February 20, 2019, April 3, 2019, May 24, 2019, August 7, 2019, October 28, 2019, December 3, 2019, April 1, 2020, and July 3, 2020, among other things, (i) recognized the Chapter 11 Cases as "foreign main proceedings" under the CCAA; (ii) stayed all existing proceedings against the Debtors in Canada; (iii) appointed Richter Advisory Group Inc. as information officer (the "**Information Officer**") to report to the Canadian Court, creditors, and other stakeholders in Canada on the status of the Chapter 11 Cases; (iv) recognized certain interim and finals orders (as applicable) entered by the Bankruptcy Court permitting the Debtors to, among other things, continue operating their respective businesses during the course of the Chapter 11 Cases, employ certain professionals, establish the General Bar Date and the Indirect Talc Claim Bar Date, make payments pursuant to their key employee retention plan, and implement bidding procedures in connection with the Sale; (v) recognized certain orders entered by the Bankruptcy Court approving the retention of the FCR and various professionals employed by the Debtors, the Tort Claimants' Committee, and the FCR; and (vi) recognized the Bankruptcy Court's order approving the ITC Stipulation (as defined below).

5.3    Appointment of the Tort Claimants' Committee

---

[4342]    *Initial Recognition Order (Foreign Main Proceeding)*, Ct. File No. CV-19-614614-00 CL (Can. Ont. Sup. Ct. J. Feb. 20, 2019).

On March 5, 2019, the Office of the United States Trustee appointed the Tort Claimants' Committee in the Chapter 11 Cases. Those individuals comprising the Tort Claimants' Committee are (listed with the law firm representing each member):

| Committee Member | Law Firm / Attorney |
|---|---|
| Robin Alander | The Lanier Law Firm |
| Nolan Zimmerman, as representative of the estate of Donna M. Arvelo | Levy Konigsberg LLP |
| Christine Birch | The Gori Law Firm |
| Bessie Dorsey-Davis | Burns Charest LLP |
| Lloyd Fadem, as representative of the estate of Margaret Ferrell | Baron & Budd, P.C. |
| Timothy R. Faltus, as representative of the estate of Shari C. Faltus | OnderLaw, LLC |
| Deborah Giannecchini | Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. |
| Kayla Martinez | Simon Greenstone Panatier, P.C. |
| Lynne Martz | Ashcraft & Gerel, LLP |
| Nicole Matteo | Cohen, Placitella & Roth, P.C. |
| Charvette Monroe, as representative of the estate of Margie Evans | The Barnes Law Group, LLC |

The Tort Claimants' Committee retained Robinson & Cole LLP as lead counsel and Willkie Farr & Gallagher LLP in the role of special litigation and corporate counsel. The Tort Claimants' Committee has also retained Gilbert LLP, as special insurance counsel, Analysis Systems, Inc., as tort liability consultant, Ducera Partners LLC and Ducera Securities LLC (together "**Ducera**"), as investment banker, and GlassRatner Advisory & Capital Group, LLC, as financial advisor. The members of the Tort Claimants' Committee are holders of Direct Talc Personal Injury Claims.

5.4    Appointment of the Legal Representative for Future Claimants

On June 3, 2019, the Bankruptcy Court entered an order appointing Mr. James L. Patton, Jr. as legal representative for future talc personal injury claimants in the Chapter 11 Cases. The FCR has retained the law firm of Young Conaway, as counsel, Ankura, as claims evaluation and financial valuation consultants, and, has co-retained with the Tort Claimants' Committee, Gilbert LLP as special insurance counsel and Ducera, as investment banker.

On June 18, 2019, certain of the Debtors' insurers (the "**Certain Excess Insurers**")[4443] appealed Mr. Patton's appointment as the FCR (the "**FCR Appeal**").  The FCR Appeal is pending before the Delaware District Court in the cases styled as *In re: Imerys Talc America, Inc.*, Civ. A. Nos. 19-00944, 19-01120, 19-01121 and 19-01122 (MN) (D. Del.).  On August 2, 2019, the District Court entered an order approving a briefing schedule, which was subsequently amended on August 22, 2019.[4544]  The Certain Excess Insurers' opening brief was filed on October 16, 2019.[4645]  On December 16, 2019, the Debtors and the FCR filed their responsive briefs, which were joined by the Tort Claimants' Committee.[4746]  On December 20, 2019, the parties to the FCR Appeal met and conferred regarding extending the Certain Excess Insurers' time to file a reply brief.[4847]  On January 7, 2020, the District Court approved a stipulation extending the Certain Excess Insurers' time to file a reply brief, and on February 14, 2020, the Certain Excess Insurers filed their reply brief [Docket No. 29].  Oral argument has been requested by the Debtors and the FCR, but as of the date of this Disclosure Statement, the District Court has not ruled on that request.

5.5    Retention of Debtors' Professionals

The Debtors retained (i) Latham, as the Debtors' bankruptcy co-counsel; (ii) Richards, Layton & Finger, P.A., as the Debtors' bankruptcy co-counsel; (iii) Stikeman Elliott LLP, as Canadian counsel to the Debtors; (iv) Alvarez & Marsal North America, LLC, as financial advisor to the Debtors; (v) NGE, as special insurance coverage and indemnification counsel to the Debtors; (vi) KCIC, LLC, as insurance and valuation consultant to the Debtors; (vii) Prime Clerk LLC, as claims and noticing agent and administrative advisor; (viii) PJT Partners LP ("**PJT**"), as the Debtors' investment banker; and (ix) Ramboll US Corporation, as environmental advisor to the

---

[4443]    The Certain Excess Insurers include: Columbia Casualty Company, Continental Casualty Company, the Continental Insurance Company, as successor to CNA Casualty of California and as successor in interest to certain insurance policies issued by Harbor Insurance Company, Lamorak Insurance Company (formerly known as OneBeacon America Insurance Company), as successor to Employers' Surplus Lines Insurance Company, Stonewall Insurance Company (now known as Berkshire Hathaway Specialty Insurance Company), and National Union, to the extent that they issued policies to Cyprus Mines Corporate prior to 1981.  In certain instances Lexington Insurance Company and National Union are not included as Certain Excess Insurers.

[4544]    *Order Adopting Report and Recommendations*, Civ. A. No. 19-00944 (D. Del. August 2, 2019) [Docket No. 11].

[4645]    *Appellants' Certain Excess Insurers' Opening Brief on Appeal From a Bankruptcy Court Order Appointing James Patton of Young Conaway as Future Claimants' Representative*, Civ. A. No. 19-00944 (D. Del. Oct. 16, 2019) [Docket No. 14].

[4746]    *Brief of Appellees Imerys Talc America, Inc., Imerys Talc Vermont, Inc., and Imerys Talc Canada, Inc.* [Docket No. 22]; *Joinder and Response Brief of Appellee James L. Patton, Jr. in His Capacity as the Future Claimants' Representative* [Docket No. 24]; *Joinder of the Official Committee of Tort Claimants in the Briefs Filed By Each of: (I) Appellees Imerys Talc America, Inc., Imerys Talc Vermont, Inc., and Imerys Talc Canada, Inc.; and (II) Appellee James L. Patton Jr., in His Capacity as the Future Claimants' Representative* [Docket No. 25], Civ. A. No. 19-00944 (D. Del. Dec. 16, 2019).

[4847]    *Appellants' Certain Excess Insurers' Reply Brief on Appeal From a Bankruptcy Court Order Appointing James Patton of Young Conaway as Future Claimants' Representative*, Civ. A. No. 19-00944 (D. Del. Feb. 14, 2019) [Docket No. 29].

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

Debtors.  The Bankruptcy Court has also authorized the Debtors to engage other law firms and professionals in the ordinary course of business.

5.6     Administrative Matters in the Chapter 11 Cases

(a)     *Exclusive Periods for the Debtors to Propose and Solicit Plan Acceptance*

Prior to the Fourth Exclusivity Motion (as defined below), Debtors sought and obtained three unopposed extensions of the periods during which they may exclusively propose and solicit acceptances of a chapter 11 plan beyond the initial 120-day and 180-day periods for plan proposal and solicitation set forth in section 1121 of the Bankruptcy Code.  The first order was entered on June 25, 2019 [Docket No. 744], the second order was entered on September 18, 2019 [Docket No. 1051], and the third order was entered on December 26, 2019 [Docket No. 1371].

On March 6, 2020, the Debtors filed a fourth motion to extend the period during which they may exclusively propose a plan of reorganization and the solicitation period for acceptances of such plan [Docket No. 1534] (the "**Fourth Exclusivity Motion**").  On March 20, 2020, J&J filed an objection to the Fourth Exclusivity Motion [Docket No. 1563], which J&J subsequently withdrew on May 1, 2020 [Docket No. 1689].  On May 5, 2020, the Bankruptcy Court entered an order granting the relief requested in the Fourth Exclusivity Motion, extending the period during which the Debtors may propose a plan of reorganization through and including June 5, 2020, and extending the solicitation period for acceptances of such a plan through and including August 7, 2020 [Docket No. 1694].

On June 2, 2020, the Debtors filed a fifth motion to extend the period during which they may exclusively propose a plan of reorganization and the solicitation period for acceptance of such plan [Docket No. 1794] (the "**Fifth Exclusivity Motion**").  This motion sought to extend the exclusive periods to (i) propose a plan to August 13, 2020 and (ii) solicit votes thereon to October 13, 2020.  On June 26, 2020, the Bankruptcy Court entered an order granting the relief requested in the Fifth Exclusivity Motion [Docket No. 1942].

(b)     *Assumption of Unexpired Leases*

The Debtors sought and obtained an unopposed extension of the period within which they were required to assume or reject unexpired leases of non-residential real property beyond the initial statutory 120-day period through and including September 11, 2019 [Docket No. 687].  On August 7, 2019, the Debtors filed a motion to assume certain unexpired leases of non-residential real property [Docket No. 931].  The Bankruptcy Court entered an order approving the assumption of these unexpired leases of non-residential real property on August 16, 2019 [Docket No. 974] and the unexpired leases were deemed to be assumed by the Debtors as of September 10, 2019.

(c)     *Extension of Period to Remove Claims*

The Debtors have sought and obtained four five unopposed extensions of the deadline by which they may file notices of removal under Bankruptcy Rules 9006(b) and 9027(a).  The first order was entered on March 19, 2019 [Docket No. 254], the second order was entered on September 18, 2019 [Docket No. 1050],  the third order was entered on January 22, 2020 [Docket No. 1447], and the fourth order was entered on June 1, 2020 [Docket No. 1784], and the fifth

order was entered on September 21, 2020 [Docket No. 2229] extending the deadline by which the Debtors may remove civil actions through and including ~~September 4~~December 30, 2020.

(d)    *Filing of Schedules of Assets and Liabilities and Statements of Financial Affairs*

On March 19, 2019, the Bankruptcy Court entered an order extending the deadline by which the Debtors must file their Schedules with the Bankruptcy Court [Docket No. 253]. In accordance with that order and pursuant to Bankruptcy Rule 1007 and Rule 1007-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors filed their Schedules on April 12, 2019 [Docket Nos. 362, 363, 365, 366, 367, and 368] and filed certain amendments to the Schedules on May 20, 2019 [Docket Nos. 577, 578, and 579]. The Schedules provide summaries of the assets held by each of the Debtors as of the Petition Date, as well as a listing of the secured, unsecured priority, and unsecured non-priority claims pending against each of the Debtors during the period prior to the Petition Date, based upon the Debtors' books and records. The Schedules also provide information concerning the Debtors' financial affairs during the period prior to the Petition Date. A description of the scheduled liabilities is provided in Article IV of this Disclosure Statement.

In addition, on (i) July 8, 2019 the Debtors filed the *Debtors' First Notice of Claims Satisfied in Full* [Docket No. 781], (ii) February 28, 2020 the Debtors filed the *Debtors' Second Notice of Claims Satisfied in Full* [Docket No. 1510], (iii) May 29, 2020 the Debtors filed the *Debtors' Third Notice of Claims Satisfied in Full or in Part* [Docket No. 1779], and (iv) July 27, 2020 the Debtors filed the *Debtors' Fourth Notice of Claims Satisfied in Full or in Part* [Docket No. 2035], pursuant to which the Debtors identified certain scheduled Claims that have been satisfied by the Debtors in full or in part after the Petition Date in accordance with the relief requested in various of the First Day Motions. All scheduled Claims identified as "satisfied" were designated as such on the register of claims maintained by the Claims Agent.

(e)    *Establishment of Bar Dates*

The Bankruptcy Court entered an order on July 25, 2019 [Docket No. 881] (the "**General Bar Date Order**") establishing October 15, 2019 as the last date by which claimants could assert any Claims against the Debtors (the "**General Bar Date**"), other than "Talc Claims"[~~49~~48] and certain

---

[~~49~~48]    As used in the General Bar Date Order, the term "Talc Claim" means any claim (as defined in section 101(5) of the Bankruptcy Code) and any future claims or Demands (as that term is defined in section 524(g) of the Bankruptcy Code), whether known or unknown, including with respect to bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring or other personal injuries (whether physical, emotional or otherwise), for which the Debtors are alleged to be liable, directly or indirectly, arising out of or relating to the presence of or exposure to talc or talc-containing products, including, without limitation: (a) any products previously manufactured, sold and/or distributed by any predecessors to the Debtors; (b) any materials present at any premises owned, leased, occupied or operated by any entity for whose products, acts, omissions, business or operations the Debtors have, or are alleged to have, liability; or (c) any talc alleged to contain asbestos or other contaminates. Talc Claims include all such claims, whether: (a) in tort, contract, warranty, restitution, conspiracy, contribution, indemnity, guarantee, subrogation or any other theory of law, equity or admiralty; (b) seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative or any other costs or damages; or (c) seeking any legal, equitable or other relief of any kind whatsoever, including, for the avoidance of doubt, any such claims

other Claims explicitly excluded in the General Bar Date Order.  The General Bar Date Order also set bar dates for any Claims resulting from any future rejections by the Debtors of executory contracts and unexpired leases.

On November 22, 2019, the Bankruptcy Court entered an order [Docket No. 1260] (the "**Indirect Talc Claim Bar Date Order**") establishing January 9, 2019 (the "**Indirect Talc Claim Bar Date**") as the last date by which claimants could assert any "Indirect Talc Claims."[50][49] The Indirect Talc Claim Bar Date Order does not apply to holders of Talc Claims, other than holders of Indirect Talc Claims.

     (f)    *Claims Objections and Claim Classification*

On February 28, 2020, the Debtors filed the *Debtors' First Omnibus (Non-Substantive) Objection to Amended Claims and Duplicative Claims* [Docket No. 1509] (the "**First Claim Objection**"), pursuant to which the Debtors sought to disallow, expunge, and/or modify certain amended or duplicative claims.  Certain objections in the First Claim Objection were withdrawn on March 26, 2020 [Docket No. 1579].  An order granting the relief sought in the First Claim Objection was entered by the Bankruptcy Court on April 8, 2020 [Docket No. 1611].

On May 29, 2020, the Debtors filed the *Debtors' Second Omnibus (Substantive) Objection to Certain No Liability Claims and Overstated State Claims* [Docket No. 1777] (the "**Second Claim Objection**") and *Debtors' Third Omnibus (Non-Substantive) Objection to Amended Claims* [Docket No. 1778] (the "**Third Claim Objection**").  Pursuant to the Second Claim Objection, the

---

assertable against one or more Debtors by Cyprus Mines Corporation, Cyprus Amax Minerals Company, and/or any of their affiliates in these Chapter 11 Cases.  Talc Claims also include any such claims that have been resolved or are subject to resolution pursuant to any agreement, or any such claims that are based on a judgment or verdict.  Talc Claims do not include (a) any claim of an insurer with respect to amounts allegedly due under any insurance policies, including policies that might have provided coverage for Talc Claims, or (b) any claim by any present or former employee of a predecessor or affiliate (as defined in section 101(2) of the Bankruptcy Code) of the Debtors for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer.  For the avoidance of doubt, the definition equally applied to foreign creditors.

[50][49]    As used in the Indirect Talc Claim Bar Date Order, an "Indirect Talc Claim" is any Talc Claim of any corporation (as defined in section 101(9) of the Bankruptcy Code), co-defendant of a Debtor, or predecessor of a Debtor (each, a "**Claimant**") for contribution, reimbursement, subrogation, or indemnity, whether contractual or implied by law (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Talc Claim of a Claimant, whether in the nature of or sounding in contract, tort, warranty, or other theory of law.  For the avoidance of doubt, an Indirect Talc Claim shall not include any claim for or otherwise relating to death, injury, or damages caused by talc or a product or material containing talc that is asserted by or on behalf of any injured individual, the estate, legal counsel, relative, assignee, or other representative of any injured individual, or an individual who claims injury or damages as a result of the injury or death of another individual regardless of whether such claim is seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs or damages, or any legal, equitable or other relief whatsoever, including pursuant to a settlement, judgment, or verdict.  By way of illustration and not limitation, an Indirect Talc Claim shall not include any claim for loss of consortium, loss of companionship, services and society, or wrongful death.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

Debtors sought to disallow and/or modify certain no liability and overstated claims. Pursuant to the Third Claim Objection, the Debtors sought to disallow, expunge, and/or modify certain amended claims. Orders granting the relief sought in the Second Claim Objection and the Third Claim Objection were entered on June 26, 2020 [Docket Nos. 1943 and 1944].

On July 27, 2020, the Debtors filed the *Debtors' Fourth Omnibus (Substantive) Objection to Certain No Liability Claims, Substantive Duplicate Claims, Reclassified Claim, and Overstated, Reclassified Claim* [Docket No. 2023] (the "**Fourth Claim Objection**") and *Debtors' Fifth Omnibus (Substantive) Objection to Certain Satisfied Claims, Substantive Duplicate Claims, and Partially Satisfied Claim* [Docket No. 2034] (the "**Fifth Claim Objection**"). Pursuant to the Fourth Claim Objection, the Debtors sought to disallow and/or modify certain no liability claims, substantive duplicative claims, a reclassified claim, and an overstated and reclassified claim. Pursuant to the Fifth Claim Objection, the Debtors sought to disallow and/or modify certain satisfied claims, substantive duplicative claims, and a partially satisfied claim. ~~The~~ Orders granting the relief sought in the Fourth Claim Objection and the Fifth Claim Objection ~~are scheduled for a hearing before the Bankruptcy Court on August 26, 2020~~were entered on September 4, 2020 [Docket Nos. 2161 and 2162].

On May 29, 2020, the Debtors also filed the *Motion of the Debtors for an Order Confirming Classification of Certain Claims Filed in the Chapter 11 Cases as Talc Personal Injury Claims and Expunging Such Claims from the Claims Register* [Docket No. 1776] (the "**Classification Motion**"), pursuant to which the Debtors sought (i) confirmation of the classification of certain claims filed in the Chapter 11 Cases identified on Schedule 1 to the Classification Motion as Talc Personal Injury Claims under the Plan and (ii) authorization to expunge such Filed Talc Claims (as defined in the Classification Motion) from the Claims Register upon the Effective Date of the Plan. Prior to the objection deadline, various holders of Filed Talc Claims filed objections to the Classification Motion. The Classification Motion is scheduled for a hearing before the Bankruptcy Court on ~~August 26~~November 16, 2020.

(g)     *ITC Stipulation*

Over the course of the Chapter 11 Cases, the Debtors have incurred and continue to incur professional fees and expenses related to the administration of the Chapter 11 Cases, including the fees and expenses of professionals retained by the Tort Claimants' Committee and the FCR. For purposes of administrative convenience only, ITA, on behalf of itself and the other Debtors, has paid, and continues to pay these professional fees as they become due. ITA has asserted certain claims and rights to reimbursement as against its co-debtor, ITC, on account of administrative expenses incurred by the Debtors' estates.

On March 26, 2020, the Bankruptcy Court approved a stipulation (the "**ITC Stipulation**") among ITA, ITC, and the Information Officer [Docket No. 1578]. Pursuant to the ITC Stipulation, ITA, ITC, and the Information Officer agreed to the following: (i) ITC shall pay ITA the sum of $3,450,000 (USD) as an initial payment on account of administrative expenses paid by ITA through February 28, 2020 and (ii) upon request from ITA, to the extent that ITC holds sufficient funds and with the consent of the Information Officer, ITC is authorized and directed to pay ITA on a periodic basis for (a) 33.33% of the fees incurred by professionals retained by the FCR and (b) 26.5% of fees incurred by professionals retained by the Tort Claimants' Committee by ITA

43

after February 28, 2020.  Pursuant to the stipulation, on account of these payments ITC has been granted claims with superpriority administrative expense status against ITA; *provided* that in the event the proposed Plan is confirmed, such superpriority claims shall be deemed satisfied in full without any payment required from ITA.  Under the ITC Stipulation, ITA, ITC and the Information Officer have reserved all rights as to ITC's obligations to reimburse ITA on account of its payment of administrative expense claims.

5.7    Litigation, Adversary Proceeding, Coverage Disputes, and Mediation

(a)    *The Cyprus Insurance Adversary Proceeding*

On March 7, 2019, the Debtors initiated an adversary proceeding against Cyprus Mines and Cyprus Amax Minerals Company ("**CAMC**," and together with Cyprus Mines, "**Cyprus**"), captioned *Imerys Talc America, Inc., et al. v. Cyprus Amax Minerals Company and Cyprus Mines Corporation*, Adv. Pro. No. 19-50115 [Adv. Pro. Docket No. 1] (the "**Cyprus Insurance Adversary Proceeding**").  The issue to be decided in the Cyprus Insurance Adversary Proceeding is whether, after Cyprus Mines sold, assigned, and transferred all of its talc assets in 1992, Cyprus retained any right to the proceeds of, or any right to assert claims under, the Cyprus Historical Policies for lawsuits alleging injuries resulting from exposure to talc or products containing talc mined, distributed, sold and/or supplied by Cyprus Mines prior to June 5, 1992.  Ultimately, the Debtors are seeking a declaration that Cyprus no longer has any right to the proceeds of, or to pursue claims under, the Cyprus Historical Policies with respect to talc-related lawsuits.

The Debtors' property rights in the proceeds of the Cyprus Historical Policies stem from that certain Agreement of Transfer and Assumption (as amended the "**ATA**"), dated June 5, 1992, by and between Cyprus Mines and CTC.  The Debtors contend that pursuant to the ATA, Cyprus Mines sold, transferred, and assigned all of its interest in assets, properties, and rights of every type relating to Cyprus Mines' talc business to CTC, which included all rights to seek the proceeds of, and pursue claims under, the Cyprus Historical Policies.[51][50]

Prior to the initiation of the Cyprus Insurance Adversary Proceeding, on February 28, 2019, Cyprus filed the *Emergency Motion for (i) Interim and Final Orders Granting Relief from the Automatic Stay under Bankruptcy Code § 362(d) to Use Insurance Coverage under Cyprus Historical Policies or, in the Alternative, (ii) Adequate Protection Under Bankruptcy Code §§ 361 and 363(e)* [Docket No. 104].  Following hearings on the motion and briefs filed by the Debtors and other parties in interest, Cyprus and the Debtors agreed to limited stay relief during the pendency of the Cyprus Insurance Adversary Proceeding.  On March 26, 2019, the Bankruptcy Court entered an order permitting Cyprus to use the Cyprus Historical Policies to defend and

---

[51][50]    Leading up to the ATA, Cyprus Mines and its subsidiaries acquired the stock or assets of other talc companies.  In 1989, Cyprus Mines purchased 100% of the stock of Windsor from J&J.  In 1992, pursuant to the ATA, Cyprus Mines and its affiliates transferred such stock and all of the other assets in their then existing talc business to a newly formed subsidiary, CTC, resulting in Windsor becoming a wholly owned subsidiary of CTC.  Contemporaneously with the consummation of the ATA, RTZ America, Inc. (later known as Rio Tinto) purchased 100% of the stock of CTC from Cyprus Mines pursuant to that certain Stock Purchase Agreement dated June 5, 1992, by and between RTZ America, Inc., Cyprus Mines, and Cyprus Minerals Company.  CTC subsequently changed its name to Luzenac America.

44

indemnify Cyprus in certain asbestos-related lawsuits in which any Cyprus entity is a defendant, and to tender any new asbestos-related lawsuits to insurers under the Cyprus Historical Policies [Docket No. 309].  The Debtors reserved their rights to assert claims against Cyprus, and any Cyprus-related entity that obtained the benefit of the Cyprus Historical Policies during the pendency of the Cyprus Insurance Adversary Proceeding.

Discovery in the Cyprus Insurance Adversary Proceeding closed at the end of January 2020, and the Cyprus Insurance Adversary Proceeding was scheduled to go to trial on March 25 and March 27, 2020.  However, in February 2020, prior to submitting summary judgment and opening trial briefs, the parties to the Cyprus Insurance Adversary Proceeding agreed to engage in mediation.

As a result, the Cyprus Insurance Adversary Proceeding (including all remaining hearings and trial dates) were removed from the Bankruptcy Court's calendar and the proceeding was stayed pending conclusion of the mediation.  Pursuant to the *Third Amended Scheduling Order and Order Appointing Mediator* [Adv. Pro. Docket No. 183] (the "**Scheduling Order**"), during this period, the parties agreed that they could continue to discuss and address with the Bankruptcy Court, among other things, (i) certain documents produced by Cyprus to which the Debtors objected, (ii) re-opening certain depositions to address newly produced documents, and (iii) the stipulation of facts between the parties.  To the extent the mediation is not successful, the Scheduling Order also provides that Cyprus and the Debtors will work together to negotiate and file with the Bankruptcy Court an amended scheduling order.

The parties held an initial mediation session before mediator Lawrence W. Pollack on March 3, 2020, and have continued to engage in mediation.

(b)    *The Cyprus Indemnity Adversary Proceeding*

On June 15, 2020, Cyprus initiated an adversary proceeding against ITA, ITV, Johnson & Johnson, and Johnson & Johnson Consumer Inc. (collectively, the "**Indemnity Proceeding Defendants**"), captioned *Cyprus Mines Corporate and Cyprus Amax Minerals Company v. Imerys Talc America, Inc., Imerys Talc Vermont, Inc., Johnson & Johnson and Johnson & Johnson Consumer Inc.*, Adv. Pro. No. 20-50626 [Adv. Pro. Docket No. 1] (the "**Cyprus Indemnity Adversary Proceeding**").  The issue to be decided in the Cyprus Indemnity Adversary Proceeding is whether Cyprus has any indemnity rights against J&J under the 1989 SPA and the 1989 Supply Agreement.  The Debtors maintain that they have indemnification rights against J&J under those agreements, regardless of whatever indemnity rights (if any) Cyprus may have against J&J.

On July 29, 2020, the Debtors filed an answer to the complaint asserting various affirmative defenses as well as counterclaims (i) seeking a declaration that Cyprus Mines lacks the right and standing to pursue the cases of action at issue in the complaint, and (ii) asserting that Cyprus Mines breached its representations and warranties under certain agreements.  On July 29, 2020, J&J filed a motion to dismiss the complaint for lack of subject matter jurisdiction, or, in the alternative, to abstain or to sever and transfer the claims to the United States District Court for the District of Vermont. The deadline for Cyprus to respond (the "**J&J Motion to Dismiss**").  On September 1, 2020, Cyprus responded to the Debtors' counterclaims and J&J's motion to dismiss has been extended to September 1, 2020.  The Court will hold a pre-trial scheduling conference in the

45

Cyprus Indemnity Adversary Proceeding on August 26, 2020 at 10:00 a.m. (ET)the J&J Motion to Dismiss, and on September 3, 2020, Cyprus filed a request for oral argument in connection with the J&J Motion to Dismiss.  On September 16, 2020, J&J filed a reply in support of the J&J Motion to Dismiss.  As of the date of this Disclosure Statement, the request for oral argument and the J&J Motion to Dismiss are pending before the Bankruptcy Court.

(c)    *Rio Tinto Mediation*

As discussed in greater detail above, the Debtors assert rights to coverage under the Zurich Policies.  Historically, Zurich has declined to defend the Mesothelioma Claims on the basis of exclusions in the policies for asbestos-related claims, but has accepted the Debtors' tender of the defense of OC Claims.[52][51]  In addition, the Rio Tinto Captive Insurers issued the Rio Tinto Captive Insurer Policies, which included Luzenac America and other Rio Tinto Corporate Entities as insureds, although Rio Tinto contends that the Debtors are not entitled to coverage under those policies under the 2011 Purchase.

The Debtors, Rio Tinto, Zurich, the FCR, the Tort Claimants' Committee, and Mircal (together, the "**Rio Tinto Mediation Parties**") agreed to enter into non-binding mediation in an attempt to reach a resolution regarding disputes over (i) alleged liabilities relating to the Rio Tinto Corporate Parties' prior ownership of the Debtors, (ii) alleged indemnification obligations of the Rio Tinto Corporate Parties, and (iii) the amount of coverage to which the Debtors claim to be entitled under Talc Insurance Policies issued by the Zurich Corporate Parties and the Rio Tinto Captive Insurers.  On December 26, 2019, the Bankruptcy Court entered an order appointing Lawrence W. Pollack to serve as mediator [Docket No. 1370].  Mediation sessions took place on January 28, January 29, and May 29, 2020.  The Rio Tinto Mediation Parties subsequently agreed to the terms of the Rio Tinto/Zurich Settlement as set forth in Section 7.6(i) of this Disclosure Statement.

(d)    *California Coverage Action and Insurers' Relief from Stay Motion*

On August 24, 2017, the Certain Excess Insurers initiated the lawsuit styled as *Columbia Cas. Co., et al. v. Cyprus Mines Corp., et al.,* No. CGC-17-560919 in the California Superior Court, County of San Francisco (the "**California Coverage Action**").  The second amended complaint filed by the Certain Excess Insurers on July 27, 2018, seeks a determination as to which of various competing corporate entities (including ITA) (collectively, the "**Corporate Entities**") have rights to the Cyprus Historical Policies.  The Certain Excess Insurers are also seeking determinations as to whether there are any obligations with respect to talc bodily injury claims that remain, the existence and extent of the Certain Excess Insurers' contribution rights against certain other insurers, and the resolution of certain discrete coverage issues under certain of the Cyprus Historical Policies.

ITA is a named defendant in all but two of the ten causes of action asserted by the Certain Excess Insurers in their second amended complaint.  Three of the causes of action address which entity or entities have coverage rights under the Cyprus Historical Policies.  The other causes of

---

[52][51]    *See Rio Tinto's Opposition to Certain Excess Insurers' Motion for Relief from Stay and Conditional Cross-Motion for Relief from Stay to Permit Rio Tinto to Pursue Cross-Claims* [Docket No. 505].

action concern the amount of coverage available under the Cyprus Historical Policies. The Debtors contend that (i) ITA has the right to seek the proceeds of, and pursue coverage under, the Cyprus Historical Policies and (ii) the amounts due under the Cyprus Historical Policies are assets of their Estates.[53][52]

On November 20, 2017, the Certain Excess Insurers agreed to extend the time for the Corporate Entities to respond to the first amended complaint to December 1, 2017. A partial stay was agreed to by the Certain Excess Insurers and the Corporate Entities whereby none of the Corporate Entities were permitted to propound discovery requests on any of the Certain Excess Insurers and the Certain Excess Insurers were precluded from seeking discovery from insurer-defendants relating to underlying lawsuits, Cyprus Mines' talc supply history, and Cyprus Mines' corporate transaction history. The stay was extended through July 20, 2018. On July 27, 2018, the Certain Excess Insurers filed their second amended complaint, and on August 16, 2018, the Certain Excess Insurers agreed to further extend the stay, which was ultimately extended through February 11, 2019.

