**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------------- x
```
In re:                                            :    Chapter 11
                                                  :
IMERYS TALC AMERICA, INC., *et al.*,[1]           :    Case No. 19-10289 (LSS)
                                                  :
          Debtors.                                :    (Jointly Administered)
                                                  :
                                                  :    **Re Docket Nos. 1714, 1715, 1716, 2083, 2084, 2184,
                                                  :    2288-1, 2289, 2290**
```
-------------------------------------------------------- x
```
                                                       **Reply Deadline: October 5, 2020
                                                       Hearing Date: October 8, 2020**

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF MOTION FOR ENTRY OF ORDER
(I) APPROVING DISCLOSURE STATEMENT AND FORM AND MANNER OF
NOTICE OF HEARING THEREON, (II) ESTABLISHING SOLICITATION
PROCEDURES, (III) APPROVING FORM AND MANNER OF NOTICE TO
ATTORNEYS AND CERTIFIED PLAN SOLICITATION DIRECTIVE, (IV)
APPROVING FORM OF BALLOTS, (V) APPROVING FORM, MANNER, AND SCOPE
OF CONFIRMATION NOTICES, (VI) ESTABLISHING CERTAIN DEADLINES IN
CONNECTION WITH APPROVAL OF DISCLOSURE STATEMENT AND
<u>CONFIRMATION OF PLAN, AND (VII) GRANTING RELATED RELIEF</u>**

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

RLF1 24099484v.1

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ...................................................................9

II. PROCEDURAL HISTORY.....................................................................15

III. THE COURT SHOULD GRANT THE MOTION .......................................16

    A. The Disclosure Statement Meets the Applicable Standards for Approval Under Section 1125................................................................16

        1. There is Adequate Information Regarding the TDP, Trust Agreement, and Ancillary Documents.............................................17

            a. The TDP and Trust Agreement Provide Adequate Information Regarding the Operation of the Talc Personal Injury Trust ...............................................18

            b. The Original TDP Adequately Addresses Specific Disclosure Issues Raised in the Objections ...................................20

                (1) Anti-Fraud Provisions.......................................................20

                (2) Treatment of Ovarian Cancer Claims Versus Mesothelioma Claims ...............................................22

                (3) Treatment of Indirect Talc Personal Injury Claims ...........22

                (4) Liability Defenses .............................................................23

            c. The Debtors have Filed Financial Projections and Intend to File Additional Information as Part of the Plan Supplement.........24

        2. The Debtors Have Adequately Described the Trust Assets, Including Indemnification and Insurance Rights.......................................25

            a. J&J's Indemnification Obligations .................................27

            b. The Debtors' Insurance.................................................32

            c. Imerys S.A.'s Indemnification Rights ...........................35

        3. The Debtors Adequately Describe the Imerys Settlement........................35

        4. The Disclosure Statement and Plan Adequately Describe the Treatment of Insurers ...............................................37

        5. The Liquidation Analysis Provides Creditors with Adequate Information Regarding Potential Creditor Recoveries in a Hypothetical Liquidation ...............................................38

        6. The Remaining Disclosure Objections are Either Without Merit or Have Already Been Addressed ...............................................41

            a. The Debtors Have Adequately Described the Talc Personal Injury Claims ...............................................41

2

b.    The Disclosure Statement Provides Adequate Information Regarding Cyprus' Insurance Policies and Purported Indemnity Rights.................................................42

c.    The Disclosure Statement Adequately Addresses J&J's Defenses, Setoff Rights, and Indemnification Claims against the Debtors........................................................44

d.    The Disclosure Statement Adequately Describes the Role of the TCC and FCR .............................................47

e.    The Disclosure Statement Adequately Describes the Non-Debtor Affiliate Releases ......................................48

B.    The Confirmation Objections are Premature and Meritless ...............................49

    1.    J&J's Bad Faith Claim is Meritless and Unsupported ..............................50

    2.    The Plan Meets the Best Interests Test ....................................................56

    3.    The Plan Does Not Provide for Improper Treatment of Indirect Talc Personal Injury Claimants.................................................................57

    4.    The Lack of Certain "Neutrality Language" for J&J Does Not Render the Plan Patently Unconfirmable..........................................59

    5.    Potential Litigation Between the Debtors and J&J Does Not Render the Plan Unconfirmable...............................................................60

C.    The Voting Procedure Objections Are Without Merit.........................................60

    1.    It is Appropriate to Assign Indirect Talc Personal Injury Claims a Value of $1 for Voting Purposes. ...........................................................60

    2.    The Treatment of FRBP 3018(a) Motions is Proper..................................64

D.    The Procedural Objections Are Meritless or Have Been Addressed....................66

    1.    The Timing of the Filing of the Disclosure Statement is Appropriate ...............................................................................................66

    2.    The Plan Confirmation Schedule is Appropriate ......................................68

    3.    The Solicitation Procedures do not Create a Material Conflict of Interest......................................................................................................69

    4.    The Notice to Contract Counterparties Provides a Sufficiently Long Response Time .................................................................................70

    5.    Expanded Service of the Plan Supplement and the Solicitation Procedures Order is Unnecessary ............................................................70

IV.    CONCLUSION........................................................................................................71

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re 20 Bayard Views, LLC,*
   445 B.R. 83 (Bankr. E.D.N.Y. 2011) ....................................................................56

*In re A.H. Robins Co., Inc.,*
   880 F.2d 694 (4th Cir. 1989) ...............................................................61, 65, 66

*In re Abeinsa Holding, Inc.,*
   562 B.R. 265 (Bankr. D. Del. 2016) ....................................................................39

*In re American Capital Equipment, LLC,*
   688 F.3d 145 (3d Cir. 2012) .........................................................................49, 50

*In re Aquatic Development Group, Inc.,*
   352 F.3d 671 (2d Cir. 2003) ...............................................................................65

*In re Armstrong World Indus., Inc.,*
   348 B.R. 136 (D. Del. 2006) .........................................................................57, 58

*In re Best Products Co., Inc.,*
   177 B.R. 791 (S.D.N.Y. 1995) ............................................................................37

*Bittner v. Borne Chemical Co., Inc.,*
   691 F.2d 134 (3d Cir. 1982) ...............................................................................60

*In re Boy Scouts of America,*
   Case No. 20-cv-0774 (RGA) (D. Del. Sept. 9, 2020) .........................................55

*In re Cellular Info. Sys., Inc.,*
   171 B.R. 926 (Bankr. S.D.N.Y. 1994) .................................................................37

*In re Combustion Engineering, Inc.,*
   391 F.3d 190 (3d Cir. 2004) .........................................................................38, 65

*In re Congoleum Corp.,*
   426 F.3d 675 (3d Cir. 2005) ...............................................................................55

*In re Dakota Rail, Inc.,*
   104 B.R. 138 (Bankr. D. Minn. 1989) .................................................................50

*In re Diversified Investors Fund XVII,*
   91 B.R. 559 (Bankr. C.D. Cal. 1988) ..................................................................39

4

*In re Duro Dyne Nat'l Corp.*,
    Case No. 18-27963 (MBK) (Bankr. D.N.J. Sept. 30, 2020) .........................................21, 22, 24

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) .........................................................................................37

*In re Flintkote Co.*,
    Case No. 04-11300 (JKF) (Bankr. D. Del. Feb. 9, 2015)
    .........................................................................................................................21, 23, 24, 38

*In re Garlock Sealing Tech., LLC*,
    Case No. 10-BK-31607 (Bankr. W.D.N.C. April 03, 2017).............................................21, 38

*In re Great Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D. N.J. 2000) .......................................................................................51

*In re Hercules Offshore, Inc.*,
    565 B.R. 732 (Bankr. D. Del. 2016) .......................................................................................51

*Matter of Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986)..........................................................................61, 63, 65

*In re Kaiser Gypsum Company, Inc.*,
    Case No. 16-31602 (JCW) (Bankr. W.D.N.C. Oct. 23, 2019) ................................................67

*In re Leslie Controls, Inc.*,
    Case No. 10-12199 (CSS) (Bankr. D. Del. Aug. 20, 2010)...................................21, 22, 23, 67

*In re Leslie Controls, Inc.*,
    No. 10-12199 (CSS), 2011 WL 1901547 (Bankr. D. Del. Jan. 18, 2011).............................56

*In re Lisanti Foods, Inc.*,
    329 B.R. 491 (D. N.J. 2005) ..................................................................................................17

*MacArthur Co. v. Johns-Manville Corp.*,
    837 F.2d 89 (2d Cir. 1988)......................................................................................................65

*In re Maremont Corp.*,
    601 B.R. 1 (Bankr. D. Del. 2019) ...............................................................................37, 51, 56

*In re Maremont Corp.*,
    Case No. 19-10118 (KJC) (Bankr. D. Del. May 17, 2019) .........................................21, 22, 24

*In re Metex Mfg. Corp.*,
    Case No. 12-14554 (BRL) (Bankr. S.D.N.Y. Dec. 23, 2013) ................................................38

*In re Monroe Well Service Inc.*,
    80 B.R. 324 (Bankr. E.D. Pa. 1987) .................................................................................14, 49

5

*In re Montreal Maine & Atlantic Railway, Ltd.*,
  Bk. No. 13-10670 (PGC), 2015 WL 7431192 (Bankr. D. Me. Oct. 9, 2015)..........................37

*In re New Hampshire Elec. Co-op., Inc.*,
  138 B.R. 668 (Bankr. D. N.H. 1992) ........................................................................................53

*In re Oakfabco, Inc.*,
  Case No. 15-27062 (Bankr. N.D. Ill. Jan. 15, 2019) ................................................................67

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
  848 F.2d 414 (3d Cir. 1988)................................................................................................13, 17

*In re PPI Enterprises (U.S.), Inc.*,
  324 F.3d 197 (3d Cir. 2003)......................................................................................................51

*Pension Ben. Guar. Corp. v. Enron Corp.*,
  No. 04 Civ. 5499 (HB), 2004 WL 2434928 (S.D.N.Y. Nov. 1, 2004)..............................61, 63

*In re Pittsburgh Corning Corp.*,
  No. 00-22876 (JKF), 2013 WL 2299620 (Bankr. W.D. Pa. May 24, 2013) ..........................57

*In re Quigley Co.*,
  346 B.R. 647 ......................................................................................................................61, 64

*In re Quigley Co., Inc.*,
  377 B.R. 110 (Bankr. S.D.N.Y. 2007)......................................................................................49

*In re Ravn Air Group, Inc.*,
  Case No. 20-10755 (BLS) (Bankr. D. Del. June 07, 2020) ......................................................62

*In re RFE Indus., Inc.*,
  283 F.3d 159 (3d Cir. 2002)......................................................................................................37

*In re River Vill. Assocs.*,
  181 B.R. 795 (E.D. Pa. 1995) ...................................................................................................17

*In re rue21, inc.*,
  575 B.R. 90 (Bankr. W.D. Pa. 2017) ..................................................................................52, 56

*In re Specialty Prods. Holding Corp.*,
  Case No. 10-11780 (PJW) (Bankr. D. Del. Oct. 23, 2014) ............................................ *passim*

*In re Stanley Hotel Inc.*,
  13 B.R. 926 (Bankr. D. Co. 1981) ............................................................................................47

*In re Stone Hedge Properties*,
  191 B.R. 59 (Bankr. M.D.Pa. 1995) .........................................................................................63

6

*In re Texaco Inc.*,
84 B.R. 893 (Bankr. S.D.N.Y. 1988) .......................................................................37

*In re Texas Extrusion Corp.*,
844 F.2d 1142 (5th Cir. 1988) ...............................................................................17

*In re TK Holdings Inc.*,
Case No. 17-11375 (BLS) (Bankr. D. Del. Jan. 23, 2018) ...............................18, 67

*In re United Gilsonite Labs*,
Case No. 5:11-bk-02032 (RNO) (Bankr. M.D. Penn. Nov. 14, 2014) ..............18, 24

*In re W.P. Hickman Sys., Inc.*
No. ADV 10-2289JAD, 2012 WL 2905446 (Bankr. W.D. Pa. July 16, 2012) ........56, 57

*In re W.R. Grace & Co.*,
446 B.R. 96 (Bankr. D. Del. 2011) .........................................................................57

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012) .....................................................................................55

*In re W.R. Grace & Co.*,
729 F.3d 311 (3d Cir. 2013).....................................................................................58

*In re Waterville Timeshare Grp.*,
67 B.R. 412 (Bankr. D. N.H. 1986) ...................................................................16, 47

*In re Yarway Corp.*,
Case No. 13-11025 (BLS) (Bankr. D. Del. March 18, 2015) ......................... *passim*

*In re Zaruba*,
384 B.R. 254 (Bankr. D. Alaska 2008) ....................................................................56

RLF1 24099484v.1

**STATUTES**

11 U.S.C.

§§ 101-1532 ...................................................................................................10
§ 105 ...................................................................................................10, 15
§ 501 .............................................................................................................63
§ 502 ......................................................................................................26, 63
§ 502(a) ......................................................................................................62
§ 502(c) ................................................................................................62, 63
§ 524(g) ..............................................................................10, 15, 55, 58
§ 524(g)(2)(B) ..........................................................................................12
§ 1122(a) ....................................................................................................57
§ 1123(a)(4) ......................................................................................58, 59
§ 1125 ............................................................................13, 16, 17, 40
§ 1125(a)(1) .......................................................................................*passim*
§ 1126 .........................................................................................................63
§ 1129(a)(3) ......................................................................................50, 51
§ 1129(a)(7) ..............................................................................................56
§ 1129(a)(7)(A) ........................................................................................56

**RULES**

Fed. R. Bank. Proc. 2002(b) ................................................................66

Fed. R. Bank. Proc. 3018(a)..............................................62, 63, 64, 65

RLF1 24099484v.1

Imerys Talc America, Inc., Imerys Talc Vermont, Inc., and Imerys Talc Canada Inc. (collectively, the "**Debtors**"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this omnibus reply (the "**Reply**") to the objections, joinders, and reservations of rights (collectively, the "**Objections**") filed by the parties listed on **Exhibit A** hereto (collectively, the "**Objectors**") with respect to the *Motion of Debtors for Entry of Order (I) Approving Disclosure Statement and Form and Manner of Notice of Hearing Thereon, (II) Establishing Solicitation Procedures, (III) Approving Form and Manner of Notice to Attorneys and Certified Plan Solicitation Directive, (IV) Approving Form of Ballots, (V) Approving Form, Manner, and Scope of Confirmation Notices, (VI) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement and Confirmation of Plan, and (VII) Granting Related Relief* [Docket No. 1716] (the "**Motion**").[2]  In support of the Reply, by and through their undersigned counsel, the Debtors respectfully state as follows:

## I.    PRELIMINARY STATEMENT

1.    Pursuant to the Motion, the Debtors seek entry of an order (a) approving the Disclosure Statement, (b) approving the form and manner of the Disclosure Statement Hearing Notice in respect of the Disclosure Statement Hearing, (c) establishing Solicitation Procedures, (d) approving the form and manner of the Direct Talc Personal Injury Claim Solicitation Notice and Certified Plan Solicitation Directive, (e) approving the forms of Ballots, (f) approving the form, manner, and scope of the Confirmation Notices in respect of the Confirmation Hearing, (g) establishing certain deadlines in connection with the foregoing, and (h) granting related relief

---

[2]    Attached hereto as **Exhibit B** is a description of the substance of each Objection and a summary of the Debtors' response thereto.

(as amended, the "**Solicitation Procedures Order**") [Docket No. 2288-1].[3]  Entry of the

Solicitation Procedures Order will allow the Debtors and the other Plan Proponents[4] to proceed

with soliciting votes on the Plan (as defined below) and will provide a path to confirmation and,

ultimately, the Debtors' emergence from bankruptcy.

2.       From the commencement of the Chapter 11 Cases, the Debtors have worked

diligently with their stakeholders to try to resolve the Debtors' liabilities in a fair and appropriate

manner pursuant to 11 U.S.C. §§ 105 and 524(g).[5]  These efforts have involved negotiations with

a number of interested parties, including, but not limited to, the TCC, the FCR, the Non-Debtor

Affiliates, Imerys S.A., Cyprus, Rio Tinto, Zurich, and J&J.  In addition, the Debtors have

committed significant resources to mediating outstanding disagreements with each of Cyprus, Rio

Tinto, Zurich, and J&J.  Through these various processes, the Debtors have expended substantial

time and effort to understand and address the concerns of the numerous stakeholders involved in

the Chapter 11 Cases.

3.       Further, the Debtors, together with the other Plan Proponents, crafted a Disclosure

Statement that provides a plethora of information regarding the Debtors, the Plan, and the

confirmation process.  Indeed, the Disclosure Statement exceeds 100 pages in length (excluding

exhibits); describes, among other things, the Debtors' history, operations, assets, and liabilities,

---

[3]       Capitalized terms used in this sentence but not otherwise defined herein shall have the definition ascribed to such terms in the Motion.

[4]       Capitalized terms not otherwise defined herein have the same meaning assigned to those terms in the *Second Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* (the "**Plan**") [Docket No. 2289] or the *Disclosure Statement for Second Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* (the "**Disclosure Statement**") [Docket No. 2290], as applicable.

