## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| IMERYS TALC AMERICA, INC., *et al.*,[1] | ) | Case No. 19-10289 (LSS) |
| | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Re: Docket No. 2355** |

### OBJECTION OF ARNOLD & ITKIN LLP TO DEBTORS' SOLICITATION MOTION AND DISCLOSURE STATEMENT FOR THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF IMERYS TALC AMERICA, INC. AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Arnold & Itkin LLP ("Arnold & Itkin"), on behalf of thousands of Talc Personal Injury Claimants[2] ("Objectors"), hereby objects (the "Objection") to the Amended Disclosure Statement[3] (the "Disclosure Statement") filed in connection with the Debtors' Solicitation Motion.[4]  In support of its Objection, Arnold & Itkin respectfully represents as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748).  The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

[2] Unless otherwise defined, defined terms used herein have the meaning set forth in the Plan.

[3] *Disclosure Statement for Third Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 2355] (the "Amended Disclosure Statement" or the "Disclosure Statement"). Defined terms have the meaning ascribed to them in the Amended Disclosure Statement or related *Second Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and the Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 2354] (the "Third Amended Plan" or the "Plan").

[4] *Motion of Debtors for Entry of Order (I) Approving Disclosure Statement and Form and Manner of Notice of Hearing Thereon, (II) Establishing Solicitation Procedures, (III) Approving Form and Manner of Notice to Attorneys and Certified Plan Solicitation Directive, (IV) Approving Form of Ballots, (V) Approving Form, Manner, and Scope of Confirmation Notices, (VI) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement and Confirmation of Plan, and (VII) Granting Related Relief* [Docket No. 1716] (the "Solicitation Motion").

## I.  **Preliminary Statement**

1.       The only impaired Class of Claims that will vote on the Plan—and thus

the only Class for which the adequacy of the Disclosure Statement matters—is Class 4,

consisting of Talc Personal Injury Claims. The terms of the proposed "Ivory America Personal

Injury Trust Distribution Procedures" ("TDP") are undeniably of critical importance to the

holders of such claims.  Although styled "procedures," the TDP contains ***all of the substantive***

***provisions*** that go to the heart of distributions to, and the treatment of, Class 4 creditors.  These

include, among others, provisions that: (i) specify a fixed allocation of Trust assets among

various categories of claims, regardless of the actual amount of the claims in each category that

are allowed against the Trust; (ii) specify lower distributions from the Trust to claimants who

have and assert rights against a third party—J&J—under the J&J Indemnities than to claimants

who do not have, or forego, such rights, while also imposing somewhat opaque limitations on the

exercise of such rights against J&J; (iii) specify less favorable treatment of the claims of

claimants who exercise their right to liquidate their claims against the Trust through judicial

proceedings (including through the exercise of jury trial rights), while at the same time limiting

the claims of such claimants to specified "Maximum Values," regardless of the amount of any

judicial award; and (iv) give the Trustees broad rights (with the consent of the Trust Advisory

Committee and FCR) to amend the TDP, without prior notice to Trust beneficiaries or any form

of judicial oversight.  Yet, apparently confusing the length of a Disclosure Statement (114 single

spaced pages, excluding Exhibits) with the adequacy of disclosure, the proposed Disclosure

Statement gives short shrift to the terms of the 65-page TDP, treating it as little more than an

afterthought, and disclosing ***none*** of these or other material TDP provisions.

        2.        To put it bluntly, the proposed "disclosure" regarding the TDP is a

charade.  The Plan Proponents' principal "disclosure" regarding the TDP is Article VIII of the

Disclosure Statement—titled "THE TALC PERSONAL INJURY TRUST AND TRUST

DISTRIBUTION PROCEDURES"—an "Article" that is ***less than one page long and buried***

***more than 90 pages into the Disclosure Statement,*** and contains only a scant, generalized

description of the TDP.  *See* Disclosure Statement at 94-95.[5]  In contrast, the historical

discussion of "Administrative Matters in the Chapter 11 Cases," which is of far less import to

Class 4 creditors, is more than ***three times*** as long and featured more prominently!  *See*

Disclosure Statement at 38-42.

        3.        Rather than requiring Class 4 creditors to sort through the complex

provisions of the TDP that only parties conversant with both mass torts and bankruptcy could

possibly understand, the Disclosure Statement should provide a clear and concise summary of

the TDP,[6] including the issues, risks and deficiencies identified herein.

        4.        Perhaps the most glaring omission in the skeletal "disclosure" regarding

the TDP is the failure to inform claimants of the substantial risk—indeed, the virtual certainty—

of unequal treatment of Class 4 claims resulting from the division of the Class 4 Claims into

---

[5] There are several other short, generalized references to the TDP.  *See, e.g.*, Disclosure Statement at 4-5, 9-10.

[6] For example, to aid victims in understanding the procedures, the Bankruptcy Court in PG&E required the debtor to provide a fair and fulsome summary of the procedures in lieu of the "phone book" style disclosures originally proposed by the debtor.  *See In re PG&E Corporation*, Case No. 19-30088 (DM) (Bankr. N.D. Cal.), *Notice of Filing of Proposed Amended Fire Victims Claims Resolution Procedures Summary with Frequently Asked Questions* [Docket No. 6329].

DOCS_SF:104420.3 05471/001

three sub-classes: (i) Ovarian Cancer A Claims; (ii) Mesothelioma Claims; and (iii) Ovarian Cancer B, C and D Claims.  More specifically, there is no disclosure that the TDP allocates a fixed percentage of Trust assets to each of these three sub-classes of claims, ***without regard to the aggregate amount of allowed Claims in each sub-class or the proportion of the total amount of the Class 4 Claims that is represented by the allowed claims in any sub-class.***  The Disclosure Statement does not inform claimants that, under the TDP, Ovarian Cancer A Claims will receive distributions solely from "Fund A," which will receive a fixed allocation of 40% of the Trust assets; Mesothelioma Claims will receive distributions solely from "Fund B," which will receive a fixed allocation of 40% of the Trust assets; and Ovarian Cancer B, C and D Claims will receive distributions solely from "Fund C," which will receive a fixed allocation of 20% of the Trust assets; nor does it contain any disclosure as to how these allocations were derived.

5.    This construct creates a significant—yet undisclosed—likelihood of unequal treatment of Class 4 Claims.  Indeed, the TDP itself appears to contemplate that holders of Claims in each sub-class will receive different "Payment Percentages" on their claims, although the extent of the potential disparity is obfuscated by the fact that the TDP's schedule of "Initial Payment Percentages" currently leaves the "Initial Payment Percentage" for each of the three categories ***blank***.  As an example of the unequal treatment that can result from this construct, Mesothelioma Claims will receive 40% of the Trust assets, even if those claims ultimately represent only 30% of the Class 4 claims allowed against the Trust.  Conversely, Ovarian Cancer Claims (which were the subject of ***16 times as many*** lawsuits pending against the Debtors as of the Petition Date as Mesothelioma Claims) will receive, in the aggregate, only 60% of the Trust assets, even if Ovarian Cancer Claims ultimately represent 70% of the Class 4

4

claims allowed against the Trust. A similar risk of disparate treatment is posed by the

unexplained 40-20 allocation of Trust assets as between Ovarian Cancer A Claims, and Ovarian

Cancer B, C and D Claims.

