# EXHIBIT A

**Trust Distribution Procedures**

US-DOCS\120811676.4

**IVORY AMERICA PERSONAL INJURY
TRUST DISTRIBUTION PROCEDURES**

# TABLE OF CONTENTS

**Page**

**IVORY AMERICA PERSONAL INJURY TDP**

SECTION I INTRODUCTION ............................................................................ 1
    1.1    Purpose ............................................................................ 1
    1.2    Interpretation ............................................................................ 1
    1.3    Definitions ............................................................................ 2
SECTION II OVERVIEW ............................................................................ 25
    2.1    Trust Purpose ............................................................................ 25
    2.2    Sub-Funds ............................................................................ 25
    2.3    Treatment of Indemnified Claims ............................................... 26
    2.4    Treatment of Ovarian Cancer A-D Claims.................................. 28
    2.5    Treatment of Mesothelioma Claims ........................................... 29
    2.6    Claim Treatment Summary ........................................................ 30
    2.7    Necessity of Filing a Trust Claim Form ...................................... 31
    2.8    Application of the Payment Percentages...................................... 31
    2.9    Determination of the Maximum Annual Payments........................ 31
    2.10    Indirect Talc Personal Injury Claims.......................................... 32
SECTION III TDP ADMINISTRATION .......................................................... 32
    3.1    TAC and FCR............................................................................ 32
    3.2    Consent and Consultation Procedures......................................... 33
SECTION IV PAYMENT PERCENTAGE; PERIODIC ESTIMATES.................... 33
    4.1    Uncertainty of Debtors' Talc Liabilities .................................... 33
    4.2    Computation of Payment Percentage .......................................... 33
    4.3    Applicability of the Payment Percentage .................................... 35
SECTION V RESOLUTION OF TALC PERSONAL INJURY CLAIMS ............... 36
    5.1    Ordering, Processing and Payment of Claims.............................. 36
    5.2    Resolution of Unliquidated Talc Personal Injury Claims .............. 39
    5.3    Categorizing Claims as Exigent ................................................. 49
    5.4    Indirect Talc Personal Injury Claims.......................................... 50
    5.5    Evidentiary Requirements ......................................................... 53
    5.6    Claims Audit Program............................................................... 55

i

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 5.7 | Arbitration | 57 |
| 5.8 | Litigation | 58 |
| SECTION VI CLAIMS MATERIALS | | 59 |
| 6.1 | Claims Materials | 59 |
| 6.2 | Withdrawal or Deferral of Claims | 59 |
| 6.3 | Filing Requirements and Fees | 60 |
| 6.4 | English Language | 61 |
| 6.5 | Confidentiality of Talc Personal Injury Claimants' Submissions | 61 |
| SECTION VII GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS | | 62 |
| 7.1 | Claims Processing | 62 |
| 7.2 | Acceptance and Release | 63 |
| 7.3 | Claims Disputes | 64 |
| 7.4 | Costs Considered | 64 |
| 7.5 | Discretion to Vary the Order and Amounts of Payments in the Event of Limited Liquidity | 65 |
| 7.6 | Punitive Damages | 65 |
| 7.7 | Sequencing Adjustments | 66 |
| 7.8 | Payment of Judgments for Money Damages | 67 |
| 7.9 | Third-Party Services | 68 |
| 7.10 | Trust Disclosure of Information | 68 |
| SECTION VIII MISCELLANEOUS | | 68 |
| 8.1 | Non-Binding Effect of Trust and/or Litigation Outcome | 68 |
| 8.2 | Independence of the Trust | 68 |
| 8.3 | Amendments | 69 |
| 8.4 | Severability | 69 |
| 8.5 | Governing Law | 69 |
| 8.6 | Administration with Other Comparable Trusts | 70 |

ii

# IVORY AMERICA PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES[1]

The Ivory America Personal Injury Trust Distribution Procedures ("**TDP**") contained herein provide the means for resolving all Talc Personal Injury Claims under the Plan for which the Protected Parties have or are alleged to have legal responsibility for or on account of Imerys Talc America, Inc., Imerys Talc Vermont, Inc., Imerys Talc Canada Inc. and/or Imerys Talc Italy S.p.A. as provided in and required by the Plan and the Trust Agreement for Ivory America, Inc. (f/k/a Imerys Talc America, Inc.), Ivory Vermont, Inc. (f/k/a Imerys Talc Vermont, Inc.), Ivory Canada, Inc. (f/k/a Imerys Talc Canada Inc.) and Imerys Talc Italy S.p.A. (the "**Trust Agreement**").

The Plan and the Trust Agreement establish the Ivory America Personal Injury Trust (the "**Trust**"). The trustees as set forth in the Plan and the Trust Agreement ("**Trustees**") shall implement and administer these TDP in accordance with the Trust Agreement.

## SECTION I

## INTRODUCTION

**1.1**  **Purpose**.  These TDP have been adopted pursuant to the Trust Agreement. These TDP are intended to provide reasonable assurance that the Trust will value, and be in a financial position to pay, Talc Personal Injury Claims that involve similar claims in substantially the same manner.

---

[1] Capitalized terms used but not defined in these TDP have the meanings ascribed to them in Article I of the Plan (defined herein).  To the extent that a term is defined in these TDP and the Plan, the definition contained in these TDP controls. It is intended that these TDP will be utilized in the Cyprus Mines Bankruptcy and will be modified accordingly.  Such modifications are not intended to change the rights and obligations of holders of Talc Personal Injury Claims in the Imerys Chapter 11 Cases under these TDPs but rather to ensure that the holders of talc personal injury claims in the anticipated Cyprus Bankruptcy will use these procedures.  For example, and not by way of limitation, there may need to be definitions added to reflect the appointment of a future claimants representative in the Cyprus Bankruptcy and the date of commencement of the Cyprus Bankruptcy.

1.2    **Interpretation**.  Except as expressly provided below, nothing in these TDP shall be deemed to create a substantive right for the holder of any Talc Personal Injury Claim. To the extent these TDP provide certain rights and benefits to holders of Talc Personal Injury Claims, such rights and benefits shall vest as of the Effective Date.

1.3    **Definitions**.  The following capitalized terms used in these TDP shall have the meanings set forth below:

1. **"Acceptance and Release"** shall have the meaning set forth in Section 7.2 of these TDP.

2. "**ADR Procedures**" shall mean the binding arbitration procedures that have or will be instituted by the Trust, with the consent of the TAC and FCR, for resolving disputes as set forth in Section 5.7 of these TDP.

3. "**Affiliate**" shall mean, with respect to any specified entity: (a) an "affiliate," as defined in Section 101(2) of the Bankruptcy Code, of such specified entity; or (b) any other entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified entity.  As used in clause (b) of the prior sentence, "control" shall include the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified entity (whether through the ownership of equity, by contract or otherwise).

4. "**Average Value**" shall mean, as to each disease as applicable, the targeted average of the value of existing and projected future Talc Personal Injury Claims.

5. "**Bankruptcy Code**" shall mean title 11 of the United States Code, as in effect on February 13, 2019.

2

6. "**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the District of Delaware which has jurisdiction over the Debtors' chapter 11 cases captioned and jointly administered as *In re Imerys Talc America, Inc., et al.*, Case No. 19-10289 (LSS).

7. "**Basic Claim Submission**" shall mean the submission of Identifying Information to the Trust.

8. "**BRCA Reduction**" shall mean (a) a 30% reduction in the value assigned to the claim of an Ovarian Cancer Claimant who is positive for the BRCA 1 or BRCA 2 mutation; or (b) a 15% reduction in the value assigned to the claim of an Ovarian Cancer Claimant who has not undergone BRCA testing but has a family history of a first-degree relative (parent, sibling, or child) having epithelial ovarian cancer or breast cancer.

9. "**Canadian Claims**" shall mean Talc Personal Injury Claims of individuals exposed in Canada or who were resident in Canada at the time such claims are filed.

10. "**Claims Audit Program**" shall have the meaning set forth in Section 5.6 of these TDP.

11. "**Claims Bar Date**" shall mean (i) October 15, 2019, for North American Debtor Claims (subject to the exceptions contained in the General Bar Date Order), (ii) January 9, 2020, for Indirect Talc Personal Injury Claims against the North American Debtors, or (iii) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to certain Claims.

12. "**Claims Materials**" shall have the meaning set forth in Section 6.1 of these TDP.

13. "**Claims Processor**" shall have the meaning set forth in Section 5.6 of these TDP.

14. "**Claimant's Jurisdiction**" shall mean either (a) the jurisdiction in which the Talc Personal Injury Claim was filed against the Debtors or any of their Affiliates in the tort system prior to the Petition Date or, (b) if the Talc Personal Injury Claim was not filed against the Debtors or any of their Affiliates in the tort system prior to the Petition Date, then at the claimant's election (i) the jurisdiction in which the claimant resides or resided at the time of diagnosis or when the claim is filed with the Trust; (ii) a jurisdiction in which the claimant experienced Debtor Exposure; or (iii) any other jurisdiction in the United States or Canada where the claimant has or could have filed a Claim against either the Debtors or any of their Affiliates or any other defendant in the tort system.

15. "**Clear Cell EOC Reduction**" shall mean a 15% reduction in the value assigned to a claim for an Ovarian Cancer Claimant involving clear cell epithelial ovarian cancer.

16. "**Complete Claim Submission**" shall mean the substantially complete submission of all required materials by a holder of a Talc Personal Injury Claim to the Trust.

17. "**Confirmation Order**" shall mean the order of the District Court; the Bankruptcy Court and the District Court acting jointly; or, if an order is entered by the Bankruptcy Court, the order of the District Court affirming the Bankruptcy Court's order, that confirms the Plan pursuant to Section 1129 of the Bankruptcy Code.

18. "**Cosmetic Talc**" shall mean talc that contains at least 90% talc mineral and/or was used in pharmaceutical, cosmetic and/or hygiene products.

19. "**Cross-Trust Audit Program**" shall mean an audit program designed to compare claims filed with the Trust against claims filed with all other trusts administered by the

Claims Processor that participate in the Cross-Trust Audit Program but shall include no fewer than four other trusts.

20. **"Cyprus"** shall mean, collectively, Cyprus Mines Corporation and Cyprus Amax Minerals Company, a Delaware corporation ("**CAMC**").

21. **"Cyprus Contribution"** shall mean, subject to the terms of the Cyprus Mines Plan and the Cyprus Settlement Agreement, and subject to the occurrence of the Cyprus Trigger Date, the Cyprus Protected Parties will make the following contributions to the Trust, to be used for the payment of Talc Personal Injury Claims in accordance with these TDP and the Trust Agreement:

(a) *Cash Payments from CAMC.* CAMC will pay a total of $130 million to the Trust in seven installments (the "**CAMC Cash Payments**"). The first three payments shall each consist of $21.67 million and shall total $65 million. The next four payments shall each consist of $16.25 million and shall total $65 million. Each payment shall be made no later than as set forth in the following schedule: (i) within 30 days after the Cyprus Trigger Date: $21.67 million (the "**First Installment**"); (ii) 1-year anniversary of the First Installment: $21.67 million; (iii) 2-year anniversary of the First Installment: $21.67 million; (iv) 3-year anniversary of the First Installment: $16.25 million; (v) 4-year anniversary of the First Installment: $16.25 million; (vi) 5-year anniversary of the First Installment: $16.25 million; and (vii) 6-year anniversary of the First Installment: $16.25 million.

(b) *Freeport Guarantee*. Freeport shall provide a guarantee of the CAMC Cash Payments and shall be subject to a minimum liquidity covenant of not less than $500 million tested as of the end of each of its fiscal quarters. If Freeport fails to meet such covenant in respect of any fiscal quarter before CAMC has paid the $130 million in full, Freeport

will post security in favor of the Trust in respect of CAMC's obligations under Section 10.10.5(a) of the Plan in the form of a performance bond, letter of credit, or other similar instrument for all remaining cash payments. For purposes of Section 10.10.5(b) of the Plan, "liquidity" means unrestricted cash of Freeport and its consolidated subsidiaries as of the applicable test date, plus availability under Freeport's revolving credit facilities at such time.

(c)     *Insurance and Other Rights*. Upon the occurrence of the Cyprus Trigger Date, and in accordance with the terms of the Cyprus Settlement Agreement: (i) the Cyprus Protected Parties will assign any and all rights to and in connection with any Cyprus Talc Insurance Policies to the Trust; (ii) the Trust will assume all present and future obligations associated with recovering proceeds under the Cyprus Talc Insurance Policies; *provided* that solely to the extent that the Trust asserts any claim as assignee of a Cyprus Protected Party bound by the PDC Agreement, the Trust shall abide by the terms of the PDC Agreement; *provided further* that unless otherwise stated in the Plan or the Cyprus Settlement Agreement, such obligations shall not include any obligations undertaken by any Cyprus Protected Party in any settlement agreement or other contract compromising or releasing any rights under any Cyprus Talc Insurance Policy; and (iii) the Cyprus Protected Parties shall transfer and assign to the Trust any and all other rights of reimbursement, contribution, or indemnification relating to or in connection with the Talc Personal Injury Claims as to which the Cyprus Protected Parties are being protected under the Plan and/or the Cyprus Mines Plan.

(d)     *Indemnification, Contribution, and Subrogation Rights*.  Upon the occurrence of the Cyprus Trigger Date, and in accordance with the terms of the Cyprus Settlement Agreement, the appropriate Cyprus Protected Parties shall each execute and deliver to the Trust, in a form reasonably acceptable to the Trust, an assignment to the Trust of: (i) all of

their rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to the payment or defense of any Talc Personal Injury Claim or any past talc-related claim against the Debtors or the Cyprus Protected Parties prior to the Cyprus Trigger Date, and (ii) all of the other rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to any Talc Personal Injury Claim or other claims channeled to the Trust. The Cyprus Contribution shall be allocated 55% to Mesothelioma Claims and 45% to Ovarian Cancer Claims.  The FCR is currently examining the allocation described in this paragraph.  For the avoidance of doubt and solely for purposes of allocations among the Funds, the Cyprus Contribution includes 100% of the proceeds of the Cyprus Talc Insurance Policies. This allocation is for internal bookkeeping only and is not an adjudication or agreement of the relative rights of Cyprus or Imerys to the Cyprus Talc Insurance Policies.

