# <u>EXHIBIT C</u>

**Rio Tinto / Zurich Settlement Agreement**

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release ("Agreement") is entered into by and between Imerys Talc America, Inc. ("ITA"), Imerys Talc Vermont, Inc. ("ITV"), Imerys Talc Canada, Inc. ("ITC"), and, to the extent it becomes a debtor in the Chapter 11 Cases, Imerys Talc Italy S.p.A. ("ITI") (collectively, the "Debtors"), on behalf of themselves and their Estates, on the one hand, and Rio Tinto America Inc. ("Rio Tinto"), Three Crowns Insurance Company, formerly known as Three Crowns Insurance Company Limited ("TCI"), Metals & Minerals Insurance Company Pte. Ltd. ("MMI"), and Falcon Insurance Ltd. ("Falcon," and together with TCI and MMI, the "Rio Tinto Captive Insurers") (Rio Tinto and the Rio Tinto Captive Insurers, collectively, the "Rio Tinto Settling Parties"), and Zurich American Insurance Company, in its own capacity and as successor-in-interest to Zurich Insurance Company, U.S. Branch ("Zurich"), on the other hand.  The Rio Tinto Settling Parties and Zurich are referred to collectively as the "Insurer Parties" and, together with the Debtors, as the "Parties."  Capitalized terms appearing in this Agreement that are not defined in this prefatory paragraph have the meanings set out in Section 1, Additional Definitions, below.

## RECITALS

WHEREAS, ITA, ITV, ITC, and ITI were formerly owned by various corporate entities affiliated with Rio Tinto (under the names Luzenac America, Inc., Windsor Minerals, Inc., Luzenac, Inc., and Luzenac Val Chisone S.p.A., respectively) and were sold pursuant to a stock purchase agreement with Mircal S.A., a subsidiary of Imerys S.A., in 2011; and

WHEREAS, numerous Talc Personal Injury Claims have been brought against one or more of the Debtors seeking damages and other relief for injury allegedly caused by exposure to

1

talc, and the Debtors expect that such Talc Personal Injury Claims will continue to be made in the future; and

WHEREAS, before the 2011 sale, Zurich and other Zurich Corporate Parties issued the Zurich Policies, liability insurance policies that included Luzenac America, Inc., Windsor Minerals, Inc., and/or Luzenac, Inc. as insureds; and

WHEREAS, before the 2011 sale, the Rio Tinto Captive Insurers issued the Rio Tinto Captive Insurer Policies, liability insurance policies that included Luzenac America Inc., Windsor Minerals, Inc., Luzenac, Inc., and/or Luzenac Val Chisone, S.p.A. as insureds; and

WHEREAS, disputes have arisen as to the existence and scope of any obligation of the Zurich Corporate Parties and the Rio Tinto Captive Insurers to provide coverage for Talc Personal Injury Claims under the Zurich Policies and Rio Tinto Captive Insurer Policies, respectively; and

WHEREAS, on February 13, 2019, ITA, ITV, and ITC filed voluntary petitions for relief with the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, commencing their respective Chapter 11 Cases; and

WHEREAS, on January 20, 2021, ITA, ITV, and ITC filed with the Bankruptcy Court the Seventh Amended Plan, under which ITI will file its own Chapter 11 Case if the Seventh Amended Plan is accepted by the requisite percentages of holders of Talc Personal Injury Claims; and

WHEREAS, the Debtors, on the one hand, and the Insurer Parties, on the other hand, wish to fully and finally resolve their disputes, and to provide for the other consideration, promises, releases, and covenants set forth in this Agreement; and

2

WHEREAS, as part of the compromise and resolution of the Parties' disputes, the Debtors have agreed to sell, and Zurich and the Rio Tinto Settling Parties have agreed to purchase, any and all of the Debtors' rights and interests in the Zurich Policies and the Rio Tinto Captive Insurer Policies, respectively, pursuant to Section 363 of the Bankruptcy Code, subject to the terms and conditions set forth in this Agreement;

NOW THEREFORE, in consideration of the foregoing, and in consideration of the other mutual considerations, promises, releases, and covenants set forth below, the sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## 1.     ADDITIONAL DEFINITIONS

The following additional definitions apply to this Agreement.  The singular form of a word includes the plural and vice versa; the disjunctive "or" is not exclusive and thus includes the conjunctive "and"; all pronouns apply to the male, female, and neutral genders; the word "any" includes the word "all" and vice versa; the words "includes" and "including" are without limitation; and the past tense of a word includes the present tense and vice versa.

1.1.    **"Affirmation Order"** shall have the meaning set forth in the Plan.

1.2.    **"Agreement Effective Date"** shall have the meaning set forth in Section 2 of this Agreement.

1.3.    "**Bankruptcy Code**" shall have the meaning set forth in the Plan.

1.4.    "**Bankruptcy Court**" shall have the meaning set forth in the Plan.

1.5.    **"Bankruptcy Rules"** shall have the meaning set forth in the Plan.

1.6.    **"Business Day"** shall have the meaning set forth in the Plan.

1.7.    **"Cash"** shall have the meaning set forth in the Plan.

1.8.    "**Channeling Injunction**" shall have the meaning set forth in the Plan.

1.9.    **"Chapter 11 Cases"** shall have the meaning set forth in the Plan.

1.10.   **"Claim,"** when capitalized, shall have the meaning set forth in the Plan.

1.11.   **"Confirmation Date"** shall have the meaning set forth in the Plan.

1.12.   "**Confirmation Order**" shall have the meaning set forth in the Plan.

1.13.   "**Consenting Entities**" means the Tort Claimants' Committee and the FCR.

1.14.   **"Contribution Claim"** means any claim by any insurer against any Rio Tinto Protected Party or Zurich Protected Party asserting any right, whether legal, equitable, contractual, or otherwise, of contribution, indemnity, reimbursement, subrogation, or other similar claim directly or indirectly arising out of or in any way relating to such insurer's payment of loss on behalf of one or more of the Debtors in connection with any Talc Personal Injury Claim.

1.15.   "**Coverage In Place Agreement**" means the Settlement and Coverage In Place Agreement (and any amendments thereto) executed by ITA, Zurich, and Rio Tinto and certain of its affiliates in May 2014.

1.16.   **"Credits"** shall have the meaning set forth in the Plan and in Section 4.3.1 of this Agreement.

1.17.   **"Debtor Released Claims"** shall have the meaning set forth in Section 6.2 of this Agreement.

1.18.   "**Direct Action Claim**" means any claim by a Person against any Zurich Protected Party or any Rio Tinto Protected Party on account of, based upon, directly or indirectly arising from, or in any way relating to any alleged right or interest of the Debtors, or any of them, in any Zurich Policy or any Rio Tinto Captive Insurer Policy, whether arising by contract, in tort, or under

4

the laws of any jurisdiction, including any statute that gives a third party a direct cause of action against any Zurich Protected Party or any Rio Tinto Protected Party.

1.19.    **"Disclosure Statement"** means the *Disclosure Statement for Seventh Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated January 20, 2021 (ECF No. 2810), or any subsequently filed disclosure statement relating to the Plan, approved by the Bankruptcy Court as containing adequate information, and distributed in accordance with such order of approval, as such disclosure statement may be amended, modified, or supplemented from time to time.

1.20.    **"District Court"** shall have the meaning set forth in the Plan.

1.21.    **"Estate"** shall have the meaning set forth in the Plan.

1.22.    **"Estate Causes of Action"** shall have the meaning set forth in the Plan.

1.23.    **"Excess Policies"** means all excess liability insurance policies purchased by corporate entities affiliated with Rio Tinto that included Luzenac America, Inc., Windsor Minerals, Inc., Luzenac, Inc., and/or Luzenac Val Chisone, S.p.A. as insureds and provided additional limits above the Rio Tinto Captive Insurer Policies, including the policies listed on Exhibit C to this Agreement.

1.24.    **"Execution Date"** means the earliest date on which this Agreement has been signed by each Party and consented to by the Consenting Entities.

1.25.    **"Extra-Contractual Claim"** means any claim against the Zurich Protected Parties or Rio Tinto Protected Parties other than a claim for coverage or benefits under a Zurich Policy or Rio Tinto Captive Insurer Policy, respectively, seeking any type of relief based upon conduct of the Zurich Protected Parties or Rio Tinto Protected Parties prior to the Agreement Effective Date, including statutory, compensatory, exemplary, or punitive damages on account of alleged bad

5

faith, failure to act in good faith, violation of any duty of good faith and fair dealing, violation of any unfair claims practices act or similar statute, regulation, or code, any type of alleged misconduct, or any other act or omission, or any claims for economic loss, general damages, attorneys' fees, or costs in connection with the handling of, or refusal to handle, any Talc Personal Injury Claim.

