> **THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE. ACCORDINGLY, THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT APPROVES THIS DISCLOSURE STATEMENT.  IN ADDITION, THIS DISCLOSURE STATEMENT MAY BE REVISED TO REFLECT EVENTS THAT OCCUR AFTER THE DATE HEREOF BUT PRIOR TO THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| IMERYS TALC AMERICA, INC., *et al.*,[1] | : | Case No. 19-10289 (LSS) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

---------------------------------------------------------- :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| IMERYS TALC ITALY S.P.A., | : | Case No. [Not yet filed] |
| | : | |
| Potential Debtor. | : | [Joint Administration To Be Requested] |
| | : | |

---------------------------------------------------------- x

## DISCLOSURE STATEMENT FOR NINTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF IMERYS TALC AMERICA, INC. AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050) and Imerys Talc Canada Inc. (6748).  The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.  This solicitation is also being conducted by Imerys Talc Italy S.p.A. pursuant to sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018.  If the Plan is accepted by the requisite number of claimants in Class 4, Imerys Talc Italy S.p.A. will commence a bankruptcy case that will be, pending entry of an order by the Bankruptcy Court, jointly administered under Case No. 19-10289 (LSS).

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins, Esq.
Michael J. Merchant, Esq.
Amanda R. Steele, Esq.
Brett M. Haywood, Esq.
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:  collins@rlf.com
          merchant@rlf.com
          steele@rlf.com
          haywood@rlf.com

**LATHAM & WATKINS LLP**
Jeffrey E. Bjork, Esq.
Kimberly A. Posin, Esq.
Helena G. Tseregounis, Esq.
Shawn P. Hansen, Esq.
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
E-mail:  jeff.bjork@lw.com
          kim.posin@lw.com
          helena.tseregounis@lw.com
          shawn.hansen@lw.com

- and -

Richard A. Levy, Esq.
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  richard.levy@lw.com

*Counsel for the Debtors and Debtors-in-Possession*

**ROBINSON & COLE LLP**
Natalie D. Ramsey, Esq.
Mark A. Fink, Esq.
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
E-mail:  nramsey@rc.com
          mfink@rc.com

- and -

Michael R. Enright, Esq.
280 Trumbull Street
Hartford, Connecticut 06103
Telephone: (860) 275-8290
Facsimile: (860) 275-8299
E-mail:  menright@rc.com

**YOUNG CONAWAY STARGATT &
TAYLOR LLP**
Robert S. Brady, Esq.
Edwin J. Harron, Esq.
Sharon M. Zieg, Esq.
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
E-mail:  rbrady@ycst.com
          eharron@ycst.com
          szieg@ycst.com

*Counsel for the Tort Claimants' Committee*

*Counsel for the Future Claimants'
Representative*

**HUGHES HUBBARD & REED LLP**
Christopher Kiplok, Esq.
Dustin P. Smith, Esq.
Erin Diers, Esq.
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
E-mail:  christopher.kiplok@hugheshubbard.com
         dustin.smith@hugheshubbard.com
         erin.diers@hugheshubbard.com

*Counsel for Imerys S.A. and the Persons Listed on Schedule II of the Plan*

# TABLE OF CONTENTS

Page

**Article I. INTRODUCTION** ...........................................................................................1

    1.1    Voting and Confirmation ......................................................................2

**Article II. OVERVIEW OF THE PLAN** ......................................................................3

    2.1    Summary of the Trust Distribution Procedures and Other Plan Provisions Critical to Claimants Entitled to Vote in Class 4 ....................................4
    2.2    General Overview ..................................................................................6
    2.3    Summary Description of Classes and Treatment..................................17
    2.4    The Plan Supplement ..........................................................................22

**Article III. GENERAL INFORMATION**......................................................................23

    3.1    History and Business, Organizational Structure, and Assets of the North American Debtors ................................................................................23
    3.2    History and Business, Organizational Structure, and Assets of ITI .....29
    3.3    Filing of the Chapter 11 Cases and Plan Discussions...........................31

**Article IV. SUMMARY OF LIABILITIES AND RELATED INSURANCE OF THE DEBTORS** .........................................................................................34

    4.1    Description of Talc Personal Injury Liabilities....................................34
    4.2    Description of Talc Insurance Coverage...............................................37
    4.3    Description of Non-Talc Liabilities of the Debtors ..............................45

**Article V. EVENTS DURING THE CHAPTER 11 CASES**........................................46

    5.1    Commencement of the Chapter 11 Cases and First Day Motions ........46
    5.2    Commencement of Canadian Proceeding.............................................46
    5.3    Appointment of the Tort Claimants' Committee ..................................47
    5.4    Appointment of the Legal Representative for Future Claimants............51
    5.5    Other Plaintiffs Groups .......................................................................52
    5.6    Retention of Debtors' Professionals ....................................................53
    5.7    Administrative Matters in the Chapter 11 Cases ..................................53
    5.8    Debtor-In-Possession Financing ..........................................................58
    5.9    Litigation, Adversary Proceeding, Coverage Disputes, and Mediation................59
    5.10   Material Settlements and Resolutions...................................................68
    5.11   Anticipated Developments Regarding ITI Before Confirmation...........70

**Article VI. SETTLEMENTS AND THE SALE OF THE NORTH AMERICAN DEBTORS' ASSETS** ...........................................................................71

    6.1    The Imerys Settlement .........................................................................71

| | | |
|---|---|---|
| 6.2 | Settlement with Rio Tinto and Zurich | 74 |
| 6.3 | Settlement with the Cyprus Parties | 76 |
| 6.4 | Sale of North American Debtors' Assets | 80 |

**Article VII. THE PLAN OF REORGANIZATION** ..................................................82

| | | |
|---|---|---|
| 7.1 | Treatment of Administrative Claims, Fee Claims, DIP Facility Claims, and Priority Tax Claims | 83 |
| 7.2 | Treatment of Classified Claims and Equity Interests | 85 |
| 7.3 | Acceptance or Rejection of Plan | 88 |
| 7.4 | Conditions Precedent to the Confirmation of the Plan | 89 |
| 7.5 | Conditions Precedent to the Effective Date of the Plan | 93 |
| 7.6 | Means for Implementation of the Plan | 94 |
| 7.7 | Effect of Confirmation | 109 |
| 7.8 | Releases, Injunctions and Exculpation | 114 |

**Article VIII. THE TALC PERSONAL INJURY TRUST AND  TRUST DISTRIBUTION PROCEDURES** ..................................................125

| | | |
|---|---|---|
| 8.1 | Overview | 125 |
| 8.2 | Select Provisions of the Trust Distribution Procedures | 132 |

**Article IX. CERTAIN FACTORS TO BE CONSIDERED** ..................................................153

| | | |
|---|---|---|
| 9.1 | Variance from Financial Projections | 153 |
| 9.2 | Failure to Confirm the Plan | 153 |
| 9.3 | Non-Occurrence of the Effective Date | 154 |
| 9.4 | The Recovery to Holders of Allowed Claims and Equity Interests Cannot Be Stated with Absolute Certainty | 154 |
| 9.5 | The Allowed Amount of Claims May Differ From Current Estimates | 154 |
| 9.6 | The Debtors May Object to the Amount or Classification of a Claim | 155 |
| 9.7 | Parties in Interest May Object to the Debtors' Classification of Claims and Interests | 155 |
| 9.8 | Appointment of Different Talc Trustees and/or Different Members of the Talc Trust Advisory Committee for the Talc Personal Injury Trust | 155 |
| 9.9 | Distributions under the Trust Distribution Procedures | 156 |
| 9.10 | The Channeling Injunction | 156 |
| 9.11 | Voting Requirements | 156 |
| 9.12 | The Debtors' Operations May be Impacted by the Continuing COVID-19 Pandemic | 157 |
| 9.13 | The Canadian Court May Not Enter an Order Recognizing the Confirmation Order | 157 |
| 9.14 | Risks Relating to ITI's Chapter 11 Filing | 157 |
| 9.15 | Risks Relating to the Cyprus Settlement | 157 |
| 9.16 | Allegations Regarding the Abandonment of Liability Defenses | 158 |
| 9.17 | Unavailability of J&J's Revised Protocol | 158 |

US-DOCS\120811663.4

9.18    Treatment of Holders of Talc Personal Injury Claims Pursuant to the Trust Distribution Procedures ........................................................................158

**Article X. VOTING PROCEDURES AND REQUIREMENTS**...........................................159

10.1    Voting Procedures Summary ............................................................159
10.2    Voting Deadline................................................................................161
10.3    Holders of Claims Entitled to Vote.................................................162
10.4    Vote Required for Acceptance by a Class .......................................162
10.5    Voting Procedures............................................................................162

**Article XI. CONFIRMATION OF THE PLAN**.................................................................165

11.1    Confirmation Hearing.....................................................................165
11.2    Requirements for Confirmation of the Plan....................................165

**Article XII. POSITIONS OF CERTAIN OBJECTING PARTIES WITH RESPECT TO DISCLOSURES**.................................................................................168

12.1    J&J ...................................................................................................169
12.2    Talc Personal Injury Claimants Represented by Arnold & Itkin....173
12.3    The Insurer Group............................................................................178
12.4    Travelers Casualty and Surety Company.........................................184

**Article XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**...................................................................................185

13.1    Alternative Plan of Reorganization.................................................185
13.2    Liquidation under Chapter 7 ...........................................................185

**Article XIV. CERTAIN TAX CONSEQUENCES OF THE PLAN**....................................185

14.1    Treatment of the Talc Personal Injury Trust...................................186
14.2    Tax Consequences to Holders of Talc Personal Injury Claims .......187

**Article XV. CONCLUSION AND RECOMMENDATION**..................................................188


**Exhibit A**:    Plan

**Exhibit B**:    Financial Projections – North American Debtors

**Exhibit C**:    Financial Projections – ITI

**Exhibit D**:    Liquidation Analysis

US-DOCS\120811663.4

**IMPORTANT DATES**

| Event[2] | Date |
|---|---|
| Voting Record Date | January 27, 2021 |
| Deadline to Mail Solicitation Packages and Related Notices | February 1, 2021 |
| Newspaper Publication Notice | February 1, 2021 – February 14, 2021 |
| Deadline to File Plan Supplement | February 5, 2021 |
| Deadline for Cure Objections | The later of (a) fourteen (14) days after receipt of a Sale Cure Notice (for North American Debtor counterparties only) or February 15, 2021 (for (i) ITI counterparties and (ii) North American Debtor counterparties not previously included on a Sale Cure Notice) and (b) fourteen (14) days after (for all counterparties) (i) the Debtors serve a counterparty with notice of any amendment or modification to such counterparty's proposed cure cost or (ii) the Debtors serve a counterparty with notice of a supplement to the list of contracts to be assumed pursuant to the Plan |
| Deadline for Assumption Objections | The later of (a) February 15, 2021 and (b) fourteen (14) days after the Debtors serve a counterparty with notice of a supplement to the list of contracts to be assumed |
| Deadline to Serve Written Discovery in Connection with Confirmation | February 15, 2021 |
| Deadline for Plaintiffs' Attorneys to Return Directive and Client List | February 17, 2021 |
| Deadline to File Rule 3018 Motions | February 19, 2021 |
| Deadline for Plan Proponents to Identify Topics of Anticipated Expert Testimony | February 19, 2021 |
| Deadline to Reply to 3018 Motions | March 5, 2021 |
| Deadline for All Parties Other than Plan Proponents to Identify Topics for Anticipated Affirmative Expert Testimony | March 5, 2021 |
| Hearing on 3018 Motions | March 15, 2021 |
| Deadline for Substantial Completion of Document Productions | March 24, 2021 |

---

[2]    Capitalized terms used in this summary of "Important Dates" and not otherwise defined herein or in the Plan shall have the meaning ascribed to them in the Voting Procedures (as defined below).

| Event[2] | Date |
|---|---|
| Voting Deadline | March 25, 2021 at 4:00 p.m. (Prevailing Eastern Time); *provided* that the Debtors are authorized to extend the Voting Deadline for any party entitled to vote on the Plan |
| Fact Depositions | March 29, 2021 – April 14, 2021 |
| Deadline to File Voting Certification[3] | April 8, 2021, at 4:00 p.m. (Prevailing Eastern Time) |
| End of Fact Discovery | April 14, 2021 |
| Affirmative Expert Reports Due | April 19, 2021 |
| Responsive Expert Reports Due | May 10, 2021 |
| Expert Depositions | May 13, 2021 – May 21, 2021 |
| End of Expert Discovery | May 21, 2021 |
| Confirmation Objection Deadline | May 28, 2021, at 4:00 p.m. (Prevailing Eastern Time) |
| Confirmation Reply Deadline and Deadline to File Form of Confirmation Order | June 14, 2021, at 4:00 p.m. (Prevailing Eastern Time) |
| Confirmation Hearing | June 21, 22 and 23, 2021 at 10:00 a.m. (Prevailing Eastern Time) |

---

[3]     In addition to tabulating the votes from Class 4 to accept or reject the Plan, the Voting Certification shall also include a list of Class 4 creditors who opted out of the releases contained in the Plan, as well as those Class 4 creditors whose solicitation packages were returned as undeliverable, or who were not served with a solicitation package pursuant to paragraph 10 of the order of the Bankruptcy Court approving the Voting Procedures [Docket No. [__]].

v

## IMPORTANT ACRONYMS, ABBREVIATED NAMES, AND DEFINITIONS

- "**FCR**" means James L. Patton (or any Bankruptcy Court-appointed successor), in his capacity as the legal representative for any and all persons who may assert Talc Personal Injury Demands in the future, but who are currently unknown. "FCR" stands for Future Claimants' Representative.

- "**Imerys Affiliated Parties**" means, in each case during the times the Debtors were direct or indirect subsidiaries of Imerys S.A. and solely in their capacities as such: (i) direct or indirect shareholders of Imerys S.A.; (ii) current and former officers, directors, principals, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, experts, and other professionals of the Imerys Corporate Parties and/or the Debtors; and (iii) with respect to each of the foregoing Persons in clauses (i) and (ii), each such Persons' respective heirs, executors, estates, and nominees, as applicable. For the avoidance of doubt, the Imerys Affiliated Parties exclude J&J, the Rio Tinto Corporate Parties, and the Cyprus Corporate Parties.

- "**Imerys Corporate Parties**" means Imerys S.A. and all Persons listed on Schedule I attached to the Plan, each of which are or were Affiliates of Imerys S.A. during the time that the Debtors were owned or controlled by Imerys S.A., hereto, and the successors and assigns of such Persons, solely in their capacity as such. Schedule I attached to the Plan is an exclusive list and does not include, among others, J&J, the Rio Tinto Corporate Parties, or the Cyprus Corporate Parties.

- "**Imerys Non-Debtors**" means Imerys S.A. and its Affiliates, excluding the Debtors.

- "**Imerys Plan Proponents**" means Imerys S.A., on behalf of itself and all Persons listed on Schedule II attached to the Plan, each of which Imerys S.A. has direct or indirect ownership or other control over.

- "**Imerys Protected Parties**" means the Imerys Corporate Parties and the Imerys Affiliated Parties.

- "**Imerys S.A.**" means Imerys S.A., the Debtors' parent entity. For the avoidance of doubt, Imerys S.A. is a non-debtor.

- "**Imerys USA**" means Imerys USA, Inc., a Non-Debtor Affiliate. For the avoidance of doubt, Imerys USA is a non-debtor.

- "**ITA**" means Imerys Talc America, Inc., a Delaware corporation, and a Debtor in the Chapter 11 Cases.

- "**ITC**" means Imerys Talc Canada Inc., a Canadian corporation, and a Debtor in the Chapter 11 Cases.

- "**ITI**" means Imerys Talc Italy S.p.A., an Italian corporation, and a potential Debtor in the Chapter 11 Cases.

- "**ITV**" means Imerys Talc Vermont, Inc., a Vermont corporation, and a Debtor in the Chapter 11 Cases.

- "**Mircal**" means Mircal S.A., a Non-Debtor Affiliate.  For the avoidance of doubt, Mircal is a non-debtor.

- "**Mircal Italia**" means Mircal Italia S.p.A., a Non-Debtor Affiliate.  For the avoidance of doubt, Mircal Italia is a non-debtor.

- "**Plan Proponents**" means, collectively, the Debtors, the Tort Claimants' Committee, the FCR, and the Imerys Plan Proponents.

- "**Reorganized Debtors**" means the Reorganized North American Debtors and Reorganized ITI.

- "**Reorganized ITA**" means ITA, renamed Ivory America, Inc., on and after the Effective Date.

- "**Reorganized ITC**" means ITC, renamed Ivory Canada, Inc., on and after the Effective Date.

- "**Reorganized ITI**" means ITI, on and after the Effective Date.

- "**Reorganized ITV**" means ITV, renamed Ivory Vermont, Inc., on and after the Effective Date.

- "**Reorganized North American Debtors**" means Reorganized ITA, Reorganized ITV, and Reorganized ITC.

- "**Tort Claimants' Committee**" means the official committee of tort claimants in the Debtors' Chapter 11 Cases appointed by the United States Trustee, as such committee is reconstituted from time to time.

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE.

THIS SOLICITATION IS BEING CONDUCTED NOT ONLY WITH RESPECT TO THE DEBTORS IN THE ABOVE-CAPTIONED BANKRUPTCY CASES, BUT ALSO BY **IMERYS TALC ITALY S.P.A.** PRIOR TO ITS FILING OF A VOLUNTARY PETITION UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE. BECAUSE NO CHAPTER 11 CASE HAS YET BEEN COMMENCED FOR IMERYS TALC ITALY S.P.A., THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE WITH RESPECT TO IMERYS TALC ITALY S.P.A. FOLLOWING COMMENCEMENT OF ITS CHAPTER 11 CASE, IMERYS TALC ITALY S.P.A. EXPECTS TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AND THE SOLICITATION OF VOTES. THE ASSETS AND LIABILITIES OF IMERYS TALC ITALY S.P.A. ARE DESCRIBED IN DETAIL IN THIS DISCLOSURE STATEMENT.

ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS ATTACHED EXHIBITS INCLUDING THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ATTACHED TO THE PLAN AND THE PLAN SUPPLEMENT, WHICH CONTROL OVER THE DISCLOSURE STATEMENT IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THIS DATE.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.

PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS OR EQUITY INTERESTS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

US-DOCS\120811663.4

THIS DISCLOSURE STATEMENT AND ANY EXHIBITS ATTACHED TO THE VOTING PROCEDURES ORDER ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.   NO SOLICITATION OF VOTES MAY BE MADE EXCEPT AFTER DISTRIBUTION OF THIS DISCLOSURE STATEMENT.  NO PERSON HAS BEEN AUTHORIZED TO DISTRIBUTE ANY INFORMATION CONCERNING THE PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS ATTACHED TO THE VOTING PROCEDURES ORDER.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.  THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT," AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS.  THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN ARTICLE IX, "CERTAIN FACTORS TO BE CONSIDERED."  IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS.   THE DEBTORS AND THE REORGANIZED DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.   THE HISTORICAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN OBTAINED FROM SUCH REPORTS AND OTHER SOURCES OF INFORMATION AS ARE AVAILABLE TO THE DEBTORS.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, EITHER THE DEBTORS OR THE REORGANIZED DEBTORS.

# ARTICLE I.

# INTRODUCTION

This Disclosure Statement[4] is being furnished by the Plan Proponents[5] as co-proponents of the *Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated January [27], 2021, pursuant to section 1125 of the Bankruptcy Code, and in connection with the solicitation of votes for acceptance or rejection of the Plan.

ITA, ITV, and ITC are debtors in the Chapter 11 Cases[6] pending in the Bankruptcy Court. ITI, an affiliate of the North American Debtors,[7] may file (but has not yet filed) a chapter 11 case. If and when ITI files a chapter 11 case, the Debtors will ask the Bankruptcy Court to enter an order jointly administering ITI's chapter 11 case with the Chapter 11 Cases under lead case number 19-10289 (LSS). The contemplated filing of ITI is designed to address the Talc Personal Injury Claims against ITI, and ITI's filing is contingent upon acceptance of the Plan by the holders of such Claims, as described more fully below. As a result, certain holders of Claims against ITI are being solicited through this Disclosure Statement to vote on the Plan prior to ITI's contemplated chapter 11 filing.

This Disclosure Statement is being transmitted in order to provide adequate information to enable holders of Claims in Class 4 (Talc Personal Injury Claims) who are the sole Impaired Class entitled to vote on the Plan to make an informed judgment in exercising their right to vote to accept or reject the Plan.

**On the Effective Date, liability for all Talc Personal Injury Claims shall be channeled to and assumed by the Talc Personal Injury Trust. As set forth in greater detail in Article VIII, the purposes of the Talc Personal Injury Trust shall be to: (i) assume all Talc Personal Injury Claims; (ii) to preserve, hold, manage, and maximize the assets of the Talc Personal Injury Trust; and (iii) to direct the processing, liquidation, and payment of all compensable Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents. The Plan Proponents believe and intend to show at the Confirmation Hearing that the Talc**

---

[4]    Capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to them in Article I of the Plan. To the extent that a term is defined in this Disclosure Statement and is defined in the Plan, the definition contained in the Plan controls.

[5]    Each of the Debtors, the Tort Claimants' Committee, the FCR, and Imerys S.A., on behalf of itself and all Persons listed on Schedule II attached to the Plan, each of which Imerys S.A. has direct or indirect ownership or other control over (the "**Imerys Plan Proponents**") are Plan Proponents. For the avoidance of doubt, ITI will be a Plan Proponent as a Debtor to the extent it commences a proceeding under the Bankruptcy Code, otherwise, ITI will be a Plan Proponent as an Imerys Plan Proponent.

[6]    As the context requires, Chapter 11 Cases includes the case to be commenced in the Bankruptcy Court under chapter 11 of the Bankruptcy Court for ITI.

[7]    The term "**Debtors**" refers to ITA, ITV, and ITC, and to the extent ITI commences a proceeding under the Bankruptcy Code, the term "Debtors" also refers to ITI. The term "**North American Debtors**" refers to ITA, ITV, and ITC.

Personal Injury Trust will resolve Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents in such a way that holders of Talc Personal Injury Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such claims, and otherwise comply in all respects with the requirements of section 524(g)(2)(B)(i) of the Bankruptcy Code. The Trust Distribution Procedures are attached to the Plan as <u>Exhibit A</u>. The Talc Personal Injury Trust Agreement is attached to the Plan as <u>Exhibit B</u>. The Trust Distribution Procedures are binding on the holders of all Talc Personal Injury Claims.

A DETAILED SUMMARY OF THE TRUST DISTRIBUTION PROCEDURES CAN BE FOUND IN <u>SECTIONS 8.1</u> AND <u>8.2</u> OF THIS DISCLOSURE STATEMENT.

For a discussion of issues raised by certain parties that filed objections to this Disclosure Statement and expressed concerns with certain provisions of the Plan, including the Trust Distribution Procedures and/or the Talc Personal Injury Trust Agreement, please review Article XII of this Disclosure Statement.

By order dated January [27], 2021, the Bankruptcy Court approved this Disclosure Statement as to the North American Debtors in accordance with section 1125 of the Bankruptcy Code, and found that it contained "adequate information" sufficient to enable a hypothetical investor of the relevant class to make an informed judgment about the Plan, and authorized its use in connection with the solicitation of votes with respect to the Plan. **Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan.** No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.

Because no chapter 11 case has yet been commenced for ITI, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code with respect to ITI. If the requisite votes are obtained, following commencement of its chapter 11 case, ITI expects to promptly seek an order of the Bankruptcy Court approving this Disclosure Statement and the solicitation of votes with respect to ITI.

1.1    <u>Voting and Confirmation</u>

**Article X of this Disclosure Statement specifies the deadlines, procedures, and instructions for voting to accept or reject the Plan, as well as the applicable standards for tabulating Ballots (as defined below). The following is an overview of certain information related to voting that is contained in Article X of this Disclosure Statement and elsewhere in this Disclosure Statement.**

Each holder of a Claim in Class 4 is entitled to vote to accept or reject the Plan. Class 4 shall have accepted the Plan pursuant to the requirements of sections 1126(c) and 524(g) of the Bankruptcy Code if at least two-thirds (2/3) in amount and seventy-five percent (75%) in number of those voting Claims in Class 4 (Talc Personal Injury Claims) voted to accept the Plan. Assuming the requisite acceptances are obtained, the Plan Proponents intend to seek confirmation of the Plan at the Confirmation Hearing scheduled for June 21, 22, and 23, 2021, at 10:00 a.m. (Prevailing

Eastern Time) before the Bankruptcy Court.  **For the avoidance of doubt, though proposed jointly, the Plan constitutes a separate Plan for each Debtor.  Accordingly, a vote cast either to accept or reject the Plan by holders of Claims in Class 4 will be applied in the same manner and in the same amount against each Debtor**.

The Debtors have engaged Prime Clerk LLC (the "**Solicitation Agent**" or "**Claims Agent**") to assist in the voting process.

The Solicitation Agent will provide additional copies of all materials and process and tabulate Ballots for Class 4.

**To be counted, your Ballot indicating acceptance or rejection of the Plan must be received by the Solicitation Agent no later than 4:00 p.m. (prevailing Eastern Time) on March 25, 2021** (the "**Voting Deadline**"), unless the Plan Proponents, in their sole discretion, extend the period during which votes will be accepted on the Plan, in which case the term "Voting Deadline" shall mean the last date on, and time by which, such period is extended.  **Any executed Ballot that does not indicate either an acceptance or rejection of the Plan or indicates both an acceptance and rejection of the Plan will not be counted as an acceptance or rejection and will not count toward the tabulations required pursuant to either sections 524(g) or 1129 of the Bankruptcy Code.**

Prior to deciding whether and how to vote on the Plan, each holder of a Claim entitled to vote should consider carefully all of the information in this Disclosure Statement, including Article IX entitled "*Certain Factors to be Considered.*"  **You should read this Disclosure Statement and the Plan with care in evaluating how the Plan will affect your Claim(s) before voting to accept or reject the Plan.**

**The Plan Proponents are the Debtors, the Tort Claimants' Committee, the FCR, and the Imerys Plan Proponents.  The Plan Proponents believe that the Plan is in the best interests of all creditors of the Debtors.  The Plan Proponents recommend that all holders of Claims against the Debtors, whose votes are being solicited, submit Ballots to accept the Plan.**

## ARTICLE II.

## OVERVIEW OF THE PLAN

The following is a general overview of how the Plan treats all holders of Claims against, and Equity Interests in, the Debtors.  It is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, financial statements, and notes appearing elsewhere in this Disclosure Statement and in the Plan.  For a more detailed description of the terms and provisions of the Plan, please refer to Article VII of this Disclosure Statement titled "*The Plan of Reorganization.*"  Capitalized terms used in this Article II and not otherwise defined herein or in the Plan have the meanings ascribed to them in the Trust Distribution Procedures.

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Plan does not contemplate the substantive consolidation of the Debtors' Estates.  Instead, the Plan, although proposed jointly, constitutes a separate chapter 11 plan for

each of ITA, ITV, ITC, and ITI (to the extent ITI commences a proceeding under the Bankruptcy Code).

In developing the Plan, the Debtors engaged in good-faith, arms'-length negotiations with Imerys S.A., the Tort Claimants' Committee, and the FCR. The Debtors are pleased to report that both the Tort Claimants' Committee and the FCR support the Plan and are Plan Proponents.

2.1    Summary of the Trust Distribution Procedures and Other Plan Provisions Critical to Claimants Entitled to Vote in Class 4

(a)    *Overview*

The Trust Distribution Procedures divide Class 4 Talc Personal Injury Claims into three categories: (i) Ovarian Cancer A Claims; (ii) Mesothelioma Claims; and (iii) Ovarian Cancer B - D Claims; and allocates a fixed percentage of the Trust Fund and the Cyprus Contribution to each of these three Funds. Specifically, Fund A will receive a fixed allocation of 40% of the Trust Fund and 30.15% of the Cyprus Contribution; Fund B will receive a fixed allocation of 40% of the Trust Fund and 55% of the Cyprus Contribution; and Fund C will receive a fixed allocation of 20% of the Trust Fund and 14.85% of the Cyprus Contribution. The proposed allocation of the Cyprus Contribution, which the FCR continues to examine, remains subject to the terms sets forth in footnote 17 of this Disclosure Statement.

The Initial Payment Percentages attributed to each of the Funds will be within the following ranges:

- Fund A (Ovarian Cancer A Claimants): 0.40% to 2.34%;

- Fund B (Mesothelioma Claimants): 3.70% to 6.24%; and

- Fund C (Ovarian Cancer B – D Claimants): 0.30% to 1.48%.

As set forth in the Plan, on the Effective Date, liability for all Talc Personal Injury Claims shall be channeled to and assumed by the Talc Personal Injury Trust without further act or deed and shall be resolved in accordance with the Trust Distribution Procedures.

Foreign Claims are a subset of Talc Personal Injury Claims that will be channeled to and assumed by the Talc Personal Injury Trust and subject to the Channeling Injunction. The Trust Distribution Procedures provide that Foreign Claims will not receive any distributions from the Talc Personal Injury Trust.

Among the assets that will be transferred to the Talc Personal Injury Trust are the Debtors' rights under the J&J Indemnification Obligations, which rights may arguably constitute the most valuable assets of the Talc Personal Injury Trust. As further described in Section 8.1(a) of this Disclosure Statement and the Talc Personal Injury Trust Agreement, the Talc Trustees have the power to make, pursue (by litigation or otherwise), collect, compromise or settle, in the name of the Talc Personal Injury Trust, any claim, right, action, or cause of action included in the Talc Personal Injury Trust Assets or which may otherwise hereafter accrue in favor of the Talc Personal Injury Trust, including, but not limited to, insurance recoveries. *See* Talc Personal Injury Trust

4

Agreement, at § 2.1(c)(xv).  Before taking certain actions, however, the Talc Trustees must either consult with or obtain the consent of each of the FCR and the Trust Advisory Committee as set forth in the Talc Personal Injury Trust Agreement.  To the extent the Trust Advisory Committee and the FCR do not provide the necessary consent, there are resolution procedures in Section 7.13 of the Talc Personal Injury Trust Agreement which include alternative dispute resolution and application to the Bankruptcy Court.  The Talc Personal Injury Trust Agreement is explicit that in the event the Talc Trustees seek to approve any release or abandonment of J&J's indemnification obligations that they must have the consent of each of the Trust Advisory Committee and the FCR. *See id.* at § 2.2(f)(xvi).

(b)    *Examples of Potential Recoveries Under the Trust Distribution Procedures*

Under the Expedited Review process, the recovery of a holder of a Talc Personal Injury Claim that is resolved in favor of payment may be determined by multiplying the applicable Payment Percentage by the applicable Scheduled Value.  For example, using the range of Initial Payment Percentages set forth in Section 5.2(a)(iii) of the Trust Distribution Procedures, with respect to Trust Election Claims, Non-Indemnified Claims, and Mixed Claims seeking Expedited Review:

| Fund | Disease | Scheduled Value | Initial Payment Percentage Range | Distribution |
|---|---|---|---|---|
| Fund B | Mesothelioma A | $400,000 | 3.70% - 6.24% | $14,800 to $24,960 ($400,000 x 3.70% to $400,000 x 6.24%) |
| Fund B | Mesothelioma B | $400,000 | 3.70% - 6.24% | $14,800 to $24,960 ($400,000 x 3.70% to $400,000 x 6.24%) |
| Fund A | Ovarian Cancer A | $400,000 | 0.40% - 2.34% | $1,600 to $9,360 ($400,000 x 0.40% to $400,000 x 2.34%) |
| Fund C | Ovarian Cancer B | $260,000 | 0.30% - 1.48% | $780 to $3,848 ($260,000 x 0.30% to $260,000 x 1.48%) |
| Fund C | Ovarian Cancer C | $140,000 | 0.30% - 1.48% | $420 to $2,072 ($140,000 x 0.30% to $140,000 x 1.48%) |
| Fund C | Ovarian Cancer D | $60,000 | 0.30% - 1.48% | $180 to $888 ($60,000 x 0.30% to $60,000 x 1.48%) |

Under the Individual Review process, the same general concept is applicable, except that such Claims are also subject to Average Values and Maximum Values as set forth in Section 5.2(b)(vii) of the Trust Distribution Procedures.

2.2     General Overview

The North American Debtors commenced their Chapter 11 Cases in order to manage the significant potential liabilities arising from claims by plaintiffs alleging personal injuries caused by exposure to talc mined, processed and/or distributed by one or more of the North American Debtors. As of the Petition Date, one or more of the North American Debtors had been sued by approximately 14,650 claimants seeking damages for personal injuries allegedly caused by exposure to the North American Debtors' talc products, with the vast majority of such claims (approximately 98.6%) based on alleged exposure to cosmetic talc products. The vast majority of such claims (approximately 13,800) asserted OC Claims (as defined below), and the remainder (about 850) asserted Mesothelioma Claims (as defined below).

The Debtors' stated purpose of the Chapter 11 Cases is to confirm a plan of reorganization that will maximize the value of the Debtors' assets for the benefit of all stakeholders and, pursuant to sections 524(g) and 105(a) of the Bankruptcy Code, will include a trust mechanism to address Talc Personal Injury Claims in a fair and equitable manner. The Plan Proponents believe that the Plan accomplishes these goals.

Indeed, the Plan embodies a global settlement of issues (the "**Imerys Settlement**") among the Plan Proponents, which resolves all outstanding disputes between the Debtors, their Estates, the Imerys Non-Debtors (as defined below), the Tort Claimants' Committee, and the FCR, and provides for a significant contribution to the Talc Personal Injury Trust. The Imerys Settlement is described in detail below.

The Plan also implements a comprehensive settlement among the Debtors, on the one hand, and Rio Tinto America Inc. ("**Rio Tinto**"), on behalf of itself and the Rio Tinto Captive Insurers (as defined below), and for the benefit of the Rio Tinto Protected Parties, and Zurich American Insurance Company, in its own capacity and as successor-in-interest to Zurich Insurance Company, U.S. Branch ("**Zurich**"), on behalf of itself and for the benefit of the Zurich Protected Parties, on the other hand, and consented to by the Tort Claimants' Committee and the FCR (the "**Rio Tinto/Zurich Settlement**"). The Rio Tinto/Zurich Settlement finally resolves disputes over (i) alleged liabilities relating to the Rio Tinto Corporate Parties' (as defined below) prior ownership of the Debtors, (ii) alleged indemnification obligations of the Rio Tinto Corporate Parties, and (iii) the amount of coverage to which the Debtors claim to be entitled under the Talc Insurance Policies issued by the Zurich Corporate Parties and the Rio Tinto Captive Insurers. The Rio Tinto/Zurich Settlement will generate substantial recoveries for the holders of Talc Personal Injury Claims.

In addition, the Plan effectuates a global settlement (the "**Cyprus Settlement**") among (i) the Debtors, (ii) Cyprus Mines Corporation ("**Cyprus Mines**"), Cyprus Amax Minerals Company ("**CAMC**," and together with Cyprus Mines, "**Cyprus**"), and Freeport-McMoRan Inc. ("**Freeport**," and together with Cyprus, the "**Cyprus Parties**"), (iii) the Tort Claimants' Committee, and (iv) the FCR (collectively, the "**Cyprus Settlement Parties**"), which represents

a comprehensive resolution of all issues between and among the Cyprus Settlement Parties, and resolves (i) the treatment of Talc Personal Injury Claims relating to Cyprus, (ii) disputes between Cyprus and the Debtors regarding entitlement to certain insurance proceeds between Cyprus and the Debtors, and (iii) disputes between Cyprus and the Debtors regarding ownership of certain indemnification rights. The Cyprus Settlement, like the Imerys Settlement and the Rio Tinto/Zurich Settlement, provides a significant benefit to holders of Talc Personal Injury Claims.

Pursuant to the Plan, a Talc Personal Injury Trust will be established that will comply in all respects with the requirements of section 524(g)(2)(B)(i) of the Bankruptcy Code, and assume all Talc Personal Injury Claims. The Talc Personal Injury Trust will be funded with the Talc Personal Injury Trust Assets in order to resolve Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents. Moreover, remaining proceeds from the Sale (as defined below) will be used to fund the Talc Personal Injury Trust in accordance with the terms of the Plan. As further described in this Disclosure Statement, the Talc Personal Injury Trust will manage the Talc Personal Injury Trust Assets, and liquidate such assets to enable it to resolve Talc Personal Injury Claims pursuant to the Trust Distribution Procedures.

Under the Plan, holders of Allowed Unsecured Claims against the North American Debtors that are not Talc Personal Injury Claims will be paid in full.

Although ITI is not currently in bankruptcy, ITI will solicit acceptance of the Plan as a "prepackaged plan of reorganization" and if the Plan is approved by the requisite number and amount of holders of Talc Personal Injury Claims, it would provide for the permanent settlement of Talc Personal Injury Claims against ITI contemporaneously with the Talc Personal Injury Claims against the North American Debtors. Holders of Equity Interests in and Claims against ITI (other than holders of Talc Personal Injury Claims and Non-Debtor Intercompany Claims) will be Unimpaired, or otherwise "ride through," the Chapter 11 Cases.

(a)     *The Channeling Injunction*

The Channeling Injunction to be issued as part of the Plan will permanently and forever stay, bar, and enjoin holders of Talc Personal Injury Claims from taking any action for the purpose of directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Talc Personal Injury Claim other than from the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures, or as otherwise set forth in the Trust Distribution Procedures. Each holder of a Talc Personal Injury Claim will have no right whatsoever at any time to assert its Talc Personal Injury Claim against any Protected Party or any property or interest in property of any Protected Party. The Protected Parties include: (i) the Debtors and any Person who served as a director or officer of either Debtor at any time during the Chapter 11 Cases, but solely in such Person's capacity as such; (ii) the Reorganized Debtors; (iii) the Imerys Protected Parties; (iv) any Person, except for the Talc Personal Injury Trust, that, pursuant to the Plan or otherwise, after the Effective Date, becomes a direct or indirect transferee of, or successor to, the Debtors, the Reorganized Debtors, or any of their respective assets (but only to the extent that liability is asserted to exist as a result of its becoming such a transferee or successor); (v) the Buyer (as defined below) (but only to the extent that liability is asserted to exist as a result of its becoming a transferee or successor to the Debtors); (vi) the

7

Settling Talc Insurance Companies; (vii) the Rio Tinto Protected Parties; and (viii) the Cyprus Protected Parties (upon the Cyprus Trigger Date).[8]

The effect of "channeling" Talc Personal Injury Claims to the Talc Personal Injury Trust is that Talc Personal Injury Claims may only be pursued against, and resolved by, the Talc Personal Injury Trust and in connection with the Trust Distribution Procedures, or as otherwise set forth in the Trust Distribution Procedures. Following the Effective Date of the Plan, Talc Personal Injury Claims may not be asserted against the Debtors, the Reorganized Debtors, or any other Protected Party. For the avoidance of doubt, Talc Personal Injury Claims include Indirect Talc Personal Injury Claims and Talc Personal Injury Demands.

(b)    *Imerys Settlement*

To resolve the Debtors' Talc Personal Injury Claims the Plan incorporates a global settlement between the Plan Proponents that provides that, *inter alia*:

- the Debtors will commence a 363 sale process to sell substantially all assets of the North American Debtors (the "**Sale**") to one or more purchaser(s) (the "**Buyer**"), in which Imerys S.A. or its non-debtor affiliates (each, a "**Non-Debtor Affiliate**", and together with Imerys S.A., the "**Imerys Non-Debtors**") may participate in any auction as bidder, but will not be designated as a stalking horse purchaser (if any is selected);[9]

- in the event the Plan is properly accepted by holders of Talc Personal Injury Claims, ITI will commence a chapter 11 bankruptcy proceeding to be jointly administered (subject to Bankruptcy Court approval) with the North American Debtors' Chapter 11 Cases prior to the Confirmation Hearing;

- the equity interests in the North American Debtors will be canceled, and on the Effective Date, equity interests in the Reorganized North American Debtors will be authorized and issued to the Talc Personal Injury Trust; and

- the equity interests in ITI will be reinstated following the Effective Date, with approximately 99.66% of such equity interests retained by Mircal Italia S.p.A. ("**Mircal Italia**"), a Non-Debtor Affiliate.

---

[8]    The "**Cyprus Trigger Date**" means the later of (i) the later of the Effective Date or the date the Affirmation Order becomes a Final Order or (ii) the Cyprus Mines Plan Trigger Date. Further, the "**Cyprus Mines Plan Trigger Date**" means the later of (a) the effective date of the Cyprus Mines Plan (as defined below) or (b) the date the order of the District Court (as defined below) affirming confirmation of the Cyprus Mines Plan and issuing or affirming the issuance of the channeling injunction (as described in the Cyprus Mines Plan) in favor of the Cyprus Protected Parties thereunder becomes a Final Order.

[9]    As discussed in Section 6.4 of this Disclosure Statement, the Bankruptcy Court approved the Sale of substantially all of the Debtors' assets on November 17, 2020 to the Buyer pursuant to the Sale Order, for a purchase price consisting of: (i) $223,000,000 in cash consideration, and (ii) the assumption of the Assumed Liabilities (as defined in the Asset Purchase Agreement (as defined below)).

The Imerys Non-Debtors have agreed to make, or cause the Imerys Contribution to be made in exchange for the releases and channeling injunction benefiting the Imerys Protected Parties as contemplated pursuant to the Plan.  As further described below, the Imerys Contribution consists of four components, which include (i) the Imerys Settlement Funds, (ii) the Imerys Cash Contribution, (iii) the Talc Trust Contribution, and (iv) the Additional Contribution (each as defined below).  For the avoidance of doubt, the releases and the Channeling Injunction, if granted, would not release direct claims against the Imerys Protected Parties held by third parties that are unrelated to the Debtors' alleged talc liabilities.

Each of the Debtors, the Tort Claimants' Committee, and the FCR conducted extensive investigations into potential claims against Imerys S.A. and other entities for which Imerys S.A. is either a direct or indirect parent.  This investigation included, among other things, the review of tens of thousands of documents and numerous meetings over several months.  The Imerys Settlement is the result of that investigation and in the view of each of the Debtors, the Tort Claimants' Committee, and the FCR is fair and equitable and in the best interest of the Debtors, their Estates, and creditors.

### *Imerys Settlement Funds*

On, prior to, or as soon as reasonably practicable after the Effective Date, the Imerys Non-Debtors will contribute, or cause to be contributed, the Imerys Settlement Funds to the Debtors or the Reorganized Debtors, as applicable, which the Debtors or the Reorganized Debtors, as applicable, will contribute to the Talc Personal Injury Trust upon receipt.

The Imerys Settlement Funds consist of (i) $75 million, consisting of $74.5 million Cash and the Talc PI Note,[10] *plus* (ii) the Sale Proceeds, *plus* (iii) a contingent purchase price enhancement of up to $102.5 million, subject to the Cash value of the Sale Proceeds *provided* that in the event the Sale contemplated by and pursuant to the Sale Order closes, no contingent purchase price enhancement shall be payable, *less* (iv) if the DIP Order is entered, amounts required to pay the DIP Facility Claims pursuant to the terms of the DIP Loan Documents and Allowed by the DIP Order, *less* (v) if the DIP Order is not entered, Imerys S.A.'s reasonable and documented out-of-pocket costs and expenses of negotiation and preparation of the DIP Loan Documents estimated to be $400,000 as of December 10, 2020.  The contingent purchase price enhancement is described in <u>Section 6.4(b)</u> of this Disclosure Statement.

### *Imerys Cash Contribution*

As provided in the Plan, on or prior to the Effective Date, the Imerys Non-Debtors have agreed to contribute, or cause to be contributed, the following to the Debtors or the Reorganized Debtors, as applicable (the "**Imerys Cash Contribution**"):

(1)  the balance of that certain loan payable from the Imerys Non-Debtors to the North American Debtors (the "**Intercompany Loan**") totaling approximately $2.5 million as of December 31, 2020, for the purpose of

---

[10]  The value of the Talc PI Note is $500,000.

funding administrative expenses during the pendency of the Chapter 11 Cases, as well as certain of the Reserves;[11]

(2)     $5 million (less any amounts already paid and noted in an accounting to the Tort Claimants' Committee and the FCR) for payment of Allowed Claims in Class 3a through inclusion in the Reorganized North American Debtor Cash Reserve or the Disputed Claims Reserve, as applicable; and

(3)     the lesser of (x) $15 million and (y) fifty percent (50%) of the sum of (I) any administrative expenses paid by the Debtors with the proceeds of the DIP Facility *plus* (II) any administrative expenses paid by the Debtors from the Sale Closing Date through the Effective Date *plus* (III) any amounts necessary to fund all reserves, costs or expenses required in connection with the Debtors' emergence from bankruptcy separate from the Unsecured Claim Contribution (the "**Contingent Contribution**"); *provided* that if the Plan is confirmed before June 25, 2021 and the Sale does not close before the Effective Date (such that the DIP Facility Claims have been satisfied in full from the Sale Proceeds and discharged in accordance with the DIP Loan Documents), then (A) the outstanding principal amount of any DIP Loans (excluding any PIK Interest (as defined in the DIP Loan Documents)) shall be applied as a dollar-for-dollar reduction of the amount of the Contingent Contribution required to be contributed by Imerys S.A. to the Debtors or the Reorganized Debtors (in an amount not to exceed $15,000,000), and (B) the remaining outstanding principal amount of any DIP Loans (excluding any PIK Interest), after giving effect to the application in clause (A) above, shall be applied as a dollar-for dollar reduction of the $75 million in Cash that is part of the Imerys Settlement Funds.

### *Talc Trust Contribution*

In addition to the Imerys Cash Contribution, the Imerys Non-Debtors have agreed to contribute, or cause to be contributed, the following to the Talc Personal Injury Trust (the "**Talc Trust Contribution**") on or prior to the Effective Date:

(1)     rights and interests of the Imerys Non-Debtors to the proceeds of the Shared Talc Insurance Policies and all rights against third parties held by the Imerys Non-Debtors relating to Talc Personal Injury Claims, including any related indemnification rights, which for the avoidance of doubt include the J&J Indemnification Obligations, each of which is to be identified in the Plan Supplement (the "**Contributed Indemnity and Insurance Interests**"); and

---

[11]     In connection with the contribution of the balance of the Intercompany Loan, the Imerys Non-Debtors have agreed to waive certain setoff rights in the amount of $13,672,414.39.  The Intercompany Loan was valued at approximately $30 million on the Petition Date, however it has been drawn down during the Chapter 11 Cases.

US-DOCS\120811663.4

(2)    a Pledge Agreement to be issued by Mircal Italia pursuant to which the Talc Personal Injury Trust will be granted an Encumbrance entitling the Talc Personal Injury Trust to fifty-one percent (51%) of the common stock of ITI in the event of a default under the Talc PI Note (the "**Talc PI Pledge Agreement**").

### The Additional Contribution

Finally, in addition to the Imerys Cash Contribution and the Talc Trust Contribution, on or prior to the Effective Date, the Imerys Non-Debtors have agreed to take the following actions (the "**Additional Contribution**"):

(1)    waive all Non-Debtor Intercompany Claims against the Debtors; and

(2)    unless otherwise assumed by the Buyer, assume any Pension Liabilities of the North American Debtors through and after the Effective Date of the Plan.

The Imerys Settlement is further described in Articles VI and VII of this Disclosure Statement.

(c)    *Rio Tinto/Zurich Settlement*

The Plan incorporates the Rio Tinto/Zurich Settlement, a comprehensive settlement among the Debtors, on the one hand, and Rio Tinto, on behalf of itself and the Rio Tinto Captive Insurers, and for the benefit of the Rio Tinto Protected Parties, and Zurich, on behalf of itself and for the benefit of the Zurich Protected Parties, on the other hand, and consented to by the Tort Claimants' Committee and the FCR, to resolve Talc Personal Injury Claims and the Rio Tinto/Zurich Released Claims (as defined below) against the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties (as applicable, and subject to the limitations provided in the Plan). The Rio Tinto/Zurich Settlement provides, *inter alia*, that:

- Zurich will buy back any and all of the Debtors' rights under Talc Insurance Policies issued by the Zurich Corporate Parties, free and clear of any rights of third parties, pursuant to section 363 of the Bankruptcy Code, and Three Crowns Insurance Company (formerly known as Three Crowns Insurance Company Limited), Metals & Minerals Company Pte. Ltd., and Falcon Insurance Ltd. (collectively, or individually, as appropriate, the "**Rio Tinto Captive Insurers**") will buy back any and all of the Debtors' rights under Talc Insurance Policies issued by the Rio Tinto Captive Insurers, free and clear of any rights of third parties, pursuant to section 363 of the Bankruptcy

Code, as set out in the Plan and in the Rio Tinto/Zurich Settlement Agreement, which is attached as Exhibit C to the Plan;[12] and

- the Rio Tinto Protected Parties and the Zurich Protected Parties will be released from the Rio Tinto/Zurich Released Claims and the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties will receive the benefit of the Channeling Injunction and related injunctive protections under the Plan, which will be effective after the Rio Tinto/Zurich Contribution (as defined in the Plan) is made to the Talc Personal Injury Trust.

Rio Tinto (on behalf of itself and the Rio Tinto Captive Insurers and for the benefit of the Rio Tinto Protected Parties) and Zurich (on behalf of itself and for the benefit of the Zurich Protected Parties) will contribute $340 million in Cash (as detailed below), along with certain rights of indemnification, contribution, and/or subrogation against third parties, to the Talc Personal Injury Trust, as follows:

- On or prior to the date that is thirty (30) days after the Rio Tinto/Zurich Trigger Date,[13] Zurich will contribute, or cause to be contributed, $260 million in Cash to the Talc Personal Injury Trust.

- On or prior to the date that is fourteen (14) days after the Rio Tinto/Zurich Trigger Date, Rio Tinto will contribute $80 million in Cash to the Talc Personal Injury Trust.

- On the Rio Tinto/Zurich Trigger Date, or as soon as reasonably practicable thereafter (not to exceed three (3) Business Days), the appropriate Rio Tinto Corporate Parties and the appropriate Zurich Corporate Parties shall each execute and deliver to the Talc Personal Injury Trust, in a form reasonably acceptable to the Talc Personal Injury Trust, an assignment to the Talc Personal Injury Trust of (i) all of their rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to the payment or defense of any Talc Personal Injury Claim or any past talc-related claim against the Debtors prior to the Effective Date, and (ii) all of their other rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to any Talc Personal Injury Claim.

---

[12]    The Zurich Policies and the Rio Tinto Captive Insurer Policies (each as defined below), including the amount of available insurance remaining under those policies, are further discussed in Article IV of this Disclosure Statement.

[13]    The "**Rio Tinto/Zurich Trigger Date**" is the date that the Tort Claimants' Committee or the Talc Personal Injury Trust provides Rio Tinto and/or Zurich (as applicable) with notice of the occurrence of the later of (a) the Effective Date, or (b) the date the Affirmation Order becomes a Final Order.

The Rio Tinto/Zurich Settlement is further described in Articles VI and VII of this Disclosure Statement.

(d)     *The Cyprus Settlement*

In December 2020, the Cyprus Parties, the Debtors, the Tort Claimants' Committee, and the FCR agreed to the terms of the Cyprus Settlement, which resolves (i) the talc personal injury claims and the Cyprus Released Claims (as defined below) against the Cyprus Protected Parties, (ii) disputes between Cyprus and the Debtors pertaining to the Debtors' rights to the Cyprus Talc Insurance Policies,[14] and (iii) disputes between Cyprus and the Debtors pertaining to the Debtors' and Cyprus' rights to indemnification by J&J.  The Cyprus Settlement provides, *inter alia*, that:

- the Cyprus Settlement will be implemented through two chapter 11 plans – (i) the Plan filed in the Chapter 11 Cases and (ii) a chapter 11 plan to be filed by Cyprus Mines (the "**Cyprus Mines Plan**") in a case under chapter 11 of the Bankruptcy Code to be commenced by Cyprus Mines in the United States Bankruptcy Court for the District of Delaware (the "**Cyprus Mines Bankruptcy**");

- CAMC, pursuant to an unsecured seven-year promissory note and for and on behalf of itself, Cyprus Mines, and all other Cyprus Protected Parties, will pay a total of $130 million to the Talc Personal Injury Trust in seven installments, which shall be guaranteed by Freeport, with the first installment paid within thirty (30) days of the Cyprus Trigger Date;

- upon the occurrence of the Cyprus Trigger Date, and in accordance with the terms of Cyprus Settlement Agreement, the Cyprus Protected Parties (as applicable) will assign the Cyprus Talc Insurance Policy Rights[15] to the Talc Personal Injury Trust;

---

[14]     "**Cyprus Talc Insurance Policy**" means any liability insurance policy (i) that was issued prior to June 30, 1992, (ii) that is currently or was previously in effect at any time on or before the Effective Date, (iii) as to which there has not been a complete release of coverage for Talc Personal Injury Claims, and (iv) that names any Cyprus Protected Party as an insured (whether as the primary or additional insured, or by virtue of being a parent or subsidiary of the named insured) or that is otherwise alleged to afford any Cyprus Protected Party insurance coverage for any Talc Personal Injury Claim or any other claims channeled to the Talc Personal Injury Trust. The Cyprus Talc Insurance Policies include, but are not limited to, the policies set forth on Schedule VIII of the Plan.

[15]     "**Cyprus Talc Insurance Policy Rights**" means (a) all rights, Claims, benefits, or causes of action held by the Cyprus Protected Parties with respect to the Cyprus Talc Insurance Policies, including the right to receive proceeds; and (b) all rights, Claims, or causes of action held by the Cyprus Protected Parties, including the right to receive proceeds, with respect to any settlement agreements or coverage-in-place agreements to the extent those agreements amend, modify, replace, or govern the rights and obligations of, and the coverage afforded to, any or all of the Cyprus Protected Parties under any Cyprus Talc Insurance Policy.  For the avoidance of doubt, subject to Section 6.1 of the Cyprus Settlement Agreement, the right to receive proceeds under any such agreements will not apply to any proceeds paid to a Cyprus Protected Party under such agreements prior to the Cyprus Trigger Date.

- upon the occurrence of the Cyprus Trigger Date, and in accordance with the terms of Cyprus Settlement Agreement, the Talc Personal Injury Trust will assume all present and future obligations associated with recovering proceeds under the Cyprus Talc Insurance Policies, *provided* that (i) solely to the extent that the Talc Personal Injury Trust asserts any claim as assignee of a Cyprus Protected Party bound by the PDC Agreement,[16] the Talc Personal Injury Trust shall abide by the terms of the PDC Agreement and (ii) unless otherwise stated in the Plan or the Cyprus Settlement Agreement, such obligations shall not include any obligations undertaken by any Cyprus Protected Party in any settlement agreement or other contract compromising or releasing any rights under any Cyprus Talc Insurance Policy;

- upon the occurrence of the Cyprus Trigger Date, and in accordance with the terms of Cyprus Settlement Agreement, the appropriate Cyprus Protected Parties shall each execute and deliver to the Talc Personal Injury Trust, in a form reasonably acceptable to the Talc Personal Injury Trust, an assignment to the Talc Personal Injury Trust of: (i) all of their rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), reimbursement, or subrogation against any Person relating to the payment or defense of any Talc Personal Injury Claim or other past talc-related claim channeled to the Talc Personal Injury Trust prior to the Cyprus Trigger Date (the "**Cyprus Credits**"), and (ii) all of their rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), reimbursement, or subrogation against any Person relating to any other Talc Personal Injury Claim or other claims channeled to the Talc Personal Injury Trust (the "**Cyprus Future Credits**"); *provided*, *however*, that the assertion of the Cyprus Credits or Cyprus Future Credits against a Protected Party shall be subject to the Channeling Injunction and nothing herein shall impact the injunctions and releases otherwise inuring to the benefit of the Cyprus Protected Parties under the terms of the Plan or the Cyprus Mines Plan; *provided further* that, for the avoidance of doubt, the foregoing shall not include, and the assignment of such rights shall not impair, the rights of any Talc Insurance Company; and

- the Plan and the Cyprus Mines Plan will include the broadest releases and channeling injunctions permitted by sections 105(a), 524(g), and 1141(d)(1) of the Bankruptcy Code so as to prevent the assertion of any further talc-related claims against the Cyprus Protected Parties.

At this time, Mr. Patton has been approached and has agreed to serve as the prepetition future claimants' representative. He has engaged Young Conaway (as defined below) as his lead counsel, and co-retained Gilbert LLP with the prepetition committee as prepetition special insurance counsel. Separately, a prepetition committee made up of eight (8) firms that each

---

[16]     The "**PDC Agreement**" is the letter agreement by and between Phelps Dodge Corporation, on the one hand, and BP Amoco Corporation, on the other hand, entered into on February 28, 2000.

represent holders of one or more talc personal injury claims against Cyprus Mines has been formed. The prepetition committee has engaged Robinson & Cole LLP as lead counsel, Willkie Farr & Gallagher LLP as special litigation and corporate counsel, and co-retained Gilbert LLP with the proposed future claimants' representative as special insurance counsel. Pursuant to Section 7.1 of the Cyprus Settlement Agreement, Cyprus Mines shall pay the reasonable fees and expenses of such professionals incurred on or after December 22, 2020, in connection with preparation for Cyprus Mines' bankruptcy case, including preparation of its plan, disclosure statement, and related documents.

The Cyprus Settlement is further described in Articles VI and VII of this Disclosure Statement.

(e)     *Talc Personal Injury Trust*

The Plan contemplates the establishment of a Talc Personal Injury Trust that will assume all Talc Personal Injury Claims and resolve Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents. The Talc Personal Injury Trust Documents include the Talc Personal Injury Trust Agreement, the Trust Distribution Procedures, the Cooperation Agreement, and all other agreements, instruments, and documents governing the establishment, administration, and operation of the Talc Personal Injury Trust. The Trust Distribution Procedures are attached to the Plan as Exhibit A, the Talc Personal Injury Trust Agreement is attached to the Plan as Exhibit B, and the Cooperation Agreement and other Talc Personal Injury Trust Documents will be included in the Plan Supplement.

On the Effective Date (unless otherwise noted below), the Talc Personal Injury Trust will receive the Talc Personal Injury Trust Assets, which include:

- the Imerys Settlement Funds;

- the right to receive the Rio Tinto/Zurich Contribution pursuant to the Rio Tinto/Zurich Settlement;

- the right to receive the Cyprus Contribution pursuant to the Cyprus Settlement, subject to the terms of the Cyprus Settlement Agreement and conditioned upon occurrence of the Cyprus Trigger Date;[17]

---

[17]     For the avoidance of doubt, the rights of any Cyprus Protected Parties under the J&J Agreements (as defined below), including any J&J Indemnification Obligations, or under any Cyprus Talc Insurance Policy or with respect to the Talc Insurance Actions, shall not constitute Talc Personal Injury Trust Assets for any purpose until the occurrence of the Cyprus Trigger Date (and then as provided for under the Cyprus Settlement).

The Tort Claimants' Committee has proposed the following allocation of the Cyprus Contribution after extensive internal deliberations: (a) 55% will be allocated to Mesothelioma Claimants; and (b) 45% will be allocated to Ovarian Cancer Claimants. As between the Ovarian Cancer Claimants, 30.15% of the Cyprus Contribution will be allocated to and become part of Fund A and 14.85% of the Cyprus Contribution will become part of Fund C. The FCR continues to examine the proposed allocation. Solely for purposes of this negotiated allocation, the Cyprus Contribution is deemed to include all rights and obligations under the Cyprus Talc Insurance Policies. For the avoidance of doubt, nothing in the Plan Documents shall be

- the balance of the Intercompany Loan not otherwise used to fund the Reserves or pay administrative expenses during the pendency of the Chapter 11 Cases;

- the balance of the $5 million used for the payment of Allowed Claims in Class 3a not otherwise used to fund the (i) Reorganized North American Debtor Cash Reserve or (ii) the Disputed Claims Reserve;

- all non-Cash assets included in the Imerys Contribution, including the Contributed Indemnity and Insurance Assets;

- all Cash held by the North American Debtors on the Effective Date, not including the Cash used to fund the Reserves;

- all Cash remaining in the Reserves to the extent required by the Plan, if any (to be distributed to the Talc Personal Injury Trust in accordance with the Plan);[18]

- the Talc Personal Injury Trust Causes of Action[19] and any and all proceeds thereof;

- the Talc Insurance Actions and the Talc Insurance Action Recoveries;

- the rights of the Debtors with respect to the Talc Insurance Policies, the Talc Insurance CIP Agreements, the Talc Insurance Settlement Agreements, and Claims thereunder;

- the Reorganized North American Debtor Stock;[20]

---

interpreted as an admission, or adjudication on the merits of any disputed issue related to the Cyprus Talc Insurance Policies, including, but not limited to, the disputed rights at issue in the Cyprus Insurance Adversary Proceeding.

Consummation of the proposed allocation of the Cyprus Contribution remains subject to: (i) approval of any tort claimants' committee to be appointed in the Cyprus Mines Bankruptcy; (ii) approval of any future claimants' representative to be appointed in the Cyprus Mines Bankruptcy; (iii) approval by the Bankruptcy Court in the Debtors' Chapter 11 Cases; (iv) approval by the bankruptcy court in the Cyprus Mines Bankruptcy; (v) the Effective Date; and (vi) the Cyprus Trigger Date.

The final allocation will be served on any party that has filed an appearance requesting notices in the Chapter 11 Cases and any party that receives a Ballot to vote in the Chapter 11 Cases. The Trust Distribution Procedures may be amended as appropriate to address the Cyprus Contribution and the Cyprus Mines Plan, as set forth in footnote 1 therein.

[18]    Subject to the foregoing, all excess Cash balances in the Reserves will be disbursed to the Talc Personal Injury Trust pursuant to the terms of the Plan.

[19]    Talc Personal Injury Trust Causes of Action include certain claims and causes of action held or assertable by the Debtors that will be transferred to the Talc Personal Injury Trust pursuant to the Plan.

[20]    The value of the Reorganized North American Debtor Stock will be dependent upon the value of the property held by the Reorganized North American Debtors following the Effective Date, which is anticipated to primarily consist of the post-Effective Date balances of the Reserves and the North American Debtor Causes of Action. Furthermore, it is contemplated that certain of the North American Debtor Causes of Action may be included in the Sale. For the avoidance of doubt, the North American Debtor Causes of Action do not include Talc Personal Injury Trust Causes of Action. The Debtors do not believe that the North American Debtor Causes of Action have significant value.

16

- any and all other funds, proceeds, or other consideration otherwise contributed to the Talc Personal Injury Trust pursuant to the Plan and/or the Confirmation Order or other order of the Bankruptcy Court;

- the rights of the Debtors with respect to the J&J Indemnification Obligations;[21] and

- the income or earnings realized or received in respect of the foregoing.

For the reasons detailed in this Disclosure Statement, the Plan Proponents believe that there will be substantially more assets available to resolve Talc Personal Injury Claims under the Plan than would be the case if there were a chapter 7 liquidation. As a result of the Imerys Settlement, the Rio Tinto/Zurich Settlement, and the Cyprus Settlement, the Imerys Non-Debtors, Rio Tinto, Zurich, and Cyprus, respectively, are contributing substantial assets to the Talc Personal Injury Trust, which would not be otherwise available for holders of Talc Personal Injury Claims, as it is unlikely that any of those entities would proceed with the settlements set forth in the Plan and Disclosure Statement in the absence of the Injunctions. Also, pursuing litigation with such entities would be costly and time consuming for the Debtors' Estates and would carry litigation risk. In addition, the Imerys Settlement paved the way for a value-maximizing sale process that, pending the close of the Sale, will fund these cases and allow for remaining proceeds to be available for distribution to holders of Talc Personal Injury Claims. The Plan Proponents also believe that conversion of the Chapter 11 Cases to chapter 7 liquidation proceedings would substantially impact the costs and efficiency of administering the Talc Personal Injury Claims compared to the Talc Personal Injury Trust. For these and other reasons explained in detail herein, the Plan Proponents believe that all holders of Talc Personal Injury Claims, the only Class entitled to vote, should vote to accept the Plan.

2.3    <u>Summary Description of Classes and Treatment</u>

Except for Administrative Claims, DIP Facility Claims, and Priority Tax Claims, which are not required to be classified, all Claims and Equity Interests are divided into classes under the Plan. The following chart summarizes the treatment of such classified and unclassified Claims and Equity Interests under the Plan. This chart is only a summary of such classification and treatment and reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests. The Plan Proponents reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

The summary of classification and treatment of Claims against and Equity Interests in the Debtors is as follow:

---

[21]    As further described in Article XII of this Disclosure Statement, the ability of the Debtors to transfer the J&J Indemnification Obligations to the Talc Personal Injury Trust is disputed by J&J, and J&J believes it has substantial defenses to the J&J Indemnification Obligations. Each of the Plan Proponents disagrees that J&J has any defenses to its indemnification obligations to the Debtors.

| Class | Designation[22] | Applicable Debtor(s) | Treatment | Impairment and Entitlement to Vote | Estimated Recovery |
|-------|-----------------|----------------------|-----------|-------------------------------------|--------------------|
| 1 | Priority Non-Tax Claims | North American Debtors and ITI | Each holder of an Allowed Priority Non-Tax Claim shall receive Cash equal to the Allowed Amount of such Priority Non-Tax Claim. | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | 100% |
| 2 | Secured Claims | North American Debtors and ITI | All Allowed Secured Claims in Class 2 shall be treated pursuant to one of the following alternatives on the Distribution Date: (i) payment in full in Cash in accordance with section 506(a) of the Bankruptcy Code; (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code; (iii) such other treatment as the Debtor and the holder shall agree; or (iv) such other treatment as may be necessary to render such Claim Unimpaired. | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | 100% |

---

[22]    The Plan Proponents reserve the right to eliminate any Class of Claims in the event they determine that there are no Claims in such Class.

| Class | Designation[22] | Applicable Debtor(s) | Treatment | Impairment and Entitlement to Vote | Estimated Recovery |
|-------|-----------------|----------------------|-----------|-------------------------------------|--------------------|
| 3a | Unsecured Claims Against the North American Debtors | North American Debtors | Each holder of an Allowed Unsecured Claim against the North American Debtors shall be paid the Allowed Amount of its Unsecured Claim on the Distribution Date. Such payment shall be (i) in full, in Cash, plus post-petition interest at the federal judgment rate in effect on the Petition Date, or (ii) upon such other less favorable terms as may be mutually agreed upon between the holder of the Unsecured Claim and the applicable North American Debtor or Reorganized North American Debtor. | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | 100% |
| 3b | Unsecured Claims Against ITI | ITI | The legal, equitable, and contractual rights of the holders of Unsecured Claim against ITI are unaltered by the Plan. Except to the extent that a holder of an Unsecured Claim against ITI agrees to a different treatment, on and after the Effective Date, Reorganized ITI will continue to pay or dispute each Unsecured Claim in the ordinary course of business in accordance with applicable law. | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | 100% |
| 4 | Talc Personal Injury Claims[23] | North American Debtors and | On the Effective Date, liability for all Talc Personal Injury Claims | Impaired<br><br>(Entitled to | The Initial Payment Percentages are estimated in the following ranges: (1) |

_____

[23]      The Talc Personal Injury Claims will be resolved pursuant to the terms of the Trust Distribution Procedures.  The estimated recovery for Foreign Claims is 0%.

| Class | Designation[22] | Applicable Debtor(s) | Treatment | Impairment and Entitlement to Vote | Estimated Recovery |
|-------|-----------------|----------------------|-----------|-------------------------------------|---------------------|
| | | ITI | shall be channeled to and assumed by the Talc Personal Injury Trust without further act or deed and shall be resolved in accordance with the Trust Distribution Procedures. Pursuant to the Plan and the Trust Distribution Procedures, each holder of a Talc Personal Injury Claim shall have its Claim permanently channeled to the Talc Personal Injury Trust, and such Claim shall thereafter be resolved in accordance with the Trust Distribution Procedures. Foreign Claims are a subset of Talc Personal Injury Claims that will be channeled to and assumed by the Talc Personal Injury Trust and subject to the Channeling Injunction; however, the Trust Distribution Procedures provide that Foreign Claims will not receive any distributions from the Talc Personal Injury Trust. | Vote) | Fund A (Ovarian Cancer A Claimants): 0.40% to 2.34%; (2) Fund B (Mesothelioma Claimants): 3.70% to 6.24%; and (3) Fund C (Ovarian Cancer B – D Claimants): 0.30% to 1.48%. _____ The Trust Distribution Procedures include provisions that would permit a subsequent modification of Payment Percentages on a Claim category by Claim category basis.[24] |

---

[24]    For a discussion of issues raised by certain objecting parties pertaining to the different treatment of these three categories of Claims in Class 4 under the Trust Distribution Procedures, please see Section 12.2 of this Disclosure Statement.

US-DOCS\120811663.4

| Class | Designation[22] | Applicable Debtor(s) | Treatment | Impairment and Entitlement to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| 5a | Non-Debtor Intercompany Claims | North American Debtors and ITI | On or after the Effective Date, all Non-Debtor Intercompany Claims (*i.e.*, a Claim held by a Non-Debtor Affiliate against a Debtor) shall be canceled, discharged, or eliminated.<br><br>Although Non-Debtor Intercompany Claims are Impaired, each holder of an Allowed Claim in Class 5a has consented to its treatment under the Plan as a Plan Proponent and is therefore presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. | Impaired<br><br>Not Entitled to Vote (Presumed to Accept) | 0% |
| 5b | Debtor Intercompany Claims | North American Debtors and ITI | At the election of the applicable Debtor, each Debtor Intercompany Claim (*i.e.*, a Claim held by a Debtor against another Debtor) shall (i) be reinstated, (ii) remain in place, and/or (iii) with respect to certain Debtor Intercompany Claims in respect of goods, services, interest, and other amounts that would have been satisfied in Cash directly or indirectly in the ordinary course of business had they not been outstanding as of the Petition Date, be settled in Cash. | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | 100% |

| Class | Designation[22] | Applicable Debtor(s) | Treatment | Impairment and Entitlement to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| 6 | Equity Interests in the North American Debtors | North American Debtors | On the Effective Date, all Equity Interests in the North American Debtors shall be canceled, annulled, and extinguished. Although Equity Interests in the North American Debtors are Impaired, each holder of an Allowed Equity Interest in Class 6 has consented to its treatment under the Plan as a Plan Proponent and is therefore presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. | Impaired Not Entitled to Vote (Presumed to Accept) | Cancelled |
| 7 | Equity Interests in ITI | ITI | On the Effective Date, all Equity Interests in ITI shall be reinstated and the legal, equitable, and contractual rights to which holders of Equity Interests in ITI are entitled shall remain unaltered to the extent necessary to implement the Plan. | Unimpaired Not Entitled to Vote (Presumed to Accept) | Reinstated |

2.4   The Plan Supplement

Unless otherwise ordered by the Bankruptcy Court, the Plan Proponents will file the Plan Supplement with the Bankruptcy Court no later than February 5, 2021. The Plan Supplement will include: (a) the list of Executory Contracts and Unexpired Leases to be assumed by the North American Debtors, together with the Cure Amount for each such contract or lease; (b) the list of Executory Contracts and Unexpired Leases to be assumed by ITI, together with the Cure Amount for each such contract or lease; (c) a list of the Executory Contracts and Unexpired Leases to be rejected by ITI; (d) a list of the Settling Talc Insurance Companies; (e) a list of the North American Debtor Causes of Action; (f) a list of the ITI Causes of Action; (g) a list of the Contributed Indemnity and Insurance Interests; (h) the Cooperation Agreement; (i) the Amended Charter Documents; (j) the list of officers and directors of the Reorganized North American Debtors; (k) the Talc PI Note; (l) the Talc PI Pledge Agreement; (m) the identity of the initial Talc Trustees and their compensation; and (n) a list of the Talc Insurance Policies; *provided* that the Plan

22

Documents listed in subsections (d), (g), (h), (i), (j), (k), and (l) shall each be in form and substance acceptable to each of the Plan Proponents; *provided further* that the Plan Documents listed in subsections (a), (b), and (c) will be revised as needed, subject to Article V of the Plan, to take into account any additional Executory Contracts and Unexpired Leases to be assumed or rejected in advance of the Confirmation Hearing.  The Plan Supplement will be served only on those parties that have requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 and any party in interest who requests in writing a copy from counsel for the Debtors; *provided* that the Plan Documents listed in subsection (m) above will be filed and served on all parties receiving Ballots.  In addition, copies of all Executory Contract and Unexpired Lease exhibits will be served on the applicable counterparties to such Executory Contracts and Unexpired Leases.  Once the Plan Supplement is filed, a copy will also be available for review on the Claims Agent's website free of charge at https://cases.primeclerk.com/ImerysTalc/ by clicking the link for "Plan & Disclosure Statement."

As provided in the Plan, certain documents included in the Plan Supplement may be revised prior to Confirmation.  For example, the list of Executory Contracts and Unexpired Leases to be assumed by the North American Debtors will be revised as needed to take into account additional Executory Contracts and Unexpired Leases to be assumed in advance of the Confirmation Hearing.  On or before February 5, 2021, the Debtors shall serve copies of the lists of Executory Contracts and Unexpired Leases provided for in the Plan Supplement on the applicable counterparties.  Additionally, the Debtors will serve any revised Executory Contract and Unexpired Lease list on affected counterparties within two (2) days of filing such lists, *provided that* each counterparty to an Executory Contract or Unexpired Lease that (i) is later added to the list and/or (ii) has its Cure Amount modified by the Debtors shall have until the date that is fourteen (14) days after the Debtors serve such counterparty with notice thereof to object to the assumption of its Executory Contract or Unexpired Lease pursuant to the Plan, including any objection as to adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code, and, if the proposed Cure Amount has been modified, exclusively to the proposed Cure Amount.

## ARTICLE III.

## GENERAL INFORMATION

This Article III provides a general overview of the North American Debtors' and ITI's corporate history, business operations, organizational structures, and assets.  It also discusses the events leading to the filing of the Chapter 11 Cases.

3.1    <u>History and Business, Organizational Structure, and Assets of the North American Debtors</u>

(a)    *Corporate History*

The Debtors were acquired in 2011 (the "**2011 Purchase**") by an Imerys Group[25] holding company, Mircal S.A. ("**Mircal**").  Mircal entered into an agreement with Rio Tinto to purchase

---

[25]    The Imerys Group is a French multinational corporation comprised of over 360 affiliated entities directly and indirectly owned by Imerys S.A.

the stock of the Rio Tinto Corporate Parties' talc operations,[26] including the stock of Luzenac America, Inc. ("**Luzenac America**") and Windsor Minerals, Inc. ("**Windsor**").[27]  The stock purchase agreement entitled Mircal to substitute other members of the Imerys Group to acquire individual talc-related entities from the Rio Tinto Corporate Parties, and Mircal exercised that right to cause Imerys Minerals Holding Limited (UK), an indirect, non-debtor subsidiary of Imerys S.A., to acquire the outstanding shares of Luzenac America.  At the same time, Mircal also acquired the stock of Luzenac, Inc. ("**Luzenac**"), which is now known as ITC, from another member of the Rio Tinto Corporate Parties, QIT Fer & Titane, Inc.  Mircal remains the direct parent entity of ITC. Luzenac America, Windsor, and Luzenac subsequently changed their names to ITA, ITV, and ITC, respectively.[28]

At the time of the 2011 Purchase there were only approximately eight Talc Personal Injury Claims pending against one or more of the Debtors, each of which was in the early stages of litigation.  Since then, the number of suits has increased significantly, with over 16,000 on or prior to Petition Date.

(b)     *North American Debtors' Operations*

The Debtors are in the business of mining, processing, selling, and/or distributing talc.  Talc is mined from talc deposits, which were geologically formed through the transformation of existing rocks under the effect of hydrothermal fluids carrying one or several of the components needed to form the mineral.  There are many types of talc and each ore body has its own features and geology. Accordingly, the mining and processing of talc requires highly-technical and specialized knowledge.  Talc is used in the manufacturing of dozens of products in a variety of sectors, including coatings, rubber, paper, polymers, cosmetics, food, and pharmaceuticals.

The operations of the North American Debtors include talc mines, plants, and distribution facilities located in: Montana (Yellowstone, Sappington, and Three Forks); Vermont (Argonaut and Ludlow); Texas (Houston); and Ontario, Canada (Timmins, Penhorwood, and Foleyet).  Talc sold by the North American Debtors is utilized in numerous products, including, but not limited to: polymers; paper; paints and coatings; specialties; rubber; personal care/cosmetics; building materials; and others.  ITA and ITV sell talc directly to their customers as well as to third party

---

[26]     As used herein, "**Rio Tinto Corporate Parties**" means Rio Tinto plc, Rio Tinto Limited, and the Persons listed on <u>Schedule IV</u> attached to the Plan, each of which is directly or indirectly controlled by Rio Tinto plc and/or Rio Tinto Limited, and the future successors or assigns of Rio Tinto plc, Rio Tinto Limited, and/or the Persons listed on <u>Schedule IV</u> attached to the Plan, solely in their capacity as such.

[27]     The Debtors have been owned by various entities over their 100-year history.  In 1989, Johnson & Johnson sold the stock of Windsor, which is now known as ITV, to Cyprus Mines.  In 1992, Cyprus Mines and its affiliates transferred such stock and all of their other assets in the talc business to a newly formed subsidiary, Cyprus Talc Corporation ("**CTC**").  As a result of this transaction, Windsor became a wholly-owned subsidiary of CTC.  Contemporaneously with the 1992 transfer, RTZ America, Inc. purchased the outstanding shares of CTC.  Also in 1992, CTC was renamed Luzenac America, which is now known as ITA.  Windsor continued to remain a wholly-owned subsidiary of Luzenac America.

[28]     A timeline of the ownership history of each of the North American Debtors is included in the *Declaration of Alexandra Picard, Chief Financial Officer of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 10] (the "**First Day Declaration**").

US-DOCS\120811663.4

and affiliate distributors.  ITC exports the vast majority of its talc into the United States almost entirely on a direct basis to its customers.

As of the Petition Date, approximately 5% of the North American Debtors' revenues were from talc sales in the United States for personal care/cosmetic applications.  In addition, as of the Petition Date, the North American Debtors' top customers in the personal care/cosmetic sector were manufacturers of baby powder (50% of personal care sales), makeup (30% of personal care sales), and soap (20% of personal care sales).  Although there are other talc suppliers in the market, the North American Debtors were historically the sole supplier of cosmetic talc to J&J.[29]  The Debtors report that although personal care/cosmetic sales make up only a minor percentage of the North American Debtors' revenue, nearly all of the pending Talc Personal Injury Claims allege injuries based on use of cosmetic products containing talc, though some claims also allege injuries based on exposure to talc in an industrial setting.

Together, the North American Debtors are the market leader with respect to talc production in North America, representing nearly 50% of the market.  Their main competitors are the following companies: Mineral Technologies Inc., American Talc Company, Inc., IMI Fabi, and Cimbar.

        (c)    *Existing Organizational Structure and Ongoing Businesses*

The North American Debtors continue to mine, process, and distribute talc, utilizing a core group of executives and staff personnel who are assisted by specialized outside professionals and consultants.

As of October 31, 2020, the North American Debtors employed approximately 277 employees – 177 by ITA, 28 by ITV, and 72 by ITC.  These employees are located at the North American Debtors' offices in Roswell, Georgia, and talc mines, plants, and distribution facilities in Montana, Vermont, Texas, and Ontario, Canada.[30]  Approximately 98 of the employees are salaried employees and approximately 179 of the employees are hourly employees.  In addition, the North American Debtors' workforce also includes approximately 4 part-time employees and approximately 29 independent contractors.[31]  The North American Debtors also rely on services provided by Imerys S.A. and certain Non-Debtor Affiliates under various shared services arrangements, as further described in the First Day Declaration and the Cash Management Motion (as defined below).

The officers (with position) of each of the North American Debtors as appointed by their respective boards of directors are: Giorgio La Motta (President), Anthony Wilson (Treasurer), and

---

[29]    "**J&J**" means Johnson & Johnson, Johnson & Johnson Baby Products Company, Johnson & Johnson Consumer Companies, Inc., Johnson & Johnson Consumer Inc., Johnson & Johnson Consumer Products, Inc., and each of their past and present parents, subsidiaries and Affiliates, direct and indirect equity holders, and the successors and assigns of each, excluding the Debtors and the Imerys Non-Debtors.

[30]    Certain of the North American Debtors' officers conduct operations from a rented office located in San Jose, California.

[31]    Included as hourly employees are approximately 111 employees who are covered by various collective bargaining agreements.

Ryan J. Van Meter (Secretary).  In addition, the boards of directors of ITA and ITV consist of Kevin Collins, Giorgio La Motta, and Douglas Smith, and the board of directors of ITC consists of Kevin Collins, Giorgio La Motta, Douglas Smith, and Matthias Reisinger.

       (d)     *Description of the North American Debtors' Assets*

The North American Debtors' assets consist primarily of cash on hand, parent loan receivables, insurance assets and indemnification rights, inventory, machinery and equipment, mineral reserves, land and buildings, and accounts receivable.  Each of these asset categories is described below.

       (1)     <u>Cash and Investments</u>

As of October 31, 2020, the North American Debtors held approximately $11.7 million in Cash in the aggregate.  The Cash is maintained, in part, in various accounts maintained by the North American Debtors.  ITA maintains a lockbox account and an EFT account, as well as an adequate assurance account in accordance with the order approving the Utilities Motion [Docket No. 296] (as defined below), each of which are located at SunTrust Bank.  ITC has two operating accounts (one for U.S. Dollars and one for Canadian Dollars) held at the Royal Bank of Canada and a deposit account held at SunTrust Bank.  ITC's deposit account was opened post-petition at the request of the United States Trustee.  ITA and ITC also maintain interest bearing savings accounts with Signature Bank that were opened in January 2020.  ITV does not hold any bank accounts.

As of October 31, 2020, the North American Debtors also had an accounts receivable balance totaling approximately $28.2 million.  This balance primarily corresponds to receivables due from third party customers incurred in the ordinary course of sales.

       (2)     <u>Cash Management System and Intercompany Loans</u>

The North American Debtors are not party to any secured financing arrangements or any third party credit facilities, and instead have relied on the positive cash flows generated by their operations to run their businesses and fund the Chapter 11 Cases.  However, and as described in <u>Section 5.8</u> of this Disclosure Statement, on November 2, 2020, the Debtors filed the DIP Motion (as defined below) seeking authority to obtain debtor-in-possession financing in an amount not to exceed $30 million (the "**DIP Facility**").  The DIP Loans would be secured by a lien on substantially all of the Debtors' assets.  A hearing on the DIP Motion was held on November 16, 2020 (the "**DIP Hearing**").  At the hearing, the Bankruptcy Court requested additional information from the Debtors with respect to the DIP Facility.  Currently, an order approving the DIP Facility has not yet been entered by the Bankruptcy Court.

Prior to the Petition Date, and as further described in the First Day Declaration, ITA and ITV participated in a zero balance accounting cash management system with their non-debtor, indirect parent, Imerys USA, Inc. ("**Imerys USA**").[32]  Under such system, at the end of each

---

[32]     A description of the Debtors' cash management system, deposit practices, and intercompany transactions is found in *Debtors' Motion for Orders Under 11 U.S.C. §§ 105(a), 345, 363, 503(b), and*

business day, funds remaining in certain of ITA's bank accounts were automatically swept to Imerys USA.  The amount swept to Imerys USA less any payments made by Imerys USA on account of expenses incurred by ITA or ITV was recorded in ITA's and Imerys USA's books as an interest-bearing intercompany loan in favor of ITA pursuant to (i) that certain Intercompany Loan and Investment Agreement, dated as of June 2018, by and between ITA and Imerys USA (the "**ITA Loan Agreement**") and (ii) that certain Intercompany Loan and Investment Agreement, dated as of June 2018, by and between ITV and Imerys USA (the "**ITV Loan Agreement**" and, together with the ITA Loan Agreement, the "**Intercompany Loan Agreement**").[33]  Prior to the Petition Date, ITA and ITV modified certain aspects of their cash management system and eliminated the practice of automatically sweeping funds to Imerys USA.  As of the date hereof, (i) ITA no longer has an outstanding loan receivable from Imerys USA and (ii) ITV has an outstanding loan receivable from Imerys USA in the amount of approximately $2,500,000.

ITC operates under a separate cash management system from the other North American Debtors.  Historically, excess cash generated by ITC's operations was periodically swept to Imerys S.A. at the discretion of ITC.  All transfers of cash that were made to Imerys S.A. (net of any cash transfers made from Imerys S.A. to ITC) were recorded as an intercompany interest-bearing loan on the books of Imerys S.A. and ITC pursuant to (i) that certain Intra-Group Treasury Agreement, by and between Imerys S.A. and certain of its subsidiaries, including the North American Debtors, and (ii) that certain Intercompany Loan and Investment Agreement by and between Imerys S.A. and ITC.  As of the date hereof, ITC no longer holds an outstanding loan due and payable from Imerys S.A.

(3)    Insurance Policies, Indemnity Rights, and Settlement Agreements

The North American Debtors are insureds, or otherwise have rights to coverage, under numerous Talc Insurance Policies covering, among other things, liability for Talc Personal Injury Claims.  Although the Debtors estimate that the amount of the aggregate insurance available is material, the realizable value of such coverage is subject to any number of factors, including, without limitation, the solvency of the insurers and the outcome of existing and any future coverage disputes.  As further described in Article V of this Disclosure Statement, prepetition, the North American Debtors were actively pursuing claims against certain insurers for substantial insurance coverage and collections against these insurers, and were engaged in disputes with certain of their predecessors in interest regarding who has the right to access certain Talc Insurance Policies.

In addition, the Debtors believe that (i) Talc Personal Injury Claims related to the North American Debtors' sale of talc to J&J are subject to uncapped indemnity rights against J&J under certain stock purchase and supply agreements and (ii) one or more of the North American Debtors (*e.g.*, ITV f/k/a Windsor Minerals, Inc.) have the rights to the proceeds of insurance policies issued

---

*507(a), Fed. R. Bankr. P. 6003 and 6004, and Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing Continuation of Existing Deposit Practices, (III) Approving the Continuation of Intercompany Transactions, and (IV) Granting Superpriority Administrative Expense Status to Certain Postpetition Intercompany Claims* [Docket No. 11] (the "**Cash Management Motion**").

[33]    The Intercompany Loan Agreements were amended by that certain Letter Agreement, dated as of February 11, 2019.

27

to J&J. J&J has historically disputed the existence and extent of any indemnity obligations owed to the Debtors or the Imerys Non-Debtors, and has disputed that the North American Debtors have any rights to the proceeds of insurance policies issued to J&J. In particular, J&J has stated that it does not believe it owes the Debtors any indemnity obligations after December 31, 2000. J&J has also stated that it believes that it has strong defenses against any indemnification obligations asserted by the Debtors or their successors and that the Debtors have materially breached their contractual indemnity agreements and common law duties.[34] The Plan Proponents disagree with J&J's assertions.

As of the date hereof, the North American Debtors have identified various insurance and indemnity assets, including:

- remaining aggregate limits under the Talc Insurance Policies with solvent insurers (not otherwise subject to a Bankruptcy Court-approved settlement agreement) having an estimated realizable value of approximately $830 million available to pay claims covered under such agreements, which estimate excludes any estimate for anticipated recoveries on account of the coverage provided by insurers who are subject to settlement agreements;

- the right to access certain shared insurance policies issued to J&J and its subsidiaries with estimated total aggregate limits of approximately $2 billion; *provided, however*, that J&J disputes that the Debtors are entitled to such proceeds;

- the right to seek the proceeds of policies issued to Standard Oil (Indiana) and its subsidiaries with total aggregate limits of approximately $1.2 billion; and

- indemnity rights against J&J.

As described in Articles IV, VI, and VII of this Disclosure Statement, the Debtors' ability to access certain of these insurance and indemnity assets is affected by the Rio Tinto/Zurich Settlement and the Cyprus Settlement.

(4)    Other Assets

As of October 31, 2020, the North American Debtors also had the following core assets:

- Inventory with an approximate value of $27.3 million. The inventory includes raw materials, finished goods, and other inventory or supplies. Raw materials represent the largest component of total inventory for ITA and ITV, totaling approximately $13.3 million and $1.9 million, respectively, and include, among other things, purchased crude ore and mined ore. Finished goods represent the largest component of total inventory for ITC, totaling approximately $2.2 million, and

---

[34]    These and other arguments made by J&J against the applicability of the indemnity obligations and the availability of the insurance proceeds are discussed in Article XII of this Disclosure Statement.

include, among other things, products that have been packaged but are awaiting distribution.

- Machinery, fixtures, and equipment with an approximate value of $36.0 million.

- Mining assets with a value of approximately $14.0 million. Mineral reserves and overburden represent approximately $5.3 million and $8.7 million of the mining assets, respectively. Moreover, the North American Debtors' mineral reserves are comprised of the unmined portion of the ore deposits at the North American Debtors' mines.

- Land and buildings with an approximate value of $5.7 million (after accumulated depreciation), primarily consisting of industrial buildings and related improvements, including infrastructure, and the land under and surrounding the buildings and production facilities.

3.2    History and Business, Organizational Structure, and Assets of ITI

(a)    *Corporate History*

In 1895, the Società Talco e Grafite Val Chisone ("**Società**") was organized for the purpose of mining minerals, including talc, from the Val Chisone and Valle Germanasca valleys in the Piedmont region of Italy. In July of 1907, Talco e Grafite Val Chisone S.V.C. ("**Talco e Grafite**") was incorporated in Pinerolo, Italy, and subsequently acquired all of the tangible and intangible assets of Società. Thereafter, on April 5, 1990, Finanziaria Minerario Industriale was organized in the Piedmont region of Italy, and on August 31, 1990, Finanziaria Minerario Industriale was merged with Talco e Grafite and renamed Talco Val Chisone S.p.A.

Talco Val Chisone S.p.A. changed its name to Luzenac Val Chisone S.p.A. after it was acquired by Rio Tinto Talc Limited. Then, as with the predecessor entities of the North American Debtors, Luzenac Val Chisone S.p.A. was acquired by the Imerys Group as part of the 2011 Purchase. Luzenac Val Chisone S.p.A. was then renamed Imerys Talc Italy S.p.A. ITI is a majority-owned subsidiary of Mircal Italia, which in turn is an indirect subsidiary of Imerys S.A.

(b)    *ITI's Operations*

Like the North American Debtors, ITI is in the business of mining, processing, selling, and/or distributing talc to a variety of end markets. ITI's talc operations include a talc mine in Rodoretto, and a plant and office in Porte. Talc that is mined in Rodoretto is sent to the plant in Porte where it is processed, refined into various talc products, and packaged for distribution. The office in Porte houses ITI's general management administrative operations.

ITI sells its talc through internal sales channels as well as through third party distributors. Talc sold by ITI is utilized in numerous products, including, but not limited to: specialties (39%); polymers (23%); personal care (22%); paints and coatings (10%); and other (6%).[35] ITI has a

---

[35]    The foregoing percentages are based on total sales in 2019.

leading market share for its products in Europe, the Middle East, and Africa. In addition, ITI also sells talc to purchasers in North America. Approximately 4% of ITI's current revenues arise from talc sales to the United States for cosmetic/personal care applications.

      (c)    *Existing Organizational Structure and Ongoing Businesses*

ITI continues to mine, process, and distribute talc, utilizing a core group of executives and personnel. ITI currently employs 83 full-time employees and one part-time employee. Specifically, 49 of ITI's employees are located at the Rodoretto mine, 23 are located at the Malanaggio plant, and 12 are located at the Porte office. ITI also benefits from certain shared services arrangements with Imerys S.A. and Imerys Talc Europe. Specifically, ITI pays an aggregate annual fee to Imerys Talc Europe for services related to, among other things: information systems and technology, research and application, general management and communications, industrial production, geology, process engineering, marketing, finance, human resources, health, safety and environment, and logistics. ITI also pays an annual fee to Imerys S.A. on account of certain group-level executive management, legal, and other corporate overhead services provided by Imerys S.A. to ITI. These services include, among other things: business administration, management, marketing and sales, legal, internal and external communications, accounting, finance, taxation, treasury, information technology, technology, transport, insurance, purchasing, and product safety and stewardship services.

The officers (with position) and Statutory Auditors of ITI are: Kosman Rivolti (CEO), Laura Campanini (Board of Statutory Auditors Chairman), Giorgio Monetti (Statutory Auditor), and Anna Angela De Benedittis (Statutory Auditor). In addition, the board of directors of ITI consists of Vincenzo Walter Gentile, Kosman Rivolti, and Kevin Collins.

      (d)    *Description of ITI's Assets*

          (1)    <u>Cash, Cash Management System and Intercompany Loan</u>

ITI has relied on the positive cash flows generated by its operations to run its business.

As of October 31, 2020, ITI held approximately $1,500,000. ITI has an operating account located at Société Générale Italy and a tax disbursement account located at Intesa Sanpaolo S.p.A. Each of these accounts are maintained in ITI's name.

ITI operates under a separate cash management system from the North American Debtors. Historically, excess cash generated by ITI's operations was swept on a daily basis to a bank account in the name of Imerys Talc Europe, where it was pooled in an operating account held by Imerys Talc Europe with funds from other European affiliates and eventually upstreamed to Imerys S.A. ITI also periodically transferred funds to Imerys S.A. as compensation for intercompany transactions, which were historically consolidated and settled with Imerys S.A. pursuant to an intercompany netting system and recorded on the relevant entity's books as a payable or receivable, as applicable. All transfers that were made to Imerys Talc Europe or Imerys S.A. (net of any cash transfers made from Imerys Talc Europe or Imerys S.A. to, or on behalf of, ITI) were recorded as an intercompany interest-bearing loan on the books of ITI and Imerys Talc Europe or Imerys S.A., as applicable.

As of the date of this Disclosure Statement, excess funds are no longer swept from ITI to Imerys Talc Europe or Imerys S.A. Instead, all funds generated from ITI's operations are retained in ITI's bank accounts. Moreover, ITI now satisfies all intercompany obligations on account of intercompany purchases or services as they come due in cash. Notwithstanding the foregoing, payables and receivables between ITI and the Debtors may continue to accumulate, with such obligations to be settled on a cash basis at the discretion of the Debtors and ITI.

As of October 31, 2020, ITI holds an outstanding loan receivable (i) from Imerys Talc Europe in the amount of approximately $21.9 million and (ii) from Imerys S.A. in the amount of approximately $160,000. ITI also had an accounts receivable balance totaling approximately $4,500,000 as of October 31, 2020. This balance primarily corresponds to receivables due from third party customers incurred in the ordinary course of sales.

        (2)    <u>Other Assets</u>

As of October 31, 2020, ITI maintained the following other core assets:

- Inventory with an approximate value of $2,000,000. The inventory includes raw materials, spare parts, work in progress, and finished goods. Raw materials represent the largest component of total inventory, totaling approximately $1,400,000, and include, among other things, crude ore, bag stops, and pallets.

- Mineral reserves with a value of approximately $1,000,000. The mineral reserves represent the unmined portion of the ore deposits at the mine.

- Land and buildings with an approximate value of $3,500,000 (after accumulated depreciation), primarily consisting of industrial buildings and related improvements, including infrastructure, and the land under and surrounding the buildings and production facilities.

## 3.3    <u>Filing of the Chapter 11 Cases and Plan Discussions</u>

        (a)    *Events Leading to the Chapter 11 Cases*

In June 2018, as a result of the increasing number of talc claims being asserted against the North American Debtors in the tort system and the unwillingness of the North American Debtors' insurers and indemnitors to provide coverage for the Debtors' mounting defense costs, the North American Debtors retained Latham & Watkins LLP ("**<u>Latham</u>**") to assist them in evaluating a number of strategic options to manage their talc-related liabilities. The North American Debtors and Latham worked with the North American Debtors' litigation defense counsel, Alston & Bird LLP ("**<u>Alston</u>**") and Gordon Rees Scully Mansukhani LLP, and insurance coverage counsel, Neal, Gerber & Eisenberg LLP ("**<u>NGE</u>**"), to identify and assess alternatives to resolve the North American Debtors' talc-related liabilities, including evaluating the costs and benefits associated with continuing to litigate talc-related claims in the tort system.

At the same time, the North American Debtors explored the viability of using a chapter 11 bankruptcy filing to address their talc liabilities by channeling them to a trust created under sections 105 and 524(g) of the Bankruptcy Code that would be structured to ensure the fair and

equitable treatment of present and future claimants.  As part of this exploratory effort and to facilitate the implementation of this potential chapter 11 strategy if and when authorized by their boards of directors, the North American Debtors entered into an engagement letter with James L. Patton, Jr. of Young Conaway Stargatt & Taylor, LLP ("**Young Conaway**") on September 25, 2018 to serve as a proposed future claims representative to represent the interests of individuals who may in the future assert talc-related demands against the Debtors.  Mr. Patton retained Young Conaway as his legal counsel and Ankura Consulting Group, LLC ("**Ankura**") as his claims analyst to provide advice in connection with such representation.  Together with his advisors, Mr. Patton initiated an extensive diligence process into the North American Debtors' businesses and the pending talc litigation, subject to a confidentiality agreement.

The North American Debtors worked constructively with Mr. Patton and his advisors throughout the prepetition process by providing access to relevant documents and responses to numerous information requests, as well as by attending multiple in-person diligence meetings, among other things.  The North American Debtors hoped to engage with plaintiffs' firms prior to the commencement of the Chapter 11 Cases to determine if a pre-arranged chapter 11 plan could be achieved.  The North American Debtors did not have sufficient time, however, to conduct the diligence process that would be necessary for the parties to engage in meaningful discussions given the pending trial calendar (and risk of incurring a judgment for which the North American Debtors could not post an appeal bond) and the ever-increasing costs of settlement and defense.  Nevertheless, the constructive discussions with Mr. Patton confirmed, from the Debtors' perspective, the viability of using chapter 11 to resolve the Talc Personal Injury Claims in a manner that would maximize the distributable value for all stakeholders and provide fair and equitable treatment of the Talc Personal Injury Claims.

(b)    *Filing the Chapter 11 Cases, Continuation of Diligence, and Plan Discussions*

After extensive discussions with their advisors, the North American Debtors ultimately determined that, due to the increasing number of Talc Personal Injury Claims being asserted against them in the tort system and the prospect of diminishing readily accessible insurance/third party indemnitor coverage, continued litigation in the tort system was not a viable option and that the commencement of the Chapter 11 Cases was in the best interests of the North American Debtors, their Estates, and their stakeholders.  Accordingly, on February 13, 2019, the North American Debtors' boards of directors authorized the filing of these Chapter 11 Cases.

Following the Petition Date, as described more fully in Article V, the FCR and the Tort Claimants' Committee were each appointed in the Chapter 11 Cases.  Plan discussions between the Tort Claimants' Committee, the FCR, and the North American Debtors (and related due diligence) progressed after the bankruptcy filing.  The plan discussion process included, among other things, in-person meetings and conference calls between counsel to the North American Debtors and counsel to the Tort Claimants' Committee and the FCR, written responses to information requests from counsel to the Tort Claimants' Committee and the FCR, and a comprehensive document production, wherein the North American Debtors produced, and counsel to the Tort Claimants' Committee and the FCR reviewed, documents and electronic files relating to the Debtors, their affiliates, and predecessors.

As discussions matured, the North American Debtors, the Tort Claimants' Committee, and the FCR focused on the possibility of a comprehensive settlement involving Imerys S.A., ITI, and the other Non-Debtor Affiliates. In furtherance of such a settlement, Imerys S.A. provided certain information and documents related to diligence requests from the Tort Claimants' Committee and the FCR. Such diligence informed the parties' views on a potential contribution that could be made to the Talc Personal Injury Trust by or on behalf of the Imerys Non-Debtors in return for protection under the Channeling Injunction.

In light of the foregoing developments, Imerys S.A. and its counsel became more directly involved in the plan negotiations in the months leading up to the filing of the Plan. Representatives of the North American Debtors, the Tort Claimants' Committee, the FCR, and Imerys S.A. spent considerable time negotiating over the terms of a framework for a plan of reorganization for the Debtors that would include a chapter 11 filing for ITI. In particular, the parties focused on the funding for the Talc Personal Injury Trust via the Imerys Contribution, and the terms of the Channeling Injunction. Ultimately, the parties reached an agreement on the key terms for a proposed plan of reorganization and global settlement, which are embodied in the Plan.

(c)     *ITI*

The global settlement encompassed in the Plan contemplates that ITI will file a voluntary petition for relief under chapter 11, provided that the requisite number of votes to accept the Plan are received from the holders of Talc Personal Injury Claims against the Debtors (including, for the avoidance of doubt, ITI).[36] ITI, like certain of the North American Debtors, has been named as a defendant in litigation asserting Talc Personal Injury Claims. Specifically, ITI has been named in eight lawsuits asserting Mesothelioma Claims, each of which has been filed by a single firm. In light of the potential chapter 11 filing of ITI contemplated under the Plan, the cases against ITI were dismissed without prejudice as to ITI pursuant to an agreement between ITI and the plaintiffs in those suits.

As a result of the foregoing, and given the potential for ITI to face increasing talc-related litigation if it remains in the tort system, ITI has determined that the commencement of a chapter 11 case in order to similarly resolve its talc-related liabilities, pending a vote to accept the Plan by holders of Claims in Class 4, is in the best interests of ITI and its stakeholders. The commencement of a chapter 11 case by ITI is a negotiated for and essential component of the Imerys Settlement, which aims to fully resolve the Talc Personal Injury Claims against the Debtors.

(d)     *J&J Negotiations*

For nearly four years prior to the Petition Date, the Debtors and J&J engaged in negotiations to resolve disputes related to indemnification rights and obligations, which involved complicated issues of allocation of indemnification obligations, purported "gap years" not covered by contractual indemnity, cross claims for indemnification between the parties, and coverage under various insurance agreements. During those years, the parties engaged in multiple conversations, including in-person meetings and letter writing, as well as mediation sessions on July 24, 2018 and

---

[36]     ITI has retainers with certain of its retained professionals in the United States, which provide it with sufficient property in the United States for purposes of commencing a chapter 11 case.

September 25, 2018, in an attempt to resolve these issues.  The parties were unable to reach a resolution in the mediation, but continued to engage in settlement discussions after the conclusion of the formal mediations.  The Debtors, the Tort Claimants' Committee, the FCR, the Imerys Non-Debtors and J&J also engaged in mediation sessions on September 18 and September 21, 2020 in an attempt to resolve issues related to the J&J Stay Motion (as defined below).  The parties were unable to resolve these issues.  As of the date of this Disclosure Statement the Plan Proponents are willing to continue to engage with J&J on issues regarding J&J's indemnification obligations.  However, the Debtors, the Tort Claimants' Committee, and the FCR are not willing to agree to a resolution along the lines of the Revised J&J Protocol (as defined below) [Docket No. 2247] because the relief proposed by J&J would be detrimental to holders of current and future Claims seeking to prosecute those Claims against J&J for the reasons set forth in the objections and responses filed by each of the Debtors, the Tort Claimants' Committee, and the FCR, which are further described in <u>Section 4.2(b)(3)</u> of this Disclosure Statement.

## ARTICLE IV.

## SUMMARY OF LIABILITIES AND RELATED INSURANCE OF THE DEBTORS

4.1 <u>Description of Talc Personal Injury Liabilities</u>

The Debtors' most significant liabilities are the numerous Talc Personal Injury Claims asserted against them, which are described in detail below.  The Debtors maintain that their talc is safe, that the Talc Personal Injury Claims are without medical or scientific merit, and that exposure to their talc products has not caused personal injuries.  The Debtors also contend that the safety of their talc has been confirmed by dozens of peer-reviewed studies and multiple regulatory and scientific bodies, including five of the largest real world studies ever conducted.  The Tort Claimants' Committee and the FCR disagree with the Debtors' position, and dispute the validity of the studies relied upon by the Debtors.  In support of their position, the Tort Claimants' Committee and the FCR assert, among other things, the relatively nascent development of this tort and the existence of new or better testing methodologies than those cited in the studies on which the Debtors rely.

As described in the First Day Declaration, it is the Debtors' view that they have had significant success defending against Talc Personal Injury Claims in the tort system and no final, unappealable verdict has been issued against any Debtor in any lawsuit asserting talc related claims.  The Debtors assert that they have been and continue to be committed to the quality and safety of their products above all else. Nevertheless, the substantial increase in alleged talc-related claims in the last few years, combined with the current state of the U.S. tort system, has led to overwhelming projected litigation costs (net of insurance) that the Debtors were unable to sustain over the long-term, leading to the chapter 11 filings.

To be clear, though they are each Plan Proponents, neither the Tort Claimants' Committee nor the FCR accept the Debtors' position regarding the safety of their talc or the safety of any products into which talc is incorporated.

34

Case 19-10289-LSS    Doc 2853    Filed 01/27/21    Page 47 of 203

(a)    *Overview*

As of the Petition Date, one or more of the Debtors were among the defendants in thousands of actions brought before various U.S. federal and state courts by multiple plaintiffs asserting Talc Personal Injury Claims.  Plaintiffs have historically asserted two types of Talc Personal Injury Claims: (1) claims alleging ovarian cancer or other related gynecological diseases arising as a result of talc exposure (the "**OC Claims**") and (2) claims alleging respiratory cancers or other asbestos-related diseases arising as a result of talc exposure ("**Mesothelioma Claims**").  As of the Petition Date, there were approximately 13,800 pending lawsuits asserting OC Claims and approximately 850 pending lawsuits asserting Mesothelioma Claims against one or more of the North American Debtors.  ITI has also been named as a defendant in litigation asserting Talc Personal Injury Claims.  As noted above, ITI has been named in eight lawsuits asserting Mesothelioma Claims, and it is possible that ITI may presently be a named defendant in other cases in which it has not been served or otherwise been made aware of such proceedings.

Approximately 98.6% of the pending lawsuits asserting Talc Personal Injury Claims allege injuries based on the use of cosmetic products containing talc.  As described above, personal care/cosmetic sales into the United States make up approximately 5% of the North American Debtors' annual revenues and 2% of ITI's annual revenues.  In addition, the Debtors historically supplied and at times were the sole supplier of, talc to J&J, and have been routinely named as a co-defendant with J&J in litigation related to the Talc Personal Injury Claims.  Approximately 99.8% of the pending and closed lawsuits asserting OC Claims against the Debtors named J&J as a co-defendant, and approximately 80.1% of the pending lawsuits asserting Mesothelioma Claims against the Debtors named J&J as a co-defendant.  The pending and completed lawsuits asserting Talc Personal Injury Claims also routinely name third parties other than or in addition to J&J.

On January 5, 2021, J&J filed its Supplemental Objection to the Disclosure Statement, which stated for the first time that "J&J settled numerous talc claims postpetition, including a large proportion of mesothelioma claims, obtaining a release of those plaintiffs' claims against the Debtors in the process."  On January 15, 2021, J&J informed the Bankruptcy Court and the Debtors that J&J has settled "most" of the outstanding Mesothelioma Claims that J&J understood to be pending against the Debtors on the Petition Date and involved J&J products and obtained releases on behalf of the Debtors with respect to such claims.[37]  This Disclosure Statement contains the Debtors' best understanding of pending Direct Talc Personal Injury Claims as of the Petition Date as no bar date was set in the Chapter 11 Cases with respect to Direct Talc Personal Injury Claims and J&J has not provided any information to the Debtors with respect to specific claims against the Debtors that have purportedly been resolved by J&J since the Petition Date.  J&J has advised the Debtors and other parties that since the Petition Date, J&J has procured releases of the Debtors and related parties in over 800 claims alleging mesothelioma caused by exposure to J&J's baby powder.  J&J likewise has asserted that, since the Petition Date, it has resolved approximately 2,000 claims alleging ovarian cancer caused by exposure to J&J's baby powder on terms that include releases of the Debtors and related parties.

---

[37]      However, J&J later confirmed that it does not know with certainty how many Mesothelioma Claims remain pending.

US-DOCS\120811663.4

J&J has subsequently stated that it intends to assert subrogation rights against the Debtors on account of the Direct Talc Personal Injury Claims it settled, in addition to the claims it has asserted and may assert as Indirect Talc Personal Injury Claims.  If J&J has such rights, and J&J is successful in asserting those rights, it will step into the shoes of the Direct Talc Personal Injury Claims and receive the same share of the Talc Personal Injury Trust Assets that other holders of Direct Talc Personal Injury Claims receive; however, the Plan Proponents believe any such rights would be offset by any portion that is subject to the J&J Indemnification Obligations.  Moreover, it is expected that the Plan Proponents and/or the Talc Trustees will object to J&J receiving a cash recovery under the Trust Distribution Procedures as a Direct Claimant (as defined in the Trust Distribution Procedures) for the claims against the Debtors that J&J settled postpetition.

The Plan Proponents did not take into account the purported J&J settlements in determining the allocation of the Talc Personal Injury Trust Assets and the Payment Percentages (as defined in the Trust Distribution Procedures) under the Trust Distribution Procedures.

The Trust Distribution Procedures do not contemplate any adjustment of the allocation of Talc Personal Injury Trust Assets between Mesothelioma Claims and OC Claims.

      (b)    *Proliferation of Talc Claims*

At the time of the Imerys Group's acquisition of the Debtors, there was only one OC Claim pending against ITA, which was in the early stages of litigation.[38]  In 2014, following a judgment against J&J, the number of suits filed involving OC Claims began to increase.  Approximately 16,500 OC Claims have been filed since 2014 and, as of the Petition Date, approximately 13,800 OC Claims were pending against one or more of the Debtors.

Similarly, when the Debtors were acquired in 2011, there were only approximately seven pending Mesothelioma Claims, which were all in the early stages of litigation.  As with OC Claims, however, plaintiffs began filing Mesothelioma Claims at an increasing pace in 2014, and in early 2016, one of the Mesothelioma Claims reached trial.  Since 2014, approximately 1,200 Mesothelioma Claims have been filed against one or more of the Debtors, of which approximately 850 were still pending as of the Petition Date.[39]

      (c)    *OC Claims*

Plaintiffs asserting OC Claims generally allege that they have developed ovarian cancer or other related gynecological cancers as a result of their use of certain cosmetic products, primarily J&J body powders (which were historically comprised almost entirely of talc) for feminine hygiene purposes.  Historically, plaintiffs have asserted that talc itself causes ovarian cancer and have not asserted that talc contained in the body powder was contaminated with trace amounts of asbestos. In 2017, however, some plaintiffs asserting OC Claims began to allege that their personal injuries

---

[38]    ITA subsequently obtained summary judgment in its favor in that case.

[39]    The Debtors do not intend to seek a formal estimation of the Debtors' total liability for Talc Personal Injury Claims, but they reserve the right to seek such a formal estimation in the future.

may also have been caused by trace asbestos contamination of the talc.  The Debtors dispute all of these allegations.

       (d)    *Mesothelioma Claims*

Plaintiffs asserting Mesothelioma Claims generally allege they have developed non-ovarian cancer personal injuries based on some form of asbestos exposure.  Some of these plaintiffs assert that they were only exposed to talc that was contaminated with trace amounts of asbestos, while others allege additional non-talc exposure to asbestos.  It is the Debtors' view that in many cases plaintiffs have made insufficient allegations for the Debtors to determine whether the Mesothelioma Claims are based on cosmetic talc exposure, industrial talc exposure, or both.  For those pending cases where the plaintiff's exposure to talc has been identified with specificity, approximately 63% percent of plaintiffs allege exposure to asbestos through the use of cosmetics, while approximately 24% of plaintiffs allege exposure in industrial occupational settings (the approximately remaining 13% of plaintiffs allege both cosmetic and industrial exposure).

## 4.2    Description of Talc Insurance Coverage

       (a)    *Talc Insurance Coverage*

The North American Debtors have access to, and rights under, various Talc Insurance Policies with Talc Insurance Companies that cover, among other things, certain talc-related personal injury liabilities and related litigation costs (including, in certain instances, defense costs).[40]  Specifically, one or more of the North American Debtors have the right to the proceeds of insurance policies for both the OC Claims and the Mesothelioma Claims.[41]  As further discussed below, the Debtors are informed and believe that the total amount of insurance available for the OC Claims and the Mesothelioma Claims is at least $670 million and $160 million, respectively.[42] Notwithstanding the foregoing, the amounts available for OC Claims that the Debtors believe are attributable to the Zurich Policies (in excess of $630 million) will be released pursuant to the Rio Tinto/Zurich Settlement in exchange for the Rio Tinto/Zurich Contribution.  Any and all rights to and in connection with the Cyprus Talc Insurance Policies will be assigned to the Talc Personal Injury Trust on the Cyprus Trigger Date pursuant to the Cyprus Settlement.  Moreover, the Debtors also believe that ITA has rights to seek the proceeds from certain other insurance policies with total aggregate limits of approximately $1.2 billion to resolve Mesothelioma Claims.

The Debtors have reviewed each of the available Talc Insurance Policies referred to herein, as well as secondary evidence.  Based on the Debtors' review, the Debtors believe that each of the Talc Insurance Policies provides coverage for bodily injury allegedly caused by exposure to talc

---

[40]    ITI has not identified any insurance coverage for Talc Personal Injury Claims asserted against it and has been paying the defense costs of talc-related personal injury litigation directly.

[41]    The payment of defense costs by certain of the Talc Insurance Companies under certain Talc Insurance Policies does not erode the limits of liability available to satisfy talc-related liabilities.

[42]    ITA currently is involved in coverage litigation in California state court regarding the scope and amount of available coverage for Mesothelioma Claims under certain Talc Insurance Policies.  This coverage dispute is further discussed below.

or talc-containing products during the applicable policy period. Based on the Debtors' review and communications with certain Talc Insurance Companies, the Debtors understand that each of the Talc Insurance Companies that issued the Talc Insurance Policies included within the available limits (as further described below) is solvent and able to pay covered claims. The Debtors base their belief that the Talc Insurance Policies have realizable value as stated herein on their review of the Talc Insurance Policies, review of secondary evidence, and communications with certain Talc Insurance Companies.[43]

Several Talc Insurance Companies have asserted coverage defenses, including but not limited to defenses based on exclusions and other limitations contained in the policies. The Debtors have evaluated these purported defenses and believe that such defenses do not preclude insurance coverage, but may impact the scope of available coverage on a claim by claim basis.

(1)    Insurance Coverage Containing Asbestos Exclusions

***Zurich and Rio Tinto Captive Insurer Policies***. One or more of the North American Debtors has asserted the right to insurance coverage under certain primary liability policies issued by a Zurich Corporate Party (the "**Zurich Policies**").[44] Zurich issued primary liability policies to Luzenac America from May 1997 to May 2001 with total aggregate limits of liability of $20 million. Zurich also issued primary liability policies to certain of the Rio Tinto Corporate Parties from May 2001 to May 2012 with total aggregate limits of $630 million. The Debtors are informed and believe that the Zurich Policies have been eroded by at least $17 million, resulting in remaining limits of in excess of $630 million. Pursuant to various agreements with Zurich and certain of the Rio Tinto Corporate Parties, the North American Debtors owe no further deductibles on the Zurich Policies. The Debtors are unaware of any excess policies issued to the Rio Tinto Corporate Parties or to the North American Debtors above the Zurich Policies. Each of the Zurich Policies contains an endorsement that purports to exclude coverage for injuries caused by exposure to asbestos.[45]

Zurich and the Rio Tinto Corporate Parties have disputed the North American Debtors' rights to the proceeds of the Zurich Policies on several grounds, including that (1) there is a lack of scientific evidence to support the theory that talc exposure, in and of itself, causes ovarian cancer, thus rendering the Debtors' liability for ovarian-cancer claims uncertain and speculative; (2) the Zurich Policies contain exclusions for asbestos-related liabilities; (3) there is a lack of relevant settlement history; (4) the Debtors have successfully asserted defenses to liability in the tort system; (5) the Debtors have substantial insurance assets other than the Zurich Policies that are available to them; and (6) under the terms of the 2011 Purchase, the Debtors are not entitled to

---

[43]    For example, a review of the Zurich Policies shows that the total limits are in excess of $650 million, and communications with Zurich confirmed that there is in excess of $630 million in remaining limits.

[44]    The Zurich Policies include any and all Talc Insurance Policies issued by the Zurich Corporate Parties, including but not limited to the Talc Insurance Policies listed on Schedule VI to the Plan. For the avoidance of doubt, the Zurich Policies shall not include any policy to the extent such policy provides reinsurance to any Rio Tinto Captive Insurer.

[45]    J&J contends that it qualifies as an additional insured under certain of the Zurich Policies.

access any Zurich Policies other than ten policies issued by Zurich between May 31, 2001 and May 31, 2011, under which Luzenac America was an insured.

In addition, the Rio Tinto Captive Insurers issued certain policies (the "**Rio Tinto Captive Insurer Policies**") that originally named Luzenac America and certain Rio Tinto Corporate Parties as insureds, and afforded difference-in-limits coverage for sums that exceeded the limits of the Zurich Policies, up to the policy limits of the Rio Tinto Captive Insurer Policies, and the Rio Tinto Corporate Parties purchased certain excess policies above those limits.[46]  Each of these policies contains an exclusion for injuries caused by exposure to asbestos.  Rio Tinto contends that, under the terms of the 2011 Purchase, the Debtors no longer have access to coverage under any of these policies.

The Rio Tinto/Zurich Settlement, including the Rio Tinto/Zurich Settlement Agreement, finally resolves all disputes regarding the Debtors' alleged rights to coverage under the above policies and releases the Zurich Protected Parties and the Rio Tinto Protected Parties from any claims directly or indirectly arising out of or related to those policies, in return for the substantial contributions to be made by Zurich and Rio Tinto to the Talc Personal Injury Trust.

*XL Policies*.  One or more of the North American Debtors have the right to insurance coverage under four primary general liability policies and four umbrella polices issued by XL Insurance America, Inc. ("**XL**") to Imerys USA and its subsidiaries.  XL issued primary general liability policies for the period of January 2011 to February 2015 with total aggregate limits of $4 million (the "**XL Primary Policies**").  XL also issued umbrella liability policies for the period of January 2011 to February 2015 with total aggregate limits of $34 million (the "**XL Umbrella Policies**," and together with the XL Primary Policies, the "**XL Policies**").  The Debtors are informed and believe that the XL Policies have total remaining limits of approximately $37 million.  Each of the XL Policies contains an endorsement that purports to exclude coverage for injuries caused by exposure to asbestos.

As described in Section 5.9 of this Disclosure Statement, the Debtors are currently participating in mediation with XL to resolve certain disputes regarding the Debtors' rights to coverage under the XL Policies.

(2)    Insurance Coverage Not Containing Asbestos Exclusions

As a result of the various transactions involving the talc business of Cyprus Mines (as discussed in Article V below), ITA believes it has the right to seek proceeds from the Cyprus Talc Insurance Policies, which provide coverage for liabilities arising out of the talc business of Cyprus Mines and/or its affiliates or predecessors.  The Debtors are informed and believe that the primary Cyprus Talc Insurance Policies that could provide coverage for asbestos-related liabilities arising out of the talc business of Cyprus Mines and/or its affiliates or predecessors have been exhausted, except four primary liability policies issued by The American Insurance Company ("**AIC**") from

---

[46]    The Rio Tinto Captive Insurance Policies include any and all Talc Insurance Policies issued by the Rio Tinto Captive Insurers, including, but not limited to the Talc Insurance Policies listed on Schedule III attached to the Plan.  For the avoidance of doubt, the Rio Tinto Captive Insurer Policies shall not include any policy to the extent such policy provides reinsurance to any Zurich Protected Party.

May 1961 to October 1964.  The remaining coverage consists of umbrella and excess policies issued by various insurers from April 1962 to July 1986 with total remaining aggregate limits of approximately $160 million.  In addition, the Debtors are informed and believe that ITA also has rights to seek the proceeds from insurance policies issued to Standard Oil (Indiana) from 1980 to 1985 with total aggregate limits of approximately $1.2 billion.

The North American Debtors are presently litigating their rights to these policies (and others issued to Cyprus) in the Cyprus Insurance Adversary Proceeding (as defined and further discussed below).  The Cyprus Settlement, if approved and implemented, would settle this litigation.  Pursuant to the Cyprus Settlement, if the Cyprus Trigger Date occurs, all rights to the Cyprus Talc Insurance Policies will be assigned to the Talc Personal Injury Trust.  However, in the event the Cyprus Trigger Date does not occur, the rights to these policies will be resolved pursuant to the Cyprus Insurance Adversary Proceeding or otherwise.

      (b)    *J&J*

      (1)    <u>J&J Insurance and Indemnity Obligations</u>

***J&J Insurance.***  The Debtors have asserted that one or more of the Debtors have the right to insurance coverage from various Talc Insurance Policies issued to J&J (including, for the purpose of this section, policies issued to J&J's corporate predecessors or subsidiaries) with total aggregate limits of approximately $2 billion.  For example, ITV (f/k/a Windsor Minerals, Inc.) was a wholly-owned J&J subsidiary during the applicable policy periods of the J&J Talc Insurance Policies and therefore entitled to coverage.  The Debtors presently are unaware of the total remaining and available limits of the Talc Insurance Policies issued to J&J.  J&J disputes that the Debtors or any third parties are entitled to the proceeds of any insurance coverage from various insurance policies issued to J&J.[47]

***J&J Indemnification Obligations***.  The Debtors also have asserted that one or more of the Debtors, the Protected Parties, and the Imerys Non-Debtors also have certain, uncapped indemnity rights against J&J for J&J Talc Claims arising under the following agreements: (i) that certain Agreement, between Cyprus Mines Corporation and Johnson & Johnson, dated as of January 6, 1989 (the "**1989 SPA**"); (ii) that certain Talc Supply Agreement, between Windsor Minerals Inc. and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc., dated as of January 6, 1989 (the "**1989 Supply Agreement**"); (iii) that certain Supply Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of April 15, 2001 (the "**2001 Supply Agreement**"); (iv) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2010; and (v) that certain Material Purchase Agreement,

---

[47]    Certain Talc Insurance Policies issued or allegedly issued to J&J are the subject of an active coverage litigation in New Jersey state court, styled as *Atlanta Int'l Ins. Co. v. Johnson & Johnson, et al.*, Case No. MID-L-3563-19.  The Debtors, the Tort Claimants' Committee, and the FCR are not parties to this litigation and have not intervened.  The Plan Proponents believe the action is subject to the automatic stay, and the Debtors have demanded that the insurers stay this action.  Although plaintiffs in the action do not believe that the automatic stay applies, pending resolution of that issue, they have agreed to conduct themselves as if the automatic stay applies.

between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2011 (the "**2011 Material Purchase Agreement**" and, together with (i), (ii), (iii), and (iv), the "**J&J Agreements**").[48]

J&J has previously disputed that the indemnification obligations arising out of these agreements in favor of the Debtors are uncapped or that they relate to future claimants.  J&J has also previously disputed that it has any indemnification obligations under the 1989 Supply Agreement to the extent any Talc Personal Injury Claims allege exposure to talc used by J&J that did not conform to J&J's specifications, and has contended that certain periods of time are not covered by any supply agreement between the Debtors and J&J.  Moreover, J&J claims that the Debtors have certain obligations to indemnify J&J under the 2001 Supply Agreement.[49]

More recently, J&J has acknowledged that indemnification obligations exist, but it has contested the scope of its obligations to the Debtors and has asserted that it has claims against the Debtors for indemnity.[50]  While neither J&J nor the Debtors have initiated litigation relating to these indemnity obligations, on June 6, 2019, a lawsuit was brought by National Union Fire Insurance Company of Pittsburgh, Pa. ("**National Union**") against Johnson & Johnson Consumer Companies, Inc., Johnson & Johnson Baby Products Company, and Johnson & Johnson (collectively, the "**J&J Defendants**") in the Superior Court of the State of Vermont, Chittenden Unit, styled as *National Union Fire Insurance Company of Pittsburgh, PA. as Subrogee of Cyprus Mines Corporation v. Johnson & Johnson Consumer Companies, Inc. et al.*, Case No. 495-6-19-CNEV (the "**Subrogation Proceeding**").  In the Subrogation Proceeding, National Union sought, among other things, to recover from the J&J Defendants, as the putative subrogee of ITA and Cyprus Mines, the amounts National Union allegedly incurred defending ITA and Cyprus Mines in various asbestos-related bodily injury product liability lawsuits.  In response, on October 8, 2019, the Debtors filed a motion to enforce the automatic stay in the Bankruptcy Court in order to enjoin National Union from continuing the Subrogation Proceeding (the "**Motion to Enforce**") [Docket No. 1117].  Prior to the filing of the Motion to Enforce, the J&J Defendants also filed an answer to National Union's complaint in the Subrogation Proceeding.  On October 18, 2019, shortly after the North American Debtors filed the Motion to Enforce, National Union agreed to dismiss the Subrogation Proceeding without prejudice, and the Debtors withdrew the Motion to Enforce.

---

[48]    For the avoidance of doubt, these indemnification obligations include any and all indemnity rights of the Debtors, the Protected Parties, and the Imerys Non-Debtors against J&J for Talc Personal Injury Claims pursuant to any other applicable agreement, order, or law.

[49]    Each of these agreements are described in Article XII of this Disclosure Statement.

[50]    *See generally Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion [For] An Order Pursuant to Bankruptcy Rule 2004* [Docket No. 750]; *Memorandum of Law in Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b)*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket No. 2]; *Reply Memorandum of Law in Further Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b)*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket No. 81].

In addition, Cyprus has also asserted uncapped indemnity rights against J&J pursuant to the 1989 Supply Agreement and the 1989 SPA, including in the Cyprus Indemnity Adversary Proceeding (as defined below). As further discussed below, the North American Debtors are presently litigating their rights to certain of these indemnification obligations in the Cyprus Indemnity Adversary Proceeding. The Cyprus Settlement, if approved and implemented, would settle the litigation as between Cyprus and the Debtors. Pursuant to the Cyprus Settlement, if the Cyprus Trigger Date occurs, Cyprus' rights to indemnification by J&J (only to the extent related to any Talc Personal Injury Claim that is channeled to the Talc Personal Injury Trust) will be assigned to the Talc Personal Injury Trust. However, in the event the Cyprus Trigger Date does not occur, the ownership of these indemnity rights will be resolved pursuant to the Cyprus Indemnity Adversary Proceeding or otherwise.

(2)    <u>J&J Removal Attempt</u>

In addition to the foregoing, on April 18, 2019, Johnson & Johnson and Johnson & Johnson Consumer Inc. (collectively, the "**J&J Removal Parties**") commenced a civil action in the U.S. District Court for the District of Delaware (the "**District Court**") and moved to fix venue in the District Court for all pending talc-related personal injury and wrongful death claims (the "**Venue Motion**").[51] The Venue Motion sought to transfer the 2,400 lawsuits under 28 U.S.C. §§ 157(b)(5) and 1334(b), which authorize the federal district court in which a bankruptcy case is pending to hear claims "related to" a debtor's bankruptcy case. Contemporaneously with that filing, the J&J Removal Parties began filing notices of removal in state court actions in order to remove such actions to federal court where they would be subject to transfer under the Venue Motion. On May 3, 2019, the J&J Removal Parties filed a motion in the Bankruptcy Court to extend the deadline to file such notices of removal in state court actions [Docket No. 486]. On June 27, 2019, the Bankruptcy Court granted the J&J Removal Parties' request to extend the removal deadline [Docket No. 755].

Numerous parties, including the Tort Claimants' Committee, the FCR, and a myriad of plaintiffs' personal injury counsel around the country, filed oppositions in response to the J&J Removal Parties' Venue Motion in the District Court.[52] On July 19, 2019, the District Court denied the J&J Removal Parties' Venue Motion.[53] Upon entry of the order, the District Court closed the civil case.[54]

(3)    <u>J&J Motion to Modify the Automatic Stay</u>

On March 27, 2020, J&J filed the *Motion Pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order Modifying Automatic Stay to*

---

[51]    *Johnson & Johnson and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b)*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket No. 1].

[52]    *See* Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket Nos. 37, 45, 46, 48, 49, 50, 53, 55, 56, 57, and 58].

[53]    *See Memorandum Opinion*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket No. 96].

[54]    *See Order*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket No. 97].

42

*Permit J&J to Send Notice Assuming Defense of Certain Talc Claims and to Implement Talc Litigation Protocol* [Docket No. 1567] (the "**J&J Stay Motion**").  Pursuant to the J&J Stay Motion, J&J sought to modify the automatic stay to (i) permit holders of certain J&J Talc Claims to pursue those claims against the Debtors, (ii) permit J&J to send notices of assumption of the defense of certain J&J Talc Claims, and (iii) take certain other actions set forth in a prior version of the J&J Protocol (the "**Initial J&J Protocol**") to assume the defense of and indemnify the Debtors for certain J&J Talc Claims.

The Debtors, the Tort Claimants' Committee, and the FCR each opposed the J&J Stay Motion [Docket Nos. 1731, 1732, and 1734], and on May 28, 2020, J&J filed *Johnson & Johnson's Omnibus Reply in Support of J&J's Motion for Entry of Order Modifying Automatic Stay to Implement Talc Litigation Protocol* [Docket No. 1769] (the "**J&J Reply**").  In the J&J Reply, J&J agreed to certain modifications to the Initial J&J Protocol in an attempt to partially resolve certain deficiencies highlighted by the Debtors, the Tort Claimants' Committee, and the FCR in their objections to the J&J Stay Motion.  On July 10, 2020, the Tort Claimants' Committee and the FCR filed the *Joint Response of the Official Committee of Tort Claimants and Future Claimants' Representative to Johnson & Johnson's Omnibus Reply in Support of J&J's Motion for Entry of Order Modifying Automatic Stay to Implement Talc Litigation Protocol* [Docket No. 1976] (the "**Committee's Response**") and the Debtors filed the *Debtors' Response to the Joint Response of the Official Committee of Tort Claimants and Future Claimants' Representative to Johnson & Johnson's Omnibus Reply in Support of J&J's Motion for Entry of Order Modifying Automatic Stay to Implement Talc Litigation Protocol* [Docket No. 1978].  Attached as Exhibit A to the Committee's Response was a revised proposed order seeking approval of certain revisions to the Initial J&J Protocol, as amended by the J&J Reply (the "**Revised Proposed J&J Order**").

J&J did not agree to the proposed revisions because J&J believed the revisions would unfairly and unduly impact J&J's rights and defenses.  Instead, and in response to the Revised Proposed J&J Order, J&J filed *Johnson & Johnson's Reply to (I) the Joint Response of the Official Committee of Tort Claimants and Future Claimants' Representative to Johnson & Johnson's Omnibus Reply in Support of Johnson & Johnson's Motion for Entry of Order Modifying Automatic Stay to Implement Talc Litigation Protocol and (II) the Debtors' Response Thereto* [Docket No. 2181] on September 10, 2020.  By contrast, the Plan Proponents believed that the Revised Proposed J&J Order would have resolved the open issues with the Initial J&J Protocol that would have otherwise had a substantial detrimental effect on the Debtors' Estates, the Tort Claimants' Committee's constituents, and those whose interests are represented by the FCR.

On September 22, 2020, the Bankruptcy Court compelled the J&J Stay Motion to go forward after J&J unilaterally continued the hearing on the motion a number of times.  Thereafter – and despite a ruling against J&J at the hearing – J&J filed a further modified proposed order granting the relief requested in the J&J Stay Motion [Docket No. 2247] (the "**Revised J&J Protocol**") in an attempt to address the Plan Proponents' objections.  However, the Revised J&J Protocol still did not address key deficiencies identified by the Debtors, the Tort Claimants' Committee, and the FCR.

Ultimately, the Bankruptcy Court determined that the relief requested by J&J in the J&J Stay Motion, as revised pursuant to the Revised J&J Protocol, could not be approved, and, on

43

September 25, 2020, the Bankruptcy Court entered the *Order Denying Motion for Order Modifying Automatic Stay* [Docket No. 2253].

      (c)    *Status of Insurance Assets*

          (1)    <u>Prepetition Claims Cost Receivables</u>

Prior to and after the Petition Date, the North American Debtors (or their counsel and vendors) sent regular billings to various insurers for reimbursement of costs and expenses paid by the Debtors prior to the Petition Date on account of Talc Personal Injury Claims ("**Prepetition Claims Cost Receivables**").  As of the date of this Disclosure Statement, the Debtors are in the process of reconciling the amounts to be collected in respect of unpaid Prepetition Claims Cost Receivables.

          (2)    <u>Insurance Settlement Agreements and Coverage Disputes</u>

The Bankruptcy Court approved two post-petition settlement agreements by and between the North American Debtors and certain Talc Insurance Companies.  These settlements, which are described in Article V of this Disclosure Statement, provide for payments to certain of the North American Debtors' defense counsel and their vendors and experts (as applicable under the respective agreements) for prepetition claims in the aggregate amount of $9,695,159.20. Moreover, as discussed above and further discussed in Articles VI and VII of this Disclosure Statement, the Plan incorporates the Rio Tinto/Zurich Settlement, which resolves all Talc Personal Injury Claims against the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties, and provides for a full release of all Rio Tinto/Zurich Released Claims against the Rio Tinto Protected Parties and the Zurich Protected Parties, in exchange for the Rio Tinto/Zurich Contribution.

The North American Debtors are also party to coverage disputes with certain Talc Insurance Companies and Cyprus, which are further described in Article V of this Disclosure Statement.  As discussed herein, these disputes may impact the North American Debtors' ability to utilize certain insurance proceeds, which will reduce the value of total assets available to holders of Talc Personal Injury Claims.  However, if effectuated, the Cyprus Settlement will resolve these disputes with respect to Cyprus, and the Cyprus Protected Parties will assign any and all of their rights to or in connection with the Cyprus Talc Insurance Policies to the Talc Personal Injury Trust, subject to the occurrence of the Cyprus Trigger Date.

Furthermore, and as discussed in <u>Section 5.9</u> of this Disclosure Statement, the Debtors are participating in mediation with XL, the Chubb Insurers (as defined below), Truck (as defined below), Old Republic (as defined below), AIC, and Allianz (as defined below) to resolve coverage disputes.

Past experience indicates that certain insurers that entered into the Talc Insurance Policies may still raise objections, contract issues, and otherwise dispute their obligation to pay claims in the future. The North American Debtors are attempting to determine the existence, nature, and scope of any such disputes and, if possible and as appropriate, resolve certain disputes before the Effective Date through negotiation and/or litigation.

4.3     Description of Non-Talc Liabilities of the Debtors

(a)     *Claims Filed Against or Scheduled By the North American Debtors*

The North American Debtors believe that they were generally current on their known prepetition trade payables as of the Petition Date. In addition, the North American Debtors are not currently party to any secured financing arrangements (although, as discussed in Section 5.8 of this Disclosure Statement, the Debtors have filed the DIP Motion and are seeking authority to obtain the DIP Facility), and they do not have outstanding public debt.

As described in Article V of this Disclosure Statement, on July 25, 2019, the Bankruptcy Court entered the General Bar Date Order (as defined below), establishing October 15, 2019 as the General Bar Date (as defined below). The General Bar Date did not apply to "Talc Claims" (as defined in the General Bar Date Order). On November 22, 2019, the Bankruptcy Court entered an order establishing January 9, 2019 as the Indirect Talc Claim Bar Date (as defined below), which solely applied to Indirect Talc Claims (as defined below).

The Non-Talc Claims filed against the North American Debtors include, without limitation, (i) trade claims; (ii) employee/pension claims; (iii) intercompany claims (asserted by Non-Debtor Affiliates); (iv) claims for professional fees that are not Fee Claims; (v) tax claims; (vi) insurance claims; and (vii) surety bond claims. In addition, numerous Non-Talc Claims were included in the North American Debtors' Schedules (as defined below). The scheduled claims fall into categories, including, but not limited to, contract claims, customer claims, trade claims, and intercompany claims.

The Debtors continue to review and analyze the proofs of claim filed to date, and reconcile these proofs of claim with the North American Debtors' scheduled claims. To this end, the Debtors or the Reorganized Debtors, as applicable, have filed and will file objections and seek stipulations with respect to certain Claims. Moreover, certain parties may attempt to file additional Claims notwithstanding the passage of the General Bar Date and the Indirect Talc Claim Bar Date and seek allowance of such Claims by the Bankruptcy Court. In addition, certain existing Claims may be amended to seek increased amounts. Accordingly, the Debtors do not presently know and cannot reasonably determine the actual number and aggregate amount of the Claims that will ultimately be Allowed against the North American Debtors.

(b)     *Claims Against and Equity Interests in ITI*

As contemplated by the Plan, all holders of Equity Interests in and Claims against ITI other than holders of Talc Personal Injury Claims and Non-Debtor Intercompany Claims will be Unimpaired (in other words, unaffected) by ITI's reorganization process. Generally, this means that all holders of such Claims against ITI will be paid in full in the ordinary course of business or otherwise permitted to pass through the reorganization process without their rights being affected. Similarly, the rights of holders of Equity Interests in ITI will be left unaltered by the implementation of the Plan.

# ARTICLE V.

# EVENTS DURING THE CHAPTER 11 CASES

The following is a general description of the major events occurring during the course of these Chapter 11 Cases.  Because ITI has not filed for bankruptcy protection, the following discussion and the use of the term "Debtors" does not apply to ITI.

5.1    Commencement of the Chapter 11 Cases and First Day Motions

The Debtors have continued to operate their businesses and manage their affairs as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code since the commencement of the Chapter 11 Cases on February 13, 2019.

On the Petition Date, the Debtors filed a number of motions seeking typical "first-day" relief in chapter 11 cases (the "**First Day Motions**").  The Debtors' stated purpose of the First Day Motions was to ensure that the Debtors were able to transition into the chapter 11 process and maintain their operations in the ordinary course so as to function smoothly while their cases were progressing.

The First Day Motions sought authority to: (i) pay prepetition wages and other benefits to employees; (ii) pay prepetition insurance obligations and maintain post-petition insurance coverage; (iii) pay prepetition claims of critical vendors, foreign vendors, and certain lienholders; (iv) approve certain notice procedures for holders of Talc Personal Injury Claims; (v) authorize ITC to act as foreign representative of the Debtors in any judicial or other proceeding in Canada; (vi) pay prepetition taxes and fees; (vii) continue use of the existing cash management system and bank accounts and waive the requirements of section 345 of the Bankruptcy Code; (viii) retain a claims agent to assist in the Chapter 11 Cases; (ix) honor prepetition obligations to customers under certain customer programs; (x) prohibit utility companies from altering or discontinuing service on account of prepetition invoices (the "**Utilities Motion**"); and (xi) enforce the protections of the automatic stay.  A description of the First Day Motions is set forth in the First Day Declaration.

On the Petition Date, the Bankruptcy Court entered an order jointly administering the Debtors' Chapter 11 Cases.  The Debtors have not sought substantive consolidation of their respective Estates and no substantive consolidation is sought in the Plan.

5.2    Commencement of Canadian Proceeding

The Chapter 11 Cases have been recognized in Canada in a proceeding commenced before the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") pursuant to the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "**CCAA**").  Recognition of the Chapter 11 Cases was sought to provide for a stay of proceedings against the Debtors, to keep Canadian creditors informed regarding the Chapter 11 Cases, and to seek to bind Canadian creditors to orders issued in the Chapter 11 Cases for which recognition is sought in

Canada.  Recognition of the Chapter 11 Cases was sought and obtained from the Canadian Court on February 20, 2019.[55]

The orders issued by the Canadian Court on February 20, 2019, April 3, 2019, May 24, 2019, August 7, 2019, October 28, 2019, December 3, 2019, April 1, 2020, July 3, 2020, November 3, 2020, November 25, 2020, and January 26, 2021, among other things, (i) recognized the Chapter 11 Cases as "foreign main proceedings" under the CCAA; (ii) stayed all existing proceedings against the Debtors in Canada; (iii) appointed Richter Advisory Group Inc. ("**Richter**") as information officer (the "**Information Officer**") to report to the Canadian Court, creditors, and other stakeholders in Canada on the status of the Chapter 11 Cases; (iv) recognized certain interim and finals orders (as applicable) entered by the Bankruptcy Court permitting the Debtors to, among other things, continue operating their respective businesses during the course of the Chapter 11 Cases, employ certain professionals, establish the General Bar Date and the Indirect Talc Claim Bar Date, make payments pursuant to their key employee retention plan, implement bidding procedures in connection with the Sale, designate Magris Resources (as defined below) as stalking horse bidder and provide Magris Resources with bid protections, and sell their assets to Magris Resources pursuant to section 363 of the Bankruptcy Code; (v) recognized certain orders entered by the Bankruptcy Court approving the retention of the FCR and various professionals employed by the Debtors, the Tort Claimants' Committee, and the FCR; (vi) recognized the Bankruptcy Court's order approving the ITC Stipulation (as defined below); and (vii) discharged Richter from its role as Information Officer and substituted Richter with KPMG Inc. as the new Information Officer.

### 5.3    Appointment of the Tort Claimants' Committee

On March 5, 2019, the Office of the United States Trustee appointed the Tort Claimants' Committee in the Chapter 11 Cases, which is comprised of holders of Direct Talc Personal Injury Claims.[56]  The individuals comprising the Tort Claimants' Committee are (listed with the law firm representing each member):[57]

| Committee Member | Law Firm / Attorney |
| --- | --- |
| Robin Alander | The Lanier Law Firm |
| Nolan Zimmerman, as representative of the estate of Donna M. Arvelo | Levy Konigsberg LLP |

---

[55]    *Initial Recognition Order (Foreign Main Proceeding)*, Ct. File No. CV-19-614614-00 CL (Can. Ont. Sup. Ct. J. Feb. 20, 2019).

[56]    It came to the attention of the Tort Claimants' Committee that each of Ms. Martz and Ms. Matteo passed away in 2019 and 2020, respectively.  On January 22, 2021, the Office of the United States Trustee filed its *Second Amended Notice of Appointment of Official Committee of Tort Claimants* [Docket No. 2818].  In that notice, the Office of the United States Trustee replaced Ms. Martz with David A. Martz as the representative of Ms. Martz' estate.  In that same notice, Ms. Matteo was replaced with Gregory W. Vella as the representative of Ms. Matteo's estate.

[57]    These same members will constitute the Talc Trust Advisory Committee as further described in Section 9.8 of this Disclosure Statement.

| Committee Member | Law Firm / Attorney |
|---|---|
| Christine Birch | The Gori Law Firm |
| Bessie Dorsey-Davis | Burns Charest LLP |
| Lloyd Fadem, as representative of the estate of Margaret Ferrell | Baron & Budd, P.C. |
| Timothy R. Faltus, as representative of the estate of Shari C. Faltus | OnderLaw, LLC |
| Deborah Giannecchini | Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. |
| Kayla Martinez | Simon Greenstone Panatier, P.C. |
| David A. Martz, as representative of the estate of Lynne Martz | Ashcraft & Gerel, LLP |
| Gregory W. Vella, as representative of the estate of Nicole Matteo | Cohen, Placitella & Roth, P.C. |
| Charvette Monroe, as representative of the estate of Margie Evans | The Barnes Law Group, LLC |

Additional information pertaining to each member of the Tort Claimants' Committee is as follows:

- *Robin Alander* – Robin Alander of Sacramento, California was 49 when she was diagnosed with cancer in 2007.  Ms. Alander is a loving wife and mother to two daughters who live nearby.  She used J&J baby powder many years for feminine hygiene.  Ms. Alander sued J&J in 2015.  Ms. Alander is represented in the underlying tort litigation by the Lanier Law Firm.

- *Nolan Zimmerman, as representative of the estate of Donna M. Arvelo* – Nolan Zimmerman is the personal representative for Donna Arvelo from New Jersey.  Ms. Arvelo was 67 when she was died of mesothelioma.  She used J&J baby powder for many years for feminine hygiene.  Mrs. Arvelo and her estate are represented in the underlying tort litigation by Levy Konigsberg.

- *Christine Birch* – Christine Birch of Oakland, California was only 46 years old when she was diagnosed with malignant mesothelioma in 2018.  Ms. Birch used J&J baby powder for many years throughout both her childhood and as a young adult for feminine hygiene.  She sued J&J and one or more of the Debtors in 2018.  The Debtors filed bankruptcy before litigation was resolved.  Ms. Birch is represented in the underlying tort litigation by the Gori Law Firm.

- *Bessie Dorsey-Davis* – Bessie Dorsey-Davis of Carrollton, Texas was 55 when she was diagnosed with ovarian cancer in 2007.  Ms. Dorsey-Davis, now retired, was formerly a business manager at IBM and is married with two grown children.  She used J&J baby powder for many years for feminine hygiene.  Ms. Dorsey-Davis

sued J&J and one or more of the Debtors in 2017 in the U.S. District Court for the District of New Jersey and her case remains pending as part of the *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, And Products Liability Litigation MDL.* Ms. Dorsey-Davis is represented in the underlying tort litigation by Burns Charest LLP.

- *Lloyd Fadem, as representative of the estate of Margaret Ferrell* – In 2017, Lloyd Fadem of Tusla, Oklahoma lost his wife, Margaret Ferrell to ovarian cancer. She was only 53 years old when she died. She used J&J baby powder for decades. In 2016, while also fighting cancer, Ms. Ferrell filed suit against several defendants including ITA seeking damages for her injuries. Mr. Fadam continues the fight for his wife on his own behalf and in his capacity as personal representative of the estate of Margaret Ferrell. Mr. Fadam and the estate of Margaret Ferrell are represented in the underlying tort litigation by Baron & Budd, P.C.

- *Timothy R. Faltus, as representative of the estate of Shari C. Faltus* – Shari Faltus, deceased, of Belleville, Illinois, was diagnosed with mesothelioma in 2013 when she was 62 years old. Mrs. Faltus taught both elementary and high school aged children for many years. She and her husband, Timothy Faltus, founded, owned and operated a banquet center. She loved gardening, reading, and crafting. Ms. Faltus died in 2016 at the age of 65, leaving behind her husband, two daughters and two grandsons. She used J&J talc and talc-based baby powder for feminine hygiene for over 30 years. Mr. Timothy Faltus filed suit on behalf of his wife, Shari Faltus, against J&J and one or more of the Debtors in 2017. This case is still pending in St. Clair County Circuit Court, Illinois. Mr. Faltus is represented in the underlying tort litigation by OnderLaw, LLC.

- *Deborah Giannecchini* – Deborah Giannecchini of Modesto, California was 59 years old when she was diagnosed with Stage 4 ovarian cancer in 2012. Ms. Giannecchini is a mother of 2 and grandmother of 5. She used J&J baby powder and Shower To Shower for many years for feminine hygiene. Ms. Giannecchini sued J&J and one or more of the Debtors. Mrs. Giannecchini is represented in the underlying tort litigation by the Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.

- *Kayla Martinez* – Kayla Martinez, of Lone Oak, Texas was 27 when she was diagnosed with malignant peritoneal mesothelioma in 2016. Ms. Martinez was born with a hearing impairment and has used a cochlear implant as a hearing aid most of her life. She was a student at the time of her diagnosis of a terminal and incurable cancer, which, in the United States, is caused only by asbestos exposure. Ms. Martinez is a single mother to her daughter, Ava. Ava was 2 years old when Ms. Martinez was diagnosed. Because of her hearing impairment, Ms. Martinez could not be left alone when she was growing up and was always in close proximity to her mother, Kim Davis. Ms. Martinez was exposed to the Debtors' talc through use of and exposure to J&J baby powder and Avon talcum powder products. Ms. Martinez's mother regularly used J&J baby powder and Avon talcum powder on herself, and on Ms. Martinez for many years beginning in 1989 and continuing

49

through 2016.  Ms. Martinez was also present for and exposed to talc supplied by one or more of the Debtors from her mother's application of Avon talcum prodder products to herself.  Ms. Martinez sued Avon, J&J, CAMC, and ITA, alleging exposures to asbestos from the Debtors' talc used by Avon and J&J baby powder products.  ITA filed for bankruptcy prior to a trial of Ms. Martinez's tort claims.  Ms. Martinez is represented in the underlying tort litigation by Simon Greenstone Panatier, P.C.

- *David A. Martz, as representative of the estate of Lynne Martz* – Lynne Martz of Cape May, New Jersey was 67 years old when she was diagnosed with ovarian cancer in 2016.  Ms. Martz, a retired employee of J&J, was a devoted wife, mother, and grandmother who enjoyed traveling and spending time with her family.  She used J&J baby powder and J&J Shower To Shower for decades for feminine hygiene.  In 2018, while still fighting her cancer, Ms. Martz filed a civil action against J&J and ITA in New Jersey state court seeking damages for her injuries.  Sadly, after four years bravely fighting cancer, she passed away in December 2019.  Mr. David Martz was appointed as the executor of Ms. Martz estate and continues the fight for his wife on his own behalf and in his capacity as the executor of her estate.  Mr. Martz and the estate of Lynne Martz are represented in the underlying tort litigation by Ashcraft & Gerel, LLP.

- *Gregory W. Vella, as representative of the estate of Nicole Matteo* – Nicole "Nikki" Matteo of Wall, New Jersey was 40 years old when she was diagnosed with ovarian cancer in 2016.  Unfortunately, in 2020, Ms. Matteo succumbed to her disease at 44.  Ms. Matteo worked as an office administrator for several years at insurance companies and law firms.  Ms. Matteo was a passionate animal lover who owned numerous dogs.  She was a beloved daughter to her surviving parents and sister to her sibling.  She used J&J baby powder from her birth until 2016 for feminine hygiene.  Following her death, Gregory W. Vella, Esq. was appointed as her executor.  Mr. Vella and the estate of Ms. Matteo are represented in the underlying tort litigation by Cohen, Placitella & Roth, P.C.

- *Charvette Monroe, as representative of the estate of Margie Evans* – Charvette Monroe is the executor of the estate of Margie Evans.  Margie Evans was a retired elementary school teacher in Augusta, GA, and was diagnosed with high grade epithelial ovarian cancer (serous subtype) in 2016.  Ms. Evans used J&J baby powder on a daily basis for 56 years.  Ms. Monroe is litigating the estate's claims in Richmond County, Georgia.  Ms. Monroe and the estate of Ms. Evans are represented in the underlying tort litigation by the Barnes Law Group.

The Tort Claimants' Committee retained Robinson & Cole LLP as lead counsel and Willkie Farr & Gallagher LLP in the role of special litigation and corporate counsel.  The Tort Claimants' Committee has also retained Gilbert LLP, as special insurance counsel, Analysis Systems, Inc., as tort liability consultant, Ducera Partners LLC and Ducera Securities LLC (together "**Ducera**"), as investment banker, and GlassRatner Advisory & Capital Group, LLC, as financial advisor.

The Tort Claimants' Committee and the FCR collectively have fiduciary obligations to represent the interests of holders of Direct Talc Personal Injury Claims and not holders of Indirect Talc Personal Injury Claims or any other creditor.  Though purported holders of Indirect Talc Personal Injury Claims are not represented by an official committee in the Chapter 11 Cases, they have appeared through sophisticated counsel and have been active throughout the Chapter 11 Cases.

5.4    Appointment of the Legal Representative for Future Claimants

On June 3, 2019, the Bankruptcy Court entered an order appointing Mr. James L. Patton, Jr. as legal representative for future talc personal injury claimants in the Chapter 11 Cases.  The FCR has retained the law firm of Young Conaway, as counsel, Ankura, as claims evaluation and financial valuation consultants, and, has co-retained with the Tort Claimants' Committee, Gilbert LLP as special insurance counsel and Ducera, as investment banker.

On June 18, 2019, certain of the Debtors' insurers (the "**Certain Excess Insurers**")[58] appealed Mr. Patton's appointment as the FCR (the "**FCR Appeal**").  The FCR Appeal is pending before the Delaware District Court in the cases styled as *In re: Imerys Talc America, Inc.*, Civ. A. Nos. 19-00944, 19-01120, 19-01121 and 19-01122 (MN) (D. Del.).  On August 2, 2019, the District Court entered an order approving a briefing schedule, which was subsequently amended on August 22, 2019.[59]  The Certain Excess Insurers' opening brief was filed on October 16, 2019.[60]  On December 16, 2019, the Debtors and the FCR filed their responsive briefs, which were joined by the Tort Claimants' Committee.[61]  On December 20, 2019, the parties to the FCR Appeal met and conferred regarding extending the Certain Excess Insurers' time to file a reply brief.[62]  On

---

[58]    The Certain Excess Insurers include: Columbia Casualty Company, Continental Casualty Company, the Continental Insurance Company, as successor to CNA Casualty of California and as successor in interest to certain insurance policies issued by Harbor Insurance Company, Lamorak Insurance Company (formerly known as OneBeacon America Insurance Company), as successor to Employers' Surplus Lines Insurance Company, Stonewall Insurance Company (now known as Berkshire Hathaway Specialty Insurance Company), and National Union, to the extent that they issued policies to Cyprus Mines Corporate prior to 1981.  In certain instances Lexington Insurance Company and National Union are not included as Certain Excess Insurers.

[59]    *Order Adopting Report and Recommendations*, Civ. A. No. 19-00944 (D. Del. August 2, 2019) [Docket No. 11].

[60]    *Appellants' Certain Excess Insurers' Opening Brief on Appeal From a Bankruptcy Court Order Appointing James Patton of Young Conaway as Future Claimants' Representative*, Civ. A. No. 19-00944 (D. Del. Oct. 16, 2019) [Docket No. 14].

[61]    *Brief of Appellees Imerys Talc America, Inc., Imerys Talc Vermont, Inc., and Imerys Talc Canada, Inc.* [Docket No. 22]; *Joinder and Response Brief of Appellee James L. Patton, Jr. in His Capacity as the Future Claimants' Representative* [Docket No. 24]; *Joinder of the Official Committee of Tort Claimants in the Briefs Filed By Each of: (I) Appellees Imerys Talc America, Inc., Imerys Talc Vermont, Inc., and Imerys Talc Canada, Inc.; and (II) Appellee James L. Patton Jr., in His Capacity as the Future Claimants' Representative* [Docket No. 25], Civ. A. No. 19-00944 (D. Del. Dec. 16, 2019).

[62]    *Appellants' Certain Excess Insurers' Reply Brief on Appeal From a Bankruptcy Court Order Appointing James Patton of Young Conaway as Future Claimants' Representative*, Civ. A. No. 19-00944 (D. Del. Feb. 14, 2019) [Docket No. 29].

51

January 7, 2020, the District Court approved a stipulation extending the Certain Excess Insurers' time to file a reply brief, and on February 14, 2020, the Certain Excess Insurers filed their reply brief [Docket No. 29].

On November 24, 2020, the District Court issued an opinion[63] and entered an order[64] (i) affirming the Bankruptcy Court's appointment of Mr. Patton as the FCR, (ii) denying a motion compelling the Debtors to respond to certain discovery requests, and (iii) affirming the Bankruptcy Court's order authorizing the FCR to retain Young Conaway as his counsel.  On December 8, 2020, the Certain Excess Insurers filed a Notice of Appeal indicating their intent to appeal the District Court FCR Order to the United States Court of Appeals for the Third Circuit.[65]

To the extent the FCR Appeal is successful or a court exercising proper appellate review finds that Mr. Patton's appointment in the Chapter 11 Cases as the FCR was inappropriate, important provisions and mechanisms in the Plan may be found to be unenforceable, including the Channeling Injunction as to Talc Personal Injury Demands.

5.5    Other Plaintiffs Groups

On November 2, 2020, the Debtors filed the *Debtors' Motion to Compel Compliance with Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 2457] (the "**2019 Motion**") in order to compel certain law firms to comply with Bankruptcy Rule 2019.  The following law firms were identified in the 2019 Motion:

- On June 8, 2020, the law firms of Brown Rudnick LLP and Morris James LLP entered an appearance on behalf of the self-titled Ad Hoc Committee of Imerys Talc Litigation Plaintiffs (the "**Ad Hoc Claimants Committee**"), which is comprised of clients represented by the Morelli Law Firm and the Segal Law Firm.[66]

- On June 17, 2020, the law firm of Shelsby & Leoni (US) entered an appearance as counsel for Kline & Specter, PC ("**Kline & Specter**"), which in turn purports to represent certain holders of Talc Personal Injury Claims.[67]

---

[63]    *Memorandum Opinion*, Civ. A. No. 19-00944 (D. Del. November 24, 2020) [Docket No. 32].

[64]    *Order*, Civ. A. No. 19-00944 (D. Del. November 24, 2020) [Docket No. 33] (the "**District Court FCR Order**").

[65]    *Notice of Appeal to the United States Court of Appeals for the Third Circuit*, Civ. A. No. 19-00944 (D. Del. November 24, 2020) [Docket No. 34].

[66]    *See Notice of Appearance and Request for Service of Notices and Documents* [Docket No. 1809].

[67]    *See Amended Notice of Appearance and Demand for Service of Papers* [Docket No. 1896] and *Objection and Joinder of the Kline & Specter Plaintiffs in Opposition to the Motion of Debtors for Entry of Order (I) Approving the Disclosure Statement and Form and Manner of Notice of Hearing Thereon, (II) Establishing Solicitation Procedures, (III) Approving Form and Manner of Notice to Attorneys and Certified Plan Solicitation Directive, (IV) Approving Form of Ballots, (V) Approving Form, Manner, and*

- On October 26, 2020, the law firm of Arnold & Itkin LLP ("**Arnold & Itkin**") entered an appearance on behalf of certain talc personal injury claimants represented by Arnold & Itkin.[68] Arnold & Itkin is represented by Pachulski Stang Ziehl & Jones LLP.

- On October 27, 2020, Williams Hart Boundas Easterby, LLP ("**Williams Hart**") filed an objection and joinder in the Chapter 11 Cases to the Disclosure Statement on behalf of certain personal injury claimants [Docket No. 2423].[69]

Subsequent to the filing of the 2019 Motion, verified statements pursuant to Bankruptcy Rule 2019 were filed by (i) Arnold & Itkin, representing holders of Talc Personal Injury Claims on whose behalf Arnold & Itkin has filed proofs of claim against the Debtors [Docket No. 2505]; (ii) Williams Hart, representing certain personal injury claimants against the Debtors [Docket No. 2521]; (iii) the Ad Hoc Claimants Committee, which is comprised of clients of the Morelli Law Firm and the Segal Law Firm [Docket No. 2525]; and (iv) Kline & Specter, which represents holders of Talc Personal Injury Claims on whose behalf Kline & Specter has filed proofs of claim in the Chapter 11 Cases [Docket No. 2746]. The Ad Hoc Claimants Committee filed an amended verified statement pursuant to Bankruptcy Rule 2019 on January 12, 2021 [Docket No. 2755].

## 5.6    Retention of Debtors' Professionals

The Debtors retained (i) Latham, as the Debtors' bankruptcy co-counsel; (ii) Richards, Layton & Finger, P.A., as the Debtors' bankruptcy co-counsel; (iii) Stikeman Elliott LLP, as Canadian counsel to the Debtors; (iv) Alvarez & Marsal North America, LLC, as financial advisor to the Debtors; (v) NGE, as special insurance coverage and indemnification counsel to the Debtors; (vi) KCIC, LLC, as insurance and valuation consultant to the Debtors; (vii) Prime Clerk LLC, as claims and noticing agent and administrative advisor; (viii) PJT Partners LP ("**PJT**"), as the Debtors' investment banker; and (ix) Ramboll US Corporation, as environmental advisor to the Debtors. The Bankruptcy Court has also authorized the Debtors to engage other law firms and professionals in the ordinary course of business.

## 5.7    Administrative Matters in the Chapter 11 Cases

(a)    *Exclusive Periods for the Debtors to Propose and Solicit Plan Acceptance*

Prior to the Fourth Exclusivity Motion (as defined below), Debtors sought and obtained three unopposed extensions of the periods during which they may exclusively propose and solicit acceptances of a chapter 11 plan beyond the initial 120-day and 180-day periods for plan proposal and solicitation set forth in section 1121 of the Bankruptcy Code. The first order was entered on

---

*Scope of Confirmation Notices, (VI) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement and Confirmation of Plan, and (VII) Granting Related Relief* [Docket No. 1872].

[68]    *See Notice of Appearance and Request for Service Pursuant to Fed. R. Bankr. P. 2002* [Docket No. 2404].

[69]    *See Objection and Joinder of William Hart Plaintiffs in Opposition to the Debtors' Solicitation Motion and Disclosure Statement for Third Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 2423].

June 25, 2019 [Docket No. 744], the second order was entered on September 18, 2019 [Docket No. 1051], and the third order was entered on December 26, 2019 [Docket No. 1371].

On March 6, 2020, the Debtors filed a fourth motion to extend the period during which they may exclusively propose a plan of reorganization and the solicitation period for acceptances of such plan [Docket No. 1534] (the "**Fourth Exclusivity Motion**").  On March 20, 2020, J&J filed an objection to the Fourth Exclusivity Motion [Docket No. 1563], which J&J subsequently withdrew on May 1, 2020 [Docket No. 1689].  On May 5, 2020, the Bankruptcy Court entered an order granting the relief requested in the Fourth Exclusivity Motion, extending the period during which the Debtors may propose a plan of reorganization through and including June 5, 2020, and extending the solicitation period for acceptances of such a plan through and including August 7, 2020 [Docket No. 1694].

On June 2, 2020, the Debtors filed a fifth motion to extend the period during which they may exclusively propose a plan of reorganization and the solicitation period for acceptance of such plan [Docket No. 1794] (the "**Fifth Exclusivity Motion**").  This motion sought to extend the exclusive periods to (i) propose a plan to August 13, 2020 and (ii) solicit votes thereon to October 13, 2020.  On June 26, 2020, the Bankruptcy Court entered an order granting the relief requested in the Fifth Exclusivity Motion [Docket No. 1942].  The Debtors' exclusive period to propose a plan expired by statutory operation on August 13, 2020.

(b)      *Assumption of Unexpired Leases*

The Debtors sought and obtained an unopposed extension of the period within which they were required to assume or reject unexpired leases of non-residential real property beyond the initial statutory 120-day period through and including September 11, 2019 [Docket No. 687].  On August 7, 2019, the Debtors filed a motion to assume certain unexpired leases of non-residential real property [Docket No. 931].  The Bankruptcy Court entered an order approving the assumption of these unexpired leases of non-residential real property on August 16, 2019 [Docket No. 974] and the unexpired leases were deemed to be assumed by the Debtors as of September 10, 2019.

(c)      *Extension of Period to Remove Claims*

The Debtors have sought and obtained six unopposed extensions of the deadline by which they may file notices of removal under Bankruptcy Rules 9006(b) and 9027(a).  The first order was entered on March 19, 2019 [Docket No. 254], the second order was entered on September 18, 2019 [Docket No. 1050], the third order was entered on January 22, 2020 [Docket No. 1447], the fourth order was entered on June 1, 2020 [Docket No. 1784], the fifth order was entered on September 21, 2020 [Docket No. 2229], and the sixth order was entered on January 8, 2021 [Docket No. 2734] extending the deadline by which the Debtors may remove civil actions through and including April 29, 2021.

(d)      *Filing of Schedules of Assets and Liabilities and Statements of Financial Affairs*

On March 19, 2019, the Bankruptcy Court entered an order extending the deadline by which the Debtors must file their Schedules with the Bankruptcy Court [Docket No. 253].  In accordance with that order and pursuant to Bankruptcy Rule 1007 and Rule 1007-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District

of Delaware (the "**Local Rules**"), the Debtors filed their Schedules on April 12, 2019 [Docket Nos. 362, 363, 365, 366, 367, and 368] and filed certain amendments to the Schedules on May 20, 2019 [Docket Nos. 577, 578, and 579].  The Schedules provide summaries of the assets held by each of the Debtors as of the Petition Date, as well as a listing of the secured, unsecured priority, and unsecured non-priority claims pending against each of the Debtors during the period prior to the Petition Date, based upon the Debtors' books and records.  The Schedules also provide information concerning the Debtors' financial affairs during the period prior to the Petition Date. A description of the scheduled liabilities is provided in Article IV of this Disclosure Statement.

In addition, on (i) July 8, 2019 the Debtors filed the *Debtors' First Notice of Claims Satisfied in Full* [Docket No. 781], (ii) February 28, 2020 the Debtors filed the *Debtors' Second Notice of Claims Satisfied in Full* [Docket No. 1510], (iii) May 29, 2020 the Debtors filed the *Debtors' Third Notice of Claims Satisfied in Full or in Part* [Docket No. 1779], and (iv) July 27, 2020 the Debtors filed the *Debtors' Fourth Notice of Claims Satisfied in Full or in Part* [Docket No. 2035], pursuant to which the Debtors identified certain scheduled Claims that have been satisfied by the Debtors in full or in part after the Petition Date in accordance with the relief requested in various of the First Day Motions.  All scheduled Claims identified as "satisfied" were designated as such on the register of claims maintained by the Claims Agent.

(e)    *Establishment of Bar Dates*

The Bankruptcy Court entered an order on July 25, 2019 [Docket No. 881] (the "**General Bar Date Order**") establishing October 15, 2019 as the last date by which claimants could assert any Claims against the Debtors (the "**General Bar Date**"), other than "Talc Claims"[70] and certain

---

[70]    As used in the General Bar Date Order, the term "Talc Claim" means any claim (as defined in section 101(5) of the Bankruptcy Code) and any future claims or Demands (as that term is defined in section 524(g) of the Bankruptcy Code), whether known or unknown, including with respect to bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring or other personal injuries (whether physical, emotional or otherwise), for which the Debtors are alleged to be liable, directly or indirectly, arising out of or relating to the presence of or exposure to talc or talc-containing products, including, without limitation: (a) any products previously manufactured, sold and/or distributed by any predecessors to the Debtors; (b) any materials present at any premises owned, leased, occupied or operated by any entity for whose products, acts, omissions, business or operations the Debtors have, or are alleged to have, liability; or (c) any talc alleged to contain asbestos or other contaminates.  Talc Claims include all such claims, whether: (a) in tort, contract, warranty, restitution, conspiracy, contribution, indemnity, guarantee, subrogation or any other theory of law, equity or admiralty; (b) seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative or any other costs or damages; or (c) seeking any legal, equitable or other relief of any kind whatsoever, including, for the avoidance of doubt, any such claims assertable against one or more Debtors by Cyprus Mines Corporation, Cyprus Amax Minerals Company, and/or any of their affiliates in these Chapter 11 Cases.  Talc Claims also include any such claims that have been resolved or are subject to resolution pursuant to any agreement, or any such claims that are based on a judgment or verdict.  Talc Claims do not include (a) any claim of an insurer with respect to amounts allegedly due under any insurance policies, including policies that might have provided coverage for Talc Claims, or (b) any claim by any present or former employee of a predecessor or affiliate (as defined in section 101(2) of the Bankruptcy Code) of the Debtors for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing

other Claims explicitly excluded in the General Bar Date Order.  The General Bar Date Order also set bar dates for any Claims resulting from any future rejections by the Debtors of executory contracts and unexpired leases.

On November 22, 2019, the Bankruptcy Court entered an order [Docket No. 1260] (the "**Indirect Talc Claim Bar Date Order**") establishing January 9, 2019 (the "**Indirect Talc Claim Bar Date**") as the last date by which claimants could assert any "Indirect Talc Claims."[71] The Indirect Talc Claim Bar Date Order does not apply to holders of Talc Claims, other than holders of Indirect Talc Claims.

      (f)     *Claims Objections and Claim Classification*

On February 28, 2020, the Debtors filed the *Debtors' First Omnibus (Non-Substantive) Objection to Amended Claims and Duplicative Claims* [Docket No. 1509] (the "**First Claim Objection**"), pursuant to which the Debtors sought to disallow, expunge, and/or modify certain amended or duplicative claims.  Certain objections in the First Claim Objection were withdrawn on March 26, 2020 [Docket No. 1579].  An order granting the relief sought in the First Claim Objection was entered by the Bankruptcy Court on April 8, 2020 [Docket No. 1611].

On May 29, 2020, the Debtors filed the *Debtors' Second Omnibus (Substantive) Objection to Certain No Liability Claims and Overstated State Claims* [Docket No. 1777] (the "**Second Claim Objection**") and *Debtors' Third Omnibus (Non-Substantive) Objection to Amended Claims* [Docket No. 1778] (the "**Third Claim Objection**").  Pursuant to the Second Claim Objection, the Debtors sought to disallow and/or modify certain no liability and overstated claims.  Pursuant to the Third Claim Objection, the Debtors sought to disallow, expunge, and/or modify certain amended claims.  Orders granting the relief sought in the Second Claim Objection and the Third Claim Objection were entered on June 26, 2020 [Docket Nos. 1943 and 1944].

On July 27, 2020, the Debtors filed the *Debtors' Fourth Omnibus (Substantive) Objection to Certain No Liability Claims, Substantive Duplicate Claims, Reclassified Claim, and Overstated,*

---

compensation to an employee from an employer.  For the avoidance of doubt, the definition equally applied to foreign creditors.

[71]     As used in the Indirect Talc Claim Bar Date Order, an "Indirect Talc Claim" is any Talc Claim of any corporation (as defined in section 101(9) of the Bankruptcy Code), co-defendant of a Debtor, or predecessor of a Debtor (each, a "**Claimant**") for contribution, reimbursement, subrogation, or indemnity, whether contractual or implied by law (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Talc Claim of a Claimant, whether in the nature of or sounding in contract, tort, warranty, or other theory of law.  For the avoidance of doubt, an Indirect Talc Claim shall not include any claim for or otherwise relating to death, injury, or damages caused by talc or a product or material containing talc that is asserted by or on behalf of any injured individual, the estate, legal counsel, relative, assignee, or other representative of any injured individual, or an individual who claims injury or damages as a result of the injury or death of another individual regardless of whether such claim is seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs or damages, or any legal, equitable or other relief whatsoever, including pursuant to a settlement, judgment, or verdict.  By way of illustration and not limitation, an Indirect Talc Claim shall not include any claim for loss of consortium, loss of companionship, services and society, or wrongful death.

*Reclassified Claim* [Docket No. 2023] (the "**Fourth Claim Objection**") and *Debtors' Fifth Omnibus (Substantive) Objection to Certain Satisfied Claims, Substantive Duplicate Claims, and Partially Satisfied Claim* [Docket No. 2034] (the "**Fifth Claim Objection**").  Pursuant to the Fourth Claim Objection, the Debtors sought to disallow and/or modify certain no liability claims, substantive duplicative claims, a reclassified claim, and an overstated and reclassified claim.  Pursuant to the Fifth Claim Objection, the Debtors sought to disallow and/or modify certain satisfied claims, substantive duplicative claims, and a partially satisfied claim.  Orders granting the relief sought in the Fourth Claim Objection and the Fifth Claim Objection were entered on September 4, 2020 [Docket Nos. 2161 and 2162].

On November 16, 2020, the Debtors filed the *Debtors' Sixth Omnibus (Substantive) Objection to Certain Satisfied Claims, Substantive Duplicate Claims, and Partially Satisfied Claims* [Docket No. 2533] (the "**Sixth Claim Objection**").  Pursuant to the Sixth Claim Objection, the Debtors sought to disallow and/or modify certain satisfied claims, substantive duplicative claims, and partially satisfied claims.  An order granting the relief sought in the Sixth Claim Objection was entered on December 15, 2020 [Docket No. 2637].

On January 11, 2021, the Debtors filed the *Debtors' Seventh Omnibus (Non-Substantive) Objection to Amended Claims* [Docket No. 2747] (the "**Seventh Claim Objection**").  Pursuant to the Seventh Claim Objection, the Debtors sought to disallow or expunge certain amended claims.  The Seventh Claim Objection has been scheduled for hearing on February 10, 2021.

On May 29, 2020, the Debtors also filed the *Motion of the Debtors for an Order Confirming Classification of Certain Claims Filed in the Chapter 11 Cases as Talc Personal Injury Claims and Expunging Such Claims from the Claims Register* [Docket No. 1776] (the "**Classification Motion**"), pursuant to which the Debtors sought (i) confirmation of the classification of certain claims filed in the Chapter 11 Cases identified on Schedule 1 to the Classification Motion as Talc Personal Injury Claims under the Plan and (ii) authorization to expunge such Filed Talc Claims (as defined in the Classification Motion) from the Claims Register upon the Effective Date of the Plan.  Prior to the objection deadline, numerous parties, including holders of Filed Talc Claims, filed objections to the Classification Motion.  It is expected that the Classification Motion will be heard on or prior to the Confirmation Hearing.

(g)     *ITC Stipulation*

Over the course of the Chapter 11 Cases, the Debtors have incurred and continue to incur professional fees and expenses related to the administration of the Chapter 11 Cases, including the fees and expenses of professionals retained by the Tort Claimants' Committee and the FCR.  For purposes of administrative convenience only, ITA, on behalf of itself and the other Debtors, has paid, and continues to pay these professional fees as they become due.  ITA has asserted certain claims and rights to reimbursement as against its co-debtor, ITC, on account of administrative expenses incurred by the Debtors' estates.

On March 26, 2020, the Bankruptcy Court approved a stipulation (the "**ITC Stipulation**") among ITA, ITC, and the Information Officer [Docket No. 1578].  Pursuant to the ITC Stipulation, ITA, ITC, and the Information Officer agreed to the following: (i) ITC shall pay ITA the sum of $3,450,000 (USD) as an initial payment on account of administrative expenses paid by ITA

through February 28, 2020 and (ii) upon request from ITA, to the extent that ITC holds sufficient funds and with the consent of the Information Officer, ITC is authorized and directed to pay ITA on a periodic basis for (a) 33.33% of the fees incurred by professionals retained by the FCR and (b) 26.5% of fees incurred by professionals retained by the Tort Claimants' Committee by ITA after February 28, 2020.  Pursuant to the stipulation, on account of these payments ITC has been granted claims with superpriority administrative expense status against ITA; *provided* that in the event the proposed Plan is confirmed, such superpriority claims shall be deemed satisfied in full without any payment required from ITA.  Under the ITC Stipulation, ITA, ITC and the Information Officer have reserved all rights as to ITC's obligations to reimburse ITA on account of its payment of administrative expense claims.

5.8    Debtor-In-Possession Financing

As a result of the length of the Chapter 11 Cases and certain operational setbacks resulting from the COVID-19 pandemic, the Debtors face liquidity constraints.  Consequently, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 2459] (the "**DIP Motion**"), pursuant to which the Debtors sought authority to obtain the DIP Facility in order to fund operations and administrative expenses.

After the DIP Hearing, the Bankruptcy Court declined to grant the relief sought in the DIP Motion given the Bankruptcy Court's concerns regarding specific terms of the DIP Loan Documents and the necessity of the proposed DIP Facility in light of the expected proceeds from the Sale.

Since the Hearing, the Plan Proponents have worked collaboratively to revise the terms and structure of the DIP Facility to address the Bankruptcy Court's comments and resolve the Bankruptcy Court's concerns.  As revised, the DIP Facility would be available to the Debtors to fund operations and administrative expenses, as needed, to bridge to the closing of the Sale.

If needed, (i) the proposed DIP Facility will serve as interim financing to fund the Debtors' operations and the costs of the Chapter 11 Cases *prior to* the closing of the Sale and (ii) the proceeds of the Sale will fund the administrative expenses and costs of the Chapter 11 Cases and any reserves required pursuant to any confirmed plan of reorganization *following* the closing of the Sale, subject to Imerys S.A.'s agreement under the terms of the Imerys Settlement to fund the Contingent Contribution up to $15 million on the Effective Date.  It is anticipated that the full amount of the Contingent Contribution will be used during the pendency of the Chapter 11 Cases or on the Effective Date of the Plan to, among other things: (i) pay working capital and general corporate expenses of the Debtors, and (ii) pay, or fund reserves with respect to, fees, costs, and expenses incurred in connection with the administration and prosecution of the Chapter 11 Cases.

Any and all amounts payable under the DIP Facility will be paid in full consistent with the DIP Loan Documents and the DIP Order.  Specifically:

- If the Sale does not close before the Effective Date and the Plan is confirmed on or before June 25, 2021, then the principal amount of the DIP Loans shall first be

applied as a dollar-for-dollar reduction of the amount of the Contingent Contribution required to be contributed by Imerys S.A. to the Debtors or the Reorganized Debtors (in an amount not to exceed $15 million). The reaming outstanding amount of the DIP Loans shall be applied as a dollar-for-dollar reduction of the $75 million in Cash that is part of the Imerys Settlements Funds. All other obligations and interest will be discharged in full and terminated.

- If the Sale closes prior to the Effective Date, the Debtors shall prepay the aggregate principal amount of the DIP Loans in full using the Sale Proceeds. To the extent the DIP Loans are prepaid with Sale Proceeds, the amount of the Contingent Contribution required to be contributed by Imerys S.A. to the Debtors pursuant to the Plan shall be the lesser of (i) $15 million and (ii) fifty percent (50%) of the sum of (A) any administrative expenses paid with the proceeds of the DIP Loans prior to such prepayment *plus* (B) any administrative expenses from the Sale Closing Date through the Effective Date *plus* (C) any amounts necessary to fund all reserves, costs, or expenses required in connection with the Debtors' emergence from bankruptcy. All other obligations and interest will be discharged in full and terminated. No adjustments shall be made to the Sale Proceeds, including with respect to the calculation of the contingent purchase price enhancement to be contributed by Imerys S.A. as described in <u>Section 6.4(b)</u> of this Disclosure Statement and set forth in <u>Section 1.1.124</u> of the Plan, in connection with any administrative expenses incurred by the Debtors and paid out of such Sale Proceeds following the closing of the Sale.[72]

- If the Plan is confirmed after June 25, 2021, the accrued interest under the DIP Facility will be required to be paid in cash on the earliest (i) the Commitment Termination Date (as defined in the DIP Loan Documents), (2) the date on which the entire principal amount of the DIP Loans become due and payable pursuant to the terms of the DIP Agreement, or (3) the date of payment in full of the DIP Loans, subject to terms of the DIP Loan Documents.

The Debtors believe that the DIP Facility is in the best interests of the Estates because it will provide the Debtors with any additional liquidity they may need to get through Confirmation of the Plan. The treatment of the DIP is further described in the Plan and the DIP Motion.

5.9    <u>Litigation, Adversary Proceeding, Coverage Disputes, and Mediation</u>

(a)    *The Cyprus Insurance Adversary Proceeding*

On March 7, 2019, the Debtors initiated an adversary proceeding against Cyprus, captioned *Imerys Talc America, Inc., et al. v. Cyprus Amax Minerals Company and Cyprus Mines Corporation*, Adv. Pro. No. 19-50115 [Adv. Pro. Docket No. 1] (the "**Cyprus Insurance Adversary Proceeding**"). The issue to be decided in the Cyprus Insurance Adversary Proceeding is whether, after Cyprus Mines sold and transferred its talc business in 1992, Cyprus retained any

---

[72]    The Plan Proponents further agree that in the event the Sale to Magris Resources closes for the amount set forth in the Sale Order, no purchase price enhancement will be payable by Imerys S.A.

US-DOCS\120811663.4

right to the proceeds of, or any right to assert claims under, the Cyprus Talc Insurance Policies for lawsuits alleging injuries resulting from exposure to talc or products containing talc mined, distributed, sold and/or supplied by Cyprus Mines prior to June 5, 1992. Ultimately, the Debtors are seeking a declaration that Cyprus no longer has any right to the proceeds of, or to pursue claims under, the Cyprus Talc Insurance Policies with respect to talc-related lawsuits.

The Debtors' property rights in the proceeds of the Cyprus Talc Insurance Policies stem from that certain Agreement of Transfer and Assumption (as amended the "**ATA**"), dated June 5, 1992, by and between Cyprus Mines and CTC. Cyprus Mines' talc-related liabilities (subject to certain exceptions) were transferred to CTC, which is now Debtor ITA. The Debtors contend that pursuant to the ATA, Cyprus Mines sold, transferred, and assigned all of its interest in assets, properties, and rights of every type relating to Cyprus Mines' talc business to CTC, which included all rights to seek the proceeds of, and pursue claims under, the Cyprus Talc Insurance Policies.[73]

Prior to the initiation of the Cyprus Insurance Adversary Proceeding, on February 28, 2019, Cyprus filed the *Emergency Motion for (i) Interim and Final Orders Granting Relief from the Automatic Stay under Bankruptcy Code § 362(d) to Use Insurance Coverage under Cyprus Historical Policies or, in the Alternative, (ii) Adequate Protection Under Bankruptcy Code §§ 361 and 363(e)* [Docket No. 104]. Following hearings on the motion and briefs filed by the Debtors and other parties in interest, Cyprus and the Debtors agreed to limited stay relief during the pendency of the Cyprus Insurance Adversary Proceeding. On March 26, 2019, the Bankruptcy Court entered an order permitting Cyprus to use the Cyprus Talc Insurance Policies to defend and indemnify Cyprus in certain asbestos-related lawsuits in which any Cyprus entity is a defendant, and to tender any new asbestos-related lawsuits to insurers under the Cyprus Talc Insurance Policies [Docket No. 309]. The Debtors reserved their rights to assert claims against Cyprus, and any Cyprus-related entity that obtained the benefit of the Cyprus Talc Insurance Policies during the pendency of the Cyprus Insurance Adversary Proceeding.

Discovery in the Cyprus Insurance Adversary Proceeding was completed in January 2020, and the Cyprus Insurance Adversary Proceeding was scheduled to go to trial on March 25 and March 27, 2020. However, in February 2020, prior to filing summary judgment and opening trial briefs, the parties to the Cyprus Insurance Adversary Proceeding agreed to stay the Cyprus Insurance Adversary Proceeding and to engage in mediation.

The Cyprus Insurance Adversary Proceeding has remained stayed since February 2020. Pursuant to the *Third Amended Scheduling Order and Order Appointing Mediator* [Adv. Pro. Docket No. 183] (the "**Scheduling Order**"), during this period, the parties agreed that they could

---

[73]     Leading up to the ATA, Cyprus Mines and its subsidiaries acquired the stock or assets of other talc companies. In 1989, Cyprus Mines purchased 100% of the stock of Windsor from J&J. In 1992, pursuant to the ATA, Cyprus Mines and its affiliates transferred such stock and substantially all of the other assets in their then existing talc business to a newly formed subsidiary, CTC, resulting in Windsor becoming a wholly owned subsidiary of CTC. Contemporaneously with the consummation of the ATA, RTZ America, Inc. (later known as Rio Tinto) purchased 100% of the stock of CTC from Cyprus Mines pursuant to that certain Stock Purchase Agreement dated June 5, 1992, by and between RTZ America, Inc., Cyprus Mines, and Cyprus Minerals Company. CTC subsequently changed its name to Luzenac America, which is now Debtor ITA.

continue to discuss and address with the Bankruptcy Court, among other things, (i) certain documents produced by Cyprus to which the Debtors objected, (ii) re-opening certain depositions to address newly produced documents, and (iii) the stipulation of facts between the parties.  To the extent the mediation was not successful, the Scheduling Order also provided that Cyprus and the Debtors would work together to negotiate and file with the Bankruptcy Court an amended scheduling order.

The parties held an initial mediation session before mediator Lawrence W. Pollack on March 3, 2020, and have continued to engage in mediation, culminating in the Cyprus Settlement (the "**Cyprus Mediation**").

Pursuant to the Cyprus Settlement, on and after December 22, 2020, the Debtors will stay and cease prosecuting the Cyprus Insurance Adversary Proceeding, and subject to the occurrence of the Cyprus Trigger Date, the Debtors will dismiss the Cyprus Insurance Adversary Proceeding.  However, in the event the Cyprus Trigger Date does not occur, the Debtors shall be entitled to continue to prosecute the Cyprus Insurance Adversary Proceeding.[74]

(b)    *The Cyprus Indemnity Adversary Proceeding*

On June 15, 2020, Cyprus initiated an adversary proceeding against ITA, ITV, Johnson & Johnson, and Johnson & Johnson Consumer Inc. (collectively, the "**Indemnity Proceeding Defendants**"), captioned *Cyprus Mines Corporate and Cyprus Amax Minerals Company v. Imerys Talc America, Inc., Imerys Talc Vermont, Inc., Johnson & Johnson and Johnson & Johnson Consumer Inc.*, Adv. Pro. No. 20-50626 [Adv. Pro. Docket No. 1] (the "**Cyprus Indemnity Adversary Proceeding**").  The issue to be decided in the Cyprus Indemnity Adversary Proceeding is whether Cyprus has any indemnity rights against J&J under the 1989 SPA and the 1989 Supply Agreement.  The Debtors maintain that they have indemnification rights against J&J under those agreements, regardless of whatever indemnity rights (if any) Cyprus may have against J&J.

On July 29, 2020, the Debtors filed an answer to the complaint asserting various affirmative defenses as well as counterclaims (i) seeking a declaration that Cyprus Mines lacks the right and standing to pursue the causes of action asserted in the complaint, and (ii) asserting that Cyprus Mines breached its representations and warranties under certain agreements.  On July 29, 2020, J&J filed a motion to dismiss the complaint for lack of subject matter jurisdiction, or, in the alternative, to abstain or to sever and transfer the claims to the United States District Court for the District of Vermont (the "**J&J Motion to Dismiss**").  On September 1, 2020, Cyprus responded to the Debtors' counterclaims and the J&J Motion to Dismiss, and on September 3, 2020, Cyprus filed a request for oral argument in connection with the J&J Motion to Dismiss.  On September 16, 2020, J&J filed a reply in support of the J&J Motion to Dismiss.  On October 6, 2020, Cyprus

---

[74]    Similarly, the Cyprus Settlement requires the Cyprus Protected Parties to stay and cease prosecuting (on or after December 22, 2020) and/or dismiss or withdraw (upon the occurrence of the Cyprus Trigger Date) all adversary proceedings, any proofs of claim, objections, discovery demands and discovery disputes, and any other litigation against the Debtors, the Tort Claimants' Committee, and the FCR. Further, and subject to the terms of the Plan, all such releases and Injunctions in the Plan and Confirmation Order with respect to the Cyprus Protected Parties will dissolve if any of the cash payments required to be made by CAMC (or Freeport as guarantor, if applicable) are not timely made.

filed a sur-reply in opposition to the J&J Motion to Dismiss, and on October 16, 2020, J&J filed an opposition to the sur-reply.  As of the date of this Disclosure Statement, the request for oral argument and the J&J Motion to Dismiss are pending before the Bankruptcy Court.

On and after December 22, 2020, Cyprus will stay and cease prosecuting the Cyprus Indemnity Adversary Proceeding as to the Debtors, and following the occurrence of the Cyprus Trigger Date, the Cyprus Indemnity Adversary Proceeding will be dismissed by Cyprus as to the Debtors.  If the Cyprus Trigger Date does not occur, Cyprus shall be entitled to continue to prosecute the Cyprus Indemnity Adversary Proceeding as to the Debtors.

(c)    *Rio Tinto/Zurich Mediation*

As discussed in greater detail above, the Debtors assert rights to coverage under the Zurich Policies.  Historically, Zurich has declined to defend the Mesothelioma Claims on the basis of exclusions in the policies for asbestos-related claims, but has accepted the Debtors' tender of the defense of OC Claims.[75]  In addition, the Rio Tinto Captive Insurers issued the Rio Tinto Captive Insurer Policies, which included Luzenac America and other Rio Tinto Corporate Entities as insureds, although Rio Tinto contends that the Debtors are not entitled to coverage under those policies under the 2011 Purchase.

The Debtors, Rio Tinto, Zurich, the FCR, the Tort Claimants' Committee, and Mircal (together, the "**Rio Tinto/Zurich Mediation Parties**") agreed to enter into non-binding mediation in an attempt to reach a resolution regarding disputes over (i) alleged liabilities relating to the Rio Tinto Corporate Parties' prior ownership of the Debtors, (ii) alleged indemnification obligations of the Rio Tinto Corporate Parties, and (iii) the amount of coverage to which the Debtors claim to be entitled under Talc Insurance Policies issued by the Zurich Corporate Parties and the Rio Tinto Captive Insurers (the "**Rio Tinto/Zurich Mediation**").  On December 26, 2019, the Bankruptcy Court entered an order appointing Lawrence W. Pollack to serve as mediator [Docket No. 1370].  Mediation sessions took place on January 28, January 29, and May 29, 2020.  The Rio Tinto/Zurich Mediation Parties subsequently agreed to the terms of the Rio Tinto/Zurich Settlement as set forth in Section 7.6(i) of this Disclosure Statement.

(d)    *California Coverage Action and Insurers' Relief from Stay Motion*

On August 24, 2017, the Certain Excess Insurers initiated the lawsuit styled as *Columbia Cas. Co., et al. v. Cyprus Mines Corp., et al.,* No. CGC-17-560919 in the California Superior Court, County of San Francisco (the "**California Coverage Action**").  The second amended complaint filed by the Certain Excess Insurers on July 27, 2018, seeks a determination as to which of various competing corporate entities (including ITA) (collectively, the "**Corporate Entities**") have rights to the Cyprus Talc Insurance Policies.  The Certain Excess Insurers are also seeking determinations as to whether there are any obligations with respect to talc bodily injury claims that remain, the existence and extent of the Certain Excess Insurers' contribution rights against certain

---

[75]    *See Rio Tinto's Opposition to Certain Excess Insurers' Motion for Relief from Stay and Conditional Cross-Motion for Relief from Stay to Permit Rio Tinto to Pursue Cross-Claims* [Docket No. 505].

other insurers, and the resolution of certain discrete coverage issues under certain of the Cyprus Talc Insurance Policies.

ITA is a named defendant in all but two of the ten causes of action asserted by the Certain Excess Insurers in their second amended complaint. Three of the causes of action address which entity or entities have coverage rights under the Cyprus Talc Insurance Policies. The other causes of action concern the amount of coverage available under the Cyprus Talc Insurance Policies. The Debtors contend that (i) ITA has the right to seek the proceeds of, and pursue coverage under, the Cyprus Talc Insurance Policies and (ii) the amounts due under the Cyprus Talc Insurance Policies are assets of their Estates.[76]

On November 20, 2017, the Certain Excess Insurers agreed to extend the time for the Corporate Entities to respond to the first amended complaint to December 1, 2017. A partial stay was agreed to by the Certain Excess Insurers and the Corporate Entities whereby none of the Corporate Entities were permitted to propound discovery requests on any of the Certain Excess Insurers and the Certain Excess Insurers were precluded from seeking discovery from insurer-defendants relating to underlying lawsuits, Cyprus Mines' talc supply history, and Cyprus Mines' corporate transaction history. The stay was extended through July 20, 2018. On July 27, 2018, the Certain Excess Insurers filed their second amended complaint, and on August 16, 2018, the Certain Excess Insurers agreed to further extend the stay, which was ultimately extended through February 11, 2019.

During the partial stay, ITA did not respond to the second amended complaint, did not participate in formal discovery, and did not engage in motion practice. Despite the partial stay, one or more of the Certain Excess Insurers continued to defend and settle various talc lawsuits on behalf of ITA subject to a reservation of rights. One or more of the Certain Excess Insurers also defended and settled certain talc lawsuits on behalf of ITA notwithstanding the fact that the Certain Excess Insurers agreed not to pursue the claims asserted in the California Coverage Action. Moreover, while the parties to the California Coverage Action did resolve certain issues, this was done through negotiations without court involvement.[77]

---

[76]    Certain other insurers, including Ace Property and Casualty Company ("**Central National**") and Unigard Insurance Company ("**Unigard**"), were named as defendants in the California Coverage Action. For instance, the Certain Excess Insurers pursued equitable contribution and subrogation claims against Central National and Unigard. On June 18, 2018, the Certain Excess Insurers filed a motion for summary adjudication against Central National and Unigard seeking a ruling that each insurer was obligated to participate in defense and indemnity upon exhaustion of primary policies. Unigard also filed a cross-complaint against Cyprus and ITA, but agreed to extend the time for ITA to respond through February 19, 2019. In light of the bankruptcy filing, ITA has not responded to Unigard's cross-complaint, which seeks, among other things, damages from ITA for an alleged breach of a settlement agreement. There is no current date for the hearing on the Certain Excess Insurers' motion for summary adjudication against Unigard, and the court in the California Coverage Action summarily denied the Certain Excess Insurers' motion for summary adjudication against Central National as premature.

[77]    ITA also filed a cross-complaint in the California Coverage Action, seeking a finding that certain cross-defendant insurers are obligated to defend ITA, or reimburse ITA for defense expenses, and indemnify ITA in connection with certain lawsuits seeking damages for personal injury caused by exposure

On April 19, 2019, the Certain Excess Insurers filed the *Certain Excess Insurers' Motion for Relief from the Automatic Stay to Permit the California Coverage Action to Proceed and Order of Abstention* [Docket No. 390] (the "**Insurers' Relief from Stay Motion**") pursuant to which the Certain Excess Insurers sought relief from the automatic stay to permit the California Coverage Action to proceed.[78]  The Certain Excess Insurers also moved for the Bankruptcy Court to abstain from interpreting the Cyprus Talc Insurance Policies in the Cyprus Insurance Adversary Proceeding.[79]  The Debtors and certain other parties in interest filed oppositions to the Insurers' Relief from Stay Motion on grounds that it is unclear whether Cyprus has any rights to the proceeds of, or any ability to pursue any claims under, the Cyprus Talc Insurance Policies for certain talc-related lawsuits until the Cyprus Insurance Adversary Proceeding is fully and finally decided.  The Debtors primarily argued that lifting the stay would be an unnecessary waste of judicial and Estate resources, and could risk inconsistent (and preclusive) judgments that would flow from the concurrent litigation of the Cyprus Insurance Adversary Proceeding and the California Coverage Action.  On June 28, 2019, the Bankruptcy Court entered an order denying the Insurers' Relief from Stay Motion [Docket No. 762].  As of the date hereof, the California Coverage Action remains subject to the automatic stay.

     (e)    *XL Mediation*

As discussed in greater detail above, the Debtors assert rights to coverage under the XL Policies.  The Debtors, XL, the Tort Claimants' Committee, and the FCR (together, the "**XL Mediation Parties**") agreed to enter into non-binding mediation in an attempt to reach a resolution regarding the amount of coverage to which the Debtors claim to be entitled under the XL Policies.  On October 12, 2020, the Bankruptcy Court entered an order appointing Lawrence W. Pollack to serve as mediator [Docket No. 2325].  The XL Mediation Parties participated in an initial mediation session before Mr. Pollack on October 22, 2020 and have continued to engage in mediation.

     (f)    *Chubb Mediation*

As noted above, ITA believes it has the right to seek coverage under the Cyprus Talc Insurance Policies.  Certain of the Cyprus Talc Insurance Policies were issued by Century Indemnity Company, Federal Insurance Company, and Central National Insurance Company of Omaha (collectively, the "**Chubb Insurers**").  Specifically, the Chubb Insurers have represented that they issued eighteen umbrella or excess policies between the years of 1975 and 1985 with total limits of approximately $110 million (the "**Chubb Policies**").  The Debtors, the Chubb Insurers, the Tort Claimants' Committee, and the FCR (together, the "**Chubb Mediation Parties**")

---

to asbestos or asbestiform minerals in talc and talc-containing products mined, delivered, or supplied by Cyprus Mines.

[78]    National Union and Lexington Insurance Company were not listed as Certain Excess Insurers in the Insurers' Relief from Stay Motion, however, they were included as Certain Excess Insurers in the Certain Excess Insurers' reply brief.

[79]    Central National Insurance Company of Omaha (for policies issued through Cravens Dargan & Co., Pacific Coast) and Providence Washington Insurance Company (as successor in interest to Seaton Insurance Company, successor in interest to Unigard Mutual Insurance Company) filed joinders in support of the motion [Docket Nos. 411 and 512].

agreed to enter into non-binding mediation in an attempt to reach a resolution regarding the amount of coverage to which the Debtors claim to be entitled under the Chubb Policies.  On October 22, 2020, the Bankruptcy Court entered an order appointing Lawrence W. Pollack to serve as mediator [Docket No. 2386].  The Chubb Mediation Parties participated in an initial mediation session before Mr. Pollack on November 19, 2020 and have continued to engage in mediation.

(g)      *Truck, Old Republic, and AIC Mediation*

Certain of the Cyprus Talc Insurance Policies were also issued by Truck.  Specifically, Truck issued a multi-year primary insurance policy between the years of 1974 and 1980 with total limits of approximately $4.5 million.  The Debtors, Truck, the Tort Claimants' Committee, and the FCR (together, the "**Truck Mediation Parties**") agreed to enter into non-binding mediation in an attempt to reach a resolution regarding disputes over certain insurance obligations.  On November 13, 2020, the Bankruptcy Court entered an order appointing Lawrence W. Pollack to serve as mediator [Docket No. 2515].

In addition, certain of the Cyprus Talc Insurance Policies were issued by (i) Old Republic Insurance Company ("**Old Republic**") and (ii) AIC and Allianz Underwriters Inc. ("**AUI**" and together with AIC, "**Allianz**") .  Old Republic issued three insurance policies between the years of 1985 and 1988 with original total limits of approximately $6 million, AIC issued four insurance policies between the years of 1961 and 1964 with original total limits of approximately $4 million, and AUI issued four insurance policies between the years of 1981 and 1984 with original total limits of approximately $20 million.  The Debtors, the Tort Claimants' Committee, and each of Old Republic and Allianz (together the "**Old Republic/AIC Mediation Parties**") agreed to enter into non-binding mediation in an attempt to reach a resolution regarding disputes over certain alleged insurance obligations.  On January 5, 2021, the Bankruptcy Court entered an order appointing Lawrence W. Pollack to serve as mediator [Docket No. 2703].

The Old Republic/AIC Mediation Parties and the Truck Mediation Parties intend to engage in a joint mediation on or about February 17, 2021.

(h)      *Talc-Related Litigation*

(1)      Consolidation of Talc Litigation in District Court and *Daubert* Hearings

On October 4, 2016, the U.S. Judicial Panel on Multidistrict Litigation (the "**MDL Panel**") ordered that pending and future personal injury or wrongful death actions in federal courts alleging that plaintiffs or their decedents developed ovarian or uterine cancer from the use of J&J's talcum powder products[80] be transferred and centralized in the U.S. District Court for the District of New Jersey, Trenton Division (the "**MDL Proceeding**").  In addition to individual actions pending in federal district courts around the country, two consumer class actions alleging that J&J's talcum powder products were marketed for use without disclosure of talc's alleged carcinogenic properties were included in the MDL Proceeding.

---

[80]      The specific J&J products involved are J&J's Baby Powder and Shower to Shower body powder.

The MDL Panel assigned U.S. District Judge Freda Wolfson as presiding judge for the MDL Proceeding. Judge Wolfson designated U.S. Magistrate Judge Lois Goodman to assist her in the MDL Proceeding. The cases were consolidated to (1) reduce or eliminate duplicative discovery, (2) prevent inconsistent pretrial rulings on discovery and privilege issues, (3) prevent inconsistent rulings on *Daubert* motion practice, and (4) conserve the resources of the parties, their counsel, and the federal judiciary in these actions. Additionally, there are common factual issues in these cases related to the alleged risk of cancer posed by talc and talc-based body powders, whether the defendants knew or should have known of this alleged risk, and whether defendants provided adequate instructions and warnings with respect to these products. As of May 1, 2020, approximately 15,390 such actions involving 16,440 plaintiffs were pending in the MDL in the U.S. District Court of New Jersey. Although the MDL Proceeding has been stayed as to ITA following the Petition Date, the MDL Proceeding is ongoing with respect to J&J and other defendants.

After creation of the MDL Proceeding and its assignment to Judge Wolfson, she ordered a hearing at which all parties could present their summary views of the medical and scientific issues related to the MDL Proceeding, as well as evidence as to whether talc-based body powder products could cause or contribute to ovarian and uterine cancer. That hearing was held on January 26, 2017. Judge Wolfson subsequently ordered full briefing by the parties on the threshold *Daubert* issue of whether reliable and sufficient scientific and medical evidence exists on the issue of causation. Judge Wolfson set an evidentiary hearing on that issue that ran from July 22 to July 31, 2019, with plaintiffs presenting five witnesses and J&J presenting three witnesses. At the conclusion of the hearing, the Judge requested final *Daubert* briefing from all parties which was submitted on October 7, 2019. On April 27, 2020, Judge Wolfson rendered her *Daubert* decision on the opinions offered by these witnesses, granting in part and denying in part J&J's motion to exclude opinions of plaintiffs' five witnesses and denying plaintiffs' motion to exclude the opinions of J&J's three experts. *In re Johnson & Johnson Talcum Powder Products Mktg., Sales Practices and Products Litig.,* MDL No. 2738, Civil Action No. 16-2638 (FLW) (D.N.J. April 27, 2020).

(2)    <u>Consolidation of State Court Talc Litigation</u>

Other OC Claim cases are pending in several state courts across the country. In New Jersey, the Supreme Court designated such cases as Multi-County Litigation for centralized management by the Superior Court of New Jersey Law Division: Atlantic County. Following a hearing on the admissibility of plaintiffs' experts' causation opinions, on September 2, 2016, the Superior Court ruled in favor of J&J and ITA, excluded plaintiffs' general causation experts, and granted summary judgment to the defendants in the first two bellwether cases set for trial. Plaintiffs' appeal of those rulings to the Appellate Division, although stayed as to Debtor ITA, is pending as to J&J.

In California state court, all cases related to OC Claims have been consolidated for pretrial purposes in Judicial Council Coordination Proceedings in the Superior Court for Los Angeles County. Before the first bellwether trial in 2017, ITA obtained summary judgment in its favor based on the bulk-supplier immunity doctrine and the sophisticated intermediary doctrine. After a plaintiff's verdict against J&J in the first bellwether trial in that proceeding, the trial court granted judgment notwithstanding the verdict and a motion for new trial, which were appealed in

66

November 2017.  In July 2019, those rulings were affirmed in part and reversed and remanded to the trial court in part.  As to ITA, the plaintiff's appeal of the summary judgment in favor of ITA was stayed with the filing of the Chapter 11 Cases.

Other cases related to OC Claims have been tried in Missouri and Georgia state courts.  Five cases in which verdicts were rendered against J&J in Missouri state court have been reversed on appeal, and others are currently pending appeal.  The first trial in Georgia state court resulted in a hung jury and has not yet been retried.  All cases are stayed as to ITA, however they continue to move forward as to J&J and the other defendants.  Approximately 150 additional cases are pending in courts of various other states around the country, including Arizona, Delaware, Florida, Illinois, Louisiana, Pennsylvania, Rhode Island, and Virginia.

(3)    Appeals

***Lanzo Appeal***

On or about December 23, 2016, the Lanzo Movants (as defined below) filed an action in the Superior Court of New Jersey, Law Division, Middlesex County (the "**NJ State Court**") against ITA for products liability resulting in personal injury in connection with the use of talcum powder, including a claim for punitive damages.  On April 5 and April 11, 2018, a jury returned a verdict in favor of the Lanzo Movants for compensatory damages in the amount of $11,468,884.93 and punitive damages in the amount of $25,000,000.00, respectively.  On April 23, 2019, the NJ State Court entered a judgment in favor of the Lanzo Movants in the amount of $36,468,884.93, including interest (the "**Lanzo Judgment**").

On April 25, 2018, ITA appealed the Lanzo Judgment (the "**Lanzo Appeal**") to the Superior Court of New Jersey, Appellate Division (the "**NJ Appellate Court**").  Moreover, on or about May 22, 2018, ITA posted a supersedeas bond issued by Aspen (as defined below) in the amount of $39,204,051.36 (the "**Lanzo Appeal Bond**").  In its opening brief, ITA alleged that it is entitled to a new trial due to prejudicial evidentiary and instructional errors, including the introduction of unreliable expert testimony and a prejudicial alternative-causation instruction.  In addition to a new trial, ITA sought vacatur of the punitive damages award.

Upon commencement of the Chapter 11 Cases, the Lanzo Appeal was stayed, and the NJ Appellate Court entered an order dismissing the Lanzo Appeal without prejudice.  Following approval of the Lanzo Stipulation (as defined below), the automatic stay was modified to permit the Lanzo Appeal to proceed to final resolution.  Thereafter, in July 2019, the Lanzo Appeal was reinstated, and on October 2, 2019, ITA filed its reply brief.  Oral argument on the issues raised in the appeal is scheduled for March 9, 2021.

***Booker Appeal***

On or about December 9, 2015, the Booker Movants (as defined below) filed an action in the Superior Court of California, County of Alameda (the "**CA State Court**") against ITA for negligence and strict product liability in connection with exposure to industrial talc, including a claim for punitive damages  On November 27 and December 11, 2017, a jury returned a verdict in favor of the Booker Movants for compensatory damages in the amount of $6,852,000.00 and punitive damages in the amount of $4,600,000.00, respectively.  On December 14, 2017, the CA

State Court entered a judgment in favor of the Booker Movants in the amount of $11,723,196.2, including $271,196.26 in costs (the "**Booker Judgment**").

On March 7, 2018, ITA appealed the Booker Judgment in the Court of Appeal of the State of California, First Appellate District, Division 3, seeking complete reversal or reversal and remand of the Booker Judgment for failure to establish exposure/causation, errors in the verdict form, and erroneous successor liability. Separately, on April 2, 2018, ITA brought a second appeal to challenge the award of costs with respect to the Booker Judgment (collectively, the "**Booker Appeals**" and, together with the Lanzo Appeal, the "**Appeals**"). In connection with the Booker Appeals, ITA posted a supersedeas bond issued by Aspen in the amount of $17,584,794.39 (the "**Booker Appeal Bond**"). The Booker Appeal Bond is in an amount greater than the face amount of the Booker Judgment to account for post-judgment interest.

Although the Booker Appeals were stayed when the Chapter 11 Cases were filed, following approval of the Booker Stipulation (as defined below) the automatic stay was modified to permit the Booker Appeals to proceed to final judgment. On December 2, 2019, the Booker Movants filed their response to the appellants' opening brief. On May 11, 2020, ITA filed its reply brief, and on December 9, 2020, oral argument was held. On December 11, 2020, the Court of Appeal of the State of California, First Appellate District, affirmed the judgment of the CA State Court. The deadline to seek further review from the Supreme Court of California was January 20, 2021.

(i)     *English Arbitration*

As of the date of this Disclosure Statement, ITA is a named defendant in an arbitration proceeding pending in London, in which a claimant is seeking contribution from ITA in General Average for damage sustained to the claimant's vessel while transporting certain goods prior to the Petition Date. The claimant has stayed the proceeding as to ITA as a result of the ongoing Chapter 11 Case, and its claims against ITA have since been resolved in full pursuant to an agreed upon settlement between the claimant and a third party insurer/guarantor. As a result of the foregoing, the arbitration has been discontinued upon agreement of the parties.

(j)     *J&J Mediation*

In an effort to resolve issues pertaining to the J&J Stay Motion, the Debtors, the Tort Claimants' Committee, the FCR, the Imerys Non-Debtors, and J&J agreed to enter into non-binding mediation. On September 11, 2020, the Bankruptcy Court entered an order appointing the Hon. Kevin Carey (Ret.) to serve as mediator [Docket No. 2188]. Mediation sessions took place on September 18 and September 21, 2020. The parties were unable to resolve the aforementioned issues. Moreover, and as noted above, the Bankruptcy Court denied the J&J Stay Motion on September 23, 2020.

5.10    Material Settlements and Resolutions

(a)     *Insurance Settlements*

National Union, Columbia Casualty Company, Continental Casualty Company, The Continental Insurance Company, Lamorak Insurance Company, Lexington Insurance Company, and Berkshire Hathaway Specialty Insurance Company (collectively, "**RMI**"), ITA, Cyprus,

Rawle & Henderson LLP ("**Rawle**"), Dentons US LLP ("**Dentons**"), and Alston, entered into a settlement (the "**RMI Settlement**") that was approved by the Bankruptcy Court on December 13, 2019 [Docket No. 1326]. Pursuant to the RMI Settlement, RMI agreed to pay certain of the Debtors' defense counsel, vendors, and experts an amount of $7,203,714 to satisfy certain prepetition and post-petition defense costs for legal work and other professional services provided in connection with the defense of ITA and/or Cyprus in talc-related litigation. The parties agreed to mutual releases related to prepetition defense costs.

In connection with the RMI Settlement, ITA and Alston also entered into a separate agreement that was approved by the Bankruptcy Court on December 17, 2019 [Docket No. 1339] (the "**Alston Settlement**"). Pursuant to the Alston Settlement, the Debtors permitted Alston to draw down a portion of a retainer from the Debtors in satisfaction of monies owed to Alston but not fully paid under the RMI Settlement. In exchange, Alston agreed to release any claim to the remaining portion of the retainer and refund the remainder of the retainer, totaling $844,745.60, to ITA.

In addition, ITA, Rawle, Dentons, Alston, and Truck Insurance Exchange ("**Truck**") entered into a settlement (the "**Truck Settlement**") that was approved by the Bankruptcy Court on September 18, 2019 [Docket No. 1052] related to Truck's obligations under a primary general liability insurance policy. Pursuant to the Truck Settlement, Truck agreed to pay a total of $2,491,445.20 to certain of the Debtors' defense counsel and vendors and experts. The parties agreed to mutual releases of prepetition defense costs.

The Plan Proponents also agreed to the terms of the Rio Tinto/Zurich Settlement and the Cyprus Settlement, which are described in Articles VI and VII of this Disclosure Statement.

(b)    *Stipulations Permitting Certain Appeals of Judgments on Account of Certain Talc Personal Injury Claims to Proceed to Final Resolution*

On May 6, 2019, Stephen Lanzo, III and Kendra Lanzo (the "**Lanzo Movants**") and Cheryl Booker, individually and as successor-in-interest to Richard Booker, *et al.* (the "**Booker Movants**"), each filed motions for relief from the automatic stay to permit the Appeals to proceed to final resolution, and, if successful, to permit the Lanzo Movants and the Booker Movants to execute and collect on the Lanzo Appeal Bond and the Booker Appeal Bond, as applicable [Docket No. 493 and 491].

On June 13, 2019, the Debtors and Aspen American Insurance Company ("**Aspen**") entered into stipulations with each of the Lanzo Movants (the "**Lanzo Stipulation**") and the Booker Movants (the "**Booker Stipulation**" and, together with the Lanzo Stipulation, the "**Stay Stipulations**") to lift the automatic stay as to the Appeals. The Stay Stipulations were approved by the Bankruptcy Court on June 27, 2019 [Docket Nos. 757 and 756].

The Stay Stipulations consensually resolved the aforementioned relief from stay motions, and permitted the Appeals to proceed subject to the conditions set forth therein. In addition, Aspen agreed to (i) bear sole responsibility for any and all fees and expenses incurred by ITA and its professionals pertaining to the Appeals and (ii) waive any claim for amounts paid on account of

such fees.  Moreover, Aspen waived any claim for amounts paid on account of punitive damages in connection with the Lanzo Judgment and the Booker Judgment.

Any claim held by Aspen stemming from (i) the Lanzo Movants' collection of the Lanzo Appeal Bond and/or (ii) the Booker Movants' collection of the Booker Appeal Bond, will be a Talc Personal Injury Claim and Aspen will have the right to pursue such claims against the Talc Personal Injury Trust, subject to the Stay Stipulations and the Trust Distribution Procedures.

5.11    Anticipated Developments Regarding ITI Before Confirmation

As discussed above, the Debtors anticipate that, if the Plan receives the requisite acceptances pursuant to each of sections 1126(c) and 524(g) of the Bankruptcy Code, ITI will file a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  This Section describes key aspects of the contemplated chapter 11 process with respect to ITI.

The Debtors anticipate that ITI's reorganization will have a minimal effect on ITI and the North American Debtors' business operations.  As discussed herein, the only holders of Claims against ITI that will be Impaired are holders of Talc Personal Injury Claims and Non-Debtor Intercompany Claims in Classes 4 and 5a, respectively.

(a)    *First-Day Motions and Related Relief*

ITI's reason for filing chapter 11 is to address its talc-related liabilities.  To ensure a smooth transition into chapter 11 and in furtherance of this goal, ITI will file a number of motions with the Bankruptcy Court on the commencement date of its restructuring proceedings, including:

- an unimpaired claims motion authorizing ITI to satisfy or honor all unimpaired claims including, among other things, claims arising from employee wage and benefit obligations and claims arising from goods and services provided by vendors and suppliers;

- a motion to ensure continued access to its prepetition cash management system;

- a motion requesting that certain of the orders previously entered in the Chapter 11 Cases be made applicable to ITI (including, without limitation, orders: (i) authorizing payment of prepetition insurance obligations and the ability to maintain post-petition insurance coverage; (ii) authorizing payment of prepetition taxes and fees; (iii) authorizing employment of professionals utilized in the ordinary course of business; (iv) authorizing the retention of the North American Debtors' professionals; (v) establishing procedures for interim compensation and reimbursement of professionals; (vi) approving this Disclosure Statement; and (vii) extending the period to remove claims);

- a motion seeking authority to have its chapter 11 case jointly administered with those of the North American Debtors for procedural purposes only under case number 19-10289 (LSS); and

- a motion seeking authority to waive certain obligations to (i) file schedules and a statement of financial affairs, (ii) file a list of ITI's twenty largest unsecured creditors, and (iii) convene a section 341 meeting of creditors.

For the avoidance of doubt, the interests of holders of Claims against ITI (except for Talc Personal Injury Claims and Non-Debtor Intercompany Claims) are Unimpaired under the Plan. Accordingly, ITI does not anticipate filing schedules and a statement of financial affairs, and will petition the Bankruptcy Court for waiver of such requirements.

(b)    *Anticipated Plan Process*

The Debtors are not presently seeking approval of this Disclosure Statement as to ITI, because at this time ITI is not a Debtor in the Chapter 11 Cases. However, upon Bankruptcy Court approval of this Disclosure Statement, the Debtors intend to solicit votes to accept or reject the Plan with respect to holders of Claims in Class 4 against ITI. Additionally, and although ITI is not yet a Debtor in the Chapter 11 Cases, the key dates with respect to solicitation of votes to accept or reject the Plan as to ITI are the same as the dates set forth in the Solicitation Order and described in Article X of this Disclosure Statement entitled "*Voting Procedures and Requirements*."

The Debtors anticipate that ITI will commence its bankruptcy proceeding in advance of the Confirmation Hearing and will, at or before the Confirmation Hearing, seek an order by the Bankruptcy Court approving this Disclosure Statement as it applies to holders of Talc Personal Injury Claims against ITI pursuant to section 1125 of the Bankruptcy Code.

In the event the Bankruptcy Court approves this Disclosure Statement as to ITI, holders of Claims in Class 4 vote in the requisite numbers necessary to approve the Plan, and the Bankruptcy Court subsequently confirms the Plan, the Confirmation Order will apply to ITI as well. Subject to the terms and conditions set forth in the Plan and described throughout this Disclosure Statement, ITI will then emerge from bankruptcy protection contemporaneously with the other Debtors.

## ARTICLE VI.

## SETTLEMENTS AND THE SALE OF THE NORTH AMERICAN DEBTORS' ASSETS

6.1    The Imerys Settlement

The Plan incorporates a global settlement that is the product of extensive negotiations and discussions among the Plan Proponents providing for the treatment of Talc Personal Injury Claims in a manner that is consistent with the Bankruptcy Code. The Plan Proponents submit that the Imerys Settlement is the product of months of intensive, arms'-length negotiations and is the lynchpin of the Plan, paving the way for a consensual resolution of these Chapter 11 Cases. The Imerys Settlement, by way of the Imerys Contribution, secures a recovery for the benefit of the Debtors' creditors, additional valuable assets that will be provided to the Talc Personal Injury

Trust, and an additional cash recovery resulting from the Sale of the North American Debtors' assets.

(a)    *Overview of the Imerys Settlement*

The Imerys Settlement provides, among other things, (i) funding to the Talc Personal Injury Trust in the form of the Imerys Settlement Funds and (ii) additional funding to the Debtors in the form of the Imerys Cash Contribution to support their reorganization efforts in this phase of the Chapter 11 Cases.[81]  Moreover, the Imerys Settlement provides the Talc Personal Injury Trust with additional, non-Cash consideration, including, but not limited to, the release of certain claims held by the Imerys Non-Debtors, and the transfer of certain insurance rights to the Talc Personal Injury Trust, all as set forth in the Plan.  In exchange, and as described in Article XII of the Plan, the Plan provides releases to the Imerys Protected Parties (the "**Imerys Releases**"), as well as a permanent channeling injunction that bars the pursuit of Talc Personal Injury Claims against the Imerys Protected Parties.  All Talc Personal Injury Claims will be channeled to and resolved by the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures.

As part of the Imerys Settlement, the Tort Claimants' Committee and the FCR have agreed to release their claims against the Imerys Non-Debtors, including those premised on certain theories of liability including, inter alia, piercing the corporate veil, alter ego, conspiracy, or successor liability.  The Imerys Non-Debtors have taken the position that the only entities that could face potential liability for Talc Personal Injury Claims are the Debtors.  To date, no court has upheld a claim against an Imerys Non-Debtor on these theories of liability, and the only court to substantively review these issues rejected these claims.  *See Order Granting Motion to Quash re: Imerys USA, Leavitt v. Johnson & Johnson*, Case No. RG17882401 (Sup. Ct. Cal. Dec. 28, 2018).  However, the Tort Claimants' Committee and the FCR have continued to maintain the validity of these claims.  After an investigation of the underlying merits of these claims by the Tort Claimants' Committee and the FCR, and in order to avoid further protracted litigation and expense, the parties agreed to resolve these claims as part of the Imerys Settlement.

As further described below, the Imerys Settlement also contemplated that the North American Debtors would initiate a sale process in pursuit of a sale of substantially all of the assets of the North American Debtors[82] under section 363 of the Bankruptcy Code.  Proceeds from the Sale will be used to fund the Talc Personal Injury Trust as described in the Plan.

Finally, in order to implement the Imerys Settlement and effectuate the Plan, upon the Effective Date (i) the equity interests in ITI will be reinstated and (ii) the equity interests in each of the North American Debtors will be canceled and the equity interests in each of the Reorganized North American Debtors will be issued to the Talc Personal Injury Trust.  The Talc PI Note will also be issued to the Talc Personal Injury Trust, which, pursuant to the Talc PI Pledge Agreement,

---

[81]    Any portions of the Imerys Cash Contribution not used by the Debtors or applied to the Reserves (pursuant to the limits established in the Plan) will revert to Talc Personal Injury Trust, subject to the limitations contained in the Plan.

[82]    For the avoidance of doubt, the Sale does not include the sale of ITI's assets.

will be secured by a majority of the voting equity interests of Reorganized ITI following the Effective Date.

The Imerys Settlement resolves all outstanding disputes and claims between the Debtors, their Estates, the Imerys Non-Debtors, the Tort Claimants' Committee, and the FCR. While the key terms of the Imerys Settlement are summarized in this Disclosure Statement, you should read the Plan for a complete understanding of the terms and conditions of the Imerys Settlement.

      (b)     *Imerys Releases and Disbursement of the Imerys Contribution*

In exchange for the Imerys Contribution, Imerys S.A. requires confirmation of the Plan and entry of a Confirmation Order by the Bankruptcy Court and affirmed by the District Court that provides the Imerys Protected Parties with the protection of the Channeling Injunction pursuant to sections 524(g) and 105(a) of the Bankruptcy Code, the Imerys Releases, and the Supplemental Settlement Injunction Order. Each is described in further detail in the Plan.

- The Imerys Non-Debtors' Contribution on Behalf of the Protected Parties

Upon the satisfaction, or waiver by the Plan Proponents in writing, of all conditions precedent to the disbursement of the Imerys Contribution in the Plan, the Imerys Contribution shall be distributed by the Imerys Non-Debtors pursuant to the terms of the Plan.

- Section 524(g) and 105(a) Injunction in Favor of the Imerys Protected Parties

Subject to the Talc Distribution Procedures, the Channeling Injunction shall permanently and completely enjoin any person or entity from asserting in any way a Talc Personal Injury Claim against the Protected Parties. All claims against the Protected Parties subject to the Channeling Injunction shall be channeled to, and paid by, the Talc Personal Injury Trust in accordance with the Trust Distribution Procedures.

Each of the Imerys Protected Parties is included as a "Protected Party" as that term is defined in the Plan. Accordingly, the Imerys Protected Parties shall receive the benefit of the Channeling Injunction in accordance with sections 524(g) and 105(a) of the Bankruptcy Code.

- Releases in Favor of the Imerys Protected Parties

The Plan contemplates certain releases in favor of the Imerys Protected Parties to be provided by (i) the Debtors and the Reorganized Debtors, on their own behalf and as representatives of their respective Estates, (ii) the Tort Claimants' Committee and the FCR, on their own behalf, and (iii) the Releasing Claim Holders. Such releases are further described in Article VII of this Disclosure Statement.

- Supplemental Settlement Injunction Order

In connection with the implementation of the Imerys Settlement, the Plan includes the Supplemental Settlement Injunction Order, pursuant to which all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Imerys Released Claims directly or indirectly against the Imerys Protected Parties (or any of them) shall be permanently

US-DOCS\120811663.4

stayed, restrained, and enjoined from pursuing now, or at any time in the future, any Imerys Released Claims. The Supplemental Settlement Injunction Order is further described in Article VII of this Disclosure Statement.

6.2     Settlement with Rio Tinto and Zurich

The Plan also incorporates a comprehensive settlement among the Debtors, on the one hand, and Rio Tinto (on behalf of itself and the Rio Tinto Captive Insurers and for the benefit of the Rio Tinto Protected Parties), and Zurich (on behalf of itself and for the benefit of the Zurich Protected Parties), on the other hand, and consented to by the Tort Claimants' Committee and the FCR, that is the product of months of intensive, arms'-length negotiations, multiple mediation sessions, and the production and review of a broad set of documents relating to the parties' disputes. The Rio Tinto/Zurich Settlement resolves complex disputes among the parties, in an effort to avoid prolonged litigation, and does not involve any admission of liability by any party to the settlement.

(a)     *Overview of the Rio Tinto/Zurich Settlement*

The Rio Tinto/Zurich Settlement (a) releases the Rio Tinto Protected Parties and the Zurich Protected Parties from the Rio Tinto/Zurich Released Claims and (b) channels to the Talc Personal Injury Trust all Talc Personal Injury Claims against any Rio Tinto Protected Party, Rio Tinto Captive Insurer, or Zurich Protected Party. Both the Rio Tinto/Zurich Released Claims and the channeled Talc Personal Injury Claims include, without limitation, any and all claims directly or indirectly arising out of or relating to (i) alleged liabilities relating to the Rio Tinto Corporate Parties' prior ownership of the Debtors, (ii) alleged indemnification obligations of the Rio Tinto Corporate Parties, and (iii) the amount of coverage to which the Debtors claim to be entitled under Talc Insurance Policies issued by the Zurich Corporate Parties and the Rio Tinto Captive Insurers. In return, the Talc Personal Injury Trust will receive the Rio Tinto/Zurich Contribution, consisting of $340 million in cash, along with certain indemnification, contribution, and/or subrogation rights against third parties held by the Zurich Corporate Parties and the Rio Tinto Corporate Parties. The Rio Tinto/Zurich Contribution will provide a substantial recovery for persons holding Talc Personal Injury Claims.

As part of the Rio Tinto/Zurich Settlement, the Tort Claimants' Committee and the FCR have agreed to the release of any and all claims against the Rio Tinto Protected Parties relating in any way to any Talc Personal Injury Claims, including those premised on liabilities such as piercing the corporate veil, alter ego, conspiracy, or successor liability. The Rio Tinto Protected Parties have taken the position that they have no such liability, and to date, no court has upheld a claim against any Rio Tinto Protected Parties on these theories of liability. The resolution of each of these matters represents a compromise of disputes among the parties, without any admission of liability, intended to avoid the costs, risks, and delay associated with protracted litigation. The Tort Claimants' Committee and the FCR have also consented to the Debtors' release of all rights under insurance policies issued by the Zurich Corporate Parties and the Rio Tinto Captive Insurers notwithstanding their disputes concerning the amount of coverage potentially available to the Debtors under these policies, the application of the policies to the Talc Personal Injury Claims, and the timing and amount of such claims in the future, in order to avoid the costs, risks, and delay associated with undertaking protracted litigation against these insurers.

74

(b)    *Terms of the Rio Tinto/Zurich Settlement*

- The Rio Tinto/Zurich Contribution

The Rio Tinto/Zurich Contribution is contingent (i) on the Bankruptcy Court's entry of a Confirmation Order and the District Court's entry of an Affirmation Order, each in a form reasonably acceptable to Rio Tinto and Zurich, confirming the Plan, and approving (a) the Rio Tinto/Zurich Settlement, including the Rio Tinto/Zurich Settlement Agreement, and (b) the releases set out in the Plan, the Channeling Injunction, and the other injunctive relief set out in the Plan, including the Supplemental Settlement Injunction, as to the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties (as applicable); (ii) on the Confirmation Order and Affirmation Order becoming Final Orders; and (iii) on the Plan's becoming effective.  If these preconditions are met, Rio Tinto and Zurich will each make their respective portions of the Rio Tinto/Zurich Contribution, or cause it to be made, in Rio Tinto's case on behalf of itself, the Rio Tinto Captive Insurers, and the Rio Tinto Protected Parties, and in Zurich's case on behalf of the Zurich Protected Parties, to the Talc Personal Injury Trust, to be used for the payment of Talc Personal Injury Claims in accordance with the Trust Distribution Procedures and the Talc Personal Injury Trust Agreement.  The releases and Injunctions provided to the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties (as applicable) will not be effective until the Rio Tinto/Zurich Contribution is made to the Talc Personal Injury Trust.

- Rio Tinto/Zurich Settlement Agreement

Confirmation of the Plan will constitute approval of the Rio Tinto/Zurich Settlement Agreement, under which Zurich and the Rio Tinto Captive Insurers, respectively, will buy back any and all of Debtors' rights under the Zurich Policies and Rio Tinto Captive Insurer Policies, free and clear of any rights of third parties, pursuant to section 363 of the Bankruptcy Code.

- Channeling Injunction Under Sections 524(g) and 105(a) in Favor of the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties

In accordance with sections 524(g) and 105(a) of the Bankruptcy Code, the Channeling Injunction shall permanently and completely enjoin any person or entity from asserting any Talc Personal Injury Claim against the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and/or the Zurich Protected Parties, as these parties are "Protected Parties" as that term is defined in the Plan.  All claims against the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and/or the Zurich Protected Parties subject to the Channeling Injunction shall be channeled to the Talc Personal Injury Trust and resolved in accordance with the Trust Distribution Procedures.

- Releases in Favor of the Rio Tinto Protected Parties and the Zurich Protected Parties

The Plan contemplates certain releases in favor of the Rio Tinto Protected Parties and the Zurich Protected Parties to be provided by (i) the Debtors and the Reorganized Debtors, on their own behalf and as representatives of their respective Estates, (ii) the Tort Claimants' Committee and the FCR, solely on their own behalf, and (iii) the Releasing Claim Holders (as to the Rio Tinto Protected Parties).  Such releases are further described in Article VII of this Disclosure Statement.

- Supplemental Settlement Injunction Order

In connection with the implementation of the Rio Tinto/Zurich Settlement, the Plan includes the Supplemental Settlement Injunction Order, pursuant to which all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Rio Tinto/Zurich Released Claims directly or indirectly against the Rio Tinto Protected Parties (or any of them) and/or the Zurich Protected Parties (or any of them) shall be permanently stayed, restrained, and enjoined from pursuing now, or at any time in the future, any Rio Tinto/Zurich Released Claims. The Supplemental Settlement Injunction Order is further described in Article VII of this Disclosure Statement.

## 6.3    Settlement with the Cyprus Parties

The Cyprus Settlement is the product of good faith and arms'-length negotiations and is a critical development in the Chapter 11 Cases, as it resolves the treatment of all Talc Personal Injury Claims relating to Cyprus and the disputes with Cyprus regarding the Debtors' entitlement to the proceeds of the Cyprus Talc Insurance Policies and the rights of the Debtors and Cyprus to certain indemnities by J&J. The parties to the Cyprus Settlement include the Debtors, the Tort Claimants' Committee, and the FCR, Cyprus Mines (acting through its independent director, D.J. (Jan) Baker), CAMC, and Cyprus' parent company, Freeport. Ultimately, the Cyprus Settlement saves the Debtors, their Estates, and their creditors significant time, expense, and uncertainty, and meaningfully increases the assets of the Talc Personal Injury Trust available for distribution to holders of Talc Personal Injury Claims. Like the Imerys Settlement and the Rio Tinto/Zurich Settlement, the Cyprus Settlement is incorporated in the Plan.

(a)    *Overview of the Cyprus Settlement*

Subject to the occurrence of the Cyprus Trigger Date, the Cyprus Settlement (a) releases the Cyprus Protected Parties from the Estate Causes of Action and the Cyprus Released Claims and (b) channels to the Talc Personal Injury Trust all Talc Personal Injury Claims against any Cyprus Protected Party. In return, and also subject to the occurrence of the Cyprus Trigger Date, the Talc Personal Injury Trust will receive $130 million in cash in seven installments, and the Cyprus Protected Parties (as applicable) will assign to the Talc Personal Injury Trust (i) the rights to and in connection with the Cyprus Talc Insurance Policies, and (ii) all rights to or claims for indemnification, contribution, or subrogation against (a) any Person relating to the payment or defense of any Talc Personal Injury Claim or other past talc-related claim channeled to the Talc Personal Injury Trust prior to the Cyprus Trigger Date, and (b) any Person relating to any other Talc Personal Injury Claim or other claims channeled to the Talc Personal Injury Trust.

The Debtors, the Tort Claimants' Committee, and the FCR have agreed to the release of any and all claims against the Cyprus Protected Parties relating in any way to any Talc Personal Injury Claim. The Cyprus Protected Parties have taken the position that they have no such liability. As with the Imerys Settlement and the Rio Tinto/Zurich Settlement, the resolution of these matters represents a compromise of disputes among the parties, without any admission of liability. Such compromise is intended to avoid the costs, risks, and delay associated with protracted litigation, and was agreed to by the Tort Claimants' Committee and the FCR after an extensive investigation of the underlying merits of these claims.

76

The Plan Proponents believe the Cyprus Settlement confers significant benefits on the Estates and their creditors.  Under the Cyprus Settlement, subject to the occurrence of the Cyprus Trigger Date, $130 million will ultimately be contributed to the Talc Personal Injury Trust.  In addition, the Cyprus Insurance Adversary Proceeding and the Cyprus Indemnity Adversary Proceedings (described in Sections 5.9(a) and 5.9(b) of this Disclosure Statement) are being settled, with Cyprus contributing any rights to the Cyprus Talc Insurance Policies that it holds to the Talc Personal Injury Trust.  The Debtors believe they have strong positions in both adversary proceedings, but the litigation would be extensive and costly and presents substantial risks, including the risk that the Bankruptcy Court would rule that the Debtors do not have enforceable rights, or do not have exclusive rights, to the proceeds of the Cyprus Talc Insurance Policies or indemnification claims against J&J.[83]  The Cyprus Settlement resolves these contested issues as between Cyprus and the Debtors, and, if effectuated, ensures that the Talc Personal Injury Trust will obtain all of the rights to the Cyprus Talc Insurance Policies, as well as the rights under the 1989 SPA and the 1989 Supply Agreement.  Issues regarding coverage available under the Cyprus Talc Insurance Policies remain subject to unresolved litigation in the California Coverage Action.

Pursuant to Section 12.3.1 of the Plan and the Cyprus Settlement, talc-related personal injury claims against Cyprus are to be channeled to the Talc Personal Injury Trust.  As noted above, in 1992, Cyprus transferred talc-related liabilities to ITA under the ATA.  Accordingly, many plaintiffs have historically sued the Debtors and Cyprus for the same talc-related liabilities arising prior to the 1992 transaction.[84]  In light of the significant overlap between talc personal injury claims against Cyprus Mines and the claims against ITA, as well as the pending disputes between the Debtors and Cyprus regarding insurance and other assets that may be available to meet such claims, the Plan Proponents and Cyprus agreed, as part of the Cyprus Settlement, that claims against Cyprus would be channeled to the Talc Personal Injury Trust along with claims against the Debtors.

It is contemplated that there will be a separate Cyprus Mines Bankruptcy filed in the United States Bankruptcy Court for the District of Delaware.  It is expected that the case will be filed as early as late January 2021.  The Cyprus Mines Plan embodying the terms of the Cyprus Settlement will be filed in the Cyprus Mines Bankruptcy.  If the disclosure statement associated with the Cyprus Mines Plan is approved, the Cyprus Mines Plan will be solicited for vote and subject to its own confirmation hearing.

It is contemplated that the Cyprus Mines Plan will contain the broadest releases and injunctions permitted by sections 105(a), 524(g), and 1141(d)(1) of the Bankruptcy Code so as to

---

[83]    See Complaint, Adv. Pro. No. 20-50626 [Adv. Pro. Docket No. 1] (Cyprus Indemnity Adversary Proceeding); Answer and Counterclaim of Cyprus Mines Corporation and Cyprus Amax Minerals Company to the Debtors' Complaint for Injunctive and Declaratory Relief, Adv. Pro. 19-50115 [Adv. Pro. Docket No. 9] (Cyprus Insurance Adversary Proceeding).

[84]    As of the Petition Date, Cyprus Mines or CAMC had been named as defendants in approximately 700 talc-related lawsuits.  In a substantial number of those lawsuits, Cyprus Mines or CAMC was named as a co-defendant of one or more of the Debtors, and the lawsuits attempted to hold Cyprus and the Debtors liable for the same conduct.

prevent an assertion of any further talc-related claims of any kind against any Cyprus Protected Party.

In the event the Cyprus Mines Trigger Date occurs, it is contemplated that all talc personal injury claims channeled pursuant to the Cyprus Mines Plan will go to the Talc Personal Injury Trust proposed in the Chapter 11 Cases of ITA, ITV, ITC, and ITI (to the extent it commences a proceeding under the Bankruptcy Code). It is the understanding of the parties to the Cyprus Settlement that the talc liability of Cyprus Mines and the Debtors is entirely coextensive as a result of ITA's assumption of Cyprus Mines' talc liability pursuant to the terms of the ATA. As a result, all of the Talc Personal Injury Claims against Cyprus and the Debtors will be channeled to the Talc Personal Injury Trust established in the Chapter 11 Cases. The Plan Proponents believe that this structure will allow for a more efficient distribution of the Talc Personal Injury Trust Assets and increase the amounts of recovery available for holders of Talc Personal Injury Claims that are resolved by the Talc Personal Injury Trust for payment.

If the Cyprus Trigger Date does not occur, then talc personal injury claims against Cyprus Mines will not be channeled to the Talc Personal Injury Trust and the Cyprus Contribution will not be made. Nonetheless, the holders of such claims would retain their rights to assert them against Cyprus Mines. In the alternative, the holders of such claims may seek a recovery from Fund A, B, or C (each as defined in the Trust Distribution Procedures) pursuant to the Trust Distribution Procedures to the extent all applicable conditions with respect thereto are met.

(b)     *Terms of the Cyprus Settlement*

- Section 105 Injunction

The Debtors shall seek an injunction pursuant to section 105 of the Bankruptcy Code against the commencement or continuation of talc-related litigation claims against Cyprus Mines or CAMC. The Cyprus Settlement Agreement is conditioned upon the Debtors seeking the Section 105 Injunction and the Bankruptcy Court entering such an injunction by the date set forth in the Cyprus Settlement Agreement (absent extension by the parties).[85]

- Implementation of the Cyprus Settlement

The Cyprus Settlement will be implemented through two chapter 11 plans, which will be coordinated to the maximum extent possible, provided that such coordination does not delay the Debtors' confirmation schedule. The Debtors understand that Cyprus Mines intends to file the Cyprus Mines Bankruptcy as early as late January 2021. The filing of the Cyprus Mines Bankruptcy is an element of the Cyprus Settlement, and was required by Cyprus Mines and CAMC to ensure that Cyprus Mines and the Cyprus Protected Parties obtain comprehensive relief. The material terms of the Cyprus Mines Plan were negotiated as part of the Cyprus Settlement and are

---

[85]     On January 21, 2021, the Debtors filed the *Debtors' Complaint for Injunctive Relief* [Docket No. 2816] seeking a preliminary injunction under section 105(a) of the Bankruptcy Code enjoining the continuation or commencement of any action by certain defendants against Cyprus asserting a personal injury claim relating to talc mined, processed, manufactured, sold and/or distributed by any of the Debtors or Cyprus Mines.

consistent with the Plan.  Effectiveness of the Plan (other than the provisions implementing the Cyprus Settlement) is not conditioned on confirmation or effectiveness of the Cyprus Mines Plan.

The terms of the Cyprus Settlement relating to assignment of insurance rights by Cyprus Protected Parties to the Talc Personal Injury Trust are set forth in the Plan.  The Cyprus Mines Plan and the Cyprus Settlement Agreement will include terms that are consistent with the terms of the Plan that relate to Cyprus Talc Insurance Policies, including terms consistent with the "Insurance Provisions" in Section 11.4.1, which preserve rights and obligations of Talc Insurance Companies.

- The Cyprus Contribution

The Cyprus Contribution is contingent on: (i) entry of the Section 105 Injunction by the Bankruptcy Court; approval by the Bankruptcy Court of the Plan, including approval of the Cyprus Settlement; (ii) entry of the Affirmation Order by the District Court, and the Affirmation Order becoming a Final Order; (iii) approval by a bankruptcy court of the Cyprus Mines Plan, including approval of the Cyprus Settlement; (iv) entry of an affirmation order by the District Court in the Cyprus Mines Bankruptcy, and the affirmation order becoming a Final Order; and (v) satisfaction of the other conditions precedent set forth in Section 9.2 of the Plan, as well as substantially similar conditions in the Cyprus Mines Plan (as applicable).  If these preconditions as more fully described in the Cyprus Settlement Agreement are met, Cyprus will make the Cyprus Contribution to the Talc Personal Injury Trust, to be used for the payment of Talc Personal Injury Claims in accordance with the Trust Distribution Procedures and the Talc Personal Injury Trust Agreement beginning on the Cyprus Trigger Date.  The releases and Injunctions provided to the Cyprus Protected Parties will not be effective until the Cyprus Contribution is made to the Talc Personal Injury Trust as further described in the Plan.  Further, and subject to the terms of the Plan, all such releases and Injunctions in the Plan and the Confirmation Order with respect to the Cyprus Protected Parties will dissolve if any of the cash payments required to be made by CAMC (or Freeport as guarantor, if applicable) are not timely made.

- Approval of the Cyprus Settlement

Confirmation of the Plan will constitute approval of the Cyprus Settlement Agreement, however the Cyprus Settlement will not be effective until the Cyprus Trigger Date.

- Channeling Injunction Under Sections 524(g) and 105(a) in Favor of the Cyprus Protected Parties

In accordance with sections 524(g) and 105(a) of the Bankruptcy Code, and subject to the occurrence of the Cyprus Trigger Date, the Channeling Injunction shall permanently and completely enjoin any person or entity from asserting any Talc Personal Injury Claim against the Cyprus Protected Parties.  All claims against the Cyprus Protected Parties subject to the Channeling Injunction shall be channeled to the Talc Personal Injury Trust and resolved in accordance with the Trust Distribution Procedures.

US-DOCS\120811663.4

- Releases in Favor of the Cyprus Protected Parties

The Plan contemplates certain releases in favor of the Cyprus Protected Parties to be provided by (i) the Debtors and the Reorganized Debtors, on their own behalf and as representatives of their respective Estates, (ii) the Tort Claimants' Committee and the FCR, solely on their own behalf, (iii) the Releasing Claim Holders, and (iv) the Cyprus Settling Talc Insurance Companies.  Such releases are further described in Article VII of this Disclosure Statement.

- Supplemental Settlement Injunction Order

In connection with the implementation of the Cyprus Settlement, the Plan includes the Supplemental Settlement Injunction Order, pursuant to which all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Cyprus Released Claims directly or indirectly against the Cyprus Protected Parties (or any of them) shall be permanently stayed, restrained, and enjoined from pursuing now, or at any time in the future, any Cyprus Released Claims, subject to the occurrence of the Cyprus Trigger Date.  The Supplemental Settlement Injunction Order is further described in Article VII of this Disclosure Statement.

6.4    Sale of North American Debtors' Assets

(a)    *Sale of Assets*

The Plan contemplates that the Debtors will undertake a sale and marketing process of the North American Debtors' assets in accordance with section 363 of the Bankruptcy Code.  To this end, on May 15, 2020, the North American Debtors filed a motion seeking a Bankruptcy Court order (i) authorizing and approving bidding procedures for the sale of all or substantially all of the North American Debtors' assets (the "**Bidding Procedures**"); (ii) establishing procedures for the assumption and assignment of certain executory contracts and unexpired leases; (iii) establishing procedures in connection with the selection of a Stalking Horse Bidder (as defined in the Sale Motion), if any, and related protections; and (iv) approving the sale of assets free and clear of all Interests (as defined in the Sale Motion) pursuant to an asset purchase agreement [Docket No. 1718] (the "**Sale Motion**").  An order approving the Bidding Procedures and timeline related to the Sale was approved on June 30, 2020 [Docket No. 1950].  On July 28, 2020, the Debtors filed the *Notice of Modified Deadlines Contained in the Bidding Procedures and the Bidding Procedures Order* [Docket No. 2039], on September 11, 2020, the Debtors filed the *Second Notice of Modified Deadlines Contained in the Bidding Procedures and the Bidding Procedures Order* [Docket No. 2189] and on October 13, 2020, the Debtors filed the *Third Notice of Modified Deadlines Contained in the Bidding Procedures and the Bidding Procedures Order* [Docket No. 2329], each of which lists revised key dates and deadlines related to the sale process.

As more fully described in the Sale Motion, in November 2019, the North American Debtors engaged PJT as their investment banker to assist the North American Debtors with their evaluation of a potential sale of all or a portion of their assets.  Following their engagement, PJT's professionals have worked closely with the North American Debtors' management, boards of directors, and other advisors to assist the North American Debtors in: (i) preparing marketing materials in conjunction with a sale and (ii) defining the terms, conditions, and impact of any sale. With the filing of the Sale Motion, PJT commenced a process to identify potential purchasers and

80

pursue potential transactions for the North American Debtors.  On July 17, 2020, PJT received initial indications of interest for the Debtors' assets, pursuant to the Bid Procedures Order, and on July 24, 2020, the Debtors, with the assistance of PJT and their other advisors, selected the Potential Bidders (as defined in Sale Motion), which were permitted to enter the second phase of the sale process.

The North American Debtors determined that a sale of substantially all of their assets, in conjunction with the implementation of the Imerys Settlement, to one or more buyer(s) would maximize the value of their Estates and result in more funds available for holders of Talc Personal Injury Claims.  The North American Debtors sought the relief requested in the Sale Motion to ensure that they had the necessary flexibility to run a value-maximizing sale process.

Imerys S.A. and the Tort Claimants' Committee agreed that Imerys S.A. would not participate in the sale process as a bidder "to avoid complicating the court-approved sale process with a potential bid from the asset's most recent owner."  *See Statement of Imerys, S.A. in Connection with the Pending Sale of Substantially All of the Debtors' Assets* [Docket No. 1975].  Further, this decision is "consistent with [Imerys, S.A.'s] management of its global business portfolio."  *See id.*

On October 13, 2020, the Debtors filed a *Notice of (I) Designation of Stalking Horse Bidder, (II) Filing of Stalking Horse Agreement and Proposed Sale Order and (III) Request for Approval of Bid Protections* [Docket No. 2330], which, among other things, designated Magris Resources Canada Inc. ("**Magris Resources**") as the Stalking Horse Bidder (as defined in the Bidding Procedures) and the Bid (as defined in as defined in the Bidding Procedures) submitted by Magris Resources as the Stalking Horse Bid (as defined in the Bidding Procedures) and provided notice that the Debtors have entered into an asset purchase agreement with Magris Resources (as may be amended or modified, the "**Asset Purchase Agreement**"), a copy of which was attached as Exhibit A to the notice, for the sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.  The purchase price payable to the Debtors under the Asset Purchase Agreement for the Purchased Assets (as defined in the Asset Purchase Agreement) consists of the following: (i) $223,000,000 in cash consideration, and (ii) the assumption of the Assumed Liabilities (as defined in the Asset Purchase Agreement).

On November 17, 2020, the Bankruptcy Court entered an order authorizing the Debtors to sell substantially all of their assets to Magris Resources [Docket No. 2539].  The Debtors anticipate that the Sale will close in the first quarter of 2021.

(b)  *Sale Proceeds and Purchase Price Enhancement*

The Sale Proceeds will be contributed to the Talc Personal Injury Trust in accordance with the terms of the Plan and any DIP Order.  In addition, and as part of the Imerys Settlement, Imerys S.A. has agreed to contribute certain additional amounts of up to $102.5 million, contingent on the value of the Sale Proceeds (the "**Purchase Price Enhancement**").  The Purchase Price Enhancement will work as follows: (i) if the Sale Proceeds are $30 million or less, Imerys S.A. will contribute $102.5 million to the Talc Personal Injury Trust as a purchase price enhancement; (ii) for every dollar of Sale Proceeds between $30 million and $60 million, the purchase price

enhancement shall be reduced by $0.50; and (iii) for every dollar of Sale Proceeds in excess of $60 million, the purchase price enhancement shall be reduced by $0.70.[86]

## ARTICLE VII.

### THE PLAN OF REORGANIZATION

The confirmation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for treating claims against, and equity interests in, a debtor. Confirmation of a plan of reorganization by a bankruptcy court makes it binding on the debtor, any person or entity acquiring property under the plan, and any creditor of, or equity interest holder in, the debtor, whether or not such creditor or equity interest holder has accepted the plan or received or retains any property under the plan. Subject to certain limited exceptions and other than as provided in a plan itself or in a confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan of reorganization.

This Article of this Disclosure Statement summarizes certain relevant provisions of the Plan. This Article is intentionally not a recitation of the entirety of the Plan, a copy of which is attached hereto as Exhibit A.

For additional information regarding the Plan not discussed in this Article, please refer to the following select Plan provisions:

| Topic | Plan Provision |
| --- | --- |
| Treatment of Executory Contracts and Unexpired Leases | Article V |
| Distributions Under the Plan on Account of Claims | Article VI |
| Resolution of Disputed Claims Other than Talc Personal Injury Claims | Article VII |
| Reservation of Rights | Section 12.5 |
| Disallowed Claims and Disallowed Equity Interests | Section 12.6 |
| No Successor Liability | Section 12.8 |
| Corporate Indemnities | Section 12.9 |
| Jurisdiction of Bankruptcy Court | Article XIII |
| Miscellaneous Provisions | Article XIV |

---

[86]    As noted above, the Plan Proponents have agreed that in the event the Sale closes for the amount set forth in the Sale Order, no purchase price enhancement will be payable by Imerys S.A.

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN.  THE PLAN PROPONENTS URGE ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS TO READ AND STUDY CAREFULLY THE PLAN, A COPY OF WHICH IS ATTACHED AS <u>EXHIBIT A</u> TO THIS DISCLOSURE STATEMENT.

7.1    <u>Treatment of Administrative Claims, Fee Claims, DIP Facility Claims, and Priority Tax Claims</u>

(a)    *Administrative Claims*

(1)    <u>Allowed Administrative Claims</u>

Holders of Allowed Administrative Claims (other than Fee Claims, which are governed by <u>Section 2.3</u> of the Plan) shall receive Cash equal to the unpaid portion of such Allowed Administrative Claims on the Distribution Date, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims, or such amounts and on such other terms as may be agreed to by the holders of such Claims and the Debtors or the Reorganized Debtors, as the case may be; *provided*, *however*, that Allowed Administrative Claims representing liabilities incurred on or after the Petition Date in the ordinary course of business by any of the Debtors shall be paid by the Debtors or the Reorganized Debtors, as the case may be, in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.  All Allowed Administrative Claims (other than Fee Claims) shall be paid from funds held in the Administrative Claim Reserve, which shall be funded from Cash on hand, the Sale Proceeds, and/or the Imerys Cash Contribution (excluding the Unsecured Claim Contribution).  The Reorganized Debtors will be entitled to transfer excess funds from the Fee Claim Reserve (after all Allowed Fee Claims have been satisfied in full) and the Reorganized North American Debtor Cash Reserve (excluding all funds attributable to the Unsecured Claim Contribution) to the Administrative Claim Reserve as they deem necessary or appropriate, on notice to the FCR and the Tort Claimants' Committee, to enable them to satisfy their obligations pursuant to the Plan.

(2)    <u>Administrative Claims Bar Date</u>

Except as otherwise provided in Article II of the Plan, requests for payment of Administrative Claims (other than Fee Claims and Claims against the North American Debtors arising under section 503(b)(9) of the Bankruptcy Code), must be filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than sixty (60) days after the Effective Date.  Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against, as applicable, the Debtors or the Reorganized Debtors, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be filed and served on the Reorganized Debtors and the requesting party, as applicable, no later than ninety (90) days after the Effective Date, unless otherwise authorized by the Bankruptcy Rules or Bankruptcy Court.  Notwithstanding the foregoing, no request for payment of an Administrative

Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under the Plan.  For the avoidance of doubt and in accordance with, and furtherance of, the terms of the ITC Stipulated Order, any ITC Stipulated Claim shall be (i) automatically disallowed upon entry of the Confirmation Order and (ii) deemed discharged upon the Effective Date, without any further action required.

(3)    Disputed Administrative Claims

If a Disputed Administrative Claim is thereafter Allowed in whole or in part, the Disbursing Agent shall (at such time as determined to be practicable by the Reorganized Debtors) distribute from the Administrative Claim Reserve, to the holder of such Administrative Claim, the Cash that such holder would have received on account of such Claim if such Administrative Claim had been an Allowed Administrative Claim on the Effective Date.  When (i) all Disputed Administrative Claims against the Reorganized Debtors have been resolved and (ii) Distributions required to be made by the Reorganized Debtors pursuant to Section 2.1 and Section 2.3 of the Plan have been made, all Cash remaining in the Administrative Claim Reserve shall be disbursed to the Talc Personal Injury Trust.

(b)    *Allowed Priority Tax Claims*

On the Distribution Date, holders of Allowed Priority Tax Claims shall receive Cash equal to the amount of such Allowed Priority Tax Claims, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims unless the holder of such claim agrees to an alternative treatment.

(c)    *Fee Claims*

All final fee requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code for services rendered to the Debtors, the Tort Claimants' Committee, or the FCR, all Fee Claims of members of the Tort Claimants' Committee for reimbursement of expenses, and all requests or Claims under section 503(b)(4) of the Bankruptcy Code, must be filed and served on the Reorganized Debtors and other parties required to be served by the Compensation Procedures Order by no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Any objections to a final Fee Claim or any requests or claims under section 503(b)(4) of the Bankruptcy Code must be filed by no later than twenty (20) days after the filing of such Claim.  The terms of the Compensation Procedures Order shall govern the allowance and payment of any final Fee Claims submitted in accordance with Section 2.3 of the Plan.  The Fee Examiner appointed under the Fee Examiner Order shall continue to act in this appointed capacity unless and until all final Fee Claims have been approved by order of the Bankruptcy Court, and the Reorganized Debtors shall be responsible to pay the fees and expenses incurred by the Fee Examiner in rendering services after the Effective Date.

The amount of the Fee Claims owing to the Professionals on and after the Effective Date shall be paid in Cash to such Professionals from funds held in the Fee Claim Reserve, which shall be funded from Cash on hand, the Sale Proceeds, and/or the Imerys Cash Contribution (excluding the Unsecured Claim Contribution), as soon as reasonably practicable after such Claims are

Allowed by a Bankruptcy Court order.  The Reorganized Debtors will be entitled to transfer excess funds from the Administrative Claim Reserve (after all Allowed Administrative Claims have been satisfied in full) and the Reorganized North American Debtor Cash Reserve (excluding all funds attributable to the Unsecured Claim Contribution) to the Fee Claim Reserve as they deem necessary or appropriate, on notice to the FCR and the Tort Claimants' Committee, to enable them to satisfy their obligations in the Plan.  When all Allowed Fee Claims and Allowed Administrative Claims have been paid in full.

    (d)    *DIP Facility Claims*

On or prior to the Effective Date, in full satisfaction, settlement, discharge, and release of, and in exchange for the DIP Facility Claims, all amounts payable by the Debtors under the DIP Facility shall be satisfied in full consistent with the DIP Loan Documents and the DIP Order; *provided* that <u>Section 2.4</u> of the Plan only applies to the extent DIP Loans are made to the Debtors on or prior to the Effective Date.

7.2    <u>Treatment of Classified Claims and Equity Interests</u>

The classification and treatment of Claims against and Equity Interests in each Debtor are set forth in detail in Article III of the Plan.

    (a)    *Class 1 – Priority Non-Tax Claims*

        (1)    Classification: Class 1 consists of all Priority Non-Tax Claims against the Debtors.

        (2)    Treatment: On the Distribution Date, each holder of an Allowed Class 1 Priority Non-Tax Claim shall receive Cash equal to the Allowed Amount of such Priority Non-Tax Claim.

        (3)    Voting: Class 1 is Unimpaired and each holder of an Allowed Claim in Class 1 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Each holder of an Allowed Claim in Class 1 is not entitled to vote to accept or reject the Plan.

    (b)    *Class 2 – Secured Claims*

        (1)    Classification: Class 2 consists of all Secured Claims against the Debtors.

        (2)    Treatment: All Allowed Secured Claims in Class 2 will be treated pursuant to one of the following alternatives on the Distribution Date: (i) payment in full in Cash in accordance with section 506(a) of the Bankruptcy Code; (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code; (iii) such other treatment as the Debtor and the holder shall agree; or (iv) such other treatment as may be necessary to render such Claim Unimpaired.

        (3)    Voting: Class 2 is Unimpaired and each holder of an Allowed Claim in Class 2 is presumed to accept the Plan pursuant to section 1126(f) of the

Bankruptcy Code. Each holder of an Allowed Claim in Class 2 is not entitled to vote to accept or reject the Plan.

(c)     *Class 3a – Unsecured Claims against the North American Debtors*

    (1)     Classification: Class 3a consists of all Unsecured Claims against the North American Debtors.

    (2)     Treatment: Each holder of an Allowed Unsecured Claim against the North American Debtors shall be paid the Allowed Amount of its Unsecured Claim on the Distribution Date. Such payment shall be (i) in full, in Cash, plus post-petition interest at the federal judgment rate in effect on the Petition Date, or (ii) upon such other less favorable terms as may be mutually agreed upon between the holder of such Unsecured Claim and the applicable North American Debtor or Reorganized North American Debtor.

    (3)     Voting: Class 3a is Unimpaired and each holder of an Allowed Claim in Class 3a is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Each holder of an Allowed Claim in Class 3a is not entitled to vote to accept or reject the Plan.

(d)     *Class 3b – Unsecured Claims against ITI*

    (1)     Classification: Class 3b consists of all Unsecured Claims against ITI.

    (2)     Treatment: The legal, equitable, and contractual rights of the holders of Unsecured Claims against ITI are unaltered by the Plan. Except to the extent that a holder of an Unsecured Claim against ITI agrees to a different treatment, on and after the Effective Date, Reorganized ITI will continue to pay or dispute each Unsecured Claim in the ordinary course of business in accordance with applicable law.

    (3)     Voting: Class 3b is Unimpaired and each holder of an Allowed Claim in Class 3b is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Each holder of an Allowed Claim in Class 3b is not entitled to vote to accept or reject the Plan.

(e)     *Class 4 – Talc Personal Injury Claims*

    (1)     Classification: Class 4 consists of all Talc Personal Injury Claims. For the avoidance of doubt, Class 4 consists of Direct Talc Personal Injury Claims and Indirect Talc Personal Injury Claims.

    (2)     Treatment: On the Effective Date, liability for all Talc Personal Injury Claims shall be channeled to and assumed by the Talc Personal Injury Trust without further act or deed and shall be resolved in accordance with the Trust Distribution Procedures. Pursuant to the Plan and Trust Distribution Procedures, each holder of a Talc Personal Injury Claim shall have its Claim

US-DOCS\120811663.4

permanently channeled to the Talc Personal Injury Trust, and such Claim shall thereafter be resolved in accordance with the Trust Distribution Procedures.  Foreign Claims are a subset of Talc Personal Injury Claims that will be channeled to and assumed by the Talc Personal Injury Trust and subject to the Channeling Injunction; however, the Trust Distribution Procedures provide that Foreign Claims will not receive any distributions from the Talc Personal Injury Trust.

(3)    Voting: Class 4 is Impaired and each holder of an Allowed Claim in Class 4 is entitled to vote to accept or reject the Plan.

(f)    *Class 5a – Non-Debtor Intercompany Claims*

(1)    Classification: Class 5a consists of all Non-Debtor Intercompany Claims.

(2)    Treatment: On or after the Effective Date, all Non-Debtor Intercompany Claims shall be canceled, discharged, or eliminated.

(3)    Voting: Class 5a is Impaired.  Each holder of an Allowed Claim in Class 5a has consented to its treatment under the Plan as a Plan Proponent and is therefore presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Each holder of an Allowed Claim in Class 5a is not entitled to accept or reject the Plan.

(g)    *Class 5b – Debtor Intercompany Claims*

(1)    Classification: Class 5b consists of all Debtor Intercompany Claims.

(2)    Treatment: At the election of the applicable Debtor, each Debtor Intercompany Claim shall (i) be reinstated, (ii) remain in place, and/or (iii) with respect to certain Debtor Intercompany Claims in respect of goods, services, interest, and other amounts that would have been satisfied in Cash directly or indirectly in the ordinary course of business had they not been outstanding as of the Petition Date, be settled in Cash.

(3)    Voting: Class 5b is Unimpaired and each holder of an Allowed Claim in Class 5b is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Each holder of a Claim in Class 5b is not entitled to accept or reject the Plan.

(h)    *Class 6 – Equity Interests in the North American Debtors*

(1)    Classification: Class 6 consists of all Equity Interests in the North American Debtors.

(2)    Treatment: On the Effective Date, all Equity Interests in the North American Debtors shall be canceled, annulled, and extinguished.

US-DOCS\120811663.4

(3)    Voting: Class 6 is Impaired. Each holder of an Allowed Class 6 Equity Interest has consented to its treatment under the Plan as a Plan Proponent and is therefore presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Each holder of an Allowed Equity Interest in Class 6 is not entitled to vote to accept or reject the Plan.

(i)    *Class 7 – Equity Interests in ITI*

(1)    Classification: Class 7 consists of all Equity Interests in ITI.

(2)    Treatment: On the Effective Date, all Equity Interests in ITI shall be reinstated and the legal, equitable, and contractual rights to which holders of Equity Interests in ITI are entitled shall remain unaltered to the extent necessary to implement the Plan.

(3)    Voting: Class 7 is Unimpaired and each holder of an Allowed Class 7 Equity Interest is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Each holder of an Allowed Equity Interest in Class 7 is not entitled to vote to accept or reject the Plan.

7.3    <u>Acceptance or Rejection of Plan</u>

(a)    *Classes Entitled to Vote*

Holders of Talc Personal Injury Claims shall be entitled to vote to the extent and in the manner provided in the Voting Procedures Order [Docket No. [__]] and the Plan.[87]

(b)    *Acceptance of Holders of Talc Personal Injury Claims*

Pursuant to sections 1126(c) and 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code, Class 4 (Talc Personal Injury Claims) shall have accepted the Plan only if at least two-thirds (2/3) in amount and seventy-five percent (75%) of the members in Class 4 actually voting on the Plan have voted to accept the Plan.

(c)    *Acceptance by Unimpaired Class*

Classes 1, 2, 3a, 3b, 5b, and 7 are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

---

[87]    Pursuant to the Voting Procedures Order, all Talc Personal Injury Claims in Class 4 of the Plan shall be temporarily allowed in the amount of $1.00 in the aggregate per claimant solely for purposes of voting to accept or reject the Plan and not for any other purpose; *provided* that any votes that are determined by final nonappealable order following a motion on notice and a hearing not filed in good faith shall be subject to the designation pursuant to section 1126(e) of the Bankruptcy Code.

(d)    *Acceptance by Impaired Class*

Classes 5a and 6 will not receive or retain any property or distribution under the Plan and are Impaired under the Plan.  Notwithstanding, Classes 5a and 6 are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code because all holders of Claims or Equity Interests (as applicable) in Classes 5a and 6 are Plan Proponents and have consented to their treatment under the Plan.

7.4    Conditions Precedent to the Confirmation of the Plan

Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived pursuant to Section 9.3 of the Plan:

(a)    The Bankruptcy Court shall have entered an order, acceptable in form and substance to each of the Plan Proponents approving this Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

(b)    Class 4 shall have voted in requisite numbers and amounts in favor of the Plan as required by sections 524(g), 1126, and 1129 of the Bankruptcy Code.

(c)    The Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto, shall be consistent with (i) section 524(g) of the Bankruptcy Code, as applicable, and (ii) the other provisions of the Plan.

(d)    The Reorganized North American Debtors shall have sufficient funds from Cash on hand and/or the Unsecured Claim Contribution to resolve all Allowed Class 3a Claims and to adequately fund the Disputed Claims Reserve as determined by each of the Plan Proponents.

(e)    The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order in conjunction therewith, in form and substance acceptable to each of the Plan Proponents.  These findings and determinations, which are designed, among other things, to ensure that the Injunctions, releases and discharges set forth in Article XII shall be effective, binding and enforceable, and shall among other things, conclude:

(1)    Good Faith Compliance.  The Plan complies with all applicable provisions of the Bankruptcy Code including, without limitation, that the Plan be proposed in good faith and that the Confirmation Order not be procured by fraud.

(2)    Voting.  Class 4 has voted in requisite numbers and amounts in favor of the Plan as required by each of sections 524(g), 1126, and 1129 of the Bankruptcy Code.

US-DOCS\120811663.4

(3)     <u>Injunctions</u>.  The Channeling Injunction, the Insurance Entity Injunction, and the Supplemental Settlement Injunction Order are to be implemented in connection with the Talc Personal Injury Trust.

(4)     <u>Named Defendants</u>.  As of the Petition Date, one or more of the Debtors had been named as a defendant in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, talc or talc-containing products.

(5)     <u>Assumption of Certain Liabilities</u>.  Upon the Effective Date, the Talc Personal Injury Trust shall assume the liabilities of the Protected Parties with respect to Talc Personal Injury Claims and have exclusive authority as of the Effective Date to satisfy or defend such Talc Personal Injury Claims.

(6)     <u>Funding of Talc Personal Injury Trust</u>.  The Talc Personal Injury Trust will be funded with the Talc Personal Injury Trust Assets, including the Talc PI Note, which will be secured by a majority of the common stock of Reorganized ITI, pursuant to the Talc PI Pledge Agreement, and include the right to receive distributions on account of the Talc PI Note pursuant to the terms set forth in the Talc PI Note.

(7)     <u>Stock Ownership</u>.  The Talc Personal Injury Trust, on the Effective Date, by the exercise of rights granted under the Plan, (i) will receive the Reorganized North American Debtor Stock and shall maintain the rights to receive dividends or other distributions on account of such stock, and (ii) will be entitled to own the majority of the common stock of Reorganized ITI if specific contingencies occur.

(8)     <u>Use of Talc Personal Injury Trust Assets</u>.  The Talc Personal Injury Trust will use its assets and income to resolve Talc Personal Injury Claims.

(9)     <u>Likelihood of Talc Personal Injury Demands</u>.  The Debtors are likely to be subject to substantial future Talc Personal Injury Demands for payment arising out of the same or similar conduct or events that gave rise to the Talc Personal Injury Claims that are addressed by the Channeling Injunction and the Insurance Entity Injunction.

(10)    <u>Talc Personal Injury Demands Indeterminate</u>.  The actual amounts, numbers, and timing of future Talc Personal Injury Demands cannot be determined.

(11)    <u>Likelihood of Threat to Plan's Purpose</u>.  Pursuit of Talc Personal Injury Claims, including Talc Personal Injury Demands, outside of the procedures prescribed by the Plan and the Plan Documents, including the Trust Distribution Procedures, is likely to threaten the Plan's purpose to treat the Talc Personal Injury Claims and Talc Personal Injury Demands equitably.

(12) <u>Injunctions Conspicuous</u>. The terms of the Discharge Injunction, the Channeling Injunction, the Supplemental Settlement Injunction Order, the Release Injunction, and the Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in conspicuous language in the Plan and in this Disclosure Statement.

(13) <u>Appropriate Trust Mechanisms</u>. Pursuant to court orders or otherwise, the Talc Personal Injury Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Talc Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Talc Personal Injury Trust will value, and be in a financial position to pay, Talc Personal Injury Claims that involve similar Claims in substantially the same manner regardless of the timing of the assertion of such Talc Personal Injury Claims.

(14) <u>Future Claimants' Representative</u>. The FCR was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Channeling Injunction, the Insurance Entity Injunction, and the Supplemental Settlement Injunction Order, for the purpose of, among other things, protecting the rights of persons that might subsequently assert Talc Personal Injury Demands of the kind that are addressed in the Channeling Injunction, the Insurance Entity Injunction, and the Supplemental Settlement Injunction Order, and transferred to and assumed by the Talc Personal Injury Trust.

(15) <u>Fair and Equitable Inclusion</u>. The inclusion of each Debtor or other Protected Party within the protection afforded by the Channeling Injunction and the Insurance Entity Injunction, as applicable, is fair and equitable with respect to the Persons that might subsequently assert Talc Personal Injury Demands against each such Debtor or other Protected Party in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by or on behalf of each such Debtor or other Protected Party.

(16) <u>Sections 105(a) and 524(g) Compliance</u>. The Plan complies with sections 105(a) and 524(g) of the Bankruptcy Code to the extent applicable.

(17) <u>Injunctions Essential</u>. The Discharge Injunction, the Channeling Injunction, the Supplemental Settlement Injunction Order, the Release Injunction, and the Insurance Entity Injunction are essential to the Plan and the Debtors' reorganization efforts.

(18) <u>Insurance Assignment Authorized</u>. The Bankruptcy Code authorizes the Assignment by preempting any terms of the Talc Insurance Policies, Cyprus Talc Insurance Policy Rights, Talc Insurance CIP Agreements, Talc Insurance Settlement Agreements, or provisions of applicable non-

US-DOCS\120811663.4

bankruptcy law that any Talc Insurance Company may otherwise argue prohibits the Assignment.

(19)     Indemnification Obligation Assignment Authorized.  The Bankruptcy Code authorizes the Assignment of the J&J Indemnification Obligations by preempting any terms of the J&J Agreements or provisions of applicable non-bankruptcy law that J&J may otherwise argue prohibits the Assignment.

(20)     The Supplemental Settlement Injunction Order.   The Supplemental Settlement Injunction Order is fair, equitable, in the best interests of the Debtors' Estates, and shall be entered in connection with the Imerys Settlement, the Rio Tinto/Zurich Settlement, and the Cyprus Settlement (upon the occurrence of the Cyprus Trigger Date).

(21)     The Imerys Settlement.  The Imerys Settlement represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' Estates, complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

(22)     The Rio Tinto/Zurich Settlement.   The Rio Tinto/Zurich Settlement (i) represents a sound exercise of the Debtors' business judgment, will yield a fair and reasonable price for the assets being sold, is in the best interest of the Debtors' Estates, and otherwise complies with section 363 of the Bankruptcy Code, (ii) meets the requirements for a sale of property free and clear of any interests of third parties in such property pursuant to section 363(f) of the Bankruptcy Code, and (iii) constitutes a purchase in good faith by Zurich and the Rio Tinto Captive Insurers pursuant to section 363(m) of the Bankruptcy Code, rendering the provisions of section 363(m) applicable.   The Rio Tinto/Zurich Settlement is accordingly approved pursuant to section 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.

(23)     The Cyprus Settlement.  The Cyprus Settlement represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' Estates, complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

To the greatest extent permitted by law, each of the conditions precedent to the Confirmation of the Plan may be waived or modified, in whole or in part, but only with the unanimous written consent of each of the Plan Proponents; *provided, however*, that Section 9.2.1 of the Plan can only be waived as provided therein.  Any waiver or modification of a condition precedent under Section 9.3 of the Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court or District Court, and without any other formal action.

US-DOCS\120811663.4

7.5     Conditions Precedent to the Effective Date of the Plan

Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall occur on the first Business Day on which each of the following conditions has been satisfied or waived pursuant to Section 9.3 of the Plan:

(a)     Confirmation Order and Affirmation Order.  The Confirmation Order shall have been submitted to the District Court for affirmation on or before June 30, 2021, and the Affirmation Order in form and substance acceptable to each of the Plan Proponents shall have been entered by the District Court, and the Confirmation Order and the Affirmation Order shall have become Final Orders; *provided*, *however*, that, subject to Section 10.10.1 of the Plan with respect to the Cyprus Settlement, the Effective Date may occur at a point in time when the Confirmation Order and/or the Affirmation Order are not Final Orders at the sole option of the Plan Proponents unless the effectiveness of the Confirmation Order or the Affirmation Order, as applicable, has been stayed or vacated, in which case the Effective Date may be the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order or the Affirmation Order.

(b)     Sale Order.  The Sale Order shall have (i) been entered on or before the date the Confirmation Order is entered, and (ii) recognized by the Canadian Court in the Canadian Proceeding on or before a date that is no later than fourteen (14) Business Days after entry of the Sale Order by the Bankruptcy Court.

(c)     Talc Personal Injury Trust.  The Talc Personal Injury Trust Assets shall, simultaneously with the occurrence of the Effective Date or as otherwise provided in the Plan, be transferred to, vested in, and assumed by the Talc Personal Injury Trust in accordance with Article IV of the Plan.

(d)     Plan Documents.  The Talc Personal Injury Trust Agreement (and related documents), and the other applicable Plan Documents necessary or appropriate to implement the Plan shall have been executed, delivered and, where applicable, filed with the appropriate governmental authorities.

(e)     Allowed Non-Talc Claims.  The Reserves shall be adequately funded as determined by each of the Plan Proponents so as to permit the Debtors to make Distributions relating to Allowed Non-Talc Claims in accordance with the Plan.

(f)     Imerys Contribution.  Imerys S.A. shall have disbursed, or satisfied all conditions of, the Imerys Contribution to the Debtors, the Reorganized North American Debtors, or the Talc Personal Injury Trust, as applicable, in accordance with Article X of the Plan.

(g)     United States Trustee's Fees.  The fees of the United States Trustee then owing by the Debtors shall have been paid in full.

93

(h)    Ancillary Proceeding in Canada.  The Canadian Court shall have entered an order in the Canadian Proceeding recognizing the Confirmation Order in its entirety and ordering the Confirmation Order and the Plan to be implemented and effective in Canada in accordance with their terms.

To the greatest extent permitted by law, each of the conditions precedent to the Effective Date of the Plan may be waived or modified, in whole or in part, but only with the unanimous written consent of each of the Plan Proponents; *provided, however*, that Section 9.2.1 of the Plan can only be waived as provided therein.  Any waiver or modification of a condition precedent under Section 9.3 of the Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court or District Court, and without any other formal action.

7.6    Means for Implementation of the Plan

(a)    *General*

On or after the Confirmation Date, each of the Plan Proponents shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable them to implement the provisions of the Plan on the Effective Date, including, without limitation, the creation of the Talc Personal Injury Trust and the preparations for the transfer of the Talc Personal Injury Trust Assets to the Talc Personal Injury Trust.

(b)    *Operations of the Debtors Between Confirmation and the Effective Date*

The Debtors shall continue to operate as debtors and debtors-in-possession during the period from the Confirmation Date through and until the Effective Date.

(c)    *Charter and Bylaws*

From and after the Effective Date, each of the Reorganized North American Debtors shall be governed pursuant to their respective Amended Charter Documents.  The Amended Bylaws and the Amended Certificates of Incorporation shall contain such provisions as are necessary to satisfy the provisions of the Plan and, to the extent necessary to prohibit the issuance of non-voting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the Amended Charter Documents after the Effective Date, as permitted by applicable law.  On or prior to the Effective Date, ITA will change its name to Ivory America, Inc., ITV will change its name to Ivory Vermont, Inc. and ITC will change its name to Ivory Canada, Inc.

From and after the Effective Date, Reorganized ITI shall continue to be governed pursuant to its existing bylaws and certificate of incorporation.

(d)    *Corporate Action*

On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtors, including, but not limited to, actions requiring a vote of the boards of directors or shareholders and execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the

94

Effective Date without any further action by the Bankruptcy Court or the officers or directors of the Debtors.

(e)     *Surrender of Existing Equity Interests*

The Plan provides that holders of Equity Interests in Class 6 shall be deemed to have surrendered such Equity Interests and other documentation underlying such Equity Interests and all such surrendered Equity Interests and other documentation shall be deemed to be canceled in accordance with Article III of the Plan.

(f)     *Post-Effective Date Governance, Continued Existence of the Reorganized North American Debtors, and the Reorganized North American Debtor Stock*

On the Effective Date, after the Reserves have been funded and all Talc Personal Injury Trust Assets have been transferred to the Talc Personal Injury Trust (as applicable): (a) all North American Debtor Stock will be canceled, and (b) simultaneously with the cancellation of such shares, the North American Debtors will issue the Reorganized North American Debtor Stock to the Talc Personal Injury Trust.

Except as otherwise provided in the Plan or as may be provided in the Plan Supplement or the Confirmation Order, each of the Reorganized North American Debtors shall continue their existence as separate entities after the Effective Date, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which each Reorganized North American Debtor is incorporated and pursuant to the Amended Charter Documents and any other formation documents in effect following the Effective Date, and such documents are deemed to be adopted pursuant to the Plan and require no further action or approval.  Moreover, on the Effective Date, the officers and directors of the Reorganized North American Debtors shall consist of the individuals that will be identified in the Plan Supplement.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in the Reorganized North American Debtors' Estates other than property constituting Talc Personal Injury Trust Assets, including, but not limited to, all North American Debtor Causes of Action and any property acquired by the North American Debtors pursuant to the Plan, shall vest in the Reorganized North American Debtors, free and clear of all Claims, interests, Liens, other Encumbrances, and liabilities of any kind.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized North American Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, interests, or North American Debtor Causes of Action without supervision or approval by the Bankruptcy Court, or notice to any other Entity, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

On the Effective Date, and if applicable, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, all assets of the North American Debtors that constitute Talc Personal Injury Trust Assets shall vest in the Talc Personal Injury Trust pursuant to the terms of the Plan.  The Talc Personal Injury Trust shall own such assets, as of the Effective Date, free and clear of all Claims, interests, Liens, other Encumbrances, and liabilities of any kind.

(g)    *Post-Effective Date Governance and Continued Existence of Reorganized ITI*

On the Effective Date, Reorganized ITI shall remain a direct subsidiary of Mircal Italia and all Equity Interests in ITI shall be reinstated.  On the Effective Date, (i) Imerys S.A. and ITI shall also issue the Talc PI Note to the Talc Personal Injury Trust, and (ii) Mircal Italia shall execute the Talc PI Pledge Agreement.

Except as otherwise provided in the Plan or as may be provided in the Plan Supplement or the Confirmation Order, Reorganized ITI shall continue to exist after the Effective Date as a separate corporate entity from each of the Reorganized North American Debtors, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which Reorganized ITI is incorporated and pursuant to its existing bylaws and certificate of incorporation and any other formation documents in effect prior to the Petition Date, and such documents are deemed to be adopted pursuant to the Plan and require no further action or approval.

In addition, except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in ITI's Estate, all ITI Causes of Action, and any property acquired by ITI pursuant to the Plan, shall vest in Reorganized ITI, free and clear of all Claims, interests, Liens, other Encumbrances, and liabilities of any kind.  On and after the Effective Date, except as otherwise provided in the Plan, Reorganized ITI may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, interests, or ITI Causes of Action without supervision or approval by the Bankruptcy Court, or notice to any other Entity, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

(h)    *Imerys Settlement*

(1)    Compromise and Settlement of Claims

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan effect a compromise and settlement of all Imerys Released Claims against the Imerys Protected Parties, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Imerys Settlement, to release all of the Imerys Released Claims, including, without limitation, the Estate Causes of Action, against each of the Imerys Protected Parties.

As further described in this Disclosure Statement, the provisions of the Plan (including the release and injunctive provisions contained in Article XII of the Plan) and the other documents entered into in connection with the Plan constitute a good faith compromise and settlement among the Plan Proponents of Claims and controversies among such parties.  The Plan, including the explanation set forth in this Disclosure Statement, shall be deemed a motion to approve the Imerys Settlement and the good faith compromise and settlement of all of the Claims and controversies described in the Plan pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Imerys Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Imerys Settlement is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Entry of the Confirmation Order shall confirm the Bankruptcy Court's approval, as

of the Effective Date of the Plan, of all components of the Imerys Settlement and the Bankruptcy Court's finding that the Imerys Settlement is in the best interests of the Debtors, their respective Estates, and is fair, equitable and reasonable.

Upon (i) satisfaction of all conditions of the Imerys Contribution in accordance with the terms of the Plan, (ii) the funding of the Reserves from Cash on hand and/or the Imerys Cash Contribution, and (iii) the transfer of the Talc Personal Injury Trust Assets to the Talc Personal Injury Trust, the Plan shall be deemed to be substantially consummated, notwithstanding any contingent obligations arising from the foregoing. For the avoidance of doubt, Imerys S.A.'s satisfaction of the Imerys Contribution is on behalf of itself and the other Imerys Protected Parties.

(2)    Imerys Contribution

*Imerys Settlement Funds*. On, prior to, or as soon as reasonably practicable after the Effective Date, the Imerys Non-Debtors will contribute, or cause to be contributed, the Imerys Settlement Funds to the Debtors or the Reorganized Debtors, as applicable, which the Debtors or the Reorganized Debtors, as applicable, will contribute to the Talc Personal Injury Trust upon receipt. For the avoidance of doubt, the proceeds from the Sale will be paid by the Buyer to the North American Debtors or the Reorganized North American Debtors, as applicable, upon the close of the Sale.

*Imerys Cash Contribution*. On or prior to the Effective Date, the Imerys Non-Debtors will contribute, or cause to be contributed, the following to the Debtors or the Reorganized Debtors, as applicable:

> (i)    the balance of the Intercompany Loan to fund administrative expenses during the pendency of the Chapter 11 Cases, as well as certain of the Reserves (with any remaining balance of the Intercompany Loan not otherwise used to fund the Reserves or pay administrative expenses to be contributed to the Talc Personal Injury Trust on or as soon as reasonably practicable after the Effective Date);

> (ii)    $5 million (less any amounts already paid and noted in an accounting to the Tort Claimants' Committee and the FCR) for payment of Allowed Claims in Class 3a through inclusion in the Reorganized North American Debtor Cash Reserve or the Disputed Claims Reserve, as applicable (with any remaining balance of the $5 million not otherwise used to fund the Reorganized North American Debtor Cash Reserve or the Disputed Claims Reserve, as applicable, to be contributed to the Talc Personal Injury Trust on or as soon as reasonably practicable after the Effective Date); and

> (iii)    the lesser of (x) $15 million and (y) fifty percent (50%) of the sum of (I) any administrative expenses paid by the Debtors with the proceeds of the DIP Facility *plus* (II) any administrative expenses paid by the Debtors from the Sale Closing Date through the Effective Date *plus* (III) any amounts necessary to fund all reserves, costs or expenses required in

connection with the Debtors' emergence from bankruptcy separate from the Unsecured Claim Contribution; *provided* that if the Plan is confirmed before June 25, 2021 and the Sale does not close before the Effective Date (such that the DIP Facility Claims have been satisfied in full from the Sale Proceeds and discharged in accordance with the DIP Loan Documents), then (A) the outstanding principal amount of any DIP Loans (excluding any PIK Interest (as defined in the DIP Loan Documents)) shall be applied as a dollar-for-dollar reduction of the amount of the Contingent Contribution required to be contributed by Imerys S.A. to the Debtors or the Reorganized Debtors (in an amount not to exceed $15,000,000), and (B) the remaining outstanding principal amount of any DIP Loans (excluding any PIK Interest), after giving effect to the application in clause (A) above, shall be applied as a dollar-for dollar reduction of the $75 million in Cash that is part of the Imerys Settlement Funds.

*Talc Trust Contribution*. On or prior to the Effective Date, the Imerys Non-Debtors have agreed to contribute, or cause to be contributed, the following to the Talc Personal Injury Trust:

(i)    rights and interests of the Imerys Non-Debtors to the proceeds of the Shared Talc Insurance Policies and all rights against third parties held by the Imerys Non-Debtors relating to Talc Personal Injury Claims, including any related indemnification rights, which for the avoidance of doubt include the J&J Indemnification Obligations, each of which is to be identified in the Plan Supplement; and

(ii)    the Talc PI Pledge Agreement.

*Additional Contribution*. On or prior to the Effective Date, the Imerys Non-Debtors have agreed to take the following actions:

(i)    waive all Non-Debtor Intercompany Claims against the Debtors; and

(ii)    unless otherwise assumed by the Buyer, assume any Pension Liabilities of the North American Debtors through and after the Effective Date of the Plan.

(3)    Cooperation Agreement

The Debtors, the Imerys Non-Debtors, and the Talc Personal Injury Trust shall enter into the Cooperation Agreement, which shall be included in the Plan Supplement.

(i)    *Rio Tinto/Zurich Settlement*

(1)    Compromise and Settlement of Claims

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the Rio Tinto/Zurich Contribution and other benefits provided pursuant to the

Rio Tinto/Zurich Settlement, the provisions of the Plan effect a compromise and settlement of all Rio Tinto/Zurich Released Claims against the Rio Tinto Protected Parties and the Zurich Protected Parties as provided in Section 12.2.1(c) of the Plan, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Rio Tinto/Zurich Settlement and to release all of the Rio Tinto/Zurich Released Claims as provided in Section 12.2.1(c) of the Plan.

The provisions of the Plan (including the release and injunctive provisions contained in Article XII of the Plan) and the other documents entered into in connection with the Plan constitute a good faith compromise and settlement among: (i) Rio Tinto, on behalf of itself and the Rio Tinto Captive Insurers, and for the benefit of the Rio Tinto Protected Parties, and Zurich, on behalf of itself and for the benefit of the Zurich Protected Parties, on the one hand, and (ii) the Debtors, on the other hand, and consented to by the Tort Claimants' Committee and the FCR, of claims and controversies among such parties. The Plan, including the explanation set forth in this Disclosure Statement, shall be deemed a motion to approve the Rio Tinto/Zurich Settlement, including the Rio Tinto/Zurich Settlement Agreement, and the good faith compromise and settlement of all of the claims and controversies described in the Plan pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Rio Tinto/Zurich Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Rio Tinto/Zurich Settlement is (i) fair, equitable, reasonable, and in the best interests of the Debtors and their Estates and (ii) fair and equitable with respect to the persons who might subsequently assert Talc Personal Injury Demands, in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by and on behalf of the Rio Tinto Protected Parties and the Zurich Protected Parties.

(2)    Rio Tinto/Zurich Settlement Contributions

*Rio Tinto/Zurich Contribution*.    Rio Tinto and Zurich will make the following contributions, on behalf of themselves and (in the case of Rio Tinto) on behalf of the Rio Tinto Captive Insurers and for the benefit of the Rio Tinto Protected Parties and (in the case of Zurich) for the benefit of the Zurich Protected Parties, to the Talc Personal Injury Trust, to be used for the payment of Talc Personal Injury Claims in accordance with the Trust Distribution Procedures and the Talc Personal Injury Trust Agreement:

(i)    *Zurich Cash Contribution*.  On or prior to the date that is thirty (30) days after the Rio Tinto/Zurich Trigger Date, Zurich will contribute, or cause to be contributed, $260 million in Cash to the Talc Personal Injury Trust (the "**Zurich Cash Contribution**").

(ii)    *Rio Tinto Cash Contribution*.  On or prior to the date that is fourteen (14) days after the Rio Tinto/Zurich Trigger Date, Rio Tinto will contribute, or cause to be contributed, $80 million in Cash to the Talc Personal Injury Trust (the "**Rio Tinto Cash Contribution**").

(iii)    *Rio Tinto/Zurich Credit Contribution*.  On the Rio Tinto/Zurich Trigger Date, or as soon as reasonably practicable thereafter (not to exceed three (3) Business Days), the appropriate Rio Tinto Corporate Parties and the appropriate Zurich Corporate Parties shall each execute and

99

deliver to the Talc Personal Injury Trust, in a form reasonably acceptable to the Talc Personal Injury Trust, an assignment to the Talc Personal Injury Trust of (i) all of their rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to the payment or defense of any Talc Personal Injury Claim or any past talc-related claim against the Debtors prior to the Effective Date (the "**Credits**"), and (ii) all of their other rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to any Talc Personal Injury Claim (the "**Future Credits**") (together, (i) and (ii), the "**Rio Tinto/Zurich Credit Contribution**"), *provided, however,* that any such claims for Credits or Future Credits against a Protected Party shall be subject to the Channeling Injunction, and nothing in the Plan shall impact the injunctions and releases otherwise inuring to the benefit of the Protected Parties under the terms of the Plan. Notwithstanding anything else contained in Section 10.9.2.1(c) of the Plan, the Rio Tinto Corporate Parties and the Zurich Corporate Parties shall retain, and shall not transfer to the Talc Personal Injury Trust, all rights of the Rio Tinto Corporate Parties and the Zurich Corporate Parties against their reinsurers and/or retrocessionaires, in their capacity as such.

(3)    Rio Tinto/Zurich Settlement Agreement

Pursuant to the Rio Tinto/Zurich Settlement Agreement, Zurich will acquire any and all rights of the Debtors in the Zurich Policies, free and clear of any right, title, or interest of any other Entity, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code. Further, the Rio Tinto Captive Insurers will acquire any and all rights of the Debtors in the Rio Tinto Captive Insurer Policies, free and clear of any right, title, or interest of any other Entity, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code.

Confirmation of the Plan will constitute approval of the Rio Tinto/Zurich Settlement Agreement pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and a finding that the Rio Tinto Captive Insurers and Zurich are good-faith purchasers entitled to the protections of section 363(m) of the Bankruptcy Code.

For the avoidance of doubt, the Plan Proponents, on the one hand, and Rio Tinto and Zurich, on the other hand, acknowledge that the Zurich Policies in effect from May 2001 through May 2008 are exhausted.

(4)    Withdrawal of Claims

On the Rio Tinto/Zurich Trigger Date, any and all Claims that the Rio Tinto Corporate Parties or the Zurich Corporate Parties have asserted or that have been asserted on their behalf in the Chapter 11 Cases shall be deemed withdrawn with prejudice. Further, the Rio Tinto Protected Parties and the Zurich Protected Parties shall not file or assert any additional Claims against any of the Debtors arising from any Debtor's conduct prior to the Confirmation Date.

US-DOCS\120811663.4

(5)     Cooperation

Rio Tinto and Zurich shall use reasonable efforts to assist and cooperate with the Talc Personal Injury Trust, Talc Trustees, Talc Trust Advisory Committee, and FCR to pursue the Credits as set forth in the Rio Tinto/Zurich Settlement Agreement.

(6)     Releases and Injunctions

Notwithstanding anything to the contrary set forth in the Plan or elsewhere, the Injunctions and the releases contained in Article XII of the Plan shall not be effective as to the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties (as applicable) until the Rio Tinto/Zurich Contribution has been made to the Talc Personal Injury Trust in accordance with Section 10.9.2.1 of the Plan.

(j)     *Cyprus Settlement*

(1)     Conditions to Effectiveness of the Cyprus Settlement and the Cyprus Contribution

The Cyprus Settlement shall not be effective and binding upon the Debtors, the Cyprus Parties, the Tort Claimants' Committee, or the FCR unless each of the following conditions has been satisfied or waived by the Debtors, the Tort Claimants' Committee, the FCR, and the Cyprus Parties, as applicable:

(i)     the Bankruptcy Court enters the Section 105 Injunction by February 28, 2021;

(ii)     approval by the Bankruptcy Court of the Plan, including approval of the Cyprus Settlement, by June 30, 2021;

(iii)     approval by a bankruptcy court of the Cyprus Mines Plan, including approval of the Cyprus Settlement, by September 30, 2021;

(iv)     the Affirmation Order shall have been entered by the District Court with respect to the Plan and shall have become a Final Order;

(v)     an affirmation order shall have been entered by the District Court with respect to the Cyprus Mines Plan and shall have become a Final Order; and

(vi)     satisfaction of other conditions precedent set forth in Section 9.2 of the Plan, as well as substantially similar conditions in the Cyprus Mines Plan.

(2)     Compromise and Settlement of Claims

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the Cyprus Contribution and other benefits provided pursuant to the Cyprus

Settlement, the provisions of the Plan effect a compromise and settlement of all Cyprus Released Claims against the Cyprus Protected Parties as provided in <u>Section 12.2.1(d)</u> of the Plan, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Cyprus Settlement and to release all of the Cyprus Released Claims as provided in <u>Section 12.2.1(d)</u> of the Plan.

The provisions of the Plan (including the release and injunctive provisions contained in Article XII of the Plan) and the other documents entered into in connection with the Plan constitute a good faith compromise and settlement between and among: (i) Cyprus Mines, CAMC, and Freeport on behalf of themselves and for the benefit of the Cyprus Protected Parties, (ii) the Debtors and their Estates, (iii) the Tort Claimants' Committee, and (iv) the FCR of claims and controversies between and among such parties, including, without limitation, all Estate Causes of Action against any Cyprus Protected Party based on theories of veil-piercing, successor liability, alter ego, conspiracy, or any other theory that could be asserted by the Debtors' Estates. The Plan, including the explanation set forth in the Disclosure Statement, shall be deemed a motion to approve the Cyprus Settlement, including the Cyprus Settlement Agreement, and the good faith compromise and settlement of all of the claims and controversies described in the Plan pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Cyprus Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Cyprus Settlement is (i) fair, equitable, reasonable, and in the best interests of the Debtors and their Estates and (ii) fair and equitable with respect to the persons who might subsequently assert Talc Personal Injury Demands, in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by and on behalf of the Cyprus Protected Parties.

For the avoidance of doubt, none of (i) the Bankruptcy Court's approval of the Plan or the Plan Documents, (ii) the Confirmation Order or any findings and conclusions entered with respect to confirmation, nor (iii) any estimation or valuation of any Claims, either individually or in the aggregate in the Chapter 11 Cases shall, absent occurrence of the Cyprus Trigger Date, affect or impair any Cyprus Protected Party's rights, causes of action or claims against J&J, including any J&J Indemnification Obligations held by any Cyprus Protected Parties.

(3)     <u>Cyprus Document Access Agreement</u>

On the Cyprus Trigger Date, Cyprus Mines, CAMC, and the Talc Personal Injury Trust shall enter into a document access agreement as described in the Cyprus Settlement Agreement.

(4)     <u>Cyprus Cooperation</u>

As more fully described in the Cyprus Settlement Agreement, the Cyprus Protected Parties shall assist and cooperate with the Talc Personal Injury Trust as may be reasonably necessary for the pursuit of coverage under the Cyprus Talc Insurance Policies, including with respect to the California Coverage Action. Such assistance shall include, but not be limited to, using commercially reasonable efforts to provide all information and documentation reasonably necessary to assert all rights under the Cyprus Talc Insurance Policies including: (a) non-privileged communications with the insurers regarding the Cyprus Talc Insurance Policies; (b) documents sufficient to show, and proof of, all amounts paid under the Cyprus Talc Insurance Policies, including for defense costs, judgments, or settlements of claims; and (c) non-privileged

communications with other third parties relating to the Cyprus Talc Insurance Policies, any rights thereunder, or any claims or defenses related thereto. For the avoidance of doubt, nothing in Section 10.10.4 of the Plan shall require any of the Cyprus Protected Parties to take any action that would expose them to liability, including for breach of confidentiality obligations.

(5)    Cyprus Contribution

Subject to the terms of the Cyprus Mines Plan and the Cyprus Settlement Agreement, and subject to the occurrence of the Cyprus Trigger Date, the Cyprus Protected Parties will make the following contributions (the "**Cyprus Contribution**") to the Talc Personal Injury Trust, to be used for the payment of Talc Personal Injury Claims in accordance with the Trust Distribution Procedures and the Talc Personal Injury Trust Agreement:

(i)    *Cash Payments from CAMC*. Pursuant to an unsecured seven-year promissory note, issued by CAMC for and on behalf of itself, Cyprus Mines, and all other Cyprus Protected Parties, in favor of the Talc Personal Injury Trust, with a stated principal amount of $130 million as of the Cyprus Trigger Date, CAMC will pay a total of $130 million to the Talc Personal Injury Trust via wire transfers in seven installments (the "**CAMC Cash Payments**"). The first three payments shall each consist of $21.67 million and shall total $65 million. The next four payments shall each consist of $16.25 million and shall total $65 million. Each payment shall be made no later than as set forth in the following schedule:

- Within thirty (30) days after the Cyprus Trigger Date: $21.67 million (the "**First Installment**");
- 1 year anniversary of the First Installment: $21.67 million;
- 2 year anniversary of the First Installment: $21.67 million;
- 3 year anniversary of the First Installment: $16.25 million;
- 4 year anniversary of the First Installment: $16.25 million;
- 5 year anniversary of the First Installment: $16.25 million; and
- 6 year anniversary of the First Installment: $16.25 million.

(ii)    *Freeport Guarantee*. Freeport shall provide a guarantee of the CAMC Cash Payments, and shall be subject to a minimum liquidity covenant of not less than $500 million tested as of the end of each of its fiscal quarters. If Freeport fails to meet such covenant in respect of any fiscal quarter before CAMC has paid the $130 million in full, Freeport will post security in favor of the Talc Personal Injury Trust in respect of the Cyprus Parties' obligations under Section 10.10.5(a) of the Plan in the form of a performance bond, letter of credit, or other similar instrument for all remaining cash payments. For purposes of Section 10.10.5(b) of the Plan, "liquidity" means the sum of unrestricted cash of Freeport and its consolidated subsidiaries as of the applicable test date, plus availability under Freeport's revolving credit facilities at such time.

(iii)    *Insurance and Other Rights*.  Upon the occurrence of the Cyprus Trigger Date, and in accordance with the terms of the Cyprus Settlement Agreement: (I) the Cyprus Protected Parties will assign the Cyprus Talc Insurance Policy Rights to the Talc Personal Injury Trust; and (II) the Talc Personal Injury Trust will assume all present and future obligations associated with recovering proceeds under the Cyprus Talc Insurance Policies; *provided* that solely to the extent that the Talc Personal Injury Trust asserts any claim as assignee of a Cyprus Protected Party bound by the PDC Agreement, the Talc Personal Injury Trust shall abide by the terms of the PDC Agreement; *provided further* that unless otherwise stated in the Plan or the Cyprus Settlement Agreement, such obligations shall not include any obligations undertaken by any Cyprus Protected Party in any settlement agreement or other contract compromising or releasing any rights under any Cyprus Talc Insurance Policy.

(iv)    *Indemnification, Contribution, and Subrogation Rights*. Upon the occurrence of the Cyprus Trigger Date, and in accordance with the terms of the Cyprus Settlement Agreement, the appropriate Cyprus Protected Parties shall each execute and deliver to the Talc Personal Injury Trust, in a form reasonably acceptable to the Talc Personal Injury Trust, an assignment to the Talc Personal Injury Trust of: (i) all of their rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), reimbursement, or subrogation against any Person relating to the payment or defense of any Talc Personal Injury Claim or other past talc-related claim channeled to the Talc Personal Injury Trust prior to the Cyprus Trigger Date, and (ii) all of their rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), reimbursement, or subrogation against any Person relating to any other Talc Personal Injury Claim or other claims channeled to the Talc Personal Injury Trust; *provided*, *however*, that the assertion of the Cyprus Credits or Cyprus Future Credits against a Protected Party shall be subject to the Channeling Injunction and nothing herein shall impact the injunctions and releases otherwise inuring to the benefit of the Cyprus Protected Parties under the terms of the Plan or the Cyprus Mines Plan; *provided further* that, for the avoidance of doubt, the foregoing shall not include, and the assignment of such rights shall not impair, the rights of any Talc Insurance Company.

(6)    <u>Dismissal of Actions, Stays of Proceedings, and Release of Claims</u>

On and after December 22, 2020, (a) the Cyprus Protected Parties shall stay and cease prosecuting all adversary proceedings, proofs of claim, objections, discovery demands and disputes, and any other litigation against the Debtors, the Tort Claimants' Committee, and the FCR, and (b) the Debtors, the Tort Claimants' Committee, and the FCR shall stay and cease prosecuting all adversary proceedings, proofs of claim, objections, discovery demands and discovery disputes, and any other litigation against the Cyprus Protected Parties; *provided* that the Debtors shall be permitted to file a proof of claim in the Cyprus Mines Bankruptcy solely to

104

preserve their rights pending the Cyprus Trigger Date; *provided further* that, for the avoidance of doubt, the filing of the Plan shall not stay, delay, or otherwise prevent the adjudication of any adversary proceedings or claims of the Cyprus Protected Parties against J&J.

Upon occurrence of the Cyprus Trigger Date, (a) the Cyprus Protected Parties shall release, dismiss and withdraw all claims against the Debtors, the Tort Claimants' Committee, and the FCR directly or indirectly arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim, including without limitation all indemnity claims, and (b) the Debtors, the Tort Claimants' Committee, and the FCR shall release, dismiss and withdraw all claims against Cyprus Mines and the Cyprus Protected Parties directly or indirectly arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim, including without limitation all indemnity claims.  For the avoidance of doubt, the foregoing dismissals and withdrawals shall be without prejudice to re-filing, and all releases shall be void and all released claims may be reinstated, if and only if the Affirmation Order or the affirmation order in the Cyprus Mines Bankruptcy is successfully challenged on appeal.

Solely in the event the conditions to effectiveness described in Section 10.10.1 of the Plan do not occur and are not waived, the stay in Section 10.10.6.1 of the Plan shall be lifted and the Cyprus Protected Parties, on the one hand, and the Debtors, on the other hand: (a) shall be fully entitled to prosecute and seek recovery on all claims against one another, including under the Trust Distribution Procedures (as applicable), and in the interim may take any necessary action to avoid forfeitures or waivers of such claims; and (b) may opt out of any consensual release in the respective plans.

In no event shall any party be deemed to have released any other party for breach of agreements adopted pursuant to the Cyprus Settlement.

(7)     Releases and Injunctions

The Injunctions and the releases contained in Article XII of the Plan shall not be effective as to the Cyprus Protected Parties until the Cyprus Trigger Date.

Pursuant to the Cyprus Settlement, the Cyprus Mines Plan will protect the Debtors with releases and injunctions substantially equivalent to those received by the Cyprus Parties under the terms of the Plan, which shall be effective as of the Cyprus Trigger Date.

The releases and Injunctions contained in the Plan and the Confirmation Order with respect to the Cyprus Protected Parties shall dissolve immediately should any of the CAMC Cash Payments (or, pursuant to the guarantee, any payments from Freeport) not be received by the Talc Personal Injury Trust within thirty (30) days of a true and accurate written notice from the Talc Personal Injury Trust to CAMC and Freeport that such payment was due and not made by the deadline set forth in Section 10.10.5(a) of the Plan.

(8)     Form of Certain Documents

The plan of reorganization shall be in form and substance acceptable to CAMC and Cyprus Mines, respectively and as applicable, with respect to any provision that is material to CAMC's or Cyprus Mines' rights and obligations in connection with the Cyprus Settlement.

The Affirmation Order and the Confirmation Order shall be in form and substance acceptable to CAMC and Cyprus Mines, respectively and as applicable, with respect to any provision that is material to CAMC's or Cyprus Mines' rights and obligations in connection with the Cyprus Settlement.

The Cyprus Mines Plan, proposed confirmation order and proposed affirmation order shall be in form and substance acceptable to the Debtors and the Imerys Plan Proponents, respectively and as applicable, with respect to any provision that is material to the Debtors' or the Imerys Plan Proponents' rights and obligations in connection with the Cyprus Settlement.

(9)    Allocation of the Cyprus Contribution

The Tort Claimants' Committee has proposed the following allocation of the Cyprus Contribution after extensive internal deliberations: (a) 55% will be allocated to Mesothelioma Claimants; and (b) 45% will be allocated to Ovarian Cancer Claimants.  As between the Ovarian Cancer Claimants, 30.15% of the Cyprus Contribution will be allocated to and become part of Fund A and 14.85% of the Cyprus Contribution will become part of Fund C.  The FCR continues to examine the proposed allocation.  Solely for purposes of this negotiated allocation, the Cyprus Contribution is deemed to include all rights and obligations under the Cyprus Talc Insurance Policies.  For the avoidance of doubt, nothing in the Plan Documents shall be interpreted as an admission, or adjudication on the merits of any disputed issue related to the Cyprus Talc Insurance Policies, including, but not limited to, the disputed rights at issue in the Cyprus Insurance Adversary Proceeding.

Consummation of the proposed allocation of the Cyprus Contribution remains subject to: (i) approval of any tort claimants' committee to be appointed in the Cyprus Mines Bankruptcy; (ii) approval of any future claimants' representative to be appointed in the Cyprus Mines Bankruptcy; (iii) approval by the Bankruptcy Court in the Debtors' Chapter 11 Cases; (iv) approval by the bankruptcy court in the Cyprus Mines Bankruptcy; (v) the Effective Date; and (vi) the Cyprus Trigger Date.

The final allocation will be served on any party that has filed an appearance requesting notices in the Chapter 11 Cases and any party that receives a Ballot to vote in the Chapter 11 Cases. The Trust Distribution Procedures may be amended as appropriate to address the Cyprus Contribution and the Cyprus Mines Plan, as set forth in footnote 1 therein.

Capitalized terms used in Section 10.10.9 of the Plan and not otherwise defined therein, have the meanings ascribed to them in the Trust Distribution Procedures.

(k)    *Good Faith Compromise and Settlement*

The Plan (including its incorporation of the Imerys Settlement, the Rio Tinto/Zurich Settlement, and the Cyprus Settlement), the Plan Documents, and the Confirmation Order constitute a good faith compromise and settlement of Claims and controversies based upon the unique circumstances of these Chapter 11 Cases, and none of the foregoing documents, the Disclosure Statement, or any other papers filed in furtherance of Plan Confirmation, nor any drafts of such documents, may be offered into evidence or deemed as an admission in any context whatsoever beyond the purposes of the Plan, in any other litigation or proceeding, except as

106

necessary, and as admissible in such context, to enforce their terms before the Bankruptcy Court or any other court of competent jurisdiction. The Plan, the Imerys Settlement, the Plan Documents, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors, the Reorganized Debtors, the Imerys Protected Parties, or the Talc Personal Injury Trust is a party. The Plan, the Rio Tinto/Zurich Settlement, the Cyprus Settlement, the Plan Documents, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors, the Reorganized Debtors, the Rio Tinto Protected Parties, the Zurich Protected Parties, the Cyprus Protected Parties, or the Talc Personal Injury Trust is a party.

(l)    *Resolution of Talc Personal Injury Claims*

Talc Personal Injury Claims shall be channeled to and resolved by the Talc Personal Injury Trust in accordance with the Trust Distribution Procedures, as applicable, subject to: (a) the right of any Talc Insurance Company to raise any valid Talc Insurer Coverage Defense in response to a demand by the Talc Personal Injury Trust that such insurer handle, defend, or pay any such claim; and (b) the right of J&J, as indemnitor, to raise any valid J&J Indemnification Defense in response to a demand by the Talc Personal Injury Trust that J&J handle, defend, or pay any such claim.

(m)    *Sources of Consideration for Plan Distributions*

(1)    <u>North American Debtor Claims</u>

All Cash consideration necessary for payments or distributions on account of the North American Debtor Claims shall be obtained from (i) the Cash on hand of the North American Debtors on the Effective Date, including Cash derived from business operations, (ii) the Sale Proceeds, and (iii) the Imerys Cash Contribution.

(2)    <u>Talc Personal Injury Claims</u>

All Cash consideration necessary for payments or distributions on account of Talc Personal Injury Claims shall be obtained from (i) the Cash on hand of the North American Debtors on the Effective Date, including Cash derived from business operations, other than the Cash placed in the Reserves, if any, (ii) the Imerys Settlement Funds, (iii) the amount of the Imerys Cash Contribution, after such funds have been disbursed in accordance with <u>Section 10.8.2</u> of the Plan; (iv) all Cash remaining in the Reserves, if applicable, as set forth in <u>Section 10.14</u> of the Plan; (v) all proceeds from the Talc Personal Injury Trust Assets; (vi) the Rio Tinto/Zurich Contribution; and (vii) the Cyprus Contribution upon the occurrence of the Cyprus Trigger Date.

(3)    <u>ITI Claims</u>

All Cash consideration necessary for payments or distributions under the Plan on account of ITI Claims, for the avoidance of doubt, other than Talc Personal Injury Claims, shall be obtained from the Cash on hand at Reorganized ITI.

(4)    <u>Transfer of Funds Between the North American Debtors</u>

The North American Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable them to satisfy their obligations under the Plan; *provided* that any transfer of funds from ITC to another North American Debtor shall be subject to review by the Information Officer.  Except as set forth therein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate or otherwise be affected by the terms of the Plan.

(5)    <u>Funding by the Talc Personal Injury Trust</u>

The Talc Personal Injury Trust shall have no obligation to fund costs and expenses other than those set forth in the Plan and/or the Talc Personal Injury Trust Documents, as applicable.

(n)    *Transfer of Remaining North American Debtors' Assets to the Talc Personal Injury Trust*

After (i) all Disputed Claims against the North American Debtors have been resolved, and (ii) all Distributions required to be made by the Reorganized North American Debtors under the Plan have been made, all Cash remaining in the Disputed Claims Reserve shall be disbursed to the Talc Personal Injury Trust, in accordance with <u>Section 7.10</u> of the Plan.

Upon the final resolution of all Claims against and obligations of the Reorganized North American Debtors, all Cash remaining in the Reorganized North American Debtor Cash Reserve shall be disbursed to the Talc Personal Injury Trust.

Any remaining balance in the Fee Claim Reserve and the Administrative Claim Reserve shall be disbursed to the Talc Personal Injury Trust subject to and in accordance with <u>Sections 2.1</u> and <u>2.3</u> of the Plan.

(o)    *Modification of the Plan*

To the extent permissible under section 1127 of the Bankruptcy Code, any proposed amendments to or modifications of the Plan under section 1127 of the Bankruptcy Code or as otherwise permitted by law will be submitted jointly by the Plan Proponents, without additional disclosure pursuant to section 1125 of the Bankruptcy Code at any time prior to substantial consummation of the Plan, unless section 1127 of the Bankruptcy Code requires additional disclosure; *provided* that no such amendment or modification of the Plan that adversely affects the rights or obligations of the Cyprus Protected Parties or the Rio Tinto Protected Parties, as applicable, shall be permitted hereunder without the prior written consent of CAMC, Cyprus Mines, or Rio Tinto, as applicable.  To the extent permissible under section 1127(b) of the Bankruptcy Code, following substantial consummation of the Plan, the Reorganized Debtors may remedy any defects or omissions or reconcile any inconsistencies in the Plan Documents for the purpose of implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan, so long as (a) the interests of the holders of Allowed Claims are not adversely affected thereby; (b) any such modifications are non-material; (c) the Tort Claimants' Committee and the FCR or, following the Effective Date, the Talc Trust Advisory Committee and the FCR

consent; (d) Imerys S.A. consents; and (e) the United States Trustee does not object, unless such objection is overruled by the Bankruptcy Court. Post-Effective Date, any holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified or supplemented pursuant to Section 10.15 of the Plan, unless the Bankruptcy Court rules otherwise.

(p)    *Revocation or Withdrawal of the Plan*

The Debtors, with the consent of each of the other Plan Proponents, reserve the right to revoke and withdraw the Plan prior to entry of the Confirmation Order. If the Debtors, with the consent of each of the other Plan Proponents, revoke or withdraw the Plan, the Plan shall be deemed null and void and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against such Debtor, or any other Entity (including the Plan Proponents), or to prejudice in any manner the rights of such Debtor, or such Entity (including the Plan Proponents) in any further proceedings involving such Debtor until the occurrence of the Effective Date. For the avoidance of doubt, unless and until the Plan is confirmed and the Effective Date occurs, the Plan will have no force or effect.

(q)    *Certain Technical Modifications*

Prior to the Effective Date, the Plan Proponents collectively may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, to the extent permissible under section 1127 of the Bankruptcy Code; *provided, however*, that such technical adjustments and modifications do not adversely affect in a material way the rights or protections of the Protected Parties or the treatment of holders of Claims or Equity Interests under the Plan.

7.7    Effect of Confirmation

(a)    *Preservation of Certain Estate Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Estate Causes of Action have been expressly released, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Non-Talc Causes of Action, whether arising before or after the Petition Date. Each Reorganized Debtor's right to commence, prosecute or settle such Non-Talc Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue the Non-Talc Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or this Disclosure Statement to any Non-Talc Cause of Action against them as any indication that the Reorganized Debtors will not pursue the Non-Talc Causes of Action. The Reorganized Debtors expressly reserve all rights to prosecute any and all Non-Talc Causes of Action, except as otherwise expressly provided in the Plan. Unless any of the Non-Talc Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all such Non-Talc Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial,

equitable or otherwise), or laches, shall apply to such Non-Talc Causes of Action as a consequence of the Confirmation of the Plan.

Upon the Effective Date, the Reorganized Debtors shall retain and enforce all defenses and counterclaims to all Claims that were or could have been asserted against the Debtors, respectively, or their respective Estates, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.  On or after the Effective Date, the Reorganized Debtors may pursue, settle or withdraw, without Bankruptcy Court approval, such claims, rights, or causes of action (other than the Talc Personal Injury Trust Causes of Action) as they determine in accordance with their best interests.

(b)     *Preservation of Talc Personal Injury Trust Causes of Action*

On the Effective Date, all Talc Personal Injury Trust Causes of Action shall be transferred to and vested in the Talc Personal Injury Trust.  Except as otherwise provided in the Plan or the Confirmation Order, the Talc Personal Injury Trust shall retain and enforce, as the appointed estate representative in accordance with section 1123(b) of the Bankruptcy Code, all Talc Personal Injury Trust Causes of Action, including, but not limited to, setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code.  The transfer of the Talc Personal Injury Trust Causes of Action to the Talc Personal Injury Trust, insofar as they relate to the ability to defend against or reduce the amount of Talc Personal Injury Claims, shall be considered the transfer of a non-exclusive right enabling the Talc Personal Injury Trust to defend itself against asserted Talc Personal Injury Claims, which transfer shall not impair, affect, alter, or modify the right of any Person, including without limitation, the Imerys Protected Parties, the Rio Tinto Protected Parties, the Zurich Protected Parties, the Cyprus Protected Parties, an insurer or alleged insurer, or co-obligor or alleged co-obligor, sued on account of a Talc Personal Injury Claim, to assert each and every defense or basis for claim reduction such Person could have asserted had the Talc Personal Injury Trust Causes of Action not been assigned to the Talc Personal Injury Trust.

(c)     *Talc Insurance Actions*

Any Talc Insurance Action, or the claims and causes of action asserted or to be asserted therein, shall be preserved for the benefit of the Talc Personal Injury Trust, for prosecution by the applicable Debtor(s) until the Effective Date subject to the consent of the FCR and the Tort Claimants' Committee, which shall not be unreasonably withheld.  As of the Effective Date, such Talc Insurance Actions along with the rights and obligations of the Debtors and the Reorganized Debtors, as applicable, and the Non-Debtor Affiliates with respect to the Talc Insurance Policies and claims thereunder shall exclusively vest in the Talc Personal Injury Trust in accordance with section 1123(a)(5)(B) of the Bankruptcy Code, and the Talc Personal Injury Trust shall retain and enforce as the appointed estate representative in accordance with section 1123(b)(3)(B) of the Bankruptcy Code all such Talc Insurance Actions.  Such Talc Insurance Actions shall be free and clear of all Liens, security interests, and other Claims or causes of action, except for Talc Insurer Coverage Defenses.  Upon vesting in the Talc Personal Injury Trust, the prosecution of the Talc Insurance Actions shall be governed by the Talc Personal Injury Trust Documents.

(d)    *Insurance Provisions*

The provisions of <u>Section 11.4</u> of the Plan shall apply to all Entities (including, without limitation, all Talc Insurance Companies).

Except as provided in the Rio Tinto/Zurich Settlement and any Talc Insurance Settlement Agreement, nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any Talc Insurance Company; (b) any rights or obligations of the Debtors arising out of or under any Talc Insurance Policy; or (c) any rights or obligations of J&J arising out of or under any Talc Insurance Policy (if any).  For all issues relating to insurance coverage allegedly provided by the Zurich Corporate Parties or the Rio Tinto Captive Insurers, the provisions, terms, conditions, and limitations of the Rio Tinto/Zurich Settlement shall control.  For all other issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Talc Insurance Policies or applicable Talc Insurance CIP Agreements or Talc Insurance Settlement Agreements shall control.  For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or the Confirmation Order shall operate to require any Talc Insurance Company to indemnify or pay the liability of any Protected Party that it would not have been required to pay in the absence of the Plan.

The Plan, the Plan Documents, and the Confirmation Order shall be binding on the Debtors, the Reorganized Debtors, and the Talc Personal Injury Trust.  The obligations, if any, of the Talc Personal Injury Trust to pay holders of Talc Personal Injury Claims shall be determined pursuant to the Plan and the Plan Documents.  Except as provided in <u>Section 11.4.1.4</u> of the Plan, none of (a) the Bankruptcy Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (c) any estimation or valuation of Talc Personal Injury Claims, either individually or in the aggregate (including, without limitation, any agreement as to the valuation of Talc Personal Injury Claims) in the Chapter 11 Cases shall, with respect to any Talc Insurance Company, constitute a trial or hearing on the merits or an adjudication or judgment, or accelerate the obligations, if any, of any Talc Insurance Company under its Talc Insurance Policies.

No provision of the Plan, other than those provisions contained in the applicable Injunctions set forth in Article XII of the Plan, shall be interpreted to affect or limit the protections afforded to any Settling Talc Insurance Company by the Channeling Injunction or the Insurance Entity Injunction.

Nothing in <u>Section 11.4.1</u> of the Plan is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Talc Insurance Company with respect to any issue that is actually litigated by such Talc Insurance Company as part of its objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by such Talc Insurance Company in conjunction with or related to Confirmation of the Plan.  Plan objections that are withdrawn prior to the conclusion of the Confirmation Hearing shall be deemed not to have been actually litigated.

No provision of the Plan shall be interpreted to assign or transfer the rights of any Cyprus Protected Party, or to resolve disputes between Cyprus and the Debtors regarding ownership or control of rights to insurance or indemnity rights, absent occurrence of the Cyprus Trigger Date. For the avoidance of doubt, any such rights being assigned under the Cyprus Settlement shall not be assigned prior to the Cyprus Trigger Date.

(e)    *J&J Indemnification Rights and Obligations*

The provisions of <u>Section 11.5</u> of the Plan shall apply to all Entities (including, without limitation, J&J).

Subject to <u>Section 11.5.1.5</u>, nothing contained in the Plan, the Plan Documents (including the Trust Distribution Procedures), or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, fixing, adjudicating, determining, altering, supplementing, changing, decreasing, modifying, or releasing the rights (if any) or obligations of J&J, including the J&J Indemnification Rights and Obligations and J&J's rights (if any) and obligations under any Talc Insurance Policy. For all issues relating to the J&J Indemnification Rights and Obligations, the provisions, terms, conditions, and limitations of any agreements underlying the J&J Indemnification Rights and Obligations shall control.

For the avoidance of doubt, nothing contained in the Plan, the Plan Documents (including the Trust Distribution Procedures), or the Confirmation Order (including any findings of fact or conclusions of law set forth therein, or any expert reports or FCR findings or conclusions) shall operate to require J&J to indemnify or pay the liability of any Debtor, the Reorganized Debtors, or any Protected Party that it would not have been required to pay in the absence of the Plan. <u>Section 11.5.1.2</u> of the Plan in no way modifies, alters or limits the rights and/or obligations set forth in <u>Section 11.5.1.1</u> of the Plan. Likewise, nothing contained in the Plan, the Plan Documents (including the Trust Distribution Procedures), or the Confirmation Order shall be interpreted to grant the Debtors or any Protected Party any right to access any insurance policies issued to J&J or naming J&J as an insured.

The Plan, the Plan Documents (including the Trust Distribution Procedures), and the Confirmation Order shall be binding on the Debtors, the Reorganized Debtors, and the Talc Personal Injury Trust. The obligations, if any, of the Talc Personal Injury Trust to pay holders of Talc Personal Injury Claims shall be determined pursuant to the Plan and the Plan Documents. Subject to <u>Sections 11.5.1.4</u> and <u>11.5.1.5</u> of the Plan, none of (a) the Bankruptcy Court's approval of the Plan or the Plan Documents (including the Trust Distribution Procedures), (b) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (c) any estimation or valuation of Talc Personal Injury Claims, either individually or in the aggregate (including, without limitation, any agreement as to the valuation of Talc Personal Injury Claims) in the Chapter 11 Cases shall, with respect to J&J, constitute a trial or hearing on the merits or an adjudication or judgment, or accelerate the obligations, if any, of J&J.

Nothing in <u>Section 11.5.1</u> of the Plan is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against J&J with respect to any issue that is actually litigated by J&J as part of its objections, if any, to

112

Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by J&J in conjunction with or related to Confirmation of the Plan. Plan objections that are withdrawn prior to the conclusion of the Confirmation Hearing shall be deemed not to have been actually litigated.

The provisions of <u>Sections 11.5.1.1</u>, <u>11.5.1.3</u>, and <u>11.5.1.6</u> of the Plan shall not apply to any claim by or against J&J to indemnification, defense, contribution, or any other right to recovery vis-à-vis any Rio Tinto Protected Party or any Zurich Protected Party or any Cyprus Protected Party, or under any Rio Tinto Captive Insurer Policy or any Zurich Policy, arising out of or relating to any Talc Personal Injury Claim.

Nothing in the Plan, the Plan Documents (including the Trust Distribution Procedures), or the Confirmation Order shall seek the Bankruptcy Court's determination or opinion as to (nor be construed to represent the Bankruptcy Court's determination or opinion as to) (i) any right, obligation, defense, claim or any other provision or entitlement of any alleged indemnification obligation of J&J, or (ii) the effect, if any, of applicable non-bankruptcy law regarding any requirement or provision (or the rights, obligations, defenses, or claims which may inure thereto or therefrom) in any contracts or in underlying proceedings by and between and/or among the Debtors, the Reorganized Debtors, and/or the Talc Personal Injury Trust and J&J.

(f)    *Institution and Maintenance of Legal and Other Proceedings*

As of the Effective Date, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability or responsibility of the Talc Personal Injury Trust, including without limitation the Talc Insurance Actions, Talc Personal Injury Claims, Indirect Talc Personal Injury Claims, the Talc Personal Injury Trust Causes of Action, and the J&J Indemnification Obligations. Without limiting the foregoing, on and after the Effective Date, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue and resolve all such actions, in the name of either of the Debtors or the Reorganized Debtors, if deemed necessary or appropriate by the Talc Personal Injury Trust. The Talc Personal Injury Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the Effective Date arising from or associated with any legal action or other proceeding which is the subject of Article IV of the Plan and shall pay or reimburse all deductibles, self-insured retentions, retrospective premium adjustments, or other charges (not constituting Indirect Talc Personal Injury Claims) which may arise from the receipt of any insurance proceeds by the Talc Personal Injury Trust. Furthermore, without limiting the foregoing, the Talc Personal Injury Trust shall be empowered to maintain, administer, preserve, or pursue the Talc-In-Place Insurance Coverage and the Talc Insurance Action Recoveries. Notwithstanding anything to the contrary in the Plan, the Talc Personal Injury Trust shall comply with the Cyprus Insurance Protocol.

(g)    *Terms of Injunctions and Automatic Stay*

All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Cases, whether pursuant to sections 105, 362, or any other provision of the Bankruptcy Code, Bankruptcy Rules, or other applicable law in existence immediately prior to the

Confirmation Date, shall remain in full force and effect until the injunctions become effective pursuant to a Final Order, and shall continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms.  In addition, on and after Confirmation, the Debtors, with the consent of each of the Plan Proponents, may collectively seek such further orders as they deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

Each of the Injunctions contained in the Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order.

(h)      *The FCR and the Tort Claimants' Committee*

The FCR and the Tort Claimants' Committee shall continue in their official capacities until the Effective Date.  The Debtors shall pay the reasonable fees and expenses incurred by the FCR and the Tort Claimants' Committee through the Effective Date, in accordance with the Compensation Procedures Order, the Fee Examiner Order, and the terms of the Plan, including Section 2.3 of the Plan.

After the Effective Date, the official capacities of the FCR and the Tort Claimants' Committee in the Chapter 11 Cases shall be limited to having standing and capacity to (i) prosecute their pre-Effective Date intervention in any adversary proceedings; (ii) object to any proposed modification of the Plan; (iii) object to or defend the Fee Claims of professionals employed by or on behalf of the Estate, or by or on behalf of members of the Tort Claimants' Committee; and (iv) participate in any pending appeals or appeals of the Confirmation Order.  Except for the foregoing, the FCR and the members of the Tort Claimants' Committee shall be released and discharged from all further authority, duties, responsibilities, liabilities, and obligations involving the Chapter 11 Cases.  Upon the closing of the Chapter 11 Cases, the Tort Claimants' Committee shall be dissolved.  The fees and expenses incurred by the FCR and the Tort Claimants' Committee relating to any post-Effective Date activities authorized under the Plan shall be payable from the Administrative Claim Reserve.

Nothing in Section 11.8 of the Plan shall limit or otherwise affect the rights of the United States Trustee under section 502 of the Bankruptcy Code or otherwise to object to Claims or requests for allowance of  DIP Facility Claims, or Fee Claims and other Administrative Claims.

7.8    Releases, Injunctions and Exculpation

The release, injunction and exculpation provisions are set forth in Article XII of the Plan, and a summary of such provisions is provided below.

(a)      *Terms of Injunction and Automatic Stay*

All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Cases, whether pursuant to sections 105, 362, or any other provision of the Bankruptcy Code, Bankruptcy Rules, or other applicable law in existence immediately prior to the Confirmation Date, shall remain in full force and effect until the injunctions become effective pursuant to a Final Order, and shall continue to remain in full force and effect thereafter as and to

114

the extent provided by the Plan, the Confirmation Order, or by their own terms.  In addition, on and after Confirmation, the Debtors, with the consent of each of the Plan Proponents, may collectively seek such further orders as they deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

Each of the Injunctions contained in the Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order.

(b) *Discharge and Injunctions*

(1) Discharge of Claims Against and Termination of Equity Interests the Debtors

Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, Confirmation of the Plan shall afford each Debtor a discharge to the fullest extent permitted by Bankruptcy Code sections 524 and 1141(d)(1).

(2) **Discharge Injunction**

**Except as specifically provided in the Plan or the Confirmation Order, from and after the Effective Date, to the maximum extent permitted under applicable law, all Persons that hold, have held, or may hold a Claim, demand or other debt or liability that is discharged, or an Equity Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan, are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, debts or liabilities, or terminated Equity Interests or rights: (i) commencing or continuing any action or other proceeding of any kind against the Debtors, the Reorganized Debtors, the Talc Personal Injury Trust, or their respective property; (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, the Talc Personal Injury Trust, or their respective property; (iii) creating, perfecting, or enforcing any Lien or Encumbrance of any kind against the Debtors, the Reorganized Debtors, the Talc Personal Injury Trust, or their respective property; and (iv) commencing or continuing any judicial or administrative proceeding, in any forum and in any place in the world, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order (the "Discharge Injunction").  The foregoing injunction shall extend to the successors of the Debtors (including, without limitation, the Reorganized Debtors) and their respective properties and interests in property.  The discharge provided in this provision shall void any judgment obtained against any Debtor at any time, to the extent that such judgment relates to a discharged Claim or demand.**

(c) *Releases*

(1) **Releases by Debtors, their Estates, and Certain Protected Parties**

**As of the Effective Date (or, with respect to the Cyprus Protected Parties, as of the Cyprus Trigger Date), for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and**

115

during the Chapter 11 Cases to facilitate the implementation of the Talc Personal Injury Trust, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Debtors and the Estates from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, causes of action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates (including any Estate Causes of Action), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, this Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission; provided, however, that the Debtors do not release, and the Reorganized Debtors shall retain, the Non-Talc Causes of Action arising out of, or related to, any act or omission of a Released Party that is a criminal act or constitutes fraud, gross negligence, or willful misconduct. The Debtors, and any other newly-formed entities that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the releases set forth in **Section 12.2.1** of the Plan. For the avoidance of doubt, Claims or causes of action arising out of, or related to, any act or omission of a Released Party prior to the Effective Date that is later found to be a criminal act or to constitute fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to **Section 12.2.1** of the Plan.

In furtherance of the Imerys Settlement, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, on their own behalf and as representatives of their respective Estates, the Reorganized Debtors, and the Tort Claimants' Committee and FCR, solely on their own behalf, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Imerys Protected Parties of and from (a) all Estate Causes of Action and (b) any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or

nature (including, without limitation, those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Debtors, their Estates, the Reorganized Debtors, the Tort Claimants' Committee, or the FCR have, had, may have, or may claim to have against any of the Imerys Protected Parties including without limitation with respect to any Talc Personal Injury Claim (clauses (a) and (b) collectively, the "Imerys Released Claims").

In furtherance of the Rio Tinto/Zurich Settlement, effective upon the Talc Personal Injury Trust's receipt of the Rio Tinto/Zurich Contribution, for good and valuable consideration, the adequacy of which is hereby confirmed, the Talc Personal Injury Trust, the Debtors, on their own behalf and as representatives of their respective Estates, the Reorganized Debtors, and the Tort Claimants' Committee and FCR, solely on their own behalf, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Rio Tinto Protected Parties and the Zurich Protected Parties of and from (a) all Estate Causes of Action and (b) any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Talc Personal Injury Trust, the Debtors, their Estates, the Reorganized Debtors, the Tort Claimants' Committee, or the FCR have, had, may have, or may claim to have against any of the Rio Tinto Protected Parties and/or the Zurich Protected Parties, directly or indirectly arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim (collectively, the "Rio Tinto/Zurich Released Claims").

In furtherance of the Cyprus Settlement, effective upon the Cyprus Trigger Date (and subject to Section 10.10.6.4 of the Plan), for good and valuable consideration, the adequacy of which is hereby confirmed, the Talc Personal Injury Trust, the Debtors, on their own behalf and as representatives of their respective Estates, the Reorganized Debtors, the Tort Claimants' Committee and FCR, and any Cyprus Settling Talc Insurance Company (regardless of when it enters into any settlement with the Debtors, the Tort Claimants' Committee, the FCR, or the Talc Personal Injury Trust), each solely on its own behalf, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Cyprus Protected Parties of and from (a) all Estate Causes of Action and (b) any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Talc Personal Injury Trust, the Debtors, their Estates, the Reorganized Debtors, the Tort Claimants' Committee, the FCR, or any Cyprus Settling Talc Insurance Company have, had, may have, or may claim to have against any of the Cyprus Protected Parties, directly or indirectly arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim (collectively, the "Cyprus Released Claims").

117

(2)    **Releases by Holders of Claims**

**As of the Effective Date (or, with respect to the Cyprus Protected Parties, as of the Cyprus Trigger Date), for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the implementation of the Talc Personal Injury Trust, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, except as otherwise explicitly provided in the Plan, by the Releasing Claim Holders from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, causes of action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates (including any Estate Causes of Action), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such entities existed prior to or after the Petition Date), their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, this Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, other than Claims or causes of action arising out of, or related to, any act or omission of a Released Party that constitutes fraud, gross negligence or willful misconduct. For the avoidance of doubt, Claims or causes of action arising out of, or related to, any act or omission of a Released Party prior to the Effective Date that is later found to be a criminal act or to constitute fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to Section 12.2.2 of the Plan**.

(3)    **Injunction Related to Releases**

**Except as otherwise provided in the Plan, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any claims, commitments, obligations, suits, judgments, damages, demands,**

US-DOCS\120811663.4

debts, causes of action and liabilities released pursuant to the Plan (the "**Release Injunction**").

(d) *The Channeling Injunction and the Insurance Entity Injunction*

In order to supplement the injunctive effect of the Discharge Injunction, and pursuant to sections 524(g) and 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following permanent injunctions to take effect as of the Effective Date.

(1) **Channeling Injunction**

(a) **Terms.** To preserve and promote the settlements contemplated by and provided for in the Plan, including the Imerys Settlement, the Rio Tinto/Zurich Settlement, and the Cyprus Settlement, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and the District Court under sections 105(a) and 524(g) of the Bankruptcy Code, the sole recourse of any holder of a Talc Personal Injury Claim against a Protected Party (on account of such Talc Personal Injury Claim) shall be the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents, and such holder shall have no right whatsoever at any time to assert its Talc Personal Injury Claim against any Protected Party or any property or interest in property of any Protected Party. On and after the Effective Date – or, as to the Cyprus Protected Parties, on or after the Cyprus Trigger Date – all holders of Talc Personal Injury Claims shall be permanently and forever stayed, restrained, barred, and enjoined from taking any action for the purpose of, directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Talc Personal Injury Claim against a Protected Party other than from the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents, including, but not limited to:

(i) commencing, conducting, or continuing in any manner, directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;

(ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property or interests in property of any Protected Party;

(iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien of any kind against any Protected Party or any property or interests in property of any Protected Party;

119

(iv)    **asserting, implementing, or effectuating any setoff, right of reimbursement, subrogation, contribution, or recoupment of any kind, in any manner, directly or indirectly, against any obligation due to any Protected Party or against any property or interests in property of any Protected Party; and**

(v)    **taking any act in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Documents, or the Talc Personal Injury Trust Documents or with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Talc Personal Injury Trust, except in conformity and compliance with the Talc Personal Injury Trust Documents.**

(b)    **Reservations.    Notwithstanding anything to the contrary in** <u>**Section 12.3.1(a)**</u> **of the Plan, this Channeling Injunction shall not impair:**

(i)    **the rights of holders of Talc Personal Injury Claims to assert such Talc Personal Injury Claims solely against the Talc Personal Injury Trust or otherwise in accordance with the Trust Distribution Procedures;**

(ii)    **the rights of holders of Talc Personal Injury Claims to assert such claims against anyone other than a Protected Party;**

(iii)    **the rights of Persons to assert any Claim, debt, obligation or liability for payment of Talc Personal Injury Trust Expenses solely against the Talc Personal Injury Trust or otherwise in accordance with the Trust Distribution Procedures; or**

(iv)    **the Talc Personal Injury Trust from enforcing its rights explicitly provided to it under the Plan and the Talc Personal Injury Trust Documents.**

(c)    **Modifications.    There shall be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.**

(d)    **Non-Limitation of Channeling Injunction.    Nothing in the Plan or the Talc Personal Injury Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan, the releases provided in the Imerys Settlement, the Rio Tinto/Zurich Settlement, and the Cyprus Settlement, or the Talc Personal Injury Trust's assumption of all liability with respect to Talc Personal Injury Claims.**

(e)    **Bankruptcy Rule 3016 Compliance.    The Plan Proponents' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.**

(f)    **Any Protected Party may enforce the Channeling Injunction as a defense to any Claim brought against such Protected Party that is enjoined under the Plan as to such Protected Party and may seek to enforce such injunction in a court of competent jurisdiction.**

(g)    **If a non-Settling Talc Insurance Company asserts that it has rights whether legal, equitable, contractual, or otherwise, of contribution, indemnity, reimbursement, subrogation or other similar claims directly or indirectly arising out of or in any way relating to such insurer's payment of loss on behalf of one or more of the Debtors in connection with any Talc Personal Injury Claim (collectively, "Contribution Claims") against a Settling Talc Insurance Company, (i) such Contribution Claims may be asserted as a defense or counterclaim against the Talc Personal Injury Trust in any Talc Insurance Action involving such non-Settling Talc Insurance Company, and the Talc Personal Injury Trust may assert the legal or equitable rights (if any) of the Settling Talc Insurance Company, and (ii) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such non-Settling Talc Insurance Company to the Talc Personal Injury Trust shall be reduced by the amount of such Contribution Claims**

(2)    **Insurance Entity Injunction**

(a)    **Purpose.  In order to protect the Talc Personal Injury Trust and to preserve the Talc Personal Injury Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court, the Bankruptcy Court shall issue the Insurance Entity Injunction; *provided*, *however*, that the Insurance Entity Injunction is not issued for the benefit of any Talc Insurance Company, and no Talc Insurance Company is a third-party beneficiary of the Insurance Entity Injunction, except as otherwise specifically provided in any Talc Insurance CIP Agreement or Talc Insurance Settlement Agreement.**

(b)    **Terms Regarding Claims Against Talc Insurance Companies. Subject to the provisions of Sections 12.3.1 and 12.3.2 of the Plan, all Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any claim, demand or cause of action (including any Talc Personal Injury Claim or any claim or demand for or respecting any Talc Personal Injury Trust Expense) against any Talc Insurance Company based upon, attributable to, arising out of, or in any way connected with any such Talc Personal Injury Claim, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim, demand, or cause of action including, without limitation:**

(i)    **commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding)**

in any forum with respect to any such claim, demand, or cause of action against any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action; *provided, however*, that to the extent any Talc Insurance Company asserts a claim against J&J, nothing in the Plan shall affect J&J's ability to assert any defense or counterclaim;

(ii)    enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;

(iii)    creating, perfecting, or enforcing in any manner, directly or indirectly, any Encumbrance against any Talc Insurance Company, or the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action; and

(iv)    except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand or cause of action;

*provided*, *however*, that (a) the injunction set forth in Section 12.3.2(b) of the Plan shall not impair in any way any (i) actions brought by the Talc Personal Injury Trust against any Talc Insurance Company and (ii) the rights of any co-insured of the Debtors (x) with respect to any Talc Insurance Policy or Talc Insurance CIP Agreement or against any Talc Insurance Company and (y) as specified under any Final Order of the Bankruptcy Court approving a Talc Insurance CIP Agreement; and (b) the Talc Personal Injury Trust shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the injunction set forth in Section 12.3.2(b) of the Plan with respect to any Talc Insurance Company upon express written notice to such Talc Insurance Company, except that the Talc Personal Injury Trust shall not have any authority to terminate, reduce or limit the scope of the injunction in the Plan with respect to any Settling Talc Insurance Company so long as, but only to the extent that, such Settling Talc Insurance Company complies fully with its obligations under any applicable Talc Insurance Settlement Agreement.

(c)    Reservations. Notwithstanding anything to the contrary above, this Insurance Entity Injunction shall not enjoin:

(i)    the rights of Entities to the treatment accorded them under the Plan, as applicable, including the rights of holders of Talc

Personal Injury Claims to assert such Claims, as applicable, in accordance with the Trust Distribution Procedures;

(ii)    the rights of Entities to assert any claim, debt, obligation, cause of action or liability for payment of Talc Personal Injury Trust Expenses against the Talc Personal Injury Trust;

(iii)    the rights of the Talc Personal Injury Trust to prosecute any action based on or arising from the Talc Insurance Policies;

(iv)    the rights of the Talc Personal Injury Trust to assert any claim, debt, obligation, cause of action or liability for payment against a Talc Insurance Company based on or arising from the Talc Insurance Policies or Talc Insurance CIP Agreements; and

(v)    the rights of any Talc Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any other Talc Insurance Company that is not a Settling Talc Insurance Company, or as otherwise specifically provided in any Talc Insurance CIP Agreement.

(d)    Subject to the terms of the Rio Tinto/Zurich Settlement, nothing in the Plan will preclude J&J from pursuing any rights it has under any Talc Insurance Policy that was issued to J&J as a named insured.

(e)    *Supplemental Settlement Injunction Order*

In order to preserve and promote the (i) Imerys Settlement, (ii) the Rio Tinto/Zurich Settlement, and (iii) the Cyprus Settlement (subject to the occurrence of the Cyprus Trigger Date), each of which is incorporated in the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date.

(a)    **Terms**

(i)    **All Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Imerys Released Claims directly or indirectly against the Imerys Protected Parties (or any of them) shall be permanently stayed, restrained, and enjoined from pursuing now, or at any time in the future, any Imerys Released Claims.**

(ii)    **All Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Rio Tinto/Zurich Released Claims directly or indirectly against the Rio Tinto Protected Parties (or any of them) and/or the Zurich Protected Parties (or any of them) shall be permanently stayed, restrained, and enjoined from**

pursuing now, or at any time in the future, any Rio Tinto/Zurich Released Claims.

(iii)    Subject to the occurrence of the Cyprus Trigger Date, all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Cyprus Released Claims directly or indirectly against the Cyprus Protected Parties (or any of them) shall be permanently stayed, restrained, and enjoined from pursuing now, or at any time in the future, any Cyprus Released Claims.

(b)    Any Imerys Protected Party, Rio Tinto Protected Party, Zurich Protected Party, or Cyprus Protected Party may enforce the Supplemental Settlement Injunction Order as a defense to any Claim brought against such Imerys Protected Party, Rio Tinto Protected Party, Zurich Protected Party, or Cyprus Protected Party that is enjoined under the Plan as to such Imerys Protected Party, Rio Tinto Protected Party, Zurich Protected Party, or Cyprus Protected Party and may seek to enforce such injunction in a court of competent jurisdiction.

(f)    *Exculpation*

None of the Debtors, the Reorganized Debtors, the Imerys Protected Parties, the Tort Claimants' Committee, the members of the Tort Claimants' Committee in their capacities as such, the FCR, the Information Officer nor any of their respective officers, directors and employees, members, agents, attorneys, accountants, financial advisors or restructuring professionals, nor any other professional Person employed by any one of them, shall have or incur any liability to any Person or Entity for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation of the Plan, the Disclosure Statement, the releases and Injunctions, the pursuit of Confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be distributed under the Plan, or the management or operation of the Debtors (except for any liability that results primarily from such Person's or Entity's gross negligence, bad faith or willful misconduct); *provided*, *however*, that this exculpation shall not apply to Talc Insurer Coverage Defenses; *provided further* that <u>Section 12.7</u> of the Plan shall also apply to any former officer or director of the Debtors that was an officer or director at any time during the Chapter 11 Cases but is no longer an officer or director.  In all respects, each and all of such Persons, firms and Entities shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and the administration of each of them.

# ARTICLE VIII.

## THE TALC PERSONAL INJURY TRUST AND
## TRUST DISTRIBUTION PROCEDURES

8.1    Overview

(a)    *General*

On the Effective Date, the Talc Personal Injury Trust shall be created in accordance with the Plan Documents.  The purposes of the Talc Personal Injury Trust shall be to: (i) assume all Talc Personal Injury Claims; (ii) to preserve, hold, manage, and maximize the assets of the Talc Personal Injury Trust; and (iii) to direct the processing, liquidation, and payment of all compensable Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents.  The Talc Personal Injury Trust will resolve Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents in such a way that holders of Talc Personal Injury Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such claims, and otherwise comply in all respects with the requirements of section 524(g)(2)(B)(i) of the Bankruptcy Code.

The Talc Personal Injury Trust Agreement provides, in pertinent part, that the Talc Trustees have the power to make, pursue (by litigation or otherwise), collect, compromise or settle, in the name of the Talc Personal Injury Trust, any claim, right, action, or cause of action included in the Talc Personal Injury Trust Assets or which may otherwise hereafter accrue in favor of the Talc Personal Injury Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction.  Talc Personal Injury Trust Agreement, at § 2.1(c)(xv).  Before taking certain actions, however, the Talc Trustees must either consult with or obtain the consent of each of the FCR and the Trust Advisory Committee as set forth in the Talc Personal Injury Trust Agreement.  Pursuant to Section 2.2(f) of the Talc Personal Injury Trust Agreement, the Talc Trustees are required to obtain the consent from each of the Trust Advisory Committee and the FCR in order to "sell, transfer, or exchange any or all of the Talc Personal Injury Trust Assets at such prices and upon such terms as the Talc Trustees may consider proper, consistent with the other terms of [the Talc Personal Injury Trust Agreement]."  *Id.* at § 2.1(f)(xiv).  To the extent, the Trust Advisory Committee and the FCR do not consent, there are resolution procedures included in Section 7.13 of the Talc Personal Injury Trust Agreement which include alternative dispute resolution and application to the Bankruptcy Court.  The Talc Personal Injury Trust Agreement is explicit that in the event the Talc Trustees seek to approve any release or abandonment of J&J's indemnification obligations that they must have the consent of each of the Trust Advisory Committee and the FCR.  *See id.* at § 2.2(f)(xvi).

The Trust Distribution Procedures, attached to the Plan as Exhibit A, set forth procedures for processing and paying the Talc Personal Injury Claims.[88]  These procedures will be binding on

---

[88]    Foreign Claims are a subset of Talc Personal Injury Claims that will be channeled to and assumed by the Talc Personal Injury Trust and subject to the Channeling Injunction; however, the Trust Distribution Procedures provide that Foreign Claims will not receive any distributions from the Talc Personal Injury Trust.

US-DOCS\120811663.4

the holders of all Talc Personal Injury Claims. The Trust Distribution Procedures provide, among other things, for the resolution of Talc Personal Injury Claims pursuant to the terms of the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures, and that resolution of a Talc Personal Injury Claim by the Talc Personal Injury Trust will result in a full or partial release of such Claim against the Talc Personal Injury Trust in accordance with the Injury Trust Distribution Procedures.

The Trust Distribution Procedures are part of the global settlement between the Debtors, the Tort Claimants' Committee, the FCR, and the other Plan Proponents. As a result of this global settlement, the Debtors reviewed and proposed revisions to the terms of the Trust Distribution Procedures prepared by the Tort Claimants' Committee and the FCR, and retain consultation rights as to the Trust Distribution Procedures. The Debtors have also actively worked with the Tort Claimants' Committee and the FCR to ensure that the Trust Distribution Procedures maximize recoveries for holders of Talc Personal Injury Claims and are consistent with the Bankruptcy Code.

Furthermore, potential claimants should be aware that any funds they recover from the Talc Personal Injury Trust, or against any "primary plan" as defined in the Medicare Secondary Payer Statute, 42 U.S.C. § 1395y(b) (the "**MSPS**"), could be subject to repayment obligations owing or potentially owing under the MSPS or related rules, regulations, or guidelines. Potential claimants should also be aware that, as a condition of receiving payment from the Talc Personal Injury Trust or any "primary plan" as defined by the MSPS, the claimants may be asked to certify that they will comply with any obligations owing or potentially owing under the MSPS or related rules, regulations, or guidelines. The Talc Personal Injury Trust Agreement requires, as applicable, that the Talc Personal Injury Trust act as a reporting entity under 42 U.S.C. § 1395y(b), to the extent applicable.

(b)    *The Tort Claimants' Committee*

The Tort Claimants' Committee is comprised of 11 members. The members include mesothelioma claimants, ovarian cancer claimants (including certain claimants who are participating in the MDL Proceeding), living victims, and estates of deceased victims. Each claimant is represented by tort counsel with significant experience in talc and/or asbestos litigation. Some of the tort counsel also have experience with mass tort trusts. All have been actively engaged in the development of the Trust Distribution Procedures.

(c)    *Talc Personal Injury Trust Funding*

(1)    Imerys S.A.

One of the first tasks for each of the Tort Claimants' Committee and the FCR was to investigate potential causes of action against Imerys S.A., including without limitation alter ego and other theories of liability. That investigation took place over several months and involved the review of tens of thousands of documents produced by each of the Debtors and Imerys S.A. This review was accomplished by counsel and other professionals for each of the Tort Claimants' Committee and the FCR. The review informed each of the Tort Claimants' Committee and the FCR of, among other things, the strength of potential claims that could be asserted against Imerys S.A., the viability of potential defenses, and the value of various assets.

126

Thereafter, each of the Tort Claimants' Committee, the FCR, the Debtors, and Imerys S.A., began an arms'-length negotiation resulting in an agreement that formed the basis of the Plan which included, among other things, a contribution by Imerys S.A. for permanent relief pursuant to sections 105(a) and 524(g) of the Bankruptcy Code.

Ultimately, the parties reached a settlement – the Imerys Settlement – whereby, in exchange for the benefit of releases and injunctions in the Plan (as further described in this Disclosure Statement), Imerys S.A. and its Non-Debtor Affiliates would contribute and/or waive any interest in assets (or the proceeds of same) that at this time appear to be far in excess of $300 million to the resolution of the Chapter 11 Cases, made up of:

- $75 million cash contribution;

- the proceeds of the Sale (expected to be $223 million, plus the assumption of certain liabilities, as set forth in the Asset Purchase Agreement), for which Imerys S.A. agreed to pay a contingent purchase enhancement of up to $102.5 million if the proceeds did not exceed an agreed amount;

- $5 million for payment of Allowed Claims in Class 3a (with any excess going to the Talc Personal Injury Trust);

- an additional contingent contribution of up to $15 million to fund the Debtors' administrative expenses;

- the balance of the Intercompany Loans;

- the Contributed Indemnity and Insurance Interests;

- waiver of the Non-Debtor Intercompany Claims against the Debtors; and

- assumption of the Pension Liabilities.

The Tort Claimants' Committee and the FCR also spent significant time ensuring that the process for selling the Debtors' assets was designed to maximize the sale price and therefore the proceeds to be contributed to the Talc Personal Injury Trust. The proceeds of the Sale are expected to be $223 million, plus the assumption of certain liabilities, as set forth in the Asset Purchase Agreement.

Moreover, the foregoing is exclusive of the amounts that will be contributed to the Talc Personal Injury Trust as a result of the Rio Tinto/Zurich Settlement and the Cyprus Settlement summarized immediately below and described more broadly in Sections 6.2 and 6.3 of this Disclosure Statement.

(2)    The Rio Tinto/Zurich Settlement

The Tort Claimants' Committee and the FCR, along with the Debtors, also reached a resolution through the Rio Tinto/Zurich Mediation of (i) alleged liabilities relating to the Rio Tinto Corporate Parties' prior ownership of certain of the Debtors, (ii) alleged indemnification obligations of the Rio Tinto Corporate Parties, and (iii) alleged coverage obligations under the Talc Insurance Policies issued by the Zurich Corporate Parties and the Rio Tinto Captive Insurers. Before the Chapter 11 Cases, certain Rio Tinto Corporate Parties had been named as defendants

127

in Imerys-related talc litigation in a small number of cases.  No Rio Tinto Corporate Party had contributed to any payment to a claimant to resolve any such Imerys-related talc litigation, nor had any judgment been entered against any Rio Tinto Corporate Party with respect to any such litigation.  As part of the Rio Tinto/Zurich Mediation, the Tort Claimants' Committee and the FCR engaged in significant discovery to evaluate Estate Causes of Action against the Rio Tinto Corporate Parties, including claims based on conspiracy and alter ego.

Ultimately, a settlement was reached finally resolving all present and future talc-related liabilities of the Rio Tinto Protected Parties and Zurich Protected Parties, in return for a cash payment of $80 million from Rio Tinto and $260 million from Zurich, plus other consideration. The total amount of this settlement will be paid to the Talc Personal Injury Trust within thirty (30) days after the Rio Tinto/Zurich Trigger Date. The Rio Tinto/Zurich Settlement is further described in Articles II, VI, and VII of this Disclosure Statement.

(3)    The Cyprus Settlement

The Cyprus Parties, the Debtors, the Tort Claimants' Committee, and the FCR also reached a resolution through the Cyprus Mediation and agreed to the terms of the Cyprus Settlement, which resolves (i) the Talc Personal Injury Claims and the Cyprus Released Claims against the Cyprus Protected Parties, (ii) disputes pertaining to the Debtors' rights to the Cyprus Talc Insurance Policies, and (iii) disputes pertaining to the Debtors' and Cyprus' rights to indemnification by J&J. As part of the Cyprus Mediation, the Tort Claimants' Committee and the FCR engaged in significant discovery to evaluate Estate Causes of Action against the Cyprus Parties, including claims based on conspiracy and alter ego.

Ultimately a settlement was reached, which is further described in Articles II, VI, and VII of this Disclosure Statement.

(d)    *Structure of the Talc Personal Injury Trust*[89]

(1)    Claims Channeled to and Paid Under the Talc Personal Injury Trust

While all J&J product-based Talc Personal Injury Claims are channeled to the Talc Personal Injury Trust and have the option of electing to pursue claims against the Debtors as set forth in the Trust Distribution Procedures, only Ovarian Cancer Claims and Mesothelioma Claims are compensable from the cash assets of the Talc Personal Injury Trust.

Parties interested in understanding the nature and scope of the J&J Agreements should examine those indemnities directly and determine the applicability to their individual claims.  As noted in Section 12.1 of this Disclosure Statement, J&J disputes its obligations under the J&J Agreements.

---

[89]    Capitalized terms used in this Section 8.1(d) and not otherwise defined herein or in the Plan have the meanings ascribed to them in the Trust Distribution Procedures.

US-DOCS\120811663.4

(2)    <u>Medical and Exposure Criteria</u>

The Trust Distribution Procedures are structured to provide an Expedited Review process using bright-line medical and exposure criteria to reduce the administrative expenses of the Talc Personal Injury Trust and ensure that funds are utilized to the maximum extent to compensate users of the Debtors' talc.  For Ovarian Cancer injuries, the criteria for Expedited Review are designed to reflect both the current medical science (for example in the minimum use requirement) and the criteria applied in the tort system (including certain biological markers for Ovarian Cancer) in connection with settlement of Ovarian Cancer Claims.

Cosmetic talc such as baby powder has been used for generations.  Due to its prevalence, essentially everyone who has or will contract Mesothelioma has been exposed.  Nonetheless, recognizing the size of the Talc Personal Injury Trust, and a desire to allocate the Talc Personal Injury Trust Assets to victims of Mesothelioma who do not have other sources for substantial recovery, use requirements defined as "Regular and Routine Exposure" in the Trust Distribution Procedures have been established for Expedited Review of Mesothelioma Claims.

Regular and Routine Exposure is generally intended to provide direction for those suffering with Mesothelioma to understand if their claim may be resolved in favor of payment pursuant to the Trust Distribution Procedures.  In order to seek compensation from the Talc Personal Injury Trust and be paid from Fund B, a holder of a Mesothelioma Claim will need to demonstrate: (A) (i) regular or routine use of a personal care/cosmetic/hygiene product containing Cyprus Talc and/or Imerys Talc for at least three years, and (ii) no other significant occupational or industrial exposure (whether direct or bystander) to asbestos from another source other than Imerys Talc and/or Cyprus Talc; or (B) (i) regular or routine personal occupation exposure (whether direct or bystander) to Cyprus and/or Imerys Industrial Talc not incorporated in a product or the regular and routine use of a product containing Cyprus and/or Imerys Industrial Talc for at least one year, and (ii) no other significant occupational or industrial exposure (whether direct or bystander) to asbestos from a source other than Cyprus and/or Imerys Talc.

Talc Personal Injury Claims that satisfy the criteria for Expedited Review are eligible to receive an offer at the Scheduled Value set forth in the Trust Distribution Procedures.  Talc Personal Injury Claims which do not meet the criteria for Expedited Review are eligible for evaluation and compensation under the Individual Review Process.  In addition, the Trust Distribution Procedures provide for Individual Review of Talc Personal Injury Claims seeking higher values.  The Trust Distribution Procedures also provide for ADR and for an exit to the tort system for those claims that are not resolved through either Expedited Review or Individual Review.  All amounts to be paid under the Trust Distribution Procedures are subject to the payment percentages established by the Talc Personal Injury Trust.

The summary contained in this <u>Section 8.1(d)(2)</u> is subject to each of: (i) the caveats set forth in footnote 17 of this Disclosure Statement; and (ii) the definition of "Regular and Routine Exposure" set forth in the Trust Distribution Procedures.

(3)    40/40/20 Fund Allocation

The division of cash derived from the Talc Personal Injury Trust Assets into three separate pools was the result of extensive internal deliberations among members of the Tort Claimants' Committee designed to achieve the support of the tort claimants. The Trust Distribution Procedures allocate 40% of the Trust Fund to Ovarian Cancer A Claims; 40% of the Trust Fund to Mesothelioma Claims; and the remaining 20% of the Trust Fund to Ovarian Cancer B, C, and D Claims. If an Ovarian Cancer B, C, or D Claimant is later diagnosed with a higher stage of Ovarian Cancer or dies from Ovarian Cancer, that claimant is entitled to return to the Talc Personal Injury Trust for the difference between the amount such claimant received as an Ovarian Cancer B, C, or D Claimant and the amount that such claimant would have received had such claimant originally filed for recovery based on the subsequent injury or circumstance.

The Tort Claimants' Committee consulted with its counsel and estimation expert and considered many different alternatives before agreeing to the current proposal. The Tort Claimants' Committee believes that the division is appropriate and the best of available alternatives, based on the nature of the claims to be paid under the Talc Personal Injury Trust, the respective severity of the claims, the state of talc litigation, and the necessity of obtaining an affirming vote on the Plan.

(4)    Cyprus Contribution Allocation

The allocation of the Cyprus Contribution was the result of extensive internal deliberations among members of the Tort Claimants' Committee designed to achieve the support of the tort claimants and the FCR in the Chapter 11 Cases. The FCR continues to examine the proposed allocation. The Tort Claimants' Committee anticipates that there will likely be an official tort claimants' committee and a future claimants' representative appointed in the Cyprus Mines Bankruptcy. The allocation of the Cyprus Contribution is further described in footnote 17 of this Disclosure Statement.

(5)    Establishment of Scheduled/Average/Maximum Values

The Plan Proponents believe that the Debtors' prepetition settlement data and overall experience in the tort system do not provide a sufficient basis for establishing the values of the present or future talc claims for ovarian cancer or for mesothelioma. The Debtors settled few claims, and there is no public data on J&J's settlements of such claims.[90] The small number of trials involving talc-related claims for these diseases have produced few verdicts (none of which are final), which the Plan Proponents assert are inadequate to serve as a basis for projecting future values. After exploring various potential reference points for valuation, the Scheduled Value for Mesothelioma was ultimately extrapolated from that of the Manville Trust, and set at a conservative $400,000. While slightly higher than the Manville Trust's Scheduled Value of $350,000 for Mesothelioma Claims, that value was set 18 years ago, in December 2002. Adjusted for subsequent inflation, if set today the Scheduled Value would exceed $500,000. Moreover, Manville's share of the asbestos liability was somewhat reduced because of the liability of other

---

[90]    The Plan Proponents are not aware of prepetition Talc Personal Injury Claims that were finally adjudicated and left unpaid as of the Petition Date.

asbestos defendants.  Because there is no data available to distinguish the values of Mesothelioma and Ovarian Cancer A Claims, and both have generated high jury verdicts as well as defense verdicts, Ovarian Cancer A Claims were set at the same value assigned to Mesothelioma Claims. The Maximum Values established by the Trust Distribution Procedures permit a claimant who has particularly high damages or other factors that would cause such claimant's claim to have a higher value in the tort system to seek a resolution at a higher value than the Scheduled Value under the Trust Distribution Procedures.  The Average Value is designed to be the average value of claims settled at the Scheduled Values or higher values as a means to, among other things, preserve the Talc Personal Injury Trust's payment percentage.

The Average and Maximum Values are based on the ratio of the scheduled to average to maximum values of existing asbestos trusts.  Based on information considered, and consistent with the valuation matrices established by those other trusts, the Average Values were set at 125% and Maximum Values were set at 337.5% of the Scheduled Values.

(6)    Indemnified/Non-Indemnified and Mixed Claims Treatment

A Tort System Election Claimant will either receive a share of the cash assets funded by the Debtors or the opportunity to pursue recovery in the tort system.  The Scheduled Value assigned to a Tort System Election Claimant reflects this election.  All claimants have a right to share in the Rio Tinto/Zurich Settlement funding.  A Mixed Claimant essentially has two claims – a J&J related claim and a non-J&J related claim.  Such claimants may assert both claims under the Trust Distribution Procedures.  Moreover, and for the avoidance of doubt, the Talc Personal Injury Trust reserves the right to pursue indemnification from J&J for any or all Indemnified Claims.

(7)    Payment Percentage

Following significant analysis by the Tort Claimants' Committee and the FCR, in consultation with their respective experts, ranges have been established for the Initial Payment Percentage to apply to each Fund.  The Initial Payment Percentages were set based on criteria including estimates of the total number of claims that will seek compensation from the Talc Personal Injury Trust, the total number of claims that will qualify for payment from the Talc Personal Injury Trust based on the criteria that has been established for payment, and the anticipated administrative costs of the Talc Personal Injury Trust.  The Initial Payment Percentage for Fund A will be established between 0.40%-2.34%; the Initial Payment Percentage for Fund B will be established between 3.70%-6.24%; and the Initial Payment Percentage for Fund C will be established between 0.30%-1.48%.  The Initial Payment Percentages may change if there are significant changes in cash attributable to the Talc Personal Injury Trust.

The ranges for the Initial Payment Percentages that are set forth in this Disclosure Statement do not take into account an allocation of the Cyprus Contribution.  The Tort Claimants' Committee and the FCR proposed an allocation of the Cyprus Contribution described in footnote 17 of this Disclosure Statement.  Consummation of the proposed allocation of the Cyprus Contribution remains subject to: (i) approval of any tort claimants' committee to be appointed in the Cyprus Mines Bankruptcy; (ii) approval of any future claimants' representative to be appointed in the Cyprus Mines Bankruptcy; (iii) approval by the Bankruptcy Court in the Debtors' Chapter

11 Cases; (iv) approval by the bankruptcy court in the Cyprus Mines Bankruptcy; (v) the Effective Date; and (vi) the Cyprus Trigger Date.

(8)    <u>Post-Effective Date Future Claimants' Representative</u>

The initial FCR under the Talc Personal Injury Trust Agreement shall be James L. Patton, Jr.  Mr. Patton's current hourly rate is $1,475.

(9)    <u>Foreign Claims</u>

Based on the fact that there is no history of Foreign Claims asserted against the Debtors, no Foreign Claims shall be paid under the Trust Distribution Procedures.  Specifically, (i) there were no Foreign Claims pending against any of the Debtors as of the Petition Date, and (ii) as of the date of this Disclosure Statement, there are no Foreign Claims pending against ITI.  For the avoidance of doubt, the eight lawsuits asserting Mesothelioma Claims that were filed against ITI and subsequently withdrawn do not fall within the definition of Foreign Claims.  Although all Talc Personal Injury Claims including Foreign Claims are channeled to the Talc Personal Injury Trust, Section 5.2(b)(ii) of the Trust Distribution Procedures makes clear that there is no recovery for any holder of a Foreign Claim.

(e)    *Objections by Various Parties*

Various parties (the "**Objectors**") have come forward to contest the legality and fairness of the proposed trust mechanism and the proposed allocation of Talc Personal Injury Trust assets among different categories of holders of Talc Personal Injury Claims on various grounds, including an asserted failure to comply with the Bankruptcy Code.  *See* Article XII.  Unlike the Debtors, the Tort Claimants' Committee, and the FCR, these claimants do not have fiduciary obligations to the Estates and to the Estates' creditors and no obligation to ensure fair treatment for all holders of current Talc Personal Injury Claims or future Demands against the Talc Personal Injury Trust. However, certain of the Objectors contend that in proposing the trust mechanisms and allocation of Talc Personal Injury Trust assets under the Trust Distribution Procedures, the Debtors, the Tort Claimants' Committee, and the FCR have failed to ensure fair treatment for all holders of current Talc Personal Injury Claims or future Demands against the Talc Personal Injury Trust.  The Plan Proponents disagree with the objections raised by the Objectors and believe that they will be overruled by the Bankruptcy Court.

(f)    *Tort System Election*

If J&J refuses to defend an Indemnified Claim asserted by the holder of a Talc Personal Injury Claim who makes a Tort System Election, the Talc Personal Injury Trust may exercise any of the rights and remedies available to it under the J&J Indemnities (as defined in the Trust Distribution Procedures), the Talc Insurance Policies, or the Cyprus Talc Insurance Policies, subject to any valid defenses under those agreements and applicable law.

8.2    <u>Select Provisions of the Trust Distribution Procedures</u>

This Section of this Disclosure Statement summarizes certain relevant provisions of the Trust Distribution Procedures, and is intentionally not a recitation of the entirety of the Trust

132

Distribution Procedures.  For additional information regarding the Trust Distribution Procedures not discussed in this Section, please refer to the following select provisions of the Trust Distribution Procedures:

| Topic | Plan Provision |
|---|---|
| Resolution of Talc Personal Injury Claims | Section V |
| Claims Materials | Section VI |
| General Guidelines for Liquidating and Paying Claims | Section VII |
| Miscellaneous | Section VIII |

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE TRUST DISTRIBUTION PROCEDURES, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE TRUST DISTRIBUTION PROCEDURES.  THE PLAN PROPONENTS URGE ALL HOLDERS OF TALC PERSONAL INJURY CLAIMS TO READ AND STUDY CAREFULLY THE TRUST DISTRIBUTION PROCEDURES, A COPY OF WHICH IS ATTACHED AS <u>EXHIBIT A</u> TO THE PLAN.  CAPITALIZED TERMS USED BUT NOT DEFINED IN THIS <u>SECTION 8.2</u> HAVE THE MEANINGS ASCRIBED TO THEM IN THE TRUST DISTRIBUTION PROCEDURES.

    (a)    *Overview*

    (1)    <u>Trust Purpose</u>

The purpose of the Trust is to assume the liability for Talc Personal Injury Claims pursuant to the terms of the Plan, and to use the Talc Personal Injury Trust Assets to resolve and, if appropriate, promptly pay Talc Personal Injury Claims in such a way that holders of similar Talc Personal Injury Claims are valued and paid in substantially the same manner and otherwise comply with the requirements of a trust set forth in section 524(g) of the Bankruptcy Code.  To this end, the Trust Distribution Procedures set forth procedures for processing, resolving, and paying (as appropriate) Ovarian Cancer A-D Claims and Mesothelioma Claims A and B through the Expedited Review Process in <u>Section 5.2(a)</u> of the Trust Distribution Procedures or the Individual Review Process in <u>Section 5.2(b)</u> of the Trust Distribution Procedures.  The Trust has established Medical/Exposure Criteria in recognition of the unique and widespread consumer and commercial nature of the use of Imerys Talc and Imerys Talc containing products and in recognition of the limited Talc Personal Injury Trust Assets and Cyprus Contribution.

    (2)    <u>Sub-Funds</u>

The Trust Fund and Cyprus Contribution shall be divided into three funds within the Trust (each, a "**Fund**").  Each Fund operates entirely separately and any changes to the administration of one Fund, such as changes to Medical/Exposure Criteria, Scheduled, Average or Maximum Values, Payment Percentage or Maximum Annual Payment, shall not affect or require changes to

133

the other Funds.  Each Fund shall be subject to the terms set forth in the Trust Distribution Procedures for such Fund, and each Fund shall be operated for the exclusive benefit of the respective beneficiaries of each Fund.  Administrative expenses attributable to the operation of one Fund (including the processing of claims asserted against such Fund) shall be allocated to that Fund separately.  Common administrative expenses incurred by the Trust that cannot be attributed to the operation of a single Fund shall be split among the three Funds in a manner to ensure that each Fund is responsible for a pro rata share of the common administrative expenses.

- **Fund A**: Ovarian Cancer A Claimants may seek a distribution from Fund A.  Fund A shall consist of a separate sub-account within the Trust equal to 40% of the total Trust Fund and 30% of the Cyprus Contribution.

- **Fund B**:  Mesothelioma Claimants and Secondary Mesothelioma Claimants may seek a distribution from Fund B.  Fund B shall consist of a separate sub-account within the Trust equal to 40% of the total Trust Fund and 55% of the Cyprus Contribution.

- **Fund C:**  Ovarian Cancer B, C, and D Claimants may seek a distribution from Fund C.  Fund C shall consist of a separate sub-account within the Trust equal to 20% of the total Trust Fund and 15% of the Cyprus Contribution.

(b)    *Treatment of Claims*

(1)    Treatment of Indemnified Claims

All holders of Indemnified Claims[91] (irrespective of cancer, disease or other personal injury) shall elect to either: (1) seek recovery for such claim solely from the Trust under the applicable Fund through the Expedited Review Process (if available) or the Individual Review Process as set forth in Sections 2.4 and 2.5 of the Trust Distribution Procedures as a Trust Election Claim; or (2) (x) pursue such claim against one or more of the Reorganized Debtors nominally in the tort system in any court of competent jurisdiction selected by such Talc Personal Injury Claimant, in their sole discretion, and (y) seek recovery for such claim as against one or more of the non-Debtor Protected Parties under the applicable Fund through the Expedited Review Process (if available) or the Individual Review Process as set forth in Sections 2.4 and 2.5 of the Trust Distribution Procedures as a Tort System Election Claim.[92]

---

[91]    "**Indemnified Claims**" means Talc Personal Injury Claims that are Indemnified, including, without limitation, any claims asserting exposure to cosmetic talc manufactured, distributed, or sold by J&J during the time periods covered by the J&J Indemnities.  In addition, "**Indemnified**" is used to describe any Talc Personal Injury Claim or any category of Talc Personal Injury Claims, in respect of which the Debtors, the Trust, and/or any other person or entity who could have asserted or may assert, rights under and to the J&J Indemnities.

[92]    As set forth in Sections 5.2(a)(iii) and 5.2(b)(vii) of the Trust Distribution Procedures, the Scheduled, Average and Maximum Values provided for Tort System Election Claims are reduced to reflect the election to pursue recovery in the tort system in lieu of sharing in the cash assets contributed by the Debtors to the Trust.

The Trust shall make available to Talc Personal Injury Claimants copies of all agreements governing the J&J Indemnities.  It shall be the responsibility of each Talc Personal Injury Claimant to determine the scope of the J&J Indemnities prior to making the election set forth in Section 2.3(a)(ii)(x) of the Trust Distribution Procedures. The defense of such claims shall be tendered to J&J and the Trust shall have no obligation to defend any such claims in the tort system.  Any settlement of or judgment in the tort system of an Indemnified Claim shall be remitted to the Talc Personal Injury Claimant and shall not be subject to any Payment Percentage or Maximum Annual Payment.  The Trust may enforce the provisions of the J&J Indemnities with respect to such claim and/or may assign the right to enforce such provisions of the J&J Indemnities with respect to such claim solely to the extent permitted by applicable law and contract.

Upon J&J's settlement of the Debtors' liability (if any) with respect to a Tort System Election Claim or entry of a judgment by Final Order in respect of such liability, none of the Trust, the Debtors or the Reorganized Debtors shall have any obligation to pay such settlement or judgment.

The Trust reserves the right to pursue indemnification from J&J for any or all Indemnified Claims.  In such event, the costs of such pursuit shall be borne in the first instance by the Trust *provided, however*, that the Trust reserves the right to charge against any recovery the costs and expenses incurred by the Trust directly or indirectly for fees and expenses incurred in pursuit of the indemnification.

Holders of Mixed Claims[93] shall receive the right to (i) in respect of their Indemnified Claims, make the same election as Indemnified Claimants set forth in Section 2.3(a) of the Trust Distribution Procedures; and (ii) in respect of their Non-Indemnified Claims seek recovery from Funds A, B, or C, whichever is applicable, as set forth in Sections 2.4 and 2.5 of the Trust Distribution Procedures.

(2)    Treatment of Ovarian Cancer A-D Claims

Ovarian Cancer A Claimants who elect to seek recovery from Fund A through the Expedited Review Process or the Individual Review Process, shall be subject to the review and valuation procedures set forth in the Trust Distribution Procedures and shall be subject to the applicable Scheduled, Average and/or Maximum Values and Payment Percentage.

Ovarian Cancer B through D Claimants who elect to seek recovery from Fund C through the Expedited Review Process or the Individual Review Process, shall be subject to the review and valuation procedures set forth in the Trust Distribution Procedures and shall be subject to the applicable Scheduled, Average and/or Maximum Values and Payment Percentage.

---

[93]    "**Mixed Claim**" means a Talc Personal Injury Claim for Ovarian Cancer or Mesothelioma that is both an Indemnified Claim and a Non-Indemnified Claim.  In addition, "**Non-Indemnified Claim**" means any Talc Personal Injury Claim that is not an Indemnified Claim.

135

Holders of Mixed Claims for Ovarian Cancer who elect to seek recovery from the applicable Fund in respect of their Non-Indemnified claims also retain the right to pursue recovery on their Indemnified Claims as set forth in Section 2.3(a) of the Trust Distribution Procedures.

(3)    Treatment of Mesothelioma Claims

Mesothelioma A Claimants and Mesothelioma B Claimants with Regular and Routine Exposure who elect to seek recovery from Fund B through the Expedited Review Process or the Individual Review Process, shall be subject to the review and valuation procedures set forth in the Trust Distribution Procedures and shall be subject to the applicable Scheduled, Average and/or Maximum Values and Payment Percentage.

Mesothelioma A Claimants and Mesothelioma B Claimants without Regular and Routine Exposure and Secondary Mesothelioma Claimants who elect to seek recovery from Fund B through the Individual Review Process, shall be subject to the review and valuation procedures set forth in the Trust Distribution Procedures (including the terms set forth in Sections 5.2(b)(iv) and (v) of the Trust Distribution Procedures) and shall be subject to the applicable Scheduled, Average and/or Maximum Values and Payment Percentage.

Holders of Mixed Claims for Mesothelioma who elect to seek recovery from Fund B in respect of their Non-Indemnified claims also retain the right to pursue recovery on their Indemnified Claims as set forth in Section 2.3(a) of the Trust Distribution Procedures.

(4)    Claim Treatment Summary

The following chart summarizes the information contained in Sections 2.3 to 2.5 of the Trust Distribution Procedures:

| Disease | Indemnified (J&J Product) | Non-Indemnified (No J&J Product) |
|---|---|---|
| Mesothelioma Claims with Regular and Routine Exposure | May elect either: (a) to proceed against the Debtors in the tort system AND seek recovery from the Trust as a Tort System Election Claimant; OR (b) to seek recovery solely from the Trust as a Trust Election Claimant. | May file a claim with the Trust under Expedited Review or Individual Review, as set forth in the Trust Distribution Procedures, for distribution from the Trust as a Non-Indemnified Claim. |
| Mesothelioma Claims without Regular and Routine Exposure and Secondary Mesothelioma Claims | May elect either: (a) to proceed against the Debtors in the tort system AND seek recovery from the Trust as a Tort System Election Claimant; OR (b) to seek recovery solely from the Trust as a Trust Election Claimant. | May file a claim with the Trust under Individual Review, as set forth in the Trust Distribution Procedures, for distribution from the Trust as a Non-Indemnified Claim. |

US-DOCS\120811663.4

| Disease | Indemnified (J&J Product) | Non-Indemnified (No J&J Product) |
|---|---|---|
| Ovarian Cancer A through D | May elect either: (a) to proceed against the Debtors in the tort system AND seek recovery from the Trust as a Tort System Election Claimant; OR (b) to seek recovery solely from the Trust as a Trust Election Claimant. | May file a claim with the Trust under Expedited Review or Individual Review, as set forth in the Trust Distribution Procedures, for distribution from the Trust as a Non-Indemnified Claim. |
| Mixed Claim | In respect of the Indemnified Claim, may elect either: (a) to proceed against the Debtors in the tort system AND seek recovery from the Trust as a Tort System Election Claimant; OR (b) may file a claim with the Trust under Expedited Review or Individual Review, as set forth in the Trust Distribution Procedures, for distribution from the Trust as a Mixed Claimant.  In respect of the Non-Indemnified Claim, may file a claim with the Trust under Expedited Review or Individual Review, as set forth in the Trust Distribution Procedures, for distribution from the Trust as a Trust Election Claimant. | |

(5)    <u>Necessity of Filing a Trust Claim Form</u>

All holders of Talc Personal Injury Claims, including Indemnified Claims and Mixed Claims, must file a Trust Claim Form with the Trust.  Holders of Indemnified Claims shall make the election set forth in <u>Section 2.3(a)</u> of the Trust Distribution Procedures.  Consent from the Trust shall be required before an Indemnified Claimant or Mixed Claimant may pursue their Indemnified Claims against the Debtors in the tort system (including claimants asserting a Talc Personal Injury Claim that is not for Mesothelioma or Ovarian Cancer).  Notice of such consent shall be provided to J&J.    Indemnified Claimants and Mixed Claimants may then commence litigation as set forth in the Trust Distribution Procedures provided he or she thereafter files a Basic Claims Submission.

(6)    <u>Application of the Payment Percentages</u>

Any adjustments to Payment Percentages shall be made only pursuant to <u>Section 4.2</u> of the Trust Distribution Procedures, and any adjustments to paid claims are governed by <u>Section 4.3</u> of the Trust Distribution Procedures.  Because there is uncertainty in the prediction of both the total amount of the Trust's talc-related liabilities and the amount of the Talc Personal Injury Trust Assets, no guarantee can be made of the Payment Percentage that will be applicable to any Talc Personal Injury Claim.

(7)    <u>Determination of the Maximum Annual Payments</u>

The Trust shall model the cash flow, principal, and income year-by-year to be paid over its entire life of each Fund to ensure that each Fund shall be available to treat all present and future holders of Talc Personal Injury Claims as similarly as possible.  In each year, based upon the model of cash flow for each Fund, the Trust shall be empowered to make offers to Talc Personal Injury Claimants up to the Maximum Annual Payment for each Fund considering the Payment Percentage provisions set forth in <u>Sections 4.2</u> and <u>4.3</u> of the Trust Distribution Procedures.  The Maximum Annual Payments for each Fund shall be determined annually by the Trustees with the consent of the TAC and the FCR.  The Trust's offers to all Talc Personal Injury Claimants from a given Fund

137

shall not exceed the applicable Fund's Maximum Annual Payment so determined for that year. Should the Maximum Annual Payment for a particular Fund not be reached in any year, the portion of the Maximum Annual Payment for each Fund that is not exhausted in that year shall be added to the Maximum Annual Payment for the applicable Fund for the following year and any subsequent year until exhausted or an adjustment is made to the Payment Percentage applicable to such Fund.  Should the Maximum Annual Payment for the applicable Fund be reached in any Trust year before all claimants in the applicable FIFO Payment Queue have been paid, such claimants shall be paid in the following year in the order they appear in such Fund's FIFO Payment Queue. The Payment Percentages and the Maximum Annual Payment amounts are based on projections over the lifetime of the Trust. If such long-term projections are revised, that may result in a new model of the Trust's anticipated cash flow and a new calculation of a Maximum Annual Payment for one or more of the Funds.

(8)    <u>Indirect Talc Personal Injury Claims</u>

As set forth in <u>Section 5.4</u> of the Trust Distribution Procedures, Indirect Talc Personal Injury Claims, if any, shall be subject to all the same limitations and provisions relating to categorization, evaluation and payment of the Trust Distribution Procedures as all other Talc Personal Injury Claims, including the applicable Payment Percentage.

***Resolution of Indirect Talc Personal Injury Claims***.  Indirect Talc Personal Injury Claims asserted against the Trust shall be treated as presumptively valid and paid by the Trust subject to the applicable Payment Percentage (and all other limitations applicable to Direct Talc Personal Injury Claims under the Trust Distribution Procedures) if (a) such claim satisfied the requirements of the Claims Bar Date for such claims established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by section 502(e) of the Bankruptcy Code or subordinated under section 509(c) of the Bankruptcy Code, and (b) the Indirect Claimant establishes to the satisfaction of the Trustees that (i) the Indirect Claimant has paid in full the liability and obligation of the Trust to the individual claimant to whom the Trust would otherwise have had a liability or obligation under the Trust Distribution Procedures (and which has not been paid by the Trust), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Trust and the Protected Parties from all liability to the Direct  Claimant and the Indirect Claimant, (iii) the claim is not otherwise barred by a statute of limitations or repose or by other applicable law; and (iv) the Indirect Claimant does not owe the Debtors, Reorganized Debtors, or the Trust an obligation to indemnify the liability so satisfied. In no event shall any Indirect Claimant have any rights against the Trust superior to the rights of the related Direct Claimant against the Trust, including any rights with respect to the timing, amount or manner of payment. In addition, no claim of an Indirect Claimant may be liquidated and paid in an amount that exceeds what the Indirect Claimant has paid the related Direct Claimant in respect of such claim for which the Trust would have liability. Further, in no event shall any Indirect Talc Personal Injury Claim exceed the Maximum Value of the compensable injury.  An Indirect Talc Personal Injury Claim shall be subject to the applicable Payment Percentages and Average Value set forth in the Trust Distribution Procedures.

To establish a presumptively valid Indirect Talc Personal Injury Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with the consent of the Trust and an appropriate full release in favor of the Trust and the Protected Parties) or a Final Order, provided

138

that such claim is valid under applicable state law. In any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the Trust and the Protected Parties a release in form and substance satisfactory to the Trustees.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the Trust and the Protected Parties with a full release of the Direct Claimant's claim, and demonstrate that the Indirect Claimant does not owe the Debtors, Reorganized Debtors or the Trust any indemnification obligation in respect of such claim, the Indirect Claimant may request that the Trust review the Indirect Talc Personal Injury Claim individually to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the Trust had to the Direct Claimant. If the Indirect Claimant can show that it has paid all or a portion of such liability or obligation, the Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, times the then applicable Payment Percentage. However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled under the Trust Distribution Procedures. Further, the liquidated value of any Indirect Talc Personal Injury Claim paid by the Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any Talc Personal Injury Claim that might be subsequently asserted by the Direct Claimant against the Trust.

Any dispute between the Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures. If such dispute is not resolved under the ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Section 5.8 of the Trust Distribution Procedures.

Indirect Claimants holding Indirect Talc Personal Injury Claims that have not been disallowed, discharged, or otherwise resolved by Final Order shall have such claims processed in accordance with procedures to be developed and implemented by the Trustees consistent with the provisions of Section 5.4 of the Trust Distribution Procedures, which procedures (a) shall determine the validity, allowability and enforceability of such claims, and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the Trust would have afforded the holders of the underlying valid Talc Personal Injury Claims.

The Trustees may develop and approve a separate claim form for Indirect Claimants with the consent of the TAC and FCR.

    (c)    *TDP Administration*

    (1)    TAC and FCR

Pursuant to the Plan, the Trust Agreement, and the Trust Distribution Procedures, the Trustees shall obtain the consent of the TAC and the FCR with respect to any amendment, change or modification to the Trust Distribution Procedures pursuant to Sections 4.1, 4.2, 5.2 and 8.3, and on such other matters as are required in the Trust Distribution Procedures or in the Trust

Agreement.  On all other matters, the Trust shall be administered by the Trustees in consultation with the TAC and the FCR.

(2)      Consent and Consultation Procedures

In those circumstances in which consultation or consent of the TAC and FCR is required, the Trustees shall provide written notice to the TAC and the FCR of the specific amendment or other action that is proposed.  The Trustees shall not implement such amendment or take such action unless and until the parties have engaged in the Consultation Process described in Section 7.1(a) or the Consent Process described in Section 7.1(b), as applicable, of the Trust Agreement.

(d)     *Payment Percentage; Periodic Estimates*

(1)      Uncertainty of Debtors' Talc Liabilities

Litigation arising from the use and/or exposure to talc is a relatively new mass tort and there is inherent uncertainty regarding the aggregate value of the Debtors' total talc-related liabilities.  The Trustees must determine from time to time the percentage of value that holders of present and future Talc Personal Injury Claims are likely to receive from the applicable Fund as reflected by the applicable Payment Percentage to provide reasonable assurance that holders of similar Talc Personal Injury Claims are valued and paid in substantially the same manner. Each Fund shall have its own Payment Percentage.  No Payment Percentage shall apply to the value of any payments owed by J&J by operation of one or more of the J&J Indemnities to holders of Tort System Election Claims or Mixed Claims determined by (a) settlement or (b) a judgment by Final Order.

(2)      Computation of Payment Percentages

The Initial Payment Percentages shall apply to all Talc Personal Injury Claims to be paid by the Trust until the Trustees, with the consent of the TAC and the FCR, determine that one or more of the Payment Percentages must be changed to assure that the Trust shall be in a financial position to pay present and future holders of similar Talc Personal Injury Claims in substantially the same manner.

In making any such change to any Payment Percentage, the Trustees, the TAC and the FCR shall take into account the fact that the holders of Talc Personal Injury Claims who voted on the Plan relied on the findings of experts that the Initial Payment Percentages represented a reasonably reliable estimate of the Trust's total assets and liabilities over the Trust's life based on the best information available at the time, and shall therefore give due consideration to the expectations of such claim holders that the applicable Initial Payment Percentage would be applied to their Talc Personal Injury Claims.

No less frequently than once every twelve (12) months, commencing on the Initial Claims Filing Date, the Trustees shall compare the liability forecasts for each Fund on which the then applicable Payment Percentage is based with the actual claims filing and payment experience of each Fund to date.  If the results of the comparison call into question the ability of any Fund to continue to rely upon the current liability forecast, the Trustees shall undertake a reconsideration

140

of the applicable Payment Percentage. The Trustees may also reconsider the then-applicable Payment Percentages at shorter intervals if the Trustees deem such reconsideration appropriate or if requested by the TAC or the FCR.

The Trustees must base their determination of each of the Payment Percentages on current estimates of the number, types, and values of present and future Talc Personal Injury Claims, the value remaining in the applicable Fund, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds available to pay the Trust's liability to present and future holders of Talc Personal Injury Claims.

(3)    <u>Applicability of the Payment Percentages</u>

The Trust shall apply the applicable Payment Percentages to all payments made to Talc Personal Injury Claimants. The payment to a claimant shall reflect the applicable Payment Percentage in effect at the time a Representative's properly completed Acceptance and Release is received by the Trust.

If the Trustees, with the consent of the TAC and the FCR, increase the Payment Percentage applicable to any Fund, the Trustees shall make supplemental payments to all claimants who previously liquidated their claims and received payments from such Fund based on the lower Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the claim in question times the applicable newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim (but excluding any such amounts attributable to any sequencing adjustment paid pursuant to <u>Section 7.7</u> of the Trust Distribution Procedures).

The Trustees' obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $250 after application of the Payment Percentage at that time, and the amount of the suspended payment to the holder of any Talc Personal Injury Claim shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they collectively would have been less than $250. However, the Trustees' obligation shall resume, and the Trustees shall pay any such aggregate supplemental payments due the claimant at such time that the cumulative aggregate exceeds $250.

(e)    *Resolution of Talc Personal Injury Claims – Settled and Unpaid Talc Personal Injury Claims*

The holder of a Settled and Unpaid Talc Personal Injury Claim may: (i) resubmit such claim for qualification and valuation under the Trust pursuant to the procedures set forth in the Trust Distribution Procedures; or (ii) agree to accept the settled amount of their claim up to the Maximum Value multiplied by the Initial Payment Percentage of the applicable Fund.

US-DOCS\120811663.4

(f)     *Resolution of Unliquidated Talc Personal Injury Claims – Expedited Review Process*

(1)     <u>In General</u>

The Expedited Review Process is designed to provide qualifying claimants (a) an expeditious, efficient, and inexpensive method for liquidating applicable, compensable Talc Personal Injury Claims where the claim, after meeting the applicable Medical/Exposure Criteria, can easily be verified by the Trust; and (b) a fixed and certain claim value. If, after completing its review, the Trust does not offer the claimant Scheduled Value, the claimant may provide additional evidence and request that the claim be reviewed pursuant to the Individual Review Process in accordance with <u>Section 5.2(b)</u> of the Trust Distribution Procedures or proceed to ADR in accordance with <u>Section 5.7</u> of the Trust Distribution Procedures.

(2)     <u>Claims Processing Under the Expedited Review Process</u>

All claimants seeking liquidation of a Talc Personal Injury Claim pursuant to the Expedited Review Process shall file the Trust Claim Form. Following receipt of a Complete Claim Submission, the Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for any claim category eligible for the Expedited Review Process and shall advise the claimant whether the submitted Trust Claim Form is compensable or deficient. If the Trust determines that a claim meets the Medical/Exposure Criteria for a claim category eligible for the Expedited Review Process, the Trust shall tender to the claimant an offer of payment equal to the Scheduled Value for such disease set forth in <u>Section 5.2(a)(iii)</u> of the Trust Distribution Procedures, subject to the applicable Payment Percentage in accordance with <u>Section 4.3</u>. Offers tendered to Ovarian Cancer A-D Claimants shall be subject to both the BRCA Reduction and the Clear Cell Reduction, as applicable, after application of the Payment Percentage. The Trust's offer shall be delivered together with the form of Acceptance and Release. Upon the Trust's receipt of a properly completed Acceptance and Release, the claim shall be placed in the applicable FIFO payment queue, and the Trust shall make payment on the claim subject to the limitations, if any, of the applicable Maximum Annual Payment.

(3)     <u>Ovarian Cancer A-D Claims and Mesothelioma Claims: Scheduled Value and Medical/Exposure Criteria</u>

The Scheduled Values and Medical/Exposure Criteria set forth below shall apply to all applicable claims for Ovarian Cancer A through D and Mesothelioma filed with the Trust on or before the Initial Claims Filing Date for which the claimant elects the Expedited Review Process and shall continue to apply unless and until changed in accordance with the Trust Distribution Procedures. On or after the Initial Claims Filing Date, the Trustees, with the consent of the TAC and FCR, may add to, change or eliminate Scheduled Values and/or Medical/Exposure Criteria for Ovarian Cancer A-D Claims and Mesothelioma Claims except that in no event shall the Scheduled Value for Ovarian Cancer A or Mesothelioma be reduced to an amount less than the Scheduled Value identified below. In addition, commencing on January 1, 2022, the Trust shall modify these valuations annually for inflation based on the CPI-U published by the United States Department of Labor, Bureau of Labor Statistics. Any such changes shall apply to such Talc Personal Injury Claims filed after the date of such change.

**Expedited Review Medical/Exposure Criteria**

| Disease/Category | Medical/Exposure Criteria for Trust Distribution |
|---|---|
| Mesothelioma A | (i) Diagnosis of Mesothelioma; (ii) Debtor Exposure; and (iii) Regular and Routine Exposure to Cosmetic Talc. |
| Mesothelioma B | (i) Diagnosis of Mesothelioma; (ii) Debtor Exposure; and (iii) Regular and Routine Exposure to Industrial Talc. |
| Ovarian Cancer A | (i) Diagnosis of Ovarian Cancer A; (ii) Debtor Exposure; and (iii) Personal Use Exposure. |
| Ovarian Cancer B | (i) Diagnosis of Ovarian Cancer B; (ii) Debtor Exposure; and (iii) Personal Use Exposure. |
| Ovarian Cancer C | (i) Diagnosis of Ovarian Cancer C; (ii) Debtor Exposure; and (iii) Personal Use Exposure. |
| Ovarian Cancer D | (i) Diagnosis of Ovarian Cancer D; (ii) Debtor Exposure; and (iii) Personal Use Exposure. |

**Scheduled Values of Claims Eligible for Expedited Review**

| Disease Level | Scheduled Values | | |
| | Tort System Election Claims | Trust Election Claims and Non-Indemnified Claims | Mixed Claims |
|---|---|---|---|
| Mesothelioma A | $140,000 | $400,000 | $400,000 |
| Mesothelioma B | $140,000 | $400,000 | $400,000 |
| Ovarian Cancer A | $140,000 | $400,000 | $400,000 |
| Ovarian Cancer B | $ 91,000 | $260,000 | $260,000 |
| Ovarian Cancer C | $ 49,000 | $140,000 | $140,000 |
| Ovarian Cancer D | $ 21,000 | $ 60,000 | $ 60,000 |

    (g)    *Resolution of Unliquidated Talc Personal Injury Claims – Individual Review Process*

    (1)    <u>In General</u>

    Subject to the provisions set forth in the Trust Distribution Procedures, a claimant may elect to have his or her Talc Personal Injury Claim reviewed under the Individual Review Process to determine whether (A) for Ovarian Cancer A-D Claims and Mesothelioma Claims that meet the relevant Medical and Exposure Criteria, whether the value of the claim differs from the Scheduled Value provided (*see* <u>Section 5.2(b)(iii)</u>) in the Trust Distribution Procedures; and (B) for Mesothelioma Claims without Regular and Routine Exposure, and Secondary Mesothelioma

143

Claims, whether the claim is compensable under the Trust Distribution Procedures and the value of such claim (*see* Sections 5.2(b)(iv) and (v) of the Trust Distribution Procedures, respectively). A Talc Personal Injury Claim liquidated in the Individual Review Process may be determined to be more or less than the Scheduled Value the claimant would have received under the Expedited Review Process. Until such time as the Trust has made an offer on a claim pursuant to the Individual Review Process, the claimant may change his or her election to proceed with the Individual Review Process and have the claim liquidated pursuant to the Expedited Review Process. In the event of such a change in the processing election, the claimant shall nevertheless retain his or her place in the applicable FIFO Processing Queue. If, after completing its review, the Trust does not extend an offer, the claimant may provide additional evidence and request that the claim be re-reviewed or proceed to ADR in accordance with Section 5.7 of the Trust Distribution Procedures.

(2)    Foreign Claims

Notwithstanding anything to the contrary in the Trust Distribution Procedures, based on the fact that there is no history of Foreign Claims asserted against the Debtors, no Foreign Claims shall be paid from the Trust or under the Trust Distribution Procedures.

(3)    Ovarian Cancer A-D Claims and Mesothelioma Claims that meet the Medical and Exposure Criteria

Ovarian Cancer A-D Claimants and Mesothelioma Claimants that meet the Medical and Exposure Criteria set forth in Section 5.2(a)(iii) of the Trust Distribution Procedures and believe they are entitled to greater than the applicable Scheduled Value, shall be eligible to seek the Individual Review Process to determine the value of their claims. The Individual Review Process is intended to result in payments equal to the full liquidated value for each claim (subject to the applicable Payment Percentage) which may be determined to be more or less than the Scheduled Value the claimant would have received under the Expedited Review Process. Because the detailed examination and valuation process pursuant to the Individual Review Process requires substantial time and effort, claimants electing to undergo the Individual Review Process may be paid on the basis of the liquidated value of their Talc Personal Injury Claims later than would have been the case had the claimant elected the Expedited Review Process. The liquidated values of Ovarian Cancer A-D Claims or Mesothelioma Claims that undergo the Individual Review Process in accordance with the factors set forth in Section 5.2(b)(vi) of the Trust Distribution Procedures may be determined to be less than the Scheduled Value for the applicable disease, and, in any event, shall not exceed the Maximum Value for such disease as set forth in the Trust Distribution Procedures.

(4)    Mesothelioma Claims without Regular and Routine Exposure

The Individual Review Process provides Mesothelioma Claimants that do not satisfy the Regular and Routine Exposure criteria with an opportunity for individual consideration and evaluation. If a Mesothelioma Claimant fails to meet the exposure period criteria in prong "a" of the Regular and Routine Exposure criteria, but such Claimant otherwise has regular or routine exposure equivalent to the applicable time period and no other exposure to asbestos, the Trust shall consider and evaluate the nature, intensity and duration of the exposure to Cyprus Talc and/or

Imerys Talc. If the Trust is satisfied that the claimant has presented a claim that would be compensable in the tort system, the Trust may offer the claimant a liquidated value up to the applicable Scheduled Value for Mesothelioma, subject to the applicable Payment Percentage. If a Mesothelioma Claimant fails to meet prong "b" of the Regular and Routine Exposure criteria, the Trust shall consider and evaluate the nature, intensity and duration of all other exposures to asbestos as well as the nature, intensity and duration of the exposure to Cyprus and/or Imerys Talc. If the Trust is satisfied that the claimant has presented a claim that would be compensable in the tort system, the Trust may offer the claimant a liquidated value up to the applicable Scheduled Value for Mesothelioma, subject to the applicable Payment Percentage.

(5)    Mesothelioma Secondary Exposure Claims

If a claimant alleges Mesothelioma from Debtor Exposure based on exposure to Cyprus and/or Imerys Industrial Talc from close physical contact to a person who was occupationally exposed (whether direct or bystander) to Cyprus Talc and/or Imerys Industrial Talc (*i.e.*, a "**Secondary Mesothelioma Claim**"), the claimant must seek the Individual Review Process for his or her claim pursuant to Section 5.2(b) of the Trust Distribution Procedures. In such a case, the claimant must establish that the occupationally exposed person would have met the exposure requirements under the Trust Distribution Procedures that would have been applicable had the occupationally exposed person filed a Mesothelioma Claim against the Trust, including the requirement of Debtor Exposure. In addition, the claimant with a Secondary Mesothelioma Claim must establish that he or she is suffering from Mesothelioma, that his or her own Debtor Exposure to the occupationally exposed person occurred within the same time frame that the occupationally exposed person was exposed to Cyprus and/or Imerys Talc, and that such secondary exposure was a cause of the Mesothelioma. If the Trust is satisfied that the claimant has presented a claim that would be compensable in the tort system, the Trust may offer the claimant a liquidated value up to the applicable Scheduled Value for Mesothelioma, subject to the applicable Payment Percentage.

(6)    Valuation Factors to Be Considered in the Individual Review Process

The Trust shall liquidate the value of each Talc Personal Injury Claim that undergoes the Individual Review Process based on the historic liquidated values of other similarly situated claims in the tort system as it exists on the Effective Date for similar claims or an analogous disease, or upon such criteria as the Trust may develop in consultation with the TAC and the FCR based upon its claims administrative experience and information available on values through continued litigation in the tort system. Accordingly, the Trust shall take into consideration all of the factors that affect the amount of damages and values in the tort system, including, but not limited to, credible evidence of (i) the degree to which the characteristics of a claim differ from the Medical/Exposure Criteria for the disease in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages, and pain and suffering; (iii) whether the claimant's damages were (or were not) caused by Debtor Exposure (for example, possible alternative causes and the strength of documentation of injuries); (iv) settlement and verdict histories in the Claimant's Jurisdiction for similarly situated or analogous claims; (v) the greater of (a) settlement and verdict histories for the claimant's law firm in the Claimant's Jurisdiction for similarly situated or analogous claims, and (b) settlement and verdict histories for the claimant's law firm, including all cases where the

145

claimant's law firm satisfies the Trust on the basis of clear and convincing evidence provided to the Trust that the claimant's law firm played a substantial role in the prosecution and resolution of the cases, such as actively participating in court appearances, discovery and/or trial of the cases, irrespective of whether a second law firm was also involved and would also be entitled to include the cases in its "settlement and verdict histories." For the avoidance of doubt, mere referral of a case, without further direct involvement, will not be viewed as having played a substantial role in the prosecution and resolution of a case. In liquidating the value of a Talc Personal Injury Claim that undergoes the Individual Review Process, the Trust shall treat a claimant as living if the claimant was alive at the time the initial prepetition complaint was filed or the Trust Claim Form was filed with the Trust even if the claimant has subsequently died.

With respect to Claimant's Jurisdiction, if the claim was not filed against the Debtors in the tort system prior to the Petition Date, the claimant may elect as the Claimant's Jurisdiction (i) the jurisdiction in which the claimant resides or resided at the time of diagnosis or when the claim is filed with the Trust; (ii) a jurisdiction in which the claimant experienced exposure to Cyprus and/or Imerys Talc or a product containing Cyprus and/or Imerys Talc; (iii) a jurisdiction in which the claimant experienced conduct which exposed a claimant to a product containing Cyprus and/or Imerys Talc for which the Debtors have legal responsibility; or (iv) any other jurisdiction in which the claimant could have brought suit in the absence of the bankruptcy cases.

With respect to the Claimant's Jurisdiction, in the event a claim is made under the Trust Distribution Procedures for compensatory damages that would otherwise satisfy the criteria for payment under the Trust Distribution Procedures, but Claimant's Jurisdiction is a Foreclosed Jurisdiction, the claimant may elect the Commonwealth of Pennsylvania as the Claimant's Jurisdiction, and such claimant's damages shall be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles. The choice of law provision in Section 8.6 of the Trust Distribution Procedures applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.2(b)(vi) of the Trust Distribution Procedures is determined to be the law of a Foreclosed Jurisdiction, shall govern only the rights between the Trust and the claimant, and, to the extent the Trust seeks recovery from any entity that provided insurance coverage to the Debtors, the law of the Foreclosed Jurisdiction shall govern.

(7)    Average and Maximum Values for Talc Personal Injury Claims

Average and Maximum Values for Talc Personal Injury Claims shall be as follows:

| Disease Level | Average Values | | |
| --- | --- | --- | --- |
| | Tort System Election Claims | Trust Election Claims and Non-Indemnified Claims | Mixed Claims |
| Mesothelioma Claims with Regular and Routine Exposure | $175,000 | $500,000 | $500,000 |

146

| Disease Level | Average Values | | |
|---|---|---|---|
| | Tort System Election Claims | Trust Election Claims and Non-Indemnified Claims | Mixed Claims |
| Mesothelioma Claims without Regular and Routine Exposure | $52,500 | $150,000 | $150,000 |
| Secondary Mesothelioma Claims | $52,500 | $150,000 | $150,000 |
| Ovarian Cancer A Claims | $175,000 | $500,000 | $500,000 |
| Ovarian Cancer B Claims | $113,750 | $325,000 | $325,000 |
| Ovarian Cancer C Claims | $61,250 | $175,000 | $175,000 |
| Ovarian Cancer D Claims | $26,250 | $75,000 | $75,000 |

| Disease Level | Maximum Values | | |
|---|---|---|---|
| | Tort System Election Claims | Trust Election Claims and Non-Indemnified Claims | Mixed Claims |
| Mesothelioma Claims with Regular and Routine Exposure | $472,500 | $1,350,000 | $1,350,000 |
| Mesothelioma Claims without Regular and Routine Exposure | $140,000 | $400,000 | $ 400,000 |
| Secondary Mesothelioma Claims | $140,000 | $ 400,000 | $400,000 |
| Ovarian Cancer A Claims | $472,500 | $1,350,000 | $1,350,000 |
| Ovarian Cancer B Claims | $307,125 | $877,500 | $877,500 |
| Ovarian Cancer C Claims | $165,375 | $472,500 | $472,500 |
| Ovarian Cancer D Claims | $70,875 | $202,500 | $202,500 |

The foregoing Average Values and Maximum Values shall apply to all Talc Personal Injury Claims filed with the Trust on or before the Initial Claims Filing Date and shall continue to apply unless and until changed in accordance with the Trust Distribution Procedures. On or after the Initial Claims Filing Date, the Trust, with the consent of the TAC and FCR may change these

147

values as set forth in <u>Section 4.1</u> of the Trust Distribution Procedures.  Any such changes shall apply to such Talc Personal Injury Claims filed after the date of such change.

(8)    <u>Claims Processing Under Individual Review</u>

All claimants seeking liquidation of a Talc Personal Injury Claim pursuant to the Individual Review Process shall file the Trust Claim Form.  Following receipt of a Complete Claim Submission, the Trust shall determine the liquidated value, if any, of the claim (as set forth in the Trust Distribution Procedures) and shall advise the claimant of that determination. The Trust shall tender to the claimant an offer of payment equal to the determined liquidated value subject to the applicable Payment Percentage in accordance with <u>Section 4.3</u> of the Trust Distribution Procedures.  Offers tendered to Ovarian Cancer A-D Claimants shall be subject to both the BRCA Reduction and the Clear Cell Reduction, as applicable, after application of the Payment Percentage.  The Trust's offer shall be delivered together with the form of Acceptance and Release. Upon the Trust's receipt of a properly completed Acceptance and Release, the claim shall be placed in the applicable FIFO Payment Queue and the Trust shall make payment on the claim, subject to the limitations, if any, of the applicable Maximum Annual Payment.

(h)    *Evidentiary Requirements*

(1)    <u>Mesothelioma Medical Evidence</u>

***In General***.  All diagnoses of Mesothelioma shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to asbestos to onset of disease, or (ii) a history of the claimant's Debtor Exposure, which may be by affidavit, sales receipts, photographs, product possession, invoices, employment, construction records, hospital records, or similar records, or by other credible evidence, sufficient to establish a 10-year latency period from date of first exposure to asbestos to onset of disease.

***Credibility of Medical Evidence***.  Before making any payment to a claimant, the Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards.  Diagnosis by a physician competent to make a diagnosis of Mesothelioma shall be sufficient medical evidence.

In addition, claimants who otherwise meet the requirements of the Trust Distribution Procedures for payment of a Talc Personal Injury Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Trust in any Individual Review Process proceeding conducted pursuant to <u>Section 5.2(b)</u> of the Trust Distribution Procedures or any Exigent Claim proceeding conducted pursuant to <u>Section 5.3(a)</u> of the Trust Distribution Procedures.  The Trust may take any action it deems appropriate to protect the interests of the Trust in response to the submission of Medical Evidence it deems unreliable.

148

(2)    Ovarian Cancer Medical Evidence

*In General*.    All diagnoses of Ovarian Cancer shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to Imerys Talc or an Imerys Talc-containing product and the diagnosis, or (ii) a history of the claimant's Debtor Exposure, which may be by affidavit, sales receipts, photographs, product possession, invoices, hospital records or similar records, or by other credible evidence, sufficient to establish a 10-year latency period.

*Credibility of Medical Evidence*.    Before making any payment to a claimant, the Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical and scientific standards.    The Trust may require the submission of pathology reports, laboratory tests, surgical reports, hospitalization records, results of medical examinations or reviews of other medical evidence.    Medical evidence that is proof of diagnosis, subtype, and stages of epithelial ovarian cancer, fallopian tube cancer, or primary peritoneal cancer by a gynecologic oncologist, medical oncologist, or pathologist, is presumptively reliable, although the Trust may seek to rebut the presumption.

In addition, claimants who otherwise meet the requirements of the Trust Distribution Procedures for payment of a Talc Personal Injury Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Trust in any Individual Review Process proceeding conducted pursuant to Section 5.2(b) of the Trust Distribution Procedures or any Exigent Claim proceeding conducted pursuant to Section 5.3(a) of the Trust Distribution Procedures.    The Trust may take any action it deems appropriate to protect the interests of the Trust in response to the submission of Medical Evidence it deems unreliable.

(3)    Exposure Evidence

To receive compensation from the Trust, a claim must demonstrate Debtor Exposure. Claims based on conspiracy theories that involve no exposure to talc or talc-containing products sold, distributed, marketed, handled, processed or manufactured by the Debtors are not compensable under the Trust Distribution Procedures.    To meet the presumptive exposure requirements of the Expedited Review Process, the holder of a claim for Ovarian Cancer A-D must also establish Personal Use Exposure in addition to Debtor Exposure.    To meet the presumptive exposure requirements of the Expedited Review Process, the holder of a Mesothelioma Claim must establish Regular and Routine Exposure in addition to Debtor Exposure.    Credible exposure evidence may be established by an affidavit or sworn statement based on personal knowledge or by other credible evidence.    The Trust may, but is not required to, ask for the submission of other or additional evidence of exposure when it deems such to be necessary.

Evidence submitted to establish proof of exposure is for the sole benefit of the Trust, not third parties or defendants in the tort system.    The Trust has no need for, and therefore claimants are not required to furnish the Trust with, evidence of exposure to specific products other than those for which the Debtors have legal responsibility, except to the extent such evidence is required

elsewhere in the Trust Distribution Procedures. Similarly, failure to identify Debtor Exposure in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the Trust, provided that the claimant satisfies the medical and exposure requirements of the Trust Distribution Procedures.

      (i)    *Claims Audit Program*

The Trust, with the consent of the TAC and the FCR, shall develop a Claims Audit Program. Such Claims Audit Program shall include methods for auditing the reliability of medical evidence, as well as the reliability of evidence of exposure to talc or talc-containing products for which the Trust has legal responsibility. The Trust shall utilize the services of a third-party claims processing facility (the "**Claims Processor**") to assist in the evaluation of claims submitted to the Trust and shall participate in a Cross-Trust Audit Program. The filing of any claim with the Trust, regardless of the treatment sought, shall constitute consent for each other trust participating in the Cross-Trust Audit Program to release to the entity overseeing the Cross-Trust Audit Program (the "**Auditor**") all information submitted to such other trusts by or on behalf of the claimant pursuant to the provisions of the Cross-Trust Audit Program and to disclose the status of any such claim and the amount and date of any payment on the claim to the Auditor.

To the extent that the Trustees believe that it is relevant, nothing in the Trust Distribution Procedures shall preclude the Trust or its Auditor, in the Trustees' sole discretion, from reviewing or taking into consideration filed state court complaints or other claims filed against other mass tort trusts. Any claimant subject to the Claims Audit Program shall cooperate and, provide the Trust with non-privileged information reasonably requested by the Trust and, if requested by the Trustees, authorization to obtain from other mass tort trusts any information such claimant has submitted to such other trusts.

In the event that an audit reveals that fraudulent information has been provided to the Trust, the Trust may penalize any claimant or claimant's attorney by rejecting the Talc Personal Injury Claim or by other means including, but not limited to, requiring the source of such fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' Talc Personal Injury Claims and any other appropriate action or sanction.

      (j)    *Withdrawal or Deferral of Claims*

A claimant may withdraw a Talc Personal Injury Claim at any time upon written notice to the Trust and file another Talc Personal Injury Claim subsequently without affecting the status of the claim for purposes of statutes of limitations or repose. All such claims filed after withdrawal shall be given a place in the FIFO Processing Queue based on the date of such subsequent filing. A claimant may also request that the processing of his or her Talc Personal Injury Claim by the Trust be deferred for a period not to exceed three (3) years without affecting the status of the claim for statute of limitations or repose purposes, in which case the claimant shall also retain his or her original place in the applicable FIFO Processing Queue. During the period of such deferral, a sequencing adjustment on such claimant's Talc Personal Injury Claim as provided in Section 7.7 of the Trust Distribution Procedures shall not accrue and payment thereof shall be deemed waived by the claimant. Except for Talc Personal Injury Claims held by representatives of deceased or

incompetent claimants for which court or probate approval of the Trust's offer is required, a claim shall be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six (6) months of the Trust's written offer of payment or of rejection of the claim. Upon written request, for good cause, the Trust may extend the withdrawal or deferral period for an additional six (6) months. During any period of deferral, a sequencing adjustment on such claimant's Talc Personal Injury Claim as provided in Section 7.7 of the Trust Distribution Procedures shall not accrue and payment thereof shall be deemed waived by the claimant.

      (k)    *General Guidelines for Liquidating and Paying Claims*

      (1)    <u>Claims Processing</u>

The Trust may utilize the services of a Claims Processor. All Talc Personal Injury Claims shall be resolved and, if determined to be eligible for payment, paid on an impartial, FIFO basis.

A claimant may not assert more than one Talc Personal Injury Claim under the Trust Distribution Procedures. However, the holder of a Direct Talc Personal Injury Claim for Ovarian Cancer B, Ovarian Cancer C, or Ovarian Cancer D who is paid from Fund C may assert a new claim for a higher level of Ovarian Cancer or Mesothelioma that is subsequently diagnosed. Any additional payments as to which such claimant may be entitled shall be paid from Fund A and shall be reduced by the amount paid from Fund C for any earlier-diagnosed disease and the remaining amount due shall be subject to the then applicable Payment Percentage.

Talc Personal Injury Claims shall be processed based on their place or places in the applicable FIFO Processing Queues based upon the election (Expedited Review Process or Individual Review Process) the Talc Personal Injury Claimant selects (if such election is available). The Trust shall take all reasonable steps to resolve Talc Personal Injury Claims as efficiently and expeditiously as possible at each stage of claims processing, including mediation and arbitration, which steps may include, in the Trust's sole discretion, conducting settlement discussions with Representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the applicable FIFO Processing Queues are maintained, and each claim is individually evaluated pursuant to the valuation factors set forth in Section 5.2(b)(vi) of the Trust Distribution Procedures. Except as set forth in the Trust Distribution Procedures, the Trust shall also make every effort to issue offers each year to at least that number of Talc Personal Injury Claims required to exhaust the applicable Maximum Annual Payment for each Fund.

The Trustees shall use their reasonable best efforts to ensure that the Trust processes claims such that over time the combination of settlements at the Scheduled Values (if applicable) and those resulting from the Individual Review Process should generally result in the applicable Average Values set forth in Section 5.2(b)(vii) of the Trust Distribution Procedures.

Nothing in the Trust Distribution Procedures shall prevent the Trust from settling multiple claims at one time

      (2)    <u>Sequencing Adjustments</u>

***General.*** Subject to the limitations set forth in the Trust Distribution Procedures, a sequencing adjustment shall be paid on all Talc Personal Injury Claims with respect to which the

claimant has had to wait a year or more for payment, provided, however, that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years, for the period when the claim was deferred or withdrawn at the claimant's request, or during any period where the Trust's provision of payment to a claimant is delayed as the result of the claimant's failure to provide the Trust with additional information as requested  on an unliquidated Talc Personal Injury Claim. The sequencing adjustment factor shall be equal to the federal funds rate per annum for each of the first five (5) years after the Effective Date; thereafter, the Trust shall have the discretion to change the annual sequencing adjustment factor with the consent of the TAC and the FCR.

*Unliquidated Talc Personal Injury Claims.*  A sequencing adjustment shall be payable on the Scheduled Value of any unliquidated Talc Personal Injury Claim whether the claim is liquidated under Expedited Review Process, Individual Review Process, or by arbitration.  No sequencing adjustment shall be available to or paid on any claim liquidated in the tort system pursuant to Section 5.8 of the Trust Distribution Procedures.  Sequencing adjustments on all such unliquidated claims shall be measured from the date of payment back to the date that is one (1) year after the date on which the claim was placed in the FIFO Payment Queue, subject to the limitation that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years. Notwithstanding the provisions hereof, a sequencing adjustment shall not accrue during any period where the Trust's provision of payment to a claimant is delayed as the result of the claimant's failure to provide the Trust with information necessary to process a Talc Personal Injury Claim.

(3)    <u>Payment of Judgments for Money Damages</u>

The following does not apply to Indemnified Claims pursued in the tort system pursuant to Section 2.3(a)(ii) of the Trust Distribution Procedures.  If and when a claimant who elected non-binding arbitration and rejected the arbitral award subsequently obtains a judgment in the tort system, the claim shall be placed in the applicable FIFO Payment Queue based on the date on which the judgment became final.  Thereafter, the claimant shall receive from the Trust an initial payment (subject to the applicable Payment Percentage and the applicable Maximum Annual Payment) of an amount equal to the greater of (i) the Trust's last offer to the claimant, or (ii) the award that the claimant declined in non-binding arbitration; provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system. The claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage, Maximum Value, and the applicable Maximum Annual Payment, if applicable, in effect on the date of the payment of the subject installment).

The total amounts paid with respect to such claims shall not exceed the relevant Maximum Values for such Disease Levels as set forth in Section 5.2(a)(iii) of the Trust Distribution Procedures, subject to the applicable Payment Percentage.  Under no circumstances shall (a) sequencing adjustments be paid pursuant to Section 7.7 of the Trust Distribution Procedures, or (b) interest be paid under any statute on any judgments obtained in the tort system.

152

# ARTICLE IX.

## CERTAIN FACTORS TO BE CONSIDERED

**Holders of Claims against the Debtors should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith or incorporated by reference, prior to voting to accept or reject the Plan. These factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.**

9.1    <u>Variance from Financial Projections</u>

The summarized financial projections contained in <u>Exhibit B</u> (the North American Debtors) and <u>Exhibit C</u> (ITI) are dependent upon numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, general business and economic conditions, and other matters, many of which are beyond the control of the Plan Proponents. Accordingly, there can be no assurance that such assumptions will prove to be valid. In addition, unanticipated and unforeseeable events and/or circumstances occurring subsequent to the preparation of the financial projections may affect the actual financial results of the Reorganized Debtors. Although the Debtors believe that the financial projections contained in <u>Exhibit B</u> and <u>Exhibit C</u> are reasonable and attainable, some or all of the estimates will vary, and variations between the actual financial results and those projected may be material.

9.2    <u>Failure to Confirm the Plan</u>

Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, that the Plan was filed in good faith, and that the value of distributions to dissenting holders of Claims and Equity Interests may not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Plan Proponents believe that the Plan will meet these tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Bankruptcy Code also requires that a Plan must provide the same treatment for each claim or interest in a particular class, unless a holder agrees to a less favorable treatment of its particular claim or interest. The Plan Proponents believe that they have complied with the requirements of the Bankruptcy Code by their classification and treatment of various holders of Claims and Equity Interests under the Plan. However, if a member of a Class objects to its treatment or if the Bankruptcy Court finds that the Plan does not comply with the requirements of the Bankruptcy Code, confirmation of the Plan could be delayed or prevented. In addition, each Impaired Class that will (or may) be entitled to receive property under the Plan will have the opportunity to vote to accept or reject the Plan.

Further, section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if the claim or interest is substantially similar to the other claims or interests in that class. The Plan Proponents believe that the classification of Claims and Equity

Interests under the Plan complies with the requirements of the Bankruptcy Code because the Classes established under the Plan each encompass Claims or Equity Interests that are substantially similar to similarly classified Claims or Equity Interests. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

9.3     Non-Occurrence of the Effective Date

The Plan provides that there are several conditions precedent to the occurrence of the Effective Date. The Plan Proponents cannot assure you as to the timing of the Effective Date. If the conditions precedent to the Effective Date have not been satisfied or waived, the Bankruptcy Court may vacate the Confirmation Order. In that event, the Plan would be deemed null and void and the Plan Proponents may propose or solicit votes on an alternative reorganization plan that may not be as favorable to parties in interest as the Plan.

9.4     The Recovery to Holders of Allowed Claims and Equity Interests Cannot Be Stated with Absolute Certainty

Due to the inherent uncertainties associated with projecting financial results and litigation outcomes, the projections contained in this Disclosure Statement should not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Plan Proponents believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. Also, because the Liquidation Analysis (as defined below), distribution projections, and other information contained herein and attached hereto are estimates only, the timing and amount of actual distributions to holders of Allowed Claims and Equity Interests, if applicable, may be affected by many factors that cannot be predicted.

The Claims estimates set forth herein are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect. Such differences may adversely affect the percentage of recovery to holders of Allowed Claims and Equity Interests, if applicable, under the Plan. Moreover, the estimated recoveries set forth herein are necessarily based on numerous assumptions, the realization of many of which are beyond the Debtors' control.

9.5     The Allowed Amount of Claims May Differ From Current Estimates

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated in this Disclosure Statement. Furthermore, a number of additional Claims may be filed, including on account of rejection damages for Executory Contracts and Unexpired Leases rejected pursuant to the Plan. Any such claims may result in a greater amount of Allowed Claims than estimated in this Disclosure Statement.

9.6     The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection may therefore not receive its expected share of the estimated distributions described in this Disclosure Statement.

9.7     Parties in Interest May Object to the Debtors' Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if the claim or interest is substantially similar to the other claims or interests in that class.  Parties in interest may object to the classification of certain Claims and Equity Interests both on the grounds that certain Claims and Equity Interests have been improperly placed in the same Class and/or that certain Claims and Equity Interests have been improperly placed in different Classes.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements of the Bankruptcy Code because the Classes established under the Plan each encompass Claims or Equity Interests that are substantially similar to similarly classified Claims or Equity Interests.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Parties in interest may object to the classification of certain Claims and Equity Interests both on grounds that certain Claims and Equity Interests have been improperly placed in the same Class and/or that certain Claims and Equity Interests have been improperly placed in different Classes.

9.8     Appointment of Different Talc Trustees and/or Different Members of the Talc Trust Advisory Committee for the Talc Personal Injury Trust

Prior to the Confirmation Hearing, the Plan Supplement shall identify the initial Talc Trustees of the Talc Personal Injury Trust.  The initial members of the Talc Trust Advisory Committee will be the same parties who served as members of Tort Claimants' Committee.  They are: (i) Robin Alander; (ii) Nolan Zimmerman, as representative of the estate of Donna M. Arvelo; (iii) Christine Birch; (iv) Bessie Dorsey-Davis; (v) Lloyd Fadem, as representative of the estate of Margaret Ferrell; (vi) Timothy R. Faltus, as representative of the estate of Shari C. Faltus; (vii) Deborah Giannecchini; (viii) Kayla Martinez; (ix) David A. Martz, as representative of the estate of Lynne Martz; (x) Gregory W. Vella, as representative of the estate of Nicole Matteo; and (xi) Charvette Monroe, as representative of the estate of Margie Evans.

Parties-in-interest, however, may object to one or more of the proposed Talc Trustees, or one or more of the proposed members of the Talc Trust Advisory Committee.  In that case, an alternate Talc Trustee or alternate Talc Trustees and/or alternative proposed members of the Talc Trust Advisory Committee would have to be nominated, potentially resulting in significant delays in the occurrence of the Confirmation Date and Effective Date.  The selection of a different Talc Trustee or different Talc Trustees, or different Talc Trust Advisory Committee Members also could materially affect administration of the Talc Personal Injury Trust.  Each Fund created pursuant to the Trust Distribution Procedures will not have its own Talc Trustees or Talc Trust Advisory Committee, as this is viewed as unnecessary and would substantially increase the

administrative costs of the Talc Personal Injury Trust to the detriment of the holders of Talc Personal Injury Claims.

9.9    Distributions under the Trust Distribution Procedures

Talc Personal Injury Claims will be resolved pursuant to the Talc Personal Injury Trust Documents, and their treatment will be based upon, among other things, estimates of the number, types, and amount of Talc Personal Injury Claims, the value of the assets of the Talc Personal Injury Trust, the liquidity of the Talc Personal Injury Trust, the Talc Personal Injury Trust's expected future income and expenses, and other matters. There can be no certainty as to the precise amounts that will be distributed by the Talc Personal Injury Trust in any particular time period or when Talc Personal Injury Claims will be resolved by the Talc Personal Injury Trust.

Holders of Talc Personal Injury Claims who (a) are Medicare beneficiaries and (b) receive a distribution from the Talc Personal Injury Trust may be required to reimburse Medicare for medical expenses paid on behalf of such holder.[94]  Additionally, excessive legal fees may not qualify as a "procurement cost" within the meaning of 42 C.F.R. § 411.37(a)(1)(i), which may affect a holder of a Talc Personal Injury Claim's reimbursement obligations.

9.10    The Channeling Injunction

The Channeling Injunction, which, among other things, bars the assertion of any Talc Personal Injury Claims against the Protected Parties, subject to exceptions contained in the Trust Distribution Procedures that permit, in certain circumstances, the assertion of such claims against the Debtors (but not any other party protected by the Channeling Injunction), is a necessary element of the Plan. Although the Plan, the Talc Personal Injury Trust Agreement, and the Trust Distribution Procedures all have been drafted with the intention of complying with sections 524(g) and (h) of the Bankruptcy Code, and satisfaction of the conditions imposed by sections 524(g) and (h) is a condition precedent to confirmation of the Plan, there is no guarantee that the validity and enforceability of the Channeling Injunction or sections 524(g) and (h) or the application of the Channeling Injunction to Talc Personal Injury Claims will not be challenged, either before or after confirmation of the Plan.

While the Debtors believe that the Plan satisfies the requirements of section 524(g) of the Bankruptcy Code, certain objections might be lodged on grounds that the requirements of section 524(g) of the Bankruptcy Code cannot be met given the unique facts of the Chapter 11 Cases. At this juncture, the Debtors believe that the Plan provides a sufficient basis for the issuance of the Channeling Injunction.

9.11    Voting Requirements

If sufficient votes are received to enable the Bankruptcy Court to confirm the Plan pursuant to both sections 524(g) and 1129 of the Bankruptcy Code, ITI intends to file for chapter 11 relief and the Debtors intend to seek, as promptly as practicable thereafter, Confirmation. If sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can

---

[94]    *See* 42 U.S.C. § 1395y(b)(2)(B)(ii); 42 C.F.R. § 411.22.

be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

### 9.12    The Debtors' Operations May be Impacted by the Continuing COVID-19 Pandemic

The continued spread of COVID-19 could have a significant impact on the Debtors' businesses, both in the context of consumer demand and production capacity.  This pandemic could dampen global growth and ultimately lead to an economic recession.  Such a scenario would negatively impact the Debtors' financial performance, and affect the underlying financial projections contained in Exhibit B and Exhibit C.

### 9.13    The Canadian Court May Not Enter an Order Recognizing the Confirmation Order

ITC's exit from bankruptcy protection will depend on, among other things, the Canadian Court's entry of a Canadian confirmation order recognizing the treatment of Claims and Equity Interests under the Plan.  The Plan Proponents believe that if the Confirmation Order is granted, the Canadian Court will likely grant the Canadian confirmation order recognizing the Confirmation Order.

### 9.14    Risks Relating to ITI's Chapter 11 Filing

The Debtors do not believe that the commencement of a chapter 11 case by ITI will affect the Chapter 11 Cases of the North American Debtors.  Moreover, to the extent ITI is unable to commence a chapter 11 case, the Plan Proponents may propose or solicit votes on an alternative plan of reorganization.  Despite the limited nature of ITI's talc liabilities, the Debtors believe that the commencement of a chapter 11 case for ITI is necessary given the potential for ITI to face increasing talc-related litigation if it remains in the tort system.

### 9.15    Risks Relating to the Cyprus Settlement

Consummation of the Cyprus Settlement is dependent on the occurrence of the Cyprus Trigger Date, which is not known at this time.  If the conditions precedent to effectiveness of the Cyprus Settlement are not satisfied or waived, the Cyprus Settlement will not become effective and binding on Cyprus and the Plan Proponents, the Cyprus Contribution will not occur, and assignments by Cyprus of insurance and indemnity rights will not occur.  Conditions to effectiveness of the Cyprus Settlement include, among others: (a) approval by the Bankruptcy Court of the Plan by June 30, 2021; and (b) approval by a bankruptcy court of the Cyprus Mines Plan by September 30, 2021.  Although the material terms of the Cyprus Settlement have been pre-negotiated by the Plan Proponents, Cyprus Mines, CAMC, Freeport, the Tort Claimants' Committee, and the FCR, there is no assurance that the Cyprus Mines Plan will be approved by September 30, 2021 or that the parties to the Cyprus Settlement will extend that deadline.  In addition, there is no assurance that the FCR and Tort Claimants' Committee in these cases will be appointed in the Cyprus Mines case, or that the cases will be assigned to the same Bankruptcy Judge and coordinated.  Lack of coordination between the cases or appointment of a different FCR or Tort Claimants' Committee may result in delay of the Cyprus Mines case.

Certain objectors have asserted that the September 30, 2021 deadline referenced above raises feasibility risks for the Plan.  As noted above and for clarity, effectiveness of the Plan as a

157

whole is not dependent on confirmation of the Cyprus Mines Plan or the occurrence of the Cyprus Trigger Date. Only the portions of the Plan that reflect the Cyprus Settlement are dependent on confirmation of the Cyprus Mines Plan and occurrence of the Cyprus Trigger Date.

Certain objectors have also asserted that the Cyprus Settlement, and in particular the assignment of insurance rights to the Talc Personal Injury Trust without resolution of whether those rights belong to the Debtors or to Cyprus, may result in there being no coverage available for Talc Personal Injury Claims. In addition, certain objectors have also asserted that the Cyprus Settlement does not assign to the Talc Personal Injury Trust both Cyprus' rights and its obligations under the policies being assigned, and that such separation of rights and obligations may result in there being no coverage available for Talc Personal Injury Claims under the Cyprus Talc Insurance Policies. The Plan Proponents disagree with the assertion that the Cyprus Settlement, including the settlement of the Cyprus Insurance Adversary Proceeding, will impair insurance coverage otherwise available to the Debtors or the Talc Personal Injury Trust.

9.16    Allegations Regarding the Abandonment of Liability Defenses

The Trust Distribution Procedures, which dictate the treatment of the Debtors' liability defenses, are the result of arms'-length negotiations between the Debtors and the other Plan Proponents. The Plan Proponents believe that the Trust Distribution Procedures and the Imerys Settlement maximize recoveries for holders of Talc Personal Injury Claims. Nonetheless, parties may assert, and J&J and certain insurance companies have asserted, that the Debtors have waived their liability defenses and that the waiver of such liability defenses may (i) dilute the recovery of any claimant with a valid claim, as he or she may be forced to share recoveries from the Talc Personal Injury Trust with claimants asserting weaker claims, and (ii) create coverage defenses for the Debtors' insurers and indemnitors, which could reduce recoveries for holders of Talc Personal Injury Claims.

9.17    Unavailability of J&J's Revised Protocol

J&J's uncapped indemnification obligation is primary to the obligations of the Debtors' insurers. By rejecting J&J's Revised Protocol, insurers may argue the Debtors have breached the J&J indemnity agreements, in which event insurers may assert a defense to coverage to the extent any alleged breach jeopardized the insurers' subrogation rights against J&J.

9.18    Treatment of Holders of Talc Personal Injury Claims Pursuant to the Trust Distribution Procedures

Certain objectors have alleged that provisions within the Trust Distribution Procedures result in holders of Talc Personal Injury Claims not being treated fairly. These parties argue, among other things, that the 40/40/20 split, the lack of a sequencing adjustment for claimants who elect to pursue a Tort System Election (as defined in the Trust Distribution Procedures), and other features of the Trust Distribution Procedures do not treat all holders of Talc Personal Injury Claims equally. The Plan Proponents disagree with these assertions.

# ARTICLE X.

# VOTING PROCEDURES AND REQUIREMENTS

10.1    <u>Voting Procedures Summary</u>[95]

The following section describes in summary fashion the procedures and requirements that have been established for voting on the Plan pursuant to the Voting Procedures Order, which approves this Disclosure Statement as containing adequate information, establishes the voting procedures (the "**Voting Procedures**"), schedules the Confirmation Hearing, and sets the voting deadline and the deadline for objecting to confirmation of the Plan.  Those procedures and requirements establish, among other things, the place to send completed Ballots, in the forms approved by the Bankruptcy Court in the Voting Procedures Order, used in voting on the Plan (each, a "**Ballot**"), together with the deadline for returning completed Ballots for voting on the Plan and the deadline for objecting to the Plan.  The Debtors have distributed Solicitation Packages in connection with the foregoing containing:

(a)    a cover letter in paper form describing the contents of the Solicitation Package and the enclosed USB flash drive, and instructions for obtaining (free of charge) printed copies of the materials provided in electronic format;

(b)    the Confirmation Hearing Notice in paper form;

(c)    a copy of this Disclosure Statement with all exhibits, including the Plan with its exhibits, which may be provided by way of a USB flash drive;

(d)    the Voting Procedures Order (without exhibits);

(e)    the Voting Procedures;

(f)    solely to counsel for holders of Direct Talc Personal Injury Claims, the Direct Talc Personal Injury Claim Solicitation Notice and the Certified Plan Solicitation Directive;

(g)    solely for holders of Talc Personal Injury Claims and their counsel, an appropriate Ballot and voting instructions for the same in paper form;

(h)    solely for holders of Talc Personal Injury Claims and their counsel, a pre-addressed, return envelope for completed Ballots; and

(i)    solely for holders of Talc Personal Injury Claims and their counsel, a letter from the Tort Claimants' Committee in the form attached to the Voting Procedures Order as <u>Exhibit 5</u>.

---

[95]    Capitalized terms used in this Article X and not otherwise defined herein or in the Plan have the meanings ascribed to them in the Voting Procedures Order or Voting Procedures (as applicable).

The Voting Procedures Order, the Voting Procedures, the Confirmation Hearing Notice, and the instructions attached to your Ballot should be read in connection with this Section of this Disclosure Statement as they set forth the Voting Procedures and deadlines in detail.  If you are a holder of a Claim who is entitled to vote on the Plan and you or your attorney did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please contact the Solicitation Agent (i) by telephone at (844) 339-4096 (Toll Free) or (929) 247-2932 (International); (ii) by e-mail at imerysballots@primeclerk.com; (iii) by visiting their website at https://cases.primeclerk.com/imerystalc; or (iv) by writing at Imerys Ballot Processing Center, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165.

The Voting Procedures set forth a process by which attorneys representing holders of Direct Talc Personal Injury Claims, as listed on the Schedules, or any filed Proof of Claim (collectively, the "**Firms**"), will receive copies of the Direct Talc Personal Injury Claim Solicitation Notice and the Certified Plan Solicitation Directive.  The Direct Talc Personal Injury Claim Solicitation Notice will notify the Firms of the options proposed for soliciting votes on the Plan in respect of Direct Talc Personal Injury Claims and request that each Firm complete and return the Certified Plan Solicitation Directive to the Solicitation Agent no later than February 15, 2021.

The Certified Plan Solicitation Directive permits each Firm to direct the Solicitation Agent with regard to the solicitation of votes on the Plan from individuals, estates, or Entities who or which hold Direct Talc Personal Injury Claims (collectively, the "**Clients**") according to one of the following procedures:

(a)    Master Ballot Solicitation Method.  If a Firm certifies that it has the authority under applicable law to vote on behalf of its Clients, the Firm may direct the Solicitation Agent to serve the Firm with one Solicitation Package and one Master Ballot on which the Firm must record the votes on the Plan for each of its Clients.  If the Firm elects this procedure, the Firm may also request that, for informational purposes, the Solicitation Agent serve Solicitation Packages (without a Ballot) on its Clients, together with a cover letter to be provided by the Firm.

(b)    Direct Solicitation Method.  If a Firm does not have the authority to vote on behalf of its Clients, or if a Firm prefers to have each of its Clients cast their own votes on the Plan, such Firm may direct the Solicitation Agent to solicit votes on the Plan directly from its Clients, and may provide the Solicitation Agent with a cover letter to be transmitted to such Clients in connection with such solicitation.

(c)    Indirect Solicitation Method.  If a Firm does not have the authority to vote on behalf of its Clients or the attorney prefers to have the Clients cast their own votes on the Plan, the attorney may direct the Solicitation Agent to deliver the Solicitation Packages to the Firm, which will, in turn, deliver the Solicitation Packages to its Clients.  If the Firm selects this method: (i) the Solicitation Agent will cause the requested number of Solicitation Packages, including appropriate Ballots, to be served on the Firm; (ii) the Firm must deliver the Solicitation Packages to the Clients within three (3) Business Days after receipt; and (iii) the Firm must file an

affidavit of service with the Bankruptcy Court, and send a copy of such affidavit to the Solicitation Agent, within three (3) Business Days of such service.  The affidavit of service filed with the Bankruptcy Court only needs to state that service was completed, the date(s) that service was completed and the attorney has provided or will provide the Solicitation Agent with the required lists of Clients, as described in the Solicitation Procedures.  The affidavit of service provided to the Solicitation Agent must also include the names and addresses of the Clients served and the Solicitation Agent will keep a copy of such affidavit for a period of five years after receipt.  The affidavit of service provided to the Solicitation Agent shall not be deemed to be filed with the Bankruptcy Court or part of the Docket in the Chapter 11 Cases and will not be published or otherwise disclosed.

(d)  <u>Hybrid Solicitation Method</u>.  If a Firm certifies that it has the authority under applicable law to vote, and intends to exercise that power, only for certain of the Clients (collectively, the "**<u>Master Ballot Clients</u>**"), the Firm may direct the Solicitation Agent to serve the Firm with one Solicitation Package and one Master Ballot on which the Firm must record the votes with respect to the Plan for the Master Ballot Clients.  The Firm may also request that, for informational purposes, the Solicitation Agent serve Solicitation Packages (without a Ballot) on the Master Ballot Clients, together with a cover letter to be provided by the Firm.  With respect to such Firm's other Clients that are not Master Ballot Clients, the Firm must elect the procedure under either the Direct Solicitation Method (subsection (b) above) or the Indirect Solicitation Method (subsection (c) above).

If you are entitled to vote on the Plan, a form of Ballot for your Claim has been provided to you, unless otherwise provided to a Firm, as contemplated by the Certified Plan Solicitation Directive.  Holders of Talc Personal Injury Claims or their attorneys, as applicable, should have received a Class 4 Ballot (relating to Talc Personal Injury Claims).  The Plan Proponents have prepared, and the Bankruptcy Court has approved the Voting Procedures.  You should refer to the Voting Procedures sent with this Disclosure Statement to determine precisely those procedures that apply with respect to the return of your Ballot.

Completed and signed Ballots can be submitted (i) by mail using the envelope included in the Solicitation Package, or by hand delivery or overnight courier to: Imerys Ballot Processing Center, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 or (ii) through the E-Ballot platform, by visiting https://cases.primeclerk.com/ImerysTalc/, clicking on the "Submit E-Ballot" section of the website, and following the instructions.  As set forth in the Voting Procedures, no other forms of electronic delivery of Ballots, *e.g.*, facsimile, will be accepted.

10.2  <u>Voting Deadline</u>

**To be considered for purposes of accepting or rejecting the Plan, all Ballots must be *received by* the Solicitation Agent no later than the Voting Deadline of 4:00 p.m. (prevailing Eastern Time) on March 25, 2021.  Only those Ballots actually received by the Solicitation Agent before the Voting Deadline will be counted as either accepting or rejecting the Plan.**

10.3    Holders of Claims Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or equity interest entitles the holder thereof, or (b) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan: (1) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy); (2) reinstates the maturity of such claim or equity interest as it existed before the default; (3) compensates the holder of such claim or equity interest for any damages from such holder's reasonable reliance on such legal right to an accelerated payment; and (4) does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Holders of claims and equity interests in impaired classes are generally entitled to vote to accept or reject a plan. However, if the holder of an impaired claim or equity interest will not receive any distribution under the plan in respect of such claim or equity interest, the Bankruptcy Code deems such holder to have rejected the plan (unless such holder has agreed to such treatment) and provides that the holder of such claim or equity interest is not entitled to vote. If the claim or equity interest is not impaired, the Bankruptcy Code conclusively presumes that the holder of such claim or equity interest has accepted the plan and provides that the holder is not entitled to vote.

**Class 4 is Impaired by the Plan and is the only Class entitled to vote on the Plan.** All other Classes are either Unimpaired or Impaired but are Plan Proponents and voluntarily agreed to waive any right to vote on or oppose the Plan.

10.4    Vote Required for Acceptance by a Class

Pursuant to sections 1126(c) and 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code, Class 4 (Talc Personal Injury Claims) shall have accepted the Plan only if at least two-thirds (2/3) in amount and seventy-five percent (75%) in number of Talc Personal Injury Claims actually voting on the Plan have voted to accept the Plan in accordance with the Voting Procedures Order.

10.5    Voting Procedures

(a)    *Ballots*

All votes to accept or reject the Plan with respect to Class 4 must be cast by properly submitting the duly completed and executed form of Ballot designated for such Claims. Holders of Claims in Class 4 or their attorneys (as applicable) voting on the Plan should complete and sign the appropriate Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept" the Plan or "Reject" the Plan. In addition, if any holder of a Claim elects not to grant the releases set forth in Article XII of the Plan, then it should check the appropriate box on its Ballot and follow the instructions contained in the Ballot.

**As set forth in the Voting Procedures, improperly completed Ballots will not be counted. By way of example and not limitation, any Ballot received which is not signed or which contains insufficient information to permit the identification of the claimant will be an invalid Ballot and will not be counted for purposes of determining acceptance or rejection**

162

**of the Plan.  In addition, a vote cast on a Ballot will not be counted if it is returned to the Solicitation Agent: (i) indicating neither acceptance nor rejection of the Plan; (ii) indicating both acceptance and rejection of the Plan; or (iii) indicating partial rejection and partial acceptance of the Plan.  Notwithstanding, any such Ballot will be considered for purposes of determining whether the claimant has opted out of the releases contained in the Plan, if that portion of the Ballot is completed and the Ballot is otherwise complete and legible.**

Ballots must be delivered to the Solicitation Agent, at its address set forth above in Section 10.1, or submitted via electronic, online transmission through a customized electronic Ballot by utilizing the E-Ballot platform on the Solicitation Agent's website https://cases.primeclerk.com/imerystalc, and received by the Voting Deadline.  **The method of such delivery is at the election and risk of the voter.**  Although the method of delivery is at the risk of the voter, for the convenience of each holder of a Talc Personal Injury Claim entitled to vote on the Plan or such holder's attorney, as applicable and in accordance with the Certified Plan Solicitation Directive, the Solicitation Package contains a pre-stamped and addressed envelope for return of such holder's Ballot by first class mail through the United States Postal Service.  If such delivery is by mail, it is recommended that voters use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested.  In all cases, sufficient time should be allowed to ensure timely delivery.  Instructions for casting an electronic Ballot can be found on the "E-Ballot" section of the Solicitation Agent's website https://cases.primeclerk.com/imerystalc by clicking on the "Submit E-Ballot" section of the website.

If you are entitled to vote and you or your attorney (as applicable) did not receive a Ballot, received a damaged Ballot or lost your Ballot, please contact the Solicitation Agent in the manner set forth above.  For additional information regarding the voting process, please refer to the Voting Procedures Order, the Voting Procedures, the Confirmation Hearing Notice, and the instructions attached to your Ballot (to the extent a Ballot was not otherwise received by your attorney pursuant to the Certified Plan Solicitation Directive).

Please refer to the Voting Procedures and Voting Procedures Order for more information regarding the voting of Talc Personal Injury Claims.

(b)    *Withdrawal of Votes and Multiple Votes on the Plan*

Any voter that delivers a valid Ballot may withdraw his, her, or its vote by delivering a written notice of withdrawal to the Solicitation Agent before the Voting Deadline (or such later date as agreed by the Debtors with the consent of the Plan Proponents, with such consent not to be unreasonably withheld).  To be valid, the notice of withdrawal must be signed by the party who signed the Ballot to be revoked.  The Debtors reserve the right to contest any withdrawals.

In addition, the following procedures for voting will be used by the Debtors to address multiple Ballots.

- If multiple Ballots are received from different holders purporting to hold the same Claim, the vote will be counted only once and only if such votes are consistent with respect to acceptance or rejection of the Plan.  In the event that the votes are not consistent, and the vote *is not* necessary (alone or in conjunction with other

inconsistent, multiple votes) to determine whether the class voted to accept the Plan, then neither vote will be counted.  If the votes are not consistent, and the vote *is* necessary (alone or in conjunction with other inconsistent, multiple votes) to determine whether the class voted to accept the Plan, the parties who submitted such Ballots must provide evidence to support their assertion that they hold such Claim directly or in a representative capacity, and the Bankruptcy Court will determine which holder has the right to vote such Claims.

- If multiple Ballots are received from the holder of a Claim **and** someone purporting to be her, her, or its attorney or agent, the Ballot received from the holder of the Claim will be the Ballot that is counted, and the vote of the purported attorney or agent will not be counted.

- If multiple Ballots are received from a holder of a Claim for the same Claim, the latest-dated otherwise valid Ballot that is received before the Voting Deadline (or such later date as agreed by the Debtors with the consent of the Plan Proponents, with such consent not to be unreasonably withheld) will be the Ballot that is counted as a vote to accept or reject the Plan; if multiple Ballots are received from the same attorney or agent with respect to the same Claim (but not from the holder thereof), the latest-dated otherwise valid Ballot that is received before the Voting Deadline (or such later date as agreed by the Debtors with the consent of the Plan Proponents, with such consent not to be unreasonably withheld) will be the Ballot that is counted as a vote to accept or reject the Plan.

- If two or more Ballots are received from separate attorneys, each of whom purports to represent the same holder of a Claim, the vote of the holder appearing on both Master Ballots will be counted only once and only if such votes are consistent with respect to acceptance or rejection of the Plan.  In the event that the votes are not consistent, and the vote *is not* necessary (alone or in conjunction with other inconsistent, multiple votes) to determine whether the class voted to accept the Plan, then neither vote will be counted.  If the votes are not consistent, and the vote *is* necessary (alone or in conjunction with other inconsistent, multiple votes) to determine whether the class voted to accept the Plan, the parties who submitted such Ballots must provide evidence to support their assertion that they hold such Claim directly or in a representative capacity, and the Bankruptcy Court will determine which holder has the right to vote such Claims.

The Debtors will not be obligated to recognize any withdrawal, revocation, or change of any vote received after the Voting Deadline (or such later date as agreed by the Debtors with the consent of the Plan Proponents, with such consent not to be unreasonably withheld).

(c)      *Requesting a Solicitation Package*

If a holder of a Talc Personal Injury Claim contacts the Solicitation Agent more than seven (7) Business Days before the Voting Deadline and requests a Solicitation Package, the Solicitation Agent will provide such claimant with a Solicitation Package within two (2) Business Days of such request, and if such request is made on or after seven (7) Business Days before the Voting

Deadline, the Solicitation Agent will provide the Solicitation Package by overnight mail or via e-mail as noted below.  All requests must be submitted by no later than three (3) Business Days before the Voting Deadline.  All Solicitation Package requests must be made to imerysballotrequests@primeclerk.com and the Solicitation Agent will not be required to provide Solicitation Packages to parties that do not make a request in this manner.  Additionally, unless hard copy service is requested, the Solicitation Agent will provide parties with the Solicitation Package documents or a link where they may be accessed via e-mail, which will include a unique E-Ballot ID# for voting through the E-Ballot platform.

## ARTICLE XI.

## CONFIRMATION OF THE PLAN

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

11.1    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan of reorganization.  By order of the Bankruptcy Court, the Confirmation Hearing is scheduled for June 21, 22, and 23, 2021 at 10:00 a.m. (Prevailing Eastern Time) before the Honorable Laurie Selber Silverstein, United States Bankruptcy Judge for the District of Delaware, in the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 6th Floor, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequently adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization.  Any objection to confirmation of the Plan must be filed with the Bankruptcy Court no later than **May 28, 2021 at 4:00 p.m. (Prevailing Eastern Time)**, and will be governed by Bankruptcy Rules 3020(b) and 9014 and the Local Rules.  **Unless an objection is timely and properly served and filed, it may not be considered by the Bankruptcy Court.**

11.2    Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan (a) is accepted by all Impaired Classes of Claims and Equity Interests, or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (b) is feasible; and (c) is in the "best interests" of holders of Claims and Interests that are Impaired under the Plan.

(a)    *Acceptance*

Class 4 is Impaired under the Plan, and the holders of Claims in such Class are entitled to vote on the Plan.  Therefore, such Class must accept the Plan in order for it to be confirmed without application of the "fair and equitable test," described below, to such Class.  Classes 5a and 6 are

Impaired under the Plan, but are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code because all holders of Claims or Equity Interests (as applicable) in Classes 5a and 6 are Plan Proponents and have consented to their treatment under the Plan.

Classes 1, 2, 3a, 3b, 5b, and 7 are Unimpaired under the Plan and are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, confirmation of the Plan will not require application of the "fair and equitable test," described below, as to those Classes.

       (b)       *Issuance of Injunction Pursuant to Sections 524(g) and 105(a) of the Bankruptcy Code*

The Bankruptcy Court shall be asked to issue the Channeling Injunction if the Plan has been accepted by at least two-thirds (2/3) in amount of those holders of Class 4 Claims actually voting on the Plan, in accordance with section 1126(c) of the Bankruptcy Code, and seventy-five percent (75%) in number of those holders of Class 4 Claims actually voting on the Plan, in accordance with section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.  The amount of the Claim for each Class 4 Claim holder for voting purposes shall be as set forth in the Voting Procedures Order.

If the Bankruptcy Court or the District Court does not enter the Channeling Injunction, the Effective Date shall not occur.

       (c)       *Feasibility*

The Bankruptcy Code also requires as a condition to confirmation of a plan of reorganization that the confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the reorganized debtor.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  The Plan Proponents believe that the Reorganized Debtors will be able to make all payments required pursuant to the Plan, and therefore, that confirmation of the Plan is not likely to be followed by the need for further reorganization.

To support their belief in the feasibility of the Plan, the Plan Proponents have relied upon the financial projections, attached hereto as Exhibit B and Exhibit C.  The financial projections indicate that the Reorganized Debtors should have sufficient Cash prior to the Effective Date to fund the Reserves and adequate cash flow post-Effective Date to fund operations, as applicable.  Accordingly, the Plan Proponents believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The financial projections are based on various assumptions, including Confirmation of the Plan in accordance with its terms, no material adverse changes in general business and economic conditions, and other matters, some of which will be beyond the control of the Reorganized Debtors.  The financial projections should be read in conjunction with Article IX above, entitled "*Certain Factors to be Considered*," and with the assumptions, qualifications and footnotes to the tables containing the Financial Projections set forth in Exhibit B and Exhibit C.

(d)    *"Best Interests" Test / Liquidation Analysis*

The "Best Interests Test" under section 1129 of the Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each holder of Impaired claims or Impaired equity interests either (a) accept the Plan or (b) receive property with a value not less than the amount such holder would receive in a chapter 7 liquidation.  As reflected in the analysis attached hereto as <u>Exhibit D</u> (the "**<u>Liquidation Analysis</u>**"), the Plan Proponents believe that under the Plan, holders of Impaired Claims and Impaired Equity Interests will receive property with a value equal to or in excess of the value such holders would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

One Class of Claims or Equity Interests (other than Non-Debtor Intercompany Claims and Equity Interests in the North American Debtors) is Impaired under the Plan: Talc Personal Injury Claims (Class 4).  The holders of Talc Personal Injury Claims, as the only Class voting under the Plan, must accept the Plan in order for the Plan to be confirmed, thereby satisfying clause (a) above.  Holders of Non-Debtor Intercompany Claims (Class 5a) and Equity Interests in the North American Debtors (Class 6) have consented to their treatment under the Plan as Plan Proponents and are presumed to accept the Plan pursuant to section 1126(f).

The Debtors have prepared the attached Liquidation Analysis to demonstrate the Plan's compliance with the provisions of section 1129(a)(7) of the Bankruptcy Code.  The Liquidation Analysis is based upon a number of reasonable assumptions that, ultimately, are subject to significant uncertainties and contingencies.  The Plan Proponents cannot assure you that these assumptions would be accepted by a Bankruptcy Court.  **Actual liquidation proceeds could be materially lower or higher than the amounts set forth below.  No representation or warranty can or is being made with respect to the actual proceeds that could be received in a chapter 7 liquidation of the Debtors.  The liquidation valuations have been prepared solely for purposes of estimating proceeds available in a chapter 7 liquidation of the Estates and do not represent values that may be appropriate for any other purpose.  Nothing contained in these valuations is intended to or may be asserted to constitute a concession or admission of the Plan Proponents for any other purpose.**

Here, the Plan is in the best interests of the Debtors' creditors (including holders of Talc Personal Injury Claims), and meets the requirements of section 1129(a)(7) of the Bankruptcy Code.  The Plan Proponents expect that there will be substantially more assets available to pay holders of Claims under the Plan than would be the case if there were no Plan because of the Imerys Contribution, the Rio Tinto/Zurich Contribution, and the Cyprus Contribution.  Moreover, the Plan is the result of extensively negotiated settlements, and avoids costly litigation that would deplete the funds available for creditors.  The Tort Claimants' Committee and the FCR negotiated the Imerys Settlement, the Rio Tinto/Zurich Settlement, and the Cyprus Settlement, and support Confirmation of the Plan, which incorporates the terms of these settlements.  These factors, among others, demonstrate that the Plan provides greater recoveries to creditors than would be realized in a chapter 7 liquidation, the costs of which would deplete much of the recoveries from the liquidation of the Debtors' assets.  Based on the Liquidation Analysis, the Debtors believe that holders of Claims and Equity Interests will receive equal or greater value as of the Effective Date than such holders would receive in a chapter 7 liquidation.

Accordingly, the Plan Proponents believe that confirmation of the Plan will provide creditors in the Impaired Classes with value that is not less than (and, in certain cases, substantially greater than) the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7. The Plan meets the "best interests" test.

Notwithstanding the foregoing, as stated in Note T of the Liquidation Analysis, the Debtors and their advisors did not have sufficient information to estimate the amounts owed to holders of Talc Personal Injury Claims for purposes of their Liquidation Analysis, so the Liquidation Analysis assigns no value to Talc Personal Injury Claims. In addition, the Debtors are unable to determine the actual amounts, numbers, and timing of such Talc Personal Injury Demands, which is a requirement of an injunction pursuant to section 524(g) of the Bankruptcy Code. *See* 11 U.S.C. § 524(g)(2)(B)(ii)(II). The Liquidation Analysis does not consider or evaluate options available to the Debtors and to holders of Talc Personal Injury Claims outside of the Plan or the hypothetical appointment by the Bankruptcy Court of a chapter 7 trustee to convert all of the Debtors' assets into cash, as there is no requirement in the Bankruptcy Code for the Debtors to do so.

# ARTICLE XII.

## POSITIONS OF CERTAIN OBJECTING PARTIES WITH RESPECT TO DISCLOSURES

The Debtors have received comments on and objections to certain disclosures included in this Disclosure Statement. In an effort to resolve such objections, the Plan Proponents have included the positions of such objecting parties in this Article XII. **For the avoidance of doubt, the Plan Proponents do not agree with the assertions or allegations contained in this Article XII and believe that this Disclosure Statement adequately discloses the key components of the Plan and that the Plan is in the best interests of the Debtors' Estates and should be approved. In addition, all references to the Trust Distribution Procedures in this Article XII refer to the Trust Distribution Procedures, filed by the Debtors on October 19, 2020 [Docket No. 2370]. Terms of the Trust Distribution Procedures were revised in the version filed on January [27], 2021 [Docket No.    ].**

These parties have no fiduciary obligations to the Debtors' Estates, the Estates' creditors, or to the holders of Talc Personal Injury Claims. In short, their comments and concerns may be fully for their own self-interest. The Plan Proponents heavily dispute the following statements but are including them here solely so that those voting on the Plan are aware that there are parties who do not agree to one or more aspects of the Plan.

J&J: (i) at one time owned certain of the mines that later came to be owned by the Debtors; (ii) was the largest customer of the Debtors' cosmetic-grade talc; (iii) decided this year to remove talc-based baby powder from store shelves in North America; (iv) is a co-defendant in more than 90% of the personal injury cases that named the Debtors prior to the Petition Date; and (v) continues to be named as a defendant in personal injury causes of action for injuries caused by its talc-containing products.

Arnold & Itkin is a law firm that does not represent any member of the Tort Claimants' Committee, but does represent over 2,000 holders of Talc Personal Injury Claims on whose behalf

Arnold & Itkin has filed proofs of claim, and is also counsel to additional holders of Talc Personal Injury Claims on whose behalf proofs of claim have not been filed at this time. Arnold & Itkin has not advised the Plan Proponents of the specific types of Talc Personal Injury Claims held by the clients it represents, other than to assert that the clients on whose behalf proofs of claim have been filed all assert claims based on ovarian cancer. Arnold & Itkin has not provided information related to the precise stage of cancer or other classification of the claim for each of its clients to assist the Plan Proponents in understanding Arnold & Itkin's concerns; but Arnold & Itkin asserts that this level of claimant-by-claimant detail is not necessary to enable the Plan Proponents to understand Arnold & Itkin's concern that the Trust Distribution Procedures allocate a disproportionate amount of Trust assets to holders of mesothelioma claims, at the expense of holders of ovarian cancer claims, or other concerns expressed by Arnold & Itkin. Arnold & Itkin has expressed displeasure about the fact that although the members of the Tort Claimants' Committee owe a fiduciary duty to the multiple claimants represented by Arnold & Itkin, the Tort Claimants' Committee would not engage in any meaningful discussions with Arnold & Itkin regarding the Plan or the Trust Distribution Procedures in the course of their development. The Bankruptcy Court opined that though Arnold & Itkin is not required by Bankruptcy Rule 2019 to provide more detailed information regarding the nature of its clients' diseases, that the failure to do so may affect Arnold & Itkin's standing to contest this Disclosure Statement or the Plan.

The Insurer Group (as defined below) is comprised of insurers that have insurance obligations to the Debtors or have issued policies to which the Debtors have asserted their rights and interests. The Insurer Group does not have liquidated claims against the Debtors' Estates and, as disclosed herein, the Plan provides for insurance neutrality meaning the Plan Proponents believe that the Insurer Group lacks standing to raise arguments regarding the Plan or this Disclosure Statement.

Travelers (as defined below), issued certain policies to Cyprus and J&J to which the Debtors have asserted their rights and interests. Travelers does not have liquidated claims against the Debtors' Estates and the Plan provides for insurance neutrality meaning the Plan Proponents believe that Travelers lacks standing to raise arguments regarding the Plan or this Disclosure Statement.

12.1    J&J

On October 19, 2020, J&J sent the Debtors comments and proposed revisions to the *Disclosure Statement for Second Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 2290]. After receiving J&J's proposed revisions, the Plan Proponents and J&J attempted to consensually resolve the issues raised by J&J pertaining to the adequacy of the Disclosure Statement. J&J has requested that the statements contained in this Section 12.1 be included in this Disclosure Statement.

(a)    *Generally*

J&J has raised the following objections, statements, and/or reservations with respect to the Disclosure Statement that do not otherwise fit into one of the categories set forth in this Section:

- J&J reserves the right to object to any dates proposed in the Chapter 11 Cases depending on entry of an agreeable discovery schedule;

- J&J disagrees that the Plan is in the best interests of holders of Talc Personal Injury Claims or other creditors; and

- J&J asserts the Plan is not confirmable and/or that confirmation of the Plan could be delayed on grounds that the Plan does not comply with the requirements of the Bankruptcy Code.

(b)   *J&J Indemnification Obligations*

(1)   <u>Transfer of the J&J Indemnification Obligations</u>

J&J asserts that the Debtors' ability to transfer the J&J Indemnification Obligations to the Talc Personal Injury Trust is uncertain. J&J believes that to the extent such obligations arise under executory contracts, those contracts cannot be assumed by the Debtors (and therefore assigned to the Talc Personal Injury Trust) as a result of purported defaults by the Debtors under such contracts. If the Bankruptcy Court agrees with J&J and such contracts are executory, then J&J believes the underlying contracts cannot be assumed by the Debtors and/or assigned to the Talc Personal Injury Trust.

In addition, J&J asserts that the J&J Agreements do not provide plaintiffs with the right to seek indemnification from J&J.

(2)   <u>The Debtors' Conduct with Respect to the J&J Indemnification Obligations</u>

J&J asserts that the Debtors chose to ignore, delay, rebuff, and oppose J&J's efforts to participate in negotiations relating to, or assume the defense of, the J&J Talc Claims,[96] which resulted in a purported breach of the Debtors' contractual indemnity agreements with J&J and their common law duties, nullifying J&J's indemnification obligations. Further, J&J asserts that the Debtors' actions—which J&J asserts include refusing to provide J&J with information through informal or formal discovery, even basic information, including information that had already been provided to other third parties including the Tort Claimants' Committee and the FCR and entering into an agreement that forbade the Debtors' counsel from speaking with J&J's counsel about the indemnity proposals without the presence of the Tort Claimants' Committee and the FCR—are inconsistent with their duties as an indemnitee, which includes the duties to minimize liability exposure and cooperate with an indemnitor, all of which also results in the nullification of J&J's indemnification obligations. Finally, J&J claims that under certain of the contracts between J&J and the Debtors, J&J does not have a duty to indemnify the Debtors if the claims against the Debtors are based on allegations of asbestos in the talc (and may have an indemnity claim against

---

[96]     As used herein, "**J&J Talc Claims**" means all Direct Talc Personal Injury Claims against a Debtor where plaintiffs allege use of talcum powder products distributed by J&J, provided the claim has not reached a final resolution (e.g., no settlement has been reached and no non-appealable final judgment has been entered against a Debtor in a court of competent jurisdiction).

the Debtors), notwithstanding the fact that both J&J and the Debtors believe these allegations have no merit.

### (3)    Potential Limitation of the J&J Indemnification Obligations

In addition to the foregoing, J&J contends that the indemnification obligations arising out of the J&J Agreements in favor of the Debtors are not uncapped for the reasons and defenses outlined in the Disclosure Statement.  J&J contends that such defenses also relate to future claimants with respect to which J&J cannot now be held to owe an indemnification obligation before any notice of a specific claim is provided and J&J is able to exercise its ability to defend such claim.  Further, J&J argues that the 2011 Material Purchase Agreement expired on December 31, 2011, and did not contain language extending the indemnification provisions beyond the termination or expiration of the agreement.

Moreover, under the 1989 Supply Agreement, J&J contends that it has no obligation to indemnify the Debtors for claims that are dependent upon allegations of asbestos-contaminated talc supplied by Debtors.  According to J&J, the 1989 Supply Agreement specifies that J&J does not have to indemnify the Debtors if the Talc Personal Injury Claims arose because of non-compliant talc supplied by the Debtors.  J&J contends that it specified that the talc supplied to J&J should not contain asbestos, and therefore, to the extent any Talc Personal Injury Claims allege exposure to asbestos in the talc used by J&J, J&J believes it has no obligation to indemnify the Debtors.  In addition, J&J claims that the 2001 and 2010 agreements contain no language supporting an obligation for J&J to indemnify the Debtors.

Additionally, J&J alleges that certain periods of time are not covered by any supply or indemnity agreement between J&J and the Debtors (*e.g.*, the years between and including 2007 and 2010, and from 2012 through the commencement of the Chapter 11 Cases).  For other periods of time, J&J also asserts that the Debtors owe indemnification obligations to J&J.

### (4)    The Debtors' Indemnification Obligations and the Availability of Insurance

According to J&J, under the 2001 Supply Agreement, the Debtors are required to indemnify J&J for claims arising from J&J's use of talc supplied by Debtors in J&J's products between and including the years 2001 and 2006.  Moreover, J&J asserts that a number of insurance policies may be available to cover Talc Personal Injury Claims.  As a result, in addition to the foregoing defenses available to J&J regarding its indemnity obligations—for example, that the Debtors violated their duties as an indemnitee by refusing to provide J&J with information and leaving J&J out of negotiations—J&J asserts that each indemnity claim brought by the Debtors will need to go through an allocation process to determine the precise amount that J&J would allegedly owe.

### (c)    *Imerys Settlement, Rio Tinto/Zurich Settlement, and Cyprus Settlement*

J&J has also raised the following objections and statements with respect to the Imerys Settlement, the Rio Tinto/Zurich Settlement, and the Cyprus Settlement:

- J&J questions whether the Imerys Non-Debtors are providing sufficient consideration to justify a release of claims against them;

- J&J objects to the Rio Tinto/Zurich Settlement to the extent it purports to cut-off J&J's rights to J&J's insurance policies;

- J&J argues that the Plan Proponents do not have the authority or the ability to (i) release or enjoin J&J's claims against the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, the Zurich Protected Parties, or the Cyprus Protected Parties, or (ii) channel to the Talc Personal Injury Trust any direct or independent claims of J&J against such parties, including, for example, bad faith claims;[97]

- J&J asserts that the Imerys Settlement has not been entered into in good faith, on grounds that it creates incentives for the Debtors to settle with the plaintiffs' representatives at whatever inflated number the plaintiffs demand (numbers the Debtors would never have agreed to prior to bankruptcy when they were footing the bill), and then attempt to offload the exposure on insurance companies and indemnitors; and

- J&J asserts that the Debtors have prioritized mitigation of potential claims against Imerys S.A. over management of liabilities and maximizing recoveries to other creditors and stakeholders of the Estates, which demonstrates a lack of good faith.

(d)    *Treatment of Talc Personal Injury Claims and the Trust Distribution Procedures*

J&J has also objected to the Disclosure Statement on grounds related to the proposed treatment of the Talc Personal Injury Claims. J&J believes that the current treatment of Talc Personal Injury Claims pursuant to the Trust Distribution Procedures modifies certain contractual arrangements and improperly forces J&J to defend Talc Personal Injury Claims.

In addition, J&J believes that the medical and exposure criteria set forth in the Trust Distribution Procedures are weaker than what would be required in the tort system, and therefore holders of stronger claims will have their recoveries diluted by allowing holders of weaker claims to collect on their claims under the Trust Distribution Procedures. Specifically, J&J asserts that claimants can recover under the Trust Distribution Procedures with no medical records and just a doctor's note providing a diagnosis. And for exposure evidence, J&J contends that claimants need only provide their own word that they were exposed to Debtors' talc. J&J argues that this is short of the type of evidence that would be needed to recover in the tort system, where a plaintiff must demonstrate both general and specific causation, *i.e.*, that the Debtors' talc can cause the claimants' injuries and that it actually did so in that specific case; where the claimant would need to show real proof of actual use of the product; pathology or medical records confirming the diagnosis; and where defendants would be entitled to (and incentivized to) cross-examine the doctor, the plaintiff, and any evidence of causation.

---

[97]    Should J&J prevail on any of these arguments, J&J believes that the Rio Tinto/Zurich Settlement and/or Cyprus Settlement may not be approved and/or incorporated into the Plan. If the Bankruptcy Court agrees with J&J over the opposition of each of the Plan Proponents and all other supporters of each of the Rio Tinto/Zurich Settlement and/or the Cyprus Settlement, then such settlement may fail.

US-DOCS\120811663.4

J&J also believes that the structure of the Talc Personal Injury Trust (specifically, the structure described in <u>Section 8.1(d)(5)</u> of this Disclosure Statement) is impermissible, as it suggests that J&J is to fully indemnify a Tort System Election Claimant in the tort system for 100% of the claim, while at the same time allowing that same claimant to obtain a lesser value from the Rio Tinto/Zurich Settlement fund in the Talc Personal Injury Trust, thus recovering greater than 100% on the claimants' single injury. J&J believes the same to be true regarding the Mixed Claimants—J&J asserts that the Debtors are impermissibly treating Mixed Claimants as having two claims with two recoveries, despite the fact that a single Mixed Claimant has a single injury. J&J asserts that this is not how tort recoveries are meant to operate. Instead, J&J argues that the tort system is predicated on the idea of making a tort victim "whole again," and it is impermissible for a plaintiff to obtain a double recovery for the same injury under multiple legal theories. J&J contends that this type of double recovery would not be available to the claimants outside of bankruptcy, and as such J&J maintains that it is not supportable inside of bankruptcy and that it is improper under United States Supreme Court precedent.

Moreover, J&J contends that the structure of the Talc Personal Injury Trust creates unreasonable hurdles and burdens for Indirect Claimants especially when compared against Direct Claimants. J&J asserts that Indirect Talc Personal Injury Claims should be heard and determined on the merits, and should not be narrowed through what J&J considers to be artificial limitations that have been created as part of this mechanism. Similarly J&J believes that Indirect Talc Personal Injury Claims should be presumptively valid where under applicable state law, an Indirect Claimant's claim against the Debtors would have survived dismissal absent the Debtors' bankruptcy and that the proposed offset or reduction for potential payments to Direct Claimants is inappropriate.

12.2    <u>Talc Personal Injury Claimants Represented by Arnold & Itkin</u>[98]

On November 18, 2020, Arnold & Itkin sent the Debtors comments and proposed additions to the *Disclosure Statement for Third Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 2235] (the "**Third Amended Disclosure Statement**"). Arnold & Itkin has requested that the statements contained in this <u>Section 12.2</u> be included in this Disclosure Statement.

Specifically, and as further described below, Arnold & Itkin, asserts that certain provisions of the Trust Distribution Procedures create the potential that some categories of Talc Personal Injury Claims will receive less favorable treatment than other categories of such Claims. According to Arnold & Itkin, counsel for certain Talc Personal Injury Claimants contend(s), among other things, that, as a result of these provisions, the Plan does not provide the "same treatment" of all Talc Personal Injury Claims in Class 4 whose holders have not agreed to less favorable treatment of their Claims, as required by section 1123(a)(4) of the Bankruptcy Code, and that, as a result, the Plan cannot be confirmed.

---

[98]    Capitalized terms used in this <u>Section 12.2</u> and not otherwise defined herein or in the Plan have the meanings ascribed to them in the Trust Distribution Procedures.

(a)    *Alleged Risk of Unequal Treatment of Talc Personal Injury Claims Resulting from the Sub-Division of the Trust Fund into Funds A, B, and C*

Arnold & Itkin contends that the Trust Distribution Procedures divide Claims in Class 4 into three categories – (i) Ovarian Cancer A Claims; (ii) Mesothelioma Claims; and (iii) Ovarian Cancer B, C, and D Claims – and allocates a fixed percentage of Trust assets to each of these three categories of claims, without reference to either the actual amount of the Allowed Claims in each claim category, or the proportion of the total amount of the Claims in Class 4 that is represented by the Allowed Claims in any claim category.  Arnold & Itkin asserts that this construct creates the risk that one or two of these categories of Claims may receive a percentage of the Trust Fund that is disproportionately high when compared to the percentage of the total Talc Personal Injury Claims represented by that Claim category, at the expense of another category of Claims that will receive a percentage of the Trust Fund that is disproportionately low when compared to the percentage of the total Talc Personal Injury Claims represented by that Claim category.

In addition, Arnold & Itkin notes that, Section 2.2 of the Trust Distribution Procedures provides that the "Trust Fund will be divided into three sub-funds within the Trust" and that "each Fund operates entirely separately and any changes to the administration of one Fund, such as changes to Medical/Exposure Criteria, Scheduled, Average or Maximum Values, Payment Percentage or Maximum Annual Payment, shall not affect or require changes to the other Funds."[99] Arnold & Itkin further notes that Mesothelioma Claimants and Secondary Mesothelioma Claimants will receive 40% of the Trust Fund (as will Ovarian Cancer A Claimants), regardless of the relative aggregate amount of the allowed claims against the Trust that such claimants ultimately hold.

As a result, Arnold & Itkin alleges that the claims that will be paid out of each of Fund A, Fund B, and Fund C may receive disparate treatment – *i.e.*, the claims payable out of the different Funds may receive different "Payment Percentages" on their claims, depending on the Fund making the distributions and the total claims allowed against that Fund.

Arnold & Itkin also notes that Section 4.2 of the Trust Distribution Procedures provides for future Fund-by-Fund adjustments in Payment Percentages.  As such, and according to Arnold & Itkin, disparities in treatment among claims to be paid from each of the three Funds could develop or become more pronounced.  Moreover, Arnold & Itkin notes that Section 2.9 provides that the Maximum Annual Payment for each Fund will be determined annually (and, presumably, separately, on a Fund-by-Fund basis), which, according to Arnold & Itkin, results in a risk of disparate treatment.

Arnold & Itkin contends that in considering the risk of non-pro-rata treatment resulting from the creation of Funds A, B and C and the fixed allocation of Trust assets among them, it should be noted that: (i) forty percent of the Trust assets will be allocated to Fund B, for Mesothelioma Claims and Secondary Mesothelioma Claims;  and (ii) historical information suggests that there may be approximately fifteen times as many Ovarian Cancer Claims as there are Mesothelioma Claims, which may suggest that an allocation of 40% of the Trust assets to holders of Mesothelioma Claims will result in such holders receiving a greater percentage of their

---

[99]    Trust Distribution Procedures, at § 2.2.

claims than holders of Ovarian Cancer Claims.  As to point (ii) Arnold & Itkin further asserts that: (x) approximately 16,500 lawsuits asserting Ovarian Cancer Claims have been filed since 2014, as compared to approximately 1,200 lawsuits asserting Mesothelioma Claims; and (y) as of the Petition Date, there were approximately 13,800 pending lawsuits asserting Ovarian Cancer Claims and approximately 850 pending lawsuits asserting Mesothelioma Claims against one or more of the North American Debtors.

(b)     *Alleged Risk of Less Favorable Treatment of Class 4 Talc Personal Injury Claims that are Liquidated by Money Judgments against the Trust, Rather than through Other Trust Procedures*

Arnold & Itkin also contends that any Class 4 claimant who exercises his or her right to file suit against the Trust to liquidate the claimant's claim judicially (and his or her right to a jury trial) faces a risk of less favorable treatment under the Trust Distribution Procedures than holders of Claims in Class 4 whose claims are not liquidated through judicial proceedings.  According to Arnold & Itkin, although Section 7.7 of the Trust Distribution Procedures provides for the payment of a "sequencing adjustment" on Talc Personal Injury Claims with respect to which the claimant has had to wait one year or more for payment (up to a maximum of seven years), "[n]o sequencing adjustment shall be available to or paid on any claim liquidated in the tort system pursuant to Section 5.8 above herein."[100]

Arnold & Itkin also asserts that following the liquidation of its claim in a judicial proceeding, the distribution to a holder of a Claim in Class 4 who obtains a judgment against the Trust will be subject to a delay of a type that is not applicable to a distribution on the claim of a claimant following the liquidation of its claim under any other Trust procedure.  According to Arnold & Itkin, (A) a holder of a Claim in Class 4 that obtains a money judgment against the Trust will receive from the Trust an initial payment of an amount equal to the greater of (i) the Trust's last offer to the claimant, or (ii) the award that the claimant declined in non-binding arbitration, not to exceed the amount of the judgment obtained in the tort system, and (B) the payment of any portion of the judgment that exceeds the greater of (i) or (ii) will be deferred, with such portion to be paid in five equal installments in years six through ten following the year of the initial payment. Thus, Arnold & Itkin contends that payment of some portion of a Claim in Class 4 that is judicially liquidated by a money judgment against the Trust may be delayed for years in a manner that is not applicable to any other Claim in Class 4 (and without any "sequencing adjustment" or other compensation for the delay).[101]

In addition, Arnold & Itkin asserts that regardless of the size of the judgment obtained by a holder of a Claim in Class 4 in a judicial proceeding, the Trust Distribution Procedures provide that the claimant cannot recover more from the Trust than the "Maximum Value" set forth in Section 5.2 of the Trust Distribution Procedures.  Arnold & Itkin alleges that this provision sets a ceiling on the allowed amount of every Talc Personal Injury Claim whose holder seeks judicial review, and disallows the amount of any claim in excess of the applicable "Maximum Value." Thus, Arnold & Itkin contends that the Trust Distribution Procedures impose a limit on the

---

[100]     *See id.* at § 7.7(b).

[101]     *See id.* at § 7.8.

maximum amount of a claim that will be allowed against the Trust, regardless of the amount of any money judgment obtained following judicial proceedings.  Arnold & Itkin further asserts that counsel for certain holders of Talc Personal Injury Claims has indicated that the legality of this limitation will be challenged, as will features of the Trust Distribution Procedures that allegedly result in less favorable treatment of Claims that are liquidated through judicial proceedings, rather than through other Trust procedures.

(c)    *Alleged Risk of Less Favorable Treatment of Holders of Indemnified Claims in Class 4*

Arnold & Itkin also contends that the Trust Distribution Procedures require a holder of a Claim in Class 4 who may have rights against J&J under the J&J Indemnities to forego such rights in order to receive the same "Scheduled Value," "Average Value," or "Maximum Value" as a holder of a Claim in Class 4 who does not have such rights against J&J; otherwise, the claimant that has and pursues rights against J&J under the J&J Indemnities will be accorded a lower Scheduled Value, Average Value or Maximum Value, as applicable (and a correspondingly lower distribution from the Trust), than a holder of a Non-Indemnified Claim in the same category (*i.e.*, Mesothelioma Claim or same category of Ovarian Cancer Claim) that is resolved through the same resolution process (*i.e.*, Expedited Review Process or Individual Review Process).  According to Arnold & Itkin, the holder of an Indemnified Claim will have to forego any right he or she may have against J&J under the J&J Indemnities in order to be accorded the same treatment of his or her claim against the Trust as the holder of a Claim in Class 4 who has no such additional rights.

Arnold & Itkin notes that the Trust Distribution Procedures distinguish between "Indemnified Claims" and "Non-Indemnified Claims."  According to Arnold & Itkin, the Trust Distribution Procedures then go on to require that the claimant that may have rights against J&J under the J&J Indemnities that other claimants do not have must forego those additional rights in order to receive the same Scheduled Value, Average Value, or Maximum Value, as applicable, as its counterpart that holds a Non-Indemnified Claim.  In particular, a holder of an Indemnified Claim must choose between holding a "Trust Election Claim" (and being a "**Trust Election Claimant**") and holding a "Tort System Election Claim" (and being a "**Tort System Election Claimant**").  A "Tort System Election Claimant" is defined as "the holder of an Indemnified Claim who elects to pursue such claim against one or more of the Debtors in the tort system . . . based on one or more of the J&J Indemnities."[102]  To qualify as a "Trust Election Claimant," the holder of an Indemnified Claim must elect "to seek recovery from the Trust in lieu of proceeding against the J&J Indemnities in the tort system."[103]  Arnold & Itkin asserts that the result of this mandatory election is that in order to receive the same Scheduled Value, Average Value or Maximum Value, as applicable, as the claimant with a Non-Indemnified Claim in the same category that is subject to the same resolution process, the holder of an Indemnified Claim must elect to become a "Trust Election Claimant," thereby foregoing the right to pursue indemnification under the J&J Indemnities – a right that its Non-Indemnified Claim holding counterpart does not have.[104]

---

[102]    *See id.* at § 1.2(97).

[103]    *See id.* at § 1.2(101).

[104]    *See id.* at § 2(a).

176

Arnold & Itkin contends that under the Scheduled Values for the Expedited Review Process under Section 5.2(a) of the Trust Distribution Procedures, an Ovarian Cancer A Claim whose holder participates in the Expedited Review Process and does not have an Indemnified Claim (*i.e.*, does not have a claim against J&J under the J&J Indemnities) will be allowed under the heading "Trust Election Claims and Non-Indemnified Claims" for $400,000.00.  However, the Ovarian Cancer A Claimant who does have a claim against J&J under the J&J Indemnities must forego the prosecution of that additional claim in order to receive the same $400,000 claim (and the same distribution from the Trust Fund); otherwise, that Ovarian Cancer A Claimant will receive the lower $140,000 Scheduled Value that would be allowed for a "Tort System Election Claim," and a correspondingly lower distribution from the Trust.

(d)    *Alleged Risk to Ovarian Cancer B, C, and D Claimants*

Furthermore, Arnold & Itkin points out that (i) Section 5.2(a)(iii) of the Trust Distribution Procedures provides that the Trustees, with the consent of the TAC and FCR can modify the Scheduled Values and/or Medical/Exposure Criteria for Ovarian Cancer A-D Claims and Mesothelioma Claims, except that in no event shall the Scheduled Value for Ovarian Cancer A or Mesothelioma Claims be reduced to an amount less than the Scheduled Value identified in the Trust Distribution Procedures and (ii) this exception to the power to amend the Trust Distribution Procedures to lower Scheduled Values does not apply to Ovarian Cancer B, C and D Claims. According to Arnold & Itkin, as a result, only the Scheduled Values for such claims are subject to being reduced by a subsequent amendment of the Trust Distribution Procedures.

In addition, Arnold & Itkin contends that the provisions of Section 7.1 of the Trust Distribution Procedures may result in the diversion of funds from Fund C – the sole source of distributions to holders of Ovarian Cancer B, C, and D claims under the Trust Distribution Procedures – to holders of Ovarian Cancer A Claimants against Fund A.  Arnold & Itkin asserts that this potential diversion results from the fact that, although the Trust Distribution Procedures provide that a Claimant cannot have a Claim in two of the Funds, it also provides that if the holder of a Claim asserted against Fund C later asserts a new claim for a higher level of Ovarian Cancer that is paid from Fund A, only the additional amount distributable to that Claimant in excess of the amount already received from Fund C is paid from Fund A, resulting in a portion of a Fund A claim effectively being paid from Fund C.

Arnold & Itkin also alleges that holders of Ovarian Cancer B, C and D claims also face the risk of unequal treatment as compared to the holders of Ovarian Cancer A Claims that results from the fixed allocation of 40% of the Trust assets to Fund A, for Ovarian Cancer A Claims, and only 20% of the Trust assets to Fund C, for Ovarian Cancer B, C and D Claims.

12.3    The Insurer Group[105]

On December 7, 2020, the Insurer Group[106] sent the Debtors comments and proposed additions to the Third Amended Disclosure Statement.  The Insurer Group has requested that the statements contained in this Section 12.3 be included in this Disclosure Statement.

The Insurer Group argues that the Disclosure Statement does not make certain disclosures that it contends are necessary before the Bankruptcy Court can approve the Disclosure Statement. In partial settlement of those objections, the Plan Proponents have agreed to include this Section 12.3 in the Disclosure Statement.  As noted above, the Plan Proponents do not necessarily agree with the statements set forth below.  The position of the Debtors and the other Plan Proponents with respect to many of the arguments and contentions made by the Insurer Group in this Section 12.3 are addressed in other sections of this Disclosure Statement.

(a)    *The Trust Distribution Procedures Allegedly Abandon the Debtors' Liability Defenses*

The Insurer Group contends that the Trust Distribution Procedures are structured in such a way that insurance coverage may not be available for any valid claim paid by the Talc Personal Injury Trust pursuant to the Trust Distribution Procedures, thereby reducing the amounts paid to holders of Claims in Class 4.

The Insurer Group points out that the Debtors vigorously and successfully defended the Talc Claims against them prior to filing the Bankruptcy Cases, and note that the Debtors' former chief financial officer has stated under oath in the Bankruptcy Cases that "Debtors believe this litigation is without merit and their strategy has consistently been to mount a vigorous defense to all such claims."[107]   The Insurer Group further notes that the Debtors continue to assert that position today, in that (i) the Debtors maintain that their talc is safe, that the Talc Personal Injury Claims are without medical or scientific merit, and that exposure to their talc products has not

---

[105]    Capitalized terms used in this Section 12.3 and not otherwise defined herein or in the Plan have the meanings ascribed to them in the Trust Distribution Procedures.

[106]    The Debtors believe the "**Insurer Group**" includes (i) Columbia Casualty Company, Continental Casualty Company, the Continental Insurance Company, as successor to CNA Casualty of California and as successor in interest to certain insurance policies issued by Harbor Insurance Company, Lamorak Insurance Company (formerly known as OneBeacon America Insurance Company), as successor to Employers' Surplus Lines Insurance Company, Stonewall Insurance Company (now known as Berkshire Hathaway Specialty Insurance Company), National Union Fire Insurance Company of Pittsburgh PA, and Lexington Insurance Company to the extent that they issued policies to Cyprus Mines Corporation prior to 1981; (ii) Century Indemnity Company, Federal Insurance Company, Central National Insurance Company of Omaha, TIG Insurance Company, International Surplus Lines Insurance Company, Mt. McKinley Insurance Company, Fairmont Premier Insurance Company, Everest Reinsurance Company, The North River Insurance Company, Providence Washington Insurance Company, and American Insurance Company; (iii) Employers Mutual Casualty Company; (iv) Hartford Accident and Indemnity Company and First State Insurance Company; and (v) Certain Underwriters at Lloyd's London and Certain London Market Insurers.

[107]    *See* First Day Declaration, at ¶ 31.

caused personal injuries, and (ii) the Debtors also contend that the safety of their talc has been confirmed by dozens of peer-reviewed studies and multiple regulatory and scientific bodies, including five of the largest real-world studies ever conducted.[108]

The Insurer Group observes that judges and juries frequently agreed with the Debtors' position, and note that the Debtors had significant prepetition success defending against Talc Personal Injury Claims in the tort system and no final, unappealable verdict has been issued against any Debtor in any lawsuit asserting talc related claims.  Specifically, as the Insurer Group notes, ITA "won outright three defense verdicts in its favor in jury trials in Missouri state court."[109]  In addition, the Insurer Group notes that in both an early federal case and a more recent state court case, the Debtors won summary judgment based on the "bulk supplier doctrine," which shields from liability a company that sells a raw material like talc that is later included in another company's finished product.[110]

The Insurer Group also observes that the Debtors have leaned heavily and successfully on causation defenses – both general causation (*e.g.*, there is no scientific evidence that talc is harmful) and specific causation (*e.g.*, the claimant did not use talc, or their injury is due to their exposure to asbestos for which some other company is responsible).  Further, the Insurer Group notes that the First Day Declaration discusses rulings by state courts in coordinated proceedings in New Jersey and California that the scientific evidence of talc as an alleged cause of ovarian cancer was insufficient to allow cases in those courts to proceed to trial against ITA.[111]

However, despite the Debtors' record of success in the tort system prepetition, the Insurer Group contends that the Trust Distribution Procedures do not appear to take into account, in any way, the Debtors' liability defenses.  According to the Insurer Group, there is, for example, no provision in the Trust Distribution Procedures that allows the Debtors or their insurers to assert

---

[108]    *See* Disclosure Statement, at § 4.1; *see also* First Day Declaration, at ¶ 37.

[109]    First Day Declaration, at ¶ 37.  The Insurer Group notes that the three cases are *Ristesund v. Johnson & Johnson*, 558 S.W.3d 77 (Mo. App. 2019) (the jury absolved Imerys of any liability, while finding J&J liable for $5 million in compensatory damages and $50 million in punitive damages), *Estate of Fox v. Johnson & Johnson*, 539 S.W.3d 48, 50 (Mo. App. 2017) (a jury held J&J liable for $10 million in compensatory damages and $62 million in punitive damages, but the jury found Imerys not liable), and *Swann v. Johnson & Johnson*, Case No. 1422-CC09326-01 (Mo. Cir. Ct. 2017) (a jury returned a defense verdict for both J&J and Imerys, rejecting plaintiff's claim that her 38 years' worth of daily J&J talcum powder use caused her ovarian cancer, and finding in favor of Imerys on negligence and misrepresentation by concealment claims).  *See also* Disclosure Statement, at § 5.8(f).

[110]    *Berg v. Johnson & Johnson, et al.*, Dkt. No. 196, Civ. No. 09-4179-KES (D.S.D. Mar. 25, 2013) (granting summary judgment to Debtors' predecessor Luzenac based on the bulk supplier doctrine); Trial Order, *Johnson & Johnson Talcum Powder Cases*, 2017 WL 4325960 (Cal. Super. Los Angeles Cty. Aug. 9, 2017).  *See also Artiglio v. General Electric Co.*, 61 Cal. App.4th 830 (1998) (discussing the bulk supplier doctrine under California law*); In re TMJ Implants Products Liability Litigation*, 97 F.3d 1050, 1057 (8th Cir. 1996) (also discussing the doctrine).

[111]    *See* First Day Declaration, at ¶ 37.  Certain members of the Insurer Group previously served Debtors with discovery designed to identify other liability defenses successfully asserted by Debtors prepetition.  The Debtors recently provided some documents in response to those requests, which the Insurer Group is reviewing.

liability defenses in response to Talc Personal Injury Claims. Rather, the Insurer Group contends that the Trust Distribution Procedures permit the Talc Personal Injury Trust to make payment to holders of Claims in Class 4 if they satisfy certain product exposure and medical criteria – without regard to whether the Debtors have viable defenses to liability for the person's claim. Moreover, the Insurer Group asserts that the Trust Distribution Procedures contain no meaningful exposure criteria and do not require claimants to list any other exposures they might have, effectively limiting any challenge to that aspect of a claim.

The Insurer Group alleges that the Trust Distribution Procedures' abandonment of the Debtors' viable liability defenses has important negative consequences for holders of Class 4 claims. Specifically the Insurer Group contends:

- First, by abandoning all of the liability defenses the Debtors successfully asserted in the tort system, the Plan significantly increases the "quantum of liability" that would be paid under the Trust Distribution Procedures. The Insurer Group asserts that this severely dilutes the recoveries of any claimants with valid claims, who might be forced to share limited assets with persons asserting invalid or more questionable claims.

- Second, it means that the Plan and the Trust Distribution Procedures may have created coverage defenses for their insurers and indemnitors, which could substantially reduce overall recoveries for holders of Direct Talc Personal Injury Claims. For example, insurance policies require insureds to cooperate in the defense of claims – but because unilateral abandonment of liability defenses is the antithesis of such cooperation, such abandonment creates new coverage defenses for insurers. If such coverage defenses are found meritorious, the Insurer Group contends that the Talc Personal Injury Trust's ability to recover insurance proceeds to assist in paying claims could be adversely affected, thereby reducing the amounts available to pay holders of Claims in Class 4.

- Third, the abandonment of liability defenses and the resulting increase in the quantum of liability at issue may give insurers viable confirmation objections, thus putting plan confirmation at risk.

(b)     *Potential Breach of the J&J Indemnification Obligations*

The Insurer Group also contends that J&J previously offered "to take over liability for, and thereby remove from the Debtors' bankruptcy estates, most of Debtors' liabilities – approximately 90% of the current and future claims against the Debtors."[112]  According to J&J, if the J&J Stay Motion had been granted, holders of Claims in Class 4 would "keep their day in court and be assured a *full recovery* of any judgment or settlement, backed by the credit of one of the world's largest companies, J&J," and "J&J would waive its claims against the Debtors *and* most of its defenses to indemnity."[113]  The Insurer Group contends that the Debtors rejected J&J's proposal,

---

[112]     J&J Reply, at ¶ 4.

[113]     *Id*. (emphasis in original).

and assert that the Trust Distribution Procedures purport to allow holders of Claims in Class 4 to elect to pursue claims against the "J&J Indemnities" in the tort system, in which event a successful claimant would not be subject to the caps on trust payments set forth in the Trust Distribution Procedures.  Because the Debtors rejected J&J's proposal, the Insurer Group notes that (i) J&J now contends that the Debtors have breached the J&J Indemnities, relieving J&J of any obligation to pay, and (ii) J&J contends that the Plan artificially increases J&J's liability and otherwise operates in a manner that relieves J&J of any indemnification obligation.  Thus, the Insurer Group asserts that even if a claimant were to obtain a judgment against the Debtors in the tort system, J&J has said that it will contest its purported indemnification obligation, leaving the judgment creditor without any recovery.

The Insurer Group asserts that if J&J is not obligated to pay under the J&J Indemnities because a court determines that the Debtors breached the J&J Indemnities, the Debtors and holders of Claim in Class 4 will not be able to turn to the Debtors' insurance for any recovery.  The Insurer Group contends that J&J's uncapped indemnification obligation is primary to the obligations of Debtors' insurers, and that if the Debtors, by rejecting J&J's offer (or otherwise), breached the J&J Indemnities, the insurers may now have a defense to coverage to the extent the Debtors' alleged breach jeopardized the insurers' subrogation rights against J&J.[114]  According to the Insurer Group, given that funding for the Talc Personal Injury Trust is largely dependent on the availability of insurance, any reduction in insurance availability may reduce the amounts available to pay holders with Claims in Class 4.

The Insurer Group also contends that the Trust Distribution Procedures do not specify who will defend Tort System Election Claims, and imply that J&J will defend all Tort System Election Claims.  According to the Insurer Group, J&J contends, however, that none of the underlying contracts impose such an obligation on J&J and that there has been no finding that J&J owes an indemnity.  The Insurer Group alleges that there is a risk that J&J may choose not to defend any or all of the Tort System Election Claims.  Further, the Insurer Group asserts that the Trust Distribution Procedures and the Plan do not require the Talc Personal Injury Trust, the Debtors, or the Debtors' insurers to defend such claims,[115] and that to the extent that Tort System Election Claimants opt to rely on the alleged J&J Indemnities, they risk having no recovery at all because the election precludes them from accessing trust assets, including the Debtors' insurance that the Plan purports to assign to the Talc Personal Injury Trust.

    (c)    *ITI as a Proper Debtor*

Because the Debtors are in the process of selling substantially all of their assets, meaning that they are liquidating rather than reorganizing, the Insurer Group asserts that the Debtors will not be entitled to a discharge under the Bankruptcy Code or a channeling injunction under section

---

[114]    *See generally Cyprus Historical Excess Insurers' Statement in Support, Objection to Debtors' Actions Impairing Rights of Subrogation, and Limited Objection to Johnson & Johnson Motion to Modify Stay [DKT. 1567]* [Docket No. 1802] (making the argument noted in the text).

[115]    Trust Distribution Procedures, at § 2.3(b); *see also id.* at § 2.3(c) ("J&J shall pay such final settlement reached with J&J or judgment entered in the tort system directly to such Tort System Election Claimant, and for the avoidance of doubt, none of the Trust, the Debtors or the Reorganized Debtors shall have any obligation to pay such settlement or judgment").

524(g) of the Bankruptcy Code.  The Insurer Group further contends that without a section 524(g) channeling injunction, it is likely that Imerys S.A., Rio Tinto, Zurich and any other persons or entities with whom the Debtors settle would not continue with their settlements.  According to the Insurer Group, in an attempt to address this problem, the Plan provides that if holders of Claims in Class 4 approve the Plan, another one of the Debtors' affiliates, ITI, will commence a chapter 11 case and purport to "reorganize."

The Insurer Group alleges that it appears, however, that ITI is not actually reorganizing. The Insurer Group notes that the Plan provides that (i) the legal, equitable, and contractual rights of the holders of Unsecured Claims against ITI (Class 3b) would be unaltered by the Plan; (ii) holders of Claims in Class 3b would not vote and they would be presumed to accept the Plan;[116] and (iii) all Equity Interests in ITI (Class 7) would be "reinstated and the legal, equitable, and contractual rights to which holders of Equity Interests in ITI are entitled shall remain unaltered to the extent necessary to implement the Plan."[117]  The Insurer Group contends that the Debtors acknowledge this in the Disclosure Statement, and state that "ITI's reorganization will have a minimal effect on ITI."[118]  Thus, the Insurer Group asserts that there appears to be no reason for ITI to file for bankruptcy.

The Insurer Group points out that the Debtors argue, however, that ITI would commence a Chapter 11 case so it can "address its talc-related liabilities."[119]  Notwithstanding, the Insurer Group asserts that ITI has not ever been held liable for any Talc Claims, nor has it ever entered into any settlement of any Talc Claims.  Rather, the Insurer Group notes that ITI's "talc-related liabilities" apparently consist of eight mesothelioma lawsuits filed by a single law firm, which agreed to dismiss (and did, in fact, dismiss) all eight suits "in light of the potential chapter 11 filing of ITI contemplated under the proposed plan."[120]  The Insurer Group also notes that it appears that ITI has never been sued for causing a plaintiff's ovarian cancer.

As a result of the foregoing, the Insurer Group contends that the Bankruptcy Court may not have statutory authority to issue a section 524(g) channeling injunction to the three existing liquidating North American Debtors and a fourth affiliated debtor (ITI) whose entire Talc Personal Injury Claim litigation history consists of just eight mesothelioma lawsuits, all of which were dismissed without payment, and whose "reorganization" consists merely of allowing the claimants who dismissed those eight lawsuits potentially to have access to a trust.  Because of these facts, the Insurer Group asserts that a section 524(g) channeling injunction may not be available to any of the Debtors, and objections to the Plan on the basis that it fails to satisfy the "good faith" requirement for confirmation under section 1129 of the Bankruptcy Code could be found to have merit.

---

[116]    Plan, at § 3.3.4.

[117]    Plan, at § 3.3.9.

[118]    Disclosure Statement, at § 5.10.

[119]    *See* Third Amended Disclosure Statement, at § 5.11(a).

[120]    *Id*. at § 4.1(a).

US-DOCS\120811663.4

According to the Insurer Group, if ITI is not eligible to be a debtor, then it appears that the Bankruptcy Court would not be able to issue any channeling injunction under section 524(g) of the Bankruptcy Code, which would preclude confirmation of the Plan.

    (d)    *Alleged Inadequacy of the "Insurance Neutrality" Provisions*

Although the Plan Proponents contend that the Plan is "insurance neutral," the Insurer Group disagrees.  Instead, the Insurer Group asserts that the Plan does not protect the insurers' contractual rights and threatens to increase insurers' obligation significantly (or vitiate coverage).[121]

The Insurer Group contends that the Trust Distribution Procedures will almost certainly result in "the quantum of liability that the insurers would be called upon to absorb" being greatly increased, because the Trust Distribution Procedures do not recognize liability defenses that the Debtors successfully asserted in the tort system prepetition and do not contain any meaningful exposure criteria.  Moreover, the Insurer Group contends that the Trust Distribution Procedures create an incentive for claimants to file "Mixed Claims" that are likely to lead to double recoveries or inflated recoveries.  The Insurer Group asserts that under the Trust Distribution Procedures, the Talc Personal Injury Trust would pay claims that would not be paid in the tort system or would pay greater amounts than would be paid in the tort system, increasing the amount of liability the insurers would be called upon to absorb.  Accordingly, under the analysis of the Third Circuit in *GIT*, the Insurer Group asserts that the Plan is not insurance neutral.

The Insurer Group also contends that the Plan directly threatens insurers' subrogation rights since J&J has taken the position that the Debtors' actions have vitiated any contractual indemnity obligation that J&J might have.  In addition, the Insurer Group asserts that the Plan purports to preempt insurers' state law rights and assign their policies to the Talc Personal Injury Trust even though the Insurer Group alleges there is significant doubt that the Debtors have rights to some of the Insurer Group's policies.

Further, the Insurer Group contends that rather than affirming insurance neutrality, the Plan provides that "[n]othing in . . . <u>Section 11.4.1</u> of the Plan is intended or shall be construed to preclude otherwise applicable principles of res judicata or collateral estoppel from being applied against any Talc Insurance Company with respect to any issue that is actually litigated by such Talc Insurance Company as part of its objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by such Talc Insurance Company in conjunction with or related to Confirmation of the Plan.  Plan objections that are withdrawn prior to the conclusion of the Confirmation Hearing shall be deemed not to have been actually

---

[121]    According to the Insurer Group, as the U.S. Court of Appeals for the Third Circuit explained in its *GIT* decision, "insurance neutrality" "is a meaningful concept where . . . a plan does not materially alter the quantum of liability that the insurers would be called upon to absorb." *In re Global Industrial Technologies, Inc.*, 645 F.3d 201, 204, 212 (3d Cir. 2011).  But where a plan would increase the liability exposure the insurers are asked to pay, "it cannot fairly be said that the . . . plan is 'insurance neutral,'" even if "the Plan provided that nothing therein or in Plan-related documents or in the Bankruptcy Court's confirmation order would preclude those insurers from asserting any rights or defenses under the policies, except those related to 'anti-assignment provisions.'" *Id*. at 206, 212.

litigated."[122]    The Insurer Group asserts that this language directly threatens collateral consequences to the insurers if they raise confirmation objections to the Plan, providing an exception that swallows the rule of the Plan's purported neutrality language.

Because the Plan is not insurance neutral (according to the Insurer Group), the Insurer Group contends there is a material risk that confirmation will be denied or, alternatively, that if the Plan is confirmed, the lack of insurance neutrality will relieve the insurers of any obligations they otherwise might have under their policies, thereby reducing the funds available to pay holders of Claims in Class 4.

12.4    Travelers Casualty and Surety Company

On December 9, 2020, Travelers Casualty and Surety Company (f/k/a The Aetna Casualty and Surety Company) ("**Travelers**") sent the Debtors comments and proposed additions to the Third Amended Disclosure Statement.  Travelers has requested that the statements contained in this Section 12.4 be included in this Disclosure Statement.

Travelers contends that the Disclosure Statement is vague regarding the treatment of Indirect Talc Personal Injury Claims under the Plan and that it does not describe how the Trust Distribution Procedures operate with respect to Indirect Talc Personal Injury Claims.  Travelers further contends that the Trust Distribution Procedures do not clarify the rights of holders of Indirect Talc Personal Injury Claims and are silent regarding what a holder of an Indirect Talc Personal Injury Claim, such as Travelers, must do to recover on its claim.

Travelers also contends that the Disclosure Statement fails to specify whether insurance policies issued or allegedly issued to J&J (the "**J&J Policies**"), including the J&J Policies, constitute Talc Insurance Policies (as defined in the Plan) and that without knowing whether the J&J Policies are Talc Insurance Policies, Travelers cannot determine whether it falls within the definition of Talc Insurance Company with respect to the J&J Policies.  Travelers further contends that the Disclosure Statement fails to disclose that policies allegedly issued to J&J are the subject of active coverage litigation in New Jersey state court and that creditors cannot adequately assess the financial resources that may be available to the proposed Talc Personal Injury Trust because the Disclosure Statement overstates the Debtors' probability of accessing J&J's insurance policies, the availability of which may be substantially reduced by insurers' meritorious coverage defenses.

Travelers also contends that it cannot assess whether the J&J Policies are subject to the purported insurance neutrality provisions of the Plan, including whether such neutrality applies to the pending New Jersey coverage action and further that the Disclosure Statement does not reconcile the Plan's purported protection of the rights of Talc Insurance Companies with the Plan's restriction on any right to contest the Plan or any Plan Documents.

Travelers further contends that: (i) the Plan as described cannot be confirmed because it does not comply with sections 105(a) and 524(g) of the Bankruptcy Code; (ii) that the Disclosure Statement does not explain why a section 524(g) trust is needed or how the requirements can be met when only a small fraction of the Talc Personal Injury Claims allege injury caused by asbestos

---

[122]    Plan, at § 11.4.1.4.

in talc; (iii) that the Disclosure Statement does not explain the risk that the Talc Personal Injury Trust may not properly value claims or treat similar claims in substantially the same manner; and (iv) that the Disclosure Statement fails to disclose that insurance may not be available to pay claims channeled to the Talc Personal Injury Trust.

# ARTICLE XIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, alternatives to the Plan include: (a) continuation in chapter 11 and formulation of an alternative plan or plans of reorganization, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Each of these possibilities is discussed in turn below.

### 13.1    Alternative Plan of Reorganization

The Plan is the product of extensive negotiations among the Plan Proponents, and reflects a balance of the respective interests held by the parties. If the Plan is not confirmed, the Debtors or any other party in interest (upon the expiration of the Debtors' exclusivity period) could attempt to formulate a different plan of reorganization. During the negotiations prior to the filing of the Plan, however, the Plan Proponents explored various alternatives to the Plan and believe that the Plan enables the Reorganized Debtors to emerge from the Chapter 11 Cases more successfully and expeditiously than any alternative plan, while preserving and maximizing the Debtors' assets, and allowing claimants of the Debtors to realize the highest recoveries under the circumstances.

### 13.2    Liquidation under Chapter 7

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In chapter 7, a trustee would be appointed to promptly liquidate the assets of the Debtors.

As described above in the Liquidation Analysis, the Plan Proponents believe that a liquidation under chapter 7 would result in a substantial diminution in the value of the Debtors' Estates. The Debtors further believe that it is likely that distributions in a chapter 7 liquidation would not occur for a substantial time, primarily due to, among other things, the time required to liquidate the Debtors' insurance-related assets.

# ARTICLE XIV.

## CERTAIN TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences expected to result from the consummation of the Plan. This discussion is only for general information purposes and only describes the expected tax consequences to holders of Talc Personal Injury Claims. It is not a complete analysis of all potential federal income tax consequences and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws. This discussion is based on the Internal Revenue Code of 1986, as amended (the "**IRC**" or "**Tax Code**"), Treasury Regulations promulgated thereunder, judicial decisions, and

published rulings and administrative pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date of this Disclosure Statement. These authorities may change, possibly retroactively, resulting in federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This discussion does not address all federal income tax considerations that may be relevant to a particular holder in light of that holder's particular circumstances. In addition, it does not address considerations relevant to holders subject to special rules under the federal income tax laws, such as holders subject to the alternative minimum tax, holders who utilize installment method reporting with respect to their Claims, non-U.S. holders and U.S. holders who have a functional currency other than the U.S. dollar. This discussion also does not address the U.S. federal income tax consequences to holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan. Additionally, this discussion does not address any consideration being received other than in a person's capacity as a holder of a Claim. Moreover, this discussion does not address the tax treatment of the Reorganized Debtors given that (a) the Reorganized North American Debtors will have limited operations after the Effective Date, (b) all items of federal income, gain, loss, and deduction of ITA and ITV arising on the Effective Date should generally be includible on the tax return of Imerys USA, and (c) the operations of ITI will be largely unaffected by the Chapter 11 Cases. In addition, the tax treatment of the Reorganized Debtors should have no impact on holders of Talc Personal Injury Claims.

**Holders should consult their own tax advisors regarding the U.S. federal income tax consequences to them of the consummation of the Plan and the receipt of amounts from the Talc Personal Injury Trust, as well as any tax consequences arising under any state, local or foreign tax laws, or any other federal tax laws. The Debtors and the Reorganized Debtors shall not be liable to any person with respect to the tax liability of a holder or its Affiliates.**

14.1    Treatment of the Talc Personal Injury Trust

It is anticipated that the Talc Personal Injury Trust will be a "qualified settlement fund" within the meaning of the Treasury Regulations promulgated under Section 468B of the Tax Code. Such Treasury Regulations provide that a fund, account, or trust will be a qualified settlement fund if three conditions are met. First, the fund, account, or trust must be established pursuant to an order of or be approved by a government authority, including a court, and must be subject to the continuing jurisdiction of that government authority. A court order giving preliminary approval to a fund, account, or trust will satisfy this requirement even though the order is subject to review or revision. Second, the fund, account, or trust must be established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability arising, among other things, out of a tort. Third, the fund, account, or trust must be a trust under applicable state law or have its assets physically segregated from the other assets of the transferor and persons related to the transferor. The Talc Personal Injury Trust has been established with the express purpose of satisfying the requirements of a qualified settlement fund and will be treated as

a separate taxable entity. Its modified gross income will generally be subject to U.S. federal income tax at the highest rate applicable to estates and trusts (currently 37%). For purposes of determining the Talc Personal Injury Trust's modified gross income, payments to the Talc Personal Injury Trust and payments from the Talc Personal Injury Trust to holders of Talc Personal Injury Claims in settlement of their Claims will not be taken into account.

14.2    <u>Tax Consequences to Holders of Talc Personal Injury Claims</u>

The tax consequences of payments received by holders of Talc Personal Injury Claims will depend on the individual nature of each such Claim and the particular circumstances and facts applicable to such holder at the time each such payment is made. To the extent that payments from the Talc Personal Injury Trust to holders of Talc Personal Injury Claims constitute damages received by such holders on account of physical injuries or physical sickness, such payments should not constitute gross income to such recipients under Section 104 of the Tax Code, except to the extent that such payments are attributable to medical expense deductions allowed under Section 213 of the Tax Code for a prior taxable year. To the extent that any payments from the Talc Personal Injury Trust to holders of Talc Personal Injury Claims constitute damages received by such holders on account of claims other than physical injuries (such as lost wages) or received as interest (or any other amounts not excludable from income under Section 104 of the Tax Code), such payments will be includible in gross income to such holders.

All distributions to holders of Talc Personal Injury Claims under the Plan are subject to any applicable withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate. Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("**<u>TIN</u>**"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**The foregoing is intended to be a summary only and not a substitute for careful tax planning with a tax advisor. The federal, state, local and foreign income tax consequences of the Plan are complex and, in some cases, uncertain. Such consequences also may vary based on the individual circumstances of each holder of a Talc Personal Injury Claim. Accordingly, each holder of a Claim is strongly urged to consult with its, his, or her own tax advisor regarding the federal, state, local, and foreign income tax consequences of the Plan.**

**Furthermore, any U.S. federal tax discussion contained in this Disclosure Statement, the Plan and any Plan Documents, and any exhibits or attachments to any such documents, was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such taxpayer by the Internal Revenue Service.**

## ARTICLE XV.

## CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that the Plan is in the best interests of all holders of Claims and urge all holders of Impaired Claims in Class 4 entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they **WILL BE** actually received on or before 4 p.m. (Prevailing Eastern Time), on March 25, 2021.

*[Remainder of page left intentionally blank]*

US-DOCS\120811663.4

Dated: January 27, 2021
      Wilmington, Delaware

**IMERYS TALC AMERICA, INC.**
(On behalf of itself and each of the Debtors)

*/s/* Ryan Van Meter
Ryan Van Meter
Secretary of Imerys Talc America, Inc., Imerys Talc
Vermont, Inc. and Imerys Talc Canada Inc.

**TORT CLAIMANTS' COMMITTEE**

*/s/* Maura Kolb, Esq. of The Lanier Law Firm
As attorney for Robin Alander,
a member of the Official Committee of Tort Claimants

*/s/* Steven T. Baron, Esq. of Baron & Budd, P.C.
As attorney for Lloyd Fadem,
as representative of the estate of Margaret Ferrell,
a member of the Official Committee of Tort Claimants

*/s/* Ted Meadows, Esq. of Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.
As attorney for Deborah Giannecchini,
a member of the Official Committee of Tort Claimants

**FUTURE CLAIMANTS' REPRESENTATIVE**

*/s/* James L. Patton, Jr., Esq.
James L. Patton Jr.
Legal Representative for Future Talc Personal Injury
Claimants

**IMERYS S.A.**
(On behalf of itself and each of the Imerys Plan
Proponents)

*/s/* Frédérique Berthier-Raymond
Frédérique Berthier-Raymond
Group General Counsel & Company Secretary of
Imerys S.A.

189

## COUNSEL FOR THE PLAN PROPONENTS

**COUNSEL FOR THE DEBTORS:**

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins, Esq.
Michael J. Merchant, Esq.
Amanda R. Steele, Esq.
Brett M. Haywood, Esq.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
E-mail: collins@rlf.com
merchant@rlf.com
steele@rlf.com
haywood@rlf.com

LATHAM & WATKINS LLP
Jeffrey E. Bjork, Esq.
Kimberly A. Posin, Esq.
Helena G. Tseregounis, Esq.
Shawn P. Hansen, Esq.
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
E-mail: jeff.bjork@lw.com
kim.posin@lw.com
helena.tseregounis@lw.com
shawn.hansen@lw.com

- and -

Richard A. Levy, Esq.
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
E-mail: richard.levy@lw.com

**COUNSEL FOR THE TORT
CLAIMANTS' COMMITTEE:**

ROBINSON & COLE LLP
Natalie D. Ramsey, Esq.
Mark A. Fink, Esq.
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
E-mail: nramsey@rc.com
mfink@rc.com

- and -

Michael R. Enright, Esq.
280 Trumbull Street
Hartford, Connecticut 06103
Telephone: (860) 275-8290
Facsimile: (860) 275-8299

**COUNSEL FOR THE FCR:**

YOUNG CONAWAY STARGATT &
TAYLOR LLP
Robert S. Brady, Esq.
Edwin J. Harron, Esq.
Sharon M. Zieg, Esq.
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
E-mail: rbrady@ycst.com
eharron@ycst.com
szieg@ycst.com

E-mail: menright@rc.com

**COUNSEL FOR THE IMERYS PLAN PROPONENTS:**

HUGHES HUBBARD & REED LLP
Christopher Kiplok, Esq.
Dustin P. Smith, Esq.
Erin Diers, Esq.
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
E-mail: christopher.kiplok@hugheshubbard.com
        dustin.smith@hugheshubbard.com
        erin.diers@hugheshubbard.com

US-DOCS\120811663.4