## EXHIBIT A

**The Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| IMERYS TALC AMERICA, INC., *et al.*,[1] | : | Case No. 19-10289 (LSS) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

---------------------------------------------------------- :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| IMERYS TALC ITALY S.P.A.,[2] | : | Case No. [Not yet filed] |
| | : | |
| Potential Debtor. | : | [Joint Administration To Be Requested] |
| | : | |

---------------------------------------------------------- x

## NINTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF IMERYS TALC AMERICA, INC. AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

THIS SOLICITATION IS BEING CONDUCTED NOT ONLY FOR THE DEBTORS IN THESE CHAPTER 11 CASES, BUT ALSO FOR IMERYS TALC ITALY S.P.A.  NO CHAPTER 11 CASE HAS BEEN COMMENCED AT THIS TIME FOR IMERYS TALC ITALY S.P.A.  THE DISCLOSURE STATEMENT AND SOLICITATION MATERIALS ACCOMPANYING THIS JOINT CHAPTER 11 PLAN HAVE NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT FOR IMERYS TALC ITALY S.P.A.  IF THE REQUISITE NUMBER OF ACCEPTANCES BY HOLDERS OF CLAIMS IN CLASS 4 ARE RECEIVED, IMERYS TALC ITALY S.P.A. WILL COMMENCE A CHAPTER 11 CASE.  FOLLOWING THE COMMENCEMENT OF SUCH A CASE AND ENTRY OF AN ORDER FOR JOINT ADMINISTRATION, IMERYS TALC ITALY S.P.A. WILL SEEK TO HAVE THE DISCLOSURE STATEMENT ORDER MADE APPLICABLE TO IT AND THE CONFIRMATION HEARING ON THIS JOINT CHAPTER 11 PLAN WILL APPLY TO IMERYS TALC ITALY S.P.A.

EVEN THOUGH A CHAPTER 11 CASE HAS NOT BEEN COMMENCED FOR IMERYS TALC ITALY S.P.A., THIS JOINT CHAPTER 11 PLAN IS DRAFTED TO ACCOUNT FOR SUCH A FILING FOR EASE OF READING.  TO THE EXTENT THAT THE REQUISITE ACCEPTANCES ARE NOT RECEIVED OR IT IS OTHERWISE DETERMINED THAT A CHAPTER 11 FILING IS NOT NECESSARY, ANY REFERENCE TO

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050) and Imerys Talc Canada Inc. (6748).  The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

[2]    This solicitation is also being conducted by Imerys Talc Italy S.p.A. pursuant to sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018.  **If the Plan is accepted by the requisite number of claimants in Class 4, Imerys Talc Italy S.p.A. will commence a bankruptcy case that will be, pending entry of an order by the Bankruptcy Court, jointly administered under Case No. 19-10289 (LSS).**  Imerys Talc Italy S.p.A.'s address is Via Nazionale 121 Porte, 10060 Turin, Italy.

THE CHAPTER 11 CASE OF IMERYS TALC ITALY S.P.A. WILL BE STRICKEN.   THE PLAN PROPONENTS RESERVE THE RIGHT TO AMEND, SUPPLEMENT OR OTHERWISE MODIFY THIS JOINT CHAPTER 11 PLAN PRIOR TO OR DURING THE CONFIRMATION HEARING TO THE EXTENT ALLOWED BY THE BANKRUPTCY CODE AND THE BANKRUPTCY RULES AND IN ACCORDANCE WITH THE TERMS OF THE PLAN.

THE PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF AN INJUNCTION PURSUANT TO SECTIONS 105(a) AND 524(g) OF THE BANKRUPTCY CODE THAT CHANNELS ALL CLASS 4 TALC PERSONAL INJURY CLAIMS AGAINST THE DEBTORS AND THE PROTECTED PARTIES (AS DEFINED HEREIN) TO A TRUST, AS WELL AS OTHER INJUNCTIONS DESCRIBED IN ARTICLE XII OF THE PLAN.

US-DOCS\120811676.4

# CONTENTS

**Page**

ARTICLE I DEFINITIONS AND RULES OF INTERPRETATION ............................................1

    1.1    Capitalized Terms ..........................................................................................1
    1.2    Interpretation; Application of Definitions; Rules of Construction; and Computation of Time..............................................................................33
    1.3    Exhibits .......................................................................................................34
    1.4    Ancillary Documents ...................................................................................34

ARTICLE II TREATMENT OF ADMINISTRATIVE CLAIMS, FEE CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS .....................................34

    2.1    Administrative Claims .................................................................................34
    2.2    Allowed Priority Tax Claims .......................................................................35
    2.3    Fee Claims ...................................................................................................35
    2.4    DIP Facility Claims......................................................................................36

ARTICLE III TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS ...........36

    3.1    Grouping of the Debtors for Convenience ..................................................36
    3.2    Claims and Equity Interests Classified .......................................................36
    3.3    Treatment and Classification of Claims and Equity Interests.....................37
    3.4    Debtors' Rights with Respect to Unimpaired Claims..................................41

ARTICLE IV THE TALC PERSONAL INJURY TRUST.........................................................41

    4.1    Establishment of the Talc Personal Injury Trust.........................................41
    4.2    Purpose and Trust Distribution Procedures .................................................41
    4.3    Selection of the Initial Talc Trustees ...........................................................41
    4.4    Advising the Talc Personal Injury Trust .....................................................42
    4.5    Transfer of Claims and Demands to the Talc Personal Injury Trust ...........42
    4.6    Transfer of Talc Personal Injury Trust Assets to the Talc Personal Injury Trust ................................................................................................43
    4.7    Talc Personal Injury Trust Expenses ..........................................................44
    4.8    Excess Talc Personal Injury Trust Assets ...................................................44
    4.9    Dissolution of the Talc Personal Injury Trust.............................................44
    4.10    Funds and Investment Guidelines ...............................................................44
    4.11    Cooperation Agreement ...............................................................................44
    4.12    Talc Personal Injury Trust Indemnification of the Protected Parties...........45
    4.13    Post-Effective Date Liabilities.....................................................................45

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................................................................................45

    5.1    General Treatment .......................................................................................45

i

5.2    Claims Based on Rejection of Executory Contracts or Unexpired Leases ...........46
5.3    Cure of Defaults for Executory Contracts and Unexpired Leases ........................47
5.4    Modifications, Amendments, Supplements, Restatements or Other Agreement ...........................................................................................................49
5.5    Reservation of Rights ...........................................................................................49
5.6    Talc Insurance Policies and Talc Insurance CIP Agreements ...............................49
5.7    Non-Talc Insurance Policies .................................................................................49

ARTICLE VI DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF CLAIMS .............50

6.1    Distributions .......................................................................................................50
6.2    Timing and Calculation of Amounts to be Distributed.........................................50
6.3    Disbursing Agent .................................................................................................50
6.4    Rights and Powers of Disbursing Agent ...............................................................50
6.5    Distributions on Account of Claims Allowed After the Effective Date .................51
6.6    Delivery of Distributions and Undeliverable or Unclaimed Distributions ............51
6.7    Time Bar to Cash Payments .................................................................................52
6.8    Disbursing Agent's Obligation to Provide Periodic Reporting .............................52
6.9    Record Date for Holders of Claims ......................................................................52
6.10   Compliance with Tax Requirements and Allocations ...........................................53
6.11   Transfers of Claims .............................................................................................53
6.12   Interest on Impaired and Disputed Claims ............................................................53
6.13   Setoffs .................................................................................................................53

ARTICLE VII RESOLUTION OF DISPUTED CLAIMS OTHER THAN  TALC PERSONAL INJURY CLAIMS .......................................................................54

7.1    Disputed Claims ..................................................................................................54
7.2    Prosecution of Claims Generally .........................................................................54
7.3    Prosecution of Disputed North American Debtor Claims and Claims Objection Deadline .......................................................................................54
7.4    ITI Claims ...........................................................................................................55
7.5    Distributions on Account of Disputed Claims ......................................................55
7.6    No Distributions Pending Allowance ...................................................................55
7.7    Estimation of Claims ...........................................................................................55
7.8    Disputed Claims Reserve for the North American Debtors....................................56
7.9    Disputed ITI Claims ............................................................................................57
7.10   Distribution of Excess Amounts in the Disputed Claims Reserve for the North American Debtors .....................................................................................57

ARTICLE VIII ACCEPTANCE OR REJECTION OF PLAN ...................................................57

8.1    Classes Entitled to Vote .......................................................................................57
8.2    Acceptance of Holders of Talc Personal Injury Claims.........................................57
8.3    Acceptance by Unimpaired Class .........................................................................57
8.4    Acceptance by Impaired Class ..............................................................................57

ii

ARTICLE IX CONDITIONS PRECEDENT TO CONFIRMATION  AND
CONSUMMATION OF THE PLAN ................................................................57

9.1      Conditions Precedent to the Confirmation of the Plan .........................................57
9.2      Conditions Precedent to the Effective Date of the Plan........................................61
9.3      Waiver of Conditions Precedent ...........................................................................62
9.4      Notice of Effective Date ........................................................................................62

ARTICLE X MEANS FOR IMPLEMENTATION OF THE PLAN ...........................................62

10.1     General...................................................................................................................62
10.2     Operations of the Debtors Between Confirmation and the Effective Date............62
10.3     Charter and Bylaws................................................................................................62
10.4     Corporate Action....................................................................................................63
10.5     Surrender of Existing Equity Interests ..................................................................63
10.6     Post-Effective Date Governance, Continued Existence of the Reorganized
         North American Debtors, and the Reorganized North American Debtor
         Stock ......................................................................................................................63
10.7     Post-Effective Date Governance and Continued Existence of Reorganized
         ITI. .........................................................................................................................64
10.8     Imerys Settlement ..................................................................................................64
10.9     Rio Tinto/Zurich Settlement ..................................................................................67
10.10    Cyprus Settlement ..................................................................................................70
10.11    Good Faith Compromise and Settlement................................................................76
10.12    Resolution of Talc Personal Injury Claims............................................................76
10.13    Sources of Consideration for Plan Distributions ...................................................76
10.14    Transfer of Remaining North American Debtors' Assets to the Talc
         Personal Injury Trust..............................................................................................77
10.15    Modification of the Plan ........................................................................................77
10.16    Revocation or Withdrawal of the Plan...................................................................78
10.17    Certain Technical Modifications............................................................................78

ARTICLE XI EFFECT OF CONFIRMATION .........................................................................78

11.1     Preservation of Certain Estate Causes of Action ..................................................78
11.2     Preservation of Talc Personal Injury Trust Causes of Action...............................79
11.3     Talc Insurance Actions ..........................................................................................79
11.4     Insurance Provisions ..............................................................................................80
11.5     J&J Indemnification Rights and Obligations.........................................................81
11.6     Institution and Maintenance of Legal and Other Proceedings..............................82
11.7     Terms of Injunctions and Automatic Stay .............................................................83
11.8     The FCR and the Tort Claimants' Committee........................................................83

ARTICLE XII RELEASES, INJUNCTION AND EXCULPATION .........................................84

12.1     Discharge and Injunctions......................................................................................84
12.2     Releases..................................................................................................................85

iii

12.3     The Channeling Injunction and the Insurance Entity Injunction ..........................88
12.4     Supplemental Settlement Injunction Order ................................................92
12.5     Reservation of Rights ....................................................................93
12.6     Disallowed Claims and Disallowed Equity Interests ...........................................93
12.7     Exculpation ............................................................................94
12.8     No Successor Liability ...................................................................94
12.9     Corporate Indemnities ..................................................................94
12.10    ERISA Pension Plans ...................................................................95

ARTICLE XIII JURISDICTION OF BANKRUPTCY COURT ..............................................96

13.1     Jurisdiction ............................................................................96
13.2     General Retention .......................................................................96
13.3     Specific Purposes .......................................................................96
13.4     District Court Jurisdiction ................................................................99
13.5     Reservation of Rights ....................................................................99
13.6     Compromises of Controversies ..........................................................99

ARTICLE XIV MISCELLANEOUS PROVISIONS ..........................................................99

14.1     Closing of Chapter 11 Cases .............................................................99
14.2     Timing of Distributions or Actions ........................................................99
14.3     Governing Law .........................................................................99
14.4     Entire Agreement ......................................................................100
14.5     Headings ...............................................................................100
14.6     Severability ............................................................................100
14.7     Notices ................................................................................100
14.8     Notice to Other Entities .................................................................102
14.9     Plan Supplement .......................................................................102
14.10    Inconsistencies .........................................................................102
14.11    Withholding of Taxes ...................................................................102
14.12    Transfer Taxes .........................................................................102
14.13    Binding Effect .........................................................................103
14.14    Payment of Statutory Fees ...............................................................103
14.15    Duty to Cooperate ......................................................................103
14.16    Effective Date Actions Simultaneous ......................................................103
14.17    Consent to Jurisdiction ..................................................................103

iv

## <u>EXHIBITS AND SCHEDULES TO PLAN</u>

Exhibit A        Trust Distribution Procedures

Exhibit B        Talc Personal Injury Trust Agreement

Exhibit C        Rio Tinto/Zurich Settlement Agreement

Exhibit D        Cyprus Settlement Agreement

Schedule I        Imerys Corporate Parties

Schedule II        Imerys Plan Proponents

Schedule III        Rio Tinto Captive Insurer Policies

Schedule IV        Rio Tinto Corporate Parties

Schedule V        Zurich Corporate Parties

Schedule VI        Zurich Policies

Schedule VII        Cyprus Corporate Parties

Schedule VIII        Cyprus Talc Insurance Policies

US-DOCS\120811676.4

**INTRODUCTION**

Imerys Talc America, Inc. and its affiliated debtors and debtors-in-possession in the above captioned Chapter 11 Cases respectfully propose the following joint chapter 11 plan of reorganization.  Imerys Talc Italy S.p.A. proposes this joint chapter 11 plan as a prepackaged plan and if the requisite acceptances from holders of Claims in Class 4 are received, then Imerys Talc Italy S.p.A. will commence a chapter 11 case to implement the Plan.  Unless otherwise indicated, capitalized terms shall have the meanings ascribed to them in <u>Section 1.1</u> of the Plan.

Nothing in the Plan Documents constitutes an admission by the Debtors as to the existence, merits, or amount of the Debtors' actual present or future liability on account of any Claim or demand (including, but not limited to, any Talc Personal Injury Demand) except to the extent that such liability is specifically provided for in the Plan or the other Plan Documents in accordance with the Confirmation Order effective as of the Effective Date.

The Plan Proponents hereby jointly propose the following Plan pursuant to the provisions of chapter 11 of Title 11 of the United States Code for the Debtors in the Chapter 11 Cases and any laws applicable to the solicitation of votes on the Plan by Imerys Talc Italy S.p.A.  Reference is made to the Disclosure Statement distributed contemporaneously herewith for, among other things, a discussion of the history, businesses, properties, and results of operations of the Debtors, projections for future operations, settlements contained in the Plan, and risks associated with the Plan.  The Disclosure Statement also provides a summary of the Plan.  YOU ARE URGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN WITH CARE IN EVALUATING HOW THE PLAN WILL AFFECT YOUR CLAIM(S) BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I**
**DEFINITIONS AND RULES OF INTERPRETATION**

1.1     <u>Capitalized Terms</u>.  The capitalized terms used herein have the respective meanings set forth below.  Any term that is not otherwise defined in this <u>Section 1.1</u> of the Plan, but that is defined elsewhere in the Plan or in the Bankruptcy Code or Bankruptcy Rules, shall have the meaning given to that term in the Plan, the Bankruptcy Code, or Bankruptcy Rules, as applicable.

1.1.1     "**Additional Contribution**" is defined in accordance with <u>Section 10.8.2.4</u> of the Plan.

1.1.2     "**Administrative Claim**" means any Claim for any cost or expense of administration of the Chapter 11 Cases under section 503(b) of the Bankruptcy Code, other than a DIP Facility Claim, including, but not limited to, (1) any actual and necessary post-petition cost or expense of preserving the Estates or operating the businesses of the Debtors, (2) any payment to be made under the Plan to cure a default on an assumed Executory Contract or Unexpired Lease, (3) post-petition costs, indebtedness or contractual obligations duly and validly incurred or assumed by the Debtors in the ordinary course of business, (4) any Fee Claim, including any Claim for compensation or reimbursement of expenses of Professionals to the extent allowed by the Bankruptcy Court under sections 327, 328, 330(a), 331, or 503(b) of the Bankruptcy Code or the provision of the

Plan, (5) any fee or charge assessed against the Estates under 28 U.S.C. § 1930(6), (6) any Claim of the Information Officer and/or counsel for the Information Officer, and (7) any Claim that has been granted superpriority administrative expense status in accordance with the Final Cash Management Order.  For the avoidance of doubt, KEIP/KERP Payments are Administrative Claims.

1.1.3    "**Administrative Claims Bar Date**" means the applicable deadline for filing requests for payment of Administrative Claims (other than Fee Claims) and shall be the Business Day that is sixty (60) days after the Effective Date.

1.1.4    "**Administrative Claim Reserve**" means an amount, as of the Effective Date, equal to (i) the Allowed Amount of Administrative Claims (excluding Fee Claims) and (ii) an estimate by the Debtors (subject to input from and consent by each of the Plan Proponents) of additional Administrative Claims (excluding Fee Claims) that may become Allowed after the Effective Date, certain amounts attributable to the transfer of the Talc Personal Injury Trust Assets to the Talc Personal Injury Trust, and costs incurred by the Reorganized North American Debtors related to post-Effective Date Administrative Claim resolution.  The sole purpose of the Administrative Claim Reserve is to pay all Allowed Administrative Claims against the Debtors in full.

1.1.5    "**Affiliate**" shall mean, with respect to any specified entity: (a) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified entity; or (b) any other Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified entity. As used in clause (b) of the prior sentence, "control" shall include the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified entity (whether through the ownership of equity, by contract or otherwise).

1.1.6    "**Affirmation Order**" means an order of the District Court affirming Confirmation of the Plan and issuing or affirming the issuance of the Channeling Injunction in favor of the Protected Parties.

1.1.7    "**Allowed**" means (a) with respect to Non-Talc Claims, and including applicable premiums and penalties to the extent allowable: (i) any Claim proof of which is timely filed by the applicable Claims Bar Date; (ii) any Claim that is listed in the Schedules as neither contingent, unliquidated, nor disputed, and for which no Proof of Claim has been timely filed; or (iii) any Claim that is allowed pursuant to the Plan; *provided*, *however*, that with respect to any Claim described in clauses (i) and (ii) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance of such Claim has been filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or such an objection is filed and the Claim shall have been allowed by a Final Order, and (b) with respect to Equity Interests: (i) any Equity Interest registered in the stock register (or its equivalent) maintained by or on behalf of the relevant Debtors as of the Confirmation Date; (ii) any Equity Interest that is allowed pursuant to the Plan; or (iii) any other Equity Interest that has been allowed by a Final Order of the Bankruptcy Court.

2

1.1.8    "**Allowed Amount**" means, with respect to any Non-Talc Claim, the amount for which that Claim is Allowed, denominated in U.S. dollars, Canadian dollars, or Euros, as applicable.

1.1.9    "**Amended Bylaws**" means, the amended and restated bylaws of each of the Reorganized North American Debtors, in substantially the form contained in the Plan Supplement.

1.1.10    "**Amended Certificate of Incorporation**" means, as to each of the Reorganized North American Debtors, the amended and restated certificate of incorporation of such Debtor, in substantially the form contained in the Plan Supplement.

1.1.11    "**Amended Charter Documents**" means, collectively, the Amended Bylaws and the Amended Certificates of Incorporation.

1.1.12    "**Asset Purchase Agreement**" means that certain Asset Purchase Agreement by and among the North American Debtors and Magris Resources Canada Inc., dated as of October 13, 2020, as amended pursuant to that certain Amendment to the Asset Purchase Agreement, dated as of October 27, 2020 (as may be further amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof).

1.1.13    "**Assignment**" means the transfer of (i) the Talc Insurance Actions, (ii) the Talc Insurance Action Recoveries, (iii) the Talc Insurance CIP Agreements, (iv) the Talc Insurance Settlement Agreements, (v) the Talc In-Place Insurance Coverage, (vi) all other rights or obligations under or with respect to the Talc Insurance Policies, and (vii) all rights in connection with the J&J Indemnification Obligations as set forth in the J&J Agreements, to the Talc Personal Injury Trust under the Plan or the other Plan Documents.

1.1.14    "**Bankruptcy Code**" means title 11 of the United States Code, as in effect on February 13, 2019.

1.1.15    "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases.

1.1.16    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code and any local rules of the Bankruptcy Court, as in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

1.1.17    "**Bid Procedures Order**" means that certain *Order (I) (A) Establishing Bidding Procedures, Assumption and Assignment Procedures, and Stalking Horse Procedures for Sale of Substantially All Assets, (B) Scheduling Auction and Sale Hearing, and (C) Approving Form and Manner of Notice Thereof, and (II) Granting Related Relief* [Docket No. 1950], as modified by the *Notice of Modified Deadlines Contained in the Bidding Procedures and the Bidding Procedures Order* [Docket No. 2039], the *Second*

3

*Notice of Modified Deadlines Contained in the Bidding Procedures and the Bidding Procedures Order* [Docket No. 2189], and the *Third Notice of Modified Deadlines Contained in the Bidding Procedures and the Bidding Procedures Order* [Docket No. 2329].

1.1.18    "**Business Day**" means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, NY are authorized or required by law or executive order to close.

1.1.19    "**Buyer**" means Magris Resources Canada Inc., as the purchaser pursuant to the Sale Order.

1.1.20    "**CAMC**" means Cyprus Amax Minerals Company, a Delaware corporation.

1.1.21    "**CAMC Cash Payments**" is defined in accordance with Section 10.10.5 of the Plan.

1.1.22    "**Canadian Claims**" shall mean Talc Personal Injury Claims of individuals exposed in Canada or who were resident in Canada at the time such claims are filed.

1.1.23    "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List).

1.1.24    "**Canadian Proceeding**" means the proceeding commenced by ITC before the Canadian Court pursuant to the Companies Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36, as amended.

1.1.25    "**Cash**" means lawful currency of the United States of America and its equivalents.

1.1.26    "**Certain Cyprus Historical Settled Insurers**" means the Cyprus Historical Settled Insurers excluding the insurers to whom a Cyprus Corporate Party has granted a release of coverage for Talc Personal Injury Claims pursuant to (i) the London Market Settlement and Release Agreement or (ii) the Seaton Settlement and Release Agreement.

1.1.27    "**Channeling Injunction**" means the permanent injunction provided for in Section 12.3 of the Plan with respect to Talc Personal Injury Claims against the Protected Parties to be issued pursuant to the Confirmation Order.

1.1.28    "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under Case No. 19-10289 (LSS), and, if applicable, the case to be commenced in the Bankruptcy Court under chapter 11 of the Bankruptcy Code for ITI.

1.1.29    "**Claim**" shall have the meaning ascribed to such term in section 101(5) of the Bankruptcy Code as it pertains to "claims" against any or all of the Debtors.

1.1.30    "**Claims Agent**" means Prime Clerk LLC.

1.1.31    "**Claims Bar Date**" means (i) October 15, 2019, for North American Debtor Claims (subject to the exceptions contained in the General Bar Date Order), (ii) January 9, 2020, for Indirect Talc Personal Injury Claims against the North American Debtors, or (iii) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to certain Claims.

1.1.32    "**Claims Objection Bar Date**" means the deadline for objecting to North American Debtor Claims set forth in Section 7.3.2 which shall be one hundred and twenty (120) days after the Effective Date, unless extended by operation of the Bankruptcy Rules or order of the Bankruptcy Court prior to the expiration of such period.

1.1.33    "**Claims Register**" means the register of Claims filed against the Debtors in the Chapter 11 Cases maintained by the Claims Agent as such register is updated from time to time to reflect, among other things, Claims that have been Allowed or Disallowed.

1.1.34    "**Class**" means a category of holders of Claims or Equity Interests described in Article III of the Plan.

1.1.35    "**Clerk**" means the clerk of the Bankruptcy Court.

1.1.36    "**Compensation Procedures Order**" means that certain *Order Under 11 U.S.C. §§ 105(a) and 331, Fed. R. Bankr. P. 2016(a), and Del. Bankr. L.R. 2016-2 Establishing Procedures for Interim Compensation and Reimbursement of Professionals* [Docket No. 301].

1.1.37    "**Confirmation**" means the entry of the Confirmation Order on the Docket of the Chapter 11 Cases.

1.1.38    "**Confirmation Date**" means the date on which the Confirmation Order is entered on the Docket in the Chapter 11 Cases.

1.1.39    "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.1.40    "**Confirmation Order**" means the order, in form and substance acceptable to the Plan Proponents, entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.1.41    "**Contingent Contribution**" is defined in accordance with Section 10.8.2.2 of the Plan.

1.1.42    "**Contributed Indemnity and Insurance Interests**" is defined in accordance with Section 10.8.2.3 of the Plan.

1.1.43    "**Contribution Claim**" is defined in accordance with Section 12.3.1(g) of the Plan.

1.1.44    "**Cooperation Agreement**" means that certain Cooperation Agreement among the Debtors, Imerys S.A., and the Talc Personal Injury Trust, in substantially the form contained in the Plan Supplement.

1.1.45    "**Credits**" is defined in accordance with Section 10.9.2.1 of the Plan.

1.1.46    "**Cure Amount**" means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default of one or more of the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of such Debtor(s) and (ii) permit such Debtor(s) to assume such Executory Contract or Unexpired Lease under section 365(a) of the Bankruptcy Code.

1.1.47    "**Cyprus**" means, collectively, Cyprus Mines and CAMC.

1.1.48    "**Cyprus Affiliated Parties**" means, for such time as Cyprus Mines was a subsidiary of CAMC or its predecessors, and solely in their capacity as such: (i) direct or indirect shareholders of CAMC or its predecessors; (ii) current and former officers, directors, principals, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, experts, and other professionals of the Cyprus Corporate Parties; and (iii) with respect to each of the foregoing Persons in clauses (i) and (ii), each such Person's respective heirs, executors, estates, and nominees, as applicable. For the avoidance of doubt, the Cyprus Affiliated Parties exclude J&J, the Rio Tinto Corporate Parties, and the Imerys Corporate Parties.

1.1.49    "**Cyprus Contribution**" is defined in accordance with Section 10.10.5 of the Plan.

1.1.50    "**Cyprus Corporate Parties**" means (a) Freeport, (b) CAMC, (c) Cyprus Mines, (d) the Persons listed on Schedule VII, each of which is directly or indirectly owned or controlled by Freeport, CAMC, and/or Cyprus Mines, and (e) any future successors or assigns of Freeport, CAMC, Cyprus Mines, and/or the Persons or Entities listed on Schedule VII, solely in their capacities as such.

1.1.51    "**Cyprus Credits**" is defined in accordance with Section 10.10.5 of the Plan.

1.1.52    "**Cyprus Future Credits**" is defined in accordance with Section 10.10.5 of the Plan.

6

1.1.53    "**Cyprus Historical Insurance Settlements**" means the following agreements, but solely to the extent of the particular Cyprus Talc Insurance Policies released in each settlement agreement: (1) the settlement and release agreement by and between CAMC, on the one hand, and The Home Insurance Company, on the other hand, dated August 14, 2002; (2) the settlement and release agreement by and among CAMC, Cyprus Mines, AMAX Inc. and Cyprus Foote Mineral Company, on the one hand, and International Insurance Company, individually and as successor in interest to International Surplus Lines Insurance Company, and North River Insurance Corporation on the other hand, dated December 19, 2000; (3) the settlement and release agreement by and between CAMC, on the one hand, and St. Paul Fire and Marine Insurance Company, on the other hand, dated June 14, 2000; (4) the settlement and release agreement by and among CAMC, on the one hand, and Westport Insurance Corporation (f/k/a Puritan Insurance Company, f/k/a Manhattan Fire and Marine Insurance Company) on the other hand, dated July 19, 2000; (5) the London Market Settlement and Release Agreement; and (6) the Seaton Settlement and Release Agreement.

1.1.54    "**Cyprus Historical Settled Insurers**" means the insurers to whom a Cyprus Corporate Party has granted a release of coverage for Talc Personal Injury Claims pursuant to the Cyprus Historical Insurance Settlements, solely with respect to the policies and claims so released.

1.1.55    "**Cyprus Insurance Protocol**" means that: (1) in the event that (a) the Talc Personal Injury Trust obtains a Judgment providing that the Talc Personal Injury Trust is entitled to a sum certain from an insurer pursuant to any Cyprus Talc Insurance Policy or if such an insurer enters into an agreement or settlement to pay, or otherwise pays, a sum certain to the Talc Personal Injury Trust pursuant to any Cyprus Talc Insurance Policy, and (b) based on such Judgment or agreement or settlement or payment, such insurer obtains a Judgment against any Cyprus Historical Settled Insurer, or an agreement to pay from any Cyprus Historical Settled Insurer, the Talc Personal Injury Trust shall voluntarily reduce its Judgment against, agreement with, settlement with, or recovery from such insurer to the extent necessary to eliminate any indemnification or other monetary obligation owed by any Cyprus Corporate Party to such Cyprus Historical Settled Insurer pursuant to the Cyprus Historical Insurance Settlements; (2) the Talc Personal Injury Trust shall not seek recovery from any London Market Insurer that was a party to the London Market Settlement and Release Agreement with respect to policies released in that agreement; (3) the Talc Personal Injury Trust shall not seek recovery from Providence Washington with respect to the policy released in the Seaton Settlement and Release Agreement; (4) if the Talc Personal Injury Trust obtains a Judgment that entitles it to receive a sum certain from any of the Certain Cyprus Historical Settled Insurers, the Talc Personal Injury Trust shall voluntarily reduce its Judgment against the Certain Cyprus Historical Settled Insurer to the extent necessary to eliminate any indemnification or other monetary obligation owed by a Cyprus Corporate Party to such Certain Cyprus Historical Settled Insurer; and (5) the Talc Personal Injury Trust shall obtain in any future settlement with any Certain Cyprus Historical Settled Insurer with respect to the Cyprus Talc Insurance Policies released in any Cyprus Historical Insurance Settlement a release by the Certain Cyprus Historical Settled Insurer of the Cyprus Protected Parties.

1.1.56    "**Cyprus Mines**" means Cyprus Mines Corporation.

1.1.57    "**Cyprus Mines Bankruptcy**" means the chapter 11 case to be filed by Cyprus Mines under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

1.1.58    "**Cyprus Mines Plan**" means the chapter 11 plan of reorganization of Cyprus Mines, as amended, modified, or supplemented from time to time, to be filed in the Cyprus Mines Bankruptcy, and which incorporates the terms of the Cyprus Settlement.

1.1.59    "**Cyprus Mines Plan Trigger Date**" means the later of (a) the effective date of the Cyprus Mines Plan or (b) the date the order of the District Court affirming confirmation of the Cyprus Mines Plan and issuing or affirming the issuance of the channeling injunction (as described in the Cyprus Mines Plan) in favor of the Cyprus Protected Parties thereunder becomes a Final Order.

1.1.60    "**Cyprus Parties**" means, collectively, Cyprus and Freeport.

1.1.61    "**Cyprus Protected Parties**" means the Cyprus Corporate Parties and the Cyprus Affiliated Parties.  For the avoidance of doubt, the Cyprus Protected Parties exclude the Debtors, the Imerys Protected Parties, the Rio Tinto Protected Parties, the Zurich Protected Parties, and J&J.

1.1.62    "**Cyprus Released Claims**" is defined in accordance with Section 12.2.1(d) of the Plan.

1.1.63    "**Cyprus Settlement**" means that certain comprehensive settlement by and among the Cyprus Parties, the Debtors, the Tort Claimants' Committee, and the FCR, the terms of which are set forth in and implemented by the Plan, the Cyprus Mines Plan, and the Cyprus Settlement Agreement, pursuant to which, in exchange for the Cyprus Contribution and other good and valuable consideration, the Cyprus Protected Parties receive the benefit of the releases, Injunctions, and other protections set forth in the Plan, the Cyprus Mines Plan, and the Cyprus Settlement Agreement.

1.1.64    "**Cyprus Settlement Agreement**" means the Settlement Agreement and Release among the Cyprus Parties, the Debtors, the Tort Claimants' Committee, and the FCR, in substantially the form attached to the Plan as Exhibit D.

1.1.65    "**Cyprus Settling Talc Insurance Company**" means any Cyprus Talc Insurance Company that enters into any settlement at any time with the Debtors, the Tort Claimants' Committee, the FCR, or the Talc Personal Injury Trust under which such Cyprus Talc Insurance Company contributes funds, proceeds, or other consideration to or for the benefit of the Talc Personal Injury Trust, but solely with respect to any Cyprus Talc Insurance Policy that is the subject of such a settlement agreement.

1.1.66    "**Cyprus Talc Insurance Company**" means any insurance company, insurance syndicate, coverholder, insurance broker or syndicate insurance broker, guaranty

8

association, or any other Entity that has, or may be alleged to have, liability under a Cyprus Talc Insurance Policy.

1.1.67    "**Cyprus Talc Insurance Policy**" means any liability insurance policy (i) that was issued prior to June 30, 1992, (ii) that is currently or was previously in effect at any time on or before the Effective Date, (iii) as to which there has not been a complete release of coverage for Talc Personal Injury Claims, and (iv) that names any Cyprus Protected Party as an insured (whether as the primary or additional insured, or by virtue of being a parent or subsidiary of the named insured) or that is otherwise alleged to afford any Cyprus Protected Party insurance coverage for any Talc Personal Injury Claim or any other claims channeled to the Talc Personal Injury Trust.  The Cyprus Talc Insurance Policies include, but are not limited to, the policies set forth on Schedule VIII.

1.1.68    "**Cyprus Talc Insurance Policy Rights**" means (a) all rights, Claims, benefits, or causes of action held by the Cyprus Protected Parties with respect to the Cyprus Talc Insurance Policies, including the right to receive proceeds; and (b) all rights, Claims, or causes of action held by the Cyprus Protected Parties, including the right to receive proceeds, with respect to any settlement agreements or coverage-in-place agreements to the extent those agreements amend, modify, replace, or govern the rights and obligations of, and the coverage afforded to, any or all of the Cyprus Protected Parties under any Cyprus Talc Insurance Policy.  For the avoidance of doubt, subject to Section 6.1 of the Cyprus Settlement Agreement, the right to receive proceeds under any such agreements will not apply to any proceeds paid to a Cyprus Protected Party under such agreements prior to the Cyprus Trigger Date.

1.1.69    "**Cyprus Trigger Date**" means the later of (i) the later of the Effective Date or the date the Affirmation Order becomes a Final Order or (ii) the Cyprus Mines Plan Trigger Date.

1.1.70    "**Debtor Exposure**" shall mean credible evidence (a) of exposure to talc or a product containing talc mined, processed, manufactured, sold and/or distributed by the Debtors, or for which the Debtors otherwise have legal responsibility, or (b) of conduct for which the Debtors have legal responsibility that exposed the claimant to such product.

1.1.71    "**Debtor Intercompany Claim**" means any Claim held by a Debtor against another Debtor.

1.1.72    "**Debtors**" means Imerys Talc America, Inc., Imerys Talc Vermont, Inc., Imerys Talc Canada Inc., and, in the event it files a voluntary petition for relief under chapter 11 of the Bankruptcy Code before the Confirmation Date, Imerys Talc Italy S.p.A.

1.1.73    "**DIP Facility**" means a debtor-in-possession financing facility provided by the DIP Facility Lender, as more fully described in the DIP Loan Documents and the DIP Order.

1.1.74    "**DIP Facility Claim**" means any Claim held by the DIP Facility Lender arising under the DIP Loan Documents and Allowed by the DIP Order.

US-DOCS\120811676.4

1.1.75    "**DIP Facility Lender**" means Imerys S.A. or any Affiliate of Imerys S.A. that is also a Plan Proponent to which Imerys S.A. assigns its rights under the DIP Loan Documents.

1.1.76    "**DIP Loan**" means any loan made by the DIP Facility Lender to the Debtors pursuant to the DIP Loan Documents.

1.1.77    "**DIP Loan Documents**" means the credit agreement setting forth the terms and conditions of the DIP Facility and all documents related thereto.

1.1.78    "**DIP Order**" means any order of the Bankruptcy Court approving the DIP Facility.

1.1.79    "**Direct Talc Personal Injury Claim**" means a Talc Personal Injury Claim that is not an Indirect Talc Personal Injury Claim.

1.1.80    "**Disallowed**" means any Non-Talc Claim or Equity Interest that (a) is denied, dismissed, expunged, overruled, or disallowed in whole or in part (but solely to the extent of the disallowance) by Final Order or under the Plan, or (b) has been withdrawn, in whole or in part (but solely to the extent of such withdrawal).

1.1.81    "**Disbursing Agent**" means each Reorganized Debtor, or such other Entity or Entities chosen by the Reorganized Debtor or Reorganized Debtors to make or facilitate Distributions pursuant to the Plan.

1.1.82    "**Discharge Injunction**" means the injunction issued in accordance with sections 524 and 1141 of the Bankruptcy Code and contained in <u>Section 12.1</u> of the Plan.

1.1.83    "**Disclosure Statement**" means the *Disclosure Statement for Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated January [27], 2021, including all exhibits and schedules thereto and references therein that relate to the Plan, approved by order of the Bankruptcy Court as containing adequate information, and distributed in accordance with such order of approval, as such disclosure statement and supplemental disclosure documents may be amended, modified, or supplemented from time to time with the consent of each of the Plan Proponents.

1.1.84    "**Disputed**" means any Non-Talc Claim or Equity Interest, or any portion thereof, that has not been Allowed or Disallowed pursuant to the Plan or a Final Order of the Bankruptcy Court, or that is contingent or unliquidated.

1.1.85    "**Disputed Claims Reserve**" means the reserve maintained by the Reorganized North American Debtors for any distributable amounts required to be set aside on account of Disputed North American Debtor Claims (other than Disputed Administrative Claims), the amount of which will be distributed (net of any expenses, including any taxes relating thereto), as provided in the Plan, as such Disputed North American Debtor Claims (other than Disputed Administrative Claims) are resolved by Final Order, and such amounts shall be distributable in respect of such Disputed North

American Debtor Claims (other than Disputed Administrative Claims) as such amounts would have been distributable had the Disputed North American Debtor Claims (other than Disputed Administrative Claims) been Allowed Claims as of the Effective Date. For the avoidance of doubt, (i) no assets of ITI will be used to fund the Disputed Claims Reserve and no amounts from the Disputed Claims Reserve will be distributed on account of Allowed ITI Claims, and (ii) available funds in the Disputed Claims Reserve will not be used to pay any Claims that are subject to payment from funds placed in the Reorganized North American Debtor Cash Reserve.

1.1.86    "**Distribution(s)**" mean(s) Cash, property, or interest in property to be paid or delivered hereunder to holders of Allowed Non-Talc Claims under the terms of the Plan.

1.1.87    "**Distribution Date**" means the date which is as soon as reasonably practicable after the later of (i) the Effective Date, or (ii) in the case of a Non-Talc Claim that is not yet Allowed as of the Effective Date, the date that such Claim becomes Allowed.

1.1.88    "**Distribution Record Date**" means the record date for determining an entitlement to receive Distributions under the Plan on account of Allowed Non-Talc Claims, which shall be the Confirmation Date.

1.1.89    "**District Court**" means the United States District Court for the District of Delaware.

1.1.90    "**Docket**" means the docket in the jointly administered Chapter 11 Cases maintained by the Clerk.

1.1.91    "**Effective Date**" means the Business Day upon which all of the conditions precedent to the occurrence of the Effective Date contained in Section 9.2 of the Plan have been satisfied or waived pursuant to Section 9.3.

1.1.92    "**Encumbrance**" means, with respect to any property (whether real or personal, tangible or intangible), any mortgage, Lien, pledge, charge, security interest, assignment or encumbrance of any kind or nature in respect of such property (including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction) to secure payment of a debt or performance of an obligation.

1.1.93    "**Entity**" shall have the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.1.94    "**Equity Interest**" means (i) the ITA Stock, (ii) the ITV Stock, (iii) the ITC Stock, and/or (iv) the ITI Stock, as applicable.

1.1.95    "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder, as amended, supplemented or substituted therefor from time to time.

11

1.1.96    "**ERISA Affiliate**" means, with respect to any Person, any other Person (whether or not incorporated) that, together with such Person, would be treated as a single employer under section 414 of the Internal Revenue Code or section 4001 of ERISA.

1.1.97    "**ERISA Pension Plan Sponsors**" is defined in accordance with Section 12.10 of the Plan.

1.1.98    "**ERISA Pension Plans**" is defined in accordance with Section 12.10 of the Plan.

1.1.99    "**Estate**" means, as to each Debtor, the estate created in its Chapter 11 Case under section 541 of the Bankruptcy Code.

1.1.100    "**Estate Causes of Action**" means any and all of the actions, claims, rights, remedies, defenses, counterclaims, suits, and causes of action owned or held, or assertable by or on behalf of any Debtor or its Estate (including, without limitation, claims assertable by the Tort Claimants' Committee or FCR on behalf of any Debtor or its Estate), whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction, including without limitation actions that (i) arise out of or are based on breach of contract, receipt of illegal dividends, fraudulent conveyances and transfers, breach of fiduciary duty, breach of duty of loyalty, legal malpractice, recovery of attorneys' fees, turnover of property and avoidance or recovery actions of the Debtors or their respective Estates, including actions that constitute property of the Estate under section 541 of the Bankruptcy Code that are or may be pursued by a representative of the Estates, including pursuant to section 323 of the Bankruptcy Code, and actions that may be commenced by a representative of the Estates under section 362 or chapter 5 of the Bankruptcy Code, seeking relief in the form of damages (actual and punitive), imposition of a constructive trust, turnover of property, restitution, and declaratory relief with respect thereto or otherwise, or (ii) seek to impose any liability upon, or injunctive relief on, any Imerys Protected Party, any Rio Tinto Protected Party, any Cyprus Protected Party, or any Settling Talc Insurance Company, or to satisfy, in whole or in part, any Talc Personal Injury Claim.  The term "Estate Causes of Action" includes any such actions, claims, rights, remedies, defenses, counterclaims, suits, and causes of action, regardless of the alleged legal theory, including without limitation:  (a) inadequate capitalization, (b) fraudulent transfer or fraudulent conveyance claims, or claims seeking to avoid and/or recover any transfers of property, under applicable state or federal law, (c) claims based on the doctrines of veil piercing, alter ego, successorship, or vicarious liability; (d) single business enterprise or common enterprise claims; (e) claims that any Debtor was the mere instrumentality, agent, dominated or controlled party, or alter ego of any Imerys Protected Party, any Rio Tinto Protected Party, or any Cyprus Protected Party, or that any Imerys Protected Party, any Rio Tinto Protected Party, or any Cyprus Protected Party was the mere instrumentality, agent, dominated or controlled party, or alter ego of any Debtor; (f) claims that any Imerys Protected Party, any Rio Tinto Protected Party, or any Cyprus Protected Party was the mere continuation of any Debtor; (g) negligent provision of services claims; and (h) claims that any Imerys Protected Party, any Rio Tinto Protected Party, or any Cyprus Protected Party, on the one hand, and any Debtor, on the other hand, conspired with one another, aided and abetted one another, or acted in concert with one another.

12

1.1.101    "**Executory Contract**" means any executory contract as to which one of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.1.102    "**FCR**" means James L. Patton (or any Bankruptcy Court-appointed successor), in his capacity as the legal representative for any and all persons who may assert Talc Personal Injury Demands in the future, but who are currently unknown. "FCR" stands for Future Claimants' Representative.

1.1.103    "**Fee Claim**" means any Claim of a (i) Professional for allowance of compensation and reimbursement of costs and expenses and (ii) member of the Tort Claimants' Committee for reimbursement of costs and expenses, in each case incurred in the Chapter 11 Cases on or before the Effective Date.

1.1.104    "**Fee Claim Reserve**" means an amount equal to the Allowed Amount of Fee Claims against the Debtors and a reasonable estimate by the Debtors (subject to input from and consent by each of the Plan Proponents) of additional Fee Claims against the Debtors that may become Allowed after the Effective Date. The sole purpose of the Fee Claim Reserve is to pay all Allowed and unpaid Fee Claims against the Debtors in full.

1.1.105    "**Fee Examiner**" means Jacob Renick (or any Bankruptcy Court-appointed successor), in his capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

1.1.106    "**Fee Examiner Order**" means the *Order Appointing Fee Examiner and Establishing Related Procedures for the Review of Applications of Retained Professionals* [Docket No. 741].

1.1.107    "**Final Cash Management Order**" means the *Final Order Under 11 U.S.C. §105(a), 345, 363, 503(b), and 507(a), Fed. R. Bankr. P. 6003 and 6004, and Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing Continuation of Existing Deposit Practices, (III) Approving the Continuation of Intercompany Transactions, and (IV) Granting Superpriority Administrative Expense Status to Certain Postpetition Intercompany Claims* [Docket No. 428].

1.1.108    "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

1.1.109    "**First Installment**" is defined in accordance with Section 10.10.5 of the Plan.

1.1.110    "**Foreign Claim**" shall mean a Talc Personal Injury Claim with respect to which: (i) the purchase of a product containing talc mined, processed, manufactured, sold and/or distributed by the Debtors, or for which the Debtors otherwise have legal responsibility occurred outside of the United States or Canada and their territories and possessions, and (ii) the Debtor Exposure occurred outside of the United States or Canada and their territory and possessions.  For the avoidance of doubt, a Canadian Claim is not a Foreign Claim.

1.1.111    "**Freeport**" means Freeport-McMoRan Inc.

1.1.112    "**Future Credits**" is defined in accordance with Section 10.9.2.1 of the Plan.

1.1.113    "**General Bar Date Order**" means the *Order (I) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim Other Than with Respect to Talc Personal Injury Claims and (II) Approving Form and Manner of Notice Thereof* [Docket No. 881].

1.1.114    "**Imerys Affiliated Parties**" means, in each case during the times the Debtors were direct or indirect subsidiaries of Imerys S.A. and solely in their capacities as such: (i) direct or indirect shareholders of Imerys S.A.; (ii) current and former officers, directors, principals, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, experts, and other professionals of the Imerys Corporate Parties and/or the Debtors; and (iii) with respect to each of the foregoing Persons in clauses (i) and (ii), each such Person's respective heirs, executors, estates, and nominees, as applicable.  For the avoidance of doubt, the Imerys Affiliated Parties exclude J&J, the Rio Tinto Corporate Parties, and the Cyprus Corporate Parties.

1.1.115    "**Imerys Cash Contribution**" is defined in accordance with Section 10.8.2.2 of the Plan.

1.1.116    "**Imerys Contribution**" is defined in accordance with Section 10.8.2 of the Plan.

1.1.117    "**Imerys Corporate Parties**" means Imerys S.A. and all Persons listed on Schedule I, each of which are or were Affiliates of Imerys S.A. during the time the Debtors were owned or controlled by Imerys S.A., hereto, and the successors and assigns of such Persons, solely in their capacity as such.  Schedule I is an exclusive list and does not include, among others, J&J, the Rio Tinto Corporate Parties, or the Cyprus Corporate Parties.

1.1.118    "**Imerys Non-Debtors**" means Imerys S.A. and its Affiliates, excluding the Debtors.

1.1.119    "**Imerys Plan Proponents**" means Imerys S.A., on behalf of itself and all Persons listed on Schedule II hereto, each of which Imerys S.A. has direct or indirect ownership or other control.

14

1.1.120    "**Imerys Protected Parties**" means the Imerys Corporate Parties and the Imerys Affiliated Parties.

1.1.121    "**Imerys Released Claims**" is defined in accordance with Section 12.2.1(b) of the Plan.

1.1.122    "**Imerys S.A.**" means Imerys S.A., the Debtors' parent entity.

1.1.123    "**Imerys Settlement**" means that certain comprehensive settlement by and among the Plan Proponents, the terms of which are set forth and implemented herein.

1.1.124    "**Imerys Settlement Funds**" means (i) $75 million, consisting of $74.5 million Cash and the Talc PI Note, *plus* (ii) the Sale Proceeds, *plus* (iii) a contingent purchase price enhancement of up to $102.5 million, subject to the Cash value of the Sale Proceeds *provided* that in the event the Sale contemplated by and pursuant to the Sale Order closes, no contingent purchase price enhancement shall be payable, *less* (iv) if the DIP Order is entered, amounts required to pay the DIP Facility Claims pursuant to the terms of the DIP Loan Documents and Allowed by the DIP Order, *less* (v) if the DIP Order is not entered, Imerys S.A.'s reasonable and documented out-of-pocket costs and expenses of negotiation and preparation of the DIP Loan Documents estimated to be $400,000 as of December 10, 2020.

1.1.125    "**Impaired**" means a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.1.126    "**Indirect Talc Personal Injury Claim**" means a Talc Personal Injury Claim of any corporation (as defined in section 101(9) of the Bankruptcy Code), co-defendant of a Debtor, or predecessor of a Debtor for contribution, reimbursement, subrogation, or indemnity, whether contractual or implied by law (as these terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Talc Personal Injury Claim of any corporation (as defined in section 101(9) of the Bankruptcy Code), co-defendant of a Debtor, or predecessor of a Debtor, whether in the nature of or sounding in contract, tort, warranty, or other theory of law.  For the avoidance of doubt, an Indirect Talc Personal Injury Claim shall not include any claim for or otherwise relating to death, injury, or damages caused by talc or a product or material containing talc that is asserted by or on behalf of any injured individual, the estate, legal counsel, relative, assignee, or other representative of any injured individual, or an individual who claims injury or damages as a result of the injury or death of another individual regardless of whether such claim is seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs or damages, or any legal, equitable or other relief whatsoever, including pursuant to a settlement, judgment, or verdict.  By way of illustration and not limitation, an Indirect Talc Personal Injury Claim shall not include any claim for loss of consortium, loss of companionship, services and society, or wrongful death.  Indirect Talc Personal Injury Claims shall be resolved by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents.

1.1.127 "**Information Officer**" means any Entity (current and former), in its capacity as the information officer appointed by the Canadian Court in the Canadian Proceeding.

1.1.128 "**Injunctions**" means the Discharge Injunction, the Channeling Injunction, the Supplemental Settlement Injunction Order, the Insurance Entity Injunction, the Release Injunction, and any other injunctions entered by the Bankruptcy Court or the District Court in connection with Confirmation of the Plan.

1.1.129 "**Insurance Entity Injunction**" means the injunction described in Section 12.3.2 of the Plan.

1.1.130 "**Insured Non-Talc Claim**" means a Non-Talc Claim that is alleged to be covered by an insurance policy issued or allegedly issued by a Non-Talc Insurance Company.

1.1.131 "**Intercompany Claim**" means (a) any Debtor Intercompany Claim or (b) any Non-Debtor Intercompany Claim.

1.1.132 "**Intercompany Loan**" means that certain outstanding loan payable from the Imerys Non-Debtors to the North American Debtors in the amount of approximately $2,500,000 as of December 31, 2020.

1.1.133 "**Internal Revenue Code**" or "**Tax Code**" means title 26 of the United States Code, 26 U.S.C. §§ 1 *et seq.*, as in effect on the Petition Date, together with all amendments, modifications, and replacements of the foregoing as the same may exist on any relevant date to the extent applicable to the Chapter 11 Cases.

1.1.134 "**ITA**" means Imerys Talc America, Inc., a Delaware corporation, and a Debtor in the Chapter 11 Cases.

1.1.135 "**ITA Stock**" means all of the outstanding shares of stock of ITA, 100% of which is held by Imerys Minerals Holding Limited.

1.1.136 "**ITC**" means Imerys Talc Canada Inc., a Canadian corporation, and a Debtor in the Chapter 11 Cases.

1.1.137 "**ITC Stipulated Claim**" means any superpriority administrative expense claim held by ITC against ITA arising as a result of the ITC Stipulated Order.

1.1.138 "**ITC Stipulated Order**" means that certain *Order Approving Stipulation and Agreement Permitting Imerys Talc Canada Inc. to Make Payments to Imerys Talc America, Inc. for Non-Debtor Professional Fees*, entered on March 26, 2020 [Docket No. 1578].

1.1.139 "**ITC Stock**" means all of the outstanding shares of stock of ITC, 100% of which is held by Mircal S.A., a Non-Debtor Affiliate.

16

1.1.140    "**ITI**" means Imerys Talc Italy S.p.A., an Italian corporation, and a potential Debtor in the Chapter 11 Cases.

1.1.141    "**ITI Causes of Action**" means any and all Estate Causes of Action (other than Talc Personal Injury Trust Causes of Action and Talc Insurance Actions) owned or held, or assertable by or on behalf of ITI or its Estate that are not otherwise released pursuant to the Plan.

1.1.142    "**ITI Claim**" means any Non-Talc Claim against ITI.

1.1.143    "**ITI Stock**" means all of the outstanding shares of (i) stock of ITI or (ii) if on or after the Effective Date, Reorganized ITI, the majority of which is held by Mircal Italia.

1.1.144    "**ITV**" means Imerys Talc Vermont, Inc., a Vermont corporation, and a Debtor in the Chapter 11 Cases.

1.1.145    "**ITV Stock**" means all of the outstanding shares of stock of ITV, 100% of which is held by ITA.

1.1.146    "**J&J**" means Johnson & Johnson, Johnson & Johnson Baby Products Company, Johnson & Johnson Consumer Companies, Inc., Johnson & Johnson Consumer Inc., Johnson & Johnson Consumer Products, Inc., and each of their past and present parents, subsidiaries and Affiliates, direct and indirect equity holders, and the successors and assigns of each, excluding the Debtors and the Imerys Non-Debtors.

1.1.147    "**J&J Agreements**" means those contracts and/or agreements setting forth the J&J Indemnification Obligations, including, without limitation: (i) that certain Agreement, between Cyprus Mines Corporation and Johnson & Johnson, dated as of January 6, 1989; (ii) that certain Talc Supply Agreement, between Windsor Minerals Inc. and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc., dated as of January 6, 1989; (iii) that certain Supply Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of April 15, 2001; (iv) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2010; (v) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2011; and/or (vi) any other applicable agreement, order, or law.

1.1.148    "**J&J Indemnification Defense**" means any and all rights and defenses that J&J may have under any J&J Agreement and applicable law with respect to a claim seeking indemnification, but J&J Indemnification Defenses do not include any defense that the Plan or any of the other Plan Documents do not comply with the Bankruptcy Code.  Upon entry of the Confirmation Order in the Chapter 11 Cases, J&J Indemnification Defenses shall not include any defense that the transfer of the J&J Indemnification Obligations to the Talc Personal Injury Trust is prohibited by the J&J Agreements or applicable non-bankruptcy law.

17

1.1.149    "**J&J Indemnification Obligations**" means any and all indemnity rights of the Debtors, the Protected Parties, and the Imerys Non-Debtors against J&J for Talc Personal Injury Claims set forth in the J&J Agreements.

1.1.150    "**J&J Indemnification Rights and Obligations**" means (i) the J&J Indemnification Obligations and (ii) any and all indemnification rights of J&J against the Debtors and the other Protected Parties for Talc Personal Injury Claims, if any, *provided, however*, that the J&J Indemnification Rights and Obligations do not include any claim by J&J to indemnification, defense, contribution, or any other right to recovery against any Rio Tinto Protected Party or any Zurich Protected Party, or under any Rio Tinto Captive Insurer Policy or any Zurich Policy, arising out of or relating to any Talc Personal Injury Claim.

1.1.151    "**Judgment**" means a final and binding judicial determination or arbitration award.

1.1.152    "**KEIP/KERP Payments**" means those certain payments to participants in the Debtors' key employee incentive plan and/or key employee retention plan as authorized by the Bankruptcy Court pursuant to the *Order Approving Debtors' Key Employee Retention Program* [Docket No. 1259] and the *Order Approving Debtors' Revised Key Employee Incentive Program* [Docket No. 1787].

1.1.153    "**Lien**" has the meaning ascribed to such term in section 101(37) of the Bankruptcy Code.

1.1.154    "**London Market Insurers**" has the meaning ascribed to such term in the London Market Settlement and Release Agreement.

1.1.155    "**London Market Settlement and Release Agreement**" means the settlement and release agreement by and between CAMC, on the one hand, and certain Underwriters at Lloyd's, London, and certain London Market Insurance Companies, on the other hand, entered into about May 2001.

1.1.156    "**Mircal Italia**" means Mircal Italia S.p.A., a Non-Debtor Affiliate.

1.1.157    "**Non-Debtor Affiliate**" means an Affiliate of any Debtor other than Imerys S.A. or one of the other Debtors.

1.1.158    "**Non-Debtor Intercompany Claim**" means any Claim (including Claims related to setoff rights) held against a Debtor by Imerys S.A. or a Non-Debtor Affiliate that is a direct or indirect subsidiary of Imerys S.A. other than (i) Administrative Claims and (ii) claims related to Postpetition Intercompany Transactions (as such term is defined in the Final Cash Management Order) made pursuant to the Final Cash Management Order, *provided* that Imerys S.A. or a Non-Debtor Affiliate that is a direct or indirect subsidiary of Imerys S.A. shall have no Administrative Claim on account of the Contingent Contribution except where Imerys S.A. is entitled to reimbursement on account of any unused portions of the Contingent Contribution that Imerys S.A. contributed pursuant to Section 10.8.2.2 of the Plan.

18

1.1.159    "**Non-Talc Causes of Action**" means the North American Debtor Causes of Action and the ITI Causes of Action.

1.1.160    "**Non-Talc Claim**" means any Claim that is not a Talc Personal Injury Claim.

1.1.161    "**Non-Talc Insurance Assets**" means any Non-Talc Insurance Policies, or settlements thereof, that afford the Debtors indemnity or insurance coverage solely with respect to any Insured Non-Talc Claims.

1.1.162    "**Non-Talc Insurance Company**" means any insurance company, insurance syndicate, coverholder, insurance broker or syndicate insurance broker, guaranty association or any other Entity, other than a Talc Insurance Company, that may have liability under a Non-Talc Insurance Policy.

1.1.163    "**Non-Talc Insurance Policies**" means any insurance policy, other than a Talc Insurance Policy or a Cyprus Talc Insurance Policy, issued to or that provides or may provide coverage at any time to the Debtors or under which the Debtors have sought or may seek coverage including, without limitation, any such policy for directors' and officers' liability, general liability, workers' compensation, and any excess or umbrella policy, and all agreements, documents, or instruments relating thereto.

1.1.164    "**North American Debtor Causes of Action**" means any and all Estate Causes of Action (other than Talc Personal Injury Trust Causes of Action and Talc Insurance Actions) owned or held, or assertable by or on behalf of any North American Debtor or their Estates that are not otherwise released pursuant to the Plan.

1.1.165    "**North American Debtor Claim**" means any Non-Talc Claim against any or all of the North American Debtors.

1.1.166    "**North American Debtor Stock**" means the ITA Stock, the ITV Stock, and the ITC Stock.

1.1.167    "**North American Debtors**" means ITA, ITV, and ITC.

1.1.168    "**PBGC**" means the Pension Benefit Guaranty Corporation.

1.1.169    "**PDC Agreement**" means the letter agreement by and between Phelps Dodge Corporation, on the one hand, and BP Amoco Corporation, on the other hand, entered into on February 28, 2000.

1.1.170    "**Pension Liabilities**" means the obligation to pay the pension benefits accrued by the employees of the North American Debtors with respect to their service with the Debtors (and any ERISA Affiliates of the Debtors) as of the Effective Date.

1.1.171    "**Person**" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership,

trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity.

1.1.172    "**Petition Date**" means February 13, 2019, and, with respect to ITI, the date on which ITI files its petition for relief commencing its Chapter 11 Case.

1.1.173    "**Plan**" means this *Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* filed by the Plan Proponents, as the same may be amended or modified from time to time pursuant to section 1127 of the Bankruptcy Code and consistent with the Imerys Settlement and the Cyprus Settlement.  The Plan shall be in form and substance acceptable to each of the Plan Proponents.

1.1.174    "**Plan Cure and Assumption Notice**" is defined in accordance with Section 5.3.3 of the Plan.

1.1.175    "**Plan Documents**" means the Plan, the Disclosure Statement, the Plan Supplement, and all of the exhibits and schedules attached to any of the foregoing (including, without limitation and for the avoidance of doubt, the Talc Personal Injury Trust Documents and the Cooperation Agreement).

1.1.176    "**Plan Proponents**" means, collectively, the Debtors, the Tort Claimants' Committee, the FCR, and the Imerys Plan Proponents.

1.1.177    "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be filed by the Debtors no later than February 5, 2021, and additional documents filed with the Bankruptcy Court before the Effective Date as amendments, modifications, or supplements to the Plan Supplement, including the following: (a) the list of Executory Contracts and Unexpired Leases to be assumed by the North American Debtors, together with the Cure Amount for each such contract or lease; (b) the list of Executory Contracts and Unexpired Leases to be assumed by ITI, together with the Cure Amount for each such contract or lease; (c) a list of the Executory Contracts and Unexpired Leases to be rejected by ITI; (d) a list of the Settling Talc Insurance Companies; (e) a list of the North American Debtor Causes of Action; (f) a list of the ITI Causes of Action; (g) a list of the Contributed Indemnity and Insurance Interests; (h) the Cooperation Agreement; (i) the Amended Charter Documents; (j) the list of officers and directors of the Reorganized North American Debtors; (k) the Talc PI Note; (l) the Talc PI Pledge Agreement; (m) the identity of the initial Talc Trustees and their compensation; and (n) a list of the Talc Insurance Policies; *provided* that the Plan Documents listed in subsections (d), (g), (h), (i), (j), (k), and (l) shall each be in form and substance acceptable to each of the Plan Proponents; *provided further* that the Plan Documents listed in subsections (a), (b), and (c) will be revised as needed, subject to Article V of the Plan, to take into account any additional Executory Contracts and Unexpired Leases to be assumed or rejected in advance of the Confirmation Hearing.  The Plan Supplement will be served only on those parties that have requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 and any party in interest who requests in writing a copy from counsel for the Debtors; *provided* that the Plan Documents listed in

subsection (m) above will be filed and served on all parties receiving Ballots (as defined in the Voting Procedures). In addition, copies of all Executory Contract and Unexpired Lease exhibits will be served on the applicable counterparties to such Executory Contracts and Unexpired Leases. Once the Plan Supplement is filed, a copy will also be available for review on the Claims Agent's website free of charge at https://cases.primeclerk.com/ImerysTalc/ by clicking the link for "Plan & Disclosure Statement."

1.1.178   "**Post-Effective Date Liabilities**" is defined in accordance with <u>Section 4.13</u> of the Plan.

1.1.179   "**Priority Non-Tax Claim**" means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Claim, a Priority Tax Claim, a Fee Claim, or a DIP Facility Claim.

1.1.180   "**Priority Tax Claim**" means any Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

1.1.181   "**Professional**" means any person retained or to be compensated pursuant to sections 327, 328, 330, 524(g)(4)(B)(i), or 1103 of the Bankruptcy Code, including, without limitation, any professional retained by the Tort Claimants' Committee and/or the FCR.

1.1.182   "**Proof of Claim**" means any proof of claim filed with the Bankruptcy Court or the Claims Agent pursuant to section 501 of the Bankruptcy Code and Bankruptcy Rules 3001 or 3002 that asserts a Claim against any of the Debtors.

1.1.183   "**Protected Party**" means any of the following:

(a)    the Debtors and any Person who served as a director or officer of any Debtor at any time during the Chapter 11 Cases, but solely in such Person's capacity as such;

(b)    the Reorganized Debtors;

(c)    the Imerys Protected Parties;

(d)    any Person, except for the Talc Personal Injury Trust, that, pursuant to the Plan or otherwise, after the Effective Date, becomes a direct or indirect transferee of, or successor to, the Debtors, the Reorganized Debtors, or any of their respective assets (but only to the extent that liability is asserted to exist as a result of its becoming such a transferee or successor);

(e)    the Buyer (but only to the extent that liability is asserted to exist as a result of its becoming a transferee or successor to the Debtors);

(f)    the Settling Talc Insurance Companies;

(g)     the Rio Tinto Protected Parties; and

(h)     the Cyprus Protected Parties (upon the Cyprus Trigger Date).

1.1.184    "**Providence Washington**" means Providence Washington Insurance Company and Seaton Insurance Company, formerly known as Unigard Security Insurance Company, formerly known as Unigard Mutual Insurance Company.

1.1.185    "**Release Injunction**" is defined in accordance with <u>Section 12.2.3</u> of the Plan.

1.1.186    "**Released Parties**" means each of: (a) the Imerys Protected Parties; (b) the Debtors; (c) the Reorganized Debtors; (d) the Tort Claimants' Committee; (e) the individual members of the Tort Claimants' Committee (in their capacities as such); (f) the FCR; (g) the Information Officer; (h) the Rio Tinto Protected Parties subject to the limitation in <u>Section 10.9.6</u> of the Plan; (i) the Cyprus Protected Parties; and (j) to the fullest extent permitted by applicable law, with respect to each of the foregoing Persons in clauses (b), (c), (d), (f), and (g), each such Person's Representatives; *provided* that, for the avoidance of doubt, the Cyprus Protected Parties will only be Released Parties upon the occurrence of the Cyprus Trigger Date.

1.1.187    "**Releasing Claim Holder**" means, collectively, (a) all holders of Claims that vote to accept the Plan; (b) all holders of Claims that are presumed to accept the Plan; (c) all holders of Claims entitled to vote on the Plan and who vote against the Plan and do not opt out of the releases provided for in the Plan, (d) all holders of Claims entitled to vote for or against the Plan who do not vote for or against the Plan and do not opt out of the releases provided for in the Plan, except for those holders of Claims whose solicitation packages were returned to the Debtors or their agent(s) as undeliverable and those holders of Claims that were not sent a solicitation package because a prior mailing sent to them in the Chapter 11 Cases was returned as undeliverable, in each case, unless such holders have notice of the Chapter 11 Cases; and (e) with respect to each of the foregoing Persons in clauses (a) through (d), such Persons' respective predecessors, successors, and assigns, each in their capacity as such.

1.1.188    "**Reorganized Debtors**" means the Reorganized North American Debtors and Reorganized ITI.

1.1.189    "**Reorganized ITA**" means ITA, renamed Ivory America, Inc. or such other name as set forth in the Amended Charter Documents, on and after the Effective Date.

1.1.190    "**Reorganized ITA Stock**" means one hundred percent (100%) of the shares of common stock of Reorganized ITA.

1.1.191    "**Reorganized ITC**" means ITC, renamed Ivory Canada, Inc. or such other name as set forth in the Amended Charter Documents, on and after the Effective Date.

1.1.192   "**Reorganized ITC Stock**" means one hundred percent (100%) of the shares of common stock of Reorganized ITC.

1.1.193   "**Reorganized ITI**" means ITI, on and after the Effective Date.

1.1.194   "**Reorganized ITV**" means ITV, renamed Ivory Vermont, Inc. or such other name as set forth in the Amended Charter Documents, on and after the Effective Date.

1.1.195   "**Reorganized ITV Stock**" means one hundred percent (100%) of the shares of common stock of Reorganized ITV.

1.1.196   "**Reorganized North American Debtor Cash Reserve**" means an amount, funded from Cash on hand of the North American Debtors, the Sale Proceeds, and/or the Imerys Cash Contribution, as of the Effective Date, subject to input from and consent by each of the Plan Proponents, equal to: (i) the Allowed Amount of Priority Tax Claims against the North American Debtors; (ii) the Allowed Amount of Priority Non-Tax Claims against the North American Debtors; (iii) the Allowed Amount of all Secured Claims against the North American Debtors; (iv) the Allowed Amount of all Debtor Intercompany Claims against the North American Debtors; (v) the Allowed Amount of all Unsecured Claims against the North American Debtors; and (vi) an estimate by the North American Debtors of additional post-Effective Date obligations that the Reorganized North American Debtors may incur, including, but not limited to, (a) amounts necessary to compensate the Disbursing Agent and cover costs incurred by the Disbursing Agent in implementing the Plan, (b) amounts necessary to enforce all rights to commence and pursue, as appropriate, any and all North American Debtor Causes of Action, and (c) amounts due in respect of the Canadian Proceeding related to the post-Effective Date period.  For the avoidance of doubt, the Reorganized North American Debtor Cash Reserve shall not be funded by the Administrative Claim Reserve, the Fee Claim Reserve, the assets of ITI, or the assets of Reorganized ITI, nor shall ITI Claims be satisfied from the Reorganized North American Debtor Cash Reserve.

1.1.197   "**Reorganized North American Debtor Stock**" means the Reorganized ITA Stock, the Reorganized ITV Stock, and the Reorganized ITC Stock, which shall be deemed authorized and issued on the Effective Date as described in Section 10.6 of the Plan.

1.1.198   "**Reorganized North American Debtors**" means Reorganized ITA, Reorganized ITV, and Reorganized ITC.

1.1.199   "**Representatives**" means with respect to any Person, such Person's (a) successors, permitted assigns, subsidiaries, and controlled affiliates, (b) present officers and directors, principals, members, employees, financial advisors, attorneys, accountants, investment bankers, consultants, experts, and other professionals, and (c) respective heirs, executors, estates, and nominees, in each case solely in their capacity as such.

23

1.1.200    "**Reserves**" means (a) the Administrative Claim Reserve; (b) Disputed Claims Reserve; (c) the Fee Claim Reserve; and (d) the Reorganized North American Debtor Cash Reserve.

1.1.201    "**Rio Tinto**" means Rio Tinto America Inc.

1.1.202    "**Rio Tinto Captive Insurer Policies**" means any and all Talc Insurance Policies issued by the Rio Tinto Captive Insurers, including, but not limited to the Talc Insurance Policies listed on Schedule III.  For the avoidance of doubt, the Rio Tinto Captive Insurer Policies shall not include any policy to the extent such policy provides reinsurance to any Zurich Protected Party.

1.1.203    "**Rio Tinto Captive Insurers**" means Three Crowns Insurance Company (formerly known as Three Crowns Insurance Company Limited), Metals & Minerals Insurance Company Pte. Ltd., and Falcon Insurance Ltd., collectively or individually, as appropriate.

1.1.204    "**Rio Tinto Cash Contribution**" means $80 million, which Rio Tinto will contribute, or cause to be contributed, to the Talc Personal Injury Trust.

1.1.205    "**Rio Tinto Corporate Parties**" means Rio Tinto plc, Rio Tinto Limited, and the Persons listed on Schedule IV, each of which is directly or indirectly controlled by Rio Tinto plc and/or Rio Tinto Limited, and the future successors or assigns of Rio Tinto plc, Rio Tinto Limited, and/or the Persons listed on Schedule IV, solely in their capacity as such.

1.1.206    "**Rio Tinto Protected Parties**" means (a) the Rio Tinto Corporate Parties; (b) direct or indirect shareholders of the Rio Tinto Corporate Parties; (c) current and former officers, directors, principals, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, insurers, investment bankers, consultants, representatives, experts, and other professionals of the Rio Tinto Corporate Parties; and (d) the respective heirs, executors, and estates, as applicable, of each Person listed in clauses (b) and (c), and, as to each Person listed in clauses (a), (b), (c) or (d), solely in their capacity as such.  For the avoidance of doubt, the Rio Tinto Protected Parties exclude the Debtors, the Imerys Protected Parties, the Cyprus Protected Parties, and J&J.

1.1.207    "**Rio Tinto/Zurich Contribution**" means, collectively, (a) the Rio Tinto Cash Contribution, (b) the Zurich Cash Contribution, and (c) the Rio Tinto/Zurich Credit Contribution.

1.1.208    "**Rio Tinto/Zurich Credit Contribution**" is defined in accordance with Section 10.9.2.1 of the Plan.

1.1.209    "**Rio Tinto/Zurich Released Claims**" is defined in accordance with Section 12.2.1(c) of the Plan.

1.1.210    "**Rio Tinto/Zurich Settlement**" means that certain comprehensive settlement set forth in the Plan and the Rio Tinto/Zurich Settlement Agreement and implemented by the Plan by and among: (i) Rio Tinto, on behalf of itself and the Rio Tinto Captive Insurers, and for the benefit of the Rio Tinto Protected Parties, and Zurich, on behalf of itself and for the benefit of the Zurich Protected Parties, on the one hand, and (ii) the Debtors, on the other hand, and consented to by the Tort Claimants' Committee and the FCR, pursuant to which, in exchange for the Rio Tinto/Zurich Contribution, the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties receive the benefit of the Channeling Injunction and other protections set forth herein and in the Rio Tinto/Zurich Settlement Agreement.

1.1.211    "**Rio Tinto/Zurich Settlement Agreement**" means the Settlement Agreement and Release among Rio Tinto, the Rio Tinto Captive Insurers, and Zurich, on the one hand, and the Debtors, on the other hand, providing for, *inter alia*, the free and clear sale, pursuant to section 363 of the Bankruptcy Code, of any and all rights and interests of the Debtors in the Rio Tinto Captive Insurer Policies and the Zurich Policies, in substantially the form attached as Exhibit C to the Plan.

1.1.212    "**Rio Tinto/Zurich Trigger Date**" means the date that the Tort Claimants' Committee or the Talc Personal Injury Trust provides Rio Tinto and/or Zurich (as applicable) with notice of the occurrence of the later of (a) the Effective Date, or (b) the date the Affirmation Order becomes a Final Order.

1.1.213    "**Sale**" means the sale of substantially all of the assets of the North American Debtors to the Buyer pursuant to the Asset Purchase Agreement, as approved by the Sale Order.

1.1.214    "**Sale Closing Date**" means the Closing Date (as defined in the Sale Order) of the Sale.

1.1.215    "**Sale Cure Notice**" is defined in accordance with Section 5.3.2 of the Plan.

1.1.216    "**Sale Motion**" means the *Debtors' Motion for Entry of Orders (I) (A) Establishing Bidding Procedures, Assumption and Assignment Procedures, and Stalking Horse Procedures for Sale of Substantially All Assets, (B) Scheduling Auction and Sale Hearing, and (C) Approving Form and Manner of Notice Thereof, (II) Approving Sale of Substantially All Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (III) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief*, filed on May 15, 2020.

1.1.217    "**Sale Order**" means the *Order (I) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith and (III) Granting Related Relief* [Docket No. 2539].

1.1.218    "**Sale Proceeds**" means the net proceeds from the Sale.

US-DOCS\120811676.4

1.1.219 "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs of the North American Debtors as filed on the Docket in accordance with section 521 of the Bankruptcy Code, as such schedules and statements may be amended or supplemented from time to time.

1.1.220 "**Seaton Settlement and Release Agreement**" means the settlement and release agreement by and between Freeport, on the one hand, and Seaton Insurance Co., f/k/a Unigard Security Insurance Co., f/k/a Unigard Mutual Insurance Co.), entered into in 2013.

1.1.221 "**Section 105 Injunction**" shall mean an injunction pursuant to section 105 of the Bankruptcy Code entered in the Chapter 11 Cases against the commencement or continuation of talc-related litigation claims against Cyprus Mines and CAMC. The Section 105 Injunction shall be effective on an interim basis and terminate, absent extension by the Bankruptcy Court, if the Confirmation Order confirming the Plan, and incorporating the Cyprus Settlement, is not entered by June 30, 2021. In the event the Plan is approved by the Bankruptcy Court by June 30, 2021, the Section 105 Injunction shall extend through at least September 30, 2021, subject to further extension by the Bankruptcy Court.

1.1.222 "**Secured Claim**" means a Claim, other than a DIP Facility Claim, or any portion thereof: (a) secured by a Lien on property in which a particular Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order, to the extent of the value of the creditor's interest in such Estate's interest in such property as determined pursuant to section 506(a) of the Bankruptcy Code, (b) subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the amount subject to setoff as determined pursuant to section 506(a) of the Bankruptcy Code, or (c) Allowed as secured pursuant to the Plan or any Final Order as a secured Claim.

1.1.223 "**Settled Talc Insurance Policy**" means any Talc Insurance Policy that is released pursuant to a Talc Insurance Settlement Agreement.

1.1.224 "**Settling Talc Insurance Company**" means, solely with respect to Settled Talc Insurance Policies:

      (a)     the Zurich Protected Parties;

      (b)     the Rio Tinto Captive Insurers;

      (c)     the Cyprus Settling Talc Insurance Companies;

      (d)     prior to the Effective Date, any other Talc Insurance Company that contributes funds, proceeds, or other consideration to or for the benefit of the Talc Personal Injury Trust and is designated, with the consent of the Debtors, the Tort Claimants' Committee, and the FCR, in the Confirmation Order and/or the Affirmation Order, to be a Settling Talc Insurance Company; and

(e)        following the Effective Date, each Talc Insurance Company that contributes funds, proceeds, or other consideration to or for the benefit of the Talc Personal Injury Trust and is designated as a Settling Talc Insurance Company by the Talc Personal Injury Trust, the Talc Trust Advisory Committee, and the FCR; *provided*, *however*, that any post-Effective Date addition to the list of Protected Parties does not become effective until entry of a Final Order approving the addition.

1.1.225    "**Shared Talc Insurance Policy**" means the Talc Insurance Policy issued by XL Insurance Company Ltd. to the Imerys Non-Debtors and the Debtors, Policy No. FR00003071LI13A, for the policy period of January 1, 2013 to December 31, 2014, and the Talc Insurance Policies issued by XL Insurance America, Inc. to Imerys USA, Inc. for the policy periods of January 1, 2011 through January 1, 2015, and any other insurance policy currently or previously in effect at any time on or before the Effective Date naming the Debtors (or any predecessor, subsidiary, or past or present Affiliate of the Debtors) as an insured (whether as the primary or additional insured, or by virtue of being a subsidiary to the named insured), or otherwise alleged to afford the Imerys Non-Debtors' insurance coverage, upon which any claim could have been, has been or may be made with respect to any Talc Personal Injury Claim, except that such insurance policies will not include any insurance policy that contains an exclusion expressly applicable to bodily injury arising in whole or in part out of exposure to talc, or talc-containing dust that has caused or allegedly caused ovarian cancer.

1.1.226    "**Supplemental Settlement Injunction Order**" means the injunction described in Section 12.4 of the Plan.

1.1.227    "**Talc In-Place Insurance Coverage**" means all of the rights, benefits or insurance coverage under any Talc Insurance Policy or any Talc Insurance CIP Agreement that is not a Settled Talc Insurance Policy, including the right to payment or reimbursement of liability, indemnity, or defense costs arising from or related to Talc Personal Injury Claims or Talc Personal Injury Trust Expenses.

1.1.228    "**Talc Insurance Action**" means any claim, cause of action, or right of the Debtors, or any one of them, under the laws of any jurisdiction, against any Talc Insurance Company with respect to any Talc Personal Injury Claim, arising from or related to: (a) any such Talc Insurance Company's failure to provide coverage or otherwise pay under Talc In-Place Insurance Coverage, (b) the refusal of any Talc Insurance Company to compromise and settle any Talc Personal Injury Claim under or pursuant to any Talc Insurance Policy, or Talc Insurance CIP Agreement, (c) the interpretation or enforcement of the terms of any Talc Insurance Policy or Talc Insurance CIP Agreement with respect to any Talc Personal Injury Claim, (d) any conduct by a Talc Insurance Company constituting "bad faith," conduct that could give rise to extra-contractual damages, or other wrongful conduct under applicable law, or (e) any other claims under, arising out of or relating to a Talc Insurance Policy, a Talc Insurance CIP Agreement, or Talc In-Place Insurance Coverage, including, but not limited, to the lawsuit styled as *Columbia Casualty Company, et al. v. Cyprus Mines Corporation, et al.*, Case No. CGC-17-560919, Superior Court of the State of California, County of San Francisco, and the lawsuit styled as *Imerys*

27

*Talc America, Inc. et al. v. Cyprus Amax Minerals Company, et al.*, Adv. Pro. No. 19-50115 (LSS), U.S. Bankruptcy Court for the District of Delaware.

1.1.229    "**Talc Insurance Action Recoveries**" means (a) Cash derived from and paid pursuant to a Talc Insurance Settlement Agreement, (b) Cash derived from and paid pursuant to a Talc Insurance CIP Agreement entered into after February 13, 2019, attributable to any Talc Personal Injury Claim other than reimbursement for payments made on account of Talc Personal Injury Claims prior to February 13, 2019, (c) the right to receive proceeds of Talc In-Place Insurance Coverage (including any receivables), and (d) the right to receive the proceeds or benefits of any Talc Insurance Action.

1.1.230    "**Talc Insurance CIP Agreement**" means (a) any settlement agreement existing by and among any Talc Insurance Company and one or more of the Debtors, that amends, modifies, replaces, or governs the rights and obligations of, and the coverage afforded to, any or all of the Debtors under any Talc Insurance Policy, other than a Talc Insurance Settlement Agreement, or (b) any settlement agreement with a Talc Insurance Company relating to any Talc Personal Injury Claim entered into by the Debtors prior to the Petition Date.

1.1.231    "**Talc Insurance Company**" means any insurance company, insurance syndicate, coverholder, insurance broker or syndicate insurance broker, guaranty association, or any other Entity that may have liability under a Talc Insurance Policy.

1.1.232    "**Talc Insurance Policy**" means any insurance policy currently or previously in effect at any time on or before the Effective Date naming the Debtors (or any predecessor, subsidiary, or past or present Affiliate of the Debtors) as an insured (whether as the primary or additional insured, or by virtue of being a subsidiary to the named insured), or otherwise alleged to afford the Debtors insurance coverage, upon which any claim could have been, has been or may be made with respect to any Talc Personal Injury Claim, including, but not limited to, the policies included in the Plan Supplement, Schedule III, and Schedule VI.  Notwithstanding the foregoing, Talc Insurance Policies shall not include any policy providing reinsurance to any Settling Talc Insurance Company.

1.1.233    "**Talc Insurance Settlement Agreement**" means (a) the Rio Tinto/Zurich Settlement Agreement and (b) any other settlement agreement entered into after the Petition Date by and among (i) any Talc Insurance Company, on the one hand, and (ii) one or more of the Debtors, and consented to by the Tort Claimants' Committee and the FCR, or the Talc Personal Injury Trust, on the other hand, in which a Talc Insurance Policy and/or the Debtors' rights thereunder with respect to Talc Personal Injury Claims are released.

1.1.234    "**Talc Insurer Coverage Defense**" means all rights and defenses that any Talc Insurance Company may have under any Talc Insurance Policy and applicable law with respect to a claim seeking insurance coverage or to a Talc Insurance Action, but Talc Insurer Coverage Defenses do not include any defense that the Plan or any of the other Plan Documents do not comply with the Bankruptcy Code.  Upon entry of the Confirmation Order in the Chapter 11 Cases determining that the Bankruptcy Code authorizes the

28

Assignment by preempting any terms or provisions of the Talc Insurance Policies that any Talc Insurance Company asserts or may assert otherwise prohibits the Assignment, a Talc Insurer Coverage Defense shall not include any defense that the Assignment is prohibited by the Talc Insurance Policies or applicable non-bankruptcy law.

      1.1.235    "**Talc Personal Injury Claim**" means any Claim and any Talc Personal Injury Demand against one or more of the Debtors or any other Protected Party whether known or unknown, including with respect to any manner of alleged bodily injury, death, sickness, disease or alleged disease process, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries (whether physical, emotional or otherwise), directly or indirectly arising out of or relating to the presence of or exposure to talc or talc-containing products based on the alleged pre-Effective Date acts or omissions of the Debtors or any other Entity for whose conduct the Debtors have or are alleged to have liability (but only to the extent such Claim or Talc Personal Injury Demand directly or indirectly arises out of or relates to the alleged pre-Effective Date acts or omissions of the Debtors), including, without limitation any claims directly or indirectly arising out of or relating to: (a) any products previously mined, processed, manufactured, sold (including, without limitation, any Sale pursuant to the Sale Order) and/or distributed by the Debtors or any other Entity for whose conduct the Debtors have or are alleged to have liability, but in all cases only to the extent of the Debtors' liability; (b) any materials present at any premises owned, leased, occupied or operated by any Entity for whose products, acts, omissions, business or operations the Debtors have, or are alleged to have, liability; or (c) any talc in any way connected to the Debtors alleged to contain asbestos or other constituent. Talc Personal Injury Claims include all such claims, whether: (1) in tort, contract, warranty, restitution, conspiracy, contribution, indemnity, guarantee, subrogation, or any other theory of law, equity or admiralty, whether brought, threatened or pursued in any United States court or court anywhere in the world; (2) seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative or any other costs, fees, injunctive or similar relief or any other measure of damages; (3) seeking any legal, equitable or other relief of any kind whatsoever, including, for the avoidance of doubt, any claims arising out of or relating to the presence of or exposure to talc or talc-containing products assertable against one or more Debtors or any other Protected Party; or (4) held by claimants residing within the United States or in a foreign jurisdiction. Talc Personal Injury Claims also include any such claims that have been resolved or are subject to resolution pursuant to any agreement, or any such claims that are based on a judgment or verdict. Talc Personal Injury Claims do not include any claim by any present or former employee of a predecessor or Affiliate of the Debtors for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer. For the avoidance of doubt, the term Talc Personal Injury Claim includes, without limitation (i) all claims, debts, obligations, or liabilities for compensatory damages (such as, without limitation, loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages; and (ii) Indirect Talc Personal Injury Claims. Notwithstanding the foregoing, Talc Personal Injury Claims do not include any claim that a Settling Talc Insurance Company may have against its reinsurers and/or retrocessionaires in their capacities as such, and nothing in the Plan, the Plan Documents, or the

Confirmation Order shall impair or otherwise affect the ability of a Settling Talc Insurance Company to assert any such claim against its reinsurers and/or retrocessionaires in their capacities as such.

1.1.236    "**Talc Personal Injury Demand**" means a demand for payment, present or future, against one or more of the Debtors or any other Protected Party that (A) falls within the meaning of "demand" in section 524(g) of the Bankruptcy Code; (B) (i) manifests after the Effective Date, (ii) arises out of the same or similar conduct or events that gave rise to a Claim that is a Talc Personal Injury Claim, and (iii) is caused or allegedly caused by any constituent other than asbestos; and/or (C) (i) was not a claim prior to the Effective Date, (ii) arises out of the same or similar conduct or events that gave rise to a Claim that is a Talc Personal Injury Claim, and (iii) is to be resolved pursuant to the terms of the Talc Personal Injury Trust.

1.1.237    "**Talc Personal Injury Trust**" means the Ivory America Personal Injury Trust established pursuant to the Talc Personal Injury Trust Agreement, which is a "qualified settlement fund" within the meaning of Treasury Regulations issued under Section 468B of the Internal Revenue Code.

1.1.238    "**Talc Personal Injury Trust Agreement**" means that certain trust agreement, substantially in the form attached hereto as Exhibit B.

1.1.239    "**Talc Personal Injury Trust Assets**" means the following assets and any income, profits, and proceeds derived from such assets subsequent to the transfer of such assets to the Talc Personal Injury Trust: (a) the Imerys Settlement Funds; (b) the right to receive the Rio Tinto/Zurich Contribution pursuant to the Rio Tinto/Zurich Settlement; (c) the right to receive the Cyprus Contribution pursuant to the Cyprus Settlement, subject to the terms of the Cyprus Settlement Agreement and conditioned upon occurrence of the Cyprus Trigger Date; (d) all Cash held by the North American Debtors as of the Effective Date, not including the Cash used to fund the Reserves; (e) all non-Cash assets included in the Imerys Contribution, including the Contributed Indemnity and Insurance Interests; (f) the Talc Personal Injury Trust Causes of Action and any and all proceeds thereof; (g) the Talc Insurance Actions; (h) the Talc Insurance Action Recoveries; (i) the rights of the Debtors with respect to Talc Insurance Policies, Talc Insurance CIP Agreements, Talc Insurance Settlement Agreements, and Claims thereunder; (j) the Reorganized North American Debtor Stock; (k) all Cash remaining in the Reserves, if any, to be distributed to the Talc Personal Injury Trust in accordance with the Plan; (l) any and all other funds, proceeds, or other consideration otherwise contributed to the Talc Personal Injury Trust pursuant to the Plan and/or the Confirmation Order or other order of the Bankruptcy Court; (m) the rights of the Debtors with respect to the J&J Indemnification Obligations; and (n) the income or earnings realized or received in respect to items (a) to (m) above.  The rights of any Cyprus Protected Parties under the J&J Agreements, including any J&J Indemnification Obligations, or under any Cyprus Talc Insurance Policy or with respect to the Talc Insurance Actions, shall not constitute "Talc Personal Injury Trust Assets" for any purpose until the occurrence of the Cyprus Trigger Date (and then as provided for under the Cyprus Settlement).  The allocation of the Cyprus Contribution among the Funds (as

30

defined in the Trust Distribution Procedures) established pursuant to the Trust Distribution Procedures is described in <u>Section 10.10.9</u> of the Plan.

1.1.240  "**Talc Personal Injury Trust Causes of Action**" means, any Estate Cause of Action, not otherwise expressly released pursuant to the Plan, attributable to: (a) all defenses to any Talc Personal Injury Claim, including, but not limited to, all defenses under section 502 of the Bankruptcy Code, (b) with respect to any Talc Personal Injury Claim, all rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted, (c) any other claims or rights with respect to Talc Personal Injury Claims that the Debtors would have had under applicable law if the Chapter 11 Cases had not occurred and the holder of such Talc Personal Injury Claim had asserted it by initiating civil litigation against any such Debtor, and (d) any claim, cause of action, or right of the Debtors or any one of them, under the laws of any jurisdiction, for reimbursement, indemnity, contribution, breach of contract, or otherwise arising from or relating to any payments made by the Debtors on account of Talc Personal Injury Claims prior to the Petition Date.

1.1.241  "**Talc Personal Injury Trust Documents**" means the Talc Personal Injury Trust Agreement, the Trust Distribution Procedures, the Cooperation Agreement, and all other agreements, instruments, and documents governing the establishment, administration, and operation of the Talc Personal Injury Trust, which shall be substantially in the form set forth as exhibits hereto or in the Plan Supplement, as they may be amended or modified from time to time in accordance with their terms and the Plan.  The Plan Proponents shall have consent rights over the Cooperation Agreement.  With respect to the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures, (i) prior to the Effective Date, the Debtors and Imerys S.A. shall have consultation rights as to the form and substance of such documents, (ii) prior to the Cyprus Trigger Date, Cyprus shall have consultation rights with respect to any provisions that are material to the rights of Cyprus thereunder, and (iii) after the Effective Date, the Plan Proponents and Cyprus shall have consent rights over modifications to such documents to the extent such modifications will materially impact the scope and the terms of the releases and injunctions included in Article XII of the Plan.

1.1.242  "**Talc Personal Injury Trust Expenses**" means any liabilities, costs, or expenses of, or imposed upon, or in respect of, the Talc Personal Injury Trust once established (except for payments to holders of Talc Personal Injury Claims on account of such Claims).  Talc Personal Injury Trust Expenses shall also expressly include (a) any and all liabilities, costs, and expenses incurred subsequent to the Effective Date in connection with the Talc Personal Injury Trust Assets (including, without limitation, the prosecution of any Talc Personal Injury Trust Causes of Action and Talc Insurance Actions), in each case whether or not any such action results in a recovery for the Talc Personal Injury Trust and (b) the reasonable documented costs and expenses incurred by the Reorganized Debtors in taking any action on behalf of or at the direction of the Talc Personal Injury Trust, if any, including, without limitation, any costs and expenses incurred by the Reorganized Debtors in being named as a defendant in any Talc Insurance Action.

31

1.1.243    "**Talc PI Note**" means that certain note to be issued by Imerys S.A. and guaranteed by ITI in favor of the Talc Personal Injury Trust in the amount of $500,000.00.

1.1.244    "**Talc PI Pledge Agreement**" means the Pledge Agreement to be issued by Mircal Italia pursuant to which the Talc Personal Injury Trust will be granted an Encumbrance entitling the Talc Personal Injury Trust to fifty-one percent (51%) of the common stock of ITI in the event of default under the Talc PI Note.

1.1.245    "**Talc Trust Advisory Committee**" means the committee appointed and serving in accordance with Section 4.4 of the Plan, and having the powers, duties and obligations set forth in the Talc Personal Injury Trust Agreement.

1.1.246    "**Talc Trust Advisory Committee Member**" means any member of the Talc Trust Advisory Committee.

1.1.247    "**Talc Trust Contribution**" is defined in accordance with Section 10.8.2.3 of the Plan.

1.1.248    "**Talc Trustee**" means an individual appointed by the Bankruptcy Court to serve as a trustee of the Talc Personal Injury Trust pursuant to the terms of the Plan and the Talc Personal Injury Trust Agreement or who subsequently may be appointed pursuant to the terms of the Talc Personal Injury Trust Agreement.

1.1.249    "**Tort Claimants' Committee**" means the official committee of tort claimants in the Debtors' Chapter 11 Cases appointed by the United States Trustee, as such committee is reconstituted from time to time.

1.1.250    "**Trust Distribution Procedures**" means the Talc Personal Injury Trust Distribution Procedures, substantially in the form attached hereto as Exhibit A.

1.1.251    "**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.1.252    "**Unimpaired**" means a Claim or Equity Interest, or a Class of Claims or Equity Interests, that is not Impaired under the Plan.

1.1.253    "**United States Trustee**" means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the District of Delaware.

1.1.254    "**Unsecured Claim**" means a Claim against one or more of the Debtors that is not an Administrative Claim, a Priority Non-Tax Claim, a Priority Tax Claim, a Secured Claim, a Talc Personal Injury Claim, or an Intercompany Claim.

1.1.255    "**Unsecured Claim Contribution**" is defined in accordance with Section 10.8.2.2 of the Plan.

32

1.1.256    "**Voting Procedures**" means those certain procedures and supplemental procedures approved by the Bankruptcy Court for soliciting and tabulating the votes to accept or reject the Plan cast by holders of Claims against and Equity Interests in the Debtors entitled to vote on the Plan.

1.1.257    "**Voting Procedures Order**" means, the order entered by the Bankruptcy Court, which, among other things, (i) fixes Talc Personal Injury Claims in the amounts designated in the Trust Distribution Procedures, solely for voting purposes and not for allowance or distribution purposes, and (ii) approves the Voting Procedures.

1.1.258    "**Zurich**" means Zurich American Insurance Company, in its own capacity and as successor-in-interest to Zurich Insurance Company, U.S. Branch.

1.1.259    "**Zurich Cash Contribution**" means $260 million, which Zurich will contribute, or cause to be contributed, to the Talc Personal Injury Trust.

1.1.260    "**Zurich Corporate Parties**" means Zurich and all Persons listed on Schedule V hereto, and the future successors and assigns of such Persons, solely in their capacity as such.  Schedule V is an exclusive list and does not include, among others, the Debtors, the Imerys Protected Parties, the Cyprus Protected Parties, and J&J.

1.1.261    "**Zurich Policies**" means any and all Talc Insurance Policies issued by the Zurich Corporate Parties, including the Talc Insurance Policies listed on Schedule VI. For the avoidance of doubt, the Zurich Policies shall not include any policy to the extent such policy provides reinsurance to any Rio Tinto Captive Insurer.

1.1.262    "**Zurich Protected Parties**" means (a) the Zurich Corporate Parties; (b) direct or indirect shareholders of Zurich; (c) current and former officers, directors, principals, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, insurers, consultants, representatives, experts, and other professionals of the Zurich Corporate Parties; and (d) with respect to each of the foregoing Persons in clauses (b) and (c), each such Persons' respective heirs, executors, estates, and nominees, as applicable and, as to each Person listed in clauses (a), (b), (c), and (d), solely in their capacity as such.  For the avoidance of doubt, the Zurich Protected Parties exclude the Debtors, the Imerys Protected Parties, the Cyprus Protected Parties, and J&J.

1.2    Interpretation; Application of Definitions; Rules of Construction; and Computation of Time.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender will include the masculine, feminine, and neuter.  Unless otherwise specified, all Article, Section, Schedule, or Exhibit references in the Plan are to the respective article or section of, or schedule or exhibit to, the Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.  The rules of construction contained in section 102 of the Bankruptcy Code will apply to the construction of the

US-DOCS\120811676.4

Plan.  Unless otherwise stated herein, all references to dollars mean United States dollars.  In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) will apply.  The words "including" or "includes" shall be without limitation.

1.3    Exhibits.  All exhibits and schedules to the Plan, to the extent not annexed hereto and any agreements referred to herein and therein will be available for review following their filing with the Bankruptcy Court on (a) the Court's website: www.deb.uscourts.gov, and (b) the website maintained by the Debtors' Claims Agent at https://primeclerk.com/imerystalc.

1.4    Ancillary Documents.  Each of the schedules and exhibits to the Plan (whether annexed hereto or included in the Plan Supplement), the Disclosure Statement and supplements thereto, and the schedules and exhibits to the Disclosure Statement and the supplements thereto are an integral part of the Plan, and are hereby incorporated by reference and made a part of the Plan, including, without limitation, the Talc Personal Injury Trust Agreement, the Trust Distribution Procedures, the Cooperation Agreement, the Amended Charter Documents, and the other Plan Documents.

## ARTICLE II
## TREATMENT OF ADMINISTRATIVE CLAIMS, FEE CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS

2.1    Administrative Claims.

2.1.1    Allowed Administrative Claims.  Holders of Allowed Administrative Claims (other than Fee Claims, which are governed by Section 2.3 of the Plan) shall receive Cash equal to the unpaid portion of such Allowed Administrative Claims on the Distribution Date, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims, or such amounts and on such other terms as may be agreed to by the holders of such Claims and the Debtors or the Reorganized Debtors, as the case may be; *provided*, *however*, that Allowed Administrative Claims representing liabilities incurred on or after the Petition Date in the ordinary course of business by any of the Debtors shall be paid by the Debtors or the Reorganized Debtors, as the case may be, in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.  All Allowed Administrative Claims (other than Fee Claims) shall be paid from funds held in the Administrative Claim Reserve, which shall be funded from Cash on hand, the Sale Proceeds, and/or the Imerys Cash Contribution (excluding the Unsecured Claim Contribution).  The Reorganized Debtors will be entitled to transfer excess funds from the Fee Claim Reserve (after all Allowed Fee Claims have been satisfied in full) and the Reorganized North American Debtor Cash Reserve (excluding all funds attributable to the Unsecured Claim Contribution) to the Administrative Claim Reserve as they deem necessary or appropriate, on notice to the FCR and the Tort Claimants' Committee, to enable them to satisfy their obligations herein.

2.1.2    Administrative Claims Bar Date.  Except as otherwise provided in this Article II, requests for payment of Administrative Claims (other than Fee Claims and Claims against the North American Debtors arising under section 503(b)(9) of the

34

Bankruptcy Code), must be filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than sixty (60) days after the Effective Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against, as applicable, the Debtors or the Reorganized Debtors, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be filed and served on the Reorganized Debtors and the requesting party, as applicable, no later than ninety (90) days after the Effective Date, unless otherwise authorized by the Bankruptcy Rules or Bankruptcy Court. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under the Plan. For the avoidance of doubt and in accordance with, and furtherance of, the terms of the ITC Stipulated Order, any ITC Stipulated Claim shall be (i) automatically disallowed upon entry of the Confirmation Order and (ii) deemed discharged upon the Effective Date, without any further action required.

2.1.3    <u>Disputed Administrative Claims</u>. If a Disputed Administrative Claim is thereafter Allowed in whole or in part, the Disbursing Agent shall (at such time as determined to be practicable by the Reorganized Debtors) distribute from the Administrative Claim Reserve, to the holder of such Administrative Claim, the Cash that such holder would have received on account of such Claim if such Administrative Claim had been an Allowed Administrative Claim on the Effective Date. When (i) all Disputed Administrative Claims against the Reorganized Debtors have been resolved and (ii) Distributions required to be made by the Reorganized Debtors pursuant to this <u>Section 2.1</u> and <u>Section 2.3</u> have been made, all Cash remaining in the Administrative Claim Reserve shall be disbursed to the Talc Personal Injury Trust.

2.2    <u>Allowed Priority Tax Claims</u>. On the Distribution Date, holders of Allowed Priority Tax Claims shall receive Cash equal to the amount of such Allowed Priority Tax Claims, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims unless the holder of such claim agrees to an alternative treatment.

2.3    <u>Fee Claims</u>.

2.3.1    All final fee requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code for services rendered to the Debtors, the Tort Claimants' Committee, or the FCR, all Fee Claims of members of the Tort Claimants' Committee for reimbursement of expenses, and all requests or Claims under section 503(b)(4) of the Bankruptcy Code, must be filed and served on the Reorganized Debtors and other parties required to be served by the Compensation Procedures Order by no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Any objections to a final Fee Claim or any requests or claims under section 503(b)(4) of the Bankruptcy Code must be filed by no later than twenty (20) days after the filing of such Claim. The terms of the Compensation Procedures Order shall govern the allowance and payment of any final Fee

Claims submitted in accordance with this <u>Section 2.3</u> of the Plan. The Fee Examiner appointed under the Fee Examiner Order shall continue to act in this appointed capacity unless and until all final Fee Claims have been approved by order of the Bankruptcy Court, and the Reorganized Debtors shall be responsible to pay the fees and expenses incurred by the Fee Examiner in rendering services after the Effective Date.

2.3.2    The amount of the Fee Claims owing to the Professionals on and after the Effective Date shall be paid in Cash to such Professionals from funds held in the Fee Claim Reserve, which shall be funded from Cash on hand, the Sale Proceeds, and/or the Imerys Cash Contribution (excluding the Unsecured Claim Contribution), as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order. The Reorganized Debtors will be entitled to transfer excess funds from the Administrative Claim Reserve (after all Allowed Administrative Claims have been satisfied in full) and the Reorganized North American Debtor Cash Reserve (excluding all funds attributable to the Unsecured Claim Contribution) to the Fee Claim Reserve as they deem necessary or appropriate, on notice to the FCR and the Tort Claimants' Committee, to enable them to satisfy their obligations herein. When all Allowed Fee Claims and Allowed Administrative Claims have been paid in full, amounts remaining in the Fee Claim Reserve, if any, shall revert to the Talc Personal Injury Trust.

2.4    <u>DIP Facility Claims</u>.    On or prior to the Effective Date, in full satisfaction, settlement, discharge, and release of, and in exchange for the DIP Facility Claims, all amounts payable by the Debtors under the DIP Facility shall be satisfied in full consistent with the DIP Loan Documents and the DIP Order; *provided* that this <u>Section 2.4</u> only applies to the extent DIP Loans are made to the Debtors on or prior to the Effective Date.

## ARTICLE III
## TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

3.1    <u>Grouping of the Debtors for Convenience</u>.    The Plan groups the Debtors together solely for the purposes of describing treatment under the Plan, Confirmation of the Plan, and making Distributions. Unless set forth in the Plan, this grouping shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets. The Plan is not premised upon and shall not cause the substantive consolidation of the Debtors, and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

3.2    <u>Claims and Equity Interests Classified</u>.    For purposes of organization, voting, and all Plan confirmation matters, and except as otherwise provided herein, all Claims (other than Administrative Claims, Fee Claims, DIP Facility Claims, and Priority Tax Claims) against and Equity Interests in the Debtors are classified as set forth in this Article III of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, Fee Claims, and DIP Facility Claims described in Article II of the Plan, have not been classified and are excluded from the following Classes. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest falls within the description of

36

such Class, and is classified in another Class or Classes to the extent that any remainder of the Claim or Equity Interest falls within the description of such other Class or Classes. Notwithstanding anything to the contrary contained in the Plan, no Distribution shall be made on account of any Claim that is not an Allowed Claim for distribution purposes.

3.3    <u>Treatment and Classification of Claims and Equity Interests</u>.  For purposes of all Plan confirmation matters, including, without limitation, voting on, Confirmation of, and Distributions under, the Plan, and except as otherwise provided herein, all Claims against (other than Administrative Claims, Fee Claims, DIP Facility Claims, and Priority Tax Claims, which are not classified) and Equity Interests in the Debtors shall be classified and treated in the manner set forth below.  Capitalized terms used in this <u>Section 3.3</u> and not otherwise defined in the Plan shall have the meaning ascribed to them in the Trust Distribution Procedures.

| Class | Designation | Treatment | Entitlement to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 3a | Unsecured Claims against the North American Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 3b | Unsecured Claims against ITI | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 4 | Talc Personal Injury Claims | Impaired | Entitled to Vote | The Initial Payment Percentages are estimated in the following ranges: (1) Fund A (Ovarian Cancer A Claimants): 0.40% to 2.34%; (2) Fund B (Mesothelioma Claimants): 3.70% to 6.24%; and (3) Fund C (Ovarian Cancer B – D Claimants): 0.30% to 1.48%. ———————————— The Trust Distribution Procedures include provisions that would permit a subsequent modification of Payment Percentages on a Claim category by Claim category basis. |

37

| Class | Designation | Treatment | Entitlement to Vote | Estimated Recovery |
|-------|-------------|-----------|---------------------|--------------------|
| 5a | Non-Debtor Intercompany Claims | Impaired | Not Entitled to Vote (Presumed to Accept) | 0% |
| 5b | Debtor Intercompany Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 6 | Equity Interests in the North American Debtors | Impaired | Not Entitled to Vote (Presumed to Accept) | Cancelled |
| 7 | Equity Interests in ITI | Unimpaired | Not Entitled to Vote (Presumed to Accept) | Reinstated |

### 3.3.1    Class 1 – Priority Non-Tax Claims

(a)    Classification: Class 1 consists of all Priority Non-Tax Claims against the Debtors.

(b)    Treatment: On the Distribution Date, each holder of an Allowed Class 1 Priority Non-Tax Claim shall receive Cash equal to the Allowed Amount of such Priority Non-Tax Claim.

(c)    Voting: Class 1 is Unimpaired and each holder of an Allowed Claim in Class 1 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Each holder of an Allowed Claim in Class 1 is not entitled to vote to accept or reject the Plan.

### 3.3.2    Class 2 – Secured Claims

(a)    Classification: Class 2 consists of all Secured Claims against the Debtors.

(b)    Treatment: All Allowed Secured Claims in Class 2 will be treated pursuant to one of the following alternatives on the Distribution Date: (i) payment in full in Cash in accordance with section 506(a) of the Bankruptcy Code; (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code; (iii) such other treatment as the Debtor and the holder shall agree; or (iv) such other treatment as may be necessary to render such Claim Unimpaired.

(c)    Voting: Class 2 is Unimpaired and each holder of an Allowed Claim in Class 2 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy

Code.  Each holder of an Allowed Claim in Class 2 is not entitled to vote to accept or reject the Plan.

### 3.3.3    Class 3a – Unsecured Claims against the North American Debtors

(a)    Classification: Class 3a consists of all Unsecured Claims against the North American Debtors.

(b)    Treatment: Each holder of an Allowed Unsecured Claim against the North American Debtors shall be paid the Allowed Amount of its Unsecured Claim on the Distribution Date.  Such payment shall be (i) in full, in Cash, plus post-petition interest at the federal judgment rate in effect on the Petition Date, or (ii) upon such other less favorable terms as may be mutually agreed upon between the holder of such Unsecured Claim and the applicable North American Debtor or Reorganized North American Debtor.

(c)    Voting: Class 3a is Unimpaired and each holder of an Allowed Claim in Class 3a is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Each holder of an Allowed Claim in Class 3a is not entitled to vote to accept or reject the Plan.

### 3.3.4    Class 3b – Unsecured Claims against ITI

(a)    Classification: Class 3b consists of all Unsecured Claims against ITI.

(b)    Treatment: The legal, equitable, and contractual rights of the holders of Unsecured Claims against ITI are unaltered by the Plan.  Except to the extent that a holder of an Unsecured Claim against ITI agrees to a different treatment, on and after the Effective Date, Reorganized ITI will continue to pay or dispute each Unsecured Claim in the ordinary course of business in accordance with applicable law.

(c)    Voting: Class 3b is Unimpaired and each holder of an Allowed Claim in Class 3b is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Each holder of an Allowed Claim in Class 3b is not entitled to vote to accept or reject the Plan.

### 3.3.5    Class 4 – Talc Personal Injury Claims

(a)    Classification: Class 4 consists of all Talc Personal Injury Claims. For the avoidance of doubt, Class 4 consists of Direct Talc Personal Injury Claims and Indirect Talc Personal Injury Claims.

(b)    Treatment: On the Effective Date, liability for all Talc Personal Injury Claims shall be channeled to and assumed by the Talc Personal Injury Trust without further act or deed and shall be resolved in accordance with the Trust Distribution Procedures.  Pursuant to the Plan and Trust Distribution Procedures, each holder of a Talc Personal Injury Claim shall have its Claim permanently channeled to the Talc Personal Injury Trust, and such Claim shall thereafter be resolved in accordance with the Trust

39

Distribution Procedures.  Foreign Claims are a subset of Talc Personal Injury Claims that will be channeled to and assumed by the Talc Personal Injury Trust and subject to the Channeling Injunction; however, the Trust Distribution Procedures provide that Foreign Claims will not receive any distributions from the Talc Personal Injury Trust.

(c)     Voting: Class 4 is Impaired and each holder of an Allowed Claim in Class 4 is entitled to vote to accept or reject the Plan.

### 3.3.6     Class 5a – Non-Debtor Intercompany Claims

(a)     Classification: Class 5a consists of all Non-Debtor Intercompany Claims.

(b)     Treatment: On or after the Effective Date, all Non-Debtor Intercompany Claims shall be canceled, discharged, or eliminated.

(c)     Voting: Class 5a is Impaired.  Each holder of an Allowed Claim in Class 5a has consented to its treatment under the Plan as a Plan Proponent and is therefore presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Each holder of an Allowed Claim in Class 5a is not entitled to accept or reject the Plan.

### 3.3.7     Class 5b – Debtor Intercompany Claims

(a)     Classification: Class 5b consists of all Debtor Intercompany Claims.

(b)     Treatment: At the election of the applicable Debtor, each Debtor Intercompany Claim shall (i) be reinstated, (ii) remain in place, and/or (iii) with respect to certain Debtor Intercompany Claims in respect of goods, services, interest, and other amounts that would have been satisfied in Cash directly or indirectly in the ordinary course of business had they not been outstanding as of the Petition Date, be settled in Cash.

(c)     Voting: Class 5b is Unimpaired and each holder of an Allowed Claim in Class 5b is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Each holder of a Claim in Class 5b is not entitled to accept or reject the Plan.

### 3.3.8     Class 6 – Equity Interests in the North American Debtors

(a)     Classification: Class 6 consists of all Equity Interests in the North American Debtors.

(b)     Treatment: On the Effective Date, all Equity Interests in the North American Debtors shall be canceled, annulled, and extinguished.

(c)     Voting: Class 6 is Impaired.  Each holder of an Allowed Class 6 Equity Interest has consented to its treatment under the Plan as a Plan Proponent and is therefore presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.

Each holder of an Allowed Equity Interest in Class 6 is not entitled to vote to accept or reject the Plan.

3.3.9    **Class 7 – Equity Interests in ITI**

(a)    Classification: Class 7 consists of all Equity Interests in ITI.

(b)    Treatment: On the Effective Date, all Equity Interests in ITI shall be reinstated and the legal, equitable, and contractual rights to which holders of Equity Interests in ITI are entitled shall remain unaltered to the extent necessary to implement the Plan.

(c)    Voting: Class 7 is Unimpaired and each holder of an Allowed Class 7 Equity Interest is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Each holder of an Allowed Equity Interest in Class 7 is not entitled to vote to accept or reject the Plan.

3.4    Debtors' Rights with Respect to Unimpaired Claims.  Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors with respect to any Unimpaired Claims, including all rights with respect to legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

## ARTICLE IV
## THE TALC PERSONAL INJURY TRUST

4.1    Establishment of the Talc Personal Injury Trust.  On the Effective Date, the Talc Personal Injury Trust shall be created in accordance with the Plan Documents.  The Talc Personal Injury Trust shall be a "qualified settlement fund" within the meaning of the Treasury Regulations issued under Section 468B of the Tax Code.

4.2    Purpose and Trust Distribution Procedures.

4.2.1    The purposes of the Talc Personal Injury Trust shall be to assume all Talc Personal Injury Claims and to use the Talc Personal Injury Trust Assets and, among other things: (a) to preserve, hold, manage, and maximize the assets of the Talc Personal Injury Trust; and (b) to direct the processing, liquidation, and payment of all compensable Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents.  The Talc Personal Injury Trust will resolve Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents in such a way that holders of Talc Personal Injury Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such claims, and otherwise comply in all respects with the requirements of section 524(g)(2)(B)(i) of the Bankruptcy Code.

4.2.2    In the event of a conflict between the terms or provisions of the Plan and the Talc Personal Injury Trust Documents, the terms of the Plan shall control.

4.3    Selection of the Initial Talc Trustees.  There shall be three initial Talc Trustees. The initial Talc Trustees of the Talc Personal Injury Trust shall be the persons identified in the

Plan Supplement. All successor Talc Trustees shall be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement. For purposes of performing their duties and fulfilling their obligations under the Talc Personal Injury Trust Agreement and the Plan, each Talc Trustee shall be deemed to be (and the Confirmation Order shall provide that it is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code. The Tort Claimants' Committee and the FCR shall jointly select the initial Talc Trustees.

4.4     Advising the Talc Personal Injury Trust.

4.4.1     The Talc Trust Advisory Committee. The Talc Trust Advisory Committee shall be established pursuant to the Talc Personal Injury Trust Agreement. The initial Talc Trust Advisory Committee shall be composed of the members of the Tort Claimants' Committee and shall have the functions, duties, and rights provided in the Talc Personal Injury Trust Agreement. Specifically, the initial members of the Talc Trust Advisory Committee shall include: (i) Robin Alander; (ii) Nolan Zimmerman, as representative of the estate of Donna M. Arvelo; (iii) Christine Birch; (iv) Bessie Dorsey-Davis; (v) Lloyd Fadem, as representative of the estate of Margaret Ferrell; (vi) Timothy R. Faltus, as representative of the estate of Shari C. Faltus; (vii) Deborah Giannecchini; (viii) Kayla Martinez; (ix) David A. Martz, as representative of the estate of Lynne Martz; (x) Gregory W. Vella, as representative of the estate of Nicole Matteo; and (xi) Charvette Monroe, as representative of the estate of Margie Evans. Each of the members of the Talc Trust Advisory Committee shall serve in accordance with the terms and conditions contained in the Talc Personal Injury Trust Agreement. To the extent any member of the Tort Claimants' Committee is replaced by the United States Trustee prior to the Effective Date, such replacement member shall serve on the Talc Trust Advisory Committee in the place of the replaced member.

4.4.2     Successor Talc Trust Advisory Committee Members. Successor Talc Trust Advisory Committee Members shall be appointed pursuant to the terms of the Talc Personal Injury Trust Agreement.

4.4.3     FCR. From and after the Effective Date, the FCR shall continue to serve in that capacity as an advisor to the Talc Personal Injury Trust and shall have the functions, duties and rights provided in the Talc Personal Injury Trust Agreement. Any expenses incurred by the FCR in this capacity shall constitute Talc Personal Injury Trust Expenses.

4.5     Transfer of Claims and Demands to the Talc Personal Injury Trust.

4.5.1     On the Effective Date or as otherwise provided herein, and without further action of any Entity, the Talc Personal Injury Trust shall assume the liabilities, obligations, and responsibilities of the Debtors, the Imerys Protected Parties, the Rio Tinto Protected Parties, and the Cyprus Protected Parties for all Talc Personal Injury Claims, financial or otherwise, including, but not limited to, Indirect Talc Personal Injury Claims. This assumption shall not affect (i) the application of the Discharge Injunction and the Channeling Injunction to the Debtors; (ii) any Talc Insurance Company's obligation under any Talc Insurance Policy; or (iii) the J&J Indemnification Obligations.

42

4.5.2    Except as otherwise expressly provided in the Plan, the Talc Personal Injury Trust Agreement, or the Trust Distribution Procedures, the Talc Personal Injury Trust shall have control over the Talc Personal Injury Trust Causes of Action and the Talc Insurance Actions, and the Talc Personal Injury Trust shall thereby become the estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with the exclusive right to enforce each of the Talc Personal Injury Trust Causes of Action and Talc Insurance Actions, and the proceeds of the recoveries on any of the Talc Personal Injury Trust Causes of Action or the Talc Insurance Actions shall be deposited in and become the property of the Talc Personal Injury Trust and the Talc Personal Injury Trust shall have the right to enforce the Plan and any of the other Plan Documents (including, but not limited to, the Cooperation Agreement) according to their respective terms, including the right to receive the Talc Personal Injury Trust Assets as provided in the Plan; *provided*, *however*, (a) the Talc Personal Injury Trust shall have no other rights against the Reorganized Debtors or the Protected Parties except to enforce the Plan and any of the other Plan Documents; (b) the Talc Personal Injury Trust Causes of Action and the Talc Insurance Actions shall not include any of the Talc Insurer Coverage Defenses; (c) the Talc Personal Injury Trust Causes of Action and the Talc Insurance Actions shall not include any claims fully and finally released, compromised, or settled pursuant to the Plan; (d) the Talc Personal Injury Trust shall comply with the Cyprus Insurance Protocol; and (e) for the avoidance of doubt, the Talc Personal Injury Trust Causes of Action and the Talc Insurance Actions do not include any rights of the Debtors, the Reorganized Debtors, or the other Protected Parties arising under the Channeling Injunction or any of the other injunctions, releases, or the discharge granted under the Plan and the Confirmation Order.

4.6    <u>Transfer of Talc Personal Injury Trust Assets to the Talc Personal Injury Trust</u>.

4.6.1    <u>Transfers on the Effective Date</u>.  On the Effective Date, subject to <u>Sections 4.6.2</u> and <u>4.6.3</u>, all right, title, and interest in and to the Talc Personal Injury Trust Assets (including the Sale Proceeds) and any proceeds thereof shall be automatically, and without further act or deed, transferred to, vested in, and assumed by the Talc Personal Injury Trust free and clear of all Claims, Equity Interests, Encumbrances, and other interests of any Entity, subject to the Channeling Injunction and other provisions of the Plan.  On the Effective Date, (i) Imerys S.A. and ITI shall issue and deliver the Talc PI Note to the Talc Personal Injury Trust and (ii) Mircal Italia shall execute the Talc PI Pledge Agreement, such that the Talc Personal Injury Trust shall be the sole holder of the Talc PI Note.

4.6.2    <u>Transfers After the Effective Date</u>.  To the extent any of the Talc Personal Injury Trust Assets are not transferred to the Talc Personal Injury Trust by operation of law on the Effective Date pursuant to the Plan, then when such assets accrue or become transferable subsequent to the Effective Date, they shall automatically and immediately transfer to the Talc Personal Injury Trust.  To the extent that action of the Reorganized Debtors is required to effectuate such transfer, the Reorganized Debtors shall promptly transfer, assign, and contribute, such remaining Talc Personal Injury Trust Assets to the Talc Personal Injury Trust.  In the event the Reorganized Debtors breach any obligation contained in this Section, the Talc Personal Injury Trust will have no adequate remedy at law and shall be entitled to preliminary and permanent declaratory and injunctive relief.

43

4.6.3    <u>Cyprus Contribution</u>.  Notwithstanding anything contained herein or otherwise, the Cyprus Contribution shall be made in accordance with <u>Section 10.10.5</u> hereof and no portion thereof shall be required to be contributed prior to the Cyprus Trigger Date.

4.6.4    <u>Cyprus Talc Insurance Policies</u>.  The Talc Personal Injury Trust shall assume all present and future obligations associated with recovering proceeds under the Cyprus Talc Insurance Policies.  Solely to the extent that the Talc Personal Injury Trust asserts any claim as assignee of a Cyprus Protected Party bound by the PDC Agreement, the Talc Personal Injury Trust shall abide by the terms of the PDC Agreement.  For the avoidance of doubt, other than as set forth in this provision or otherwise stated in the Plan or the Cyprus Settlement Agreement, the Talc Personal Injury Trust is not assuming any obligations undertaken by any Cyprus Protected Party in any settlement agreement or other contract compromising or releasing any rights under any Cyprus Talc Insurance Policy.

4.7    <u>Talc Personal Injury Trust Expenses</u>.  The Talc Personal Injury Trust shall pay all Talc Personal Injury Trust Expenses from the Talc Personal Injury Trust Assets, including proceeds of applicable Talc Insurance Policies.  The Talc Personal Injury Trust shall bear sole responsibility with respect to the payment of the Talc Personal Injury Trust Expenses.  Additionally, the Talc Personal Injury Trust shall promptly pay all reasonable and documented Talc Personal Injury Trust Expenses incurred by the Reorganized Debtors for any and all liabilities, costs or expenses as a result of taking action on behalf of or at the direction of the Talc Personal Injury Trust.

4.8    <u>Excess Talc Personal Injury Trust Assets</u>.  To the extent there are any Talc Personal Injury Trust Assets remaining at such time as the Talc Personal Injury Trust is dissolved, such excess Talc Personal Injury Trust Assets shall be transferred to a charity or charities for such charitable purposes as the Talc Trustees, in their reasonable discretion, shall determine.

4.9    <u>Dissolution of the Talc Personal Injury Trust</u>.  The Talc Personal Injury Trust shall be dissolved upon satisfaction of the purposes of the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents.  Upon dissolution of the Talc Personal Injury Trust: (a) the Talc Trustees and the Talc Trust Advisory Committee Members shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Cases, and (b) the Talc Trust Advisory Committee shall be dissolved.

4.10    <u>Funds and Investment Guidelines</u>.  All monies held in the Talc Personal Injury Trust shall be invested, subject to the investment limitations and provisions enumerated in the Talc Personal Injury Trust Agreement.

4.11    <u>Cooperation Agreement</u>.  The Debtors, the Imerys Non-Debtors, and the Talc Personal Injury Trust shall enter into the Cooperation Agreement on the Effective Date in substantially the form contained in the Plan Supplement that provides for the transfer and assignment of certain documents of the Debtors to the Talc Personal Injury Trust.  The parties to the Cooperation Agreement shall be bound by the terms thereof.

US-DOCS\120811676.4

4.12    <u>Talc Personal Injury Trust Indemnification of the Protected Parties</u>.  From and after the Effective Date, the Talc Personal Injury Trust shall indemnify, to the fullest extent permitted by applicable law, each of the Debtors, the Reorganized Debtors, and the other Protected Parties for reasonable documented out-of-pocket expenses (including, without limitation, attorney's fees and expenses) that occur after the Effective Date attributable to the defense of any Talc Personal Injury Claim asserted against the Debtors, Reorganized Debtors, or the other Protected Parties; *provided, however*, that the limit of the indemnification with respect to each of the Imerys Protected Parties, the Rio Tinto Protected Parties, the Cyprus Protected Parties, and any Settling Insurance Company will be the amount contributed by such party to the Talc Personal Injury Trust in Cash and further provided that the Talc Personal Injury Trust shall not indemnify any party for any alleged Foreign Claim; *provided further* that the indemnification obligations of the Talc Personal Injury Trust to the Cyprus Protected Parties shall be effective only on the Cyprus Trigger Date.

4.13    <u>Post-Effective Date Liabilities</u>.    Notwithstanding anything to the contrary in the Plan Documents or the Confirmation Order, neither any claim against nor the liability of any Entity arising out of or relating to the alleged post-Effective Date acts or omissions of such Entity (each, a "**Post-Effective Date Liability**") shall be a Talc Personal Injury Claim.  No Post-Effective Date Liabilities are affected by the filing of the Chapter 11 Cases, confirmation or effectiveness of the Plan, or any of the transactions effectuated in connection therewith. To the extent an individual has both a Talc Personal Injury Claim and a claim based on any Post-Effective Date Liability, that individual may seek recovery from the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents and will retain any and all rights under applicable law with respect to such Post-Effective Date Liabilities.

# ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1    <u>General Treatment</u>.

5.1.1    Subject to <u>Section 5.7</u> hereof, except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts or Unexpired Leases of the North American Debtors, shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease (i) was assumed or rejected previously by the North American Debtor counterparty thereto, (ii) previously expired or terminated pursuant to its own terms, (iii) is the subject of a motion to assume filed on or before the Effective Date, (iv) is identified as an Executory Contract or Unexpired Lease to be assumed by the North American Debtors pursuant to the Sale Order; or (v) is identified as an Executory Contract or Unexpired Lease to be assumed by the North American Debtors in the Plan Supplement.

5.1.2    Notwithstanding the foregoing, in the event that ITI becomes a Debtor before the Effective Date, all Executory Contracts and Unexpired Leases of ITI will be assumed by ITI, except for those Executory Contracts and Unexpired Leases that (i) have been rejected by ITI by order of the Bankruptcy Court, (ii) are the subject of a motion to reject filed by ITI that is pending as of the Effective Date, (iii) are identified as Executory

Contracts and Unexpired Leases to be rejected by ITI in the Plan Supplement, or (iv) are rejected or terminated by ITI pursuant to the terms of the Plan. All Executory Contracts or Unexpired Leases to be assumed by ITI will be identified in the Plan Supplement.

5.1.3    Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumption or rejection of Executory Contracts and Unexpired Leases, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated herein or as provided for in the Sale Order, all assumptions or rejections of Executory Contracts and Unexpired Leases are effective as of the Effective Date. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party on or before the Effective Date shall (i) in the case of an Executory Contract or Unexpired Lease that is a Talc Personal Injury Trust Asset, be assigned to the Talc Personal Injury Trust on the date such trust is established or as soon as reasonably practicable thereafter, and shall vest in, and be fully enforceable by the Talc Personal Injury Trust in accordance with its terms, except as such terms may have been modified by such order, or (ii) revest in and be fully enforceable by the Reorganized Debtors, as applicable, in accordance with its terms, except as such terms may have been modified by such order.

5.1.4    Notwithstanding anything to the contrary in the Plan, but subject to the limitations provided in <u>Section 5.3</u> of the Plan, (i) the North American Debtors reserve the right to alter, amend, modify, or supplement the list of Executory Contracts and Unexpired Leases to be assumed by the North American Debtors identified in the Plan Supplement at any time before the date that is sixteen (16) days prior to the Confirmation Hearing, and (ii) ITI reserves the right to alter, amend, modify, or supplement the list of Executory Contracts and Unexpired Leases to be assumed by ITI identified in the Plan Supplement and the list of Executory Contracts and Unexpired Leases to be assumed by ITI identified in the Plan Supplement at any time before the date that is sixteen (16) days prior to the Confirmation Hearing, in each case, in order to take into account Executory Contracts and Unexpired Leases to be assumed or rejected in advance of the Confirmation Hearing. After the Effective Date, the Reorganized Debtors, or any assignee, as applicable, shall have the right to terminate, amend, or modify any intercompany contracts, leases or other agreements to which they are a party without approval of the Bankruptcy Court.

5.2    <u>Claims Based on Rejection of Executory Contracts or Unexpired Leases</u>.

5.2.1    If the rejection or deemed rejection of an Executory Contract or Unexpired Lease by any Debtor (for the avoidance of doubt, including ITI) results in damages to the other party or parties to such Executory Contract or Unexpired Lease, a Claim for such damages shall be forever barred and shall not be enforceable against any of the Debtors, the Reorganized Debtors, any assignee, or their properties, whether by way of setoff, recoupment, or otherwise unless a Proof of Claim is filed with the Claims Agent and served upon counsel for the Debtors by the *earlier* of (i) thirty (30) days after service of notice of the Effective Date, and (ii) thirty (30) days after service of notice of entry of a Final Order rejecting such Executory Contract or Unexpired Lease pursuant to a motion filed by any Debtor, which notice, in each case, will set forth such deadline.

5.2.2    Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time period provided in Section 5.2.1 will be automatically disallowed, forever barred from assertion and shall not be enforceable, without the need for any objection, or further notice to, or action, order or approval of the Bankruptcy Court.  All Allowed Claims arising from the rejection of an Executory Contract or Unexpired Lease shall be classified as a Class 3a or Class 3b Unsecured Claim against the applicable North American Debtor or ITI, and shall be treated in accordance with Article III of the Plan.

5.3    <u>Cure of Defaults for Executory Contracts and Unexpired Leases</u>.

5.3.1    Notwithstanding anything to the contrary contained herein, any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Distribution Date (i) from the Administrative Claim Reserve (if assumed by one of the North American Debtors pursuant to the Plan and Plan Supplement, but for the avoidance of doubt, not if assumed by the North American Debtors pursuant to the Sale Order), or (ii) by Reorganized ITI (if assumed by ITI), subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments necessary to cure such a default, (2) the ability of the Debtors or any assignee to provide any "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

5.3.2    On July 28, 2020, August 28, 2020, October 28, 2020, January 15, 2021, and January 22, 2021, in connection with the Bid Procedures Order and the Sale Order, the North American Debtors served on applicable contract counterparties a notice of the potential assumption and assignment of such party's Executory Contract or Unexpired Lease to a potential buyer of the Debtors' assets, the proposed Cure Amount associated with such potential assumption and assignment, and the deadline to object to the proposed Cure Amount or to the assumption and assignment of the Executory Contract or Unexpired Lease (each, and any such supplemental notice, a "**Sale Cure Notice**").  Applicable counterparties had until that date that was fourteen (14) days after service of the Sale Cure Notice identifying such counterparty to object to the proposed Cure Amount.  Any counterparty to an Executory Contract or Unexpired Lease that failed to timely object to any Cure Amount in the applicable Sale Cure Notice is deemed to have consented to such Cure Amount.  Pursuant to the Bid Procedures Order, the foregoing deadlines and requirements apply to any counterparty that is identified in any supplemental Sale Cure Notice.

5.3.3    On or prior to February 1, 2021, and subject to Section 5.3.4, the North American Debtors shall distribute, or cause to be distributed, (i) notices of proposed assumption and proposed Cure Amounts to the applicable counterparty or counterparties to each Executory Contract or Unexpired Lease that may be assumed by a North American

Debtor, which notices shall include procedures for objecting to the proposed assumption of such Executory Contract or Unexpired Lease and any Cure Amounts to be paid in connection therewith (as to North American Debtor Executory Contracts and Unexpired Leases not previously included on a Sale Cure Notice) and the anticipated procedure for resolution of disputes by the Bankruptcy Court and (ii) notices of proposed assumption and proposed Cure Amounts to the applicable counterparty or counterparties to each Executory Contract or Unexpired Lease that may be assumed by ITI, which notices shall include procedures for objecting to the proposed assumption of such Executory Contract or Unexpired Lease and any Cure Amounts to be paid in connection therewith and the anticipated procedure for resolution of disputes by the Bankruptcy Court (the "**Plan Cure and Assumption Notice**").  Any objection to a proposed assumption by any of the North American Debtors or ITI pursuant to the Plan (including any objection as to adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code) or related Cure Amount (as to (i) ITI Executory Contracts and Unexpired Leases and (ii) North American Debtor Executory Contracts and Unexpired Leases not previously included on a Sale Cure Notice) by a counterparty to an Executory Contract or Unexpired Lease must be filed, served and actually received by counsel to the Debtors and the other parties specified in the Plan Cure and Assumption Notice by February 15, 2021.  Any unresolved objection shall be heard at the Confirmation Hearing, unless otherwise agreed by the parties or at such other date and time as may be fixed by the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to any proposed assumption and/or Cure Amount will be deemed to have assented to such assumption and/or Cure Amount.  To the extent an Executory Contract or Unexpired Lease with ITI is not identified as an Executory Contract or Unexpired Lease to be assumed or rejected by ITI, then the Cure Amount for such Executory Contract or Unexpired Lease is $0 and such Executory Contract or Unexpired Lease will be assumed by ITI pursuant to the Plan.

5.3.4    On or before February 5, 2021, the Debtors shall serve copies of the lists of Executory Contracts and Unexpired Leases provided for in the Plan Supplement on the applicable counterparties.  In addition, the Debtors will serve any revised Executory Contract and Unexpired Lease list on affected counterparties within two (2) days of filing such lists, *provided* that each counterparty to an Executory Contract or Unexpired Lease that (i) is later added to the list and/or (ii) has its Cure Amount modified by the Debtors shall have until the date that is fourteen (14) days after the Debtors serve such counterparty with notice thereof to object to the assumption of its Executory Contract or Unexpired Lease pursuant to the Plan, including any objection as to adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code, and, if the proposed Cure Amount has been modified, exclusively to the proposed Cure Amount.

5.3.5    Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

5.4    <u>Modifications, Amendments, Supplements, Restatements or Other Agreement</u>.

     5.4.1    Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated, or is rejected or repudiated under the Plan.

     5.4.2    Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

5.5    <u>Reservation of Rights</u>.    Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on (i) the list of the Executory Contracts and Unexpired Leases to be assumed by the North American Debtors, (ii) the lists of the Executory Contracts and Unexpired Leases to be assumed or rejected by ITI, as applicable, or (iii) anything contained in the Plan or Plan Supplement, shall constitute an admission by any of the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors, or any assignee has any liability thereunder.    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, the Reorganized Debtors, or any assignee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

5.6    <u>Talc Insurance Policies and Talc Insurance CIP Agreements</u>.    Notwithstanding <u>Section 5.1</u> above, all Talc Insurance Policies and Talc Insurance CIP Agreements entered into prior to the Petition Date shall be considered non-executory contracts and shall neither be assumed nor rejected by the Debtors.    Other than the permissibility of the Assignment, which is to be determined by or in connection with Confirmation of the Plan, the rights and obligations of the parties under such Talc Insurance Policies and Talc Insurance CIP Agreements, including the question of whether any breach has occurred, shall be determined under applicable law.

5.7    <u>Non-Talc Insurance Policies</u>.    The Debtors do not believe that the Non-Talc Insurance Policies (or settlements related thereto) constitute executory contracts.    However, to the extent such Non-Talc Insurance Policies are considered to be executory contracts, then, notwithstanding anything contained in Article V to the contrary, the Plan will constitute a motion to assume such Non-Talc Insurance Policies, and authorize the Reorganized Debtors, as applicable, to pay all future obligations, if any, in respect thereof.    Subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, their respective Estates and all parties in interest. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of any

Debtor existing as of the Confirmation Date with respect to each such Non-Talc Insurance Policy. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption of the Non-Talc Insurance Assets, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

## ARTICLE VI
## DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF CLAIMS

6.1     <u>Distributions</u>.  Distributions on account of Allowed Non-Talc Claims shall be made on or after the Distribution Date as provided in the Plan.  All Talc Personal Injury Claims shall be liquidated and, as appropriate, paid, or resolved by the Talc Personal Injury Trust pursuant to and in accordance with the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures.

6.2     <u>Timing and Calculation of Amounts to be Distributed</u>.

6.2.1     Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Non-Talc Claim shall receive the full amount of the Distribution that the Plan provides for such Allowed Claim in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.2.2     If and to the extent that there are Disputed Non-Talc Claims, Distributions on account of any such Disputed Non-Talc Claims shall be made pursuant to the provisions set forth in this Article VI of the Plan.

6.3     <u>Disbursing Agent</u>.  Except as otherwise provided herein, all Distributions under the Plan shall be made by the Disbursing Agent.  The Reorganized Debtors, or any such other Entity or Entities designated by the Reorganized Debtors, shall serve as Disbursing Agent for all Non-Talc Claims.

6.4     <u>Rights and Powers of Disbursing Agent</u>.

6.4.1     The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all Distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions thereof.

6.4.2    Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors from the Reorganized North American Debtor Cash Reserve.

6.5    Distributions on Account of Claims Allowed After the Effective Date. Notwithstanding any other provision of the Plan, no Distributions shall be made under the Plan on account of any Disputed Non-Talc Claim, unless and until such Disputed Non-Talc Claim becomes an Allowed Non-Talc Claim.  Distributions made after the Effective Date to holders of Disputed Non-Talc Claims that are not Allowed Non-Talc Claims as of the Effective Date but which later become Allowed Non-Talc Claims shall be made as if such Claim had been an Allowed Claim on the Effective Date.  Except as otherwise may be agreed to by the Debtors or the Reorganized Debtors, on the one hand, and the holder of a Disputed Non-Talc Claim, on the other hand, and notwithstanding any provision otherwise in the Plan, no partial payments and no partial Distributions shall be made with respect to any Disputed Non-Talc Claim until all Disputed Non-Talc Claims held by the holder of such Disputed Non-Talc Claim have become Allowed Non-Talc Claims or have otherwise been resolved by settlement or Final Order.

6.6    Delivery of Distributions and Undeliverable or Unclaimed Distributions.

6.6.1    Delivery of Distributions to Holders of North American Debtor Claims. Except as otherwise provided in the Plan, Distributions to holders of Allowed North American Debtor Claims shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent: (a) to the signatory set forth on any of the Proof of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the North American Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address.

6.6.2    Delivery of Distributions to Holders of ITI Claims.  The legal, equitable, and contractual rights of the holders of ITI Claims are unaltered by the Plan.  Except to the extent that a holder of an ITI Claim agrees to a different treatment, on and after the Effective Date, Reorganized ITI will continue to pay or dispute each ITI Claim in the ordinary course of business in accordance with applicable law.

6.6.3    Full Benefit of Distributions.  Distributions under the Plan on account of Non-Talc Claims shall not be subject to levy, garnishment, attachment or similar legal process, so that each holder of an Allowed Non-Talc Claim shall have and receive the benefit of the Distributions in the manner set forth in the Plan.  None of the Debtors, the Reorganized Debtors, or the applicable Disbursing Agent shall incur any liability whatsoever on account of any Distributions under the Plan except where such Distributions

are found by Final Order to have been made with gross negligence, willful misconduct or fraud.

6.6.4    <u>Undeliverable Distributions and Unclaimed Property</u>.  In the event that any Distribution to any holder of an Allowed Non-Talc Claim is returned as undeliverable, no further Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such Distribution shall be made as soon as practicable after such Distribution has become deliverable to such holder without interest; *provided*, *however*, that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of three (3) months from the applicable Distribution Date.  After such date, (i) all "unclaimed property" or interests in property in respect of the Reorganized North American Debtors shall revert to the applicable Reserve used to fund the Allowed Non-Talc Claim to be held and/or disbursed in accordance with the Plan, or, to the Reorganized North American Debtors to be used and/or disbursed in accordance with the Plan if the applicable Reserve is no longer in effect, and (ii) all "unclaimed property" or interests in property in respect of ITI shall revert to ITI (in each case, (i) and (ii), notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary).  The claim of any holder to such property or interest in property shall be discharged and forever barred.

6.7    <u>Time Bar to Cash Payments</u>.  Checks issued by the Disbursing Agent in respect of Allowed Non-Talc Claims shall be null and void if not cashed within one hundred and eighty (180) days of the date of issuance thereof.  The holder of the Allowed Non-Talc Claim with respect to which such check originally was issued may make a request for re-issuance of any check directly to the Disbursing Agent; *provided*, *however*, that any such request for re-issuance of a check shall be made on or before the twelve (12) month anniversary of the Distribution Date.  After such date, all Non-Talc Claims in respect of void checks shall be discharged and forever barred.

6.8    <u>Disbursing Agent's Obligation to Provide Periodic Reporting</u>.  The Disbursing Agent will provide quarterly reporting on the status of the claims process of the Reorganized North American Debtors including funds remaining in each of the Reserves to the Talc Personal Injury Trust, the Talc Trust Advisory Committee, the FCR, and Imerys S.A.  The first quarterly report will encompass the first three (3) full months following the Effective Date (plus any partial month during which the Effective Date occurs).  Each report will be delivered within thirty (30) days of the conclusion of the preceding quarterly period.  These reports will not be filed with the Bankruptcy Court.

6.9    <u>Record Date for Holders of Claims</u>.  Except as otherwise provided in an order of the Bankruptcy Court that is not subject to any stay, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001, on or prior to the Distribution Record Date, shall be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.  If there is any dispute regarding the identity of the Person entitled to receive a Distribution in respect of a Claim under the Plan, no Distribution need be made in respect of such Claim until such dispute has been resolved.

6.10    Compliance with Tax Requirements and Allocations.

6.10.1    In connection with the Plan and all Distributions hereunder, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state or local taxing authority, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions including tax certification forms, or establishing any other mechanisms it believes are reasonable and appropriate.

6.10.2    For tax purposes, Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

6.11    Transfers of Claims.  In the event that the holder of any Claim shall transfer such Claim after the Distribution Record Date, it shall immediately advise the applicable Reorganized Debtor(s) or the Talc Personal Injury Trust (to the extent it pertains to a Talc Personal Injury Claim), in writing of such transfer and file a notice of the transfer with the Bankruptcy Court. The Reorganized Debtors or the Talc Personal Injury Trust, as the case may be, shall be entitled to assume that no transfer of any Claim has been made by any holder unless and until written notice of a transfer has been actually received by the applicable Reorganized Debtor(s) or the Talc Personal Injury Trust, as applicable. Each transferee of any Claim shall take such Claim subject to the provisions of the Plan, and, except as provided in a notice of transfer, the Reorganized Debtors or the Talc Personal Injury Trust, as the case may be, shall be entitled to assume conclusively that the transferee named in any notice of transfer shall thereafter be vested with all rights and powers of the transferor of such Claim.

6.12    Interest on Impaired and Disputed Claims.  Except as specifically provided for herein or in the Talc Personal Injury Trust Documents (as related to Talc Personal Injury Claims), interest shall not accrue on Impaired Claims, and no holder of an Impaired Claim shall be entitled to interest accruing on or after the Petition Date on any such Impaired Claim.  Interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

6.13    Setoffs.  The Debtors and the Reorganized Debtors (or the Talc Personal Injury Trust to the extent it pertains to a Talc Personal Injury Claim) may, pursuant to the applicable provisions of the Bankruptcy Code, or applicable non-bankruptcy law, set off against any applicable Allowed Claim (before any Distribution is made on account of such Claim) any and all claims, rights, causes of action, debts or liabilities of any nature that the Debtors or the Reorganized Debtors (or the Talc Personal Injury Trust (in its own right or as assignee of the Debtors) to the extent it pertains to a Talc Personal Injury Claim) may hold against the holder of such Allowed Claim; *provided*, *however*, that the failure to effect such a setoff shall not constitute a waiver or release of any such claims, rights, causes of action, debts or liabilities.

53

## ARTICLE VII
## RESOLUTION OF DISPUTED CLAIMS OTHER THAN
## TALC PERSONAL INJURY CLAIMS

7.1     <u>Disputed Claims</u>.  All Disputed Claims against the Debtors, other than Talc Personal Injury Claims, Administrative Claims, and Fee Claims, shall be subject to the provisions of this Article VII.  All Talc Personal Injury Claims shall be resolved by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents.  All Administrative Claims, Fee Claims, and DIP Facility Claims shall be determined and, if Allowed, paid in accordance with Article II of the Plan.

7.2     <u>Prosecution of Claims Generally</u>.

7.2.1     Subject to the provisions contained herein, including as set forth in <u>Section 11.8.2</u> of the Plan, after the Effective Date, only the Reorganized Debtors may object to the allowance of any Non-Talc Claim, except that the United States Trustee, the FCR, the other Notice Parties (as that term is defined in the Compensation Procedures Order), and the Imerys Non-Debtors, as applicable, shall also have standing and capacity to object to the Fee Claims of the Professionals.  After the Effective Date, the Reorganized Debtors shall be accorded the power and authority to allow or settle and compromise any Non-Talc Claim, except for Fee Claims, without notice to any other party or approval of or notice to the Bankruptcy Court.  For the avoidance of doubt, no fees resulting from objections to the Fee Claims, other than objections by the Reorganized Debtors and/or the Fee Examiner will be funded by the Reorganized Debtors.

7.2.2     Notwithstanding anything to the contrary in this Article VII, (i) resolution of Talc Personal Injury Claims shall be handled exclusively by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents, (ii) objections to Fee Claims shall be handled in accordance with the Compensation Procedures Order, subject to <u>Section 2.3</u>, and (iii) objections to Administrative Claims (excluding Fee Claims) shall be handled in accordance with <u>Section 2.1</u> of the Plan.

7.2.3     Notwithstanding anything to the contrary in this Article VII, objections to Non-Talc Claims against ITC shall be subject to review by the Information Officer.

7.3     <u>Prosecution of Disputed North American Debtor Claims and Claims Objection Deadline</u>.

7.3.1     Each Reorganized North American Debtor shall have the right, after the Effective Date, to file objections to the North American Debtor Claims that have not already been Allowed by Final Order, agreement, or the Plan, and litigate to judgment, settle, or withdraw such objections to Disputed North American Debtor Claims; *provided* that objections to and the prosecution of Non-Talc Claims against ITC shall be subject to review by the Information Officer.  Without limiting the foregoing, each Reorganized North American Debtor, as applicable, shall have the right to litigate any Disputed North American Debtor Claim either in the Bankruptcy Court or in any court of competent jurisdiction.

US-DOCS\120811676.4

7.3.2     Unless otherwise ordered by the Bankruptcy Court, objections to North American Debtor Claims (other than Administrative Claims, Fee Claims, or late-filed Claims) shall be filed with the Bankruptcy Court and served upon the holders of each such North American Debtor Claim to which objections are made on or before the Claims Objection Bar Date, unless extended by order of the Bankruptcy Court prior to the expiration of such period.  Objections to late-filed Claims against the North American Debtors shall be filed before the later of (i) six (6) months following the Effective Date, or (ii) ninety (90) days after the Reorganized North American Debtors receive actual notice of the filing of such Claim.

7.4     <u>ITI Claims</u>.

7.4.1     Except as otherwise provided in the Plan, holders of ITI Claims or Equity Interests in ITI shall not be required to file a Proof of Claim or proof of interest, and no such parties should file a Proof of Claim or proof of interest.  The legal equitable, and contractual rights of holders of ITI Claims are unaltered by the Plan.  Except to the extent that a holder of an ITI Claim agrees to a different treatment, on and after the Effective Date, Reorganized ITI will continue to pay or dispute each ITI Claim in the ordinary course of business in accordance with applicable law.  ITI may, in its discretion, file with the Bankruptcy Court (or any other court of competent jurisdiction) an objection to the allowance of any ITI Claim or any other appropriate motion or adversary proceeding with respect thereto.  All such objections will be litigated to Final Order; *provided*, *however*, that ITI or Reorganized ITI, as applicable, may compromise, settle, withdraw, or resolve by any other method approved by the Bankruptcy Court any objections to ITI Claims.

7.4.2     ITI or Reorganized ITI, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to ITI Claims or Equity Interests in ITI as permitted under the Plan.  From and after the Effective Date, Reorganized ITI may settle or compromise any Disputed ITI Claim or Disputed Equity Interest in ITI without approval of the Bankruptcy Court.  ITI also reserves the right to resolve any Disputed ITI Claim or Disputed Equity Interest in ITI outside the jurisdiction of the Bankruptcy Court under applicable governing law.

7.5     <u>Distributions on Account of Disputed Claims</u>.  At such time as determined to be practicable by the Reorganized Debtors, the Disbursing Agent will make Distributions on account of any Disputed Claim that has become Allowed.  Such Distributions will be made pursuant to the applicable provisions of Article VI of the Plan.

7.6     <u>No Distributions Pending Allowance</u>.  No Distributions or other consideration shall be paid with respect to any Claim that is a Disputed Claim unless and until all objections to such Disputed Claim are resolved by agreement or Final Order and such Disputed Claim becomes an Allowed Claim.

7.7     <u>Estimation of Claims</u>.  The Debtors (before the Effective Date) or the Reorganized Debtors (on or after the Effective Date) may, at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim,

or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors (before the Effective Date) or the Reorganized Debtors (on or after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

7.8     Disputed Claims Reserve for the North American Debtors.

7.8.1     On the Effective Date, the North American Debtors shall deposit in the Disputed Claims Reserve the Cash that would have been distributed to the holders of Disputed North American Debtor Claims if such Disputed North American Debtor Claims had been Allowed Claims as of the Effective Date. The Disputed Claims Reserve shall be funded from Cash on hand of the North American Debtors on the Effective Date, the Sale Proceeds, and/or the Imerys Cash Contribution (excluding the Contingent Contribution). The amount to be deposited shall be determined based on the lesser of (1) the asserted amount of the Disputed North American Debtor Claims in the applicable Proofs of Claim; (2) the amount, if any, estimated by the Bankruptcy Court pursuant to (i) section 502(c) of the Bankruptcy Code or (ii) Section 7.7 of the Plan if, after the Effective Date, a motion is filed by any Reorganized North American Debtor to estimate such Claim; (3) the amount otherwise agreed to by the Debtors (or the Reorganized North American Debtors, if after the Effective Date) and the holders of such Disputed North American Debtor Claims; or (4) any amount otherwise approved by the Bankruptcy Court.

7.8.2     If a North American Debtor Claim that remains a Disputed Claim as of the Effective Date is thereafter Allowed in whole or in part, the Disbursing Agent shall (at such time as determined to be practicable by the Reorganized North American Debtors) distribute from the Disputed Claims Reserve, to the holder of such North American Debtor Claim, the Cash that such holder would have received on account of such Claim if such Claim had been an Allowed Claim on the Effective Date.

7.8.3     The Reorganized North American Debtors shall determine, on each six (6) month anniversary of the Effective Date, whether the amounts available in the Reorganized North American Debtor Cash Reserve are in excess of the amount necessary to satisfy the purpose for which such reserve was established. If the Reorganized North American Debtors determine a surplus exists in the Reorganized North American Debtor Cash Reserve as of the date of such determination, such surplus Cash shall be allocated to the Disputed Claims Reserve to the extent such reserve is insufficiently funded to satisfy the purpose for which such reserve was established.

7.9     <u>Disputed ITI Claims</u>.  If a Claim against ITI that remains a Disputed Claim as of the Effective Date is thereafter Allowed in whole or in part, the Disbursing Agent (at such time as determined to be practicable by Reorganized ITI) will distribute from the monies available at Reorganized ITI, to the holder of such Claim, the monies that such holder would have received on account of such Claim if such Claim had been an Allowed Claim on the Effective Date.

7.10     <u>Distribution of Excess Amounts in the Disputed Claims Reserve for the North American Debtors</u>.  When all Disputed North American Debtor Claims are resolved and either become Allowed or Disallowed, to the extent Cash remains in the Disputed Claims Reserve after all holders of such Claims have been paid the full amount they are entitled to pursuant to the treatment set forth for under the Plan, then such excess amounts will be transferred to the Talc Personal Injury Trust and become Talc Personal Injury Trust Assets, whereby such excess amounts will be made available to satisfy Talc Personal Injury Trust Expenses and for disbursement to holders of Claims in Class 4 pursuant to the Trust Distribution Procedures.

## ARTICLE VIII
## ACCEPTANCE OR REJECTION OF PLAN

8.1     <u>Classes Entitled to Vote</u>.  Holders of Talc Personal Injury Claims shall be entitled to vote to the extent and in the manner provided in the Voting Procedures Order and the Plan.

8.2     <u>Acceptance of Holders of Talc Personal Injury Claims</u>.  Pursuant to sections 1126(c) and 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code, Class 4 (Talc Personal Injury Claims) shall have accepted the Plan only if at least two-thirds (2/3) in amount and seventy-five percent (75%) of the members in Class 4 actually voting on the Plan have voted to accept the Plan.

8.3     <u>Acceptance by Unimpaired Class</u>.  Classes 1, 2, 3a, 3b, 5b, and 7 are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

8.4     <u>Acceptance by Impaired Class</u>.  Classes 5a and 6 will not receive or retain any property or distribution under the Plan and are Impaired under the Plan.  Notwithstanding, Classes 5a and 6 are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code because all holders of Claims or Equity Interests (as applicable) in Classes 5a and 6 are Plan Proponents and have consented to their treatment under the Plan.

## ARTICLE IX
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

9.1     <u>Conditions Precedent to the Confirmation of the Plan</u>.  Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived pursuant to <u>Section 9.3</u> of the Plan:

9.1.1     The Bankruptcy Court shall have entered an order, acceptable in form and substance to each of the Plan Proponents approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

9.1.2     Class 4 shall have voted in requisite numbers and amounts in favor of the Plan as required by sections 524(g), 1126, and 1129 of the Bankruptcy Code.

9.1.3     The Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto, shall be consistent with (i) section 524(g) of the Bankruptcy Code, as applicable, and (ii) the other provisions of the Plan.

9.1.4     The Reorganized North American Debtors shall have sufficient funds from Cash on hand and/or the Unsecured Claim Contribution to resolve all Allowed Class 3a Claims and to adequately fund the Disputed Claims Reserve as determined by each of the Plan Proponents.

9.1.5     The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order in conjunction therewith, in form and substance acceptable to each of the Plan Proponents. These findings and determinations, which are designed, among other things, to ensure that the Injunctions, releases and discharges set forth in Article XII shall be effective, binding and enforceable, and shall among other things, conclude:

(i)     Good Faith Compliance.  The Plan complies with all applicable provisions of the Bankruptcy Code including, without limitation, that the Plan be proposed in good faith and that the Confirmation Order not be procured by fraud.

(ii)     Voting.  Class 4 has voted in requisite numbers and amounts in favor of the Plan as required by each of sections 524(g), 1126, and 1129 of the Bankruptcy Code.

(iii)     Injunctions.  The Channeling Injunction, the Insurance Entity Injunction, and the Supplemental Settlement Injunction Order are to be implemented in connection with the Talc Personal Injury Trust.

(iv)     Named Defendants.  As of the Petition Date, one or more of the Debtors had been named as a defendant in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, talc or talc-containing products.

(v)     Assumption of Certain Liabilities.  Upon the Effective Date, the Talc Personal Injury Trust shall assume the liabilities of the Protected Parties with respect to Talc Personal Injury Claims and have exclusive authority as of the Effective Date to satisfy or defend such Talc Personal Injury Claims.

(vi)     Funding of Talc Personal Injury Trust.  The Talc Personal Injury Trust will be funded with the Talc Personal Injury Trust Assets, including the Talc PI Note, which will be secured by a majority of the common stock of Reorganized ITI, pursuant to the Talc PI Pledge Agreement, and include the right to receive distributions on account of the Talc PI Note pursuant to the terms set forth in the Talc PI Note.

(vii)    <u>Stock Ownership</u>.  The Talc Personal Injury Trust, on the Effective Date, by the exercise of rights granted under the Plan, (i) will receive the Reorganized North American Debtor Stock and shall maintain the rights to receive dividends or other distributions on account of such stock, and (ii) will be entitled to own the majority of the common stock of Reorganized ITI if specific contingencies occur.

(viii)    <u>Use of Talc Personal Injury Trust Assets</u>.  The Talc Personal Injury Trust will use its assets and income to resolve Talc Personal Injury Claims.

(ix)    <u>Likelihood of Talc Personal Injury Demands</u>.  The Debtors are likely to be subject to substantial future Talc Personal Injury Demands for payment arising out of the same or similar conduct or events that gave rise to the Talc Personal Injury Claims that are addressed by the Channeling Injunction and the Insurance Entity Injunction.

(x)    <u>Talc Personal Injury Demands Indeterminate</u>.  The actual amounts, numbers, and timing of future Talc Personal Injury Demands cannot be determined.

(xi)    <u>Likelihood of Threat to Plan's Purpose</u>.  Pursuit of Talc Personal Injury Claims, including Talc Personal Injury Demands, outside of the procedures prescribed by the Plan and the Plan Documents, including the Trust Distribution Procedures, is likely to threaten the Plan's purpose to treat the Talc Personal Injury Claims and Talc Personal Injury Demands equitably.

(xii)    <u>Injunctions Conspicuous</u>.  The terms of the Discharge Injunction, the Channeling Injunction, the Supplemental Settlement Injunction Order, the Release Injunction, and the Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in conspicuous language in the Plan and in the Disclosure Statement.

(xiii)    <u>Appropriate Trust Mechanisms</u>.    Pursuant to court orders or otherwise, the Talc Personal Injury Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Talc Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Talc Personal Injury Trust will value, and be in a financial position to pay, Talc Personal Injury Claims that involve similar Claims in substantially the same manner regardless of the timing of the assertion of such Talc Personal Injury Claims.

(xiv)    <u>Future Claimants' Representative</u>.  The FCR was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Channeling Injunction, the Insurance Entity Injunction, and the Supplemental Settlement Injunction Order, for the purpose of, among other things, protecting the rights of persons that might subsequently assert Talc Personal Injury Demands of the kind that are addressed in the Channeling Injunction, the Insurance Entity

Injunction, and the Supplemental Settlement Injunction Order, and transferred to and assumed by the Talc Personal Injury Trust.

(xv)     Fair and Equitable Inclusion.  The inclusion of each Debtor or other Protected Party within the protection afforded by the Channeling Injunction and the Insurance Entity Injunction, as applicable, is fair and equitable with respect to the Persons that might subsequently assert Talc Personal Injury Demands against each such Debtor or other Protected Party in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by or on behalf of each such Debtor or other Protected Party.

(xvi)     Sections 105(a) and 524(g) Compliance.  The Plan complies with sections 105(a) and 524(g) of the Bankruptcy Code to the extent applicable.

(xvii)     Injunctions Essential.  The Discharge Injunction, the Channeling Injunction, the Supplemental Settlement Injunction Order, the Release Injunction, and the Insurance Entity Injunction are essential to the Plan and the Debtors' reorganization efforts.

(xviii)  Insurance Assignment Authorized.   The Bankruptcy Code authorizes the Assignment by preempting any terms of the Talc Insurance Policies, Cyprus Talc Insurance Policy Rights, Talc Insurance CIP Agreements, Talc Insurance Settlement Agreements, or provisions of applicable non-bankruptcy law that any Talc Insurance Company may otherwise argue prohibits the Assignment.

(xix)     Indemnification Obligation Assignment Authorized.   The Bankruptcy Code authorizes the Assignment of the J&J Indemnification Obligations by preempting any terms of the J&J Agreements or provisions of applicable non-bankruptcy law that J&J may otherwise argue prohibits the Assignment.

(xx)     The Supplemental Settlement Injunction Order.  The Supplemental Settlement Injunction Order is fair, equitable, in the best interests of the Debtors' Estates, and shall be entered in connection with the Imerys Settlement, the Rio Tinto/Zurich Settlement, and the Cyprus Settlement (upon the occurrence of the Cyprus Trigger Date).

(xxi)     The Imerys Settlement.  The Imerys Settlement represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' Estates, complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

(xxii)     The Rio Tinto/Zurich Settlement.  The Rio Tinto/Zurich Settlement (i) represents a sound exercise of the Debtors' business judgment, will yield a fair and reasonable price for the assets being sold, is in the best interest of the Debtors' Estates, and otherwise complies with section 363 of the Bankruptcy Code, (ii) meets the requirements for a sale of property free and clear of any interests of third parties in such property pursuant to section 363(f) of the Bankruptcy Code,

60

and (iii) constitutes a purchase in good faith by Zurich and the Rio Tinto Captive Insurers pursuant to section 363(m) of the Bankruptcy Code, rendering the provisions of section 363(m) applicable. The Rio Tinto/Zurich Settlement is accordingly approved pursuant to section 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.

(xxiii) <u>The Cyprus Settlement</u>. The Cyprus Settlement represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' Estates, complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

9.2    <u>Conditions Precedent to the Effective Date of the Plan</u>. Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall occur on the first Business Day on which each of the following conditions has been satisfied or waived pursuant to <u>Section 9.3</u>:

9.2.1    <u>Confirmation Order and Affirmation Order</u>. The Confirmation Order shall have been submitted to the District Court for affirmation on or before June 30, 2021, and the Affirmation Order in form and substance acceptable to each of the Plan Proponents shall have been entered by the District Court, and the Confirmation Order and the Affirmation Order shall have become Final Orders; *provided*, *however*, that, subject to <u>Section 10.10.1</u> with respect to the Cyprus Settlement, the Effective Date may occur at a point in time when the Confirmation Order and/or the Affirmation Order are not Final Orders at the sole option of the Plan Proponents unless the effectiveness of the Confirmation Order or the Affirmation Order, as applicable, has been stayed or vacated, in which case the Effective Date may be the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order or the Affirmation Order.

9.2.2    <u>Sale Order</u>. The Sale Order shall have (i) been entered on or before the date the Confirmation Order is entered, and (ii) recognized by the Canadian Court in the Canadian Proceeding on or before a date that is no later than fourteen (14) Business Days after entry of the Sale Order by the Bankruptcy Court.

9.2.3    <u>Talc Personal Injury Trust</u>. The Talc Personal Injury Trust Assets shall, simultaneously with the occurrence of the Effective Date or as otherwise provided herein, be transferred to, vested in, and assumed by the Talc Personal Injury Trust in accordance with Article IV of the Plan.

9.2.4    <u>Plan Documents</u>. The Talc Personal Injury Trust Agreement (and related documents), and the other applicable Plan Documents necessary or appropriate to implement the Plan shall have been executed, delivered and, where applicable, filed with the appropriate governmental authorities.

9.2.5    <u>Allowed Non-Talc Claims</u>. The Reserves shall be adequately funded as determined by each of the Plan Proponents so as to permit the Debtors to make Distributions relating to Allowed Non-Talc Claims in accordance with the Plan.

US-DOCS\120811676.4

9.2.6    <u>Imerys Contribution</u>.  Imerys S.A. shall have disbursed, or satisfied all conditions of, the Imerys Contribution to the Debtors, the Reorganized North American Debtors, or the Talc Personal Injury Trust, as applicable, in accordance with Article X hereof.

9.2.7    <u>United States Trustee's Fees</u>.  The fees of the United States Trustee then owing by the Debtors shall have been paid in full.

9.2.8    <u>Ancillary Proceeding in Canada</u>.  The Canadian Court shall have entered an order in the Canadian Proceeding recognizing the Confirmation Order in its entirety and ordering the Confirmation Order and the Plan to be implemented and effective in Canada in accordance with their terms.

9.3    <u>Waiver of Conditions Precedent</u>.  To the greatest extent permitted by law, each of the conditions precedent in this Article IX may be waived or modified, in whole or in part, but only with the unanimous written consent of each of the Plan Proponents; *provided, however*, that <u>Section 9.2.1</u> can only be waived as provided therein.  Any waiver or modification of a condition precedent under this <u>Section 9.3</u> may be effected at any time, without notice, without leave or order of the Bankruptcy Court or District Court, and without any other formal action.

9.4    <u>Notice of Effective Date</u>.  The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within five (5) Business Days thereafter, which notice shall confirm that the foregoing conditions have been satisfied or waived.

# ARTICLE X
# MEANS FOR IMPLEMENTATION OF THE PLAN

10.1    <u>General</u>.  On or after the Confirmation Date, each of the Plan Proponents shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable them to implement the provisions of the Plan on the Effective Date, including, without limitation, the creation of the Talc Personal Injury Trust and the preparations for the transfer of the Talc Personal Injury Trust Assets to the Talc Personal Injury Trust.

10.2    <u>Operations of the Debtors Between Confirmation and the Effective Date</u>.  The Debtors shall continue to operate as debtors and debtors-in-possession during the period from the Confirmation Date through and until the Effective Date.

10.3    <u>Charter and Bylaws</u>.

10.3.1    From and after the Effective Date, each of the Reorganized North American Debtors shall be governed pursuant to their respective Amended Charter Documents.  The Amended Bylaws and the Amended Certificates of Incorporation shall contain such provisions as are necessary to satisfy the provisions of the Plan and, to the extent necessary to prohibit the issuance of non-voting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the Amended Charter Documents after the Effective Date, as permitted by applicable law.  On or prior to the Effective Date, ITA will change its name to Ivory America, Inc. (or such other name as set forth in the Amended Charter Documents), ITV will change its name to Ivory

Vermont, Inc. (or such other name as set forth in the Amended Charter Documents), and ITC will change its name to Ivory Canada, Inc. (or such other name as set forth in the Amended Charter Documents).

        10.3.2    From and after the Effective Date, Reorganized ITI shall continue to be governed pursuant to its existing bylaws and certificate of incorporation.

        10.4    <u>Corporate Action</u>.  On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtors, including, but not limited to, actions requiring a vote of the boards of directors or shareholders and execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers or directors of the Debtors.

        10.5    <u>Surrender of Existing Equity Interests</u>.  The Plan provides that holders of Equity Interests in Class 6 shall be deemed to have surrendered such Equity Interests and other documentation underlying such Equity Interests and all such surrendered Equity Interests and other documentation shall be deemed to be canceled in accordance with Article III of the Plan.

        10.6    <u>Post-Effective Date Governance, Continued Existence of the Reorganized North American Debtors, and the Reorganized North American Debtor Stock</u>.

        10.6.1    On the Effective Date, after the Reserves have been funded and all Talc Personal Injury Trust Assets have been transferred to the Talc Personal Injury Trust (as applicable): (a) all North American Debtor Stock will be canceled, and (b) simultaneously with the cancellation of such shares, the North American Debtors will issue the Reorganized North American Debtor Stock to the Talc Personal Injury Trust.

        10.6.2    Except as otherwise provided herein or as may be provided in the Plan Supplement or the Confirmation Order, each of the Reorganized North American Debtors shall continue their existence as separate entities after the Effective Date, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which each Reorganized North American Debtor is incorporated and pursuant to the Amended Charter Documents and any other formation documents in effect following the Effective Date, and such documents are deemed to be adopted pursuant to the Plan and require no further action or approval.

        10.6.3    On the Effective Date, the officers and directors of the Reorganized North American Debtors shall consist of the individuals that will be identified in the Plan Supplement.

        10.6.4    Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in the Reorganized North American Debtors' Estates other than property constituting Talc Personal Injury Trust Assets, including, but not limited to, all North American Debtor Causes of Action and any property acquired by the North American Debtors pursuant to the Plan, shall vest in the Reorganized North American Debtors, free and clear of all Claims, interests, Liens, other Encumbrances, and liabilities of any kind.

On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized North American Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, interests, or North American Debtor Causes of Action without supervision or approval by the Bankruptcy Court, or notice to any other Entity, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

10.6.5    On the Effective Date, and if applicable, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, all assets of the North American Debtors that constitute Talc Personal Injury Trust Assets shall vest in the Talc Personal Injury Trust pursuant to the terms of the Plan.  The Talc Personal Injury Trust shall own such assets, as of the Effective Date, free and clear of all Claims, interests, Liens, other Encumbrances, and liabilities of any kind.

10.7    Post-Effective Date Governance and Continued Existence of Reorganized ITI.

10.7.1    On the Effective Date, Reorganized ITI shall remain a direct subsidiary of Mircal Italia and all Equity Interests in ITI shall be reinstated.  On the Effective Date, (i) Imerys S.A. and ITI shall also issue the Talc PI Note to the Talc Personal Injury Trust, and (ii) Mircal Italia shall execute the Talc PI Pledge Agreement.

10.7.2    Except as otherwise provided herein or as may be provided in the Plan Supplement or the Confirmation Order, Reorganized ITI shall continue to exist after the Effective Date as a separate corporate entity from each of the Reorganized North American Debtors, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which Reorganized ITI is incorporated and pursuant to its existing bylaws and certificate of incorporation and any other formation documents in effect prior to the Petition Date, and such documents are deemed to be adopted pursuant to the Plan and require no further action or approval.

10.7.3    Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in ITI's Estate, all ITI Causes of Action, and any property acquired by ITI pursuant to the Plan, shall vest in Reorganized ITI, free and clear of all Claims, interests, Liens, other Encumbrances, and liabilities of any kind.  On and after the Effective Date, except as otherwise provided in the Plan, Reorganized ITI may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, interests, or ITI Causes of Action without supervision or approval by the Bankruptcy Court, or notice to any other Entity, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

10.8    Imerys Settlement.

10.8.1    Compromise and Settlement of Claims.

10.8.1.1    Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan effect a compromise and settlement of all Imerys Released Claims against the Imerys Protected Parties,

and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Imerys Settlement, to release all of the Imerys Released Claims, including, without limitation, the Estate Causes of Action, against each of the Imerys Protected Parties.

10.8.1.2    As further described in the Disclosure Statement, the provisions of the Plan (including the release and injunctive provisions contained in Article XII of the Plan) and the other documents entered into in connection with the Plan constitute a good faith compromise and settlement among the Plan Proponents of Claims and controversies among such parties. The Plan, including the explanation set forth in the Disclosure Statement, shall be deemed a motion to approve the Imerys Settlement and the good faith compromise and settlement of all of the Claims and controversies described in the Plan pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Imerys Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Imerys Settlement is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Entry of the Confirmation Order shall confirm the Bankruptcy Court's approval, as of the Effective Date of the Plan, of all components of the Imerys Settlement and the Bankruptcy Court's finding that the Imerys Settlement is in the best interests of the Debtors, their respective Estates, and is fair, equitable and reasonable.

10.8.1.3    Upon (i) satisfaction of all conditions of the Imerys Contribution in accordance with the terms of the Plan, (ii) the funding of the Reserves from Cash on hand and/or the Imerys Cash Contribution, and (iii) the transfer of the Talc Personal Injury Trust Assets to the Talc Personal Injury Trust, the Plan shall be deemed to be substantially consummated, notwithstanding any contingent obligations arising from the foregoing.  For the avoidance of doubt, Imerys S.A.'s satisfaction of the Imerys Contribution is on behalf of itself and the other Imerys Protected Parties.

10.8.2    Imerys Contribution.

10.8.2.1    Imerys Settlement Funds.  On, prior to, or as soon as reasonably practicable after the Effective Date, the Imerys Non-Debtors will contribute, or cause to be contributed, the Imerys Settlement Funds to the Debtors or the Reorganized Debtors, as applicable, which the Debtors or the Reorganized Debtors, as applicable, will contribute to the Talc Personal Injury Trust upon receipt. For the avoidance of doubt, the proceeds from the Sales will be paid by the Buyer to the North American Debtors or the Reorganized North American Debtors, as applicable, upon the close of the Sales.

10.8.2.2    Imerys Cash Contribution.  On or prior to the Effective Date, the Imerys Non-Debtors will contribute, or cause to be contributed, the following to the Debtors or the Reorganized Debtors, as applicable (the "**Imerys Cash Contribution**"):

a.      the balance of the Intercompany Loan to fund administrative expenses during the pendency of the Chapter 11 Cases, as well as certain of the Reserves (with any remaining balance of the Intercompany Loan not otherwise used to fund the Reserves or pay administrative expenses to be contributed to the Talc Personal Injury Trust on or as soon as reasonably practicable after the Effective Date);

b.      $5 million (less any amounts already paid and noted in an accounting to the Tort Claimants' Committee and the FCR) for payment of Allowed Claims in Class 3a through inclusion in the Reorganized North American Debtor Cash Reserve or the Disputed Claims Reserve, as applicable (with any remaining balance of the $5 million not otherwise used to fund the Reorganized North American Debtor Cash Reserve or the Disputed Claims Reserve, as applicable, to be contributed to the Talc Personal Injury Trust on or as soon as reasonably practicable after the Effective Date) (the "**Unsecured Claim Contribution**"); and

c.      the lesser of (x) $15 million and (y) fifty percent (50%) of the sum of (I) any administrative expenses paid by the Debtors with the proceeds of the DIP Facility *plus* (II) any administrative expenses paid by the Debtors from the Sale Closing Date through the Effective Date *plus* (III) any amounts necessary to fund all reserves, costs or expenses required in connection with the Debtors' emergence from bankruptcy separate from the Unsecured Claim Contribution (the "**Contingent Contribution**"); *provided* that if the Plan is confirmed before June 25, 2021 and the Sale does not close before the Effective Date (such that the DIP Facility Claims have been satisfied in full from the Sale Proceeds and discharged in accordance with the DIP Loan Documents), then (A) the outstanding principal amount of any DIP Loans (excluding any PIK Interest (as defined in the DIP Loan Documents)) shall be applied as a dollar-for-dollar reduction of the amount of the Contingent Contribution required to be contributed by Imerys S.A. to the Debtors or the Reorganized Debtors (in an amount not to exceed $15,000,000), and (B) the remaining outstanding principal amount of any DIP Loans (excluding any PIK Interest), after giving effect to the application in clause (A) above, shall be applied as a dollar-for dollar reduction of the $75 million in Cash that is part of the Imerys Settlement Funds.

10.8.2.3      Talc Trust Contribution.  On or prior to the Effective Date, the Imerys Non-Debtors have agreed to contribute, or cause to be contributed, the following to the Talc Personal Injury Trust (the "**Talc Trust Contribution**"):

a.      rights and interests of the Imerys Non-Debtors to the proceeds of the Shared Talc Insurance Policies and all rights against third parties held by the Imerys Non-Debtors relating to Talc Personal Injury Claims, including any related indemnification rights, which for the avoidance of doubt include the J&J Indemnification Obligations, each of

66

which is to be identified in the Plan Supplement (the "**Contributed Indemnity and Insurance Interests**"); and

b.        the Talc PI Pledge Agreement.

10.8.2.4        <u>Additional Contribution</u>. On or prior to the Effective Date, the Imerys Non-Debtors have agreed to take the following actions (the "**Additional Contribution**," and together with the Imerys Settlement Funds, the Imerys Cash Contribution, and the Talc Trust Contribution, the "**Imerys Contribution**"):

a.        waive all Non-Debtor Intercompany Claims against the Debtors; and

b.        unless otherwise assumed by the Buyer, assume any Pension Liabilities of the North American Debtors through and after the Effective Date of the Plan.

10.8.3        <u>Cooperation Agreement</u>. The Debtors, the Imerys Non-Debtors, and the Talc Personal Injury Trust shall enter into the Cooperation Agreement, which shall be included in the Plan Supplement.

10.9        <u>Rio Tinto/Zurich Settlement</u>.

10.9.1        <u>Compromise and Settlement of Claims</u>.

10.9.1.1        Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the Rio Tinto/Zurich Contribution and other benefits provided pursuant to the Rio Tinto/Zurich Settlement, the provisions of the Plan effect a compromise and settlement of all Rio Tinto/Zurich Released Claims against the Rio Tinto Protected Parties and the Zurich Protected Parties as provided in <u>Section 12.2.1(c)</u> of the Plan, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Rio Tinto/Zurich Settlement and to release all of the Rio Tinto/Zurich Released Claims as provided in <u>Section 12.2.1(c)</u> of the Plan.

10.9.1.2        The provisions of the Plan (including the release and injunctive provisions contained in Article XII of the Plan) and the other documents entered into in connection with the Plan constitute a good faith compromise and settlement among: (i) Rio Tinto, on behalf of itself and the Rio Tinto Captive Insurers, and for the benefit of the Rio Tinto Protected Parties, and Zurich, on behalf of itself and for the benefit of the Zurich Protected Parties, on the one hand, and (ii) the Debtors, on the other hand, and consented to by the Tort Claimants' Committee and the FCR, of claims and controversies among such parties. The Plan, including the explanation set forth in the Disclosure Statement, shall be deemed a motion to approve the Rio Tinto/Zurich Settlement, including the Rio Tinto/Zurich Settlement Agreement, and the good faith compromise and settlement of all of the claims and controversies described in the Plan pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's

approval of the Rio Tinto/Zurich Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Rio Tinto/Zurich Settlement is (i) fair, equitable, reasonable, and in the best interests of the Debtors and their Estates and (ii) fair and equitable with respect to the persons who might subsequently assert Talc Personal Injury Demands, in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by and on behalf of the Rio Tinto Protected Parties and the Zurich Protected Parties.

10.9.2    <u>Rio Tinto/Zurich Settlement Contributions</u>.

10.9.2.1    <u>Rio Tinto/Zurich Contribution</u>.  Rio Tinto and Zurich will make the following contributions, on behalf of themselves and (in the case of Rio Tinto) on behalf of the Rio Tinto Captive Insurers and for the benefit of the Rio Tinto Protected Parties and (in the case of Zurich) for the benefit of the Zurich Protected Parties, to the Talc Personal Injury Trust, to be used for the payment of Talc Personal Injury Claims in accordance with the Trust Distribution Procedures and the Talc Personal Injury Trust Agreement:

a.    *Zurich Cash Contribution*.  On or prior to the date that is thirty (30) days after the Rio Tinto/Zurich Trigger Date, Zurich will contribute, or cause to be contributed, $260 million in Cash to the Talc Personal Injury Trust.

b.    *Rio Tinto Cash Contribution*.  On or prior to the date that is fourteen (14) days after the Rio Tinto/Zurich Trigger Date, Rio Tinto will contribute, or cause to be contributed, $80 million in Cash to the Talc Personal Injury Trust.

c.    *Rio Tinto/Zurich Credit Contribution*.    On the Rio Tinto/Zurich Trigger Date, or as soon as reasonably practicable thereafter (not to exceed three (3) Business Days), the appropriate Rio Tinto Corporate Parties and the appropriate Zurich Corporate Parties shall each execute and deliver to the Talc Personal Injury Trust, in a form reasonably acceptable to the Talc Personal Injury Trust, an assignment to the Talc Personal Injury Trust of (i) all of their rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to the payment or defense of any Talc Personal Injury Claim or any past talc-related claim against the Debtors prior to the Effective Date (the "**Credits**"), and (ii) all of their other rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to any Talc Personal Injury Claim (the "**Future Credits**")  (together, (i) and (ii), the "**Rio Tinto/Zurich Credit Contribution**"), *provided, however,* that any such claims for Credits or Future Credits against a Protected Party shall be subject to the Channeling Injunction, and nothing herein shall impact the injunctions and releases otherwise inuring to the benefit of the Protected Parties under the terms of the Plan.  Notwithstanding anything else

68

contained in this Section 10.9.2.1(c), the Rio Tinto Corporate Parties and the Zurich Corporate Parties shall retain, and shall not transfer to the Talc Personal Injury Trust, all rights of the Rio Tinto Corporate Parties and the Zurich Corporate Parties against their reinsurers and/or retrocessionaires, in their capacity as such.

10.9.3    Rio Tinto/Zurich Settlement Agreement.

10.9.3.1    Pursuant to the Rio Tinto/Zurich Settlement Agreement, Zurich will acquire any and all rights of the Debtors in the Zurich Policies, free and clear of any right, title, or interest of any other Entity, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code.  Further, the Rio Tinto Captive Insurers will acquire any and all rights of the Debtors in the Rio Tinto Captive Insurer Policies, free and clear of any right, title, or interest of any other Entity, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code.

10.9.3.2    Confirmation of the Plan will constitute approval of the Rio Tinto/Zurich Settlement Agreement pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and a finding that the Rio Tinto Captive Insurers and Zurich are good-faith purchasers entitled to the protections of section 363(m) of the Bankruptcy Code.

10.9.3.3    For the avoidance of doubt, the Plan Proponents, on the one hand, and Rio Tinto and Zurich, on the other hand, acknowledge that the Zurich Policies in effect from May 2001 through May 2008 are exhausted.

10.9.4    Withdrawal of Claims.  On the Rio Tinto/Zurich Trigger Date, any and all Claims that the Rio Tinto Corporate Parties or the Zurich Corporate Parties have asserted or that have been asserted on their behalf in the Chapter 11 Cases shall be deemed withdrawn with prejudice.  Further, the Rio Tinto Protected Parties and the Zurich Protected Parties shall not file or assert any additional Claims against any of the Debtors arising from any Debtor's conduct prior to the Confirmation Date.

10.9.5    Cooperation.  Rio Tinto and Zurich shall use reasonable efforts to assist and cooperate with the Talc Personal Injury Trust, Talc Trustees, Talc Trust Advisory Committee, and FCR to pursue the Credits, as set forth in the Rio Tinto/Zurich Settlement Agreement.

US-DOCS\120811676.4

10.9.6    <u>Releases and Injunctions</u>.  Notwithstanding anything to the contrary set forth in the Plan or elsewhere, the Injunctions and the releases contained in Article XII of the Plan shall not be effective as to the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties (as applicable) until the Rio Tinto/Zurich Contribution has been made to the Talc Personal Injury Trust in accordance with <u>Section 10.9.2.1</u> of the Plan.

10.10    <u>Cyprus Settlement</u>.

10.10.1    <u>Conditions to Effectiveness of the Cyprus Settlement and the Cyprus Contribution</u>.  The Cyprus Settlement shall not be effective and binding upon the Debtors, the Cyprus Parties, the Tort Claimants' Committee, or the FCR unless each of the following conditions has been satisfied or waived by the Debtors, the Tort Claimants' Committee, the FCR, and the Cyprus Parties, as applicable:

> a.    the Bankruptcy Court enters the Section 105 Injunction by February 28, 2021;

> b.    approval by the Bankruptcy Court of the Plan, including approval of the Cyprus Settlement, by June 30, 2021;

> c.    approval by a bankruptcy court of the Cyprus Mines Plan, including approval of the Cyprus Settlement, by September 30, 2021;

> d.    the Affirmation Order shall have been entered by the District Court with respect to the Plan and shall have become a Final Order;

> e.    an affirmation order shall have been entered by the District Court with respect to the Cyprus Mines Plan and shall have become a Final Order; and

> f.    satisfaction of other conditions precedent set forth in <u>Section 9.2</u> of the Plan, as well as substantially similar conditions in the Cyprus Mines Plan.

10.10.2    <u>Compromise and Settlement of Claims</u>.

10.10.2.1    Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the Cyprus Contribution and other benefits provided pursuant to the Cyprus Settlement, the provisions of the Plan effect a compromise and settlement of all Cyprus Released Claims against the Cyprus Protected Parties as provided in <u>Section 12.2.1(d)</u> of the Plan, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Cyprus Settlement and to release all of the Cyprus Released Claims as provided in <u>Section 12.2.1(d)</u> of the Plan.

10.10.2.2    The provisions of the Plan (including the release and injunctive provisions contained in Article XII of the Plan) and the other documents

entered into in connection with the Plan constitute a good faith compromise and settlement between and among: (i) Cyprus Mines, CAMC, and Freeport on behalf of themselves and for the benefit of the Cyprus Protected Parties, (ii) the Debtors and their Estates, (iii) the Tort Claimants' Committee, and (iv) the FCR of claims and controversies between and among such parties, including, without limitation, all Estate Causes of Action against any Cyprus Protected Party based on theories of veil-piercing, successor liability, alter ego, conspiracy, or any other theory that could be asserted by the Debtors' Estates. The Plan, including the explanation set forth in the Disclosure Statement, shall be deemed a motion to approve the Cyprus Settlement, including the Cyprus Settlement Agreement, and the good faith compromise and settlement of all of the claims and controversies described in the Plan pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Cyprus Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Cyprus Settlement is (i) fair, equitable, reasonable, and in the best interests of the Debtors and their Estates and (ii) fair and equitable with respect to the persons who might subsequently assert Talc Personal Injury Demands, in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by and on behalf of the Cyprus Protected Parties.

10.10.2.3    For the avoidance of doubt, none of (i) the Bankruptcy Court's approval of the Plan or the Plan Documents, (ii) the Confirmation Order or any findings and conclusions entered with respect to confirmation, nor (iii) any estimation or valuation of any Claims, either individually or in the aggregate in the Chapter 11 Cases shall, absent occurrence of the Cyprus Trigger Date, affect or impair any Cyprus Protected Party's rights, causes of action or claims against J&J, including any J&J Indemnification Obligations held by any Cyprus Protected Parties.

10.10.3    <u>Cyprus Document Access Agreement</u>.  On the Cyprus Trigger Date, Cyprus Mines, CAMC, and the Talc Personal Injury Trust shall enter into a document access agreement as described in the Cyprus Settlement Agreement.

10.10.4    <u>Cyprus Cooperation</u>.  As more fully described in the Cyprus Settlement Agreement, the Cyprus Protected Parties shall assist and cooperate with the Talc Personal Injury Trust as may be reasonably necessary for the pursuit of coverage under the Cyprus Talc Insurance Policies, including with respect to the California coverage action, styled as *Columbia Casualty Co., et al.* v. *Cyprus Mines Corp., et al.*, No. CGC-17-560919 (Cal. Super. Ct.).  Such assistance shall include, but not be limited to, using commercially reasonable efforts to provide all information and documentation reasonably necessary to assert all rights under the Cyprus Talc Insurance Policies including: (a) non-privileged communications with the insurers regarding the Cyprus Talc Insurance Policies; (b) documents sufficient to show, and proof of, all amounts paid under the Cyprus Talc Insurance Policies, including for defense costs, judgments, or settlements of claims; and (c) non-privileged communications with other third parties relating to the Cyprus Talc Insurance Policies, any rights thereunder, or any claims or defenses related thereto.  For the avoidance of doubt, nothing in this <u>Section 10.10.4</u> shall require any of the Cyprus

Protected Parties to take any action that would expose them to liability, including for breach of confidentiality obligations.

10.10.5    Cyprus Contribution.  Subject to the terms of the Cyprus Mines Plan and the Cyprus Settlement Agreement, and subject to the occurrence of the Cyprus Trigger Date, the Cyprus Protected Parties will make the following contributions (the "**Cyprus Contribution**") to the Talc Personal Injury Trust, to be used for the payment of Talc Personal Injury Claims in accordance with the Trust Distribution Procedures and the Talc Personal Injury Trust Agreement:

a.    *Cash Payments from CAMC*.   Pursuant to an unsecured seven-year promissory note, issued by CAMC for and on behalf of itself, Cyprus Mines, and all other Cyprus Protected Parties, in favor of the Talc Personal Injury Trust, with a stated principal amount of $130 million as of the Cyprus Trigger Date, CAMC will pay a total of $130 million to the Talc Personal Injury Trust via wire transfers in seven installments (the "**CAMC Cash Payments**").  The first three payments shall each consist of $21.67 million and shall total $65 million.  The next four payments shall each consist of $16.25 million and shall total $65 million.  Each payment shall be made no later than as set forth in the following schedule:

- Within thirty (30) days after the Cyprus Trigger Date: $21.67 million (the "**First Installment**");
- 1 year anniversary of the First Installment: $21.67 million;
- 2 year anniversary of the First Installment: $21.67 million;
- 3 year anniversary of the First Installment: $16.25 million;
- 4 year anniversary of the First Installment: $16.25 million;
- 5 year anniversary of the First Installment: $16.25 million; and
- 6 year anniversary of the First Installment: $16.25 million.

b.    *Freeport Guarantee*.  Freeport shall provide a guarantee of the CAMC Cash Payments, and shall be subject to a minimum liquidity covenant of not less than $500 million tested as of the end of each of its fiscal quarters.  If Freeport fails to meet such covenant in respect of any fiscal quarter before CAMC has paid the $130 million in full, Freeport will post security in favor of the Talc Personal Injury Trust in respect of the Cyprus Parties' obligations under Section 10.10.5(a) in the form of a performance bond, letter of credit, or other similar instrument for all remaining cash payments.   For purposes of this Section 10.10.5(b), "liquidity" means the sum of unrestricted cash of Freeport and its consolidated subsidiaries as of the applicable test date, plus availability under Freeport's revolving credit facilities at such time.

c.    *Insurance and Other Rights*.  Upon the occurrence of the Cyprus Trigger Date, and in accordance with the terms of the Cyprus Settlement Agreement: (I) the Cyprus Protected Parties will assign the Cyprus Talc Insurance Policy Rights to the Talc Personal Injury Trust; and

US-DOCS\120811676.4

(II) the Talc Personal Injury Trust will assume all present and future obligations associated with recovering proceeds under the Cyprus Talc Insurance Policies; *provided* that solely to the extent that the Talc Personal Injury Trust asserts any claim as assignee of a Cyprus Protected Party bound by the PDC Agreement, the Talc Personal Injury Trust shall abide by the terms of the PDC Agreement; *provided further* that unless otherwise stated in the Plan or the Cyprus Settlement Agreement, such obligations shall not include any obligations undertaken by any Cyprus Protected Party in any settlement agreement or other contract compromising or releasing any rights under any Cyprus Talc Insurance Policy.

d.    *Indemnification, Contribution, and Subrogation Rights*. Upon the occurrence of the Cyprus Trigger Date, and in accordance with the terms of the Cyprus Settlement Agreement, the appropriate Cyprus Protected Parties shall each execute and deliver to the Talc Personal Injury Trust, in a form reasonably acceptable to the Talc Personal Injury Trust, an assignment to the Talc Personal Injury Trust of: (i) all of their rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), reimbursement, or subrogation against any Person relating to the payment or defense of any Talc Personal Injury Claim or other past talc-related claim channeled to the Talc Personal Injury Trust prior to the Cyprus Trigger Date (the "**Cyprus Credits**"), and (ii) all of their rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), reimbursement, or subrogation against any Person relating to any other Talc Personal Injury Claim or other claims channeled to the Talc Personal Injury Trust (the "**Cyprus Future Credits**"); *provided*, *however*, that the assertion of the Cyprus Credits or Cyprus Future Credits against a Protected Party shall be subject to the Channeling Injunction and nothing herein shall impact the injunctions and releases otherwise inuring to the benefit of the Cyprus Protected Parties under the terms of the Plan or the Cyprus Mines Plan; *provided further* that, for the avoidance of doubt, the foregoing shall not include, and the assignment of such rights shall not impair, the rights of any Talc Insurance Company.

10.10.6    <u>Dismissal of Actions, Stays of Proceedings, and Release of Claims</u>.

10.10.6.1    On and after December 22, 2020, (a) the Cyprus Protected Parties shall stay and cease prosecuting all adversary proceedings, proofs of claim, objections, discovery demands and discovery disputes, and any other litigation against the Debtors, the Tort Claimants' Committee, and the FCR, and (b) the Debtors, the Tort Claimants' Committee, and the FCR shall stay and cease prosecuting all adversary proceedings, proofs of claim, objections, discovery demands and discovery disputes, and any other litigation against the Cyprus Protected Parties; *provided* that the Debtors shall be permitted to file a proof of claim in the Cyprus Mines Bankruptcy solely to preserve their rights pending the Cyprus Trigger Date; *provided further* that, for the avoidance of doubt, the filing

of the Plan shall not stay, delay, or otherwise prevent the adjudication of any adversary proceedings or claims of the Cyprus Protected Parties against J&J.

10.10.6.2    Upon occurrence of the Cyprus Trigger Date, (a) the Cyprus Protected Parties shall release, dismiss and withdraw all claims against the Debtors, the Tort Claimants' Committee, and the FCR directly or indirectly arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim, including without limitation all indemnity claims, and (b) the Debtors, the Tort Claimants' Committee, and the FCR shall release, dismiss and withdraw all claims against Cyprus Mines and the Cyprus Protected Parties directly or indirectly arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim, including without limitation all indemnity claims.  For the avoidance of doubt, the foregoing dismissals and withdrawals shall be without prejudice to re-filing, and all releases shall be void and all released claims may be reinstated, if and only if the Affirmation Order or the affirmation order in the Cyprus Mines Bankruptcy is successfully challenged on appeal.

10.10.6.3    Solely in the event the conditions to effectiveness described in Section 10.10.1 do not occur and are not waived, the stay in Section 10.10.6.1 shall be lifted and the Cyprus Protected Parties, on the one hand, and the Debtors, on the other hand: (a) shall be fully entitled to prosecute and seek recovery on all claims against one another, including under the Trust Distribution Procedures (as applicable), and in the interim may take any necessary action to avoid forfeitures or waivers of such claims; and (b) may opt out of any consensual release in the respective plans.

10.10.6.4    In no event shall any party be deemed to have released any other party for breach of agreements adopted pursuant to the Cyprus Settlement.

10.10.7    Releases and Injunctions.

10.10.7.1    The Injunctions and the releases contained in Article XII of the Plan shall not be effective as to the Cyprus Protected Parties until the Cyprus Trigger Date.

10.10.7.2    Pursuant to the Cyprus Settlement, the Cyprus Mines Plan will protect the Debtors with releases and injunctions substantially equivalent to those received by the Cyprus Parties under the terms of the Plan, which shall be effective as of the Cyprus Trigger Date.

10.10.7.3    The releases and Injunctions contained in the Plan and the Confirmation Order with respect to the Cyprus Protected Parties shall dissolve immediately should any of the CAMC Cash Payments (or, pursuant to the guarantee, any payments from Freeport) not be received by the Talc Personal Injury Trust within thirty (30) days of a true and accurate written notice from the Talc Personal Injury Trust to CAMC and Freeport that such payment was due and not made by the deadline set forth in Section 10.10.5(a).

74

10.10.8    Form of Certain Documents.

10.10.8.1    This plan of reorganization shall be in form and substance acceptable to CAMC and Cyprus Mines, respectively and as applicable, with respect to any provision that is material to CAMC's or Cyprus Mines' rights and obligations in connection with the Cyprus Settlement.

10.10.8.2    The Affirmation Order and the Confirmation Order shall be in form and substance acceptable to CAMC and Cyprus Mines, respectively and as applicable, with respect to any provision that is material to CAMC's or Cyprus Mines' rights and obligations in connection with the Cyprus Settlement.

10.10.8.3    The Cyprus Mines Plan, proposed confirmation order and proposed affirmation order shall be in form and substance acceptable to the Debtors and the Imerys Plan Proponents, respectively and as applicable, with respect to any provision that is material to the Debtors' or the Imerys Plan Proponents' rights and obligations in connection with the Cyprus Settlement.

10.10.9    Allocation of the Cyprus Contribution.

10.10.9.1    The Tort Claimants' Committee has proposed the following allocation of the Cyprus Contribution after extensive internal deliberations: (a) 55% will be allocated to Mesothelioma Claimants; and (b) 45% will be allocated to Ovarian Cancer Claimants.  As between the Ovarian Cancer Claimants, 30.15% of the Cyprus Contribution will be allocated to and become part of Fund A and 14.85% of the Cyprus Contribution will become part of Fund C.  The FCR continues to examine the proposed allocation.  Solely for purposes of this negotiated allocation, the Cyprus Contribution is deemed to include all rights and obligations under the Cyprus Talc Insurance Policies.  For the avoidance of doubt, nothing in the Plan Documents shall be interpreted as an admission, or adjudication on the merits of any disputed issue related to the Cyprus Talc Insurance Policies, including, but not limited to, the disputed rights at issue in the Cyprus Insurance Adversary Proceeding (as defined in the Disclosure Statement).

10.10.9.2    Consummation of the proposed allocation of the Cyprus Contribution remains subject to: (i) approval of any tort claimants' committee to be appointed in the Cyprus Mines Bankruptcy; (ii) approval of any future claimants' representative to be appointed in the Cyprus Mines Bankruptcy; (iii) approval by the Bankruptcy Court in the Debtors' Chapter 11 Cases; (iv) approval by the bankruptcy court in the Cyprus Mines Bankruptcy; (v) the Effective Date; and (vi) the Cyprus Trigger Date.

10.10.9.3    The final allocation will be served on any party that has filed an appearance requesting notices in the Chapter 11 Cases and any party that receives a Ballot (as defined in the Voting Procedures) to vote in the Chapter 11 Cases.  The Trust Distribution Procedures may be amended as appropriate to

75

address the Cyprus Contribution and the Cyprus Mines Plan, as set forth in footnote 1 therein.

10.10.9.4    Capitalized terms used in this <u>Section 10.10.9</u> and not otherwise defined herein, have the meanings ascribed to them in the Trust Distribution Procedures.

10.11    <u>Good Faith Compromise and Settlement</u>.  The Plan (including its incorporation of the Imerys Settlement, the Rio Tinto/Zurich Settlement, and the Cyprus Settlement), the Plan Documents, and the Confirmation Order constitute a good faith compromise and settlement of Claims and controversies based upon the unique circumstances of these Chapter 11 Cases, and none of the foregoing documents, the Disclosure Statement, or any other papers filed in furtherance of Plan Confirmation, nor any drafts of such documents, may be offered into evidence or deemed as an admission in any context whatsoever beyond the purposes of the Plan, in any other litigation or proceeding, except as necessary, and as admissible in such context, to enforce their terms before the Bankruptcy Court or any other court of competent jurisdiction.  The Plan, the Imerys Settlement, the Plan Documents, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors, the Reorganized Debtors, the Imerys Protected Parties, or the Talc Personal Injury Trust is a party.  The Plan, the Rio Tinto/Zurich Settlement, the Cyprus Settlement, the Plan Documents, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors, the Reorganized Debtors, the Rio Tinto Protected Parties, the Zurich Protected Parties, the Cyprus Protected Parties, or the Talc Personal Injury Trust is a party.

10.12    <u>Resolution of Talc Personal Injury Claims</u>.  Talc Personal Injury Claims shall be channeled to and resolved by the Talc Personal Injury Trust in accordance with the Trust Distribution Procedures, as applicable, subject to: (a) the right of any Talc Insurance Company to raise any valid Talc Insurer Coverage Defense in response to a demand by the Talc Personal Injury Trust that such insurer handle, defend, or pay any such claim; and (b) the right of J&J, as indemnitor, to raise any valid J&J Indemnification Defense in response to a demand by the Talc Personal Injury Trust that J&J handle, defend, or pay any such claim.

10.13    <u>Sources of Consideration for Plan Distributions</u>.

10.13.1    <u>North American Debtor Claims</u>.  All Cash consideration necessary for payments or distributions on account of the North American Debtor Claims shall be obtained from (i) the Cash on hand of the North American Debtors on the Effective Date, including Cash derived from business operations, (ii) the Sale Proceeds, and (iii) the Imerys Cash Contribution.

10.13.2    <u>Talc Personal Injury Claims</u>.  All Cash consideration necessary for payments or distributions on account of Talc Personal Injury Claims shall be obtained from (i) the Cash on hand of the North American Debtors on the Effective Date, including Cash derived from business operations, other than the Cash placed in the Reserves, if any, (ii) the Imerys Settlement Funds, (iii) the amount of the Imerys Cash Contribution, after such funds

have been disbursed in accordance with <u>Section 10.8.2</u>; (iv) all Cash remaining in the Reserves, if applicable, as set forth in <u>Section 10.14</u> of the Plan; (v) all proceeds from the Talc Personal Injury Trust Assets; (vi) the Rio Tinto/Zurich Contribution; and (vii) the Cyprus Contribution upon the occurrence of the Cyprus Trigger Date.

10.13.3    <u>ITI Claims</u>.    All Cash consideration necessary for payments or distributions under the Plan on account of ITI Claims, for the avoidance of doubt, other than Talc Personal Injury Claims, shall be obtained from the Cash on hand at Reorganized ITI.

10.13.4    <u>Transfer of Funds Between the North American Debtors</u>.    The North American Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable them to satisfy their obligations under the Plan; *provided* that any transfer of funds from ITC to another North American Debtor shall be subject to review by the Information Officer.  Except as set forth therein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate or otherwise be affected by the terms of the Plan.

10.13.5    <u>Funding by the Talc Personal Injury Trust</u>.    The Talc Personal Injury Trust shall have no obligation to fund costs and expenses other than those set forth in the Plan and/or the Talc Personal Injury Trust Documents, as applicable.

10.14    <u>Transfer of Remaining North American Debtors' Assets to the Talc Personal Injury Trust</u>.

10.14.1    After (i) all Disputed Claims against the North American Debtors have been resolved, and (ii) all Distributions required to be made by the Reorganized North American Debtors under the Plan have been made, all Cash remaining in the Disputed Claims Reserve shall be disbursed to the Talc Personal Injury Trust, in accordance with <u>Section 7.10</u> of the Plan.

10.14.2    Upon the final resolution of all Claims against and obligations of the Reorganized North American Debtors, all Cash remaining in the Reorganized North American Debtor Cash Reserve shall be disbursed to the Talc Personal Injury Trust.

10.14.3    Any remaining balance in the Fee Claim Reserve and the Administrative Claim Reserve shall be disbursed to the Talc Personal Injury Trust subject to and in accordance with <u>Sections 2.1</u> and <u>2.3</u> of the Plan.

10.15    <u>Modification of the Plan</u>.    To the extent permissible under section 1127 of the Bankruptcy Code, any proposed amendments to or modifications of the Plan under section 1127 of the Bankruptcy Code or as otherwise permitted by law will be submitted jointly by the Plan Proponents, without additional disclosure pursuant to section 1125 of the Bankruptcy Code at any time prior to substantial consummation of the Plan, unless section 1127 of the Bankruptcy Code requires additional disclosure; *provided* that no such amendment or modification of the Plan that adversely affects the rights or obligations of the Cyprus Protected Parties or the Rio Tinto Protected Parties, as applicable, shall be permitted hereunder without the prior written consent of CAMC,

Cyprus Mines, or Rio Tinto, as applicable.  To the extent permissible under section 1127(b) of the Bankruptcy Code, following substantial consummation of the Plan, the Reorganized Debtors may remedy any defects or omissions or reconcile any inconsistencies in the Plan Documents for the purpose of implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan, so long as (a) the interests of the holders of Allowed Claims are not adversely affected thereby; (b) any such modifications are non-material; (c) the Tort Claimants' Committee and the FCR or, following the Effective Date, the Talc Trust Advisory Committee and the FCR consent; (d) Imerys S.A. consents; and (e) the United States Trustee does not object, unless such objection is overruled by the Bankruptcy Court.  Post-Effective Date, any holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified or supplemented pursuant to this <u>Section 10.15</u>, unless the Bankruptcy Court rules otherwise.

10.16   <u>Revocation or Withdrawal of the Plan</u>.  The Debtors, with the consent of each of the other Plan Proponents, reserve the right to revoke and withdraw the Plan prior to entry of the Confirmation Order.  If the Debtors, with the consent of each of the other Plan Proponents, revoke or withdraw the Plan, the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against such Debtor, or any other Entity (including the Plan Proponents), or to prejudice in any manner the rights of such Debtor, or such Entity (including the Plan Proponents) in any further proceedings involving such Debtor until the occurrence of the Effective Date.  For the avoidance of doubt, unless and until the Plan is confirmed and the Effective Date occurs, the Plan will have no force or effect.

10.17   <u>Certain Technical Modifications</u>.  Prior to the Effective Date, the Plan Proponents collectively may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, to the extent permissible under section 1127 of the Bankruptcy Code; *provided, however*, that such technical adjustments and modifications do not adversely affect in a material way the rights or protections of the Protected Parties or the treatment of holders of Claims or Equity Interests under the Plan.

### ARTICLE XI
### EFFECT OF CONFIRMATION

11.1   <u>Preservation of Certain Estate Causes of Action</u>.

11.1.1   In accordance with section 1123(b) of the Bankruptcy Code, and except where such Estate Causes of Action have been expressly released, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Non-Talc Causes of Action, whether arising before or after the Petition Date.  Each Reorganized Debtor's right to commence, prosecute or settle such Non-Talc Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue the Non-Talc Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.

11.1.2   No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Non-Talc Cause of Action against them as any indication that the Reorganized Debtors will not pursue the Non-Talc Causes

of Action.  The Reorganized Debtors expressly reserve all rights to prosecute any and all Non-Talc Causes of Action, except as otherwise expressly provided in the Plan.  Unless any of the Non-Talc Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all such Non-Talc Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Non-Talc Causes of Action as a consequence of the Confirmation of the Plan.

11.1.3    Upon the Effective Date, the Reorganized Debtors shall retain and enforce all defenses and counterclaims to all Claims that were or could have been asserted against the Debtors, respectively, or their respective Estates, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.  On or after the Effective Date, the Reorganized Debtors may pursue, settle or withdraw, without Bankruptcy Court approval, such claims, rights, or causes of action (other than the Talc Personal Injury Trust Causes of Action) as they determine in accordance with their best interests.

11.2    <u>Preservation of Talc Personal Injury Trust Causes of Action</u>.  On the Effective Date, all Talc Personal Injury Trust Causes of Action shall be transferred to and vested in the Talc Personal Injury Trust.  Except as otherwise provided in the Plan or the Confirmation Order, the Talc Personal Injury Trust shall retain and enforce, as the appointed estate representative in accordance with section 1123(b) of the Bankruptcy Code, all Talc Personal Injury Trust Causes of Action, including, but not limited to, setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code.  The transfer of the Talc Personal Injury Trust Causes of Action to the Talc Personal Injury Trust, insofar as they relate to the ability to defend against or reduce the amount of Talc Personal Injury Claims, shall be considered the transfer of a non-exclusive right enabling the Talc Personal Injury Trust to defend itself against asserted Talc Personal Injury Claims, which transfer shall not impair, affect, alter, or modify the right of any Person, including without limitation, the Imerys Protected Parties, the Rio Tinto Protected Parties, the Zurich Protected Parties, the Cyprus Protected Parties, an insurer or alleged insurer, or co-obligor or alleged co-obligor, sued on account of a Talc Personal Injury Claim, to assert each and every defense or basis for claim reduction such Person could have asserted had the Talc Personal Injury Trust Causes of Action not been assigned to the Talc Personal Injury Trust.

11.3    <u>Talc Insurance Actions</u>.  Any Talc Insurance Action, or the claims and causes of action asserted or to be asserted therein, shall be preserved for the benefit of the Talc Personal Injury Trust, for prosecution by the applicable Debtor(s) until the Effective Date subject to the consent of the FCR and the Tort Claimants' Committee, which shall not be unreasonably withheld.  As of the Effective Date, such Talc Insurance Actions along with the rights and obligations of the Debtors and the Reorganized Debtors, as applicable, and the Non-Debtor Affiliates with respect to the Talc Insurance Policies and claims thereunder shall exclusively vest in the Talc Personal Injury Trust in accordance with section 1123(a)(5)(B) of the Bankruptcy Code, and the Talc Personal Injury Trust shall retain and enforce as the appointed estate representative in accordance with section 1123(b)(3)(B)of the Bankruptcy Code all such Talc Insurance Actions.  Such Talc Insurance Actions shall be free and clear of all Liens, security interests, and other Claims or causes

US-DOCS\120811676.4

of action, except for Talc Insurer Coverage Defenses.  Upon vesting in the Talc Personal Injury Trust, the prosecution of the Talc Insurance Actions shall be governed by the Talc Personal Injury Trust Documents.

11.4    <u>Insurance Provisions</u>.

11.4.1    The provisions of this <u>Section 11.4</u> shall apply to all Entities (including, without limitation, all Talc Insurance Companies).

11.4.1.1    Except as provided in the Rio Tinto/Zurich Settlement and any Talc Insurance Settlement Agreement, nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any Talc Insurance Company; (b) any rights or obligations of the Debtors arising out of or under any Talc Insurance Policy; or (c) any rights or obligations of J&J arising out of or under any Talc Insurance Policy (if any).  For all issues relating to insurance coverage allegedly provided by the Zurich Corporate Parties or the Rio Tinto Captive Insurers, the provisions, terms, conditions, and limitations of the Rio Tinto/Zurich Settlement shall control.  For all other issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Talc Insurance Policies or applicable Talc Insurance CIP Agreements or Talc Insurance Settlement Agreements shall control.  For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or the Confirmation Order shall operate to require any Talc Insurance Company to indemnify or pay the liability of any Protected Party that it would not have been required to pay in the absence of the Plan.

11.4.1.2    The Plan, the Plan Documents, and the Confirmation Order shall be binding on the Debtors, the Reorganized Debtors, and the Talc Personal Injury Trust.  The obligations, if any, of the Talc Personal Injury Trust to pay holders of Talc Personal Injury Claims shall be determined pursuant to the Plan and the Plan Documents.  Except as provided in <u>Section 11.4.1.4</u>, none of (a) the Bankruptcy Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (c) any estimation or valuation of Talc Personal Injury Claims, either individually or in the aggregate (including, without limitation, any agreement as to the valuation of Talc Personal Injury Claims) in the Chapter 11 Cases shall, with respect to any Talc Insurance Company, constitute a trial or hearing on the merits or an adjudication or judgment, or accelerate the obligations, if any, of any Talc Insurance Company under its Talc Insurance Policies.

11.4.1.3    No provision of the Plan, other than those provisions contained in the applicable Injunctions set forth in Article XII of the Plan, shall be interpreted to affect or limit the protections afforded to any Settling Talc Insurance Company by the Channeling Injunction or the Insurance Entity Injunction.

US-DOCS\120811676.4

11.4.1.4        Nothing in this Section 11.4.1 is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Talc Insurance Company with respect to any issue that is actually litigated by such Talc Insurance Company as part of its objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by such Talc Insurance Company in conjunction with or related to Confirmation of the Plan.  Plan objections that are withdrawn prior to the conclusion of the Confirmation Hearing shall be deemed not to have been actually litigated.

11.4.1.5        No provision of the Plan shall be interpreted to assign or transfer the rights of any Cyprus Protected Party, or to resolve disputes between Cyprus and the Debtors regarding ownership or control of rights to insurance or indemnity rights, absent occurrence of the Cyprus Trigger Date.  For the avoidance of doubt, any such rights being assigned under the Cyprus Settlement shall not be assigned prior to the Cyprus Trigger Date.

11.5    J&J Indemnification Rights and Obligations.

11.5.1    The provisions of this Section 11.5 shall apply to all Entities (including, without limitation, J&J).

11.5.1.1        Subject to Section 11.5.1.5, nothing contained in the Plan, the Plan Documents (including the Trust Distribution Procedures), or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, fixing, adjudicating, determining, altering, supplementing, changing, decreasing, modifying, or releasing the rights (if any) or obligations of J&J, including the J&J Indemnification Rights and Obligations and J&J's rights (if any) and obligations under any Talc Insurance Policy.  For all issues relating to the J&J Indemnification Rights and Obligations, the provisions, terms, conditions, and limitations of any agreements underlying the J&J Indemnification Rights and Obligations shall control.

11.5.1.2        For the avoidance of doubt, nothing contained in the Plan, the Plan Documents (including the Trust Distribution Procedures), or the Confirmation Order (including any findings of fact or conclusions of law set forth therein, or any expert reports or FCR findings or conclusions) shall operate to require J&J to indemnify or pay the liability of any Debtor, the Reorganized Debtors, or any Protected Party that it would not have been required to pay in the absence of the Plan.  This Section 11.5.1.2 in no way modifies, alters or limits the rights and/or obligations set forth in Section 11.5.1.1 above.  Likewise, nothing contained in the Plan, the Plan Documents (including the Trust Distribution Procedures), or the Confirmation Order shall be interpreted to grant the Debtors or any Protected Party any right to access any insurance policies issued to J&J or naming J&J as an insured.

11.5.1.3        The Plan, the Plan Documents (including the Trust Distribution Procedures), and the Confirmation Order shall be binding on the Debtors, the Reorganized Debtors, and the Talc Personal Injury Trust.   The obligations, if any, of the Talc Personal Injury Trust to pay holders of Talc Personal Injury Claims shall be determined pursuant to the Plan and the Plan Documents. Subject to Sections 11.5.1.4 and 11.5.1.5, none of (a) the Bankruptcy Court's approval of the Plan or the Plan Documents (including the Trust Distribution Procedures), (b) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (c) any estimation or valuation of Talc Personal Injury Claims, either individually or in the aggregate (including, without limitation, any agreement as to the valuation of Talc Personal Injury Claims) in the Chapter 11 Cases shall, with respect to J&J, constitute a trial or hearing on the merits or an adjudication or judgment, or accelerate the obligations, if any, of J&J.

11.5.1.4        Nothing in this Section 11.5.1 is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against J&J with respect to any issue that is actually litigated by J&J as part of its objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by J&J in conjunction with or related to Confirmation of the Plan.  Plan objections that are withdrawn prior to the conclusion of the Confirmation Hearing shall be deemed not to have been actually litigated.

11.5.1.5        The provisions of Sections 11.5.1.1, 11.5.1.3, and 11.5.1.6 shall not apply to any claim by or against J&J to indemnification, defense, contribution, or any other right to recovery vis-à-vis any Rio Tinto Protected Party or any Zurich Protected Party or any Cyprus Protected Party, or under any Rio Tinto Captive Insurer Policy or any Zurich Policy, arising out of or relating to any Talc Personal Injury Claim.

11.5.1.6        Nothing in the Plan, the Plan Documents (including the Trust Distribution Procedures), or the Confirmation Order shall seek the Bankruptcy Court's determination or opinion as to (nor be construed to represent the Bankruptcy Court's determination or opinion as to) (i) any right, obligation, defense, claim or any other provision or entitlement of any alleged indemnification obligation of J&J, or (ii) the effect, if any, of applicable non-bankruptcy law regarding any requirement or provision (or the rights, obligations, defenses, or claims which may inure thereto or therefrom) in any contracts or in underlying proceedings by and between and/or among the Debtors, the Reorganized Debtors, and/or the Talc Personal Injury Trust and J&J.

11.6      Institution and Maintenance of Legal and Other Proceedings.  As of the Effective Date, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability or responsibility of the Talc Personal Injury Trust, including without limitation the Talc Insurance Actions, Talc Personal Injury Claims, Indirect Talc Personal Injury Claims, the Talc Personal Injury Trust Causes of Action, and the J&J Indemnification Obligations.

Without limiting the foregoing, on and after the Effective Date, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue and resolve all such actions, in the name of either of the Debtors or the Reorganized Debtors, if deemed necessary or appropriate by the Talc Personal Injury Trust.  The Talc Personal Injury Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the Effective Date arising from or associated with any legal action or other proceeding which is the subject of Article IV of the Plan and shall pay or reimburse all deductibles, self-insured retentions, retrospective premium adjustments, or other charges (not constituting Indirect Talc Personal Injury Claims) which may arise from the receipt of any insurance proceeds by the Talc Personal Injury Trust.  Furthermore, without limiting the foregoing, the Talc Personal Injury Trust shall be empowered to maintain, administer, preserve, or pursue the Talc-In-Place Insurance Coverage and the Talc Insurance Action Recoveries.  Notwithstanding anything to the contrary herein, the Talc Personal Injury Trust shall comply with the Cyprus Insurance Protocol.

11.7    Terms of Injunctions and Automatic Stay.

11.7.1    All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Cases, whether pursuant to sections 105, 362, or any other provision of the Bankruptcy Code, Bankruptcy Rules, or other applicable law in existence immediately prior to the Confirmation Date, shall remain in full force and effect until the injunctions become effective pursuant to a Final Order, and shall continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms.  In addition, on and after Confirmation, the Debtors, with the consent of each of the Plan Proponents, may collectively seek such further orders as they deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

11.7.2    Each of the Injunctions contained in the Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order.

11.8    The FCR and the Tort Claimants' Committee.

11.8.1    The FCR and the Tort Claimants' Committee shall continue in their official capacities until the Effective Date.  The Debtors shall pay the reasonable fees and expenses incurred by the FCR and the Tort Claimants' Committee through the Effective Date, in accordance with the Compensation Procedures Order, the Fee Examiner Order, and the terms of the Plan, including Section 2.3 of the Plan.

11.8.2    After the Effective Date, the official capacities of the FCR and the Tort Claimants' Committee in the Chapter 11 Cases shall be limited to having standing and capacity to (i) prosecute their pre-Effective Date intervention in any adversary proceedings; (ii) object to any proposed modification of the Plan; (iii) object to or defend the Fee Claims of professionals employed by or on behalf of the Estate, or by or on behalf of members of the Tort Claimants' Committee; and (iv) participate in any pending appeals or appeals of the Confirmation Order.  Except for the foregoing, the FCR and the members of the Tort

Claimants' Committee shall be released and discharged from all further authority, duties, responsibilities, liabilities, and obligations involving the Chapter 11 Cases.  Upon the closing of the Chapter 11 Cases, the Tort Claimants' Committee shall be dissolved.  The fees and expenses incurred by the FCR and the Tort Claimants' Committee relating to any post-Effective Date activities authorized hereunder shall be payable from the Administrative Claim Reserve.

11.8.3    Nothing in this <u>Section 11.8</u> of the Plan shall limit or otherwise affect the rights of the United States Trustee under section 502 of the Bankruptcy Code or otherwise to object to Claims or requests for allowance of DIP Facility Claims, or Fee Claims and other Administrative Claims.

## ARTICLE XII
## RELEASES, INJUNCTION AND EXCULPATION

12.1    <u>Discharge and Injunctions</u>.

12.1.1    <u>Discharge of Claims Against and Termination of Equity Interests in the Debtors</u>.  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, Confirmation of the Plan shall afford each Debtor a discharge to the fullest extent permitted by Bankruptcy Code sections 524 and 1141(d)(1).

12.1.2    **<u>Discharge Injunction</u>.  Except as specifically provided in the Plan or the Confirmation Order, from and after the Effective Date, to the maximum extent permitted under applicable law, all Persons that hold, have held, or may hold a Claim, demand or other debt or liability that is discharged, or an Equity Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan, are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, debts or liabilities, or terminated Equity Interests or rights: (i) commencing or continuing any action or other proceeding of any kind against the Debtors, the Reorganized Debtors, the Talc Personal Injury Trust, or their respective property; (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, the Talc Personal Injury Trust, or their respective property; (iii) creating, perfecting, or enforcing any Lien or Encumbrance of any kind against the Debtors, the Reorganized Debtors, the Talc Personal Injury Trust, or their respective property; and (iv) commencing or continuing any judicial or administrative proceeding, in any forum and in any place in the world, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order (the "<u>Discharge Injunction</u>").  The foregoing injunction shall extend to the successors of the Debtors (including, without limitation, the Reorganized Debtors) and their respective properties and interests in property.  The discharge provided in this provision shall void any judgment obtained against any Debtor at any time, to the extent that such judgment relates to a discharged Claim or demand.**

US-DOCS\120811676.4

12.2   **Releases**.

12.2.1   **Releases by Debtors, their Estates, and Certain Protected Parties**.

(a)   **As of the Effective Date (or, with respect to the Cyprus Protected Parties, as of the Cyprus Trigger Date), for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the implementation of the Talc Personal Injury Trust, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Debtors and the Estates from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, causes of action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates (including any Estate Causes of Action), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission; provided, however, that the Debtors do not release, and the Reorganized Debtors shall retain, the Non-Talc Causes of Action arising out of, or related to, any act or omission of a Released Party that is a criminal act or constitutes fraud, gross negligence, or willful misconduct. The Debtors, and any other newly-formed entities that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the releases set forth in this Section 12.2.1 of the Plan. For the avoidance of doubt, Claims or causes of action arising out of, or related to, any act or omission of a Released Party prior to the Effective Date that is later found to be a criminal act or to constitute fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to this Section 12.2.1 of the Plan.**

(b)     **In furtherance of the Imerys Settlement, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, on their own behalf and as representatives of their respective Estates, the Reorganized Debtors, and the Tort Claimants' Committee and FCR, solely on their own behalf, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Imerys Protected Parties of and from (a) all Estate Causes of Action and (b) any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including, without limitation, those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Debtors, their Estates, the Reorganized Debtors, the Tort Claimants' Committee, or the FCR have, had, may have, or may claim to have against any of the Imerys Protected Parties including without limitation with respect to any Talc Personal Injury Claim (clauses (a) and (b) collectively, the "<u>Imerys Released Claims</u>").**

(c)     **In furtherance of the Rio Tinto/Zurich Settlement, effective upon the Talc Personal Injury Trust's receipt of the Rio Tinto/Zurich Contribution, for good and valuable consideration, the adequacy of which is hereby confirmed, the Talc Personal Injury Trust, the Debtors, on their own behalf and as representatives of their respective Estates, the Reorganized Debtors, and the Tort Claimants' Committee and FCR, solely on their own behalf, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Rio Tinto Protected Parties and the Zurich Protected Parties of and from (a) all Estate Causes of Action and (b) any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Talc Personal Injury Trust, the Debtors, their Estates, the Reorganized Debtors, the Tort Claimants' Committee, or the FCR have, had, may have, or may claim to have against any of the Rio Tinto Protected Parties and/or the Zurich Protected Parties, directly or indirectly arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim (collectively, the "<u>Rio Tinto/Zurich Released Claims</u>").**

(d)     **In furtherance of the Cyprus Settlement, effective upon the Cyprus Trigger Date (and subject to <u>Section 10.10.6.4</u>), for good and valuable consideration, the adequacy of which is hereby confirmed, the Talc Personal Injury Trust, the Debtors, on their own behalf and as representatives of their respective Estates, the Reorganized Debtors, the Tort Claimants' Committee and FCR, and any Cyprus Settling Talc Insurance Company (regardless of when it enters into any settlement with the Debtors, the Tort Claimants' Committee, the FCR, or the Talc Personal Injury Trust), each solely on its own behalf, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Cyprus Protected Parties of and from (a) all Estate Causes of Action**

86

and (b) any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Talc Personal Injury Trust, the Debtors, their Estates, the Reorganized Debtors, the Tort Claimants' Committee, the FCR, or any Cyprus Settling Talc Insurance Company have, had, may have, or may claim to have against any of the Cyprus Protected Parties, directly or indirectly arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim (collectively, the "<u>Cyprus Released Claims</u>").

      12.2.2    **<u>Releases by Holders of Claims</u>.  As of the Effective Date (or, with respect to the Cyprus Protected Parties, as of the Cyprus Trigger Date), for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the implementation of the Talc Personal Injury Trust, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, except as otherwise explicitly provided herein, by the Releasing Claim Holders from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, causes of action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates (including any Estate Causes of Action), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such entities existed prior to or after the Petition Date), their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation,**

US-DOCS\120811676.4

formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, other than Claims or causes of action arising out of, or related to, any act or omission of a Released Party that constitutes fraud, gross negligence or willful misconduct.  For the avoidance of doubt, Claims or causes of action arising out of, or related to, any act or omission of a Released Party prior to the Effective Date that is later found to be a criminal act or to constitute fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to this <u>Section 12.2.2</u> of the Plan.

12.2.3    <u>Injunction Related to Releases</u>.  Except as otherwise provided in the Plan, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities released pursuant to the Plan (the "<u>Release Injunction</u>").

12.3    <u>The Channeling Injunction and the Insurance Entity Injunction</u>.  In order to supplement the injunctive effect of the Discharge Injunction, and pursuant to sections 524(g) and 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following permanent injunctions to take effect as of the Effective Date.

12.3.1    <u>Channeling Injunction</u>.

(a)    **Terms.**  To preserve and promote the settlements contemplated by and provided for in the Plan, including the Imerys Settlement, the Rio Tinto/Zurich Settlement, and the Cyprus Settlement, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and the District Court under sections 105(a) and 524(g) of the Bankruptcy Code, the sole recourse of any holder of a Talc Personal Injury Claim against a Protected Party (on account of such Talc Personal Injury Claim) shall be the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents, and such holder shall have no right whatsoever at any time to assert its Talc Personal Injury Claim against any Protected Party or any property or interest in property of any Protected Party.  On and after the Effective Date – or, as to the Cyprus Protected Parties, on or after the Cyprus Trigger Date – all holders of Talc Personal Injury Claims shall be permanently and forever stayed, restrained, barred, and enjoined from taking any action for the purpose of, directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Talc Personal Injury Claim against a Protected Party other than from the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents, including, but not limited to:

(i)    commencing, conducting, or continuing in any manner, directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;

88

(ii)      enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property or interests in property of any Protected Party;

(iii)      creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien of any kind against any Protected Party or any property or interests in property of any Protected Party;

(iv)      asserting, implementing, or effectuating any setoff, right of reimbursement, subrogation, contribution, or recoupment of any kind, in any manner, directly or indirectly, against any obligation due to any Protected Party or against any property or interests in property of any Protected Party; and

(v)      taking any act in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Documents, or the Talc Personal Injury Trust Documents or with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Talc Personal Injury Trust, except in conformity and compliance with the Talc Personal Injury Trust Documents.

(b)      Reservations.  Notwithstanding anything to the contrary in Section 12.3.1(a) of the Plan, this Channeling Injunction shall not impair:

(i)      the rights of holders of Talc Personal Injury Claims to assert such Talc Personal Injury Claims solely against the Talc Personal Injury Trust or otherwise in accordance with the Trust Distribution Procedures;

(ii)      the rights of holders of Talc Personal Injury Claims to assert such claims against anyone other than a Protected Party;

(iii)      the rights of Persons to assert any Claim, debt, obligation or liability for payment of Talc Personal Injury Trust Expenses solely against the Talc Personal Injury Trust or otherwise in accordance with the Trust Distribution Procedures; or

(iv)      the Talc Personal Injury Trust from enforcing its rights explicitly provided to it under the Plan and the Talc Personal Injury Trust Documents.

(c)      Modifications.  There shall be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

US-DOCS\120811676.4

(d)     **Non-Limitation of Channeling Injunction. Nothing in the Plan or the Talc Personal Injury Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan, the releases provided in the Imerys Settlement, the Rio Tinto/Zurich Settlement, and the Cyprus Settlement, or the Talc Personal Injury Trust's assumption of all liability with respect to Talc Personal Injury Claims.**

(e)     **Bankruptcy Rule 3016 Compliance. The Plan Proponents' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.**

(f)     **Any Protected Party may enforce the Channeling Injunction as a defense to any Claim brought against such Protected Party that is enjoined under the Plan as to such Protected Party and may seek to enforce such injunction in a court of competent jurisdiction.**

(g)     **If a non-Settling Talc Insurance Company asserts that it has rights whether legal, equitable, contractual, or otherwise, of contribution, indemnity, reimbursement, subrogation or other similar claims directly or indirectly arising out of or in any way relating to such insurer's payment of loss on behalf of one or more of the Debtors in connection with any Talc Personal Injury Claim (collectively, "Contribution Claims") against a Settling Talc Insurance Company, (i) such Contribution Claims may be asserted as a defense or counterclaim against the Talc Personal Injury Trust in any Talc Insurance Action involving such non-Settling Talc Insurance Company, and the Talc Personal Injury Trust may assert the legal or equitable rights (if any) of the Settling Talc Insurance Company, and (ii) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such non-Settling Talc Insurance Company to the Talc Personal Injury Trust shall be reduced by the amount of such Contribution Claims.**

12.3.2     **Insurance Entity Injunction.**

(a)     **Purpose. In order to protect the Talc Personal Injury Trust and to preserve the Talc Personal Injury Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court, the Bankruptcy Court shall issue the Insurance Entity Injunction; *provided*, *however*, that the Insurance Entity Injunction is not issued for the benefit of any Talc Insurance Company, and no Talc Insurance Company is a third-party beneficiary of the Insurance Entity Injunction, except as otherwise specifically provided in any Talc Insurance CIP Agreement or Talc Insurance Settlement Agreement.**

(b)     **Terms Regarding Claims Against Talc Insurance Companies. Subject to the provisions of Sections 12.3.1 and 12.3.2 of the Plan, all Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any claim, demand or cause of action (including any Talc Personal Injury Claim or any claim or demand for or respecting any Talc Personal Injury Trust Expense) against**

any Talc Insurance Company based upon, attributable to, arising out of, or in any way connected with any such Talc Personal Injury Claim, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim, demand, or cause of action including, without limitation:

(i)    commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such claim, demand, or cause of action against any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action; *provided, however*, that to the extent any Talc Insurance Company asserts a claim against J&J, nothing in the Plan shall affect J&J's ability to assert any defense or counterclaim;

(ii)    enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;

(iii)    creating, perfecting, or enforcing in any manner, directly or indirectly, any Encumbrance against any Talc Insurance Company, or the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action; and

(iv)    except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand or cause of action;

*provided, however*, that (a) the injunction set forth in this Section 12.3.2(b) shall not impair in any way any (i) actions brought by the Talc Personal Injury Trust against any Talc Insurance Company and (ii) the rights of any co-insured of the Debtors (x) with respect to any Talc Insurance Policy or Talc Insurance CIP Agreement or against any Talc Insurance Company and (y) as specified under any Final Order of the Bankruptcy Court approving a Talc Insurance CIP Agreement; and (b) the Talc Personal Injury Trust shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the injunction set forth in this Section 12.3.2(b) with respect to any Talc Insurance Company upon express written

US-DOCS\120811676.4

notice to such Talc Insurance Company, except that the Talc Personal Injury Trust shall not have any authority to terminate, reduce or limit the scope of the injunction herein with respect to any Settling Talc Insurance Company so long as, but only to the extent that, such Settling Talc Insurance Company complies fully with its obligations under any applicable Talc Insurance Settlement Agreement.

(c)     **Reservations.** Notwithstanding anything to the contrary above, this Insurance Entity Injunction shall not enjoin:

(i)     the rights of Entities to the treatment accorded them under the Plan, as applicable, including the rights of holders of Talc Personal Injury Claims to assert such Claims, as applicable, in accordance with the Trust Distribution Procedures;

(ii)     the rights of Entities to assert any claim, debt, obligation, cause of action or liability for payment of Talc Personal Injury Trust Expenses against the Talc Personal Injury Trust;

(iii)     the rights of the Talc Personal Injury Trust to prosecute any action based on or arising from the Talc Insurance Policies;

(iv)     the rights of the Talc Personal Injury Trust to assert any claim, debt, obligation, cause of action or liability for payment against a Talc Insurance Company based on or arising from the Talc Insurance Policies or Talc Insurance CIP Agreements; and

(v)     the rights of any Talc Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any other Talc Insurance Company that is not a Settling Talc Insurance Company, or as otherwise specifically provided in any Talc Insurance CIP Agreement.

(d)     Subject to the terms of the Rio Tinto/Zurich Settlement, nothing in the Plan will preclude J&J from pursuing any rights it has under any Talc Insurance Policy that was issued to J&J as a named insured.

12.4     <u>Supplemental Settlement Injunction Order</u>.  In order to preserve and promote the (i) Imerys Settlement, (ii) the Rio Tinto/Zurich Settlement, and (iii) the Cyprus Settlement (subject to the occurrence of the Cyprus Trigger Date), each of which is incorporated herein, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date.

(a)     **Terms.**

(i)     All Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Imerys Released

Claims directly or indirectly against the Imerys Protected Parties (or any of them) shall be permanently stayed, restrained, and enjoined from pursuing now, or at any time in the future, any Imerys Released Claims.

(ii)    **All Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Rio Tinto/Zurich Released Claims directly or indirectly against the Rio Tinto Protected Parties (or any of them) and/or the Zurich Protected Parties (or any of them) shall be permanently stayed, restrained, and enjoined from pursuing now, or at any time in the future, any Rio Tinto/Zurich Released Claims.**

(iii)    **Subject to the occurrence of the Cyprus Trigger Date, all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Cyprus Released Claims directly or indirectly against the Cyprus Protected Parties (or any of them) shall be permanently stayed, restrained, and enjoined from pursuing now, or at any time in the future, any Cyprus Released Claims.**

(b)    **Any Imerys Protected Party, Rio Tinto Protected Party, Zurich Protected Party, or Cyprus Protected Party may enforce the Supplemental Settlement Injunction Order as a defense to any Claim brought against such Imerys Protected Party, Rio Tinto Protected Party, Zurich Protected Party, or Cyprus Protected Party that is enjoined under the Plan as to such Imerys Protected Party, Rio Tinto Protected Party, Zurich Protected Party, or Cyprus Protected Party and may seek to enforce such injunction in a court of competent jurisdiction.**

12.5    <u>Reservation of Rights</u>.  Notwithstanding any other provision of the Plan to the contrary, the satisfaction, release and discharge and the Injunctions set forth in this Article XII shall not be deemed or construed to satisfy, discharge, release or enjoin claims by the Talc Personal Injury Trust, the Reorganized Debtors, or any other Entity, as the case may be, against (a) the Talc Personal Injury Trust for payment of Talc Personal Injury Claims in accordance with the Trust Distribution Procedures, (b) the Talc Personal Injury Trust for the payment of Talc Personal Injury Trust Expenses, or (c) any Talc Insurance Company that has not performed under a Talc Insurance Policy, a Talc Insurance Settlement Agreement, or a Talc Insurance CIP Agreement.  Nothing in this <u>Section 12.5</u> is intended or shall be construed to limit the assertion, applicability, or effect of any Talc Insurer Coverage Defense.

12.6    <u>Disallowed Claims and Disallowed Equity Interests</u>.  On and after the Effective Date, the Debtors and the Reorganized Debtors shall have no liability or obligation on a Disallowed Claim or a Disallowed Equity Interest, and any order disallowing a Claim or an Equity Interest which is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such Final Order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall, nevertheless, become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided herein, shall constitute a Final Order: (a) in relation to each Debtor disallowing all Claims (other than Talc Personal Injury Claims) and Equity

Interests to the extent such Claims and Equity Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims and Equity Interests, and Claims for unmatured interest, and (b) in relation to each Debtor disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

12.7    **Exculpation. None of the Debtors, the Reorganized Debtors, the Imerys Protected Parties, the Tort Claimants' Committee, the members of the Tort Claimants' Committee in their capacities as such, the FCR, the Information Officer nor any of their respective officers, directors and employees, members, agents, attorneys, accountants, financial advisors or restructuring professionals, nor any other professional Person employed by any one of them, shall have or incur any liability to any Person or Entity for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation of the Plan, the Disclosure Statement, the releases and Injunctions, the pursuit of Confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be distributed under the Plan, or the management or operation of the Debtors (except for any liability that results primarily from such Person's or Entity's gross negligence, bad faith or willful misconduct); *provided, however*, that this exculpation shall not apply to Talc Insurer Coverage Defenses; *provided further* that this <u>Section 12.7</u> shall also apply to any former officer or director of the Debtors that was an officer or director at any time during the Chapter 11 Cases but is no longer an officer or director. In all respects, each and all of such Persons, firms and Entities shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and the administration of each of them.**

12.8    <u>No Successor Liability</u>. Except as otherwise expressly provided in the Plan, the Reorganized Debtors do not, pursuant to the Plan or otherwise, assume, agree to perform, pay or indemnify any Entity or Person, or otherwise have any responsibility for any liabilities or obligations of the Debtors relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on or after the Effective Date. Neither the Plan Proponents, the Reorganized Debtors, nor the Talc Personal Injury Trust is, or shall be deemed to be, a successor to any of the Debtors by reason of any theory of law or equity (except as otherwise provided in Article IV of the Plan), and none shall have any successor or transferee liability of any kind or character; *provided, however*, the Reorganized Debtors and the Talc Personal Injury Trust shall assume and remain liable for their respective obligations specified in the Plan and the Confirmation Order.

12.9    <u>Corporate Indemnities</u>.

12.9.1    <u>Prepetition Indemnification and Reimbursement Obligations</u>. The respective obligations of the Debtors to indemnify and reimburse Persons who are or were directors, officers or employees of the Debtors on the Petition Date or at any time thereafter through the Effective Date, against and for any obligations pursuant to the articles of incorporation, codes of regulation, bylaws, applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, (i) shall survive Confirmation of the Plan and remain unaffected thereby, (ii) are assumed by the Imerys Non-Debtors, and (iii) shall not be discharged under section 1141 of the Bankruptcy Code, irrespective of

whether indemnification or reimbursement is owed in connection with any event occurring before, on or after the Petition Date. In furtherance of, and to implement the foregoing, as of the Effective Date the Imerys Non-Debtors shall obtain and maintain in full force insurance for the benefit of each and all of the above-indemnified directors, officers and employees, at levels no less favorable than those existing as of the date of entry of the Confirmation Order, and for a period of no less than three (3) years following the Effective Date.

12.9.2    <u>Plan Indemnity</u>. In addition to the matters set forth above and not by way of limitation thereof, the Imerys Non-Debtors shall indemnify and hold harmless all Persons who are or were officers or directors of the Debtors on the Petition Date or at any time thereafter through the Effective Date on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost or expense (including attorney's fees) on account of claims or causes of action threatened or asserted by any third party against such officers or directors that seek contribution, indemnity, equitable indemnity, or any similar claim, based upon or as the result of the assertion of primary claims against such third party by any representative of the Debtors' Estates.

12.9.3    <u>Limitation on Indemnification</u>. Notwithstanding anything to the contrary set forth in the Plan or elsewhere, the Debtors, the Reorganized Debtors, and the Imerys Non-Debtors, as applicable, shall not be obligated to indemnify and hold harmless any Entity for any claim, cause of action, liability, judgment, settlement, cost or expense that results primarily from (i) such Entity's bad faith, gross negligence or willful misconduct or (ii) a Talc Personal Injury Claim.

12.10    <u>ERISA Pension Plans</u>.

12.10.1    The Debtors are Affiliates of Imerys USA, Inc., C-E Minerals Inc., Kerneos Inc., and IMERYS Fused Minerals Niagara Falls, Inc. (collectively "**ERISA Pension Plan Sponsors**"), and members of each of the ERISA Pension Plan Sponsors' controlled group. Specifically, (i) Imerys USA, Inc. is the contributing sponsor of the IMERYS USA Pension Plan, and the IMERYS USA, Inc. Retirement Growth Account Plan, (ii) C-E Minerals, Inc. is the contributing sponsor of the C-E Minerals Inc. Retiree Health Capital Accumulation Plan, (iii) Kerneos, Inc. is the contributing sponsor of the Kerneos Inc. Pension Plan for Hourly Employees, and (iv) IMERYS Fused Minerals Niagara Falls, Inc. is the contributing sponsor of the IMERYS Fused Minerals Niagara Falls, Inc. USW Local 4-277 Pension Plan, and the Treibacher Schleifmittel North America, Inc. Pension Plan For Iam Local 1420. These six pension plans ("**ERISA Pension Plans**") are covered by ERISA and are not modified or affected by any provision of the Plan.

12.10.2    Notwithstanding any provision to the contrary, no provision contained in the Plan, Confirmation Order, the Bankruptcy Code (including section 1141 of the Bankruptcy Code), or any other document filed in the Chapter 11 Cases shall be construed to exculpate, discharge, release or relieve the Debtors, or any other party (other than the Buyer, unless otherwise provided for in the Asset Purchase Agreement), in any capacity, from any liability or responsibility to PBGC with respect to the ERISA Pension Plans under

any law, governmental policy, or regulatory provision. PBGC and the ERISA Pension Plans shall not be enjoined or precluded from enforcing such liability or responsibility, as a result of any of the provisions of the Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims), the Confirmation Order, the Bankruptcy Code (including section 1141 of the Bankruptcy Code), or any other document filed in the Chapter 11 Cases. Notwithstanding anything to the contrary herein, the Reorganized Debtors and the Talc Personal Injury Trust shall have no liability on account of the ERISA Pension Plans including but not limited to: (i) any liability as a member of a "Controlled Group" as defined in 29 U.S.C. §1301(a)(14)(A); (ii) pursuant to the federal successor doctrine; or (iii) otherwise.

## ARTICLE XIII
## JURISDICTION OF BANKRUPTCY COURT

13.1   <u>Jurisdiction</u>.  Until the Chapter 11 Cases are closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction that is permissible, including the jurisdiction necessary to ensure that the purposes and intent of the Plan are carried out. Except as otherwise provided in the Plan or the Talc Personal Injury Trust Agreement, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against and Equity Interests in the Debtors, and to adjudicate and enforce the Talc Insurance Actions, the Talc Personal Injury Trust Causes of Action, and all other causes of action which may exist on behalf of the Debtors. Nothing contained herein shall prevent the Reorganized Debtors or the Talc Personal Injury Trust, as applicable, from taking such action as may be necessary in the enforcement of any Estate Cause of Action, Talc Insurance Action, Talc Personal Injury Trust Cause of Action, or other cause of action which the Debtors have or may have and which may not have been enforced or prosecuted by the Debtors, which actions or other causes of action shall survive Confirmation of the Plan and shall not be affected thereby except as specifically provided herein. Nothing contained herein concerning the retention of jurisdiction by the Bankruptcy Court shall be deemed to be a finding or conclusion that (i) the Bankruptcy Court in fact has jurisdiction with respect to any Talc Insurance Action, (ii) any such jurisdiction is exclusive with respect to any Talc Insurance Action, or (iii) abstention or dismissal of any Talc Insurance Action pending in the Bankruptcy Court or the District Court as an adversary proceeding is or is not advisable or warranted, so that another court can hear and determine such Talc Insurance Action(s). Any court other than the Bankruptcy Court that has jurisdiction over a Talc Insurance Action shall have the right to exercise such jurisdiction.

13.2   <u>General Retention</u>.  Following Confirmation of the Plan, the administration of the Chapter 11 Cases will continue until the Chapter 11 Cases are closed by a Final Order of the Bankruptcy Court. The Bankruptcy Court shall also retain jurisdiction for the purpose of classification of any Claims and the re-examination of Claims which have been Allowed for purposes of voting, and the determination of such objections as may be filed with the Bankruptcy Court with respect to any Claims. The failure by the Plan Proponents to object to, or examine, any Claim for the purposes of voting, shall not be deemed a waiver of the rights of the Debtors, the Reorganized Debtors, or the Talc Personal Injury Trust, as the case may be, to object to or re-examine such Claim in whole or part.

13.3   <u>Specific Purposes</u>.  In addition to the foregoing, the Bankruptcy Court shall retain jurisdiction for each of the following specific purposes after Confirmation of the Plan:

96

(a)     to modify the Plan after Confirmation, pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

(b)     to correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Plan, the Talc Personal Injury Trust Agreement, or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(c)     to assure the performance by the Talc Personal Injury Trust and the Disbursing Agent of their respective obligations to make Distributions under the Plan;

(d)     to enforce and interpret the terms and conditions of the Plan, the Plan Documents and the Talc Personal Injury Trust Agreement; to enter such orders or judgments, including, but not limited to, injunctions (i) as are necessary to enforce the title, rights and powers of the Reorganized Debtors and the Talc Personal Injury Trust, and (ii) as are necessary to enable holders of Claims to pursue their rights against any Entity that may be liable therefor pursuant to applicable law or otherwise;

(e)     to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters, including without limitation contested matters arising on account of transactions contemplated by the Plan, or relating to the period of administration of the Chapter 11 Cases;

(f)     to hear and determine all applications for compensation of Professionals and reimbursement of expenses under sections 330, 331, or 503(b) of the Bankruptcy Code;

(g)     to hear and determine any causes of action arising during the period from the Petition Date through the Effective Date, or in any way related to the Plan or the transactions contemplated hereby, against the Debtors, the Reorganized Debtors, the other Plan Proponents, or the Talc Personal Injury Trust, and their respective current and former officers, directors, stockholders, employees, members, attorneys, accountants, financial advisors, representatives and agents;

(h)     to determine any and all motions for the rejection, assumption or assignment of Executory Contracts or Unexpired Leases and the allowance of any Claims resulting therefrom;

(i)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(j)     to determine the allowance and/or disallowance of any Claims, including Administrative Claims, against or Equity Interests in the Debtors or their Estates, including, without limitation, any objections to any such Claims and/or Equity Interests, and the compromise and settlement of any Claim, including Administrative Claims, against or Equity Interest in the Debtors or their Estates;

(k)     to hear and resolve disputes concerning any reserves under the Plan or the administration thereof;

(l)     to determine all questions and disputes regarding title to the assets of the Debtors or their Estates, or the Talc Personal Injury Trust;

(m)     to determine all questions and disputes regarding, and to enforce, the Imerys Settlement;

(n)     to determine all questions and disputes regarding, and to enforce, the Rio Tinto/Zurich Settlement;

(o)     to determine all questions and disputes regarding, and to enforce, the Cyprus Settlement;

(p)     to hear and determine the Talc Insurance Actions, any Talc Personal Injury Trust Cause of Action and any similar claims, causes of action or rights of the Talc Personal Injury Trust to construe and take any action to enforce any Talc Insurance Policy or Talc Insurance CIP Agreement, and to issue such orders as may be necessary for the execution, consummation and implementation of any Talc Insurance Policy or Talc Insurance CIP Agreement, and to determine all questions and issues arising thereunder;

(q)     to hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Cases;

(r)     to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Equity Interest is discharged hereunder or for any other purpose;

(s)     to enter in aid of implementation of the Plan such orders as are necessary, including, but not limited to, the implementation and enforcement of the Releases and the Injunctions described herein; and

(t)     to enter and implement such orders as may be necessary or appropriate if any aspect of the Plan, the Talc Personal Injury Trust, or the Confirmation Order is, for any reason or in any respect, determined by a court to be inconsistent with, violative of, or insufficient to satisfy any of the terms, conditions, or other duties associated with any Talc Insurance Policies, *provided however*, (i) such orders shall not impair the Talc Insurer Coverage Defenses or the rights, claims, or defenses, if any, of any Talc Insurance Company that are set forth or provided for in the Plan, the Plan Documents, the Confirmation Order, or any other Final Orders entered in the Debtors' Chapter 11 Cases, (ii) this provision does not, in and of itself, grant this Court jurisdiction to hear and decide disputes arising out of or relating to the Talc Insurance Policies, and (iii) all interested

parties, including any Talc Insurance Company, reserve the right to oppose or object to any such motion or order seeking such relief.

Notwithstanding anything herein to the contrary, however, such retention of jurisdiction by the Bankruptcy Court in this <u>Section 13.3</u> shall not be deemed to be a retention of exclusive jurisdiction with respect to any matter described in this <u>Section 13.3</u>; rather, any court other than the Bankruptcy Court which has jurisdiction over any matter described in this <u>Section 13.3</u> shall have the right to exercise such jurisdiction. To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the foregoing matters, the reference to the "Bankruptcy Court" in this Article shall be deemed to be replaced by the "District Court." Nothing contained in this Section shall expand the exclusive jurisdiction of the Bankruptcy Court beyond that provided by applicable law.

13.4    <u>District Court Jurisdiction</u>. The District Court shall, without regard to the amount in controversy, retain exclusive jurisdiction after entry of the Affirmation Order to hear and determine any motion to extend the Channeling Injunction to a Talc Insurance Company, and shall be deemed to have withdrawn the reference to the Bankruptcy Court for such purpose.

13.5    <u>Reservation of Rights</u>. Nothing contained in the Plan will (i) constitute a waiver of any claim, right or cause of action that a Debtor, the Reorganized Debtors, or the Talc Personal Injury Trust, as the case may be, may hold against the insurer under any policy of insurance or insurance agreement, except to the extent the insurer is a Settling Insurance Company; or (ii) limit the assertion, applicability or effect of any Talc Insurer Coverage Defense.

13.6    <u>Compromises of Controversies</u>. From and after the Effective Date, the Reorganized Debtors and/or the Talc Personal Injury Trust, as appropriate based on assets and liabilities retained or owed by each respectively, shall be authorized to compromise controversies in their discretion in a manner not inconsistent with the terms of the Plan, without notice to any other party or approval of or notice to the Bankruptcy Court.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

14.1    <u>Closing of Chapter 11 Cases</u>. The Reorganized Debtors shall, promptly after the full administration of each Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close such Chapter 11 Case.

14.2    <u>Timing of Distributions or Actions</u>. If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

14.3    <u>Governing Law</u>. Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), or an instrument, agreement or other document executed under the Plan provides otherwise, the rights, duties and obligations arising under the Plan, and the instruments, agreements and other documents executed in connection with

the Plan, shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Delaware without giving effect to the principles of conflicts of law thereof.

14.4    <u>Entire Agreement</u>.    The Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions, negotiations, understandings and documents.  No Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for in the Plan or the other Plan Documents or as may hereafter be agreed to by the affected parties in writing.

14.5    <u>Headings</u>.    Headings are utilized in the Plan for convenience and reference only and shall not constitute a part of the Plan for any other purpose.

14.6    <u>Severability</u>.    If, prior to entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the consent of Imerys S.A., the Tort Claimants' Committee, and the FCR, which consent shall not be unreasonably withheld), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with this Section, is valid and enforceable pursuant to its terms.

14.7    <u>Notices</u>.    All notices, requests and demands required or permitted to be provided to the Debtors, the Reorganized Debtors, or the Plan Proponents under the Plan, in order to be effective, shall be in writing, and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, to the addresses set forth below:

**THE DEBTORS:**

IMERYS TALC AMERICA, INC.,
Attention: Ryan Van Meter, Esq.
100 Mansell Court East, Suite 300
Roswell, Georgia 3007
Telephone:  (770) 645-3739
Facsimile:  (770) 645-3475
Email:  ryan.vanmeter@imerys.com

**COUNSEL FOR THE DEBTORS:**

RICHARDS, LAYTON & FINGER, P.A.          LATHAM & WATKINS LLP
Mark D. Collins, Esq.                                    Jeffrey E. Bjork, Esq.
Michael J. Merchant, Esq.                           Kimberly A. Posin, Esq.

Amanda R. Steele, Esq.
Brett M. Haywood, Esq.
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:  collins@rlf.com
            merchant@rlf.com
            steele@rlf.com
            haywood@rlf.com

Helena G. Tseregounis, Esq.
Shawn P. Hansen, Esq.
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
E-mail:  jeff.bjork@lw.com
            kim.posin@lw.com
            helena.tseregounis@lw.com
            shawn.hansen@lw.com

- and -

Richard A. Levy, Esq.
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  richard.levy@lw.com

**COUNSEL FOR THE TORT CLAIMANTS' COMMITTEE:**

ROBINSON & COLE LLP
Natalie D. Ramsey, Esq.
Mark A. Fink, Esq.
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
E-mail:  nramsey@rc.com
            mfink@rc.com

- and -

Michael R. Enright, Esq.
280 Trumbull Street
Hartford, Connecticut 06103
Telephone: (860) 275-8290
Facsimile: (860) 275-8299
E-mail:  menright@rc.com

**COUNSEL FOR THE FCR:**

YOUNG CONAWAY STARGATT & TAYLOR LLP
Robert S. Brady, Esq.
Edwin J. Harron, Esq.
Sharon M. Zieg, Esq.
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

E-mail:  rbrady@ycst.com
            eharron@ycst.com
            szieg@ycst.com

101

**COUNSEL FOR THE IMERYS PLAN PROPONENTS:**

HUGHES HUBBARD & REED LLP
Christopher Kiplok, Esq.
Dustin P. Smith, Esq.
Erin Diers, Esq.
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

E-mail:  christopher.kiplok@hugheshubbard.com
        dustin.smith@hugheshubbard.com
        erin.diers@hugheshubbard.com

14.8    Notice to Other Entities.    After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to entities providing that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that neither of: (i) the U.S. Trustee and (ii) counsel of record to Imerys S.A., need not file such a renewed request and shall continue to receive documents without any further action being necessary.    After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to: (i) the U.S. Trustee; (ii) counsel of record to Imerys S.A.; (iii) counsel of record to CAMC; and (iv) those entities that have filed such renewed requests.

14.9    Plan Supplement.    Any and all exhibits, lists, or schedules referred to herein but not filed with the Plan shall be contained in the Plan Supplement to be filed with the Clerk of the Bankruptcy Court prior to the Confirmation Hearing on the Plan, and such Plan Supplement is incorporated into and is part of the Plan as if set forth in full herein.    The Plan Supplement will be available for inspection in the office of the Clerk of the Bankruptcy Court during normal court hours, at the website maintained by the Claims Agent (https://case.primeclerk.com/imerystalc), and at the Bankruptcy Court's website (ecf.deb.uscourts.gov).

14.10    Inconsistencies.    To the extent the Plan is inconsistent with the Disclosure Statement or other Plan Documents, the provisions of the Plan shall be controlling.    To the extent the Plan is inconsistent with the Confirmation Order on the Plan, the provisions of such Confirmation Order shall be controlling.

14.11    Withholding of Taxes.    The Disbursing Agent, the Talc Personal Injury Trust or any other applicable withholding agent, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property which must be withheld for foreign, federal, state and local taxes payable with respect thereto or payable by the Person entitled to such assets to the extent required by applicable law.

14.12    Transfer Taxes.    Pursuant to section 1146 of the Bankruptcy Code, and to the fullest extent permitted by law, no stamp tax, transfer tax, filing fee, sales or use tax or other similar tax

shall be imposed or assessed by any taxing authority on account of (i) the transfer of any assets or property pursuant to the Plan; (ii) the making or delivery of an instrument of transfer under the Plan; or (iii) the termination or extinguishment of any Equity Interests. The appropriate state or local government officials or agents shall be directed to forego the collection of any such tax and to accept for filing or recordation of any of the foregoing instruments or other documents without the payment of any such tax.

14.13    <u>Binding Effect</u>.  The rights, duties and obligations of any Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Entity.

14.14    <u>Payment of Statutory Fees</u>.  All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.  The Reorganized Debtors shall pay all such fees that arise after the Effective Date, but before the closing of the Chapter 11 Cases, and shall comply with all applicable statutory reporting requirements.

14.15    <u>Duty to Cooperate</u>.   Nothing in the Plan, the other Plan Documents or the Confirmation Order shall relieve (by way of injunction or otherwise) any Entity that is or claims to be entitled to indemnity under a Talc Insurance Policy from any duty to cooperate that may be required by any such insurance policy or under applicable law with respect to the defense and/or settlement of any Claim for which coverage is sought under such Talc Insurance Policy.  To the extent that any Entity incurs costs in satisfying such duty to cooperate with respect to Talc Personal Injury Claims, the Talc Personal Injury Trust shall reimburse such Entity for all such reasonable out-of-pocket expenses.

14.16    <u>Effective Date Actions Simultaneous</u>.  Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

14.17    <u>Consent to Jurisdiction</u>.  Upon default under the Plan, the Reorganized Debtors, the Talc Personal Injury Trust, the Talc Trustees, the Tort Claimants' Committee, the FCR, and the Imerys Protected Parties, respectively, consent to the jurisdiction of the Bankruptcy Court, or any successor thereto, and agree that it shall be the preferred forum for all proceedings relating to any such default.

US-DOCS\120811676.4

Dated: January 27, 2021
     Wilmington, Delaware

**IMERYS TALC AMERICA, INC.**
(On behalf of itself and each of the Debtors)

*/s/* Ryan Van Meter
Ryan Van Meter
Secretary of Imerys Talc America, Inc., Imerys Talc
Vermont, Inc. and Imerys Talc Canada Inc.

**TORT CLAIMANTS' COMMITTEE**

*/s/* Maura Kolb, Esq. of The Lanier Law Firm
As attorney for Robin Alander,
a member of the Official Committee of Tort Claimants

*/s/* Steven T. Baron, Esq. of Baron & Budd, P.C.
As attorney for Lloyd Fadem,
as representative of the estate of Margaret Ferrell,
a member of the Official Committee of Tort Claimants

*/s/* Ted Meadows, Esq. of Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.
As attorney for Deborah Giannecchini,
a member of the Official Committee of Tort Claimants

**FUTURE CLAIMANTS' REPRESENTATIVE**

*/s/* James L. Patton, Jr., Esq.
James L. Patton Jr.
Legal Representative for Future Talc Personal Injury
Claimants

**IMERYS S.A.**
(On behalf of itself and each of the Imerys Plan
Proponents)

*/s/* Frédérique Berthier-Raymond
Frédérique Berthier-Raymond
Group General Counsel & Company Secretary of
Imerys S.A.

**COUNSEL FOR THE PLAN PROPONENTS**

**COUNSEL FOR THE DEBTORS:**

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins, Esq.
Michael J. Merchant, Esq.
Amanda R. Steele, Esq.
Brett M. Haywood, Esq.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
E-mail: collins@rlf.com
   merchant@rlf.com
   steele@rlf.com
   haywood@rlf.com

LATHAM & WATKINS LLP
Jeffrey E. Bjork, Esq.
Kimberly A. Posin, Esq.
Helena G. Tseregounis, Esq.
Shawn P. Hansen, Esq.
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
E-mail: jeff.bjork@lw.com
   kim.posin@lw.com
   helena.tseregounis@lw.com
   shawn.hansen@lw.com

- and -

Richard A. Levy, Esq.
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
E-mail: richard.levy@lw.com

**COUNSEL FOR THE TORT CLAIMANTS' COMMITTEE:**

ROBINSON & COLE LLP
Natalie D. Ramsey, Esq.
Mark A. Fink, Esq.
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
E-mail: nramsey@rc.com
   mfink@rc.com

- and -

Michael R. Enright, Esq.
280 Trumbull Street
Hartford, Connecticut 06103

**COUNSEL FOR THE FCR:**

YOUNG CONAWAY STARGATT & TAYLOR LLP
Robert S. Brady, Esq.
Edwin J. Harron, Esq.
Sharon M. Zieg, Esq.
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
E-mail: rbrady@ycst.com
   eharron@ycst.com
   szieg@ycst.com

Telephone: (860) 275-8290
Facsimile: (860) 275-8299
E-mail:  menright@rc.com

**COUNSEL FOR THE IMERYS PLAN PROPONENTS:**

HUGHES HUBBARD & REED LLP
Christopher Kiplok, Esq.
Dustin P. Smith, Esq.
Erin Diers, Esq.
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
E-mail:  christopher.kiplok@hugheshubbard.com
        dustin.smith@hugheshubbard.com
        erin.diers@hugheshubbard.com

# **EXHIBIT A**

## **Trust Distribution Procedures**

**IVORY AMERICA PERSONAL INJURY
TRUST DISTRIBUTION PROCEDURES**

# TABLE OF CONTENTS

**Page**

## IVORY AMERICA PERSONAL INJURY TDP

SECTION I INTRODUCTION ......................................................................... 1

    1.1    Purpose ................................................................................... 1

    1.2    Interpretation ......................................................................... 1

    1.3    Definitions ............................................................................. 2

SECTION II OVERVIEW ............................................................................. 25

    2.1    Trust Purpose ....................................................................... 25

    2.2    Sub-Funds ............................................................................. 25

    2.3    Treatment of Indemnified Claims ....................................... 26

    2.4    Treatment of Ovarian Cancer A-D Claims ......................... 28

    2.5    Treatment of Mesothelioma Claims .................................... 29

    2.6    Claim Treatment Summary .................................................. 30

    2.7    Necessity of Filing a Trust Claim Form .............................. 31

    2.8    Application of the Payment Percentages .............................. 31

    2.9    Determination of the Maximum Annual Payments ............. 31

    2.10    Indirect Talc Personal Injury Claims .................................. 32

SECTION III TDP ADMINISTRATION ....................................................... 32

    3.1    TAC and FCR ....................................................................... 32

    3.2    Consent and Consultation Procedures ................................. 33

SECTION IV PAYMENT PERCENTAGE; PERIODIC ESTIMATES .................... 33

    4.1    Uncertainty of Debtors' Talc Liabilities ............................. 33

    4.2    Computation of Payment Percentage ................................... 33

    4.3    Applicability of the Payment Percentage ............................ 35

SECTION V RESOLUTION OF TALC PERSONAL INJURY CLAIMS ............... 36

    5.1    Ordering, Processing and Payment of Claims ..................... 36

    5.2    Resolution of Unliquidated Talc Personal Injury Claims ............... 39

    5.3    Categorizing Claims as Exigent .......................................... 49

    5.4    Indirect Talc Personal Injury Claims .................................. 50

    5.5    Evidentiary Requirements .................................................... 53

    5.6    Claims Audit Program .......................................................... 55

i

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 5.7 | Arbitration | 57 |
| 5.8 | Litigation | 58 |
| SECTION VI CLAIMS MATERIALS | | 59 |
| 6.1 | Claims Materials | 59 |
| 6.2 | Withdrawal or Deferral of Claims | 59 |
| 6.3 | Filing Requirements and Fees | 60 |
| 6.4 | English Language | 61 |
| 6.5 | Confidentiality of Talc Personal Injury Claimants' Submissions | 61 |
| SECTION VII GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS | | 62 |
| 7.1 | Claims Processing | 62 |
| 7.2 | Acceptance and Release | 63 |
| 7.3 | Claims Disputes | 64 |
| 7.4 | Costs Considered | 64 |
| 7.5 | Discretion to Vary the Order and Amounts of Payments in the Event of Limited Liquidity | 65 |
| 7.6 | Punitive Damages | 65 |
| 7.7 | Sequencing Adjustments | 66 |
| 7.8 | Payment of Judgments for Money Damages | 67 |
| 7.9 | Third-Party Services | 68 |
| 7.10 | Trust Disclosure of Information | 68 |
| SECTION VIII MISCELLANEOUS | | 68 |
| 8.1 | Non-Binding Effect of Trust and/or Litigation Outcome | 68 |
| 8.2 | Independence of the Trust | 68 |
| 8.3 | Amendments | 69 |
| 8.4 | Severability | 69 |
| 8.5 | Governing Law | 69 |
| 8.6 | Administration with Other Comparable Trusts | 70 |

# IVORY AMERICA PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES[1]

The Ivory America Personal Injury Trust Distribution Procedures ("**TDP**") contained herein provide the means for resolving all Talc Personal Injury Claims under the Plan for which the Protected Parties have or are alleged to have legal responsibility for or on account of Imerys Talc America, Inc., Imerys Talc Vermont, Inc., Imerys Talc Canada Inc. and/or Imerys Talc Italy S.p.A. as provided in and required by the Plan and the Trust Agreement for Ivory America, Inc. (f/k/a Imerys Talc America, Inc.), Ivory Vermont, Inc. (f/k/a Imerys Talc Vermont, Inc.), Ivory Canada, Inc. (f/k/a Imerys Talc Canada Inc.) and Imerys Talc Italy S.p.A. (the "**Trust Agreement**").

The Plan and the Trust Agreement establish the Ivory America Personal Injury Trust (the "**Trust**"). The trustees as set forth in the Plan and the Trust Agreement ("**Trustees**") shall implement and administer these TDP in accordance with the Trust Agreement.

## SECTION I

## INTRODUCTION

**1.1**         **Purpose**.  These TDP have been adopted pursuant to the Trust Agreement. These TDP are intended to provide reasonable assurance that the Trust will value, and be in a financial position to pay, Talc Personal Injury Claims that involve similar claims in substantially the same manner.

---

[1] Capitalized terms used but not defined in these TDP have the meanings ascribed to them in Article I of the Plan (defined herein).  To the extent that a term is defined in these TDP and the Plan, the definition contained in these TDP controls. It is intended that these TDP will be utilized in the Cyprus Mines Bankruptcy and will be modified accordingly.  Such modifications are not intended to change the rights and obligations of holders of Talc Personal Injury Claims in the Imerys Chapter 11 Cases under these TDPs but rather to ensure that the holders of talc personal injury claims in the anticipated Cyprus Bankruptcy will use these procedures.  For example, and not by way of limitation, there may need to be definitions added to reflect the appointment of a future claimants representative in the Cyprus Bankruptcy and the date of commencement of the Cyprus Bankruptcy.

**1.2** **Interpretation**.  Except as expressly provided below, nothing in these TDP shall be deemed to create a substantive right for the holder of any Talc Personal Injury Claim. To the extent these TDP provide certain rights and benefits to holders of Talc Personal Injury Claims, such rights and benefits shall vest as of the Effective Date.

**1.3** **Definitions**.  The following capitalized terms used in these TDP shall have the meanings set forth below:

1.  **"Acceptance and Release"** shall have the meaning set forth in Section 7.2 of these TDP.

2.  "**ADR Procedures**" shall mean the binding arbitration procedures that have or will be instituted by the Trust, with the consent of the TAC and FCR, for resolving disputes as set forth in Section 5.7 of these TDP.

3.  "**Affiliate**" shall mean, with respect to any specified entity: (a) an "affiliate," as defined in Section 101(2) of the Bankruptcy Code, of such specified entity; or (b) any other entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified entity.  As used in clause (b) of the prior sentence, "control" shall include the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified entity (whether through the ownership of equity, by contract or otherwise).

4.  "**Average Value**" shall mean, as to each disease as applicable, the targeted average of the value of existing and projected future Talc Personal Injury Claims.

5.  "**Bankruptcy Code**" shall mean title 11 of the United States Code, as in effect on February 13, 2019.

6. "**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the District of Delaware which has jurisdiction over the Debtors' chapter 11 cases captioned and jointly administered as *In re Imerys Talc America, Inc., et al.*, Case No. 19-10289 (LSS).

7. "**Basic Claim Submission**" shall mean the submission of Identifying Information to the Trust.

8. "**BRCA Reduction**" shall mean (a) a 30% reduction in the value assigned to the claim of an Ovarian Cancer Claimant who is positive for the BRCA 1 or BRCA 2 mutation; or (b) a 15% reduction in the value assigned to the claim of an Ovarian Cancer Claimant who has not undergone BRCA testing but has a family history of a first-degree relative (parent, sibling, or child) having epithelial ovarian cancer or breast cancer.

9. "**Canadian Claims**" shall mean Talc Personal Injury Claims of individuals exposed in Canada or who were resident in Canada at the time such claims are filed.

10. "**Claims Audit Program**" shall have the meaning set forth in Section 5.6 of these TDP.

11. "**Claims Bar Date**" shall mean (i) October 15, 2019, for North American Debtor Claims (subject to the exceptions contained in the General Bar Date Order), (ii) January 9, 2020, for Indirect Talc Personal Injury Claims against the North American Debtors, or (iii) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to certain Claims.

12. "**Claims Materials**" shall have the meaning set forth in Section 6.1 of these TDP.

13. "**Claims Processor**" shall have the meaning set forth in Section 5.6 of these TDP.

14.  "**Claimant's Jurisdiction**" shall mean either (a) the jurisdiction in which the Talc Personal Injury Claim was filed against the Debtors or any of their Affiliates in the tort system prior to the Petition Date or, (b) if the Talc Personal Injury Claim was not filed against the Debtors or any of their Affiliates in the tort system prior to the Petition Date, then at the claimant's election (i) the jurisdiction in which the claimant resides or resided at the time of diagnosis or when the claim is filed with the Trust; (ii) a jurisdiction in which the claimant experienced Debtor Exposure; or (iii) any other jurisdiction in the United States or Canada where the claimant has or could have filed a Claim against either the Debtors or any of their Affiliates or any other defendant in the tort system.

15.  "**Clear Cell EOC Reduction**" shall mean a 15% reduction in the value assigned to a claim for an Ovarian Cancer Claimant involving clear cell epithelial ovarian cancer.

16.  "**Complete Claim Submission**" shall mean the substantially complete submission of all required materials by a holder of a Talc Personal Injury Claim to the Trust.

17.  "**Confirmation Order**" shall mean the order of the District Court; the Bankruptcy Court and the District Court acting jointly; or, if an order is entered by the Bankruptcy Court, the order of the District Court affirming the Bankruptcy Court's order, that confirms the Plan pursuant to Section 1129 of the Bankruptcy Code.

18.  "**Cosmetic Talc**" shall mean talc that contains at least 90% talc mineral and/or was used in pharmaceutical, cosmetic and/or hygiene products.

19.  "**Cross-Trust Audit Program**" shall mean an audit program designed to compare claims filed with the Trust against claims filed with all other trusts administered by the

Claims Processor that participate in the Cross-Trust Audit Program but shall include no fewer than four other trusts.

20. **"Cyprus"** shall mean, collectively, Cyprus Mines Corporation and Cyprus Amax Minerals Company, a Delaware corporation ("**CAMC**").

21. **"Cyprus Contribution"** shall mean, subject to the terms of the Cyprus Mines Plan and the Cyprus Settlement Agreement, and subject to the occurrence of the Cyprus Trigger Date, the Cyprus Protected Parties will make the following contributions to the Trust, to be used for the payment of Talc Personal Injury Claims in accordance with these TDP and the Trust Agreement:

(a)     *Cash Payments from CAMC.*  CAMC will pay a total of $130 million to the Trust in seven installments (the "**CAMC Cash Payments**"). The first three payments shall each consist of $21.67 million and shall total $65 million. The next four payments shall each consist of $16.25 million and shall total $65 million. Each payment shall be made no later than as set forth in the following schedule: (i) within 30 days after the Cyprus Trigger Date: $21.67 million (the "**First Installment**"); (ii) 1-year anniversary of the First Installment: $21.67 million; (iii) 2-year anniversary of the First Installment: $21.67 million; (iv) 3-year anniversary of the First Installment: $16.25 million; (v) 4-year anniversary of the First Installment: $16.25 million; (vi) 5-year anniversary of the First Installment: $16.25 million; and (vii) 6-year anniversary of the First Installment: $16.25 million.

(b)     *Freeport Guarantee*. Freeport shall provide a guarantee of the CAMC Cash Payments and shall be subject to a minimum liquidity covenant of not less than $500 million tested as of the end of each of its fiscal quarters. If Freeport fails to meet such covenant in respect of any fiscal quarter before CAMC has paid the $130 million in full, Freeport

will post security in favor of the Trust in respect of CAMC's obligations under Section 10.10.5(a) of the Plan in the form of a performance bond, letter of credit, or other similar instrument for all remaining cash payments. For purposes of Section 10.10.5(b) of the Plan, "liquidity" means unrestricted cash of Freeport and its consolidated subsidiaries as of the applicable test date, plus availability under Freeport's revolving credit facilities at such time.

(c)     *Insurance and Other Rights*. Upon the occurrence of the Cyprus Trigger Date, and in accordance with the terms of the Cyprus Settlement Agreement: (i) the Cyprus Protected Parties will assign any and all rights to and in connection with any Cyprus Talc Insurance Policies to the Trust; (ii) the Trust will assume all present and future obligations associated with recovering proceeds under the Cyprus Talc Insurance Policies; *provided* that solely to the extent that the Trust asserts any claim as assignee of a Cyprus Protected Party bound by the PDC Agreement, the Trust shall abide by the terms of the PDC Agreement; *provided further* that unless otherwise stated in the Plan or the Cyprus Settlement Agreement, such obligations shall not include any obligations undertaken by any Cyprus Protected Party in any settlement agreement or other contract compromising or releasing any rights under any Cyprus Talc Insurance Policy; and (iii) the Cyprus Protected Parties shall transfer and assign to the Trust any and all other rights of reimbursement, contribution, or indemnification relating to or in connection with the Talc Personal Injury Claims as to which the Cyprus Protected Parties are being protected under the Plan and/or the Cyprus Mines Plan.

(d)     *Indemnification, Contribution, and Subrogation Rights*.  Upon the occurrence of the Cyprus Trigger Date, and in accordance with the terms of the Cyprus Settlement Agreement, the appropriate Cyprus Protected Parties shall each execute and deliver to the Trust, in a form reasonably acceptable to the Trust, an assignment to the Trust of: (i) all of

6

their rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to the payment or defense of any Talc Personal Injury Claim or any past talc-related claim against the Debtors or the Cyprus Protected Parties prior to the Cyprus Trigger Date, and (ii) all of the other rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to any Talc Personal Injury Claim or other claims channeled to the Trust. The Cyprus Contribution shall be allocated 55% to Mesothelioma Claims and 45% to Ovarian Cancer Claims.  The FCR is currently examining the allocation described in this paragraph.  For the avoidance of doubt and solely for purposes of allocations among the Funds, the Cyprus Contribution includes 100% of the proceeds of the Cyprus Talc Insurance Policies. This allocation is for internal bookkeeping only and is not an adjudication or agreement of the relative rights of Cyprus or Imerys to the Cyprus Talc Insurance Policies.

22. **"Cyprus Industrial Talc"** shall mean Cyprus Talc that was intended to be incorporated into and/or was incorporated into products other than pharmaceutical, cosmetic and/or hygiene products.

23. **"Cyprus Parties"** shall mean, collectively, Cyprus and Freeport.

24. **"Cyprus Settlement"** shall mean that certain comprehensive settlement by and among the Cyprus Parties, the Debtors, the Tort Claimants' Committee, the FCR, and the Imerys Plan Proponents, the terms of which are set forth in and implemented by the Plan, the Cyprus Mines Plan, and the Cyprus Settlement Agreement, pursuant to which, in exchange for the Cyprus Contribution and other good and valuable consideration, the Cyprus Protected Parties receive the benefit of the releases, Injunctions, and other protections set forth in the Plan, the Cyprus Mines Plan, and the Cyprus Settlement Agreement.

25. **"Cyprus Settlement Agreement"** shall mean the Settlement Agreement and Release among the Cyprus Parties, the Debtors, the Tort Claimants' Committee, the FCR, and the Imerys Plan Proponents, in substantially the form contained in the Plan Supplement.

26. **"Cyprus Talc"** shall mean talc mined, processed, manufactured, sold, and/or distributed by Cyprus Mines Corporation or any of its predecessors or affiliates including but not limited to United Sierra Corporation, Cyprus Industrial Minerals Corporation, CMC-Sierra Corporation or Cyprus Georesearch Company**.**

27. **"Cyprus Trigger Date"** means the later of (i) the later of the Effective Date or the date the Affirmation Order becomes a Final Order or (ii) the Cyprus Mines Plan Trigger Date.

28. **"Debtors"** shall mean Ivory America, Inc. (f/k/a Imerys Talc America, Inc.), Ivory Vermont, Inc. (f/k/a Imerys Talc Vermont, Inc.), Ivory Canada, Inc. (f/k/a Imerys Talc Canada Inc.) and Imerys Talc Italy S.p.A. individually, collectively or in any combination.

29. **"Debtor Exposure"** shall mean credible evidence (a) of exposure to talc or a product containing talc mined, processed, manufactured, sold and/or distributed by the Debtors, or for which the Debtors otherwise have legal responsibility, or (b) of conduct for which the Debtors have legal responsibility that exposed the claimant to such product.

30. **"Direct Claimant"** shall mean the holder of a Direct Talc Personal Injury Claim to whom the Trust has a liability or obligation under the Plan and these TDP.

31. **"Direct Talc Personal Injury Claim"** shall mean a Talc Personal Injury Claim that is not an Indirect Talc Personal Injury Claims.

32. **"Effective Date"** shall mean the date on which the Plan becomes effective.

33. "**Exigent Claim**" shall mean an Exigent Health Claim or an Exigent Hardship Claim.

34. "**Exigent Hardship Claim**" shall mean a Direct Talc Personal Injury Claim that is compensable hereunder, for which the Trust, in its sole discretion, determines that (i) the claimant needs immediate financial assistance based on the claimant's expenses and all sources of available income, and (ii) there is a causal connection between the claimant's dire financial condition, and the claimant's talc-related disease.

35. "**Exigent Health Claim**" shall mean a Direct Talc Personal Injury Claim filed by a claimant who is living when the Direct Talc Personal Injury Claim is filed and that is compensable hereunder, and as to which the claimant provides a declaration or affidavit made under penalty of perjury by a physician who has examined the claimant within one hundred twenty (120) days of the date of declaration or affidavit in which the physician states that (a) there is substantial medical doubt that the claimant will survive beyond six (6) months from the date of the declaration or affidavit, and (b) the claimant's terminal condition is caused, in whole or in part, by the relevant talc-related disease.

36. "**Expedited Review Process**" shall mean the claims-resolution method by which Talc Personal Injury Claims for Ovarian Cancer or Mesothelioma are evaluated to determine whether they are entitled to receive the applicable Scheduled Values as described in Section 5.2(a) hereof.

37. "**FIFO**" shall mean "first-in-first-out" and refers to the impartial basis for establishing a sequence pursuant to which all Talc Personal Injury Claims shall be valued and paid by the Trust.

38. "**FIFO Processing Queue**" shall mean the FIFO line-up on which the Trust reviews Complete Claim Submissions.

39. "**FIFO Payment Queue**" shall have the meaning assigned set forth in Section 5.1(b) of these TDP.

40. "**Final Order**" shall mean, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

41. "**Foreclosed Jurisdiction**" shall mean a jurisdiction which describes a claim for compensatory damages under these TDP as a claim for "exemplary" or "punitive" damages thereby foreclosing a claimant from a remedy or compensation under these TDP if the law for that jurisdiction were to be applied hereunder.

42. "**Foreign Claim**" shall mean a Talc Personal Injury Claim with respect to which: (i) the purchase of a product containing talc mined, processed, manufactured, sold and/or distributed by the Debtors, or for which the Debtors otherwise have  legal responsibility occurred outside of the United States or Canada and their territories and possessions, and (ii) the Debtor Exposure occurred outside of the United States or Canada and their territory and possessions. For the avoidance of doubt, a Canadian Claim is not a Foreign Claim.

10

43. **"Freeport"** shall mean Freeport-McMoRan Inc.

44. **"FCR"** shall mean James L. Patton, Jr., Esquire, the legal representative for persons who might subsequently assert talc-related demands, who was appointed pursuant to an order of the Bankruptcy Court dated June 3, 2019 [Docket No. 647] and continues in that capacity in connection with the Trust, and any validly appointed successor.

45. **"Identifying Information"** shall mean, with respect to the holder of a Talc Personal Injury Claim, the holder's: (i) name, (ii) address; (iii) social security number (if the holder has one); and (iv) counsel serving as the holder's Representative (if any) and such counsel's address.

46. **"Imerys Affiliated Parties"** shall mean, in each case during the times the Debtors were direct or indirect subsidiaries of Imerys S.A. and solely in their capacities as such: (i) direct or indirect shareholders of Imerys S.A.; (ii) current and former officers, directors, principals, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, experts, and other professionals of the Imerys Corporate Parties and/or the Debtors; and (iii) with respect to each of the foregoing Persons in clauses (i) and (ii), each such Persons' respective heirs, executors, estates, and nominees, as applicable. For the avoidance of doubt, the Imerys Affiliated Parties exclude J&J, Rio Tinto, and Cyprus.

47. **"Imerys Corporate Parties"** shall mean Imerys S.A. and all Persons listed on Schedule I to the Plan, each of which are or were Affiliates of Imerys S.A. during the time that the Debtors were owned or controlled by Imerys S.A., hereto, and the successors and assigns of such Persons, solely in their capacity as such. Schedule I is an exclusive list.  For avoidance of doubt, Imerys Corporate Parties does not include, among others, J&J, Rio Tinto, or Cyprus.

48. **"Imerys Industrial Talc"** shall mean Imerys Talc that was intended to be incorporated into and/or was incorporated into products other than pharmaceutical, cosmetic and/or hygiene products.

49. **"Imerys Protected Parties"** shall mean the Imerys Corporate Parties and the Imerys Affiliated Parties.

50. **"Imerys Settlement"** shall mean that certain comprehensive settlement by and among the Plan Proponents, the terms of which are set forth and implemented in the Plan.

51. **"Imerys Settlement Proceeds**" shall mean (i) $75 million, consisting of $74.5 million in Cash and the Talc PI Note, plus (ii) the Sale Proceeds, plus (iii) a contingent purchase price enhancement of up to $102.5 million, subject to the Cash value of the Sale Proceeds provided that in the event the Sale contemplated by and pursuant to the Sale Order closes, no contingent purchase price enhancement shall be payable, less (iv) if the DIP Order is entered, amounts required to pay the DIP Facility Claims pursuant to the terms of the DIP Loan Documents and Allowed by the DIP Order, less (v) if the DIP Order is not entered, Imerys S.A.'s reasonable and documented out-of-pocket costs and expenses of negotiation and preparation of the DIP Loan Documents estimated to be $400,000 as of December 10, 2020.

52. **"Imerys Talc"** shall mean talc mined, processed, manufactured, sold, and/or distributed by the Debtors and any of their predecessors including but not limited to (i) Imerys Talc Vermont, Inc f/k/a Windsor Minerals, Inc., and Cyprus Windsor Minerals Corp.; (ii) Imerys Talc America, Inc, f/k/a Cyprus Talc Corporation and Luzenac America, Inc.; and (iii) Imerys Talc Canada Inc. f/k/a Luzenac, Inc.  Notwithstanding anything contained here, neither J&J nor any Affiliate of J&J shall be treated as or considered a predecessor to any of the Debtors, Rio Tinto, or Cyprus.

53. **"Indemnified"** shall mean, when used to describe any Talc Personal Injury Claim or any category of Talc Personal Injury Claims, in respect of which the Debtors, the Trust, and/or any other person or entity who could have asserted, or may assert, rights under and to the J&J Indemnities.

54. **"Indemnified Claims"** shall mean Talc Personal Injury Claims that are Indemnified, including, without limitation, any claims asserting exposure to cosmetic talc manufactured, distributed or sold by J&J during the time periods covered by the J&J Indemnities.

55. **"Indemnified Claimants"** shall mean the holders of Indemnified Claims.

56. "**Indirect Talc Personal Injury Claim**" shall mean a Talc Personal Injury Claim of any corporation (as defined in section 101(9) of the Bankruptcy Code), co-defendant of a Debtor, or predecessor of a Debtor for contribution, reimbursement, subrogation, or indemnity, whether contractual or implied by law (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Talc Personal Injury Claim of any corporation (as defined in section 101(9) of the Bankruptcy Code), co-defendant of a Debtor, or predecessor of a Debtor, whether in the nature of or sounding in contract, tort, warranty, or other theory of law. For the avoidance of doubt, an Indirect Talc Personal Injury Claim shall not include any claim for or otherwise relating to death, injury, or damages caused by talc or a product or material containing talc that is asserted by or on behalf of any injured individual, the estate, legal counsel, relative, assignee, or other representative of any injured individual, or an individual who claims injury or damages as a result of the injury or death of another individual regardless of whether such claim is seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs or damages, or any legal, equitable or

other relief whatsoever, including pursuant to a settlement, judgment, or verdict.  By way of illustration and not limitation, an Indirect Talc Personal Injury Claim shall not include any claim for loss of consortium, loss of companionship, services and society, or wrongful death.

57.  "**Indirect Claimant**" shall mean the holder of an Indirect Talc Personal Injury Claim.

58.  "**Individual Review Process**" shall mean the claims-resolution method in which a Talc Personal Injury Claim is individually evaluated as described in Section 5.2(b).

59.  "**Initial Claims Filing Date**" shall mean the date on which the Trust first begins to accept claims.

60.  "**Initial Payment Percentages**" shall mean the initial payment percentages established herein based upon (i) an equitable distribution of the Trust with respect to existing and projected future claims, (ii) the assumption that generally the Average Values will be achieved with respect to existing and projected future Talc Personal Injury Claims; and (iii) the funding of the Trust.

61.  "**J&J**" shall mean Johnson & Johnson, Johnson & Johnson Baby Products Company, Johnson & Johnson Consumer Companies, Inc., Johnson & Johnson Consumer Inc., Johnson & Johnson Consumer Products, Inc., and each of their past and present parents, subsidiaries and Affiliates, direct and indirect equity holders, and the successors and assigns of each, excluding the Debtors and the Imerys Non-Debtors.

62.  "**J&J Indemnities**" shall mean any and all indemnity rights of the Debtors, the Protected Parties, and the Imerys Non-Debtors against J&J for Talc Personal Injury Claims, including, without limitation, pursuant to: (i) that certain Agreement, between Cyprus Mines Corporation and Johnson & Johnson, dated as of January 6, 1989; (ii) that certain Talc Supply

Agreement, between Windsor Minerals Inc. and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc., dated as of January 6, 1989; (iii) that certain Supply Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of April 15, 2001; (iv) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2010; (v) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2011; or (vi) any other applicable agreement, order, or law.

63. **"J&J Product"** shall mean any product manufactured, distributed or sold by J&J containing or allegedly containing Cyprus Talc or Imerys Talc, including without limitation *Johnson's Baby Powder* and *Shower to Shower*.

64. "**Maximum Annual Payments**" shall mean the maximum allowable amounts to be paid out for Talc Personal Injury Claims by the Trust for each Fund annually.

65. "**Maximum Value**" shall mean the maximum amount payable by the Trust for a Talc Personal Injury Claim for a specific category of disease under the Trust Agreement.

66. "**Medical/Exposure Criteria**" shall mean the presumptive medical and exposure requirements for a Talc Personal Injury Claimant to receive an offer under the Expedited Review Process or the Individual Review Process.

67. "**Mesothelioma**" shall mean a type of cancer caused by exposure to asbestos that develops from the thin layer of tissue that covers many of the internal organs known as the mesothelium, including that found in the lining of the lungs and chest wall, abdomen, heart, and testes.

68.  **"Mesothelioma Claim"** shall mean a Talc Personal Injury Claim for Mesothelioma A or Mesothelioma B.

69.  **"Mesothelioma A"** shall mean a Mesothelioma Claim alleging Regular and Routine Exposure to Cosmetic Talc.

70. **"Mesothelioma B"** shall mean Mesothelioma Claim alleging Regular and Routine Exposure to Industrial Talc.

71.  **"Mesothelioma __ Claim"** shall mean in reference to Mesothelioma A or Mesothelioma B, a Talc Personal Injury Claim for Mesothelioma A or Mesothelioma B, respectively.

72.  **"Mesothelioma __ Claimant"** shall mean a Talc Personal Injury Claimant for the applicable Mesothelioma Claim.

73.  **"Mixed Claim"** shall mean a Talc Personal Injury Claim for Ovarian Cancer or Mesothelioma that is both an Indemnified Claim and a Non-Indemnified Claim.

74.  **"Non-Indemnified Claim"** shall mean any Talc Personal Injury Claim that is not an Indemnified Claim.

75.  **"Other Disease"** shall mean any Talc Personal Injury Claim that is not for Ovarian Cancer A-D or Mesothelioma A-B.

76.  **"Ovarian Cancer"** shall mean epithelial ovarian cancer (serous, endometrioid, undifferentiated, clear cell, borderline and mucinous), fallopian tube cancer, or primary peritoneal cancer.  For the avoidance of doubt, Ovarian Cancer includes Ovarian Cancer A through D.

77. "**Ovarian Cancer A**" shall mean: (a) a diagnosis of Stage IV Ovarian Cancer of a person with serous, endometrioid, clear cell and/or undifferentiated Ovarian Cancer, or (b) recurrence of or death from serous, endometrioid, clear cell, or undifferentiated Ovarian Cancer.

78. "**Ovarian Cancer B**" shall mean a diagnosis of Stage III Ovarian Cancer of a person with serous, endometrioid, clear cell, or undifferentiated Ovarian Cancer.

79. "**Ovarian Cancer C**" shall mean a diagnosis of Stage II Ovarian Cancer of a person with serous, endometrioid, clear cell, or undifferentiated Ovarian Cancer.

80. "**Ovarian Cancer D**" shall mean (i) a diagnosis of Stage I Ovarian Cancer of a person with serous, endometrioid, clear cell, or undifferentiated Ovarian Cancer, and (ii) all borderline serous Ovarian Cancers.

81. "**Ovarian Cancer __ Claim**" shall mean in reference to Ovarian Cancer A through D, a Talc Personal Injury Claim for Ovarian Cancer A through D, respectively.

82. "**Ovarian Cancer __ Claimant**" shall mean a Talc Personal Injury Claimant for the applicable Ovarian Cancer Claim.

83. "**Ovarian Cancer A-D Claim**" shall mean all Talc Personal Injury Claims for Ovarian Cancer A, Ovarian Cancer B, Ovarian Cancer C and Ovarian Cancer D.

84. "**Ovarian Cancer Claim**" shall mean a Talc Personal Injury Claim for Ovarian Cancer.

85. "**Payment Percentage**" shall have the meaning set forth in Section 4.1 of these TDP.

86. "**Personal Use Exposure**" shall mean, in connection with Ovarian Cancer, the regular or routine application of body powder containing Imerys Talc to the genital area by

girls who have reached puberty or women, for a period of three-years, which period does not have to be continuous.

87. **"Petition Date"** shall mean February 13, 2019 for each of the Debtors except Imerys Talc Italy S.p.A. for which the date is __[TBD]____.

88. "**Plan**" shall mean the *Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, as the same may be amended or modified from time to time.

89. **"Protected Parties"** shall mean any of the following: (a) the Debtors and any Person who served as a director or officer of any Debtor at any time during the Chapter 11 Cases, but solely in such Person's capacity as such; (b) the Reorganized Debtors; (c) the Imerys Protected Parties; (d) any Person, except for the Trust, that, pursuant to the Plan or otherwise, after the Effective Date, becomes a direct or indirect transferee of, or successor to, the Debtors, the Reorganized Debtors, or any of their respective assets (but only to the extent that liability is asserted to exist as a result of its becoming such a transferee or successor); (e) the Buyer (but only to the extent that liability is asserted to exist as a result of its becoming a transferee or successor to the Debtors); (f) the Settling Talc Insurance Companies; (g) the Rio Tinto Protected Parties; and (h) the Cyprus Protected Parties (upon the Cyprus Trigger Date). For the avoidance of doubt, J&J is not a Protected Party.

90. **"Regular and Routine Exposure"** shall mean, as applicable, Regular and Routine Exposure to Cosmetic Talc or Regular and Routine Exposure to Industrial Talc.

91. "**Regular and Routine Exposure to Cosmetic Talc**" shall mean, in connection with Mesothelioma, (a) a three-year period of the regular or routine use of a personal care/cosmetic/hygiene product containing Cyprus Talc and/or Imerys Talc, and (b) no other

significant occupational or industrial exposure (whether direct or bystander) to asbestos from a source other than Cyprus Talc and/or Imerys Talc.

92. **"Regular and Routine Exposure to Industrial Talc"** shall mean, in connection with Mesothelioma, (a) a one-year period of the regular or routine (i) personal occupational exposure (whether direct or bystander) to Cyprus and/or Imerys Industrial Talc not incorporated in a product, or (ii) use of a product containing Cyprus and/or Imerys Industrial Talc, and (b) no other significant occupational or industrial exposure (whether direct or bystander) to asbestos from a source other than Cyprus and/or Imerys Talc.

93. "**Reorganized Debtors**" shall mean the Debtors on and after the Effective Date.

94. **"Representative"** shall mean an individual or entity acting under legal authority on behalf of a holder of a Talc Personal Injury Claim, which includes counsel. For the avoidance of doubt, a representation of authority by counsel shall be sufficient evidence of authority.

95. **"Rio Tinto"** shall mean the Rio Tinto Corporate Parties identified in the Rio Tinto/Zurich Settlement. For the avoidance of doubt, Rio Tinto does not include Zurich American Insurance Company.

96. "**Rio Tinto/Zurich Settlement**" shall mean that certain comprehensive settlement set forth in the Plan and the Rio Tinto/Zurich Settlement Agreement and implemented by the Plan by and among: (i) Rio Tinto, on behalf of itself and the Rio Tinto Captive Insurers, and for the benefit of the Rio Tinto Protected Parties, and Zurich, on behalf of itself and for the benefit of the Zurich Protected Parties, on the one hand, and (ii) the Debtors, on the other hand, and consented to by the Tort Claimants' Committee and the FCR, pursuant to which, in

exchange for the Rio Tinto/Zurich Contribution, the Rio Tinto Protected Parties, the Rio Tinto

Captive Insurers, and the Zurich Protected Parties receive the benefit of the Channeling

Injunction and other protections set forth herein and in the Rio Tinto/Zurich Settlement

Agreement.

      97.  **"Rio Tinto/Zurich Settlement Proceeds"** shall mean the Cash proceeds of

the Rio Tinto/Zurich Settlement consisting of $340 million.

      98.  "**Scheduled Value**" shall mean the specific value set forth in Section

5.2(a)(iii) of these TDP to be assigned to claims that elect the Expedited Review Process and

satisfy the applicable Medical/Exposure Criteria.

      99.  **"Secondary Mesothelioma Claim A"** shall have the meaning set forth in

Section 5.2(b)(v) of these TDP.

      100.  **"Secondary Mesothelioma Claim B"** shall have the meaning set forth in

Section 5.2(b)(v) of these TDP.

      101.  **"Secondary Mesothelioma Claimant"** shall mean the holder of a Talc

Personal Injury Claim for the applicable Secondary Mesothelioma Claim A or B.

      102.  **"Settled and Unpaid Talc Personal Injury Claim"** shall mean a Talc

Personal Injury Claim that was settled and resolved prior to the Petition Date but for which

payment did not occur prior to the Petition Date.

      103.  "**Settling Talc Insurance Company**" shall mean, solely with respect to

Settled Talc Insurance Policies: (a) the Zurich Protected Parties; (b) the Rio Tinto Captive

Insurers; (c) the Cyprus Settling Talc Insurance Companies; (d) prior to the Effective Date, any

other Talc Insurance Company that contributes funds, proceeds, or other consideration to or for

the benefit of the Talc Personal Injury Trust and is designated, with the consent of the Debtors,

20

the Tort Claimants' Committee, and the FCR, in the Confirmation Order and/or the Affirmation

Order, to be a Settling Talc Insurance Company; and (e) following the Effective Date, each Talc

Insurance Company that contributes funds, proceeds, or other consideration to or for the benefit

of the Talc Personal Injury Trust and is designated as a Settling Talc Insurance Company by the

Talc Personal Injury Trust, the Talc Trust Advisory Committee, and the FCR; *provided*,

*however*, that any post-Effective Date addition to the list of Protected Parties does not become

effective until entry of a Final Order approving the addition.

104. **"TAC"** shall mean the Trust Advisory Committee that represents the

interests of holders of present Talc Personal Injury Claims pursuant to the Plan and Trust

Agreement.

105. "**Talc Insurance Company**" shall mean any insurance company, insurance

syndicate, coverholder, insurance broker or syndicate insurance broker, guaranty association, or

any other Entity that may have liability under a Talc Insurance Policy.

106. "**Talc Insurance Settlement Agreements**" shall mean (a) the Rio

Tinto/Zurich Settlement Agreement and (b) any other settlement agreement entered into after

February 13, 2019 by and among any Talc Insurance Company and one or more of the Debtors

and consented to by the Tort Claimants' Committee (or the TAC, after the Effective Date) and

the FCR, in which a Talc Insurance Policy and/or the Debtors' rights thereunder with respect to

Talc Personal Injury Claims are released.

107. **"Talc Insurance Proceeds"** shall mean the proceeds of the Talc Insurance

Settlement Agreements.

108. "**Talc Personal Injury Claim**" shall mean any Claim and any Talc Personal

Injury Demand against one or more of the Debtors or any other Protected Party whether known

or unknown, including with respect to any manner of alleged bodily injury, death, sickness, disease or alleged disease process, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries (whether physical, emotional or otherwise), directly or indirectly arising out of or relating to the presence of or exposure to talc or talc-containing products based on the alleged pre-Effective Date acts or omissions of the Debtors or any other entity for whose conduct the Debtors have or are alleged to have liability (but only to the extent such Claim or Talc Personal Injury Demand directly or indirectly arises out of or relates to the alleged pre-Effective Date acts or omissions of the Debtors), including, without limitation any claims directly or indirectly arising out of or relating to: (a) any products previously mined, processed, manufactured, sold (including, without limitation, any Sale pursuant to the Sale Order) and/or distributed by the Debtors or any other entity for whose conduct the Debtors have or are alleged to have liability, but in all cases only to the extent of the Debtors' liability; (b) any materials present at any premises owned, leased, occupied or operated by any entity for whose products, acts, omissions, business or operations the Debtors have, or are alleged to have, liability; or (c) any talc in any way connected to the Debtors alleged to contain asbestos or other constituent. Talc Personal Injury Claims include all such claims, whether: (1) in tort, contract, warranty, restitution, conspiracy, contribution, indemnity, guarantee, subrogation, or any other theory of law, equity or admiralty, whether brought, threatened or pursued in any United States court or court anywhere in the world; (2) seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative or any other costs, fees, injunctive or similar relief or any other measure of damages; (3) seeking any legal, equitable or other relief of any kind whatsoever, including, for the avoidance of doubt, any claims arising out of or relating to the presence of or exposure to talc or talc-containing products assertable against one or more

Debtors or any other Protected Party; or (4) held by claimants residing within the United States or in a foreign jurisdiction. Talc Personal Injury Claims also include any such claims that have been resolved or are subject to resolution pursuant to any agreement, or any such claims that are based on a judgment or verdict. Talc Personal Injury Claims do not include any claim by any present or former employee of a predecessor or Affiliate of the Debtors for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer. For the avoidance of doubt, the term Talc Personal Injury Claim includes, without limitation (i) all claims, debts, obligations, or liabilities for compensatory damages (such as, without limitation, loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages; and (ii) Indirect Talc Personal Injury Claims.  Notwithstanding the foregoing, Talc Personal Injury Claims do not include any claim that a Settling Talc Insurance Company may have against its reinsurers and/or retrocessionaires in their capacities as such, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of a Settling Talc Insurance Company to assert any such claim against its reinsurers and/or retrocessionaires in their capacities as such.

   **109.  "Talc Personal Injury Claimant"** shall mean the holder of a Talc Personal Injury Claim.

   **110.  "Talc Personal Injury Demand"** shall mean a demand for payment, present or future, against one or more of the Debtors or any other Protected Party that (A) falls within the meaning of "demand" in section 524(g) of the Bankruptcy Code; (B) (i) manifests after the Effective Date, (ii) arises out of the same or similar conduct or events that gave rise to a

Claim that is a Talc Personal Injury Claim, and (iii) is caused or allegedly caused by any constituent other than asbestos; and/or (C) (i) was not a claim prior to the Effective Date, (ii) arises out of the same or similar conduct or events that gave rise to a Claim that is a Talc Personal Injury Claim, and (iii) is to be resolved pursuant to the terms of the Talc Personal Injury Trust.

      **111. "Talc Personal Injury Trust Assets"** shall mean the following assets and any income, profits, and proceeds derived from such assets subsequent to the transfer of such assets to the Talc Personal Injury Trust: (a) the Imerys Settlement Funds; (b) the right to receive the Rio Tinto/Zurich Contribution pursuant to the Rio Tinto/Zurich Settlement; (c) the right to receive the Cyprus Contribution pursuant to the Cyprus Settlement, subject to the terms of the Cyprus Settlement Agreement and conditioned upon occurrence of the Cyprus Trigger Date; (d) all Cash held by the North American Debtors as of the Effective Date, not including the Cash used to fund the Reserves; (e) all non-Cash assets included in the Imerys Contribution, including the Contributed Indemnity and Insurance Interests; (f) the Talc Personal Injury Trust Causes of Action and any and all proceeds thereof; (g) the Talc Insurance Actions; (h) the Talc Insurance Action Recoveries; (i) the rights of the Debtors with respect to Talc Insurance Policies, Talc Insurance CIP Agreements, Talc Insurance Settlement Agreements, and Claims thereunder; (j) the Reorganized North American Debtor Stock; (k) all Cash remaining in the Reserves, if any, to be distributed to the Talc Personal Injury Trust in accordance with the Plan; (l) any and all other funds, proceeds, or other consideration otherwise contributed to the Talc Personal Injury Trust pursuant to the Plan and/or the Confirmation Order or other order of the Bankruptcy Court; (m) the rights of the Debtors with respect to the J&J Indemnification Obligations; and (n) the income or earnings realized or received in respect to items (a) to (m) above. The rights of any Cyprus

Protected Parties under the J&J Agreements, including any J&J Indemnification Obligations, or under any Cyprus Talc Insurance Policy or with respect to the Talc Insurance Actions, shall not constitute "Talc Personal Injury Trust Assets" for any purpose until the occurrence of the Cyprus Trigger Date (and then as provided for under the Cyprus Settlement).

112.  **"Tort System Election Claim"** shall mean the Talc Personal Injury Claim of a Tort System Election Claimant.

113.  **"Tort System Election Claimant"** shall mean the holder of an Indemnified Claim or Mixed Claim who elects to pursue such claim against one or more of the Debtors in the tort system in any court of competent jurisdiction selected by such Talc Personal Injury Claimant, in their sole discretion.

114.  **"Trust Claim Form"** shall mean the form issued by the Trust for submitting a claim, which form shall be subject to the consent of the TAC and FCR.

115.   **"Trust Election Claim"** shall mean the Talc Personal Injury Claim of a Trust Election Claimant.

116.  **"Trust Election Claimant"** shall mean the holder of an Indemnified Claim that elects to seek recovery from the Trust in lieu of proceeding in the tort system.

117.  **"Trust Fund"** shall mean the Talc Personal Injury Trust Assets but not including the Cyprus Contribution.

**SECTION II**

**OVERVIEW**

2.1       **Trust Purpose**.  The purpose of the Trust is to assume the liability for Talc Personal Injury Claims pursuant to the terms of the Plan, and to use the Talc Personal Injury Trust Assets to resolve and, if appropriate, promptly pay Talc Personal Injury Claims in such a way that holders of similar Talc Personal Injury Claims are valued and paid in substantially the

25

same manner and otherwise comply with the requirements of a trust set forth in section 524(g) of the Bankruptcy Code. To this end, these TDP set forth procedures for processing, resolving, and paying (as appropriate) Ovarian Cancer A-D Claims and Mesothelioma Claims A and B through the Expedited Review Process in Section 5.2(a) or the Individual Review Process in Section 5.2(b). The Trust has established Medical/Exposure Criteria in recognition of the unique and widespread consumer and commercial nature of the use of Imerys Talc and Imerys Talc containing products and in recognition of the limited Talc Personal Injury Trust Assets and Cyprus Contribution.

     **2.2**     **Sub-Funds.** The Trust Fund and Cyprus Contribution shall be divided into three funds within the Trust (each, a "**Fund**"). Each Fund operates entirely separately and any changes to the administration of one Fund, such as changes to Medical/Exposure Criteria, Scheduled, Average or Maximum Values, Payment Percentage or Maximum Annual Payment, shall not affect or require changes to the other Funds. Each Fund shall be subject to the terms set forth herein for such Fund, and each Fund shall be operated for the exclusive benefit of the respective beneficiaries of each Fund. Administrative expenses attributable to the operation of one Fund (including the processing of claims asserted against such Fund) shall be allocated to that Fund separately. Common administrative expenses incurred by the Trust that cannot be attributed to the operation of a single Fund shall be split among the three Funds in a manner to ensure that each Fund is responsible for a pro rata share of the common administrative expense.

     **(a)**     **Fund A**: Ovarian Cancer A Claimants may seek a distribution from Fund A. Fund A shall consist of a separate sub-account within the Trust equal to 40% of the total Trust Fund and 30% of the Cyprus Contribution.

(b)    **Fund B**:  Mesothelioma Claimants and Secondary Mesothelioma Claimants may seek a distribution from Fund B.  Fund B shall consist of a separate sub-account within the Trust equal to 40% of the total Trust Fund and 55% of the Cyprus Contribution.

(c)    **Fund C:**  Ovarian Cancer B, C, and D Claimants may seek a distribution from Fund C.  Fund C shall consist of a separate sub-account within the Trust equal to 20% of the total Trust Fund and 15% of the Cyprus Contribution.

2.3        **Treatment of Indemnified Claims**.

(a)    All holders of Indemnified Claims (irrespective of cancer, disease or other personal injury) shall elect to either:

(i)        seek recovery for such claim solely from the Trust under the applicable Fund through the Expedited Review Process (if available) or the Individual Review Process as set forth in Sections 2.4 and 2.5 as a Trust Election Claim; or

(ii)        (x) pursue such claim against one or more of the Reorganized Debtors nominally in the tort system in any court of competent jurisdiction selected by such Talc Personal Injury Claimant, in their sole discretion, and (y) seek recovery for such claim as against one or more of the non-Debtor Protected Parties under the applicable Fund through the Expedited Review Process (if available) or the Individual Review Process as set forth in Sections 2.4 and 2.5 as a Tort System Election Claim.[2]

(b)    The Trust shall make available to Talc Personal Injury Claimants copies of all agreements governing the J&J Indemnities.  It shall be the responsibility of each Talc Personal Injury Claimant to determine the scope of the J&J Indemnities prior to making the

---

[2] As set forth in Sections 5.2(a)(iii) and 5.2(b)(vii) below, the Scheduled, Average and Maximum Values provided for Tort System Election Claims are  reduced to reflect the election to pursue recovery in the tort system in lieu of sharing in the cash assets contributed by the Debtors to the Trust.

election set forth in Section 2.3(a)(ii)(x). The defense of such claims shall be tendered to J&J and the Trust shall have no obligation to defend any such claims in the tort system.  Any settlement of or judgment in the tort system of an Indemnified Claim shall be remitted to the Talc Personal Injury Claimant and shall not be subject to any Payment Percentage or Maximum Annual Payment.  The Trust may enforce the provisions of the J&J Indemnities with respect to such claim and/or may assign the right to enforce such provisions of the J&J Indemnities with respect to such claim solely to the extent permitted by applicable law and contract.

(c)    Upon J&J's settlement of the Debtors' liability (if any) with respect to a Tort System Election Claim or entry of a judgment by Final Order in respect of such liability, none of the Trust, the Debtors or the Reorganized Debtors shall have any obligation to pay such settlement or judgment.

(d)    The Trust reserves the right to pursue indemnification from J&J for any or all Indemnified Claims.  In such event, the costs of such pursuit shall be borne in the first instance by the Trust; provided, however, that the Trust reserves the right to charge against any recovery the costs and expenses incurred by the Trust directly or indirectly for fees and expenses incurred in pursuit of the indemnification.

(e)    Holders of Mixed Claims shall receive the right to (i) in respect of their Indemnified Claims, make the same election as Indemnified Claimants set forth above in Section 2.3(a); and (ii) in respect of their Non-Indemnified Claims seek recovery from Funds A, B, or C whichever is applicable, as set forth in Sections 2.4 and 2.5 below.

**2.4        Treatment of Ovarian Cancer A-D Claims**.

(a)    Ovarian Cancer A Claimants who elect to seek recovery from Fund A through the Expedited Review Process or the Individual Review Process, shall be subject to the

review and valuation procedures set forth herein and shall be subject to the applicable Scheduled, Average and/or Maximum Values and Payment Percentage.

**(b)** Ovarian Cancer B through D Claimants who elect to seek recovery from Fund C through the Expedited Review Process or the Individual Review Process, shall be subject to the review and valuation procedures set forth herein and shall be subject to the applicable Scheduled, Average and/or Maximum Values and Payment Percentage.

**(c)** Holders of Mixed Claims for Ovarian Cancer who elect to seek recovery from the applicable Fund in respect of their Non-Indemnified claims also retain the right to pursue recovery on their Indemnified Claims as set forth in Section 2.3(a) above.

**2.5** **Treatment of Mesothelioma Claims**.

**(a)** Mesothelioma A Claimants and Mesothelioma B Claimants with Regular and Routine Exposure who elect to seek recovery from Fund B through the Expedited Review Process or the Individual Review Process, shall be subject to the review and valuation procedures set forth herein and shall be subject to the applicable Scheduled, Average and/or Maximum Values and Payment Percentage.

**(b)** Mesothelioma A Claimants and Mesothelioma B Claimants without Regular and Routine Exposure and Secondary Mesothelioma Claimants who elect to seek recovery from Fund B through the Individual Review Process, shall be subject to the review and valuation procedures set forth herein (including the terms set forth in Sections 5.2(b)(iv) and (v)) and shall be subject to the applicable Scheduled, Average and/or Maximum Values and Payment Percentage.

(c)     Holders of Mixed Claims for Mesothelioma who elect to seek recovery from the applicable Fund in respect of their Non-Indemnified claims also retain the right to pursue recovery on their Indemnified Claims as set forth in Section 2.3(a) above.

**2.6        Claim Treatment Summary.**  The following chart summarizes the information contained in Sections 2.3 to 2.5 above:

| Disease | Indemnified (J&J Product) | Non-Indemnified (No J&J Product) |
|---|---|---|
| Mesothelioma Claims with Regular and Routine Exposure | May elect either: (a) to proceed against the Debtors in the tort system AND seek recovery from the Trust as a Tort System Election Claimant; OR (b) to seek recovery solely from the Trust as a Trust Election Claimant. | May file a claim with the Trust under Expedited Review or Individual Review, as set forth herein, for distribution from the Trust as a Non-Indemnified Claim. |
| Mesothelioma Claims without Regular and Routine Exposure and Secondary Mesothelioma Claims | May elect either: (a) to proceed against the Debtors in the tort system AND seek recovery from the Trust as a Tort System Election Claimant; OR (b) to seek recovery solely from the Trust as a Trust Election Claimant. | May file a claim with the Trust under Individual Review, as set forth herein, for distribution from the Trust as a Non-Indemnified Claim. |
| Ovarian Cancer A through D | May elect either: (a) to proceed against the Debtors in the tort system AND seek recovery from the Trust as a Tort System Election Claimant; OR (b) to seek recovery solely from the Trust as a Trust Election Claimant. | May file a claim with the Trust under Expedited Review or Individual Review, as set forth herein, for distribution from the Trust as a Non-Indemnified Claim. |
| Mixed Claim | In respect of the Indemnified Claim, may elect either: (a) to proceed against the Debtors in the tort system AND seek recovery from the Trust as a Tort System Election Claimant; OR (b) may file a claim with the Trust under Expedited Review or Individual Review, as set forth herein, for distribution from the Trust as a Mixed Claimant. In respect of the Non-Indemnified Claim, may file a claim with the Trust under Expedited Review or Individual Review, as set forth herein, for distribution from the Trust as a Trust Election Claimant. | |

**2.7** **Necessity of Filing a Trust Claim Form.** All holders of Talc Personal Injury Claims, including Indemnified Claims and Mixed Claims, must file a Trust Claim Form with the Trust. Holders of Indemnified Claims shall make the election set forth in Section 2.3(a) above. Consent from the Trust shall be required before an Indemnified Claimant or Mixed Claimant may pursue their Indemnified Claims against the Debtors in the tort system (including claimants asserting a Talc Personal Injury Claim that is not for Mesothelioma or Ovarian Cancer). Notice of such consent shall be provided to J&J. Indemnified Claimants and Mixed Claimants may then commence litigation as set forth herein provided he or she thereafter files a Basic Claims Submission.

**2.8** **Application of the Payment Percentages.** Any adjustments to Payment Percentages shall be made only pursuant to Section 4.2 below, and any adjustments to paid claims are governed by Section 4.3 below. Because there is uncertainty in the prediction of both the total amount of the Trust's talc-related liabilities and the amount of the Talc Personal Injury Trust Assets, no guarantee can be made of the Payment Percentage that will be applicable to any Talc Personal Injury Claim.

**2.9** **Determination of the Maximum Annual Payments**. The Trust shall model the cash flow, principal, and income year-by-year to be paid over its entire life of each Fund to ensure that each Fund shall be available to treat all present and future holders of Talc Personal Injury Claims as similarly as possible. In each year, based upon the model of cash flow for each Fund, the Trust shall be empowered to make offers to Talc Personal Injury Claimants up to the Maximum Annual Payment for each Fund considering the Payment Percentage provisions set forth in Sections 4.2 and 4.3 below. The Maximum Annual Payments for each Fund shall be determined annually by the Trustees with the consent of the TAC and the FCR. The Trust's

offers to all Talc Personal Injury Claimants from a given Fund shall not exceed the applicable

Fund's Maximum Annual Payment so determined for that year. Should the Maximum Annual

Payment for a particular Fund not be reached in any year, the portion of the Maximum Annual

Payment for each Fund that is not exhausted in that year shall be added to the Maximum Annual

Payment for the applicable Fund for the following year and any subsequent year until exhausted

or an adjustment is made to the Payment Percentage applicable to such Fund.  Should the

Maximum Annual Payment for the applicable Fund be reached in any Trust year before all

claimants in the applicable FIFO Payment Queue have been paid, such claimants shall be paid in

the following year in the order they appear in such Fund's FIFO Payment Queue. The Payment

Percentages and the Maximum Annual Payment amounts are based on projections over the

lifetime of the Trust. If such long-term projections are revised, that may result in a new model of

the Trust's anticipated cash flow and a new calculation of a Maximum Annual Payment for one

or more of the Funds.

       **2.10**       **Indirect Talc Personal Injury Claims**.  As set forth in Section 5.4 below,

Indirect Talc Personal Injury Claims, if any, shall be subject to all the same limitations and

provisions relating to categorization, evaluation and payment of these TDP as all other Talc

Personal Injury Claims, including the applicable Payment Percentage.

**SECTION III**

**TDP ADMINISTRATION**

       **3.1**       **TAC and FCR**.  Pursuant to the Plan, the Trust Agreement, and these TDP,

the Trustees shall obtain the consent of the TAC and the FCR with respect to any amendment,

change or modification to these TDP pursuant to Sections 4.1, 4.2, 5.2 and 8.3, and on such other

matters as are required herein or in the Trust Agreement. On all other matters, the Trust shall be

administered by the Trustees in consultation with the TAC and the FCR.

32

**3.2**        **Consent and Consultation Procedures**.  In those circumstances in which consultation or consent of the TAC and FCR is required, the Trustees shall provide written notice to the TAC and the FCR of the specific amendment or other action that is proposed. The Trustees shall not implement such amendment or take such action unless and until the parties have engaged in the Consultation Process described in Section 7.1(a) or the Consent Process described in Section 7.1(b), as applicable, of the Trust Agreement.

## SECTION IV

## PAYMENT PERCENTAGE; PERIODIC ESTIMATES

**4.1**        **Uncertainty of Debtors' Talc Liabilities**.  Litigation arising from the use and/or exposure to talc is a relatively new mass tort and there is inherent uncertainty regarding the aggregate value of the Debtors' total talc-related liabilities.  The Trustees must determine from time to time the percentage of value that holders of present and future Talc Personal Injury Claims are likely to receive from the applicable Fund as reflected by the applicable Payment Percentage to provide reasonable assurance that holders of similar Talc Personal Injury Claims are valued and paid in substantially the same manner. Each Fund shall have its own Payment Percentage. No Payment Percentage shall apply to the value of any payments owed by J&J by operation of one or more of the J&J Indemnities to holders of Tort System Election Claims or Mixed Claims determined by (a) settlement or (b) a judgment by Final Order.

**4.2**        **Computation of Payment Percentage**s.  The Initial Payment Percentage for each Fund shall be as follows:

| Fund | Payment Percentage[3] |
|------|----------------------|
| A | 0.40% - 2.34% |
| B | 3.70% - 6.24% |
| C | 0.30% - 1.48% |

The Initial Payment Percentages shall apply to all Talc Personal Injury Claims to be paid by the Trust until the Trustees, with the consent of the TAC and the FCR, determine that one or more of the Payment Percentages must be changed to assure that the Trust shall be in a financial position to pay present and future holders of similar Talc Personal Injury Claims in substantially the same manner.

In making any such change to any Payment Percentage, the Trustees, the TAC and the FCR shall take into account the fact that the holders of Talc Personal Injury Claims who voted on the Plan relied on the findings of experts that the Initial Payment Percentages represented a reasonably reliable estimate of the Trust's total assets and liabilities over the Trust's life based on the best information available at the time, and shall therefore give due consideration to the expectations of such claim holders that the applicable Initial Payment Percentage would be applied to their Talc Personal Injury Claims.

No less frequently than once every twelve (12) months, commencing on the Initial Claims Filing Date, the Trustees shall compare the liability forecasts for each Fund on which the then applicable Payment Percentage is based with the actual claims filing and payment experience of each Fund to date. If the results of the comparison call into question the ability of any Fund to continue to rely upon the current liability forecast, the Trustees shall undertake a

---

[3] The Initial Payment Percentage for each Fund has not been finalized. It is estimated that the Initial Payment Percentage for each Fund will be within the ranges set forth in this chart.

reconsideration of the applicable Payment Percentage. The Trustees may also reconsider the then-applicable Payment Percentages at shorter intervals if the Trustees deem such reconsideration appropriate or if requested by the TAC or the FCR.

The Trustees must base their determination of each of the Payment Percentages on current estimates of the number, types, and values of present and future Talc Personal Injury Claims, the value remaining in the applicable Fund, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds available to pay the Trust's liability to present and future holders of Talc Personal Injury Claims.

4.3     **Applicability of the Payment Percentages.**  The Trust shall apply the applicable Payment Percentages to all payments made to Talc Personal Injury Claimants. The payment to a claimant shall reflect the applicable Payment Percentage in effect at the time a Representative's properly completed Acceptance and Release is received by the Trust.

If the Trustees, with the consent of the TAC and the FCR, increase the Payment Percentage applicable to any Fund, the Trustees shall make supplemental payments to all claimants who previously liquidated their claims and received payments from such Fund based on the lower Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the claim in question times the applicable newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim (but excluding any such amounts attributable to any sequencing adjustment paid pursuant to Section 7.7 below).

The Trustees' obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $250 after application of the

Payment Percentage at that time, and the amount of the suspended payment to the holder of any

Talc Personal Injury Claim shall be added to the amount of any prior supplemental

payment/payments that was/were also suspended because it/they collectively would have been

less than $250. However, the Trustees' obligation shall resume, and the Trustees shall pay any

such aggregate supplemental payments due the claimant at such time that the cumulative

aggregate exceeds $250.

**SECTION V**

**RESOLUTION OF TALC PERSONAL INJURY CLAIMS**

5.1        **Ordering, Processing and Payment of Claims**.

(a)    **Ordering of Claims.**

(i)        **Establishment of FIFO Processing Queues**.  The Trust shall

order all Trust Claim Forms to be reviewed for processing purposes on a FIFO basis in the order

each Basic Claim Submission is received, except as otherwise provided herein.  For all Talc

Personal Injury Claims in respect of which a Basic Claim Submission is filed on or before the

date six (6) months after the Initial Claims Filing Date, a claimant's position in the FIFO

Processing Queue shall be determined as of the earliest of (i) the date prior to the Petition Date

that the specific claim was filed against the Debtors in the tort system; (ii) the date prior to the

Petition Date that the claim was filed against another defendant in the tort system if at the time

the claim was subject to a tolling agreement with the Debtors; (iii) the date subsequent to the

Petition Date but prior to the date that the Trust first makes available the Trust Claim Form and

other claims materials required to file a claim with the Trust that the claim was filed against

another defendant in the tort system; and (iv)  the date a ballot was submitted on behalf of the

claimant for purposes of voting to accept or reject the Plan pursuant to voting procedures

approved by the Bankruptcy Court.

For all Talc Personal Injury Claims in respect of which a Basic Claim Submission is filed after the date six (6) months after the Initial Claims Filing Date, a claimant's position in the FIFO Processing Queue shall be determined by (i) the date of receipt of the claimant's Basic Claim Submission; or (ii) the date that the claim was filed against one or more Debtors in the tort system.  If any Basic Claim Submissions are filed on the same date, a claimant's position in the applicable FIFO Processing Queue vis-à-vis such other same-day claims shall be determined by the date of the diagnosis of the disease with the earlier diagnosis having priority over the later diagnosis. If any Basic Claim Submissions are filed and diagnosed on the same date, a claimant's position in the applicable FIFO Processing Queue vis-à-vis such other same-day claims shall be determined by the claimant's date of birth, with older claimants given priority over younger claimants.

(ii)    **Effect of Statutes of Limitations and Repose.**  To be considered timely and eligible for compensation, all unliquidated Talc Personal Injury Claims filed against the Trust must meet either: (i) in the case of claims first filed in the tort system against the Debtors prior to the Petition Date, the applicable federal or state statute of limitations and repose that was in effect at the time of the filing of the claim in the tort system; or (ii) in the case of claims not filed against the Debtors in the tort system prior to the Petition Date, the applicable federal or state statute of limitations and repose that was in effect at the time of the filing of a Basic Claim Submission with the Trust. However, the running of the applicable statute of limitations or repose shall be tolled as of the earliest of: (a) the actual filing of a claim against one or more Debtors prior to the Petition Date in the tort system; (b) the date specified by agreement or otherwise among the Debtors and/or the Trust, on the one hand, and the applicable claimant, on the other hand, (or, if none, the date of the agreement) in the case of tolling prior to

the Petition Date by an agreement or otherwise, provided such tolling was still in effect on the Petition Date; or (c) the Petition Date.

If a Talc Personal Injury Claim meets any of the tolling provisions described in the preceding paragraph and the claim was not barred by the applicable federal or state statute of limitations or repose at the time of the relevant tolling event, it shall be treated as timely filed if a Basic Claim Submission in respect of such claim is filed with the Trust within three (3) years after the Initial Claims Filing Date. In addition, any Talc Personal Injury Claim that is first diagnosed after the Petition Date, irrespective of the application of any relevant federal or state statute of limitations or repose, shall be treated as timely filed if a Basic Claim Submission in respect of such claim is filed with the Trust within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims Filing Date, whichever is later. However, the processing of any Talc Personal Injury Claim by the Trust may be deferred at the election of the claimant pursuant to Section 6.2 below.

(b)    **Payment of Claims**.  Talc Personal Injury Claims that have been liquidated in accordance with the terms hereof shall be paid from the applicable Fund in FIFO order based on the date their liquidation became final, all such payments being subject to the applicable Payment Percentage in accordance with Section 4.3, the applicable Maximum Annual Payment, and any sequencing adjustment provided for in Section 7.7 below, except as otherwise provided herein (the "**FIFO Payment Queue**").  For the avoidance of doubt, each Fund shall have its own FIFO Payment Queue.

Where a claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to submission of the Acceptance and Release by the Representative, an offer made by the

Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the Trust has been furnished with evidence that the settlement offer has been submitted to such court or in that probate process for approval. If the offer is ultimately approved by the court or through the probate process and a properly completed Acceptance and Release is submitted to the Trust, the Trust shall pay the claim in the amount so offered, multiplied by the greater of (a) the applicable Payment Percentage in effect at the time the offer was first made, or (b) the applicable Payment Percentage in effect at the time the Trust received the properly completed Acceptance and Release.

If any claims are liquidated on the same date, the claimant's position in the applicable FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's talc-related disease with the earlier diagnosis having priority over the later diagnosis. If any claims are liquidated on the same date and the respective claimants' talc-related diseases were diagnosed on the same date, the position of those claimants in the applicable FIFO Payment Queue shall be determined by the Trust based on the claimants' dates of births, with older claimants given priority over younger claimants.

(c)     **Settled and Unpaid Talc Personal Injury Claims.** The holder of a Settled and Unpaid Talc Personal Injury Claim may: (i) resubmit such claim for qualification and valuation under the Trust pursuant to the procedures set forth in these TDP; or (ii) agree to accept the settled amount of their claim up to the Maximum Value multiplied by the Initial Payment Percentage of the applicable Fund.

5.2     **Resolution of Unliquidated Talc Personal Injury Claims**.  Within sixty (60) days after the establishment of the Trust, the Trustees, with the consent of the TAC and the FCR, shall adopt procedures for reviewing and liquidating all unliquidated Ovarian Cancer A-D

Claims and Mesothelioma Claims, which shall include deadlines for processing such claims. Such procedures shall also require that claimants seeking compensation from the Trust in respect of unliquidated Talc Personal Injury Claims must first file a Complete Claim Submission, in accordance with the provisions of Sections 6.1 below.

The Trust Claim Form for claimants seeking to recover from the Trust shall require, in addition to a Basic Claim Submission: (i) Disease; (ii) Debtor Exposure; and (iii) election to proceed through the Expedited Review Process or the Individual Review Process.

Upon filing a Basic Claim Submission and electing the Expedited Review Process or the Individual Review Process (as applicable), a Talc Personal Injury Claimant seeking to recover from the Trust shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1(a) above.

(a)    **Expedited Review Process.**

(i)    **In General.**  The Expedited Review Process is designed to provide qualifying claimants (a) an expeditious, efficient, and inexpensive method for liquidating applicable, compensable Talc Personal Injury Claims where the claim, after meeting the applicable Medical/Exposure Criteria, can easily be verified by the Trust; and (b) a fixed and certain claim value.  If, after completing its review, the Trust does not offer the claimant Scheduled Value, the claimant may provide additional evidence and request that the claim be reviewed pursuant to Individual Review Process in accordance with Section 5.2(b) below or proceed to ADR in accordance with Section 5.7.

(ii)    **Claims Processing Under the Expedited Review Process.**  All claimants seeking liquidation of a Talc Personal Injury Claim pursuant to the Expedited Review Process shall file the Trust Claim Form.  Following receipt of a Complete Claim Submission, the

40

Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for any claim category eligible for the Expedited Review Process and shall advise the claimant whether the submitted Trust Claim Form is compensable or deficient.  If the Trust determines that a claim meets the Medical/Exposure Criteria for a claim category eligible for the Expedited Review Process, the Trust shall tender to the claimant an offer of payment equal to the Scheduled Value for such disease set forth in Section 5.2(a)(iii) below, subject to the applicable Payment Percentage in accordance with Section 4.3.  Offers tendered to Ovarian Cancer A-D Claimants shall be subject to both the BRCA Reduction and the Clear Cell Reduction, as applicable, after application of the Payment Percentage.  The Trust's offer shall be delivered together with the form of Acceptance and Release.  Upon the Trust's receipt of a properly completed Acceptance and Release, the claim shall be placed in the applicable FIFO payment queue, and the Trust shall make payment on the claim subject to the limitations, if any, of the applicable Maximum Annual Payment.

(iii)    **Ovarian Cancer A-D Claims and Mesothelioma Claims: Scheduled Value and Medical/Exposure Criteria.**  The Scheduled Values and Medical/Exposure Criteria set forth below shall apply to all applicable claims for Ovarian Cancer A through D and Mesothelioma filed with the Trust on or before the Initial Claims Filing Date for which the claimant elects the Expedited Review Process and shall continue to apply unless and until changed in accordance with these TDP.  On or after the Initial Claims Filing Date, the Trustees, with the consent of the TAC and FCR, may add to, change or eliminate Scheduled Values and/or Medical/Exposure Criteria for Ovarian Cancer A-D Claims and Mesothelioma Claims except that in no event shall the Scheduled Value for Ovarian Cancer A or Mesothelioma be reduced to an amount less than the Scheduled Value identified below.  In addition,

commencing on January 1, 2022, the Trust shall modify these valuations annually for inflation based on the CPI-U published by the United States Department of Labor, Bureau of Labor Statistics. Any such changes shall apply to such Talc Personal Injury Claims filed after the date of such change.

**Expedited Review Medical/Exposure Criteria**

| Disease/Category | Medical/Exposure Criteria for Trust Distribution |
|---|---|
| Mesothelioma A | (i) Diagnosis of Mesothelioma; (ii) Debtor Exposure; and (iii) Regular and Routine Exposure to Cosmetic Talc. |
| Mesothelioma B | (i) Diagnosis of Mesothelioma; (ii) Debtor Exposure; and (iii) Regular and Routine Exposure to Industrial Talc. |
| Ovarian Cancer A | (i) Diagnosis of Ovarian Cancer A; (ii) Debtor Exposure; and (iii) Personal Use Exposure. |
| Ovarian Cancer B | (i) Diagnosis of Ovarian Cancer B; (ii) Debtor Exposure; and (iii) Personal Use Exposure. |
| Ovarian Cancer C | (i) Diagnosis of Ovarian Cancer C; (ii) Debtor Exposure; and (iii) Personal Use Exposure. |
| Ovarian Cancer D | (i) Diagnosis of Ovarian Cancer D; (ii) Debtor Exposure; and (iii) Personal Use Exposure. |

**Scheduled Values of Claims Eligible for Expedited Review**

| Disease Level | Scheduled Values | | |
|---|---|---|---|
| | Tort System Election Claims | Trust Election Claims and Non-Indemnified Claims | Mixed Claims |
| Mesothelioma A | $140,000 | $400,000 | $400,000 |
| Mesothelioma B | $140,000 | $400,000 | $400,000 |
| Ovarian Cancer A | $140,000 | $400,000 | $400,000 |
| Ovarian Cancer B | $ 91,000 | $260,000 | $260,000 |
| Ovarian Cancer C | $ 49,000 | $140,000 | $140,000 |
| Ovarian Cancer D | $ 21,000 | $ 60,000 | $ 60,000 |

    **(b)    Individual Review Process.**

(i)      **In General.**  Subject to the provisions set forth below, a claimant may elect to have his or her Talc Personal Injury Claim reviewed under the Individual Review Process to determine whether (A) for Ovarian Cancer A-D Claims and Mesothelioma Claims that meet the relevant Medical and Exposure Criteria, whether the value of the claim differs from the Scheduled Value provided (*see* Section 5.2(b)(iii)) below; and (B) for Mesothelioma Claims without Regular and Routine Exposure, and Secondary Mesothelioma Claims, whether the claim is compensable hereunder and the value of such claim (*see* Sections 5.2(b)(iv) and (v) below, respectively).  A Talc Personal Injury Claim liquidated in the Individual Review Process may be determined to be more or less than the Scheduled Value the claimant would have received under the Expedited Review Process.  Until such time as the Trust has made an offer on a claim pursuant to the Individual Review Process, the claimant may change his or her election to proceed with the Individual Review Process and have the claim liquidated pursuant to the Expedited Review Process. In the event of such a change in the processing election, the claimant shall nevertheless retain his or her place in the applicable FIFO Processing Queue.  If, after completing its review, the Trust does not extend an offer, the claimant may provide additional evidence and request that the claim be re-reviewed or proceed to ADR in accordance with section 5.7.

(ii)      **Foreign Claims.**  Notwithstanding anything to the contrary herein, based on the fact that there is no history of Foreign Claims asserted against the Debtors, no Foreign Claims shall be paid from the Trust or under these TDP.

(iii)      **Ovarian Cancer A-D Claims and Mesothelioma Claims that meet the Medical and Exposure Criteria.**  Ovarian Cancer A-D Claimants and Mesothelioma Claimants that meet the Medical and Exposure Criteria set forth in Section 5.2(a)(iii) and believe

they are entitled to greater than the applicable Scheduled Value, shall be eligible to seek the Individual Review Process to determine the value of their claims. The Individual Review Process is intended to result in payments equal to the full liquidated value for each claim (subject to the applicable Payment Percentage) which may be determined to be more or less than the Scheduled Value the claimant would have received under the Expedited Review Process.  Because the detailed examination and valuation process pursuant to the Individual Review Process requires substantial time and effort, claimants electing to undergo the Individual Review Process may be paid on the basis of the liquidated value of their Talc Personal Injury Claims later than would have been the case had the claimant elected the Expedited Review Process.  The liquidated values of Ovarian Cancer A-D Claims or Mesothelioma Claims that undergo the Individual Review Process in accordance with the factors set forth in Section 5.2(b)(vi) below may be determined to be less than the Scheduled Value for the applicable disease, and, in any event, shall not exceed the Maximum Value for such disease as set forth herein.

(iv)    **Mesothelioma Claims without Regular and Routine Exposure.**
The Individual Review Process provides Mesothelioma Claimants that do not satisfy the Regular and Routine Exposure criteria with an opportunity for individual consideration and evaluation. If a Mesothelioma Claimant fails to meet the exposure period criteria in prong "a" of the Regular and Routine Exposure criteria, but such Claimant otherwise has regular or routine exposure equivalent to the applicable time period and no other exposure to asbestos, the Trust shall consider and evaluate the nature, intensity and duration of the exposure to Cyprus Talc and/or Imerys Talc. If the Trust is satisfied that the claimant has presented a claim that would be compensable in the tort system, the Trust may offer the claimant a liquidated value up to the applicable Scheduled Value for Mesothelioma, subject to the applicable Payment Percentage. If a

Mesothelioma Claimant fails to meet prong "b" of the Regular and Routine Exposure criteria, the Trust shall consider and evaluate the nature, intensity and duration of all other exposures to asbestos as well as the nature, intensity and duration of the exposure to Cyprus and/or Imerys Talc. If the Trust is satisfied that the claimant has presented a claim that would be compensable in the tort system, the Trust may offer the claimant a liquidated value up to the applicable Scheduled Value for Mesothelioma, subject to the applicable Payment Percentage.

(v)    **Mesothelioma Secondary Exposure Claims**.  If a claimant alleges Mesothelioma from Debtor Exposure based on exposure to Cyprus and/or Imerys Industrial Talc from close physical contact to a person who was occupationally exposed (whether direct or bystander) to Cyprus Talc and/or Imerys Industrial Talc (i.e., a "**Secondary Mesothelioma Claim**"), the claimant must seek the Individual Review Process for his or her claim pursuant to Section 5.2(b) above. In such a case, the claimant must establish that the occupationally exposed person would have met the exposure requirements under these TDP that would have been applicable had the occupationally exposed person filed a Mesothelioma Claim against the Trust, including the requirement of Debtor Exposure. In addition, the claimant with a Secondary Mesothelioma Claim must establish that he or she is suffering from Mesothelioma, that his or her own Debtor Exposure to the occupationally exposed person occurred within the same time frame that the occupationally exposed person was exposed to Cyprus and/or Imerys Talc, and that such secondary exposure was a cause of the Mesothelioma.  If the Trust is satisfied that the claimant has presented a claim that would be compensable in the tort system, the Trust may offer the claimant a liquidated value up to the applicable Scheduled Value for Mesothelioma, subject to the applicable Payment Percentage.

**(vi)      Valuation Factors to Be Considered in the Individual Review**

**Process**.  The Trust shall liquidate the value of each Talc Personal Injury Claim that undergoes

the Individual Review Process based on the historic liquidated values of other similarly situated

claims in the tort system as it exists on the Effective Date for similar claims or an analogous

disease, or upon such criteria as the Trust may develop in consultation with the TAC and the

FCR based upon its claims administrative experience and information available on values

through continued litigation in the tort system.  Accordingly, the Trust shall take into

consideration all of the factors that affect the amount of damages and values in the tort system,

including, but not limited to, credible evidence of (i) the degree to which the characteristics of a

claim differ from the Medical/Exposure Criteria for the disease in question; (ii) factors such as

the claimant's age, disability, employment status, disruption of household, family or recreational

activities, dependencies, special damages, and pain and suffering; (iii) whether the claimant's

damages were (or were not) caused by Debtor Exposure (for example, possible alternative causes

and the strength of documentation of injuries); (iv) settlement and verdict histories in the

Claimant's Jurisdiction for similarly situated or analogous claims; (v) the greater of (a)

settlement and verdict histories for the claimant's law firm in the Claimant's Jurisdiction for

similarly situated or analogous claims, and (b) settlement and verdict histories for the claimant's

law firm, including all cases where the claimant's law firm satisfies the Trust on the basis of

clear and convincing evidence provided to the Trust that the claimant's law firm played a

substantial role in the prosecution and resolution of the cases, such as actively participating in

court appearances, discovery and/or trial of the cases, irrespective of whether a second law firm

was also involved and would also be entitled to include the cases in its "settlement and verdict

histories." For the avoidance of doubt, mere referral of a case, without further direct

involvement, will not be viewed as having played a substantial role in the prosecution and resolution of a case. In liquidating the value of a Talc Personal Injury Claim that undergoes the Individual Review Process, the Trust shall treat a claimant as living if the claimant was alive at the time the initial pre-petition complaint was filed or the Trust Claim Form was filed with the Trust even if the claimant has subsequently died.

With respect to Claimant's Jurisdiction, if the claim was not filed against the Debtors in the tort system prior to the Petition Date, the claimant may elect as the Claimant's Jurisdiction (i) the jurisdiction in which the claimant resides or resided at the time of diagnosis or when the claim is filed with the Trust; (ii) a jurisdiction in which the claimant experienced exposure to Cyprus and/or Imerys Talc or a product containing Cyprus and/or Imerys Talc; (iii) a jurisdiction in which the claimant experienced conduct which exposed a claimant to a product containing Cyprus and/or Imerys Talc for which the Debtors have legal responsibility; or (iv) any other jurisdiction in which the claimant could have brought suit in the absence of the bankruptcy case.

With respect to the Claimant's Jurisdiction, in the event a claim is made under these TDP for compensatory damages that would otherwise satisfy the criteria for payment under these TDP, but Claimant's Jurisdiction is a Foreclosed Jurisdiction, the claimant may elect the Commonwealth of Pennsylvania as the Claimant's Jurisdiction, and such claimant's damages shall be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles. The choice of law provision in Section 8.6 below applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.2(b)(vi) is determined to be the law of a Foreclosed Jurisdiction, shall govern only the rights between the

Trust and the claimant, and, to the extent the Trust seeks recovery from any entity that provided insurance coverage to the Debtors, the law of the Foreclosed Jurisdiction shall govern.

(vii)    **Average and Maximum Values for Talc Personal Injury Claims.**  Average and Maximum Values for Talc Personal Injury Claims shall be as follows:

| Disease Level | Average Values | | |
|---|---|---|---|
| | Tort System Election Claims | Trust Election Claims and Non-Indemnified Claims | Mixed Claims |
| Mesothelioma Claims with Regular and Routine Exposure | $175,000 | $500,000 | $500,000 |
| Mesothelioma Claims without Regular and Routine Exposure | $52,500 | $150,000 | $150,000 |
| Secondary Mesothelioma Claims | $52,500 | $150,000 | $150,000 |
| Ovarian Cancer A Claims | $175,000 | $500,000 | $500,000 |
| Ovarian Cancer B Claims | $113,750 | $325,000 | $325,000 |
| Ovarian Cancer C Claims | $61,250 | $175,000 | $175,000 |
| Ovarian Cancer D Claims | $26,250 | $75,000 | $75,000 |

| Disease Level | Maximum Values | | |
|---|---|---|---|
| | Tort System Election Claims | Trust Election Claims and Non-Indemnified Claims | Mixed Claims |
| Mesothelioma Claims with Regular and Routine Exposure | $472,500 | $1,350,000 | $1,350,000 |
| Mesothelioma Claims without Regular and Routine Exposure | $140,000 | $400,000 | $ 400,000 |
| Secondary Mesothelioma Claims | $140,000 | $ 400,000 | $400,000 |
| Ovarian Cancer A Claims | $472,500 | $1,350,000 | $1,350,000 |
| Ovarian Cancer B Claims | $307,125 | $877,500 | $877,500 |
| Ovarian Cancer C Claims | $165,375 | $472,500 | $472,500 |
| Ovarian Cancer D Claims | $70,875 | $202,500 | $202,500 |

49

The foregoing Average Values and Maximum Values shall apply to all Talc Personal Injury Claims filed with the Trust on or before the Initial Claims Filing Date and shall continue to apply unless and until changed in accordance with these TDP.  On or after the Initial Claims Filing Date, the Trust, with the consent of the TAC and FCR may change these values as set forth in Section 4.1. Any such changes shall apply to such Talc Personal Injury Claims filed after the date of such change.

(viii)    **Claims Processing under Individual Review**.  All claimants seeking liquidation of a Talc Personal Injury Claim pursuant to the Individual Review Process shall file the Trust Claim Form.  Following receipt of a Complete Claim Submission, the Trust shall determine the liquidated value, if any, of the claim (as set forth herein) and shall advise the claimant of that determination. The Trust shall tender to the claimant an offer of payment equal to the determined liquidated value subject to the applicable Payment Percentage in accordance with Section 4.3.  Offers tendered to Ovarian Cancer A-D Claimants shall be subject to both the BRCA Reduction and the Clear Cell Reduction, as applicable, after application of the Payment Percentage.  The Trust's offer shall be delivered together with the form of Acceptance and Release.  Upon the Trust's receipt of a properly completed Acceptance and Release, the claim shall be placed in the applicable FIFO Payment Queue and the Trust shall make payment on the claim, subject to the limitations, if any, of the applicable Maximum Annual Payment.

**5.3**        **Categorizing Claims as Exigent**.

(a)    **Exigent Claims**.  At any time, the Trust may liquidate and pay Direct Talc Personal Injury Claims that qualify as Exigent Health Claims or Exigent Hardship Claims as set forth below. Exigent Claims may be considered separately under the Individual Review Process no matter what the order of processing otherwise would have been under these TDP. An

Exigent Claim, following its liquidation, shall be placed first in the applicable FIFO Payment Queue ahead of all other Talc Personal Injury Claims and shall be subject to the applicable Maximum Annual Payment.

(i)     **Exigent Health Claims**.  A Direct Talc Personal Injury Claim qualifies for payment as an Exigent Health Claim if the claim meets the Medical/Exposure Criteria for Mesothelioma or Ovarian Cancer and the claimant is living when the claim is filed, and the claimant provides a declaration or affidavit made under penalty of perjury by a physician who has examined the claimant within one hundred twenty (120) days of the date of declaration or affidavit in which the physician states (a) that there is substantial medical doubt that the claimant will survive beyond six (6) months from the date of the declaration or affidavit, and (b) that the claimant's terminal condition is caused by the relevant talc-related disease.

(ii)     **Exigent Hardship Claims.**  A Direct Talc Personal Injury Claim qualifies for payment as an Exigent Hardship Claim if the claim meets the relevant Medical/Exposure Criteria for Mesothelioma or Ovarian Cancer and the Trust, in its sole discretion, determines (i) that the claimant needs immediate financial assistance based on the claimant's expenses and all sources of available income, and (ii) that there is a causal connection between the claimant's dire financial condition and the claimant's talc-related disease.

5.4     **Indirect Talc Personal Injury Claims**.  Indirect Talc Personal Injury Claims asserted against the Trust shall be treated as presumptively valid and paid by the Trust subject to the applicable Payment Percentage (and all other limitations applicable to Direct Talc Personal Injury Claims hereunder) if (a) such claim satisfied the requirements of the Claims Bar Date for such claims established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by Section 502(e) of the Bankruptcy Code or subordinated under Section 509(c) of the

Bankruptcy Code, and (b) the Indirect Claimant establishes to the satisfaction of the Trustees that (i) the Indirect Claimant has paid in full the liability and obligation of the Trust to the individual claimant to whom the Trust would otherwise have had a liability or obligation under these TDP (and which has not been paid by the Trust), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Trust and the Protected Parties from all liability to the Direct Claimant and the Indirect Claimant, (iii) the claim is not otherwise barred by a statute of limitations or repose or by other applicable law; and (iv) the Indirect Claimant does not owe the Debtors, Reorganized Debtors, or the Trust an obligation to indemnify the liability so satisfied. In no event shall any Indirect Claimant have any rights against the Trust superior to the rights of the related Direct Claimant against the Trust, including any rights with respect to the timing, amount or manner of payment. In addition, no claim of an Indirect Claimant may be liquidated and paid in an amount that exceeds what the Indirect Claimant has paid the related Direct Claimant in respect of such claim for which the Trust would have liability.  Further, in no event shall any Indirect Talc Personal Injury Claim exceed the Maximum Value of the compensable injury.  An Indirect Talc Personal Injury Claim shall be subject to the applicable Payment Percentages and Average Value set forth herein.

To establish a presumptively valid Indirect Talc Personal Injury Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with the consent of the Trust and an appropriate full release in favor of the Trust and the Protected Parties) or a Final Order, provided that such claim is valid under applicable state law. In any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the Trust under applicable law by

way of a settlement, the Indirect Claimant shall obtain for the benefit of the Trust and the Protected Parties a release in form and substance satisfactory to the Trustees.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the Trust and the Protected Parties with a full release of the Direct Claimant's claim, and demonstrate that the Indirect Claimant does not owe the Debtors, Reorganized Debtors or the Trust any indemnification obligation in respect of such claim, the Indirect Claimant may request that the Trust review the Indirect Talc Personal Injury Claim individually to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the Trust had to the Direct Claimant. If the Indirect Claimant can show that it has paid all or a portion of such liability or obligation, the Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, times the then applicable Payment Percentage. However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled under these TDP. Further, the liquidated value of any Indirect Talc Personal Injury Claim paid by the Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any Talc Personal Injury Claim that might be subsequently asserted by the Direct Claimant against the Trust.

Any dispute between the Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures. If such dispute is not resolved under the ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Section 5.8 below.

Indirect Claimants holding Indirect Talc Personal Injury Claims that have not been disallowed, discharged, or otherwise resolved by Final Order shall have such claims processed in accordance with procedures to be developed and implemented by the Trustees consistent with the provisions of this Section 5.4, which procedures (a) shall determine the validity, allowability and enforceability of such claims, and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the Trust would have afforded the holders of the underlying valid Talc Personal Injury Claims.

The Trustees may develop and approve a separate claim form for Indirect Claimants with the consent of the TAC and FCR.

**5.5      Evidentiary Requirements**.

**(a)    Mesothelioma Medical Evidence.**

**(i)      In General.**  All diagnoses of  Mesothelioma shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to asbestos to onset of disease, or (ii) a history of the claimant's Debtor Exposure, which may be by affidavit, sales receipts, photographs, product possession, invoices, employment, construction records, hospital records, or similar records, or by other credible evidence, sufficient to establish a 10-year latency period from date of first exposure to asbestos to onset of disease.

**(ii)      Credibility of Medical Evidence.**  Before making any payment to a claimant, the Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards. Diagnosis by a physician competent to make a diagnosis of Mesothelioma shall be sufficient medical evidence.

In addition, claimants who otherwise meet the requirements of these TDP for payment of a Talc Personal Injury Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Trust in any Individual Review Process proceeding conducted pursuant to Section 5.2(b) or any Exigent Claim proceeding conducted pursuant to Section 5.3(a). The Trust may take any action it deems appropriate to protect the interests of the Trust in response to the submission of Medical Evidence it deems unreliable.

      **(b)**   **Ovarian Cancer Medical Evidence.**

         **(i)**     **In General.** All diagnoses of Ovarian Cancer shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to Imerys Talc or an Imerys Talc-containing product and the diagnosis, or (ii) a history of the claimant's Debtor Exposure, which may be by affidavit, sales receipts, photographs, product possession, invoices, hospital records or similar records, or by other credible evidence, sufficient to establish a 10-year latency period.

         **(ii)**     **Credibility of Medical Evidence.** Before making any payment to a claimant, the Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical and scientific standards. The Trust may require the submission of pathology reports, laboratory tests, surgical reports, hospitalization records, results of medical examinations or reviews of other medical evidence. Medical evidence that is proof of diagnosis, subtype, and stages of epithelial ovarian cancer, fallopian tube cancer, or primary peritoneal cancer by a gynecologic oncologist, medical

oncologist, or pathologist, is presumptively reliable, although the Trust may seek to rebut the presumption.

In addition, claimants who otherwise meet the requirements of these TDP for payment of a Talc Personal Injury Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Trust in any Individual Review Process proceeding conducted pursuant to Section 5.2(b) or any Exigent Claim proceeding conducted pursuant to Section 5.3(a). The Trust may take any action it deems appropriate to protect the interests of the Trust in response to the submission of Medical Evidence it deems unreliable.

(c)    **Exposure Evidence.**  To receive compensation from the Trust, a claim must demonstrate Debtor Exposure. Claims based on conspiracy theories that involve no exposure to talc or talc-containing products sold, distributed, marketed, handled, processed or manufactured by the Debtors are not compensable under these TDP.  To meet the presumptive exposure requirements of the Expedited Review Process, the holder of a claim for Ovarian Cancer A-D must also establish Personal Use Exposure in addition to Debtor Exposure.  To meet the presumptive exposure requirements of the Expedited Review Process, the holder of a Mesothelioma Claim must establish Regular and Routine Exposure in addition to Debtor Exposure.   Credible exposure evidence may be established by an affidavit or sworn statement based on personal knowledge or by other credible evidence. The Trust may, but is not required to, ask for the submission of other or additional evidence of exposure when it deems such to be necessary.

Evidence submitted to establish proof of exposure is for the sole benefit of the Trust, not third parties or defendants in the tort system. The Trust has no need for, and therefore claimants are not required to furnish the Trust with, evidence of exposure to specific products other than those for which the Debtors have legal responsibility, except to the extent such evidence is required elsewhere in these TDP.  Similarly, failure to identify Debtor Exposure in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the Trust, provided that the claimant satisfies the medical and exposure requirements of these TDP.

**5.6**    **Claims Audit Program**.  The Trust, with the consent of the TAC and the FCR, shall develop a Claims Audit Program.  Such Claims Audit Program shall include methods for auditing the reliability of medical evidence, as well as the reliability of evidence of exposure to talc or talc-containing products for which the Trust has legal responsibility.  The Trust shall utilize the services of a third-party claims processing facility (the "**Claims Processor**") to assist in the evaluation of claims submitted to the Trust and shall participate in a Cross-Trust Audit Program.  The filing of any claim with the Trust, regardless of the treatment sought, shall constitute consent for each other trust participating in the Cross-Trust Audit Program to release to the entity overseeing the Cross-Trust Audit Program (the "**Auditor**") all information submitted to such other trusts by or on behalf of the claimant pursuant to the provisions of the Cross-Trust Audit Program and to disclose the status of any such claim and the amount and date of any payment on the claim to the Auditor.

To the extent that the Trustees believe that it is relevant, nothing herein shall preclude the Trust or its Auditor, in the Trustees' sole discretion, from reviewing or taking into consideration filed state court complaints or other claims filed against other mass tort trusts.  Any claimant

subject to the Claims Audit Program shall cooperate and, provide the Trust with non-privileged information reasonably requested by the Trust and, if requested by the Trustees, authorization to obtain from other mass tort trusts any information such claimant has submitted to such other trusts.

In the event that an audit reveals that fraudulent information has been provided to the Trust, the Trust may penalize any claimant or claimant's attorney by rejecting the Talc Personal Injury Claim or by other means including, but not limited to, requiring the source of such fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' Talc Personal Injury Claims and any other appropriate action or sanction.

> **5.7**     **Arbitration**.

>> **(a)**    **Establishment of ADR Procedures**.  The Trust, with the consent of the TAC and the FCR, shall develop and adopt ADR Procedures, which shall provide for binding or non-binding arbitration to resolve disputes concerning (a) the valuation of a claim by the Trust, (b) whether the Trust's determination that a claim would not receive an offer was proper, or (c) whether the claimant's medical condition or exposure history meets the requirements of these TDP for purposes of categorizing a claim.  In addition, disputes over the validity of an Indirect Talc Personal Injury Claim shall be eligible for ADR.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 5.5 above. In an arbitration involving any such claim, the Trust shall not offer into evidence or describe any model or assert that any information generated by the model has any evidentiary relevance or should be used by the arbitrator in determining the presumed correct liquidated value in the arbitration. The underlying data that

was used to create the model may be relevant and may be made available to the arbitrator but only if provided to the claimant or his or her counsel ten days prior to the arbitration proceeding. The claimant and his or her counsel may use the data that is provided by the Trust in the arbitration and shall agree to otherwise maintain the confidentiality of such information. Any disputes regarding confidentiality shall be resolved by the arbitrator.

With respect to all claims eligible for arbitration, the claimant shall elect either non-binding or binding arbitration.  The Trust will consent to the type of ADR elected by the claimant.  The ADR Procedures may be modified by the Trust with the consent of the TAC and the FCR.

**(b)**    **Claims Eligible for Arbitration**.  To be eligible for arbitration on the question of the appropriate liquidated value to be assigned to a claim, the Talc Personal Injury Claimant must first complete the Individual Review Process set forth in Section 5.2(b) above with respect to the disputed issue. The Individual Review Process shall be treated as completed for these purposes after the Trust has made an offer on the claim (or declined to make an offer on the claim) and the claimant has rejected the liquidated value resulting from the Individual Review Process in writing (or been notified that the Trust declined to make an offer).

**(c)**    **Limitations on and Payment of Arbitration Awards**.  A claimant who submits to binding arbitration will receive payments in the same manner as one who accepts the Trust's original valuation of the claim. If a claimant elects non-binding arbitration and both the claimant and the Trust agree to be bound by the award therein, then the claimant will receive payments in the same manner as one who accepts the Trust's original valuation of the claim.

**5.8**    **Litigation**.  Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the Trust in the

Claimant's Jurisdiction as defined in Section 5.2(b)(vi) above. Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. All defenses (including, with respect to the Trust, all defenses which could have been asserted by any Protected Party) shall be available to both sides at trial; however, the Trust may waive any defense and/or concede any issue of fact or law. If the claimant was alive at the time the initial pre-petition complaint was filed or the Trust Claim Form was filed with the Trust, the Trust shall treat the claims as a personal injury case with all personal injury damages to be considered even if the claimant died during the pendency of the litigation. A claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the Trust's available Cash only as set forth in Section 7.8 below.

**SECTION VI**

**CLAIMS MATERIALS**

**6.1    Claims Materials**.  The Trust shall prepare suitable and efficient Claims Materials, consisting of (i) a detailed Trust Claim Form (or forms); (ii) instructions each as may be prepared by the Trustees with the consent of the TAC and FCR; and (iii) a copy of these TDP for all holders of Talc Personal Injury Claims and shall provide such Claims Materials upon a written request for such materials to the Trust. In addition, a separate Trust Claim Form for Indirect Talc Personal Injury Claims shall be developed.  The Trust Claim Form shall also include a certification by the claimant or his or her Representative sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure. In developing its claim filing procedures, the Trust shall make every effort to provide claimants with the opportunity to utilize currently available technology in their discretion, including filing claims and supporting documentation over the internet and electronically. The Trust Claim Form shall be developed by

the Trust and submitted to the TAC and the FCR for approval; it may be changed by the Trustees with the consent of the TAC and the FCR.

      **6.2**        **Withdrawal or Deferral of Claims**.  A claimant may withdraw a Talc Personal Injury Claim at any time upon written notice to the Trust and file another Talc Personal Injury Claim subsequently without affecting the status of the claim for purposes of statutes of limitations or repose. All such claims filed after withdrawal shall be given a place in the FIFO Processing Queue based on the date of such subsequent filing.  A claimant may also request that the processing of his or her Talc Personal Injury Claim by the Trust be deferred for a period not to exceed three (3) years without affecting the status of the claim for statute of limitations or repose purposes, in which case the claimant shall also retain his or her original place in the applicable FIFO Processing Queue. During the period of such deferral, a sequencing adjustment on such claimant's Talc Personal Injury Claim as provided in Section 7.7 hereunder shall not accrue and payment thereof shall be deemed waived by the claimant. Except for Talc Personal Injury Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the Trust's offer is required, a claim shall be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six (6) months of the Trust's written offer of payment or of rejection of the claim. Upon written request, for good cause, the Trust may extend the withdrawal or deferral period for an additional six (6) months. During any period of deferral, a sequencing adjustment on such claimant's Talc Personal Injury Claim as provided in Section 7.7 hereunder shall not accrue and payment thereof shall be deemed waived by the claimant.

      **6.3**        **Filing Requirements and Fees**.  The Trustees shall have the discretion to determine, with the consent of the TAC and the FCR, whether a filing fee should be required for

any Talc Personal Injury Claims, and in what amount. A filing fee shall not be required for any

Talc Personal Injury Claimant who has commenced litigation against any party based on Debtor

Exposure or for any Indemnified Claimant who, in connection with submission of a Trust Claim

Form, will commence litigation in respect of an Indemnified Claim.  Any filing fee paid to the

Trust shall be reimbursed in full without application of the applicable Payment Percentage if and

when such claim is paid by the Trust.

> **6.4**      **English Language**.  All claims, claims forms, submissions and evidence

submitted to the Trust or in connection with any claim or its liquidation not in the English

language shall be accompanied by an English translation.

> **6.5**      **Confidentiality of Talc Personal Injury Claimants' Submissions**.  All

submissions to the Trust by a holder of a Talc Personal Injury Claim, including a claim form and

materials related thereto, shall be treated as made in the course of settlement discussions between

the holder and the Trust and intended by the parties to be confidential and to be protected by all

applicable state and federal privileges, including, but not limited to, those directly applicable to

settlement discussions. The Trust will preserve the confidentiality of such claimant submissions

and shall disclose the contents thereof only, with the permission of the holder, to another trust

established for the benefit of talc or asbestos personal injury claimants pursuant to Sections

105(a) and  524(g) of the Bankruptcy Code or other applicable law, or to such other persons as

authorized by the holder, or in response to a valid subpoena of such materials issued by the

Bankruptcy Court, a Delaware state court, the United States District Court for the District of

Delaware or any other court of competent jurisdiction.

> Furthermore, the Trust shall provide counsel for the holder a copy of any such subpoena

immediately upon being served; provided, however, that if a subpoena seeks records or

information pertaining to more than fifty (50) claimants, the Trust may instead provide a copy of the subpoena to counsel for the TAC and FCR and delay providing a copy of the subpoena to counsel for individual holders of Talc Personal Injury Claims until, in the Trustees' judgment, it appears likely that information or records relating to the holders may have to be produced in response to the subpoena. In such a case, the Trust shall ensure that the notice that is provided to counsel for the holders allows such counsel sufficient time to object to the production. The Trust shall on its own initiative or upon request of the claimant or claimants in question take all necessary and appropriate steps to preserve any and all privileges.

Notwithstanding anything in the foregoing to the contrary, with the consent of the TAC and the FCR, the Trust may disclose information, documents, or other materials reasonably necessary in the Trust's judgment to preserve, litigate, resolve or settle coverage, or to comply with an applicable obligation under an insurance policy, indemnity, or settlement agreement; provided, however, that the Trust shall take any and all steps reasonably feasible in its judgment to preserve the further confidentiality of such information, documents and materials, and prior to the disclosure of such information, documents or materials to a third party, the Trust shall receive from such third party a written agreement of confidentiality that (a) ensures that the information, documents and materials provided by the Trust shall be used solely by the receiving party for the purpose stated in the agreement and (b) prohibits any other use or further dissemination of the information, documents and materials by the third party.

## SECTION VII

## GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS

7.1     **Claims Processing.**  The Trust may utilize the services of a Claims Processor. All Talc Personal Injury Claims shall be resolved and, if determined to be eligible for payment, paid on an impartial, FIFO basis.

A claimant may not assert more than one Talc Personal Injury Claim hereunder. However, the holder of a Direct Talc Personal Injury Claim for Ovarian Cancer B, Ovarian Cancer C, or Ovarian Cancer D who is paid from Fund C may assert a new claim for a higher level of Ovarian Cancer or Mesothelioma that is subsequently diagnosed.  Any additional payments as to which such claimant may be entitled shall be paid from Fund A and shall be reduced by the amount paid from Fund C for any earlier-diagnosed disease and the remaining amount due shall be subject to the then applicable Payment Percentage.

Talc Personal Injury Claims shall be processed based on their place or places in the applicable FIFO Processing Queues based upon the election (Expedited Review Process or Individual Review Process) the Talc Personal Injury Claimant selects (if such election is available).  The Trust shall take all reasonable steps to resolve Talc Personal Injury Claims as efficiently and expeditiously as possible at each stage of claims processing, including mediation and arbitration, which steps may include, in the Trust's sole discretion, conducting settlement discussions with Representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the applicable FIFO Processing Queues are maintained, and each claim is individually evaluated pursuant to the valuation factors set forth in Section 5.2(b)(vi) herein. Except as set forth herein, the Trust shall also make every effort to issue offers each year to at least that number of Talc Personal Injury Claims required to exhaust the applicable Maximum Annual Payment for each Fund.

The Trustees shall use their reasonable best efforts to ensure that the Trust processes claims such that over time the combination of settlements at the Scheduled Values (if applicable) and those resulting from the Individual Review Process should generally result in the applicable Average Values set forth in Section 5.2(b)(vii).

Nothing herein shall prevent the Trust from settling multiple claims at one time.

**7.2**      **Acceptance and Release.** A claimant may accept an offer of payment from the Trust by completing the applicable acceptance and release form to be adopted by the Trust with the consent of the TAC and FCR (the "**Acceptance and Release**"). The Acceptance and Release form provided to holders of Non-Indemnified Claims and Trust Election Claimants shall include a release of all Protected Parties. The Acceptance and Release form provided to Tort System Election Claimants will explicitly provide that such claimant is not releasing the Debtors but is solely releasing the Trust's liability in respect of other Protected Parties and will provide that such claimant's right to pursue Indemnified Claims against the Debtors in the tort system is preserved and unaffected as a result of any payment from the Trust. The applicable Acceptance and Release shall be available for completion electronically and may be executed by the claimant or the Representative through DocuSign or a similar authorized electronic signature program, or such other simplified and expedient means as the Trust, with the consent of the TAC and FCR, may adopt.

**7.3**      **Claims Disputes.** All unresolved disputes regarding a claimant's medical condition, exposure history and/or the liquidated value of the claim may be subject to informal mediation and then, at the election of the claimant, to binding or non-binding arbitration as set forth in Section 5.7 herein under the ADR Procedures to be adopted by the Trust with the consent of the TAC and FCR. Talc Personal Injury Claims that are the subject of a dispute with the Trust that are not resolved by arbitration may enter the tort system solely as provided in Sections 5.8.

**7.4**      **Costs Considered.** Notwithstanding any provisions of these TDP to the contrary, the Trustees shall always provide appropriate consideration to the cost of ensuring that

payment of valid Talc Personal Injury Claims is not further impaired by costs incurred related to the Trust's investigation of the validity of the medical and exposure evidence supporting any claim for Ovarian Cancer or Mesothelioma. Nothing herein shall prevent the Trustees, in appropriate circumstances, from contesting the validity of any claim against the Trust whatever the costs or declining to accept medical evidence from sources that the Trustees have determined to be unreliable pursuant to the Claims Audit Program described in Section 5.6 above.

**7.5      Discretion to Vary the Order and Amounts of Payments in the Event of Limited Liquidity**.  Consistent with the provisions hereof and subject to the FIFO Processing and Payment Queue and the applicable Maximum Annual Payments set forth above, the Trustees shall proceed as quickly as possible to liquidate valid Talc Personal Injury Claims and shall make payments to holders of such claims in accordance with these TDP promptly as funds become available and as claims are liquidated, while maintaining sufficient resources to pay future valid claims in substantially the same manner.

Because the Trust's assets and liabilities over time remain uncertain, and decisions about payments must be based on estimates that cannot be made precisely, such decisions may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants. However, the Trustees shall use their best efforts to treat similar claims in substantially the same manner, consistent with their duties as Trustees, the purposes of the Trust, and the practical limitations imposed by the inability to predict the future with precision.

In the event that the Trust faces issues with respect to liquidity, the Trustees may, with the consent of the TAC and the FCR, (a) suspend the normal order of payment, or (b) temporarily limit or suspend payments altogether.

**7.6**        **Punitive Damages**.  Except to the extent that punitive damages are the sole recovery provided under applicable law, in determining the value of any liquidated or unliquidated Talc Personal Injury Claim, punitive or exemplary damages (*i.e.*, damages other than compensatory damages) shall not be considered or allowed, notwithstanding their availability in the tort system. Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the Trust in the tort system pursuant to Sections 5.8 herein.

For the avoidance of doubt, this Section 7.5 shall not affect in any way any claimant's or the Trust's ability to recover from any entity other than the Trust or the Protected Parties, including, by way of example and not limitation, J&J.

**7.7**        **Sequencing Adjustments**.

(a)    **General**. Subject to the limitations set forth below, a sequencing adjustment shall be paid on all Talc Personal Injury Claims with respect to which the claimant has had to wait a year or more for payment, provided, however, that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years, for the period when the claim was deferred or withdrawn at the claimant's request, or during any period where the Trust's provision of payment to a claimant is delayed as the result of the claimant's failure to provide the Trust with additional information as requested  on an unliquidated Talc Personal Injury Claim. The sequencing adjustment factor shall be equal to the federal funds rate per annum for each of the first five (5) years after the Effective Date; thereafter, the Trust shall have the discretion to change the annual sequencing adjustment factor with the consent of the TAC and the FCR.

(b)    **Unliquidated Talc Personal Injury Claims**. A sequencing adjustment shall be payable on the Scheduled Value of any unliquidated Talc Personal Injury Claim

whether the claim is liquidated under Expedited Review Process, Individual Review Process, or by arbitration. No sequencing adjustment shall be available to or paid on any claim liquidated in the tort system pursuant to Section 5.8 above herein.  Sequencing adjustments on all such unliquidated claims shall be measured from the date of payment back to the date that is one (1) year after the date on which the claim was placed in the FIFO Payment Queue, subject to the limitation that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years.  Notwithstanding the provisions hereof, a sequencing adjustment shall not accrue during any period where the Trust's provision of payment to a claimant is delayed as the result of the claimant's failure to provide the Trust with information necessary to process a Talc Personal Injury Claim.

**7.8**    **Payment of Judgments for Money Damages**.  This section does not apply to Indemnified Claims pursued in the tort system pursuant to Section 2.3(a)(ii) hereof. If and when a claimant who elected non-binding arbitration and rejected the arbitral award subsequently obtains a judgment in the tort system, the claim shall be placed in the applicable FIFO Payment Queue based on the date on which the judgment became final. Thereafter, the claimant shall receive from the Trust an initial payment (subject to the applicable Payment Percentage and the applicable Maximum Annual Payment) of an amount equal to the greater of (i) the Trust's last offer to the claimant, or (ii) the award that the claimant declined in non-binding arbitration; provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system. The claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage, Maximum Value, and the

applicable Maximum Annual Payment, if applicable, in effect on the date of the payment of the subject installment).

The total amounts paid with respect to such claims shall not exceed the relevant Maximum Values for such Disease Levels as set forth in Section 5.2(a)(iii) above, subject to the applicable Payment Percentage. Under no circumstances shall (a) sequencing adjustments be paid pursuant to Section 7.7, or (b) interest be paid under any statute on any judgments obtained in the tort system.

**7.9**        **Third-Party Services**.  Nothing in these TDP shall preclude the Trust from contracting with another claims resolution organization to provide services to the Trust so long as decisions about the categorization and liquidated value of Talc Personal Injury Claims are based on the relevant provisions of these TDP, including the Disease Levels, Scheduled Values, Average Values, Maximum Values, and Medical/Exposure Criteria set forth above.

**7.10**        **Trust Disclosure of Information**.  Periodically, but not less often than once a year, the Trust shall make available to claimants and other interested parties, the number of claims by each disease that have been resolved both by the Individual Review Process and by arbitration as well as by litigation in the tort system indicating the amounts of the awards and the averages of the awards by jurisdiction.

## SECTION VIII

## MISCELLANEOUS

**8.1**        **Non-Binding Effect of Trust and/or Litigation Outcome.**  Notwithstanding any other provision of these TDP, a decision by the Trust to pay or not to pay any claim shall not be used in, be admissible as evidence in, binding in, or have any *res judicata*, collateral estoppel, or other preclusive effect in any lawsuit or other proceeding against J&J or any other entity other than the Trust.  Notwithstanding any other provision of these TDP, the outcome of litigation

against the Debtors by the holder of an Indemnified Claim shall not be used in, be admissible as evidence in, binding in or have any other preclusive effect in connection with the Trust's resolution or valuation of an Indemnified Claim.

8.2     **Independence of the Trust.**  Neither J&J nor any of its Affiliates shall have any rights or involvement whatsoever in the Trust, including without limitation its management or operation, or in connection with this TDP.  Neither J&J nor any of its Affiliates are a third-party beneficiary of the Trust or these TDP, and nothing herein creates any rights or obligations that may give rise to a claim or cause of action by J&J or any of its Affiliates against the Trust or any claimant.

8.3     **Amendments**.  Except as otherwise provided herein, the Trustees may not amend, modify, delete, or add to any provisions of these TDP, without the written consent of the TAC and the FCR.  Nothing herein is intended to preclude the TAC or the FCR from proposing to the Trustees, in writing, amendments to these TDP.  For the avoidance of doubt, these TDP may not be amended to alter the allocation of the assets of the Trust between or among Funds.

8.4     **Severability**.  Should any provision contained in these TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these TDP. Should any provision contained in these TDP be determined to be inconsistent with or contrary to Debtors' obligations to any insurance company providing insurance coverage to the Debtors in respect of claims for personal injury based on exposure to talc and/or a talc-containing product, or to conduct that exposed the claimant to talc and/or a talc product, for which the Debtors have legal responsibility or products containing talc for which the Debtors have legal responsibility, the Trustees, with the consent of the TAC and the FCR, may amend these TDP and/or the Trust Agreement to make the

provisions of either or both documents consistent with the duties and obligations of the Debtors to said insurance company.

**8.5**     **Governing Law**.  Except for purposes of determining the liquidated value of any Talc Personal Injury Claim, administration of these TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware. The law governing the liquidation of Talc Personal Injury Claims in the case of the Individual Review Process, mediation, arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in Section 5.2(b)(vi) above.

**8.6**     **Administration with Other Comparable Trusts**.  In order to efficiently administer the Talc Personal Injury Trust Assets, the Trustees may determine, with the consent of the TAC and the FCR, to provide for the administration of the Talc Personal Injury Trust Assets and/or these TDP by or in conjunction with another trust or trusts established under Sections 105 and/or 524(g) of the Bankruptcy Code, provided, however, that appropriate accounting, trust, confidentiality, or other procedures shall be adopted and followed to ensure that the Talc  Personal Injury Assets are maintained separate and segregated from any other trust's assets or res and the Trust's value can be separately ascertained at all appropriate times, and all claimant information is maintained on a confidential basis.

# EXHIBIT B

**Talc Personal Injury Trust Agreement**

**IVORY AMERICA PERSONAL INJURY TRUST AGREEMENT**

## TABLE OF CONTENTS

**Page**

ARTICLE I        AGREEMENT OF TRUST ........................................................................ 3

    1.1    Creation and Name ................................................................................ 3

    1.2    Purpose ..................................................................................................... 3

    1.3    Transfer of Assets ................................................................................. 3

    1.4    Acceptance of Assets and Assumption of Liabilities .......................... 4

ARTICLE II       POWERS AND TRUST ADMINISTRATION ........................... 5

    2.1    Powers ..................................................................................................... 5

    2.2    General Administration ......................................................................... 9

    2.3    Claims Administration ......................................................................... 13

ARTICLE III      ACCOUNTS,  INVESTMENTS, AND PAYMENTS ................... 13

    3.1    Accounts ................................................................................................ 13

    3.2    Investments ........................................................................................... 13

    3.3    Source of Payments .............................................................................. 16

ARTICLE IV      TRUSTEES; DELAWARE TRUSTEE .......................................... 16

    4.1    Number .................................................................................................. 16

    4.2    Term of Service .................................................................................... 16

    4.3    Appointment of Successor Trustees .................................................... 17

    4.4    Liability of Trustees, Members of the TAC and the FCR .................. 18

    4.5    Compensation and Expenses of Trustees and Delaware Trustee ........ 18

    4.6    Indemnification .................................................................................... 19

    4.7    Lien ........................................................................................................ 20

    4.8    Trustees' Employment of Experts; Delaware Trustees' Employment of
         Counsel .................................................................................................. 21

    4.9    Trustees' Independence ....................................................................... 21

    4.10   Bond ...................................................................................................... 21

    4.11   Delaware Trustee ................................................................................. 22

    4.12   Medicare Reporting Obligations ......................................................... 24

ARTICLE V       TRUST ADVISORY COMMITTEE .............................................. 24

    5.1    Members ................................................................................................ 24

    5.2    Duties .................................................................................................... 25

20877240v15

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 5.3 | Term of Office | 25 |
| 5.4 | Appointment of Successor | 26 |
| 5.5 | TAC's Employment of Professionals | 27 |
| 5.6 | Compensation and Expenses of the TAC | 28 |
| 5.7 | Procedures for Consultation with and Obtaining the Consent of the TAC | 29 |
| ARTICLE VI | THE FCR | 31 |
| 6.1 | Duties | 31 |
| 6.2 | Term of Office | 32 |
| 6.3 | Appointment of Successor | 32 |
| 6.4 | FCR's Employment of Professionals | 33 |
| 6.5 | Compensation and Expenses of the FCR | 34 |
| 6.6 | Procedures for Consultation with and Obtaining the Consent of the FCR | 34 |
| ARTICLE VII | GENERAL PROVISIONS | 36 |
| 7.1 | Irrevocability | 36 |
| 7.2 | Term; Termination | 36 |
| 7.3 | Amendments | 38 |
| 7.4 | Meetings | 39 |
| 7.5 | Severability | 39 |
| 7.6 | Notices | 39 |
| 7.7 | Successors and Assigns | 41 |
| 7.8 | Limitation on Claim Interests for Securities Laws Purposes | 41 |
| 7.9 | Entire Agreement; No Waiver | 41 |
| 7.10 | Headings | 42 |
| 7.11 | Governing Law | 42 |
| 7.12 | Settlors' Representative and Cooperation | 43 |
| 7.13 | Dispute Resolution | 43 |
| 7.14 | Enforcement and Administration | 44 |
| 7.15 | Effectiveness | 44 |
| 7.16 | Counterpart Signatures | 44 |

## IVORY AMERICA PERSONAL INJURY TRUST AGREEMENT

This Ivory America Personal Injury Trust Agreement (this **"Trust Agreement"**), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into pursuant to the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code [Docket No. _____] (as may be further amended or modified, the **"Plan"**),[1] by Imerys Talc America, Inc. and its Debtor affiliates (referred to as the **"Debtors"**)[2], the debtors and debtors-in-possession whose Chapter 11 Cases are administered under Case No. 19-10289 (LSS) in the United States Bankruptcy Court for the District of Delaware (**"Bankruptcy Court"**); the Tort Claimants' Committee (**"TCC"**); the Legal Representative of Future Claimants (the **"FCR"**); [_____] (the **"Delaware Trustee"**); the Trustees identified on the signature pages hereof (the **"Trustees"**); and the members of the Talc Trust Advisory Committee identified on the signature pages hereof (the **"TAC"** and, together with the Debtors, the TCC, the FCR, the Delaware Trustee, and the Trustees, the **"Parties"**);

**WHEREAS,** the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code in the cases filed in the Bankruptcy Court jointly administered and known as *In re: Imerys Talc America, Inc., et al.,* Case No. 19-10289 (LSS); and

**WHEREAS,** the Confirmation Order has been entered by the Bankruptcy Court and the Affirmation Order entered by the District Court; and

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference.  All capitalized terms not defined herein or in the Plan, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Bankruptcy Rules, and such definitions are incorporated herein by reference.

[2] To the extent Imerys Talc Italy S.p.A. ("**ITI**") seeks protection pursuant to the terms of the Bankruptcy Code in the Bankruptcy Court, the defined term Debtors shall include ITI.

**WHEREAS,** the Plan provides, *inter alia,* for the creation of the Ivory America Personal Injury Trust (the **"Talc Personal Injury Trust"** or the **"Talc Trust"**); and

**WHEREAS,** pursuant to the Plan, the Talc Trust is to use its assets and income to resolve all Talc Personal Injury Claims (**"Talc Claims"**); and

**WHEREAS,** it is the intent of the TCC, the Debtors, the FCR, the Trustees, and the TAC that the Talc Trust will value, and be in a financial position to pay, Talc Claims that involve similar claims in substantially the same manner and in accordance with the terms of this Trust Agreement and the Trust Distribution Procedures (the **"TDP"**) attached to the Plan as Exhibit A; and

**WHEREAS,** all rights of the holders of Talc Claims arising under this Trust Agreement and the TDP shall vest upon the Effective Date; and

**WHEREAS,** pursuant to the Plan, the Talc Trust is intended to qualify as a "qualified settlement fund" (a **"Qualified Settlement Fund"**) within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the **"QSF Regulations"**); and

**WHEREAS,** the Bankruptcy Court has determined that the Talc Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to sections 524(g) and 105(a) of the Bankruptcy Code with respect to any and all Talc Claims, and such injunction has been entered in connection with the Confirmation Order;

**NOW, THEREFORE,** it is hereby agreed as follows:

## ARTICLE I

## AGREEMENT OF TRUST

1.1    **Creation and Name.**  The Debtors as settlors (**"Settlors"**) hereby create a trust known as the "Imerys America Personal Injury Trust," which is the Talc Trust provided for and

-2-

referred to in the Plan.  The Trustees of the Talc Trust may transact the business and affairs of the Talc Trust in the name of the Talc Trust, and references herein to the Talc Trust shall include the Trustees acting on behalf of the Talc Trust.  It is the intention of the Parties that the Talc Trust constitutes a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 *et seq.* (the **"Act"**) and that this document constitute the governing instrument of the Talc Trust.  The Trustees and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as Exhibit 1.

1.2    **Purpose.**  The purpose of the Talc Trust is to assume all liabilities and responsibility for all Talc Claims and, among other things, to: (a) direct the processing, liquidation, and payment of all Talc Claims in accordance with the Plan, the TDP, and the Confirmation Order; (b) preserve, hold, manage, and maximize the assets of the Talc Trust for use in paying and resolving Talc Claims; and (c) qualify at all times as a Qualified Settlement Fund.  The Talc Trust is to use the Talc Trust's assets and income to pay the holders of all Talc Claims in accordance with this Trust Agreement and the TDP in such a way that such holders of Talc Claims are treated fairly, equitably, and reasonably in light of the assets available to resolve such claims, and to otherwise comply in all respects with the requirements of a trust set forth in section 524(g)(2)(B) of the Bankruptcy Code.

1.3    **Transfer of Assets.**  Pursuant to, and in accordance with Article IV of the Plan, the Talc Trust has received the Talc Personal Injury Trust Assets to fund the Talc Trust and settle or discharge all Talc Claims.  In all events, the Talc Personal Injury Trust Assets or any other assets to be transferred to the Talc Trust under the Plan will be transferred to the Talc Trust free and clear of any liens or other claims by the Debtors, the Reorganized Debtors, the other

-3-

Protected Parties, any creditor, or other entity except as otherwise provided in the Plan. Article IV, Section 4.6 of the Plan provides for the Debtors and the Reorganized Debtors, among others, to execute and deliver such documents to the Talc Trust as the Trustees may request to effectuate the transfer and assignment of any Talc Personal Injury Trust Assets to the Talc Trust.

   **1.4**  <u>**Acceptance of Assets and Assumption of Liabilities**</u>.

    (a)  In furtherance of the purposes of the Talc Trust, the Talc Trust hereby expressly accepts the transfer to the Talc Trust of the Talc Personal Injury Trust Assets or any other transfers contemplated by the Plan in the time and manner as, and subject to the terms, contemplated in the Plan.

    (b)  In furtherance of the purposes of the Talc Trust, the Talc Trust expressly assumes all liabilities and responsibility for all Talc Claims (except as set forth in the Plan) and the indemnification obligations in Section 4.12 of the Plan in substitution for the financial or other responsibility or liability of the Reorganized Debtors therefor and neither the Reorganized Debtors nor any of the Protected Parties shall have any further financial or other responsibility or liability therefor except as explicitly set forth in the Plan. Except as otherwise provided in this Trust Agreement and the TDP, the Talc Trust shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding such claims that the Debtors or the Reorganized Debtors have or would have had under applicable law. Regardless of the foregoing, however, a claimant must meet otherwise applicable federal and state statutes of limitations and repose, except as otherwise provided in Section 5.1(a)(ii) of the TDP.

20877240v15

(c)      Notwithstanding anything to the contrary herein, no provision herein or in the TDP shall be construed or implemented in a manner that would cause the Talc Trust to fail to qualify as a Qualified Settlement Fund under the QSF Regulations.

(d)      Nothing in this Trust Agreement shall be construed in any way to limit (i) the scope, enforceability, or effectiveness of the Injunctions or (ii) the Talc Trust's assumption of liability for all Talc Claims subject to the provisions of Section 1.4(b) above and the Plan.

(e)      In this Trust Agreement and the TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(f)      To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the Talc Trust (the **"Beneficial Owners"**) shall be deemed to be the holders of Talc Claims; provided that (i) the holders of Talc Claims, as such Beneficial Owners, shall have only such rights with respect to the Talc Trust and its assets as are set forth in the TDP and (ii) no greater or other rights, including upon dissolution, liquidation, or winding up of the Talc Trust, shall be deemed to apply to the holders of Talc Claims in their capacity as Beneficial Owners.

## ARTICLE II

## POWERS AND TRUST ADMINISTRATION

**2.1    Powers.**

(a)      The Trustees are and shall act as fiduciaries to the Talc Trust in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order. The Trustees shall, at all times, administer the Talc Trust and the Talc Personal Injury Trust Assets in accordance with the purposes set forth in Section 1.2 above.  Subject to the limitations

-5-

set forth in this Trust Agreement, the Trustees shall have the power to take any and all actions that, in the judgment of the Trustees, are necessary or proper to fulfill the purposes of the Talc Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)     Except as required by applicable law or otherwise specified herein, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)     Without limiting the generality of Section 2.1(a) above, and except as limited below or by the Plan, the Trustees shall have the power to:

(i)     receive and hold the Talc Personal Injury Trust Assets and exercise all rights with respect thereto, including the right to vote and sell any securities that are included in the Talc Personal Injury Trust Assets;

(ii)     invest the monies held from time to time by the Talc Trust;

(iii)     enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the Talc Trust to operate;

(iv)     pay liabilities and expenses of the Talc Trust including the indemnification obligations set forth in section 4.12 of the Plan;

(v)     establish such funds, reserves, and accounts within the Talc Trust estate, the Trustees deem useful in carrying out the purposes of the Talc Trust;

(vi)     sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding;

-6-

(vii)    establish, supervise, and administer the Talc Trust in accordance with this Trust Agreement and the TDP and the terms thereof;

(viii)    appoint such officers, hire such employees, engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the Talc Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of the Talc Trust;

(ix)    pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents (including those engaged by the Talc Trust in connection with its alternative dispute resolution activities);

(x)    as provided below, (a) compensate the Trustees, the Delaware Trustee, and the FCR, and the employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents of each of them, and (b) reimburse the Trustees, the Delaware Trustee, and the FCR for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xi)    execute and deliver such instruments as the Trustees deem proper in administering the Talc Trust;

(xii)    enter into such other arrangements with third parties as the Trustees deem useful in carrying out the purposes of the Talc Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement;

(xiii)    in accordance with Sections 4.4 and 4.6 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) (A) the Trustees, (B) the Delaware

-7-

Trustee, (C) the TAC and its members, (D) the FCR, and (E) the officers, employees, consultants, advisors, and agents of each of the Talc Trust, the TAC, and the FCR (each of those in (E) herein, the **"Additional Indemnitees"**), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives.  No party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.4 below;

(xiv)    consult with the TAC and the FCR at such times and with respect to such issues relating to the purpose, conduct, and affairs of the Talc Trust as the Trustees consider desirable;

(xv)    make, pursue (by litigation or otherwise), collect, compromise, or settle, in the name of the Talc Trust, any claim, right, action, or cause of action included in the Talc Personal Injury Trust Assets or which may otherwise hereafter accrue in favor of the Talc Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction; and

(xvi)    exercise any and all other rights, and take any and all other actions as are permitted, of the Trustees in accordance with the terms of this Trust Agreement.

(d)    The Trustees shall not have the power to guarantee any debt of other persons.

(e)    The Trustees agree to take the actions of the Talc Trust required hereunder.

(f)     The Trustees shall give the TAC and the FCR prompt notice of any act performed or taken pursuant to Sections 2.1(c)(i) or (vi) above, and any act proposed to be performed or taken pursuant to Section 2.2(f) below.

**2.2     General Administration.**

(a)     The Trustees shall act in accordance with this Trust Agreement, the Plan, the Confirmation Order and the TDP.  In the event of a conflict between the terms of this Trust Agreement and the TDP, the terms of this Trust Agreement shall control.  In the event of a conflict between the terms or provisions of the (i) Plan and (ii) this Trust Agreement or the TDP, the terms of the Plan shall control.

(b)     The Trustees shall (i) timely file such income tax and other returns and statements required to be filed and shall timely pay all taxes required to be paid by the Talc Trust, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the Talc Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations, and (iv) take no action that could cause the Talc Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.

(c)     The Trustees shall timely account to the Bankruptcy Court as follows:

(i)     The Trustees shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual report (the **"Annual Report"**) containing financial statements of the Talc Trust (including, without limitation, a balance sheet of the Talc Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent certified public accountants selected by the Trustees and accompanied

-9-

by an opinion of such firm as to the fairness of the financial statements' presentation of the cash and investments available for the payment of claims. The Trustees shall provide a copy of such Annual Report to the TAC and the FCR when such reports are filed with the Bankruptcy Court.

(ii)     Simultaneously with the filing of the Annual Report, the Trustees shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of claims resolved during the period covered by the financial statements. The Trustees shall provide a copy of such report to the TAC and the FCR when such report is filed.

(iii)     All materials required to be filed with the Bankruptcy Court by this Section 2.2(c) shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court and shall be filed with the Office of the United States Trustee for Region Three (the **"UST"**).

(d)     The Trustees shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The budget and cash flow projections shall include a determination of the Maximum Annual Payment pursuant to Section 2.9 of the TDP. The Trustees shall provide a copy of the budget and cash flow projections to the TAC and the FCR.

(e)     The Trustees shall consult with the TAC and the FCR on (i) the general implementation and administration of the Talc Trust; (ii) the general implementation and administration of the TDP; and (iii) such other matters as may be required under this Trust Agreement or the TDP.

20877240v15

(f)     The Trustees shall be required to obtain the consent of the TAC and the FCR pursuant to the consent process set forth in Section 7.1(b) below, in addition to any other instances elsewhere enumerated, in order:

(i)     to reduce the number of Trustees as provided in Section 4.1 below;

(ii)     to determine, establish, or change the Payment Percentage described in Section 2.8 of the TDP as provided in Section 4.2 of the TDP;

(iii)     to change the Scheduled Values and/or Medical/Exposure Criteria set forth in Section 5.3(a)(iii) of the TDP;

(iv)     to establish and/or to change the Claims Materials to be provided to holders of Talc Claims under Section 6.1 of the TDP;

(v)     to require that claimants provide additional kinds of medical evidence pursuant to Section 6.1 of the TDP;

(vi)     to change the form of Acceptance and Release to be provided pursuant to Section 7.2 of the TDP;

(vii)     to terminate the Talc Trust pursuant to Section 7.3 below;

(viii)     to settle the liability of any insurer under any insurance policy or legal action related thereto;

(ix)     to change the compensation and/or expense reimbursement limitations of the members of the TAC, the FCR, the Delaware Trustee, or the Trustees, other than to reflect cost-of-living increases or to reflect changes approved by the Bankruptcy Court as otherwise provided herein;

(x)     to take actions to minimize any tax on the Talc Personal Injury Trust Assets, provided that no such action may be taken if it prevents the Talc Trust from

-11-

qualifying as a Qualified Settlement Fund within the meaning of the QSF Regulations or requires an election for the Talc Trust to be treated as a grantor trust for tax purposes;

(xi)      to amend any provision of this Trust Agreement or the TDP in accordance with the terms thereof; provided that no such amendment shall be in contravention of the Plan;

(xii)      to acquire an interest in, or to merge any claims resolution organization formed by the Talc Trust with, another claims resolution organization that is not specifically created by this Trust Agreement or the TDP, or to contract with another claims resolution organization or other entity that is not specifically created by this Trust Agreement or the TDP, or permit any other party to join in any claims resolution organization that is formed by the Talc Trust pursuant to this Trust Agreement or the TDP; provided that such acquisition, merger, contract, or joinder shall not (a) subject the Reorganized Debtors, or any successors in interest thereto, or the Protected Parties to any risk of having any Talc Claim asserted against it or them, or (b) otherwise jeopardize the validity or enforceability of the Injunctions or any other injunction or release issued or granted in connection with the Plan and/or the Confirmation Order, (c) permit the surviving organization to make decisions about the allowability and value of claims that are not in accordance with the TDP, or (d) cause the Talc Trust to fail to qualify as a Qualified Settlement Fund under the QSF Regulations;

(xiii)    if and to the extent required by Section 6.5 of the TDP, to disclose any information, documents, or other materials to preserve, litigate, resolve, or settle coverage, or to comply with an applicable obligation under an insurance policy or settlement agreement pursuant to Section 6.5 of the TDP;

(xiv)    sell, transfer, or exchange any or all of the Talc Personal Injury Trust Assets at such prices and upon such terms as the Trustees may consider proper, consistent with the other terms of this Trust Agreement;

(xv)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Talc Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 below; or

(xvi)    to approve any release or abandonment of the J&J Indemnification Obligations.

(g)    The Trustees shall meet with the TAC and the FCR no less often than quarterly.  The Trustees shall meet in the interim with the TAC and the FCR when so requested by either.  Meetings may be held in person, by telephone conference call, or by a combination of the two.

(h)    The Trustees, upon notice from either the TAC or the FCR, if practicable in view of pending business, shall at their next meeting with the TAC or the FCR consider issues submitted by the TAC or the FCR.  The Trustees shall keep the TAC and the FCR reasonably informed regarding all aspects of the administration of the Talc Trust.

2.3    **Claims Administration.**  The Trustees shall promptly proceed to implement the TDP.

2.4    **Medicare Reporting Obligations.**

(a)        The Talc Trust shall register as a Responsible Reporting Entity (**"<u>RRE</u>"**) under the reporting provisions of section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173) (**"<u>MMSEA</u>"**).

(b)        The Talc Trust shall, at its sole expense, timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the Talc Trust or with respect to contributions to the Talc Trust.  The Talc Trust, in its role as RRE, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, **"<u>CMS</u>"**) to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(c)        Before remitting funds to claimants' counsel, or to the claimant if such claimant is acting *pro se*, in respect of any Talc Claim, the Trustees shall obtain a certification that said claimant (or such claimant's authorized representative) has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Talc Claim.

## ARTICLE III

## <u>ACCOUNTS,  INVESTMENTS, AND PAYMENTS</u>

**3.1**        <u>**Accounts.**</u>

(a)        The Trustees may, from time to time, create such accounts and reserves within the Talc Trust estate as they deem necessary, prudent, or useful in order to provide for the payment of expenses and payment of Talc Claims and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereto.

-14-

(b)     The Trustees shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account, and the payments from each such account in the reports to be filed with the Bankruptcy Court and provided to the TAC and the FCR pursuant to Section 2.2(c)(i) above.

**3.2     Investments.**  Investment of monies held in the Talc Trust shall be administered in a manner consistent with the standards set forth in the Uniform Prudent Investor Act, subject to the following limitations and provisions;

(a)     With respect to equity investments, the Talc Trust may invest only in diversified equity portfolios whose benchmark is a broad equity market index such as, but not limited to, the S&P 500 Index, Russell 1000 Index, S&P ADR Index, or MSCI EAFE Index. The Talc Trust shall not acquire, directly or indirectly, equity in any entity (other than the Reorganized Debtors or any successor to the Reorganized Debtors) or business enterprise if, immediately following such acquisition, the Talc Trust would hold more than 5% of the equity in such entity or business enterprise.  The Talc Trust shall not hold, directly or indirectly, more than 5% of the equity in any entity (other than the Reorganized Debtors, or any successor to the Reorganized Debtors) or business enterprise.

(b)     The Talc Trust shall not acquire or hold any long-term debt securities unless (i) such securities are Talc Trust Assets under the Plan, (ii) such securities are rated "Baa" or higher by Moody's, "BBB" or higher by Standard & Poor's (**"S&P"**), or have been given an equivalent investment grade rating by another nationally recognized statistical rating agency, or (iii) have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.  This restriction does not apply to any pooled

-15-

investment vehicles where pooled assets receive an investment grade rating (*i.e.*, "BBB" rating or above) by a nationally recognized rating agency.

(c)     The Talc Trust shall not acquire or hold for longer than ninety (90) days any commercial paper unless such commercial paper is rated "Prime-l" or higher by Moody's or "A-l" or higher by S&P or has been given an equivalent rating by another nationally recognized statistical rating agency.

(d)     The Talc Trust shall not acquire any debt securities or other debt instruments issued by any entity if, following such acquisition, the aggregate market value of all such debt securities and/or other debt instruments issued by such entity held by the Talc Trust would exceed 5% of the then current aggregate value of the Talc Trust's assets.  There is no limitation on holding debt securities or other debt instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.

(e)     The Talc Trust shall not acquire or hold any certificates of deposit in an amount exceeding any federal insurance on such certificates of deposit unless all publicly held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Section 3.2(b) above.

(f)     The Talc Trust may acquire and hold any securities or instruments issued by the Reorganized Debtors or any successor to the Reorganized Debtors or obtained as proceeds of litigation or otherwise to resolve disputes, without regard to the limitations set forth in Subsections (a)-(e) above.

(g)     The Talc Trust shall not acquire or hold any repurchase obligations unless, in the opinion of the Trustees, such obligations are adequately collateralized.

-16-

(h)    The Talc Trust may allow its investment managers to acquire or hold derivative instruments—including, without limitation, options, futures, and swaps—in the normal course of portfolio management to help hedge, manage, or mitigate portfolio risk, including, without limitation, interest rate risk and equity market risk.  However, using derivative instruments to speculate or to leverage a portfolio at a much greater risk to the portfolio is prohibited.

(i)    The Talc Trust may lend securities on a short-term basis, subject to adequate, normal, and customary collateral arrangements.

(j)    Notwithstanding (a) above, the Talc Trust may acquire and hold an equity interest in a claims resolution organization without limitation as to the size of the equity interest acquired and held if prior to such acquisition, the Talc Trust complies with the provisions of Section 2.2(f)(xii) hereof with respect to the acquisition.

**3.3    Source of Payments.**

(a)    All Talc Trust expenses and payments and all liabilities with respect to Talc Claims shall be payable solely by the Talc Trust out of the Talc Personal Injury Trust Assets.  Neither the Trustees, the Delaware Trustee, the TAC, the FCR, nor any of their officers, employees, consultants, advisors, and agents, nor the Debtors, the Reorganized Debtors, nor any other Protected Party, shall be liable for the payment of any Talc Trust expense or any other liability of the Talc Trust, except to the extent explicitly provided for in (i) the Plan or, (ii) solely with respect to the Trustees, the Delaware Trustee, the TAC, the FCR, and any of their officers, employees, consultants, advisors, and agents, the Plan Documents.

(b)    The Trustees shall include in the Annual Report a reasonably detailed description of any payments made in accordance with this Section 3.3

-17-

(c)    The Trustees, with the consent of the TAC and the FCR, shall establish and implement billing guidelines applicable to the Trustees, the TAC, and the FCR as well as their respective professionals who seek compensation from the Talc Trust.

## ARTICLE IV

## TRUSTEES; DELAWARE TRUSTEE

**4.1    Number.**  In addition to the Delaware Trustee appointed pursuant to Section 4.11, there shall be three (3) Trustees who shall be those persons named on the signature pages hereof. Upon the unanimous vote of the Trustees, with the consent of the TAC and the FCR, the number of Trustees may be reduced to two (2) or one (1) at such time as the Trustees see fit.

**4.2    Term of Service.**

(a)    The initial Trustees named pursuant to Section 4.1 above shall serve an initial term of service of three-, four-, or five years from the date on the signature pages hereof. Thereafter, each term of service shall be for five (5) years.  The initial Trustees shall serve from the Effective Date until the earliest of (i) the end of his or her term, (ii) his or her death, (iii) his or her mandatory retirement at the end of the year in which he or she reaches the age of 70 (unless, and for so long as, this mandatory retirement requirement is waived by the agreement of the TAC and the FCR), (iv) his or her resignation pursuant to Section 4.2(b) below, (v) his or her removal pursuant to Section 4.2(c) below, or (vi) the termination of the Talc Trust pursuant to Section 7.3 below.

(b)    A Trustee may resign at any time by written notice to the TAC and the FCR.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    A Trustee may be removed by the Bankruptcy Court on the motion of the other Trustees, the TAC or the FCR, in the event that he or she becomes unable to discharge his

-18-

or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause.  Good cause shall be deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 2.2 above, a consistent pattern of neglect and failure to perform or participate in performing the duties of a Trustee hereunder, or repeated non-attendance at scheduled meetings.  Such removal shall take effect at such time as the Bankruptcy Court shall determine.

       **4.3**       **Appointment of Successor Trustees.**

      (a)      In the event of a vacancy in a Trustee position, whether by term expiration, death, retirement, resignation, or removal, the vacancy shall be filled by the unanimous vote of the remaining Trustees, with the consent of the TAC and FCR.  In the event that the remaining Trustees cannot agree on the successor Trustee or the TAC and FCR do not consent, the Bankruptcy Court shall select the successor Trustee.

      (b)      Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers, and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act.  No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee.  No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

      (c)      Each successor Trustee shall serve until the earliest of (i) the end of the term of five (5) years for which he or she was appointed if his or her immediate predecessor Trustee completed his or her term pursuant to Section 4.2(a) above, (ii) the end of the term of the Trustee whom he or she replaced if his or her predecessor Trustee did not complete such term, (iii) his or her death, (iv) his or her mandatory retirement at the end of the year in which the Trustee reaches the age of 70 (unless, and for so long as, this mandatory retirement requirement

-19-

is waived by the agreement of the TAC and the FCR), (v) his or her resignation pursuant to Section 4.2(b) above, (vi) his or her removal pursuant to Section 4.2(c) above, or (vii) the termination of the Talc Trust pursuant to Section 7.3 below.

(d)     Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as a Trustee for one or more additional terms.

**4.4     Liability of Trustees and Others.**  The Trustees, the members of the TAC, the FCR, and each of their officers, employees, consultants, advisors, and agents shall not be liable to the Talc Trust, to any individual holding a Talc Claim, or to any other person, except for their own acts or omissions that constitute a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e).

**4.5     Compensation and Expenses of the Trustees.**

(a)     Each Trustee shall receive a retainer from the Talc Trust for his or her service as a Trustee in the amount of [$____] per annum, paid annually.  Hourly time, as described below, shall first be billed and applied to the annual retainer.  Hourly time in excess of the annual retainer shall be paid by the Talc Trust.  For all time expended as Trustees, including attending meetings, preparing for such meetings, and working on authorized special projects, the Trustees shall receive the sum of [$____] per hour.  For all non-working travel time in connection with Talc Trust business, the Trustees shall receive the sum of [$___] per hour.  All time shall be computed on a decimal (1/10th) hour basis.  The Trustees shall record all hourly time to be charged to the Talc Trust on a daily basis.  The hourly compensation payable to the Trustees hereunder shall be reviewed every year by the Trustees and, after consultation with the members of the TAC and the FCR, appropriately adjusted for changes in the cost of living.

(b)     The Talc Trust will promptly reimburse the Trustees for all reasonable out-of-pocket costs and expenses incurred by the Trustees in connection with the performance of their duties hereunder.

(c)     The Talc Trust shall include in the Annual Report a description of the amounts paid under this Section 4.5.

**4.6     Indemnification of Trustees and Others.**

(a)     The Talc Trust shall indemnify and defend the Trustees, the members of the TAC, the Delaware Trustee, and the FCR in the performance of their duties hereunder to the fullest extent that a statutory trust organized under the laws of the State of Delaware (after the application of Section 7.11) is from time to time entitled to indemnify and defend such persons against any and all liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to the Effective Date in connection with the formation, establishment, or funding of the Talc Trust.  The Talc Trust shall indemnify to the fullest extent permitted by applicable law any of the Additional Indemnitees in the performance of their duties hereunder against any and all liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to the Effective Date in connection with the formation, establishment, or funding of the Talc Trust, except for their own acts or omissions that constitute a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e).  Notwithstanding the foregoing, no individual shall be indemnified or defended in any way for any liability, expense, claim, damage, or loss for which he or she is ultimately liable under Section 4.4 above.

-21-

(b)      Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trustees, a member of the TAC, the Delaware Trustee, the FCR, or an Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from which they are indemnified by the Talc Trust pursuant to Section 4.6(a) above, shall be paid by the Talc Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trustees, the member of the TAC, the Delaware Trustee, the FCR, or the Additional Indemnitee (as applicable), to repay such amount in the event that it shall be determined ultimately by final order that the Trustees, the member of the TAC, the Delaware Trustee, the FCR, or the Additional Indemnitee (as applicable) is not entitled to be indemnified by the Talc Trust.

(c)      The Talc Trust must purchase and maintain reasonable amounts and types of insurance on behalf of each individual who is or was a Trustee, a member of the TAC, the Delaware Trustee, the FCR, or an Additional Indemnitee, including against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee, TAC member, Delaware Trustee, FCR, or Additional Indemnitee.

(d)      From and after the Effective Date, the Talc Trust shall indemnify, to the fullest extent permitted by applicable law, each of the Debtors, the Reorganized Debtors, and the other Protected Parties for reasonable documented out-of-pocket expenses (including, without limitation, attorney's fees and expenses) that occur after the Effective Date attributable to the defense of any Talc Claim asserted against the Debtors, Reorganized Debtors, or the other Protected Parties to the extent set forth in Section 4.12 of the Plan.  Nothing provided in this Trust Agreement or the TDP shall obligate the Trust to indemnify or pay any liabilities, fees, or

expenses that Johnson & Johnson and/or Johnson & Johnson Consumer Inc. is obligated to pay or indemnify.

4.7 **Lien.** The Trustees, members of the TAC, the FCR, and the Additional Indemnitees shall have a first priority lien upon the Talc Personal Injury Trust Assets to secure the payment of any amounts payable to them pursuant to Section 4.6 above or any undisputed compensation.

4.8 **Trustees' Employment of Experts.** The Trustees may, but are not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the Trustees to be qualified as experts on the matters submitted to them (the **"Trust Professionals"**) regardless of whether any such party is affiliated with any of the Trustees in any manner (except as otherwise expressly provided in this Trust Agreement). In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any such party deemed by the Trustees to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustees hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

4.9 **Trustee Independence.** The Trustees shall not, during the term of their service, hold a financial interest in, act as attorney or agent for, or serve as an officer or as any other professional for the Reorganized Debtors. Notwithstanding the foregoing, the Trustees may serve, without any additional compensation other than the compensation to be paid by the Talc Trust pursuant to Section 4.5(a) above, as a director of the Reorganized Debtors. The Trustees

shall not act as an attorney, agent, or other professional for any person who holds a Talc Claim. For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

      **4.10**   **No Bond.**  Neither the Trustees nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

      **4.11**   **Delaware Trustee.**

      (a)   There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act.  The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware in accordance with section 3807 of the Act, otherwise meets the requirements of applicable Delaware law and shall act through one or more persons authorized to bind such entity.  If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 4.11, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.11(c) below.  For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

      (b)   The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustees set forth herein.  The Delaware Trustee shall be one of the trustees of the Talc Trust for the sole and limited purpose of fulfilling the requirements of section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act.  The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the Talc Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of

-24-

Delaware that the Delaware Trustee is required to execute under section 3811 of the Act (acting solely at the written direction of the Trustees) and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Talc Trust, the other Parties hereto or any beneficiary of the Talc Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.

(c)     The Delaware Trustee shall serve until such time as the Trustees remove the Delaware Trustee or the Delaware Trustee resigns, and a successor Delaware Trustee is appointed by the Trustees in accordance with the terms of Section 4.11(d) below.  The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustees; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustees in accordance with Section 4.11(d) below.  If the Trustees do not act within such 60-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustees shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee.  Any successor Delaware Trustee must satisfy the requirements of section 3807 of the Act.  Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the

-25-

Trustees and any undisputed fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Trust Agreement.

(e)     The Delaware Trustee shall neither be required nor permitted to attend meetings relating to the Talc Trust.

(f)     The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(g)     The Talc Trust will promptly reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Delaware Trustee in connection with the performance of their duties hereunder.

(h)     The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

## ARTICLE V

## TRUST ADVISORY COMMITTEE

**5.1     Members.**  The original TAC shall consist of the eleven (11) members who were appointed to serve as members of the Tort Claimants' Committee.  To the extent that a member of the TAC elects to resign from the TAC in accordance with Section 5.3(b) below or is removed pursuant to Section 5.3(c) below, that member shall not be replaced; provided, however, that: (i) this Section 5.1 shall not prevent the appointment of a successor pursuant to Section 5.4(a); and

-26-

(ii) notwithstanding anything contained herein, the membership in the TAC shall not be less than five (5) members.

     **5.2**   **Duties.**  The members of the TAC shall serve in a fiduciary capacity, representing the interests of all holders of present Talc Claims.  The TAC shall have no fiduciary obligations or duties to any party other than the holders of present Talc Claims.  The Trustees must consult with the TAC on matters identified in Section 2.2(e) above and in other provisions herein and must obtain the consent of the TAC on matters identified in Section 2.2(f) above.  Where provided in the TDP, certain other actions by the Trustees are also subject to the consent of the TAC.  Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the TDP), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC.  To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the Talc Trust, the other Parties hereto or any beneficiary of the Talc Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in this Trust Agreement and the documents referenced herein (including the TDP, the Plan and the Confirmation Order).

     **5.3**   **Term of Office.**

     (a)    The initial members of the TAC appointed in accordance with Section 5.1 above shall serve the staggered three-, four-, or five-year terms shown on the signature pages hereof.  Thereafter, each term of office shall be five (5) years.  Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) below, (iii) his or her removal pursuant to Section 5.3(c) below, (iv) the end of his or her term as provided above, or (v) the termination of the Talc Trust pursuant to Section 7.3 below.

-27-

(b)     A member of the TAC may resign at any time by written notice to the other members of the TAC, the Trustees, and the FCR.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause.  Such removal may be made by the Bankruptcy Court on the motion of the remaining members of the TAC, the Talc Trust, or the FCR.

**5.4     Appointment of Successors.**

(a)     If, prior to the termination of service of a member of the TAC other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a member of the TAC, such individual shall be his or her successor.  If such member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service as contemplated above, such member's law firm may designate his or her successor.  If: (i) a member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service and such member's law firm does not designate his or her successor as contemplated above or (ii) a member is removed pursuant to Section 5.3(c) above, no successor will be appointed unless absent such appointment, the membership of the TAC would be reduced to a number less than five (5).  If, absent appointment of a successor, the TAC will not have of at least five (5) members, the successor shall be appointed by a majority of the remaining members of the TAC and if such members cannot agree on a successor, the

Bankruptcy Court.  Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as a member of the TAC for an additional term, and there shall be no limit on the number of terms that a TAC member may serve.

(b)        Each successor TAC member shall serve until the earlier of (i) the end of the full term for which he or she was appointed, (ii) the end of the term of the member of the TAC whom he or she replaced if his or her predecessor member did not complete such term, (iii) his or her death, (iv) his or her resignation pursuant to Section 5.3(b) above, (v) his or her removal pursuant to Section 5.3(c) above, or (vi) the termination of the Talc Trust pursuant to Section 7.3 below.

(c)        No successor TAC member shall be liable personally for any act or omission of his or her predecessor TAC member.  No successor TAC member shall have any duty to investigate the acts or omissions of his or her predecessor TAC member.  No TAC member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**5.5**        **TAC's Employment of Professionals.**

(a)        The TAC may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the TAC to be qualified as experts on the matters submitted to them (the **"TAC Professionals"**).  The TAC and the TAC Professionals shall at all times have complete access to the Talc Trust's officers, employees, and agents, as well as to the Trust Professionals, and shall also have complete access to all non-privileged information generated by them or otherwise available to the Talc Trust or the Trustees.  In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of

-29-

12 Del. C. § 3806(e), the written opinion of or information provided by any TAC Professional or Trust Professional deemed by the TAC to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by the TAC Professional or Trust Professional.

(b)     The Talc Trust shall promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel and forecasters (including estimation consultants and experts) pursuant to this provision in connection with the TAC's performance of its duties hereunder.  The Talc Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of any other TAC Professional pursuant to this provision in connection with the TAC's performance of its duties hereunder; *provided, however,* that (i) the TAC has first submitted to the Talc Trust a written request for such reimbursement setting forth (A) the reasons why the TAC desires to employ such TAC Professional, and (B) the basis upon which the TAC seeks advice independent of the Trust Professionals to meet the need of the TAC for such expertise or advice, and (ii) the Talc Trust has approved the TAC's request for reimbursement in writing, which approval must not be unreasonably withheld, delayed, or denied.  If the Talc Trust agrees to pay for the TAC Professional, such reimbursement shall be treated as a Talc Trust expense.  If the Talc Trust declines to pay for the TAC Professional, it must set forth its reasons in writing.  If the TAC still desires to employ the TAC Professional at the Talc Trust's expense, the TAC and/or the Trustees shall resolve the dispute pursuant to Section 7.13 below.

20877240v15

(c)     In the event that the TAC retains counsel in connection with any matter whether or not related to any claim that has been or might be asserted against the TAC and irrespective of whether the Talc Trust pays such counsel's fees and related expenses, any communications between the TAC and such counsel shall be deemed to be within the attorney-client privilege and protected by section 3333 of Title 12 of the Delaware Code, regardless of whether such communications are related to any claim that has been or might be asserted by or against the TAC and regardless of whether the Talc Trust pays such counsel's fees and related expenses.

5.6     **Compensation and Expenses of the TAC.**  The members of the TAC shall not: (i) receive compensation from the Talc Trust for their services as TAC members; or (ii) receive reimbursement for any out-of-pocket costs or expenses incurred in connection with the performance of such member's duties hereunder notwithstanding the reasonableness of such cost or expense.

## ARTICLE VI

## THE FCR

6.1     **Duties.**  The initial FCR shall be the individual identified on the signature pages hereof.  He or she shall serve in a fiduciary capacity, representing the interests of the holders of future Talc Claims for the purpose of protecting the rights of such persons.  The FCR shall have no fiduciary obligations or duties to any party other than holders of future Talc Claims.  The Trustees must consult with the FCR on matters identified in Section 2.2(e) above and in other provisions herein and must obtain the consent of the FCR on matters identified in Section 2.2(f) above.  Where provided in the TDP, certain other actions by the Trustees are also subject to the consent of the FCR.  Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the TDP), there shall be no other duties (including

-31-

fiduciary duties) or obligations, express or implied, at law or in equity, of the FCR.  To the extent that, at law or in equity, the FCR has duties (including fiduciary duties) and liabilities relating thereto to the Talc Trust, the other Parties hereto or any beneficiary of the Talc Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the FCR expressly set forth in this Trust Agreement and the documents referenced herein (including the TDP, the Plan and the Confirmation Order).

> **6.2**    **Term of Office**.

> > (a)    The FCR shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b) below, (iii) his or her removal pursuant to Section 6.2(c) below, or (iv) the termination of the Talc Trust pursuant to Section 7.3 below.

> > (b)    The FCR may resign at any time by written notice to the Trustees and the TAC.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

> > (c)    The FCR may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause.  Such removal may be made upon a unanimous vote of the Trustees and consent of the TAC, or by the Bankruptcy Court on the motion of the Talc Trust, or the TAC.

> **6.3**    **Appointment of Successor**.

> > (a)    A vacancy caused by resignation or death shall be filled with an individual nominated by the former FCR prior to the effective date of the resignation or death.  A vacancy caused by removal of the FCR based on inability of the FCR to discharge his or her duties due to

-32-

accident, physical deterioration, or mental incompetence shall be filled with an individual nominated by the FCR prior to the inability.  In the event a nominee has not been pre-selected, the successor shall be chosen by the Trustees in consultation with the TAC.  A vacancy caused by removal of the FCR for other reasons shall be filled by a successor selected by the Trustees in consultation with the TAC.

(b)     No successor FCR shall be liable personally for any act or omission of his or her predecessor.  No successor FCR shall have any duty to investigate the acts or omissions of his or her predecessor.  No FCR shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

### 6.4     FCR's Employment of Professionals.

(a)     The FCR may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the FCR to be qualified as experts on the matters submitted to them (the **"FCR Professionals"**).  The FCR and the FCR Professionals shall at all times have complete access to the Talc Trust's officers, employees, and agents, as well as to the Trust Professionals, and shall also have complete access to all non-privileged information generated by them or otherwise available to the Talc Trust or the Trustees.  In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any FCR Professional or Trust Professional deemed by the FCR to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the FCR in good faith and in accordance with the written opinion of or information provided by the FCR Professional or Trust Professional.

-33-

(b)      The Talc Trust shall promptly reimburse, or pay directly if so instructed, the FCR for all reasonable fees and costs associated with the FCR's employment of legal counsel and forecasters (including estimation consultants and experts) pursuant to this provision in connection with the FCR's performance of his or her duties hereunder.  The Talc Trust shall also promptly reimburse, or pay directly if so instructed, the FCR for all reasonable fees and costs associated with the FCR's employment of any other FCR Professionals pursuant to this provision in connection with the FCR's performance of his or her duties hereunder; *provided, however,* that (i) the FCR has first submitted to the Talc Trust a written request for such reimbursement setting forth (A) the reasons why the FCR desires to employ such FCR Professional, and (B) the basis upon which the FCR seeks advice independent of the Trust Professionals to meet the need of the FCR for such expertise or advice, and (ii) the Talc Trust has approved the FCR's request for reimbursement in writing, which approval must not be unreasonably withheld, delayed, or denied.  If the Talc Trust agrees to pay for the FCR Professional, such reimbursement shall be treated as a Talc Trust expense.  If the Talc Trust declines to pay for the FCR Professional, it must set forth its reasons in writing.  If the FCR still desires to employ the FCR Professional at the Talc Trust's expense, the FCR and/or the Trustees shall resolve the dispute pursuant to Section 7.13 below.

(c)      In the event that the FCR retains counsel in connection with any matter whether or not related to any claim that has been or might be asserted against the FCR and irrespective of whether the Talc Trust pays such counsel's fees and related expenses, any communications between the FCR and such counsel shall be deemed to be within the attorney-client privilege and protected by section 3333 of Title 12 of the Delaware Code, regardless of whether such communications are related to any claim that has been or might be asserted by or

-34-

against the FCR and regardless of whether the Talc Trust pays such counsel's fees and related expenses.

**6.5**    **Compensation and Expenses of the FCR.**  The FCR shall receive compensation from the Talc Trust in the form of payment at the FCR's normal hourly rate for services performed, as such may be adjusted from time to time.  The Talc Trust will promptly reimburse the FCR for all reasonable out-of-pocket costs and expenses incurred by the FCR in connection with the performance of his or her duties hereunder.  Such reimbursement or direct payment shall be deemed a Talc Trust expense.  The Talc Trust shall include a description of the amounts paid under this Section 6.5 in the Annual Report to be filed with the Bankruptcy Court and provided to the FCR and the TAC pursuant to Section 2.2(c)(i).

**ARTICLE VII**

**GENERAL PROVISIONS**

**7.1**    **Procedures for Consulting with or Obtaining Consent of the TAC and FCR.**

(a)    <u>Consultation Process</u>.

(i)    In the event the Trustees are required to consult with the TAC and FCR pursuant to Section 2.2(e) above, the TDP, the Plan, or otherwise, the Trustees shall provide the TAC and FCR with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustees shall also provide the TAC and FCR with such reasonable access to the Trust Professionals and other experts retained by the Talc Trust and its staff (if any) as the TAC and FCR may reasonably request during the time that the Trustees are considering such matter, and shall also provide the TAC and FCR the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustees.

(ii)     In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 7.1(a), the Trustees shall take into consideration the time required for the TAC and FCR, if they so wish, to engage and consult with their own independent financial or investment advisors as to such matter.  In any event, the Trustees shall not take definitive action on any such matter until at least thirty (30) days after providing the TAC and FCR with the initial written notice that such matter is under consideration by the Trustees, unless such period is waived by the TAC and FCR.

(b)     Consent Process.

(i)     In the event the Trustees are required to obtain the consent of the TAC and FCR pursuant to Section 2.2(f) above, the TDP, the Plan, or otherwise, the Trustees shall provide the TAC and FCR with a written notice stating that their consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustees propose to take, and explaining in detail the reasons why the Trustees desire to take such action. The Trustees shall provide the TAC and FCR as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances.  The Trustees shall also provide the TAC and FCR with such reasonable access to the Trust Professionals and other experts retained by the Talc Trust and its staff (if any) as the TAC and FCR may reasonably request during the time that the Trustees are considering such action, and shall also provide the TAC and FCR the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustees.

(ii)     The TAC and FCR must consider in good faith and in a timely fashion any request for their consent by the Trustees and must in any event advise the Trustees in writing of their consent or objection to the proposed action within thirty (30) days of receiving

-36-

the original request for consent from the Trustees, or within such additional time as the Trustees and TAC and FCR may agree.  The TAC and FCR may not withhold their consent unreasonably. If the TAC or FCR decides to withhold consent, they must explain in detail their objections to the proposed action.  If either the TAC or the FCR does not advise the Trustees in writing of its consent or objections to the proposed action within thirty (30) days of receiving notice regarding such request (or any additional time period agreed to by the Trustees), then consent of the TAC or the FCR (as applicable) to the proposed action shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 7.1(b), the TAC or FCR continues to object to the proposed action and to withhold its consent to the proposed action, the Trustees and the TAC or FCR shall resolve their dispute pursuant to Section 7.13.  The TAC or FCR (as applicable) shall bear the burden of proving that it reasonably withheld its consent.  If the TAC or FCR (as applicable) meets that burden, the Talc Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the TAC or the FCR's reasonable objection.

**7.2**    **Irrevocability.**  To the fullest extent permitted by applicable law, the Talc Trust is irrevocable.

**7.3**    **Term; Termination.**

(a)    The term for which the Talc Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 7.3 (b) - (d) below.

(b)    The Talc Trust shall automatically dissolve on the date (the **"Dissolution Date"**) ninety (90) days after the first occurrence of any of the following events:

-37-

(i) the date on which the Trustees decide, with the consent of the TAC and the FCR, to dissolve the Talc Trust because (A) the Trustees deem it unlikely that new Talc Claims will be filed against the Talc Trust, (B) all Talc Claims duly filed with the Talc Trust have been liquidated and paid or otherwise resolved, and (C) twelve (12) consecutive months have elapsed during which no new Talc Claim has been filed with the Talc Trust; or

(ii) if the Trustees, with the consent of the TAC and the FCR, have procured and have in place irrevocable insurance policies and have established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the Talc Trust in a manner consistent with this Trust Agreement and the TDP, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a Final Order; or

(iii) subject to the periods provided herein, the Talc Trust shall be perpetual to the fullest extent permitted by Delaware law, provided however to the extent that any property of the Talc Trust is subject to any rule against perpetuities then applicable to the Talc Trust, then the Talc Trust shall terminate as to such property only on the date on which twenty-one (21) years less ninety-one (91) days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof, or such other permissible last day of the perpetuities period.

(c) On the Dissolution Date (or as soon thereafter as is reasonably practicable), after the wind-up of the Talc Trust's affairs by the Trustees and payment of all the Talc Trust's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in the Talc Trust shall be given to charitable organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue

-38-

Code, which tax-exempt organization(s) shall be selected by the Trustees using their reasonable discretion; *provided, however,* that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on the cure of, or other relief for individuals suffering from talc-related disorders, and (ii) the tax-exempt organization(s) shall not bear any relationship to the Reorganized Debtors within the meaning of section 468B(d)(3) of the Internal Revenue Code. Notwithstanding any contrary provision of the Plan and related documents, this Section 7.3(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the assets of the Talc Trust, the Talc Trust shall terminate and the Trustees and the Delaware Trustee (acting solely at the written direction of the Trustees) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the Talc Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the Talc Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

**7.4    Amendments.**  The Trustees, after consultation with the TAC and the FCR, and subject to the unanimous consent of the TAC and the FCR, may modify or amend this Trust Agreement (except with respect to Section 7.3(c), which by its own terms is expressly not subject to modification or amendment). The Trustees, after consultation with the TAC and the FCR, and subject to the consent of the TAC and the FCR, may modify or amend the TDP; *provided, however,* that no amendment to the TDP shall be inconsistent with the provisions limiting amendments to that document provided therein, and in particular the provisions limiting amendment of the Payment Percentage set forth in Section 4.2 of the TDP. Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Trust Agreement or the TDP to the contrary, neither this Trust Agreement, the

-39-

TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify (i) the applicability of section 524(g) and section 105 of the Bankruptcy Code to the Plan, the Confirmation Order, or the Talc Trust, (ii) the efficacy or enforceability of the Injunctions or any other injunction or release issued or granted in connection with the Plan, (iii) the Talc Trust's Qualified Settlement Fund status under the QSF Regulations, or (iv) except with the written advance consent of the Reorganized Debtors and the Imerys Plan Proponents, the scope and the terms of the releases and injunctions included in Article XII of the Plan.  Any amendment affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent.

      **7.5**    **Severability.**  Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

      **7.6**    **Notices.**

      (a)    Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's representative, in each case as provided on such person's claim form submitted to the Talc Trust in accordance with the TDP  with respect to his or her Talc Claim, or by such other means, including electronic notice, as may be agreed between the Talc Trust and the TAC.

      (b)    Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated below, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed below in compliance with the terms hereof.

To the Talc Trust through the Trustees:

     Ivory America Personal Injury Trust
     c/o
     [_____]

With a copy to:

     [_____]

To the Delaware Trustee;

     [_____]

To the TAC:

     [_____]

To the FCR:

     [_____]

With a copy to:

     [_____]

To the Reorganized Debtors:

     [_____]

With a copy to:

     [_____]

     (c)     All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

     **7.7**     **Successors and Assigns.**  The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Debtors, the Talc Trust, the FCR, the TAC, the

-41-

Trustees, and the Reorganized Debtors, and their respective successors and assigns, except that neither the Debtors, the Talc Trust, the FCR, the TAC, the Trustees, nor the Reorganized Debtors may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in the case of the Trustees in accordance with Section 4.3 above, the TAC members in accordance with Section 5.4 above, and the FCR in accordance to Section 6.3 above.

      **7.8**    **Limitation on Claim Interests for Securities Laws Purposes.**  Talc Claims, and any interests therein, (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest; provided, however, that clause (a) of this Section 7.8 shall not apply to the holder of a claim that is subrogated to a Talc Claim as a result of its resolution of such Talc Claim.

      **7.9**    **Entire Agreement; No Waiver.**  The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof.  No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege.  The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

      **7.10**    **Headings.**  The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

20877240v15

**7.11    Governing Law.**  The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the Parties hereto intend that the provisions hereof shall control and there shall not be applicable to the Talc Trust, the Trustees, the Delaware Trustee, the TAC, the FCR, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustees accounts or schedules of Trustees fees and charges; (b) affirmative requirements to post bonds for the Trustees, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to the Trustees, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of Trustees, the Delaware Trustee, the TAC, or the FCR set forth or referenced in this Trust Agreement.  Section 3540 of the Act shall not apply to the Talc Trust.

20877240v15

**7.12**    **Settlors' Representative and Cooperation.**  The Debtors are hereby irrevocably designated as the Settlors and are hereby authorized to take any action required of the Settlors by the Trustees in connection with the Trust Agreement.  The Reorganized Debtors agree to cooperate in implementing the goals and objectives of this Trust Agreement at the sole expense of the Talc Trust.

**7.13**    **Dispute Resolution.**  Any disputes that arise under this Trust Agreement or under the TDP among the Parties hereto shall be resolved by submission of the matter to an alternative dispute resolution (**"ADR"**) process mutually agreeable to the Parties involved.  Should any Party to the ADR process be dissatisfied with the decision of the arbitrator(s), that Party may apply to the Bankruptcy Court for a judicial determination of the matter.  Any review conducted by the Bankruptcy Court shall be *de novo*.  In any case, if the dispute arose pursuant to the consent provision set forth in Section 7.1, the Party or Parties who withheld consent shall bear the burden of proving that it reasonably withheld its consent.  If the objecting Party meets that burden, the Talc Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the reasonable objection.  Should the dispute not be resolved by the ADR process within thirty (30) days after submission, the Parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court.  If the Trustees determine that the matter in dispute is exigent and cannot await the completion of the ADR process, the Trustees shall have the discretion to elect out of the ADR process altogether or at any stage of the process and seek resolution of the dispute in the Bankruptcy Court.

**7.14**    **Enforcement and Administration.**  The provisions of this Trust Agreement and the TDP shall be enforced by the Bankruptcy Court pursuant to the Plan and the Confirmation Order.  The Parties hereby acknowledge and agree that the Bankruptcy Court shall have

-44-

continuing exclusive jurisdiction over the settlement of the accounts of the Trustees and over any disputes that arise under this Trust Agreement or the TDP and are not resolved by alternative dispute resolution in accordance with Section 7.13 above.

      **7.15**   **Effectiveness.**  This Trust Agreement shall not become effective until the Effective Date of the Plan and it has been executed and delivered by all the Parties hereto.

      **7.16**   **Counterpart Signatures.**  This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

20877240v15

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement this_____ day of _____, 2021.

**SETTLORS:**

**IMERYS TALC AMERICA, INC.**                  **IMERYS  TALC VERMONT, INC.**


By:_____                  By:_____


**IMERYS TALC CANADA INC.**


By:_____



**OFFICIAL COMMITTEE OF TORT CLAIMANTS**


By:_____

**TRUSTEES**

**DELAWARE TRUSTEE**
**[_____]**

_____

Name:
Expiration Date of Initial Term:
anniversary of the date of this Trust Agreement

By:_____

    Name:
    Title:

_____

Name:
Expiration Date of Initial Term:
anniversary of the date of this Trust Agreement

_____

Name:
Expiration Date of Initial Term:
anniversary of the date of this Trust Agreement

-47-

## TRUST ADVISORY COMMITTEE

_____
Firm:   Ashcraft & Gerel LLP
Name: Michelle A. Parfitt
Initial Term of ____(_) years

_____
Firm:   Gori Julian & Assocs., P.C.
Name: Wendy M. Julian
Initial Term of ____(_) years

_____
Firm:   Barnes Law Group
Name: John R. Bevis
Initial Term of ____(_) years

_____
Firm:   The Lanier Law Firm
Name: Maura Kolb
Initial Term of ____(_) years

_____
Firm:   Baron & Budd P.C.
Name: Steve Baron
Initial Term of ____(_) years

_____
Firm:   Levy Konigsberg LLP
Name: Audrey Raphael
Initial Term of ____(_) years

_____
Firm:   Beasley Allen Crow Methvin Portis
& Miles P.C.
Name: Ted G. Meadows
Initial Term of ____(_) years

_____
Firm:   OnderLaw, LLC
Name: James G. Onder
Initial Term of ____(_) years

_____
Firm:   Burns Charest LLP
Name: Amanda Klevorn
Initial Term of ____(_) years

_____
Firm:   Simon Greenstone Panatier, P.C.
Name: Leah Kagan
Initial Term of ____(_) years

_____
Firm:   Cohen Placitella Roth PC
Name: Christopher Placitella
Initial Term of ____(_) years

20877240v15

**FCR**

_____
Firm:   Young Conaway Stargatt & Taylor LLP
Name:  Sharon M. Zieg

**Exhibit 1**

Certificate of Trust

**(TO COME)**

## EXHIBIT C

**Rio Tinto / Zurich Settlement Agreement**

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release ("Agreement") is entered into by and between Imerys Talc America, Inc. ("ITA"), Imerys Talc Vermont, Inc. ("ITV"), Imerys Talc Canada, Inc. ("ITC"), and, to the extent it becomes a debtor in the Chapter 11 Cases, Imerys Talc Italy S.p.A. ("ITI") (collectively, the "Debtors"), on behalf of themselves and their Estates, on the one hand, and Rio Tinto America Inc. ("Rio Tinto"), Three Crowns Insurance Company, formerly known as Three Crowns Insurance Company Limited ("TCI"), Metals & Minerals Insurance Company Pte. Ltd. ("MMI"), and Falcon Insurance Ltd. ("Falcon," and together with TCI and MMI, the "Rio Tinto Captive Insurers") (Rio Tinto and the Rio Tinto Captive Insurers, collectively, the "Rio Tinto Settling Parties"), and Zurich American Insurance Company, in its own capacity and as successor-in-interest to Zurich Insurance Company, U.S. Branch ("Zurich"), on the other hand.  The Rio Tinto Settling Parties and Zurich are referred to collectively as the "Insurer Parties" and, together with the Debtors, as the "Parties."  Capitalized terms appearing in this Agreement that are not defined in this prefatory paragraph have the meanings set out in Section 1, Additional Definitions, below.

## RECITALS

WHEREAS, ITA, ITV, ITC, and ITI were formerly owned by various corporate entities affiliated with Rio Tinto (under the names Luzenac America, Inc., Windsor Minerals, Inc., Luzenac, Inc., and Luzenac Val Chisone S.p.A., respectively) and were sold pursuant to a stock purchase agreement with Mircal S.A., a subsidiary of Imerys S.A., in 2011; and

WHEREAS, numerous Talc Personal Injury Claims have been brought against one or more of the Debtors seeking damages and other relief for injury allegedly caused by exposure to

1

talc, and the Debtors expect that such Talc Personal Injury Claims will continue to be made in the future; and

WHEREAS, before the 2011 sale, Zurich and other Zurich Corporate Parties issued the Zurich Policies, liability insurance policies that included Luzenac America, Inc., Windsor Minerals, Inc., and/or Luzenac, Inc. as insureds; and

WHEREAS, before the 2011 sale, the Rio Tinto Captive Insurers issued the Rio Tinto Captive Insurer Policies, liability insurance policies that included Luzenac America Inc., Windsor Minerals, Inc., Luzenac, Inc., and/or Luzenac Val Chisone, S.p.A. as insureds; and

WHEREAS, disputes have arisen as to the existence and scope of any obligation of the Zurich Corporate Parties and the Rio Tinto Captive Insurers to provide coverage for Talc Personal Injury Claims under the Zurich Policies and Rio Tinto Captive Insurer Policies, respectively; and

WHEREAS, on February 13, 2019, ITA, ITV, and ITC filed voluntary petitions for relief with the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, commencing their respective Chapter 11 Cases; and

WHEREAS, on January 20, 2021, ITA, ITV, and ITC filed with the Bankruptcy Court the Seventh Amended Plan, under which ITI will file its own Chapter 11 Case if the Seventh Amended Plan is accepted by the requisite percentages of holders of Talc Personal Injury Claims; and

WHEREAS, the Debtors, on the one hand, and the Insurer Parties, on the other hand, wish to fully and finally resolve their disputes, and to provide for the other consideration, promises, releases, and covenants set forth in this Agreement; and

WHEREAS, as part of the compromise and resolution of the Parties' disputes, the Debtors have agreed to sell, and Zurich and the Rio Tinto Settling Parties have agreed to purchase, any and all of the Debtors' rights and interests in the Zurich Policies and the Rio Tinto Captive Insurer Policies, respectively, pursuant to Section 363 of the Bankruptcy Code, subject to the terms and conditions set forth in this Agreement;

NOW THEREFORE, in consideration of the foregoing, and in consideration of the other mutual considerations, promises, releases, and covenants set forth below, the sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## 1.    ADDITIONAL DEFINITIONS

The following additional definitions apply to this Agreement.  The singular form of a word includes the plural and vice versa; the disjunctive "or" is not exclusive and thus includes the conjunctive "and"; all pronouns apply to the male, female, and neutral genders; the word "any" includes the word "all" and vice versa; the words "includes" and "including" are without limitation; and the past tense of a word includes the present tense and vice versa.

1.1.    **"Affirmation Order"** shall have the meaning set forth in the Plan.

1.2.    **"Agreement Effective Date"** shall have the meaning set forth in Section 2 of this Agreement.

1.3.    "**Bankruptcy Code**" shall have the meaning set forth in the Plan.

1.4.    "**Bankruptcy Court**" shall have the meaning set forth in the Plan.

1.5.    **"Bankruptcy Rules"** shall have the meaning set forth in the Plan.

1.6.    **"Business Day"** shall have the meaning set forth in the Plan.

1.7.    **"Cash"** shall have the meaning set forth in the Plan.

1.8.    "**Channeling Injunction**" shall have the meaning set forth in the Plan.

3

1.9.    **"Chapter 11 Cases"** shall have the meaning set forth in the Plan.

1.10.    "**Claim,**" when capitalized, shall have the meaning set forth in the Plan.

1.11.    **"Confirmation Date"** shall have the meaning set forth in the Plan.

1.12.    "**Confirmation Order**" shall have the meaning set forth in the Plan.

1.13.    "**Consenting Entities**" means the Tort Claimants' Committee and the FCR.

1.14.    **"Contribution Claim"** means any claim by any insurer against any Rio Tinto Protected Party or Zurich Protected Party asserting any right, whether legal, equitable, contractual, or otherwise, of contribution, indemnity, reimbursement, subrogation, or other similar claim directly or indirectly arising out of or in any way relating to such insurer's payment of loss on behalf of one or more of the Debtors in connection with any Talc Personal Injury Claim.

1.15.    "**Coverage In Place Agreement**" means the Settlement and Coverage In Place Agreement (and any amendments thereto) executed by ITA, Zurich, and Rio Tinto and certain of its affiliates in May 2014.

1.16.    **"Credits"** shall have the meaning set forth in the Plan and in Section 4.3.1 of this Agreement.

1.17.    **"Debtor Released Claims"** shall have the meaning set forth in Section 6.2 of this Agreement.

1.18.    "**Direct Action Claim**" means any claim by a Person against any Zurich Protected Party or any Rio Tinto Protected Party on account of, based upon, directly or indirectly arising from, or in any way relating to any alleged right or interest of the Debtors, or any of them, in any Zurich Policy or any Rio Tinto Captive Insurer Policy, whether arising by contract, in tort, or under

4

the laws of any jurisdiction, including any statute that gives a third party a direct cause of action against any Zurich Protected Party or any Rio Tinto Protected Party.

1.19. **"Disclosure Statement"** means the *Disclosure Statement for Seventh Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated January 20, 2021 (ECF No. 2810), or any subsequently filed disclosure statement relating to the Plan, approved by the Bankruptcy Court as containing adequate information, and distributed in accordance with such order of approval, as such disclosure statement may be amended, modified, or supplemented from time to time.

1.20. **"District Court"** shall have the meaning set forth in the Plan.

1.21. **"Estate"** shall have the meaning set forth in the Plan.

1.22. **"Estate Causes of Action"** shall have the meaning set forth in the Plan.

1.23. **"Excess Policies"** means all excess liability insurance policies purchased by corporate entities affiliated with Rio Tinto that included Luzenac America, Inc., Windsor Minerals, Inc., Luzenac, Inc., and/or Luzenac Val Chisone, S.p.A. as insureds and provided additional limits above the Rio Tinto Captive Insurer Policies, including the policies listed on Exhibit C to this Agreement.

1.24. **"Execution Date"** means the earliest date on which this Agreement has been signed by each Party and consented to by the Consenting Entities.

1.25. **"Extra-Contractual Claim"** means any claim against the Zurich Protected Parties or Rio Tinto Protected Parties other than a claim for coverage or benefits under a Zurich Policy or Rio Tinto Captive Insurer Policy, respectively, seeking any type of relief based upon conduct of the Zurich Protected Parties or Rio Tinto Protected Parties prior to the Agreement Effective Date, including statutory, compensatory, exemplary, or punitive damages on account of alleged bad

faith, failure to act in good faith, violation of any duty of good faith and fair dealing, violation of any unfair claims practices act or similar statute, regulation, or code, any type of alleged misconduct, or any other act or omission, or any claims for economic loss, general damages, attorneys' fees, or costs in connection with the handling of, or refusal to handle, any Talc Personal Injury Claim.

1.26. "**FCR**" shall have the meaning set forth in the Plan.

1.27. "**Final Order**" shall have the meaning set forth in the Plan.

1.28. "**Future Credits**" shall have the meaning set forth in the Plan and in Section 4.3.1 of this Agreement.

1.29. "**HDI Agreement**" means the December 15, 2016 Confidential Settlement Agreement and Mutual Releases among ITA, Rio Tinto, and HDI Global SE and the accompanying Side Letter agreement between Rio Tinto and ITA dated December 4, 2016.

1.30. "**Indirect Talc Personal Injury Claim**" shall have the meaning set forth in the Plan.

1.31. "**Person**" shall have the meaning set forth in the Plan.

1.32. "**Plan**" means the Seventh Amended Plan, as the same may be amended or modified from time to time pursuant to section 1127 of the Bankruptcy Code, consistent with the terms of the Rio Tinto/Zurich Settlement set out in the Seventh Amended Plan.

1.33. "**Plan Effective Date**" shall have the same meaning as the term "Effective Date" in the Plan.

1.34. "**Protected Party**" shall have the meaning set forth in the Plan.

1.35. "**Reorganized Debtors**" shall have the meaning set forth in the Plan.

1.36.   **"Rio Tinto Buyback"** means the sale to the Rio Tinto Settling Parties, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code and as implemented by the Plan and this Agreement, of any and all of the Debtors' rights and interests in the Rio Tinto Captive Insurer Policies, free and clear of any and all rights, claims, or interests of any other entity.

1.37.   **"Rio Tinto Cash Contribution"** means $80 million, which Rio Tinto will contribute, or cause to be contributed, to the Talc Personal Injury Trust.

1.38.   "**Rio Tinto Captive Insurer Policies**" means any and all Talc Insurance Policies issued by the Rio Tinto Captive Insurers, including the Talc Insurance Policies listed on Schedule III to the Plan, attached as Exhibit B to this Agreement.  For the avoidance of doubt, the Rio Tinto Captive Insurer Policies shall not include any policy to the extent such policy provides reinsurance to any Zurich Protected Party.

1.39.   "**Rio Tinto Corporate Parties**" shall have the meaning set forth in the Plan.

1.40.   "**Rio Tinto Protected Parties**" shall have the meaning set forth in the Plan.

1.41.   **"Rio Tinto/Zurich Contribution"** means, collectively, (a) the Rio Tinto Cash Contribution, (b) the Zurich Cash Contribution, and (c) the Rio Tinto/Zurich Credit Contribution.

1.42.   **"Rio Tinto/Zurich Credit Contribution"** shall have the meaning set forth in the Plan and in Section 4.3.1 of this Agreement.

1.43.   **"Rio Tinto/Zurich Released Claims"** shall have the meaning set forth in the Plan and in Section 6.1 of this Agreement.

1.44.   **"Rio Tinto/Zurich Settlement"** shall have the meaning set forth in the Plan.

1.45.   "**Rio Tinto/Zurich Trigger Date**" means the date that the Tort Claimants' Committee or the Talc Personal Injury Trust provides Rio Tinto and/or Zurich (as applicable)

7

with notice of the occurrence of the later of (a) the Effective Date or (b) the date the Affirmation Order becomes a Final Order.

1.46. "**Settling Talc Insurance Company**" shall have the meaning set forth in the Plan.

1.47. **"Seventh Amended Plan"** means the *Seventh Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated January 20, 2021 (ECF No. 2809).

1.48. **"Supplemental Settlement Injunction Order"** shall have the meaning set forth in the Plan.

1.49. **"Talc Insurance Policy"** shall have the meaning set forth in the Plan.

1.50. "**Talc Personal Injury Claim**" shall have the meaning set forth in the Plan.

1.51. "**Talc Personal Injury Trust**" shall have the meaning set forth in the Plan.

1.52. "**Talc Personal Injury Trust Documents**" shall have the meaning set forth in the Plan.

1.53. "**Tort Claimants' Committee**" shall have the meaning set forth in the Plan.

1.54. **"Trust"** means the Talc Personal Injury Trust.

1.55. "**XL"** means XL Insurance America, Inc.

1.56. **"XL Agreement"** means the "RIO TINTO DEFENSE COSTS REIMBURSEMENT AGREEMENT" among Rio Tinto and certain of its affiliates, XL, and Zurich, dated on or about 20 March 2018.

1.57. **"Zurich Buyback"** means the sale to Zurich, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code and as implemented by the Plan and this Agreement, of any and all of the Debtors' rights and interests in the Zurich Policies, free and clear of any and all rights, claims, or interests of any other entity.

8

1.58.    "**Zurich Cash Contribution**" means $260 million, which Zurich will contribute, or cause to be contributed, to the Talc Personal Injury Trust.

1.59.    "**Zurich Corporate Parties**" shall have the meaning set forth in the Plan.

1.60.    "**Zurich Policies**" means any and all Talc Insurance Policies issued by the Zurich Corporate Parties, including the Talc Insurance Policies listed on Schedule VI to the Plan, attached as Exhibit A to this Agreement, *provided*, however, that Policy No. SXL 8129701, issued to Standard Oil Company (Indiana) for the period August 17, 1983 to June 1, 1984, shall not be considered a "Zurich Policy" for purposes of this Agreement.  For the avoidance of doubt, the Zurich Policies shall not include any policy to the extent such policy provides reinsurance to any Rio Tinto Captive Insurer.

1.61.    "**Zurich Protected Parties**" shall have the meaning set forth in the Plan.

## 2.    EFFECTIVE DATE OF AGREEMENT

This Agreement shall become effective on the earliest date on which all of the following conditions precedent have occurred (the **"Agreement Effective Date"**), *provided, however*, that any of the conditions precedent set out in Sections 2.3, 2.4, and 2.5 below may be waived pursuant to a writing signed by each Party and consented to by the Consenting Entities (if before the Plan Effective Date) or signed by the Insurer Parties and the Trust (if after the Plan Effective Date):

2.1.    Each Party has executed the Agreement.

2.2.    Each Consenting Entity has consented to the Agreement in writing, and the Debtors have provided Zurich and Rio Tinto with evidence of such written consent.

2.3.    The Bankruptcy Court has entered a Confirmation Order and the District Court has entered an Affirmation Order providing that:

9

2.3.1.  The Rio Tinto/Zurich Settlement and this Agreement are approved pursuant to sections 363 and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019.

2.3.2.  The Zurich Buyback and Rio Tinto Buyback are approved, and each (a) represents a sound exercise of the Debtors' business judgment, will yield a fair and reasonable price for the assets being sold, is in the best interest of the Debtors' Estates, and otherwise complies with Section 363 of the Bankruptcy Code, (b) meets the requirements for a sale of the Debtors' property free and clear of any interests of third parties in such property pursuant to section 363(f) of the Bankruptcy Code, and (c) constitutes a purchase in good faith pursuant to section 363(m) of the Bankruptcy Code, rendering the provisions of section 363(m) applicable.

2.3.3.  The Zurich Protected Parties and the Rio Tinto Captive Insurers are Settling Talc Insurance Companies, and hence Protected Parties, under the Plan, and the Rio Tinto Protected Parties are Protected Parties under the Plan.  As Protected Parties, the Zurich Protected Parties, the Rio Tinto Captive Insurers, and the Rio Tinto Protected Parties are entitled to the protection of the Channeling Injunction, which shall permanently channel all Talc Personal Injury Claims, including any Indirect Talc Personal Injury Claims, against any Protected Party to the Trust, and pursuant to which any holder of a Talc Personal Injury Claim shall be permanently and forever stayed, restrained, barred, and enjoined from taking any action against a Protected Party for the purpose of directly, indirectly, or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Talc Personal Injury Claim.

2.3.4.  The Talc Personal Injury Trust, the Debtors and the Reorganized Debtors, on their own behalf and as representatives of their respective Estates, and the Tort

10

Claimants' Committee and FCR, solely on their own behalf, irrevocably and unconditionally release the Rio Tinto Protected Parties and the Zurich Protected Parties from all Rio Tinto/Zurich Released Claims.

2.3.5.   Pursuant to the Supplemental Settlement Injunction Order, all Persons are permanently enjoined from pursuing any Rio Tinto/Zurich Released Claim against any Rio Tinto Protected Party or Zurich Protected Party.

2.4.   The Debtors (or the Tort Claimants' Committee or the Trust) have provided notice to Zurich and Rio Tinto that the Affirmation Order has become a Final Order.

2.5.   The Debtors (or the Tort Claimants' Committee or the Trust) have provided notice to Zurich and Rio Tinto that the Plan Effective Date has occurred.

## 3.   VOIDABILITY

3.1.   This Agreement shall not become effective, or shall be rendered null and void, as applicable, upon the occurrence of any of the following contingencies, *provided, however*, that any of the contingencies set out in Sections 3.1.1 through 3.1.6 may be waived by the Parties pursuant to a writing signed by each Party and, if before the Plan Effective Date, consented to by the Consenting Entities:

3.1.1.   The entry of a Confirmation Order by the Bankruptcy Court, or of an Affirmation Order by the District Court, confirming or affirming the confirmation of a Chapter 11 plan of reorganization for the Debtors that does not contain the provisions set out in Section 2.3 of this Agreement;

3.1.2.   The entry by the Bankruptcy Court or District Court of a Final Order denying approval of the Rio Tinto/Zurich Settlement or of this Agreement;

11

3.1.3.   The entry by the Bankruptcy Court or District Court of a Final Order denying approval of the Zurich Buyback or the Rio Tinto Buyback, finding that the Zurich Buyback or Rio Tinto Buyback is not free and clear of all interests of third parties in the Zurich Policies or Rio Tinto Captive Insurer Policies, respectively, or finding that Zurich or the Rio Tinto Settling Parties are not entitled to the good-faith purchaser protections of section 363(m) of the Bankruptcy Code;

3.1.4.   The entry by the Bankruptcy Court or District Court of a Final Order stating that any Zurich Protected Party or Rio Tinto Captive Insurer is not a Settling Talc Insurance Company or is not a Protected Party, or that any Rio Tinto Protected Party is not a Protected Party, or that otherwise contravenes the designation of any Zurich Protected Party, Rio Tinto Captive Insurer, or Rio Tinto Protected Party as a Protected Party entitled to the protections of the Channeling Injunction;

3.1.5.   The entry by the Bankruptcy Court, prior to the Plan Effective Date, of a Final Order converting the Chapter 11 Cases into cases under Chapter 7 of the Bankruptcy Code or dismissing the Chapter 11 Cases;

3.1.6.   The entry by the Bankruptcy Court, prior to the Plan Effective Date, of a Final Order appointing a trustee or an examiner substantially possessing the rights, powers, and duties of a bankruptcy trustee in the Chapter 11 Cases; or

3.1.7.   The statement in writing, prior to the Plan Effective Date, by the Tort Claimants' Committee or the FCR that such entity refuses to consent to this Agreement.

3.2.   Notwithstanding anything in this Agreement to the contrary, in the event that one of the contingencies listed in Section 3.1 above occurs and is not waived by the Parties:

3.2.1.   This Agreement, except for this Section 3 and any definitions of capitalized terms used herein (which shall remain in full force and effect), shall be vitiated and shall be a nullity;

3.2.2.   None of the Parties shall be bound by the terms of the Rio Tinto/Zurich Settlement or of this Agreement;

3.2.3.   Zurich and Rio Tinto shall not be obligated to pay the Zurich Cash Contribution or the Rio Tinto Cash Contribution, or to make the Rio Tinto/Zurich Credit Contribution;

3.2.4.   The Zurich Protected Parties and the Rio Tinto Captive Insurers shall not be designated as Settling Talc Insurance Companies or as Protected Parties, and the Rio Tinto Protected Parties shall not be designated as Protected Parties, in the Plan, Confirmation Order, or Affirmation Order, and the Zurich Protected Parties, the Rio Tinto Captive Insurers, and the Rio Tinto Protected Parties shall not be entitled to assert the Channeling Injunction as a defense to any Talc Personal Injury Claim;

3.2.5.   The Parties shall have all of the same rights, defenses, and obligations under or with respect to any and all of the Zurich Policies, the Rio Tinto Captive Insurance Policies, the Excess Policies, the HDI Agreement, the XL Agreement, and the Coverage In Place Agreement that they would have had absent this Agreement; and

3.2.6.   Any and all otherwise applicable statutes of limitations or repose, or other time-related limitations, shall be deemed to have been tolled for the period from the Execution Date through the date on which this Agreement becomes null and void in accordance with Section 3.1 above, and no Party shall assert that any other Party's failure during said period to raise any claim that would have been resolved by this Agreement,

13

had this Agreement become effective or not been voided, as applicable, renders such claim time-barred.

## 4.    RIO TINTO/ZURICH CONTRIBUTION

### 4.1.    Zurich Cash Contribution

4.1.1.   As consideration for the releases and injunctive protections set forth in this Agreement and in the Plan, on or prior to the date that is thirty (30) days after the Rio Tinto/Zurich Trigger Date, Zurich will irrevocably and indefeasibly pay, or cause to be paid, $260 million in Cash, via wire transfer, to the Talc Personal Injury Trust.

4.1.2.   Prior to the Rio Tinto/Zurich Trigger Date, the Trust shall provide all information needed by Zurich to pay the Zurich Cash Contribution, including providing Zurich with a Form W-9 containing the Talc Personal Injury Trust's tax identification number and bank account information sufficient to make the required wire transfer.

4.1.3.   Zurich's payment of the Zurich Cash Contribution is in addition to any and all payments the Zurich Corporate Parties may have made to or for the benefit of the Debtors under, arising out of, or related to the Zurich Policies prior to the Rio Tinto/Zurich Trigger Date, and all such payments are deemed final and irrevocable, except as provided in Section 3 hereto.

4.1.4.   The Parties expressly agree that the Zurich Cash Contribution, together with any amounts paid by the Zurich Corporate Parties prior to the Rio Tinto/Zurich Trigger Date as set out in Section 4.1.3 of this Agreement, fully satisfies any and all indemnity, defense, or other obligations the Zurich Protected Parties may have on account of claims by the Debtors or any other Person directly or indirectly arising from or in any way related to any rights of the Debtors under the Zurich Policies.  The Parties further expressly agree

14

that the payment of the Zurich Cash Contribution fully exhausts the available limits of the following Zurich Policies:

| Policy Number | Policy Period |
|---|---|
| GLO 8210196-04 | 5/31/2001–5/31/2002 |
| GLO 8210196-05 | 5/31/2002–5/31/2003 |
| GLO 8210196-06 | 5/31/2003–5/31/2004 |
| GLO 8210196-07 | 5/31/2004–5/31/2005 |
| GLO 8210196-08 | 5/31/2005–5/31/2006 |
| GLO 8210196-09 | 5/31/2006–5/31/2007 |
| GLO 8210196-10 | 5/31/2007–5/31/2008 |

4.1.5.  The Zurich Cash Contribution shall not be subject to any claims for deductions, setoffs, or charge-backs to the Debtors of any kind, including claims involving recoupment of deductibles, allocated loss adjustment expenses, contribution, self-insured retentions, additional premiums, or retrospective or reinstatement premiums under the Zurich Policies.

4.2.  **Rio Tinto Cash Contribution**

4.2.1.  As consideration for the releases and injunctive protections set forth in this Agreement and in the Plan, on or prior to the date that is fourteen (14) days after the Rio Tinto/Zurich Trigger Date, Rio Tinto will irrevocably and indefeasibly pay, or cause to be paid, $80 million in Cash, via wire transfer, to the Talc Personal Injury Trust.

4.2.2.  Prior to the Rio Tinto/Zurich Trigger Date, the Trust shall provide all information needed by Rio Tinto to pay the Rio Tinto Cash Contribution, including providing Rio Tinto with a Form W-9 containing the Talc Personal Injury Trust's tax

identification number and bank account information sufficient to make the required wire transfer.

4.2.3.   Rio Tinto's payment of the Rio Tinto Cash Contribution is in addition to any and all payments the Rio Tinto Corporate Parties may have made to or for the benefit of the Debtors under, arising out of, or related to the Rio Tinto Captive Insurer Policies prior to the Rio Tinto/Zurich Trigger Date, and all such payments are deemed final and irrevocable, except as provided for in Section 3 hereto.

4.2.4.   The Parties expressly agree that the Rio Tinto Cash Contribution, together with any amounts paid by the Rio Tinto Corporate Parties prior to the Rio Tinto/Zurich Trigger Date as set out in Section 4.2.3 above, fully satisfies any indemnity, defense, or other obligations the Rio Tinto Protected Parties may have on account of claims by the Debtors or any other Person directly or indirectly arising from or in any way related to any rights of the Debtors under the Rio Tinto Captive Insurer Policies.

4.2.5.   The Rio Tinto Cash Contribution shall not be subject to any claims for deductions, setoffs, or charge-backs to the Debtors of any kind, including claims involving recoupment of deductibles, contribution, self-insured retentions, additional premiums, or retrospective or reinstatement premiums under the Rio Tinto Captive Insurer Policies.

4.3.   **Rio Tinto/Zurich Credit Contribution**

4.3.1.   On the Rio Tinto/Zurich Trigger Date, or as soon as reasonably practicable thereafter (not to exceed three (3) Business Days), the appropriate Rio Tinto Corporate Party or Parties and the appropriate Zurich Corporate Party or Parties shall execute and deliver to the Talc Personal Injury Trust an assignment, in substantially the form set forth in Exhibit D to this Agreement, assigning to the Trust (a) all of their rights to or claims for

16

indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to the payment or defense of any Talc Personal Injury Claim or any past talc-related claim against the Debtors prior to the Plan Effective Date (the **"Credits"**) and (b) all of their other rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to any Talc Personal Injury Claim (the **"Future Credits"**) (the Credits and the Future Credits, collectively, the **"Rio Tinto/Zurich Credit Contribution"**); *provided, however,* that any such claims for Credits or Future Credits against a Protected Party shall be subject to the Channeling Injunction, and nothing in the Plan or this Agreement shall impact the injunctions and releases otherwise inuring to the benefit of the Protected Parties under the terms of the Plan.  Notwithstanding anything else contained in this Section 4.3.1, the Rio Tinto Corporate Parties and the Zurich Corporate Parties shall retain, and shall not transfer to the Talc Personal Injury Trust, all rights of the Rio Tinto Corporate Parties and the Zurich Corporate Parties against their reinsurers and/or retrocessionaires, in their capacities as such.

   4.3.2. The Rio Tinto Settling Parties and Zurich hereby represent their good faith belief that they possess a legal entitlement to the Credits assigned in Exhibit D, and that they are duly authorized to fully assign such Credits to the Talc Personal Injury Trust. Rio Tinto hereby represents that it has provided the Debtors and the Consenting Entities with its good-faith estimate, based on various calculations and assumptions, of the amount of the Credits.  All parties, however, acknowledge that the Rio Tinto Settling Parties and Zurich are not representing or warranting that the Talc Personal Injury Trust will recover that amount (or any amount) on the Credits.

4.3.3.  The Insurer Parties shall assist and cooperate with the Talc Personal Injury Trust as may be reasonably necessary for the pursuit of Credits and Future Credits assigned to the Talc Personal Injury Trust under this Agreement.  Such assistance shall include providing all information and documentation reasonably necessary to assert and prove such Credits and Future Credits, including: (a) documents sufficient to show, and proof of, all amounts paid by the Insurer Parties under the Policies, including for defense costs, judgments, or settlements of claims; (b) all communications with other potentially responsible entities relating to amounts due or paid with respect to claims under the Zurich Policies or Rio Tinto Captive Insurer Policies; and (c) communications with other potentially responsible parties relating to the Insurer Parties' claims to the Credits and Future Credits and any defenses thereto, *provided*, *however*, that such assistance will not extend to any documents or information of the Insurer Parties that are subject to any applicable privilege, including attorney-client privilege, common-interest privilege, or mediation privilege, or to the work-product doctrine, and will be provided subject to the requirements of any existing confidentiality agreements, unless modified or waived.  Such cooperation shall be conditioned on the Talc Personal Injury Trust's reimbursement of all reasonable documented fees and expenses of outside professionals and vendors engaged by Zurich or Rio Tinto to comply with requests made by the Talc Personal Injury Trust, within thirty (30) days after Zurich or Rio Tinto provides documentation of such fees and expenses to the Talc Personal Injury Trust.

4.3.4.  The Insurer Parties agree not to assert or file any new claim seeking contribution, indemnity, or defense against any other Person in order to recover any portion of the Credits or Future Credits assigned to the Trust under this Agreement.

4.3.5.  On the Agreement Effective Date, the Talc Personal Injury Trust will assume the obligations of Zurich and of Rio Tinto and its affiliates (if any) to XL under the XL Agreement, if, or to the extent that, the XL Agreement provides any obligation to share with XL the proceeds of any recovery by the Talc Personal Injury Trust on any Credits or Future Credits assigned to the Trust pursuant to Section 4.3.1 of this Agreement.

4.4.  **Reinsurance.**  Notwithstanding any other provision of this Section 4 or of this Agreement, nothing in this Agreement is intended to or shall be construed to prevent any Zurich Corporate Party or any Rio Tinto Corporate Party from making any claim against, or seeking to recover any part of the Rio Tinto/Zurich Contribution or any other payment from, any of the Zurich Corporate Parties' or Rio Tinto Corporate Parties' reinsurers and/or retrocessionaires, in their capacities as such.

## 5.  ZURICH AND RIO TINTO BUYBACKS

5.1.  The Plan shall constitute a request by the Debtors for the Bankruptcy Court to approve the Zurich Buyback and the Rio Tinto Buyback, as set out in the Plan and this Agreement, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, and to find that Zurich and the Rio Tinto Settling Parties are good-faith purchasers pursuant to section 363(m) of the Bankruptcy Code.

5.2.  **Zurich Buyback.**  Subject to the approval of the Bankruptcy Court and to all the terms and conditions of this Agreement, the Debtors shall sell and Zurich shall acquire, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, any and all of the Debtors' rights and interests in the Zurich Policies, free and clear of any and all rights, claims, or interests of any other entity, including (a) any claim by any alleged additional insured under the Zurich Policies with respect to any Talc Personal Injury Claim, (b) any Contribution Claim, (c) any Direct Action

19

Claim, and (d) any other claim that directly or indirectly arises out of or relates to the Zurich Policies.

5.3.    **Rio Tinto Buyback.**  Subject to the approval of the Bankruptcy Court and to all the terms and conditions of this Agreement, the Debtors shall sell and the Rio Tinto Settling Parties shall acquire, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, any and all of the Debtors' rights and interests in the Rio Tinto Captive Insurer Policies, free and clear of any and all rights, claims, or interests of any other entity, including (a) any claim by any alleged additional insured under the Rio Tinto Captive Insurer Policies with respect to any Talc Personal Injury Claim, (b) any Contribution Claim, (c) any Direct Action Claim, and (d) any other claim that directly or indirectly arises out of or relates to the Rio Tinto Captive Insurer Policies.

## 6.  RELEASE

6.1.    **Release of Rio Tinto/Zurich Released Claims.**  Effective upon the Talc Personal Injury Trust's receipt of the Rio Tinto/Zurich Contribution, for good and valuable consideration, the adequacy of which is hereby confirmed, the Trust, the Debtors, on their own behalf and as representatives of their respective Estates, and the Reorganized Debtors shall be deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Rio Tinto Protected Parties and the Zurich Protected Parties of and from (a) all Estate Causes of Action and (b) any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Trust, the Debtors, their Estates, or the Reorganized Debtors have, had, may have, or may claim to have against any of the

Rio Tinto Protected Parties and/or the Zurich Protected Parties, directly or indirectly arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim (collectively, the **"Rio Tinto/Zurich Released Claims"**).  For the avoidance of doubt, the Rio Tinto/Zurich Released Claims include all Extra-Contractual Claims and any and all other claims directly or indirectly arising out of, with respect to, or in any way relating to the Zurich Policies, the Rio Tinto Captive Insurer Policies, the Excess Policies, the HDI Agreement, and the Coverage in Place Agreement, excluding only claims against the Zurich Protected Parties arising under Policy No. SXL 8129701, issued to Standard Oil Company (Indiana) for the period August 17, 1983 to June 1, 1984.  Also effective upon the Trust's receipt of the Rio Tinto/Zurich Contribution, the Trust, the Debtors (on their own behalf and as representatives of their respective Estates), and the Reorganized Debtors shall withdraw any and all requests, demands, or tenders for defense or indemnity previously submitted to any Zurich Protected Party or Rio Tinto Protected Party, and shall surrender, relinquish, and release any further right to tender or present any Rio Tinto/Zurich Released Claim, and the Zurich Protected Parties and Rio Tinto Protected Parties shall have no duty to defend or indemnify the Trust, the Debtors or their Estates, or the Reorganized Debtors with respect to any Rio Tinto/Zurich Released Claim.

      6.2.    **Release of Debtor Released Claims.**  Effective upon the occurrence of the Rio Tinto/Zurich Trigger Date, the Rio Tinto Settling Parties and Zurich shall be deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge the Debtors, their Estates, the Reorganized Debtors, and the Trust from any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the

Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Rio Tinto Settling Parties and Zurich have, had, may have, or may claim to have against any of the Debtors, their Estates, the Reorganized Debtors, and the Trust directly or indirectly arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim (collectively, the **"Debtor Released Claims"**), to the extent such Debtor Released Claims arise on or prior to the Confirmation Date.  Also effective upon the occurrence of the Rio Tinto/Zurich Trigger Date, the Rio Tinto Settling Parties and Zurich shall withdraw any and all requests or demands for payment of any Debtor Released Claim arising on or prior to the Confirmation Date, and the Debtors, or their Estates, shall have no duty to indemnify, pay, or reimburse the Rio Tinto Settling Parties and Zurich with respect to any Debtor Released Claim arising on or prior to the Confirmation Date.

6.3.    **Unknown or Future Claims.**  The Parties expressly acknowledge that there may be changes in the law or the Parties may hereafter discover facts different from, or in addition to, those that they now believe to be true with respect to any and all of the claims released in Sections 6.1 and 6.2 above.  Nevertheless, the Parties hereby agree that (subject to Section 3 of this Agreement) the releases set forth in Sections 6.1 and 6.2 above shall be and remain effective in all respects, notwithstanding any changes in the law or the discovery of such additional or different facts.  In addition, the Parties acknowledge that they have been advised by their respective legal counsel regarding, and are familiar with, the provisions of section 1542 of the California Civil Code, which provides:

> **A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.**

Except with respect to claims of the Rio Tinto Settling Parties or Zurich arising after the Confirmation Date, the Parties expressly waive and relinquish any and all rights or benefits they have or may have under California Civil Code § 1542 and under any other federal or state statute, rule, law, or common law principle of similar effect, as to the releases given in this Agreement, to the full extent that such right or benefit may be lawfully waived.  In connection with the waiver and relinquishment of rights or benefits under California Civil Code § 1542, each Party acknowledges that it fully understands that facts may later be discovered in addition to or different from those facts which are now known or believed to be true with respect to the subject matter of this Agreement, and that, except with respect to claims of the Rio Tinto Settling Parties or Zurich arising after the Confirmation Date, it is that Party's intention hereby to fully, finally and forever release all claims and rights, known or unknown, suspected or unsuspected, which now exist, may exist in the future, and/or have ever existed in the past, as to the matters released in Sections 6.1 and 6.2 of this Agreement.

6.4.    **Other Rights and Obligations Under This Agreement Not Affected.**  The releases set forth in Sections 6.1 and 6.2 of this Agreement are not intended to, and shall not, extend to or otherwise release any rights, privileges, benefits, duties, or obligations of the Parties pursuant to or arising from this Agreement or the Plan.

7.    **BANKRUPTCY-RELATED OBLIGATIONS**

7.1.    Prior to the Execution Date, the Debtors will seek and obtain the Consenting Entities' written consent to the Debtors' entry into this Agreement and shall furnish evidence of such written consent to each of Zurich and Rio Tinto.

7.2.    The Parties shall cooperate in good faith to ensure that the Confirmation Order and Affirmation Order are entered, contain and/or affirm the provisions set out in Section 2.3 of this Agreement, as applicable, and become Final Orders.

7.3.    Except to contend that the Debtors have breached this Agreement (including Section 7.2), neither Zurich nor Rio Tinto shall object to the Plan or seek formal discovery from the Debtors, the Tort Claimants' Committee, or the FCR (and the Debtors, the Tort Claimants' Committee, and the FCR shall not seek formal discovery from Zurich or Rio Tinto) with respect to the Plan.  Within five (5) days following the Execution Date, Zurich and Rio Tinto shall withdraw any and all objections to the Plan and Disclosure Statement they have made in the Chapter 11 Cases.  Such withdrawals shall be without prejudice until the occurrence of the Agreement Effective Date, at which time such withdrawals shall be deemed to be with prejudice.

7.4.    On the Rio Tinto/Zurich Trigger Date, any and all Claims that the Rio Tinto Corporate Parties or the Zurich Corporate Parties have asserted or that have been asserted on their behalf in the Chapter 11 Cases shall be deemed withdrawn with prejudice.  Further, the Rio Tinto Protected Parties and the Zurich Protected Parties shall not file or assert any additional Claims against any of the Debtors arising from any Debtor's conduct prior to the Confirmation Date.

7.5.    On the Plan Effective Date, the rights and obligations of the Debtors under this Agreement shall be deemed to have been assigned and transferred to the Talc Personal Injury Trust without need of further action by any Party or Person, and the Talc Personal Injury Trust shall be bound by all of the provisions of this Agreement.  The Reorganized Debtors shall continue to be bound by this Agreement and shall retain the obligations and benefits hereunder to the extent consistent with the Plan.

8.    **CONTRIBUTION CLAIMS; JUDGMENT REDUCTION**

8.1.    To the extent that the Debtors or the Talc Personal Injury Trust reach a settlement with any other insurer or other Person of any claim directly or indirectly arising out of or in any way relating to any Talc Personal Injury Claim or Rio Tinto/Zurich Released Claim, the Debtors or the Talc Personal Injury Trust, as applicable, will use their best efforts to obtain a waiver of any and all of that other insurer's or other Person's Contribution Claims against any Zurich Protected Party or Rio Tinto Protected Party based upon, arising out of, or in any way attributable to such Talc Personal Injury Claim or Rio Tinto/Zurich Released Claim.    Such waiver may be accomplished by an assignment of such claims to the Trust, which such claims will be subject to the Release set forth in Section 6 herein.

8.2.    In the event that any other entity asserts any Contribution Claim against any Zurich Protected Party or Rio Tinto Protected Party and such claim is determined to be valid in any judicial determination or binding arbitration award, the Talc Personal Injury Trust shall voluntarily reduce its judgment(s) or claim(s) against, or settlement with, such other entity to the extent necessary to eliminate such Contribution Claim.    To ensure that such a reduction is accomplished, any Zurich Protected Party or Rio Tinto Protected Party shall be entitled to assert this paragraph as a defense to any action against them for any such Contribution Claim and shall be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the judgment reduction and to protect the Zurich Protected Party or Rio Tinto Protected Party from any liability for the Contribution Claim.

9.    **COOPERATION**

9.1.    Each Party shall use its reasonable efforts to obtain the outcomes sought by this Agreement, and to take such steps and execute such documents as may be reasonably necessary

and proper to effectuate the purpose and intent of this Agreement and to preserve its validity and enforceability.  In the event that any action or proceeding is commenced or prosecuted by any Person to invalidate or prevent the validation, enforcement, or carrying out of all or any provisions of this Agreement, the Parties mutually agree to cooperate fully in opposing such action or proceeding.

9.2.    Each of the Parties shall reasonably cooperate with each of the other Parties in responding to or opposing any motion, objection, claim, assertion, or argument by any third party that this Agreement is not binding, or should be avoided, or that valuable and fair consideration or reasonably equivalent value has not been exchanged pursuant to this Agreement.

9.3.    To the extent required by Section 4.3.3 of this Agreement, the Insurer Parties shall assist and cooperate with the Talc Personal Injury Trust as may be reasonably necessary for the pursuit of Credits and Future Credits assigned to the Talc Personal Injury Trust under this Agreement.

**10.    NO ADMISSIONS OR WAIVER OF PRIVILEGE**

Nothing contained in this Agreement, or in any negotiations, discussions, correspondence, or other materials of any kind relating to this Agreement or relating to the negotiation of this Agreement, shall be deemed to be an admission by any Party with respect to any matter or any factual or legal issue of any kind.  Nothing in this Agreement waives or shall be deemed to waive any Party's work-product protection or right to claim the protections of any applicable privilege, including attorney-client privilege, common-interest privilege, or mediation privilege.

## 11.    BINDING EFFECT OF AGREEMENT

Upon the Agreement Effective Date, all terms and provisions of this Agreement shall be binding on, and shall inure to the benefit of, the Parties and their respective successors and assigns, including the Talc Personal Injury Trust.

## 12.    DISPUTE RESOLUTION

If any dispute should arise concerning the terms, meaning, or implementation of this Agreement, the Parties agree to use their best efforts to reach a prompt resolution of such dispute. If the Parties are unable to reach an agreement, they shall proceed to mediation.  Either Party may initiate litigation in the Bankruptcy Court to the extent the Bankruptcy Court has subject-matter jurisdiction, or to the extent it does not, in any other appropriate forum, but no Party may initiate litigation until 45 days after a mediation has commenced and the mediator has determined that the Parties' mediation has reached an impasse.  All of the Parties consent to personal jurisdiction in any federal court (including the Bankruptcy Court) or state court in the State of Delaware for purposes of resolving any dispute concerning the terms, meaning, or implementation of this Agreement.

## 13.    CONSTRUCTION OF AGREEMENT

13.1.   The Parties represent and acknowledge that they have participated in the preparation and drafting of this Agreement or have each given their approval to all of the language contained in this Agreement, and it is expressly agreed and acknowledged that if any of the Parties later asserts that there is an ambiguity in the language of this Agreement, such asserted ambiguity shall not be presumptively construed for or against any Party on the basis that one Party drafted the language of this Agreement or played a greater role in the drafting of the language.

27

13.2.    The headings of this Agreement are included for convenience and are not part of the provisions hereof and shall have no force or effect.

13.3.    If any provision of this Agreement or application thereof is held to be invalid or unenforceable, the remainder of this Agreement shall remain in effect and be interpreted so as best to reasonably effect the intent of the Parties.  Notwithstanding the foregoing, Sections 2, 3, 4.1, 4.2, 5, and 6 and the definitions of the capitalized terms that appear in those Sections shall not be severable from this Agreement.

## 14.    MEDICARE AND OTHER THIRD-PARTY CLAIMS

14.1.    Rio Tinto's and Zurich's payment obligations under this Agreement run solely to the Talc Personal Injury Trust, as set forth in Section 4 above.  In no event shall any Zurich Corporate Party or Rio Tinto Corporate Party pay or be obligated to pay directly any claimant, any representative of any claimant, or the Debtors' defense counsel on account of any Talc Personal Injury Claim.

14.2.    The Parties agree that, given the buy-back nature of this settlement, Zurich and the Rio Tinto Settling Parties are not "Responsible Reporting Entities," and no Zurich Corporate Party or Rio Tinto Corporate Party shall have any responsibility to make any reports (or to make any payments owed or sums to be paid) to Medicare or to the United States Government or any agency or instrumentality thereof pursuant to the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b)(2), and/or under any related rules, regulations, or guidance issued in connection therewith or relating thereto, including 42 C.F.R. § 411.20 et seq., with respect to any payment the Talc Personal Injury Trust receives under this Agreement or makes on account of Talc Personal Injury Claims.

14.3.    The Talc Personal Injury Trust shall be designated as the "**RRE Agent**."

14.4.    The RRE Agent shall, at its sole expense, act as Zurich's and the Rio Tinto Settling Parties' reporting agent, and shall timely submit all reports that are required by a Responsible Reporting Entity under the reporting provisions of Section III of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173) or any other similar statute or regulation ("**MMSEA**") on account of Talc Personal Injury Claims paid by the RRE Agent.  The RRE Agent shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports under MMSEA (collectively, "**CMS**") to determine whether or not and, if so, how to report to CMS pursuant to MMSEA.

14.5.    The RRE Agent shall provide a written notification to Rio Tinto and Zurich within ten (10) Business Days following receipt of any notification from CMS that any report was rejected or otherwise identified as noncompliant by CMS, along with the basis for such rejection or noncompliance.

14.5.1. With respect to any reports rejected or otherwise identified as noncompliant by CMS, the RRE Agent shall, at Rio Tinto's or Zurich's request, promptly provide copies of the original reports submitted to CMS, as well as any response received from CMS with respect to such reports.  The RRE Agent shall reasonably undertake to remedy any issues of noncompliance that CMS identifies and to resubmit such reports to CMS.  Upon request by Rio Tinto or Zurich, the RRE Agent shall provide copies of such resubmissions.  With respect to copies of original reports and resubmissions provided under this Section 14.5.1, the RRE Agent may redact from such copies the names, social security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers,

employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the injured parties, claimants, guardians, conservators, and/or other personal representatives, as applicable.

14.5.2. All documentation that the RRE Agent relies upon in making a determination that a payment does not have to be reported to CMS shall be maintained for a minimum of six (6) years following such determination.

14.6.    Absent guidance to the contrary from CMS, the Secretary of Health and Human Services or a controlling court, including the United States Court of Appeals for the Third Circuit, the RRE Agent is not required by this Agreement to report any Talc Personal Injury Claim for a claimant who alleges that exposure to or ingestion of talc or talc-containing product for which Debtors are allegedly responsible took place exclusively before December 5, 1980.

14.7.    In the event that CMS concludes that reporting done by the RRE Agent in accordance with this Section 14 is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a timely manner, or if CMS communicates to the RRE Agent, any Zurich Corporate Party, or any Rio Tinto Corporate Party a concern with respect to the sufficiency or timeliness of such reporting or non-reporting, then Rio Tinto and Zurich shall have the right to submit their own reports to CMS under MMSEA, and the RRE Agent shall provide to Rio Tinto and Zurich such information as either may require to comply with MMSEA, including the full reports filed by the RRE Agent without any redactions.  Rio Tinto and Zurich shall keep any information received from the RRE Agent pursuant to this Paragraph confidential and shall not use such information for any purpose other than meeting obligations under MMSEA.

14.8.    The Talc Personal Injury Trust shall obtain, prior to remittance of funds to claimants' counsel or the claimant, if pro se, in respect of any Talc Personal Injury Claim, a

certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Talc Personal Injury Claim.  The Talc Personal Injury Trust shall provide a certification of its compliance with this Section to Rio Tinto and Zurich upon either's request, but not more often than quarterly.

14.9.    Compliance with the requirements of this Section shall be a material obligation of the Debtors and/or the Talc Personal Injury Trust in favor of Zurich and the Rio Tinto Settling Parties under this Agreement.

## 15.    REPRESENTATIONS, WARRANTIES, AND OTHER MISCELLANEOUS PROVISIONS

15.1.    Each Party represents and warrants that, subject to the preconditions set out in Section 2 of this Agreement, it has taken all necessary corporate and legal action required to duly approve the making and performance of this Agreement and that no further action is necessary to make this Agreement binding and legally enforceable according to its terms.

15.2.    Each Party represents and warrants that, to the best of its knowledge and belief, the making and performance of this Agreement will not violate any provision of law or any of its respective articles of incorporation or bylaws or any contract or agreement by which it is bound.

15.3.    Each Party represents and warrants that (a) it is the owner of the rights and claims to be compromised and released by it under this Agreement and (b) it has not assigned or transferred to any Person any such right or claim or other matter to be compromised and released hereunder.

15.4.    Each Party represents and warrants that this Agreement is supported by valid and lawful consideration sufficient to make all aspects of this Agreement legally binding and enforceable on and after the Agreement Effective Date.

31

15.5.    Each Party represents and warrants that this Agreement has been entered into in good faith, as a result of arm's-length negotiations, with advice of counsel, and that this Agreement represents a fair, reasonable, proportionate, and good faith compromise of disputed claims, disputed liabilities, and disputed issues.

15.6.    Each Party represents and warrants that it has read this Agreement in its entirety, fully understands all of its terms and the consequences thereof, and that the individual signing this Agreement on its behalf has full and complete authority and competency to legally bind it to all terms and consequences of this Agreement.

15.7.    The Rio Tinto Captive Insurers represent and warrant that they issued insurance policies only to Rio Tinto plc, Rio Tinto Limited, and their respective past and present affiliated companies, and did not issue insurance policies to any other entities on the open market.

15.8.    This Agreement (including the exhibits attached to it) sets forth the entire agreement among the Parties as to its subject matter, and supersedes any and all prior or contemporaneous statements, agreements, negotiations, or understandings, whether written or oral, except that the Agreement should be read *in pari materia* with the Plan and Disclosure Statement.

15.9.    All notices, demands, or other communications to be provided pursuant to this Agreement shall be in writing and sent by electronic mail and also by overnight mail (or United States first-class mail, postage prepaid), to the other Parties and Consenting Entities at the addresses set forth below, or to such other persons or addresses as the Parties or Consenting Entities may designate in writing from time to time:

For Zurich:

Robert Koscielniak
Director, Latent & Environmental Claims
Zurich North America
1299 Zurich Way
Schaumburg, IL  60196-1056
robert.koscielniak@zurichna.com

Mark D. Plevin, Esq.
Crowell & Moring LLP
Three Embarcadero Center
26th Floor
San Francisco, CA  94111
mplevin@crowell.com

Karen Dixon, Esq.
Skarzynski Marick & Black LLP
353 N. Clark Street, Suite 3650
Chicago, IL 60654
kdixon@skarzynski.com

For Rio Tinto:

Andrea Frost, Esq.
Senior Counsel – Litigation
Rio Tinto
4700 W. Daybreak Parkway
South Jordan, UT 84009
Andrea.frost@riotinto.com

With a copy to:

CompanySecretaryNotices@riotinto.com and the subject line must start with the words: "RIO TINTO AMERICA INC."

John D. Green, Esq.
Farella Braun + Martel LLP
Russ Building
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
jgreen@fbm.com

Danielle Spinelli, Esq.
Wilmer Cutler Pickering Hale and
Dorr LLP
1875 Pennsylvania Ave, N.W.
Washington, DC 20006
danielle.spinelli@wilmerhale.com

For the Debtors:

Ryan Van Meter, Esq.
Imerys Talc America, Inc.
100 Mansell Court East, Suite 300
Roswell, Georgia 30076
ryan.vanmeter@imerys.com

With a copy to:

Kimberly A. Posin, Esq.
Latham & Watkins LLP
355 S. Grand Avenue, Suite 100
Los Angeles, CA 90071
kim.posin@lw.com

Angela R. Elbert, Esq.
Neal, Gerber & Eisenberg LLP
Two North La Salle Street, Suite 1700
Chicago, IL 60602
aelbert@nge.com

For the Consenting Entities:

Kami E. Quinn, Esq.
Gilbert LLP
700 Pennsylvania Ave. SE
Washington, DC 20003
quinnk@gilbertlegal.com

with a copy to:

*Tort Claimants' Committee:*

Natalie D. Ramsey, Esq.
Robinson & Cole LLP
1201 North Market Street
Suite 1406
Wilmington, DE  19801
Direct 302.516.1702
nramsey@rc.com

*FCR:*

Edwin J. Harron, Esq.
Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE  19801
eharron@ycst.com

15.10.  This Agreement may be amended only by a writing signed by or on behalf of each Party and, if before the Agreement Effective Date, each of the Consenting Entities.

15.11.  Zurich represents that it has made a good faith search and has located no evidence of any liability policies issued by Zurich under which any Debtor is insured (excluding expired claims-made policies), other than those listed on Exhibit A, and that it is not aware of any such policy, secondary evidence of any such policy, or any reason to believe such policy exists (other than Policy No. SXL 8129701, issued to Standard Oil Company (Indiana) for the period August 17, 1983 to June 1, 1984).  Rio Tinto represents that it has made a good faith search and has located no evidence of any liability policies issued by the Rio Tinto Captive Insurers under which any Debtor is insured (excluding expired claims-made policies), other than those listed on Exhibit B, and that it is not aware of any such policy, secondary evidence of any such policy, or any reason to believe such policy exists.

15.12.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.  Execution of

this Agreement may be effected by PDF or other electronic transmission of executed copies of the signature pages delivered to counsel for the Parties.

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the last date indicated below.

**IMERYS TALC AMERICA, INC. (on behalf of itself and each of the Debtors in the Chapter 11 Cases)**

By: _____

Name: _____

Title: _____

Date: _____

**IMERYS TALC ITALY S.P.A.**

By: _____

Name: _____

Title: _____

Date: _____

**RIO TINTO AMERICA INC. (on behalf of itself, Three Crowns Insurance Company, Metals & Minerals Insurance Company Pte. Ltd., and Falcon Insurance Limited)**

By: _____

Name: _____

Title: _____

Date: _____

**ZURICH AMERICAN INSURANCE COMPANY**

By: _____

Name: _____

Title: _____

Date: _____

**IN WITNESS WHEREOF**, the Consenting Entities have consented to this Agreement as of the last date indicated below.

**TORT CLAIMANTS' COMMITTEE**          **FCR**

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

**EXHIBIT A**

**Zurich Policies**

| Issuing Insurer | Policy No. | Policy Period |
|---|---|---|
| Zurich Insurance Company, US Branch | GLC 8209842-00/01 | 5/1/1996–5/31/1997 |
| Zurich Insurance Company, US Branch | GLO 8210069-00 | 5/31/1997–5/31/1998 |
| Zurich Insurance Company, US Branch | GLO 8210069-01 | 5/31/1998–5/31/1999 |
| Zurich American Insurance Company | GLO 8210069-02 | 5/31/1999–5/31/2000 |
| Zurich American Insurance Company | GLO 8210069-03 | 5/31/2000–5/31/2001 |
| Zurich American Insurance Company | GLO 8210196-04 | 5/31/2001–5/31/2002 |
| Zurich American Insurance Company | GLO 8210196-05 | 5/31/2002–5/31/2003 |
| Zurich American Insurance Company | GLO 8210196-06 | 5/31/2003–5/31/2004 |
| Zurich American Insurance Company | GLO 8210196-07 | 5/31/2004–5/31/2005 |
| Zurich American Insurance Company | GLO 8210196-08 | 5/31/2005–5/31/2006 |
| Zurich American Insurance Company | GLO 8210196-09 | 5/31/2006–5/31/2007 |
| Zurich American Insurance Company | GLO 8210196-10 | 5/31/2007–5/31/2008 |
| Zurich American Insurance Company | GLO 8210196-11 | 5/31/2008–5/31/2009 |
| Zurich American Insurance Company | GLO 8249662-00 | 5/31/2009–5/31/2010 |
| Zurich American Insurance Company | GLO 8249662-01 | 5/31/2010–5/31/2011 |
| Zurich American Insurance Company | GLO 8249662-02 | 5/31/2011–5/31/2012 |
| Zurich Insurance Company Ltd (Canadian Branch) | 8828308 | 5/31/1997-5/31/2007 |
| Zurich Insurance Company Ltd (Canadian Branch) | 8835547 | 5/31/2007-5/31/2009 |
| Zurich Insurance Company Ltd (Canadian Branch) | 8837911 | 5/31/2009-5/31/2011 |

**EXHIBIT B**

**Rio Tinto Captive Insurer Policies**

| Issuing Insurer | Policy Number | Policy Period |
|---|---|---|
| Metals and Minerals Insurance Pte. Limited | M&M GL/97-98/001 | 5/31/1997 - 5/31/1998 |
| Three Crowns Insurance Company Limited | 98162 | 5/31/1998 - 5/31/1999 |
| Three Crowns Insurance Company Limited | 98162 | 5/31/1999 - 5/31/2000 |
| Three Crowns Insurance Company Limited | 98162 | 5/31/2000 - 5/31/2001 |
| Three Crowns Insurance Company Limited | 98162/01 | 5/31/2001 - 5/31/2002 |
| Three Crowns Insurance Company Limited | 98162/02 | 5/31/2002 - 5/31/2003 |
| Three Crowns Insurance Company Limited | 98162/02A | 5/31/2002 - 5/31/2003 |
| Three Crowns Insurance Company Limited | 98162/02B | 5/31/2002 - 5/31/2003 |
| Three Crowns Insurance Company Limited | 98162/03 | 5/31/2003 - 5/31/2004 |
| Three Crowns Insurance Company Limited | 98162/04 | 5/31/2004 - 5/31/2005 |
| Three Crowns Insurance Company Limited | 98162/05 | 5/31/2005 - 5/31/2006 |
| Three Crowns Insurance Company Limited | 98162/06/A | 5/31/2006 - 5/31/2007 |
| Falcon Insurance Ltd. | 98162/06/C | 5/31/2006 - 5/31/2007 |
| Metals and Minerals Insurance Pte. Limited | 98162/07/B | 5/31/2007 - 5/31/2008 |
| Falcon Insurance Ltd. | 98162/07/C | 5/31/2007 - 5/31/2008 |
| Metals and Minerals Insurance Pte. Limited | 98162/08/B | 5/31/2008 - 5/31/2009 |
| Falcon Insurance Ltd. | 98162/08/C | 5/31/2008 - 5/31/2009 |
| Metals and Minerals Insurance Pte. Limited | 98162/09/B | 5/31/2009 - 5/31/2010 |
| Falcon Insurance Ltd. | 98162/09/C | 5/31/2009 - 5/31/2010 |
| Metals and Minerals Insurance Pte. Limited | 98162/10/B | 5/31/2010 - 5/31/2011 |
| Falcon Insurance Ltd. | 98162/10/C | 5/31/2010 - 5/31/2011 |
| Metals and Minerals Insurance Pte. Limited | 98162/11/B | 5/31/2011 - 5/31/2012 |
| Falcon Insurance Ltd. | 98162/11/C | 5/31/2011 - 5/31/2012 |

## EXHIBIT C

### Excess Policies

| Insurer Participant(s) | Policy Period |
|---|---|
| Allianz SE | 5/31/1997 – 5/31/1998 |
| Zurich Insurance Group Ltd. | 5/31/1997 – 5/31/1998 |
| Lexington Insurance Co., Tamarack, CNA Insurance Company Ltd., USF&G Corporation | 5/31/1997 – 5/31/1998 |
| Reliance National Insurance Company | 5/31/1997 – 5/31/1998 |
| TIG Insurance Company | 5/31/1997 – 5/31/1998 |
| Kemper Insurance Companies | 5/31/1997 – 5/31/1998 |
| Starr Excess Insurance Company | 5/31/1997 – 5/31/1998 |
| XL Insurance Company Ltd. | 5/31/1997 – 5/31/1998 |
| ACE Ltd. | 5/31/1997 – 5/31/1998 |
| Zurich Insurance Group Ltd. | 5/31/1998 – 5/31/2001 |
| Allianz SE | 5/31/1998 – 5/31/2001 |
| CNA Insurance Company Ltd.; Gulf Insurance Company; Kemper Insurance Companies; National Union; USF&G Corporation | 5/31/1998 – 5/31/2001 |
| XL Insurance Company Ltd.; Starr Excess Insurance Company | 5/31/1998 – 5/31/2001 |
| ACE Ltd. | 5/31/1998 – 5/31/2001 |
| Aegis Security Insurance Company; National Union Fire Insurance Co.; St. Paul Fire & Marine Insurance Company; Zurich Global Energy; Kemper Insurance Companies | 5/31/2001 – 5/31/2002 |
| Starr Excess Liability Insurance International Ltd. | 5/31/2001 – 5/31/2002 |
| ACE Ltd.; Oil Casualty Insurance Ltd.; XL Insurance Company Ltd. | 5/31/2001 – 5/31/2002 |
| Zurich Global Energy | 5/31/2002 – 5/31/2003 |
| Kemper Insurance Companies | 5/31/2002 – 5/31/2003 |
| Rock River Insurance Company | 5/31/2002 – 5/31/2003 |
| Athena | 5/31/2002 – 5/31/2003 |
| Great Lakes Reinsurance (UK) Ltd. | 5/31/2002 – 5/31/2003 |
| Arch Bermuda | 5/31/2002 – 5/31/2003 |
| Endurance | 5/31/2002 – 5/31/2003 |
| XL (Sydney) | 5/31/2002 – 5/31/2003 |

| Insurer Participant(s) | Policy Period |
|---|---|
| Starr Excess Liability Insurance International Ltd. | 5/31/2002 – 5/31/2003 |
| Oil Casualty Insurance, Ltd. | 5/31/2002 – 5/31/2003 |
| ACE | 5/31/2002 – 5/31/2003 |
| Starr Excess Liability Insurance International Ltd. | 5/31/2003 – 5/31/2004 |
| XL Insurance Company Ltd. | 5/31/2003 – 5/31/2004 |
| Zurich Insurance Group Ltd. | 5/31/2003 – 5/31/2004 |
| XL Insurance Company Ltd. | 5/31/2004 – 5/31/2005 |
| American Home Assurance Co. | 5/31/2004 – 5/31/2005 |
| Starr Excess Liability Insurance International Ltd. | 5/31/2004 – 5/31/2005 |
| Zurich Insurance Group Ltd. | 5/31/2004 – 5/31/2005 |
| XL Insurance Company Ltd. | 5/31/2005 – 5/31/2006 |
| American Home Assurance Co. | 5/31/2005 – 5/31/2006 |
| Starr Excess Liability Insurance International Ltd. | 5/31/2005 – 5/31/2006 |
| Zurich Insurance Group Ltd. | 5/31/2005 – 5/31/2006 |
| Liberty Mutual Ins. Co.; XL Insurance Company Ltd. | 5/31/2006 – 5/31/2007 |
| American Home Assurance Co. | 5/31/2006 – 5/31/2007 |
| Starr Excess Liability Insurance International Ltd. | 5/31/2006 – 5/31/2007 |
| Zurich Insurance Group Ltd. | 5/31/2006 – 5/31/2007 |
| Liberty Mutual Ins. Co.; XL Insurance Company Ltd. | 5/31/2007 – 5/31/2008 |
| American Home Assurance Co. | 5/31/2007 – 5/31/2008 |
| Starr Excess Liability Insurance International Ltd. | 5/31/2007 – 5/31/2008 |
| Catlin Underwriting Agencies, Ltd.; Zurich Insurance Group Ltd. | 5/31/2007 – 5/31/2008 |
| Catlin Underwriting Agencies, Ltd.; Liberty Mutual Insurance Co; XL Insurance Company Ltd. | 5/31/2008 – 5/31/2009 |
| AIG Excess Liability Insurance International Ltd. | 5/31/2008 – 5/31/2009 |
| Starr Excess Liability Insurance International Ltd. | 5/31/2008 – 5/31/2009 |
| Catlin Underwriting Agencies, Ltd.; Zurich Insurance Group Ltd. | 5/31/2008 – 5/31/2009 |
| AIG London; AIG Australia; DA Constable; Liberty Mutual Ins. Co.; XL Insurance Company Ltd. | 5/31/2009 – 5/31/2010 |
| Catlin Underwriting Agencies, Ltd.; Zurich Insurance Group Ltd. | 5/31/2009 – 5/31/2010 |

| Insurer Participant(s) | Policy Period |
|---|---|
| AIG; American Home Assurance Co.; DA Constable; Liberty Mutual Ins. Co.; XL Insurance Company Ltd. | 5/31/2010 – 5/31/2011 |
| Catlin Underwriting Agencies, Ltd.; Zurich Insurance Group Ltd. | 5/31/2010 – 5/31/2011 |
| AIG; American Home Assurance Co.; DA Constable; Liberty Mutual Ins. Co.; XL Insurance Company Ltd. | 5/31/2011 – 5/31/2012 |
| Catlin Underwriting Agencies, Ltd.; Starr Excess Liability Insurance International Ltd.; Zurich Insurance Group Ltd. | 5/31/2011 – 5/31/2012 |
| Arch Insurance Co.; Iron-Starr Underwriting Agency Ltd. | 5/31/2011 – 5/31/2012 |

## EXHIBIT D

### Assignment of Rights

This Assignment of Rights ("Assignment") is executed by Rio Tinto America Inc. ("Rio Tinto"), on its own behalf and on behalf of the Rio Tinto Captive Insurers (Rio Tinto and the Rio Tinto Captive Insurers, collectively, the "Rio Tinto Settling Parties"), and Zurich American Insurance Company, in its own capacity and as successor-in-interest to Zurich Insurance Company, U.S. Branch ("Zurich," and collectively with the Rio Tinto Settling Parties, the "Insurer Parties").  Except where otherwise specified, capitalized terms appearing in this Assignment have the meanings set out in the accompanying Settlement Agreement and Release.

WHEREAS, the Debtors and the Insurer Parties entered into the Rio Tinto/Zurich Settlement, including the accompanying Settlement Agreement and Release dated [_____], in order to fully and finally resolve their disputes, and to provide for other consideration, promises, releases, and covenants set forth therein;

WHEREAS, in exchange for consideration set out in the Rio Tinto/Zurich Settlement and the Settlement Agreement and Release, the Insurer Parties agreed to make cash contributions to the Talc Personal Injury Trust as set forth therein;

WHEREAS, in addition to the foregoing cash contributions, as part of the Rio Tinto/Zurich Settlement the Insurer Parties agreed to assign to the Talc Personal Injury Trust the Credits and the Future Credits, as defined therein; *provided, however*, that the Insurer Parties did not agree to assign to the Talc Personal Injury Trust, and will retain, all of their rights against their reinsurers and/or retrocessionaires, in their capacities as such;

WHEREAS, pursuant to an October 17, 2017 Assignment of Claims (the "Zurich Assignment of Claims"), Zurich and its affiliated companies previously assigned to Rio Tinto and its affiliated companies any and all rights of recovery against third parties with respect to sums already paid or thereafter paid under the Zurich Policies in connection with any lawsuit filed against Imerys Talc America, Inc. in which the plaintiff alleges ovarian cancer and/or bodily injury caused by exposure to products containing talc provided, distributed, or mined by Luzenac America, Inc. or other entities divested by Rio Tinto and its affiliated companies to Imerys Talc America, Inc. and/or its affiliated companies;

WHEREAS, Zurich acknowledges that, through the Zurich Assignment of Claims, it has assigned to Rio Tinto and its affiliated companies any and all rights of subrogation, contribution and/or indemnity arising out of the defense or payment of Talc Personal Injury Claims, but for the avoidance of doubt, Zurich wishes to assign any remaining rights it may have;

THEREFORE, the Insurer Parties hereby assign to the Talc Personal Injury Trust the Credits and the Future Credits; *provided, however,* that the Insurer Parties do not assign to the Talc Personal Injury Trust, and do retain, all of their rights against their reinsurers and/or retrocessionaires, in their capacities as such.

Rio Tinto America Inc.

By: _____

Printed Name: _____

Date: _____


Zurich American Insurance Company Inc.

By: _____

Printed Name: _____

Date: _____

## **EXHIBIT D**

**Cyprus Settlement Agreement**

## <u>SETTLEMENT AGREEMENT AND RELEASE</u>

This Settlement Agreement and Release (the **"Cyprus Settlement Agreement"**) is entered into by and among Cyprus Mines Corporation (**"Cyprus Mines"**), Cyprus Amax Minerals Company (**"CAMC,"** together with Cyprus Mines, **"Cyprus"**), Freeport-McMoRan Inc. (**"Freeport"** and, together with Cyprus, the **"Cyprus Parties"**), on the one hand, and Imerys Talc America, Inc. (**"ITA"**), Imerys Talc Vermont, Inc. (**"ITV"**), Imerys Talc Canada Inc. (**"ITC"**), and, to the extent it becomes a debtor in the Imerys Chapter 11 Cases, Imerys Talc Italy S.p.A. (**"ITI"**), the Tort Claimants' Committee in the Imerys Chapter 11 Cases (the **"Tort Claimants' Committee"**), and James L. Patton as Future Claims Representative in the Imerys Chapter 11 Cases (the **"FCR"**) on the other hand.  Capitalized terms appearing in this Cyprus Settlement Agreement that are not defined in this prefatory paragraph have the meanings set out in Section 1 of this Cyprus Settlement Agreement.

## RECITALS

WHEREAS, certain Talc Personal Injury Claims have been brought, and in the future may be brought, against the Imerys Debtors and/or Cyprus seeking damages and other relief for, among other things, alleged bodily injury;

WHEREAS, disputes have arisen as to the liabilities or obligations of the Imerys Debtors and of Cyprus for Talc Personal Injury Claims;

WHEREAS, disputes have also arisen as to (a) the rights of the Imerys Debtors and of Cyprus to seek coverage for Talc Personal Injury Claims under the Cyprus Talc Insurance Policies and (b) the existence and scope of the rights of the Imerys Debtors and of Cyprus to seek indemnification for Talc Personal Injury Claims from J&J;

WHEREAS, on February 13, 2019, ITA, ITV, and ITC filed voluntary petitions for relief with the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, commencing their respective chapter 11 cases;

WHEREAS, pursuant to the Imerys Plan, ITI will file its own Chapter 11 Case if the Imerys Plan is accepted by the requisite percentages of holders of Talc Personal Injury Claims;

WHEREAS, the Imerys Debtors, on the one hand, and the Cyprus Parties, on the other hand, while denying that they are liable for any injuries relating to the Talc Personal Injury Claims, wish to fully and finally resolve their disputes as part of a global compromise and settlement to be implemented through the Imerys Plan and the Cyprus Mines Plan; and

WHEREAS, the global compromise and settlement is intended: (a) to provide the Cyprus Protected Parties with a full and comprehensive resolution and release of – and an injunction channeling to the Talc Personal Injury Trust – any and all current and future potential liabilities, at law or equity, arising out of or related to talc-related litigation claims that may be channeled, released and/or enjoined under the Bankruptcy Code (including sections 105(a), 524(g), and 1141(d) of the Bankruptcy Code) and Rule 9019 of the Bankruptcy Rules, and (b) to resolve any and all estate claims (including claims based on theories of veil piercing, successor liability or conspiracy) that any of the Imerys Debtors, or Cyprus Mines as a debtor, could assert against Cyprus Mines (in the case of the Imerys Debtors), CAMC, or any other Cyprus Protected Party;

NOW THEREFORE, in consideration of the foregoing, and in consideration of the other mutual considerations, promises, releases, and covenants set forth below, the sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

US-DOCS\120836835.1

## 1.    ADDITIONAL DEFINITIONS

The following definitions apply to this Cyprus Settlement Agreement.  The singular form of a word includes the plural and vice versa; the disjunctive "or" is not exclusive and thus includes the conjunctive "and"; all pronouns apply to the male, female, and neutral genders; the word "any" includes the word "all" and vice versa; and the words "includes" and "including" are without limitation.

1.1.    **"Affirmation Order"** shall have the meaning set forth in the Imerys Plan.

1.2.    **"ATA"** shall mean that certain Agreement of Transfer and Assumption (as amended) dated June 5, 1992 between Cyprus Mines and Cyprus Talc Corporation (n/k/a Imerys Talc America, Inc.).

1.3.    **"Bankruptcy Code"** shall have the meaning set forth in the Imerys Plan.

1.4.    **"Bankruptcy Court"** shall have the meaning set forth in the Imerys Plan.

1.5.    **"Bankruptcy Rules"** shall have the meaning set forth in the Imerys Plan.

1.6.    **"Business Day"** shall have the meaning set forth in the Imerys Plan.

1.7.    **"California Coverage Action"** means the action captioned as *Columbia Casualty Co., et al.* v. *Cyprus Mines Corp., et al.*, No. CGC-17-560919 (Cal. Super. Ct.).

1.8.    **"CAMC Cash Payments"** shall have the meaning set forth in Section 3.1 of this Cyprus Settlement Agreement.

1.9.    **"CAMC Funding Loan"** shall have the meaning set forth in Section 5.7 of this Cyprus Settlement Agreement.

1.10.    **"Cash"** shall have the meaning set forth in the Imerys Plan.

1.11.    **"Channeling Injunction"** shall mean the permanent injunction provided for in the Imerys Plan and the Cyprus Plan with respect to Talc Personal Injury Claims against the

3

Protected Parties to be issued pursuant to the Confirmation Order and the confirmation order in the Cyprus Mines Bankruptcy, it being understood that the scope of the Channeling Injunction in the Cyprus Mines Plan shall channel all Talc Personal Injury Claims as defined in the Cyprus Mines Plan and shall otherwise be substantially similar to the Channeling Injunction in the Imerys Plan.

1.12.   **"Claim,"** when capitalized, shall have the meaning set forth in the Imerys Plan.

1.13.   **"CMAC"** shall mean Climax Molybdenum Asia Corporation.

1.14.   **"Confirmation Date"** shall have the meaning set forth in the Imerys Plan.

1.15.   **"Confirmation Order"** shall have the meaning set forth in the Imerys Plan.

1.16.   **"Cyprus Affiliated Parties"** shall have the meaning set forth in the Imerys Plan.

1.17.   **"Cyprus Contribution"** shall have the meaning set forth in the Imerys Plan.

1.18.   **"Cyprus Indemnity Adversary Proceeding"** shall mean *Cyprus Mines Corporation and Cyprus Amax Minerals Company v. Imerys Talc America, Inc., Imerys Talc Vermont, Inc., Johnson & Johnson and Johnson & Johnson Consumer Inc.*, Adv. Pro. No. 20-50626 (Bankr. D. Del.).

1.19.   **"Cyprus Indemnity Rights"** shall mean (i) all of the Cyprus Parties' rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), reimbursement or subrogation against any Person relating to the payment or defense of any Talc Personal Injury Claim or other past talc-related claim channeled to the Talc Personal Injury Trust prior to the Cyprus Trigger Date (the **"Cyprus Credits"**), and (ii) all of their rights or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), reimbursement or subrogation against any Person relating to any other Talc Personal Injury Claim or other claims channeled to the Talc Personal Injury Trust (the **"Cyprus Future**

4

**Credits"**); *provided, however*, that the assertion of the Cyprus Credits or Cyprus Future Credits against a Protected Party shall be subject to the Channeling Injunction, and nothing herein shall impact the injunctions and releases otherwise inuring to the benefit of the Cyprus Protected Parties under the terms of the Imerys Plan and Cyprus Plan; and *provided further* that, for the avoidance of doubt, the Cyprus Indemnity Rights shall not include, and the assignment of such rights shall not impair, the rights of any Talc Insurance Company.

1.20.    **"Cyprus Insurance Adversary Proceeding"** shall mean *Imerys Talc America, Inc., et al. v. Cyprus Amax Minerals Company and Cyprus Mines Corporation*, Adv. Pro. No. 19-50115 (Bankr. D. Del.).

1.21.    **"Cyprus Insurance Protocol"** shall have the meaning set forth in the Imerys Plan, it being understood that any changes to the Cyprus Insurance Protocol from that which is set out in the Fifth Amended Imerys Plan must be consented to by the Parties hereto.

1.22.    **"Cyprus Mines Bankruptcy"** shall have the meaning set forth in the Imerys Plan.

1.23.    **"Cyprus Mines Estate"** means the estate created in the Cyprus Mines Bankruptcy under section 541 of the Bankruptcy Code.

1.24.    **"Cyprus Mines Plan"** shall have the meaning set forth in the Imerys Plan.

1.25.    **"Cyprus Mines Released Claims"** shall have the meaning set forth in Section 4.3 of this Cyprus Settlement Agreement.

1.26.    **"Cyprus Parties"** shall have the meaning set forth in the Imerys Plan.

1.27.    **"Cyprus Protected Parties"** shall have the meaning set forth in the Imerys Plan.

1.28.    **"Cyprus Released Claims"** shall have the meaning set forth in Section 4.1 of this Cyprus Settlement Agreement and Section 12.2.1(d) of the Imerys Plan, it being understood

5

that the Cyprus Mines Plan shall include a definition of "Cyprus Released Claims" substantially similar to the definition in the Imerys Plan.

1.29. **"Cyprus Settlement"** means that certain comprehensive settlement by and among the Cyprus Parties, the Debtors, the Tort Claimants' Committee, and the FCR, the terms of which are set forth in and implemented by the Imerys Plan, the Cyprus Mines Plan, and this Cyprus Settlement Agreement, pursuant to which, in exchange for the Cyprus Contribution and other good and valuable consideration, the Cyprus Protected Parties receive the benefit of the releases, injunctions, and other protections set forth in the Imerys Plan, the Cyprus Mines Plan, and this Cyprus Settlement Agreement

1.30. **"Cyprus Talc Insurance Company"** shall have the meaning set forth in the Imerys Plan.

1.31. **"Cyprus Talc Insurance Policy"** shall have the meaning set forth in the Imerys Plan.

1.32. **"Cyprus Talc Insurance Policy Rights"** shall mean (a) all rights, Claims, benefits or causes of action held by the Cyprus Protected Parties with respect to the Cyprus Talc Insurance Policies, including the right to receive proceeds; and (b) all rights, Claims, or causes of action held by the Cyprus Protected Parties, including the right to receive proceeds, with respect to any settlement agreements or coverage-in-place agreements to the extent those agreements amend, modify, replace, or govern the rights and obligations of, and the coverage afforded to, any or all of the Cyprus Protected Parties under any Cyprus Talc Insurance Policy. For the avoidance of doubt, subject to Section 6.1 hereof, the right to receive proceeds under any such agreements will not apply to any proceeds paid to a Cyprus Protected Party under such agreements prior to the Cyprus Trigger Date.

6

1.33.    **"Cyprus Trigger Date"** shall have the meaning set forth in the Imerys Plan.

1.34.    **"Disclosure Statement"** shall have the meaning set forth in the Imerys Plan.

1.35.    **"District Court"** shall have the meaning set forth in the Imerys Plan.

1.36.    **"Document Access Agreement"** shall have the meaning set forth in Section 8.3 of this Cyprus Settlement Agreement.

1.37.    **"Estate Causes of Action"** shall mean all actions, claims, rights remedies, defenses, counterclaims, suit and causes of action that fall within the definition of "Estate Cause of Action" in the Imerys Plan or in the Cyprus Mines Plan, as applicable, it being understood that the Cyprus Mines Plan shall include a definition of "Estate Cause of Action" substantially similar to the definition in the Imerys Plan.

1.38.    **"Execution Date"** means the earliest date on which this Cyprus Settlement Agreement has been signed by all Parties.

1.39.    **"Fifth Amended Imerys Plan"** shall mean the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, Case No. 19-10289, D.I. 2673 (filed Dec. 22, 2020).

1.40.    **"Final Order"** shall have the meaning set forth in the Imerys Plan.

1.41.    **"First Installment"** shall have the meaning set forth in Section 3.1.1.1 of this Cyprus Settlement Agreement.

1.42.    **"Foreign Claims"** shall have the meaning set forth in the Imerys Plan.

1.43.    **"Imerys Chapter 11 Cases"** means the procedurally consolidated chapter 11 cases of the Imerys Debtors pending in the Bankruptcy Court and jointly administered as Case No. 19-10289 (LSS), and, if applicable, the chapter 11 case to be commenced by ITI.

7

1.44.   **"Imerys Debtors"** means ITA, ITV, ITC, and, to the extent it becomes a debtor in the Imerys Chapter 11 Cases, ITI.

1.45.   **"Imerys Debtor Released Claims"** shall have the meaning set forth in Section 4.2 of this Cyprus Settlement Agreement.

1.46.   **"Imerys Effective Date"** shall have the same meaning as the term "Effective Date" in the Imerys Plan.

1.47.   **"Imerys Estates"** means the estates created in the Imerys Chapter 11 Cases under section 541 of the Bankruptcy Code.

1.48.   **"Imerys Plan"** means the *Seventh Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated January 20, 2021 (ECF No. 2809), as the same may be amended or modified from time to time pursuant to section 1127 of the Bankruptcy Code, and with Cyprus' consent to the extent required by the Imerys Plan.

1.49.   **"Imerys Plan Supplement"** shall have the same meaning as the term "Plan Supplement" in the Imerys Plan.

1.50.   **"J&J"** shall have the meaning set forth in the Imerys Plan.

1.51.   **"Minimum Liquidity Covenant"** shall have the meaning set forth in Section 3.2 of this Cyprus Settlement Agreement.

1.52.   **"Parties"** shall mean the Cyprus Parties, the Imerys Debtors, the Tort Claimants' Committee and the FCR (and each, individually, a **"Party"**).

1.53.   **"PDC Agreement"** shall have the meaning set forth in the Imerys Plan.

1.54.   **"Person"** shall have the meaning set forth in the Imerys Plan.

1.55.   **"Plan Documents"** shall have the meaning set forth in the Imerys Plan.

8

1.56.    **"Protected Party"** shall have the meaning set forth in the Imerys Plan.

1.57.    **"Reorganized Imerys Debtors"** shall have the same meaning as the term "Reorganized Debtors" in the Imerys Plan.

1.58.    **"Section 105 Injunction"** shall mean an injunction pursuant to Section 105 of the Bankruptcy Code entered in the Imerys Chapter 11 Cases against the commencement or continuation of any Talc Personal Injury Claims against Cyprus Mines and CAMC.    The Section 105 Injunction shall be effective on an interim basis and terminate, absent extension by the Bankruptcy Court, if the Confirmation Order confirming the Imerys Plan, and incorporating the Cyprus Settlement, is not entered by June 30, 2021.    In the event the Imerys Plan is approved by the Bankruptcy Court by June 30, 2021, the Section 105 Injunction shall extend through at least September 30, 2021, subject to further extension by the Bankruptcy Court.

1.59.    **"Supplemental Settlement Injunction Order"** shall have the meaning set forth in the Imerys Plan.

1.60.    **"Talc Insurance Company"** shall have the meaning set forth in the Imerys Plan.

1.61.    **"Talc Personal Injury Claim"** shall mean any Claim or Talc Personal Injury Demand (as such terms are defined in the Imerys Plan or the Cyprus Mines Plan) that falls within the definition of "Talc Personal Injury Claim" in the Imerys Plan or in the Cyprus Mines Plan, it being understood that the Cyprus Mines Plan shall include a definition of "Talc Personal Injury Claim" that includes claims, with respect to any manner of alleged bodily injury, death, sickness, disease or alleged disease process, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries (whether physical, emotional or otherwise), against any Cyprus Protected Party that directly or indirectly arise out of or relate to the alleged acts or omissions of Cyprus Mines, or any other entity for whose conduct Cyprus Mines has or is alleged to have

9

liability, relating to talc or talc-related products.  As in the Imerys Plan, the definition of "Talc Personal Injury Claim" in the Cyprus Mines Plan shall include Indirect Talc Personal Injury Claims as defined in the Cyprus Mines Plan.

1.62.    **"Talc Personal Injury Trust"** shall have the meaning set forth in the Imerys Plan.

1.63.    **"Trust Distribution Procedures"** shall have the meaning set forth in the Imerys Plan.

## 2.  CONDITIONS TO EFFECTIVENESS

2.1.    This Cyprus Settlement Agreement shall become effective and binding on the earliest date on which all of the following conditions precedent have occurred, *provided, however*, that any of the conditions precedent set out in Sections 2.1.1 through 2.1.8 below may be waived pursuant to a writing signed by each Party (if before the Imerys Effective Date), or signed by each of the Cyprus Parties and the Talc Personal Injury Trust (if after the Imerys Effective Date) on a prospective or retroactive basis:

2.1.1.    Each Party executes this Cyprus Settlement Agreement;

2.1.2.    The Imerys Debtors seek the Section 105 Injunction no later than January 21, 2021;

2.1.3.    The Bankruptcy Court enters the Section 105 Injunction by February [28], 2021;

2.1.4.    The Bankruptcy Court confirms the Imerys Plan, including approval of the Cyprus Settlement, by June 30, 2021;

2.1.5.    A bankruptcy court confirms the Cyprus Mines Plan, including approval of the Cyprus Settlement, by September 30, 2021;

2.1.6.  The District Court enters the Affirmation Order with respect to the Imerys Plan and the Affirmation Order becomes a Final Order;

2.1.7.  A district court enters an affirmation order with respect to the Cyprus Mines Plan and that affirmation order becomes a Final Order;

2.1.8.  The other conditions precedent set forth in Section 9.2 of the Imerys Plan and substantially similar conditions in the Cyprus Mines Plan have been satisfied or waived in accordance with the terms of the applicable plan;

2.1.9.  The Imerys Effective Date has occurred; and

2.1.10. The Cyprus Trigger Date has occurred.

## 3.    CYPRUS CONTRIBUTION

3.1.  **CAMC Cash Payments**

3.1.1.  Following the Cyprus Trigger Date, pursuant to an unsecured seven-year promissory note, issued by CAMC, for and on behalf of itself, Cyprus Mines, and all other Cyprus Protected Parties, in favor of the Talc Personal Injury Trust, with a stated principal amount of $130 million as of the Cyprus Trigger Date, CAMC will pay, or cause to be paid, a total of $130 million in Cash, via wire transfers, to the Talc Personal Injury Trust (the **"CAMC Cash Payments"**) in seven installments, where each subsequent payment shall be made on or before the anniversary of the first payment.  The sum of the first three payments shall be $65 million, and the sum of the next four payments shall be $65 million. Each payment shall be made no later than as set forth in the following schedule:

- Within thirty (30) days after the Cyprus Trigger Date: $21.67 million (the **"First Installment"**);

- 1-year anniversary of the First Installment: $21.67 million;

11

- 2-year anniversary of the First Installment: $21.67 million;

- 3-year anniversary of the First Installment: $16.25 million;

- 4-year anniversary of the First Installment: $16.25 million;

- 5-year anniversary of the First Installment: $16.25 million; and

- 6-year anniversary of the First Installment: $16.25 million.

3.1.2.   Prior to the Cyprus Trigger Date, the Talc Personal Injury Trust shall provide the Cyprus Parties with a Form W-9 containing the Talc Personal Injury Trust's tax identification number and bank account information sufficient to make the required wire transfers to the Talc Personal Injury Trust.

3.1.3.   Payment of the CAMC Cash Payments by CAMC, for and on behalf of itself, Cyprus Mines, and all other Cyprus Protected Parties, shall not be reduced or affected by any payments the Cyprus Parties may have made in connection with Talc Personal Injury Claims prior to the Cyprus Trigger Date.

3.1.4.   The releases and injunctions contained in the Imerys Plan, this Cyprus Settlement Agreement, and the Confirmation Order with respect to the Cyprus Protected Parties shall dissolve immediately should any of the CAMC Cash Payments (or, if required by the guarantee in Section 3.2.1, any payments from Freeport) not be received by the Talc Personal Injury Trust within thirty (30) days of a true and accurate written notice from the Talc Personal Injury Trust to CAMC and Freeport in accordance with

12

Section 14.8 that such payment was due and not made by the applicable deadline set forth in Section 3.1.1.

3.2.    **Freeport Guarantee of CAMC Obligations**

3.2.1.   Freeport shall provide a guarantee of the CAMC Cash Payments and shall be subject to a minimum liquidity covenant of not less than $500 million tested as of the end of each of its fiscal quarters (the **"Minimum Liquidity Covenant"**).

3.2.2.   If Freeport fails to meet the Minimum Liquidity Covenant in respect of any such fiscal quarter before CAMC has paid the $130 million in full, Freeport will post security in favor of the Talc Personal Injury Trust in respect of the Cyprus Parties' obligations under Section 3 in the form of a performance bond, letter of credit, or other similar instrument for all remaining cash payments.

3.2.3.   For purposes of this Section 3.2, "liquidity" means the sum of unrestricted cash of Freeport and its consolidated subsidiaries as of the applicable test date, plus availability under Freeport's revolving credit facilities at such time.

3.3.    **Transfer of the Cyprus Talc Insurance Policies**

3.3.1.   On the Cyprus Trigger Date, or promptly thereafter (not to exceed five (5) Business Days), the Cyprus Parties shall execute and deliver to the Talc Personal Injury Trust an Assignment of Rights substantially in the form of **Exhibit A** assigning and transferring to the Talc Personal Injury Trust any and all of the Cyprus Talc Insurance Policy Rights, and any and all Cyprus Indemnity Rights.

3.3.2.   Upon the occurrence of the Cyprus Trigger Date, the Talc Personal Injury Trust will assume all present and future obligations associated with recovering proceeds under the Cyprus Talc Insurance Policies; *provided that* solely to the extent that the Talc

13

Personal Injury Trust asserts any claim as assignee of a Cyprus Protected Party bound by the PDC Agreement, the Talc Personal Injury Trust shall abide by the terms of the PDC Agreement; *provided further that* unless otherwise stated in the Imerys Plan or this Cyprus Settlement Agreement, the Talc Personal Injury Trust obligations shall not include any obligations undertaken by any Cyprus Protected Party in any settlement agreement or other contract compromising or releasing any rights under any Cyprus Talc Insurance Policy.

3.3.3.   Within five (5) Business Days of the Cyprus Trigger Date, CAMC shall deliver an officer's certificate representing that the Cyprus Protected Parties do not have insurance policies issued prior to June 30, 1992 that may provide coverage for any Talc Personal Injury Claim other than the Cyprus Talc Insurance Policies.

3.3.4.   Following the Cyprus Trigger Date, the Cyprus Protected Parties agree not to assert, file, or pursue any claim seeking contribution or indemnity against any Person in order to recover any proceeds of the Cyprus Talc Insurance Policies.

3.3.5.   The Cyprus Protected Parties shall assist and cooperate with the Talc Personal Injury Trust as may be reasonably necessary for the pursuit of coverage under the Cyprus Talc Insurance Policies, including with respect to the California Coverage Action.  Such assistance shall include, at least, using commercially reasonable efforts to provide all information and documentation reasonably necessary to assert all rights under the Cyprus Talc Insurance Policies, including: (a) non-privileged communications with the Cyprus Talc Insurance Companies regarding the Cyprus Talc Insurance Policies; (b) documents sufficient to show, and proof of, all amounts paid under the Cyprus Talc Insurance Policies, including for defense costs, judgments, or settlements of claims; and

14

(c) non-privileged communications with other third parties relating to the Cyprus Talc Insurance Policies, any rights thereunder, or any claims or defenses related thereto; *provided*, *however*, that such assistance will not extend to any documents or information that are subject to any applicable privilege, including attorney-client privilege, common-interest privilege, or mediation privilege, or to the work-product doctrine, and will be provided subject to the requirements of any existing confidentiality agreements, unless modified or waived by the necessary parties, and *provided further* that nothing in this Section 3.3.5 shall require any of the Cyprus Protected Parties to take any action that would expose them to liability, including for breach of confidentiality obligations**.**

3.4.    **Cyprus Insurance Protocol.**  The Talc Personal Injury Trust shall comply with the Cyprus Insurance Protocol.

# 4. RELEASES

4.1.    **Release of the Cyprus Released Claims.**  Effective upon the Cyprus Trigger Date (and subject to Section 9 herein), for good and valuable consideration, the adequacy of which is hereby confirmed, the Imerys Debtors, on their own behalf and as representatives of their respective Imerys Estates, and the Reorganized Imerys Debtors, and any of their successors, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Cyprus Protected Parties of and from (a) all Estate Causes of Action and (b) any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Imerys Debtors, the Imerys Estates, and the

15

Reorganized Imerys Debtors have, had, may have, or may claim to have against any of the Cyprus Protected Parties, directly or indirectly arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim, including any and all claims and causes of action asserted or assertable in the Cyprus Insurance Adversary Proceeding and the Cyprus Indemnity Adversary Proceeding (collectively, the **"Cyprus Released Claims"**).

4.2.    **Release of Imerys Debtor Released Claims.**  Effective upon the occurrence of the Cyprus Trigger Date (and subject to Section 9 herein), for good and valuable consideration, the adequacy of which is hereby confirmed, the Cyprus Protected Parties shall be deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge the Imerys Debtors, the Imerys Estates, the Reorganized Imerys Debtors, and (other than as provided in the Imerys Plan) the Talc Personal Injury Trust from any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Cyprus Protected Parties have, had, may have, or may claim to have against any of the Imerys Debtors, the Imerys Estates, the Reorganized Imerys Debtors, or (other than as provided in the Imerys Plan) the Talc Personal Injury Trust directly or indirectly arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim, including any and all claims and causes of action asserted or assertable in the Cyprus Insurance Adversary Proceeding and the Cyprus Indemnity Adversary Proceeding (collectively, the **"Imerys Debtor Released Claims"**). For avoidance of doubt, nothing in this Section 4.2 shall affect or impair any Cyprus Protected Party's rights, causes of action or claims against J&J.

16

4.3.    **Release by Cyprus Mines of Cyprus Protected Parties**.    Effective upon the Cyprus Trigger Date (and subject to Section 9 herein), for good and valuable consideration, the adequacy of which is hereby confirmed, Cyprus Mines, on its own behalf and on behalf of the Cyprus Mines Estate, is deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Cyprus Protected Parties of and from (a) all Estate Causes of Action and (b) any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which Cyprus Mines or the Cyprus Mines Estate has, had, may have, or may claim to have against any of the Cyprus Protected Parties, directly or indirectly arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim (collectively, the **"Cyprus Mines Released Claims"**).

4.4.    **Unknown or Future Claims.**    The Parties expressly acknowledge that there may be changes in the law or the Parties may hereafter discover facts different from, or in addition to, those that they now believe to be true with respect to any and all of the claims released in Sections 4.1, 4.2, and 4.3 above.    Nevertheless, the Parties hereby agree that (subject to Section 9 of this Cyprus Settlement Agreement) the releases set forth in Sections 4.1, 4.2, and 4.3 above shall be and remain effective in all respects, notwithstanding any changes in the law or the discovery of such additional or different facts.    In addition, the Parties acknowledge that they have been advised by their respective legal counsel regarding, and are familiar with, the provisions of section 1542 of the California Civil Code, which provides:

**A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of**

17

**executing the release, and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.**

The Parties expressly waive and relinquish any and all rights or benefits they have or may have under California Civil Code § 1542 and under any other federal or state statute, rule, law, or common law principle of similar effect, as to the releases given in this Cyprus Settlement Agreement, to the full extent that such right or benefit may be lawfully waived.  In connection with the waiver and relinquishment of rights or benefits under California Civil Code § 1542 or any other federal or state statute, rule, law or common law principle of similar effect, each Party acknowledges that it fully understands that facts may later be discovered in addition to or different from those facts which are now known or believed to be true with respect to the subject matter of this Cyprus Settlement Agreement, and that it is that Party's intention hereby to fully, finally and forever release all claims and rights, known or unknown, suspected or unsuspected, which now exist, may exist in the future, and/or have ever existed in the past, as to the matters released in Sections 4.1, 4.2, and 4.3 of this Cyprus Settlement Agreement.

4.5.    **Releases Cumulative.**  For the avoidance of doubt, the releases contained in this Section 4 are cumulative of any applicable releases contained in the Imerys Plan and the Cyprus Mines Plan.

4.6.    **Other Rights and Obligations Under This Cyprus Settlement Agreement Not Affected.**  The releases set forth in Section 4 of this Cyprus Settlement Agreement are not intended to, and shall not, extend to or otherwise release any of the respective rights, privileges, benefits, duties, or obligations of the Parties pursuant to or arising from this Cyprus Settlement Agreement, the Imerys Plan, or the Cyprus Mines Plan.

18

US-DOCS\120836835.1

**5.      CYPRUS MINES BANKRUPTCY**

5.1.      The Cyprus Mines Plan shall be in a form and substance reasonably acceptable to the Imerys Debtors, the Tort Claimants' Committee and the FCR, respectively and as applicable, with respect to each provision that is material to the Imerys Debtors, the Tort Claimants' Committee or the FCR's rights and obligations in connection with the Cyprus Settlement.  The Cyprus Mines Plan, the proposed confirmation order in the Cyprus Mines Bankruptcy, and the proposed affirmation order in the Cyprus Mines Bankruptcy shall be in form and substance acceptable to CAMC.

5.2.      The Imerys Debtors, Tort Claimants' Committee, and FCR agree to take all reasonable and necessary steps to obtain approval of the Cyprus Settlement in the Imerys Chapter 11 Cases.  The Tort Claimants' Committee and FCR also agree to take all reasonable and necessary steps to obtain approval of the Cyprus Settlement in the Cyprus Mines Bankruptcy.  The Tort Claimants' Committee, FCR, and the Cyprus Parties shall cooperate in good faith to seek entry of a confirmation order in the Cyprus Mines Bankruptcy and an affirmation order in the Cyprus Mines Bankruptcy that are each consistent with this Cyprus Settlement Agreement.

5.3.      The Parties shall coordinate the preparation and filing of the Imerys Plan and the Cyprus Mines Plan to the maximum extent possible, *provided that* such coordination is not the cause for delay of the Imerys Debtors' confirmation schedule as approved by the Bankruptcy Court.

5.4.      The Cyprus Mines Plan will provide that (a) unsecured claims against Cyprus Mines other than Talc Personal Injury Claims, including any environmental and pension claims, will proceed through the bankruptcy and be unimpaired and (b) the equity of CAMC in Cyprus

19

Mines and Cyprus Mines' equity in CMAC shall not be affected or impaired, except to the extent that equity in Cyprus Mines is pledged to the Talc Personal Injury Trust.

5.5.    Prior to the Cyprus Trigger Date, Cyprus Mines shall provide the Tort Claimants' Committee and the FCR with diligence showing the current assets and value of CMAC.

5.6.    Absent the consent of the other Parties hereto, Cyprus Mines and CAMC agree that they shall not seek, pursuant to Section 105 of the Bankruptcy Code or otherwise, any interim injunctive protection applicable to any Talc Personal Injury Claim in connection with the Cyprus Mines Bankruptcy for the benefit of any party other than a Cyprus Protected Party.

5.7.    CAMC will provide superpriority debtor-in-possession financing to Cyprus Mines, on an unsecured basis, to fund the reasonable administrative expenses of the Cyprus Mines Bankruptcy, including the fees and expenses of a tort claimants' committee and future claims representative in the Cyprus Mines Bankruptcy (the **"CAMC Funding Loan"**).  Subject to Section 5.8 hereof, the CAMC Funding Loan will be in an amount reasonable and necessary to effectuate the Cyprus Settlement and consistent with customary terms and conditions.  The CAMC Funding Loan may not be used for purposes inconsistent with this Cyprus Settlement Agreement, including for pursuit of litigation against any Cyprus Protected Parties.  The CAMC Funding Loan (including any and all fees, costs, and expenses) will be forgiven upon the effective date of the Cyprus Mines Plan and the effectiveness of all associated releases and injunctions.

5.8.    Notwithstanding any other provision hereof, CAMC shall not be obligated to provide total financing in excess of $15 million (the **"Funding Commitment"**) in connection with the CAMC Funding Loan or to fund other expenses allocable to CAMC, Cyprus Mines or the Cyprus Mines Estate under Section 7 hereof.

20

5.9.    The Cyprus Mines Plan will contain the broadest releases and channeling injunctions permitted by sections 105(a), 524(g), and 1141(d)(1) of the Bankruptcy Code so as to prevent the assertion of any further Talc Personal Injury Claims of any kind against any Cyprus Protected Party.  The intent of the Parties is to provide the Cyprus Protected Parties with "global peace" from any further talc-related litigation.

5.10.    The Cyprus Mines Plan shall provide the following provisions or other equivalent provisions and protections, consistent with or parallel to the analogous provisions in the Imerys Plan:

5.10.1. The definition of "Estate Causes of Action" shall include causes of action against the Imerys Debtors, the Imerys Estates, and the Reorganized Imerys Debtors;

5.10.2. The definition of "Released Parties" shall include the Imerys Debtors, the Imerys Estates, and the Reorganized Imerys Debtors;

5.10.3. The definition of "Protected Parties" shall include the Imerys Debtors, the Imerys Estates, and the Reorganized Imerys Debtors;

5.10.4. This Cyprus Settlement Agreement shall be an exhibit to the Cyprus Mines Plan or included as part of the Cyprus Mines Plan Supplement;

5.10.5. The "Indemnification of Protected Parties" provision of the Cyprus Mines Plan shall provide for the indemnification of the Imerys Debtors, the Imerys Estates and the Reorganized Imerys Debtors;

5.10.6. The "Releases by Debtor and the Estate" provision of the Cyprus Mines Plan shall protect the Imerys Debtors, the Imerys Estates, and the Reorganized Imerys Debtors;

21

5.10.7. The "Releases by Holders of Claims" provision of the Cyprus Mines Plan shall protect the Imerys Debtors, the Imerys Estates, and the Reorganized Imerys Debtors;

5.10.8. The "Injunction Related to Releases" provision of the Cyprus Mines Plan shall protect the Imerys Debtors, the Imerys Estates and the Reorganized Imerys Debtors;

5.10.9. The "Channeling Injunction" provision of the Cyprus Mines Plan shall protect the Imerys Debtors, the Imerys Estates, and the Reorganized Imerys Debtors;

5.10.10. The Cyprus Mines Plan shall contain a provision substantially similar to the "Supplemental Settlement Injunction Order" provision of the Imerys Plan, and such provision shall protect the Imerys Debtors, the Imerys Estates, and the Reorganized Imerys Debtors; and

5.10.11. Proposed findings of fact and conclusions of law consistent with the relief to be provided to the Imerys Debtors, their Estates, and the Reorganized Imerys Debtors as set forth herein shall be included in the proposed order approving the Cyprus Mines Plan.

## 6.    IMERYS CHAPTER 11 CASE

6.1.    Following the entry of the Section 105 Injunction, as to all claims and lawsuits against Cyprus Mines and CAMC that are enjoined or stayed, and to the extent such injunctions or stays are and remain in place, Cyprus shall take all reasonable steps to avoid taking actions that would reduce the available limits of the Cyprus Talc Insurance Policies.

22

6.2.    The Parties shall cooperate in good faith to seek entry of the Confirmation Order and Affirmation Order in the Imerys Chapter 11 Cases.  The Imerys Plan, Confirmation Order, and Affirmation Order shall be in form and substance acceptable to CAMC and Cyprus Mines, respectively and as applicable, with respect to each provision that is material to CAMC's or Cyprus Mines' rights and obligations in connection with the Cyprus Settlement.

6.3.    The Imerus Plan shall include all terms that are material to the Cyprus Settlement that were first included in the Fifth Amended Imerys Plan, including at least the following provisions, and other terms necessary to effectuate the releases and protections to be afforded to the Cyprus Protected Parties pursuant to this Cyprus Settlement Agreement:

> 6.3.1.  The definition of "Estate Causes of Action" shall include causes of action against Cyprus Protected Parties.
>
> 6.3.2.  The definition of "Released Parties" shall include the Cyprus Protected Parties.
>
> 6.3.3.  The definition of "Protected Parties" shall include the Cyprus Protected Parties.
>
> 6.3.4.  This Cyprus Settlement Agreement shall be attached to the Imerys Plan.
>
> 6.3.5.  The "Indemnification of Protected Parties" provision shall include the Cyprus Protected Parties.  For the avoidance of doubt, the indemnification of the Cyprus Protected Parties shall not extend to Foreign Claims.
>
> 6.3.6.  The "Releases by Debtors and Estates" provision of the Imerys Plan shall protect the Cyprus Protected Parties, and a subsection of the Imerys Plan shall include a provision relating to "Cyprus Released Claims" that is

23

analogous to the "Imerys Released Claims" and "Rio Tinto/Zurich Released Claims" provisions as contained therein.

6.3.7.  The "Releases by Holders of Claims" provision of the Imerys Plan shall protect the Cyprus Protected Parties.

6.3.8.  The "Injunction Related to Releases" provision of the Imerys Plan shall protect the Cyprus Protected Parties.

6.3.9.  The "Channeling Injunction" provision of the Imerys Plan shall protect the Cyprus Protected Parties.

6.3.10. The "Supplemental Settlement Injunction Order" provision of the Imerys Plan shall protect the Cyprus Protected Parties.

6.3.11. The Talc Personal Injury Trust shall assume the liabilities, obligations, and responsibilities of the Imerys Debtors and the Cyprus Protected Parties for all Talc Personal Injury Claims, financial or otherwise, including Indirect Talc Personal Injury Claims.

6.3.12. Proposed findings of fact and conclusions of law consistent with the relief to be provided to the Cyprus Protected Parties as set forth herein shall be included in the proposed order approving the Imerys Plan.

6.4.    On and after December 22, 2020, (a) the Cyprus Protected Parties shall stay and cease prosecuting all adversary proceedings, proofs of claim, objections, discovery demands and discovery disputes, and any other litigation against the Imerys Debtors, the Tort Claimants' Committee, and the FCR, and (b) the Imerys Debtors, the Tort Claimants' Committee, and the FCR shall stay and cease prosecuting all adversary proceedings, proofs of claim, objections, discovery demands and discovery disputes, and any other litigation against Cyprus Mines and the

24

other Cyprus Protected Parties; *provided that* the Imerys Debtors shall be permitted to file a proof of claim in the Cyprus Mines Bankruptcy solely to preserve their rights pending the Cyprus Trigger Date; *provided further* that, for the avoidance of doubt, the filing of the Imerys Plan shall not stay, delay, or otherwise prevent the adjudication of any adversary proceedings or claims of the Cyprus Protected Parties against J&J.

6.5.    Upon occurrence of the Cyprus Trigger Date, (a) the Cyprus Protected Parties shall release, dismiss and withdraw all claims against the Imerys Debtors arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim, including without limitation all indemnity claims, and (b) the Imerys Debtors shall release, dismiss and withdraw all claims against Cyprus Mines and the other Cyprus Protected Parties arising out of, with respect to, or in any way relating to any Talc Personal Injury Claim, including all indemnity claims.  The foregoing dismissals and withdrawals shall be without prejudice to re-filing, and all releases shall be void and all released claims may be reinstated, if and only if the Affirmation Order or the affirmation order in the Cyprus Mines Bankruptcy fails to become a Final Order.

6.6.    Except to contend that any of the Parties hereto have breached this Cyprus Settlement Agreement, or to address any changes to the Imerys Plan or the Plan Documents materially impacting the rights of any Cyprus Protected Party or treatment of their Claims against the Imerys Debtors, the Cyprus Protected Parties shall not object to the Imerys Plan or seek any formal discovery from the Imerys Debtors, the Tort Claimants' Committee, or the FCR (and the Imerys Debtors, the Tort Claimants' Committee, and the FCR shall not seek formal discovery from the Cyprus Protected Parties) with respect to the Imerys Plan.  Within three (3) days following the Execution Date, any pending objections of the Cyprus Parties to the Imerys Plan and Disclosure Statement shall be deemed withdrawn.  Such withdrawals shall be without prejudice until the

25

occurrence of the Cyprus Trigger Date, at which time such withdrawals shall be deemed to be with prejudice.  For the avoidance of doubt, in the event that this Cyprus Settlement Agreement is terminated or is no longer effective, this Section 6.6 shall no longer be effective and shall not prejudice the Cyprus Protected Parties' rights to take any of the actions described in this Section 6.6.

6.7.    On the Imerys Effective Date, the rights and obligations of the Imerys Debtors under this Cyprus Settlement Agreement shall be deemed to have been assigned and transferred to the Talc Personal Injury Trust without need of further action by any Party or Person, and the Talc Personal Injury Trust shall be bound by all of the provisions of this Cyprus Settlement Agreement.  The Reorganized Imerys Debtors shall continue to be bound by this Cyprus Settlement Agreement and shall retain the obligations and benefits hereunder to the extent consistent with the Imerys Plan.

6.8.    Solely in the event the conditions to effectiveness described in Section 2 of this Cyprus Settlement Agreement do not occur and are not waived, the stays described in Sections 6.5 and 6.6 shall be lifted and the Cyprus Protected Parties, on the one hand, and the Imerys Debtors, on the other hand: (a) shall be fully entitled to prosecute and seek recovery on all claims against one another, including under the Trust Distribution Procedures (as applicable), and in the interim may take any necessary action to avoid forfeitures or waivers of such claims; and (b) notwithstanding any prior actions or omissions, may opt out of any consensual release in the respective plans.

## 7.    ALLOCATION OF PROFESSIONAL FEES

7.1.    Cyprus Mines shall pay the reasonable fees and expenses of professionals for the TCC and FCR incurred on or after December 22, 2020, including to the extent those

US-DOCS\120836835.1

professionals act in unofficial capacities on behalf of Cyprus Mines tort claimants prior to the Cyprus Mines Bankruptcy, in connection with preparation for Cyprus Mines' bankruptcy case, including preparation of its plan, disclosure statement and related documents.  Cyprus Mines shall provide reasonable retainers for Robinson & Cole LLP, Young Conaway Stargatt & Taylor, LLP, Willkie Farr & Gallagher LLP and Gilbert LLP for work in advance of the Cyprus Mines Bankruptcy on behalf of tort claimants against Cyprus Mines and the proposed representative of future tort claimants against Cyprus Mines.

7.2.    Any and all reasonable and documented fees and expenses incurred by the Tort Claimants' Committee and the FCR in the Imerys Chapter 11 Cases on or after December 22, 2020 related exclusively to the Cyprus Settlement or the defense of same will be paid by CAMC. For the avoidance of doubt, this includes the costs of litigating any objection made to the approval or implementation of this Cyprus Settlement Agreement by any entity in the Imerys Chapter 11 Case.

7.3.    Any and all reasonable and documented fees and expenses incurred by the Tort Claimants' Committee and the FCR in the Imerys Chapter 11 Cases defending objections or for other work that the Parties reasonably determine, in good faith, materially relates to both to the Cyprus Settlement and to other aspects of the Imerys Plan shall be allocated equally between the CAMC and the Imerys Estates (50% to each) until CAMC has expended $2.5 million under this Section 7.3.

7.4.    After CAMC has expended $2.5 million under Section 7.3, then fees and expenses in the category described in Section 7.3 shall be allocated equitably between CAMC and the Imerys Estates based on the relative benefit to the Cyprus Protected Parties, on the one hand, and the Imerys Estates, on the other.

27

7.5.    Fees or expenses relating to the Imerys Plan that do not relate in any material respect to the Cyprus Protected Parties and the Cyprus Settlement will be allocated solely to the Imerys Estates and not to Cyprus Mines or CAMC.

7.6.    The Parties will negotiate in good faith to resolve disputes regarding assignment of fees and expenses among the categories above.  Absent agreement, the Parties will submit to accelerated binding arbitration of disputes by Lawrence Pollack using a streamlined process to be determined in consultation with Mr. Pollack.

7.7.    For the avoidance of doubt, all fees and expenses paid by CAMC under this Section 7 shall be counted towards the $15 million Funding Commitment limit set forth in Section 5.8.

## 8.  COOPERATION

8.1.    Each Party shall use its reasonable efforts to obtain approval of this Cyprus Settlement Agreement.  In the event that any action or proceeding is commenced or prosecuted by any Person to invalidate or prevent the approval, validation, enforcement, or carrying out of all or any provisions of this Cyprus Settlement Agreement, the Parties mutually agree to cooperate in opposing such action or proceeding.

8.2.    Each of the Parties shall reasonably cooperate with each of the other Parties in responding to or opposing any motion, objection, claim, assertion, or argument by any Person that this Cyprus Settlement Agreement is not binding, or should be avoided, or that valuable and fair consideration or reasonably equivalent value has not been exchanged pursuant to this Cyprus Settlement Agreement.

8.3.    On the Cyprus Trigger Date, Cyprus Mines, CAMC and the Talc Personal Injury Trust shall enter into an agreement (the **"Document Access Agreement"**) whereby (i) certain

28

books and records of the Cyprus Protected Parties will be transferred, or otherwise made available, to the Talc Personal Injury Trust, and (ii) the Cyprus Protected Parties will reasonably cooperate with the Talc Personal Injury Trust with respect to all rights and causes of action assigned or contributed to the Talc Personal Injury Trust, including claims related to insurance or indemnity rights transferred to the Talc Personal Injury Trust against any Talc Insurance Company or J&J; *provided that* nothing in this Section 8.3 shall require any of the Cyprus Protected Parties to take any action that would expose them to liability.  The Document Access Agreement shall be filed by no later than the date of filing of the Plan Supplement in the Cyprus Mines Bankruptcy.

## 9.  VOIDABILITY

9.1.    This Cyprus Settlement Agreement shall be rendered null and void, as applicable, if any of the following contingencies occur, *provided, however*, that any of the contingencies set out in Sections 9.1.1 through 9.1.4 may be waived by the Parties pursuant to a writing signed by each Party (if before the Imerys Effective Date, including the Tort Claimants Committee and the FCR; if after the Imerys Effective Date, including the Talc Personal Injury Trust):

9.1.1.  The entry of a Confirmation Order by the Bankruptcy Court, or of an Affirmation Order by the District Court, confirming or affirming the confirmation of a Chapter 11 plan of reorganization for the Imerys Debtors that is not the Imerys Plan;

9.1.2.   The entry of a confirmation order by a bankruptcy court, or of an affirmation order by a district court, confirming or affirming the confirmation of a Chapter 11 plan of reorganization for Cyprus Mines that does not incorporate the terms of the Cyprus Settlement as set forth in this Cyprus Settlement Agreement and the Imerys Plan;

9.1.3.  The entry by the Bankruptcy Court or District Court of an order denying approval of the Cyprus Settlement or of this Cyprus Settlement Agreement, including an

29

order denying approval of the Imerys Plan to the extent it incorporates the Cyprus Settlement or the Cyprus Mines Plan to the extent it incorporates the Cyprus Settlement;

9.1.4.   The entry by the Bankruptcy Court, prior to the Imerys Effective Date, of a Final Order converting the Imerys Chapter 11 Cases into cases under Chapter 7 of the Bankruptcy Code or dismissing the Imerys Chapter 11 Cases;

9.1.5.   The non-occurrence of any of the conditions set forth in Section 2.1, including:

- Each Party executes this Cyprus Settlement Agreement;

- The Imerys Debtors seek the Section 105 Injunction no later than January 21, 2021;

- The Bankruptcy Court enters the Section 105 Injunction by February [28], 2021;

- The Bankruptcy Court confirms the Imerys Plan, including approval of the Cyprus Settlement, by June 30, 2021;

- A bankruptcy court confirms the Cyprus Mines Plan, including approval of the Cyprus Settlement, by September 30, 2021;

9.1.6.   The entry by the Bankruptcy Court, prior to the Imerys Effective Date, of a Final Order appointing a trustee or an examiner substantially possessing the rights, powers, and duties of a bankruptcy trustee in the Imerys Chapter 11 Cases; or

US-DOCS\120836835.1

9.1.7.  The entry by the Bankruptcy Court of a Final Order appointing a trustee or an examiner substantially possessing the rights, powers, and duties of a bankruptcy trustee in the Cyprus Mines Bankruptcy.

9.2.    Notwithstanding anything in this Cyprus Settlement Agreement to the contrary, in the event that one of the contingencies listed in Section 9.1 above occurs and is not waived by the Parties on a prospective or retrospective basis:

9.2.1.  This Cyprus Settlement Agreement, except for this Section 9 and any definitions of capitalized terms used herein (which shall remain in full force and effect), shall be null and void and:

- None of the Parties shall be bound by the terms of the Cyprus Settlement or any of the terms of this Cyprus Settlement Agreement (including the releases contained in Section 4 and the Assignment of Rights attached as Exhibit A);

- CAMC, for and on behalf of itself, Cyprus Mines, and all other Cyprus Protected Parties and/or Freeport shall not be obligated to pay the CAMC Cash Payments as described in Section 3.1 herein, and the Cyprus Protected Parties shall not be obligated to assign the Cyprus Talc Insurance Policy Rights or the Cyprus Indemnity Rights to the Talc Personal Injury Trust as described in Section 3.3 herein.

- The Cyprus Protected Parties shall not be designated as Protected Parties, in the Imerys Plan, Confirmation Order, or Affirmation Order, and the Cyprus Protected Parties shall not be entitled to assert the Channeling Injunction as a defense to any Talc Personal Injury Claim;

31

- The Cyprus Protected Parties shall not be obligated to pay any of the professional fees allocated to any of them pursuant to Section 7 that have not yet been incurred as of the date that one of the contingencies listed in Section 9.1 above occurs and is not waived by the Parties; and

- The Parties shall have all of the same rights, defenses, and obligations under or with respect to any and all of the Cyprus Talc Insurance Policies, and any and all agreements giving rise to the Cyprus Indemnity Rights, that they would have had absent this Cyprus Settlement Agreement.

9.2.2.  In the event of a material breach of this Cyprus Settlement Agreement by any Party to this agreement (regardless of whether such Party has signed the Settlement Agreement or been authorized to enter into the agreement), any Party to this Settlement Agreement whose rights are materially affected by such breach may terminate the Settlement Agreement and all obligations hereunder by providing notice to all other Parties hereto in accordance with Section 14.8.  Upon such termination, the Parties shall have no further obligations under the Cyprus Settlement Agreement, and, for the avoidance of doubt, the provisions of Section 9.2.1 shall apply.    Termination    of    this    Cyprus Settlement Agreement pursuant to this Section 9.2.2 shall be the exclusive remedy for material breach of this Cyprus Settlement Agreement.

9.2.3.  Any and all otherwise applicable statutes of limitations or repose, or other time-related limitations, shall be deemed to have been tolled for the period from the Execution Date through the date on which this Cyprus Settlement Agreement becomes null and void in accordance with Section 9.1 above, and no Party shall assert that any other

32

Party's failure during said period to raise any claim that would have been resolved by this Cyprus Settlement Agreement, had this Cyprus Settlement Agreement become effective or not been voided, as applicable, renders such claim time-barred.

## 10.    NO ADMISSIONS OR WAIVER OF PRIVILEGE

Nothing contained in this Cyprus Settlement Agreement, or in any negotiations, discussions, correspondence, or other materials of any kind relating to this Cyprus Settlement Agreement or relating to the negotiation of this Cyprus Settlement Agreement, shall be deemed to be an admission by any Party with respect to any matter or any factual or legal issue of any kind. In particular, nothing in this Agreement shall constitute an admission by any Party with respect to any factual or legal issue of any kind regarding the claims and causes of action asserted or assertable in the Cyprus Insurance Adversary Proceeding and the Cyprus Indemnity Adversary Proceeding.  Nothing in this Cyprus Settlement Agreement is intended to waive, waives or shall be deemed to waive any Party's work-product protection or right to claim the protections of any applicable privilege, including attorney-client privilege, common-interest privilege, or mediation privilege.

## 11.    BINDING EFFECT OF AGREEMENT

Upon the Cyprus Trigger Date, all terms and provisions of this Cyprus Settlement Agreement shall be binding on, and shall inure to the benefit of, the Parties and their respective successors and assigns, including the Talc Personal Injury Trust.

## 12.    DISPUTE RESOLUTION

If any dispute should arise concerning the terms, meaning, or implementation of this Cyprus Settlement Agreement, the Parties agree to use their best efforts to reach a prompt resolution of such dispute.  If the Parties are unable to reach an agreement, they shall proceed to

US-DOCS\120836835.1

mediation administered by JAMS, and agree to request that Lawrence Pollack shall serve as mediator. Either Party may initiate litigation in the Bankruptcy Court to the extent the Bankruptcy Court has subject-matter jurisdiction, or to the extent it does not, in any other appropriate forum, but no Party may initiate litigation until forty-five (45) days after a mediation has commenced and the mediator has determined that the Parties' mediation has reached an impasse. All of the Parties consent to personal jurisdiction in any federal court (including the Bankruptcy Court) or state court in the State of Delaware for purposes of resolving any dispute concerning the terms, meaning, or implementation of this Cyprus Settlement Agreement.

## 13.    CONSTRUCTION OF AGREEMENT

13.1.    The Parties represent and acknowledge that they have participated in the preparation and drafting of this Cyprus Settlement Agreement or have each given their approval to all of the language contained in this Cyprus Settlement Agreement, and it is expressly agreed and acknowledged that if any of the Parties later asserts that there is an ambiguity in the language of this Cyprus Settlement Agreement, such asserted ambiguity shall not be presumptively construed for or against any Party on the basis that one Party drafted the language of this Cyprus Settlement Agreement or played a greater role in the drafting of the language.

13.2.    This Cyprus Settlement Agreement shall be interpreted and construed consistent and *in pari materia* with the Imerys Plan. To the extent the Cyprus Protected Parties obtain benefits or protection under this Cyprus Settlement Agreement but not under the Imerys Plan, or vice versa, all benefits or protections are to be deemed cumulative and non-exclusive.

13.3.    The headings of this Cyprus Settlement Agreement are included for convenience and are not part of the provisions hereof and shall have no force or effect.

US-DOCS\120836835.1

13.4.    If any provision of this Cyprus Settlement Agreement or application thereof is held to be invalid or unenforceable, any Party shall be entitled to terminate this Cyprus Settlement Agreement as though a material breach had occurred under Section 9.2.2.

## 14.    REPRESENTATIONS, WARRANTIES, AND OTHER MISCELLANEOUS PROVISIONS

14.1.    Each Party represents and warrants that, subject to the conditions precedent set out in Section 2 of this Cyprus Settlement Agreement, it has taken all necessary corporate governance and legal action required to duly approve the making and performance of this Cyprus Settlement Agreement and that no further action is necessary to make this Cyprus Settlement Agreement binding and legally enforceable according to its terms.

14.2.    Each Party represents and warrants that, to the best of its knowledge and belief, the making and performance of this Cyprus Settlement Agreement will not violate any provision of law or any of its respective articles of incorporation or bylaws or any contract or agreement by which it is bound.

14.3.    Each Party represents and warrants that (a) it is the owner, or believes itself to be the owner, of the rights and claims to be compromised and released by it under this Cyprus Settlement Agreement and (b) it has not assigned or transferred, or does not believe it has assigned or transferred, to any Person any such right or claim or other matter to be compromised and released hereunder.

14.4.    Each Party represents and warrants that this Cyprus Settlement Agreement is supported by valid and lawful consideration sufficient to make all aspects of this Cyprus Settlement Agreement legally binding and enforceable on and after the Cyprus Trigger Date.

14.5.    Each Party represents and warrants that this Cyprus Settlement Agreement has been entered into in good faith, as a result of arm's-length negotiations, with advice of counsel,

35

and that this Cyprus Settlement Agreement represents a fair, reasonable, proportionate, and good faith compromise of disputed claims, disputed liabilities, and disputed issues.

14.6.    Each Party represents and warrants that it has read this Cyprus Settlement Agreement in its entirety, fully understands all of its terms and the consequences thereof, and that the individual signing this Cyprus Settlement Agreement on its behalf has full and complete authority and competency to legally bind it to all terms and consequences of this Cyprus Settlement Agreement.

14.7.    This Cyprus Settlement Agreement (including the exhibits attached to it) sets forth the entire agreement among the Parties as to its subject matter, and supersedes any and all prior or contemporaneous statements, agreements, negotiations, or understandings, whether written or oral, except that this Cyprus Settlement Agreement shall be read *in pari materia* with the Imerys Plan.

14.8.    All notices, demands, or other communications to be provided pursuant to this Cyprus Settlement Agreement shall be in writing and sent by electronic mail and also by overnight mail (or United States first-class mail, postage prepaid), to the other Parties at the addresses set forth below, or to such other persons or addresses as the Parties may designate in writing from time to time:

For Cyprus Mines:

D. Jansing Baker
PO Box 609
Garrison, NY 10524
djbaker@djbaker.net

With a copy to:

Paul M. Singer
Reed Smith LLP
225 Fifth Avenue
Pittsburgh, PA 15222
psinger@reedsmith.com

36

<u>For CAMC</u>:

Scott Statham
c/o Freeport-McMoRan Inc.
333 North Central Ave.
Phoenix, AZ 85004
sstatham@fmi.com

With a copy to:

Emil A. Kleinhaus
Wachtell, Lipton, Rosen & Katz
52 West 52nd Street
New York, NY 10019
eakleinhaus@wlrk.com

<u>For Freeport</u>:

Scott Statham
c/o Freeport-McMoRan Inc.
333 North Central Ave.
Phoenix, AZ 85004
sstatham@fmi.com

With a copy to:

Emil A. Kleinhaus
Wachtell, Lipton, Rosen & Katz
52 West 52nd Street
New York, NY 10019
eakleinhaus@wlrk.com

<u>For the Imerys Debtors</u>:

Ryan Van Meter, Esq.
Imerys Talc America, Inc.
100 Mansell Court East, Suite 300
Roswell, Georgia 30076
ryan.vanmeter@imerys.com

US-DOCS\120836835.1

<u>With a copy to:</u>

Kimberly A. Posin, Esq.
Latham & Watkins LLP
355 S. Grand Avenue, Suite 100
Los Angeles, CA 90071
kim.posin@lw.com

Angela R. Elbert, Esq.
Neal, Gerber & Eisenberg LLP
Two North La Salle Street, Suite 1700
Chicago, IL  60602
aelbert@nge.com

<u>For the Tort Claimants Committee and the FCR</u>:

Kami E. Quinn, Esq.
Gilbert LLP
700 Pennsylvania Ave. SE
Washington, DC  20003
quinnk@gilbertlegal.com

with a copy to:

*Tort Claimants' Committee:*

Natalie D. Ramsey, Esq.
Robinson & Cole LLP
1201 North Market Street
Suite 1406
Wilmington, DE  19801
Direct 302.516.1702
nramsey@rc.com

*FCR:*

Edwin J. Harron, Esq.
Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE  19801
eharron@ycst.com

14.9.    This Cyprus Settlement Agreement may be amended only by a writing signed by or on behalf of each Party (if before the Imerys Effective Date, by the Tort Claimants Committee and the FCR; if after the Imerys Effective Date, by the Talc Personal Injury Trust).

14.10.    This Cyprus Settlement Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.    Execution of this Cyprus Settlement Agreement may be effected by electronic transmission of executed copies of the signature pages delivered to counsel for the Parties.

**IN WITNESS WHEREOF**, the Parties have duly executed this Cyprus Settlement Agreement as of the last date indicated below.

**IMERYS TALC AMERICA, INC. (on behalf of itself and each of the Imerys Debtors in the Imerys Chapter 11 Cases)**

By:    _____

Name: _____

Title: _____

Date: _____

**IMERYS TALC ITALY S.P.A.**

By:    _____

Name: _____

Title: _____

Date: _____

**CYPRUS MINES CORPORATION**

By:    _____

Name: _____

Title: _____

Date: _____

**CYPRUS AMAX MINERALS COMPANY**

By:    _____

Name: _____

Title: _____

Date: _____

**FREEPORT-MCMORAN INC.**

39

By: _____

Name: _____

Title: _____

Date: _____


**TORT CLAIMANTS' COMMITTEE**          **FCR**

By: _____      By: _____

Name: _____    Name: _____

Title: _____   Title: _____

Date: _____    Date: _____

**SCHEDULE I**

**Imerys Corporate Parties**

**CURRENT AFFILIATES**

- 000 CALDERYS
- AFRICA REFRACTORY CONSULTANTS (PTY) LTD
- AKROTIRIO THAHILAS DYO S.A.
- ALMATECH MINERAL INTERNATIONAL LTD
- ALMERIA, SA DE CV
- ALUMICA CANADA INC.
- AMERICARB, INC.
- AMMIN HOLDINGS, INC.
- ANGANG STOLLBERG & SAMIL CO., LTD
- ARDOISIERES D'ANGERS
- AUSTRALIAN VERMICULITE INDUSTRIES (PTY) LTD
- B & B REFRACTORY SERVICES PTY LTD
- CALDERYS ALGERIE SERVICES SPA
- CALDERYS ALGERIE SPA
- CALDERYS AUSTRALIA PTY LTD
- CALDERYS BELGIUM
- CALDERYS CHINA CO., LTD
- CALDERYS DANMARK A/S
- CALDERYS DEUTSCHLAND GMBH
- CALDERYS FINLAND OY
- CALDERYS FRANCE
- CALDERYS IBERICA REFRACTARIOS, SA
- CALDERYS INDIA REFRACTORIES LIMITED
- CALDERYS ITALIA SRL
- CALDERYS JAPAN CO., LTD
- CALDERYS KOREA CO. LTD
- CALDERYS MAGYARORSZAG K.F.T. (HUNGARY)
- CALDERYS NGJ LIMITED
- CALDERYS NORDIC AB
- CALDERYS POLSKA SP. Z.O.O.
- CALDERYS REFRACTARIOS VENEZOLANOS SA
- CALDERYS REFRAKTER
- CALDERYS SOUTH AFRICA (PTY) LTD
- CALDERYS TAÏWAN CO LTD
- CALDERYS THE NETHERLANDS B.V.
- CALDERYS UK LTD
- CALDERYS UKRAINE LTD
- CALDERYS USA, INC.

- CEBO HOLLAND B.V.
- CEBO INTERNATIONAL B.V.
- CEBO MARINE  B.V.
- CEBO UK LIMITED
- CHANGBAI CELITE DIATOMITE CO., LTD
- DONBASSKERAMIKA
- DONKAOLIN
- ECCA HOLDINGS (PTY) LTD
- ECCA MINERALS (PTY) LTD
- ECO-BOS DEVELOPMENT LIMITED
- ELMIN BAUXITES SA
- FAGERSTA ELDFASTA AB
- FIBERLEAN TECHNOLOGIE LIMITED
- FIBERLEAN TECHNOLOGIE NA INC.
- FIBERLEAN TECNOLOGIA E SOLUCOES EIRELI
- FOKIS MINING PARK
- GIMPEX-IMERYS INDIA PRIVATE LTD
- GUIYANG JIANAI SPECIAL ALUMINATES
- HARBORLITE AEGEAN ENDUSTRI MINERALLERI SANAYI A.S.
- IMERTECH
- IMERTECH USA, INC.
- IMERYS  KILN FURNITURE HUNGARY KFT.
- IMERYS (SHANGHAI) INVESTMENT MANAGEMENT CO., LTD
- IMERYS ADMINISTRATIVE GERMANY GMBH
- IMERYS AL ZAYANI FUSED MINERALS CO. W.L.L.
- IMERYS ALÜMINÄT DIS TICARET
- IMERYS ALUMINATES ASIA PACIFIC PTE LTD
- IMERYS ALUMINATES GMBH
- IMERYS ALUMINATES ITALIA S.R.L.
- IMERYS ALUMINATES LIMITED
- IMERYS ALUMINATES NORDIC AB
- IMERYS ALUMINATES SA
- IMERYS ARGENTINA SRL
- IMERYS ASIA PACIFIC PTE LTD
- IMERYS BELGIUM SA
- IMERYS BENTONITE GEORGIA LTD
- IMERYS BENTONITE HUNGARY KFT
- IMERYS BENTONITE ITALY S.P.A.
- IMERYS CANADA INC.
- IMERYS CARBONATES (THAILAND), LTD
- IMERYS CARBONATES AUSTRIA GMBH
- IMERYS CARBONATES INDIA LIMITED
- IMERYS CARBONATES USA, INC.
- IMERYS CERAMICS (INDIA) PRIVATE LIMITED

- IMERYS CERAMICS (THAILAND) LTD
- IMERYS CERAMICS BRASIL MINERAIS PARA CERAMICAS LTDA
- IMERYS CERAMICS EGYPT
- IMERYS CERAMICS FRANCE
- IMERYS CERAMICS ITALY S.R.L.
- IMERYS CERAMICS MEXICO SA DE CV
- IMERYS CERAMICS NEW ZEALAND
- IMERYS CERAMICS PORTUGAL, SA
- IMERYS CLAYS, INC.
- IMERYS CSI SWITZERLAND SAGL
- IMERYS DIATOMITA ALICANTE, S.A.
- IMERYS DIATOMITA MEXICO, SA DE CV
- IMERYS DO BRASIL COMERCIO
- IMERYS FILTRATION FRANCE
- IMERYS FILTRATION MINERALS, INC.
- IMERYS FUSED MINERALS (YINGKOU) CO., LTD
- IMERYS FUSED MINERALS BEYREDE SAS
- IMERYS FUSED MINERALS DOMODOSSOLA S.P.A.
- IMERYS FUSED MINERALS FRANCE SARL
- IMERYS FUSED MINERALS GREENEVILLE, INC.
- IMERYS FUSED MINERALS GUIZHOU CO. LTD
- IMERYS FUSED MINERALS LAUFENBURG GMBH
- IMERYS FUSED MINERALS MURG GMBH
- IMERYS FUSED MINERALS NIAGARA FALLS, INC.
- IMERYS FUSED MINERALS RUSE D.O.O.
- IMERYS FUSED MINERALS SALTO LTDA
- IMERYS FUSED MINERALS TEUTSCHENTHAL GMBH
- IMERYS FUSED MINERALS VILLACH GMBH
- IMERYS FUSED MINERALS ZSCHORNEWITZ GMBH
- IMERYS GECKO GRAPHITE (NAMIBIA) (PTY) LTD
- IMERYS GECKO HOLDING (NAMIBIA) (PTY) LTD
- IMERYS GECKO OKANJANDE MINING (PTY) LTD
- IMERYS GRAPHITE & CARBON BELGIUM SA
- IMERYS GRAPHITE & CARBON CANADA INC.
- IMERYS GRAPHITE & CARBON JAPAN KK
- IMERYS GRAPHITE & CARBON KOREA
- IMERYS GRAPHITE & CARBON SWITZERLAND SA
- IMERYS HIGH RESISTANCE MINERALS JAPAN KK
- IMERYS INDUSTRIAL MINERALS DENMARK A/S
- IMERYS INDUSTRIAL MINERALS GREECE S.A.
- IMERYS ITATEX SOLUCOES MINERAIS LTDA
- IMERYS KAOLIN, INC.
- IMERYS KILN FURNITURE (THAILAND) CO. LTD
- IMERYS KILN FURNITURE ESPAÑA, SA

- IMERYS METALCASTING FRANCE SARL
- IMERYS METALCASTING GERMANY GMBH
- IMERYS MICA KINGS MOUTAIN, INC.
- IMERYS MIDDLE EAST HOLDING COMPANY W.L.L.
- IMERYS MINERAL AB
- IMERYS MINERAL ARABIA LLC
- IMERYS MINERALES ARGENTINA S.A.
- IMERYS MINERALES CHILE SPA
- IMERYS MINERALES PERU SAC
- IMERYS MINERALI CORSICO SRL
- IMERYS MINERALI SPA
- IMERYS MINERALS (INDIA) PRIVATE LIMITED
- IMERYS MINERALS (TAIWAN) LTD
- IMERYS MINERALS (THAILAND) LTD
- IMERYS MINERALS AUSTRALIA PTY LTD
- IMERYS MINERALS BULGARIA AD
- IMERYS MINERALS CHINA, INC.
- IMERYS MINERALS GMBH
- IMERYS MINERALS HOLDING LIMITED
- IMERYS MINERALS INTERNATIONAL SALES
- IMERYS MINERALS JAPAN KK
- IMERYS MINERALS KOREA LTD
- IMERYS MINERALS LTD
- IMERYS MINERALS MALAYSIA SDN. BHD.
- IMERYS MINERALS NETHERLANDS B.V.
- IMERYS MINERALS OY
- IMERYS MINERALS USA, INC.
- IMERYS MINERALS VIETNAM LIMITED
- IMERYS MINERAUX BELGIQUE SA
- IMERYS MINÉRAUX FRANCE
- IMERYS NEWQUEST (INDIA) PRIVATE LIMITED
- IMERYS OILFIELD MINERALS, INC.
- IMERYS PACIFIC LTD
- IMERYS PARTICIPACOES LTDA
- IMERYS PCC FRANCE
- IMERYS PCC UK
- IMERYS PERFORMANCE AND FILTRATION MINERALS PRIVATE LIMITED
- IMERYS PERLITA BARCELONA, S.A.
- IMERYS PERLITE SARDINIA S.R.L.
- IMERYS PERLITE USA, INC.
- IMERYS PIGMENTS (QINGYANG) CO., LTD
- IMERYS PIGMENTS (WUHU) CO., LTD
- IMERYS RE
- IMERYS REFRACTORY MINERALS CLERAC

- IMERYS REFRACTORY MINERALS GLOMEL
- IMERYS REFRACTORY MINERALS INTERNATIONAL SALES
- IMERYS REFRACTORY MINERALS SOUTH AFRICA (PTY) LTD
- IMERYS REFRACTORY MINERALS USA, INC.
- IMERYS RIO CAPIM CAULIM SA
- IMERYS SERAMIK HAMMADDELERI SANAYI VE TICARET LIMITED SIRKETI
- IMERYS SERVICES
- IMERYS SERVICES GERMANY GMBH & CO. KG
- IMERYS SERVICES GREECE
- IMERYS SOUTH AFRICA (PTY) LTD
- IMERYS SOUTH EUROPE, S.L.
- IMERYS SPECIALITIES JAPAN CO., LTD
- IMERYS STEELCASTING DO BRASIL LTDA
- IMERYS STEELCASTING INDIA PRIVATE LIMITED
- IMERYS STEELCASTING USA, INC.
- IMERYS TABLEWARE CR S.R.O.
- IMERYS TABLEWARE DEUTSCHLAND GMBH
- IMERYS TABLEWARE FRANCE
- IMERYS TALC AUSTRALIA PTY LTD
- IMERYS TALC AUSTRIA GMBH
- IMERYS TALC BELGIUM
- IMERYS TALC EUROPE
- IMERYS TALC FINLAND OY
- IMERYS TALC GERMANY GMBH
- IMERYS TALC ITALY S.P.A. [1]
- IMERYS TALC LUZENAC FRANCE
- IMERYS TALC MEXICO, SA DE CV
- IMERYS TALC SPAIN, S.A.
- IMERYS TALC UK HOLDING LTD
- IMERYS TCSI SWITZERLAND SAGL
- IMERYS TRADING MINERALS EGYPT
- IMERYS TRUSTEES LTD
- IMERYS UK FINANCE LIMITED
- IMERYS UK LTD
- IMERYS UK PENSION FUND TRUSTEES LTD
- IMERYS USA, INC.
- IMERYS WOLLASTONITE USA, LLC
- IMERYS ZHEJIANG ZIRCONIA CO., LTD
- INDUSTRIA MACINAZIONE MINERALI PER L'INDUSTRIA CERAMICA S.P.A
- INDUSTRIAL MINERALS OF GREECE
- ISOCON S.A.

---

[1]    Imerys Talc Italy S.p.A. is only an Imerys Corporate Party to the extent it does not commence a bankruptcy case.

- KAOLIN AUSTRALIA PTY LTD
- KENTUCKY-TENNESSEE CLAY COMPANY
- KERNEOS (CHINA) ALUMINATE TECHNOLOGIES CO., LTD
- KERNEOS AUSTRALIA PTY LTD
- KERNEOS CORPORATE SAS
- KERNEOS DO BRASIL COMERCIAL LTDA
- KERNEOS GROUP SAS
- KERNEOS HOLDING NORTHERN EUROPE LIMITED
- KERNEOS INC.
- KERNEOS INDIA ALUMINATE PRIVATE LIMITED
- KERNEOS INDIA ALUMINATE TECHNOLOGIES PRIVATE LIMITED
- KERNEOS SOUTHERN AFRICA PTY LTD
- KINTA POWDERTEC SDN. BHD
- LATOMIA N. KORAKAS SA
- LAVIOSA CHIMICA MINERARIA SPA
- LAVIOSA PROMASA S.A.
- LINJIANG  IMERYS DIATOMITE CO., LTD
- LIQUID QUIMICA MEXICANA, SA DE CV
- LLC IMERYS ALUMINATES
- METALLEION METALLEYMATON
- MICRON-ITA INDUSTRIA E COMERCIO DE MINERAIS LTDA
- MICRON-ITA MINERACAO LTDA
- MIKRO MINERAL ENDUSTRIYEL MINERALLER SANAYI VE TICARET A.S.
- MILOS INITIATIVE
- MILOS MINING MUSEUM
- MINERA ROCA RODANDO  S.DE R.L. DE C.V.
- MINERAL RESOURCES DEVELOPMENT (M.R.D.) CO. LTD
- MINERALIEN SCHIFFAHRT SPEDITION UND TRANSPORT GMBH - MST
- MINVEN - (C-E MINERALES DE VENEZUELA)
- MIRCAL
- MIRCAL AUSTRALIA PTY LTD
- MIRCAL BRESIL
- MIRCAL DE MEXICO SA DE CV
- MIRCAL EUROPE
- MIRCAL ITALIA SPA
- MONREFCO GMBH
- MRD-ECC CO. LTD
- MSL MINERAIS S.A.
- NIIGATA GCC LTD
- NIPPON POWER GRAPHITE CO., LTD
- NORTH AFRICAN INDUSTRIAL MINERAL EXPLORATION SARL - NAIMEX
- NYCO MINERALS, LLC
- ORGANIK MADENCILIK AS
- PABALK MADEN SANAYI VE TICARET A.S.

- PARIMETAL
- PARNASSE TRENTE DEUX
- PERAMIN AB
- PERGEM MINERAL MADENCILIK SANAYI VE TICARET AS
- PGB SA
- PLIBRICO INSTALLACIONES REFRACTARIAS
- PPSA
- PPSA OVERSEAS LTD
- PT BINAH SURINDAH CEMERLANG
- PT ESENSINDO CIPTA CEMERLANG
- PT IMERYS CERAMICS INDONESIA
- PT INDOPORLEN
- PT INDOPORLEN SAKTI
- PT STOLLBERG - SAMIL INDONESIA
- PYRAMAX CERAMICS SOUTHEAST, LLC
- QA REFRACTORIES (PTY) LTD
- QINGDAO STOLLBERG & SAMIL CO., LTD
- QS ABRASIVI MARENGO SRL
- QUARTZ CORP (SHANGHAÏ) CO., LTD
- RECLAYM LIMITED
- REFRACTORY MINERALS (PTY) LTD
- RT 043 MINERACAO LTDA
- RUMICO FEUERFESTE BAUSTOFFE GMBH
- S&B BENTONITE CHAOYANG CO., LTD
- S&B ENDUSTRIYEL MINERALLER A.S.
- S&B HOLDING GMBH
- S&B INDUSTRIAL MINERALS (HENAN) CO., LTD
- S&B INDUSTRIAL MINERALS MOROCCO S.A.R.L.
- S&B INDUSTRIAL MINERALS SPAIN S.L.U.
- S&B MINERALS FINANCE SARL
- S&B MINERALS PARTICIPATIONS SARL
- S&B WINES S.A.
- SAMREC (PTY) LTD
- SERVICIOS PIEDRA TUMBANTE S.DE R.L. DE C.V.
- SHANDONG IMERYS MOUNT TAI CO., LTD
- SIBIMIN OVERSEAS LTD
- SPRINDEALS SIX PTY LTD
- STOLLBERG & SAMI CO., LTD
- TERMORAK (THAILAND) CO LTD
- THE QUARTZ CORP AS
- THE QUARTZ CORP SAS
- THE QUARTZ CORP USA
- TYGERKLOOF MINING (PTY) LTD
- US CERAMICS LLC

- VATUTINSKY KOMBINAT VOGNETRYVIV
- VERMICULITA Y DERIVADOS, SL
- VOUGIOUKLI QUARRIES AVEE
- XINYANG ATHENIAN MINING CO., LTD
- YBB CALCIUM PRODUCTS CO. LTD
- YUEYANG IMERYS ANTAI MINERALS CO., LTD
- ZHENGZHOU JIANAI SPECIAL ALUMINATES CO., LTD

**FORMER AFFILIATES**

- 11656490 CANADA INC.
- ADVANCED MINERALS CORPORATION
- AKROTIRIO TRAHILAS TRIA S.A.
- AMERICAN TRIPOLI, INC.
- ANADOLU PERLIT MEDENCILIK SANAYI
- ARC FUSED ALUMINA
- ARDOISE ET JARDIN
- AREFCON B.V.
- AREFCON HISMA B.V.
- ASSOS MERMER SANAYI VE TICARET LTD SIRKETI
- BAOTOU JINGYUAN GRAPHITE CO., LTD
- BLX TRADING SAS
- CALDERYS CHINA
- CALDERYS CZECH S.R.O
- CALDERYS DE MEXICO SA DE CV
- CALDERYS NORWAY AS
- CAPTELIA
- CARBONATOS ANDINOS SA
- C-E NEWELL, INC.
- CELITE MEXICANA, SA DE CV
- CHARGES MINERALES DU PERIGORD - CMP
- CHOICEWISE LIMITED
- CONDIMENTUM OY
- COVEO
- DALIAN JINSHENG FINE CHEMICAL INDUSTRY CO., LTD
- DAMOLIN ETRECHY
- DAMOLIN GMBH
- DAMOLIN INVESTMENT A/S
- DOLPHIN FELDSPAR PRIVATE  LIMITED
- DOYET TERRE CUITE
- ECC OVERSEAS INVESTMENTS LTD
- ECC PACIFIC (AUSTRALIA) PTY LTD
- ECCA CALCIUM PRODUCTS, INC.
- EDWIN H. BRADLEY HOLDINGS LTD

- ELMIN BAUXITES S.R.L.
- ENGLISH CHINA CLAYS LTD
- EUROARGILLE
- EUROPE COMMERCE REFRACTORY
- FEL-MAC COMPANY LLC
- GOONAMARRIS LIMITED
- GRAN BIANCO CARRARA SRL
- GUIZHOU S&B NEW-TYPE MATERIALS CO., LTD
- GUIZHOU STAR MINERALS CO., LTD
- GUNUNG IMBANGAN SDN. BHD
- HARBORLITE (UK) LTD
- HJM INDUSTRIES SDN. BHD
- IGM FOR FIBRE GLASS
- IMERPLAST UK LIMITED
- IMERYS (SHANGHAÏ) FILTRATION MINERALS TRADING CO., LTD
- IMERYS ADVANCED MATERIALS (YINGKOU) CO., LTD
- IMERYS BENTONITE USA, LLC
- IMERYS CALCIUM SOLUTIONS AUSTRIA GMBH
- IMERYS CANADA 2004, INC.
- IMERYS CANADA LP
- IMERYS CARBONATES LLC
- IMERYS CERAMICS ESPAÑA
- IMERYS CERAMICS ITALIA
- IMERYS FINE CHEMICAL (CHANGSHU) CO., LTD
- IMERYS FUSED MINERALS (TAICANG) CO., LTD
- IMERYS FUSED MINERALS (ZIBO) CO., LTD
- IMERYS FUSED MINERALS HULL LIMITED
- IMERYS GRAPHITE & CARBON (CHANGZHOU) CO., LTD
- IMERYS GRAPHITE & CARBON GERMANY GMBH
- IMERYS GRAPHITE & CARBON USA, INC.
- IMERYS KAOLIN BELGIUM
- IMERYS KILN FURNITURE FRANCE
- IMERYS MICA SUZORITE INC.
- IMERYS MINERALES ESPANA, S.L.
- IMERYS MINERALES PERU S.A.C.
- IMERYS MINERALES SANTIAGO LIMITADA
- IMERYS MINERALI GAMALERO SRL
- IMERYS MINERALS (HEZHOU) CO., LTD
- IMERYS MINERALS CALIFORNIA, INC.
- IMERYS MINERALS HONG KONG LIMITED
- IMERYS MINERAUX DE TUNISIE "IMT"
- IMERYS MINING DEVELOPMENT (QINGYANG) CO., LTD
- IMERYS PAPER CARBONATES LLC
- IMERYS PERLITA PAULINIA MINERAIS LTDA

- IMERYS PIGMENTS TRADING (SHANGHAI) CO., LTD
- IMERYS PIGMENTS, INC.
- IMERYS REFRACTARIOS PARTICIPACOES MONTE DOURADO LTDA
- IMERYS REFRACTORY MINERALS JAPAN KK
- IMERYS TABLEWARE BALKANS SRL
- IMERYS TABLEWARE GUANGZHOU CO., LTD
- IMERYS TABLEWARE NEW ZEALAND LTD
- IMERYS TALC CALIFORNIA, INC.
- IMERYS TALC DELAWARE, INC.
- IMERYS TALC OHIO, INC.
- IMERYS TC
- IMERYS TECHNOLOGY CENTER AUSTRIA GMBH
- IMERYS TOITURE BELGIE N.V.
- IMERYS VOSTOK
- IMERYS WINDFARM PROJECT LTD
- IMERYS YILONG ANDALUSITE (XINJIANG) CO, LTD
- IMPALA ADMINCO LTD
- INDUSTRIALMIN
- ITACA S.R.L.
- KAOLINS DE NOZAY (SOCIÉTÉ ANONYME DES)
- KAOPOLITE, INC.
- KERAPLAN GMBH
- KERN TECH 1
- KERN TECH 2
- KERN TECH 3
- KERNEOS DE MEXICO SA DE CV
- KERNEOS ESPANA SL
- KERNEOS HOLDING GROUP SAS
- KERNEOS HOLDING NORTH AMERICA, INC.
- KERNEOS POLSKA SP. Z.O.O.
- KERNEOS SERVICIOS SA DE CV
- KILITEAM V
- KORUND D.O.O.
- KPCL   K.V.S.
- LA FRANCAISE DES TUILES ET BRIQUES
- L-IMERYS INDUSTRIA E COMERCIO DE CAL LTDA
- LUXOL PHOTOVOLTAICS SN
- LUZENAC MICRO MILLING LIMITED
- MAGEMO SCI
- MASSA MINERALI SRL
- MATISCO DEVELOPPEMENT
- METRAMCO (PTY) LTD
- MINERAL HOLDINGS, INC.
- MINERALS MILLING TUNISIA

- MINERALS TRADING, INC.
- MIRCAL ARGENTINA SRL
- MIRCAL ASIA
- MIRCAL CHILI
- MIRCAL TALC HOLDING
- MSL OVERSEAS LTD
- MULLITE COMPANY OF AMERICA – MULCOA
- N.G. JOHNSON (NORTHERN) HOLDINGS LIMITED
- N.G. JOHNSON LIMITED
- NIZEROLLES
- NYCO MINERALS CANADA, INC.
- PANSHI HUANYU WOLLASTONITE CO., LTD
- PARNASSE TRENTE ET UN
- PARNASSE TRENTE TROIS
- PARNASSE VINGT DEUX
- PERU MINERALS CORPORATION
- PERUCO, INC.
- PLIBRICO LTD
- PLR REFRACTAIRES SAS U
- PROFIMO
- PROPERTY COMPANY ONE
- PROPERTY COMPANY TWO
- PYRAMAX CERAMICS ARKANSAS, LLC
- PYRAMAX CERAMICS, LLC
- QUARTZ DE MAURITANIE SA
- RECURSOS MINERALES DEL NORTE, SA DE CV
- S&B INDUSTRIAL MINERALS (SHANGHAI) CO., LTD
- S&B INDUSTRIAL MINERALS (TIANJIN) CO., LTD
- S&B MINERALS LIMITED
- S&B MINERALS PARTICIPATIONS 2 SARL
- S&B MINERALS PARTICIPATIONS LLC
- S&B MINERALS US HOLDING GMBH
- S&B MINERALS VERWALTUNG GMBH
- SAMREC VERMICULITE (ZIMBABWE) ( PRIVATE) LTD
- SCEA STE COLOMBE
- SCOVER PLUS
- SEG
- SET LININGS GMBH
- SIDEX MONOLITHIQUES SRL
- SILLA DE PAITA S.A.C.
- SLS BAUSTOFFE GESELLSCHAFT MBH
- SOCIEDAD MINERA CELITE DEL PERU SA
- SOCIETE DE VALORISATION DES MINERAUX INDUSTRIELS SAS
- SOTRIVAL

- TALIMMO
- TENNESSEE ELECTRO MINERALS, INC. – TECO
- TERMORAK AB
- TERMORAK OY
- TOKAI CERAMICS CO., LTD
- TREIBACHER SCHLEIFMITTEL ABRASIVES KAILI CO., LTD
- TREIBACHER SCHLEIFMITTEL ASIA LTD
- TREIBACHER SCHLEIFMITTEL INTERNATIONALE VERTRIEBS MBH
- TREIBACHER SCHLEIFMITTEL ITALIA P. MAROZZI & CO SAS
- UCM GROUP LTD
- UCM MAGNESIA, INC.
- UNITEC CERAMICS LIMITED
- VERMICULITE INTERNATIONAL SALES
- WORLD MINERALS AMERICA LATINA, SA
- WORLD MINERALS USD LLC
- WORLD MINERALS USD SARL
- ZHENGZHOU TREIBACHER SCHLEIFMITTEL TENGDA ABRASIVES CO., LTD

## SCHEDULE II

**Imerys Plan Proponents**

1. ALMATECH MINERAL INTERNATIONAL LIMITED
2. IMERTECH
3. IMERYS (SHANGHAI) INVESTMENT MANAGEMENT CO., LTD.
4. IMERYS CANADA INC.
5. IMERYS CARBONATES USA
6. IMERYS CLAYS, INC.
7. IMERYS DIATOMITA MEXICO, SA DE CV
8. IMERYS DO BRASIL COMERCIO DE EXTRAÇAO DE MINÉRIOS
9. IMERYS FILTRATION MINERALS, INC.
10. IMERYS GRAPHITE & CARBON CANADA INC.
11. IMERYS HIGH RESISTANCE MINERALS JAPAN KK
12. IMERYS ITATEX SOLUCOES MINERAIS LTDA
13. IMERYS MICA KINGS MOUNTAIN INC.
14. IMERYS MINERALI SPA
15. IMERYS MINERALS AUSTRALIA PTY LTD
16. IMERYS MINERALS INTERNATIONAL SALES S.A.
17. IMERYS MINERALS KOREA LTD
18. IMERYS PERFORMANCE AND FILTRATION MINERALS PRIVATE LIMITED
19. IMERYS RIO CAPIM CAULIM S.A.
20. IMERYS SERVICES
21. IMERYS SPECIALITIES JAPAN CO. LIMITED
22. IMERYS TALC AUSTRALIA PTY LTD
23. IMERYS TALC AUSTRIA GMBH
24. IMERYS TALC BELGIUM
25. IMERYS TALC EUROPE
26. IMERYS TALC ITALY S.P.A.[1]
27. IMERYS TALC LUZENAC FRANCE
28. IMERYS USA, INC.
29. IMERYS WOLLASTONITE USA, LLC
30. KENTUCKY-TENNESSEE CLAY COMPANY
31. MINERA ROCA RODANDO S. DE. R.L. DE C.V.
32. NYCO MINERALS, LLC

---

[1]    Imerys Talc Italy S.p.A. is only an Imerys Plan Proponent to the extent it does not commence a bankruptcy case.

**SCHEDULE III**

**Rio Tinto Captive Insurer Policies**

| Issuing Insurer | Policy No. | Policy Period |
|---|---|---|
| Metals and Minerals Insurance Pte. Limited | M&M GL/97-98/001 | 5/31/1997 - 5/31/1998 |
| Three Crowns Insurance Company Limited | 98162 | 5/31/1998 - 5/31/1999 |
| Three Crowns Insurance Company Limited | 98162 | 5/31/1999 - 5/31/2000 |
| Three Crowns Insurance Company Limited | 98162 | 5/31/2000 - 5/31/2001 |
| Three Crowns Insurance Company Limited | 98162/01 | 5/31/2001 - 5/31/2002 |
| Three Crowns Insurance Company Limited | 98162/02 | 5/31/2002 - 5/31/2003 |
| Three Crowns Insurance Company Limited | 98162/02A | 5/31/2002 - 5/31/2003 |
| Three Crowns Insurance Company Limited | 98162/02B | 5/31/2002 - 5/31/2003 |
| Three Crowns Insurance Company Limited | 98162/03 | 5/31/2003 - 5/31/2004 |
| Three Crowns Insurance Company Limited | 98162/04 | 5/31/2004 - 5/31/2005 |

| Issuing Insurer | Policy No. | Policy Period |
|---|---|---|
| Three Crowns Insurance Company Limited | 98162/05 | 5/31/2005 - 5/31/2006 |
| Three Crowns Insurance Company Limited | 98162/06/A | 5/31/2006 - 5/31/2007 |
| Falcon Insurance Ltd. | 98162/06/C | 5/31/2006 - 5/31/2007 |
| Metals and Minerals Insurance Pte. Limited | 98162/07/B | 5/31/2007 - 5/31/2008 |
| Falcon Insurance Ltd. | 98162/07/C | 5/31/2007 - 5/31/2008 |
| Metals and Minerals Insurance Pte. Limited | 98162/08/B | 5/31/2008 - 5/31/2009 |
| Falcon Insurance Ltd. | 98162/08/C | 5/31/2008 - 5/31/2009 |
| Metals and Minerals Insurance Pte. Limited | 98162/09/B | 5/31/2009 - 5/31/2010 |
| Falcon Insurance Ltd. | 98162/09/C | 5/31/2009 - 5/31/2010 |
| Metals and Minerals Insurance Pte. Limited | 98162/10/B | 5/31/2010 - 5/31/2011 |
| Falcon Insurance Ltd. | 98162/10/C | 5/31/2010 - 5/31/2011 |
| Metals and Minerals Insurance Pte. Limited | 98162/11/B | 5/31/2011 - 5/31/2012 |
| Falcon Insurance Ltd. | 98162/11/C | 5/31/2011 - 5/31/2012 |

## SCHEDULE IV

### Rio Tinto Corporate Parties

- 10029734 Canada Inc.
- 1043802 Ontario Ltd
- 10676276 Canada Inc.
- 10676284 Canada Inc.
- 11091905 Canada Inc.
- 1109723 B.C. Ltd.
- 201 Logistics Center, LLC
- 46106 YUKON INC.
- 46117 YUKON INC.
- 535630 YUKON INC.
- 7600 West Center, LLC
- 7999674 CANADA INC.
- AGM Holding Company Pte. Ltd.
- Alcan Alumina Ltda.
- Alcan Asia Limited
- Alcan Betriebs- und Verwaltungsgesellschaft GmbH
- Alcan Chemicals Limited
- Alcan Composites Brasil Ltda
- Alcan Corporation
- Alcan Farms Limited
- Alcan Finances USA LLC
- Alcan Gove Development Pty Limited
- Alcan Holdings Australia Pty Limited
- Alcan Holdings Europe B.V.
- Alcan Holdings Nederland B.V.
- Alcan Holdings Switzerland AG (SA/Ltd.)
- Alcan International Network U.S.A. Inc.
- Alcan Lebensmittelverpackungen GmbH
- Alcan Management Services (Shanghai) Co., Ltd.
- Alcan Management Services Canada Limited / Societe de Services de Gestion Alcan Canada Limitee
- Alcan Northern Territory Alumina Pty Limited
- Alcan Packaging Mühltal Gmbh & Co. KG
- Alcan Primary Metal Australia Pty Ltd
- Alcan Primary Products Company LLC
- Alcan Primary Products Corporation
- Alcan Realty Limited / Societe Immobiliere Alcan Limitee
- Alcan South Pacific Pty Ltd
- Alcan Trading AG (SA/Ltd.)
- Alufluor AB

- Aluminerie Alouette Inc.
- Aluminerie De Bécancour, Inc.
- Aluminium & Chemie Rotterdam B.V.
- Aluminium Pechiney
- Aluminum Company of Canada Limited / Aluminium du Canada Limitee
- AML Properties Pty Ltd
- Anglesey Aluminium Metal Limited
- AP Service
- Argyle Diamond Mines Pty Limited
- Argyle Diamonds Limited
- Ashton Mining Pty Ltd
- Ashton Nominees Pty Limited
- Asia Gold Mongolia LLC
- Asia Naran Bulag LLC
- Asia Now Resources Corp
- Australian Coal Holdings Pty. Limited
- Australian Mining & Smelting Pty Ltd
- Balkhash Saryshagan LLP
- Bao-HI Ranges Joint Venture
- Beasley River Joint Venture
- Beasley River Management Pty Limited
- Beasley River Marketing Pty Ltd
- Beasley River Mining Pty Limited
- Beijing Iron Ore Trading Centre Corporation
- Bektau B.V.
- Boké Investment Company
- Boke Personnel Limited
- Boké Services Company SA
- Boké Services Management, Inc.
- Boké Trading Inc.
- Borax España, S.A.
- Borax Europe Limited
- Borax Francais
- Borax Malaysia Sdn Bhd
- Borax Rotterdam N.V.
- Boyne Smelters Limited
- British Alcan Aluminium Limited
- C.V.G. Bauxilum C.A.
- Canning Resources Pty Limited
- CanPacific Potash Inc.
- Cape Bougainville Joint Venture
- Capricorn Diamonds Investments Pty Limited
- Carol Lake Company Ltd.
- Cathjoh Holdings Pty Limited

- Champlain Reinsurance Company Ltd.
- Channar Management Services Pty Limited
- Channar Mining Joint Venture
- Channar Mining Pty Ltd
- Chinalco Rio Tinto Exploration Co. Ltd
- Chlor Alkali Unit Pte Ltd
- CIA. Inmobiliaria e Inversiones Cosmos S.A.C.
- Compagnie des Bauxites de Guinée
- Compania de Transmision Sierraoriente S.A.C.
- Consórcio de Alumínio do Maranhão
- CRA Investments Pty. Limited
- CRA Pty Ltd
- Dampier Salt Limited
- Daybreak Development LLC
- Daybreak Property Holdings LLC
- Daybreak Secondary Water Distribution Company
- Daybreak Water Holding LLC
- DB Medical I LLC
- DBVC1 LLC
- Diamond Producers Association Limited
- Diavik Diamond Mines (2012) Inc.
- Diavik Joint Venture
- Donkerpoort Iron Ltd
- East Kalimantan Coal Pte. Ltd
- Eastland Management Inc.
- Electric Power Generation Limited
- Elysis Limited Partnership / Elysis Societe en Commandite
- Empresa de Mineracao Finesa Ltda.
- Enarotali Gold Project Limited
- Endurvinnslan Ltd.
- Energy Resources of Australia Ltd
- Entrée Resources Ltd.
- Exeltium
- EXELTIUM 2
- Fabrica De Plasticos Mycsa, S.A.
- Falcon Insurance Ltd.
- Flambeau Mining Company
- Fondation Rio Tinto
- Foundation for Australia-Japan Studies
- France Aluminium Recyclage Sa
- Fundsprops Pty. Limited
- Gladstone Infrastructure Pty Ltd
- Gladstone Power Station Joint Venture
- Global Coal Limited

- Global Hubco BV
- Globalore Pte. Ltd.
- Gove Aluminium Ltd
- GPS Energy Pty Limited
- GPS Nominee Pty Limited
- GPS Power Pty. Limited
- Green Mountain Mining Venture
- Groupement pour la Gestion de Pensions Complementaires
- Gulf Power Company / La Compagnie Gulf Power
- Halco (Mining) Inc.
- Hamersley Exploration Pty Limited
- Hamersley HMS Pty Ltd
- Hamersley Holdings Limited
- Hamersley Iron - Yandi Pty Limited
- Hamersley Iron Pty. Limited
- Hamersley Resources Limited
- Hamersley WA Pty Ltd
- Henlopen Manufacturing Co., Inc.
- Heruga Exploration LLC
- High Purity Iron Inc.
- HIsmelt Corporation Pty Limited
- Hope Downs Joint Venture
- Hope Downs Marketing Company Pty Ltd
- Hunter Valley Resources Pty Ltd
- IAL Holdings Singapore Pte. Ltd.
- IEA Coal Research Limited
- IEA Environmental Projects Limited
- Industrias Metalicas Castello S.A.
- Integrity Land and Cattle LLC
- InterEmballage
- IOC Sales Limited
- Iron Ore Company of Canada
- Itallumina Srl
- Johcath Holdings Pty Limited
- Juna Station Pty Ltd
- Kalimantan Gold Pty Limited
- Kelian Pty. Limited
- Kembla Coal & Coke Pty. Limited
- Kennecott Barneys Canyon Mining Company
- Kennecott Exploration Company
- Kennecott Exploration Mexico, S.A. de C.V.
- Kennecott Holdings Corporation
- Kennecott Land Company
- Kennecott Land Investment Company LLC

- Kennecott Molybdenum Company
- Kennecott Nevada Copper Company
- Kennecott Ridgeway Mining Company
- Kennecott Royalty Company
- Kennecott Services Company
- Kennecott Uranium Company
- Kennecott Utah Copper LLC
- Kennecott Water Distribution LLC
- Korgantas LLP
- Kutaibar Holdings Pty Ltd
- Lao Sanxai Minerals Company Limited
- Lawson Mardon Flexible Limited
- Lawson Mardon Smith Brothers Ltd.
- Magma Arizona Railroad Company
- Metallwerke Refonda AG
- Metals & Minerals Insurance Pte. Limited
- Minera Escondida Ltda
- Minera IRL Limited
- Minera Kennecott, S.A. de C.V.
- Mineração Rio do Norte S.A.
- Mineracao Tabuleiro Ltda
- Minmetals Rio Tinto Exploration Company Limited
- Mitchell Plateau Bauxite Co. Pty. Limited
- Mitchell Plateau Joint Venture
- Mount Bruce Mining Pty Limited
- Mount Pleasant Pty Ltd
- Movele
- Mutamba Mineral Sands S.A.
- NBH Pty Ltd
- New Zealand Aluminium Smelters Ltd
- Nhulunbuy Corporation Limited
- Norgold Pty Limited
- North Gold (W.A.) Pty Ltd
- North Insurances Pty. Ltd.
- North IOC (Bermuda) Holdings Limited
- North IOC (Bermuda) Limited
- North IOC Holdings Pty Ltd
- North Limited
- North Mining Limited
- Northern Land Company Ltd
- Nozalela Mineral Sands (Pty) Ltd
- NZAS Retirement Fund Trustee Limited
- Oyu Tolgoi LLC
- Oyu Tolgoi Netherlands BV

- Pacific Aluminium (New Zealand) Limited
- Pacific Aluminium Pty. Limited
- Pacific Coast Mines, Inc.
- Pechiney Aviatube Limited
- Pechiney Bâtiment
- Pechiney Bécancour, Inc.
- Pechiney Cast Plate, Inc.
- Pechiney Consolidated Australia Pty Limited
- Pechiney Holdings, Inc.
- Pechiney Metals LLC
- Pechiney Philippines Inc.
- Pechiney Plastic Packaging, Inc.
- Pechiney Reynolds Quebec, Inc.
- Pechiney Sales Corporation
- Peko Exploration Pty Ltd.
- Peko-Wallsend Pty Ltd
- Pilbara Iron Company (Services) Pty Ltd
- Pilbara Iron Pty Ltd
- Port d'Ehoala S.A.
- Procivis Savoie
- Project Generation Group Pty Ltd
- PT Hutan Lindung Kelian Lestari
- PT Kelian Equatorial Mining
- PT Rio Tinto Consultants
- QIT Madagascar Minerals Ltd
- QIT Madagascar Minerals SA
- Quebec North Shore and Labrador Railway Company / Compagnie de Chemin de Fer du Littoral Nord de Quebec et du Labrador Inc.
- Queensland Alumina Limited
- Queensland Coal Pty. Limited
- Química e Metalúrgica Mequital Ltda.
- Ranges Management Company Pty Ltd
- Ranges Mining Pty Ltd
- Resolution Copper Company
- Resolution Copper Mining LLC
- Rhodes Ridge Joint Venture
- Richards Bay Mining (Proprietary) Limited
- Richards Bay Mining Holdings (Proprietary) Limited
- Richards Bay Prefco (Pty) Ltd
- Richards Bay Titanium (Proprietary) Limited
- Richards Bay Titanium Holdings (Proprietary) Limited
- Rightship Pty Ltd
- Rio de Contas Desenvolvimentos Minerais Ltda
- Rio Santa Rita Empreenimentos e-Particiacoes Ltda

- Rio Sava Exploration DOO
- Rio Tinto (Commercial Paper) Limited
- Rio Tinto (Hong Kong) Ltd
- Rio Tinto Advisory Services Pty Limited
- Rio Tinto Alcan Fund Inc.
- Rio Tinto Alcan Inc.
- Rio Tinto Alcan International Ltd. / Rio Tinto Alcan International Ltee
- Rio Tinto Alcan Middle East DMCC
- Rio Tinto Alcan Technology Pty Ltd
- Rio Tinto Aluminium (Bell Bay) Limited
- Rio Tinto Aluminium (Holdings) Limited
- Rio Tinto Aluminium Bell Bay Sales Pty Limited
- Rio Tinto Aluminium Limited
- Rio Tinto Aluminium Pechiney
- Rio Tinto Aluminium Services Pty Limited
- Rio Tinto America Holdings Inc.
- Rio Tinto America Inc.
- Rio Tinto Asia Ltd
- Rio Tinto Asia Pty. Limited.
- Rio Tinto AuM Company
- Rio Tinto Australian Holdings Limited
- Rio Tinto Bahia Holdings Limited
- Rio Tinto Base Metals Pty. Limited
- Rio Tinto Brazilian Holdings Limited
- Rio Tinto Brazilian Investments Limited
- Rio Tinto Canada Diamond Operation Management Inc.
- Rio Tinto Canada Inc
- Rio Tinto Canada Management Inc./ Rio Tinto Gestion Canada Inc.
- Rio Tinto Canada Uranium Corporation
- Rio Tinto Chile S.A.S.
- Rio Tinto Coal (Clermont) Pty Ltd
- Rio Tinto Coal Australia Pty Limited
- Rio Tinto Coal Investments Pty Limited
- Rio Tinto Coal NSW Holdings Limited
- Rio Tinto Commercial Americas Inc.
- Rio Tinto Commercial GmbH
- Rio Tinto Commercial Pte. Ltd.
- Rio Tinto Desenvolvimentos Minerais LTDA.
- Rio Tinto Diamonds and Minerals Canada Holding Inc.
- Rio Tinto Diamonds Limited
- Rio Tinto Diamonds Netherlands B.V.
- Rio Tinto Diamonds NV
- Rio Tinto Eastern Investments B.V.
- Rio Tinto Energy America Inc.

- Rio Tinto Energy Limited
- Rio Tinto Escondida Limited
- Rio Tinto European Holdings Limited
- Rio Tinto Exploration (Asia) Holdings Pte. Ltd.
- Rio Tinto Exploration (PNG) Limited
- Rio Tinto Exploration and Mining (India) Private Limited
- Rio Tinto Exploration Canada Inc.
- Rio Tinto Exploration Dunav d.o.o. Beograd-Vracar
- Rio Tinto Exploration Finland OY
- Rio Tinto Exploration India Private Limited
- Rio Tinto Exploration Kazakhstan LLP
- Rio Tinto Exploration Pty Limited
- Rio Tinto Exploration Zambia Limited
- Rio Tinto FalCon Diamonds Inc.
- Rio Tinto Fer et Titane inc.
- Rio Tinto Finance (USA) Inc.
- Rio Tinto Finance (USA) Limited
- Rio Tinto Finance (USA) plc
- Rio Tinto Finance Limited
- Rio Tinto Finance plc
- Rio Tinto France S.A.S.
- Rio Tinto Global Employment Company Pte. Ltd.
- Rio Tinto Guinée S.A.
- Rio Tinto Holdings LLC
- Rio Tinto Hydrogen Energy LLC
- Rio Tinto Iceland Ltd.
- Rio Tinto India Private Limited
- Rio Tinto Indonesian Holdings Limited
- Rio Tinto International Holdings Limited
- Rio Tinto Investments One Pty Limited
- Rio Tinto Investments Two Pty Limited
- Rio Tinto Iron & Titanium (Suzhou) Co., Ltd
- Rio Tinto Iron & Titanium GmbH
- Rio Tinto Iron & Titanium Holdings GmbH
- Rio Tinto Iron & Titanium Limited
- Rio Tinto Iron and Titanium Canada Inc. / Rio Tinto Fer et Titane Canada Inc.
- Rio Tinto Iron Ore Atlantic Limited
- Rio Tinto Iron Ore Europe S.A.S.
- Rio Tinto Iron Ore Trading China Limited
- Rio Tinto Japan Ltd
- Rio Tinto Jersey Holdings 2010 Limited
- Rio Tinto Korea Ltd
- Rio Tinto Limited
- Rio Tinto London Limited

- Rio Tinto Management Services South Africa (Proprietary) Ltd
- Rio Tinto Marketing Pte. Ltd.
- Rio Tinto Marketing Services Limited
- Rio Tinto Medical Plan Trustees Limited
- Rio Tinto Metals Limited
- Rio Tinto Minera Peru Limitada SAC
- Rio Tinto Mineracao do Brasil Ltda
- Rio Tinto Minerals Asia Pte Ltd
- Rio Tinto Minerals Development Limited
- Rio Tinto Minerals Exploration (Beijing) Co., Ltd
- Rio Tinto Minerals Inc.
- Rio Tinto Mining and Exploration Inc.
- Rio Tinto Mining and Exploration Limited
- Rio Tinto Mining and Exploration S.A.C.
- Rio Tinto Mining Commercial (Shanghai) Co., Ltd.
- Rio Tinto Mongolia LLC
- Rio Tinto Nominees Limited
- Rio Tinto Orissa Mining Private Ltd
- Rio Tinto OT Management Limited
- Rio Tinto Overseas Holdings Limited
- Rio Tinto PACE Australia Pty Limited
- Rio Tinto PACE Canada Inc. / Gestion Rio Tinto PACE Canada Inc.
- Rio Tinto Pension 2009 Trustees Limited
- Rio Tinto Pension Fund Trustees Limited
- Rio Tinto Pension Investments Limited
- Rio Tinto Peru Limited
- Rio Tinto plc
- Rio Tinto Potash Management Inc. / Rio Tinto Potasse Management Inc.
- Rio Tinto Procurement (Singapore) Pte Ltd
- Rio Tinto Pte Ltd
- Rio Tinto Saskatchewan Management Inc.
- Rio Tinto Saskatchewan Potash Holdings General Partner Inc.
- Rio Tinto Saskatchewan Potash Holdings Limited Partnership
- Rio Tinto Secretariat Limited
- Rio Tinto Services Inc.
- Rio Tinto Services Limited
- Rio Tinto Shared Services Pty Limited
- Rio Tinto Shipping (Asia) Pte. Ltd.
- Rio Tinto Shipping Pty. Limited.
- Rio Tinto Simfer UK Limited
- Rio Tinto Singapore Holdings Pte Ltd
- Rio Tinto Sohar Logistics LLC
- Rio Tinto South East Asia Limited
- Rio Tinto Staff Fund (Retired) Pty Limited

- Rio Tinto Sulawesi Holdings Limited
- Rio Tinto Technological Resources Inc.
- Rio Tinto Technological Resources UK Limited
- Rio Tinto Trading (Shanghai) Co., Ltd.
- Rio Tinto Uranium Limited
- Rio Tinto Western Holdings Limited
- Rio Tinto Winu Pty Limited
- Riversdale Connections (Proprietary) Ltd
- Robe River Iron Associates Joint Venture
- Robe River Limited
- Robe River Mining Co. Pty. Ltd.
- Robe River Ore Sales Pty. Ltd.
- Rocklea Station Pty Ltd
- RTA AAL Australia Limited
- RTA Boyne Limited
- RTA Gove Pty Limited
- RTA Holdco 1 Limited
- RTA Holdco 4 Limited
- RTA Holdco 7 Limited
- RTA Holdco 8 Limited
- RTA Holdco Australia 1 Pty Ltd
- RTA Holdco Australia 3 Pty Ltd
- RTA Holdco Australia 5 Pty Ltd
- RTA Holdco Australia 6 Pty Ltd
- RTA HOLDCO FRANCE 1 S.A.S.
- RTA HOLDCO FRANCE 2 S.A.S.
- RTA Pacific Pty Limited
- RTA Sales Pty Ltd
- RTA Smelter Development Pty Limited
- RTA Weipa Pty Ltd
- RTA Yarwun Pty Ltd
- RTAlcan 1 LLC
- RTAlcan 2 LLC
- RTAlcan 3 LLC
- RTLDS Aus Pty. Ltd
- RTLDS UK Limited
- RTPDS Aus Pty Ltd
- Saryarka B.V.
- Scheuch Unterstuetzungskasse GmbH
- SGLS LLC
- Sharp Strategic Funding Pte. Ltd.
- Simfer Jersey Finance 1 Ltd
- Simfer Jersey Finance 2 Ltd
- Simfer Jersey Limited

- Simfer Jersey Nominee Limited
- SIMFER S.A.
- Singapore Metals Pte. Ltd.
- Skymont Corporation
- Société De Financement Des Risques Industriels
- Société Départementale De Développement 65
- Société Minière Et De Participations Guinée-Alusuisse
- Sohar Aluminium Co. L.L.C.
- Sohio Western Mining Company
- Solutions Strategiques Funding LLC
- Southern Copper Pty. Limited
- Swift Current Land & Cattle LLC
- Swiss Aluminium Australia Limited
- TBAC Limited
- Technological Resources Pty. Limited
- The Barrier Corporation (Vic.) Pty. Limited
- The Kelian Community and Forest Protection Trust
- The Pyrites Company, Inc.
- The Roberval and Saguenay Railway Company/ La Compagnie du Chemin de Fer Roberval Saguenay
- The Zinc Corporation Pty Ltd
- Thos. W. Ward Limited
- THR Aruba Holdings LLC A.V.V.
- THR Delaware Holdings, LLC
- THR Kharmagtai Pte. Ltd.
- THR MINES (BC) LTD.
- THR Mines Services Co. Ltd.
- THR OYU TOLGOI LTD.
- THR Ulaan Pte. Ltd.
- Three Crowns Insurance Company, formerly known as Three Crowns Insurance Company Limited
- Tinto Holdings Australia Pty. Limited
- Tisand (Proprietary) Limited
- Tomago Aluminium Company Pty Limited
- Tomago Aluminium Joint Venture
- Trans Territory Pipeline Pty Limited
- TRQ Australia Pty. Ltd.
- Turquoise Hill (Beijing) Services Company Ltd
- Turquoise Hill Netherlands Cooperatief U.A.
- Turquoise Hill Resources Ltd.
- Turquoise Hill Resources Philippines Inc.
- Turquoise Hill Resources Singapore Pte Ltd.
- Twin Falls Power Corporation Ltd
- U.S. Borax Inc.

- Victoria Technology Inc.
- Waste Solutions and Recycling LLC
- West Kutai Foundation Limited
- Wimmera Industrial Minerals Pty. Limited
- Winchester South Development Company Proprietary Limited
- Winter Road Joint Venture
- Wright Mgmt Services Pte. Ltd.
- Wyoming Coal Resources Company
- Yalleen Pastoral Co. Pty. Ltd.
- Yarraloola Pastoral Co
- Zululand Titanium (Pty) Ltd

## SCHEDULE V

### Zurich Corporate Parties

- Zurich American Insurance Company, in its own capacity and as successor-in-interest to Zurich Insurance Company, U.S. Branch
- American Guarantee and Liability Insurance Company
- American Zurich Insurance Company
- Colonial American Casualty & Surety Company
- Empire Fire and Marine Insurance Company
- Empire Indemnity Insurance Company
- Fidelity and Deposit Company of Maryland
- Hoplite Reinsurance Company of Vermont, Inc.
- Rural Community Insurance Company
- Steadfast Insurance Company
- Universal Underwriters Insurance Company
- Universal Underwriters of Texas Insurance Company
- Zurich American Insurance Company of Illinois
- Zurich Insurance Company Ltd (Canadian Branch)
- Zurich American Puerto Rico Insurance Company
- Zurich American Life Insurance Company
- Zurich American Insurance Company of New York
- Maryland Casualty Company
- Northern Insurance Company of New York
- Assurance Company of America

**SCHEDULE VI**

**Zurich Policies**

| Issuing Insurer | Policy No. | Policy Period |
|---|---|---|
| Zurich Insurance Company, US Branch | GLC 8209842-00/01 | 5/1/1996–5/31/1997 |
| Zurich Insurance Company, US Branch | GLO 8210069-00 | 5/31/1997–5/31/1998 |
| Zurich Insurance Company, US Branch | GLO 8210069-01 | 5/31/1998–5/31/1999 |
| Zurich American Insurance Company | GLO 8210069-02 | 5/31/1999–5/31/2000 |
| Zurich American Insurance Company | GLO 8210069-03 | 5/31/2000–5/31/2001 |
| Zurich American Insurance Company | GLO 8210196-04 | 5/31/2001–5/31/2002 |
| Zurich American Insurance Company | GLO 8210196-05 | 5/31/2002–5/31/2003 |
| Zurich American Insurance Company | GLO 8210196-06 | 5/31/2003–5/31/2004 |
| Zurich American Insurance Company | GLO 8210196-07 | 5/31/2004–5/31/2005 |
| Zurich American Insurance Company | GLO 8210196-08 | 5/31/2005–5/31/2006 |
| Zurich American Insurance Company | GLO 8210196-09 | 5/31/2006–5/31/2007 |
| Zurich American Insurance Company | GLO 8210196-10 | 5/31/2007–5/31/2008 |
| Zurich American Insurance Company | GLO 8210196-11 | 5/31/2008–5/31/2009 |

| Issuing Insurer | Policy No. | Policy Period |
|---|---|---|
| Zurich American Insurance Company | GLO 8249662-00 | 5/31/2009–5/31/2010 |
| Zurich American Insurance Company | GLO 8249662-01 | 5/31/2010–5/31/2011 |
| Zurich American Insurance Company | GLO 8249662-02 | 5/31/2011–5/31/2012 |
| Zurich Insurance Company Ltd (Canadian Branch) | 8828308 | 5/31/1997-5/31/2007 |
| Zurich Insurance Company Ltd (Canadian Branch) | 8835547 | 5/31/2007-5/31/2009 |
| Zurich Insurance Company Ltd (Canadian Branch) | 8837911 | 5/31/2009-5/31/2011 |

## SCHEDULE VII

### Cyprus Corporate Parties

- Ajo Improvement Company [AZ]
- Amax Arizona, Inc. [NV]
- Amax Energy Inc. [DE]
- Amax Exploration, Inc. [DE]
- Amax Metals Recovery Inc. [DE]
- Amax Nickel Overseas Ventures, Inc. [DE]
- Amax Research & Development, Inc. [DE]
- Amax Specialty Coppers Corporation [DE]
- Amax Specialty Metals (Driver), Inc. [DE]
- Amax Zinc (Newfoundland) Limited [DE]
- American Metal Climax, Inc. [DE]
- Ametalco Limited [UK]
- Ametalco, Inc. [DE]
- Apache Nitrogen Products, Incorporated [AZ]
- Arguello Inc. [DE]
- Arroyo Grande Land Company LLC [DE]
- Asarel-Exploration AD [Bulgaria]
- Atlantic Copper, S.L.U. [Spain]
- AZ Big Sandy, LLC [NV]
- Bagdad Fire and Rescue, Inc. [DE]
- Balkan Metals and Minerals EOOD [Bulgaria]
- Bisbee Queen Mining Co. [DE]
- Blackwell Zinc Company, Inc. [DE]
- Byner Cattle Company [NV]
- Cane River Development LLC [DE]
- Capital Gestao de Negocios LTDA. [Brazil]
- Carollite Holdings B.V. [The Netherlands]
- Cattierite Holdings Coöperatief U.A. [The Netherlands]
- Chino Acquisition LLC [DE]
- Climax Canada LTD. [DE]
- Climax Engineered Materials, LLC [CO]
- Climax Molybdenum Asia Corporation [DE]
- Climax Molybdenum B.V. [The Netherlands]
- Climax Molybdenum China Corporation [DE]
- Climax Molybdenum Company [DE]
- Climax Molybdenum GMBH [Germany]
- Climax Molybdenum Marketing Corporation [DE]
- Climax Molybdenum U.K. Limited [UK]
- Cobaltite Holdings Limited [Bermuda]
- Compania Exploradora De La Isla, S.A. [Cuba]

- Copper Market Inc. [AZ]
- Copper Overseas Service Company [DE]
- CuAu International Holdings (BVI) LTD. [BVI]
- Cukaru Peki B.V. [The Netherlands]
- Cyprus Amax Indonesia Corporation [DE]
- Cyprus Amax Minerals Company [DE]
- Cyprus Climax Metals Company [DE]
- Cyprus Copper Marketing Corporation [DE]
- Cyprus Copperstone Gold Corporation [DE]
- Cyprus El Abra Corporation [DE]
- Cyprus Exploration and Development Corporation [DE]
- Cyprus Gold Company [DE]
- Cyprus Gold Exploration Corporation [DE]
- Cyprus Metals Company [DE]
- Cyprus Mines Corporation [DE]
- Cyprus Pinos Altos Corporation [DE]
- Cyprus Specialty Metals Company [DE]
- Cyprus Tohono Corporation [DE]
- Discovery Metals Kazakhstan LLP [Kazakhstan]
- Drum Mountains Mineral Properties LLC [DE]
- Eastern Mining Company, Inc. [DE]
- Enarotali Gold Project Limited [Isle of Jersey]
- Exploraciones Antakana S.A.C. [Peru]
- FCX Investment LLC [DE]
- FCX Investment LTD [Cayman Islands]
- FCX Oil & Gas LLC [DE]
- Flobarco S.A. de C.V. [Mexico]
- FM Chile Holdings Inc. [DE]
- FM Myanmar Holding LTD. [Bermuda]
- FM O&G Mexico Holdings B.V. [The Netherlands]
- FM O&G Mexico Intermediate Holdings B.V. [The Netherlands]
- FM Services Company [DE]
- FNS Holdings, LLC [AZ]
- Freeport Asia Holdings PTE. LTD. [Singapore]
- Freeport Azufre Limitada [Chile]
- Freeport Canadian Exploration Company [DE]
- Freeport Cobalt Americas LLC [DE]
- Freeport Cobalt Asia LTD. [Taiwan]
- Freeport Cobalt Europe GMBH [Germany]
- Freeport Cobalt Japan Inc. [Japan]
- Freeport Cobalt OY [Finland]
- Freeport Cobalt Trading (Shanghai) Co., LTD. [China]
- Freeport Copper Company [DE]
- Freeport Finance Company B.V. [Netherlands]

- Freeport International, Inc. [DE]
- Freeport Minerals Corporation [DE]
- Freeport Overseas Service Company [DE]
- Freeport Research and Engineering Company [DE]
- Freeport Sulphur Company [DE]
- Freeport Warim Inc. [DE]
- Freeport-McMoRan Inc. [DE]
- Freeport-McMoRan Australasia Inc. [DE]
- Freeport-McMoRan Bagdad Inc. [DE]
- Freeport-McMoRan Bulgaria B.V. [The Netherlands]
- Freeport-McMoRan Chino Inc. [DE]
- Freeport-McMoRan Chino Mines Company [NM]
- Freeport-McMoRan Cobalt Holdings Limited [Bermuda]
- Freeport-McMoRan Copper & Gold China Corporation [Cayman Islands]
- Freeport-McMoRan Copper & Gold Energy Services LLC [DE]
- Freeport-McMoRan Copper & Gold Investment Co., S.A. [Cayman Islands]
- Freeport-McMoRan do Brasil Mineração LTDA. [Brazil]
- Freeport-McMoRan Energy LLC [DE]
- Freeport-McMoRan Exploration & Production LLC [DE]
- Freeport-McMoRan Exploration Australia PTY LTD [Australia]
- Freeport-McMoRan Exploration Corporation [DE]
- Freeport-McMoRan Mercantile Company Inc. [DE]
- Freeport-McMoRan Miami Inc. [DE]
- Freeport-McMoRan Mineral Properties Canada Inc. [Canada]
- Freeport-McMoRan Mineral Properties Inc. [DE]
- Freeport-McMoRan Morenci Inc. [DE]
- Freeport-McMoRan Nevada LLC [DE]
- Freeport-McMoRan of Canada Limited [DE]
- Freeport-McMoRan Oil & Gas Inc. [DE]
- Freeport-McMoRan Oil & Gas LLC [DE]
- Freeport-McMoRan Safford Inc. [DE]
- Freeport-McMoRan Sales Company Inc. [DE]
- Freeport-McMoRan Shelf Properties LLC [DE]
- Freeport-McMoRan Sierrita Inc. [DE]
- Freeport-McMoRan Spain Inc. [DE]
- Freeport-McMoRan Tyrone Inc. [DE]
- Freeport-McMoRan Tyrone Mining LLC [NM]
- Fundacion Freeport-McMoRan Chile [Chile]
- Gaviota Gas Plant Company [CA]
- Grand Ecaille Land Company, Inc. [LA]
- Gulf Coast Ultra Deep Royalty Trust [DE]
- Habirshaw Cable and Wire Corporation [DE]
- Hidalgo Mining, LLC [NM]
- International Administrative Services Company [DE]

- International Air Capital Inc. [DE]
- International Asaz LLC [DE]
- International Mining Investments, LLC [DE]
- International Purveyors Inc. [DE]
- International Support LLC [DE]
- James Douglas Insurance Company, LTD. [Bermuda]
- Jenny East Holdings LTD. [Bermuda]
- JRTW Holdings Inc. [DE]
- Kameni Potok Coöperatief U.A. [The Netherlands]
- Kisanfu Holdings LTD. [Bermuda]
- K-Mc Venture I LLC [DE]
- Koboltti Chemicals Holdings Limited [Bermuda]
- Las Quintas Serenas Water Co. [AZ]
- LHD Ventures, LLC [DE]
- Lompoc Land Company LLC [DE]
- Main Pass Energy Hub LLC [DE]
- McMoRan Exploration LLC [DE]
- Mcmoran Oil & Gas LLC [DE]
- Midwest Land Acquisition Company LLC [DE]
- Minera Cuicuilco S.A. de C.V. [Mexico]
- Minera Freeport-McMoRan South America Limitada [Chile]
- Minera Freeport-McMoRan South America S.A.C. [Peru]
- Missouri Lead Smelting Company [DE]
- Molinos Corporation [AZ]
- Montebello Land Company LLC [DE]
- MSS Properties, LLC [DE]
- Mt. Emmons Mining Company [DE]
- Nabire Bakti LLC [DE]
- Nicaro Nickel Company [DE]
- Nuevo Energy Company [DE]
- Overseas Service Company [DE]
- Pacific Western Land Company [CA]
- PD Peru, Inc. [DE]
- PD Receivables, LLC [DE]
- PDM Energy, LLC [AZ]
- PDRC Laurel Hill 9, LLC [DE]
- PDRC Laurel Hill Development, LLC [DE]
- Phelps Dodge Ajo, Inc. [DE]
- Phelps Dodge Congo S.A.R.L. [DRC]
- Phelps Dodge Development Corporation [DE]
- Phelps Dodge Hidalgo, Inc. [DE]
- Phelps Dodge High Performance Conductors of NJ, Inc. [NJ]
- Phelps Dodge Holdings Mexico, S.A. de C.V. [Mexico]
- Phelps Dodge Industries, Inc. [DE]

- Phelps Dodge Katanga Corporation [DE]
- Phelps Dodge Mining (Zambia) Limited [Zambia]
- Phelps Dodge Molybdenum Corporation [DE]
- Phelps Dodge of Africa, LTD. [DE]
- Phelps Dodge Refining Corporation [DE]
- Plains Acquisition Corporation [DE]
- Plains Offshore LLC [DE]
- Plains Offshore Operations Inc. [DE]
- Plains Vietnam LTD. [Cayman Islands]
- Pogo Partners, Inc. [TX]
- Point Arguello Natural Gas Line Company [CA]
- Point Arguello Pipeline Company [CA]
- PT Airfast Aviation Facilities Company [Indonesia]
- PT Eksplorasi Nusa Jaya [Indonesia]
- PT Freeport Indonesia [Indonesia]
- PT Freeport Management Indonesia [Indonesia]
- PT IRJA Eastern Minerals [Indonesia]
- PT Kencana Infra Nusakarya [Indonesia]
- PT Kencana Wisata Nusakarya [Indonesia]
- PT Manyar Maju Refinery [Indonesia]
- PT Mineserve International [Indonesia]
- PT Mitradaya Vulkanisindo [Indonesia]
- PT Nabire Bakti Mining [Indonesia]
- PT Papua Utama Mitra [Indonesia]
- PT Puncakjaya Power [Indonesia]
- PT Rio Tinto Indonesia [Indonesia]
- PT Smelting [Indonesia]
- PXP Aircraft LLC [DE]
- PXP Gulf Coast LLC [DE]
- PXP Louisiana LLC [DE]
- PXP Louisiana Operations LLC [DE]
- PXP Luxembourg S.A.R.L. [Luxembourg]
- PXP Morocco B.V. [The Netherlands]
- PXP Oil & Gas Inc. [DE]
- PXP Producing Company LLC [DE]
- PXP Resources LLC [DE]
- Rakita Exploraton DOO BOR [Serbia]
- Red Metal Limited [Australia]
- Servicios Especiales Nacionales, SA de CV a.k.a. "PD SENSA" [El Salvador]
- Silver Springs Ranch, Inc. [CO]
- Sociedad Contractual Minera El Abra [Chile]
- Sociedad Minera Cerro Verde S.A.A. [Peru]
- Southern Bayou Holdings, LLC [DE]
- Southern Discovery Metals LTD. [BVI]

- Southern Pearl Holdings, LLC [DE]
- Suva Reka (BVI) LTD. [BVI]
- Tank Barge LLC [DE]
- The Morenci Water & Electric Company [AZ]
- Timok JVSA (BVI) LTD. [BVI]
- Timok Metals D.O.O. BOR [Serbia]
- Tucson, Cornelia and Gila Bend Railroad Company [AZ]
- United States Metals Refining Company [DE]
- Warren Company [AZ]
- Western Nuclear, Inc. [DE]

## SCHEDULE VIII

**Cyprus Talc Insurance Policies**

| Insurer | Policy Number | Policy Start | Policy End |
|---|---|---|---|
| American Insurance Company | K2238871 | May 23, 1961 | May 23, 1962 |
| American Insurance Company | K2257131 | May 23, 1962 | May 23, 1963 |
| American Insurance Company | K2276210 | May 23, 1963 | May 23, 1964 |
| American Insurance Company | K2290639 | May 23, 1964 | October 15, 1964 |
| Continental Casualty Company | CL4284386 | October 15, 1964 | January 1, 1965 |
| Continental Casualty Company | RDX9996941 | October 15, 1964 | April 17, 1965 |
| Employers Surplus Lines Insurance Company | E504218 | October 15, 1964 | April 17, 1965 |
| Employers Surplus Lines Insurance Company | E504219 | October 15, 1964 | April 17, 1965 |
| Continental Casualty Company | CL24319352 | January 1, 1965 | January 1, 1966 |
| Employers Surplus Lines Insurance Company | E509914 | April 17, 1965 | February 2, 1968 |
| Harbor Insurance Company | 102632 | April 17, 1965 | January 31, 1968 |
| Continental Casualty Company | 2402140673 | January 1, 1966 | January 1, 1969 |
| Employers Surplus Lines Insurance Company | E513910 | February 1, 1968 | March 1, 1971 |
| Continental Casualty Company | CCP2404125889 | January 1, 1969 | November 1, 1969 |
| Continental Casualty Company | CCP2405051090R | November 1, 1969 | November 1, 1972 |
| Employers Surplus Lines Insurance Company | E63850 | March 1, 1971 | March 1, 1972 |
| CNA Casualty of California | RDU9231389 | March 1, 1972 | March 1, 1973 |
| Midland Insurance Company | XL1952 | March 1, 1972 | March 1, 1973 |
| Mission Insurance Company | M74758 | March 1, 1972 | March 1, 1973 |
| Fireman's Fund Insurance Company | XLX1056187 | March 1, 1972 | March 1, 1973 |
| Aetna Casualty & Surety Company | 01XN244WCA | March 1, 1972 | March 1, 1973 |
| Continental Casualty | CCP9677215R | November 1, 1972 | October 1, 1974 |
| Reserve Insurance Company | UCP00067 | March 1, 1973 | April 2, 1975 |
| Stonewall Insurance Company | D11910 | March 1, 1973 | July 1, 1976 |
| Truck Insurance Exchange | 3504134 | October 1, 1974 | July 1, 1980 |
| Central National Insurance Company of Omaha | CNU122873 | April 2, 1975 | April 2, 1976 |
| Mission Insurance Company | M830271 | April 2, 1975 | April 2, 1976 |
| Central National Insurance Company of Omaha | CNU125306 | April 2, 1976 | July 1, 1977 |
| Mission Insurance Company | M832531 | April 2, 1976 | April 2, 1977 |
| Stonewall Insurance Company | 13584 | July 1, 1976 | July 1, 1977 |
| Granite State Insurance Company | SCLD 80-93902 | July 1, 1976 | July 1, 1977 |

| Insurer | Policy Number | Policy Start | Policy End |
|---------|---------------|--------------|------------|
| Lexington Insurance Company | LC0140 | July 1, 1977 | July 1, 1978 |
| Pine Top Insurance Company | MLP 100304 | July 1, 1977 | July 1, 1978 |
| Columbia Casualty Company | RDX3652421 | July 1, 1977 | July 1, 1978 |
| Harbor Insurance Company | 135171 | July 1, 1978 | July 1, 1979 |
| Columbia Casualty Company | RDX4169299 | July 1, 1978 | July 1, 1979 |
| AIU Insurance Company | 75100270 | July 1, 1978 | July 1, 1979 |
| Mission Insurance Company | M843870 | July 1, 1978 | July 1, 1979 |
| Union Indemnity Insurance Company of New York | UF11 00 128 | June 1, 1979 | June 1, 1980 |
| London Market | 881/ULL0705 | June 1, 1979 | June 1, 1980 |
| Lexington Insurance Company | 5512603 | June 1, 1979 | June 1, 1980 |
| Lexington Insurance Company | 5512604 | June 1, 1979 | June 1, 1980 |
| Gibraltar Casualty Company | GMX 00143 | June 1, 1979 | June 1, 1980 |
| Central National Insurance Company of Omaha (The) | CNZ 14-16-28 | June 1, 1979 | June 1, 1980 |
| Federal Insurance Company | (80) 7922-6248 | June 1, 1979 | June 1, 1980 |
| National Union Fire Insurance Company of Pittsburgh, Pa. | BE1326219 | July 1, 1979 | July 1, 1980 |
| Insurance Company of North America | ISL 1083 | July 1, 1979 | July 1, 1981 |
| Employers Mutual Casualty Company | MMO71462 | June 1, 1980 | June 1, 1981 |
| London market insurers | WM22007 & UMH0287 | June 1, 1980 | June 1, 1981 |
| Lexington Insurance Company | 5512643 | June 1, 1980 | June 1, 1981 |
| Employers Mutual Casualty Company | MMO71463 | June 1, 1980 | June 1, 1981 |
| International Surplus Lines Insurance Company | XSI6996 | June 1, 1980 | June 1, 1981 |
| London market insurers | WM23004 & UMH0288 | June 1, 1980 | June 1, 1981 |
| Employers Mutual Casualty Company | MMO71464 | June 1, 1980 | June 1, 1981 |
| Landmark Insurance Company | FE40000337 | June 1, 1980 | June 1, 1981 |
| International Surplus Lines Insurance Company | XSI6997 | June 1, 1980 | June 1, 1981 |
| London market insurers | WM23006 & UMH0289 | June 1, 1980 | June 1, 1981 |
| Central National Insurance Company of Omaha | CNZ142075 | June 1, 1980 | June 1, 1981 |
| Granite State Insurance Company | 6680-2317 | June 1, 1980 | June 1, 1981 |
| Union Indemnity Insurance Company | UF1100193 | June 1, 1980 | June 1, 1981 |

| Insurer | Policy Number | Policy Start | Policy End |
|---|---|---|---|
| Lexington Insurance Company | 5512644 | June 1, 1980 | June 1, 1981 |
| AIU Insurance Company | 75-1010687 | June 1, 1980 | June 1, 1981 |
| Travelers Indemnity Company | TJEX121T880A80 | June 1, 1980 | June 1, 1981 |
| Gibraltar Casualty Company | GMX00619 | June 1, 1980 | June 1, 1981 |
| First State Insurance Company | 930527 | June 1, 1980 | June 1, 1981 |
| Federal Insurance Company | 81-79226248 | June 1, 1980 | June 1, 1981 |
| Allianz Underwriters, Inc. | AUX5200117 | June 1, 1980 | June 1, 1981 |
| International Surplus Lines Insurance Company | XSI6998 | June 1, 1980 | June 1, 1981 |
| Integrity Insurance Company | XL201671 | June 1, 1980 | June 1, 1981 |
| Granite State Insurance Company | 6680-2318 | June 1, 1980 | June 1, 1981 |
| Birmingham Fire Insurance Company of Pennsylvania | SE6073736 | June 1, 1980 | June 1, 1981 |
| National Union Fire Insurance Company of Pittsburgh, Pa. | 1226464 | June 1, 1980 | June 1, 1981 |
| Gibraltar Casualty Company | GMX00620 | June 1, 1980 | June 1, 1981 |
| First State Insurance Company | 930625 | June 1, 1980 | June 1, 1981 |
| American Excess Insurance Company | EUL5074786 | June 1, 1980 | June 1, 1981 |
| Northbrook Excess and Surplus Insurance Company | 63006816 | June 1, 1980 | June 1, 1981 |
| Insurance Company of North America | XCP143852 | June 1, 1980 | June 1, 1981 |
| London Market | UMH0450 | September 19, 1980 | June 1, 1981 |
| London market insurers | WM23009 & WMBA400 | September 19, 1980 | June 1, 1981 |
| Midland Insurance Company | XL152834 | October 1, 1980 | June 1, 1981 |
| Protective National Insurance Company of Omaha | XUB18068-62 | October 1, 1980 | June 1, 1981 |
| International Surplus Lines Insurance Company | XSI7184 | October 1, 1980 | June 1, 1981 |
| First State Insurance Company | 931168 | October 1, 1980 | June 1, 1981 |
| Federal Insurance Company | 7922-6337 | October 1, 1980 | June 1, 1981 |
| American Excess Insurance Company | EUL5075361 | October 1, 1980 | June 1, 1981 |
| Lexington Insurance Company | 5512663 | October 1, 1980 | June 1, 1981 |
| International Surplus Lines Insurance Company | XSI7138 | October 1, 1980 | June 1, 1981 |
| London market insurers | WN30027 & UNH0204 | June 1, 1981 | June 1, 1982 |
| Lexington Insurance Company | 5512677 | June 1, 1981 | June 1, 1982 |
| International Insurance Company | 5220293553 | June 1, 1981 | June 1, 1982 |

| Insurer | Policy Number | Policy Start | Policy End |
|---------|---------------|-------------|-----------|
| London market insurers | WN31008, UNH0205 & UNH0206 | June 1, 1981 | June 1, 1982 |
| Lexington Insurance Company | 5512682 | June 1, 1981 | June 1, 1982 |
| International Insurance Company | 522293562 | June 1, 1981 | June 1, 1982 |
| London Market | 551/UNH0207 | June 1, 1981 | June 1, 1982 |
| London Market | UNH0237 | June 1, 1981 | June 1, 1982 |
| London market insurers | WN31009 | June 1, 1981 | June 1, 1982 |
| London market insurers | WNBK300 | June 1, 1981 | June 1, 1982 |
| London market insurers | WN31018 | June 1, 1981 | June 1, 1982 |
| Birmingham Fire Insurance Company of Pennsylvania | SE6073846 | June 1, 1981 | June 1, 1982 |
| Travelers Indemnity Company | TJEX121T880A81 | June 1, 1981 | June 1, 1982 |
| Granite State Insurance Company | 6681-2667 | June 1, 1981 | June 1, 1982 |
| Allianz Underwriters, Inc. | AUX5200359 | June 1, 1981 | June 1, 1982 |
| Integrity Insurance Company | XL203241 | June 1, 1981 | June 1, 1982 |
| Northbrook Excess and Surplus Insurance Company | 63008-019 | June 1, 1981 | June 1, 1982 |
| Insurance Company of North America | XCP144061 | June 1, 1981 | June 1, 1982 |
| Gibraltar Casualty Company | GMX01234 | June 1, 1981 | June 1, 1982 |
| First State Insurance Company | 932421 | June 1, 1981 | June 1, 1982 |
| Federal Insurance Company | 8207922 6248 | June 1, 1981 | June 1, 1982 |
| Employers Mutual Casualty Company | MMO71831 | June 1, 1981 | June 1, 1982 |
| International Insurance Company | 5220293571 | June 1, 1981 | June 1, 1982 |
| Midland Insurance Company | XL723954 | June 1, 1981 | June 1, 1982 |
| Protective National Insurance Company of Omaha | XUB1806914 | June 1, 1981 | June 1, 1982 |
| First State Insurance Company | 932422 | June 1, 1981 | June 1, 1982 |
| American Excess Insurance Company | EUL5081285 | June 1, 1981 | June 1, 1982 |
| Lexington Insurance Company | 5512678 | June 1, 1981 | June 1, 1982 |
| International Insurance Company | 5220293589 | June 1, 1981 | June 1, 1982 |
| London market insurers | UPH0171 | June 1, 1982 | June 1, 1983 |
| London market insurers | UPH0172 | June 1, 1982 | June 1, 1983 |
| London market insurers | UPH00336 | June 1, 1982 | June 1, 1983 |
| Lexington Insurance Company | 5523305 | June 1, 1982 | June 1, 1983 |
| International Insurance Company | 5220311256 | June 1, 1982 | June 1, 1983 |
| London market insurers | UPH0173 | June 1, 1982 | June 1, 1983 |
| Lexington Insurance Company | 5513306 | June 1, 1982 | June 1, 1983 |
| International Insurance Company | 5220311265 | June 1, 1982 | June 1, 1983 |

| Insurer | Policy Number | Policy Start | Policy End |
|---|---|---|---|
| London market insurers | UPH0337 & UPH0174 | June 1, 1982 | June 1, 1983 |
| International Insurance Company | 5220311274 | June 1, 1982 | June 1, 1983 |
| London market insurers | UPH0338 & UPH0175 | June 1, 1982 | June 1, 1983 |
| Birmingham Fire Insurance Company of Pennsylvania | SE6073951 | June 1, 1982 | June 1, 1983 |
| Granite State Insurance Company | 6682-3454 | June 1, 1982 | June 1, 1983 |
| Allianz Underwriters, Inc. | AUX5200755 | June 1, 1982 | June 1, 1983 |
| Integrity Insurance Company | XL204016 | June 1, 1982 | June 1, 1983 |
| Northbrook Excess and Surplus Insurance Company | 63008784 | June 1, 1982 | June 1, 1983 |
| Insurance Company of North America | XCP144433 | June 1, 1982 | June 1, 1983 |
| Gibraltar Casualty Company | GMX01702 | June 1, 1982 | June 1, 1983 |
| First State Insurance Company | 934444 | June 1, 1982 | June 1, 1983 |
| Federal Insurance Company | (83)7922-62-48 | June 1, 1982 | June 1, 1983 |
| Employers Mutual Casualty Company | MMO73174 | June 1, 1982 | June 1, 1983 |
| International Insurance Company | 5220311283 | June 1, 1982 | June 1, 1983 |
| Midland Insurance Company | XL724700 | June 1, 1982 | June 1, 1983 |
| Protective National Insurance Company of Omaha | XUB1807045 | June 1, 1982 | June 1, 1983 |
| Northbrook Excess and Surplus Insurance Company | 63008785 | June 1, 1982 | June 1, 1983 |
| First State Insurance Company | 934445 | June 1, 1982 | June 1, 1983 |
| Lexington Insurance Company | 5223307 | June 1, 1982 | June 1, 1983 |
| International Insurance Company | 5220311292 | June 1, 1982 | June 1, 1983 |
| London market insurers | UQH0180 | June 1, 1983 | June 1, 1984 |
| London market insurers | UQH0181, UQH0182 & UQH0186 | June 1, 1983 | June 1, 1984 |
| Lexington Insurance Company | 5523326 | June 1, 1983 | June 1, 1984 |
| International Insurance Company | 5220437094 | June 1, 1983 | June 1, 1984 |
| Lexington Insurance Company | 5523325 | June 1, 1983 | June 1, 1984 |
| International Insurance Company | 5220437103 | June 1, 1983 | June 1, 1984 |
| London market insurers | UQH0183 & UQH0187 | June 1, 1983 | June 1, 1984 |
| International Insurance Company | 5220437111 | June 1, 1983 | June 1, 1984 |
| London market insurers | UQH0188 & UQH0184 | June 1, 1983 | June 1, 1984 |
| London market insurers | UQH0185 & UQH0189 | June 1, 1983 | June 1, 1984 |

| Insurer | Policy Number | Policy Start | Policy End |
|---|---|---|---|
| Birmingham Fire Insurance Company of Pennsylvania | SE6074094 | June 1, 1983 | June 1, 1984 |
| Granite State Insurance Company | 6683-4116 | June 1, 1983 | June 1, 1984 |
| Federal Insurance Company | (84)7922-62-48 | June 1, 1983 | June 1, 1984 |
| Allianz Underwriters, Inc. | AUX5200953 | June 1, 1983 | June 1, 1984 |
| Integrity Insurance Company | XL207293 | June 1, 1983 | June 1, 1984 |
| Insurance Company of North America | XCP145342 | June 1, 1983 | June 1, 1984 |
| First State Insurance Company | 934636 | June 1, 1983 | June 1, 1984 |
| Employers Mutual Casualty Company | MMO75390 | June 1, 1983 | June 1, 1984 |
| Gibraltar Casualty Company | GMX03540 | June 1, 1983 | June 1, 1984 |
| International Insurance Company | 5220437121 | June 1, 1983 | June 1, 1984 |
| Midland Insurance Company | XL739224 | June 1, 1983 | June 1, 1984 |
| Protective National Insurance Company of Omaha | XUB1807046 | June 1, 1983 | June 1, 1984 |
| Pine Top Insurance Company | XL700011 | June 1, 1983 | June 1, 1984 |
| Insurance Corporation of Ireland | XL7-13000-0 | June 1, 1983 | June 1, 1984 |
| Century Indemnity Company | CIZ425524 | June 1, 1983 | June 1, 1984 |
| Marine Office of America Corporation | EXH101628 | June 1, 1983 | June 1, 1984 |
| First State Insurance Company | 934674 | June 1, 1983 | June 1, 1984 |
| International Insurance Company | 5220437139 | June 1, 1983 | June 1, 1984 |
| Lexington Insurance Company | 5523331 | June 1, 1983 | June 1, 1984 |
| Zurich American Insurance Company | 8129701 | June 1, 1983 | June 1, 1984 |
| Century Indemnity Company | CIZ425525 | June 1, 1983 | June 1, 1984 |
| Constitution State | CCA841F503A | June 1, 1983 | June 1, 1984 |
| Royal Insurance Company | RED102107 | June 1, 1983 | June 1, 1984 |
| Republic Insurance Company | CDE0796 | June 1, 1983 | June 1, 1984 |
| Home Insurance Company | HEC1203840 | June 1, 1983 | June 1, 1984 |
| London market insurers | URH0093 | June 1, 1984 | June 1, 1985 |
| London market insurers | URH0098 & URH0162 | June 1, 1984 | June 1, 1985 |
| Allianz Underwriters, Inc. | [unknown] | June 1, 1984 | June 1, 1985 |
| International Insurance Company | 5220473841 | June 1, 1984 | June 1, 1985 |
| London market insurers | URH0097 & URH0161 | June 1, 1984 | June 1, 1985 |
| International Insurance Company | 5220473832 | June 1, 1984 | June 1, 1985 |
| London market insurers | URH0096 & URH0160 | June 1, 1984 | June 1, 1985 |
| International Insurance Company | 5220473823 | June 1, 1984 | June 1, 1985 |
| International Insurance Company | 5220473814 | June 1, 1984 | June 1, 1985 |

| Insurer | Policy Number | Policy Start | Policy End |
|---|---|---|---|
| Integrity Insurance Company | XL208526 | June 1, 1984 | June 1, 1985 |
| Insurance Company of North America | XCP144196 | June 1, 1984 | June 1, 1985 |
| Granite State Insurance Company | 6684-4895 | June 1, 1984 | June 1, 1985 |
| Gibraltar Casualty Company | GMX03711 | June 1, 1984 | June 1, 1985 |
| First State Insurance Company | EU002200 | June 1, 1984 | June 1, 1985 |
| Federal Insurance Company | 85-79226248 | June 1, 1984 | June 1, 1985 |
| Allianz Underwriters, Inc. | AUX5203031 | June 1, 1984 | June 1, 1985 |
| Republic | CDE 1159 | June 1, 1984 | June 1, 1985 |
| Old Republic Insurance Company | ZC46316 | July 1, 1985 | July 1, 1986 |
| Lexington Insurance Company | USA 0370 | July 1, 1985 | July 1, 1986 |
| Lexington Insurance Company | USA 0371 | July 1, 1985 | July 1, 1986 |
| Old Republic Insurance Company | ZC46784 | July 1, 1986 | July 1, 1987 |
| Lexington Insurance Company | 5572150 | November 26, 1986 | July 1, 1987 |
| Old Republic Insurance Company | ZZ50105 | July 1, 1987 | July 1, 1988 |
| Lexington Insurance Company | 5521451 | July 1, 1987 | July 1, 1988 |
| Lexington Insurance Company | 5521482 | July 1, 1988 | July 1, 1989 |
| Lexington Insurance Company | 8641274 | July 1, 1988 | July 1, 1989 |
| National Union Fire Insurance Company of Pittsburgh, Pa. | RMGLCM 459-69-51 | July 1, 1989 | July 1, 1990 |
| National Union Fire Insurance Company of Pittsburgh, Pa. | RMGLCM 460-02-64 | July 1, 1989 | July 1, 1990 |
| National Union Fire Insurance Company of Pittsburgh, Pa. | RMGL 459-69-50 | July 1, 1989 | July 1, 1990 |
| National Union Fire Insurance Company of Pittsburgh, Pa. | GLA 459-69-56 | July 1, 1989 | July 1, 1990 |
| Lexington Insurance Company | 556-7598 | July 1, 1989 | July 1, 1990 |
| XL Insurance Company | XLUMB-00592 | July 1, 1989 | July 1, 1999 |
| National Union Fire Insurance Company of Pittsburgh, Pa. | CLM 308-33-90 | July 1, 1991 | July 1, 1992 |
| National Union Fire Insurance Company of Pittsburgh, Pa. | RMGLCM 325-28-26 | July 1, 1991 | July 1, 1992 |
| National Union Fire Insurance Company of Pittsburgh, Pa. | RMGL 325-28-27 | July 1, 1991 | July 1, 1992 |
| National Union Fire Insurance Company of Pittsburgh, Pa. | RMGL 325-28-28 | July 1, 1991 | July 1, 1992 |