**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **In re** | Chapter 11 |
| **IMERYS TALC AMERICA, INC.,** *et al.*[1] | Case No. 19-10289 (LSS) |
| **Debtors.** | (Jointly Administered) |

<u>**AMESED**[2] **NOTICE OF DEPOSITION UPON ORAL EXAMINATION OF**</u>
<u>**DESIGNATED REPRESENTATIVE(S) OF IMERYS S.A.**</u>

PLEASE TAKE NOTICE, that pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, made applicable herein by Rules 7030 and 9014 of the Federal Rules of Bankruptcy

Procedure, Johnson & Johnson and Johnson & Johnson Consumer Inc. (collectively, "J&J"), by

its attorneys, will take the deposition upon oral examination of the designated representative(s) of

Imerys S.A. in connection with *the  Ninth Amended Joint Chapter 11 Plan of Reorganization of*

*Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (D.I.

2864) in the above-captioned chapter 11 cases.

PLEASE TAKE NOTICE that the deposition will take place on April 14, 2021, at 9am

(prevailing Eastern Time), and thereafter as necessary until completed, by video teleconferencing

service, or at such other time or manner as may be agreed to by the parties. The deposition will be

taken under oath before a notary public or other person authorized by law to administer oaths. The

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

[2] This Notice supersedes the Notice of Deposition previously filed March 15, 2021 (D.I. 3107).

deposition will be recorded by stenographic means and may be videotaped.

## DEFINITIONS

The terms utilized herein shall have the meanings specified below.  Each defined term shall have the meaning ascribed to it regardless of whether the term is capitalized.  Any term referencing any business, legal, or governmental entity or association shall be deemed a reference to any and all of its predecessors, successors, Affiliates and subsidiaries, as well as any and all of its past or present officers, directors, partners, members, managers, employees, representatives, and agents. This includes, without limitation, the following:

1.    "40-40-20 Split" means the allocation of the Talc Personal Injury Trust among the Funds, as provided for in § 2.2 of the Trust Distribution Procedures.

2.    "1989 Stock Purchase Agreement" means the 1989 Stock Purchase Agreement between Cyprus Mines Corp. and J&J.

3.    "1989 Talc Supply Agreement" means the 1989 Supply Agreement between Windsor Mineral Inc. and J&J.

4.    "2001 Talc Supply Agreement" means the 2001 Supply Agreement between Luzenac America, Inc. and J&J.

5.    "2010 Material Purchase Agreement" means the Material Purchase Agreement between J&J Consumer Companies and Luzenac America, Inc.

6.    "2011 Supply Agreement" means the 2011 Supply Agreement between Luzenac America, Inc. and J&J.

7.    "Affiliate" means any entity ascribed to such term in § 101(2) of the Bankruptcy Code.

8.    "Analyses and Models" means any Document relating to the Debtors' past, present or future financial condition, prospects or results, including without limitation: (a) Documents that analyze, constitute or support the Debtors' financial statements; (b) budgets, forecasts, projections, outlooks and strategic or other plans, including short-term or multi-year projections, supporting models and assumptions; (c) capital investment analyses or plans; (d) financial models; (e) operating results; (f) operating statistics; (g) acquisitions, divestments or ventures; (h) any solvency analyses, valuations, appraisals, fairness opinions, assessments; (i) operating statistics and financial information prepared in connection with potential or completed financings; (j) any and all reports or presentations

2

generated in, or outside, the ordinary course of business; and (k) modeling or analyses of tort or other personal injury claims.

9.    "Assumed J&J Contracts" means the 1989 Stock Purchase Agreement; an Escrow Agreement, dated September 9, 1988; a Tax Matters Agreement, dated January 6, 1989; the 1989 Talc Supply Agreement; the 2001 Talc Supply Agreement; the 2010 Material Purchase Agreement; and a Material Purchase Agreement and General Terms and Conditions, dated as of January 1, 2011.

10.    "Average Value" has the meaning ascribed to it in § 1.3.4 of the Trust Distribution Procedures.

11.    "Channeling Injunction" has the meaning ascribed to it in § 1.1.27 of the Plan.

12.    "Chapter 11 Cases" means the cases before the United States Bankruptcy Court for the District of Delaware docketed as, or associated with, 19-10289.

