Amy C. Quartarolo
Direct Dial: +1.213.891.8966
Amy.Quartarolo@lw.com

355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Tel: +1.213.485.1234  Fax: +1.213.891.8763
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Beijing | Moscow |
| Boston | Munich |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

# LATHAM&WATKINS LLP

March 29, 2021

BY CM/ECF AND ELECTRONIC MAIL

The Honorable Laurie Selber Silverstein
United States Bankruptcy Judge
United States Bankruptcy Court
For the District of Delaware
824 North Market Street, 6th Floor
Wilmington, Delaware 19801

Re: Imerys Talc America, Inc. et al., Case No. 19-10289 (LSS)

Dear Judge Silverstein:

We write on behalf of the Debtors[1] in connection with their collection, review, and production of responsive, non-privileged materials in response to over 600 separate discovery requests served on the Debtors in connection with discovery in anticipation of the confirmation hearing scheduled to begin on June 21, 2021.

Since this Court issued the February 23, 2021 letter in response to the parties' submissions regarding the application of the common interest doctrine to certain categories of materials withheld from production [D.I. 3004] (the "February 23 Letter"), the Debtors have dedicated significant efforts to the review and analysis of certain materials previously segregated from review and withheld from production. Based on that review, the Debtors have identified and produced nearly 600 additional documents, comprising over 9,500 pages of materials previously withheld on the basis of one or more privileges or protections. These additional produced materials consist primarily of (i) communications between and among the Debtors, Imerys S.A., Imerys USA, Inc. and/or other non-debtor affiliates (together, the "Non-Debtor Affiliates"), the TCC, and the FCR regarding the negotiation and drafting of the Trust Distribution Procedures ("TDPs"), and

---

[1] Capitalized terms not otherwise defined herein shall have the meaning set forth in the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc., and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code [D.I. 2852] (the "Plan").

LATHAM&WATKINS LLP

(ii) certain communications between the Debtors and the Non-Debtor Affiliates in connection with plan-related negotiations with the TCC and FCR.

In reviewing materials in response to the February 23 Letter – materials that had previously been segregated from the review population on the presumption of one or more applicable privileges or protections – the Debtors identified certain confidential materials, shared solely among in-house attorneys, outside legal counsel, and senior leadership for the Debtors and the Non-Debtor Affiliates, that reflect and disclose the mental impressions and strategies of the Debtors' and the Non-Debtor Affiliates' counsel relating to the bankruptcy.  The materials were exchanged for the express purpose of addressing and discussing legal strategy and other litigation issues that counsel for both the Debtors and the Non-Debtor Affiliates anticipated would arise in the context of a chapter 11 proceeding as between the Debtors and/or the Non-Debtor Affiliates, on the one hand, and the TCC, FCR, other creditors and interested parties, on the other hand. Based on relevant precedent and the specific facts here, the Debtors contend that these materials, which generally fall within two sub-categories, constitute confidential attorney work product that is protected from disclosure to the Debtors' and the Non-Debtor Affiliates' adversaries.[2] Disclosure of these materials would run afoul of the key tenets underlying the attorney work product doctrine, which are, among others, to protect from disclosure counsel's mental impressions and legal strategy prepared in anticipation of litigation.

Accordingly, the Debtors bring this issue to the Court proactively and as soon as practicable in light of its review and analysis, identifying the general categories of materials withheld and explaining the legal and factual bases supporting the withholding of these materials from production.[3]  To assist in the Court's consideration of these issues, the Debtors are preparing a log identifying and describing the materials withheld from production, which they will submit to the Court this week (the "Work Product and Privilege Log").  In addition, the Debtors set forth below the legal framework justifying protection of these materials under the work product doctrine and/or other applicable protections.   The Debtors also set forth below additional context for the

---

[2]     The Debtors understand that the Non-Debtor Affiliates independently assert that the withheld documents are subject to a claim of one or more applicable privileges or protections and separately will be submitting a letter to the Court setting forth the basis for these assertions.

[3]     For the purposes of this letter, the Debtors primarily address and rely upon protections under the work product doctrine.  However, on the same facts discussed herein, such materials are also protected from disclosure under the attorney-client privilege and common interest doctrine.  *See*, *e.g.*, *In re 15375 Memorial Corp.*, Bkr. Nos. 06-10859, 06-10860, 06-50822, 2007 Bankr. LEXIS 610, at *6 (Bankr. D. Del. Mar. 1, 2007) (noting that sharing of privileged documents as between parent and subsidiary does not act as a waiver, even where such entities are "potential adversaries in intercompany claims litigations or challenges"); *In re Quigley Co.*, Case No. 04-15739 (SMB), 2009 Bankr. LEXIS 1352 (Bankr. S.D.N.Y. Apr. 24 2009) (upholding privileges as between parent and subsidiary during bankruptcy where, as here, they participated in a joint strategy to file and prosecute the bankruptcy); *In re Cherokee Simeon Venture I, LLC*, No. 12-12913 (KG), 2012 Bankr. LEXIS 6194, at *8 (Bankr. D. Del. May 31, 2013) (holding that a debtor and its managing company had a common interest in prosecuting the bankruptcy case and defending against claims brought by the debtor's primary secured creditor, noting that "in the context of a bankruptcy, the common-interest privilege has been applied between a debtor and . . . *an affiliate company*") (emphasis added).

