

**Hughes
Hubbard
& Reed**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Office:+1 (212) 837-6000
Fax: +1 (212) 422-4726
hugheshubbard.com

March 29, 2021

**VIA EMAIL/ECF**

The Honorable Laurie Selber Silverstein
United States Bankruptcy Judge
United States Bankruptcy Court
For the District of Delaware
824 North Market Street, 6th Floor
Wilmington, Delaware 19801

   Re: <u>In re: Imerys Talc America, Inc., et al.</u>, Case No. 19-10289[1]

Dear Judge Silverstein:

   I submit this letter on behalf of two non-debtor affiliates of the Debtors[2] in the above-captioned cases, Imerys S.A. and Imerys USA, Inc. (together, the "**Non-Debtor Affiliates**").

   By simultaneous letter, the Debtors set forth the basis for their withholding certain documents from their production in response to discovery propounded by Johnson & Johnson and Johnson & Johnson Consumer Inc. (together, "**J&J**") in connection with the Plan (the "**Debtors' Production**") on the grounds of work product protection and privilege. The Non-Debtor Affiliates agree with and support the Debtors' position concerning these documents (the "**Protected Documents**"), and below provide the Court with the basis for that support. Because the Protected Documents contain highly sensitive, privileged information that should not be seen by J&J, its attorneys or—equally as critically—other parties in these Chapter 11 Cases, the Non-Debtor Affiliates respectfully submit that the Court should conduct an *in camera* review of all or a representative sample of the Protected Documents to provide the Court with additional information about the documents.

---

1. The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050) and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

2. Capitalized terms not otherwise defined herein shall have the meaning set forth in the *Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc., and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* [ECF No. 2864] (the "**Plan**").

## I.    <u>Introduction</u>

Over the past six months, J&J has waged an aggressive, multi-front discovery campaign against the Debtors and other Plan Proponents, including Imerys S.A. and the other Non-Debtor Affiliates.  Most recently, J&J served deposition notices on at least twelve parties involved in these proceedings, including a notice to depose Imerys S.A. on *98 separate topics* (many with multiple subparts, meaning the total deposition topics literally number in the hundreds).[3]  Previously, J&J demanded production of foreign documents far beyond the scope of any potential relevance to it in this bankruptcy case, which no party with an actual interest in such alleged derivative liability of Imerys S.A. or the other Non-Debtor Affiliates had decided were worth pursuing.

This discovery onslaught appears to be part of J&J's efforts to bolster its repeated, baseless allegations that these bankruptcy proceedings—in which a nearly billion-dollar trust for underlying claimants is already taking shape—are allegedly a "sham" and present some "moral hazard" that this Court must recognize and prevent.  The "moral hazard" that J&J complains of appears to be the bankruptcy process itself, and the Debtors availing themselves of protections provided by the Bankruptcy Code.  Ironically, J&J is the reason the Debtors filed for bankruptcy—J&J refused to honor its clear indemnity obligations, leaving the Debtors with only insufficient, dwindling insurance.

The Non-Debtor Affiliates are participants in these cases because personal injury claimants allege that the corporate veil should be pierced and the Non-Debtor Affiliates should pay because they are allegedly the "alter egos" of the Debtors.  The allegations are not new, and some of the Non-Debtor Affiliates were named as defendants and actively defended themselves in personal injury suits pre-petition.  Most notably, there was a lengthy battle concerning veil piercing in *Leavitt*, a California mesothelioma case that was one of the last to proceed to trial before the Debtors went into bankruptcy.[4]  The trial judge in that case ultimately agreed that there is no basis to pierce the corporate veil and attach liability to entities other than the Debtors.

Notwithstanding the impropriety and overreach of J&J's overbroad, irrelevant and unduly burdensome discovery campaign,[5] the Non-Debtor Affiliates have repeatedly sought to cooperate with J&J and produced voluminous materials in response to J&J's excessive requests, all in the interests of moving expeditiously towards the confirmation of the Plan.  However, J&J should not receive the Protected Documents, in which the Non-Debtor Affiliates also have rights to claim protection against their production.

It is within this context that the Non-Debtor Affiliates respectfully ask the Court to recognize that the Protected Documents are clearly attorney work product entitled to protection

---

3.   ECF No. 3184.

4.   *See* Order Granting Mot. to Quash re: Imerys USA, *Leavitt v. Johnson & Johnson*, Case No. RG17882401 (Super. Ct. Cal. Dec. 28, 2018).

