# Weil, Gotshal & Manges LLP

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Theodore E. Tsekerides**
+1 (212) 310-8218
theodore.tsekerides@weil.com

June 9, 2021

**BY EMAIL/ECF**

The Honorable Laurie Selber Silverstein
United States Bankruptcy Judge
United States Bankruptcy Court
For the District of Delaware
824 North Market Street, 6th Floor
Wilmington, Delaware 19801

Re:    In re: Imerys Talc America, Inc. et al., Case No. 19-10289 (LSS)[1]

Dear Judge Silverstein:

We write on behalf of Johnson & Johnson and Johnson & Johnson Consumer Inc. (together, "**J&J**") seeking the Court's intervention in connection with discovery sought concerning the solicitation and voting to "approve" the Plan.[2] While some of the issues raised here overlap with those raised in the discovery motion filed by Arnold & Itkin ("**A&I**") to be heard on June 22, 2021 (the "**A&I Motion**") [D.I. 3425], there are additional issues J&J respectfully requests the Court to consider. J&J hereby also joins in the relief requested in the A&I Motion.

As Your Honor knows, J&J and other interested parties have repeatedly asserted during the course of these cases that the Plan Proponents have not been transparent in disclosing information concerning Plan negotiations and settlements and, instead, have worked to stymie efforts to obtain discovery that would shed light on the Plan, its negotiation, and its impact. Rather than operate under the principle that plan proponents should be transparent with the Court and others, these Plan Proponents have preferred to operate in the shadows. But that is not how bankruptcy is supposed to work. *See, e.g.*, *In re Myers*, 2018 WL 4701387 at * 6 (Bankr. D. Md. 2018) ("[T]he debtor should be required to abide by the 'cardinal rule: when in doubt, disclose.'"); *In re Korn*, 523 B.R. 453, 467 (Bankr. E.D. Pa. 2014) (debtor's actions were "totally at odds with the spirt of transparency required in the bankruptcy reorganization process and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [D.I. 2864].

**Weil, Gotshal & Manges LLP**

June 9, 2021
Page 2

far more consistent with a dishonest state of mind"); *In re Gordon Properties, LLC*, 514 B.R. 449, 460 (Bankr. E.D. Va. 2013) ("[T]he hallmark of every bankruptcy case is transparency—the full, fair, and timely disclosure of information that affects the administration of the estate.").

Yet again, the Plan Proponents seek to deprive J&J (and other Plan objectors) of discovery that is critical to Plan confirmation—this time as it relates to Plan solicitation and voting. Hiding behind technical arguments regarding allegedly applicable deadlines and limitations on the number of depositions, the Plan Proponents have refused to produce relevant documents and have asserted that J&J may not depose additional witnesses beyond those already scheduled. These efforts to avoid probing into the solicitation and voting process, including with respect to how votes may have been improperly procured, is especially suspicious and concerning given how narrowly the Plan purportedly was accepted and the thousands of "no" votes that were switched to "yes" after the Voting Deadline without which the Plan would necessarily fail.[3] The Debtors' position here is particularly troubling—one would expect the Debtors to be concerned with (and to investigate) various red flags surrounding the voting process and potential illegitimate claims. But they instead appear to be more interested in trying to ram through a flawed plan than in the integrity of the process.

Indeed, the more the Plan Proponents seek to prevent parties in interest from discovering the facts, the greater the need for those facts to be uncovered. One cannot help but wonder: What are they afraid will be disclosed if the discovery goes forward? There is too much at stake for all parties to permit the Plan Proponents to escape discovery on these cornerstone issues.

I.      <u>Discovery Related to Plan Solicitation and Voting Should Be Compelled</u>

Following receipt of the initial declaration relating to the Plan vote filed on April 7, 2021 (the "**Initial Voting Declaration**") by the Debtors' claims and noticing agent, Prime Clerk LLC ("**Prime Clerk**"),[4] J&J served targeted discovery on certain Plan Proponents relevant to the vote, including communications among the Plan Proponents and third parties concerning solicitation and voting on the Plan. J&J also served subpoenas on Prime Clerk for similar documents and has since served document subpoenas on three of the plaintiffs' law firms who changed their clients' votes from rejecting to accepting

---

[3] *See generally Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on The Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [D.I. 3534] (the "**Supplemental Voting Declaration**").

