# EXHIBIT A

Page 1

1

2   IN THE UNITED STATES BANKRUPTCY COURT

3   FOR THE DISTRICT OF DELAWARE

4   ---------------------------*

5   In re:                      Chapter 11

6   IMERYS TALC AMERICA, INC.,   Case No. 19-10289(LSS)

7   et al.,                      Jointly Administered

8              Debtors.

9   ---------------------------*

10            STENOGRAPHIC REMOTE VIRTUAL

11            DEPOSITION OF JASON ITKIN

12               Friday, June 4, 2021

13                  1:04 p.m.

14

15

16

17

18

19   Reported before and by:

20   Josephine H. Fassett, RPR, CCR

21   Job No. 4612362

22

23

24

25

Page 2

1

2                    Friday, June 4, 2021

3                         1:04 p.m.

4

5         T R A N S C R I P T of the stenographic remote

6    virtual deposition of JASON ITKIN, held on Friday,

7    June 4, 2021, commencing at approximately 1:04 p.m.,

8    before Josephine H. Fassett, a Registered

9    Professional Reporter, Certified Court Reporter, and

10   Notary Public of the State of New York and New

11   Jersey.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1

2  REMOTE APPEARANCES:

3  COUNSEL FOR THE DEBTORS:

4       LATHAM & WATKINS LLP

5       355 South Grand Avenue

6       Los Angeles, California 90071-1560

7       213.485.1234

8  BY:  AMY C. QUARTAROLO, ESQ.

9       amy.quartarolo@lw.com

10      ALICE REICHMAN HOESTEREY, ESQ.

11      alice.hoesterey@lw.com

12      JOSEPH TERESI, ESQ.

13      joe.teresi@lw.com

14      KIMBERLY A. POSIN, ESQ.

15      kim.posin@lw.com

16      MATTHEW S. SALERNO, ESQ.

17      matthew.salerno@lw.com

18      HELENA G. TSEREGOUNIS, ESQ.

19      helena.tseregounis@lw.com

20

21

22

23

24

25

Page 4

1

2    REMOTE APPEARANCES (CONT'D.):

3    CO-COUNSEL FOR THE DEBTORS:

4         RICHARDS LAYTON & FINGER P.A.

5         920 North King Street

6         Wilmington, Delaware 19801

7         302.651.7700

8    BY:  MARCOS A. RAMOS, ESQ.

9         ramos@rlf.com

10   SPECIAL INSURANCE COVERAGE AND INDEMNIFICATION

11   COUNSEL TO THE DEBTORS:

12        NEAL GERBER & EISENBERG LLP

13        2 North LaSalle Street

14        Suite 1700

15        Chicago, Illinois 60602

16        312.269.8000

17   BY:  JASON A. FRYE, ESQ.

18        jfrye@nge.com

19

20

21

22

23

24

25

Page 5

1

2    REMOTE APPEARANCES (CONT'D.):

3    COUNSEL FOR CYPRUS MINES CORP. OFFICIAL COMMITTEE OF

4    TORT CLAIMANTS:

5         CAPLIN & DRYSDALE

6         One Thomas Circle, N.W.

7         Suite 1100

8         Washington, D.C. 20005-5802

9         202.862.5000

10    BY:  MONTY CRAWFORD, ESQ.

11         mcrawford@capdale.com

12         SHAHRIAR M. (SHAH) RAAFI, ESQ.

13         sraafi@capdale.com

14    COUNSEL FOR CYPRUS AMAX MINERALS COMPANY:

15         WACHTELL LIPTON ROSEN & KATZ

16         51 West 52nd Street

17         New York, New York 10019

18         212.403.1000

19    BY:  NICHOLAS WALTER, ESQ.

20         nwalter@wlrk.com

21

22

23

24

25

Page 6

1

2    REMOTE APPEARANCES (CONT'D.):

3    COUNSEL FOR THE OFFICIAL COMMITTEE OF TORT

4    CLAIMANTS:

5          ROBINSON & COLE LLP

6          1650 Market Street

7          Suite 3600

8          Philadelphia, Pennsylvania 19103

9          267.319.7900

10   BY:  MICHAEL R. ENRIGHT, ESQ.

11         menright@rc.com

12   SPECIAL LITIGATION AND CORPORATE COUNSEL TO OFFICIAL

13   COMMITTEE OF IMERYS TORT CLAIMANTS:

14         WILLKIE FARR & GALLAGHER LLP

15         787 Seventh Avenue

16         New York, New York 10019-6099

17         212.728.8000

18   BY:  STUART R. LOMBARDI, ESQ.

19         slombardi@willkie.com

20

21

22

23

24

25

1

2   REMOTE APPEARANCES (CONT'D.):

3   INSURANCE COUNSEL TO OFFICIAL COMMITTEE OF IMERYS

4   TORT CLAIMANTS:

5        GILBERT LLP

6        700 Pennsylvania Avenue, S.E.

7        Washington, D.C. 20003

8        202.772.2200

9   BY:  HEATHER FRAZIER, ESQ.

10       fraizerh@gilbertlegal.com

11  COUNSEL FOR IMERYS SA:

12       HUGHES HUBBARD & REED LLP

13       One Battery Park Plaza

14       New York, New York 10004

15       212.837.6000

16  BY:  ERIN DIERS, ESQ.

17       erin.diers@hugheshubbard.com

18  COUNSEL FOR ALLSTATE:

19       WINDELS MARX LANE & MITTENDORF LLP

20       One Giraldo Farms

21       Madison, New Jersey 07940

22       973.966.3200

23  BY:  ANDREW K. CRAIG, ESQ.

24       acraig@windelsmarx.com

25

Page 8

1

2   REMOTE APPEARANCES (CONT'D.):

3   COUNSEL FOR AMERICAN INSURANCE:

4        MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, P.C.

5        666 Third Avenue

6        New York, New York 10017

7        212.935.3000

8   BY:  MARC E. HAAS, ESQ.

9        mehaas@mintz.com

10  COUNSEL FOR HARTFORD ACCIDENT AND INDEMNITY COMPANY

11  AND FIRST STATE INSURANCE COMPANY:

12        SHIPMAN & GOODWIN LLP

13        1875 K Street, N.W.

14        Suite 609

15        Washington, D.C. 20006-1251

16        202.469.7750

17  BY:  MIRANDA H. TURNER, ESQ.

18        mturner@goodwin.com

19

20

21

22

23

24

25

Page 9

1

2    REMOTE APPEARANCES (CONT'D.):

3    COUNSEL FOR PROVIDENCE WASHINGTON INSURANCE CO.:

4        ARMSTRONG TEASDALE LLP

5        300 Delaware Avenue

6        Suite 210

7        Wilmington, Delaware 19801

8        302.824.7089

9    BY:   RAFAEL X. ZAHRALDDIN, ESQ.

10       rzahralddin@atllp.com

11   COUNSEL FOR ALYSTOCK:

12       KLEE TUCHIN BOGDANOFF & STERN LLP

13       1801 Century Park East

14       26th Floor

15       Los Angeles, California 90067-2328

16       310.407.4000

17   BY:   NIR MAOZ, ESQ.

18       nmaoz@ktbslaw.com

19

20

21

22

23

24

25

1

2    REMOTE APPEARANCES (CONT'D.):

3    COUNSEL FOR RIO TINTO AMERICA HOLDINGS, INC., RIO

4    TINTO AMERICA INC., AND RIO TINTO SERVICES INC.:

5         WILMER CUTLER PICKERING HALE AND DORR LLP

6         1875 Pennsylvania Avenue, N.W.

7         Washington, D.C. 20006

8         202.663.8000

9    BY:  ISLEY M. GOSTIN, ESQ.

10         isley.gostin@wilmerhale.com

11   COUNSEL FOR WILLIAMS HART PLAINTIFFS:

12         ANDREWS MYERS, P.C.

13         1885 Saint James Place #1500

14         Houston, Texas 77056

15         713.850.4200

16   BY:  LISA M. NORMAN, ESQ.

17         lnorman@andrewsmyers.com

18

19

20

21

22

23

24

25

1

2    REMOTE APPEARANCES (CONT'D.):

3    COUNSEL FOR THE OFFICE OF THE UNITED STATES TRUSTEE:

4         U.S. DEPARTMENT OF JUSTICE

5         UNITED STATES TRUSTEE PROGRAM

6         844 King Street

7         Room 2207

8         Wilmington, Delaware 19801

9         302.573.6485

10   BY:  LINDA RICHENDERFER, ESQ.

11        linda.richenderfer@usdoj.gov

12   COUNSEL FOR JOHNSON & JOHNSON:

13        WEIL GOTSHAL & MANGES LLP

14        767 Fifth Avenue

15        New York, New York 10153

16        212.310.8000

17   BY:  THEODORE E. TSEKERIDES, ESQ.

18        theodore.tsekerides@weil.com

19        RONIT J. BERKOVICH, ESQ.

20        ronit.berkovich@weil.com

21

22

23

24

25

Page 12

1

2   REMOTE APPEARANCES (CONT'D.):

3   COUNSEL FOR PERSONAL CARE PRODUCTS:

4        SEYFARTH SHAW LLP

5        975 F Street, N.W.

6        Washington, D.C. 20004

7        202.463.2400

8   BY:  THOMAS T. LOCKE, ESQ.

9        tlocke@seyfarth.com

10  COUNSEL FOR FUTURE CLAIMANTS REPRESENTATIVE:

11       YOUNG CONAWAY STARGATT & TAYLOR LLP

12       Rodney Square

13       1000 North King Street

14       Wilmington, Delaware 19801

15       302.571.6600

16  BY:  KEVIN A. GUERKE, ESQ.

17       kguerke@ycst.com

18

19

20

21

22

23

24

25

1

2    REMOTE APPEARANCES (CONT'D.):

3    SPECIAL BANKRUPTCY COUNSEL TO ARNOLD & ITKIN LLP:

4         PACHULSKI STANG ZIEHL & JONES LLP

5         919 North Market Street

6         17th Floor

7         Wilmington, Delaware 19899-8705

8         302.652.4100

9    BY:   JOHN A. MORRIS, ESQ.

10         jmorris@pszjlaw.com

11         LAURA DAVIS JONES, ESQ.

12         ljones@pszjlaw.com

13

14   ALSO PRESENT REMOTELY:

15         APRIL CARTER, Veritext Concierge

16

17

18

19

20

21

22

23

24

25

Page 14

1

2   --------------------INDEX------------------------

3   WITNESS                                        PAGE

4   JASON ITKIN

5       By Ms. Quartarolo                          16

6       By Mr. Tsekerides                          202

7

8   --------------------EXHIBITS----------------------

9   EXHIBIT      DESCRIPTION                        PAGE

10  Exhibit 1   Notice of Oral and Videotaped       18

11              Deposition of Arnold & Itkin LLP

12  Exhibit 2   Document titled The Top Two         23

13              Reasons The Imerys Bankruptcy

14              Plan Is Bad For Your Ovarian

15              Cancer Clients

16  Exhibit 3   Verified Statement of Arnold &      77

17              Itkin LLP Pursuant to Bankruptcy

18              Rule 2019

19  Exhibit 4   Amended Verified Statement of       86

20              Arnold & Itkin LLP Pursuant to

21              Bankruptcy Rule 2019

22  Exhibit 5   Supplement to Amended Verified      90

23              Statement of Arnold & Itkin LLP

24              Pursuant to Bankruptcy Rule 2019

25

Page 15

1

2    -------------------EXHIBITS----------------------

3    EXHIBIT       DESCRIPTION                        PAGE

4    Exhibit 6    Motion of Holders of Talc            151

5                 Personal Injury Claims

6                 Represented by Arnold & Itkin LLP

7                 to Extend Discovery Deadlines and

8                 Permit Discovery of the Plan

9                 Proponents, Prime Clerk, and

10                Certain Third Parties Relating to

11                the Solicitation and Voting with

12                Respect to the Ninth Amended

13                Joint Chapter 11 Plan of

14                Reorganization of Imerys Talc

15                America, Inc. and its Debtor

16                Affiliates under Chapter 11 of

17                the Bankruptcy Code

18

19

20

21

22

23

24

25

```
 1                      ITKIN
 2            (Whereupon, on the stenographic
 3         record.)
 4                    JASON ITKIN
 5    the witness, having been duly sworn, was examined
 6    and testified under oath as follows:
 7                    EXAMINATION
 8    BY MS. QUARTAROLO:
 9         Q.   Good morning, or afternoon where you may
10    be.
11              Mr. Itkin, I am Amy Quartarolo.  I'm one
12    of the attorneys of Latham & Watkins representing
13    the debtors in the Imerys bankruptcy.
14              Thanks for making time for us this
15    morning.
16              As an initial matter, you're a litigator
17    by trade, yes?
18         A.   Correct.
19         Q.   And so I assume that you're generally
20    familiar with the ground rules for deposition?
21         A.   Correct.
22         Q.   And have you been deposed before?
23         A.   I don't think so.  I tried to think of
24    this yesterday and I can't -- I feel like I've
25    testified before, but I can't think of when, so I
```

```
 1                       ITKIN
 2   don't think so.
 3        Q.   Okay.  So just, you know, normal ground
 4   rules with sort of heightened sensitivity given
 5   that we are in this remote setting.
 6             So I'll try not to talk over you, I'll
 7   ask you to do the same for me.
 8             You can take a break whenever you need
 9   one.  I'll try to take breaks periodically.  I'll
10   just ask that you answer whatever question is
11   pending before we take a break.  Is that
12   understood?
13        A.   Understood.  Sure.
14        Q.   Thanks.  My associate, Alice, is going
15   to help with some exhibits.
16             Do you have access to Exhibit Share?
17   Did your counsel get you set up with that?
18        A.   I was trying to and that was part of
19   issue.  I've got my iPad here and so hopefully we
20   can do it, but I don't know.  I guess we'll -- if
21   there's a way to share screen or something like
22   that.
23        Q.   Sure.
24             MS. QUARTAROLO:  So, I guess, let's --
25        Alice, can you please bring up Exhibit 1,
```

```
 1                         ITKIN
 2        which is the 30(b)(6) depo notice.
 3              (Notice of Oral and Videotaped
 4        Deposition of Arnold & Itkin LLP marked as
 5        Exhibit 1, as of this date.)
 6              MS. HOESTEREY:  We're going to do this
 7        with share screen instead of exhibit --
 8        instead of him pulling them up.
 9   BY MS. QUARTAROLO:
10        Q.   To view it in Exhibit Share -- and
11   hopefully at the first break we can get you set up
12   with Exhibit Share, Mr. Itkin, so that's not an
13   issue going forward.
14              But just because everyone else has
15   access to -- should have access to Exhibit Share,
16   let's bring things up on Exhibit Share.
17              MS. QUARTAROLO:  And while that's
18        being handled, one of the points that I
19        just wanted to flag for you, Mr. Itkin, but
20        also for your counsel and anyone else in
21        attendance today, is that we may be using
22        some information during the course of this
23        deposition that has been marked by, I think
24        your counsel, as highly confidential, and
25        so I will try to flag that in advance.  But
```

```
 1                        ITKIN

 2         I just want to make sure to anyone who's

 3         attending the deposition today that there's

 4         no one on the line who is not entitled to

 5         see highly confidential information.  And

 6         if there is, please let us know so that we

 7         can make sure that you are excused from the

 8         deposition for any portion of that.

 9   BY MS. QUARTAROLO:

10         Q.   Okay.  So, Mr. Itkin, do you see what's

11   been put up on the screen as Exhibit 1?

12         A.   Yes.  It's the deposition notice.

13         Q.   And have you seen this document before?

14         A.   I believe so.

15         MS. QUARTAROLO:  And if, Alice, if you

16         could scroll down to the section that

17         begins with the topics.

18         Q.   And we can scroll through any of these

19   if you'd like, but, Mr. Itkin, my question for you

20   is:  It's my understanding that you've been

21   designated on behalf of Arnold & Itkin to speak on

22   behalf of the topics set forth in this notice?

23         MR. MORRIS:  Object --

24         THE WITNESS:  Sorry, John.

25         MR. MORRIS:  Yeah, Amy, subject to the
```

```
 1                      ITKIN
 2      agreement that we had when the debtors
 3      withdrew a number of those topics, I just
 4      want to remind you of that.
 5           MS. QUARTAROLO:  Understood.
 6           MR. MORRIS:  Okay.  Go ahead.
 7           MS. QUARTAROLO:  So just to put it
 8      into the record, I think what we've agreed
 9      to restrict the topics to Topics 1, 4, 5,
10      7, 8, 10 through 21, 23, and 26 through 29.
11  BY MS. QUARTAROLO:
12      Q.   I'm happy to go through those
13  individually, but my question for you, Mr. Itkin,
14  is:  Are you prepared today to testify on behalf
15  of Arnold & Itkin on those topics?
16      A.   Assuming those are the correct topics,
17  yes, I am prepared to do that.
18      Q.   And what did you do to prepare to
19  testify on those topics?
20      A.   I had a couple of phone conversations
21  with bankruptcy counsel, and I reviewed some of
22  the paperwork filed in the bankruptcy proceeding,
23  and that's mainly it.
24      Q.   When you say "bankruptcy counsel," are
25  you referring to your counsel today, Mr. Morris?
```

Page 21

1                          ITKIN

2       A.    Correct.

3       Q.    Was anyone else on any of those phone

4   calls?

5       A.    Yes.  Laura Davis Jones and Isaac

6   Pachulski.

7       Q.    Anyone else?

8       A.    No.

9       Q.    Did you speak with anyone other than

10   bankruptcy counsel at Pachulski to prepare for

11   your deposition today?

12       A.    No.

13       Q.    The documents that you reviewed, you

14   indicated that you reviewed some paperwork that

15   was filed in the bankruptcy.  Do you recall what

16   documents you reviewed?

17       A.    They -- not to give you an inventory,

18   but essentially there were objections that were

19   filed to various, you know, plans and TDPs.

20   There's a motion for discovery that we filed.  And

21   I believe that's probably all I reviewed.

22       Q.    Did you review any correspondence?

23       A.    I reviewed -- not in preparation for my

24   deposition, no.

25       Q.    Other than documents that have been

```
                                          Page 22
 1                        ITKIN
 2   filed with the bankruptcy court, did you review
 3   any other documents in preparation for your
 4   deposition today?
 5        A.    Not in preparation for my deposition.
 6        Q.    Are you generally familiar with the
 7   plan, the latest version of the plan that's been
 8   proposed by the debtors?
 9        A.    I --
10              MR. MORRIS:  Objection to the form of
11        the question.
12        A.    Yeah.  I'm familiar with it.  I'm not a
13   bankruptcy -- I'm a lawyer.  I'm a litigator.  I'm
14   familiar with it, but I am not by any means a
15   bankruptcy expert and so there's some things that
16   I obviously rely very heavily on counsel for.
17        Q.    But you've seen the plan?
18        A.    I believe so, yes.
19              MS. QUARTAROLO:  Alice, you can go
20        ahead and take this down from the screen.
21        Q.    And have you also -- are you familiar
22   with the -- what's referred to as the TDPs or the
23   Trust Distribution Procedures?
24        A.    Correct.
25        Q.    And have you reviewed those?
```

Page 23

ITKIN

1
2      A.   Yes.

3      Q.   And if I use the term "plan proponents"

4  during the deposition today, do you understand

5  what that term means?

6      A.   I think so, but why don't you tell me

7  what it means so that you and I are --

8      Q.   Aligned, yes.

9      A.   -- communicating, yeah.

10     Q.   So when I use the term plan proponents,

11 I'm referring to the debtors; the TCC, which is

12 the Tort Claimants Committee; the FCR or Future

13 Claimants Representative; and Imerys S.A. on

14 behalf of Imerys non-debtor affiliates.  Do you

15 understand that?

16     A.   Yes.

17          MS. QUARTAROLO:  Alice, can you bring

18      up Exhibit 2.

19          (Document titled The Top Two Reasons

20      The Imerys Bankruptcy Plan Is Bad For Your

21      Ovarian Cancer Clients marked as Exhibit 2,

22      as of this date.)

23 BY MS. QUARTAROLO:

24     Q.   Mr. Itkin, what's been marked as

25 Exhibit 2 is a three-page document entitled "The

```
 1                        ITKIN
 2   Top Two Reasons the Imerys Bankruptcy Plan Is Bad
 3   For Your Ovarian Cancer Clients."  Do you see
 4   that?
 5        A.   I do.
 6        Q.   Have you seen this document before?
 7        A.   I have seen this document before.  I
 8   don't know that I've ever read the document
 9   completely.
10        Q.   What was the occasion in which you saw
11   this document for the first time?
12             MR. MORRIS:  Objection to the form of
13        the question.
14        A.   This -- I don't know the first time I've
15   seen -- I saw the document.  My memory is this
16   document was circulated by a lawyer who was at the
17   time going to vote against the plan.
18        Q.   And what lawyer are you referring to?
19        A.   It either would have been John Boundas
20   or Avram Blair.
21        Q.   I'm sorry.  Can you repeat those names
22   one time?
23        A.   John Boundas or Avram Blair.
24        Q.   And are they associated with a
25   particular law firm?
```

Page 25

```
 1                    ITKIN
 2      A.   John Boundas is -- and I don't know if
 3   he's -- I believe he's a partner at Williams Hart,
 4   I believe, is the current name.
 5           And Avram Blair is -- I don't know the
 6   name of Avram's firm, but I think it's something
 7   like Avram Blair & Associates or something along
 8   those lines.
 9      Q.   And when did you first receive this
10   document?
11           MR. MORRIS:  Objection to the form of
12       the question.
13      A.   I don't -- I couldn't tell you the date.
14   It would have been in approximately during the
15   time period very close in time to the voting
16   deadline.
17      Q.   Do you know who drafted this?
18      A.   I do not.
19      Q.   Did you ever ask anyone who drafted
20   this?
21      A.   I don't believe I asked that particular
22   question, no.
23      Q.   And, I'm sorry, I just want to -- so you
24   said you think that you received this either from
25   John Boundas or Avram Blair; is that correct?
```

Page 26

```
 1                        ITKIN
 2            MR. MORRIS:  Objection to the form of
 3        the question.  Mischaracterizes the
 4        testimony.
 5        A.    I think that it would have been on an
 6   email, that it would have been emailed in
 7   connection with people talking about whether to
 8   vote for or against the plan.
 9        Q.    Who else was on that email that you're
10   referring to?
11        A.    I don't know.
12        Q.    Were there other law firms other than
13   Arnold & Itkin and the two individuals you
14   mentioned?
15            MR. MORRIS:  Objection to the form of
16        the question.
17        A.    And so that's -- that's the issue that
18   I'm just -- sitting here today, I don't know the
19   answer to.  There's probably an email that would
20   tell you.  I believe that this document or
21   something similar to this document would have been
22   sent by Avram Blair or John Boundas, two people
23   who had questions about whether to vote or not
24   vote in favor of the plan.  And I don't -- I can't
25   tell you when the exact date was because it's not
```

1              ITKIN

2    a document that I've -- I just don't know.

3         Q.   You received it by email; is that

4    correct?

5         A.   That would be my -- yeah, it would have

6    been by email.

7         Q.   After you received this by email, did

8    you forward it to anyone?

9         A.   I don't believe I would have forwarded

10   it to anyone unless it would have been by

11   bankruptcy counsel, but I don't believe I

12   forwarded it to anyone.

13        Q.   Did you respond to the email that you

14   received, including this document?

15        A.   I would want to see the emails to be

16   completely accurate.  But if I did respond to an

17   email about it, it was not about this particular

18   document.

19        Q.   I don't understand what that means.

20        A.   Sure.  I had email correspondence with

21   people who were wondering about whether to vote

22   for or against the plan.  To the extent Avram or

23   John Boundas attached this document to that, one

24   of those email chains, I may have responded back,

25   for example, "I'm available to hop on a phone call

```
 1                        ITKIN
 2    at XYZ time."  But I would not, I don't believe,
 3    have, you know, responded to an email attaching
 4    this document with anything substantive about this
 5    document.
 6        Q.   And so you didn't review this document
 7    in connection with your preparation for the
 8    deposition today?
 9        A.   I did not.  And I don't --
10        Q.   And you didn't --
11        A.   Go ahead.
12        Q.   I'm sorry, go ahead.
13        A.   No, I did not.
14        Q.   And you also didn't review any of the
15    correspondence that you had related to this
16    document in preparation for your deposition today;
17    is that right?
18        A.    In terms of preparing for my deposition?
19    I'm sorry, can you reask the question?
20        Q.   Yeah.  In preparation for your
21    deposition today, it also is correct that you
22    didn't review any of the correspondence that you
23    referred to related to this document; is that
24    correct?
25        A.   Correct.
```

```
 1                        ITKIN
 2       Q.   Are you aware if any of your colleagues
 3   at Arnold & Itkin circulated this document to
 4   others?
 5       A.   I'm not aware of anyone at Arnold &
 6   Itkin circulating this document to anyone.
 7       Q.   Did you ask any of your colleagues if
 8   they circulated this document to anyone?
 9       A.   I didn't ask colleagues if they did or
10   didn't, but it would not be -- I would not suspect
11   anyone would have circulated this document.
12       Q.   What was your reaction to this document
13   when you received it?
14       A.   I did not have much of a reaction to the
15   document one way or the other.
16       Q.   Did you agree with the contents of this
17   document?
18       A.   I didn't review the document close
19   enough to agree or disagree.
20       Q.   Why did you not review the document
21   close enough?
22       A.   If you go to the top of the document,
23   it's labeled "The Top Two Reasons That The Imerys
24   Bankruptcy Plan Is Bad For Ovarian Cancer
25   Clients." I had -- you know, through counsel --
```

```
 1                      ITKIN
 2   had already filed objections and such explaining
 3   why I didn't believe the plan was a good plan and
 4   so this document really wasn't germane to me.
 5        Q.   You see point number 1 in the document,
 6   it says:  Your clients lose money because:  The
 7   plan removes your negotiating leverage with J&J by
 8   giving mesothelioma lawyers (the TCC/TAC) the
 9   right to control your client's derivative
10   indemnity recoveries, or to make those
11   recoveries -- make sure those recoveries are never
12   sought in the first place.  Do you see that?
13        A.   I do.
14        Q.   Do you agree with that statement?
15             MR. MORRIS:  Objection.  Is this on a
16        30(b)(6) topic?  He said he hasn't really
17        reviewed this document.
18             MS. QUARTAROLO:  I understand.  We
19        have -- yes, there's a 30(b)(6) topic that
20        is correspondence with others.
21             MR. MORRIS:  But this is not
22        correspondence that he reviewed.  There's
23        no foundation.
24             MS. QUARTAROLO:  He received the
25        document.
```

```
 1                      ITKIN
 2           MR. MORRIS:  He did.
 3           MS. QUARTAROLO:  I'm not going to
 4      argue with you, counsel.  Are you
 5      instructing him not to answer?
 6           MR. MORRIS:  I might.  Ask the
 7      question again, please.
 8           MS. QUARTAROLO:  Could you read the
 9      question back, please.
10           ("QUESTION:  You see point number 1 in
11      the document, it says:  Your clients lose
12      money because:  The plan removes your
13      negotiating leverage with J&J by giving
14      mesothelioma lawyers (the TCC/TAC) the
15      right to control your client's derivative
16      indemnity recoveries, or to make those
17      recoveries -- make sure those recoveries
18      are never sought in the first place.  Do
19      you see that?")
20           MR. MORRIS:  You can answer that
21      question.
22           MS. QUARTAROLO:  So I'll go ahead and
23      ask the question.
24   BY MS. QUARTAROLO:
25      Q.   Do you agree with the statement that is
```

1                        ITKIN

2  listed in number 1?

3      A.   I don't think I can agree or disagree

4  with that statement without giving you kind of my

5  work product and mental impressions, and so I

6  don't think I can answer your question.

7      Q.   Do you have any factual basis to believe

8  that the plan removed negotiating leverage with

9  J&J?

10     A.   I think you're running into the same

11 issue with having to take privilege there and so I

12 can't answer that question.

13     Q.   Well, I'm not looking for privilege and

14 work product, I am looking for the factual bases.

15          If you believe that that statement is

16 correct, then I would ask you to answer the

17 question as stated.

18     A.   Right.  I don't think I can answer the

19 question as stated without giving you attorney

20 work product or attorney-client privilege, so I

21 don't think I can answer your question.

22     Q.   Do you know what this document means by

23 "the right to control your client's derivative

24 indemnity recoveries"?

25          MR. MORRIS:  Objection to the form of

```
 1                         ITKIN
 2       the question.
 3       A.    All right.  I didn't -- I'm not the
 4  author of this document, and so I don't want to
 5  speculate on what the author meant.  I have
 6  suspicion of what it may mean, but, once again, I
 7  don't know what the author meant.
 8       Q.    And, again, my question was worded such
 9  that I'm asking for your understanding, not for
10  the author's understanding.
11            Do you have --
12       A.    And that's why I think you're getting
13  into attorney-client work product privileges.  I
14  don't think I can answer your question.
15            MR. MORRIS:  And I would add, Amy,
16       respectfully, that I don't believe this is
17       related to any 30(b)(6) topic.
18            MS. QUARTAROLO:  This is within Topic
19       No. 23.
20            MR. MORRIS:  Which is what?
21            MS. QUARTAROLO:  "Documents sent to or
22       received from and any other communications
23       between A&I and any individual talc
24       claimant or such talc claimant's counsel."
25            MR. MORRIS:  And I appreciate that,
```

```
 1                        ITKIN
 2         but it's also a document that he said he
 3         didn't read, and he actually gave you the
 4         very specific reason why he didn't really
 5         read it.  So to cross-examine --
 6              MS. QUARTAROLO:  Fine.
 7              MR. MORRIS:  Yeah, I'm just -- I want
 8         to make my record, too.
 9              So to cross-examine him on a document
10         that he didn't read for perfectly rational
11         reasons, seems like just a shot at free
12         discovery.  We're not putting on an
13         affirmative case, as I've told you, so I'm
14         not sure what his views have to do with
15         anything to begin with.  But this isn't --
16         somebody sent him a document that he didn't
17         read.
18              MS. QUARTAROLO:  Well, that's -- now
19         you're misstating his testimony, and I'll
20         proceed with my questioning.
21              MR. MORRIS:  Okay.
22    BY MS. QUARTAROLO:
23         Q.   Has Arnold & Itkin had any
24    communications with any party other than its
25    bankruptcy counsel about whether the plan removes
```

```
 1                        ITKIN
 2  negotiating leverage with J&J?
 3       A.   Arnold & Itkin, yes, sure.
 4       Q.   With who?
 5       A.   Well, let me, let me -- let me do it
 6  this way, because the way your question's phrased
 7  I'm not sure.
 8            I will tell you that Arnold & Itkin are
 9  or myself on behalf of Arnold & Itkin has had
10  conversations about how the indemnity claim -- the
11  importance of the indemnity claim is what I
12  would -- is what I would say.
13       Q.   What do you mean by "importance of the
14  indemnity claim"?
15       A.   The indemnity claim is, I think, the
16  largest, potentially the largest asset of the
17  bankruptcy estate.
18       Q.   And what's your basis for believing it's
19  the largest asset in the bankruptcy estate?
20       A.   Well, I heard as much from Steve Baron.
21       Q.   So you've spoken about this with Steve
22  Baron?
23       A.   Correct.
24       Q.   Anyone other than Steve Baron you've
25  spoken about that topic with?
```

```
 1                    ITKIN
 2      A.    I've had conversations about the
 3  indemnity with several people.
 4      Q.    Who?
 5      A.    I've had conversations with John Boundas
 6  and Avram Blair.  Steve Baron I told you.  Jim
 7  Onder.  I had conversations with some members of
 8  the Molten Group or the ad hoc committee.  And
 9  there may be others, but that's a pretty good
10  start.
11      Q.    And we can do this generally, if we can,
12  but I'll dig in, if we need to.
13            Over what period of time were the
14  conversations that you're referencing?
15      A.    They would have been probably mid -- I
16  couldn't tell you when they would have begun, but
17  the bulk of the conversations happened in early
18  2021.
19      Q.    And for what purpose were you having
20  those conversations?
21      A.    Most of those conversations I believe
22  are privileged and so I don't know that I can tell
23  you the purpose.  The conversations, you know,
24  with Steve Baron were about him trying to convince
25  me to drop my objections to the plan.
```

```
1                        ITKIN
2        Q.    And what did he say to you in that
3    regard?
4        A.    Well, we had a couple of conversations.
5    At the beginning Steve Baron was trying to
6    convince me that there would be transparency and
7    accountability and how the indemnity would be
8    prosecuted.  And later on he was trying to
9    convince me to drop my objections in exchange for,
10   essentially, you know, to be involved in how and
11   why the indemnity claims would be prosecuted.
12       Q.    What does that mean in exchange for?
13   Did he promise you something specifically?
14       A.    I was promised a seat on the TAC.  And I
15   was promised -- a seat on the TAC along with some,
16   you know, with some other conditions.
17       Q.    What other conditions?
18       A.    It was essentially a seat on the TAC.
19   There would be, I believe, a 66 percent voting
20   requirement to approve any settlement that I would
21   have to drop my objections.  I'd have to get the
22   Pachulski law firm's agreement not to be involved
23   with any other objectors or to be involved at all
24   in the bankruptcy.  That I would try to use
25   efforts to convince other objectors to not object
```

Page 38

                               ITKIN
1
2    to the plan.

3          Q.    And what was your response?

4          A.    I did not accept the proposal.

5          Q.    Why?

6          A.    That I think invades attorney-client

7    work product issues.

8          Q.    Did you tell Mr. Baron why?

9          A.    I think that I was very consistent in my

10   communications with Mr. Baron and -- and others

11   that I wanted to make sure that the plan was in

12   the best interest of my clients.  That there was

13   transparency and accountabilities as it relates to

14   the indemnity.  And that on the 40/40/20 split

15   that it was, you know, done more -- on a more

16   equitable pro rata type basis.  And that I didn't

17   think that offering me a seat on a committee was

18   going to accomplish those goals.

19         Q.    I want to unpack that a bit.

20               When you said you wanted to make sure

21   there was transparency and accountability, did you

22   suggest anything to Mr. Baron that would address

23   that issue?

24         A.    I don't know that I ever specifically

25   addressed anything to Mr. Baron.

```
 1                      ITKIN
 2       Q.   Did you address that to anyone else?
 3       A.   I don't think I can give you an answer
 4  to that without implicating joint prosecution or
 5  joint interest privilege.
 6       Q.   So, respectfully, Mr. Itkin, I think
 7  your client -- excuse me -- your counsel can
 8  object and can instruct you not to answer, but I'm
 9  going to ask that you not make a decision on your
10  own to withhold information in response to
11  questions.
12            MR. MORRIS:  Amy, just respectfully,
13       Mr. Itkin is a seasoned lawyer.  He's the
14       one who participated in the conversations.
15       I did not.  So it's not always easy for me
16       to anticipate whether your question is
17       impinging, some of it won't, and he was
18       just very candid about his conversations
19       with people that were not subject to the
20       common interest privilege.  So I'm going to
21       allow him to do that, and if you want to
22       test it, you're welcome to do that.  But I
23       can't, I can't get in his head because I
24       wasn't privy to a lot of these
25       conversations.  That's what he did, and
```

```
 1                        ITKIN
 2         you're trying to get the facts, and I
 3         appreciate that.  And I think Mr. Itkin is
 4         honestly and capably trying to divulge all
 5         that he can consistent with his obligations
 6         under the common interest privilege.
 7              MS. QUARTAROLO:  So let me test it
 8         this way.
 9    BY MS. QUARTAROLO:
10         Q.   Mr. Itkin, other than your counsel, who
11    do you believe you've had conversations with that
12    are subject to a privilege?
13         A.   So Jim Onder.  Avram Blair.  The
14    Williams Hart law firm.  The -- I call them the
15    Molten Group.  I think they have an ad hoc name.
16    I think it's now called the Talc Litigation.  I
17    call them the Molten Group, just so you know.
18              The Aylstock firm.  And I believe that
19    there may be others, but I believe that would be
20    it.  That is sort of a big -- that would cover
21    almost most of it.
22         Q.   Just to make sure the record is
23    complete.
24              Is it your testimony today that you will
25    not provide testimony or answer questions about
```

```
 1                    ITKIN
 2   any of your communications with any of the law
 3   firms or attorneys at those law firms that you've
 4   just referenced.
 5        A.    Through a point --
 6        Q.    What does that mean?
 7        A.    -- in time.
 8              Well, I think communications, for
 9   example, with Williams Hart after they changed
10   their vote are probably not privileged.
11        Q.    Anyone else who it changed over time?
12        A.    Well, I would say Jim Onder probably
13   falls into that category, because he voted in
14   favor of the plan.
15        Q.    And did you have any conversations with
16   anyone at the Williams Hart firm about the plan,
17   any aspect of the plan, after they made their
18   decision to change to accept the plan?
19        A.    Yes.
20        Q.    And with whom did you speak?
21        A.    It would have been, I believe, John
22   Boundas only.
23        Q.    And what were the subject matters that
24   you covered in those discussions?
25        A.    Essentially that why they had decided to
```

Page 42

1                          ITKIN
2      vote in favor of the plan.
3           Q.   What did they say?  What did John say?
4           A.   That Steve Baron had offered them a seat
5      on the TAC.  That the seat was conditioned upon
6      them, I believe, switching their vote from a no to
7      a yes after the deadline.  Or there was an
8      extension.  I don't know if they actually voted no
9      or there was an extension, but there'll be
10     documents that show that.
11               That they would have to use best efforts
12     to convince other firms who would also be given
13     extensions on their voting time to change their
14     votes.
15               And that, essentially that, you know,
16     this was a decision that they had to make
17     professionally and they hoped that our personal
18     relationship would not be affected.
19          Q.   What was your response?
20          A.   That everybody should act in what they
21     believe is the best interest of their clients, and
22     that I would respect their votes, their decision.
23          Q.   And any other topics that were covered
24     in those discussions with John Boundas after
25     Williams Hart voted the claims that it represents

1                    **ITKIN**

2    in favor of the plan?

3         A.    I don't believe so.

4         Q.    What about, you mentioned the Onder

5    firm, who did you speak with at the Onder firm?

6         A.    Jim Onder.

7         Q.    And what conversations did you have with

8    Jim Onder about the plan?

9         A.    I think I had one conversation after the

10   vote with Jim Onder.  It was a very short

11   conversation where he indicated that he believed

12   the plan did not have the votes.

13        Q.    And when was that?

14        A.    I couldn't give you an exact date, but

15   it was post -- it was before -- let me do it this

16   way:  It was after the voting deadline, but before

17   the prime clerk's first declaration of, you know,

18   preliminary voting numbers.

19        Q.    Did he tell you why he believed the plan

20   didn't have the votes?

21        A.    No.  It was -- no.  I believe the call

22   was not even necessarily about talc, I think it

23   had more to do with Roundup, because he and I are

24   both involved in the Roundup litigation, and I

25   think it was just sort of an offhand comment.

Page 44

1                          ITKIN

2        Q.    But he didn't provide any information to

3   you about his basis for that statement?

4        A.    He did not, and I did not ask him.

5        Q.    And, I'm sorry, is that the only

6   conversation you had with Jim Onder after they

7   voted their claims?

8        A.    About talc, I believe so, correct.

9        Q.    And just going back to a topic we were

10  covering a moment ago about transparency and

11  accountability.  Do you remember that?

12       A.    I do.

13       Q.    Did you ever make suggestions to any of

14  the plan proponents about how you felt any

15  concerns about transparency and accountability

16  with regard to the indemnity could be addressed?

17       A.    I had a conversation with Steve Baron

18  where we talked through some of those issues.  I

19  wouldn't call them like a formal proposal, but it

20  was a conversation about some of those issues.

21       Q.    Okay.  My question for you is:  Did you

22  ever make any suggestions about how that could be

23  addressed?

24       A.    Outside of what's, I think, filed in our

25  documents -- I mean, obviously, we have our

Page 45

```
 1                      ITKIN
 2   objections on file that, you know, touch on some
 3   of it is.  But in terms of the conversation with
 4   Steve Baron I mentioned, you know, some things
 5   that -- actually, I wouldn't call them suggestions
 6   about how to address them, I'd call it suggestions
 7   about -- more about just raising some of my
 8   concerns about transparency and accountability.
 9       Q.    So is it correct that you never made a
10   suggestion about how those could be addressed?
11       A.    I'm having -- and I'm really --
12             MR. MORRIS:  Objection to the form of
13        the question.
14             THE WITNESS:  Yeah.
15             MR. MORRIS:  Go ahead.
16       A.    I'm not trying to quibble with you.  I
17   had a conversation with Steve Baron where it was a
18   conversation on a weekend morning where we talked
19   through some issues about the indemnity claim.
20   And if you think those -- if those count as a
21   suggestion, then, okay, I had those.  I had -- but
22   other than that, I don't believe I made like a
23   formal proposal to -- I'm trying to be very
24   mindful of the privilege here which is why I'm
25   hesitating.
```

Page 46

```
 1                      ITKIN
 2           I don't believe we made a formal
 3   proposal -- is how I would say it -- to a plan
 4   proponent about how to address some of those
 5   accountability issues.
 6      Q.   Did you ever make anything short of a
 7   formal proposal to any of the plan proponents
 8   about how to address your concerns about
 9   transparency and accountability with regard to the
10   J&J indemnity?
11      A.   In terms of in an official capacity as a
12   plan proponent, I do not believe so.
13      Q.   I'm sorry, I don't understand the
14   restriction you're placing on your answer.
15      A.   Well, Jim Onder is a member of the TCC,
16   and I had conversations with Jim Onder that are
17   privileged, and I'm trying to stay away from
18   those.
19      Q.   So you will not testify regarding
20   conversations you had with Jim Onder about
21   suggestions that you may have made about
22   addressing your concerns about transparency and
23   accountability?
24      A.   Through a time period, correct.
25           MR. MORRIS:  And just to be clear,
```

```
 1                    ITKIN
 2       Amy, I think what Mr. Itkin is saying, and
 3       I think what the facts would bear out, is
 4       that he had communications with Mr. Onder
 5       in his personal capacity, and it's those
 6       conversations that he's asserting a common
 7       interest privilege on.  And, as he
 8       mentioned, there came a point in time when
 9       obviously even that ended.
10            MS. QUARTAROLO:  I'll let the witness
11       testify.
12  BY MS. QUARTAROLO:
13       Q.  Did you ever -- just to make sure that I
14  understand this.
15            You never made a specific suggestion to
16  Steve Baron, whether it was a formal proposal or
17  an informal proposal, about how to address your
18  concerns about transparency and accountability
19  with regard to the J&J indemnity; is that right?
20       A.  I discussed with Steve Baron ideas
21  ranging from having a committee that would oversee
22  the indemnity.  About ideas of the process for
23  selecting counsel to prosecute the indemnity.
24  Ideas in terms of court approval for settlement of
25  the indemnity.  And ideas in terms of how a
```

1                          ITKIN

2    committee -- what types of people should be

3    involved in the committee.  But I wouldn't call

4    those suggestions or proposals necessarily, more

5    along the lines of it was a discussion that we

6    had.

7         Q.   And what was the response to those

8    suggestions?

9         A.   Noncommittal.  Let's keep talking.

10   We'll think about it.  But very noncommittal.

11             I also -- now that you've jogged my

12   memory -- had a conversation with lawyers for the

13   TCC and the FCR that predate my conversation with

14   Steve Baron.  In that conversation, I was told by

15   lawyers -- and I'm not sure who the lawyer was

16   because it was a conference call unlike a Zoom

17   call, and I don't know everybody's voice and

18   you'll have to forgive me.  But it was mainly

19   lawyers and I was invited because I am a client of

20   a lawyer, and I guess a lawyer myself.  But on

21   that call I was told by, I believe a lawyer for

22   the FCR, although it could have been for the TCC,

23   that there would not be a prosecution of the

24   indemnity claims because it would be too expensive

25   and costly to do so.

```
                                              Page 49
 1                        ITKIN
 2        Q.    When was that conversation?
 3        A.    That conversation, it would predate the
 4   Zoom conversation that I had with members of the
 5   TCC.  I can't tell you the exact date, it was a,
 6   it was a --.
 7        Q.    Was it before and after the voting
 8   deadline?
 9        A.    Before the voting deadline.
10        Q.    And when you say they told you that
11   there would not be a prosecution of the indemnity
12   claims, did you take that to mean ever or at
13   some -- in some window of time?
14        A.    Ever.
15              MR. MORRIS:  Objection to the form of
16        the question.
17        A.    Post-confirmation I would assume.
18        Q.    Have you ever had communications
19   directly with the debtors about ways to address
20   your concerns about transparency and
21   accountability with regard to the J&J indemnity?
22        A.    I believe my counsel has had
23   conversations with the debtor, but I can't tell
24   you that for certain.  I believe counsel for the
25   debtor may have been on the phone call.  In
```

```
                                           Page 50
 1                      ITKIN
 2   fact -- and forgive me, but you're from Latham; is
 3   that correct?
 4        Q.    Correct.
 5        A.    I believe Latham was on the phone call.
 6   Someone from Latham may have been on the phone
 7   call where I was told the indemnity would not be
 8   prosecuted.  But other than that, I personally
 9   don't believe I've had conversations with the
10   debtor.
11        Q.    Have you ever had any conversations with
12   anyone representing J&J or associated with J&J
13   about the indemnity?
14        A.    I don't believe so, no.
15             MS. QUARTAROLO:  We've been going
16        about an hour.  Why don't we take a
17        10-minute break, if that works for you,
18        Mr. Itkin.
19             THE WITNESS:  Certainly.
20             MS. QUARTAROLO:  Thank you.
21             MR. MORRIS:  Thank you.
22             (Whereupon, off the record.)
23             (Whereupon, resumed.)
24   BY MS. QUARTAROLO:
25        Q.    Mr. Itkin, I just want to explore
```

```
 1                        ITKIN
 2   briefly the common interest that you've asserted.
 3             So you've named several parties with
 4   whom -- that represent other talc claimants that
 5   you said that you assert a common interest over
 6   communications with them, and that list included
 7   Jim Onder; is that right?
 8        A.   Correct.
 9        Q.   Why is it you believe you have a common
10   interest with Jim Onder?
11             MR. MORRIS:  Objection to the form of
12        the question.
13        A.   I don't know that that interest
14   exists -- well, it exists in some areas and not in
15   others today.  But Mr. Onder and his firm, we had
16   a meeting.  At the meeting we agreed that we had a
17   common interest in certain areas, and that all of
18   our communications going forward, that we would
19   each consider them privileged and would each
20   maintain that privilege.
21        Q.   And when was that meeting?
22        A.   I don't know the exact date, but it was
23   pre -- it was a meeting in my office and it
24   predated the vote.
25        Q.   Do you know by how many weeks or months
```

```
                                          Page 52
 1                      ITKIN
 2    it predated the vote?
 3        A.   It would have been months, not weeks.
 4        Q.   And you understand that Mr. Onder
 5    represents a member of the TCC?
 6        A.   Correct.
 7        Q.   What was -- I think you mentioned that
 8    there were certain subjects where you agreed that
 9    there would be a common interest, what were those
10    subjects?
11        A.   They involved the plan and they involved
12    maximizing the value of our respective clients'
13    claims.
14        Q.   Anything else?
15        A.   I think there's probably some
16    subcategories underneath that, but that pretty
17    much would be the privilege.
18        Q.   Did you ever document this in writing?
19        A.   It is not documented in writing.
20        Q.   And over what period of time do you
21    contend that there was a common interest with
22    Mr. Onder?
23        A.   In some areas there still are, but
24    obviously that as it relates to the plan.  I say
25    obviously.  In some areas I believe there's still
```

1                          **ITKIN**

2    a common interest privilege with Mr. Onder, but as

3    it relates to the plan when he ultimately voted in

4    favor of the plan, I believe communications going

5    forward as they relate to the plan are not

6    privileged.

7         Q.   And so at what period of time do you

8    believe that communications with Mr. Onder are no

9    longer subject to a common interest privilege to

10   the extent they're related to the plan?

11        A.   The date of whenever his vote was

12   counted or submitted and -- well, I guess it would

13   be when I became aware that he voted in favor of

14   the plan, which I believe is the same date that he

15   voted in favor of the plan, which would be the

16   deadline date.

17        Q.   Did you have any conversations with

18   Mr. Onder about why he voted on behalf of his

19   claimants to accept the plan?

20        A.   No.

21        Q.   You said that you believed that there's

22   still certain subject matters that are covered by

23   a common interest with Mr. Onder; is that right?

24        A.   Correct.

25        Q.   What are those?

Page 54

1                          ITKIN

2          A.    They involve prosecution of certain

3     claims.

4          Q.    What claims?

5          A.    State court and MDL, outside of the

6     bankruptcy court, but talc personal injury claims.

7          Q.    And I think the others where you said

8     there was a common interest, I just want to run

9     through them quickly.

10              So you mentioned John Boundas.  Over

11     what period of time do you contend that you had a

12     common interest that protects communications that

13     you may have had with John Boundas or his firm?

14          A.    It would be a similar period of time.

15     It predates Onder, though, by a few weeks.

16          Q.    Was that ever committed to writing?

17          A.    I don't believe so.

18          Q.    And at some point did that common

19     interest cease to exist?

20          A.    As it relates to the plan.

21          Q.    And as it relates to the state court

22     litigations and MDL claims?

23          A.    I believe there's probably -- there is

24     still a common interest there.

25          Q.    What about Mr. Blair?

1                          ITKIN

2        A.    It would be the same as Mr. Boundas.

3        Q.    Same time period?

4        A.    Correct.  And that may -- well, to be

5    precise.  It may be, you know, within a day or so,

6    but I don't know if I spoke to -- I would say it's

7    the same time period.  It would be the same time

8    period.

9        Q.    And just to confirm.  That also was not

10   reduced to writing; is that correct?

11       A.    Correct.  Correct.

12       Q.    And you referred to the Molten Group,

13   which was also formed into an ad hoc group that

14   has now been disbanded.  You're aware that's been

15   disbanded?

16       A.    Correct.

17       Q.    Do you have an understanding as to why

18   that was disbanded?

19       A.    Yes.

20       Q.    And what's your understanding?

21       A.    I can't tell you that because it

22   would -- it would involve privilege.

23       Q.    Why do you say it would involve

24   privilege?

25       A.    It's part of our joint interest

```
                                      Page 56
 1                      ITKIN
 2    privilege.
 3         Q.   When did the common interest begin with
 4    the Molten Group, between A&I and the Molten
 5    Group?
 6         A.   It would have begun before -- I don't
 7    know the exact date, but I can tell you that it
 8    predates with the Williams Hart folks.
 9         Q.   Do you have an estimate as to how -- how
10    long before the voting deadline it would have come
11    into being?
12         A.   Months, months before the voting
13    deadline.
14         Q.   And does it cover the same subject
15    matters, in your opinion, as you spoke about with
16    regard to the others, the plan and state court and
17    MDL claims?
18              MR. MORRIS:  Objection to the form.
19         A.   I would say it covers issues in the
20    bankruptcy court, as well as what could broadly be
21    referred to as talc personal injury and death
22    cases, the prosecution of such.
23         Q.   And you believe that that common
24    interest still exists?
25         A.   I do.
```

ITKIN

1

2      Q.   Is there -- other than those parties

3  that we just discussed by name, are there any

4  other parties, law firms or lawyers, or other

5  parties that you contend you have a common

6  interest with that protects information that you

7  may have shared from discovery in this action?

8      A.   There are, and I believe I've named some

9  of them earlier today.

10     Q.   I may not have taken good notes.  I

11 apologize.

12     A.   That's okay.

13     Q.   Can you --

14     A.   I've been in your -- I've been in your

15 seat, I understand.

16          So you would have the Aylstock firm.

17 Client inspector.  There may be others, but those

18 are the ones that are -- I'm thinking of right now

19 that --

20     Q.   And --

21     A.   Yeah, go ahead.

22     Q.   So, as to the Aylstock firm, when did

23 that come into being?

24     A.   That would have been later in time.

25 Closer to --

```
                                          Page 58
 1                      ITKIN
 2        Q.   Do you know when?
 3        A.   It would have been before the vote, but
 4   not much before the vote.
 5        Q.   And is that still in existence today?
 6        A.   Yes.
 7        Q.   The same subject matters?
 8        A.   Correct.
 9        Q.   Was it reduced to writing?
10        A.   I do not believe so.
11        Q.   And then as to client inspector, when
12   did that come into being that was a common
13   interest?
14        A.   Before the vote, significantly.
15        Q.   Months?
16        A.   Months, correct.
17        Q.   And is it still in existence?
18        A.   Yes.
19        Q.   The same subject matters?
20        A.   Correct.
21        Q.   Ever reduced to writing?
22        A.   I don't believe so.
23        Q.   Do you have any agreements or writings
24   that document A&I having a common interest with
25   any other party with regard to the Imerys
```

```
                                            Page 59
 1                      ITKIN
 2   bankruptcy?
 3        A.   I don't -- let me say it this way.
 4             There's not, for example, like a joint
 5   prosecution agreement that would, you know -- I
 6   don't believe there's a writing of such that says
 7   that, so no, I think, is the answer to your
 8   question.
 9        Q.   Do you have any common interest
10   agreement with any of the insurers who have
11   appeared in connection with the Imerys bankruptcy?
12        A.   You mean like Zurich or such?
13        Q.   Any that you're aware of.
14        A.   No.
15        Q.   Do you have any common interest that
16   would prohibit or protect information from
17   discovery with Johnson & Johnson in connection
18   with the Imerys bankruptcy?
19             MR. MORRIS:  I object to the form.
20        A.   Can you ask that question again?
21        Q.   Sure.  So does Arnold & Itkin have a
22   common interest that you understand protects
23   information from discovery that may have been
24   exchanged with Johnson & Johnson?
25        A.   I don't believe so.
```

1                        ITKIN

2        Q.   You referenced earlier discussing the

3   40/40/20 allocation with various parties.  Do you

4   recall that?

5        A.   I do.

6        Q.   And you're familiar with the 40/40/20

7   allocation as it's set forth in the TDPs?

8        A.   Yes.

9        Q.   Do you believe that that allocation is

10  unfair?

11       A.   I can't answer that without implicating

12  attorney-client work product privileges.

13       Q.   So you decline to answer the question?

14       A.   Yes.

15       Q.   Have you ever told anyone outside of any

16  common interest that you may assert that that

17  allocation was unfair?

18            MR. MORRIS:  Objection to the form of

19       the question.

20       A.   We have filed papers with the court that

21  set forth our position on those papers or on the

22  40/40/20.

23       Q.   And other than what may be set forth in

24  filings before the bankruptcy court, have you ever

25  told anyone outside of communications that may be

Page 61

                            ITKIN

1

2    protected by the common interest that you believe

3    that the 40/40/20 allocation is unfair?

4        A.    Sitting here today, I cannot think of

5    any conversation where I would have said that

6    beyond things that would be protected by

7    privilege, beyond what's in the public filings.

8        Q.    Does Arnold & Itkin believe that there's

9    some alternate allocation that might be fair?

10       A.    Once again, beyond what's in public

11   filings, all of this would be attorney-client work

12   product.

13           MR. MORRIS:  And just as a reminder,

14       Amy, we're not prosecuting an affirmative

15       case.

16           MS. QUARTAROLO:  Understood.  I think

17       that's on the record.

18           MR. MORRIS:  Yeah.

19   BY MS. QUARTAROLO:

20       Q.    Has Arnold & Itkin ever made a

21   suggestion to any party as to an appropriate

22   alternate allocation of the trust assets?

23       A.    Can you ask that question one more time?

24           MS. QUARTAROLO:  Can you read it back,

25       please.

Page 62

```
 1                         ITKIN
 2              (Whereupon, the requested portion was
 3          read back by the Reporter:
 4              "QUESTION:  Has Arnold & Itkin ever
 5          made a suggestion to any party as to an
 6          appropriate alternate allocation of the
 7          trust assets?")
 8              MR. MORRIS:  Objection to the form of
 9          the question.
10          A.   I'm not sure I can answer your question
11     without implicating privilege.
12          Q.   So other than any communications that
13     you may have had, that Arnold & Itkin may have
14     had, with its own counsel or with any party with
15     whom we've talked about Arnold & Itkin asserting a
16     common interest, has Arnold & Itkin suggested any
17     alternate allocation of the trust assets?
18          A.   I don't believe so.
19          Q.   Mr. Itkin, when was Arnold & Itkin
20     founded?
21          A.   August 1, 2004.
22          Q.   You have that committed to memory.
23              How many lawyers do you employ?
24          A.   Don't ask me that question, please.  I
25     say that sort of jokingly.  We've -- recently I
```

Page 63

1                          ITKIN
2    had somebody leave.  It'll be -- it's less -- it's
3    less than 30, more than 20.
4         Q.   And generally what types of cases does
5    Arnold & Itkin handle?
6         A.   We handle catastrophic injury cases.
7    Maritime cases.  Plant explosion cases.
8    18-wheeler cases.  Just tried a wrongful death
9    case the last three weeks.  We also do
10   pharmaceutical litigation.  So the broad spectrum
11   of litigation.  We do some commercial litigation
12   as well.
13        Q.   When did Arnold & Itkin first represent
14   a claimant with regard to talc personal injury
15   claims?
16        A.   I don't know the date of our first
17   retainer agreement.  I believe our first filed
18   case was in 2017.
19        Q.   And that was against whom, against which
20   defendant?
21        A.   I'd have to look at the complaint.
22        Q.   Do you know any of them, sitting here
23   today?
24             MR. MORRIS:  Objection to the form of
25        the question.

Page 64

1                         ITKIN
2        A.    Sorry, do I know?
3        Q.    Can you recall any of the defendants
4     from that initial action?
5        A.    Oh, from the very first one we filed.  I
6     don't know because in some -- I mean, as you know,
7     in some of the cases Imerys is a defendant, in
8     some cases they're not.  Some J&J parties are
9     defendants, sometimes you have retailer
10    defendants, and so you'd have to look at a
11    specific complaint to tell you who the defendants
12    are.
13       Q.    Is it true that -- let me back up.
14             You're aware that Imerys filed for
15    bankruptcy in February of 2019?
16       A.    I believe that's the date, correct.
17       Q.    I'll represent to you, and your counsel
18    can --
19       A.    Yeah, I'm not, I'm not quibbling with
20    you, it's just --
21       Q.    Did --
22       A.    Yeah.
23       Q.    Prior to Imerys filing for bankruptcy,
24    had Arnold & Itkin ever filed a talc-related
25    personal injury claim against any Imerys entity?

Page 65

```
 1                    ITKIN
 2      A.    I don't know the answer to that offhand.
 3   It's obviously something that is searchable and
 4   findable, though.
 5      Q.    What would you look at to find that?
 6      A.    I would probably run a search of
 7   complaints that we filed before February of 2019
 8   and look through them to see if Imerys was a
 9   defendant in any of them.
10             MR. MORRIS:  Amy, I'm okay with some
11         background here, but does this tie to
12         anything in particular on the 30(b)(6)
13         list?
14             MS. QUARTAROLO:  Yes, it does.  It is
15         background, and it also ties to the 2019.
16             MR. MORRIS:  Okay.  Fine.
17   BY MS. QUARTAROLO:
18      Q.    How does Arnold & Itkin connect with
19   potential clients in the talc personal injury
20   space?
21      A.    We get a lot of cases on referral from
22   other law firms and some from marketing.
23      Q.    What type of marketing does Arnold &
24   Itkin do in regard to talc personal injury?
25      A.    That is not something that I'm prepared
```

```
 1                      ITKIN
 2   to talk about.  I'm not intimately familiar with
 3   that part of it.  We have a website.  I know we do
 4   some internet marketing, but beyond that I'm not
 5   the right person to talk to about that.
 6        Q.   And when you say you get cases on
 7   referral, what do you mean?
 8        A.   Other law firms contact us to prosecute
 9   their cases for them.
10        Q.   And does Arnold & Itkin pay those other
11   law firms in connection with assuming those
12   clients?
13             MR. MORRIS:  I object that this is not
14        within the topic of the 2019 Statement.
15             MS. QUARTAROLO:  Okay.  Mr. Itkin is
16        also here in his individual capacity, so.
17             MR. MORRIS:  I'll allow this question,
18        but we're not going -- we're not putting
19        Arnold & Itkin on trial today.
20             MS. QUARTAROLO:  I think we're allowed
21        to probe this.  If you're going to instruct
22        him not to answer --
23             MR. MORRIS:  Like I said, I'll allow
24        him to answer this question, but let's see
25        how far you really need to go here.
```

```
 1                     ITKIN
 2   BY MS. QUARTAROLO:
 3       Q.   Mr. Itkin, can you answer my question?
 4       A.   We have co-counsel relationships where
 5   we share fees with firms if there are -- if
 6   there's a recovery.
 7       Q.   Do you ever pay outright as opposed to
 8   co-counseling for leads or for signing up clients?
 9       A.   Like I said, this is not my area --
10            MR. MORRIS:  Objection.
11       A.   -- and I'm not sure what.  Most -- I
12   really don't know the answer to these questions,
13   so.  And I --
14       Q.   Is your answer you don't know if your
15   firm does that?
16       A.   My answer is, I'm generally familiar
17   that we do some marketing.  My answer is that we
18   get cases on referral and cases through inquiries,
19   but this doesn't seem to me to be a topic.  I'll
20   let Mr. Morris object, he's my counsel.  But this
21   doesn't seem to be one of the topics that I was
22   asked to be prepared to talk about today, and I
23   certainly don't -- and I, you know, don't see the
24   relevance or otherwise for getting into it.  It's
25   certainly not something under oath that I feel
```

Page 68

                              ITKIN

1                            ITKIN

2    comfortable discussing.

3        Q.   Again, Mr. Itkin, I'm not trying to make

4    you feel uncomfortable.  I'm not trying to argue

5    with you on the record.  I will ask that you

6    answer my question unless your client -- excuse

7    me -- your counsel instructs you not to answer.

8             So my question for you is:  Does Arnold

9    & Itkin ever pay outright as opposed to through a

10   co-counseling relationship or leads or referrals

11   for talc personal injury claims?

12       A.   I'm not, I'm not prepared, I don't want

13   to give you an answer under oath.

14            MR. MORRIS:  That's proprietary.  It's

15       proprietary information.

16            MS. QUARTAROLO:  Are you instructing

17       him not to answer?

18            MR. MORRIS:  I am.

19   BY MS. QUARTAROLO:

20       Q.   Are you going to follow your counsel's

21   instruction?

22       A.   Yes.

23       Q.   When Arnold & Itkin does intake on a

24   client for talc personal injury claims, does it

25   require verification for medical conditions?

Page 69

1                          ITKIN
2              MR. MORRIS:  Objection to the form of
3         the question.  I'm going to direct him not
4         to answer.  We're not going to -- we're not
5         going to allow examination into -- if you
6         want to ask about the 2019 Statement, by
7         all means, but we're not going to allow an
8         examination into the attorney-client
9         relationship between Arnold & Itkin and its
10        clients.
11             MS. QUARTAROLO:  I think this is
12        absolutely relevant to both the 2019 and to
13        the bankruptcy more broadly.  If you're
14        going to instruct him not to answer, you
15        can do so on a question-by-question basis,
16        but I'll ask my questions.
17             MR. MORRIS:  That's fine.  And I
18        encourage you to tie it to the 2019, and I
19        won't object to that.
20   BY MS. QUARTAROLO:
21        Q.   Mr. Itkin, you're aware that Arnold &
22   Itkin has filed 2019 statements in the Imerys
23   bankruptcy?
24        A.   Correct.
25        Q.   You know what those are?

```
                                        Page 70
 1                      ITKIN
 2       A.    Correct.
 3       Q.    Have you seen those?
 4       A.    I have.
 5       Q.    And those 2019 statements -- which we
 6   can talk about in a moment and get those in front
 7   of you -- list the clients that Arnold & Itkin has
 8   at any given point in time that might have claims
 9   against Imerys; is that right?
10       A.    Broadly speaking, correct.
11       Q.    And my question for you is:  For the
12   clients that you have listed on your 2019
13   Statement, did Arnold & Itkin investigate the
14   claims held by those individuals?
15            MR. MORRIS:  Objection to the form of
16        the question.  It's work product.  I
17        mean -- you can answer yes or no.
18       A.    Yes.
19       Q.    And what investigation did Arnold &
20   Itkin do regarding those claims?
21            MR. MORRIS:  I direct the witness not
22        to answer.  That's work product.
23       Q.    Did Arnold & Itkin review medical
24   records for those clients?
25            MR. MORRIS:  You can answer that one
```

```
 1                       ITKIN
 2        yes or no.
 3        A.   Some yes, some no.
 4        Q.   Or would you be able to tell which of
 5   the clients you reviewed medical records for and
 6   which you didn't?
 7        A.   Not in this deposition today.
 8        Q.   How would --
 9        A.   And probably not without revealing work
10   product or attorney-client privilege information.
11        Q.   But there's some clients who are listed
12   on your 2019 statements where Arnold & Itkin has
13   not reviewed medical records; is that right?
14        A.   Potentially, yes.
15        Q.   What does that mean "potentially, yes"?
16        A.   Like I said, I'm not -- I have not
17   made -- I don't do that.  That's not part of my
18   daily job is reviewing the medical records, and so
19   I would need to make inquiry into that.  And that
20   was not something that I considered as part of
21   this 30(b)(6) notice.  And I'm not sure that I
22   could tell you that information without divulging
23   work product and attorney client.
24             And so three questions ago when I said
25   some yes, some no, that was based on the
```

Page 72

ITKIN

1
2    assumption that we got 7500 clients and that, you
3    know, occasionally you run into an issue where,
4    for example, the medical records are not available
5    for various reasons or otherwise.  But to tell you
6    that, you know, on Abbie Watt's claim or, you
7    know, somebody else's case, what was reviewed or
8    what wasn't reviewed, I'm not in a position to be
9    able to tell you that today in this deposition.
10            MR. MORRIS:  And I would just point
11        out for you, Amy, that the 2019 is only
12        related to those claimants that have filed
13        proofs of claim.
14            MS. QUARTAROLO:  I'm not sure that I
15        understand the distinction that you're
16        making.
17            MR. MORRIS:  Go ahead.
18    BY MS. QUARTAROLO:
19        Q.    Does Arnold & Itkin require medical
20    records in order to confirm the diagnosis in
21    connection with filing a proof of claim against
22    Imerys on behalf of the claimant?
23        A.    I think you're getting into work product
24    and attorney client and I can't answer those
25    questions.

```
 1                    ITKIN
 2          MR. MORRIS:  Agreed.
 3          MS. QUARTAROLO:  You're instructing
 4     him not to answer?
 5          MR. MORRIS:  Yeah, it is work product.
 6     Yes, ma'am.
 7     Q.   And you're following your client's
 8  instruction -- excuse me -- your counsel's
 9  instruction?
10     A.   Correct.
11     Q.   When did Arnold & Itkin hire the
12  Pachulski law firm?
13     A.   I don't know the exact date.  I believe
14  the -- there's a contract that may have been
15  produced that would give you that.  From my
16  impression, we hired them before the contract was
17  produced.  Do you want to just talk about when did
18  we start discussions and seeking legal advice, but
19  the contract would give you a pretty good date.
20     Q.   And so you're talking about the
21  engagement letter; is that correct?
22     A.   Correct.
23     Q.   How long before the engagement letter is
24  dated did discussions begin with the Pachulski
25  firm about representing you in connection with the
```

```
 1                      ITKIN
 2   Imerys bankruptcy?
 3        A.    I don't, I don't know the exact date,
 4   but things happened close in time.
 5        Q.    Weeks?  Months?
 6        A.    Definitely not months.  Days, maybe
 7   weeks.
 8        Q.    Aside from claimants that may hold
 9   talc-related personal injury claims against
10   Imerys, has Arnold & Itkin ever represented
11   clients with talc-related personal injury claims
12   against other entities?
13        A.    There may have been a one-off claim here
14   or there, but nothing that's a significant part of
15   our practice.
16        Q.    Does Arnold & Itkin have talc-related
17   personal injury claims where it represents the
18   claimant for claims against Johnson & Johnson?
19        A.    Talc-related personal injury cases
20   against Johnson & Johnson?
21        Q.    Correct.
22        A.    Yes.
23        Q.    And when did Arnold & Itkin first
24   represent a client with regard to a talc-related
25   personal injury claim against Johnson & Johnson?
```

ITKIN

1

2          A.    Yeah, this is, I feel like it would be

3    similar to the questions that maybe were asked a

4    little bit earlier.  I don't know the exact date

5    of the first engagement.  The first case we filed

6    in this talc personal injury litigation I believe

7    was in April of 2017.

8          Q.    And was that against Johnson & Johnson?

9          A.    I assume Johnson & Johnson or one of

10   their subsidiaries was a defendant, I don't know

11   if Imerys was.

12         Q.    What about a Cyprus entity?  Has Arnold

13   & Itkin ever represented a claimant with regard to

14   a talc-related personal injury claim against a

15   Cyprus entity?

16         A.    I'd have to look at the defendants in

17   the cases.

18         Q.    And the same question as to a Rio Tinto

19   entity.

20         A.    The answer would be the same.

21         Q.    How many talc-related personal injury

22   claims that have been filed as litigation does

23   Arnold & Itkin currently represent?

24         A.    I'd have to run those numbers, I don't

25   know.

1                       ITKIN

2        Q.   Approximately?

3        A.   I don't, I couldn't.  I couldn't tell

4   you an approximate.  I believe we have close to

5   700 that are in state court.  I don't know how

6   many are in federal court.

7        Q.   Is Arnold & Itkin involved in the MDL?

8        A.   We are counsel for claimants in the MDL.

9        Q.   How many claimants do you represent in

10   the MDL?

11        A.   That's -- I don't know.  I mean, it's a

12   number that's -- I don't want -- I couldn't tell

13   you approximately, but it's a number that's easily

14   knowable, I just don't know what it is.

15        Q.   Has Arnold & Itkin ever settled a

16   talc-related personal injury claim on behalf of a

17   claimant it represents?

18        A.   I don't believe so.

19        Q.   Has Arnold & Itkin ever tried to verdict

20   a talc-related personal injury claim?

21        A.   Not yet.

22        Q.   Has a claim that Arnold & Itkin has

23   brought -- let me back up.

24             Has a talc-related personal injury claim

25   that Arnold & Itkin has brought against any party

```
1                      ITKIN
2    ever been dismissed at any stage of the
3    litigation?
4            MR. MORRIS:  Objection to the form of
5        the question.
6        A.   We'd have to pull the docket sheets to
7    tell you the answer to that question.
8        Q.   Sitting here today you don't know?
9        A.   Correct.  Sitting here today, I couldn't
10   tell you definitively yes or no.
11       Q.   At the time Imerys filed for bankruptcy
12   in February of 2019, do you know approximately how
13   many claimants A&I represented that held
14   talc-related personal injury claims?
15       A.   I couldn't tell you that number today.
16           MS. QUARTAROLO:  Alice, can you bring
17       up Exhibit 3.
18           (Verified Statement of Arnold & Itkin
19       LLP Pursuant to Bankruptcy Rule 2019 marked
20       as Exhibit 3, as of this date.)
21   BY MS. QUARTAROLO:
22       Q.   While she's doing that, Mr. Itkin,
23   Exhibit 3 is going to be the November 2020 2019
24   Statement that's filed by Arnold & Itkin in the
25   bankruptcy.
```

                          ITKIN
1
2        A.    Okay.
3        Q.    Are you familiar with that document?
4        A.    I've reviewed it in preparation for
5   today's deposition.
6             MS. HOESTEREY:  Hold on.  It seems to
7        be frozen in distributing the file.  I'm
8        sorry.  Are we screen sharing again or do
9        you have access to Exhibit Share?
10            MS. QUARTAROLO:  That's a good
11       question.
12            Mr. Itkin, were you able to get access
13       to Exhibit Share during the break?
14            THE WITNESS:  I don't know that
15       anything's changed since the break.
16            THE CONCIERGE:  Have you checked your
17       email, Mr. Itkin?
18            THE WITNESS:  I haven't, but I can
19       take a real quick look.
20            MS. QUARTAROLO:  Why don't we do this
21       one by screen share, and after we're done
22       with this we can take a quick break and
23       hopefully you can get access to Exhibit
24       Share.
25            THE WITNESS:  Looking, I don't see

```
 1                     ITKIN
 2      anything since -- if you want to screen
 3      share it, I'm looking here, I don't see
 4      anything from Lexitas.
 5          THE CONCIERGE:  Yeah, it would be
 6      coming from Egnyte or Veritext.
 7          THE WITNESS:  Or Veritext.  Yeah, I
 8      don't see anything since the break.
 9          THE CONCIERGE:  All right.  Thank you.
10  BY MS. QUARTAROLO:
11      Q.   So, again, Mr. Itkin, just for the
12  record, Exhibit 19 is -- excuse me -- Exhibit 3 is
13  the Verified Statement of Arnold & Itkin LLP
14  Pursuant to Bankruptcy Rule 2019 that was filed on
15  November 12, 2020.  Do you see that?
16      A.   I do.
17      Q.   And you said that you reviewed this
18  document before it was filed?
19      A.   I believe I reviewed it before it was
20  filed, but that would be by memory only.  I
21  reviewed it before today's deposition.
22      Q.   And this document is quite lengthy with
23  all the attachments, but -- and we're happy to
24  show you any portion of it.  But since you said
25  you reviewed it in preparation for your deposition
```

```
 1                      ITKIN
 2   today, let's see if we can do this without
 3   scrolling through a lengthy document to save
 4   time --
 5        A.    Sure.
 6        Q.    -- for all of us.
 7              My understanding is the 2019 Statement
 8   reflects just shy of 2800 clients represented by
 9   Arnold & Itkin; is that right?
10        A.    Yeah.  I mean, they're numbered, so
11   whatever the number is is what the number is.
12        Q.    Yeah, I think it's 2798.  Does that
13   sound right to you?
14        A.    Yes.
15        Q.    And this statement --
16              MS. QUARTAROLO:  And, I guess, Alice,
17         can you scroll down, since Mr. Itkin
18         doesn't have control of the document, to
19         the attachment that lists the claims.
20              You can stop here.
21   BY MS. QUARTAROLO:
22        Q.    This document, as you can see on the
23   screen, includes a client name and address and
24   says, Nature of the Claim, Talc Personal Injury
25   claim.  Do you see that?
```

```
 1                        ITKIN
 2        A.    I do.
 3        Q.    Are all of these individuals ovarian
 4    cancer claims?
 5        A.    We do not represent any mesothelioma
 6    claims and so they should be ovarian cancer
 7    claims.
 8        Q.    Okay.  And it's still true, is it still
 9    true today that Arnold & Itkin does not represent
10    mesothelioma claims?
11             MR. MORRIS:  Objection to the form of
12        the question.
13        A.    I can't tell you with 100 percent
14    certainty that we -- whether we represent any
15    mesothelioma claims.  What I can tell you is, the
16    vast, vast majority of our claims are ovarian
17    cancer claims.
18        Q.    Okay.  Let me actually try to narrow the
19    question --
20        A.    Sure.
21        Q.    -- and see if we can do this.
22             In connection with the Imerys
23    bankruptcy --
24        A.    Correct.
25        Q.    -- does Arnold & Itkin represent any
```

Page 82

1                          ITKIN
2      mesothelioma claims?
3           A.   And my answer is the same.  If it is
4      it's -- you know, I think we have 7300, roughly,
5      on the latest 2019 Statement, and I believe all of
6      those are ovarian cancer claims.
7           Q.   Fair enough.  So my question for you:
8      For this document that lists 2798 as the number of
9      clients, as of November 12, 2020, was that the
10     number of claimants that Arnold & Itkin
11     represented that had talc-related personal injury
12     claims against Imerys?
13          A.   No.
14          Q.   So there were individuals that you
15     represented that were not on the initial 2019 that
16     was filed?
17          A.   That's my understanding.
18          Q.   Why were they not included on the
19     initial 2019?
20          A.   I can't tell you that, that would
21     implicate privilege.
22          Q.   Do you know how many were not included
23     on this initial 2019?
24          A.   I can't -- the answer to that question
25     would be no.

```
 1                    ITKIN
 2        Q.   Do you know approximately how many were
 3   not included -- let me back up.
 4             Do you know approximately how many
 5   talc-related personal injury claimants Arnold &
 6   Itkin represented at the time in November 2020
 7   that were not included on the initial 2019
 8   Statement that's Exhibit 3?
 9        A.   Sitting here today, I do not.
10        Q.   Not even approximately?
11        A.   Correct.
12        Q.   More than a hundred?
13        A.   Yes.
14        Q.   More than a thousand?
15        A.   I can answer -- well, let me do it this
16   way:  I can answer, I could answer that question,
17   but I don't think I can without implicating
18   privilege.
19        Q.   I don't understand how this implicates
20   privilege.  I'm asking you about the number of
21   claimants you represented.
22        A.   And I understand that, but I don't -- I
23   can't tell you because of -- ask your question a
24   different way.  I think you can get there without
25   implicating privilege.
```

```
 1                    ITKIN
 2      Q.    Can you give me an estimate of the
 3  number of talc-related personal injury claimants
 4  that Arnold & Itkin represented that held claims
 5  against Imerys that were not included on the
 6  November 20, 2019 Statement?
 7            MR. MORRIS:  Objection --
 8      A.    I can --
 9            MR. MORRIS:  Objection --
10      A.    I can give you a broad --
11            MR. MORRIS:  -- to the form of the
12      question.  Go ahead.
13            THE WITNESS:  Sorry, John.
14      A.    I can give you a broad, I can give you a
15  broad answer to that question.
16      Q.    Which is what?
17      A.    In the thousands.
18      Q.    More than 3,000?
19      A.    I would need to do some looking, but I
20  would say that is probably correct.
21      Q.    More than 5,000?
22      A.    Now I can't -- now you've broadened out
23  where I'm not exactly sure.
24      Q.    And just because I want to make sure the
25  record's clear.  You won't tell me because you
```

1                    ITKIN

2    assert that it's privileged why they were not

3    included on the initial 2019; is that right?

4        A.    That is correct.

5             MR. MORRIS:  Correct.

6             MS. QUARTAROLO:  Let's take a short

7        break and try to get you Exhibit Share

8        access.  My preference always is that the

9        witness actually has control of the

10       document and can scroll back and forth, so

11       let's try to get that for you over a break.

12       And I understand -- we can go off the

13       record.

14            (Whereupon, off the record.)

15            (Whereupon, resumed.)

16            MS. QUARTAROLO:  So, Mr. Itkin, I

17       apologize, we still haven't been able to

18       get you access to the Exhibit Share, but

19       we'll make do and hopefully we'll get you

20       access soon.

21            Joe, can you please bring up what is

22       Exhibit 4, which is the Amended Verified

23       Statement of Arnold & Itkin Pursuant to

24       Bankruptcy Rule 2004 filed on January 22,

25       2021.

```
 1                         ITKIN
 2             MR. TERESI:  Yes, one second.
 3             MR. MORRIS:  Did you mean 2019?
 4             MS. QUARTAROLO:  No.  It was filed --
 5        I may have misspoken.  It's pursuant to
 6        Bankruptcy Rule 2019, but it was filed on
 7        January 22, 2021.
 8             MR. MORRIS:  I thought you said Rule
 9        2004, but maybe I'm mistaken.
10             (Amended Verified Statement of Arnold
11        & Itkin LLP Pursuant to Bankruptcy Rule
12        2019 marked as Exhibit 4, as of this date)
13             MS. QUARTAROLO:  And just so that the
14        record reflects it.  This has been stamped
15        highly confidential and is an unsealed
16        version of the statement that was filed.
17   BY MS. QUARTAROLO:
18        Q.   Mr. Itkin, are you familiar with this
19   document?
20        A.   I believe so, yeah.
21        Q.   And did you review it before it was
22   filed?
23        A.   I believe so.
24             MS. QUARTAROLO:  And we can scroll
25        down to -- Joe, if you can scroll down to
```

Page 87

```
 1                        ITKIN
 2        the list of claimants.
 3               Okay.  You can stop there.
 4   BY MS. QUARTAROLO:
 5        Q.    So, Mr. Itkin, it looks like the form of
 6   the exhibit has changed slightly in this filing.
 7   It identifies Type of Disease, Ovarian Cancer.  Do
 8   you see that?
 9        A.    I do.
10        Q.    And this exhibit reflects 3,186 clients.
11               MS. QUARTAROLO:  And, Joe, can you
12          scroll down to the end of Exhibit A-1 so
13          Mr. Itkin can verify that.
14        A.    Yeah, I -- it does.
15        Q.    Okay.  And, as of January 22, 2021, does
16   this filing, this 2019 disclosure, include and
17   reflect all of the talc-related personal injury
18   claimants that Arnold & Itkin represented that had
19   claims again Imerys?
20               MS. QUARTAROLO:  I'm getting an echo,
21          if someone can turn off maybe their phone.
22               MR. MORRIS:  Yeah, that was my fault.
23          I was trying to get to these exhibits
24          through my phone.  I apologize.
25
```

1                          ITKIN

2     BY MS. QUARTAROLO:

3          Q.    Mr. Itkin, did you hear my question?

4          A.    I think so.  You're asking if the 3,000

5     or so people on this list were all of our clients,

6     and the answer to that is no.

7          Q.    And why is it that there were

8     approximately 388 clients -- claimants who were

9     disclosed beyond the -- included on the initial

10    disclosure?

11         A.    I don't think I can tell you that

12    without revealing attorney-client work product.

13         Q.    And did the 388 claimants that appear on

14    this amended statement that did not appear on the

15    original statement, did Arnold & Itkin represent

16    those 388 claimants at the time it filed its

17    original 2019 Statement in November of 2020?

18         A.    I would have to go client by client and

19    contract by contract, and I have not done that

20    analysis.

21         Q.    Do you know generally?

22         A.    I would not feel comfortable telling you

23    one way or the other.

24         Q.    Because of privilege or for some other

25    reason?

1                        ITKIN

2        A.    I've not done that analysis, so I can't

3   tell you that.   I have suspicions, but I don't,

4   you know, under oath I couldn't tell you that they

5   were all new or all not new.

6        Q.   Do you have any understanding, sitting

7   here today, as to whether Arnold & Itkin

8   represented any of those 388 claimants that appear

9   on the amended statement at the time it filed its

10  original statement in November of 2020?

11       A.    If I had to speculate, the answer would

12  be that we did.

13       Q.   And is it correct that you will not

14  testify as to why they were not included on the

15  original statement?

16       A.    That's correct.

17       Q.    Because of privilege?

18            MR. MORRIS:   Correct.

19       Q.    And just so that the record is clear.

20            How many claimants above this 3186

21  number did Arnold & Itkin represent it held claims

22  against Imerys at the time it filed, Arnold &

23  Itkin filed the Amended Verified Statement in

24  January of 2021?

25       A.    I couldn't tell you an exact number, but

```
                                          Page 90
 1                         ITKIN
 2   it would be on the same order of magnitude that we
 3   were talking about in the previous exhibit.
 4        Q.    Thousands; is that correct?
 5        A.    I believe so.
 6        Q.    And why did Arnold & Itkin not disclose
 7   those on its Amended Verified Statement that is
 8   Exhibit 4?
 9             THE WITNESS:  John, you're muted.
10             MR. MORRIS:  Yeah.  That's -- I direct
11        the witness because that's privileged
12        communications.
13             MS. QUARTAROLO:  Joe, can you take
14        this one down and bring up Exhibit 5.
15             (Supplement to Amended Verified
16        Statement of Arnold & Itkin LLP Pursuant to
17        Bankruptcy Rule 2019 marked as Exhibit 5,
18        as of this date.)
19   BY MS. QUARTAROLO:
20        Q.    Mr. Itkin, Exhibit 5 is the Supplement
21   to Amended Verified Statement of Arnold & Itkin
22   Pursuant to Bankruptcy Rule 2019 that was filed
23   March 25, 2021.
24        A.    Okay.
25             MR. MORRIS:  Amy, is this one in the
```

```
 1                      ITKIN
 2       share?  Is it in the --
 3             MS. QUARTAROLO:  It will be.
 4             MR. MORRIS:  Okay.
 5             MS. QUARTAROLO:  I think given the
 6       size of these documents, they take a while
 7       to appear.
 8             MR. MORRIS:  Gotcha.
 9   BY MS. QUARTAROLO:
10       Q.   Do you see that document, Mr. Itkin?
11       A.   I do.
12       Q.   And are you familiar with this document?
13       A.   I believe so, yes.
14       Q.   Did you review this document before it
15   was filed?
16       A.   I believe so, yes.
17       Q.   And this document -- again, we can
18   scroll down -- but this reflects 7,355 claimants
19   that A&I has disclosed it represents?
20       A.   Correct.
21       Q.   And, as of the time this was filed in
22   March of 2021, is that the full population of
23   claimants that Arnold & Itkin represents that have
24   talc-related personal injury claims against
25   Imerys?
```

1                          ITKIN

2          A.    As of the March 25, '21, date?  Is that

3     the time frame?

4          Q.    Correct.

5          A.    I believe that would be the list.

6          Q.    The complete list?

7          A.    Correct.

8          Q.    So they're --

9          A.    As of March 25, 2021.

10         Q.    So is it a correct statement that as of

11    March 25, 2021, Arnold & Itkin was listing all

12    claimants that it represented on its Amended

13    Verified 2019 Statement that is Exhibit 5?

14         A.    All claimants that would have claims

15    against Imerys potentially in the Imerys

16    bankruptcy, that's correct.

17         Q.    And why did Arnold & Itkin amend its

18    2019 Statement to include these additional

19    claimants?

20         A.    That I can't tell you because it would

21    implicate privilege.

22         Q.    For how many claimants did Arnold &

23    Itkin submit a vote on the plan?

24         A.    I don't know that number offhand, but

25    there is a submission that has that number.

1                      ITKIN

2        Q.   I will represent to you that it -- I

3   think that that number, according to what I've

4   seen, matches the number that is on this Amended

5   Verified Statement, the 7,355.  Does that sound

6   right to you?

7        A.   It does.  It does.

8        Q.   And sitting here today, does Arnold &

9   Itkin represent claimants holding talc personal

10  injury claims against Imerys beyond the 355 that

11  are included on the amended statement that is

12  Exhibit 5?

13       A.   Beyond the 7,300 --

14            MR. MORRIS:  Objection to the form of

15       the question.

16       A.   I think you said 355 --

17       Q.   Correct.

18       A.   -- and you meant 7,000 --

19       Q.   7,355.

20       A.   I believe the answer to that question

21  would be yes, that we represent more people.

22       Q.   How many?

23       A.   I couldn't tell you that answer.

24       Q.   Hundreds?

25       A.   I don't know that number.  I don't know

```
 1                       ITKIN
 2   if it's hundreds or thousands.
 3        Q.    Is it more than 10?
 4        A.    Yes.
 5        Q.    But you don't know if it's more than a
 6   hundred?
 7        A.    No.  And I would -- it is more than a
 8   hundred, but I don't -- beyond that, I don't know,
 9   and -- I just don't know the answer to that.
10        Q.    How did Arnold & Itkin come to represent
11   those additional claimants beyond those that are
12   listed in the Exhibit 5?
13        A.    I don't know the specifics.
14              MR. MORRIS:  Objection to the form of
15        the question.  That's fine.
16        Q.    Do you know if Arnold & Itkin is in a
17   co-counseling relationship with one or more other
18   parties in connection with those new claimants
19   that are not listed on Exhibit 5?
20        A.    I would assume so, but I don't know.
21        Q.    Does Arnold & Itkin intend to file a new
22   2019 statement?
23        A.    I think that implicates privilege so I
24   can't tell you that.
25              MS. QUARTAROLO:  The debtors formally
```

```
 1                       ITKIN
 2        request that Arnold & Itkin file further
 3        amended or supplemental list disclosing all
 4        claimants that it currently represents.
 5              And can we go -- Joe, can you put up
 6        Exhibit 4 again.
 7              And if you can scroll down to
 8        Exhibit A-2, which should be page 252 of
 9        the PDF or something around there.
10              There we go.
11   BY MS. QUARTAROLO:
12        Q.   So is this -- can you read this
13   document, Mr. Itkin?
14        A.   No, but I'm generally familiar with it.
15        Q.   Okay.  And if we need to, we can make it
16   larger.
17        A.   Sure.
18        Q.   Or try.
19              So is this Exhibit A-2 to the amended
20   2019 that is Exhibit 4 in the record for the
21   deposition, is this an exemplar of an engagement
22   letter that Arnold & Itkin enters into with its
23   clients?
24        A.   Correct.
25        Q.   And this is specific to talc personal
```

1                         ITKIN
2    injury claims; is that right?
3         A.    I believe, correct.
4         Q.    And the contingency fee that's listed on
5    this is 40 percent; is that right?
6         A.    That is correct.
7         Q.    And is that the same for all talc
8    claimants that Arnold & Itkin represents?
9         A.    For the vast majority.
10        Q.    Do you know if for any it's either
11   higher or lower than 40 percent?
12        A.    It wouldn't be higher, there could be a
13   case or several that are lower.
14        Q.    Do you know, are there other versions of
15   this agreement that reflect different terms with
16   particular claimants?
17        A.    I don't believe so.
18        Q.    So if the contingency fee percentage was
19   lower than 40 percent, where would it be
20   documented if not in the engagement letter?
21        A.    This is a little beyond my factual
22   knowledge, but with -- so this is kind of
23   speculation.  But with 7300 claimants, it wouldn't
24   surprise me if one or more said we would like to
25   see if you would do something less than 40 percent

```
 1                       ITKIN
 2   on the fee agreement, and that there may have been
 3   a negotiation to something, you know, whether
 4   that's a third, 35, 38, I don't know, and that
 5   they probably crossed out the 40 percent and
 6   changed it to whatever that percentage was.  I
 7   don't know that that's happened, that's
 8   speculation, but it wouldn't surprise me if that
 9   situation came up.
10       Q.   Fair enough.  And if it did happen, is
11   your assumption that it would have been reflected
12   on the engagement letter itself or would there be
13   some other document?
14       A.   It would, it would most likely be on the
15   engagement letter.  It's a little -- I don't know
16   that that's happened, but that's what I would
17   expect the situation to reflect.
18       Q.   And does Arnold & Itkin receive that
19   40 percent if there's a recovery on that claim
20   through the Imerys bankruptcy?
21           MR. MORRIS:  Objection to the form of
22       the question.
23       A.   The way our contract works is that any
24   recovery is -- it's based on the gross recovery.
25   So if there's monies recovered out of the Imerys
```

1                        ITKIN

2    bankruptcy, we'd be entitled to fees.

3         Q.   My question was probably imprecise.

4              But if there's a claim that is submitted

5    against the trust, and that claim is recovered

6    upon, and that's a claimant that is represented by

7    Arnold & Itkin, Arnold & Itkin would receive

8    40 percent of that amount; is that right?

9              MR. MORRIS:  Objection to the form of

10        the question.

11        A.   I believe that is correct.  I don't know

12   if there's something in the bankruptcy -- the

13   reason I'm being a little bit hesitant is that I

14   just don't know if there's something in the

15   bankruptcy plan or rules that would alter that.

16   And if there is, obviously, what the court says,

17   you know, if there's something in the plan that

18   could alter it, that we'd be subject to that,

19   potentially.  So I don't know the answer to that

20   question, but I would assume here that the

21   recovery from the trust would be subject to fees.

22   But I would want to -- there's been no recovery

23   yet and so I'd want to dig into that issue a

24   little.

25        Q.   Has A&I estimated how much it would

Page 99

1                         ITKIN

2    recover in fees if the plan is approved and its

3    claimants were paid based on the current TDPs?

4         A.    Have we?

5         Q.    Yes.

6         A.    Not as the question is phrased, but we

7    have done analysis as to how the current plan

8    would affect our clients.

9         Q.    So my question is slightly different,

10   which is:  Not specific to your clients, but has

11   A&I done analysis as to how much it stands to

12   receive if the plan is approved and the claimants

13   that Arnold & Itkin represents are paid based on

14   the contingency fees?

15        A.    Are you asking what our fees would be,

16   in other words?

17        Q.    Yes.

18        A.    We've not done that analysis.

19        Q.    But you have done analysis on how your

20   claimants would be affected; is that what you

21   said?

22        A.    We have done some analysis as to how the

23   plan would affect our clients, but not as you have

24   phrased the question or you had framed analysis.

25        Q.    And what analysis have you done?

```
 1                    ITKIN
 2      A.   We've tried to understand the plan and
 3 tried to understand it's been as you -- let me do
 4 it this way.
 5           There is a lot of unknown about how the
 6 plan would affect clients, and that, you've seen
 7 that in our documents.  We have tried to do, with
 8 the information we have, some analysis on how it
 9 would affect our clients.  And -- and done that,
10 and that's what we've done.
11      Q.   And what has that analysis shown?
12      A.   That I can't tell you, it would be
13 implicating attorney-client work product.
14      Q.   Has Arnold --
15           MS. QUARTAROLO:  And, Joe, you can
16      take this down, please.
17      Q.   Mr. Itkin, has Arnold & Itkin undertaken
18 any analysis of the value of its clients'
19 talc-related personal injury claims?
20      A.   We have undertaken analysis, that's
21 correct.
22      Q.   And what analysis have you undertaken?
23      A.   That I can't tell you without
24 implicating privileges.
25           MR. MORRIS:  It's actually work
```

1                          ITKIN

2       product, but.

3       Q.   Will you tell me what you think the

4   range of individual claimants' claims are worth?

5       A.   I can't do that without implicating

6   privilege.

7       Q.   Will you tell me what the bulk of the

8   claims -- excuse me.

9            If you take the aggregate of all of the

10  talc-related personal injury claims that Arnold &

11  Itkin represents, what is the total value that you

12  believe is associated with those claims?

13      A.   I can't answer questions like that

14  without implicating privilege.

15      Q.   Have you had any discussions with any

16  party not subject to common interest that you've

17  said you assert about the value that Arnold &

18  Itkin ascribes to talc-related personal injury

19  claims?

20      A.   I've not had any --

21           MR. MORRIS:  Objection to the form of

22      the question.

23           THE WITNESS:  Go ahead.  I'm sorry,

24      John.

25           MR. MORRIS:  Yeah, I just objected to

Page 102

1                       ITKIN
2        the form of the question.
3                THE WITNESS:  Okay.
4                MR. MORRIS:  But you can answer.
5        A.    I haven't had any conversations that
6   would -- I think what you're asking -- that would
7   not be privileged about value.
8        Q.    Has Arnold & Itkin had any discussions
9   with Johnson & Johnson about the value of the
10  talc-related personal injury claims?
11       A.    Arnold & Itkin had any discussions with
12  Johnson & Johnson?  Nothing substantive.
13       Q.    What about non-substantive discussions?
14       A.    I'm not being coy here with you, but
15  nothing that I would consider a real discussion
16  about it.
17       Q.    Right.  But I'm asking about --
18       A.    I have other litigation with Johnson &
19  Johnson that I'm not going to comment on here in
20  this deposition where there may have been an
21  offhand comment about talc values.  But it was --
22  any comments would have been in jest and not sort
23  of anything, anything worth repeating under oath.
24       Q.    Who were those conversations with or was
25  it a single conversation or multiple

1                         ITKIN

2    conversations?

3         A.   It would have been, to the best of my

4    memory, it would have been one single

5    conversation.

6         Q.   And who was that with?

7         A.   It would have been with J&J settlement

8    counsel.

9         Q.   Who's that?

10        A.   I don't know who it was for talc

11   specifically, but it was --

12        Q.   Well, who was it that you were talking

13   to?

14        A.   I was talking to Jim Murdica in the

15   Risperdal litigation.

16        Q.   And what was the comment made about

17   talc?

18        A.   I don't actually remember the comment

19   made, but it was -- it was a comment that

20   something to the effect J&J was doing a good job

21   of holding down values in terms of settlement.

22        Q.   And who said that comment; was that

23   something Mr. Murdica said or something that you

24   said?

25        A.   That would have been a comment in jest

Page 104

1                          ITKIN

2    by me.  And not really in jest, there's a little,

3    I would say, tongue-and-cheek comment by me

4    complimenting Mr. Murdica on his efforts.

5         Q.    And why do you say it was in jest?

6         A.    We weren't talking about talc.  It was,

7    sort of, we had a conversation about Risperdal.

8    And we talked, like many conversations, five

9    minutes about weather, politics, sports, and an

10   offhand comment about talc made by me that I don't

11   even think he responded to.  And then we had our

12   substantive conversation about something else.

13        Q.    And what did you mean by J&J was doing a

14   good job holding down values?

15        A.    I did -- I meant nothing.  It was, it

16   was -- which is why I was hesitant to even go down

17   this road with you.  It was part of a discussion.

18             My understanding had been that many of

19   the lawyers on the TCC had settled their cases

20   minus one client or so, so that they could keep

21   their TCC seats.  I had heard something about

22   values and made a comment to Mr. Murdica that

23   probably if I ever thought that you'd be asking me

24   questions on a Friday afternoon, never would have

25   made because it wasn't intended for anything other

Page 105

1                    ITKIN
2    than sort of smalltalk.
3        Q.   Has Arnold & Itkin had any discussions
4    with Johnson & Johnson about settling talc claims?
5        A.   With Johnson?  I would answer that
6    question no.
7        Q.   Has Johnson & Johnson ever made an offer
8    to Arnold & Itkin to settle one or more
9    talc-related personal injury claims?
10       A.   That answer is no.
11            MR. MORRIS:  And I just want to make
12       sure that we're just talking about within
13       the confines of the bankruptcy case and not
14       otherwise.  Is that --
15            MS. QUARTAROLO:  That's not, my
16       question is not limited to the bankruptcy
17       case.
18            MR. MORRIS:  All right.  Well, he
19       answered no anyway, so it doesn't matter.
20   BY MS. QUARTAROLO:
21       Q.   Has Arnold & Itkin ever reached out to
22   Johnson & Johnson to initiate any sort of
23   potential settlement discussions about
24   talc-related personal injury claims?
25       A.   I don't believe so.

1                          ITKIN

2        Q.   Are you aware of any amounts that

3    Johnson & Johnson has paid to settle talc-related

4    personal injury claims?

5             MR. MORRIS:  Objection to the form of

6         the question.

7        A.   I don't have firsthand knowledge of that

8    information.

9        Q.   Do you have other knowledge of that

10   information?

11       A.   There are rumors.

12       Q.   What does that mean?

13       A.   People talk in the legal industry about

14   values and some of it is accurate, some of it is

15   not accurate, so there are rumors about that.

16       Q.   What are the rumors?

17       A.   That different firms have received

18   different values.  Some people within firms have

19   received different values for different portions.

20   I have no idea if it's true or false.

21       Q.   Do you have any information about the

22   range of values for talc-related personal injury

23   claims that Johnson & Johnson has settled?

24       A.   Not that I would --

25             MR. MORRIS:  Objection to the form of

```
 1                    ITKIN
 2       the question.
 3            THE WITNESS:  Sorry.
 4       A.   Not that I'd be comfortable saying under
 5  oath.
 6       Q.   And respectfully, Mr. Itkin, I'm not
 7  asking what you're comfortable with saying, I'm
 8  asking whether you've heard any information that
 9  gives you any basis to say what these rumors are
10  in terms of the numbers.
11       A.   I don't, I don't have that information.
12  I don't have those facts.
13       Q.   Has anyone said to you what the range of
14  numbers is, or any number, assigned to a
15  talc-related personal injury claim that's been
16  settled by Johnson & Johnson?
17       A.   I've heard, I've heard a hundred
18  thousand.  I've heard 125,000.  I've heard 40,000.
19  I've heard half a million.  So the point being,
20  rumors are rumors and, you know, that is what it
21  is.
22       Q.   Do you believe that the values that
23  you've heard are high or low?
24       A.   I can't answer that.
25            MR. TSEKERIDES:  I object to the form.
```

```
                          ITKIN
 1
 2         Put an objection on for me, Ted Tsekerides.
 3         A.   Yeah, I'd have to get into work product
 4    and attorney-client privilege to answer your
 5    question.
 6         Q.   Have you had any discussions --
 7    actually, let me back up.
 8              Who have you had those discussions with
 9    where those numbers came up?
10         A.   I could not tell you that.  I don't know
11    offhand.  I talk to a lot of lawyers.
12         Q.   It was from other lawyers who have
13    talc-related personal injury claims; is that
14    correct?
15         A.   I don't know if they had talc-related
16    personal injury claims.  I don't know who it was,
17    is the short answer.  I mean, it's sort of like
18    things, you know -- I don't pay much attention to
19    rumors.
20         Q.   Have you ever had a discussion with
21    anyone on behalf of Johnson & Johnson about any of
22    the numbers that you've heard as associated with
23    settlements for talc-related personal injury
24    claims?
25         A.   I do not believe so.
```

1                          ITKIN

2        Q.    Have you ever made any efforts to verify

3   whether those rumors are true?

4        A.    I know there's been some discovery

5   that's been sought in the bankruptcy on this

6   subject, but beyond that I personally have not

7   gone under to do that myself, no.

8        Q.    Do you have an understanding as to what

9   that discovery has shown in terms of the amounts

10  of the settlements that J&J has entered into for

11  talc-related personal injury claims?

12            MR. MORRIS:  Objection.  I direct the

13        witness not to answer.  That's work product

14        at this point.

15            MS. QUARTAROLO:  It's work product

16        whether that information was shared with

17        him?

18            MR. MORRIS:  You can answer the

19        question yes or no, that's fine.

20        A.    Sitting here I don't know.

21        Q.    You don't know if it was shared with

22  you?

23        A.    I'm sorry, can you ask the question

24  again, I lost it in the objection.

25        Q.    Sure.  So the information that's been

1                      ITKIN

2     obtained through discovery relating to J&J

3     settlements of talc-related personal injury

4     claims, has any of that information been

5     communicated to you?

6          A.   I don't believe so, but I'm not sure.

7     Not that I have any knowledge sitting here today.

8              MR. MORRIS:  Actually, now that I

9          heard the question, the answer's no.

10             MR. TSEKERIDES:  It had better be.

11             MR. MORRIS:  Thanks, Ted.  It's always

12         helpful to hear a question the second time.

13    BY MS. QUARTAROLO:

14         Q.   So you indicated earlier that you're

15    familiar with the debtor's plan as proposed and

16    the trust distribution procedures, correct?

17         A.   Yeah, generally I am.

18         Q.   And I am hopeful that we can do this in

19    a somewhat expedited fashion, but if we need to go

20    more slowly, then we can do so.

21              So does A&I contend that the TDPs result

22    in unequal treatment of Class 4 claims?

23         A.   I would refer you to the objections that

24    we filed.

25         Q.   Respectfully, I'm asking you sitting

1                        ITKIN

2    here today.  I mean, if your answer is you don't

3    know, that's your answer.

4         A.   Well --

5         Q.   But I think I'm allowed to ask you that

6    question.

7         A.   I think your answer implicates -- to

8    answer that question it would implicate

9    attorney-client and work product privileges.  And

10   so to be specific and precise, I would tell you

11   that we have filed multiple objections and briefs

12   on these subjects and I feel that they set forth

13   our position.  I suspect that if a vote is

14   ultimately counted as a vote in favor of

15   confirmation, that there may be additional things

16   that we file that may clarify or add to or

17   supplement our position.  But as of now I think

18   that, you know, the brief and -- do a good job of

19   laying out our positions.

20        Q.   And you are well represented by counsel,

21   but these are specific topics that are set forth

22   in the deposition notice and so I'm going to ask

23   my question again and ask you to answer it.

24             Does Arnold & Itkin assert that the TDPs

25   result in unequal treatment of Class 4 claims?

1                      ITKIN

2       A.   Once again, I would refer you to the

3   briefs, to tell you anything beyond that I think

4   implicates privilege.

5       Q.   It's a yes-or-no question.

6       A.   I gave you --

7       Q.   I don't think you can just point to

8   briefs.

9       A.   Well, I've given you my answer.

10      Q.   So you will not answer that question yes

11  or no?

12      A.   I feel like I've answered the question.

13           MR. MORRIS:  Yeah.

14      Q.   And what are the bases for Arnold &

15  Itkin's assertion that the TDPs result in unequal

16  treatment of Class 4 claims?

17      A.   I would tell you again that you can --

18           THE WITNESS:  I'm sorry, John, I

19      didn't mean to interrupt.

20           MR. MORRIS:  That's okay.  I don't

21      know if this will be helpful, Amy.  You're

22      entitled to ask your questions, but in

23      general I think -- I think Mr. Itkin is

24      likely to just adopt the positions that

25      we've taken thus far subject to further

```
 1                        ITKIN
 2       discovery.
 3             MS. QUARTAROLO:  Okay.  Well, I mean,
 4       these are -- again, I don't mean to argue
 5       with anyone on the record, but these are
 6       topics that we've specifically set forth.
 7       We expect the witness to be prepared to
 8       answer questions.
 9             MR. MORRIS:  He is.
10             MS. QUARTAROLO:  I think it is not
11       sufficient in terms of him answering
12       questions and being adequately prepared to
13       simply point to filings that have been made
14       by counsel.
15             MR. MORRIS:  Okay.
16             MS. QUARTAROLO:  We can have that
17       discussion off the record after the
18       deposition is over, but our position is
19       that that is not adequate preparation.
20             MR. MORRIS:  Go ahead and ask your
21       questions.
22    BY MS. QUARTAROLO:
23       Q.   Mr. Itkin, what are the bases for Arnold
24    & Itkin's assertion that the TDPs result in
25    unequal treatment of Class 4 claims?
```

1                        ITKIN

2        A.   I'll give you the same answer, which is,

3   we lodged paperwork or filed paperwork that has

4   specific objections dealing with the 40/40/20

5   split, the indemnity and otherwise.  And, you

6   know, when you get beyond that, you're implicating

7   privilege and attorney-client work product, so I

8   can't answer beyond that.

9        Q.   Are you aware, sitting here today, of

10  any facts that Arnold & Itkin relies upon to

11  support its assertion that the TDP results in

12  unequal treatment of Class 4 claim?

13       A.   Once again, I mean, I think we can go

14  through this however you want to go through it,

15  but I'm going to continue to refer you to the

16  briefs as well as, you know, tell you that beyond

17  that we're getting into privilege.

18       Q.   Do you have any specific facts that

19  you're prepared to testify to or are you just

20  going to point to the briefs?

21       A.   I'm going to point to the briefs.  And,

22  I mean, you can ask your questions, obviously, if

23  you choose to and we can see how it goes.  But I

24  think that my anticipation is, I'm going to

25  probably be telling you to look at the briefs for

```
 1                    ITKIN
 2   our positions and beyond that it's going to
 3   implicate attorney-client work product.
 4        Q.   Okay.  Topic No. 11, does Arnold & Itkin
 5   assert that the TDP was not negotiated in good
 6   faith?
 7        A.   This would be the same answers I've told
 8   you before, so I would refer you to the briefs, as
 9   well as tell you beyond that you're getting into
10   mental impressions and work product.
11        Q.   Sitting here today, are you aware of any
12   facts that suggests that the TDP was not
13   negotiated in good faith?
14             MR. MORRIS:  Amy, it might be helpful,
15        if you believe that that's what our
16        contention is, to just show him the
17        document that you're relying on to say
18        that.
19             MS. QUARTAROLO:  These are topics in
20        the notice, so I'm entitled to ask them.
21        We expect that he be prepared on them.  We
22        have no objection to these topics.  So,
23        again, we don't need to argue about it on
24        the record.  I'll ask my questions and
25        he'll answer them or he won't.
```

```
 1                        ITKIN
 2             MR. MORRIS:  I'm just suggesting you
 3          might try to refresh his recollection, but
 4          that's okay, you do it your way.
 5    BY MS. QUARTAROLO:
 6        Q.    Can you answer my question, Mr. Itkin?
 7        A.    So I don't recall seeing the phrase
 8    "good faith" in the briefs.  If it's there,
 9    obviously I'm happy to look at it.  But I
10    generally will tell you to look at the briefs and,
11    you know, beyond that you're getting into
12    attorney-client work product and mental
13    impressions.
14        Q.    My question again was specific to facts.
15             Sitting here today, are you aware of any
16    facts that suggests that TDPs were not negotiated
17    in good faith?
18        A.    I think the issue I have is with the
19    phrase "good faith."  If you want to define good
20    faith and what you mean by good faith --
21        Q.    What do you understand good faith to
22    mean?
23        A.    It means a lot of different things in a
24    lot of different contexts.
25        Q.    So however you would understand it, do
```

1                      ITKIN

2     you have any facts that suggests that the TDPs

3     were not negotiated in good faith?

4          A.   I don't think I can answer the question

5     because of the way the phrase good faith is used.

6     It necessarily implicates my mental impressions of

7     attorney-client privilege.

8          Q.   For the record, I disagree.  This is a

9     topic that's set forth in the deposition notice.

10    There were no objections to this topic and we

11    can -- I think someone might not be on mute.

12              THE CONCIERGE:  Yeah.  This is April,

13         the concierge.  I was trying not to

14         interrupt, but I believe we have your

15         Exhibit Share situation resolved.

16              MS. QUARTAROLO:  Okay.  Why don't we

17         just take a short break.  Hopefully we can

18         do this in five minutes, if everyone just

19         stays close to their computer, and we'll

20         get you set up with Exhibit Share,

21         Mr. Itkin.

22              THE WITNESS:  Great.

23              MS. QUARTAROLO:  Thanks.

24              (Whereupon, off the record.)

25              (Whereupon, resumed.)

1                       ITKIN

2    BY MS. QUARTAROLO:

3         Q.   Mr. Itkin, you now have Exhibit Share

4    access --

5         A.   I believe so, yes.

6         Q.   -- a couple hours into the depo?

7         A.   Yes.

8         Q.   Does Arnold & Itkin contend that there

9    was anything improper about how the TDPs were

10   negotiated?

11             MR. MORRIS:  Objection to the form of

12        the question.

13        A.   I mean, there's discovery obviously

14   that's ongoing.  We filed our position as it

15   exists today in the briefs.  And, you know, that

16   position improper is kind of just sort of a --

17   once again, I'm really not trying to put words,

18   but improper is a very broad meaning, and you can

19   interpret some of the things we said in the briefs

20   saying it's improper, then you have there our

21   position that improper means something more

22   nefarious or otherwise.  You know, it's kind of a

23   long scale and you're starting to invade work

24   product and attorney-client privilege.

25             As to my beliefs, I believe your

1                        ITKIN

2    question, I think, was what our contentions are.

3    Contentions as they exist today are set forth in

4    the brief.

5         Q.   So, sitting here today, without

6    referring to legal briefs, can you answer whether

7    Arnold & Itkin contends that there was anything

8    improper about how the TDPs were negotiated?

9         A.   I would take that question --

10             MR. MORRIS:  Objection to the form of

11        the question.

12             THE WITNESS:  Yeah.

13        A.   That question implicates attorney-client

14   privilege, work product privilege and otherwise.

15   Our briefs indicate our stated public positions.

16        Q.   Okay.  Sitting here today, Mr. Itkin,

17   are you aware of any facts that suggests that

18   there was anything improper about how the TDPs

19   were negotiated?

20             MR. MORRIS:  Objection.  Asked and

21        answered.

22        A.   And I can't -- I gave kind of a longer

23   answer maybe two or three questions ago.  I can't

24   answer that question beyond what's in the briefs

25   without implicating privilege and the fact that

1                      ITKIN

2    there's some discovery that still needs to be

3    done.

4              MR. MORRIS:  I mean, Amy -- yeah.

5              MS. QUARTAROLO:  I mean, I'll go

6         through my questions.  If this is the

7         answer over and over, we'll talk again.

8              MR. MORRIS:  Yeah.

9              MS. QUARTAROLO:  We will bring a

10        motion to have a witness who's prepared to

11        answer.  Referring to legal briefs is not a

12        proper response to "Are you aware of any

13        facts?"

14   Q.   Mr. Itkin --

15             MS. QUARTAROLO:  Did you have

16        something to say, John?

17             MR. MORRIS:  No, that's okay.  Yeah, I

18        guess I'll just repeat what I said before,

19        and that is, we haven't taken discovery.

20        We haven't taken any depositions other than

21        the liquidation analysis.  It's a point

22        that he continues to make.

23             Now, I appreciate the fact that you

24        want to know, do we have any facts today.

25        To the extent that we have anything to say

```
 1                      ITKIN
 2        on these topics, he's referring you to the
 3        brief.
 4             MS. QUARTAROLO:  That's not an
 5        appropriate answer to a question.
 6             MR. MORRIS:  It's not more --
 7             MS. QUARTAROLO:  We don't need to
 8        argue about it.
 9             MR. MORRIS:  Okay.  Go right ahead.
10   BY MS. QUARTAROLO:
11        Q.   Mr. Itkin, sitting here today, are you
12   aware of any facts that suggest that the plan
13   proponents did not have good intentions in
14   proposing the TDPs?
15             MR. MORRIS:  Objection to the form of
16        the question.
17        A.   The answer to these questions would be
18   the same because -- part of the problem is, when
19   you're talking about improper good intentions, you
20   can't necessarily separate that just from what are
21   the facts.  If you want to ask me about specific
22   facts, I can try to answer those questions.  But
23   if you're asking me to apply a judgment to those
24   facts -- intentions, improperness, bad faith --
25   those things implicate privilege beyond what's in
```

Page 122

1                         ITKIN

2     the briefs.

3         Q.   For the record, I disagree, but we'll

4     move on.

5              Are you aware of any facts that you

6     believe would suggest that the plan proponents did

7     not propose the plan with a basis for expecting a

8     reorganization of the debtors under Chapter 11?

9         A.   I don't think I understand your

10    question.

11             MR. MORRIS:  Objection to the form of

12        the question, yeah.

13        Q.   You don't understand the question?

14        A.   I don't.

15        Q.   Are you aware of any facts, sitting here

16    today, that suggests that the plan proponents in

17    proposing the current plan are not intending to

18    effect a reorganization of the debtors under

19    Chapter 11?

20        A.   I don't, I don't know one way or the

21    other.

22        Q.   Mr. Itkin, does Arnold & Itkin contend

23    that the claim values that are set forth in the

24    TDP are not appropriate?

25        A.   I can't answer that question without

Page 123

1                         ITKIN
2    implicating privileges.
3         Q.    You can't answer yes or no without
4    implicating privilege?
5         A.    Do we feel that they're appropriate
6    values?
7         Q.    Yes.
8         A.    I'm not -- I can't answer that without
9    implicating work product or attorney-client
10   privilege.
11        Q.    Has Arnold & Itkin suggested any
12   alternate claim values for the TDP to any party?
13        A.    Not to anyone that is not privileged.
14        Q.    Leaving aside your direct counsel, has
15   Arnold & Itkin suggested any alternate claim
16   values to anyone?
17        A.    Not outside of our firm or our counsel.
18        Q.    Do you, sitting here today, have a
19   belief of what appropriate claim values should be?
20             MR. MORRIS:  Objection to the form of
21        the question.
22        A.    I have opinions, yes.
23        Q.    And what do you believe an appropriate
24   claim value for a mesothelioma claim is?
25        A.    I --

```
 1                    ITKIN
 2          MR. MORRIS:  I direct you that's
 3      attorney work product.
 4          MS. QUARTAROLO:  And would you also
 5      direct not to answer for any variation of
 6      an ovarian cancer claim?
 7          MR. MORRIS:  Yes, ma'am.
 8      Q.   And are you going to follow your
 9   attorney's instruction?
10      A.   Yes.
11          MR. MORRIS:  Yeah, and I would just
12      point out that this is kind of the opposite
13      of what happened between the debtor and
14      J&J.  We're not putting on an affirmative
15      case.  We're not going to try to
16      establish --
17          MS. QUARTAROLO:  John, respectfully,
18      you've made that statement at least four
19      times today.
20          MR. MORRIS:  But it's --
21          MS. QUARTAROLO:  I understand.  We're
22      taking a deposition and this is not your
23      opportunity to say the same thing four
24      times.
25          MR. MORRIS:  I apologize.
```

1                        ITKIN

2    BY MS. QUARTAROLO:

3        Q.   Is there an alternative to the claim

4    values set forth in the TDPs that Arnold & Itkin

5    would support?

6        A.   It would have to be presented with

7    something and analyze it.

8        Q.   Has Arnold & Itkin ever suggested

9    alternative claim values to any of the plan

10   proponents that it would support?

11       A.   I'm not aware of any such conversations.

12       Q.   In all of your conversations with

13   Mr. Baron, you never suggested alternative claim

14   values?

15       A.   Correct.  I don't -- I'm not -- that --

16   no, we did not have that discussion.

17       Q.   And you've also never suggested

18   alternative claim values for the TDPs to the

19   debtors; is that correct?

20       A.   Correct.  I mean, Mr. Baron and I -- we

21   had -- Mr. Baron and I had a conversation about

22   the 40/40/20 split where he informed me that that

23   was a very contentious issue within the TCC.  And

24   that because members of the TCC, some of them

25   represent mesothelioma claimants, some of them

ITKIN

1

2  represent mainly ovarian cancer claimants, so

3  there was a tension within the TCC about that.

4  And that they came to the compromise of the

5  40/40/20 split, however they came to that, and

6  that that was not an area that he felt was

7  appropriate for -- it was not an area that any

8  proposals from us would be considered, that would

9  be areas that he would even take to his fellow TCC

10  members, and so it was not an area that Mr. Baron

11  and I had any discussions about because he

12  basically told me that anything that we could or

13  would propose would be dead on arrival.

14       Q.   Did you have any discussions about what

15  you might propose if you were going to make such a

16  proposal?

17       A.   We did not.

18       Q.   Sitting here today, do you have in mind

19  what you would propose that A&I would support if

20  the plan proponents or the TCC were open to such a

21  proposal?

22       A.   We've obviously made our positions clear

23  in the papers about some of the problems that we

24  have with the 40/40/20 split, including, you know,

25  the lack of the claimants being treated equally.

```
 1                        ITKIN
 2   You know, obviously, if the TCC wanted to have a
 3   discussion, you know, I think that we could have a
 4   discussion about that, but that line of
 5   communication has never been open.
 6        Q.   So I don't think that answers my
 7   question, so I'll ask it again.
 8             What would Arnold & Itkin propose if the
 9   plan proponents were open to such a proposal?
10        A.   That I can't tell you without
11   implicating --
12             THE WITNESS:  Sorry, John, I didn't
13        mean to interrupt.
14             MR. MORRIS:  That's okay.
15             I object to the form of the question
16        and our settlement position is at this
17        point attorney work product.
18   BY MS. QUARTAROLO:
19        Q.   Has there been -- just to confirm.  I'm
20   not trying to retread ground but to close the
21   loop.
22             Has there been any proposal made by
23   Arnold & Itkin with regard to an alternative to
24   the 40/40/20?
25        A.   Not -- there's not been a proposal to
```

Page 128

                          ITKIN

1    the TCC or the plan proponents.

2         Q.   Has there been a proposal made to some

3    other party?

4         A.   So there was a proposal put forward to a

5    member of the TCC in his non-TCC capacity that was

6    not really a proposal but a kind of framework.

7    And my understanding -- but it never really went

8    any further than that.  It was more of a framework

9    for discussions is how I would probably describe

10   it.

11        Q.   And when you say -- that was a framework

12   that was proposed by Arnold & Itkin?

13        A.   I believe the proposal would have come

14   from us.

15        Q.   And to whom was that proposal made?

16        A.   Jim Onder.

17        Q.   And when was that?

18        A.   It was around -- it was around the time

19   of the confirmation vote.

20        Q.   Around the time in March?

21        A.   Yeah.  I would tell you it's probably

22   March -- it would be two or three days before the

23   confirmation, would be my guess it would be.

24   Within a week of the vote.

Page 129

                         ITKIN

1

2        Q.   Was that put in writing?

3        A.   I'd have to go back and look, but I

4   believe there's probably an email.

5        Q.   And what generally was the framework

6   that was proposed by Arnold & Itkin?

7        A.   That would be privileged.  It was

8   intended to be kept private.

9        Q.   It was intended to be kept private or it

10  was privileged?

11       A.   It is privileged and was intended by

12  virtue of it being privileged that it be not

13  shared.

14            MR. MORRIS:  It's subject to common

15        interest privilege.

16            THE WITNESS:  Correct, that's a better

17        way of saying it.

18            MS. QUARTAROLO:  And I will ask you to

19        confirm -- and, John, you can do this

20        offline -- on what date that proposal was

21        made.

22            MR. MORRIS:  We'll take that under

23        advisement.

24  BY MS. QUARTAROLO:

25       Q.   Was that framework that was proposed to

```
 1                     ITKIN
 2  Mr. Onder communicated to any other party by
 3  Arnold & Itkin?
 4       A.   It -- it would have been the product of
 5  discussions with Arnold & Itkin, Williams Hart,
 6  and Jim Onder during the time period in which the
 7  TCC was trying to convince us not to vote against
 8  the plan.
 9       Q.   Do you know if it was ever communicated
10  to any of the plan proponents?
11       A.   I would not expect that it would have
12  been communicated to the plan proponents.
13       Q.   Why do you say that?  What do you mean?
14       A.   Because it was meant to be kept between
15  us.
16       Q.   So I guess my question is:  Why did
17  Arnold & Itkin not communicate that framework to
18  any of the plan proponents?
19       A.   The plan proponents were going -- were
20  trying to get people to drop their opposition or
21  change their stated opposition and -- at that
22  time.  And without -- I'm trying to, I'm trying to
23  be careful not to invade privilege here so bear
24  with me.
25            At that time period, the plan proponents
```

```
 1                    ITKIN
 2  were trying to get people to vote in favor of the
 3  plan.  At that time we were all opposed to the
 4  plan in a common interest of that sort, and this
 5  framework was the genesis of privileged
 6  conversations that we had amongst ourselves.
 7       Q.   Again, I'm not trying to quibble with
 8  you, but I don't think that answers my question.
 9            I guess my question is:  At any time why
10  did Arnold & Itkin not communicate this proposed
11  framework to the plan proponent, either before or
12  after the vote?
13       A.   That's work product and attorney client
14  the why, but that was not communicated as far as I
15  know.  There was a -- actually, let me back up for
16  a second.
17            There was a call between Steve Baron,
18  myself, lawyers for the TCC, lawyers from the
19  Pachulski firm.  Jim Onder was on the call.  And I
20  believe John Boundas may have been on the call as
21  well.
22       Q.   And when was that the call you're
23  referring to?
24       A.   I don't know the exact date, but it was
25  close in time to the vote, and it was an effort to
```

```
 1                         ITKIN
 2   see if we could reach some agreement.  On the
 3   call, when the 60/40 or the 40/40/20 came up, a
 4   lawyer for the TCC mentioned that the meso claims
 5   should be paid more because they were the only
 6   claims that could deliver, I believe it's 523(g)
 7   channeling injunction.  I may have my bankruptcy
 8   code wrong.  But there's a provision of the
 9   bankruptcy code that allows for channeling
10   injunction.  And when that happened the
11   conversation went from at least cordial to being
12   less cordial, and it sort of ended at that point.
13            And so the only time where things may
14   have been communicated -- that any information may
15   have been shared from us to the TCC about the
16   40/40/20 would have been during that call.  And so
17   I want to make sure that I didn't tell you
18   something inaccurate.  There was a call about it.
19        Q.   So what did Arnold & Itkin communicate
20   about the framework during that call?
21        A.   I don't think we got to the point of a
22   framework.  When we brought up the 40/40/20, the
23   lawyer -- I think it was Mr. Fink, if I'm correct,
24   but I don't know because it was a call and I
25   don't -- I'm not great with the names, but I
```

1                         ITKIN

2     believe it was Mr. Fink -- kind of came in with

3     the point the 40/40/20 began to be discussed.  We

4     talked about the meso claims from their view were

5     the only ones that could deliver a channeling

6     injunction.  And the call then -- and Steve Baron

7     kind of cut the lawyer off and had some things to

8     say to Mr. Pachulski, and then the conversation

9     kind of went downhill from there.

10         Q.   And on that call -- I just want to make

11    sure I understand -- did Arnold & Itkin make any

12    suggestions or proposals about alternatives to any

13    provision of the TDP?

14         A.   I don't -- I think we had laid -- we

15    laid out some concerns about the indemnity, the

16    sort of lack of transparency with the indemnity.

17    The lack of sort of wanting to make sure that it

18    was handled.  That whoever was handling it was,

19    you know, accountable.  That there was

20    transparency.  And that we laid out some concerns

21    with the 40/40/20 that are more or less identical

22    to what's in our briefing.  And then we began to

23    have the conversation where I think maybe perhaps

24    proposals, you know, if you were having a 408

25    discussion, you know, somebody says their

Page 134

```
 1                         ITKIN
 2    position, somebody else -- usually the way these
 3    things happen, my experience, one side states
 4    their position, the other side states their
 5    position.  Everybody tries to be respectful and
 6    openminded and listen.  And before we got to the
 7    point of getting our position out, and then
 8    getting to the point of proposals, the
 9    conversations sort of devolved over the issue of
10    the 40/40/20.
11        Q.   So Arnold & Itkin didn't make any sort
12    of specific proposal or suggestion during that
13    call?
14        A.   Not as a -- not to my memory as a formal
15    position or suggestion, correct.
16        Q.   At any time before or after that call,
17    did Arnold & Itkin make any sort of a formal
18    proposal about an alternative to the 40/40/20
19    split to the plan proponents?
20        A.   Like I had mentioned earlier, there was
21    a framework to Mr. Onder in kind of an individual
22    capacity where there's joint -- joint interest
23    privilege.  I don't believe that there was a
24    formal proposal to the plan proponents.
25        Q.   And why has Arnold & Itkin not made a
```

ITKIN

1

2   formal proposal to the plan proponents?

3       A.   That would implicate privilege.

4            And let me -- and let me back up, one

5   other thing, just to make sure the record is

6   complete.

7            There may have been a conversation

8   between lawyers for the TCC and lawyers for Arnold

9   & Itkin where some things may have been discussed,

10  but I was not on that conversation and don't know

11  what was said there.  But that would be -- I don't

12  believe a formal proposal would have been

13  communicated then, but -- so I don't want to leave

14  that out of the timeline.

15      Q.   Sure.  So several of these deposition

16  topics relate to, number 13, relates to

17  alternatives to the claim values set forth in the

18  TDPs.

19           Did anyone buy or on behalf of Arnold &

20  Itkin ever make a proposal to the plan proponents

21  about an alternative to claim values?

22      A.   To the plan proponents, I don't believe

23  so.

24      Q.   And Topic No. 16 relates to alternatives

25  to the 40/40/20 split proposed or supported by

1                    ITKIN

2    A&I.

3            Did anyone by or on behalf of Arnold &

4    Itkin ever make a proposal, formal or informal,

5    about any alternative to the 40/40/20 split

6    proposed or supported by A&I?

7            MR. MORRIS:  Object to the form of the

8        question.

9        A.   Yeah, to the plan proponents, I do not

10   believe so.

11       Q.   Topic No. 20 is any alternatives to the

12   scheduled values, average values and maximum

13   values set forth in the TDP proposed or supported

14   by A&I.

15           Did A&I, anyone by or on behalf of A&I,

16   ever make any formal or informal proposal about an

17   alternative to the scheduled values, average

18   values and maximum values set forth in the TDP to

19   the plan proponents?

20       A.   To my knowledge today, I do not believe

21   anything to the plan proponents.

22       Q.   What does A&I believe are the factors

23   that should be considered in coming up with an

24   appropriate allocation of assets under the trust?

25       A.   That would implicate attorney-client

1                           ITKIN

2      work product privilege.

3           Q.   So you can't answer that outside of the

4      privilege; is that correct?

5           A.   Correct.

6           Q.   Mr. Itkin, are you aware that the plan

7      includes several settlements with third parties as

8      part of the plan?

9           A.   I'm generally aware of that, yes.

10          Q.   And among those is a settlement with the

11     Imerys non-debtor affiliates and Imerys S.A. as

12     the parent.  Are you aware of that?

13          A.   I am.

14          Q.   Are you aware of the nature of the

15     contribution that is being made pursuant to that

16     settlement?

17               MR. MORRIS:  Objection to the form of

18          the question.

19          A.   Yeah, it's, it's -- I know it's laid out

20     in the plan, the amounts, and so generally I'm

21     aware of it.

22          Q.   Does Arnold & Itkin take any position

23     with regard to the amount of the contribution that

24     is being made pursuant to the Imerys non-debtor

25     affiliate settlement?

1                      ITKIN

2        A.    This is kind of back to the areas we

3   were in earlier where we laid out positions in our

4   briefs, going to do some discovery, and beyond

5   that you're kind of getting into attorney-client

6   work product privilege.

7        Q.    So, sitting here today, do you have any

8   factual basis to say that there's anything

9   inappropriate about the settlement that is

10  embodied in the plan with regard to the Imerys

11  non-debtor affiliates?

12       A.    Yeah.  I mean --

13            MR. MORRIS:  Object to the form of the

14       question, but you can answer.

15       A.    I'd give you the same answer I just gave

16  you a minute ago.

17       Q.    I'm actually going to ask you to answer

18  that question because I don't think you did

19  before.

20       A.    Okay.  I mean, we've set forth positions

21  in the briefs about what we think is objectionable

22  to the plan and the TDP.  We have -- obviously are

23  doing discovery now.  My deposition I think is one

24  of the earlier depositions, but there'll be

25  presumably some facts discovered in this area that

```
 1                      ITKIN
 2   may affect our position.
 3              And then, you know, in addition, sort of
 4   other things that I could answer about potentially
 5   would be attorney-client information that is
 6   privileged or work product information that is
 7   privileged, so I can't answer the question beyond
 8   those things.
 9       Q.   So, sitting here today, are you aware of
10   any facts that you believe suggests that there's
11   any reason why Arnold & Itkin would oppose the
12   settlement that's embodied in the plan with regard
13   to the Imerys non-debtor affiliates?
14       A.   I would give you the same answer that I
15   gave you one question ago.
16       Q.   Which is pointing to the filings that
17   you've made and the fact that discovery is
18   ongoing; is that right?
19       A.   The filing and discovery is ongoing and
20   other things would implicate privilege.
21       Q.   With regard to the other settlements
22   that are in the plan, which would include the
23   Rio Tinto/Zurich settlement and the Cyprus
24   settlement, is Arnold & Itkin aware of any facts
25   that it believes support a basis to oppose either
```

                              ITKIN
1
2    of those settlements in the plan?
3              MR. MORRIS:  Objection to the form of
4         the question.
5         A.   Yeah.  These questions are going to be
6    the same answers as the last two that we've, you
7    know, stated our positions into what's
8    objectionable in our prior objections.  There's
9    discovery that's ongoing that will provide
10   information about other settlements, and that may
11   change our objections, and anything else right now
12   would be work product or attorney-client privilege
13   that I can't tell you.
14        Q.   Has Arnold & Itkin done any evaluation
15   of the value of the J&J indemnity obligation?
16        A.   Yes.
17        Q.   When did Arnold & Itkin do that
18   evaluation?
19        A.   Before the plan was voted on.
20        Q.   And what specifically did Arnold & Itkin
21   evaluate with regard to the J&J indemnity?
22        A.   That I can't tell you without
23   implicating.
24        Q.   And are you also going to assert work
25   product over what that evaluation showed?

```
 1                      ITKIN
 2           MR. MORRIS:  Yes.
 3      Q.   Has Arnold & Itkin hired any third party
 4   or expert to assist in that regard with the
 5   valuation of the J&J indemnity?
 6      A.   I can't answer that question without
 7   implicating privilege at this point.
 8           MR. MORRIS:  Work product.  We don't
 9        have a testifying expert.
10           MS. QUARTAROLO:  I understand.
11      Q.   Has Arnold & Itkin had any discussions
12   with Johnson & Johnson about the value of the
13   indemnity?
14      A.   Not to my knowledge.
15      Q.   Has Arnold & Itkin done any evaluation
16   of the value of insurance available to the
17   debtors?
18      A.   Yes.
19      Q.   Has Arnold & Itkin done any valuation of
20   the value of insurance available to cover
21   mesothelioma claims versus ovarian cancer claims?
22      A.   Some.
23      Q.   What does that mean?
24      A.   It's some of the -- the answer is yes.
25   I'll just leave it at yes.  I don't want to
```

```
 1                         ITKIN
 2    implicate privilege.
 3         Q.   So are you asserting privilege and/or
 4    work product -- as your client -- as your counsel
 5    will remind you -- over the actual analysis that's
 6    been performed or evaluation that's been
 7    performed?
 8              MR. MORRIS:  Yes.
 9         A.   Yes.
10         Q.   Has Arnold & Itkin hired any third party
11    or outside consultant or expert with regard to the
12    valuation of insurance assets available?
13         A.   I can't answer that without implicating
14    privilege.
15              MR. MORRIS:  Work product.
16         Q.   Approximately how many discussions has
17    Arnold & Itkin had regarding the plan with anyone
18    on behalf of the TCC?
19              MR. MORRIS:  Objection to the form of
20         the question.
21         A.   I had a conference call where I was told
22    that they wouldn't pursue the indemnity agreement.
23    I had a -- if you exclude some email traffic about
24    setting up a conference call that was just -- I'm
25    going to exclude that.
```

```
 1                    ITKIN
 2           So there's the conference call where I
 3  was told the indemnity would not be pursued.
 4           There was a Zoom meeting with members of
 5  the TCC and -- the Williams Hart folks and I
 6  believe Jim Onder.
 7           There was -- and Jim Onder I don't
 8  believe was actually on that Zoom, so I take that
 9  back.
10           There was a conversation I had with
11  Steve Baron.
12           There was the conference call where
13  things devolved quickly.
14           So I believe four conversations, if
15  memory serves me right.
16      Q.   Have there been any -- I thought you
17  said that you had talked to Steve Baron more than
18  once.  Was that just the one conversation you had
19  or did you talk to him more than once?
20      A.   Well, Steve Baron was a part of the
21  Zoom, the initial Zoom.  Steve Baron was a part of
22  a call where he called me privately, either the
23  next day or day after.  And then there was the
24  conference call with Steve Baron and the lawyer.
25  So there would have been at least three
```

```
                                   ITKIN
 1
 2    conversations with Steve Baron.
 3         Q.   Okay.  So, according to my count -- and
 4    I'm not an expert in math, but --
 5         A.   That makes two of us.
 6         Q.   -- you personally have been involved in
 7    at least four conversations with the TCC about, or
 8    someone on behalf of the TCC about the plan; is
 9    that right?
10         A.   I think that's right.  Four is what we
11    just came up with, I believe.
12         Q.   And then has your counsel had additional
13    conversations in addition to that with the TCC; in
14    addition to the ones you've indicated?
15         A.   Yeah, I don't know exactly every
16    conversation my counsel's had, which is nothing
17    of -- my counsel, I have terrific counsel, they've
18    done a terrific job, and so, but I don't expect
19    them to update me with every phone call they've
20    had with Imerys or J&J.  If we have something to
21    talk about, we discuss it.  But I do believe they
22    may have had conversations with lawyers for the
23    TCC that I was not involved in.
24         Q.   And has Arnold & Itkin had conversations
25    with anyone on behalf of the FCR about the plan?
```

```
 1                    ITKIN
 2        A.   I believe the FCR was on the initial
 3   call where we were told that the indemnity
 4   wouldn't be pursued.  And we were -- I don't
 5   believe the FCR was on the call, but they may have
 6   been on the call where we were told that
 7   mesothelioma cases are the only cases that could
 8   bring a channeling injunction in terms of a global
 9   settlement with J&J, but other than that I don't
10   believe the FCR was involved.
11        Q.   As I --
12        A.   I thought they were in the -- I don't
13   know, I just -- I don't know if they were in that
14   call about the channeling, where the channeling
15   injunction issue came up.  They may have been.
16        Q.   Fair enough.  Has Arnold & Itkin, either
17   you directly or anyone on behalf of Arnold &
18   Itkin, had any discussions with the FCR about the
19   plan other than discussions that you already
20   referenced that involved the TCC?
21        A.   Yeah, not anyone from Arnold & Itkin.
22   You know, if my lawyers had conversations with
23   them, they may have had those conversations, but
24   not Arnold & Itkin.
25        Q.   Has anyone on behalf of Arnold & Itkin
```

```
 1                      ITKIN
 2   had any communications with the United States
 3   Trustee's Office about the plan?
 4        A.    I don't believe so.  Unless there's
 5   conversations with the lawyers, but I don't
 6   believe so.
 7             MS. QUARTAROLO:  I'm at a natural
 8        stopping point and I need to refill my
 9        water, so let's do a five-minute break.
10        I'm hopeful that we're nearing the end, or
11        the last few topics.  And, you know, not
12        trying to take up anyone's Friday afternoon
13        more than necessary, so let me go through
14        the rest of my notes on this break and get
15        some water and we'll regroup, if that's
16        okay.
17             THE WITNESS:  Sounds good.
18             MR. MORRIS:  Okay.
19             (Whereupon, off the record.)
20             (Whereupon, resumed.)
21             MS. QUARTAROLO:  We're back on the
22        record.
23             I understand after taking a break that
24        Mr. Itkin wants to clarify one of his prior
25        responses.
```

1                    ITKIN

2            THE WITNESS:  You asked about

3       conversations with J&J on -- there's a line

4       of questions about conversations with J&J,

5       and I have not had conversations with J&J

6       directly.  I have from time to time had

7       conversations with Jim Murdica involving

8       another tort.  I mentioned one of those

9       comments earlier today about an off comment

10      I made about talc, which is really the only

11      comment that I remember either way.  But I

12      want to make sure that I'm accurate in that

13      because I can't -- I want to make sure I'm

14      accurate under oath because there is -- Jim

15      and I I don't think have had official

16      conversations about talc where he would be

17      representing J&J's official position.  But

18      I don't want to say that the word "talc"

19      has never been uttered in a conversation

20      that we've had because we've had multiple

21      conversations, mostly about fishing,

22      politics and otherwise, but I want to be

23      accurate in my answer.

24   BY MS. QUARTAROLO:

25        Q.   So other than the one comment that you

```
 1                        ITKIN
 2   referenced earlier about talc, sitting here today,
 3   do you recall any other conversations with anyone
 4   on behalf of J&J where talc was raised?
 5        A.   That's the conversation I remember.  And
 6   that wasn't in his official capacity of -- I
 7   didn't take it.  He was there to talk to me about
 8   another tort.  And to say that the word talc has
 9   never come up in other conversations we've had, I
10   would suspect one of us or others have made talc
11   comments, but my comment that I specifically
12   remember was the one I testified about earlier
13   about it seeming like he was doing a very good job
14   on behalf of his client.
15        Q.   Did you have any conversations with
16   anyone about your testimony since you gave your
17   testimony earlier today and this clarification
18   that you're making now?
19        A.   I did not.  I mean, I was sitting there
20   thinking about your conversation on the break
21   about J&J and when -- if I'm having conversations
22   with someone about settlement discussion, there's
23   a difference between being authorized to have
24   those discussions or not being authorized to have
25   those discussions.  And, you know, I know -- let
```

1                          ITKIN

2    me say it this way.

3              I believe that Jim is involved, Jim

4    Murdica is involved in settlement discussions on

5    J&J's behalf in an official capacity, that he's

6    been retained in that regard.  I don't believe

7    that Jim and I have had conversations about talc

8    in an official capacity.

9         Q.   What does that mean "in an official

10   capacity"?

11        A.   Well, where Jim would be authorized by

12   his client to talk to me about, you know,

13   settlement, settlement values or otherwise.  Or

14   where I would be talking to him on behalf of my

15   clients about settlement, settlement values or

16   otherwise.  Jim and I talk, sometimes in official

17   capacities, and -- but not about talc that I would

18   say.  There may have been a comment here or

19   comment there about talc, but we are not -- it's

20   not like we sat down and shared client lists and,

21   you know, talked about values per case and those

22   sort of things.

23        Q.   How did you become aware that Jim

24   Murdica was involved on behalf of J&J in

25   connection with settlement discussions relating to

1                        ITKIN

2   talc?

3        A.   I don't know that.  I don't know how I

4   became involved, but I think it's common

5   knowledge.  It was -- I mean, it was discussed on

6   one of the calls with the TCC.

7        Q.   Did anyone on behalf of J&J, including

8   Jim Murdica, ever tell you that?

9        A.   I don't know that Jim told me that or

10  not.  I certainly don't remember it, but I don't

11  think it's -- it's, I think, common knowledge in

12  the plaintiff's bar generally that Jim Murdica is

13  representing J&J to the extent J&J has interest in

14  resolving these cases.  He's at least one of the

15  people resolving part of their settlement team and

16  that he's had conversations with members of the

17  TCC about some sort of global resolution.

18       Q.   And where did you learn that from?

19       A.   I don't know where I learned it from.

20  It was -- you know, but it was a topic of

21  conversation on one of the Zoom calls where --

22  with the TCC.

23            MS. QUARTAROLO:  Alice, can you bring

24       up what is -- we're skipping a number here.

25       It will be Exhibit 6, but I think it might

Page 151

                              ITKIN
1

2     be labeled in the folder as Exhibit 7.

3     It's a motion that's been filed by Arnold &

4     Itkin in the bankruptcy.

5          MS. HOESTEREY:  The motion to extend

6     discovery deadlines?

7          MS. QUARTAROLO:  Correct.

8          (Motion of Holders of Talc Personal

9     Injury Claims Represented by Arnold & Itkin

10    LLP to Extend Discovery Deadlines and

11    Permit Discovery of the Plan Proponents,

12    Prime Clerk, and Certain Third Parties

13    Relating to the Solicitation and Voting

14    with Respect to the Ninth Amended Joint

15    Chapter 11 Plan of Reorganization of Imerys

16    Talc America, Inc. and its Debtor

17    Affiliates under Chapter 11 of the

18    Bankruptcy Code marked as Exhibit 6, as of

19    this date.)

20         MS. QUARTAROLO:  And hopefully now

21    that we have Exhibit Share working for you,

22    you'll be able to access this directly, if

23    you choose.  This is exhibit -- it's now in

24    there, Alice?

25         THE CONCIERGE:  If you just refresh,

```
 1                      ITKIN
 2        you should be able to see it, Mr. Itkin.
 3             THE WITNESS:  Yep.  Can y'all still
 4        see me or hear me?
 5             MR. MORRIS:  We hear you.
 6             MS. QUARTAROLO:  We hear you.  You've
 7        dropped off the video, though.
 8             THE WITNESS:  I see Exhibit 7, but it
 9        looks like I can only have one -- I'm on an
10        iPad here, and it looks like I can only
11        have one thing up at a time.  I'm going to
12        put y'all up so I can see you guys.  And if
13        I need to flip back to the motion, or if
14        y'all can screen share the portions that
15        you want to talk about.  Whatever's
16        easiest.
17             MS. QUARTAROLO:  Sure.  Sure.  You
18        know how to access it if you want to.
19   BY MS. QUARTAROLO:
20        Q.   So what is being introduced as Exhibit 6
21   is the Motion of Holders of Talc Personal Injury
22   Claims Represented by Arnold & Itkin LLP to Extend
23   Discovery Deadlines and Permit Discovery of the
24   Plan Proponents, Prime Clerk, and Certain Third
25   Parties Relating to the Solicitation and Voting
```

```
 1                        ITKIN
 2   with Respect to the Ninth Amended Joint Chapter 11
 3   Plan of Reorganization of Imerys Talc America,
 4   Inc. and its Debtor Affiliates under Chapter 11 of
 5   the Bankruptcy Code.
 6             Are you familiar with that document,
 7   Mr. Itkin?
 8        A.   Yes.
 9        Q.   And did you review the motion before it
10   was filed?
11        A.   Yes.
12        Q.   And you also submitted a declaration in
13   support of that motion; is that right?
14        A.   Correct.
15        Q.   Okay.  You can flip back and forth at
16   your leisure.  I'm going to refer to specific
17   paragraphs and portions, but I'll try to describe
18   them for the record, if that's helpful.  But you
19   can go back at any time.
20             So in paragraph 5 of the motion, it
21   refers to the fact that Bevan & Associates LPA
22   Inc. cast approximately 15,000 votes in the
23   bankruptcy.  Do you recall that provision, that
24   statement?
25        A.   I do.
```

1              ITKIN

2      Q.    Have you ever spoken with anyone

3  associated with the Bevan law firm?

4      A.    I have not.

5      Q.    Did you reach out to -- did anyone on

6  behalf of Arnold & Itkin reach out to Bevan in

7  connection with verifying any of the statements

8  that are made in the motion or your declaration?

9      A.    Not about that, not to my knowledge, we

10  had not spoken to Bevan.

11      Q.    In paragraph 18 of the motion, Arnold &

12  Itkin references the fact that Bevan has never

13  appeared in the multi-district litigation

14  proceeding.  This is also included in your

15  declaration.

16          Do you contend that a law firm cannot

17  vote on behalf of the talc personal injury

18  claimants it represents unless it has participated

19  in the MDL proceedings?

20      A.    No.  I don't think the two are mutually

21  exclusive.  I just think you need to be -- no, I

22  don't think the two are mutually exclusive.

23      Q.    So you could vote on behalf of the

24  Imerys plan but not be involved in the MDL; is

25  that right?

1                          ITKIN

2        A.    Correct.

3        Q.    Also in paragraph 18 of the motion it

4   states, "Until Bevan showed up with a Master

5   Ballot chock full of votes, it was conspicuous by

6   its absence."  Are you familiar with that

7   statement?

8        A.    I do remember reading it.

9        Q.    What does that mean, "conspicuous by its

10  absence"?

11       A.    Bevan showed up with 15,000 votes and

12  nobody, as far as I am aware, was aware that Bevan

13  had so many clients.

14       Q.    Would you expect that you're aware of

15  everyone who has -- every other firm that has

16  clients that might assert claims against Imerys?

17       A.    I think we had a pretty good handle on

18  who the law firms were that had substantial

19  numbers of clients.  And this 15,000 would be the

20  second largest, I believe, number of clients on

21  behalf of a law firm.  Second or third.  It would

22  be in the top three or four.

23       Q.    And why do you say that you would

24  expect -- you would be aware of them?

25       A.    Because there's -- I mean, it's sort of

1                         ITKIN

2    just how the -- how pharmaceutical litigation

3    works, or, you know, this is not quite

4    pharmaceutical litigation, but I guess you could

5    put it under the umbrella of pharmaceutical

6    litigation.  Mass tort litigation.  Generally

7    people know who has cases and who doesn't have

8    cases.  Who's involved in litigation, who's not

9    involved in litigation.

10        Q.   Are you aware that the Bevan firm

11   represents or practices in the mass tort base?

12        A.   I know, by research only, that they --

13   you know, you can look up their website -- they

14   claim to be an asbestos group.

15        Q.   And sitting here today, do you have any

16   basis to believe that the Bevan firm does not

17   represent the claimants on whose behalf it

18   submitted votes in favor of the plaintiff?

19        A.   I would describe the 15,000 votes as a

20   red flag and I'd probably ask for discovery about

21   it.

22        Q.   But that doesn't answer my question.

23             Sitting here today, are you aware of any

24   facts that suggests that Bevan does not represent

25   the claimants on whose behalf it voted in favor of

1                    ITKIN

2      the plan?

3            MR. MORRIS:  Objection.  You can

4         answer.

5         A.   Yeah.  I mean, perhaps they do, perhaps

6      they don't.  You know, they may have -- I'd be

7      speculating to say they may have 15,000 talcum

8      powder/mesothelioma cases, or they may have gone

9      through an inventory of old asbestos cases and

10     voted them and I don't know.  It's one -- it would

11     be speculation on my part, but it's one of the

12     things in terms of making sure that the vote --

13     that there was -- you know, there's integrity to

14     the process.  That this is a red flag that I think

15     should be -- there should be discovery on it.

16        Q.   Elsewhere in the motion in paragraph 18

17     Arnold & Itkin states that Bevan has not filed a

18     single pleading in these Chapter 11 cases, not

19     even a request for notice.  Are you aware of that

20     statement?

21        A.   I believe that -- I believe that is in

22     there and I believe you read it correctly.

23        Q.   Do you know if there's other firms who

24     submitted votes in connection with the plan that

25     had done so without ever filing a pleading in

```
 1                    ITKIN
 2    these Chapter 11 cases?
 3         A.   I don't know that, because I'd have to
 4    look, but I suspect that that is an accurate
 5    assumption.  I mean, they either have or they
 6    haven't, but I would suspect these firms haven't
 7    filed anything in the Chapter 11 and voted on it.
 8         Q.   In paragraph -- excuse me -- 10 of the
 9    motion, Arnold & Itkin states, "One can reasonably
10    infer from the agreed delay in submitting late
11    Master Ballots that the attorneys who ultimately
12    admitted them might have been reluctant to vote to
13    accept the plan or even inclined to reject it."
14    Do you recall that statement?
15         A.   I do.
16         Q.   What is your basis to contend that, or
17    do you have a factual basis for the statement that
18    the delay in submitting master ballots was on
19    account of being reluctant to vote to accept the
20    plan?
21         A.   Well, I would say that discovery will
22    bear it out one way or the other.  But I do know
23    or -- I'd say discovery will bear it out one way
24    or another.  But I -- for example, you know, the
25    Williams Hart folks.  I mean, I believe there's
```

1                          ITKIN

2     a -- there is a document that will lay out, you

3     know, from Steve Baron to the Williams Hart folks

4     it lays out this switching of the vote and the

5     conditions as to why and an extension as to why.

6     And so, you know, I think it's a reasonable

7     assumption.  And, you know, which is part of the

8     reason we asked for discovery.

9          Q.   When you say you believe that there's a

10    document that lays that out, what's your basis for

11    that?  Have you seen such a document?

12         A.   I've not seen the document.

13         Q.   Has someone told you that such a

14    document exists?

15         A.   That was part of the conversation I had,

16    it's John Boundas after they changed their vote.

17         Q.   Have you asked him to send you that

18    document?

19         A.   I have not.

20         Q.   And other than that document that you

21    just referenced, do you have a basis, sitting here

22    today, to believe that there's any other documents

23    or information that suggests that those who

24    submitted late master ballots were reluctant to

25    vote to accept the plan?

1                    ITKIN

2       A.   Well, it's -- once again, this would be

3  subject to discovery, so --

4       Q.   Again, respectfully, I'm not -- I just

5  want to make sure that we don't belabor points

6  that we don't need to belabor.

7            I completely understand that your motion

8  is to seek discovery, so I get that.  I understand

9  that every answer could be, "We want to seek

10  discovery and this is all the reasons we want."

11  So I'm really asking you to focus your answers on

12  what facts you have sitting here today and what

13  you're aware of sitting here today.

14       A.   Well, Steve Baron, right, offered seats

15  on the TAC to -- or seat on the TAC to Williams

16  Hart.  It's my understanding that in addition to

17  that, that part of the agreement was to convince

18  others that were going to vote against

19  confirmation to vote yes.  And how that bears out

20  in discovery, I don't know, because I wasn't

21  involved in those conversations.  But that

22  certainly is a red flag to me that is something

23  that should be explored.

24       Q.   Why do you think it's a red flag?

25       A.   That gets into, I would say,

1                         ITKIN

2    attorney-client work product.  But I don't think,

3    you know, without -- I'm trying to avoid answering

4    your question without implicating work product.

5    Can you reask your question maybe a slightly

6    different way?

7         Q.   Why do you think that that's a red flag?

8    I'm using your words.

9         A.   The why I believe implicates sort of my

10   mental thoughts and impressions.  I can tell you

11   the facts that I've described to you.  That you

12   have voters.  You know, lawyers that represent

13   people who are being offered seats on a committee

14   in exchange for changing their votes and trying to

15   change the minds of others.  That is something

16   that I think, when you're looking at a vote, where

17   a large percentage of votes were late, a large

18   percent of the votes that were on time were

19   excluded.  Late votes were predominantly Yes

20   votes.  The votes that were excluded were

21   predominantly No votes.  And, you know, did I

22   think that this is an area for, as we said,

23   discovery.  It may be.  What the discovery shows,

24   we don't know, but it's an area for discovery.

25         Q.   Are you aware that the plan proponents

1                          ITKIN

2      accepted all late votes without regard -- late

3      votes that were submitted prior to the filing of

4      the initial voting declaration regardless for

5      whether they were a vote to accept or a vote to

6      reject?

7           A.   I don't know that.  I know that there

8      were votes that were accepted that were late and

9      votes that were rejected.  Votes to accept -- late

10     votes to accept -- I know there were yes and nos.

11          I'm trying to figure out a way to say

12     this.  It's going to read terribly on the

13     deposition.

14          But the answer is, I know there were yes

15     and nos that were late that were accepted.

16          Q.   But there were both votes to accept the

17     plan and votes to reject the plan that the plan

18     proponents accepted as votes prior to the voting

19     certification but after the voting deadline; is

20     that right?

21          A.   I believe --

22          Q.   Are you aware of that?

23          A.   I believe that to be correct.

24          Q.   Did Arnold & Itkin communicate directly

25     with any of the firms that filed -- that submitted

```
 1                        ITKIN
 2   late votes in connection -- let me back up.
 3            Did Arnold & Itkin communicate directly
 4   with any firms that submitted late votes after the
 5   voting deadline about their vote?
 6            MR. MORRIS:  Objection to the form of
 7        the question.
 8        A.   Some of that is protected by common
 9   interest privilege.  So the answer is yes, there
10   were communications.  The subject of those
11   communications much of which would be the common
12   interest privilege.  And then there was the
13   conversation that we discussed already with John
14   Boundas and the conversation with Jim Onder that
15   we've discussed already as well.
16        Q.   Other than those two conversations with
17   Onder and Boundas, did Arnold & Itkin have any
18   other conversations with firms that submitted late
19   votes about their vote?
20        A.   Not that wouldn't be protected by the
21   common interest privilege that I can remember.
22        Q.   So respectfully, you know, you can
23   assert -- your client can instruct, but I think
24   I'm entitled to know the who.  If there were such
25   communications, who those were with.  And if you
```

```
 1                        ITKIN
 2    want to instruct not to answer as to the
 3    substance, you can do so, but I would ask that you
 4    tell me who those other firms were.
 5              THE WITNESS:  John, you okay?
 6              MR. MORRIS:  Yes.  Yes.  This is,
 7         remember we talked about, this is akin to
 8         the privilege log?
 9              THE WITNESS:  Yes.  Okay.  I just want
10         to make sure.
11              MR. MORRIS:  You've got to give the to
12         and the from.
13              THE WITNESS:  I thought -- I thought
14         that would be your instruction, but I
15         didn't want to be the client that wasn't in
16         receipt of his lawyer.
17         A.   I would have had conversations with the
18    Aylstock firm and with what I call the Molten
19    Group.
20         Q.   And is it your understanding that the
21    Aylstock firm submitted late votes?
22         A.   You know what, I don't know that they
23    submitted late votes or not.  I'd have to look at
24    who the list of late voters were.  I did not give
25    a precise answer to your question.  I apologize
```

Page 165

1                         ITKIN
2     for that.
3          Q.    So let me ask it again.
4          A.    Sure.
5          Q.    It might be your answer might change.
6                With which firms that submitted late
7     votes has Arnold & Itkin spoken with about the
8     fact that it submitted late votes?
9          A.    Okay.  And I believe the late votes are
10    listed in a footnote to the prime clerk's
11    declaration that I don't have in front of me.  But
12    my memory would be it would only be the Williams
13    Hart firm on that list.  I think it's -- the firms
14    are Bevan, which I haven't spoken to.  Williams
15    Hart, which I have.  The Trammell law firm, which
16    I have not spoken to.  Linville I have not spoken
17    to.  And I don't remember who else is on that
18    list, but I think the correct answer without --
19    actually, on that list would be Williams Hart.  We
20    discussed that conversation.
21         Q.    In paragraph 13 of the motion it states,
22    "As far as Arnold & Itkin knows, parties who
23    submitted ballots with claimed deficiencies were
24    not given notice of the alleged defect and an
25    opportunity to cure."  Are you familiar with that

```
 1                         ITKIN
 2   statement?
 3        A.   I am.
 4        Q.   What claimed deficiencies are you
 5   referring to there?
 6        A.   It mainly refers to the social security
 7   number issue.
 8        Q.   And I think we'll get to that in a
 9   second.
10             Any other deficiencies that you're
11   referencing there other than the social security
12   number issue?
13        A.   Not as I can recall sitting here right
14   now.
15        Q.   Are you aware of any requirement under
16   the solicitation procedures for parties to be
17   given an opportunity to cure defective votes?
18        A.   I don't.  I'd have to look at the
19   solicitation procedures.  I don't know that that's
20   in there.
21        Q.   And you understand that the solicitation
22   procedures were approved by the court, right?
23        A.   I do understand that.
24        Q.   In paragraph 32 of the motion, Arnold &
25   Itkin asserts that "Movants further understand
```

1                         ITKIN

2    that one or more counsel for certain members of

3    the TCC encouraged certain claimants and/or their

4    counsel to withdraw or revoke votes made to reject

5    the plan and instead cast such ballots to accept

6    the plan implicating Rule 3018."

7              Are you aware of that statement in the

8    motion?

9         A.   I am.

10        Q.   What is that understanding based on?

11        A.   Well, Rule 3018, I am a lawyer, but

12   bankruptcy is not my -- so there's parts of this

13   that I don't know, but I believe this refers --

14   there's kind of a section in here in my

15   declaration that would refer to the Williams Hart

16   issue we discussed.

17        Q.   I'm sorry.  What do you mean the

18   Williams Hart issue?

19        A.   The late votes that the TCC encouraged

20   others to change their vote in exchange for, you

21   know, doing certain things.

22        Q.   So is your understanding based on

23   anything other than what statements you've made

24   about what you understand Williams Hart

25   communications were with the TCC?

1                      ITKIN

2       A.   So what my declaration refers to is that

3  communication that we discussed.

4       Q.   And this you can pull it up, if you'd

5  like.  Included also in this Exhibit 6 -- and I'll

6  get you the page number just so everyone is on

7  the --

8            MR. MORRIS:  I'm sorry.  Is this the

9       motion?

10            MS. QUARTAROLO:  Yeah.  So the

11       declaration is actually attached to the

12       motion.

13            MR. MORRIS:  Right.

14            MS. QUARTAROLO:  And unfortunately,

15       when these get added to the Exhibit Share,

16       I can't give you the number of the PDF, but

17       what I can give you is -- hold on.

18            MR. MORRIS:  It's just --

19            MS. QUARTAROLO:  Yeah, it's -- so

20       it's --

21            MR. MORRIS:  It's right after

22       Exhibit C.

23            MS. QUARTAROLO:  Yeah.

24  BY MS. QUARTAROLO:

25       Q.   It's at the end of Exhibit 6.  It's

```
 1                      ITKIN
 2   Docket No. 3425-4 is your declaration and an
 3   attachment.
 4            And, Mr. Itkin, I take it from the fact
 5   that your video is off that you're looking at this
 6   document?
 7        A.   I am.
 8        Q.   Okay.  And you reviewed this declaration
 9   before it was filed?
10        A.   I did.  Let me just get to it.
11        Q.   Sure.
12        A.   Oh, boy.  Okay.  I think I am -- I'm
13   there and I'm going to come back to you.  If I
14   need to get to it again, I will.
15        Q.   Sure.  I'll try to make it clear for the
16   record any references that we're making, but you
17   have access to it to the extent you want to look
18   at it.
19            Who drafted this declaration?
20        A.   I think it was a collaborative effort.
21        Q.   Between you and your counsel?
22        A.   Correct.
23        Q.   Did you review it in full before it was
24   filed?
25        A.   I did.
```

1                         ITKIN

2        Q.   And confirm it was accurate?

3        A.   I did.

4        Q.   So in number, paragraph number 4, it

5   references the exhibit to your declaration which

6   is a PVC or Preliminary Voting Certification,

7   Exhibit C, and your analysis of that.  Do you

8   recall that?

9        A.   I do.

10        Q.   Who prepared that analysis?

11        A.   I believe that's a collaborative effort

12   between my office and our lawyers.

13        Q.   Did you ensure that no votes in that

14   analysis were double counted?

15        A.   I believe the analysis is accurate.  If

16   there's something that's inaccurate, I'm happy to

17   discuss it with you.

18        Q.   Did you make an effort to eliminate any

19   double counting of votes when you did that

20   analysis?  Let me clarify.

21        A.   Sure.  I --

22        Q.   Let me clarify.

23             So you're aware -- and I think you state

24   this elsewhere in your motion -- that certain

25   firms changed their votes, they had voted one way

1                         ITKIN

2    and then changed them; is that right?

3         A.    Correct.

4         Q.    And did you account for that change when

5    you were doing your analysis?

6         A.    I believe that is accounted for, but if

7    it's not, show it to me and, you know, if the

8    analysis is wrong, it is wrong.  But I don't --

9    you know, it's math and so it's, you know,

10   there's -- I believe the analysis accounts for the

11   switching of the votes.  But if there's a mistake

12   in it, I'm happy to look at it and discuss it and,

13   you know, correct it.  But I don't believe there's

14   a mistake at this moment.

15        Q.    Sitting here today, you're not aware of

16   any mistakes?

17        A.    Correct.

18        Q.    In paragraph 5 of your declaration, it

19   states, "To the best of my knowledge, parties

20   whose ballots were excluded from the voting

21   tabulation were not given notice of the alleged

22   defects and an opportunity to cure the same prior

23   to the filing of the Preliminary Voting

24   Certification."

25              Are you aware of that statement in your

Page 172

1                        ITKIN

2    declaration?

3         A.    Yes.

4         Q.    What did you do to determine that those

5    with excluded ballots weren't given notice of the

6    alleged defects and an opportunity here?

7         A.    Well, we weren't.  I mean, we had, I

8    think, 2,000 of them.

9         Q.    That's based on your personal

10   experience?

11        A.    Correct.

12        Q.    Arnold & Itkin's.  Okay.  And that's

13   confined to the social security issue, number

14   issue that you referenced earlier?

15        A.    Yeah.  Sitting here today, I think that

16   that is the -- that's correct that there may be

17   one or two that's something else that I don't

18   remember on a, you know, a Friday afternoon, but

19   the vast, vast majority is, if not all of these, a

20   social security issue.

21        Q.    Does Arnold & Itkin have any reason to

22   believe that any of the plan proponents acted in

23   any way or manner inconsistent with the

24   requirements of the solicitation procedures order?

25        A.    I'm not sure I can answer that question.

1                           ITKIN

2       Q.   Why?

3       A.   I am not familiar enough with the

4  solicitation procedures to give you that answer

5  and then -- individually here and then to do so

6  without implicating, you know, maybe things that

7  would be attorney-client privilege.

8       Q.   Are you familiar with the requirements

9  of the solicitation procedures order?

10       A.   I am, but I'm not a bankruptcy expert,

11  and my memory of the solicitation procedures is

12  that they're -- you know, it's not a one-page

13  document and so I don't feel comfortable opining

14  on the solicitation procedures and how they relate

15  to conduct in a bankruptcy vote solicitation.

16       Q.   So let me ask it slightly differently.

17       A.   Sure.

18       Q.   Sitting here today, do you believe that

19  any of the plan proponents acted in any way

20  inconsistent with the solicitation procedures

21  order?

22       A.   Like I said, I can't answer that

23  question one way or the other.  I think there's

24  discovery that needs to be done and I do not

25  feel -- I'm not an expert on solicitation

1                          ITKIN

2    procedures.

3         Q.    I'm not asking you, respectfully,

4    Mr. Itkin, and we'll be here for a long time if we

5    can't get answers to questions, but I'm trying to

6    move this forward.

7              I'm just asking for your information as

8    the declarant in support of a motion, sitting here

9    today, are you aware of anything?

10        A.    That wasn't my -- that wasn't part of my

11   declaration, and I've given you my answer.

12        Q.    I'll ask it one more time.

13             Sitting here today, are you aware of any

14   information that would suggest that the plan

15   proponents acted in any way inconsistent with the

16   solicitation procedures order?  It's a yes-or-no

17   question.

18        A.    I've given you my answer.

19        Q.    I disagree and we'll take that up later.

20             In your declaration in paragraph 5 you

21   state that 2200 votes cast by Arnold & Itkin on

22   behalf of its clients were excluded largely

23   because the master ballot stated that counsel did

24   not have the last four digits of the social

25   security numbers for the applicable claimants.  Do

```
 1                          ITKIN
 2   you recall that?
 3         A.    I do.
 4         Q.    You were aware, weren't you, that social
 5   security numbers were required for master ballot,
 6   correct?
 7         A.    That is part of the requirements and I
 8   appreciate them.
 9         Q.    It is part of --
10         A.    Yes, that is part of, I believe that was
11   one of the voting requirements.
12         Q.    And for many of the claimants that
13   Arnold & Itkin voted on behalf of, it did submit
14   social security numbers, right?
15         A.    Correct.
16         Q.    Why did Arnold & Itkin not submit social
17   security numbers on behalf of the other clients,
18   those other 2200 clients?
19         A.    Yeah, I can't answer that question
20   without implicating attorney-client or work
21   product privilege.
22         Q.    Does Arnold & Itkin have the social
23   security numbers for those 2200 claimants?
24         A.    For some we do and there's probably some
25   that we do not.
```

ITKIN

1

2     Q.    Did Arnold & Itkin make any effort

3     between the time that it -- let me back up.

4            Does Arnold & Itkin collect social

5     security numbers as part of its intake for

6     clients?

7     A.    I'm not going to answer that question

8     under attorney-client or work product privilege.

9            MS. QUARTAROLO:  Apparently Alexa is

10           talking to me.

11           MR. MORRIS:  She wants to know how

12           much longer.

13           MS. QUARTAROLO:  We'll see.

14    BY MS. QUARTAROLO:

15    Q.    I'm sorry.  Your answer was, you won't

16    answer that question?

17    A.    Yeah, that invokes privilege.

18    Q.    So whether or not you have social

19    security numbers for individuals as part of the

20    intake process you believe invokes privilege?

21    A.    Yeah, our intake process is confidential

22    and privileged.

23    Q.    As part of -- actually, let me back up.

24           So Arnold & Itkin voted on behalf of

25    7,355 claimants in the Imerys bankruptcy, right?

1                         ITKIN

2        A.    I believe that's the right number, yes.

3        Q.    And some portion of those Arnold & Itkin

4   represents in the MDL proceeding?

5        A.    Some of those claims are filed in the

6   federal MDL, correct.

7        Q.    And you're aware that for purposes of

8   the MDL, you have to submit a social security

9   number for a claimant, right?

10       A.    There are requirements in the MDL for

11  certain information you're supposed to provide.

12  I -- there are requirements, yes.

13       Q.    And has Arnold & Itkin submitted social

14  security numbers for its claimants in the MDL?

15       A.    I'm not aware that we have any

16  deficiencies in the MDL right now.  If there are

17  some, it's not something I looked at today to tell

18  you yes or no because it seemed not within the

19  scope of what we're here to talk about.  But

20  sitting here today, I'm not aware of anyone saying

21  that we have deficiencies in any of the

22  information we're supposed to provide within the

23  MDL.

24             And I would say, if there are

25  deficiencies, we're probably undertaking a process

1                         ITKIN

2    to cure whatever they are.  I don't know.  I don't

3    have that information in front of me.

4         Q.   And I think you might have --

5              MS. QUARTAROLO:  If someone is not on

6         mute, could you just go ahead and put

7         yourself on mute?  Thanks.  We're getting

8         some background noise.

9    BY MS. QUARTAROLO:

10        Q.   You may have answered that you're not

11   going to answer this question because of

12   privilege, but I'm going to make sure the record

13   is clear.

14             Why did Arnold & Itkin not include

15   social security numbers in connection with the

16   master ballot for those claimants that did not

17   have a social security number listed on the master

18   ballot?

19        A.   I think we asked that question and we

20   did invoke the privilege.

21             MR. MORRIS:  Right.

22        Q.   In paragraph 8 of your declaration it

23   says:  Based on my understanding of the

24   approximate number of clients of the eight firms

25   other than the Bevan firm that were permitted to

1                        **ITKIN**

2    submit host voting deadline ballots, it appears

3    Bevan ultimately -- excuse me -- untimely cast the

4    lion's share of the late votes accepting the plan.

5    Are you familiar with that?

6         A.    I am.

7         Q.    And what is the basis for that

8    understanding?

9         A.    It's math.  I mean it's -- I think Bevan

10   is 15,000 roughly votes.  The other firms, I

11   believe -- I don't have the Prime Clerk

12   declaration in front of me, but I think it's like

13   18,000 total.  So if you figure out 15,000 minus

14   3,000.  And I believe Prime Clerk at some point

15   had a second supplemental, maybe a second or third

16   declaration, where they clarified that Bevan

17   was -- should have switched from a no to a yes.

18        Q.    In paragraph 9 of your declaration you

19   state:  Upon information and belief, I understand

20   that with the plan potentially facing the risk of

21   rejection by Class 4, the plan proponents,

22   particularly one or more attorneys who were

23   members of the TCC, arranged to extend the voting

24   deadline for counsel who expressed an inclination

25   to vote to reject the plan on behalf of their

1                          ITKIN

2     client claimants in order to obtain more time to

3     convince such counsel to vote for the plan.

4              Are you familiar with that statement in

5     your declaration?

6          A.    I am.

7          Q.    And what is the basis for your

8     information and belief?

9          A.    This is, we've discussed this with the

10    Williams Hart and switching their vote and being

11    asked to get others to switch their vote.

12         Q.    Any basis for this information and

13    belief other than the conversation you've referred

14    to with Williams Hart?

15         A.    My declaration refers to that Williams

16    Hart conversation.  There may be other information

17    that I have post-declaration, but that would be

18    privileged.

19         Q.    Well, I think your counsel will agree

20    with me that facts are not privileged, regardless

21    of their source.

22              So, I'll ask you, what facts do you have

23    that support or refute this information and belief

24    that you have obtained after the declaration was

25    filed?

1                    ITKIN

2       A.    Facts, all I have is conversations, and

3  those conversations would implicate privilege and

4  I am not going to waive privilege.

5       Q.    Okay.  Again, I'll just state for the

6  record -- I'm not going to argue with you -- facts

7  are not privileged.  I'm asking you for your

8  facts.  If you're telling me that you're not

9  prepared to give them, we'll talk about it

10 offline.

11      A.    I'm telling you, yeah, the declaration

12 refers to the Williams Hart conversation which

13 I've shared with you.

14      Q.    And just to make sure the record is

15 clear.

16            You've indicated that you have

17 additional information that you've obtained since

18 the filing of your declaration and I'm asking you

19 what information is that.

20      A.    And I'm telling you, I can't tell you

21 that information without implicating privileged

22 conversations.

23      Q.    We'll take that up offline.

24            Are you aware of any counsel or

25 claimants who requested an extension of the

```
 1                        ITKIN
 2    deadline to vote on the plan and were denied an
 3    extension?
 4         A.    I'm not aware one way or the other.
 5         Q.    Are you aware of any counsel or claimant
 6    for whom an extension was conditioned on whether
 7    their ultimate vote would be to accept or reject
 8    the plan?
 9         A.    I don't -- I don't have factual
10    knowledge of that.
11         Q.    You have some other knowledge other than
12    factual knowledge?
13         A.    Of whether an extension was given with
14    the -- but it was conditioned upon voting in favor
15    of the plan, is that the question?
16         Q.    Sure.
17         A.    I don't -- I'm not -- I don't have
18    information I can testify to about that.
19         Q.    In paragraph 9 you go on to say:  It is
20    my understanding that the plan proponents used
21    their ability to extend the voting deadline as a
22    tool in aid of soliciting votes to accept the plan
23    from counsel who might otherwise have voted to
24    reject the plan and forced to choose by the voting
25    deadline.
```

1                        ITKIN

2            What is the basis for that

3      understanding?

4            A.    This is in declaration paragraph 9?

5            Q.    Correct.

6            A.    Let me look at it real quick.

7            Q.    Yep.  It's the second sentence.

8            A.    This is the -- this refers to the

9      Williams Hart conversation that we discussed.

10                MS. QUARTAROLO:  Someone's not on mute

11           again.

12                THE WITNESS:  I think it's a

13           conversation in my hallway.  If we take a

14           break, I'm going to mute and tell them to

15           move down the road.

16                MS. QUARTAROLO:  Sure.

17                THE WITNESS:  Okay.

18                (Whereupon, off the record.)

19                (Whereupon, resumed.)

20      BY MS. QUARTAROLO:

21           Q.    So you said that the last sentence of

22      paragraph 9 is based on your conversation with

23      Williams Hart; is that correct?

24           A.    The last -- I'm sorry, I've switched you

25      back to the screen.

1                    ITKIN

2        Q.    Yeah, no problem.

3        A.    Correct.

4        Q.    And what specifically -- this was a

5    conversation with John Boundas; is that right?

6        A.    Correct.  There's a conversation

7    afterwards where the sort of terms of the

8    agreement were laid out.  I think we talked about

9    it.  Seat on the TAC.  You change your vote to

10   yes.  You go solicit these other people that would

11   otherwise vote no to change it to yes.

12       Q.    Was there anything communicated as part

13   of that conversation that you haven't spoken about

14   in your testimony today?

15       A.    I don't think so.  I felt we've talked

16   about it a bunch.

17       Q.    Paragraph number 10 reads:  Upon

18   information and belief, I understand that at least

19   one of the firms that ultimately late voted in

20   favor of the plan had previously indicated to

21   their clients that they had planned to vote

22   against confirmation.

23       A.    Correct.

24       Q.    What firm were you referring to?

25       A.    So there were two firms.  This would

ITKIN

1

2    be -- but this is, one of them, I would say, my

3    declaration is potentially incorrect about.  And

4    so one would be the Onder firm.  But in the course

5    of sorting through some of the dual rep issues, I

6    saw a communication from the Onder firm that would

7    cast -- it would be different from what my

8    understanding was at the time I filled out the

9    declaration.  And the other one is the Williams

10   Hart firm.  But once again, the reason it's upon

11   information and belief is I have not seen the

12   communications with their clients and so I

13   don't -- it's upon information and belief for that

14   reason.

15        Q.   So at the time you signed the

16   declaration, you were referring to both the

17   Williams Hart firm and the Onder firm in

18   paragraph 10?

19        A.   Correct.

20        Q.   And you still believe that is the case

21   but you haven't seen the information, the actual

22   communications as to Williams Hart; is that right?

23        A.   I believe it to be the case, but it's --

24   either it is or it isn't.  I mean, it's -- and

25   that's why I think it's conditioned with the upon

                                        Page 186

1                           ITKIN

2    information and belief.

3         Q.   And for the Onder firm, you indicated

4    that what you -- including them in paragraph 10

5    may not be correct -- and I'm not trying to put

6    words in your mouth but that was my impression.

7    So I want to ask you what led you to believe that

8    Onder is not part of what you're referring to in

9    paragraph 10 of your declaration.

10        A.   He may very well be, I don't know.  But

11   my understanding was that he had communicated --

12   let me do it this way.

13             Prime Clerk.  There was inconsistent

14   votes where the same client was voted by two

15   firms.  And then the Prime Clerk directed

16   everybody to sort of try to see if they could work

17   it out.  And one of those firms, one of the

18   clients was -- signed representation agreements

19   with both the Onder law firm and our law firm.

20   And Onder obviously voted in favor and we voted

21   against.  And Onder's firm provided a document

22   that indicated something along the lines of Onder

23   had authority to vote, but it didn't say, at least

24   to my reading of it, which way he would vote.  And

25   so my understanding about the -- I don't know if

Page 187

```
1                        ITKIN
2    that was specific to that one particular client or
3    if that is something he sent to the
4    twenty-whatever-thousand people that he
5    represents.  And I don't know that and don't want
6    to speculate about that in the deposition.  But
7    that would indicate to me potentially that that
8    portion of the declaration, you know, at least in
9    part, could potentially be inaccurate.
10        Q.   But sitting here today, do you have any
11   basis to believe that Onder indicated to his
12   clients that they had planned to vote against
13   confirmation?
14        A.   Ask that one more time.
15        Q.   Sure.  Sitting here today, do you have
16   any information that suggests that Onder indicated
17   to his clients that he had planned or the firm had
18   planned to vote against confirmation?
19        A.   My understanding at the time of the
20   declaration was that they had -- my understanding
21   having read the document, it calls into question
22   as to whether my understanding was accurate.
23        Q.   And this document is this email that
24   you're referring to?
25        A.   It was a -- it's an actual -- I don't
```

```
 1                         ITKIN
 2   know if it was an email, but it's a -- it's like a
 3   communication from the Onder law firm to a client
 4   that indicates that the Onder law firm intends to
 5   vote, but instead of saying, "We're voting against
 6   confirmation," it just it was, it didn't say one
 7   way or the other, it was just we have the
 8   authority to vote.
 9        Q.   And you said that at the time that you
10   filed your declaration you believed that Onder had
11   indeed told his clients that they planned to vote
12   against confirmation; is that right?
13        A.   Correct.  I was not surprised to see a
14   document from Onder to his clients about voting in
15   the bankruptcy.  I was just surprised -- surprised
16   that it -- surprised may be the wrong word, but it
17   didn't have what I expected it to be in the
18   document.
19        Q.   My question for you is:  What was your
20   understanding based on that Onder had indicated to
21   his clients that he planned to vote against
22   confirmation on behalf of those claimants?
23        A.   That would have been -- what was my
24   understanding that he -- I'm speculating a little
25   bit.  I'm struggling because I'm having trouble
```

1                       **ITKIN**

2    remembering the exact way it came up.  But my best

3    memory here this afternoon is that when he told me

4    that he was voting, that he had voted in favor of

5    the plan, that there was mention of the fact that

6    he did not think that it mattered that he had --

7    maybe it said something in writing beforehand that

8    he was going to vote -- communicated something in

9    writing that he was going to vote against the

10   plan.

11        Q.   And that's the basis for your

12   understanding to the extent you're referring to

13   Onder in paragraph 10?

14        A.   Correct.

15        Q.   In paragraph 11 of your declaration you

16   note:  I understand that one or more counsel for

17   certain members of the TCC encouraged claimants,

18   certain claimants and/or their counsel to withdraw

19   or revoke votes made to reject the plan and

20   instead cast such ballots to accept the plan.

21             What is the basis for that

22   understanding?

23        A.   Let me look at this one more time

24   because -- I'm not picking on you -- you read it

25   kind of fast.

```
 1                      ITKIN
 2           This is back to the Williams Hart issue.
 3      Q.    That's based on your conversation with
 4   John Boundas?
 5      A.    Correct.
 6      Q.    You had indicated a few moments ago the
 7   issue with duplicate votes.  Do you recall that?
 8      A.    I do.
 9      Q.    And do you know for how many of the
10   claims that Arnold & Itkin voted the 7355, how
11   many of those another firm also voted on behalf of
12   that same claimant?
13      A.    I don't offhand.  There's a number from
14   Prime Clerk and I want to say it's like in the
15   thousand range, but it's also something that's
16   just it's a number.  I don't know what it is
17   offhand, no.  Someone can look it up and say it.
18   It may be 1100, but I don't, I don't -- I don't
19   know for sure.
20      Q.    At the time that Arnold & Itkin
21   submitted its master ballot on behalf of those
22   claimants, did it take -- had it taken steps to
23   ensure that those claimants were not represented
24   by some other law firm?
25      A.    So questions about our intake process
```

1                        ITKIN

2     and how we, you know, communicate with counsel --

3     with our clients I think is proprietary work

4     product and attorney-client privilege, so I'm not

5     going to answer your question as phrased.

6         Q.   So other than anything Arnold & Itkin

7     would have done during the intake process, did

8     Arnold & Itkin take any steps prior to submitting

9     its master ballot to ensure that claimants that

10    were listed on the master ballot submitted by

11    Arnold & Itkin were not separately represented by

12    another law firm?

13        A.   Let me do it this way.  We had a

14    good-faith basis for every client that we voted

15    believing that they were our clients, we had the

16    right to vote for them.

17        Q.   Respectfully, that doesn't answer my

18    question.  I'm asking if you did anything prior to

19    submitting the master ballot that gave you that

20    good-faith basis that you contend you had.

21        A.   What you're asking me for implicates

22    attorney-client communications.  It implicates

23    work product.  It implicates proprietary things to

24    our law firm that all of which respectfully you

25    were, you know, not entitled to divulge into.  But

```
 1                      ITKIN
 2   I can tell you that when we voted, we had a
 3   good-faith basis to believe that the clients --
 4   that we had authority to vote for the clients and
 5   that we were voting on their behalf and in their
 6   best interest.
 7         Q.   Now you're using the term good faith.
 8         A.   I think it was your term, but either
 9   way.
10         Q.   What is the basis for that good-faith
11   belief that you had?
12         A.   Yeah, I'm not going to get into
13   attorney-client privilege.
14         Q.   You're claiming privilege over all
15   things that relate to Arnold & Itkin's good-faith
16   belief that it had the authority to vote on behalf
17   of the claimants that are on its master ballot; is
18   that right?
19             MR. MORRIS:  It's the work product
20         portion is the process by which Arnold &
21         Itkin and those working on its behalf
22         created the master ballot and --
23             MS. QUARTAROLO:  Respectfully, John,
24         you can object.  You can object to form.
25         You can state that you think it's work
```

1                        ITKIN

2       product.

3               MR. MORRIS:  I do.

4               MS. QUARTAROLO:  There's been way too

5       many speaking objections today and we need

6       to cut it out and get on with the depo.

7               MR. MORRIS:  There's been very few,

8       but okay, go ahead.

9   BY MS. QUARTAROLO:

10      Q.   When Arnold & Itkin was made aware by

11  prime clerk that votes that it had submitted, some

12  other law firm had also submitted a vote on behalf

13  of those claimants, what did Arnold & Itkin do in

14  an attempt to resolve that issue?

15      A.   Typically there were conversations

16  between someone at our firm and someone at the

17  other firm and the issues were usually worked out.

18      Q.   Who was in charge of those

19  conversations?

20      A.   For different firms they had

21  different --

22      Q.   I'm sorry.  On behalf of Arnold & Itkin

23  who was in charge of those conversations?

24      A.   It would have primarily been Brittany

25  Clark and Noah Wexler.

1                    ITKIN

2        Q.   And you said they worked it out, how did

3   they work it out?

4        A.   Typically there's a conversation between

5   the two law firms and they usually come to an

6   agreement over who should go forward and represent

7   a client.  The client consents, obviously, because

8   the client, you know, also has a say in who they

9   want to be their lawyer.  And then one of us, one

10  of the firms would have authority to, you know,

11  prosecute the case and to vote.

12       Q.   And did Arnold & Itkin, in fact, go back

13  to all of the claimants on who were included on

14  that list of duplicative claims to confirm that

15  that client wanted Arnold & Itkin to be its

16  counsel?

17       A.   I don't think we can go back.  We'd have

18  to go client by client and I'm not -- you know,

19  we, I guess, could do that.  I'm not prepared to

20  talk to you about each individual client.  But

21  generally the process was, check in with the

22  client, check in with the other law firm, and

23  something is worked out.  And I believe it was

24  worked out, if not for all of the cases where

25  there were dual reps, as they're called in the --

```
 1                     ITKIN
 2   you know, I think they're colloquially called,
 3   too, it was worked out for the vast majority of
 4   the dual reps pretty amicably and pretty easily.
 5          Q.    Did Arnold & Itkin propose a solution to
 6   work it out to those other firms?  When you say
 7   they worked it out amicably, how did they do so?
 8          A.    I mean, I think each law firm in each
 9   situation is a different, you know, would be
10   different based on the facts and circumstances.
11   And --.
12          Q.    Do you know if that outreach was in
13   writing or orally?
14          A.    It probably was both.
15          Q.    Did Arnold & Itkin discuss having its
16   claimant vote count as the final vote for
17   confirmation purposes rather than the other firm's
18   vote?
19          A.    I didn't anticipate this would
20   necessarily be a part of the 30(b)(6) notice, but
21   my sense is that was a topic of conversation in
22   all of those discussions because the reason for
23   the impetus for these discussions would be that
24   they were two votes for the same client, so
25   someone had to figure out who's going to vote on
```

Page 196

1                           ITKIN
2    the client's behalf.
3        Q.   Were there any of those discussions
4    where Arnold & Itkin agreed that the other firm
5    could vote that claim?
6        A.   I haven't looked for it claim by claim
7    but I assume they probably were.
8        Q.   Were you involved in the communication
9    back to Prime Clerk where Arnold & Itkin notified
10   Prime Clerk that it indeed had authority to vote
11   on behalf of all of its claims?
12       A.   I'm not sure there was that
13   communication.
14            Well, let me say this:  I may have been
15   copied on communications to the Prime Clerk.  If
16   you have something you want to show me, I'm happy
17   to look at it and see.
18            But if you're talking about the
19   situation we were just talking about, dual reps, I
20   believe there were communications to Prime Clerk
21   about that and I believe I was copied on some of
22   it.  But I don't think that I primarily was the
23   one communicating with Prime Clerk.
24       Q.   Who was the one primarily communicating
25   with Prime Clerk regarding the inconsistent or

1                         ITKIN

2     duplicate votes?

3          A.    On our behalf it would most -- it would

4     either be bankruptcy counsel or Brittany Clark.

5     It may have been somewhat Noah Wexler.

6          Q.    In resolving and working out these

7     issues with the other law firms, did A&I propose

8     that it should be deemed lead counsel?

9          A.    Once again, you'd have to go firm by

10    firm and case by case and fact by fact.  In some

11    of those we would be lead counsel for sure.

12         Q.    Do you know if that was suggested to all

13    of the other firms in resolving those issues?

14         A.    I can't tell you one way or the other.

15    It would be typical that we would be lead counsel,

16    though.

17         Q.    Did Arnold & Itkin offer to split any

18    attorney fees recovered with other firms in

19    exchange for it being permitted to vote on behalf

20    of the claimant?

21         A.    Not the way you phrased, probably not.

22    They're typically in a dual rep situation.

23    There's usually a split of attorney's fees.

24    Especially if both sets of lawyers have done work

25    on a case.  But the way you phrased the question,

```
 1                    ITKIN
 2   it sounds like we were asking, you know, giving
 3   fees for the right to vote and that I don't, I
 4   don't think that is what happened.
 5        Q.   Did you review all of the communications
 6   that were sent out to the other law firms
 7   regarding working these issues out?
 8        A.   No.  I mean, this is primarily handled
 9   by other people in my law firm and usually other
10   people in the other plaintiffs' law firms.
11        Q.   Do you know if Arnold & Itkin, in fact,
12   did agree to split fees in connection with working
13   these issues out with the other law firms?
14        A.   I've not really drilled down on it, but
15   it would -- you know, if you want me to kind of
16   guess on it on a Friday afternoon, I would
17   probably tell you that I would be -- that I'd
18   assume that we would do that because that's what
19   typically happens in situations where dual
20   representation occurs.
21        Q.   Did Arnold & Itkin offer to advance
22   expenses on any cases in connection with A&I being
23   permitted to vote on behalf of the plaintiff?
24        A.   You keep saying vote on behalf of the
25   claimant.  If we were going to be lead counsel in
```

1                    ITKIN

2  the case, we would typically advance expenses.

3  But, you know, I think the implication that you're

4  trying to -- I don't know if you're trying to or

5  not, but usually there's a deal worked out with

6  dual reps and usually the deal involves between

7  the lawyers fees and expenses who's going to pay

8  for what going forward and sometimes even going

9  backwards.  And so I suspect that if you went

10  through each of the situations that there would be

11  different deals between the law firms on different

12  cases and they are what they are.

13      Q.    Did Arnold & Itkin offer to reimburse

14  any other law firm for previously incurred

15  expenses in connection with being permitted to

16  vote on behalf of the claimant?

17      A.    You keep asking permitted to vote, and

18  it -- you know, I don't know if that's intentional

19  or not, but I'd have to look case by case.  I'm

20  not sure if this is even within the scope of the

21  30(b)(6) notice, but I'll let my counsel --

22      Q.    Just a reminder, Mr. Itkin, you're also

23  here in your individual capacity.

24          MR. MORRIS:  Yeah, for purposes of the

25      declaration and the voting and solicitation

```
 1                    ITKIN
 2        issues for sure.
 3        Q.   What did Arnold & Itkin do to confirm
 4   that a particular claimant wanted Arnold & Itkin
 5   to vote on his or her behalf as opposed to having
 6   another firm vote on its behalf?
 7        A.   I'm not going to get into the
 8   attorney-client communications or work product.
 9        Q.   You won't answer that?
10        A.   Correct.
11        Q.   Did any law firms reject the proposal by
12   Arnold & Itkin to be lead counsel?
13        A.   Once again, like this is -- I'll defer
14   to counsel about whether this is permitted area of
15   inquiry, but I'm sure that there were, there were
16   not.  It wouldn't surprise me if there's both.
17             MR. MORRIS:  Yeah, if it's subject to
18        privilege, if you're communicating with
19        co-counsel, then I would assert the
20        privilege.  It's a fair question to ask,
21        but if the answer is subject to a
22        privilege, we assert the privilege.
23             MS. QUARTAROLO:  I guess, just for a
24        clean record, I'll ask the question again.
25
```

1                          ITKIN

2    BY MS. QUARTAROLO:

3         Q.   Did any firms reject the proposal by A&I

4    to be lead counsel in connection with working out

5    the issues regarding duplicative votes?

6         A.   I'd have to look on a case-by-case

7    basis.  There may be, there may not be.

8         Q.   Sitting here today, you don't know?

9         A.   Correct.

10        Q.   Did any firms agree to let Arnold &

11   Itkin's vote supercede any vote that the other

12   firm had submitted?

13        A.   Again, we'd have to go look case by

14   case.  I suspect that would be the case if we were

15   lead counsel.

16        Q.   And do you know if any firm -- if A&I

17   agreed to let any other firm supercede the vote

18   cast by A&I?

19        A.   Once again, we'd have to go case by

20   case, and I don't know.  But if we weren't lead

21   counsel and somebody else was, they would vote a

22   different way, then I suspect they would vote how

23   they vote.

24        Q.   But sitting here today you don't know?

25        A.   I've not gone through it.  I mean, it

```
 1                        ITKIN
 2   is, once again, someone's lead counsel, someone's
 3   not, and the vote on the case is what the vote on
 4   the case is.
 5              MS. QUARTAROLO:  Okay.  Let's just --
 6         I think I'm almost done.  Let me just look
 7         through my notes.  Give me three minutes
 8         and we'll wrap up, at least with my
 9         questions.
10              MR. MORRIS:  Okay.
11              (Whereupon, off the record.)
12              (Whereupon, resumed.)
13              MS. QUARTAROLO:  Mr. Itkin, thank you
14         for your time today.  I have no further
15         questions.  I understand that counsel for
16         Johnson & Johnson has what he's represented
17         to be one question.
18              MR. MORRIS:  He's got one shot.
19              MR. TSEKERIDES:  That's it.
20                      EXAMINATION
21   BY MR. TSEKERIDES:
22         Q.   Hi, Mr. Itkin.  Ted Tsekerides from Weil
23   Gotshal for J&J.
24              And my one question is:  Do you know if
25   Mr. Onder was promised anything in exchange for
```

1                         ITKIN

2    voting in support of the plan?

3         A.    I don't know.

4              MR. TSEKERIDES:  Okay.  Fair enough.

5         One question.  That's it.  Thank you.

6              THE WITNESS:  Thank you, sir.

7              MS. QUARTAROLO:  Off the record.

8              (Whereupon, off the record.)

9              (Whereupon, deposition adjourned 6:17

10        p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 204

1

2                 C E R T I F I C A T E

3

4        I, JOSEPHINE H. FASSETT, a Registered

5   Professional Reporter, Certified Court Reporter, and

6   Notary Public within and for the State of New York

7   and New Jersey, do hereby certify that the witness,

8   whose stenographic remote virtual deposition is

9   hereinbefore set forth, was first duly sworn by me

10  on the date indicated, and that the foregoing

11  stenographic remote virtual deposition is a true and

12  accurate record of the testimony given by such

13  witness.

14       I FURTHER CERTIFY that I am not employed by nor

15  related to any of the parties to this action by

16  blood or marriage, and that I am in no way

17  interested in the outcome of this matter.

18       IN WITNESS WHEREOF, I have subscribed my hand

19  this 7th day of June 2021.

20

21

22  _____

        JOSEPHINE H. FASSETT, CCR, RPR

23      CCR License No. 30XI00098400

        NCRA License No. 32148

24      New Jersey Notary Public

        New York Notary Public

25

Page 205

1

2                    CERTIFICATION OF WITNESS

3

4        I, JASON ITKIN, hereby certify that I have read

5    the transcript of my testimony taken under oath in

6    my stenographic remote virtual deposition of June 4,

7    2021, and that the transcript is a true, complete

8    and accurate record of my testimony, and that the

9    answers on the record as given by me are true and

10   correct, subject to the changes/corrections, if any,

11   shown on the attached page.

12

13

                    _____

14                        JASON ITKIN

15

16   Subscribed and sworn to before me this_____ day

17   of_____, 2021.

18

19                  _____

                    Notary Public State of

20

21

22

23

24

25

Page 206

**ERRATA SHEET**

CASE:  IMERYS TALC AMERICA, INC., ET AL.

DATE:  JUNE 4, 2021

WIT.:  JASON ITKIN

PAGE LINE(s)          CHANGE                    REASON

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

_____

JASON ITKIN

Subscribed and sworn to before me this_____ day

of_____, 2021.

_____    _____

      Notary Public            My Commission Expires

| & |
|---|
| **&**   3:4 4:4,12 5:5 |
| 5:15 6:5,14 7:12 |
| 7:19 8:4,12 9:12 |
| 11:12,13 12:11 |
| 13:3,4 14:11,16,20 |
| 14:23 15:6 16:12 |
| 18:4 19:21 20:15 |
| 25:7 26:13 29:3,5 |
| 34:23 35:3,8,9 |
| 59:17,21,24 61:8 |
| 61:20 62:4,13,15 |
| 62:16,19 63:5,13 |
| 64:24 65:18,23 |
| 66:10,19 68:9,23 |
| 69:9,21 70:7,13,19 |
| 70:23 71:12 72:19 |
| 73:11 74:10,16,18 |
| 74:20,23,25 75:8,9 |
| 75:13,23 76:7,15 |
| 76:19,22,25 77:18 |
| 77:24 79:13 80:9 |
| 81:9,25 82:10 |
| 83:5 84:4 85:23 |
| 86:11 87:18 88:15 |
| 89:7,21,22 90:6,16 |
| 90:21 91:23 92:11 |
| 92:17,22 93:8 |
| 94:10,16,21 95:2 |
| 95:22 96:8 97:18 |
| 98:7,7 99:13 |
| 100:17 101:10,17 |
| 102:8,9,11,12,18 |
| 105:3,4,7,8,21,22 |
| 106:3,23 107:16 |
| 108:21 111:24 |
| 112:14 113:24 |
| 114:10 115:4 |
| 118:8 119:7 |
| 122:22 123:11,15 |
| 125:4,8 127:8,23 |

128:13 129:6
130:3,5,17 131:10
132:19 133:11
134:11,17,25
135:9,19 136:3
137:22 139:11,24
140:14,17,20
141:3,11,12,15,19
142:10,17 144:24
145:16,17,21,24
145:25 151:3,9
152:22 153:21
154:6,11 157:17
158:9 162:24
163:3,17 165:7,22
166:24 172:12,21
174:21 175:13,16
175:22 176:2,4,24
177:3,13 178:14
190:10,20 191:6,8
191:11 192:15,20
193:10,13,22
194:12,15 195:5
195:15 196:4,9
197:17 198:11,21
199:13 200:3,4,12
201:10 202:16

| 0 |
|---|
| **07940**   7:21 |

| 1 |
|---|
| **1**   14:10 17:25 18:5 |
| 19:11 20:9 30:5 |
| 31:10 32:2 62:21 |
| 87:12 |
| **10**   20:10 50:17 |
| 94:3 158:8 184:17 |
| 185:18 186:4,9 |
| 189:13 |
| **100**   81:13 |

**1000**   12:13
**10004**   7:14
**10017**   8:6
**10019**   5:17
**10019-6099**   6:16
**10153**   11:15
**11**   1:5 15:13,16
115:4 122:8,19
151:15,17 153:2,4
157:18 158:2,7
189:15
**1100**   5:7 190:18
**12**   79:15 82:9
**125,000**   107:18
**13**   135:16 165:21
**15,000**   153:22
155:11,19 156:19
157:7 179:10,13
**1500**   10:13
**151**   15:4
**16**   14:5 135:24
**1650**   6:6
**1700**   4:14
**17th**   13:6
**18**   14:10 63:8
154:11 155:3
157:16
**18,000**   179:13
**1801**   9:13
**1875**   8:13 10:6
**1885**   10:13
**19**   79:12
**19-10289**   1:6
**19103**   6:8
**19801**   4:6 9:7 11:8
12:14
**19899-8705**   13:7
**1:04**   1:13 2:3,7

| 2 |
|---|
| **2**   4:13 14:12 23:18 |
| 23:21,25 95:8,19 |
| **2,000**   172:8 |
| **20**   63:3 84:6 |
| 136:11 |
| **20003**   7:7 |
| **20004**   12:6 |
| **20005-5802**   5:8 |
| **20006**   10:7 |
| **20006-1251**   8:15 |
| **2004**   62:21 85:24 |
| 86:9 |
| **2017**   63:18 75:7 |
| **2019**   14:18,21,24 |
| 64:15 65:7,15 |
| 66:14 69:6,12,18 |
| 69:22 70:5,12 |
| 71:12 72:11 77:12 |
| 77:19,23 79:14 |
| 80:7 82:5,15,19,23 |
| 83:7 84:6 85:3 |
| 86:3,6,12 87:16 |
| 88:17 90:17,22 |
| 92:13,18 94:22 |
| 95:20 |
| **202**   14:6 |
| **202.463.2400**   12:7 |
| **202.469.7750**   8:16 |
| **202.663.8000**   10:8 |
| **202.772.2200**   7:8 |
| **202.862.5000**   5:9 |
| **2020**   77:23 79:15 |
| 82:9 83:6 88:17 |
| 89:10 |
| **2021**   1:12 2:2,7 |
| 36:18 85:25 86:7 |
| 87:15 89:24 90:23 |
| 91:22 92:9,11 |
| 204:19 205:7,17 |
| 206:4,22 |

**21**   20:10 92:2
**210**   9:6
**212.310.8000**
   11:16
**212.403.1000**   5:18
**212.728.8000**   6:17
**212.837.6000**   7:15
**212.935.3000**   8:7
**213.485.1234**   3:7
**22**   85:24 86:7
   87:15
**2200**   174:21
   175:18,23
**2207**   11:7
**23**   14:12 20:10
   33:19
**25**   90:23 92:2,9,11
**252**   95:8
**26**   20:10
**267.319.7900**   6:9
**26th**   9:14
**2798**   80:12 82:8
**2800**   80:8
**29**   20:10

**3**

**3**   14:16 77:17,20
   77:23 79:12 83:8
**3,000**   84:18 88:4
   179:14
**3,186**   87:10
**30**   18:2 30:16,19
   33:17 63:3 65:12
   71:21 195:20
   199:21
**300**   9:5
**3018**   167:6,11
**302.571.6600**
   12:15
**302.573.6485**   11:9
**302.651.7700**   4:7

**302.652.4100**   13:8
**302.824.7089**   9:8
**30xi00098400**
   204:23
**310.407.4000**   9:16
**312.269.8000**   4:16
**3186**   89:20
**32**   166:24
**32148**   204:23
**3425-4**   169:2
**35**   97:4
**355**   3:5 93:10,16
**3600**   6:7
**38**   97:4
**388**   88:8,13,16
   89:8

**4**

**4**   1:12 2:2,7 14:19
   20:9 85:22 86:12
   90:8 95:6,20
   110:22 111:25
   112:16 113:25
   114:12 170:4
   179:21 205:6
   206:4
**40**   96:5,11,19,25
   97:5,19 98:8
**40,000**   107:18
**40/40/20**   38:14
   60:3,6,22 61:3
   114:4 125:22
   126:5,24 127:24
   132:3,16,22 133:3
   133:21 134:10,18
   135:25 136:5
**408**   133:24
**4612362**   1:21
**4880**   204:21

**5**

**5**   14:22 20:9 90:14
   90:17,20 92:13
   93:12 94:12,19
   153:20 171:18
   174:20
**5,000**   84:21
**51**   5:16
**523**   132:6
**52nd**   5:16

**6**

**6**   15:4 18:2 30:16
   30:19 33:17 65:12
   71:21 150:25
   151:18 152:20
   168:5,25 195:20
   199:21
**60/40**   132:3
**60602**   4:15
**609**   8:14
**66**   37:19
**666**   8:5

**7**

**7**   20:10 151:2
   152:8
**7,000**   93:18
**7,300**   93:13
**7,355**   91:18 93:5
   93:19 176:25
**700**   7:6 76:5
**713.850.4200**
   10:15
**7300**   82:4 96:23
**7355**   190:10
**7500**   72:2
**767**   11:14
**77**   14:16
**77056**   10:14
**787**   6:15

**7th**   204:19

**8**

**8**   20:10 178:22
**844**   11:6
**86**   14:19

**9**

**9**   179:18 182:19
   183:4,22
**90**   14:22
**90067-2328**   9:15
**90071-1560**   3:6
**919**   13:5
**920**   4:5
**973.966.3200**   7:22
**975**   12:5

**a**

**a&i**   33:23 56:4
   58:24 77:13 91:19
   98:25 99:11
   110:21 126:19
   136:2,6,14,15,15
   136:22 197:7
   198:22 201:3,16
   201:18
**abbie**   72:6
**ability**   182:21
**able**   71:4 72:9
   78:12 85:17
   151:22 152:2
**absence**   155:6,10
**absolutely**   69:12
**accept**   38:4 41:18
   53:19 158:13,19
   159:25 162:5,9,10
   162:16 167:5
   182:7,22 189:20
**accepted**   162:2,8
   162:15,18
**accepting**   179:4

**access** 17:16 18:15
18:15 78:9,12,23
85:8,18,20 118:4
151:22 152:18
169:17
**accident** 8:10
**accomplish** 38:18
**account** 158:19
171:4
**accountabilities**
38:13
**accountability**
37:7 38:21 44:11
44:15 45:8 46:5,9
46:23 47:18 49:21
**accountable**
133:19
**accounted** 171:6
**accounts** 171:10
**accurate** 27:16
106:14,15 147:12
147:14,23 158:4
170:2,15 187:22
204:12 205:8
**acraig** 7:24
**act** 42:20
**acted** 172:22
173:19 174:15
**action** 57:7 64:4
204:15
**actual** 142:5
185:21 187:25
**ad** 36:8 40:15
55:13
**add** 33:15 111:16
**added** 168:15
**addition** 139:3
144:13,14 160:16
**additional** 92:18
94:11 111:15
144:12 181:17

**address** 38:22
39:2 45:6 46:4,8
47:17 49:19 80:23
**addressed** 38:25
44:16,23 45:10
**addressing** 46:22
**adequate** 113:19
**adequately** 113:12
**adjourned** 203:9
**administered** 1:7
**admitted** 158:12
**adopt** 112:24
**advance** 18:25
198:21 199:2
**advice** 73:18
**advisement**
129:23
**affect** 99:8,23
100:6,9 139:2
**affiliate** 137:25
**affiliates** 15:16
23:14 137:11
138:11 139:13
151:17 153:4
**affirmative** 34:13
61:14 124:14
**afternoon** 16:9
104:24 146:12
172:18 189:3
198:16
**aggregate** 101:9
**ago** 44:10 71:24
119:23 138:16
139:15 190:6
**agree** 29:16,19
30:14 31:25 32:3
180:19 198:12
201:10
**agreed** 20:8 51:16
52:8 73:2 158:10
196:4 201:17

**agreement** 20:2
37:22 59:5,10
63:17 96:15 97:2
132:2 142:22
160:17 184:8
194:6
**agreements** 58:23
186:18
**ahead** 20:6 22:20
28:11,12 31:22
45:15 57:21 72:17
84:12 101:23
113:20 121:9
178:6 193:8
**aid** 182:22
**akin** 164:7
**al** 1:7 206:3
**alexa** 176:9
**alice** 3:10 17:14,25
19:15 22:19 23:17
77:16 80:16
150:23 151:24
**alice.hoesterey**
3:11
**aligned** 23:8
**alleged** 165:24
171:21 172:6
**allocation** 60:3,7,9
60:17 61:3,9,22
62:6,17 136:24
**allow** 39:21 66:17
66:23 69:5,7
**allowed** 66:20
111:5
**allows** 132:9
**allstate** 7:18
**alter** 98:15,18
**alternate** 61:9,22
62:6,17 123:12,15
**alternative** 125:3
125:9,13,18

127:23 134:18
135:21 136:5,17
**alternatives**
133:12 135:17,24
136:11
**alystock** 9:11
**amax** 5:14
**amend** 92:17
**amended** 14:19,22
15:12 85:22 86:10
88:14 89:9,23
90:7,15,21 92:12
93:4,11 95:3,19
151:14 153:2
**america** 1:6 10:3,4
15:15 151:16
153:3 206:3
**american** 8:3
**amicably** 195:4,7
**amount** 98:8
137:23
**amounts** 106:2
109:9 137:20
**amy** 3:8 16:11
19:25 33:15 39:12
47:2 61:14 65:10
72:11 90:25
112:21 115:14
120:4
**amy.quartarolo**
3:9
**analysis** 88:20
89:2 99:7,11,18,19
99:22,24,25 100:8
100:11,18,20,22
120:21 142:5
170:7,10,14,15,20
171:5,8,10
**analyze** 125:7
**andrew** 7:23

**andrews** 10:12
**andrewsmyers.c...** 10:17
**angeles** 3:6 9:15
**answer** 17:10 26:19 31:5,20 32:6,12,16,18,21 33:14 39:3,8 40:25 46:14 59:7 60:11,13 62:10 65:2 66:22,24 67:3,12,14,16,17 68:6,7,13,17 69:4 69:14 70:17,22,25 72:24 73:4 75:20 77:7 82:3,24 83:15,16,16 84:15 88:6 89:11 93:20 93:23 94:9 98:19 101:13 102:4 105:5,10 107:24 108:4,17 109:13 109:18 111:2,3,7,8 111:23 112:9,10 113:8 114:2,8 115:25 116:6 117:4 119:6,23,24 120:7,11 121:5,17 121:22 122:25 123:3,8 124:5 137:3 138:14,15 138:17 139:4,7,14 141:6,24 142:13 147:23 156:22 157:4 160:9 162:14 163:9 164:2,25 165:5,18 172:25 173:4,22 174:11,18 175:19 176:7,15,16 178:11 191:5,17 200:9,21
**answer's** 110:9
**answered** 105:19 112:12 119:21 178:10
**answering** 113:11 161:3
**answers** 115:7 127:6 131:8 140:6 160:11 174:5 205:9
**anticipate** 39:16 195:19
**anticipation** 114:24
**anyone's** 146:12
**anything's** 78:15
**anyway** 105:19
**apologize** 57:11 85:17 87:24 124:25 164:25
**apparently** 176:9
**appear** 88:13,14 89:8 91:7
**appearances** 3:2 4:2 5:2 6:2 7:2 8:2 9:2 10:2 11:2 12:2 13:2
**appeared** 59:11 154:13
**appears** 179:2
**applicable** 174:25
**apply** 121:23
**appreciate** 33:25 40:3 120:23 175:8
**appropriate** 61:21 62:6 121:5 122:24 123:5,19,23 126:7 136:24
**approval** 47:24
**approve** 37:20
**approved** 99:2,12 166:22
**approximate** 76:4 178:24
**approximately** 2:7 25:14 76:2,13 77:12 83:2,4,10 88:8 142:16 153:22
**april** 13:15 75:7 117:12
**area** 67:9 126:6,7 126:10 138:25 161:22,24 200:14
**areas** 51:14,17 52:23,25 126:9 138:2
**argue** 31:4 68:4 113:4 115:23 121:8 181:6
**armstrong** 9:4
**arnold** 13:3 14:11 14:16,20,23 15:6 18:4 19:21 20:15 26:13 29:3,5 34:23 35:3,8,9 59:21 61:8,20 62:4,13,15,16,19 63:5,13 64:24 65:18,23 66:10,19 68:8,23 69:9,21 70:7,13,19,23 71:12 72:19 73:11 74:10,16,23 75:12 75:23 76:7,15,19 76:22,25 77:18,24 79:13 80:9 81:9 81:25 82:10 83:5 84:4 85:23 86:10 87:18 88:15 89:7 89:21,22 90:6,16 90:21 91:23 92:11 92:17,22 93:8 94:10,16,21 95:2 95:22 96:8 97:18 98:7,7 99:13 100:14,17 101:10 101:17 102:8,11 105:3,8,21 111:24 112:14 113:23 114:10 115:4 118:8 119:7 122:22 123:11,15 125:4,8 127:8,23 128:13 129:6 130:3,5,17 131:10 132:19 133:11 134:11,17,25 135:8,19 136:3 137:22 139:11,24 140:14,17,20 141:3,11,15,19 142:10,17 144:24 145:16,17,21,24 145:25 151:3,9 152:22 154:6,11 157:17 158:9 162:24 163:3,17 165:7,22 166:24 172:12,21 174:21 175:13,16,22 176:2,4,24 177:3 177:13 178:14 190:10,20 191:6,8 191:11 192:15,20 193:10,13,22 194:12,15 195:5 195:15 196:4,9 197:17 198:11,21 199:13 200:3,4,12 201:10

**arranged** 179:23

**arrival** 126:13

**asbestos** 156:14
157:9

**ascribes** 101:18

**aside** 74:8 123:14

**asked** 25:21 67:22
75:3 119:20 147:2
159:8,17 178:19
180:11

**asking** 33:9 83:20
88:4 99:15 102:6
102:17 104:23
107:7,8 110:25
121:23 160:11
174:3,7 181:7,18
191:18,21 198:2
199:17

**aspect** 41:17

**assert** 51:5 60:16
85:2 101:17
111:24 115:5
140:24 155:16
163:23 200:19,22

**asserted** 51:2

**asserting** 47:6
62:15 142:3

**assertion** 112:15
113:24 114:11

**asserts** 166:25

**asset** 35:16,19

**assets** 61:22 62:7
62:17 136:24
142:12

**assigned** 107:14

**assist** 141:4

**associate** 17:14

**associated** 24:24
50:12 101:12
108:22 154:3

**associates** 25:7
153:21

**assume** 16:19
49:17 75:9 94:20
98:20 196:7
198:18

**assuming** 20:16
66:11

**assumption** 72:2
97:11 158:5 159:7

**atllp.com** 9:10

**attached** 27:23
168:11 205:11

**attaching** 28:3

**attachment** 80:19
169:3

**attachments** 79:23

**attempt** 193:14

**attendance** 18:21

**attending** 19:3

**attention** 108:18

**attorney** 32:19,20
33:13 38:6 60:12
61:11 69:8 71:10
71:23 72:24 88:12
100:13 108:4
111:9 114:7 115:3
116:12 117:7
118:24 119:13
123:9 124:3
127:17 131:13
136:25 138:5
139:5 140:12
161:2 173:7
175:20 176:8
191:4,22 192:13
197:18 200:8

**attorney's** 124:9
197:23

**attorneys** 16:12
41:3 158:11

179:22

**august** 62:21

**author** 33:4,5,7

**author's** 33:10

**authority** 186:23
188:8 192:4,16
194:10 196:10

**authorized** 148:23
148:24 149:11

**available** 27:25
72:4 141:16,20
142:12

**avenue** 3:5 6:15
7:6 8:5 9:5 10:6
11:14

**average** 136:12,17

**avoid** 161:3

**avram** 24:20,23
25:5,7,25 26:22
27:22 36:6 40:13

**avram's** 25:6

**aware** 29:2,5
53:13 55:14 59:13
64:14 69:21 106:2
114:9 115:11
116:15 119:17
120:12 121:12
122:5,15 125:11
137:6,9,12,14,21
139:9,24 149:23
155:12,12,14,24
156:10,23 157:19
160:13 161:25
162:22 166:15
167:7 170:23
171:15,25 174:9
174:13 175:4
177:7,15,20
181:24 182:4,5
193:10

**aylstock** 40:18
57:16,22 164:18
164:21

**b**

**b** 18:2 30:16,19
33:17 65:12 71:21
195:20 199:21

**back** 27:24 31:9
44:9 61:24 62:3
64:13 76:23 83:3
85:10 108:7 129:3
131:15 135:4
138:2 143:9
146:21 152:13
153:15,19 163:2
169:13 176:3,23
183:25 190:2
194:12,17 196:9

**background** 65:11
65:15 178:8

**backwards** 199:9

**bad** 14:14 23:20
24:2 29:24 121:24

**ballot** 155:5
174:23 175:5
178:16,18 190:21
191:9,10,19
192:17,22

**ballots** 158:11,18
159:24 165:23
167:5 171:20
172:5 179:2
189:20

**bankruptcy** 1:2
13:3 14:13,17,21
14:24 15:17 16:13
20:21,22,24 21:10
21:15 22:2,13,15
23:20 24:2 27:11
29:24 34:25 35:17
35:19 37:24 54:6

56:20 59:2,11,18
60:24 64:15,23
69:13,23 74:2
77:11,19,25 79:14
81:23 85:24 86:6
86:11 90:17,22
92:16 97:20 98:2
98:12,15 105:13
105:16 109:5
132:7,9 151:4,18
153:5,23 167:12
173:10,15 176:25
188:15 197:4
**bar** 150:12
**baron** 35:20,22,24
36:6,24 37:5 38:8
38:10,22,25 42:4
44:17 45:4,17
47:16,20 48:14
125:13,20,21
126:10 131:17
133:6 143:11,17
143:20,21,24
144:2 159:3
160:14
**base** 156:11
**based** 71:25 97:24
99:3,13 167:10,22
172:9 178:23
183:22 188:20
190:3 195:10
**bases** 32:14
112:14 113:23
**basically** 126:12
**basis** 32:7 35:18
38:16 44:3 69:15
107:9 122:7 138:8
139:25 156:16
158:16,17 159:10
159:21 179:7
180:7,12 183:2

187:11 189:11,21
191:14,20 192:3
192:10 201:7
**battery** 7:13
**bear** 47:3 130:23
158:22,23
**bears** 160:19
**began** 133:3,22
**beginning** 37:5
**begins** 19:17
**begun** 36:16 56:6
**behalf** 19:21,22
20:14 23:14 35:9
53:18 72:22 76:16
108:21 135:19
136:3,15 142:18
144:8,25 145:17
145:25 148:4,14
149:5,14,24 150:7
154:6,17,23
155:21 156:17,25
174:22 175:13,17
176:24 179:25
188:22 190:11,21
192:5,16,21
193:12,22 196:2
196:11 197:3,19
198:23,24 199:16
200:5,6
**belabor** 160:5,6
**belief** 123:19
179:19 180:8,13
180:23 184:18
185:11,13 186:2
192:11,16
**beliefs** 118:25
**believe** 19:14
21:21 22:18 25:3
25:4,21 26:20
27:9,11 28:2 30:3
32:7,15 33:16

36:21 37:19 40:11
40:18,19 41:21
42:6,21 43:3,21
44:8 45:22 46:2
46:12 48:21 49:22
49:24 50:5,9,14
51:9 52:25 53:4,8
53:14 54:17,23
56:23 57:8 58:10
58:22 59:6,25
60:9 61:2,8 62:18
63:17 64:16 73:13
75:6 76:4,18
79:19 82:5 86:20
86:23 90:5 91:13
91:16 92:5 93:20
96:3,17 98:11
101:12 105:25
107:22 108:25
110:6 115:15
117:14 118:5,25
122:6 123:23
128:14 129:4
131:20 132:6
133:2 134:23
135:12,22 136:10
136:20,22 139:10
143:6,8,14 144:11
144:21 145:2,5,10
146:4,6 149:3,6
155:20 156:16
157:21,21,22
158:25 159:9,22
161:9 162:21,23
165:9 167:13
170:11,15 171:6
171:10,13 172:22
173:18 175:10
176:20 177:2
179:11,14 185:20
185:23 186:7

187:11 192:3
194:23 196:20,21
**believed** 43:11,19
53:21 188:10
**believes** 139:25
**believing** 35:18
191:15
**berkovich** 11:19
**best** 38:12 42:11
42:21 103:3
171:19 189:2
192:6
**better** 110:10
129:16
**bevan** 153:21
154:3,6,10,12
155:4,11,12
156:10,16,24
157:17 165:14
178:25 179:3,9,16
**beyond** 61:6,7,10
66:4 88:9 93:10
93:13 94:8,11
96:21 109:6 112:3
114:6,8,16 115:2,9
116:11 119:24
121:25 138:4
139:7
**big** 40:20
**bit** 38:19 75:4
98:13 188:25
**blair** 24:20,23
25:5,7,25 26:22
36:6 40:13 54:25
**blood** 204:16
**bogdanoff** 9:12
**boundas** 24:19,23
25:2,25 26:22
27:23 36:5 41:22
42:24 54:10,13
55:2 131:20

159:16 163:14,17
184:5 190:4
**boy** 169:12
**break** 17:8,11
18:11 50:17 78:13
78:15,22 79:8
85:7,11 117:17
146:9,14,23
148:20 183:14
**breaks** 17:9
**brief** 111:18 119:4
121:3
**briefing** 133:22
**briefly** 51:2
**briefs** 111:11
112:3,8 114:16,20
114:21,25 115:8
116:8,10 118:15
118:19 119:6,15
119:24 120:11
122:2 138:4,21
**bring** 17:25 18:16
23:17 77:16 85:21
90:14 120:9 145:8
150:23
**brittany** 193:24
197:4
**broad** 63:10 84:10
84:14,15 118:18
**broadened** 84:22
**broadly** 56:20
69:13 70:10
**brought** 76:23,25
132:22
**bulk** 36:17 101:7
**bunch** 184:16
**buy** 135:19

**c**

**c** 2:5 3:8 168:22
170:7 204:2,2

**california** 3:6 9:15
**call** 27:25 40:14,17
43:21 44:19 45:5
45:6 48:3,16,17,21
49:25 50:5,7
131:17,19,20,22
132:3,16,18,20,24
133:6,10 134:13
134:16 142:21,24
143:2,12,22,24
144:19 145:3,5,6
145:14 164:18
**called** 40:16
143:22 194:25
195:2
**calls** 21:4 150:6,21
187:21
**cancer** 14:15
23:21 24:3 29:24
81:4,6,17 82:6
87:7 124:6 126:2
141:21
**candid** 39:18
**capably** 40:4
**capacities** 149:17
**capacity** 46:11
47:5 66:16 128:6
134:22 148:6
149:5,8,10 199:23
**capdale.com** 5:11
5:13
**caplin** 5:5
**care** 12:3
**careful** 130:23
**carter** 13:15
**case** 1:6 34:11
61:15 63:9,18
72:7 75:5 96:13
105:13,17 124:15
149:21 185:20,23
194:11 197:10,10

197:25 199:2,19
199:19 201:6,6,13
201:14,14,19,20
202:3,4 206:3
**cases** 56:22 63:4,6
63:7,7,8 64:7,8
65:21 66:6,9
67:18,18 74:19
75:17 104:19
145:7,7 150:14
156:7,8 157:8,9,18
158:2 194:24
198:22 199:12
**cast** 153:22 167:5
174:21 179:3
185:7 189:20
201:18
**catastrophic** 63:6
**category** 41:13
**ccr** 1:20 204:22,23
**cease** 54:19
**century** 9:13
**certain** 15:10
49:24 51:17 52:8
53:22 54:2 151:12
152:24 167:2,3,21
170:24 177:11
189:17,18
**certainly** 50:19
67:23,25 150:10
160:22
**certainty** 81:14
**certification**
162:19 170:6
171:24 205:2
**certified** 2:9 204:5
**certify** 204:7,14
205:4
**chains** 27:24
**change** 41:18
42:13 130:21

140:11 161:15
165:5 167:20
171:4 184:9,11
206:6
**changed** 41:9,11
78:15 87:6 97:6
159:16 170:25
171:2
**changes** 205:10
**changing** 161:14
**channeling** 132:7
132:9 133:5 145:8
145:14,14
**chapter** 1:5 15:13
15:16 122:8,19
151:15,17 153:2,4
157:18 158:2,7
**charge** 193:18,23
**check** 194:21,22
**checked** 78:16
**cheek** 104:3
**chicago** 4:15
**chock** 155:5
**choose** 114:23
151:23 182:24
**circle** 5:6
**circulated** 24:16
29:3,8,11
**circulating** 29:6
**circumstances**
195:10
**claim** 35:10,11,14
35:15 45:19 64:25
72:6,13,21 74:13
74:25 75:14 76:16
76:20,22,24 80:24
80:25 97:19 98:4
98:5 107:15
114:12 122:23
123:12,15,19,24
123:24 124:6

125:3,9,13,18
135:17,21 156:14
196:5,6,6
**claimant** 33:24
63:14 72:22 74:18
75:13 76:17 98:6
177:9 182:5
190:12 195:16
197:20 198:25
199:16 200:4
**claimant's** 33:24
**claimants** 5:4 6:4
6:13 7:4 12:10
23:12,13 51:4
53:19 72:12 74:8
76:8,9 77:13
82:10 83:5,21
84:3 87:2,18 88:8
88:13,16 89:8,20
91:18,23 92:12,14
92:19,22 93:9
94:11,18 95:4
96:8,16,23 99:3,12
99:20 101:4
125:25 126:2,25
154:18 156:17,25
167:3 174:25
175:12,23 176:25
177:14 178:16
180:2 181:25
188:22 189:17,18
190:22,23 191:9
192:17 193:13
194:13
**claimed** 165:23
166:4
**claiming** 192:14
**claims** 15:5 37:11
42:25 44:7 48:24
49:12 52:13 54:3
54:4,6,22 56:17

63:15 68:11,24
70:8,14,20 74:9,11
74:17,18 75:22
77:14 80:19 81:4
81:6,7,10,15,16,17
82:2,6,12 84:4
87:19 89:21 91:24
92:14 93:10 96:2
100:19 101:4,8,10
101:12,19 102:10
105:4,9,24 106:4
106:23 108:13,16
108:24 109:11
110:4,22 111:25
112:16 113:25
132:4,6 133:4
141:21,21 151:9
152:22 155:16
177:5 190:10
194:14 196:11
**clarification**
148:17
**clarified** 179:16
**clarify** 111:16
146:24 170:20,22
**clark** 193:25 197:4
**class** 110:22
111:25 112:16
113:25 114:12
179:21
**clean** 200:24
**clear** 46:25 84:25
89:19 126:22
169:15 178:13
181:15
**clerk** 15:9 151:12
152:24 179:11,14
186:13,15 190:14
193:11 196:9,10
196:15,20,23,25

**clerk's** 43:17
165:10
**client** 32:20 33:13
38:6 39:7 48:19
57:17 58:11 60:12
61:11 68:6,24
69:8 71:10,23
72:24 74:24 80:23
88:12,18,18
100:13 104:20
108:4 111:9 114:7
115:3 116:12
117:7 118:24
119:13 123:9
131:13 136:25
138:5 139:5
140:12 142:4
148:14 149:12,20
161:2 163:23
164:15 173:7
175:20 176:8
180:2 186:14
187:2 188:3 191:4
191:14,22 192:13
194:7,7,8,15,18,18
194:20,22 195:24
200:8
**client's** 30:9 31:15
32:23 73:7 196:2
**clients** 14:15 23:21
24:3 29:25 30:6
31:11 38:12 42:21
52:12 65:19 66:12
67:8 69:10 70:7
70:12,24 71:5,11
72:2 74:11 80:8
82:9 87:10 88:5,8
95:23 99:8,10,23
100:6,9,18 149:15
155:13,16,19,20
174:22 175:17,18

176:6 178:24
184:21 185:12
186:18 187:12,17
188:11,14,21
191:3,15 192:3,4
**close** 25:15 29:18
29:21 74:4 76:4
117:19 127:20
131:25
**closer** 57:25
**code** 15:17 132:8,9
151:18 153:5
**cohn** 8:4
**cole** 6:5
**collaborative**
169:20 170:11
**colleagues** 29:2,7
29:9
**collect** 176:4
**colloquially** 195:2
**come** 56:10 57:23
58:12 94:10
128:14 148:9
169:13 194:5
**comfortable** 68:2
88:22 107:4,7
173:13
**coming** 79:6
136:23
**commencing** 2:7
**comment** 43:25
102:19,21 103:16
103:18,19,22,25
104:3,10,22 147:9
147:11,25 148:11
149:18,19
**comments** 102:22
147:9 148:11
**commercial** 63:11
**commission**
206:24

**committed** 54:16
62:22
**committee** 5:3 6:3
6:13 7:3 23:12
36:8 38:17 47:21
48:2,3 161:13
**common** 39:20
40:6 47:6 51:2,5,9
51:17 52:9,21
53:2,9,23 54:8,12
54:18,24 56:3,23
57:5 58:12,24
59:9,15,22 60:16
61:2 62:16 101:16
129:14 131:4
150:4,11 163:8,11
163:21
**communicate**
130:17 131:10
132:19 162:24
163:3 191:2
**communicated**
110:5 130:2,9,12
131:14 132:14
135:13 184:12
186:11 189:8
**communicating**
23:9 196:23,24
200:18
**communication**
127:5 168:3 185:6
188:3 196:8,13
**communications**
33:22 34:24 38:10
41:2,8 47:4 49:18
51:6,18 53:4,8
54:12 60:25 62:12
90:12 146:2
163:10,11,25
167:25 185:12,22
191:22 196:15,20

198:5 200:8
**company** 5:14
8:10,11
**complaint** 63:21
64:11
**complaints** 65:7
**complete** 40:23
92:6 135:6 205:7
**completely** 24:9
27:16 160:7
**complimenting**
104:4
**compromise** 126:4
**computer** 117:19
**conaway** 12:11
**concerns** 44:15
45:8 46:8,22
47:18 49:20
133:15,20
**concierge** 13:15
78:16 79:5,9
117:12,13 151:25
**conditioned** 42:5
182:6,14 185:25
**conditions** 37:16
37:17 68:25 159:5
**conduct** 173:15
**conference** 48:16
142:21,24 143:2
143:12,24
**confidential** 18:24
19:5 86:15 176:21
**confined** 172:13
**confines** 105:13
**confirm** 55:9
72:20 127:19
129:19 170:2
194:14 200:3
**confirmation**
49:17 111:15
128:20,24 160:19

184:22 187:13,18
188:6,12,22
195:17
**connect** 65:18
**connection** 26:7
28:7 59:11,17
66:11 72:21 73:25
81:22 94:18
149:25 154:7
157:24 163:2
178:15 198:12,22
199:15 201:4
**consents** 194:7
**consider** 51:19
102:15
**considered** 71:20
126:8 136:23
**consistent** 38:9
40:5
**conspicuous** 155:5
155:9
**consultant** 142:11
**cont'd** 4:2 5:2 6:2
7:2 8:2 9:2 10:2
11:2 12:2 13:2
**contact** 66:8
**contend** 52:21
54:11 57:5 110:21
118:8 122:22
154:16 158:16
191:20
**contends** 119:7
**contention** 115:16
**contentions** 119:2
119:3
**contentious**
125:23
**contents** 29:16
**contexts** 116:24
**contingency** 96:4
96:18 99:14

**continue** 114:15
**continues** 120:22
**contract** 73:14,16
73:19 88:19,19
97:23
**contribution**
137:15,23
**control** 30:9 31:15
32:23 80:18 85:9
**conversation** 43:9
43:11 44:6,17,20
45:3,17,18 48:12
48:13,14 49:2,3,4
61:5 102:25 103:5
104:7,12 125:21
132:11 133:8,23
135:7,10 143:10
143:18 144:16
147:19 148:5,20
150:21 159:15
163:13,14 165:20
180:13,16 181:12
183:9,13,22 184:5
184:6,13 190:3
194:4 195:21
**conversations**
20:20 35:10 36:2
36:5,7,14,17,20,21
36:23 37:4 39:14
39:18,25 40:11
41:15 43:7 46:16
46:20 47:6 49:23
50:9,11 53:17
102:5,24 103:2
104:8 125:11,12
131:6 134:9
143:14 144:2,7,13
144:22,24 145:22
145:23 146:5
147:3,4,5,7,16,21
148:3,9,15,21

149:7 150:16
160:21 163:16,18
164:17 181:2,3,22
193:15,19,23
**convince** 36:24
37:6,9,25 42:12
130:7 160:17
180:3
**copied** 196:15,21
**cordial** 132:11,12
**corp** 5:3
**corporate** 6:12
**correct** 16:18,21
20:16 21:2 22:24
25:25 27:4 28:21
28:24,25 32:16
35:23 44:8 45:9
46:24 50:3,4 51:8
52:6 53:24 55:4
55:10,11,11,16
58:8,16,20 64:16
69:24 70:2,10
73:10,21,22 74:21
77:9 81:24 83:11
84:20 85:4,5
89:13,16,18 90:4
91:20 92:4,7,10,16
93:17 95:24 96:3
96:6 98:11 100:21
108:14 110:16
125:15,19,20
129:16 132:23
134:15 137:4,5
151:7 153:14
155:2 162:23
165:18 169:22
171:3,13,17
172:11,16 175:6
175:15 177:6
183:5,23 184:3,6
184:23 185:19

186:5 188:13
189:14 190:5
200:10 201:9
205:10
**corrections** 205:10
**correctly** 157:22
**correspondence**
21:22 27:20 28:15
28:22 30:20,22
**costly** 48:25
**counsel** 3:3 4:3,11
5:3,14 6:3,12 7:3
7:11,18 8:3,10 9:3
9:11 10:3,11 11:3
11:12 12:3,10
13:3 17:17 18:20
18:24 20:21,24,25
21:10 22:16 27:11
29:25 31:4 33:24
34:25 39:7 40:10
47:23 49:22,24
62:14 64:17 67:4
67:20 68:7 76:8
103:8 111:20
113:14 123:14,17
142:4 144:12,17
144:17 167:2,4
169:21 174:23
179:24 180:3,19
181:24 182:5,23
189:16,18 191:2
194:16 197:4,8,11
197:15 198:25
199:21 200:12,14
200:19 201:4,15
201:21 202:2,15
**counsel's** 68:20
73:8 144:16
**counseling** 67:8
68:10 94:17

**count** 45:20 144:3
195:16
**counted** 53:12
111:14 170:14
**counting** 170:19
**couple** 20:20 37:4
118:6
**course** 18:22
185:4
**court** 1:2 2:9 22:2
47:24 54:5,6,21
56:16,20 60:20,24
76:5,6 98:16
166:22 204:5
**cover** 40:20 56:14
141:20
**coverage** 4:10
**covered** 41:24
42:23 53:22
**covering** 44:10
**covers** 56:19
**coy** 102:14
**craig** 7:23
**crawford** 5:10
**created** 192:22
**cross** 34:5,9
**crossed** 97:5
**cure** 165:25
166:17 171:22
178:2
**current** 25:4 99:3
99:7 122:17
**currently** 75:23
95:4
**cut** 133:7 193:6
**cutler** 10:5
**cyprus** 5:3,14
75:12,15 139:23

| **d** |

**d.c.** 5:8 7:7 8:15
10:7 12:6
**daily** 71:18
**date** 18:5 23:22
25:13 26:25 43:14
49:5 51:22 53:11
53:14,16 56:7
63:16 64:16 73:13
73:19 74:3 75:4
77:20 86:12 90:18
92:2 129:20
131:24 151:19
204:10 206:4
**dated** 73:24
**davis** 13:11 21:5
**day** 55:5 143:23
143:23 204:19
205:16 206:21
**days** 74:6 128:23
**dead** 126:13
**deadline** 25:16
42:7 43:16 49:8,9
53:16 56:10,13
162:19 163:5
179:2,24 182:2,21
182:25
**deadlines** 15:7
151:6,10 152:23
**deal** 199:5,6
**dealing** 114:4
**deals** 199:11
**death** 56:21 63:8
**debtor** 15:15
23:14 49:23,25
50:10 124:13
137:11,24 138:11
139:13 151:16
153:4
**debtor's** 110:15

**debtors** 1:8 3:3 4:3
4:11 16:13 20:2
22:8 23:11 49:19
94:25 122:8,18
125:19 141:17
**decided** 41:25
**decision** 39:9
41:18 42:16,22
**declarant** 174:8
**declaration** 43:17
153:12 154:8,15
162:4 165:11
167:15 168:2,11
169:2,8,19 170:5
171:18 172:2
174:11,20 178:22
179:12,16,18
180:5,15,17,24
181:11,18 183:4
185:3,9,16 186:9
187:8,20 188:10
189:15 199:25
**decline** 60:13
**deemed** 197:8
**defect** 165:24
**defective** 166:17
**defects** 171:22
172:6
**defendant** 63:20
64:7 65:9 75:10
**defendants** 64:3,9
64:10,11 75:16
**defer** 200:13
**deficiencies**
165:23 166:4,10
177:16,21,25
**define** 116:19
**definitely** 74:6
**definitively** 77:10
**delaware** 1:3 4:6
9:5,7 11:8 12:14

13:7
**delay** 158:10,18
**deliver** 132:6
133:5
**denied** 182:2
**department** 11:4
**depo** 18:2 118:6
193:6
**deposed** 16:22
**deposition** 1:11
2:6 14:11 16:20
18:4,23 19:3,8,12
21:11,24 22:4,5
23:4 28:8,16,18,21
71:7 72:9 78:5
79:21,25 95:21
102:20 111:22
113:18 117:9
124:22 135:15
138:23 162:13
187:6 203:9 204:8
204:11 205:6
**depositions** 120:20
138:24
**derivative** 30:9
31:15 32:23
**describe** 128:10
153:17 156:19
**described** 161:11
**description** 14:9
15:3
**designated** 19:21
**determine** 172:4
**devolved** 134:9
143:13
**diagnosis** 72:20
**diers** 7:16
**difference** 148:23
**different** 83:24
96:15 99:9 106:17
106:18,19,19

116:23,24 161:6
185:7 193:20,21
195:9,10 199:11
199:11 201:22
**differently** 173:16
**dig** 36:12 98:23
**digits** 174:24
**direct** 69:3 70:21
90:10 109:12
123:14 124:2,5
**directed** 186:15
**directly** 49:19
145:17 147:6
151:22 162:24
163:3
**disagree** 29:19
32:3 117:8 122:3
174:19
**disbanded** 55:14
55:15,18
**disclose** 90:6
**disclosed** 88:9
91:19
**disclosing** 95:3
**disclosure** 87:16
88:10
**discovered** 138:25
**discovery** 15:7,8
21:20 34:12 57:7
59:17,23 109:4,9
110:2 113:2
118:13 120:2,19
138:4,23 139:17
139:19 140:9
151:6,10,11
152:23,23 156:20
157:15 158:21,23
159:8 160:3,8,10
160:20 161:23,23
161:24 173:24

**discuss** 144:21
170:17 171:12
195:15
**discussed** 47:20
57:3 133:3 135:9
150:5 163:13,15
165:20 167:16
168:3 180:9 183:9
**discussing** 60:2
68:2
**discussion** 48:5
102:15 104:17
108:20 113:17
125:16 127:3,4
133:25 148:22
**discussions** 41:24
42:24 73:18,24
101:15 102:8,11
102:13 105:3,23
108:6,8 126:11,14
128:10 130:5
141:11 142:16
145:18,19 148:24
148:25 149:4,25
195:22,23 196:3
**disease** 87:7
**dismissed** 77:2
**distinction** 72:15
**distributing** 78:7
**distribution** 22:23
110:16
**district** 1:3 154:13
**divulge** 40:4
191:25
**divulging** 71:22
**docket** 77:6 169:2
**document** 14:12
19:13 23:19,25
24:6,7,8,11,15,16
25:10 26:20,21
27:2,14,18,23 28:4

28:5,6,16,23 29:3
29:6,8,11,12,15,17
29:18,20,22 30:4,5
30:17,25 31:11
32:22 33:4 34:2,9
34:16 52:18 58:24
78:3 79:18,22
80:3,18,22 82:8
85:10 86:19 91:10
91:12,14,17 95:13
97:13 115:17
153:6 159:2,10,11
159:12,14,18,20
169:6 173:13
186:21 187:21,23
188:14,18
**documented** 52:19
96:20
**documents** 21:13
21:16,25 22:3
33:21 42:10 44:25
91:6 100:7 159:22
**doing** 77:22
103:20 104:13
138:23 148:13
167:21 171:5
**dorr** 10:5
**double** 170:14,19
**downhill** 133:9
**drafted** 25:17,19
169:19
**drilled** 198:14
**drop** 36:25 37:9
37:21 130:20
**dropped** 152:7
**drysdale** 5:5
**dual** 185:5 194:25
195:4 196:19
197:22 198:19
199:6

**duly** 16:5 204:9
**duplicate** 190:7
197:2
**duplicative** 194:14
201:5

**e**

**e** 8:8 11:17 204:2,2
**earlier** 57:9 60:2
75:4 110:14
134:20 138:3,24
147:9 148:2,12,17
172:14
**early** 36:17
**easiest** 152:16
**easily** 76:13 195:4
**east** 9:13
**easy** 39:15
**echo** 87:20
**effect** 103:20
122:18
**effort** 131:25
169:20 170:11,18
176:2
**efforts** 37:25
42:11 104:4 109:2
**egnyte** 79:6
**eight** 178:24
**eisenberg** 4:12
**either** 24:19 25:24
96:10 131:11
139:25 143:22
145:16 147:11
158:5 185:24
192:8 197:4
**eliminate** 170:18
**else's** 72:7
**email** 26:6,9,19
27:3,6,7,13,17,20
27:24 28:3 78:17
129:4 142:23
187:23 188:2

**emailed** 26:6
**emails** 27:15
**embodied** 138:10
139:12
**employ** 62:23
**employed** 204:14
**encourage** 69:18
**encouraged** 167:3
167:19 189:17
**ended** 47:9 132:12
**engagement** 73:21
73:23 75:5 95:21
96:20 97:12,15
**enright** 6:10
**ensure** 170:13
190:23 191:9
**entered** 109:10
**enters** 95:22
**entities** 74:12
**entitled** 19:4 23:25
98:2 112:22
115:20 163:24
191:25
**entity** 64:25 75:12
75:15,19
**equally** 126:25
**equitable** 38:16
**erin** 7:16
**erin.diers** 7:17
**errata** 206:2
**especially** 197:24
**esq** 3:8,10,12,14
3:16,18 4:8,17
5:10,12,19 6:10,18
7:9,16,23 8:8,17
9:9,17 10:9,16
11:10,17,19 12:8
12:16 13:9,11
**essentially** 21:18
37:10,18 41:25
42:15

**establish** 124:16
**estate** 35:17,19
**estimate** 56:9 84:2
**estimated** 98:25
**et** 1:7 206:3
**evaluate** 140:21
**evaluation** 140:14
140:18,25 141:15
142:6
**everybody** 42:20
134:5 186:16
**everybody's** 48:17
**exact** 26:25 43:14
49:5 51:22 56:7
73:13 74:3 75:4
89:25 131:24
189:2
**exactly** 84:23
144:15
**examination** 16:7
69:5,8 202:20
**examine** 34:5,9
**examined** 16:5
**example** 27:25
41:9 59:4 72:4
158:24
**exchange** 37:9,12
161:14 167:20
197:19 202:25
**exchanged** 59:24
**exclude** 142:23,25
**excluded** 161:19
161:20 171:20
172:5 174:22
**exclusive** 154:21
154:22
**excuse** 39:7 68:6
73:8 79:12 101:8
158:8 179:3
**excused** 19:7

exemplar 95:21
exhibit 14:9,10,12
  14:16,19,22 15:3,4
  17:16,25 18:5,7,10
  18:12,15,16 19:11
  23:18,21,25 77:17
  77:20,23 78:9,13
  78:23 79:12,12
  83:8 85:7,18,22
  86:12 87:6,10,12
  90:3,8,14,17,20
  92:13 93:12 94:12
  94:19 95:6,8,19,20
  117:15,20 118:3
  150:25 151:2,18
  151:21,23 152:8
  152:20 168:5,15
  168:22,25 170:5,7
exhibits 14:8 15:2
  17:15 87:23
exist 54:19 119:3
existence 58:5,17
exists 51:14,14
  56:24 118:15
  159:14
expect 97:17 113:7
  115:21 130:11
  144:18 155:14,24
expected 188:17
expecting 122:7
expedited 110:19
expenses 198:22
  199:2,7,15
expensive 48:24
experience 134:3
  172:10
expert 22:15 141:4
  141:9 142:11
  144:4 173:10,25
expires 206:24

explaining 30:2
explore 50:25
explored 160:23
explosion 63:7
expressed 179:24
extend 15:7 151:5
  151:10 152:22
  179:23 182:21
extension 42:8,9
  159:5 181:25
  182:3,6,13
extensions 42:13
extent 27:22 53:10
  120:25 150:13
  169:17 189:12

**f**

f 12:5 204:2
facing 179:20
fact 50:2 119:25
  120:23 139:17
  153:21 154:12
  165:8 169:4 189:5
  194:12 197:10,10
  198:11
factors 136:22
facts 40:2 47:3
  107:12 114:10,18
  115:12 116:14,16
  117:2 119:17
  120:13,24 121:12
  121:21,22,24
  122:5,15 138:25
  139:10,24 156:24
  160:12 161:11
  180:20,22 181:2,6
  181:8 195:10
factual 32:7,14
  96:21 138:8
  158:17 182:9,12
fair 61:9 82:7
  97:10 145:16

200:20 203:4
faith 115:6,13
  116:8,17,19,20,20
  116:21 117:3,5
  121:24 191:14,20
  192:3,7,10,15
falls 41:13
false 106:20
familiar 16:20
  22:6,12,14,21 60:6
  66:2 67:16 78:3
  86:18 91:12 95:14
  110:15 153:6
  155:6 165:25
  173:3,8 179:5
  180:4
far 66:25 112:25
  131:14 155:12
  165:22
farms 7:20
farr 6:14
fashion 110:19
fassett 1:20 2:8
  204:4,22
fast 189:25
fault 87:22
favor 26:24 41:14
  42:2 43:2 53:4,13
  53:15 111:14
  131:2 156:18,25
  182:14 184:20
  186:20 189:4
fcr 23:12 48:13,22
  144:25 145:2,5,10
  145:18
february 64:15
  65:7 77:12
federal 76:6 177:6
fee 96:4,18 97:2
feel 16:24 67:25
  68:4 75:2 88:22

111:12 112:12
  123:5 173:13,25
fees 67:5 98:2,21
  99:2,14,15 197:18
  197:23 198:3,12
  199:7
fellow 126:9
felt 44:14 126:6
  184:15
ferris 8:4
fifth 11:14
figure 162:11
  179:13 195:25
file 45:2 78:7
  94:21 95:2 111:16
filed 20:22 21:15
  21:19,20 22:2
  30:2 44:24 60:20
  63:17 64:5,14,24
  65:7 69:22 72:12
  75:5,22 77:11,24
  79:14,18,20 82:16
  85:24 86:4,6,16,22
  88:16 89:9,22,23
  90:22 91:15,21
  110:24 111:11
  114:3 118:14
  151:3 153:10
  157:17 158:7
  162:25 169:9,24
  177:5 180:25
  188:10
filing 64:23 72:21
  87:6,16 139:19
  157:25 162:3
  171:23 181:18
filings 60:24 61:7
  61:11 113:13
  139:16
filled 185:8

**final** 195:16
**find** 65:5
**findable** 65:4
**fine** 34:6 65:16
69:17 94:15
109:19
**finger** 4:4
**fink** 132:23 133:2
**firm** 24:25 25:6
40:14,18 41:16
43:5,5 51:15
54:13 57:16,22
67:15 73:12,25
123:17 131:19
154:3,16 155:15
155:21 156:10,16
164:18,21 165:13
165:15 178:25
184:24 185:4,6,10
185:17,17 186:3
186:19,19,21
187:17 188:3,4
190:11,24 191:12
191:24 193:12,16
193:17 194:22
195:8 196:4 197:9
197:10 198:9
199:14 200:6
201:12,16,17
**firm's** 37:22
195:17
**firms** 26:12 41:3,3
42:12 57:4 65:22
66:8,11 67:5
106:17,18 155:18
157:23 158:6
162:25 163:4,18
164:4 165:6,13
170:25 178:24
179:10 184:19,25
186:15,17 193:20

194:5,10 195:6
197:7,13,18 198:6
198:10,13 199:11
200:11 201:3,10
**first** 8:11 18:11
24:11,14 25:9
30:12 31:18 43:17
63:13,16,17 64:5
74:23 75:5,5
204:9
**firsthand** 106:7
**fishing** 147:21
**five** 104:8 117:18
146:9
**flag** 18:19,25
156:20 157:14
160:22,24 161:7
**flip** 152:13 153:15
**floor** 9:14 13:6
**focus** 160:11
**folder** 151:2
**folks** 56:8 143:5
158:25 159:3
**follow** 68:20 124:8
**following** 73:7
**follows** 16:6
**footnote** 165:10
**forced** 182:24
**foregoing** 204:10
**forgive** 48:18 50:2
**form** 22:10 24:12
25:11 26:2,15
32:25 45:12 49:15
51:11 56:18 59:19
60:18 62:8 63:24
69:2 70:15 77:4
81:11 84:11 87:5
93:14 94:14 97:21
98:9 101:21 102:2
106:5,25 107:25
118:11 119:10

121:15 122:11
123:20 127:15
136:7 137:17
138:13 140:3
142:19 163:6
192:24
**formal** 44:19
45:23 46:2,7
47:16 134:14,17
134:24 135:2,12
136:4,16
**formally** 94:25
**formed** 55:13
**forth** 19:22 60:7
60:21,23 85:10
111:12,21 113:6
117:9 119:3
122:23 125:4
135:17 136:13,18
138:20 153:15
204:9
**forward** 18:13
27:8 51:18 53:5
128:5 174:6 194:6
199:8
**forwarded** 27:9,12
**foundation** 30:23
**founded** 62:20
**four** 124:18,23
143:14 144:7,10
155:22 174:24
**fraizerh** 7:10
**frame** 92:3
**framed** 99:24
**framework** 128:7
128:9,12 129:5,25
130:17 131:5,11
132:20,22 134:21
**frazier** 7:9
**free** 34:11

**friday** 1:12 2:2,6
104:24 146:12
172:18 198:16
**front** 70:6 165:11
178:3 179:12
**frozen** 78:7
**frye** 4:17
**full** 91:22 155:5
169:23
**further** 95:2
112:25 128:9
166:25 202:14
204:14
**future** 12:10 23:12

**g**

**g** 3:18 132:6
**gallagher** 6:14
**general** 112:23
**generally** 16:19
22:6 36:11 63:4
67:16 88:21 95:14
110:17 116:10
129:5 137:9,20
150:12 156:6
194:21
**genesis** 131:5
**gerber** 4:12
**germane** 30:4
**getting** 33:12
67:24 72:23 87:20
114:17 115:9
116:11 134:7,8
138:5 178:7
**gilbert** 7:5
**gilbertlegal.com**
7:10
**giraldo** 7:20
**give** 21:17 39:3
43:14 68:13 73:15
73:19 84:2,10,14
84:14 114:2

138:15 139:14
164:11,24 168:16
168:17 173:4
181:9 202:7
**given** 17:4 42:12
70:8 91:5 112:9
165:24 166:17
171:21 172:5
174:11,18 182:13
204:12 205:9
**gives** 107:9
**giving** 30:8 31:13
32:4,19 198:2
**global** 145:8
150:17
**glovsky** 8:4
**go** 20:6,12 22:19
28:11,12 29:22
31:22 45:15 57:21
66:25 72:17 84:12
85:12 88:18 95:5
95:10 101:23
104:16 110:19
113:20 114:13,14
120:5 121:9 129:3
146:13 153:19
178:6 182:19
184:10 193:8
194:6,12,17,18
197:9 201:13,19
**goals** 38:18
**goes** 114:23
**going** 17:14 18:6
18:13 24:17 31:3
38:18 39:9,20
44:9 50:15 51:18
53:4 66:18,21
68:20 69:3,4,5,7
69:14 77:23
102:19 111:22
114:15,20,21,24

115:2 124:8,15
126:15 130:19
138:4,17 140:5,24
142:25 152:11
153:16 160:18
162:12 169:13
176:7 178:11,12
181:4,6 183:14
189:8,9 191:5
192:12 195:25
198:25 199:7,8,8
200:7
**good** 16:9 30:3
36:9 57:10 73:19
78:10 103:20
104:14 111:18
115:5,13 116:8,17
116:19,19,20,21
117:3,5 121:13,19
146:17 148:13
155:17 191:14,20
192:3,7,10,15
**goodwin** 8:12
**goodwin.com** 8:18
**gostin** 10:9
**gotcha** 91:8
**gotshal** 11:13
202:23
**grand** 3:5
**great** 117:22
132:25
**gross** 97:24
**ground** 16:20 17:3
127:20
**group** 36:8 40:15
40:17 55:12,13
56:4,5 156:14
164:19
**guerke** 12:16
**guess** 17:20,24
48:20 53:12 80:16

120:18 128:24
130:16 131:9
156:4 194:19
198:16 200:23
**guys** 152:12

## h

**h** 1:20 2:8 8:17
204:4,22
**haas** 8:8
**hale** 10:5
**half** 107:19
**hallway** 183:13
**hand** 204:18
**handle** 63:5,6
155:17
**handled** 18:18
133:18 198:8
**handling** 133:18
**happen** 97:10
134:3
**happened** 36:17
74:4 97:7,16
124:13 132:10
198:4
**happens** 198:19
**happy** 20:12 79:23
116:9 170:16
171:12 196:16
**hart** 10:11 25:3
40:14 41:9,16
42:25 56:8 130:5
143:5 158:25
159:3 160:16
165:13,15,19
167:15,18,24
180:10,14,16
181:12 183:9,23
185:10,17,22
190:2
**hartford** 8:10

**he'll** 115:25
**head** 39:23
**hear** 88:3 110:12
152:4,5,6
**heard** 35:20
104:21 107:8,17
107:17,18,18,19
107:23 108:22
110:9
**heather** 7:9
**heavily** 22:16
**heightened** 17:4
**held** 2:6 70:14
77:13 84:4 89:21
**helena** 3:18
**helena.tseregounis**
3:19
**help** 17:15
**helpful** 110:12
112:21 115:14
153:18
**hereinbefore**
204:9
**hesitant** 98:13
104:16
**hesitating** 45:25
**hi** 202:22
**high** 107:23
**higher** 96:11,12
**highly** 18:24 19:5
86:15
**hire** 73:11
**hired** 73:16 141:3
142:10
**hoc** 36:8 40:15
55:13
**hoesterey** 3:10
18:6 78:6 151:5
**hold** 74:8 78:6
168:17

**holders**  15:4 151:8
  152:21
**holding**  93:9
  103:21 104:14
**holdings**  10:3
**honestly**  40:4
**hop**  27:25
**hoped**  42:17
**hopeful**  110:18
  146:10
**hopefully**  17:19
  18:11 78:23 85:19
  117:17 151:20
**host**  179:2
**hour**  50:16
**hours**  118:6
**houston**  10:14
**hubbard**  7:12
**hughes**  7:12
**hugheshubbard....**
  7:17
**hundred**  83:12
  94:6,8 107:17
**hundreds**  93:24
  94:2

                    **i**

**idea**  106:20
**ideas**  47:20,22,24
  47:25
**identical**  133:21
**identifies**  87:7
**illinois**  4:15
**imerys**  1:6 6:13
  7:3,11 14:13
  15:14 16:13 23:13
  23:14,20 24:2
  29:23 58:25 59:11
  59:18 64:7,14,23
  64:25 65:8 69:22
  70:9 72:22 74:2
  74:10 75:11 77:11

81:22 82:12 84:5
87:19 89:22 91:25
92:15,15 93:10
97:20,25 137:11
137:11,24 138:10
139:13 144:20
151:15 153:3
154:24 155:16
176:25 206:3
**impetus**  195:23
**impinging**  39:17
**implicate**  82:21
  92:21 111:8 115:3
  121:25 135:3
  136:25 139:20
  142:2 181:3
**implicates**  83:19
  94:23 111:7 112:4
  117:6 119:13
  161:9 191:21,22
  191:23
**implicating**  39:4
  60:11 62:11 83:17
  83:25 100:13,24
  101:5,14 114:6
  119:25 123:2,4,9
  127:11 140:23
  141:7 142:13
  161:4 167:6 173:6
  175:20 181:21
**implication**  199:3
**importance**  35:11
  35:13
**imprecise**  98:3
**impression**  73:16
  186:6
**impressions**  32:5
  115:10 116:13
  117:6 161:10
**improper**  118:9
  118:16,18,20,21

119:8,18 121:19
**improperness**
  121:24
**inaccurate**  132:18
  170:16 187:9
**inappropriate**
  138:9
**inclination**  179:24
**inclined**  158:13
**include**  87:16
  92:18 139:22
  178:14
**included**  51:6
  82:18,22 83:3,7
  84:5 85:3 88:9
  89:14 93:11
  154:14 168:5
  194:13
**includes**  80:23
  137:7
**including**  27:14
  126:24 150:7
  186:4
**inconsistent**
  172:23 173:20
  174:15 186:13
  196:25
**incorrect**  185:3
**incurred**  199:14
**indemnification**
  4:10
**indemnity**  8:10
  30:10 31:16 32:24
  35:10,11,14,15
  36:3 37:7,11
  38:14 44:16 45:19
  46:10 47:19,22,23
  47:25 48:24 49:11
  49:21 50:7,13
  114:5 133:15,16
  140:15,21 141:5

141:13 142:22
143:3 145:3
**index**  14:2
**indicate**  119:15
  187:7
**indicated**  21:14
  43:11 110:14
  144:14 181:16
  184:20 186:3,22
  187:11,16 188:20
  190:6 204:10
**indicates**  188:4
**individual**  33:23
  66:16 101:4
  134:21 194:20
  199:23
**individually**  20:13
  173:5
**individuals**  26:13
  70:14 81:3 82:14
  176:19
**industry**  106:13
**infer**  158:10
**informal**  47:17
  136:4,16
**information**  18:22
  19:5 39:10 44:2
  57:6 59:16,23
  68:15 71:10,22
  100:8 106:8,10,21
  107:8,11 109:16
  109:25 110:4
  132:14 139:5,6
  140:10 159:23
  174:7,14 177:11
  177:22 178:3
  179:19 180:8,12
  180:16,23 181:17
  181:19,21 182:18
  184:18 185:11,13
  185:21 186:2

187:16
**informed** 125:22
**initial** 16:16 64:4
  82:15,19,23 83:7
  85:3 88:9 143:21
  145:2 162:4
**initiate** 105:22
**injunction** 132:7
  132:10 133:6
  145:8,15
**injury** 15:5 54:6
  56:21 63:6,14
  64:25 65:19,24
  68:11,24 74:9,11
  74:17,19,25 75:6
  75:14,21 76:16,20
  76:24 77:14 80:24
  82:11 83:5 84:3
  87:17 91:24 93:10
  96:2 100:19
  101:10,18 102:10
  105:9,24 106:4,22
  107:15 108:13,16
  108:23 109:11
  110:3 151:9
  152:21 154:17
**inquiries** 67:18
**inquiry** 71:19
  200:15
**inspector** 57:17
  58:11
**instruct** 39:8
  66:21 69:14
  163:23 164:2
**instructing** 31:5
  68:16 73:3
**instruction** 68:21
  73:8,9 124:9
  164:14
**instructs** 68:7

**insurance** 4:10 7:3
  8:3,11 9:3 141:16
  141:20 142:12
**insurers** 59:10
**intake** 68:23 176:5
  176:20,21 190:25
  191:7
**integrity** 157:13
**intend** 94:21
**intended** 104:25
  129:8,9,11
**intending** 122:17
**intends** 188:4
**intentional** 199:18
**intentions** 121:13
  121:19,24
**interest** 38:12 39:5
  39:20 40:6 42:21
  47:7 51:2,5,10,13
  51:17 52:9,21
  53:2,9,23 54:8,12
  54:19,24 55:25
  56:3,24 57:6
  58:13,24 59:9,15
  59:22 60:16 61:2
  62:16 101:16
  129:15 131:4
  134:22 150:13
  163:9,12,21 192:6
**interested** 204:17
**internet** 66:4
**interpret** 118:19
**interrupt** 112:19
  117:14 127:13
**intimately** 66:2
**introduced** 152:20
**invade** 118:23
  130:23
**invades** 38:6
**inventory** 21:17
  157:9

**investigate** 70:13
**investigation**
  70:19
**invited** 48:19
**invoke** 178:20
**invokes** 176:17,20
**involve** 54:2 55:22
  55:23
**involved** 37:10,22
  37:23 43:24 48:3
  52:11,11 76:7
  144:6,23 145:10
  145:20 149:3,4,24
  150:4 154:24
  156:8,9 160:21
  196:8
**involves** 199:6
**involving** 147:7
**ipad** 17:19 152:10
**isaac** 21:5
**isley** 10:9
**isley.gostin** 10:10
**issue** 17:19 18:13
  26:17 32:11 38:23
  72:3 98:23 116:18
  125:23 134:9
  145:15 166:7,12
  167:16,18 172:13
  172:14,20 190:2,7
  193:14
**issues** 38:7 44:18
  44:20 45:19 46:5
  56:19 185:5
  193:17 197:7,13
  198:7,13 200:2
  201:5
**it'll** 63:2
**itkin** 1:11 2:6 13:3
  14:4,11,17,20,23
  15:6 16:1,4,11
  17:1 18:1,4,12,19

19:1,10,19,21 20:1
  20:13,15 21:1
  22:1 23:1,24 24:1
  25:1 26:1,13 27:1
  28:1 29:1,3,6 30:1
  31:1 32:1 33:1
  34:1,23 35:1,3,8,9
  36:1 37:1 38:1
  39:1,6,13 40:1,3
  40:10 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1,2 48:1
  49:1 50:1,18,25
  51:1 52:1 53:1
  54:1 55:1 56:1
  57:1 58:1 59:1,21
  60:1 61:1,8,20
  62:1,4,13,15,16,19
  62:19 63:1,5,13
  64:1,24 65:1,18,24
  66:1,10,15,19 67:1
  67:3 68:1,3,9,23
  69:1,9,21,22 70:1
  70:7,13,20,23 71:1
  71:12 72:1,19
  73:1,11 74:1,10,16
  74:23 75:1,13,23
  76:1,7,15,19,22,25
  77:1,18,22,24 78:1
  78:12,17 79:1,11
  79:13 80:1,9,17
  81:1,9,25 82:1,10
  83:1,6 84:1,4 85:1
  85:16,23 86:1,11
  86:18 87:1,5,13,18
  88:1,3,15 89:1,7
  89:21,23 90:1,6,16
  90:20,21 91:1,10
  91:23 92:1,11,17
  92:23 93:1,9 94:1
  94:10,16,21 95:1,2

95:13,22 96:1,8
97:1,18 98:1,7,7
99:1,13 100:1,17
100:17 101:1,11
101:18 102:1,8,11
103:1 104:1 105:1
105:3,8,21 106:1
107:1,6 108:1
109:1 110:1 111:1
111:24 112:1,23
113:1,23 114:1,10
115:1,4 116:1,6
117:1,21 118:1,3,8
119:1,7,16 120:1
120:14 121:1,11
122:1,22,22 123:1
123:11,15 124:1
125:1,4,8 126:1
127:1,8,23 128:1
128:13 129:1,6
130:1,3,5,17 131:1
131:10 132:1,19
133:1,11 134:1,11
134:17,25 135:1,9
135:20 136:1,4
137:1,6,22 138:1
139:1,11,24 140:1
140:14,17,20
141:1,3,11,15,19
142:1,10,17 143:1
144:1,24 145:1,16
145:18,21,24,25
146:1,24 147:1
148:1 149:1 150:1
151:1,4,9 152:1,2
152:22 153:1,7
154:1,6,12 155:1
156:1 157:1,17
158:1,9 159:1
160:1 161:1 162:1
162:24 163:1,3,17

164:1 165:1,7,22
166:1,25 167:1
168:1 169:1,4
170:1 171:1 172:1
172:21 173:1
174:1,4,21 175:1
175:13,16,22
176:1,2,4,24 177:1
177:3,13 178:1,14
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
190:10,20 191:1,6
191:8,11 192:1,21
193:1,10,13,22
194:1,12,15 195:1
195:5,15 196:1,4,9
197:1,17 198:1,11
198:21 199:1,13
199:22 200:1,3,4
200:12 201:1
202:1,13,22 203:1
205:4,14 206:5,18
**itkin's** 112:15
113:24 172:12
192:15 201:11

**j**

**j** 11:19
**j&j** 30:7 31:13
32:9 35:2 46:10
47:19 49:21 50:12
50:12 64:8 103:7
103:20 104:13
109:10 110:2
124:14 140:15,21
141:5 144:20
145:9 147:3,4,5
148:4,21 149:24
150:7,13,13
202:23

**j&j's** 147:17 149:5
**james** 10:13
**january** 85:24
86:7 87:15 89:24
**jason** 1:11 2:6
4:17 14:4 16:4
205:4,14 206:5,18
**jersey** 2:11 7:21
204:7,24
**jest** 102:22 103:25
104:2,5
**jfrye** 4:18
**jim** 36:6 40:13
41:12 43:6,8,10
44:6 46:15,16,20
51:7,10 103:14
128:17 130:6
131:19 143:6,7
147:7,14 149:3,3,7
149:11,16,23
150:8,9,12 163:14
**jmorris** 13:10
**job** 1:21 71:18
103:20 104:14
111:18 144:18
148:13
**joe** 85:21 86:25
87:11 90:13 95:5
100:15
**joe.teresi** 3:13
**jogged** 48:11
**john** 13:9 19:24
24:19,23 25:2,25
26:22 27:23 36:5
41:21 42:3,24
54:10,13 84:13
90:9 101:24
112:18 120:16
124:17 127:12
129:19 131:20
159:16 163:13

164:5 184:5 190:4
192:23
**johnson** 11:12,12
59:17,17,24,24
74:18,18,20,20,25
74:25 75:8,8,9,9
102:9,9,12,12,18
102:19 105:4,4,5,7
105:7,22,22 106:3
106:3,23,23
107:16,16 108:21
108:21 141:12,12
202:16,16
**joint** 15:13 39:4,5
55:25 59:4 134:22
134:22 151:14
153:2
**jointly** 1:7
**jokingly** 62:25
**jones** 13:4,11 21:5
**joseph** 3:12
**josephine** 1:20 2:8
204:4,22
**judgment** 121:23
**june** 1:12 2:2,7
204:19 205:6
206:4
**justice** 11:4

**k**

**k** 7:23 8:13
**katz** 5:15
**keep** 48:9 104:20
198:24 199:17
**kept** 129:8,9
130:14
**kevin** 12:16
**kguerke** 12:17
**kim.posin** 3:15
**kimberly** 3:15
**kind** 32:4 96:22
118:16,22 119:22

124:12 128:7
133:2,7,9 134:21
138:2,5 167:14
189:25 198:15
**king** 4:5 11:6
12:13
**klee** 9:12
**know** 17:3,20 19:6
21:19 24:8,14
25:2,5,17 26:11,18
27:2 28:3 29:25
32:22 33:7 36:22
36:23 37:10,16
38:15,24 40:17
42:8,15 43:17
45:2,4 48:17
51:13,22,25 55:5,6
56:7 58:2 59:5
63:16,22 64:2,6,6
65:2 66:3 67:12
67:14,23 69:25
72:3,6,7 73:13
74:3 75:4,10,25
76:5,11,14 77:8,12
78:14 82:4,22
83:2,4 88:21 89:4
92:24 93:25,25
94:5,8,9,13,16,20
96:10,14 97:3,4,7
97:15 98:11,14,17
98:19 103:10
107:20 108:10,15
108:16,18 109:4
109:20,21 111:3
111:18 112:21
114:6,16 116:11
118:15,22 120:24
122:20 126:24
127:2,3 130:9
131:15,24 132:24
133:19,24,25

135:10 137:19
139:3 140:7
144:15 145:13,13
145:22 146:11
148:25,25 149:12
149:21 150:3,3,9
150:19,20 152:18
156:3,7,12,13
157:6,10,13,23
158:3,22,24 159:3
159:6,7 160:20
161:3,12,21,24
162:7,7,10,14
163:22,24 164:22
164:22 166:19
167:13,21 171:7,9
171:9,13 172:18
173:6,12 176:11
178:2 186:10,25
187:5,8 188:2
190:9,16,19 191:2
191:15 194:8,10
194:18 195:2,9,12
197:12 198:2,11
198:15 199:3,4,18
199:18 201:8,16
201:20,24 202:24
203:3
**knowable** 76:14
**knowledge** 96:22
106:7,9 110:7
136:20 141:14
150:5,11 154:9
171:19 182:10,11
182:12
**knows** 165:22
**ktbslaw.com** 9:18

**l**

**labeled** 29:23
151:2

**lack** 126:25
133:16,17
**laid** 133:14,15,20
137:19 138:3
184:8
**lane** 7:19
**large** 161:17,17
**largely** 174:22
**larger** 95:16
**largest** 35:16,16
35:19 155:20
**lasalle** 4:13
**late** 158:10 159:24
161:17,19 162:2,2
162:8,9,15 163:2,4
163:18 164:21,23
164:24 165:6,8,9
167:19 179:4
184:19
**latest** 22:7 82:5
**latham** 3:4 16:12
50:2,5,6
**laura** 13:11 21:5
**law** 24:25 26:12
37:22 40:14 41:2
41:3 57:4 65:22
66:8,11 73:12
154:3,16 155:18
155:21 165:15
186:19,19 188:3,4
190:24 191:12,24
193:12 194:5,22
195:8 197:7 198:6
198:9,10,13
199:11,14 200:11
**lawyer** 22:13
24:16,18 39:13
48:15,20,20,21
132:4,23 133:7
143:24 164:16
167:11 194:9

**lawyers** 30:8
31:14 48:12,15,19
57:4 62:23 104:19
108:11,12 131:18
131:18 135:8,8
144:22 145:22
146:5 161:12
170:12 197:24
199:7
**lay** 159:2
**laying** 111:19
**lays** 159:4,10
**layton** 4:4
**lead** 197:8,11,15
198:25 200:12
201:4,15,20 202:2
**leads** 67:8 68:10
**learn** 150:18
**learned** 150:19
**leave** 63:2 135:13
141:25
**leaving** 123:14
**led** 186:7
**legal** 73:18 106:13
119:6 120:11
**leisure** 153:16
**lengthy** 79:22 80:3
**letter** 73:21,23
95:22 96:20 97:12
97:15
**leverage** 30:7
31:13 32:8 35:2
**levin** 8:4
**lexitas** 79:4
**license** 204:23,23
**limited** 105:16
**linda** 11:10
**linda.richenderfer**
11:11
**line** 19:4 127:4
147:3 206:6

**lines** 25:8 48:5
186:22
**linville** 165:16
**lion's** 179:4
**lipton** 5:15
**liquidation** 120:21
**lisa** 10:16
**list** 51:6 65:13
70:7 87:2 88:5
92:5,6 95:3
164:24 165:13,18
165:19 194:14
**listed** 32:2 70:12
71:11 94:12,19
96:4 165:10
178:17 191:10
**listen** 134:6
**listing** 92:11
**lists** 80:19 82:8
149:20
**litigation** 6:12
40:16 43:24 63:10
63:11,11 75:6,22
77:3 102:18
103:15 154:13
156:2,4,6,6,8,9
**litigations** 54:22
**litigator** 16:16
22:13
**little** 75:4 96:21
97:15 98:13,24
104:2 188:24
**ljones** 13:12
**llp** 3:4 4:12 6:5,14
7:5,12,19 8:12 9:4
9:12 10:5 11:13
12:4,11 13:3,4
14:11,17,20,23
15:6 18:4 77:19
79:13 86:11 90:16
151:10 152:22

**lnorman** 10:17
**locke** 12:8
**lodged** 114:3
**log** 164:8
**lombardi** 6:18
**long** 56:10 73:23
118:23 174:4
**longer** 53:9 119:22
176:12
**look** 63:21 64:10
65:5,8 75:16
78:19 114:25
116:9,10 129:3
156:13 158:4
164:23 166:18
169:17 171:12
183:6 189:23
190:17 196:17
199:19 201:6,13
202:6
**looked** 177:17
196:6
**looking** 32:13,14
78:25 79:3 84:19
161:16 169:5
**looks** 87:5 152:9
152:10
**loop** 127:21
**los** 3:6 9:15
**lose** 30:6 31:11
**lost** 109:24
**lot** 39:24 65:21
100:5 108:11
116:23,24
**low** 107:23
**lower** 96:11,13,19
**lpa** 153:21
**lss** 1:6
**lw.com** 3:9,11,13
3:15,17,19

**m**

**m** 5:12 10:9,16
**ma'am** 73:6 124:7
**madison** 7:21
**magnitude** 90:2
**maintain** 51:20
**majority** 81:16
96:9 172:19 195:3
**making** 16:14
72:16 148:18
157:12 169:16
**manges** 11:13
**manner** 172:23
**maoz** 9:17
**marc** 8:8
**march** 90:23
91:22 92:2,9,11
128:21,23
**marcos** 4:8
**maritime** 63:7
**marked** 18:4,23
23:21,24 77:19
86:12 90:17
151:18
**market** 6:6 13:5
**marketing** 65:22
65:23 66:4 67:17
**marriage** 204:16
**marx** 7:19
**mass** 156:6,11
**master** 155:4
158:11,18 159:24
174:23 175:5
178:16,17 190:21
191:9,10,19
192:17,22
**matches** 93:4
**math** 144:4 171:9
179:9
**matter** 16:16
105:19 204:17

**mattered** 189:6
**matters** 41:23
53:22 56:15 58:7
58:19
**matthew** 3:16
**matthew.salerno**
3:17
**maximizing** 52:12
**maximum** 136:12
136:18
**mcrawford** 5:11
**mdl** 54:5,22 56:17
76:7,8,10 154:19
154:24 177:4,6,8
177:10,14,16,23
**mean** 33:6 35:13
37:12 41:6 44:25
49:12 59:12 64:6
66:7 70:17 71:15
76:11 80:10 86:3
104:13 106:12
108:17 111:2
112:19 113:3,4
114:13,22 116:20
116:22 118:13
120:4,5 125:20
127:13 130:13
138:12,20 141:23
148:19 149:9
150:5 155:9,25
157:5 158:5,25
167:17 172:7
179:9 185:24
195:8 198:8
201:25
**meaning** 118:18
**means** 22:14 23:5
23:7 27:19 32:22
69:7 116:23
118:21

**meant** 33:5,7
  93:18 104:15
  130:14
**medical** 68:25
  70:23 71:5,13,18
  72:4,19
**meeting** 51:16,16
  51:21,23 143:4
**mehaas** 8:9
**member** 46:15
  52:5 128:6
**members** 36:7
  49:4 125:24
  126:10 143:4
  150:16 167:2
  179:23 189:17
**memory** 24:15
  48:12 62:22 79:20
  103:4 134:14
  143:15 165:12
  173:11 189:3
**menright** 6:11
**mental** 32:5
  115:10 116:12
  117:6 161:10
**mention** 189:5
**mentioned** 26:14
  43:4 45:4 47:8
  52:7 54:10 132:4
  134:20 147:8
**meso** 132:4 133:4
**mesothelioma**
  30:8 31:14 81:5
  81:10,15 82:2
  123:24 125:25
  141:21 145:7
  157:8
**michael** 6:10
**mid** 36:15
**million** 107:19

**mind** 126:18
**mindful** 45:24
**minds** 161:15
**minerals** 5:14
**mines** 5:3
**mintz** 8:4
**mintz.com** 8:9
**minus** 104:20
  179:13
**minute** 50:17
  138:16 146:9
**minutes** 104:9
  117:18 202:7
**miranda** 8:17
**mischaracterizes**
  26:3
**misspoken** 86:5
**misstating** 34:19
**mistake** 171:11,14
**mistaken** 86:9
**mistakes** 171:16
**mittendorf** 7:19
**molten** 36:8 40:15
  40:17 55:12 56:4
  56:4 164:18
**moment** 44:10
  70:6 171:14
**moments** 190:6
**money** 30:6 31:12
**monies** 97:25
**months** 51:25 52:3
  56:12,12 58:15,16
  74:5,6
**monty** 5:10
**morning** 16:9,15
  45:18
**morris** 13:9 19:23
  19:25 20:6,25
  22:10 24:12 25:11
  26:2,15 30:15,21
  31:2,6,20 32:25

33:15,20,25 34:7
34:21 39:12 45:12
45:15 46:25 49:15
50:21 51:11 56:18
59:19 60:18 61:13
61:18 62:8 63:24
65:10,16 66:13,17
66:23 67:10,20
68:14,18 69:2,17
70:15,21,25 72:10
72:17 73:2,5 77:4
81:11 84:7,9,11
85:5 86:3,8 87:22
89:18 90:10,25
91:4,8 93:14
94:14 97:21 98:9
100:25 101:21,25
102:4 105:11,18
106:5,25 109:12
109:18 110:8,11
112:13,20 113:9
113:15,20 115:14
116:2 118:11
119:10,20 120:4,8
120:17 121:6,9,15
122:11 123:20
124:2,7,11,20,25
127:14 129:14,22
136:7 137:17
138:13 140:3
141:2,8 142:8,15
142:19 146:18
152:5 157:3 163:6
164:6,11 168:8,13
168:18,21 176:11
178:21 192:19
193:3,7 199:24
200:17 202:10,18
**motion** 15:4 21:20
120:10 151:3,5,8
152:13,21 153:9

153:13,20 154:8
154:11 155:3
157:16 158:9
160:7 165:21
166:24 167:8
168:9,12 170:24
174:8
**mouth** 186:6
**movants** 166:25
**move** 122:4 174:6
183:15
**mturner** 8:18
**multi** 154:13
**multiple** 102:25
111:11 147:20
**murdica** 103:14
103:23 104:4,22
147:7 149:4,24
150:8,12
**mute** 117:11 178:6
178:7 183:10,14
**muted** 90:9
**mutually** 154:20
154:22
**myers** 10:12

**n**

**n** 2:5
**n.w.** 5:6 8:13 10:6
12:5
**name** 25:4,6 40:15
57:3 80:23
**named** 51:3 57:8
**names** 24:21
132:25
**narrow** 81:18
**natural** 146:7
**nature** 80:24
137:14
**ncra** 204:23
**neal** 4:12

**nearing** 146:10
**necessarily** 43:22
  48:4 117:6 121:20
  195:20
**necessary** 146:13
**need** 17:8 36:12
  66:25 71:19 84:19
  95:15 110:19
  115:23 121:7
  146:8 152:13
  154:21 160:6
  169:14 193:5
**needs** 120:2
  173:24
**nefarious** 118:22
**negotiated** 115:5
  115:13 116:16
  117:3 118:10
  119:8,19
**negotiating** 30:7
  31:13 32:8 35:2
**negotiation** 97:3
**never** 30:11 31:18
  45:9 47:15 104:24
  125:13,17 127:5
  128:8 147:19
  148:9 154:12
**new** 2:10,10 5:17
  5:17 6:16,16 7:14
  7:14,21 8:6,6
  11:15,15 89:5,5
  94:18,21 204:6,7
  204:24,24
**nge.com** 4:18
**nicholas** 5:19
**ninth** 15:12
  151:14 153:2
**nir** 9:17
**nmaoz** 9:18
**noah** 193:25 197:5

**noise** 178:8
**non** 23:14 102:13
  128:6 137:11,24
  138:11 139:13
**noncommittal**
  48:9,10
**normal** 17:3
**norman** 10:16
**north** 4:5,13 12:13
  13:5
**nos** 162:10,15
**notary** 2:10 204:6
  204:24,24 205:19
  206:24
**note** 189:16
**notes** 57:10 146:14
  202:7
**notice** 14:10 18:2
  18:3 19:12,22
  71:21 111:22
  115:20 117:9
  157:19 165:24
  171:21 172:5
  195:20 199:21
**notified** 196:9
**november** 77:23
  79:15 82:9 83:6
  84:6 88:17 89:10
**number** 20:3 30:5
  31:10 32:2 76:12
  76:13 77:15 80:11
  80:11 82:8,10
  83:20 84:3 89:21
  89:25 92:24,25
  93:3,4,25 107:14
  135:16 150:24
  155:20 166:7,12
  168:6,16 170:4,4
  172:13 177:2,9
  178:17,24 184:17
  190:13,16

**numbered** 80:10
**numbers** 43:18
  75:24 107:10,14
  108:9,22 155:19
  174:25 175:5,14
  175:17,23 176:5
  176:19 177:14
  178:15
**nwalter** 5:20

**o**

**oath** 16:6 67:25
  68:13 89:4 102:23
  107:5 147:14
  205:5
**object** 19:23 37:25
  39:8 59:19 66:13
  67:20 69:19
  107:25 127:15
  136:7 138:13
  192:24,24
**objected** 101:25
**objection** 22:10
  24:12 25:11 26:2
  26:15 30:15 32:25
  45:12 49:15 51:11
  56:18 60:18 62:8
  63:24 67:10 69:2
  70:15 77:4 81:11
  84:7,9 93:14
  94:14 97:21 98:9
  101:21 106:5,25
  108:2 109:12,24
  115:22 118:11
  119:10,20 121:15
  122:11 123:20
  137:17 140:3
  142:19 157:3
  163:6
**objectionable**
  138:21 140:8

**objections** 21:18
  30:2 36:25 37:9
  37:21 45:2 110:23
  111:11 114:4
  117:10 140:8,11
  193:5
**objectors** 37:23,25
**obligation** 140:15
**obligations** 40:5
**obtain** 180:2
**obtained** 110:2
  180:24 181:17
**obviously** 22:16
  44:25 47:9 52:24
  52:25 65:3 98:16
  114:22 116:9
  118:13 126:22
  127:2 138:22
  186:20 194:7
**occasion** 24:10
**occasionally** 72:3
**occurs** 198:20
**offer** 105:7 197:17
  198:21 199:13
**offered** 42:4
  160:14 161:13
**offering** 38:17
**offhand** 43:25
  65:2 92:24 102:21
  104:10 108:11
  190:13,17
**office** 11:3 51:23
  146:3 170:12
**official** 5:3 6:3,12
  7:3 46:11 147:15
  147:17 148:6
  149:5,8,9,16
**offline** 129:20
  181:10,23
**oh** 64:5 169:12

**okay** 17:3 19:10
20:6 34:21 44:21
45:21 57:12 65:10
65:16 66:15 78:2
81:8,18 87:3,15
90:24 91:4 95:15
102:3 112:20
113:3,15 115:4
116:4 117:16
119:16 120:17
121:9 127:14
138:20 144:3
146:16,18 153:15
164:5,9 165:9
169:8,12 172:12
181:5 183:17
193:8 202:5,10
203:4
**old** 157:9
**once** 33:6 61:10
112:2 114:13
118:17 143:18,19
160:2 185:10
197:9 200:13
201:19 202:2
**onder** 36:7 40:13
41:12 43:4,5,6,8
43:10 44:6 46:15
46:16,20 47:4
51:7,10,15 52:4,22
53:2,8,18,23 54:15
128:17 130:2,6
131:19 134:21
143:6,7 163:14,17
185:4,6,17 186:3,8
186:19,20,22
187:11,16 188:3,4
188:10,14,20
189:13 202:25
**onder's** 186:21

**ones** 57:18 133:5
144:14
**ongoing** 118:14
139:18,19 140:9
**open** 126:20 127:5
127:9
**openminded** 134:6
**opining** 173:13
**opinion** 56:15
**opinions** 123:22
**opportunity**
124:23 165:25
166:17 171:22
172:6
**oppose** 139:11,25
**opposed** 67:7 68:9
131:3 200:5
**opposite** 124:12
**opposition** 130:20
130:21
**oral** 14:10 18:3
**orally** 195:13
**order** 72:20 90:2
172:24 173:9,21
174:16 180:2
**original** 88:15,17
89:10,15
**outcome** 204:17
**outreach** 195:12
**outright** 67:7 68:9
**outside** 44:24 54:5
60:15,25 123:17
137:3 142:11
**ovarian** 14:14
23:21 24:3 29:24
81:3,6,16 82:6
87:7 124:6 126:2
141:21
**oversee** 47:21

**p**

**p** 2:5
**p.a.** 4:4
**p.c.** 8:4 10:12
**p.m.** 1:13 2:3,7
203:10
**pachulski** 13:4
21:6,10 37:22
73:12,24 131:19
133:8
**page** 14:3,9 15:3
23:25 95:8 168:6
173:12 205:11
206:6
**paid** 99:3,13 106:3
132:5
**papers** 60:20,21
126:23
**paperwork** 20:22
21:14 114:3,3
**paragraph** 153:20
154:11 155:3
157:16 158:8
165:21 166:24
170:4 171:18
174:20 178:22
179:18 182:19
183:4,22 184:17
185:18 186:4,9
189:13,15
**paragraphs**
153:17
**parent** 137:12
**park** 7:13 9:13
**part** 17:18 55:25
66:3 71:17,20
74:14 104:17
121:18 137:8
143:20,21 150:15
157:11 159:7,15
160:17 174:10

175:7,9,10 176:5
176:19,23 184:12
186:8 187:9
195:20
**participated** 39:14
154:18
**particular** 24:25
25:21 27:17 65:12
96:16 187:2 200:4
**particularly**
179:22
**parties** 15:10 51:3
57:2,4,5 60:3 64:8
94:18 137:7
151:12 152:25
165:22 166:16
171:19 204:15
**partner** 25:3
**parts** 167:12
**party** 34:24 58:25
61:21 62:5,14
76:25 101:16
123:12 128:4
130:2 141:3
142:10
**pay** 66:10 67:7
68:9 108:18 199:7
**pdf** 95:9 168:16
**pending** 17:11
**pennsylvania** 6:8
7:6 10:6
**people** 26:7,22
27:21 36:3 39:19
48:2 88:5 93:21
106:13,18 130:20
131:2 150:15
156:7 161:13
184:10 187:4
198:9,10
**percent** 37:19
81:13 96:5,11,19

96:25 97:5,19
98:8 161:18
**percentage** 96:18
97:6 161:17
**perfectly** 34:10
**performed** 142:6
142:7
**period** 25:15
36:13 46:24 52:20
53:7 54:11,14
55:3,7,8 130:6,25
**periodically** 17:9
**permit** 15:8
151:11 152:23
**permitted** 178:25
197:19 198:23
199:15,17 200:14
**person** 66:5
**personal** 12:3 15:5
42:17 47:5 54:6
56:21 63:14 64:25
65:19,24 68:11,24
74:9,11,17,19,25
75:6,14,21 76:16
76:20,24 77:14
80:24 82:11 83:5
84:3 87:17 91:24
93:9 95:25 100:19
101:10,18 102:10
105:9,24 106:4,22
107:15 108:13,16
108:23 109:11
110:3 151:8
152:21 154:17
172:9
**personally** 50:8
109:6 144:6
**pharmaceutical**
63:10 156:2,4,5
**philadelphia** 6:8

**phone** 20:20 21:3
27:25 49:25 50:5
50:6 87:21,24
144:19
**phrase** 116:7,19
117:5
**phrased** 35:6 99:6
99:24 191:5
197:21,25
**pickering** 10:5
**picking** 189:24
**place** 10:13 30:12
31:18
**placing** 46:14
**plaintiff** 156:18
198:23
**plaintiff's** 150:12
**plaintiffs** 10:11
198:10
**plan** 14:14 15:8,13
22:7,7,17 23:3,10
23:20 24:2,17
26:8,24 27:22
29:24 30:3,3,7
31:12 32:8 34:25
36:25 38:2,11
41:14,16,17,18
42:2 43:2,8,12,19
44:14 46:3,7,12
52:11,24 53:3,4,5
53:10,14,15,19
54:20 56:16 92:23
98:15,17 99:2,7,12
99:23 100:2,6
110:15 121:12
122:6,7,16,17
125:19 126:20
127:9 128:2 130:8
130:10,12,18,19
130:25 131:3,4,11
134:19,24 135:2

135:20,22 136:9
136:19,21 137:6,8
137:20 138:10,22
139:12,22 140:2
140:19 142:17
144:8,25 145:19
146:3 151:11,15
152:24 153:3
154:24 157:2,24
158:13,20 159:25
161:25 162:17,17
162:17 167:5,6
172:22 173:19
174:14 179:4,20
179:21,25 180:3
182:2,8,15,20,22
182:24 184:20
189:5,10,19,20
203:2
**planned** 184:21
187:12,17,18
188:11,21
**plans** 21:19
**plant** 63:7
**plaza** 7:13
**pleading** 157:18
157:25
**please** 17:25 19:6
31:7,9 61:25
62:24 85:21
100:16
**point** 30:5 31:10
41:5 47:8 54:18
70:8 72:10 107:19
109:14 112:7
113:13 114:20,21
120:21 124:12
127:17 132:12,21
133:3 134:7,8
141:7 146:8
179:14

**pointing** 139:16
**points** 18:18 160:5
**politics** 104:9
147:22
**popeo** 8:4
**population** 91:22
**portion** 19:8 62:2
79:24 177:3 187:8
192:20
**portions** 106:19
152:14 153:17
**posin** 3:14
**position** 60:21
72:8 111:13,17
113:18 118:14,16
118:21 127:16
134:2,4,5,7,15
137:22 139:2
147:17
**positions** 111:19
112:24 115:2
119:15 126:22
138:3,20 140:7
**post** 43:15 49:17
180:17
**potential** 65:19
105:23
**potentially** 35:16
71:14,15 92:15
98:19 139:4
179:20 185:3
187:7,9
**powder** 157:8
**practice** 74:15
**practices** 156:11
**pre** 51:23
**precise** 55:5
111:10 164:25
**predate** 48:13
49:3

**predated**  51:24
52:2
**predates**  54:15
56:8
**predominantly**
161:19,21
**preference**  85:8
**preliminary**  43:18
170:6 171:23
**preparation**  21:23
22:3,5 28:7,16,20
78:4 79:25 113:19
**prepare**  20:18
21:10
**prepared**  20:14,17
65:25 67:22 68:12
113:7,12 114:19
115:21 120:10
170:10 181:9
194:19
**preparing**  28:18
**present**  13:14
**presented**  125:6
**presumably**
138:25
**pretty**  36:9 52:16
73:19 155:17
195:4,4
**previous**  90:3
**previously**  184:20
199:14
**primarily**  193:24
196:22,24 198:8
**prime**  15:9 43:17
151:12 152:24
165:10 179:11,14
186:13,15 190:14
193:11 196:9,10
196:15,20,23,25
**prior**  64:23 140:8
146:24 162:3,18

171:22 191:8,18
**private**  129:8,9
**privately**  143:22
**privilege**  32:11,13
32:20 39:5,20
40:6,12 45:24
47:7 51:20 52:17
53:2,9 55:22,24
56:2 61:7 62:11
71:10 82:21 83:18
83:20,25 88:24
89:17 92:21 94:23
101:6,14 108:4
112:4 114:7,17
117:7 118:24
119:14,14,25
121:25 123:4,10
129:15 130:23
134:23 135:3
137:2,4 138:6
139:20 140:12
141:7 142:2,3,14
163:9,12,21 164:8
173:7 175:21
176:8,17,20
178:12,20 181:3,4
191:4 192:13,14
200:18,20,22,22
**privileged**  36:22
41:10 46:17 51:19
53:6 85:2 90:11
102:7 123:13
129:7,10,11,12
131:5 139:6,7
176:22 180:18,20
181:7,21
**privileges**  33:13
60:12 100:24
111:9 123:2
**privy**  39:24

**pro**  38:16
**probably**  21:21
26:19 36:15 41:10
41:12 52:15 54:23
65:6 71:9 84:20
97:5 98:3 104:23
114:25 128:10,22
129:4 156:20
175:24 177:25
195:14 196:7
197:21 198:17
**probe**  66:21
**problem**  121:18
184:2
**problems**  126:23
**procedures**  22:23
110:16 166:16,19
166:22 172:24
173:4,9,11,14,20
174:2,16
**proceed**  34:20
**proceeding**  20:22
154:14 177:4
**proceedings**
154:19
**process**  47:22
157:14 176:20,21
177:25 190:25
191:7 192:20
194:21
**produced**  73:15
73:17
**product**  32:5,14
32:20 33:13 38:7
60:12 61:12 70:16
70:22 71:10,23
72:23 73:5 88:12
100:13 101:2
108:3 109:13,15
111:9 114:7 115:3
115:10 116:12

118:24 119:14
123:9 124:3
127:17 130:4
131:13 137:2
138:6 139:6
140:12,25 141:8
142:4,15 161:2,4
175:21 176:8
191:4,23 192:19
193:2 200:8
**products**  12:3
**professional**  2:9
204:5
**professionally**
42:17
**program**  11:5
**prohibit**  59:16
**promise**  37:13
**promised**  37:14,15
202:25
**proof**  72:21
**proofs**  72:13
**proper**  120:12
**proponent**  46:4,12
131:11
**proponents**  15:9
23:3,10 44:14
46:7 121:13 122:6
122:16 125:10
126:20 127:9
128:2 130:10,12
130:18,19,25
134:19,24 135:2
135:20,22 136:9
136:19,21 151:11
152:24 161:25
162:18 172:22
173:19 174:15
179:21 182:20
**proposal**  38:4
44:19 45:23 46:3

46:7 47:16,17
126:16,21 127:9
127:22,25 128:3,5
128:7,14,16
129:20 134:12,18
134:24 135:2,12
135:20 136:4,16
200:11 201:3
**proposals** 48:4
126:8 133:12,24
134:8
**propose** 122:7
126:13,15,19
127:8 195:5 197:7
**proposed** 22:8
110:15 128:13
129:6,25 131:10
135:25 136:6,13
**proposing** 121:14
122:17
**proprietary** 68:14
68:15 191:3,23
**prosecute** 47:23
66:8 194:11
**prosecuted** 37:8
37:11 50:8
**prosecuting** 61:14
**prosecution** 39:4
48:23 49:11 54:2
56:22 59:5
**protect** 59:16
**protected** 61:2,6
163:8,20
**protects** 54:12
57:6 59:22
**provide** 40:25
44:2 140:9 177:11
177:22
**provided** 186:21
**providence** 9:3

**provision** 132:8
133:13 153:23
**pszjlaw.com** 13:10
13:12
**public** 2:10 61:7
61:10 119:15
204:6,24,24
205:19 206:24
**pull** 77:6 168:4
**pulling** 18:8
**purpose** 36:19,23
**purposes** 177:7
195:17 199:24
**pursuant** 14:17,20
14:24 77:19 79:14
85:23 86:5,11
90:16,22 137:15
137:24
**pursue** 142:22
**pursued** 143:3
145:4
**put** 19:11 20:7
95:5 108:2 118:17
128:5 129:2
152:12 156:5
178:6 186:5
**putting** 34:12
66:18 124:14
**pvc** 170:6

**q**

**quartarolo** 3:8
14:5 16:8,11
17:24 18:9,17
19:9,15 20:5,7,11
22:19 23:17,23
30:18,24 31:3,8,22
31:24 33:18,21
34:6,18,22 40:7,9
47:10,12 50:15,20
50:24 61:16,19,24
65:14,17 66:15,20

67:2 68:16,19
69:11,20 72:14,18
73:3 77:16,21
78:10,20 79:10
80:16,21 85:6,16
86:4,13,17,24 87:4
87:11,20 88:2
90:13,19 91:3,5,9
94:25 95:11
100:15 105:15,20
109:15 110:13
113:3,10,16,22
115:19 116:5
117:16,23 118:2
120:5,9,15 121:4,7
121:10 124:4,17
124:21 125:2
127:18 129:18,24
141:10 146:7,21
147:24 150:23
151:7,20 152:6,17
152:19 168:10,14
168:19,23,24
176:9,13,14 178:5
178:9 183:10,16
183:20 192:23
193:4,9 200:23
201:2 202:5,13
203:7
**question** 17:10
19:19 20:13 22:11
24:13 25:12,22
26:3,16 28:19
31:7,9,10,21,23
32:6,12,17,19,21
33:2,8,14 39:16
44:21 45:13 49:16
51:12 59:8,20
60:13,19 61:23
62:4,9,10,24 63:25
66:17,24 67:3

68:6,8 69:3,15,15
70:11,16 75:18
77:5,7 78:11
81:12,19 82:7,24
83:16,23 84:12,15
88:3 93:15,20
94:15 97:22 98:3
98:10,20 99:6,9,24
101:22 102:2
105:6,16 106:6
107:2 108:5
109:19,23 110:9
110:12 111:6,8,23
112:5,10,12 116:6
116:14 117:4
118:12 119:2,9,11
119:13,24 121:5
121:16 122:10,12
122:13,25 123:21
127:7,15 130:16
131:8,9 136:8
137:18 138:14,18
139:7,15 140:4
141:6 142:20
156:22 161:4,5
163:7 164:25
172:25 173:23
174:17 175:19
176:7,16 178:11
178:19 182:15
187:21 188:19
191:5,18 197:25
200:20,24 202:17
202:24 203:5
**question's** 35:6
**questioning** 34:20
**questions** 26:23
39:11 40:25 67:12
69:16 71:24 72:25
75:3 101:13
104:24 112:22

113:8,12,21
114:22 115:24
119:23 120:6
121:17,22 140:5
147:4 174:5
190:25 202:9,15
**quibble** 45:16
131:7
**quibbling** 64:19
**quick** 78:19,22
183:6
**quickly** 54:9
143:13
**quite** 79:22 156:3

**r**

**r** 2:5,5 6:10,18
204:2
**raafi** 5:12
**rafael** 9:9
**raised** 148:4
**raising** 45:7
**ramos** 4:8,9
**range** 101:4
106:22 107:13
190:15
**ranging** 47:21
**rata** 38:16
**rational** 34:10
**rc.com** 6:11
**reach** 132:2 154:5
154:6
**reached** 105:21
**reaction** 29:12,14
**read** 24:8 31:8
34:3,5,10,17 61:24
62:3 95:12 157:22
162:12 187:21
189:24 205:4
**reading** 155:8
186:24

**reads** 184:17
**real** 78:19 102:15
183:6
**really** 30:4,16 34:4
45:11 66:25 67:12
104:2 118:17
128:7,8 147:10
160:11 198:14
**reask** 28:19 161:5
**reason** 34:4 88:25
98:13 139:11
159:8 172:21
185:10,14 195:22
206:6
**reasonable** 159:6
**reasonably** 158:9
**reasons** 14:13
23:19 24:2 29:23
34:11 72:5 160:10
**recall** 21:15 60:4
64:3 116:7 148:3
153:23 158:14
166:13 170:8
175:2 190:7
**receipt** 164:16
**receive** 25:9 97:18
98:7 99:12
**received** 25:24
27:3,7,14 29:13
30:24 33:22
106:17,19
**recollection** 116:3
**record** 16:3 20:8
34:8 40:22 50:22
61:17 68:5 79:12
85:13,14 86:14
89:19 95:20 113:5
113:17 115:24
117:8,24 122:3
135:5 146:19,22
153:18 169:16

178:12 181:6,14
183:18 200:24
202:11 203:7,8
204:12 205:8,9
**record's** 84:25
**records** 70:24 71:5
71:13,18 72:4,20
**recover** 99:2
**recovered** 97:25
98:5 197:18
**recoveries** 30:10
30:11,11 31:16,17
31:17 32:24
**recovery** 67:6
97:19,24,24 98:21
98:22
**red** 156:20 157:14
160:22,24 161:7
**reduced** 55:10
58:9,21
**reed** 7:12
**refer** 110:23 112:2
114:15 115:8
153:16 167:15
**referenced** 41:4
60:2 145:20 148:2
159:21 172:14
**references** 154:12
169:16 170:5
**referencing** 36:14
166:11
**referral** 65:21
66:7 67:18
**referrals** 68:10
**referred** 22:22
28:23 55:12 56:21
180:13
**referring** 20:25
23:11 24:18 26:10
119:6 120:11
121:2 131:23

166:5 184:24
185:16 186:8
187:24 189:12
**refers** 153:21
166:6 167:13
168:2 180:15
181:12 183:8
**refill** 146:8
**reflect** 87:17 96:15
97:17
**reflected** 97:11
**reflects** 80:8 86:14
87:10 91:18
**refresh** 116:3
151:25
**refute** 180:23
**regard** 37:3 44:16
46:9 47:19 49:21
56:16 58:25 63:14
65:24 74:24 75:13
127:23 137:23
138:10 139:12,21
140:21 141:4
142:11 149:6
162:2
**regarding** 46:19
70:20 142:17
196:25 198:7
201:5
**regardless** 162:4
180:20
**registered** 2:8
204:4
**regroup** 146:15
**reichman** 3:10
**reimburse** 199:13
**reject** 158:13
162:6,17 167:4
179:25 182:7,24
189:19 200:11
201:3

**rejected** 162:9
**rejection** 179:21
**relate** 53:5 135:16
  173:14 192:15
**related** 28:15,23
  33:17 53:10 64:24
  72:12 74:9,11,16
  74:19,24 75:14,21
  76:16,20,24 77:14
  82:11 83:5 84:3
  87:17 91:24
  100:19 101:10,18
  102:10 105:9,24
  106:3,22 107:15
  108:13,15,23
  109:11 110:3
  204:15
**relates** 38:13
  52:24 53:3 54:20
  54:21 135:16,24
**relating** 15:10
  110:2 149:25
  151:13 152:25
**relationship** 42:18
  68:10 69:9 94:17
**relationships** 67:4
**relevance** 67:24
**relevant** 69:12
**relies** 114:10
**reluctant** 158:12
  158:19 159:24
**rely** 22:16
**relying** 115:17
**remember** 44:11
  103:18 147:11
  148:5,12 150:10
  155:8 163:21
  164:7 165:17
  172:18
**remembering**
  189:2

**remind** 20:4 142:5
**reminder** 61:13
  199:22
**remote** 1:10 2:5
  3:2 4:2 5:2 6:2 7:2
  8:2 9:2 10:2 11:2
  12:2 13:2 17:5
  204:8,11 205:6
**remotely** 13:14
**removed** 32:8
**removes** 30:7
  31:12 34:25
**reorganization**
  15:14 122:8,18
  151:15 153:3
**rep** 185:5 197:22
**repeat** 24:21
  120:18
**repeating** 102:23
**reported** 1:19
**reporter** 2:9,9
  62:3 204:5,5
**represent** 51:4
  63:13 64:17 74:24
  75:23 76:9 81:5,9
  81:14,25 88:15
  89:21 93:2,9,21
  94:10 125:25
  126:2 156:17,24
  161:12 194:6
**representation**
  186:18 198:20
**representative**
  12:10 23:13
**represented** 15:6
  74:10 75:13 77:13
  80:8 82:11,15
  83:6,21 84:4
  87:18 89:8 92:12
  98:6 111:20 151:9
  152:22 190:23

  191:11 202:16
**representing**
  16:12 50:12 73:25
  147:17 150:13
**represents** 42:25
  52:5 74:17 76:17
  91:19,23 95:4
  96:8 99:13 101:11
  154:18 156:11
  177:4 187:5
**reps** 194:25 195:4
  196:19 199:6
**request** 95:2
  157:19
**requested** 62:2
  181:25
**require** 68:25
  72:19
**required** 175:5
**requirement**
  37:20 166:15
**requirements**
  172:24 173:8
  175:7,11 177:10
  177:12
**research** 156:12
**resolution** 150:17
**resolve** 193:14
**resolved** 117:15
**resolving** 150:14
  150:15 197:6,13
**respect** 15:12
  42:22 151:14
  153:2
**respectful** 134:5
**respectfully** 33:16
  39:6,12 107:6
  110:25 124:17
  160:4 163:22
  174:3 191:17,24
  192:23

**respective** 52:12
**respond** 27:13,16
**responded** 27:24
  28:3 104:11
**response** 38:3
  39:10 42:19 48:7
  120:12
**responses** 146:25
**rest** 146:14
**restrict** 20:9
**restriction** 46:14
**result** 110:21
  111:25 112:15
  113:24
**results** 114:11
**resumed** 50:23
  85:15 117:25
  146:20 183:19
  202:12
**retailer** 64:9
**retained** 149:6
**retainer** 63:17
**retread** 127:20
**revealing** 71:9
  88:12
**review** 21:22 22:2
  28:6,14,22 29:18
  29:20 70:23 86:21
  91:14 153:9
  169:23 198:5
**reviewed** 20:21
  21:13,14,16,21,23
  22:25 30:17,22
  71:5,13 72:7,8
  78:4 79:17,19,21
  79:25 169:8
**reviewing** 71:18
**revoke** 167:4
  189:19
**richards** 4:4

**richenderfer** 11:10
**right** 28:17 30:9 31:15 32:18,23 33:3 47:19 51:7 53:23 57:18 66:5 70:9 71:13 79:9 80:9,13 85:3 93:6 96:2,5 98:8 102:17 105:18 121:9 139:18 140:11 143:15 144:9,10 153:13 154:25 160:14 162:20 166:13,22 168:13,21 171:2 175:14 176:25 177:2,9,16 178:21 184:5 185:22 188:12 191:16 192:18 198:3
**rio** 10:3,3,4 75:18 139:23
**risk** 179:20
**risperdal** 103:15 104:7
**rlf.com** 4:9
**road** 104:17 183:15
**robinson** 6:5
**rodney** 12:12
**ronit** 11:19
**ronit.berkovich** 11:20
**room** 11:7
**rosen** 5:15
**roughly** 82:4 179:10
**roundup** 43:23,24
**rpr** 1:20 204:22

**rule** 14:18,21,24 77:19 79:14 85:24 86:6,8,11 90:17,22 167:6,11
**rules** 16:20 17:4 98:15
**rumors** 106:11,15 106:16 107:9,20 107:20 108:19 109:3
**run** 54:8 65:6 72:3 75:24
**running** 32:10
**rzahralddin** 9:10

**s**

**s** 2:5 3:16 206:6
**s.a.** 23:13 137:11
**s.e.** 7:6
**sa** 7:11
**saint** 10:13
**salerno** 3:16
**sat** 149:20
**save** 80:3
**saw** 24:10,15 185:6
**saying** 47:2 107:4 107:7 118:20 129:17 177:20 188:5 198:24
**says** 30:6 31:11 59:6 80:24 98:16 133:25 178:23
**scale** 118:23
**scheduled** 136:12 136:17
**scope** 177:19 199:20
**screen** 17:21 18:7 19:11 22:20 78:8 78:21 79:2 80:23 152:14 183:25

**scroll** 19:16,18 80:17 85:10 86:24 86:25 87:12 91:18 95:7
**scrolling** 80:3
**search** 65:6
**searchable** 65:3
**seasoned** 39:13
**seat** 37:14,15,18 38:17 42:4,5 57:15 160:15 184:9
**seats** 104:21 160:14 161:13
**second** 86:2 110:12 131:16 155:20,21 166:9 179:15,15 183:7
**section** 19:16 167:14
**security** 166:6,11 172:13,20 174:25 175:5,14,17,23 176:5,19 177:8,14 178:15,17
**see** 19:5,10 24:3 27:15 30:5,12 31:10,19 65:8 66:24 67:23 78:25 79:3,8,15 80:2,22 80:25 81:21 87:8 91:10 96:25 114:23 132:2 152:2,4,8,12 176:13 186:16 188:13 196:17
**seeing** 116:7
**seek** 160:8,9
**seeking** 73:18
**seen** 19:13 22:17 24:6,7,15 70:3

93:4 100:6 159:11 159:12 185:11,21
**selecting** 47:23
**send** 159:17
**sense** 195:21
**sensitivity** 17:4
**sent** 26:22 33:21 34:16 187:3 198:6
**sentence** 183:7,21
**separate** 121:20
**separately** 191:11
**serves** 143:15
**services** 10:4
**set** 17:17 18:11 19:22 60:7,21,23 111:12,21 113:6 117:9,20 119:3 122:23 125:4 135:17 136:13,18 138:20 204:9
**sets** 197:24
**setting** 17:5 142:24
**settle** 105:8 106:3
**settled** 76:15 104:19 106:23 107:16
**settlement** 37:20 47:24 103:7,21 105:23 127:16 137:10,16,25 138:9 139:12,23 139:24 145:9 148:22 149:4,13 149:13,15,15,25 150:15
**settlements** 108:23 109:10 110:3 137:7 139:21 140:2,10

**settling** 105:4
**seventh** 6:15
**seyfarth** 12:4
**seyfarth.com** 12:9
**shah** 5:12
**shahriar** 5:12
**share** 17:16,21
  18:7,10,12,15,16
  67:5 78:9,13,21,24
  79:3 85:7,18 91:2
  117:15,20 118:3
  151:21 152:14
  168:15 179:4
**shared** 57:7
  109:16,21 129:13
  132:15 149:20
  181:13
**sharing** 78:8
**shaw** 12:4
**sheet** 206:2
**sheets** 77:6
**shipman** 8:12
**short** 43:10 46:6
  85:6 108:17
  117:17
**shot** 34:11 202:18
**show** 42:10 79:24
  115:16 171:7
  196:16
**showed** 140:25
  155:4,11
**shown** 100:11
  109:9 205:11
**shows** 161:23
**shy** 80:8
**side** 134:3,4
**signature** 204:21
**signed** 185:15
  186:18
**significant** 74:14

**significantly** 58:14
**signing** 67:8
**similar** 26:21
  54:14 75:3
**simply** 113:13
**single** 102:25
  103:4 157:18
**sir** 203:6
**sitting** 26:18 61:4
  63:22 77:8,9 83:9
  89:6 93:8 109:20
  110:7,25 114:9
  115:11 116:15
  119:5,16 121:11
  122:15 123:18
  126:18 138:7
  139:9 148:2,19
  156:15,23 159:21
  160:12,13 166:13
  171:15 172:15
  173:18 174:8,13
  177:20 187:10,15
  201:8,24
**situation** 97:9,17
  117:15 195:9
  196:19 197:22
**situations** 198:19
  199:10
**size** 91:6
**skipping** 150:24
**slightly** 87:6 99:9
  161:5 173:16
**slombardi** 6:19
**slowly** 110:20
**smalltalk** 105:2
**social** 166:6,11
  172:13,20 174:24
  175:4,14,16,22
  176:4,18 177:8,13
  178:15,17

**solicit** 184:10
**solicitation** 15:11
  151:13 152:25
  166:16,19,21
  172:24 173:4,9,11
  173:14,15,20,25
  174:16 199:25
**soliciting** 182:22
**solution** 195:5
**somebody** 34:16
  63:2 72:7 133:25
  134:2 201:21
**someone's** 183:10
  202:2,2
**somewhat** 110:19
  197:5
**soon** 85:20
**sorry** 19:24 24:21
  25:23 28:12,19
  44:5 46:13 64:2
  78:8 84:13 101:23
  107:3 109:23
  112:18 127:12
  167:17 168:8
  176:15 183:24
  193:22
**sort** 17:4 40:20
  43:25 62:25
  102:22 104:7
  105:2,22 108:17
  118:16 131:4
  132:12 133:16,17
  134:9,11,17 139:3
  149:22 150:17
  155:25 161:9
  184:7 186:16
**sorting** 185:5
**sought** 30:12
  31:18 109:5
**sound** 80:13 93:5

**sounds** 146:17
  198:2
**source** 180:21
**south** 3:5
**space** 65:20
**speak** 19:21 21:9
  41:20 43:5
**speaking** 70:10
  193:5
**special** 4:10 6:12
  13:3
**specific** 34:4 47:15
  64:11 95:25 99:10
  111:10,21 114:4
  114:18 116:14
  121:21 134:12
  153:16 187:2
**specifically** 37:13
  38:24 103:11
  113:6 140:20
  148:11 184:4
**specifics** 94:13
**spectrum** 63:10
**speculate** 33:5
  89:11 187:6
**speculating** 157:7
  188:24
**speculation** 96:23
  97:8 157:11
**split** 38:14 114:5
  125:22 126:5,24
  134:19 135:25
  136:5 197:17,23
  198:12
**spoke** 55:6 56:15
**spoken** 35:21,25
  154:2,10 165:7,14
  165:16,16 184:13
**sports** 104:9
**square** 12:12

**sraafi** 5:13
**stage** 77:2
**stamped** 86:14
**stands** 99:11
**stang** 13:4
**stargatt** 12:11
**start** 36:10 73:18
**starting** 118:23
**state** 2:10 8:11
  54:5,21 56:16
  76:5 170:23
  174:21 179:19
  181:5 192:25
  204:6 205:19
**stated** 32:17,19
  119:15 130:21
  140:7 174:23
**statement** 14:16
  14:19,23 30:14
  31:25 32:4,15
  44:3 66:14 69:6
  70:13 77:18,24
  79:13 80:7,15
  82:5 83:8 84:6
  85:23 86:10,16
  88:14,15,17 89:9
  89:10,15,23 90:7
  90:16,21 92:10,13
  92:18 93:5,11
  94:22 124:18
  153:24 155:7
  157:20 158:14,17
  166:2 167:7
  171:25 180:4
**statements** 69:22
  70:5 71:12 154:7
  167:23
**states** 1:2 11:3,5
  134:3,4 146:2
  155:4 157:17
  158:9 165:21

171:19
**stay** 46:17
**stays** 117:19
**stenographic** 1:10
  2:5 16:2 204:8,11
  205:6
**steps** 190:22 191:8
**stern** 9:12
**steve** 35:20,21,24
  36:6,24 37:5 42:4
  44:17 45:4,17
  47:16,20 48:14
  131:17 133:6
  143:11,17,20,21
  143:24 144:2
  159:3 160:14
**stop** 80:20 87:3
**stopping** 146:8
**street** 4:5,13 5:16
  6:6 8:13 11:6 12:5
  12:13 13:5
**struggling** 188:25
**stuart** 6:18
**subcategories**
  52:16
**subject** 19:25
  39:19 40:12 41:23
  53:9,22 56:14
  58:7,19 98:18,21
  101:16 109:6
  112:25 129:14
  160:3 163:10
  200:17,21 205:10
**subjects** 52:8,10
  111:12
**submission** 92:25
**submit** 92:23
  175:13,16 177:8
  179:2
**submitted** 53:12
  98:4 153:12

156:18 157:24
159:24 162:3,25
163:4,18 164:21
164:23 165:6,8,23
177:13 190:21
191:10 193:11,12
201:12
**submitting** 158:10
  158:18 191:8,19
**subscribed** 204:18
  205:16 206:21
**subsidiaries** 75:10
**substance** 164:3
**substantial** 155:18
**substantive** 28:4
  102:12,13 104:12
**sufficient** 113:11
**suggest** 38:22
  121:12 122:6
  174:14
**suggested** 62:16
  123:11,15 125:8
  125:13,17 197:12
**suggesting** 116:2
**suggestion** 45:10
  45:21 47:15 61:21
  62:5 134:12,15
**suggestions** 44:13
  44:22 45:5,6
  46:21 48:4,8
  133:12
**suggests** 115:12
  116:16 117:2
  119:17 122:16
  139:10 156:24
  159:23 187:16
**suite** 4:14 5:7 6:7
  8:14 9:6
**supercede** 201:11
  201:17

**supplement** 14:22
  90:15,20 111:17
**supplemental** 95:3
  179:15
**support** 114:11
  125:5,10 126:19
  139:25 153:13
  174:8 180:23
  203:2
**supported** 135:25
  136:6,13
**supposed** 177:11
  177:22
**sure** 17:13,23 19:2
  19:7 27:20 30:11
  31:17 34:14 35:3
  35:7 38:11,20
  40:22 47:13 48:15
  59:21 62:10 67:11
  71:21 72:14 80:5
  81:20 84:23,24
  95:17 105:12
  109:25 110:6
  132:17 133:11,17
  135:5,15 147:12
  147:13 152:17,17
  157:12 160:5
  164:10 165:4
  169:11,15 170:21
  172:25 173:17
  178:12 181:14
  182:16 183:16
  187:15 190:19
  196:12 197:11
  199:20 200:2,15
**surprise** 96:24
  97:8 200:16
**surprised** 188:13
  188:15,15,16
**suspect** 29:10
  111:13 148:10

158:4,6 199:9
201:14,22
**suspicion** 33:6
**suspicions** 89:3
**switch** 180:11
**switched** 179:17
183:24
**switching** 42:6
159:4 171:11
180:10
**sworn** 16:5 204:9
205:16 206:21

**t**

**t** 2:5,5 12:8 204:2
204:2
**tabulation** 171:21
**tac** 30:8 31:14
37:14,15,18 42:5
160:15,15 184:9
**take** 17:8,9,11
22:20 32:11 49:12
50:16 78:19,22
85:6 90:13 91:6
100:16 101:9
117:17 119:9
126:9 129:22
137:22 143:8
146:12 148:7
169:4 174:19
181:23 183:13
190:22 191:8
**taken** 57:10
112:25 120:19,20
190:22 205:5
**talc** 1:6 15:4,14
33:23,24 40:16
43:22 44:8 51:4
54:6 56:21 63:14
64:24 65:19,24
68:11,24 74:9,11
74:16,19,24 75:6

75:14,21 76:16,20
76:24 77:14 80:24
82:11 83:5 84:3
87:17 91:24 93:9
95:25 96:7 100:19
101:10,18 102:10
102:21 103:10,17
104:6,10 105:4,9
105:24 106:3,22
107:15 108:13,15
108:23 109:11
110:3 147:10,16
147:18 148:2,4,8
148:10 149:7,17
149:19 150:2
151:8,16 152:21
153:3 154:17
206:3
**talcum** 157:7
**talk** 17:6 66:2,5
67:22 70:6 73:17
106:13 108:11
120:7 143:19
144:21 148:7
149:12,16 152:15
177:19 181:9
194:20
**talked** 44:18 45:18
62:15 104:8 133:4
143:17 149:21
164:7 184:8,15
**talking** 26:7 48:9
73:20 90:3 103:12
103:14 104:6
105:12 121:19
149:14 176:10
196:18,19
**taylor** 12:11
**tcc** 23:11 30:8
31:14 46:15 48:13
48:22 49:5 52:5

104:19,21 125:23
125:24 126:3,9,20
127:2 128:2,6,6
130:7 131:18
132:4,15 135:8
142:18 143:5
144:7,8,13,23
145:20 150:6,17
150:22 167:3,19
167:25 179:23
189:17
**tdp** 114:11 115:5
115:12 122:24
123:12 133:13
136:13,18 138:22
**tdps** 21:19 22:22
60:7 99:3 110:21
111:24 112:15
113:24 116:16
117:2 118:9 119:8
119:18 121:14
125:4,18 135:18
**team** 150:15
**teasdale** 9:4
**ted** 108:2 110:11
202:22
**tell** 23:6 25:13
26:20,25 35:8
36:16,22 38:8
43:19 49:5,23
55:21 56:7 64:11
71:4,22 72:5,9
76:3,12 77:7,10,15
81:13,15 82:20
83:23 84:25 88:11
89:3,4,25 92:20
93:23 94:24
100:12,23 101:3,7
108:10 111:10
112:3,17 114:16
115:9 116:10

127:10 128:22
132:17 140:13,22
150:8 161:10
164:4 177:17
181:20 183:14
192:2 197:14
198:17
**telling** 88:22
114:25 181:8,11
181:20
**tension** 126:3
**teresi** 3:12 86:2
**term** 23:3,5,10
192:7,8
**terms** 28:18 45:3
46:11 47:24,25
96:15 103:21
107:10 109:9
113:11 145:8
157:12 184:7
**terribly** 162:12
**terrific** 144:17,18
**test** 39:22 40:7
**testified** 16:6,25
148:12
**testify** 20:14,19
46:19 47:11 89:14
114:19 182:18
**testifying** 141:9
**testimony** 26:4
34:19 40:24,25
148:16,17 184:14
204:12 205:5,8
**texas** 10:14
**thank** 50:20,21
79:9 202:13 203:5
203:6
**thanks** 16:14
17:14 110:11
117:23 178:7

theodore 11:17
theodore.tsekeri...
  11:18
thing 124:23 135:5
  152:11
things 18:16 22:15
  45:4 61:6 74:4
  108:18 111:15
  116:23 118:19
  121:25 132:13
  133:7 134:3 135:9
  139:4,8,20 143:13
  149:22 157:12
  167:21 173:6
  191:23 192:15
think 16:23,23,25
  17:2 18:23 20:8
  23:6 25:6,24 26:5
  32:3,6,10,18,21
  33:12,14 35:15
  38:6,9,17 39:3,6
  40:3,15,16 41:8
  43:9,22,25 44:24
  45:20 47:2,3
  48:10 52:7,15
  54:7 59:7 61:4,16
  66:20 69:11 72:23
  80:12 82:4 83:17
  83:24 88:4,11
  91:5 93:3,16
  94:23 101:3 102:6
  104:11 111:5,7,17
  112:3,7,23,23
  113:10 114:13,24
  116:18 117:4,11
  119:2 122:9 127:3
  127:6 131:8
  132:21,23 133:14
  133:23 138:18,21
  138:23 144:10
  147:15 150:4,11

150:11,25 154:20
154:21,22 155:17
157:14 159:6
160:24 161:2,7,16
161:22 163:23
165:13,18 166:8
169:12,20 170:23
172:8,15 173:23
178:4,19 179:9,12
180:19 183:12
184:8,15 185:25
189:6 191:3 192:8
192:25 194:17
195:2,8 196:22
198:4 199:3 202:6
thinking 57:18
  148:20
third 8:5 15:10
  97:4 137:7 141:3
  142:10 151:12
  152:24 155:21
  179:15
thomas 5:6 12:8
thought 86:8
  104:23 143:16
  145:12 164:13,13
thoughts 161:10
thousand 83:14
  107:18 187:4
  190:15
thousands 84:17
  90:4 94:2
three 23:25 63:9
  71:24 119:23
  128:23 143:25
  155:22 202:7
tie 65:11 69:18
ties 65:15
time 16:14 24:11
  24:14,17,22 25:15
  25:15 28:2 36:13

41:7,11 42:13
46:24 47:8 49:13
52:20 53:7 54:11
54:14 55:3,7,7
57:24 61:23 70:8
74:4 77:11 80:4
83:6 88:16 89:9
89:22 91:21 92:3
110:12 128:19,21
130:6,22,25 131:3
131:9,25 132:13
134:16 147:6,6
152:11 153:19
161:18 174:4,12
176:3 180:2 185:8
185:15 187:14,19
188:9 189:23
190:20 202:14
timeline 135:14
times 124:19,24
tinto 10:3,4,4
  75:18 139:23
titled 14:12 23:19
tlocke 12:9
today 18:21 19:3
  20:14,25 21:11
  22:4 23:4 26:18
  28:8,16,21 40:24
  51:15 57:9 58:5
  61:4 63:23 66:19
  67:22 71:7 72:9
  77:8,9,15 80:2
  81:9 83:9 89:7
  93:8 110:7 111:2
  114:9 115:11
  116:15 118:15
  119:3,5,16 120:24
  121:11 122:16
  123:18 124:19
  126:18 136:20
  138:7 139:9 147:9

148:2,17 156:15
156:23 159:22
160:12,13 171:15
172:15 173:18
174:9,13 177:17
177:20 184:14
187:10,15 193:5
201:8,24 202:14
today's 78:5 79:21
told 34:13 36:6
  48:14,21 49:10
  50:7 60:15,25
  115:7 126:12
  142:21 143:3
  145:3,6 150:9
  159:13 188:11
  189:3
tongue 104:3
tool 182:22
top 14:12 23:19
  24:2 29:22,23
  155:22
topic 30:16,19
  33:17,18 35:25
  44:9 66:14 67:19
  115:4 117:9,10
  135:24 136:11
  150:20 195:21
topics 19:17,22
  20:3,9,9,15,16,19
  42:23 67:21
  111:21 113:6
  115:19,22 121:2
  135:16 146:11
tort 5:4 6:3,13 7:4
  23:12 147:8 148:8
  156:6,11
total 101:11
  179:13
touch 45:2

**trade** 16:17
**traffic** 142:23
**trammell** 165:15
**transcript** 205:5,7
**transparency** 37:6
  38:13,21 44:10,15
  45:8 46:9,22
  47:18 49:20
  133:16,20
**treated** 126:25
**treatment** 110:22
  111:25 112:16
  113:25 114:12
**trial** 66:19
**tried** 16:23 63:8
  76:19 100:2,3,7
**tries** 134:5
**trouble** 188:25
**true** 64:13 81:8,9
  106:20 109:3
  204:11 205:7,9
**trust** 22:23 61:22
  62:7,17 98:5,21
  110:16 136:24
**trustee** 11:3,5
**trustee's** 146:3
**try** 17:6,9 18:25
  37:24 81:18 85:7
  85:11 95:18 116:3
  121:22 124:15
  153:17 169:15
  186:16
**trying** 17:18 36:24
  37:5,8 40:2,4
  45:16,23 46:17
  68:3,4 87:23
  117:13 118:17
  127:20 130:7,20
  130:22,22 131:2,7
  146:12 161:3,14
  162:11 174:5

186:5 199:4,4
**tsekerides** 11:17
  14:6 107:25 108:2
  110:10 202:19,21
  202:22 203:4
**tseregounis** 3:18
**tuchin** 9:12
**turn** 87:21
**turner** 8:17
**twenty** 187:4
**two** 14:12 23:19
  24:2 26:13,22
  29:23 119:23
  128:23 140:6
  144:5 154:20,22
  163:16 172:17
  184:25 186:14
  194:5 195:24
**type** 38:16 65:23
  87:7
**types** 48:2 63:4
**typical** 197:15
**typically** 193:15
  194:4 197:22
  198:19 199:2

**u**

**u.s.** 11:4
**ultimate** 182:7
**ultimately** 53:3
  111:14 158:11
  179:3 184:19
**umbrella** 156:5
**uncomfortable**
  68:4
**underneath** 52:16
**understand** 23:4
  23:15 27:19 30:18
  46:13 47:14 52:4
  57:15 59:22 72:15
  83:19,22 85:12
  100:2,3 116:21,25

122:9,13 124:21
  133:11 141:10
  146:23 160:7,8
  166:21,23,25
  167:24 179:19
  184:18 189:16
  202:15
**understanding**
  19:20 33:9,10
  55:17,20 80:7
  82:17 89:6 104:18
  109:8 128:8
  160:16 164:20
  167:10,22 178:23
  179:8 182:20
  183:3 185:8
  186:11,25 187:19
  187:20,22 188:20
  188:24 189:12,22
**understood** 17:12
  17:13 20:5 61:16
**undertaken**
  100:17,20,22
**undertaking**
  177:25
**unequal** 110:22
  111:25 112:15
  113:25 114:12
**unfair** 60:10,17
  61:3
**unfortunately**
  168:14
**united** 1:2 11:3,5
  146:2
**unknown** 100:5
**unpack** 38:19
**unsealed** 86:15
**untimely** 179:3
**update** 144:19
**usdoj.gov** 11:11

**use** 23:3,10 37:24
  42:11
**usually** 134:2
  193:17 194:5
  197:23 198:9
  199:5,6
**uttered** 147:19

**v**

**valuation** 141:5,19
  142:12
**value** 52:12
  100:18 101:11,17
  102:7,9 123:24
  140:15 141:12,16
  141:20
**values** 102:21
  103:21 104:14,22
  106:14,18,19,22
  107:22 122:23
  123:6,12,16,19
  125:4,9,14,18
  135:17,21 136:12
  136:12,13,17,18
  136:18 149:13,15
  149:21
**variation** 124:5
**various** 21:19 60:3
  72:5
**vast** 81:16,16 96:9
  172:19,19 195:3
**verdict** 76:19
**verification** 68:25
**verified** 14:16,19
  14:22 77:18 79:13
  85:22 86:10 89:23
  90:7,15,21 92:13
  93:5
**verify** 87:13 109:2
**verifying** 154:7
**veritext** 13:15
  79:6,7

**version**  22:7 86:16
**versions**  96:14
**versus**  141:21
**video**  152:7 169:5
**videotaped**  14:10
  18:3
**view**  18:10 133:4
**views**  34:14
**virtual**  1:10 2:6
  204:8,11 205:6
**virtue**  129:12
**voice**  48:17
**vote**  24:17 26:8,23
  26:24 27:21 41:10
  42:2,6 43:10
  51:24 52:2 53:11
  58:3,4,14 92:23
  111:13,14 128:20
  128:25 130:7
  131:2,12,25
  154:17,23 157:12
  158:12,19 159:4
  159:16,25 160:18
  160:19 161:16
  162:5,5 163:5,19
  167:20 173:15
  179:25 180:3,10
  180:11 182:2,7
  184:9,11,21
  186:23,24 187:12
  187:18 188:5,8,11
  188:21 189:8,9
  191:16 192:4,16
  193:12 194:11
  195:16,16,18,25
  196:5,10 197:19
  198:3,23,24
  199:16,17 200:5,6
  201:11,11,17,21
  201:22,23 202:3,3

**voted**  41:13 42:8
  42:25 44:7 53:3
  53:13,15,18
  140:19 156:25
  157:10 158:7
  170:25 175:13
  176:24 182:23
  184:19 186:14,20
  186:20 189:4
  190:10,11 191:14
  192:2
**voters**  161:12
  164:24
**votes**  42:14,22
  43:12,20 153:22
  155:5,11 156:18
  156:19 157:24
  161:14,17,18,19
  161:20,20,21
  162:2,3,8,9,9,10
  162:16,17,18
  163:2,4,19 164:21
  164:23 165:7,8,9
  166:17 167:4,19
  170:13,19,25
  171:11 174:21
  179:4,10 182:22
  186:14 189:19
  190:7 193:11
  195:24 197:2
  201:5
**voting**  15:11 25:15
  37:19 42:13 43:16
  43:18 49:7,9
  56:10,12 151:13
  152:25 162:4,18
  162:19 163:5
  170:6 171:20,23
  175:11 179:2,23
  182:14,21,24
  188:5,14 189:4

192:5 199:25
203:2

## w

**wachtell**  5:15
**waive**  181:4
**walter**  5:19
**want**  19:2 20:4
  25:23 27:15 33:4
  34:7 38:19 39:21
  50:25 54:8 68:12
  69:6 73:17 76:12
  79:2 84:24 98:22
  98:23 105:11
  114:14 116:19
  120:24 121:21
  132:17 133:10
  135:13 141:25
  147:12,13,18,22
  152:15,18 160:5,9
  160:10 164:2,9,15
  169:17 186:7
  187:5 190:14
  194:9 196:16
  198:15
**wanted**  18:19
  38:11,20 127:2
  194:15 200:4
**wanting**  133:17
**wants**  146:24
  176:11
**washington**  5:8
  7:7 8:15 9:3 10:7
  12:6
**water**  146:9,15
**watkins**  3:4 16:12
**watt's**  72:6
**way**  17:21 29:15
  35:6,6 40:8 43:16
  59:3 83:16,24
  88:23 97:23 100:4
  116:4 117:5

122:20 129:17
134:2 147:11
149:2 158:22,23
161:6 162:11
170:25 172:23
173:19,23 174:15
182:4 186:12,24
188:7 189:2
191:13 192:9
193:4 197:14,21
197:25 201:22
204:16
**ways**  49:19
**we've**  20:8 50:15
  62:15,25 99:18
  100:2,10 112:25
  113:6 126:22
  138:20 140:6
  147:20,20 148:9
  163:15 180:9
  184:15
**weather**  104:9
**website**  66:3
  156:13
**week**  128:25
**weekend**  45:18
**weeks**  51:25 52:3
  54:15 63:9 74:5,7
**weil**  11:13 202:22
**weil.com**  11:18,20
**welcome**  39:22
**went**  128:8 132:11
  133:9 199:9
**west**  5:16
**wexler**  193:25
  197:5
**whatever's**  152:15
**wheeler**  63:8
**whereof**  204:18
**williams**  10:11
  25:3 40:14 41:9

41:16 42:25 56:8
130:5 143:5
158:25 159:3
160:15 165:12,14
165:19 167:15,18
167:24 180:10,14
180:15 181:12
183:9,23 185:9,17
185:22 190:2
**willkie**  6:14
**willkie.com**  6:19
**wilmer**  10:5
**wilmerhale.com**
  10:10
**wilmington**  4:6
  9:7 11:8 12:14
  13:7
**windels**  7:19
**windelsmarx.com**
  7:24
**window**  49:13
**wit**  206:5
**withdraw**  167:4
  189:18
**withdrew**  20:3
**withhold**  39:10
**witness**  14:3 16:5
  19:24 45:14 47:10
  50:19 70:21 78:14
  78:18,25 79:7
  84:13 85:9 90:9
  90:11 101:23
  102:3 107:3
  109:13 112:18
  113:7 117:22
  119:12 120:10
  127:12 129:16
  146:17 147:2
  152:3,8 164:5,9,13
  183:12,17 203:6
  204:7,13,18 205:2

**wlrk.com**  5:20
**wondering**  27:21
**word**  147:18 148:8
  188:16
**worded**  33:8
**words**  99:16
  118:17 161:8
  186:6
**work**  32:5,14,20
  33:13 38:7 60:12
  61:11 70:16,22
  71:9,23 72:23
  73:5 88:12 100:13
  100:25 108:3
  109:13,15 111:9
  114:7 115:3,10
  116:12 118:23
  119:14 123:9
  124:3 127:17
  131:13 137:2
  138:6 139:6
  140:12,24 141:8
  142:4,15 161:2,4
  175:20 176:8
  186:16 191:3,23
  192:19,25 194:3
  195:6 197:24
  200:8
**worked**  193:17
  194:2,23,24 195:3
  195:7 199:5
**working**  151:21
  192:21 197:6
  198:7,12 201:4
**works**  50:17 97:23
  156:3
**worth**  101:4
  102:23
**wrap**  202:8
**writing**  52:18,19
  54:16 55:10 58:9

58:21 59:6 129:2
189:7,9 195:13
**writings**  58:23
**wrong**  132:8 171:8
  171:8 188:16
**wrongful**  63:8

| x |
| --- |

**x**  9:9
**xyz**  28:2

| y |
| --- |

**y'all**  152:3,12,14
**ycst.com**  12:17
**yeah**  19:25 22:12
  23:9 27:5 28:20
  34:7 45:14 57:21
  61:18 64:19,22
  73:5 75:2 79:5,7
  80:10,12 86:20
  87:14,22 90:10
  101:25 108:3
  110:17 112:13
  117:12 119:12
  120:4,8,17 122:12
  124:11 128:22
  136:9 137:19
  138:12 140:5
  144:15 145:21
  157:5 168:10,19
  168:23 172:15
  175:19 176:17,21
  181:11 184:2
  192:12 199:24
  200:17
**yep**  152:3 183:7
**yesterday**  16:24
**york**  2:10 5:17,17
  6:16,16 7:14,14
  8:6,6 11:15,15
  204:6,24

**young**  12:11

| z |
| --- |

**zahralddin**  9:9
**ziehl**  13:4
**zoom**  48:16 49:4
  143:4,8,21,21
  150:21
**zurich**  59:12
  139:23

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.