**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| IMERYS TALC AMERICA, INC., *et al.*,[1] | ) | Case No. 19-10289 (LSS) |
| | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Re: Docket Nos. 2863, 3334, 3425, 3640** |

**REPLY IN SUPPORT OF MOTION OF HOLDERS OF TALC PERSONAL INJURY
CLAIMS REPRESENTED BY ARNOLD & ITKIN LLP TO EXTEND DISCOVERY
DEADLINES AND PERMIT DISCOVERY OF THE PLAN PROPONENTS, PRIME
CLERK AND CERTAIN THIRD PARTIES RELATING TO THE SOLICITATION
AND VOTING WITH RESPECT TO THE NINTH AMENDED JOINT CHAPTER 11
PLAN OF REORGANIZATION OF IMERYS TALC AMERICA, INC. AND ITS
DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Arnold & Itkin LLP ("Arnold & Itkin"), on behalf of more than seven thousand holders

of Talc Personal Injury Claims (the "Movants"), hereby submits this reply (the "Reply") in

support of its motion (the "Motion") for entry of an order granting (i) an extension of certain of

the deadlines for discovery set forth in the *Order (I) Approving Disclosure Statement and Form*

*and Manner of Notice of Hearing Thereon, (II) Establishing Solicitation Procedures, (III)*

*Approving Form and Manner of Notice to Attorneys and Certified Plan Solicitation Directive,*

*(IV) Approving Form of Ballots, (V) Approving Form, Manner, and Scope of Confirmation*

*Notices, (VI) Establishing Certain Deadlines in Connection with Approval of Disclosure*

*Statement and Confirmation of Plan, and (VII) Granting Related Relief* [Docket No. 2863] (the

"Solicitation Procedures Order")[2] entered in connection with the confirmation proceedings

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748).  The
Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

[2] Capitalized terms used and not otherwise defined herein have the meaning ascribed thereto in the Motion. In
support of the Motion, Movants submitted the Declaration of Jason A. Itkin dated April 17, 2021 (the "Itkin
Declaration") [Docket 3425-4].

related to the Plan (defined below), (ii) permission to take discovery of certain of the Plan

Proponents, Prime Clerk LLC ("Prime Clerk") and certain third parties who were permitted to

submit Master Ballots after the Voting deadline ("Late Voting Parties") relating to the

solicitation and voting with respect to the Plan and matters related thereto, and (iii) related relief.

In further support of the Motion, Movants respectfully represent as follows:

**Preliminary Statement**

1.      As of the Voting Deadline, Class 4 had rejected Plan.  Twelve days later,

approximately 18,000 votes had been changed from reject to accept, thereby changing the result

of the Plan vote. These vote changes were not simple, "plain vanilla" vote changes; they were

last minute vote changes procured by the Plan Proponents after the Voting Deadline that changed

the outcome of the Plan vote.  There can be no legitimate question that parties in interest are

entitled to discovery that would shed some light on the details of  how that dramatic change

occurred and was procured.

2.      The Debtors trumpet the fact that all but one of the late Master Ballots were

submitted within one day after the Voting Deadline. Debtors' Objection ¶ 6, FN 11.  But they

acknowledge that the Voting Deadline was extended for up to twelve days (Debtors' Objection

¶¶ 6, 20) meaning that one of the late Master Ballots was submitted twelve days after the Voting

Deadline--i.e., April 6, one day before the Preliminary Voting Certification was filed.[3]  The

Debtors do not identify the party that cast this last Master Ballot in their Objection, but based on

information recently received from the Debtors, Movants understand that this last Master Ballot

was the one by which Bevan changed its prior votes rejecting the Plan--and thereby changed the

outcome of the Plan vote.  If that is true, not only would it support the conclusion that the

---

[3] The Solicitation Procedures Order established April 8, 2021 as the deadline for the filing of the voting certification.

Debtors dragged their feet on filing a voting certification and kept the voting "open" until they could secure Bevan's vote change, but it would raise the question of exactly what inducements were used to procure Bevan's vote change during what seems to have been a prolonged negotiation. The Debtors should not be permitted to sweep these questionable circumstances under the rug by invoking a discovery deadline that passed months before these facts came to light.

