## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:

IMERYS TALC AMERICA, INC., *et al.*,[1]

        Debtors.

------------------------------------------------------------ x

Chapter 11

Case No. 19-10289 (LSS)

(Jointly Administered)

**Hearing Date: August 24, 2021 at 10:00 a.m. (ET)**
**Obj. Deadline: August 17, 2021 at 4:00 p.m. (ET)**

## DEBTORS' MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTORS TO PURSUE AND EFFECTUATE PURCHASE OF PROPERTIES LOCATED IN LYNDONVILLE, VERMONT AND JOHNSON, VERMONT

The debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") hereby file this motion (the "**Motion**") for entry of an order substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**") (a) authorizing Debtor Imerys Talc Vermont, Inc. ("**ITV**") to pursue the purchase of certain properties located in Lyndonville, Vermont (the "**Lyndonville Property**") and Johnson, Vermont (the "**Johnson Property**" and, together with the Lyndonville Property, the "**Properties**"), in each case subject to an existing ground lease, together with the seller's rights and interests as landlord pursuant to such lease (collectively, the "**Acquisitions**"), (b) authorizing the Debtors to make one or more refundable earnest deposits with respect to the Acquisitions on the terms and conditions set forth herein, (c) authorizing the Debtors to take other actions as they may deem necessary to effectuate the Acquisitions, and (d) granting related relief. In support of this Motion, the Debtors respectfully represent as follows:

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050) and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

## JURISDICTION

1. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b) and, under Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue of these Chapter 11 Cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2. The statutory and legal predicates for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 9013-1.

## BACKGROUND

### A. General Background

3. On February 13, 2019 (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court commencing cases for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  On March 5, 2019, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed the Tort Claimants' Committee (the "**TCC**") [Docket No. 132] in the Chapter 11 Cases.  On June 3, 2019, the Court entered an order [Docket No. 647] appointing the future claimants' representative (the "**FCR**") pursuant to sections 105(a), 524(g)(4)(B)(i) and 1109(b) of the Bankruptcy Code.  As of the date hereof, no trustee or

examiner has been requested in the Chapter 11 Cases. The Chapter 11 Cases are jointly administered for procedural purposes only.

4.        On February 29, 2019, Debtor Imerys Talc Canada Inc., as the "foreign representative" acting on behalf of the Debtors' estates, commenced an ancillary proceeding under the Companies' Creditors Arrangement Act (Canada), R.S.C. 1985, c. C-36, as amended, in the Ontario Superior Court of Justice (Commercial List) and filed an application therein to recognize the Chapter 11 Cases and the United States as the center of main interest.

5.        On November 17, 2020, the Court entered an order [Docket No. 2539] (the "**Sale Order**"), which, among other things, approved the consummation of the sale (the "**Sale**") of substantially all of the Debtors' assets (the "**Assets**") on terms and conditions set forth in an asset purchase agreement with Magris Resources Canada Inc. (the "**Buyer**"), dated as of October 13, 2020 (as amended, the "**Asset Purchase Agreement**"). Pursuant to the Asset Purchase Agreement, the Debtors agreed to sell the Assets to the Buyer for a purchase price comprised of $223 million in cash and the assumption of certain liabilities. On February 17, 2021, the closing of the Sale occurred. (Danner Decl. ¶ 6.) The proceeds of the February 2021 consummation of the Sale are currently maintained in savings accounts earning a negligible 0.1% return. (*Id.*)

6.        On January 27, 2021, the Debtors filed their *Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 2852] (as may be amended or modified, the "**Plan**"). The Plan contemplates the establishment of a trust pursuant to sections 105(a) and 524(g) of the Bankruptcy Code (the "**Trust**") to which the Debtors' Talc Personal Injury Claims (as defined in the Plan) will be channeled upon the Effective Date (as defined in the Plan). As anticipated under the Plan, upon the Effective Date, the Trust will take full ownership of the Reorganized North American Debtors

US-DOCS\124929238.12

(as defined in the Plan), including any assets or businesses held by those entities on the Effective Date. *See* Plan § 9.1.5.

7.    On March 12, 2021, the Court entered an order authorizing the Debtors to employ CohnReznick LLP ("**CohnReznick**") to provide interim management services and designate Eric Danner as Chief Restructuring Officer ("**CRO**") of the Debtors, *nunc pro tunc* to January 28, 2021, and as President and Treasurer of the Debtors effective as of February 17, 2021 [Docket No. 3087].

