**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------- x
In re:                                             :   Chapter 11
                                                   :
IMERYS TALC AMERICA, INC., et al.,¹                :   Case No. 19-10289 (LSS)
                                                   :
        Debtors.                                   :   (Jointly Administered)
                                                   :
                                                   :   Re: Docket Nos. 3881, 3937, 3927, 3935 & 3933
                                                   :
-------------------------------------------------- x
```

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF MOTION FOR ENTRY
OF ORDER AUTHORIZING DEBTORS TO PURSUE AND EFFECTUATE
PURCHASE OF PROPERTIES LOCATED IN
<u>LYNDONVILLE, VERMONT AND JOHNSON, VERMONT</u>**

The above-captioned debtors and debtors-in-possession (collectively, the "**<u>Debtors</u>**") in these chapter 11 cases (the "**<u>Chapter 11 Cases</u>**") hereby file this reply (the "**<u>Reply</u>**") in support of the Motion[2] and in response to the (i) *Certain Insurers' Objection to Debtors' Motion for Entry of an Order Authorizing Debtors' Purchase of Vermont Properties* [Docket No. 3937] (cited herein as "**Certain Ins. Obj. __.**"), (ii) *Objection of Arnold & Itkin LLP to Debtors' Motion for Entry of Order Authorizing Debtors to Pursue and Effectuate Purchase of Properties Located in Lyndonville, Vermont and Johnson, Vermont Filed by Imerys Talc America, Inc.* [Docket No. 3927] (cited herein as "**A&I Obj. __.**"), (iii) *Joinder of Certain Underwriters at Lloyd's, London and Certain London Market Insurers to Certain Insurers' Objection to Debtors' Motion for Entry of Order Authorizing Debtors' Purchase of Vermont Properties* [Docket No. 3935], and

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748).  The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

[2]    The "Motion" refers to the *Debtors' Motion for Entry of Order Authorizing Debtors to Pursue and Effectuate Purchase of Properties Located in Lyndonville, Vermont and Johnson, Vermont* [Docket No. 3881].

(iv) *Joinder by AWKO Claimants to Objections to Debtors' Motion for Entry of Order Authorizing Purchase of Vermont Properties* [Docket No. 3933] (collectively, the "**Objections**" and the "**Objectors**").  In support of this Reply, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    The Debtors have undoubtedly met their burden of demonstrating a valid business justification for pursuing and effectuating the Acquisitions.[3]

2.    The applicable legal standard is whether the Acquisitions are a sound exercise of the Debtors' business judgment pursuant to section 363(b) of the Bankruptcy Code.  In applying the business judgment standard, courts consistently recognize that the debtor's judgment is entitled to deference and should be shielded from second-guessing so long as it is supported by some legitimate business rationale.  Here, the Debtors' business rationale for pursuing the Acquisitions is clear and compelling:  the proposed Acquisitions will enhance the value of the estates by earning a return on the purchase that is 50 to 60 times greater than the negligible 0.1% such funds are currently earning.  As is true of any business venture, the Acquisitions come with some degree of risk.  The relatively minor risks here, however, are greatly outweighed by the benefits and do not negatively affect the value proposition for the Debtors.  Because these opportunities are subject to existing long-term triple-net leases, where the Debtors' out-of-pocket capital expenses are limited, and are backed by a corporate guarantee from Dollar General Corporation ("**Dollar General**"), a publicly traded company with an investment-grade credit

---

[3]    Capitalized terms not otherwise defined herein shall have the definitions ascribed to them in the Motion.

rating that operates thousands of small-box stores across the country, the downside risk associated with the Acquisitions is remote and insignificant.

3.          The Debtors also believe that acquiring one or more operating businesses may help address certain anticipated objections to the Plan, specifically whether the Debtors can satisfy the so-called "ongoing business" requirement of section 524(g) of the Bankruptcy Code. The Debtors continue to maintain that the Plan as currently filed is confirmable and the Court need not consider whether the Plan satisfies section 524(g) (or any other confirmation related provision) to determine whether the Debtors have a valid business justification for the Acquisitions.  Nevertheless, the possibility for the Acquisitions to assist in resolving certain Plan objections, removing an impediment to confirmation of a Plan that incorporates over $500 million in third-party settlements that are contingent on obtaining a section 524(g) channeling injunction, is an appropriate consideration for pursuing the Acquisitions and an independent business justification, distinct from the purely commercial considerations discussed above, that satisfies section 363(b).

4.          At bottom, the Objectors' arguments seek to second-guess the Debtors' business judgement and interject themselves into business decisions that are to be left to the sound discretion of the Debtors.  The Debtors are best-positioned to determine how to utilize the funds of the estates during the Chapter 11 Cases, and the Objectors have not demonstrated any reason this Court should disregard the typical deference given to a debtor's business judgment.

5.          The Objectors' single-minded focus is on obstructing the Debtors' progress towards confirmation of the Plan.  Simply put, because there is a possibility that the relief sought in the Motion will strengthen the Debtors' ability to confirm the Plan, the Objectors oppose it. That is not a sufficient reason to override the Debtors' business judgment.

