## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| IMERYS TALC AMERICA, INC., *et al.*, | ) | Case No. 19-10289 (LSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| _____ | ) | **Re: Dkt. Nos. 3624, 3744, 3922, 4005** |

### OPINION

Before me are four related motions that were presented over the last several months in this mass tort case. Each motion addresses the voting on Debtors' Ninth Amended Plan of Reorganization.[1] The motions are not academic. Debtors' confirmation hearing is scheduled to begin on November 15, 2021. Absent other developments in these cases, the outcome here will determine whether the only voting class has accepted the Plan and whether Debtors have the vote to support an argument that they are otherwise entitled to receive a § 524(g) injunction.

The first motion is Arnold & Itkin LLP's Motion to Disregard[2] certain vote changes. Arnold & Itkin asks that I disregard the votes of three other law firms—Bevan & Associates, LPA, Inc., Trammel P.C. and Williams Hart Boundas Easterby LLP—that submitted

---

[1] Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Dkt. No. 2864 ("Plan"). The Plan was amended post-solicitation, Dkt. No. 4099.

[2] Motion of Holders of Talc Personal Injury Claims Represented by Arnold & Itkin LP to Disregard Certain Vote Changes made without Complying with Bankruptcy Rule 3018, and the Required Showing of Cause in Connection with the Voting on the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Dkt. No. 3624. The Motion to Disregard was joined by Johnson & Johnson & Johnson & Johnson Consumer Inc. Dkt. No. 3653; the Cyprus Historical Excess Insurers, Dkt. No. 3679; Aylstock, Witkin, Kreis & Overholtz PLLC, Dkt. No. 3685; and Imerys S.A., Dkt. No. 3690.

Master Ballots in connection with the Plan. Arnold & Itkin, which has voted to reject the Plan on behalf of its clients, asserts that these other three law firms did not comply with the appropriate procedure for changing their votes from rejecting to accepting the Plan. Argument was heard on June 22, 2021.

I held off ruling on the Motion to Disregard as two of the firms stated that they intended to file their own motions. Thereafter, Bevan & Associates and Williams Hart each separately filed a motion seeking permission to change their respective votes pursuant to Bankruptcy Rule 3018;[3] Trammel did not. The Rule 3018 Motions were the subject of an evidentiary hearing on September 20, 2021. At that time, I also heard the fourth motion, J&J's Motion to Designate.[4] J&J also opposes the Plan. It seeks alternative relief pursuant to Bankruptcy Code § 1126(e) in the event any of the three law firms are permitted to change their respective votes.

Having considered the evidence and arguments:

(i)     the Motion to Disregard is granted with respect to Trammel—its 1670 votes will remain votes to reject the Plan;

(ii)    the Williams Hart Rule 3018 Motion is granted—its 493 votes will be changed to reflect votes to accept the Plan;

---

[3] Motion of Bevan Claimants to Affirm Certain Vote Changes in Connection with the Voting on the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code Pursuant to Bankruptcy Rule 3018, Dkt. No. 3744 ("Bevan & Associates Rule 3018 Motion"); Williams Hart Plaintiffs' Motion Pursuant to Rule 3018 to Affirm Certain Vote Changes in Connection with the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Dkt. No. 3922 ("Williams Hart Rule 3018 Motion" and together with the Bevan & Associates Rule 3018 Motion, the "Rule 3018 Motions").

[4] Johnson & Johnson and Johnson & Johnson Consumer Inc.'s (collectively, "J&J") Motion Pursuant to 11 U.S.C. § 1126(e) for Entry of an Order Designating Votes to Accept the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code Cast by Bevan & Associates LPA, Inc., Williams Hart Boundas Easterby LLP, and Trammell PC, Dkt. No. 4005.

(iii)    the Bevan & Associates Rule 3018 Motion is denied; further, its original Master Ballot will be deemed withdrawn—its 15,719 votes will not be counted as a vote for or against the Plan; and

(iv)    the Motion to Designate is moot with respect to Trammel and Bevan & Associates and is denied with respect to Williams Hart.

## Background[5]

### *The Solicitation Procedures*

Imerys Talc America Inc. ("Imerys" or "Debtor") and certain affiliated entities (collectively, with Imerys, "Debtors") filed voluntary petitions under chapter 11 of the United States Bankruptcy Code on February 13, 2019. The impetus for the filing was the thousands of prepetition lawsuits alleging personal injuries caused by talc mined, processed or distributed by Debtors. Those lawsuits were overwhelmingly based on exposure to cosmetic (not industrial) talc.

---

[5] The Court makes findings of fact and conclusions of law pursuant to Fed. R. Civ. Pro. 52, applicable to these contested matters by Fed. R. Bankr. Pro. 7052 and 9014(c). I thank the parties for supplying a Combined List of Potential Exhibits. There were no objections to the exhibits tendered for admission except for Exhibit 90, which consists of extracts from the Boundas deposition. Williams Hart objects to the admission of excerpts on completeness and asks that the entire Boundas deposition be admitted. J&J and Arnold & Itkin object to the entire deposition being admitted. I will admit the entire deposition transcript. Mr. Boundas took the stand and was cross-examined by both J&J and Arnold & Itkin. Notwithstanding the opportunity to elicit testimony from Mr. Boundas, J&J and Arnold & Itkin now seek to enter into evidence select portions of the Boundas deposition. Fairness and completeness dictate that the entire deposition be included in the record. References to the Exhibits herein shall be according to the number on the Combined List of Potential Exhibits. As all exhibits were not tendered, the Exhibit numbers are not sequential.

By Order dated January 27, 2021,[6] I approved a disclosure statement and Solicitation

Procedures[7] for the Plan.  The only voting class is Class 4: Talc Personal Injury Claims.

Simply put, Talc Personal Injury Claims are claims of individuals based on bodily injury or

death arising out of exposure to Debtors' talc or talc-containing products ("Direct Talc

Personal Injury Claims") as well as claims of corporations, co-defendants or predecessors

for indemnification, contribution or reimbursement ("Indirect Talc Personal Injury

Claims").[8]

---

[6] Ex. 7 (Order (I) Approving Disclosure Statement and Form and Manner of Notice of Hearing Thereon, (II) Establishing Solicitation Procedures, (III) Approving Form and Manner of Notice to Attorneys and Certified Plan Solicitation Directive, (IV) Approving Form of Ballots, (V) Approving Form, Manner, and Scope of Confirmation Notices, (VI) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement and Confirmation of Plan, and (VII) Granting Related Relief, Dkt. No. 2863).

[7] The Solicitation Procedures are Exhibit 1 to the Order.  Capitalized terms herein that are not defined have the meaning set forth in the Solicitation Procedures, the Order or the Plan, as applicable.

