## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------- x
In re:                                          :   Chapter 11
                                                :
IMERYS TALC AMERICA, INC., et al.,[1]           :   Case No. 19-10289 (LSS)
                                                :
          Debtors.                              :   (Jointly Administered)
                                                :
                                                :   Hearing Date: July 20, 2022 at 10:00 a.m. ET
-------------------------------------------------------- x
```

**DEBTORS' OBJECTION TO MOTION BY NON-PARTY MOVANTS DANIEL EDLEY AND ROGER EDLEY FOR AN ORDER (I) CONFIRMING THAT THE AUTOMATIC STAY AND PRELIMINARY INJUNCTION DO NOT APPLY TO A PUTATIVE CLASS ACTION AGAINST JOHNSON AND JOHNSON AND OTHER NONDEBTOR DEFENDANTS, OR, IN THE ALTERNATIVE, (II) GRANTING RELIEF FROM THE AUTOMATIC STAY TO ALLOW THE PUTATIVE CLASS ACTION TO PROCEED**

Imerys Talc America, Inc., Imerys Talc Vermont, Inc. ("**Imerys Vermont**"), and Imerys Talc Canada Inc. (collectively, the "**Debtors**") hereby file this objection (the "**Objection**") to the *Motion by Non-Party Movants Daniel Edley and Roger Edley for an Order (I) Confirming that the Automatic Stay and Preliminary Injunction Do Not Apply to a Putative Class Action Against Johnson and Johnson and other Nondebtor Defendants, or, in the Alternative, (II) Granting Relief from the Automatic Stay to Allow the Putative Class Action to Proceed* [Docket No. 4865] (the "**Motion**") filed by Daniel Edley and Roger Edley ("**Movants**").  In support of this Objection, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748).  The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

## PRELIMINARY STATEMENT

1.      On May 9, 2022, the Edley Plaintiffs[2] filed a *Class Action Complaint and Jury Demand* (the "**Complaint**") against Johnson & Johnson ("**J&J**") in the Superior Court of New Jersey (the "**Action**").    The Complaint asserts claims against J&J for fraud, spoliation, and fraudulent concealment stemming from its alleged historical practice of falsely claiming that asbestos had never been found in talc produced by Windsor Minerals, Inc. ("**Windsor**"), a former subsidiary of J&J that is now known as Debtor Imerys Vermont, and concealing or destroying evidence with respect thereto.    The Edley Plaintiffs claim that Laszlo "Louis" Edley and other members of the putative class dismissed their talc-related personal injury lawsuits against Windsor/Imerys Vermont as the result of alleged misstatements and fraudulent actions of J&J and related persons and entities, including Windsor/Imerys Vermont.

2.      Although framed as a direct action against J&J, the claims asserted in the Complaint are premised on allegations that Windsor/Imerys Vermont and certain of its principals engaged in misconduct similar to (and arguably more egregious than) that of J&J.    Despite these allegations, Windsor/Imerys Vermont is not named as a defendant in the Action because doing so would be an undeniable violation of the automatic stay.

3.      The intentional omission of Imerys Vermont as a defendant is an obvious end run around the automatic stay as the Action directly implicates Imerys Vermont and may result in findings and determinations with respect to the conduct of J&J and Windsor/Imerys Vermont that will prejudice Imerys Vermont and its estate.    In seeking a determination that the automatic stay does not apply to the Action or, in the alternative, relief from the automatic stay to allow the Action

---

[2]      As used herein, "**Edley Plaintiffs**" refers to Movants, individually, as personal representatives of the Estate of Laszlo "Louis" Edley, deceased on behalf of said Estate, and as representatives of others similarly situated.

to proceed, Movants mislead the Court and attempt to minimize the impact the Action will have on Imerys Vermont.  Contrary to Movants' arguments, Courts have routinely extended the automatic stay to third party actions against non-debtors where, as here, the resolution of the third party action would have a significant and negative impact on a debtor.

4.    The Action also attempts to assert possession or control of property of the Debtors' estates.  In arguing that J&J either directed or controlled Imerys Vermont (including its alleged misconduct) and its talc operations through its ownership interest, the Edley Plaintiffs pursue claims against J&J premised on alter ego liability, which claims are property of the Debtors' estates.  Indeed, the Complaint and the Motion are brimming with allegations that J&J controlled Imerys Vermont's decision making with respect to disclosures surrounding the safety of its talc and general litigation strategy in the underlying personal injury lawsuits.  By pursuing these alter ego claims, the Edley Plaintiffs are attempting to assert possession over property that belongs to the Debtors in direct violation of the automatic stay.

5.    Finally, Movants fail to show that cause exists to lift the automatic stay.  If permitted to proceed, the Action will prejudice the Debtors by forcing them to actively participate in the Action—including arduous discovery practice—in order to protect themselves from a judgment or findings that could frame Imerys Vermont as a tortfeasor.  The need to participate in the Action will further deplete the Debtors' resources and shift their focus away from resolving these Chapter 11 Cases.  The potential prejudice to the Debtors outweighs any hardship to Movants, who are unable to show why it is of tantamount importance that the Action proceeds prior to the resolution of the Chapter 11 Cases.  The Edley Plaintiffs were aware of the alleged fraud perpetrated by Imerys Vermont and J&J as early as 2017, yet only recently took steps to commence the Action.  While the Debtors are cognizant of the fact that the Edley Plaintiffs are

eager to proceed with the Action, this eagerness alone does not outweigh the protections the Debtors are afforded by the automatic stay, which is intended to give them the opportunity to work toward a resolution of the Chapter 11 Cases without unnecessary distractions.  As such, the Edley Plaintiffs' attempt to use creative pleading to side step the automatic stay is disingenuous and prejudicial to the Debtors' estates at the expense of *all* of the Debtors' creditors—including holders of talc-related personal injury claims.

## FACTUAL BACKGROUND

**I.    The Chapter 11 Cases**

6.    On February 13, 2019 (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court commencing cases for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Alexandra Picard, Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 10] (the "**First Day Declaration**") and the *Disclosure Statement for Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 2853] (the "**Disclosure Statement**"), which are fully incorporated herein by reference.

7.    Prior to commencing the Chapter 11 Cases, one or more of the Debtors faced significant potential liability resulting from the assertion of thousands of talc-related personal injury claims.  *See* First Day Declaration at ¶ 8; Disclosure Statement, § 4.1.  As of the Petition Date, there were approximately 13,800 pending lawsuits asserting ovarian cancer claims and approximately 850 pending lawsuits asserting mesothelioma claims against one or more of the Debtors allegedly resulting from exposure to the Debtors' talc.  Disclosure Statement, § 4.1.  The

Debtors filed the Chapter 11 Cases to manage these potential liabilities through a plan of reorganization and trust intended to maximize the value of the Debtors' assets for the benefit of all stakeholders and address talc-related personal injury claims in a fair and equitable manner.

## II.    Overview of the Debtors' Corporate History

8.     In 1989, Cyprus Mines Corporation ("**Cyprus Mines**") purchased 100% of the stock of Windsor from J&J.  On June 5, 1992, Cyprus Mines and its affiliates transferred such stock and all other assets in their then-existing talc business to a newly-formed subsidiary, Cyprus Talc Corporation ("**CTC**"), pursuant to that certain Agreement of Transfer and Assumption (the "**ATA**").  As a result of the ATA, Windsor became a wholly-owned subsidiary of CTC. Contemporaneously with the consummation of the ATA, RTZ America, Inc. (later known as Rio Tinto America, Inc.) purchased 100% of the stock of CTC from Cyprus Mines pursuant to a Stock Purchase Agreement by and between RTZ America, Inc., Cyprus Mines, and Cyprus Minerals Company.  CTC was subsequently renamed Luzenac America, Inc.

