**Exhibit A**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Cohen, Placitella & Roth, P.C.
Christopher M. Placitella
Michael Coren
Dennis M. Geier
Eric S. Pasternack
cplacitella@cprlaw.com
mcoren@cprlaw.com
dgeier@cprlaw.com
epasternack@cprlaw.com
jmplacitella@cprlaw.com
justinplacitella@cprlaw.com
127 Maple Avenue
Red Bank, NJ 07701
Telephone: (732) 747-9003
Facsimile: (732) 747-9004

*Attorneys for Non-Party Movants Daniel Edley and*
*Roger Edley*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,<br><br>        Debtor.[1] | Chapter 11<br>Case No. 21-30589 (MBK)<br><br>Hearing Date: April 12, 2022 |

MEMORANDUM OF LAW IN SUPPORT OF MOTION BY NON-PARTY MOVANTS DANIEL EDLEY AND ROGER EDLEY FOR AN ORDER (I) CONFIRMING THAT THE AUTOMATIC STAY AND PRELIMINARY INJUNCTION DO NOT APPLY TO AN INTENDED PUTATIVE CLASS ACTION TO BE FILED AGAINST JOHNSON AND JOHNSON AND OTHER NONDEBTOR DEFENDANTS, OR, IN THE ALTERNATIVE, (II) GRANTING RELIEF FROM THE AUTOMATIC STAY TO ALLOW THE INTENDED PUTATIVE CLASS ACTION TO PROCEED

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933

Non-party movants, Daniel Edley and Roger Edley (the "Edleys"), move the Court for an order (i) declaring that the automatic stay and preliminary injunction do not apply to a putative class action against Johnson and Johnson ("J&J") and other nondebtor John/Jane Doe defendants that they intend to forthwith file in the Superior Court of New Jersey, Middlesex Vicinage, or, in the alternative, (ii)(a) lifting the automatic stay to allow the Edleys to file the intended putative class action against J&J and other nondebtor John/Jane Doe defendants or (b) modifying the automatic stay to permit the intended putative class action to proceed.  In support hereof, the Edleys respectfully represent as follows:

## I.    Introduction

The family of Louis Edley, deceased, intends to file a class action complaint against Johnson & Johnson ("J&J") and other nondebtor John/Jane Doe defendants in the Superior Court of New Jersey, Middlesex Vicinage (the "Edley Class Action") and before doing so seeks a declaration from this Court that they are not enjoined from filing the Complaint and that the Class Action is not stayed by this Court's Preliminary Injunction Order or Section 362(a)'s automatic stay provision.[2]

---

[2] The Complaint (Exhibit A) along with the accompanying exhibits detail J&J's scheme to conceal evidence as well as the recent discovery of documents proving the deception of its "no evidence" of asbestos in talc defense.

1

The *Edley* Class Action charges J&J with fraud, fraudulent concealment, and fraud upon the courts in its defense of past asbestos personal injury lawsuits arising from exposure to industrial talc ("J&J/Windsor's Industrial Talc") mined, milled, and manufactured by its subsidiary, Windsor Minerals, Inc. ("Windsor"). J&J concealed evidence in litigation that its talc contained asbestos. It also deceived litigants and courts by falsely stating that no such evidence existed. As a result of J&J's deception, thousands of injured workers who had been exposed to J&J/Windsor's Industrial Talc voluntarily dismissed their suits on unfavorable terms or suffered the involuntary dismissal of their cases. J&J now admits that its representations about there being no evidence of asbestos contamination in its talc were false.

None of the claims in the *Edley* Complaint was asserted or could have been asserted against the Debtor LTL Management LLC or its predecessors, including Old JJCI. Nor did any of the dismissed claims involve injuries caused by exposure to cosmetic talc.[3] The lawsuits underlying the *Edley* Class Action were instead filed against J&J, Windsor Minerals, Inc. ("Windsor"), a direct subsidiary of J&J,

---

[3] *See* Exhibit B, ¶ 8-9 (affidavit of Gene M. Williams, an attorney for J&J and JJCI, distinguishing between industrial and cosmetic talc stating "industrial talc is different from the cosmetic talc used in Johnson's Baby Powder or Shower to Shower, including that industrial talc was a different grade of talc which was processed and handled in a manner different from cosmetic talc").

or a legally responsible third-party for J&J/Windsor's Industrial Talc. The claims of the *Edley* Class Action thus neither concern liabilities of the Debtor nor asbestos injuries resulting from use of or exposure to cosmetic talc.

The *Edley* Class Action is also not a personal injury case and does not seek to reopen or relitigate the dismissed underlying lawsuits. The *Edley* Class Action indeed is "not itself an asbestos injury case, but rather an action about [defendant's] conduct when [it] confronted asbestos injury cases in state courts around the country." *See Williams v. BASF Catalysts LLC*, 765 F.3d 306, 310 (3d Cir. 2014). As a result, and for the reasons outlined below, before filing their Complaint and in the interest of judicial economy, the Edleys seek a declaration from this Court that claims to be asserted in their action are not "Enjoined Talc Claims," as defined by this Court's March 7, 2022 Order (Dkt. 1635) and are not otherwise barred by Section 362(a)'s automatic stay.

## II.    Background

Louis Edley, like so many others, was exposed to asbestos dust while working with and around J&J/Windsor's Industrial Talc. Exhibit A, ¶ 7. J&J did not warn Mr. Edley, or others like him, that by working with or near the Industrial Talc they would be exposed to asbestos, or that asbestos could make them sick and die. *Id.* at ¶ 8. After Mr. Edley became ill with asbestosis and brought a personal

injury suit against J&J's subsidiary, Windsor Minerals, Inc.,[4] J&J responded by

denying the existence of any evidence that there was asbestos in its talc. *Id.* at ¶¶

12, 13.

On August 27, 1986, John Beidler, Esq., an in-house J&J lawyer, went even

further by writing to Mr. Edley's attorney, Ronald Grayzel, on letterhead of the

Office of J&J's General Counsel, demanding that he dismiss the case because no

evidence of asbestos "has ever been revealed" in J&J/Windsor's Industrial Talc.

His letter threatened sanctions under New Jersey's rule against baseless lawsuits.

*Id.* at ¶ 79.

After Mr. Edley's counsel did not immediately submit to J&J's dismissal

demand, J&J continued pressuring Mr. Edley to dismiss his case. J&J sent Mr.

Edley's lawyer a sworn affidavit from Roger Miller (then the president of J&J's

subsidiary, Windsor Minerals). The Miller affidavit copied word for word the

representations made by J&J's in-house counsel: "***No evidence*** of the presence of

asbestos in Windsor Minerals' product ***has ever been revealed*** by this testing." *Id.*

at ¶ 80 (emphasis added). Lacking the critical proof that the Industrial Talc

contained asbestos, Mr. Edley dismissed his case.

---

[4] Mr. Edley brought the lawsuit in the Superior Court of New Jersey, Middlesex Vicinage, under Docket No. L-075913-86.

At the time, neither Mr. Edley nor his attorney knew, or could have known, that the representations in Mr. Beidler's letter and Mr. Miller's affidavit were false. In fact, J&J had dozens of talc sample analysis reports documenting the presence of asbestos fibers in talc mined and milled by Windsor. J&J also had numerous memoranda and correspondence by and between its officers, scientists and other employees addressing these reports and how the company should deal with them in the face of anticipated asbestos injury litigation arising from workers exposed to Windsor's Industrial Talc. *Id.* at ¶¶ 49-61.

By the end of 1989, more than a thousand industrial talc cases were pending alleging that J&J/Windsor's Industrial Talc caused asbestos-related disease in industrially exposed workers. *Id.* at ¶ 86. In each case, J&J misleadingly asserted the false defense through its attorneys and representatives that no evidence whatsoever existed indicating that J&J/Windsor's Industrial Talc ever contained asbestos. *Id.* at ¶¶ 78-105.

In 2017, J&J finally began unveiling reports and correspondence revealing that, contrary to what it had represented to Mr. Edley and thousands of other industrial workers, J&J had known of evidence showing that J&J/Windsor's Industrial Talc contained asbestos. The *Edley* Class Action Complaint details the many instances of J&J's knowledge of, as well as its machinations to conceal this evidence. *Id.* at ¶¶ 141-147.

5

For example, beyond merely denying the existence of the asbestos-positive reports it possessed, J&J had developed testing protocols that, by its own admission, were designed to avoid detecting and reporting low levels of chrysotile or tremolite asbestos existing in J&J/Windsor's Industrial Talc. *Id.* at ¶¶ 62-77. It even tested these protocols with talc spiked with asbestos verifying that the misleading testing methods worked as J&J had intended. *Id.* at ¶ 65.

When testing nevertheless found asbestos in assay or test samples, J&J required its consultants to use misleading language in their reports to suggest that they "did not find any quantifiable amount of asbestiform minerals in any of the samples," which J&J embellished upon even further to represent the tests were negative, even though asbestos had been found. *Id.* at ¶ 75. As described in the *Edley* Complaint, when J&J's consultants failed to follow its instructions, J&J insisted that the reports be changed to use the misleading language preferred by J&J. *Id.* at ¶ 76.

The recently discovered evidence also revealed that J&J had destroyed physical evidence in its possession and control, thereby compounding the effect of its concealment. Although J&J, in the early 1970s, had accurately forecasted asbestos talc cases would be coming, and it was actually sued continuously thereafter, J&J intentionally failed to preserve the relevant evidence as the law

required, giving rise to the *Edley* Class Action Complaint's claims for intentional

spoliation. *Id.* at ¶ 106-140.

The story does not end there. Though some of the material evidence that J&J

should have (but failed) to produce has been uncovered, more apparently remains

to be uncovered. For example, shortly before this Bankruptcy Action was filed,

J&J was ordered to turnover a memo documenting a meeting between Vermont

Geology Professor Barry Doolan and J&J's in-house counsel, John

O'Shaughnessy. As set forth in that memo, Professor Doolan reviewed the original

asbestos testing file of an early J&J consultant, McCrone Associates, and

afterwards advised Mr. O'Shaughnessy that the file, in fact, contained positive test

results indicating Windsor talc contained chrysotile asbestos. *Id.* at ¶ 144. The

whereabouts of the original file remains unknown.

Given little choice but to finally admit the truth, J&J's corporate

representatives have been forced since 2017 to acknowledge that J&J's "no

evidence of asbestos" defense was false. For example, during cross-examination at

a trial in 2019, J&J corporate representative Dr. John Hopkins admitted that the

affidavit signed by Windsor's President, Roger Miller, in Louis Edley's case, was

false:

> Q. This is the President of Windsor Mineral [Roger N. Miller] in a
> lawsuit saying, no evidence of the presence of asbestos in Windsor
> Minerals' product. And he included -- I asked you, he included

everything they'd ever sold, cosmetic and industrial, has ever revealed
or been revealed by this testing. Here's the question. Was that true or
was that false?

A. On the face of it, it does not appear to be true.

***

Q. And he was under oath, wasn't he?

A. I believe so, yes.

Q. And that is -- you understand that is perjury, do you not?

A. I do.

*Id.* at ¶ 146. Dr. Hopkin's admission alone proves that J&J's "no evidence"

defense constituted a fraud, which J&J devised and employed to obtain the

dismissal of scores of cases. *Id.* at ¶ 147. This and other evidence revealing J&J's

deceptive conduct forms the basis for the *Edley* claims.

The *Edley* Complaint seeks "relief for thousands of asbestos claimants, who

previously sued and whose cases were dismissed against J&J, its wholly owned

subsidiary, Windsor Minerals, Inc. ("Windsor"), and/or any third-parties alleged to

be legally responsible for the sale of Windsor's ***industrial talc*** ("Responsible Third

Party"), for asbestos personal injury damages caused by exposure to ***industrial talc***

***products*** mined, milled, sold, and distributed prior to January 6, 1989, by Windsor

or its corporate predecessor." *Id.* at ¶ 1.

8

For avoidance of any doubt, the *Edley* Complaint does not assert any claims against the Debtor or its immediate predecessors. As set forth in the Complaint, the Edleys neither, directly or indirectly, seek:

> Any legal or equitable claim for relief or remedy relating to the manufacture or sale of Johnson's Baby Powder or Shower to Shower against or with respect to the former or current Johnson & Johnson Consumer Inc. (**"JJCI"**)(formerly known as Johnson & Johnson Baby Products Company, a New Jersey company incorporated in 1979 and wholly owned by J&J), nor against LTL Management LLC (**"LTL Mgt."**). This lawsuit is not seeking, directly or indirectly, any damages or equitable relief, for any talc-related injury claims against JJCI or LTL Mgt., including any claims relating in any way to talc or talc-containing materials that formerly were asserted against (or that could have been asserted against) the former Johnson & Johnson Consumer Inc., formerly known as Johnson & Johnson Baby Products Company ("Old JJCI") on any theory of liability (whether direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise). The claims asserted are, therefore, not Enjoined Talc Claims as the term is defined in the protective injunction and restraining orders entered in LTL Mgt.'s current Chapter 11 proceeding, as of the time of this Action's commencement.

*Id.* at ¶ 20(a). Rather, the *Edley* Class Action is to be "brought under New Jersey law solely for J&J's fraud, fraudulent concealment, and fraud on the court in defending personal injury claims arising out of the Industrial Talc Products mined, milled, sold, and distributed by its wholly owned subsidiary, Windsor, whether or not J&J was a named party in the prior Underlying Lawsuits." *Id.* at ¶ 21.

## III.    Basis for Requested Relief

### A. The Edley Class Action is not subject to the Preliminary Injunction Order or the automatic stay in this Action.

As requested by Debtor, this Court's Preliminary Injunction Order (Dkt. 1635) stays claims against the "Protected Parties" but only for "Enjoined Talc Claims."

Paragraph 3 of the Preliminary Injunction Order states:

> [T]he Court finds and declares that the commencement or continued prosecution of any ***Enjoined Talc Claims*** by any Defendant against any of the Protected Parties while the Chapter 11 Case remains pending including the actions listed in the last sentence of paragraph 2 above, would violate the automatic stay imposed by sections 362(a)(1) and 362(a)(3) of the Bankruptcy Code and therefore is prohibited.

Dkt. 1635, ¶ 3 (emphasis added). As defined in the Preliminary Injunction Order, "Enjoined Talc Claims" means:

> [A]ny talc-related claims ***against the Debtor***, including all claims relating in any way to talc or talc-containing materials that were ***asserted against (or that could have been asserted against) the former Johnson & Johnson Consumer Inc. ("Old JJCI")*** on any theory of liability (whether direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise). For the avoidance of doubt, Enjoined Talc Claims include, without limitation, all talc personal injury claims and other talc-related claims ***allocated to the Debtor from Old JJCI in the documents implementing the 2021 Corporate Restructuring***.

*Id.*, pg. 2 n.2 (emphasis added).

10

Plainly stated, the claims asserted in the *Edley* Class Action do not fall

within the definition of "Enjoined Talc Claims." They are not talc personal injury

claims. Nor are they asserted against or been allocated from Old JJCI to the

Debtor. As Debtor's Chief Legal Officer confirmed, in 1979 J&J transferred its

liabilities for cosmetic talc to the Baby Products division. Dkt. 5, ¶ 10. After

several more transactions, those liabilities apparently wound up on the balance

sheets of Old JJCI. *Id.* at ¶ 11-14. There has been no assertion that in any of those

transactions, J&J transferred to Old JJCI its or Windsor's liabilities for Industrial

Talc or J&J's liabilities resulting from its own conduct in defending against

Industrial Talc lawsuit claims. Moreover, the Edleys' claims are about J&J's

misconduct in prior litigation, not claims for asbestos injuries.

This distinction is critical as the Third Circuit recognized in *Williams v.*

*BASF Catalysts LLC*, 765 F.3d 306 (3d Cir. 2014). Much like the allegations of the

*Edley* Complaint, the *Williams* Action asserted that after the defendants there

learned that their industrial talc contained asbestos, they "pursue[d] a strategy of

denial and deceit" rather "than confront the consequences of [the] discovery." *Id.*

at 310. As part of that scheme, the defendants "collected tests and reports that

documented the presence of asbestos and "destroyed or hid them[.]" *Id.* at 310-11.

The *Williams* Action further alleged that the defendants thereafter represented that

the talc "did not contain asbestos and that no tests had ever said otherwise." *Id.* at

11

311. The Third Circuit recognized the severity of the deceit alleged in *Williams*, noting that the action for fraud and fraudulent concealment was "not itself an asbestos injury case, but rather an action about [defendants'] conduct when they confronted asbestos injury cases in state courts around the country." *Id.* Accordingly, the Third Circuit reversed the District Court's dismissal of the case and remanded it to the District Court.

The Preliminary Injunction Order should not be applied to bar the *Edley* Class Action because the claims to be asserted in *Edley* are not "Enjoined Talc Claims." They are not personal injury or cosmetic talc claims but are claims for fraud, fraudulent concealment, and fraud on the court against J&J for its conduct in defending J&J/Windsor's Industrial Talc cases using the "no evidence" of asbestos defense.

### B. The Bankruptcy Code does not provide a basis for enjoining the *Edley* Class Action's claims against J&J.

The definition of "Enjoined Talc Claims" does not include claims like those asserted in the *Edley* Class Action because the Bankruptcy Code does not provide the Court with the authority to stay the direct, non-derivative claims asserted against nondebtor J&J.

In *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012), the Supreme Court observed that the Bankruptcy Code is a

12

"comprehensive scheme" that Congress designed to "deliberately target[] specific

problems with specific solutions." *Id.* at 645 (quoting *Varity Corp. v. Howe*, 516

U.S. 489, 519 (1996)).  However, as a comprehensive scheme, the inclusion in the

Bankruptcy Code of a provision granting bankruptcy courts certain authority,

means the Code's silence reflects the opposite: a decision to not grant authority. In

the same way, the Third Circuit has recognized, under the canon of "*expressio*

*unius est exclusio alterius*," when a statute specifically enumerates some

categories, it impliedly excludes others." *United States v. Daniels*, 915 F.3d 148,

156 (3d Cir. 2019).

> Section 362(a) of the Bankruptcy Code operates as a stay of:
>
> (1) the commencement or continuation, including the issuance or
> employment of process, of a judicial, administrative, or other action or
> proceeding ***against the debtor*** that was or could have been
> commenced before the commencement of the case under this title, or
> to recover a claim against the debtor that arose before the
> commencement of the case under this title;
>
> . . .
>
> (3) any act to obtain possession of property of the estate or of property
> from estate or to exercise control over property of the estate[.]"

