**Exhibit C**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

```
IN RE:                      .    Case No. 21-30589(MBK)
                            .
LTL MANAGEMENT LLC,         .
                            .
         Debtor.            .
. . . . . . . . . . . . . .
LTL MANAGEMENT, LLC,        .    Adversary No. 21-3032(MBK)
                            .
         Plaintiff,         .
                            .    Clarkson S. Fisher U.S.
    v.                      .     Courthouse
                            .    402 East State Street
THOSE PARTIES LISTED ON     .    Trenton, NJ 08608
APPENDIX A TO THE           .
COMPLAINT, ET AL.,          .
                            .
         Defendants.        .    Tuesday, April 12, 2022
. . . . . . . . . . . . . .      10:03 a.m.
```

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

```
For the Debtor:          Jones Day
                         By:  GREGORY M. GORDON, ESQ.
                              DANIEL B. PRIETO, ESQ.
                              AMANDA RUSH, ESQ.
                         2727 North Harwood Street, Suite 500
                         Dallas, TX 75201

                         Otterbourg P.C.
                         By:  MELANIE CYGANOWSKI, ESQ.
                         230 Park Avenue
                         New York, NY  10169

Audio Operator:          Luz Di Dolci
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

| | |
|---|---|
| For the Official Committee of Talc Claimants 1: | Brown Rudnik, LLP<br>By:  DAVID J. MOLTON, ESQ.<br>7 Times Square<br>New York, NY 10036 |
| For the Official Committee of Talc Claimants 2: | Cooley, LLP<br>By: CULLEN DRESHCER SPECKHART, ESQ.<br>55 Hudson Yards<br>New York, NY 10001 |
| | Sherman Silverstein<br>By:  ARTHUR ABRAMOWITZ, ESQ.<br>East Gate Corporate Center<br>308 Harper Drive, Suite 200<br>Moorestown, NJ 08057 |
| | Bailey & Glasser, LLP<br>By:  BRIAN GLASSER, ESQ.<br>     MAGGIE BURNS, ESQ.<br>105 Thomas Jefferson Street NW<br>Suite 540<br>Washington, DC 20007 |
| For the U.S. Trustee: | U.S. Department of Justice<br>By:  LAUREN BIELSKIE, ESQ.<br>     JEFF SPONDER ESQ.<br>One Newark Center, Suite 2100<br>Newark, NJ  07102 |
| For DeSanto Canadian Class Action Plaintiffs: | Lite DePalma Greenberg & Afanador, LLC<br>By:  ALLEN JOSEPH UNDERWOOD, II, ESQ.<br>570 Broad Street, Suite 1201<br>Newark, NJ 07102 |
| For Aylstock, Witkin, Kreiss & Overholtz, PLLC: | Klee, Tuchin, Bogdanoff & Stern, LLP<br>By:  ROBERT J. PFISTER, ESQ.<br>1801 Century Park East, 26th Floor<br>Los Angeles, CA 90067 |
| For Sue Sommer-Kresse: | Motley Rice<br>BY:  DANIEL LAPINSKI, ESQ.<br>210 Lake Drive East, Suite 101<br>Cherry Hill, NJ 08002 |

APPEARANCES (Cont'd):

For Motley Rice:            Greenbaum, Rowe, Smith & Davis LLP
                            BY:  NANCY ISAACSON, ESQ.
                            99 Wood Avenue South
                            Iselin, NJ 08830

For the Edley Family:       Cohen Placitella & Roth, P.C.
                            BY:  CHRIS PLACITELLA, ESQ.
                            127 Maple Avenue
                            Red Bank, NJ 07701

For Randy Derouen:          Levy Konigsberg LLP
                            BY:  JEROME BLOCK, ESQ.
                            800 3rd Avenue, 11th Floor
                            New York, NY 10022

For Imerys Debtors:         Latham & Watkins LLP
                            BY:  KIMBERLY POSIN, ESQ.
                            355 South Grand Avenue
                            Los Angeles, CA 90071

For Giovanni Sosa:          Cooney & Conway
                            BY:  KATHY BYRNE, ESQ.
                            120 North Lasalle Street, Suite 3000
                            Chicago, IL 60602

For San Diego County        Robbins Geller Rudman & Dowd LLP
Employees' Retirement       BY:  ROBERT R. HENSSLER, ESQ.
Association:                655 West Broadway, Suite 1900
                            San Diego, CA 92101

                            Cooley LLP
                            BY:  KEVIN COOPER, ESQ.
                            55 Hudson Yards
                            New York, NY 10001

TELEPHONIC APPEARANCES:

For San Diego County        Barulich Dugoni & Suttman
Employees' Retirement       BY:  LAURENCE MAY, ESQ.
Association:                577 Airport Blvd, Suite 400
                            Burlingame, CA 94010

1  it, and we can address the terms.  It's also uncomfortable to

2  address terms of retention and fee arrangements after the fact,

3  whether it's a flat fee versus an hourly Section 330 outlook.

4         But it's clear to the Court that from March 11th on

5  there was no need for a separate firm by TCC2 whose life span

6  was only extended for limited purposes and, again, it was

7  without notice to the Court.  So I am not even accepting the

8  invitation to retain them effective March 11th.  I am denying

9  the retention and I'll leave the parties to their -- to pursue

10 their rights.  Thank you.

11        All right.  Let's move to Number 9 on the agenda with

12 number one on CHAP, which is the motion by -- behalf of Daniel

13 Edley and Roger Edley seeking an order that the automatic stay

14 and preliminary injunction do not apply in this case.

15        MR. PLACITELLA:  Good morning Your Honor.

16        THE COURT:  Good morning, Counsel.

17        MR. PLACITELLA:  I'll be 30 seconds to get up and

18 running with Rebecca here.

19        THE COURT:  That's fine.

20        Luz, do you need a break?

21        THE CLERK:  I'm okay, Judge.

22        THE COURT:  All right.  Why don't we --

23        MR. PLACITELLA:  I'm fine to take a break because I

24 might be awhile.

25        THE COURT:  Well, why don't we take a five-minute

1 break.

2          MR. PLACITELLA: Okay.

3          THE COURT:  All right.

4          MR. PLACITELLA:  All right.

5          THE COURT:  I look around, I still see some of the

6 audience who need it.

7          (Recess at 11:20 a.m./Reconvened at 11:31 a.m.)

8          THE COURT:  All right.  Just wait one moment.

9          All right.  Good morning, Counsel.

10          MR. PLACITELLA:  Good morning, Your Honor.  Nice to

11 see you.  Chris Placitella from Cohen Placitella & Roth.  I'm

12 here on behalf of the Edley Family.  Thank you for giving me

13 the time this morning.

14          In 1947, Louis Edley went to work at a roofing

15 factory in Perth Amboy, New Jersey, not far from where he

16 lived.  He worked there until 1981.  Every day he worked making

17 roofing shingles.  And as part of that process, they dumped

18 50-pound pegs of talc all day long.  And he would go home at

19 night covered with the talc material.  He eventually got sick.

