# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| IMERYS TALC AMERICA, INC., *et al.*,[1] | Case No. 19-10289 (LSS) |
| Debtors. | Jointly Administered |
| | Ref. Docket No. 5052 |

### JAMES L. PATTON, JR.'S, THE LEGAL REPRESENTATIVE FOR FUTURE TALC PERSONAL INJURY CLAIMANTS AGAINST THE DEBTORS, *AMENDED* OBJECTION TO THE RIVERSTONE INSURERS' MOTION TO DISMISS BANKRUPTCY CASE

James L. Patton, Jr., the legal representative for future talc personal injury claimants (the "FCR"), by and through his undersigned counsel, hereby objects to the *Riverstone Insurers' Motion to Dismiss Bankruptcy Case* [Docket No. 5052] (the "Motion") on the grounds set forth below.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

29787302.2

**OBJECTION**[2]

The Riverstone Insurers are not creditors in these chapter 11 cases. They are debtors to the Debtors. The insurers retain their rights to dispute whatever they may be asked to pay in future proceedings, and their liability under their policies remains untouched.

Accordingly, the Riverstone Insurers cannot allege any injury that would confer standing on them to seek the extraordinary remedy of dismissal. Instead, they focus exclusively on how the Debtors *may attempt* to confirm a plan, and how a plan *might* affect them. These arguments are mere speculation. At best, they are confirmation issues. But, as discussed below, they do not confer standing on the Riverstone Insurers to seek dismissal of these chapter 11 cases.

And as discussed further below, even assuming the Riverstone Insurers possess standing and could demonstrate cause,[3] the cases should not be dismissed because dismissal is not in the best interests of creditors. The actual creditors in these cases, especially future claimants, are best served by an orderly reorganization that results in substantially all of the Debtors' assets being funneled to a settlement trust while also channeling claimants to that same trust for recovery.

**I.     The Riverstone Insurers lack standing**

To appear and be heard in a bankruptcy case, a party must establish standing under either (i) Article III of the United States Constitution or (ii) section 1109 of the Bankruptcy Code, but the boundaries for standing under Article III and the Bankruptcy Code are coextensive. *In re New Century TRS Holdings, Inc.*, 505 B.R. 431, 438 (Bankr. D. Del. 2014) (citing *In re Global Indus. Tech., Inc.*, 645 F.3d 201, 210–11 (3d Cir. 2011)). Section 1109(b) does not permit parties to

---

[2] A factual background is set forth in the Debtors and Committee's objections to the Motion. For the sake of judicial economy, the FCR does not repeat that background here.

[3] The FCR joins in the argument set forth in the Debtors and Committee's objections as to why cause does not exist to dismiss these chapter 11 cases.

29787302.2

circumvent the "bedrock" case-or-controversy requirement and the "irreducible constitutional minimum" for standing, which requires a party to demonstrate an "injury in fact," that is "concrete," "distinct and palpable," and "actual or imminent." *In re Mid-Valley, Inc.*, 305 B.R. 425, 430 (Bankr. W.D. Pa. 2004) (quoting *McConnell v. Federal Election Commission*, 540 U.S. 93, 225 (2003)); *see also In re Flintkote Co.*, 486 B.R. 99, 114-15 (Bankr. D. Del. 2012) *aff'd*, 526 B.R. 515 (D. Del. 2014) (ruling that to the extent a party may have a claim in the future against a debtor, that claim is "speculative," "far from imminent," and cannot confer "party in interest" standing).

Moreover, as the court in *In re Mid-Valley, Inc.* emphasized, section 1112(b) "provides for dismissal 'for cause' if it is in the best interests of the *creditors and the estate*." *In re Mid-Valley, Inc.*, 305 B.R. at 430 (Bankr. W.D. Pa. 2004) (emphasis in original). That is, the court's focus "is with respect to *creditors*." *Id.* at 431 (emphasis added).

The *Mid-Valley* decision is illustrative in other respects as well. There, certain insurers moved to dismiss the bankruptcy cases based on arguments identical to those raised by the Riverstone Insurers. Namely, the insurers argued that the trust distribution procedures would violate their policies, that the plan would prevent them from raising coverage defenses, and that they had the right to participate in the settlement process that the debtors engaged in with asbestos claimants. *See id.* at 427-29.

