# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>IMERYS TALC AMERICA, Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-10289 (LSS)<br>(Jointly Administered)<br><br>**Hearing Date: May 15, 2024, at 2:00 p.m. (ET)**<br>**Obj. Deadline: May 2, 2024, at 4:00 p.m. (ET)** |
| In re:<br><br>CYPRUS MINES CORPORATION,[2]<br><br>Debtor. | Chapter 11<br><br>Case No. 21-10398 (LSS)<br><br>**Hearing Date: May 15, 2024, at 2:00 p.m. (ET)**<br>**Obj. Deadline: May 2, 2024, at 4:00 p.m. (ET)** |

## JOINT MOTION OF IMERYS DEBTORS AND CYPRUS DEBTOR FOR AN ORDER (I) APPROVING THE SETTLEMENT AGREEMENT AMONG THE IMERYS DEBTORS, THE CYPRUS DEBTOR, CYPRUS AMAX MINERALS CORPORATION, AND OLD REPUBLIC INSURANCE COMPANY, AND (II) APPROVING THE SALE OF CERTAIN INSURANCE POLICIES

Imerys Talc America, Inc., Imerys Talc Vermont, Inc., and Imerys Talc Canada Inc. (collectively, the "Imerys Debtors"), the debtors and debtors-in-possession in the above-captioned cases jointly administered under Case No. 19-10289 (LSS) (the "Imerys Cases"), and Cyprus Mines Corporation (the "Cyprus Debtor" and, together with the Imerys Debtors, the "Debtors"), the debtor and debtor-in-possession in the above-captioned Case No. 21-10398 (LSS) (the "Cyprus

---

[1] The Imerys Debtors, along with the last four digits of each Imerys Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Imerys Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

[2] The last four digits of the Cyprus Debtor's taxpayer identification number are 0890. The Cyprus Debtor's address is 333 North Central Avenue, Phoenix, AZ 85004.

Case"), through their undersigned counsel, hereby move (this "Motion") this Court, pursuant to sections 105 and 363 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), and Rules 2002, 6004, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of an order: (i) approving the Old Republic Settlement Agreement (the "Settlement Agreement"), dated April 9, 2024, by and among the Imerys Debtors, the Cyprus Debtor, Cyprus Amax Minerals Corporation ("CAMC"), and Old Republic Insurance Company ("Old Republic"), a copy of which is attached hereto as **Exhibit A**; and (ii) approving the sale of certain insurance policies issued by Old Republic. In support of this Motion, the Debtors respectfully represent as follows:[3]

## PRELIMINARY STATEMENT

1.      The Imerys Cases and the Cyprus Case were filed to manage the potential liabilities arising from claims by plaintiffs alleging personal injuries caused by exposure to talc mined, processed, and/or distributed by any of the Debtors or their former subsidiaries. Through confirmation of chapter 11 plans (collectively, the "Plans") in each of the Imerys Cases and the Cyprus Case, the Debtors intend to establish a single personal injury trust (the "Trust") in accordance with sections 105(a) and 524(g) of the Bankruptcy Code that will assume liability for, and use its assets to resolve, the Debtors' talc-related personal injury liabilities.

2.      The Debtors and their affiliates assert rights to numerous primary, excess, and umbrella comprehensive general liability insurance policies that provide coverage for product liabilities. Old Republic issued several of those policies to the Cyprus Debtor's parent company

---

[3] Capitalized terms used but not defined in this Motion have the meanings given in the Settlement Agreement.

- 2 -

between 1985 and 1988, with original total limits of approximately $6 million.  The proposed

Settlement Agreement resolves various issues regarding the scope and accessibility of coverage

that remains available under the Old Republic policies.  If approved, the Settlement Agreement is

expected to yield settlement proceeds of $6.25 million, which will be transferred (along with other

assets) to the Trust for the benefit of current and future talc claimants.

