## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>IMERYS TALC AMERICA, Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-10289 (LSS)<br>(Jointly Administered)<br><br>**Hearing Date: August 15, 2024, at 11:00 am (ET)**<br>**Objection Deadline: July 29, 2024, at 4:00 pm (ET)** |
| In re:<br><br>CYPRUS MINES CORPORATION,[2]<br><br>Debtor. | Chapter 11<br><br>Case No. 21-10398 (LSS)<br><br>**Hearing Date: August 15, 2024, at 11:00 am (ET)**<br>**Objection Deadline: July 29, 2024, at 4:00 pm (ET)** |

## JOINT MOTION OF THE
## IMERYS DEBTORS AND THE CYPRUS DEBTOR
## FOR AN ORDER (I) APPROVING THE SETTLEMENT
## AGREEMENT BETWEEN THE IMERYS DEBTORS, THE CYPRUS
## DEBTOR, JOHNSON & JOHNSON, AND THE OTHER PARTIES THERETO,
## AND (II) APPROVING THE SALE OF CERTAIN RIGHTS

Imerys Talc America, Inc., Imerys Talc Vermont, Inc., and Imerys Talc Canada Inc. (collectively, the "**Imerys Debtors**"), the debtors and debtors-in-possession in the above-captioned cases jointly administered under Case No. 19-10289 (LSS) (the "**Imerys Cases**"), and Cyprus Mines Corporation (the "**Cyprus Debtor**" and, together with the Imerys Debtors, the "**Debtors**"), the debtor and debtor-in-possession in the above-captioned Case No. 21-10398 (LSS) (the "**Cyprus Case**"), through their undersigned counsel, hereby move (this "**Motion**") this Court,

---

[1]   The Imerys Debtors, along with the last four digits of each Imerys Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Imerys Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

[2]   The last four digits of the Cyprus Debtor's taxpayer identification number are 0890. The Cyprus Debtor's address is 333 North Central Avenue, Phoenix, AZ 85004.

pursuant to sections 105 and 363 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**"), and Rules 2002, 6004, and 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for the entry of an order (i) approving the Settlement Agreement and Release (inclusive of the Estate Allocation (as defined below), the "**Settlement Agreement**"), dated July 13, 2024, by and among the Debtors, Imerys S.A., ITI, CAMC, the Claimant Fiduciaries, and J&J (each as defined below, and collectively, the "**Parties**"), a copy of which is attached hereto as **Exhibit A** and (ii) approving the J&J Buyback (as defined below).  In support of this Motion, the Debtors respectfully represent as follows:[3]

## PRELIMINARY STATEMENT

1.      The Imerys Cases and the Cyprus Case were filed to manage liabilities arising from claims alleging personal injuries caused by exposure to talc mined, processed, milled, and/or distributed by one or more of the Debtors or their former subsidiaries.  Through confirmation of chapter 11 plans[4] in each of the Imerys Cases and the Cyprus Case, the Debtors intend to establish a single personal injury trust (the "**Trust**") in accordance with sections 105(a) and 524(g) of the Bankruptcy Code that will assume liability for, and use its assets to resolve, the Debtors' current and future talc-related personal injury liabilities.

---

[3]   Capitalized terms used but not defined in this Motion have the meanings given in the Settlement Agreement. Moreover, unless otherwise noted, (i) citations and references to documents filed in the Imerys Cases are to filings made in the lead Imerys Case and adhere to the following format:  Imerys D.I. [__] and (ii) citations and references to documents filed in the Cyprus Case adhere to the following format:  Cyprus D.I. [__].

[4]   On January 31, 2024, the Imerys Debtors filed the *Second Joint Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Imerys D.I. 6051] (together with all schedules and exhibits thereto, and as may be modified, amended, or supplemented from time to time, the "**Imerys Plan**") and the Cyprus Debtor filed the *First Amended Plan of Reorganization of Cyprus Mines Corporation Under Chapter 11 of the Bankruptcy Code* [Cyprus D.I. 2132] (together with all schedules and exhibits thereto, and as may be modified, amended, or supplemented from time to time, the "**Cyprus Plan**").  As used herein, "**Plans**" refers to the Imerys Plan and the Cyprus Plan.

2.      Three fundamental disputes exist among the Parties.  *First*, the Debtors and their affiliates assert rights against certain J&J Corporate Parties for, among other things, contractual indemnification arising under the J&J Agreements (as defined below).  The J&J Corporate Parties dispute the existence and scope of any obligation to indemnify the Debtors under the J&J Agreements and assert rights against the Debtors for, among other things, contractual indemnification arising under certain of the J&J Agreements.  *Second*, the J&J Corporate Parties dispute the Debtors' entitlement to proceeds of certain insurance policies with alleged remaining solvent limits of approximately $1.5 billion issued to one or more of the J&J Corporate Parties by third-party insurers that potentially cover talc-related liabilities (the "**J&J Policies**").[5]  *Third*, J&J contends that certain provisions of the Plans and related documents, including the *Ivory America/Cyprus Personal Injury Trust Distribution Procedures* [Imerys D.I. 6051-1; Cyprus D.I. 2132-2] (as may be modified, amended, or supplemented from time to time, the "**TDP**"), could be used to impose liability on J&J through its purported indemnity obligations.

3.      The proposed settlement (the "**Settlement**") is the result of months of hard fought arms' length and good faith negotiations between the Parties and resolves all of these issues, including (i) the existence and scope of the Parties' respective rights and obligations under the J&J Agreements and applicable law, and claims the Parties may have against each other relating to the J&J Agreements or otherwise related to the supply of talc by the Debtors to any J&J Corporate Party, (ii) the Debtors' rights to the proceeds of the J&J Policies, and (iii) the reservations and objections of the J&J Corporate Parties with respect to the Plans (including the TDP).  If approved, the Settlement is guaranteed to yield settlement proceeds of at least $505 million that will be

---

[5]   For the avoidance of doubt, the J&J Policies do not include the Debtors' Policies (as defined in the Settlement Agreement).

transferred (along with other assets) to the Debtors and/or the Trust for the benefit of current and future talc claimants no later than December 31, 2025, subject to the terms of the Settlement Agreement and the Plans.[6]  The Settlement will enable the Debtors, their estates, and the Trust to avoid costly litigation with uncertain results and clears a path towards a less contentious resolution of the Imerys Cases and the Cyprus Case by offering the Debtors and their estates finality with respect to issues that have been hotly contested and heavily litigated at a great cost to the Debtors' estates over a period of years, while also substantially increasing recoveries for talc claimants. **Importantly, the Settlement *does not* prohibit talc claimants from pursuing any of their direct claims against J&J.**

4.      The Imerys Debtors, the Cyprus Debtor, and the Claimant Fiduciaries are aware of a potential third bankruptcy filing to address J&J's talc liabilities.  Accordingly, the Settlement includes a provision that makes each of Johnson & Johnson, and any successor thereto, and LLT (as defined below), and any successor thereto, jointly and severally liable for the J&J Payment Obligations (as defined in the Settlement Agreement) and makes clear that the commencement of a proceeding under the Bankruptcy Code by a J&J Corporate Party will not operate as a stay of or affect the obligation of any of the others to make the J&J Payment Obligations.

5.      For the reasons set forth herein, approval of the Settlement Agreement is in the best interests of the Debtors, their estates, and their creditors.  Importantly, the tort claimants' committee appointed in the Imerys Cases (the "**Imerys TCC**"), the tort claimants' committee appointed in the Cyprus Case (the "**Cyprus TCC**"), the future claimants' representative appointed in the Imerys Cases (the "**Imerys FCR**"), and the future claimants' representative appointed in the

---

[6]    Any description or summary of the Settlement Agreement contained herein is qualified and superseded in all respects by the terms of the Settlement Agreement.

Cyprus Case (the "**Cyprus FCR**" and, collectively with the Imerys TCC, the Cyprus TCC, and the Imerys FCR, the "**Claimant Fiduciaries**") each support (and will be signatories to) the proposed Settlement Agreement and the relief requested in this Motion. Accordingly, every single party with a fiduciary responsibility to the Debtors' estates and their known and unknown creditors supports the Settlement Agreement.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory predicates for the relief requested herein are sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9019.

## BACKGROUND

A.      **The Imerys Cases**

8.      On February 13, 2019 (the "**Imerys Petition Date**"), each of the Imerys Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**"). The Imerys Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Imerys Cases.

9.      On March 5, 2019, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed the Imerys TCC (as has been reconstituted from time to time) in the Imerys Cases [Imerys D.I. 132]. On June 3, 2019, the Court entered an order appointing James L. Patton Jr. as the Imerys FCR [Imerys D.I. 647].

- 5 -

B.      **The Cyprus Case**

10.     On February 11, 2021, the Cyprus Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court.  The Cyprus Debtor continues to manage and operate its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Cyprus Case.

11.     On March 4, 2021, the U.S. Trustee appointed the Cyprus TCC (as has been reconstituted from time to time) in the Cyprus Case [Cyprus D.I. 96].  On June 10, 2021, the Court entered an order appointing Roger Frankel as the Cyprus FCR [Cyprus D.I. 344].

C.      **Relevant Corporate History of the Debtors**

12.     On January 6, 1989, the Cyprus Debtor and Johnson & Johnson entered into a Stock Purchase Agreement (the "**1989 SPA**"), pursuant to which the Cyprus Debtor acquired from Johnson & Johnson all of the stock of Windsor Minerals, Inc.  Windsor Minerals, Inc. operated talc mines in Vermont and historically supplied talc to J&J for use in baby powder.  In connection with the acquisition, Windsor Minerals, Inc. entered into the 1989 Supply Agreement (as defined below), pursuant to which it continued to supply talc to J&J.  The Cyprus Debtor renamed Windsor Minerals, Inc. as Cyprus Windsor Minerals Corp. ("**Windsor**").  As a subsidiary of the Cyprus Debtor, Windsor supplied J&J with talc between 1989 and 1992.  The Cyprus Debtor itself never supplied talc to J&J except for a limited period between December 1979 and March 1980.  As discussed below, Windsor is now Debtor Imerys Talc Vermont, Inc.

