**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| IMERYS TALC AMERICA, INC., *et al.,* | Case No. 19-10289 (LSS) |
| Debtors. | Jointly Administered |
| | |
| In re: | Chapter 11 |
| CYPRUS MINES CORPORATION, | Case No. 21-10398 (LSS) |
| Debtors. | Jointly Administered |

**THE RMI INSURERS' SUPPLEMENTAL OBJECTION TO THE DEBTORS'**
**JOINT SETTLEMENT MOTION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 5

STATEMENT OF FACTS .................................................................................................... 6

    A.    The Debtors uncapped indemnity rights ................................................. 6

    B.    The Debtors have long represented that the indemnity protects Imerys and Cyprus from claims based on the sale of J&J products ........................................ 8

    C.    Admissions by Cyprus, Imerys and J&J ................................................. 9

    D.    The Debtors Acknowledge RMI Insurers Subrogation Rights ........................... 11

    E.    The Numerous Factual Findings Sought by the Debtors .................................... 12

ARGUMENT ......................................................................................................... 14

    A.    The Settlement and Proposed Order Must Provide for the Repayment of RMI Insurers' Subrogated Claims or for Adequate Protection of RMI Insurers' Subrogated Claims. ................................................................... 14

          1.    RMI Insurers' Subrogation Rights Constitute a Property Interest in the Proceeds of the Sale ................................................................ 14

          2.    RMI Insurers' Property Rights Must Be Fully Preserved and Adequately Protected ................................................................ 17

          3.    The Extent of the Adequate Protection Required ................................... 20

    B.    The Court Cannot Make the Proposed Factual Findings Because the Debtors Have Provided No Evidentiary Support and Testimony Supports Contrary Findings ............................................................................. 22

    C.    The 14-day Stay Required by Bankruptcy Rule 6004(h) Should Not be Waived ........................................................................................ 24

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Sur. Co. of New York v. Bethlehem Nat. Bank of Bethlehem, Pa.*,
    314 U.S. 314 (1941) ....................................................................................... 14

*Associated Elec. & Gas Ins. Servs. Ltd. v. Elec. Power Sys., Inc.*,
    2014 WL 12717669 (D. Vt. Dec. 23, 2014) ..................................................... 15, 16

*Chateaugay Corp. v. LTV Steel Co., Inc. (In re Chateaugay Corp.*,
    94 F.3d 772 (2d Cir. 1996) ............................................................................. 18

*Cont'l Cas. Co. v. Ryan Inc. E.*,
    973 So. 2d 368 (Fla. 2008) .............................................................................. 15

*Fid. & Deposit Co. of Maryland v. Westra Constr., Inc.*,
    CIV.A. 1:08-CV-1219, 2010 WL 1904524 (M.D. Pa. May 10, 2010) ................... 15

*Folger Adam Security, Inc. v. Dematteis/Macgregor, JV*,
    209 F.3d 252 (3d Cir. 2000) ........................................................................... 19

*French v. Frey (In re Bergman)*,
    467 F.3d 536 (6th Cir. 2006) ........................................................................... 17

*In re AMR Corp.*,
    490 B.R. 470 (S.D.N.Y. 2013) ....................................................................... 20, 21

*In re Elmira Litho, Inc.*,
    174 B.R. 892 (Bankr. S.D.N.Y. 1994) ............................................................. 21

*In re Martin*,
    91 F.3d 389 (3d Cir. 1996) ............................................................................. 24

*In re McGreevy*,
    388 B.R. 917 (Bankr. D. S.D. 2008) ............................................................... 17

*In re Nutraquest Inc.*,
    434 F.3d 639 (3d Cir. 2006) ........................................................................... 24

*In Van Huffel v. Harkelrode*,
    284 U.S. 225 (1931) ....................................................................................... 18

*Interstate Fire & Cas. Ins. Co. v. Cleveland Wrecking Co.*,
    182 Cal. App. 4th 23 (2010) ........................................................................... 16

*Kinney v. Sando*,
    182 P.2d 45 (1947) ....................................................................................... 24

*MacArthur Co. v. Johns-Manville*,
    837 F.2d 89 (2d Cir. 1988) ............................................................................. 18

*Pearlman v. Reliance Ins. Co.*,
    371 U.S.132 (1962) ....................................................................................... 14, 17

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
 390 U.S. 414 (1968) ............................................................................................... 24

*Pulte Home Corp. v. CBR Elect., Inc.*,
 50 Cal. App. 5th 216 (2020) ................................................................................ 16

*St. Paul Fire & Marine Ins. Co. v. American Int'l Spec. Lines Ins. Co.*,
 365 F.3d 263 (4th Cir. 2004) ................................................................................. 9

*Town of Stowe v. Stowe Theatre*,
 180 Vt. 165 (2006) ............................................................................................... 16

*Travelers Indem. Co. v. Evans Pipe Co.*,
 432 F.2d 211 (6th Cir. 1970) ............................................................................... 15

*Utica Nat'l v. Cyr*,
 183 Vt. 564 (2007) ............................................................................................... 16

*Wal-Mart Stores, Inc. v. RLI Ins. Co.*,
 292 F.3d 583 (8th Cir. 2002) ................................................................................. 9

*West Bend Mut. Ins. Co. v. MacDougall Pierce Constr., Inc.*,
 11 N.E.3d 531 (Ind. App. 2014) ........................................................................... 9

**Statutes**

11 U.S.C. § 363(e) ....................................................................................................... 19

The RMI Insurers as identified in the signature block below hereby file this supplemental objection to the *Joint Motion of the Imerys Debtors and the Cyprus Debtor for an Order (I) Approving the Settlement Agreement Between the Imerys Debtors, the Cyprus Debtor, Johnson & Johnson, and the Other Parties Thereto, and (II) Approving the Sale of Certain Rights* [Dkt. No. 2361] (the "Settlement Motion") and state as follows:

## PRELIMINARY STATEMENT

1.     The proposed settlement addressed in the Settlement Motion[1] does not pay or adequately protect the RMI Insurers' Subrogated Claims for indemnification from the J&J Payment Obligations.

