# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>IMERYS TALC AMERICA, Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-10289 (LSS)<br>(Jointly Administered)<br><br>Re: D.I. 6376<br><br>Hearing Date: Sept. 25, 2024, at 9:30 am (ET) |
| In re:<br><br>CYPRUS MINES CORPORATION,[2]<br><br>Debtor. | Chapter 11<br><br>Case No. 21-10398 (LSS)<br><br>Re: D.I. 2361<br><br>Hearing Date: Sept. 25, 2024, at 9:30 am (ET) |

**DECLARATION OF D. J. (JAN) BAKER, INDEPENDENT DIRECTOR
OF THE CYPRUS DEBTOR, IN SUPPORT OF THE JOINT MOTION OF THE
IMERYS DEBTORS AND THE CYPRUS DEBTOR FOR AN ORDER (I) APPROVING
THE SETTLEMENT AGREEMENT BETWEEN THE IMERYS DEBTORS,
THE CYPRUS DEBTOR, JOHNSON & JOHNSON, AND THE OTHER PARTIES
THERETO, AND (II) APPROVING THE SALE OF CERTAIN RIGHTS**

I, D. J. (Jan) Baker, hereby declare as follows:

1. I am the sole Independent Director of Cyprus Mines Corporation (the "**Cyprus Debtor**").

2. I am authorized to submit this declaration (this "**Declaration**") on behalf of the Cyprus Debtor in support of the joint motion [D.I. 2361] (the "**Settlement Motion**") of Imerys Talc America, Inc., Imerys Talc Vermont, Inc., and Imerys Talc Canada Inc. (collectively, the

---

[1] The Imerys Debtors, along with the last four digits of each Imerys Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Imerys Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

[2] The last four digits of the Cyprus Debtor's taxpayer identification number are 0890. The Cyprus Debtor's address is 333 North Central Avenue, Phoenix, AZ 85004.

"**Imerys Debtors**") and the Cyprus Debtor (together with the Imerys Debtors, the "**Debtors**") for the entry of an order (i) approving the *Settlement Agreement and Release* (the "**Settlement Agreement**"), dated as of July 13, 2024, by and among the Debtors, Imerys S.A., ITI, CAMC, the Claimant Fiduciaries, and J&J (collectively, the "**Parties**"), a copy of which is attached to the Settlement Motion as Exhibit A, and (ii) approving the J&J Buyback.[3]

3. I am a lawyer and a member of the bar of New York. I began my legal career in 1973, as an associate at Fulbright & Jaworski in Houston, Texas. I became a partner at that firm in 1980 and continued to practice as a partner there and at four other firms over the next 36 years. I joined Weil, Gotshal & Manges LLP in 1985; Gibson Dunn & Crutcher LLP in 1999; Skadden, Arps, Slate, Meagher & Flom LLP in 2001; and Latham & Watkins LLP in 2008. I was a global co-chair of the restructuring practice groups at Gibson, Dunn & Crutcher and at Latham & Watkins. I retired from the practice of law in 2016. Over the course of my legal career, I specialized in restructuring and reorganization matters and thus am familiar with title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**"), and the Federal Rules of Bankruptcy Procedure. During my law practice, I represented approximately 150 companies in either in-court or out-of-court restructuring matters. Since my retirement, I have served as an independent, outside director for approximately 25 companies going through bankruptcy or restructuring processes, including the Debtor.

4. In August 2019, the Cyprus Debtor retained me as a consultant for the purpose of evaluating strategic alternatives for managing and resolving talc-related claims against the Cyprus Debtor. Effective as of February 1, 2020, I was elected as a director of the Cyprus Debtor. Since

---

[3] Capitalized terms used but not defined in this Declaration have the meanings given in the Settlement Motion or the Settlement Agreement (as applicable).

joining the Cyprus Debtor's Board of Directors, through a review of external and internal documents and my discussions with knowledgeable persons, I have become familiar with the Cyprus Debtor's history, assets, financial condition, policies and procedures, books and records, and litigation.  Effective as of January 8, 2021, the Cyprus Debtor's Board of Directors appointed me as the sole member of a special committee of the Board of Directors (the "**Special Committee**") to represent the interests of the Cyprus Debtor in connection with any transaction, agreement, action, or proceeding concerning (i) the commencement, administration, and resolution of any case of the Cyprus Debtor under chapter 11 of the Bankruptcy Code, (ii) obtaining financing from any affiliate of the Cyprus Debtor, (iii) the prosecution or settlement of any claims and causes of action of the Cyprus Debtor against any affiliate of the Cyprus Debtor, and (iv) any other matter in which there may be a conflict or divergence between the interests of the Cyprus Debtor and the interests of any affiliate of the Cyprus Debtor.

