## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| IMERYS TALC AMERICA, INC., *et al.,* | Case No. 19-10289 (LSS) |
| Debtors. | Jointly Administered |
| | **Hearing Date:  October 28, 2024 at 10:00 a.m. EDT** |
| | **Objection Deadline:  October 7, 2024 at 4:00 p.m. EDT (extended by agreement)** |

## INSURERS' OBJECTION TO DISCLOSURE STATEMENT FOR SECOND JOINT PLAN OF REORGANIZATION OF IMERYS TALC AMERICA, INC. AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

I.     BACKGROUND ......................................................................................................... 3

    A.   The Debtors Successfully Defended Themselves in the Tort System. ............................... 3

    B.   The Debtors file for bankruptcy........................................................................................ 6

    C.   The TDPs abandon all defenses. ...................................................................................... 8

    D.   The lack of any causation criteria is designed to ensure payment of claims that would not be paid in the tort system. .............................................................................................. 10

II.    OBJECTIONS TO THE DISCLOSURE STATEMENT ...................................... 12

    A.   Legal Standard ................................................................................................................. 12

    B.   Additional disclosures are required regarding the establishment of a single trust to pay Talc Personal Injury Claims asserted against separate debtors. ....................................... 14

    C.   The Basis for the Trust Fund Allocation is not described. ................................................ 15

    D.   The Disclosure Statement does not explain the basis for the "Dual Estate Factor." ........ 16

    E.   The Disclosure Statement does not adequately explain how insurer claims are to be treated. ............................................................................................................................. 17

    F.   The Disclosure Statement should provide additional information regarding Imerys Talc Italy and its potential involvement in these Chapter 11 Cases. ........................................ 20

    G.   The Disclosure Statement lacks adequate claim validation procedures and fails to disclose risks of improper claims...................................................................................................... 22

    H.   The Disclosure Statement does not adequately address the risks that the Plan poses to the recovery of insurance or the scope of possible insurance defenses. ................................. 26

    I.   The Disclosure Statement omits necessary documents. .................................................... 28

        1.   The Liquidation Analysis is not attached.................................................................. 28

        2.   The Feasibility Analysis is also not attached. ........................................................... 29

        3.   The Plan Supplement contains necessary information that must be disclosed prior to solicitation. ............................................................................................................... 30

    J.   The Plan is patently unconfirmable. ................................................................................. 31

        1.   The Plan improperly classifies and treats claims. .................................................... 31

        2.   Debtors cannot receive § 524(g) relief because they are liquidating, not reorganizing.33

            a.   Imerys Talc Vermont's purchase of two Dollar General stores after Debtors liquidated their pre-petition business does not create an "ongoing business." ........ 34

b.   Even if ITV qualifies for § 524(g) protection based on its property acquisitions, ITA and ITC remain ineligible for § 524(g) protection because they are liquidated companies. ................................................................................................ 38

c.   This Court cannot not use § 105(a) to achieve a result that is expressly prohibited by § 524(g). ............................................................................................................. 39

3.   Debtors cannot channel non-asbestos claims to a § 524(g) trust. ................................ 40

4.   The third-party releases provided under the Plan fall outside the scope of § 524(g)'s statutory relationship requirements. .............................................................................. 41

5.   Imerys has no legal or equitable rights in the Insurers' Policies and thus cannot assign them to the Imerys Trust. ............................................................................................. 42

6.   The Plan improperly impairs insurers' rights. ............................................................. 45

7.   The Plan is not the culmination of good faith, arms'-length negotiations among parties with competing interests and therefore violates Section 1129. ..................................... 46

CONCLUSION ..................................................................................................................... 49

# TABLE OF AUTHORITIES

## Cases

*Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*, 107 B.R. 856 (E.D. Pa. .1989), *aff'd,* 908 F.2d 961 (3d Cir. 1990)................................................................................19

*Anderson v. Conine*, 203 F.3d 855 (5th Cir. 2000)........................................................45

*Artiglio v. General Electr. Co.*, 61 Cal. App. 4th 830 (1998) ......................................4

*Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 959 P.2d 1213 (1998).................44

*Berg v. J & J*, Dkt. No. 196, Civ. No. 09-4179-KES (D.S.D. Mar. 25, 2013) ..................4

*Cadagin (Driscoll) v. J & J*, No.18-CV-1821 (Ill. Cir. Ct. St. Clair Cty. July 30, 2021) ...............5

*Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989)...................................................36

*Cissel v. American Home Assur. Co.*, 521 F.2d 790 (6th Cir. 1975), *cert. denied,* 423 U.S. 1074 (1976).......................................................................................................................46

*Clarkson v. Cooke Sales & Serv. Co.*, 767 F.2d 417 (8th Cir. 1985) .............................30

*Coca-Cola Bottling Co. of Shreveport, Inc. v. The Coca-Cola Co.*, 769 F. Supp. 671 (D. Del. 1991), *aff'd,* 988 F.2d 414 (3d Cir. 1992)....................................................................46

*Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co)*, 900 F.3d 126 (3d Cir. 2018)..................... 33, 41

*Cooper Cos. v. Transcontinental Ins. Co*, 31 Cal. App.4th 1094 (1995)...........................44

*Duff v. United States Trustee (In re California Fidelity, Inc.)*, 198 B.R. 567 (9th Cir. B.A.P. 1996) ......................................................................................................................12

*Duvar Apt., Inc. v. FDIC (In re Duvar Apt., Inc.)*, 205 B.R. 196 (9th Cir. B.A.P. 1996) ..............36

*Forrest v. J & J et al.*, Case No. 1522-CC00419-01 (Cir. Ct. of the City of St. Louis, Mo............5

*Giese (Forrest) v. J & J*, No. 1522-CC00419-02 (Mo. Cir. Ct., St. Louis Cty. Sept. 27, 2021) .....5

*Global Industrial Technologies, Inc.*, 645 F.3d 201 (3rd Cir. 2011) ........................... 11, 47

*Grausz v. Sampson*, 63 Fed. Appx. 647 (4th Cir. 2003) ................................................ 35, 37

*In re 641 Associates, Ltd.*, 1993 WL 332646 (E.D. Pa. August 26, 1993).......................46

*In re ACandS, Inc.*, 311 B.R. 36 (Bankr. D. Del. 2004) ..................................................47

*In re Am. Capital Equip., LLC*, 688 F.3d 145 (3d Cir. 2012)........................... 12, 13, 14, 33

*In re AMA Corp.*, 175 B.R. 894 (Bankr. W.D. Va. 1995).................................................36

*In re Amatex Corp.*, 107 B.R. 856 (E.D. Pa. 1989), *aff'd,* 908 F.2d 961 (3d Cir. 1990)................12

*In re American Capital Equipment*, 688 F.3d 145 (3d Cir. 2012)................................... 8, 47

*In re AOV Indus., Inc.*, 792 F.2d 1140 (D.C. Cir. 1986) .................................................32

*In re Berwick Black Cattle Co.*, 394 B.R. 448 (Bankr. C.D. Ill. 2008) ...............................36

*In re Boy Scouts of America*, No. 20-10343 (LSS) (Bankr. D. Del. Sept. 8, 2022).............25, 26, 30

*In re Budd Co.*, 550 B.R. 407 (Bankr. N.D. Ill. 2016)...............................................................13

*In re Cajun Elec. Power Co-op., Inc.*, 230 B.R. 715 (Bankr. M.D. La. 1999) ................................46

*In re Cardinal Congregate I*, 121 B.R. 760 (Bankr. S.D. Ohio 1990) ...............................................13

*In re Chateaugay Corp.*, 1993 WL 563068 (Bankr. S.D.N.Y. 1993)...............................................32

*In re Coburn*, 250 B.R. 401 (Bankr. M.D. Fla. 1999)...................................................................45

*In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004)...........................................................passim

*In re Congoleum Corp.*, 426 F.3d 675 (3d Cir. 2005) .................................................................47

*In re CRIIMI MAE, Inc.*, 251 B.R. 796 (Bankr. D. Md. 2000) ...................................................13

*In re Curtis Ctr. Ltd. P'ship*, 195 B.R. 631 (Bankr. E.D. Pa. 1996)............................................13

*In re DeVeau*, 611 B.R. 484 (Bankr. D. Mass. 2019) ...............................................................44

*In re Diocese of Camden, New Jersey*, No. 20-21257-JNP (Bankr. D.N.J. Aug. 29, 2023)...........25

*In re Durrett*, 139 B.R. 1 (Bankr. D.N.H. 1992) ......................................................................32

*In re Exide Holdings, Inc.*, No. 20-11157, 2021 WL 3145612 (D. Del. July 26, 2021)...................46

*In re Federal-Mogul Global, Inc.*, 411 B.R. 148 (Bankr. D. Del. 2008) ........................................39

*In re Ferretti*, 128 B.R. 16 (Bankr. D.N.H. 1991) ...................................................................13

*In re Flintkote Co.*, 486 B.R. 99 (Bankr. D. Del. 2012) *aff'd*, 526 B.R. 515 (D. Del. 2014) . 33, 34, 35, 38

*In re Forty-Eight Insulations, Inc.*, 149 B.R. 860 (N.D. Ill. 1992) .....................................................44

*In re Gandy*, 299 F.3d 489 (5th Cir. 2002)..............................................................................15

*In re Garlock Sealing Techs., LLC,* 504 B.R. 71 (Bankr. W.D.N.C. 2014) ....................................24

*In re G-I Holdings, Inc.*, 328 B.R. 691 (D.N.J. 2005) ...............................................................33

*In re Gladwell*, 2009 WL 140098 (C.D. Ill. Jan. 21, 2009)........................................................12

*In re Global Ocean Carriers, Ltd.*, 251 B.R. 31 (Bankr. D. Del. 2000) ..........................................21, 28

*In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Litigation,* 509 F. Supp. 3d 116 (D.N.J. Apr. 27, 2020) ...............................................................25

*In re Lason, Inc.*, 300 B.R. 227 (Bankr. D. Del. 2003) ...............................................................28

*In re Lloyd E. Mitchell, Inc.*, 2012 Bankr. LEXIS 5531 (Bankr. D. Md. Nov. 29, 2012)........12, 35

*In re LTL Management,* 64 F.4th 84 (3d Cir. 2023).....................................................................21

*In re LTL Management, LLC*, No. 23-12825-MBK (Bankr. D.N.J. Apr. 24, 2023).......................25

*In re LTL Management, LLC*, No. 23-12825-MBK (Bankr. D.N.J. June 22, 2023) .......................25

*In re Maremont Corp.*, 602 B.R. 1 (Bankr. D. Del. 2019)................................................................33, 37

*In re Maxim Indus., Inc.*, 22 B.R. 611 (Bankr. D. Mass. 1982)................................................36

*In re Parkway Calabasas Ltd.*, 89 B.R. 832 (Bankr. C.D. Cal. 1988) ...............................15

*In re Phoenix Petroleum, Inc.*, 278 B.R. 385 (Bankr. E.D. Pa. 2001)................................12

*In re Plant Insulation Co.*, 734 F.3d 900 (9th Cir. 2013)...................................... 33, 48

*In re Quigley Co.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010) ..............................................48

*In re Quigley Co., Inc.*, 377 B.R. 110 (Bankr. S.D.N.Y. 2007) ...............................13, 32

*In re Rodeo Canon Dev. Corp.*, 362 F.3d 603 (9th Cir. 2004)..........................................45

*In re Scioto Valley Mortgage Co.*, 88 B.R. 168 (Bankr. S.D. Oh. 1988) ...........................29

*In re Unichem Corp.*, 72 B.R. 95 (Bankr. N.D. Ill. 1987)................................................13

*In re Universal Med. Servs., Inc.*, 460 F.2d 524 (3d Cir. 1972) ......................................44

*In re Victory Construction Co.*, 9 B.R. 549 (Bankr. C.D. Cal. 1981), *modified*, 9 B.R. 570,
    *vacated as moot*, 37 B.R. 222 (9th Cir. B.A.P. 1984)............................................36

*In re W.R. Grace & Co.*, 475 B.R. 34 (D. Del. 2012) ...................................... 32, 33

*In re W.R. Grace & Co.*, 729 F.3d 311 (3d Cir. 2013) .............................................48

*In re Washington Mut.*, 442 B.R. 314 (Bankr. D. Del. 2011)...........................................29

*J & J Talcum Powder Cases*, 2017 WL 4325960 (Cal. Super. Los Angeles Cty. Aug. 9, 2017)....4

*Kleiner v. J & J*, No. No. 2:21-cv-03366 (Pa. Common Pleas, Philadelphia Cty. Sept. 24, 2021).5

*Landry v. Exxon Pipeline Co.*, 260 B.R. 769 (Bankr. D. La. 2001)....................................43

*Las Torres Development*, 413 B.R. 687 (Bankr. S.D. Tex. 2009 .......................................15

*Moldo v. Clark*, 266 B.R. 163 (9th Cir. BAP 2001)........................................................45

*Monroe v. J & J*, No. 2018RCSC01222 (Ga. Sup. Ct., Richmond Cty. Oct. 5, 2021) ....................5

*Moody v. Amoco Oil Co.*, 734 F.2d 1200 (7th Cir. 1984), *cert. denied*, 469 U.S. 982 (1984).......46

*Official Comm. Of Unsecured Creditors v. Michelson (In re Michelson)*, 141 B.R. 715 (Bankr.
    E.D. Cal. 1992) ....................................................................................12

*Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d
    414 (3d Cir. 1988)........................................................................ 12, 13

*Pearlman v. Reliance Ins. Co.*, 371 U.S. 132 (1962) .................................................44

*Rand v. Porsche Fin. Servs., Inc.*, 2010 WL 6259960 (9th Cir. B.A.P. Dec. 7, 2010)...................36

*Reider*, 31 F.3d 1102 (11th Cir. 1994) ...............................................................15

*Ryan Ops. G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355 (3d Cir. 1996)...............................12

*Spirtos v. Moreno (In re Spirtos)*, 992 F.2d 1004 (9th Cir. 1993)........................................45

*Spokane Rock I, LLC v. Um, 2015 WL 6684504 (Bankr. W.D. Wash., Sept. 30, 2015) aff'd, 2016
    WL 7714141 (W.D. Wash. Aug. 18, 2016)................................................ 35, 37*

*Swann v. J & J*, Case No. 1422-CC09326-01 (Mo. Cir. 2017) .................................................. 6

*Um v. Spokane Rock I, LLC*, 904 F.3d 815 (9th Cir. 2018) .................................................. 35