During the partial stay, ITA did not respond to the second amended complaint, did not participate in formal discovery, and did not engage in motion practice. Despite the partial stay, one or more of the Certain Excess Insurers continued to defend and settle various talc lawsuits on behalf of ITA subject to a reservation of rights. One or more of the Certain Excess Insurers also defended and settled certain talc lawsuits on behalf of ITA notwithstanding the fact that the Certain Excess Insurers agreed not to pursue the claims asserted in the California Coverage Action. Moreover, while the parties to the California Coverage Action did resolve certain issues, this was done through negotiations without court involvement.[54][53]

On April 19, 2019, the Certain Excess Insurers filed the *Certain Excess Insurers' Motion for Relief from the Automatic Stay to Permit the California Coverage Action to Proceed and Order of Abstention* [Docket No. 390] (the "**Insurers' Relief from Stay Motion**") pursuant to which the Certain Excess Insurers sought relief from the automatic stay to permit the California Coverage

---

[53][52]    Certain other insurers, including Ace Property and Casualty Company ("**Central National**") and Unigard Insurance Company ("**Unigard**"), were named as defendants in the California Coverage Action. For instance, the Certain Excess Insurers pursued equitable contribution and subrogation claims against Central National and Unigard. On June 18, 2018, the Certain Excess Insurers filed a motion for summary adjudication against Central National and Unigard seeking a ruling that each insurer was obligated to participate in defense and indemnity upon exhaustion of primary policies. Unigard also filed a cross-complaint against Cyprus and ITA, but agreed to extend the time for ITA to respond through February 19, 2019. In light of the bankruptcy filing, ITA has not responded to Unigard's cross-complaint, which seeks, among other things, damages from ITA for an alleged breach of a settlement agreement. There is no current date for the hearing on the Certain Excess Insurers' motion for summary adjudication against Unigard, and the court in the California Coverage Action summarily denied the Certain Excess Insurers' motion for summary adjudication against Central National as premature.

[54][53]    ITA also filed a cross-complaint in the California Coverage Action, seeking a finding that certain cross-defendant insurers are obligated to defend ITA, or reimburse ITA for defense expenses, and indemnify ITA in connection with certain lawsuits seeking damages for personal injury caused by exposure to asbestos or asbestiform minerals in talc and talc-containing products mined, delivered, or supplied by Cyprus Mines.

US-DOCS\116915437US-DOCS\117855212RLFI 23862506v.124099353v.1

Action to proceed.[55][54]  The Certain Excess Insurers also moved for the Bankruptcy Court to abstain from interpreting the Cyprus Historical Policies in the Cyprus Insurance Adversary Proceeding.[56][55] The Debtors and certain other parties in interest filed oppositions to the Insurers' Relief from Stay Motion on grounds that it is unclear whether Cyprus has any rights to the proceeds of, or any ability to pursue any claims under, the Cyprus Historical Policies for certain talc-related lawsuits until the Cyprus Insurance Adversary Proceeding is fully and finally decided.  The Debtors primarily argued that lifting the stay would be an unnecessary waste of judicial and Estate resources, and could lead to the risk of inconsistent (and preclusive) judgments that would flow from the concurrent litigation of the Cyprus Insurance Adversary Proceeding and the California Coverage Action.  On June 28, 2019, the Bankruptcy Court entered an order denying the Insurers' Relief from Stay Motion [Docket No. 762].  As of the date hereof, the California Coverage Action remains subject to the automatic stay.

(e)      *XL Mediation*

As discussed in greater detail above, the Debtors assert rights to coverage under the XL Policies.  In order to resolve certain disputes related to these policies, the Debtors intend to participate in mediation with XL.

(f)      ~~(e)~~*Talc-Related Litigation*

(1)      Consolidation of Talc Litigation in District Court and *Daubert* Hearings

On October 4, 2016, the U.S. Judicial Panel on Multidistrict Litigation (the "**MDL Panel**") ordered that pending and future personal injury or wrongful death actions in federal courts alleging that plaintiffs or their decedents developed ovarian or uterine cancer from the use of J&J's talcum powder products[57][56] be transferred and centralized in the U.S. District Court for the District of New Jersey, Trenton Division (the "**MDL Proceeding**").  In addition to individual actions pending in federal district courts around the country, two consumer class actions alleging that J&J's talcum powder products were marketed for use without disclosure of talc's alleged carcinogenic properties were included in the MDL Proceeding.

The MDL Panel assigned U.S. District Judge Freda Wolfson as presiding judge for the MDL Proceeding.  Judge Wolfson designated U.S. Magistrate Judge Lois Goodman to assist her in the MDL Proceeding.  The cases were consolidated to (1) reduce or eliminate duplicative discovery, (2) prevent inconsistent pretrial rulings on discovery and privilege issues, (3) prevent inconsistent rulings on *Daubert* motion practice, and (4) conserve the resources of the parties, their counsel, and the federal judiciary in these actions.  Additionally, there are common factual issues

---

[55][54]      National Union and Lexington Insurance Company were not listed as Certain Excess Insurers in the Insurers' Relief from Stay Motion, however, they were included as Certain Excess Insurers in the Certain Excess Insurers' reply brief.

[56][55]      Central National Insurance Company of Omaha (for policies issued through Cravens Dargan & Co., Pacific Coast) and Providence Washington Insurance Company (as successor in interest to Seaton Insurance Company, successor in interest to Unigard Mutual Insurance Company) filed joinders in support of the motion [Docket Nos. 411 and 512].

[57][56]      The specific J&J products involved are J&J's Baby Powder and Shower to Shower body powder.

in these cases related to the alleged risk of cancer posed by talc and talc-based body powders, whether the defendants knew or should have known of this alleged risk, and whether defendants provided adequate instructions and warnings with respect to these products. As of May 1, 2020, approximately 15,390 such actions involving 16,440 plaintiffs were pending in the MDL in the U.S. District Court of New Jersey. Although the MDL Proceeding has been stayed as to ITA following the Petition Date, the MDL Proceeding is ongoing with respect to J&J and other defendants.

After creation of the MDL Proceeding and its assignment to Judge Wolfson, she ordered a hearing at which all parties could present their summary views of the medical and scientific issues related to the MDL Proceeding, as well as evidence as to whether talc-based body powder products could cause or contribute to ovarian and uterine cancer. That hearing was held on January 26, 2017. Judge Wolfson subsequently ordered full briefing by the parties on the threshold *Daubert* issue of whether reliable and sufficient scientific and medical evidence exists on the issue of causation. Judge Wolfson set an evidentiary hearing on that issue that ran from July 22 to July 31, 2019, with plaintiffs presenting five witnesses and J&J presenting three witnesses. At the conclusion of the hearing, the Judge requested final *Daubert* briefing from all parties which was submitted on October 7, 2019. On April 27, 2020, Judge Wolfson rendered her *Daubert* decision on the opinions offered by these witnesses, granting in part and denying in part J&J's motion to exclude opinions of plaintiffs' five witnesses and denying plaintiffs' motion to exclude the opinions of J&J's three experts. Judge Wolfson ordered the parties to confer within 45 days of her order and raise any issues with respect to specific experts who were not covered by the opinion and order. Moreover, as of the date of this Disclosure Statement, the parties remaining in the MDL Proceeding are working on a schedule and plan on how to move the cases forward as a result of the *Daubert* opinion.

(2)    Consolidation of State Court Talc Litigation

Other OC Claim cases are pending in several state courts across the country. In New Jersey, the Supreme Court designated such cases as Multi-County Litigation for centralized management by the Superior Court of New Jersey Law Division: Atlantic County. Following a hearing on the admissibility of plaintiffs' experts' causation opinions, on September 2, 2016, the Superior Court ruled in favor of J&J and ITA, excluded plaintiffs' general causation experts, and granted summary judgment to the defendants in the first two bellwether cases set for trial. Plaintiffs' appeal of those rulings to the Appellate Division, although stayed as to Debtor ITA, is pending as to J&J.

In California state court, all cases related to OC Claims have been consolidated for pretrial purposes in Judicial Council Coordination Proceedings in the Superior Court for Los Angeles County. Before the first bellwether trial in 2017, ITA obtained summary judgment in its favor. After a plaintiff's verdict against J&J in the first bellwether trial in that proceeding, the trial court granted judgment notwithstanding the verdict and a motion for new trial, which were appealed in November 2017. In July 2019, those rulings were affirmed in part and reversed and remanded to the trial court in part. As to ITA, the plaintiff's appeal of the summary judgment in favor of ITA was stayed with the filing of the Chapter 11 Cases.

49

Other cases related to OC Claims have been tried in Missouri and Georgia state courts. Five cases in which verdicts were rendered against J&J in Missouri state court have been reversed on appeal, and others are currently pending appeal. The first trial in Georgia state court resulted in a hung jury and has not yet been retried. All cases are stayed as to ITA, however they continue to move forward as to J&J and the other defendants. Approximately 150 additional cases are pending in courts of various other states around the country, including Arizona, Delaware, Florida, Illinois, Louisiana, Pennsylvania, Rhode Island, and Virginia.

      (3)    <u>Appeals</u>

***Lanzo Appeal***

On or about December 23, 2016, the Lanzo Movants (as defined below) filed an action in the Superior Court of New Jersey, Law Division, Middlesex County (the "**NJ State Court**") against ITA for products liability resulting in personal injury in connection with the use of talcum powder, including a claim for punitive damages. On April 5 and April 11, 2018, a jury returned a verdict in favor of the Lanzo Movants for compensatory damages in the amount of $11,468,884.93 and punitive damages in the amount of $25,000,000.00, respectively. On April 23, 2019, the NJ State Court entered a judgment in favor of the Lanzo Movants in the amount of $36,468,884.93, including interest (the "**Lanzo Judgment**").

On April 25, 2018, ITA appealed the Lanzo Judgment (the "**Lanzo Appeal**") to the Superior Court of New Jersey, Appellate Division (the "**NJ Appellate Court**"). Moreover, on or about May 22, 2018, ITA posted a supersedeas bond issued by Aspen (as defined below) in the amount of $39,204,051.36 (the "**Lanzo Appeal Bond**"). In its opening brief, ITA alleged that it is entitled to a new trial due to prejudicial evidentiary and instructional errors, including the introduction of unreliable expert testimony and a prejudicial alternative-causation instruction. In addition to a new trial, ITA sought vacatur of the punitive damages award.

Upon commencement of the Chapter 11 Cases, the Lanzo Appeal was stayed, and the NJ Appellate Court entered an order dismissing the Lanzo Appeal without prejudice. Following approval of the Lanzo Stipulation (as defined below), the automatic stay was modified to permit the Lanzo Appeal to proceed to final resolution. Thereafter, in July 2019, the Lanzo Appeal was reinstated, and on October 2, 2019, ITA filed its reply brief. As of the date of this Disclosure Statement, the Lanzo Movants and ITA are awaiting oral argument on the issues raised in the appeal.

***Booker Appeal***

On or about December 9, 2015, the Booker Movants (as defined below) filed an action in the Superior Court of California, County of Alameda (the "**CA State Court**") against ITA for negligence and strict product liability in connection with exposure to talc, including a claim for punitive damages On November 27 and December 11, 2017, a jury returned a verdict in favor of the Booker Movants for compensatory damages in the amount of $6,852,000.00 and punitive damages in the amount of $4,600,000.00, respectively. On December 14, 2017, the CA State Court entered a judgment in favor of the Booker Movants in the amount of $11,723,196.2, including $271,196.26 in costs (the "**Booker Judgment**").

On March 7, 2018, ITA appealed the Booker Judgment in the Court of Appeal of the State of California, First Appellate District, Division 3, seeking complete reversal or reversal and remand of the Booker Judgment for failure to establish exposure/causation, errors in the verdict form, and erroneous successor liability.  Separately, on April 2, 2018, ITA brought a second appeal to challenge the award of costs with respect to the Booker Judgment (collectively, the "**Booker Appeals**" and, together with the Lanzo Appeal, the "**Appeals**").  In connection with the Booker Appeals, ITA posted a supersedeas bond issued by Aspen in the amount of $17,584,794.39 (the "**Booker Appeal Bond**").  The Booker Appeal Bond is in an amount greater than the face amount of the Booker Judgment to account for post-judgment interest.

Although the Booker Appeals were stayed when the Chapter 11 Cases were filed, following approval of the Booker Stipulation (as defined below) the automatic stay was modified to permit the Booker Appeals to proceed to final judgment.  On December 2, 2019, the Booker Movants filed their response to the appellants' opening brief.  On May 11, 2020, ITA filed its reply brief, and as of the date of this Disclosure Statement a date for oral argument has not been scheduled.

(g)    (f)*English Arbitration*

As of the date of this Disclosure Statement, ITA is a named defendant in an arbitration proceeding pending in London, in which a claimant is seeking contribution from ITA in General Average for damage sustained to the claimant's vessel while transporting certain goods prior to the Petition Date.  The claimant has stayed the proceeding as to ITA as a result of the ongoing Chapter 11 Case, and its claims against ITA have since been resolved in full pursuant to an agreed upon settlement between the claimant and a third party insurer/guarantor.  As a result of the foregoing, the arbitration has been discontinued upon agreement of the parties.

(h)    *J&J Mediation*

In an effort to resolve issues pertaining to the J&J Stay Motion, the Debtors, the Tort Claimants' Committee, the FCR, the Imerys Non-Debtors, and J&J agreed to enter into non-binding mediation.  On September 11, 2020, the Bankruptcy Court entered an order appointing the Hon. Kevin Carey (Ret.) to serve as mediator [Docket No. 2188].  Mediation sessions took place on September 18 and September 21, 2018.  The parties were unable to resolve the aforementioned issues and remain in continued negotiations.  Moreover, and as noted above, the Bankruptcy Court denied the J&J Stay Motion on September 23, 2020.

5.8    Material Settlements and Resolutions

(a)    *Insurance Settlements*

National Union, Columbia Casualty Company, Continental Casualty Company, The Continental Insurance Company, Lamorak Insurance Company, Lexington Insurance Company, and Berkshire Hathaway Specialty Insurance Company (collectively, "**RMI**"), ITA, Cyprus, Rawle & Henderson LLP ("**Rawle**"), Dentons US LLP ("**Dentons**"), and Alston, entered into a settlement (the "**RMI Settlement**") that was approved by the Bankruptcy Court on December 13, 2019 [Docket No. 1326].  Pursuant to the RMI Settlement, RMI agreed to pay certain of the Debtors' defense counsel, vendors, and experts an amount of $7,203,714 to satisfy certain prepetition and post-petition defense costs for legal work and other professional services provided

in connection with the defense of ITA and/or Cyprus in talc-related litigation.  The parties agreed to mutual releases related to prepetition defense costs.

In connection with the RMI Settlement, ITA and Alston also entered into a separate agreement that was approved by the Bankruptcy Court on December 17, 2019 [Docket No. 1339] (the "**Alston Settlement**").  Pursuant to the Alston Settlement, the Debtors permitted Alston to draw down a portion of a retainer from the Debtors in satisfaction of monies owed to Alston but not fully paid under the RMI Settlement.  In exchange, Alston agreed to release any claim to the remaining portion of the retainer and refund the remainder of the retainer, totaling $844,745.60, to Debtor ITA.

In addition, ITA, Rawle, Dentons, Alston, and Truck Insurance Exchange ("**Truck**") entered into a settlement (the "**Truck Settlement**") that was approved by the Bankruptcy Court on September 18, 2019 [Docket No. 1052] related to Truck's obligations under a primary general liability insurance policy.  Pursuant to the Truck Settlement, Truck agreed to pay a total of $2,491,445.20 to certain of the Debtors' defense counsel and vendors and experts.  The parties agreed to mutual releases of prepetition defense costs.

The Plan Proponents also agreed to the terms of the Rio Tinto/Zurich Settlement ~~as~~, which are described in ~~Section 6.2~~ Articles VI and ~~7.6(i)~~ VII of this Disclosure Statement.

    (b)    *Stipulations Permitting Certain Appeals of Judgments on Account of Certain Talc Personal Injury Claims to Proceed to Final Resolution*

On May 6, 2019, Stephen Lanzo, III and Kendra Lanzo (the "**Lanzo Movants**") and Cheryl Booker, individually and as successor-in-interest to Richard Booker, *et al.* (the "**Booker Movants**"), each filed motions for relief from the automatic stay to permit the Appeals to proceed to final resolution, and, if successful, to permit the Lanzo Movants and the Booker Movants to execute and collect on the Lanzo Appeal Bond and the Booker Appeal Bond, as applicable [Docket No. 493 & 491].

On June 13, 2019, the Debtors and Aspen entered into stipulations with each of the Lanzo Movants (the "**Lanzo Stipulation**") and the Booker Movants (the "**Booker Stipulation**" and, together with the Lanzo Stipulation, the "**Stay Stipulations**") to lift the automatic stay as to the Appeals.  The Stay Stipulations were approved by the Bankruptcy Court on June 27, 2019 [Docket Nos. 757 and 756].

The Stay Stipulations consensually resolved the aforementioned relief from stay motions, and permitted the Appeals to proceed subject to the conditions set forth therein.  In addition, Aspen agreed to (i) bear sole responsibility for any and all fees and expenses incurred by ITA and its professionals pertaining to the Appeals and (ii) waive any claim for amounts paid on account of such fees.  Moreover, Aspen waived any claim for amounts paid on account of punitive damages in connection with the Lanzo Judgment and the Booker Judgment.

5.9    <u>Anticipated Developments Regarding ITI Before Confirmation</u>

As discussed above, the Debtors anticipate that, if the Plan receives the requisite acceptances pursuant to each of sections 1126(c) and 524(g) of the Bankruptcy Code, ITI will file

52

a voluntary petition for relief under chapter 11 of the Bankruptcy Code. This Section describes key aspects of the contemplated chapter 11 process with respect to ITI.

The Debtors anticipate that ITI's reorganization will have a minimal effect on ITI and the North American Debtors' business operations. As discussed herein, the only holders of Claims against ITI that will be Impaired are holders of Talc Personal Injury Claims ~~in Class 4~~and Non-Debtor Intercompany Claims in Classes 4 and 5a, respectively.

(a)     *First-Day Motions and Related Relief*

ITI's reason for filing chapter 11 is to address its talc-related liabilities. To ensure a smooth transition into chapter 11 and in furtherance of this goal, ITI will file a number of motions with the Bankruptcy Court on the commencement date of its restructuring proceedings, including:

- an unimpaired claims motion authorizing ITI to satisfy or honor all unimpaired claims including, among other things, claims arising from employee wage and benefit obligations and claims arising from goods and services provided by vendors and suppliers;

- ~~an "all trade" motion requesting authorization to honor prepetition trade-related claims and obligations in the ordinary course of business;~~

- a motion to ensure continued access to its prepetition cash management system;

- a motion requesting that certain of the orders previously entered in the Chapter 11 Cases be made applicable to ITI (including, without limitation, orders: (i) authorizing payment of prepetition insurance obligations and the ability to maintain post-petition insurance coverage; (ii) authorizing payment of prepetition taxes and fees; (iii) authorizing employment of professionals utilized in the ordinary course of business; (iv) authorizing the retention of the North American Debtors' professionals; (v) establishing procedures for interim compensation and reimbursement of professionals; (vi) approving this Disclosure Statement; and (vii) extending the period to remove claims);

- a motion seeking authority to have its chapter 11 case jointly administered with those of the North American Debtors for procedural purposes only under case number 19-10289 (LSS); and

- a motion seeking authority to waive certain obligations to (i) file schedules and a statement of financial affairs, (ii) file a list of ITI's twenty largest unsecured creditors, and (iii) convene a section 341 meeting of creditors.

For the avoidance of doubt, the interests of holders of Claims against ITI (except for Talc Personal Injury Claims and Non-Debtor Intercompany Claims) are Unimpaired under the Plan. Accordingly, ITI does not anticipate filing schedules and a statement of financial affairs, and will petition the Bankruptcy Court for waiver of such requirements.

(b)    *Anticipated Plan Process*

The Debtors are not presently seeking approval of this Disclosure Statement as to ITI, because at this time ITI is not a Debtor in the Chapter 11 Cases.  However, upon Bankruptcy Court approval of this Disclosure Statement, the Debtors intend to solicit votes to accept or reject the Plan with respect to holders of Claims in Class 4 against ITI.  Additionally, and although ITI is not yet a Debtor in the Chapter 11 Cases, the key dates with respect to solicitation of votes to accept or reject the Plan as to ITI are the same as the dates set forth in the Solicitation Order and described in Article X of this Disclosure Statement entitled "*Voting Procedures and Requirements*."

The Debtors anticipate that ITI will commence its bankruptcy proceeding in advance of the Confirmation Hearing and will, at or before the Confirmation Hearing, seek an order by the Bankruptcy Court approving this Disclosure Statement as it applies to holders of Talc Personal Injury Claims against ITI pursuant to section 1125 of the Bankruptcy Code.

In the event the Bankruptcy Court approves this Disclosure Statement as to ITI, holders of Claims in Class 4 vote in the requisite numbers necessary to approve the Plan, and the Bankruptcy Court subsequently confirms the Plan, the Confirmation Order will apply to ITI as well.  Subject to the terms and conditions set forth in the Plan and described throughout this Disclosure Statement, ITI will then emerge from bankruptcy protection contemporaneously with the other Debtors.

## ARTICLE VI.

## SETTLEMENTS, ~~THE J&J PROTOCOL~~ AND THE SALE OF THE NORTH AMERICAN DEBTORS' ASSETS

6.1    The Imerys Settlement

The Plan incorporates a global settlement that is the product of extensive negotiations and discussions among the Plan Proponents providing for the treatment of Talc Personal Injury Claims in a manner that is consistent with the Bankruptcy Code.  The Imerys Settlement is the product of months of intensive, arms'-length negotiations and is the lynchpin of the Plan, paving the way for a consensual resolution of these Chapter 11 Cases.  The Imerys Settlement, by way of the Imerys Contribution, secures a recovery for the benefit of the Debtors' creditors, additional valuable assets that will be provided to the Talc Personal Injury Trust, and a possibility for additional cash recovery by virtue of a potential sale of the North American Debtors' assets.

(a)    *Overview of the Imerys Settlement*

The Imerys Settlement provides, among other things, (i) funding to the Talc Personal Injury Trust in the form of the Imerys Settlement Funds and (ii) additional funding to the Debtors in the form of the Imerys Cash Contribution to support their reorganization efforts in this phase of the

Chapter 11 Cases.[58][57]  Moreover, the Imerys Settlement provides the Talc Personal Injury Trust with additional, non-Cash consideration, including, but not limited to, the release of certain claims held by the Imerys Non-Debtors, and the transfer of certain insurance rights to the Talc Personal Injury Trust, all as set forth in the Plan.  In exchange, and as described in Article XII of the Plan, the Plan provides releases to the Imerys Protected Parties (the "**Imerys Releases**"), as well as a permanent channeling injunction that bars the pursuit of Talc Personal Injury Claims against the Imerys Protected Parties.  All Talc Personal Injury Claims will be channeled to and resolved by the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures.

As part of the Imerys Settlement, the Tort Claimants' Committee and the FCR have agreed to release their claims against the Imerys Non-Debtors, including those premised on certain theories of liability including, inter alia, piercing the corporate veil, alter ego, conspiracy, or successor liability.  The Imerys Non-Debtors have taken the position that the only entities that could face potential liability for Talc Personal Injury Claims are the Debtors.  To date, no court has upheld a claim against an Imerys Non-Debtor on these theories of liability, and the only court to substantively review these issues rejected these claims.  *See Order Granting Motion to Quash re: Imerys USA, Leavitt v. Johnson & Johnson*, Case No. RG17882401 (Sup. Ct. Cal. Dec. 28, 2018).  However, the Tort Claimants' Committee and the FCR have continued to maintain the validity of these claims.  After an investigation of the underlying merits of these claims by the Tort Claimants' Committee and the FCR, and in order to avoid further protracted litigation and expense, the parties agreed to resolve these claims as part of the Imerys Settlement.

As further described below, the Imerys Settlement also contemplates that the North American Debtors will initiate a sale process in pursuit of a sale of substantially all of the assets of the North American Debtors[59][58] under section 363 of the Bankruptcy Code.  The net proceeds from the Sale will be used to fund the Talc Personal Injury Trust as described in the Plan.

Finally, in order to implement the Imerys Settlement and effectuate the Plan, upon the Effective Date (i) the equity interests in ITI will be reinstated and (ii) the equity interests in each of the North American Debtors will be canceled and the equity interests in each of the Reorganized North American Debtors will be issued to the Talc Personal Injury Trust.  The Talc PI Note will also be issued to the Talc Personal Injury Trust, which, pursuant to the Talc PI Pledge Agreement, will be secured by a majority of the voting equity interests of Reorganized ITI following the Effective Date.

The Imerys Settlement resolves all outstanding disputes and claims between the Debtors, their Estates, the Imerys Non-Debtors, the Tort Claimants' Committee, and the FCR.  While the key terms of the Imerys Settlement are summarized in this Disclosure Statement, you should read the Plan for a complete understanding of the terms and conditions of the Imerys Settlement.

---

[58][57]   Any portions of the Imerys Cash Contribution not used by the Debtors or applied to the Reserves (pursuant to the limits established in the Plan) will revert to Talc Personal Injury Trust, subject to the limitations contained in the Plan.

[59][58]   For the avoidance of doubt, the Sale does not include the sale of ITI's assets.

(b)    *Imerys Releases and Disbursement of the Imerys Contribution*

In exchange for the Imerys Contribution, Imerys S.A. requires confirmation of the Plan and entry of a Confirmation Order by the Bankruptcy Court and affirmed by the District Court that provides the Imerys Protected Parties with the protection of the Channeling Injunction pursuant to sections 524(g) and 105(a) of the Bankruptcy Code, the Imerys Releases, and the Supplemental Settlement Injunction Order.  Each is described in further detail in the Plan.

- The Imerys Non-Debtors' Contribution on Behalf of the Protected Parties

Upon the satisfaction, or waiver by the Plan Proponents in writing, of all conditions precedent to the disbursement of the Imerys Contribution in the Plan, the Imerys Contribution, shall be distributed by the Imerys Non-Debtors pursuant to the terms of the Plan.

- Section 524(g) and 105(a) Injunction in Favor of the Imerys Protected Parties

Subject to the Talc Distribution Procedures, the Channeling Injunction shall permanently and completely enjoin any person or entity from asserting in any way a Talc Personal Injury Claim against the Protected Parties.  All claims against the Protected Parties subject to the Channeling Injunction shall be channeled to, and paid by, the Talc Personal Injury Trust in accordance with the Trust Distribution Procedures.

Each of the Imerys Protected Parties is included as a "Protected Party" as that term is defined in the Plan.  Accordingly, the Imerys Protected Parties shall receive the benefit of the Channeling Injunction in accordance with sections 524(g) and 105(a) of the Bankruptcy Code.

- Releases in Favor of the Imerys Protected Parties

The Plan contemplates certain releases in favor of the Imerys Protected Parties to be provided by (i) the Debtors and the Reorganized Debtors, on their own behalf and as representatives of their respective Estates, (ii) the Tort Claimants' Committee and the FCR, on their own behalf, and (iii) the Releasing Claim Holders.  Such releases are further described in Article VII of this Disclosure Statement.

- Supplemental Settlement Injunction Order

In connection with the implementation of the Imerys Settlement, the Plan includes the Supplemental Settlement Injunction Order, pursuant to which all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Imerys Released Claims directly or indirectly against the Imerys Protected Parties (or any of them) shall be permanently stayed, restrained, and enjoined from pursuing now, or at any time in the future, any Imerys Released Claims.   The Supplemental Settlement Injunction Order is further described in Article VII of this Disclosure Statement.

## 6.2    Settlement with Rio Tinto and Zurich

The Plan also incorporates a comprehensive settlement among the Debtors, on the one hand, and Rio Tinto (on behalf of itself and the Rio Tinto Captive Insurers and for the benefit of

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

the Rio Tinto Protected Parties), and Zurich (on behalf of itself and for the benefit of the Zurich Protected Parties), on the other hand, and consented to by the Tort Claimants' Committee and the FCR, that is the product of months of intensive, arms'-length negotiations, multiple mediation sessions, and the production and review of a broad set of documents relating to the parties' disputes. The Rio Tinto/Zurich Settlement resolves complex disputes among the parties, in an effort to avoid prolonged litigation, and does not involve any admission of liability by any party to the settlement.

      (a)    *Overview of the Rio Tinto/Zurich Settlement*

The Rio Tinto/Zurich Settlement (a) releases the Rio Tinto Protected Parties and the Zurich Protected Parties from the Rio Tinto/Zurich Released Claims and (b) channels to the Talc Personal Injury Trust all Talc Personal Injury Claims against any Rio Tinto Protected Party, Rio Tinto Captive Insurer, or Zurich Protected Party. Both the Rio Tinto/Zurich Released Claims and the channeled Talc Personal Injury Claims include, without limitation, any and all claims directly or indirectly arising out of or relating to (i) alleged liabilities relating to the Rio Tinto Corporate Parties' prior ownership of the Debtors, (ii) alleged indemnification obligations of the Rio Tinto Corporate Parties, and (iii) the amount of coverage to which the Debtors claim to be entitled under Talc Insurance Policies issued by the Zurich Corporate Parties and the Rio Tinto Captive Insurers. In return, the Talc Personal Injury Trust will receive the Rio Tinto/Zurich Contribution, consisting of $340 million in cash, along with certain indemnification, contribution, and/or subrogation rights against third parties held by the Zurich Corporate Parties and the Rio Tinto Corporate Parties. The Rio Tinto/Zurich Contribution will provide a substantial recovery for persons holding Talc Personal Injury Claims.

As part of the Rio Tinto/Zurich Settlement, the Tort Claimants' Committee and the FCR have agreed to the release of any and all claims against the Rio Tinto Protected Parties relating in any way to any Talc Personal Injury Claims, including those premised on liabilities such as piercing the corporate veil, alter ego, conspiracy, or successor liability. The Rio Tinto Protected Parties have taken the position that they have no such liability, and to date, no court has upheld a claim against any Rio Tinto Protected Parties on these theories of liability. The resolution of each of these matters represents a compromise of disputes among the parties, without any admission of liability, intended to avoid the costs, risks, and delay associated with protracted litigation. The Tort Claimants' Committee and the FCR have also consented to the Debtors' release of all rights under insurance policies issued by the Zurich Corporate Parties and the Rio Tinto Captive Insurers notwithstanding their disputes concerning the amount of coverage potentially available to the Debtors under these policies, the application of the policies to the Talc Personal Injury Claims, and the timing and amount of such claims in the future, in order to avoid the costs, risks, and delay associated with undertaking protracted litigation against these insurers.