[5]       Hereafter, unless otherwise indicated, statutory references are to the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**").

the circumstances leading to the commencement of the Chapter 11 Cases, ongoing settlement discussions and/or agreements, and the structure and terms of the Plan; and includes a liquidation analysis and financial projections.

4.    Following the filing of the *Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* (the "**Original Disclosure Statement**") [Docket No. 1715] on May 15, 2020, and the Objections to the Original Disclosure Statement thereafter, the Debtors carefully considered all of the issues raised by the Objectors and took steps to address those concerns that warranted further information or changes to the Original Disclosure Statement.  For instance, the Debtors worked collaboratively with the other Plan Proponents, Rio Tinto, Zurich and the U.S. Trustee to craft additional language to include in the Disclosure Statement.  After analyzing the Objections to the Original Disclosure Statement and engaging in discussions and negotiations with other parties as appropriate, on August 12, 2020, the Debtors filed the *Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* (the "**First Amended Plan**") [Docket No. 2083] and the *Disclosure Statement for Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* (the "**First Amended Disclosure Statement**") [Docket No. 2084].  The First Amended Disclosure Statement added additional disclosures and clarified certain information included in the Original Disclosure Statement to resolve a number of the concerns raised by the Objectors.  The First Amended Disclosure Statement also (i) included proposed treatment for J&J's indemnification obligations to the Debtors based upon the relief sought by J&J in the J&J Stay Motion [Docket No. 1567], and (ii)

11

contained updated exhibits, including financial projections and an amended liquidation analysis. (First Amended Disclosure Statement at Exs. B, C, D.)

5.       Thereafter, in mid-August, certain of the Objectors filed objections and responses to the First Amended Disclosure Statement.  On September 10, 2020, the Debtors filed a *Notice of Filing Exhibits to Amended Plan* [Docket No. 2184], which contains both Exhibit A to the Plan (the Trust Distribution Procedures (the "**Original TDP**")) and Exhibit B to the Plan (the Talc Personal Injury Trust Agreement (the "**Trust Agreement**")).  The intent of the Original TDP was to "provide reasonable assurance that the [Talc Personal Injury Trust] will value, and be in a financial position to pay, Talc Personal Injury Claims that involve similar claims in substantially the same manner."  (Original TDP § 1.1.)  Similarly, the Trust Agreement governs the obligations of the Talc Trustees to administer the Talc Personal Injury Trust.  (Trust Agreement §§ 1.2, 2.1.) As the Trust Agreement summarizes, "[t]he Talc Trust is to use the Talc Trust's assets and income to pay the holders of all Talc Claims in accordance with this Trust Agreement and the TDP in such a way that such holders of Talc Claims are treated fairly, equitably, and reasonably in light of the assets available to resolve such claims, and to otherwise comply in all respects with the requirements of a trust set forth in section 524(g)(2)(B) of the Bankruptcy Code."  (*Id.* § 1.2.)

6.       Finally, on September 25, 2020, the Court entered an order denying the J&J Stay Motion [Docket No. 2253].  Additional Objections to the First Amended Disclosure Statement and the Original TDP were filed after the Court's ruling.  In order to address the Court's ruling and additional Objections filed by certain of the Objectors, the Debtors, with the support of the Plan Proponents, filed the Plan and Disclosure Statement on October 5, 2020, and intend to file an amended TDP (the "**Amended TDP**").

7.     The Objections themselves primarily fall into four categories:  (a) objections as to the adequacy of the information contained in the Original Disclosure Statement, the First Amended Disclosure Statement and/or the Original TDP (the "**Disclosure Objections**"); (b) objections raising issues with respect to the confirmability of the Plan (the "**Confirmation Objections**"); (c) objections regarding the Debtors' proposed voting and solicitation procedures (the "**Solicitation Procedures Objections**"); and (d) objections regarding logistical or procedural concerns (the "**Procedural Objections**").  Each of the Objections either lacks merit or has been resolved by revisions to the Plan and/or Disclosure Statement, the filing of exhibits to the Plan, or amendments to the Solicitation Procedures Order.  (*See* Ex. B.)

8.     First, the Debtors have either fully addressed the Disclosure Objections by adding additional information to the Plan, Disclosure Statement and/or Amended TDP, or have determined that additional information is not necessary pursuant to the "adequate information" standard under section 1125—because the additional disclosures requested by the Objectors are, among other things, duplicative, confusing, misleading, self-serving, incomplete, incorrect, argumentative, and/or unwarranted.  As described in more detail below, the adequate information standard requires a debtor to disclose information "as far as is reasonably practicable in light of the nature and history of the debtor" "that would enable [] a hypothetical investor of the relevant class to make an informed judgment about the plan[.]"  11 U.S.C. § 1125(a)(1).  The precise contours of the information that must be disclosed varies based on the "facts and circumstances of each case."  *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988).  Here, the Disclosure Statement, as supplemented, provides more than adequate information to allow those parties entitled to vote to make an informed decision regarding the Plan.

13

9.      Second, the Confirmation Objections, asserted primarily by J&J, do not meet the significant burden of demonstrating that the Plan, on its face, cannot "possibly be confirmed." *See In re Monroe Well Service Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987).  In addition, each of the "patently unconfirmable" objections lacks merit, as there are simply no grounds to declare the Plan unconfirmable.

10.      Third, the Solicitation Procedures Objections are meritless.  Courts have expansive discretion to approve voting procedures that ensure voting power is allocated fairly and in a manner that prevents one individual or group from drowning out the voices of others.  As a result, in mass tort cases where individual claims are numerous and hard to value, courts have frequently permitted such claims to be valued at $1 for purposes of voting.  In addition, barring direct claimants from filing motions pursuant to Federal Rule of Bankruptcy Procedure ("**FRBP**") 3018(a) while allowing indirect claimants to do so serves the same goal of achieving a fair voting structure.  Because indirect claimants often reflect multiple underlying claims (whereas direct claimants represent only a single claim), it may be appropriate to adjust the voting power of indirect claimants.  In sum, the proposed Solicitation Procedures are intended to produce a fair and equitable voting structure, and the Court has wide discretion to approve such procedures.

11.      Finally, the Procedural Objections are also without merit.  These objections are primarily directed at the proposed Plan confirmation schedule from approval of the Disclosure Statement until the Confirmation Hearing.  However, the schedule provides more than sufficient time for discovery, consideration of the Plan, and voting.  In addition, after careful consideration, the Debtors have adopted some of the Objectors' proposed changes to logistical considerations such as service.  For those changes the Debtors did not adopt, the Debtors concluded, as explained

more fully below, that such changes are unnecessary and would add additional burden, complexity, and/or cost.

12.     In light of the fact that each of the Objections has either been resolved or lacks merit, the Debtors respectfully request that the Court find that the Disclosure Statement provides adequate information, grant the remaining relief requested in the Motion, and enter the Solicitation Procedures Order.

## II.     PROCEDURAL HISTORY

13.     The Debtors' Chapter 11 Cases were filed on February 13, 2019.  The TCC was appointed on March 5, 2019 [Docket No. 132], and the FCR was approved by the Court on June 3, 2019 [Docket No. 647].  Shortly after the TCC was constituted, the Debtors, the FCR, and the TCC begin discussing the potential framework for a bankruptcy plan under sections 105 and 524(g) of the Bankruptcy Code.  Imerys, S.A. and the other Non-Debtor Affiliates subsequently joined in such negotiations in an effort to try to reach a more global resolution.  These negotiations ultimately led to the Imerys Settlement, pursuant to which the Non-Debtor Affiliates shall provide (i) $75 million, consisting of Cash and the Talc PI Note, (ii) the Sale Proceeds, and (iii) a contingent purchase price enhancement of $102.5 million, subject to the value of the Sale Proceeds.  (Disclosure Statement at § 2.1(b).)

14.     The Debtors filed the *Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* (the "**Original Plan**") [Docket No. 1714], the Original Disclosure Statement, and the Motion on May 15, 2020. After consideration of the Objections thereto, the Debtors filed the First Amended Plan and First Amended Disclosure Statement on August 12, 2020 and the Plan and Disclosure Statement on October 5, 2020.

15.     Although the original hearing on the Motion was scheduled for June 30, 2020, the hearing was continued to October 8, 2020 to allow the Plan Proponents sufficient time to incorporate a $340 million settlement that was subsequently reached with Rio Tinto and Zurich following a successful mediation and to finalize the Original TDP, as well as to make additional refinements to the Plan and the Disclosure Statement to, among other things, address the Objections and the Court's recent denial of the J&J Stay Motion.

## III.     THE COURT SHOULD GRANT THE MOTION

### A.     The Disclosure Statement Meets the Applicable Standards for Approval Under Section 1125.

16.     Section 1125 defines adequate information with respect to a disclosure statement as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

11 U.S.C. § 1125(a)(1). Although a disclosure statement must contain "adequate information," debtors must also avoid over-complicating disclosure statements with additions that would not assist a party in the shoes of an average claimant voting on the plan. *See In re Waterville Timeshare Grp.*, 67 B.R. 412, 413 (Bankr. D. N.H. 1986) ("[O]verly technical and extremely numerous additions to a disclosure statement suggested by an objecting party may themselves be self-defeating in terms of the resulting clarity and understandability of the document to the average investor.").

16

17.     Bankruptcy courts have significant discretion in determining whether a disclosure statement contains adequate information.  *See, e.g., In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (D. N.J. 2005) ("Section 1125 affords the Bankruptcy Court substantial discretion in considering the adequacy of a disclosure statement."); *In re River Vill. Assocs.*, 181 B.R. 795, 804 (E.D. Pa. 1995) (explaining that the legislative history of section 1125(a)(1) provides that, "[b]oth the kind and form of information are left essentially to the judicial discretion of the court, guided by the specification in subparagraph (a)(1) that it be of a kind and in sufficient detail that a reasonable and typical investor can make an informed judgment about the plan.  The information required will necessarily be governed by the circumstances of the case.").  Moreover, the determination of whether adequate information exists is subjective and must be made on a case-by-case basis.  *See Oneida Motor Freight*, 848 F.2d at 417 ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case"); *see also In re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis.").

18.     Here, the Disclosure Statement and the Plan, as amended, provide more than adequate information to those who are entitled to vote on the Plan.

### 1.     There is Adequate Information Regarding the TDP, Trust Agreement, and Ancillary Documents

19.     Several of the Objectors object to the lack of disclosures regarding the Talc Personal Injury Trust, particularly with respect to its distribution and administrative procedures. (Docket No. 1847 at ¶¶ 14-18; Docket No. 1865 at pp. 5-8; Docket No. 1866 at ¶¶ 25-34; Docket No. 1869 at ¶¶ 11-17; Docket No. 1870 at ¶ 5; Docket No. 1878 at ¶¶ 13-20; Docket No. 1894 at pp. 6-7; Docket No. 1911 at ¶¶ 43-53; Docket No. 2097 at pp. 1-2; Docket No. 2015 at ¶ 6; Docket No. 2106 at p. 3; Docket No. 2110 at ¶¶ 5-6, Docket No. 2270 at pp. 7-12.)  These Objections have

been fully addressed by the Debtors' supplemental filings on August 12, September 10, and October 5, 2020.

      a.     *The TDP and Trust Agreement Provide Adequate Information Regarding the Operation of the Talc Personal Injury Trust*

20.     As an initial matter and contrary to the concerns raised by several Objectors (Docket No. 1865 at p. 8; Docket No. 1894 at p. 2; Docket No. 2097 at pp. 6-8; Docket No. 2106 at p. 4-5), it is exceedingly common for trust distribution procedures and trust agreements to be filed after the disclosure statement has been filed (and less than 28 days in advance of the disclosure statement hearing) and often even after the disclosure statement has been approved. *See, e.g.*, *In re Yarway Corp.*, Case No. 13-11025 (BLS) (Bankr. D. Del. March 18, 2015) [Docket No. 827-1] (TDP filed after the disclosure statement was approved); *In re Specialty Prods. Holding Corp.*, Case No. 10-11780 (PJW) (Bankr. D. Del. Oct. 23, 2014) [Docket No. 5117-3] (TDP filed after the hearing to seek approval of the disclosure statement); *In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Jan. 23, 2018) [Docket No. 1789-14] (same); *In re United Gilsonite Labs*, Case No. 5:11-bk-02032 (RNO) (Bankr. M.D. Penn. Nov. 14, 2014) [Docket No. 2098-6] (same).  In any event, the timing of the filing of the Original TDP and Trust Agreement is fully compliant with FRBP 2002(b) and 3017.1(a).  Indeed, both documents were filed 28 days in advance of the October 8, 2020 hearing.  The Amended TDP will be filed for the main purpose of addressing the Court's September 25, 2020 denial of the J&J Stay Motion.  The vast majority of the Amended TDP will remain unaltered from the prior version filed on September 10, 2020. Accordingly, all interested parties have had sufficient time to review the Original TDP and the Trust Agreement, for adequacy of disclosure purposes, prior to the hearing on the Motion.

21.     In addition, a number of Objectors argue that the Original Disclosure Statement, which did not yet attach any trust distribution procedures, did not give sufficient information

regarding various aspects of the Talc Personal Injury Trust, including topics such as how different types of Talc Personal Injury Claims would be treated, the process for distributions, and the method of ascertaining the validity of claims. (*See, e.g.,* Docket No. 1847 at ¶¶ 15-18; Docket No. 1866 at ¶¶ 25-34; Docket No. 1878 at ¶¶ 13-20.) The September 10, 2020 filing of the Original TDP remedied this issue.[6] The Original TDP (and the Amended TDP) is a thorough document providing more than adequate information regarding the operation and procedures of the Talc Personal Injury Trust. Among other things, the Original TDP (and the Amended TDP) explains (i) the treatment of different types of Talc Personal Injury Claims (Original TDP at §§ 2.3-2.6; *see also* Amended TDP); (ii) the procedures for the resolution of such Talc Personal Injury Claims (Original TDP at §§ 5.1-5.8; *see also* Amended TDP); and (iii) guidelines for liquidating and paying claims (Original TDP at §§ 7.1-7.10; *see also* Amended TDP).[7]

22.    Beyond the Original TDP's (and the Amended TDP's) detailed explanation of the distribution procedures of the Talc Personal Injury Trust, the Debtors' filing of the Trust Agreement resolves Objections regarding a lack of disclosures regarding the administration of the

---

[6]    Certain of the Objections, most notably the Objections filed by J&J, the U.S. Trustee, Cyprus, and the Certain Insurers, criticize the substance of certain provisions included in the Original TDP. (Docket No. 2258 at ¶¶ 7-13, 18-26; Docket No. 2270 at pp. 9-12; Docket No. 2279 at 9-12, 14-20, 27; Docket No. 2282 at ¶¶ 11-18.) These criticisms include, but are not limited to, the magnitude of the scheduled values, how pre-existing conditions should affect recoveries from the Talc Personal Injury Trust, the treatment of different categories of claims, the application of certain "Valuation Factors," whether Indirect Talc Personal Injury Claims are treated equitably, whether the distribution procedures could allow for double recoveries, the magnitude of medical evidence that should be required to submit a claim, the evidence of exposure that must be submitted, the treatment of foreign claims, the propriety of the sub-fund structure, the ability of claimants to keep claims confidential, and the amount of attorneys' fees available. (*Id.*) However, none of these issues are ripe for discussion and, instead, should be addressed, as appropriate, in the context of plan confirmation.

[7]    J&J also asserts that the TDP is deficient because it does not include information on how claim values were derived. (Docket No. 2258 at ¶ 26.) However, the information that is relevant to a claimant's assessment of the Plan, Disclosure Statement, and TDP is not the process by which claims values were reached, but the ultimate claim values themselves. Accordingly, a detailed explanation of how the TDP's claim values were established is unnecessary.

Talc Personal Injury Trust.[8]  (Docket No. 1847 at ¶¶ 14-18; Docket No. 1866 at ¶¶ 14, 34; Docket

No. 1869 at ¶¶ 11-14; Docket No. 1911 at ¶¶ 7, 22-24, 43.)  The Trust Agreement thoroughly

addresses the key aspects of the administration of the Talc Personal Injury Trust, including the role

and responsibilities of the Talc Trustees (Trust Agreement at §§ 4.1-4.12), the Trust Advisory

Committee (*id.* at §§ 5.1-5.7), and the FCR (*id.* at §§ 6.1-6.6).[9]

     b. *The Original TDP Adequately Addresses Specific Disclosure Issues*
       *Raised in the Objections*

       (1) <u>Anti-Fraud Provisions</u>

  23. Certain Objectors argue that the Debtors have provided insufficient information

regarding the Talc Personal Injury Trust's anti-fraud provisions.  (Docket No. 1878 at ¶¶ 21-22;

Docket No. 1911 at ¶¶ 6, 51; Docket No. 2015 at ¶ 33; Docket No. 2258 at ¶¶ 14-17.)  However,

the Original TDP (and the Amended TDP) cures this concern with specific provisions regarding

anti-fraud measures.  In particular, the Original TDP (and the Amended TDP) calls for the

development of a "Claims Audit Program," which may include "methods for auditing the

---

[8] The U.S. Trustee objects that the Trust Agreement does not identify the Talc Trustees or the members of the Talc Trust Advisory Committee and that the Debtors have not presented the Cooperation Agreement.  (Docket No. 2279 at ¶¶ 3, 10, 23-26.)  The identities of the Talc Trustees and members of the Talc Trust Advisory Committee will be disclosed as part of the Plan Supplement.  To the extent the U.S. Trustee objects to a Talc Trustee or member of the Talc Trust Advisory Committee, that is a confirmation objection and is premature at this stage.  Similarly, the Debtors will disclose the Cooperation Agreement with the Plan Supplement, which is appropriate timing for that document.