6.      The Disclosure Statement mentions none of this—let alone any rationale,

basis or assumptions underlying this facially arbitrary allocation of assets among the three Funds

and corresponding creditor sub-Classes.  Nor is a word said about the substantial risk (indeed,

likelihood) of unequal and disparate treatment of the three sub-classes of Class 4 Claims created

by this fixed-asset allocation. To make matters worse, two facts compound the inadequacy of

disclosure regarding the disparate treatment of Class 4 Claims facts.

7.      First, the Plan Proponents exacerbate their failure to adequately disclose

the possibility of unequal treatment of Class 4 claims (and the justification for such treatment) by

including the following conclusory and self-serving statement in the proposed Disclosure

Statement:

> The Bankruptcy Code also requires that a Plan must provide the
> same treatment for each claim or interest in a particular Class,
> unless a holder agrees to a less favorable treatment of its particular
> claim or interest.  The Plan Proponents believe that they have
> complied with the requirements of the Bankruptcy Code by their
> Classification and treatment of various holders of Claims and
> Equity Interests under the Plan.

Disclosure Statement at 95.  Nothing is said about the substantial risk of treatment that is not "the

same treatment" arising from the sub-classification of Class 4 claims under the TDP.

8.      Second, disclosing the risk of unequal treatment of Class 4 claims arising

from the TDP's three-tiered construct is particularly important in order for the holders of Ovarian

Cancer Claims that constitute the preponderance of the Class 4 claims to make an informed

5

judgment about the Plan, because of the significant (and undisclosed) risk, described below, that

Ovarian Cancer Claims will be disadvantaged by the proposed 40-40-20 allocation of Trust

assets—which may well be skewed in favor of Mesothelioma Claims.  From a "numerosity"

standpoint, the holders of Ovarian Cancer Claims are likely to control the Class 4 vote (and,

therefore, whether the Class 4 vote satisfies the numerosity requirement of Section

524(g)(2)(B)(ii)(IV)(bb) of the Code).  As of the Petition Date, there were ***over sixteen times*** the

number of pending lawsuits involving Ovarian Cancer Claims as there were pending lawsuits

involving Mesothelioma Claims (*see* Disclosure Statement at 25).

        9.      The Objectors respectfully submit that the Plan Proponents should not be

permitted to obtain acceptances of the Plan by the holders of the Ovarian Cancer Claims by

means of a Disclosure Statement that obfuscates the substantial risk of disparate and less

favorable treatment imposed by the TDP's construct, particularly where there is no disclosure as

to the bases and justification for such potentially unequal treatment.  Moreover, the Objectors

believe that, as a matter of law, because of the unequal treatment of Class 4 claims under the

TDP, the Plan does not comply with the "same treatment" mandate of Section 1123(a)(4) of the

Code and cannot be confirmed.

        10.     In addition, many other provisions interspersed throughout the 65-page

TDP create significant, unreasonable, yet undisclosed risks for some or all holders of Class 4

Claims, including the unequal treatment of Class 4 Claims in a number of other respects. Yet,

from reading the Disclosure Statement a Class 4 Claimant would not know ***any*** of this and might

assume that, given the Plan Proponents' stated "belief" that they have complied with the Code's

6

"same treatment" requirement, all Talc Personal Injury Claims are treated equality. ***They most certainly are not.***

        11.      The infirmities in the Disclosure Statement and compounding disclosure shortcomings in the TDP include:

- The Disclosure Statement provides no estimates of the expected aggregate amounts of the claims that will receive distributions from each sub-fund established under the Trust for the different categories of Talc Personal Injury Claims under the Trust (*i.e.,* Mesothelioma or Secondary Mesothelioma, Ovarian Cancer A, Ovarian Cancer B, C, and D).

- The TDP (as well as the Disclosure Statement) does not set forth any of the Initial Payment Percentages for the sub-funds (*see* TDP § 4.2); hence, a Talc Personal Injury Claimant voting on the Plan cannot determine either what percentage distribution will initially be made on its allowed claim against the Trust, or the potential magnitude of any disparity in distributions among the three subclasses of Class 4 Claims created by the TDP. In addition, the Initial Payment Percentages are stated to be based on the "findings of experts," but nothing about those experts or their findings is disclosed. Nor is there any disclosure that Payment Percentages may be changed in the future on a Fund by Fund basis, so that the ultimate discrepancy in the percentage distributions to the three categories of Class 4 Claims created under the TDP is essentially unknown.

- The Disclosure Statement provides no information as to how the Plan Proponents arrived at the 40/40/20 split established in the TDP for the sub-funds and corresponding Claim subclasses. TDP § 2.2. Again, the Plan Proponents apparently relied upon "experts" in arriving at the 40/40/20 split and the various claim "Values" listed in the TDP (*see* TDP § 5.2), but no information is provided on how the split or values were established so that parties can assess the credibility and reasonableness of the undisclosed experts' conclusions.

- The Disclosure Statement does not disclose or explain the multiple provisions under the TDP that may cause unequal treatment to Class 4 creditors, so that those creditors can make an informed judgment about the Plan that takes into account the potential impact of those provisions.

7

- Their Disclosure Statement does not even mention the fact that the TDP provides for lower distributions from the Trust to holders of Indemnified Claims that elect to pursue rights against a third party, J&J, under the J&J Indemnities than to holders of Non-Indemnified Claims and holders of Indemnified Claims who forego such rights. (*see* TDP § 2.6). In particular, the Disclosure Statement does not disclose that holders of Indemnified Claims must make an election to (i) receive a lesser distribution from the Trust than a holder of a Non-Indemnified Claim and pursue a suit in the tort system against J&J under the J&J Indemnities, or (ii) receive the same distribution from the Trust as the holder of a Non-Indemnified Claim and forgo that right; nor are or any of the risks associated with making that election disclosed. (*see id.*).

- The Disclosure Statement makes no mention of the fact that, under the TDP, even if the holder of an Indemnified Claim makes a Tort System Election, thereby reducing the Claimant's recovery from the Trust, the Trustees must nonetheless consent to pursuit of the claim under the J&J Indemnities; thus, it seems that a Claimant could make the election and never be permitted to actually prosecute that claim. (*see* TDP § 2.7).

- The Disclosure Statement does not mention the fact that the Trust may pursue indemnification claims against J&J on behalf of the Trust Election Claimants, thereby competing with the Tort System Election Claimants for recovery on the J&J indemnitees. (*see* TDP 2.3 § (d)).

- The Disclosure Statement does not mention the fact that despite any reliance on the part of Class 4 creditors on the provisions of the TDP in voting on the Plan, including the matrices of Scheduled, Average and Maximum Values and other provision of the TDP, ***nearly all of these key provisions can be changed after confirmation without any prior notice to, or recourse on the part of, claimants.*** Taken together, section 3.1, and the other sections cited therein indicate that the Trustees, with the consent of the TAC and the FCR, and without any judicial review, have *carte blanche* to amend the TDP in material ways as they see fit. That should be disclosed so that Claimants voting on the Plan understand that the claim resolution and payment procedures that they are voting on may not be the procedures that end up binding them, and that amendments will not be subject to any form of prior notice or judicial review. (*see* TDP §3.1).