22.  **"Cyprus Industrial Talc"** shall mean Cyprus Talc that was intended to be incorporated into and/or was incorporated into products other than pharmaceutical, cosmetic and/or hygiene products.

23. **"Cyprus Parties"** shall mean, collectively, Cyprus and Freeport.

24.  **"Cyprus Settlement"** shall mean that certain comprehensive settlement by and among the Cyprus Parties, the Debtors, the Tort Claimants' Committee, the FCR, and the Imerys Plan Proponents, the terms of which are set forth in and implemented by the Plan, the Cyprus Mines Plan, and the Cyprus Settlement Agreement, pursuant to which, in exchange for the Cyprus Contribution and other good and valuable consideration, the Cyprus Protected Parties receive the benefit of the releases, Injunctions, and other protections set forth in the Plan, the Cyprus Mines Plan, and the Cyprus Settlement Agreement.

25.  **"Cyprus Settlement Agreement"** shall mean the Settlement Agreement and Release among the Cyprus Parties, the Debtors, the Tort Claimants' Committee, the FCR, and the Imerys Plan Proponents, in substantially the form contained in the Plan Supplement.

26. **"Cyprus Talc"** shall mean talc mined, processed, manufactured, sold, and/or distributed by Cyprus Mines Corporation or any of its predecessors or affiliates including but not limited to United Sierra Corporation, Cyprus Industrial Minerals Corporation, CMC-Sierra Corporation or Cyprus Georesearch Company**.**

27.  **"Cyprus Trigger Date"** means the later of (i) the later of the Effective Date or the date the Affirmation Order becomes a Final Order or (ii) the Cyprus Mines Plan Trigger Date.

28.  **"Debtors"** shall mean Ivory America, Inc. (f/k/a Imerys Talc America, Inc.), Ivory Vermont, Inc. (f/k/a Imerys Talc Vermont, Inc.), Ivory Canada, Inc. (f/k/a Imerys Talc Canada Inc.) and Imerys Talc Italy S.p.A. individually, collectively or in any combination.

29.  **"Debtor Exposure"** shall mean credible evidence (a) of exposure to talc or a product containing talc mined, processed, manufactured, sold and/or distributed by the Debtors, or for which the Debtors otherwise have legal responsibility, or (b) of conduct for which the Debtors have legal responsibility that exposed the claimant to such product.

30.  **"Direct Claimant"** shall mean the holder of a Direct Talc Personal Injury Claim to whom the Trust has a liability or obligation under the Plan and these TDP.

31.  **"Direct Talc Personal Injury Claim"** shall mean a Talc Personal Injury Claim that is not an Indirect Talc Personal Injury Claims.

32.  **"Effective Date"** shall mean the date on which the Plan becomes effective.

33. "**Exigent Claim**" shall mean an Exigent Health Claim or an Exigent Hardship Claim.

34. "**Exigent Hardship Claim**" shall mean a Direct Talc Personal Injury Claim that is compensable hereunder, for which the Trust, in its sole discretion, determines that (i) the claimant needs immediate financial assistance based on the claimant's expenses and all sources of available income, and (ii) there is a causal connection between the claimant's dire financial condition, and the claimant's talc-related disease.

35. "**Exigent Health Claim**" shall mean a Direct Talc Personal Injury Claim filed by a claimant who is living when the Direct Talc Personal Injury Claim is filed and that is compensable hereunder, and as to which the claimant provides a declaration or affidavit made under penalty of perjury by a physician who has examined the claimant within one hundred twenty (120) days of the date of declaration or affidavit in which the physician states that (a) there is substantial medical doubt that the claimant will survive beyond six (6) months from the date of the declaration or affidavit, and (b) the claimant's terminal condition is caused, in whole or in part, by the relevant talc-related disease.

36. "**Expedited Review Process**" shall mean the claims-resolution method by which Talc Personal Injury Claims for Ovarian Cancer or Mesothelioma are evaluated to determine whether they are entitled to receive the applicable Scheduled Values as described in Section 5.2(a) hereof.

37. "**FIFO**" shall mean "first-in-first-out" and refers to the impartial basis for establishing a sequence pursuant to which all Talc Personal Injury Claims shall be valued and paid by the Trust.

38. "**FIFO Processing Queue**" shall mean the FIFO line-up on which the Trust reviews Complete Claim Submissions.

39. "**FIFO Payment Queue**" shall have the meaning assigned set forth in Section 5.1(b) of these TDP.

40. "**Final Order**" shall mean, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

41. "**Foreclosed Jurisdiction**" shall mean a jurisdiction which describes a claim for compensatory damages under these TDP as a claim for "exemplary" or "punitive" damages thereby foreclosing a claimant from a remedy or compensation under these TDP if the law for that jurisdiction were to be applied hereunder.

42. "**Foreign Claim**" shall mean a Talc Personal Injury Claim with respect to which: (i) the purchase of a product containing talc mined, processed, manufactured, sold and/or distributed by the Debtors, or for which the Debtors otherwise have legal responsibility occurred outside of the United States or Canada and their territories and possessions, and (ii) the Debtor Exposure occurred outside of the United States or Canada and their territory and possessions. For the avoidance of doubt, a Canadian Claim is not a Foreign Claim.

43. **"Freeport"** shall mean Freeport-McMoRan Inc.

44. **"FCR"** shall mean James L. Patton, Jr., Esquire, the legal representative for persons who might subsequently assert talc-related demands, who was appointed pursuant to an order of the Bankruptcy Court dated June 3, 2019 [Docket No. 647] and continues in that capacity in connection with the Trust, and any validly appointed successor.

45. **"Identifying Information"** shall mean, with respect to the holder of a Talc Personal Injury Claim, the holder's: (i) name, (ii) address; (iii) social security number (if the holder has one); and (iv) counsel serving as the holder's Representative (if any) and such counsel's address.

46. **"Imerys Affiliated Parties"** shall mean, in each case during the times the Debtors were direct or indirect subsidiaries of Imerys S.A. and solely in their capacities as such: (i) direct or indirect shareholders of Imerys S.A.; (ii) current and former officers, directors, principals, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, experts, and other professionals of the Imerys Corporate Parties and/or the Debtors; and (iii) with respect to each of the foregoing Persons in clauses (i) and (ii), each such Persons' respective heirs, executors, estates, and nominees, as applicable. For the avoidance of doubt, the Imerys Affiliated Parties exclude J&J, Rio Tinto, and Cyprus.

47. **"Imerys Corporate Parties"** shall mean Imerys S.A. and all Persons listed on Schedule I to the Plan, each of which are or were Affiliates of Imerys S.A. during the time that the Debtors were owned or controlled by Imerys S.A., hereto, and the successors and assigns of such Persons, solely in their capacity as such. Schedule I is an exclusive list.  For avoidance of doubt, Imerys Corporate Parties does not include, among others, J&J, Rio Tinto, or Cyprus.

48. **"Imerys Industrial Talc"** shall mean Imerys Talc that was intended to be incorporated into and/or was incorporated into products other than pharmaceutical, cosmetic and/or hygiene products.

49. **"Imerys Protected Parties"** shall mean the Imerys Corporate Parties and the Imerys Affiliated Parties.

50. **"Imerys Settlement"** shall mean that certain comprehensive settlement by and among the Plan Proponents, the terms of which are set forth and implemented in the Plan.

51. **"Imerys Settlement Proceeds"** shall mean (i) $75 million, consisting of $74.5 million in Cash and the Talc PI Note, plus (ii) the Sale Proceeds, plus (iii) a contingent purchase price enhancement of up to $102.5 million, subject to the Cash value of the Sale Proceeds provided that in the event the Sale contemplated by and pursuant to the Sale Order closes, no contingent purchase price enhancement shall be payable, less (iv) if the DIP Order is entered, amounts required to pay the DIP Facility Claims pursuant to the terms of the DIP Loan Documents and Allowed by the DIP Order, less (v) if the DIP Order is not entered, Imerys S.A.'s reasonable and documented out-of-pocket costs and expenses of negotiation and preparation of the DIP Loan Documents estimated to be $400,000 as of December 10, 2020.

52. **"Imerys Talc"** shall mean talc mined, processed, manufactured, sold, and/or distributed by the Debtors and any of their predecessors including but not limited to (i) Imerys Talc Vermont, Inc f/k/a Windsor Minerals, Inc., and Cyprus Windsor Minerals Corp.; (ii) Imerys Talc America, Inc, f/k/a Cyprus Talc Corporation and Luzenac America, Inc.; and (iii) Imerys Talc Canada Inc. f/k/a Luzenac, Inc.  Notwithstanding anything contained here, neither J&J nor any Affiliate of J&J shall be treated as or considered a predecessor to any of the Debtors, Rio Tinto, or Cyprus.

53.  **"Indemnified"** shall mean, when used to describe any Talc Personal Injury Claim or any category of Talc Personal Injury Claims, in respect of which the Debtors, the Trust, and/or any other person or entity who could have asserted, or may assert, rights under and to the J&J Indemnities.

54.  **"Indemnified Claims"** shall mean Talc Personal Injury Claims that are Indemnified, including, without limitation, any claims asserting exposure to cosmetic talc manufactured, distributed or sold by J&J during the time periods covered by the J&J Indemnities.

55.  **"Indemnified Claimants"** shall mean the holders of Indemnified Claims.

56.  "**Indirect Talc Personal Injury Claim**" shall mean a Talc Personal Injury Claim of any corporation (as defined in section 101(9) of the Bankruptcy Code), co-defendant of a Debtor, or predecessor of a Debtor for contribution, reimbursement, subrogation, or indemnity, whether contractual or implied by law (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Talc Personal Injury Claim of any corporation (as defined in section 101(9) of the Bankruptcy Code), co-defendant of a Debtor, or predecessor of a Debtor, whether in the nature of or sounding in contract, tort, warranty, or other theory of law.  For the avoidance of doubt, an Indirect Talc Personal Injury Claim shall not include any claim for or otherwise relating to death, injury, or damages caused by talc or a product or material containing talc that is asserted by or on behalf of any injured individual, the estate, legal counsel, relative, assignee, or other representative of any injured individual, or an individual who claims injury or damages as a result of the injury or death of another individual regardless of whether such claim is seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs or damages, or any legal, equitable or

other relief whatsoever, including pursuant to a settlement, judgment, or verdict.  By way of illustration and not limitation, an Indirect Talc Personal Injury Claim shall not include any claim for loss of consortium, loss of companionship, services and society, or wrongful death.

57.  "**Indirect Claimant**" shall mean the holder of an Indirect Talc Personal Injury Claim.

58.  "**Individual Review Process**" shall mean the claims-resolution method in which a Talc Personal Injury Claim is individually evaluated as described in Section 5.2(b).

59.  "**Initial Claims Filing Date**" shall mean the date on which the Trust first begins to accept claims.

60.  "**Initial Payment Percentages**" shall mean the initial payment percentages established herein based upon (i) an equitable distribution of the Trust with respect to existing and projected future claims, (ii) the assumption that generally the Average Values will be achieved with respect to existing and projected future Talc Personal Injury Claims; and (iii) the funding of the Trust.

61.  "**J&J**" shall mean Johnson & Johnson, Johnson & Johnson Baby Products Company, Johnson & Johnson Consumer Companies, Inc., Johnson & Johnson Consumer Inc., Johnson & Johnson Consumer Products, Inc., and each of their past and present parents, subsidiaries and Affiliates, direct and indirect equity holders, and the successors and assigns of each, excluding the Debtors and the Imerys Non-Debtors.

62.  "**J&J Indemnities**" shall mean any and all indemnity rights of the Debtors, the Protected Parties, and the Imerys Non-Debtors against J&J for Talc Personal Injury Claims, including, without limitation, pursuant to: (i) that certain Agreement, between Cyprus Mines Corporation and Johnson & Johnson, dated as of January 6, 1989; (ii) that certain Talc Supply

Agreement, between Windsor Minerals Inc. and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc., dated as of January 6, 1989; (iii) that certain Supply Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of April 15, 2001; (iv) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2010; (v) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2011; or (vi) any other applicable agreement, order, or law.

63. **"J&J Product"** shall mean any product manufactured, distributed or sold by J&J containing or allegedly containing Cyprus Talc or Imerys Talc, including without limitation *Johnson's Baby Powder* and *Shower to Shower*.

64. "**Maximum Annual Payments**" shall mean the maximum allowable amounts to be paid out for Talc Personal Injury Claims by the Trust for each Fund annually.

65. "**Maximum Value**" shall mean the maximum amount payable by the Trust for a Talc Personal Injury Claim for a specific category of disease under the Trust Agreement.

66. "**Medical/Exposure Criteria**" shall mean the presumptive medical and exposure requirements for a Talc Personal Injury Claimant to receive an offer under the Expedited Review Process or the Individual Review Process.

67. "**Mesothelioma**" shall mean a type of cancer caused by exposure to asbestos that develops from the thin layer of tissue that covers many of the internal organs known as the mesothelium, including that found in the lining of the lungs and chest wall, abdomen, heart, and testes.

68. **"Mesothelioma Claim"** shall mean a Talc Personal Injury Claim for Mesothelioma A or Mesothelioma B.

69. **"Mesothelioma A"** shall mean a Mesothelioma Claim alleging Regular and Routine Exposure to Cosmetic Talc.

70. **"Mesothelioma B"** shall mean Mesothelioma Claim alleging Regular and Routine Exposure to Industrial Talc.

71. **"Mesothelioma __ Claim"** shall mean in reference to Mesothelioma A or Mesothelioma B, a Talc Personal Injury Claim for Mesothelioma A or Mesothelioma B, respectively.

72. **"Mesothelioma __ Claimant"** shall mean a Talc Personal Injury Claimant for the applicable Mesothelioma Claim.

73. **"Mixed Claim"** shall mean a Talc Personal Injury Claim for Ovarian Cancer or Mesothelioma that is both an Indemnified Claim and a Non-Indemnified Claim.