1.26.    "**FCR**" shall have the meaning set forth in the Plan.

1.27.    "**Final Order**" shall have the meaning set forth in the Plan.

1.28.    **"Future Credits"** shall have the meaning set forth in the Plan and in Section 4.3.1 of this Agreement.

1.29.    **"HDI Agreement"** means the December 15, 2016 Confidential Settlement Agreement and Mutual Releases among ITA, Rio Tinto, and HDI Global SE and the accompanying Side Letter agreement between Rio Tinto and ITA dated December 4, 2016.

1.30.    **"Indirect Talc Personal Injury Claim"** shall have the meaning set forth in the Plan.

1.31.    "**Person**" shall have the meaning set forth in the Plan.

1.32.    "**Plan**" means the Seventh Amended Plan, as the same may be amended or modified from time to time pursuant to section 1127 of the Bankruptcy Code, consistent with the terms of the Rio Tinto/Zurich Settlement set out in the Seventh Amended Plan.

1.33.    **"Plan Effective Date"** shall have the same meaning as the term "Effective Date" in the Plan.

1.34.    **"Protected Party"** shall have the meaning set forth in the Plan.

1.35.    **"Reorganized Debtors"** shall have the meaning set forth in the Plan.

6

1.36.   **"Rio Tinto Buyback"** means the sale to the Rio Tinto Settling Parties, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code and as implemented by the Plan and this Agreement, of any and all of the Debtors' rights and interests in the Rio Tinto Captive Insurer Policies, free and clear of any and all rights, claims, or interests of any other entity.

1.37.   **"Rio Tinto Cash Contribution"** means $80 million, which Rio Tinto will contribute, or cause to be contributed, to the Talc Personal Injury Trust.

1.38.   "**Rio Tinto Captive Insurer Policies**" means any and all Talc Insurance Policies issued by the Rio Tinto Captive Insurers, including the Talc Insurance Policies listed on Schedule III to the Plan, attached as Exhibit B to this Agreement.  For the avoidance of doubt, the Rio Tinto Captive Insurer Policies shall not include any policy to the extent such policy provides reinsurance to any Zurich Protected Party.

1.39.   "**Rio Tinto Corporate Parties**" shall have the meaning set forth in the Plan.

1.40.   "**Rio Tinto Protected Parties**" shall have the meaning set forth in the Plan.

1.41.   **"Rio Tinto/Zurich Contribution"** means, collectively, (a) the Rio Tinto Cash Contribution, (b) the Zurich Cash Contribution, and (c) the Rio Tinto/Zurich Credit Contribution.

1.42.   **"Rio Tinto/Zurich Credit Contribution"** shall have the meaning set forth in the Plan and in Section 4.3.1 of this Agreement.

1.43.   **"Rio Tinto/Zurich Released Claims"** shall have the meaning set forth in the Plan and in Section 6.1 of this Agreement.

1.44.   **"Rio Tinto/Zurich Settlement"** shall have the meaning set forth in the Plan.

1.45.   "**Rio Tinto/Zurich Trigger Date**" means the date that the Tort Claimants' Committee or the Talc Personal Injury Trust provides Rio Tinto and/or Zurich (as applicable)

with notice of the occurrence of the later of (a) the Effective Date or (b) the date the Affirmation Order becomes a Final Order.

1.46.    "**Settling Talc Insurance Company**" shall have the meaning set forth in the Plan.

1.47.    "**Seventh Amended Plan**" means the *Seventh Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated January 20, 2021 (ECF No. 2809).

1.48.    "**Supplemental Settlement Injunction Order**" shall have the meaning set forth in the Plan.

1.49.    "**Talc Insurance Policy**" shall have the meaning set forth in the Plan.

1.50.    "**Talc Personal Injury Claim**" shall have the meaning set forth in the Plan.

1.51.    "**Talc Personal Injury Trust**" shall have the meaning set forth in the Plan.

1.52.    "**Talc Personal Injury Trust Documents**" shall have the meaning set forth in the Plan.

1.53.    "**Tort Claimants' Committee**" shall have the meaning set forth in the Plan.

1.54.    "**Trust**" means the Talc Personal Injury Trust.

1.55.    "**XL**" means XL Insurance America, Inc.

1.56.    "**XL Agreement**" means the "RIO TINTO DEFENSE COSTS REIMBURSEMENT AGREEMENT" among Rio Tinto and certain of its affiliates, XL, and Zurich, dated on or about 20 March 2018.

1.57.    "**Zurich Buyback**" means the sale to Zurich, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code and as implemented by the Plan and this Agreement, of any and all of the Debtors' rights and interests in the Zurich Policies, free and clear of any and all rights, claims, or interests of any other entity.

8

1.58.    "**Zurich Cash Contribution**" means $260 million, which Zurich will contribute, or cause to be contributed, to the Talc Personal Injury Trust.

1.59.    "**Zurich Corporate Parties**" shall have the meaning set forth in the Plan.

1.60.    **"Zurich Policies"** means any and all Talc Insurance Policies issued by the Zurich Corporate Parties, including the Talc Insurance Policies listed on Schedule VI to the Plan, attached as Exhibit A to this Agreement, *provided*, however, that Policy No. SXL 8129701, issued to Standard Oil Company (Indiana) for the period August 17, 1983 to June 1, 1984, shall not be considered a "Zurich Policy" for purposes of this Agreement.  For the avoidance of doubt, the Zurich Policies shall not include any policy to the extent such policy provides reinsurance to any Rio Tinto Captive Insurer.

1.61.    "**Zurich Protected Parties**" shall have the meaning set forth in the Plan.

## 2.    EFFECTIVE DATE OF AGREEMENT

This Agreement shall become effective on the earliest date on which all of the following conditions precedent have occurred (the **"Agreement Effective Date"**), *provided, however*, that any of the conditions precedent set out in Sections 2.3, 2.4, and 2.5 below may be waived pursuant to a writing signed by each Party and consented to by the Consenting Entities (if before the Plan Effective Date) or signed by the Insurer Parties and the Trust (if after the Plan Effective Date):

2.1.    Each Party has executed the Agreement.

2.2.    Each Consenting Entity has consented to the Agreement in writing, and the Debtors have provided Zurich and Rio Tinto with evidence of such written consent.

2.3.    The Bankruptcy Court has entered a Confirmation Order and the District Court has entered an Affirmation Order providing that:

2.3.1. The Rio Tinto/Zurich Settlement and this Agreement are approved pursuant to sections 363 and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019.

2.3.2. The Zurich Buyback and Rio Tinto Buyback are approved, and each (a) represents a sound exercise of the Debtors' business judgment, will yield a fair and reasonable price for the assets being sold, is in the best interest of the Debtors' Estates, and otherwise complies with Section 363 of the Bankruptcy Code, (b) meets the requirements for a sale of the Debtors' property free and clear of any interests of third parties in such property pursuant to section 363(f) of the Bankruptcy Code, and (c) constitutes a purchase in good faith pursuant to section 363(m) of the Bankruptcy Code, rendering the provisions of section 363(m) applicable.

2.3.3. The Zurich Protected Parties and the Rio Tinto Captive Insurers are Settling Talc Insurance Companies, and hence Protected Parties, under the Plan, and the Rio Tinto Protected Parties are Protected Parties under the Plan. As Protected Parties, the Zurich Protected Parties, the Rio Tinto Captive Insurers, and the Rio Tinto Protected Parties are entitled to the protection of the Channeling Injunction, which shall permanently channel all Talc Personal Injury Claims, including any Indirect Talc Personal Injury Claims, against any Protected Party to the Trust, and pursuant to which any holder of a Talc Personal Injury Claim shall be permanently and forever stayed, restrained, barred, and enjoined from taking any action against a Protected Party for the purpose of directly, indirectly, or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Talc Personal Injury Claim.

2.3.4. The Talc Personal Injury Trust, the Debtors and the Reorganized Debtors, on their own behalf and as representatives of their respective Estates, and the Tort

10

Claimants' Committee and FCR, solely on their own behalf, irrevocably and unconditionally release the Rio Tinto Protected Parties and the Zurich Protected Parties from all Rio Tinto/Zurich Released Claims.

    2.3.5.  Pursuant to the Supplemental Settlement Injunction Order, all Persons are permanently enjoined from pursuing any Rio Tinto/Zurich Released Claim against any Rio Tinto Protected Party or Zurich Protected Party.

2.4.    The Debtors (or the Tort Claimants' Committee or the Trust) have provided notice to Zurich and Rio Tinto that the Affirmation Order has become a Final Order.