13.    "Common Interest Ruling" means the Court's February 23, 2021 decision regarding the assertion of the common interest doctrine (D.I. 3004).

14.    "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise), including meetings, conversations in person, telephone conversations, records of conversations or messages, telegrams, facsimile transmissions, electronic mail transmissions, letters, reports, memoranda, formal statements, press releases, and newspaper stories. References to communications with business entities shall be deemed to include all officers, directors, employees, personnel, agents, attorneys, accountants, consultants, independent contractors, or other representatives of such entities.

15.    "Cooperation Agreement" has the meaning ascribed to it in § 1.1.44 of the Plan and § 7.6(h)(3) of the Disclosure Statement.

16.    "Debtors" means ITA, ITV, and ITC and any of their attorneys, representatives, consultants, advisors or anyone acting on the Debtors' behalf.

17.    "Direct Talc Personal Injury Claim" has the meaning ascribed to it in § 1.1.79 of the Plan.

18.    "Disclosure Statement" means the *Disclosure Statement for Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (D.I. 2866) or any prior or subsequent version thereof.

19.    "Documents" means all written, graphic, or printed matter of any kind, however produced or reproduced, including all originals, drafts, working papers and non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, and all electronic, mechanical, or optical records or representations of any kind or other data compilations from which information can be obtained, or translated, if necessary, through detection devices into reasonable usable form. The term "Documents" includes, but is not limited to:

a.     correspondence, memoranda, notes, calendar or diary entries, statistics, letters, electronic mail, notebooks, telegrams, journals, minutes, agendas, notices, announcements, instructions, charts, schedules, requests, contracts, prospective contracts, agreements, prospective agreements, licenses, prospective licenses, order forms, books, accounts, records, reports, studies, surveys, experiments, analyses, checks, cancelled checks, wire confirmations, statements, receipts, returns, vouchers, statements, credit memoranda, sales slips, promissory notes, summaries, pamphlets, prospectuses, manuals, brochures, announcements, certificates, drawings, plans, inter-office and intra-office communications, or offers;

b.     notations in any form made of conversations, telephone calls, meetings, negotiations or other communications;

c.     bulletins, circulars, schedules, lists, guides, printed matter (including newspapers, magazines and other publications, articles and clippings therefrom), press releases, computer printouts, teletypes, telecopies, telexes, invoices, ledgers, balance sheets, financial statements or worksheets;

d.     electronic, mechanical or optical records or representations of any kind (including tapes, cassettes, discs, hard drives, recordings, voice mail, electronic mail, computer-stored data or material), or transcriptions thereof; and

e.     all drafts, alterations, modifications, changes and amendments of any of the foregoing and any material underlying, supporting or used in the preparation of any document.

20.    "Effective Date" has the meaning ascribed to in § 1.1.91 of the Plan.

21.    "FCR" means James L. Patton, Jr., the appointed future claimants' representative in these Chapter 11 Cases, and any attorneys, representatives, consultants, advisors, or anyone acting on the FCR's behalf.

22.    "Funds" has the meaning ascribed to it in § 2.2. of the Trust Distribution Procedures.

23.    "First Day Declaration" means the *Declaration of Alexandra Picard, Chief Financial Officer of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings* filed on February 13, 2019 (D.I. 10).

24.    "Imerys Contribution" has the meaning ascribed to it in § 1.1.116 of the Plan.

25.    "Imerys Protected Parties" has the meaning ascribed to it in § 1.1.120 of the Plan.

26.    "Imerys Released Claims" has the meaning ascribed to it in § 1.1.121 of the Plan.

27.    "Imerys S.A." means Imerys S.A., the Debtors' parent entity.

28.    "Imerys Settlement" has the meaning ascribed to it in § 1.1.123 of the Plan.

29.    "Imerys Settlement Funds" has the meaning ascribed to it in § 1.1.124 of the Plan.

30.    "Indirect Talc Personal Injury Claim" has the meaning ascribed to it in § 1.1.126 of the Plan.

31.    "Initial Payment Percentages" shall have the meaning ascribed to that term in § 1.3.60 of the Trust Distribution Procedure.