relationship between the Debtors and the Non-Debtor Affiliates that supports protecting the withheld materials from disclosure. The Debtors believe that the Court could assess the Debtors' claims set forth herein on the basis of exemplars of documents identified on the Work Product and Privilege Log, but can make any or all of the withheld materials available for *in camera* review.[4]

## I. THE DEBTORS' DISCOVERY AND PRODUCTION EFFORTS

### A. Plan-related Discovery Efforts

Since the commencement of Plan-related discovery in June 2020, the Debtors have expended significant resources evaluating and responding to over 400 individual Requests for Production ("RFPs") from numerous objecting parties.[5] While Plan-related discovery has been ongoing for nearly ten months, the Debtors received an influx of additional (and largely duplicative) discovery requests leading up to the February 15, 2021 deadline for service of written discovery. In the six weeks since the Debtors last provided an update to the Court, the Debtors responded to an additional 116 RFPs, 52 individual interrogatories, and 88 individual requests for admission from a variety of objecting parties.[6,7] In total, the Debtors received and responded to

---

[4] The Debtors' Work Product and Privilege Log "describes the nature of the documents [or] communications . . . not produced or disclosed . . . in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5).

[5] The Debtors have outlined at least certain of these efforts in their prior letters, including their January 20, 2021 letter to the Court. *See* D.I. 2807.

[6] The "Cyprus Historical Excess Insurers" include Columbia Casualty Company, Continental Casualty Company, the Continental Insurance Company, as successor to CNA Casualty of California and as successor in interest to certain insurance policies issued by Harbor Insurance Company, Lamorak Insurance Company (formerly known as OneBeacon America Insurance Company), as successor to Employers' Surplus Lines Insurance Company, Stonewall Insurance Company (now known as Berkshire Hathaway Specialty Insurance Company), National Union Fire Insurance Company of Pittsburgh, Pa., and Lexington Insurance Company to the extent that they issued policies to Cyprus Mines Corporation prior to 1981.

[7] In particular, since January 20, 2021, the Debtors have received the following requests: (i) requests for production (7 requests) served by Arnold & Itkin LLP ("A&I") on February 7, 2021; (ii) requests for production (10 requests) served by the Ad Hoc Committee of Imerys Talc Litigation Claimants (the "Ad Hoc Committee") on February 12, 2021; (iii) requests for production (14 requests), requests for admission (72 requests), and a set of interrogatories (10 interrogatories) served by the Cyprus Historical Excess Insurers on February 15, 2021; (iv) requests for production (21 requests), requests for admission (16 requests), and a set of interrogatories (24 interrogatories) served by Johnson & Johnson and Johnson & Johnson Consumer Inc. (together "J&J") on February 4, 2021; (v) requests for production (83 requests) and a set of interrogatories (22 interrogatories) served by J&J on February 15, 2021; (vi) requests for production (27 requests) served by Travelers Casualty and Surety Company on February 15, 2021; and (vii) additional interrogatories (18 interrogatories) to which the Debtors responded to as a result of meet and confer conferences with counsel for, among others, the "Certain Insurers" (including Century Indemnity Company, Federal Insurance Company, Central National Insurance Company of Omaha, Certain Underwriters at Lloyd's, London and Certain London Market Insurers, TIG Insurance Company, International Surplus

over 380 RFPs, over 80 interrogatories, and over 160 requests for admission from 9 different sets of propounding parties in connection with Plan-related discovery.[8] In response to these requests, the Debtors have produced over 300,000 pages of materials. The Debtors also have continued meet and confer discussions with multiple parties in an effort to address and narrow remaining discovery disputes.

### B. The Court's Prior Discovery Rulings

As the Court is aware based on the discovery issues raised to date, the Debtors previously provided to interested parties a categorical privilege log setting out certain categories of documents segregated from review and withheld from production based on one or more privileges or other protections. Following discussion with the Court concerning that categorical privilege log during the January 15, 2021 hearing, on January 20, 2021, the Debtors submitted to the Court a letter describing the general categories of materials withheld, including on the basis of a common interest as between the Debtors and the other Plan Proponents. *See* D.I. 2807.[9] The Debtors identified several general categories of materials over which they claimed a common legal interest. Among those categories identified were documents and communications between the Debtors and the Non-Debtor Affiliates, and their respective counsel and/or advisors, addressing legal issues related to a proposed plan.[10]

In its February 23 Letter, the Court responded to the issues raised and set forth guidance as to the applicability of the common interest doctrine to each of the categorical assertions of privilege made by the Debtors and other Plan Proponents.[11] D.I. 3004. Among the guidance provided, the Court determined that, on the facts and arguments presented, the Debtors had not met their burden to show a common legal interest with Imerys S.A. that "predate[d] the agreement on the Imerys Settlement [on March 5, 2020]." *Id*. at 9.