5.   Under Federal Rule of Civil Procedure 26(b)(1), made applicable here by Federal Bankruptcy Rules 7026 and 9014(c), discovery is permitted only to the extent that it is "relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b); *see* Fed. R. Bankr. P. 7026, 9014(c).

from disclosure under applicable law.  For the reasons explained below, because the Debtors and Non-Debtor Affiliates were not acting as adversaries in exchanging the Protected Documents, the attorney work product doctrine provides an absolute basis to withhold the Protected Documents from the Debtors' Production.

In addition, although the Court need not reach the issue because the Protected Documents are properly withheld as protected by the attorney work product doctrine, they are also properly withheld as privileged pursuant to the common interest doctrine.[6]  In the weeks following the Court's February 23, 2021 letter providing guidance to the parties with respect to the common interest doctrine (the "**February 23 Letter**"),[7] the Non-Debtor Affiliates worked diligently with the Debtors to identify and review the Protected Documents and analyze the privileges that apply in light of the Court's guidance.  The Non-Debtor Affiliates respectfully submit that, at the time the Court directed the Debtors, the Official Committee of Tort Claimants ("**TCC**") and the Future Claimants' Representative ("**FCR**") to submit letter briefs on the common interest doctrine,[8] no party had yet challenged the Non-Debtor Affiliates' assertion of common interest doctrine as to the Protected Documents.  Accordingly, the Non-Debtor Affiliates did not submit briefing or evidence in connection with the February 23 Letter.  In its February 23 Letter, this Court observed that "context matters" and that its decision was based on the record that was then before it.  Importantly, the Court cited the fact that it had not been established on the record then presented to it that Imerys S.A. had defended cases with the Debtors in the tort system as a reason why the Court should not follow the decision in the *Quigley* bankruptcy (*In re Quigley Co., Inc.*, 2009 WL 2913450).  Imerys S.A. and Imerys USA, Inc. were absolutely named as co-defendants in talc personal injury claims in several cases.  Attached hereto as **Exhibit 1** a non-comprehensive list of more than 70 cases that the Non-Debtor Affiliates have defended as co-defendants with the Debtors.  With this factual issue cleared up, the situation here is highly similar to the *Quigley* bankruptcy.[9]

## II.    The Relationship between the Non-Debtor Affiliates and the Debtors

Following years of defending talc personal injury claims in the tort system and faced with J&J's refusal to honor its indemnity obligations and dwindling available common insurance, the

---

6.  *See Goldenberg v. Indel, Inc.*, No. 09-5202 (JBS/AMD), 2012 WL 12906333, at *5 (D.N.J. May 31, 2012) ("the Court need not [again] address whether the common interest also permits [the withholding]" because, as explained below, "there has been no waiver of the work-product doctrine's protection," ending the inquiry).

7.  ECF No. 3004.

8.  S*ee* Hr'g Tr. Jan. 15, 2021 at 113-19.

9.  Imerys S.A. agreed to produce certain documents to J&J pursuant to the procedure set forth in this Court's order authorizing the appointment of a Commissioner for Discovery in France. [ECF No. 3099]  In the interest of expediency and with the March 24, 2021 deadline for substantial completion of document production approaching, Imerys S.A. began reviewing and preparing a potential production in advance of the Court's February 23 Letter.  Upon the Court's issuance of the February 23 Letter, rather than conduct a duplicative overseas privilege re-review, Imerys S.A. worked with the Debtors to identify and analyze documents potentially subject to the February 23 Letter, including communications with the Non-Debtor Affiliates' in-house and outside counsel.  Therefore, Imerys S.A.'s production pursuant to the Hague Convention does not include such documents.

Non-Debtor Affiliates and Debtors (together, the "**Parties**") engaged in a joint effort beginning in 2018 to consider alternatives to resolve their liabilities related to the personal injury claims, including bankruptcy.[10]  These efforts preceded the commencement of the Chapter 11 Cases on February 13, 2019.