[4] *See Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Preliminary Tabulation of Ballots Cast on the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code Filed by Imerys Talc America, Inc.* [D.I. 3334] (the "**Initial Voting Declaration**"). The Supplemental Voting Declaration was filed by Prime Clerk one month later on May 7, 2021 [D.I. 3534].

**Weil, Gotshal & Manges LLP**

June 9, 2021
Page 3

the Plan. J&J also intends to serve at least one additional document subpoena based on recent testimony taken by the Debtors in connection with the A&I Motion.

Notwithstanding that the Initial Voting Declaration on its face revealed many discrepancies, inconsistencies, and substantial questions with respect to the voting and its tabulation—raising serious questions as to whether the requisite statutory acceptance threshold was obtained—the Plan Proponents have refused to produce any documents themselves, and have moved to quash the subpoenas served on Prime Clerk [D.I. 3459] to prevent it from producing documents either.[5] In refusing to produce these documents, the Plan Proponents claim that a February 15, 2021 deadline for written discovery forever precludes discovery of any subsequent events, including relating to the solicitation and voting process. But, as explained below, that deadline was never intended to be, nor could it be, applicable to these solicitation and voting issues that only arose months later. Moreover, given that the parties have agreed to extend the fact discovery deadline to July 23, 2021, there is no credible basis to withhold these documents, and certainly no prejudice to any party in allowing this discovery.

It was upon reviewing the Initial Voting Declaration that it became immediately clear to J&J that the Plan vote was fraught with errors, inconsistencies, and unexplained results. For example, the Initial Voting Declaration states that nearly 80,000 votes were counted in the tabulation for Class 4 Talc Personal Injury Claims—more than *five times* the number of claims that the Debtors identified as pending in their First Day Declaration.[6] This 80,000 figure does not even include the more than 27,000 votes that were excluded from the count, meaning that over 100,000 votes in total were submitted on the Plan. This is an astonishingly high number that should give both the Plan Proponents and this Court serious concern as to the propriety of the voting process—especially when the preliminary tabulation (as set forth in the Supplemental Voting Declaration) indicates that Class 4 members accepted the Plan by a margin of less than 5%. Moreover, if the number of voting claims greatly exceed the estimate of current claims on which the TDPs are based, not only should the Plan Proponents be suspicious of these numbers, they should also consider whether the Payment Percentages should be lowered in light of this new information. The Supplemental Voting Declaration raises additional questions, such as why did the Plan Proponents decide not to reach out to voting creditors to cure certain alleged voting deficiencies, like the lack of a social security number?

As a result of these material concerns and questions, J&J immediately sought to uncover more details regarding this highly irregular Plan vote. On April 9, 2021, just two days after the Initial Voting Declaration was filed, J&J served requests for production on the Debtors, the TCC, and Imerys S.A.,[7]

---

[5] That motion will also be heard on June 22, 2021 and J&J's opposition will be filed on June 10, 2021.

[6] *See Declaration of Alexandra Picard, Chief Financial Officer of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings* ¶¶ 34, 36 [D.I. 10].

[7] Copies of the requests for production that J&J served on the Debtors, the TCC, and Imerys S.A. are attached hereto as Exhibits A, B, and C, respectively.

**Weil, Gotshal & Manges LLP**

June 9, 2021
Page 4

narrowly targeted to issues surrounding the Plan vote. Specifically, J&J requested documents and communications, between and/or among the Plan Proponents and the Class 4 members who cast ballots, concerning both solicitation of the Plan and the voting results. Rather than respond to J&J's requests, the Debtors, the TCC, and Imerys S.A. refused to produce anything. During the meet-and-confer process, the Plan Proponents advised that they would not be responding to J&J's requests because they considered them untimely based on the February 15 written discovery deadline. J&J explained that this deadline was not relevant to an issue that only arose, and events that only occurred, well after that deadline, and could not legitimately be the basis for refusing to produce such relevant discovery. The Plan Proponents, however, have confirmed their refusal to produce any documents in response to these requests. The Court should overrule the Plan Proponents' objections and compel them to produce this critical information.