3.     The Motion raises important issues surrounding the integrity and even-handedness of the Plan voting and vote tabulation process, that arise out of matters that came to light once Prime Clerk's original Preliminary Voting Certification was filed on April 7, and have been magnified by Prime Clerk's later acknowledgment, in its supplemental declaration (filed after the Motion was filed [Docket No. 3534] (the "Prime Clerk Supplemental Declaration")) of an error in Prime Clerk's original description of the reason for excluding approximately 18,000 votes that were originally cast to reject the Plan.  Those issues are implicated in the Plan Proponents' apparent adoption (subject to verification through discovery) of a paradigm for the conduct of Plan voting and the tabulation of Plan votes under which:

- Plan Proponents who learn, through  exclusive access to non-public voting results, that they have lost the Plan vote as of the Voting Deadline can use their power to extend the Voting Deadline to try to reverse their loss by seeking to procure vote changes from previously rejecting voters and, if such efforts succeed, can extend the Voting Deadline to permit the late vote changes, all without any disclosure of the means or inducements  used to procure the late vote changes; and

- Discretion with respect to the inclusion, exclusion, or opportunity to cure ballots that may be questionable or deficient can be exercised in a "Plan Proponent friendly" fashion, to favor a category of votes that voted largely to accept the Plan (here, post-Voting Deadline votes and vote changes) and disfavor a category of votes that voted largely to reject the Plan (here, votes in SSN Issue Ballots).

4.      The Motion does not, however, seek substantive relief regarding any of these issues or this troubling paradigm; rather, it seeks only the opportunity to inquire into these matters through discovery.  It is not surprising—but quite telling (and typical of the Debtors' "closed door" approach) – that the Debtors seek to block  discovery that could shed some light on the Plan Proponents election tactics and filed an objection (the "Debtors' Objection") to the Motion in an effort to foreclose discovery of these critical issues. [Docket No. 3640].

5.      The Debtors' primary argument opposing such discovery is that Movants have not shown "excusable neglect" for seeking an extension of the deadline for written discovery that was set by the Solicitation Procedures Order as February 15, 2021. The Debtors apparently think that Movants should have been able to see into the future and could anticipate that months after the February 15, 2021 deadline, Prime Clerk's filings would disclose that the Solicitation Procedures had been manipulated so that the Plan Proponents could change the outcome of the Plan vote after the Voting Deadline, as well as other issues raised in the Motion.  Such an assertion is particularly incredible, because it also assumes that Movants should have foreseen that the means by which changes in the votes cast on behalf of approximately 18,000 claimants had been procured would be kept cloaked in secrecy, because the Debtors would disregard Rule 3018(a) of the Federal Rules of Bankruptcy Procedures ("Rule 3018") and accept changes of votes after the Voting Deadline without the notice, hearing and showing of cause required pursuant to Rule 3018.[4]

6.      Discovery deadlines may be extended where the moving party demonstrates good cause by showing that a more diligent pursuit of the discovery would have been impossible.  *See Comuso v. AMTRAK*, Civil Action No. 97-7891, 1998 U.S. Dist. LEXIS 18054, *3-4 (E.D. Pa.

---

[4] Movants filed a subsequent motion regarding the Rule 3018 issue seeking an order of the Court disregarding the late changed votes in light of the violation of Rule 3018 (the "Rule 3018 Motion").  [Docket No. 3624]

Nov. 9, 1998); *Welton v. Conrail,* Civil Action No. 92-1679, 1993 U.S. Dist. LEXIS 138, *4-5 (E.D. Pa. Jan. 4, 1993). In this case, it was impossible for Movants to know, by February 15, that they would need discovery on the issue of votes changing after the March 25 Voting Deadline. Moreover, it is preposterous for the Debtors to suggest that, on or before February 15, Movants could or should have known the identities of the parties who would be induced to change their votes after the March 25 Voting Deadline, and from whom Movants would need to seek discovery.