8.    The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the *Declaration of Alexandra Picard, Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 10] (the "**First Day Declaration**") as well as the *Disclosure Statement for Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 2853] (the "**Disclosure Statement**").[2]

9.    On May 14, 2021, the Debtors filed the *Debtors' Motion for Entry of Order (I) Approving Notice Procedures, (II) Authorizing Acquisitions and (III) Granting Related Relief* [Docket No. 3561] (the "**Notice Procedures Motion**") (cited herein as "Notice Pro. Mot. ___"), seeking, among other things, (a) authority to purchase one or more businesses for an aggregate purchase price not to exceed $12 million, (b) authority to make one or more refundable deposits with respect to the potential acquisitions, and (c) approval of certain notice procedures related thereto.  On June 21, 2021, the Debtors filed the *Notice of Revised Order (I) Approving Notice Procedures, (II) Authorizing Acquisitions, and (III) Granting Related Relief* [Docket No. 3726],

---

[2]    The First Day Declaration and other relevant case information is available on (i) the Court's website, www.deb.uscourts.gov, and (ii) the website maintained by the Debtors' claims and noticing agent, Prime Clerk LLC, at https://cases.primeclerk.com/ImerysTalc/.

pursuant to which the Debtors amended certain of the notice procedures to address objections to the Notice Procedures Motion. On June 22, 2021, the Court held a hearing with respect to the Notice Procedures Motion (the "**Notice Procedures Motion Hearing**"), at the conclusion of which the Court took the matter under submission.

### B.     The Proposed Acquisitions

10.     The Debtors, together with their advisors, considered various options to maximize the value generated from the proceeds of the Sale. As described in the Notice Procedures Motion, the Debtors determined that utilizing a portion of the Sale proceeds to purchase one or more operating businesses is the best path forward because they are likely to generate a reliable stream of revenue in excess of what the Sale proceeds are currently generating. (Notice Pro. Mot. ¶¶ 9-16.) The Debtors' strategy has developed in light of experiences in the market and feedback the Debtors received in connection with the Notice Procedures Motion and the objections thereto. In light of these influences, the Debtors' focus has turned to real property opportunities including a triple-net lease (or similar) component. (Danner Decl. ¶ 7.)

11.     Real property assets with a triple-net lease component are low-risk opportunities that have an established revenue stream and are more likely to retain or increase in value over time. (*Id.* ¶ 8.) In a typical triple-net lease arrangement the owner of the real property leases the property to a lessee, which then operates a business on the premises and pays the owner-landlord rent. (*Id.*) In addition to the obligation to pay rent, the tenant is customarily responsible for all expenses associated with the property and the business, including real estate taxes, insurance, common charges, maintenance of the premises, and any other costs, charges, or expenses relating to the premises or operation of the business. (*Id.*)

12.     Here, the Lyndonville Property is subject to an existing triple-net lease (as described above) and the Johnson Property is subject to an existing absolute triple-net lease, which

provides that the Tenant (as defined below) is responsible for all the expenses covered by a typical triple-net lease plus any capital costs associated with the underlying property and the improvements thereon.  (*Id.* ¶ 9.)  In a typical triple net lease the landlord-owner would be responsible for capital costs associated with maintenance of the building itself including, for example, repairing or replacing the building's roof.  (*Id.*)  In an absolute triple-net lease, however, the tenant-operator would also be obligated to pay the costs associated with maintenance or replacement of the building's roof in addition to all of the obligations covered by a typical triple-net lease.  (*Id.*)

13.     Following the filing of the Notice Procedures Motion, the Debtors have continued to explore potential opportunities and have engaged with sellers and brokers regarding a number of properties.  (*Id.* ¶ 10.)  In particular, since the Notice Procedures Motion Hearing, the Debtors have reviewed 84 business acquisition opportunities, including 51 net lease opportunities.  (*Id.*)  Based on an initial review, the Debtors contacted sellers and/or brokers to express initial indications of interest with respect to 21 of these opportunities.  (*Id.*)   While the Debtors have diligently pursued attractive opportunities as they have become available, their efforts have yet to result in an executed purchase agreement.  (*Id.*)  As described in the Notice Procedures Motion, due to the active market and the relatively simple nature of these types of transactions, opportunities do not tend to remain on the market for an extended period of time.  (*Id.*)