6.      Moreover, as a threshold matter, the objecting insurers—the Certain Insurers and the London Market Insurers (collectively, the "**Insurers**")—lack standing to object to the Motion.[4]  The Plan does not impair, alter or modify the rights and obligations of the Insurers arising under the Policies and preserves defenses the Insurers may have against the Trust.  Thus, the Insurers have no pecuniary interest in how the Debtors use $6.2 million in Sale proceeds otherwise earmarked for the Trust because they have no interest in the extent to which the Trust is funded (or not) on the Effective Date of the Plan.

7.      In light of the objecting Insurers' attenuated, generalized interest in the Motion, it is critically important that both the Tort Claimants' Committee (the "**TCC**") and the legal

---

[4]      Party in interest standing under section 1109(b) of the Bankruptcy Code is limited generally to entities having a direct pecuniary interest in the outcome of the specific matter before the bankruptcy court. *See In re Fuller-Austin Insulation*, No. 98-2038-JJF, 1998 WL 812388, at *3 (D. Del. Nov. 10, 1998) (holding that marginal parties who face only incidental harm are not parties in interest).  Indeed, as the Court has recognized, a party "can be a party-in-interest for one purpose [in a chapter 11 case], and not another."  *See Bench Ruling on Motion to Appoint James L. Patton, Jr. as the Legal Representative for Future Talc Personal Injury Claimants* [Docket No. 503] at 2.  Here, the Insurers lack any pecuniary interest in the Motion and should not be entitled to object to the proposed Acquisitions.  If confirmed, nothing in the Plan will operate to, or have the effect of, impairing, altering, supplementing, or modifying the rights and obligations of the Insurers or the Debtors arising under any Talc Insurance Policy (as defined in the Plan).  *See* Plan § 11.4.1.1.  Given this broad reservation, the Insurers' pecuniary interests are not affected by the Acquisitions or the extent to which the Trust is funded on the Effective Date.  *See In re Flintkote Co.*, No. 04-11300-KG, Docket No. 3495 (Bankr. D. Del. July 24, 2008) (finding that debtors' parent and certain insurers lacked standing to be heard on the debtors' motion to authorize the purchase of certain properties subject to triple-net leases because objecting parties had no interest in motion).

The Debtors have objected to all proofs of claim filed by the Insurers on the basis, among others, that the claims fail to establish *prima facie* validity and are contingent on future events that may never occur.  Indeed, when it suited their interests in opposing the Indirect Talc Bar Date, certain of the Insurers acknowledged as much: "[h]olders of 'potential' Indirect Talc Claims . . . with 'unknown' claims clearly cannot vote on any plan of reorganization as they are not 'creditors' as defined in § 101(10) of the Bankruptcy Code." *Objection of Cyprus Historical Excess Insurers to Motion of the Debtors for an Order (I) Establishing a Bar Date for Indirect Talc Claims and Related Procedures for Filing Proofs of Claim for Indirect Talc Claims and (II) Approving Form and Manner of Notice Thereof* [Docket No. 1246] at 3-4 (cited herein as "Insurer Bar Date Obj. __.").

representative of future claimants (the "**FCR**")—the official, appointed representatives of the main beneficiaries of the Trust—support and have joined the Debtors' Motion.[5]

## ARGUMENT

**A.    The Debtors Have Satisfied the Business Judgment Standard Under Section 363(b)**

8.    The Objectors' myriad arguments that the Debtors have failed to satisfy section 363(b) of the Bankruptcy Code fall into two categories. *First*, the Objectors argue that the proposed Acquisitions are not supported by a valid business justification. *Second*, the Objectors argue that the proposed Acquisitions are the product of a flawed process evidencing the lack of sound business judgment. Both lines of argument are unavailing. For the reasons set forth herein and in the Motion, the Debtors have undoubtedly met their burden under the deferential business judgment standard.

### i.    A Valid Business Justification Exists for the Proposed Acquisitions

9.    Section 363 of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). As set forth fully in the Motion, courts emphasize that the deferential business judgment rule is "not a difficult standard to satisfy" and may be satisfied if the proposed action appears calculated to enhance the debtor's estate. *In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009). In recognition that the debtors are typically best positioned to make decisions about how to optimally use estate assets, courts are generally unwilling to second-guess the debtor's decisions or substitute their own judgment for that of the

---

[5]    *Joinder of the Future Claimants' Representative to Debtors' Motion for Entry of Order Authorizing Debtors to Pursue and Effectuate Purchase of Properties Located in Lyndonville, Vermont and Johnson, Vermont* [Docket No. 3893]; *See Joinder of the Official Committee of Tort Claimants to Debtors' Motion for Entry of Order Authorizing Debtors to Pursue and Effectuate Purchase of Properties Located in Lyndonville, Vermont and Johnson, Vermont* [Docket No. 3906].

debtor's management.  *See, e.g., In re Nine West Holdings, Inc.*, 588 B.R. 678, 692 (Bankr. S.D.N.Y. 2018) ("The business judgment standard applied by courts presumes that the court will not second guess the business judgment of a debtor's board in making a business decision.").