[8] Less simply put, "**Talc Personal Injury Claim**" means any Claim and any Talc Personal Injury Demand against one or more of the Debtors or any other Protected Party whether known or unknown, including with respect to any manner of alleged bodily injury, death, sickness, disease or alleged disease process, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries (whether physical, emotional or otherwise), directly or indirectly arising out of or relating to the presence of or exposure to talc or talc-containing products based on the alleged pre-Effective Date acts or omissions of the Debtors or any other Entity for whose conduct the Debtors have or are alleged to have liability (but only to the extent such Claim or Talc Personal Injury Demand directly or indirectly arises out of or relates to the alleged pre-Effective Date acts or omissions of the Debtors), including, without limitation any claims directly or indirectly arising out of or relating to: (a) any products previously mined, processed, manufactured, sold (including, without limitation, any Sale pursuant to the Sale Order) and/or distributed by the Debtors or any other Entity for whose conduct the Debtors have or are alleged to have liability, but in all cases only to the extent of the Debtors' liability; (b) any materials present at any premises owned, leased, occupied or operated by any Entity for whose products, acts, omissions, business or operations the Debtors have, or are alleged to have, liability; or (c) any talc in any way connected to the Debtors alleged to contain asbestos or other constituent. Talc Personal Injury Claims include all such claims, whether: (1) in tort, contract, warranty, restitution, conspiracy, contribution, indemnity, guarantee, subrogation, or any other theory of law, equity or admiralty, whether brought, threatened or pursued in any United States court or court anywhere in the world; (2) seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative or any other costs, fees, injunctive or

The Plan provides that Class 4 Claims are channeled into a § 524(g) trust governed by Trust Distribution Procedures. The Trust Distribution Procedures provide for distributions only to claimants suffering from mesothelioma or various stages of ovarian cancer. Except for the proceeds of a settlement with Cyprus Mines Corporation, the Imerys Trust Assets are split among three sub-funds: 40% to Sub-Fund A for the benefit of claimants suffering from Ovarian Cancer A; 40% to Sub-Fund B for the benefit of claimants suffering from Mesothelioma; and 20% to Sub-Fund C for the benefit of claimants suffering from Ovarian Cancer B, C or D. This has been referred to in these cases as the 40/40/20 split.

Several provisions of the Solicitation Procedures are particularly relevant to the four motions. First, the Solicitation Procedures require that all ballots be submitted by

---

similar relief or any other measure of damages; (3) seeking any legal, equitable or other relief of any kind whatsoever, including, for the avoidance of doubt, any claims arising out of or relating to the presence of or exposure to talc or talc-containing products assertable against one or more Debtors or any other Protected Party; or (4) held by claimants residing within the United States or in a foreign jurisdiction. Talc Personal Injury Claims also include any such claims that have been resolved or are subject to resolution pursuant to any agreement, or any such claims that are based on a judgment or verdict. Talc Personal Injury Claims do not include any claim by any present or former employee of a predecessor or Affiliate of the Debtors for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer. For the avoidance of doubt, the term Talc Personal Injury Claim includes, without limitation (i) all claims, debts, obligations, or liabilities for compensatory damages (such as, without limitation, loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages; and (ii) Indirect Talc Personal Injury Claims. Notwithstanding the foregoing, Talc Personal Injury Claims do not include any claim that a Settling Talc Insurance Company may have against its reinsurers and/or retrocessionaires in their capacities as such, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of a Settling Talc Insurance Company to assert any such claim against its reinsurers and/or retrocessionaires in their capacities as such. Plan § 1.1.235. A Direct Talc Personal Injury Claim is any claim that is not an Indirect Talc Personal Injury Claim. Plan § 1.1.79.

March 25, 2021 at 4:00 p.m. (prevailing eastern time), which is defined in the Solicitation Procedures as the "Voting Deadline." Second, the Solicitation Procedures provide Debtors with significant discretion to extend deadlines, including for voting, and/or to permit defects in ballots to be corrected.

Third, the Solicitation Procedures provide "Special Procedures" for voting Direct Talc Personal Injury Claims. The Solicitation Procedures contemplate that individuals will be solicited in accordance with the directive of their respective counsel.[9] Law firms have three options: (i) a firm can certify that it has authority to vote on behalf of its clients and direct Prime Clerk[10] to serve the firm with one solicitation package and one Master Ballot on which the firm "must record the votes on the Plan" for each of its clients; (ii) if a firm does not have authority to vote on behalf of its clients or prefers not to exercise its authority it can elect to (x) direct Prime Clerk to solicit votes directly from its clients or (y) direct Prime Clerk to deliver the solicitation packages to the law firm, which will forward them to its clients; or (iii) a firm can vote some of its clients by Master Ballot and direct Prime Clerk to directly solicit others. So that Prime Clerk knows sufficiently in advance of the service deadline the method by which each holder of a Direct Talc Personal Injury Claim will vote, each law firm is required to complete and return a Certified Plan Solicitation Directive by no later than February 17, 2021. If a firm fails to timely submit a Certified Plan Solicitation

---

[9] The Solicitation Procedures do not appear to contemplate soliciting votes from holders of Direct Talc Personal Injury Claims that are unrepresented.

[10] Prime Clerk LLC was authorized to assist Debtors with the tabulation of votes on the Plan.

Directive or otherwise fails to select a solicitation method, Prime Clerk is to solicit that law firm's clients directly.

Fourth, Article VI. 2 of the Solicitation Procedures contain various rules for tabulating votes as well as certain "general solicitation procedures and standard assumptions." These rules include:

- Any voter that delivers a valid Ballot may withdraw his, her, or its vote by delivering a written notice of withdrawal to the Solicitation Agent before the Voting Deadline (or such later date as agreed by the Debtors with the consent of the Plan Proponents, with such consent not to be unreasonably withheld). To be valid, the notice of withdrawal must be signed by the party who signed the Ballot to be revoked. The Debtors reserve the right to contest any withdrawals. (Art. VI. 2.c.).

- . . . if multiple Ballots are received form the same attorney or agent with respect to the same Claim (but not from the holder thereof), the latest-dated otherwise valid Ballot that is received before the Voting Deadline (or such later date as agreed by the Debtors with the consent of the Plan Proponents, with such consent not to be unreasonably withheld) will be the Ballot that is counted as a vote to accept or reject the Plan. (Art. VI. 2.h).

- The Debtors will not be obligated to recognize any withdrawal, revocation or change of any vote received after the Voting Deadline (or such later date as agreed by the Debtors with the consent of the Plan Proponents, with such consent not to be unreasonably withheld). (Art. VI. 2. j).

- There will be a rebuttable presumption that any claimant who submits a properly completed superceding Ballot or withdrawal of a Ballot on or before the Voting Deadline has sufficient cause, within the meaning of Bankruptcy Rule 3018(a), to change or withdraw such claimant's acceptance or rejection of the Plan. (Art. VI. 2.f.)

***The Voting Declarations***

The Order required Prime Clerk to file its Voting Certification by April 8, 2021. On April 7, Christina Pullo, Vice President of Global Corporate Actions for Prime Clerk filed her declaration ("First Voting Declaration") regarding the solicitation of votes and

"preliminary" tabulation of ballots.[11] In the text of the First Voting Declaration, Ms. Pullo declares that Debtors directed Prime Clerk to include in the vote tabulation Master Ballots received after the Voting Deadline from nine law firms. She also declares that Prime Clerk received Master Ballots from law firms that did not submit a valid Certified Plan Solicitation Directive, which Debtors also instructed Prime Clerk to include in the vote tabulation

Exhibit C to the First Voting Declaration provides detail on each ballot not counted and the reason for exclusion. Bevan & Associates, Williams Hart and Trammel are each listed on Exhibit C as having submitted a Master Ballot rejecting the Plan. The reason for exclusion of each of these Master Ballots is "Master Ballot superseded by later received valid master ballot from *different laws firm* with *consistent vote* on account of the same holder."[12]

Taking into account the included and excluded ballots, Prime Clerk concluded that Class 4 Talc Personal Injury Claims voted to accept the Plan, as follows:

| Class | Class Description | Number Accepting | Number Rejecting | Amount Accepting | Amount Rejecting | Class Voting Result |
|---|---|---|---|---|---|---|
| | | % | % | % | % | |
| 4 | Talc Personal Injury Claims | 62,549 | 15,900 | $62,549.00 | $15,900.00 | ACCEPTS |
| | | 79.73% | 20.27% | 79.73% | 20.27% | |

---

[11] Ex. 11 (Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Preliminary Tabulation of Ballots Cast on the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Dkt. No. 3334).

[12] Certain of the votes recorded on Trammel's Master Ballot were also excluded from the voting tabulation because the ballot did not contain a valid social security number or an indication that the claimant does not have a social security number.