9.     In 2011, an affiliate of the Debtors, Mircal S.A., entered into an agreement with Rio Tinto America, Inc. to purchase the stock of the Rio Tinto Group's talc operations, including Windsor (the "**2011 Purchase**").  In accordance with the 2011 Purchase, Mircal S.A. exercised its right to cause Imerys Minerals Holding Limited (UK) to acquire the outstanding shares of Luzenac America, Inc.  At the same time, Mircal S.A. acquired the stock of Luzenac, Inc. from another member of the Rio Tinto Group.  Luzenac America, Inc., Luzenac, Inc., and Windsor subsequently changed their names to Imerys Talc America, Inc., Imerys Talc Canada Inc., and Imerys Talc Vermont, Inc., respectively.

### III.    Movants' Motion in the LTL Bankruptcy and the Debtors' Limited Objection

10.    On March 14, 2022, Movants[3] filed the *Motion by Non-Party Movants Daniel Edley and Roger Edley for an Order (I) Confirming that the Automatic Stay and Preliminary Injunction Do Not Apply to an Intended Putative Class Action to be Filed Against Johnson and Johnson and Other Nondebtor Defendants or, in the Alternative, (II) Granting Relief From the Automatic Stay to Allow the Intended Putative Class Action to Proceed* (the "**LTL Stay Relief Motion**") [LTL Docket No. 1722][4] in the chapter 11 case pending before the Honorable Michael B. Kaplan in the United States Bankruptcy Court for the District of New Jersey (the "**LTL Court**") under the caption *In re LTL Management LLC*, Case No. 21-30589 (the "**LTL Bankruptcy**"), seeking an order declaring that the automatic stay and preliminary injunction in effect in the LTL Bankruptcy did not apply to the putative class action the Edley Plaintiffs sought to file against J&J.[5]  Debtor LTL Management LLC is a wholly owned subsidiary of J&J.  Attached to the LTL Stay Relief Motion was a proposed complaint (the "**Proposed Complaint**")[6] to be filed by the Edley Plaintiffs against J&J in the Superior Court of New Jersey in Middlesex County (the "**New Jersey Court**").

---

[3]    The Edley Plaintiffs and Movants are represented by Cohen, Placitella & Roth, P.C., which also represents Gregory W. Vella, as representative of the estate of Nicole Matteo, in his role as a member of the official committee of tort claimants appointed in the Chapter 11 Cases.  As such Cohen, Placitella & Roth, P.C. has been heavily involved, on behalf of its client, in the Chapter 11 Cases.

[4]    "LTL Docket No." is a reference to the docket in the LTL Bankruptcy (as defined herein).  The LTL Stay Relief Motion is attached hereto as **Exhibit A**.

[5]    In a footnote in the Motion, Movants claim that because "the [Debtors] are not named as defendants in the [Complaint], there was no apparent need for [Movants] to seek a similar declaration with respect to the [Debtors] before filing their Complaint."  Motion at 2, fn.3.  Prior to filing the Complaint, the Debtors raised concerns with counsel for Movants that the Complaint would violate the automatic stay in these Chapter 11 Cases.  Notwithstanding these concerns, Movants filed the Complaint without seeking similar guidance from this Court as to the applicability of the automatic stay.

[6]    The Proposed Complaint (without exhibits) is appended to **Exhibit A**.

The Proposed Complaint did not name Imerys Vermont or either of the other Debtors as defendants.

11.     In the interest of judicial efficiency, the Debtors filed a limited objection to the LTL Stay Relief Motion [LTL Docket No. 1973] (the "**Objection to the LTL Stay Motion**") arguing, among other things, that the Edley Plaintiffs must seek relief from the automatic stay in these Chapter 11 Cases given the allegations against Imerys Vermont (f/k/a Windsor)[7] contained in the Proposed Complaint.[8]

12.     At the hearing on the LTL Stay Relief Motion (the "**LTL Hearing**"), the Debtors reiterated this point, noting: "if [the LTL Court] does permit the complaint to proceed against J&J, the Imerys debtors will seek appropriate relief in the Delaware bankruptcy court to prevent a violation of their separate stay." *In re LTL Management LLC*, Case No. 21-30589 (MBK), *Transcript of Hearing Before the Honorable Michael B. Kaplan* (Bankr. D.N.J. Apr. 12, 2022) at 81:3-7 (cited herein as "**LTL Hearing Tr.**").[9]  While the LTL Court determined, and debtor LTL Management LLC conceded, that the Proposed Complaint did not violate the stay or the preliminary injunction in the LTL Bankruptcy, the LTL Court declined to rule as to whether it violated the automatic stay in the Chapter 11 Cases.[10]  *Id.* at 90:8-12 (The Court: "But let me be

---

[7]     As noted above, Windsor was renamed Imerys Vermont after it was acquired by the Imerys Group. For purposes of this Motion, Windsor is referred to as Imerys Vermont.

[8]     The Objection to the LTL Stay Motion is attached hereto as **Exhibit B**.

[9]     An excerpt of the transcript from the LTL Hearing is attached hereto as **Exhibit C**.

[10]     The LTL Court held that the preliminary injunction in effect in the LTL Bankruptcy, which enjoined cosmetic talc litigation against certain affiliates of LTL Management LLC, including J&J, did not also enjoin the Proposed Complaint because debtor LTL Management LLC had not assumed responsibility and liability for the claims asserted against J&J in the Proposed Complaint.  LTL Hearing Tr. at 89:7-22; *see also id.* at 60:7-16 (Mr. Placitella discussing the LTL Court's prior decision to extend the stay to J&J with respect to cosmetic talc claims and noting that, in considering whether LTL Management LLC was the real party in interest with respect to such claims, the Court considered the fact that the claims against J&J "involved the same products, the same time periods, the same alleged injuries, and the same evidence

clear what the Court is not ruling upon, whether or not the [putative] class action would violate the automatic stay in the Imerys talc bankruptcy . . . the Court has concerns and reservations as to whether it does[.]"); *id.* at 71:23-72:1 (Mr. Prieto: "Let me just state clearly, the debtor does not dispute that the class-action complaint avoids Your Honor's PI order and the automatic stay in this case.").

13.    Following the LTL Court's ruling, counsel for the Debtors and the Edley Plaintiffs discussed whether potential revisions to the Proposed Complaint could be made to avoid a violation of the automatic stay in the Chapter 11 Cases.  The Debtors' concerns with the Proposed Complaint focused primarily on the allegations that directly implicate Imerys Vermont and certain of its former principals as tortfeasors.  Although the Edley Plaintiffs made certain revisions to the Proposed Complaint[11] subsequent to these discussions, such revisions were minimal and did not adequately address the Debtors' concerns that the putative class action complaint would violate the automatic stay in the Chapter 11 Cases.

14.    Over the objection of the Debtors and without seeking affirmative relief from this Court, on May 9, 2022, the Edley Plaintiffs filed the Complaint in the New Jersey Court naming J&J and certain related persons and entities as defendants.  The Complaint is attached to the Motion

---

as the claims against the debtor" and arguing that "[n]one of that applies to the Edley case."); *id.* at 61:25-62:3 (Mr. Placitella: "But if you looked at the underlying case where the fraud was committed, that was an industrial talc case used for making roofing.  It was not used for baby powder.  So the product is different."). However, the industrial talc at issue in the Complaint is the same industrial talc that was mined, manufactured and distributed by Windsor/Imerys Vermont.  Indeed, the claims against J&J and the related allegations against Imerys Vermont in the Complaint involve the same products, the same time periods, the same alleged injuries and the same evidence.

11    For example, the Proposed Complaint included a statement that "J&J's in-house attorneys working directly for the General Counsel of J&J served on Windsor's Board of Directors and made all decisions concerning litigation involving Windsor, its predecessors and successors."  Proposed Complaint at ¶ 37. The Complaint revised this language to remove the reference to Windsor's Board of Directors, but, as discussed herein, such nominal alterations do not change the Debtors' underlying issue with the Complaint and its allegations against Imerys Vermont.  Complaint at ¶ 37.