11 U.S.C. §§ 362(a)(1) (emphasis added).

"[T]he clear language of section 362(a)(1) stays actions only against a

'debtor.'" Dkt. 1573, pg. 8 (internal citations omitted). Therefore, with Congress

having affirmatively granted bankruptcy courts the authority to stay actions against

debtors, the Code's silence as to nondebtors should not be taken as a grant of authority, but an exclusion of such authority. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236-37 (3d Cir. 2004) (holding where the Bankruptcy Code "***provides no specific authority***," bankruptcy courts could not use Section 105 or their equitable powers to extend a channeling injunction under Section 524(g)) (emphasis added); *Purdue Pharma, L.P.*, __ B.R. __, 2021 U.S. Dist. LEXIS 242236, *189 (S.D.N.Y. 2021) (holding that provisions of shareholder release were not consistent with Section 524(e) because they permitted "the discharge of debts that are not contemplated by § 524(e)); *see also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.");

The same result obtains under Section 362(a)(3). By its terms, this provision stays only actions affecting possession or the exercise of control of the estate's property (in contrast to Section 362(a)(1), which more broadly applies to an action commenced against a "debtor"). Section 362(a)(3) permits a bankruptcy court to enjoin a non-debtor or third-party from taking an action that would directly affect the estate's property. But it does not permit a stay of an action against a nondebtor by a third-party that has no effect on the bankruptcy estate of the debtor. Here, neither J&J nor the Edleys have any recourse against the Debtor's estate for J&J's

14

direct fraudulent acts committed in the defense of Industrial Talc cases brought

against it and Windsor. The Edley Class Action is therefore not an action against

Debtor or its estate, but against nondebtor J&J.

While not provided for in the Bankruptcy Code, there is a line of cases

nonetheless holding that bankruptcy courts may properly stay proceedings against

nondebtors when there are "unusual circumstances." Dkt. 1573, pg. 9 (citing *A.H.*

*Robins Co.*, 788 F.2d 994, 1001-03 (4th Cir. 1986)). In those cases, the rationale for

extending the automatic stay to nondebtors, as the Fourth Circuit put it, rests on the

premise that when "unusual circumstances" are present to justify the grant of a stay

to a nondebtor, the refusal of an application for a stay of a claim against a

nondebtor "would defeat the very purpose and intent of the statute." *A.H. Robins*,

788 F.2d at 999.

While addressing a different issue concerning priority under the Bankruptcy

Code, the Supreme Court's recent decision in *Czyzewski v. Jevic Holding Corp.*,

137 S.Ct. 973 (2017), calls into question the "unusual circumstances" grounds for

extending Section 362(a)'s automatic stay to nondebtors. The *Czyzewski* Court

stressed that the Bankruptcy Code's protections cannot be overridden in a "rare"

case, even if doing so would carry out certain bankruptcy objectives. *Id.* at 987. In

rejecting the argument that a bankruptcy court could disregard priority if there

were "sufficient reasons," the Supreme Court aptly noted: "It is difficult to give

15

precise content to the concept 'sufficient reasons.' That fact threatens to turn a

'rare case' exception into a more general rule.'" *Id.* at 986. So, as the Court

concluded, "Courts cannot deviate from the strictures of the [Bankruptcy] Code,

even in 'rare cases.'" *Id.*

The Supreme Court in *Czyzewski*, in essence, held that Congress "did not

authorize a 'rare case' exception." *Id.* at 987. For the same reason, Congress also

did not authorize an "unusual circumstances" exception. It thus remains that even

where there may arguably be some laudable purpose for granting a stay to a

nondebtor, a bankruptcy court cannot, following *Czyzewski*, grant a stay to a

nondebtor just because some "unusual circumstance" might exist or there would be

some benefit to be gained by extending the stay. Moreover, if it were simply

enough that a third-party action against a nondebtor could have some conceivable

adverse impact on the debtor's ability to reorganize, such "unusual circumstances"

would not be the exception, but the rule. And that would fundamentally and

impermissibly "alter the balance struck by the statute," *id.* at 987 (quoting *Law v.

Siegel*, 571 U.S. 415, 427 (2014)), which allows stays only "against the debtor." 11

U.S.C. § 362(a)(1).

That said, there are no "unusual circumstances" raised by the *Edley* Class

Action that warrant application of the stay to nondebtor J&J. The *Edley* case is

founded on different legal bases than those facing the Debtor (fraud v. product

defect), and the Debtor would not be a party to, nor impacted by the claims to be asserted against the *Edley* defendants. The short of it is that any liability against the *Edley* defendants will not impact Debtor's obligations or ability to successfully reorganize.

Section 105 of the Bankruptcy Code also should not be relied on to extend automatic stays to nondebtors. Section 105, for all its powers, only operates "within the context of bankruptcy proceedings." *Joubert v. ABN Motg. Group Inc*., 411 F.3d 452, 455 (3d Cir. 2005). Indeed, "any 'power that a judge enjoys under § 105 must derive ultimately from some other provision of the Bankruptcy Code.'" *In re Purdue Pharma*, 2021 U.S. Dist. LEXIS at *189 (quoting D*eutsche Bank AG, London Branch v. Metromedia Fibert Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005)). Section 105 does not "create substantive rights that would otherwise be unavailable under the code." *Joubert*, 411 F.3d at 455 (quoting *In re Morristown & Erie Railroad Co.*, 85 F.2d 98 (3d Cir. 1990)). Yet the use of Section 105 to grant stays to nondebtors does precisely that, it creates a substantive right for nondebtors not authorized by Congress.

As the Third Circuit has cautioned, Section 105 cannot be relied on "to achieve a result inconsistent with" another provision of the Bankruptcy Code. *Combustion Eng'g*, 391 F.3d at 236. In *Combustion Engineering*, the bankruptcy court, having recognized the "limitations imposed by §524(g)," "relied upon its

equitable powers under § 105(a) to expand the scope of [a] channeling injunction."
*Id.* at 235. But recognizing that Section 105 does not "constitute a roving
commission to do equity[,]" the Third Circuit reversed, finding the bankruptcy
court's use of Section 105 inappropriate because "§ 524(g) provides ***no specific***
***authority*** to extend a channeling injunction to include third-party actions against
non-debtors where the liability alleged is not derivative of the debtor." *Id.* at 236
(emphasis added).

 The use of Section 105 in this manner also runs contrary to the principle that
specific statutory provisions govern the general, as expressed by the Supreme
Court in *RadLAX Gateway Hotel*, where the Court recognized that the canons of
statutory construction require the specific to govern the general. *RadLAX Gateway
Hotel,* 566 U.S. at 645. As the Court acknowledged, the perhaps most frequently
applied general/specific canon involves a general permission or prohibition that is
contradicted by a specific prohibition or permission. *Id.* In such cases, the "specific
provision is construed as an exception to the general one." *Id.* (citing *Morton v.
Mancari*, 417 U.S. 535, 550-51 (1974)).

 As in *RadLAX Gateway Hotel,* there are two Bankruptcy Code provisions at
issue here, one of which is a more general authorization (§ 105) and the other
(§ 362), a more specific one. The more general provision, Section 105, authorizes
this Court to "issue any order, process, or judgment that is necessary or appropriate

to carry out the provisions of this title." 11 U.S.C. § 105(a). That provision, however, does not specify when the court may exercise such authority. In contrast, the more specific provision here, Section 362(a), does specify when the court can grant a stay. And as that provision makes clear, Congress only authorized bankruptcy courts to issue stays against debtors. *See* Dkt. 1573, pg. 8 (quoting *McCartney*, 106 F.3d at 509). Under the canons of statutory construction, as recognized by the Supreme Court in *RadLAX Gateway Hotel*, Section 105 therefore cannot be used to enlarge the reach of Section 362(a) to nondebtors for to do so, would violate the maxim that the specific should limit the general. In the end, "[t]he terms of the specific authorization must be complied with." *RadLAX Gateway Hotel*, 566 U.S. at 645. And for that reason, Section 105 cannot be used to circumvent the limitations imposed by the more specific authorization, Section 362(a)(1).

Nor should a court's inherent authority and equitable powers be used to expand the authority granted to the bankruptcy court under Section 362(a). In *Norwest Bank Worthington v. Ahlers*, the Supreme Court held that the "traditional equitable power" of a bankruptcy court "can only be exercised within the confines of the Bankruptcy Code. 485 U.S. 197, 206 (1988). So, too, in *Law v. Siegel*, the Supreme Court reasoned that a bankruptcy court "may not exercise its authority to 'carry out' the provisions of the Code" by taking an action inconsistent with its

other provisions. 571 U.S. 415, 425 (2014). Echoing the discussion in *RadLAX Gateway Hotel* about the Bankruptcy Code being "comprehensive," the *Law* Court explained: "The Code's meticulous—not to say mind-numbingly detailed— enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions." *Id.* at 424. Therefore, with the Bankruptcy Code authorizing automatic stays against only debtors, a bankruptcy court's inherent authority and equitable powers cannot be used to afford relief to nondebtors not expressly provided for under the Bankruptcy Code.

The Third Circuit has recognized the limits of a bankruptcy court's exercise of jurisdiction over claims like *Edley* that are not derivative and have no relationship to the Debtor. In the context of examining the right to extend a channeling injunction to the nondebtor under Section 524(g), the Third Circuit in *In Re Combustion Engineering* recognized that while affording nondebtor affiliated companies the right to avoid unrelated civil lawsuits might facilitate the debtor's reorganization, it would also impermissibly allow the nondebtors "to cleanse themselves of non-derivative asbestos liability without enduring the rigors of bankruptcy." *Combustion Eng'g*, 391 F.3d at 237. The Third Circuit further noted that "[a]lthough some asbestos claimants here may benefit from an augmented fund, equity does not permit nondebtor affiliated entities to secure the benefits of Chapter 11 in contravention of the plain language" of the Bankruptcy Code. *Id.*

Accordingly, the Third Circuit found the bankruptcy court's jurisdiction lacking over independent, non-derivative claims against two affiliated companies of the debtor. *Id.*

In reaching that conclusion, the Third Circuit found that "the asbestos-related personal injury claims asserted against Combustion Engineering, Basic and Lummus arise from ***different products***, involved ***different asbestos-containing materials***, and were sold to ***different markets***." *Id.* at 231 (emphasis added). As such, the Third Circuit recognized that "[t]hese ***distinct products and customers*** do not establish a 'unity of interest' between [the debtor] and the nondebtors." *Id.* (emphasis added). In finding no "related to" jurisdiction, the Third Circuit also rejected the argument that the use of "common production sites" shared by the debtor and nondebtors could result in indemnification claims creating a unity of interest. *Id.* On this point, the Third Circuit explained that any indemnification claims "would require the intervention of another lawsuit to affect the bankruptcy estate, and thus cannot provide a basis for 'related to' jurisdiction." *Id.*

As in *Combustion Engineering*, different products and different markets are at issue here. But here, there is an additional factor that makes jurisdiction over the direct, non-derivative claims against J&J and the other nondebtor John/Jane Doe defendants all the more inappropriate: this case is one for fraud, fraudulent concealment, and fraud on the courts for J&J's misleading conduct in defending

21

Industrial Talc cases, not product liability claims. Accordingly, the Edleys

respectfully submit that Section 362(a)'s automatic stay does not protect

nondebtors from direct, non-derivative litigation and should not bar the

commencement of the *Edley* Class Action against nondebtor J&J and other

nondebtor John/Jane Doe defendants.

## C. If the automatic stay applies to the *Edley* Class Action, cause exists to grant relief under Bankruptcy Code Section 362(d)(1).

The claims to be asserted against nondebtor J&J and other nondebtor

John/Jane Doe defendants in the *Edley* Class Action are direct and not derivative of

any claims against Debtor or Old JJCI. Therefore, if the Court determines that the

*Edley* Class Action is subject to the automatic stay, "cause" exists to lift the stay

under Bankruptcy Code Section 362(d)(1).

The Bankruptcy Code does not define "cause." 11 U. S. C. § 362(d)(1). The

Third Circuit has nonetheless recognized that "cause" is a broad and flexible

concept that must be determined on a case-by-case basis. *In re Wilson*, 116 F.3d

87, 90 (3d Cir. 1997); *In re The Score Bd., Inc.*, 238 B.R. 585, 593 (D.N.J. 1999).

When deciding whether cause exists to lift a stay, this Court has conducted a

balancing test, in which the interests of the Debtor's estate are weighed against the

hardships that will be incurred by the movant. *In re Donington, Karcher, Salmond,*

*Ronan & Rainone, P.A.*, 194 B.R. 750, 751 (D.N.J. 1996).

### a. The Edleys and the many others similarly defrauded by J&J will suffer significant hardship if the stay is not lifted.

In a case very similar to the one the Edleys seek to file, the Third Circuit recognized that, under New Jersey law, an action for fraudulent concealment is separate and distinct from the underlying cause of action targeted by the fraud. *Williams,* 765 F.3d at 315. There, as here, the defendants were accused of concealing evidence "about the presence of asbestos in their products."[5] *Id.* at 323. Addressing the significance of concealing such evidence, the Third Circuit rhetorically asked: "What could be more important to a claim that talc caused asbestos disease than proof that the talc contained asbestos?" *Id.* Answering that question, the Third Circuit responded that the plaintiffs' cases against "[Defendants] would have been much stronger if [they] have evidence that [its] products contained asbestos." *Id.* As in *Williams*, Mr. Edley would have had a much stronger case had J&J not concealed evidence of asbestos in the J&J/Windsor's Industrial Talc; without such evidence, he had no case.

Having had to voluntarily dismiss their underlying asbestos cases for no or, at best, nominal payment or suffer the dismissal of their cases by court order due to the absence of evidence of asbestos in J&J/Windsor's Industrial Talc, the members

---

[5] The product at issue in the *Williams* matter was talc produced from a mine in Vermont once owned directly by J&J and subsequently by its subsidiary Windsor Minerals.

of the putative *Edley* Class Action have been victimized once. To now join them

into a bankruptcy action over a different product and product-line, a different

harm, and a different cause of action against a tortfeasor that did not, itself, seek

the protections of bankruptcy, would victimize the members of the putative *Edley*

Class Action again. *See Combustion Eng'g*, 391 F.3d at 231.

In the end, plaintiffs earnestly believe there is no good reason for staying the

*Edley* Class Action Complaint against J&J and burdening this Court with the task

of dealing with charges against nondebtor J&J, which, by any measure, are not

"Enjoined Talc Claims." *Cf. In re Rexene Prods. Co.*, 141 B.R. 574, 577 (Bankr.

D. Del. 1992) (modifying automatic stay to allow prosecution of a class action

against debtor where the claim would have to be resolved before plan

confirmation); *see also Purdue Pharma*, 2021 U.S. Dist. LEXIS at 133 (finding

that Bankruptcy Code does not authorize nondebtor, nonconsensual releases).

Here, the harm to the Edleys and the putative Class Members is significant,

and further delay would especially exacerbate the prejudice to these putative Class

Members considering that, in many instances, they were denied justice decades

ago.

**b. In addition, the bankruptcy process should not be used to delay the public interest in holding J&J accountable for its fraud upon the courts particularly as the *Edley* Class Action will not impact Debtor, its estate or creditors.**

The Debtor assumed Old JJCI's liabilities for cosmetic talc and not for the Industrial Talc at issue in the *Edley* Class Action. This is the result of a decision by J&J (several, in fact) when structuring its affairs to separate its cosmetic and industrial talc divisions and subsidiaries. J&J made the deliberate decision to keep separate the liabilities and obligations of Windsor Minerals and old JJCI. At no time, did Old JJCI assume any liabilities relating to Industrial Talc. There is simply is no basis to conclude that J&J took an additional, significant step of assigning to Debtor J&J's liability for its own corporate misconduct in defending Industrial Talc cases.

While J&J may want the benefit of the automatic stay for its direct and non-derivative liability, its desire is irrelevant. What matters is whether Debtor would benefit. And here, stopping the Edleys from filing suit would not affect or benefit Debtor, as the claims the Edleys seek to bring solely concern: (1) J&J's fraudulent conduct that caused the wrongful dismissal of cases involving exposure to J&J/Windsor Mineral's Industrial Talc; and (2) J&J's own conduct in fraudulently defending these Industrial Talc personal injury actions. Because Debtor has not assumed J&J's liability relating to Industrial Talc or J&J's misdeeds in defending Industrial Talc lawsuits involving a completely different subsidiary separate and

25

apart from Old JJCI, the *Edley* Class Action will not impact Debtor's reorganization. Nor would it lessen J&J's ability to satisfy its obligation to provide funding to Debtor for the matters at issue in this bankruptcy proceeding or assist in developing a Chapter 11 Plan. J&J's funding obligation is tied to Debtor's liabilities resulting from cosmetic talc and the 2021 Funding Agreement guarantees J&J's obligation to the "full value of JJCI," which Debtor's Chief Legal Office has valued at $60 billion (which while considerable, pales in comparison to J&J and its $400 billion valuation).[6]

Conversely, extending the automatic stay so that the Edleys cannot file and proceed with the contemplated fraudulent concealment Class Action would impinge upon Debtor's reorganization efforts. With the 2021 Funding Agreement limited to the value of JJCI, keeping the *Edley* Class Action in the bankruptcy proceeding could result in an already too small fund being divided even further. So, while J&J might benefit from staying the filing of the *Edley* Class Action, it would be alone in this regard.

---

[6] *See* Transcript of Proceedings dated Nov. 4, 2021, T2250:10-23, attached as Exhibit 14 to the Rochester Declaration. As of March 8, 2022, MarketWatch reports that J&J is valued at $452.79 billion. https://www.marketwatch.com/investing/stock/jnj?mod=mw_quote_tab (last visited March 8, 2022).

Any argument for sweeping up the *Edley* Class Action into the present bankruptcy action is in the end fatally undermined by the lack of any identity of interests between the *Edley* claims for fraud and fraudulent concealment relating to Industrial Talc cases and Debtor's liabilities arising from injuries allegedly caused by cosmetic talc. The affidavit J&J by Gene M. Williams, Esq., an attorney for J&J and Old JJCI, puts to bed any notion that there is significant corporate interconnectedness between litigation over Industrial Talc and cosmetic talc to justify enjoining the *Edley* Class Action from proceeding. He avers on behalf of J&J in a prior matter, that J&J recognizes "industrial talc cases" as being distinct from the "Johnson's Baby Powder cases." Exhibit B, ¶ 8. Mr. Williams further explains in his affidavit that "industrial talc is different from the cosmetic talc used in Johnson's Baby Powder or Shower to Shower, including that industrial talc was a different grade of talc which was processed and handled in a manner different from cosmetic talc." *Id.*, ¶ 9.

Ultimately, J&J could have sought bankruptcy protection. It did not. Only Debtor LTL Management has, and while it has sought (and obtained) a Preliminary Injunction barring the commencement of "Enjoined Talc Claims," neither it nor J&J have sought a stay of claims such as those in the *Edley* Class Action. That decision confirms that the Debtor's claims (which again, arise from cosmetic talc) bear no relation to claims against J&J over Industrial Talc, much less the fraud,

27

fraudulent concealment, and fraud on the court claims relating to J&J's actions in

defending Industrial Talc cases involving a completely different subsidiary

corporation: Windsor Minerals, Inc. That liability is direct and nonderivative of

any claims against Debtor. Indeed, under New Jersey law, they are separate causes

of action for fraud and fraudulent concealment distinct from the underlying

dismissed asbestos claims. *See Williams,* 765 F.3d at 315. Therefore, allowing the

Edleys to bring the proposed Class Action would not impact Debtor's

reorganization.