20          In 1986, he went to the Middlesex County Court in New

21 Brunswick, New Jersey to file his lawsuit seeking compensation

22 for his exposure.  Shortly after he filed his case, he heard

23 directly from Johnson & Johnson.  Johnson & Johnson's in-house

24 counsel in the General Counsel's Office wrote Mr. Edley's

25 lawyer a letter.  And they didn't go through the local counsel

56

1  or national counsel.  They went directly from Johnson & Johnson

2  to Mr. Edley's lawyer, Mr. Ron Grayzel from Edison, New Jersey.

3            And what they said to Mr. Grayzel was there's no

4  evidence of asbestos in our industrial talc.  And if you don't

5  dismiss your lawsuit now, we're going to come after you for

6  costs.  So what happened?

7            Well, Mr. Grayzel and Mr. Edley, they didn't dismiss

8  their case at first.  But they continued to be pursuit, so then

9  Johnson & Johnson came back again at Mr. Edley, this time with

10 an affidavit from the president that was authored by the

11 Johnson & Johnson lawyer.

12           THE CLERK:  Judge?

13           THE COURT:  Hold on a second.

14           THE CLERK:  We have a (indiscernible).

15           THE COURT:  Oh, all right.  Now it's unmuted.  Sorry.

16           MR. PLACITELLA:  It's not the first time that's

17 happened to me, Your Honor.

18           So they came back again, this time with an affidavit

19 from the president of the subsidiary Johnson & Johnson that was

20 selling the talc using the exact same language used by the

21 lawyer for Johnson & Johnson word for word.  They also said to

22 his lawyer, now will you give up your case and, oh by the way,

23 you're not the first one.  Other people have gotten the same

24 information from us and have agreed to dismiss their case.

25           So Mr. Edley did give up, and he dismissed his case.

1  And from 1986 until sometime in 2017, thousands of other people

2  met the same fate.  They were made representations by Johnson &

3  Johnson that the evidence didn't exist when in fact they knew

4  it did.  And in 2017 in the context of the cosmetic talc cases,

5  the evidence was produced.  The evidence was produced showing

6  that in the industrial talc, there was in fact evidence of

7  asbestos, not that Johnson & Johnson had to agree with it but

8  there was in fact evidence that was denied to the thousands of

9  people including Mr. Edley.  And then what happened?

10          So the industrial talc cases are long over now.

11  Those people's cases have been dismissed.  And in the context

12  of the cosmetic cases, the plaintiffs tried to bring in the

13  evidence from the contamination of the industrial talc.  And

14  Johnson & Johnson said, whoa, that's irrelevant.  Whether we

15  had asbestos in our industrial talc or not, that can't come in

16  this case.  In fact, they filed motions and represented to

17  courts -- and I put one up on the screen, where they said

18  evidence of industrial talc was irrelevant to a cosmetic talc

19  case.

20          Then they stood up before juries and they said the

21  same thing.  They said -- and I showed you two different

22  openings and a closing from their lawyers, by the way, in the

23  same courthouse that Mr. Edley lost his rights, two blocks from

24  the Johnson & Johnson's headquarters.  The Johnson & Johnson's

25  lawyers stood up in Middlesex County very recently, and they

1    said, well, there might be asbestos -- evidence of asbestos in

2    the industrial talc, but that doesn't count and should not be

3    admitted and you should ignore it in the cosmetic talc cases.

4         And then, their corporate representative took the

5    stand in a case we were involved in, again, two blocks from the

6    Johnson & Johnson headquarters.  And he was asked about the

7    promises and representations that were made to Mr. Edley back

8    in 1986 saying that there was no evidence.

9         And the corporate representative said in trying to

10   draw the distinction between cosmetic talc and industrial talc,

11   trying to convince the jury and the court that it was not

12   relevant, said, well, you know, the representation that we made

13   to Mr. Edley that caused him to get rid of his case.  That

14   wasn't true.  And then he was pressed by my co-counsel and

15   ultimately admitted that the statements that were made were

16   perjurious.  So what happens next?

17        Well, the Edley family decides that it's time to take

18   advantage of the law and get a little bit of their dignity

19   back.  And they rely upon a Third Circuit decision in Williams

20   v. BASF, which was strikingly similar to the circumstances at

21   issue here.  And the Third Circuit in looking at the

22   circumstances actually says what could be more important to a

23   case than evidence that there's asbestos in the talc.

24        And the court acknowledged that the plaintiff there,

25   like the plaintiff here, had a right to just compensation for

1  what happened to them.  And the court said this is not an
2  asbestos case anymore.  This is not an asbestos injury case
3  anymore.  This is a fraudulent concealment case under New
4  Jersey law that we recognize and that give these people the
5  rights, even though their case is long dismissed, to come
6  forward and get compensation.

7          So we filed a motion, Your Honor, out of respect for
8  this Court knowing that it was highly likely that Johnson &
9  Johnson would come to this court and say that if we filed this
10  case, that we were in violation of your stay order.  So -- and
11  we anticipated that they would come here and attempt to use
12  your stay as a shield for what they did to the Edley family.

13          And we filed that application before you.  And we
14  only asked for one thing, confirmation that your order does not
15  make the Edley claim an enjoined claim under your order.
16  Nothing more.  There was a lot of stuff in their papers that
17  had nothing to do with what we are asking.  So we looked at
18  your order and your order was pretty clear the stay was
19  extended to Johnson & Johnson because in this case before you
20  now -- not the Edley case -- you found that it was a claim
21  against the debtor or it could have been a claim filed against
22  JJCI.  That doesn't exist here.

23          So what happens?  Mr. Edley files his lawsuit
24  directly against Johnson & Johnson.  He has -- or they have no
25  claim against JJCI.  JJCI had nothing to do with industrial

60

1  talc.  JJCI sold baby powder.  And yet, Johnson & Johnson says,

2  well, judge, please sweep us under the blanket and give us

3  protection.  So I looked at your opinion extending the stay to

4  Johnson & Johnson.  And while we certainly on another level

5  have issue with it -- and that's for another day -- but your

6  opinion actually supports our position here.

7        In your opinion, one of the things you do is you look

8  at what are, quote, the unusual circumstances to justify

9  extending the stay to non-debtors, like Johnson & Johnson.  And

10 you said you look to see if the debtor is actually the real

11 party defendant.  And in coming to the conclusion and extending

12 the stay, which we disagree with, but extending the stay, you

13 say the reason I'm doing that is because it involved the same

14 products, the same time periods, the same alleged injuries, and

15 the same evidence as the claims against the debtor.  None of

16 that applies to the Edley case.