The court rejected the insurers' arguments and concluded that the insurers lacked standing because they were not creditors and had no injury in fact:

> The certain insurers are not creditors of these Debtors; they are debtors to the Debtors. The injury they assert will befall them is not imminent. They are not called upon to do anything in the case. The fact that Debtors agreed to pay more to asbestos claimants to settle their liabilities than the certain insurers think Debtors should have agreed to does not create an injury to the certain insurers. The insurers

> retain rights to dispute whatever they may be asked to pay in future proceedings. Moreover, Debtors' agreement with asbestos claimants to a limit of liability does not bind the certain insurers to pay that same amount. The certain insurers can raise challenges at the appropriate time and place. The insurers' liability under their policies is untouched. Whether the Debtors' failure to include the certain insurers in settlement discussions that the Debtors conducted with asbestos claimants or their attorneys constitutes a breach of the policy is not before this court and is certainly not ripe for decision as the insurers are not yet called upon to pay. Dismissal of the bankruptcy cases will not remedy the alleged injury.

*Id.* at 431-32.

As in *Mid-Valley*, the Riverstone Insurers have not alleged any injury that would confer standing upon them to seek dismissal of these cases. The Riverstone Insurers are not creditors of the Debtors. They have not filed any proofs of claim. They have not been called upon to do anything in these cases, and their rights remain unaffected.

The Riverstone Insurers' attempt to dismiss these cases is little different than the insurers' previous tactics to frustrate these cases, including their attempt to disqualify the FCR and his counsel. The Third Circuit called the insurers out on their tactics, noting that they were "only bringing [the] objection as a tactical one to delay Imerys's plan confirmation." *Id.* The insurers' conduct was "just the sort of bad-faith tactic" that the Third Circuit had cautioned against when considering parties' standing. *In re Imerys Talc Am., Inc.*, 38 F.4th 361, 371 (3d Cir. 2022). The Third Circuit reaffirmed Article III's "case or controversy" requirement in ruling that the insurers who were not parties to the cases underlying the alleged conflict did not possess standing to raise the issue. *Id.*

Here, again, there is no case or controversy. The Riverstone Insurers simply disapprove of the deal that they believe the Debtors might agree to. The Riverstone Insurers claim that the Debtors, in an effort to protect their corporate parent, will harm the Riverstone Insurers by allegedly abandoning defenses and agreeing to trust distribution procedures they view as

29787302.2

unfavorable.  As a threshold matter, there is no plan currently before the Court, and therefore these allegations are nothing more than speculation.  But, to be clear, nothing in the plans proposed to date was intended to alter or preclude any of the insurers' alleged defenses.

Assuming arguendo that a plan was on file, the Riverstone Insurers' allegations still do not constitute injuries.  At best, these issues, along with the Riverstone Insurers' objection to proposed releases of the Debtors' corporate affiliates,[4] should be heard at confirmation.  The Riverstone Insurers' true remedy for their alleged grievance is to deny coverage for the claims and resolve the dispute in coverage litigation following plan confirmation.  But their allegations do not give them standing to seek dismissal of these chapter 11 cases.

## II.    Dismissal is not in the best interests of future claimants

Section 1112(b)(1) precludes dismissal of a bankruptcy case if it is not in the best interests of creditors.  There is no bright line test as to what constitutes the "best interests of creditors," but significant weight should be placed on the expressed preference of creditors because "parties will be the best judge of their own interests, and if all the parties agree on one course of action, the court should accommodate their desire." *Lakefront Invs. LLC v. Clarkson*, 484 B.R. 72, 82 (D. Md. 2012), *aff'd sub nom. Lakefront Invs., LLC v. Sydnor*, 520 F. App'x 221 (4th Cir. 2013) (citing 7 COLLIER ON BANKRUPTCY § 1112.04).  Considering that the Riverstone Insurers are not creditors, their preference should be afforded little weight, if any.