3.      For the reasons set forth herein, approval of the Settlement Agreement is in the best

interests of the Debtors, their estates, and their creditors, including all holders of Talc Personal

Injury Claims (as defined herein).  Importantly, the tort claimants' committee appointed in the

Imerys Cases (the "Imerys TCC"), the tort claimants' committee appointed in the Cyprus Case

(the "Cyprus TCC"),  the future claimants' representative appointed in the Imerys Cases

(the "Imerys FCR"),  and the future claimants' representative appointed in the Cyprus Case

(the "Cyprus FCR" and, collectively with the Imerys TCC, the Cyprus TCC, and the Imerys FCR,

the "Supporting Parties") each support the Settlement Agreement and the relief requested in this

Motion.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).  Venue is proper in this Court

pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief requested herein are sections 105 and 363 of

the Bankruptcy Code.  Such relief is warranted under Bankruptcy Rules 2002, 6004, and 9019.

- 3 -

## BACKGROUND

### A.    The Imerys Cases

6.    On February 13, 2019 (the "Imerys Petition Date"), each of the Imerys Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").[4]

7.    The Imerys Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8.    On March 5, 2019, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Imerys TCC in the Imerys Cases.  See Imerys D.I. 132.

9.    On June 3, 2019, the Court entered an order appointing James L. Patton Jr. as the Imerys FCR.  See Imerys D.I. 647.

10.    As of this date, no trustee or examiner has been requested or appointed in the Imerys Cases.

### B.    The Cyprus Case

11.    On February 11, 2021 (the "Cyprus Petition Date"), the Cyprus Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court.[5]

---

[4] In this Motion, unless otherwise noted, citations and references to documents filed in the Imerys Cases are to filings made in the lead Imerys Case and adhere to the following format:  Imerys D.I. [#].

[5] In this Motion, unless otherwise noted, citations and references to documents filed in the Cyprus Case adhere to the following format:  Cyprus D.I. [#].

- 4 -

12.     The Cyprus Debtor continues in the management of its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Cyprus Case.

13.     On March 4, 2021, the U.S. Trustee appointed the Cyprus TCC in the Cyprus Case. See Cyprus D.I. 96.

14.     On June 10, 2021, the Court entered an Order appointing Roger Frankel as the Cyprus FCR.  See Cyprus D.I. 344.

### C.     Relevant Corporate History of the Debtors

15.     In 1980, Standard Oil Company (Indiana)—the Cyprus Debtor's then-parent corporation—contributed the stock of the Cyprus Debtor to Amoco Minerals Company, a wholly-owned subsidiary of Standard Oil Company (Indiana) incorporated under Delaware law.  In 1985, Standard Oil Company (Indiana) changed its name to Amoco Corporation, and Amoco Minerals Company changed its name to Cyprus Minerals Company.  Amoco Corporation thereafter spun off Cyprus Minerals Company as an independent company, with the Cyprus Debtor remaining as its subsidiary.

16.     On January 6, 1989, the Cyprus Debtor and Johnson & Johnson ("J&J") entered into a stock purchase agreement, pursuant to which the Cyprus Debtor acquired from J&J all of the stock of Windsor Minerals, Inc.  Windsor Minerals, Inc. operated talc mines in Vermont and historically supplied talc to J&J for use in baby powder.  In connection with the acquisition, Windsor Minerals, Inc. entered into a supply agreement, pursuant to which it continued to supply talc to J&J.  The Cyprus Debtor renamed Windsor Minerals, Inc. as Cyprus Windsor Minerals Corp. ("Windsor").  Windsor supplied J&J with talc between 1989 and 1992.  The Cyprus Debtor

- 5 -

itself never supplied talc to J&J except for a limited period between December 1979 and March 1980.

17.    In June 1992, the Cyprus Debtor sold its talc-related assets to RTZ America Inc. (later known as Rio Tinto America, Inc.) ("RTZ") through a two-step process. *First*, the Cyprus Debtor transferred its talc-related assets and liabilities (subject to minor exceptions that are not relevant), including its stock in Windsor, to a newly formed subsidiary of the Cyprus Debtor now named Imerys Talc America, Inc. (formerly Cyprus Talc Corporation) ("ITA")—one of the Imerys Debtors—pursuant to an *Agreement of Transfer and Assumption*, dated June 5, 1992. *Second*, the Cyprus Debtor sold the stock of Cyprus Talc Corporation to RTZ pursuant to a *Stock Purchase Agreement*, also dated June 5, 1992 (as amended, the "1992 SPA").