13.     In June 1992, the Cyprus Debtor sold its talc-related assets to RTZ America Inc. (later known as Rio Tinto America, Inc.) ("**RTZ**") in several steps.  First, the Cyprus Debtor transferred its talc-related assets and liabilities, including its stock in Windsor, to Cyprus Talc Corporation, a newly formed subsidiary of the Cyprus Debtor, pursuant to an Agreement of

- 6 -

Transfer and Assumption, dated June 5, 1992.  Second, the Cyprus Debtor sold the stock of Cyprus

Talc Corporation to RTZ pursuant to a Stock Purchase Agreement, also dated June 5, 1992.

14.     The Cyprus Debtor's former talc assets underwent their own ownership changes.

Soon after the 1992 transactions, RTZ merged Cyprus Talc Corporation with RTZ's existing

subsidiary, Luzenac America, Inc.  As the surviving corporation, Cyprus Talc Corporation then

changed its name to Luzenac America, Inc.  As discussed below, Luzenac America, Inc. is now

Debtor Imerys Talc America, Inc.

15.     The Imerys Debtors were acquired in 2011 (the "**2011 Purchase**") by an Imerys

Group holding company, Mircal S.A. ("**Mircal**").  Mircal entered into an agreement with Rio Tinto

America, Inc. to purchase the stock of Rio Tinto Group's talc operations.  Pursuant to the stock

purchase agreement, Mircal caused Imerys Minerals Holding Limited (UK), an indirect, non-

debtor subsidiary of Imerys S.A., to acquire the outstanding shares of Luzenac America, Inc.  At

the same time, Mircal also acquired the stock of Luzenac, Inc., from another member of the Rio

Tinto Group.   Luzenac America, Inc., Windsor (a subsidiary of Luzenac America, Inc.), and

Luzenac, Inc. subsequently changed their names to Imerys Talc America, Inc. ("**ITA**"), Imerys

Talc Vermont, Inc. ("**ITV**"), and Imerys Talc Canada Inc., respectively.  As part of the 2011

Purchase, the Imerys Group also acquired Luzenac Val Chisone S.p.A., which was then renamed

Imerys Talc Italy S.p.A. ("**ITI**").[7]

16.     Between 1993 and 2007, the identity of the Cyprus Debtor's ultimate owner

changed three more times.  In 1993, Cyprus Minerals Company, the Cyprus Debtor's then parent,

merged with AMAX Inc. to form Cyprus Amax Minerals Corporation ("**CAMC**").  In 1999,

---

[7]    The Imerys Debtors anticipate that, if the plan filed in the Imerys Cases receives the requisite acceptances pursuant
to each of sections 1126(c) and 524(g) of the Bankruptcy Code, ITI will file a voluntary petition for relief under
chapter 11 of the Bankruptcy Code.

Phelps Dodge Corporation, a holding company for various mining properties and operations, acquired CAMC.  Freeport-McMoRan Inc. purchased CAMC in 2007.  CAMC has never had any talc operations, and today it remains the direct parent of the Cyprus Debtor.

**D.    Talc Supply Agreements**

17.    Historically, ITV served as J&J's sole supplier of talc used in products manufactured and sold by certain of the J&J Corporate Parties.  Prior to 1989, talc was supplied by ITV (then known as Windsor) through its direct subsidiary relationship with J&J.

18.    Since 1989, ITA and ITV supplied talc to certain J&J Corporate Parties through four supply agreements: (i) that certain Talc Supply Agreement, between Windsor Minerals, Inc. and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc., dated as of January 6, 1989 (the "**1989 Supply Agreement**"), as amended (the "**1996 Amendment**"); (ii) that certain Supply Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated April 15, 2001 (the "**2001 Supply Agreement**"), as amended (the "**2004 Amendment**"); (iii) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2010 (the "**2010 Supply Agreement**"); and (iv) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2011 (the "**2011 Supply Agreement**") (collectively, with the 1989 SPA, the 1989 Supply Agreement, the 1996 Amendment, the 2001 Supply Agreement, the 2004 Amendment, the 2010 Supply Agreement, and the 2011 Supply Agreement, the "**J&J Agreements**").

- 8 -

E.    **The Debtors' Disputes with J&J**

19.    The Debtors have asserted claims against certain J&J Corporate Parties for indemnification under the J&J Agreements.[8]  Indeed, for nearly four years prior to the Imerys Petition Date, the Imerys Debtors and certain J&J Corporate Parties engaged in negotiations to resolve disputes related to J&J's indemnification rights and obligations, which involve complicated issues of allocation of indemnification obligations, purported "gap years" not covered by contractual indemnity, cross claims for indemnification between the parties, and coverage under the J&J Agreements.  During this period, the parties engaged in multiple conversations, including several in-person meetings and mediation sessions, to resolve these issues.

20.    During the Imerys Cases, the Imerys Debtors, the Imerys TCC, the Imerys FCR, Johnson & Johnson, and Old JJCI (as defined below) also engaged in mediation sessions on September 18 and September 21, 2020 in an attempt to resolve issues related to a relief from stay motion filed by J&J on March 27, 2020.  However, these mediation sessions and discussions were unsuccessful.

21.    Faced with continuing uncertainty regarding a significant asset of the Debtors' respective estates, the Imerys Debtors and the Cyprus Debtor sought declaratory judgments regarding the J&J Corporate Parties' and the Debtors' respective rights and obligations under the J&J Agreements, and J&J actively participated in the Imerys Cases in its own attempt to protect its rights and defend against its purported obligations under the J&J Agreements as well as to avoid, among other things, what it contends was an attempt by the Debtors and the Claimant Fiduciaries to impose liability on J&J.

---

[8]    Specifically, the Debtors have asserted claims against the J&J Corporate Parties for indemnification under the 1989 SPA, the 1989 Supply Agreement, the 2010 Supply Agreement, and the 2011 Supply Agreement.

1. *Cyprus Indemnity Adversary Proceedings*

22.    On June 15, 2020, the Cyprus Debtor initiated an adversary proceeding (the "**Cyprus Indemnity Adversary Proceeding**") against ITA, ITV, Johnson & Johnson, and Old JJCI to determine the rights of the Cyprus Debtor under the J&J Agreements [Cyprus Indem. Adv. Pro. D.I. 1].[9]  The Cyprus Debtor asserted that it has indemnity rights against J&J under the 1989 SPA and 1989 Supply Agreement notwithstanding the position taken by the Imerys Debtors that all such indemnity rights were transferred to the Imerys Debtors in connection with the corporate restructuring discussed above.

23.    On July 29, 2020, the Imerys Debtors filed an answer to the complaint asserting various affirmative defenses as well as counterclaims (i) seeking a declaration that the Cyprus Debtor lacks the right and standing to pursue the causes of action asserted in the complaint, and (ii) asserting that the Cyprus Debtor breached its representations and warranties under certain agreements [Cyprus Indem. Adv. Pro. D.I. 8].  On the same day, J&J filed a motion to dismiss the complaint for lack of subject matter jurisdiction, or, in the alternative, to abstain or to sever and transfer the claims to the United States District Court for the District of Vermont [Cyprus Indem. Adv. Pro. D.I. 9 & 10] (the "**J&J Motion to Dismiss**").[10]

24.    The Cyprus Debtor, the Imerys Debtors, and J&J engaged in motion practice relating to the Cyprus Indemnity Adversary Proceeding until October 22, 2021,[11] when the Cyprus

---

[9]    The Cyprus Indemnity Adversary Proceeding is captioned *Cyprus Mines Corporation and Cyprus Amax Minerals Company v. Imerys Talc America, Inc., Imerys Talc Vermont, Inc., Johnson & Johnson and Johnson & Johnson Consumer Inc.*, Adv. Pro. No. 20-50626 (LSS) (Bankr. D. Del. Jun. 15, 2020).

[10]    The Settlement resolves disputes between the Imerys Debtors and the Cyprus Debtor regarding which entities are entitled to indemnity rights under the J&J Agreements.

[11]    On September 1, 2020, the Cyprus Debtor and CAMC responded to the Imerys Debtors' counterclaims and the J&J Motion to Dismiss [Cyprus Indem. Adv. Pro. D.I. 19 & 20], and on September 3, 2020, the Cyprus Debtor and CAMC filed a request for oral argument in connection with the J&J Motion to Dismiss [Cyprus Indem. Adv. Pro. D.I. 22].  On September 16, 2020, J&J filed a reply in support of the J&J Motion to Dismiss [Cyprus Indem. Adv. Pro. D.I. 23].  On October 6, 2020, the Cyprus Debtor and CAMC filed a motion for leave to file a sur-reply

Indemnity Adversary Proceeding was stayed as a result of the LTL chapter 11 filing.[12]  Prior to the filing of the LTL 2021 Bankruptcy, the request for oral argument and the J&J Motion to Dismiss were pending before the Court.  The Cyprus Indemnity Adversary Proceeding has not been prosecuted as to J&J since the filing of the LTL 2021 Bankruptcy.

### 2.  *Imerys Indemnity Adversary Proceeding*

25.    On July 27, 2021, ITA and ITV commenced an adversary proceeding (the "**Imerys Indemnity Adversary Proceeding**", and together with the Cyprus Indemnity Adversary Proceeding, the "**J&J Adversary Proceedings**") against Johnson & Johnson and Old JJCI seeking declaratory judgment regarding (i) the indemnity obligations of Johnson & Johnson and Old JJCI under the J&J Agreements and (ii) the Imerys Debtors' indemnity obligations to Johnson & Johnson and Old JJCI under the J&J Agreements [Imerys Indem. Adv. Pro. D.I. 1].[13]  The next day, on July 28, 2021, the Imerys TCC and the Imerys FCR filed a motion to join and intervene in the Imerys Indemnity Adversary Proceeding [Imerys Indem. Adv. Pro. D.I. 8] (the "**Motion to Intervene**") and a motion for temporary restraining order and preliminary injunction [Imerys Indem. Adv. Pro. D.I. 4] (the "**J&J Injunction Motion**"), seeking to enjoin J&J from using a

---

in opposition to the J&J Motion to Dismiss [Cyprus Indem. Adv. Pro. D.I. 26], and on October 16, 2020, J&J filed an opposition to the motion for leave to file a sur-reply [Cyprus Indem. Adv. Pro. D.I. 32].