2.     The proposed settlement involves a "buyback" of the Debtors' and all others' rights to pursue indemnity or other claims against the J&J Corporate Parties. This buyback is a settlement of **all of** J&J's indemnification obligations owed to the Debtors pursuant to certain contracts described in the Settlement Motion and below.

3.     The J&J contractual indemnity precludes a claim against the RMI Insurers as to bodily injury claims that arise from sales of J&J products. The manner in which the indemnity has been and is being impaired would gut this protection and give rise to a massive administrative claim. Imerys and Cyprus acknowledge that J&J indemnified Cyprus Windsor and all of its affiliates for all liability related to Cyprus's sale of talc to J&J, which had gone so far as to invoke the indemnity by moving to lift the stay to try to take over the defense and indemnity of the claims. Imerys and Cyprus rebuffed J&J's offer to assume the defense and when one of the RMI Insurers initiated an action in state court to assert that insurer's subrogated indemnity rights against J&J,

---

[1] All capitalized terms not otherwise defined have the meaning ascribed to them in the Settlement Motion.

the Debtors took the extraordinary step of blocking that action—which only would have benefited Imerys and Cyprus.

4.    This is not a close call. Imerys and Cyprus have represented to the Court that the J&J indemnity provides uncapped defense and indemnity for talc claims and that the RMI Insurers have an enforceable subrogation claim. The RMI Insurers are subrogated to the rights of the Debtors to assert the indemnity. And Cyprus and Imerys have a duty to cooperate and not impair the indemnity, which is a key defense. Further the RMI Insurers have paid out tens of millions of dollars in defense and indemnity which is subrogated to any payment on a first dollar basis.

5.    The settlement attempts to cut out the RMI Insurers' Subrogation Claim, arguing that this preserves the status quo, but that's not the case because such a provision seeks to eliminate the primary method of recouping the insurers' subrogated claims—directly from settlement payments to the insured—and breaches the Debtors obligation to cooperate in securing subrogation.

## STATEMENT OF FACTS

### A.    The Debtors uncapped indemnity rights

6.    The Debtors have repeatedly represented in various pleadings that one or more of the Debtors have uncapped indemnity rights against J&J for Talc Personal Injury Claims arising under the following agreements: (i) that certain Agreement, between Cyprus Mines Corporation and Johnson & Johnson, dated as of January 6, 1989 (the "1989 SPA"); (ii) that certain Talc Supply Agreement, between Windsor Minerals, Inc. and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc., dated as of January 6, 1989 (the "1989 Supply Agreement"); (iii) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2001 (the "2001 Material Purchase Agreement"); and (iv) that certain Material Purchase Agreement,

between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of

January 1, 2011 (the "2011 Material Purchase Agreement" and, together with the 1989 SPA, the

1989 Supply Agreement, and the 2001 Material Purchase Agreement, the "J&J Agreements").[2]

7.      The various J&J Agreements contain provisions indemnifying one or more of the

Debtors against claims arising out of their supply of talc to J&J:

- **1989 SPA**: J&J agrees to indemnify Cyprus for "any product liability-based claim, suit, demand or cause of action directed against Cyprus, Windsor or Western or any of their affiliates arising out of the sale of talc or talc-containing products manufactured by Windsor, Western, J&J or the affiliates of Windsor, Western or J&J, prior to Closing. J&J's obligation of indemnification . . . shall survive the Closing forever."

- **1989 Supply Agreement**:  J&J agrees "to indemnify, defend and hold harmless [ITV], and its affiliates, and each of their respective directors, officers, employees, and agents from and against all liabilities arising out of any product liability-based claim, suit, demand or cause of action directed against [ITV] or any of [ITV]'s affiliates: (i) **arising out of the sale of cosmetic talc products to consumer markets, which products were manufactured by [ITV] prior to [January 6, 1989]**; or (ii) **for which [JJCI] is directly or indirectly responsible as a result of [JJCI's] possession, use or processing of Talc delivered to [JJCI] pursuant to this Agreement, or as the result of [JJCI's] manufacture, shipment and sale of Talc-containing product** (including, without limitation, baby powder and adult powder) derived from Talc delivered to [JJCI] pursuant to this Agreement."

- **2001 Supply Agreement**: "[J&J] shall be solely liable for, and shall indemnify [ITA] for any cost, loss, damage or expense suffered by [ITA] arising out of the failure of the [talc] to conform to the microbiological quality standards established therefor, as the same may be amended from time to time."

- **2011 Material Purchase Agreement**: J&J agrees to "indemnify, defend and hold harmless [ITA] for any third-party claims brought against [ITA] based on the use of the [talc] by [J&J]."

---

[2] *See* Dkt. # 6440 (Disclosure Statement for Second Joint Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, the "**Aug. 2 Disclosure Statement**") at 46.

8.    Accordingly, the Imerys entities have long asserted that they are entitled to uncapped indemnity from J&J. "[T]he Debtors believe that (i) Talc Personal Injury Claims related to the North American Debtors' sale of talc to J&J are subject to uncapped indemnity rights against J&J under certain stock purchase and supply agreements and (ii) one or more of the North American Debtors (e.g., ITV f/k/a Windsor) have the rights to the proceeds of insurance policies issued to J&J." Aug. 2 Disclosure Statement at 32.

9.    J&J recognizes these indemnification rights. In the *Imerys* case, J&J moved for relief from the stay to defend and indemnify all J&J Talc Claims.[3]  And according to Cyprus Debtor, "[o]n at least one occasion in 1994, Cyprus Mines asserted indemnity rights against J&J and tendered a suit to J&J; J&J acknowledged those rights and accepted the tender."[4]  The Imerys Debtors further admit that J&J settled claims and obtained releases for Imerys.[5]

### B.    The Debtors have long represented that the indemnity protects Imerys and Cyprus from claims based on the sale of J&J products

10.    The Debtors have long represented to the Court, their insurers and the public that these indemnity rights exist, are enforceable and protect Imerys and Cyprus from claims based on the sale of J&J products.[6]  The indemnity rights are particularly significant because virtually all of the historical liability of the Imerys and Cyprus Debtors involved J&J Talc Claims.