5.      In my capacity as the sole member of the Special Committee, I oversaw and directed the negotiations of, and executed, the Settlement Agreement on behalf of the Cyprus Debtor.  I also reviewed the Settlement Motion and authorized its filing.  The Settlement Agreement and the relief sought in the Settlement Motion are fair and equitable and in the best interests of the Cyprus Debtor and its estate.

6.      Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from persons directly involved in serving the Debtor or retained advisers who report to me in the ordinary course of my responsibilities.  References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters from my own experience.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## I.    RELEVANT CORPORATE HISTORY

7.    On January 6, 1989, the Cyprus Debtor and Johnson & Johnson entered into a Stock Purchase Agreement (the "**1989 SPA**"), pursuant to which the Cyprus Debtor acquired from Johnson & Johnson all of the stock of Windsor Minerals, Inc.  Windsor Minerals, Inc. operated talc mines in Vermont and historically supplied talc to J&J for use in baby powder.  In connection with the acquisition, Windsor Minerals, Inc. entered into the 1989 Supply Agreement (as defined below), pursuant to which it continued to supply talc to J&J.  The Cyprus Debtor renamed Windsor Minerals, Inc. as Cyprus Windsor Minerals Corp. ("**Windsor**").  As a subsidiary of the Cyprus Debtor, Windsor supplied J&J with talc between 1989 and 1992.  The Cyprus Debtor itself never supplied talc to J&J except for a limited period between December 1979 and March 1980.  Windsor is now Debtor Imerys Talc Vermont, Inc. ("**ITV**").

8.    In June 1992, the Cyprus Debtor sold its talc-related assets to RTZ America Inc. (later known as Rio Tinto America, Inc.) ("**RTZ**") in several steps.  First, the Cyprus Debtor transferred its talc-related assets and liabilities, including its stock in Windsor, to Cyprus Talc Corporation, a newly formed subsidiary of the Cyprus Debtor, pursuant to an Agreement of Transfer and Assumption, dated June 5, 1992.  Second, the Cyprus Debtor sold the stock of Cyprus Talc Corporation to RTZ pursuant to a Stock Purchase Agreement, also dated June 5, 1992.

9.    Soon after the 1992 transactions, RTZ merged Cyprus Talc Corporation with RTZ's existing subsidiary, Luzenac America, Inc.  As the surviving corporation, Cyprus Talc Corporation then changed its name to Luzenac America, Inc.  Luzenac America, Inc. is now Debtor Imerys Talc America, Inc. ("**ITA**").

10.    Between 1993 and 2007, the identity of the Cyprus Debtor's ultimate owner changed three more times.  In 1993, Cyprus Minerals Company, the Cyprus Debtor's then parent,

merged with AMAX Inc. to form Cyprus Amax Minerals Corporation ("**CAMC**").  In 1999, Phelps Dodge Corporation, a holding company for various mining properties and operations, acquired CAMC.  Freeport-McMoRan Inc. purchased Phelps Dodge Corporation and CAMC in 2007.  CAMC has never had any talc operations, and today it remains the direct parent of the Cyprus Debtor.

## II.   TALC SUPPLY AGREEMENTS

11.   Historically, ITV (previously Windsor) served as J&J's sole supplier of talc used in products manufactured and sold by certain of the J&J Corporate Parties.  Prior to 1989, talc was supplied by ITV (then known as Windsor Minerals, Inc.) through its direct subsidiary relationship with J&J.

12.   Since 1989, ITA and ITV supplied talc to certain J&J Corporate Parties through four supply agreements:  (i) that certain Talc Supply Agreement, between Windsor Minerals, Inc. and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc., dated as of January 6, 1989 (the "**1989 Supply Agreement**"), as amended (the "**1996 Amendment**"); (ii) that certain Supply Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated April 15, 2001 (the "**2001 Supply Agreement**"), as amended (the "**2004 Amendment**"); (iii) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2010 (the "**2010 Supply Agreement**"); and (iv) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2011 (the "**2011 Supply Agreement**") (collectively, with the 1989 SPA, the 1989 Supply Agreement, the 1996 Amendment, the 2001 Supply Agreement, the