Statutes

11 U.S.C. § 105 .................................................. 14

11 U.S.C. § 105(a) .................................................. 39, 40

11 U.S.C. § 109 .................................................. 21

11 U.S.C. § 1122 .................................................. 32

11 U.S.C. § 1122(a) .................................................. 32

11 U.S.C. § 1123(a)(4) .................................................. 32

11 U.S.C. § 1125(a) .................................................. 12

11 U.S.C. § 1125(b) .................................................. 18, 50

11 U.S.C. § 1129 .................................................. 33

11 U.S.C. § 1129(a)(1)-(3) .................................................. 46

11 U.S.C. § 1129(a)(11) .................................................. 29

11 U.S.C. § 1129(a)(3) .................................................. 47

11 U.S.C. § 1129(a)(7) .................................................. 28

11 U.S.C. § 1141 .................................................. 33, 36

11 U.S.C. § 1141(d) .................................................. 33, 37

11 U.S.C. § 1141(d)(3) .................................................. 33, 34, 35, 36

11 U.S.C. § 502(b)(1) .................................................. 10

11 U.S.C. § 524(e) .................................................. 41

11 U.S.C. § 524(g) .................................................. 2, 31

11 U.S.C. § 524(g)(1)(A) .................................................. 33

11 U.S.C. § 524(g)(1)(B) .................................................. 33

11 U.S.C. § 524(g)(4)(A) .................................................. 39

11 U.S.C. § 524(g)(4)(A)(ii) .................................................. 39, 41

11 U.S.C. § 524(g)(4)(A)(ii)(I)-(IV) .................................................. 39

11 U.S.C. § 524(g)(4)(B)(ii) .................................................. 49

11 U.S.C. § 541(d) .................................................. 43

11 U.S.C. § 727(a)(1) .................................................. 33

Other Authorities

140 Cong. Rec. S4521–01, S4523 (Apr. 20, 1994) .................................................. 34

Cara Salvatore, *J&J Gets its First Win in Mo. Talcum Powder Trials*, Law360 (March 3, 2017), *available at* https://www.law360.com/articles/898203/j-j-gets-its-first-win-in-mo-talcum-powder-trials ..................................................................................................................5

Daniel Siegal, *St. Louis Jury Clears J&J For Its 2nd Talc Win In A Week,* LAW 360 (Dec. 23, 2019), *available at* https://www.law360.com/health/articles/1230494/st-louis-jury-clears-j-j-for-its-2nd-talc-win-in-a-week ..................................................................................................................5

The Insurers hereby object to the proposed disclosure statement for Debtors' Revised Second Joint Plan Of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 Of The Bankruptcy Code (the "Disclosure Statement," Dkt. No. 6440).[1]

## INTRODUCTION

The Imerys Debtors (the "Debtors") have been in bankruptcy for over four years.  During that time, they have sold their business, shed all their employees, and paid well over $100 million in professional fees. After doing all this, they turned over development of their claims administration to the claimants, acquiescing to a process designed to use insurance proceeds to pay billions of dollars of claims that would have received no payment outside bankruptcy.

The Debtors previously filed approximately nine amendments to their original proposed plan and solicited votes on their Ninth Amended Joint Chapter 11 Plan (Dkt. No. 2852). More recently, Debtors filed two additional plans in apparent coordination with Cyprus (Dkt. No. 5809 and 6051). Numerous disputes and substantial numbers of dubious claims marred the vote.

---

[1] The "Insurers" joining this objection are Century Indemnity Company, Federal Insurance Company, and Central National Insurance Company of Omaha (collectively, the "Century Insurers"), TIG Insurance Company, International Surplus Lines Insurance Company, Mt. McKinley Insurance Company, Fairmont Premier Insurance Company, Everest Reinsurance Company, and The North River Insurance Company (collectively, the "RiverStone Insurers"), Columbia Casualty Company, Continental Casualty Company, in its own right, and as successor to CNA Casualty of California, The Continental Insurance Company, as successor in interest to certain insurance policies issued by Harbor Insurance Company, Stonewall Insurance Company (now known as Berkshire Hathaway Specialty Insurance Company), National Union Fire Insurance Company of Pittsburgh PA, and Lexington Insurance Company to the extent they issued policies to Cyprus Mines Corporation prior to 1981; and AIU Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, Granite State Insurance Company, The Continental Insurance Company, as successor to The Fidelity and Casualty Company of New York and as successor in interest to certain policies issued by London Guarantee & Accident of New York, and Republic Insurance Company to the extent they issued policies to Standard Oil of Indiana prior to 1986 (collectively, the "RMI Insurers"), Employers Mutual Casualty Company, and Hartford Accident and Indemnity Company and First State Insurance Company.

Ultimately, the Ninth Amended Plan failed to achieve the requisite 75% approval required by § 524(g), and the Debtors did not move forward with a confirmation hearing. Based on the relatively modest changes from the Ninth Amended Plan to the current Revised Second Joint Plan (Dkt. No. 6439, the "Plan")), the Debtors, Cyprus, and the claimants have spent most of the past two years deciding how to split up the proceeds they hope to access through this claim process.

Despite the many previous plans and two years of mediation among Debtors, Cyprus, and their respective TCCs and FCRs, the current Plan fails to comply with the Bankruptcy Code and is designed to pay, in amounts not tethered to Debtors' extremely limited pre-petition claims experience, claims that would not be paid in the tort system. Unsurprisingly, the Disclosure Statement fails to provide critical information and describes a plan marred by many of the same flaws as the Debtors' prior, aborted plans. Like the failed Ninth Amended Plan, the current Plan contemplates a trust to handle both Imerys and Cyprus claims, it contains broad third-party releases of non-debtor parent entities, and it relies on lax trust distribution procedures that will result in enormous inflation of liability compared to the Debtors' tort system experience.

Ultimately, the Disclosure Statement describes a plan that facially fails to comply with the Bankruptcy Code and applicable law. The Insurers have, therefore, devoted considerable space in this brief to addressing some of the many reasons that the Plan is unconfirmable. Although the Insurers are cognizant that such issues are often heard only as objections to confirmation, the Court and parties should not engage in another ill-fated, full-scale confirmation process when the Plan's flaws are obvious. At a minimum, the Court should only approve the Disclosure Statement if changes are made to address significant problems inherent in the Plan.

## I.      BACKGROUND

### A.      The Debtors Successfully Defended Themselves in the Tort System.

Before filing bankruptcy, the Debtors were in the business of mining, processing, selling, and/or distributing talc. Talc is mined from talc deposits, which were geologically formed through the transformation of existing rocks under the effect of hydrothermal fluids carrying one or several of the components needed to form the mineral. There are many types of talc and each ore body has its own features and geology. Accordingly, the mining and processing of talc requires highly technical and specialized knowledge. Talc is used in the manufacturing of dozens of products in a variety of sectors, including coatings, rubber, paper, polymers, cosmetics, food, and pharmaceuticals.[2]

Following the Debtors' acquisition by Imerys S.A. in 2011, they began to be named in suits alleging injuries due to exposure to talc or asbestos in talc. Both the Debtors and Cyprus were broadly successful in defending these claims.[3]   Pre-petition, Imerys had significant success in defending both ovarian cancer claims and mesothelioma claims, winning cases on summary judgment and at trial; 2,823 claims were dismissed in the tort system pre-petition,[4] as opposed to just 74 paid settlements,[5] with no final adverse judgments that withstood appeal. Debtors paid $32 million pre-petition.

---

[2] Disclosure Statement, Dkt. No. 6440, at 29.

[3]   *See*, *e.g.*, Declaration of Imerys CFO Alexandra Picard in Support of Ch. 11 Petitions and First-Day Pleadings, *In re Imerys Talc America*, Dkt. No. 10 (Feb. 13, 2019) at ¶ 37 (describing Imerys' success in defending against talc claims).

[4]   Report of Marc Peterson at Ex. B, attached to Declaration of George Calhoun as Ex. 1.

[5]   Report of Thomas Vasquez Report at 6, Calhoun Decl. at Ex. 2.

In contrast to products that are well-established as containing measurable levels of asbestos or other carcinogens, courts and juries have not regularly determined that the Debtors' product causes, or has caused, any of the injuries alleged by the tort claimants.[6] Of particular significance, the *Fox* and *Ristesund* juries distinguished between J&J and Imerys, rendering defense verdicts in favor of Imerys while awarding plaintiffs' verdicts against J&J.  Thus J&J's adverse litigation results cannot serve as a proxy for estimating Debtors' future liability for ovarian cancer claims. Moreover, J&J has won several recent talc trials, even where plaintiff experts were allowed to testify.

Defenses as to general causation (*e.g.*, lack of scientific evidence that Debtors' talc causes injury) and specific causation (*e.g.*, the claimant did not use talc, or their injuries were due to exposure to asbestos for which a different company was responsible) enabled Imerys to successfully defend against pre-petition talc claims. Even if a claimant could prove general causation, she would still need to prove specific causation, i.e., that *Imerys talc* caused her injuries.

In addition to the significant causation defenses, Imerys also won summary judgments based on the "bulk supplier doctrine,"[7] which shields from liability a company that sells a raw

---

[6] *See e.g., Cadagin v. Johnson & Johnson,* No. 18-L-572 (Ill. Cir. Ct., St. Clair Cty. July 30, 2021) (an Illinois jury ruled in favor of J&J after a three-week trial involving expert testimony presented by both sides, finding that the plaintiff failed to show that J&J talc products caused the plaintiff's decedent's ovarian cancer, which ultimately led to her death); *Kleiner v. Johnson & Johnson Consumer Inc.,* No. 170102505 (Pa. Comm. Pleas, Philadelphia Cty. Sept. 24, 2021) (after a six-week trial, the jury issued a defense verdict for J&J. This was a trial in which the plaintiff's expert evidence was heard by the jury, which apparently disbelieved the plaintiffs' expert and his analysis.).

[7] *Berg v. J & J*, Dkt. No. 196, Civ. No. 09-4179-KES (D.S.D. Mar. 25, 2013) (granting summary judgment to Debtors' predecessor Luzenac based on bulk supplier doctrine); Trial Order, *J & J Talcum Powder Cases*, 2017 WL 4325960 (Cal. Super. Los Angeles Cty. Aug. 9, 2017). *See also Artiglio v. General Electr. Co.*, 61 Cal. App. 4th 830 (1998) (discussing bulk supplier doctrine under California law).

material such as talc that is later included in another company's finished product.[8] The Debtors'

liability is not comparable to *Manville* or any other ubiquitous asbestos defendant because the

Debtors—who were raw material miners and suppliers, not public-facing consumer products

companies—have significant liability defenses that have proven successful, and which the Insurers

would assert on Imerys' behalf to eliminate or reduce liability if afforded their contractual right

and opportunity to defend (as some of the Insurers who provided primary coverage did in

defending Debtors prior to their bankruptcy filings).

J&J, which plaintiffs argue has substantially more liability than Debtors or Cyprus, also

has had significant success defending against tort claims.[9] The Plan Proponents have contended

throughout the case that J&J is obligated to indemnify the Debtors for most of the talc claims

against the Debtors. For its part, J&J contends that its products have never included asbestos and

that Red River Talc filed for bankruptcy due to the large number of filings and increasing defense

costs.[10] Jurors in several other ovarian cancer cases had previously found in J&J's favor in several

cases.[11] J&J achieved defense verdicts against six of the eight plaintiffs whose claims were tried

---

[8] *See* Van Meter Dep. Tr. at 153:19-24 ("Q. And you've gotten summary judgment on the bulk supplier doctrine in some jurisdictions; correct? A. Yes, we have. I think of that as both bulk supplier and sophisticated user defenses, which are somewhat related. So yes.").

[9] *See supra* n. 7; *see also Monroe v. J & J*, No. 2018RCSC01222 (Ga. Sup. Ct., Richmond Cty. Oct. 5, 2021); *Giese (Forrest) v. J & J*, No. 1522-CC00419-02 (Mo. Cir. Ct., St. Louis Cty. Sept. 27, 2021); *Kleiner v. J & J*, No. No. 2:21-cv-03366 (Pa. Common Pleas, Philadelphia Cty. Sept. 24, 2021); *Cadagin (Driscoll) v. J & J*, No.18-CV-1821 (Ill. Cir. Ct. St. Clair Cty. July 30, 2021).

[10] *See In re Red River Talc, LLC*, S.D.Tx. Bankr., Case No. 24-90505, Dkt. No. 3 at 6-7.

[11] *See* Daniel Siegal, *St. Louis Jury Clears J&J For Its 2nd Talc Win In A Week,* LAW 360 (Dec. 23, 2019), *available at* https://www.law360.com/health/articles/1230494/st-louis-jury-clears-j-j-for-its-2nd-talc-win-in-a-week (reporting on J&J defense verdict in *Forrest v. J & J et al.*, Case No. 1522-CC00419-01 (Cir. Ct. of the City of St. Louis, Mo.)); Cara Salvatore, *J&J Gets its First Win in Mo. Talcum Powder Trials*, Law360 (March 3, 2017), *available at* https://www.law360.com/articles/898203/j-j-gets-its-first-win-in-mo-talcum-powder-trials) (reporting on defense verdict for J&J and Imerys in *Swann v. J & J*, Case No. 1422-CC09326-01 (Mo. Cir. 2017); Brendan Pierson, *Latest J&J talc trial ends with hung jury*, Reuters, available at

by a jury between January 1, 2021 and October 14, 2021. All the ovarian cancer plaintiff verdicts against J&J were reversed on appeal except *Ingham*.[12] J&J also achieved significant successes reversing a $117 million mesothelioma verdict (*Lanzo*, New Jersey) and a $417 million ovarian cancer verdict (*Echeverria*, California).[13] Most recently, J&J successfully obtained reversal of a large verdict in Oregon.[14]

**B.    The Debtors file for bankruptcy.**

Despite successfully defending and managing tort claims in the past, the Imerys Debtors filed for bankruptcy on February 13, 2019.  Following the bankruptcy filing, the Debtors proceeded to liquidate by selling substantially all their assets. Specifically, on November 17, 2020, the Bankruptcy Court approved the sale of substantially all of the Imerys Debtors' assets to Magris Resources Canada Inc. ("Magris") for a total of $223 million in cash plus the assumption of certain additional liabilities.[15] The Debtors have since used those funds to pay for the administration of the case, with professional fees exceeding $100 million.

Between 2019 and 2021, the Debtors proposed multiple plans and ultimately sought confirmation of its Ninth Amended Plan in 2021. After a lengthy and flawed voting process, the Bankruptcy Court issued an opinion on October 13, 2021 (Dkt. No. 4239) specifying that

---

https://www.reuters.com/legal/latest-jj-talc-trial-ends-with-hung-jury-2024-03-05/    (discussing March 2024 mistrial in an ovarian cancer case against J&J, the first ovarian cancer case to reach a jury since LTL's bankruptcy filing).

[12]  *See* Info. Br. of LTL Mgmt, LLC, Dkt. No. 3, Case No. 21-30589 (*In re LTL Management LLC*, Bankr. W.D.N.C.) at 116.

[13] *Id.* at 116-17.