      (b)    *Terms of the Rio Tinto/Zurich Settlement*

- The Rio Tinto/Zurich Contribution

The Rio Tinto/Zurich Contribution is contingent (i) on the Bankruptcy Court's entry of a Confirmation Order and the District Court's entry of an Affirmation Order, each in a form reasonably acceptable to Rio Tinto and Zurich, confirming the Plan, and approving (a) the Rio

Tinto/Zurich Settlement, including the Rio Tinto/Zurich Settlement Agreement, and (b) the releases set out in the Plan, the Channeling Injunction, and the other injunctive relief set out in the Plan, including the Supplemental Settlement Injunction, as to the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties (as applicable); (ii) on the Confirmation Order and Affirmation Order becoming Final Orders; and (iii) on the Plan's becoming effective. If these preconditions are met, Rio Tinto and Zurich will each make their respective portions of the Rio Tinto/Zurich Contribution, or cause it to be made, in Rio Tinto's case on behalf of itself, the Rio Tinto Captive Insurers, and the Rio Tinto Protected Parties, and in Zurich's case on behalf of the Zurich Protected Parties, to the Talc Personal Injury Trust, to be used for the payment of Talc Personal Injury Claims in accordance with the Trust Distribution Procedures and the Talc Personal Injury Trust Agreement. The releases and Injunctions provided to the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties (as applicable) will not be effective until the Rio Tinto/Zurich Contribution is made to the Talc Personal Injury Trust.

- Rio Tinto/Zurich Settlement Agreement

Confirmation of the Plan will constitute approval of the Rio Tinto/Zurich Settlement Agreement, under which Zurich and the Rio Tinto Captive Insurers, respectively, will buy back any and all of Debtors' rights under the Zurich Policies and Rio Tinto Captive Insurer Policies, free and clear of any rights of third parties, pursuant to section 363 of the Bankruptcy Code.

- Channeling Injunction Under Sections 524(g) and 105(a) in Favor of the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties

In accordance with sections 524(g) and 105(a) of the Bankruptcy Code, the Channeling Injunction shall permanently and completely enjoin any person or entity from asserting any Talc Personal Injury Claim against the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and/or the Zurich Protected Parties, as these parties are "Protected Parties" as that term is defined in the Plan. All claims against the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and/or the Zurich Protected Parties subject to the Channeling Injunction shall be channeled to the Talc Personal Injury Trust and resolved in accordance with the Trust Distribution Procedures.

- Releases in Favor of the Rio Tinto Protected Parties and the Zurich Protected Parties

The Plan contemplates certain releases in favor of the Rio Tinto Protected Parties and the Zurich Protected Parties to be provided by (i) the Debtors and the Reorganized Debtors, on their own behalf and as representatives of their respective Estates, (ii) the Tort Claimants' Committee and the FCR, solely on their own behalf, and (iii) the Releasing Claim Holders (as to the Rio Tinto Protected Parties). Such releases are further described in Article VII of this Disclosure Statement.

- Supplemental Settlement Injunction Order

In connection with the implementation of the Rio Tinto/Zurich Settlement, the Plan includes the Supplemental Settlement Injunction Order, pursuant to which all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Rio Tinto/Zurich Released Claims directly or indirectly against the Rio Tinto Protected Parties (or any of them)

US-DOCS\116915437US-DOCS\117855212RLFI 23862506v.124099353v.1

and/or the Zurich Protected Parties (or any of them) shall be permanently stayed, restrained, and enjoined from pursuing now, or at any time in the future, any Rio Tinto/Zurich Released Claims. The Supplemental Settlement Injunction Order is further described in Article VII of this Disclosure Statement.

6.3    J&J Protocol

The Trust Distribution Procedures incorporate the Revised Proposed J&J Order, pursuant to which holders of current and future J&J Talc Claims are permitted to pursue J&J Talc Claims against the Debtors nominally, J&J is permitted to send notice of J&J's assumption of the defense of all J&J Talc Claims and to take certain other actions set forth in the J&J Protocol to assume the defense of and indemnify the Debtors for the J&J Talc Claims, and J&J is required to indemnify the Debtors fully for all J&J Talc Claims.  Pursuant to the Revised Proposed J&J Order, all J&J Talc Claims will be channeled to the Talc Personal Injury Trust and J&J will assume the defense of the J&J Talc Claims.  The Debtors will retain indemnification claims against J&J for costs incurred prior to the Effective Date relating to J&J Talc Claims resolved by the Debtors prior to the date of the J&J Protocol Order, and J&J will waive certain indemnification claims against the Debtors.  Moreover, the Revised Proposed J&J Order provides for a comprehensive notice protocol whereby J&J will provide holders of J&J Talc Claims with notice of its assumption of the defense of such claims.

The Revised Proposed J&J Order provides the following:

- Notice to Debtors.  Within three (3) days of the Bankruptcy Court's entry of the J&J Protocol Order, J&J will give formal notice of J&J's assumption of the defense of the J&J Talc Claims to the Debtors (the "**Assumption Notice**"), as contemplated by the 1989 SPA and 1989 Supply Agreement, and its exclusive right to defend and resolve the J&J Talc Claims on behalf of the Debtors.

- Notice to Parties in Interest.  Within fourteen (14) days of the entry of the J&J Protocol Order, the Debtors, in consultation with J&J, will file and serve upon all J&J Talc Claimants (as defined on Exhibit 2 to the Revised Proposed J&J Order),[60] the United States Trustee, and any other party requesting notice pursuant to Bankruptcy Rule 2002 (i) a copy of the J&J Protocol Order; (ii) the Assumption Notice; and (iii) lists of each action or proceeding (including any litigation, arbitration, mediation, negotiation, or other adversarial process) that is a J&J Talc Claim (A) that has been stayed as against the Debtors by application of the automatic stay (each, a "**Stayed  Proceeding**"), whether or not such stay was lifted, including proceedings in which the Debtors filed a notice of suggestion of bankruptcy to put parties on notice of the stay of litigation with respect to the Debtors, but in which the Debtors were not removed as defendants; (B) from which the proceedings against the Debtors have been severed from the

---

[60]    All known J&J Talc Claimants shall receive such notice directly unless such holders are represented by counsel in which case the notice will be provided to counsel pursuant to the *Final Order (I) Authorizing the Filing of (A) a Consolidated Master List of Creditors, (B) a Consolidated List of the Top Thirty Law Firms Representing Talc Claimants, and (C) a Consolidated List of Creditors Holding the Thirty Largest Unsecured Claims, and (II) Approving Certain Notice Procedures for Talc Claimants* [Docket No. 248].

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

proceedings against J&J (each, a "**Severed Proceeding**"); (C) in which a Debtor was dismissed as a defendant, or the proceeding was dismissed as against a Debtor, without prejudice (each, a "**Debtor-Dismissed Proceeding**"); and (D) that commenced after the Petition Date (or that will be commenced in the future) against J&J in which J&J believes the Debtors are appropriate co-defendants, whether or not the automatic stay would preclude the Debtors being named as co-defendants absent the relief requested herein (each, a "**Postpetition Proceeding**" and together with any Stayed Proceeding, Severed Proceeding, or Debtor-Dismissed Proceedings, a "**Proceeding**").

- Right to Appoint Counsel. J&J will be authorized to identify, appoint, and/or designate counsel ("**Appointed Counsel**") to represent the Debtors with respect to the Stayed Proceedings (and each Severed Proceeding, Debtor-Dismissed Proceeding, and Postpetition Proceeding, as may become necessary) in conformance with Section 11.4 of the 1989 SPA and will notify the Debtors of such designation. The Debtors will have seven (7) days after receiving notice of J&J's proposed counsel to notify J&J in writing if the Debtors believe there is any conflict of interest in connection with or otherwise object to J&J's designated counsel, which conflict will be resolved in conformance with Section 11.4 of the 1989 SPA. For the avoidance of doubt, each party or plaintiff who is asserting a J&J Talc Claim that may have a right to raise a potential conflict of interest or objection to the Appointed Counsel under applicable law shall retain such rights to the extent such right would have otherwise been available. Upon the appointment or designation of counsel, the Debtors will reasonably cooperate in the defense and resolution of such Proceedings at J&J's expense, and will within a reasonable time provide Appointed Counsel with all pleadings, correspondence, discovery, and existing attorney work product related to such proceedings.

- Notices in Proceedings. Appointed Counsel in any Proceeding will serve a copy of the J&J Protocol Order upon all parties to the Proceeding, file a notice of appearance in the applicable Proceeding, and file a notice on the applicable docket providing that the automatic stay of the Proceeding against the Debtors has been modified and the proceeding will continue as against the Debtors upon the Effective Date of the Plan. Appointed Counsel, at J&J's direction, will be authorized to (i) conduct the defense of the Debtors in the Proceeding, and/or (ii) settle J&J Talc Claims on behalf of the Debtors without prior Bankruptcy Court approval; *provided*, *however*, that such settlements will be covered by the J&J indemnity and paid by J&J.

- Communication with Claimants' Counsel. Appointed Counsel will inform the J&J Talc Claimants' counsel of the impact of the J&J Protocol Order on their J&J Talc Claims, including that (i) plaintiffs' exclusive means of recovery on their J&J Talc Claims are through commencement of a lawsuit or other non-bankruptcy proceeding against the Debtors and defended by J&J or Appointed Counsel on behalf of the Debtors, or through settlement with J&J or Appointed Counsel on behalf of the Debtors, and (ii) J&J is fully indemnifying the Debtors for their J&J Talc Claims, and confer with the claimants' counsel, if necessary, to determine a course of action to advance the Proceeding in light of the J&J Protocol Order and the Debtors' participation in the Proceeding. The form of J&J's communication with the J&J Talc

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

Claimants' counsel shall be reasonably acceptable to the Tort Claimants' Committee, the FCR and the Debtors.  In any Debtor-Dismissed Proceeding in which the Debtors had been dismissed without prejudice as a co-defendant, any Severed Proceeding, or any Postpetition Proceeding in which the Debtors are not named co-defendants, J&J will make reasonable efforts, where feasible, to facilitate the addition or joinder of the applicable Debtor(s) as co-defendants in accordance with local procedural rules; *provided, however*, that if the Proceeding is beyond the discovery stage and claimants' counsel determines not to include the Debtors as co-defendants in the Proceeding against J&J, J&J will not seek to add them.

- Proofs of J&J Talc Claims.  J&J will notify any J&J Talc Claimant (as defined in the J&J Protocol Order) that files a proof of claim for its J&J Talc Claim in the Chapter 11 Cases that the defense and any resolution of such Claim will be conducted by J&J in the applicable non-bankruptcy forum and, if the J&J Talc Claimant is not already party to a Proceeding, that the J&J Talc Claimant must commence or join a Proceeding to recover on account of such Claim.  The Debtors will use reasonable best efforts to notify J&J of any proof of claim filed for a J&J Talc Claim.

- Debtors' Cooperation.  The Debtors shall cooperate in good faith in the defense of J&J Talc Claims at J&J's sole expense, including maintaining their attorney-client, attorney work product, and joint defense privilege claims vis a vis the Talc Trustee, the Tort Claimants' Committee, the FCR, and any J&J Talc Claimant, and making the Debtors' discoverable documents available to J&J in the defense of the J&J Talc Claims to the extent they would normally be available under applicable law in the absence of the J&J Protocol Order.

- Debtors' Successors.  Any provision included in the J&J Protocol that applies to the Debtors shall be deemed to apply to the Reorganized Debtors with respect to the J&J Talc Claims to the same extent as to the Debtors.

The Revised Proposed J&J Order will provide holders of J&J Talc Claims with the same opportunities they would have had in the absence of the filing of the Chapter 11 Cases, subject to certain limitations set forth in the Trust Distribution Procedures.  If holders of J&J Talc Claims succeed on their claims against the Debtors in the tort system, they will be paid any final judgment entered against the Debtors by J&J.  In addition, the Revised Proposed J&J Order resolves the J&J Stay Motion and all of J&J's indemnity obligations with respect to the J&J Talc Claims.

### 6.3    6.4 Sale of North American Debtors' Assets

(a)    *Sale of Assets*

The Plan contemplates that the Debtors will undertake a sale and marketing process of the North American Debtors' assets in accordance with section 363 of the Bankruptcy Code.  On May 15, 2020, the North American Debtors filed a motion seeking a Bankruptcy Court order (i) authorizing and approving bidding procedures for the sale of all or substantially all of the North American Debtors' assets; (ii) establishing procedures for the assumption and assignment of certain executory contracts and unexpired leases; (iii) establishing procedures in connection with

the selection of a Stalking Horse Bidder (as defined in the Sale Motion), if any, and related protections; and (iv) approving the sale of assets free and clear of all Interests (as defined in the Sale Motion) pursuant to an asset purchase agreement [Docket No. 1718] (the "**Sale Motion**"). An order approving the bidding procedures and timeline related to the Sale was approved on June 30, 2020 [Docket No. 1950].  On July 28, 2020, the Debtors filed the *Notice of Modified Deadlines Contained in the Bidding Procedures and the Bidding Procedures Order* [Docket No. 2039], ~~which set forth a~~ and on September 11, 2020, the Debtors filed the *Second Notice of Modified Deadlines Contained in the Bidding Procedures and the Bidding Procedures Order* [Docket No. 2189], each of which lists revised ~~list of~~ key dates and deadlines related to the sale process.  A timeline of certain remaining key dates and deadlines is as follows:

**Key Auction and Sale-Related Dates**[~~61~~59]

| Event | Proposed Date |
|---|---|
| ~~Deadline to serve Bidding Procedures Order on Transaction Notice Parties~~ | ~~Within three (3) calendar days of entry of Bidding Procedures Order~~ |
| ~~Indication of Interest Deadline~~ | ~~July 17, 2020 at 4:00 p.m. (prevailing Eastern Time)~~ |
| ~~Deadline to select Potential Bidders~~ | ~~July 24, 2020 at 4:00 p.m. (prevailing Eastern Time)~~ |
| Deadline to select Stalking Horse Bidder, if any | ~~September 25~~October 9, 2020 at 4:00 p.m. (prevailing Eastern Time) |
| Stalking Horse Objection Deadline, if any Stalking Horse Notice is filed | Within fourteen (14) calendar days from the filing of a Stalking Horse Notice |
| Sale Objection Deadline | October 21, 2020 at 4:00 p.m. (prevailing Eastern Time) |
| Bid Deadline | October ~~7~~23, 2020 at 4:00 p.m. (prevailing Eastern Time) |
| Auction (if necessary) | October ~~13~~29, 2020 at 10:00 a.m. (prevailing Eastern Time) |
| Deadline to file and serve notice of the Successful Bidder and amount of the Successful Bid | 12:00 p.m. (prevailing Eastern Time) the calendar day after the Auction is completed |
| ~~Sale Objection Deadline~~ | ~~October 21, 2020 at 4:00 p.m. (prevailing Eastern Time)~~ |

---

[~~61~~59]    Capitalized terms used in this summary and not otherwise defined herein shall have the meaning ascribed to them in the Sale Motion.

~~US-DOCS\116915437~~US-DOCS\117855212RLF1 ~~23862506v.1~~24099353v.1

| Event | Proposed Date |
|---|---|
| Sale Hearing | November ~~4~~16, 2020 at 10:00 a.m. (prevailing Eastern Time) |
| Hearing in Canadian Proceeding to recognize the Sale Order | Within fourteen (14) Business Days from entry of the Sale Order |

As more fully described in the Sale Motion, in November 2019, the North American Debtors engaged PJT as their investment banker to assist the North American Debtors with their evaluation of a potential sale of all or a portion of their assets. Following their engagement, PJT's professionals have worked closely with the North American Debtors' management, boards of directors, and other advisors to assist the North American Debtors in: (i) preparing marketing materials in conjunction with a sale and (ii) defining the terms, conditions, and impact of any sale. With the filing of the Sale Motion, PJT commenced a process to identify potential purchasers and pursue potential transactions for the North American Debtors. On July 17, 2020, PJT received initial indications of interest for the Debtors' assets, pursuant to the Bid Procedures Order, and on July 24, 2020, the Debtors, with the assistance of PJT and their other advisors, selected the Potential Bidders (as defined in Sale Motion), which were permitted to enter the second phase of the sale process.

The North American Debtors have determined that a sale of substantially all of their assets, in conjunction with the implementation of the Imerys Settlement, to one or more buyer(s) will maximize the value of their Estates and result in more funds available for holders of Talc Personal Injury Claims. Based on communications with PJT, the North American Debtors are optimistic that they will receive competitive bids for their assets. The North American Debtors are seeking the relief requested in the Sale Motion to ensure that they have the necessary flexibility to run a value-maximizing sale process.

Imerys S.A. and the Tort Claimants' Committee agreed that Imerys S.A. will not participate in the sale process as a bidder "to avoid complicating the court-approved sale process with a potential bid from the asset's most recent owner." *See Statement of Imerys, S.A. in Connection with the Pending Sale of Substantially All of the Debtors' Assets* [Docket No. 1975]. Further, this decision is "consistent with [Imerys, S.A.'s] management of its global business portfolio." *See id.*

(b)    *Sale Proceeds and Purchase Price Enhancement*

The ~~Plan contemplates that 100% of the~~ Sale Proceeds ~~(as defined in the Plan),~~ will be contributed to the Talc Personal Injury Trust in accordance with the terms of the Plan. In addition, and as part of the Imerys Settlement, Imerys S.A. has agreed to contribute certain additional amounts of up to $102.5 million, contingent on the value of the Sale Proceeds (the "**Purchase Price Enhancement**"). The Purchase Price Enhancement will work as follows: (i) if the Sale Proceeds are $30 million or less, Imerys S.A. will contribute $102.5 million to the Talc Personal Injury Trust as a purchase price enhancement; (ii) for every dollar of Sale Proceeds between $30 million and $60 million, the purchase price enhancement shall be reduced by $0.50; and (iii) for every dollar of Sale Proceeds in excess of $60 million, the purchase price enhancement shall be reduced by $0.70.

63

## ARTICLE VII.

## THE PLAN OF REORGANIZATION

The confirmation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for treating claims against, and equity interests in, a debtor.  Confirmation of a plan of reorganization by a bankruptcy court makes it binding on the debtor, any person or entity acquiring property under the plan, and any creditor of, or equity interest holder in, the debtor, whether or not such creditor or equity interest holder has accepted the plan or received or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in a plan itself or in a confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan of reorganization.

This Section of this Disclosure Statement summarizes certain relevant provisions of the Plan.  This Section is intentionally not a recitation of the entirety of the Plan, a copy of which is attached hereto as <u>Exhibit A</u>.

For additional information regarding the Plan not discussed in this Section, please refer to the following select Plan provisions:

| Topic | Plan Provision |
|---|---|
| Treatment of Executory Contracts and Unexpired Leases | Article V |
| Distributions Under the Plan on Account of Claims | Article VI |
| Resolution of Disputed Claims Other than Talc Personal Injury Claims | Article VII |
| Reservation of Rights | Section 12.5 |
| Disallowed Claims and Disallowed Equity Interests | Section 12.6 |
| No Successor Liability | Section 12.8 |
| Corporate Indemnities | Section 12.9 |
| Jurisdiction of Bankruptcy Court | Article XIII |
| Miscellaneous Provisions | Article XIV |

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN.  THE PLAN PROPONENTS URGE ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS TO READ AND STUDY CAREFULLY THE PLAN, A COPY OF WHICH IS ATTACHED AS <u>EXHIBIT A</u> TO THIS DISCLOSURE STATEMENT.

7.1    <u>Treatment of Administrative Claims, Fee Claims, and Priority Tax Claims</u>

    (a)    *Administrative Claims*

        (1)    <u>Allowed Administrative Claims</u>

Holders of Allowed Administrative Claims (other than Fee Claims, which are governed by <u>Section 2.3</u> of the Plan) shall receive Cash equal to the unpaid portion of such Allowed Administrative Claims on the Distribution Date, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims, or such amounts and on such other terms as may be agreed to by the holders of such Claims and the Debtors or the Reorganized Debtors, as the case may be; *provided*, *however*, that Allowed Administrative Claims representing liabilities incurred on or after the Petition Date in the ordinary course of business by any of the Debtors shall be paid by the Debtors or the Reorganized Debtors, as the case may be, in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.  All Allowed Administrative Claims (other than Fee Claims) shall be paid from funds held in the Administrative Claim Reserve, which shall be funded from Cash on hand, and/or the Imerys Cash Contribution (excluding the Unsecured Claim Contribution).  The Reorganized Debtors will be entitled to transfer excess funds from the Fee Claim Reserve (after all Allowed Fee Claims have been satisfied in full) and the Reorganized North American Debtor Cash Reserve (excluding all funds attributable to the Unsecured Claim Contribution) to the Administrative Claim Reserve as they deem necessary or appropriate, on notice to the FCR and the Tort Claimants' Committee, to enable them to satisfy their obligations pursuant to the Plan.

        (2)    <u>Administrative Claims Bar Date</u>

Except as otherwise provided in Article II of the Plan, requests for payment of Administrative Claims (other than Fee Claims and Claims against the North American Debtors arising under section 503(b)(9) of the Bankruptcy Code), must be filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than sixty (60) days after the Effective Date.  Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against, as applicable, the Debtors or the Reorganized Debtors, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be filed and served on the Reorganized Debtors and the requesting party, as applicable, no later than ninety (90) days after the Effective Date, unless otherwise authorized by the Bankruptcy Rules or Bankruptcy Court.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under the Plan.  For the avoidance of doubt and in accordance with, and furtherance of, the terms of the ITC Stipulated Order, any ITC Stipulated Claim shall be (i) automatically disallowed upon entry of the Confirmation Order and (ii) deemed discharged upon the Effective Date, without any further action required.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

(3)    <u>Disputed Administrative Claims</u>

If a Disputed Administrative Claim is thereafter Allowed in whole or in part, the Disbursing Agent shall (at such time as determined to be practicable by the Reorganized Debtors) distribute from the Administrative Claim Reserve, to the holder of such Administrative Claim, the Cash that such holder would have received on account of such Claim if such Administrative Claim had been an Allowed Administrative Claim on the Effective Date.  When (i) all Disputed Administrative Claims against the Reorganized Debtors have been resolved and (ii) Distributions required to be made by the Reorganized Debtors pursuant to <u>Section 2.1</u> and <u>Section 2.3</u> of the Plan have been made, all Cash remaining in the Administrative Claim Reserve shall be disbursed to the Talc Personal Injury Trust, *except* that any Cash remaining in the Administrative Claim Reserve after all Allowed Administrative Claims have been satisfied pursuant to <u>Section 2.1</u> of the Plan and all Allowed Fee Claims have been satisfied pursuant to <u>Section 2.3</u> that is attributable to the Contingent Contribution, shall be disbursed with fifty percent (50%) distributed to the Talc Personal Injury Trust and fifty percent (50%) distributed to Imerys S.A.

(b)    *Allowed Priority Tax Claims*

On the Distribution Date, holders of Allowed Priority Tax Claims shall receive Cash equal to the amount of such Allowed Priority Tax Claims, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims unless the holder of such claim agrees to an alternative treatment.

(c)    *Fee Claims*

All final fee requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code for services rendered to the Debtors, the Tort Claimants' Committee, or the FCR, all Fee Claims of members of the Tort Claimants' Committee for reimbursement of expenses, and all requests or Claims under section 503(b)(4) of the Bankruptcy Code, must be filed and served on the Reorganized Debtors and other parties required to be served by the Compensation Procedures Order by no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Any objections to a final Fee Claim or any requests or claims under section 503(b)(4) of the Bankruptcy Code must be filed by no later than twenty (20) days after the filing of such Claim.  The terms of the Compensation Procedures Order shall govern the allowance and payment of any final Fee Claims submitted in accordance with <u>Section 2.3</u> of the Plan.  The Fee Examiner appointed under the Fee Examiner Order shall continue to act in this appointed capacity unless and until all final Fee Claims have been approved by order of the Bankruptcy Court, and the Reorganized Debtors shall be responsible to pay the fees and expenses incurred by the Fee Examiner in rendering services after the Effective Date.

The amount of the Fee Claims owing to the Professionals on and after the Effective Date shall be paid in Cash to such Professionals from funds held in the Fee Claim Reserve, which shall be funded from Cash on hand and/or the Imerys Cash Contribution (excluding the Unsecured Claim Contribution), as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order.  The Reorganized Debtors will be entitled to transfer excess funds from the Administrative Claim Reserve (after all Allowed Administrative Claims have been satisfied in

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

full) and the Reorganized North American Debtor Cash Reserve (excluding all funds attributable to the Unsecured Claim Contribution) to the Fee Claim Reserve as they deem necessary or appropriate, on notice to the FCR and the Tort Claimants' Committee, to enable them to satisfy their obligations herein.  When all Allowed Fee Claims and Allowed Administrative Claims have been paid in full, amounts remaining in the Fee Claim Reserve, if any, shall revert to the Talc Personal Injury Trust, *except* that any Cash remaining in the Fee Claim Reserve after all Allowed Fee Claims have been satisfied pursuant to <u>Section 2.3</u> of the Plan and all Allowed Administrative Claims have been satisfied pursuant to <u>Section 2.1</u> that is attributable to the Contingent Contribution, shall be disbursed with fifty percent (50%) distributed to the Talc Personal Injury Trust and fifty percent (50%) distributed to Imerys S.A.

7.2    <u>Treatment of Classified Claims and Equity Interests</u>

The classification and treatment of Claims against and Equity Interests in each Debtor are set forth in detail in Article III of the Plan.

(a)    *Class 1 – Priority Non-Tax Claims*

(1)    Classification: Class 1 consists of all Priority Non-Tax Claims against the Debtors.

(2)    Treatment: On the Distribution Date, each holder of an Allowed Class 1 Priority Non-Tax Claim shall receive Cash equal to the Allowed Amount of such Priority Non-Tax Claim.

(3)    Voting: Class 1 is Unimpaired and each holder of an Allowed Claim in Class 1 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Each holder of an Allowed Claim in Class 1 is not entitled to vote to accept or reject the Plan.

(b)    *Class 2 – Secured Claims*

(1)    Classification: Class 2 consists of all Secured Claims against the Debtors.

(2)    Treatment: All Allowed Secured Claims in Class 2 will be treated pursuant to one of the following alternatives on the Distribution Date: (i) payment in full in Cash in accordance with section 506(a) of the Bankruptcy Code; (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code; (iii) such other treatment as the Debtor and the holder shall agree; or (iv) such other treatment as may be necessary to render such Claim Unimpaired.

(3)    Voting: Class 2 is Unimpaired and each holder of an Allowed Claim in Class 2 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Each holder of an Allowed Claim in Class 2 is not entitled to vote to accept or reject the Plan.

US-DOCS\116915437US-DOCS\117855212RLFI 23862506v.124099353v.1

(c)     *Class 3a – Unsecured Claims against the North American Debtors*

 (1) Classification: Class 3a consists of all Unsecured Claims against the North American Debtors.

 (2) Treatment: Each holder of an Allowed Unsecured Claim against the North American Debtors shall be paid the Allowed Amount of its Unsecured Claim on the Distribution Date.  Such payment shall be (i) in full, in Cash, plus post-petition interest at the federal judgment rate in effect on the Petition Date, or (ii) upon such other less favorable terms as may be mutually agreed upon between the holder of such Unsecured Claim and the applicable North American Debtor or Reorganized North American Debtor.

 (3) Voting: Class 3a is Unimpaired and each holder of an Allowed Claim in Class 3a is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Each holder of an Allowed Claim in Class 3a is not entitled to vote to accept or reject the Plan.

(d)     *Class 3b – Unsecured Claims against ITI*

 (1) Classification: Class 3b consists of all Unsecured Claims against ITI.

 (2) Treatment: The legal, equitable, and contractual rights of the holders of Unsecured Claims against ITI are unaltered by the Plan.  Except to the extent that a holder of an Unsecured Claim against ITI agrees to a different treatment, on and after the Effective Date, Reorganized ITI will continue to pay or dispute each Unsecured Claim in the ordinary course of business in accordance with applicable law.

 (3) Voting: Class 3b is Unimpaired and each holder of an Allowed Claim in Class 3b is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Each holder of an Allowed Claim in Class 3b is not entitled to vote to accept or reject the Plan.

(e)     *Class 4 – Talc Personal Injury Claims*

 (1) Classification: Class 4 consists of all Talc Personal Injury Claims.  For the avoidance of doubt, Class 4 consists of Direct Talc Personal Injury Claims and Indirect Talc Personal Injury Claims.

 (2) Treatment: On the Effective Date, liability for all Talc Personal Injury Claims shall be channeled to and assumed by the Talc Personal Injury Trust without further act or deed and shall be resolved in accordance with the Trust Distribution Procedures.  Pursuant to the Plan and Trust Distribution Procedures, each holder of a Talc Personal Injury Claim shall have its Claim permanently channeled to the Talc Personal Injury Trust, and such Claim shall thereafter be ~~asserted exclusively against the Talc Personal Injury Trust and~~ resolved in accordance with the Trust Distribution Procedures.

68

On the Effective Date, all Talc Personal Injury Claims that were filed in the Chapter 11 Cases shall be expunged from the Claims Register as provided in Section 11.9 of the Plan.

(3)     Voting: Class 4 is Impaired and each holder of an Allowed Claim in Class 4 is entitled to vote to accept or reject the Plan.

(f)     *Class 5a – Non-Debtor Intercompany Claims*

(1)     Classification: Class 5a consists of all Non-Debtor Intercompany Claims.

(2)     Treatment: On or after the Effective Date, all Non-Debtor Intercompany Claims shall be canceled, discharged, or eliminated.

(3)     Voting: Class 5a is Impaired. Each holder of an Allowed Claim in Class 5a has consented to its treatment under the Plan as a Plan Proponent and is therefore presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Each holder of an Allowed Claim in Class 5a is not entitled to accept or reject the Plan.

(g)     *Class 5b – Debtor Intercompany Claims*

(1)     Classification: Class 5b consists of all Debtor Intercompany Claims.

(2)     Treatment: At the election of the applicable Debtor, each Debtor Intercompany Claim shall (i) be reinstated, (ii) remain in place, and/or (iii) with respect to certain Debtor Intercompany Claims in respect of goods, services, interest, and other amounts that would have been satisfied in Cash directly or indirectly in the ordinary course of business had they not been outstanding as of the Petition Date, be settled in Cash.

(3)     Voting: Class 5b is Unimpaired and each holder of an Allowed Claim in Class 5b is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Each holder of a Claim in Class 5b is not entitled to accept or reject the Plan.

(h)     *Class 6 – Equity Interests in the North American Debtors*

(1)     Classification: Class 6 consists of all Equity Interests in the North American Debtors.

(2)     Treatment: On the Effective Date, all Equity Interests in the North American Debtors shall be canceled, annulled, and extinguished.

(3)     Voting: Class 6 is Impaired. Each holder of an Allowed Class 6 Equity Interest has consented to its treatment under the Plan as a Plan Proponent and is therefore presumed to accept the Plan pursuant to section 1126(f) of

the Bankruptcy Code.  Each holder of an Allowed Equity Interest in Class 6 is not entitled to vote to accept or reject the Plan.

(i)    *Class 7 – Equity Interests in ITI*

(1)    Classification: Class 7 consists of all Equity Interests in ITI.