[9] The U.S. Trustee's, Certain Insurers' and Cyprus Historical Excess Insurers' argument that a summary of the trust distribution procedures must be included within the confines of the Disclosure Statement itself and not attached as an exhibit is nonsensical.  (Docket No. 2270 at pp. 7-8; Docket No. 2278 at pp. 4, 8-9; Docket No. 2279 at ¶ 36.)  Merely incorporating the terms of a separate exhibit into the Disclosure Statement itself bears the dual risk of making the Disclosure Statement unwieldy and overwhelming for creditors faced with a document bordering on 150 pages or more, and of creating inconsistencies and confusion to the extent that the Disclosure Statement does not include the entirety of the trust distribution procedures, all of which are important to the mechanics of the Talc Personal Injury Trust.  Accordingly, the Disclosure Statement is not merely a "placeholder" or incomplete simply because it does not provide a summary of a document that it attaches in full and that voters may review in its entirety.  (*See* Docket No. 2278 at pp. 5-8.)

reliability of medical evidence, as well as the reliability of evidence of exposure to talc or talc-containing products for which the Trust has legal responsibility." (Original TDP at § 5.6; *see also* Amended TDP.)  Among other things, this program will include a "Cross-Trust Audit Program" to compare claims submitted to the Talc Personal Injury Trust against other trusts participating in the Cross-Trust Audit Program.  (*Id.*)  The Original TDP (and the Amended TDP) also imposes penalties for providing fraudulent information, including "rejecting the Talc Personal Injury Claim" or "requiring the source of such fraudulent information to pay the costs associated with the audit and any future audit or audits." (*Id.*)  Moreover, these audit procedures are substantially identical to similar provisions contained in other trust distribution procedures that have been approved by courts in other mass tort cases.[10]  *See, e.g.*, *In re Maremont Corp.*, Case No. 19-10118 (KJC) (Bankr. D. Del. May 17, 2019) [Docket No. 241-1]; *In re Duro Dyne Nat'l Corp.*, Case No. 18-27963 (MBK) (Bankr. D.N.J. Sept. 30, 2020) [Docket No. 1295-4]; *In re Garlock Sealing Tech., LLC*, Case No. 10-BK-31607 (Bankr. W.D.N.C. April 03, 2017) [Docket No. 5795-4]; *In re Yarway Corp.*, Case No. 13-11025 (BLS) (Bankr. D. Del. April 8, 2015) [Docket No. 859-3]; *In re Flintkote Co.*, Case No. 04-11300 (JKF) (Bankr. D. Del. Feb. 9, 2015) [Docket No. 8709]; *In re Specialty Prods. Holding Corp.*, Case No. 10-11780 (PJW) (Bankr. D. Del. Oct. 23, 2014) [Docket No. 5117-3]; *In re Leslie Controls, Inc.*, Case No. 10-12199 (CSS) (Bankr. D. Del. Aug. 20, 2010) [Docket No. 172-3].

---

[10]     To the extent certain Objectors, such as the U.S. Trustee, believe that the anti-fraud procedures are insufficient, that is a confirmation objection and is not ripe for determination at this phase.  (Docket No. 2279 at ¶¶ 1, 41, 46, 50.)

(2)    Treatment of Ovarian Cancer Claims Versus Mesothelioma
Claims

24.    At least one Objector noted that the Debtors had not adequately described how the

Plan would treat ovarian cancer versus mesothelioma claims.  (Docket No. 1866 at ¶ 14.)  Again,

the Original TDP (and the Amended TDP) addresses this concern.  Specifically, the Original TDP

(and the Amended TDP) contains detailed provisions specifically explaining the treatment of both

ovarian cancer and mesothelioma claims.  (Original TDP at §§ 2.4, 2.5; *see also* Amended TDP.)

Thus, the Plan, as supplemented by the Original TDP (and the Amended TDP), provides more than

sufficient information to allow a claimant to assess how different types of Talc Personal Injury

Claims will be treated.

(3)    Treatment of Indirect Talc Personal Injury Claims

25.    The Certain Insurers and the Cyprus Historical Excess Insurers criticize the

Original TDP as lacking key information needed for holders of Indirect Talc Personal Injury

Claims to assess their treatment under the Plan.  (Docket No. 2270 at pp. 8-9; Docket No. 2278 at

p. 9.)  In particular, both Objectors focus on language contained in Section 5.4 of the Original TDP

that allows both for certain procedures with respect to the handling of Indirect Talc Personal Injury

Claims and an Indirect Talc Personal Injury Claim form to be developed at a later date.  (*Id.*)

However, both Objectors also neglect the remainder of the detailed discussion of the treatment of

Indirect Talc Personal Injury Claims in the Original TDP, which spans 2 ½ pages.  (*See* Original

TDP at § 5.4; *see also* Amended TDP.)  Moreover, the Objectors ignore the fact that the criticized

language has been included nearly verbatim in numerous trust distribution procedures that have

been approved in other mass tort cases.  *See, e.g. In re Maremont Corp.*, Case No. 19-10118 (KJC)

(Bankr. D. Del. March 12, 2019) [Docket No. 241-1]; *In re Duro Dyne Nat'l Corp.*, Case No. 18-

27963 (MBK) (Bankr. D.N.J. Nov. 16, 2018) [Docket No. 1295-4]; *In re Yarway Corp.*, Case No.

13-11025 (BLS) (Bankr. D. Del. March 18, 2015) [Docket No. 859-3]; *In re Flintkote Co.*, Case No. 04-11300 (JKF) (Bankr. D. Del. Feb. 9, 2015) [Docket No. 8709]; *In re Specialty Prods. Holding Corp.*, Case No. 10-11780 (PJW) (Bankr. D. Del. Oct. 23, 2014) [Docket No. 5117-3]; *In re Leslie Controls, Inc.*, Case No. 10-12199 (CSS) (Bankr. D. Del. Aug. 12, 2010) [Docket No. 172-3].

(4)    <u>Liability Defenses</u>

26.    The Certain Insurers, the Cyprus Historical Excess Insurers, and the U.S. Trustee also argue that the Original TDP does not take into account the Debtors' liability defenses. (Docket No. 2270 at pp. 9-12; Docket No. 2278 at pp. 10-12; Docket No. 2279 at ¶¶ 18-19.) To the contrary, the scheduled values included in the Original TDP are based on a number of factors, including settlement values for Talc Personal Injury Claims that were resolved prior to the Petition Date and, as such, by definition take into account the attendant litigation risks and the Debtors' asserted defenses. In any event, any criticism of the settlement values contained in the Original TDP (or the Amended TDP) should be left for resolution in connection with confirmation of the Plan.

27.    Thus, with the Debtors' September 10, 2020 filing, including the Original TDP and the Trust Agreement, more than adequate information exists regarding the operation, procedures, and administration of the Talc Personal Injury Trust. To the extent the Objections instead raise concerns with respect to the substance of the Original TDP, interested parties will have a sufficient opportunity to raise those issues with the Court at the Confirmation Hearing. This Court need not pre-judge plan objections at this stage in the plan process. Without a doubt, the Trust Agreement and the Original TDP (as supplemented by the Amended TDP) are sufficiently robust and descriptive to assist the average talc claimant voting on the Plan. Indeed, substantially similar plan documents have been approved by other courts for both solicitation and confirmation purposes in

other mass tort cases.  *See, e.g., In re Maremont Corp.*, Case No. 19-10118 (KJC) (Bankr. D. Del. March 12, 2019) [Docket Nos. 136, 241-1]; *In re Duro Dyne Nat'l Corp.*, Case No. 18-27963 (MBK) (Bankr. D. N.J. Nov. 16, 2018) [Docket Nos. 279-1, 279-6, 1295-4]; *In re Yarway Corp.*, Case No. 13-11025 (BLS) (Bankr. D. Del. Apr. 8, 2015) [Docket Nos. 859-1, 859-3]; *In re Flinktote Co.*, Case No. 04-11300 (MFW) (Bankr. D. Del. Feb. 9, 2015) [Docket Nos. 8708, 8709]; *In re United Gilsonite Labs*, Case No. 5:11-bk-02032 (RNO) (Bankr. M.D. Penn. Nov. 14, 2014) [Docket Nos. 2098-5, 2098-6]*; In re Specialty Prods. Holding Corp.*, Case No. 10-11780 (PJW) (Bankr. D. Del. Oct. 23, 2014) [Docket Nos. 5117-1, 5117-3].

> c.  *The Debtors have Filed Financial Projections and Intend to File Additional Information as Part of the Plan Supplement*

28.  The U.S. Trustee also objects that the Original Disclosure Statement did not include the Debtors' financial projections.  (Docket No. 1911 at ¶¶ 9, 27.)  However, financial projections for the Debtors and for Imerys Talc Italy S.P.A. ("**ITI**") were attached to the First Amended Disclosure Statement (First Amended Disclosure Statement, Exs. B-C) filed on August 12, 2020, and updated financial projections were attached to the Disclosure Statement (Disclosure Statement, Exs. B-C) filed on October 5, 2020.

29.  Certain other documents, including (a) the list of Executory Contracts and Unexpired Leases to be assumed by the North American Debtors, together with the Cure Amount for each such contract or lease; (b) the list of Executory Contracts and Unexpired Leases to be assumed by ITI, together with the Cure Amount for each such contract or lease; (c) the list of the Executory Contracts and Unexpired Leases to be rejected by ITI; (d) the list of the Settling Talc Insurance Companies; (e) the list of the North American Debtor Causes of Action; (f) the list of the ITI Causes of Action; (g) the list of the Contributed Indemnity and Insurance Interests; (h) the Cooperation Agreement; (i) the Amended Charter Documents; (j) the list of officers and directors

of the Reorganized North American Debtors; (k) the Talc PI Note; (l) the Talc PI Pledge Agreement; (m) the identity of the initial Talc Trustees; (n) the list of the initial members of the Talc Trust Advisory Committee; (o) a list of the Talc Insurance Policies; and (p) the Rio Tinto/Zurich Settlement Agreement, will be filed as part of the Plan Supplement.  It is not uncommon for these and similar documents to be filed after the disclosure statement hearing and after the solicitation period begins.  Under the revised schedule set forth in the Solicitation Procedures, voters will have three full weeks between the filing deadline for the Plan Supplement on October 30, 2020, and the Voting Deadline of November 20, 2020, which allows the voting class more than sufficient time to review and consider these additional documents.

> **2.      The Debtors Have Adequately Described the Trust Assets, Including Indemnification and Insurance Rights**

30.      The Plan and Disclosure Statement contain extensive explanations of the nature of the Talc Personal Injury Assets.  For example, Section 1.1.196 of the Plan defines "Talc Personal Injury Trust Assets" as:

> The following assets and any income, profits, and proceeds derived from such assets subsequent to the transfer of such assets to the Talc Personal Injury Trust: (a) the Imerys Settlement Funds; (b) the right to receive the Rio Tinto/Zurich Contribution pursuant to the Rio Tinto/Zurich Settlement; (c) all Cash held by the North American Debtors as of the Effective Date, not including the Cash used to fund the Reserves; (d) all non-Cash assets included in the Imerys Contribution, including the Contributed Indemnity and Insurance Interests; (e) the Talc Personal Injury Trust Causes of

Action[11] and any and all proceeds thereof; (f) the Talc Insurance Actions;[12] (g) the Talc Insurance Action Recoveries; (h) the rights of the Debtors with respect to Talc Insurance Policies, Talc Insurance CIP Agreements, Talc Insurance Settlement Agreements, and Claims thereunder; (i) the Reorganized North American Debtor Stock; (j) all Cash remaining in the Reserves, if any, to be distributed to the Talc Personal Injury Trust in accordance with the Plan . . . (k) any and all other funds, proceeds, or other consideration otherwise contributed to the Talc Personal Injury Trust pursuant to the Plan and/or the Confirmation Order or other order of the Bankruptcy Court; (l) the rights of the Debtors with respect to the J&J Indemnification Obligations; and (m) the income or earnings realized or received in respect to items (a) to (l) above.

(Plan at § 1.1.196.)  Moreover, the Disclosure Statement contains more specific information regarding the categories of assets that fall within the definition of Talc Personal Injury Trust Assets.  (Disclosure Statement at §§ 2.1(d) (describing fourteen categories of Talc Personal Injury

---

[11]     Talc Personal Injury Trust Causes of Action are defined in the Plan as: "any Estate Cause of Action, not otherwise expressly released pursuant to the Plan, attributable to: (a) all defenses to any Talc Personal Injury Claim, including, but not limited to, all defenses under section 502 of the Bankruptcy Code, (b) with respect to any Talc Personal Injury Claim, all rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted, (c) any other claims or rights with respect to Talc Personal Injury Claims that the Debtors would have had under applicable law if the Chapter 11 Cases had not occurred and the holder of such Talc Personal Injury Claim had asserted it by initiating civil litigation against any such Debtor, and (d) any claim, cause of action, or right of the Debtors or any one of them, under the laws of any jurisdiction, for reimbursement, indemnity, contribution, breach of contract, or otherwise arising from or relating to any payments made by the Debtors on account of Talc Personal Injury Claims prior to the Petition Date."  (Plan at § 1.1.197.)

[12]     Talc Insurance Action is defined in the Plan to mean: "any claim, cause of action, or right of the Debtors, or any one of them, under the laws of any jurisdiction, against any Talc Insurance Company with respect to any Talc Personal Injury Claim, arising from or related to: (a) any such Talc Insurance Company's failure to provide coverage or otherwise pay under Talc In-Place Insurance Coverage, (b) the refusal of any Talc Insurance Company to compromise and settle any Talc Personal Injury Claim under or pursuant to any Talc Insurance Policy, or Talc Insurance CIP Agreement, (c) the interpretation or enforcement of the terms of any Talc Insurance Policy or Talc Insurance CIP Agreement with respect to any Talc Personal Injury Claim, (d) any conduct by a Talc Insurance Company constituting "bad faith," conduct that could give rise to extra-contractual damages, or other wrongful conduct under applicable law, or (e) any other claims under, arising out of or relating to a Talc Insurance Policy, a Talc Insurance CIP Agreement, or Talc In-Place Insurance Coverage, including, but not limited, to the lawsuit styled as *Columbia Casualty Company, et al. v. Cyprus Mines Corporation, et al.*, Case No. CGC-17-560919, Superior Court of the State of California, County of San Francisco, and the lawsuit styled as *Imerys Talc America, Inc. et al. v. Cyprus Amax Minerals Company et al.*, Adv. Pro. No. 19-50115 (LSS), U.S. Bankruptcy Court for the District of Delaware."  (Plan at § 1.1.185.)

Trust Assets); 3.1(d) (discussing North American Debtors' current assets).)  To the extent the Debtors have estimated the value of any of the Talc Personal Injury Trust Assets, such estimations have been included in the Disclosure Statement.  Likewise, the Disclosure Statement describes any defenses that the Debtors are aware of with respect any particular Talc Personal Injury Trust Assets.  However, the value of many of these assets are not easily capable of estimation or may be subject to certain defenses of which the Debtors are not yet aware with respect to any causes of action and/or insurance rights that have not yet been asserted by the Debtors and/or thoroughly analyzed.  Despite the plethora of information provided regarding the Talc Personal Injury Trust Assets, several Objectors argue that the discussion of these assets is deficient with respect to J&J's indemnification obligations, the Debtors' insurance policies and rights, and Imerys S.A.'s indemnification rights.  (*See, e.g.,* Docket No. 1847 at ¶¶ 25-26; Docket No. 1866 at ¶¶ 35-38; Docket No. 1878 at ¶¶ 24-27.)  However, as explained below, the Disclosure Statement, particularly as supplemented, provides more than adequate information regarding each of these assets.

a.  *J&J's Indemnification Obligations*

31.  Various Objectors assert that the Disclosure Statement does not contain sufficient information regarding J&J's indemnification obligations to the Debtors, including J&J's position with respect to such obligations, the parties' attempts to resolve ongoing disputes surrounding the indemnification obligations, and the treatment of J&J's indemnification obligations under the Plan. (Docket No. 1847 at ¶¶ 25-26; Docket No. 1869 at ¶¶ 18-19; Docket No. 1871 at ¶¶ 1-3;  Docket No. 1878 at ¶¶ 23-27, 30-36; Docket No. 1894 at pp. 7-11; Docket No. 1908 at ¶ 3.)  However, the Disclosure Statement—which now captures a number of developments regarding the J&J indemnification obligations that have occurred over the past four months—provides adequate information regarding J&J's indemnification obligations.

27

32.     As an initial matter, the Disclosure Statement lays out both the Debtors' and J&J's general positions with respect to J&J's indemnification obligations.  For example, the Disclosure Statement explains the Debtors' position that J&J owes indemnification obligations to the Debtors and identifies the contracts that form the basis of those obligations.  (Disclosure Statement at § 4.2(b)(1).)  In addition, the Disclosure Statement makes clear that J&J contests the scope of its indemnification obligations to the Debtors.  (*Id.* ("J&J has acknowledged that indemnification obligations exist, but it has contested the scope of its obligations to the Debtors . . .").)