- The Disclosure Statement does not mention the significant (and likely unconfirmable) penalties that are applied if a claimant

8

exercises its legal right to judicial review of the Trust's Claims
determination.  (*see* TDP §7.8).

- The Disclosure Statement contains a wholly inadequate
  Liquidation Analysis as it lacks any estimates for plan recoveries
  for the only voting Class under the Plan.

- The form of Acceptance and Release that claimants have to sign to
  accept an offer of payment from the Trust (*see* TDP §7.2), which
  is not included in the TDP or Disclosure Statement, should be
  disclosed before Class 4 creditors who will have to execute that
  document vote on the Plan.  According to the TDP, the release will
  include "a release of Protected Parties"; but the Plan ***already***
  releases them.  See Plan §12.3.  If the Acceptance and Release is to
  add something to the release of Protected Parties under the Plan,
  creditors who will be required to sign that document must be told
  as much ***before*** they vote.

12.    Absent the missing information identified above, and the other

information detailed below, no Class 4 Creditor can make an informed decision about whether to

accept or reject the Plan.  Accordingly, the Court should deny approval of the Disclosure

Statement in its present form and require that these serious omissions be rectified.

## II.    **Background**

13.    On February 13, 2019 (the "Petition Date"), the Debtors filed voluntary

petitions in this Court commencing cases for relief under chapter 11 of the Bankruptcy Code.

14.    On May 15, 2020, the Debtors filed the *Joint Chapter 11 Plan of*

*Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the*

*Bankruptcy Code Filed by Imerys Talc America, Inc.* [Docket No. 1714] (the "Plan"), the

original Disclosure Statement, and the Solicitation Motion.

15.    On June 15, 2020, Arnold & Itkin filed an objection to the original

Disclosure Statement.  The hearing on the Solicitation Motion was adjourned several times.

16.     On August 12, 2020, the Debtors filed the *Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* (the "First Amended Plan") [Docket No. 2083] and the *Disclosure Statement for Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* (the "First Amended Disclosure Statement") [Docket No. 2084].

17.     On September 10, 2020, the Debtors filed a *Notice of Filing Exhibits to Amended Plan* [Docket No. 2184], which contains both Exhibit A to the Plan (the Trust Distribution Procedures (the "Original TDP")) and Exhibit B to the Plan (the Talc Personal Injury Trust Agreement (the "Trust Agreement")).

18.     On October 5, 2020, the Debtors filed the Amended Disclosure Statement and Second Amended Plan.  The Debtors also filed the revised TDP [Docket No. 2296, 2298]. Following a status conference on October 7, 2020, the Court adjourned the hearing on the Amended Disclosure Statement to November 16, 2020.

19.     After hours, on Friday October 16, 2020, the Debtors filed the *Third Amended Plan and Disclosure Statement in Support of the Third Amended Plan* [Docket No. 2354, 2355].  Despite the Court's prior admonitions to provide a reasonable amount of time to key parties to review and comment on the Plan documents, on October 19, 2020, the Debtors filed a *Notice of Further Revised Trust Distribution Procedures* [Docket No. 2370].

20.     Arnold & Itkin represents thousands of talc personal injury claimants who will be classified as Class 4 "Talc Personal Injury Claims" under the Plan, which is the sole impaired voting class.

### III.    <u>Disclosure Statement Objections</u>

**A.    The Disclosure Statement Fails to Provide "Adequate Information" Regarding the Treatment of Class 4 Claims, and the Terms of the TDP**

21.    The summary of material omissions from the Disclosure Statement, and the shortcomings in the adequacy of the information that it provides, regarding the treatment of Class 4 Claims set forth above demonstrates that the Disclosure Statement fails to provide Class 4 creditors with "adequate information."  Many of those points are self-explanatory and require no elaboration.  However, some of the more glaring deficiencies in disclosure are explained in further detail below:

**B.    The Disclosure Statement Does Not Disclose the Unequal Treatment of Class 4 Claims Resulting from the Establishment of Funds A, B and C and Related Subclassification of Class 4 Claims, or the Adverse Consequences Thereof to Certain Class 4 Creditors**

22.    As set forth above, the TDP breaks Class 4 Claims into three sub-classes—(i) Ovarian Cancer A Claims; (ii) Mesothelioma Claims; and (iii) Ovarian Cancer B, C and D Claims—and allocates a fixed percentage of Trust assets to each of these three sub-classes of claims, ***without regard to the actual amount of allowed Claims in each sub-class or the proportion of the total amount of the Class 4 Claims that is represented by the allowed claims in any sub-class.***

23.    Specifically,  Section 2.2 of the TDP provides that the Trust Fund will be divided into three sub-funds within the Trust (each, a separate "<u>Fund</u>"):

> Each Fund operates entirely separately and any changes to the administration of one Fund, such as changes to Medical/Exposure Criteria, Scheduled, Average or Maximum Values, Payment

11

Percentage or Maximum Annual Payment, shall not affect or
require changes to the other Funds.

TDP § 2.2.

24.    Under Section 2.2, Ovarian Cancer A Claimants will receive distributions

only from Fund A, which will hold 40% of the total Trust Fund; Mesothelioma Claimants and

Secondary Mesothelioma Claimants will receive distributions only from Fund B, which will hold

40% of the total Trust Fund; and Ovarian Cancer B, C, and D Claimants will receive

distributions only from Fund C, which will hold 20% of the total Trust Fund.  Thus,

Mesothelioma Claimants and Secondary Mesothelioma Claimants will receive 40% of the Trust

Fund (as will Ovarian Cancer A Claimants), ***regardless of the relative aggregate amount of the***

***allowed claims against the Trust that they ultimately hold.***

25.    Significantly, the TDP itself seems to contemplate that the claims that will

be paid out of each of Fund A, Fund B and Fund C will receive disparate treatment—that is, that

claims payable out of different Funds will receive different "Payment Percentages" on their

claims, depending on the Fund making the distributions.  Thus, in specifying the "Initial

Payment Percentage" to be paid on claims payable from each Fund, section 4.2 of the TDP

contains a line item chart of the "Initial Payment Percentage," with separate lines for each of

Fund A, Fund B and Fund C:

| Fund | Payment Percentage |
|:---:|:---:|
| A | |
| B | |
| C | |

12

TDP at 29.  Illustrative of the inadequacy of disclosure, however, the actual Initial Payment

Percentages in the chart are blank.  Thus, Class 4 creditors voting on the plan have no insight as

to the extent of the potential disparity in treatment among the three sub-classes of Class 4

creditors.  This omission is exacerbated by the statement immediately following this chart:

> In making any such change to any Payment Percentage, the
> Trustees, the TAC and the FCR shall take into account the fact that
> **_the holders of Talc Personal Injury Claims who voted on the_**
> **_Plan relied on the findings of experts that the Initial Payment_**
> **_Percentages represented a reasonably reliable estimate of the_**
> **_Trust's total assets and liabilities over the Trust's life based on_**
> **_the best information available at the time,_** and shall therefore give
> due consideration to the expectations of such claim holders that the
> applicable Initial Payment Percentage would be applied to their
> Talc Personal Injury Claims.