74. **"Non-Indemnified Claim"** shall mean any Talc Personal Injury Claim that is not an Indemnified Claim.

75. **"Other Disease"** shall mean any Talc Personal Injury Claim that is not for Ovarian Cancer A-D or Mesothelioma A-B.

76. **"Ovarian Cancer"** shall mean epithelial ovarian cancer (serous, endometrioid, undifferentiated, clear cell, borderline and mucinous), fallopian tube cancer, or primary peritoneal cancer.  For the avoidance of doubt, Ovarian Cancer includes Ovarian Cancer A through D.

77. **"Ovarian Cancer A**" shall mean: (a) a diagnosis of Stage IV Ovarian Cancer of a person with serous, endometrioid, clear cell and/or undifferentiated Ovarian Cancer, or (b) recurrence of or death from serous, endometrioid, clear cell, or undifferentiated Ovarian Cancer.

78. **"Ovarian Cancer B"** shall mean a diagnosis of Stage III Ovarian Cancer of a person with serous, endometrioid, clear cell, or undifferentiated Ovarian Cancer.

79. **"Ovarian Cancer C"** shall mean a diagnosis of Stage II Ovarian Cancer of a person with serous, endometrioid, clear cell, or undifferentiated Ovarian Cancer.

80. **"Ovarian Cancer D"** shall mean (i) a diagnosis of Stage I Ovarian Cancer of a person with serous, endometrioid, clear cell, or undifferentiated Ovarian Cancer, and (ii) all borderline serous Ovarian Cancers.

81. **"Ovarian Cancer __ Claim"** shall mean in reference to Ovarian Cancer A through D, a Talc Personal Injury Claim for Ovarian Cancer A through D, respectively.

82. **"Ovarian Cancer __ Claimant"** shall mean a Talc Personal Injury Claimant for the applicable Ovarian Cancer Claim.

83. **"Ovarian Cancer A-D Claim"** shall mean all Talc Personal Injury Claims for Ovarian Cancer A, Ovarian Cancer B, Ovarian Cancer C and Ovarian Cancer D.

84. **"Ovarian Cancer Claim"** shall mean a Talc Personal Injury Claim for Ovarian Cancer.

85. **"Payment Percentage"** shall have the meaning set forth in Section 4.1 of these TDP.

86. **"Personal Use Exposure"** shall mean, in connection with Ovarian Cancer, the regular or routine application of body powder containing Imerys Talc to the genital area by

17

girls who have reached puberty or women, for a period of three-years, which period does not have to be continuous.

87. **"Petition Date"** shall mean February 13, 2019 for each of the Debtors except Imerys Talc Italy S.p.A. for which the date is __[TBD]____.

88. "**Plan**" shall mean the *Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, as the same may be amended or modified from time to time.

89. **"Protected Parties"** shall mean any of the following:  (a) the Debtors and any Person who served as a director or officer of any Debtor at any time during the Chapter 11 Cases, but solely in such Person's capacity as such; (b) the Reorganized Debtors; (c) the Imerys Protected Parties; (d) any Person, except for the Trust, that, pursuant to the Plan or otherwise, after the Effective Date, becomes a direct or indirect transferee of, or successor to, the Debtors, the Reorganized Debtors, or any of their respective assets (but only to the extent that liability is asserted to exist as a result of its becoming such a transferee or successor); (e) the Buyer (but only to the extent that liability is asserted to exist as a result of its becoming a transferee or successor to the Debtors); (f) the Settling Talc Insurance Companies; (g) the Rio Tinto Protected Parties; and (h) the Cyprus Protected Parties (upon the Cyprus Trigger Date).  For the avoidance of doubt, J&J is not a Protected Party.

90. **"Regular and Routine Exposure"** shall mean, as applicable, Regular and Routine Exposure to Cosmetic Talc or Regular and Routine Exposure to Industrial Talc.

91. "**Regular and Routine Exposure to Cosmetic Talc**" shall mean, in connection with Mesothelioma, (a) a three-year period of the regular or routine use of a personal care/cosmetic/hygiene product containing Cyprus Talc and/or Imerys Talc, and (b) no other

significant occupational or industrial exposure (whether direct or bystander) to asbestos from a source other than Cyprus Talc and/or Imerys Talc.

92.  **"Regular and Routine Exposure to Industrial Talc"** shall mean, in connection with Mesothelioma, (a) a one-year period of the regular or routine (i) personal occupational exposure (whether direct or bystander) to Cyprus and/or Imerys Industrial Talc not incorporated in a product, or (ii) use of a product containing Cyprus and/or Imerys Industrial Talc, and (b) no other significant occupational or industrial exposure (whether direct or bystander) to asbestos from a source other than Cyprus and/or Imerys Talc.

93.  "**Reorganized Debtors**" shall mean the Debtors on and after the Effective Date.

94.  **"Representative"** shall mean an individual or entity acting under legal authority on behalf of a holder of a Talc Personal Injury Claim, which includes counsel.  For the avoidance of doubt, a representation of authority by counsel shall be sufficient evidence of authority.

95.  **"Rio Tinto"** shall mean the Rio Tinto Corporate Parties identified in the Rio Tinto/Zurich Settlement.  For the avoidance of doubt, Rio Tinto does not include Zurich American Insurance Company.

96.  "**Rio Tinto/Zurich Settlement**" shall mean that certain comprehensive settlement set forth in the Plan and the Rio Tinto/Zurich Settlement Agreement and implemented by the Plan by and among: (i) Rio Tinto, on behalf of itself and the Rio Tinto Captive Insurers, and for the benefit of the Rio Tinto Protected Parties, and Zurich, on behalf of itself and for the benefit of the Zurich Protected Parties, on the one hand, and (ii) the Debtors, on the other hand, and consented to by the Tort Claimants' Committee and the FCR, pursuant to which, in

exchange for the Rio Tinto/Zurich Contribution, the Rio Tinto Protected Parties, the Rio Tinto

Captive Insurers, and the Zurich Protected Parties receive the benefit of the Channeling

Injunction and other protections set forth herein and in the Rio Tinto/Zurich Settlement

Agreement.

97. **"Rio Tinto/Zurich Settlement Proceeds"** shall mean the Cash proceeds of

the Rio Tinto/Zurich Settlement consisting of $340 million.

98. "**Scheduled Value**" shall mean the specific value set forth in Section

5.2(a)(iii) of these TDP to be assigned to claims that elect the Expedited Review Process and

satisfy the applicable Medical/Exposure Criteria.

99. **"Secondary Mesothelioma Claim A"** shall have the meaning set forth in

Section 5.2(b)(v) of these TDP.

100. **"Secondary Mesothelioma Claim B"** shall have the meaning set forth in

Section 5.2(b)(v) of these TDP.

101. **"Secondary Mesothelioma Claimant"** shall mean the holder of a Talc

Personal Injury Claim for the applicable Secondary Mesothelioma Claim A or B.

102. **"Settled and Unpaid Talc Personal Injury Claim"** shall mean a Talc

Personal Injury Claim that was settled and resolved prior to the Petition Date but for which

payment did not occur prior to the Petition Date.

103. "**Settling Talc Insurance Company**" shall mean, solely with respect to

Settled Talc Insurance Policies: (a) the Zurich Protected Parties; (b) the Rio Tinto Captive

Insurers; (c) the Cyprus Settling Talc Insurance Companies; (d) prior to the Effective Date, any

other Talc Insurance Company that contributes funds, proceeds, or other consideration to or for

the benefit of the Talc Personal Injury Trust and is designated, with the consent of the Debtors,

the Tort Claimants' Committee, and the FCR, in the Confirmation Order and/or the Affirmation

Order, to be a Settling Talc Insurance Company; and (e) following the Effective Date, each Talc

Insurance Company that contributes funds, proceeds, or other consideration to or for the benefit

of the Talc Personal Injury Trust and is designated as a Settling Talc Insurance Company by the

Talc Personal Injury Trust, the Talc Trust Advisory Committee, and the FCR; *provided*,

*however*, that any post-Effective Date addition to the list of Protected Parties does not become

effective until entry of a Final Order approving the addition.

104.  **"TAC"** shall mean the Trust Advisory Committee that represents the

interests of holders of present Talc Personal Injury Claims pursuant to the Plan and Trust

Agreement.

105.  "**Talc Insurance Company**" shall mean any insurance company, insurance

syndicate, coverholder, insurance broker or syndicate insurance broker, guaranty association, or

any other Entity that may have liability under a Talc Insurance Policy.

106.  "**Talc Insurance Settlement Agreements**" shall mean (a) the Rio

Tinto/Zurich Settlement Agreement and (b) any other settlement agreement entered into after

February 13, 2019 by and among any Talc Insurance Company and one or more of the Debtors

and consented to by the Tort Claimants' Committee (or the TAC, after the Effective Date) and

the FCR, in which a Talc Insurance Policy and/or the Debtors' rights thereunder with respect to

Talc Personal Injury Claims are released.

107.  **"Talc Insurance Proceeds"** shall mean the proceeds of the Talc Insurance

Settlement Agreements.

108.  "**Talc Personal Injury Claim**" shall mean any Claim and any Talc Personal

Injury Demand against one or more of the Debtors or any other Protected Party whether known

or unknown, including with respect to any manner of alleged bodily injury, death, sickness, disease or alleged disease process, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries (whether physical, emotional or otherwise), directly or indirectly arising out of or relating to the presence of or exposure to talc or talc-containing products based on the alleged pre-Effective Date acts or omissions of the Debtors or any other entity for whose conduct the Debtors have or are alleged to have liability (but only to the extent such Claim or Talc Personal Injury Demand directly or indirectly arises out of or relates to the alleged pre-Effective Date acts or omissions of the Debtors), including, without limitation any claims directly or indirectly arising out of or relating to: (a) any products previously mined, processed, manufactured, sold (including, without limitation, any Sale pursuant to the Sale Order) and/or distributed by the Debtors or any other entity for whose conduct the Debtors have or are alleged to have liability, but in all cases only to the extent of the Debtors' liability; (b) any materials present at any premises owned, leased, occupied or operated by any entity for whose products, acts, omissions, business or operations the Debtors have, or are alleged to have, liability; or (c) any talc in any way connected to the Debtors alleged to contain asbestos or other constituent. Talc Personal Injury Claims include all such claims, whether: (1) in tort, contract, warranty, restitution, conspiracy, contribution, indemnity, guarantee, subrogation, or any other theory of law, equity or admiralty, whether brought, threatened or pursued in any United States court or court anywhere in the world; (2) seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative or any other costs, fees, injunctive or similar relief or any other measure of damages; (3) seeking any legal, equitable or other relief of any kind whatsoever, including, for the avoidance of doubt, any claims arising out of or relating to the presence of or exposure to talc or talc-containing products assertable against one or more

Debtors or any other Protected Party; or (4) held by claimants residing within the United States or in a foreign jurisdiction. Talc Personal Injury Claims also include any such claims that have been resolved or are subject to resolution pursuant to any agreement, or any such claims that are based on a judgment or verdict. Talc Personal Injury Claims do not include any claim by any present or former employee of a predecessor or Affiliate of the Debtors for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer. For the avoidance of doubt, the term Talc Personal Injury Claim includes, without limitation (i) all claims, debts, obligations, or liabilities for compensatory damages (such as, without limitation, loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages; and (ii) Indirect Talc Personal Injury Claims.  Notwithstanding the foregoing, Talc Personal Injury Claims do not include any claim that a Settling Talc Insurance Company may have against its reinsurers and/or retrocessionaires in their capacities as such, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of a Settling Talc Insurance Company to assert any such claim against its reinsurers and/or retrocessionaires in their capacities as such.

> **109. "Talc Personal Injury Claimant"** shall mean the holder of a Talc Personal Injury Claim.

> **110. "Talc Personal Injury Demand"** shall mean a demand for payment, present or future, against one or more of the Debtors or any other Protected Party that (A) falls within the meaning of "demand" in section 524(g) of the Bankruptcy Code; (B) (i) manifests after the Effective Date, (ii) arises out of the same or similar conduct or events that gave rise to a

Claim that is a Talc Personal Injury Claim, and (iii) is caused or allegedly caused by any constituent other than asbestos; and/or (C) (i) was not a claim prior to the Effective Date, (ii) arises out of the same or similar conduct or events that gave rise to a Claim that is a Talc Personal Injury Claim, and (iii) is to be resolved pursuant to the terms of the Talc Personal Injury Trust.

      **111. "Talc Personal Injury Trust Assets"** shall mean the following assets and any income, profits, and proceeds derived from such assets subsequent to the transfer of such assets to the Talc Personal Injury Trust: (a) the Imerys Settlement Funds; (b) the right to receive the Rio Tinto/Zurich Contribution pursuant to the Rio Tinto/Zurich Settlement; (c) the right to receive the Cyprus Contribution pursuant to the Cyprus Settlement, subject to the terms of the Cyprus Settlement Agreement and conditioned upon occurrence of the Cyprus Trigger Date; (d) all Cash held by the North American Debtors as of the Effective Date, not including the Cash used to fund the Reserves; (e) all non-Cash assets included in the Imerys Contribution, including the Contributed Indemnity and Insurance Interests; (f) the Talc Personal Injury Trust Causes of Action and any and all proceeds thereof; (g) the Talc Insurance Actions; (h) the Talc Insurance Action Recoveries; (i) the rights of the Debtors with respect to Talc Insurance Policies, Talc Insurance CIP Agreements, Talc Insurance Settlement Agreements, and Claims thereunder; (j) the Reorganized North American Debtor Stock; (k) all Cash remaining in the Reserves, if any, to be distributed to the Talc Personal Injury Trust in accordance with the Plan; (l) any and all other funds, proceeds, or other consideration otherwise contributed to the Talc Personal Injury Trust pursuant to the Plan and/or the Confirmation Order or other order of the Bankruptcy Court; (m) the rights of the Debtors with respect to the J&J Indemnification Obligations; and (n) the income or earnings realized or received in respect to items (a) to (m) above. The rights of any Cyprus

Protected Parties under the J&J Agreements, including any J&J Indemnification Obligations, or under any Cyprus Talc Insurance Policy or with respect to the Talc Insurance Actions, shall not constitute "Talc Personal Injury Trust Assets" for any purpose until the occurrence of the Cyprus Trigger Date (and then as provided for under the Cyprus Settlement).