2.5.    The Debtors (or the Tort Claimants' Committee or the Trust) have provided notice to Zurich and Rio Tinto that the Plan Effective Date has occurred.

## 3.     VOIDABILITY

3.1.    This Agreement shall not become effective, or shall be rendered null and void, as applicable, upon the occurrence of any of the following contingencies, *provided, however*, that any of the contingencies set out in Sections 3.1.1 through 3.1.6 may be waived by the Parties pursuant to a writing signed by each Party and, if before the Plan Effective Date, consented to by the Consenting Entities:

    3.1.1.  The entry of a Confirmation Order by the Bankruptcy Court, or of an Affirmation Order by the District Court, confirming or affirming the confirmation of a Chapter 11 plan of reorganization for the Debtors that does not contain the provisions set out in Section 2.3 of this Agreement;

    3.1.2.  The entry by the Bankruptcy Court or District Court of a Final Order denying approval of the Rio Tinto/Zurich Settlement or of this Agreement;

3.1.3.    The entry by the Bankruptcy Court or District Court of a Final Order denying approval of the Zurich Buyback or the Rio Tinto Buyback, finding that the Zurich Buyback or Rio Tinto Buyback is not free and clear of all interests of third parties in the Zurich Policies or Rio Tinto Captive Insurer Policies, respectively, or finding that Zurich or the Rio Tinto Settling Parties are not entitled to the good-faith purchaser protections of section 363(m) of the Bankruptcy Code;

3.1.4.    The entry by the Bankruptcy Court or District Court of a Final Order stating that any Zurich Protected Party or Rio Tinto Captive Insurer is not a Settling Talc Insurance Company or is not a Protected Party, or that any Rio Tinto Protected Party is not a Protected Party, or that otherwise contravenes the designation of any Zurich Protected Party, Rio Tinto Captive Insurer, or Rio Tinto Protected Party as a Protected Party entitled to the protections of the Channeling Injunction;

3.1.5.    The entry by the Bankruptcy Court, prior to the Plan Effective Date, of a Final Order converting the Chapter 11 Cases into cases under Chapter 7 of the Bankruptcy Code or dismissing the Chapter 11 Cases;

3.1.6.    The entry by the Bankruptcy Court, prior to the Plan Effective Date, of a Final Order appointing a trustee or an examiner substantially possessing the rights, powers, and duties of a bankruptcy trustee in the Chapter 11 Cases; or

3.1.7.    The statement in writing, prior to the Plan Effective Date, by the Tort Claimants' Committee or the FCR that such entity refuses to consent to this Agreement.

3.2.    Notwithstanding anything in this Agreement to the contrary, in the event that one of the contingencies listed in Section 3.1 above occurs and is not waived by the Parties:

3.2.1.   This Agreement, except for this Section 3 and any definitions of capitalized terms used herein (which shall remain in full force and effect), shall be vitiated and shall be a nullity;

3.2.2.   None of the Parties shall be bound by the terms of the Rio Tinto/Zurich Settlement or of this Agreement;

3.2.3.   Zurich and Rio Tinto shall not be obligated to pay the Zurich Cash Contribution or the Rio Tinto Cash Contribution, or to make the Rio Tinto/Zurich Credit Contribution;

3.2.4.   The Zurich Protected Parties and the Rio Tinto Captive Insurers shall not be designated as Settling Talc Insurance Companies or as Protected Parties, and the Rio Tinto Protected Parties shall not be designated as Protected Parties, in the Plan, Confirmation Order, or Affirmation Order, and the Zurich Protected Parties, the Rio Tinto Captive Insurers, and the Rio Tinto Protected Parties shall not be entitled to assert the Channeling Injunction as a defense to any Talc Personal Injury Claim;

3.2.5.   The Parties shall have all of the same rights, defenses, and obligations under or with respect to any and all of the Zurich Policies, the Rio Tinto Captive Insurance Policies, the Excess Policies, the HDI Agreement, the XL Agreement, and the Coverage In Place Agreement that they would have had absent this Agreement; and

3.2.6.   Any and all otherwise applicable statutes of limitations or repose, or other time-related limitations, shall be deemed to have been tolled for the period from the Execution Date through the date on which this Agreement becomes null and void in accordance with Section 3.1 above, and no Party shall assert that any other Party's failure during said period to raise any claim that would have been resolved by this Agreement,

13

had this Agreement become effective or not been voided, as applicable, renders such claim time-barred.

4.    **RIO TINTO/ZURICH CONTRIBUTION**

4.1.    **Zurich Cash Contribution**

4.1.1.    As consideration for the releases and injunctive protections set forth in this Agreement and in the Plan, on or prior to the date that is thirty (30) days after the Rio Tinto/Zurich Trigger Date, Zurich will irrevocably and indefeasibly pay, or cause to be paid, $260 million in Cash, via wire transfer, to the Talc Personal Injury Trust.

4.1.2.    Prior to the Rio Tinto/Zurich Trigger Date, the Trust shall provide all information needed by Zurich to pay the Zurich Cash Contribution, including providing Zurich with a Form W-9 containing the Talc Personal Injury Trust's tax identification number and bank account information sufficient to make the required wire transfer.

4.1.3.    Zurich's payment of the Zurich Cash Contribution is in addition to any and all payments the Zurich Corporate Parties may have made to or for the benefit of the Debtors under, arising out of, or related to the Zurich Policies prior to the Rio Tinto/Zurich Trigger Date, and all such payments are deemed final and irrevocable, except as provided in Section 3 hereto.

4.1.4.    The Parties expressly agree that the Zurich Cash Contribution, together with any amounts paid by the Zurich Corporate Parties prior to the Rio Tinto/Zurich Trigger Date as set out in Section 4.1.3 of this Agreement, fully satisfies any and all indemnity, defense, or other obligations the Zurich Protected Parties may have on account of claims by the Debtors or any other Person directly or indirectly arising from or in any way related to any rights of the Debtors under the Zurich Policies.  The Parties further expressly agree

14

that the payment of the Zurich Cash Contribution fully exhausts the available limits of the following Zurich Policies:

| Policy Number | Policy Period |
|---|---|
| GLO 8210196-04 | 5/31/2001–5/31/2002 |
| GLO 8210196-05 | 5/31/2002–5/31/2003 |
| GLO 8210196-06 | 5/31/2003–5/31/2004 |
| GLO 8210196-07 | 5/31/2004–5/31/2005 |
| GLO 8210196-08 | 5/31/2005–5/31/2006 |
| GLO 8210196-09 | 5/31/2006–5/31/2007 |
| GLO 8210196-10 | 5/31/2007–5/31/2008 |

4.1.5.  The Zurich Cash Contribution shall not be subject to any claims for deductions, setoffs, or charge-backs to the Debtors of any kind, including claims involving recoupment of deductibles, allocated loss adjustment expenses, contribution, self-insured retentions, additional premiums, or retrospective or reinstatement premiums under the Zurich Policies.

4.2.    **Rio Tinto Cash Contribution**

4.2.1.   As consideration for the releases and injunctive protections set forth in this Agreement and in the Plan, on or prior to the date that is fourteen (14) days after the Rio Tinto/Zurich Trigger Date, Rio Tinto will irrevocably and indefeasibly pay, or cause to be paid, $80 million in Cash, via wire transfer, to the Talc Personal Injury Trust.

4.2.2.   Prior to the Rio Tinto/Zurich Trigger Date, the Trust shall provide all information needed by Rio Tinto to pay the Rio Tinto Cash Contribution, including providing Rio Tinto with a Form W-9 containing the Talc Personal Injury Trust's tax

identification number and bank account information sufficient to make the required wire transfer.

4.2.3.  Rio Tinto's payment of the Rio Tinto Cash Contribution is in addition to any and all payments the Rio Tinto Corporate Parties may have made to or for the benefit of the Debtors under, arising out of, or related to the Rio Tinto Captive Insurer Policies prior to the Rio Tinto/Zurich Trigger Date, and all such payments are deemed final and irrevocable, except as provided for in Section 3 hereto.

4.2.4.  The Parties expressly agree that the Rio Tinto Cash Contribution, together with any amounts paid by the Rio Tinto Corporate Parties prior to the Rio Tinto/Zurich Trigger Date as set out in Section 4.2.3 above, fully satisfies any indemnity, defense, or other obligations the Rio Tinto Protected Parties may have on account of claims by the Debtors or any other Person directly or indirectly arising from or in any way related to any rights of the Debtors under the Rio Tinto Captive Insurer Policies.

4.2.5.  The Rio Tinto Cash Contribution shall not be subject to any claims for deductions, setoffs, or charge-backs to the Debtors of any kind, including claims involving recoupment of deductibles, contribution, self-insured retentions, additional premiums, or retrospective or reinstatement premiums under the Rio Tinto Captive Insurer Policies.