32.    "Insurance Policies" has the definition assigned to it by ¶ 125 of the Picard Declaration, including commercial and general liability, umbrella liability, automobile, ERISA bond, fiduciary liability, property, employment practices liability, crime, directors' and officers' liability, excess, reinsurance and cargo.

33.    "ITA" means Imerys Talc America, Inc., formerly Luzenac America, formerly Cyprus Talc Corporation.

34.    "ITC" means Imerys Talc Canada Inc.

35.    "ITI" means Imerys Talc Italy S.p.A., an Italian corporation, and a potential Debtor in the Chapter 11 Cases.

36.    "ITV" means Imerys Talc Vermont, Inc., formerly Cyprus Windsor Minerals, Inc., formerly Windsor Minerals, Inc.

37.    "J&J" means Johnson & Johnson and Johnson & Johnson Consumer Inc.

38.    "J&J Agreements" means the 1989 Stock Purchase Agreement, 1989 Talc Supply Agreement, 2001 Talc Supply Agreement, 2010 Supply Agreement, and 2011 Supply Agreement, collectively.

39.    "KCIC" means KCIC, LLC, or any of its employees, agents, advisors, or representatives.

40.    "Legal Analysis Systems" means Legal Analysis Systems, Inc., or any of its employees, agents, advisors, or representatives.

41.    "Maximum Value" has the meaning ascribed to it in § 1.3.65 of the Trust Distribution Procedures.

42.    "Mesothelioma Claims" has the meaning ascribed to it in § 1.3.68 of the Trust Distribution Procedures.

43.    "Non-Debtor Affiliate" has the meaning ascribed to it in § 1.1.157 of the Plan.

44.    "North American Debtors" means ITA, ITV, and ITC.

45.    "Ovarian Cancer Claims" has the meaning ascribed to it in § 1.3.84 of the Trust Distribution Procedures.

46.    "Parent" or "Imerys Non-Debtors" means Imerys S.A. and its Affiliates, and any of their attorneys, representatives, consultants, advisors or anyone acting on their behalf.

47.    "Petition Date" means February 13, 2019.

48.    "PJT Partners" means PJT Partners LLP, or any of its employees, agents, advisors, or representatives.

49.    "Plan" means the *Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (D.I. 2864) or any prior or subsequent version thereof.

50.    "Plan Documents" has the meaning ascribed to it in § 1.1.175 of the Plan.

51.    "Plan Proponents" has the meaning ascribed to it in § 1.1.176 of the Plan.

52.    "Plan Supplement" means the *Notice of Filing of Plan Supplement for Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* (D.I. 2900) or any prior or subsequent version thereof.

53.    "Protected Party" has the meaning ascribed to it in § 1.1.183 of the Plan.

54.    "Relating" means concerning, referring to, describing, evidencing or constituting.

55.    "Reorganized Debtors" means the Reorganized North American Debtors and Reorganized ITI.

56.     "Scheduled Value" has the meaning ascribed to it in § 5.2(a) of the Trust Distribution Procedures.

57.    "Talc Personal Injury Claim" has the meaning ascribed to it in § 1.1.235 of the Plan.

58.    "Talc Personal Injury Claimant" has the meaning ascribed to it in § 1.3.109 of the Trust Distribution Procedures.

59.    "Talc Personal Injury Demand" has the meaning ascribed to it in § 1.1.236 of the Plan.

60.    "Talc Personal Injury Trust Assets" has the meaning ascribed to it in § 1.1.239 of the Plan.

61.    "Talc Personal Injury Trust" has the meaning ascribed to it in § 1.1.237 of the Plan.

62.    "TCC" means the Official Committee of Tort Claimants appointed in these Chapter 11 Cases, including its individual members and any attorneys, representatives, consultants, advisors, or anyone acting on the TCC's behalf.

63.    "Tort System Election Claim" has the meaning ascribed to it in § 1.3.112 of the Trust Distribution Procedures.

64.     "Trust Distribution Procedures" or "TDPs" has the meaning ascribed to it in § 1.1.250 of the Plan.