Consistent with the Court's guidance set forth in the February 23 Letter, the Debtors collected, reviewed, and analyzed for production additional potentially-responsive materials to identify (i) documents and communications between and among Plan Proponents related to negotiation of the TDPs, and (ii) documents and communications between the Debtors and the

---

Lines Insurance Company, Mt. McKinley Insurance Company, Fairmont Premier Insurance Company, Everest Reinsurance Company, and The North River Insurance Company.").

[8] In addition to the requests served on the Debtors, the objecting parties collectively served an additional 46 RFPs and 22 interrogatories on Imerys Talc Italy S.p.A. in anticipation of its own chapter 11 filing.

[9] On January 20, 2021, the TCC and FCR also made a submission addressing issues of common interest. *See* D.I. 2806. Responsive submissions were filed by J&J [D.I. 2844, 2845], A&I [D.I. 2840], the Ad Hoc Committee [D.I. 2843], and the Cyprus Historical Excess Insurers [D.I. 2846].

[10] Because the assertion of privilege as between the Debtors and Imerys S.A. had not been the primary focus of the prior discussions, this category of withheld materials was addressed in a footnote. *See* D.I. 2807, n.9.

[11] No hearing was held following the submission of the various letters.

**LATHAM&WATKINS**LLP

Non-Debtor Affiliates responsive to various Plan-related RFPs. On the basis of that review, the Debtors identified and produced approximately 600 documents (over 9,500 pages), including communications between the Debtors and the Plan Proponents regarding the TDPs, and between the Debtors and the Non-Debtor Affiliates (and their legal counsel) regarding term sheets exchanged between and among the Debtors, the TCC and the FCR. These documents were produced on March 23, 2021 and March 24, 2021.[12]

During the course of their review in response to the guidance set forth in the February 23 Letter, the Debtors identified approximately 260 families of documents and communications that, as described further below, were authored by in-house and/or outside counsel for the Debtors and/or the Non-Debtor Affiliates. These communications and related materials include confidential presentations and discussions between counsel for the Debtors and the Non-Debtor Affiliates concerning (i) the prospects of a potential bankruptcy filing in light of outstanding litigation threats to both the Debtors and the Non-Debtor Affiliates, (ii) legal analysis regarding certain potential liabilities and claims affecting the Debtors and the Non-Debtor Affiliates, (iii) the strengths and weaknesses of certain legal arguments that could be pursued within and/or outside a chapter 11 proceeding, and (iv) negotiation status and tactics related to potential negotiations in connection with litigation and confirmation of a chapter 11 plan. Each of these documents reflects attorney mental impressions and strategic analysis.

Given the content of these materials and the context in which they were created, the Debtors assert that these materials are protected from disclosure under the work product doctrine. Accordingly, the Debtors are logging these materials on the Work Product and Privilege Log, to be provided to the Court this week. These materials generally fall into two categories: (1) materials reflecting legal impressions, strategy, and other work product prepared for the joint strategy of executing a successful bankruptcy as between the Debtors and the Non-Debtor Affiliates, and (2) materials reflecting settlement notes and strategy in negotiations with the TCC and FCR (collectively, the "Protected Materials"), as further explained below.[13]

## II. THE DEBTORS AND THE NON-DEBTOR AFFILIATES' JOINT DEFENSE OF LEGAL CLAIMS AND JOINT BANKRUPTCY STRATEGY

As the relationship and posture of the Debtors and the Non-Debtor Affiliates is relevant for the Court's analysis of the work product protection, it is important to underscore the context in which these proceedings emerged. In the years prior to the chapter 11 filings, the Debtors and the

---

[12] The Debtors understand that the TCC has similarly made supplemental productions in response to the February 23 Letter.

[13] While the Debtors maintain that a document-by-document review confirms that the common interest doctrine is an additional basis to protect the Protected Materials from discovery (many of which are expressly designated "Common Interest Privileged"), for the reasons set forth below, the Debtors believe they are independently protected from disclosure under the attorney work product doctrine irrespective of the existence of a complete alignment of legal interest. The Debtors' reasoning for the assertion of common interest privilege is set forth in the Debtors' January 20, 2021 letter submission and incorporated herein by reference.