From the beginning, the Parties knew that negotiating a Plan that resolved the claims against all of them would be an essential component of a consensual Plan in these Chapter 11 Cases.[11]  Both the Debtors and the Non-Debtor Affiliates had common insurance and indemnity rights and a common interest in negotiating a consensual Plan, and they proceeded jointly pursuant to their common interest.  Because the Debtors and Non-Debtor Affiliates were the beneficiaries of shared insurance policies and shared rights to indemnities, negotiation of a consensual Plan with the TCC and FCR would necessarily involve coordination by the Parties.[12]  There was no conflict in their positions because they knew that the representatives of the underlying tort claimants would never accept any agreement solely between the Debtors and the Non-Debtor Affiliates resolving any potential exposure of the Non-Debtor Affiliates.  Resolution of any claims against the Non-Debtor Affiliates would have to be negotiated by representatives of the underlying tort claimants, just as those claims had been brought in civil litigation by those representatives pre-petition.

In fact, that is exactly what happened.  Shortly after the TCC was appointed in these cases, the TCC insisted that the Debtors agree that the TCC had standing to pursue claims against the Non-Debtor Affiliates.  Accordingly, on March 19, 2019, the Debtors memorialized the agreement with the TCC that "the [TCC] as estate representative . . . has derivative standing to commence on behalf of the estates any action against Imerys S.A. or non-debtor affiliates" (the "**March 2019 Agreement**").[13]  Thus, as anticipated from the beginning, it was the TCC as estate representative, not the Debtors, that investigated potential claims against the Non-Debtor

---

10.  *See* Disclosure Statement 3.3(a) [ECF No. 2866].

11.  *See* Declaration of Alexandra Picard, Chief Financial Officer of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings [ECF No. 10] at ¶ 11 ("The Debtors' primary goal in filing these Chapter 11 Cases is to confirm a consensual plan of reorganization pursuant to Sections 105(a), 524(g), and 1129 of the Bankruptcy Code that channels all of the present and future Talc Claims to a trust vested with substantial assets and provides for a channeling injunction prohibiting claimants from asserting against *any Debtor or non-debtor affiliate* any claims arising from talc mined, produced, sold, or distributed by any of the Debtors prior to their emergence from these Chapter 11 Cases.") (emphasis added); *see also id*. ¶ 50 ("During the Chapter 11 Cases, the Debtors intend to negotiate the terms of a consensual plan of reorganization with the future claimants' representative appointed by the Court, representatives of the holders of current alleged Talc Claims and the non-debtor Parent on behalf of the rest of the Imerys Group in order to resolve the Talc Claims and develop a go-forward strategy for the affected talc business").

12.  The settlement ultimately reached among the Debtors, Non-Debtor Affiliates, TCC and FCR provides for the Non-Debtor Affiliates and Debtors to contribute to the Talc Personal Injury Trust all of their respective rights and interests with respect to shared indemnity and insurance interests, including insurance issued by XL Insurance America, Inc. and all rights related to the stock purchase agreement, dated 10 June 2011, between Rio Tinto America, Inc. and Mircal S.A., a subsidiary of Imerys S.A.  *See* Plan § 10.8.2.3(a); Plan Supplement, Ex. 7 [ECF No. 2900].

13.  *See* Email from Jeff Bjork to Natalie Ramsey, *et. al*. (Mar. 19, 2019) (**Ex. 2**).

Affiliates and negotiated the amount and character of the Non-Debtor Affiliates' contribution to the Debtors' estates in exchange for releases and a channeling injunction under the Plan.

The Parties and their counsel communicated candidly and freely with each other as non-adversaries concerning anticipated litigation in these bankruptcy cases and their joint strategy to negotiate a consensual Plan with the TCC and FCR.  For the reasons set forth above, the Parties reasonably understood that their relationship was non-adversarial, as demonstrated by the nature and substance of the Protected Documents; in fact, the Parties consistently labeled those communications as "Common Interest."

## III.    The Protected Documents Are Attorney Work Product that is Not Discoverable

The attorney work product privilege protects the Protected Documents from disclosure and, given the non-adversarial nature of the Parties' relationship within these bankruptcy proceedings, the Non-Debtor Affiliates did not waive the privilege, as attorney work product protection is waived "only in cases in which the material is disclosed in a manner inconsistent with keeping it from an adversary."[14]

### A.    The Protected Documents are Attorney Work Product

The Court has already set forth a comprehensive recitation of the purpose and scope of the attorney work product doctrine.  *See In re Imerys Talc Am., Inc.,* Adv. Pro. No. 19-50115 (LSS) (Dec. 16, 2019).

The Protected Documents are precisely the type of information that the attorney work product privilege exists to protect:  they contain opinion work product, *i.e.*, the mental impressions, conclusions and opinions of the Parties' in-house and outside counsel and were prepared (i) in anticipation of current and future litigation within these bankruptcy proceedings and (ii) in an effort to negotiate the terms of a consensual Plan among the Debtors, Non-Debtor Affiliates, TCC and FCR that would resolve the talc liabilities of the Debtors and Non-Debtor Affiliates.