*First*, the Plan Proponents' argument regarding the February 15 written discovery deadline is facially untenable. J&J could not possibly have foreseen in February the issues related to the Plan vote that were first presented in the Initial Voting Declaration. J&J could not have known, for example, that (i) the number of ballots cast would be more than five times what the Debtors initially predicted, or (ii) Prime Clerk would identify "an excess of 20,000 potential duplicative votes." Initial Voting Declaration ¶ 9. It was not until after the potential improprieties regarding the vote came to light in the Initial Voting Declaration that J&J was able to draft meaningful and timely discovery requests—and J&J served these requests, without delay, just two days after the Initial Voting Declaration was filed. And it is not just a foreseeability issue, as most of the events for which J&J seeks discovery occurred after February. Thus, the Plan Proponents' position that the February 15 written discovery deadline applies to prevent discovery relating to *subsequent* facts and potential improprieties is simply absurd.

*Second*, this Court set the February 15 written discovery deadline at a time when fact discovery was scheduled to end on April 14, 2021. However, at the April 7, 2021 hearing, the Plan Proponents, without providing any prior notice to J&J, asked the Court to adjourn the confirmation hearing by six weeks.[8] The following afternoon, J&J conferred with the Plan Proponents and, given the six-week continuance, the parties tentatively agreed to extend the fact discovery deadline from April 14 to May 14, 2021.[9] The fact discovery deadline has since been extended again by agreement to July 23, 2021. Also at the April 7, 2021 hearing, the Plan Proponents stated that the purpose for extending the discovery deadline was to provide more time to conduct discovery.[10]

---

[8] *See* Kimberly Posin, Counsel for the Debtors, Apr. 7, 2021 Hr'g Tr. 6:11–18. The relevant excerpts of the April 7, 2021 hearing transcript are attached hereto as Exhibit D.

[9] *See Order Adjourning Confirmation Hearing and Related Dates* ¶ 2 [D.I. 3412], attached hereto as Exhibit E.

[10] Exhibit D, Kimberly Posin, Counsel for the Debtors, Apr. 7, 2021 Hr'g Tr. 6:21–24 ("[W]e do believe that additional time will provide all parties in interest, you know, more time to finalize discovery in a, you know, timely and reasonably manner."); *see also* Exhibit D, Edwin Harron, Counsel for the FCR, Apr. 7, 2021 Hr'g Tr. 7:25–8:3 ("[W]hile we're eager to get the plan confirmed . . . we do support the effort to continue [the confirmation hearing] to give us some more time to properly address all of the discovery.").

June 9, 2021
Page 5

With the fact discovery deadline extended, the Plan Proponents have now had months to produce responsive documents to the targeted requests on solicitation and voting and could not possibly claim to suffer prejudice in having to produce the requested discovery. In contrast, J&J and other plan objectors will suffer substantial prejudice if deprived of the ability to probe what occurred during the solicitation and voting process. Indeed, the information J&J seeks, both from the Plan Proponents and other third parties, is highly relevant to Plan confirmation and the Plan Proponents should be compelled to produce it. For example, if there were communications between the Plan Proponents and claimants extending their deadline to vote, discussing potential Plan revisions, or other quid pro quo or undisclosed secret agreements to aid in attempts to reverse votes, or other discussions with voters, such information could support the designation of votes (depending on the substance of the communications) or at least raise serious questions about the voting process or results. We will never know whether in fact the vote in favor of the Plan was legitimate without this discovery.