7.    Importantly, one cannot lose sight of the corrosive systemic implications of allowing the Debtors to suppress such an inquiry; permitting the last-minute vote changes procured after the Voting Deadline that changed the voting results to remain shrouded in secrecy; and the prospect that, if left unreviewed and unchecked, the questionable election tactics of the Plan Proponents here could become a template for plan votes in future cases. To place those implications, and the issues raised by the Motion, in perspective, it is worth considering the following analogy: If a State proposed to enact a new election law under which, following the casting of ballots and the close of balloting stations on election day, one of the two major political parties (but not the other) (i) had exclusive access to the results of the voting at that time and knew whether it had lost the election as of the close of balloting: (ii) could continue to campaign and attempt to induce voters who had voted against that party to change their votes, and (iii) could extend the balloting deadline to have those late changed votes counted and change the outcome of the vote, there would be justifiable condemnation of the skewed voting process that would result from such a one-sided construct. But that is pretty much the construct created by the Debtors when, knowing that they had fallen short on the Plan vote based on ballots cast as of the Voting Deadline, they apparently used their discretion (with the consent of the other Plan

Proponents) to extend the Voting Deadline, not simply to enable voters who failed to vote prior

to  the deadline for some legitimate reason to vote and avoid being disenfranchised, ***but to try to***

***reverse the results of a Plan vote that  the Plan Proponents had apparently lost as of the***

***Voting Deadline.***  This tactical use of the power to extend the Voting Deadline entailed trying to

induce parties who had already voted to reject the Plan prior to the Voting Deadline to change

their votes, and, if these inducements succeeded, extending the Voting Deadline for up to almost

two weeks to allow the late-changed votes to be counted – all without any of the disclosures

(including the means of persuasion) required by Rule 3018.

       8.     The Plan Proponents' apparent tactical use (or abuse) of their power to extend the

Voting Deadline is illustrated by the following testimony of Mr. Itkin as to what he was told by

an attorney at the law firm of Williams Hart Boundas Easterby, LLP ("<u>Williams Hart</u>") about

why that firm changed its Plan vote on behalf of its clients from a "no" vote to a "yes" vote:

> 15 Q. And did you have any conversations with
> 16 anyone at the Williams Hart firm about the plan,
> 17 any aspect of the plan, after they made their
> 18 decision to change to accept the plan?
> 19 A. Yes.
> 20 Q. And with whom did you speak?
> 21 A. It would have been, I believe, John
> 22 Boundas only.
> 23 Q. And what were the subject matters that
> 24 you covered in those discussions?
> 25 A. Essentially that why they had decided to
> 2 vote in favor of the plan.
> 3 Q. What did they say? What did John say?
> 4 A. That Steve Baron had offered them a seat
> 5 on the TAC. That the seat was conditioned upon
> 6 them, I believe, switching their vote from a no to

7 a yes after the deadline. Or there was an

8 extension. I don't know if they actually voted no

9 or there was an extension, but there'll be

10 documents that show that.

11 ***That they would have to use best efforts***

12 ***to convince other firms who would also be given***

13 ***extensions on their voting time to change their***

14 ***votes.***

Debtors' Objection Exhibit A (Itkin Deposition) at 41:15-42:14 (emphasis added).[5] (Steve

Baron, who made the offer to Williams Hart, is an attorney for one of the TCC members and

serves as co-chair of the TCC.)  The Plan Proponents' resort to this tactic suggests that, without

it, the Plan would not have obtained the votes necessary to confirm a section 524(g) plan.  *See Id.*

43:9-18 (referring to a conversation with counsel to a TCC member where counsel "indicated

that he believed the Plan did not have the votes," that took place "after the voting deadline, but

before the prime clerk's first declaration of . . . preliminary voting number").