14.     The Debtors' experience since the Notice Procedures Motion Hearing, and feedback from sellers and brokers, has reinforced the Debtors' assessment that the inability to make earnest money deposits and contingencies regarding court approval are significant impediments to the Debtors' ability to execute on attractive opportunities.  (*Id.* ¶ 11.)  Sellers and/or brokers have indicated that uncertainty regarding ability to close and timing to close due to

the bankruptcy proceedings is a material consideration in assessing a potential offer from the Debtors. (*Id.*) Under the circumstances, the ability to make deposits to demonstrate financial wherewithal and move expeditiously towards documenting and closing a transaction once an agreement on the critical business terms has been reached is crucial for the Debtors. (*Id.*)

15.     Notwithstanding these challenges, the Debtors continue to believe that acquiring one more operating businesses is in the best interest of the Debtors and their estates. The Debtors, together with their advisors, have identified two promising opportunities that they are actively pursuing. (*Id.* ¶ 12.) In consideration of the challenges described above, the Debtors seek authority to pursue and effectuate the Acquisitions, including making deposits, executing asset purchase agreements, and taking other steps necessary to close on the Acquisitions, on the terms and conditions set forth herein.

16.     On July 28, 2021, ITV submitted a non-binding letter of intent with respect to each of the Lyndonville Property (the "**Lyndonville LOI**") and the Johnson Property (the "**Johnson LOI**"), extending an offer to purchase such properties on the terms outlined herein.[3]

17.     Key information with respect to the Lyndonville Property is attached as **Exhibit A** to the Danner Declaration. The key terms of the proposed acquisition of the Lyndonville Property are as follows:

- Purchase Price:  The Debtors seek authority to purchase the Lyndonville Property for a total unadjusted purchase price of not more than 5% in excess of the listing price of $4,200,000.00.

- Earnest Deposit: The Debtors will deposit $200,000.00 refundable earnest money by wire transfer for Douglass Properties, LLC (the "**Lyndonville Seller**") to Debtors' selected title company within 10 business days

---

[3]     Copies of the Lyndonville LOI and the Johnson LOI will be made available to counsel to interested parties pursuant to the terms of the Protective Order, provided such parties have executed the Protective Order. The "Protective Order" is a reference to that certain protective order approved by the Court on September 27, 2019 [Docket No. 1083].

following the execution of a purchase and sale agreement with the Lyndonville Seller (the "**Lyndonville Purchase Agreement**"), subject to Court approval.  Earnest money shall be refundable until contingencies are removed in writing at the end of the due diligence period, subject to Court approval.

- Purchased Property:  The acquired assets would include that certain real property located at 164 Broad Street, Lyndonville, Vermont 05851, and certain fixtures and improvements located thereon.  The subject property is a plus size store consisting of 17,725 square feet and is situated on approximately 1.90 acres.

- Key Lease Terms:  The Lyndonville Property is subject to an existing triple-net ground lease (the "**Lyndonville Lease Agreement**") with DG Retail, LLC (the "**Tenant**") with 9+ years remaining on the initial lease term and 2 options for the Tenant to extend for additional 5-year terms with rent escalations (*i.e.*, a potential total remaining term of 19+ years).  Under the terms of the Lyndonville Lease Agreement, Tenant is responsible for all taxes, utilities, common area maintenance, and insurance, as well as certain repairs and maintenance costs.  The landlord is responsible for certain other repair and maintenance costs, including costs associated with roof and exterior, parking lot maintenance and landscaping beyond the $495.00/month the Tenant is obligated to pay for such items, and snow removal.  Tenant pays rent monthly in the amount of $21,011.75 under the current lease term, which is subject to a 10% rental increase each option period.

- Business:  The Tenant operates a franchise of Dollar General Corporation ("**Dollar General**") on the premises.