10.     The Certain Insurers argue that the Acquisitions will not enhance the value of the estates because "it would take 17 years for the Debtors just to recoup their investment" based on the aggregate purchase price of $6.2 million and annual rental payments of approximately $363,817.  Certain Ins. Obj. at 10.  The proper focus, however, is not on how long it will take for the Debtors to recoup the purchase price, but rather on the difference between the returns the funds are earning today and the expected returns if the Acquisitions are consummated.  The funds are currently earning a negligible 0.1% per annum return compared with a projected 5.0 to 6.0% per annum capitalization rate for the Properties, amounting to a return on the purchase price that is 50 to 60 times greater than the status quo.  *See* Danner Decl. ¶¶ 7, 9.

11.     Moreover, the Certain Insurers assume that once the sales close the purchase price is lost and can only be recouped through rental revenues.  That is simply not the case.  The Debtors are acquiring not only a revenue stream but also hard real property assets.  The Properties could be sold at any time.  Indeed, the Debtors have first-hand experience of the robust and active market for this asset class, and the Debtors' expectation is that the Properties will maintain (and potentially increase in) value over time.

12.     The Certain Insurers also object that the Acquisitions – representing "only approximately 2.8% of the Sale Proceeds" – are too "paltry" to "move the needle in adding overall value to the Trust" (and do so apparently unbothered by the contradictory argument that the Acquisitions would impose grave risks on the estates' assets).  *See* Certain Ins. Obj. at 14-15.  However, the Acquisitions utilize only a modest amount of the Sale proceeds to serve as a

proof of concept.  No doubt, if the Debtors had attempted to execute on a series of transactions with a larger percentage of the Sale proceeds, the Debtors would be faulted for taking on too great a risk.  Moreover, nothing in the business judgment standard requires the Debtors to establish that any use of estate assets outside the ordinary course will produce a certain level of income before it may be approved.  And, in any event, the proper comparison is not whether the Acquisitions will bring income that will "move the needle" as compared to either the total sale proceeds or anticipated Trust assets, but rather whether the Debtors have properly exercised their business judgment in determining that the value of estate assets utilized is likely to be maximized through pursuit of the relief sought in the Motion.

13.    Likewise, nothing in the business judgment standard requires that a proposed use of estate assets outside the ordinary course be entirely risk free.  Rather, courts recognize that risk is inherent in any business venture and consistently defer to the debtor's judgment on whether the potential rewards are commensurate with the associated risks.  *See In re Global Crossing Ltd.*, 295 B.R. 726, 746 (Bankr. S.D.N.Y. 2003) (holding that debtor's decision to pursue a particular sale transaction "was well within the bounds of reasonable business judgment" notwithstanding the "risk and uncertainty" inherent in that decision); *see also* Tr. of Proceedings Before the Honorable Judith K. Fitzgerald, *In re Flintkote Co.*, No. 04-11300 (Bankr. D. Del. July 21, 2008) at 98:5-11 ("It is not a substantial transaction given the debtors' overall cash position, and as a result, I think that . . . venturing into this business enterprise is worth the risk that is involved.") (cited herein as "**Flintkote Tr.**," relevant excerpts of which are attached hereto as Exhibit A).

14.    The Debtors have weighed the risks associated with the Acquisitions and have determined that they are marginal in comparison to the value proposition.  *See* Deposition of

Eric Danner, August 11, 2021 at 145:10-146:7 (noting that while the Debtors expect the value of the Properties to gradually rise, if diligence reveals the assets would likely decline in value the Debtors would not acquire the Properties) (cited herein as "**Danner Dep.**," relevant excerpts of which are attached hereto as Exhibit B).  Specifically, the Certain Insurers point to four potential risks.  *First*, the Certain Insurers argue that there is a risk that "a tenant could leave" and be unwilling or unable to pay rent.  *See* Certain Ins. Obj. at 12.  The Tenant, which is the same entity at each property, is a subsidiary of Dollar General – not an individual franchisee. Accordingly, the risk in the first instance that a member of the Dollar General corporate family would be unable to perform its obligations under the lease is remote.  While the Debtors are still actively engaged in due diligence, preliminary due diligence confirms this understanding, showing that the Tenant has stable financials that will support its ability to pay rent.  For example, the Lyndonville Property is in the top 2% of Dollar General locations and due diligence suggests the Johnson Property is located in an area of significant demand, and low supply, for Dollar General products.  In addition, financial documents confirm that the Tenant has paid their 2020 rental payments for both Properties in full.  The risk that "a tenant could leave" is also remote because the Tenant is party to an existing long-term lease at each property – there are 9 years remaining on the initial term under the Lyndonville Lease Agreement with options to extend for up to an additional 10 years, and 12 years remaining on the initial term under the Johnson Lease Agreement with options to extend for up to an additional 20 years.  The options to extend were specifically negotiated by the Tenant, suggesting that there is a reasonable likelihood that the Tenant will want to remain at the Properties beyond the initial lease terms.  Finally, if the Tenant were to stop paying rent or abandon a property in breach of the lease agreement, the Debtors

would be entitled to exercise all rights and remedies available to them under the applicable lease agreement and applicable law.