After the filing of the First Voting Declaration, Arnold & Itkin filed a motion seeking to extend the Plan discovery deadline in order to take discovery with respect to the voting and tabulation of the vote.[13]  Arnold & Itkin argued that the First Voting Declaration was inaccurate as it seemed to encompass a statistically implausible result.  In particular, the negative votes reflected in the Master Ballot submitted by Bevan & Associates alone accounted for all but 200 of the ballots to reject the Plan.  I granted that request over a disappointing argument by Debtors (and others in support of the Plan) that the discovery deadline had passed and parties should have anticipated the issues raised by the First Voting Declaration.

As it turned out, Arnold & Itkin's suspicions were correct.  A month later, on May 7, 2021, Christina Pullo filed a Supplemental Voting Declaration.[14]  In the Supplemental Voting Declaration, Prime Clerk again concludes that Class 4 accepted the Plan:

| Class | Class Description | Number Accepting | Number Rejecting | Amount Accepting | Amount Rejecting | Class Voting Result |
|-------|-------------------|------------------|------------------|------------------|------------------|---------------------|
|       |                   | % | % | % | % |  |
|       |                   | 62,553 | 15,804 | $62,553.00 | $15,804.00 |  |
| 4 | Talc Personal Injury Claims | 79.83% | 20.17% | 79.83% | 20.17% | ACCEPTS |

[13]  Motion of Holders of Talc Personal Injury Claims Represented by Arnold & Itkin LLP to Extend Discovery Deadlines and Permit Discovery of the Plan Proponents, Prime Clerk and Certain Third Parties Relating to the Solicitation and Voting With Respect to Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code [Dkt. No. 3425].  Others joined in: Certain Insurers, Dkt. No. 3491; Cyprus Historical Excess Insurers, Dkt. No. 3502; Aylstock Witkin, Kreis & Overholtz PLLC, Dkt. No. 3527.

[14]  Ex. 12 (Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Preliminary Tabulation of Ballots Cast on the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Dkt. No. 3534).

But, the reason for exclusion of Master Ballots filed by Bevan & Associates, Williams Hart

and Trammel now reads: "Master Ballot superseded by latest-dated valid Master Ballot

from *the same law firm* with *inconsistent vote* on account of the same holder." The

Supplemental Voting Certification, therefore, is the first time that parties or the court were

advised that these three firms had changed their respective votes from rejecting the Plan to

accepting the Plan.

**Resolution of the Motions**

### I.     *The Motion to Disregard is Granted with respect to Trammel*

On June 8, 2021, Arnold & Itkin filed its Motion to Disregard. Arnold & Itkin

argues that none of the three firms sought permission to change their respective votes from

rejecting to accepting in derogation of Bankruptcy Rule 3018(a). While the Motion to

Disregard is moot as to Bevan & Associates and Williams Hart, it is still relevant as to the

1,670 votes cast by Trammel.

In support of the vote changes, Debtors[15] and the law firms who seek to change their

votes rely heavily on the Order arguing that Debtors and Prime Clerk complied with the

Solicitation Procedures and so the vote changes should be permitted. Specifically, Debtors

argue that the Order requires Prime Clerk to count the last-dated ballot received before or

after the Voting Deadline if Debtors consent, which they did. Taken together with the

---

[15] Debtors' Objection to Motion of Holders of Talc Personal Injury Claims Represented by Arnold & Itkin LP to Disregard Certain Vote Changes made without Complying with Bankruptcy Rule 3018, and the Required Showing of Cause in Connection with the Voting on the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Dkt. No. 3686. In this objection, Debtors do not really argue in favor of Trammel or Williams Hart and thus it could be argued that they have no objection to the Motion to Disregard with respect to either of those firms.

rebuttable presumption of cause within the meaning of Rule 3018, Debtors argue that the Solicitation Procedures allow claimants to file superseding ballots before or after the Voting Deadline and obviate the need for the filing of a Rule 3018 motion.[16]

A presumption requires the factfinder to accept some facts as proven once provided proof of other facts. It is a procedural rule under which "if a basic fact (Fact A) is established than the finder of fact must accept that the presumed fact (Fact B) has been established."[17] A presumption is not evidence, however, and is not given the weight of evidence.[18] And, a rebuttable presumption is just that—rebuttable. Once the opposing party comes forward with some evidence to create a material fact, the presumption disappears; the party with the burden of persuasion always retains it.[19]

The creation of the presumption in the Solicitation Procedures arguably runs counter to Rule 3018. There is no general entitlement to change a vote once cast.[20] Bankruptcy Rule 3018(a) only permits a change "for cause."[21] The overarching concern underlying

---

[16] It is, of course, understandable that parties should rely on the Order, but as I discuss herein the presumption provision was arguably improvidently entered. While Debtors cited a string of orders for the proposition that such a presumption is typical, including in the mass tort context, there is no indication that any of the orders were contested or were otherwise challenged as is the case here.

[17] 1 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 301.01[1] (2d ed. 2021).

[18] *Id.* (citing New York Life Ins. Co. v. Gamer, 303 U.S. 161 (1938)).

[19] *Weinstein's Federal Evidence* § 301.01[2].

[20] 9 Collier on Bankruptcy, ¶ 3018.01[4] (16th ed. 2021) ("A change of vote may not occur as a matter of right.").

[21] The relevant part of Bankruptcy Rule 3018 provides: "[f]or cause shown, the court after notice and a hearing may permit a creditor or equity security holder to change or withdraw an acceptance of rejection."

Rule 3018 is that any vote change not be "improperly motivated,"[22] a proposition that requires both an explanation and scrutiny. The presumption created in the Solicitation Procedures requires neither; nor is there any logical nexus between Fact A (the change of vote) and Fact B (cause, or a proper motivation).

I expressed skepticism at argument regarding whether I could and/or should have created the presumption in the Solicitation Procedures, but I need not decide that here.[23] The three law firms do not meet even the minimal requisite in the Solicitation Procedures for the creation of the presumption because it arises only if a vote is changed prior to the Voting Deadline. It is undisputed that Trammel and Williams Hart changed their respective votes the day after the Voting Deadline. It is also undisputed that Bevan & Associates first withdrew its vote on March 29 and then resubmitted a Master Ballot accepting the Plan on April 6 more than a week after the Voting Deadline. "Fact A" has not been established by any of the three firms.

Debtors and others in support of counting the changed votes contend that because Trammel and Williams Hart changed their votes within the extended deadline granted by Debtors that those firms are entitled to the presumption. I disagree. The Solicitation Procedures contain multiple provisions in which the term Voting Deadline is qualified by the granting of an extension,[24] but the presumption provision contains no such qualification.

---

[22] *In re MPM Silicones, LLC,* 2014 Bankr. LEXIS 4062 * 5 (Bankr. S.D.N.Y. Sept. 17, 2014) (citing 9 Collier on Bankruptcy, ¶ 3018.01[4] (16th ed. 2021)).

[23] No party briefed the issue of whether a court can create a presumption and the circumstances under which it might be permissible to do so. As discussed at the hearing, in many circumstances the presumption created here could cut down on unnecessary and ancillary litigation.

[24] *See supra.*

I will not re-write the Solicitation Procedures to expand the presumption provision especially where, as here, it appears that the presumption may be in derogation of the very rule it references.

As importantly, there is nothing in the Order or the Solicitation Procedures that excuses the filing of a Rule 3018 Motion. Even assuming a presumption is permissible, the presumption must be applied in the context of an actual controversy. Under the Bankruptcy Rules, a change of vote is initiated by the filing of a Rule 3018 motion. While supporters of the vote changes argue that the Solicitation Procedures imply such a motion is unnecessary, given the atypical creation of the presumption, I will not entertain the waiver of the requirement to file a Rule 3018 motion by implication.