as Exhibit B.  Like the Proposed Complaint, the Complaint did not name Imerys Vermont or the other Debtors as defendants.  However, the Complaint did not fully address the issues raised by the Debtors in the pre-filing discussions.

15.     On May 23, 2022, J&J removed the Action to the United States District Court for the District of New Jersey, Case No. 3:22-cv-02970-FLW-TJB (the "**New Jersey District Court**").  On June 7, 2022, the Debtors filed a *Notice of Suggestion of Pendency of Bankruptcy and Automatic Stay of Proceedings* in the New Jersey District Court asserting that the Action has been automatically stayed to the extent the allegations of the Complaint violate section 362(a) of the Bankruptcy Code.

## IV.    The Complaint

16.     At its core, the Complaint seeks:

> declaratory, equitable, and legal remedies and relief for thousands of asbestos claimants, who previously sued and whose cases were dismissed against J&J, its wholly owned subsidiary, [Windsor], and/or any third-parties alleged to be legally responsible for Windsor's industrial talc [], for asbestos personal injury damages caused by exposure to industrial talc products mined, milled, sold, and distributed prior to January 6, 1989, by Windsor or its corporate predecessor.

*See* Complaint at ¶ 1.  One of the purported bases for such relief is that "J&J executives and representatives . . . falsely represented to courts and litigants that no evidence ever existed indicating that J&J/Windsor Industrial Talc contained asbestos."  *Id.* at ¶ 3.

17.     The Complaint stems from the voluntary dismissal of a lawsuit filed by Lazlo "Louis" Edley in 1986 against Imerys Vermont alleging that he developed asbestosis as a result of exposure to Imerys Vermont talc (the "**Personal Injury Lawsuit**").[12]  Complaint at ¶ 12.  The

---

[12]     The Personal Injury Lawsuit did not name J&J as a defendant.

Edley Plaintiffs point to fraudulent statements purportedly made by J&J and Imerys Vermont to Mr. Edley and other plaintiffs denying the existence of asbestos in Imerys Vermont talc and their alleged efforts to conceal evidence of asbestos in Imerys Vermont talc, which the Edley Plaintiffs assert led to the dismissal of Mr. Edley's lawsuit and similar lawsuits.  Complaint at ¶ 13.  Based on these allegations, the Edley Plaintiffs assert three causes of action in the Complaint: (i) fraudulent concealment and spoliation; (ii) fraud and deceit; and (iii) fraud upon courts, and seek, among other things:

- a declaratory determination and judgment that fraudulent concealment and spoliation of material evidence relating to the existence of asbestos in J&J's/Windsor's Industrial Talc Products has occurred to the detriment of the Class Members; and

- a declaratory determination and judgment that J&J committed fraud and deceit, and, a fraud upon courts, relating to the existence of asbestos in J&J/Windsor's Industrial Talc to the detriment and harm of the Class Members.

*See* Complaint at ¶¶ 63-64.[13]

18.    Although Imerys Vermont is not named as a defendant in the Action, the Complaint is rife with allegations relating to talc produced by Imerys Vermont[14] and the conduct of former principals of Imerys Vermont—including alleged misrepresentations made by those individuals relating to the absence of asbestos in Imerys Vermont talc—to support the Edley Plaintiffs' contention that J&J engaged in fraud.  For example, the Complaint relies upon, among other things:

- A May 1, 1973 letter from Imerys Vermont President Roger Miller to Dr. Detwitt Petterson at J&J noting that "the ore body contains [a form of asbestos fibers]." *Id.* at ¶ 57.

---

[13]    Capitalized terms used but not defined in this Section have the meanings ascribed to them in the Complaint.

[14]    As Movants concede, the talc at issue in the Action was mined and manufactured solely by Imerys Vermont, *not* J&J.  *See* Motion at 7.

- Letters to and from officers and employees of Imerys Vermont, which purportedly indicate the presence of asbestos fibers in talc samples, including a 1985 letter from McCrone Associates—Imerys Vermont's talc testing consultants—to Imerys Vermont's Safety, Health and Training Director, Arthur LaPierre, allegedly indicating that asbestos was detected in Imerys Vermont talc.  *Id.* at ¶ 76.

- A contemporaneous letter from Roger Miller admonishing McCrone Associates for including a statement indicating a positive asbestos finding in their letter to Arthur LaPierre.  *Id.* at ¶ 77.

- A 1987 affidavit signed by Roger Miller to Louis Edley claiming "no evidence of the presence of asbestos" in any Imerys Vermont talc "has ever been revealed."  *Id.* at ¶¶ 2, 80.

- Numerous allegedly false sworn discovery responses, as well as affidavits similar to that used to secure the Personal Injury Lawsuit dismissal, that were verified or sworn to by Roger Miller, including two 1988 affidavits from Roger Miller claiming, again, "*[n]o evidence of the presence of asbestos* in Windsor Mineral, Inc.'s product *has ever been revealed* by this testing*"* (emphasis in original).  *Id.* at ¶¶ 88, 89.

- 2007 deposition testimony from Roger Miller, in which he testified that Imerys Vermont's talc testing consultants never found asbestos in any of J&J's mines or in one of Imerys Vermont's mines.  *Id.* at ¶¶ 95, 96.

19.     Given the Edley Plaintiffs' reliance on these allegations, any judgment against J&J in the Action would necessarily implicate Imerys Vermont and result in direct findings that attribute fraudulent conduct to Imerys Vermont and certain of its former principals.[15]

## V.    The Motion

20.     On June 17, 2022, Movants filed the Motion seeking a determination that the automatic stay does not apply, or, in the alternative, relief from the automatic stay to proceed with the Action.

---

[15]     For the avoidance of doubt, not all the allegations in the Complaint implicate the Debtors or are viewed by the Debtors as violative of the automatic stay in the Chapter 11 Cases.  For example, direct claims against J&J alleging spoliation or destruction of evidence do not appear to implicate the conduct of Imerys Vermont.

21.     The Motion reiterates that the Complaint "does not name the [Debtors] as defendants," "assert a cause of action against the Debtors, directly or indirectly," or "implicate the [Debtors]."  Motion at 1, 3.  It also alleges that "J&J and its in-house counsel directly and systematically concealed evidence that its talc contained asbestos" and "deceived litigants and courts by falsely claiming that no such evidence existed and manufactur[ed] false exculpatory evidence" which led "thousands of injured workers . . . [to] voluntarily dismiss their suits on unfavorable terms or suffer[] the involuntary dismissal of their cases."  *Id.* at 2-3.

## Argument

### I.     The Complaint Violates the Automatic Stay in the Chapter 11 Cases

22.     Section 362(a) of the Bankruptcy Code provides that the filing of a bankruptcy petition "operates as a stay, applicable to all entities, of," among other things, "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy case]" or "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the [bankruptcy case]."  *See* 11 U.S.C. §§ 362(a)(1), (a)(6).  The Bankruptcy Code further provides that "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" is automatically enjoined.  *Id.* at § 362(a)(3).  In turn, section 541(a)(1) of the Bankruptcy Code provides that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case" which includes estate claims and causes of action. *Id.* at § 541(a)(1); *see also In re Scott Acquisition Corp.*, 364 B.R. 562, 569 (Bankr. D. Del. 2007) ("Causes of action are included in the broad language of § 541(a)(1) as one of the types of interests that enter the estate.").