In balancing these interests, this Court should find that the harm to the

putative *Edley* Class Members by staying their litigation indefinitely while this

bankruptcy action plays out far outweighs any argued benefit that the Debtor might

obtain from staying the case during the pendency of this Bankruptcy Action. In

fact, there is no benefit to be gained by the Debtor because the Edleys and the

members of the putative Class are not creditors of the Debtor and J&J has

guaranteed funding to Debtor. J&J may find comfort from delaying the inevitable

results of the *Edley* Complaint going forward—but that is of no moment. J&J has

not sought the protections of bankruptcy. Debtor and its parent companies,

therefore, should not be able to obtain a stay of the *Edley* Class Action, which is

intended to bring justice to all those whose personal injury claims were dismissed

because of J&J's fraudulent concealment scheme and to hold J&J and other

nondebtor John/Jane Doe defendants accountable for fraud on the judicial system.

## IV.   Conclusion

For all these reasons, the Court should (1) clarify that the Preliminary

Injunction Order does not stay the commencement of the *Edley* Class Action; or in

the alternative, (2) lift the automatic stay so that the Edleys may bring the direct,

non-derivative claims against Johnson & Johnson and other nondebtor John/Jane

Doe defendants for fraud, fraudulent concealment, and fraud on the courts.

COHEN, PLACITELLA & ROTH PC


____/S/ Christopher M. Placitella_____
Christopher M. Placitella (ID 27781981)
Michael Coren (ID 24871979)
Dennis M. Geier (ID 035272006)
Eric S. Pasternack (ID 015132011)
Jared M. Placitella (ID 068272013)
Justin I. Placitella (ID 105812014)
(732) 747-9003
cplacitella@cprlaw.com
mcoren@cprlaw.com
dgeier@cprlaw.com
epasternack@cprlaw.com
jmplacitella@cprlaw.com
justinplacitella@cprlaw.com


Dated: March 14, 2022

**Cohen, Placitella & Roth, P.C.**
Christopher M. Placitella, Esq. (ID 27781981)
127 Maple Avenue
Red Bank, New Jersey 07701
(732) 747-9003
cplacitella@cprlaw.com

(Additional Counsel are identified below)

| | |
|---|---|
| **DANIEL EDLEY and ROGER EDLEY** individually, as personal representatives of the Estate of Laszlo "Louis" Edley, deceased on behalf of said Estate, and as representative of others similarly situated,<br><br> Plaintiffs,<br><br>vs.<br><br>**JOHNSON & JOHNSON,**<br><br>**John/Jane Doe Attorneys 1-1000** are the fictitious names of lawyers and law firms, legal professional corporations, legal professional partnerships, or other professional business entities or organizations, or their agents, employees, or servants, acting within the course and scope of their employment, or other individuals whose identities are not presently known, and who may have perpetrated, and/or are responsible for, or are the alter egos of, or are otherwise responsible for the conduct or liability of those who perpetrated, aided and abetted, or acted in concert with, in furtherance of, or in conjunction with the others in the conduct, activities, acts, and omissions set forth herein, and<br><br>**John/Jane Doe J&J Corporate Members 1-1000,** are the fictitious names of individuals who are fictitiously named defendants that are or were Directors, officers and/or employees of Johnson & Johnson whose identities are not presently known, and who may have perpetrated, aided and abetted, or acted in concert with, in furtherance of, or in conjunction with, the others in the conduct, activities, acts, and omissions set forth herein,<br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY<br><br>LAW DIVISION<br><br>MIDDLESEX COUNTY<br><br><br>Civil Action No.<br><br><br>CLASS ACTION COMPLAINT AND JURY DEMAND |

1

**"All of the talc mined by Windsor Minerals Inc., whether ultimately sold to industrial users or used in Johnson's Baby Powder, is sampled and tested for the presence of asbestos and no evidence of the presence of asbestos in any Windsor Minerals product has ever been revealed."**

—__*Exhibit 1*__, *August 27, 1986, Letter from John Beidler, Esq., Office of Johnson & Johnson's General Counsel, to Ronald Grayzel, Esq., attorney for Louis Edley, which was repeated verbatim in an affidavit offered in support of the dismissal of the Edley case, dated July 13, 1987, signed by Roger N. Miller, President of Windsor Minerals, Inc. (See __Exhibit 34__).*

**"Q.    This is the President of Windsor Mineral [Roger N. Miller] in a lawsuit saying, no evidence of the presence of asbestos in Windsor Minerals' product.**
**And he included -- I asked you, he included everything they'd ever sold, cosmetic and industrial, has ever revealed or been revealed by this testing.**
**Here's the question. Was that true or was that false?**
**A.    On the face of it, it does not appear to be true.**
                                    **\*\*\*\***
**Q.    And he was under oath, wasn't he?**
**A.    I believe so, yes.**
**Q.    And that is -- you understand that is perjury, do you not?**
**A.    I do."**

—__*Exhibit 2*__, *Testimony of Dr. John Hopkins, Ph.D., (Vol. 1 of 2), Johnson & Johnson Corporate Representative, 7/23/2019 __Barden__ Trial Transcript, 192:24-193:7; 194:24-195:3.*

**"What could be more important to a claim that talc caused asbestos disease than proof that the talc contained asbestos?"**

—*Williams v. BASF Catalysts LLC*, 765 F.3d 306, 322 (3d Cir. 2014) (Fuentes, J.).

## COMPLAINT

Plaintiffs, Daniel Edley and Roger Edley, bring this suit in their individual capacity, as personal representatives of the Estate of Laszlo ("Louis") Edley, deceased, individually and on behalf of all other individuals similarly situated, for their claims and causes of action against Johnson & Johnson (**"J&J"**) and the fictitious defendants referenced herein, based upon personal knowledge as to Plaintiffs' own family members' respective actions and, as to all other

matters, upon information and belief based upon the investigation of counsel,[1] and state and

allege against Defendant, and in the alternative the following:

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................... 4

II.   PARTIES ............................................................................................................... 11

   A.   Plaintiffs............................................................................................................ 11

   B.   Defendant Johnson & Johnson.......................................................................... 12

   C.   John/Jane Doe Defendants ................................................................................ 15

III. VENUE AND JURISDICTION ............................................................................. 16

IV.  FACTS COMMON TO CLASS CERTIFICATION AND ALL COUNTS ....................... 16

   A.   By the early 1970s, J&J knew of the presence of asbestos in Windsor Minerals talc ..... 16

   B.   J&J created and utilized testing protocols designed to prevent the detection of asbestos present in samples and required certain words to be employed in reporting results to create the false impression that there was no asbestos in J&J's talc........................................................ 22

   C.   J&J made material misrepresentations to courts and litigants for more than 40 years.... 27

      1.   *Edley v. Windsor Minerals Inc., et al.*, No. MID-L-075913-86 (N.J. Law Div.). ........ 27

      2.   Thousands of fraudulent dismissals followed in the 1980s and 1990s. ....................... 31

      3.   *Durham v. Metropolitan Life Ins. Co.*, No. 05C-07-136 ASB (Del. Sup. Ct. New Castle Cnty.) ................................................................................................................ 32

      4.   *Lopez v. J&J*, (2007) .......................................................................... 33

   D.   The same J&J misrepresentations were made to every plaintiff....................................... 34

   E.   J&J's destruction and concealment of relevant evidence. ............................................... 35

      1.   J&J's failure to preserve talc samples and testing documentation and output. ............ 36

      2.   J&J's failure to preserve litigation case materials and records. .................................... 40

---

[1] The investigation of Plaintiffs' counsel, Cohen, Placitella & Roth, P.C. (**"CPR"**), includes the discovery taken in the litigation of talc cases by members of CPR and by other claimants' counsel, in which counsel were fortunate to have begun unearthing the misconduct of Johnson & Johnson, its subsidiaries and confederates in previous waves of asbestos litigation. This includes the investigation and discovery conducted in asbestos civil actions conducted before the Superior Court of New Jersey, Middlesex Vicinage's Asbestos Program. Such lawsuits addressed the existence of asbestos in talc sold for cosmetic/personal application as well as that sold and distributed for industrial and manufacturing use (hereinafter as **"Industrial Talc"** or **"Industrial Talc Products"**). This matter, as explained herein, only involves **"Underlying Lawsuits"** that asserted claims based upon exposure to Industrial Talc Products.

3.   J&J's failure to preserve its toxicology files on talc. ................................................... 41

4.   J&J's failure to preserve William Ashton's materials and records. .............................. 41

5.   J&J's failure to preserve McCrone Associates' materials and records. ........................ 41

F.   Recent discovery in contemporary talc litigation has uncovered thousands of documents which reveal that the exculpatory statements that there was no evidence of asbestos in J&J/Windsor's Industrial Talc Products J&J routinely made to courts and asbestos claimants were materially false and misleading. ..................................................................................... 42

G.   J&J's fraudulent concealment and spoliation prevented Plaintiffs, Plaintiffs' decedent, and Class Members from discovering J&J's fraudulent activity despite the exercise of diligence, thereby warranting the tolling of any applicable statute of limitations. ................... 44

V. CLASS ACTION ALLEGATIONS ........................................................................................ 46

VI. CAUSES OF ACTION ......................................................................................................... 54

COUNT I: FRAUDULENT CONCEALMENT AND SPOLIATION ................................... 54

COUNT II: FRAUD AND DECEIT .............................................................................. 59

COUNT III: FRAUD UPON COURTS ................................................................................ 62

VIII. DEMANDS FOR RELIEF63

VIII. JURY DEMAND .................................................................................................................. 65

# I.    INTRODUCTION

1. This class action seeks declaratory, equitable, and legal remedies and relief for thousands of asbestos claimants, who previously sued and whose cases were dismissed against J&J, its wholly owned subsidiary, Windsor Minerals, Inc. (**"Windsor"**), and/or any third-parties alleged to be legally responsible for Windsor's industrial talc (**"Responsible Third Party"**), for asbestos personal injury damages caused by exposure to industrial talc products mined, milled, sold, and distributed prior to January 6, 1989, by Windsor or its corporate predecessor. (Such talc ore and resulting talc products involved in this matter and the class claims being made herein as **"J&J/Windsor Industrial Talc"**).

2.       This Action is not an asbestos injury case and does not seek to revive claims of class members whose cases or claims relating to J&J/Windsor Industrial Talc were wrongfully dismissed. Rather, it is an action about J&J's misconduct and fraud upon litigants

4

and courts while defending asbestos personal injury cases involving Windsor Minerals Industrial

Talc in state and federal courts around the country. *See Williams v. BASF Catalysts LLC*, 754

F.3d 306, 311 (3d Cir. 2014).

3.  Thousands of cases were wrongfully dismissed, because J&J executives and

representatives, including its in-house attorneys, falsely represented to courts and litigants that no

evidence ever existed indicating that J&J/Windsor Industrial Talc contained asbestos. Accordingly,

this Action seek redress for J&J's fraudulent concealment, spoliation, and fraud as described in this

Complaint, which are independent torts under New Jersey law. *Id*. at 315.

4.  The representative Plaintiffs' deceased family member and all members of the putative

Class filed such personal injury lawsuits seeking damages based upon exposure to J&J/Windsor

Industrial Talc (**"Underlying Lawsuits"**). Each, however, was eventually forced to either: a)

voluntarily dismiss the Underlying Lawsuit (sometimes under threat of frivolous litigation sanctions)

while receiving no, or, at best, nominal consideration, or, b) alternatively, suffer an involuntary

dismissal of the suit related to J&J/Windsor Industrial Talc when he/she could not proffer admissible

evidence of asbestos in J&J/Windsor Industrial Talc.

5.  The inability to provide such evidence was not for a want of investigation or discovery

efforts on the claimants' lawyers' part. Nor was it the result of unassailable scientific or physical fact

that talc from Windsor's mines do not contain asbestos.[2] Rather, the dismissals of the Underlying

Lawsuits were the result of a concerted, systematic, and multiple decades-long scheme of fraud,

---

[2] The talc from Windsor's mines have been found to contain asbestos as described herein. *See* §IV.(A).

spoliation, and fraudulent concealment of evidence by J&J regarding the existence of asbestos in J&J/Windsor's Industrial Talc.

6.   The circumstances giving rise to this case began in or about the early 1970s when multiple sources, inside and outside of J&J, repeatedly advised J&J that the talc sold by its wholly owned subsidiary, Windsor Minerals, Inc., contained asbestos.

7.   During this time, Louis Edley unwittingly breathed in asbestos dust while working with and around J&J/Windsor Industrial Talc on a daily basis at Bird & Son in Perth Amboy, New Jersey.

8.   Rather than warn Louis Edley and tens of thousands of others like him, J&J went to great lengths to conceal the fact that it had been repeatedly advised that its talc contained asbestos.

9.   The plan to conceal evidence included editing test results and adopting testing methods designed to mask the presence of asbestos in samples conducted by and for J&J. Over time, reports began to appear in the press that talc often contained asbestos.

10.   Eventually, workers began to file lawsuits against J&J and Windsor alleging that they developed asbestos-related diseases, including cancer, because of their work with and around J&J/Windsor Industrial Talc.

11.   Instead of defending these cases on the merits, J&J routinely, systematically, and falsely represented to litigants, courts, and the public that there was no evidence whatsoever that its talc ever contained any amount of asbestos.

12.   In 1986, Louis Edley commenced a personal injury lawsuit in the Superior Court of New Jersey, Law Division, Middlesex Vicinage, against J&J's subsidiary, Windsor Minerals, Inc., under the caption *Louis Edley v. Windsor Minerals, Inc.*, et al., Docket No. MID-L-75913-86.

The complaint alleged that Mr. Edley developed asbestosis because of his work with and around J&J/Windsor's Industrial Talc while working at Bird & Son's factory.

13.     As set forth in more detail below, J&J threatened Edley and his lawyer with monetary sanctions if they refused to consent to dismiss his case against J&J's subsidiary, Windsor Minerals, Inc. In so doing, J&J's in-house counsel, and, the President of Windsor Minerals, both represented to Edley's attorney that there was no evidence whatsoever that there was ever any amount of asbestos in the J&J's talc. Edley eventually relented and voluntarily dismissed his case against Windsor Minerals without receiving any compensation from J&J or Windsor.

14.     The dismissal of Louis Edley's case was not unusual. To the contrary, it is one of thousands of J&J/Windsor Industrial Talc cases that were filed and dismissed over nearly 50 years because of a deception which J&J and its attorneys, acting on its direction and behest, wrought on plaintiffs, their lawyers, and presiding courts across the nation about the presence of asbestos in J&J/Windsor's Industrial Talc, all with the intent and design to obtain or force the dismissal of all asbestos claims filed against J&J and Windsor.

15.     J&J carried out this deception in a universal plan to defraud plaintiffs and the courts through at least four (4) principal means:

(a) In violation of rules of the court and the law, J&J falsely claimed in discovery responses, sworn testimony, court filings, and other statements that there was no evidence, including any test results, reporting the presence of asbestos in its talc or talc products;

(b) J&J hid, destroyed, or discarded those tests, which in fact, showed the presence of asbestos in its talc in violation of its duty to preserve evidence and to turn over such evidence to plaintiffs and the courts;

7

(c) J&J devised and employed testing methods with the specific purpose of producing results

incapable of detecting the presence of asbestos in talc samples from Windsor's mines,

including detecting it in samples that were, in fact, known by J&J to contain asbestos;"

and

(d) J&J required or induced outside assay laboratories to use J&J's insensitive testing

methods and thereafter use in their reports prescribed, deceptive language, in order to

create and lead to the false conclusion that the Windsor talc did not contain any asbestos,

even when asbestos had, in fact, been found in the samples.

16.    At all times material to this lawsuit, the integrity of the judicial system is founded

upon the bedrock principle that the truth be spoken, evidence not altered or concealed, and the rules

of court, including the discovery and disclosure rules, be obeyed and adhered to by all litigants and

their counsel.

17.    As a result of J&J's misconduct, including its disregard of the rules of evidence

and procedure, the duty of candor to adversaries and courts, and the obligations to preserve and not

alter evidence, thousands of industrial workers and presiding courts were deprived of essential

evidence needed to establish and adjudicate asbestos injury claims. Consequently, thousands of

asbestos claims and cases against J&J and its subsidiary company, Windsor Minerals, Inc., or

alleged Responsible Third Parties were dismissed, voluntarily or by court order, without full and fair

compensation being paid to the asbestos injury claimants.

18.    After the dismissal of Mr. Edley's case and thousands of other Industrial Talc

asbestos exposure suits against J&J, Windsor, and/or alleged Responsible Third Parties, a trove of

evidence was uncovered in litigation over injuries alleged to have been caused by exposure to

asbestos in J&J's talc products that exposed the lies in J&J's "no evidence of asbestos in our talc"

defense. This evidence includes:

(a) Dozens of reports on J&J's talc-containing products that showed the presence of asbestos

and the withholding of such information from litigants, courts, and the public;

(b) Internal J&J communications sharing the asbestos positive testing results, thereby

proving knowledge of asbestos in its industrial talc products at the highest managerial

levels within J&J; and

(c) Internal J&J communications regarding the development and implementation of a

strategy to publicly discredit independent reports and studies showing the presence of

asbestos in J&J's talc.

19.    Accordingly, this Action seeks to establish the existence, degree, duration,

targets, victims, and effects of J&J's obstruction of justice and fraud upon the courts, and thereupon,

obtain class-wide declaratory and equitable relief addressing the resulting injuries to the judicial

process and corresponding abridgment of the economic, property, and personal rights of the

members of the Class (**"Class Members"**) defined herein, including:

(a) A declaratory judgment that a fraud and/or fraudulent concealment and spoliation of

material evidence relating to the existence of asbestos in J&J/Windsor's talc has been

committed by J&J to the detriment of the Class Members;

(b) A determination of J&J's liability for compensatory and punitive damages to Plaintiffs

and the Members of the Class relating to the fraud, fraudulent concealment, and

spoliation of evidence relevant and material to establishing the dismissed J&J/Windsor

Industrial Talc asbestos injury claims;

(c) A declaration, injunction, or decree imposing a constructive trust upon J&J's property and requiring J&J to render an accounting to the Court of all fees, revenues, costs, insurance proceeds, and expense savings relating to Plaintiffs' and the Class Members' dismissed asbestos injury claims;

(d) A determination and declaration of J&J's liability for disgorgement of revenues, profits, and money unjustly earned, saved, retained, or received from the commission of the frauds upon the courts, Plaintiffs, and Members of the Class and/or the commission of proscribed activities described below, together with a determination and decree on the disposition and distribution of such disgorgement;

(e) A determination and declaration of the need for and ordering execution of a pending action notice program paid for by J&J, with such notice informing Class Members or their representatives of: (1) the pendency of this Action, (2) J&J's alleged misconduct, and (3) their rights against J&J;

(f) Such other and further relief in favor of the Plaintiffs and the putative Class as may be available and just.

20.      For avoidance of any misunderstanding or doubt, the present lawsuit is *not* asserting, directly nor indirectly:

(a) Any legal or equitable claim for relief or remedy relating to the manufacture or sale of Johnson's Baby Powder or Shower to Shower products against or with respect to the former or current Johnson & Johnson Consumer Inc. (**"JJCI"**) (formerly known as Johnson & Johnson Baby Products Company, a New Jersey company incorporated in 1979 and wholly owned by J&J), nor against LTL Management, LLC (**"LTL Mgt."**).