17        And then I went back and I looked at the PowerPoint

18 that was used by Johnson & Johnson to argue before the North

19 Carolina court and this court as to why Johnson & Johnson says

20 the law supports extending a stay to a non-debtor.  And I broke

21 that down.  I looked at your decision and their argument.  And

22 when you look at that, Johnson & Johnson's argument entirely

23 falls apart.

24        Johnson & Johnson -- and one of the things that you

25 said in your opinion that was important was that the debtor

1  actually had assumed liability for the baby powder, but with

2  respect to industrial talc, there is no assumption of

3  liability.  In fact, it's actually admitted by Johnson &

4  Johnson and LTL in their papers at Page 4 that there was no

5  assumption of liability.

6          So one of the big underpinnings for your decision in

7  extending the stay to Johnson & Johnson certainly doesn't exist

8  here.  And the elements of proof are vastly different between

9  the cause of action recognized by the Third Circuit for

10 fraudulent concealment in the Williams case and what the LTL

11 claimants must bring forward to you.  Here, issues in terms of

12 product identification, causation, specific causation, none of

13 that matters in the Third Circuit analysis.  That's not what we

14 need to prove.  So the elements of proof are dramatically

15 different.

16         The plaintiffs are dramatically different.  The Edley

17 family has nothing to do with the LTL claimants.  They're not

18 seeking damages for personal injuries.  They've lost that

19 right.  They are not prosecuting their underlying case.  That

20 case is over.  Their case is the case that's recognized by the

21 Third Circuit.  And the product at issue is different.  And

22 Johnson & Johnson and LTL admit that it's different in their

23 very briefs.

24         Now actually, in the Edley case that we put before

25 the Court, it's not even a product liability case.  But if you

62

1  looked at the underlying case where the fraud was committed,

2  that was an industrial talc case used for making roofing.  It

3  was not used for baby powder.  So the product is different.

4          The injuries are different going down Mr. Gordon's

5  slide.  The injuries are different.  The LTL claimants make

6  claims for mesothelioma and ovarian cancer.  The injury to the

7  Edley family, as recognized by the Third Circuit, is the loss

8  of a right to bring their case to begin with, that they were

9  materially hampered and impaired and prevented from proving

10 their underlying case.

11         The damages sought are dramatically different.  While

12 the LTL claimants asked for pain and suffering, emotional

13 distress, loss of enjoyment of life, and wrongful death, those

14 are not the damages sought and allowed by the Third Circuit in

15 the Edley case.

16         THE COURT:  What would be the damages in your case?

17 What would be sought in the proofs for those damages?

18         MR. PLACITELLA:  The damages, a jury would determine

19 what would be the value of the loss of the ability to bring a

20 case, one, as recognized by the Third Circuit; two, the

21 expenses involved in prosecuting that case, including whatever

22 experts you needed to bring and all the things you needed to

23 bring to bear, all the discovery that you needed to do.

24         It clearly is not -- the jury is not asked to assess

25 by virtue of what the Third Circuit said.  They're not allowed

1  to say how much for pain and suffering, how much for wrongful

2  death.  The issue is what is the value of the fraud, what is

3  the value for the loss of the right to bring a case.  And a

4  jury has a right to look at that.  And that --

5         THE COURT:  Does the prospects for success, the

6  ability to prove the underlying case, have any relevance?

7         MR. PLACITELLA:  Actually, the Third Circuit says no.

8  The Third Circuit says that you can bring this case even if you

9  lose your underlying case.

10        THE COURT:  I was going to say even if you win.

11        MR. PLACITELLA:  Even if -- no, even if you lose.  So

12 what the Third Circuit says if you brought your original case

13 and there was information that was withheld from you and you

14 lost that case, you can still bring this case recognized by the

15 Third Circuit.

16        So you do not have to prove your underlying case

17 under Third Circuit law.  You clearly only have to prove that

18 information was withheld to you -- from you, that was material,

19 and had an effect on your ability to bring a case.

20        THE COURT:  I thought in my reading of Williams the

21 underlying test is did the destruction of the -- and that was a

22 destruction of evidence, they call it concealment of evidence

23 -- that the concealment of evidence harmed the plaintiff's

24 case.

25        MR. PLACITELLA:  Yes.

1        THE COURT:  If that's the standard, don't you have to

2   establish that there was a viable underlying case?

3        MR. PLACITELLA:  Absolutely not.  All we have to do

4   is show that the person had a prima facie case to bring and

5   that they were denied the evidence to move forward.  We

6   absolutely do not have to prove that we would have prevailed on

7   the underlying case.  All we have to show is that the evidence

8   that was withheld had an impact on our ability to move forward

9   in the case.

10       And clearly, here it did because they said the

11  evidence didn't exist and, based on that representation, the

12  case was dismissed.  We never got beyond that.  And a jury has

13  a right to hear that.  So, no, we do not have to prove that.

14       THE COURT:  Again, I'm just trying to clarify for my

15  understanding.  So that the damages that would be sought in a

16  case for spoilation, in essence, are unrelated to the injuries

17  of a plaintiff, the underlying injuries?  In other words,

18  aren't you to establish any of the same elements with regard to

19  damages as far as injuries to the plaintiff?

20       MR. PLACITELLA:  We do not have to prove causation.

21  We would have to show what the case was about, but we're not

22  required to prove causation.  We're not required to prove pain

23  and suffering.  We tried to prove that this is what the injury

24  was, and the jury I'm sure could hear a little bit about it,

25  and that the person was denied the ability to go forward.

1          And then the jury can determine what is the value for

2   taking that away on a compensatory basis and, if the conduct is

3   egregious enough, whether punitive damages are available.  So,

4   no, we do not have to prove that.  And the Third Circuit is

5   very clear about that.  So the damages are different.

6          And one of the points the Court made in its decision

7   was that indemnification rights were very important in

8   extending the stay to J&J.  Well, there is no indemnification

9   issue as it relates to the Edley case.  The debtor had no

10  relationship with Edley.  There's no claim and there's no

11  assertion by Johnson & Johnson that there's any indemnity at

12  issue at all in this case.

13         And another thing the Court relied upon in your

14  decision was the issue of shared insurance.  You said because

15  that could have a conceivable effect on the bankruptcy estate.

16  But there is no issue of shared insurance here, and that's

17  conceded.

18         And, lastly, in terms of the issues outlined by

19  Mr. Gordon in his prior presentation, would the litigation put

20  an end to reorganization efforts.  Clearly, it would not.  In

21  fact, Mr. Edley has nothing to do with what's going on in this

22  courtroom.  He's not part of the mediation.  He doesn't want to

23  be part of the mediation.  And whether his case goes forward in

24  Middlesex County, New Jersey will have no bearing on the

25  outcome of this bankruptcy, good or bad.