---

[4] The Riverstone Insurers mischaracterize the FCR's deposition testimony regarding his views on Imerys S.A's potential liability.  They claim that the FCR stated that "Imerys S.A.'s anticipated liabilities were 'in the billions.'" Motion at 13.  That is unequivocally false.  The testimony immediately following the excised quote demonstrates that the FCR was referring to the Debtors' liability, although analysis was also being done regarding potential causes of action against Imerys S.A.  *See* Patton Dep. Tr. at 73:3-20 ("[Q.] Is it the liability of the debtors and I guess in this case S.A. as well? [A.] Well, there are really two questions. One is what's the debtors' liability in terms of projected, present, and future claims. . . . And then we were evaluating the potential for [estate causes] of action against the parent.  [Q.] If you know, when the liability assessment is being done, is that the amount that represents the debtor's liability or is that the amount that represents the value of claims that a plaintiff might hold, even if it's against other defendants? [A.] We were attempting to estimate the debtor's liability, not -- not the theoretical projected value of an OC claim, for example.")

29787302.2

In the FCR's view, it is in future claimants' best interests to remain before this Court. Otherwise, there will be a race to the courthouse to fight over dwindling assets, and future claimants, by definition, will always lose that race. *See In re W.R. Grace & Co.*, 475 B.R. 34, 171 (D. Del. 2012)*, aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), *and aff'd*, 532 F. App'x 264 (3d Cir. 2013), *and aff'd sub nom. In re WR Grace & Co.,* 729 F.3d 332 (3d Cir. 2013)*, and aff'd*, 729 F.3d 311 (3d Cir. 2013) ("§ 524(g) was also designed to ensure that present claimants do not exhaust all of the debtor's assets before future claimants have even manifested injuries[.]"); *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 598 (1997) ("[D]ockets in both federal and state courts continue to grow; long delays are routine; trials are too long; the same issues are litigated over and over; transaction costs exceed the victims' recovery by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether.").

In contrast to the tort system, bankruptcy offers a unique opportunity to promote the participation of all parties in interest in a single forum with an aim of reaching a viable and fair settlement. A key aspect in mass tort bankruptcies' settlements is the creation of settlement trusts. The Third Circuit has noted the effectiveness of settlement trusts established in connection with mass tort bankruptcies:

> [T]he trusts appear to have fulfilled Congress's expectation that they would serve the interests of both current and future asbestos claimants and corporations saddled with asbestos liability. In particular, observers have noted the trusts' effectiveness in remedying some of the intractable pathologies of asbestos litigation, especially given the continued lack of a viable alternative providing a just and comprehensive resolution. Empirical research suggests the trusts considerably reduce transaction costs and attorneys' fees over comparable rates in the tort system.

*In re Federal-Mogul Glob., Inc.*, 684 F.3d 355, 359 (3d Cir. 2012).

These trusts are especially critical for future claimants. In fact, "Congress codified the Johns–Manville trust mechanism as a 'creative solution to help protect future asbestos claimants[.]'" *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 359 (3d Cir. 2012) (citing H.R.Rep. No. 103–835, at 47 (1994), reprinted in 1994 U.S.C.C.A.N. 3340, 3348, in the Bankruptcy Reform Act of 1994, Pub.L. 103–394, § 111, 108 Stat. 4106, 4113–17 (codified at 11 U.S.C. § 524(g)-(h))); *see also id.* ("Congress intended the trusts as a means to give full consideration to the interests of future claimants by ensuring their claims would be compensated comparably to present claims[.]"). Congress's intent to protect future claimants is manifested in section 524(g), which requires trusts to "operate through mechanisms . . . that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner." 11 U.S.C. § 524(g)(2)(B)(ii)(V).

Here, given the limited assets available to satisfy claims against the Debtors, it is in the best interests of future claimants for a settlement trust to be established because future claimants bear the risk that assets will be exhausted. Although the Riverstone Insurers claim (without evidence) that insurance will cover the Debtors' tort-related liabilities "forever," that allegation belies the record in these cases and flies in the face of the insurers' conduct to this point. Indeed, one of the primary reasons the Debtors entered into bankruptcy was because their insurers had denied coverage,[5] and certain insurers even moved to lift the automatic stay to pursue a coverage action in which they seek to deny coverage.[6]

---

[5] *See, e.g.*, Decl. of Alexandra Picard, Chief Financial Officer of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings ¶ 9 [Docket No. 10] ("[W]hile the Debtors have access to valuable insurance assets that they have relied on to fund their defense and appropriate settlement costs to date, the Debtors have been forced to fund certain litigation costs and settlements out of their free cash flow due to a lack of currently available coverage for certain Talc Claims, or insurers asserting defenses to coverage. The Debtors lack the financial wherewithal to litigate against the mounting Talc Claims being asserted against them in the tort system.").