18.    Between 1993 and 2007, the identity of the Cyprus Debtor's ultimate owner changed three more times. In 1993, Cyprus Minerals Company, the Cyprus Debtor's then-parent, merged with AMAX Inc. to form CAMC. In 1999, Phelps Dodge Corporation, a holding company for various mining properties and operations, acquired CAMC. Freeport-McMoRan Inc. purchased CAMC in 2007. CAMC never has had any talc operations, and today it remains the direct parent of the Cyprus Debtor.

19.    In that same time frame, the Cyprus Debtor's former talc assets underwent their own changes in ownership. Soon after the 1992 SPA, RTZ merged Cyprus Talc Corporation with RTZ's existing subsidiary, Luzenac America, Inc. As the surviving corporation, Cyprus Talc Corporation then changed its name to Luzenac America, Inc. In 2011, RTZ sold the stock of Luzenac America, Inc. to Imerys Minerals UK, Ltd., which then changed the name of Luzenac

America, Inc. to ITA.  As part of these transactions, Windsor (which was wholly owned by Luzenac America, Inc.) became Imerys Talc Vermont, Inc.—one of the Imerys Debtors.

### D.    Talc Personal Injury Claims

20.    The Imerys Debtors commenced the Imerys Cases in order to manage the significant potential liabilities arising from claims by plaintiffs alleging personal injuries caused by exposure to talc mined, processed and/or distributed by one or more of the Imerys Debtors (the "Imerys Talc Personal Injury Claims").  As of the Imerys Petition Date, one or more of the Imerys Debtors had been sued by approximately 15,580 claimants seeking damages for personal injuries allegedly caused by exposure to the Imerys Debtors' talc products, with the vast majority of such claims (approximately 98%) based on alleged exposure to cosmetic talc products.

21.    The Cyprus Debtor commenced the Cyprus Case in order to manage the potential liabilities arising from claims by plaintiffs alleging personal injuries caused by exposure to talc mined, processed, and/or distributed by the Cyprus Debtor or its former subsidiaries (the "Cyprus Talc Personal Injury Claims" and, together with the Imerys Talc Personal Injury Claims, the "Talc Personal Injury Claims").  As of January 29, 2021, the Cyprus Debtor had been sued by approximately 427 claimants seeking damages for personal injuries allegedly caused by exposure to talc mined, processed, and/or distributed by the Cyprus Debtor or a former subsidiary, with the majority of such claims based on alleged exposure to cosmetic talc products.

### E.    Old Republic Policies

22.    Between the 1985 and 1988, Old Republic issued certain liability insurance policies to Cyprus Minerals Company (which also provided coverage to the Cyprus Debtor and

CAMC)[6] with original total limits of approximately $6 million, as identified on **Exhibit B** attached hereto (collectively, the "Policies").[7]  The Policies also provide for defense costs outside of the coverage limits.

### F.    Negotiation of the Settlement Agreement

23.    Prior to the Cyprus Petition Date, the Imerys Debtors conducted extensive, good faith negotiations with Old Republic for the purpose of resolving disputes regarding the scope of Old Republic's obligations to provide coverage for Imerys Talc Personal Injury Claims.

24.    The Imerys TCC and the Imerys FCR worked with the Imerys Debtors in connection with the negotiations and settlement reached with Old Republic.

25.    Likewise, after the Cyprus Petition Date, the Cyprus Debtor, CAMC, the Cyprus TCC, and the Cyprus FCR conducted a review of the Policies and the negotiations between Old Republic and the Imerys Debtors.

26.    The Settlement Agreement contemplates a settlement payment to the Trust in the aggregate amount of $6.25 million (the "Settlement Payment"), which is in excess of the Policies' coverage limit.  Through the Settlement Agreement, the Debtors have resolved various issues regarding the scope and accessibility of coverage that remains available under the Policies. Without the negotiated resolution of these issues as embodied in the Settlement Agreement, the parties faced the prospect of having to resolve these disputes through insurance coverage litigation.