[12]  On October 14, 2021, LLT Management LLC (f/k/a LTL Management LLC) ("**LTL**" or "**LLT**", as applicable), a subsidiary of Johnson & Johnson which Johnson & Johnson asserts was formed to manage its talc liabilities, filed a chapter 11 case in the Western District of North Carolina, captioned as *In re LTL Management LLC*, Case No. 21-30589 (the "**LTL 2021 Bankruptcy**").  The LTL 2021 Bankruptcy was subsequently transferred to the District of New Jersey (the "**LTL Bankruptcy Court**").  The LTL 2021 Bankruptcy was ultimately dismissed by the LTL Bankruptcy Court in April 2023.  LTL then filed another chapter 11 case in the LTL Bankruptcy Court, captioned as *In re LTL Management LLC*, Case No. 23-12825 (the "**LTL 2023 Bankruptcy**").  The LTL 2023 Bankruptcy was again dismissed by the LTL Bankruptcy Court in August 2023.  LTL has appealed the dismissal of the LTL 2023 Bankruptcy to the Third Circuit.  LTL subsequently changed its name to LLT Management LLC and, on May 1, 2024, announced that it intends to solicit votes on a 524(g) plan of reorganization that could result in a third chapter 11 filing.  On June 3, 2024, LLT commenced the voting solicitation on such plan.

[13]  The Imerys Indemnity Adversary Proceeding is captioned *Imerys Talc America, Inc. and Imerys Talc Vermont, Inc. v. Johnson & Johnson and Johnson & Johnson Consumer Inc.*, Adv. Pro. No. 21-51006 (LSS) (Bankr. D. Del. July 27, 2021).

divisive merger or other corporate transaction to separate J&J from the purported indemnification obligations owed to the Imerys Debtors.

26.     J&J opposed the Motion to Intervene and the J&J Injunction Motion [Imerys Indem. Adv. Pro. D.I. 28 & 29].  Subsequently, the Imerys TCC and the Imerys FCR filed the *Reply Memorandum of Law in Support of the Official Committee of Tort Claimants' and the Future Claimants' Representatives Motion for Preliminary Injunction*, which contained an additional cause of action "request[ing] a judicial declaration that [J&J's] allocation or transfer of [its] contractual indemnity liabilities to one or more different entities in a manner that is intended to, or has the effect of, separating those liabilities from [J&J's] other assets violates the automatic stay." [Imerys Indem. Adv. Pro. D.I. 35-3].[14]

27.     After a hearing on the Motion to Intervene and the J&J Injunction Motion, on August 27, 2021, the Court issued a *Bench Ruling Granting Motion to Intervene and Denying Motion for Preliminary Injunction* [Imerys Indem. Adv. Pro. D.I. 47], where the Court permitted the Imerys TCC and the Imerys FCR to intervene in the Imerys Indemnity Adversary Proceeding but found that a divisive merger as averred in the complaint would not violate the automatic stay. As a result, the Court denied the J&J Injunction Motion.[15]

28.     Thereafter, on September 21, 2021, J&J filed a motion to dismiss the Imerys Indemnity Adversary Proceeding claiming, among other things, that the Imerys Debtors' claims of breach of the indemnity provisions under certain of the J&J Agreements are contrary to the terms of the agreements (*i.e.*, that the Imerys Debtors are misconstruing or taking too expansive of

---

[14]   *See Complaint in Intervention* at ¶ 174 [Imerys Indem. Adv. Pro. D.I. No. 35-3].

[15]   On September 20, 2021, the Cyprus Debtor and CAMC filed a motion to intervene in the Imerys Indemnity Adversary Proceeding [Imerys Indem. Adv. Pro. D.I. 55], which J&J opposed [Imerys Indem. Adv. Pro. D.I. 58], and on October 13, 2021, the Cyprus TCC and the Cyprus FCR also filed a motion to intervene in the Imerys Indemnity Adversary Proceeding [Imerys Indem. Adv. Pro. D.I. 62].

a view of J&J's obligations or that J&J has no duty to indemnify the Imerys Debtors under certain of the J&J Agreements for claims alleging that talc supplied by the Imerys Debtors contained asbestos) and that J&J's indemnity obligations under certain of the J&J Agreements were nullified as a result of the Imerys Debtors' refusal to cooperate with J&J in the underlying talc litigation and the Imerys Cases [Imerys Indem. Adv. Pro. D.I. 56 & 57]. As with the Cyprus Indemnity Adversary Proceeding, LTL asserted that the Imerys Indemnity Adversary Proceeding was stayed as a result of the LTL 2021 Bankruptcy.

### 3. *J&J Proofs of Claim*

29.     Aside from the claims asserted by the Debtors in the J&J Adversary Proceedings, J&J has also asserted indemnity rights against the Debtors. In the Imerys Cases, J&J filed Proof of Claim Nos. 915, 922, and 926 (the "**<u>J&J Proofs of Claim</u>**") asserting a claim for, among other things, indemnification against the Imerys Debtors under the 2001 Supply Agreement on grounds that ITA supplied talc for use in J&J's products that violated various state common and statutory laws, including failure to warn, negligence, and strict liability. J&J Proofs of Claim ¶ 7. The Imerys Debtors filed an objection to the J&J Proofs of Claim on grounds that J&J is not entitled to indemnity under the terms of the 2001 Supply Agreement [Imerys D.I. 2284]. This was followed by a subsequent response from J&J [Imerys D.I. 2465]. In light of the complex issues raised by the J&J Proofs of Claim, the Imerys Debtors and J&J agreed to continue the Imerys Debtors' objection to the J&J Proofs of Claim to a date to be determined after plan confirmation [Imerys D.I. 2888].

### 4. *Insurance Disputes*

30.     The Debtors have asserted that one or more of the Debtors have the right to insurance coverage from the J&J Policies. ITV was a wholly owned subsidiary of Johnson &

Johnson until 1989 and, therefore, the Debtors allege they are successors to insureds, and the insured's rights, under the pre-1989 J&J Policies.  Certain of the J&J Corporate Parties dispute that any third parties are entitled to the proceeds of any insurance coverage from the J&J Policies. Furthermore, J&J has alleged it has rights to insurance coverage for policies procured by the Debtors or their predecessors.

### 5. *Other Objections Raised by J&J*

31.    In addition to the foregoing, J&J has raised numerous objections throughout the course of the Imerys Cases.  Though the Imerys Debtors view these objections and pleadings as meritless, responding to them has required the Imerys Debtors to deplete valuable estate resources that could otherwise be used to satisfy creditors.  For example, among other things, J&J:

- filed *Johnson & Johnson's Objection and Reservation of Rights Regarding Debtors' Notice of Assumption of Certain Johnson & Johnson Contracts* in the Imerys Cases [Imerys D.I. 3022];

- opposed the 2021 Imerys Plan and sought both extensive discovery on and clarification of the Debtors' process, substance, and treatment of J&J under the 2021 Imerys Plan [Imerys D.I. 2412];[16]

- opposed the 2021 Imerys Plan as it relates to the proposed trust distribution procedures, which J&J asserted, among other things, would have been used by the Trust to manufacture liability against J&J under the J&J Agreements [Imerys D.I. 2412];

- filed (i) *Johnson & Johnson and Johnson & Johnson Consumer Inc.'s Omnibus Objection to (I) Motion of Bevan Claimants to Affirm Certain Vote Changes in Connection With the Voting on the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code Pursuant to Bankruptcy Rule 3018, and (II) Williams Hart Plaintiffs Motion Pursuant to Rule 3018 to Affirm Certain Vote Changes in Connection with the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Imerys D.I. 4004] and (ii) *Johnson &*

---

[16]    On January 27, 2021, the Court authorized the Imerys Debtors to solicit votes on the *Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Imerys D.I. 2852] (the "**2021 Imerys Plan**").

> *Johnson and Johnson & Johnson Consumer Inc.'s Motion Pursuant to 11 U.S.C. § 1126(e) for Entry of an Order Designating Votes to Accept the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code Cast By Bevan & Associates LPA, Inc., Williams Hart Boundas Easterby LLP, and Trammel PC* [Imerys D.I. 4005], which raised objections to the voting process under the 2021 Imerys Plan;[17]

- filed *Johnson & Johnson's Motion Pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order Modifying Automatic Stay to Permit J&J to Send Notice Assuming Defense of Certain Talc Claims and to Implement Talc Litigation Protocol* [Imerys D.I. 1567], which was denied by the Court after months of litigation [Imerys D.I. 2253];

- filed *Johnson & Johnson and Johnson & Johnson Consumer Inc's Motion to Dismiss the Claims in the Adversary Complaint* [Imerys Adv. Pro. D.I. 56] and *Opening Brief in Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Dismiss the Claims in the Adversary Complaint* [Imerys Adv. Pro. D.I. 57]; and

- requested extensive discovery relating to plan negotiations and document exchanges between the Imerys TCC and Imerys FCR, including expert reports, and has subpoenaed more than a dozen witnesses.

32.    Such objections and the disputes between the Debtors and J&J also create a significant litigation risk that has the potential to further extend the timeline of the Imerys Cases and the Cyprus Case and potentially delay implementation of any confirmed plan in the Imerys Cases and the Cyprus Case through the conclusion of the appeal process.

## F.    The Settlement Agreement

33.    The Debtors, CAMC, Imerys S.A., and the Claimant Fiduciaries have engaged in extensive, good faith negotiations with J&J[18] over the course of months for the purpose of

---

[17]    On October 13, 2021, the Court issued the *Opinion* [Imerys D.I. 4239], which excluded 15,719 votes in favor of the 2021 Imerys Plan.  As a result, the Imerys Debtors filed a notice cancelling their confirmation hearing and suspending all confirmation deadlines.

[18]    "**J&J**" means Johnson & Johnson and any successor thereto, Johnson & Johnson Holdco (NA) Inc. (f/k/a Johnson & Johnson Consumer, Inc.) ("**Old JJCI**") and any successor thereto, and LLT and any successor thereto including, if formed, Red River Talc LLC and/or Pecos River Talc LLC.

resolving disputes regarding the Parties' respective indemnification rights and obligations under the J&J Agreements and applicable law, the Debtors' entitlement to the proceeds of the J&J Policies, and J&J's objections to the Plans and TDP.