---

[3] *See* Dkt. No. 1567 ("Motion Pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order Modifying Automatic Stay to Permit J&J to Send Notice Assuming Defense of Certain Talc Claims and to Implement Talc Litigation Protocol"). J&J's stay motion defined "J&J Talc Claims" very broadly as "all claims against the Debtors alleging harm caused by the Debtors' talc based on the alleged use of J&J product prior to January 1, 2020 that have not reached final resolution." *Id.* at 1.

[4] Cyprus-Indemnity Adversary Proceeding, 20-50626, Complaint, at ¶ 6.

[5] *See* Aug. 2 Disclosure Statement at 39 ("J&J has asserted that it has resolved a substantial number of claims alleging mesothelioma and ovarian cancer caused by exposure to J&J's baby powder on terms that include releases of the Debtors and related parties.").

[6] For example, counsel for the Imerys TCC stated: "The debtors filed this adversary proceeding against J&J to litigate the estate's biggest asset: the debtors' contractual right to be indemnified by J&J against talc liabilities." August 24, 2021 Tr. at 117 (Stuart Lombardi for the TCC) (attached to Calhoun Dec'l at Ex. B). The Imerys Debtors similarly represented in their prior Disclosure Statement that the J&J Related Rights "arguably constitute the most valuable assets of the Talc Personal Injury Trust." Imerys January 31 Disclosure Statement, Dkt. No. 6052, at 5.

11.     "[N]early all the pending Talc Personal Injury Claims allege injuries based on the use of cosmetic products containing talc."[7] "Approximately 99.99% of the lawsuits pending against the Debtors asserting OC Claims named J&J as a co-defendant, and approximately 76% of the lawsuits pending against the Debtors asserting Mesothelioma Claims named J&J as a co-defendant."[8] Historically, therefore, the overwhelming majority of claims against the Debtors were J&J Talc Claims.

12.     The RMI Insurers and other insurers have a right to subrogate against third parties – including various J&J Corporate Parties – that are contractually liable for any Talc Personal Injury Claims.[9]

13.     The Debtors' indemnity rights against J&J are the subject of Insurers' subrogation rights that this settlement seeks to extinguish.  Insurers have contribution, indemnity, and coverage rights that the terms of the Settlement and Settlement Order alter.  Extinguishing those rights without proper and adequate protection impairs the insurers' rights and interests and causes serious harm to insurers.

### C.     Admissions by Cyprus, Imerys and J&J

14.     Cyprus's Representations in its Adversary Complaint:

- "[*T]he 1989 [J&J] SPA protects Cyprus Mines and CAMC from all lawsuits arising out of the supply of talc prior to January 6, 1989, including the supply of talc to J&J between December 1979 and March 1980.* And the 1989 SA protects Cyprus Mines and CAMC from lawsuits arising out of the supply of talc to J&J between January 1989 and June 1992. (The 1989 SA also protects Cyprus Mines and CAMC from any lawsuits brought against them relating to Cyprus Windsor's pre-

---

[7] Aug. 2 Disclosure Statement at 29.

[8] *Id.* at 39.

[9] The majority rule in the country is that a contractual indemnitor's obligation to pay a claim takes priority over the obligations of its indemnitee and the indemnitee's insurers.  *See West Bend Mut. Ins. Co. v. MacDougall Pierce Constr., Inc.*, 11 N.E.3d 531, 545-46 (Ind. App. 2014) (because of an indemnification agreement between two insureds, the indemnitor's primary and excess insurers were required to bear loss before indemnitee's primary and excess insurers were obligated to defend or indemnify their insured), citing *Wal-Mart Stores, Inc. v. RLI Ins. Co.*, 292 F.3d 583 (8th Cir. 2002); *St. Paul Fire & Marine Ins. Co. v. American Int'l Spec. Lines Ins. Co.*, 365 F.3d 263, 272 (4th Cir. 2004) (*Wal-Mart* "represent[s] general practices and the majority position on the respective issues").

1989 talc supply.)" *Cyprus Mines Corp. v. Johnson & Johnson, et al.*, Adv. Pro. No. 20-50626, Dkt. No. 1, at ¶ 33.

- "J&J has longstanding indemnity obligations to Cyprus Mines and CAMC for ***any liabilities associated with talc*** supplied to J&J by Cyprus Mines or its subsidiaries…" *Id.* at ¶ 1.

- "Cyprus Mines and CAMC have asserted their ***indemnity rights*** against J&J." *Id.*

- "Cyprus Mines and CAMC have enforceable indemnity rights against J&J." *Id.* at ¶ 2.

- "Cyprus Mines asserted indemnity rights against J&J and tendered a suit to J&J; ***J&J acknowledged those rights and accepted the tender***." *Id.*

- "Cyprus tendered the suits to ITA [Imerys], which ***acknowledged its responsibility*** to defend Cyprus from the suits under the 1992 ATA, and in fact defended Cyprus." *Id.* at ¶ 6.

15.    Imerys's Representations in its disclosure statements:

- "Talc Personal Injury Claims related to the North American Debtors' sale of talc to J&J are subject to ***uncapped indemnity rights*** against J&J under certain stock purchase and supply agreements." Aug. 2 Disclosure Statement at 32.

- "[U]nder that certain Agreement, between Cyprus Mines Corporation and J & J, dated as of January 6, 1989, J&J agreed to indemnify one or more of the Debtors for ***all liabilities arising out of use or exposure to talc***-containing products supplied to J&J prior to the January 6, 1989, closing date." Imerys May 15, 2020, Disclosure Statement, Dkt. No. 1715, at 24.

- "ITA has stated, in communications with J&J, that it has indemnity rights under the 1989 agreements as the "successor in interest to Cyprus[ Mines'] rights." *See* Letter from Gregory N. Harris to Denise H. Houghton, dated March 24, 2017, attached hereto as Exhibit D Complaint in Case 19-10289-LSS, [D.I. 1850].