2004 Amendment, the 2010 Supply Agreement, and the 2011 Supply Agreement, the "**J&J Agreements**").

13. The Cyprus Debtor and its affiliates, including CAMC, believe that they have broad indemnity rights against certain J&J Corporate Parties covering any liabilities and obligations arising out of the Cyprus Debtor's or Windsor's supply of talc to J&J prior to the 1992 transactions. Under the 1989 SPA, pursuant to which the Cyprus Debtor purchased Windsor Minerals, Inc. (the entity known today as ITV), certain J&J Corporate Parties agreed to indemnify the Cyprus Debtor and affiliates for any product liability-based claim arising out the sale of talc to J&J prior to the January 6, 1989, closing date. In addition, under the 1989 Supply Agreement, certain J&J Corporate Parties agreed to indemnify Windsor (and its affiliates, including the Cyprus Debtor) from and against all liabilities arising out of any product liability-based claim for which J&J is directly or indirectly responsible as a result of J&J's manufacture, shipment, and sale of a talc-containing product derived from talc delivered under the 1989 Supply Agreement. J&J has refused to acknowledge or honor its indemnification obligations.

### III. THE DEBTORS' DISPUTES WITH J&J

14. Among the Parties, disputes have arisen as to (i) the existence and scope of any obligation of the J&J Corporate Parties to indemnify the Debtors and/or the Debtor Corporate Parties under the J&J Agreements, (ii) the existence and scope of any obligation of certain Debtors and/or Debtor Corporate Parties to indemnify the J&J Corporate Parties under the J&J Agreements, (iii) Claims the Parties may have against each other relating to the J&J Agreements or otherwise related to the supply of talc by the Debtors to any J&J Corporate Party, and (iv) other Claims the Parties may have against each other arising out of or relating to the Talc Personal Injury

Claims, including Estate Causes of Action Against J&J and contribution, subrogation, equitable indemnification, and other Claims, including under common law.

15. Faced with continuing uncertainty regarding a significant asset of the Debtors' respective estates, the Imerys Debtors and the Cyprus Debtor initiated adversary proceedings seeking declaratory judgments regarding the J&J Corporate Parties' and the Debtors' respective rights and obligations under the J&J Agreements, and J&J actively participated in the Imerys Cases and the Cyprus Case in its own attempt to protect its rights and defend against its purported obligations under the J&J Agreements as well as to avoid, among other things, what it contends was an attempt by the Debtors and the Claimant Fiduciaries to impose liability on J&J.

16. On June 15, 2020, after J&J repeatedly denied that it has indemnification obligations to the Cyprus Debtor, and after J&J and the Imerys Debtors asserted that the Cyprus Debtor transferred its indemnity rights to ITA in 1992, the Cyprus Debtor initiated an adversary proceeding (the "**Cyprus Indemnity Adversary Proceeding**") against ITA, ITV, Johnson & Johnson, and Old JJCI to determine the rights of the Cyprus Debtor under the J&J Agreements [Cyprus Indem. Adv. Pro. D.I. 1].[4] In the Cyprus Indemnity Adversary Proceeding, the Cyprus Debtor asserted that it has indemnity rights against J&J under the 1989 SPA and 1989 Supply Agreement notwithstanding the position taken by the Imerys Debtors that all such indemnity rights were transferred to the Imerys Debtors in connection with the corporate restructuring discussed above.

17. On July 29, 2020, the Imerys Debtors filed an answer to the complaint asserting various affirmative defenses as well as counterclaims (i) seeking a declaration that the Cyprus

---

[4] The Cyprus Indemnity Adversary Proceeding is captioned *Cyprus Mines Corporation and Cyprus Amax Minerals Company v. Imerys Talc America, Inc., Imerys Talc Vermont, Inc., Johnson & Johnson and Johnson & Johnson Consumer Inc.*, Adv. Pro. No. 20-50626 (LSS) (Bankr. D. Del. Jun. 15, 2020).

Debtor lacks the right and standing to pursue the causes of action asserted in the complaint, and (ii) asserting that the Cyprus Debtor breached its representations and warranties under certain agreements [Cyprus Indem. Adv. Pro. D.I. 8]. On the same day, J&J filed a motion to dismiss the complaint for lack of subject matter jurisdiction, or, in the alternative, to abstain or to sever and transfer the claims to the United States District Court for the District of Vermont [Cyprus Indem. Adv. Pro. D.I. 9 & 10] (the "**J&J Motion to Dismiss**").[5]

18. The Cyprus Debtor, the Imerys Debtors, and J&J engaged in motion practice relating to the Cyprus Indemnity Adversary Proceeding until October 22, 2021,[6] when the Cyprus Indemnity Adversary Proceeding was stayed as a result of the LTL chapter 11 filing.[7] Prior to the filing of the LTL 2021 Bankruptcy, the request for oral argument and the J&J Motion to Dismiss were pending before the Court. The Cyprus Indemnity Adversary Proceeding has not been prosecuted as to J&J since the filing of the LTL 2021 Bankruptcy.