[14] *See* Reuters, *J&J gets $260 million talc verdict overturned in Oregon, new trial ordered*, available at https://www.reuters.com/legal/jj-gets-260-mln-talc-verdict-overturned-oregon-new-trial-ordered-2024-09-16/

[15] Discl. Statement. at 29.

numerous votes that had been cast would not count due to irregularities in those votes.[16] As a result, the Debtors failed to obtain the necessary votes for confirmation and did not proceed with a hearing. Since that time, for nearly three years, the Debtors have engaged in mediation with the claimant constituencies, Cyprus, and the Cyprus claimant representatives. Although the Debtors and Cyprus participated in the lengthy mediations following the withdrawal of the Ninth Amended Plan, every indication is that the trust distribution procedures and allocations of funds were decided exclusively among the plaintiff groups. The Debtors elected not to participate in, and the Insurers were excluded entirely from, any discussions concerning the TDPs or the criteria for allowing and liquidating Direct Talc Personal Injury Claims. The result of having the plaintiffs decide how their own claims will be evaluated is a predictable massive inflation in the Debtors' forecasted liability.

On July 13, 2024, the Debtors filed a motion seeking approval of a settlement with Johnson & Johnson (Dkt. No. 6376).  Pursuant to that agreement, J&J agreed to pay the Imerys and Cyprus estates at least $505 million.  In exchange, the Debtors released their indemnity claims against J&J, which they previously represented were uncapped.  Moreover, pursuant to the settlement, the Debtors cannot recover from any insurers for any "J&J Claim." Therefore, talc claims alleging liability based on exposure to J&J products, which constitute substantially all of the historic liability of the Debtors, may only recover from estate assets and cannot be paid by insurers.  The Debtors – and the Cyprus debtor – have contended that non-J&J claims will nonetheless be of sufficient volume to exhaust all potentially applicable insurance. Indeed, as discussed further below, the TDP appear designed to allow just that.  Despite the significance of Debtors' agreement

---

[16] As detailed in Insurers' objection to the solicitation procedures, claimants' lawyers voted their "inventories" which resulted in tens of thousands of votes being cast without the knowledge of individual claimants and where many of those claimants had no cognizable claim against the Debtors.

to not seek coverage for any liabilities attributable to J&J Talc Claims, the TDPs have no procedures to identify non-J&J Talc claims or to apportion liability between J&J Talc Claims and non-J&J Talc Claims.

Ultimately, the result of the past three years is a plan marred by obvious flaws and shortcomings that fundamentally represents a bargain in which Imerys has acceded to the demands of claimants so that it can obtain otherwise unavailable relief for its non-debtor parent company and affiliates.[17]

### C.      The TDPs abandon all defenses.

From the Insurers' perspective, the Plan's central failing concerns the total abdication of rigor with respect to claim evaluation. Despite the Debtors' success in defending claims in the tort system and the undeveloped nature of the alleged tort, the TCC's and FCR's experts estimate that the Trust's liability for talc claims will be between $16 billion and $160 billion.[18] These figures are, inexplicably, multiples of the amounts that J&J proposes to pay under the *Red River* plan, which it asserts has the support of 83% of the more than 80,000 claimants who voted on the plan.

This massive explosion in forecasted liability is due to the fact that the trust distribution procedures abandon all defenses previously successfully asserted by Debtors in the tort system and do not allow the Trustee, J&J, the Insurers, or anyone else to assert them.  In fact, the Plan Proponents in this case *agreed* that—for at least some cases—the prior TDPs would pay invalid

---

[17] At the confirmation stage (if it is reached), Insurers intend to argue that the Plan was not proposed in good faith. A plan that manufactures liability and sabotages potential defenses, causing insurers to pay significantly more than they would have paid in the tort system, is not proposed in good faith.  *See In re American Capital Equipment*, 688 F.3d 145 (3d Cir. 2012).

[18] Peterson Expert Report at 28; Vasquez Report at 4-6; Report of David Terrell Report at 6, 10, Calhoun Decl. Ex. 3. The claiming behavior would see a similar explosion in number of claims, from 16,653 claims pre-petition to an estimated range of between 50,528 and 923,800 additional claims under the Trust.  Peterson Report at 11, 15; Vasquez Report at 4, 6.

claims that insurers will have no opportunity to contest.[19] Nor, as TCC 30(b)(6) designee Steve

Baron testified at his 2021 deposition, was the Trust (or anyone else) permitted to deny a claim

based on one of Imerys' strongest defenses, the bulk supplier doctrine:

> Q:  Mr. Baron, do you know if there is a provision in the TDP that
> would allow the trust to deny a claim based on the bulk supplier
> doctrine?
>
> BARON:  If that were the whole reason for the denial of the claim,
> I am not aware of a provision that would make that an appropriate
> denial.[20]

The FCR, James Patton, likewise testified that no provision in the prior TDPs would allow

the Trust to deny a claim based on any of the Debtors' liability defenses, including lack of

causation or the bulk supplier doctrine.[21] If a claimant shows a qualifying diagnosis of ovarian

cancer, for example, and alleges sufficient "Personal Use Exposure" to an Imerys product, then

the Trust must liquidate the claim for the scheduled value without any proof of medical causation.[22]

The same is true now.  If anything, the current TDPs are even more permissive.

This is true even though, as acknowledged by the claimants' representatives in this case,

liability for talc exposure is an immature tort. As recently as March 28, 2024, the court overseeing

the J&J Talc MDL, entered an order recognizing "the emergence of new relevant science" and

---

[19] *See Official Committee of Tort Claimants' Objection to J&J's Motion Pursuant to 11 U.S.C. § 1126(e)* [Dkt. No. 4079] at 23 n. 12 ("even if J&J has identified issues that might defeat a hand-picked group of individual claims pursued in the tort system, there would be no bar to recovery from the Trust, based on the TDPs.").

[20] Baron Dep. Tr. at 682:16-21, Calhoun Decl. Ex. 4.

[21] *See* Patton Dep. Tr. at 350:19-351:4, Calhoun Decl. Ex. 5.

[22] *See* TDP § 5.2(a)(ii) ("If the Trust determines that a claim meets the Medical/Exposure Criteria for a claim category eligible for the Expedited Review Process, the Trust shall tender to the claimant an offer of payment equal to the Scheduled Value for such disease set forth in Section 5.2(a)(iii) below, subject to the applicable Payment Percentage in accordance with Section 4.3."). The Personal Use Exposure requirement for Ovarian Cancer claims requires an allegation of three years of talc exposure, which need not be continuous or consecutive.  *See* TDP §1.86.

ordered the re-filing of *Daubert* motions concerning the admissibility of plaintiffs' expert witness testimony. The outcome of that process (if not mooted by the Red River Talc bankruptcy and prepackaged plan) could cause seismic shifts in the talc landscape but are totally unaccounted for in the Plan now before the Court.

The lack of scrutiny that the trust process provides, combined with the TDPs surrendering meritorious pre-petition defenses, give the Trust a broad mandate to allow and pay invalid claims in direct contravention of the Bankruptcy Code's requirement that the court disallow claims that are "unenforceable against the debtor … under … applicable law."[23]

### D. The lack of any causation criteria is designed to ensure payment of claims that would not be paid in the tort system.

Taken together, the lack of rigorous criteria for validating the Direct Talc Personal Injury Claims and the Plan's abrogation of the insurers' rights to defend and resolve those Claims or be involved in negotiating the TDPs make clear that the Plan has been designed to create an unequivocal and impactful spike in the value of Direct Talc Personal Injury Claims against the Trust. And the Plan Proponents' own experts estimate that the lax allowance procedures that the prior TDPs created will result in payment of between 75% and 100% of claim submissions—even though dismissals far outnumbered case settlements before the petition date.[24] The lack of any scrutiny of alleged exposure "evidence" would render nearly any alleged qualifying injury

---

[23] *See* 11 U.S.C. § 502(b)(1).

[24] *See* Peterson Initial Report at 15-16 ("Our forecasts presume that claimants have ovarian cancer and we expect a relatively high likelihood of establishing exposure to Johnson & Johnson or other products with Imerys talcs because of, among other things, the widespread proliferation of cosmetic talc products; the longstanding use of Johnson & Johnson products.."); Vasquez Report at 11, 15 (Generally, the percent of claims filed and paid is assumed to hold true in the future. However, Imerys has limited pre-bankruptcy experience … we do not believe the 10% level holds into the future … we believe it is reasonable to assume up to 70% of the individuals contracting ovarian cancer will file against the Trust.") ("We believe that up to 70% of individuals with mesothelioma will file claims against the Trust."). Calhoun Decl. Ex. 6.

compensable under the TDPs at hundreds of thousands of dollars per claim.

Another critical flaw in the Plan and TDP is that there are no guidelines for the identification of non-J&J Claims. Because Debtors have waived any right to recover from their insurers for J&J Talc Claims, the claimants have significant incentive to characterize their claims in these bankruptcies as arising from any cause other than J&J products. Nonetheless, all of Imerys' liability in the tort system was from J&J products and the Debtors' own Disclosure Statement supports the fact that effectively all of the claims allege at least some J&J exposure. Yet the TDPs do not provide for any mechanism – or even trustee discretion – to test the claims with respect to the cause of the alleged injuries. Thus, it seems likely that the trust will be besieged by tens of thousands of claims alleging non-J&J exposure, despite the fact that few such claims have materialized in the tort system to date, and the trust will simply pay those claims and then seek coverage for them. The result will be the Insurers are asked to pay claims that do not exist in the tort system.

The TDPs are designed to multiply Debtors' putative liability by orders of magnitude. The Third Circuit in *GIT* made clear that the kind of deal central to this Plan—in which a debtor obtains protection for itself in return for allowing plaintiffs' lawyers to craft procedures designed to pay invalid and inflated claims and send insurers the bill—is anathema to "the integrity of the bankruptcy proceeding."[25] As in *GIT*, where the silica claims were of dubious validity due to the manner in which they were diagnosed,[26] the Plan and TDP here attempt to bypass—or ignore entirely—the rights of Insurers to take steps to minimize the liability that they are being asked to

---

[25] *In re Global Industrial Technologies, Inc.*, 645 F.3d 201, 214 (3rd Cir. 2011) ("*GIT*").
[26] *See id.* at 213-14.

pay by requiring that dubious claims be tested in the tort system. The Court cannot confirm a Plan that impermissibly modifies or limits the Insurers' rights in this manner.[27]

## ARGUMENT

## II.    OBJECTIONS TO THE DISCLOSURE STATEMENT

### A.    Legal Standard

Section 1125(b) of the Bankruptcy Code requires that a disclosure statement contain "adequate information," which the Code defines as "information of a kind, and in sufficient detail . . . that would enable a hypothetical investor of the relevant class to make an informed judgment about the plan."[28]  The provision of adequate information in a disclosure statement is a key requirement of the Bankruptcy Code.[29]  Plan proponents bear the burden of establishing that their disclosure statement contains adequate information.[30]

The purpose of a disclosure statement "is to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of a plan."[31]

---

[27] *See In re Gladwell*, 2009 WL 140098, * 2 (C.D. Ill. Jan. 21, 2009) ("The owner of an insurance policy cannot obtain greater rights to the proceeds of that policy merely by filing a bankruptcy petition").  "[T]he rights and obligations of the Debtor and [its insurer] under the [insurance] policy are not altered because of the Debtor's Chapter 11 filing." *In re Amatex Corp.*, 107 B.R. 856, 865-66 (E.D. Pa. 1989), *aff'd*, 908 F.2d 961 (3d Cir. 1990).  *See also In re Lloyd E. Mitchell, Inc.*, 2012 Bankr. LEXIS 5531, at *20 (Bankr. D. Md. Nov. 29, 2012) ("insurance contracts cannot be re-written" in bankruptcy).

[28]  11 U.S.C. § 1125(a).

[29]   *See, e.g., Ryan Ops. G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996), citing *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414 (3d Cir. 1988).

[30]   *In re Am. Capital Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012) ("The debtor has the burden of proving that a disclosure statement is adequate"); *Official Comm. Of Unsecured Creditors v. Michelson (In re Michelson)*, 141 B.R. 715, 720 (Bankr. E.D. Cal. 1992).

[31]   *Duff v. United States Trustee (In re California Fidelity, Inc.)*, 198 B.R. 567, 571 (9th Cir. B.A.P. 1996).  *See also In re Phoenix Petroleum, Inc.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001) ("the general purpose of a disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the

Therefore, "[a] proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."[32]  A debtor's obligation to file a disclosure statement containing "candid disclosure" is a "pivotal" and "critical step" in a Chapter 11 reorganization:

> The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court.  Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of "adequate information."[33]

The disclosure statement is meant to function as the means by which creditors are provided with "all pertinent information bearing on the success or failure of the proposals in the plan of reorganization," and "should contain [ ] all material information relating to the risks posed to creditors and equity interest holders under the proposed plan of reorganization."[34]

A disclosure statement that describes a plan that is unconfirmable should not be approved. *See In re Am. Cap. Equip., LLC,* 688 F.3d 145, 154-55 (3d Cir. 2012) ("if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage. . . .  The debtor has the burden of proving that a disclosure statement is adequate, including showing that the plan is confirmable" (internal quotation marks and citations omitted)).[35]  A plan is "patently unconfirmable where (1) confirmation defects cannot be overcome by creditor voting results, and (2) those defects concern matters upon which all

---

proposed plan and determine whether to vote in favor of or against that plan."); *In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987) (same).
[32]  *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).
[33]  *In re Oneida Motor Freight, Inc.*, 848 F.2d at 417.
[34] *In re Budd Co.*, 550 B.R. 407, 412 (Bankr. N.D. Ill. 2016), quoting *In re Cardinal Congregate I*, 121 B.R. 760, 765-66 (Bankr. S.D. Ohio 1990) (citations and internal quotation marks omitted).
[35] *See also In re Quigley Co., Inc.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007); *In re CRIIMI MAE, Inc.*, 251 B.R. 796, 799 (Bankr. D. Md. 2000); *In re Curtis Ctr. Ltd. P'ship*, 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996).

material facts are not in dispute or have been fully developed at the disclosure statement hearing." *Id.* at 154-55 (cleaned up).

> **B.    Additional disclosures are required regarding the establishment of a single trust to pay Talc Personal Injury Claims asserted against separate debtors.**

The Disclosure Statement does not explain how a single Trust can be established under § 524(g) in the Debtors' cases to pay claims against both the Debtors and Cyprus, an unaffiliated corporate debtor in its own separate bankruptcy case. To the extent that Cyprus' liability is derivative of the Imerys Debtors' liability, then full channeling injunction protection should be available to Cyprus in the *Imerys* case. To the extent that Cyprus is seeking to gain protection against independent liabilities that are not derivative of Imerys' liability, those liabilities should be resolved in Cyprus' separate Chapter 11 case. The Disclosure Statement should also discuss whether any other Chapter 11 plan has ever channeled one debtor's liabilities to the 524(g) or 105 trust of an unaffiliated debtor and not provided for separate handling of such claims. The Insurers are aware of no such plan.

The Plans propose to fund the Trust with contributions by both the Imerys Debtors and Cyprus (along with third-party settlement funds).[36] The Trust Assets will then be divided between two sub-funds (Fund A to pay OC Claims and Fund B to pay Mesothelioma and Lung Cancer Claims).[37] Under the TDPs, there is no mechanism to pay Cyprus Talc Personal Injury Claims just with Cyprus assets, or to pay Imerys Talc Personal Injury Claims just with Imerys assets. Rather, all OC Claims will be paid from Fund A, and all Mesothelioma Claims and Lung Cancer Claims will be paid from Fund B.