(2)    Treatment: On the Effective Date, all Equity Interests in ITI shall be reinstated and the legal, equitable, and contractual rights to which holders of Equity Interests in ITI are entitled shall remain unaltered to the extent necessary to implement the Plan.

(3)    Voting: Class 7 is Unimpaired and each holder of an Allowed Class 7 Equity Interest is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Each holder of an Allowed Equity Interest in Class 7 is not entitled to vote to accept or reject the Plan.

7.3    Acceptance or Rejection of Plan

(a)    *Classes Entitled to Vote*

Holders of Talc Personal Injury Claims shall be entitled to vote to the extent and in the manner provided in the Voting Procedures Order [Docket No. [___]] and the Plan.[6260]

(b)    *Acceptance of Holders of Talc Personal Injury Claims*

Pursuant to sections 1126(c) and 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code, Class 4 (Talc Personal Injury Claims) shall have accepted the Plan only if at least two-thirds (2/3) in amount and seventy-five percent (75%) of the members in Class 4 actually voting on the Plan have voted to accept the Plan.

(c)    *Acceptance by Unimpaired Class*

Classes 1, 2, 3a, 3b, 5b, and 7 are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

(d)    *Acceptance by Impaired Class*

Classes 5a and 6 will not receive or retain any property or distribution under the Plan and are Impaired under the Plan.  Notwithstanding, Classes 5a and 6 are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code because all holders of Claims or

---

[6260]    Pursuant to the Voting Procedures Order, all Talc Personal Injury Claims in Class 4 of the Plan shall be temporarily allowed in the amount of $1.00 in the aggregate per claimant solely for purposes of voting to accept or reject the Plan and not for any other purpose; *provided* that any votes that are determined by final nonappealable order following a motion on notice and a hearing not filed in good faith shall be subject to the designation pursuant to section 1126(e) of the Bankruptcy Code.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

Equity Interests (as applicable) in Classes 5a and 6 are Plan Proponents and have consented to their treatment under the Plan.

7.4    <u>Conditions Precedent to the Confirmation of the Plan</u>

Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived pursuant to <u>Section 9.3</u> of the Plan:

(a)    The Bankruptcy Court shall have entered an order, acceptable in form and substance to each of the Plan Proponents approving this Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

(b)    Class 4 shall have voted in requisite numbers and amounts in favor of the Plan as required by sections 524(g), 1126, and 1129 of the Bankruptcy Code.

(c)    The Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto, shall be consistent with (i) section 524(g) of the Bankruptcy Code, as applicable, and (ii) the other provisions of the Plan.

(d)    The Reorganized North American Debtors shall have sufficient funds from Cash on hand and/or the Unsecured Claim Contribution to resolve all Allowed Class 3a Claims and to adequately fund the Disputed Claims Reserve as determined by each of the Plan Proponents.

(e)    The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order in conjunction therewith, in form and substance acceptable to each of the Plan Proponents. These findings and determinations, are designed, among other things, to ensure that the Injunctions, releases and discharges set forth in Article XII shall be effective, binding and enforceable, and shall among other things, conclude:

(1)    <u>Good Faith Compliance</u>.  The Plan complies with all applicable provisions of the Bankruptcy Code including, without limitation, that the Plan be proposed in good faith and that the Confirmation Order not be procured by fraud.

(2)    <u>Voting</u>.  Class 4 has voted in requisite numbers and amounts in favor of the Plan as required by each of sections 524(g), 1126, and 1129 of the Bankruptcy Code.

(3)    <u>Injunctions</u>.  The Channeling Injunction, the Insurance Entity Injunction, and the Supplemental Settlement Injunction Order are to be implemented in connection with the Talc Personal Injury Trust.

(4)    <u>Named Defendants</u>.  As of the Petition Date, one or more of the Debtors had been named as a defendant in personal injury, wrongful death or

property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, talc or talc-containing products.

(5) <u>Assumption of Certain Liabilities</u>.  Upon the Effective Date, the Talc Personal Injury Trust shall assume the liabilities of the Protected Parties with respect to Talc Personal Injury Claims and~~, except as set forth in the J&J Protocol Order,~~ have exclusive authority as of the Effective Date to satisfy or defend such Talc Personal Injury Claims.

(6) <u>Funding of Talc Personal Injury Trust</u>.  The Talc Personal Injury Trust will be funded with the Talc Personal Injury Trust Assets, including the Talc PI Note, which will be secured by a majority of the common stock of Reorganized ITI, pursuant to the Talc PI Pledge Agreement, and include the right to receive distributions on account of the Talc PI Note pursuant to the terms set forth in the Talc PI Note.

(7) <u>Stock Ownership</u>.  The Talc Personal Injury Trust, on the Effective Date, by the exercise of rights granted under the Plan, (i) will receive the Reorganized North American Debtor Stock and shall maintain the rights to receive dividends or other distributions on account of such stock, and (ii) will be entitled to own the majority of the common stock of Reorganized ITI if specific contingencies occur.

(8) <u>Use of Talc Personal Injury Trust Assets</u>.  The Talc Personal Injury Trust will use its assets and income to resolve Talc Personal Injury Claims.

(9) <u>Likelihood of Talc Personal Injury Demands</u>.  The Debtors are likely to be subject to substantial future Talc Personal Injury Demands for payment arising out of the same or similar conduct or events that gave rise to the Talc Personal Injury Claims that are addressed by the Channeling Injunction and the Insurance Entity Injunction.

(10) <u>Talc Personal Injury Demands Indeterminate</u>.  The actual amounts, numbers, and timing of future Talc Personal Injury Demands cannot be determined.

(11) <u>Likelihood of Threat to Plan's Purpose</u>.  Pursuit of Talc Personal Injury Claims, including Talc Personal Injury Demands, outside of the procedures prescribed by the Plan and the Plan Documents, including the Trust Distribution Procedures, is likely to threaten the Plan's purpose to treat the Talc Personal Injury Claims and Talc Personal Injury Demands equitably.

(12) <u>Injunctions Conspicuous</u>.  The terms of the Discharge Injunction, the Channeling Injunction, the Supplemental Settlement Injunction Order, the Release Injunction, and the Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in conspicuous language in the Plan and in ~~the~~ this Disclosure Statement.

72

(13)  <u>Appropriate Trust Mechanisms</u>.  Pursuant to court orders or otherwise, the Talc Personal Injury Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Talc Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Talc Personal Injury Trust will value, and be in a financial position to pay, Talc Personal Injury Claims that involve similar Claims in substantially the same manner regardless of the timing of the assertion of such Talc Personal Injury Claims.

(14)  <u>Future Claimants' Representative</u>.  The FCR was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Channeling Injunction, the Insurance Entity Injunction, and the Supplemental Settlement Injunction Order, for the purpose of, among other things, protecting the rights of persons that might subsequently assert Talc Personal Injury Demands of the kind that are addressed in the Channeling Injunction, the Insurance Entity Injunction, and the Supplemental Settlement Injunction Order, and transferred to and assumed by the Talc Personal Injury Trust.

(15)  <u>Fair and Equitable Inclusion</u>.  The inclusion of each Debtor or other Protected Party within the protection afforded by the Channeling Injunction and the Insurance Entity Injunction, as applicable, is fair and equitable with respect to the Persons that might subsequently assert Talc Personal Injury Demands against each such Debtor or other Protected Party in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by or on behalf of each such Debtor or other Protected Party.

(16)  <u>Sections 105(a) and 524(g) Compliance</u>.  The Plan complies with sections 105(a) and 524(g) of the Bankruptcy Code to the extent applicable.

(17)  <u>Injunctions Essential</u>.  The Discharge Injunction, the Channeling Injunction, the Supplemental Settlement Injunction Order, the Release Injunction, and the Insurance Entity Injunction are essential to the Plan and the Debtors' reorganization efforts.

(18)  <u>Assignment Authorized</u>.  The Bankruptcy Code authorizes the Assignment by preempting any terms of the Talc Insurance Policies, Talc Insurance CIP Agreements, Talc Insurance Settlement Agreements, or provisions of applicable non-bankruptcy law that any Talc Insurance Company may otherwise argue prohibits the Assignment.

(19)  <u>The Supplemental Settlement Injunction Order</u>.  The Supplemental Settlement Injunction Order is to be implemented in connection with the Imerys Settlement and the Rio Tinto/Zurich Settlement.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

(20) <u>The Rio Tinto/Zurich Settlement</u>.   The Rio Tinto/Zurich Settlement (i) represents a sound exercise of the Debtors' business judgment, will yield a fair and reasonable price for the assets being sold, is in the best interest of the Debtors' Estates, and otherwise complies with section 363 of the Bankruptcy Code, (ii) meets the requirements for a sale of property free and clear of any interests of third parties in such property pursuant to section 363(f) of the Bankruptcy Code, and (iii) constitutes a purchase in good faith by Zurich and the Rio Tinto Captive Insurers pursuant to section 363(m) of the Bankruptcy Code, rendering the provisions of section 363(m) applicable.   The Rio Tinto/Zurich Settlement is accordingly approved pursuant to section 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.

To the greatest extent permitted by law, each of the conditions precedent to the Confirmation of the Plan may be waived or modified, in whole or in part, but only with the unanimous written consent of each of the Plan Proponents.   Any waiver or modification of a condition precedent under <u>Section 9.3</u> of the Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court or District Court, and without any other formal action.

7.5   <u>Conditions Precedent to the Effective Date of the Plan</u>

Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall occur on the first Business Day on which each of the following conditions has been satisfied or waived pursuant to <u>Section 9.3</u> of the Plan:

(a)   <u>Confirmation Order and Affirmation Order</u>.   The Confirmation Order shall have been submitted to the District Court for affirmation on or before ~~November 30~~January 8, ~~2020~~ 2021, and the Affirmation Order in form and substance acceptable to each of the Plan Proponents shall have been entered by the District Court, and the Confirmation Order and the Affirmation Order shall have become Final Orders; *provided*, *however*, that the Effective Date may occur at a point in time when the Confirmation Order and/or the Affirmation Order are not Final Orders at the sole option of the Plan Proponents unless the effectiveness of the Confirmation Order or the Affirmation Order, as applicable, has been stayed or vacated, in which case the Effective Date may be the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order or the Affirmation Order.

(b)   <u>Sale Order</u>.   The Sale Order shall have (i) been entered on or before the date the Confirmation Order is entered, and (ii) recognized by the Canadian Court in the Canadian Proceeding on or before a date that is no later than fourteen (14) Business Days after entry of the Sale Order by the Bankruptcy Court.

(c)   <u>Talc Personal Injury Trust</u>.   The Talc Personal Injury Trust Assets shall, simultaneously with the occurrence of the Effective Date, be transferred to, vested

US-DOCS\116915437US-DOCS\117855212RLFI 23862506v.124099353v.1

in, and assumed by the Talc Personal Injury Trust in accordance with Article IV of the Plan.

(d)    <u>Plan Documents</u>.    The Talc Personal Injury Trust Agreement (and related documents), and the other applicable Plan Documents necessary or appropriate to implement the Plan shall have been executed, delivered and, where applicable, filed with the appropriate governmental authorities.

(e)    <u>Allowed Non-Talc Claims</u>.  The Reserves shall be adequately funded as determined by each of the Plan Proponents so as to permit the Debtors to make Distributions relating to Allowed Non-Talc Claims in accordance with the Plan.

(f)    <u>Imerys Contribution</u>.  Imerys S.A. shall have disbursed, or satisfied all conditions of, the Imerys Contribution to the Debtors, the Reorganized North American Debtors, or the Talc Personal Injury Trust, as applicable, in accordance with Article X of the Plan.

(g)    <u>United States Trustee's Fees</u>.  The fees of the United States Trustee then owing by the Debtors shall have been paid in full.

(h)    <u>Ancillary Proceeding in Canada</u>.  The Canadian Court shall have entered an order in the Canadian Proceeding recognizing the Confirmation Order in its entirety and ordering the Confirmation Order and the Plan to be implemented and effective in Canada in accordance with their terms.

To the greatest extent permitted by law, each of the conditions precedent to the Effective Date of the Plan may be waived or modified, in whole or in part, but only with the unanimous written consent of each of the Plan Proponents.  Any waiver or modification of a condition precedent under <u>Section 9.3</u> of the Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court or District Court, and without any other formal action.

7.6    <u>Means for Implementation of the Plan</u>

(a)    *General*

On or after the Confirmation Date, each of the Plan Proponents shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable them to implement the provisions of the Plan on the Effective Date, including, without limitation, the creation of the Talc Personal Injury Trust and the preparations for the transfer of the Talc Personal Injury Trust Assets to the Talc Personal Injury Trust.

(b)    *Operations of the Debtors Between Confirmation and the Effective Date*

The Debtors shall continue to operate as debtors and debtors-in-possession during the period from the Confirmation Date through and until the Effective Date.

(c)    *Charter and Bylaws*

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

From and after the Effective Date, each of the Reorganized North American Debtors shall be governed pursuant to their respective Amended Charter Documents. The Amended Bylaws and the Amended Certificates of Incorporation shall contain such provisions as are necessary to satisfy the provisions of the Plan and, to the extent necessary to prohibit the issuance of non-voting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the Amended Charter Documents after the Effective Date, as permitted by applicable law. On the Effective Date, ITA will change its name to Ivory America, Inc., ITV will change its name to Ivory Vermont, Inc. and ITC will change its name to Ivory Canada, Inc.

From and after the Effective Date, Reorganized ITI shall continue to be governed pursuant to its existing bylaws and certificate of incorporation.

(d)    *Corporate Action*

On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtors, including, but not limited to, actions requiring a vote of the boards of directors or shareholders and execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers or directors of the Debtors.

(e)    *Surrender of Existing Equity Interests*

The Plan provides that holders of Equity Interests in Class 6 shall be deemed to have surrendered such Equity Interests and other documentation underlying such Equity Interests and all such surrendered Equity Interests and other documentation shall be deemed to be canceled in accordance with Article III of the Plan.

(f)    *Post-Effective Date Governance, Continued Existence of the Reorganized North American Debtors, and the Reorganized North American Debtor Stock*

On the Effective Date, after the Reserves have been funded and all Talc Personal Injury Trust Assets have been transferred to the Talc Personal Injury Trust (as applicable): (a) all North American Debtor Stock will be canceled, and (b) simultaneously with the cancellation of such shares, the North American Debtors will issue the Reorganized North American Debtor Stock to the Talc Personal Injury Trust.

Except as otherwise provided in the Plan or as may be provided in the Plan Supplement or the Confirmation Order, each of the Reorganized North American Debtors shall continue their existence as separate entities after the Effective Date, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which each Reorganized North American Debtor is incorporated and pursuant to the Amended Charter Documents and any other formation documents in effect following the Effective Date, and such documents are deemed to be adopted pursuant to the Plan and require no further action or approval. Moreover, on the Effective Date, the officers and directors of the Reorganized North American Debtors shall consist of the individuals that will be identified in the Plan Supplement.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in the Reorganized North American Debtors' Estates other than property constituting Talc Personal Injury Trust Assets, including, but not limited to, all North American Debtor Causes of Action and any property acquired by the North American Debtors pursuant to the Plan, shall vest in the Reorganized North American Debtors, free and clear of all Claims, interests, Liens, other Encumbrances, and liabilities of any kind.   On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized North American Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, interests, or North American Debtor Causes of Action without supervision or approval by the Bankruptcy Court, or notice to any other Entity, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

On the Effective Date, and if applicable, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, all assets of the North American Debtors that constitute Talc Personal Injury Trust Assets shall vest in the Talc Personal Injury Trust pursuant to the terms of the Plan.   The Talc Personal Injury Trust shall own such assets, as of the Effective Date, free and clear of all Claims, interests, Liens, other Encumbrances, and liabilities of any kind.

(g)     *Post-Effective Date Governance and Continued Existence of Reorganized ITI*

On the Effective Date, Reorganized ITI shall remain a direct subsidiary of Mircal Italia and all Equity Interests in ITI shall be reinstated.   On the Effective Date, (i) Imerys S.A. and ITI shall also issue the Talc PI Note to the Talc Personal Injury Trust, and (ii) Mircal Italia shall execute the Talc PI Pledge Agreement.

Except as otherwise provided in the Plan or as may be provided in the Plan Supplement or the Confirmation Order, Reorganized ITI shall continue to exist after the Effective Date as a separate corporate entity from each of the Reorganized North American Debtors, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which Reorganized ITI is incorporated and pursuant to its existing bylaws and certificate of incorporation and any other formation documents in effect prior to the Petition Date, and such documents are deemed to be adopted pursuant to the Plan and require no further action or approval.

In addition, except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in ITI's Estate, all ITI Causes of Action, and any property acquired by ITI pursuant to the Plan, shall vest in Reorganized ITI, free and clear of all Claims, interests, Liens, other Encumbrances, and liabilities of any kind.   On and after the Effective Date, except as otherwise provided in the Plan, Reorganized ITI may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, interests, or ITI Causes of Action without supervision or approval by the Bankruptcy Court, or notice to any other Entity, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

(h)    *Imerys Settlement*

(1)    <u>Compromise and Settlement of Claims</u>

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan effect a compromise and settlement of all Imerys Released Claims against the Imerys Protected Parties, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Imerys Settlement, to release all of the Imerys Released Claims, including, without limitation, the Estate Causes of Action, against each of the Imerys Protected Parties.

As further described in this Disclosure Statement, the provisions of the Plan (including the release and injunctive provisions contained in Article XII of the Plan) and the other documents entered into in connection with the Plan constitute a good faith compromise and settlement among the Plan Proponents of Claims and controversies among such parties.  The Plan, including the explanation set forth in this Disclosure Statement, shall be deemed a motion to approve the Imerys Settlement and the good faith compromise and settlement of all of the Claims and controversies described in the Plan pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Imerys Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Imerys Settlement is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Entry of the Confirmation Order shall confirm the Bankruptcy Court's approval, as of the Effective Date of the Plan, of all components of the Imerys Settlement and the Bankruptcy Court's finding that the Imerys Settlement is in the best interests of the Debtors, their respective Estates, and is fair, equitable and reasonable.

Upon (i) satisfaction of all conditions of the Imerys Contribution in accordance with the terms of the Plan, (ii) the funding of the Reserves from Cash on hand and/or the Imerys Cash Contribution, and (iii) the transfer of the Talc Personal Injury Trust Assets to the Talc Personal Injury Trust, the Plan shall be deemed to be substantially consummated, notwithstanding any contingent obligations arising from the foregoing.  For the avoidance of doubt, Imerys S.A.'s satisfaction of the Imerys Contribution is on behalf of itself and the other Imerys Protected Parties.

(2)    <u>Imerys Contribution</u>

*Imerys Settlement Funds*.  On, prior to, or as soon as reasonably practicable after the Effective Date, the Imerys Non-Debtors will contribute ~~,~~ or cause to be contributed, the Imerys Settlement Funds to the Debtors or the Reorganized Debtors, as applicable, which the Debtors or the Reorganized Debtors, as applicable, will contribute to the Talc Personal Injury Trust upon ~~the Effective Date~~receipt.  For the avoidance of doubt, ~~all~~ the proceeds from the Sale(s) will be paid by the Buyer to the North American Debtors or the Reorganized North American Debtors, as applicable, upon the close of the Sale(s).

*Imerys Cash Contribution*.  On or prior to the Effective Date, the Imerys Non-Debtors will contribute, or cause to be contributed, the following to the Debtors or the Reorganized Debtors, as applicable:

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

(i)    the balance of the Intercompany Loan to fund administrative expenses during the pendency of the Chapter 11 Cases, as well as certain of the Reserves (with any remaining balance of the Intercompany Loan not otherwise used to fund the Reserves or pay administrative expenses to be contributed to the Talc Personal Injury Trust on or as soon as reasonably practicable after the Effective Date);

(ii)    $5 million (less any amounts already paid and noted in an accounting to the Tort Claimants' Committee and the FCR) for payment of Allowed Claims in Class 3a through inclusion in the Reorganized North American Debtor Cash Reserve or the Disputed Claims Reserve, as applicable (with any remaining balance of the $5 million not otherwise used to fund the Reorganized North American Debtor Cash Reserve or the Disputed Claims Reserve, as applicable, to be contributed to the Talc Personal Injury Trust on or as soon as reasonably practicable after the Effective Date); and

(iii)    up to $15 million, to the extent the Debtors do not have available Cash after exhaustion of the Intercompany Loan to pay all Administrative Claims in full on the Effective Date and would otherwise be administratively insolvent; *provided* that Imerys S.A. shall fund the Debtors' administrative expenses as follows: Imerys S.A. shall pay fifty percent (50%) of such expenses in Cash (in an amount not to exceed $15 million) and fifty percent (50%) shall be funded by a dollar-for-dollar reduction of the Imerys Settlement Funds (in an amount not to exceed $15 million).

*Talc Trust Contribution*.  On or prior to the Effective Date, the Imerys Non-Debtors have agreed to contribute, or cause to be contributed, the following to the Talc Personal Injury Trust:

(i)    rights and interests to the proceeds of the Shared Talc Insurance Policies and all rights against third parties held by the Imerys Non-Debtors relating to Talc Personal Injury Claims, ~~including~~ any related indemnification rights, including, but not limited to, the J&J Indemnification Obligations, each of which is to be identified in the Plan Supplement; and

(ii)    the Talc PI Pledge Agreement.

*Additional Contribution*.  On or prior to the Effective Date, the Imerys Non-Debtors have agreed to take the following actions:

(i)    waive all Non-Debtor Intercompany Claims against the Debtors; and

(ii)    unless otherwise assumed by the Buyer, assume any Pension Liabilities of the North American Debtors through and after the Effective Date of the Plan.

79

(3)    <u>Cooperation Agreement</u>

The Debtors, the Imerys Non-Debtors, and the Talc Personal Injury Trust shall enter into the Cooperation Agreement, which shall be included in the Plan Supplement.

(i)    *Rio Tinto/Zurich Settlement*

(1)    <u>Compromise and Settlement of Claims</u>

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the Rio Tinto/Zurich Contribution and other benefits provided pursuant to the Rio Tinto/Zurich Settlement, the provisions of the Plan effect a compromise and settlement of all Rio Tinto/Zurich Released Claims against the Rio Tinto Protected Parties, and Zurich, on behalf of Parties as provided in <u>Section 12.2.1(c)</u> of the Plan, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Rio Tinto/Zurich Settlement and to release all of the Rio Tinto/Zurich Released Claims as provided in <u>Section 12.2.1(c)</u> of the Plan.

The provisions of the Plan (including the release and injunctive provisions contained in Article XII of the Plan) and the other documents entered into in connection with the Plan constitute a good faith compromise and settlement among: (i) Rio Tinto, on behalf of itself and the Rio Tinto Captive Insurers, and for the benefit of the Rio Tinto Protected Parties, and Zurich, on behalf of itself and for the benefit of the Zurich Protected Parties, on the one hand, and (ii) the Debtors, on the other hand, and consented to by the Tort Claimants' Committee and the FCR, of claims and controversies among such parties.  The Plan, including the explanation set forth in ~~the~~ this Disclosure Statement, shall be deemed a motion to approve the Rio Tinto/Zurich Settlement, including the Rio Tinto/Zurich Settlement Agreement, and the good faith compromise and settlement of all of the claims and controversies described in the Plan pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Rio Tinto/Zurich Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Rio Tinto/Zurich Settlement is (i) fair, equitable, reasonable, and in the best interests of the Debtors and their Estates and (ii) fair and equitable with respect to the persons who might subsequently assert Talc Personal Injury Demands, in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by and on behalf of the Rio Tinto Protected Parties and the Zurich Protected Parties.

(2)    <u>Rio Tinto/Zurich Settlement Contributions</u>

*Rio Tinto/Zurich Contribution*.  Rio Tinto and Zurich will make the following contributions, on behalf of themselves and (in the case of Rio Tinto) on behalf of the Rio Tinto Captive Insurers and for the benefit of the Rio Tinto Protected Parties and (in the case of Zurich) for the benefit of the Zurich Protected Parties, to the Talc Personal Injury Trust, to be used for the payment of Talc Personal Injury Claims in accordance with the Trust Distribution Procedures and the Talc Personal Injury Trust Agreement:

        (i)    *Zurich Cash Contribution*.  On or prior to the date that is thirty (30) days after the Rio Tinto/Zurich Trigger Date, Zurich will contribute, or cause to be contributed, $260 million in Cash to the Talc Personal Injury Trust (the "**Zurich Cash Contribution**").

(ii)    *Rio Tinto Cash Contribution*.  On or prior to the date that is fourteen (14) days after the Rio Tinto/Zurich Trigger Date, Rio Tinto will contribute, or cause to be contributed, $80 million in Cash to the Talc Personal Injury Trust (the "**Rio Tinto Cash Contribution**").

(iii)    *Rio Tinto/Zurich Credit Contribution*.    On the Rio Tinto/Zurich Trigger Date, or as soon as reasonably practicable thereafter (not to exceed three (3) Business Days), the appropriate Rio Tinto Corporate Parties and the appropriate Zurich Corporate Parties shall each execute and deliver to the Talc Personal Injury Trust, in a form reasonably acceptable to the Talc Personal Injury Trust, an assignment to the Talc Personal Injury Trust of (i) all of their rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to the payment or defense of any Talc Personal Injury Claim or any past talc-related claim against the Debtors prior to the Effective Date (the "**Credits**"), and (ii) all of their other rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to any Talc Personal Injury Claim (the "**Future Credits**")  (together, (i) and (ii), the "**Rio Tinto/Zurich Credit Contribution**"), *provided, however,* that any such claims for Credits or Future Credits against a Protected Party shall be subject to the Channeling Injunction, and nothing herein shall impact the injunctions and releases otherwise inuring to the benefit of the Protected Parties under the terms of the Plan.  Notwithstanding anything else contained in Section 10.9.2.1(c) of the Plan, the Rio Tinto Corporate Parties and the Zurich Corporate Parties shall retain, and shall not transfer to the Talc Personal Injury Trust, all rights of the Rio Tinto Corporate Parties and the Zurich Corporate Parties against their reinsurers and/or retrocessionaires, in their capacity as such.

*Rio Tinto/Zurich Settlement Agreement*

(i)    Pursuant to the Rio Tinto/Zurich Settlement Agreement, Zurich will acquire any and all rights of the Debtors in the Zurich Policies, free and clear of any right, title, or interest of any other Entity, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code.  Further, the Rio Tinto Captive Insurers will acquire any and all rights of the Debtors in the Rio Tinto Captive Insurer Policies, free and clear of any right, title, or interest of any other Entity, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code.

(ii)    Confirmation of the Plan will constitute approval of the Rio Tinto/Zurich Settlement Agreement pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and a finding that the Rio Tinto Captive Insurers and Zurich are good-faith purchasers entitled to the protections of section 363(m) of the Bankruptcy Code.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

(iii)    For the avoidance of doubt, the Plan Proponents, on the one hand, and Rio Tinto and Zurich, on the other hand, acknowledge that the Zurich Policies in effect from May 2001 through May 2008 are exhausted.

(3)    <u>Withdrawal of Claims</u>

On the Rio Tinto/Zurich Trigger Date, any and all Claims that the Rio Tinto Corporate Parties or the Zurich Corporate Parties have asserted or that have been asserted on their behalf in the Chapter 11 Cases shall be deemed withdrawn with prejudice.  Further, the Rio Tinto Protected Parties and the Zurich Protected Parties shall not file or assert any additional Claims against any of the Debtors arising from any Debtor's conduct prior to the Confirmation Date.

(4)    <u>Cooperation</u>

Rio Tinto and Zurich shall use reasonable efforts to assist and cooperate with the Talc Personal Injury Trust, Talc Trustees, Talc Trust Advisory Committee, and FCR to pursue the Credits as set forth in the Rio Tinto/Zurich Settlement Agreement.

(5)    <u>Releases and Injunctions</u>

Notwithstanding anything to the contrary set forth in the Plan or elsewhere, the Injunctions and the releases contained in Article XII of the Plan shall not be effective as to the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties (as applicable) until the Rio Tinto/Zurich Contribution has been made to the Talc Personal Injury Trust in accordance with <u>Section 10.9.2.1</u> of the Plan.

(j)    *Good Faith Compromise and Settlement*

The Plan (including its incorporation of the Imerys Settlement and the Rio Tinto/Zurich Settlement), the Plan Documents, and the Confirmation Order constitute a good faith compromise and settlement of Claims and controversies based upon the unique circumstances of these Chapter 11 Cases, and none of the foregoing documents, ~~the~~ this Disclosure Statement, or any other papers filed in furtherance of Plan Confirmation, nor any drafts of such documents, may be offered into evidence or deemed as an admission in any context whatsoever beyond the purposes of the Plan, in any other litigation or proceeding, except as necessary, and as admissible in such context, to enforce their terms before the Bankruptcy Court or any other court of competent jurisdiction.  The Plan, the Imerys Settlement, the Plan Documents, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors, the Reorganized Debtors, the Imerys Protected Parties, or the Talc Personal Injury Trust is a party. The Plan, the Rio Tinto/Zurich Settlement, the Plan Documents, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors, the Reorganized Debtors, the Rio Tinto Protected Parties, the Zurich Protected Parties, or the Talc Personal Injury Trust is a party.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

(k)    *Resolution of Talc Personal Injury Claims*

(1)Talc Personal Injury TrustClaims shall be channeled to and resolved by the Talc Personal Injury Trust in accordance with the Trust Distribution Procedures, as applicable, subject to the right of any valid Talc Insurance Company to raise any Talc Insurer Coverage Defense in response to a demand by the Talc Personal Injury Trust that such insurer handle, defend, or pay any such claim.

Talc Personal Injury Claims, including J&J Talc Claims, shall be channeled to and resolved by the Talc Personal Injury Trust in accordance with the Trust Distribution Procedures and/or the J&J Protocol, as applicable, subject to (i) the right of any Talc Insurance Company to raise any Talc Insurer Coverage Defense in response to a demand by the Talc Personal Injury Trust that such insurer handle, defend, or pay any such claim; and (ii) J&J's rights and obligations pursuant to the J&J Protocol Order with respect to J&J Talc Claims.

(l)    *Sources of Consideration for Plan Distributions*

(1)    North American Debtor Claims

All Cash consideration necessary for payments or distributions on account of the North American Debtor Claims shall be obtained from (i) the Cash on hand of the North American Debtors on the Effective Date, including Cash derived from business operations and (ii) the Imerys Cash Contribution.

(2)    Talc Personal Injury Claims

All Cash consideration necessary for payments or distributions on account of Talc Personal Injury Claims shall be obtained from (i) the Cash on hand of the North American Debtors on the Effective Date, including Cash derived from business operations, other than the Cash placed in the Reserves, if any, (ii) the Imerys Settlement Funds, (iii) the amount of the Imerys Cash Contribution, after such funds have been disbursed in accordance with Section 10.8.2 of the Plan; (iv) all Cash remaining in the Reserves, if applicable, as set forth in Section 10.13 of the Plan; (v) all proceeds from the Talc Personal Injury Trust Assets; and (vi) the Rio Tinto/Zurich Contribution; and (vii) with respect to the J&J Talc Claims, J&J as described in the J&J Protocol Order.

(3)    ITI Claims

All Cash consideration necessary for payments or distributions under the Plan on account of ITI Claims, for the avoidance of doubt, other than Talc Personal Injury Claims, shall be obtained from the Cash on hand at Reorganized ITI.