33.     In addition, the Debtors revised the Disclosure Statement to include further disclosures regarding J&J's indemnification obligations.  For example, several Objectors, including J&J itself, asserted that the Disclosure Statement does not adequately disclose J&J's position with respect to the scope of its indemnification obligations.  (Docket No. 1866 at ¶ 38; Docket No. 1878 at ¶¶ 24-27.)  The Debtors added several additional disclosures clarifying J&J's stance to the Disclosure Statement in response to these Objections.  First, the Debtors added new language to make clear that J&J disputes the existence and extent of its indemnification obligations.  (*See, e.g.,* Disclosure Statement at § 3.1(d)(3) ("J&J has historically disputed the existence and extent of any indemnity obligations owed to the Debtors or the Imerys Non-Debtors, and has disputed that the North American Debtors have any rights to the proceeds of insurance policies issued to J&J.").)  Moreover, the following paragraph was added to describe J&J's position with respect to its indemnification obligations:

> J&J has previously disputed that the indemnification obligations arising out of these agreements in favor of the Debtors are uncapped or that they relate to future claimants.  J&J has also previously disputed that it has any indemnification obligations under the 1989 Supply Agreement to the extent any Talc Personal Injury Claims allege exposure to talc used by J&J that did not conform to J&J's specifications, and has contended that certain periods of time are not covered by any supply agreement between the Debtors and J&J.

(Disclosure Statement at § 4.2(b)(1).)  Accordingly, the Disclosure Statement makes clear that J&J

has (at least previously) contested, on various grounds, its indemnity obligations to the Debtors.

34.    In addition, several Objectors assert that the Disclosure Statement lacks a sufficient

discussion of J&J's proposals regarding its indemnity obligations, the status of settlement

negotiations between the Debtors and J&J, how a settlement might impact creditors, and/or the

Plan's ultimate treatment of J&J's indemnification obligations.  (Docket No. 1866 at ¶ 37; Docket

No. 1869 at ¶ 19.)  Moreover, the Cyprus Historical Excess Insurers object that the Debtors should

"disclose the reasons that they have sought to block Johnson & Johnson from assuming the

defense" of the J&J Talc Claims.[13]  (Docket No. 1894 at p. 9.)  Both categories of objections have

---

[13]    The Cyprus Historical Excess Insurers' Objection misconstrues the Debtors' position with respect to the J&J Stay Motion, which has never been that J&J should ignore or abandon its indemnification obligations or that J&J should not assume the defense of J&J Talc Claims against the Debtors.  Rather, in opposing the J&J Stay Motion, the Debtors sought to make clear that (i) a motion to modify the automatic stay was an improper procedural mechanism for the relief that J&J seeks (*i.e.*, the J&J Stay Motion was essentially a one-sided, forced settlement through which J&J was attempting to amend its existing indemnification obligations and to require the Debtors to release J&J from any past indemnification obligations, which are otherwise valuable assets of the Debtors' Estates), with which the Court agreed in denying the J&J Stay Motion, and (ii) J&J should not be allowed to unilaterally dictate the conditions of the fulfillment of its indemnification obligations to the Debtors.  As described in the Disclosure Statement, the TCC and the FCR, with the support of the Debtors, subsequently proposed changes to J&J's Talc Litigation Protocol (*see* Docket Nos. 1976, 1978) that would have permitted J&J to comply with its indemnification obligations in a manner that is in the best interest of all stakeholders and resolves many of the flaws the Debtors and the TCC raised in opposing the J&J Stay Motion (*see* Docket Nos. 1731, 1732).

Similarly, other Objections improperly assert that the Disclosure Statement must include a "warning" that the Debtors' objection to the J&J Stay Motion may constitute a waiver of J&J's indemnification obligations (*see* Docket No. 1865 at pp. 2, 8-11; Docket No. 1894 at pp. 10-11; Docket No. 2270 at pp. 12-15; Docket No. 2270 at pp. 13-15; Docket No. 2278 at pp. 15-23).  No actions taken by the Debtors have been unreasonable or could be determined to result in the waiver of J&J's extensive obligations to the Debtors.  Instead, the Debtors continue to engage in good faith negotiations with J&J with respect to such obligations.  The Debtors' refusal to accept J&J's deeply flawed proposal—even though it also presented benefits—cannot be viewed as a breach of any obligations that the Debtors may have to J&J (or any of the Debtors' insurers).  This is particularly true given that the J&J Stay Motion was not procedurally proper and because J&J's proposal could have had detrimental effects on the Debtors' stakeholders.  In sum, it would be misleading and confusing to voters to include in the Disclosure Statement the language demanded by the Certain Insurers and the Cyprus Historical Excess Insurers to the effect that the Debtors have somehow waived both their indemnification rights and their rights to any insurance proceeds as the result of the Court's denial of J&J's faulty stay relief motion.

been resolved by the Debtors' modifications to the Plan and the addition of additional disclosures in the Disclosure Statement that describe the J&J Stay Motion and the deficiencies which ultimately led the Court to enter an order denying the relief requested by J&J on September 25, 2020.[14]

35.     As the result of the Court's ruling, the Plan and Disclosure Statement now provide that all of J&J indemnification rights and obligations with respect to the Debtors that are not resolved prior to the Effective Date will be transferred to the Talc Personal Injury Trust for resolution post-Effective Date.  (Disclosure Statement at § 2.1(d); Plan at §§ 1.1.196, 4.6.)  Once any disputes with J&J are resolved, which could take a substantial amount of time, the Talc Trustees will implement the outcome pursuant to the Trust Agreement and the Original TDP (as supplemented by the Amended TDP).  Ultimately, the holders of Talc Personal Injury Claims will likely either have the ability to assert claims against the Debtors in the tort system to be defended by J&J or to assert claims directly against the Talc Personal Injury Trust (if J&J is determined to have indemnification defenses)—but the outcome of this dispute should not affect how the holders of Talc Personal Injury Claims vote because rejecting the Plan will not make it more or less likely that J&J will ultimately be held responsible for its indemnification obligations by this Court or another court of competent jurisdiction.  In any event, the resolution of the dispute with J&J need not hold up the Debtors' plan confirmation process any longer.

36.     Thus, overall, the Plan and Disclosure Statement adequately describe J&J's position in these proceedings.  Sections 4.2(b) and 7.7(e) of the Disclosure Statement accurately

---

[14]     In its Objection, Cyprus asserts that the implication of J&J's indemnity obligations is that there is "no need to impair [] Talc Personal Injury Claims[.]"  (Docket No. 1869 at ¶ 18.)  However, no path forward with respect to the resolution of J&J's indemnification obligations has been suggested that is acceptable to the Debtors or the Court.

describe J&J's involvement in the Chapter 11 Cases, the J&J Stay Motion, the Debtors' response thereto, and the Plan's preservation of J&J's indemnification obligations and rights.  However, as there has not yet been any resolution with respect to J&J's indemnification obligations to the Debtors, the Debtors are unable to provide any additional information with respect thereto.[15] Accordingly, the Disclosure Statement includes the best information currently available to the Debtors with respect to J&J, the J&J Stay Motion, and the protocols that may govern the treatment of J&J's indemnification obligations given the Court's denial of the J&J Stay Motion.[16]

37.    In addition, it is disingenuous for J&J to steadfastly refuse to assume its indemnification obligations to the Debtors (without insisting on imposing significant burdens on the Debtors and the Talc Personal Injury Trust), while complaining that the Disclosure Statement does not adequately describe J&J's treatment under the Plan.  (*See* Docket No. 1878 at ¶¶ 23-27.) Similarly, J&J's demand that the Disclosure Statement include both (a) a statement that J&J strongly disputes its indemnification obligations to the Debtors and a description of each of J&J's purported defenses thereto (none of which the Debtors believe have any merit) and (b) a thorough description of the relief that it sought in the J&J Stay Motion, which has now been denied by the Court, is equally disingenuous (and would likely be very confusing to voting creditors); it also

---

[15]    J&J requests that its specific version of the history of the parties' negotiations be included in the Disclosure Statement.  (*See* Docket No. 1878 at ¶ 33.)  The Debtors, however, have not included J&J's proposed addition, as it is unnecessary and potentially confusing and/or misleading.  J&J's proposed language presents an incomplete history and excludes any mention of the numerous times that J&J ignored the Debtors' indemnification requests prior to the Petition Date.  Moreover, the addition proposed by J&J would not be helpful to an average claimant assessing the propriety of the Plan and would likely only create confusion as to how J&J's indemnification obligations will be handled.  The Debtors need not provide every scintilla of information regarding their interactions with J&J, only adequate information—which the Debtors have achieved and surpassed.

[16]    J&J objects that the Original Disclosure Statement failed "to explain the numerous benefits to the estates and creditors that the J&J Stay Motion offers."  (Docket No. 1878 at ¶ 6.)  In light of the Court's denial of the J&J Stay Motion, it is difficult to see how such information would assist, and not confuse, the average voter.

31

makes it extremely difficult for the Debtors to place a value on J&J's indemnification obligations to the Debtors, as certain of the Objectors have demanded. Given J&J's actions to date, the Disclosure Statement accurately and appropriately describes the state of play with respect to J&J, its defenses, indemnity obligations, and related proposals.[17]

38. Finally, the Objections of J&J, the Certain Insurers, the U.S. Trustee and the Cyprus Historical Excess Insurers that the Plan and TDP are improperly based on a non-existant "J&J Protocol Order" have been mooted by the Debtors' October 5, 2020 filing of the Plan and Disclosure Statement. (Docket No. 2258 at ¶ 6; Docket No. 2270 at pp. 2, 12-19; Docket No. 2278 at pp. 4, 23-28; Docket No. 2279 at ¶¶ 1, 13, 49; Docket No. 2282 at ¶¶ 7-10.) Specifically, following the Court's denial of the J&J Stay Motion, the Plan Proponents worked to remove references to a purported resolution of said motion and, instead, to provide for a preservation of J&J's rights and obligations in the amended documents.

39. In sum, the Disclosure Statement, as supplemented, provides more than adequate information regarding the indemnification obligations owed by J&J to the Debtors and how those obligations will be treated under the Plan.

        b.    *The Debtors' Insurance*

40. The Disclosure Statement describes, at length, the Debtors' insurance policies and rights. Specifically, the Disclosure Statement contains over three pages describing the Debtors' talc-related insurance rights and the current status of such rights. (Disclosure Statement at §§ 3.1(d)(3); 4.2(a).) Among other things, the Disclosure Statement contains known information

---

[17] The Debtors disagree with the objection of the Ad Hoc Committee that a future settlement with J&J would necessarily require resolicitation of votes on the Plan. (*See* Docket No. 1866 at ¶ 37.) In any event, the mere possibility of a potential settlement in the future should not prevent the Debtors from proceeding with soliciting votes on the Plan now.

about such insurance rights, including dates of the relevant policies, aggregate limits, the amount of claims made against such policies, and any exclusions to such policies.[18] (*Id.*) Further, the Plan and Disclosure Statement describe how the Debtors' insurance assets will be transferred to the Talc Personal Injury Trust, which will be responsible for prosecuting insurance claims standing in the shoes of the Debtors. (Plan at § 4.6; Disclosure Statement at § 2.1(d).)

41.    The Disclosure Statement also describes, in detail, ongoing and resolved disputes involving the Debtor's insurance rights. (Disclosure Statement at § 5.7.) For example, Section 5.7(a) provides background on the Debtors' ongoing dispute with Cyprus (referred to as the "Cyprus Insurance Adversary Proceeding"), which concerns whether Cyprus retains any rights to the proceeds of, or any right to assert claims under, the Cyprus Historical Policies. (*Id.*) As described in the Disclosure Statement, the Debtors contend that such policies are a part of the Debtors' Estates pursuant to an Agreement of Transfer and Assumption, dated June 5, 1992, and that "Cyprus no longer has any rights to the proceeds of, or to pursue claims under, the Cyprus Historical Policies . . .." (*Id.*)

42.    Similarly, Section 5.7(c) provides details of the outcome of the Debtors' mediation with Rio Tinto and Zurich and incorporates a summary of the settlement reached among the Debtors, Rio Tinto, Zurich, and other interested parties, including the $340 million cash contribution to be made to the Talc Personal Injury Trust. (*Id.* at §§ 5.7(c); 7.6(i).) The Disclosure Statement also explains that the Debtors intend to engage in mediation with XL Insurance America, Inc. ("**XL**"). (*Id.* at § 4.2(a)(1).)

---

[18]    Many of the insurance policies that the Debtors have asserted rights under were not originally issued to the Debtors. As a result, the Debtors do not necessarily have full information with respect to such policies, including remaining limits and potential defenses.

43.    In addition, the Disclosure Statement dedicates several pages to a discussion of the California Coverage Action, a lawsuit brought by certain insurers against Cyprus seeking to determine which among various entities possesses rights to the Cyprus Historical Policies.  (*Id.* at § 5.7(d).)  As stated in the Disclosure Statement, the California Coverage Action has been stayed pending the resolution of these Chapter 11 Cases.  (*Id.*; *see also* Docket No. 762.)

44.    Further, the Debtors have also added additional disclosures regarding their insurance rights in response to certain Objections.  (*See* Docket No. 1847 at ¶ 25; Docket No. 1878 at ¶¶ 44-45.)  For example, in response to Arnold & Itkin's Objection, the Disclosure Statement discusses the Debtors' review of the available Talc Insurance Policies, and their conclusions that (i) the Debtors are entitled to coverage, and (ii) the relevant insurers are solvent and able to pay covered claims.  (Disclosure Statement at § 4.2(a).)  Similarly, the Disclosure Statement discusses the fact that several insurers have asserted coverage defenses, but that the Debtors have evaluated such defenses and believe that they "do not preclude insurance coverage, but may impact the scope of available coverage on a claim by claim basis."  (*Id.*)

45.    Moreover, the Debtors have incorporated additional language in the Disclosure Statement to resolve J&J's Objections.  (Docket No. 1878 at ¶ 45.)  For example, to address J&J's assertion that it is an "additional insured under the Zurich Policies," the Debtors added a footnote reflecting J&J's contention.  (Disclosure Statement at § 4.2(a)(1) n.34.)  Further, the Debtors revised Section 4.2(b) of the Disclosure Statement to reflect that "J&J disputes that the Debtors or

RLF1 24099484v.1

any third parties are entitled to the proceeds of any insurance from various insurance policies issued to J&J." (Disclosure Statement at § 4.2(b)(1).)[19]

46.    In sum, the Disclosure Statement provides eligible voters with more than sufficient information to assess the Debtors' insurance assets.

c.    *Imerys S.A.'s Indemnification Rights*

47.    J&J asserts an Objection based on the fact that the Original Plan was unclear as to whether Imerys S.A.'s indemnification rights would be contributed to the Trust. (Docket No. 1878 at ¶ 46.) Section 10.8.2.3 of the Plan currently provides as follows: "the Imerys Non-Debtors have agreed to contribute, or cause to be contributed . . . all rights against third parties held by the Imerys Non-Debtors relating to Talc Personal Injury Claims, [and] any related indemnification rights, including, but not limited to, the J&J Indemnification Obligations[.]" (Plan at § 10.8.2.3.) "Imerys Non-Debtors" means "Imerys S.A. and its Affiliates, excluding the Debtors." (*Id.* at § 1.1.85). As such, it is clear that Imerys S.A. is included in the entities contributing indemnification rights to the Talc Personal Injury Trust.[20]

**3.    The Debtors Adequately Describe the Imerys Settlement**

48.    The Disclosure Statement includes adequate information regarding the Imerys Settlement. The Disclosure Statement explains the Imerys Settlement at length and includes descriptions of the key provisions of the settlement as well as a summary of the Imerys

---

[19]    Certain Objectors, including J&J and the Cyprus Historical Excess Insurers, objected that the Debtors should specifically identify the Talc Insurance Policies. (Docket No. 1878 at ¶ 45; Docket No. 1894 at p. 3.) While the nature and aggregate limits of the Debtors are germane to consideration of the Plan by an average creditor, the identification of specific insurance agreements is not. Nevertheless, as discussed above, a list of the Talc Insurance Policies will be included as part of the Plan Supplement.

[20]    J&J also objects to the extent the Plan and Disclosure statement do not provide sufficient information concerning "Imerys S.A.'s indemnification rights [and] where they come from." (Docket No. 1878 at ¶ 46.) The Debtors are not aware of any such indemnification rights, but, to the extent the Debtors become aware of any such rights, they will identify them.

Contribution that Imerys S.A. committed to make in exchange for releases and the channeling injunction. (Disclosure Statement at §§ 2.1(b); 6.1.) Moreover, the Disclosure Statement provides detailed information regarding each component of the Imerys Contribution (*i.e.*, the Imerys Settlement Funds, the Imerys Cash Contribution, the Talc Trust Contribution, and the Additional Contribution). (*Id.*)

49.     Beyond this overview of the Imerys Settlement and the associated Imerys Contribution, the Disclosure Statement provides further information regarding the nature of the Imerys Settlement and the types of potential claims against the Imerys Protected Parties that are being released. For instance, the Disclosure Statement makes clear that the TCC and the FCR have "agreed to release their claims against the Imerys Non-Debtors, including those premised on certain theories of liability including, inter alia, piercing the corporate veil, alter ego, conspiracy, or successor liability." (Disclosure Statement at § 6.1(a).) The Disclosure Statement also provides information regarding the merits of these claims, explaining that, "[t]o date, no court has upheld a claim against any Imerys Non-Debtor on these theories of liability, and the only court to substantively review these issues rejected these claims." (*Id.*) In sum, the Disclosure Statement, as supplemented, provides adequate information regarding the scope of the Imerys Settlement, the claims at issue, and compensation flowing from the settlement.