TDP § 4.2, at 29 (emphasis added).  This provision is misleading, at best.  The TDP asserts that,

in voting on the Plan, Class 4 creditors relied on "the findings of experts that the Initial Payment

Percentages represented a reasonably reliable estimate of the Trust's total assets and liabilities

over the Trust's life . . .," but neither the Initial Payment Percentages, nor the relied-upon

"findings of experts," nor the basis for those undisclosed "findings," are disclosed.[7]

      26.     To make matters even more opaque, section 4.2 provides for future Fund-

by-Fund adjustments in Payment Percentages, which means that, over time, disparities in

---

[7] In light of the quoted statement in the TDP that anticipates and acknowledges the reliance of Class 4 creditors on "the findings of experts . . ." in voting on the Plan, any argument by any Plan Proponent that the reports of such experts are privileged and need not be disclosed in order to provide Class 4 creditors with "adequate information" borders on the frivolous.  Moreover, if the 40-40-20 allocation of Trust assets under the TDP is based on the reports of experts, adequate disclosure would in any event require the disclosure of these reports, notwithstanding any potentially applicable privilege that a Plan Proponent might otherwise assert: If the Plan Proponents who crafted the TDP relied on the advice of experts in arriving at the 40-40-20 allocation of Trust assets, they must disclose those reports to provide creditors with adequate information about that allocation. After all, the Plan Proponents will in any event  have to place those reports into evidence at the hearing on confirmation of the Plan to justify this Trust asset allocation.

treatment among claims to be paid from each of the three Funds could become more pronounced. Compounding the likelihood of disparate treatment of the three creditor subclasses, section 2.09 provides that the Maximum Annual Payment for each Fund will be determined annually (and, presumably, separately, on a Fund-by-Fund basis). *None* of this is disclosed in the proposed Disclosure Statement.

27.     Further, the proposed Disclosure Statement says nothing about how the Plan Proponents decided to allocate 40% of the Trust assets to holders of Mesothelioma Claims and 60% of the Trust assets to holders of Ovarian Cancer Claims, or any of the assumptions that underlie that allocation. What makes the inadequacy of this (non) disclosure even more glaring is that this 60-40 allocation appears to ***conflict*** with: (i) the fact that there appear to be ***approximately  fifteen times*** as many Ovarian Cancer Claims as there are  Mesothelioma Claims; (ii) the respective Scheduled Values that apply to Mesothelioma Claims and Ovarian Cancer Claims under the TDP's Expedited Review Process; and (iii) the respective "Average Values" and "Maximum Values" for such claims under the TDP's Individual Review Process. Consideration of these factors indicates that the 60-40 allocation is skewed in favor of holders of Mesothelioma Claims, to the disadvantage of holders of Ovarian Cancer Claims. At the very least, the risk of this possibility should be disclosed.

28.     To begin with, approximately 16,500 lawsuits asserting Ovarian Cancer Claims have been filed since 2014, as compared to approximately 1,200 lawsuits asserting Mesothelioma Claims—***a ratio of approximately 14:1 in favor of Ovarian Cancer Claims***. *See* Disclosure Statement at 24-25. As of the Petition Date, there were approximately 13,800 pending lawsuits asserting Ovarian Cancer Claims and approximately 850 pending lawsuits

14

asserting Mesothelioma Claims against one or more of the North American Debtors—*a ratio of approximately 16:1 in favor of Ovarian Cancer Claims*.  *See id.* at 25.

29.     Using the number of pending lawsuits as of the Petition Date as a proxy for the comparative numbers of Mesothelioma Claims and Ovarian Cancer Claims for illustrative purposes, the following illustrations demonstrate the inconsistency between the various "Values" assigned to Ovarian Cancer Claims and Mesothelioma Claims under the TDP and the allocation of 40% of the Trust assets to Fund B, for Mesothelioma Claims.

### Illustration A – "Scheduled Values" Under the Expedited Review Process

- This illustration assumes that all of the Class 4 claimants participate in the Expedited Review Process and are "Trust Election Claims and Non-Indemnified Claims."  This illustration also assumes that all of the Ovarian Cancer Claims are the least severe form of Ovarian Cancer Claim, Ovarian Cancer D Claims, with a scheduled value of only $60,000.00.  This latter assumption clearly will *understate* the aggregate "Scheduled Values" of the Ovarian Cancer Claims, because some of those claims will be Ovarian Cancer A, Ovarian Cancer B or Ovarian Cancer C Claims, with substantially higher Scheduled values of $400,000.00, $200,000.00, and $140,000.00, respectively.

- The Mesothelioma Claims would all have a Scheduled value of $400,000. *See* TDP § 5.2, at 37.  Based on these assumptions, the aggregate Scheduled Values of the approximately 850 Mesothelioma Claims would be approximately $340M (850 claims multiplied by $400,000) and the aggregate Scheduled Values of the approximately 13,800 Ovarian Cancer Claims would be approximately $828M (13,800 multiplied by $60,000). Under this illustration, the aggregate Mesothelioma Claims would represent slightly less than *30%* of the total Class 4 claims; yet the holders of Mesothelioma Claims would receive approximately 40% of the Trust assets, *i.e.,* a premium of 33%. This clearly disadvantages holders of Ovarian Cancer Claims.

### Illustration B – "Average Values" Under Individual Review Process

This illustration assumes that all Class 4 claimants participate in the Individual Review Process and receive "Average Values."  It further assumes that all holders of Mesothelioma Claims receive the Average Values assigned to Trust Election Claims and Non-Indemnified Claims for

15

"Mesothelioma Claims with Regular and Routine Exposure" of $500,000.00; this assumption overstates the aggregate Average Values of the Mesothelioma Claims, because some of those claims will be "Mesothelioma Claims without Regular and Routine Exposure" or "Secondary Mesothelioma Claims," for which Trust Election Claims and Non-Indemnified Claims are assigned substantially lower Average Values of only $150,000.00. *See* TDP § 5.2(b) (vii), at 43.

- All Ovarian Cancer Claims will be Ovarian Cancer D Claims with Average Values of only $75,000.00; this assumption understates the aggregate Average Values of the Ovarian Cancer Claims, because some of the Ovarian Cancer Claims will be Ovarian Cancer A Claims, Ovarian Cancer B Claims, or Ovarian Cancer C Claims, with substantially higher Average Values of $500,000.00, $325,000.00 and $175,000.00, respectively. *See id.*

- Based on these assumptions, the approximately 850 Mesothelioma Claims would have aggregate Average Values of approximately $425M (850 claims multiplied by $500,000.00) and the approximately 13,800 Ovarian Cancer Claims would have aggregate Average Values of approximately $1.035B (13,800 claims multiplied by $75,000.00). Once again, the holders of Mesothelioma Claims would receive 40% of the Trust assets, even though they would have fewer than 30% of the total claims.