**112. "Tort System Election Claim"** shall mean the Talc Personal Injury Claim of a Tort System Election Claimant.

**113. "Tort System Election Claimant"** shall mean the holder of an Indemnified Claim or Mixed Claim who elects to pursue such claim against one or more of the Debtors in the tort system in any court of competent jurisdiction selected by such Talc Personal Injury Claimant, in their sole discretion.

**114. "Trust Claim Form"** shall mean the form issued by the Trust for submitting a claim, which form shall be subject to the consent of the TAC and FCR.

**115. "Trust Election Claim"** shall mean the Talc Personal Injury Claim of a Trust Election Claimant.

**116. "Trust Election Claimant"** shall mean the holder of an Indemnified Claim that elects to seek recovery from the Trust in lieu of proceeding in the tort system.

**117. "Trust Fund"** shall mean the Talc Personal Injury Trust Assets but not including the Cyprus Contribution.

**SECTION II**

**<u>OVERVIEW</u>**

**2.1    Trust Purpose**.  The purpose of the Trust is to assume the liability for Talc Personal Injury Claims pursuant to the terms of the Plan, and to use the Talc Personal Injury Trust Assets to resolve and, if appropriate, promptly pay Talc Personal Injury Claims in such a way that holders of similar Talc Personal Injury Claims are valued and paid in substantially the

same manner and otherwise comply with the requirements of a trust set forth in section 524(g) of the Bankruptcy Code. To this end, these TDP set forth procedures for processing, resolving, and paying (as appropriate) Ovarian Cancer A-D Claims and Mesothelioma Claims A and B through the Expedited Review Process in Section 5.2(a) or the Individual Review Process in Section 5.2(b). The Trust has established Medical/Exposure Criteria in recognition of the unique and widespread consumer and commercial nature of the use of Imerys Talc and Imerys Talc containing products and in recognition of the limited Talc Personal Injury Trust Assets and Cyprus Contribution.

      **2.2**      **Sub-Funds.** The Trust Fund and Cyprus Contribution shall be divided into three funds within the Trust (each, a "**Fund**"). Each Fund operates entirely separately and any changes to the administration of one Fund, such as changes to Medical/Exposure Criteria, Scheduled, Average or Maximum Values, Payment Percentage or Maximum Annual Payment, shall not affect or require changes to the other Funds. Each Fund shall be subject to the terms set forth herein for such Fund, and each Fund shall be operated for the exclusive benefit of the respective beneficiaries of each Fund. Administrative expenses attributable to the operation of one Fund (including the processing of claims asserted against such Fund) shall be allocated to that Fund separately. Common administrative expenses incurred by the Trust that cannot be attributed to the operation of a single Fund shall be split among the three Funds in a manner to ensure that each Fund is responsible for a pro rata share of the common administrative expense.

      **(a)**      **Fund A**: Ovarian Cancer A Claimants may seek a distribution from Fund A. Fund A shall consist of a separate sub-account within the Trust equal to 40% of the total Trust Fund and 30% of the Cyprus Contribution.

**(b)**    **Fund B**:  Mesothelioma Claimants and Secondary Mesothelioma Claimants may seek a distribution from Fund B.  Fund B shall consist of a separate sub-account within the Trust equal to 40% of the total Trust Fund and 55% of the Cyprus Contribution.

**(c)**    **Fund C:**  Ovarian Cancer B, C, and D Claimants may seek a distribution from Fund C.  Fund C shall consist of a separate sub-account within the Trust equal to 20% of the total Trust Fund and 15% of the Cyprus Contribution.

**2.3**        **Treatment of Indemnified Claims**.

**(a)**    All holders of Indemnified Claims (irrespective of cancer, disease or other personal injury) shall elect to either:

**(i)**        seek recovery for such claim solely from the Trust under the applicable Fund through the Expedited Review Process (if available) or the Individual Review Process as set forth in Sections 2.4 and 2.5 as a Trust Election Claim; or

**(ii)**        (x) pursue such claim against one or more of the Reorganized Debtors nominally in the tort system in any court of competent jurisdiction selected by such Talc Personal Injury Claimant, in their sole discretion, and (y) seek recovery for such claim as against one or more of the non-Debtor Protected Parties under the applicable Fund through the Expedited Review Process (if available) or the Individual Review Process as set forth in Sections 2.4 and 2.5 as a Tort System Election Claim.[2]

**(b)**    The Trust shall make available to Talc Personal Injury Claimants copies of all agreements governing the J&J Indemnities.  It shall be the responsibility of each Talc Personal Injury Claimant to determine the scope of the J&J Indemnities prior to making the

---

[2] As set forth in Sections 5.2(a)(iii) and 5.2(b)(vii) below, the Scheduled, Average and Maximum Values provided for Tort System Election Claims are  reduced to reflect the election to pursue recovery in the tort system in lieu of sharing in the cash assets contributed by the Debtors to the Trust.

election set forth in Section 2.3(a)(ii)(x). The defense of such claims shall be tendered to J&J and the Trust shall have no obligation to defend any such claims in the tort system.  Any settlement of or judgment in the tort system of an Indemnified Claim shall be remitted to the Talc Personal Injury Claimant and shall not be subject to any Payment Percentage or Maximum Annual Payment.  The Trust may enforce the provisions of the J&J Indemnities with respect to such claim and/or may assign the right to enforce such provisions of the J&J Indemnities with respect to such claim solely to the extent permitted by applicable law and contract.

(c)    Upon J&J's settlement of the Debtors' liability (if any) with respect to a Tort System Election Claim or entry of a judgment by Final Order in respect of such liability, none of the Trust, the Debtors or the Reorganized Debtors shall have any obligation to pay such settlement or judgment.

(d)    The Trust reserves the right to pursue indemnification from J&J for any or all Indemnified Claims.  In such event, the costs of such pursuit shall be borne in the first instance by the Trust; provided, however, that the Trust reserves the right to charge against any recovery the costs and expenses incurred by the Trust directly or indirectly for fees and expenses incurred in pursuit of the indemnification.

(e)    Holders of Mixed Claims shall receive the right to (i) in respect of their Indemnified Claims, make the same election as Indemnified Claimants set forth above in Section 2.3(a); and (ii) in respect of their Non-Indemnified Claims seek recovery from Funds A, B, or C whichever is applicable, as set forth in Sections 2.4 and 2.5 below.

**2.4        Treatment of Ovarian Cancer A-D Claims**.

(a)    Ovarian Cancer A Claimants who elect to seek recovery from Fund A through the Expedited Review Process or the Individual Review Process, shall be subject to the

review and valuation procedures set forth herein and shall be subject to the applicable Scheduled, Average and/or Maximum Values and Payment Percentage.

**(b)**  Ovarian Cancer B through D Claimants who elect to seek recovery from Fund C through the Expedited Review Process or the Individual Review Process, shall be subject to the review and valuation procedures set forth herein and shall be subject to the applicable Scheduled, Average and/or Maximum Values and Payment Percentage.

**(c)**  Holders of Mixed Claims for Ovarian Cancer who elect to seek recovery from the applicable Fund in respect of their Non-Indemnified claims also retain the right to pursue recovery on their Indemnified Claims as set forth in Section 2.3(a) above.

**2.5**  **Treatment of Mesothelioma Claims**.

**(a)**  Mesothelioma A Claimants and Mesothelioma B Claimants with Regular and Routine Exposure who elect to seek recovery from Fund B through the Expedited Review Process or the Individual Review Process, shall be subject to the review and valuation procedures set forth herein and shall be subject to the applicable Scheduled, Average and/or Maximum Values and Payment Percentage.

**(b)**  Mesothelioma A Claimants and Mesothelioma B Claimants without Regular and Routine Exposure and Secondary Mesothelioma Claimants who elect to seek recovery from Fund B through the Individual Review Process, shall be subject to the review and valuation procedures set forth herein (including the terms set forth in Sections 5.2(b)(iv) and (v)) and shall be subject to the applicable Scheduled, Average and/or Maximum Values and Payment Percentage.

(c)     Holders of Mixed Claims for Mesothelioma who elect to seek recovery from the applicable Fund in respect of their Non-Indemnified claims also retain the right to pursue recovery on their Indemnified Claims as set forth in Section 2.3(a) above.

**2.6**       **Claim Treatment Summary.**  The following chart summarizes the information contained in Sections 2.3 to 2.5 above:

| Disease | Indemnified (J&J Product) | Non-Indemnified (No J&J Product) |
|---|---|---|
| Mesothelioma Claims with Regular and Routine Exposure | May elect either: (a) to proceed against the Debtors in the tort system AND seek recovery from the Trust as a Tort System Election Claimant; OR (b) to seek recovery solely from the Trust as a Trust Election Claimant. | May file a claim with the Trust under Expedited Review or Individual Review, as set forth herein, for distribution from the Trust as a Non-Indemnified Claim. |
| Mesothelioma Claims without Regular and Routine Exposure and Secondary Mesothelioma Claims | May elect either: (a) to proceed against the Debtors in the tort system AND seek recovery from the Trust as a Tort System Election Claimant; OR (b) to seek recovery solely from the Trust as a Trust Election Claimant. | May file a claim with the Trust under Individual Review, as set forth herein, for distribution from the Trust as a Non-Indemnified Claim. |
| Ovarian Cancer A through D | May elect either: (a) to proceed against the Debtors in the tort system AND seek recovery from the Trust as a Tort System Election Claimant; OR (b) to seek recovery solely from the Trust as a Trust Election Claimant. | May file a claim with the Trust under Expedited Review or Individual Review, as set forth herein, for distribution from the Trust as a Non-Indemnified Claim. |
| Mixed Claim | In respect of the Indemnified Claim, may elect either: (a) to proceed against the Debtors in the tort system AND seek recovery from the Trust as a Tort System Election Claimant; OR (b) may file a claim with the Trust under Expedited Review or Individual Review, as set forth herein, for distribution from the Trust as a Mixed Claimant. In respect of the Non-Indemnified Claim, may file a claim with the Trust under Expedited Review or Individual Review, as set forth herein, for distribution from the Trust as a Trust Election Claimant. | |

**2.7**        **Necessity of Filing a Trust Claim Form.**  All holders of Talc Personal Injury Claims, including Indemnified Claims and Mixed Claims, must file a Trust Claim Form with the Trust.  Holders of Indemnified Claims shall make the election set forth in Section 2.3(a) above. Consent from the Trust shall be required before an Indemnified Claimant or Mixed Claimant may pursue their Indemnified Claims against the Debtors in the tort system (including claimants asserting a Talc Personal Injury Claim that is not for Mesothelioma or Ovarian Cancer).  Notice of such consent shall be provided to J&J.  Indemnified Claimants and Mixed Claimants may then commence litigation as set forth herein provided he or she thereafter files a Basic Claims Submission.

**2.8**        **Application of the Payment Percentages.**  Any adjustments to Payment Percentages shall be made only pursuant to Section 4.2 below, and any adjustments to paid claims are governed by Section 4.3 below.  Because there is uncertainty in the prediction of both the total amount of the Trust's talc-related liabilities and the amount of the Talc Personal Injury Trust Assets, no guarantee can be made of the Payment Percentage that will be applicable to any Talc Personal Injury Claim.

**2.9**        **Determination of the Maximum Annual Payments**.  The Trust shall model the cash flow, principal, and income year-by-year to be paid over its entire life of each Fund to ensure that each Fund shall be available to treat all present and future holders of Talc Personal Injury Claims as similarly as possible. In each year, based upon the model of cash flow for each Fund, the Trust shall be empowered to make offers to Talc Personal Injury Claimants up to the Maximum Annual Payment for each Fund considering the Payment Percentage provisions set forth in Sections 4.2 and 4.3 below. The Maximum Annual Payments for each Fund shall be determined annually by the Trustees with the consent of the TAC and the FCR. The Trust's

offers to all Talc Personal Injury Claimants from a given Fund shall not exceed the applicable

Fund's Maximum Annual Payment so determined for that year. Should the Maximum Annual

Payment for a particular Fund not be reached in any year, the portion of the Maximum Annual

Payment for each Fund that is not exhausted in that year shall be added to the Maximum Annual

Payment for the applicable Fund for the following year and any subsequent year until exhausted

or an adjustment is made to the Payment Percentage applicable to such Fund.  Should the

Maximum Annual Payment for the applicable Fund be reached in any Trust year before all

claimants in the applicable FIFO Payment Queue have been paid, such claimants shall be paid in

the following year in the order they appear in such Fund's FIFO Payment Queue. The Payment

Percentages and the Maximum Annual Payment amounts are based on projections over the

lifetime of the Trust. If such long-term projections are revised, that may result in a new model of

the Trust's anticipated cash flow and a new calculation of a Maximum Annual Payment for one

or more of the Funds.

      **2.10**      **Indirect Talc Personal Injury Claims**.  As set forth in Section 5.4 below,

Indirect Talc Personal Injury Claims, if any, shall be subject to all the same limitations and

provisions relating to categorization, evaluation and payment of these TDP as all other Talc

Personal Injury Claims, including the applicable Payment Percentage.

**SECTION III**

**TDP ADMINISTRATION**

      **3.1**      **TAC and FCR**.  Pursuant to the Plan, the Trust Agreement, and these TDP,

the Trustees shall obtain the consent of the TAC and the FCR with respect to any amendment,

change or modification to these TDP pursuant to Sections 4.1, 4.2, 5.2 and 8.3, and on such other

matters as are required herein or in the Trust Agreement. On all other matters, the Trust shall be

administered by the Trustees in consultation with the TAC and the FCR.

**3.2**        **Consent and Consultation Procedures**.  In those circumstances in which consultation or consent of the TAC and FCR is required, the Trustees shall provide written notice to the TAC and the FCR of the specific amendment or other action that is proposed. The Trustees shall not implement such amendment or take such action unless and until the parties have engaged in the Consultation Process described in Section 7.1(a) or the Consent Process described in Section 7.1(b), as applicable, of the Trust Agreement.