4.3.  **Rio Tinto/Zurich Credit Contribution**

4.3.1.  On the Rio Tinto/Zurich Trigger Date, or as soon as reasonably practicable thereafter (not to exceed three (3) Business Days), the appropriate Rio Tinto Corporate Party or Parties and the appropriate Zurich Corporate Party or Parties shall execute and deliver to the Talc Personal Injury Trust an assignment, in substantially the form set forth in Exhibit D to this Agreement, assigning to the Trust (a) all of their rights to or claims for

16

indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to the payment or defense of any Talc Personal Injury Claim or any past talc-related claim against the Debtors prior to the Plan Effective Date (the **"Credits"**) and (b) all of their other rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to any Talc Personal Injury Claim (the **"Future Credits"**) (the Credits and the Future Credits, collectively, the **"Rio Tinto/Zurich Credit Contribution"**); *provided, however,* that any such claims for Credits or Future Credits against a Protected Party shall be subject to the Channeling Injunction, and nothing in the Plan or this Agreement shall impact the injunctions and releases otherwise inuring to the benefit of the Protected Parties under the terms of the Plan.  Notwithstanding anything else contained in this Section 4.3.1, the Rio Tinto Corporate Parties and the Zurich Corporate Parties shall retain, and shall not transfer to the Talc Personal Injury Trust, all rights of the Rio Tinto Corporate Parties and the Zurich Corporate Parties against their reinsurers and/or retrocessionaires, in their capacities as such.

4.3.2.   The Rio Tinto Settling Parties and Zurich hereby represent their good faith belief that they possess a legal entitlement to the Credits assigned in Exhibit D, and that they are duly authorized to fully assign such Credits to the Talc Personal Injury Trust. Rio Tinto hereby represents that it has provided the Debtors and the Consenting Entities with its good-faith estimate, based on various calculations and assumptions, of the amount of the Credits.  All parties, however, acknowledge that the Rio Tinto Settling Parties and Zurich are not representing or warranting that the Talc Personal Injury Trust will recover that amount (or any amount) on the Credits.

4.3.3.   The Insurer Parties shall assist and cooperate with the Talc Personal Injury Trust as may be reasonably necessary for the pursuit of Credits and Future Credits assigned to the Talc Personal Injury Trust under this Agreement.   Such assistance shall include providing all information and documentation reasonably necessary to assert and prove such Credits and Future Credits, including: (a) documents sufficient to show, and proof of, all amounts paid by the Insurer Parties under the Policies, including for defense costs, judgments, or settlements of claims; (b) all communications with other potentially responsible entities relating to amounts due or paid with respect to claims under the Zurich Policies or Rio Tinto Captive Insurer Policies; and (c) communications with other potentially responsible parties relating to the Insurer Parties' claims to the Credits and Future Credits and any defenses thereto, *provided*, *however*, that such assistance will not extend to any documents or information of the Insurer Parties that are subject to any applicable privilege, including attorney-client privilege, common-interest privilege, or mediation privilege, or to the work-product doctrine, and will be provided subject to the requirements of any existing confidentiality agreements, unless modified or waived.   Such cooperation shall be conditioned on the Talc Personal Injury Trust's reimbursement of all reasonable documented fees and expenses of outside professionals and vendors engaged by Zurich or Rio Tinto to comply with requests made by the Talc Personal Injury Trust, within thirty (30) days after Zurich or Rio Tinto provides documentation of such fees and expenses to the Talc Personal Injury Trust.

4.3.4.   The Insurer Parties agree not to assert or file any new claim seeking contribution, indemnity, or defense against any other Person in order to recover any portion of the Credits or Future Credits assigned to the Trust under this Agreement.

4.3.5.  On the Agreement Effective Date, the Talc Personal Injury Trust will assume the obligations of Zurich and of Rio Tinto and its affiliates (if any) to XL under the XL Agreement, if, or to the extent that, the XL Agreement provides any obligation to share with XL the proceeds of any recovery by the Talc Personal Injury Trust on any Credits or Future Credits assigned to the Trust pursuant to Section 4.3.1 of this Agreement.

4.4.  **Reinsurance.**  Notwithstanding any other provision of this Section 4 or of this Agreement, nothing in this Agreement is intended to or shall be construed to prevent any Zurich Corporate Party or any Rio Tinto Corporate Party from making any claim against, or seeking to recover any part of the Rio Tinto/Zurich Contribution or any other payment from, any of the Zurich Corporate Parties' or Rio Tinto Corporate Parties' reinsurers and/or retrocessionaires, in their capacities as such.

## 5.  ZURICH AND RIO TINTO BUYBACKS

5.1.  The Plan shall constitute a request by the Debtors for the Bankruptcy Court to approve the Zurich Buyback and the Rio Tinto Buyback, as set out in the Plan and this Agreement, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, and to find that Zurich and the Rio Tinto Settling Parties are good-faith purchasers pursuant to section 363(m) of the Bankruptcy Code.

5.2.  **Zurich Buyback.**  Subject to the approval of the Bankruptcy Court and to all the terms and conditions of this Agreement, the Debtors shall sell and Zurich shall acquire, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, any and all of the Debtors' rights and interests in the Zurich Policies, free and clear of any and all rights, claims, or interests of any other entity, including (a) any claim by any alleged additional insured under the Zurich Policies with respect to any Talc Personal Injury Claim, (b) any Contribution Claim, (c) any Direct Action

Claim, and (d) any other claim that directly or indirectly arises out of or relates to the Zurich Policies.

5.3. **Rio Tinto Buyback.** Subject to the approval of the Bankruptcy Court and to all the terms and conditions of this Agreement, the Debtors shall sell and the Rio Tinto Settling Parties shall acquire, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, any and all of the Debtors' rights and interests in the Rio Tinto Captive Insurer Policies, free and clear of any and all rights, claims, or interests of any other entity, including (a) any claim by any alleged additional insured under the Rio Tinto Captive Insurer Policies with respect to any Talc Personal Injury Claim, (b) any Contribution Claim, (c) any Direct Action Claim, and (d) any other claim that directly or indirectly arises out of or relates to the Rio Tinto Captive Insurer Policies.

## 6. RELEASE

6.1. **Release of Rio Tinto/Zurich Released Claims.** Effective upon the Talc Personal Injury Trust's receipt of the Rio Tinto/Zurich Contribution, for good and valuable consideration, the adequacy of which is hereby confirmed, the Trust, the Debtors, on their own behalf and as representatives of their respective Estates, and the Reorganized Debtors shall be deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Rio Tinto Protected Parties and the Zurich Protected Parties of and from (a) all Estate Causes of Action and (b) any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Trust, the Debtors, their Estates, or the Reorganized Debtors have, had, may have, or may claim to have against any of the

Rio Tinto Protected Parties and/or the Zurich Protected Parties, directly or indirectly arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim (collectively, the **"Rio Tinto/Zurich Released Claims"**).  For the avoidance of doubt, the Rio Tinto/Zurich Released Claims include all Extra-Contractual Claims and any and all other claims directly or indirectly arising out of, with respect to, or in any way relating to the Zurich Policies, the Rio Tinto Captive Insurer Policies, the Excess Policies, the HDI Agreement, and the Coverage in Place Agreement, excluding only claims against the Zurich Protected Parties arising under Policy No. SXL 8129701, issued to Standard Oil Company (Indiana) for the period August 17, 1983 to June 1, 1984.  Also effective upon the Trust's receipt of the Rio Tinto/Zurich Contribution, the Trust, the Debtors (on their own behalf and as representatives of their respective Estates), and the Reorganized Debtors shall withdraw any and all requests, demands, or tenders for defense or indemnity previously submitted to any Zurich Protected Party or Rio Tinto Protected Party, and shall surrender, relinquish, and release any further right to tender or present any Rio Tinto/Zurich Released Claim, and the Zurich Protected Parties and Rio Tinto Protected Parties shall have no duty to defend or indemnify the Trust, the Debtors or their Estates, or the Reorganized Debtors with respect to any Rio Tinto/Zurich Released Claim.

6.2.    **Release of Debtor Released Claims.**  Effective upon the occurrence of the Rio Tinto/Zurich Trigger Date, the Rio Tinto Settling Parties and Zurich shall be deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge the Debtors, their Estates, the Reorganized Debtors, and the Trust from any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the

Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Rio Tinto Settling Parties and Zurich have, had, may have, or may claim to have against any of the Debtors, their Estates, the Reorganized Debtors, and the Trust directly or indirectly arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim (collectively, the **"Debtor Released Claims"**), to the extent such Debtor Released Claims arise on or prior to the Confirmation Date.  Also effective upon the occurrence of the Rio Tinto/Zurich Trigger Date, the Rio Tinto Settling Parties and Zurich shall withdraw any and all requests or demands for payment of any Debtor Released Claim arising on or prior to the Confirmation Date, and the Debtors, or their Estates, shall have no duty to indemnify, pay, or reimburse the Rio Tinto Settling Parties and Zurich with respect to any Debtor Released Claim arising on or prior to the Confirmation Date.