## RULE 30(b)(6) DEPOSITION TOPICS

Pursuant to Federal Rule of Civil Procedure 30(b)(6), the Parent must designate one or more persons to testify on their behalf with regard to all matters known or reasonably available to the Parent on the following topics:

### Issues Related to the Parent

1.  The corporate structure of Imerys Non-Debtors.

2.  The formation, incorporation, or corporate by-laws, including any amendments thereto, of the following entities:

    a.  Imerys USA;

    b.  Imerys Minerals;

    c.  ITI;

    d.  ITA;

    e.  ITV; and

    f.  ITC.

3.  The acquisition of the assets and/or liabilities of the following entities:

    a.  Luzenac America, Inc.;

    b.  Windsor Minerals, Inc.; and

    c.  Luzenac, Inc.

4.  Any payments, financing, dividends, profits, gifts, or contributions that the Debtors made to the Parent, including the date made, the amount, and the description thereof.

5.  The Parent's contribution to the Talc Personal Injury Trust as referenced in § 10.8.2 of the Plan and § 2.2 of the Disclosure Statement, including, but not limited to:

    a.  How the amount and nature of the contribution was determined;

   b.  Any investigation of the Debtors' claims against the Parent and its affiliates;

   c.  Any investigation of other parties' claims against the Parent that are getting channeled to the Trust, including the value thereof and the estimated Plan recoveries thereon;

   d.  Any studies, projections, estimations, analyses, or research that went into determining the amount of the contribution; and

   e.  The release of "certain claims" referenced in § 6.1 of the Disclosure Statement.

6.  Negotiations and discussions between the Parent, on the one hand, and either or both of the TCC and the FCR, on the other hand relating to the 1989 Talc Supply Agreement, the 1989 Stock Purchase Agreement, the 2001 Talc Supply Agreement, and the 2011 Supply Agreement.

7.  All Communications, meetings, and negotiations between the Parent and any or all of the Debtors, the TCC, the TCC's representatives, individual members of the TCC, individual claimants, the FCR and/or the FCR's representatives relating to the Plan.

8.  All meetings, whether in person or otherwise, between the Parent and any of the Plan Proponents, without the Debtors' involvement.

9.  The Parent's analysis of potential claims by J&J against the Parent, the Debtors, and/or the Debtors' Non-Debtor Affiliates, including the possible implications of such claims on available proceeds for Talc Personal Injury Claimants.

10. The Parent's involvement in drafting the Plan and/or Plan related documents, including, but not limited to the Parent's requirement that it must consent to any modification of the Plan as referenced in § 10.15 of the Plan and § 7.6 of the Disclosure Statement.

11. All Communications between the Parent and the TCC, including, but not limited:

   a.  Any representations the Parent or the TCC made about the value of the Debtors' alleged indemnity rights against J&J; and

   b.  Any responses, written or otherwise, made by the Parent in response to requests from TCC and/or the TCC's representatives.

12. All Communications between the Parent and the FCR, including, but not limited to:

   a.  Any representations the Parent or the FCR made about the value of the Debtors' alleged indemnity rights against J&J; and

   b.  Any responses, written or otherwise, made by the Parent in response to requests from FCR and/or the FCR's representatives.

**<u>Issues Related to ITI</u>**

13. ITI's potential chapter 11 filing as referenced in Article I of the Disclosure Statement, including reasons for the filing, Talc Personal Injury Claims against ITI, negotiations concerning ITI, who was responsible for representing ITI in negotiations, and what alterations to the Plan were made in the interest of ITI.

14. The amount and type of contribution that ITI will make to the Talc Personal Injury Trust, including but not limited to, all Communications between and/or among ITI and the Plan Proponents related thereto.

15. The amount and type of contribution that may be made on account of ITI to the Talc Personal Injury Trust, including but not limited to, all Communications between and/or among ITI and the Plan Proponents related thereto.

16. The release of any Talc Personal Injury Claims against to ITI, including but not limited to, all Communications between and/or among ITI and the Plan Proponents related thereto.

17. Talc Personal Injury Trust Causes of Action where ITI is or was a named defendant, including but not limited to, all Communications between and/or among ITI and the Plan Proponents related thereto.

18. All Communications related to the purchase and sale of ITI to Rio Tinto Talc Limited.

19. All Communications between and/or among the Plan Proponents relating to the purchase and sale of ITI to Mircal Italia S.p.A.