Non-Debtors Affiliates jointly defended against a steadily increasing number of lawsuits brought against them alleging talc-related personal injury claims.[14] Several of these litigations named the Debtors and the Non-Debtor Affiliates as co-defendants, with tort claimants alleging that Imerys USA (among others) were liable for the Debtors' purported conduct under theories of *alter ego* liability. *See, e.g.*, Order Granting Motion to Quash re: Imerys USA, *Leavitt v. Johnson & Johnson*, Case No. RG17882401 (Sup. Ct. Cal. Dec. 28, 2018). During the course of these litigations, the Debtors and Non-Debtor Affiliates pursued joint strategies for defense, ultimately (and successfully) litigating these very issues. *Id*. At the same time, the Debtors and the Non-Debtor Affiliates jointly pursued and attempted to enforce various insurance and indemnification rights for costs incurred in defense of the talc-related claims brought against both the Debtors and the Non-Debtor Affiliates.

Beginning in 2018, counsel for the Debtors and the Non-Debtor Affiliates jointly explored their legal options in the wake of several significant personal injury verdicts that threatened the Debtors' continued operations.[15] The Debtors, through counsel, and in consultation with Imerys S.A. and other Non-Debtor Affiliates, ultimately determined that protection through a chapter 11 proceeding was necessary and in the best interests of the Debtors. A chapter 11 filing could be beneficial not only to the Debtors, but to the Non-Debtor Affiliates, which were facing litigation costs and exposure in the tort system.[16]

In connection with the planning for a potential bankruptcy filing, both the Debtors and the Non-Debtor Affiliates understood that claims of intercompany liability as between the Debtors and the Non-Debtor Affiliates under theories of *alter ego* liability were conceivable during a chapter 11 proceeding. However, as both the Debtors and the Non-Debtor Affiliates had spent years successfully disputing such allegations in the tort system, and further believed such claims to be meritless, they understood that court-appointed fiduciaries representing the interests of current and future tort claimants would be best situated to prosecute such theories of liability on behalf of the Debtors' estates and/or negotiate a contribution by Imerys S.A. (on behalf of the Non-Debtor Affiliates) to resolve any such potential liability. Indeed, shortly before the chapter 11 filings, counsel for certain tort claimants had vigorously litigated these very issues against certain Non-Debtor Affiliates in a California state court action asserting personal injuries arising from mesothelioma. *See* Order Granting Motion to Quash re: Imerys USA, *Leavitt*, Case No.

---

[14] The Debtors and Non-Debtor affiliates were jointly named in well over 50 such litigations filed between 2017 and 2019 alone across nine states. The Debtors understand the Non-Debtor Affiliates have provided a non-exhaustive index of such cases with their letter submission to the Court addressing these issues.

[15] *See* Declaration of Alexandra Picard, Chief Financial Officer of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings at ¶ 31 [D.I. 10].

[16] *Id*. at ¶ 11 ("The Debtors' primary goal in filing these Chapter 11 Cases is to confirm a consensual plan of reorganization pursuant to Sections 105(a), 524(g), and 1129 of the Bankruptcy Code that channels all of the present and future Talc Claims to a trust vested with substantial assets and provides for a channeling injunction prohibiting claimants from asserting against *any Debtor or non-debtor affiliate* any claims arising from talc mined, produced, sold, or distributed by any of the Debtors prior to their emergence from these Chapter 11 Cases.") (emphasis added).

**LATHAM&WATKINS**LLP

RG17882401 (Sup. Ct. Cal. Dec. 28, 2018). Thus, in planning for such a bankruptcy, the Debtors and the Non-Debtor Affiliates continued to be aligned in their interests, with the expectation that the TCC, in consultation with the FCR, would diligence and pursue claims against Non-Debtor Affiliates.

As expected, within weeks of the TCC's appointment, counsel for the TCC demanded that the TCC "as estate representative (subject to the rights of the FCR to participate) [have] derivative standing to commence, on behalf of the [Debtors'] estates" certain actions and pursue certain claims, including claims "against Imerys S.A. or non-debtors affiliates."[17] The Debtors agreed to grant the TCC standing, acknowledging that the Debtors and Imerys S.A. were aligned for the purposes of plan-related negotiations with the TCC and FCR. This dynamic is reflected throughout correspondence between the Debtors, the TCC, and the FCR prior to the parties' reaching an agreement for the framework of the Plan on March 5, 2020,[18] and indeed is expressly referenced in court filings.[19]

As a result of this dynamic, counsel for the Debtors and Imerys S.A. communicated frequently and candidly regarding strategy and legal issues in connection with the chapter 11 proceedings and issues the parties were likely to encounter. Similarly, counsel for the Debtors and Imerys S.A. communicated regarding the status and progress of negotiations with the TCC and FCR, including as to potential litigation. These communications were treated with utmost confidentiality, were routinely designated some combination of "Attorney Work Product", "Confidential", "Privileged", and/or "Common Interest", and were not disclosed outside the core legal teams and respective leadership of the Debtors and Imerys S.A.