Here, the Protected Documents fall within two categories:[15]

(i)    emails and presentations exchanged among the Parties' in-house and outside counsel concerning the present and future course of these bankruptcy cases, including:  (A) pre-petition planning for the filing; (B) developments in negotiations with the TCC and FCR, (C) analysis of potential future litigation with the TCC and FCR; and (D) analysis of strategy with respect to addressing other contested matters within the bankruptcy cases—including Plan confirmation—with J&J, the Debtors' insurers, the U.S. Trustee, ad hoc claimant groups, and other parties-in-interest ("**Category 1**"); and

---

14.  *In re Chevron Corp.*, 633 F.3d 153, 165 (3d Cir. 2011).

15.  The Non-Debtor Affiliates will make these Protected Documents or some representative subset of them available for *in camera* review, should the Court wish to examine them.

(ii)     communications among the Parties' in-house and outside counsel concerning the terms of the comprehensive settlement among the Debtors, Non-Debtor Affiliates, TCC and FCR ultimately embodied in the Plan, including as to the amount and character of the Non-Debtor Affiliates' contribution to the Debtors' estates in exchange for releases and a channeling injunction ("**Category 2**").

The Debtors and the Non-Debtor Affiliates would be gravely prejudiced should they be forced to disclose their mental impressions, conclusions and opinions in connection with pursuing these Chapter 11 Cases and reaching the settlement embodied in the proposed Plan, allowing the parties on the other side of a negotiation to peer into the minds of the Parties with respect to how they considered and approached the negotiations in anticipation of current and future litigation within these bankruptcy proceedings.  As such, the attorney work product privilege protects the Protected Documents from "falling into the hands" of the TCC, the FCR, J&J, and other adverse (or formerly adverse) parties.[16]

## 1.    Category 1

Documents and communications in Category 1, described above, are classic attorney work product:  drafts, comments and revisions of presentations shared between a parent company and its subsidiaries and their counsel in furtherance of their joint legal strategy in these bankruptcy cases.[17]  Litigation was "reasonably anticipated" at the time of creation of these documents and communications, as they specifically concern current and future litigation in these bankruptcy cases.  These documents and communications were not created in the ordinary course of business, nor do they merely "prove useful in subsequent litigation."[18]  Rather, they contain "attorney[] legal strategy . . . [and] evaluation of the strengths and weaknesses of [current and future litigation within the bankruptcy]," and should therefore be "accorded an almost absolute protection from discovery."[19]

The Protected Documents in Category 1 thus clearly satisfy the "reasonable anticipation test" and "can fairly be said to have been prepared or obtained because of the prospect of litigation."[20]

---

16.  *In re Chevron Corp.*, 633 F.3d at 165.

17.  *See In re Quigley Co., Inc.*, No. 04-15739 (SMB), 2009 WL 2913450, at *1 (Bankr. S.D.N.Y. June 19, 2009) (documents "prepared in contemplation of [a] joint strategy" in bankruptcy were protected as work product); *see also In re 15375 Memorial Corp.*, No. 06-50822, 2007 WL 675948, at *2 (Bankr. D. Del. Mar. 1, 2007) (Gross, J.) (debtors' sharing of work product with parent company in contemplation of filing for bankruptcy did not waive work product privilege because "there is overwhelming case law supporting the proposition that the existence of communications of privileged information between a parent and its subsidiary does not constitute a waiver," even as "potential adversaries in intercompany claims litigation or challenges").

18.  *In re Gabapentin Pat. Litig.*, 214 F.R.D. 178, 184 (D.N.J. 2003).

19.  *Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir. 1985).

20.  *In re Grand Jury Proc.*, 604 F.2d 798, 803 (3d Cir. 1979) (internal quotations and citation omitted).