*Third*, even more troubling is that we know from the Supplemental Voting Declaration and recently produced spreadsheets from Prime Clerk, that over 17,000 votes were changed from rejecting to accepting the Plan after the Voting Deadline. Without these changed votes, the Plan Proponents would not have secured enough accepting votes to confirm the Plan. We also know that the lion's share of those changed votes were submitted by the clients of just three law firms: Bevan and Associates LPA, Inc. ("**Bevan**"), Trammell, P.C. ("**Trammell**"), and Williams Hart Boundas Easterby LLP ("**Williams Hart**"), with the vast majority having been submitted the day before the Initial Voting Declaration was filed. It also was discovered during the deposition of Jason Itkin, whom the Debtors deposed in connection with the A&I Motion, that counsel for one of the TCC members (Steve Baron of Baron & Budd, P.C. ("**Baron & Budd**")) offered him, among other things, a seat on the Trust Advisory Committee (the "**TAC**") if he would vote to support the Plan.[11] While Mr. Itkin refused that offer, he testified that lawyers at Williams Hart agreed to change their vote to accept the Plan in exchange for Mr. Baron's promise of a seat on the TAC.[12] Williams Hart was also apparently to use its best efforts to convince others to change their votes.[13]

What we do not know, but should be permitted to probe in discovery, is what was said between Mr. Baron (or other Plan Proponents) and those who changed their votes or whose votes were sought to be changed, including, when those conversations took place, what was given or promised in exchange for the changed votes, and who exactly benefits from those changed votes as between the plaintiffs' lawyers and their actual clients. There has been no public disclosure of any of these agreements. If there were any actual or "handshake" agreements between parties to change votes, those need to be disclosed—particularly if they involved fiduciaries, such as members of the TCC. It simply is shocking that, instead of working with J&J and A&I to ensure that these proceedings are administered with integrity and

---

[11] *See* Itkin Dep. Tr. 35:21–38:4. The relevant excerpts of Mr. Itkin's June 4, 2021 deposition transcript are attached hereto as Exhibit F.

[12] *See* Itkin Dep. Tr. 40:22–42:18.

[13] *See id.*

5

**Weil, Gotshal & Manges LLP**

June 9, 2021
Page 6

transparency, the Plan Proponents have chosen secrecy and opacity. The Court should shine a light on this process and compel the Plan Proponents to respond to the propounded discovery.

## II.    J&J Should Be Granted Leave To Take Additional Depositions

On March 15, 2021, J&J served deposition notices pursuant to Federal Rules of Civil Procedure Rule 30(b)(6) upon three sets of parties:  (i) the Plan Proponents (*i.e.*, the TCC, the Debtors, Imerys S.A., and the FCR (as a 30(b)(1)), (ii) Imerys Talc Italy, S.p.A. (a potential would-be Debtor entity and essentially another Plan Proponent), and (iii) Cyprus Amax Minerals Company, Zurich America Insurance Company, Three Crowns Insurance Company, Cyprus Mines Corporation, and Rio Tinto America Inc. (entities that have reached settlements under the Plan) [D.I.s 3105–3114, respectively]. Thus, just with these central parties the number of depositions noticed by J&J totals ten (10).[14]

On March 29, 2021, J&J served deposition notices pursuant to Federal Rule 30(b)(1) upon future Talc Personal Injury Trust trustees David Levi [D.I. 3264], Ellen Pryor [D.I. 3265], and Anne Ferazzi [D.I. 3266]. Even though these depositions presumably would have exceeded the ten depositions the Plan Proponents now assert J&J cannot take without leave of Court, none of them objected.[15] In fact, the Plan Proponents have indicated that they have no objection to J&J taking any of the depositions previously noticed, including that of Prime Clerk that was noticed by another party, but object to any additional depositions on the basis that J&J is not entitled to more. It was only after J&J served subpoenas on plaintiffs' law firms that represent members of the TCC and are slated to be on the TAC (Levy Konigsberg LLP [D.I. 3338] and OnderLaw, LLC [D.I. 3354]) on April 7 & 9, 2021, that the Plan Proponents raised any concerns about the number of depositions. In addition to those two additional depositions, J&J also intends to depose Baron & Budd, Bevan, Trammell, and Williams Hart based on recently revealed information.

While J&J believes the Plan Proponents' objection to additional depositions is without merit under the circumstances of these proceedings—where several other objectors already noticed the same depositions—in order to address this issue directly and avoid any further dispute, J&J respectfully requests that the Court grant it leave to take up to six (6) additional depositions in connection with Plan confirmation. Three of these deponents are also identified in the A&I Motion.