9.    To make matters even more troubling, the Plan Proponents' apparent use of their

"discretion" to extend the Voting Deadline as a tool in aid of their campaign to change the voting

results was not disclosed until after the Motion was filed.  Prime Clerk's original Preliminary

Voting Certification contained an error in describing the reason for the exclusion of

approximately 18,000 votes to reject the Plan that masked the existence and extent of the

massive post-Voting Deadline vote changes; the Debtors' extension of the Voting Deadline to

permit those vote changes; and the fact that the Plan Proponents had lost the Plan vote as of the

Voting Deadline.

---

[5]    Before its abrupt, last minute vote change, Williams Hart had objected the Disclosure Statement and Plan.  *See* Objection and Joinder of William Hart Plaintiffs in Opposition to the Debtors' Solicitation Motion And Disclosure Statement for Third Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code.  [Docket No. 2423].

10.     It was only after Movants filed the Motion and demonstrated the implausibility of Prime Clerk's original "explanation" for excluding thousands of votes to reject the Plan that Prime Clerk ultimately acknowledged its error.  But the question remains of how Prime Clerk – which touts the fact that, "Prime Clerk and its employees have considerable experience in soliciting and tabulating votes to accept or reject chapter 11 plans" (Preliminary Voting Certification ¶ 3) – could have made such a significant mistake in the first place.  In any event, serious questions worthy of inquiry exist as to the manner in which the Debtors, in collaboration with the other Plan Proponents, used (or abused) their power to extend the Voting Deadline as an election campaign tool.

11.     In addition, facts that have come to light upon and following the April 7 filing of the Preliminary Voting Certification suggest that a Plan-Proponent friendly double standard was applied in accommodating different categories of ballots that were subject  to challenge. As indicated, the Debtors had no trouble granting extensions of the Voting Deadline to permit ballots cast by Late Voting Parties to be counted—all but one of which voted to accept the Plan (with the outlier "late" rejecting Master Ballot being only a few minutes late). In contrast, over 5,000 votes on behalf of clients whose law firms did not include the last four digits of such clients' security numbers on their ballots –the majority of which rejected the Plan—were excluded, without simple steps being taken to provide notice and an opportunity to cure the defect. The Debtors' excuse —that Prime Clerk had no obligation to permit the cure of defects in ballots—rings hollow in light of the fact that the Debtors had  no obligation to grant extensions of the Voting Deadline, either, but did so anyway. Discovery into the reason for these very different approaches—including whether they reflected improper electoral gamesmanship—is appropriate.

8

12.     Movants respectfully submit that the Plan Proponents should not be permitted to block discovery regarding facts that cast doubt on the overall fairness, integrity and even-handedness of the vote solicitation and tabulation process, and that suggest that, in order to avoid an imminent defeat on the Plan vote, the Plan Proponents turned what should have been a level playing field on the Plan vote into a process that was unfairly skewed in their favor.

<u>**Argument**</u>

### A.  Movants Could Not Have Sought Discovery On the Voting Issues Prior to February 15, 2021

13.     As discussed above, there was no "neglect" by Movants in failing to seek discovery regarding facts and circumstances that did not occur until months after the written discovery deadline.  The Supreme Court has held that it is not neglect where a party's failure to take action was for reasons "beyond his or her control."  *See  Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 394-395, 113 S. Ct. 1489, 1498 (1993) (citations omitted). Thus, as Movants could not have sought this discovery prior to the February 15 deadline, there is not a question of whether there was neglect or whether such neglect was excusable, and the discovery deadline should be extended to address these critical new issues.

14.     Even if the question of "excusable neglect" was at issue, there is no question that any "neglect" on Movants' part  was "excusable," as Movants could not have reasonably anticipated the questions that would arise months later  about the conduct of the Debtors and others in connection with the voting process.  The determination of excusable neglect is "an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include, as the Court of Appeals found, the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including

whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Id.*

15.     Here, the Debtors assert that Movants had months to pursue discovery related to confirmation including with respect to solicitation.  Debtors' Objection ¶¶ 15-18. Yet, Debtors offer no explanation for how Movants could possibly have anticipated the issues relating to the voting that only came to light beginning on April 7, 2021 -- months after the February 15, 2021 deadline.  Nor do the Debtors explain how, short of powers of clairvoyance, Movants should have anticipated, by February 15, that the Plan Proponents would induce and permit parties to change thousands of votes after the March 25 Voting Deadline in order to change the outcome of the Plan vote, let alone the identities of the parties who would so change their votes and be appropriate subjects of discovery.  Moreover, the fact that there will be depositions of Prime Clerk or the Plan Proponents does not address discovery relating to Late Voting Parties, particularly such Late Voting Parties that changed their votes after the Voting Deadline ("Late Vote Change Parties") or explain why Movants should be expected blindly to depose Prime Clerk or the Plan Proponents without the benefit of written discovery. Nor do the Debtors address the fact that documents obtained through written discovery may reveal facts and communications that the particular deponents may not know of or remember, or that, unlike deposition witnesses, documents do not forget or suffer from convenient lapses of memory. For example, if there are documents that reflect inducements offered to Late Vote Change Parties in exchange for their vote changes, Movants should have access to those documents, and not be relegated to the proffered recollection of the parties to the communications.

16.     The idea that this discovery could or should have been sought in advance of the filing of the Preliminary Voting Certification is also belied by the impact the Motion has already

had on the process.  It was only after the Motion was filed raising the issue regarding the exclusion of superseded ballots rejecting the Plan that the so-called "typographical error" in the Preliminary Voting Certification (Debtors' Objection ¶ 8) that had effectively concealed the changing of approximately 18,000 votes to reject the Plan after the Voting Deadline in apparent violation of Rule 3018 was disclosed.[6]  In fact, if Rule 3018 motions had been filed as required, then parties in interest would have been entitled to discovery regarding the relief sought in those motions that would encompass many of the issues raised by this Motion.

17.    Not only was it not possible to have requested this discovery in advance of the February 15, 2021 deadline, but Debtors cannot claim any meaningful prejudice from permitting this discovery to go forward.  The initial deadlines for discovery were set in connection with a discovery deadline of April 14, 2021, which has since been extended with agreement of the other parties to July 23, 2021.[7]  The Confirmation Hearing is not scheduled until August leaving more than ample time for this critical discovery.  Finally, Movants have acted in good faith making the Motion shortly after the various voting issues raised by the Preliminary Voting Certification came to light.

**B.  Alleged Adherence to the Letter of the Solicitation Procedures is Not a Basis to Deny Discovery**

1.  **Movants are Not Required to Provide Evidence That Improper Incentives May Have Been Used to Obtain Vote Changes in Order to Obtain Discovery as to the Details of the Vote Changes and the Means by which they were Procured**

---

[6] Though the Solicitation Procedures allowed for superseding Master Ballots and provided a rebuttable presumption of cause under Rule 3018 to the extent such ballots represented changed votes, that presumption only applied to votes cast in advance of the Voting Deadline. *See infra* ¶ 22. Moreover, the creation of any such presumption did not excuse the filing of a Rule 3018 Motion—the presumption was rebuttable, not conclusive.

[7] Additionally, to the extent the Motion seeks discovery of third parties, there is a question whether the deadline for written discovery of February 15, 2021 encompassed third parties.

18.      Debtors assert that their actions have been in compliance with the Solicitation Procedures and that Movants have no evidence to support their concerns.  They further assert that in following the procedures, the process has been transparent.  *See* Debtors' Objection, Argument Section B.[8]

19.      To begin with, the process has been anything but transparent. An error in the Preliminary Voting Certification relating to the description of the reason for excluding roughly 18,000 votes to reject the Plan obfuscated the fact that, as of the Voting Deadline, the Plan Proponents had lost the Plan vote, and used their power to extend the Voting Deadline to change the outcome by procuring vote changes. Meanwhile, evidence and knowledge as to the means by which the vote changes were obtained—and whether any improper inducements or threats were employed —are in the exclusive possession of the very parties from which Movants seek discovery—the Plan Proponents who procured the vote changes, and the Late Vote Change Parties who changed their votes. Moreover, due to the failure to file motions under Rule 3018 regarding the changed votes, Movants do not even have the benefit of the Late Vote Change Parties' story of how and why their vote changes took place.