- Due Diligence:  The due diligence shall commence upon the execution of a mutually acceptable Lyndonville Purchase Agreement and shall expire 30 calendar days thereafter. During the due diligence period, ITV shall have the right to terminate the Lyndonville Purchase Agreement for any reason or no reason with no further obligation to the Lyndonville Seller.  The following items will be made available to ITV within 2 days following the execution of the Lyndonville Purchase Agreement, provided that they are in the possession of the Lyndonville Seller:

  - Environmental Report
  - Preliminary Title Report/Commitment and copies of all underlying title docs
  - Alta Survey, including any applicable easements
  - Lease Agreements, and all amendments, guarantees, estoppels
  - Building Plans

8

- o Building Guarantees and Contract Agreements (if any)

- o Insurance Certificates and current Property Tax Bill

- o Income/Expense Profit & Loss Report and Tenant Store Sales for Previous 2 Years (if available)

- o Other items as ITV may reasonably request, and the Lyndonville Seller can reasonably provide.

- Corporate Guarantee:  The Tenant's obligations under the lease are guaranteed by Dollar General.

- Annual Net Operating Income:  ITV, as landlord, would stand to generate annual net operating income of approximately $252,141.00 under the current lease term.

- Capitalization Rate:  6.00%.

18.    The Lyndonville Purchase Agreement is contingent on Bankruptcy Court approval and successful completion of due diligence to ITV's satisfaction.  (*Id.* ¶ 15.)

19.    Key information with respect to the Johnson Property is attached as **Exhibit B** to the Danner Declaration.  The key terms of the proposed acquisition of the Johnson Property are as follows:

- Purchase Price:  The Debtors seek authority to purchase the Johnson Property for a total unadjusted purchase price of not more than 5% in excess of the listing price of $2,030,476.00.

- Earnest Deposit: The Debtors will deposit $100,000.00 refundable earnest money by wire transfer for Barry Sloane Trust (the "**Johnson Seller**") to Debtors' selected title company within 10 business days following the execution of a purchase and sale agreement with the Johnson Seller (the "**Johnson Purchase Agreement**"), subject to Court approval.  Earnest money shall be refundable until contingencies are removed in writing at the end of the due diligence period, subject to Court approval.

- Purchased Property:  The acquired assets would include that certain real property located at 793 VT 15, Johnson, Vermont 05656, and certain fixtures and improvements located thereon.  The subject property is a store consisting of 7,489 square feet and is situated on approximately 0.98 acres.

- Key Lease Terms:  The Johnson Property is subject to an existing absolute triple-net ground lease with the Tenant (the "**Johnson Lease Agreement**") with 12 years remaining on the initial lease term and 4 options for the

9

Tenant to extend for additional 5-year terms (*i.e.*, a potential total remaining term of 32 years).  Under the terms of the Johnson Lease Agreement, Tenant is responsible for all costs associated with the property and the business, including real estate taxes, insurance, maintenance of the premises and the improvements thereon, and any other costs, charges, or expenses relating to the premises or operation of the business.  Tenant pays rent monthly in the amount of $9,306.00 under the current lease term, which is subject to a 10% rental increase each option period.

- <u>Business:</u>  The Tenant operates a franchise of Dollar General on the premises.

- <u>Due Diligence:</u>  The due diligence shall commence upon the execution of a mutually acceptable Johnson Purchase Agreement and shall expire 30 calendar days thereafter. During the due diligence period, ITV shall have the right to terminate the Johnson Purchase Agreement for any reason or no reason with no further obligation to the Johnson Seller. The following items will be made available to ITV within 2 days following the execution of the Johnson Purchase Agreement, provided that they are in the possession of the Johnson Seller:

  o Environmental Report

  o Preliminary Title Report/Commitment and copies of all underlying title docs

  o Alta Survey, including any applicable easements

  o Lease Agreements, and all amendments, guarantees, estoppels

  o Building Plans

  o Building Guarantees and Contract Agreements (if any)

  o Insurance Certificates and current Property Tax Bill

  o Income/Expense Profit & Loss Report and Tenant Store Sales for Previous 2 Years (if available

  o Other Items as ITV may reasonably request, and the Johnson Seller can reasonably provide.

- <u>Corporate Guarantee:</u>  The Tenant's obligations under the lease are guaranteed by Dollar General.

- <u>Annual Net Operating Income:</u>  ITV, as landlord, would stand to generate annual net operating income of approximately $111,676.00 under the current lease term.

- <u>Capitalization Rate:</u>  5.50%.

10

20.     The Johnson Purchase Agreement is contingent on Bankruptcy Court approval and successful completion of due diligence to ITV's satisfaction. (*Id.* ¶ 18.)