15.    Additionally, the corporate guarantee of the Tenant's obligations under the lease agreements further mitigates the risk of nonpayment, abandonment, or other breach.  The Certain Insurers insinuate that the corporate guarantee cannot be given any weight because the Debtors have not sufficiently diligenced the guarantee.  *Id.* at 5, 12.  The guarantee is provided by Dollar General, which is the ultimate parent entity of the Dollar General corporate family.  Dollar General is a publicly traded company with an 80-year history of operating small-box retail stores throughout the United States.  *See* Dollar General Corp., Annual Report (Form 10-K) (Mar. 19, 2021) at 4.  In fiscal year 2020, Dollar General reported net income of $2.65 billion.  *See id.* at 25.  Dollar General also boasts an investment-grade credit rating from each of the major credit rating agencies.  *See id.* at 19, 36 ("Our debt securities are currently rated investment grade . . . Our senior unsecured debt is rated 'Baa2,' by Moody's with a stable outlook and 'BBB' by Standard & Poor's with a stable outlook.").  Considering Dollar General's financial wherewithal, the corporate guarantee offers meaningful assurances that the Debtors will receive the benefit of their bargain and mitigates against the risk of the Tenant's failure to perform.

16.    *Second*, the Certain Insurers argue that the Debtors would be responsible for certain capital maintenance costs with respect to the Lyndonville Property, which could exceed the rental income.  *See* Certain Ins. Obj. at 11-12.  While the property inspection report will detail the likelihood of such a risk, the possibility is remote.  For example, one of the most significant expenses the Debtors could potentially incur is with respect to the maintenance or replacement of the roof.  The building located on the Lyndonville Property was constructed in 2008 and the usual lifespan of a commercial roof is 30 to 40 years.  The Johnson Property is

9

subject to an absolute triple net lease, which greatly limits the landlord's obligations with respect to capital expenditures.  Moreover, as described below, diligence is ongoing (and will include a property inspection) and the Debtors have the right to terminate each Purchase and Sale Agreement if diligence is unsatisfactory.  As such, the risk that the Lyndonville Property will require substantial capital expenditures in the short-term is remote.

17.    *Third*, the Certain Insurers make the unremarkable point that "any property acquired at one price could lose value." *Id.* at 12.  Of course, it is always possible that any real property asset (like any other property or asset) could lose value over time.  That concern cannot overcome the deference afforded to the Debtors' business judgment as how best to utilize estate funds.  Indeed, if the standard for approving a use of estate assets was whether there was any possibility that the purchased assets could lose value over time, then chapter 11 debtors would be entirely foreclosed from utilizing section 363(b) for this purpose.

18.    *Fourth*, the Certain Insurers lob an array of unsubstantiated allegations at Dollar General to imply that the Debtors' association with Dollar General will risk "potentially sizable liabilities." *Id.* at 12.  As noted above, Dollar General is an established, publicly-traded company with a long track-record of operating successful small-box retail stores throughout the country.  And, in any event, the Debtors' relationship with Dollar General would be limited to that of landlord and tenant with Debtor ITV serving as landlord to a Dollar General subsidiary, the Tenant, under leases that are backed by a guarantee from Dollar General.  As such, the principal risk Dollar General poses to the Debtors (if any) is credit exposure in the form of rent payments and other obligations under the lease agreements. The Debtors would have limited exposure to the ups and downs of the Dollar General businesses operated on the premises.  Specifically, the Debtors would not share in any losses from the stores and would have no obligation to deploy

10

additional capital to support the stores.  The Debtors would have exposure to the Dollar General business only insofar as the health of that business affects the ability of the Tenant to meet its obligations under the lease agreements.  Even in the event that the stores underperform, Dollar General's financial ability to meet its obligations under the corporate guarantee is unquestionable and therefore, the risk Dollar General poses to the Debtors is minimal.

19.    Finally, the Certain Insurers object that the proposed Acquisitions cannot be justified because the transaction and operating costs "could exceed the amount they seek to spend on the Acquisitions."  *See* Certain Ins. Obj. at 11.  The Debtors have taken steps to limit costs associated with the Acquisitions.  The Debtors have agreed to an arrangement with CohnReznick where its fees related to diligence on potential targets are capped at $55,000.  *See* Tr. of Proceedings Before the Honorable Laurie Selber Silverstein, *In re Imerys Talc America, Inc.*, No. 19-10289 (Bankr. D. Del. June 22, 2021) at 38:9-24 (relevant excerpts of which are attached here to as Exhibit C).  Importantly, the $55,000 is a cap, not a fixed fee – no matter how many additional opportunities the Debtors consider and pursue, there is a ceiling on the diligence costs to the estate, but if CohnReznick accrues fees and expenses that are less than the cap, the Debtors are only billed for the fees and expenses actually accrued.  *Id.*

20.    In addition to the fees and expenses of CohnReznick, the Debtors anticipate incurring approximately $41,000 to $55,000 for real estate counsel, Phase I environmental diligence, a survey, and a property condition assessment.