I received little evidence with respect to the votes cast by Trammel, which only came in peripherally through Mr. Boundas' testimony. His testimony as well as undisputed representations in the submissions are that Trammel originally cast a timely ballot rejecting the Plan, was given a one-day extension it did not request (but, was requested for it by Mr. Boundas) and then subsequently changed its vote to accept within the extended deadline. Because Trammel did not file a Rule 3018 motion, did not file an opposition to the Motion to Disregard nor present any evidence of its own, I have no evidence as to why Trammel changed its vote. Accordingly, I will not permit the vote change.

The Motion to Disregard is granted as to Trammel. As for Williams Hart and Bevan & Associates, the Motion to Disregard is moot. I will consider the Rule 3018 Motions on

the merits, but the law firms will not be entitled to a presumption of cause.[25] Each has the

burden of both production and persuasion on its motion.

## II.    *The Rule 3018 Motions*

Bankruptcy Rule 3018 provides "[f]or cause shown, the court after notice and

hearing may permit a creditor or equity security holder to change or withdraw an

acceptance or rejection" of a plan.   Neither the Bankruptcy Rules nor the Bankruptcy Code

define cause.  It is up to judges to determine "cause" based on the context and to grant or

deny a motion in their discretion.[26]  While "cause" is necessarily a fact-driven

determination, some general principles have emerged from the caselaw as set forth in *MPM*

*Silicones.*[27]  First, the "for cause" standard should not be hard to meet.  "As long as the

reason for the vote change is not tainted, the change of vote should usually be permitted."[28]

Second, human error is "cause" to change a vote.   Human error occurs when there is (i) a

breakdown in communications at the voting entity; (ii) a misreading of the plan terms; or

(iii) the execution of a ballot by one without authority corrected by one with authority.[29]

Third, courts look unfavorably on votes changes made to enhance an objector's leverage in

---

[25] Even if Williams Hart and Bevan & Associates were entitled to the presumption, I conclude that the presumption has been rebutted based on the evidence submitted at the hearing.

[26] *MPM Silicones* *5; *In re J.C. Householder Land Trust # 1,* 502 B.R. 602 (Bankr. M.D. Fla. 2013).

[27] *MPM Silicones, LLC* (collecting cases).

[28] *In re Dow Corning Corp.,* 237 B.R. 374, 377 (Bankr. E.D. Mich. 1999) (citing 9 Collier on Bankruptcy ¶ 3018[4] (15ᵗʰ ed. Rev. 1999)).

[29] *MPM Silicones* *2 (citing *In re Kellogg Square Partnership,* 160 B.R. 332, 334 (Bankr. D. Minn. 1993)).

situations such as to force a cram down.[30]  Fourth, cause should be "more than a mere change of heart."[31]  Fifth, where plan proponents support the vote change in furtherance of a consensual resolution, cause likely exists unless there is some extra consideration being offered for the vote change.[32]  I will apply these general principles separately to each Rule 3018 Motion.

### A. The Bevan & Associates Rule 3018 Motion is Denied.

On June 25, 2021, Bevan & Associates filed its Rule 3018 Motion.  By its motion, Bevan & Associates seeks to change the votes of its 15,719 clients from votes to reject the Plan to votes to accept the Plan.  That same day, Bevan & Associates filed a Rule 2019 statement identifying its clients.[33]

**Findings of Fact**

Mr. Bevan is a named partner in Bevan & Associates LPA, Inc.[34]  He has been practicing for 30 years and his primary area of practice is asbestos litigation.[35]  While he is not a bankruptcy lawyer, he has represented clients in numerous bankruptcy cases over the years and has represented clients who have served on several creditors' committees in

---

[30]  *Id.*\* 2 (citing *In re Eastern Systems, Inc.*, 118 B.R. 223 (Bankr. S.D.N.Y. 1990) (denying motion), *In re Windmill Durango Office, LLC*, 481 B.R. 51 (B.A.P. 9th Cir. 2012) (denying motion)).

[31]  *Id.* (citing *Windmill Durango*, 481 B.R. at 66).

[32]  *Id. (*citing *Dow Corning).*

[33]  Exs. 16, 16A.

[34]  Hr'g Tr. 15:14-15, Sept. 20, 2021, Dkt. No. 4144.

[35]  Hr'g Tr. 15:18-19; 24:24-25:6.

asbestos cases.[36]  Mr. Bevan could not recall whether or how many lawsuits his firm may have filed against Imerys prepetition.[37]  Bevan & Associates was not involved in the multi-district talc litigation proceeding in New Jersey.[38]  For purposes of solicitation, it appears that Debtors supplied Prime Clerk the name of only one claimant represented by Bevan & Associates.[39]

Bevan & Associates did not take an active role (or any role) in the bankruptcy case prior to voting.  As for voting, Bevan & Associates did not send Prime Clerk a Certified Plan Solicitation Directive by the February 17, 2021 deadline.[40]  Rather, Bevan & Associates' first communication with Prime Clerk was by email on March 18, 2021 seeking a Master Ballot for voting purposes.[41]  On March 23, 2021, Bevan & Associates emailed a Certified Plan Solicitation Directive to Prime Clerk.[42]  After receiving approval from Debtors' counsel, Prime Clerk approved the late request to vote by Master Ballot[43] and Bevan & Associates submitted a Master Ballot to Prime Clerk, by email, on

---

[36]  Hr'g Tr. 15:20-21; 28:13-29:1.

[37]  Ex. 90 (Aug. 31, 2021 Dep. of Thomas W. Bevan 14:25-16:4, Dkt. No. 4092-28).

[38]  Bevan Dep. 20:24-21:4.

[39]  Ex. 26.  I say, "it appears" because the email from Prime Clerk to Bevan & Associates listing clients Prime Clerk has on file references the "Haffner law."

[40]  Ex. 23; Ex. 26.

[41]  Ex. 26.

[42]  Ex. 26.

[43]  Ex. 28.

March 25, 2021.[44] By the Master Ballot, Bevan & Associates voted on behalf of all of its clients to reject the Plan.[45]

From at least February 24, 2021, Prime Clerk sent Debtors and their counsel periodic updates on the progress of the voting tabulation.[46] Late in the evening of March 25, 2021, that report tallied all ballots received through the Voting Deadline and revealed that Class 4 rejected the Plan with only 57% of voters accepting the Plan and 43% of voters rejecting the Plan.[47]

That evening, Natalie Ramsey, counsel for the Tort Claimants Committee texted Mr. Bevan as follows: "Hi.  Reaching out for another case.  Could we chat about Imerys tomorrow morning?  So you know before responding – I represent the committee and learned tonight you cast around 15,000 votes against the plan.  Want to understand your concerns."[48] Mr. Baron, individual counsel for a member of the TCC, also reached out to Mr. Bevan that evening.[49]

Ms. Ramsey and Mr. Bevan spoke the following day (March 26).[50] Mr. Bevan expressed concern that a vote in favor of the Imerys Plan would preclude him from voting

---

[44] Exs. 32; 60.

[45] *Id.*

[46] Ex. 54.

[47] Ex. 54.

[48] Ex. 51.

[49] Ex. 30.