23.     The automatic stay imposed by section 362 of the Bankruptcy Code is one of the most fundamental protections afforded to a debtor.  *See Midlantic Nat'l Bank v. N.J. Dep't of Envt'l Prot.*, 474 U.S. 494, 503 (1986); *In re Nortel Networks, Inc.*, 669 F.3d 128, 137 (3d Cir. 2011).  The automatic stay broadly extends to all matters which may have an effect on a debtor's estate, enabling bankruptcy courts to ensure that debtors have the opportunity to rehabilitate and reorganize their operations.  *See In re Johns-Manville Corp.*, 801 F.2d 60, 62-64 (2d Cir. 1986); *see also Fidelity Mortg. Investors v. Camelia Builders, Inc.*, 550 F.2d 47, 53 (2d Cir. 1976) ("Such jurisdiction is necessary to exclude any interference by the acts of others or by proceedings in other courts where such activities or proceedings tend to hinder the process of reorganization.") (quotations omitted); *see In re Bennett*, 528 B.R. 273, 279 (Bankr. E.D. Pa. 2015) ("The automatic stay is intended to cast a wide net and is applied broadly to effectuate its purposes.") (citing *In re Krystal Cadillac Oldsmobile GMC Truck, Inc.*, 142 F.3d 631, 637 (3d Cir. 1998)); *accord In re Linear Elec. Co., Inc.*, 852 F.3d 313, 317 (3d Cir. 2017) ("In general, we interpret the breadth of the stay broadly."); *In re Atl. Bus. & Cmty. Corp.*, 901 F.2d 325, 327 (3d Cir. 1990) ("The scope of the automatic stay is undeniably broad.").  To this end, courts have recognized that application of the automatic stay is not limited to suits or actions where the debtor is a named party.  Rather, the automatic stay must be enforced with respect to any action or proceeding "against an interest of the debtor."  *In re Kaiser Aluminum Corp, Inc.*, 315 B.R. 655, 658 (D. Del. 2004) (affirming bankruptcy court order enforcing automatic stay and voiding *ab initio* an action filed against a non-debtor); *see also In re Colonial Realty,* 980 F.2d 125, 131-32 (2d Cir. 1992) ("Section 362(a)(1) provides that actions 'against the debtor' *or* 'to recover a claim against the debtor' are subject to the automatic stay.  The latter category must encompass cases in which the debtor is not

a defendant; it would otherwise be totally duplicative of the former category and pure surplusage.").

24.    The automatic stay in the Chapter 11 Cases remains in full force and effect, preventing the commencement of any prepetition cause of action against any of the Debtors and/or the pursuit of any act to obtain control or possession of any property of the Debtors' estates absent an order of the Court lifting or modifying the stay.  While a court may grant relief from the stay for "cause," the party seeking such relief must affirmatively bring such a motion and bears the burden of making a prima facie case for such relief.  *See, e.g.*, *Del. Trust Co. v. Energy Future Intermediate Holding Co.* (*In re Energy Future Holdings Corp.*), 533 B.R. 106, 117 (Bankr. D. Del. 2015).  Absent such relief being sought and granted, the automatic stay remains in full effect.

### A.    *The Complaint Violates Sections 362(a)(1) and 362(a)(6) As It Constitutes an Action Against the Debtors*

25.    Although the Complaint does not name Imerys Vermont as a defendant,[16] if permitted to proceed, the Complaint would ultimately and necessarily implicate Imerys Vermont as certain of the causes of action contained in the Complaint—*i.e.*, fraud and deceit, fraud upon courts, and fraudulent concealment—are premised on the allegedly fraudulent conduct of Imerys Vermont and certain of its former principals.

26.    For example, in seeking to establish that J&J made fraudulent statements to Mr. Edley or concealed evidence of asbestos in Imerys Vermont talc, the Edley Plaintiffs rely extensively on the alleged misconduct of Roger Miller, the then President of Imerys Vermont, who

---

[16]    The Complaint claims that the Edley Plaintiffs are not "asserting, directly or indirectly . . . [a]ny legal or equitable claim for relief or remedy against . . . Imerys Talc America or Imerys Talc Vermont, Inc. (collectively referred to herein as 'Imerys').  This lawsuit is also not seeking, directly or indirectly, any damages, equitable relief, declaratory judgment or any other relief against Cyprus or Imerys."  Complaint at ¶ 20.  But, of course, this statement ignores the fact that the Complaint directly implicates Imerys Vermont and is premised on alleged misconduct by principals of Imerys Vermont.

allegedly, among other things: (i) admitted in correspondence that Imerys Vermont talc contained asbestos, (ii) required a testing facility to revise a report to strike language that suggested Imerys Vermont talc contained asbestos, and (iii) provided affidavits to Mr. Edley and others, under penalty of perjury, that there was no evidence of asbestos in Imerys Vermont talc despite knowledge that this statement was false.  These and other allegations discussed above, which will be used to prove J&J's liability in the Action, implicate Imerys Vermont's own potential liability.

27.     Moreover, the allegations against Imerys Vermont (*i.e.*, its allegedly fraudulent actions) are substantially similar (if not identical) to the allegations against J&J.  To the extent J&J's conduct leads to a judgment in favor of the Edley Plaintiffs, there is a strong possibility that Imerys Vermont could face liability for its similar conduct in future litigation.  Thus, any judgment against J&J will likely result in findings and/or determinations that will prejudice Imerys Vermont.

28.     Movants sidestep these considerations and instead argue that the automatic stay—specifically sections 362(a)(1) and 362(a)(6) of the Bankruptcy Code—does not apply because Imerys Vermont is not a named defendant in the Action.  Movant's contention is mistaken.  As courts have made clear, "[t]he protection of the automatic stay extends to any action or proceeding against an interest of the debtor," and "[t]he scope of this protection is not determined solely ***by whom a party chose to name in the proceeding, but rather, by who is the party with a real interest in the litigation***."  *In re Kaiser Aluminum Corp., Inc.*, 315 B.R. at 658 (emphasis added).[17]

---

[17]     The Court has authority to extend the stay to the Action solely on the basis of section 362(a) without invoking its equitable power under section 105(a).  *See McCartney v. Integra Nat. Bank. N.*, 106 F.3d 506, 511 (3d Cir. 1997) (finding, without invoking section 105(a), that plaintiff's action was stayed against non-debtor third party due to the unusual circumstances of the case because doing so would "defeat the purpose of § 362").  In a recent opinion, the LTL Court highlighted the interplay between sections 105(a) and 362(a) in the context of third-party actions noting that "[c]ourts in this circuit have recognized that caselaw concerning the use of authority conferred by section 105(a) to implement the substantive powers created by section 362(a) is not entirely consistent."  *See In re LTL Management, LLC*, 638 B.R. 291, 300 (Bankr. D.N.J. 2022).  The LTL Court further acknowledged that (i) "[i]n this Court's view, ample authority exists to conclude that § 362(a), § 105(a), or a court's inherent powers can each serve as independent bases for

29.    Courts have routinely applied the automatic stay to suits against non-debtor defendants where unusual circumstances are present and the resolution of the third party action may have a significant impact on the debtor.  *See McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 510 (3d Cir. 1997); *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986); *Maaco Enterprises, Inc. v. Corrao*, No. CIV. A. 91-3325, 1991 WL 255132, at *2 (E.D. Pa. Nov. 25, 1991).

30.    Typically, courts in this circuit and others have applied the automatic stay to actions against non-debtors where (i) there is an identity of interest between the non-debtor defendant and the debtor such that an action against the non-debtor is the equivalent to an action against the

---

extension of a stay to third parties" and (ii) "the Third Circuit in *McCartney* upheld extension of the stay to a nondebtor solely on the basis of § 362, and without mention of § 105(a) in its analysis." *Id.* at 300-01. Notwithstanding, the LTL Court opted to utilize a three-step inquiry stemming from cases decided in the Eastern District of Pennsylvania. *Id.* at 301 ("Ultimately, until the Third Circuit provides clearer guidance, this issue remains unsettled. Indeed, in several cases out of the Eastern District of Pennsylvania, district courts have used and re-used a three-step inquiry to determine whether the bankruptcy court's extension of a stay to a nondebtor was appropriate: (1) whether the Bankruptcy Court had jurisdiction to issue the injunction; (2) whether the Bankruptcy Court properly extended the automatic stay under section 362(a) to the non-debtors; and (3) whether the Bankruptcy Court properly exercised its discretion in issuing the injunction.") (quotations omitted). Regardless, Movants' arguments that application of the stay to third-party suits would "alter the comprehensive Bankruptcy Code contrary to the balance struck by Congress and the canons of statutory construction" and that "with Congress having affirmatively granted bankruptcy courts the authority to stay actions against debtors, the Code's silence on nondebtors should not be taken as a grant of authority, but an exclusion of such authority" stand contrary to well established case law that the automatic stay can be applied to third-party actions. *See* Motion at 12-16.