10

This lawsuit is not seeking, directly or indirectly, any damages or equitable relief, for any talc-related injury claims against JJCI or LTL Mgt., including any claims relating in any way to talc or talc-containing materials that formerly were asserted against (or that could have been asserted against) the former Johnson & Johnson Consumer Inc., formerly known as Johnson & Johnson Baby Products Company (**"Old JJCI"**), on any theory of liability (whether direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise). The claims asserted are, therefore, not Enjoined Talc Claims as the term is defined in the protective injunction and restraining orders entered in LTL Mgt.'s current Chapter 11 proceeding, as of the time of this Action's commencement.

(b) Any legal or equitable claim for relief or remedy against the former or current Cyprus Mines Corporation (**"Cyprus"**), or, Imerys Talc America (**"Imerys"**). This lawsuit is also not seeking, directly or indirectly, any damages, equitable relief, or declaratory judgment against Cyprus or Imerys.

21.     Rather, the claims in this case are brought under New Jersey law solely for J&J's fraud, direct spoliation, and fraudulent concealment in defending personal injury claims arising out of the Industrial Talc Products mined, milled, sold, and distributed by its wholly owned subsidiary, Windsor, whether or not J&J was a named party in the prior Underlying Lawsuits.

## II.     PARTIES

### A.     Plaintiffs

22.     Plaintiffs, Daniel Edley and Roger Edley (collectively as **"Edley"**), are citizens of the State of New Jersey, with Daniel Edley residing at 191 Route 9 South, Unit 12, Englishtown, New Jersey 07726 and Roger Edley residing at 482 Brookside Avenue, Laurence Harbor, New

Jersey 08879. At all times relevant herein, they are the sons of the late Laszlo "Louis" Edley, who died on July 27, 1994. They are also the personal representatives of Mr. Edley's Estate.

23.     Plaintiffs bring this suit in their individual capacity, as personal representatives of the Estate of Louis Edley, deceased, on behalf of said Estate, and as Class representatives of a Class of others similarly situated as defined below.

24.     Plaintiffs' decedent, Louis Edley, filed a lawsuit against Windsor claiming that he developed an asbestos disease as result of exposure to J&J/Windsor's Industrial Talc described more fully below at §IV.C.1.

25.     Due to J&J's fraudulent defense scheme, as it was practiced upon Plaintiffs' decedent, Louis Edley, and his lawyers, their father voluntarily dismissed his Underlying Lawsuit against Windsor without compensation by stipulation of dismissal dated July 23, 1987, and, filed on August 17, 1987.

26.     Plaintiffs' decedent, Mr. Edley, while alive, did not know nor suspect that he had been a victim of the Defendants' fraudulent defense scheme described herein.

**B.     Defendant Johnson & Johnson**

27.     Johnson & Johnson ("**J&J**") is a New Jersey corporation formed in 1894. Today, J&J is a multi-national, multi-billion-dollar corporation with its principal executive offices located in New Brunswick, New Jersey.

28.     In 1965, J&J decided it wanted complete control of the source of talc for its products and decided to own and operate its own talc mines.

29.     In 1965, J&J acquired all of the assets of Eastern Magnesia Talc Co., Inc. ("**EMTCI**"), a Vermont corporation, including its talc mines, talc mills, and related facilities located

in northern and southern Vermont. Since at least 1924, EMTCI and its predecessors had been in the business of mining and processing talc ore into talc products, which were sold for personal cosmetic and industrial uses.

30.　　In acquiring EMTCI in 1965, J&J agreed to pay, indemnify, and hold harmless the former EMTCI for all debts, obligations, contracts, and civil liabilities as they existed on the Closing Date of any kind, character, or description whether accrued, absolute, contingent, or otherwise, other than certain described exceptions not relevant to this Action.

31.　　After the purchase of EMTCI, J&J's Vermont talc mines became the exclusive source for the talc used in J&J's cosmetic talc products. J&J also continued to sell Industrial Talc Products from its Vermont mines to industrial and manufacturing facilities throughout the United States for use in the manufacturing of roofing materials, rubber products, joint compound, and other applications.

32.　　In 1967, J&J sold a portion of the Eastern Magnesia Talc (**"EMTAL"**) business it had acquired from EMTCI to a third party. The portion sold included EMTCI's Johnson Vermont talc mine and Johnson Vermont talc mill located in northern Vermont, and the EMTAL industrial talc product lines (collectively the mine, mill, and product line J&J sold are referred to as the **"EMTAL Business"**).

33.　　After the sale, J&J continued to operate the remaining talc mining and milling operation located in southern Vermont it had acquired in 1965.

34.　　At the time of the sale of the EMTAL northern Vermont business assets in 1967, J&J changed the corporate identity of its subsidiary operating the southern talc mine and mill to Windsor Minerals, Inc, a Vermont corporation, a wholly owned subsidiary of J&J.

35.     From 1967 to 1989, J&J directly and through its wholly owned and controlled subsidiary, Windsor, owned and operated the aforementioned underground mines, mills, and related facilities in southern Vermont, which it had acquired from EMTCI, from which it recovered talc ore and produced, marketed, distributed, and sold talc to its customers and users for both cosmetic and industrial uses.

36.     J&J controlled all major decisions made by Windsor, including decisions relating to the health and safety of J&J's talc products.

37.     J&J's in-house attorneys working directly for the General Counsel of J&J served on Windsor's Board of Directors and made all decisions concerning litigation involving Windsor, its predecessors and successors. **Exhibit 3** (10/29/1982 Deposition of Windsor President, Roger N. Miller, *Westfall v. Whittaker, Clark & Daniels, et al.*, C.A. #79-0269 (D. R.I.), 77:7-11).

38.     J&J processed the talc ore from the Vermont mines into talc powder, which it then distributed and sold to third parties, for use in the manufacture and application of many industrial products, including roofing materials, plastics, paint, wall board, joint compound, and rubber goods.

39.     The J&J/Windsor Industrial Talc was actually marketed as an "asbestos substitute" for use in products like joint compound, and as a result, was installed in countless homes and offices throughout the United States.

40.     At all times relevant, J&J dictated the marketing and health and safety decisions as well as the litigation strategies and actions of Windsor and its defense counsel resulting in respective asbestos claimants' exposure to J&J talc and the unjust dismissal of lawsuits seeking compensation for those injuries.

14

41.     At all times material herein, Defendant J&J, acted by and through its officers, employees, servants, attorneys, agents, actual, apparent and/or ostensible, any and all of whom were then and there acting within the course and scope of their authority, duties, and employment, actual or apparent. Among these employees and officers, were members of J&J's in-house legal department and ranking management members.

## C.    John/Jane Doe Defendants

42.     John/Jane Doe Attorneys 1-1000 are fictitiously named defendants who are members of J&J's in-house legal department or were outside counsel to J&J, (including law firms responsible for such counsel), their exact identities being currently unknown to Plaintiffs, who, either singularly, jointly and/or in concert with others knowingly or in reckless disregard for the truth made, implemented, aided or abetting, materially assisted and/or failed to stop or correct the scheme of false representations and fraudulent concealments described herein that, in words or effect, portrayed and represented to the public, to industrial purchasers, to asbestos claimants and their counsel, and to presiding asbestos courts, that no evidence existed indicating that J&J/Windsor Industrial Talc contained asbestos, and, as a result, thousands of industrial talc asbestos claimants' lawsuits were wrongfully dismissed without just compensation.

43.     John/Jane Doe J&J Corporate Members 1-1000 are fictitiously named defendants that are J&J's Directors, officers and/or employees, their exact identities being currently unknown to Plaintiffs, who either singularly, jointly and/or in concert with others, both inside and external to J&J, knowingly, or in reckless disregard for the truth, approved, directed, authorized, condoned, ratified, made, implemented, and/or failed to stop or correct the scheme of false representations and fraudulent concealments described herein that, in words or effect, portrayed and represented to the public, to industrial purchasers, to asbestos claimants and their counsel, and to presiding asbestos

courts, that there was no evidence existed indicating that J&J/Windsor Industrial Talc contained

asbestos, and, as a result, thousands of industrial talc asbestos claimants' lawsuits were wrongfully

dismissed without just compensation.

### III. VENUE AND JURISDICTION

44.     Venue is proper in this Court because the events or omissions giving rise to the

individual and Class claims occurred within the vicinage of this Court and Defendant is subject to

personal jurisdiction in this State.

45.     J&J directed, controlled, and/or committed the unlawful and other tortious

activities and omissions alleged and complained about herein from its headquarters here in the State

of New Jersey, even though the impact and harm to many of the Class Members and their decedents

may have occurred outside of New Jersey. This Court therefore has jurisdiction over the parties and

claims herein.

### IV.    FACTS COMMON TO CLASS CERTIFICATION AND ALL COUNTS

**A.     By the early 1970s, J&J knew of the presence of asbestos in Windsor Minerals talc.**

46.     At all times relevant hereto, J&J understood the dangers posed to human health by

asbestos exposure and that asbestos was a known contaminant of talc.

47.     J&J's management was sophisticated in the mineralogy of talc and understood its

connection to asbestos. J&J further understood that asbestos appeared in talc in multiple forms.

48.     Internally, J&J defined "asbestos" as "the fibrous serpentine chrysotile and the

fibrous forms of … anthophyllite, … tremolite, and actinolite." **Exhibit 4** (8/16/2018 Deposition of

Dr. John Hopkins, Ph.D., (Vol. 1), J&J Corporate Representative, MDL No. 16-2738, (D. N.J.),

174:24–175:23). These forms of the listed minerals have needle-like crystalline structures, which are a threat to human health.

49.　　On April 15, 1969, Dr. T.M. Thompson, M.D., then the Medical Director for J&J, wrote to Mr. William H. Ashton, a J&J executive supervising the company's talc-based products, to advise him of the danger posed by the "inhalation" of the "spicule" or "needle-like" crystals of tremolite in J&J's talc. *See* **Exhibit 5** (JNJ000087991, J&J 4/15/1969 Letter from Dr. T.M. Thompson to W. Ashton re: Alternate Domestic Talc Sources – Project Code #101). Dr. Thompson recommended that "since pulmonary diseases, including inflammatory, fibroplastic, and neoplastic types, appear to be on the increase, it would seem prudent to limit any possible content of tremolite in our powder formulations to an absolute minimum." *Id*.

50.　　Although Dr. Thompson stated that he was not aware of "any litigation involving either skin or lung penetration by our talc formulations," he cautioned Mr. Ashton that "since the usage of these products is so widespread, and the existence of pulmonary disease is increasing, it is not inconceivable that [J&J] could become involved in litigation in which pulmonary fibrosis or other changes might be rightfully or wrongfully attributed to inhalation of our powder formulations." *Id*. To that end, Dr. Thompson recommended that "someone in the Law Department should be consulted with regard to the defensibility of our position in the event that such a situation could ever arise." *Id*.; *See also* **Exhibit 6** (2/15/2019 Deposition of Nancy Musco (Vol. 1), J&J Corporate Representative, *Foley v. Avon Products, Inc., et al.*, No. MID-L-3095-18 (N.J. Law Div.), 64:18–68:1).

51.　　Dr. Thompson further forewarned Mr. Ashton that J&J could confront a situation where the company would be compelled to remove talc from its products "if it became known that our talc formulations contained any significant amount of Tremolite." *See* **Exhibit 5**

17

(JNJ000087991, 4/15/1969 J&J Letter from Dr. T.M. Thompson to W. Ashton re: Alternate

Domestic Talc Sources – Project #101).

52.        In July 1971, J&J's managers reported a conversation with Dr. Clark Cooper, a

professor at the School of Public Health at the University of California, Berkeley. Dr. Cooper

expressed his concern that there is no place for asbestos in talc and any talc with asbestos should be

removed from the market. **Exhibit 7** (7/30/1971 J&J Letter from Dr. G. Hildick-Smith to Dr. R.A.

Fuller).

53.        In 1971, J&J retained the Mount Sinai School of Medicine to privately test its

talc. Mt. Sinai School of Medicine's School of Environmental Science reported that there was, in

fact, asbestos in the talc to J&J's Director of Clinical Research, Dr. Gavin Hildick-Smith. *See*

**Exhibit 8** (11/10/1971 Mt. Sinai Letter from Dr. A.M. Langer to Dr. G. Hildick-Smith), and,

**Exhibit 10** (J&J Meeting with Dr. Langer on July 9 Concerning Analytical Analysis of Talc).

*54.*        In 1972, J&J hired Professor Thomas Hutchinson from the University of

Minnesota Space Science Center to assay its talc. In testing it, he found "incontrovertible asbestos"

in J&J's talc. *See* **Exhibit 11** (Handwritten Notes, Talc Testing Analytical Results, and

Photomicrographs by Professor Hutchinson). Thereafter, Professor Hutchinson provided J&J with a

formal report documenting his findings with photographs of the asbestos he found in the talc. *See*

**Exhibit 11**, and, **Exhibit 12** (University of Minnesota Space Science Center - Investigation of

Possible Asbestos Contamination in Talc Samples).

55.        Although J&J had Professor Hutchinson's results identifying chrysotile asbestos

in its talc, J&J nevertheless told the FDA that Professor Hutchinson did not find any asbestos in the

J&J talc that he tested. *See* **Exhibit 12**; *See also* editing out chrysotile asbestos results on pg. 6 of

**Exhibit 14** (6/21/1973 McCrone Letter and 6/22/1973 Report from Ian Stewart to Dr. A. Goudie).

18

56.      In 1972, J&J Research Director, Dr. Wilson Nashed, confirmed that Walter C. McCrone Associates, Inc. (**"McCrone"** or **"McCrone Associates"**), a testing company frequently used by J&J, found tremolite in the J&J talc. He acknowledged that these findings are "not new." **Exhibit 15** (J&J Handwritten Note from Dr. W. Nashed to Dr. A. Goudie).

57.      On May 1, 1973, Roger N. Miller, then the President of J&J's mining company, Windsor, informed Dr. Dewitt Petterson of J&J that "the ore body contains actinolite." **Exhibit 16** (5/1/1973 Windsor Memo from Roger N. Miller to Dr. D. Petterson re Memo-D. Hamer-4/19/73-Dispersion Straining, etc.).

58.      One week later, on May 8, 1973, J&J's chief talc scientist, William Ashton, informed Dr. Dewitt Petterson that "[t]he first showing of actinolite we know about is October 1972." **Exhibit 17** (5/8/1973 J&J Memo from W. Ashton to Dr. D. Petterson).

59.      Similarly, in March of 1974, Professor R.C. Reynolds at Dartmouth College's Department of Earth Sciences, provided information to J&J that "Actinolite is the dominant fiber form amphibole in the ore and talc product provided by Windsor Minerals." **Exhibit 18** (JNJ 000266903, 3/1974 Dartmouth College Memo from R.C. Reynolds to Windsor re: Analysis of Talc Products and Ores for Asbestiform Amphiboles).

60.      McCrone Associates, and the Colorado School of Mines Research Institute also tested J&J's talc and its source mines. All of these testing laboratories, among others, found asbestos minerals in J&J's source mines.[3]

_____

[3] *See, e.g.* **Exhibit 58** (4/14/1971 Colorado School of Mines Research Institute Letter to J&J); **Exhibit 59** (10/27/1972 McCrone Report); **Exhibit 60** (2/26/1973 Colorado School of Mines Institute to W. Ashton of Johnson & Johnson re: Mineralogical Exam of Five Talc Samples); **Exhibit 62** (2/11/1974 McCrone to Dr. F.R. Rolle); **Exhibit 63** (4/10/1974 McCrone to JJ

19

61.     The following chart (depicted as *Figure 1* below), which a J&J corporate

representative acknowledged is accurate, summarizes the J&J testing finding asbestos in J&J talc

from 1965 through 1989[4]:


[Balance of page intentionally blank]

---

Russell); **Exhibit 64** (4/24/1974 McCrone Report); **Exhibit 65** (4/27/1973 Microscopic Exam of
Johnson's Baby Powder); **Exhibit 66** (5/8/1974 McCrone Report); **Exhibit 67** (7/8/1974
McCrone to Dr. R.R. Rolle); **Exhibit 68** (10/10/1974 McCrone to Windsor Minerals, Inc.);
**Exhibit 69** (12/9/1974 McCrone to J&J); **Exhibit 70** (7/1/1975 McCrone to Windsor Minerals,
Inc.); **Exhibit 71** (8/31/1976 J&J Memo re: Vermont 66 Talc); **Exhibit 72** (9/11/1975 I. Stewart
to V. Zeitz); **Exhibit 73** (11/5/1975 McCrone to Windsor Minerals, Inc.); **Exhibit 74**
(11/19/1975 McCrone to Windsor Minerals, Inc.); **Exhibit 75** (7/5/1976 Colorado School of
Mines Research Institute Report); **Exhibit 76** (1/25/1977 Dr. F.D. Pooley to Dr. F.R. Rolle);
**Exhibit 77** (4/1/1977 EMV Report to J&J); **Exhibit 78** (10/5/1978 McCrone to Windsor
Minerals, Inc.); **Exhibit 79** (2/9/1979 Handwritten Notes re Conversation with Harold Cohen);
**Exhibit 80** (11/6/1980 McCrone to Windsor Minerals, Inc.); **Exhibit 81** (8/22/1985 McCrone to
Windsor Minerals, Inc.); **Exhibit 82** (4/29/1986 McCrone to Windsor Minerals Inc.); **Exhibit 83**
(3/25/1992 Interoffice Memo by Munro); **Exhibit 43** (12/4/1997 Bain Environmental Report);
**Exhibit 84** (5/23/2002 Luzenac America Inc. (hereinafter **"Luzenac"**) Technical Report);
**Exhibit 85** (2/26/2004 Luzenac Product Certification Report); **Exhibit 86** (2/27/2004 Luzenac -
Product Certification); **Exhibit 87** (3/4/2011 Summary of TEM Asbestos Results: Grade 66/96
USP Product Composites).

[4] **Exhibit 89** (8/14/2019 Testimony of Dr. John Hopkins, Ph.D. (Vol. 1 of 2), J&J Corporate
Representative, *Barden* Trial Transcript, 117:17-118:24).