1          So then raised by the debtor and J&J in their papers
2  was the risk of evidentiary taint.  So I went back again and I
3  looked at Your Court's decision and what the Court considered
4  in making its determination.  And the Court was pretty clear
5  that when it considered the issue of evidentiary taint, you
6  looked and said it was the same product, the same time period,
7  the same defect, and the same harm.  Well, clearly here, that
8  is not the case.  It's a different product.  It's different
9  times.  The defect is in an industrial talc product.  And the
10 harm is the harm to the case.  So clearly, it's different.

11          And if you looked even further, from an evidentiary
12 perspective, Edley poses no risk of evidentiary taint, as Your
13 Honor has defined.  This is an industrial talc case, not a
14 cosmetic talc case.  The inculpating documents, it's not like
15 this case is going to get filed and more stuff is going to come
16 out.  The inculpating documents are already out in the open.
17 And according to the Third Circuit, the Edley case, like the
18 Williams case, is not a personal-injury case.  So there is no
19 danger of evidentiary taint.

20          And as I said, J&J actually takes the position that
21 industrial talc has nothing to do with the Johnson's baby
22 powder case.  They take the position that it's entirely
23 separate.  They say that it is irrelevant.  They file motions
24 before courts to keep the industrial talc evidence out of
25 court.

1    Their lawyers stand up before juries and say

2 industrial talc contamination, well, maybe the industrial talc

3 is contaminated, but that came from a different place.  We put

4 our product through some purification process so, ladies and

5 gentlemen of the jury, you may hear evidence of industrial

6 talc, but it's irrelevant.  It's irrelevant, and they say that

7 case in and case out.

8    And there's no danger of taint here as it relates to

9 Mr. Edley because their corporate representative already got on

10 the stand in Middlesex County, raised his hand, and told the

11 court and a jury that what was told to Mr. Edley was false.  So

12 there's no danger of more information coming out that could

13 hurt the baby powder case.

14    And then we get to the issue of whether an injunction

15 is -- even if you found that somehow the stay is extended, is

16 an injunction appropriate in these circumstances.  And, again,

17 I go back to your opinion and I look at your opinion and lay

18 out four distinct issues: one, whether the movant has a

19 reasonable probability of success on the merits.  Now, based on

20 what I heard this morning, that might not be so anymore.

21    But putting that aside, then you look at whether the

22 movant will be irreparably injured -- and the movant there was

23 obviously Johnson & Johnson -- by the denial of relief.  And

24 then you defined what irreparable injury is in your opinion,

25 and you say, well, if the case goes forward, will it hinder

1  reorganization efforts.  Will it drain the resources of Johnson

2  & Johnson to be able to focus on the bankruptcy?  Are there

3  contractual indemnification issues that we can't get around?

4       Well, starting with the last one, we know that that

5  doesn't apply.  We know that there's going to be no inhibition

6  on the ability to handle Mr. Edley's little case.  Johnson &

7  Johnson is litigating product-liability cases all over the

8  United States right now.  They have the resources.  They are

9  manning every one of these cases.  They have the resources and

10  the talent and the legal firepower to deal with it.  They're

11  dealing with attorney generals in I don't know how many, 40,

12  different states on issues.

13       So can they go down two blocks away from corporate

14  headquarters to little Middlesex County, New Jersey and defend

15  against the Edley case?  I would submit that they can and that

16  there's no drain on their resources.  And if you look at their

17  most recent 10Q filed, I think, on 1/2/22, they actually say,

18  well, look, despite all the stuff that we're involved in, this

19  will have no effect on us.  We have the resources and the power

20  to move forward, and this will not affect our bottom line.  We

21  can handle all the legal issues we have before us.  And I would

22  submit that includes Mr. Edley.

23       So then, you stated in your opinion but the Court

24  must next consider whether granting the injunction would cause

25  harm to there the talc claimants but here the Edleys.  And I

1  submit the evidence is overwhelming.  The Edleys, they have no
2  right to anything in this bankruptcy.  They're not covered by
3  this bankruptcy.

4         If they don't get their day to go forward in court,
5  they don't get compensated for what happened to them.  They
6  don't get compensated for the things that went on in Middlesex
7  County, New Jersey.  They're not part of any QSF, nor do they
8  want to be.  And what will happen is that the Edleys will
9  suffer irreparable injury if this case is enjoined.  Their
10 opportunity for justice will be denied, and they will not get
11 the relief that the Third Circuit says they're entitled to
12 seek.

13        And then the last thing that you specify, Your Honor,
14 is will enjoining the Edley case be in the public interest.
15 Well, it's hard to imagine how stopping the Edley case could be
16 in the public interest.  Then thousands of people who suffered
17 the same fate as the Edley family will never see their day in
18 court.  The thousands of people who Johnson & Johnson told
19 there was no evidence and their lawyers gave up and they went
20 home and they lost their constitutional right to a jury trial,
21 they'll never see their day in court.

22        And then, the courts where this case was eventually
23 brought will never have the opportunity to examine what exactly
24 happened to the Edleys and other people like them.

25        Lastly, Your Honor, there was a lot of rhetoric in

1  the papers submitted by the debtor and Imerys about the Imerys

2  bankruptcy.  Well, I would submit that our application has

3  nothing to do with that.  We're here before you asking for one

4  thing out of respect for Your Honor, and that is a confirmation

5  that the Edley case is not an enjoined claim as defined by your

6  order and elucidated by your opinion.

7          And I would submit, respectfully, that despite best

8  efforts, this Court does not have jurisdiction over the effect

9  of the Imerys bankruptcy and whether that should apply.  And I

10 would submit, and it was startling, frankly, that when I read

11 the papers of my opposition, they never mentioned the fact that

12 the issue of a stay was already addressed in the Delaware court

13 under less egregious circumstances than this.

14         So if we're forced to go there and address it, and I

15 don't think we ever will be, we're more than willing to do

16 that.  But as it relates to this Court, there was one issue to

17 deal with and one issue only: Is the Edley case an enjoined

18 claim under your order?  And we would submit that it is not.

19         Now I recall that there were three or four pages in

20 the beginning of Johnson & Johnson's brief criticizing counsel

21 and criticizing statements made to the North Carolina court

22 that statistics are people with tears wiped away and somehow

23 that I was out of line for saying that.  So I submit to you,

24 Your Honor, I don't feel out of line saying that here because

25 Johnson & Johnson wants Mr. Edley to be a statistic with the

1  tears wiped away that they've long since forgotten.

2        And we ask that you not let him be forgotten and

3  allow him at least from your perspective and say it's not an

4  enjoined claim to move forward with this case elsewhere.

5        Thank you.

6        THE COURT:  Thank you, Counsel.

7        Good morning.

8        MR. PRIETO:  Good morning or good afternoon, Your

9  Honor.

10        THE COURT:  Well, good afternoon.  We got there.

11        MR. PRIETO:  Dan Prieto of Jones Day on behalf of the

12  debtor.