[6] *See* Certain Excess Insurers' Motion for Relief from the Automatic Stay to Permit the California Coverage Action to Proceed and Order of Abstention [Docket No. 390]; Debtors' Obj. to Certain Excess Insurers' Motion for Relief

And it would only take one verdict the size of the well-known *Ingham* case—over $2.2 billion—to erode all of the Debtors' remaining insurance coverage. Although the Riverstone Insurers claim that the Debtors might be able to assert defenses to the talc claims (as all defendants typically do), there is no reason that any such defenses cannot be assessed and addressed in a bankruptcy resolution just as they are routinely assessed and addressed through negotiated settlements outside the bankruptcy context. As this Court noted when confirming the plan in *In re Boy Scouts of Am. & Delaware BSA, LLC*, the insurers and debtors can settle coverage in light of potential coverage defenses, costs and delay. No. 20-10343 (LSS), 2022 WL 3030138, at *39 (Bankr. D. Del. July 29, 2022). And this Court further observed that "resolutions [in bankruptcy] do away with the need to resolve individual coverage disputes" on large subsets of mass tort claims. *Id.* at *40.

Potential verdicts aside, the Debtors' insurance policies (save one) pay defense costs within limits, meaning that the cost of defending these claims in the tort system also diminishes the funds ultimately available for tort victim recoveries. Accordingly, outside of bankruptcy, the Debtors' insurance coverage would be exhausted by defense and indemnity costs related to the now-pending 16,000 pre-petition claims. Since LTL, Johnson & Johnson ("J&J") and its affiliates, and Cyprus now enjoy the protections of the automatic stay, if Imerys (the exclusive supplier to J&J since 1992) were to return to the tort system the Debtors alone would be forced to bear the overwhelming defense costs associated with those claims. And the public record in the LTL bankruptcy reveals that LTL's predecessor incurred $4.5 billion in defense costs alone

---

from the Automatic Stay to Permit the California Coverage Action to Proceed and Order of Abstention [Docket No. 510].

29787302.2

before filing bankruptcy. *See In re LTL Management LLC* [Docket No. 956] (Debtors' Objection to Motion to Dismiss at 2). This amount would more than exhaust the available coverage.

### III. The mediation should continue

Ten months ago, the Court approved the parties' (including insurers') request to mediate their disputes, and they have made substantial strides toward resolving these chapter 11 cases. The mediation has been conducted under the guidance of Lawrence Pollack and Kenneth Feinberg, both of whom have been successful in resolving complex matters. Mr. Feinberg, for example, recently and successfully mediated the bankruptcy case of *In re Paddock Enterprises, LLC*, Case No. 20-10028 (LSS). This Court noted in *Paddock* that, after the parties went away "for a good year-plus" to mediate, the debtors came back with a confirmable plan, and that "really is the way that bankruptcy is supposed to work." May 16, 2022 Hr'g Tr. at 81:8, 109:9-10 [Docket No. 1382].

The Debtors and their creditors (and insurers if they choose to participate constructively) should be afforded the opportunity to achieve the same outcome in these chapter 11 cases, which are undoubtedly larger and more complex than the *Paddock* case. The parties' efforts should not be wasted now—without the Debtors even being allowed to propose a plan—for the sole benefit of non-creditors who, by their own admission, should be unaffected by the chapter 11 cases.

*- Remainder of the page intentionally left blank -*

## **CONCLUSION**

For the reasons discussed above, the FCR respectfully submits that the Court should deny the Motion.

Dated: October 7, 2022	YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Jared W. Kochenash*
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Travis G. Buchanan (No. 5595)
Jared W. Kochenash (No. 6557)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
    eharron@ycst.com
    tbuchanan@ycst.com
    jkochenash@ycst.com

*Counsel to the Future Claimants' Representative*