---

[6] The Imerys Debtors and Cyprus Debtor disagreed regarding whether the Cyprus Debtor retained its rights under the Policies following the various transactions highlighted in Paragraphs 15-19 above.  This dispute was settled pursuant to the global settlement agreement between the Imerys Debtors and Cyprus Debtor embodied in the Plans, which necessitates a joint settlement involving all Debtors.

[7] The Policies also are listed on Exhibit 1 to the Settlement Agreement.

- 8 -

2ca2c896a8e68f9f

The Settlement Agreement avoids both the costs and the risk of an adverse decision with respect to such litigation.

**SUMMARY OF THE SETTLEMENT AGREEMENT**

27.    The Settlement Agreement resolves all claims of the Debtors and CAMC against Old Republic in respect of the Policies.  The material terms can be summarized as follows:[8]

a.    Old Republic will pay a total of $6.25 million (the "Settlement Amount") to the Trust within thirty (30) days of the earliest date on which both of the following preconditions shall have occurred: (i) the Court's orders approving the Settlement Agreement become final and non-appealable, and (ii) the effective date of the Plans occurs;

b.    The Policies will be sold back to Old Republic free and clear of all liens, Claims, Interests, and encumbrances under section 363(f) of the Bankruptcy Code;

c.    The Debtors will designate Old Republic as a "Settling Talc Insurance Company" that is entitled to the benefits of the channeling injunction contained in the Plans pursuant to sections 105(a) and 524(g) of the Bankruptcy Code;

d.    The Debtors, CAMC, and Old Republic agreed to mutual release provisions relating to the Policies and Old Republic's insuring relationship with the Debtors; and

e.    The Settlement Agreement will become null and void upon the occurrence of several contingencies, including the entry of an order by the Bankruptcy Court confirming a chapter 11 plan for the Imerys Debtors or the Cyprus Debtor that does not include the channeling injunction in favor of Old Republic as a "Settling Talc Insurance Company."

28.    The Debtors believe that the Settlement Agreement is fair and equitable and in the best interests of their estates.  The Settlement Amount will enable the Debtors to arrange for an orderly distribution of those monies to claimants who are asserting Talc Personal Injury Claims

---

[8]  This is a summary only.  Reference should be made to the Settlement Agreement, which shall supersede the terms of this summary in all instances.

against the Debtors, while avoiding the costs of litigating or otherwise resolving the parties'

dispute over the availability of any coverage for Talc Personal Injury Claims under the Policies.

## BASIS FOR RELIEF

**A.    The Court Should Approve the Settlement Agreement Under Bankruptcy Rule 9019.**

29.    Bankruptcy Rule 9019 provides that "[o]n motion by the trustee [or debtor in

possession] and after notice and a hearing, the court may approve a compromise or settlement."

Fed. R. Bankr. P. 9019(a).  Compromises are a normal part of the bankruptcy process.  Protective

Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968).

As a matter of policy, compromises and settlements are favored in order to minimize litigation and

expedite administration of the estate.  In re Martin, 91 F.3d 389, 393 (3d Cir. 1996); In re A & C

Props., 784 F.2d 1377, 1381 (9th Cir. 1986); accord In re Heissinger Res. Ltd.,

67 B.R. 378, 383 (C.D. Ill. 1986) ("the bankruptcy court is to consider that the law favors

compromise").

30.    The decision to approve a settlement is within a bankruptcy court's discretion.  See

In re Summit Metals, Inc., 477 F. App'x 18, 21 (3d Cir. 2012) (applying the abuse of discretion

standard to affirm the bankruptcy court's approval of a settlement).   A settlement should be

approved where the court determines it is fair and equitable and in the best interests of the

bankruptcy estate.  See In re Capmark Fin. Grp. Inc., No. 09-13684, 2011 WL 6013698 (Bankr.