34.     The Settlement Agreement contemplates, among other things, (i) a settlement payment from J&J in the aggregate amount of $225 million (the "**J&J Initial Payment**"), (ii) a contribution from the J&J Corporate Parties of the first $200 million and 50% of the next $160 million of insurance proceeds recovered under the J&J Policies (subject to an aggregate capped guarantee of $280 million and certain other limitations) (the "**J&J Insurance Payments**"),[19] and (iii) contribution of the entirety of the Home Proceeds (collectively, (i), (ii), and (iii), the "**J&J Payment Obligations**").[20]

35.     In addition, J&J will acquire the rights of the Debtors and their estates in the J&J Agreements and any and all of the Debtor J&J Released Claims (as defined in the Settlement Agreement) held by the Debtors and/or their estates (collectively, the "**Debtor J&J Rights**") free and clear of any and all rights, claims and interests of any other entity pursuant to sections 363(b) and 363(f) of the Bankruptcy Code (the "**J&J Buyback**"), subject to certain limitations described in the Settlement Agreement.  The J&J Buyback and the releases contained in the Settlement Agreement, resolve, among other things, current and future disputes under the J&J Agreements, the claims being pursued by the Parties in the J&J Adversary Proceedings, and all such other claims or causes of action as further detailed in the Settlement Agreement.  The J&J Buyback does not

---

[19]  The J&J Insurance Payments do not include (i) amounts recovered or received by J&J from Middlesex Assurance Company Limited ("**Middlesex**") or in connection with any insurance policy issued by Middlesex to another J&J Corporate Party, including defense cost recoveries paid to J&J Corporate Parties by Middlesex, and (ii) the Home Proceeds (as defined herein).

[20]  The J&J Initial Payment, J&J Insurance Payments, and the Home Proceeds are further discussed and explained below.

include any rights or interests in claims against the J&J Corporate Parties arising out of or in connection with prepetition payments to any of the Imerys Parties or Cyprus Parties, by way of subrogation or otherwise, asserted by Truck Insurance Exchange ("**Truck**"), any insurer currently or previously managed by Resolute Management, Inc. ("**RMI Managed Insurers**"), including National Union Fire Insurance Company of Pittsburgh, PA ("**National Union**"), or any other insurer that has made prepetition payments to any of the Imerys Parties or Cyprus Parties.

36.    The Settlement Agreement contemplates that subsequent to the Trigger Date, J&J will pay to the Debtors (if prior to the Plans' Effective Date) or the Trust (if after the Plans' Effective Date) the full amount of the J&J Initial Payment and any portions of the J&J Insurance Payments that have been received by J&J and immediately assign all of their rights to receive the Home Proceeds, as further detailed in the Settlement Agreement.  J&J will continue to pay amounts received in respect of the J&J Policies until the full amount of the J&J Insurance Payments have been transferred to the Debtors or the Trust (as applicable), provided that, any remaining amounts owed under the J&J Insurance Payments, up to $280,000,000, will be paid by J&J using other sources no later than December 31, 2025.  Effective as of the Insurance Reporting Termination Date, the Debtors and/or the Trust will assign to J&J all rights, interests, and remedies they have under the J&J Policies.

37.    Through the Settlement Agreement, the Debtors have resolved (i) the existence and scope of the Parties' indemnification obligations under the J&J Agreements, (ii) other Claims the Parties may have against each other relating to the J&J Agreements or related to the supply of talc by the Debtors to any J&J Corporate Party, and (iii) disputes between the Parties concerning the Debtors' rights with respect to the J&J Policies.  The Settlement Agreement also resolves any and all disputes between the Imerys Debtors' estates, on the one hand, and the Cyprus Debtor's estate,

- 17 -

on the other, regarding potentially competing rights to recovery on the J&J indemnity claims, providing for an even split between the two estates.[21]  Without the negotiated resolution of the issues embodied in the Settlement Agreement, the Parties face the prospect of having to resolve these disputes through costly and time-consuming litigation that may further extend the timeline of the Imerys Cases and the Cyprus Case.  The Settlement Agreement avoids both the costs and the risk of an adverse decision with respect to such litigation.

## SUMMARY OF THE SETTLEMENT AGREEMENT

38.     The material terms of the Settlement can be summarized as follows:[22]

| | |
|---|---|
| *Trigger Date* | The "**Trigger Date**" shall be the earliest date on which all of the following conditions precedent have occurred:<br><br>• The Imerys Debtors and the Cyprus Debtor each have filed the J&J Settlement Motion in their respective Chapter 11 Cases.<br><br>• The Bankruptcy Court has entered the J&J Settlement Order.<br><br>• The Voting Affirmation Date. |
| *J&J Initial Payment* | Two hundred twenty-five million U.S. dollars ($225,000,000). |
| *Timing of J&J Initial Payment* | On or prior to the date that is five (5) Business Days after the Trigger Date, J&J shall pay, or cause to be paid, the J&J Initial Payment, in immediately available funds in U.S. dollars via wire transfer(s) to, if the Talc Personal Injury Trust has not been established, the Designated Accounts, and, if the Talc Personal Injury Trust has been established, the account of the Talc Personal Injury Trust or the Designated Accounts, as applicable. Any payments to the Designated Accounts under this provision shall be divided evenly (50%/50%) between the Cyprus Designated Account and the Imerys Designated Account. |
| *J&J Insurance Payments* | The "**J&J Insurance Payments**" consist of the first two hundred million U.S. dollars ($200,000,000) of any Insurance Recoveries, and fifty-percent (50%) of the next one-hundred sixty million U.S. dollars ($160,000,000), to be paid by J&J from Insurance |

---

[21]   As a component of the overall Settlement, to the extent payments are made by J&J with respect to the J&J Payment Obligations prior to the Plans' Effective Date, the Imerys Debtors and the Cyprus Debtor shall direct J&J to pay 50% of such funds to the Imerys Designated Account and 50% of such funds to the Cyprus Designated Account (the "**Estate Allocation**").  On the Plans' Effective Date, all amounts remaining in the Imerys Designated Account and the Cyprus Designated Account will be transferred to the Trust.  For the avoidance of doubt, in the event the Plans' Confirmation Date and/or the Plans' Effective Date does not occur, but the other conditions detailed in the Settlement Agreement are satisfied, the funds held in or payable to the Cyprus Designated Account will be retained by or become the property of the Cyprus Debtor and the funds held in or payable to the Imerys Designated Account will be retained by or become the property of the Imerys Debtors.

[22]   The summary is qualified and superseded in all respects by the terms of the Settlement Agreement.

- 18 -

| | |
|---|---|
| | Recoveries in accordance with Section 5.6 of the Settlement Agreement (if before the Trigger Date) or Section 5.10 of the Settlement Agreement (if on or after the Trigger Date); <u>provided</u>, <u>however</u>, (i) J&J shall pay, or cause to be paid, one hundred and sixty-seven million U.S. dollars ($167,000,000), in immediately available funds in U.S. dollars via wire transfer, to the Escrow Account within five (5) Business Days following the later to occur of (a) the entry by the Bankruptcy Court of the J&J Settlement Order and (b) the opening of the Escrow Account, and (ii) if the full two hundred and eighty million U.S. dollars ($280,000,000) has not been paid by J&J before December 31, 2025, J&J shall pay the unpaid balance thereof using other sources on December 31, 2025, in accordance with the payment instructions in Section 4.1 of the Settlement Agreement. |
| ***Home Proceeds*** | The "**Home Proceeds**" consist of all payments made by The Home Insurance Company in Liquidation's ("**Home**") estate with respect to the full amount of the Home allowance for proofs of claims made by ITV and J&J under any policies issued by The Home Insurance Company and/or its affiliates, which assert claims of $111,381,494, whether an initial payment or any subsequent payments relating to such allowance. For the avoidance of doubt, Home Proceeds refers to the claims and proceeds referenced in the April 3, 2024 letter on behalf of the New Hampshire Insurance Commissioner to J&J and ITV. |
| ***Timing of J&J Insurance Payments and Payment of Home Proceeds*** | Prior to the Trigger Date, within five (5) Business Days after receipt of any portion of any J&J Insurance Payments or Home Proceeds by any J&J Corporate Party, J&J shall pay, or cause to be paid, the J&J Insurance Payments or Home Proceeds received, in immediately available funds in U.S. dollars via wire transfer, to the Escrow Account. |
| | After occurrence of the Trigger Date, and after ten (10) Business Days prior written notice from the Debtors to J&J, the Debtors shall instruct the Escrow Agent to irrevocably and indefeasibly pay, or cause to be paid, the balance of the Escrow Account, in immediately available funds in U.S. dollars via wire transfer(s), as follows: (i) if after the Plans' Effective Date, to the Talc Personal Injury Trust; and (ii) if prior to the Plans' Effective Date, to the Designated Accounts. Any payments to the Designated Accounts under this provision shall be divided evenly (50%/50%) between the Cyprus Designated Account and the Imerys Designated Account. |
| | As of the Trigger Date, within five (5) Business Days after receipt of any portion of any J&J Insurance Payments or Home Proceeds by any J&J Corporate Party, J&J shall irrevocably and indefeasibly pay, or cause to be paid, any unpaid portion of the J&J Insurance Payments or Home Proceeds received as set forth in the statement delivered in accordance with Section 5.3 of the Settlement Agreement, in immediately available funds in U.S. dollars via wire transfer(s), as follows: (i) if after the Plans' Effective Date, to the Talc Personal Injury Trust or the Designated Accounts, as applicable; and (ii) if prior to the Plans' Effective Date, to the Designated Accounts. Any payments to the Designated Accounts under this provision shall be divided evenly (50%/50%) between the Cyprus Designated Account and the Imerys Designated Account. |
| | The obligation of J&J and LLT to make J&J Insurance Payments to the Talc Personal Injury Trust, the Escrow Account, or the Designated Accounts as applicable, under the Settlement Agreement shall total $280,000,000 in the aggregate. |
| | Effective upon the Closing Date, J&J shall irrevocably assign and transfer all of its rights with respect to the Home Proceeds to the Debtors, as joint owners of an undivided interest (if prior to the Plans' Effective Date) or the Talc Personal Injury Trust (if after the Plans' Effective Date) without need for further action, and J&J will work cooperatively with the Debtors, the Claimant Fiduciaries, and/or the Talc Personal |