16.    J&J's Representation in its Lift Stay Motion:

- "On March 20, 2020, J&J filed a motion in this Court acknowledging that it had "agreed to defend and indemnify Cyprus [Mines] and any affiliated companies" from "claims alleging injury from use of J&J products with talc supplied to J&J," whether the supply occurred before or after the 1989 sale. *J & J's Motion Pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order Modifying Automatic Stay*, Dkt. No. 1567, at ¶ 12 ("Lift-Stay Motion").

**D.    The Debtors Acknowledge RMI Insurers Subrogation Rights**

17.    Each of the RMI Insurers has contractual and equitable rights to subrogation.[10]  For

example, the National Union policies contain an express subrogation clause, which states:

> **Application of Salvages – Subrogation.**  All salvages, recoveries or payments
> recovered or received subsequent to a loss settlement under this insurance shall be
> applied as if recovered or received prior to such settlement and all necessary
> adjustments shall be made between the Insured and the Company, provided
> always that nothing in this clause shall be construed or mean that losses under this
> insurance are not recoverable until the Insured's ultimate net loss has been finally
> ascertained.  Inasmuch as this policy is "Excess Coverage", the Insured's right to
> recovery against any person or other entity cannot always be exclusively subrogated
> to the Company.  It is therefore understood and agreed that in case of any payment
> hereunder, the Company shall act in concert with all other interests (including the
> Insured) concerned, in the exercise of such rights of recovery.  The apportioning of
> any amounts which may be so recovered shall follow the principle that any interests
> (including the Insured) that shall have paid an amount over and above any payment
> hereunder, shall first be reimbursed up to the amount paid by them; the Company
> shall then be reimbursed out of any balance then remaining up to the amount paid
> hereunder; lastly, the interests (including the Insured) of whom this coverage is
> excess are entitled to claim the residue, if any.  Expense necessary to the recovery
> of any such amounts shall be apportioned between the interests (including the
> Insured) concerned, in the ratio of their respective recoveries as finally settled.

National Union Policy, Dkt. No. 1170-1, at ¶ 10, p. 9.

18.    This and similar provisions provide RMI Insurers rights with respect to third-party

sources of indemnification such as the Debtor J&J Rights.

19.    When reimbursement of these costs was disrupted in the run up to the bankruptcy

and afterwards, certain of the RMI Insurers made payments to Imerys related to indemnity and

defense costs in the amount of $36,841,487, which have since accrued interest of $21,375,585.[11]

The RMI Insurers initiated suit to seek declaratory relief that they were entitled to indemnification

---

[10] The Imerys and Cyprus Debtors claim entitlement to coverage under policies issued to Cyprus and Standard
Oil, which are identified as "Cyprus Talc Insurance Policies" in the Debtors' most recent chapter 11 plans. *See* Dkt.
6051-5 (Second Joint Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates ("Plan") at
Schedule VIII) (Listing Cyprus Talc Insurance Policies). The RMI Insurers are alleged to have issued insurance
policies that may provide coverage to one or more of the Debtors.

[11] *See* Sept. 6, 2024, Declaration of Marc C. Scarcella in Support of Certain Insurers' Objection to the Debtors'
Joint Settlement Motion ("Scarcella Decl."), at 2.

for these costs.[12]  Although the Imerys Debtor was a not a defendant, it asserted that the suit

violated the automatic stay.  By agreement of the parties, the suit was withdrawn without prejudice

with indications that its rights would be protected. And only now that the Debtors have reached an

agreement on an indemnity payment from J&J are they willing to allow the RMI Insurers to

proceed with their suit against J&J.

### E.    The Numerous Factual Findings Sought by the Debtors

The Debtors seek more than sixteen separate findings of fact in their proposed order for

the sale of the Debtors' contractual indemnification rights against J&J for any J&J Talc Claims

free and clear of all rights, interests and encumbrances.[13]

- **Proposed Sale Order, ¶ C:**  "The Settlement Agreement, including the releases contained therein and the Estate Allocation, ***is fair and equitable*** and in the best interests of the Debtors and their estates" based upon "the probability of success in litigation; the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it…"

- **Proposed Sale Order, ¶ D.**  "The ***probability of success*** in prosecuting the various matters resolved by the Settlement is uncertain.  The Settlement is a global resolution of the Parties' disputes including multiple adversary proceedings and filed claims, each of which individually have their own strengths and weaknesses. The Court concludes that a global resolution of the respective claims and disputes resolved by the Settlement, including resolving J&J's objections to the Plans, is in the best interests of the Debtors' estates."

- **Proposed Sale Order, ¶ E:**  "In the absence of a settlement, the Debtors and their estates ***face considerable litigation expense, risk***, and delay."

- **Proposed Sale Order, ¶ F:** "The Settlement Agreement and the J&J Buyback were ***negotiated extensively*** and ***at arms' length*** with all Parties having been represented by competent counsel, ***without collusion*** or fraud, and in good faith by and between the Parties."

---

[12] *See* Exhibit 1 (Vermont Complaint) attached to Sept. 6, 2024, Declaration of Stamatios Stamoulis ("Stamoulis Decl.").

[13] *See* Dkt. No. 6376-3, at 4-7, 10 (proposed Sale Order).

- **Proposed Sale Order, ¶ G:**  "The terms and conditions of the Settlement Agreement, including the rationale and facts underlying the Settlement, have been adequately disclosed to the Court."

- **Proposed Sale Order, ¶ H.**  "[T]he J&J Buyback (a) represents a sound exercise of the ***Debtors' business judgments*** and otherwise complies with section 363 of the Bankruptcy Code"

- **Proposed Sale Order, ¶ I.**  "[T]he J&J Buyback …(b) meets the requirements for a sale of the Debtor J&J Rights free and clear of any interests and claims of third parties in such property, including any claim of any person or entity on account of … any alleged right, claim, or interest of the Debtors and/or their estates… in the Debtor J&J Rights, ***including subrogation claims*** (except as provided in Section 6.1 of the Settlement Agreement), pursuant to section 363(f) of the Bankruptcy Code".

- **Proposed Sale Order, ¶ I:**  "[T]he J&J Buyback.  (c) constitutes ***a purchase by J&J in good faith***."