---

[5] The Settlement Agreement resolves disputes between the Imerys Debtors and the Cyprus Debtor regarding which entities are entitled to indemnity rights under the J&J Agreements.

[6] On September 1, 2020, the Cyprus Debtor and CAMC responded to the Imerys Debtors' counterclaims and the J&J Motion to Dismiss [Cyprus Indem. Adv. Pro. D.I. 19 & 20], and on September 3, 2020, the Cyprus Debtor and CAMC filed a request for oral argument in connection with the J&J Motion to Dismiss [Cyprus Indem. Adv. Pro. D.I. 22]. On September 16, 2020, J&J filed a reply in support of the J&J Motion to Dismiss [Cyprus Indem. Adv. Pro. D.I. 23]. On October 6, 2020, the Cyprus Debtor and CAMC filed a motion for leave to file a sur-reply in opposition to the J&J Motion to Dismiss [Cyprus Indem. Adv. Pro. D.I. 26], and on October 16, 2020, J&J filed an opposition to the motion for leave to file a sur-reply [Cyprus Indem. Adv. Pro. D.I. 32].

[7] On October 14, 2021, LLT Management LLC (f/k/a LTL Management LLC) ("**LTL**" or "**LLT**", as applicable), a subsidiary of Johnson & Johnson which Johnson & Johnson asserts was formed to manage its talc liabilities, filed a chapter 11 case in the Western District of North Carolina, captioned as *In re LTL Management LLC*, Case No. 21-30589 (the "**LTL 2021 Bankruptcy**"). The LTL 2021 Bankruptcy was subsequently transferred to the District of New Jersey (the "**LTL Bankruptcy Court**"). The LTL 2021 Bankruptcy was ultimately dismissed by the LTL Bankruptcy Court in April 2023. LTL then filed another chapter 11 case in the LTL Bankruptcy Court, captioned as *In re LTL Management LLC*, Case No. 23-12825 (the "**LTL 2023 Bankruptcy**"). The LTL 2023 Bankruptcy was again dismissed by the LTL Bankruptcy Court in August 2023. LTL has appealed the dismissal of the LTL 2023 Bankruptcy to the Third Circuit. LTL subsequently changed its name to LLT Management LLC and, on May 1, 2024, announced that it intends to solicit votes on a 524(g) plan of reorganization that could result in a third chapter 11 filing.

19. On July 27, 2021, ITA and ITV commenced an adversary proceeding (the "**Imerys Indemnity Adversary Proceeding**" and, together with the Cyprus Indemnity Adversary Proceeding, the "**J&J Adversary Proceedings**") against Johnson & Johnson and Old JJCI seeking a declaratory judgment regarding (i) the indemnity obligations of Johnson & Johnson and Old JJCI under the J&J Agreements and (ii) the Imerys Debtors' indemnity obligations to Johnson & Johnson and Old JJCI under the J&J Agreements [Imerys Indem. Adv. Pro. D.I. 1].[8]

20. In addition to the claims asserted by the Debtors in the J&J Adversary Proceedings, J&J has also asserted indemnity rights against the Debtors.

21. The Debtors have also asserted that one or more of the Debtors have the right to insurance coverage from the J&J Policies. ITV was a wholly owned subsidiary of Johnson & Johnson until 1989 and, therefore, certain Debtors allege they are successors to insureds, and the insured's rights, under the pre-1989 J&J Policies. Certain of the J&J Corporate Parties dispute that any third parties are entitled to the proceeds of any insurance coverage from the J&J Policies. Furthermore, J&J has alleged it has rights to insurance coverage for policies procured by the Debtors or their predecessors.

22. Additionally, certain J&J Corporate Parties have stated that they oppose the Plans, including the TDP, and intend to object to their confirmation and approval absent the Settlement. These disputes between the Debtors and J&J create a significant litigation risk that has the potential to increase administrative expenses borne by the Debtors' estates and extend the timeline of the Imerys Cases and the Cyprus Case and/or potentially delay implementation of any confirmed plan in the Imerys Cases and the Cyprus Case through the conclusion of the appeal process.