---

[36]  TDPs, § 1.3.152 (definition of "Trust Assets").
[37]  *Id.*, § 2.2.

By combining the assets of separate debtors to pay liabilities owed by these separate debtors, the plans appear to be effectuating a substantive consolidation of the Debtors and Cyprus.[38] Substantive consolidation has been described as "substitut[ing] a single debtor, a single estate with a common fund of assets, and a single body of creditors."[39] A bankruptcy court may order substantive consolidation under § 105(a), and "in appropriate circumstances," may "order less than substantive consolidation," or impose conditions or limitations on substantive consolidation.[40] Given that the Disclosure Statement specifically states that Debtors' plan is ***not*** effecting a substantive consolidation among the Debtors, it cannot be the case that the separate Imerys and Cyprus plans are effecting a substantive consolidation of all the Imerys Debtors with Cyprus. The Disclosure Statement should explain whether the Debtors intend to create a substantive consolidation, and if so, why such "an extreme and unusual remedy" is justified on the facts of this case.[41] The lack of clarity and disclosure on this point renders the Disclosure Statement insufficient. The Plan also appears to be patently unconfirmable for this reason.

### C.      The Basis for the Trust Fund Allocation is not described.

The Disclosure Statement contains a complicated split of assets between Fund A and Fund B, which are to evaluate and pay different types of disease claims.[42] The Disclosure Statement sets forth no rationale for this division. It simply says that the committees and FCRs agreed to it. No effort is made to justify it based on the various debtors' historical claims experiences. Nor is there any disclosure concerning how the split will impact claimants' recoveries.   The Disclosure

---

[38]   *See Las Torres Development*, 413 B.R. at 693 ("substantive consolidation entails combining the assets and liabilities of separate and distinct entities into a single pool and treating those assets and liabilities as if they belong to one entity").

[39]   *In re Parkway Calabasas Ltd.*, 89 B.R. 832, 837 (Bankr. C.D. Cal. 1988).

[40]   *Id.*

[41]   *In re Gandy*, 299 F.3d 489, 499 (5th Cir. 2002).  *See also Reider*, 31 F.3d 11-at 1109 (the proponent of substantive consolidation bears an "exacting" burden).

[42]   Disclosure Statement at § 8.1(d)(3), p. 151 ("Trust Fund Allocation").

Statement does not contend that this allocation is intended to ensure that tort claimants are paid a similar percentage of their claims. To the contrary, the Plan appears to contemplate that different payment percentages will apply to claimants channeled to these separate funds.[43] This arbitrary division of assets appears to create roadblocks to confirmation.

The division of the sub-fund assets is significant to the Insurers and other claimants for several reasons. First, insurance pays specific covered claims. Uninsured claims are not eligible for reimbursement from insurance, but the proposed allocation simply proposes to split insurance recoveries without regard to the actual claims allowed, their value, or whether such claims are covered. Similarly, the Debtors propose to divide proceeds from the J&J Settlement between the two sub-funds without regard to which claims are entitled to indemnity or whether insurers are entitled to such funds pursuant to their subrogation rights. Second, upon payment, insurers would be subrogated to the rights of their insureds, meaning the Insurers would have rights to recover under the Debtors' indemnity rights (to the extent not already released). The Debtors should explain the basis for the allocation of assets and how that allocation complies with the Bankruptcy Code.[44]

### D.    The Disclosure Statement does not explain the basis for the "Dual Estate Factor."

Section 8.1(d)(6) of the Disclosure Statement explains that claimants with claims against both Cyprus and Debtors will be entitled to a "Dual Estate Factor, which multiplies the applicable Payment Percentage for any Imerys-Cyprus Talc Personal Injury Claim by 1.45."[45] This multiplier was introduced in the latest versions of the Debtors' many plans and was proposed by the Cyprus

---

[43] *See* TDP at § 4.2, p. 33 (discussing payment percentage for "each Fund").

[44] As set forth below, this improper classification and treatment scheme renders the Plan patently unconfirmable.

[45] *Id.* at §8.1(d)(6), p. 152-53.

FCR. The alleged rationale for the multiplier is that holders of claims against Cyprus *all* also hold claims against Imerys.[46] The Disclosure Statement states that the Cyprus FCR conducted an analysis of several factors to reach this number, but they apparently failed to consider actual tort system experience. In practice, no claimants received payment from both Imerys and Cyprus.[47] To the contrary, Imerys defended the claims prior to its petition and almost all claims in the tort system were also filed against J&J and its settlements also required the dismissal of Imerys and Cyprus.

Moreover, Insurers' coverage terminated in 1986, long before Cyprus sold its talc business to predecessors of Imerys. Although a claimant has the right under tort law to pursue recovery from both Cyprus (which mined talc during the policy periods of the Insurers' coverage) and Debtors (as the subsequent owner of the talc business that had been owned by Cyprus), a claimant is only entitled under fundamental principles of tort law to a single recovery. There is no legal or factual justification to recover 1.45 times the amount of a claim. The "Dual Estate Factor" therefore appears to be a pretext for (further) inflating the values of the tort claims. The Disclosure Statement should explain why a claimant is entitled to a 1.45x multiplier on claims just because he or she purports to assert the same claim against a shared asset pool contributed by two different entities.

### E.    The Disclosure Statement does not adequately explain how insurer claims are to be treated.

The Disclosure Statement does not adequately describe how Indirect Claims and other insurer claims will be treated. Section 7.2(e) of the Disclosure Statement states that Indirect Personal Injury Claims are channeled to the trust but says nothing about their treatment. In contrast, it says that Direct Talc Personal Injury Claims "shall thereafter be resolved in accordance with the Trust Distribution Procedures." But the TDPs themselves lack key information needed for holders

---

[46] *Id.*
[47] *See, e.g.,* Cyprus Disclosure Statement, Cyprus Dkt. No. 2133, at 25 (describing Imerys defense of Cyprus claims and Cyprus' lack of historic liability in the tort system).

of Indirect Talc Personal Injury Claims to assess their treatment under the Plan, such as procedures for payment of Indirect Claims resulting from settlements, as well as the forms required to submit an Indirect Claim.[48] This makes the TDPs essentially nothing more than a meaningless placeholder for insurer claims.

The Disclosure Statement fails to provide any information about the treatment under the TDPs of Indirect Talc Personal Injury Claims (and certainly no plain language explanation). For example, § 5.4 of the TDPs advises that procedures for handling Indirect Talc Personal Injury Claims will be developed at some future time:

> Indirect Talc Personal Injury Claims that have not been disallowed, discharged, or otherwise resolved by Final Order shall be processed in accordance with procedures to be developed and implemented by the Trustees consistent with the provisions of this Section 5.4, which procedures (a) shall determine the validity, allowability and enforceability of such claims, and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the Trust would have afforded the holders of the underlying valid Talc Personal Injury Claims.[49]

Under this provision, holders of Indirect Talc Personal Injury Claims cannot begin to determine how their claims will be treated under the Plan. Coupled with the absence of any supplemental or explanatory information in the Disclosure Statement regarding the TDPs generally, this constitutes a tremendous information gap that bars approval of the Disclosure Statement.

Section 5.4 goes on to assert that "[t]he Trustees ***may develop and approve*** a separate claim form for Indirect Claimants with the consent of the TAC and FCR."[50] In other words, the forms that Indirect Claimants will be required to submit in order to receive payment from the Trust have not yet been drafted. This leaves Indirect Claimants, including Insurers, completely in the dark regarding what they would need to submit to be paid under the Plan.  As a result, the Disclosure

---

[48] *See* TDPs, Dkt. No. 5995-1.
[49] TDPs, § 5.4, p. 57 (emphasis added).
[50] *Id.* (emphasis added.)

Statement fails to provide holders of Class 4 claims such as Insurers with "adequate information" as required by § 1125(b).

This problem is even worse with respect to insurer claims that do not pertain to the direct resolution of underlying claims. Insurers also have claims pertaining to the payment or nonpayment of deductible and self-insured retention amounts. The Disclosure Statement, at p. 135, states that:

> The Talc Personal Injury Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the Effective Date arising from or associated with any legal action or other proceeding which is the subject of Article IV of the Plan and shall pay or reimburse all deductibles, self-insured retentions, retrospective premium adjustments, or other charges (not constituting Indirect Talc Personal Injury Claims) which may arise from the receipt of any insurance proceeds by the Talc Personal Injury Trust.

This language does not indicate whether SIRs and deductibles are being treated as Indirect Claims or whether the Trust is obligated to pay them in full. Any failure to pay an SIR in full would threaten coverage under the policies.[51] Absent a clear disclosure that insurance coverage for Abuse Claims will be reduced or negated by Debtors' (or the Trust's) failure to satisfy applicable SIRs, Abuse Claimants could be falsely lulled into accepting a Plan that may provide little or no benefit to them. The Disclosure Statement should explain (i) exactly what obligations the Plan Proponents propose to have assumed by the Trust under the various insurance policies and (ii) which obligations they propose to treat as Indirect Claims.

---

[51] SIRs function as conditions precedent to coverage; an insured must satisfy, or pay, the full amount of an SIR as a pre-condition to accessing coverage sitting above SIRs. *See, e.g., Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*, 107 B.R. 856, 872 (E.D. Pa. .1989), *aff'd,* 908 F.2d 961 (3d Cir. 1990) (table) (debtor must exhaust "self-insured retention limit and must seek indemnification from its primary insurance policies before looking to Stonewall for indemnification").

**F.      The Disclosure Statement should provide additional information regarding Imerys Talc Italy and its potential involvement in these Chapter 11 Cases.**

The Debtors should explain why the Plan involves a potential bankruptcy filing by Imerys Talc Italy S.P.A. ("ITI"), what benefits (if any) such a bankruptcy filing provides for claimants, and the risk that the Plan will fail if the Court were to conclude at a future date that ITI is not a proper debtor because it is not in financial distress and, even if it is, that channeling injunction protection for the current three Debtors cannot be based on a separate bankruptcy filing by ITI.[52]

The Plan provides that if Class 4 approves the Plan, ITI will file a Chapter 11 case. In that event, the legal, equitable, and contractual rights of the holders of Unsecured Claims against ITI (Class 3b) would be unaltered. Holders of Class 3b claims would not vote and they would be presumed to accept the Plan.[53] In addition, all Equity Interests in ITI would be "reinstated" and would remain "unaltered to the extent necessary to implement the Plan." *Id.* at § 7.2(j), p. 105. The Disclosure Statement says that "ITI's reorganization will have a minimal effect on ITI." *Id.* at § 5.11, p. 83.

The ostensible reason for ITI to file a Chapter 11 case "is to address its talc-related liabilities." *Id.* But it appears that ITI has not ever been held liable for anything related to talc, nor has it ever entered into a talc-related settlement. Rather ITI's "talc-related liabilities" apparently consist of eight mesothelioma lawsuits filed by a single law firm, which agreed years ago to dismiss all eight suits "in light of the potential chapter 11 filing of ITI contemplated under the proposed plan." *Id*. at § 3.3(c), p. 37-38. It appears that ITI has never been sued for causing a plaintiff's ovarian cancer.

This story leaves much untold. Specifically: Why is ITI, which has never paid a single talc-

---

[52] As set forth below, the ITI provisions appear to render the Plan patently unconfirmable.
[53] Plan § 3.3. *See also* Disclosure Statement at § 7.2(d), p. 109.

related personal injury claim, contemplating bankruptcy in the United States to address eight dismissed lawsuits? Why is it waiting to file its Chapter 11 case until after the Plan is voted on – it is because it really has no need to "reorganize"?  What was the status of the eight lawsuits before they were dismissed? Did ITI ever ship talc to the United States?  If so, when did it do so, and in what quantities? Why were the eight lawsuits dismissed rather than pursued? Did some or all of the plaintiffs in the eight lawsuits settle with J&J and release their claims against ITI in connection with such settlements? Perhaps most importantly, is ITI in financial distress due to these eight dismissed lawsuits?[54] If not, it lacks a good faith basis to file a bankruptcy.[55] That is especially true for a debtor who, as discussed below, does not appear to have any assets or business in the United States.[56]

---

[54]  The Disclosure Statement identifies multiple assets of ITI, and states that it has positive cash flow, but identifies no liabilities other than the dismissed talc lawsuits.

[55]  *See In re LTL Management,* 64 F.4th 84 (3d Cir. 2023) ("Because LTL was not in financial distress, it cannot show its petition served a valid bankruptcy purpose and was filed in good faith under Code § 1112(b)").

[56]  It appears from the Disclosure Statement that ITI may not be eligible to be a debtor under Bankruptcy Code § 109 because ITI does not reside or have a domicile, a place of business, or property in the United States. The Disclosure Statement suggests that ITI is an Italian company with its place of business in the Piedmont region of Italy with bank accounts located in Italy. *See* Disclosure Statement at 33.  In fact, "ITI operates under a separate cash management system from the North American Debtors" pursuant to which "all funds generated from ITI's operations are retained in ITI's bank accounts." *Id.* at 35. The Debtors state that ITI is eligible to be a debtor because it has retainers with professionals in the United States. Disclosure Statement at § 3.3(c), n. 59, p. 37.  Even if this met the literal wording of § 109, it strongly suggests a lack of good faith. If sending money to a U.S. attorney is sufficient to establish standing as a U.S. debtor, every company in the world may file for bankruptcy through the simple expediency of hiring a U.S. lawyer.  No Third Circuit decision addresses whether payment of a retainer to a lawyer satisfies the requirements of § 109(a).  Nor does any decision by a district court in Delaware.  A quarter-century ago, Judge Walrath in *In re Global Ocean Carriers*, 251 B.R. 31, 39 (Bankr. D. Del. 2000), held that payment of a retainer to counsel was sufficient to meet the requirements of § 109.  But there is little reason to think that the Third Circuit would adopt a rule that essentially nullifies § 109(a).  The Disclosure Statement should also disclose the risks to the Plan and to claimants if the Court were to conclude that ITI, in fact, is not eligible to be a debtor.

We believe the reason ITI is contemplating a Chapter 11 filing is that the existing Debtors are liquidating rather than reorganizing, but the supplemental channeling injunction sought by the Debtors under § 524(g) requires that a plan of reorganization be confirmed. Thus, ITI would file its case as a pretext so that it can "reorganize" (although the Plan provides that all of its non-talc unsecured claims are unimpaired, as are the equity interests in ITI). Debtors are gambling that ITI's "reorganization" will provide a sufficient basis for issuance of a § 524(g) channeling injunction in favor of the three current Debtors and all their affiliated companies. That is a gambit that, to Insurers' knowledge, has not previously been tried. It is not clear whether a bankruptcy court can issue a § 524(g) injunction to three liquidating debtors and a fourth affiliated debtor whose entire asbestos litigation history consists of just eight lawsuits, all of which were dismissed without payment, and whose "reorganization" consists merely of allowing the claimants who dismissed those eight lawsuits potentially to have access to a trust that categorically will not pay claims against the foreign debtor.