(4)    Transfer of Funds Between the North American Debtors

The North American Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable them to satisfy their obligations under the Plan; *provided* that any transfer of funds from ITC to another North American Debtor shall be subject to review by the Information Officer.  Except as set forth therein,

83

any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate or otherwise be affected by the terms of the Plan.

(5)    <u>Funding by the Talc Personal Injury Trust</u>

The Talc Personal Injury Trust shall have no obligation to fund costs and expenses other than those set forth in the Plan and/or the Talc Personal Injury Trust Documents, as applicable.

(m)    *Transfer of Remaining North American Debtors' Assets to the Talc Personal Injury Trust*

After (i) all Disputed Claims against the North American Debtors have been resolved, and (ii) all Distributions required to be made by the Reorganized North American Debtors under the Plan have been made, all Cash remaining in the Disputed Claims Reserve shall be disbursed to the Talc Personal Injury Trust, in accordance with <u>Section 7.10</u> of the Plan.

Upon the close of the Chapter 11 Cases, all Cash remaining in the Reorganized North American Debtor Cash Reserve shall be disbursed to the Talc Personal Injury Trust.

Any remaining balance in the Fee Claim Reserve and the Administrative Claim Reserve shall be disbursed to the Talc Personal Injury Trust subject to and in accordance with <u>Sections 2.1</u> and <u>2.3</u> of the Plan, *provided that* any Cash remaining in the Fee Claim Reserve and the Administrative Claim Reserve that is attributable to the Contingent Contribution shall be disbursed with fifty percent (50%) distributed to the Talc Personal Injury Trust and fifty percent (50%) distributed to Imerys S.A.

(n)    *Modification of the Plan*

To the extent permissible under section 1127 of the Bankruptcy Code, any proposed amendments to or modifications of the Plan under section 1127 of the Bankruptcy Code or as otherwise permitted by law will be submitted jointly by the Plan Proponents, without additional disclosure pursuant to section 1125 of the Bankruptcy Code at any time prior to substantial consummation of the Plan, unless section 1127 of the Bankruptcy Code requires additional disclosure. To the extent permissible under section 1127(b) of the Bankruptcy Code, following substantial consummation of the Plan, the Reorganized Debtors may remedy any defects or omissions or reconcile any inconsistencies in the Plan Documents for the purpose of implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan, so long as (a) the interests of the holders of Allowed Claims are not adversely affected thereby; (b) any such modifications are non-material; (c) the Tort Claimants' Committee and the FCR or, following the Effective Date, the Talc Trust Advisory Committee and the FCR consent; (d) Imerys S.A. consents; and (e) the United States Trustee does not object, unless such objection is overruled by the Bankruptcy Court. Post-Effective Date, any holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified or supplemented pursuant to <u>Section 10.14</u> of the Plan, unless the Bankruptcy Court rules otherwise.

84

(o)     *Revocation or Withdrawal of the Plan*

The Debtors, with the consent of each of the other Plan Proponents, reserve the right to revoke and withdraw the Plan prior to entry of the Confirmation Order. If the Debtors, with the consent of each of the other Plan Proponents, revoke or withdraw the Plan, or if Confirmation of the Plan as to any Debtor does not occur, then, with respect to such Debtor, the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against such Debtor, or any other Entity (including the Plan Proponents), or to prejudice in any manner the rights of such Debtor, or such Entity (including the Plan Proponents) in any further proceedings involving such Debtor.

(p)     *Certain Technical Modifications*

Prior to the Effective Date, the Plan Proponents collectively may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, to the extent permissible under section 1127 of the Bankruptcy Code; *provided*, *however*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests under the Plan.

## 7.7     Effect of Confirmation

(a)     *Preservation of Certain Estate Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Estate Causes of Action have been expressly released, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Non-Talc Causes of Action, whether arising before or after the Petition Date. Each Reorganized Debtor's right to commence, prosecute or settle such Non-Talc Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue the Non-Talc Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or this Disclosure Statement to any Non-Talc Cause of Action against them as any indication that the Reorganized Debtors will not pursue the Non-Talc Causes of Action. The Reorganized Debtors expressly reserve all rights to prosecute any and all Non-Talc Causes of Action, except as otherwise expressly provided in the Plan. Unless any of the Non-Talc Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all such Non-Talc Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Non-Talc Causes of Action as a consequence of the Confirmation of the Plan.

Upon the Effective Date, the Reorganized Debtors shall retain and enforce all defenses and counterclaims to all Claims that were or could have been asserted against the Debtors, respectively, or their respective Estates, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code. On or after the Effective Date, the Reorganized Debtors may pursue, settle or withdraw, without Bankruptcy Court approval, such claims, rights, or causes

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

of action (other than the Talc Personal Injury Trust Causes of Action) as they determine in accordance with their best interests.

(b)    *Preservation of Talc Personal Injury Trust Causes of Action*

On the Effective Date, all Talc Personal Injury Trust Causes of Action shall be transferred to and vested in the Talc Personal Injury Trust.  Except as otherwise provided in the Plan or the Confirmation Order, the Talc Personal Injury Trust shall retain and enforce, as the appointed estate representative in accordance with section 1123(b) of the Bankruptcy Code, all Talc Personal Injury Trust Causes of Action, including, but not limited to, setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code.  The transfer of the Talc Personal Injury Trust Causes of Action to the Talc Personal Injury Trust, insofar as they relate to the ability to defend against or reduce the amount of Talc Personal Injury Claims, shall be considered the transfer of a non-exclusive right enabling the Talc Personal Injury Trust to defend itself against asserted Talc Personal Injury Claims, which transfer shall not impair, affect, alter, or modify the right of any Person, including without limitation, the Imerys Protected Parties, the Rio Tinto Protected Parties, the Zurich Protected Parties, an insurer or alleged insurer, or co-obligor or alleged co-obligor, sued on account of a Talc Personal Injury Claim, to assert each and every defense or basis for claim reduction such Person could have asserted had the Talc Personal Injury Trust Causes of Action not been assigned to the Talc Personal Injury Trust.

(c)    *Talc Insurance Actions*

Any Talc Insurance Action, or the claims and causes of action asserted or to be asserted therein, shall be preserved for the benefit of the Talc Personal Injury Trust, for prosecution by the applicable Debtor(s) until the Effective Date subject to the consent of the FCR and the Tort Claimants' Committee, which shall not be unreasonably withheld.  As of the Effective Date, such Talc Insurance Actions along with the rights and obligations of the Debtors and the Reorganized Debtors, as applicable, and the Non-Debtor Affiliates with respect to the Talc Insurance Policies and claims thereunder shall exclusively vest in the Talc Personal Injury Trust in accordance with section 1123(a)(5)(B) of the Bankruptcy Code, and the Talc Personal Injury Trust shall retain and enforce as the appointed estate representative in accordance with section 1123(b)(3)(B) of the Bankruptcy Code all such Talc Insurance Actions.  Such Talc Insurance Actions shall be free and clear of all Liens, security interests, and other Claims or causes of action, except for Talc Insurer Coverage Defenses.  Upon vesting in the Talc Personal Injury Trust, the prosecution of the Talc Insurance Actions shall be governed by the Talc Personal Injury Trust Documents.

(d)    *Insurance Provisions*

The provisions of <u>Section 11.4</u> of the Plan shall apply to all Entities (including, without limitation, all Talc Insurance Companies).

Except as provided in the Rio Tinto/Zurich Settlement and any Talc Insurance Settlement Agreement, nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any Talc Insurance Company, or (b) any rights or

86

obligations of the Debtors arising out of or under any Talc Insurance Policy. For all issues relating to insurance coverage allegedly provided by the Zurich Corporate Parties or the Rio Tinto Captive Insurers, the provisions, terms, conditions, and limitations of the Rio Tinto/Zurich Settlement shall control. For all other issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Talc Insurance Policies or applicable Talc Insurance CIP Agreements or Talc Insurance Settlement Agreements shall control. For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or the Confirmation Order shall operate to require any Talc Insurance Company to indemnify or pay the liability of any Protected Party that it would not have been required to pay in the absence of the Plan.

The Plan, the Plan Documents, and the Confirmation Order shall be binding on the Debtors, the Reorganized Debtors, and the Talc Personal Injury Trust. The obligations, if any, of the Talc Personal Injury Trust to pay holders of Talc Personal Injury Claims shall be determined pursuant to the Plan and the Plan Documents. Except as provided in Section 11.4.1.4 of the Plan, none of (a) the Bankruptcy Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (c) any estimation or valuation of Talc Personal Injury Claims, either individually or in the aggregate (including, without limitation, any agreement as to the valuation of Talc Personal Injury Claims) in the Chapter 11 Cases shall, with respect to any Talc Insurance Company, constitute a trial or hearing on the merits or an adjudication or judgment, or accelerate the obligations, if any, of any Talc Insurance Company under its Talc Insurance Policies.

No provision of the Plan, other than those provisions contained in the applicable Injunctions set forth in Article XII of the Plan, shall be interpreted to affect or limit the protections afforded to any Settling Talc Insurance Company by the Channeling Injunction or the Insurance Entity Injunction.

Nothing in Section 11.4.1 of the Plan is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Talc Insurance Company with respect to any issue that is actually litigated by such Talc Insurance Company as part of its objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by such Talc Insurance Company in conjunction with or related to Confirmation of the Plan. Plan objections that are withdrawn prior to the conclusion of the Confirmation Hearing shall be deemed not to have been actually litigated.

(e)    *J&J Indemnification Rights and Obligations*

Subject to Section 11.5.5 of the Plan, nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the J&J Indemnification Rights and Obligations. For all issues relating to J&J Indemnification Rights and Obligations, the provisions, terms, conditions, and limitations of any agreements underlying the J&J Indemnification Rights and Obligations shall control.

For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or the Confirmation Order shall operate to require J&J to indemnify or pay the liability of any Debtor or

the Reorganized Debtors that it would not have been required to pay in the absence of the Plan. Section 11.5.2 of the Plan in no way modifies, alters or limits the rights and/or obligations set forth in Section 11.5.1 of the Plan.

Subject to Section 11.5.5 of the Plan, none of (i) the Bankruptcy Court's confirmation of the Plan or approval of the Plan Documents, (ii) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (iii) any estimation or valuation of any Claims, either individually or in the aggregate in the Chapter 11 Cases shall, with respect to J&J, constitute a trial or hearing on the merits or an adjudication or judgment with respect to any Direct Talc Personal Injury Claim against J&J or any J&J Indemnification Rights and Obligations.

Nothing in Section 11.5 of the Plan is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against J&J with respect to any issue that is actually litigated by J&J as part of its objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by J&J in conjunction with or related to Confirmation of the Plan.  Plan objections that are withdrawn prior to the conclusion of the Confirmation Hearing shall be deemed not to have been actually litigated.

~~(as may have been modified and supplemented by the J&J Protocol Order and/or the J&J Protocol) and the J&J Protocol Order and J&J Protocol shall control; *provided, however*, that with respect to all issues relating~~ For the avoidance of doubt, the provisions of Sections 11.5.1 and 11.5.3 of the Plan shall not apply to any claim by J&J to indemnification, defense, contribution, or any other right to recovery against any Rio Tinto Protected Party or any Zurich Protected Party~~-~~, or under any Rio Tinto Captive Insurer Policy or any Zurich Policy, arising out of or relating to any Talc Personal Injury Claim~~, in the event of any conflict between the J&J Protocol Order and/or the J&J Protocol, on the one hand, and the Rio Tinto/Zurich Settlement, on the other, the Rio Tinto/Zurich Settlement shall control~~.

~~None of (i) the Bankruptcy Court's confirmation of the Plan or approval of the Plan Documents, (ii) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (iii) any estimation or valuation of any Claims, either individually or in the aggregate in the Chapter 11 Cases shall, with respect to J&J, constitute a trial or hearing on the merits or an adjudication or judgment with respect to any J&J Talc Claim.~~

(f)      *Institution and Maintenance of Legal and Other Proceedings*

As of the Effective Date, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability or responsibility of the Talc Personal Injury Trust, including without limitation the Talc Insurance Actions, Talc Personal Injury Claims ~~(except with respect to the J&J Talc Claims channeled to the Talc Personal Injury Trust, which shall be resolved in accordance with the J&J Protocol Order)~~, Indirect Talc Personal Injury Claims, ~~and~~ the Talc Personal Injury Trust Causes of Action, and the J&J Indemnification Obligations.  Without limiting the foregoing, on and after the Effective Date, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue and resolve all such actions, ~~other than actions with respect to J&J Talc Claims (which shall be resolved in accordance with the J&J Protocol Order)~~, in the name of either of the Debtors or the Reorganized

Debtors, if deemed necessary or appropriate by the Talc Personal Injury Trust.  The Talc Personal Injury Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the Effective Date arising from or associated with any legal action or other proceeding which is the subject of Article IV of the Plan and shall pay or reimburse all deductibles, self-insured retentions, retrospective premium adjustments, or other charges (not constituting Indirect Talc Personal Injury Claims) which may arise from the receipt of any insurance proceeds by the Talc Personal Injury Trust.  Furthermore, without limiting the foregoing, the Talc Personal Injury Trust shall be empowered to maintain, administer, preserve, or pursue the Talc-In-Place Insurance Coverage and the Talc Insurance Action Recoveries.

(g)     *Terms of Injunctions and Automatic Stay*

All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Cases, whether pursuant to sections 105, 362, or any other provision of the Bankruptcy Code, Bankruptcy Rules, or other applicable law in existence immediately prior to the Confirmation Date, shall remain in full force and effect until the injunctions become effective pursuant to a Final Order, and shall continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms.  In addition, on and after Confirmation, the Debtors, with the consent of each of the Plan Proponents, may collectively seek such further orders as they deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

Each of the Injunctions contained in the Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order.

(h)     *The FCR and the Tort Claimants' Committee*

The FCR and the Tort Claimants' Committee shall continue in their official capacities until the Effective Date.  The Debtors shall pay the reasonable fees and expenses incurred by the FCR and the Tort Claimants' Committee through the Effective Date, in accordance with the Compensation Procedures Order, the Fee Examiner Order, and the terms of the Plan, including Section 2.3 of the Plan.

After the Effective Date, the official capacities of the FCR and the Tort Claimants' Committee in the Chapter 11 Cases shall be limited to having standing and capacity to (i) prosecute their pre-Effective Date intervention in any adversary proceedings; (ii) object to any proposed modification of the Plan; (iii) object to or defend the Fee Claims of professionals employed by or on behalf of the Estate, or by or on behalf of members of the Tort Claimants' Committee; and (iv) participate in any pending appeals or appeals of the Confirmation Order.  Except for the foregoing, the FCR and the members of the Tort Claimants' Committee shall be released and discharged from all further authority, duties, responsibilities, liabilities, and obligations involving the Chapter 11 Cases.  Upon the closing of the Chapter 11 Cases, the Tort Claimants' Committee shall be dissolved.  The fees and expenses incurred by the FCR and the Tort Claimants' Committee relating to any post-Effective Date activities authorized hereunder shall be payable from the Administrative Claim Reserve.

Nothing in Section 11.8 of the Plan shall limit or otherwise affect the rights of the United States Trustee under section 502 of the Bankruptcy Code or otherwise to object to Claims or requests for allowance of Fee Claims or other Administrative Claims.

(i)     *Expungement of Talc Personal Injury Claims from the Claims Register*

On the Effective Date, all Talc Personal Injury Claims filed against the Debtors in the Chapter 11 Cases shall be expunged from the Claims Register, and resolved in accordance with the Trust Distribution Procedures.

7.8     Releases, Injunctions and Exculpation

The release, injunction and exculpation provisions are set forth in Article XII of the Plan, and a summary of such provisions is provided below.

(a)     *Terms of Injunction and Automatic Stay*

All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Cases, whether pursuant to sections 105, 362, or any other provision of the Bankruptcy Code, Bankruptcy Rules, or other applicable law in existence immediately prior to the Confirmation Date, shall remain in full force and effect until the injunctions become effective pursuant to a Final Order, and shall continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms.  In addition, on and after Confirmation, the Debtors, with the consent of each of the Plan Proponents, may collectively seek such further orders as they deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

Each of the Injunctions contained in the Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation.

(b)     *Discharge and Injunctions*

(1)     Discharge of Claims Against and Termination of Equity Interests the Debtors

Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, Confirmation of the Plan shall afford each Debtor a discharge to the fullest extent permitted by Bankruptcy Code sections 524 and 1141(d)(1).

(2)     **Discharge Injunction**

**Except as specifically provided in the Plan or the Confirmation Order, from and after the Effective Date, to the maximum extent permitted under applicable law, all Persons that hold, have held, or may hold a Claim, demand or other debt or liability that is discharged, or an Equity Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan, are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, debts or liabilities, or terminated**

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

Equity Interests or rights: (i) commencing or continuing any action or other proceeding of any kind against the Debtors, the Reorganized Debtors, the Talc Personal Injury Trust, or their respective property; (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, the Talc Personal Injury Trust, or their respective property; (iii) creating, perfecting, or enforcing any Lien or Encumbrance of any kind against the Debtors, the Reorganized Debtors, the Talc Personal Injury Trust, or their respective property; and (iv) commencing or continuing any judicial or administrative proceeding, in any forum and in any place in the world, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order (the "**Discharge Injunction**").  The foregoing injunction shall extend to the successors of the Debtors (including, without limitation, the Reorganized Debtors) and their respective properties and interests in property.  The discharge provided in this provision shall void any judgment obtained against any Debtor at any time, to the extent that such judgment relates to a discharged Claim or demand.

      (c)    *Releases*

      (1)    <u>Releases by Debtors and Estates</u>

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the implementation of the Talc Personal Injury Trust, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Debtors and the Estates from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, causes of action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates (including any Estate Causes of Action), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, ~~the~~ **this** Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation or implementation thereof, the

~~US-DOCS\116915437~~US-DOCS\117855212RLF1 ~~23862506v.1~~24099353v.1

solicitation of votes with respect to the Plan, or any other act or omission; provided, however, that the Debtors do not release, and the Reorganized Debtors shall retain, the Non-Talc Causes of Action arising out of, or related to, any act or omission of a Released Party that is a criminal act or constitutes fraud, gross negligence, or willful misconduct.  The Debtors, and any other newly-formed entities that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the releases set forth in Section 12.2.1 of the Plan.  For the avoidance of doubt, Claims or causes of action arising out of, or related to, any act or omission of a Released Party prior to the Effective Date that is later found to be a criminal act or to constitute fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to Section 12.2.1 of the Plan.

In furtherance of the Imerys Settlement, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors ~~and the Reorganized Debtors~~, on their own behalf and as representatives of their respective Estates, the Reorganized Debtors, and the Tort Claimants' Committee and FCR, solely on their own behalf, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Imerys Protected Parties of and from (a) all Estate Causes of Action and (b) any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including, without limitation, those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Debtors, ~~the~~ their Estates, the Reorganized Debtors, the Tort Claimants' Committee, or the FCR have, had, may have, or may claim to have against any of the Imerys Protected Parties including without limitation with respect to any Talc Personal Injury Claim (clauses (a) and (b) collectively, the "Imerys Released Claims").

In furtherance of the Rio Tinto/Zurich Settlement, ~~on the Effective Date~~effective upon the Talc Personal Injury Trust's receipt of the Rio Tinto/Zurich Contribution, for good and valuable consideration, the adequacy of which is hereby confirmed, the ~~Debtors and the Reorganized~~ Talc Personal Injury Trust, the Debtors, on their own behalf and as representatives of their respective Estates, the Reorganized Debtors, and the Tort Claimants' Committee and FCR, solely on their own behalf, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Rio Tinto Protected Parties and the Zurich Protected Parties of and from (a) all Estate Causes of Action and (b) any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including, without limitation, those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Talc Personal Injury Trust, the Debtors, ~~the~~ their Estates, the Reorganized Debtors, the Tort Claimants' Committee, or the FCR have, had, may have, or may claim to have against any of the Rio Tinto Protected Parties and/or the Zurich Protected Parties, directly or indirectly arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim (collectively, the "Rio Tinto/Zurich Released Claims").

(2)    **Releases by Holders of Claims**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the implementation of the Talc Personal Injury Trust, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, except as otherwise explicitly provided herein, by the Releasing Claim Holders from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, causes of action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates (including any Estate Causes of Action), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such entities existed prior to or after the Petition Date), their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, ~~the~~ **this** Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, other than Claims or causes of action arising out of, or related to, any act or omission of a Released Party that constitutes fraud, gross negligence or willful misconduct.  For the avoidance of doubt, Claims or causes of action arising out of, or related to, any act or omission of a Released Party prior to the Effective Date that is later found to be a criminal act or to constitute fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to **Section 12.2.2** of the Plan.

(3)    **Injunction Related to Releases**

Except as otherwise provided in the Plan, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any claims, commitments, obligations, suits, judgments, damages, demands,

US-DOCS\116915437US-DOCS\117855212RLFI 23862506v.124099353v.1

debts, causes of action and liabilities released pursuant to the Plan (the "**Release Injunction**").

(d)    *The Channeling Injunction and the Insurance Entity Injunction*

In order to supplement the injunctive effect of the Discharge Injunction, and pursuant to sections 524(g) and 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following permanent injunctions to take effect as of the Effective Date.

(1)    **Channeling Injunction**

(a)    **Terms.**  To preserve and promote the settlements contemplated by and provided for in the Plan, including the Imerys Settlement and the Rio Tinto/Zurich Settlement, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and the District Court under sections 105(a) and 524(g) of the Bankruptcy Code, the sole recourse of any holder of a Talc Personal Injury Claim against a Protected Party (on account of such Talc Personal Injury Claim) shall be the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents, and such holder shall have no right whatsoever at any time to assert its Talc Personal Injury Claim against any Protected Party or any property or interest in property of any Protected Party.  On and after the Effective Date, all holders of Talc Personal Injury Claims shall be permanently and forever stayed, restrained, barred, and enjoined from taking any action for the purpose of, directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Talc Personal Injury Claim against a Protected Party other than from the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents, including, but not limited to:

(i)    commencing, conducting, or continuing in any manner, directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;

(ii)    enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property or interests in property of any Protected Party;

(iii)    creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien of any kind against any Protected Party or any property or interests in property of any Protected Party;

(iv)    asserting, implementing, or effectuating any setoff, right of reimbursement, subrogation, contribution, or recoupment of any

94

kind, in any manner, directly or indirectly, against any obligation due to any Protected Party or against any property or interests in property of any Protected Party; and

(v)    taking any act in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Documents, or the Talc Personal Injury Trust Documents or with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Talc Personal Injury Trust, except in conformity and compliance with the Talc Personal Injury Trust Documents.

(b)    Reservations.  Notwithstanding anything to the contrary in Section 12.3.1(a) of the Plan, this Channeling Injunction shall not impair:

(i)    the rights of holders of Talc Personal Injury Claims to assert such Talc Personal Injury Claims solely against the Talc Personal Injury Trust or otherwise in accordance with the Trust Distribution Procedures;

(ii)    the rights of holders of Talc Personal Injury Claims to assert such claims against anyone other than a Protected Party;

(iii)    the rights of Persons to assert any Claim, debt, obligation or liability for payment of Talc Personal Injury Trust Expenses solely against the Talc Personal Injury Trust or otherwise in accordance with the Trust Distribution Procedures; or

(iv)    the Talc Personal Injury Trust from enforcing its rights explicitly provided to it under the Plan and the Talc Personal Injury Trust Documents.

(c)    Modifications.  There shall be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

(d)    Non-Limitation of Channeling Injunction.  Nothing in the Plan or the Talc Personal Injury Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan, the releases provided in the Imerys Settlement and the Rio Tinto/Zurich Settlement, or the Talc Personal Injury Trust's assumption of all liability with respect to Talc Personal Injury Claims.

(e)    Bankruptcy Rule 3016 Compliance.  The Plan Proponents' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

US-DOCS\116915437US-DOCS\117855212RLFI 23862506v.124099353v.1

(f)     **Any Protected Party may enforce the Channeling Injunction as a defense to any Claim brought against such Protected Party that is enjoined under the Plan as to such Protected Party and may seek to enforce such injunction in a court of competent jurisdiction.**

(g)     **If a non-Settling Talc Insurance Company asserts that it has rights of contribution, indemnity, reimbursement, subrogation or other similar claims (collectively, "**Contribution Claims**") against a Settling Talc Insurance Company, (i) such Contribution Claims may be asserted as a defense or counterclaim against the Talc Personal Injury Trust in any Talc Insurance Action involving such non-Settling Talc Insurance Company, and the Talc Personal Injury Trust may assert the legal or equitable rights (if any) of the Settling Talc Insurance Company, and (ii) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such non-Settling Talc Insurance Company to the Talc Personal Injury Trust shall be reduced by the amount of such Contribution Claims**

(2)     **Insurance Entity Injunction**

(a)     **Purpose.  In order to protect the Talc Personal Injury Trust and to preserve the Talc Personal Injury Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court, the Bankruptcy Court shall issue the Insurance Entity Injunction;** *provided*, *however*, **that the Insurance Entity Injunction is not issued for the benefit of any Talc Insurance Company, and no Talc Insurance Company is a third-party beneficiary of the Insurance Entity Injunction, except as otherwise specifically provided in any Talc Insurance CIP Agreement or Talc Insurance Settlement Agreement.**

(b)     **Terms Regarding Claims Against Talc Insurance Companies. Subject to the provisions of** Sections 12.3.1 **and** 12.3.2 **of the Plan, all Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any claim, demand or cause of action (including any Talc Personal Injury Claim or any claim or demand for or respecting any Talc Personal Injury Trust Expense) against any Talc Insurance Company based upon, attributable to, arising out of, or in any way connected with any such Talc Personal Injury Claim, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim, demand, or cause of action including, without limitation:**

(i)     **commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such claim, demand, or cause of action against any Talc Insurance Company, or against the property of any**

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

Talc Insurance Company, with respect to any such claim, demand, or cause of action;

(ii)    enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;

(iii)    creating, perfecting, or enforcing in any manner, directly or indirectly, any Encumbrance against any Talc Insurance Company, or the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action; and

(iv)    except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand or cause of action;

*provided*, *however*, that (a) the injunction set forth in Section 12.3.2(b) of the Plan shall not impair in any way any (i) actions brought by the Talc Personal Injury Trust against any Talc Insurance Company and (ii) the rights of any co-insured of the Debtors (x) with respect to any Talc Insurance Policy or Talc Insurance CIP Agreement or against any Talc Insurance Company and (y) as specified under any Final Order of the Bankruptcy Court approving a Talc Insurance CIP Agreement; and (b) the Talc Personal Injury Trust shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the injunction set forth in Section 12.3.2(b) of the Plan with respect to any Talc Insurance Company upon express written notice to such Talc Insurance Company, except that the Talc Personal Injury Trust shall not have any authority to terminate, reduce or limit the scope of the injunction herein with respect to any Settling Talc Insurance Company so long as, but only to the extent that, such Settling Talc Insurance Company complies fully with its obligations under any applicable Talc Insurance Settlement Agreement.

(c)    Reservations.  Notwithstanding anything to the contrary above, this Insurance Entity Injunction shall not enjoin:

(i)    the rights of Entities to the treatment accorded them under the Plan, as applicable, including the rights of holders of Talc Personal Injury Claims to assert such Claims, as applicable, in accordance with the Trust Distribution Procedures;

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

(ii)    the rights of Entities to assert any claim, debt, obligation, cause of action or liability for payment of Talc Personal Injury Trust Expenses against the Talc Personal Injury Trust;

(iii)    the rights of the Talc Personal Injury Trust to prosecute any action based on or arising from the Talc Insurance Policies;

(iv)    the rights of the Talc Personal Injury Trust to assert any claim, debt, obligation, cause of action or liability for payment against a Talc Insurance Company based on or arising from the Talc Insurance Policies or Talc Insurance CIP Agreements; and

(v)    the rights of any Talc Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any other Talc Insurance Company that is not a Settling Talc Insurance Company, or as otherwise specifically provided in any Talc Insurance CIP Agreement.

(e)    *Supplemental Settlement Injunction Order*

In order to preserve and promote the Imerys Settlement and the Rio Tinto/Zurich Settlement, each of which is incorporated in the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date.

(a)    **Terms**

(i)    **All Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Imerys Released Claims directly or indirectly against the Imerys Protected Parties (or any of them) shall be permanently stayed, restrained, and enjoined from pursuing now, or at any time in the future, any Imerys Released Claims.**

(ii)    **All Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Rio Tinto/Zurich Released Claims directly or indirectly against the Rio Tinto Protected Parties (or any of them) and/or the Zurich Protected Parties (or any of them) shall be permanently stayed, restrained, and enjoined from pursuing now, or at any time in the future, any Rio Tinto/Zurich Released Claims.**

(b)    **Any Imerys Protected Party, Rio Tinto Protected Party, or Zurich Protected Party may enforce the Supplemental Settlement Injunction Order as a defense to any Claim brought against such Imerys Protected Party, Rio Tinto Protected Party, or Zurich Protected Party that is enjoined under the Plan as to such**

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

**Imerys Protected Party, Rio Tinto Protected Party, or Zurich Protected Party and may seek to enforce such injunction in a court of competent jurisdiction.**

(f)      *Exculpation*

**None of the Debtors, the Reorganized Debtors, the Imerys Protected Parties, the Tort Claimants' Committee, the members of the Tort Claimants' Committee in their capacities as such, the FCR, the Information Officer nor any of their respective officers, directors and employees, members, agents, attorneys, financial advisors or restructuring professionals, nor any other professional Person employed by any one of them, shall have or incur any liability to any Person or Entity for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation of the Plan, the Disclosure Statement, the releases and Injunctions, the pursuit of Confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be distributed under the Plan, or the management or operation of the Debtors (except for any liability that results primarily from such Person's or Entity's gross negligence, bad faith or willful misconduct); *provided*, *however*, that this exculpation shall not apply to Talc Insurer Coverage Defenses; *provided further* that Section 12.7 of the Plan shall also apply to any former officer or director of the Debtors that was an officer or director at any time during the Chapter 11 Cases but is no longer an officer or director.  In all respects, each and all of such Persons, firms and Entities shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and the administration of each of them.**

## ARTICLE VIII.

## THE TALC PERSONAL INJURY TRUST AND TRUST DISTRIBUTION PROCEDURES

On the Effective Date, the Talc Personal Injury Trust shall be created in accordance with the Plan Documents.  The purposes of the Talc Personal Injury Trust shall be to assume all Talc Personal Injury Claims and to use the Talc Personal Injury Trust Assets and, among other things: (a) to preserve, hold, manage, and maximize the assets of the Talc Personal Injury Trust; and (b) to direct the processing, liquidation, and payment of all compensable Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents.  The Talc Personal Injury Trust will resolve Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents in such a way that holders of Talc Personal Injury Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such claims, and otherwise comply in all respects with the requirements of section 524(g)(2)(B)(i) of the Bankruptcy Code.

The Trust Distribution Procedures, attached to the Plan as Exhibit A, set forth procedures for processing and paying the Talc Personal Injury Claims.  These procedures will be binding on the holders of all Talc Personal Injury Claims.  The Trust Distribution Procedures provide, among other things, for the resolution of Talc Personal Injury Claims pursuant to the terms of the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures, and that resolution of a Talc Personal Injury Claim by the Talc Personal Injury Trust will result in a full or partial release

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

of such Claim against the Talc Personal Injury Trust in accordance with the Injury Trust Distribution Procedures.