50.     To the extent several Objectors point to the Disclosure Statement's purported lack of a discussion of the factors courts consider when *approving a settlement*, such concerns are premature and misplaced. (Docket No. 1847 at ¶¶ 19-21; Docket No. 1866 at ¶ 38.) The decision before the court is not whether to approve the Imerys Settlement, but rather whether the Debtors have provided adequate information regarding the Imerys Settlement to provide voting parties with sufficient information to be able to submit such votes. Indeed, none of the cases cited by the

Objectors in support of their claim that the Disclosure Statement must discuss the settlement factors relates to a motion to approve a disclosure statement. *See In re RFE Indus., Inc.*, 283 F.3d 159, 165 (3d Cir. 2002) (reversing and remanding decision to disapprove settlement in context of a bankruptcy case in which the court dismissed the case but retained jurisdiction to approve a settlement between trustee and third party); *In re Exide Techs.*, 303 B.R. 48, 67-71 (Bankr. D. Del. 2003) (denying approval of debtor's settlement of adversary proceeding in context of motion to confirm reorganization plan); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 953 (Bankr. S.D.N.Y. 1994) (approving settlement in context of competing motions to confirm two different plans); *In re Texaco Inc.*, 84 B.R. 893, 902-03 (Bankr. S.D.N.Y. 1988) (approving settlement in context of confirming plan of reorganization).

51.     To the contrary, courts typically reserve the determination of whether a settlement should be approved for plan confirmation. *See, e.g.*, *In re Maremont Corp.*, 601 B.R. 1, 16 (Bankr. D. Del. 2019); *see also In re Best Products Co., Inc.*, 177 B.R. 791, 794 n. 4 (S.D.N.Y. 1995) ("The Settlement was appropriately approved in conjunction with the confirmation hearing"); *In re Montreal Maine & Atlantic Railway, Ltd.*, Bk. No. 13-10670 (PGC), 2015 WL 7431192 (Bankr. D. Me. Oct. 9, 2015) (approving settlements in conjunction with the debtor's plan of reorganization). The Objectors' demand that the settlement approval factors be discussed and considered now constitutes a premature confirmation objection, which will be addressed at the appropriate time.

### 4.     The Disclosure Statement and Plan Adequately Describe the Treatment of Insurers

52.     The Cyprus Historical Excess Insurers argue that the Disclosure Statement does not adequately describe the treatment of insurers.  (Docket No. 2278 at pp. 12-14.)  However, the

Disclosure Statement and Plan contain common and robust "insurance neutrality" language, as follows:

> Except as provided in the Rio Tinto/Zurich Settlement and any Talc Insurance Settlement Agreement, nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any Talc Insurance Company, or (b) any rights or obligations of the Debtors arising out of or under any Talc Insurance Policy. For all issues relating to insurance coverage allegedly provided by the Zurich Corporate Parties or the Rio Tinto Captive Insurers, the provisions, terms, conditions, and limitations of the Rio Tinto/Zurich Settlement shall control. For all other issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Talc Insurance Policies or applicable Talc Insurance CIP Agreements or Talc Insurance Settlement Agreements shall control. For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or the Confirmation Order shall operate to require any Talc Insurance Company to indemnify or pay the liability of any Protected Party that it would not have been required to pay in the absence of the Plan.

(Plan at § 11.4.1.1; *see also* Disclosure Statement at § 7.7(d).)

53.     Similar neutrality language has been approved in numerous other mass tort bankruptcy cases. *See In re Combustion Engineering, Inc.*, 391 F.3d 190, 209, 216 (3d Cir. 2004) (finding that substantially similar language "broadly preserves insurers' pre-petition rights under the subject insurance policies"); *see also In re Garlock Sealing Tech., LLC*, Case No. 10-BK-31607 (Bankr. W.D.N.C. May 14, 2017) [Docket No. 5951-1]; *In re Flintkote Co.*, Case No. 04-11300 (JKF) (Bankr. D. Del. Feb. 9, 2015) [Docket No. 8706]; *In re Metex Mfg. Corp.*, Case No. 12-14554 (BRL) (Bankr. S.D.N.Y. Dec. 23, 2013) [Docket No. 363]. Thus, the Disclosure Statement adequately describes the treatment of the Debtors' various insurance policies and rights.

### 5.     The Liquidation Analysis Provides Creditors with Adequate Information Regarding Potential Creditor Recoveries in a Hypothetical Liquidation

54.     The purpose of a liquidation analysis is to allow creditors to compare what they will receive from a chapter 11 plan against their potential recovery from a chapter 7 liquidation.

38

*See In re Abeinsa Holding, Inc.*, 562 B.R. 265, 275-766 (Bankr. D. Del. 2016); *In re Diversified Investors Fund XVII*, 91 B.R. 559, 561 (Bankr. C.D. Cal. 1988) ("[T]he disclosure statement must contain a liquidation analysis which compares the proposed plan of reorganization with a Chapter 7 liquidation."). The Debtors' liquidation analysis does just that.

55. As the original liquidation analysis concluded: "[T]he Plan will provide all holders of Claims and Equity Interests with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code[.]" (Original Disclosure Statement, Ex. C at 4.) Moreover, the Debtors filed an amended liquidation analysis, which incorporates additional details and analysis demonstrating that creditors will be at least as well off under the Plan as compared to a liquidation. (Disclosure Statement, Ex. D ("**Amended Liquidation Analysis**").) Specifically, the Amended Liquidation Analysis explains:

> Under the proposed Plan, holders of Unsecured Claims would be paid in full, and the Talc Personal Injury Trust would receive contributions of at least (i) $75 million and a further amount of up to $102.5 million subject to a reduction mechanism proportionate to the Sale Proceeds from the Imerys Non-Debtors pursuant to the Imerys Settlement (subject to the Contingent Contribution and certain setoffs described in the Plan)[21] and (ii) $340 million pursuant to the Rio Tinto/Zurich Settlement. In a liquidation under chapter 7 of the Bankruptcy Code, there is no guarantee that any of the funds to be paid pursuant to the Imerys Settlement and the Rio Tinto/Zurich Settlement would be available for distribution to holders of Talc Personal Injury Claims.

---

[21]    In addition, pursuant to the Imerys Settlement, the Imerys Non-Debtors will contribute (i) $5 million for the payment of Allowed Claims in Class 3 against the North American Debtors, and (b) $14.1 million, which represents the balance of the Intercompany Loans, to fund administrative expenses during the pendency of the Chapter 11 Cases. (Disclosure Statement at § 2.1(b).)

(*Id*. at 144-45.)  In addition, to provide further information to assist creditors in assessing the Plan, the Amended Liquidation Analysis contains "Low," "MidPoint," and "High" recovery estimates for all creditor classes in a liquidation scenario.  (*Id.* at 147.)

56.     Finally, to address the concerns of certain Objectors (*see* Docket No. 1847 at ¶¶ 22-24; Docket No 1878 at ¶¶ 61-66), the Amended Liquidation Analysis makes its analytical assumptions clear.   For instance, the Debtors disclose that they do not expect insurance or indemnification recoveries (including with respect to J&J's indemnification obligations) to be higher in a chapter 7 liquidation as compared to the Plan.  (Amended Liquidation Analysis at 143.) Similarly, the Amended Liquidation Analysis explains that it does not "include recoveries potentially attributable to claims that are being settled under the Plan (*e.g*., claims against Imerys S.A. or Rio Tinto and Zurich)" because "the value attributable to such claims will be less in the context of a chapter 7 liquidation given that (i) any recoveries on such claims will be offset by substantial legal costs associated with prosecuting the claims and (ii) the settling parties would not be entitled to the same injunctions and releases in the context of a chapter 7 liquidation."  (*Id.* at 143.)[22]   In sum, the Amended Liquidation Analysis contains sufficient information to allow

---

[22]     J&J and the Cyprus Historical Excess Insurers assert that the Liquidation Analysis does not evaluate other options available to the Debtors.  (Docket No. 1878 at 19-20 ("Liquidation Analysis does not consider or evaluate options available to the Debtors and to the holders of Talc Personal Injury Claims outside of the Plan or the hypothetical appointment by the Bankruptcy Court of a chapter 7 trustee . . ."); *see also* Docket No. 1894 at 9 ("Section 12.1-12.2 of the Disclosure Statement discusses no alternative to the Plan of Reorganization other than liquidation under Chapter 7"); Docket No. 2278 at pp. 16-17.) However, section 1125 explicitly states:  "adequate information need not include such information about any other possible or proposed plan[.]"  11 U.S.C. § 1125(a)(1).  Thus, the Debtors need not evaluate other potential plans as part of their disclosure statement or liquidation analysis.

creditors to assess whether they will be better off under the Plan as compared to their treatment in a potential chapter 7 liquidation.[23]

6.    **The Remaining Disclosure Objections are Either Without Merit or Have Already Been Addressed**

a.    <u>The Debtors Have Adequately Described the Talc Personal Injury Claims</u>

57.    Contrary to the assertions of the Ad Hoc Committee (*see* Docket No. 1866 at ¶ 38), the Disclosure Statement provides adequate information regarding the Talc Personal Injury Claims.  Indeed, the Disclosure Statement spends more than two pages describing the nature and history of the Talc Personal Injury Claims, the general magnitude of such claims (approximately 14,650 pending claims as of the Petition Date), and the different types of such claims (OC Claims and Mesothelioma Claims).  (Disclosure Statement at §§ 2.1, 4.1.)

58.    Nevertheless, the Ad Hoc Committee argues that, despite this significant amount of information, the Disclosure Statement is still inadequate and that, "to the extent that the Trust Distribution Procedures will liquidate such claims, an estimate of the total liquidated amount of the claims should be provided."  (Docket No. 1866 at ¶ 38.)  However, as noted above, the liquidated value of such claims is irrelevant because the Plan does not contemplate full payment

---

[23]    J&J also objects that the Liquidation Analysis does not provide adequate information because the Debtors have stated that they do not have sufficient information to estimate the amount of the Talc Personal Injury Claims and, as a result, did not assign a value to Class 4.  (Docket No. 1878 at ¶ 38.)  However, claimants in Class 4 are the only impaired class receiving any recovery.  Moreover, essentially all remaining assets of the Debtors will be transferred to the Talc Personal Injury Trust for the benefit of these claimants, meaning the Class 4 claimants will receive the remainder of the Debtors' Estates.  As the Amended Liquidation Analysis concludes, the Plan maximizes the remainder of the Debtors' Estates through various settlements that provide a superior recovery to Talc Personal Injury Claimants as compared to a chapter 7 liquidation.  (*See* Amended Liquidation Analysis at 143 ("[T]he Liquidation Analysis does not . . . include recoveries potentially attributable to claims that are being settled under the Plan (*e.g.*, claims against Imerys S.A. or Rio Tinto and Zurich) as the Debtors assume that the value attributable to such claims will be less in the context of a chapter 7 liquidation . . . .").  This conclusion is all that is required of a liquidation analysis, and further discussion of the actual amount and value of the Talc Personal Injury Claims is irrelevant.

41

of the Talc Personal Injury Claims.  Rather, the Plan calls for the channeling of all Talc Personal Injury Claims to the Talc Personal Injury Trust, which shall then resolve such claims in accordance with the Original TDP (as supplemented by the Amended TDP).  (*See, e.g.,* Plan at § 3.3.5.)  In any event, the Original TDP contains adequate information regarding Talc Personal Injury Claim values.  In particular, Section 5.2 lays out the scheduled values (under both an "Expedited Review Process" and "Individual Review Process") of the different types of Direct Talc Personal Injury Claims.  (Original TDP at § 5.2; *see also* Amended TDP.)  As such, although the estimated liquidated value of the Talc Personal Injury Claims in the aggregate is not germane to those who are entitled to vote on the Plan, the Amended Liquidation Analysis, in combination with the Original TDP (and Amended TDP), provide adequate information regarding such claim values to the extent they are currently capable of being estimated.

      b.     <u>The Disclosure Statement Provides Adequate Information Regarding Cyprus' Insurance Policies and Purported Indemnity Rights.</u>

59.     Both Cyprus and the Cyprus Historical Excess Insurers argue that the Disclosure Statement must explain that the Debtors, Cyprus, and the Cyprus Historical Excess Insurers are currently litigating the Debtors' entitlement to the proceeds of certain insurance policies originally issued to Cyprus as well as Cyprus's indemnification rights.  (Docket No. 1869 at ¶¶ 20; Docket No. 1894 at pp. 12-13.)  However, the Disclosure Statement contains more than sufficient information regarding the ongoing disputes between the Debtors, Cyprus, and the Cyprus Historical Excess Insurers.

60.     For instance, in describing the Cyprus Historical Polices, the Disclosure Statement makes clear:  "[T]he North American Debtors are presently litigating their rights to these [insurance] policies in the Cyprus Insurance Adversary Proceeding."  (Disclosure Statement at § 4.2(a)(2).)  Moreover, as mentioned above, the Disclosure Statement contains a thorough

42

description of the Cyprus Adversary Proceeding, including the issue to be decided (*i.e.,* whether Cyprus retained any rights to the proceeds of the Cyprus Historical Policies), the Debtors' position that Cyprus "no longer has any right to the proceeds of . . . the Cyprus Historical Policies with respect to talc-related lawsuits," and the status of the proceeding.  (*Id*. at § 5.7(a).)[24]  Further, the Debtors also describe the Cyprus Historical Excess Insurer's lawsuit against Cyprus, Imerys Talc America, Inc., and others to determine who possesses the rights to the Cyprus Historical Policies (the "**California Coverage Action**").  (*Id.* at § 5.7(d).)  This dispute seeks a determination as to which of various competing entities, including the Debtors, have rights to the Cyprus Historical Policies.  The Debtors contend both that they have the right to seek the proceeds of the policies, and that any amount due thereunder is an asset of the Debtors' Estates.  (*Id.*)  As explained in the Disclosure Statement, the California Coverage Action is stayed pursuant to the Court's order denying the Cyprus Historical Excess Insurers' stay relief motion.  (*Id.*; *see also* Docket No. 762.)  As such, the Disclosure Statement already provides an in-depth description of the various litigation matters relating to Cyprus.

---

[24]     The Debtors have not added Cyprus's proposed language with respect to the Insurance Entity Injunction. (*See* Docket No. 1869 at ¶¶ 21-22; Docket No. 2282 at ¶¶ 19-21.)  In arguing for this language, Cyprus asserts essentially that it is a "co-insured of the Debtors." (*Id.*)  However, as explained above, the Debtors contest Cyprus's rights to the Cyprus Historical Policies, and this is a key issue that has yet to be resolved in the Cyprus Adversary Proceeding.  Similarly, the Debtors have not added Cyprus's proposed language regarding the definition of "Talc Personal Injury Trust Causes of Action," as the proposed revision is confusing and unnecessary given the current structure of the definitions. (Docket No. 1869 at ¶¶ 23-24.)  Specifically, the Plan defines Talc Personal Injury Trust Cause of Action as "any Estate Cause of Action, not otherwise expressly released pursuant to the Plan, attributable to" certain categories of claims and defenses. (Plan at § 1.1.197.)  In turn, "Estate Cause of Action," means "any and all of the actions, claims, rights, remedies, defenses, counterclaims, suits, and causes of action ***owned or held, or assertable by or on behalf of any Debtor or its Estate*** (including, without limitation, claims assertable by the Tort Claimants' Committee or FCR on behalf of any Debtor or its Estate) . . . ." (Plan at § 1.1.69 (emphasis added).)  As such, the definitions of Talc Personal Injury Trust Cause of Action and Estate Cause of Action already exclude claims and rights held by third parties such as Cyprus.  Cyprus's language only serves to add confusion to the already clear definitions.

61.     Moreover, in response to Cyprus's request for further disclosures regarding Cyprus's claim to indemnification rights (*see* Docket No. 1869 at ¶¶ 23-24; Docket No. 2282 at ¶¶ 22-23), the Disclosure Statement provides additional information with respect to Cyprus's claims regarding its asserted rights to indemnification from J&J.  Specifically, the Disclosure Statement includes Section 5.7(b), which describes the additional adversary proceeding that Cyprus filed on June 15, 2020 against the Debtors and J&J, which is set to determine if "Cyprus has any indemnity rights against J&J."  (Disclosure Statement at § 5.7(b).)

62.     Accordingly, the Disclosure Statement adequately explains the current disputes between the Debtors, Cyprus, and the Cyprus Historical Excess Insurers regarding indemnification and insurance obligations.[25]

        c.      The Disclosure Statement Adequately Addresses J&J's Defenses, Setoff
                Rights, and Indemnification Claims against the Debtors

63.     J&J asserts that the Disclosure Statement is inadequate because it does not address J&J's "rights of setoff and recoupment, as well as its defenses against the Debtors' indemnification claims."  (Docket No. 1878 at ¶¶ 40-43.)  In response to this Objection, additional language has been added to the Disclosure Statement as follows:

> J&J has previously disputed that the indemnification obligations arising out of these agreements in favor of the Debtors are uncapped or that they relate to future claimants.  J&J has also previously disputed that it has any indemnification obligations under the 1989 Supply Agreement to the extent any Talc Personal Injury Claims allege exposure to talc used by J&J that did not conform to J&J's specifications, and has contended that certain periods of time are not covered by any supply agreement between the Debtors and J&J.