### Illustration C – "Maximum Values" Under Individual Review Process

- This illustration assumes that all Class 4 claimants participate in the Individual Review Process and receive the Maximum Values for Trust Election Claims and Non-Indemnified claims.

- It further assumes that all holders of Mesothelioma Claims receive the Maximum Values assigned to Trust Election Claims and Non-Indemnified Claims for "Mesothelioma Claims with Regular and Routine Exposure" of $1,350,000.00; this assumption overstates the aggregate Maximum Values of the Mesothelioma Claims because some of those claims will be "Mesothelioma Claims without Regular and Routine Exposure" or "Secondary Mesothelioma Claims" for which Trust Election Claims and Non-Indemnification Claims are assigned substantially lower Maximum Values of only $400,000.00. *See id.*

- All Ovarian Cancer Claims will be Ovarian Cancer D Claims with Average Values of only $202,500.00; this assumption understates the aggregate Maximum Values of the Ovarian Cancer Claims, because some of the Ovarian Cancer Claims will be Ovarian Cancer A Claims, Ovarian Cancer B Claims, or Ovarian Cancer C Claims, with substantially higher Maximum Values of $1,350,000.00, $877,500.00 and $472,500.00,

16

respectively.  *See id.*

- Based on these assumptions, the aggregate Maximum Values of the approximately 850 Mesothelioma Claims would be approximately $1.15B (850 claims multiplied by $1,350,000.00) and the aggregate Maximum Values of the approximately 13,800 Ovarian Cancer Claims would be approximately $2.79B (13,800 claims multiplied by $202,500.00).  Once again, holders of Mesothelioma Claims would receive ***40%*** of the Trust assets, even though they would hold slightly less than ***30%*** of the total claims.

30.    The Plan Proponents may argue that each of these Illustrations is flawed because: (i) the actual number of Ovarian Cancer Claims and Mesothelioma Claims against the Trust will ultimately exceed the number of such claims asserted in lawsuits that were pending on the Petition Date, and the ratio of Ovarian Cancer Claims to Mesothelioma claims may change; (ii) not all claims will participate in the Expedited Review Process and not all claims will participate in the Individual Review Process (and some claims may end up being resolved judicially through money judgments in the tort system, rather than under either Process); (iii) not all Mesothelioma Claims will be Mesothelioma Claims with Regular and Routine Exposure; and (iv) not all Ovarian Cancer Claims will be Ovarian Cancer D Claims.  These are fair points; but rather than support the Plan Proponents, these points simply highlight the shortcomings of their disclosure.  The last two points suggest that the disproportionately favorable treatment which the TDP's subclassification of Class 4 Claims affords Mesothelioma Claims is even more pronounced than that suggested by the illustrations.  Meanwhile, points (i) and (ii) help bring into focus the shortcomings of the Plan Proponents' (non) disclosure regarding the basis for, and assumptions underlying, the 40-40-20 allocation of Trust assets among Funds A, B and C.  The Plan Proponents have not disclosed ***any*** of the assumptions regarding the number or value of the

17

claims in each of the three subclasses that underlie the 40-40-20 allocation of Trust assets. They have not disclosed how they arrived at this allocation. They have not disclosed any basis for concluding that this allocation will result in "the same treatment" of the three subclasses of Class 4 Claims that their TDP construct creates, rather than disadvantaging one group of Class 4 creditors, to the advantage of another group. To date, all of this critical information seems to be a closely-guarded secret.

31.     The point is simple: In light of the substantial risk of disparate treatment of commonly Classified claims posed by the TDP's trifurcation of Trust assets and subclassification of Class 4 creditors, the Plan Proponents should be required to disclose the following: (i) the existence of the sub-Classification of Class 4 claims and fixed allocation of Trust assets among three separate Funds; (ii) the potential effect of this construct on the treatment of claims in each of the three sub-classes and the likelihood of unequal treatment of the three sub-classes that it creates; (iii) the rationale and justification for creating these separate Funds; (iv) the basis for, and assumptions underlying, the proposed 40-40-20 allocation of Trust assets among the three Funds; and (v) why they believe that the common feature of a single trust fund in which all commonly classified Class 4 creditors participate ratably is not appropriate. Moreover, because this information is critical to the ability of Class 4 creditors to make an informed judgment about the Plan, this information should be included in the front section of the Disclosure Statement, and not buried in the back where Article VII is currently situated.

32.     Although the creation of sub-classes of claims within Class 4 probably represents the most significant driver of the unequal treatment of Class 4 Claims, there are at

least three other issues of unequal treatment created by the proposed TDP that are not (but should

be) disclosed.

**C.    The Disclosure Statement Does Not Disclose the Unequal Treatment of Class 4 Claims that Are Liquidated by Money Judgments Against the Trust that Results from Provisions Penalizing Holders of Class 4 Claims Who Exercise Their Right to A Judicial Resolution of Their Claims (and a Jury Trial)**

33.    The TDP penalizes any Class 4 claimant who exercises his or her right to

file suit against the Trust to liquidate the claimant's claim judicially (and his or her right to a jury

trial), by subjecting such a Class 4 claimant to less favorable treatment than Class 4 claimants

whose claims are not liquidated through judicial proceedings.  To begin with, although Section

7.7 of the TDP provides for the payment of a "sequencing adjustment" on Talc Personal Injury

Claims with respect to which the claimant has had to wait one year or more for payment (up to a

maximum of seven years), "No sequencing adjustment shall be available to or paid on any claim

liquidated in the tort system pursuant to Section 5.8 above herein."  TDP § 7.7(b).

34.    Moreover, following the liquidation of its claim in a judicial proceeding,

the distribution to a Class 4 claimant who obtains a judgment against the Trust will be subject to

a delay of a type that is not applicable to a distribution on the claim of a Class 4 claimant

following the liquidation of its claim under any other Trust procedure.  A Class 4 claimant that

obtains a money judgment against the Trust will receive from the Trust an initial payment of an

amount equal to the greater of (i) the Trust's last offer to the claimant, or (ii) the award that the

claimant declined in non-binding arbitration, not to exceed the amount of the judgment obtained

in the tort system.  The payment of any portion of the judgment that exceeds the greater of (i) or

(ii) will be deferred, with such portion to be paid in five equal installments in years six through

ten following the year of the initial payment.  The net effect of this convoluted provision is that payment of some portion of a Class 4 claim that is judicially liquidated by a money judgment against the Trust may be delayed for years in a manner that is not applicable to any other Class 4 claim (and without any "sequencing adjustment" or other compensation for the delay).  *See* TDP § 7.08.