## SECTION IV

## PAYMENT PERCENTAGE; PERIODIC ESTIMATES

**4.1**        **Uncertainty of Debtors' Talc Liabilities**.  Litigation arising from the use and/or exposure to talc is a relatively new mass tort and there is inherent uncertainty regarding the aggregate value of the Debtors' total talc-related liabilities.  The Trustees must determine from time to time the percentage of value that holders of present and future Talc Personal Injury Claims are likely to receive from the applicable Fund as reflected by the applicable Payment Percentage to provide reasonable assurance that holders of similar Talc Personal Injury Claims are valued and paid in substantially the same manner. Each Fund shall have its own Payment Percentage. No Payment Percentage shall apply to the value of any payments owed by J&J by operation of one or more of the J&J Indemnities to holders of Tort System Election Claims or Mixed Claims determined by (a) settlement or (b) a judgment by Final Order.

**4.2**        **Computation of Payment Percentage**s.  The Initial Payment Percentage for each Fund shall be as follows:

| Fund | Payment Percentage[3] |
|:---:|:---:|
| **A** | 0.40% - 2.34% |
| **B** | 3.70% - 6.24% |
| **C** | 0.30% - 1.48% |

The Initial Payment Percentages shall apply to all Talc Personal Injury Claims to be paid by the Trust until the Trustees, with the consent of the TAC and the FCR, determine that one or more of the Payment Percentages must be changed to assure that the Trust shall be in a financial position to pay present and future holders of similar Talc Personal Injury Claims in substantially the same manner.

In making any such change to any Payment Percentage, the Trustees, the TAC and the FCR shall take into account the fact that the holders of Talc Personal Injury Claims who voted on the Plan relied on the findings of experts that the Initial Payment Percentages represented a reasonably reliable estimate of the Trust's total assets and liabilities over the Trust's life based on the best information available at the time, and shall therefore give due consideration to the expectations of such claim holders that the applicable Initial Payment Percentage would be applied to their Talc Personal Injury Claims.

No less frequently than once every twelve (12) months, commencing on the Initial Claims Filing Date, the Trustees shall compare the liability forecasts for each Fund on which the then applicable Payment Percentage is based with the actual claims filing and payment experience of each Fund to date. If the results of the comparison call into question the ability of any Fund to continue to rely upon the current liability forecast, the Trustees shall undertake a

---

[3] The Initial Payment Percentage for each Fund has not been finalized. It is estimated that the Initial Payment Percentage for each Fund will be within the ranges set forth in this chart.

reconsideration of the applicable Payment Percentage. The Trustees may also reconsider the then-applicable Payment Percentages at shorter intervals if the Trustees deem such reconsideration appropriate or if requested by the TAC or the FCR.

The Trustees must base their determination of each of the Payment Percentages on current estimates of the number, types, and values of present and future Talc Personal Injury Claims, the value remaining in the applicable Fund, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds available to pay the Trust's liability to present and future holders of Talc Personal Injury Claims.

4.3     **Applicability of the Payment Percentages.**  The Trust shall apply the applicable Payment Percentages to all payments made to Talc Personal Injury Claimants. The payment to a claimant shall reflect the applicable Payment Percentage in effect at the time a Representative's properly completed Acceptance and Release is received by the Trust.

If the Trustees, with the consent of the TAC and the FCR, increase the Payment Percentage applicable to any Fund, the Trustees shall make supplemental payments to all claimants who previously liquidated their claims and received payments from such Fund based on the lower Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the claim in question times the applicable newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim (but excluding any such amounts attributable to any sequencing adjustment paid pursuant to Section 7.7 below).

The Trustees' obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $250 after application of the

Payment Percentage at that time, and the amount of the suspended payment to the holder of any Talc Personal Injury Claim shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they collectively would have been less than $250. However, the Trustees' obligation shall resume, and the Trustees shall pay any such aggregate supplemental payments due the claimant at such time that the cumulative aggregate exceeds $250.

**SECTION V**

**RESOLUTION OF TALC PERSONAL INJURY CLAIMS**

5.1        **Ordering, Processing and Payment of Claims**.

(a)    **Ordering of Claims.**

(i)        **Establishment of FIFO Processing Queues**.  The Trust shall order all Trust Claim Forms to be reviewed for processing purposes on a FIFO basis in the order each Basic Claim Submission is received, except as otherwise provided herein.  For all Talc Personal Injury Claims in respect of which a Basic Claim Submission is filed on or before the date six (6) months after the Initial Claims Filing Date, a claimant's position in the FIFO Processing Queue shall be determined as of the earliest of (i) the date prior to the Petition Date that the specific claim was filed against the Debtors in the tort system; (ii) the date prior to the Petition Date that the claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with the Debtors; (iii) the date subsequent to the Petition Date but prior to the date that the Trust first makes available the Trust Claim Form and other claims materials required to file a claim with the Trust that the claim was filed against another defendant in the tort system; and (iv)  the date a ballot was submitted on behalf of the claimant for purposes of voting to accept or reject the Plan pursuant to voting procedures approved by the Bankruptcy Court.

36

For all Talc Personal Injury Claims in respect of which a Basic Claim Submission is filed after the date six (6) months after the Initial Claims Filing Date, a claimant's position in the FIFO Processing Queue shall be determined by (i) the date of receipt of the claimant's Basic Claim Submission; or (ii) the date that the claim was filed against one or more Debtors in the tort system.  If any Basic Claim Submissions are filed on the same date, a claimant's position in the applicable FIFO Processing Queue vis-à-vis such other same-day claims shall be determined by the date of the diagnosis of the disease with the earlier diagnosis having priority over the later diagnosis. If any Basic Claim Submissions are filed and diagnosed on the same date, a claimant's position in the applicable FIFO Processing Queue vis-à-vis such other same-day claims shall be determined by the claimant's date of birth, with older claimants given priority over younger claimants.

     **(ii)**  **Effect of Statutes of Limitations and Repose.**  To be considered timely and eligible for compensation, all unliquidated Talc Personal Injury Claims filed against the Trust must meet either: (i) in the case of claims first filed in the tort system against the Debtors prior to the Petition Date, the applicable federal or state statute of limitations and repose that was in effect at the time of the filing of the claim in the tort system; or (ii) in the case of claims not filed against the Debtors in the tort system prior to the Petition Date, the applicable federal or state statute of limitations and repose that was in effect at the time of the filing of a Basic Claim Submission with the Trust. However, the running of the applicable statute of limitations or repose shall be tolled as of the earliest of: (a) the actual filing of a claim against one or more Debtors prior to the Petition Date in the tort system; (b) the date specified by agreement or otherwise among the Debtors and/or the Trust, on the one hand, and the applicable claimant, on the other hand, (or, if none, the date of the agreement) in the case of tolling prior to

the Petition Date by an agreement or otherwise, provided such tolling was still in effect on the Petition Date; or (c) the Petition Date.

If a Talc Personal Injury Claim meets any of the tolling provisions described in the preceding paragraph and the claim was not barred by the applicable federal or state statute of limitations or repose at the time of the relevant tolling event, it shall be treated as timely filed if a Basic Claim Submission in respect of such claim is filed with the Trust within three (3) years after the Initial Claims Filing Date. In addition, any Talc Personal Injury Claim that is first diagnosed after the Petition Date, irrespective of the application of any relevant federal or state statute of limitations or repose, shall be treated as timely filed if a Basic Claim Submission in respect of such claim is filed with the Trust within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims Filing Date, whichever is later. However, the processing of any Talc Personal Injury Claim by the Trust may be deferred at the election of the claimant pursuant to Section 6.2 below.

     **(b)**   **Payment of Claims**.  Talc Personal Injury Claims that have been liquidated in accordance with the terms hereof shall be paid from the applicable Fund in FIFO order based on the date their liquidation became final, all such payments being subject to the applicable Payment Percentage in accordance with Section 4.3, the applicable Maximum Annual Payment, and any sequencing adjustment provided for in Section 7.7 below, except as otherwise provided herein (the "**FIFO Payment Queue**").  For the avoidance of doubt, each Fund shall have its own FIFO Payment Queue.

Where a claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to submission of the Acceptance and Release by the Representative, an offer made by the

Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the Trust has been furnished with evidence that the settlement offer has been submitted to such court or in that probate process for approval. If the offer is ultimately approved by the court or through the probate process and a properly completed Acceptance and Release is submitted to the Trust, the Trust shall pay the claim in the amount so offered, multiplied by the greater of (a) the applicable Payment Percentage in effect at the time the offer was first made, or (b) the applicable Payment Percentage in effect at the time the Trust received the properly completed Acceptance and Release.

If any claims are liquidated on the same date, the claimant's position in the applicable FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's talc-related disease with the earlier diagnosis having priority over the later diagnosis. If any claims are liquidated on the same date and the respective claimants' talc-related diseases were diagnosed on the same date, the position of those claimants in the applicable FIFO Payment Queue shall be determined by the Trust based on the claimants' dates of births, with older claimants given priority over younger claimants.

(c)     **Settled and Unpaid Talc Personal Injury Claims.** The holder of a Settled and Unpaid Talc Personal Injury Claim may: (i) resubmit such claim for qualification and valuation under the Trust pursuant to the procedures set forth in these TDP; or (ii) agree to accept the settled amount of their claim up to the Maximum Value multiplied by the Initial Payment Percentage of the applicable Fund.

**5.2     Resolution of Unliquidated Talc Personal Injury Claims**.  Within sixty (60) days after the establishment of the Trust, the Trustees, with the consent of the TAC and the FCR, shall adopt procedures for reviewing and liquidating all unliquidated Ovarian Cancer A-D

Claims and Mesothelioma Claims, which shall include deadlines for processing such claims. Such procedures shall also require that claimants seeking compensation from the Trust in respect of unliquidated Talc Personal Injury Claims must first file a Complete Claim Submission, in accordance with the provisions of Sections 6.1 below.

The Trust Claim Form for claimants seeking to recover from the Trust shall require, in addition to a Basic Claim Submission: (i) Disease; (ii) Debtor Exposure; and (iii) election to proceed through the Expedited Review Process or the Individual Review Process.

Upon filing a Basic Claim Submission and electing the Expedited Review Process or the Individual Review Process (as applicable), a Talc Personal Injury Claimant seeking to recover from the Trust shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1(a) above.

(a)    **Expedited Review Process.**

(i)    **In General.**  The Expedited Review Process is designed to provide qualifying claimants (a) an expeditious, efficient, and inexpensive method for liquidating applicable, compensable Talc Personal Injury Claims where the claim, after meeting the applicable Medical/Exposure Criteria, can easily be verified by the Trust; and (b) a fixed and certain claim value.  If, after completing its review, the Trust does not offer the claimant Scheduled Value, the claimant may provide additional evidence and request that the claim be reviewed pursuant to Individual Review Process in accordance with Section 5.2(b) below or proceed to ADR in accordance with Section 5.7.

(ii)    **Claims Processing Under the Expedited Review Process.**  All claimants seeking liquidation of a Talc Personal Injury Claim pursuant to the Expedited Review Process shall file the Trust Claim Form.  Following receipt of a Complete Claim Submission, the

Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for any claim category eligible for the Expedited Review Process and shall advise the claimant whether the submitted Trust Claim Form is compensable or deficient.  If the Trust determines that a claim meets the Medical/Exposure Criteria for a claim category eligible for the Expedited Review Process, the Trust shall tender to the claimant an offer of payment equal to the Scheduled Value for such disease set forth in Section 5.2(a)(iii) below, subject to the applicable Payment Percentage in accordance with Section 4.3.  Offers tendered to Ovarian Cancer A-D Claimants shall be subject to both the BRCA Reduction and the Clear Cell Reduction, as applicable, after application of the Payment Percentage.  The Trust's offer shall be delivered together with the form of Acceptance and Release.  Upon the Trust's receipt of a properly completed Acceptance and Release, the claim shall be placed in the applicable FIFO payment queue, and the Trust shall make payment on the claim subject to the limitations, if any, of the applicable Maximum Annual Payment.

(iii)    **Ovarian Cancer A-D Claims and Mesothelioma Claims: Scheduled Value and Medical/Exposure Criteria.**  The Scheduled Values and Medical/Exposure Criteria set forth below shall apply to all applicable claims for Ovarian Cancer A through D and Mesothelioma filed with the Trust on or before the Initial Claims Filing Date for which the claimant elects the Expedited Review Process and shall continue to apply unless and until changed in accordance with these TDP.  On or after the Initial Claims Filing Date, the Trustees, with the consent of the TAC and FCR, may add to, change or eliminate Scheduled Values and/or Medical/Exposure Criteria for Ovarian Cancer A-D Claims and Mesothelioma Claims except that in no event shall the Scheduled Value for Ovarian Cancer A or Mesothelioma be reduced to an amount less than the Scheduled Value identified below.  In addition,

commencing on January 1, 2022, the Trust shall modify these valuations annually for inflation based on the CPI-U published by the United States Department of Labor, Bureau of Labor Statistics. Any such changes shall apply to such Talc Personal Injury Claims filed after the date of such change.