6.3.    **Unknown or Future Claims.**  The Parties expressly acknowledge that there may be changes in the law or the Parties may hereafter discover facts different from, or in addition to, those that they now believe to be true with respect to any and all of the claims released in Sections 6.1 and 6.2 above.  Nevertheless, the Parties hereby agree that (subject to Section 3 of this Agreement) the releases set forth in Sections 6.1 and 6.2 above shall be and remain effective in all respects, notwithstanding any changes in the law or the discovery of such additional or different facts.  In addition, the Parties acknowledge that they have been advised by their respective legal counsel regarding, and are familiar with, the provisions of section 1542 of the California Civil Code, which provides:

> **A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.**

Except with respect to claims of the Rio Tinto Settling Parties or Zurich arising after the Confirmation Date, the Parties expressly waive and relinquish any and all rights or benefits they have or may have under California Civil Code § 1542 and under any other federal or state statute, rule, law, or common law principle of similar effect, as to the releases given in this Agreement, to the full extent that such right or benefit may be lawfully waived.  In connection with the waiver and relinquishment of rights or benefits under California Civil Code § 1542, each Party acknowledges that it fully understands that facts may later be discovered in addition to or different from those facts which are now known or believed to be true with respect to the subject matter of this Agreement, and that, except with respect to claims of the Rio Tinto Settling Parties or Zurich arising after the Confirmation Date, it is that Party's intention hereby to fully, finally and forever release all claims and rights, known or unknown, suspected or unsuspected, which now exist, may exist in the future, and/or have ever existed in the past, as to the matters released in Sections 6.1 and 6.2 of this Agreement.

6.4.    **Other Rights and Obligations Under This Agreement Not Affected.**  The releases set forth in Sections 6.1 and 6.2 of this Agreement are not intended to, and shall not, extend to or otherwise release any rights, privileges, benefits, duties, or obligations of the Parties pursuant to or arising from this Agreement or the Plan.

7.    **BANKRUPTCY-RELATED OBLIGATIONS**

7.1.    Prior to the Execution Date, the Debtors will seek and obtain the Consenting Entities' written consent to the Debtors' entry into this Agreement and shall furnish evidence of such written consent to each of Zurich and Rio Tinto.

7.2.    The Parties shall cooperate in good faith to ensure that the Confirmation Order and Affirmation Order are entered, contain and/or affirm the provisions set out in Section 2.3 of this Agreement, as applicable, and become Final Orders.

7.3.    Except to contend that the Debtors have breached this Agreement (including Section 7.2), neither Zurich nor Rio Tinto shall object to the Plan or seek formal discovery from the Debtors, the Tort Claimants' Committee, or the FCR (and the Debtors, the Tort Claimants' Committee, and the FCR shall not seek formal discovery from Zurich or Rio Tinto) with respect to the Plan.  Within five (5) days following the Execution Date, Zurich and Rio Tinto shall withdraw any and all objections to the Plan and Disclosure Statement they have made in the Chapter 11 Cases.  Such withdrawals shall be without prejudice until the occurrence of the Agreement Effective Date, at which time such withdrawals shall be deemed to be with prejudice.

7.4.    On the Rio Tinto/Zurich Trigger Date, any and all Claims that the Rio Tinto Corporate Parties or the Zurich Corporate Parties have asserted or that have been asserted on their behalf in the Chapter 11 Cases shall be deemed withdrawn with prejudice.  Further, the Rio Tinto Protected Parties and the Zurich Protected Parties shall not file or assert any additional Claims against any of the Debtors arising from any Debtor's conduct prior to the Confirmation Date.

7.5.    On the Plan Effective Date, the rights and obligations of the Debtors under this Agreement shall be deemed to have been assigned and transferred to the Talc Personal Injury Trust without need of further action by any Party or Person, and the Talc Personal Injury Trust shall be bound by all of the provisions of this Agreement.  The Reorganized Debtors shall continue to be bound by this Agreement and shall retain the obligations and benefits hereunder to the extent consistent with the Plan.

8.      **CONTRIBUTION CLAIMS; JUDGMENT REDUCTION**

8.1.    To the extent that the Debtors or the Talc Personal Injury Trust reach a settlement with any other insurer or other Person of any claim directly or indirectly arising out of or in any way relating to any Talc Personal Injury Claim or Rio Tinto/Zurich Released Claim, the Debtors or the Talc Personal Injury Trust, as applicable, will use their best efforts to obtain a waiver of any and all of that other insurer's or other Person's Contribution Claims against any Zurich Protected Party or Rio Tinto Protected Party based upon, arising out of, or in any way attributable to such Talc Personal Injury Claim or Rio Tinto/Zurich Released Claim.   Such waiver may be accomplished by an assignment of such claims to the Trust, which such claims will be subject to the Release set forth in Section 6 herein.

8.2.    In the event that any other entity asserts any Contribution Claim against any Zurich Protected Party or Rio Tinto Protected Party and such claim is determined to be valid in any judicial determination or binding arbitration award, the Talc Personal Injury Trust shall voluntarily reduce its judgment(s) or claim(s) against, or settlement with, such other entity to the extent necessary to eliminate such Contribution Claim.  To ensure that such a reduction is accomplished, any Zurich Protected Party or Rio Tinto Protected Party shall be entitled to assert this paragraph as a defense to any action against them for any such Contribution Claim and shall be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the judgment reduction and to protect the Zurich Protected Party or Rio Tinto Protected Party from any liability for the Contribution Claim.

9.      **COOPERATION**

9.1.    Each Party shall use its reasonable efforts to obtain the outcomes sought by this Agreement, and to take such steps and execute such documents as may be reasonably necessary

and proper to effectuate the purpose and intent of this Agreement and to preserve its validity and enforceability.  In the event that any action or proceeding is commenced or prosecuted by any Person to invalidate or prevent the validation, enforcement, or carrying out of all or any provisions of this Agreement, the Parties mutually agree to cooperate fully in opposing such action or proceeding.

9.2.    Each of the Parties shall reasonably cooperate with each of the other Parties in responding to or opposing any motion, objection, claim, assertion, or argument by any third party that this Agreement is not binding, or should be avoided, or that valuable and fair consideration or reasonably equivalent value has not been exchanged pursuant to this Agreement.

9.3.    To the extent required by Section 4.3.3 of this Agreement, the Insurer Parties shall assist and cooperate with the Talc Personal Injury Trust as may be reasonably necessary for the pursuit of Credits and Future Credits assigned to the Talc Personal Injury Trust under this Agreement.

**10.    NO ADMISSIONS OR WAIVER OF PRIVILEGE**

Nothing contained in this Agreement, or in any negotiations, discussions, correspondence, or other materials of any kind relating to this Agreement or relating to the negotiation of this Agreement, shall be deemed to be an admission by any Party with respect to any matter or any factual or legal issue of any kind.  Nothing in this Agreement waives or shall be deemed to waive any Party's work-product protection or right to claim the protections of any applicable privilege, including attorney-client privilege, common-interest privilege, or mediation privilege.

## 11.    BINDING EFFECT OF AGREEMENT

Upon the Agreement Effective Date, all terms and provisions of this Agreement shall be binding on, and shall inure to the benefit of, the Parties and their respective successors and assigns, including the Talc Personal Injury Trust.

## 12.    DISPUTE RESOLUTION

If any dispute should arise concerning the terms, meaning, or implementation of this Agreement, the Parties agree to use their best efforts to reach a prompt resolution of such dispute. If the Parties are unable to reach an agreement, they shall proceed to mediation.  Either Party may initiate litigation in the Bankruptcy Court to the extent the Bankruptcy Court has subject-matter jurisdiction, or to the extent it does not, in any other appropriate forum, but no Party may initiate litigation until 45 days after a mediation has commenced and the mediator has determined that the Parties' mediation has reached an impasse.  All of the Parties consent to personal jurisdiction in any federal court (including the Bankruptcy Court) or state court in the State of Delaware for purposes of resolving any dispute concerning the terms, meaning, or implementation of this Agreement.

## 13.    CONSTRUCTION OF AGREEMENT

13.1.   The Parties represent and acknowledge that they have participated in the preparation and drafting of this Agreement or have each given their approval to all of the language contained in this Agreement, and it is expressly agreed and acknowledged that if any of the Parties later asserts that there is an ambiguity in the language of this Agreement, such asserted ambiguity shall not be presumptively construed for or against any Party on the basis that one Party drafted the language of this Agreement or played a greater role in the drafting of the language.