20. The nature and value of ITI's assets, as described in § 3.2 of the Disclosure Statement.

21. Contracts between ITI and J&J, including but not limited to the years in which ITI supplied talc to J&J and the volume thereof.

22. Contracts between ITI and entities other than J&J, including but not limited to the years in which ITI supplied talc to those entities and the volume thereof.

23. Contracts for sale of ITI's talc in North America, including but not limited to brands or products that were sold in the United States containing talc that originated from ITI.

24. ITI's and its predecessors' annual revenue relating to sales in the United States from 2011 to present.

25. Any intercompany claims between ITI, on the one hand, and the Debtors, Parent, or Imerys Non-Debtors, on the other.

26. The basis for the assertion that the Plan Documents comply with § 524 of the Bankruptcy Code, including but not limited the "ongoing business" requirement under § 524(g).

27. What business, if any, ITI will engage in post-Effective Date.

28. What assets, if any, ITI will own post-Effective Date.

29. Who will manage ITI post-Effective Date.

30. ITI's operations post-Effective Date, including but not limited to whether ITI has an obligation to pay dividends to the Talc Personal Injury Trust at any point or under any circumstances or if certain contingencies occur.

31. ITI's obligations after the Effective Date, including but not limited to whether ITI has an obligation to pay dividends to the Talc Personal Injury Trust at any point or under any scenarios.

## Issues Related to the TDPs

32. The determination of the Scheduled Value, Average Value, Initial Payment Percentages Maximum Value and/or eligibility criteria for Talc Personal Injury Claims in the Trust Distribution Procedures, including, but not limited to any Documents relating to the negotiations of those values or basis for those values and alternatives to such values that were proposed or considered.

33. The Parent's participation in the drafting and/or negotiation of the Trust Distribution Procedures, including as relates to the Scheduled Value, Average Value, Initial Payment Percentages and/or Maximum Value for Talc Personal Injury Claims set forth therein.

34. The basis for the Plan Proponents' assertion that the Trust Distribution Procedures and Scheduled Value, Average Value, Initial Payment Percentages, and/or Maximum Value, as described in § 5.2(a) of the Trust Distribution Procedures, were negotiated in good faith.

35. The decision to utilize claim values from the *Manville* asbestos trust to determine the TDP Scheduled Values, as referenced in § 8.1(d)(5) of the Disclosure Statement.

## Issues Related to the Value and Treatment of Claims

36. The decision not to seek to estimate the value of the Talc Personal Injury Claims against the Debtors, including but not limited to the decision not to seek a *Daubert* hearing in the Bankruptcy Court with respect to the Talc Personal Injury Claims and the decision not to seek discovery or obtain information from holders of Talc Personal Injury Claims.

37. Efforts taken by the Parent or the Debtors to limit, control, and/or reduce the values of the Talc Personal Injury Claims as set forth in the Trust Distribution Procedures.

38. Efforts or steps taken by the Parent or the Debtors to minimize Scheduled Value, Average Value, Initial Payment Percentages, and/or Maximum Value for Talc Personal Injury Claims including but not limited to Communications with Plan Proponents regarding such efforts or steps.

39. Efforts taken by the Debtors to negotiate claims values, claim eligibility criteria, or any other aspect of the TDPs.

40. The negotiation of the Imerys Settlement and Imerys Contribution.

41. All Communications relating to, discussions of, or investigations into, whether or not the Imerys Settlement Funds were sufficient to justify the release of all of the Imerys Released Claims against each of the Imerys Protected Parties.

42. The determination that the proposed contributions of the Protected Parties, as described in the Plan, were sufficient to justify receiving the protections of the Channeling Injunction.

43. Any payments made by the Parent or its Affiliates relating to or arising from the satisfaction, settlement or resolution of any Talc Personal Injury Claims, including all settlement agreements, claim information sheets, and claim summaries.

44. All Communications between the Debtors and the Parent, consistent with the Court's Common Interest Ruling, relating to Debtors' filing of these Chapter 11 Cases and the Plan.

45. The basis for the Talc Personal Injury Trust Assets allocation as between Mesothelioma Claims and Ovarian Cancer Claims.