---

[17] *See* Email from J. Bjork to N. Ramsey, *et al.* (Mar. 19, 2019), Imerys_Plan_00117143. A copy of this document is appended hereto as Exhibit A. The Debtors and the TCC agreed that "other than standing, the Debtor[s] and the Committee [would] reserve all rights as to any claims or defenses." *Id.*

[18] Indeed, the Debtors' production (generally) at Imerys_Plan_00117097—Imerys_Plan_00118596 contains materials directly relevant to this issue.

[19] For instance, Article VIII Section 8.1(c)(1) of the *Disclosure Statement for Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [D.I. 2866], expressly discloses: "One of the first tasks for each of the [TCC] and the FCR was to investigate potential causes of action against Imerys S.A., including without limitation alter ego and other theories of liability. That investigation took place over several months and involved the review of tens of thousands of documents produced by each of the Debtors and Imerys S.A. This review was accomplished by counsel and other professionals for each of the [TCC] and the FCR. The review informed each of the [TCC] and FCR of, among other things, the strength of potential claims that could be asserted against Imerys S.A., the viability of potential defenses, and the value of various assets."). *See also id.* at Art. VI § 6.1(a) ("After an investigation of the underlying merits of these claims by the [TCC] and the FCR, and in order to avoid further protracted litigation and expense, the parties agreed to resolve these claims as part of the Imerys Settlement.").

### III. THE PROTECTED MATERIALS ARE SHIELDED FROM DISCOVERY

#### A. The Attorney Work Product Doctrine, Generally[20]

The work product doctrine, as codified at Federal Rule of Civil Procedure 26(b)(3) and made applicable here through Federal Rule of Bankruptcy 7026, provides that, "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." The work product doctrine protects, *inter alia*, "an attorney's statements, memoranda, correspondence, briefs, and mental impressions, obtained or prepared by an attorney in anticipation of identifiable litigation." *Novartis Pharmaceuticals Corp. v. Abbott Laboratories, Inc.*, 203 F.R.D. 159, 163 (D. Del. 2001). This protection may be overcome only where a propounding party shows a "substantial need" for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means . . . ." Fed. R. Civ. P. 26(b)(3)(A)(ii). The attorney work product doctrine therefore stands as an exception to the broad rules of discovery, and allows parties to protect relevant materials from disclosure where those materials were prepared in anticipation of litigation or for trial. *See United States v. Veolia Environment N. Am. Operations, Inc.*, Civ. No. 13-mc-03-LPS, 2014 U.S. Dist. LEXIS 154717, at *7 (D. Del. Oct. 31, 2014).

The attorney work product doctrine protects both "fact" work product, which contains raw factual information gathered by or at the direction of attorneys, and "opinion" work product, which is "generally afforded near absolute protection from discovery." *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 663 (3d Cir. 2003). Opinion, or "core" work product is granted a higher degree of protection than fact work product because it contains "the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B). As this Court has previously noted, "if a party is able to make the requisite showing of substantial need for a document containing fact work product, the court may order production of the document, *but should protect against disclosure of opinion work product*." *See* Mem. at 7, *Imerys Talc America, Inc. v. Cyprus Amax Minerals Co. (In re Imerys Talc America Inc.)*, Ch. 11 Case No. 19-10289, Adv. Proc. No. 19-50115 (LSS) (Bankr. D. Del. Dec. 16, 2019) (Adv. Proc. D.I. 159) (emphasis added).

"In determining whether a document or other tangible item is protected work product, courts consider the nature of the document and the factual circumstances of the particular case." *Martin v. Bally's Park Place Hotel and Casino*, 983 F.2d 1252, 1264 (3rd. Cir. 1993). The Third Circuit has explained that litigation "need not be imminent" for materials to be protected work product; rather, the question is whether, "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *United States v. Rockwell Int'l*, 897 F.2d 1255, 1266 (3d

---

[20] The Court has set forth in extensive detail the parameters of the work product doctrine in its prior rulings in these bankruptcy proceedings. *See* Mem. at 7, *In re Imerys Talc America, Inc.*, Adv. Proc. No. 19-50115 (Adv. Proc. D.I. 159). The Debtors therefore provide the following brief overview, consistent with the Court's analysis, solely for completeness of this submission.

**LATHAM&WATKINS**LLP

Cir. 1990) (finding work product where "the primary motivating purpose behind the creation of the document was to aid in possible future litigation"). Such work product is contrasted with materials prepared "in the ordinary course of business or pursuant to public requirements unrelated to litigation," which may not be afforded such a privilege. *Id.* (internal quotations omitted.); *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 138 (3d Cir. 2000) (same).