### 2.    Category 2

The documents and communications in Category 2, as described above, reflect the mental impressions, opinions and legal strategy of the Parties' counsel in negotiating with the TCC and FCR, and were created with the prospect of litigation with stakeholders in the bankruptcy in mind, as the Parties anticipated that they might be forced to litigate issues relating to the amount and scope of the Talc Personal Injury Claims or be forced to jointly defend the Plan during a contested confirmation process.[21]  These documents and communications would not just coincidentally "prove useful" in litigation, but instead were deliberately prepared in anticipation of concrete, identifiable litigation—*i.e.*, an estimation proceeding or a contested confirmation of the Plan.[22]

As such, the Protected Documents in Category 2 satisfy the "reasonable anticipation test" and "can fairly be said to have been prepared or obtained because of the prospect of litigation."[23]

### B.    The Non-Debtor Affiliates Did Not Waive the Attorney Work Product Privilege by Sharing the Protected Documents with the Debtors Because the Parties Were Not Acting as Adversaries

The Non-Debtor Affiliates did not waive the attorney work product privilege by sharing the Protected Documents with the Debtors, as attorney work product protection is waived "only in cases in which the material is disclosed in a manner inconsistent with keeping it from an adversary."[24]  A party waives its attorney work product protection only when it "enable[s] an adversary to gain access to the information."[25]  Therefore, courts must "distinguish between disclosures to adversaries and disclosures to non-adversaries."[26]

The Debtors and Non-Debtor Affiliates were not acting as adversaries in exchanging the Protected Documents because, from the beginning, they (1) both wanted a consensual Plan and (2) there was no conflict in their positions because they knew that the representatives of the underlying tort claimants would never accept any agreement between the Debtors and the Non-

---

21.  *Cf. Asbestos Health Claimants' Comm. v. Jasper Corp.* (*In re Celotex Corp.*), 196 B.R. 596, 599 (Bankr. M.D. Fla. 1996) (holding that, because the documents at issue were prepared post-petition regarding the "Debtor's professional activities associated with the general [bankruptcy] case," they were prepared in anticipation of litigation); *In re McDowell*, 483 B.R. 471, 494 (Bankr. S.D. Tex. 2012) (holding that documents prepared in anticipation of the filing of a bankruptcy petition are also prepared "in anticipation of litigation").

22.  *In re Gabapentin Pat. Litig.*, 214 F.R.D. at 184; *see Burtch v. Luminescent Sys., Inc.* (*In re AE Liquidation, Inc.*), No. 10-55460 (MFW), 2012 WL 6139950, at *3 (Bankr. D. Del. Dec. 11, 2012) (documents are created in anticipation of litigation when the litigation is "identifiable") (citation omitted); *see also In re McDowell*, 483 B.R. at 494.

23.  *In re Grand Jury Proc.*, 604 F.2d at 803 (internal quotations and citation omitted).

24.  *In re Chevron Corp.*, 633 F.3d at 165.

25.  *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991).

26.  *Id.*

Debtor Affiliates resolving any potential exposure of the Non-Debtor Affiliates, and any claims against the Non-Debtor Affiliates would have to be negotiated by representatives of the underlying tort claimants, the TCC and FCR.

> ### C.    J&J Cannot Meet Its Burden to Show a Substantial Need for the Protected Documents

J&J cannot show the substantial need for the Protected Documents required to overcome the work product privilege. The mental impressions, conclusions and opinions of in-house and outside counsel to the Parties does not carry any probative value as to contested matters related to confirmation of the proposed Plan, and such documents are not needed in order to accomplish any legitimate goal of J&J in these Chapter 11 Cases. The Plan Proponents have produced hundreds of emails among the Plan Proponents discussing the investigation of estate claims against the Non-Debtor Affiliates and negotiation of the settlement embodied in the proposed Plan.

## IV.    The Evidence Now Before the Court Establishes a Common Interest under Applicable Law

The common interest doctrine also shields the Protected Documents from disclosure, separately and independently of the attorney work product privilege.

The Court recognized in the February 23 Letter that "context matters," as (i) "parties can simultaneously share a common legal interest with respect to some issues but not other issues" and (ii) "to the extent that parties share a common legal interest, the common interest doctrine only protects the communications that are in furtherance of that common legal interest."[27] The Court also recognized that *In re Quigley Co., Inc.*, No. 04-15739 SMB, 2009 WL 9034027 (Bankr. S.D.N.Y. Apr. 24, 2009) "hold[s] that it is possible for a parent and subsidiary to share a common legal interest in confirming a plan of reorganization".[28] However, the Court found that, "[u]nlike *Quigley*, there [was] no evidence before [the Court] that Imerys S.A. was a co-defendant in the Imerys prepetition litigation or that Imerys S.A. shares derivative liability with Debtors, factors the *Quigley* court heavily relie[d] on in its decision."[29] The Court also found that there was "no evidence of a joint defense agreement between the Debtors and Imerys SA, much less any evidence before [it] of decades-long coordinated defense efforts, factors the *Quigley* court thought were relevant in establishing the common legal interest."[30]

The Non-Debtor Affiliates now respectfully submit such evidence, which was not before the Court when it issued the February 23 Letter, in support of their position that it is proper to

---

27.  February 23 Letter at 4.

28.  *Id*. at 9; *see id*. at 4.