---

[14] Half of these depositions were also noticed by other parties:  (1) Debtors: Arnold & Itkin [D.I. 3067], Certain Insurers [D.I. 3134], Ad Hoc Committee of Imerys Talc Litigation Claimants [D.I. 3120]; (2) ITI: Certain Insurers [D.I. 3192], joinder by Certain Underwriters at Lloyds of London, *et al.* [D.I. 3197]; (3) FCR: Arnold & Itkin [D.I. 3073], Certain Insurers [D.I. 3135]; (4) TCC: Arnold & Itkin [D.I. 3068]; Certain Insurers [D.I. 3137]; and (5) Imerys S.A.: Certain Insurers [D.I. 3191].

[15] J&J has already deposed Mr. Levi and Ms. Ferazzi and does not intend to depose Ms. Pryor.

**Weil, Gotshal & Manges LLP**

June 9, 2021
Page 7

The decision to grant such leave is left to this Court's discretion and leave should be granted when consistent with Federal Rule 26(b)(1) and (2). Fed. R. Civ. P. 30(a)(2)(A). Importantly, Federal Rule 26(b)(1) provides that the requested discovery must be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *see e.g.*, *In re Maxus Energy Corp.*, 617 B.R. 806, 813 (Bankr. D. Del. 2020) (permitting depositions of up to twenty (20) fact witnesses per party).

Here, there can be no serious doubt that the depositions sought by J&J are all relevant to the confirmation hearing and proportional to the needs of the case—especially given the high stakes that all parties recognize are at issue here. The TAC depositions sought are of only two of the eleven law firms that will comprise the TAC and are relevant given the TAC's role under the Talc Personal Injury Trust. The TAC members are fiduciaries "representing the interests of all holders of present Talc Claims," they are to be consulted by the Talc Trustees on all matters relating to the general administration of the Talc Personal Injury Trust, and their consent is necessary in order to, among other things, change the payment percentages of (or claims values set forth in) the TDPs or require claimants to provide additional medical evidence. Trust Distribution Procedures § 5.2. It is thus paramount that J&J be permitted to depose each and every party it has noticed. *See In re Maxus Energy Corp.*, 617 B.R. at 813 (quoting Federal Rule 26(b)(1) and providing "the parties' relative access to relevant information" as a factor to permit additional depositions).[16]

The depositions of Baron & Budd, Bevan, Trammell, and Williams Hart are each relevant and necessary given the critical and unique involvement they have had relating to the solicitation and voting issues discussed above. Baron & Budd should be deposed to determine, among other things, what it promised in exchange for votes to accept the Plan. Similarly, the lawyers who changed their clients' votes should be examined about the communications with Plan Proponents or their representatives that led to the switch to determine if there is a basis to designate those votes. The examination of Bevan is particularly important, given the sheer number of that firm's votes that were switched, and the fact that Bevan does not appear to have had an active or meaningful role in the talc MDL. It is necessary to explore not only the circumstances that led to the almost 16,000 vote swing attributable to Bevan—enough to have swayed the outcome of the vote—but also the bona fides of the claims the firm purports to represent. Accordingly, J&J submits that it is appropriate for the Court to grant it leave to take up to six (6) additional depositions.

If there is to be transparency in this process, especially as relates to voting on the Plan, J&J respectfully requests that the Court compel production of the requested documents and grant J&J leave to take six (6) additional depositions. J&J has conferred with the Plan Proponents regarding the scheduling

---

[16] J&J remains open to continuing its meet and confer regarding the two TAC subpoenas. Nevertheless, to the extent an agreement cannot be reached and motions to quash those subpoenas are filed, J&J submits that any grounds for such motion should not include that the number of permitted depositions has been exceeded.

**Weil, Gotshal & Manges LLP**

June 9, 2021
Page 8


of this dispute and the parties have agreed that they will be addressed during the June 22, 2021 hearing, with opposition to this submission due on June 14, 2021.


Respectfully Submitted,

*/s/  Theodore E. Tsekerides*

Theodore E. Tsekerides


All counsel by ECF