20.      As to the vote change by Williams Hart, we know from the testimony of Mr. Itkin quoted above that he was told by John Boundas, an attorney at that firm, that Williams Hart was offered a seat on the TAC in exchange for changing its vote and using its best efforts to convince other law firms that had voted to reject the Plan to change their votes after the Voting Deadline. But short of discovery, we do not know whether there are other significant details of Mr.

---

[8] Debtors point out that they accepted late ballots both rejecting and accepting the Plan and note that Movants did not seek discovery from a late voting firm that voted to reject the Plan.  Interestingly, that firm, Aylstock, Witkin, Kreis & Overholtz, PLLC ("AWKO"), filed a joinder (the "AWKO Joinder") to the Motion [Docket No. 3527] noting that their late votes were provided a mere four minutes late.  AWKO Joinder ¶ 6.  Moreover, the Debtors' charade of "even-handedness" does not change the fact that they used their power to extend the Voting Deadline to change the result of the Plan vote.

Boundas' conversations with Mr. Baron (or others) regarding the vote change that were not discussed with Mr. Itkin that may be germane; and access to written communications reflecting the negotiation of the vote change may cast further light on significant details of those negotiations.

> **2.    The Solicitation Procedures Do Not Sanction Vote Changes Made Without Compliance with  Rule 3018—the Rule Makes the Filing of a Rule 3018 Motion Mandatory, and Contains no Exception to that Requirement**

21.    Additionally, contrary to  the Debtors assertions regarding compliance with the Solicitation Procedures, the Solicitation Procedures did not give Debtors the right to abrogate Rule 3018.   To begin with, Rule 3018 contains no exception to the provision for notice, a hearing, a showing of "cause" and court approval in connection with a vote change.  So, if the Debtors wanted to abrogate the application of Rule 3018, they would have had to provide specifically for such abrogation and explain to the Court the source of the Court's power to abrogate the vote change requirements of that Rule—which they did not do.  As part of the Solicitation Procedures, Debtors, with the consent of the Plan Proponents, could extend the Voting Deadline with respect to a Ballot.  Solicitation Procedures Section VI 1.b.  The Solicitation Agent also had the discretion to contact voters to cure defects in the Ballots. *Id.* at VI 2.b.  The Solicitation Procedures did not explain or disclose that these provisions would empower the Plan Proponents to extend the Voting Deadline for parties that had already submitted Ballots so that such parties could change their votes without complying with Rule 3018 and disclosing the reason for the vote change.

22.    Section VI(2)(h) of the Solicitation Procedures provides that "if multiple Ballots are received from the same attorney or agent with respect to the same Claim (but not from the holder thereof), the latest-dated otherwise valid Ballot that is received before the Voting Deadline (or such later date as agreed by the Debtors with the consent of the Plan Proponents,

with such consent not to be unreasonably withheld) will be the Ballot that is counted as a vote to

accept or reject the Plan."  Prime Clerk Supplemental Declaration FN 10.

23.    Although the above language of the Solicitation Procedures Order purportedly

provides for the tabulation of such "superseding" Master Ballots;  it does not explicitly address

the issue of whether those votes may be tabulated to the extent that they represent a change or

withdrawal of such votes, made without complying with the requirements of Rule 3018 and

without Bankruptcy Court approval upon a showing of cause.  Indeed, while Section VI(2)(f) of

the Solicitation Procedures provides a rebuttable presumption that a change in vote in a

superseding Master Ballot is for "cause" pursuant to Rule 3018, that presumption is not

conclusive and does not purport to eliminate entirely Rule 3018's  requirement that court

approval for the vote change be sought, and the reason for the vote change explained. Moreover,

this rebuttable presumption of cause applies only to votes cast *before* the original Voting

Deadline:

> There will be a rebuttable presumption that any claimant who submits a properly
> completed superseding Ballot or withdrawal of a Ballot **on or before the Voting
> Deadlin**e has sufficient cause, within the meaning of Bankruptcy Rule 3018(a), to change
> or withdraw such claimant's acceptance or rejection of the Plan.