21.     The Debtors are engaged in ongoing negotiations with respect to each Property and intend to execute non-binding letters of intent in the coming days. (*Id.* ¶ 20.) If the opportunities remain available and the Debtors determine in the exercise of their business judgment that it is in the best interest of their estates to proceed with the proposed Acquisitions, the Debtors intend to enter into purchase agreements with respect to each Property. (*Id.*) The Debtors will file with the Court the Lyndonville Purchase Agreement and the Johnson Purchase Agreement, as applicable, within one (1) business day after such documents are executed.

## RELIEF REQUESTED

22.     By this Motion, the Debtors request entry of the Proposed Order:

    i.     authorizing ITV to pursue and effectuate the purchase of the Properties and any fixtures and improvements located thereon, and certain personal property related thereto, pursuant to the Lyndonville Purchase Agreement and the Johnson Purchase Agreement, subject to the existing Lyndonville Lease Agreement and Johnson Lease Agreement, respectively, which purchases shall include the sellers' rights and interests as landlord under such leases; *provided* that (x) the TCC and the FCR consent to the final terms of each purchase, and (y) the final purchase price of the Lyndonville Property shall not exceed 5% of the offering price of $4,200,000.00 and the final purchase price of the Johnson Property shall not exceed 5% of the offering price of $2,030,476.00;

    ii.     authorizing the Debtors to make one or more refundable deposits on customary terms and conditions with respect to the potential Acquisitions in the aggregate amount not to exceed $200,000.00 for the Lyndonville Property and $100,000.00 for the Johnson Property;

    iii.     authorizing the Debtors to take other actions as they may determine to be necessary to effectuate the Acquisitions, including, subject to the consent of the TCC and the FCR, performing under the Lyndonville Purchase Agreement and the Johnson Purchase Agreement, as applicable;

    iv.     granting related relief.

US-DOCS\124929238.12

23.     In  support of this Motion, the Debtors respectfully submit the *Declaration of Eric Danner in Support of Debtors' Motion for Entry of Order Authorizing Debtors to Pursue and Effectuate Purchase of Properties Located in Lyndonville, Vermont and Johnson, Vermont* (the "**Danner Declaration**") (cited herein as "Danner Decl. ___.") attached hereto as **Exhibit B**.

### BASIS FOR RELIEF

**I.     APPROVAL OF THE ACQUISITIONS IS APPROPRIATE UNDER SECTION 363 OF BANKRUPTCY CODE.**

24.     Section 363 of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  The business judgment standard applies to a debtor's use of assets outside the ordinary course of business. *See In re Montgomery Ward Holding Corp*., 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions."); *In re Elpida Memory, Inc*., No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012) ("The section 363(b) standard is well-settled.  A debtor may [use] assets outside the ordinary course of business when it has demonstrated that the [use] of such assets represents the sound exercise of business judgment."); *In re ASARCO, L.L.C*., 650 F.3d 593, 601 (5th Cir. 2011) ("Section 363(b) of the Bankruptcy Code addresses the debtor's use of property of the estate and incorporates a business judgment standard.").

25.     Under the business judgment standard, courts will typically defer to a debtor's judgment concerning the use of property when there is a legitimate business justification. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that courts "defer to the trustee's judgment so long as there is a legitimate business justification."). Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "as long as the proposed

action appears to enhance the debtor's estate." *Crystalin, L.L.C. v. Selma Props,. Inc. (In re Crystalin, L.L.C.)*, 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003) (internal quotations and alterations omitted); *see also In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (the business judgment standard is "not a difficult standard to satisfy"); *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

26.    The business judgment rule "reflects the reality that corporate decisions are better left to those who are close to the facts and have the experience to weigh the significance of those facts in an increasingly complex business environment." *Brown v. Ferro Corp.*, 763 F.2d 798, 800 n.2 (6th Cir. 1985) (internal citations and quotations omitted).  Moreover, "[b]ankruptcy courts should be no more willing to second guess competent, disinterested trustees and debtors-in-possession than other courts are willing to second guess competent, disinterested directors" because the "reorganization or liquidation of a distressed debtor requires as much, if not more, creativity and risk-taking as the management of a healthy entity."  *See In re Engman*, 331 B.R. 277, 299 (Bankr. W.D. Mich. 2005); *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 567 n.16 (8th Cir. 1997) ("Where the trustee's request is not manifestly unreasonable or made in bad faith, the court should normally grant approval 'as long as the proposed action appears to enhance the debtor's estate.'" (citing *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (internal alterations omitted)).  Based on this rationale, courts (both within and outside of this district) have regularly authorized a debtor's purchase of assets as a sound exercise of business judgment under section 363 of the Bankruptcy Code.[4]