21.    The costs the Debtors expect to incur with respect to the maintenance and management of the Properties are relatively minimal.  As the Certain Insurers acknowledge, the Johnson Property is subject to an absolute triple-net lease under which "the tenant is responsible for all costs associated with the property."  *See* Certain Ins. Obj. at 7.  The Lyndonville Property

11

is subject to an existing triple-net lease under which the Debtors would be obligated for certain repair and maintenance costs, including costs associated with roof and exterior, parking lot maintenance and landscaping, which the Debtors expect to be minimal.  As noted above, the Debtors do not anticipate incurring significant costs for roof maintenance for at least another 15 years.  Moreover, the Tenant is obligated to pay, in addition to the base rental payments, $495 per month towards such maintenance costs, which will offset the Debtors' out-of-pocket costs. Preliminary diligence has revealed that the $495 has been more than sufficient to cover the maintenance costs and has resulted in additional gain to the current landlord.  In addition, CohnReznick will expend time managing the properties, which will entail, among other things, organizing the books, managing vendors, ensuring real estate taxes are paid and appropriate insurance is in place, communicating with the Tenant, communicating with the municipalities, and periodically visiting the sites.  The additional costs associated with these services are expected to be *de minimis* as managing the Properties will be but one of a number of tasks CohnReznick will be performing in connection with the wind-down of the Debtors.

22.    Comparing the benefits of the Acquisitions – the expectation that the Properties will generate revenues that are 50 to 60 times greater than current returns on the funds – to the minimal risks and costs the Debtors would be incurring, a valid business justification exists to proceed with the Acquisitions under section 363(b).

ii.    **The Acquisitions are the Product of a Thorough, Careful Process that is Consistent with the Sound Exercise of the Debtors' Business Judgement**

23.    The Certain Insurers argue that the Acquisitions are the product of a rushed process where the Debtors failed to adequately consider alternative opportunities.  *See* Certain

Ins. Obj. at 9.[6]  This argument is meritless.  The Debtors have been actively engaged in an effort to acquire one or more operating businesses for over seven months.  Since the June 22, 2021 hearing on the Notice Procedures Motion, the Debtors have reviewed 84 business acquisition opportunities, including 51 net lease opportunities. Danner Decl. ¶ 10.  Based on an initial review, the Debtors contacted sellers and/or brokers to express initial indications of interest with respect to 21 of these opportunities.  *Id.*  The Debtors have diligently pursued attractive opportunities as they have become available, and have let many less attractive opportunities pass without further consideration, but have been unable to secure a target due in large part to the active market for these type transactions.  *Id.*

24.    The Debtors have observed many promising opportunities come on and off the market in a matter of days.  Considering the active market and the complications associated with seeking bankruptcy court approval, the Debtors determined that they must move expeditiously if they are to have any hope of securing an opportunity.  To that end, the Debtors' decision to file the Motion seeking authority to pursue and effectuate the Acquisitions immediately after submitting non-binding LOIs was a practical necessity.  The Debtors believe that waiting until after purchase and sale agreements had been negotiated and executed to file the Motion and start the clock running on the notice period would have jeopardized both transactions.

25.    Nevertheless, despite extensive briefing and testimony on the Debtors' need for expediency, the Certain Insurers contend that the Debtors have "offered no explanation for their haste" in filing the Motion.  Certain Ins. Obj. at 9.  Yet, at the same time, the Certain Insurers

---

[6]    As a threshold matter, contrary to the Certain Insurers' meritless contention, the Debtors need not show that they have explored the "entire universe" of possible alternatives in order to show a valid business justification for the Motion.  *See* Flintkote Tr. at 73:1-5 (stating in response to an argument that certain objectors need discovery into alternative transactions, "There may [be better investments available] . . . . The debtor doesn't have to explore the entire universe of every invest[ment] or every business transaction.").

recognize that "[a]cquisition candidates appeared on, and disappeared from, Debtors' radar screen in rapid succession," including one of the Debtors top-candidates in the days before the Motion was filed. *Id.* at 4. While the Certain Insurers attempt to use this fact to paint the Debtors as aimless and undiscerning, the manifest reality is that attractive opportunities, such as the Properties, do not stay on the market for long and buyers must be nimble and act decisively to compete. The constantly evolving nature of the Debtors' target list is a testament to that reality.

26.     With respect to the specific Acquisitions at issue here, the Certain Insurers argue that the Debtors failed to adequately diligence the Properties, effectively making "a $6.2 million decision sight unseen." *Id.* at 9-10. This argument misunderstands, or deliberately misconstrues, how the acquisition process works and where the Debtors are in that process (and were in the process when the Motion was filed). The Debtors filed the Motion a day after submitting the Lyndonville LOI and the Johnson LOI (collectively, the "**LOIs**"), which are nothing more than non-binding letters expressing the Debtors' intention to pursue the Acquisitions on the terms and conditions specified therein. The Debtors convened a meeting of the Board of Directors to discuss the potential Acquisitions the evening before the Motion was filed, at which Kevin Collins, the Debtors' sole and independent director (the "**Director**"), authorized the Debtors to file the Motion and pursue the purchase of the Properties, subject to Court approval.