[50] Hr'g Tr. 75:4-13.

against a Plan in the Cyprus Mines bankruptcy case.[51]  Ms. Ramsey discussed the interplay between the Cyprus Mines and Imerys cases and subsequently put in writing her understanding of the same in a "settlement communication."[52]  The communication states, among other things, that "[t]here is nothing in the Imerys Plan that attempts to limit or circumscribe the rights of the Cyprus Committee or any creditor in the Cyprus Bankruptcy Case."[53]  She also proposes to place the following language in any order confirming the Imerys Plan: "Notwithstanding anything contained in this Confirmation Order, the failure to submit a Ballot, withdrawal of a Ballot, or submission of a Ballot voting in favor of the Imerys Plan does not and shall not affect any rights of any claimant with respect to the Cyprus Bankruptcy, including without limitation the Cyprus Settlement.  For the avoidance of doubt, a vote in favor of the Imerys Plan is not and shall not be deemed to be a vote in favor of the Cyprus Settlement."[54]

Ms. Ramsey followed up with Mr. Bevan by text on March 27 and March 29 asking if he could let her know whether he will be leaving his votes in place, withdrawing them or changing them to accepting votes.[55]  On March 29, Mr. Bevan responds saying that he will be withdrawing his votes that day based on the communication Ms. Ramsey sent him.[56]

---

[51] Hr'g Tr. 17:17-25; 76:14-77:1.  Cyprus Mines Corporation is a previous owner of Debtors' talc assets and filed its own bankruptcy case in this Court, Case No. 21-10398.  The Cyprus Mines case is proceeding separately, but prior to filing bankruptcy, Cyprus Mines and Debtors reached a settlement agreement which is embodied in the Imerys Plan.

[52] Hr'g Tr. 18:5-13.

[53] Ex. 31.

[54] *Id.*

[55] Ex. 51; Hr'g Tr. 83:1-12; 84:14-85:1.

[56] Ex. 51.

Bevan & Associates did, in fact, withdraw its Master Ballot on March 29, via an email to Prime Clerk.[57] At that point, Mr. Bevan believed he was concluded with the voting process.[58]

Later on March 29, Debtors approved what they termed a "request" to withdraw Bevan & Associates Master Ballot.[59] Unfortunately from Debtors' perspective, Prime Clerk's revised report reflecting Bevan & Associates' withdrawal of its ballot revealed that while Class 4 now accepted the Plan, it did not meet the 75% threshold required for a § 524(g) channeling injunction, with only 73.65% of those voting, voting in favor.[60]

Ms. Ramsey reached out to Mr. Bevan by phone sometime between March 29 and April 6 as did Mr. Placitella, another attorney representing a member of the TCC.[61] While Mr. Bevan does not remember the particulars of either conversation, he had the impression that the TCC needed "yes" votes and was told that he could change the votes of his clients to accept the Plan.[62] On April 6, 2021, Bevan & Associates communicated with Prime Clerk again. This time, Bevan & Associates sought to "reinstate" its Master Ballot and vote

---

[57] Ex. 32; Hr'g Tr. 86:13-87:2.

[58] Hr'g Tr. 133:21-134:4.

[59] Ex. 55.

[60] Ex. 55.

[61] Hr'g Tr. 89:25-90:16.

[62] Hr'g Tr. 91:5-23; 134:5-19.

to accept the Plan.[63]  Attached to the email was a Master Ballot and an excel spreadsheet with the name of the clients on whose behalf Bevan & Associates was voting.[64]

Mr. Bevan voted on behalf of 15,719 clients.  He did not consult with any of his clients prior to voting on the Plan (either the vote rejecting the Plan, the withdrawal of the vote, or the vote accepting the Plan).[65]  Rather, he relies on a one page general "Attorney Agreement" which provides that Mr. Bevan can vote on behalf of his client in a bankruptcy case filed by any debtor.[66]  Clients may have signed the Attorney Agreement as far back as twenty years ago.[67]  He uses this Attorney Agreement to act on behalf of his clients even if they are unaware that a specific bankruptcy has been filed.  The only time that Mr. Bevan believes he informs a client of a specific bankruptcy case is if he going to submit that client for consideration on a creditors' committee.[68]

---

[63] Ex. 86.

[64] *Id.*

[65] Hr'g Tr. 97:12-16.

> Q:    Okay.  So, how do you know that your clients wanted you to vote against the plan, when you voted in March?
> A:    Because my clients want me to do what's - - what's best, and I don't check with my clients on every little thing that I do on their case."

[66] Ex. 16 A ("The undersigned claimant hereby authorizes Thomas W. Bevan, as attorney in fact and with full power of substitution to vote on any questions that may be lawfully submitted by debtors and any debtor in bankruptcy, in any Chapter 11 filed on behalf of any Debtor; to vote, after review of the appropriate disclosure statement, for any Plan of Reorganization of the Debtor; and in general, to perform any act not constituting the practice of law of the undersigned in all matters arising in any bankruptcy case.").

[67] Hr'g Tr. 103:3-5.

[68] Hr'g Tr. 153:13-154:25.

In this case and in previous bankruptcy cases in which Mr. Bevan has cast votes for his clients, he votes in a block. Mr. Bevan either accepts or rejects the plan on behalf of all of his clients; he has never split a vote.[69] In voting in this fashion, he does what he believes is best for his clients as a whole.[70] In other words, Bevan & Associates does not make an individual assessment of how to vote each client; rather Mr. Bevan treats his clients "as a group."[71] Mr. Bevan is aware that a given plan may provide different treatment for his various clients, but he does not consider that to create a conflict situation.[72] Rather, it is just a fact that some of his clients will be compensated under a given plan and some will not.[73]

It is likely that Bevan & Associates previously submitted claims on behalf of the majority of its 15,719 clients in other bankruptcy cases, including the Quigley, Garlock, ACandS and Sepco bankruptcy cases[74] and in the BASF class action litigation.[75] Indeed, if Bevan & Associates were to submit a ballot in the Imerys case today, it is likely they would

---

[69] Hr'g Tr. 104: 24-105:2.

[70] Hr'g Tr. 104:24-105:2; 135:3-14.

[71] Hr'g Tr. 133:14-20; 135:3-14. Hr'g Tr. 135:25–137:6.

> Q: Okay, And just as you didn't make an individualized assessment for – on behalf of each of your clients to withdraw the master ballot, you did not make an individualized assessment on behalf of each of your clients to vote affirmatively, correct?
> A: I – you know --, and I'm not sure how to characterize the individual assessment. Again, I – I assessed my clients' claims as a whole, because there is so much similarity in their claims as a whole, that I decided what's best for them as a whole. Do I – did I go through each individual, with (indiscernable) a yes/no? It doesn't really work that way in a – in our business.

[72] Hr'g Tr. 155:1-14.

[73] Hr'g Tr. 155:1-156:13.

[74] Hr'g Tr. 117:6-119:4.

[75] Hr'g Tr. 158:23-160:1.

vote for more than 15,719 clients as they have since taken on more clients.  If the balloting deadline had been a year prior to the Voting Deadline it would have submitted fewer votes. In Mr. Bevan's words — "it's a moving target."[76]

Based on his in-take process and the characterization of Debtors' products as "ubiquitous," Mr. Bevan believes it is "likely" that all of his clients were exposed to Debtors' talc.[77]  Bevan & Associates' in-take process included a question regarding exposure to talc,[78] but there was never a specific question directed to exposure to an Imerys talc product.[79]  Bevan & Associates' intake process asks more general questions regarding exposures, work experience and disease diagnosis.[80]  In submitting the Master Ballot, Bevan & Associates did not parse through its database to determine which of its clients were likely exposed to Debtors' product (or any talc product) and which were not.[81]  Rather, Mr. Bevan "believes" that "it is likely" his clients have such claims.[82]

Approximately 400 of Bevan & Associates' clients suffer from mesothelioma with the remainder suffering from some other form of cancer.[83]  None of its clients have been

---

[76] Hr'g Tr. 149:4-14.

[77] Hr'g Tr. 147:16-148:6; 160:14-21; *see also* Hr'g Tr. 48:6-15.