Moreover, Movants' contention that a threshold jurisdictional inquiry is required—*i.e.*, whether the Court has subject matter jurisdiction over the Edley Plaintiffs' state law claims against J&J—prior to extending the automatic stay to the Action is incorrect. The Court has "core" jurisdiction to resolve the issues before it. *See Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999) (noting "'section 157 provides the bankruptcy court with two levels of judicial power,'" including "core" proceedings in which the bankruptcy court "assumes the role of a court of first instance with comprehensive power to hear, decide and enter final orders and judgments") (citation omitted). Section 157 explicitly states "motions to terminate, annul, or modify the automatic stay" are "core proceedings." 28 U.S.C.A. § 157(2)(G). In addition, although the Third Circuit has not addressed this precise issue, courts have routinely concluded that motions to extend the automatic stay to non-debtor third parties also qualify as core proceedings. *See LTL Management LLC*, 638 B.R. at 302 (citing *LTL Mgmt., LLC. v. Those Parties Listed on Appendix A to Complaint*, No. 21-cv-20252 (FLW), 2022 WL 190673, at *4 (D.N.J. Jan. 21, 2022) (collecting cases).

debtor, (ii) the third party action will have a preclusive effect on the non-defendant debtor, and (iii) discovery would be a substantial burden to the non-defendant debtor's reorganization. *See* 3 Collier on Bankruptcy P 362.03 (16th 2022); *McCartney*, 106 F.3d at 510; *A.H. Robins Co.*, 788 F.2d at 999; *In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa. 2009); *In re Jefferson Cnty.*, 491 B.R. 277, 280-81 (Bankr. N.D. Ala. 2013); *In re Sudbury, Inc.*, 140 B.R. 461, 462 (Bankr. N.D. Ohio 1992); *In re Kaiser Aluminum Corp*, 315 B.R. at 658.[18]  Each of these factors is satisfied here.

31.    First, courts have applied the automatic stay to actions against non-debtor defendants where "there is such an identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *See McCartney*, 106 F.3d at 510.  In analyzing the foregoing, courts have found an "identity of interest" between a non-debtor

---

[18]    For example, in *In re Jefferson Cnty.*, two different plaintiffs brought actions for, among other things, fraud based upon the same underlying facts, but only one named the debtor as a defendant in its action. 491 B.R. at 281-82.  Both suits included allegations of fraud being perpetrated by both the named defendant and the debtor. *Id.*  The court held that the degree of sameness between the two lawsuits was sufficient for the automatic stay to apply because it was obvious that the debtor was a party in interest where the complaint in both cases contained numerous material allegations implicating conduct of the debtor. *Id.* at 281.  In addition, the court found that the purpose of the stay would be circumvented if the action were to proceed because the debtor would be required to expend resources defending its interest against contractual and common law indemnity claims levied against it in the action, and to avoid the preclusive effects of any findings in the action against the debtor. *Id.* at 284.

Similarly, in *In re Sudbury*, plaintiffs brought suit against the debtor's officers and directors based on allegations of fraud. 140 B.R. at 464.  The court held that "[t]he continued prosecution of Plaintiffs' actions would violate the spirit, but not the letter, of § 362 of the Bankruptcy Code" and that "[w]here, as in this case, it appears that the Debtor is inextricably involved in actions against third parties, several courts have held there are 'unusual circumstances' which justify application of section 362." *Id.* at 464.  The court found "fundamental similarities" to cases in which courts applied the automatic stay to actions against non-debtors, namely that the "actions are based upon [] prepetition transactions with the Debtor, and Debtor will be compelled to defend them because of legitimate indemnity and collateral estoppel concerns." *Id.*

defendant and a debtor where the non-debtor defendant has colorable claims for indemnification against the debtor. *See In re Philadelphia Newspapers, LLC*, 407 B.R. at 616; *In re Jefferson Cnty., Ala.*, 491 B.R. at 287-90. Although the Debtors do not believe that Imerys Vermont owes a contractual indemnification obligation to J&J with respect to the allegations in the Complaint, J&J may allege that Imerys Vermont has a common law indemnification or contribution obligation to J&J given that the fraud allegedly committed by J&J is premised, in part, on the alleged misrepresentations and fraudulent conduct of principals formerly employed by Imerys Vermont. Courts have clarified that "absolute indemnity is not required for the unusual circumstances exception to apply." *See In re Jefferson Cnty.*, 491 B.R. at 288–89. Instead, "the 'possibility' of a right of indemnification is sufficient" to establish an identity of interest. *Id.*; *In re Sudbury*, 140 B.R. at 464 (finding that the "unusual circumstances" exception applied despite "questions as to the enforceability of the indemnities").

32.     Courts have similarly found an identity of interest to exist where the debtor is the "real party in interest" with respect to claims against non-debtors when it is apparent that the key allegations in the plaintiff's complaint concern the debtor's conduct. *See In re Cont'l Airlines, Inc.*, 177 B.R. 475, 479-81 (D. Del. 1993) (finding debtor was real party in interest in action against non-debtors where "the substantive allegations raised in the pleadings by plaintiffs . . . demonstrate that [the debtor] is the alleged wrongdoer in those actions and that there is an identity of interest between [the debtor] and the parties-defendant therein"); *In re Reliance Acceptance Grp., Inc.*, ADV. A-98-310, 2000 WL 33712305, at *5 (Bankr. D. Del. Dec. 6, 2000) (staying action against non-debtor where claims were based on non-debtor's "alleged improper conduct engaged in with [the debtor]"); *In re Frascella Enters.*, 349 B.R. 421, 434 (Bankr. E.D. Pa. 2006) (finding identity of interests between debtor and non-debtors where the "[t]he claims of unlawful activity by the

Debtor [were] the same claims of unlawful activity by the [non-debtors]" and the complaint "often [made] no distinction" between such claims.  As a multitude of the allegations contained in the Complaint directly concern the conduct of Imerys Vermont, an identity of interest between the Debtors and J&J exists with respect to the Action.

33.     Second, any judgment against J&J in the Action could have a preclusive effect on Imerys Vermont, as any finding that J&J engaged in fraud will result in the implication that similar conduct of Imerys Vermont was also fraudulent.  Where an action against a non-debtor is likely to require a finding that could impose liability on the debtor, as is the case here, that action is stayed under section 362 of the Bankruptcy Code.  *In re Jefferson Cnty.*, 491 B.R. at 290 (finding "unusual circumstances" warranted application of the automatic stay where a judgment against a third party could, via collateral estoppel, result in a judgement against the debtor when the third party pursues claims for indemnification and contribution, even when the fraud allegations were yet to be addressed by the court and state law could ultimately prevent indemnification obligations)*; see also In re Sudbury*, 140 B.R. at 463 (finding that the automatic stay applied to third party actions where "it [was] not plausible that the defendants in these actions could be found liable to plaintiffs except on facts that would impose liability on the Debtor").

34.     When addressing preclusion, courts look to the laws of the state in which judgment would be or has been rendered.  *See, e.g.*, *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 375 (1985).  Looking to New Jersey law, courts have found that collateral estoppel applies if:  (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with

a party to the earlier proceeding. *See Matter of Estate of Dawson*, 136 N.J. 1, 20-21 (1994); *see also Myrus Hack, LLC v. McDonald's Corp.*, Civil Action No. 05-2700, 2009 WL 872176, at *3 (D.N.J. Mar. 30, 2009). Here, all of the hallmarks of collateral estoppel would be present. A final ruling on the allegedly fraudulent actions by J&J (which are substantially the same as those alleged misrepresentations made by Imerys Vermont) would be essential to a judgment against J&J for fraud or fraudulent concealment. Further, Imerys Vermont could be held to be in privity with J&J given potential indemnification claims by J&J[19] and the fact that Imerys Vermont was a subsidiary of J&J at the time of the alleged fraud. *See In re Jefferson Cnty.*, 491 B.R. at 290 ("Privity often exists in the relationship between an indemnitor and indemnitee"); *see also Myrus Hack, LLC*, 2009 WL 872176, at *8 ("Corporations in in a parent-subsidiary relationship . . . are closely related enough that they satisfy privity."). Given its potential preclusive effect, if the Action is permitted to proceed, the Debtors will be compelled to participate to defend the conduct of their former principals and ensure an accurate factual record.