20

*Figure 1*

## J&J's Internal Documentation 1968-1972

| Date | Organization | Ore/Product | Type |
|---|---|---|---|
| 1/24/68 | Battelle Memorial | Italian Source Talc | Tremolite |
| 5/10/71 | Colorado School of Mines | Johnson's Baby Powder | Tremolite needles |
| 7/7/71 | Colorado School of Mines | Vermont Production Samples | Tremolite/Actinolite x 6 |
| 7/9/71 | Dr. Langer-Mt. Sinai | Johnson's Baby Powder | Chrysotile |
| 7/23/71 | Colorado School of Mines | Vermont Talc | Amphiboles |
| 8/6/71 | Johnson & Johnson | Italian Talc | Tremolite, Actinolite & Chrysotile |
| 8/9/71 | Johnson & Johnson | Johnson's Baby Powder | fines implicated in asbestos toxicology |
| 9/3/71 | McCrone | Johnson's Medicated Powder | Chrysotile |
| 11/10/71 | Dr. Langer-Mt. Sinai | Johnson's Baby Powder | Chrysotile |
| 2/72 | Turin Polytechnic | Italian Source Talc | Tremolite |
| 9/8/72 | Prof. Pooley-Cardiff | Italian Source Talc | Tremolite |
| 10/27/72 | McCrone | Johnson's Baby Powder "1087" | Tremolite |
| 10/27/72 | McCrone | Johnson's Baby Powder "1087" | Tremolite |
| 9/72 | Johnson & Johnson | Johnson's Baby Powder | Tremolite |
| 9/72 | Minnesota Space Center | Shower to Shower/ Lewin Shower/Shower | Chrysotile x 2 |

PLAINTIFF'S TRIAL EXHIBIT 3695-83

## J&J's Internal Documentation 1973-1974

| Date | Organization | Ore/Product | Type |
|---|---|---|---|
| 4/19/73 | Johnson & Johnson | Johnson's Baby Powder | Tremolite Fibers x 4 |
| 4/27/73 | Johnson & Johnson | Johnson's Baby Powder (further analysis) | Actinolite Rods |
| 5/16/73 | Prof. Pooley - Cardiff | Vermont Source Talc | Tremolite type asbestos |
| 6/4/73 | Prof. Pooley-Cardiff | Vermont Talc | Tremolite |
| 10/29/73 | Johns Manville | Italian Source Talc | Tremolite |
| 10/29/73 | Johns Manville | Johnson's Baby Powder | Chrysotile |
| 9/13/73 | Prof. Pooley-Cardiff | Vermont Talc | Actinolite |
| 9/13/73 | Prof. Pooley-Cardiff | Italian Talc | Tremolite |
| 12/13/73 | Dutch Consumer Organization | Johnson's Baby Powder | Asbestos |
| 1974 | Pooley/Langer | Italian Source Talc | Tremolite & Possible Anthophyllite |
| 3/1974 | Dartmouth-Professor Reynolds | Vermont Source Talc | Fiberform actinolite and anthophyllite |
| 5/14/74 | Windsor Minerals/JJ | Vermont Source Talc | Chrysotile x 4 |
| 5/14/74 | Windsor Minerals/JJ | Vermont Source Talc | Fibrous Anthophyllite |

PLAINTIFF'S TRIAL EXHIBIT 3695-84

## J&J's Internal Documentation 1975-2004

| Date | Organization | Ore/Product | Type |
|---|---|---|---|
| 11/19/75 | McCrone | Vermont Source Talc | Asbestiform Amphiboles x 2 |
| 3/1976 | Rubino, et al. | Italian Source Talc | Fibers of Tremolite |
| 9/26/84 | Paoletti, et al. | Italian Talc | Tremolite Asbestos x 7 |
| 9/26/84 | Paoletti, et al. | Italian Talc | Chrysotile Asbestos x 1 |
| 1/30/87 | Johnson & Johnson | Vermont Floated Talc | Amphiboles |
| 1/30/87 | Johnson & Johnson | Johnson's Baby Powder | Amphiboles |
| 3/30/87 | Johnson & Johnson | Vermont Floated Talc | Amphiboles |
| 1990 | McCrone | Vermont Talc | Anthophyllite Asbestos |
| 1991 | Alice Blount, Rutgers | Johnson's Baby Powder & Vermont Talc | Tremolite Asbestos |
| 2/10/92 | Alice Blount, Rutgers | Johnson's Baby Powder & Vermont Talc | Blount reiterates Asbestos findings |
| 10/13/95 | RJ Lee Group | Johnson's Baby Powder | Tremolite |
| 4/23/98 | Alice Blount, Rutgers | Johnson's Baby Powder & Vermont Talc | Blount reiterates Asbestos findings |
| 1/5/04 | Forensic Analytical Services | Johnson's Baby Powder | Anthophyllite Asbestos |

PLAINTIFF'S TRIAL EXHIBIT 3695-86

## J&J's Internal Documentation 1974-1975

| Date | Organization | Ore/Product | Type |
|---|---|---|---|
| 4/4/74 | Johnson & Johnson | Vermont Source Talc | Fibrous Tremolite |
| 4/4/74 | Johnson & Johnson | Vermont Source Talc | Fibrous Chrysotile |
| 4/24/74 | McCrone | Vermont-Argonaut | Chrysotile x 15 |
| 4/24/74 | McCrone | Vermont-Argonaut | Asbestiform Amphibole x 15 |
| 5/9/74 | McCrone | Vermont-Argonaut Ore | Chrysotile asbestos contamination |
| 5/9/74 | McCrone | Vermont-Argonaut Product | Chrysotile asbestos contamination |
| 7/8/74 | McCrone | Vermont-Weekly Samples | Chrysotile x 5 |
| 7/8/74 | McCrone | Vermont-Weekly Samples | Tremolite fiber |
| 1974 | Società Talco e Grafite Val Chisone | Italian Source Talc | Chrysotile |
| 7/1/75 | McCrone | Vermont Source Talc | Asbestos x 9 |
| 11/5/75 | McCrone | Vermont Source Talc | Asbestos x 13 |

PLAINTIFF'S TRIAL EXHIBIT 3695-85

**B.**     **J&J created and utilized testing protocols designed to prevent the detection of asbestos present in samples and required certain words to be employed in reporting results to create the false impression that there was no asbestos in J&J's talc.**

62.     J&J responded to its internal testing showing its talc was contaminated with asbestos by developing a means of testing and reporting analysis results of talc samples that would not find or reveal asbestos even if present in the samples, which it would then use as proof in asbestos injury claims that J&J's talc was asbestos free. The testing method, called J4-1, utilized X-ray diffraction (**"XRD"**) as an initial screen to determine if any further testing was necessary. **Exhibit 19** (10/7/1976 CTFA Method J4-1 Part I & Part II). If an XRD test result was negative, no more testing would occur, and the sample would be reported as "none detected." J&J knew that XRD testing lacked the sensitivity to detect the low levels of asbestos previously reported, but still not disclosed, in its talc. In short, this testing process virtually guaranteed that low levels of asbestos would never be found in J&J's talc.

63.     J&J similarly knew that XRD could not detect chrysotile asbestos at levels below two or three percent (2 or 3%) of the talc product and was also incapable of detecting low levels of tremolite asbestos, both of which were found in earlier tests of J&J's talc. **Exhibit 20** (2/19/2019 Deposition of Dr. Susan Nicholson, M.D., (Vol. 1), *Foley v. Avon Products, Inc., et al.*, No. MID-L-3095-18 (N.J. Law Div.), 196:19-198:8).

64.     Pursuant to the J4-1 protocols, if an XRD screening test result was positive, the sample would then have been analyzed using polarized light microscopy (**"PLM"**). Scientifically reliable PLM analysis required the analyst to count all asbestos fibers seen in a sample. But J&J's J4-1 testing protocol excluded asbestos fibers shorter than a defined size from the count. **Exhibit 19** (10/7/1976 CTFA Method J4-1 Part I & Part II). Although excluded from the count pursuant to J4-1 protocols, short asbestos fibers are carcinogenic.

22

65.      In arriving at the J4-1 method, J&J verified that the protocol would fail to detect the presence of asbestos fibers in its talc samples by spiking samples with known quantities of asbestos. The testing of the J&J samples spiked with asbestos demonstrated that the J4-1 method would not find asbestos in the talc eighty-six percent (86%) of the time even when asbestos was intentionally added. **Exhibit 9** (5/17/1977 Cosmetic, Toiletry, and Fragrance Association (**"CTFA"**) Meeting Minutes).

66.      At the same time J&J was designing and implementing the J4-1 testing protocol, its consultants advised J&J that there were better testing methods, which would find asbestos contamination, if it existed.

67.      One of those methods was the "pre-concentration" method, a process shared with J&J by the Colorado School of Mines Research Institute, Professor Dr. Fred D. Pooley of Cardiff University, and Rutgers University.[5]

68.      Because the sensitivity of the pre-concentration method would accurately reveal the presence of asbestos in talc samples, J&J rejected its use as contrary to "[J&J's] worldwide company interest." **Exhibit 21** (JNJAZ55_00001892, 5/16/1973 J&J Memo from Dr. F.R. Rolle to

---

[5] **Exhibit 90** (JNJ 000268037, 12/27/1973 Colorado School of Mines Research Institute Report, Prepared for J&J re A Procedure to Examine Talc for the Presence of Chrysotile and Tremolite-Actinolite Fibers); **Exhibit 61** (JNJAZ55_000005081, 6/6/1973 J&J Memo from Dr. F.R. Rolle to Dr. F.D. Pooley); **Exhibit 24** (JNJ000266903, 3/1974 Dartmouth College Memo from R.C. Reynolds, Jr., to Windsor re Analysis of Talc Products and Ores for Asbestiform Amphiboles) ("a concentration technique is mandatory because it brings the amphiboles into a reasonable concentration range for optical or other methods of analysis."); **Exhibit 25** (JNJNL61_000007330, Special Talc Studies Monthly Report, 3/1974, Assay Methods for Asbestos Minerals in Talc); **Exhibit 88** (JNJ 000250919, 3/11/1974 J&J Memo from Dr. J.P. Schelz to Dr. F.R. Rolle re Methods of Concentration of Asbestos in Talc-Project #0503-00); **Exhibit 53** (JNJNL61_000062964, 11/26/1974 J&J Memo from Dr. J.P. Schelz to Dr. F.R. Rolle re Review of Experimental Techniques for the Concentration of Asbestos Minerals in Talc – Project #0503-00) (collectively referred to as "concentration method").

23

Dr. T.H. Shelley re Proposed Specs for Analyzing Talc for Asbestos). **Exhibit 22**
(JNJNL61_000062953, 2/18/1975 J&J Limited Letter from Dr. F.R. Rolle to J&J).

69.      J&J's consultants also urged it to use a Transmission Electron Microscope
(**"TEM"**) to test for asbestos, as it was far more sensitive and effective than the J4-1 method used by
J&J. *See, e.g.*, **Exhibit 23** (JNJNL61_000006726, J&J 5/18/1973 Memo from G.E. Heinze to W.
Ashton et al., re Talc Symposium - 5/18/1973 - Department of the Interior).

70.      J&J eventually began to use TEM on a very limited basis, but also adopted a
reporting methodology called, TM7024, that it knew would yield negative results (*i.e.*, no asbestos)
even in samples where asbestos was present. Under the TM7024 method, J&J's scientists were
directed to evaluate only ten percent (10%) of an available sample. And even when asbestos was
found looking at ten percent (10%) of the sample, J&J's scientists still reported the tests as negative
and "not quantifiable" unless five (5) or more asbestos fibers of the same variety were counted.
**Exhibit 26** (JNJNL_000005032, 5/21/1995 J&J TM7024 TEM Analysis of Talc for Asbestiform
Minerals). Thus, even if the examiner counted as many as sixteen (16) asbestos fibers (*i.e.*, four (4)
fibers of each type, including tremolite, actinolite, anthophyllite, and chrysotile) using the TM7024
method, the resulting assay would be reported as not finding asbestos or "not quantifiable."

71.      J&J's position on the scientific propriety of its TM7024 testing protocol was and
remains inconsistent with those of environmental and health agencies, including the United States
Environmental Protection Agency (**"EPA"**). **Exhibit 27** (4/20/2006 U.S. EPA Region IX Response
to November 2005 R.J. Lee Group, Inc.).

72.      Further reducing the likelihood of detecting asbestos in its talc ore, J&J required
the use of the J4-1 testing method on only a composite sample drawn from every two (2) silos of talc
(each silo containing hundreds of tons of talc), TM7024 testing only quarterly from a composite

24

sample drawn from all siloed talc, and a monthly composite of "float feed" talc undergoing a type of processing. **Exhibit 28** (JNJMX68_000002913, 10/4/1984 J&J Memo from J.A. Molnar to Dr. B. Semple re Evaluation Program for Talc).

73.     Consequently, the total amount of talc J&J ever put under a microscope to test for asbestos was approximately 1/100 of a breath mint by weight. **Exhibit 29** (1/29/2020 Testimony of Matthew Sanchez (Vol. 1 of 2), *Barden v. Brenntag North America, et al.*, MID-1809-17 (N.J. Law Div.), Trial Transcript, 134:19-135:20.).

74.     Even though J&J tested minuscule amounts of talc product, and utilized methods specifically designed to yield negative (absence of asbestos) results at low levels, J&J nevertheless still found asbestos in its talc. **Exhibit 30** (11/5/2018 Deposition of Dr. John Hopkins (Vol. 4), *In Re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, and Products Liability Litigation,* No. 16-2738, Exhibit of "Hopkins 28", Chart of various J&J testing results). When that occurred, J&J had internal policies to suppress and conceal such positive findings of asbestos in its talc.

75.     When asbestos was found, J&J required and implemented the strategy of using misleading "language" in formal reports, such as "not quantifiable" or "no quantifiable amount" of asbestiform minerals to cover up the positive asbestos findings, which J&J in turn reported as negative for asbestos in its talc.

76.     For instance, on August 22, 1985, McCrone Associates reported that "[c]hrysotile asbestos was detected" in two (2) samples of Windsor talc. **Exhibit 31** (8/22/1985 McCrone Letter to Arthur LaPierre, Safety, Health and Training Director at Windsor re: McCrone Project No. ME-1862). When Windsor's President Roger N. Miller learned of the report, he wrote to McCrone admonishing: "We received on August 22, the enclosed report on these samples mailed to another

Company employee. The August 22, report is couched in substantially different language than earlier reports. As I explained to you on my visit to Chicago it is very important that specific language be used." **Exhibit 32** (9/10/1985 Windsor Letter from Roger N. Miller to Ian Stewart re: Methodology and Reports). *Figure 2* reproduces the letter below:

*Figure 2*

77.     After receiving the letter from Windsor's President, Roger N. Miller, McCrone Associates issued a new report regarding the same talc samples, but omitted the statement of positive asbestos findings. Instead, McCrone used J&J's misleading "language" indicating that it "did not find any quantifiable amount of asbestiform minerals in any of the samples[,]" which was intended to create the false impression of a negative test result for asbestos. **Exhibit 33** (10/8/1985 McCrone Letter to Roger N. Miller re: McCrone Project No: ME-1862).

**C.      J&J made material misrepresentations to courts and litigants for more than 40 years.**

**1.      *Edley v. Windsor Minerals Inc., et al.*, No. MID-L-075913-86 (N.J. Law Div.).**

78.     On August 4, 1986, Plaintiffs' decedent, Louis Edley, filed a lawsuit against Windsor and other potentially responsible parties in the Superior Court of New Jersey, Law Division, Middlesex Vicinage, New Jersey, under Docket No. MID-L-075913-86. Mr. Edley alleged that he developed asbestosis as a result of working with J&J/Windsor's Industrial Talc.

79.     On August 27, 1986, John N. Beidler, Esq., an attorney with J&J's Office of General Counsel and someone who possessed the information as well as access to all the documents in J&J's possession evidencing the presence of asbestos in J&J/Windsor's talc referenced above, wrote to Plaintiffs' decedent (Louis Edley)'s attorney, Ronald B. Grayzel, Esq. demanding a dismissal of Edley's lawsuit against Windsor, claiming that "no evidence of the presence of asbestos" in any of J&J's/Windsor's talc "has ever been revealed", and citing New Jersey's frivolous lawsuit statute as a veiled threat. *See* **Exhibit 1** (8/27/1986 J&J Letter from John Beidler, Esq., to Ronald Grayzel, Esq., re: *Edley v. Windsor Minerals, Inc.,* No. MID-L-075913-86 (N.J. Law Div.)). *Figure 3* reproduces the letter below:

27

*Figure 3*



Johnson&Johnson

OFFICE OF
GENERAL COUNSEL

ONE JOHNSON & JOHNSON PLAZA
NEW BRUNSWICK, N.J. 08933-7002

August 27, 1986

Ronald B. Grayzel, Esq.
Levinson, Conover, Axelrod, Wheaton & Grayzel
Lincoln Plaza
2 Lincoln Highway, P.O. Box 2905
Edison  NJ  08818-2905

Re: Edley v. Windsor Minerals Inc.

Dear Mr. Grayzel:

As you may know, Windsor Minerals Inc. is a wholly-owned
subsidiary of Johnson & Johnson and, accordingly, the Summons
and Complaint in the above-captioned matter has recently been
referred to my attention.

Please be advised that Windsor Minerals Inc., contrary to the
allegation in the Complaint, does not now engage and never has
engaged in the manufacture or supply of "asbestos-containing
products". Rather, the exclusive business of Windsor Minerals
Inc. is and has been the mining and milling of talc from a
single mining district in Windsor, Vermont. That mining
district is the exclusive source of talc for all of the
Johnson's Baby Powder sold in the United States as well as a
source of pure talc sold to independent industrial users. All
of the talc mined by Windsor Minerals Inc., whether ultimately
sold to industrial users or used in Johnson's Baby Powder, is
sampled and tested for the presence of asbestos and no evidence
of the presence of asbestos in any Windsor Minerals product has
ever been revealed. Under the circumstances, there obviously
can be no reasonable knowledge, information or belief which
provides good ground to support this pleading under R1:4-8.

Parenthetically, we received a Complaint several months ago
filed by the Wysoker firm here in New Brunswick on behalf of
another former employee of Bird & Son and, upon being told the
forgoing facts, the plaintiff's attorneys immediately forwarded
to me a dismissal of the action as to Windsor Minerals Inc.

-2-

I am hopeful that you and your client will appreciate that
there is no benefit to keeping Windsor Minerals in this case,
from which in all fairness it should be dismissed and, I hope
that this matter can be resolved as expeditiously as was the
prior case.  In the event that you require an affidavit
confirming the forgoing facts, please let me know.

May I hear from you promptly?

Very truly yours,

John N. Beidler

/rd

80.     When Edley's counsel, Ronald Grayzel, Esq., did not immediately dismiss the

case against J&J's Windsor subsidiary, J&J made an additional effort to convince Edley to dismiss

his case. On July 23, 1987, J&J provided an affidavit from Roger N. Miller, then the president of

J&J's subsidiary, Windsor Minerals, Inc., using the **exact same language** Mr. Beidler, Esq., of

J&J's Office of General Counsel, originally used in his letter to Edley's attorney, Mr. Grayzel, Esq.,

urging Edley to dismiss his case against Windsor. *See* **Exhibit 34** (7/23/1987 Letter from R. Levitt,

Esq., to R. Grayzel, Esq., attaching Roger N. Miller Affidavit).

81.     To support Beidler and Miller's representations that there was "no evidence" of asbestos in J&J/Windsor's talc, Windsor President Miller's July 13, 1987 affidavit included a February 2, 1987 McCrone report on an assay of J&J's talc. The report used the J&J's misleading "language" indicating that there was "no quantifiable amounts of asbestiform minerals" in J&J/Windsor's talc samples. *Id*. (**Exhibit 34**).