13        Your Honor, let me just start by saying I'm not here

14  to address the merits of the underlying class action complaint.

15  There were some comments and some slides regarding allegations

16  made in that complaint.  I'll just say it for the record, we

17  dispute those allegations and believe they're distortions of

18  the evidence.  But that can be addressed, if we need to, at a

19  later date.

20        Also, there seems to be some confusion about what the

21  debtors' position is with respect to this motion because we

22  spent a lot -- Counsel spent a lot of time going through Your

23  Honor's PI order and whether or not it applied.  Let me just

24  state clearly, the debtor does not dispute that the class-

25  action complaint avoids Your Honor's PI order and the automatic

72

1  stay in this case.  And, frankly, that appears to be by design.

2           But I would submit to Your Honor there are two

3  primary reasons why we believe the Court should not endorse the

4  filing of this class-action complaint and should not approve

5  this motion.

6           First, the complaint is premised on allegations --

7  again, which we dispute, Your Honor -- that have been

8  previously made in the cosmetic talc litigation against Old

9  JJCI, which is now LTL's responsibility, and J&J.  And as a

10 result, if the class-action complaint is filed, the debtor will

11 feel compelled to go seek to enjoin it under 105.

12          And then, second, Your Honor -- you saw this in the

13 papers -- the complaint, we believe, is clearly subject to the

14 automatic stay in the Imerys case and, thus, cannot go forward

15 without counsel seeking relief from the Imerys bankruptcy

16 court.

17          So, you know, from our perspective, this motion

18 should have also been filed in the Imerys case.  But since it

19 was filed here -- and I will make one more comment about that.

20 Counsel indicated that, well, we felt compelled out of respect

21 for Your Honor and we didn't want to go run afoul of the order.

22 But they never came to the debtor and previewed this or asked

23 us what our views were before filing it.  It just was filed.

24          So, you know, given that it was filed, we felt

25 compelled to respond to it and feel compelled to raise issues

1  that go to whether it's appropriate for this class action to

2  proceed.  So let me just briefly discuss, Your Honor -- I'll

3  try to be very brief -- you know, in a little more detail the

4  two reasons why we think this complaint should not go forward.

5        First, let me talk about the overlap with respect to

6  the allegations made in the cosmetic talc litigation.  The

7  allegations made in the underlying cosmetic talc litigation are

8  virtually identical, Your Honor, to the allegations that you

9  see in this draft class-action complaint.  And I think the

10 example that's probably the clearest of that is the proposed

11 amended master complaint in the MDL, which we attached to our

12 objection.

13       And as Your Honor may be aware, the MDL is dealing

14 with cosmetic talc products, shower-to-shower, Johnson's baby

15 powder.  It's not dealing with industrial talc.  Yet, if you

16 look at the proposed amended complaint, it contained virtually

17 the same exact allegations that are in the class-action

18 complaint that's not styled as an industrial talc case.

19       And, you know, so think about that, Your Honor.  We

20 have the MDL against Old JJCI and J&J -- Old JJCI being our

21 responsibility -- making the same exact arguments that are now

22 being packaged in an industrial talc case, yet, the MDL is

23 stayed.  So if this were to go forward, the same exact

24 allegations would be pursued outside of this court during the

25 pendency of our Chapter 11 case.

1           And, Your Honor, even in the class-action complaint

2  itself, there's extensive reliance on evidence from the

3  cosmetic talc cases.  The class action cites, I think, 12

4  witness transcripts over 50 documents from those cosmetic talc

5  cases.  So they're really relying on some of the same evidence

6  that's relevant to the debtor in those cosmetic talc cases.

7           And I heard counsel today say, well, but, you know,

8  Old JJCI and J&J have argued that those are -- you know, that

9  industrial talc evidence is irrelevant to the cosmetic talc

10 cases.  That's true.  We believe that.  But here, you have them

11 using the cosmetic talc evidence in their industrial talc

12 complaint.  How is that appropriate?

13          So, Your Honor, because of this overlap, this is

14 precisely why if the class-action complaint is filed, the

15 debtor will have no choice but to come before Your Honor

16 seeking to enjoin it because, again, otherwise, the allegations

17 made against LTL in those cosmetic talc cases will be

18 adjudicated outside of this court while we're in bankruptcy

19 trying to resolve this case.

20          And, you know, this is particularly -- the timing of

21 all this is particularly bothersome and troubling because, you

22 know, Your Honor's well aware the status of this case.  We're

23 in the midst of mediation and, you know, really don't think

24 it's an appropriate time to be distracted by, you know, this

25 type of complaint which would require us to take action.

1      So -- and I guess the final point I wanted to make,

2 there was a lot of discussion about, well, J&J has the

3 resources to deal with this, J&J, you know, won't be bothered

4 by this.  Well, this -- the argument I'm advancing is not about

5 J&J's interest.  It's about the impact it would have on LTL's

6 bankruptcy case.  So I would submit all of that argument is not

7 relevant to the issues.

8      So let me talk briefly about the Imerys stay.  Your

9 Honor, from our perspective, the class-action complaint makes

10 clear that the fraud claims asserted against J&J arise from

11 exposure to industrial talc that was mined and sold by Windsor

12 Minerals, Inc.  And I think Your Honor's probably well aware of

13 this from the papers but, just to be clear, Windsor is Imerys

14 Talc Vermont, Inc., which is one of the Imerys debtors.

15      And so I believe there's two reasons why this class-

16 action complaint would violate Imerys' stay.  The first is that

17 the claims asserted in the class-action claim -- complaint are

18 necessarily, from my perspective, claims against Imerys and,

19 therefore, are stayed under Section 362(a)(1).

20      There really could be no fraud by J&J, as is alleged,

21 unless the talc mined by Imerys actually harmed the claimants.

22 I mean was actually the cause of their injury.  And I know we

23 had some discussion about this.  Your Honor had some discussion

24 with counsel.  From my perspective, there can be no damages

25 either for the alleged conduct if, in fact, the industrial talc

1  mined by Imerys was safe and free from asbestos.

2          I read the Third Circuit opinion I think the same way

3  Your Honor did, which is what's the ultimate impact on the

4  value of the case.  Well, if there is no value to the case

5  because asbestos was not in the talc and the talc is safe, how

6  could there be damages?

7          And the final thing I would note about that, Your

8  Honor, you're not hearing counsel make a concession or offer to

9  not put on evidence that they believe the talc was contaminated

10 or was harmful.  And I'm confident based on my reading of the

11 class-action complaint that, in fact, they will be arguing that

12 if it goes forward.