D. Del. Apr. 15, 2011).

31.    In determining whether a proposed settlement is fair and equitable, neither an

evidentiary hearing nor a rigid mathematical analysis is required.  Tri-State Fin., LLC v. Lovald,

525 F.3d 649, 655 (8th Cir. 2008), cert. denied, 555 U.S. 1046 (2008); In re Am. Reserve Corp.,

- 10 -

841 F.2d 159, 163 (7th Cir. 1987) (minitrial not required).  Rather, the court must determine whether the proposed compromise falls within the reasonable range of litigation possibilities.  Tri-State Fin., LLC v. Lovald, 525 F.3d at 654 (the court is required only to "determine that the settlement does not fall below the lowest point in the range of reasonableness"); In re Jiangbo Pharm., Inc., 520 B.R. 316, 321 (Bankr. S.D. Fla. 2014) (same).

32.    When deciding whether to approve a settlement under Bankruptcy Rule 9019, courts consider the following relevant factors:  (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. In re Martin, 91 F.3d at 393.  Courts also may apply weight to a debtor's business judgment that the proposed settlement should be approved.  See In re Wheeling-Pittsburgh Steel Corp., 72 B.R. 845, 849 (Bankr. W.D. Pa. 1987) (concluding that the court should not interfere with or second guess the debtor's sound business judgment).

33.    In resolving their coverage disputes with Old Republic, the Debtors reviewed, among other things, the Policies, past costs, available claims data (including existing talc verdict and settlement figures), and applicable law and determined that $6.25 million was an equitable settlement payment given the range of potential litigation outcomes.  Old Republic disputed that it had any obligations to provide coverage for Talc Personal Injury Claims under any of the Policies. The Supporting Parties, on the other hand, maintained that:  (i) the Debtors faced extensive liability for both ovarian cancer and mesothelioma talc claims that triggered Old Republic's coverage obligations, (ii) certain of the Policies pay defense in addition to limits, (iii) Old Republic was responsible for certain portions of defense costs previously paid by other

- 11 -

insurers, and (iv) the Debtors' extensive liability would exhaust the Policies.  The Settlement Agreement eliminates these risks by providing for liquidation of the Policies and making the settlement proceeds available to Trust upon the effective date of the Plan.

34.    Given the significant risks inherent in litigating any dispute with Old Republic, the recovery provided for in the Settlement Agreement must be viewed as significant and propitious for the Debtors and their creditors.  Considering the range of reasonable outcomes of those disputes, the resolution afforded by the Settlement Agreement certainly exceeds the lowest point in the range of reasonableness.

35.    The support of the Supporting Parties for approval of the Settlement Agreement demonstrates that such approval is in the paramount interest of creditors.  See In re Martin, 91 F.3d 389, 393 (3d Cir. 1996) (court must consider "paramount interest of the creditors" when approving settlements under Rule 9019); In re Matco Elecs. Grp., Inc., 287 B.R. 68, 76-77 (Bankr. N.D.N.Y. 2002) ("[When approving a settlement,] a major consideration for the Court is the interests of the unsecured creditors.").  Together with the Debtors, the Supporting Parties believe that approval of the Settlement Agreement serves the paramount interests of creditors because, among other reasons, it (i) resolves and thereby eliminates the dispute between the Debtors and Old Republic over the scope of Old Republic's obligations to provide coverage for Talc Personal Injury Claims under the Policies, (ii) makes the settlement proceeds more immediately accessible than had the Debtors litigated with Old Republic or awaited the normal delays attendant to the tort system, and (iii) facilitates the fair and efficient distribution of proceeds to the Debtors' talc creditors.

36.    Under the circumstances of the Cyprus Case and the Imerys Cases, where the settlement to be approved concerns the insurance funds that ultimately will be paid to the Trust

and devoted to compensating Talc Personal Injury Claims, the Supporting Parties' support is significant and weighs heavily in favor of approving the Settlement Agreement.  See Travelers Cas. & Sur. Co. v. Future Claimants Representative, No. CIVA 07-2785 FLW, 2008 WL 821088, at *8 n.8 (D.N.J. Mar. 25, 2008) (focusing on creditor view of insurance settlements that will fund asbestos trust because debtor "has no direct pecuniary interest in the amount of the insurance settlements [and] the true beneficiaries of the insurance are the asbestos claimants").

37.    For the foregoing reasons, the Settlement Agreement satisfies the requirements of Bankruptcy Rule 9019 and the Martin factors.