| | Injury Trust in any efforts necessary to effectuate the assignment and recovery of the Home Proceeds, including by notifying the New Hampshire Insurance Commissioner. |
|---|---|
| ***Release by Debtor Releasing Parties*** | Effective upon the Closing Date, for good and valuable consideration, the adequacy of which is confirmed by the Settlement Agreement, the Debtors, the Estates, the Reorganized Debtors, and the Talc Personal Injury Trust, and any successors, assigns, or representatives of each of the foregoing and any other persons claiming under or through them (collectively, the "**Debtor Releasing Parties**") shall be deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge the J&J Corporate Parties from any and all claims the Debtor Releasing Parties have against them, with the exception of "Subrogated Claims," as defined below, including: (a) all Claims raised (or that any Debtor Releasing Party could have raised) in the Adversary Proceedings; and (b) any and all Claims, counterclaims, causes of action, Estate Causes of Action Against J&J, disputes, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether arising pre-petition or post-petition, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, in law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including Claims or causes of action based on a theory of contribution, subrogation, contractual and/or equitable indemnification, or common law, or insurance coverage claims against Middlesex, which the Debtor Releasing Parties have, had, may have, or may claim to have against any of the J&J Corporate Parties directly, derivatively, or indirectly arising out of, with respect to, or in any way relating to Talc Personal Injury Claims, the J&J Agreements, or otherwise to the supply of talc by the Debtors to any J&J Corporate Party ("**Debtor J&J Released Claims**"). For the avoidance of doubt, the Debtor J&J Released Claims shall include any Claim or right against a J&J Corporate Party held by a Protected Party or a Talc Insurance Company (including a Settling Talc Insurance Company) that is assigned or otherwise transferred to the Talc Personal Injury Trust pursuant to the Plans (including the Contributed Indemnity and Insurance Interests, and the Rio Tinto/Zurich Credit Contribution, each as defined in the Plans).  Notwithstanding the above, the Debtor J&J Released Claims shall not include any claims relating to J&J Talc Claims as to which, and in the amount as to which, any RMI Managed Insurer and/or Truck made pre-petition payments to or on behalf of the Imerys Parties or the Cyprus Parties (the "**Subrogated Claims**").  Upon the Closing Date, any and all requests, demands, or tenders for defense or indemnity previously submitted to the J&J Corporate Parties by any of the Debtor Releasing Parties with respect to a Debtor J&J Released Claim shall be deemed withdrawn, the Debtor Releasing Parties shall surrender, relinquish, and release any further right to tender or present any Debtor J&J Released Claims, and the J&J Corporate Parties shall have no duty to defend, indemnify, reimburse, or otherwise pay the Debtor Releasing Parties with respect to any Debtor J&J Released Claims.  For the avoidance of doubt, the Settlement Agreement shall have no effect on any subrogation rights that any insurer that has made pre-petition payments to or on behalf of any of the Imerys Parties or the Cyprus Parties, including Truck and the RMI Managed Insurers (including National Union) has asserted or may assert against J&J in connection with or as a result of such payments.  The Imerys Parties and the Cyprus Parties represent that, other than the RMI Managed Insurers, including National Union, and Truck, and any affiliates thereof, they are aware of no insurers that have paid defense or indemnity costs to or on behalf of a Debtor Released Party in relation to J&J Talc Claims.  From and after the Execution Date, unless and until the Settlement Agreement is terminated in accordance with Section 8 of the Settlement Agreement, the Debtor |

|  | Releasing Parties shall not pursue, and the Claimant Fiduciaries shall not seek standing to pursue, any Debtor J&J Released Claims; provided, however, for the avoidance of doubt, the Imerys Parties and the Cyprus Parties may file proof(s) of claim in any J&J Related Bankruptcy Case to ensure that the Debtor J&J Released Claims are not waived or impaired pending the Closing Date. |
|---|---|
| **Release by Non-Debtor Releasing Parties** | Effective upon the Closing Date, for good and valuable consideration, the adequacy of which is confirmed by the Settlement Agreement, the Debtor Corporate Parties, any successors, assigns, or representatives of any of them, and any other persons claiming under or through them (collectively, the "**Non-Debtor Releasing Parties**") shall be deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge the J&J Corporate Parties from any and all claims the Non-Debtor Releasing Parties have against them relating to J&J Talc Claims, with the exception of Subrogated Claims, including (a) all Claims raised (or that any Non-Debtor Releasing Party could have raised) in the Adversary Proceedings; and (b) any and all Claims, counterclaims, causes of action, disputes, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether pre-petition or post-petition, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, in law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including Claims or causes of action based on a theory of contribution, subrogation, contractual and/or equitable indemnification, or common law, or insurance coverage claims against Middlesex, which the Non-Debtor Releasing Parties have, had, may have, or may claim to have against any of the J&J Corporate Parties directly, derivatively, or indirectly arising out of, with respect to, or in any way relating to Talc Personal Injury Claims, the J&J Agreements, or otherwise to the supply of talc by the Debtors to any J&J Corporate Party ("**Non-Debtor J&J Released Claims**"). Upon the Closing Date, any and all requests, demands, or tenders for defense or indemnity previously submitted to the J&J Corporate Parties by any of the Non-Debtor Releasing Parties with respect to a Non-Debtor J&J Released Claim shall be deemed withdrawn, the Non-Debtor Releasing Parties shall surrender, relinquish, and release any further right to tender or present any Non-Debtor J&J Released Claims, and the J&J Corporate Parties shall have no duty to defend, indemnify, reimburse, or otherwise pay the Non-Debtor Releasing Parties with respect to any Non-Debtor J&J Released Claims. From and after the Execution Date until the Settlement Agreement is terminated in accordance with Section 8 of the Settlement Agreement, the Non-Debtor Releasing Parties shall not pursue any Non-Debtor J&J Released Claims; provided, however, for the avoidance of doubt, the Non-Debtor Releasing Parties may file proof(s) of claim in any J&J Related Bankruptcy Case to ensure that the Non-Debtor J&J Released Claims are not waived or impaired pending the Closing Date. |
|  | Effective upon the Execution Date and, unless and until the Settlement Agreement is terminated in accordance with Section 8 of the Settlement Agreement, or J&J provides express written consent, for good and valuable consideration, the adequacy of which is confirmed by the Settlement Agreement, the Debtor Releasing Parties and Non-Debtor Releasing Parties covenant not to pursue insurance coverage, or accept any payment, under any insurance policy, for J&J Talc Claims, including to recover any defense costs. To the extent such claims have been made in the past and remain pending, the Debtor Releasing Parties and the Non-Debtor Releasing Parties shall pause any pursuit of the claims, shall so advise the party from whom they are pursuing such coverage, and shall not accept any payment for or in connection with such J&J Talc Claims. For the |

- 21 -

| | avoidance of doubt, the Settlement Agreement does not prohibit or restrict any person or entity from pursuing coverage under the Debtors' Policies for Talc Personal Injury Claims or portions of Talc Personal Injury Claims that are not J&J Talc Claims. |
|---|---|
| ***Release by J&J Corporate Parties*** | Effective upon the Closing Date, for good and valuable consideration, the adequacy of which is confirmed by the Settlement Agreement, the J&J Corporate Parties, any successors, assigns, or representatives of any of them, and any other persons claiming under or through any of them (collectively, the "**J&J Releasing Parties**"), shall be deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge the Debtor Releasing Parties, the Non-Debtor Releasing Parties, and the Claimant Fiduciaries (and their agents and representatives) (collectively, the "**Debtor Released Parties**") from any and all claims the J&J Corporate Parties have against them, including:  (a) all Claims raised (or that any J&J Corporate Party could have raised) in the Adversary Proceedings or in the Proofs of Claim; and (b) any and all Claims, counterclaims, causes of action, disputes, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether arising pre-petition or post-petition, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, in law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including Claims or causes of action based on a theory of contribution, subrogation, contractual and/or equitable indemnification, or common law, which the J&J Corporate Parties have, had, may have, or may claim to have against any of the Debtor Released Parties directly, derivatively, or indirectly arising out of, with respect to, or in any way relating to Talc Personal Injury Claims, the J&J Agreements, or otherwise to the supply of talc by the Debtors to any J&J Corporate Party (collectively, "**Debtor Released Claims**").  Upon the Closing Date, any and all requests, demands, or tenders for defense or indemnity previously submitted to the Debtor Released Parties by any of the J&J Corporate Parties with respect to a Debtor Released Claim shall be deemed withdrawn, and the J&J Corporate Parties shall surrender, relinquish, and release any further right to tender or present any Debtor Released Claims, and the Debtor Released Parties and the Estates shall have no duty to defend, indemnify, reimburse, or otherwise pay the J&J Corporate Parties with respect to any Debtor Released Claims.  Upon the Closing Date, any and all requests or demands for payment of any Debtor Released Claim by the J&J Corporate Parties against any Debtor or Debtor Corporate Party or the Estates shall be deemed withdrawn with prejudice and the J&J Corporate Parties agree to waive any claim against the Talc Personal Injury Trust for any reason, including, without limitation, indirect claims, contribution, or subrogation for any Talc Personal Injury Claim (as defined in the Plans) paid by a J&J Corporate Party.  From and after the Execution Date, unless and until the Settlement Agreement is terminated in accordance with Section 8 of the Settlement Agreement, the J&J Corporate Parties shall not pursue any Debtor Released Claims. |
| ***J&J Buyback*** | The J&J Settlement Motion shall constitute a request by the Debtors for the Bankruptcy Court to approve the J&J Buyback, which shall be effective as of the Closing Date and consistent with the terms as set out in the Settlement Agreement, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, free and clear of all interests and claims, including any claim of any person or entity against the J&J Corporate Parties, or any of them, on account of, based upon, directly or indirectly arising from, or in any way relating to any alleged right, claim, or interest of the Debtors, or any of them, in the J&J Agreements or Debtor J&J Released Claims, including subrogation claims (except as provided for in Section 6.1 of the Settlement Agreement), and to find that J&J is a good- |