- **Proposed Sale Order, ¶ J:**  "[E]xcept as provided for in Section 6.1 of the Settlement Agreement, each …entity asserting a lien, claim, or encumbrance in the Debtor J&J Rights (a) has consented to the J&J Buyback, (b) could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest, and/or (c) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code."

- **Proposed Sale Order, ¶ K.**  "The total consideration provided by the J&J Corporate Parties pursuant to the Settlement Agreement ***constitutes reasonably equivalent value and fair consideration*** under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the laws of the State of Delaware, and any other applicable law, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law…"

- **Proposed Sale Order, ¶ K.**  "[T]he Settlement Agreement and the J&J Buyback are not being entered into and consummated for ***the purpose of hindering, delaying or defrauding creditors*** of the Debtors…"

- **Proposed Sale Order, ¶ L:**  "J&J would not have entered into the Settlement Agreement and would not consummate the J&J Buyback if the Debtor J&J Rights could not be purchased free and clear of all liens, claims and encumbrances, including subrogation claims (except as provided for in Section 6.1 of the Settlement Agreement)."

- **Proposed Sale Order, ¶ M**:  "J&J's agreement not to pursue objections to the Plans is in reliance on all the terms of the Settlement Agreement being effective, including that the Plans and TDP approved in the Imerys Cases and the Cyprus Case will not

be used to ***impact, prejudice, or affect the J&J Corporate Parties*** in the tort system or a bankruptcy case."

- **Proposed Sale Order, ¶ N:** "The claims for which the rights of the Debtors and their estates are being sold free and clear, including certain subrogation claims, pursuant to the J&J Buyback ***are "interests"*** as that term is used in section 363(f) of the Bankruptcy Code."

- **Proposed Sale Order, ¶ P:** "Notwithstanding Bankruptcy Rule 6004(h), … this Court expressly ***finds that there is no just reason for delay*** in the implementation of this Order."

- **Proposed Sale Order, ¶ 12**: "J&J is ***a good-faith purchaser*** of the Debtor J&J Rights without knowledge of adverse claims."

20.    The Sale Motion cites no evidence, and the Debtors offered no declarations, witnesses or documentation with their moving papers to support any of the foregoing proposed findings of fact.[14]

## ARGUMENT

**A.    The Settlement and Proposed Order Must Provide for the Repayment of RMI Insurers' Subrogated Claims or for Adequate Protection of RMI Insurers' Subrogated Claims.**

### 1.    RMI Insurers' Subrogation Rights Constitute a Property Interest in the Proceeds of the Sale

21.    "[T]here are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed. This rule, widely applied in this country and generally known as the right of subrogation . . . ." *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136-37 (1962); *see also Am. Sur. Co. of New York v. Bethlehem Nat. Bank of Bethlehem, Pa.*, 314 U.S. 314, 317 (1941) (describing a surety's subrogation rights as "one of the[] oldest doctrines . . . the surety [once it has paid on its policy] is a special kind of secured creditor"). "[Subrogation] is a rule that the law adopts to compel the

---

[14] *See* Sale Motion, Dkt. No. 6376.

eventual satisfaction of an obligation by the one who ought to pay it. In the suretyship context, subrogation provides a secondary obligor [surety] who performs a secondary obligation with the obligee's rights with respect to the underlying obligations as though the obligation had not been satisfied." Restatement (Third) of Suretyship & Guaranty § 27 (1996) comment a.  Thus, under black letter law as articulated by the Supreme Court, sureties for the secondary obligor, Imerys, are entitled to be reimbursed by J&J for the amounts voluntarily paid by the surety with respect to tort claims for which J&J is primarily liable.

22.      "The right of subrogation is extraordinarily valuable to the surety because of the recourse it affords the surety to recover its losses . . . ." Subrogation, 4A Bruner & O'Connor Construction Law § 12:100. When an insurer obtains subrogation rights, by payment or performance under its policy, it steps into the shoes of both its principal and its obligee. *Cont'l Cas. Co. v. Ryan Inc. E.*, 973 So. 2d 368, 380 (Fla. 2008) ("When a surety performs or pays on behalf of its principal, it becomes subrogated to the rights of both its principal and its obligee."); *Travelers Indem. Co. v. Evans Pipe Co.*, 432 F.2d 211, 212-13 (6th Cir. 1970) ("Travelers was subrogated not only to the rights of its principal (Mitchell) but also to the rights of its obligee . . . ."); *Fid. & Deposit Co. of Maryland v. Westra Constr., Inc.*, CIV.A. 1:08-CV-1219, 2010 WL 1904524, at *4 (M.D. Pa. May 10, 2010) ("The subrogation right is an expansive one, and when a surety has paid claims, it succeeds both to the rights of the principal and obligee.").

23.      The right of subrogation has "particular approval" under Vermont law, which governs J&J's indemnity obligations under the 1989 SPA.  Under Vermont law, the contractual indemnitor's responsibility to indemnify precedes that of an insurer.  *Associated Elec. & Gas Ins. Servs. Ltd. v. Elec. Power Sys., Inc.*, 2014 WL 12717669, *6 (D. Vt. Dec. 23, 2014) (insurers' rights are superior to those of the contractual indemnitor.).  Further, the doctrine of subrogation

"allows an insurer who has reimbursed its insured for a loss to be subrogated in a corresponding amount to the insured's right of action against any other person responsible for the loss." *Utica Nat'l v. Cyr*, 183 Vt. 564, 565 (2007) (emphasis added, citation omitted).

24.     Subrogation is "central" to the principle of indemnity; "if insurers could not recover from tortfeasors via subrogation, paying claims promptly would be a far riskier proposition." *Id.* Subrogation "prevents unjust enrichment to the tortfeasor that would result if the tortfeasor were absolved from liability … just because of the insured's foresight in obtaining insurance protection." *Town of Stowe v. Stowe Theatre*, 180 Vt. 165, 167 (2006).