---

[8] The Imerys Indemnity Adversary Proceeding is captioned *Imerys Talc America, Inc. and Imerys Talc Vermont, Inc. v. Johnson & Johnson and Johnson & Johnson Consumer Inc.*, Adv. Pro. No. 21-51006 (LSS) (Bankr. D. Del. July 27, 2021).

## IV. SETTLEMENT NEGOTIATIONS

23. The Debtors, CAMC, Imerys S.A., and the Claimant Fiduciaries have engaged in extensive, good faith negotiations with J&J over the course of months for the purpose of resolving disputes regarding the Parties' respective indemnification rights and obligations under the J&J Agreements and applicable law, the Debtors' entitlement to the proceeds of the J&J Policies, and J&J's objections to the Plans and TDP.

24. Negotiations regarding the material terms of the Settlement took place principally between February and April 2024, resulting in a term sheet dated April 29, 2024, which reflected an agreement among the Parties as to the material terms of the Settlement. On May 1, 2024, J&J announced that the Debtors and J&J reached an agreement-in-principle to resolve all talc-related claims against J&J by the Debtors. From that time through the date that the Settlement Agreement was fully executed on July 13, 2024, the Parties devoted substantial time and resources to documenting the deal consistent with their agreement as to the material terms of the Settlement. Throughout this process, negotiations among the Parties took place primarily via the Parties' legal counsel through primarily one-on-one and group telephone conferences and Zoom meetings, as well as emails.

25. Although I did not personally participate in any negotiation sessions with other Parties or their counsel, I received regular status reports from the Cyprus Debtor's counsel concerning the negotiations, reviewed the April 29 term sheet and certain drafts of the agreement at various stages, and oversaw and directed the Cyprus Debtor's counsel throughout the process. Through that oversight function, I observed a good faith, arms'-length process with considerable give-and-take among the Parties regarding numerous complicated issues. The complexity of the negotiations was exacerbated by the number of Parties involved, each represented by reputable

and competent counsel looking to protect their clients' respective unique and distinct interests. As a result of the large number of sophisticated and experienced parties, law firms, and lawyers involved, many of whom expended an enormous amount of time and energy in the settlement and negotiation process, this negotiation exemplified the ideal of any arms'-length, heavily negotiated settlement agreement.

26. The resulting Settlement Agreement is a positive step forward for the Cyprus Debtor that, if approved, will enable the Cyprus Debtor and its estate to avoid costly litigation with uncertain results and clears a path towards a less contentious resolution of this Chapter 11 Case by offering the Cyprus Debtor and its estate finality with respect to issues that have been hotly contested and heavily litigated over a period of years, while also substantially increasing the funds available to provide a trust to pay claimants.

V.   SUMMARY OF SETTLEMENT AGREEMENT

27. The Settlement Agreement contemplates, among other things, (i) a settlement payment from J&J in the aggregate amount of $225 million (the "**J&J Initial Payment**"), (ii) a contribution from the J&J Corporate Parties of the first $200 million and 50% of the next $160 million of insurance proceeds recovered under the J&J Policies (subject to an aggregate capped guarantee of $280 million and certain other limitations) (the "**J&J Insurance Payments**"),[9] and (iii) contribution of the entirety of the Home Proceeds (collectively, (i), (ii), and (iii), the "**J&J Payment Obligations**").

28. In addition, J&J will acquire the rights of the Debtors and their estates in the J&J Agreements and any and all of the Debtor J&J Released Claims (as defined in the Settlement

---

[9]   The J&J Insurance Payments do not include (i) amounts recovered or received by J&J from Middlesex Assurance Company Limited ("**Middlesex**") or in connection with any insurance policy issued by Middlesex to another J&J Corporate Party, including defense cost recoveries paid to J&J Corporate Parties by Middlesex, and (ii) the Home Proceeds.