The Disclosure Statement should be candid about the reasons for ITI's contemplated Chapter 11 filing, the limited nature of its purported "liability" for asbestos claims, the novelty of the gambit being attempted here, the possibility that objections might be lodged (for example, on the grounds that the requirements of § 524(g) are not met, or that a Plan structured in such a fashion cannot satisfy the good faith requirement for confirmation), and the risks that the Court might not confirm a Plan that seeks to premise § 524(g) relief on such attenuated facts.

### G.    The Disclosure Statement lacks adequate claim validation procedures and fails to disclose risks of improper claims.

The Disclosure Statement also lacks sufficient information because it fails to identify what steps, if any, the Plan Proponents or the proposed Trust will take to ensure that only valid claims are paid and that the Trust does not dilute recoveries for valid claim holders by paying illegitimate

claims. The funds that are available to the Trust are limited. Because the Plan contemplates that payments from the Trust will be subject to a payment percentage, acceptance and payment of invalid claims necessarily will diminish payments to legitimate claimants.

Here, the prospect that the Trust will pay invalid claims is a genuine concern. The TDPs that are being proposed as part of this case would allow for the payment of two new categories of claims that were not contemplated under the Ninth Amended Joint Chapter 11 Plan – Lung Cancer claims, as well as a nebulous category of "Other Disease Claims." *See* TDP § 5.2(b). These claims raise significant concerns for those persons who hold legitimate direct or indirect claims against the debtor. The "Other Disease Claims," in particular, appear to be a vehicle to increase insurance recoveries by inventing a new type of claim that was never paid in the tort system pre-petition.

Serious questions persist concerning whether lung cancer claims would be compensable against Debtors in the tort system. This TDP ignores that no causative link has been established between exposure to cosmetic talc and lung cancer. And, to the extent that such claims could be legitimate, the TDPs make no effort to weed out claims where the disease is likely caused by other factors. The TDPs do not require Claimants to show that Imerys talc was a substantial cause of their disease, which would be required in the tort system; rather, all that is required is a doctor's note stating that Imerys talc was a "contributing factor" to the claimant's lung cancer—and there is no reason to believe that a doctor who has not conducted causation studies would have any basis to state whether Imerys talc was, or was not, a contributing factor. Likewise, there is no requirement that the claimant disclose smoking history, which has been directly linked to lung cancer, or any history of occupational exposure to asbestos. *See, e.g.,* TDP § 5.5(b). The presence of either (or both) may cast significant doubt on any claim that use of cosmetic talc was a causative factor in any claimant's lung cancer. Nor is the claimant required to disclose other settlements with

- 23 -

or judgments against other companies that are alleged to be responsible for the claimant's lung cancer, the disclosure of which could cast doubt on the Trust's responsibility for that claim.[57] While the TDPs do state that the Trust will participate in a "cross-trust audit program," which "may" result in sharing medical information across trusts, there is no indication of what measures, if any, the Trust will employ to determine whether another entity is primarily (or entirely) liable for a lung cancer claim, or whether the claimant has pursued claims against other entities in the tort system, all of which may suggest that the Trust will pay claims that would not be the debtors' responsibility in the tort system.  Yet there is no indication that the Trust will investigate any of this. To the contrary, the TDPs expressly direct the Trust to consider "costs incurred" in investigating claims to ensure that only valid claims are paid.  *See* TDP § 7.3.  There is no similar language directing the Trust to consider the likely diminution in recoveries that will occur if potentially invalid or insufficient claims are not investigated but rather are accepted and paid.

These concerns are even greater with respect to "Other Disease Claims." The TDPs permit the Trustee to approve any claim submitted by a claimant if the Trustee believes that the Debtors' talc was a contributing factor to that disease and there is "peer-reviewed" medical literature to support that conclusion.  *See* TDPs § 5.2(b)(vii). That broad discretion is an invitation to unsubstantiated claims, particularly when (a) the TDPs place no limitations at all on what diseases

---

[57]    The TDPs likewise do not require claimants to come forward with lawsuits or other evidence of other responsible parties in the tort system for Mesothelioma Claims and Ovarian Cancer Claims, notwithstanding that such evidence would be required in a civil lawsuit.  There is a well-established pattern of plaintiffs filing lawsuits and failing to identify trust defendants as potential alternative sources of exposure, then later (inconsistently) alleging that the trust defendant is responsible.  *See, e.g., In re Garlock Sealing Techs., LLC,* 504 B.R. 71, 86-87 (Bankr. W.D.N.C. 2014). The TDPs here propose to exacerbate this issue by permitting claimants to defer consideration of their trust claims by up to three years while pursuing litigation in the tort system. *See* TDP § 6.2. This permits claimants to assert in their tort suits that they have not had any other recoveries and then, subsequently, to pursue a trust claim which, under the proposed TDPs, is not diminished by any recoveries in the tort system.

the Trustee may endorse under this category and (b) there are few guardrails, if any, as to what criteria the Trustee (who is not a medical expert) will use in deciding whether to accept a claim. No court has accepted the premise that talc is responsible for other forms of gynecological cancers or other, similar diseases.[58] Indeed, claimants themselves have rejected the contention that such claims could have merit. In the second *LTL* bankruptcy, for example, the creditors' committee asserted that these "other cancer" claims were "unproven" and could not be the source of financial distress sufficient to warrant a good faith filing because "there is no evidence that any of these newly unfiled [other cancer] cases are actually compensable, meaning that outside of bankruptcy their effect on LTL's financial distress is nil."[59] Yet, here, Plan Proponents have constructed a trust to compensate a substantially similar set of alleged plaintiffs without explaining what measures, if any, the trust will take to ensure that evidence of causation is established, and that other, more likely causes of disease are eliminated before the trust accepts and pays these claims, depleting trust resources.

Other courts have expressed concerns about a plan's lack of guardrails to prevent the payment of illegitimate claims, even for relatively low-dollar convenience claims. *See, e.g.,* Memorandum Decision Denying Confirmation of Eighth Amended Plan, *In re Diocese of Camden, New Jersey*, No. 20-21257-JNP (Bankr. D.N.J. Aug. 29, 2023) at 66. And in *Boy Scouts*, this Court

---

[58]    *See In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Litigation,* 509 F. Supp. 3d 116, 181 (D.N.J. Apr. 27, 2020) ("The testimony of Plaintiffs' experts demonstrates that their opinions rest on good grounds and considered scientific evidence to conclude that the association is specific to ovarian cancer. The experts do not opine as to any link between talc use and any other genital cancer. Their findings are limited to epithelial ovarian cancer.").

[59]    *See* TCC Reply Br. In Support of Motion to Dismiss, *In re LTL Management, LLC*, No. 23-12825-MBK (Bankr. D.N.J. June 22, 2023) at 54-55 [Dkt. No. 857]; TCC Motion to Dismiss the Second Bankruptcy Petition of LTL Management, LLC, *In re LTL Management, LLC*, No. 23-12825-MBK (Bankr. D.N.J. Apr. 24, 2023) at 19-20 [Dkt. No. 286-1] ("there is no evidence supporting a scientific causal connection with the use of talcum powder.").

required, as part of its Confirmation Order, that the Trustee adopt a Court-approved audit program "to identify fraudulent claims, taking into account factors the Settlement Trustee deems appropriate (and which may include a cost/benefit analysis) and which is independent of the claimant-controlled STAC."[60] The Plan and TDPs contain no similarly rigorous requirement.

The Plan Proponents seem not to have taken those concerns to heart. Apart from the "cross-trust audit" against some other, unidentified trust(s), there is little reason to believe that the Trust will adopt (or will be permitted by the STAC and the FCRs to adopt) any meaningful measures to exclude claims that are insufficient to state a legitimate claim against the Trust. The Disclosure Statement briefly references this Court's order disregarding the votes of certain claimants represented by Bevan & Associates LP.[61] That discussion is insufficient because it fails to explain how the failure to weed out invalid claims may affect and dilute recoveries by claimants. That discussion should be supplemented and, as discussed in the Objecting Insurers' separate objection, the solicitation procedures should be amended to address this issue.

> **H.      The Disclosure Statement does not adequately address the risks that the Plan poses to the recovery of insurance or the scope of possible insurance defenses.**

Despite spanning more than 190 pages, the Disclosure Statement contains no discussion concerning the ability of claimants to recover from insurance. Rather than a forthright discussion of insurance risks, the Disclosure Statement merely incorporates provisions from prior disclosures. In particular, Section 9.15 of the Disclosure Statement refers creditors to Article XII of the prior disclosure statement for a description of issues raised by insurers with respect to the prior plan.

---

[60] *See* Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) For Boy Scouts of America and Delaware BSA, LLC, *In re Boy Scouts of America*, No. 20-10343 (LSS) at ¶ 19 [Dkt. No. 10316] (Bankr. D. Del. Sept. 8, 2022).

[61] Disclosure Statement at § 2.5, p. 26-27.

Reference to a separate, lengthy document is unlikely to adequately inform voters of the risks attended to the Plan. Moreover, the disclosure statement should be updated to advise claimants that, in connection with approval of the J&J settlement, Debtors will waive any rights to seek coverage from their insurers for J&J Talc Claims (and, indeed, will be enjoined from making any such claims for coverage).

Any Disclosure Statement approved by the Court should contain a complete and accurate discussion of the risks inherent in the current plan—not merely a cite to an outdated discussion in some other document. The reality is that most of the coverage potentially available does not apply to the claims asserted against Debtors. Almost all the coverage predates the acquisition of the Windsor mine in 1989. Yet most of the claims tried in the tort system specifically pertain to that mine, which supplied talc to J&J. Moreover, a large percentage of the potential claims post-date 1989 and thus would be ineligible for reimbursement from pre-1989 insurers. The insurers under the Standard Oil policies (which ended even earlier, in 1986) also have strong arguments that their policies do not provide coverage to talc claims due to an exclusion in those policies for products-related claims. The J&J Settlement also will have a major impact on insurance recoveries. Before that settlement, if the Debtors recovered from insurers, the insurer could have pursued subrogation rights against J&J under the various indemnity agreements. Now, the Debtors and claimants are barred from seeking coverage for J&J Talc Claims. That means that only non-J&J Talc Claims will be eligible for reimbursement from insurance. The Disclosure Statement does not disclose how this will impact the recoveries of claimants, particularly those holding J&J Talc Claims. While these issues cannot be decided now, the claimants should at least be told that the large amounts of insurance discussed in the Disclosure Statement are speculative and likely not available to most of them.

**I.      The Disclosure Statement omits necessary documents.**

The Disclosure Statement does not contain a liquidation analysis or financial projections for the Debtors. Nor does it contain any financial information about ITI, which should be disclosed before claimants are required to release claims against it. Similarly, the Plan Proponents stated that they intend to disclose critical information, such as the identity of proposed trustees, in a proposed plan supplement that has not yet been filed.[62]

**1.      The Liquidation Analysis is not attached.**

The Disclosure Statement states it attaches, as Exhibit D, the Liquidation Analysis.  Disclosure Statement, p. 193. Notwithstanding that representation, no such analysis is provided.  See Exhibit D to the Disclosure Statement (Liquidation Analysis "[TO COME]").

A plan is only confirmable if the debtors have successfully shown that each creditor in an impaired class has either (i) accepted the plan, or (ii) will receive at least as much under the plan as that creditor would receive if a chapter 7 trustee were to liquidate and distribute all the debtor's assets. 11 U.S.C. § 1129(a)(7); *see In re Global Ocean Carriers, Ltd.*, 251 B.R. 31, 46 (Bankr. D. Del. 2000) (plan proponent bears burden of proof of demonstrating that the proposed plan satisfies Section 1129(a)(7)).  Referred to as the "best interests" test, § 1129(a)(7) is satisfied when the plan proponent demonstrates that its plan provides for a distribution to each individual dissenting creditor that is at least equal to what that creditor would receive in a hypothetical chapter 7 liquidation.  *See In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("To measure value, the Court must contrive a hypothetical chapter 7 liquidation conducted on the effective date of the plan").

There is substantial question as to whether the Plan meets the best interests test because the Plan does not treat similar claims the same, does not separately classify dissimilar claims, and contains

---

[62] *See* Disclosure Statement at § 2.2, p. 24.

- 28 -

nonconsensual third-party releases. The best interest test "is not limited to comparing distributions, i.e., the amounts that creditors will receive. The express language of § 1129(a)(7) also requires . . . consider[ation of] the value of the property that each dissenting creditor will retain under the plan and in the hypothetical chapter 7."[63] Such property includes claims against non-debtors that are released under a chapter 11 plan but cannot be released in a chapter 7 liquidation.[64] Here, the released parties include various Imerys affiliates and Imerys S.A.

To make the determination as to whether the Plan is in their best interests, parties need to be provided the Liquidation Analysis and any other relevant financial analysis well before approval of the Disclosure Statement. *See In re Scioto Valley Mortgage Co.*, 88 B.R. 168, 170 (Bankr. S.D. Oh. 1988) (disclosure statement should include liquidation analysis). Because non-debtor third parties are being released, and potential subrogation claims are being channeled to the Trust, information on those released parties must be included in any analysis. Absent that, the Disclosure Statement does not show that the creditors are receiving greater value under the proposed plan than they would under a chapter 7 liquidation. The Liquidation Analysis must be provided well in advance of the Disclosure Statement hearing.

### 2.      The Feasibility Analysis is also not attached.

To obtain confirmation of the Plan, the proponents must demonstrate that it is feasible. 11 U.S.C. § 1129(a)(11). This requirement is imposed to preclude confirmation of an unrealistic and speculative plan of reorganization which is likely to be followed by further financial difficulties.

---

[63]   *Quigley*, 437 B.R. at 144-45.

[64]   *See Washington Mut.*, 442 B.R. at 359-60 ("In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation"); *Quigley*, 437 B.R. at 145 ("the Fourth Plan releases [debtor's non-debtor parent] from derivative liability; [debtor's non-debtor parent] would not receive a release in a hypothetical chapter 7 case").

*Clarkson v. Cooke Sales & Serv. Co.*, 767 F.2d 417 (8th Cir. 1985) (plan not feasible where no showing that the debtors' future operations can fund their plan). Accordingly, information relating to the feasibility of the plan is of utmost importance to creditors when determining whether to accept or reject the plan. The Disclosure Statement does not provide adequate information regarding feasibility of the Plan and regarding the financial projections of the Debtors and ITI. The Disclosure Statement states that Exhibits B and C to the Disclosure Statement demonstrate that the Plan is feasible and that the Debtors have and will have sufficient cash to fund Effective Date reserves and post Effective Date operations. *See* Disclosure Statement, p. 192. However, Exhibits B and C are not attached to the Disclosure Statement. Therefore, parties do not have adequate information with which to evaluate the feasibility of the Plan.

These exhibits must be attached to the Disclosure Statement, and before any disclosure statement is approved, creditors and parties in interest must have an adequate opportunity to review and evaluate the sufficiency of the documents. This is particularly true in the case of ITI, which has not yet filed a bankruptcy case and which has not publicly disclosed anything about its operations and finances.