Furthermore, potential claimants should be aware that any funds they recover from the Talc Personal Injury Trust, or against any "primary plan" as defined in the Medicare Secondary Payer Statute, 42 U.S.C. § 1395y(b) (the "**MSPS**"), could be subject to repayment obligations owing or potentially owing under the MSPS or related rules, regulations, or guidelines.  Potential claimants should also be aware that, as a condition of receiving payment from the Talc Personal Injury Trust or any "primary plan" as defined by the MSPS, the claimants may be asked to certify that they will comply with any obligations owing or potentially owing under the MSPS or related rules, regulations, or guidelines.  The Talc Personal Injury Trust Agreement requires, as applicable, that the Talc Personal Injury Trust act as a reporting entity under 42 U.S.C. § 1395y(b), to the extent applicable.

## ARTICLE IX.

## CERTAIN FACTORS TO BE CONSIDERED

**Holders of Claims against the Debtors should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith or incorporated by reference, prior to voting to accept or reject the Plan.  These factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.**

9.1     Variance from Financial Projections

The summarized financial projections contained in Exhibit B (the North American Debtors) and Exhibit C (ITI) are dependent upon numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, general business and economic conditions, and other matters, many of which are beyond the control of the Plan Proponents.  Accordingly, there can be no assurance that such assumptions will prove to be valid.  In addition, unanticipated and unforeseeable events and/or circumstances occurring subsequent to the preparation of the financial projections may affect the actual financial results of the Reorganized Debtors.  Although the Debtors believe that the financial projections contained in Exhibit B and Exhibit C are reasonable and attainable, some or all of the estimates will vary, and variations between the actual financial results and those projected may be material.

9.2     Failure to Confirm the Plan

Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, that the Plan was filed in good faith, and that the value of distributions to dissenting holders of Claims and Equity Interests may not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Plan Proponents believe that the Plan will meet these tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Bankruptcy Code also requires that a Plan must provide the same treatment for each claim or interest in a particular class, unless a holder agrees to a less favorable treatment of its particular claim or interest. The Plan Proponents believe that they have complied with the requirements of the Bankruptcy Code by their classification and treatment of various holders of Claims and Equity Interests under the Plan. However, if a member of a Class objects to its treatment or if the Bankruptcy Court finds that the Plan does not comply with the requirements of the Bankruptcy Code, confirmation of the Plan could be delayed or prevented. In addition, each Impaired Class that will (or may) be entitled to receive property under the Plan will have the opportunity to vote to accept or reject the Plan.

Further, section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if the claim or interest is substantially similar to the other claims or interests in that class. The Plan Proponents believe that the classification of Claims and Equity Interests under the Plan complies with the requirements of the Bankruptcy Code because the Classes established under the Plan each encompass Claims or Equity Interests that are substantially similar to similarly classified Claims or Equity Interests. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

9.3    <u>Non-Occurrence of the Effective Date</u>

The Plan provides that there are several conditions precedent to the occurrence of the Effective Date. The Plan Proponents cannot assure you as to the timing of the Effective Date. If the conditions precedent to the Effective Date have not been satisfied or waived, the Bankruptcy Court may vacate the Confirmation Order. In that event, the Plan would be deemed null and void and the Plan Proponents may propose or solicit votes on an alternative reorganization plan that may not be as favorable to parties in interest as the Plan.

9.4    <u>The Recovery to Holders of Allowed Claims and Equity Interests Cannot Be Stated with Absolute Certainty</u>

Due to the inherent uncertainties associated with projecting financial results and litigation outcomes, the projections contained in this Disclosure Statement should not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Plan Proponents believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. Also, because the Liquidation Analysis (as defined below), distribution projections, and other information contained herein and attached hereto are estimates only, the timing and amount of actual distributions to holders of Allowed Claims and Equity Interests, if applicable, may be affected by many factors that cannot be predicted.

The Claims estimates set forth herein are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect. Such differences may adversely affect the percentage of recovery to holders of Allowed Claims and Equity Interests, if applicable, under the Plan. Moreover, the estimated recoveries set forth herein are necessarily based on numerous assumptions, the realization of many of which are beyond the Debtors' control.

9.5     The Allowed Amount of Claims May Differ From Current Estimates

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated in this Disclosure Statement. Furthermore, a number of additional Claims may be filed, including on account of rejection damages for Executory Contracts and Unexpired Leases rejected pursuant to the Plan. Any such claims may result in a greater amount of Allowed Claims than estimated in this Disclosure Statement.

9.6     The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection may therefore not receive its expected share of the estimated distributions described in this Disclosure Statement.

9.7     Parties in Interest May Object to the Debtors' Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if the claim or interest is substantially similar to the other claims or interests in that class. Parties in interest may object to the classification of certain Claims and Equity Interests both on the grounds that certain Claims and Equity Interests have been improperly placed in the same Class and/or that certain Claims and Equity Interests have been improperly placed in different Classes. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements of the Bankruptcy Code because the Classes established under the Plan each encompass Claims or Equity Interests that are substantially similar to similarly classified Claims or Equity Interests. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

9.8     Appointment of Different Talc Trustees and/or Different Members of the Talc Trust Advisory Committee for the Talc Personal Injury Trust

Prior to the Confirmation Hearing, the Talc Personal Injury Trust Agreement shall (i) identify certain individuals as the initial Talc Trustees of the Talc Personal Injury Trust and (ii) propose certain individuals as the initial members of the Talc Trust Advisory Committee. The Bankruptcy Court, however, may reject or otherwise decline to approve the appointment of one or more of the proposed Talc Trustees, or one or more of the proposed members of the Talc Trust Advisory Committee. In that case, an alternate Talc Trustee or alternate Talc Trustees and/or alternative proposed members of the Talc Trust Advisory Committee would have to be nominated, potentially resulting in significant delays in the occurrence of the Confirmation Date and Effective Date. The selection of a different Talc Trustee or different Talc Trustees, or different Talc Trust Advisory Committee Members also could materially affect administration of the Talc Personal Injury Trust.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

9.9    Distributions under the Trust Distribution Procedures

Talc Personal Injury Claims will be resolved pursuant to the Talc Personal Injury Trust Documents, and their treatment will be based upon, among other things, ~~whether they are J&J Talc Claims,~~ estimates of the number, types, and amount of Talc Personal Injury Claims, the value of the assets of the Talc Personal Injury Trust, the liquidity of the Talc Personal Injury Trust, the Talc Personal Injury Trust's expected future income and expenses, and other matters.  There can be no certainty as to the precise amounts that will be distributed by the Talc Personal Injury Trust in any particular time period or when Talc Personal Injury Claims will be resolved by the Talc Personal Injury Trust.

Holders of Talc Personal Injury Claims who (a) are Medicare beneficiaries and (b) receive a distribution from the Talc Personal Injury Trust may be required to reimburse Medicare for medical expenses paid on behalf of such holder.[~~63~~61]  Additionally, excessive legal fees may not qualify as a "procurement cost" within the meaning of 42 C.F.R. § 411.37(a)(1)(i), which may affect a holder of a Talc Personal Injury Claim's reimbursement obligations.

9.10   The Channeling Injunction

The Channeling Injunction, which, among other things, bars the assertion of any Talc Personal Injury Claims against the Protected Parties, subject to exceptions contained in the Trust Distribution Procedures that permit, in certain circumstances, the assertion of such claims against the Debtors (but not any other party protected by the Channeling Injunction), is a necessary element of the Plan.  Although the Plan, the Talc Personal Injury Trust Agreement, and the Trust Distribution Procedures all have been drafted with the intention of complying with sections 524(g) and (h) of the Bankruptcy Code, and satisfaction of the conditions imposed by sections 524(g) and (h) is a condition precedent to confirmation of the Plan, there is no guarantee that the validity and enforceability of the Channeling Injunction or sections 524(g) and (h) or the application of the Channeling Injunction to Talc Personal Injury Claims will not be challenged, either before or after confirmation of the Plan.

9.11   Voting Requirements

If sufficient votes are received to enable the Bankruptcy Court to confirm the Plan pursuant to both sections 524(g) and 1129 of the Bankruptcy Code, ITI intends to file for chapter 11 relief and the Debtors intend to seek, as promptly as practicable thereafter, Confirmation.  If sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

9.12   The Debtors' Operations and Ability to Consummate a Sale May be Impacted by the Continuing COVID-19 Pandemic

The continued spread of COVID-19 could have a significant impact on the Debtors' businesses, both in the context of consumer demand and production capacity.  This pandemic could

---

[~~63~~61]    *See* 42 U.S.C. § 1395y(b)(2)(B)(ii); 42 C.F.R. § 411.22.

~~US-DOCS\116915437~~US-DOCS\117855212RLF1 ~~23862506v.1~~24099353v.1

dampen global growth and ultimately lead to an economic recession. Such a scenario would negatively impact the Debtors' financial performance, and affect the underlying financial projections contained in Exhibit B and Exhibit C. In addition, the Debtors' ability to monetize the North American Debtors' assets in the Sale is subject to physical and economic uncertainties that have arisen as a result of the spread of COVID-19. Given negative impacts on global economies, the contemplated sale process may result in fewer actionable bids for the North American Debtors' assets than would have been expected prior to the COVID-19 pandemic.

9.13    The Canadian Court May Not Enter an Order Recognizing the Confirmation Order

ITC's exit from bankruptcy protection will depend on, among other things, the Canadian Court's entry of a Canadian confirmation order recognizing the treatment of Claims and Equity Interests under the Plan. The Plan Proponents believe that if the Confirmation Order is granted, the Canadian Court will likely grant the Canadian confirmation order recognizing the Confirmation Order.

**ARTICLE X.**

**VOTING PROCEDURES AND REQUIREMENTS**

10.1    Voting Procedures Summary[6462]

The following section describes in summary fashion the procedures and requirements that have been established for voting on the Plan pursuant to the Voting Procedures Order, which approves this Disclosure Statement as containing adequate information, establishes the voting procedures (the "**Voting Procedures**"), schedules the Confirmation Hearing, and sets the voting deadline and the deadline for objecting to confirmation of the Plan. Those procedures and requirements establish, among other things, the place to send completed ballots, in the forms approved by the Bankruptcy Court in the Voting Procedures Order, used in voting on the Plan (each, a "**Ballot**"), together with the deadline for returning completed Ballots for voting on the Plan and the deadline for objecting to the Plan. The Debtors have distributed Solicitation Packages in connection with the foregoing containing:

(a)    a cover letter in paper form describing the contents of the Solicitation Package and the enclosed USB flash drive (described below), and instructions for obtaining (free of charge) printed copies of the materials provided in electronic format;

(b)    the Confirmation Hearing Notice in paper form;

(c)    a copy of this Disclosure Statement with all exhibits, including the Plan with its exhibits, which may be provided by way of a USB flash drive;

(d)    the Voting Procedures Order (without exhibits);

---

[6462]    Capitalized terms used but not defined in this Article X have the meanings ascribed to them in the Voting Procedures Order.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

(e)     the Voting Procedures;

(f)     solely to counsel for holders of Direct Talc Personal Injury Claims, the Direct Talc Personal Injury Claim Solicitation Notice and the Certified Plan Solicitation Directive;

(g)     solely for holders of Talc Personal Injury Claims and their counsel, an appropriate Ballot and voting instructions for the same in paper form;

(h)     solely for holders of Talc Personal Injury Claims and their counsel, a pre-addressed, return envelope for completed Ballots; and

(i)     solely for holders of Talc Personal Injury Claims and their counsel, a letter from the Tort Claimants' Committee and the FCR in the form attached to the Voting Procedures Order as <u>Exhibit 5</u>.

The Voting Procedures Order, the Voting Procedures, the Confirmation Hearing Notice, and the instructions attached to your Ballot should be read in connection with this Section of this Disclosure Statement as they set forth the Voting Procedures and deadlines in detail.  If you are a holder of a Claim who is entitled to vote on the Plan and you or your attorney did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please contact the Solicitation Agent (i) by telephone at (844) 339-4096 (Toll Free) or (929) 247-2932 (International); (ii) by e-mail at imerysballots@primeclerk.com; (iii) by visiting their website at https://cases.primeclerk.com/imerystalc; or (iv) by writing at Imerys Ballot Processing Center, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165.

The Voting Procedures set forth a process by which attorneys representing holders of Direct Talc Personal Injury Claims, as listed on the Schedules, or any filed Proof of Claim (collectively, the "**Firms**"), will receive copies of the Direct Talc Personal Injury Claim Solicitation Notice and the Certified Plan Solicitation Directive.  The Direct Talc Personal Injury Claim Solicitation Notice will notify the Firms of the options proposed for soliciting votes on the Plan in respect of Direct Talc Personal Injury Claims and request that each Firm complete and return the Certified Plan Solicitation Directive to the Solicitation Agent no later than ~~September 10, 2020 (12 calendar days after the Solicitation Date)~~<u>October 26, 2020</u>.

The Certified Plan Solicitation Directive permits each Firm to direct the Solicitation Agent with regard to the solicitation of votes on the Plan from individuals, estates, or Entities who or which hold Direct Talc Personal Injury Claims (collectively, the "**Clients**") according to one of the following procedures:

(a)     <u>Master Ballot Solicitation Method</u>.  If a Firm certifies that it has the authority under applicable law to vote on behalf of its Clients, the Firm may direct the Solicitation Agent to serve the Firm with one Solicitation Package and one Master Ballot on which the Firm must record the votes on the Plan for each of its Clients.  If the Firm elects this procedure, the Firm may also request that, for informational purposes, the Solicitation Agent serve Solicitation Packages (without a Ballot) on its Clients, together with a cover letter to be provided by the Firm.

(b)     <u>Direct Solicitation Method</u>.  If a Firm does not have the authority to vote on behalf of its Clients, or if a Firm prefers to have each of its Clients cast their own votes on the Plan, such Firm may direct the Solicitation Agent to solicit votes on the Plan directly from its Clients, and may provide the Solicitation Agent with a cover letter to be transmitted to such Clients in connection with such solicitation.

(c)     <u>Indirect Solicitation Method</u>.  If a Firm does not have the authority to vote on behalf of its Clients or the attorney prefers to have the Clients cast their own votes on the Plan, the attorney may direct the Solicitation Agent to deliver the Solicitation Packages to the Firm, which will, in turn, deliver the Solicitation Packages to its Clients.  If the Firm selects this method: (i) the Solicitation Agent will cause the requested number of Solicitation Packages, including appropriate Ballots, to be served on the Firm; (ii) the Firm must deliver the Solicitation Packages to the Clients within three Business Days after receipt; and (iii) the Firm must file an affidavit of service with the Bankruptcy Court, and send a copy of such affidavit to the Solicitation Agent, within three Business Days of such service.  The affidavit of service filed with the Bankruptcy Court only needs to state that service was completed, the date(s) that service was completed and the attorney has provided or will provide the Solicitation Agent with the required lists of Clients, as described in the Solicitation Procedures.  The affidavit of service provided to the Solicitation Agent must also include the names and addresses of the Clients served.  The affidavit of service provided to the Solicitation Agent shall not be deemed to be filed with the Bankruptcy Court or part of the Docket in the Chapter 11 Cases and shall not be published or otherwise disclosed.

(d)     <u>Hybrid Solicitation Method</u>.  If a Firm certifies that it has the authority under applicable law to vote, and intends to exercise that power, only for certain of the Clients (collectively, the "**Master Ballot Clients**"), the Firm may direct the Solicitation Agent to serve the Firm with one Solicitation Package and one Master Ballot on which the Firm must record the votes with respect to the Plan for the Master Ballot Clients.  The Firm also may request that, for informational purposes, the Solicitation Agent serve Solicitation Packages (without a Ballot) on the Master Ballot Clients, together with a cover letter to be provided by the Firm.  With respect to such Firm's other Clients that are not Master Ballot Clients, the Firm must elect the procedure under either the Direct Solicitation Method (subsection (b) above) or the Indirect Solicitation Method (subsection (c) above).

If you are entitled to vote on the Plan, a form of Ballot for your Claim has been provided to you, unless otherwise provided to a Firm, as contemplated by the Certified Plan Solicitation Directive.  Holders of Talc Personal Injury Claims or their attorneys, as applicable, should have received a Class 4 Ballot (relating to Talc Personal Injury Claims).  The Plan Proponents have prepared, and the Bankruptcy Court has approved the Voting Procedures.  You should refer to the Voting Procedures sent with this Disclosure Statement to determine precisely those procedures that apply with respect to the return of your Ballot.

Completed and signed Ballots can be submitted (i) by mail using the envelope included in the Solicitation Package, or by hand delivery or overnight courier to: Imerys Ballot Processing

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

Center, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 or (ii) through the E-Ballot platform, by visiting https://cases.primeclerk.com/ImerysTalc/, clicking on the "Submit E-Ballot" section of the website, and following the instructions. As set forth in the Voting Procedures, no other forms of electronic delivery of Ballots, *e.g.*, facsimile, will be accepted.

## 10.2   Voting Deadline

**To be considered for purposes of accepting or rejecting the Plan, all Ballots must be *received by* the Solicitation Agent no later than the Voting Deadline of 4:00 p.m. (prevailing Eastern Time) on ~~October 5~~November 20, 2020. Only those Ballots actually received by the Solicitation Agent before the Voting Deadline will be counted as either accepting or rejecting the Plan.**

## 10.3   Holders of Claims Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or equity interest entitles the holder thereof, or (b) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan: (1) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy); (2) reinstates the maturity of such claim or equity interest as it existed before the default; (3) compensates the holder of such claim or equity interest for any damages from such holder's reasonable reliance on such legal right to an accelerated payment; and (4) does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Holders of claims and equity interests in impaired classes are generally entitled to vote to accept or reject a plan. However, if the holder of an impaired claim or equity interest will not receive any distribution under the plan in respect of such claim or equity interest, the Bankruptcy Code deems such holder to have rejected the plan (unless such holder has agreed to such treatment) and provides that the holder of such claim or equity interest is not entitled to vote. If the claim or equity interest is not impaired, the Bankruptcy Code conclusively presumes that the holder of such claim or equity interest has accepted the plan and provides that the holder is not entitled to vote.

**<u>Class 4 is Impaired by the Plan and is the only Class entitled to vote on the Plan.</u>** All other Classes are either Unimpaired or Impaired but are Plan Proponents and voluntarily agreed to waive any right to vote on or oppose the Plan.

## 10.4   Vote Required for Acceptance by a Class

Pursuant to sections 1126(c) and 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code, Class 4 (Talc Personal Injury Claims) shall have accepted the Plan only if at least two-thirds (2/3) in amount and seventy-five percent (75%) in number of Talc Personal Injury Claims actually voting on the Plan have voted to accept the Plan in accordance with the Voting Procedures Order.

## 10.5   Voting Procedures

~~US-DOCS\116915437~~US-DOCS\117855212RLFI ~~23862506v.1~~24099353v.1

      (a)    *Ballots*

All votes to accept or reject the Plan with respect to Class 4 must be cast by properly submitting the duly completed and executed form of Ballot designated for such Claims. Holders of Claims in Class 4 or their attorneys (as applicable) voting on the Plan should complete and sign the appropriate Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept" the Plan or "Reject" the Plan. In addition, if any holder of a Claim elects not to grant the releases set forth in Article XII of the Plan, then it should check the appropriate box on its Ballot and follow the instructions contained in the Ballot.

**As set forth in the Voting Procedures, improperly completed Ballots will not be counted. By way of example and not limitation, any Ballot received which is not signed or which contains insufficient information to permit the identification of the claimant will be an invalid Ballot and will not be counted for purposes of determining acceptance or rejection of the Plan. In addition, a vote cast on a Ballot will not be counted if it is returned to the Solicitation Agent: (i) indicating neither acceptance nor rejection of the Plan; (ii) indicating both acceptance and rejection of the Plan; or (iii) indicating partial rejection and partial acceptance of the Plan. Notwithstanding, any such Ballot will be considered for purposes of determining whether the claimant has opted out of the releases contained in the Plan, if that portion of the Ballot is completed and the Ballot is otherwise complete and legible.**

Ballots must be delivered to the Solicitation Agent, at its address set forth above in Section 10.1, or submitted via electronic, online transmission through a customized electronic Ballot by utilizing the E-Ballot platform on the Solicitation Agent's website https://cases.primeclerk.com/imerystalc, and received by the Voting Deadline. **The method of such delivery is at the election and risk of the voter.** Although the method of delivery is at the risk of the voter, for the convenience of each holder of a Talc Personal Injury Claim entitled to vote on the Plan or such holder's attorney, as applicable and in accordance with the Certified Plan Solicitation Directive, the Solicitation Package contains a pre-stamped and addressed envelope for return of such holder's Ballot by first class mail through the United States Postal Service. If such delivery is by mail, it is recommended that voters use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to ensure timely delivery. Instructions for casting an electronic Ballot can be found on the "E-Ballot" section of the Solicitation Agent's website https://cases.primeclerk.com/imerystalc by clicking on the "Submit E-Ballot" section of the website.

If you are entitled to vote and you or your attorney (as applicable) did not receive a Ballot, received a damaged Ballot or lost your Ballot, please contact the Solicitation Agent in the manner set forth above. For additional information regarding the voting process, please refer to the Voting Procedures Order, the Voting Procedures, the Confirmation Hearing Notice, and the instructions attached to your Ballot (to the extent a Ballot was not otherwise received by your attorney pursuant to the Certified Plan Solicitation Directive).

Please refer to the Voting Procedures and Voting Procedures Order for more information regarding the voting of Talc Personal Injury Claims.

      (b)    *Withdrawal of Votes and Multiple Votes on the Plan*

Any voter that delivers a valid Ballot may withdraw his, her, or its vote by delivering a written notice of withdrawal to the Solicitation Agent before the Voting Deadline (or such later date as agreed by the Debtors with the consent of the Plan Proponents, with such consent not to be unreasonably withheld). To be valid, the notice of withdrawal must be signed by the party who signed the Ballot to be revoked. The Debtors reserve the right to contest any withdrawals.

In addition, the following procedures for voting will be used by the Debtors to address multiple Ballots.

- If multiple Ballots are received from different holders purporting to hold the same Claim, the vote will be counted only once and only if such votes are consistent with respect to acceptance or rejection of the Plan. In the event that the votes are not consistent, and the vote *is not* necessary (alone or in conjunction with other inconsistent, multiple votes) to determine whether the class voted to accept the Plan, then neither vote will be counted. If the votes are not consistent, and the vote *is* necessary (alone or in conjunction with other inconsistent, multiple votes) to determine whether the class voted to accept the Plan, the parties who submitted such Ballots must provide evidence to support their assertion that they hold such Claim directly or in a representative capacity, and the Bankruptcy Court will determine which holder has the right to vote such Claims.

- If multiple Ballots are received from the holder of a Claim **and** someone purporting to be his, her, or its attorney or agent, the Ballot received from the holder of the Claim will be the Ballot that is counted, and the vote of the purported attorney or agent will not be counted.

- If multiple Ballots are received from a holder of a Claim for the same Claim, the latest-dated otherwise valid Ballot that is received before the Voting Deadline (or such later date as agreed by the Debtors with the consent of the Plan Proponents, with such consent not to be unreasonably withheld) will be the Ballot that is counted as a vote to accept or reject the Plan; if multiple Ballots are received from the same attorney or agent with respect to the same Claim (but not from the holder thereof), the latest-dated otherwise valid Ballot that is received before the Voting Deadline (or such later date as agreed by the Debtors with the consent of the Plan Proponents, with such consent not to be unreasonably withheld) will be the Ballot that is counted as a vote to accept or reject the Plan.

- If two or more Ballots are received from separate attorneys, each of whom purports to represent the same holder of a Claim, the vote of the holder appearing on both Master Ballots will be counted only once and only if such votes are consistent with respect to acceptance or rejection of the Plan. In the event that the votes are not consistent, and the vote *is not* necessary (alone or in conjunction with other inconsistent, multiple votes) to determine whether the class voted to accept the Plan, then neither vote will be counted. If the votes are not consistent, and the vote *is* necessary (alone or in conjunction with other inconsistent, multiple votes) to determine whether the class voted to accept the Plan, the parties who submitted

such Ballots must provide evidence to support their assertion that they hold such Claim directly or in a representative capacity, and the Bankruptcy Court will determine which holder has the right to vote such Claims.

The Debtors will not be obligated to recognize any withdrawal, revocation, or change of any vote received after the Voting Deadline (or such later date as agreed by the Debtors with the consent of the Plan Proponents, with such consent not to be unreasonably withheld).

## ARTICLE XI.

## CONFIRMATION OF THE PLAN

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### 11.1    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan of reorganization.  By order of the Bankruptcy Court, the Confirmation Hearing is scheduled for ~~November 4~~December 17, 2020 at 10:00 a.m. (Prevailing Eastern Time) before the Honorable Laurie Selber Silverstein, United States Bankruptcy Judge for the District of Delaware, in the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 6th Floor, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequently adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization.  Any objection to confirmation of the Plan must be filed with the Bankruptcy Court no later than ~~October 5~~**November 20**, **2020 at 4:00 p.m. (Prevailing Eastern Time)**, and will be governed by Bankruptcy Rules 3020(b) and 9014 and the Local Rules. **Unless an objection is timely and properly served and filed, it may not be considered by the Bankruptcy Court.**

### 11.2    Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan (a) is accepted by all Impaired Classes of Claims and Equity Interests, or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (b) is feasible; and (c) is in the "best interests" of holders of Claims and Interests that are Impaired under the Plan.

(a)    *Acceptance*

Class 4 is Impaired under the Plan, and the holders of Claims in such Class are entitled to vote on the Plan.  Therefore, such Class must accept the Plan in order for it to be confirmed without application of the "fair and equitable test," described below, to such Class.  Classes 5a and 6 are

Impaired under the Plan, but are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code because all holders of Claims or Equity Interests (as applicable) in Classes 5a and 6 are Plan Proponents and have consented to their treatment under the Plan.

Classes 1, 2, 3a, 3b, 5b, and 7 are Unimpaired under the Plan and are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, confirmation of the Plan will not require application of the "fair and equitable test," described below, as to those Classes.

(b)  *Issuance of Injunction Pursuant to Sections 524(g) and 105(a) of the Bankruptcy Code*

The Bankruptcy Court shall be asked to issue the Channeling Injunction if the Plan has been accepted by at least two-thirds (2/3) in amount of those holders of Class 4 Claims actually voting on the Plan, in accordance with section 1126(c) of the Bankruptcy Code, and seventy-five percent (75%) in number of those holders of Class 4 Claims actually voting on the Plan, in accordance with section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code. The amount of the Claim for each Class 4 Claim holder for voting purposes shall be as set forth in the Voting Procedures Order.

If the Bankruptcy Court or the District Court does not enter the Channeling Injunction, the Effective Date shall not occur.

(c)  *Feasibility*

The Bankruptcy Code also requires as a condition to confirmation of a plan of reorganization that the confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the reorganized debtor. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. The Plan Proponents believe that the Reorganized Debtors will be able to make all payments required pursuant to the Plan, and therefore, that confirmation of the Plan is not likely to be followed by the need for further reorganization.

To support their belief in the feasibility of the Plan, the Plan Proponents have relied upon the financial projections, attached hereto as Exhibit B and Exhibit C. The financial projections indicate that the Reorganized Debtors should have sufficient Cash prior to the Effective Date to fund the Reserves and adequate cash flow post-Effective Date to fund operations, as applicable. Accordingly, the Plan Proponents believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The financial projections are based on various assumptions, including Confirmation of the Plan in accordance with its terms, no material adverse changes in general business and economic conditions, and other matters, some of which will be beyond the control of the Reorganized Debtors. The financial projections should be read in conjunction with Article IX above, entitled "*Certain Factors to be Considered*," and with the assumptions, qualifications and footnotes to the tables containing the Financial Projections set forth in Exhibit B and Exhibit C.

(d)  *"Best Interests" Test / Liquidation Analysis*

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

The "Best Interests Test" under section 1129 of the Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each holder of Impaired claims or Impaired equity interests either (a) accept the Plan or (b) receive property with a value not less than the amount such holder would receive in a chapter 7 liquidation. As reflected in the analysis attached hereto as <u>Exhibit D</u> (the "**Liquidation Analysis**"), the Plan Proponents believe that under the Plan, holders of Impaired Claims and Impaired Equity Interests will receive property with a value equal to or in excess of the value such holders would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

One Class of Claims or Equity Interests (other than Non-Debtor Intercompany Claims and Equity Interests in the North American Debtors) is Impaired under the Plan: Talc Personal Injury Claims (Class 4). The holders of Talc Personal Injury Claims, as the only Class voting under the Plan, must accept the Plan in order for the Plan to be confirmed, thereby satisfying clause (a) above. Holders of Non-Debtor Intercompany Claims (Class 5a) and Equity Interests in the North American Debtors (Class 6) have consented to their treatment under the Plan as Plan Proponents and are presumed to accept the Plan pursuant to section 1126(f).

The Debtors have prepared the attached Liquidation Analysis to demonstrate the Plan's compliance with the provisions of section 1129(a)(7) of the Bankruptcy Code. The Liquidation Analysis is based upon a number of reasonable assumptions that, ultimately, are subject to significant uncertainties and contingencies. The Plan Proponents cannot assure you that these assumptions would be accepted by a Bankruptcy Court. **Actual liquidation proceeds could be materially lower or higher than the amounts set forth below. No representation or warranty can or is being made with respect to the actual proceeds that could be received in a chapter 7 liquidation of the Debtors. The liquidation valuations have been prepared solely for purposes of estimating proceeds available in a chapter 7 liquidation of the Estates and do not represent values that may be appropriate for any other purpose. Nothing contained in these valuations is intended to or may be asserted to constitute a concession or admission of the Plan Proponents for any other purpose.**

Here, the Plan is in the best interests of the Debtors' creditors (including holders of Talc Personal Injury Claims), and meets the requirements of section 1129(a)(7) of the Bankruptcy Code. The Plan Proponents expect that there will be substantially more assets available to pay holders of Claims under the Plan than would be the case if there were no Plan because of the Imerys Contribution. Moreover, the Plan is the result of an extensively negotiated settlement, which avoids costly litigation that would deplete the funds available for creditors. The Tort Claimants' Committee and the FCR negotiated the Imerys Settlement and support Confirmation of the Plan, which incorporates the terms of the settlement. These factors, among others, demonstrate that the Plan provides greater recoveries to creditors than would be realized in a chapter 7 liquidation, the costs of which would deplete much of the recoveries from the liquidation of the Debtors' assets. Based on the Liquidation Analysis, the Debtors believe that holders of Claims and Equity Interests will receive equal or greater value as of the Effective Date than such holders would receive in a chapter 7 liquidation.

Accordingly, the Plan Proponents believe that confirmation of the Plan will provide creditors in the Impaired Classes with value that is not less than (and, in certain cases, substantially

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

greater than) the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7.  The Plan meets the "best interests" test.

## ARTICLE XII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, alternatives to the Plan include: (a) continuation in chapter 11 and formulation of an alternative plan or plans of reorganization, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  Each of these possibilities is discussed in turn below.