---

[25]     The Cyprus Historical Excess Insurers argue that the Plan "effectively presumes that the Debtors have rights under the [Cyprus Historical Insurance] policies and that its transfer of those rights is valid and not subject to challenge."  (Docket No. 2278 at pp. 14-15.)  But, as discussed above, the Disclosure Statement makes clear the various ongoing disputes regarding the Cyprus-related insurance policies.

More recently, J&J has acknowledged that indemnification obligations exist, but it has contested the scope of its obligations to the Debtors and has asserted that it has claims against the Debtors for indemnity.

(Disclosure Statement at § 4.2(b)(1).)

64.    The Disclosure Statement also describes the filings associated with the J&J Stay Motion, including the revised order proposed by the TCC and FCR and supported by the Debtors, as well as the Court's order denying the relief sought by J&J in the J&J Stay Motion.  As a result of the denial, the following language has been included in the Plan and Disclosure Statement with respect to J&J's indemnification rights and obligations:

11.5.1   Subject to Section 11.5.5, nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the J&J Indemnification Rights and Obligations.[26] For all issues relating to J&J Indemnification Rights and Obligations, the provisions, terms, conditions, and limitations of any agreements underlying the J&J Indemnification Rights and Obligations shall control.

11.5.2   For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or the Confirmation Order shall operate to require J&J to indemnify or pay the liability of any Debtor or the Reorganized Debtors that it would not have been required to pay in the absence of the Plan.  This

---

[26]    "J&J Indemnification Rights and Obligations" means "(i) the J&J Indemnification Obligations and (ii) any and all indemnification rights of J&J against the Debtors and the other Protected Parties for Talc Personal Injury Claims, if any, *provided, however*, that the J&J Indemnification Rights and Obligations do not include any claim by J&J to indemnification, defense, contribution, or any other right to recovery against any Rio Tinto Protected Party or any Zurich Protected Party, or under any Rio Tinto Captive Insurer Policy or any Zurich Policy, arising out of or relating to any Talc Personal Injury Claim."  (Plan at § 1.1.115.)  "J&J Indemnification Obligations" means  "any and all indemnity rights of the Debtors, the Protected Parties, and the Imerys Non-Debtors against J&J for Talc Personal Injury Claims, including, without limitation, pursuant to: (i) that certain Agreement, between Cyprus Mines Corporation and Johnson & Johnson, dated as of January 6, 1989; (ii) that certain Talc Supply Agreement, between Windsor Minerals Inc. and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc., dated as of January 6, 1989; (iii) that certain Supply Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of April 15, 2001; (iv) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2010; (v) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2011; and/or (vi) any other applicable agreement, order, or law."  (*Id.* at § 1.1.114.)

Section 11.5.2 in no way modifies, alters or limits the rights and/or obligations set forth in Section 11.5.1 above.

11.5.3  Subject to Section 11.5.5, none of (i) the Bankruptcy Court's confirmation of the Plan or approval of the Plan Documents, (ii) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (iii) any estimation or valuation of any Claims, either individually or in the aggregate in the Chapter 11 Cases shall, with respect to J&J, constitute a trial or hearing on the merits or an adjudication or judgment with respect to any Direct Talc Personal Injury Claim against J&J or any J&J Indemnification Rights and Obligations.

(Plan at § 11.5; *see also* Disclosure Statement at § 7.7(e).)

65.    Accordingly, the Disclosure Statement appropriately addresses the Plan's treatment of J&J's asserted defenses to its indemnification obligations to the Debtors.

66.    J&J further asserts that the Disclosure Statement fails to adequately describe J&J's own claims against the Debtors for indemnification.  (*See* Docket No. 1878 at ¶¶ 28-30.)  However, the Disclosure Statement has always made clear that J&J has previously asserted that it has indemnification claims against the Debtors.  (Disclosure Statement at § 4.2(b)(1) ("[J&J] has contested the scope of its obligations to the Debtors and has asserted that it has claims against the Debtors for indemnity.").)  In addition, the Disclosure Statement adds further language explaining that issues relating to the "J&J Indemnification Rights and Obligations" will be governed by the agreements underlying those obligations and the Disclosure Statement and Plan make it clear that, subject to Section 11.5.5 of the Plan, nothing in the Plan or the Confirmation Order will "operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying" J&J's Indemnification Rights and Obligations.  (Disclosure Statement at § 7.7(e); Plan

at § 11.5.1.)[27]  Thus, the Debtors have provided sufficient information regarding J&J's purported indemnification rights against the Debtors.

67.    In sum, the Disclosure Statement provides more than sufficient information to a "typical" creditor regarding J&J's indemnity rights and obligations as originally asserted, and the Plan's proposed preservation of J&J's indemnification rights and obligations.

        d.    <u>The Disclosure Statement Adequately Describes the Role of the TCC and FCR</u>

68.    J&J wrongly asserts that the Disclosure Statement is inadequate because it "fails to describe the scope of the TCC's and the FCR's interests" and their negotiating histories.  (Docket No. 1878 at ¶ 47.)  To the contrary, the Disclosure Statement contains a description of the composition of the TCC, as well as an explanation of who the FCR is and that the FCR is a "legal representative for future talc personal injury claimants in the Chapter 11 Cases."  (Disclosure Statement at § 5.4.)  The Disclosure Statement further explains that the FCR "was appointed by the Bankruptcy Court . . . for the purpose of, among other things, protecting the rights of persons that might subsequently assert Talc Personal Injury Demands . . . ."  (*Id.* at § 7.4(e)(xiv).)  In addition, the Debtors added a sentence to make it clear that the TCC was appointed by the U.S. Trustee to represent the interests of holders of Direct Talc Personal Injury Claims.  (*Id.* at § 5.3.)  The U.S. Trustee did not deem it necessary to separately empanel a committee of holders of Indirect Talc Personal Injury Claims, nor has any argument been made to date in these Chapter 11

---

[27]    Contrary to J&J's suggestion, the Debtors need not include additional information regarding J&J's specific theories regarding the source of J&J's purported indemnification rights against the Debtors. (Docket No. 1878 at ¶¶ 28-30.)  Such specific information regarding J&J's legal arguments is not relevant to a typical creditor evaluating the Plan.  *See*  11 U.S.C. 1125(a)(1); *In re Waterville Timeshare Grp.*, 67 B.R. 412, 413-14 (Bankr. D. N.H. 1986) ("A disclosure statement must be meaningful to be understood, and it must be understood to be effective.  Thus, what lawyers regard as useful information based upon their experience might be meaningless verbiage in the hands of a 'typical' investor") (citing *In re Stanley Hotel Inc.*, 13 B.R. 926, 933 (Bankr. D. Co. 1981).).

Cases that such a committee is warranted.  As is clear from their activity in these Chapter 11 Cases to date, the holders of Indirect Talc Personal Injury Claims are fully capable of adequately representing their own various interests.

69.     Any additional information regarding the TCC, the FCR, and their negotiating histories beyond the aforementioned descriptions is not germane to the decision of whether or not to vote for the Plan.  Indeed, upon the Effective Date of the Plan, the roles and responsibilities of the TCC and the FCR with respect to the Plan will become limited, as they will only be permitted to participate in certain proceedings.  For example, the TCC will be limited to ancillary functions such as objecting to modifications of the Plan or participating in appeals of the Confirmation Order. (Plan at § 11.8.2.)[28]  In addition, pursuant to the Trust Agreement, after the Effective Date, the regular business of the Talc Personal Injury Trust will be conducted by the Talc Trustees, with limited consultation by the Trust Advisory Committee ("**TAC**") and the FCR.  (Trust Agreement at Arts. 2, 5, 6.)  Given the circumscribed role the TCC and the FCR will play in terms of the actual operation of the Plan, the Disclosure Statement provides more than adequate information regarding the TCC and the FCR.

e.      The Disclosure Statement Adequately Describes the Non-Debtor Affiliate Releases

70.     J&J objects that the Disclosure Statement does not adequately describe the "nature of the potential liability of the Imerys Corporate Parties" to be released under the Plan.  (Docket No. 1878 at ¶ 37.)  To the contrary, the Disclosure Statement describes in detail the scope of the releases and the types of liabilities that will be released.  Specifically, Section 7.8(c) states in detail

---

[28]     To increase the clarity of the Disclosure Statement, information was added paralleling the provisions of Section 11.8.2 of the Plan to explain the TCC and the FCR's diminished role following the Effective Date.  (Disclosure Statement at § 7.7(h).)

the types and scope of claims that are being released.  (Disclosure Statement at § 7.8(c).)  It is not clear how describing hypothetical claims (as J&J suggests) would add to the clarity of the already extensive description of the Plan's releases.[29]

### B.    The Confirmation Objections are Premature and Meritless

71.    In an effort to prematurely address confirmation issues under the pretense of an objection to the Disclosure Statement, certain Objectors (particularly J&J) claim that the Debtors' Plan is "patently unconfirmable."  (Docket No. 1878 at ¶¶ 48-49; *see also* Docket No. 1870 at ¶ 12; Docket No. 2279 at ¶¶ 43-50.)  However, these Objectors have failed to demonstrate that such a drastic conclusion is appropriate in this case.

72.    While it may "occasionally" be appropriate to find that a proposed plan is so flawed that it "could not possibly be confirmed," bankruptcy courts consistently state that such action "must be used carefully so as not to convert the disclosure statement hearing into a confirmation hearing."  *In re Monroe Well Service,* 80 B.R. at 332-33; *see also In re American Capital Equipment, LLC*, 688 F.3d 145, 154 n.6 (3d Cir. 2012) ("[B]ankruptcy courts must ensure that due process concerns are protected by, *inter alia*, providing sufficient notice to plan proponents, and taking care not to prematurely convert a disclosure statement hearing into a confirmation hearing.") (internal quotations omitted); *In re Quigley Co., Inc.*, 377 B.R. 110, 119 (Bankr. S.D.N.Y. 2007) (in the context of approving a disclosure statement, the court noted that a settlement agreement raised questions regarding "good faith," "improper voter manipulation," and "vote designation," among others," but concluded that "these are confirmation issues" and deferred

---

[29]    J&J also suggests that the Debtors should provide more information regarding the Imerys Corporate Parties that are included in the releases.  (Docket No. 1878 at ¶ 37.)  However, Schedule I of the Plan already provides the complete list of Imerys Corporate Parties.  Moreover, J&J has not suggested what additional information regarding the Imerys Corporate Parties would assist a voter in assessing the Plan.

their consideration).  "Only where the disclosure statement *on its face* relates to a plan that cannot

be confirmed" is it appropriate to dismiss a proposed plan prior to the solicitation of votes;

"otherwise, confirmation issues are left for later consideration."  *In re Dakota Rail, Inc.*, 104 B.R.

138, 143 (Bankr. D. Minn. 1989) (emphasis in original).

73.     Because dismissing a plan at the disclosure statement approval stage is such an

extreme measure, doing so is appropriate only where "(1) confirmation defects cannot be

overcome by creditor voting results and (2) those defects concern matters upon which all material

facts are not in dispute or have been fully developed at the disclosure statement hearing."  *In re*

*American Capital Equip., LLC*, 688 F.3d at 155 (internal quotations omitted).  While Objectors

like J&J acknowledge these requirements, it is telling that they make no attempt to satisfy them.

Moreover, as discussed below, the Confirmation Objections are meritless, based on contested

facts, and, to the extent necessary, could be cured by creditor voting.  The Objectors asserting

Confirmation Objections have thus failed to clear the steep hurdle of proving that the Plan is

"patently unconfirmable."

### 1.      J&J's Bad Faith Claim is Meritless and Unsupported

74.     Contrary to J&J's assertion, the Debtors' Plan was not proposed in bad faith and is

not unconfirmable on such grounds.[30]  (Docket No. 1878 at ¶¶ 50-54; Docket No. 2258 at ¶¶ 16-

21.)  To be confirmed, a plan of reorganization must have "been proposed in good faith and not by

any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Courts have concluded that a plan was

---

[30]     The U.S. Trustee also argues that the plan is unconfirmable because it does not have sufficient
safeguards to prevent the payment of fraudulent claims.  (Docket No. 2279 at ¶¶ 43-50.)  As discussed
above, the U.S. Trustee's concerns with the TDP's anti-fraud provisions are confirmation objections and
are premature at this phase.  Similarly, the U.S. Trustee's related concern about the TDP's lack of
identification of the Talc Trustees and members of the Talc Advisory Committee will be addressed with
the Plan Supplement, and the U.S. Trustee can raise any objections to the Talc Trustees or members of the
Talc Advisory Committee at that time.  (*See id.* at ¶ 48.)

proposed in "good faith" where such plan: "(1) fosters a result consistent with the [Bankruptcy] Code's objectives . . . ; (2) has been proposed with honest and good intentions and with a basis for expecting that reorganization can be effected . . . ; or (3) is supportable based on the totality of the circumstances." *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 237-38 (Bankr. D. N.J. 2000) (citations omitted); *see also In re Hercules Offshore, Inc.*, 565 B.R. 732, 764 (Bankr. D. Del. 2016) ("The good faith standard requires that the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.") (internal quotations omitted).  The good faith determination is "a fact-intensive, case-by-case inquiry." *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 211 (3d Cir. 2003).

75.    Here, the Plan achieves results consistent with the Bankruptcy Code and was proposed with honest and good intentions and the support of each of the TCC, the FCR, Imerys S.A., and the Non-Debtor Affiliates.  Most significantly, the Plan is structured to achieve the overall goal of a global resolution of present and future talc-related claims in an equitable manner. (*See* Plan at §7.1 ("All Talc Personal Injury Claims shall be resolved by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents."); *see also In re Maremont Corp.*, 601 B.R. 1, 20-21 (Bankr. D. Del. 2019) (finding good faith pursuant to 11 U.S.C. § 1129(a)(3) where "[t]he Chapter 11 Cases were filed and the Plan was proposed with the legitimate purpose of providing a fair and equitable resolution of the Debtors' Asbestos Personal Injury Claims and maximizing the returns available to creditors and other parties in interest.").) Moreover, the process of developing the Plan evidences compliance with section 1129(a)(3), as negotiations between the Debtors, the TCC, the FCR, Imerys S.A., and the Non-Debtor Affiliates were conducted in good faith and at arm's length.  (Disclosure Statement at § 3.3; *see also In re*

*Maremont Corp.*, 601 B.R. at 20 ("The record demonstrates that the Debtors engaged in extensive good-faith, arm's length negotiations with [the debtors' parent], the Ad Hoc Committee, and the prepetition Future claimants' Representative, which led to the Plan's formulation."); *see also In re rue21, inc.*, 575 B.R. 90, 107-08 (Bankr. W.D. Pa. 2017).)

76.     Despite the substantial amount of evidence supporting the propriety of the Debtors' Plan, J&J makes various allegations regarding the Debtors' purported bad faith.  (Docket No. 1878 at ¶¶ 52-54.)  First, J&J claims that the Debtors' rejection of J&J's indemnity proposals evidences bad faith.  (*Id.* at ¶ 52.)  However, as the Debtors have expressed to J&J, each of J&J's indemnity proposals have been materially flawed because they offer only a partial solution that does not advance the goal of these Chapter 11 Cases—the equitable resolution of all talc-related claims. (*See* December 12, 2019 Letter from Richard A. Levy to Marcia L. Goldstein, Esq. at 3 [Docket No. 1731-6] ("Over the course of our discussions with you and your client, we have advised that the Debtors desire to have a consensual plan that resolves *all* talc claims, as that is the only way the Debtors can successfully emerge from Bankruptcy.  As we pointed out in response to J&J's recent proposal, J&J purports to offer only a partial solution . . . .").)  Accordingly, the Debtors' responses to such proposals are not an example of bad faith, but merely an attempt to negotiate with J&J to reach an agreement regarding J&J's indemnification obligations that best serves all stakeholders.

77.     In addition, it is true that the Debtors opposed the J&J Stay Motion, both because (i) it provided an incomplete resolution of J&J Talc Claims (and allowed for J&J to relinquish its indemnification obligations if J&J made certain subjective assessments of the Debtor's post-petition "conduct") (*see* Docket No. 1567 at ¶ 25), which could have potentially resulted in stranding thousands of talc claims in the tort system without a party to defend or satisfy them), and

(ii) it was procedurally improper.[31]  Nevertheless, in an effort to resolve the ongoing dispute with

J&J regarding J&J's indemnity obligations in a manner that is fair and equitable to all stakeholders,

the Debtors confirmed that they would stipulate to lift the protections of the automatic stay if

certain specific changes were made to J&J's proposed stay order.  (*See* Docket No. 1978 at ¶ 2.)[32]

Thus, there is no evidence to suggest that the Debtors rejected J&J's proposals in bad faith.  Rather,

the Debtors have taken numerous affirmative steps to try to reach a resolution regarding J&J's

indemnity obligations that is in the best interests of all parties.

78.    Second, J&J incorrectly claims that the Debtors' failure to negotiate with J&J

without the TCC or the FCR demonstrates bad faith.  As an initial matter, there is no legal

requirement that the Debtors negotiate with J&J at all.  *In re New Hampshire Elec. Co-op., Inc.*,

138 B.R. 668, 670 (Bankr. D. N.H. 1992) ("There is no good faith bargaining requirement in the

sense of statutory 'duty to bargain in good faith' . . . .  Obviously any party in interest can seek to

negotiate on a consensual plan and equally the other parties can refuse to negotiate with a particular

party if they feel that that party's position is not going to lead to a consensual arrangement.").