35.    Also not disclosed is the fact that regardless of the size of the judgment, the claimant cannot recover more from the Trust than the "Maximum Value" set forth in Section 5.2 .  In effect, this provision sets a ceiling by fiat on the allowed amount of every Talc Personal Injury Claim that seeks judicial review, and disallows the amount of any claim in excess of the applicable "Maximum Value," without any proceeding under Section 502 or other judicial proceeding of any sort.  This provision—which is not disclosed in the Disclosure Statement— impermissibly deprives Class 4 Claimants of their statutory right to the adjudication of their claims by a court in violation of the Bankruptcy Code and is flatly unlawful.[8]

36.    In the mass tort context, the administrative difficulty of adjudicating tens of thousands of claims has led trusts to incorporate mechanisms for resolving claims that have included consensual settlement mechanisms under which the trust would make a settlement offer to a claimant to resolve the claim (often in accordance with matrices designed to ensure that similar claims would receive similar treatment).  But the law is clear that a claimant that does not

---

[8] Penalizing a claimant for exercising its jury trial rights, or ignoring a jury verdict and limiting a claim to some "Maximum Value" regardless of that verdict, creates serious due process issues.  *See Official Comm. of Asbestos Claimants v. Asbestos Prop. Damage Comm. (In re Federal-Mogul Global Inc.)*, 330 B.R. 133, 154 (D. Del. 2005) (each claimant must "be afforded the procedural protections of the *due process clause of the Fifth Amendment*, thereby requiring" a trial by jury for cases that present disputed issues of fact) (emphasis added).

accept such a settlement following the completion of the settlement process is entitled by law to

access the courts to adjudicate the allowance or disallowance of its claim.  *In re G-I Holdings*,

*Inc*., 323 B.R. 583, 616-17 (Bankr. D. N.J. 2005) (noting that estimation/liquidation procedures

conducted by a nonjudicial entity are subject to judicial review).

37.    This imposition of the ceiling on the maximum amount of a claim that will

be allowed against the Trust, regardless of the amount of any money judgment obtained

following judicial proceedings, and the fact that the legality of that provision is being challenged,

must also be disclosed in the Disclosure Statement.

**D.    The Disclosure Statement Does Not Disclose the Unequal Treatment of Holders of Indemnified Claims in Class 4, Who Are Required to Forego Prosecution of Any Rights Against J&J Under the J&J Indemnities on Order to Receive the Same Treatment of Their Claims Against the Trust as Holders of Non-Indemnified Claims Who Do Not Have Such Additional Rights Against J&J**

38.    The TDP essentially requires a Class 4 claimant who may have rights

against J&J under the J&J Indemnities to forego such rights in order to receive the same

"Scheduled Value," "Average Value," or "Maximum Value" as a Class 4 claimant who does not

have such rights against J&J; otherwise, the Class 4 claimant that has and pursues rights against

J&J under the J&J Indemnities will be accorded a ***lower*** Scheduled Value, Average Value or

Maximum Value, as applicable (and a correspondingly ***lower*** distribution from the Trust), than a

holder of a Class 4 Non-Indemnified Claim in the same category (*i.e.,* Mesothelioma Claim or

same category of Ovarian Cancer Claim) that is resolved through the same resolution process

(*i.e.,* Expedited Review Process or Individual Review Process).

39.    To place this issue in context, it is important to understand that although

"the most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage

21

settlements to co-Class members," that is not the only form of inequality prohibited by

§ 1123(a)(4).

> The other side of the coin of unequal payment . . . has to be
> unequal consideration tendered for equal payment.  It is disparate
> treatment when members of a common Class are required to tender
> more valuable consideration— be it their claim against specific
> property of the debtor or some other cognizable chose in action—
> in exchange for the same percentage of recovery.

*In re AOV Industries, Inc.*, 792 F.2d 1140, 1151 (D.C. Cir. 1986).[9]

40.    The Plan Proponents' conclusory disclosure regarding the issue of equal

treatment (*see* Disclosure Statement at 95) should disclose that the TDP raises an "unequal

treatment" issue akin to that in *AOV Industries*.  In particular, they should disclose that the holder

of an Indemnified Claim will have to forego any right he or she may have against J&J under the

---

[9] The court in *AOV Industries* explained the "unequal treatment" issue in the case before it (in which it reversed the lower court's determination that the Plan complied with § 1123(a)(4)) as follows:

> Once a plan has classified creditors, it must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." *11 U.S.C. § 1123 (a)(4) (1982)*; *see also In re B & W Enterprises*, 19 Bankr. 421, 425 (Bankr. D. Idaho 1982) (equal treatment of class members basic premise of bankruptcy law).  Hawley asserts that the Plan violated this principle.  While other Class 5 members received their pro rata distributions from the Sleigh and Steag fund in exchange for release of their *derivative* claims, Hawley was required to release a more valuable, direct claim against the guarantors. . . .
>
> . . . .
>
> Even though neither the Code nor the legislative history precisely defines the standards of equal treatment, the most conspicuous inequality that *§ 1123(a)(4)* prohibits is payment of different percentage settlements to co-class members.  The other side of the coin of unequal payment, however, has to be unequal consideration tendered for equal payment.  It is disparate treatment when members of a common class are required to tender more valuable consideration—be it their claim against specific property of the debtor or some other cognizable chose in action—in exchange for the same percentage of recovery.  We are not prepared to make a finding that Hawley in fact had a guarantee from Steag; indeed, the litigation in the New York district court leads to a contrary conclusion.  However, to the extent that the creditor was called upon to release a unique, direct claim in order to participate in the $3 million Fund, we conclude that Hawley was being subjected to unequal treatment in violation of *11 U.S.C. § 1123(a)(4)*.

*In re AOV Industries, Inc.*, 792 F.2d at 1151-52.

22

J&J Indemnities in order to be accorded the same treatment of its claim against the Trust as a

Class 4 creditor who has not such additional rights.

41.    To elaborate on this point, the TDP distinguishes between "Indemnified

Claims" and "Non-Indemnified Claims."  An "Indemnified Claim" is a Talc Personal Injury

Claim that is "Indemnified," defined to mean:

> . . . when used to describe any Talc Personal Injury Claim or any
> category of Talc Personal Injury Claims, in respect of which the
> Debtors, Talc Personal Injury Claimants, the Trust, and/or any
> other person or entity who could have asserted, or may assert,
> rights under and to the J&J Indemnities.

TDP § 1.2 (45).  A Talc Personal Injury Claim that is not "Indemnified" is a "Non-Indemnified

Claim."  *Id.* § 1.2 (62).