**Expedited Review Medical/Exposure Criteria**

| Disease/Category | Medical/Exposure Criteria for Trust Distribution |
|---|---|
| Mesothelioma A | (i) Diagnosis of Mesothelioma; (ii) Debtor Exposure; and (iii) Regular and Routine Exposure to Cosmetic Talc. |
| Mesothelioma B | (i) Diagnosis of Mesothelioma; (ii) Debtor Exposure; and (iii) Regular and Routine Exposure to Industrial Talc. |
| Ovarian Cancer A | (i) Diagnosis of Ovarian Cancer A; (ii) Debtor Exposure; and (iii) Personal Use Exposure. |
| Ovarian Cancer B | (i) Diagnosis of Ovarian Cancer B; (ii) Debtor Exposure; and (iii) Personal Use Exposure. |
| Ovarian Cancer C | (i) Diagnosis of Ovarian Cancer C; (ii) Debtor Exposure; and (iii) Personal Use Exposure. |
| Ovarian Cancer D | (i) Diagnosis of Ovarian Cancer D; (ii) Debtor Exposure; and (iii) Personal Use Exposure. |

**Scheduled Values of Claims Eligible for Expedited Review**

| Disease Level | Scheduled Values | | |
|---|---|---|---|
| | Tort System Election Claims | Trust Election Claims and Non-Indemnified Claims | Mixed Claims |
| Mesothelioma A | $140,000 | $400,000 | $400,000 |
| Mesothelioma B | $140,000 | $400,000 | $400,000 |
| Ovarian Cancer A | $140,000 | $400,000 | $400,000 |
| Ovarian Cancer B | $ 91,000 | $260,000 | $260,000 |
| Ovarian Cancer C | $ 49,000 | $140,000 | $140,000 |
| Ovarian Cancer D | $ 21,000 | $ 60,000 | $ 60,000 |

    **(b)**   **Individual Review Process.**

(i)    **In General.**  Subject to the provisions set forth below, a claimant may elect to have his or her Talc Personal Injury Claim reviewed under the Individual Review Process to determine whether (A) for Ovarian Cancer A-D Claims and Mesothelioma Claims that meet the relevant Medical and Exposure Criteria, whether the value of the claim differs from the Scheduled Value provided (*see* Section 5.2(b)(iii)) below; and (B) for Mesothelioma Claims without Regular and Routine Exposure, and Secondary Mesothelioma Claims, whether the claim is compensable hereunder and the value of such claim (*see* Sections 5.2(b)(iv) and (v) below, respectively).  A Talc Personal Injury Claim liquidated in the Individual Review Process may be determined to be more or less than the Scheduled Value the claimant would have received under the Expedited Review Process.  Until such time as the Trust has made an offer on a claim pursuant to the Individual Review Process, the claimant may change his or her election to proceed with the Individual Review Process and have the claim liquidated pursuant to the Expedited Review Process. In the event of such a change in the processing election, the claimant shall nevertheless retain his or her place in the applicable FIFO Processing Queue.  If, after completing its review, the Trust does not extend an offer, the claimant may provide additional evidence and request that the claim be re-reviewed or proceed to ADR in accordance with section 5.7.

(ii)    **Foreign Claims.**  Notwithstanding anything to the contrary herein, based on the fact that there is no history of Foreign Claims asserted against the Debtors, no Foreign Claims shall be paid from the Trust or under these TDP.

(iii)    **Ovarian Cancer A-D Claims and Mesothelioma Claims that meet the Medical and Exposure Criteria.**  Ovarian Cancer A-D Claimants and Mesothelioma Claimants that meet the Medical and Exposure Criteria set forth in Section 5.2(a)(iii) and believe

43

they are entitled to greater than the applicable Scheduled Value, shall be eligible to seek the Individual Review Process to determine the value of their claims. The Individual Review Process is intended to result in payments equal to the full liquidated value for each claim (subject to the applicable Payment Percentage) which may be determined to be more or less than the Scheduled Value the claimant would have received under the Expedited Review Process.  Because the detailed examination and valuation process pursuant to the Individual Review Process requires substantial time and effort, claimants electing to undergo the Individual Review Process may be paid on the basis of the liquidated value of their Talc Personal Injury Claims later than would have been the case had the claimant elected the Expedited Review Process.  The liquidated values of Ovarian Cancer A-D Claims or Mesothelioma Claims that undergo the Individual Review Process in accordance with the factors set forth in Section 5.2(b)(vi) below may be determined to be less than the Scheduled Value for the applicable disease, and, in any event, shall not exceed the Maximum Value for such disease as set forth herein.

(iv)    **Mesothelioma Claims without Regular and Routine Exposure.**

The Individual Review Process provides Mesothelioma Claimants that do not satisfy the Regular and Routine Exposure criteria with an opportunity for individual consideration and evaluation. If a Mesothelioma Claimant fails to meet the exposure period criteria in prong "a" of the Regular and Routine Exposure criteria, but such Claimant otherwise has regular or routine exposure equivalent to the applicable time period and no other exposure to asbestos, the Trust shall consider and evaluate the nature, intensity and duration of the exposure to Cyprus Talc and/or Imerys Talc. If the Trust is satisfied that the claimant has presented a claim that would be compensable in the tort system, the Trust may offer the claimant a liquidated value up to the applicable Scheduled Value for Mesothelioma, subject to the applicable Payment Percentage. If a

Mesothelioma Claimant fails to meet prong "b" of the Regular and Routine Exposure criteria, the Trust shall consider and evaluate the nature, intensity and duration of all other exposures to asbestos as well as the nature, intensity and duration of the exposure to Cyprus and/or Imerys Talc. If the Trust is satisfied that the claimant has presented a claim that would be compensable in the tort system, the Trust may offer the claimant a liquidated value up to the applicable Scheduled Value for Mesothelioma, subject to the applicable Payment Percentage.

> **(v)** **Mesothelioma Secondary Exposure Claims**.  If a claimant

alleges Mesothelioma from Debtor Exposure based on exposure to Cyprus and/or Imerys Industrial Talc from close physical contact to a person who was occupationally exposed (whether direct or bystander) to Cyprus Talc and/or Imerys Industrial Talc (i.e., a "**Secondary Mesothelioma Claim**"), the claimant must seek the Individual Review Process for his or her claim pursuant to Section 5.2(b) above. In such a case, the claimant must establish that the occupationally exposed person would have met the exposure requirements under these TDP that would have been applicable had the occupationally exposed person filed a Mesothelioma Claim against the Trust, including the requirement of Debtor Exposure. In addition, the claimant with a Secondary Mesothelioma Claim must establish that he or she is suffering from Mesothelioma, that his or her own Debtor Exposure to the occupationally exposed person occurred within the same time frame that the occupationally exposed person was exposed to Cyprus and/or Imerys Talc, and that such secondary exposure was a cause of the Mesothelioma.  If the Trust is satisfied that the claimant has presented a claim that would be compensable in the tort system, the Trust may offer the claimant a liquidated value up to the applicable Scheduled Value for Mesothelioma, subject to the applicable Payment Percentage.

**(vi)    Valuation Factors to Be Considered in the Individual Review Process**.  The Trust shall liquidate the value of each Talc Personal Injury Claim that undergoes the Individual Review Process based on the historic liquidated values of other similarly situated claims in the tort system as it exists on the Effective Date for similar claims or an analogous disease, or upon such criteria as the Trust may develop in consultation with the TAC and the FCR based upon its claims administrative experience and information available on values through continued litigation in the tort system.  Accordingly, the Trust shall take into consideration all of the factors that affect the amount of damages and values in the tort system, including, but not limited to, credible evidence of (i) the degree to which the characteristics of a claim differ from the Medical/Exposure Criteria for the disease in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages, and pain and suffering; (iii) whether the claimant's damages were (or were not) caused by Debtor Exposure (for example, possible alternative causes and the strength of documentation of injuries); (iv) settlement and verdict histories in the Claimant's Jurisdiction for similarly situated or analogous claims; (v) the greater of (a) settlement and verdict histories for the claimant's law firm in the Claimant's Jurisdiction for similarly situated or analogous claims, and (b) settlement and verdict histories for the claimant's law firm, including all cases where the claimant's law firm satisfies the Trust on the basis of clear and convincing evidence provided to the Trust that the claimant's law firm played a substantial role in the prosecution and resolution of the cases, such as actively participating in court appearances, discovery and/or trial of the cases, irrespective of whether a second law firm was also involved and would also be entitled to include the cases in its "settlement and verdict histories." For the avoidance of doubt, mere referral of a case, without further direct

involvement, will not be viewed as having played a substantial role in the prosecution and resolution of a case. In liquidating the value of a Talc Personal Injury Claim that undergoes the Individual Review Process, the Trust shall treat a claimant as living if the claimant was alive at the time the initial pre-petition complaint was filed or the Trust Claim Form was filed with the Trust even if the claimant has subsequently died.

With respect to Claimant's Jurisdiction, if the claim was not filed against the Debtors in the tort system prior to the Petition Date, the claimant may elect as the Claimant's Jurisdiction (i) the jurisdiction in which the claimant resides or resided at the time of diagnosis or when the claim is filed with the Trust; (ii) a jurisdiction in which the claimant experienced exposure to Cyprus and/or Imerys Talc or a product containing Cyprus and/or Imerys Talc; (iii) a jurisdiction in which the claimant experienced conduct which exposed a claimant to a product containing Cyprus and/or Imerys Talc for which the Debtors have legal responsibility; or (iv) any other jurisdiction in which the claimant could have brought suit in the absence of the bankruptcy case.

With respect to the Claimant's Jurisdiction, in the event a claim is made under these TDP for compensatory damages that would otherwise satisfy the criteria for payment under these TDP, but Claimant's Jurisdiction is a Foreclosed Jurisdiction, the claimant may elect the Commonwealth of Pennsylvania as the Claimant's Jurisdiction, and such claimant's damages shall be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles. The choice of law provision in Section 8.6 below applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.2(b)(vi) is determined to be the law of a Foreclosed Jurisdiction, shall govern only the rights between the

Trust and the claimant, and, to the extent the Trust seeks recovery from any entity that provided insurance coverage to the Debtors, the law of the Foreclosed Jurisdiction shall govern.

(vii)    **Average and Maximum Values for Talc Personal Injury Claims.**  Average and Maximum Values for Talc Personal Injury Claims shall be as follows:

| Disease Level | Average Values | | |
|---|---|---|---|
| | Tort System Election Claims | Trust Election Claims and Non-Indemnified Claims | Mixed Claims |
| Mesothelioma Claims with Regular and Routine Exposure | $175,000 | $500,000 | $500,000 |
| Mesothelioma Claims without Regular and Routine Exposure | $52,500 | $150,000 | $150,000 |
| Secondary Mesothelioma Claims | $52,500 | $150,000 | $150,000 |
| Ovarian Cancer A Claims | $175,000 | $500,000 | $500,000 |
| Ovarian Cancer B Claims | $113,750 | $325,000 | $325,000 |
| Ovarian Cancer C Claims | $61,250 | $175,000 | $175,000 |
| Ovarian Cancer D Claims | $26,250 | $75,000 | $75,000 |

| Disease Level | Maximum Values | | |
|---|---|---|---|
| | Tort System Election Claims | Trust Election Claims and Non-Indemnified Claims | Mixed Claims |
| Mesothelioma Claims with Regular and Routine Exposure | $472,500 | $1,350,000 | $1,350,000 |
| Mesothelioma Claims without Regular and Routine Exposure | $140,000 | $400,000 | $ 400,000 |
| Secondary Mesothelioma Claims | $140,000 | $ 400,000 | $400,000 |
| Ovarian Cancer A Claims | $472,500 | $1,350,000 | $1,350,000 |
| Ovarian Cancer B Claims | $307,125 | $877,500 | $877,500 |
| Ovarian Cancer C Claims | $165,375 | $472,500 | $472,500 |
| Ovarian Cancer D Claims | $70,875 | $202,500 | $202,500 |

The foregoing Average Values and Maximum Values shall apply to all Talc Personal Injury Claims filed with the Trust on or before the Initial Claims Filing Date and shall continue to apply unless and until changed in accordance with these TDP.  On or after the Initial Claims Filing Date, the Trust, with the consent of the TAC and FCR may change these values as set forth in Section 4.1. Any such changes shall apply to such Talc Personal Injury Claims filed after the date of such change.

(viii)    **Claims Processing under Individual Review**.  All claimants seeking liquidation of a Talc Personal Injury Claim pursuant to the Individual Review Process shall file the Trust Claim Form.  Following receipt of a Complete Claim Submission, the Trust shall determine the liquidated value, if any, of the claim (as set forth herein) and shall advise the claimant of that determination. The Trust shall tender to the claimant an offer of payment equal to the determined liquidated value subject to the applicable Payment Percentage in accordance with Section 4.3.  Offers tendered to Ovarian Cancer A-D Claimants shall be subject to both the BRCA Reduction and the Clear Cell Reduction, as applicable, after application of the Payment Percentage.  The Trust's offer shall be delivered together with the form of Acceptance and Release.  Upon the Trust's receipt of a properly completed Acceptance and Release, the claim shall be placed in the applicable FIFO Payment Queue and the Trust shall make payment on the claim, subject to the limitations, if any, of the applicable Maximum Annual Payment.

**5.3**        **Categorizing Claims as Exigent**.

(a)    **Exigent Claims**.  At any time, the Trust may liquidate and pay Direct Talc Personal Injury Claims that qualify as Exigent Health Claims or Exigent Hardship Claims as set forth below. Exigent Claims may be considered separately under the Individual Review Process no matter what the order of processing otherwise would have been under these TDP. An

Exigent Claim, following its liquidation, shall be placed first in the applicable FIFO Payment Queue ahead of all other Talc Personal Injury Claims and shall be subject to the applicable Maximum Annual Payment.

        **(i)**     **Exigent Health Claims**.  A Direct Talc Personal Injury Claim qualifies for payment as an Exigent Health Claim if the claim meets the Medical/Exposure Criteria for Mesothelioma or Ovarian Cancer and the claimant is living when the claim is filed, and the claimant provides a declaration or affidavit made under penalty of perjury by a physician who has examined the claimant within one hundred twenty (120) days of the date of declaration or affidavit in which the physician states (a) that there is substantial medical doubt that the claimant will survive beyond six (6) months from the date of the declaration or affidavit, and (b) that the claimant's terminal condition is caused by the relevant talc-related disease.

        **(ii)**     **Exigent Hardship Claims.**  A Direct Talc Personal Injury Claim qualifies for payment as an Exigent Hardship Claim if the claim meets the relevant Medical/Exposure Criteria for Mesothelioma or Ovarian Cancer and the Trust, in its sole discretion, determines (i) that the claimant needs immediate financial assistance based on the claimant's expenses and all sources of available income, and (ii) that there is a causal connection between the claimant's dire financial condition and the claimant's talc-related disease.