27

13.2.    The headings of this Agreement are included for convenience and are not part of the provisions hereof and shall have no force or effect.

13.3.    If any provision of this Agreement or application thereof is held to be invalid or unenforceable, the remainder of this Agreement shall remain in effect and be interpreted so as best to reasonably effect the intent of the Parties.  Notwithstanding the foregoing, Sections 2, 3, 4.1, 4.2, 5, and 6 and the definitions of the capitalized terms that appear in those Sections shall not be severable from this Agreement.

## 14.    MEDICARE AND OTHER THIRD-PARTY CLAIMS

14.1.    Rio Tinto's and Zurich's payment obligations under this Agreement run solely to the Talc Personal Injury Trust, as set forth in Section 4 above.  In no event shall any Zurich Corporate Party or Rio Tinto Corporate Party pay or be obligated to pay directly any claimant, any representative of any claimant, or the Debtors' defense counsel on account of any Talc Personal Injury Claim.

14.2.    The Parties agree that, given the buy-back nature of this settlement, Zurich and the Rio Tinto Settling Parties are not "Responsible Reporting Entities," and no Zurich Corporate Party or Rio Tinto Corporate Party shall have any responsibility to make any reports (or to make any payments owed or sums to be paid) to Medicare or to the United States Government or any agency or instrumentality thereof pursuant to the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b)(2), and/or under any related rules, regulations, or guidance issued in connection therewith or relating thereto, including 42 C.F.R. § 411.20 et seq., with respect to any payment the Talc Personal Injury Trust receives under this Agreement or makes on account of Talc Personal Injury Claims.

14.3.    The Talc Personal Injury Trust shall be designated as the "**RRE Agent**."

28

14.4.    The RRE Agent shall, at its sole expense, act as Zurich's and the Rio Tinto Settling Parties' reporting agent, and shall timely submit all reports that are required by a Responsible Reporting Entity under the reporting provisions of Section III of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173) or any other similar statute or regulation ("**MMSEA**") on account of Talc Personal Injury Claims paid by the RRE Agent.  The RRE Agent shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports under MMSEA (collectively, "**CMS**") to determine whether or not and, if so, how to report to CMS pursuant to MMSEA.

14.5.    The RRE Agent shall provide a written notification to Rio Tinto and Zurich within ten (10) Business Days following receipt of any notification from CMS that any report was rejected or otherwise identified as noncompliant by CMS, along with the basis for such rejection or noncompliance.

14.5.1. With respect to any reports rejected or otherwise identified as noncompliant by CMS, the RRE Agent shall, at Rio Tinto's or Zurich's request, promptly provide copies of the original reports submitted to CMS, as well as any response received from CMS with respect to such reports.  The RRE Agent shall reasonably undertake to remedy any issues of noncompliance that CMS identifies and to resubmit such reports to CMS.  Upon request by Rio Tinto or Zurich, the RRE Agent shall provide copies of such resubmissions.  With respect to copies of original reports and resubmissions provided under this Section 14.5.1, the RRE Agent may redact from such copies the names, social security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers,

29

employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the injured parties, claimants, guardians, conservators, and/or other personal representatives, as applicable.

14.5.2. All documentation that the RRE Agent relies upon in making a determination that a payment does not have to be reported to CMS shall be maintained for a minimum of six (6) years following such determination.

14.6.    Absent guidance to the contrary from CMS, the Secretary of Health and Human Services or a controlling court, including the United States Court of Appeals for the Third Circuit, the RRE Agent is not required by this Agreement to report any Talc Personal Injury Claim for a claimant who alleges that exposure to or ingestion of talc or talc-containing product for which Debtors are allegedly responsible took place exclusively before December 5, 1980.

14.7.    In the event that CMS concludes that reporting done by the RRE Agent in accordance with this Section 14 is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a timely manner, or if CMS communicates to the RRE Agent, any Zurich Corporate Party, or any Rio Tinto Corporate Party a concern with respect to the sufficiency or timeliness of such reporting or non-reporting, then Rio Tinto and Zurich shall have the right to submit their own reports to CMS under MMSEA, and the RRE Agent shall provide to Rio Tinto and Zurich such information as either may require to comply with MMSEA, including the full reports filed by the RRE Agent without any redactions.  Rio Tinto and Zurich shall keep any information received from the RRE Agent pursuant to this Paragraph confidential and shall not use such information for any purpose other than meeting obligations under MMSEA.

14.8.    The Talc Personal Injury Trust shall obtain, prior to remittance of funds to claimants' counsel or the claimant, if pro se, in respect of any Talc Personal Injury Claim, a

certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Talc Personal Injury Claim.  The Talc Personal Injury Trust shall provide a certification of its compliance with this Section to Rio Tinto and Zurich upon either's request, but not more often than quarterly.

14.9.    Compliance with the requirements of this Section shall be a material obligation of the Debtors and/or the Talc Personal Injury Trust in favor of Zurich and the Rio Tinto Settling Parties under this Agreement.

## 15.    REPRESENTATIONS, WARRANTIES, AND OTHER MISCELLANEOUS PROVISIONS

15.1.    Each Party represents and warrants that, subject to the preconditions set out in Section 2 of this Agreement, it has taken all necessary corporate and legal action required to duly approve the making and performance of this Agreement and that no further action is necessary to make this Agreement binding and legally enforceable according to its terms.

15.2.    Each Party represents and warrants that, to the best of its knowledge and belief, the making and performance of this Agreement will not violate any provision of law or any of its respective articles of incorporation or bylaws or any contract or agreement by which it is bound.

15.3.    Each Party represents and warrants that (a) it is the owner of the rights and claims to be compromised and released by it under this Agreement and (b) it has not assigned or transferred to any Person any such right or claim or other matter to be compromised and released hereunder.

15.4.    Each Party represents and warrants that this Agreement is supported by valid and lawful consideration sufficient to make all aspects of this Agreement legally binding and enforceable on and after the Agreement Effective Date.

31

15.5.    Each Party represents and warrants that this Agreement has been entered into in good faith, as a result of arm's-length negotiations, with advice of counsel, and that this Agreement represents a fair, reasonable, proportionate, and good faith compromise of disputed claims, disputed liabilities, and disputed issues.

15.6.    Each Party represents and warrants that it has read this Agreement in its entirety, fully understands all of its terms and the consequences thereof, and that the individual signing this Agreement on its behalf has full and complete authority and competency to legally bind it to all terms and consequences of this Agreement.

15.7.    The Rio Tinto Captive Insurers represent and warrant that they issued insurance policies only to Rio Tinto plc, Rio Tinto Limited, and their respective past and present affiliated companies, and did not issue insurance policies to any other entities on the open market.

15.8.    This Agreement (including the exhibits attached to it) sets forth the entire agreement among the Parties as to its subject matter, and supersedes any and all prior or contemporaneous statements, agreements, negotiations, or understandings, whether written or oral, except that the Agreement should be read *in pari materia* with the Plan and Disclosure Statement.

15.9.    All notices, demands, or other communications to be provided pursuant to this Agreement shall be in writing and sent by electronic mail and also by overnight mail (or United States first-class mail, postage prepaid), to the other Parties and Consenting Entities at the addresses set forth below, or to such other persons or addresses as the Parties or Consenting Entities may designate in writing from time to time:

32

For Zurich:

Robert Koscielniak
Director, Latent & Environmental Claims
Zurich North America
1299 Zurich Way
Schaumburg, IL 60196-1056
robert.koscielniak@zurichna.com

Mark D. Plevin, Esq.
Crowell & Moring LLP
Three Embarcadero Center
26th Floor
San Francisco, CA 94111
mplevin@crowell.com

Karen Dixon, Esq.
Skarzynski Marick & Black LLP
353 N. Clark Street, Suite 3650
Chicago, IL 60654
kdixon@skarzynski.com

For Rio Tinto:

Andrea Frost, Esq.
Senior Counsel – Litigation
Rio Tinto
4700 W. Daybreak Parkway
South Jordan, UT 84009
Andrea.frost@riotinto.com

With a copy to:

CompanySecretaryNotices@riotinto.com and the subject line must start with the words: "RIO TINTO AMERICA INC."