46. The decision to adopt the 40-40-20 Split, including but not limited to:

   a. The factors or reasons relied upon to establish the 40-40-20 Split;

   b. The methodology utilized to establish the 40-40-20 Split;

   c. Any alternatives to the 40-40-20 Split that were proposed or considered;

   d. The Parent's role and the individual(s) involved in the 40-40-20 Split decision;

   e. The process or negotiations that resulted in the establishment of the 40-40-20 Split; and

   f. Communications with any other Plan Proponent concerning the 40-40-20 Split.

47. All Communications and negotiations between and among the Debtors, the Parent, the TCC, and/or the FCR prior to the Petition Date.

48. All Communications between the Debtors, the Parent, ITI, the TCC, and/or the FCR, consistent with the Court's Common Interest Ruling, relating to:

   a. Valuation of the Direct Talc Personal Injury Claims;

   b. Valuation of the Indirect Talc Personal Injury Claims;

   c. The basis for the Talc Personal Injury Trust Assets allocation as between Mesothelioma Claims and Ovarian Cancer Claims;

   d. The setting of Scheduled Value, Average Value, Maximum Value, Initial Payment Percentage, and/or the eligibility criteria for the Talc Personal Injury Claims set forth in the Trust Distribution Procedures;

   e. Eligibility criteria in the Trust Distribution Procedures;

f. The reasons for the Talc Personal Injury Trust potentially paying Talc Personal Injury Claims that would be barred in certain states as described in § 5.1(a)(ii) of the TDPs and the basis for that decision;

g. The Plan, and any prior drafts, proposals, or term sheets;

h. The TDPs, and any prior drafts, proposals, or term sheets, including settlement amounts and criteria;

i. Treatment of Tort System Election Claims, including but not limited to as it relates to J&J and the statement that the "Trust shall have no obligation to defend any such claims in the tort system" as set forth in § 2.3 of the TDPs.

j. The decision not to use Debtors' talc claims settlement and verdict history in setting TDP values;

k. The decision to utilize claim values from the *Manville* asbestos trust to determine the Talc Personal Injury Claims values, as referenced in § 8.1(d)(5) of the Disclosure Statement;

l. The Channeling Injunction referenced in §§ 12.1 – 12.4 of the Plan and § 7.8 of the Disclosure Statement, and any prior drafts, proposals, or term sheets;

m. Any insurance or indemnity to which the Parent or Debtors contend the Talc Personal Injury Trust is entitled from J&J; and

n. Any insurance or indemnity to which the Parent or Debtor contend the Talc Personal Injury Trust is entitled from sources other than J&J.

49. All Communications related to Talc Personal Injury Claims, consistent with the Court's Common Interest Ruling, including, but not limited to:

a. Historical dismissals issued for claims against Debtors, the Parent, or any Non-Debtor Affiliates; and

b. Historical verdicts and judgments of Claims against Debtors, the Parent, or any Non-Debtor Affiliates.

c. Historical settlements of Claims against ITI, the Debtors, the Parent, or any Non-Debtor Affiliates.

50. The Channeling Injunction and release of claims against the Debtors, Parent, and Non-Debtor Affiliates as referenced in §§ 12.1 – 12.4 of the Plan and § 7.8 of the Disclosure Statement.

51. All Communications relating to the Talc Personal Injury Claims, including, but not limited to those that were given for "diligence" purposes including those documents referenced in § 3.3(a) of the Disclosure Statement.

52. The decision to classify Direct and Indirect Talc Personal Injury Claims together.

53. The decision to set the Indirect Talc Personal Injury Claims bar date.

54. The basis for the statement that "[t]he Debtors maintain that their talc is safe" as set forth in § 4.1 of the Disclosure Statement.

55. The allegations by the TCC, the FCR, and/or the holders of Talc Personal Injury Claims relating to talc purportedly contaminated with asbestos.

56. The basis for the decision not to tender future Talc Personal Injury Claims to J&J.

57. Any efforts by the Debtors to estimate the number of future Talc Personal Injury Claims.

58. Any research, studies, analyses, testing, or other Documents that analyze the safety of Debtors' talc and/or the merits of the Talc Personal Injury Claims, including, but not limited to those relied on by Debtors, the Parent, the TCC, or the FCR in valuing the tort claims, or in underlying litigation.