Importantly, the work product doctrine "is not coterminous with the attorney-client privilege; it may protect information from discovery that falls outside the attorney-client privileged." *Asbestos Health Claimants' Comm. v. Jasper Corp. (In re Celotex Corp.)*, 196 B.R. 596, 599 (Bankr. M.D. Fla. 1996). Moreover, unlike the attorney-client privilege, "disclosure to a third party does not necessarily waive the protection of the work-product doctrine." *In re Chevron Corp.*, 633 F.3d 153, 165 (3d Cir. 2011) (quoting *Westinghouse Elec. Corp. v. Republic of Phil.*, 951 F.2d 1414 (3d. Cir. 1991)). Instead, "a court [must] distinguish between disclosures to adversaries and disclosures to non-adversaries." *Id.* "[P]rotection for work product is waived only when the information is disclosed in a manner inconsistent with keeping the documents from the adversary. . . . Furthermore, any disclosure must substantially increase the likelihood that the emails will be seen by the adversary." *Goldenberg v. Indel, Inc.*, Civ. No. 09-5202 (JBS/AMD), U.S. Dist. LEXIS 199516, at *13-14 (D.N.J. May 31, 2012).[21]

### B. The Work Product Doctrine As Applied To The Protected Materials

As set forth further below, the Debtors have identified two general categories of Protected Materials subject to protection under the attorney work product doctrine.[22] All of the Protected Materials are shielded from discovery by the work product doctrine because the materials were prepared in anticipation of (or during) litigation, disclose the mental impressions and opinions of counsel for the Debtors and/or Imerys S.A., and have not been shared in a manner inconsistent with maintaining applicable protections.

#### 1. *Protected Materials Disclosing Broad Bankruptcy Strategy and Legal Considerations, Prepared In Anticipation Of Litigation and Contested Matters*

Certain of the Protected Materials include discussions and analysis by the Debtors' and the Non-Debtor Affiliates' in-house and outside counsel, prepared in anticipation of or during the chapter 11 proceedings, addressing the strategy for the bankruptcy, including as related to: (i) the

---

[21] The question is therefore not whether a common interest exists between the parties sharing attorney work product-protected materials, but whether the materials were shared in such a way that would substantially increase the likelihood of disclosure. *See, e.g.*, *Goldenberg*, 2012 U.S. Dist. LEXIS 199516 at *13; *Times of Trenton Publ'g Corp. v. Pub. Util. Serv. Corp.*, Civ. A. No. 03-6026 (AET), 2005 U.S. Dist. LEXIS 34624 at *15-16 (D.N.J. May 3, 2005) (upholding work product privilege where materials were shared between parent and subsidiary to "keep [the parent] abreast of activities of one of its subsidiaries," and because "the reports were distributed with the intent and understanding that they would remain confidential and not be widely disseminated.").

[22] While the Debtors discuss the Protected Materials according to two categories, many of the materials contain a mix of both categories.

9

potential for the initiation of bankruptcy proceedings, the legal considerations for such proceedings as they relate to both the Non-Debtor Affiliates and the Debtors, and how such proceedings would likely progress, (ii) plans for and development of negotiations or litigation with various parties-in-interest, and (iii) legal and strategic considerations regarding anticipated contested matters with respect to disputes with certain parties-in-interest (collectively, "Category 1").

By way of non-exclusive example, Category 1 includes draft and final presentations prepared by counsel for the Debtors and Imerys S.A. to the Debtors' and Imerys S.A.'s leadership concerning the timing and schedule of potential bankruptcy filings, anticipated legal issues and potential litigations in the context of the chapter 11 proceedings, and the costs and benefits of pursuing certain negotiating tactics with various parties-in-interest. Category 1 also includes correspondence reflecting similar analyses. These materials are infused with attorney assessments, proposals, and conclusions as to legal strategy, and therefore fall squarely within the meaning of "core" or "opinion" work product entitled to a "near absolute protection from discovery." *In re Cendant Corp.*, 343 F.3d at 663; Fed. R. Civ. P. 26(b)(3)(B) (protecting "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."). A small subset of Category 1 also includes discussion and evaluation of certain ongoing talc litigations, including how the outcome of those litigations or motions brought within those litigations might impact legal strategy of a planned or ongoing bankruptcy process.

The Protected Materials within Category 1 were not prepared in the "ordinary course of business." *See Rockwell*, 897 F.2d at 1266. Rather, such materials were uniformly prepared by counsel for the sole purpose of navigating the legal strategy for the bankruptcy and anticipated contested matters during the chapter 11 proceedings. Many courts have concluded such materials were generated "in anticipation" of litigation, even when not in the context of a filed adversary proceeding. *See, e.g.*, *In re Celotex Corp.*, 196 B.R. at 600 (holding that discussions related to the "Debtor's professional activities associated with the general [bankruptcy] case," prepared by counsel and shared with non-debtor affiliates, were protected work product); *In re McDowell*, 483 B.R. 471, 494 (Bankr. S.D. Tex. 2012) (finding "the filing of a bankruptcy petition constitutes the filing of a lawsuit; and, therefore . . . that documents prepared in anticipation of a bankruptcy filing are prepared for litigation"); *Coyle v. Coyle (In re Coyle)*, 538 B.R. 753, 762 (Bankr. C.D. Ill. 2015) ("An attorney's work-product developed for a client in anticipation of litigation, including the filing of a bankruptcy case, is covered by the broad privilege."); *In re Quigley Co., Inc.*, No. 04-15739 (SMB), 2009 Bankr. LEXIS 1359, at *4-5 (Bankr. S.D.N.Y. June 19, 2009) ("[E]mails [and other documents] prepared in contemplation of the joint strategy of using a [debtor] bankruptcy to discharge [debtor and non-debtor affiliate] liabilities and channel the asbestos claims to a trust to the extent allowed by § 524(g) of the Bankruptcy Code . . . qualify as work product.").