29.  *Id.* at 9.

30.  *Id.*

withhold the Protected Documents from the Debtors' Production based on the common interest doctrine.

*First*, as in *Quigley*, the Non-Debtor Affiliates and Debtors were co-defendants in prepetition litigation, with Imerys S.A. and Imerys USA, Inc. having been named, as in the underlying asbestos cases at issue in *Quigley*, in a derivative liability capacity for supplying the exact same product that allegedly caused the underlying plaintiffs' injuries. This alleged liability of certain Non-Debtor Affiliates was a substantial focus of certain cases in the tort system, including in *Leavitt*, a California mesothelioma case where the trial court issued a detailed ruling regarding the alleged alter ego liability of Imerys USA, Inc. shortly before the Debtors filed for bankruptcy.[31] Like in *Quigley,* the Debtors and Non-Debtor Affiliates "share a common interest in resolving their joint liabilities through [the Debtors'] chapter 11 case to the extent permitted by § 524(g)."[32]

*Second*, the March 2019 Agreement, and the Parties' understanding that such an agreement was inevitable, were not before the Court when it issued the February 23 Letter. This is critical, because it explains why the Parties were never adverse and provides irrefutable documentary evidence. In addition, if the Court reviews all or a sample of the Protected Documents *in camera,* the Court will see that the Parties reasonably undertook a joint strategy (i) to reach an expedient consensual Plan with the TCC and FCR and (ii) in preparing for anticipated litigation in these bankruptcy proceedings. While there was a not a written joint defense agreement between the Parties, there was a "meeting of the minds" that the Parties were communicating in confidence about these topics, as evidenced by both the substance of the communications and the Parties' contemporaneous labeling of the Protected Documents as "Common Interest."[33]

*Third,* like in *Quigley,* the Debtors and Non-Debtor Affiliates are covered by shared insurance that they used to defend against pre-petition talc personal injury claims, and are the beneficiaries of a shared right to indemnification from a third party, which the Debtors and Non-Debtor Affiliates jointly pursued pre-petition.[34]

---

31.  *See* Order Granting Mot. to Quash re: Imerys USA, *Leavitt v. Johnson & Johnson*, Case No. RG17882401 (Super. Ct. Cal. Dec. 28, 2018).

32.  *In re Quigley Co., Inc.*, 2009 WL 9034027, at *4.

33.  *See, e.g., In re Cherokee Simeon Venture I, LLC*, No. 12-12913 (KG), 2012 WL 12940975, at *2 ("[T]he privilege does not require a formal agreement reduced to writing. Rather, a 'meeting of the minds' is sufficient provided communications were given in confidence and the [parties] reasonably understood them to be so given.") (citation omitted).

34.  *In re Quigley Co., Inc.* 2009 WL 9034027, at 4 (noting that Quigley and Pfizer "are covered by shared insurance that they have used to defend against [asbestos-related] claims").

With the benefit of this information, the Non-Debtor Affiliates respectfully submit that, if the Court decides to reach the issue, the Court should find the Protected Documents privileged pursuant to the common interest doctrine.[35]

* * * * *

For the foregoing reasons, the Protected Documents should be withheld from disclosure because they are absolutely protected against disclosure by the attorney work-product privilege. Should the Court reach the issue, the Protected Documents are also protected against disclosure as privileged pursuant to the common interest doctrine.

The Non-Debtor Affiliates look forward to further addressing these issues with the Court at its convenience and invite the Court to review the specific documents at issue so that it can see firsthand that they contain attorney work product and should not be disclosed. Because time is of the essence, to move expeditiously towards the confirmation of the Plan, the Non-Debtor Affiliates will follow the Court's preferred procedure to receive a prompt ruling.

Respectfully submitted,

/s/ William J. Beausoleil

William J. Beausoleil
Partner

Attachments

cc:   All counsel ECF

---

35. *Id*. (finding common interest where, among other things, the parties "engaged in a joint strategy to prosecute [the bankruptcy] to achieve the common benefits of the release and channeling injunction").