Solicitation Procedures Order Section VI(2)(f) (emphasis added). It would be nonsensical to read

the Solicitation Procedures as contemplating compliance with Rule 3018, albeit with the benefit

of as rebuttable presumption of "cause," in the case of vote changes submitted before the Voting

Deadline, but excusing compliance with Rule 3018 entirely in the case of ballots submitted after

the Voting Deadline.  Rather, the quoted language makes clear that vote changes made after the

Voting Deadline do not have the benefit of any presumption of "cause," even if the Voting

Deadline was extended.

24.     Thus, not only is it highly questionable whether a court even could approve Solicitation Procedures that purported to abrogate the requirements of Rule 3018 relating to vote changes, but the Solicitation Procedures here, which contain no explicit abrogation of Rule 3018, cannot fairly be read to do so. Hence, any vote changes made after the Voting Deadline could become effective only after compliance with the requirements of Rule 3018, including notice and a hearing and a showing of cause.

25.     Finally, even if the Solicitation Procedures could be read to allow for non-Rule 3018 compliant vote changes,  this Court retains its inherent power under section 105 of the Bankruptcy Code to determine whether Rule 3018 should be applied to the late vote changes at issue here—particularly since those vote changes altered the outcome of the Plan vote.  Here, the Court and parties in interest could not have anticipated  from the Solicitation Procedures that Debtors could or would manipulate the process by using their power to extend the Voting Deadline to change the outcome of the Plan vote after the Voting Deadline and, in the course of so doing, allow the submission of late vote change ballots without any compliance with Rule 3018 or any opportunity for the Court or parties in interest to inquire into  the means by which the vote changes had been procured.

**3. Discovery Regarding the Apparently Discriminatory Standards Applied in Addressing Different Categories of Votes that Were Subject to Challenge is Appropriate: While Debtors Granted Extensions of the Voting Deadline to Permit Late Votes and Vote Changes that Largely Accepted the Plan, No Simple Cure Opportunity was Offered to Prevent the Exclusion of Thousands of Votes on SSN Issue Ballots that Largely Rejected the Plan.**

26.    Debtors also claim that, with respect to the exclusion of ballots based on the lack of a social security number, there was no obligation under the Solicitation Procedures for Prime Clerk to offer an opportunity to such claimants to correct their ballots.  Debtors' Objection ¶¶ 24-27. This excuse rings hollow, however, because the Debtors were under no obligation to grant extensions of the Voting Deadline, either, but did so anyway to permit the inclusion of late votes and vote changes that largely accepted the Plan. Why the difference? There seems to have been a double standard at work here, depending on whether the category of votes subject to challenge had largely accepted the Plan or largely rejected it.

27.    Although the Plan Proponents were very accommodating when it came to extending the Voting Deadline to permit late vote changes, a far more restrictive approach was applied in excluding over 5,000 votes cast on behalf of clients whose law firms apparently did not include the last four digits of those clients' social security numbers on the relevant Master Ballots – the majority of which votes were votes to reject the Plan.  According to Prime Clerk, it "excluded from the final voting tabulation Ballots that failed, ***prior to the Voting Deadline***, to include the last four digits of the claimant's Social Security Number and did not state that the claimant on whose behalf the vote was cast did not have a Social Security Number." Prime Clerk Supplemental Declaration at 7-8, n. 9 (emphasis added).  So, while the Debtors were willing to make Voting Deadline extensions of up to twelve days available to voters who had already voted to reject the Plan to change their votes, the Debtors offered no extension of the Voting Deadline to permit parties who had submitted SSN Issue Ballots that largely rejected the Plan to take

corrective measures.  Although the Debtors may counter that no one asked for such an extension, that is because none of the affected parties was notified prior to the filing of the Preliminary Voting Certification that votes which they had cast had been excluded.