---

[4]    *See, e.g., In re iHeartMedia, Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex. Sept. 25, 2018) [Docket No. 1510] (authorizing debtors' $55 million purchase of a podcasting company); *In re Cumulus Media*, No. 17-13381 (SCC) (Bankr. S.D.N.Y. Apr. 10, 2018) [Docket No. 663] (authorizing debtors' $18 million

US-DOCS\124929238.12

27.     Once a court determines that a valid business justification exists for a use of property outside the ordinary course of business, courts must determine whether: (a) adequate and reasonable notice was given to interested parties, (b) the purchase price is fair and reasonable, and (c) the parties have acted in good faith. *In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012); *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008). As described below, the proposed Acquisitions meet each of these requirements.

### A.     A Valid Business Justification Exists for the Proposed Acquisitions

28.     The Debtors have a valid business justification for the proposed Acquisitions. Following the Sale, the Debtors are no longer engaged in their historical talc operations and are holding a significant amount of cash in bank accounts that earn *de minimis* returns. (Danner Decl. ¶ 6.) The confirmation hearing on the Plan is not scheduled to commence until November 2021. Together with their advisors, the Debtors considered various options to maximize the value generated from the Sale proceeds, including the purchase of operating businesses in various industries, pending their ultimate emergence from the chapter 11 process. (*Id.* ¶ 7.) In the end, the Debtors determined that acquiring one or more operating businesses is the best path forward

---

purchase of a radio station and related intellectual property rights); *In re Longview Power, LLC*, No. 13-12211 (BLS) (Bankr. D. Del. Dec. 18, 2013) [Docket No. 662] (authorizing debtors' $4.5 million purchase of equity interests in other companies); *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Aug. 28, 2012) [Docket No. 4207] (authorizing debtors' purchase of aircraft); *In re Allied Holdings, Inc.*, No. 05-12515 (CRM) (Bankr. N.D. Ga. May 11, 2007) [Docket No. 3071] (authorizing debtor's $15 million financing and acquisition of approximately 150 tractor and trailer rigs and related equipment); *In re W. R. Grace & Co.*, No. 01-01139 (JKF) (Bankr. D. Del. May 16, 2006) [Docket No. 12438] (authorizing debtors' $20 million acquisition of target business assets, including buildings, production machinery and equipment, formulations, technology, customer lists, intellectual property, and goodwill); *In re Solutia Inc.*, No. 03-17949 (PCB) (Bankr. S.D.N.Y. Dec. 15, 2005) [Docket No. 2743] (authorizing debtor's $19.6 million acquisition of interest in Mexican production entity and related real property from debtor's joint venture partner); *In re Tower Auto., Inc.*, No. 05-10578 (ALG) (Bankr. S.D.N.Y. Oct. 12, 2005) [Docket No. 802] (authorizing debtor's $10 million acquisition of manufacturing facility).

US-DOCS\124929238.12

because they are likely to generate a reliable stream of revenue in excess of what the Sale proceeds are currently generating during the Chapter 11 Cases.[5]  (*Id.*)

29.    The Debtors expect the proposed Acquisitions to generate a reliable stream of revenue and a favorable return on the purchase price.  The Debtors have taken steps to limit costs associated with the Acquisitions, including agreeing to a fixed fee arrangement with CohnReznick for its efforts in pursuing such opportunities and engaging cost-effective legal counsel with respect to the Acquisitions.  (Danner Decl. ¶ 21.)