27.     The Certain Insurers argue that because the Director was not made aware of the proposed Acquisitions until the night before the Motion was filed, the Debtors gave insufficient consideration to the Acquisitions. *See* Certain Ins. Obj. at 5. Given the early stage of the Debtors' formal discussions with the Sellers, it is hardly surprising that this was the first discussion of these particular Acquisitions at the board level. Moreover, notwithstanding board

14

approval, the Debtors maintain absolute flexibility to walk away from the Acquisitions if due diligence reveals unfavorable facts, as described further below.

28.     Following an agreement in principal on the commercial terms set forth in the LOIs, the Debtors' real estate counsel, on the one hand, and counsel to the Lyndonville Seller and counsel to the Johnson Seller (together with the Lyndonville Seller, the "**Sellers**"), on the other hand, began negotiating purchase and sale agreements for each of the Acquisitions.  On August 12, 2021, the Debtors filed substantially final forms of the purchase and sale agreement for the Lyndonville Property (the "**Lyndonville Purchase and Sale Agreement**") and the purchase and sale agreement for the Johnson Property (the "**Johnson Purchase and Sale Agreement**" and, together with the Lyndonville Purchase and Sale Agreement, the "**Purchase and Sale Agreements**") [Docket No. 3924].  On August 16, 2021, Debtor ITV and the Johnson Seller executed the Johnson Purchase and Sale Agreement and on August 17, 2021, the Debtor ITV and the Lyndonville Seller executed the Lyndonville Purchase and Sale Agreement.[7]

29.     Each Purchase and Sale Agreement is conditioned on the Debtors obtaining an order of this Court approving the agreement and authorizing them to perform thereunder.  *See* Docket No. 3924, Ex. A, § 3(b) (cited herein as "**Lyndonville PSA __.**"); Ex. B, § 3(b) (cited herein as "**Johnson PSA __.**").  Additionally, each Purchase and Sale Agreement includes a 30-day due diligence period that runs from the date of execution.  *See* Lyndonville PSA § 4; Johnson PSA § 4.  If the Debtors, in their "*sole discretion*, determine during the Due Diligence Period, that [they do] not desire to purchase the Property for *any reason whatsoever*" they have a right

---

[7]     The Certain Insurers complain that executed Purchase and Sale Agreements were not available in advance of Mr. Danner's deposition. *See* Certain Ins. Obj. at 10.  However, the Debtors committed to filing the Purchase and Sale Agreements "in substantially final form no later than August 12, 2021." Mot. ¶ 35. The Debtors satisfied that commitment.  It is not a fault of the Debtors' process that the Certain Insurers scheduled Mr. Danner's deposition on August 11, 2021, with full knowledge that they may not have the Purchase and Sale Agreements in hand at that time.

to terminate each Purchase and Sale Agreement.  *See* Lyndonville PSA § 14(c) (emphasis added); Johnson PSA § 14(c) (emphasis added).  The Debtors are also entitled to the return of the earnest-money deposit if they walk away during the due diligence period.

30.     The Certain Insurers argue that it was somehow imprudent for the Debtors to submit non-binding LOIs without first having visited the Properties.  *See* Certain Ins. Obj. at 9-10.  As noted above, the LOIs are non-binding expressions of intent to formally engage with the Sellers – they do not in any sense commit the Debtors to purchase the Properties.  Following submission of the LOIs and before the Purchase and Sale Agreements were negotiated, Mr. Danner, the Debtors' Chief Restructuring Officer, personally visited both sites.  Danner Dep. 32:23–33:3, 102:25–103:3.  Moreover, each Purchase and Sale Agreement gives the Debtors "the right to enter upon the Property for the purpose of performing such examinations and tests (including soil tests), as [the Debtors] may deem appropriate . . . ."  *See* Lyndonville PSA § 4(a); Johnson PSA § 4(a).  Thus, it was always contemplated that the Debtors would have an opportunity to conduct comprehensive site inspections and engage in other customary due diligence during the 30-day diligence period.  The Debtors intend to use this period to conduct Phase I environmental diligence, an inspection of the property, and a survey of the property, and to continue to review and analyze the financial and other diligence that has been provided by the Sellers.[8]  Prior to the conclusion of the diligence period, the Debtors will again assess whether each Acquisition offers an attractive value proposition in light of the entire universe of information received through the diligence process.  If the Debtors determine to proceed, the Acquisitions will proceed to closing, subject to prior court approval and consent of the TCC and

---

[8]     The deadline for the Seller to provide deliverables under the Lyndonville PSA was August 19, 2021 and the deadline for the Seller to provide deliverables under the Johnson PSA was August 18, 2021.

the FCR, which will provide an important additional check on the Debtors' exercise of their business judgment.

31.    Because the Debtors may, in their sole discretion, walk away from the Acquisitions during the due diligence period for "any reason whatsoever," it cannot be said that the Debtors made a "$6.2 million decision sight unseen."  The Debtors have engaged in a careful and thorough process that appropriately balances the Debtors' need to act swiftly to execute on attractive opportunities while maintaining significant safeguards to ensure that the Acquisitions will be value maximizing.  The Debtors' decision-making process evidences a sound exercise of business judgment that satisfies the requirements of section 363(b).