[78] Hr'g Tr. 163:9-15.

[79] Hr'g Tr: 60:4-18.

[80] Hr'g Tr. 162:14-25.

[81] Hr'g Tr. 145:22-146:7.

[82] Hr'g Tr. 59:22-25; 148:12-149:3; 145:22-146:7.

[83] Hr'g Tr. 56:2-11.

diagnosed with ovarian cancer.[84] Nor were any of its clients employed by Debtors.[85] Mr.

Bevan was aware when voting on the Plan that the Imerys Plan and proposed Trust

Distribution Procedures provide recoveries only for claimants diagnosed with mesothelioma

or ovarian cancer.[86] He was aware when voting on the Plan that approximately 15,319 of

his clients were currently ineligible for a recovery under the Trust Distribution Procedures.[87]

And, Mr. Bevan did not ask any individual client how he/she wanted to vote his/her claim.

Rather, as Mr. Bevan testified:

> THE WITNESS:    We do not ask our clients what they want us to do in any voting situation, because our clients have no expertise in this particular area. And they, you know, it – it would be a exercise in futility, I guess I would call it, to – to ask each one of my clients what they want to do, when that, particularly as you've said, is why they've hired us.
>
> BY MR. TSEKERIDES:
>
> Q:    Okay. Do you think it takes expertise to know you're not getting any money under a plan?
>
> A:    I think it takes expertise to understand the full plan, and why they wouldn't get any money in that particular case.[88]

### *Discussion*

Were I to mechanically apply the general principles to the Bevan & Associates Rule

3018 Motion, I would likely grant it. Mr. Bevan testified that he initially voted on behalf of

---

[84] Hr'g Tr. 54:25-55:23. More accurately, Bevan & Associates is not pursuing ovarian cancer claims against Imerys on behalf of any of its clients.

[85] Hr'g Tr. 62:7-9.

[86] Hr'g Tr. 56:12-15.

[87] Hr'g Tr. 51:4-9; 56:12-24.

[88] Hr'g Tr. 100:4-15.

his clients to reject the Plan because he believed a vote in support of the Plan could negatively impact his vote in the related, but separate, Cyprus Mines bankruptcy case. Mr. Bevan's reading of the Plan is incorrect as a vote for the Imerys Plan does not preclude a vote against any Cyprus Mines plan. As changing a vote after receiving corrected information falls squarely within the "human error" category (i.e. a misreading of the Plan), this counsels in favor of permitting the vote change.

So, too, I would likely reject the many reasons proffered by Arnold & Itkin and J&J for denying the motion. For example, I do not accept the argument that Mr. Bevan's reason for changing the vote is not genuine. The contemporaneous documentary evidence verifies his concern over the relatedness of the vote between the Imerys and Cyprus Mines plans. While it may be true that a person concerned more about recoveries against Cyprus Mines might vote to reject the Imerys Plan and that the clarification sent by Ms. Ramsey is not precisely accurate,[89] the correctness of Mr. Bevan's assessment based on his communications is not an issue in a Rule 3018 context. Relatedly, it may also be true that it is logical for a claimant who receives nothing under the Plan, at least currently, to vote to reject the plan. Once, again, however, a determination of what is in the best interest of a particular creditor is left up to that creditor in most instances. Finally, the evidence is clear that Bevan & Associates was not offered anything to change its clients' votes. While perhaps Mr. Bevan was trying to curry some favor with other members of the plaintiff's bar,

---

[89] A vote in favor of the Imerys Plan is, in essence, a vote in favor of the Imerys settlement with Cyprus Mines at least in the context of the Imerys Plan.

that, too, is not necessarily a reason to prohibit a vote change given the documented explanation.[90]

But, there are more fundamental issues at play here: the evidence raises significant questions as to whether any of Bevan & Associates' clients have a claim against any Debtor. What is crystal clear is that: (i) Bevan & Associates has a database of clients built up over the past thirty years, (ii) prior to voting, Bevan & Associates performed zero diligence to discern which of its clients, if any, had been exposed to talc, much less to Debtors' talc and (iii) Bevan & Associates submitted its Master Ballot without regard to whether any of its 15,713 clients had a Talc Personal Injury Claim as required to vote on the Plan. In other words, Bevan & Associates simply printed out a list of its clients in excel spreadsheet format and slapped it behind a Master Ballot.

Master Ballots seem to be commonplace in mass tort bankruptcies.[91] At Debtors' request, and without objection by any party-in-interest, as part of the Solicitation Procedures

---

[90] Two groups of insurers also objected to the Motion. The Cyprus Excess Insurers would have me deny the motion because of asserted conflicts among Bevan & Associates' clients. The Cyprus Excess Insurers contend that there is an inherent conflict between those claimants who will receive a distribution under the Trust Distribution Procedures and those who will not. To rule on this ground would require an exploration of the attorney-client relationships between Bevan & Associates and its clients, the various professional rules of responsibility in the states in which Bevan & Associates practices and the application of those rules to each of its clients and, perhaps, to mass tort representations, generally. I find the conflict-of-interest allegations concerning, but I hesitate to address them when it is not necessary to do so to decide what is before me and without the benefit of a complete factual record and legal briefing. The Certain Insurers argue by analogy to § 1126(g) of the Bankruptcy Code that claimants who receive nothing under a plan are deemed to reject the Plan and so Bevan & Associates' 15,319 clients who will not currently receive anything under the Plan should not be able to vote in favor of it. The Future Claimants' Representative does not challenge this argument directly, but instead argues that eligibility to vote is based on whether a claimant has a claim that will be "addressed" by the trust not on whether a claim "satisfies the presumptive validity" under trust distribution procedures. Limited Response to (A) the 3018 Objections and (B) Johnson & Johnson and Johnson & Johnson Consumer Inc.'s Motion to Designate, D.I. 4080. These two positions raise a host of intellectually challenging issues that may also have very practical consequences in mass tort cases. I need not decide them either in order to determine this motion.

[91] I do not comment on whether Master Ballots should be commonplace.

I approved the use of a Master Ballot. Simultaneously, and again without objection, I temporarily allowed the claims of Direct Talc Personal Injury Claims (which are unliquidated and disputed claims) at $1.00 for voting purposes. The result was that law firms submitted at least eighty-five Master Ballots.[92] In order for Master Ballots to work, great trust is placed in the plaintiff's bar.[93] With respect to Bevan & Associates, the evidence shows that such trust was not well-placed. It is true that Direct Talc Personal Injury Claims will be channeled to a trust for liquidation, but a lawyer filing a Master Ballot still has the obligation to ensure that he only votes on behalf of clients who have a claim against Debtors. Indeed, embedded in the defined term is the requirement that a person must have been exposed to Debtors' talc. And, in signing the Master Ballot, the attorney certifies that each client he votes for has a Direct Talc Personal Injury Claim.[94]

Debtors argue that I should focus on the Rule 3018 standard and grant the motion because there was no improper motive underlying the vote change. In essence, Debtors' argument is that I should ignore the evidence regarding the questionable nature of the Bevan & Associates Master Ballot and just grant the motion. This thinking is misguided. While no case cited for the Rule 3018 standard appears to include a requirement that the

---

[92] The actual number of Master Ballots submitted does not appear to be in the evidence submitted. This number was based on a review of information in the Supplemental Declaration.

[93] In this case, Debtors did not request a bar date for holders of Direct Talc Personal Injury Claims, thus the Master Ballots and any Rule 2019 statements are the only opportunity for parties in interest to review the basis for any Direct Talc Personal Injury Claims.