35.     Finally, the Action will subject Imerys Vermont to the substantial burdens imposed by discovery, as the Debtors will undoubtedly be required to defend or comply with discovery requests from the Edley Plaintiffs and J&J with respect to the specific allegations contained in the Complaint—*e.g.*, the alleged misconduct of Imerys Vermont—and other related topics. Indeed, interested parties will assuredly seek discovery with respect to Imerys Vermont's alleged misconduct and fraudulent representations in an effort to expose the true cause of Mr. Edley's decision to dismiss the Personal Injury Lawsuit.

---

[19]     As discussed above, while the Debtors are unaware of any contractual indemnity owed by Imerys Vermont to J&J, given that the allegations in the Complaint rely on the conduct of Imerys Vermont, J&J could argue common law claims for indemnification against Imerys Vermont based on the alleged misrepresentations of Imerys Vermont.

36.     Participating in this type of extensive discovery would substantially interfere with the Debtors' reorganization efforts by diverting significant resources away from the Chapter 11 Cases.  The Debtors remain focused on confirming a plan of reorganization and are currently engaged in mediation in an effort to reach a consensual resolution of the Chapter 11 Cases. Discovery, coupled with the need to litigate the allegations raised in the Complaint given the potential preclusive effect of the Action, will distract the Debtors, exhaust their already limited resources, and hinder their ability to take meaningful steps forward in the Chapter 11 Cases.  Courts have generally found that similar considerations weigh in favor of applying the automatic stay to third party actions.  *See In re Jefferson Cnty.*, 491 B.R. at 290 (citing cases in which "[c]ourts apply the § 362(a)(1) stay to proceedings against non-debtor defendants when discovery in those proceedings would impose a burden on the debtor that would substantially hinder the debtor's reorganization").

### B.     *The Complaint Violates Section 362(a)(3) by Asserting Alter Ego Claims That Are Property of the Debtors' Estates*

37.     Despite Movants' arguments to the contrary, it is clear that the Action would constitute an act to obtain possession of or exercise control over property of the Debtors' estates as the Complaint asserts alter ego claims.[20]

---

[20]     Although not a focus of this Objection, the Debtors also believe that the Action would affect the their access to shared insurance policies.  The Debtors contend that one or more of the Debtors are entitled to coverage under certain insurance policies (the "**J&J Insurance Policies**") issued to J&J and its subsidiaries, including Imerys Vermont, that would provide coverage for, among other things, sums that an insured becomes obligated to pay on account of liability imposed on the insured, as well as defense costs incurred in connection with lawsuits seeking to impose such liability.  *See* First Day Declaration at ¶¶ 38, 42.  Courts have long held that insurance policies are property of a bankruptcy estate.  *See, e.g., ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006) ("It has long been the rule in this Circuit that insurance policies are considered part of the property of a bankruptcy estate"); *In re Johns-Manville Corp.*, 26 B.R. 420, 436 (Bankr. S.D.N.Y. 1983) (holding that debtor's "rights under its insurance policies and all causes of action arising thereunder constitute property of the [debtor's] estates within the purview of Section 541(a) of the Code").  If the Action is permitted to proceed and J&J is able to access insurance to defend against the claims asserted in the Complaint then the pool of insurance proceeds otherwise available to Imerys Vermont will be diminished.  As such, the Action would affect the Debtors' interests

38.    The Action is premised in part on the conduct of Imerys Vermont.  The fraud alleged by the Edley Plaintiffs arises from exposure to industrial talc that was mined and distributed by Imerys Vermont and many of the misrepresentations that form the foundation of the Complaint were statements allegedly made by principals of Imerys Vermont.  *See* Complaint at ¶¶ 35-37, 40, 45, 105.  Indeed, the Personal Injury Lawsuit was filed against Imerys Vermont, not J&J, and it was Imerys Vermont, not J&J, that had an obligation to defend that lawsuit.  It remains unclear from the Complaint why Mr. Edley would have relied on any statements made by J&J in determining to dismiss the Personal Injury Lawsuit against Imerys Vermont, unless he understood J&J to be speaking for and on behalf of Imerys Vermont.

39.    Indeed, this alleged alter ego type relationship between J&J and Imerys Vermont is highlighted throughout the Complaint.  For example, the Complaint makes the following representations:

- "[f]rom 1967 to 1989, J&J directly owned and controlled Windsor.  Talc ore from underground mines, mills, and related facilities in southern Vermont, was marketed, distributed, and sold for industrial use until J&J sold the mining operations in 1989";

- "J&J controlled all major decisions made by Windsor relating to the health and safety of J&J's talc products";

---

in the J&J Insurance Policies—property of the Debtors' estates—which would be in violation of the automatic stay.  *See In re Global Indus. Technologies, Inc.*, 303 B.R. 753, 760 (Bankr. W.D. Penn 2004); *see also A.H. Robins Co.*, 788 F.2d at 1001 (holding that a debtor's insurance policy may well be the most important asset of the estate, and "any action in which the judgment may diminish this 'important asset' is unquestionably subject to a stay under [11 U.S.C. 362(a)(3)]") (quoting *In re Johns-Manville Corp.*, 40 B.R. at 229); *ACandS, Inc.*, 435 F.3d at 261 (recognizing that section 362(a)(3) "has consistently been interpreted to prevent acts that diminish future recoveries from a debtor's insurance policies").

Movants contend that section 362(a)(3) of the Bankruptcy Code is inapplicable as the Action does not involve "any shared insurance coverage to which the Imerys estate claims an interest."  Motion at 16-17.  This is not accurate for the reasons provided above.

- "[a]t all relevant times, J&J dictated the litigation strategies and actions of Windsor and its defense counsel which resulted in the unjust dismissal of lawsuits claiming injury from exposure to J&J talc"; and

- citing 1982 deposition testimony from Imerys Vermont president Roger Miller, "J&J's in-house attorneys working directly for the General Counsel of J&J made all decisions concerning litigation involving the sale of Windsor talc prior to January 6, 1989." *See id.* at ¶¶ 35-37, 40.

40.     These allegations form the basis of quintessential alter ego claims,[21] whereby the Edley Plaintiffs are arguing that J&J is liable for the actions of Imerys Vermont (*e.g.*, Imerys Vermont's production of allegedly tainted talc and the misconduct of Imerys Vermont's principals) as a result of its ownership of, and alleged control over, Imerys Vermont.

41.     These claims, which frame Imerys Vermont and J&J as alter egos, are the type of generalized claims inuring to the benefit of all creditors that courts have consistently found are property of a debtor's estate.  *See In re Emoral, Inc.,* 740 F.3d 875, 879 (3d Cir. 2014) ("The 'estate,' as defined in the Bankruptcy Code, includes 'all legal or equitable interests of the debtor in property as of the commencement of the case.'  This includes causes of action, which are considered property of the bankruptcy estate 'if the claim existed at the commencement of the filing and the debtor could have asserted the claim on his own behalf under state law. . . .  A cause

---

[21]     The Third Circuit has recognized that New Jersey law permits a company to pierce its own corporate veil. *See In re Buildings by Jamie, Inc.* 230 B.R. 36, 42 (Bankr. D.N.J. 1998) ("Without deciding the question whether a trustee has standing to assert an alter ego action, the Third Circuit noted that New Jersey courts have permitted corporate debtors to piece their own veils."). Under New Jersey law, piercing the corporate veil is a tool of equity that is involved when a subservient corporation is acting as an alter ego of a dominant corporation.  In order to state a claim for piecing the corporate veil under New Jersey law, a plaintiff must show that: (1) "the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent" and (2) "the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." *Craig v. Lake Asbestos of Quebec*, *Ltd.*, 843. F.2d 145, 149 (3d Cir. 1988).  Factors the Third Circuit has considered in determining whether to pierce the corporate veil include: "gross undercapitalization, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning officers or directors, absence of corporate records, and the fact that the corporation is merely a façade for the operations of the dominant stockholder(s)." *American Bell Inc. v. Federation of Telephone Workers*, 736 F.2d 879, 886 (3d Cir. 1984).