82.     Beidler and Miller's statements (which Beidler made as an officer of the court representing J&J's Office of General Counsel, and, Miller made under oath as President of Windsor) were knowingly and intentionally false, and, were purposely crafted to induce Edley to dismiss his case against Windsor. Beidler and Miller both knew of the positive test results findings of asbestos in J&J/Windsor's talc when denying to plaintiff's counsel there was any evidence of asbestos in the J&J/Windsor's Industrial Talc.

83.     Throughout this effort to convince Edley and his attorney to drop the case, neither Beidler or Miller referenced or provided any of the other testing reports in the possession of J&J, which found asbestos in J&J/Windsor's talc.

84.     In order to further induce Edley to drop his case against Windsor, J&J's August 27, 1986 letter from John Beidler, Esq., references as precedent another case dismissed two months earlier, of a plaintiff who also worked at Mr. Edley's employer, based upon the same false representations. **Exhibit 1** (8/27/1986 J&J Letter from John Beidler, Esq., to Ronald Grayzel, Esq., re: *Edley v. Windsor Minerals, Inc.*).

85.     On or about August 17, 1987, Louis Edley filed a voluntary dismissal of his lawsuit against Windsor. In doing so, he reasonably relied and acted on the misrepresentations and material omissions made by J&J to his attorney, Ronald Grayzel, Esq. *See, e.g.*, **Exhibit 38** (*Edley* Stipulation of Dismissal re R.B. Grayzel, Esq.); **Exhibit 37** (10/10/1986 Windsor's Filed Answer re

30

*Yuhas*, and, 1/13/1987 *Yuhas* Filed Stipulation of Dismissal). As a result, Louis Edley was deprived

of the fair opportunity to pursue his claims with evidence of the most essential fact in any asbestos

case—proof that the product contained asbestos—and to litigate his claims on an even playing field

in a fair judicial proceeding in pursuit of full, fair, and adequate compensation for his injuries.

### 2.  Thousands of fraudulent dismissals followed in the 1980s and 1990s.

86.     By the end of 1989, there were more than 1,000 cases filed and pending, which

alleged that J&J/Windsor's talc caused asbestos-related disease in industrially exposed workers.

87.     Plaintiffs and their counsel's investigation, to date, has found numerous false

sworn discovery responses as well as affidavits similar to that used to secure dismissals in the *Edley*

and *Yuhas* cases that were verified or sworn to by Windsor President Roger N. Miller or other

J&J/Windsor executives and prepared and served by the John Doe Attorneys representing

J&J/Windsor.

88.     As illustration, on July 8, 1988, a year after executing his affidavit in the *Edley*

case, Windsor President Roger N. Miller executed another sworn affidavit attesting:

> All of the talc mined by Windsor Minerals, Inc. has been regularly sampled and
> tested for the presence of asbestos. ***No evidence of the presence of asbestos*** in
> Windsor Mineral, Inc.'s product ***has ever been revealed*** by this testing.

**Exhibit 39** (7/8/1988 Affidavit of Roger N. Miller, *Andonian v. A.C. & S, Inc.*, No. ACV-88-6-

1731 (Summit Cnty. Ct. Ohio Comm. Pls.)) (emphasis added).

89.     On the same date in another asbestos case, Windsor President Miller again swore:

> All of the talc mined by Windsor Minerals, Inc. has been regularly sampled and
> tested for the presence of asbestos. ***No evidence of the presence of asbestos*** in
> Windsor Mineral, Inc.'s [product] ***has ever been revealed*** by this testing.

**Exhibit 40** (7/8/1988 Affidavit of Roger N. Miller, *Miller v. A.C. & S, Inc.*, No. ACV884-1087 (Summit Cnty. Ct. Ohio Comm. Pls.)) (emphasis added).

90.      These false representations achieved their goals. The plaintiffs receiving these materials dismissed their cases against J&J or Windsor. Stipulations of dismissals from those cases are attached hereto as **Exhibit 41 (**Summit County Ohio Asbestos Litigation Windsor Minerals Dismissal Order, (N.D. Ohio)).

>    *3.*      *Durham v. Metropolitan Life Ins. Co.,* **No. 05C-07-136 ASB (Del. Sup. Ct. New Castle Cnty.)**

91.      Nearly twenty years after the *Edley* case was dismissed based upon Windsor President Roger N. Miller's "no evidence of the presence of asbestos" representation, J&J corporate representative, Dr. John Hopkins, Ph.D., executed a similar affidavit in the Delaware State Court matter of *Durham v. Metropolitan Life Ins. Co.*, No. 05C-07-136 ASB (Del. Sup. Ct. New Castle Cnty.). There, under oath, Dr. Hopkins stated the following:

(a) "The conclusion of the Audits was that for both of the Italian and Vermont mines, there was ***zero evidence*** of asbestos in the geology and mineralogy of the mines."

(b) "For the talc sources in use in the United States over the period 1955-2002, there has ***never been an instance*** of asbestos contamination."

(c) "**No evidence** of asbestos in the mineralogy and geology in the talc mines supplying Johnson & Johnson in the United States."

(d) "**No evidence** of asbestos contamination in each production batch sampling as certified by the suppliers, from the period 1975 – date."

(e) "It may be concluded that there has never been asbestos contamination of the talc used by Johnson & Johnson in the United States from the period in question, 1955-2002."

**Exhibit 42** (09/14/2006 Affidavit of Dr. John Hopkins, Ph.D., J&J Corporate Representative, *Durham v. Metropolitan Life Ins. Co.*) (emphasis added).

92.        Dr. Hopkins identified Dr. Fred D. Pooley of Cardiff University, a consultant to J&J in the 1970s and 1980s, as one who reported to J&J "zero evidence" of asbestos in the Vermont mines. (*Id.* at 3).

93.        Evidence discovered years later, however, proves unequivocally that Dr. Hopkins's representations concerning Dr. Pooley were false.

94.         An internal J&J memo dated May 16, 1973, establishes J&J's knowledge that Dr. Pooley himself found asbestos "tremolite-type in Vermont." **Exhibit 21** (JNJAZ55_00001892, 5/16/1973 J&J Memo from Dr. F.R. Rolle to Dr. T.H. Shelley re Proposed Specs for Analyzing Talc for Asbestos).

### 4.    *Lopez v. J&J (San Francisco Superior Ct. 2007)*

95.        In January 2007, Windsor President Roger N. Miller testified in *Consuelo Lopez, et al. v. J&J, et al.,* No. 434580 (San Francisco Superior Ct. 2007), which contended J&J's talc products caused plaintiff's asbestos disease. Miller testified that J&J's testing consultant, McCrone Associates, never found asbestos in the talc from any of J&J's mines. **Exhibit 44** (1/16/2007 Deposition of Roger N. Miller, *Lopez v. J&J*, 84:12-15).

96.        During his deposition in *Lopez*, Windsor President Miller went on to testify that the testing of the Argonaut Mine, which was the one of the Windsor mines used to produce Industrial Talc, "never found" any asbestos in its talc. *Id.* at 103:10-104:13.

97.        Windsor President Miller's testimony on both points was false according to numerous reports that were discovered during recent talc litigation, including a report issued by

33

McCrone, before the Argonaut Mine was officially opened, finding chrysotile asbestos throughout the mine. **Exhibit 45** (4/24/1974 McCrone Examination of Talc Samples, Argonaut Ore Body).

**D.      The same J&J misrepresentations were made to every plaintiff.**

98.      Upon information and belief, thousands of cases similar to those referenced above were filed by people with asbestos-related injuries, including asbestosis, lung cancer, and mesothelioma, which alleged that exposure to J&J/Windsor's talc caused the plaintiffs' injuries.

99.      No matter where and when those cases were filed, and despite all of the evidence to the contrary outlined above, J&J/Windsor represented to every plaintiff and their counsel that there was no evidence of asbestos in J&J/Windsor's talc. **Exhibit 46** (3/8/2019 Deposition of Nancy Musco (Vol. 2), J&J Corporate Representative, *Foley v. Avon Products, Inc., et al.*, No. MID-L-3095-18 (N.J. Law Div.), 400:12–401:15).

100.      J&J understood there was a difference between representing that evidence existed that J&J disagrees with and the representation that no evidence of any asbestos in the talc exists at all. **Exhibit 6** (2/15/2019 Deposition of Nancy Musco (Vol. 1), J&J Corporate Representative, *Foley v. Avon Products, Inc., et al.*, 173:10-21), and, **Exhibit 35** (6/30/2021 Deposition of John O'Shaughnessy, Esq., (Vol. 2), ***Vickie Forrest, et al., v. J&J, et al.*, No. 1522-CC0419-02, MDL No. 16-2738 (3d. Cir.),** 466:12-20).

101.      J&J's representations and its failure to disclose evidence it knew to exist, as exemplified in the cases set out in the above paragraphs, constitute a systematic pattern and practice of spoliation, fraudulent concealment, and fraud upon the courts in defending talc-injury litigation, the central element of which was J&J and its legal department members' concealment, suppression and/or manipulation of all evidence of asbestos in its talc in order to represent that no such evidence existed. **Exhibit 46** (3/8/2019 Deposition of Nancy Musco (Vol. 2), *Foley, supra*, 400:12–401:15)

(J&J Corporate Representative confirming consistent representation to plaintiff lawyers that that no evidence of asbestos in J&J's talc existed).

102.    J&J in-house counsel John O'Shaughnessy, Esq., recently admitted under oath that he supervised the J&J/Windsor's talc litigation nationally wherein J&J continually represented that J&J talc never contained asbestos in any form or tremolite. *See* **Exhibit 47** (6/23/2021 Deposition of John O'Shaughnessy, Esq., *Forrest, supra,* 289:4-290:5).

103.    In furtherance of this practice, J&J routinely provided sworn affidavits from company executives asserting that there was no evidence of asbestos in its talc. **Exhibit 46** (3/8/2019 Deposition of Nancy Musco (Vol. 2), J&J Corporate Representative, *Foley, supra*, 415:17–416:25).

104.    J&J repeatedly had its litigation corporate representatives certify answers to interrogatories in asbestos-injury cases that falsely stated that there was never any evidence of asbestos in its talc. **Exhibit 6** (2/15/2019 Deposition of Nancy Musco (Vol. 1), J&J Corporate Repr., *Foley, supra*, 139:8-22).

105.    Even in cases involving J&J/Windsor's talc where J&J or Windsor was not named as a defendant directly, J&J had its in-house and outside defense counsel take over, control, and orchestrate the defense regarding J&J/Windsor's talc, including providing false answers to discovery, false affidavits, and allowing in their presence, J&J witnesses to falsely testify under oath that there was no evidence of asbestos in J&J/Windsor's talc.

   **E.    J&J's destruction and concealment of relevant evidence.**

106.    While some evidence of J&J/Windsor's talc-containing asbestos was recently discovered, despite J&J's past assertions that no such evidence existed, evidence has surfaced that

other material evidence has been destroyed or secreted away and continues to remain missing to this day.

107.    Beginning in 1969, and certainly no later than 1971, J&J was on notice that the threat of asbestos talc litigation was looming over the horizon. From that point forward, J&J had a duty to preserve evidence and documents relevant to foreseeable litigation, including the responsibility to suspend any document destruction policies.

108.    Although J&J had an obligation to preserve evidence once litigation concerning the health effects of its talc products was foreseeable, at all times material hereto, it has failed to do so. *Id.* (2/15/2019 Deposition of Nancy Musco (Vol. 1), J&J Corporate Representative, *Foley, supra*, 278:24-280:23).

109.    Documents listed on J&J's privilege log recently produced in current talc litigation prove J&J's involvement in talc litigation dating back to 1971 and nearly every year thereafter. *Id.* at 93:3-16.

110.    While J&J internally recognized there could be consequences for failing to preserve evidence, there is no record of a litigation hold ever being imposed prior to 1997. Even then, J&J's General Counsel, John O'Shaughnessy, Esq., only preserved evidence when there was a specific case actually pending and not when anticipated. **Exhibit 35** (6/30/2021 Deposition of John O'Shaughnessy, Esq., *Forrest, supra,* 728:20-729:5).

### 1.    *J&J's failure to preserve talc samples and testing documentation and output.*

111.    At all times relevant to this current Action, J&J has been in complete control of all operational and safety aspects of the domestic and foreign subsidiaries implicated in its talc, including, but not limited to, the testing of talc source ore mines and testing of industrial talc.

112.     Despite its duty under court rules, and the obvious need to and importance of retaining specimens and samples of its talc, J&J did not retain any samples of J&J/Windsor talc, which it tested regularly (albeit insufficiently), for the presence of asbestos and asbestiform minerals at any time until 2017. *See* **Exhibit 49** (10/18/2018 Deposition of James Mittenthal (Vol. 2), *Leavitt and McElroy et al., v. J&J, et al.*, No. RG17882401 (Calif. Sup. Ct. Alameda Cnty.), 405:22-407:9; 424:2-425:7).

113.     The entries on J&J's privilege log produced in recent talc litigation indicate that samples of talc relevant to litigation existed at the time the litigation in the 1970s, 1980s, and 1990s was pending, but those samples were since destroyed. **Exhibit 6** (2/15/2019 Deposition of Nancy Musco (Vol. 1), J&J Corporate Representative, *Foley, supra*, at 93:17-94:16).

114.     Although litigation was pending and anticipated, the talc samples relied upon by J&J specifically to support the "no asbestos in talc" defense, were not retained under the company's evidence retention schedules and were not subject to any litigation hold. **Exhibit 49** (10/18/2018 Deposition of James Mittenthal (Vol. 2), *Leavitt, supra*, 371:14-374:9, 384:8-387:4, 405:22-407:9).

115.     J&J's failure to institute a litigation hold made certain that the talc testing samples and results were destroyed in accordance with its routine document retention policy. *Id.* at 405:22-407:1.

116.     J&J knew, or should have known, that this data and the tested talc samples would be material in pending and anticipated cases alleging injury resulting from exposure to its talc products, and, therefore, had a duty to preserve that testing evidence. Nevertheless, J&J destroyed those testing results and discarded its samples of talc. J&J, moreover, failed to preserve its talc samples maintained in its museum after 1982 when the museum was suspended, even though litigation was pending and anticipated at that time. **Exhibit 50** (7/12/2018 Deposition of Margaret

Gurowitz, *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practicing, and Products Liability Litigation*, MDL No. 16-2738, (D. N.J.), 157:24–159:17).

117.    From the 1950s to the 2000s, J&J or outside laboratories, (including RJ Lee Group, Inc., and, McCrone), tested samples of J&J's talc for asbestos.

118.    J&J did not instruct its consultants that tested its talc ore and products to retain the samples tested, even though litigation was pending and anticipated. *See, e.g.*, **Exhibit 50** (7/12/2018 Deposition of Margaret Gurowitz, MDL No. 16-2738, 158:12–159:16).

119.    Although J&J knew it was McCrone's policy to dispose of samples 30 days after testing results were generated, it never instructed McCrone to retain any samples, including the samples tested for purposes of litigation. *See, e.g.*, **Exhibit 51** (JNJTALC000387715, 1/28/1987 McCrone Letter to Windsor Roger N. Miller re McCrone Project No. ME-3241).

120.    Based on current knowledge and belief, J&J failed to ensure the preservation of these analysis materials: TEM grids, count sheets, photomicrographs, and other documents generated during the testing. A South Carolina Court, after considering all of the evidence regarding the fate of these materials, found that the testing data was wrongfully destroyed. **Exhibit 52**, (11/5/2021 Order of Jean Toal, *Angela Hood v. Acme Markets Inc., et al.*, State of South Carolina, Charleston County, C/A No. 2020-CP-10-03946 (Charleston Ct. of Common. Pl.).

*121.*    Any test results that J&J has not yet produced are presumed to be destroyed because of J&J's failure to issue a litigation hold and suspend the disposal of evidence pursuant to the document retention schedule. *Id.*

*122.*    This missing scientific data, as well as J&J's failure to preserve it, was of utmost importance to the fair and proper adjudication of Plaintiffs' and the Class Members' claims and

J&J's defense. The limited underlying scientific data that still exists confirms that the reports of "no detectable" asbestos are (and can be) belied by the underlying scientific data, which shows evidence of asbestos.

123.     By withholding underlying or backup data/output/notes relating to the purported "none found" or "no quantifiable amount" reports to Plaintiffs' decedents and the members of the Class, J&J greatly impaired and prejudiced Plaintiffs' and the Class Members' Underlying Lawsuit cases by hampering (indeed eliminating) their ability to prove their case, as evidenced by the fact that underlying data that, by happenstance, avoided a shredder proves that the tests that J&J asserts were negative actually found the assayed J&J talc was contaminated with asbestos.

124.     J&J destroyed documents it acknowledged to be false. In this regard, J&J's internal documents produced in recent talc litigation matters indicate that numerous records related to "Products Safety" "Records Falsification", and "Record Retention Policy" were destroyed in 1998. *See* **Exhibit 48,** JNJTALC000837418 at JNJTALC00837248.

125.     The destruction of the underlying testing data was not limited to the testing conducted by McCrone, but extended and encompassed all the outside consultants hired by J&J. For example, while the University of Minnesota found asbestos in J&J's talc while litigation was pending against J&J, the photomicrographs underlying the reported findings of asbestos minerals are missing. **Exhibit 54** (3/6/2019 Deposition of Dr. Susan Nicholson, M.D., (Vol. 2), *Foley v. Avon Products, Inc., et al.*, No. MID-L-3095-18 (N.J. Law Div.), 333:8-23).

126.     In 1989, after facing litigation related to its talc for nearly two decades, including the case involving Louis Edley, and anticipating further litigation, J&J intentionally destroyed records relating to its Hammondsville, Vermont mining operations. **Exhibit 55** (JNJ 000240739,

11/23/1993 J&J Talc Report, R. Denton to W. Ashton and D. Jones, re Talc Validation Team

Meeting 11/16/1993, Windsor, Vermont, p. 3).

### 2.  *J&J's failure to preserve litigation case materials and records.*

127.    J&J preserved no records whatsoever from the majority of talc cases filed against

it prior to 2010 including the cases involving Class Members.

128.    The cases described on the J&J privilege log indicate that the records from J&J's

talc litigation dating back to 1971 are missing. **Exhibit 6** (2/15/2019 Deposition of Nancy Musco

(Vol. 1), J&J Corporate Representative, *Foley, supra*, 93:17-94:16).

129.    J&J knew and understood that evidence gathered in or adduced during litigation

concerning the health effects of its talc products would be material and relevant to other anticipated

cases. *Id.* Yet J&J failed to preserve records from any of the lawsuits that alleged injuries as a result

of all of its talc-based products, including J&J/Windsor Industrial Talc and Johnson's Baby Powder,

even though J&J knew that relevant and material documents existed and were in its possession.

130.    For those cases where there is at least some documentation, J&J either lost or

destroyed most of the material evidence related to historical litigation alleging asbestos-related

disease from its talc-based products. *See e.g.,* **Exhibit 46** (3/8/2019 Deposition of Nancy Musco

(Vol. 2), J&J Corporate Representative, *Foley, supra*, 361:24-362:17); **Exhibit 6** (2/15/2019

Deposition of Nancy Musco (Vol. 1), J&J Corporate Repr., *Foley, supra*, 232:9-17) (re missing

*Edley* interrogatories); (*id*. at 111:23–112:3) (no records from the *Cunningham* case); (*id*. at 112:10-

25) (no records from the *Kreppel* case); (*id*. at 113:12–114:3) (no records from the *Lopez* case); *id*. at

114:19-22) (no records from the *Sheldon* case).