13         So, you know, therefore, what's being implicated is

14 Imerys' conduct.  Did Imerys produce a harmful product?  Did

15 Imerys cause this injury?  And then the complaint is coming up

16 with a theory as to how to pursue J&J for those -- for Imerys'

17 conduct.  And I think that's in part why you're seeing Imerys

18 file an objection and I think you'll hear from Imerys today.

19         But more fundamentally, Your Honor, the number of the

20 alleged misrepresentations inserted in the -- asserted in the

21 complaint were actually made by directors, officers, and

22 employees of Imerys itself.

23         And, in particular, Your Honor -- and you heard it

24 again today during the slides -- there was a 1987 affidavit

25 signed by Windsor's president, there's a number of citations to

1  the complaint about alleged statements that Windsor's present

2  made, there's decisions of the Windsor's board that are alleged

3  to have been improper, there's letters to and from directors

4  and officers of Windsor.  That's all in the complaint.  You can

5  see some of it in Paragraphs 37 and 76.

6          So, again, fundamentally, the complaint's asserting

7  claims based at least in part on the alleged fraud by officers,

8  directors, and employees of Imerys Talc Vermont, which to me

9  clearly implicates the Imerys stay.

10         And then, second, Your Honor, the class-action

11 complaint, the way I read it, alleges claims owned by Imerys'

12 estate and, thus, violates Section 362(a)(3) because it would

13 be an effort to exercise control over those claims, which is

14 property of the estate.

15         Now, look, we dispute that Imerys has those valuable

16 claims against J&J or LTL.  But if you allege that Imerys

17 supplied harmful industrial talc, as they do, and that you

18 allege Imerys made misrepresentations about the talc or about

19 the evidence relating to the talc, then the question is how do

20 you hold J&J responsible for it.  Well, it must be based either

21 on an allegation that J&J is the alter ego of Imerys Vermont or

22 that J&J owed indemnity to Imerys Vermont.

23         And with respect to the alter ego, Your Honor, I

24 think the complaint, to me, pretty clearly asserts alter ego.

25 The complaint seems to allege that J&J is the alter ego by

1  alleging that J&J controlled Windsor, that J&J controlled all

2  major decisions made by Windsor.  That's in Paragraphs 35, 36,

3  and 37 of the complaint.  And Paragraph 40, I think, even says

4  it even more clearly, and I'll just quote it -- part of it, at

5  least:

6           "At all times relevant, J&J dictated the marketing

7            and health and safety decisions as well as all the

8            litigation strategies and actions of Windsor."

9           And, to me, those are the typical type of allegations

10 that are advanced to try to support a veil-piercing or alter-

11 ego claim based on alleged domination and control.  And, of

12 course, you know, you read in the papers that Imerys asserts

13 that it has indemnity rights against LTL And J&J.  And,

14 obviously, to the extent that the plaintiff is relying on that

15 indemnity, that would be property of Imerys' estate.

16          Now counsel this morning argued that -- I think it's

17 in the papers, as well -- that the Delaware District Court

18 opinion in In re Imerys Talc America dictates that the

19 automatic stay does not apply in Imerys to the class-action

20 claim.

21          And I think the argument that they're making is that,

22 well, there the court ruled that the district court lacked

23 jurisdiction over the claims against J&J because the claims

24 were about J&J's own conduct and not by -- not alleged to be

25 violations by Imerys and that the resolution of the claims

1  before the district court in that case would not determine the

2  liability of Imerys debtors.

3          Also, I would note that that case was not an

4  industrial talc case.  That was a cosmetic talc case.  But the

5  situation here is very different with respect to the

6  class-action complaint.  As I just discussed, Your Honor, the

7  class-action complaint alleges fraud by Imerys itself.  So

8  that's very distinguishable than the opinion they're relying

9  on.

10          And the premise of the complaint is that the

11  industrial talc mined and sold by Imerys was harmful and

12  contained asbestos.  Again, different from the opinion in the

13  Imerys Talc America's decision.  In fact, Your Honor, the very

14  first paragraph of the class-action complaint asserts that the

15  action seeks relief for claimants who sued Windsor for asbestos

16  personal-injury damages caused by exposure to industrial talc

17  products mined, milled, sold, and distributed by Windsor.

18          So, Your Honor, the final argument I think I'll

19  address -- I'm trying to see if I missed anything -- is that

20  the -- Counsel argued that they do not need an alter-ego claim

21  -- I think he argued this in his reply -- because they're just

22  alleging fraud by J&J and the class-action complaint, so what's

23  this discussion about alter ego.  But, again, they're just

24  ignoring that the complaint is filled with allegations the

25  Windsor engaged in tortuous conduct and that J&J should be held

1  responsible for that conduct because it is alleged to dominate

2  and control Windsor.

3          So, Your Honor, just to conclude, I would submit to

4  Your Honor that the motion should be denied.  There's really no

5  dispute in terms of, you know, the PI order and the stay.  But

6  we don't -- you don't need to endorse this action because it

7  would distract this case.  And I think more fundamentally, it's

8  clearly subject to the Imerys stay, and if they want relief

9  from the Imerys court on that issue, they should go seek it.

10         THE COURT:  All right.  Thank you.

11         MR. PRIETO:  Thank you, Your Honor.

12         THE COURT:  Thank you, Counsel.

13         MS. POSIN:  Good morning, or good afternoon, Your

14  Honor.

15         THE COURT:  Good afternoon.

16         MS. POSIN:  Kim Posin of Latham and Watkins, counsel

17  for the Imerys debtors, Imerys Talc America, Imerys Talc

18  Vermont, and Imerys Talc Canada.

19         As this Court is aware, each of the Imerys debtors

20  have a Chapter 11 case pending in Delaware.  Mr. Prieto stole a

21  bunch of my thunder, so I will try to be much more brief.  He

22  made a lot of the points that I had intended to make today and

23  that were also in our objection.

24         As both Mr. Placitella and Mr. Prieto have pointed

25  out, the motion before the Court today is only relating to the

1  automatic stay that is imposed by this Court in this case, the

2  LTL case.  It does not separately request, nor could it, relief

3  from the Imerys automatic stay.  However, given the allegations

4  of the proposed complaint, if this Court does permit the

5  complaint to proceed against J&J, the Imerys debtors will seek

6  appropriate relief in the Delaware bankruptcy court to prevent

7  a violation of their separate stay.

8          The proposed complaint is problematic from the Imerys

9  debtors' perspective for a couple of reasons, many of which

10  have already been pointed out.  First, the industrial talc at

11  issue, as Mr. Prieto noted, was mined, processed, and

12  manufactured by Imerys Talc Vermont, or ITV, one of my clients,

13  formerly known as Windsor Minerals when it was a subsidiary of

14  J&J prior to its sale in 1989.

15          Second, the alleged misrepresentations and the prior

16  statements and reports that are provided in the complaint upon

17  which the movants rely to support their case include a number

18  of statements made by officers, directors, employees of ITV,

19  including multiple statements by Roger Miller, who was at that

20  time, the president of ITV.  In fact, I think the first page of

21  the complaint provides an excerpt with respect to statements

22  that were made by Mr. Miller.