**B.    The Court Should Approve The Sale Of The Policies To Old Republic Under Section 363 Of The Bankruptcy Code.**

38.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor-in-possession may sell property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  Courts have recognized that insurance policies are property of a debtor's estate that may be sold with court approval under section 363 of the Bankruptcy Code.  See, e.g., MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 92-93 (2d Cir. 1988) (because numerous courts have determined that a debtor's insurance policies are property of the estate, court authorized a settlement of the debtor's insurance coverage claims pursuant to the court's authority to approve the sale of the debtor's property); Estate of Lellock v. Prudential Ins. Co., 811 F.2d 186, 189 (3d Cir. 1987) (same).

39.    A debtor's sale of property outside the normal course should be authorized pursuant to section 363 of the Bankruptcy Code as long as a sound business purpose exists for doing so. See, e.g., In re Schipper, 933 F. 2d 513, 515 (7th Cir. 1991); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1989); In re Lionel Corp., 722 F.2d 1063, 1070-71 (2d Cir. 1983).  The

- 13 -

Debtors' sale of the Policies to Old Republic is an integral component of the Settlement Agreement, in exchange for which the Debtors and their talc creditors will receive the benefit of the Old Republic settlement proceeds. Additionally, as indicated above, payment of the settlement proceeds under the Settlement Agreement facilitates the fair and efficient administration of Talc Personal Injury Claims by the Trust. Accordingly, a sound business purpose exists for the sale of the Policies.

40.     Section 363(f) of the Bankruptcy Code provides that the debtor-in-possession may sell property "free and clear of any interest in such property of an entity other than the estate" if at least one of the following conditions is satisfied: (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f)(1)-(5). Section 363(f) authorizes a sale free and clear of "interests," not merely liens, and thus permits a sale of property free and clear of all claims and interests of any entity that "are derivative of the debtor's rights in that property." In re Dow Corning Corp., 198 B.R. 214, 244 (Bankr. E.D. Mich. 1996).

41.     The Policies may be sold free and clear of all liens, encumbrances, and other interests of any entity pursuant to sections 363(f)(2), (f)(4) or (f)(5) of the Bankruptcy Code.

42.     *First*, entities that receive notice of the Settlement Agreement and fail to object should be deemed to have consented to the Settlement Agreement for purposes of section 363(f)(2) of the Bankruptcy Code. See, e.g., In re Dura Auto. Sys., Inc., No. 06-11202 KJC, 2007 WL

7728109, at *6 (Bankr. D. Del. Aug. 15, 2007) (concluding that creditors who do not object to the asset sale are "deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code"); In re James, 203 B.R. 449, 453 (Bankr. W.D. Mo. 1997) (section 363(f)(2) satisfied where secured creditor had notice and failed to object to proposed sale and thus "implicitly conveyed its consent to the sale"); In re Elliot, 94 B.R. 343, 345-46 (E.D. Pa. 1988) (implied consent sufficient to authorize section 363(f)(2) sale; consent implied from non-debtor that "received notice of the proposed sale and also admits that it did not file any timely objection").  Non-objectors should be deemed to have consented to the sale for purposes of section 363(f)(2) of the Bankruptcy Code.

43.    *Second*, to the extent any objections are filed, the Policies may be sold free and clear of all claims and interests pursuant to section 363(f)(4) of the Bankruptcy Code.  A sale free and clear is appropriate under section 363(f)(4) because the interests of the holders of such claims plainly are "in *bona fide* dispute" here.  See In re Johns-Manville Corp., 837 F.2d at 93 (holding that vendor's alleged rights under certain endorsements for indemnity for asbestos claims was in *bona fide* dispute because a dispute existed as to whether "the product liability limits on the policies to which the vendor endorsements attach have been exhausted").  In particular, to the extent an objector is asserting the right as an insured under the Policies, the Debtors dispute the interest of such entity as an insured under such policies.  To the extent an objector is a talc plaintiff asserting a right to recover directly from Old Republic under the Policies, the Debtors have not conceded that any particular talc claim is valid or in the amounts sought by the claimant and expect that the Debtors or the Trust will challenge or deny certain claims due to lack of proof.  Accordingly, the interest of any objector in the Policies is in dispute.  In short, there are a number of actual

- 15 -

unresolved "disputes" with respect to the claims and interests that make section 363(f)(4) of the Bankruptcy Code applicable to a sale of the Policies.