- 22 -

|  | faith purchaser pursuant to section 363(m) of the Bankruptcy Code and approve the mutual releases and other compromises set forth in the Settlement Agreement pursuant to Bankruptcy Rule 9019.  For the avoidance of doubt, and notwithstanding the foregoing, the J&J Buyback does not include, and J&J is not purchasing, any rights or interests in Claims against the J&J Corporate Parties arising out of or in connection with pre-petition payments to any of the Imerys Parties or Cyprus Parties, by way of subrogation or otherwise, asserted by Truck, the RMI Managed Insurers, including National Union, or any other insurer that has made pre-petition payments to any of the Imerys Parties or Cyprus Parties. |
|---|---|
| *Other Provisions* | ***J&J Obligations to Pay***<br><br>Each of Johnson & Johnson, and any successor thereto, and LLT, and any successor thereto, are jointly and severally liable for payment of the J&J Initial Payment, and the J&J Insurance Payments and any Home Proceeds received by any J&J Corporate Party as set forth in Section 5 of the Settlement Agreement (the "**J&J Payment Obligations**"), and the commencement of a proceeding under the Bankruptcy Code by one (including, if formed, Red River Talc LLC and/or Pecos River Talc LLC) will not operate as a stay of, or otherwise affect, the obligation of any of the others to make the J&J Payment Obligations.  If the payment of any of the J&J Payment Obligations is subsequently avoided for any reason, including through the exercise of a trustee's avoidance powers under the Bankruptcy Code, any of the Parties jointly and severally liable for the J&J Payment Obligations shall irrevocably and indefeasibly pay, or cause to be paid, the J&J Payment Obligations, via wire transfer(s), to the entity(ies) as set forth in Section 4.1 of the Settlement Agreement within five (5) Business Days from the date of written notice of the avoidance of any J&J Payment Obligation.<br><br>***Assignment of Rights to the J&J Policies***<br><br>Effective upon the Insurance Reporting Termination Date, for good and valuable consideration, the adequacy of which is confirmed by the Settlement Agreement, the Debtors, the Debtor Corporate Parties, and the Talc Personal Injury Trust shall assign to J&J all rights, interests and remedies they may have under the J&J Policies.<br><br>***Cooperation and Bankruptcy-Related Obligations***<br><br>The Debtors shall (i) amend each of their respective Plans to be consistent with the Settlement Agreement and thereafter cause each of their respective Plans to remain consistent with the Settlement Agreement, (ii) solicit votes on each of their respective Plans, (iii) file the Voting Certification with the Bankruptcy Court, (iv) request that the Bankruptcy Court enter an order setting a Voting Objection Deadline no later than thirty (30) days after the Voting Certification is filed with the Bankruptcy Court, and (v) if one or more Voting Objections(s) are filed with the Bankruptcy Court before expiration of the Voting Objection Deadline, seek to have the Bankruptcy Court decide such Voting Objection(s), in each case as expeditiously as reasonably practicable, taking into account the availability of the Bankruptcy Court, if applicable.  The Debtors acknowledge that the inclusion of Section 7.1 of the Settlement Agreement is a material inducement to the willingness of J&J to enter into the Settlement Agreement.<br><br>Each Party shall use its reasonable efforts, and take such steps and execute such documents as may be reasonably necessary and proper to effectuate the purpose and intent of, and obtain the outcomes sought by, the Settlement Agreement, including entry of the J&J Settlement Order, filing the Voting Certification, confirmation of the Plans, and the occurrence of the Plans' Effective Date, and to preserve the validity and enforceability of the Settlement Agreement.  In the event that any objection, action, or proceeding is commenced or prosecuted by any Person to invalidate, hinder, or prevent the approval, validation, enforcement, or carrying out of all or any provisions of the Settlement Agreement or to appeal the J&J Settlement Order, the Parties mutually agree |

|  | to reasonably cooperate in good faith in opposing such objection, action, proceeding, or appeal. Each of the Parties shall reasonably cooperate in good faith with each of the other Parties in responding to or opposing any motion, objection, claim, assertion, or argument by any third party that the Settlement Agreement is not binding, or should be avoided, or that valuable and fair consideration or reasonably equivalent value has not been exchanged pursuant to the Settlement Agreement. For the avoidance of doubt, the obligations contained in Section 7.5 of the Settlement Agreement shall survive and remain binding on the Parties until such time as the later of (i) the Plans' Effective Date has occurred and (ii) the Insurance Reporting Termination Date has occurred. The J&J Corporate Parties acknowledge that the inclusion of Section 7.5 of the Settlement Agreement is a material inducement to the Debtors entering into the Settlement Agreement in addition to payment in full of the J&J Payment Obligations.
|  | ***Certain Plan Language***
|  | The Plans shall provide that, on the Plans' Effective Date, the rights of the Debtors under the Settlement Agreement shall be deemed to have been assigned and transferred to the Talc Personal Injury Trust without need of further action by any Party or Person, and the Talc Personal Injury Trust shall be bound by all of the applicable provisions of the Settlement Agreement. Unless the Settlement Agreement is validly terminated pursuant to the terms hereof, the Debtors, the Reorganized Debtors, and the Debtor Corporate Parties shall continue to be bound by the Settlement Agreement and shall retain all of the obligations and benefits hereof, notwithstanding the Debtors' assignment and transfer of rights under the Settlement Agreement to the Talc Personal Injury Trust.
|  | The Parties agree, and the Plans shall include the following provision: "Nothing in the Plans or the Trust Distribution Procedures shall be binding on or used to impact, prejudice, or affect the J&J Corporate Parties (including, without limitation, LLT, Johnson & Johnson, and, if formed, Red River Talc LLC and/or Pecos River Talc LLC), in the tort system or in a bankruptcy case."
|  | The Parties agree that nothing in the Settlement Agreement shall be binding on or used to impact, prejudice, or affect in any way the rights that any holder of a Talc Personal Injury Claim (or such holder's heirs, executors, and assigns) has directly against a J&J Corporate Party. For the avoidance of doubt, the Parties acknowledge and agree that the immediately preceding sentence does not apply to rights to pursue Debtor J&J Released Claims.
| **Certain Defined Terms** | "**Closing Date**" means the date on or after the Trigger Date, on which the Designated Accounts (if prior to the Plans' Effective Date) or the Talc Personal Injury Trust (if after the Plans' Effective Date) receives the J&J Initial Payment, $167,000,000 of the J&J Insurance Payments, and any additional portion of the J&J Insurance Payments and Home Proceeds recovered prior to the Trigger Date.
|  | "**Insurance Recoveries**" means any funds received by any J&J Corporate Party arising out of or relating to coverage under the J&J Policies for talc claims against J&J, including the proceeds of any settlement agreements with any insurance carrier, any insurer's reimbursement of defense costs, payments, settlements, or judgments, and the proceeds of any judgment against any insurer or insurers. Insurance Recoveries include any settlement or reimbursement received on or after April 29, 2024 relating to talc claims against J&J, including approximately $167,000,000 J&J believes it will recover, as referenced in Section 5.2 of the Settlement Agreement. For the avoidance of doubt, Insurance Recoveries do not include (i) amounts recovered or received by J&J from Middlesex or in connection with any insurance policy issued by Middlesex to another J&J Corporate Party, including defense cost recoveries paid to J&J Corporate Parties by Middlesex; and (ii) the Home Proceeds.

- 24 -

"**J&J Talc Claim**" means (i) any Talc Personal Injury Claim (including any Indirect Talc Personal Injury Claim) that alleges bodily injury exclusively due to talc or a talc-containing product mined, manufactured, processed, sold, marketed, and/or distributed by a J&J Corporate Party or (ii) for any Talc Personal Injury Claim (including any Indirect Talc Personal Injury Claim) that alleges bodily injury due to a product mined, manufactured, processed, sold, marketed, and/or distributed by more than one entity (in addition to the Debtors), that portion of the claim that alleges bodily injury due to talc or a talc-containing product mined, manufactured, processed, sold, marketed, and/or distributed by Debtors and a J&J Corporate Party. For the avoidance of doubt, (i) any Talc Personal Injury Claim (including any Indirect Talc Personal Injury Claim) that alleges bodily injury exclusively due to any talc or a talc-containing product mined, manufactured, processed, sold, marketed, and/or distributed by entities that are not J&J Corporate Parties are not J&J Talc Claims and (ii) for any Talc Personal Injury Claim (including any Indirect Talc Personal Injury Claim) that alleges bodily injury due to any talc or a talc-containing product mined, manufactured, processed, sold, marketed, and/or distributed by more than one entity (in addition to the Debtors), that portion of the claim that alleges bodily injury due to a talc or a talc-containing product mined, manufactured, processed, sold, marketed, and/or distributed entirely by entities (other than the Debtors or in addition to the Debtors) that are not J&J Corporate Parties is not a J&J Talc Claim

"**Voting Affirmation Date**" means the date after the Voting Certification has been filed with the Bankruptcy Court in the Chapter 11 Cases evidencing requisite claimant approval of the Plans on which either (i) the Voting Objection Deadline has expired without (a) any Voting Objection being filed or (b) Voting Objection(s) being filed before expiration of the Voting Objection Deadline that, in the reasonable discretion of each of the Imerys Parties, Cyprus Parties and the Claimant Fiduciaries, if granted, individually or collectively could result in one or both of the Plans not having received requisite claimant approval or (ii) if one or more Voting Objection(s) are filed before expiration of the Voting Objection Deadline that, in the reasonable discretion of each of the Imerys Parties, Cyprus Parties and the Claimant Fiduciaries, if granted, individually or collectively could result in one or both of the Plans not having received requisite claimant approval, such Voting Objection(s) are resolved by the applicable parties or the Bankruptcy Court in a manner that confirms both of the Plans have received requisite claimant approval.

"**Voting Certification**" shall have the meaning set forth in the Debtors' joint solicitation procedures motion, as the same may be amended or modified.

"**Voting Objection**" means (i) a request that the Bankruptcy Court designate an entity on the basis that its acceptance or rejection of either Plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code and (ii) any other objection to the Voting Certification or to any one or more vote(s) accepting or rejecting either Plan.

"**Voting Objection Deadline**" means the last day upon which any party in interest may file a Voting Objection.

39.    The Debtors believe that the Settlement Agreement is fair and equitable and in the best interests of their estates. The Settlement will enable the Debtors to arrange for a substantial infusion of additional funds to the Trust, while avoiding the cost and uncertainty of litigation regarding the Parties' respective rights and obligations under the J&J Agreements and the J&J

Policies.  The Settlement Agreement will resolve J&J's objections to the Debtors' Plans, including the TDP, which will reduce go-forward litigation costs during the pendency of the Imerys Cases and the Cyprus Case and improve the likelihood of confirmation of the Plans.  Importantly, as set forth in Section 12.1 of the Settlement Agreement, notwithstanding any other provision within the Settlement Agreement, nothing contained therein shall affect the rights of an individual holder of a Talc Personal Injury Claim (as defined in the Plans), or such individual holder's heirs, executors, and assigns, to prosecute such individual holder's claims against any J&J Corporate Party.