25.     Insurers' rights are superior to those of the contractual indemnitor here. In *Associated Elec. & Gas Ins. Servs. Ltd. v. Elec. Power Sys., Inc.*, 2014 WL 12717669, *6 (D. Vt. Dec. 23, 2014), a federal court applying Vermont law held that an insurer that issued an indemnity-only policy and settled a claim on behalf of its insured could seek subrogation against a party that owed a contractual duty to indemnify the insured.  The California Court of Appeal also recognizes that a contractual indemnitor like J&J "has a liability of greater primacy than an independent insurer that insures against loss." *Interstate Fire & Cas. Ins. Co. v. Cleveland Wrecking Co.*, 182 Cal. App. 4th 23, 44 (2010) (citations omitted). *See also Pulte Home Corp. v. CBR Elect., Inc.*, 50 Cal. App. 5th 216, 233 (2020) (following *Cleveland Wrecking* and holding that contractual indemnitors—not general liability insurer—were primarily liable *for* a loss).

26.     The RMI Insurers' subrogation rights do not simply exist exclusively against J&J, as the primary tortfeasor; the plain meaning of the insurance policy's subrogation language also provides the RMI Insurers a right to recover directly from compensation the insured received from any third party tortfeasor, including and especially from J&J.  *See* National Union Policy, Dkt. No. 1170-1, at ¶ 10, p. 9. "The subrogation rights conferred by contract are not affected by the

Bankruptcy Code or the bankruptcy proceedings of the insured." *French v. Frey (In re Bergman)*, 467 F.3d 536, 538 (6th Cir. 2006). The contract provides that "*[a]ll* salvages, recoveries or payments recovered or received subsequent to a loss settlement under this insurance ***shall be applied*** as if recovered or received prior to such settlement ***and all necessary adjustment shall be made*** between the Insured and the Company,"[15] unambiguously conveying a right to the RMI Insurers to be paid directly out of subsequent recoveries obtained by Imerys and Cyprus after the RMI Insurers paid loss settlement amounts.

27.     This isn't a simple right to repayment, it's a contractual subrogation right to the payments made by a third-party primary tortfeasor to the insured.  *See In re Bergman*, 467 F.3d at 539.  Subrogation rights limit a debtor's interest in property.  *See In re McGreevy*, 388 B.R. 917, 921 (Bankr. D. S.D. 2008) ("The Court concludes the bankruptcy estate's interest in the settlement funds is limited by Wellmark's subrogation interest."). The property interest of RMI Insurers does not become property of the bankruptcy estate because the Debtors have filed for bankruptcy and nothing in the Bankruptcy Code affords the court the power to disregard the RMI Insurers' property interest in the subrogated portion of payments recovered from J&J.  *See Pearlman v. Reliance Ins. Co.*, 371 U.S. at 135-36; *In re Bergman*, 467 F.3d at 539.

### 2. RMI Insurers' Property Rights Must Be Fully Preserved and Adequately Protected

28.     While the Court has power to approve settlements and sales of the Debtors' property, its ability to limit third-party rights is constrained by the contours of the Bankruptcy Code.  Section 363 of the Bankruptcy Code is the only source of authority for selling the rights of the Debtors and their Estates in the J&J Agreements and any and all of the Debtor J&J Released Claims held by the Debtors and/or their Estates to J&J free and clear of the RMI Insurers' claims.

---

[15] National Union Policy, Dkt. No. 1170-1, at ¶ 10, p. 9 (emphasis added).

29.     If the Court approves the settlement, adequate protection must be given to the RMI Insurers' in exchange for the use of their property interests. *See* 11 U.S.C. § 363(e); *Chateaugay Corp. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 94 F.3d 772, 782 (2d Cir. 1996) (finding that Aetna was owed adequate protection by the debtor in exchange for the use of its subrogation interest in a settlement between the debtor and the department of labor).

30.     Adequate protection requires, minimally, that any interests in the Debtor J&J Rights (such as subrogation claims) attach to and travel with any settlement proceeds. As the Second Circuit observed in *MacArthur Co. v. Johns-Manville*, to the extent that the bankruptcy court has the authority to approve settlements "and to channel claims arising under the policies to the proceeds of the settlement." 837 F.2d 89, 92–93 (2d Cir. 1988) (citing *In Van Huffel v. Harkelrode*, 284 U.S. 225 (1931)). The Second Circuit found this power under 11 U.S.C. § 363(f), which permits, under certain circumstances, sales of property in the debtor's estate "free and clear of any interest in such property of an entity other than the estate." To do so, however, the interest being stripped must follow and apply with equal force and priority to the proceeds of the settlement.

> It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition. *See Ray v. Norseworthy*, *supra*, 90 U.S. at 134–35; S. Rep. No. 989, 95th Cong., 2d Sess. 56 (1978), reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5842 (committee report on 11 U.S.C. § 363(f)) ("Most often, adequate protection in connection with a sale free and clear of other interests will be to have those interests attach to the proceeds of the sale.").

*Johns-Manville*, 837 F.2d at 93.

31.     Recognizing the common-law requirements highlighted by the Second Circuit, Congress codified the protection of third-party interests in section 363(e). That section provides, in relevant part:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used,

sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e).

32.    The Third Circuit similarly recognizes this controlling principle applicable to claim-stripping Section 363 sales.  *See, e.g.*, *Folger Adam Security, Inc. v. Dematteis/Macgregor, JV*, 209 F.3d 252, 257 (3d Cir. 2000) ("[T]he holdings of the courts suggest that any interest in property that can be reduced to a money satisfaction constitutes a claim for purposes of section 363(f) and, therefore, attaches to the proceeds of the sale." (internal citations omitted)).  Thus, insurers' subrogation rights must attach to the proceeds of the Settlement, which requires that such funds be substantially reserved.

33.    The Debtors acknowledge that the RMI Insurers have subrogation claims in the Settlement Motion by carving out the Subrogated Claims from the Debtor J&J Released Claims. *See* § 6.1 of the Settlement Agreement.  The Debtors contend that adequate protection is not necessary because this carve out purportedly maintains the status quo.  It does not.  The Settlement Agreement cuts off the RMI Insurers' property rights in the settlement proceeds, thereby seeking to eliminate a primary contractual right held by the RMI Insurers and impermissibly subordinating the RMI Insurers' subrogation claims to the Debtors' indemnity claims.