Agreement) held by the Debtors and/or their estates (collectively, the "**Debtor J&J Rights**") free and clear of any and all rights, claims and interests of any other entity pursuant to sections 363(b) and 363(f) of the Bankruptcy Code (the "**J&J Buyback**"), subject to certain limitations described in the Settlement Agreement.  The J&J Buyback and the releases contained in the Settlement Agreement, resolve, among other things, current and future disputes under the J&J Agreements, the claims being pursued by the Parties in the J&J Adversary Proceedings, and all such other claims or causes of action as further detailed in the Settlement Agreement.[10]

29. The Settlement Agreement contemplates that, subsequent to the Trigger Date, J&J will pay to the Debtors (if prior to the Plans' Effective Date) or the Trust (if after the Plans' Effective Date) the full amount of the J&J Initial Payment and any portions of the J&J Insurance Payments that have been received by J&J and immediately assign all of their rights to receive the Home Proceeds, as further detailed in the Settlement Agreement.  J&J will continue to pay amounts received in respect of the J&J Policies until the full amount of the J&J Insurance Payments have been transferred to the Debtors or the Trust (as applicable), provided that, any remaining amounts owed under the J&J Insurance Payments, up to $280,000,000, will be paid by J&J using other sources no later than December 31, 2025.  Effective as of the Insurance Reporting Termination Date, the Debtors and/or the Trust will assign to J&J all rights, interests, and remedies they have under the J&J Policies.

30. As a component of the Settlement, to the extent payments are made by J&J with respect to the J&J Payment Obligations prior to the Plans' Effective Date, such payments will be

---

[10]  The J&J Buyback does not include any rights or interests in claims against the J&J Corporate Parties arising out of or in connection with prepetition payments to any of the Imerys Parties or Cyprus Parties, by way of subrogation or otherwise, asserted by Truck Insurance Exchange, any insurer currently or previously managed by Resolute Management, Inc., including National Union Fire Insurance Company of Pittsburgh, PA, or any other insurer that has made prepetition payments to any of the Imerys Parties or Cyprus Parties.

divided evenly (50%/50%) between the Cyprus Designated Account and the Imerys Designated Account (the "**Estate Allocation**"). *See, e.g.*, Settlement Agreement §§ 4.1 & 5.7. On the Plans' Effective Date, all amounts remaining in the Imerys Designated Account and the Cyprus Designated Account will be transferred to the Trust. For the avoidance of doubt, in the event the Plans' Confirmation Date and/or the Plans' Effective Date does not occur, but the other conditions detailed in the Settlement Agreement are satisfied, the funds held in or payable to the Cyprus Designated Account will be retained by or become the property of the Cyprus Debtor and the funds held in or payable to the Imerys Designated Account will be retained by or become the property of the Imerys Debtors.

31. Many contested issues arose during the negotiations of the Settlement, including issues relating to how to address the Debtors' intent to preserve insurers' existing subrogation rights. J&J desired a settlement that resulted in complete peace from all claims relating to indemnification obligations under its various agreements with the Debtors, and, initially, that included insurers' subrogation rights. The Cyprus Debtor, however, was concerned that any outcome that was perceived by insurers as negatively affecting their existing subrogation rights would likely raise insurer objections, so it instead negotiated to preserve those rights in the Settlement. To that end, the Settling Parties agreed to carve out from the J&J Buyback and from the Debtor J&J Released Claims any claims against the J&J Corporate Parties arising out of or in connection with prepetition payments made by insurers to or on behalf of any of the Imerys Parties or Cyprus Parties (the "**Subrogated Claims**"). The purpose of these carve-outs is to confirm that the Subrogated Claims are not being sold to J&J and are not being settled by the Debtors. Additionally, the Settling Parties incorporated in the Settlement Agreement a covenant not to pursue insurance coverage, or accept any payment, under any insurance policy, for J&J Talc

Claims, as well as provisions for the issuance of an injunction as part of the proposed approval order that enjoins the Debtors and certain related parties from accepting payment or otherwise pursuing insurance coverage for J&J Talc Claims. These provisions provide substantial collateral benefits to the insurers by prohibiting the Debtors and certain other related parties from pursuing coverage for J&J Talc Claims in the future.

## VI. SETTLEMENT AGREEMENT IS FAIR AND EQUITABLE AND IN THE BEST INTERESTS OF THE CYPRUS DEBTOR'S ESTATE

32. Through the Settlement Agreement, the Debtors have resolved (i) the existence and scope of the Parties' indemnification obligations under the J&J Agreements, (ii) other Claims the Parties may have against each other relating to the J&J Agreements or related to the supply of talc by the Debtors to any J&J Corporate Party, (iii) disputes between the Parties concerning the Debtors' rights with respect to the J&J Policies, and (iv) J&J's potential objections to the Plans (including the TDP). Stated differently, the Settlement Agreement is expected to result in global peace among the Debtors and J&J and eliminates uncertainty regarding significant assets of the estates. Through the Estate Allocation, the Settlement Agreement also resolves any and all disputes between the Imerys Debtors' estates, on the one hand, and the Cyprus Debtor's estate, on the other, regarding potentially competing rights to recovery on the J&J indemnity claims, providing for an even split between the two estates.