> **3.     The Plan Supplement will contain necessary information that must be disclosed prior to solicitation.**

The Plan provides that additional information will be submitted in a "Plan Supplement."[65] That supplement is to contain the names of the proposed trustees of the Trust, the list of insurance policies the Plan Proponents seek to assign, executory contract information, and the underlying transactional documents.

This information is critical to determine whether the Plan may be confirmed. As the Court will recall, plan proponents in *Boy Scouts* initially proposed unsuitable trustees that were rejected

---

[65]  Plan at §1.1.211, p. 23; Disclosure Statement at § 2.4.

by the Court. Although Insurers believe that the trust structure in this case creates an inherent conflict of interest, the suitability of the trustees cannot be judged until their identity is known. By concealing that information until after the objection deadline, the plan proponents are keeping critical information from creditors and other interested parties and, thus, denying them due process. The Court should order that the identity of the trustees and the details of property being assigned pursuant to the Plan be disclosed as part of the Disclosure Statement and not some later-filed document.

### J. The Plan is patently unconfirmable.

The flawed process upon which the current Plan is based has resulted in a plan with numerous, obvious legal deficiencies. While any one of these flaws would be fatal to the Plan, their combination shows that the Plan lacks good faith and is patently unconfirmable. Among other things, the Plan violates black letter bankruptcy law by improperly classifying and treating claims, impairing insurer subrogation rights, and failing to satisfy the requirements of § 524(g). Although the Plan is unconfirmable for additional reasons, which the Insurers will raise at confirmation if the Disclosure Statement is approved over the Insurers' objections, the defects discussed below render the Plan unconfirmable as a matter of law such that approval of a disclosure statement would be improper.

### 1. The Plan improperly classifies and treats claims.

The Plan (along with the Cyprus Plan) attempts to channel the claims of two different debtor groups to one trust. That trust contains two sub-funds. Those sub-funds do not apply to the claims of the different debtors, but to claims alleging various disease categories. Each sub-fund will have a separate payment percentage. Indirect Claims will also be channeled to the same trust and be paid out of one or both sub-funds. Nonetheless, the Plan treats all these dissimilar claims as Class 4 claims. Despite having spent nearly two years coming up with this arrangement, the

Plan Proponents apparently failed to consider clearly established law governing the classification and treatment of claims.

Bankruptcy Code § 524(g) requires that present and future claims be paid in "substantially the same manner." Similarly, § 1123(a)(4) requires that all claims in a single class be treated the same.[66] Here, Class 4 consists of all Talc claims against Debtors and all Talc claims against Cyprus, an unaffiliated debtor. "Same treatment" requires that all class members be subject to the same process for claim satisfaction and receive equal value.[67] Here, the Plan channels Class 4 claims to two separate funds within the Trust, which will have access to separate assets and apply different payment percentages. Axiomatically, all the claims in Class 4 are not being treated the same. Because Class 4 claims are not being treated the same, they are "dissimilar" and must be classified separately under § 1122 of the Bankruptcy Code.[68]   Because they are not, the Plan cannot be confirmed.

---

[66]  *See* 11 U.S.C. § 1123(a)(4) ("a plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest").

[67]  *See In re W.R. Grace & Co.*, 475 B.R. 34, 121 (D. Del. 2012) (equal treatment means "(1) all class members must be subject to the same process for claim satisfaction; (2) all class members' claims must be of "equal value" through the application of the same pro rata distribution or payment percentage procedures to all claims…") (cleaned up); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986) ("the most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members"); *In re Quigley Co., Inc.*, 377 B.R. 110, 116-17 (Bankr. S.D.N.Y. 2007) ("[A]ll members of the class must receive equal value. In addition, each member of the class must pay the same consideration for its distribution.").

[68]  *See* 11 U.S.C. § 1122(a) ("a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class"); *In re Chateaugay Corp.*, 1993 WL 563068, *4 (Bankr. S.D.N.Y. 1993) ("If LTV had proposed a plan that included both subordinated and unsubordinated claims in the same class, it would have clearly violated § 1123(a)(4) and such plan would not have been confirmable."); *In re Durrett*, 139 B.R. 1, 8 (Bankr. D.N.H. 1992) ("Even if Shawmut possesses an unsecured claim similar to that of other members of the class, the disparate treatment of Shawmut's claim makes it substantially dissimilar to those of other members of class 12.").

### 2.    Debtors cannot receive § 524(g) relief because they are liquidating, not reorganizing.

A § 524(g) discharge injunction does not apply to a debtor that liquidates, which is what Debtors have done.[69] The Debtors will not emerge from Chapter 11 as operating businesses because, during their bankruptcies, they previously sold their business operations.[70] This liquidation precludes them from confirming a plan that invokes the asbestos trust and channeling injunction provisions of § 524(g).  To qualify for a channeling injunction, a debtor must satisfy both the requirements of § 524(g) and the standard plan confirmation prerequisites in §§ 1129[71] and 1141(d) by preserving itself "as an economically viable entity."[72] The Debtors' Plan does not satisfy this standard because the Debtors have no "ongoing business"[73] and there is no corresponding § 1141 discharge injunction to supplement.[74]

---

[69] 11 U.S.C. § 1141(d)(3) (discharge injunction not applicable where "(A) the plan provides for the liquidation of all or substantially all of the property of the estate [and] (B) the debtor does not engage in business after consummation of the plan."); *see also* 11 U.S.C. § 727(a)(1) (corporate debtor does not receive a discharge injunction under chapter 7 of the Bankruptcy Code).

[70] *See* Notice of Closing of Sale and Final List of Selected Contracts, Dkt. No. 3103 (stating that "the sale of substantially all of the assets" of Debtors to Magris closed on February 17, 2021).

[71] *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004) (parenthetical).

[72] *In re W.R. Grace & Co.*, 475 B.R. 34 at 91 (D. Del. 2012), citing *Combustion Eng'g*, 391 F.3d at 234; *In re G-I Holdings, Inc.*, 328 B.R. 691, 694-95 (D.N.J. 2005); 11 U.S.C. § 524(g)(1)(B) (emphasis added); 11 U.S.C. § 524(g)(1)(A) (emphasis added); *see also Combustion Eng'g*, 391 F.3d at 234 n.46; *Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co)*, 900 F.3d 126, 130 (3d Cir. 2018), quoting *In re Plant Insulation Co.*, 734 F.3d 900, 906 (9th Cir. 2013).

[73] *See In re Maremont Corp.*, 602 B.R. 1, 109 (Bankr. D. Del. 2019) (parenthetical).

[74] *See In re Flintkote Co.*, 486 B.R. 99, 129 (Bankr. D. Del. 2012) ("a bankruptcy court may issue a channeling injunction 'to supplement the injunctive effect of a discharge under this section.'  It follows then that there must be a discharge for the channeling injunction to 'supplement.'"), *aff'd*, 526 B.R. 515 (D. Del. 2014); *see also In re Am. Capital Equip., LLC*, 688 F.3d 145, 151 (3d Cir. 2012) (citing, but not reviewing, the bankruptcy court's refusal to approve a § 524(g) trust absent a going concern business).

a.   **Imerys Talc Vermont's purchase of two Dollar General stores after Debtors liquidated their pre-petition business does not create an "ongoing business."**

The clear purpose and intent of § 524(g) is to protect *ongoing* businesses and their employees. As Congress noted in enacting § 524(g), the channeling injunction available under that section of the Bankruptcy Code was intended to allow "*an otherwise viable business* to quantify, consolidate, and manage its debt so that it can satisfy its creditors to the maximum extent feasible, but without threatening its continued existence and the thousands of jobs that it provides.[75] Thus, under *Combustion Engineering* and *Flintkote*, if a debtor is liquidating substantially all of its assets and not engaging in post-confirmation business, it cannot receive a discharge because it deviates from § 524(g) and violates the purposes of Chapter 11.[76]

In February 2021, the Debtors completed the sale of all or substantially all their property and assets to Magris Resources Canada Inc.[77] Without its pre-petition business or assets, the Debtors will not engage in an ***ongoing*** business, as required by § 524(g). Thus, they are not entitled to protection from § 524(g)'s channeling injunction provisions.

ITV's purchase of the Vermont properties does not help Debtors qualify for a discharge nor satisfy § 524(g)'s ongoing business requirement. Indeed, the Debtors do not qualify for a discharge at all. In pertinent part, § 1141(d)(3) provides for denial of a discharge where a "plan provides for the liquidation of all <u>or substantially all</u> of the property of the estate" and where "the debtor does not engage in business after consummation of the plan." Here, regardless of whether the Dollar General purchase is considered engaging in business, there is no doubt that the Debtors

---

[75] *In re Combustion Eng'g, Inc.*, 391 F.3d at 248 n.69, quoting 140 Cong. Rec. S4521–01, S4523 (Apr. 20, 1994) (statement of Senator Heflin).
[76] 11 U.S.C. § 1141(d)(3); *Flintkote*, 486 B.R. at 129 n.80.
[77] Notice of Closing of Sale and Final List of Selected Contracts, Dkt. No. 3103 (stating that "the sale of substantially all of the assets" of Debtors to Magris closed on February 17, 2021).

have liquidated substantially all of their assets. The Fourth Circuit, which is the sole court of appeals to address this issue directly, held in *In re Grausz* that it was "clear" that the "engag[ing] in business after consummation of the plan" requirement of § 1141(d)(3) refers "to the **continuation** of a **pre-petition** business."[78] The *Grausz* court affirmed denial of a Chapter 11 discharge due to the debtor's failure to continue any of its pre-petition businesses because post-consummation business activity that was "*unrelated* to" the debtor's pre-petition businesses did not qualify under § 1141(d)(3).[79]

Likewise, the bankruptcy and district courts in *In re Um* each held that a debtor could be entitled to a discharge only if it engaged in its pre-petition business following confirmation.[80]  The *Um* bankruptcy court found *Grausz* "particularly compelling": "Based on the legislative history and the [case law], the Court is persuaded that § 1141(d)(3)(B) refers to the **continuation** of a debtor's pre-petition business in the requirement that 'the debtor does not engage in business after consummation of the plan.'"[81] The Ninth Circuit affirmed but did not address this issue.[82]  Other

---

[78] *Grausz v. Sampson* (*In re Grausz*), 63 Fed. Appx. 647, 650 (4th Cir. 2003) (emphasis in original); *see also In re Lloyd E. Mitchell, Inc.*, No. 06-13250, 2012 Bankr. LEXIS 5531, at *11–12. n. 6 (Bankr. D. Md. Nov. 29, 2012) ("LEM cannot satisfy what has been described as the 'ongoing business requirement' which is a predicate to the establishment of such a trust because LEM has no ongoing business.").

[79] *Grausz*, 63 Fed. Appx. at 650 (emphasis by court).

[80] *Spokane Rock I, LLC v. Um* (*In re Um*), 2015 WL 6684504, at *7 (Bankr. W.D. Wash., Sept. 30, 2015) ("Based on the legislative history and the cases most factually analogous to this case, the Court is persuaded that § 1141(d)(3)(B) refers to the **continuation** of a debtor's pre-petition business in the requirement that 'the debtor does not engage in business after consummation of the plan'") (emphasis in original), *aff'd*, 2016 WL 7714141, at *4 (W.D. Wash. Aug. 18, 2016) ("the Court concludes that, in the context of the bankruptcy code, the term 'business' in § 1141(d)(3)(B) means pre-petition business").

[81] *Spokane Rock I, LLC v. Um (In re Um)*, 2015 WL 6684504, at *7 (Bankr. W.D. Wash., Sept. 30, 2015) (emphasis by court), *aff'd*, 2016 WL 7714141. While the bankruptcy court and district court in *Flintkote* disagreed with *Grausz*, the Third Circuit has not had occasion to address this point.  The bankruptcy court in *In re Um* noted the bankruptcy court's ruling in *Flintkote* but declined to follow it.

[82] *See Um v. Spokane Rock I, LLC*, 904 F.3d 815, 820 (9th Cir. 2018).

courts agree that chapter 11 reorganization requires an existing business. For example, the Fourth Circuit has held that a chapter 11 reorganization is objectively futile where there is no pre-petition business to reorganize.[83] Similarly, the Ninth Circuit bankruptcy appellate panel noted in *Duvar Apt., Inc. v. FDIC (In re Duvar Apt., Inc.)*, 205 B.R. 196, 201 (9th Cir. B.A.P. 1996) that "The use of chapter 11 to create and organize a new business, not to reorganize or rehabilitate an existing enterprise, is a misuse of the reorganization process."[84]

Instead of continuing a pre-petition business, like the *Manville* debtor and as contemplated by the § 524(g) statutory scheme modeled thereon, the Debtors liquidated substantially all of the property of the estate of each Debtor, using the proceeds to fund the § 524(g) trust (and pay DIP-related expenses or claims). Regardless of what label the Debtors may give to their Chapter 11 plan, it is in substance a liquidating plan, proposed by corporate debtors, who do not plan to "engage in business after consummation of the plan."[85] Therefore, the Debtors do not qualify for a discharge injunction under § 1141 and, accordingly, they cannot qualify for the supplemental § 524(g) channeling injunction.

---

[83] *Carolin Corp. v. Miller*, 886 F.2d 693, 702 (4th Cir. 1989) (a valid chapter 11 case must involve an effort to "use the provisions to Chapter 11 to reorganize or rehabilitate an existing enterprise or to preserve going concern values of a viable or existing business").

[84] *See also, In re Parasram,* 647 B.R. 1, 16 (S.D.N.Y. 2022) (debtor was not engaging in business when all pre-petition businesses had been sold); *In re Maxim Indus., Inc*., 22 B.R. 611 (Bankr. D. Mass. 1982) (use of bankruptcy to shield a new business, not reorganize an existing one, was not in good faith); *Rand v. Porsche Fin. Servs., Inc.*, 2010 WL 6259960, at *8-9 (9th Cir. B.A.P. Dec. 7, 2010) (same);; *Cf. In re Victory Construction Co*., 9 B.R. 549, 564 (Bankr. C.D. Cal. 1981), *modified*, 9 B.R. 570, *vacated as moot*, 37 B.R. 222 (9th Cir. B.A.P. 1984) (Chapter 11 case is inconsistent with the purposes of Chapter 11 when the debtor seeks to use the bankruptcy to "create and organize a new business, not to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business"); *In re Berwick Black Cattle Co*., 394 B.R. 448 (Bankr. C.D. Ill. 2008) (same); *In re AMA Corp*., 175 B.R. 894, 897 (Bankr. W.D. Va. 1995) ("A key factor in assessing objective futility is whether there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's 'terminal euphoria.'").

[85] *See* 11 U.S.C. § 1141(d)(3).