### 12.1    Alternative Plan of Reorganization

The Plan is the product of extensive negotiations among the Plan Proponents, and reflects a balance of the respective interests held by the parties.  If the Plan is not confirmed, the Debtors or any other party in interest (upon the expiration of the Debtors' exclusivity period) could attempt to formulate a different plan of reorganization.  During the negotiations prior to the filing of the Plan, however, the Plan Proponents explored various alternatives to the Plan and believe that the Plan enables the Reorganized Debtors to emerge from the Chapter 11 Cases more successfully and expeditiously than any alternative plan, while preserving and maximizing the Debtors' assets, and allowing claimants of the Debtors to realize the highest recoveries under the circumstances.

### 12.2    Liquidation under Chapter 7

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code.  In chapter 7, a trustee would be appointed to promptly liquidate the assets of the Debtors.

As described above in the Liquidation Analysis, the Plan Proponents believe that a liquidation under chapter 7 would result in a substantial diminution in the value of the Debtors' Estates.  The Debtors further believe that it is likely that distributions in a chapter 7 liquidation would not occur for a substantial time, primarily due to, among other things, the time required to liquidate the Debtors' insurance-related assets.

## ARTICLE XIII.

## CERTAIN TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences expected to result from the consummation of the Plan.  This discussion is only for general information purposes and only describes the expected tax consequences to holders of Talc Personal Injury Claims.  It is not a complete analysis of all potential federal income tax consequences and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws.  This discussion is based on the Internal Revenue Code of 1986, as amended (the "**IRC**" or "**Tax Code**"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date of this Disclosure Statement.  These authorities may change, possibly

113

retroactively, resulting in federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This discussion does not address all federal income tax considerations that may be relevant to a particular holder in light of that holder's particular circumstances. In addition, it does not address considerations relevant to holders subject to special rules under the federal income tax laws, such as holders subject to the alternative minimum tax, holders who utilize installment method reporting with respect to their Claims, non-U.S. holders and U.S. holders who have a functional currency other than the U.S. dollar. This discussion also does not address the U.S. federal income tax consequences to holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan. Additionally, this discussion does not address any consideration being received other than in a person's capacity as a holder of a Claim. Moreover, this discussion does not address the tax treatment of the Reorganized Debtors given that (a) the Reorganized North American Debtors will have limited operations after the Effective Date, (b) all items of federal income, gain, loss, and deduction of ITA and ITV arising on the Effective Date should generally be includible on the tax return of Imerys USA, and (c) the operations of ITI will be largely unaffected by the Chapter 11 Cases. In addition, the tax treatment of the Reorganized Debtors should have no impact on holders of Talc Personal Injury Claims.

**Holders should consult their own tax advisors regarding the U.S. federal income tax consequences to them of the consummation of the Plan and the receipt of amounts from the Talc Personal Injury Trust, as well as any tax consequences arising under any state, local or foreign tax laws, or any other federal tax laws. The Debtors and the Reorganized Debtors shall not be liable to any person with respect to the tax liability of a holder or its Affiliates.**

13.1    Treatment of the Talc Personal Injury Trust

It is anticipated that the Talc Personal Injury Trust will be a "qualified settlement fund" within the meaning of the Treasury Regulations promulgated under Section 468B of the Tax Code. Such Treasury Regulations provide that a fund, account, or trust will be a qualified settlement fund if three conditions are met. First, the fund, account, or trust must be established pursuant to an order of or be approved by a government authority, including a court, and must be subject to the continuing jurisdiction of that government authority. A court order giving preliminary approval to a fund, account, or trust will satisfy this requirement even though the order is subject to review or revision. Second, the fund, account, or trust must be established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability arising, among other things, out of a tort. Third, the fund, account, or trust must be a trust under applicable state law or have its assets physically segregated from the other assets of the transferor and persons related to the transferor. The Talc Personal Injury Trust has been established with the express purpose of satisfying the requirements of a qualified settlement fund and will be treated as a separate taxable entity. Its modified gross income will generally be subject to U.S. federal income tax at the highest rate applicable to estates and trusts (currently 37%). For purposes of

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

determining the Talc Personal Injury Trust's modified gross income, payments to the Talc Personal Injury Trust and payments from the Talc Personal Injury Trust to holders of Talc Personal Injury Claims in settlement of their Claims will not be taken into account.

13.2    Tax Consequences to Holders of Talc Personal Injury Claims

The tax consequences of payments received by holders of Talc Personal Injury Claims will depend on the individual nature of each such Claim and the particular circumstances and facts applicable to such holder at the time each such payment is made.  To the extent that payments from the Talc Personal Injury Trust to holders of Talc Personal Injury Claims constitute damages received by such holders on account of physical injuries or physical sickness, such payments should not constitute gross income to such recipients under Section 104 of the Tax Code, except to the extent that such payments are attributable to medical expense deductions allowed under Section 213 of the Tax Code for a prior taxable year.  To the extent that any payments from the Talc Personal Injury Trust to holders of Talc Personal Injury Claims constitute damages received by such holders on account of claims other than physical injuries (such as lost wages) or received as interest (or any other amounts not excludable from income under Section 104 of the Tax Code), such payments will be includible in gross income to such holders.

All distributions to holders of Talc Personal Injury Claims under the Plan are subject to any applicable withholding.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate.  Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("**TIN**"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**The foregoing is intended to be a summary only and not a substitute for careful tax planning with a tax advisor.  The federal, state, local and foreign income tax consequences of the Plan are complex and, in some cases, uncertain.  Such consequences also may vary based on the individual circumstances of each holder of a Talc Personal Injury Claim.  Accordingly, each holder of a Claim is strongly urged to consult with its, his, or her own tax advisor regarding the federal, state, local, and foreign income tax consequences of the Plan.**

**Furthermore, any U.S. federal tax discussion contained in this Disclosure Statement, the Plan and any Plan Documents, and any exhibits or attachments to any such documents, was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such taxpayer by the Internal Revenue Service.**

## ARTICLE XIV.

## CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that the Plan is in the best interests of all holders of Claims and urge all holders of Impaired Claims in Class 4 entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they **WILL BE** actually received on or before 4 p.m. (Prevailing Eastern Time), on ~~October 5~~November 20, 2020.

[*Remainder of page left intentionally blank*]

116

Dated: ~~August 12~~[_____], 2020

    Wilmington, Delaware

**IMERYS TALC AMERICA, INC.**
(On behalf of itself and each of the Debtors)

*/s/* _____

[ ● ]

**TORT CLAIMANTS' COMMITTEE**

*/s/* _____

[ ● ]

**FUTURE CLAIMANTS' REPRESENTATIVE**

*/s/* _____

[ ● ]

**IMERYS S.A.**
(On behalf of itself and each of the Imerys Plan Proponents)

*/s/* _____

[ ● ]

~~US-DOCS\116915437~~US-DOCS\117855212RLF1 ~~23862506v.1~~24099353v.1

**COUNSEL FOR THE PLAN PROPONENTS**

**COUNSEL FOR THE DEBTORS:**

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins, Esq.
Michael J. Merchant, Esq.
Amanda R. Steele, Esq.
Brett M. Haywood, Esq.
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:  collins@rlf.com
        merchant@rlf.com
        steele@rlf.com
        haywood@rlf.com

LATHAM & WATKINS LLP
Jeffrey E. Bjork, Esq.
Kimberly A. Posin, Esq.
Helena G. Tseregounis, Esq.
Shawn P. Hansen, Esq.
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
E-mail:  jeff.bjork@lw.com
        kim.posin@lw.com
        helena.tseregounis@lw.com
        shawn.hansen@lw.com

- and -

Richard A. Levy, Esq.
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  richard.levy@lw.com

**COUNSEL FOR THE TORT CLAIMANTS' COMMITTEE:**

ROBINSON & COLE LLP
Natalie D. Ramsey, Esq.
Mark A. Fink, Esq.
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
E-mail:  nramsey@rc.com
        mfink@rc.com

- and -

Michael R. Enright, Esq.
280 Trumbull Street
Hartford, Connecticut 06103
Telephone: (860) 275-8290
Facsimile: (860) 275-8299

**COUNSEL FOR THE FCR:**

YOUNG CONAWAY STARGATT & TAYLOR LLP
Robert S. Brady, Esq.
Edwin J. Harron, Esq.
Sharon M. Zieg, Esq.
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
E-mail:  rbrady@ycst.com
        eharron@ycst.com
        szieg@ycst.com

118

E-mail:  menright@rc.com


**COUNSEL FOR THE IMERYS PLAN PROPONENTS:**

HUGHES HUBBARD & REED LLP
Christopher Kiplok, Esq.
Dustin P. Smith, Esq.
Erin Diers, Esq.
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
E-mail:  christopher.kiplok@hugheshubbard.com
         dustin.smith@hugheshubbard.com
         erin.diers@hugheshubbard.com

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

# EXHIBIT A

## The Plan

# **EXHIBIT B**

**Financial Projections – North American Debtors**

**Financial Projections: Imerys Talc America, Inc., Imerys Talc Vermont, Inc. and Imerys Talc Canada Inc.**

**Introduction**

Imerys Talc America, Inc. ("**ITA**"), Imerys Talc Vermont, Inc. ("**ITV**") and Imerys Talc Canada Inc. ("**ITC**"), with the assistance of their restructuring, legal, and financial advisors, have prepared these projections (the "**North American Debtors Projections**").  The North American Debtors Projections should be read in connection with the assumptions and qualifications as described herein and in the Disclosure Statement.[65][63]  For the purpose of projecting liabilities and continuing costs, the Debtors have assumed that the Effective Date of the Plan will be December 31February 14, 2020.[66][64]

In order to fully administer the Plan, it is estimated that the Reorganized North American Debtors will require a consolidated cash balance totaling approximately $26.2 28.4 million.  The cash balance is expected to be funded, as of the Effective Date, through a combination of the following sources:

- Cash held by the Debtors as of the date operations are discontinued and assets are transferred to a third party buyer;
- liquidation of any remaining receivable owed from Imerys USA to ITA or ITV;
- liquidation of any remaining receivable owed from Imerys S.A. to ITC;
- contribution from the Imerys Non-Debtors totaling $5.0mm to pay general unsecured claims of the North American Debtors;
- the Contingent Contribution; and
- additional contributions from one or more Plan Proponents or Protected Parties, if applicable.

Estimated liabilities included as part of the North American Debtors Projections have been allocated to four separate Reserves, as required pursuant to the Plan.  Funds held in the Reserves attributable to these liabilities will be disbursed on or following the Effective Date.  The table below summarizes the projected disbursements and related timing, by year.  The sections that follow provide additional details for the underlying costs within each Reserve.

---

[65][63] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Second Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (as may be amended from time to time, the "**Plan**").

[66][64] If the Plan is accepted by the requisite number of claimants in Class 4, Imerys Talc Italy S.p.A. ("**ITI**") will commence a bankruptcy case that will be, pending entry of an order by the Bankruptcy Court, jointly administered under Case No. 19-10289 (LSS).  Financial projections related to ITI are separately attached to the Disclosure Statement.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

| Plan of Reorganization: Funding Rollforward *($ in 000s)* | 2021 | 2022 | Total |
|---|---:|---:|---:|
| **Beginning Cash Balance** | **$28,212** | **$3,594** | **$28,212** |
| | | | |
| **Reserved Liabilities** | | | |
| Administrative Claim Reserve | (5,161) | (135) | (5,296) |
| Fee Claim Reserve | (14,370) | - | (14,370) |
| Disputed Claims Reserve | (357) | - | (357) |
| Reorganized North American Debtor Cash Reserve | (4,730) | (1,425) | (6,156) |
| **Total Disbursements** | **(24,618)** | **(1,560)** | **(26,179)** |
| | | | |
| Undistributed Imerys S.A. contribution for General Unsecured Claims (transferred to Trust) | - | (2,033) | (2,033) |
| | | | |
| **Total Estate Disbursements** | **(24,618)** | **(3,594)** | **(28,212)** |
| | | | |
| **Ending Cash Balance** | **$3,594** | **$0** | **$0** |

| Plan of Reorganization: Funding Rollforward *($ in 000s)* | 2021 | 2022 | Total |
|---|---:|---:|---:|
| **Beginning Cash Balance** | **$28,386** | **$3,594** | **$28,386** |
| | | | |
| **Reserved Liabilities** | | | |
| Administrative Claim Reserve | (3,041) | (135) | (3,176) |
| Fee Claim Reserve | (16,662) | - | (16,662) |
| Disputed Claims Reserve | (357) | - | (357) |
| Reorganized North American Debtor Cash Reserve | (4,732) | (1,425) | (6,157) |
| **Total Disbursements** | **(24,793)** | **(1,560)** | **(26,353)** |
| | | | |
| Undistributed Imerys S.A. contribution for General Unsecured Claims (transferred to Trust) | - | (2,033) | (2,033) |
| | | | |
| **Total Estate Disbursements** | **(24,793)** | **(3,594)** | **(28,386)** |
| | | | |
| **Ending Cash Balance** | **$3,594** | **$0** | **$0** |

## Administrative Claim Reserve

As of the Effective Date, the Debtors project that certain Administrative Claims will be incurred, but remain unpaid.  In addition to any accrued and unpaid Administrative Claims as of the Effective Date, the Estates will continue to incur costs, which would be granted administrative expense priority and/or be paid from the Administrative Claim Reserve, until the final decree is entered.  The full balance of projected claims allocated to the Administrative Claim Reserve are discussed below.

United States Trustee Fees

Includes quarterly United States Trustee fees accrued for the period ~~October 2020~~ January 2021 through ~~December 2020~~February 2021.  Individual balances for each of the North American Debtors are as follows:

3

($s in thousands)
- ▪ Imerys Talc America $250.0
- ▪ Imerys Talc Vermont $28.0
- ▪ Imerys Talc Canada $88.0

Contract Cures

The Debtors do not currently estimate any reserve requirements related to contract cures, as no service agreements or similar third-party contracts are necessary post-Effective Date.  To the extent certain indemnification agreements are deemed executory, the Debtors would likely assume such contracts, and currently do not estimate any cures with respect to such agreements.

2020 Management Fee

The Debtors remain liable for an accrued management fee to Imerys S.A. that is projected to total $1.8 million on the Effective Date.  This management fee includes charges for, among other things, executive management, legal and other corporate overhead services.

Fees and Expenses of the Canadian Information Officer and Counsel to the Information Officer

The Information Officer is expected to remain in place until a final decree is entered in order to ensure adequate treatment of Canadian creditors and to close out the Canadian Proceeding. Estimated costs for the Information Officer and counsel to the Information Officer total $270.0 thousand.

Employee Obligations

Employee obligations include estimates for earned, but unpaid bonuses and retention payments.  Employee obligations include the following:

- ▪ Key Employee Incentive Plan (AIP component): $260.0 thousand
- ▪ Key Employee Retention Plan: $320.0 thousand
- ▪ 2nd half 2020 Annual Incentive Plan (non-management): $1.6 million

Post-Effective Date Claim Activities

The Debtors anticipate being required to undertake certain activities corresponding to the transfer of Talc Personal Injury Trust Assets to the Talc Personal Injury Trust.  These activities include, but are not limited to, eDiscovery, document production, and maintaining records.  In addition to these costs, the Debtors also estimate additional costs will be incurred by the Reorganized North American Debtors related to post-Effective Date claim objections (as related to Administrative Claims), other sale costs, and contingencies.

503(b)(9) and Disputed Administrative Claims

4

The Debtors' estimates currently include $472.5 thousand for allowed 503(b)(9) claims, Disputed Administrative Claims, and Administrative Claims not yet identified.

**Fee Claim Reserve**

Concurrent with the Effective Date, any accrued and unpaid professional fees will be held in the Fee Claim Reserve.  These unpaid professional fees remain subject to Bankruptcy Court approval and timing per the Compensation Procedures Order.  Professional fees included with the Fee Claim Reserve include:

- retained professionals for the Debtors, FCR, and Tort Claimants' Committee;
- monthly fee applications, interim fee applications, and final fee applications not otherwise paid prior to the Effective Date; and
- investment bankers' transaction and advisory fees.

Note: Restructuring professionals fees related to ITI are excluded from the Fee Claim Reserve.  It is assumed that all restructuring fees related to ITI will be paid directly by ITI or reimbursed by ITI to ITA prior to the Effective Date.

**Disputed Claims Reserve**

The Debtors and their advisors continue to reconcile Claims recorded on the Claims Register maintained by Prime Clerk LLC ("**Prime Clerk**").  Amounts included in the Disputed Claims Reserve are maintained for distributable amounts required to be set aside on account of Disputed Non-Talc Claims.  If the Debtors prevail in their objections to Disputed Non-Talc Claims included within this Reserve, any undistributed amounts from this Reserve will be transferred to the Talc Personal Injury Trust.

**Reorganized North American Debtor Cash Reserve**

The following section details key assumptions and post-Effective Date costs that are required to be reserved, and will be paid from Cash held by the Estates.  The Reorganized North American Debtor Cash Reserve will be funded in a sufficient amount to satisfy certain Non-Talc Claims, and account for post-Effective Date obligations of the Reorganized North American Debtors, including, but not limited to, amounts necessary to (i) compensate the Disbursing Agent, (ii) enforce all rights to commence and pursue certain causes of action (as applicable), and (iii) administer the Canadian Proceeding.

<u>Disbursing Agent</u>

The Plan requires appointment of a Disbursing Agent to make or facilitate Distributions pursuant to the Plan.  Projected costs for the Disbursing Agent, during the post-Effective Date period, total approximately $1.1 million.  The following key assumptions outline this position and related costs:

- Retention of a third party professional services firm with experience in these matters;

- Financial books and records electronically archived prior to the Effective Date; and
- Disbursing Agent will require 24 months from the Effective Date to close the North American Debtors' Chapter 11 Cases.

As the responsible party for the Reorganized North American Debtors, it is anticipated that the Disbursing Agent's role will include the following:

- Compliance with fiduciary duties required by the Reorganized North American Debtors;
- Assist legal counsel with filing objections to any Disputed Non-Talc Claims;
- Remit Distributions to holders of remaining Allowed Non-Talc Claims;
- Prosecute remaining Estate Causes of Action (if and as applicable);
- Distribute agreed documents and assets to the Talc Personal Injury Trust; and
- File final tax returns for 2020, as well as any additional non-operating years (2021, 2022).

## Legal Counsel

Legal counsel to provide support for Disbursing Agent mandates. The current reserve estimate of $700.0 thousand assumes legal counsel's role will involve the following:

- Resolve Claims objections;
- Resolve Disputed Claims;
- File motion to obtain authority for 2020 AIP payment;
- Respond to United States Trustee inquiries; and
- Final decree to close Chapter 11 Cases for the North American Debtors.

## Counsel for Canadian Recognition Proceeding

Canadian counsel will need to be retained as the Canadian Proceeding will continue until the ITA and ITV Chapter 11 Cases are closed.  The estimated costs of $200.0 thousand are based on a historical 3-month average of incurred costs for the period December 2019 through February 2020.

## Noticing Agent

Estimated costs of $765.0 thousand incurred by Prime Clerk from the Effective Date through entry of final decree for services including maintenance of official Claims Register, noticing, serving objections, motions and distributions, if requested.

## Independent Contractor Costs

Additional costs to periodically engage legacy Debtor personnel as contractors for *ad hoc* services projected to total approximately $40.0 thousand.

## Final Post-Effective Activities

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

Included within the Reorganized North American Debtor Cash Reserve are estimates for a variety of other potential costs the Reorganized North American Debtors could incur post-Effective Date.  These estimates total $465.0 thousand and include, without limitation:

- Cooperation costs (*e.g.*, expenses incurred under the Cooperation Agreement as outlined therein);
- Filing of final tax returns (2020 - 2022);
- Provide W-2s to former employees; and
- Document retention and destruction.

<u>Allowed Non-Talc Claims</u>

Through extensive claim reconciliation efforts, the Debtors and their advisors estimate that Distributions on account of Allowed Non-Talc Claims will be as follows:

- Priority & Secured Claims: $70.0 thousand
- Unsecured Claims: $2.6 million

<u>Post-Effective Date United States Trustee Fee</u>

Reserved amount totals $260.0 thousand, and is based on projected disbursements made by the Reorganized North American Debtors following the Effective Date.  This estimate utilizes the same methodology and assumptions applied for each United States Trustee quarterly fee payment calculated during the pendency of the Chapter 11 Cases.

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

# <u>EXHIBIT C</u>

**Financial Projections - ITI**

## Financial Projections: Imerys Talc Italy S.p.A.

### Introduction

Imerys Talc Italy S.p.A. ("**ITI**"), with the assistance of its restructuring, legal, and financial advisors, has prepared these projections (the "**Financial Projections**").  The Financial Projections should be read in connection with the assumptions and qualifications as described herein and in the Disclosure Statement.[67][65]  The Financial Projections represent management's estimate of the statements of income and simplified statements of cash flows forecasted over the period from 2020 through 2023 (the "**Projection Period**").

### Accounting Policies

The Financial Projections have been prepared by management using accounting policies that are generally consistent with those applied in ITI's internally reported financial statements. The below projected financial information was not, however, prepared with a view toward compliance with guidelines established by the American Institute of Certified Public Accountants, the Financial Accounting Standards Board or the rules and regulations of the Securities & Exchange Commission.  The below Financial Projections have been disclosed to – but not been examined          or          compiled          by          –          independent          auditors.

**Projected Income Statement**
*($ in thousands)*

| Fiscal Year Ending December 31 | 2020 Forecast | 2021 Forecast | 2022 Forecast | 2023 Forecast |
|---|---|---|---|---|
| Sales | 18,250 | 17,524 | 16,878 | 16,300 |
| *Growth YoY* | *(5.8)%* | *(4.0)%* | *(3.7)%* | *(3.4)%* |
| | | | | |
| Variable Costs | (5,563) | (5,304) | (5,097) | (4,933) |
| Fixed Costs | (8,346) | (8,506) | (8,670) | (8,837) |
| **Gross Margin** | **4,342** | **3,714** | **3,111** | **2,531** |
| *Gross Margin %* | *23.8%* | *21.2%* | *18.4%* | *15.5%* |
| | | | | |
| Total Overhead | (1,321) | (1,334) | (1,347) | (1,361) |
| **Current Operating Income** | **3,021** | **2,380** | **1,764** | **1,170** |
| *Current Operating Income %* | *16.6%* | *13.6%* | *10.5%* | *7.2%* |

---

[67][65] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Second Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (as may be amended from time to time, the "**Plan**").

2

**Projected Statement of Cash Flows**
*($ in thousands)*

| *Fiscal Year Ending December 31* | 2020 Forecast | 2021 Forecast | 2022 Forecast | 2023 Forecast |
|---|---|---|---|---|
| Current Operating Income | 3,021 | 2,380 | 1,764 | 1,170 |
| | | | | |
| Depreciation | 779 | 787 | 795 | 803 |
| Depreciation - Overburden assets | 189 | 179 | 170 | 164 |
| National income tax on current operating income | (846) | (667) | (494) | (328) |
| **Operating Cash Flow** | **3,143** | **2,680** | **2,235** | **1,809** |
| | | | | |
| Maintenance CapEx | (284) | (284) | (284) | (284) |
| Growth CapEx (Overburden assets) | (358) | (358) | (358) | (358) |
| **Capital Expenditures** | **(642)** | **(642)** | **(642)** | **(642)** |
| | | | | |
| **Change in Working Capital** | **(170)** | **(170)** | **(170)** | **(170)** |
| | | | | |
| **Free Operating Cash Flow** | **2,331** | **1,867** | **1,423** | **996** |

*Note: EUR/USD FX rate as of June 11, 2020*

**Projected Income Statement**
*($ in thousands)*

| *Fiscal Year Ending December 31* | 2020 Forecast | 2021 Forecast | 2022 Forecast | 2023 Forecast |
|---|---|---|---|---|
| Sales | 22,026 | 18,261 | 17,587 | 16,985 |
| *Growth YoY* | *9.1%* | *(17.1)%* | *(3.7)%* | *(3.4)%* |
| | | | | |
| Variable Costs | (6,396) | (5,501) | (5,278) | (5,099) |
| Fixed Costs | (8,046) | (8,203) | (8,363) | (8,527) |
| **Gross Margin** | **7,585** | **4,557** | **3,946** | **3,359** |
| *Gross Margin %* | *34.4%* | *25.0%* | *22.4%* | *19.8%* |
| | | | | |
| Total Overhead | (889) | (898) | (907) | (916) |
| **Current Operating Income** | **6,696** | **3,659** | **3,039** | **2,443** |
| *Current Operating Income %* | *30.4%* | *20.0%* | *17.3%* | *14.4%* |

3

**Projected Statement of Cash Flows**
*($ in thousands)*

| *Fiscal Year Ending December 31* | 2020 Forecast | 2021 Forecast | 2022 Forecast | 2023 Forecast |
|---|---|---|---|---|
| Current Operating Income | 7,177 | 3,659 | 3,039 | 2,443 |
| | | | | |
| Depreciation | 939 | 948 | 958 | 967 |
| Depreciation - Overburden assets | 370 | 316 | 301 | 289 |
| National income tax on current operating income | (2,010) | (1,025) | (851) | (684) |
| **Operating Cash Flow** | **6,476** | **3,899** | **3,447** | **3,015** |
| | | | | |
| Maintenance CapEx | (178) | (178) | (178) | (178) |
| Growth CapEx (Overburden assets) | (592) | (592) | (592) | (592) |
| **Capital Expenditures** | **(770)** | **(770)** | **(770)** | **(770)** |
| | | | | |
| **Change in Working Capital** | **(178)** | **(178)** | **(178)** | **(178)** |
| | | | | |
| **Free Operating Cash Flow** | **5,529** | **2,952** | **2,500** | **2,068** |

*Note: EUR/USD FX rate as of September 17, 2020*

## Summary of Significant Assumptions

The Financial Projections are based on numerous assumptions regarding the anticipated future operating performance of ITI, general business and economic conditions, and other factors. Most of these assumptions are beyond the control of ITI and its management. Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period will vary from the projected result. Although management believes the assumptions underlying the Financial Projections, when considered on an overall basis, are reasonable in light of current circumstances, actual results may differ subject to market conditions and changes to the input costs.

### *Revenue and Operating Expenses*

<u>Revenues</u>

The Financial Projections assume sales decrease at a compound annual growth rate of 3.78.3% during the Projection Period. This decrease over the Projection Period is primarily driven by lower volumes – in terms of Dry Metric Tonne ("**DMT**") – on specialties (in particular pharmaceutical – premium products with higher €/DMT value – and chewing gum industries), personal care products, and intercompany sales (mostly due to sales on North American market and to the opening of a new talc mine in the Slovak Republic that will absorb Imerys Talc Austria GmbH intercompany volumes). These Financial Projections take into consideration various factors, including modest actions on pricing per DMT (+1% year on year, substantially aligned with fundamental Italian inflation outlook), market dynamics, product mix (both volumes and

US-DOCS\116915437US-DOCS\117855212RLF1 23862506v.124099353v.1

pricing), as well as different sales initiatives. However, the projections do not include any corrective actions taken by management to offset expected volume declines. While not included in the revenue projections, management has identified initiatives that would favorably impact the current Financial Projections. Examples of these initiatives include new products that will increase volumes within the food market, and capital investments (*e.g.*, packing machine and dryer) that will increase throughput volumes for pharmaceutical and cosmetic markets.

<u>Variable Costs</u>

Variable costs mainly include raw materials, consumables, freight costs, utilities, and overburden costs (capitalized cost incurred when removing waste rock in order to access the mineral deposit/ore and amortized over the expected remaining life of the mine) and were forecast primarily based on historical trends and margins.

<u>Total Fixed Costs</u>

Fixed costs primarily represent personnel expenses, cleaning, maintenance and repair costs, external services, and direct depreciation. Such costs were projected to increase based on either historical levels growing at approximately 1% year over year or, as per labor cost, at a higher 2.5% per year in order to reflect the National Collective Bargaining Employment Contract renewal recently negotiated with certain unions. As anticipated, the Financial Projections – even considering a reduction in sales volume over the Projection Period – do not envisage any cost savings initiatives that might partially or totally offset the margin erosion.

<u>Overheads</u>

Overheads mostly include Selling, ~~General~~ and ~~Administrative~~ Marketing Expenses and were forecast assuming a 1% increase per year.

***Income Tax on Current Operating Income***

The Financial Projections assume income tax expenses at an average tax rate of 29% applied to Current Operating Income.

***Capital Expenditures***

Projected capital expenditures are forecast based on management's estimated investments required to support the business. Such expenditures include maintenance, growth and overburden capital expenditures. In addition, management is evaluating revisions to their 3-year capital expenditure plan, and may include new investments not factored into these Financial Projections. Those investments include geological exploration designed to lengthening the life of the mine, an advanced packing machine and a dryer. The equipment under consideration would improve the efficiency of operations, and offset potential negative sales trends in pharmaceutical and personal care products.

***Working Capital***

The Financial Projections assume a flat working capital absorption over the Projection Period. Please note that ITI has approximately $~~22M~~ 23.9M in receivables from Imerys Talc Europe as of ~~April~~ August 2020.

5

**EXHIBIT D**

**Liquidation Analysis**

## Liquidation Analysis

### 1) Introduction

The Debtors, with the assistance of their restructuring, legal, and financial advisors, have prepared this hypothetical Liquidation Analysis in connection with the Debtors' Plan and Disclosure Statement pursuant to chapter 11 of the Bankruptcy Code.[6866]  The Liquidation Analysis indicates the estimated recoveries that may be obtained by Classes of Claims and Equity Interests in a hypothetical liquidation pursuant to chapter 7 of the Bankruptcy Code upon disposition of assets as an alternative to the Plan.  Accordingly, asset values discussed herein may be different than amounts referred to in the Plan.  In addition, ITI is included in the Liquidation Analysis even though ITI does not intend to file a chapter 11 bankruptcy petition unless holders of Claims in Class 4 vote to accept the Plan.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation of the Plan, that each holder of a Claim or Equity Interest in each Impaired Class: (i) has accepted the Plan; or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  In order to make these findings, the Bankruptcy Court must: (1) estimate the cash proceeds (the "**Liquidation Proceeds**") that a chapter 7 trustee (the "**Trustee**") would generate if each Debtor's chapter 11 case was converted to a chapter 7 case on the Effective Date and the assets of such Debtor's Estate (as defined below) were liquidated; (2) determine the distribution (the "**Liquidation Distribution**") that each holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (3) compare each holder's Liquidation Distribution to the distribution under the Plan that such holder would receive if the Plan were confirmed and consummated.  Accordingly, asset values discussed herein may be different than amounts referred to in the Plan.  The Liquidation Analysis is based upon certain assumptions discussed herein and in the Disclosure Statement.

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN, OR A TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS.  IN THE EVENT THAT THE CHAPTER 11 CASES ARE CONVERTED TO A CHAPTER 7 LIQUIDATION, ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THE LIQUIDATION ANALYSIS.