Accordingly, the Debtors have no absolute obligation to engage in negotiations with J&J (or any

other entity).

79.    Nevertheless, the Debtors have expended substantial efforts to negotiate a

settlement with J&J that would fully address J&J's indemnification obligations.  The Debtors have

responded to each of J&J's indemnity proposals.  (*See* March 4, 2020 Letter from Richard A. Levy

---

[31]    *See Debtors' Response to the Joint Response of the Official Committee of Tort Claimants and Future Claimants' Representative to Johnson & Johnson's Omnibus Reply in Support of J&J's Motion for Entry of Order Modifying Automatic Stay to Implement Talc Litigation Protocol* [Docket No. 1978]; *see also Order Denying Motion for Order Modifying Automatic Stay* [Docket No. 2253].

[32]    The Court ultimately agreed with the Debtors' assessment of the defects in the J&J Stay Motion and denied J&J's requested relief.  *See Order Denying Motion for Order Modifying Automatic Stay* [Docket No. 2253].

to Ronit J. Berkovich, Esq. [Docket No. 1567-1 at 213] ("[Y]our February 7 letter erroneously alleges that the Debtors have 'no desire to cooperate with J&J with regard to the resolution of the Talc Claims' . . . .  As is reflected in the numerous letters exchanged between the parties before and during the pendency of the chapter 11 cases and the various in-person meetings and substantive telephonic discussions that have taken place to date, the Debtors have engaged with J&J, and have responded to and pointed out the significant issues with each of J&J's 'proposals.'").)  Moreover, even after the J&J Stay Motion was filed, the Debtors continued to try to work with J&J to reach a consensual resolution, which resulted in the Revised Proposed J&J Order endorsed by the TCC, the FCR, and the Debtors.  (*See* Disclosure Statement at § 4.2(b).)  Finally, in September 2020, the Debtors agreed to participate in a two day mediation with J&J to try to resolve the remaining issues surrounding the J&J Stay Motion.  (*See Order Appointing Mediator* [Docket No. 2188].)  In sum, the Debtors have made numerous attempts to negotiate with J&J and reach an equitable agreement that takes into account the status of the Chapter 11 Cases and the Debtors' intent to close the sale of substantially all of their assets and emerge from bankruptcy without additional delay.

80.    Finally, contrary to J&J's assertion, the Debtors did not demonstrate bad faith by "ceding control" over the drafting of the Original TDP and the Amended TDP to the TCC and the FCR.  As explained in the Plan, the Debtors have retained, as is typical, "consultation rights as to the form and substance" of all Talc Personal Injury Trust Documents, which includes the trust distribution procedures.  (Plan at § 1.1.198.)  Accordingly, the Debtors have provided input regarding the structure and content of the Original TDP and the Amended TDP.  Moreover, the Debtors would not endorse the Plan if they felt the Original TDP or the Amended TDP were improper or otherwise deficient, and the Plan provides that, in the event of any conflict between

54

the terms or provisions of the Plan and the Talc Personal Injury Trust Documents, the terms of the Plan shall control.  (Plan at § 4.2.2.)  Thus, the Debtors have not improperly ceded control of the trust distribution procedures  to the TCC and/or the FCR.

81.     In addition, several courts have recognized that involvement of claimants' counsel in creating trusts is a regular and expected part of the trust practice, particularly given the 75% approval requirement of section 524(g).  *In re Congoleum Corp.*, 426 F.3d 675, 680 (3d Cir. 2005)[33] (noting that "realities of securing favorable votes from thousands of claimants to meet the 75% approval requirements forces debtors to work closely with the few attorneys who represent large numbers of claimants . . . .  A [plan] acceptable to the debtor must be satisfactory for the claimants as well and, consequently, extensive negotiations are necessary"); *In re W.R. Grace & Co.*, 475 B.R. 34, 195 (D. Del. 2012) ("The Court likewise declines to find that permitting [plaintiffs' counsel] to be involved in the drafting process 'rigs' the provisions of a TDP."). Indeed, even counsel for the Cypress Historical Excess Insurers has conceded in another mass tort case pending before this Court that it is common for the representatives of claimants to exercise "considerable control over the design of the trust, appointments to leadership roles within the trust, and the distribution procedures that define the process for reviewing and paying claims" as the result of the "supermajority vote requirement."  *See In re Boy Scouts of America*, Case No. 20-cv-0774 (RGA) (D. Del. Sept. 9, 2020) [Docket No. 23] at p. 10 (citations omitted).

82.     In sum, J&J's blanket and unsubstantiated assertions that the Debtors have acted in bad faith is not only premature, but entirely without merit.

---

[33]     Notably, counsel for Cypress Historical Excess Insurers was involved in the *Congoleum* case.

2.      **The Plan Meets the Best Interests Test**

83.      J&J also incorrectly argues that the Plan is unconfirmable because it does not meet the "best interests test." (Docket No. 1878 at ¶¶ 61-62.) Section 1129(a)(7)—frequently referred to as the "best interests test"—requires that each holder of a claim or interest of an impaired class either "(i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. 1129(a)(7)(A); *see also In re 20 Bayard Views, LLC*, 445 B.R. 83, 98 (Bankr. E.D.N.Y. 2011). Typically, courts consider a liquidation analysis as one of the key pieces of evidence with respect to the best interests inquiry. *See In re Maremont Corp.*, 601 B.R. at 22; *In re rue 21 inc.*, 575 B.R. at 101; *In re Leslie Controls, Inc.*, No. 10-12199 (CSS), 2011 WL 1901547, at *10 (Bankr. D. Del. Jan. 18, 2011). Moreover, at the disclosure statement phase, courts focus on whether or not a liquidation analysis has been performed, rather than the conclusions of the analysis. *See In re W.P. Hickman Sys., Inc.* No. ADV 10-2289JAD, 2012 WL 2905446, at *6 (Bankr. W.D. Pa. July 16, 2012) ("[T]he basis for an objection to a disclosure statement and its liquidation analysis would be that it contained inadequate information, not that the liquidation analysis was inaccurate."); *see also In re Zaruba*, 384 B.R. 254, 257 (Bankr. D. Alaska 2008) (refusing to approve disclosure statement where "the debtors appear to have dispensed with an appropriate liquidation analysis because most creditors have voted for the plans.").

84.      Here, as discussed in Section III.A.5, *supra*, the Debtors have filed an Amended Liquidation Analysis, which demonstrates that claimants are likely to receive recoveries under the Plan that are equal to or greater than the recoveries available to them in a liquidation scenario, largely as a result of the Imerys Settlement and the Rio Tinto/Zurich Settlement, each of which are

dependent upon confirmation of the Plan.  (Amended Liquidation Analysis at pp. 141-44.)  To the extent J&J contests the conclusions of the Amended Liquidation Analysis, such an objection should be addressed at the Confirmation Hearing.  *See In re W.P. Hickman Sys.*, 2012 WL 2905446, at *6.

### 3.     The Plan Does Not Provide for Improper Treatment of Indirect Talc Personal Injury Claimants

85.     Under section 1122(a), "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a).  J&J argues that the Plan and Disclosure Statement are improper because they classify Direct Talc Personal Injury Claims and Indirect Talc Personal Injury Claims within the same class.  (*See* Docket No. 1878 at ¶¶ 63-65.)  However, grouping direct and indirect mass tort claims within the same class is widely accepted within the Third Circuit.  *See In re Pittsburgh Corning Corp.*, No. 00-22876 (JKF), 2013 WL 2299620, at *67 (Bankr. W.D. Pa. May 24, 2013) ("Asbestos Personal Injury Claims (as defined in the Plan) are substantially similar to Indirect Asbestos Claims (as defined in the Plan) in that all such claims are unsecured, nonpriority claims arising from personal injury caused by exposure to asbestos or asbestos-containing products"); *In re W.R. Grace & Co.*, 446 B.R. 96, 129 (Bankr. D. Del. 2011) (holding that "a contribution or indemnity claim that arises from the asbestos liabilities of Debtors" is "substantially similar to the Direct Claims"); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159-60 (D. Del. 2006) ("Because all Asbestos Personal Injury Claims in Class 7 (including Indirect PI Trust Claims) relate, directly or indirectly, to AWI's liability for asbestos-related personal injury and wrongful death claims, whether arising under tort law . . . or under contract . . . a reasonable basis exists for the classification of the Asbestos Personal Injury Claims together in a single class.").

86.     Indeed, it is not at all unreasonable to place such claims within a single class as they all arise from the same conduct or actions.  A "Talc Personal Injury Claim" is defined as:

> any Claim and any Talc Personal Injury Demand against one or more of the Debtors or any other Protected Party whether known or unknown, including with respect to any manner of alleged bodily injury, death, sickness, disease or alleged disease process, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries (whether physical, emotional or otherwise), directly or indirectly arising out of or relating to the presence of or exposure to talc or talc-containing products based on the alleged pre-Effective Date acts or omissions of the Debtors or any other Entity for whose conduct the Debtors have or are alleged to have liability (but only to the extent such Claim or Talc Personal Injury Demand directly or indirectly arises out of or relates to the alleged pre-Effective Date acts or omissions of the Debtors) . . . .

(Plan at § 1.1.192.)  Thus, the term Talc Personal Injury Claim encompasses both Direct Talc Personal Injury Claims and Indirect Talc Personal Injury Claims.  (*Id.*)  As such, the Debtors' placement of Direct Talc Personal Injury Claims and Indirect Talc Personal Injury Claims in a single class is appropriate and proper.

87.     Moreover, beyond the classification of claims, the Bankruptcy Code also requires that a plan of reorganization provide the "same treatment" for claims within a particular class.  11 U.S.C. § 1123(a)(4); *see also* 11 U.S.C. § 524(g) (requiring that "similar claims" be treated in "substantially the same manner").  For a plan to provide equal treatment to all similar claims, the plan must provide such claimants with the "same opportunity" for recovery.  *See In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013).  Here, the Original TDP (and the Amended TDP) makes clear that holders of Indirect Talc Personal Injury Claims will be "paid by the Trust subject to the applicable Payment Percentage (and all other limitations applicable to Direct Talc Personal Injury Claims hereunder)," if the Indirect Talc Personal Injury Claimants can fulfill certain administrative prerequisites.  (Original TDP at § 5.4; *see also* Amended TDP.)  Moreover, as is made clear by the Original TDP (and the Amended TDP), the Payment Percentages apply equally to Direct Talc

Personal Injury Claims and Indirect Talc Personal Injury Claims (Original TDP at § 4; *see also*

Amended TDP.)   Accordingly, holders of Indirect Talc Personal Injury Claims will have the same

opportunity for recovery as holders of Direct Talc Personal Injury Claims, thereby fulfilling the

requirement of section 1123(a)(4).

88.    In sum, although the assessment of the treatment of holders of Indirect Talc

Personal Injury Claims is premature and should be addressed at confirmation, both the

classification and treatment of Indirect Talc Personal Injury Claims are proper.

### 4.    The Lack of Certain "Neutrality Language" for J&J Does Not Render the Plan Patently Unconfirmable

89.    Contrary to J&J's assertion (Docket No. 1878 at ¶¶ 55-60) regarding the need for

additional "neutrality language," the Plan and Disclosure Statement (as supplemented) contain

appropriate and sufficient language regarding the treatment of J&J's indemnity obligations and

insurance coverage.

90.    With respect to J&J's indemnification obligations, as discussed in Section III.A.6.c,

*supra*, the Disclosure Statement makes clear that:

> Subject to Section 11.5.5 of the Plan, none of (i) the Bankruptcy Court's confirmation of the Plan or approval of the Plan Documents, (ii) the Confirmation Order or any findings and conclusions entered with respect to the Confirmation, nor (iii) any estimation or valuation of any Claims, either individually or in the aggregate in the Chapter 11 Cases shall, with respect to J&J, constitute a trial or hearing on the merits or an adjudication or judgment with respect to any Direct Talc Personal Injury Claim against J&J or any J&J Indemnification Rights and Obligations.

(Disclosure Statement at § 7.7(e).)

In terms of J&J's insurance rights, given that J&J is not itself an insurer, it is not clear why

J&J demands "robust insurance neutrality provisions," which are not customarily provided to non-

insurers.  In any event, Section 7.7(e) of the Disclosure Statement provides that J&J's rights and

obligations under its various agreements with the Debtors are fully preserved.  (Disclosure

Statement at § 7.7(e) ("For all issues relating to J&J Indemnification Rights and Obligations, the provisions, terms, conditions, and limitations of any agreements underlying the J&J Indemnification Rights and Obligations shall control.")

### 5. Potential Litigation Between the Debtors and J&J Does Not Render the Plan Unconfirmable

91.    American International Industries ("**AII**") objects, without support or explanation, that the "inevitable litigation between Johnson & Johnson and the Debtors makes the Plan unconfirmable." (Docket No. 1870 at ¶ 12.)  AII does not elaborate as to why litigation between J&J and the Debtors "is inevitable" nor how such litigation would impact confirmation of the Plan. In particular, AII does not explain why hypothetical litigation between J&J and the Debtors would prevent the operation of the Talc Personal Injury Trust or any other component of the Plan.  In any event such a hypothetical concern is clearly premature and should be addressed (if at all) during the confirmation process.

92.    The Plan and Disclosure Statement contemplate that any rights and obligations of J&J with respect to J&J's indemnification obligations to the Debtors will be transferred to the Talc Personal Injury Trust for resolution after the Effective Date of the Plan.  This is not dissimilar to other Chapter 11 cases in which insurance disputes and significant claims objections are resolved after a plan has been confirmed.

## C. The Voting Procedure Objections Are Without Merit

### 1. It is Appropriate to Assign Indirect Talc Personal Injury Claims a Value of $1 for Voting Purposes.

93.    The Bankruptcy Code gives bankruptcy courts "wide latitude . . . to evaluate the evidence supporting a particular claim within the context of a particular bankruptcy proceeding." *Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134, 136 (3d Cir. 1982).  In the plan solicitation context, this discretion manifests as the ability to evaluate and estimate claims—for the sole

purpose of voting—according to the totality of the circumstances of the bankruptcy and in order to "ensure voting power [is] commensurate with economic interest." *Pension Ben. Guar. Corp. v. Enron Corp.*, No. 04 Civ. 5499 (HB), 2004 WL 2434928 at *5 (S.D.N.Y. Nov. 1, 2004). This goal of allocating voting rights fairly is what drives the evaluation of voting procedures. *See id.* (discounting the value of RICO claims by one-third to account for the disproportionate impact of the RICO statutes treble damages provision on Plan voting rights); *see also Matter of Johns-Manville Corp.*, 68 B.R. 618, 631 (Bankr. S.D.N.Y. 1986) (holding that the "construct of the voting procedure is proper as it clearly meets the desideratum of expanded suffrage and participation in the reorganization by all parties in interest" where the "unstated goal of the [objectors], on the other hand, would seem to be to silence the vast majority of those parties in interest who are the central concern of this reorganization.").

94.      In the specific context of mass tort bankruptcies in which numerous individual tort claimants hold claims that are difficult to value, it is common—for the purposes of allocating voting power for Plan confirmation—for bankruptcy courts to approve voting procedures that allocate voting rights not according to the value of the claims themselves, but equally among all similarly-situated claimants. *See, e.g., Matter of Johns-Manville Corp.*, 68 B.R. at 631 (approving plan that estimated asbestos plaintiffs' claim values at $1 for the purposes of voting); *see also In re Quigley Co.*, 346 B.R. 647, 654-5 (commenting that the bankruptcy code's voting provisions are "difficult to apply in tort cases" and noting that one approach courts have developed to address the issue is to "value[] all of the claims at $1.00 for voting purposes."); *In re A.H. Robins Co., Inc.*, 880 F.2d 694, 697-8 (4th Cir. 1989) (valuing each individual tort claim equally for voting purposes because "any attempt to evaluate each of the 195,000 individual claims for voting purposes would cause intolerable delay."). This is exactly the approach adopted in the Debtors' proposed

Solicitation Procedures, and falls well within the Court's discretion to approve voting procedures that allocate votes according to claimants' economic interest in the Chapter 11 Cases.

95.     J&J objects to the Plan's valuation—for voting purposes only—of its Indirect Talc Personal Injury Claim at $1 rather than $20,000,000—the asserted amount of its indemnification claim against the Debtors in its Proof of Claim—on the basis that its claim is deemed "allowed" under section 502(a).  As an "allowed" claim, J&J seeks to value it at $20,000,000 for voting purposes "without need for a Rule 3018(a) motion."  (Docket No. 1878 at ¶ 68.)  As an initial matter, the Debtors do not believe that J&J's $20,000,000 indemnification claim is valid and, as such, have filed an objection to such claim.  [Docket No. [2284].  Therefore, as J&J concedes, its claim is no longer deemed "allowed" under section 502(a).  To the extent J&J's objection relies on its claim being "allowed," its objection has been mooted by the filing of the Debtors' objection.  *See* 11 U.S.C. § 502(a) (a claim or interest is deemed allowed unless a party in interest objects); *see also In re Ravn Air Group, Inc.*, Case No. 20-10755 (BLS) [Docket No. 318] (Bankr. D. Del. June 07, 2020) (providing that "[i]f a Claim for which a proof of Claim has been timely filed is . . . disputed, such Claim is accorded one vote and valued at one dollar ($1.00) for voting purposes.").