42.    The TDP then goes on to require, in substance, that the Class 4 claimant

that may have rights against J&J under the J&J Indemnities that other Class 4 claimants do not

have must forego those ***additional*** rights in order to receive the ***same*** Scheduled Value, Average

Value, or Maximum Value, as applicable, as its Class 4 counterpart that holds a Non-

Indemnified claim.  In particular, a holder of an Indemnified Claim must choose between holding

a "Trust Election Claim" (and being a "<u>Trust Election Claimant</u>") and holding a "Tort System

Election Claim" (and being a "<u>Tort System Election Claimant</u>").  A "Tort System Election

Claimant" is defined as "the holder of an Indemnified Claim who elects to pursue such claim

against one or more of the Debtors in the tort system . . . based on one or more of the J&J

Indemnities."  TDP § 1.2 (97).  To qualify as a "Trust Election Claimant," the holder of an

Indemnified Claim must elect "to seek recovery from the Trust in lieu of proceeding against the

J&J Indemnities in the tort system."  *Id.* § 2 (101).  The upshot of this mandatory "election" is

that in order to receive the *same* Scheduled Value, Average Value or Maximum Value, as applicable, as the Class 4 claimant with a Non-Indemnified Claim in the same category (*i.e.*, Mesothelioma Claim or same category of Ovarian Cancer Claim) that is subject to the same resolution process (*i.e.,* Expedited Review Process or Individual Review Process), the holder of an Indemnified Claim must elect to become a "Trust Election Claimant," thereby foregoing the right to pursue indemnification under the J&J Indemnities—a right that its Non-Indemnified Claim holding counterpart does not have. *See* TDP § 2(a), at 221.[10]

43.    As an example of how this mandatory election works, under the Scheduled Values for the Expedited Review Process under Section 5.2(a) of the TDP (*see* TDP at 37), an Ovarian Cancer A Claim whose holder participates in the Expedited Review Process and does

---

[10]    The TDP summarizes the election that the holder of an Indemnified Claim must make in the following chart.

| Disease | Indemnified (J&J Product) | Non-Indemnified (No J&J Product) |
|---|---|---|
| Mesothelioma Claims with Regular and Routine Exposure | May elect either: (a) to proceed against the Debtors in the tort system pursuant to indemnification by J&J AND seek recovery from the Trust as a Tort System Election Claimant; OR (b) to seek recovery solely from the Trust as a Trust Election Claimant. | May file a claim with the Trust under Expedited Review or Individual Review, as set forth herein, for distribution from the Trust Fund as a Non-Indemnified Claim. |
| Mesothelioma Claims without Regular and Routine Exposure and Secondary Mesothelioma Claims | May elect either: (a) to proceed against the Debtors in the tort system pursuant to indemnification by J&J AND seek recovery from the Trust as a Tort System Election Claimant; OR (b) to seek recovery solely from the Trust as a Trust Election Claimant. | May file a claim with the Trust under Individual Review, as set forth herein, for distribution from the Trust Fund as a Non-Indemnified Claim. |
| Ovarian Cancer A through D | May elect either: (a) to proceed against the Debtors in the tort system pursuant to indemnification by J&J AND seek recovery from the Trust as a Tort System Election Claimant; OR (b) to seek recovery solely from the Trust as a Trust Election Claimant. | May file a claim with the Trust under Expedited Review or Individual Review, as set forth herein, for distribution from the Trust Fund as a Non-Indemnified Claim. |

TDP § 2.6, at 25-26.

not have an Indemnified Claim (*i.e.,* does not have a claim against J&J under the J&J

Indemnities) will be allowed under the heading "Trust Election Claims and Non-Indemnified

Claims" for $400,000.00.  However, the Ovarian Cancer A Claimant who does have a claim

against J&J under the J&J Indemnities must forego the prosecution of that **additional** claim in

order to receive the ***same*** $400,000 claim (and the same distribution from the Trust Fund) (rather

than the dramatically reduced $140,000 Scheduled Value that would be allowed for a "Tort

System Election Claim," and the correspondingly lower distribution from the Trust).  Thus, the

TDP would effectively require the Ovarian Cancer A claimant who holds an Indemnified Claim

to give up his or her ***additional*** rights against J&J that the Ovarian Cancer A Claimant with a

Non-Indemnified Claim does not have, in order to receive the ***same*** distribution as that Non-

Indemnified Ovarian Cancer A claimant.

44.    This construct is true for each category of Class 4 Claim in the Expedited

Review Process and the Individual Review Process; in every case, the holder of an Indemnified

Claim will have to forego any additional rights against J&J under the J&J Indemnities in order to

have a "Trust Election Claim" that will provide it with the same "Value" for its claim (and the

same distribution from the Trust) as the holder of the Non-Indemnified Claim who has no such

additional rights to forego.

45.    The Objectors believe that, as a matter of law, because of the unequal

treatment of Class 4 claims under the TDP, the Plan does not comply with the "same treatment"

mandate of Section 1123(a)(4) of the Code and cannot be confirmed.[11]  Nevertheless,

---

[11] Among other reasons, the Court will not be able to both: (i) make one of the findings required to confirm the Plan
and (ii) still find that the 40-40-20 allocation of assets among Funds A, B and C is proportionate to the respective

recognizing that the Court does not wish to hear Plan confirmation issues at this time, the

Objectors are not now asking the Court to determine whether the Plan complies with

§ 1123(a)(4).[12]  Rather, the point is that the Disclosure Statement should clearly disclose and

explain the multiple provisions for unequal treatment under the TDP to Class 4 creditors, so that

those creditors can make an informed judgment about the Plan that takes into account the

potential impact of those provisions.

**E.      The Disclosure Statement Does Not, But Should, Disclose to Ovarian Cancer B, C and D Claimants That There Are Provisions of the TDP That Will Adversely Affect Them and No Other Class 4 Creditors**

46.     Section 5.2(a)(iii) of the TDP provides that the Trustee, with the consent

of the TAC and FCR can "add to, change or eliminate" the Scheduled Values and/or

Medical/Exposure Criteria for Ovarian Cancer A-D Claims and Mesothelioma Claims, ***except***

***that*** in no event shall the Scheduled Value for Ovarian Cancer A or Mesothelioma Claims be

reduced to an amount less than the Scheduled Value identified in the chart in the TDP.  This

exception to the power to amend the TDP does not apply to Ovarian Cancer B, C and D Claims.

The Disclosure Statement should (but fails to) disclose this unexplained disparity to the Ovarian

Cancer B, C and D Claimants in Class 4, so that they can consider whether it is acceptable.

---

amounts of the ultimately allowed claims in each of the three categories that will receive distributions from those Funds.  One of the conditions to confirmation of the Plan is that the Bankruptcy Court find, "the actual amount, numbers and timing of future Talc Personal Injury Demands cannot be determined."  Plan § 9.1.5(x), at 52.  The Objectors believe that the Court cannot simultaneously make this finding, while at the same time finding that the amount of the respective categories of claims (including Talc Personal Injury Demands) that will ultimately be allowed against each of the three Funds is proportionate to the allocation of Trust assets among the three Funds.

[12] The Objectors do, however, reserve the right to seek summary adjudication of that issue (as well as any other Plan confirmation issue) prior to the hearing on confirmation.

47.    In addition, the Disclosure Statement should (but does not) disclose to the

holders of Ovarian Cancer B, C and D Claims in Class 4 who will receive distributions from

Fund C that the provisions of  section 7.1 may result in the diversion of funds from Fund C to

Ovarian Cancer A Claimants against Fund A.  This potential diversion results from the fact that,

although the TDP provides that a Claimant cannot have a Claim in two of the Funds, it also

provides that if the holder of a Claim asserted against Fund C later asserts a new claim for a

higher level of Ovarian Cancer that is paid from Fund A, only the additional amount distributable

to that Claimant in excess of the amount already received from Fund C is paid from Fund A,

resulting in a portion of a Fund A claim effectively being paid from Fund C.