     **5.4**     **Indirect Talc Personal Injury Claims**.  Indirect Talc Personal Injury Claims asserted against the Trust shall be treated as presumptively valid and paid by the Trust subject to the applicable Payment Percentage (and all other limitations applicable to Direct Talc Personal Injury Claims hereunder) if (a) such claim satisfied the requirements of the Claims Bar Date for such claims established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by Section 502(e) of the Bankruptcy Code or subordinated under Section 509(c) of the

Bankruptcy Code, and (b) the Indirect Claimant establishes to the satisfaction of the Trustees that (i) the Indirect Claimant has paid in full the liability and obligation of the Trust to the individual claimant to whom the Trust would otherwise have had a liability or obligation under these TDP (and which has not been paid by the Trust), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Trust and the Protected Parties from all liability to the Direct Claimant and the Indirect Claimant, (iii) the claim is not otherwise barred by a statute of limitations or repose or by other applicable law; and (iv) the Indirect Claimant does not owe the Debtors, Reorganized Debtors, or the Trust an obligation to indemnify the liability so satisfied. In no event shall any Indirect Claimant have any rights against the Trust superior to the rights of the related Direct Claimant against the Trust, including any rights with respect to the timing, amount or manner of payment. In addition, no claim of an Indirect Claimant may be liquidated and paid in an amount that exceeds what the Indirect Claimant has paid the related Direct Claimant in respect of such claim for which the Trust would have liability.  Further, in no event shall any Indirect Talc Personal Injury Claim exceed the Maximum Value of the compensable injury.  An Indirect Talc Personal Injury Claim shall be subject to the applicable Payment Percentages and Average Value set forth herein.

To establish a presumptively valid Indirect Talc Personal Injury Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with the consent of the Trust and an appropriate full release in favor of the Trust and the Protected Parties) or a Final Order, provided that such claim is valid under applicable state law. In any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the Trust under applicable law by

way of a settlement, the Indirect Claimant shall obtain for the benefit of the Trust and the Protected Parties a release in form and substance satisfactory to the Trustees.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the Trust and the Protected Parties with a full release of the Direct Claimant's claim, and demonstrate that the Indirect Claimant does not owe the Debtors, Reorganized Debtors or the Trust any indemnification obligation in respect of such claim, the Indirect Claimant may request that the Trust review the Indirect Talc Personal Injury Claim individually to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the Trust had to the Direct Claimant. If the Indirect Claimant can show that it has paid all or a portion of such liability or obligation, the Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, times the then applicable Payment Percentage. However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled under these TDP. Further, the liquidated value of any Indirect Talc Personal Injury Claim paid by the Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any Talc Personal Injury Claim that might be subsequently asserted by the Direct Claimant against the Trust.

Any dispute between the Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures. If such dispute is not resolved under the ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Section 5.8 below.

Indirect Claimants holding Indirect Talc Personal Injury Claims that have not been disallowed, discharged, or otherwise resolved by Final Order shall have such claims processed in accordance with procedures to be developed and implemented by the Trustees consistent with the provisions of this Section 5.4, which procedures (a) shall determine the validity, allowability and enforceability of such claims, and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the Trust would have afforded the holders of the underlying valid Talc Personal Injury Claims.

The Trustees may develop and approve a separate claim form for Indirect Claimants with the consent of the TAC and FCR.

### 5.5 Evidentiary Requirements.

#### (a) Mesothelioma Medical Evidence.

(i) **In General.** All diagnoses of Mesothelioma shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to asbestos to onset of disease, or (ii) a history of the claimant's Debtor Exposure, which may be by affidavit, sales receipts, photographs, product possession, invoices, employment, construction records, hospital records, or similar records, or by other credible evidence, sufficient to establish a 10-year latency period from date of first exposure to asbestos to onset of disease.

(ii) **Credibility of Medical Evidence.** Before making any payment to a claimant, the Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards. Diagnosis by a physician competent to make a diagnosis of Mesothelioma shall be sufficient medical evidence.

In addition, claimants who otherwise meet the requirements of these TDP for payment of a Talc Personal Injury Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Trust in any Individual Review Process proceeding conducted pursuant to Section 5.2(b) or any Exigent Claim proceeding conducted pursuant to Section 5.3(a). The Trust may take any action it deems appropriate to protect the interests of the Trust in response to the submission of Medical Evidence it deems unreliable.

  **(b)**   **Ovarian Cancer Medical Evidence.**

   **(i)**    **In General.** All diagnoses of Ovarian Cancer shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to Imerys Talc or an Imerys Talc-containing product and the diagnosis, or (ii) a history of the claimant's Debtor Exposure, which may be by affidavit, sales receipts, photographs, product possession, invoices, hospital records or similar records, or by other credible evidence, sufficient to establish a 10-year latency period.

   **(ii)**    **Credibility of Medical Evidence.** Before making any payment to a claimant, the Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical and scientific standards. The Trust may require the submission of pathology reports, laboratory tests, surgical reports, hospitalization records, results of medical examinations or reviews of other medical evidence. Medical evidence that is proof of diagnosis, subtype, and stages of epithelial ovarian cancer, fallopian tube cancer, or primary peritoneal cancer by a gynecologic oncologist, medical

oncologist, or pathologist, is presumptively reliable, although the Trust may seek to rebut the presumption.

In addition, claimants who otherwise meet the requirements of these TDP for payment of a Talc Personal Injury Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Trust in any Individual Review Process proceeding conducted pursuant to Section 5.2(b) or any Exigent Claim proceeding conducted pursuant to Section 5.3(a). The Trust may take any action it deems appropriate to protect the interests of the Trust in response to the submission of Medical Evidence it deems unreliable.

     **(c)**    **Exposure Evidence.**  To receive compensation from the Trust, a claim must demonstrate Debtor Exposure. Claims based on conspiracy theories that involve no exposure to talc or talc-containing products sold, distributed, marketed, handled, processed or manufactured by the Debtors are not compensable under these TDP.  To meet the presumptive exposure requirements of the Expedited Review Process, the holder of a claim for Ovarian Cancer A-D must also establish Personal Use Exposure in addition to Debtor Exposure.  To meet the presumptive exposure requirements of the Expedited Review Process, the holder of a Mesothelioma Claim must establish Regular and Routine Exposure in addition to Debtor Exposure.   Credible exposure evidence may be established by an affidavit or sworn statement based on personal knowledge or by other credible evidence. The Trust may, but is not required to, ask for the submission of other or additional evidence of exposure when it deems such to be necessary.

Evidence submitted to establish proof of exposure is for the sole benefit of the Trust, not third parties or defendants in the tort system. The Trust has no need for, and therefore claimants are not required to furnish the Trust with, evidence of exposure to specific products other than those for which the Debtors have legal responsibility, except to the extent such evidence is required elsewhere in these TDP.  Similarly, failure to identify Debtor Exposure in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the Trust, provided that the claimant satisfies the medical and exposure requirements of these TDP.

**5.6** **Claims Audit Program**.  The Trust, with the consent of the TAC and the FCR, shall develop a Claims Audit Program.  Such Claims Audit Program shall include methods for auditing the reliability of medical evidence, as well as the reliability of evidence of exposure to talc or talc-containing products for which the Trust has legal responsibility.  The Trust shall utilize the services of a third-party claims processing facility (the "**Claims Processor**") to assist in the evaluation of claims submitted to the Trust and shall participate in a Cross-Trust Audit Program.  The filing of any claim with the Trust, regardless of the treatment sought, shall constitute consent for each other trust participating in the Cross-Trust Audit Program to release to the entity overseeing the Cross-Trust Audit Program (the "**Auditor**") all information submitted to such other trusts by or on behalf of the claimant pursuant to the provisions of the Cross-Trust Audit Program and to disclose the status of any such claim and the amount and date of any payment on the claim to the Auditor.

To the extent that the Trustees believe that it is relevant, nothing herein shall preclude the Trust or its Auditor, in the Trustees' sole discretion, from reviewing or taking into consideration filed state court complaints or other claims filed against other mass tort trusts.  Any claimant

subject to the Claims Audit Program shall cooperate and, provide the Trust with non-privileged information reasonably requested by the Trust and, if requested by the Trustees, authorization to obtain from other mass tort trusts any information such claimant has submitted to such other trusts.

In the event that an audit reveals that fraudulent information has been provided to the Trust, the Trust may penalize any claimant or claimant's attorney by rejecting the Talc Personal Injury Claim or by other means including, but not limited to, requiring the source of such fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' Talc Personal Injury Claims and any other appropriate action or sanction.

      **5.7**        **Arbitration**.

        **(a)**    **Establishment of ADR Procedures**.  The Trust, with the consent of the TAC and the FCR, shall develop and adopt ADR Procedures, which shall provide for binding or non-binding arbitration to resolve disputes concerning (a) the valuation of a claim by the Trust, (b) whether the Trust's determination that a claim would not receive an offer was proper, or (c) whether the claimant's medical condition or exposure history meets the requirements of these TDP for purposes of categorizing a claim.  In addition, disputes over the validity of an Indirect Talc Personal Injury Claim shall be eligible for ADR.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 5.5 above. In an arbitration involving any such claim, the Trust shall not offer into evidence or describe any model or assert that any information generated by the model has any evidentiary relevance or should be used by the arbitrator in determining the presumed correct liquidated value in the arbitration. The underlying data that

was used to create the model may be relevant and may be made available to the arbitrator but only if provided to the claimant or his or her counsel ten days prior to the arbitration proceeding. The claimant and his or her counsel may use the data that is provided by the Trust in the arbitration and shall agree to otherwise maintain the confidentiality of such information. Any disputes regarding confidentiality shall be resolved by the arbitrator.

With respect to all claims eligible for arbitration, the claimant shall elect either non-binding or binding arbitration.  The Trust will consent to the type of ADR elected by the claimant.  The ADR Procedures may be modified by the Trust with the consent of the TAC and the FCR.

(b)     **Claims Eligible for Arbitration**.  To be eligible for arbitration on the question of the appropriate liquidated value to be assigned to a claim, the Talc Personal Injury Claimant must first complete the Individual Review Process set forth in Section 5.2(b) above with respect to the disputed issue. The Individual Review Process shall be treated as completed for these purposes after the Trust has made an offer on the claim (or declined to make an offer on the claim) and the claimant has rejected the liquidated value resulting from the Individual Review Process in writing (or been notified that the Trust declined to make an offer).

(c)     **Limitations on and Payment of Arbitration Awards**.  A claimant who submits to binding arbitration will receive payments in the same manner as one who accepts the Trust's original valuation of the claim. If a claimant elects non-binding arbitration and both the claimant and the Trust agree to be bound by the award therein, then the claimant will receive payments in the same manner as one who accepts the Trust's original valuation of the claim.

5.8     **Litigation**.  Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the Trust in the

Claimant's Jurisdiction as defined in Section 5.2(b)(vi) above.  Any such lawsuit must be filed

by the claimant in his or her own right and name and not as a member or representative of a

class, and no such lawsuit may be consolidated with any other lawsuit.  All defenses (including,

with respect to the Trust, all defenses which could have been asserted by any Protected Party)

shall be available to both sides at trial; however, the Trust may waive any defense and/or

concede any issue of fact or law. If the claimant was alive at the time the initial pre-petition

complaint was filed or the Trust Claim Form was filed with the Trust, the Trust shall treat the

claims as a personal injury case with all personal injury damages to be considered even if the

claimant died during the pendency of the litigation.  A claimant shall be eligible for payment of a

judgment for monetary damages obtained in the tort system from the Trust's available Cash only

as set forth in Section 7.8 below.

## SECTION VI

## CLAIMS MATERIALS

**6.1**　　　**Claims Materials**.  The Trust shall prepare suitable and efficient Claims

Materials, consisting of (i) a detailed Trust Claim Form (or forms); (ii) instructions each as may

be prepared by the Trustees with the consent of the TAC and FCR; and (iii) a copy of these TDP

for all holders of Talc Personal Injury Claims and shall provide such Claims Materials upon a

written request for such materials to the Trust. In addition, a separate Trust Claim Form for

Indirect Talc Personal Injury Claims shall be developed.  The Trust Claim Form shall also

include a certification by the claimant or his or her Representative sufficient to meet the

requirements of Rule 11(b) of the Federal Rules of Civil Procedure. In developing its claim filing

procedures, the Trust shall make every effort to provide claimants with the opportunity to utilize

currently available technology in their discretion, including filing claims and supporting

documentation over the internet and electronically. The Trust Claim Form shall be developed by

the Trust and submitted to the TAC and the FCR for approval; it may be changed by the Trustees with the consent of the TAC and the FCR.

   **6.2**   **Withdrawal or Deferral of Claims**.  A claimant may withdraw a Talc Personal Injury Claim at any time upon written notice to the Trust and file another Talc Personal Injury Claim subsequently without affecting the status of the claim for purposes of statutes of limitations or repose. All such claims filed after withdrawal shall be given a place in the FIFO Processing Queue based on the date of such subsequent filing.  A claimant may also request that the processing of his or her Talc Personal Injury Claim by the Trust be deferred for a period not to exceed three (3) years without affecting the status of the claim for statute of limitations or repose purposes, in which case the claimant shall also retain his or her original place in the applicable FIFO Processing Queue. During the period of such deferral, a sequencing adjustment on such claimant's Talc Personal Injury Claim as provided in Section 7.7 hereunder shall not accrue and payment thereof shall be deemed waived by the claimant. Except for Talc Personal Injury Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the Trust's offer is required, a claim shall be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six (6) months of the Trust's written offer of payment or of rejection of the claim. Upon written request, for good cause, the Trust may extend the withdrawal or deferral period for an additional six (6) months. During any period of deferral, a sequencing adjustment on such claimant's Talc Personal Injury Claim as provided in Section 7.7 hereunder shall not accrue and payment thereof shall be deemed waived by the claimant.

   **6.3**   **Filing Requirements and Fees**.  The Trustees shall have the discretion to determine, with the consent of the TAC and the FCR, whether a filing fee should be required for

any Talc Personal Injury Claims, and in what amount. A filing fee shall not be required for any

Talc Personal Injury Claimant who has commenced litigation against any party based on Debtor

Exposure or for any Indemnified Claimant who, in connection with submission of a Trust Claim

Form, will commence litigation in respect of an Indemnified Claim.  Any filing fee paid to the

Trust shall be reimbursed in full without application of the applicable Payment Percentage if and

when such claim is paid by the Trust.