John D. Green, Esq.
Farella Braun + Martel LLP
Russ Building
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
jgreen@fbm.com

Danielle Spinelli, Esq.
Wilmer Cutler Pickering Hale and
Dorr LLP
1875 Pennsylvania Ave, N.W.
Washington, DC 20006
danielle.spinelli@wilmerhale.com

For the Debtors:

Ryan Van Meter, Esq.
Imerys Talc America, Inc.
100 Mansell Court East, Suite 300
Roswell, Georgia 30076
ryan.vanmeter@imerys.com

With a copy to:

Kimberly A. Posin, Esq.
Latham & Watkins LLP
355 S. Grand Avenue, Suite 100
Los Angeles, CA 90071
kim.posin@lw.com

Angela R. Elbert, Esq.
Neal, Gerber & Eisenberg LLP
Two North La Salle Street, Suite 1700
Chicago, IL 60602
aelbert@nge.com

For the Consenting Entities:

Kami E. Quinn, Esq.
Gilbert LLP
700 Pennsylvania Ave. SE
Washington, DC 20003
quinnk@gilbertlegal.com

with a copy to:

*Tort Claimants' Committee:*

Natalie D. Ramsey, Esq.
Robinson & Cole LLP
1201 North Market Street
Suite 1406
Wilmington, DE  19801
Direct 302.516.1702
nramsey@rc.com

*FCR:*

Edwin J. Harron, Esq.
Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE  19801
eharron@ycst.com

15.10.  This Agreement may be amended only by a writing signed by or on behalf of each

Party and, if before the Agreement Effective Date, each of the Consenting Entities.

15.11.  Zurich represents that it has made a good faith search and has located no evidence

of any liability policies issued by Zurich under which any Debtor is insured (excluding expired

claims-made policies), other than those listed on Exhibit A, and that it is not aware of any such

policy, secondary evidence of any such policy, or any reason to believe such policy exists (other

than Policy No. SXL 8129701, issued to Standard Oil Company (Indiana) for the period August

17, 1983 to June 1, 1984).  Rio Tinto represents that it has made a good faith search and has located

no evidence of any liability policies issued by the Rio Tinto Captive Insurers under which any

Debtor is insured (excluding expired claims-made policies), other than those listed on Exhibit B,

and that it is not aware of any such policy, secondary evidence of any such policy, or any reason

to believe such policy exists.

15.12.  This Agreement may be executed in multiple counterparts, each of which shall be

deemed an original but all of which shall constitute one and the same instrument.  Execution of

this Agreement may be effected by PDF or other electronic transmission of executed copies of

the signature pages delivered to counsel for the Parties.

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the last

date indicated below.

**IMERYS TALC AMERICA, INC. (on behalf of itself and each of the Debtors in the Chapter 11 Cases)**

By: _____

Name: _____

Title: _____

Date: _____

**IMERYS TALC ITALY S.P.A.**

By: _____

Name: _____

Title: _____

Date: _____

**RIO TINTO AMERICA INC. (on behalf of itself, Three Crowns Insurance Company, Metals & Minerals Insurance Company Pte. Ltd., and Falcon Insurance Limited)**

By: _____

Name: _____

Title: _____

Date: _____

**ZURICH AMERICAN INSURANCE COMPANY**

By: _____

Name: _____

Title: _____

Date: _____

**IN WITNESS WHEREOF**, the Consenting Entities have consented to this Agreement as of the last date indicated below.

**TORT CLAIMANTS' COMMITTEE**     **FCR**

By:    _____        By:    _____

Name: _____        Name: _____

Title: _____        Title: _____

Date: _____        Date: _____

**EXHIBIT A**

**Zurich Policies**

| Issuing Insurer | Policy No. | Policy Period |
|---|---|---|
| Zurich Insurance Company, US Branch | GLC 8209842-00/01 | 5/1/1996–5/31/1997 |
| Zurich Insurance Company, US Branch | GLO 8210069-00 | 5/31/1997–5/31/1998 |
| Zurich Insurance Company, US Branch | GLO 8210069-01 | 5/31/1998–5/31/1999 |
| Zurich American Insurance Company | GLO 8210069-02 | 5/31/1999–5/31/2000 |
| Zurich American Insurance Company | GLO 8210069-03 | 5/31/2000–5/31/2001 |
| Zurich American Insurance Company | GLO 8210196-04 | 5/31/2001–5/31/2002 |
| Zurich American Insurance Company | GLO 8210196-05 | 5/31/2002–5/31/2003 |
| Zurich American Insurance Company | GLO 8210196-06 | 5/31/2003–5/31/2004 |
| Zurich American Insurance Company | GLO 8210196-07 | 5/31/2004–5/31/2005 |
| Zurich American Insurance Company | GLO 8210196-08 | 5/31/2005–5/31/2006 |
| Zurich American Insurance Company | GLO 8210196-09 | 5/31/2006–5/31/2007 |
| Zurich American Insurance Company | GLO 8210196-10 | 5/31/2007–5/31/2008 |
| Zurich American Insurance Company | GLO 8210196-11 | 5/31/2008–5/31/2009 |
| Zurich American Insurance Company | GLO 8249662-00 | 5/31/2009–5/31/2010 |
| Zurich American Insurance Company | GLO 8249662-01 | 5/31/2010–5/31/2011 |
| Zurich American Insurance Company | GLO 8249662-02 | 5/31/2011–5/31/2012 |
| Zurich Insurance Company Ltd (Canadian Branch) | 8828308 | 5/31/1997-5/31/2007 |
| Zurich Insurance Company Ltd (Canadian Branch) | 8835547 | 5/31/2007-5/31/2009 |
| Zurich Insurance Company Ltd (Canadian Branch) | 8837911 | 5/31/2009-5/31/2011 |

**EXHIBIT B**

**Rio Tinto Captive Insurer Policies**

| Issuing Insurer | Policy Number | Policy Period |
|---|---|---|
| Metals and Minerals Insurance Pte. Limited | M&M GL/97-98/001 | 5/31/1997 - 5/31/1998 |
| Three Crowns Insurance Company Limited | 98162 | 5/31/1998 - 5/31/1999 |
| Three Crowns Insurance Company Limited | 98162 | 5/31/1999 - 5/31/2000 |
| Three Crowns Insurance Company Limited | 98162 | 5/31/2000 - 5/31/2001 |
| Three Crowns Insurance Company Limited | 98162/01 | 5/31/2001 - 5/31/2002 |
| Three Crowns Insurance Company Limited | 98162/02 | 5/31/2002 - 5/31/2003 |
| Three Crowns Insurance Company Limited | 98162/02A | 5/31/2002 - 5/31/2003 |
| Three Crowns Insurance Company Limited | 98162/02B | 5/31/2002 - 5/31/2003 |
| Three Crowns Insurance Company Limited | 98162/03 | 5/31/2003 - 5/31/2004 |
| Three Crowns Insurance Company Limited | 98162/04 | 5/31/2004 - 5/31/2005 |
| Three Crowns Insurance Company Limited | 98162/05 | 5/31/2005 - 5/31/2006 |
| Three Crowns Insurance Company Limited | 98162/06/A | 5/31/2006 - 5/31/2007 |
| Falcon Insurance Ltd. | 98162/06/C | 5/31/2006 - 5/31/2007 |
| Metals and Minerals Insurance Pte. Limited | 98162/07/B | 5/31/2007 - 5/31/2008 |
| Falcon Insurance Ltd. | 98162/07/C | 5/31/2007 - 5/31/2008 |
| Metals and Minerals Insurance Pte. Limited | 98162/08/B | 5/31/2008 - 5/31/2009 |
| Falcon Insurance Ltd. | 98162/08/C | 5/31/2008 - 5/31/2009 |
| Metals and Minerals Insurance Pte. Limited | 98162/09/B | 5/31/2009 - 5/31/2010 |
| Falcon Insurance Ltd. | 98162/09/C | 5/31/2009 - 5/31/2010 |
| Metals and Minerals Insurance Pte. Limited | 98162/10/B | 5/31/2010 - 5/31/2011 |
| Falcon Insurance Ltd. | 98162/10/C | 5/31/2010 - 5/31/2011 |
| Metals and Minerals Insurance Pte. Limited | 98162/11/B | 5/31/2011 - 5/31/2012 |
| Falcon Insurance Ltd. | 98162/11/C | 5/31/2011 - 5/31/2012 |