59. Any research, studies, analyses, testing, or other Documents that analyze the safety of the Parents' or the Debtors' talc and/or the merits of the Talc Personal Injury Claims, including, but not limited to those relied on by Debtors, the Parent, the TCC, or the FCR in valuing the tort claims, or in underlying litigation.

60. All Communications between Parent and Legal Analysis Systems, Inc., including, but not limited to any models, analyses, matrices, spreadsheets, comparisons, studies, investigations, or drafts of the same relating to the valuation of the Talc Personal Injury Claims, the scope of the Talc Personal Injury Claims, and the percentage of claims asserted against J&J as compared with the total Talc Personal Injury Claims asserted against the Parent, Debtors, and/or the Non-Debtor Affiliates.

61. All Communications between the Parent and PJT Partners, including any and all studies, analyses, summaries, projections, or valuations that Debtors, Debtors' Parent or PJT Partners undertook, including, but not limited to potential buyers, marketing strategies, and estimates, analyses, or projections of the potential proceeds related to the sale of Debtors' assets as defined in § 1.1.2.13 of the Plan and referenced in § 6.4 of the Disclosure Statement.

62. Any models, analyses, matrices, spreadsheets, comparisons, studies, investigations, or drafts of the same created by or on behalf of the Parent, the Debtors or KCIC, relating to the Parent's, Debtors', or Non-Debtor Affiliates' potential liability, exposure, or resolution to Talc Personal Injury Claims, including, but not limited to:

   a. Any efforts to establish the value of the Talc Personal Injury Claims, present and future; and

   b. Analyses and Models of the scope of Talc Personal Injury Demands, including the percentage of claims asserted against J&J as compared with the total Talc Personal Injury Claims asserted against the Parent, Debtors, and/or the Non-Debtor Affiliates.

**Issues Related to Insurance and Indemnity**

63. Any representations made by the Debtors, the TCC, and the FCR regarding J&J's alleged indemnity obligations, consistent with the Court's Common Interest Ruling.

64. The Parent's assertions that the Talc Personal Injury Trust is entitled to indemnification from J&J under the various J&J Agreements in connection with Talc Personal Injury Claims, including all facts that the Parent contends support such allegations.

65. The basis for including in the TDPs that the Talc Personal Injury Trust may assign the right to enforce the indemnity provisions of the J&J Agreements with respect to a Talc Personal Injury Claim.

66. The basis for including in the TDPs that the Talc Personal Injury Trust shall have no obligation to defend any Talc Personal Injury Claim in the tort system.

67. The Debtors' contributions to the Trust as referenced in § 10.8.2.3 of the Plan, including, but not limited to:

    a.  Indemnity agreements; and

    b.  Insurance Policies and/or proceeds.

68. The decision to assign rights but not obligations under the J&J Agreements.

69. Communications between the Parent, on the one hand, and any of the Debtors, the TCC, and the FCR, on the other hand relating to the J&J Agreements, consistent with the Court's Common Interest Ruling.

70. All Communications between the Parent and/or FCR and the TCC relating to the value of the Debtors' alleged indemnity rights against J&J, consistent with the Court's Common Interest Ruling.

71. Any attempts by the Parent, the Debtors, TCC, and/or FCR to engage J&J in Plan negotiations.

72. The basis for the decision to not include J&J in Plan negotiations.

73. Negotiations regarding J&J's indemnity proposals exchanged between October 2019 and when J&J filed the Stay Motion in March 2020.

74. The Plan Proponents' rejection of J&J's indemnity proposals and the reasons for same,

75. The basis for the Plan Proponents' belief that the Plan treats Talc Personal Injury Claimants more favorably than J&J's indemnity proposal of March 20, 2021.