As the Debtors believe will be confirmed by *in camera* review, the materials in Category 1 are protected from disclosure in these proceedings.

        2.        *Protected Materials Disclosing Analysis And Strategy Regarding Settlement Negotiations Against The TCC And FCR*

The second category of Protected Materials withheld from production consists of confidential communications between in-house and outside counsel for the Debtors and Imerys

S.A. analyzing, assessing, and furthering the negotiation between the Debtors and Imerys S.A., on the one hand, and the TCC and FCR, on the other hand, with respect to the terms of a settlement that eventually became the Plan ("Category 2"). These materials, created in the context of anticipated litigation against the TCC and FCR, include email summaries by counsel of negotiations, draft term sheets, discussions regarding potential parameters of contribution by Imerys S.A., suggested tactical steps, concerns, and reactions of counsel during negotiations, and other factors that could inform litigation risk as against the TCC and FCR.

As with the Category 1 materials, the Category 2 materials reflect attorney views and impressions from settlement discussions and negotiations with the TCC and FCR, and fall squarely within the bounds of protected work product. Indeed, emails, notes, and communications disclosing settlement strategy in the context of anticipated or pending litigation, which comprise the bulk of Category 2, are core work product immune from discovery.[23] *See, e.g.*, *Nationwide Mut. Ins. Co. v. LaFarge Corp.*, Civ. No. H-90-2390, 1994 U.S. Dist. LEXIS 3851, at *29 (D. Md. Jan. 3, 1994) (finding that strategy regarding settlement negotiations was "clearly immune from discovery under the work product doctrine" because "[s]ettlement strategy is obviously based on the mental impressions and conclusions of a party and on the legal theories on which such conclusions are based."); *U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am.*, Civ. No. 99-3298, (MDL) (RCL), 2004 U.S. Dist. LEXIS 18747, at *18 (D.D.C. May 17, 2004) ("The notes, legal memoranda, [and] legal research . . . prepared or obtained by [counsel] related to the proposed settlement . . . [are] protected by the work product privilege, specifically, the opinion work product privilege as these documents reflect the mental impressions and legal evaluations of counsel."). The same is true for counsels' notes, impressions, or summaries relaying settlement communications with the TCC and FCR, as such summaries necessarily reflect counsels' judgment as to what aspects of negotiations are included in those summaries. *See, e.g.*, *Wilson v. Dep't of Justice,* Civ. A. No. 87-2415-LFO, 1991 U.S. Dist. LEXIS 12617, at *12-13 (D.D.C. June 14, 1991) (holding "protection of an attorney's notes taken at a settlement negotiation is central to the work-product doctrine's goal of preserving the adversary process."). Indeed, "[b]y choosing what details to record and what details to omit" in their notes and email notes regarding these settlement discussions, counsel for the Debtors and the Non-Debtor Affiliates "implanted [their] mental impressions in [their] notes, thereby making them opinion work product." *Stevens v. Brigham Young University-Idaho*, No. 4:15-cv-00530-BLW, 2019 U.S. Dist. LEXIS 59435 (D. Idaho Apr. 4, 2019).

Similar to the Category 1 materials, the materials in Category 2 were necessarily created in the context of a potential and pending bankruptcy, fully anticipating that the Debtors and the Non-Debtor Affiliates would be required to litigate with the TCC and the FCR on several issues, including amounts of contribution, in the event the parties were unable to reach agreement as to the framework for a plan of reorganization. Accordingly, such materials constitute protected work product.

---

[23] Moreover, setting a precedent for disclosure of these types of materials would be manifestly unfair, as such disclosure would provide a roadmap to actual and potential adversaries as to the Debtors' and Imerys S.A.'s contemplated negotiating strengths and weaknesses.

### C. The Debtors Have Not Waived Their Work Product Protections

Neither the Debtors nor the Non-Debtor Affiliates waived protection of the Protected Materials under the work product doctrine. Here, the relevant question is whether the Protected Materials were disclosed to an "adversary," or whether, by sharing the work product, the Debtors "substantially increase[d] the likelihood that the [materials would] be seen by the adversary." *Goldenberg*, 2012 U.S. Dist. LEXIS 199516, at *13-14; *see also In re Chevron Corp.*, 663 F.3d at 165 (noting necessity to distinguish between disclosure to adversaries and disclosures to non-adversaries). That plainly is not the case.