28.    The Solicitation Procedures provide the Solicitation Agent with the power to permit cures of asserted defects  in the ballots.  Solicitation Procedures Section VI 2.b.  Prime Clerk could very easily have sent an email or two to each of the approximately 30 relevant law firms advising them of the alleged shortcoming and giving them a reasonable time and opportunity to obtain and provide the missing information, but elected no to do so.  By opposing the Discovery Motion, the Debtors seek to block any inquiry, not only into why Prime Clerk made this decision, but also into the extent (if any) to which the Debtors, estate fiduciaries, and other Plan Proponents were involved in this decision to disenfranchise thousands of voters.

29.    Debtors further assert that permitting the cure of the defect relating to the missing last four digits of the claimant's social; security number would not have altered the outcome of the Plan vote. Such a cure would, however, certainly have made the vote closer.  Moreover, this issue, and the effect of providing an opportunity to cure in this instance, cannot be viewed in isolation; the resolution of other issues that might result in the inclusion of previously excluded votes, or the exclusion of previously included votes, could, in combination with such a cure, change the voting outcome.  For example, other parties have already raised questions about the propriety of some of the votes to accept purportedly cast by Bevan on behalf of its clients[9] and similar issues may arise as to other votes to accept purportedly cast by Bevan on behalf of its clients.

---

[9] Objection of the Cyprus Historical Excess Insurers to Debtors' Motion to Quash or for a Protective Order in Connection with (I) J&J's Subpoena To Prime Clerk LLC For Production Of Documents Dated March 26, 2021, (II) J&J's Subpoena To Prime Clerk LLC for Production of Documents Dated April 13, 2021, and (III) The Cyprus

**Relief Requested**

30.     Movants respectfully request entry of an Order authorizing further factual discovery (document requests and depositions) relating to solicitation of votes on the Plan, the Preliminary Voting Certification, and the Prime Clerk Supplemental Declaration, including permitting discovery of the Plan Proponents, Prime Clerk, and certain of the Late Voting Parties, including all of the Late Vote Change Parties.  The requested discovery is necessary to provide transparency into (and to determine whether there was any impropriety in) the inclusion or exclusion of Ballots, and the procurement of vote changes from the Late Vote Change Parties.

31.     The need for, and appropriateness of, this discovery is compounded by the fact that, as noted above, it is now clear that as of the Voting Deadline, the Debtors had lost the Plan vote.   Twelve days later, with post-Voting Date, non-Rule 3018 compliant vote changes in hand, they were able to claim victory.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

Historical Excess Insurers' Subpoena to Prime Clerk LLC for Production Of Documents Dated April 16, 2021 [Docket No. 3636].

DOCS_NY:43423.9 05471/001

WHEREFORE, Arnold & Itkin respectfully requests entry of the Order, granting the

relief requested in the Motion and such other relief as the Court deems appropriate under the

circumstances.

Dated: June 14, 2021                    PACHULSKI STANG ZIEHL & JONES LLP

                                        */s/ Laura Davis Jones*
                                        Laura Davis Jones (DE Bar No. 2436)
                                        Debra I. Grassgreen (CA Bar No. 169978)
                                        John A. Morris (NY Bar No. 2405397)
                                        Peter J. Keane (DE Bar No. 5503)
                                        919 N. Market Street, 17th Floor
                                        P.O. Box 8705
                                        Wilmington, DE 19899-8705 (Courier 19801)
                                        Telephone: (302) 652-4100
                                        Facsimile: (302) 652-4400
                                        Email:    ljones@pszjlaw.com
                                                  dgrassgreen@pszjlaw.com
                                                  jmorris@pszjlaw.com
                                                  pkeane@pszjlaw.com

                                        *Special Bankruptcy Counsel to Arnold & Itkin LLP*

                                        -and-

                                        ARNOLD & ITKIN LLP
                                        Jason A. Itkin
                                        6009 Memorial Drive
                                        Houston, TX 77007
                                        Main: 713.222.3800
                                        Fax: 713.222.3850
                                        Email: jitkin@arnolditkin.com

                                        *Counsel to the Movants*