30.    Additionally, the Acquisitions will not impose significant downside risk on the Debtors or their estates.  Triple-net lease opportunities are particularly low risk, as the tenant-operator is obligated to pay operating costs of the business, pay maintenance and capital costs associated with the property and the improvements thereon, and absorb any risk of loss from the business.  (*Id.* ¶ 8.)  The Debtors' potential loss is limited to lost rent payments under the Lyndonville Lease Agreement and the Johnson Lease Agreement, as applicable, if the tenants are unable to meet their obligations, and certain repairs and maintenance costs under the Lyndonville Lease Agreement.  Here, the risk of non-payment is particularly remote because Dollar General is

---

[5]    The Debtors contend that section 345(b) of the Bankruptcy Code is inapplicable to the Acquisitions. Section 345 is relevant only to situations where a debtor seeks to invest cash in bank accounts or other securities such as stocks, bonds and mutual funds, not a debtor's proposed purchase of assets under section 363(b).  *See* 5 Collier Bankruptcy Practice Guide ¶ 86.06 (2021) ("The limitation of section 345(b) does not act to prevent the trustee from utilizing the funds of the estate and investing those funds in the maintenance, improvement, and operation of the debtor's business.").  As Judge Fitzgerald recognized in *Flintkote*, an overly literal reading of section 345 would require *any* non-ordinary course use of cash pursuant to section 363 of the Bankruptcy Code to be subject to section 345(b), effectively writing section 363 out of the Bankruptcy Code.  *See* Tr. of Proceedings Before the Honorable Judith K. Fitzgerald, *In re Flintkote Co.*, No. 04-11300 (Bankr. D. Del. July 21, 2008) at 34:7-19; *see also Thorpe v. Borough of Thorpe*, 770 F.3d 255, 263 (3d Cir. 2014) (rejecting literal reading of statute where "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters" (internal citation omitted)).  Indeed, the Debtors have located no case in which a Court has determined that section 345 is implicated by a request to use estate funds to acquire property or a business pursuant to section 363(b) of the Bankruptcy Code.

an established national brand with a demonstrated track-record of positive results and each of the Lyndonville Lease Agreement and Johnson Lease Agreement is backed by a corporate guarantee from Dollar General. (*Id.* ¶¶ 16, 19.) Moreover, the Debtors' risk is further mitigated by the fact that the Properties are durable pieces of real property that are likely to retain value over time. (*Id.* ¶¶ 16, 19.)

31.     The Debtors have determined, in the exercise of their sound business judgment, that the proposed Acquisitions will generate superior value for the estates, which could help offset some of the administrative expenses being incurred in the Chapter 11 Cases. The Acquisitions could also provide a source of go-forward revenue for the Trust, which, upon the Effective Date of the Plan, will take full ownership of the Reorganized North American Debtors, including any assets or businesses held by those estates on the Effective Date.

32.     The Debtors also have a separate justification for pursuing the Acquisitions: the acquisition of one or more operating businesses could help address certain expressed objections to the Plan, specifically whether the Debtors can satisfy the so-called "ongoing business" requirement of section 524(g) of the Bankruptcy Code. The Debtors maintain that the Plan as currently filed is confirmable and the Court need not consider whether the Plan satisfies section 524(g) (or any other confirmation related provision) to determine whether the Debtors have a valid business justification for the Acquisitions. Nevertheless, the potential of the Acquisitions to address anticipated confirmation objections and advance the Plan toward confirmation was an appropriate additional consideration of the Debtors in determining to pursue the Acquisitions. As fiduciaries of the estates, the Debtors have been clear in their intent to confirm a plan that meets the requirements of section 524(g) of the Bankruptcy Code. Indeed, the Plan proposed by the Plan Proponents (as defined in the Plan), and the more than $500 million in cash from third-party

US-DOCS\124929238.12

settlements that will be contributed to the Trust if the Plan is approved,[6] are predicated on the Debtors obtaining a section 524(g) channeling injunction, as well as "Protected Party" status for certain of the settling parties.  *See* Plan §§ 10.8-10.10.

33.    Taking steps that could help clear the path to confirmation and maximize the value of the estates is consistent with the Debtors' duties owed to the estates and a valid exercise of the Debtors' business judgment.

### B.    Reasonable and Adequate Notice of the Proposed Acquisitions Will Be Provided to Interested Parties

34.    The Debtors will provide adequate and reasonable notice of the Motion.  In accordance with Bankruptcy Rule 2002, notice of the Motion will be provided to (i) the Office of the United States Trustee, (ii) counsel to the TCC, (iii) counsel to the FCR, (iv) the Office of the United States Attorney for the District of Delaware, (v) the Information Officer, (vi) each party that has requested notice pursuant to Bankruptcy Rule 2002 and (vii) each of the parties that objected to the Notice Procedures Motion (collectively, the "**Notice Parties**").  In addition, the Debtors filed the Notice Procedures Motion on May 14, 2021, which provided notice to all interested parties of the Debtors' intention to pursue one or more acquisitions and was considered at the Notice Procedures Motion Hearing on June 22, 2021.