**B.**    **Consideration of the Potential Impact of the Acquisitions on a Section 524(g) Analysis is Inappropriate at This Time**

32.    As set out above, the Debtors have established a business justification for the Acquisitions that is entirely independent of the Acquisitions' potential effect on the Debtors' ability to satisfy the purported "ongoing business" requirement of section 524(g).  Nevertheless, the Objectors again use the Motion as an opportunity to raise premature objections to the Plan.  Certain Ins. Obj. at  15-21.  The Debtors maintain that a full and fair opportunity for all parties to brief the Court on such issues will and should properly take place in connection with plan confirmation when the Court has all confirmation-related facts and evidence before it.  The specific issue of whether the Debtors can establish that they satisfy the purported "ongoing business" requirement should not be considered in a vacuum months ahead of the anticipated confirmation hearing, without consideration of all facts and legal arguments.  And, to that end, the Proposed Order expressly reserves the rights of all parties to raise any and all objections in connection with confirmation, including whether the Plan satisfies the requirements of section 524(g).

33.     To be sure, the Debtors disagree with the Objectors' characterization of the requirements of section 524(g) as it relates to plan confirmation.  The Debtors contend that the Plan as currently filed is fully confirmable, and this is true whatever the Court's decision on the Motion.  At the same time, the Debtors recognize that the proposed Acquisitions could help address the Objectors' arguments regarding the nature of post-Effective Date operations, which would be beneficial in pursuing confirmation of the Plan.  The Debtors have made no secret of their desire to confirm a section 524(g) plan and have worked toward such a plan from the start of these Chapter 11 Cases.  Indeed, as contemplated by the Plan (which was overwhelmingly accepted by 79.83% of claimants)[9], certain third parties have committed to provide over $500 million to be contributed to the Trust in exchange for the protection of a section 524(g) channeling injunction.  *See* Plan §§ 10.8-10.10.

34.     As such, the ability for the Acquisitions to assist in resolving certain Plan objections was not only an appropriate consideration for pursuing these Acquisitions, but an independent justification, distinct from the business justifications detailed above, that further evidences a valid rationale for the transactions in satisfaction of section 363(b).  Indeed, in *Flintkote*, Judge Fitzgerald explicitly rejected arguments that the Debtors' desire to address potential confirmation objections evidenced a lack of valid business judgment, instead finding that "[a] business opportunity which puts a small and not very substantial portion of its wealth into a different type of investment that gives it an operating business that may . . . give[] an

---

[9]     *See Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 3534].

18

argument [in response to potential "ongoing business" objections] that it doesn't currently have

. . . [is] the exercise of very good business judgment." *See* Flintkote Tr. at 42:20-25–43:1-10.

35.     Because the Objections raise issues more appropriately considered at confirmation, the Motion includes a broad reservation of rights that make it abundantly clear that the parties' rights to raise objections at confirmation will not be implicated by the Motion.

**C.     The Motion and Proposed Acquisitions Are Consistent With the Plan and Do Not Require Further Disclosure or Resolicitation**

36.     The relief sought in the Motion does not require a material modification of the Plan that would, in turn, require resolicitation.  Nevertheless, as with the bulk of the Objections, the issue of whether any Acquisitions the Debtors enter into would require resolicitation of the Plan (which the Debtors submit they would not) are also confirmation issues which are not before the Court today.  *See* Certain Ins. Obj. at 21.  The Proposed Order reserves the rights of all parties to argue plan modification issues at confirmation.  As explained in the Debtors' reply in support of the Notice Procedures Motion, to the extent raised at confirmation, the Debtors will demonstrate that such arguments fail on the merits.  *See Debtors' Omnibus Reply in Support of Motion for Entry of Order (I) Approving Notice Procedures, (II) Authorizing Acquisitions and (III) Granting Related Relief* [Docket No. 3715] at ¶ 34.

37.     In any event, the Certain Insurers, who have raised this objection and lack standing to be heard on this Motion, are particularly ill-positioned to argue that the Motion constitutes a plan modification that necessitates resolicitation.  The Certain Insurers, as they have acknowledged, are *not* entitled to vote on the Plan and therefore have no cognizable interest in whether creditors that are entitled to vote – but have not objected to the Motion on this basis – have received adequate disclosure.  *See* Insurer Bar Date Obj. at 3-4.

### D.    Section 345 of the Bankruptcy Code Does Not Apply to the Relief Sought in the Motion

38.    The Certain Insurers continue to argue that the proposed Acquisitions are inconsistent with section 345(b) of the Bankruptcy Code and the U.S. Trustee guidelines, despite the fact that the U.S. Trustee did not object to the Motion.  *See* Certain Ins. Obj. at 21.  However, neither the Debtors nor the Objectors have located any case in which a Court has determined that section 345 is implicated by a request to use estate funds to acquire property or a business pursuant to section 363(b) of the Bankruptcy Code.[10]  In fact, in *Flintkote*, Judge Fitzgerald explicitly found to the contrary, determining that section 345 was not implicated by the debtor's motion to acquire triple-net lease properties.  *See* Flintkote Tr. at 34:7-19 (finding that section 345 was "not workable in a context of acquisition of property . . . I think it writes § 363 out of the Code.  I don't think that's – in fact, I think the Bankruptcy Court would commit reversible error if it did not read the sections in a copacetic form and read § 345 as trumping § 363, that's clearly not the intent, and I simply don't think it works.  I don't think the argument holds any weight.").