[94] Ex. 86 ("[e]ach holder of a Direct Talc Personal Injury Claim listed on the Exhibit accompanying this Master Ballot, as of the Voting Deadline, has a Direct Talc Personal Injury Claim in Class 4.").

underlying claim be valid, that is hardly surprising. Application of Rule 3018 presupposes that the vote movant seeks to change is supported by a valid claim against the debtor.[95]

Debtors also argue that the issue of how to handle the Bevan & Associates Master Ballot should be reserved for confirmation. Upon questioning, however, counsel candidly admitted that the same arguments would be raised at that time. Delaying decision on a motion is sometimes attractive, but it is not appropriate here. This issue has been pending for several months, parties-in-interest engaged in discovery and a full evidentiary hearing was held. The immediacy of the confirmation hearing counsels in favor of, not against, resolution. Given the magnitude of its vote, all parties-in-interest need to know the outcome of the Bevan & Associates Rule 3018 Motion. While Debtors are free to address additional voting issues, as appropriate, if they choose,[96] this matter is ripe for decision.

Given the evidence, the only fair result is to use my discretion to exclude any vote by Bevan & Associates. I will not permit Bevan & Associates to change its votes and accept the Plan, but neither will I permit its Master Ballot to be counted as votes to reject the Plan. The Master Ballot will be considered withdrawn. While I do not make this move lightly, in ruling on this request, I cannot—and will not—ignore how the Master Ballot was generated.

Finally, before concluding my discussion on this motion, I feel compelled to observe my disagreement with Mr. Bevan's apparent strongly-held belief that that his clients cannot make a decision in their best interest when it comes to voting on a plan. I agree that plans

---

[95] If proofs of claim are filed, then assuming no objections, holders of those claims are entitled to vote on a plan. 11 U.S.C. § 1126(a). If an objection to a proof of claim is filed and the creditor wants to vote, it needs to file a motion to have its claim estimated for voting purposes. Fed. R. Bankr. P. 3018 (a).

[96] Debtors suggested at argument that it may be appropriate to review Master Ballots filed by other plaintiff firms. Whether or not that is appropriate, it does not change the outcome here.

of reorganization, including the Imerys Plan, are complicated documents. But, it is counsel's job to make the plan understandable and (if counsel is not empowered to vote for the client) to provide advice on whether to accept or reject the plan. This is the second time this year in a mass tort case that counsel has suggested that these types of cases are too complicated for individuals to comprehend. To paraphrase my previous response: "I don't buy it."[97]

### B. The Williams Hart Rule 3018 Motion is Granted.

On August 12, 2021, Williams Hart filed its Rule 3018 Motion. By its motion, Williams Hart seeks to change the votes of its 493 clients from votes to reject the Plan to votes to accept the Plan.

**Findings of Fact**

Mr. Boundas is a named partner in Williams Hart.[98] The firm represents 493 clients suffering from ovarian cancer, which are listed in the firm's Rule 2019 Statement.[99] During

---

[97] *In re Cyprus Mines Corporation, Case No. 21-10398 (LSS)*, United States Bankruptcy Court, District of Delaware, May 17, 2021, Bench Ruling on Motion of the Kazan McClain Firm Personal Injury Plaintiffs for Modification of the Tort Claimants Committee or for Appointment of Tort Claimants Conflicts Committee, D.I. 302. ("Why this 'committee by proxy' universe has evolved, I can only guess. And, I won't speculate here.. But, it was suggested at argument it is because these are complex cases and the claimants have to rely on their individual counsel for bankruptcy experience. Mass tort cases are certainly unique and undoubtedly present complex and complicated issues. But, from the perspective of committee member participation, mass tort cases are no more or less complex than any other type of bankruptcy case. And, they are no more or less complex than patent infringement cases, medical malpractice cases or even the underlying asbestos cases in which individuals serve as jurors every day in this country and make decisions unaided by counsel in the jury room. Bottom line: I simply don't buy that argument. More importantly, individuals serving on committees bring valuable real life/non-legal perspectives (whether business or personal) to committee deliberations and how a case should proceed.").

[98] Hr'g Tr. 165:5-7.

[99] Ex. 9.

an interview and vetting process, Williams Hart confirms both exposure to talc products and a diagnosis of ovarian cancer.[100]

Williams Hart followed the bankruptcy case since its inception.[101] Through its own counsel, Williams Hart filed an objection to the approval of the disclosure statement raising two main objections. Williams Hart believes that Debtors may have a large indemnification claim against J&J, but Williams Hart does not see anything in the Plan or Trust Distribution Procedures that requires that claim to be vigorously pursued.[102] Williams Hart also questions the justification for the 40/40/20 split of the Imerys Trust Assets.[103] In addition to filing the disclosure statement objection, Mr. Boundas was in contact with other plaintiffs' firms (including Arnold & Itkin) regarding issues raised by the Plan and attended a zoom call in February 2021 with other plaintiff firms and counsel for the TCC.[104]

In the days leading up to the Voting Deadline, Mr. Boundas was in discussions regarding possible resolutions.[105] As the Voting Deadline approached with no firm agreement, Mr. Boundas reached out to Mr. Baron. On March 25, Mr. Boundas and Mr. Baron exchanged emails regarding possible resolutions, but Williams Hart's objections were not resolved by the 4:00 p.m. (eastern) deadline to submit ballots.[106] Accordingly, out of an

---

[100] Hr'g Tr. 167:11-20; *see also* Ex. 9 (Exemplar Power of Attorney and Employment Agreement: Talcum Powder Cancer Claim).

[101] Hr'g Tr. 168:3-8.

[102] Hr'g Tr. 168:9-23; 179:19-180:24.

[103] Hr'g Tr. 168:24-170:2;182:1-183:4.

[104] Hr'g Tr. 170:16-171:5.

[105] Hr'g Tr. 171:10-172:4.

[106] Hr'g Tr. 171:10-172:19.

"abundance of caution" at 3:59 p.m. Williams Hart emailed to Prime Clerk a Master Ballot voting each of its clients' claims to reject the Plan.[107]  At the same time, however, Debtors granted Williams Hart and four other firms an extension of the Voting Deadline to noon (eastern) the following day.[108]

Later in the day of March 25, Mr. Boundas and Mr. Baron reached an agreement after exchanging terms multiple times.  The final agreement, which was memorialized in an email, is as follows:

1. Vote on plan passes.

2. WH votes yes, withdraws all objections; contacts other objectors to discuss voting yes as well or changing votes if possible.

3. Indemnity claim will be pursued against J&J (no drafting changes in plan).

4. WH firm on TAC, and as a TAC member will be involved in indemnity matters to the extent the TAC is involved.

5. Trustees need (i) TAC consent* and (ii) court approval to settle claims.

6. Approval of indemnity settlement requires 66% of TAC members to approve.

7. WH reserves the right to object to court approval of any settlement on any grounds (including the division of funds among claimants) in their individual capacities.

*Note, if TAC doesn't consent, Trustee reserves the right to go to court to get approval over TAC objection. [109]

---

[107]  Ex. 49; Hr'g Tr. 173:8-22.

[108]  Ex. 48; Hr'g Tr. 176:4-25.  The other four firms were Aylstock Witkin, Trammell Law, Linville Johnson and Fears, Nachawati.  While these firms did not request an extension, Mr. Boundas was speaking with representatives of these firms and passed their names along to Mr. Baron.

[109]  Ex. 47.