of action that is 'property of the estate' is properly pursued by the bankruptcy trustee because it inures to the benefit of all creditors.") (internal citations omitted); *see also In re Mee Apparel, LLC*, No. CV 15-5697 (FLW), 2016 WL 3535805, at *7 (D.N.J. June 28, 2016) (recognizing "bankruptcy law is clear" that generalized alter ego claims "belong to the bankruptcy estate and may only be pursued by the trustee").  Accordingly, any attempt by the Edley Plaintiffs to pursue these causes of action is an attempt to "exercise control over property of the estate" in violation of the automatic stay pursuant to section 362(a)(3) of the Bankruptcy Code.  *See* 11 U.S.C. § 362(a)(3); *see also Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 628 (D. Del. 2018) ("Having found that [plaintiff's] alter ego claim is property of the bankruptcy estate under Section 541(a)(1), the automatic stay of Section 362(a)(3) is clearly implicated.").[22]

42.    Movants make the assertion that the Action is not an "alter ego claim or a claim that proceeds on a theory of successor liability" but fail to elaborate on why this is the case.  Motion at 17.  Movants' failure to provide a rationale for their position (aside from the bare assertion that the Action is not an alter ego claim) is especially suspect given the Debtors' contention in the Objection to the LTL Stay Motion that the Complaint may give rise to alter ego claims.[23]  In any case, Movants fail to offer tangible support for their contention that the Complaint does not violate section 362(a)(3) of the Bankruptcy Code in respect of its pursuit of alter ego claims.

---

[22]    The fact that the Complaint does not specifically plead alter ego theories does not lead to a different result.  As the court in *In re Mee Apparel* recognized, "the controlling consideration is not whether the claims are *specifically pled* as alter ego claims, or even whether they would *succeed* as alter-ego claims, but rather whether they are *in the nature of* alter-ego claims at all."  2016 WL 3535805, at *6 (citing *In re Emoral*, 740 F.3d at 875).

[23]    *See* Objection to the LTL Stay Motion at ¶ 10 (noting that the Proposed Complaint may give rise to alter ego claims against J&J).

**II.      Cause Does Not Exist to Grant Relief from the Automatic Stay**

43.      To lift the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code,

Movants must demonstrate a *prima facie* case that there is cause to lift the automatic stay. *See In*

*re DBSI, Inc.*, 432 B.R. 126, 132-35 (Bankr. D. Del. 2010) (denying relief from stay where movant

failed to demonstrate *prima facie* cause to lift stay); *In re Am. Classic Voyages, Co.*, 298 B.R. 222,

225 (D. Del. 2003) ("To establish cause, the party seeking relief from the stay must show that the

balance of hardships from not obtaining relief tips significantly in [its] favor.") (quotations

omitted).

44.      Although "cause" as used in section 362(d)(1) of the Bankruptcy Code is undefined,

courts have held that "whether there is cause to lift the automatic stay must be determined on a

case-by-case basis." *In re DBSI*, 407 B.R. 159, 166 (Bankr. D. Del. 2009). Courts in the Third

Circuit apply a three-part balancing test to assess whether cause exists to lift the automatic stay:

(1) "[w]hether any great prejudice to either the bankrupt estate or the debtor will result from

continuation of the civil suit;" (2) "[w]hether the hardship to the non-bankrupt party by

maintenance of the stay considerably outweighs the hardship to the debtor;" and (3) "[t]he

probability of the creditor prevailing on the merits." *Id.* (quotations omitted); *see also In re*

*Telegroup, Inc.*, 237 B.R. 87, 91 (Bankr. D.N.J. 1999) ("In determining whether or not cause exists,

the bankruptcy court must balance the inherent hardships on all parties and base its decision on the

degree of hardship and the overall goals of the Bankruptcy Code.") (quotations omitted). Beyond

the three-part test, courts also consider whether lifting the automatic stay would "impede[] the

orderly administration of the debtor's estate." *In re DBSI.* 407 B.R. at 167; *see also Borman v.*

*Raymark Indus., Inc*., 946 F.2d 1031, 1036 (3d Cir. 1991) ("The automatic stay was designed 'to

prevent certain creditors from gaining a preference for their claims against the debtor; to forestall

the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in

general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.'")
(quoting *Assoc. of St. Croix Condominium Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d
Cir. 1982)).

45.     For the reasons set forth above, the Complaint is in direct violation of the automatic
stay.  Accordingly, Movants bear the initial burden to establish cause.  *Matter of Rexene Prod.
Co.*, 141 B.R. 574, 577 (Bankr. D. Del. 1992).  "Failure to prove a prima facie case requires denial
of the requested relief."  *In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006);
*see also In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990) ("Section 362(d)(1) requires
an initial showing of cause by the movant[.]  If the movant fails to make an initial showing of
cause, however, the court should deny relief without requiring any showing from the debtor that it
is entitled to continued protection.").

A.     ***The Debtors Will Suffer Significant Prejudice if the Complaint Goes Forward***

46.     As highlighted above, any benefit afforded to the Edley Plaintiffs if the Action is
allowed to proceed at this time is overshadowed by the logistical and financial burdens the Action
will impose on the Debtors, which will waste estate resources and impair the Debtors' efforts to
resolve the Chapter 11 Cases.  Importantly, courts have recognized even a "slight interference"
with the administration of the debtor's estate "may be enough to preclude relief in the absence of
a commensurate benefit."  *See In re Curtis*, 40 B.R. 795, 806 (Bankr. D. Utah 1984).

47.     Given the potential preclusive effect a finding that J&J's conduct was fraudulent
would have on the Debtors, the Debtors will be forced to actively participate in the Action to
protect Imerys Vermont's rights and to ensure an accurate factual record, which will require
expending valuable and diminishing resources.  *See In re Jefferson*, 491 B.R. at 297 (finding that
the debtor would be prejudiced by not staying a third-party action where "it would be forced to
participate in an extensive and expensive discovery process and a trial in another state, further

depleting the [debtor's] rapidly diminishing [assets]"); *see also In re Sudbury*, 140 B.R. at 463 (finding that the automatic stay applied to a third-party suit where "it [was] not plausible that the defendants in these actions could be found liable to plaintiffs except on facts that would impose liability on the Debtor").

48.     Coupled with the need to litigate the merits of the allegations raised against Imerys Vermont, the Action will also subject Imerys Vermont to discovery-related burdens.  As the Action commences, the Debtors will assuredly be required to defend or comply with discovery requests from the Edley Plaintiffs and J&J with respect to the alleged misconduct of Imerys Vermont and its role in J&J's alleged misconduct, which is likely to include: (i) communications between Imerys Vermont and Mr. Edley in connection with the Personal Injury Lawsuit and (ii) information with respect to J&J's purported control over Imerys Vermont and its employees.  There is also a likelihood that the Debtors will seek discovery from the Edley Plaintiffs related to topics designed to expose whether there was an alternative cause for Mr. Edley's decision to dismiss the Personal Injury Lawsuit.  As with the need to litigate the merits of the Complaint, such discovery will divert significant resources away from the Chapter 11 Cases at a time when the Debtors remain focused on confirming a plan of reorganization and are actively involved in mediation to consensually resolve the Chapter 11 Cases.  *See In re W.R. Grace & Co.*, Nos. 01-01139 (JFK), 2007 WL 1129170, at *3 (Bankr. D. Del. Apr. 13, 2007) (denying motion to lift automatic stay, in part, because litigating actions outside of bankruptcy "would require the time and commitment of a number of Debtors' key personnel, most of whom are crucial to the reorganization process"); *see also In re SunEdison, Inc.*, 557 B.R. 303, 308 (Bankr. S.D.N.Y. 2016) (denying motion to lift automatic stay where lifting stay would divert the "Debtors' resources and personnel at a critical time in the case"); *A.H. Robins Co.*, 788 F.2d at 998  (describing one of the purposes of automatic

stay to be "to provide the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportuning to formulate a plan of reorganization for the debtor").