131.    Despite being involved in countless talc/asbestos cases dating back to 1971, J&J maintains that it is only able to locate two sets of discovery responses out of the thousands of cases filed against it before 2010. *See id.* at 202:2-13.

### 3.    J&J's failure to preserve its toxicology files on talc.

132.    J&J maintained toxicology information related to talc in boxes and binders.

133.    This toxicology information contained in those files was never disclosed in the Underlying Lawsuits and to date also remains missing.

### 4.    J&J's failure to preserve William Ashton materials and records.

134.    William Ashton, a J&J corporate scientist known within J&J as "Mr. Talc," was intimately involved in issues involving and affecting the safety of talc for the entire length of his career at J&J which spanned many decades.

135.    As part of his responsibilities at J&J, William Ashton maintained his own set of files concerning J&J's talc.

136.    The files concerning talc and asbestos maintained by William Ashton, which existed while the Underlying Lawsuit litigation was pending, are presently unaccounted for in contemporary talc litigation despite their relevance. *See* **Exhibit 56** (J&J Handwritten Note from Rebecca Farlow to William Ashton) ("Here is a list of TALC files from the last case.").

### 5.    J&J's failure to preserve McCrone Associates' materials and records.

137.    According to J&J's records, McCrone was J&J and Windsor's primary outside consultant tasked with testing J&J talc for asbestos.

138.    McCrone's original testing files on J&J's talc were sent to J&J's in-house counsel while litigation was pending.

41

139.     Instead of producing those files to litigants alleging talc related injuries in the Underlying Lawsuits, the files were secreted away by J&J in the offices of its outside defense counsel. *See* **Exhibit 57** (1/3/1995 McCrone Letter from L. Brain to J. O'Shaughnessy, Esq., re Windsor - McCrone File No. ME-4055), and, **Exhibit 35** (6/30/2021 Deposition of John O'Shaughnessy, Esq., *Forrest, supra,* 442:10-443:1; 573:12-574:3; 669:14-670:13).

140.     While some McCrone testing results were finally produced in contemporary talc litigation matters sometime after 2016, which documents show the relevance of the information, the complete McCrone files, which would have included all of the original testing data secreted away in the offices of outside counsel, were neither produced to Class Members in their Underlying Lawsuits nor been produced today to plaintiffs prosecuting contemporary talc claims against J&J. The location or fate of the complete arsenal of McCrone files is unknown. Based upon this, Plaintiffs believe, and, therefore, allege that all of this critical underlying scientific data has accordingly been either lost or destroyed.

**F.     Recent discovery in contemporary talc litigation has uncovered thousands of documents which reveal that the exculpatory statements that there was no evidence of asbestos in J&J/Windsor's Industrial Talc Products J&J routinely made to courts and asbestos claimants were materially false and misleading.**

141.     Sometime after 2016, J&J in contemporary talc litigation was forced to acknowledge the existence of and eventually produce evidence of asbestos testing it withheld for nearly 50 years.

142.     That evidence established that contrary to the sworn statements of J&J's representatives and the representations of its counsel as officers of the Court, there was, in fact, evidence of asbestos in J&J's talc and its source, the Vermont mines.

143.     Not only did the routine testing of J&J's talc demonstrate the presence of asbestos as set forth above, the consulting scientists and experts used by J&J to help defend litigation secretly told J&J's in-house counsel that there was, in fact, evidence of asbestos in J&J's talc.

144.     In this regard, a recently discovered memo from 1995, that J&J's lawyers fought to keep under seal, documents a meeting between University of Vermont Geology Professor Barry Doolan and J&J's in-house counsel, John O'Shaughnessy, Esq. According to the memo, Professor Doolan reviewed the original McCrone asbestos testing file and advised O'Shaughnessy that there were, in fact, testing results in the file reporting that J&J's talc contained chrysotile asbestos.

**Exhibit 36** (4/4/1995 J&J Memo re: Site Visit to Vermont Mines and Interview with Barry Doolan – 3/23/1995).

145.     In 1998, J&J's litigation consultant, Dr. Alice Blount, Ph.D., a Rutgers University Mineralogist, advised the J&J's counsel that she ran her own tests on J&J's talc and found asbestos. **Exhibit 13** (JNJ 000064241, 4/23/1998 Letter from Dr. A. Blount, Ph.D., to M. Raymond Hatcher, Esq.). In the letter, Dr. Blount informed J&J "[a]s I told you, I believe that Johnson & Johnson's Vermont talc contains trace amounts of asbestos…." *Id.*

146.     When confronted with the evidence unearthed through recent discovery, J&J Corporate Representative, Dr. John Hopkins, Ph.D., admitted during cross examination at a recent trial that the affidavit signed by Windsor's President, Roger N. Miller in Louis Edley's case, was false. According to Dr. Hopkins's testimony:

> Q.     This is the President of Windsor Mineral [Roger N. Miller] in a lawsuit saying, no evidence of the presence of asbestos in Windsor Minerals' product. And he included – I asked you, he included everything they'd ever sold, cosmetic and industrial, has ever revealed or been revealed by this testing. Here's the question. Was that true or was that false?
>
> A.     On the face of it, it does not appear to be true.

43

****

Q.      And he was under oath, wasn't he?

A.      I believe so, yes.

Q.      And that is – you understand that is perjury, do you not?

A.      I do.

**Exhibit 2** (Testimony of Dr. John Hopkins, Ph.D., (Vol. 1 of 2), J&J Corporate Representative,

7/23/19 *Barden v. Brenntag North America, et al.*, MID-1809-17 (N.J. Law Div.), Trial

Transcript, 192:24-193:7; 194:24-195:3).

147.    Dr. Hopkins's admission proves that every statement made by J&J that there was

**no evidence** of asbestos in J&J/Windsor's talc in the context of prior litigation, including his own,

was false.

      **G.      J&J's fraudulent concealment and spoliation prevented Plaintiffs, Plaintiffs'
              decedent, and Class Members from discovering J&J's fraudulent activity despite
              the exercise of diligence, thereby warranting the tolling of any applicable statute
              of limitations.**

148.    For nearly 50 years, J&J was able to successfully keep its ongoing fraudulent

coverup of the fact that its talc contained asbestos secret and unknown by Plaintiffs, their counsel,

and others similarly situated.

149.    The successful operation of the fraudulent defense, as well as the Defendants'

own financial, corporate and/or professional well-being once the scheme got underway, depended

upon: (a) the false denial of the existence of evidence of asbestos in J&J's talc; (b) the destruction,

secreting and/or concealment of J&J's documents and evidence relating to Class Members'

underlying asbestos injury claims beginning in 1971, and (c) the concealment and cover-up of the

spoliation of documents and evidence.

150.    The successful operation of Defendants' fraudulent scheme, as well as its own financial, corporate, and/or professional well-being, once execution of the scheme got underway, depended upon maintaining continuity, consistency, and secrecy in making the false exculpatory misrepresentations and misleading omissions involved in the scheme.

151.     When executing the fraudulent defense and collateral activities described above, Defendants, therefore, carefully, consistently and, as it turned out, successfully, concealed the existence of its fraudulent litigation strategy, as well as the scheme, of its participants' involvement and activities in its commission.

152.    In view of the foregoing, Plaintiffs and the Members of the Class (as well as their decedents and lawyers) could not have discovered the fraudulent litigation actions and omissions being directed and perpetrated against them despite the exercise of reasonable diligence.

153.    In view of the foregoing, any applicable statutes of limitations should be held inapplicable or tolled due to and on account of Defendants' knowing and active concealment, suppression, and denial of the facts and evidence, as alleged herein.

154.    Further, Plaintiffs, Plaintiffs' decedent while alive, and Members of the Class (and their respective decedents where applicable) have, as a direct result of Defendants' conduct, been kept in ignorance of vital information essential to the pursuit of their claims, without any fault or lack of reasonable diligence on their part.

155.    Plaintiffs and Members of the Class could not reasonably have discovered the spoliation and the fraudulent nature of Defendants' conduct. Accordingly, Defendants should be estopped and/or enjoined from asserting or relying upon any statute of limitations, statutes of repose,

laches, or defense to any substantive cause of action based upon time limitations to defeat or hinder

any of Plaintiffs' claims asserted herein.

## V. CLASS ACTION ALLEGATIONS

156.     Plaintiffs bring this action in their own right, as personal representatives of their

late father's Estate, and as class representatives pursuant to *R.* 4:32-1 (b)(1)(A), (b)(2), and (b)(3) on

behalf of a class (**"Class"**) defined as follows:

> All Persons within the United States and its territories (or where a person is or was
> deceased, the estate of such person), who prior to the commencement date of this
> litigation: (a) filed a lawsuit (or was the subject of a survival or wrongful death
> action) against J&J, Windsor and/or a Responsible Third Party (**"Underlying
> Lawsuit"**) to obtain asbestos-related bodily injury, survival action, and/or wrongful
> death action compensation arising from or involving claimed exposure to
> J&J/Windsor Industrial Talc; and (b) who either, (i) after the suit was filed,
> voluntarily dismissed or terminated the Underlying Lawsuit or any claim in the
> Underlying Lawsuit that was based on claimed asbestos exposure from
> J&J/Windsor's Industrial Talc, including any voluntary dismissal or release of
> claims due to settlement; or, (ii) after the suit was filed, had their Underlying
> Lawsuit or any claim in the Underlying Lawsuit that was based on claimed asbestos
> exposure from J&J/Windsor Industrial Talc, involuntarily dismissed as to J&J,
> Windsor and/or a Responsible Third Party.

157.     For purposes of this class definition:

(a) **"Industrial Talc"** means talc that has not been added into or packaged into a

consumer product distributed or sold for personal body application or personal use,

such as body powder, cosmetics, or as a pharmaceutical ingredient.

(b) **"Responsible Third Party"** means any entity that was charged in an Underlying

Lawsuit with being legally responsible in whole or in part for J&J/Windsor Industrial

Talc distributed or sold prior to January 6, 1989, as to all Windsor mines, excluding

any talc distributed or sold after October 1, 1967, originating from the Johnson Mine.

46

(c) The Class includes those persons who have or had the right to claim damages derivatively based upon the Underlying Lawsuit's asbestos exposed person's asbestos-related injury, such as, by way of illustration, a spouse with consortium claims, an appointed personal representative of decedent, or the exposed person's wrongful death statute heirs or beneficiaries.

(d) The terms **"J&J"** or **"Responsible Third Party"** specifically do *not* include:

    (i)    LTL Management, LLC, or, Johnson & Johnson Consumer, Inc. (formerly known as Johnson & Johnson Baby Products Company, a New Jersey company incorporated in 1979 and wholly owned by J&J); and

    (ii)    BASF Catalysts, LLC, (formerly known as Engelhard Corporation), including its following subsidiaries and affiliates: Engelhard Industries, Engelhard Minerals & Chemicals Corporation, Minerals & Chemicals Phillipp Corporation, Eastern Magnesia Talc Company, Porocel Corporation, and Pita Realty Limited, along with each of these BASF company successors, affiliates, direct and indirect parent(s) (including BASF Corporation and BASF SE), and, any predecessor(s) who owned and/or operated the Emtal Talc mine in Johnson, Vermont, at any point on or after October 1, 1967.

(e) For avoidance of doubt, notwithstanding anything in the definition to the contrary or alleged herein, specifically *excluded* from the Class are:

    (i)    those persons who were harmed exclusively by talc that has been added into or packaged into a consumer product distributed or sold for personal

body application or personal use such as body powder, cosmetics, or as a

pharmaceutical ingredient (**"Cosmetic/Personal Use Talc Exclusion"**);

(ii)    any governmental entities;

(iii)   all judges assigned to hear any aspect of this litigation, as well as their

immediate family members, and

(iv)   the directors and officers of Defendant and its affiliated companies along

with their immediate families.

158.    Plaintiffs are a Member of the Class that they seek to represent.

159.    Members of the Class can be identified from: J&J's records, third party co-

defendants' records, insurance company records, court records, records of J&J's counsel, records of

asbestos claimants' counsel, records of unions in which Class Members belonged, and asbestos

claims representatives and claimants' records. Notice can be given to the Class through direct notice

and general print and electronic publication means.

160.    Plaintiffs' claims are typical of the claims of the other Class Members' because

Plaintiffs and all putative Class Members were and are similarly affected by Defendants' spoliation

of asbestos evidence, fraud, and fraudulent concealment, including the fraudulent litigation scheme,

which involved a systematic pattern and practice of uniform misrepresentations, concealments,

alterations, and suppression of material facts, and the declaratory and equitable relief sought and

compensatory and punitive damages related to Defendants' fraud and fraudulent concealment under

New Jersey law herein is for the benefit of Plaintiffs and Members of the Class.

161.    Class Members are so numerous that their individual joinder is impracticable. On

information and belief, the class numbers in many thousands.

48

162.    Common questions of law and fact predominate over the questions affecting only individual Class Members. Some of the common legal and factual questions include:

(a) Whether J&J and its subsidiaries, attorneys, officers, employees, agents, and representatives fraudulently concealed and spoliated material evidence relating to Class Members' underlying asbestos claims?

(b) Whether J&J and its subsidiaries, attorneys, officers, employees, agents, and representatives concealed and covered up the spoliation of material evidence relating to Class Members' Underlying Lawsuits?

(c) Whether J&J and its subsidiaries, attorneys, officers, employees, agents, and representatives wrongfully, tortiously, and unjustly utilized and exploited the spoliation of evidence relating to Class Members' underlying asbestos claims to J&J's benefit and the Class Members' detriment and harm?

(d) Whether J&J and its subsidiaries, attorneys, officers, employees, agents, and representatives systematically and uniformly misrepresented to Class Members that J&J/Windsor's Industrial Talc did not contain asbestos?

(e) Whether J&J and its respective attorneys, officers, employees, agents, and representatives systematically and uniformly misrepresented to Class Members that there was no evidence that J&J/Windsor's Industrial Talc Products contained asbestos?

(f) Whether J&J and its subsidiaries, attorneys, officers, employees, agents, and representatives knowingly and purposely withheld material information and facts to Class Members concerning the existence, whereabouts or fate of documents, and other evidence regarding the presence of asbestos in J&J/Windsor's Industrial Talc Products?

(g) Whether J&J and its subsidiaries, attorneys, officers, employees, agents, and representatives systematically and uniformly withheld material information and facts to Class Members concerning the presence of asbestos in J&J/Windsor's Industrial Talc?

(h) Whether J&J and its subsidiaries, attorneys, officers, employees, agents, and representatives directed, aided and abetted others to commit acts in furtherance of the fraudulent litigation strategy or any of its elements, and if so, who and when?

(i) Whether Defendants are liable to the Class for compensatory and punitive damages and other available relief under New Jersey law for committing spoliation, fraud, and fraudulent concealment of evidence, or materially assisting those who have done so?

(j) Whether Plaintiffs and the Class are entitled to declaratory or equitable relief based upon Defendants committing spoliation, fraudulent concealment, or aiding and abetting other defendants in the commission of these tortious acts?

(k) Whether Defendants committed obstruction of justice or a fraud upon the court by their commission of the fraudulent litigation strategy?

(l) Whether Plaintiffs and the Class are entitled to declaratory or equitable relief that alleviates and cures any impairment, detriment, or harm inflicted upon them by the spoliation of the evidence relating to Class Members' Underlying Lawsuits, including any detriment or harm attributable to the passage of time such as loss of witnesses and documentation needed to establish a Class Member's Underlying Lawsuit's asbestos injury claim?

(m) Whether Plaintiffs and the Class are entitled to equitable relief that alleviates and cures any impairment, detriment, or harm inflicted upon them by the Defendants' fraudulent and deceitful misrepresentations, acts, and omissions in furtherance of the fraudulent litigation

50

strategy, including any harm attributable to the passage of time, such as loss of witnesses and
other documentation needed to establish Class Members' claims herein?

(n) Whether Defendants should, on equitable principles, be required to disgorge any money that
are found to unjustly enrich them or were illegally earned, saved, or retained?

(o)  Whether assessment of compensatory and punitive damages against the Defendants are
warranted and just under the circumstances?

(p) Whether the spoliation of evidence relating to Class Members' Underlying Lawsuits'
asbestos injury claims was unknown and unknowable to Plaintiffs and Members of the Class
due to Defendants' concealment of the spoliation and its fraudulent litigation strategy?

(q) Whether in light of the extraordinary misconduct giving rise to this case, an immediate
publication notice to the Class apprising them of the alleged circumstances and their legal
rights at Defendants' expense is warranted and should be ordered as preliminary injunctive
relief? and

(r) Whether Class Members are entitled to a declaration that J&J's communications and/or
attorney work product relating to the fraudulent conduct and/or the spoliation of evidence are
not privileged attorney-client communication or work product under the crime-fraud
exception?

163.    The Defendants engaged in a course of conduct to perpetuate a common,
coordinated fraudulent scheme giving rise to the legal rights sought to be enforced by Plaintiffs and
the Class Members. Similar or identical common law violations are involved, and New Jersey's law
may be constitutionally, properly, and prudentially applied in this matter. Individual questions, if

any, pale in comparison and are indeed subordinate to the numerous common questions that predominate.

164.    The injuries sustained by Plaintiffs and Class Members flow, in each instance, from a common nucleus of operative facts—the spoliation of evidence and/or fraudulent or misleading denial of the existence of and/or withholding of evidence material to Class Members' underlying asbestos injury claims; the Defendants' uniform pattern practice of misrepresentations and deceitful misconduct and non-disclosures regarding the nature of J&J/Windsor's talc products; and the Defendants' false claim of nonexistence of any evidence that these products contained asbestos.

165.    Plaintiffs and the Class Members have been damaged by the Defendants' misconduct by being hampered or unable to prove claims based on the existence of asbestos in J&J/ Windsor Industrial Talc Products. In the absence of the fraudulent scheme, Plaintiffs and the Class Members would have had the unfettered right to pursue litigation against J&J and any Responsible Third Party on an even playing field in a fair and honest judicial proceeding, including the opportunity to recover compensation for their respective economic damages and losses.

166.    Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are familiar with the basic facts that form the bases of their and the Class Members' claims. Plaintiffs' interests do not conflict with the interests of the other Class Members that Plaintiffs seek to represent. Plaintiffs have retained counsel competent and experienced in class action litigation and intend to prosecute this Action vigorously.

167.    The Class is certifiable under *R.* 4:32-1(b)(1)(A) in that prosecuting separate actions by individual class members against the Defendants could create a risk of inconsistent or

varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class, the Defendants herein.

168. The Class is certifiable under *R.* 4:32-1(b)(2) in that Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

169. The Class is certifiable under *R.* 4:32-1(b)(3), because:

(a) Individual litigation of the legal and factual issues raised by Defendants' wrongful conduct would increase delay and expense to all parties and to the court system, causing a denial of justice to many Class Members.