23          We're not arguing, to be very clear, that every talc

24  claim against J&J is necessarily a claim against ITV.  We are

25  not making that argument.  But here, the specific factual

1  allegations of this complaint make it very clear that the

2  allegations against J&J are undeniably intertwined with

3  allegations against ITV.

4       The movants allege on behalf of the class of many

5  thousands of asbestos claimants that they dismissed pending

6  asbestos-related personal injury claims against ITV, not

7  against J&J, against ITV, specifically based on exposure to

8  talc produced by ITV as a result of allegedly false statements

9  made by ITV, as well as statements made by J&J.  Thus, the

10 complaint is not strictly limited to J&J's conduct, as alleged

11 by the movants in their reply.

12       In addition to relying on statements made

13 specifically by ITV, the complaint contains no allegations that

14 I could see that J&J itself ever actually produced any of the

15 industrial talc that is at the heart of the movants' claims.

16 As such, the movants could seemingly rely on many of the same

17 alleged facts to try to bring precisely the same fraud claims

18 directly against ITV in a separate or an amended complaint, but

19 for the existence of the automatic stay.

20       Notably, Paragraph 162 of the complaint provides that

21 eight of the common questions for the class refer to J&J and

22 its subsidiaries, which presumably would include ITV, including

23 whether J&J and its subsidiaries fraudulently concealed and

24 spoliated material evidence relating to class members'

25 underlying asbestos claims and whether J&J and its subsidiaries

1  systematically and uniformly misrepresented to class members

2  that J&J/Windsor's industrial talc did not contain asbestos and

3  that there was no evidence that J&J/Windsor's industrial talc

4  products contained asbestos.

5       There is no purpose to including allegedly false

6  statements made by ITV in the proposed complaint, unless

7  movants also seek to establish direct claims against ITV or, as

8  Mr. Prieto points out, unless they seek to assert alter ego

9  claims against J&J resulting from those statements based on

10 J&J's prior ownership of ITV at the time and numerous

11 allegations in the complaint that J&J directed or orchestrated

12 the statements that were made by ITV and/or controlled ITV

13 during this period of time.

14      To the extent the movants argue that J&J was the

15 alter ego of ITV prior to 1989, such that statements made by

16 ITV can be attributed to J&J, any such alter ego claims belong

17 to the Imerys debtors' estates.  Likewise, to the extent the

18 movants are attempting instead to argue that their claims

19 against ITV should be indemnified by J&J pursuant to J&J's

20 indemnification obligations to the Imerys debtors, those claims

21 likewise belong to the Imerys debtors' estates.

22      Finally, and I wanted to touch on some of the points

23 or the questions that Your Honor had for Mr. Placitella.  If

24 the complaint were permitted to proceed, it is probable, almost

25 certain, that both sides would seek discovery with respect to

1  the alleged misrepresentations, including those that are

2  attributed to ITV, and that a court would consider those

3  materials relating to ITV's talc and to those representations

4  in determining whether the movants or other members of the

5  class were harmed and are, therefore, entitled to damages.

6                         (Audio interference)

7            MS. POSIN:  The BASF opinion, as cited by the

8  movants, does not make the requirement to show damages any less

9  of a reality.  As the New Jersey district court later

10  determined in a related discovery dispute in the BASF case,

11  "Causation still creates an issue for discovery.  Defendants

12  are entitled to explore, through discovery, the link by

13  causation between defendant's conduct and plaintiff's damages."

14            The district court also noted that the Third Circuit

15  decision that was cited by the movants, "acknowledges the need

16  for discovery into how the defendant's alleged misconduct

17  affected the plaintiff's underlying cases."  That's Williams

18  vs. BASF Catalysts, 2017 W.L. 3317295.  The district court also

19  concluded that a plain reading of the New Jersey Supreme

20  Court's decision in Rosenblit vs. Zimmerman, which is also

21  cited to, makes clear that exposition of the underlying

22  litigation is required.

23            For all of these reasons, the allegations pertaining

24  to ITV in the complaint and any court rulings or findings

25  related thereto constitute an action that would directly affect

1  the Imerys debtors' estates under Section 362(a)(3) of the

2  Bankruptcy Code.  To the extent this Court denies the motion,

3  there may be no further action that needs to be taken in the

4  Imerys debtors' cases, but if that is not the outcome of

5  today's proceedings, then the Imerys debtors are prepared to

6  take any steps necessary in the Delaware bankruptcy court to

7  ensure the protection of their estates.

8          Thank you, Your Honor.

9          THE COURT:  Thank you.

10         Mr. Placitella.

11         MR. PLACITELLA:  Thank you, Your Honor.

12         So to be clear, I'm trying to understand what I just

13 heard.  J&J does not oppose our motion, but if you grant our

14 motion, then they're going to come back under 105 and say it's

15 enjoined.  Or they don't want you to rule on it, that's why we

16 came here.  We came here to ask you just to confirm that the

17 Edley case is not an enjoined talc action.  That's what we

18 asked for.

19         All this argument about Imerys, they want to go fight

20 that somewhere else, let them have at it.  I believe the law is

21 pretty clear that it won't be enjoined there either.  And there

22 is no alter ego claim.  The law is pretty clear.  The plaintiff

23 is the master of their complaint.  We are going by the book

24 from the Third Circuit argument from the Third Circuit decision

25 about what the elements are that we intend to prove.

1          The fact that we put evidence in the complaint, which

2    is supported by the Third Circuit's decision in terms of how it

3    should be framed, doesn't take away from the fact that the

4    elements are what they are.  This is not a personal injury

5    case.  It is a fraud case.  And J&J is now asking the Court to

6    go one step further than they did before.  Not only should you

7    protect us from litigating cosmetic talc cases, but we need you

8    to protect us so we don't have to answer for any of our conduct

9    going back to the 1980s for what they did to these people.

10          If the Court enjoins this case, then the Edleys and

11   the other people like them will lose their rights.  They say

12   that they'll be distracted.  They're not going to be

13   distracted.  They're going to keep fighting with T1 and T2 and

14   T0.  They're not going to be distracted.  They'll have a

15   different team dealing with this case in Middlesex County, New

16   Jersey.  They're there every day.  I spoke to one of them

17   yesterday morning.  They'll have a different team.  So it's not

18   going to distract anyone.