44.     *Third*, under section 363(f)(5) of the Bankruptcy Code, holders of any Talc Personal Injury Claims that object to the sale could be compelled to accept a money satisfaction for their interests.  Indeed, the potential right to a money satisfaction is likely the *only* interest such claim or interest holders could have in the Policies.  For this reason, courts have approved the sale of insurance policies free and clear of asbestos claims pursuant to section 363(f)(5) of the Bankruptcy Code.  See, e.g., In re Thorpe Insulation Co., No. 07-19271 (BB), Doc. Nos. 1676 and 1677 (Bankr. C.D. Cal. Nov. 25, 2008); In re Burns and Roe Enters., Inc., Case No. 00-41610 (RG), Doc. No. 1200 (Bankr. D.N.J. Feb. 17, 2005).

45.     Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under [section 363(b) or (c)] of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith."  11 U.S.C. § 363(m).  The Settlement Agreement, including the related sale of the Policies, was negotiated in good faith between the Debtors and Old Republic.  As a result of those arms' length negotiations, Old Republic is entitled to the protections under section 363(m) of the Bankruptcy Code.

## NO PRIOR REQUEST

46.     No previous request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit C**:  approving the Settlement Agreement pursuant to

- 16 -

Bankruptcy Rule 9019; approving the sale, transfer, and conveyance by the Debtors of its interest in the Policies to Old Republic, free and clear of any and all liens, claims, encumbrances, and interests of any kind or nature pursuant to sections 363(b), (f), and (m) of the Bankruptcy Code; approving the completion of performance of the other terms and conditions of the Settlement Agreement; and granting such other relief as is appropriate.

RLF1 30845321v.1

Dated: April 18, 2024
    Wilmington, Delaware

By: */s/ Jason D. Angelo*          
    **REED SMITH LLP**
    Kurt F. Gwynne (No. 3951)
    Jason D. Angelo (No. 6009)
    1201 North Market Street, Suite 1500
    Wilmington, DE 19801
    Telephone:  (302) 778-7500
    Facsimile:   (302) 778-7575
    E-mail:  kgwynne@reedsmith.com
            jangelo@reedsmith.com

    -and-

    Paul M. Singer, Esq. (*pro hac vice*)
    Luke A. Sizemore, Esq. (*pro hac vice*)
    Reed Smith Centre
    225 Fifth Avenue, Suite 1200
    Pittsburgh, PA 15222
    Telephone:  (412) 288-3131
    Facsimile:   (412) 288-3063
    E-mail:  psinger@reedsmith.com
            lsizemore@reedsmith.com

    *Counsel to the Cyprus Debtor and*
    *Debtor-in-Possession*

Dated: April 18, 2024
    Wilmington, Delaware

By: */s/ Amanda R. Steele*          
    **RICHARDS, LAYTON & FINGER, P.A.**
    Mark D. Collins (No. 2981)
    Michael J. Merchant (No. 3854)
    Amanda R. Steele (No. 5530)
    One Rodney Square
    920 N. King Street
    Wilmington, DE 19801
    Telephone:  (302) 651-7700
    Facsimile:   (302) 651-7701
    Email:  collins@rlf.com
           merchant@rlf.com
           steele@rlf.com

    - and –

    **LATHAM & WATKINS LLP**
    Jeffrey E. Bjork, Esq. (*pro hac vice*)
    Kimberly A. Posin, Esq. (*pro hac vice*)
    Helena G. Tseregounis, Esq. (*pro hac vice*)
    Shawn P. Hansen, Esq. (*pro hac vice*)
    355 South Grand Avenue, Suite 100
    Los Angeles, CA 90071
    Telephone:  (213) 485-1234
    Facsimile:   (213) 891-8763
    Email:  jeff.bjork@lw.com
           kim.posin@lw.com
           helena.tseregounis@lw.com
           shawn.hansen@lw.com

    *Counsel to the Imerys Debtors and*
    *Debtors-in-Possession*

- 18 -