## BASIS FOR RELIEF

### I.    The Court Should Approve the Settlement Agreement Under Bankruptcy Rule 9019.

40.    Bankruptcy Rule 9019 provides that "[o]n motion by the trustee [or debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  Compromises are a normal part of the bankruptcy process.  *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).  As a matter of policy, compromises and settlements are favored in order to minimize litigation and expedite administration of the estate.  *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996); *In re A & C Prop.*, 784 F.2d 1377, 1381 (9th Cir. 1986); *accord In re Heissinger Res. Ltd.*, 67 B.R. 378, 383 (C.D. Ill. 1986) ("[T]he bankruptcy court is to consider that the law favors compromise[.]").

41.    The decision to approve a settlement is within a bankruptcy court's discretion.  *See In re Summit Metals, Inc.*, 477 F. App'x 18, 21 (3d Cir. 2012) (applying the abuse of discretion standard to affirm the bankruptcy court's approval of a settlement).  A settlement should be approved where the court determines it is fair and equitable and in the best interests of the

bankruptcy estate.  *See In re Capmark Fin. Grp. Inc.*, No. 09-13684, 2011 WL 6013698 (Bankr. D. Del. Apr. 15, 2011).

42.     In determining whether a proposed settlement is fair and equitable, neither an evidentiary hearing nor a rigid mathematical analysis is required.  *Tri-State Fin., LLC v. Lovald*, 525 F.3d 649, 655 (8th Cir. 2008), *cert. denied*, 555 U.S. 1046 (2008); *see also In re NovaPro Holdings, LLC*, 815 F. App'x 655, 658 (3d Cir. 2020) ("The Bankruptcy Court need not probe the merits of all claims or conduct a 'mini-trial' before approving the settlement"); *In re Am. Reserve Corp.*, 841 F.2d 159, 163 (7th Cir. 1987) (mini-trial regarding settled claims not required).  Rather, the court must determine whether the proposed compromise falls within the reasonable range of litigation possibilities.  *See Tri-State Fin., LLC v. Lovald*, 525 F.3d at 654 (the court is required only to "determine that the settlement does not fall below the lowest point in the range of reasonableness"); *accord In re Managed Storage Int'l, Inc.*, No. 09-10368 (MWF), 2020 WL 1532390, at *4 (D. Del. Mar. 31, 2020); *In re Jiangbo Pharm., Inc.*, 520 B.R. 316, 321 (Bankr. S.D. Fla. 2014).

43.     The Court should consider the following relevant factors: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.  *See In re Martin*, 91 F.3d at 393.

### A.     The Probability of Success in Litigation

44.     The proposed Settlement is the culmination of extensive negotiations over the course of months among the Debtors, CAMC, Imerys S.A., the Claimant Fiduciaries, and J&J regarding the Parties' respective claims under the J&J Agreements, the J&J Policies, and applicable law.  The Debtors believe that the proposed Settlement, including the J&J Payment

- 27 -

Obligations, represents a fair and equitable settlement given the range of potential litigation outcomes. Critically, the J&J Corporate Parties dispute that they have any obligations to indemnify the Debtors under the J&J Agreements and applicable law, and have vigorously opposed the Debtors' actions relating to the J&J Agreements under the Plans (including the TDP) and the prior plan filed by the Imerys Debtors. J&J has also stated that it would object to any modified plan that seeks to impose liability on J&J through the TDP. The Debtors, on the other hand, have consistently maintained their rights under the J&J Agreements, including by commencing the J&J Adversary Proceedings. Moreover, J&J has long disputed the Debtors' entitlement to the J&J Policies, notwithstanding the Debtors' firm belief that they have the right to access the proceeds of such policies.

45.     The proposed Settlement (i) resolves the Parties' ongoing disputes regarding their respective rights and obligations under the J&J Agreements and J&J Policies, (ii) resolves J&J's potential objections to the Plans (including the TDP), and (iii) eliminates uncertainty regarding significant assets of the estates. Indeed, the Settlement will guarantee at least $505 million in cash for the benefit of the Debtors' estates and creditors and assist the Debtors' efforts to confirm the Plans, without leaving the resolution of significant disputes to what would undoubtedly be intense litigation. Litigation carries an uncertain outcome and would drain proceeds from the estates or, if done post-effective date, the Trust, reducing funds available for resolution of claims.

46.     Given the significant risks inherent in litigation regarding critical assets of the Debtors' estates, the recovery provided for in the Settlement Agreement must be viewed as significantly beneficial for the Debtors, their estates, and creditors. Considering the range of reasonable outcomes of the Parties' disputes—including the likelihood that J&J will appeal any adverse decisions that may assign it liability—the resolution afforded by the Settlement Agreement

certainly exceeds the lowest point in the range of reasonableness.  The support of the Settlement by each of the Claimant Fiduciaries speaks to the reasonableness of the proposed Settlement.

## B.    The Difficulties Associated with Collection

47.    The Settlement Agreement removes any uncertainty of collection because J&J has agreed to make the J&J Payment Obligations as a condition of the Settlement.  Importantly, the Settlement Agreement avoids any cost and delay that would result from a potential, additional LLT chapter 11 filing (or the filing of an affiliated entity).  Approval of the Settlement Agreement would avoid these and other potential collection disputes that may arise under the unique facts and circumstances present here.

## C.    The Complexity of the Litigation and the Attendant Expense, Inconvenience, and Delay

48.    Without the Settlement Agreement, (a) the Debtors and/or the Trust (if the Plans are confirmed) would be forced to expend significant resources to litigate highly complex and disputed issues of fact and contract interpretation over the Parties' rights and obligations under the J&J Agreements and the J&J Policies and (b) the Debtors would need to continue to engage in litigation with certain J&J Corporate Parties during the course of the Imerys Cases and the Cyprus Case as they seek to confirm their respective Plans and after plan confirmation if the Plans are confirmed over J&J's objections as J&J would likely appeal any unfavorable rulings.  Such litigation has the potential to significantly delay implementation of the Plans and further extend the duration of the Imerys Cases and the Cyprus Case.  Importantly, the Settlement removes the J&J Corporate Parties as objecting parties to the Debtors' Plans, thus saving the costs and expenses

- 29 -

of future litigation, while providing significant savings for the Debtors and their estates and economic stakeholders.

   **D.    The Paramount Interests of Creditors**

   49.    Together with the Debtors, the Claimant Fiduciaries believe that approval of the Settlement Agreement serves the paramount interests of creditors because, among other reasons, it (i) resolves and thereby eliminates disputes among the Debtors and certain J&J Corporate Parties regarding critical assets of the estates, (ii) provides a guaranteed recovery for the Debtors' estates or the Trust (subject to the effective date of the Plans) without the cost and delay of post-effective date litigation, (iii) avoids uncertainty regarding the proposed assignment of the Debtors' rights under the J&J Agreements to the Trust under the Debtors' Plans, and (iv) makes closer the reality of the Debtors achieving the stated purpose of their cases – establishing a trust for the benefit of the holders of Talc Personal Injury Claims.  As noted above, the participation of the Claimant Fiduciaries in the settlement discussions and their support of the Settlement Agreement speaks volumes as to the fairness of the settlement for the Debtors' talc creditors, the only impaired class of creditors under the Plans.

   50.    Under the circumstances of these chapter 11 cases, where the settlement to be approved concerns funds that ultimately will be transferred to the Trust and devoted to administering the Trust for the benefit of those with claims channeled to the Trust for resolution, the support from the Claimant Fiduciaries is significant and weighs heavily in favor of approving the Settlement Agreement.  *See Travelers Cas. & Sur. Co. v. Future Claimants Representative*, No. CIVA 07-2785 FLW, 2008 WL 821088, at *8 n.8 (D.N.J. Mar. 25, 2008) (concluding that it was within the bankruptcy court's discretion to consider the position of the official committees in

deciding whether to approve a settlement because "the true beneficiaries of the insurance are the claimants, including the future claimants.")

51.     For the foregoing reasons, the Settlement Agreement satisfies the requirements of Bankruptcy Rule 9019 and the *Martin* factors.

## II.    The Court Should Approve the Sale of the Debtor J&J Rights to J&J Under Section 363 of the Bankruptcy Code.

52.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor-in-possession may sell property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  A debtor's sale of property outside the normal course should be authorized pursuant to section 363 of the Bankruptcy Code as long as a sound business purpose exists for doing so. *See, e.g., In re Schipper*, 933 F. 2d 513, 515 (7th Cir. 1991); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1989); *In re Lionel Corp.*, 722 F.2d 1063, 1070-71 (2d Cir. 1983); *In re Mallinckrodt PLC*, No. BR 20-12522-JTD, 2022 WL 906458, at *6 (D. Del. Mar. 28, 2022).  The J&J Buyback is an integral component of the Settlement Agreement, in exchange for which the Debtors, their estates, and creditors will receive the benefit of the J&J Payment Obligations.  As indicated above, the J&J Payment Obligations facilitate the goal of these cases – formulation of a trust to resolve Talc Personal Injury Claims.  Accordingly, a sound business purpose exists for the sale of the Debtor J&J Rights.

53.     Section 363(f) of the Bankruptcy Code provides that the debtor-in-possession may sell property "free and clear of any interest in such property of an entity other than the estate" if at least one of the following conditions is satisfied: (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal

- 31 -

or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f)(1)-(5).

Section 363(f) authorizes a sale free and clear of "interests," not merely liens, and thus permits a

sale of property free and clear of all claims and interests of any entity that "are derivative of the

debtor's rights in that property."  *In re Dow Corning Corp.*, 198 B.R. 214, 244 (Bankr. E.D. Mich.

1996).

54.     The Debtor J&J Rights may be sold free and clear of all liens, encumbrances, and

other interests of any entity pursuant to sections 363(f)(2), (f)(4) or (f)(5) of the Bankruptcy Code.