34.    The RMI Insurers' policies require the cooperation of the insured in pursuing subrogation claims against a third-party tortfeasor and include contract terms providing a right to subsequent settlement proceeds paid to the insured. It is utterly inconsistent with the contract for the Debtors to keep the settlement proceeds, strip the RMI Insurers rights to the proceeds and leave them with an illusory right to litigate with J&J after the Debtors have released J&J of its obligation.

35.     The Debtors intend to settle their indemnification claims against J&J through the Settlement, claims that are subrogated to the RMI Insurers to the extent of the RMI Insurers' payments made to the Debtors for J&J Talc Claims.  Accordingly, the RMI Insurers' share of the Settlement—the Subrogated Claims—must be paid to the RMI Insurers from the J&J Payment Obligations before any amount is paid to the Debtors.  To approve the Settlement without such terms would materially, adversely and impermissibly modify the RMI Insurers' contractual rights.[16]

### 3.  The Extent of the Adequate Protection Required

36.     When a secured party moves for adequate protection pursuant to § 363(e), the statute mandates that "the [debtor] has the burden of proof on the issue of adequate protection; and the entity asserting an interest in property has the burden of proof on the issue of validity, priority, or extent of such interest." *See In re AMR Corp.*, 490 B.R. 470, 477 (S.D.N.Y. 2013) (*citing* 11 U.S.C. § 363(p)). Thus, "when a secured creditor moves for adequate protection pursuant to § 363(e), it need only establish the validity of its interest in the collateral, while 'the Debtor bears the initial burden of proof as to the issue of 'adequate protection.'" *Id.* (*quoting In re Village Green I, GP,* 435 B.R. 525, 530 (Bankr.W.D.Tenn.2010)). "The movant on a § 363(e) motion therefore bears a much lighter burden than the movant on a § 362(d) motion." *In re AMR Corp.*, 490 B.R. 470, 477 (S.D.N.Y. 2013).

---

[16] J&J's representative stated in their deposition that J&J has no indemnification obligations because Imerys and Cyprus breached the terms of the SPA and supply agreements by not providing J&J with timely notice of the claims. Exhibit 2 to Stamoulis Decl. (Aug. 28 Deposition Transcript of John Kim, Esq.) at 50:21-51:3. He also testified that Imerys and Cyprus further breached the supply agreements because they likely violated the covenant to provide J&J with asbestos-free talc. *Id.* at 50:14-50:20. With the Debtors discharged  J&J will contest it has any obligation to indemnify under the contracts in the first place.  And if they prove true, then Imerys and Cyprus have breached the terms of the RMI Insurers' insurance policies by impairing the insurers' subrogation rights generating a further administrative claim.

37.     The burden of proof for the secured party seeking adequate protection was also examined by *In re Elmira Litho, Inc.,* 174 B.R. 892, 902 (Bankr.S.D.N.Y.1994) in the context of a motion seeking relief from the automatic stay pursuant to 11 U.S.C. § 362.  The court there held that, while the movant on a § 362(d) motion "must prove [a] decline in value—or the threat of decline—in order to establish a *prima facie* case," *id.* at 902, "[t]he burden of proof on motion under § 363(e) is governed by § 363 ([p])," which merely "requires the party asserting an interest in property to prove the 'validity, priority, or extent of such interest,' and imposes on the [debtor-in-possession] the 'burden of proof on the issue of adequate protection.'" *Id.* at 905 (*quoting* 11 U.S.C. § 363(p)(1) & (2) (citations omitted)).

38.     In this matter, the validity of the RMI Insurers' interest is unchallenged.  Under the clear language of insurance contracts with the Debtors, RMI Insurers have a secured subrogation interest equal to the amount it expended on the defense and indemnity of the Debtor in the personal injury cases for which the Debtors sought coverage, plus the interest accrued thereon.  The Debtors further do not dispute that funds were actually expended by RMI Insurers, as they and J&J were well aware of the subrogation issue while negotiating the J&J settlement.  Finally the extent of the claim has been established by the RMI Insurers to the degree required by § 363(p).  *See In re AMR Corp.,* 490 B.R. at 477-78 (holding that a secured party is "merely required to establish the validity of their interest in the Collateral (which was unchallenged), while the Debtors had the burden of affirmatively demonstrating that the [secured party's] interest in the Collateral was adequately protected without the conditions sought by the [secured party]." (*citing* 11 U.S.C. § 363(p) and *Elmira Litho*, 174 B.R. at 902–05)).

39.     RMI Insurers paid $16,748,264 on indemnity and $20,093,222 on defense expenses under the policies, which has accrued interest in an amount of $21,375,585 for a total claim of

$58,217,072.[17]  At least a large majority of the claims resolved by the RMI Insurers' payments named J&J as a co-defendant.[18]  Accordingly, no less than $58,217,072 must be set aside in escrow from the J&J Payment Obligations subject to further proceedings before this Court to determine the precise value of adequate protection owed to RMI Insurers for their Subrogated Claims.

## B.    The Court Cannot Make the Proposed Factual Findings Because the Debtors Have Provided No Evidentiary Support and Testimony Supports Contrary Findings

40.    The Court cannot make the findings sought without any evidence and zero diligence regarding the J&J Talc Claims having been conducted.[19]

41.    Paragraph K of the Proposed Sale Order asks this Court to find that the total consideration proposed to be paid by J&J "constitutes reasonably equivalent value and fair consideration," a finding that must be made in order to approve an asset sale under section 363 since the sale of an asset with value that exceeds the price at which the sale was consummated may be avoided under section 363(n).  However, the Debtors 30(b)(6) corporate representative witnesses admitted that no analyses or valuations of the J&J Talc Claims for which J&J's indemnity obligations are owed to the Debtors were conducted.  *See* Exhibit 3 of Stamoulis Decl. (Aug. 22, 2024, Deposition Transcript of David J. Baker) at 47:7-24 (stating that Cyprus never even attempted to go through the claims to segregate those that allege J&J from those that don't); Exhibit 4 of Stamoulis Decl. (Aug. 28, 2024, Deposition Transcript of Ryan Van Meter) at 37:23-25, 38, 39:1-5 (describing how they did not see a benefit in attempting to calculate the percentage of claims that allege J&J products as a source for purposes of the settlement negotiations); *Id.* at

---

[17] Scarcella Decl., at 2.