33. At its core, the Settlement Agreement is a settlement of disputed indemnification rights related to the J&J Agreements, as well as the rights, if any, that certain Debtors might have under insurance policies issued to J&J. The Settlement is not a settlement of individual tort claims. Consequently, the relative strengths and weaknesses and potential benefits and risks associated with the pending litigation of the J&J indemnification and related rights—not the value of the

underlying tort claims—primarily informed the Cyprus Debtor's judgment regarding the reasonableness of the Settlement.

34. After holistically evaluating the Settlement, the Cyprus Debtor concluded that the Settlement was fair and reasonable and in the best interests of its estate. In reaching this conclusion, the Cyprus Debtor considered (without limitation) the following factors: (i) the probability of success in litigation in light of the parties' ongoing disputes and J&J's demonstrated history of aggressively opposing the Debtors' actions throughout the Chapter 11 Cases; (b) the likely difficulties in collection from an extremely well-funded and litigious counterparty; (c) the significant complexity of the litigation involved (as evidenced by the events in the Chapter 11 Cases to date), and the expense, inconvenience, and delay necessarily attending it; and (d) the paramount interest of the talc creditors represented by the Claimant Fiduciaries who support the Settlement.

35. The proposed Settlement, including the J&J Payment Obligations, represents a fair and equitable settlement given the range of complex disputes among the Parties and the potential litigation outcomes. *First*, the J&J Corporate Parties dispute that they have any obligations to indemnify the Debtors under the J&J Agreements and applicable law and have vigorously opposed the Debtors' actions relating to the J&J Agreements in the Cyprus Indemnity Adversary Proceeding and under the Plans (including the TDP). What is more, J&J has asserted that certain Debtors and/or Debtor Corporate Parties have indemnification obligations ***to J&J*** under the J&J Agreements. The Debtors, on the other hand, have consistently maintained their rights under the J&J Agreements, including by commencing the J&J Adversary Proceedings. *Second*, even if it is determined that certain J&J Corporate Parties have obligations to indemnify the Cyprus Debtor under the 1989 SPA and the 1989 Supply Agreement, the Imerys Debtors contend that all such

indemnity rights were transferred from the Cyprus Debtor to the Imerys Debtors in connection with the 1992 transactions.  *Third*, J&J has long disputed the Debtors' entitlement to the J&J Policies, notwithstanding the Debtors' firm belief that at least one of the Debtors has the right to access the proceeds of such policies.  *Fourth*, J&J has stated that it would object to any modified plan that seeks to impose liability on J&J through the TDP.  The complexity of these disputes is apparent from the pleadings filed in the J&J Adversary Proceedings and J&J's objections to the Imerys Debtor's prior chapter 11 plan.

36.     The range of potential litigation outcomes for these disputes includes a worst-case scenario in which, not only are the Debtors unable to recover any amounts from J&J under the J&J Agreements or from the J&J Policies, but it could be determined that the Debtors and/or the Debtor Corporate Parties must indemnify J&J under the J&J Agreements.  Or, alternatively, for the Cyprus Debtor, the range of potential litigation outcomes includes a scenario in which a court determines that the Cyprus Debtor's indemnity rights against certain J&J Corporate Parties under the 1989 SPA and 1989 Supply Agreement were transferred to the Imerys Debtors in connection with the corporate restructuring discussed above.  Although these scenarios do not represent likely outcomes, they are not outside the range of possibility and should be considered in any settlement analysis.

37.     Given the significant risks inherent in litigation regarding critical assets of the Debtors' estates, the recovery provided for in the Settlement Agreement is significantly beneficial for the Cyprus Debtor, its estate, and creditors.  The settlement consideration of $505 million (which is payable on or before December 31, 2025) plus the Home Proceeds is a substantial sum that will materially increase the assets of the Trust and recoveries that may be made available to claimants.  Considering the range of reasonable outcomes of the Parties' disputes—including the

likelihood that J&J will appeal any adverse decisions that may assign it liability—the resolution afforded by the Settlement Agreement certainly well exceeds the lowest point in the range of reasonableness.