ITV's sudden foray into passive real estate investment and commercial leasing does not change the fact that the Debtors already liquidated their assets. Under *Grausz* and *Um*, the ongoing business requirement of § 1141(d) (and, by extension, § 524(g)'s going concern requirement) can only be satisfied when the Debtors continue a pre-petition business. Nowhere in the First Day Declaration [Dkt. No. 10] or the Disclosure Statement [Dkt. No. 6052] are the Debtors described as being engaged in real estate investment or commercial leasing. Instead, the Debtors declared that their "operations are exclusively focused on the mining, processing, and/or distribution of talc."[86]

When the Debtors landed on the Dollar General idea (conspicuously, the same investment made by the *Maremont* debtors), they revealed what appeared to be their true motivation, to "help address certain expressed objections to the Plan, specifically whether the Debtors can satisfy the so-called 'ongoing business' requirement of section 524(g) of the Bankruptcy Code."[87]

When approving the purchase of the Vermont properties, this Court cautioned that the approval did not constitute a ruling on whether the post-liquidation purchase of properties outside any pre-petition line of business satisfies the going concern requirements of §§ 524(g) and 1141(d). Specifically, the court stated: "And let me be clear, I consider the 524(g) argument a confirmation issue. I am making no assessment or ruling on Section 524(g) in approving this motion. The debtors' business judgment has nothing to do with Section 524(g)." As a result, the Court ordered that:

> No provision of this Order or record of the proceedings on the Motion shall operate as collateral estoppel against, or otherwise prejudice any rights of, any party in interest to make any arguments or objections in connection with confirmation of

---

[86] First Day Declaration, Dkt. No. 1 at ¶ 7; Hr'g Tr. 66:3–4, Aug. 24, 2021, Dkt. No. 3965 (testimony of Mr. Danner) (Debtors' pre-petition business was mining, not real estate).

[87] *See* Debtors' Motion for Entry of Order Authorizing Debtors to Pursue and Effectuate Purchase of Properties Located in Lyndonville, Vermont and Johnson, Vermont [Dkt. No. 3881] ¶ 32.

the Plan (or any later amended or new chapter 11 plan) with respect to (i) whether the Plan (or any later amended or new chapter 11 plan) satisfied the requirements of section 1129, 524(g), and 1141(d) of the Bankruptcy Code....[88]

For the reasons stated above, the purchase of the two Dollar General properties does not satisfy the applicable going concern requirements, precluding confirmation of the Plan.

> **b.  Even if ITV qualifies for § 524(g) protection based on its property acquisitions, ITA and ITC remain ineligible for § 524(g) protection because they are liquidated companies.**

Even if Imerys Talc Vermont qualifies for § 524(g) protection based on its Dollar General property acquisitions, Imerys Talc America and Imerys Talc Canada do not.  ITA and ITC indisputably are liquidated companies with no current business operations, making them ineligible for a discharge and, thus, ineligible for § 524(g) relief. In particular, ITA and ITC cannot rely upon ITV to obtain supplemental protection under § 524(g).

Third Circuit courts apply the plain language of § 524(g) when analyzing the availability of a channeling injunction for an asbestos debtor that is either not going to operate its pre-petition business post-confirmation (*Flintkote*) or whose business operations are minimal (*Combustion Engineering*).  Those decisions reveal that each debtor must receive a discharge and engage in business post-confirmation to benefit from a channeling injunction under § 524(g).[89]

In *Combustion Engineering*, the Third Circuit held that two non-debtor affiliates could not be protected by a § 524(g) channeling injunction for their "independent liability, wholly separate

---

[88] *See* Dkt. No. 3961, Aug. 24, 2021, Order Authorizing Debtors to Pursue and Effectuate Purchase.
[89] *See In re Flintkote Co.*, 486 B.R. 99, 129 (Bankr. D. Del. 2012) ("There are several indications that § 524(g) requires the debtor to engage in business post-confirmation.  First, a bankruptcy court may issue a channeling injunction 'to supplement the injunctive effect of a discharge under this section.' *It follows then that there must be a discharge for the channeling injunction to 'supplement'*") (emphasis added), *aff'd*, 526 B.R. 515 (D. Del. 2014); *In re Combustion Eng'g*, 391 F.3d 190, 248 (3d. Cir. 2004) (noting that it was "debatable" whether debtor's post-confirmation leasing activity of owned real estate was sufficient to satisfy the "engage in business" requirement of § 1141(d)).

from any liability involving [the debtor]."[90] Similarly, in *Federal-Mogul*, non-debtor third parties did not qualify for a channeling injunction under § 524(g) because their alleged liability did not arise "by reason of" one of the four statutory relationships with the debtor.[91]

Nowhere do the Debtors contend that ITA and ITC are "liable for the conduct of, claims against, or demands on" ITV, as required by § 524(g)(4)(A)(ii).[92] Claims against ITA and ITC "allege independent liability, wholly separate from any liability involving [ITV]."[93] "As the plain language of the statute makes clear, § 524(g)(4)(A) does not permit the extension of a channeling injunction to include these non-derivative third-party actions."[94] The liabilities of ITA and ITC arise by reason of their own operations, and they are not derivative of ITV's operations. The Debtors specifically have not sought substantive consolidation. Thus, § 524(g)(4)(A)(ii)(I)-(IV) does not apply.

### c.  This Court cannot not use § 105(a) to achieve a result that is expressly prohibited by § 524(g).

Even assuming ITV is somehow eligible for § 524(g) relief, this Court cannot use § 105(a) to permit ITA and ITC to receive the protections of a channeling injunction. Such a result is not authorized by § 524(g). The Third Circuit has made clear that when the requirements of § 524(g) have not been satisfied, § 105(a) cannot be used to grant an otherwise unavailable § 524(g) channeling injunction.[95] In *Combustion Engineering*, the Third Circuit denied relief under § 105(a) to a non-debtor affiliate that did not qualify for protection under § 524(g). "Because § 524(g)

---

[90] *Combustion Eng'g*, 391 F.3d at 235.
[91] *See In re Federal-Mogul Global, Inc.*, 411 B.R. 148, 165-66 (Bankr. D. Del. 2008) (non-debtor affiliates were not entitled to receive a channeling injunction pursuant to § 524(g)(4)(A)(ii)(I)-(IV) where their asbestos liability was not derivative of the debtor's liability).
[92] 11 U.S.C. § 524(g)(4)(A)(ii); *Combustion Eng'g*, 391 F.3d at 235.
[93] *Combustion Eng'g*, 391 F.3d at 235.
[94] *Id*.
[95] *Id*.

expressly contemplates the inclusion of third parties' liability within the scope of a channeling injunction—and sets out the specific requirements that must be met in order to permit inclusion—the general powers of § 105(a) cannot be used to achieve a result not contemplated by the more specific provisions of § 524(g)," nor can § 105(a) "give the court the power to create substantive rights that would otherwise be unavailable under the Code."[96] Accordingly, because ITA and ITC cannot themselves satisfy the requirements of § 524(g), they may not be protected with a channeling injunction under § 105(a).

In *Combustion Engineering*, the court held that the affiliates could not "cleanse themselves of non-derivative asbestos liability" because the court found "no evidence that either [affiliate] need[ed] to reorganize under Chapter 11."[97] Likewise, ITA and ITC have no need to reorganize under Chapter 11. As liquidated companies, they are not operating any business.  They are not mining or producing talc, they are not providing any services, and they have no employees. In reality, ITA and ITV are nothing more than shell companies holding whatever cash remains from the proceeds of the Magris Sale. Allowing ITA and ITC to reap the benefit of a channeling injunction is not authorized under Chapter 11.

### 3.    Debtors cannot channel non-asbestos claims to a § 524(g) trust.

Section 524(g) applies only to asbestos claims. The Disclosure Statement admits that most ovarian cancer "plaintiffs have asserted that talc itself causes ovarian cancer and have not asserted that talc contained in the body powder was contaminated with trace amounts of asbestos."[98] Debtors described the claims against them as follows in their first day declaration: "Historically, plaintiffs have asserted that talc itself causes ovarian cancer and have not

---

[96] *Id*. at 236-37 (citations omitted).
[97] *Id*.
[98]  Disclosure Statement at 40, Dkt. No. 6052.

asserted that talc contained in the body powder was contaminated with asbestos." Indeed, the Debtors dispute that their talc contained asbestos.

Nonetheless, the Plan attempts to channel all the Debtors' tort claims to a trust pursuant to § 524(g) of the Bankruptcy Code.[99] That provision, however, applies only to asbestos claims. The Plan improperly attempts to expand the Bankruptcy Code to enable the Debtors and their non-debtor affiliate companies to take advantage of releases and protective provisions not otherwise available to them. Because § 524(g) does not apply to non-asbestos claims, the plan cannot be confirmed. To the extent that the Plan relies on Section 105 to channel claims to the Trust, such relief is unavailable based on the Supreme Court's ruling in *Harrington v. Purdue Pharma*, which held that nonconsensual third-party releases cannot be included in a chapter 11 plan outside of the 524(g) context. 603 U.S. __ (2024). The Disclosure Statement should disclose that this poses a risk to confirmation.

### 4. The third-party releases provided under the Plan fall outside the scope of § 524(g)'s statutory relationship requirements.

Generally, discharge of debt of the debtor does not affect other entities,[100] with one exception found in § 524(g), which provides for the release of third party non-debtor entities facing asbestos liability that is ***derivative*** of the debtor's liability.[101] The claims against non-debtor entities that the Plan would channel to the Trust do not appear to be "derivative" of the Debtors'

---

[99] Plan at § 12.3.1, p. 96, Dkt. No. 6439.

[100] *See* 11 U.S.C. § 524(e).

[101] *See In re Combustion Eng'g*, 391 F.3d at 236, n.48 ("Outside the context of § 524(g), § 524(e) provides statutory authority for limiting the extension of bankruptcy relief to non-debtors"); 11 U.S.C. § 524(g)(4)(A)(ii) (third party releases in favor of non-debtors are allowed where the parties are "liable for, directly or indirectly, the conduct of, or claims against a debtor"); *see also Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.)*, 900 F.3d 126, 136 (3d Cir. 2018).

liability.[102] For example, Schedule I identifies Imerys Talc Italy S.P.A. ("ITI") as an Imerys

Corporate Party to the extent it does not commence a bankruptcy case. Similar to Debtors, ITI is a

supplier of talc that has been named in personal injury lawsuits. Thus, rather than being derivative,

ITI's liability is direct, arising out of ITI's own mining of talc that purportedly contained asbestos.

Accordingly, there is no basis to include ITI among the parties receiving the benefit of the § 524(g)

channeling injunction, if it does not commence its own Chapter 11 case.[103] The same appears true

of many other entities in the Plan's list of protected parties.

> **5.      Imerys has no legal or equitable rights in the Insurers' Policies and thus cannot assign them to the Imerys Trust.**

The Disclosure Statement contains a description of the Debtors' alleged rights to insurance

and its settlement with Cyprus but does not disclose who holds rights to those insurance policies.[104]

Pursuant to the Debtors' proposed settlement, the rights under the policies at issue will be assigned

to the Trust created by the Plan. By their own judicial admissions in pleadings filed in this Court,

only *one* of the two debtor groups can be entitled to coverage (*i.e.*, either Imerys or Cyprus, but

not both). Which debtors are entitled to coverage will potentially impact the recovery of claimants

and the availability of coverage.

---

[102] *See In re Combustion Eng'g*, 391 F.3d 190, 236 (3d Cir. 2004) ("As both the plain language of the statute and its legislative history make clear, § 524(g) provides no specific authority to extend a channeling injunction to include third-party actions against non-debtors where the liability alleged is not derivative of the debtor.").

[103] If ITI does file a petition, Insurers reserve the right to argue that any such petition is a bad-faith filing because ITI is not in financial distress, as the Third Circuit required in *In re LTL Mgmt., Inc.*, 64 F.4th 84 (3d Cir. 2023).

[104] *See* Disclosure Statement at § 4.3(a)(2), p. 43, referencing the adversary proceeding between Imerys debtors and Cyprus; § 5.9(a) (same). At a minimum, the Disclosure Statement should affirmatively explain which debtor or debtors holds the insurance rights purportedly being assigned to the Trust.

Debtors have not proven that they have any rights to any of the Insurers' policies. Cyprus (or its former corporate parent, Standard Oil) are the insureds on the vast majority of insurance policies at issue. Before the policies may be assigned to the Imerys Trust, Debtors must prove that the policies are property of the Imerys bankruptcy estate, which it has not done. Debtors filed an adversary proceeding over three years ago to prove that Imerys has rights to the policies. That adversary proceeding, however, never got beyond discovery and has been stayed since February 2020.

While Cyprus or its former parent, Standard Oil, is the Named Insured on the policies at issue, Cyprus has settled with Imerys with the intent of sharing coverage with Debtors under duress from the TCC. But the policies cannot cover liability for both entities, when Debtors and Cyprus each contend that they have exclusive rights to the coverage, and that the other has no rights to the coverage. If the proposed settlement between the Imerys and Cyprus debtors attempts to expand the coverage under the policies, it may result in no coverage being available at all, to anyone.

Absent a judicial decision holding that Debtors were assigned these policies, and therefore have the right to assign them to the Trust, Debtors are appropriating insurance policies that they do not own and have no right to assign. Insurance policy proceeds that are not otherwise payable to a debtor cannot somehow become property of the estate "merely because such property has the effect of reducing the estate's liability, or because of some other beneficial effect such property has on the estate."[105] "[P]roperty of the estate comes into the estate subject to all restrictions applicable to that property under state law" and, as a result, "insurance proceeds, if they were considered property of the estate, necessarily would be distributed only to those whom the state

---

[105] *Landry v. Exxon Pipeline Co.*, 260 B.R. 769, 787 n. 62 (Bankr. D. La. 2001).

insurance law, or the policies themselves, gave a right to distribution."[106]  The issue of policy ownership is critical because it cannot be the case that both Debtors and Cyprus are insured under the policies. The Disclosure Statement attempts to evade this fundamental issue by contending that the assignment to the Trust by both debtor groups eliminates the issue. It does not. Only claimants against one debtor (if any) are eligible for insurance. Yet, as the Plan's Dual Estate Factor demonstrates, the debtors propose to pay – and presumably to recover insurance for – claims on behalf of both debtors.

A party that does not have valid rights to an insurance policy cannot assign those "rights" to a bankruptcy trust,[107] and the Named Insured cannot assign the policies to another entity while retaining rights to those policies, which would effectively mean adding an additional insured without the insurer's consent or payment of additional premium.[108] Further, it is an insured's obligation to prove coverage, and Debtors cannot meet that burden without proving that Cyprus assigned the policies to Imerys.[109]

---

[106] *Id.*; *see also* 11 U.S.C. § 541(d) ("Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.").

[107] *See In re DeVeau*, 611 B.R. 484, 489 (Bankr. D. Mass. 2019) (explaining that bankruptcy estate had no rights under insurance policy contributed by debtor where debtor lacked rights under the policy as of petition date); *In re Forty-Eight Insulations, Inc.*, 149 B.R. 860, 863 (N.D. Ill. 1992) (non-debtor's interests in insurance policies do not become "property of the estate"); *Cf. Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135–36 (1962) ("The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors"); *In re Universal Med. Servs., Inc.*, 460 F.2d 524, 526 (3d Cir. 1972) (property in trustee's possession that actually belongs to a third person should be restored to the third person).