### 2) Basis of Presentation

The Liquidation Analysis has been prepared assuming that the Debtors' chapter 7 liquidation would commence on or about ~~November 4~~December 17, 2020 (the "**Liquidation Date**").  The *pro forma* values referenced herein are projected as of ~~November 4~~December 17, 2020.  The Liquidation Analysis assumes that if the Plan is not confirmed at the Confirmation

---

[6866] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Second Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "**Plan**").

Hearing scheduled for ~~November 4~~December 17, 2020, the Chapter 11 Cases would immediately convert to a chapter 7 liquidation. The Liquidation Analysis was prepared on a legal entity basis for each Debtor and summarized into a consolidated report.

The Liquidation Analysis represents an estimate of recovery values and percentages based upon a hypothetical liquidation if a trustee were appointed by the Bankruptcy Court to convert assets into cash. The determination of the hypothetical proceeds from the liquidation of assets is a *highly uncertain* process involving the extensive use of estimates and assumptions that, although considered reasonable by management and their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors and their management team. The Liquidation Analysis should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.

The Liquidation Analysis assumes a timeline in which:

- on the Liquidation Date, the Debtors convert existing raw materials to finished goods for sale to customers over a 1-month period, ceasing operations by ~~November 30~~January 15, 2020; and

- all assets are assumed to be sold and book-keeping is finalized by ~~February 28~~April 15, 2021, over a 3-month period following the cessation of operations.

In preparing the Liquidation Analysis, the Debtors have estimated an amount of Allowed Claims – except that no value has been estimated for Claims in Class 4 for the reasons set forth in Note U below – or Equity Interests for each Class of claimants based upon a review of the Debtors' balance sheets as of ~~February 29~~July 31, 2020, adjusted for estimated balances as of the Liquidation Date where needed. The estimate of Allowed Claims in the Liquidation Analysis is based on the par value of each of these Claims. The estimate of the amount of Allowed Claims and Equity Interests set forth in the Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims and Equity Interests under the Plan. The actual amount of Allowed Claims and Equity Interests could be materially different from the amount of Claims estimated in the Liquidation Analysis.

The cessation of business in a liquidation is likely to trigger certain claims that otherwise would not exist under a chapter 11 plan absent a liquidation. Examples of these kinds of claims included in this analysis are various potential employee claims (for such items as severance) and rejection damages claims relating to executory contracts or unexpired leases.

For the avoidance of doubt, the Liquidation Analysis does not:

- include estimates for the tax consequences that may be triggered upon the liquidation and sale of assets in the manner described above (although such tax consequences may be material);

- assign value to Claims in Class 4 for the reasons discussed in Note U;

- estimate insurance or indemnity recoveries, including potential recoveries associated with the J&J ~~indemnification obligations~~<u>Indemnification Obligations</u>, for purposes of determining the Liquidation Proceeds, as the Debtors do not expect that insurance or indemnification recoveries would be higher in a chapter 7 liquidation than they would be pursuant to the Plan;

- include recoveries resulting from any potential preference, fraudulent transfer, or other litigation or avoidance actions; given the complexities in calculating such estimates, and the costs associated with prosecuting such actions, any potential recoveries were assumed to be negligible; or

- include recoveries potentially attributable to claims that are being settled under the Plan (*e.g.*, claims against Imerys S.A. or Rio Tinto and Zurich) as the Debtors assume that the value attributable to such claims will be less in the context of a chapter 7 liquidation given that (i) any recoveries on such claims will be offset by substantial legal costs associated with prosecuting the claims and (ii) the settling parties would not be entitled to the same injunctions and releases in the context of a chapter 7 liquidation.

## 3)  Liquidation Process

For purposes of this analysis, the Debtors' hypothetical liquidation would be conducted in a chapter 7 environment with the Trustee managing the bankruptcy estate of each Debtor (each an "**Estate**" or the "**Estates**") to maximize recovery in an expedited process.  The Trustee's initial step would be to develop a liquidation plan to generate proceeds from the sale of entity specific assets for distribution to creditors.  The three major components of the liquidation are as follows:

-
  - generation of cash proceeds from asset sales, largely sold on a piecemeal basis;[~~69~~67]

  - costs related to the liquidation process, such as personnel retention costs, severance, Estate wind-down costs and Trustee, professional, and other administrative fees; and

  - distribution of net proceeds generated from asset sales to the holders of Claims and Equity Interests in accordance with the priority scheme under chapter 7 of the Bankruptcy Code.[~~70~~68]

---

[~~69~~67] The Liquidation Analysis assumes that there will not be a sale of the assets of the North American Debtors as contemplated by the Sale Motion.

[~~70~~68] The liquidation process would include a reconciliation of claims asserted against the Estates to determine the Allowed Claim amount per Class.

~~US-DOCS\116572500~~US-DOCS\118071123.2RLF1 ~~23862506v.1~~24099353v.1

**4)  Distribution of Net Proceeds to Claimants**

Any available net proceeds would be allocated to the applicable holders of Claims and Equity Interests in strict priority in accordance with section 726 of the Bankruptcy Code:

- Secured Claims: includes claims arising from capital leases and auto leases.

- Chapter 11 Administrative Expense and Priority Claims: includes post-petition liabilities, post-petition vacation and severance for all employees terminated as part of the liquidation of the company, priority taxes, and restructuring professional fees.

- Unsecured Claims: includes contract rejection claims, trade claims and various other unsecured liabilities.

- Talc Personal Injury Claims: includes claims against one or more of the Debtors directly or indirectly arising out of or relating to the presence of or exposure to talc or talc-containing products based on alleged acts or omissions of the Debtors or any other entity for whose conduct the Debtors have or are alleged to have liability, prior to the Effective Date.

- Intercompany Claims: includes claims held by both non-debtor affiliates and other Debtors.

- Existing Equity Interests: includes any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all common stock or units, preferred stock or units, or other instruments evidencing an ownership interest in any of the Debtors.

**5)  Conclusion**

The Debtors have determined, as summarized in the following analysis, upon the Effective Date, the Plan will provide all holders of Claims and Equity Interests with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and as such believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

Under the proposed Plan, holders of Unsecured Claims would be paid in full, and the Talc Personal Injury Trust would receive contributions of at least (i) $75 million, and a further amount of up to $102.5 million subject to a reduction mechanism proportionate to the Sale Proceeds from the Imerys Non-Debtors pursuant to the Imerys Settlement (subject to the Contingent Contribution)[7][69] and (ii) $340 million pursuant to the Rio Tinto/Zurich Settlement.  In a liquidation under chapter 7 of the Bankruptcy Code, there is no guarantee that any of the funds to

---

[7][69] In addition, pursuant to the Imerys Settlement, the Imerys Non-Debtors will contribute (i) $5 million for the payment of Allowed Claims in Class 3 against the North American Debtors, and (b) $18.6 14.1 million, which represents the balance of the Intercompany Loans, to fund administrative expenses during the pendency of the Chapter 11 Cases.

be paid pursuant to the Imerys Settlement and the Rio Tinto/Zurich Settlement would be available for distribution to holders of Talc Personal Injury Claims.

US-DOCS\116572500US-DOCS\118071123.2RLF1 23862506v.124099353v.1

*[Remainder of This Page Intentionally Left Blank]*

The following Liquidation Analysis should be reviewed with the accompanying notes.  The following tables reflect the rollup of the deconsolidated liquidation analysis for the Debtors.

*($ in 000s)*

| | Notes | Net Book Value 7/31/2020 | Adjustment | Pro Forma Value 12/17/2020 | Recovery Estimate $ | | |
|---|---|---|---|---|---|---|---|
| | | | | | Low | Midpoint | High |
| **Gross Liquidation Proceeds** | | | | | | | |
| **Current Assets** | | | | | | | |
| Cash & Cash Equivalents | [A] | $ 14,455 | ($ 11,097) | $ 3,359 | $ 3,359 | $ 3,359 | $ 3,359 |
| Accounts Receivable | [B] | 18,314 | 4,732 | 23,046 | 18,388 | 19,557 | 20,727 |
| Intergroup Loan | [C] | 42,166 | (17,839) | 24,328 | 24,328 | 24,328 | 24,328 |
| Inventory | [D] | 31,948 | -- | 31,948 | 7,213 | 9,057 | 10,930 |
| Other Current Assets | | | | | | | |
| Amounts owed from Debtors | [E] | 9,468 | 5,455 | 14,923 | 4,025 | 5,601 | 7,117 |
| Amounts owed from Non-Debtor Affiliates | [E] | (426) | 2,787 | 2,361 | 2,361 | 2,361 | 2,361 |
| Prepaid Expenses | [E] | 1,483 | (708) | 775 | 58 | 58 | 58 |
| Other Receivables | [E] | 440 | -- | 440 | 241 | 276 | 310 |
| Total Current Assets | | 117,849 | (16,669) | 101,181 | 59,974 | 64,598 | 69,190 |
| **Long Term Assets** | | | | | | | |
| PP&E | [F] | 63,643 | (3,863) | 59,781 | 16,410 | 19,557 | 22,448 |
| Deferred Tax | [G] | 11,260 | -- | 11,260 | -- | -- | -- |
| Intangible Assets | [H] | 465 | (131) | 334 | -- | -- | -- |
| Other Long-Term Assets | [I] | 17,970 | (61) | 17,908 | 615 | 923 | 1,230 |
| Total Long-Term Assets | | 93,338 | (4,055) | 89,283 | 17,025 | 20,480 | 23,679 |
| **Total Assets** | | **$ 211,187** | **($ 20,724)** | **$ 190,463** | **77,000** | **85,078** | **92,869** |
| Intra-Debtor Equity Proceeds | | | | | -- | -- | -- |
| **Total Distributable Value** | | | | | **77,000** | **85,078** | **92,869** |
| **Less: Liquidation Costs** | | | | | | | |
| Post-Conversion Cash Flow | [J] | | | | 5,380 | 5,380 | 5,380 |
| Severance Costs | [K] | | | | (1,417) | (1,417) | (1,417) |
| Chapter 7 U.S. Trustee Fee | [L] | | | | (2,335) | (2,577) | (2,811) |
| Chapter 7 Professional Fees | [M] | | | | (1,841) | (2,043) | (2,238) |
| Orderly Wind-Down Costs | [N] | | | | (8,690) | (8,690) | (8,690) |
| Estate Wind-Down Costs | [O] | | | | (520) | (520) | (520) |
| Decommissioning Costs | [P] | | | | (4,916) | (4,916) | (4,916) |
| **Total Liquidation Adjustment** | | | | | **(14,340)** | **(14,784)** | **(15,213)** |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$ 62,660** | **$ 70,294** | **$ 77,656** |

US-DOCS\116572500US-DOCS\118071123.2RLF1 23862506v.124099353v.1

| Net Liquidation Proceeds Available for Distribution to Creditors | | | $ 63,641 | $ 70,886 | $ 77,842 |
|---|---|---|---|---|---|
| | **Notes** | **Estimated Claims** | **Recovery Estimate $** | | |
| | | | **Low** | **MidPoint** | **High** |
| Class 2 - Secured Claims | [Q] | $ 111 | $ 111 | $ 111 | $ 111 |
| **Remaining Amount Available for Distribution** | | | 63,530 | 70,775 | 77,731 |
| Administrative Claims | [R] | 26,117 | 26,117 | 26,117 | 26,117 |
| **Remaining Amount Available for Distribution** | | | 37,413 | 44,658 | 51,614 |
| Priority Tax Claims | [S] | 3,364 | 3,364 | 3,364 | 3,364 |
| **Remaining Amount Available for Distribution** | | | 34,049 | 41,294 | 48,250 |
| Class 1 - Priority Non-Tax Claims | [T] | 2,588 | 2,588 | 2,588 | 2,588 |
| **Remaining Amount Available for Distribution** | | | 31,461 | 38,706 | 45,662 |
| Classes 3-5 - Nonpriority Unsecured Claims | [U] | 52,969 | 11,624 | 18,344 | 24,774 |
| **Remaining Amount Available for Distribution** | | | 19,837 | 20,362 | 20,888 |
| Class 6 - Equity Interests in North America Debtors | [V] | 110,218 | -- | -- | -- |
| **Remaining Amount Available for Distribution** | | | 19,837 | 20,362 | 20,888 |
| Class 7 - Equity Interests in ITI | [W] | $ 26,650 | 19,837 | 20,362 | 20,888 |
| **Remaining Amount Available for Distribution** | | | **$ 0** | **$ 0** | **$ 0** |

US-DOCS\116572500US-DOCS\118071123.2RLF1 23862506v.124099353v.1

| Net Liquidation Proceeds Available for Distribution to Creditors | | | $ 62,660 | $ 70,294 | $ 77,656 |
|---|---|---|---|---|---|
| | | **Estimated** | **Recovery Estimate $** | | |
| **Notes** | | **Claims** | **Low** | **MidPoint** | **High** |
| Class 2 - Secured Claims | [Q] | $ 111 | $ 111 | $ 111 | $ 111 |
| **Remaining Amount Available for Distribution** | | | 62,549 | 70,183 | 77,545 |
| Administrative Claims | [R] | 32,419 | 32,419 | 32,419 | 32,419 |
| **Remaining Amount Available for Distribution** | | | 30,130 | 37,764 | 45,126 |
| Priority Tax Claims | [S] | 4,736 | 4,736 | 4,736 | 4,736 |
| **Remaining Amount Available for Distribution** | | | 25,394 | 33,027 | 40,390 |
| Class 1 - Priority Non-Tax Claims | [T] | 2,616 | 2,616 | 2,616 | 2,616 |
| **Remaining Amount Available for Distribution** | | | 22,778 | 30,412 | 37,774 |
| Classes 3-5 - Nonpriority Unsecured Claims | [U] | 50,394 | 1,612 | 8,668 | 15,452 |
| **Remaining Amount Available for Distribution** | | | 21,166 | 21,744 | 22,322 |
| Class 6 - Equity Interests in North America Debtors | [V] | 94,528 | -- | -- | -- |
| **Remaining Amount Available for Distribution** | | | 21,166 | 21,744 | 22,322 |
| Class 7 - Equity Interests in ITI | [W] | $ 28,945 | 21,166 | 21,744 | 22,322 |
| **Remaining Amount Available for Distribution** | | | **$ 0** | **$ 0** | **$ 0** |

*[Remainder of This Page Intentionally Left Blank]*

US-DOCS\116572500US-DOCS\118071123.2RLF1 23862506v.124099353v.1

**Specific Notes to the Liquidation Analysis**

*Net Liquidation Proceeds*[72][70]

- **Note A - Cash & Cash Equivalents**
  - Consists of rollforward of book cash as of the Liquidation Date for all legal entities.
  - Includes all cash held at SunTrust, Royal Bank of Canada, Signature Bank, ~~Societe Generale~~Société Générale Italy, and Intesa Sanpaolo.
  - The projected cash balance as of ~~November 4~~December 17, 2020 is based on the latest *pro forma* business plan projections prepared by the Debtors and its advisors.
  - The Debtors estimate a 100% recovery of the *pro forma* balance of cash.

- **Note B - Accounts Receivable**
  - Accounts receivable consists of accrued revenue, which is assumed to be paid in the ordinary course on 30 to 60 day payment terms.
  - The projected accounts receivable balances as of ~~November 4~~December 17, 2020 is based on the latest *pro forma* business plan projections prepared by the Debtors and its advisors.
  - The analysis assumes that a chapter 7 Trustee would retain certain existing staff to handle collection efforts for outstanding trade accounts receivable for the entities undergoing liquidation.
  - There are high risks with collecting accounts receivable once a liquidation is announced.
  - The adjustments to collections reflect the potential costs of litigation if customers do not pay or delay payments, customers attempting to offset payables due to business disruption, contract breach expenses as a result of the cessation of operations, and other offset risks.
  - The Debtors estimate the liquidation recovery value of accounts receivable is ~~79~~80% to ~~89~~90% of the *pro forma* value.

- **Note C - Intergroup Loan**
  - Consists of prepetition amounts owed from non-debtor affiliates.
  - The projected parent receivable balance as of ~~November 4~~December 17, 2020 is based on the latest *pro forma* business plan projections prepared by the Debtors and its advisors and reflects draws against the balance for liquidity purposes to fund operations.
  - The Debtors estimate a 100% recovery of the *pro forma* balance of the intergroup loan.

- **Note D - Inventory**
  - Inventory includes raw materials, spare parts, and finished goods.  Debtors hold no goods on consignment.

---

[72][70] Estimated net Liquidation Proceeds do not include an estimate for rights to insurance or indemnification proceeds as the Debtors do not expect that insurance or indemnification recoveries would be higher in a chapter 7 liquidation than they would be pursuant to the Plan.

- o Inventory is held across multiple locations and includes multiple SKUs and types.
- o Recovery percentages were estimated based on turnover metrics, days on hand, recent market price, and discussions with management.
- o Recovery percentages for finished goods assumed assets are sold in a fire-sale scenario.
- o Recovery percentages for raw materials reflect recovery against *pro forma* balances after adjustment for conversion of raw materials to finished goods during the post-conversion cash flow period.
- o The Debtors estimate the liquidation recovery value of inventory is 23% to ~~36~~34% of the *pro forma* value.

- **Note E - Other Current Assets**
  - o Other current assets primarily include amounts owed from other Debtors, amounts owed from non-debtor affiliates, prepaid expenses, and other receivables.
  - o For both Debtor and non-debtor affiliate balances, debit balances located on the liability side of balance sheet were re-classed to receivables.
  - o Debtor and non-debtor affiliate receivable balances were offset by post-petition payable balances at the legal entity level.
  - o Prepaid expenses includes short-term portion of prepaid expenses. Prepaid expenses include insurance, software, railcars, natural gas, and other short term prepaids.
  - o Per discussion with management, the Debtors' insurance policies do not provide for return of unearned premium.
  - o Other receivables include tax receivables that correspond to a value added tax refund owed by Canadian authorities for credit arising from prior amounts paid in the supply chain.
  - o The Debtors estimate the liquidation recovery value of other current assets is ~~45~~36% to ~~61~~53% of the *pro forma* value.

- **Note F - Property, Plant, and Equipment**
  - o Consists primarily of production plants, equipment utilized at the plant and mines, and land.
  - o Estimated recoveries are based on estimates from management team and guidance on current market environment.
  - o Recoveries on plants assume that the Debtors have ceased operations and no volumes are moving through the plants and they are sold in a fire-sale scenario. The buyer would purchase the plants as-is and would be responsible for any dismantling and transportation costs to relocate the assets to an operating location.
  - o Other tangible assets were evaluated for their marketability to a non-talc related purchaser.
  - o Recovery on land was discounted given the assumption that the asset was disposed in a fire-sale scenario.
  - o The Debtors estimate the liquidation recovery value of Property, Plant, and Equipment is ~~20~~27% to ~~30~~37% of the *pro forma* value.

2

- **Note G - Deferred Taxes**
  - o Deferred income taxes are assets arising from differences between statutory accounting and tax basis.
  - o Per discussions with the parent company's internal tax professionals, deferred taxes can only be utilized by the Debtors and have no market value to third parties.
  - o The Debtors estimate the liquidation recovery value of deferred taxes is 0% of the *pro forma* value.

- **Note H - Intangible Assets**
  - o Consists primarily of software, goodwill, intangibles, and other assets, including intellectual property, patents, and business methodologies.
  - o The Debtors estimate the liquidation recovery value of intangible assets is 0% of the *pro forma* value.

- **Note I - Other Long-Term Assets**
  - o Other long-term assets includes overburden and mineral reserves associated with operating the mills and mines.
  - o Overburden is a capitalized cost incurred when removing the surface, rock and soil in order to access the underlying mineral deposit.  As there is no tangible asset associated with this capitalized cost, no estimated recovery is assumed.
  - o Mineral reserves are the economically mineable part of a measured or indicated mineral resource and represents mineable ore within the mine.  Talc mines with remaining useful life and unmined resources are primarily marketable to companies that mine talc minerals.  This assumption creates the highest and best use, maximizes return for the estates, and has been included as part of the Liquidation Analysis.
  - o The Debtors estimate the liquidation recovery value of other long-term assets is 43% to 7% of the *pro forma* value.

*Liquidation Adjustments*

- **Note J - Post-Conversion Cash Flow**
  - o Adjustment is based on estimated cash flow generated (used) by individual operating Debtors for 1-month subsequent to Liquidation Date for converting existing raw materials into finished goods for sale to third parties.
  - o For the North American Debtors, amounts are allocated to each legal entity based on the ratable gross liquidation proceeds generated by such legal entity.  Estimated post-conversion cash flow for the North American Debtors is assumed to be $4.8 million.
  - o ITI post-conversion cash flow was calculated independently for 1-month of operations until mine production and maintenance activities are assumed to be completely eliminated.  Estimated post-conversion cash flow for ITI is assumed to be $0.6 million.

US-DOCS\116572500US-DOCS\118071123.2RLF1 23862506v.124099353v.1

- **Note K - Severance Costs**
  - o Adjustment assumes that conversion to a chapter 7 liquidation will trigger employee termination costs, including severance, accrued and unpaid paid time-off and COBRA for the North American Debtors.
  - o Estimate assumes 30% of total severance owed for each employee employed through post-conversion cash flow or wind-down period.
  - o Costs were calculated at an individual level and are allocated to each North American Debtor based on employing legal entity.

- **Note L - Chapter 7 Trustee Fees**
  - o Chapter 7 Trustee fees consist of fees paid to the chapter 7 Trustee to liquidate the Estates of the Debtors.
  - o The estimate is pursuant to section 326 of the Bankruptcy Code and is calculated at approximately 3% of all gross Liquidation Proceeds in excess of $1.0 million.
  - o Based on the Liquidation Proceeds forecast, the Debtors estimate the chapter 7 Trustee fees to be $~~2.4~~ 2.3 million to $2.8 million.

- **Note M - Chapter 7 Professional Fees**
  - o Chapter 7 professional fees includes costs to retain key professionals (attorneys, investment bankers, and financial advisors).
  - o Costs are assumed at 2.5% of Liquidation Proceeds, excluding cash & cash equivalents.
  - o Based on the Liquidation Proceeds forecast, the Debtors estimate the chapter 7 professional fees to be $1.8 million to $2.2 million.

- **Note N - Orderly Wind-Down Costs**
  - o Includes payroll, facility and overhead costs to assist the Trustee and retained professionals with post-close activities, which include: (i) accounting and remittance for accrued and unpaid invoices, capex, any other pre-closing obligations, and (ii) calculate and distribute final payouts.
  - o Additional wind-down activities include monetizing assets, reconciling claims and winding-down the estate.
  - o For the North American Debtors, these expenses are incurred during the 3-month period subsequent to cessation of operations.
  - o For ITI, a collective dismissal procedure would be required and managed according to established union procedures and labor law.  This communication and consultation lasts a maximum of 75 days.
  - o Additional costs at ITI include $3.2 million to account for a 12 months lay-off incentive to facilitate trade unions negotiations, $1.4 million in lieu of the dismissal notice requirement, and $0.7 million for dismissal tickets and the employee termination fund.
  - o Wind-down budget drafted in coordination with management, with an initial headcount totaling 311 FTEs declining over 4 months.
  - o Orderly wind-down costs for all of Debtors is estimated to be $~~8.9~~ 8.7 million.

4

- **Note O - Estate Wind-Down Costs**
  - o Includes document retention, final W-2s, and final tax returns.
  - o Costs are estimated to be $0.5 million.

- **Note P - Decommissioning Costs**
  - o Includes amounts associated with decommissioning and reclamation of the Argonaut and Rodoretto mines at each of the Debtors.
  - o Amounts associated with decommissioning and reclamation of the Yellowstone and Penhorwood mines, $9.6 million and $1.8 million, respectively, are not included in waterfall of funds due to assumption of sale of mines to third party who would assume such costs. These costs are excluded in an effort to take the most beneficial approach to creditors, but in the event the mines are not able to be sold as a going concern, the Debtors would incur the full decommissioning costs thus resulting in a lower recovery for unsecured claimants.
  - o Examples of costs include earthwork/excavation, demolition, equipment demobilization, and associated operating expenses during the decommissioning period.
  - o Costs for the North American Debtors are estimated to be the average of the two most frequent appraisals performed by third parties.
  - o Total estimated costs are estimated to be $16.4 million. Costs flowing through waterfall for the "best interests" test are $4.9 million.

*Claims*

- **Note Q - Secured Claims (Class 2)**
  - o Includes claims arising from capital leases and auto leases at ITI.
  - o The Debtors estimate that there will be approximately $0.1 million of secured claims as of the Liquidation Date and that the recoveries will be 100%.

- **Note R - Administrative Expenses**
  - o Includes actual and necessary post-petition cost or expense of preserving the Estates or operating the businesses of the Debtors, post-petition costs, indebtedness or contractual obligations duly and validly incurred or assumed by the Debtors in the ordinary course of business, and compensation or reimbursement of expenses of Professionals to the extent allowed by the Bankruptcy Court under sections 327, 328, and 330(a) of the Bankruptcy Code.
  - o Claims pursuant to section 503(b)(9) of the Bankruptcy Code as a result of receiving goods in the 20-day period prior to the Petition Date, have been paid in the ordinary course during chapter 11.
  - o Estimate of accrued professional fees based on the latest *pro forma* cash flow forecast projections prepared by the Debtors and their advisors.
  - o Accrued professional fee balances were offset at the advisor level for any retainers in place as of the Petition Date.
  - o The Debtors estimate that there will be approximately $~~26.1~~ 32.4 million of chapter 11 administrative expenses remaining as of the Liquidation Date and that the recoveries will be 100%.

5

- **Note S - Priority Tax Claims**
  - Allowed priority tax claims will be treated per section 1129(a)(9)(C) of the Bankruptcy Code and will receive interest on such allowed priority tax claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.
  - The Debtors estimate that there will be approximately $~~3.4~~ 4.7 million of priority tax claims and that recoveries will be 100%.

- **Note T – Employment Related Claims (Administrative Claims) and Priority Non-Tax Claims (Class 1)**
  - Includes unpaid vacation and severance obligations for employees, subject to the $12,850 individual cap, per §507(a)(4) of the Bankruptcy Code, as applicable.
  - The Debtors estimate that there will be approximately $2.6 million of priority non-tax claims and that recoveries will be 100%.

- **Note U – Non-Priority Unsecured Claims (Class 3)**
  - *Overview – Classes 3, 4, and 5*
    - Claims in Classes 3, 4, and 5 are treated pari passu, and the Debtors estimate that in a chapter 7 liquidation there would be approximately $~~11.6~~ 1.6 million to $~~24.8~~ 15.4 million distributed to holders of Claims in these Classes.  The estimated amount of Claims in these Classes, other than Talc Personal Injury Claims, is $~~53~~ 50 million.
    - Assuming Talc Personal Injury Claims are excluded from the Liquidation Analysis, Holders of Unsecured Claims and Intercompany Claims against ITI are expected to recover in full in a hypothetical liquidation pursuant to chapter 7.
  - *Unsecured Claims (Class 3)*
    - Includes lease rejections, non-priority employee obligations, unpaid prepetition trade, legal costs arising from prepetition talc litigation and surety bond claims.
    - The Debtors estimate that there will be approximately $~~37.9~~ 36.6 million of unsecured claims as of the Liquidation Date.
    - For purposes of the Liquidation Analysis, estimated recovery values do not contemplate any potential distributions on account of the Talc Personal Injury Claims, given the inability to estimate such Claims.  Accordingly, recovery values for Unsecured Claims may be materially less, depending on the actual value of the Talc Personal Injury Claims.
  - *Talc Personal Injury Claims (Class 4)*
    - Represents claims against one or more of the Debtors directly or indirectly arising out of or relating to the presence of or exposure to talc or talc-containing products based on alleged acts or omissions of the Debtors or any other entity for whose conduct the Debtors have or are alleged to have liability, prior to the Effective Date.
    - At the time the Disclosure Statement was filed, Talc Personal Injury Claims remain unliquidated, and the aggregate amount of such Claims is unknown.

US-DOCS\116572500US-DOCS\118071123.2RLF1 23862506v.124099353v.1

The Debtors do not have sufficient information to estimate the amount of these Claims for purposes of this analysis, and therefore, no value has been assigned to Class 4 and no recovery value is currently projected.

- Conversion to chapter 7 would substantially impact the cost and efficiency of resolving the Talc Personal Injury Claims.  Chapter 7 of the Bankruptcy Code contains no provision for establishing a trust or other efficient means to resolve such Claims.
- Under chapter 7, the Talc Personal Injury Claims, or any portion of such Claims~~, that are not otherwise defended by J&J~~ would need to be resolved through litigation~~,~~ and the Trustee would need to engage litigation counsel to defend and liquidate those Claims.  This differs significantly from the Plan, which proposes to establish the Talc Personal Injury Trust to resolve such Claims through the Trust Distribution Procedures.  As such, litigation in a chapter 7 liquidation is likely to be more costly and time-consuming than resolving all Talc Personal Injury Claims through the Talc Personal Injury Trust to be established under the Plan.  Additionally, and as discussed above, the Plan guarantees that certain amounts will be contributed to the Talc Personal Injury Trust as part of the Imerys Settlement and the Rio Tinto/Zurich Settlement.  All or a portion of these amounts would likely not be paid in a chapter 7 liquidation or not without incurring significant litigation expenses.

- o *Intercompany Claims (Class 5)*
  - Includes claims held by both non-debtor affiliates and other Debtors.  Claims held by non-debtor affiliates represent prepetition balances that arose in the ordinary course of business in trading relationships with the Debtors.
  - Debtor intercompany claims represent prepetition amounts owed to ITA from ITV, ITC, and ITI.
  - The Debtors estimate that there will be approximately $~~15.1~~ 13.8 million of intercompany claims as of the Liquidation Date.

- **Note V - Equity Interests in the North American Debtors (Class 6)**
  - o Existing Interests consists of interests of any holders of any class of equity securities of any of the North American Debtors, represented by shares of common or preferred stock, limited partnership interests or other instruments evidencing an ownership interest in any of the North American Debtors, whether or not certificated, transferable, voting or denominated "stock" or a similar security, or any option, warrant or right, contractual or otherwise, to acquire any such interest.
  - o ITA is the direct parent of ITV and receives any proceeds remaining subsequent to ITV distributions following strict priority in accordance with section 726 of the Bankruptcy Code.
  - o There are no estimated recoveries for equity interests in the North American Debtors.

~~US-DOCS\116572500~~US-DOCS\118071123.2RLF1 ~~23862506v.1~~24099353v.1

- **<u>Note W - Equity Interests in ITI (Class 7)</u>**
  - o Existing Interests consists of interests of any holders of any class of equity securities of ITI, represented by shares of common or preferred stock, limited partnership interests or other instruments evidencing an ownership interest in any of ITI, whether or not certificated, transferable, voting or denominated "stock" or a similar security, or any option, warrant or right, contractual or otherwise, to acquire any such interest.
  - o Estimated recoveries for Equity Interests in ITI range from $~~19.8~~ 21.2 million to $~~20.9~~ 22.3 million.  Such recoveries assume payment of holders of Claims against ITI in full.  As discussed in Note U, no value has been assigned to Talc Personal Injury Claims against ITI.  Accordingly, recoveries for Equity Interests in ITI will decrease proportionately with any recoveries attributable to Claims in Class 4 against ITI.

~~US-DOCS\116572500~~US-DOCS\118071123.2RLF1 ~~23862506v.1~~24099353v.1