96.     In addition, J&J's objection misstates the law and, by ignoring the full context of these Chapter 11 Cases, twists the proper objective of assigning voting rights according to claimants' proportionate economic interests.  First, J&J conflates its claim's status as "allowed" under section 502(c) with an acceptance of the monetary value of that claim being the proper measure of its holder's voting power.  To the contrary, courts have consistently differentiated between claim estimation under section 502(c), which permits courts to estimate the value of contingent or unliquidated claims for the purposes of becoming an "allowed" claim, and claim estimation under FRBP 3018(a), which permits estimation for the purposes of allocating voting

62

rights.  *See, e.g., In re Stone Hedge Properties*, 191 B.R. 59, 65 (Bankr. M.D.Pa. 1995) (contrasting mandatory estimation under section 502(c) with discretionary estimation under FRBP 3018(a)); *see also Enron*, *supra*, 2004 WL 2434928 at *5-6 (emphasizing that FRBP 3018(a) gives courts discretion to estimate claims for the purpose of determining "*voting strength*," distinct from their status as an "allowed" claim, which affects "the fundamental right to vote.").  Second, by arguing that its liquidated Indirect Talc Personal Injury Claim should be valued at $20,000,000 while all unliquidated Direct Talc Personal Injury Claims and other Indirect Talc Personal Injury Claims are valued at $1, J&J will have an inequitable amount of voting power; especially since other claims in the same class, if liquidated, could be determined to have a value equal to or greater than the value of J&J's purported claim.

97.    Moreover, J&J's proposal upends the objective of the Solicitation Procedures to allocate voting power fairly and equally among all talc claimants.  By valuing all Talc Personal Injury Claims at $1 for voting purposes, the Solicitation Procedures attempt to treat each  talc claimant equally for the purposes of voting on the Plan.  J&J's proposal is counter to the policy goals underlying the Bankruptcy Code.  *See Matter of Johns-Manville Corp.*, *supra*, 68 B.R. at 631 (emphasizing that courts should look to the purpose and effects of proposed voting procedures, rather than to whether they "rigidly comply with §§ 501, 502, and 1126 of the Code," in evaluating their propriety); *see also Enron*, *supra*, 2004 WL 2434928 at *6 (affirming the bankruptcy court's determination that "it is somewhat absurd for [a claimholder] to vote $76 billion worth of claims [. . .] which would lead [to] an extraordinarily absurd result.").

98.    Should J&J believe that its vote on the Plan should count 20,000,000 times more than the vote of any other holder of a Talc Personal Injury Claim, the Solicitation Procedures permit J&J to seek such relief pursuant to FRBP 3018(a).

## 2.    The Treatment of FRBP 3018(a) Motions is Proper.

99.    In contrast with J&J, the U.S. Trustee objects on the basis that the Solicitation Procedures treat holders of Direct Talc Personal Injury Claims and Indirect Talc Personal Injury Claims differently in that they do not allow the former to file a motion under FRBP 3018(a) to seek to adjust their voting rights, while allowing Indirect Talc Personal Injury Claimants to do so. (*See* Docket No. 1911.)  It is telling that the U.S. Trustee alone has made this objection.  The TCC, which is made up of and represents the holders of Direct Talc Personal Injury Claims, supports the Solicitation Procedures as drafted.  Moreover, despite having received adequate notice of the disclosure statement hearing, no holder of a Direct Talc Personal Injury Claim has objected to the Solicitation Procedures.  In fact, two other groups representing holders of Direct Talc Personal Injury Claims filed timely objections to the Motion and the Disclosure Statement, but neither raised concerns about the valuation of claims for voting purposes.

100.    In addition, much like J&J, the U.S. Trustee's objection misconstrues the underlying purpose of the Solicitation Procedures.  By assigning each Direct Talc Personal Injury Claim a value of $1 for voting purposes, the Plan attempts to give each claim holder an equal voice in Plan confirmation.  Such a voting scheme is commonly accepted in mass tort bankruptcies such as this as a method of ensuring that voting power is commensurate with each creditor's economic interests in the bankruptcy.  *See In re Quigley*, *supra*, 346 B.R. at 653-5.  However, while each Direct Talc Personal Injury Claim represents an individual claim, each Indirect Talc Personal Injury Claim may represent a number of individual claims.  (*See* Plan at § 1.1.93.)  In order to achieve the ultimate goal of ensuring that each claim is afforded the proper voting power, it may be appropriate, as the Plan contemplates, to adjust the value of certain Indirect Talc Personal Injury Claims accordingly for voting purposes only to reflect the number of individual claims that underlie such claim.  *See In re Quigley Co.*, 346 B.R. at 654 ("In the end, any estimation should

64

ensure that the voting power is commensurate with the creditor's economic interests in the case."). The same cannot be said of the Direct Talc Personal Injury Claims, which remain unliquidated and disputed, and the Solicitation Procedures propose to value equally for voting purposes.

101.    Such an approach is consistent with bankruptcy courts' well-established ability to craft solutions in furtherance of the policies underlying the provisions of the Bankruptcy Code. *See, e.g., In re Combustion Engineering., Inc.*, 391 F.3d 190, 235 (3d Cir. 2004) ("Bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process") (citation omitted); *see also Matter of Johns-Manville Corp.*, 68 B.R. at 624-5 ("[T]his court sits both as a court of equity and as one charged with fulfilling a legislative mandate"); *In re Aquatic Development Group, Inc.*, 352 F.3d 671, 680 (2d Cir. 2003) ("[I]t is axiomatic that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.") (Straub, J., concurring). To this end, bankruptcy courts ensure that "substance will not give way to form, that technical considerations will not prevent substantial justice." *In re A.H. Robins Co, Inc.*, 880 F.2d at 702 (quoting *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988)).

102.    The U.S. Trustee's objection would have this Court ignore the substance of the Solicitation Procedures—which are designed to ensure that each individual with a Talc Personal Injury Claim is treated equally for voting purposes—in favor of arrangements that would contravene the spirit of the Bankruptcy Code.  Instead, by suggesting that each holder of a Direct Talc Personal Injury Claim should be able to adjust the value of their claim for voting purposes through a 3018(a) motion, it would impose on the Debtors and this Court the significant burden of estimating the dollar value of thousands of individual tort claims, a burden bankruptcy courts have consistently recognized would result in "intolerable delay," and which might ultimately be "more

confusing than helpful." *In re A.H. Robins Co., Inc.*, 880 F.2d at 697-8. It is because of this substantial and overwhelming burden that the TCC and the FCR support the Solicitation Procedures as drafted. The U.S. Trustee should not be permitted to impose such a burden on the Debtors' Estates and this Court should overrule the Objection accordingly.

D.     **The Procedural Objections Are Meritless or Have Been Addressed**

1.     **The Timing of the Filing of the Disclosure Statement is Appropriate**

103.     The Debtors anticipate that the Objectors may object to the fact that the Debtors filed the operative Disclosure Statement less than 28 days before the hearing on the Motion. As an initial matter, the Debtors filed the Original Disclosure Statement on May 15, 2020, almost five months prior to the hearing. The additions and revisions made to the Disclosure Statement in the interim were intended to accomplish three goals: (a) to incorporate information regarding the Rio Tinto/Zurich Settlement (which was already included in the First Amended Plan filed on August 12, 2020); (b) to add or revise language to address the Objections; and (c) to adequately describe the status of J&J's indemnification obligations to the Debtors. Thus, individuals and entities entitled to vote on the Plan are not reviewing for the first time the entire Disclosure Statement, but only those specific portions that were updated or added since the filing of the First Amended Disclosure Statement.[34]

104.     The First Amended Plan and the First Amended Disclosure Statement were filed on August 12, 2020, almost two months prior to the hearing on the Disclosure Statement. The changes to the First Amended Disclosure Statement that are reflected in the operative Disclosure Statement filed on October 5 , 2020, are relatively minimal and focus on the following key areas:

---

[34]     Notably, FRBP 2002(b) sets forth a 28-day requirement for the original filing of a disclosure statement in advance of a hearing to approve the disclosure statement, but it is silent as to any subsequent amended filings.

(i) replacement of provisions with respect to the J&J Stay Motion—which has now been denied—with language similar to (and more protective than) the language contained in the Original Disclosure Statement, and (ii) updates regarding the progress of various motions, adversary proceedings, and mediations.  As such, all parties in interest have had more than substantial time to determine whether the disclosures contained in the Disclosure Statement are adequate.

105.     In addition, courts have repeatedly approved amended disclosure statements filed less than 28 days before the hearing.  *See In re Yarway Corp.*, Case No. 13-11025 (BLS) (Bankr. D. Del. Jan. 28, 2015) [Docket Nos. 704, 737, 756] (approving amended disclosure statement filed less than a week before the approval hearing); *In re Leslie Controls, Inc.*, Case No. 10-12199 (CSS) (Bankr. D. Del. Aug. 19, 2010) [Docket Nos. 16, 142, 166] (approving amended disclosure statement filed on August 12, 2010 at hearing held on August 19, 2010); *In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Jan. 5, 2018) [Docket Nos. 1164, 1363 1400, 1474-86, 1551, 1654, 1639] (the debtor amended its disclosure statement on December 19, 2017 and January 2, 2018, the hearing was held on January 3, 2018, and the amended disclosure statement was approved on January 5, 2018); *In re Specialty Products Holding Corp.*, Case No. 10-11780 (PJW) (Bankr. D. Del. Oct. 21, 2014) [Docket Nos. 5026, 5112] (approving disclosure statement filed on October 3, 2014 at hearing held on October 20, 2014); *In re Oakfabco, Inc.*, Case No. 15-27062 (Bankr. N.D. Ill. Jan. 15, 2019) [Docket Nos. 770, 771] (approving amended disclosure statement filed one day in advance of the scheduled hearing); *In re Kaiser Gypsum Company, Inc.*, Case No. 16-31602 (JCW) (Bankr. W.D.N.C. Oct. 23, 2019) [Docket Nos. 1815, 1861, 1875] (approving amended disclosure statement filed on September 24, 2019, and amended again on October 15, 2019, in advance of hearing on October 17, 2019).  In sum, it is common and appropriate for a debtor to file an amended disclosure statement—particularly one that addresses objections with

respect to the original disclosure statement—less than 28 days before the hearing to approve the disclosure statement.[35]

### 2.    The Plan Confirmation Schedule is Appropriate

106.    Several Objectors argue that the plan confirmation schedule presented in the Solicitation Procedures does not provide sufficient time for parties in interest to evaluate the Plan, file amended proofs of claim, review the Plan Supplement, and conduct discovery.  (*See* Docket No. 1865 at 16-17; Docket No. 1869 at ¶¶ 25-29; Docket No. 1894 at p. 14; Docket No. 2278 at pp. 30-31; Docket No. 2282 at ¶¶ 24-27.)  However, given the passage of time since the filing of the Original Disclosure Statement and the adjustments that have been made to the plan confirmation schedule since, there is more than sufficient time for consideration of the Plan and the completion of discovery within the revised proposed schedule.

107.    The Original Disclosure Statement and Plan were filed almost five months ago, on May 15, 2020.  Under the modified schedule set forth in the revised Solicitation Procedures Order filed on October 5, 2020 [Docket No. 2288-1], (a) the Voting Record Date will be October 8, 2020, (b) the deadline to vote on or object to the Plan will be November 20, 2020, which is over six weeks away, and (c) the Confirmation Hearing will be held on December 17, 2020.  This timeline complies with the requirements of the Bankruptcy Code.

108.    Similarly, Objections that the proposed timeline does not allow for adequate discovery are meritless.  First, such objections fail to describe how the proposed timeline will prevent adequate discovery.  Instead, they simply complain that the Original Disclosure Statement

---

[35]    Given that the amendments filed on October 5, 2020 dealt with only a narrow range of information (which became necessary due to developments since the filing of the Amended Disclosure Statement), and that Courts allow the filing of amended disclosure statements within the 28 days' prescribed by statute, the Cyprus Historical Excess Insurers' objection regarding the lack of adequate notice should be overruled. (Docket No. 2278 at p. 30.)

made no *specific mention* of discovery. (*See, e.g.*, Docket No. 1894 at 14 ("Debtors' proposed confirmation schedule [. . .] says nothing about discovery or experts. But it should."); *see also* Docket No. 2278 at pp. 31-32.) This is inadequate. Nearly five months have already passed since the Debtors filed the Original Disclosure Statement, and, given the November 20, 2020 Confirmation Objection Deadline, there remains sufficient time to conduct additional discovery. Second, and more importantly, at least four Objectors who objected on this basis in fact *have* utilized the months since May 15 to serve discovery requests on the Debtors regarding the Plan— and the Debtors have produced documents in response to such requests. Moreover, several Objectors have also served discovery on other Plan Proponents, as well as Rio Tinto and Zurich. Simply put, the confirmation timeline includes ample time to conduct Plan discovery, which is already well underway.

### 3. The Solicitation Procedures do not Create a Material Conflict of Interest

109. The U.S. Trustee asserts that the Solicitations Procedures create a conflict of interest because the definitions of "Released Parties" and "Representatives" interact to potentially cause holders of Talc Personal Injury Claims to provide releases to some of the law firms representing them. (Docket No. 1911 at ¶¶ 55-62.) The Debtors believe that the U.S. Trustee's concern should be overruled because the scope of the potential releases identified by the U.S. Trustee is so narrow and contextually constrained as to not present a realistic problem. Moreover, the U.S. Trustee's concern is premised on law firms unilaterally "determin[ing] whether their clients will opt-out of giving releases" and "determining whether to vote to accept the Plan." (*Id.* at ¶ 58.) It does not factor in that these law firms will communicate with their clients about the Plan, as well as the effects of opting-out of giving releases (or not). Given the limited applicability of these releases and the mitigating effect of communications between law firms and their clients, no further changes or actions are necessary to address the U.S. Trustee's concern.

69

4.      **The Notice to Contract Counterparties Provides a Sufficiently Long Response Time**

110.    The U.S. Trustee asserts that the proposed Solicitation Procedures are deficient because they may not give counterparties sufficient time to file objections the Debtors' assumption of contracts or leases.  (Docket No. 1911 at ¶ 67.)  The Debtors have amended the Plan and Disclosure Statement to expand the amount of notice given to contract counterparties. Specifically, under the Plan, notice of any revisions or additions to the list of contracts that will be assumed as part of the Plan will occur no later than 16 days prior to the Confirmation Hearing. (Plan at § 5.1.4.)

5.      **Expanded Service of the Plan Supplement and the Solicitation Procedures Order is Unnecessary**

111.    The U.S. Trustee argues that the Debtors should be required to serve copies of the Plan Supplement on all creditors entitled to vote and the 2002 list.  In addition, the U.S. Trustee also requests that the Debtors serve the order approving the Disclosure Statement on certain additional government entities, including (i) state and local taxing authorities in the jurisdictions in which the Debtors have tax liability, and (ii) federal, state and local authorities that regulate any portion of the debtors' business, including the Environmental Protection Agency, and state environmental agencies.  (Docket No. 1911 at ¶¶ 69-70.)  However, the U.S. Trustee's expanded service is not required by the Bankruptcy Code and is costly, burdensome and impractical, especially considering that, during the global pandemic, many individuals and entities are not receiving physical mail in the normal time or manner.  Moreover, the Plan Supplement and Solicitation Procedures Order will be available online through the Debtors' Claims Agent's website at https://cases.primeclerk.com/ImerysTalc/.   In addition, each of the Confirmation Hearing Notice, the Publication Notice, the Notice of Non-Voting Status, and the Contract/Lease Notice includes a section with respect to how to obtain copies of the Plan, the Disclosure

Statement, the Solicitation Procedures Order, and other documents related to the Plan, including

through the Debtors' Claims Agent's website.  As such, all of the aforementioned parties will have

full access to the documents referenced by the U.S. Trustee.[36]  In addition, the Debtors have agreed

that they will serve copies of all Executory Contract and Unexpired Lease Plan Supplement

exhibits on the applicable contract or lease counterparties.  (Solicitation Procedures Order at ¶ 13.)

## IV.    **CONCLUSION**

112.    The Debtors respectfully request that the Court enter the Solicitation Procedures

Order and order such additional relief as the Court may deem proper and appropriate.

Dated: October 5, 2020                Respectfully submitted,
       Wilmington, Delaware            */s/ Sarah E. Silveira*


**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brett M. Haywood (No. 6166)
Sarah E. Silveira (No. 6580)
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:  collins@rlf.com
        merchant@rlf.com
        steele@rlf.com
        haywood@rlf.com
        silveira@rlf.com

- and -

---

[36]    Nevertheless, the Debtors have agreed to serve the order approving the Disclosure Statement and Solicitation Procedures and the Confirmation hearing Notice on (i) state and local taxing authorities in the United States and Canada in the jurisdiction in which the Debtors have tax liability, and (ii) federal, state, and local authorities in the United States and Canada that regulate any portion of the Debtors' businesses, including the Environmental Protection Agency.

**LATHAM & WATKINS LLP**

Jeffrey E. Bjork (admitted *pro hac vice*)
Kimberly A. Posin (admitted *pro hac vice*)
Amy C. Quartarolo (admitted *pro hac vice*)
Helena G. Tseregounis (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
E-mail:  jeff.bjork@lw.com
          kim.posin@lw.com
          amy.quartarolo@lw.com
          helena.tseregounis@lw.com

- and -

Richard A. Levy (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  richard.levy@lw.com

*Counsel for Debtors and Debtors-in-Possession*