48.    The Disclosure Statement also fails to disclose to holders of Ovarian

Cancer B, C and D claims the risk of disparate treatment as compared to the holders of Ovarian

Cancer A Claims that results from the fixed allocation of 40% of the Trust assets to Fund A, for

Ovarian Cancer A Claims, and only 20% of the Trust Assets to Fund C, for Ovarian Cancer B, C

and D claims. Indeed, the non-disclosure  regarding  this potential disparity is even *worse* than

that regarding the potential disparity in treatment between Ovarian Cancer Claims  as a whole

and Mesothelioma Claims that results from the allocation of 40% of the Trust assets to

Mesothelioma Claims: Although the Disclosure Statement provides some information  as to the

comparative numbers of Ovarian Cancer and Mesotheliomas Claims that were the subject of

lawsuits pending as of the Petition Date, it provides no  information as to the comparative

numbers of Ovarian Cancer A Claims and Ovarian Cancer B, C and D claims that have been

asserted.  If the Plan Proponents have such information, the Disclosure Statement should disclose

it; if they do not, the Disclosure Statement should explain how they came up with the 40-20

27

Trust asset allocation between Ovarian Cancer A Claims and Ovarian Cancer B, C and D claims without it.

**F.      The Disclosure Statement Fails to, but Should, Update Total Talc Personal Injury Claim Estimates Based on Current Information**

49.      The Plan Proponents have not provided any updated estimates for the total number or amount of Talc Personal Injury Claims outstanding in each of the three categories of cancer Claims that will receive distributions from the three sub-funds under the TDP.  The Disclosure Statement still provides only broad aggregate numbers for the total number of Talc Personal Injury Claims asserted against the Debtors that have not been updated since the Petition Date.

50.      In the First Day Declaration, the Debtors indicated that as of the Petition Date, there were approximately 14,650 lawsuits pending that asserted Talc Personal Injury Claims, of which 13,800 alleged claims were ovarian cancer claims and approximately 850 alleged claims that were mesothelioma claims.  *See* First Day Declaration at ¶¶9, 32.  The Amended Disclosure Statement simply restates those same numbers.  *See* Amended Disclosure Statement at 25.

51.      The Debtors filed their chapter 11 cases more than 18 months ago.  Surely, the numbers of talc personal injury claimants disclosed in the First Day Declaration have changed.  Cases have undoubtedly been settled by J&J since the Petition Date particularly where J&J has been the deep-pocketed co-defendant named with the Debtors in many of the personal

injury lawsuits.  *See* First Day Declaration, ¶18; Amended Disclosure Statement at 26.[13]

Moreover, the Plan Proponents must have estimates of the numbers and amounts of Talc

Personal Injury Claims in each of the three categories of Claims under the TDP as a basis for the

40-40-20 Trust asset allocation; as such, they should disclose their estimate of the number of

claims in each category that they relied upon in coming up with that allocation.  The Disclosure

Statement should provide voting creditors with updated information about the estimated universe

of what the Debtors believe are Talc Personal Injury Claims as of today, not 18 months ago.

Creditors should be given at least some sense of the size and composition (by TDP category, if

nothing else) of the Class 4 Claims pool before voting.

52.    This lack of updated Class 4 Claims information stands in marked contrast

to chronological updates the Debtors have made in other parts of the Amended Disclosure

Statement reflecting the progress of their chapter 11 cases, including updates reflecting that the

J&J Stay Motion was denied on September 23, 2020.  Disclosure Statement at 50.  Yet, in the 18

months since filing these cases, the Debtors have not bothered to include updated claim estimates

for the only voting Class of claims under their Plan.

**F.    The Disclosure Statement Must Be Updated With
Information About the MDL Proceeding Common Benefit Fund**

53.    On September 17, 2020, the MDL Court in the MDL Proceeding entered

an order establishing a common benefit fund (the "<u>Common Benefit Order</u>"), a copy of which is

attached to this Objection as **<u>Exhibit A</u>**.  The Common Benefit Order provides for a common

---

[13] "In addition, the Debtors historically supplied and at times were the sole supplier of, talc to J&J, and have been routinely named as a co-defendant with J&J in litigation related to the Talc Personal Injury Claims."

benefit fund to compensate plaintiffs' attorneys who work for the common good of all plaintiffs, to compensate them for their work in the MDL Proceeding. Importantly, the Common Benefit Order includes the following provision:

> The Court recognizes that at the time of entry of this Order, it has jurisdiction only over Defendants Johnson & Johnson; Johnson & Johnson Consumer, Inc and PCPC, in that Talcum Powder Products cases and claims that are pending against Defendant Imerys are now part of the proceedings against Imerys in the United States Bankruptcy Court in Delaware. The Court is advised that in those bankruptcy court proceedings, there is a Tort Claimants Committee which, *inter alia*, is representing the interests of the Talcum Powder Product Claimants in that bankruptcy. To the extent those bankruptcy proceedings result in a recovery for Talcum Powder Product Claimants, the Court will address (to the extent appropriately addressed in this MDL litigation) whether and how any recovery in the Imerys bankruptcy should be assessed pursuant to a process to be established by the bankruptcy court, possibly in conjunction with this MDL Court.

Common Benefit Order at 17, n.2.

54.    More information must be included in the Disclosure Statement about the entry of the Common Benefit Order and about any type of "process" that will be established, whether by the Trust or within the TDP, with respect to that Order. If there is a possibility that recoveries under the Plan will be "taxed" through the Common Benefit Fund, that must be disclosed, including a discussion of what efforts, if any, will be undertaken to assure there is no double dipping out of recoveries from the Trust and also the common benefit fund in the MDL Proceeding.

## IV.    <u>Reservation of Rights</u>

55.    In addition to the deficiencies in the Disclosure Statement, the TDP and the Plan identified in this Objection, Arnold & Itkin has objections to confirmation of the Plan

and to the terms of the TDP not referred to herein and reserves all rights to object to confirmation of the Plan and to the terms of the TDP on any grounds, whether or not stated herein, and to seek summary adjudication of any issues relating thereto prior to or at the hearing on confirmation of the Plan.  Nothing contained herein shall be construed or deemed to limit any objections to confirmation of the Plan or to the terms of the TDP which it may assert.

[*Remainder of page intentionally left blank.*]

DOCS_SF:104420.3 05471/001

**<u>Conclusion</u>**

Based on the foregoing, the Court should deny approval of the Amended

Disclosure Statement.

Dated: October 26, 2020                    PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Debra I. Grassgreen (CA Bar No. 169978)
John A. Morris (NY Bar No. 2405397)
Peter J. Keane (DE Bar No. 5503)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:      ljones@pszjlaw.com
            dgrassgreen@pszjlaw.com
            jmorris@pszjlaw.com
            pkeane@pszjlaw.com

*Special Bankruptcy Counsel to Arnold & Itkin LLP*

-and-

ARNOLD & ITKIN LLP
Jason A. Itkin
6009 Memorial Drive
Houston, TX 77007
Main: 713.222.3800
Fax: 713.222.3850
Email: jitkin@arnolditkin.com

*Counsel to the Arnold & Itkin Plaintiffs*