      **6.4**      **English Language**.  All claims, claims forms, submissions and evidence

submitted to the Trust or in connection with any claim or its liquidation not in the English

language shall be accompanied by an English translation.

      **6.5**      **Confidentiality of Talc Personal Injury Claimants' Submissions**.  All

submissions to the Trust by a holder of a Talc Personal Injury Claim, including a claim form and

materials related thereto, shall be treated as made in the course of settlement discussions between

the holder and the Trust and intended by the parties to be confidential and to be protected by all

applicable state and federal privileges, including, but not limited to, those directly applicable to

settlement discussions. The Trust will preserve the confidentiality of such claimant submissions

and shall disclose the contents thereof only, with the permission of the holder, to another trust

established for the benefit of talc or asbestos personal injury claimants pursuant to Sections

105(a) and  524(g) of the Bankruptcy Code or other applicable law, or to such other persons as

authorized by the holder, or in response to a valid subpoena of such materials issued by the

Bankruptcy Court, a Delaware state court, the United States District Court for the District of

Delaware or any other court of competent jurisdiction.

      Furthermore, the Trust shall provide counsel for the holder a copy of any such subpoena

immediately upon being served; provided, however, that if a subpoena seeks records or

information pertaining to more than fifty (50) claimants, the Trust may instead provide a copy of the subpoena to counsel for the TAC and FCR and delay providing a copy of the subpoena to counsel for individual holders of Talc Personal Injury Claims until, in the Trustees' judgment, it appears likely that information or records relating to the holders may have to be produced in response to the subpoena. In such a case, the Trust shall ensure that the notice that is provided to counsel for the holders allows such counsel sufficient time to object to the production. The Trust shall on its own initiative or upon request of the claimant or claimants in question take all necessary and appropriate steps to preserve any and all privileges.

Notwithstanding anything in the foregoing to the contrary, with the consent of the TAC and the FCR, the Trust may disclose information, documents, or other materials reasonably necessary in the Trust's judgment to preserve, litigate, resolve or settle coverage, or to comply with an applicable obligation under an insurance policy, indemnity, or settlement agreement; provided, however, that the Trust shall take any and all steps reasonably feasible in its judgment to preserve the further confidentiality of such information, documents and materials, and prior to the disclosure of such information, documents or materials to a third party, the Trust shall receive from such third party a written agreement of confidentiality that (a) ensures that the information, documents and materials provided by the Trust shall be used solely by the receiving party for the purpose stated in the agreement and (b) prohibits any other use or further dissemination of the information, documents and materials by the third party.

## SECTION VII

## GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS

**7.1     Claims Processing.**  The Trust may utilize the services of a Claims Processor. All Talc Personal Injury Claims shall be resolved and, if determined to be eligible for payment, paid on an impartial, FIFO basis.

A claimant may not assert more than one Talc Personal Injury Claim hereunder. However, the holder of a Direct Talc Personal Injury Claim for Ovarian Cancer B, Ovarian Cancer C, or Ovarian Cancer D who is paid from Fund C may assert a new claim for a higher level of Ovarian Cancer or Mesothelioma that is subsequently diagnosed.  Any additional payments as to which such claimant may be entitled shall be paid from Fund A and shall be reduced by the amount paid from Fund C for any earlier-diagnosed disease and the remaining amount due shall be subject to the then applicable Payment Percentage.

Talc Personal Injury Claims shall be processed based on their place or places in the applicable FIFO Processing Queues based upon the election (Expedited Review Process or Individual Review Process) the Talc Personal Injury Claimant selects (if such election is available).  The Trust shall take all reasonable steps to resolve Talc Personal Injury Claims as efficiently and expeditiously as possible at each stage of claims processing, including mediation and arbitration, which steps may include, in the Trust's sole discretion, conducting settlement discussions with Representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the applicable FIFO Processing Queues are maintained, and each claim is individually evaluated pursuant to the valuation factors set forth in Section 5.2(b)(vi) herein. Except as set forth herein, the Trust shall also make every effort to issue offers each year to at least that number of Talc Personal Injury Claims required to exhaust the applicable Maximum Annual Payment for each Fund.

The Trustees shall use their reasonable best efforts to ensure that the Trust processes claims such that over time the combination of settlements at the Scheduled Values (if applicable) and those resulting from the Individual Review Process should generally result in the applicable Average Values set forth in Section 5.2(b)(vii).

Nothing herein shall prevent the Trust from settling multiple claims at one time.

**7.2**     **Acceptance and Release.**  A claimant may accept an offer of payment from the Trust by completing the applicable acceptance and release form to be adopted by the Trust with the consent of the TAC and FCR (the "**Acceptance and Release**").  The Acceptance and Release form provided to holders of Non-Indemnified Claims and Trust Election Claimants shall include a release of all Protected Parties.  The Acceptance and Release form provided to Tort System Election Claimants will explicitly provide that such claimant is not releasing the Debtors but is solely releasing the Trust's liability in respect of other Protected Parties and will provide that such claimant's right to pursue Indemnified Claims against the Debtors in the tort system is preserved and unaffected as a result of any payment from the Trust.  The applicable Acceptance and Release shall be available for completion electronically and may be executed by the claimant or the Representative through DocuSign or a similar authorized electronic signature program, or such other simplified and expedient means as the Trust, with the consent of the TAC and FCR, may adopt.

**7.3**     **Claims Disputes.**  All unresolved disputes regarding a claimant's medical condition, exposure history and/or the liquidated value of the claim may be subject to informal mediation and then, at the election of the claimant, to binding or non-binding arbitration as set forth in Section 5.7 herein under the ADR Procedures to be adopted by the Trust with the consent of the TAC and FCR. Talc Personal Injury Claims that are the subject of a dispute with the Trust that are not resolved by arbitration may enter the tort system solely as provided in Sections 5.8.

**7.4**     **Costs Considered.**  Notwithstanding any provisions of these TDP to the contrary, the Trustees shall always provide appropriate consideration to the cost of ensuring that

payment of valid Talc Personal Injury Claims is not further impaired by costs incurred related to the Trust's investigation of the validity of the medical and exposure evidence supporting any claim for Ovarian Cancer or Mesothelioma. Nothing herein shall prevent the Trustees, in appropriate circumstances, from contesting the validity of any claim against the Trust whatever the costs or declining to accept medical evidence from sources that the Trustees have determined to be unreliable pursuant to the Claims Audit Program described in Section 5.6 above.

**7.5** **Discretion to Vary the Order and Amounts of Payments in the Event of Limited Liquidity**. Consistent with the provisions hereof and subject to the FIFO Processing and Payment Queue and the applicable Maximum Annual Payments set forth above, the Trustees shall proceed as quickly as possible to liquidate valid Talc Personal Injury Claims and shall make payments to holders of such claims in accordance with these TDP promptly as funds become available and as claims are liquidated, while maintaining sufficient resources to pay future valid claims in substantially the same manner.

Because the Trust's assets and liabilities over time remain uncertain, and decisions about payments must be based on estimates that cannot be made precisely, such decisions may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants. However, the Trustees shall use their best efforts to treat similar claims in substantially the same manner, consistent with their duties as Trustees, the purposes of the Trust, and the practical limitations imposed by the inability to predict the future with precision.

In the event that the Trust faces issues with respect to liquidity, the Trustees may, with the consent of the TAC and the FCR, (a) suspend the normal order of payment, or (b) temporarily limit or suspend payments altogether.

**7.6**        **Punitive Damages**.  Except to the extent that punitive damages are the sole recovery provided under applicable law, in determining the value of any liquidated or unliquidated Talc Personal Injury Claim, punitive or exemplary damages (*i.e.*, damages other than compensatory damages) shall not be considered or allowed, notwithstanding their availability in the tort system. Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the Trust in the tort system pursuant to Sections 5.8 herein.

For the avoidance of doubt, this Section 7.5 shall not affect in any way any claimant's or the Trust's ability to recover from any entity other than the Trust or the Protected Parties, including, by way of example and not limitation, J&J.

**7.7**        **Sequencing Adjustments**.

**(a)**    **General**. Subject to the limitations set forth below, a sequencing adjustment shall be paid on all Talc Personal Injury Claims with respect to which the claimant has had to wait a year or more for payment, provided, however, that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years, for the period when the claim was deferred or withdrawn at the claimant's request, or during any period where the Trust's provision of payment to a claimant is delayed as the result of the claimant's failure to provide the Trust with additional information as requested  on an unliquidated Talc Personal Injury Claim. The sequencing adjustment factor shall be equal to the federal funds rate per annum for each of the first five (5) years after the Effective Date; thereafter, the Trust shall have the discretion to change the annual sequencing adjustment factor with the consent of the TAC and the FCR.

**(b)**    **Unliquidated Talc Personal Injury Claims**. A sequencing adjustment shall be payable on the Scheduled Value of any unliquidated Talc Personal Injury Claim

whether the claim is liquidated under Expedited Review Process, Individual Review Process, or by arbitration. No sequencing adjustment shall be available to or paid on any claim liquidated in the tort system pursuant to Section 5.8 above herein.  Sequencing adjustments on all such unliquidated claims shall be measured from the date of payment back to the date that is one (1) year after the date on which the claim was placed in the FIFO Payment Queue, subject to the limitation that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years.  Notwithstanding the provisions hereof, a sequencing adjustment shall not accrue during any period where the Trust's provision of payment to a claimant is delayed as the result of the claimant's failure to provide the Trust with information necessary to process a Talc Personal Injury Claim.

**7.8** **Payment of Judgments for Money Damages**.  This section does not apply to Indemnified Claims pursued in the tort system pursuant to Section 2.3(a)(ii) hereof. If and when a claimant who elected non-binding arbitration and rejected the arbitral award subsequently obtains a judgment in the tort system, the claim shall be placed in the applicable FIFO Payment Queue based on the date on which the judgment became final. Thereafter, the claimant shall receive from the Trust an initial payment (subject to the applicable Payment Percentage and the applicable Maximum Annual Payment) of an amount equal to the greater of (i) the Trust's last offer to the claimant, or (ii) the award that the claimant declined in non-binding arbitration; provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system. The claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage, Maximum Value, and the

applicable Maximum Annual Payment, if applicable, in effect on the date of the payment of the subject installment).

The total amounts paid with respect to such claims shall not exceed the relevant Maximum Values for such Disease Levels as set forth in Section 5.2(a)(iii) above, subject to the applicable Payment Percentage. Under no circumstances shall (a) sequencing adjustments be paid pursuant to Section 7.7, or (b) interest be paid under any statute on any judgments obtained in the tort system.

**7.9    Third-Party Services**.  Nothing in these TDP shall preclude the Trust from contracting with another claims resolution organization to provide services to the Trust so long as decisions about the categorization and liquidated value of Talc Personal Injury Claims are based on the relevant provisions of these TDP, including the Disease Levels, Scheduled Values, Average Values, Maximum Values, and Medical/Exposure Criteria set forth above.

**7.10    Trust Disclosure of Information**.  Periodically, but not less often than once a year, the Trust shall make available to claimants and other interested parties, the number of claims by each disease that have been resolved both by the Individual Review Process and by arbitration as well as by litigation in the tort system indicating the amounts of the awards and the averages of the awards by jurisdiction.

**SECTION VIII**

**<u>MISCELLANEOUS</u>**

**8.1    Non-Binding Effect of Trust and/or Litigation Outcome.**  Notwithstanding any other provision of these TDP, a decision by the Trust to pay or not to pay any claim shall not be used in, be admissible as evidence in, binding in, or have any *res judicata*, collateral estoppel, or other preclusive effect in any lawsuit or other proceeding against J&J or any other entity other than the Trust.  Notwithstanding any other provision of these TDP, the outcome of litigation

against the Debtors by the holder of an Indemnified Claim shall not be used in, be admissible as evidence in, binding in or have any other preclusive effect in connection with the Trust's resolution or valuation of an Indemnified Claim.

8.2     **Independence of the Trust.**  Neither J&J nor any of its Affiliates shall have any rights or involvement whatsoever in the Trust, including without limitation its management or operation, or in connection with this TDP.  Neither J&J nor any of its Affiliates are a third-party beneficiary of the Trust or these TDP, and nothing herein creates any rights or obligations that may give rise to a claim or cause of action by J&J or any of its Affiliates against the Trust or any claimant.

8.3     **Amendments**.  Except as otherwise provided herein, the Trustees may not amend, modify, delete, or add to any provisions of these TDP, without the written consent of the TAC and the FCR.  Nothing herein is intended to preclude the TAC or the FCR from proposing to the Trustees, in writing, amendments to these TDP.  For the avoidance of doubt, these TDP may not be amended to alter the allocation of the assets of the Trust between or among Funds.

8.4     **Severability**.  Should any provision contained in these TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these TDP. Should any provision contained in these TDP be determined to be inconsistent with or contrary to Debtors' obligations to any insurance company providing insurance coverage to the Debtors in respect of claims for personal injury based on exposure to talc and/or a talc-containing product, or to conduct that exposed the claimant to talc and/or a talc product, for which the Debtors have legal responsibility or products containing talc for which the Debtors have legal responsibility, the Trustees, with the consent of the TAC and the FCR, may amend these TDP and/or the Trust Agreement to make the

provisions of either or both documents consistent with the duties and obligations of the Debtors to said insurance company.

**8.5**        **Governing Law**.  Except for purposes of determining the liquidated value of any Talc Personal Injury Claim, administration of these TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware. The law governing the liquidation of Talc Personal Injury Claims in the case of the Individual Review Process, mediation, arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in Section 5.2(b)(vi) above.

**8.6**        **Administration with Other Comparable Trusts**.  In order to efficiently administer the Talc Personal Injury Trust Assets, the Trustees may determine, with the consent of the TAC and the FCR, to provide for the administration of the Talc Personal Injury Trust Assets and/or these TDP by or in conjunction with another trust or trusts established under Sections 105 and/or 524(g) of the Bankruptcy Code, provided, however, that appropriate accounting, trust, confidentiality, or other procedures shall be adopted and followed to ensure that the Talc  Personal Injury Assets are maintained separate and segregated from any other trust's assets or res and the Trust's value can be separately ascertained at all appropriate times, and all claimant information is maintained on a confidential basis.