**EXHIBIT C**

**Excess Policies**

| Insurer Participant(s) | Policy Period |
|---|---|
| Allianz SE | 5/31/1997 – 5/31/1998 |
| Zurich Insurance Group Ltd. | 5/31/1997 – 5/31/1998 |
| Lexington Insurance Co., Tamarack, CNA Insurance Company Ltd., USF&G Corporation | 5/31/1997 – 5/31/1998 |
| Reliance National Insurance Company | 5/31/1997 – 5/31/1998 |
| TIG Insurance Company | 5/31/1997 – 5/31/1998 |
| Kemper Insurance Companies | 5/31/1997 – 5/31/1998 |
| Starr Excess Insurance Company | 5/31/1997 – 5/31/1998 |
| XL Insurance Company Ltd. | 5/31/1997 – 5/31/1998 |
| ACE Ltd. | 5/31/1997 – 5/31/1998 |
| Zurich Insurance Group Ltd. | 5/31/1998 – 5/31/2001 |
| Allianz SE | 5/31/1998 – 5/31/2001 |
| CNA Insurance Company Ltd.; Gulf Insurance Company; Kemper Insurance Companies; National Union; USF&G Corporation | 5/31/1998 – 5/31/2001 |
| XL Insurance Company Ltd.; Starr Excess Insurance Company | 5/31/1998 – 5/31/2001 |
| ACE Ltd. | 5/31/1998 – 5/31/2001 |
| Aegis Security Insurance Company; National Union Fire Insurance Co.; St. Paul Fire & Marine Insurance Company; Zurich Global Energy; Kemper Insurance Companies | 5/31/2001 – 5/31/2002 |
| Starr Excess Liability Insurance International Ltd. | 5/31/2001 – 5/31/2002 |
| ACE Ltd.; Oil Casualty Insurance Ltd.; XL Insurance Company Ltd. | 5/31/2001 – 5/31/2002 |
| Zurich Global Energy | 5/31/2002 – 5/31/2003 |
| Kemper Insurance Companies | 5/31/2002 – 5/31/2003 |
| Rock River Insurance Company | 5/31/2002 – 5/31/2003 |
| Athena | 5/31/2002 – 5/31/2003 |
| Great Lakes Reinsurance (UK) Ltd. | 5/31/2002 – 5/31/2003 |
| Arch Bermuda | 5/31/2002 – 5/31/2003 |
| Endurance | 5/31/2002 – 5/31/2003 |
| XL (Sydney) | 5/31/2002 – 5/31/2003 |

| Insurer Participant(s) | Policy Period |
|---|---|
| Starr Excess Liability Insurance International Ltd. | 5/31/2002 – 5/31/2003 |
| Oil Casualty Insurance, Ltd. | 5/31/2002 – 5/31/2003 |
| ACE | 5/31/2002 – 5/31/2003 |
| Starr Excess Liability Insurance International Ltd. | 5/31/2003 – 5/31/2004 |
| XL Insurance Company Ltd. | 5/31/2003 – 5/31/2004 |
| Zurich Insurance Group Ltd. | 5/31/2003 – 5/31/2004 |
| XL Insurance Company Ltd. | 5/31/2004 – 5/31/2005 |
| American Home Assurance Co. | 5/31/2004 – 5/31/2005 |
| Starr Excess Liability Insurance International Ltd. | 5/31/2004 – 5/31/2005 |
| Zurich Insurance Group Ltd. | 5/31/2004 – 5/31/2005 |
| XL Insurance Company Ltd. | 5/31/2005 – 5/31/2006 |
| American Home Assurance Co. | 5/31/2005 – 5/31/2006 |
| Starr Excess Liability Insurance International Ltd. | 5/31/2005 – 5/31/2006 |
| Zurich Insurance Group Ltd. | 5/31/2005 – 5/31/2006 |
| Liberty Mutual Ins. Co.; XL Insurance Company Ltd. | 5/31/2006 – 5/31/2007 |
| American Home Assurance Co. | 5/31/2006 – 5/31/2007 |
| Starr Excess Liability Insurance International Ltd. | 5/31/2006 – 5/31/2007 |
| Zurich Insurance Group Ltd. | 5/31/2006 – 5/31/2007 |
| Liberty Mutual Ins. Co.; XL Insurance Company Ltd. | 5/31/2007 – 5/31/2008 |
| American Home Assurance Co. | 5/31/2007 – 5/31/2008 |
| Starr Excess Liability Insurance International Ltd. | 5/31/2007 – 5/31/2008 |
| Catlin Underwriting Agencies, Ltd.; Zurich Insurance Group Ltd. | 5/31/2007 – 5/31/2008 |
| Catlin Underwriting Agencies, Ltd.; Liberty Mutual Insurance Co; XL Insurance Company Ltd. | 5/31/2008 – 5/31/2009 |
| AIG Excess Liability Insurance International Ltd. | 5/31/2008 – 5/31/2009 |
| Starr Excess Liability Insurance International Ltd. | 5/31/2008 – 5/31/2009 |
| Catlin Underwriting Agencies, Ltd.; Zurich Insurance Group Ltd. | 5/31/2008 – 5/31/2009 |
| AIG London; AIG Australia; DA Constable; Liberty Mutual Ins. Co.; XL Insurance Company Ltd. | 5/31/2009 – 5/31/2010 |
| Catlin Underwriting Agencies, Ltd.; Zurich Insurance Group Ltd. | 5/31/2009 – 5/31/2010 |

| Insurer Participant(s) | Policy Period |
|---|---|
| AIG; American Home Assurance Co.; DA Constable; Liberty Mutual Ins. Co.; XL Insurance Company Ltd. | 5/31/2010 – 5/31/2011 |
| Catlin Underwriting Agencies, Ltd.; Zurich Insurance Group Ltd. | 5/31/2010 – 5/31/2011 |
| AIG; American Home Assurance Co.; DA Constable; Liberty Mutual Ins. Co.; XL Insurance Company Ltd. | 5/31/2011 – 5/31/2012 |
| Catlin Underwriting Agencies, Ltd.; Starr Excess Liability Insurance International Ltd.; Zurich Insurance Group Ltd. | 5/31/2011 – 5/31/2012 |
| Arch Insurance Co.; Iron-Starr Underwriting Agency Ltd. | 5/31/2011 – 5/31/2012 |

## EXHIBIT D

### Assignment of Rights

This Assignment of Rights ("Assignment") is executed by Rio Tinto America Inc. ("Rio Tinto"), on its own behalf and on behalf of the Rio Tinto Captive Insurers (Rio Tinto and the Rio Tinto Captive Insurers, collectively, the "Rio Tinto Settling Parties"), and Zurich American Insurance Company, in its own capacity and as successor-in-interest to Zurich Insurance Company, U.S. Branch ("Zurich," and collectively with the Rio Tinto Settling Parties, the "Insurer Parties").  Except where otherwise specified, capitalized terms appearing in this Assignment have the meanings set out in the accompanying Settlement Agreement and Release.

WHEREAS, the Debtors and the Insurer Parties entered into the Rio Tinto/Zurich Settlement, including the accompanying Settlement Agreement and Release dated [_____], in order to fully and finally resolve their disputes, and to provide for other consideration, promises, releases, and covenants set forth therein;

WHEREAS, in exchange for consideration set out in the Rio Tinto/Zurich Settlement and the Settlement Agreement and Release, the Insurer Parties agreed to make cash contributions to the Talc Personal Injury Trust as set forth therein;

WHEREAS, in addition to the foregoing cash contributions, as part of the Rio Tinto/Zurich Settlement the Insurer Parties agreed to assign to the Talc Personal Injury Trust the Credits and the Future Credits, as defined therein; *provided, however*, that the Insurer Parties did not agree to assign to the Talc Personal Injury Trust, and will retain, all of their rights against their reinsurers and/or retrocessionaires, in their capacities as such;

WHEREAS, pursuant to an October 17, 2017 Assignment of Claims (the "Zurich Assignment of Claims"), Zurich and its affiliated companies previously assigned to Rio Tinto and its affiliated companies any and all rights of recovery against third parties with respect to sums already paid or thereafter paid under the Zurich Policies in connection with any lawsuit filed against Imerys Talc America, Inc. in which the plaintiff alleges ovarian cancer and/or bodily injury caused by exposure to products containing talc provided, distributed, or mined by Luzenac America, Inc. or other entities divested by Rio Tinto and its affiliated companies to Imerys Talc America, Inc. and/or its affiliated companies;

WHEREAS, Zurich acknowledges that, through the Zurich Assignment of Claims, it has assigned to Rio Tinto and its affiliated companies any and all rights of subrogation, contribution and/or indemnity arising out of the defense or payment of Talc Personal Injury Claims, but for the avoidance of doubt, Zurich wishes to assign any remaining rights it may have;

THEREFORE, the Insurer Parties hereby assign to the Talc Personal Injury Trust the Credits and the Future Credits; *provided, however,* that the Insurer Parties do not assign to the Talc Personal Injury Trust, and do retain, all of their rights against their reinsurers and/or retrocessionaires, in their capacities as such.

Rio Tinto America Inc.

By: _____

Printed Name: _____

Date: _____

Zurich American Insurance Company Inc.

By: _____

Printed Name: _____

Date: _____