76. Any projection, analysis, study, estimates, research, or other Documents pertaining to insurance available to the Parent, including, but not limited to:

    a.  Any insurance the Parent has where J&J is an additional insured;

    b.  Any J&J insurance the Parent or the Debtors allege they have rights to;

    c.  Any other insurance that supports the bases that the Debtors have at least $670 million for Ovarian Cancer claims, and $160 million for Mesothelioma Claims as referenced in §4.2 of the Disclosure Statement;

    d.  All insurance applications provided to carriers or potential carriers;

    e.  All claims data provided to carriers or potential carriers;

    f.  Any representations or disclosures made to any third party relating to the amount and availability of insurance coverage;

    g.  Any internal analysis of the amount and availability of insurance coverage;

## Issues Related to the Assumption of Contracts by Debtors

77. The respective obligations of all parties to the J&J Agreements, including but not limited to the Debtors' obligations under the J&J Agreements.

78. All Communications between the Parent, on the one hand, and the Debtors, the Parent, TCC, FCR and/or any other third party regarding the decision of which contracts and agreements with J&J would be assumed as set forth in Exhibit 1 of the Plan Supplement, consistent with the Court's Common Interest Ruling.

79. All Communications between the Parent, on the one hand, and the Debtors, TCC, FCR and/or any other third party regarding the decision of what rights set forth in Item 2 of Exhibit 7 of the Plan Supplement would be assigned to the Talc Personal Injury Trust, consistent with the Court's Common Interest Ruling.

80. Any alleged indemnity rights, demand, or claims the Parent contends the Talc Personal Injury Trust has against any other third party related to the Talc Personal Injury Claim.

81. Any analysis of potential indemnification claims that J&J has alleged against the Parent or the Debtors.

82. Any analysis or assessment of alleged indemnification claims that the Debtors or a trustee may have against J&J.

83. Whether the Plan complies with the Assumed J&J Agreements, including but not limited to whether the Plan would create any defaults under such contracts.

84. The basis for deciding which contracts and agreements with J&J would be assumed by the Reorganized Debtors, as listed in Exhibit 1 to the Plan Supplement.

85. The basis for deciding which contracts and agreements with J&J would be assumed by the Talc Personal Injury Trust, as listed in Exhibit 1 to the Plan Supplement.

**Other**

86. The feasibility of the Plan as required by § 1129(a)(11) of the Bankruptcy Code.

87. The statement in the Plan that the Plan is in the best interests of the Debtors, Debtors' estates, and Talc Personal Injury Claimants, including, but not limited to what alternatives were explored as referenced in § 10.8.1.2 of the Plan and § 3.3(b) of the Disclosure Statement.

88. The statement in § 3.3 and § 6.4 of the Disclosure Statement that the Plan maximizes the value of the Debtors' estates and the Talc Personal Injury Claimants' recoveries, and in what ways it does so in comparison with alternate options.

89. The Cooperation Agreement including, but not limited to all Communications and Documents relating to the negotiation and drafting of the Cooperation Agreement.

90. The basis for not allowing the Debtors to have discussions with J&J without the TCC/FCR being present.

91. All documents produced or to be produced by the Parent in these chapter 11 cases.

92. The effect of talc-related litigation involving the Debtors on the Parent's financial condition, including on the Parent's stock price.

93. The effect or potential effect on the Parent's financial condition, including the Parent's stock price, of the inclusion of the Parent as a Protected Party under the Plan.

94. The use of these chapter 11 cases to limit the liability of the Parent.

95. The decision to begin negotiations with an FCR relating to a potential chapter 11 filing and the choice of James Patton as FCR.

96. The appointment of advisors for the Debtors.

97. The involvement of the Parent in the decision for the Debtors to file for bankruptcy instead of continuing negotiations with J&J.

98. The decision to negotiate exclusively with the Tort Claimants' Committee and FCR, and not J&J, upon filing chapter 11 cases.

Dated: March 22, 2021
      Wilmington, Delaware

                    */s/ Patrick A. Jackson*
                    Patrick A. Jackson (Del. Bar No. 4976)
222 Delaware Ave., Ste. 1410
Wilmington, Delaware 19801
Telephone: (302) 467-4210
Facsimile: (302) 651-7701
Patrick.Jackson@faegredrinker.com

-and-

WEIL, GOTSHAL & MANGES LLP
Diane P. Sullivan (*pro hac vice*)
Ronit J. Berkovich (*pro hac vice*)
Theodore E. Tsekerides (*pro hac vice*)
Konrad L. Cailteux (*pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Johnson & Johnson and Johnson & Johnson Consumer Inc.*