As explained above, at no time were the Debtors and the Non-Debtor Affiliates factually or legally "adverse" to each other, either in the context of the chapter 11 proceedings or otherwise. For instance, the Debtors and Imerys S.A., as parent and subsidiary, were not involved in any litigation against each other prior to or during the pendency of these chapter 11 proceedings, and indeed jointly defended against litigations as co-defendants prior to the Debtors' filing their petitions for chapter 11 protection. Further, it is apparent from a review of the materials (which the Debtors will make available for *in camera* review), and as confirmed by certain documents produced during discovery, that neither the Debtors nor the Non-Debtor Affiliates considered themselves to be, nor positioned themselves as potential "adversaries" in navigating the chapter 11 proceedings.[24] Indeed, as described above, within weeks of the TCC's appointment in these chapter 11 cases, the Debtors agreed to grant standing to the TCC and FCR to pursue claims against the Non-Debtor Affiliates for the benefit of current and future claimants. Courts have held documents exchanged between parent entities and their debtor-subsidiary in the context of bankruptcy proceedings, including as related to the "formulation of the plan of reorganization," are protected work product as to which there has been no waiver. *See, e.g.*, *In re Celotex*, 196 B.R. at 598 (finding no waiver of work product after debtor's sharing of draft valuation analyses and other debtor materials with debtor's parent entities); *In re Quigley Co., Inc.*, 2009 Bankr. LEXIS 1359, at *4-5 (upholding work product protection for materials prepared as a "joint strategy" between debtor and non-debtor affiliates).

Neither the Debtors nor the Non-Debtor Affiliates shared the Protected Materials in any manner that would make it more likely that the materials would be disclosed to actual adversaries in the bankruptcy (i.e., the TCC, FCR, or other parties-in-interest). As noted above, a substantial portion of all such materials shared between the Debtors and the Non-Debtor Affiliates were marked "Confidential," "Attorney Work Product," and/or "Common Interest," and all such materials were shared with the understanding that they would be kept strictly confidential. Such protective treatment further supports a finding that there has been no waiver. *See, e.g.*, *Goldenberg*, 2012 U.S. Dist. LEXIS 199516 at *14 (finding no waiver of work product protection where emails contained a confidentiality notice "stating the privileged and confidential nature of the emails"); *see also Times of Trenton Publ'g Corp.*, 2005 U.S. Dist. LEXIS 34624, at *16

---

[24] This makes sense, in that both the Debtors and the Non-Debtor Affiliates shared overlapping legal interests, both within the tort system, where the Debtors jointly defended claims with the Non-Debtor Affiliates, and in connection with the chapter 11 proceedings.

(finding no work product waiver where disclosure to individuals outside the debtor was "at all times in the hands of trusted associates, 'kept away from adversaries[.]'").

### D. There is No Substantial Need For These Materials, And Disclosure Would Cause Significant Prejudice

There is no substantial need for the disclosure of the Protected Materials. The Debtors have produced plan-related discussions involving the TCC and FCR through March 5, 2020, when the Plan Proponents reached agreement as to the material terms of a plan, and have further produced all discussion regarding the TDPs. Discussions solely between the Debtors and the Non-Debtor Affiliates as to negotiations against the TCC and FCR, or other materials generally prepared by counsel, carry no probative value as to whether the Plan as proposed should be confirmed, and no party has articulated a legitimate interest in the disclosure of these materials. Moreover, as described above, the materials identified on the Work Product and Privilege Log are the precise type of materials that this Court has held it "should protect against disclosure." *See* Mem. at 7, *In re Imerys Talc America, Inc.*, Adv. Proc. No. 19-50115 (Adv. Proc. D.I. 159); *see also In re Cendant Corp.*, 343 F.3d at 663 (affording opinion work product "near absolute protection from discovery."). Moreover, disclosure of the Protected Materials, which include counsel's mental impressions regarding the Plan, negotiations related to settlement parameters, and similar strategy, would provide an unfair advantage to potential adversaries, and could unfairly frustrate and hinder ultimate resolution of these chapter 11 proceedings. These are the precise outcomes that the attorney work product doctrine was designed to avoid. *See Hickman v. Taylor*, 329 U.S. 495, 511 (1947) (noting that forcing disclosure of mental impressions would result in "inefficiency [and] unfairness," and as a result, "justice would be poorly served").

\* \* \*

The Debtors' assertions of applicable privileges and protections, including under the attorney work product doctrine, are in accordance with relevant precedent and supported by the facts here. The Debtors look forward to further addressing these issues with the Court at its convenience and presenting materials *in camera* to assist the Court considering these issues.

Respectfully submitted,

/s/ *Amy C. Quartarolo*

Amy C. Quartarolo
of LATHAM & WATKINS LLP

Encl.