35.    As noted above, the Debtors are engaged in ongoing negotiations with the sellers of the Properties having submitted non-binding letters of intent on July 28, 2021.  The Debtors intend to continue negotiations with respect to the letters of intent and, if the opportunities remain available and the Debtors determine in their business judgment that it is in the best interest of their

---

[6]    The Trust will also receive significant non-cash estate assets, such as insurance and indemnity rights and the equity interests in the Reorganized North American Debtors. *See* Disclosure Statement § 2.2(e).

US-DOCS\124929238.12

estates, will enter into purchase agreements and ultimately consummate either or both Acquisitions in line with the letters of intent and subject to the purchase price caps set forth herein.  The Debtors will file the Lyndonville Purchase Agreement and Johnson Purchase Agreement signed by both ITV and the respective sellers, which shall be subject to Court approval, with the Court within one (1) business day after such documents are in substantially final form.  Given the aforementioned issues with respect to the timing of potential acquisition opportunities that the Debtors have experienced over the course of the last five months, the Debtors did not believe it would be prudent to wait until after a purchase agreement was negotiated to initiate the Court approval process for the Acquisitions.  The Debtors will file with the Court the Lyndonville Purchase Agreement and Johnson Purchase Agreement in substantially final form no later than August 12, 2021.

36.    The Debtors submit that, under the circumstances, all interested parties will receive reasonable and adequate notice of the proposed Acquisitions.

### C.    The Purchase Price is Fair and Reasonable

37.    The Debtors will receive fair and reasonable value in consideration for the proposed purchase prices not to exceed 5% of the offering prices, which are $6,230,476.00 in the aggregate. Based on the annual net operating income of the Properties, the Debtors expect a capitalization rate with respect to the Lyndonville Property of 6.00% and a capitalization rate with respect to the Johnson Property of 5.50%.  The expected return on investment from the Properties is far in excess of what the funds are currently garnering and is firmly within the expected range for triple-net lease opportunities of this type.  (Danner Decl. ¶ 7.)  Moreover, the estates will benefit from any appreciation in value of the Properties.  Under the circumstances, the Debtors believe that the proposed maximum purchase price for each Property is fair and reasonable.

### D.    The Acquisitions Are Proposed in Good Faith

38.    Ongoing negotiations with the sellers have been, and will continue to be, in good faith and at arms' length.  Neither potential seller is an insider or otherwise affiliated with the Debtors.  (*Id.* ¶ 22.)  As discussed herein, the Debtors believe that the terms of the proposed Acquisitions are fair and reasonable.  Thus, the Debtors submit that the Acquisitions are proposed in good faith.

## CONCLUSION

39.    For the above reasons, the Debtors respectfully request that the Court enter the Proposed Order.

## NOTICE

40.    Notice of this Motion will be given to: (a) the U.S. Trustee; (b) the United States District Attorney for the District of Delaware; (c) the Internal Revenue Service; (d) counsel to the TCC; (e) counsel to the FCR; (f) those parties that have requested notice pursuant to Bankruptcy Rule 2002 and (g) those parties that objected to the Notice Procedures Motion.  The Debtors submit that, under the circumstances, no other or further notice is required.

## NO PRIOR MOTION

41.    The Debtors have not made any prior motion for the relief sought in this Motion to this Court or any other.

US-DOCS\124929238.12

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Order,

granting the relief requested in this Motion and such other relief as may be just and proper.

Dated:  July 29, 2021
         Wilmington, Delaware

Respectfully submitted,

*/s/ Amanda R. Steele*

**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:  collins@rlf.com
       merchant@rlf.com
       steele@rlf.com

- and -

**LATHAM & WATKINS LLP**

Jeffrey E. Bjork (admitted *pro hac vice*)
Kimberly A. Posin (admitted *pro hac vice*)
Helena G. Tseregounis (admitted *pro hac vice*)
Shawn P. Hansen (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
E-mail:  jeff.bjork@lw.com
       kim.posin@lw.com
       helena.tseregounis@lw.com
       shawn.hansen@lw.com

- and -

Richard A. Levy (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  richard.levy@lw.com

*Counsel for Debtors and Debtors-in-Possession*