39.    The Objectors' unprecedented reading of section 345(b) is contradicted by the statute's plain terms.  Section 345 – titled "Money of estates" – addresses a debtor-in-possession's cash management system and establishes terms and conditions on which the debtor may deposit or invest money.  *See In re Ditech Holding Corp.*, 605 B.R. 10, 16 (Bankr. S.D.N.Y.

---

[10]    The Certain Insurers' Objection cites a single, unpublished out-of-circuit case in support of its reading of section 345.  *See* Certain Insurers' Objection at 21; *In re Fischer*, No. 03-13704, 2010 WL 2746329 (Bankr. D. Md. July 9, 2010).  *In re Fischer* dealt with a chapter 7 trustee's motion to purchase a judgment obtained against the debtor as an alternative investment asset, which would allow the trustee to pursue property of the debtor in order to recover value for the estates.  *See id.* at *11.  Here, the Debtors are requesting authority to purchase the Properties as part of the Debtors' business operations through the Effective Date.  The Motion is not requesting authority to engage in an alternative investment of estate funds.

2019) ("Section 345 of the Bankruptcy Code governs management of money of the estate by a trustee or debtor in possession."). Specifically, section 345(a) provides that a debtor-in-possession "may make such deposit or investment of the money of the estate . . . as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." Section 345(b), in turn, places limitations on the types of deposits or investments a debtor may make – *i.e.*, except where the deposit or investment is insured by the United States or backed by the full faith and credit of the United States, the debtor is required to obtain a bond or other surety. 11 U.S.C. § 345(b).

40.    Section 345, however, is relevant only to situations where a debtor seeks to invest cash in bank accounts or other securities such as stocks, bonds and mutual funds, not a debtor's proposed purchase of assets under section 363(b). *See* 5 Collier Bankruptcy Practice Guide ¶ 86.06 (2021) ("The limitation of section 345(b) does not act to prevent the trustee from utilizing the funds of the estate and investing those funds in the maintenance, improvement, and operation of debtor's business.").

41.    As Judge Fitzgerald recognized, if this Court were to accept such an overly literal reading of section 345, the practical result would be that *any* non-ordinary course use of cash pursuant to section 363 of the Bankruptcy Code would be subject to section 345(b), effectively writing section 363 out of the Bankruptcy Code. *See, e.g., Thorpe v. Borough of Thorpe*, 770 F.3d 255, 263 (3d Cir. 2014) (rejecting literal reading of statute where "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters" (internal citation omitted)). Under such an interpretation, practically, any use of section 363(b) would require the backing of the full faith and credit of the United States (or its equivalents), severely

impeding any debtor's ability to purchase assets or use cash outside of the ordinary course in a chapter 11 proceeding.  Surely this was not the intent of section 345.

### E.     The Motion is Procedurally Proper and Independent of the Notice Procedures Motion

42.     A&I argues that the Motion is premature and procedurally improper because the Notice Procedures Motion remains under advisement, accusing the Debtors of "arrogantly assum[ing] that their version of the proposed purchase procedures should govern the transactions."  A&I Obj. ¶ 1.  The Notice Procedures Motion is narrowly tailored to establish certain notice procedures that would permit the Debtors to seek expedited consideration of a proposed acquisition – it did not seek authority to effectuate any particular acquisition.  Here, by contrast, the Debtors seek authority to make the Acquisitions without reference to the relief requested in the Notice Procedures Motion.  The Debtors did not seek to utilize the notice procedures to expedite consideration of the Acquisitions.  Rather, in recognition that the Notice Procedures Motion remains under advisement, the Debtors noticed the current Motion and set it for hearing in full compliance with the applicable Bankruptcy Rules and Local Rules.  As such, the Motion is procedurally proper and A&I's objection is without merit.

## <u>CONCLUSION</u>

43.     For the reasons stated herein, the Court should overrule the Objections and grant the relief requested in the Motion.

Dated: August 20, 2021
      Wilmington, Delaware

*/s/ Amanda R. Steele*

**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:  collins@rlf.com
        merchant@rlf.com
        steele@rlf.com


- and -

**LATHAM & WATKINS LLP**

Jeffrey E. Bjork (admitted *pro hac vice*)
Kimberly A. Posin (admitted *pro hac vice*)
Helena G. Tseregounis (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
E-mail:  jeff.bjork@lw.com
        kim.posin@lw.com
        helena.tseregounis@lw.com


- and -

Richard A. Levy (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  richard.levy@lw.com

*Counsel for Debtors and Debtors-in-Possession*