Mr. Boundas believes that while not ideal, this agreement sufficiently addresses Williams Hart's two primary objections to the Plan.[110] Further, he views the reservation of rights in item number 6 to apply to all claimants, not just Williams Hart.[111] As for a position on the TAC (Trust Advisory Committee), Mr. Boundas believes that having a seat at the table is favorable for his clients and gives further voice to claimants suffering from ovarian cancer claimants. But, he was not overly enthusiastic about this position.[112]

Mr. Boundas took several actions based on this agreement. As promised, he reached out to the four firms for whom he got an extension.[113] And, on March 26 at 11:10 a.m. he submitted a new Master Ballot to Prime Clerk voting all of his clients claims to accept the Plan.[114]

*Discussion*

J&J is the primary objector to Williams Hart's request to change its vote. J&J argues that Williams Hart has not met its burden to show cause for the vote change for two main reasons. J&J contends that the change of vote is tainted because granting Williams Hart a seat on the TAC is providing something of value that is prohibited. J&J posits that while it might have been appropriate to provide ovarian cancer claimants with another seat on the

---

[110] Ex. 90 (Aug. 12, 2021 Dep. of John Theodore Boundas 91:8-17, Dkt. No. 4061-2).

[111] Hr'g Tr. 185-86.

[112] Boundas Dep. 91:22-94:3.

[113] Hr'g Tr. 179:10-18.

[114] Ex. 50.

TAC, offering it to Williams Hart was simply vote buying. J&J also argues that the reservation of rights on the 40/40/20 split is undisclosed and, perhaps, illusory.[115]

Having listened carefully to Mr. Boundas' testimony and read his deposition, I find cause exists to permit Williams Hart to change the vote of its clients. Mr. Boundas was entirely credible and straight forward in his answers to questions in both settings. Williams Hart expressed valid concerns with respect to the Plan and engaged in negotiations to see if a resolution could be reached. Ultimately, Williams Hart accepted a deal, not a perfect deal, but an agreement that was good enough to convince it to support the Plan. Williams Hart then changed its vote.

The two issues raised by J&J do merit consideration, but I am unconvinced that they require me to deny the motion. First, the evidence does not suggest that the seat on the TAC drove the negotiations; indeed, there is no evidence that Mr. Boundas initially made this demand. The only testimony on this front is that the seat on the TAC was the "least appealing" part of the agreement, but was part of advocating for pursuit of the indemnity claim against J&J.[116] In different circumstances, a seat on a governance board may constitute an improper motivation or "extra consideration" for a vote change. In the circumstances here, however, I do not find it to be outside of the bounds of proper negotiation to come to a consensual resolution of significant objections to a plan. Further, any objections to the make-up of the TAC (including the participation by Williams Hart) can be raised at confirmation.

---

[115] Arnold & Itkin filed a limited objection seeking only to ensure that point 7 in the settlement agreement reached between Williams Hart and the TCC would apply to all parties-in-interest.

[116] It is not lost on me that J&J is the only party objecting to Williams Harts' inclusion on the TAC.

As for the reservation of rights to revisit the 40/40/20 split in the future, to the extent it was not disclosed I do not attribute that to Williams Hart. Williams Hart is not a plan proponent and has no responsibility to amend the Plan or the Trust Distribution Procedures, if amendment is necessary. Further, the 40/40/20 split and any reservation of rights is a confirmation issue. As discussed on the record, I am skeptical that this split of Imerys Trust Assets can be revisited if there is a recovery against or settlement with J&J at some point in the future. The 40/40/20 split has been the subject of much discussion in the case and will no doubt be addressed at confirmation. In any event, that this aspect of the agreement may be illusory or that Williams Hart's clients may not receive the benefit of this aspect of the bargain is not a basis to deny Williams Hart the ability to change its votes.

Williams Hart has met its burden of proof. The Williams Hart Rule 3018 Motion is granted.

### III.    The Motion to Designate is Denied.

J&J filed the Motion to Designate on September 3, 2021. By the Motion, J&J asks me to designate the votes of each of Bevan & Associates, Trammel and Williams Hart if any of them are permitted to change their votes. Given the resolution of the Motion to Disregard and the Bevan & Associate Rule 2019 Motion, the Motion to Designate is moot as to them. It remains pending as to Williams Hart.[117]

Of this seventy-one page speaking motion, approximately seven pages are devoted to Williams Hart's change of votes. Once again, J&J contends the sanctionable behavior is that Williams Hart improperly received a seat on the TAC and that the agreement reached

---

[117] The Findings of Fact on the Williams Hart 3018 Motion are incorporated herein by reference.

is arguably inconsistent with the Plan. J&J argues Williams Hart received an "unfair advantage" not available to other creditors.

Section 1126(e) provides that the court "may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title."[118] Section 1126(e) is permissive, not mandatory, and is within the discretion of the court.[119] Designating a vote is a "drastic remedy" and the burden on the movant is a heavy one.[120]

A review of the authorities J&J cites directed to Williams Hart show that the conduct at issue here is not close to the conduct that would lead to designation of Williams Hart's votes. For example, the *Dune Deck* Court explains:

> Over the years, Courts have developed several badges of bad faith which may justify disqualification. They include creditor votes designed to (1) assume control of the debtor, (2) put the debtor out of business or otherwise gain a competitive advantage, (3) destroy the debtor out of pure malice or (4) obtain benefits available under a private agreement with a third party which depends on the debtor's failure to reorganize.[121]

---

[118]  11 U.S.C. § 1126(e).

[119]  *In re Adelphia Communications Corp.*, 359 B.R. 54, 60 (Bankr. S.D.N.Y. 2006).

[120]  *Id.* at 61.

[121]  *In re Dune Deck Owners Corp.*, 175 B.R. 839, 844 (interior citations omitted) (Bankr. S.D.N.Y. 1995). *See also* 7 Collier on Bankruptcy ¶ 1126.06 [2] (interior citations omitted) (16th ed. 2021):

The party seeking to designate a claim under section 1126(e) bears a heavy burden. Courts generally reserve designation for situations in which the evidence demonstrates an improper purpose or ulterior motive on the part of the voting creditor. For example, a creditor's vote may be designated in the following instances:

- a competitor purchases a blocking position in a class of claims after a plan is proposed in order to control the bankruptcy process to pursue a strategic transaction with the debtor rather than maximize its return on its claim;
- a vote to block a reorganization plan in order to acquire the debtor company for one's self;
- the purchaser and potential voter of an impaired claim is a co-proponent of the plan and would become the general partner of the debtor upon confirmation;

These examples evidence some type of obstructive behavior or behavior inconsistent with the creditor's interest *qua* creditor.   The negotiation between Williams Hart and the TCC is not the type of destructive or controlling behavior that designation is designed to remedy. The agreement reached does not enable Williams Hart to control Debtors (or even the TAC), put Debtors out of business or prevent confirmation.

The decision in *Adelphia* is instructive.   There, the court refused to designate the votes of creditors even though their conduct was considered "overly aggressive and/or stepped over the line."   That conduct included extracting special consideration in the way of releases, exculpation and fee awards not provided to others in their class.   The court concluded that if complaints regarding such conduct were appropriate, they could be addressed at confirmation, but conduct furthering one's self-interest as a creditor is not sanctionable by designation.

I agree with the *Adelphia* court and once again conclude that the agreement reached with Williams Hart can be addressed at confirmation, if appropriate.   Any "unfair advantage" Williams Hart received furthered the interests of its clients in maximizing their recoveries from the Trust.   Even assuming such conduct was "over the line," it does not warrant the drastic remedy of disqualifying votes.

---

- the purchase of claims by an affiliate or an insider of the debtor for the sole purpose of blocking the confirmation of a competing plan;
- a vote to accept a plan motivated by financial incentives provided under a separate settlement agreement;
- a vote motivated by considerations not consistent with protecting the creditor's self-interest;
- a creditor's purposeful destruction of a debtor's business.

J&J has not carried its burden of proof.  The Motion to Delegate as to Williams Hart is denied.

**Conclusion**

Separate orders will be issued on each motion consistent with the above.


Dated: October 13, 2021

Laurie Selber Silverstein
United States Bankruptcy Judge