49.     Finally, the Action misappropriates alter ego claims, which as noted above, constitute property of the Debtors' estates and inure to the benefit of all creditors.  Movants' attempt to pursue the Action for their own benefit would prejudice the Debtors and their estates by prohibiting the Debtors from realizing the potential value of these assets.  This risk of loss would be further compounded by litigation costs associated with any affirmative relief the Debtors would need to seek to appropriately litigate the status of these claims as alter ego claims if the Complaint is permitted to proceed.

50.     Accordingly, the Motion should be denied due to the significant prejudice the Debtors would incur if the Action goes forward.

**B.     *Movants Have Failed to Make an Initial Showing of Harm and Cannot Demonstrate that Any Harm They Might Suffer Considerably Outweighs the Harm to the Debtors***

51.     Movants have failed to demonstrate that the hardship they will suffer if the Motion is denied outweighs the hardship the Debtors will suffer if the Motion is granted.  Courts have held that the party seeking relief from the stay bears "the heavy and possibly insurmountable burden of proving that the balance of hardships tips significantly in favor of granting relief."  *In re W.R. Grace & Co.*, 2007 WL 1129170, at *3 (citation omitted); *In re DBSI,* 407 B.R. at 166 (considering "[w]hether the hardship to the non-bankrupt party by maintenance of the stay *considerably outweighs* the hardship to the debtor" (emphasis added) (citation omitted)).

52.     In support of their position, Movants first argue that if the stay is not lifted, Movants and similarly situated plaintiffs would suffer significant hardship as evidence supporting their claims against J&J may be "lost to the passage of time."  *See* Motion at 22.  Movants' assertion is

speculative at best and overlooks the fact that Movants waited approximately 5 years after J&J's purported "fraudulent concealment scheme" was uncovered to file the Complaint.  Motion at 6-8 ("In 2017, J&J's fraudulent concealment scheme began to unravel and the truth emerged.").  If Movants were concerned that delay would weaken their case against J&J or result in lost evidence, surely they would have promptly filed the Complaint instead of waiting years to do so.  The Complaint itself demonstrates that Movants were aware of the alleged fraud at least as of the June 2019 deposition of Dr. John Hopkins.  Complaint at ¶ 2.  Thus, even in a "best-case" scenario, Movants waited nearly three years to bring the Complaint.  In light of this delay, Movants cannot now claim prejudice if the stay is not immediately lifted.

53.    Second, Movants argue that the bankruptcy process should not be used to delay the public interest in holding J&J accountable for its fraud, especially when the Action would not impact the Debtors.  Motion at 22.  Specifically, Movants (i) contend that there "is no benefit to be gained by the Debtors because the Edleys and the members of the putative Class are not creditors of the Debtor and do not seek any damages or other relief against them in the Complaint" and (ii) point to the overwhelming "public interest" considerations underlying their lawsuit against J&J, which, according to Movants, "is intended to benefit the public interest by protecting the integrity of the judicial system while also bringing justice to all members of the putative *Edley* Class whose personal injury claims were dismissed because of J&J's fraudulent concealment scheme."  *Id.* at 24.

54.    This altruistic rhetoric aside, Movants' campaign against the alleged "monster" that is J&J and the damage resulting from its decades of fraudulent conduct does not render the automatic stay inapplicable or minimize the prejudice that the Debtors will face if Movants proceed with the Complaint.  The automatic stay extends broadly to all matters which may have an effect

on a debtor's estate to ensure that a debtor has the opportunity to rehabilitate and reorganize. The stay serves its own important public purpose by allowing for an orderly restructuring process that (i) centralizes disputes concerning a debtor's estate, (ii) prevents an uncoordinated race among creditors to gain preference for their claims, and (iii) forestalls the depletion of estate assets due to legal costs in defending proceedings against a debtor. *See In re SCO Grp., Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007); *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990). The Complaint is essentially an action against the Debtors and, by proceeding with the Action, Movants attempt to subvert the "public interest" of providing debtors with a breathing spell to move through bankruptcy without the need to expend unnecessary resources dealing with issues like those raised by Movants.

55. Moreover, the hardship to Movants is less substantial given the posture of the Action. The Action is in its infancy and the Edley Plaintiffs have yet to actually litigate their claims against J&J. This is not a situation where the Edley Plaintiffs (or J&J) have spent significant resources and a multitude of hours litigating the issues raised in the Complaint. Nor is it clear whether the Complaint will survive initial motion practice. Simply, the Edley Plaintiffs have not provided a sufficient explanation as to why they are unable to wait for the resolution of the Chapter 11 Cases before opening the floodgates to expensive and aggressive litigation.

56. In sum, the highly speculative and unsupported nature of the purported harm to Movants is outweighed by the real prejudice the Debtors will suffer if the automatic stay is lifted. As a result, Movants cannot satisfy the second of the aforementioned factors, which requires that Movants demonstrate that the harm they would suffer from the denial of the Motion *considerably* outweighs the harm to the Debtors if the Motion were granted. *In re DBSI, Inc.*, 407 B.R. at 166; *see also Matter of Rexene Prod. Co.*, 141 B.R. at 576 (listing second factor as, "the hardship to the

[non-bankrupt party] by maintenance of the stay considerably outweighs the hardship to the debtor").

### C. *Movants Have Failed to Show Probability of Success*

57.     Movants cannot show a probability of prevailing on the merits of their claims.  As discussed above, the Action has just begun; no answer has been filed, and no discovery has been taken.  As such, the only evidence with which to judge the probability of success is Movants' own inconclusive allegations found in the Complaint.  For these reasons, to the extent this factor is applicable, Movants have failed to demonstrate a probability of success on the merits.

58.     Moreover, given that Movants have not demonstrated that they will face any significant hardship that outweighs the prejudice the Debtors would face if the stay is lifted, this factor should have even less significance in determining whether cause exists to lift the stay.  *See In re Spansion, Inc.*, 418 B.R. 84, 97 (Bankr. D. Del. 2009) (the probability of success on the merits was "not crucial" where other factors weighed in favor of stay), *vacated on other grounds sub nom. Samsung Elecs. Co. Ltd. v. Ad Hoc Consortium of Floating Rate Noteholders*, Civil No. 09-0836, 2010 WL 2636115 (D. Del. June 29, 2010).

### CONCLUSION

59.     For the foregoing reasons, the automatic stay applies to the Complaint and Movants have not met their burden to show that "cause" exists to lift the automatic stay.  Therefore, the Motion should be denied.

Dated: July 6, 2022                 /s/ *Amanda R. Steele*
          Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:  (302) 651-7559
Facsimile:  (302) 498-7559
E-mail:  collins@rlf.com
        merchant@rlf.com
        steele@rlf.com

- and -

**LATHAM & WATKINS LLP**

Jeffrey E. Bjork (admitted *pro hac vice*)
Kimberly A. Posin (admitted *pro hac vice*)
Amy C. Quartarolo (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
E-mail:  jeff.bjork@lw.com
        kim.posin@lw.com
        amy.quartarolo@lw.com

*Counsel for Debtors and Debtors-in-Possession*