(b) The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision and management of a complex situation created by Defendants' egregious alleged misconduct by a single court.

(c) Given the similar nature of the Class Members' claims, the uniform applicability of New Jersey common law and applicable rules of evidence in this case is warranted and proper due to, *inter alia*, the following factors: New Jersey's overwhelming significant contacts and government interests to the matter; the location of J&J's headquarters in New Jersey, where the fraudulent litigation strategy was created, directed and controlled; the location of the J&J legal department charged with implementing the strategy, the spoliation of evidence occurring in New Jersey or being directed therefrom; the commission of numerous deceitful acts and omissions taking place in New Jersey, where some of J&J's alleged fraudulent affirmations under oath were signed and notarized; and the relative

absence of material differences in the laws upon which the Class Members' claims are based; and,

(d)  The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the Class Members. The burden and expense entailed in the individual prosecution of individual cases against the Defendants on the claims at issue greatly overshadow the values of most if not all individual cases, and the number of Underlying Lawsuits effected would make trying individual suits a burden up the courts.

## VI. CAUSES OF ACTION

## COUNT I: FRAUDULENT CONCEALMENT AND SPOLIATION

170.      Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

171.      Beginning in 1969, and continuing thereafter as well, J&J was cognizant and aware that J&J had been sued by asbestos injury claimants contending that J&J/Windsor Industrial Talc contained asbestos, which caused asbestos personal injuries.

172.      In 1969, and continuing thereafter as well, J&J was cognizant and aware that it was foreseeable and likely that J&J and/or Windsor in the future would be sued by other asbestos injury claimants, including claimants who were injured or residing in New Jersey, and who would claim and contend that J&J/Windsor talc products comprised of or made therewith contained asbestos which injured them.

173.      In 1969, and continuing thereafter as well, given their knowledge about the volume and the wide use of J&J/Windsor Industrial Talc in the United States in many industries, the

54

latent and progressive nature of asbestos disease, and the direction of asbestos litigation at that time,

J&J was aware and understood that it was foreseeable and likely that J&J and/or Windsor in the

future, would be directly sued by asbestos injury claimants (including claimants who were injured or

residing in New Jersey), who would claim and contend that J&J/Windsor Talc and/or products made

with same contained asbestos which injured them. J&J also became similarly aware that it might be

called upon to defend asbestos injury claims brought against Responsible Third Parties with respect

to J&J/Windsor Industrial Talc sold during the time Windsor had operated the Vermont mines.

174.    In view of their knowledge that talc asbestos litigation against J&J, and

Responsible Third Parties was foreseeable and likely, at all times material herein, including after

1969, J&J was under a duty to preserve evidence and documents in its possession, custody, or

control that were relevant to such claims and litigation, including a duty to suspend or modify any

document retention policies that were in effect or were being put into operation as such related to the

destruction and retention of documents and evidence relevant to asbestos injury claims involving

talc.

175.    At all times material herein, J&J and its attorneys, officers, employees, agents,

and representatives also were under a legal duty of candor and truthfulness towards asbestos litigants

suing it or them, as well as to courts presiding over the lawsuits concerning these claims. This duty

of candor or truthfulness precluded the filing or submission of affidavits and verifications in support

of facts, requests, or motions where J&J, acting as aforesaid, knew the facts to be false or where it

had no reasonable and good faith basis to believe and assert the facts as being true.

176.    As set forth above, and in violation of their duties regarding the preservation of

evidence, beginning in or about the early 1970s, J&J, acting as aforesaid, began and continued to

engage in, and directed and orchestrated others to engage in, a uniform and persistent pattern and

practice of evidence spoliation by altering test reports, withholding test reports, hiding test reports

and backup data/materials, devising and then employing test methods designed to avoid or conceal

detection of asbestos in talc ore or talc products, failing to preserve evidence, and otherwise

withholding, concealing and/or destroying material evidence relating to the Plaintiffs' decedent's

and the Class Members' underlying asbestos injury claims—all with the purpose, intent, and design

of obstructing, impeding, impairing, disrupting, and/or otherwise defeating the rights of asbestos

injury litigation claimants in suits in which J&J or Windsor was or were a party or its talc products

were in issue.

177.     At all times materials herein, J&J knew that there was inculpating material

evidence relating to Plaintiffs' decedent's and Class Members' underlying asbestos injury claims in

its or their possession, custody, or control, including evidence and corporate knowledge that J&J/

Windsor Industrial Talc contained asbestos.

178.     At all times material herein, J&J knew that it and its' subsidiaries' records and

corporate knowledge, along with discovery and other litigation materials, including deposition

transcripts and related documents, in prior asbestos injury suits or claims, were a material and

important source of information and evidence regarding J&J/Windsor's Industrial Talc. J&J also

knew that said information and evidence as time progressed could not be obtained by Plaintiffs'

decedent and Class Members from any other source.

179.     As the direct, proximate, and naturally occurring result of the above described

deliberate withholding, destruction, and/or concealment of documents and evidence relating to Class

Members' Underlying Lawsuits' asbestos claims, and/or the false and misleading statements

thereafter that no such documents or evidence existed, Plaintiffs and Members of the Class were

hampered and impaired in the prosecution of their cases, and, therefore, either: (a) suffered an

involuntary dismissal of their lawsuit or a claim therein, because they could not produce evidence contradicting the false and misleading assertions and averments that J&J/Windsor Industrial Talc did not contain any asbestos and there was no evidence that it did; (b) voluntarily dismissed or discontinued their cases or claims based upon asbestos being present in J&J/Windsor Industrial Talc without consideration; or (c) voluntarily dismissed or discontinued their cases in whole or part as to J&J, Windsor, or Responsible Third Parties as parties in the Underlying Lawsuit—or as to claims in the Underlying Lawsuits that were based upon asbestos being present in J&J/Windsor Industrial Talc for a nominal or token consideration instead of full, fair, and complete compensation they were entitled to under law.

180.    As the result of the voluntary or involuntary dismissal or discontinuance of asbestos claims against J&J, Windsor, or Responsible Third Parties, Plaintiffs and Members of the Class suffered the loss of their asbestos injury claims, their right under law to pursue and receive full, fair, and just compensation for their asbestos injury claims and their right to fair, honest, and just judicial proceedings.

181.    As a further proximate result of the above tortious acts, activities, and omissions, Plaintiffs and other Class Members were hindered and impaired in the prosecution of their cases and consequently may or will incur, or have already incurred, pecuniary losses and damages, including, but not limited to: the loss of their underlying asbestos injury claims, the expenses and costs of proceeding without this evidence, the expenses and costs incurred in the effort to replace, locate, or identify evidence, and/or the cost of prosecuting this case to prove fraud, fraudulent concealment, and spoliation of evidence; any and all of which Plaintiffs and the Members of the Class would not otherwise have suffered or incurred.

182.    Plaintiffs and the Class have been irreparably harmed by Defendants' spoliation, fraud, and fraudulent concealment. Given the extraordinary circumstances here, together with the matter's overwhelming contacts and connection to New Jersey, declaratory and equitable relief from this Court is needed and warranted to help remedy the widespread injuries, harm, and deprivations suffered by Plaintiffs and the Class Members victimized by Defendants' wrongdoing in the form of, *inter alia*: (a) a declaratory judgment determination and finding that Defendants committed fraud, fraudulent concealment, and spoliation that targeted persons making asbestos claims against J&J, Windsor, or Responsible Third Parties, or, persons establishing claims based upon J&J/Windsor Industrial Talc; (b) a robust notification program providing information about Defendants' fraud, fraudulent concealment, and spoliation, as well as other information designed to enable those victimized and injured by the fraud (or where deceased or incompetent their personal representatives or next of kin) to make an informed decision regarding their rights; (c) adjunct declaratory and injunctive relief curing, as needed and just, any evidentiary harm and proof impediments Defendants' egregious misconduct is responsible for creating; and (d) a decree ordering Defendants to render an accounting and thereafter disgorgement of any monetary benefits and funds revealed in the accounting which, in all equity and conscious of the Court, Defendants should not retain under the circumstances, together with an equitable distribution of such disgorgement.

183.    In addition to the forgoing equitable relief, Plaintiffs and Members of the Class are entitled to compensatory and punitive damages against J&J for loss of their right and ability to fully and fairly prosecute their Underlying Lawsuits, under the law of New Jersey-wherein the fraudulent concealment of evidence, including the spoliation of the documents and materials, was committed, or such other law the Court finds applicable for spoliating and fraudulently concealing evidence, based upon J&J's role or roles in committing and or in directing, orchestrating, and /or

58

aiding and abetting others in the spoliation of evidence material to Plaintiffs' and Class Members'

Underlying Lawsuits.

## COUNT II: FRAUD AND DECEIT

184.　　Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated

herein.

185.　　As set forth above, beginning on or about 1971, J&J, acting as aforesaid, engaged

in a continuous, uniform, and persistent pattern and practice of falsely misrepresenting, or directing

or orchestrating others to falsely misrepresent, to Plaintiffs, Members of the Class, their counsel, and

presiding courts, that:

(a)　　J&J/Windsor Industrial Talc Products did not contain asbestos fibers; and/or

(b)　　That there was not any evidence that J&J/Windsor Industrial Talc Products

contained asbestos.

186.　　Each such representation was false and misleading at the time it was made.

187.　　Defendants, acting as aforesaid, knew each representation was false and

misleading or made the representation in reckless disregard as to its truth or falsity.

188.　　Each representation was deliberately made or directed to be made by J&J, acting

as aforesaid, with the purpose and design of obstructing, impeding, impairing, terminating, and/or

otherwise disrupting asbestos injury litigation in which J&J, Windsor, and/or a Responsible Third

Party was or were a party.

189.　　In addition to the above misrepresentations, J&J, acting as aforesaid, engaged in a

continuous, uniform, and persistent pattern and practice of, directly or indirectly, making or directing

and orchestrating others to make, material omissions of fact, or, alternatively, omitting and

withholding facts that J&J and Responsible Third Parties were under a duty to divulge in order make

any statements made, in the light of the circumstances under which they were made, not misleading,

regarding: (a) the absence of asbestos in J&J/Windsor Industrial Talc Products; and/or, (b) the non-

existence of evidence that J&J/Windsor Industrial Talc Products contained asbestos.

190.    Defendants, acting as aforesaid, knew the misrepresented, omitted, or withheld

facts and/or its non-disclosures were false and misleading to those they were made or directed to,

including Plaintiffs' decedent and Members of the Class, their respective counsel, and where and

when applicable, presiding courts. Defendants knew and intended that its misrepresentations and

non-disclosures would be repeated or republished amongst the asbestos plaintiffs' bar, be accepted

as true, and affect the advice given to and decisions made by asbestos claimants regarding asbestos

claims against J&J.

191.    Each misrepresentation and omission of material fact was deliberate and

committed with the intent, purpose, and design of obstructing, hampering, impeding, impairing,

terminating, and/or otherwise disrupting asbestos injury litigation in which J&J, Windsor, or a

Responsible Third Party was a party, or asbestos litigation in which J&J/Windsor Industrial Talc was

in issue in the matter, as well as to cover up Defendants' wrongdoing.

192.    Plaintiffs and Members of the Class, as did their respective counsel, naturally,

reasonably and detrimentally relied upon J&J to tell the truth and produce evidence required by the

rule of law, which J&J failed to do (or directed or permitted others it controlled or confederated with

to fail to do), thereby causing Plaintiffs' decedent and Class Members to either: (a) suffer an

involuntary dismissal of their lawsuit or a claim therein, because they could not produce evidence

contradicting the false and misleading assertions and averments that J&J/Windsor Industrial Talc did

not contain any asbestos and there was no evidence that it did; (b) voluntarily dismiss or discontinue

60

their cases or claims based upon asbestos being present in J&J/Windsor's Industrial Talc without

consideration; (c) voluntarily dismiss or discontinue their cases in whole or part as to J&J, Windsor,

or Responsible Third Parties as parties in the Underlying Lawsuit—or as to claims in the Underlying

Lawsuits that were based upon asbestos being present in J&J's/Windsor Industrial Talc — for a

nominal or token consideration instead of full, fair, and complete compensation they were entitled to

under law.

193.     Given the extraordinary circumstances here, together with the matter's

overwhelming contacts and connection to New Jersey, declaratory, and equitable relief from this

Court is needed and warranted to help remedy the widespread injuries, harm, and deprivations

suffered by Plaintiffs and the Class Members victimized by Defendants' wrongdoing in the form of,

*inter alia*: (a) a declaratory judgment determination and finding that Defendant committed fraud,

suppression of facts, and spoliation that targeted persons making asbestos claims against J&J,

Windsor, or Responsible Third Parties—or claims based upon J&J/Windsor's Industrial Talc; (b) a

robust notification program providing information about Defendants' fraud, spoliation, and

suppression of facts, as well as other information designed to enable those victimized and injured by

the fraud (or where deceased or incompetent their personal representatives or next of kin) to make an

informed decision regarding their rights against J&J; (c) adjunct declaratory and injunctive relief

curing, as needed and just, any evidentiary harm and proof impediments Defendants' egregious

misconduct is responsible for creating; and (d) a decree ordering Defendants to render an accounting

and thereafter disgorgement of any monetary benefits and funds revealed in the accounting which, in

all equity and conscious of the Court, Defendants should not retain under the circumstances, together

with an equitable distribution of such disgorgement.

## COUNT III: FRAUD UPON COURTS

194.    Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

195.    The fraudulent and deceitful acts and flagrant violations of the rules of court by J&J (and those by others at J&J's direction, authorization, or permission) alleged above committed in each instance a fraud upon the courts that tainted and affected the presiding court's ability to fairly adjudicate the Class Members' respective Underlying Lawsuits as well as protect and maintain the integrity of the presiding court and its judicial processes.

196.    Courts have an inherent right, power, and duty to deter such assaults upon their core function and integrity such as Defendants perpetrated, and, provide full and complete equitable relief necessary to right and correct the wrongs Defendants inflicted, including the harm to the rights and claims of parties targeted by the misconduct.

197.    Plaintiffs' decedent and Members of the Class were targeted and subjected to Defendants' acts, activities, and omissions constituting a fraud upon the courts, including the courts of New Jersey, and were proximately caused to be harmed thereby as described above.

198.    Plaintiffs and the Class have been irreparably harmed by the Defendants' fraud upon the courts for which there is no adequate remedy at law given Defendants' extraordinary misconduct and the circumstances it created thereby. Given the extraordinary circumstances here, together with the matter's overwhelming contacts and connection to New Jersey, declaratory and equitable relief from this Court is needed and warranted to help remedy the widespread injuries, harm, and deprivations suffered by Plaintiffs and the Class Members victimized by Defendants' wrongdoing in the form of, *inter alia*: (a) a declaratory judgment determination and finding that the Defendants committed fraud, fraudulent concealment, and spoliation that targeted persons making

asbestos claims against J&J, Windsor, or Responsible Third Parties or claims based upon

J&J/Windsor's Industrial Talc; (b) a robust notification program providing information about

Defendants' fraud, fraudulent concealment, and spoliation, as well as other information designed to

enable those victimized and injured by the fraud (or where deceased or incompetent their personal

representatives or next of kin) to make an informed decision regarding their rights against J&J; (c)

adjunct declaratory and injunctive relief curing, as needed and just, any evidentiary harm and proof

impediments Defendants' egregious misconduct is responsible for creating; and (d) a decree ordering

Defendants to render an accounting and thereafter disgorgement of any monetary benefits and funds

revealed in the accounting which, in all equity and conscious of the Court, Defendants should not

retain under the circumstances, together with an equitable distribution of such disgorgement.

## ¶VIII. DEMANDS FOR RELIEF

**WHEREFORE**, Plaintiffs in their own right, and on behalf of others similarly situated,

demand judgment against Defendants in the alternative for the following relief:

a.   Certification of the matter as a class action as requested;

b.   A declaratory determination and judgment that fraudulent concealment and

spoliation of material evidence relating to the existence of asbestos in J&J/Windsor's

Industrial Talc Products has occurred to the detriment of the Class Members with

corresponding mandatory injunctive relief requiring Defendants to locate and notify Class

Members or, if applicable, their personal representatives or their next of kin, as of this

finding and their corresponding need to promptly consult with counsel regarding their legal

rights as a result;

c.   A declaratory determination and judgment that J&J committed fraud and deceit, and, a fraud upon courts, relating to the existence of asbestos in J&J/Windsor's Industrial Talc to the detriment and harm of the Class Members with corresponding mandatory injunctive relief requiring Defendants to locate and notify Class Members or, if applicable, their personal representatives or their next of kin, as of this finding and their corresponding need to promptly consult with counsel regarding their legal rights as a result;

d.   A determination and declaration of the need for and ordering execution of a notice program paid for by Defendants informing Class Members or their representatives of the pendency of this Action, J&J's alleged misconduct, and their rights to proceed against Defendant to pursue the causes of action set forth herein;

e.   A declaration, injunction, or decree imposing a constructive trust upon J&J's property, and, requiring J&J render an accounting to the Court of all fees, revenues, costs, insurance proceeds, and expense savings relating to Plaintiffs' and absent Class Members' asbestos injury claims;

f.   A determination and declaration of J&J's liability for disgorgement or restitution of revenues, profits, and money unjustly earned from the commission of the frauds upon the courts, upon Plaintiffs' and Members of the Class and/or by the commission of proscribed activities described above;

g.   A determination of Defendants' liability for compensatory and punitive damages to Plaintiffs and the Class relating to the fraud, fraudulent concealment, and spoliation of evidence relevant and material to establishing asbestos injury claims against J&J; and

h.   Such other relief as may be available and just.

64

## VIII. JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: March __, 2022                    **COHEN, PLACITELLA & ROTH, P.C.**


_____/S/ Christopher M. Placitella_____
Christopher M. Placitella, Esq. (ID 27781981)
Michael Coren, Esq. (ID 24871979)
Dennis M. Geier, Esq. (ID 035272006)
Eric S. Pasternack, Esq. (ID 015132011)
Jared M. Placitella, Esq. (ID 068272013)
Justin I. Placitella, Esq. (ID 105812014)
(732) 747-9003
cplacitella@cprlaw.com
mcoren@cprlaw.com
dgeier@cprlaw.com
epasternack@cprlaw.com
jmplacitella@cprlaw.com
justinplacitella@cprlaw.com


## DESIGNATION OF TRIAL COUNSEL

Pursuant to _Rule_ 4:25-4, Christopher M. Placitella, Esq., is hereby designated as trial

counsel in this matter. Mr. Placitella's attorney identification number is 027781981.

Dated: March __, 2022                    **COHEN, PLACITELLA & ROTH, P.C.**


____/S/ Christopher M. Placitella_____
Christopher M. Placitella, Esq.

## CERTIFICATION

I hereby certify that to my knowledge the within matter in controversy is not the subject

of any other action pending in any court or of a pending arbitration proceeding, and that no other

action or arbitration proceeding is contemplated. I have no knowledge at this time of any non-

party who should be joined in this action.

Dated: March __, 2022                **COHEN, PLACITELLA & ROTH P.C.**


___/S/ Christopher M. Placitella_____
Christopher M. Placitella, Esq.