19          So at its base, the Edley case is not an enjoined

20   claim.  There are no assumption of liabilities.  There is no

21   indemnification.  None of the factors that you articulated in

22   your decision justifying extending the stay to J&J apply here.

23   And these people will be irreparably harmed.  And if Imerys

24   wants to take the Edleys to court in Delaware, let them have at

25   it.  But that's not for this Court.  And I'm, frankly, puzzled

1 why they're -- I guess they want you to articulate some

2 language that they can use when they go to Delaware, and we'll

3 deal with Delaware if that's where they go.  But if you look at

4 the opinion from the Delaware court where a lot of the

5 allegations were the same on a compensatory case, the court

6 struck away this argument of related-to.

7          But this is a different case.  Yes, the evidence may

8 be some of the same, but this case is about fraud.  There is no

9 personal injury left in the case.  They lost that.

10          Now, what a court will value, what a jury will value,

11 some court will decide in the *limine* motions later on.  But

12 that's not for here.  The only thing we're asking you, and I'm

13 going to sit down, I promise --

14          THE COURT:  It's all right.

15          MR. PLACITELLA:  -- is to determine one way or

16 another whether your order was intended to enjoin the Edley

17 case.  That's it.

18          Thank you.

19          THE COURT:  Thank you, Counsel.

20          All right.  The procedural posture of the issues

21 presented actually make, from the Court's perspective, a

22 decision relatively easy and straightforward.  This motion

23 filed on behalf of Daniel and Roger Edley seeking an order of

24 this Court confirming that the automatic stay or the

25 preliminary injunction previously entered do not apply to a

1  punitive class action to be filed against Johnson and Johnson

2  and other non-debtor defendants or in the alternative, seeking

3  stay relief.

4          This Court has jurisdiction over this matter pursuant

5  to 28 U.S.C. Section 1334.  This is a core matter under

6  28 U.S.C. Section 157(b)(2).

7          The issue presented is relatively narrow, as

8  explained.  Does the automatic stay initiated as a result of

9  LTL Management's bankruptcy filing extend to the punitive class

10 action?  Or does the punitive class action fall within the

11 enjoined talc claims that are enjoined pursuant to this Court's

12 prior order?

13         Let's address the first issue.

14         This is not an action facially against the debtor,

15 LTL Management.  The issue becomes, is there the identity of

16 interests or are there property interests that could be

17 impaired?  So in other words, we look at 362(a)(1) and

18 362(a)(3).  And the criteria employed in the Court's prior

19 decision focused on the fact that there was shared insurance,

20 that there were indemnification issues, that there were

21 obligations relative to this debtor's assumption of liabilities

22 related to the personal injury claims arising from the sale and

23 distribution of talc under the 1979 transaction.

24         Those issues aren't present here.  The Court cannot

25 make a determination that the proposed class action, which will

89

1 be bottomed on spoliation issues, which will be bottomed on

2 fraud on the Court against Johnson and Johnson, are subject to

3 the automatic stay because the Court cannot make a finding that

4 the debtor has any indemnification obligations or that there's

5 any shared insurance that would be threatened by continued

6 prosecution of such claims.

7        Turning to the preliminary injunction aspects, the

8 Court looks at the definition of enjoined claims.  And I

9 believe it's been acknowledged by Counsel for LTL that under

10 the definition, which reads "of enjoined talc claims" means any

11 talc-related claims against the debtor, including all claims

12 relating in any way to talc or talc containing materials that

13 were asserted against, or that could have been asserted

14 against, the former Johnson and Johnson Consumer, Inc., Old

15 JJCI, on any theory of liability, whether direct,

16 (indiscernible) joint, several, et cetera, allocated to the

17 debtor from Old JJCI and the documents implementing the 2021

18 corporate restructuring.

19        The Court doesn't see on this record that the claims

20 that are subject to the punitive class action could be, or

21 could have been, brought against Old JJCI for which the debtor

22 assumed responsibility and liability.  So in answering the

23 question that is raised by the motion, the Court's prepared to

24 grant the motion limited in that fashion, that the automatic

25 stay does not apply to that class action.

1           And let me be clear because we're going to want to

2    discuss this, the automatic stay in this proceeding initiated

3    by LTL Management, LLC's, filing does not apply to stay the

4    punitive class action.  Nor, as defined in the Court order,

5    would such a class action fall under the enjoined talc claims

6    that are subject to the existing preliminary injunction.  So

7    the Court can grant the motion in those limited respects.

8           But let me be clear what the Court is not ruling

9    upon, whether or not the punitive class action would violate

10   the automatic stay in the Imerys talc bankruptcy.  Not only

11   would my comments on that -- well, let me -- the Court has

12   concerns and reservations as to whether it does, but my ruling

13   on that would not be binding on Judge Silverstein or the

14   Delaware court unless it would be simply advisory, and I have

15   enough problem with giving my rulings that aren't advisory.  I

16   don't need to enter advisory rulings.  That's for another day

17   in another court.

18          Nor am I ruling that this debtor cannot make a case

19   out for a preliminary injunction of this class action before

20   me.  But that's not what was presented on this record.  What

21   was asked is whether the existing injunction covers that class

22   action, and it doesn't.  I have no inclination one way or

23   another on whether the debtor can satisfy the significant

24   burdens in meeting the standards for a preliminary injunction

25   of this action were it to be brought before me.

1           And while I need not invite more litigation in front

2     of me, I can't avoid it either.  If it happens, it happens.

3     But on this record, I am prepared to grant the motion as filed.

4     I'll take a look at it and make sure it doesn't go beyond the

5     scope of how I've ruled and what I'm not ruling upon.  But for

6     our purposes today, the ruling will stand as granted.

7           Well, let's see, it's 12:35, and this was going to be

8     the easier one.  We have the adversary proceeding on San Diego.

9     What's the inclination of Counsel?  I hate to steam through

10    because that's going to go, I would anticipate, another hour,

11    if there's any indication.  Any thoughts, Counsel?  And then,

12    we still have a few matters that Mr. Abramowitz wanted to

13    raise, housekeeping matters, but are we breaking for lunch?

14          MR. GORDON:  Greg Gordon on behalf of the debtor.

15          I would say, Your Honor, an hour is probably a fair

16    estimate.  I would indicate that we have an agreement with the

17    other side that there's no evidentiary matters that have to be

18    addressed.  I think both sides have agreed that the respective

19    declarations can be submitted.  There wouldn't be any cross-

20    examination, so it's just argument.  But I'm guessing that in

21    total will take 45 minutes to an hour.

22          I don't know if other Counsel has a different view.

23          MR. HENSSLER:  Hi, Your Honor, Bobby Henssler from

24    Robbins Geller Rudman and Dowd on behalf of San Diego.

25          I think our argument is likely around 45 minutes or