55.     *First*, entities that receive notice of the Settlement Agreement and fail to object

should be deemed to have consented to the Settlement Agreement for purposes of section 363(f)(2)

of the Bankruptcy Code.  *See, e.g., In re Dura Auto. Sys., Inc.*, No. 06-11202 KJC, 2007 WL

7728109, at *6 (Bankr. D. Del. Aug. 15, 2007) (concluding that creditors who do not object to the

asset sale are "deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code");

*In re James*, 203 B.R. 449, 453 (Bankr. W.D. Mo. 1997) (section 363(f)(2) satisfied where secured

creditor had notice and failed to object to proposed sale and thus "implicitly conveyed its consent

to the sale"); *In re Elliot*, 94 B.R. 343, 345-46 (E.D. Pa. 1988) (implied consent sufficient to

authorize section 363(f)(2) sale; consent implied from non-debtor that "received notice of the

proposed sale and also admits that it did not file any timely objection").  Non-objectors should be

deemed to have consented to the sale for purposes of section 363(f)(2) of the Bankruptcy Code.

56.     *Second*, to the extent any objections are filed, the Debtor J&J Rights may be sold

free and clear of all claims and interests pursuant to section 363(f)(4) of the Bankruptcy Code.  A

sale free and clear is appropriate under section 363(f)(4) because the interests of the holders of

such claims plainly are "in bona fide dispute" under such circumstances.  *See Macarthur v. Johns-

Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, at 93 (2d Cir. 1988) (holding that

vendor's alleged rights under certain endorsements for indemnity for asbestos claims was in bona fide dispute because a dispute existed as to whether "the product liability limits on the policies to which the vendor endorsements attach have been exhausted").  By definition, the Debtor J&J Rights comprise only rights of the Debtors and their estates.  Furthermore, to the extent a talc claimant objects to the Motion asserting a right to recover directly from J&J under the Debtor J&J Rights on account of a talc claim, the Debtors have scheduled all talc claims as disputed. Therefore, section 363(f)(4) of the Bankruptcy Code is applicable to a sale of the Debtor J&J Rights.

57.     *Third*, to the extent a talc claimant could assert an interest in the Debtor J&J Rights on account of an undisputed talc claim, the Debtor J&J Rights may nonetheless be sold free and clear of such an interest under section 363(f)(5) of the Bankruptcy Code as holders of any Talc Personal Injury Claims that object to the sale could be compelled to accept a money satisfaction for such interests.  Indeed, the potential right to a money satisfaction is likely the only possible interest such claimant could have in the Debtor J&J Rights.  Further, as set forth in the Settlement Agreement, the direct claims such holders may have against any J&J Corporate Party are not impacted, prejudiced, or affected in any way by the Settlement, other than with respect to rights, if any, to pursue Debtor J&J Released Claims.

58.     Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under [section 363(b) or (c)] of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith."  11 U.S.C. § 363(m).  The Settlement Agreement, including the J&J Buyback, was negotiated in good faith between the Parties.  As a result of those

arms' length negotiations, J&J is entitled to the protections under section 363(m) of the Bankruptcy Code for their acquisition of the Debtor J&J Rights.

59.    As further detailed in the Settlement Agreement, the J&J Buyback does not include, and J&J is not purchasing, any rights or interests in claims arising out of or in connection with prepetition payments to any of the Imerys Parties or Cyprus Parties, by way of subrogation or otherwise, asserted by Truck, the RMI Managed Insurers, including National Union, or any other insurer that has made prepetition payments to any of the Imerys Parties or Cyprus Parties.  As a result, the Debtors submit that no one is prejudiced by the free and clear sale described therein.

60.    Lastly, it is common for debtors to sell insurance and indemnity rights pursuant to section 363 of the Bankruptcy Code, free and clear of claims, whether under a section 363 motion or through a chapter 11 plan.  For example, insurers that provide liability coverage for tort claims being restructured under a debtor's plan have used section 363(f) to resolve their contractual liability under their policies, including with respect to claims of other insurers and additional insureds.  *See, e.g.*, *In re Boy Scouts of America*, No. 20-10343 (LSS) (Bankr. D. Del. Sept. 8, 2022) [Docket No. 10316] (approving a sale of insurance policies pursuant to section 363 of the Bankruptcy Code and providing for an injunction of any claims that may be asserted against the insurer); *In re Blitz U.S.A., Inc.*, No. 11-13603 (PJW) (Bankr. D. Del. Sept. 11, 2012) [Docket No. 758]; *In re Flintkote Co.*, No. 04-11300 (JFK) (Bankr. D. Del. July 14, 2010) [Docket No. 5173] (same); *In re Burns & Roe Enters.*, No. 00-41610RG, 2005 Bankr. LEXIS 3173 (Bankr. D.N.J. Feb. 17, 2005) (same).  Under these buybacks, insurers have purchased debtors' rights under policies free and clear of other claims.  Indeed, the Imerys Plan contemplates settlements between the Imerys Debtors and insurers pursuant to which such insurers will buy back their insurance policies free and clear of the rights of others.

- 34 -

## NOTICE

61.    Notice of this Motion will be provided to: (a) the U.S. Trustee; (b) the United States Attorney for the District of Delaware; (c) the Internal Revenue Service; (d) counsel to the Imerys TCC; (e) counsel to the Imerys FCR; (f) counsel to the Cyprus TCC; (g) counsel to the Cyprus FCR; (h) those parties that have requested notice pursuant to Bankruptcy Rule 2002 in the Imerys Cases; (i) those parties that have requested notice pursuant to Bankruptcy Rule 2002 in the Cyprus Case; (j) counsel to Imerys SA's current subsidiaries and affiliates (other than the Imerys Debtors); (k) counsel to Freeport-McMoRan Inc. and its direct and indirect subsidiaries (other than the Cyprus Debtor); (l) counsel to J&J's current subsidiaries and affiliates; (m) any Talc Insurance Company whose address is known to the Debtors; (m) former affiliates of Imerys S.A. whose addresses are known to the Debtors; and (n) former affiliates of either Freeport-McMoran Inc. or CAMC whose addresses are known to the Debtors (collectively, the "**Core Notice Parties**").

62.    In addition, notwithstanding the requirements of the *Final Order (I) Authorizing the Filing of (A) a Consolidated Master List of Creditors, (B) a Consolidated List of the Top Thirty Law Firms Representing Talc Claimants, and (C) a Consolidated List of Creditors Holding the Thirty Largest Unsecured Claims, and (III) Approving Certain Notice Procedures for Talc Claims* [Imerys D.I. 248] entered in the Imerys Cases, the Debtors will serve copies of the notice attached hereto as **Exhibit B** (the "**Settlement Notice**") by first class mail on the following parties: (a) the Core Notice Parties; (b) known counsel to holders of Talc Personal Injury Claims; (c) holders of Talc Personal Injury Claims against the Imerys Debtors who submitted an individual ballot to vote on the Imerys Debtors' prior plan or filed a proof of claim directly in the Imerys Cases; (d) known holders of Talc Personal Injury Claims against the Cyprus Debtor whose personal addresses are known to the Cyprus Debtor; (e) known holders of Indirect Talc Personal Injury Claims (as defined

in the Plans); (f) the issuers of the J&J Policies; and (g) holders of interests in the policies issued by any Talc Insurance Company and the J&J Policies whose addresses are known to the Debtors. Apart from this extensive direct notice program, the Debtors will also publish a notice of the Settlement, in substance substantially similar to the Settlement Notice, in *The Wall Street Journal*, *USA Today National Edition*, *New York Times National Edition*, and *Globe & Mail (Canada) National Edition* after the Motion is filed (the "**Publication Notice**").

63.    The Settlement Notice will indicate that copies of this Motion and the Settlement Agreement can be obtained on the website of the Debtors' claims and noticing agent, Kroll Restructuring Administration, LLC.  The Settlement Notice indicates the deadline for objecting to the Settlement Agreement and the date and time of the hearing to approve the Settlement.  The Debtors request that the Settlement Notice and the Publication Notice be deemed to be sufficient and proper notice of the Settlement Agreement with respect to interested parties.

## NO PRIOR REQUEST

64.    No prior request for the relief sought in this Motion has been made to this or any other court in connection with the Imerys Cases and the Cyprus Case.

RLF1 31213776v.1

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit C**, approving the Settlement and granting such additional relief as is appropriate.

Dated:  July 13, 2024
        Wilmington, Delaware

By: */s/ Jason D. Angelo*
    **REED SMITH LLP**
    Kurt F. Gwynne (No. 3951)
    Jason D. Angelo (No. 6009)
    1201 North Market Street, Suite 1500
    Wilmington, DE 19801
    Telephone:  (302) 778-7500
    Facsimile:  (302) 778-7575
    E-mail:  kgwynne@reedsmith.com
           jangelo@reedsmith.com

    -and-

    Paul M. Singer, Esq. (*pro hac vice*)
    Luke A. Sizemore, Esq. (*pro hac vice*)
    Reed Smith Centre
    225 Fifth Avenue, Suite 1200
    Pittsburgh, PA 15222
    Telephone:  (412) 288-3131
    Facsimile:  (412) 288-3063
    E-mail:  psinger@reedsmith.com
           lsizemore@reedsmith.com

    *Counsel to the Cyprus Debtor and Debtor-in-Possession*

Dated:  July 13, 2024
        Wilmington, Delaware

By: */s/ Michael J. Merchant*
    **RICHARDS, LAYTON & FINGER, P.A.**
    Mark D. Collins (No. 2981)
    Michael J. Merchant (No. 3854)
    Amanda R. Steele (No. 5530)
    One Rodney Square
    920 N. King Street
    Wilmington, DE 19801
    Telephone:  (302) 651-7700
    Facsimile:  (302) 651-7701
    Email:  collins@rlf.com
          merchant@rlf.com
          steele@rlf.com

    - and –

    **LATHAM & WATKINS LLP**
    Jeffrey E. Bjork, Esq. (*pro hac vice*)
    Kimberly A. Posin, Esq. (*pro hac vice*)
    Helena G. Tseregounis, Esq. (*pro hac vice*)
    Shawn P. Hansen, Esq. (*pro hac vice*)
    355 South Grand Avenue, Suite 100
    Los Angeles, CA 90071
    Telephone:  (213) 485-1234
    Facsimile:  (213) 891-8763
    Email:  jeff.bjork@lw.com
          kim.posin@lw.com
          helena.tseregounis@lw.com
          shawn.hansen@lw.com

    *Counsel to the Imerys Debtors and Debtors-in-Possession*