[18] *See* Exhibit 5 to Stamoulis Decl. (An indemnification demand letter sent by RMI Insurers to J&J on February 28, 2020, describing the nature of the subrogation claims and the claims the RMI Insurers indemnified and paid defense costs for, the large majority of which include J&J as a co-defendant).

[19] For example, back on October 13, 2021, the Court entered an order excluding 15,713 Talc Personal Injury Claims voted by Bevan & Associates for similar reasons, including that zero diligence had been conducted and it was impossible to tell whether any of the claimants held a claim required to vote on the proposed plan. *See Opinion* [Dkt. No. 4239] at 25, 27-28.

42:2-10 (stating that no analysis was conducted to try and determine what percentage of the current claims would be satisfied by the $505 million from J&J).

42.     If the Debtors do not even know which claims are J&J Talc Claims, how can they ask this Court to make a determination that the consideration being paid to satisfy indemnification obligations for such claims is "reasonably equivalent value and fair consideration"?

43.     The proceeds of the Sale are intended to resolve the J&J indemnity obligations owed to the Debtors for the J&J Talc Claims, which the Debtors have characterized as representing the vast majority of the approximately 15,000 claims filed against Imerys and 500 filed against Cyprus, despite not having considered an allocation analysis. *See* Exhibit 3 of Stamoulis Decl. (Aug. 22, 2024, Deposition Transcript of David J. Baker) at 47:7-17; Aug. 2 Disclosure Statement at 39 ("Approximately 99.99% of the lawsuits pending against the Debtors asserting [Ovarian Cancer] Claims named J&J as a co-defendant, and approximately 76% of the lawsuits pending against the Debtors asserting Mesothelioma Claims named J&J as a co-defendant.").

44.     No evidence is offered to show how many claims these proceeds are actually expected to resolve.  In such a scenario, it's impossible to say whether the Settlement Agreement is fair and equitable and in the best interests of the Debtors and their estates, as the Court is asked to find in Paragraph C of the Proposed Sale Order, let alone that the Settlement Agreement adequately resolves any number of claims against the Debtors.

45.     If the Debtors are not held to their evidentiary burden to show which and how many claims these proceeds are actually expected to resolve, what is alleged as just a J&J Talc Claim today will overnight be alleged to be a non-J&J claim in a race to gin up new claims beyond the

$505 million proposed to be paid by J&J.[20]  The Court has already heard testimony earlier in this case on how thousands of industrial tire worker claims became baby power claims in an effort to secure the vote on a prior failed plan.

46.     The proposed settlement must be "fair and equitable," *In re Nutraquest Inc*., 434 F.3d 639, 644 (3d Cir. 2006) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)), and "assess and balance the value of the claim that is being compromised against the value to the estate of . . . accept[ing] . . . the compromise." *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996). The settlement must also be in good faith.

47.     Findings of fact cannot simply be pulled from the ether; some amount of evidence, documentation, sworn testimony, etc. is a necessary requirement for a court to be able to make factual findings like those proposed by the Debtors in the Sale Motion. *See*, *e.g.*, *Kinney v. Sando*, 182 P.2d 45, 48 (1947) (it is "improper" to make findings where "there was no evidence nor... any admissions upon which the findings as a whole could be based.". No such evidence has been presented to this Court.

**C.     The 14-day Stay Required by Bankruptcy Rule 6004(h) Should Not be Waived**

48.     Under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Without this procedural protection provided under Rule 6004(h), the District Court will be burdened with emergency applications for a stay before a decision is even rendered by the Bankruptcy Court or the parties can consider the decision.  The 1999 Advisory Committee Notes on Rule 6004(g)—renumbered

---

[20] *See* Aug. 22, 2024, Deposition Transcript of David J. Baker at 56:17-22 ("I'm not aware of any provision of the settlement agreement that would by its terms prevent a claimant from amending a current claim to add an additional potential source of exposure.")

to today's Rule 6004(h) as part of the 2008 Amendment)—contemplates this problem: "Subdivision (g) is added to provide sufficient time for a party to request a stay pending appeal of an order authorizing the use, sale, or lease of property under §363(b) of the Code before the order is implemented."

49.    Waiver of the fourteen-day stay of a sale order under Rule 6004(h) is uncalled for here.  The Debtors have not explained why this order must be implemented on such an expedited basis and therefor have not provided any basis for requiring such a waiver.

## CONCLUSION

50.    (a) The RMI Insurers should be granted adequate protection in the form of cash from the J&J Payment Obligations that is set aside in a trust in the amount of $58,217,072 subject to subsequent valuation proceedings to determine the value of the adequate protection to be paid to the RMI Insurers, or (b) the Settlement Motion should be denied.

Dated:  September 6, 2024
         Wilmington, Delaware

Respectfully Submitted,


By:  */s/ Stamatios Stamoulis*
      Stamatios Stamoulis

**STAMOULIS & WEINBLATT LLC**
800 N. West Street
Third Floor
Wilmington, Delaware  19801
Telephone:    302 999 1540
Email:          stamoulis@swdelaw.com

*Counsel for RMI Insurers defined as Columbia Casualty Company, Continental Casualty Company, in its own right, and as successor to CNA Casualty of California, The Continental Insurance Company, as successor to and as successor in interest to certain insurance policies issued by Harbor Insurance Company, Stonewall Insurance Company (now known as Berkshire Hathaway Specialty Insurance Company), National Union Fire Insurance Company of Pittsburgh PA, and Lexington Insurance Company to the extent they issued policies to Cyprus Mines Corporation prior to 1981; and AIU Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, Granite State Insurance Company, The Continental Insurance Company, as successor to The Fidelity and Casualty Company of New York and as successor in interest to certain policies issued by London Guarantee & Accident of New York, and Republic Insurance Company to the extent they issued policies to Standard Oil of Indiana prior to 1986*