38. The Settlement Agreement also removes any uncertainty of collection because Johnson & Johnson and LLT are jointly and severally liable for the J&J Payment Obligations, and those parties have agreed to pay the J&J Payment Obligations as a condition of the Settlement. Importantly, the Settlement Agreement avoids any cost and delay that would result from a potential, additional LLT chapter 11 filing (or the filing of an affiliated entity).

39. Without the negotiated resolution of the issues embodied in the Settlement Agreement, (a) the Debtors and/or the Trust (if the Plans are confirmed) would be forced to expend significant resources to litigate highly complex and disputed issues of fact and contract interpretation over the Parties' rights and obligations under the J&J Agreements and the J&J Policies and (b) the Debtors would need to continue to engage in litigation with certain J&J Corporate Parties during the course of the Imerys Cases and the Cyprus Case as they seek to confirm their respective Plans. Even if the Debtors or any of the other Parties were successful in litigating their claims against J&J and obtaining confirmation, any judgment or confirmation order would be subject to appeal with no guarantee as to the ultimate outcome or the timeline for obtaining a final order. Such litigation, including any appellate process, would be intense and time-consuming, involve extensive and costly briefing and discovery, and has the potential to significantly delay implementation of the Plans and further extend the duration of the Imerys Cases and the Cyprus Case. Moreover, the Parties' combined legal spend during this protracted litigation process, including J&J's objections to the Plans, would be significant and further forestall the

return of value to the Debtors' creditors. The litigation would drain proceeds from the estates or, if done post-effective date, the Trust, reducing funds available for resolution of claims.

40. The Settlement avoids both the costs and the risk of one or more adverse decisions with respect to such litigation. Importantly, the Settlement resolves the Parties' disputes now and removes the J&J Corporate Parties as objecting parties to the Debtors' Plans, thus saving the costs and expenses of future litigation, while providing significant savings for the Debtors and their estates and economic stakeholders.

41. For similar reasons, the Estate Allocation component of the Settlement also is fair and reasonable and in the best interests of the Cyprus Debtor's estate. As discussed above, the Imerys Debtors assert that the Cyprus Debtor transferred its indemnity rights against J&J to ITA in 1992. The Cyprus Debtor asserts that it has indemnity rights against J&J under the 1989 SPA and 1989 Supply Agreement notwithstanding the position taken by the Imerys Debtors that all such indemnity rights were transferred to the Imerys Debtors. These disputes were raised and are pending in the Cyprus Indemnity Adversary Proceeding. The Estate Allocation settles these disputes in the event that J&J Payment Obligations are received from J&J but the Debtors' plans ultimately do not become effective. Such inter-estate settlement was critical from the Cyprus Debtor's perspective so that the J&J Adversary Proceedings could be resolved completely by the Settlement under any circumstance, and the parties would not need to return at some later time to the negotiating table for a second round of negotiations or, worse, to potentially years of additional litigation, in each case, likely further delaying the resolution of these Chapter 11 Cases for a considerable period of time.

42. In considering the Estate Allocation, I understood that litigation likely would result in an all-or-nothing outcome: either the Cyprus Debtor retained its indemnity rights as part of the

1992 transactions, in which case it would receive 100% of the settlement proceeds associated with those rights, or the Cyprus Debtor sold its indemnity rights to ITA, in which case it would receive 0% of the settlement proceeds associated with those rights. Although the Cyprus Debtor believes in the strengths of its litigation position, I also understand that litigation is inherently unpredictable. Coupled with that uncertainty, I anticipate that any litigation of these issues would take a considerable period of time and be quite expensive. Under these circumstances, I viewed an even split of the J&J Payment Obligations between the Cyprus Debtor's estate and the Imerys Debtors' estates to be a fair and equitable compromise of the parties' disputes.

43. For all of these reasons, the Settlement Agreement is fair and equitable and in the best interests of the Cyprus Debtor's estate given potential litigation outcomes. I am not alone in this view. It is telling and meaningful, given the paramount interests of creditors in the outcome of these disputes, that each of the Claimant Fiduciaries in the Cyprus Case and the Imerys Cases not only supports the Settlement (including the Estate Allocation), but has signed onto the Settlement Agreement.

44. I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information, and belief, and respectfully request that all of the relief requested in the Motion be granted, together with such other and further relief as is appropriate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this  20th  day of September 2024.

                                                 /s/ D. J. Baker
                                                 D. J. (Jan) Baker
                                                 Independent Director
                                                 Cyprus Mines Corporation