[108] *See, e.g., Cooper Cos. v. Transcontinental Ins. Co*, 31 Cal. App.4th 1094 (1995) (coverage only provided for companies during the policy period and did not apply to later acquired companies).

[109] *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1188, 959 P.2d 1213, 1215 (1998), *as modified on denial of reh'g* (Oct. 14, 1998) ("The burden is on an insured to establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage").

In similar circumstances, a bankruptcy court may not allow the transfer of property as "property of the estate" without first determining whether the debtor in fact owned the property.[110] Absent adjudication of Imerys' rights to the policies, any improperly distributed insurance proceeds are subject to disgorgement.[111]

### 6.    The Plan improperly impairs insurers' rights.

The Plan also impermissibly strips the Insurers of the contractual rights that they have under their policies to contest and reduce liability for talc claims including by impairing, if not voiding, the J&J indemnity as to which the Insurers have subrogation rights. The Plan and the actions taken by Debtors during the bankruptcy case with regard to the J&J indemnity render illusory any putative "neutrality" language because they: (i) impaired the J&J indemnity and the Insurers' contractual rights to control the defense and settlement of any claims that might not be subject to the J&J indemnity; (ii) abandon the Debtors' tort liability defenses; (iii) fail to disclose that the TDPs are set up to encourage the trustee to seek insurance coverage for the entire Claim "value" in the TDPs (established unilaterally by the claimants), rather than for the amounts actually

---

[110] *See Moldo v. Clark (In re Clark)*, 266 B.R. 163, 172 (9th Cir. BAP 2001) (holding that "[t]he threshold question, is [the property] still property of the estate, must be decided" before the property can be transferred); *Anderson v. Conine (In re Robertson)*, 203 F.3d 855, 863 (5th Cir. 2000) ("Because the separate property home of [a nondebtor] was not included or owned in indivision with the property of the Debtor's bankruptcy estate, the Trustee lacked authority to sell her home . . . as property of the estate in which there is an interest of 'an entity other than the estate' under section 363(f)"); *In re Coburn*, 250 B.R. 401, 403 (Bankr. M.D. Fla. 1999) (finding it necessary to determine whether an asset is property of the estate in order to decide whether the trustee is entitled to sell the asset pursuant to § 363(f)).

[111] *See Spirtos v. Moreno (In re Spirtos)*, 992 F.2d 1004, 1006-07 (9th Cir. 1993); *In re Rodeo Canon Dev. Corp.*, 362 F.3d 603 (9th Cir. 2004) (bankruptcy court should not have authorized sale of certain property that, although legally titled in Chapter 7 debtor-partner's name, was allegedly owned by partnership, without first adjudicating ownership dispute), *opinion withdrawn and superseded*, 126 F. App'x 353 (9th Cir. 2005), *as amended on denial of reh'g* (Apr. 1, 2005) (remanding to the bankruptcy court for a determination of the appropriate distribution of the sale proceeds).

paid to claimants; and (iv) impair Insurers' contribution rights against other potentially responsible parties, including settled insurers. Each of these defects is fatal to the Plan in its current form.

Because the Plan affirmatively prejudices Insurers, it violates § 1129(a)(1)-(3) of the Bankruptcy Code.[112] Nothing in the Bankruptcy Code authorizes the Court to disregard state law contractual rights.[113] Accordingly, bankruptcy courts have long recognized that they cannot alter or enlarge insurers' contractual obligations even outside the context of plan neutrality.[114]

>    7.    **The Plan is not the culmination of good faith, arms'-length negotiations among parties with competing interests and therefore violates Section 1129.**

The Disclosure Statement should further warn claimants that the Insurers intend to challenge the good faith of the Plan under Bankruptcy Code § 1129(a)(3). Under Third Circuit law, the "integrity of the bankruptcy proceeding is called into question" when debtors and plaintiffs' lawyers ask a bankruptcy court to approve a plan that would allow invalid or dubious claims and then demand insurers pay them while stripping insurers of the protections that their

---

[112]    *See In re Cajun Elec. Power Co-op., Inc.*, 230 B.R. 715, 737 (Bankr. M.D. La. 1999) (finding that plan violated § 1129(a)(3) and, therefore, was unconfirmable because it "call[ed] for an improper modification of the [power supply contracts] in that it seeks to bind the Members for 25 years to treatment which they do not want and for which they did not contract"); *cf. Coca-Cola Bottling Co. of Shreveport, Inc. v. The Coca-Cola Co.*, 769 F. Supp. 671, 707 (D. Del. 1991), *aff'd*, 988 F.2d 414 (3d Cir. 1992) ("Courts do not rewrite contracts to include terms not assented to by the parties"); *In re Exide Holdings, Inc.*, No. 20-11157, 2021 WL 3145612, at *6 (D. Del. July 26, 2021) (citing *Coca-Cola Bottling Co. of Shreveport*, 769 F. Supp. at 707, with approval).

[113]    *In re 641 Associates, Ltd.*, 1993 WL 332646 at *8 (E.D. Pa. August 26, 1993) ("There is no provision in the Bankruptcy Code allowing a bankruptcy court to disregard state-law contractual rights"); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984), *cert. denied*, 469 U.S. 982 (1984) (holding that the Bankruptcy Code is not intended to expand debtor's rights against others more than they exist at the commencement of the case).

[114]    *See, e.g.*, *Cissel v. American Home Assur. Co.*, 521 F.2d 790, 792 (6th Cir. 1975), *cert. denied,* 423 U.S. 1074 (1976) (bankruptcy trustee could not obtain recovery from insurer for claims filed against the estate absent a judgment or a written settlement agreement between the policyholder, the claimant, and the insurance company, as required by the policyholder).

policies and the Bankruptcy Code require. *GIT*, 645 F.3d at 212-16; *In re American Capital Equipment*, 688 F.3d 145 (3d Cir. 2012).[115]

A plan that manufactures liability and sabotages potential defenses (including at the expense of insurers) is not proposed in good faith. In *American Capital Equipment*, the Third Circuit held that a plan in an asbestos mass tort case was "patently unconfirmable" because the plan:

- provided for tort claims against the debtor to be paid by a trust funded by an assignment of the debtor's rights to insurance and resolved according to procedures that gave the decision-makers "financial[] incentiv[es] to sabotage [the debtor's] own defense" and maximize the claims insurers would be asked to pay; and

- the TDPs would "severely limit[] or eliminat[e] Insurers' ability to take discovery, submit evidence, contest causation, [or] appeal a decision," and otherwise "strip[] Insurers of [their] procedural and substantive rights."[116]

This Plan's scheme for liquidating talc claims is arguably even more egregious. The Debtors' decisions to (i) refuse J&J's offer to defend claims and (ii) abandon their successful liability defenses,[117] all while stripping the Insurers of their contractual right to assert those very same defenses, be involved in the settlement of claims, or obtain discovery to enable Debtors and their corporate parent to walk away from liability for the talc claims—impermissibly accelerates and increases liability. Having since settled with J&J, whose affiliate Red River Talc recently filed its own bankruptcy, the Debtors now seek to maximize insurance recoveries by pumping up non-

---

[115] *See also In re Congoleum Corp.*, 426 F.3d 675, 692 (3d Cir. 2005) ("careful scrutiny" is required when the "parties … seek the court's imprimatur of a reorganization that will free the debtor of all … [tort] liability"); *In re ACandS, Inc.*, 311 B.R. 36, 42-43 (Bankr. D. Del. 2004) (denying confirmation of plan under § 1129(a)(3) because plaintiffs' lawyers representing asbestos claimants drafted the plan and trust documents, chose the trustee, and "decided who was going to get what"; "[g]iven the unbridled dominance of the [plaintiffs' lawyers] in the debtor's affairs and actions … and the obvious self-dealing that resulted from control of the debtor, it is impossible to conclude that the plan was consistent with the objectives and purposes of the Bankruptcy Code").
[116] *See* 688 F.3d at 158-164.
[117] *See, e.g.*, Picard Decl., Dkt. No. 10 at ¶ 37.

J&J Talc Claims, which have a scant history in the tort system. The scheme was confected by Debtors and the claimants, during negotiations from which Insurers were completely excluded, because including the Insurers in negotiations would have limited the claimants' ability to reach into the Insurers' pockets.  This is all bad faith that renders the Plan unconfirmable.

The Plan here gives insurers—who are expected to pay the claims—no role at all in the defense and handling of the claims, while at the same time the Plan prohibits the Trust from denying a claim where successful defenses apply. The Plan requires the allowance and payment of claims without legal, scientific, or other bases for the proposed exposure criteria or valuation of claims. Moreover, the Plan and accompanying TDP do not even contemplate how to determine if a claim constitutes a "J&J Talc Claim" or a "non-J&J Talc Claim" despite the fact that this determination is now critical with respect to potential insurance recoveries.

In addition, the Plan is designed to provide questionable releases to the corporate parents and affiliates of the Debtors.  In assessing whether an injunction is fair and equitable under § 524(g)(4)(B)(ii), "courts look for a relationship between the protected parties' contribution to the trust and the benefit they are receiving from the injunction."  *In re W.R. Grace & Co.*, 729 F.3d 311, 331 (3d Cir. 2013) (citing *In re Quigley Co.*, 437 B.R. 102, 140 (Bankr. S.D.N.Y. 2010)). The "fair and equitable" requirement "is centered around whether the trust obtained a fair deal in the transaction."  *In re Plant Insulation Co.*, 734 F.3d at 914. Here, there are at least substantial questions as to whether Debtors, Imerys S.A., and Freeport McMoran, non-debtor protected parties who were on the front line of negotiating contributions to the proposed combined Imerys-Cyprus Talc Trust, are contributing enough money to receive the benefit of protection from liability for talc claims. The Debtors surrendered valuable claim defenses to obtain the claimants' consent to this non-debtor relief. Thus, the Plan does not accomplish the legitimate goals of the Bankruptcy

- 48 -

Code, and cannot be confirmed.[118] The Disclosure Statement should, minimally, highlight these issues as risk factors.

## CONCLUSION

The Disclosure Statement is incomplete in fundamental respects and affirmatively confusing and misleading in other respects. It also describes a plan that cannot be confirmed. Insurers, therefore, urge the Court to decline to approve the Disclosure Statement because it fails to provide "adequate information" as required by § 1125(b) of the Bankruptcy Code and because the Plan is patently unconfirmable.


DATED:  October 7, 2024

Timothy Martin
White and Williams LLP
Courthouse Square
600 N. King Street, Suite 800
Wilmington, Delaware 19801
Phone: (302) 467-4509
E-mail:  martint@whiteandwilliams.com

Respectfully submitted,

*/s/ Marc Casarino*
Marc Casarino (DE 3613)
Kennedys LLP
222 Delaware Avenue
Suite 710
Wilmington, DE 19801
marc.casarino@kennedyslaw.com

Mark D. Plevin (admitted *pro hac vice*)
Plevin & Turner LLP
580 California Street, 12th Floor
San Francisco, California 94104
Phone: (415) 580-6640
E-mail:  mplevin@plevinturner.com

George R. Calhoun (admitted *pro hac vice*)
Ifrah PLLC
1717 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Phone: (202) 525-4147
george@ifrahlaw.com

Tacie H. Yoon (admitted *pro hac vice*)
Plevin & Turner LLP
1701 Pennsylvania Ave., N.W.

*Attorneys for TIG Insurance Company, as successor by merger to International Insurance Company, International Surplus Lines Insurance Company, Mt. McKinley*

---

[118] The Court and parties in interest have already seen that Debtors' abandonment of their responsibilities has led to irregularities—if not fraud—including votes by claimants who either are known not to have valid claims (*e.g.*, claimants who litigated claims against Imerys pre-bankruptcy and lost at summary judgment for lack of product exposure) or whose claims may be improper (*e.g.*, claimants whose counsel voted on their behalf without asking whether the claimant alleged exposure to the Debtors' talc and without regard to the claimant's having filed claims in other asbestos bankruptcies).  *See* Bevan Tr. 140:14-141:24; 158:22-159:12, Calhoun Decl. Ex. 12.

Washington, D.C. 20006
Phone: (202) 580-6640
Email:  tyoon@plevinturner.com

*Attorneys for Century Indemnity Company, Federal Insurance Company, and Central National Insurance Company of Omaha*

*Insurance Company (formerly known as Gibraltar Insurance Company), Fairmont Premier Insurance Company (formerly known as Transamerica Premier Insurance Company), Everest Reinsurance Company (formerly known as Prudential Reinsurance Company), and The North River Insurance Company*

**KLEHR HARRISON HARVEY BRANZBURG LLP**

Richard M. Beck (DE Bar No. 3370)
Sally E. Veghte (DE Bar No. 4762)
919 Market Street, Suite 1000
Wilmington, Delaware 19801-3062
Telephone:      (302) 426-1189
Facsimile:      (302) 426-9193
Email:      rbeck@klehr.com
sveghte@klehr.com

- and -

James P. Ruggeri (*pro hac vice*)
Joshua D. Weinberg (*pro hac vice*)
Joshua P. Mayer (*pro hac vice*)
**RUGGERI PARKS WEINBERG LLP**
1875 K Street NW, Suite 600
Washington, DC  20006-1251
Telephone: (202) 984-1400
Facsimile: (202) 984-1401
Email: jruggeri@ruggerilaw.com
          jweinberg@ruggerilaw.com

          jmayer@ruggerilaw.com

*Counsel for Hartford Accident and Indemnity Company and First State Insurance Company*

**DILWORTH PAXSON LLP**

Martin J. Weis (No. 4333)
800 N. King Street
Suite 202
Wilmington, DE  19801
mweis@dilworthlaw.com
(T):  302-571-9800
(F):  302-351-8735
*Attorney for Employers Mutual Casualty Company*

**STAMOULIS & WEINBLATT LLC**

Stamatios Stamoulis (#4606)
800 N. West Street
Third Floor
Wilmington, Delaware 19801
Telephone: 302 999 1540
Facsimile: 302 762 1688

-and-

**O'MELVENY & MYERS LLP**

Tancred Schiavoni (pro hac vice)
Adam P. Haberkorn (pro hac vice anticipated)
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
tschiavoni@omm.com
ahaberkorn@omm.com

*Counsel for Columbia Casualty Company, Continental Casualty Company, in its own right, and as successor to CNA Casualty of*

*California, The Continental Insurance Company, as successor to and as successor in interest to certain insurance policies issued by Harbor Insurance Company, Stonewall Insurance Company (now known as Berkshire Hathaway Specialty Insurance Company), National Union Fire Insurance Company of Pittsburgh PA, and Lexington Insurance Company to the extent they issued policies to Cyprus Mines Corporation prior to 1981; and AIU Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, Granite State Insurance Company, The Continental Insurance Company, as successor to The Fidelity and Casualty Company of New York and as successor in interest to certain policies issued by London Guarantee & Accident of New York, and Republic Insurance Company to the extent they issued policies to Standard Oil of Indiana prior to 1986.*