## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------ x
In re:                                          :    Chapter 11
                                                :
IMERYS TALC AMERICA, INC., et al.,[1]           :    Case No. 19-10289 (LSS)
                                                :
                                                :    (Jointly Administered)
                Debtors.                        :
------------------------------------------------------------ x
```

## SECOND JOINT PLAN OF REORGANIZATION OF IMERYS TALC AMERICA, INC. AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

THE PLAN PROPONENTS RESERVE THE RIGHT TO AMEND, SUPPLEMENT OR OTHERWISE MODIFY THIS JOINT CHAPTER 11 PLAN PRIOR TO OR DURING THE CONFIRMATION HEARING TO THE EXTENT ALLOWED BY THE BANKRUPTCY CODE AND THE BANKRUPTCY RULES AND IN ACCORDANCE WITH THE TERMS OF THE PLAN.

THE PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF AN INJUNCTION PURSUANT TO SECTIONS 105(a) AND 524(g) OF THE BANKRUPTCY CODE THAT CHANNELS ALL CLASS 4A AND CLASS 4B TALC PERSONAL INJURY CLAIMS AGAINST THE DEBTORS AND THE PROTECTED PARTIES (AS DEFINED HEREIN) TO A TRUST, AS WELL AS OTHER INJUNCTIONS DESCRIBED IN ARTICLE XII OF THE PLAN.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number (to the extent applicable), are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

# CONTENTS

Page

ARTICLE I DEFINITIONS AND RULES OF INTERPRETATION ............................................1

    1.1    Capitalized Terms ...........................................................................................1
    1.2    Interpretation; Application of Definitions; Rules of Construction; and Computation of Time .................................................................................39
    1.3    Exhibits ........................................................................................................39
    1.4    Ancillary Documents ...................................................................................39

ARTICLE II TREATMENT OF ADMINISTRATIVE CLAIMS, FEE CLAIMS, AND PRIORITY TAX CLAIMS ...............................................................................40

    2.1    Administrative Claims ..................................................................................40
    2.2    Allowed Priority Tax Claims .......................................................................41
    2.3    Fee Claims ....................................................................................................41

ARTICLE III TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS ..........42

    3.1    Grouping of the Debtors for Convenience ..................................................42
    3.2    Claims and Equity Interests Classified .......................................................42
    3.3    Treatment and Classification of Claims and Equity Interests ......................42
    3.4    Debtors' Rights with Respect to Unimpaired Claims ..................................46

ARTICLE IV THE TALC PERSONAL INJURY TRUST ........................................................46

    4.1    Establishment of the Talc Personal Injury Trust .........................................46
    4.2    Purpose and Trust Distribution Procedures .................................................46
    4.3    Initial Talc Trustees .....................................................................................47
    4.4    Delaware Trustee .........................................................................................47
    4.5    Advising the Talc Personal Injury Trust .....................................................47
    4.6    Transfer of Talc Personal Injury Claims to the Talc Personal Injury Trust ..........48
    4.7    Transfer of Talc Personal Injury Trust Assets to the Talc Personal Injury Trust ..............................................................................................49
    4.8    Talc Personal Injury Trust Expenses ..........................................................50
    4.9    Excess Talc Personal Injury Trust Assets ...................................................50
    4.10    Dissolution of the Talc Personal Injury Trust .............................................50
    4.11    Funds and Investment Guidelines ...............................................................50
    4.12    Cooperation Agreement ...............................................................................50
    4.13    Indemnification of the Protected Parties for Talc Personal Injury Claims ..........51
    4.14    Post-Effective Date Liabilities .....................................................................51
    4.15    Institution and Maintenance of Legal and Other Proceedings ....................51

US-DOCS\164401015.3RLF1 33881412v.1

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ................................................................................................52

5.1     General Treatment ...................................................................................52
5.2     Claims Based on Rejection of Executory Contracts or Unexpired Leases ...........52
5.3     Cure of Defaults for Executory Contracts and Unexpired Leases ........................53
5.4     Modifications, Amendments, Supplements, Restatements or Other
        Agreement ...............................................................................................55
5.5     Reservation of Rights ...............................................................................55
5.6     Talc Insurance Policies, Cyprus Talc Insurance Policies, J&J Policies, and
        Talc Insurance CIP Agreements .............................................................55
5.7     Non-Talc Insurance Policies ....................................................................56

ARTICLE VI DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF CLAIMS
OTHER THAN TALC CLAIMS ...........................................................56

6.1     Distributions .............................................................................................56
6.2     Timing and Calculation of Amounts to be Distributed ...........................56
6.3     Disbursing Agent ......................................................................................57
6.4     Rights and Powers of Disbursing Agent ..................................................57
6.5     Distributions on Account of Claims Allowed After the Effective Date ...............57
6.6     Delivery of Distributions and Undeliverable or Unclaimed Distributions ...........57
6.7     Time Bar to Cash Payments .....................................................................58
6.8     Disbursing Agent's Obligation to Provide Periodic Reporting ................58
6.9     Record Date for Holders of Claims .........................................................58
6.10    Compliance with Tax Requirements and Allocations .............................59
6.11    Transfers of Claims ..................................................................................59
6.12    Interest on Impaired and Disputed Claims ..............................................59
6.13    Setoffs ......................................................................................................59

ARTICLE VII RESOLUTION OF DISPUTED CLAIMS OTHER THAN TALC
CLAIMS, ADMINISTRATIVE CLAIMS, AND FEE CLAIMS .........60

7.1     Disputed Claims .......................................................................................60
7.2     Prosecution of Claims Generally .............................................................60
7.3     Prosecution of Disputed Non-Talc Claims and Claims Objection Deadline ........60
7.4     [Reserved] ................................................................................................61
7.5     Distributions on Account of Disputed Claims .........................................61
7.6     No Distributions Pending Allowance ......................................................61
7.7     Estimation of Claims ................................................................................61
7.8     Disputed Claims Reserve for the Debtors ................................................61
7.9     [Reserved] ................................................................................................62
7.10    Distribution of Excess Amounts in the Disputed Claims Reserve for the
        Debtors .....................................................................................................62

US-DOCS\164401015.3RLF1 33881412v.1

ARTICLE VIII ACCEPTANCE OR REJECTION OF PLAN ....................................................62

8.1    Classes Entitled to Vote..................................................................................62
8.2    Acceptance of Holders of Talc Personal Injury Claims...........................62
8.3    Acceptance by Unimpaired Classes.............................................................63

ARTICLE IX CONDITIONS PRECEDENT TO CONFIRMATION  AND
CONSUMMATION OF THE PLAN ....................................................63

9.1    Conditions Precedent to the Confirmation of the Plan .............................63
9.2    Conditions Precedent to the Effective Date of the Plan...........................67
9.3    Waiver of Conditions Precedent ...................................................................69
9.4    Notice of Effective Date ................................................................................69
9.5    Concurrent Effectiveness of the Plan and the Cyprus Mines Plan ........69

ARTICLE X MEANS FOR IMPLEMENTATION OF THE PLAN ...........................................69

10.1    General.............................................................................................................69
10.2    Operations of the Debtors Between Confirmation and the Effective Date...........69
10.3    Charter and Bylaws........................................................................................69
10.4    Corporate Action............................................................................................70
10.5    Post-Effective Date Governance and Continued Existence of the
Reorganized Debtors......................................................................................70
10.6    Effective Date Merger....................................................................................71
10.7    Imerys Settlement ..........................................................................................72
10.8    Rio Tinto/Zurich Settlement .........................................................................74
10.9    Cyprus Settlement...........................................................................................77
10.10    XL Settlement .................................................................................................81
10.11    Good Faith Compromise and Settlement....................................................82
10.12    Resolution of Talc Personal Injury Claims................................................83
10.13    Sources of Consideration for Plan Distributions .......................................83
10.14    Transfer of Remaining Debtors' Assets to the Talc Personal Injury Trust...........84
10.15    Modification of the Plan ...............................................................................84
10.16    Revocation or Withdrawal of the Plan........................................................85
10.17    Certain Technical Modifications...................................................................85

ARTICLE XI EFFECT OF CONFIRMATION ....................................................................85

11.1    Preservation of Certain Estate Causes of Action ......................................85
11.2    Preservation of Talc Personal Injury Trust Causes of Action................86
11.3    Talc Insurance Actions ..................................................................................86
11.4    Insurance Provisions ......................................................................................86
11.5    Institution and Maintenance of Legal and Other Proceedings................87
11.6    Terms of Injunctions and Automatic Stay ..................................................88
11.7    The FCR and the Tort Claimants' Committee ...........................................88
11.8    Lack of Precedential Value ...........................................................................89
11.9    Expungement of Talc Claims from the Claims Register ..........................89

iv

11.10   Provisions Related to the J&J Settlement ...........................................................89

ARTICLE XII RELEASES, INJUNCTION AND EXCULPATION .........................................90

12.1   Discharge and Injunctions .................................................................................90
12.2   Releases ..............................................................................................................91
12.3   The Channeling Injunction and the Insurance Entity Injunction .......................95
12.4   Supplemental Settlement Injunction Order ........................................................99
12.5   Reservation of Rights .......................................................................................100
12.6   Disallowed Claims ............................................................................................100
12.7   Exculpation .......................................................................................................100
12.8   No Successor Liability ......................................................................................101
12.9   Corporate Indemnities ......................................................................................101
12.10  ERISA Pension Plans .......................................................................................102
12.11  Survival of Foreign Claims ..............................................................................103

ARTICLE XIII JURISDICTION OF BANKRUPTCY COURT ...........................................103

13.1   Jurisdiction .......................................................................................................103
13.2   General Retention .............................................................................................104
13.3   Specific Purposes .............................................................................................104
13.4   District Court Jurisdiction ................................................................................106
13.5   Reservation of Rights .......................................................................................106
13.6   Compromises of Controversies ........................................................................107
13.7   Talc Personal Injury Claims .............................................................................107

ARTICLE XIV MISCELLANEOUS PROVISIONS ............................................................107

14.1   Closing of Chapter 11 Cases ............................................................................107
14.2   Timing of Distributions or Actions ..................................................................107
14.3   Governing Law .................................................................................................107
14.4   Entire Agreement ..............................................................................................107
14.5   Headings ...........................................................................................................107
14.6   Severability .......................................................................................................107
14.7   Notices ..............................................................................................................108
14.8   Notice to Other Entities ...................................................................................111
14.9   Plan Supplement ...............................................................................................111
14.10  Inconsistencies .................................................................................................111
14.11  Withholding of Taxes .......................................................................................112
14.12  Transfer Taxes ..................................................................................................112
14.13  Binding Effect ..................................................................................................112
14.14  Payment of Statutory Fees ...............................................................................112
14.15  Effective Date Actions Simultaneous ..............................................................112
14.16  Consent to Jurisdiction .....................................................................................112
14.17  Further Assurances ...........................................................................................112

## <u>EXHIBITS AND SCHEDULES TO PLAN</u>

Exhibit A          Trust Distribution Procedures

Exhibit B          Talc Personal Injury Trust Agreement

Exhibit C          Rio Tinto/Zurich Settlement Agreement

Exhibit D          XL Settlement Agreement

Exhibit E          J&J Settlement Agreement

Schedule I         Imerys Corporate Parties

Schedule II        Imerys Plan Proponents

Schedule III       Imerys Protected Parties

Schedule IV        Rio Tinto Captive Insurer Policies

Schedule V         Rio Tinto Corporate Parties

Schedule VI        Zurich Corporate Parties

Schedule VII       Zurich Policies

Schedule VIII      Cyprus Corporate Parties

Schedule IX        Cyprus Talc Insurance Policies

Schedule X         XL Corporate Parties

Schedule XI        XL Policies

US-DOCS\164401015.3RLF1 33881412v.1

## INTRODUCTION

Imerys Talc America, Inc. and its affiliated debtors and debtors-in-possession in the above captioned Chapter 11 Cases respectfully propose the following joint chapter 11 plan of reorganization.  Unless otherwise indicated, capitalized terms shall have the meanings ascribed to them in Section 1.1 of the Plan.

Nothing in the Plan Documents constitutes an admission by the Debtors as to the existence, merits, or amount of the Debtors' actual present or future liability on account of any Claim or demand (including, but not limited to, any Talc Demand) except to the extent that such liability is specifically provided for in the Plan or the other Plan Documents in accordance with the Confirmation Order effective as of the Effective Date.

The Plan Proponents hereby jointly propose the following Plan pursuant to the provisions of chapter 11 of title 11 of the United States Code for the Debtors in the Chapter 11 Cases. Reference is made to the Disclosure Statement distributed in accordance with the terms of the Voting Procedures Order, for, among other things, a discussion of the history, businesses, properties, and results of operations of the Debtors, projections for future operations, settlements contained in the Plan, and risks associated with the Plan.  The Disclosure Statement also provides a summary of the Plan.

## ARTICLE I
## DEFINITIONS AND RULES OF INTERPRETATION

1.1    Capitalized Terms.  The capitalized terms used herein have the respective meanings set forth below.  Any term that is not otherwise defined in this Section 1.1 of the Plan, but that is defined elsewhere in the Plan or in the Bankruptcy Code or Bankruptcy Rules, shall have the meaning given to that term in the Plan, the Bankruptcy Code, or Bankruptcy Rules, as applicable.

1.1.1    "**Acceptance and Release**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.2    "**Additional Contribution**" is defined in accordance with Section 10.7.2.4 of the Plan.

1.1.3    "**Administrative Claim**" means any Claim for any cost or expense of administration of the Chapter 11 Cases under section 503(b) of the Bankruptcy Code, including, but not limited to, (1) any actual and necessary post-petition cost or expense of preserving the Estates or operating the businesses of the Debtors, (2) any payment to be made under the Plan to cure a default on an assumed Executory Contract or Unexpired Lease, (3) post-petition costs, indebtedness or contractual obligations duly and validly incurred or assumed by the Debtors in the ordinary course of business, (4) any Fee Claim, including any Claim for compensation or reimbursement of expenses of Professionals to the extent allowed by the Bankruptcy Court under sections 327, 328, 330(a), 331, or 503(b) of the Bankruptcy Code or the provisions of the Plan, (5) any fee or charge assessed against the Estates under 28 U.S.C. § 1930(6), (6) any Claim of the Information Officer and/or counsel for the Information Officer, and (7) any Claim that has been granted superpriority administrative expense status in accordance with the Final Cash Management Order.

1.1.4    "**Administrative Claims Bar Date**" means the applicable deadline for filing requests for payment of Administrative Claims (other than Fee Claims) and shall be the Business Day that is sixty (60) days after the Effective Date.

1.1.5    "**Administrative Claim Reserve**" means an amount, as of the Effective Date, equal to (i) the Allowed Amount of Administrative Claims (excluding Fee Claims) and (ii) an estimate by the Debtors (subject to input from and consent by each of the Plan Proponents) of additional Administrative Claims (excluding Fee Claims) that may become Allowed after the Effective Date, certain amounts attributable to the transfer of the Talc Personal Injury Trust Assets to the Talc Personal Injury Trust, and costs incurred by the Reorganized Debtors related to post-Effective Date Administrative Claim resolution.  The sole purpose of the Administrative Claim Reserve is to pay the Allowed Administrative Claims against the Debtors and such other costs described in this Section 1.1.4 in full.

1.1.6    "**Administrative Expense Contribution**" is defined in accordance with Section 10.7.2.2 of the Plan.

1.1.7    "**Affiliate**" means, with respect to any specified entity: (a) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified entity; or (b) any other Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified entity.  As used in clause (b) of the prior sentence, "control" shall include the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified entity (whether through the ownership of equity, by contract or otherwise).

1.1.8    "**Affirmation Order**" means an order of the District Court affirming Confirmation of the Plan and issuing or affirming the issuance of the Channeling Injunction in favor of the Protected Parties.

1.1.9    "**Allowed**" means (a) with respect to Non-Talc Claims, and including applicable premiums and penalties to the extent allowable: (i) any Claim proof of which is timely filed by the applicable Claims Bar Date; (ii) any Claim that is listed in the Schedules as neither contingent, unliquidated, nor disputed, and for which no Proof of Claim has been timely filed; or (iii) any Claim that is allowed pursuant to the Plan; *provided, however*, that with respect to any Claim described in clauses (i) and (ii) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance of such Claim has been filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or such an objection is filed and the Claim shall have been allowed by a Final Order, and (b) with respect to Equity Interests: (i) any Equity Interest registered in the stock register (or its equivalent) maintained by or on behalf of the relevant Debtors as of the Confirmation Date; (ii) any Equity Interest that is allowed pursuant to the Plan; or (iii) any other Equity Interest that has been allowed by a Final Order of the Bankruptcy Court.

1.1.10    "**Allowed Amount**" means, with respect to any Non-Talc Claim, the amount for which that Claim is Allowed, denominated in U.S. dollars, Canadian dollars, or Euros, as applicable.

1.1.11    "**Amended Bylaws**" means, the amended and restated bylaws of each of the Reorganized Debtors, in substantially the form contained in the Plan Supplement.

1.1.12    "**Amended Certificate of Incorporation**" means, as to each of the Reorganized Debtors, the amended and restated certificate of incorporation of such Debtor, in substantially the form contained in the Plan Supplement.

1.1.13    "**Amended Charter Documents**" means, collectively, the Amended Bylaws and the Amended Certificates of Incorporation.

1.1.14    "**Amoco**" is defined in accordance with <u>Section 1.1.69</u> of the Plan.

1.1.15    "**Asset Purchase Agreement**" means that certain Asset Purchase Agreement by and among the Debtors and Magris Resources Canada Inc., dated as of October 13, 2020, as amended pursuant to that certain Amendment to the Asset Purchase Agreement, dated as of October 27, 2020 (as may be further amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof).

1.1.16    "**Assignment**" means the transfer to the Talc Personal Injury Trust of the Talc Insurance Assets.

1.1.17    "**Bankruptcy Code**" means title 11 of the United States Code, as in effect on February 13, 2019.

1.1.18    "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases.

1.1.19    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code and any local rules of the Bankruptcy Court, as in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

1.1.20    "**Bid Procedures Order**" means that certain *Order (I) (A) Establishing Bidding Procedures, Assumption and Assignment Procedures, and Stalking Horse Procedures for Sale of Substantially All Assets, (B) Scheduling Auction and Sale Hearing, and (C) Approving Form and Manner of Notice Thereof, and (II) Granting Related Relief* [Docket No. 1950], as modified by the *Notice of Modified Deadlines Contained in the Bidding Procedures and the Bidding Procedures Order* [Docket No. 2039], the *Second Notice of Modified Deadlines Contained in the Bidding Procedures and the Bidding Procedures Order* [Docket No. 2189], and the *Third Notice of Modified Deadlines Contained in the Bidding Procedures and the Bidding Procedures Order* [Docket No. 2329].

1.1.21    "**Business Day**" means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, NY are authorized or required by law or executive order to close.

1.1.22    "**Buyer**" means Magris Resources Canada Inc., as the purchaser pursuant to the Sale Order.

1.1.23    "**California Coverage Action**" means the lawsuit styled as *Columbia Cas. Co., et al. v. BP Corp. N. Am., Inc., et al.,* No. CGC-17-560919 in the California Superior Court, County of San Francisco.

1.1.24    "**CAMC**" means Cyprus Amax Minerals Company, a Delaware corporation, and the immediate parent of Cyprus Mines.

1.1.25    "**CAMC Cash Payments**" is defined in accordance with Section 10.9.3 of the Plan.

1.1.26    "**Canadian Claims**" means Talc Personal Injury Claims of individuals exposed in Canada or who were resident in Canada at the time such claims are filed.

1.1.27    "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List).

1.1.28    "**Canadian Proceeding**" means the proceeding commenced by ITC before the Canadian Court pursuant to the Companies Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36, as amended.

1.1.29    "**Cash**" means lawful currency of the United States of America and its equivalents.

1.1.30    "**Certain Cyprus Historical Settled Insurers**" means the Cyprus Historical Settled Insurers excluding the insurers to whom a Cyprus Corporate Party has granted a release of coverage for Talc Claims pursuant to (i) the London Market Settlement and Release Agreement or (ii) the Seaton Settlement and Release Agreement.

1.1.31    "**Channeling Injunction**" means the permanent injunction provided for in Section 12.3 of the Plan with respect to Talc Personal Injury Claims against the Protected Parties to be issued pursuant to the Confirmation Order.

1.1.32    "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under Case No. 19-10289 (LSS).

1.1.33    "**Claim**" shall have the meaning ascribed to such term in section 101(5) of the Bankruptcy Code.

1.1.34    "**Claims Agent**" means Kroll Restructuring Administration LLC (f/k/a Prime Clerk LLC).

1.1.35    "**Claims Bar Date**" means (i) October 15, 2019, for Non-Talc Claims (subject to the exceptions contained in the General Bar Date Order), (ii) January 9, 2020, for Indirect Talc Claims against the Debtors, or (iii) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for submitting certain Claims.

1.1.36    "**Claims Objection Bar Date**" means the deadline for objecting to Non-Talc Claims set forth in Section 7.3.2 which shall be one hundred and twenty (120) days after the Effective Date, unless extended by operation of the Bankruptcy Rules or order of the Bankruptcy Court prior to the expiration of such period.

1.1.37    "**Claims Register**" means the register of Claims filed against the Debtors in the Chapter 11 Cases maintained by the Claims Agent as such register is updated from time to time to reflect, among other things, Claims that have been Allowed or Disallowed.

1.1.38    "**Class**" means a category of holders of Claims or Equity Interests described in Article III of the Plan.

1.1.39    "**Clerk**" means the clerk of the Bankruptcy Court.

1.1.40    "**Compensation Procedures Order**" means that certain *Order Under 11 U.S.C. §§ 105(a) and 331, Fed. R. Bankr. P. 2016(a), and Del. Bankr. L.R. 2016-2 Establishing Procedures for Interim Compensation and Reimbursement of Professionals* [Docket No. 301].

1.1.41    "**Confirmation**" means the entry of the Confirmation Order on the Docket of the Chapter 11 Cases.

1.1.42    "**Confirmation Date**" means the date on which the Confirmation Order is entered on the Docket in the Chapter 11 Cases.

1.1.43    "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.1.44    "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.1.45    "**Contributed Indemnity and Insurance Interests**" is defined in accordance with Section 10.7.2.3 of the Plan.

1.1.46    "**Contribution Claim**" is defined in accordance with Section 12.3.1(g) of the Plan.

1.1.47    "**Cooperation Agreement**" means that certain Cooperation Agreement among the Debtors, Imerys S.A., on behalf of itself and the Non-Debtor Affiliates, the Talc Personal Injury Trust, Alston & Bird LLP, and Gordon Rees Scully Mansukhani LLP, in substantially the form contained in the Plan Supplement.

5

1.1.48    "**Cure Amount**" means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default of one or more of the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of such Debtor(s) and applicable non-bankruptcy law and (ii) permit such Debtor(s) to assume such Executory Contract or Unexpired Lease under section 365(a) of the Bankruptcy Code.

1.1.49    "**Cyprus**" means, collectively, Cyprus Mines and CAMC.

1.1.50    "**Cyprus Affiliated Parties**" means, for such time as Cyprus Mines was a subsidiary of CAMC or its predecessors, and solely in their capacity as such: (i) direct or indirect shareholders of CAMC or its predecessors; (ii) current and former officers, directors, principals, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, experts, and other professionals of the Cyprus Corporate Parties; and (iii) with respect to each of the foregoing Persons in clauses (i) and (ii), each such Person's respective heirs, executors, estates, and nominees, as applicable.  For the avoidance of doubt, the Cyprus Affiliated Parties exclude the J&J Corporate Parties, the Rio Tinto Corporate Parties, the Imerys Corporate Parties, and the Debtors.

1.1.51    "**Cyprus Affirmation Order**" means an order of the District Court affirming the confirmation of the Cyprus Mines Plan and issuing or affirming the issuance of a channeling injunction under section 524(g) and other applicable provisions of the Bankruptcy Code in favor of the Debtors, the Imerys Protected Parties, and the Cyprus Protected Parties.

1.1.52    "**Cyprus Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Cyprus Mines Plan pursuant to section 1129 of the Bankruptcy Code.

1.1.53    "**Cyprus Contributions**" is defined in accordance with Section 10.9.3 of the Plan.

1.1.54    "**Cyprus Corporate Parties**" means (a) Freeport, (b) CAMC, (c) Cyprus Mines, (d) the Persons listed on Schedule VIII, each of which is directly or indirectly owned or controlled by Freeport, CAMC, and/or Cyprus Mines, and (e) any future successors or assigns of Freeport, CAMC, Cyprus Mines, and/or the Persons or Entities listed on Schedule VIII, solely in their capacities as such.

1.1.55    "**Cyprus Designated Account**" has the meaning ascribed to such term in the J&J Settlement Agreement.

1.1.56    "**Cyprus FCR**" means Roger Frankel (or any Bankruptcy Court-appointed successor), in his capacity as the legal representative for any and all persons who assert Cyprus Talc Personal Injury Demands against Cyprus Mines, but who are currently unknown.

1.1.57    [Reserved]

6

1.1.58    "**Cyprus Historical Insurance Settlements**" means the following agreements, but solely to the extent of the particular Cyprus Talc Insurance Policies released in each settlement agreement: (1) the settlement and release agreement by and between CAMC, on the one hand, and The Home Insurance Company, on the other hand, dated August 14, 2002; (2) the settlement and release agreement by and among CAMC, Cyprus Mines, AMAX Inc. and Cyprus Foote Mineral Company, on the one hand, and International Insurance Company, individually and as successor in interest to International Surplus Lines Insurance Company, and North River Insurance Corporation on the other hand, dated December 19, 2000; (3) the settlement and release agreement by and between CAMC, on the one hand, and St. Paul Fire and Marine Insurance Company, on the other hand, dated June 14, 2000; (4) the settlement and release agreement by and among CAMC, on the one hand, and Westport Insurance Corporation (f/k/a Puritan Insurance Company, f/k/a Manhattan Fire and Marine Insurance Company) on the other hand, dated July 19, 2000; (5) the London Market Settlement and Release Agreement; and (6) the Seaton Settlement and Release Agreement.

1.1.59    "**Cyprus Historical Settled Insurers**" means the insurers to whom a Cyprus Corporate Party has granted a release of coverage for Talc Claims pursuant to the Cyprus Historical Insurance Settlements, solely with respect to the policies and claims so released.

1.1.60    "**Cyprus Insurance Protocol**" means that: (1) in the event that (a) the Talc Personal Injury Trust obtains a Judgment providing that the Talc Personal Injury Trust is entitled to a payment from an insurer pursuant to any Cyprus Talc Insurance Policy or if such an insurer enters into an agreement or settlement to pay, or otherwise pays, an amount to the Talc Personal Injury Trust pursuant to any Cyprus Talc Insurance Policy, and (b) based on such Judgment or agreement or settlement or payment, such insurer obtains a Judgment against any Cyprus Historical Settled Insurer, or an agreement to pay from any Cyprus Historical Settled Insurer, the Talc Personal Injury Trust shall voluntarily reduce its Judgment against, agreement with, settlement with, or recovery from such insurer to the extent necessary to eliminate any indemnification or other monetary obligation owed by any Cyprus Corporate Party to such Cyprus Historical Settled Insurer pursuant to the Cyprus Historical Insurance Settlements; (2) the Talc Personal Injury Trust shall not seek recovery from any London Market Insurer that was a party to the London Market Settlement and Release Agreement, or any other insurer, with respect to policies and claims released in that agreement; (3) the Talc Personal Injury Trust shall not seek recovery from Providence Washington, or any other insurer, with respect to the policy released in the Seaton Settlement and Release Agreement; (4) if the Talc Personal Injury Trust obtains a Judgment that entitles it to receive a payment from any of the Certain Cyprus Historical Settled Insurers, the Talc Personal Injury Trust shall voluntarily reduce its Judgment against the Certain Cyprus Historical Settled Insurer to the extent necessary to eliminate any indemnification or other monetary obligation owed by a Cyprus Corporate Party to such Certain Cyprus Historical Settled Insurer; and (5) the Talc Personal Injury Trust shall obtain in any future settlement with any Certain Cyprus Historical Settled Insurer with respect to the Cyprus Talc Insurance Policies released in any Cyprus Historical Insurance Settlement a release by the Certain Cyprus Historical Settled Insurer of the Cyprus Protected Parties.

1.1.61    "**Cyprus Mines**" means Cyprus Mines Corporation.

1.1.62    "**Cyprus Mines Bankruptcy**" means the chapter 11 case filed by Cyprus Mines on February 11, 2021, under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, Case No. 21-10398 (LSS).

1.1.63    "**Cyprus Mines Plan**" means the *Third Modified First Amended Plan of Reorganization of Cyprus Mines Corporation Under Chapter 11 of the Bankruptcy Code*, as may be amended, modified, or supplemented from time to time, filed by Cyprus Mines in the Cyprus Mines Bankruptcy, and which incorporates the terms of the Cyprus Settlement.

1.1.64    "**Cyprus Mines Plan Note**" means the unsecured, seven-year promissory note, in substantially the form contained in the Cyprus Mines Plan Supplement, issued by CAMC and the Reorganized Cyprus Mines Debtor, jointly and severally, for and on behalf of themselves, Cyprus Mines, and all other Cyprus Protected Parties, in favor of the Talc Personal Injury Trust with an aggregate outstanding principal amount of $195 million as of the effective date of the Cyprus Mines Plan, payable as set forth in Section 10.9.3 of the Plan.

1.1.65    "**Cyprus Mines Plan Note Pledge Agreement**" means the Pledge Agreement, in substantially the form contained in the Cyprus Mines Plan Supplement, to be issued by CAMC in favor of the Talc Personal Injury Trust, pursuant to which the Talc Personal Injury Trust will be granted an Encumbrance entitling the Talc Personal Injury Trust to 51% of the equity interests in the Reorganized Cyprus Mines Debtor in the event of default and exercise of remedies under the Cyprus Mines Plan Note.

1.1.66    "**Cyprus Mines Plan Supplement**" means "Plan Supplement" as that term is defined in the Cyprus Mines Plan.

1.1.67    "**Cyprus Parties**" means, collectively, Cyprus and Freeport.

1.1.68    "**Cyprus Plan Proponents**" means "Plan Proponents" as that term is defined in the Cyprus Mines Plan.

1.1.69    "**Cyprus Protected Parties**" means the Cyprus Corporate Parties and the Cyprus Affiliated Parties.  With regard to Amoco Corporation or any successor or predecessor thereto that is not otherwise a Protected Party (collectively, "**Amoco**"): (i) with respect to any talc-related claims or liabilities relating to its indirect or direct ownership of Cyprus Mines prior to July 1, 1985, including any talc-related claim or liability that could give rise to any claim against CAMC under the Memorandum of Agreement dated June 28, 1985 between Amoco Corporation and Cyprus Minerals Company, Amoco shall be a Cyprus Protected Party, and (ii) with respect to any indemnity or similar obligations that it undertook after July 1, 1985, including to any Cyprus Talc Insurance Company with respect to any Cyprus Talc Insurance Policy, Amoco shall not be a Cyprus Protected Party. For the avoidance of doubt, the Cyprus Protected Parties exclude the Debtors, the Imerys Released Parties, the Rio Tinto Protected Parties, the Zurich Protected Parties, the XL Protected Parties, and the J&J Corporate Parties.

1.1.70    "**Cyprus Released Claims**" is defined in accordance with Section 12.2.1(d) of the Plan.

1.1.71    "**Cyprus Settlement**" means that certain comprehensive settlement by and among the Cyprus Parties, the Debtors, the Tort Claimants' Committee, the FCR, the Cyprus Tort Claimants' Committee, and the Cyprus FCR, the terms of which are set forth in and implemented by the Plan and the Cyprus Mines Plan.

1.1.72    "**Cyprus Settling Talc Insurance Company**" means any Cyprus Talc Insurance Company that enters into any settlement at any time with the Debtors, the Tort Claimants' Committee, the FCR, or the Talc Personal Injury Trust under which such Cyprus Talc Insurance Company contributes funds, proceeds, or other consideration to or for the benefit of the Talc Personal Injury Trust, but solely with respect to any Cyprus Talc Insurance Policy that is the subject of such settlement agreement.  For the avoidance of doubt, Old Republic is a Cyprus Settling Talc Insurance Company.

1.1.73    "**Cyprus Talc Claim**" means "Talc Claim" as that term is defined in the Cyprus Mines Plan.

1.1.74    "**Cyprus Talc Insurance Company**" means any insurance company, insurance syndicate, coverholder, insurance broker or syndicate insurance broker, guaranty association, or any other Entity that has, or may be alleged to have, liability under a Cyprus Talc Insurance Policy.

1.1.75    "**Cyprus Talc Insurance Policy**" means any liability insurance policy (i) that was issued prior to June 30, 1992, (ii) that is currently or was previously in effect at any time on or before the Effective Date, (iii) as to which there has not been a complete release of coverage for Talc Claims, and (iv) that names any Cyprus Protected Party as an insured (whether as the primary or additional insured, or by virtue of being a parent or subsidiary of the named insured) or that is otherwise alleged to afford any Cyprus Protected Party indemnity or insurance coverage for any Talc Claim or any other claims channeled to the Talc Personal Injury Trust.  The Cyprus Talc Insurance Policies include, but are not limited to, the policies set forth on Schedule IX.  For the avoidance of doubt, the Cyprus Talc Insurance Policies do not include any J&J Policies.

1.1.76    "**Cyprus Talc Insurance Policy Rights**" means (a) all rights, Claims, benefits, or causes of action, if any, held by the Cyprus Protected Parties with respect to the Cyprus Talc Insurance Policies and the J&J Policies, including the right to receive proceeds, subject to the J&J Settlement Agreement; and (b) all rights, Claims, or causes of action, if any, held by the Cyprus Protected Parties, including the right to receive proceeds, with respect to any settlement agreements or coverage-in-place agreements to the extent those agreements amend, modify, replace, or govern the rights and obligations of, and the coverage afforded to, any or all of the Cyprus Protected Parties under any Cyprus Talc Insurance Policy and any J&J Policy, subject to the J&J Settlement Agreement.

1.1.77    "**Cyprus Talc Personal Injury Claim**" means "Talc Personal Injury Claim" as that term is defined in the Cyprus Mines Plan.

1.1.78    "**Cyprus Talc Personal Injury Demand**" means "Talc Personal Injury Demand" as that term is defined in the Cyprus Mines Plan.

1.1.79    "**Cyprus Tort Claimants' Committee**" means the official committee of tort claimants in the Cyprus Mines Bankruptcy appointed by the United States Trustee, as such committee is reconstituted from time to time.

1.1.80    "**Debtor Causes of Action**" means any and all Estate Causes of Action (other than Talc Personal Injury Trust Causes of Action and Talc Insurance Actions) owned or held, or assertable by or on behalf of any Debtor or their Estates that are not otherwise released pursuant to the Plan. For the avoidance of doubt, the Debtor Causes of Action do not include any claims or causes of action that are Purchased Assets (as that term is defined in the Asset Purchase Agreement).

1.1.81    "**Debtor Intercompany Claim**" means any Claim held by a Debtor against another Debtor.

1.1.82    "**Debtor J&J Released Claims**" has the meaning ascribed to such term in the J&J Settlement Agreement.

1.1.83    "**Debtor Stock**" means the ITA Stock and the ITC Stock.

1.1.84    "**Debtors**" means Imerys Talc America, Inc., Imerys Talc Vermont, Inc., and Imerys Talc Canada Inc.

1.1.85    "**Delaware Trustee**" means the Entity appointed in accordance with Section 4.4 to serve as the "Delaware Trustee" in accordance with the terms of the Plan, the Cyprus Mines Plan, and the Talc Personal Injury Trust Agreement.

1.1.86    "**Designated Accounts**" has the meaning ascribed to such term in the J&J Settlement Agreement.

1.1.87    "**DIP Loan Documents**" means the credit agreement setting forth the terms and conditions of the debtor-in-possession financing facility contemplated by the DIP Motion and all documents related thereto. For the avoidance of doubt, (i) an order approving the DIP Motion was not entered by the Bankruptcy Court and the DIP Motion has been withdrawn, and (ii) no debtor-in-possession financing facility has been funded in the Chapter 11 Cases.

1.1.88    "**DIP Motion**" means the *Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 2459]. A notice of withdrawal of the DIP Motion was filed on September 16, 2021.

1.1.89    "**Disallowed**" means any Non-Talc Claim or Equity Interest that (a) is denied, dismissed, expunged, overruled, or disallowed in whole or in part (but solely to the extent of the disallowance) by Final Order or under the Plan, or (b) has been withdrawn, in whole or in part (but solely to the extent of such withdrawal).

1.1.90    "**Disbursing Agent**" means each Reorganized Debtor, or such other Entity or Entities chosen by the Reorganized Debtor or Reorganized Debtors to make or facilitate Distributions pursuant to the Plan.  For the avoidance of doubt, the Talc Personal Injury Trust shall not be considered a Disbursing Agent.

1.1.91    "**Discharge Injunction**" means the injunction issued in accordance with sections 524 and 1141 of the Bankruptcy Code and contained in Section 12.1 of the Plan.

1.1.92    "**Disclosure Statement**" means the *Disclosure Statement for Second Joint Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated November 5, 2024, including all exhibits and schedules thereto and references therein that relate to the Plan, approved by order of the Bankruptcy Court as containing adequate information, and distributed in accordance with such order of approval, as such disclosure statement and supplemental disclosure documents may be amended, modified, or supplemented from time to time with the consent of each of the Plan Proponents.

1.1.93    "**Disputed**" means any Non-Talc Claim or Equity Interest, or any portion thereof, that has not been Allowed or Disallowed pursuant to the Plan or a Final Order of the Bankruptcy Court, or that is contingent or unliquidated.

1.1.94    "**Disputed Claims Reserve**" means the reserve maintained by the Reorganized Debtors for any distributable amounts required to be set aside on account of Disputed Non-Talc Claims (other than Disputed Administrative Claims), the amount of which will be distributed (net of any expenses, including any taxes relating thereto), as provided in the Plan, as such Disputed Non-Talc Claims (other than Disputed Administrative Claims) are resolved by Final Order, and such amounts shall be distributable in respect of such Disputed Non-Talc Claims (other than Disputed Administrative Claims) as such amounts would have been distributable had the Disputed Non-Talc Claims (other than Disputed Administrative Claims) been Allowed Claims as of the Effective Date.  For the avoidance of doubt, available funds in the Disputed Claims Reserve will not be used to pay any Claims that are subject to payment from funds placed in the Reorganized Debtor Cash Reserve.

1.1.95    "**Distribution(s)**" mean(s) Cash, property, or interest in property to be paid or delivered hereunder to holders of Allowed Non-Talc Claims under the terms of the Plan.

1.1.96    "**Distribution Date**" means the date which is as soon as reasonably practicable after the later of (i) the Effective Date, or (ii) in the case of a Non-Talc Claim that is not yet Allowed as of the Effective Date, the date that such Claim becomes Allowed.

1.1.97    "**Distribution Record Date**" means the record date for determining an entitlement to receive Distributions under the Plan on account of Allowed Non-Talc Claims, which shall be the Confirmation Date.

1.1.98    "**District Court**" means the United States District Court for the District of Delaware.

1.1.99    "**Docket**" means the docket in the jointly administered Chapter 11 Cases maintained by the Clerk.

1.1.100    "**Dual Estate Factor**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.101    "**Effective Date**" means the Business Day upon which all of the conditions precedent to the occurrence of the Effective Date contained in Section 9.2 of the Plan have been satisfied or waived pursuant to Section 9.3.

1.1.102    "**Encumbrance**" means, with respect to any property (whether real or personal, tangible or intangible), any mortgage, Lien, pledge, charge, security interest, assignment or encumbrance of any kind or nature in respect of such property (including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction) to secure payment of a debt or performance of an obligation.

1.1.103    "**Entity**" shall have the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.1.104    "**Equity Interest**" means (i) the ITA Stock, (ii) the ITV Stock, and (iii) the ITC Stock, as applicable.

1.1.105    "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder, as amended, supplemented or substituted therefor from time to time.

1.1.106    "**ERISA Affiliate**" means, with respect to any Person, any other Person (whether or not incorporated) that, together with such Person, would be treated as a single employer under section 414 of the Internal Revenue Code or section 4001 of ERISA.

1.1.107    "**ERISA Pension Plan Sponsors**" is defined in accordance with Section 12.10 of the Plan.

1.1.108    "**ERISA Pension Plans**" is defined in accordance with Section 12.10 of the Plan.

1.1.109    "**Estate**" means, as to each Debtor, the estate created in its Chapter 11 Case under section 541 of the Bankruptcy Code.

1.1.110   "**Estate Causes of Action**" means any and all of the actions, claims, rights, remedies, defenses, counterclaims, suits, and causes of action owned or held, or assertable by or on behalf of any Debtor or its Estate (including, without limitation, claims assertable by the Tort Claimants' Committee or FCR, or by any other creditors, on behalf of any Debtor or its Estate), whether or not asserted, whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction, including, without limitation, claims or causes of action: (i) based on a theory of veil piercing, alter ego, vicarious liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, or any theory seeking to hold an Affiliate of a Debtor or other Protected Party liable for any Debtor's obligations; (ii) to avoid, invalidate or recover any transfer of any kind made by any Debtor, or any obligation of any Debtor, including under Chapter 5 of the Bankruptcy Code or other applicable law; (iii) based on a theory that any Affiliate of any Debtor or other Protected Party conspired with, aided or abetted, or acted in concert with any Debtor in allegedly harming holders of Talc Claims; or (iv) assertable by any Debtor or its Estate as a "generalized" claim under any federal, state, or other applicable law.

1.1.111   "**Executory Contract**" means any executory contract as to which one of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.1.112   "**FCR**" means James L. Patton (or any Bankruptcy Court-appointed successor), in his capacity as the legal representative for any and all persons who assert Talc Personal Injury Demands, but who are currently unknown.  "FCR" stands for Future Claimants' Representative.

1.1.113   "**Fee Claim**" means any Claim of a (i) Professional for allowance of compensation and reimbursement of costs and expenses and (ii) member of the Tort Claimants' Committee for reimbursement of costs and expenses, in each case incurred in the Chapter 11 Cases on or before the Effective Date.

1.1.114   "**Fee Claim Reserve**" means an amount equal to the Allowed Amount of Fee Claims against the Debtors and a reasonable estimate by the Debtors (subject to input from and consent by each of the Plan Proponents) of additional Fee Claims against the Debtors that may become Allowed after the Effective Date.  The sole purpose of the Fee Claim Reserve is to pay all Allowed and unpaid Fee Claims against the Debtors in full.

1.1.115   "**Fee Examiner**" means M. Jacob Renick (or any Bankruptcy Court-appointed successor), in his capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

1.1.116   "**Fee Examiner Order**" means the *Order Appointing Fee Examiner and Establishing Related Procedures for the Review of Applications of Retained Professionals* [Docket No. 741].

1.1.117    "**Final Cash Management Order**" means the *Final Order Under 11 U.S.C. §105(a), 345, 363, 503(b), and 507(a), Fed. R. Bankr. P. 6003 and 6004, and Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing Continuation of Existing Deposit Practices, (III) Approving the Continuation of Intercompany Transactions, and (IV) Granting Superpriority Administrative Expense Status to Certain Postpetition Intercompany Claims* [Docket No. 428].

1.1.118    "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

1.1.119    "**Foreign Claim**" means a Talc Claim solely involving talc or a product containing talc (i) that was purchased entirely outside of the US/Canada, and (ii) as to which the claimant's exposure to any such talc or product occurred entirely outside of the US/Canada.  For the avoidance of doubt, talc and products containing talc will be deemed to have been purchased entirely outside of the US/Canada only if (x) all the talc, or all the talc contained in the products, that the claimant used and that the claimant alleges caused his or her injury was mined, milled, processed, and shipped from locations entirely outside of the US/Canada and not distributed into the US/Canada, and (y) the claimant or other retail consumer purchased the product containing such talc entirely outside of the US/Canada.  For purposes of this definition, a Canadian Claim is not a Foreign Claim.

1.1.120    "**Foreign Claim Funding Agreement**" is defined in accordance with Section 10.7.2.4 of the Plan.

1.1.121    [Reserved]

1.1.122    "**Freeport**" means Freeport-McMoRan Inc.

1.1.123    "**Freeport Plan Note Guarantee**" means the guarantee agreement, in substantially the form contained in the Cyprus Mines Plan Supplement, to be executed by Freeport and delivered to the Talc Personal Injury Trust pursuant to which, upon the occurrence of the effective date of the Cyprus Mines Plan, Freeport will guarantee CAMC's and the Reorganized Cyprus Mines Debtor's payment obligations under the Cyprus Mines Plan Note and be subject to a minimum liquidity covenant of not less than $500 million tested as of the end of each of its fiscal quarters.  For purposes of this definition, "liquidity" means the sum of unrestricted cash of Freeport and its consolidated subsidiaries as of the applicable test date, plus availability under Freeport's revolving credit facilities at such time.

14

1.1.124    "**Fund**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.125    "**Fund A**" means the Fund described in Section 2.2(a) of the Trust Distribution Procedures.

1.1.126    "**Fund A Claims**" means Talc Personal Injury Claims that are Ovarian Cancer Claims and Other Gynecological Disease Claims, which will be compensated from Fund A in accordance with the Trust Distribution Procedures.  Fund A Claims do not include Foreign Claims.

1.1.127    "**Fund B**" means the Fund described in Section 2.2(b) of the Trust Distribution Procedures.

1.1.128    "**Fund B Claims**" means Talc Personal Injury Claims that are Mesothelioma Claims, Lung Cancer Claims, and Other Non-Gynecological Disease Claims, which will be compensated from Fund B in accordance with the Trust Distribution Procedures.  Fund B Claims do not include Foreign Claims.

1.1.129    "**General Bar Date Order**" means the *Order (I) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim Other Than with Respect to Talc Personal Injury Claims and (II) Approving Form and Manner of Notice Thereof* [Docket No. 881].

1.1.130    "**Home Proceeds**" has the meaning ascribed to such term in the J&J Settlement Agreement.

1.1.131    "**Imerys Affiliated Parties**" means, in each case during the times the Debtors were direct or indirect subsidiaries of Imerys S.A. and solely in their capacities as such: (i) direct or indirect shareholders of Imerys S.A.; (ii) current and former officers, directors, principals, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, experts, and other professionals of the Imerys Corporate Parties and/or the Debtors; and (iii) with respect to each of the foregoing Persons in clauses (i) and (ii), each such Person's respective heirs, executors, estates, and nominees, as applicable.  For the avoidance of doubt, the Imerys Affiliated Parties exclude the J&J Corporate Parties, the Rio Tinto Corporate Parties, and the Cyprus Corporate Parties.

1.1.132    "**Imerys Cash Contribution**" is defined in accordance with Section 10.7.2.2 of the Plan.

1.1.133    "**Imerys Contribution**" is defined in accordance with Section 10.7.2.4 of the Plan.

1.1.134    "**Imerys Corporate Parties**" means Imerys S.A. and all Persons listed on Schedule I, each of which are or were Affiliates of Imerys S.A. during the time that the Debtors were owned or controlled by Imerys S.A., and the successors and assigns of such Persons, solely in their capacity as such.  Schedule I is an exclusive list and does not

15

include, among others, the J&J Corporate Parties, the Rio Tinto Corporate Parties, or the Cyprus Corporate Parties.

1.1.135    "**Imerys Designated Account**" has the meaning ascribed to such term in the J&J Settlement Agreement.

1.1.136    [Reserved]

1.1.137    "**Imerys Non-Debtors**" means Imerys S.A. and its Affiliates, excluding the Debtors.

1.1.138    "**Imerys Plan Proponents**" means Imerys S.A., on behalf of itself and all Persons listed on Schedule II hereto, each of which Imerys S.A. has direct or indirect ownership or other control.

1.1.139    "**Imerys Protected Parties**" means (i) Imerys S.A., (ii) all Persons listed on Schedule III and (iii) the Imerys Affiliated Parties.  Schedule III is an exclusive list and does not include, among others, the J&J Corporate Parties, the Rio Tinto Corporate Parties, or the Cyprus Corporate Parties.

1.1.140    "**Imerys Released Parties**" means the Imerys Corporate Parties and the Imerys Affiliated Parties.

1.1.141    "**Imerys Released Claims**" is defined in accordance with Section 12.2.1(b) of the Plan.

1.1.142    "**Imerys S.A.**" means Imerys S.A., the Debtors' parent entity.

1.1.143    "**Imerys Settlement**" means that certain comprehensive settlement by and among the Plan Proponents, the terms of which are set forth and implemented herein.

1.1.144    "**Imerys Settlement Funds**" means (i) $75 million, *plus* (ii) the Sale Proceeds, *less* (iii) $376,630.14, representing Imerys S.A.'s reasonable and documented out-of-pocket costs and expenses of negotiation and preparation of the DIP Loan Documents.  For the avoidance of doubt, the Talc Personal Injury Trust will receive the *remaining* Sale Proceeds after accounting for (i) amounts used to fund the Chapter 11 Cases and (ii) any and all amounts payable or reserved pursuant to the Plan.

1.1.145    "**Imerys USA**" means Imerys USA, Inc., a Non-Debtor Affiliate.

1.1.146    "**Impaired**" means a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.1.147    "**Indirect Talc Claim**" means a Talc Claim of any corporation (as defined in section 101(9) of the Bankruptcy Code), insurer, co-defendant of a Debtor, or predecessor of a Debtor for contribution, reimbursement, subrogation, or indemnity, whether contractual or implied by law (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Talc Claim of any

corporation (as defined in section 101(9) of the Bankruptcy Code), insurer, co-defendant of a Debtor, or predecessor of a Debtor, whether in the nature of or sounding in contract, tort, warranty, or other theory of law. For the avoidance of doubt, an Indirect Talc Claim shall not include any claim for or otherwise relating to death, injury, or damages caused by talc or a product or material containing talc that is asserted by or on behalf of any injured individual, the estate, legal counsel, relative, assignee, or other representative of any injured individual, or an individual who claims injury or damages as a result of the injury or death of another individual regardless of whether such claim is seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs or damages, or any legal, equitable or other relief whatsoever, including pursuant to a settlement, judgment, or verdict. By way of illustration and not limitation, an Indirect Talc Claim shall not include any claim for loss of consortium, loss of companionship, services and society, or wrongful death. Indirect Talc Claims (that are not Foreign Claims) shall be resolved by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents.

1.1.148    "**Information Officer**" means any Entity (current and former), in its capacity as the information officer appointed by the Canadian Court in the Canadian Proceeding.

1.1.149    "**Initial Payment Percentages**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.150    "**Injunctions**" means the Discharge Injunction, the Channeling Injunction, the Supplemental Settlement Injunction Order, the Insurance Entity Injunction, the Release Injunction, and any other injunctions entered by the Bankruptcy Court or the District Court in connection with Confirmation of the Plan.

1.1.151    "**Insurance Adversary Proceeding**" means the adversary proceeding styled as *Imerys Talc America, Inc., et al. v. Cyprus Amax Minerals Company, et al.*, Adv. Pro. No. 19-50115 (LSS), U.S. Bankruptcy Court for the District of Delaware.

1.1.152    "**Insurance Entity Injunction**" means the injunction described in Section 12.3.2 of the Plan.

1.1.153    "**Insured Non-Talc Claim**" means a Non-Talc Claim that is alleged to be covered by an insurance policy issued or allegedly issued by a Non-Talc Insurance Company.

1.1.154    "**Intercompany Claim**" means (a) any Debtor Intercompany Claim or (b) any Non-Debtor Intercompany Claim.

1.1.155    "**Intercompany Loan**" means that certain loan payable from the Imerys Non-Debtors to the Debtors in the amount of approximately $23,963,000 as of the Petition Date, which has been paid in full, as of January 29, 2021.

1.1.156    "**Internal Revenue Code**" or "**Tax Code**" means title 26 of the United States Code, 26 U.S.C. §§ 1 *et seq.*, as in effect on the Petition Date, together with all

amendments, modifications, and replacements of the foregoing as the same may exist on any relevant date to the extent applicable to the Chapter 11 Cases.

1.1.157    "**ITA**" means Imerys Talc America, Inc., a Delaware corporation, and a Debtor in the Chapter 11 Cases.

1.1.158    "**ITA Stock**" means all of the outstanding shares of stock of (i) ITA, 100% of which is currently held by Imerys USA, or (ii) if on or after the Effective Date, Reorganized ITA, and which, upon the Effective Date, will be contributed to the Talc Personal Injury Trust.  On the Petition Date, the ITA Stock was held by Imerys Minerals Holding Limited.

1.1.159    "**ITC**" means Imerys Talc Canada Inc., a Quebec (Canada) corporation, and a Debtor in the Chapter 11 Cases.

1.1.160    "**ITC Stipulated Claim**" means any superpriority administrative expense claim held by ITC against ITA arising as a result of the Professional Fee Stipulated Order.

1.1.161    "**ITC Stock**" means all of the outstanding shares of stock of (i) ITC, 100% of which is currently held by Mircal S.A., a Non-Debtor Affiliate, or (ii) if on or after the Effective Date, Reorganized ITC, and which, upon the Effective Date, will be contributed to the Talc Personal Injury Trust.

1.1.162    "**ITV**" means Imerys Talc Vermont, Inc., a Vermont corporation, and a Debtor in the Chapter 11 Cases.

1.1.163    "**ITV Stipulated Claim**" means any superpriority administrative expense claim held by ITV against ITA arising as a result of the Professional Fee Stipulated Order.

1.1.164    "**ITV Stock**" means all of the outstanding shares of stock of (i) ITV, 100% of which is currently held by ITA, or (ii) if on or after the Effective Date, Reorganized ITV.

1.1.165    "**J&J**" means Johnson & Johnson, Johnson & Johnson Baby Products Company, Johnson & Johnson Consumer Companies, Inc., Johnson & Johnson Consumer Inc., Johnson & Johnson Consumer Products, Inc., and each of their past and present parents, subsidiaries and Affiliates, direct and indirect equity holders, and the successors and assigns of each.  For the avoidance of doubt, J&J includes LLT Management LLC (f/k/a LTL Management LLC), Kenvue, Inc., Janssen Pharmaceuticals, Inc., and Johnson & Johnson Holdco (NA) Inc. and excludes the Debtors, the Imerys Corporate Parties, the Cyprus Corporate Parties, and the Rio Tinto Corporate Parties.

1.1.166    "**J&J Agreements**" means: (i) that certain Agreement, between Cyprus Mines Corporation and Johnson & Johnson, dated as of January 6, 1989; (ii) that certain Talc Supply Agreement, between Windsor Minerals, Inc. and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc., dated as of

18

January 6, 1989, as amended; (iii) that certain Supply Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of April 15, 2001, as amended; (iv) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2010; and (v) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2011.

1.1.167    "**J&J Corporate Parties**" has the meaning ascribed to such term in the J&J Settlement Agreement.  For the avoidance of doubt, the J&J Corporate Parties exclude the Debtors, the Imerys Corporate Parties, the Cyprus Corporate Parties, and the Rio Tinto Corporate Parties.

1.1.168    "**J&J Initial Payment**" means $225,000,000.

1.1.169    "**J&J Insurance Payments**" has the meaning ascribed to such term in the J&J Settlement Agreement.

1.1.170    "**J&J Insurance Recoveries**" has the meaning ascribed to the term "Insurance Recoveries" in the J&J Settlement Agreement.

1.1.171    "**J&J Payment Obligations**" has the meaning ascribed to such term in the J&J Settlement Agreement.

1.1.172    "**J&J Payment Protocol**" means the protocol governing the payment of the J&J Payment Obligations to the Debtors, Cyprus Mines, and/or the Talc Personal Injury Trust, as applicable, which is set forth in Sections 4 and 5 of the J&J Settlement Agreement.

1.1.173    "**J&J Policies**" has the meaning ascribed to such term in the J&J Settlement Agreement.

1.1.174    "**J&J Related Rights**" means any and all rights and claims the Debtors or any Protected Party has against J&J in respect of Talc Claims under the J&J Agreements, the Plan, the other Plan Documents, the Cyprus Mines Plan, or applicable law including, without limitation, rights of and claims for contribution, reimbursement, subrogation, indemnification, and/or breach of contract.

1.1.175    "**J&J Settlement**" means that certain settlement set forth in the J&J Settlement Agreement and approved by the Bankruptcy Court pursuant to the J&J Settlement Order.

1.1.176    "**J&J Settlement Agreement**" means the Amended and Restated Settlement Agreement and Release among the Debtors, Imerys S.A., Cyprus Mines, CAMC, the Tort Claimants' Committee, the FCR, the Cyprus Tort Claimants' Committee, and the Cyprus FCR, and solely with respect to Sections 6.2, 6.3, 6.4 and 6.5 thereof, Rio Tinto and Zurich, on the one hand, and the J&J Settling Parties, on the other hand, which was approved by the Bankruptcy Court pursuant to the J&J Settlement Order and is attached hereto as Exhibit E.

US-DOCS\164401015.3RLF1 33881412v.1

1.1.177   "**J&J Settlement Closing Date**" has the meaning ascribed to the term "Closing Date" in the J&J Settlement Agreement.

1.1.178   "**J&J Settlement Order**" means the *Order (I) Approving the Amended and Restated Settlement Agreement Between the Imerys Debtors, the Cyprus Debtor, Johnson & Johnson, and the Other Parties Thereto, and (II) Approving the Sale of Certain Rights* [Docket No. 6715].

1.1.179   "**J&J Settlement Proceeds**" means the amount of the J&J Payment Obligations and the Home Proceeds that is (i) received by the Cyprus Designated Account prior to the Effective Date, (ii) in the Imerys Designated Account on the Effective Date, and (iii) payable to the Talc Personal Injury Trust on or after the Effective Date pursuant to the terms of the J&J Settlement Agreement.

1.1.180   "**J&J Settling Parties**" means Johnson & Johnson and any successor thereto, Johnson & Johnson Holdco (NA) Inc. (f/k/a J&J Intermediate Holding Corp.) and any successor thereto, Pecos River Talc LLC and any successor thereto, and Red River Talc LLC and any successor thereto.  For the avoidance of doubt, the J&J Settling Parties exclude the Debtors, the Imerys Corporate Parties, the Cyprus Corporate Parties, and the Rio Tinto Corporate Parties.

1.1.181   "**Judgment**" means a final and binding judicial determination or arbitration award.

1.1.182   "**Lien**" has the meaning ascribed to such term in section 101(37) of the Bankruptcy Code.

1.1.183   "**London Market Insurers**" has the meaning ascribed to such term in the London Market Settlement and Release Agreement.

1.1.184   "**London Market Settlement and Release Agreement**" means the settlement and release agreement by and between CAMC, on the one hand, and certain Underwriters at Lloyd's, London, and certain London Market Insurance Companies, on the other hand, entered into about May 2001.

1.1.185   "**Lung Cancer Claim**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.186   "**Merger Agreement**" means that certain Merger Agreement by and among Reorganized ITA, Reorganized ITV, and Reorganized ITC, in substantially the form to be filed in the Plan Supplement if the Merger Toggle occurs.

1.1.187   "**Merger Toggle**" means a decision by the Debtors, with the consent of the Imerys Plan Proponents, the Tort Claimants' Committee and the FCR, to pursue and implement the Reorganized Debtor Merger.

1.1.188   "**Mesothelioma Claim**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.189   "**Mesothelioma / Lung Cancer TAC**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.190   "**Mircal Italia**" means Mircal Italia S.p.A., a Non-Debtor Affiliate.

1.1.191   "**Non-Debtor Affiliate**" means an Affiliate of any Debtor other than Imerys S.A. or one of the other Debtors.

1.1.192   "**Non-Debtor Covered Entities**" has the meaning ascribed to such term in the XL Settlement Agreement.

1.1.193   "**Non-Debtor Intercompany Claim**" means any Claim (including Claims related to setoff rights) held against a Debtor by Imerys S.A. or a Non-Debtor Affiliate that is a direct or indirect subsidiary of Imerys S.A. other than (i) Administrative Claims and (ii) claims related to post-petition Intercompany Transactions (as such term is defined in the Final Cash Management Order) made pursuant to the Final Cash Management Order, *provided* that Imerys S.A. or a Non-Debtor Affiliate that is a direct or indirect subsidiary of Imerys S.A. shall have no Administrative Claim on account of the Administrative Expense Contribution.

1.1.194   "**Non-Talc Claim**" means any Claim that is not a Talc Claim.

1.1.195   "**Non-Talc Insurance Assets**" means any Non-Talc Insurance Policies, or settlements thereof, that afford the Debtors indemnity or insurance coverage solely with respect to any Insured Non-Talc Claims.

1.1.196   "**Non-Talc Insurance Company**" means any insurance company, insurance syndicate, coverholder, insurance broker or syndicate insurance broker, guaranty association or any other Entity, other than a Talc Insurance Company, that may have liability under a Non-Talc Insurance Policy.

1.1.197   "**Non-Talc Insurance Policies**" means any insurance policy, other than a Talc Insurance Policy or a Cyprus Talc Insurance Policy, issued to or that provides may provide coverage at any time to the Debtors or under which the Debtors have sought or may seek coverage including, without limitation, any such policy for directors' and officers' liability, general liability, workers' compensation, and any excess or umbrella policy, and all agreements, documents, or instruments relating thereto.

1.1.198   "**Old Republic**" means Old Republic Insurance Company.

1.1.199   "**Other Gynecological Disease Claim**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.200   "**Other Non-Gynecological Disease Claim**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.201   "**Ovarian Cancer Claim**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

21

1.1.202    "**Ovarian Cancer TAC**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.203    "**Payment Percentages**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.204    "**PBGC**" means the Pension Benefit Guaranty Corporation.

1.1.205    "**PDC Agreement**" means the letter agreement by and between Phelps Dodge Corporation, on the one hand, and BP Amoco Corporation, on the other hand, entered into on February 28, 2000.

1.1.206    "**PDC Agreement Talc Insurance and Indemnity Rights**" means all rights, Claims, benefits, or causes of action held by the Cyprus Protected Parties with respect to Talc Claims and the PDC Agreement, including the right to receive proceeds paid under any Cyprus Talc Insurance Policy subject to the PDC Agreement or from BP Amoco Corporation as indemnitor of certain insurance companies.

1.1.207    "**Pension Liabilities**" means the obligation to pay the pension benefits accrued by the employees of the Debtors with respect to their service with the Debtors (and any ERISA Affiliates of the Debtors) as of the Effective Date.

1.1.208    "**Person**" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity.

1.1.209    "**Petition Date**" means February 13, 2019.

1.1.210    "**Plan**" means this *Second Joint Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* filed by the Plan Proponents, as the same may be amended or modified from time to time pursuant to section 1127 of the Bankruptcy Code and consistent with the Imerys Settlement and the Cyprus Settlement.  The Plan shall be in form and substance acceptable to each of the Plan Proponents.

1.1.211    "**Plan Cure and Assumption Notices**" means notices of proposed assumption and proposed Cure Amounts distributed or to be distributed to the applicable counterparty or counterparties to each Executory Contract or Unexpired Lease that may be assumed by a Debtor pursuant to the Plan, which notices include procedures for objecting to the proposed assumption of such Executory Contract or Unexpired Lease and any Cure Amounts to be paid in connection therewith and the anticipated procedure for resolution of disputes by the Bankruptcy Court.

1.1.212    "**Plan Documents**" means the Plan, the Disclosure Statement, the Plan Supplement, and all of the exhibits and schedules attached to any of the foregoing (including, without limitation and for the avoidance of doubt, the Talc Personal Injury Trust Documents and the Cooperation Agreement).

US-DOCS\164401015.3RLF1 33881412v.1

1.1.213 "**Plan Proponents**" means, collectively, the Debtors, the Tort Claimants' Committee, the FCR, and the Imerys Plan Proponents.

1.1.214 "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan filed by the Debtors, with terms consistent with the Plan, no later than fourteen (14) days prior to the earlier of (i) the deadline for submission of Ballots (as defined in the Voting Procedures) to vote to accept or reject the Plan, or (ii) the deadline to object to Confirmation of the Plan, unless otherwise ordered by the Bankruptcy Court, and additional documents filed with the Bankruptcy Court before the Effective Date as amendments, modifications, or supplements to the Plan Supplement, including the following: (a) the list of Executory Contracts and Unexpired Leases to be assumed by the Debtors, together with the Cure Amount for each such contract or lease; (b) a list of the Settling Talc Insurance Companies; (c) a list of the Debtor Causes of Action; (d) a list of the Contributed Indemnity and Insurance Interests; (e) the Cooperation Agreement; (f) the Amended Charter Documents; (g) the list of officers and directors of the Reorganized Debtors; (h) a list of the Talc Insurance Policies; (i) the Share Purchase Agreement; (j) the initial members of the Ovarian Cancer TAC and the initial members of the Mesothelioma / Lung Cancer TAC; (k) the Foreign Claim Funding Agreement; and (l) the Merger Agreement (if the Merger Toggle occurs); *provided* that (x) the Plan Documents listed in subsections (b), (d), (e), (f), (g), (i), (j), (k), and (l) shall each be in form and substance acceptable to each of the Plan Proponents and (y) the Plan Documents listed in subsections (b), (d), (h), and (j) shall be in form and substance reasonably acceptable to each of the Cyprus Plan Proponents (but only with respect to any terms or provisions that are material to the rights of the applicable Cyprus Plan Proponent or to the treatment of Cyprus Talc Personal Injury Claims). The Plan Supplement, and any amendments or supplements to the foregoing, will be served only on those parties that have requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 and any party in interest who requests in writing a copy from counsel for the Debtors; *provided* that (i) the initial members of the Ovarian Cancer TAC and the Mesothelioma / Lung Cancer TAC and (ii) any amendments to the identity of the initial Talc Trustees and their compensation, the identity of the initial Delaware Trustee, the initial members of the Ovarian Cancer TAC and the initial members of the Mesothelioma / Lung Cancer TAC, will be filed and served on all parties receiving Ballots. In addition, copies of all Executory Contract and Unexpired Lease exhibits, and any amendments thereto, will be served on the applicable counterparties to such Executory Contracts and Unexpired Leases. A copy of the Plan Supplement and any amendments or supplements thereto will be available for review on the Claims Agent's website free of charge at https://cases.ra.kroll.com/ImerysTalc/ by clicking the link for "Plan & Disclosure Statement."

1.1.215 "**Post-Effective Date FCRs**" has the meaning ascribed to such term in the Talc Personal Injury Trust Documents.

1.1.216 "**Post-Effective Date Liabilities**" is defined in accordance with Section 4.15 of the Plan.

1.1.217 "**Prior Plan Cure and Assumption Notice**" means any Plan Cure and Assumption Notice distributed or caused to be distributed prior to October 13, 2021, to a

counterparty to an Executory Contract or Unexpired Lease that may be assumed by a Debtor. For the avoidance of doubt, any objection to the proposed assumption by any of the Debtors pursuant to the Plan (including any objection as to adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code) or related Cure Amount (not previously included on a Sale Cure Notice) by a counterparty to a Debtor Executory Contract or Unexpired Lease that received a Prior Plan Cure and Assumption Notice was required to be filed, served and actually received by counsel to the Debtors and the other parties specified in the Prior Plan Cure and Assumption Notice by February 15, 2021 or such later date as identified in the applicable Prior Plan Cure and Assumption Notice.

1.1.218  "**Priority Non-Tax Claim**" means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Claim, a Priority Tax Claim, or a Fee Claim.

1.1.219  "**Priority Tax Claim**" means any Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

1.1.220  "**Professional**" means any person retained or to be compensated pursuant to sections 327, 328, 330, 524(g)(4)(B)(i), or 1103 of the Bankruptcy Code, including, without limitation, any professional retained by the Tort Claimants' Committee and/or the FCR.

1.1.221  "**Professional Fee Stipulated Order**" means that certain *Order Approving Revised Stipulation and Agreement Permitting Imerys Talc Canada Inc. and Imerys Talc Vermont, Inc. to Make Payments to Imerys Talc America, Inc. for Chapter 11 Costs* [Docket No. 5504], which supersedes that certain *Order Approving Stipulation and Agreement Permitting Imerys Talc Canada Inc. to Make Payments to Imerys Talc America, Inc. for Non-Debtor Professional Fees*, entered on March 26, 2020 [Docket No. 1578].

1.1.222  "**Proof of Claim**" means any proof of claim filed with the Bankruptcy Court or the Claims Agent pursuant to section 501 of the Bankruptcy Code and Bankruptcy Rules 3001 or 3002 that asserts a Claim against any of the Debtors.

1.1.223  "**Protected Party**" means any of the following:

(a)  the Debtors and any Person who served as a director or officer of any Debtor at any time during the Chapter 11 Cases, but solely in such Person's capacity as such;

(b)  the Reorganized Debtors;

(c)  the Imerys Protected Parties;

(d)  any Person, except for the Talc Personal Injury Trust, that, pursuant to the Plan or otherwise, after the Effective Date, becomes a direct or indirect transferee of, or successor to, the Debtors, the Reorganized Debtors, or any of their respective assets (but only to the extent that liability is asserted to exist as a result of its becoming such a transferee or successor);

(e)     the Buyer (but only to the extent that liability is asserted to exist as a result of its becoming a transferee or successor to the Debtors);

(f)     the Settling Talc Insurance Companies;

(g)     the Rio Tinto Protected Parties; and

(h)     the Cyprus Protected Parties.

1.1.224   "**Providence Washington**" means Providence Washington Insurance Company and Seaton Insurance Company, formerly known as Unigard Security Insurance Company, formerly known as Unigard Mutual Insurance Company.

1.1.225   "**Purchased Properties**" means (i) any properties ITV has or may acquire pursuant to the *Order Authorizing Debtors to Pursue and Effectuate Purchase of Property Located in Lyndonville, Vermont and Johnson, Vermont* [Docket No. 3961] and (ii) other properties acquired by the Debtors with the approval of the Bankruptcy Court before the Effective Date.

1.1.226   "**Reinstated**" means, with respect to any Claim or Equity Interest, that the Claim or Equity Interest shall not be discharged hereunder or channeled to the Talc Personal Injury Trust, and the holder's legal, equitable and contractual rights on account of such Claim or Equity Interest shall remain unaltered by Confirmation, rendering such Claim or Equity Interest Unimpaired in accordance with section 1124 of the Bankruptcy Code.

1.1.227   "**Release Injunction**" is defined in accordance with Section 12.2.3 of the Plan.

1.1.228   "**Released Parties**" means each of: (a) the Imerys Released Parties; (b) the Debtors; (c) the Reorganized Debtors; (d) the Tort Claimants' Committee; (e) the individual members of the Tort Claimants' Committee (in their capacities as such); (f) the FCR; (g) the Information Officer; (h) the Rio Tinto Protected Parties subject to Section 10.8.6 of the Plan; (i) the Cyprus Protected Parties; (j) the Reorganized Cyprus Mines Debtor; (k) the Cyprus Tort Claimants' Committee; (l) the individual members of the Cyprus Tort Claimants' Committee (in their capacities as such); (m) the Cyprus FCR; (n) the Zurich Protected Parties; (o) the XL Protected Parties; and (p) to the fullest extent permitted by applicable law, with respect to each of the foregoing Persons in clauses (b), (c), (d), (f), (g), (j), (k), and (m), each such Person's Representatives.

1.1.229   "**Releasing Claim Holder**" means, collectively, (a) all holders of Claims that vote to accept the Plan; (b) all holders of Claims that are presumed to accept the Plan other than holders of Foreign Claims; (c) all holders of Claims entitled to vote on the Plan and who vote against the Plan and do not opt out of the releases provided for in the Plan; (d) all holders of Claims entitled to vote for or against the Plan who do not vote for or against the Plan and do not opt out of the releases provided for in the Plan, except for those holders of Claims whose solicitation packages were returned to the Debtors or their agent(s) as undeliverable and those holders of Claims that were not sent a solicitation

package because a prior mailing sent to them in the Chapter 11 Cases was returned as undeliverable, in each case, unless such holders have notice of the Chapter 11 Cases; and (e) with respect to each of the foregoing Persons in clauses (a) through (d), such Person's respective predecessors, successors, and assigns, each in their capacity as such.

1.1.230   "**Reorganized Cyprus Mines Debtor**" means Cyprus Mines as it exists after the effective date of the Cyprus Mines Plan.

1.1.231   "**Reorganized Debtor Cash Reserve**" means an amount, funded from Cash on hand of the Debtors, including the Sale Proceeds, and/or the Imerys Cash Contribution, as of the Effective Date, subject to input from and consent by each of the Plan Proponents, equal to: (i) the Allowed Amount of Priority Tax Claims against the Debtors; (ii) the Allowed Amount of Priority Non-Tax Claims against the Debtors; (iii) the Allowed Amount of all Secured Claims against the Debtors; (iv) the Allowed Amount of all Debtor Intercompany Claims against the Debtors; (v) the Allowed Amount of all Unsecured Claims against the Debtors; and (vi) an estimate by the Debtors of additional post-Effective Date obligations that the Debtors may incur, including, but not limited to, (a) amounts necessary to compensate the Disbursing Agent and cover costs incurred by the Disbursing Agent in implementing the Plan, (b) amounts necessary to enforce all rights to commence and pursue, as appropriate, any and all Debtor Causes of Action, (c) amounts due in respect of the Canadian Proceeding related to the post-Effective Date period, (d) amounts the Reorganized Debtors will require for working capital purposes, (e) amounts necessary to fund the Debtors' medical retiree benefit obligations for the Debtors' retired employees, and (f) amounts to defend against Foreign Claims, if and as applicable.  For the avoidance of doubt, (i) the Reorganized Debtor Cash Reserve shall not be funded by the Administrative Claim Reserve or the Fee Claim Reserve, and (ii) post-Effective Date proceeds from the Purchased Properties not otherwise paid to the Talc Personal Injury Trust as a dividend will remain in the Reorganized Debtor Cash Reserve subject to Section 10.14.2 of the Plan.

1.1.232   "**Reorganized Debtors**" means Reorganized ITA, Reorganized ITV, and Reorganized ITC; *provided* that if the Reorganized Debtor Merger is consummated, "Reorganized Debtors" shall be a reference to Reorganized ITA.

1.1.233   "**Reorganized Debtor Merger**" means the merger of Reorganized ITV and Reorganized ITC with and into Reorganized ITA (with Reorganized ITA as the surviving corporation) to be consummated pursuant to the Merger Agreement.

1.1.234   "**Reorganized ITA**" means ITA, renamed Ivory America, Inc. or such other name as set forth in the Amended Charter Documents, on and after the Effective Date.

1.1.235   "**Reorganized ITC**" means ITC, renamed Ivory Canada, Inc. or such other name as set forth in the Amended Charter Documents, on and after the Effective Date.

1.1.236    "**Reorganized ITV**" means ITV, renamed Ivory Vermont, Inc. or such other name as set forth in the Amended Charter Documents, on and after the Effective Date.

1.1.237    "**Representatives**" means with respect to any Person, such Person's (a) successors, permitted assigns, subsidiaries, and controlled affiliates, (b) officers and directors, principals, members, employees, financial advisors, attorneys, accountants, investment bankers, consultants, experts, and other professionals, and (c) respective heirs, executors, estates, and nominees, in each case solely in their capacity as such.

1.1.238    "**Reserves**" means (a) the Administrative Claim Reserve; (b) Disputed Claims Reserve; (c) the Fee Claim Reserve; and (d) the Reorganized Debtor Cash Reserve.

1.1.239    "**Rio Tinto**" means Rio Tinto America Inc.

1.1.240    "**Rio Tinto Captive Insurer Policies**" means any and all Talc Insurance Policies issued by the Rio Tinto Captive Insurers, including, but not limited to the Talc Insurance Policies listed on Schedule IV.  For the avoidance of doubt, the Rio Tinto Captive Insurer Policies shall not include any policy to the extent such policy provides reinsurance to any Zurich Protected Party.

1.1.241    "**Rio Tinto Captive Insurers**" means Three Crowns Insurance Company (formerly known as Three Crowns Insurance Company Limited) and Metals & Minerals Insurance Pte. Ltd. (both in their own capacities and, as applicable, as successor to Falcon Insurance Ltd.), and any future successors or assigns of any of the foregoing but only in their capacities as such, collectively or individually, as appropriate.

1.1.242    "**Rio Tinto Cash Contribution**" means $80 million, which Rio Tinto will contribute, or cause to be contributed, to the Talc Personal Injury Trust.

1.1.243    "**Rio Tinto Corporate Parties**" means Rio Tinto plc, Rio Tinto Limited, and the Persons listed on Schedule V, each of which is directly or indirectly controlled by Rio Tinto plc and/or Rio Tinto Limited, and the future successors or assigns of Rio Tinto plc, Rio Tinto Limited, and/or the Persons listed on Schedule V, solely in their capacity as such.

1.1.244    "**Rio Tinto Protected Parties**" means (a) the Rio Tinto Corporate Parties; (b) direct or indirect shareholders of the Rio Tinto Corporate Parties; (c) current and former officers, directors, principals, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, insurers, investment bankers, consultants, representatives, experts, and other professionals of the Rio Tinto Corporate Parties; and (d) the respective heirs, executors, and estates, as applicable, of each Person listed in clauses (b) and (c), and, as to each Person listed in clauses (b), (c) or (d), solely in their capacity as such.  For the avoidance of doubt, the Rio Tinto Protected Parties exclude the Debtors, the Imerys Released Parties, the Cyprus Protected Parties, the XL Protected Parties, and the J&J Corporate Parties.

27

1.1.245    "**Rio Tinto/Zurich Contribution**" means, collectively, (a) the Rio Tinto Cash Contribution, (b) the Zurich Cash Contribution, and (c) the Rio Tinto/Zurich Credit Contribution.

1.1.246    "**Rio Tinto/Zurich Credit Contribution**" is defined in accordance with Section 10.8.2.1 of the Plan.

1.1.247    "**Rio Tinto/Zurich Credits**" is defined in accordance with Section 10.8.2.1 of the Plan.

1.1.248    "**Rio Tinto/Zurich Future Credits**" is defined in accordance with Section 10.8.2.1 of the Plan.

1.1.249    "**Rio Tinto/Zurich Released Claims**" is defined in accordance with Section 12.2.1(c) of the Plan.

1.1.250    "**Rio Tinto/Zurich Settlement**" means that certain comprehensive settlement set forth in the Plan and the Rio Tinto/Zurich Settlement Agreement and implemented by the Plan by and among: (i) Rio Tinto, on behalf of itself and the Rio Tinto Captive Insurers, and for the benefit of the Rio Tinto Protected Parties, and Zurich, on behalf of itself and for the benefit of the Zurich Protected Parties, on the one hand, and (ii) the Debtors, on the other hand, and consented to by the Tort Claimants' Committee and the FCR, pursuant to which, in exchange for the Rio Tinto/Zurich Contribution, the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties receive the benefit of the Channeling Injunction and other protections set forth herein and in the Rio Tinto/Zurich Settlement Agreement.

1.1.251    "**Rio Tinto/Zurich Settlement Agreement**" means the Settlement Agreement and Release among Rio Tinto, the Rio Tinto Captive Insurers, and Zurich, on the one hand, and the Debtors, on the other hand, providing for, *inter alia*, the free and clear sale, pursuant to section 363 of the Bankruptcy Code, of any and all rights and interests of the Debtors in the Rio Tinto Captive Insurer Policies and the Zurich Policies, in substantially the form attached as Exhibit C to the Plan, as it may be amended from time to time.

1.1.252    "**Rio Tinto/Zurich Trigger Date**" has the meaning ascribed to such term in the Rio Tinto/Zurich Settlement Agreement.

1.1.253    "**Sale**" means the sale of substantially all of the assets of the Debtors to the Buyer pursuant to the Asset Purchase Agreement, as approved by the Sale Order.

1.1.254    "**Sale Closing Date**" means February 17, 2021.

1.1.255    "**Sale Cure Notice**" means a notice of the potential assumption and assignment of certain Executory Contracts and Unexpired Leases to a potential buyer of the Debtors' assets, the proposed Cure Amount associated with such potential assumption and assignment, and the deadline to object to the proposed Cure Amount or to the assumption and assignment of the Executory Contract or Unexpired Lease that was served

on applicable contract counterparties in connection with the Bid Procedures Order and the Sale Order on July 28, 2020, August 28, 2020, October 28, 2020, January 15, 2021, January 22, 2021, January 29, 2021, and April 30, 2021 (as applicable).  For the avoidance of doubt, applicable counterparties had until that date that was fourteen (14) days after service of the Sale Cure Notice identifying such counterparty to object to the proposed Cure Amount.  Pursuant to the Bid Procedures Order, the foregoing deadlines and requirements apply to any counterparty that was identified in any supplemental Sale Cure Notice.

1.1.256   "**Sale Order**" means the *Order (I) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith and (III) Granting Related Relief* [Docket No. 2539].

1.1.257   "**Sale Proceeds**" means the net proceeds from the Sale.

1.1.258   "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs of the Debtors as filed on the Docket in accordance with section 521 of the Bankruptcy Code, as such schedules and statements may be amended or supplemented from time to time.

1.1.259   "**Seaton Settlement and Release Agreement**" means the settlement and release agreement by and between Freeport, on the one hand, and Seaton Insurance Co., f/k/a Unigard Security Insurance Co., f/k/a Unigard Mutual Insurance Co., entered into in 2013.

1.1.260   "**Secured Claim**" means a Claim, or any portion thereof: (a) secured by a Lien on property in which a particular Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order, to the extent of the value of the creditor's interest in such Estate's interest in such property as determined pursuant to section 506(a) of the Bankruptcy Code, (b) subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the amount subject to setoff as determined pursuant to section 506(a) of the Bankruptcy Code, or (c) Allowed as secured pursuant to the Plan or any Final Order as a secured Claim.

1.1.261   "**Settled Talc Insurance Policy**" means any Talc Insurance Policy that is released pursuant to a Talc Insurance Settlement Agreement.

1.1.262   "**Settling Talc Insurance Company**" means, solely with respect to Settled Talc Insurance Policies:

(a)   the Zurich Protected Parties;

(b)   the Rio Tinto Captive Insurers;

(c)   the Cyprus Settling Talc Insurance Companies;

(d)   the XL Protected Parties;

(e)    prior to the Effective Date, any other Talc Insurance Company that contributes funds, proceeds, or other consideration to or for the benefit of the Talc Personal Injury Trust and is designated, with the consent of the Debtors, the Tort Claimants' Committee, and the FCR, in the Confirmation Order and/or the Affirmation Order, to be a Settling Talc Insurance Company; and

(f)    following the Effective Date, each Talc Insurance Company that contributes funds, proceeds, or other consideration to or for the benefit of the Talc Personal Injury Trust and is designated as a Settling Talc Insurance Company by the Talc Personal Injury Trust, the Talc Trust Advisory Committees, and the Post-Effective Date FCRs; *provided*, *however*, that any post-Effective Date addition to the list of Protected Parties does not become effective until entry of a Final Order approving the addition.

1.1.263    "**Share Purchase Agreement**" means that certain Share Purchase Agreement by and between Reorganized ITA and Reorganized ITC, in substantially the form contained in the Plan Supplement.

1.1.264    "**Shared Talc Insurance Policies**" means the Talc Insurance Policies issued by XL Insurance Company Ltd. to the Imerys Non-Debtors and the Debtors, including policy numbers FR00003071LI11A, FR00003071LI12A, and FR00003071LI13A, and any other insurance policy currently or previously in effect at any time on or before the Effective Date naming the Debtors (or any predecessor, subsidiary, or past or present Affiliate of the Debtors) as an insured (whether as the primary or additional insured, or by virtue of being a subsidiary to the named insured), or otherwise alleged to afford the Imerys Non-Debtors' insurance coverage, upon which any claim could have been, has been or may be made with respect to any Talc Claim, except that such insurance policies will not include any insurance policy that contains an exclusion expressly applicable to bodily injury arising in whole or in part out of exposure to talc, or talc-containing dust that has caused or allegedly caused ovarian cancer.  For the avoidance of doubt, the XL Policies are not Shared Talc Insurance Policies.

1.1.265    "**Supplemental Settlement Injunction Order**" means the injunction described in <u>Section 12.4</u> of the Plan.

1.1.266    "**Talc Claim**" means any Claim or any Talc Demand against one or more of the Debtors or any other Protected Party whether known or unknown, including with respect to any manner of alleged bodily injury, death, sickness, disease or alleged disease process, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries or harms (whether physical, emotional or otherwise and whether or not diagnosable or manifested before Confirmation or the close of the Chapter 11 Cases), directly or indirectly arising out of or relating to the presence of or exposure to talc or talc-containing products in connection with the alleged pre-Effective Date acts or omissions of one or more of the Debtors or any other Entity for whose conduct one or more of the Debtors (i) have liability or (ii) are alleged to have liability by reason of a Debtor's direct or indirect ownership or control of, conduct of business, or any transaction with such Entity. Talc Claims include, without limitation, any such claims or demands directly or

indirectly arising out of or relating to: (a) any products previously mined, processed, milled, manufactured, sold (including, without limitation, any Sale pursuant to the Sale Order) and/or distributed by a Debtor or by any other Entity for whose conduct a Debtor has liability or is alleged to have liability; (b) any materials present at any premises owned, leased, occupied or operated by any Entity for whose products, acts, omissions, business or operations one or more of the Debtors have, or are alleged to have, liability; or (c) any talc in any way connected to a Debtor alleged to contain asbestos or other constituent. Talc Claims include all such claims, whether: (1) in tort, contract, warranty, restitution, conspiracy, contribution, indemnity, guarantee, subrogation, or any other theory of law, equity or admiralty, whether brought, threatened or pursued in any United States court or court anywhere in the world; (2) seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative or any other costs, fees, injunctive or similar relief or any other measure of damages; (3) seeking any legal, equitable or other relief of any kind whatsoever, including in the nature of alter ego, veil piercing, successor or vicarious liability, mere continuation, fraudulent transfer or conveyance, or conspiracy, and including, for the avoidance of doubt, any claims arising out of or relating to the presence of or exposure to talc or talc-containing products assertable against one or more Debtors or any other Protected Party; or (4) held by claimants residing within the United States or in a foreign jurisdiction. Talc Claims also include any such claims that have been resolved or are subject to resolution pursuant to any agreement, or any such claims that are based on a judgment or verdict.  The term "Talc Claim" includes, without limitation (i) all claims, debts, obligations, or liabilities for compensatory damages (such as, without limitation, loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages; and (ii) Indirect Talc Claims.  For the avoidance of doubt, the term "Talc Claim" does not encompass any Claim against a Protected Party (other than a Debtor) that does not arise out of or relate directly or indirectly to such Protected Party's current or former (i) affiliation or corporate relationship with a Debtor (including direct or indirect ownership of a Debtor or predecessor thereof), (ii) control over a Debtor or predecessor thereof, (iii) provision of insurance to or for the benefit of a Debtor, or (iv) conduct of business or transactions involving a Debtor or predecessor thereof, but does encompass any Claim against a Protected Party that is covered by or comes within any of clauses (i) – (iv) of this sentence. Notwithstanding the foregoing, Talc Claims do not include: (a) any claim by any present or former employee of a predecessor or Affiliate of the Debtors for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer; or (b) any claims or defenses that a Settling Talc Insurance Company may have against its reinsurers and/or retrocessionaires in their capacities as such (including any reinsurers or retrocessionaires that are Released Parties) or that any reinsurer or retrocessionaire of a Settling Talc Insurance Company may have against such Settling Talc Insurance Company in its capacity as a reinsured, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of any Settling Talc Insurance Company (or any reinsurer or retrocessionaire) to assert any such claim or defense in any forum; *provided* that no such claim can be asserted against the Talc Personal Injury Trust unless otherwise provided in the Plan.  For the avoidance of doubt, a "Talc Claim" includes any Foreign Claim.

US-DOCS\164401015.3RLF1 33881412v.1

1.1.267    "**Talc Demand**" means a demand for payment, present or future, against one or more of the Debtors or any Protected Party that (i) was not a Claim prior to the Effective Date and (ii) arises out of the same or similar conduct or events that gave rise to a Claim that is a Talc Claim.

1.1.268    "**Talc In-Place Insurance Coverage**" means all of the rights, benefits or insurance coverage under any Talc Insurance Policy or any Talc Insurance CIP Agreement that is not a Settled Talc Insurance Policy, including the right to payment or reimbursement of liability, indemnity, or defense costs arising from or related to Talc Claims or Talc Personal Injury Trust Expenses.

1.1.269    "**Talc Insurance Action**" means any claim, cause of action, or right of the Debtors, or any one of them, under the laws of any jurisdiction, against any Talc Insurance Company with respect to any Talc Claim, arising from or related to: (a) any such Talc Insurance Company's failure to provide coverage or otherwise pay under Talc In-Place Insurance Coverage, whether prior to or after the Petition Date, (b) the refusal of any Talc Insurance Company to compromise and settle any Talc Claim under or pursuant to any Talc Insurance Policy, or Talc Insurance CIP Agreement, (c) the interpretation or enforcement of the terms of any Talc Insurance Policy or Talc Insurance CIP Agreement with respect to any Talc Claim, (d) any conduct by a Talc Insurance Company constituting "bad faith," conduct that could give rise to extra-contractual damages, or other wrongful conduct under applicable law, or (e) any other claims under, arising out of or relating to a Talc Insurance Policy, a Talc Insurance CIP Agreement, or Talc In-Place Insurance Coverage, including, but not limited to, the California Coverage Action and the Insurance Adversary Proceeding.

1.1.270    "**Talc Insurance Action Recoveries**" means (a) Cash derived from and paid pursuant to a Talc Insurance Settlement Agreement, (b) Cash derived from and paid pursuant to a Talc Insurance CIP Agreement entered into after February 13, 2019, attributable to any Talc Claim other than reimbursement for payments made on account of Talc Claims prior to February 13, 2019, (c) the right to receive proceeds of Talc In-Place Insurance Coverage (including any receivables), and (d) the right to receive the proceeds or benefits of any Talc Insurance Action.

1.1.271    "**Talc Insurance Assets**" means (a) the Talc Insurance Actions, (b) the Talc Insurance Action Recoveries, (c) the Talc Insurance CIP Agreements, (d) the Talc Insurance Settlement Agreements, (e) the Talc In-Place Insurance Coverage, (f) the Talc Insurance Policy Rights, including the Cyprus Talc Insurance Policy Rights, (g) the PDC Agreement Talc Insurance and Indemnity Rights, and (h) all other rights under or with respect to the Talc Insurance Policies, subject to the J&J Settlement Agreement.  For the avoidance of doubt, the Talc Insurance Assets do not include rights under any Settled Talc Insurance Policies except as expressly set forth in the applicable Talc Insurance Settlement Agreement.

1.1.272    "**Talc Insurance CIP Agreement**" means (a) any settlement agreement existing by and among any Talc Insurance Company and one or more of the Debtors, that amends, modifies, replaces, or governs the rights and obligations of, and the coverage

afforded to, any or all of the Debtors under any Talc Insurance Policy, other than a Talc Insurance Settlement Agreement, or (b) any settlement agreement with a Talc Insurance Company relating to any Talc Claim entered into by the Debtors prior to the Petition Date.

1.1.273    "**Talc Insurance Company**" means any insurance company, insurance syndicate, coverholder, insurance broker or syndicate insurance broker, guaranty association, or any other Entity that may have liability under a Talc Insurance Policy.

1.1.274    "**Talc Insurance Policy**" means any insurance policy currently or previously in effect at any time on or before the Effective Date naming the Debtors (or any predecessor, subsidiary, or past or present Affiliate of the Debtors) as an insured (whether as the primary or additional insured, or by virtue of being a subsidiary to the named insured), or otherwise alleged to afford the Debtors insurance coverage, upon which any claim could have been, has been or may be made with respect to any Talc Claim, including, but not limited to, the policies included in the Plan Supplement, Schedule IV, and Schedule VII.  Notwithstanding the foregoing, Talc Insurance Policies shall not include any policy providing reinsurance to any Settling Talc Insurance Company.

1.1.275    "**Talc Insurance Policy Rights**" means (a) all rights, Claims, benefits, or causes of action, if any, held by the Debtors with respect to the Talc Insurance Policies, the Cyprus Talc Insurance Policies, and the J&J Policies, including the right to receive proceeds, subject to the J&J Settlement Agreement; and (b) all rights, Claims, or causes of action, if any, held by the Debtors, including the right to receive proceeds, with respect to any settlement agreements or coverage-in-place agreements to the extent those agreements amend, modify, replace, or govern the rights and obligations of, and the coverage afforded to, any or all of the Debtors under any Talc Insurance Policy, any Cyprus Talc Insurance Policy, and any J&J Policy, subject to the J&J Settlement Agreement.

1.1.276    "**Talc Insurance Settlement Agreement**" means (a) the Rio Tinto/Zurich Settlement Agreement, (b) the XL Settlement Agreement, and (c) any other settlement agreement entered into after the Petition Date by and among (i) any Talc Insurance Company, on the one hand, and (ii) one or more of the Debtors and consented to by the Tort Claimants' Committee and the FCR (or the Talc Personal Injury Trust, the Talc Trust Advisory Committees and the Post-Effective Date FCRs, after the Effective Date), on the other hand, in which a Talc Insurance Policy and/or the Debtors' rights thereunder with respect to Talc Claims are released.

1.1.277    "**Talc Insurer Coverage Defense**" means all rights and defenses that any Talc Insurance Company may have under any Talc Insurance Policy and applicable law with respect to a claim seeking insurance coverage or to a Talc Insurance Action, but Talc Insurer Coverage Defenses do not include any defense that the Plan or any of the other Plan Documents do not comply with the Bankruptcy Code.  Upon entry of the Confirmation Order in the Chapter 11 Cases determining that the Bankruptcy Code authorizes the Assignment by preempting any terms or provisions of the Talc Insurance Policies that any Talc Insurance Company asserts or may assert otherwise prohibits the Assignment, a Talc

Insurer Coverage Defense shall not include any defense that the Assignment is prohibited by the Talc Insurance Policies or applicable non-bankruptcy law.

1.1.278    "**Talc Personal Injury Claim**" means any Talc Claim that is not a Foreign Claim.

1.1.279    "**Talc Personal Injury Demand**" means a demand for payment, present or future, against one or more of the Debtors or any Protected Party that (i) was not a Claim prior to the Effective Date, (ii) arises out of the same or similar conduct or events that gave rise to a Claim that is a Talc Personal Injury Claim, and (iii) is to be channeled and resolved pursuant to the terms of the Talc Personal Injury Trust Documents.

1.1.280    "**Talc Personal Injury Trust**" means the Ivory America / Cyprus Personal Injury Trust established pursuant to the Talc Personal Injury Trust Agreement, the other Plan Documents, and the Cyprus Mines Plan, which is a "qualified settlement fund" within the meaning of Treasury Regulations issued under Section 468B of the Internal Revenue Code.

1.1.281    "**Talc Personal Injury Trust Agreement**" means that certain trust agreement, substantially in the form attached hereto as <u>Exhibit B</u>.

1.1.282    "**Talc Personal Injury Trust Assets**" means the following assets and any income, earnings, profits, and proceeds derived from such assets subsequent to the transfer of such assets to the Talc Personal Injury Trust: (a) the Imerys Settlement Funds; (b) the right to receive the Rio Tinto/Zurich Contribution pursuant to the Rio Tinto/Zurich Settlement; (c) the right to receive the Cyprus Contributions pursuant to the Cyprus Settlement; (d) the right to receive the XL Contribution pursuant to the XL Settlement; (e) all Cash held by the Debtors as of the Effective Date, not including the Cash used to fund the Reserves; (f) all non-Cash assets included in the Imerys Contribution, including the Contributed Indemnity and Insurance Interests; (g) the Talc Personal Injury Trust Causes of Action and any and all proceeds thereof; (h) the Talc Insurance Assets and all Claims thereunder; (i) the Debtor Stock; (j) all Cash remaining in the Reserves, if any, to be distributed to the Talc Personal Injury Trust in accordance with the Plan; (k) any and all other funds, proceeds, or other consideration otherwise contributed to the Talc Personal Injury Trust pursuant to the Plan and/or the Confirmation Order or other order of the Bankruptcy Court; (l) the right to receive the J&J Settlement Proceeds; and (m) the income or earnings realized or received in respect to items (a) to (l) above.  For the avoidance of doubt, the Purchased Properties, which will be owned and operated by Reorganized ITV, or Reorganized ITA in the event the Reorganized Debtor Merger occurs, on and after the Effective Date, shall not constitute "Talc Personal Injury Trust Assets," *provided*, *however*, that any proceeds derived from operation of the Purchased Properties (except Cash required to fund the Reserves) and realized from the liquidation of the Purchased Properties in accordance with <u>Section 10.14.2</u> shall constitute "Talc Personal Injury Trust Assets."  The allocation of the Talc Personal Injury Trust Assets among the Funds is set forth in the Trust Distribution Procedures.

US-DOCS\164401015.3RLF1 33881412v.1

1.1.283    "**Talc Personal Injury Trust Causes of Action**" means, any Estate Cause of Action, not otherwise expressly released pursuant to the Plan, attributable to: (a) all defenses to any Talc Personal Injury Claim, including, but not limited to, all defenses under section 502 of the Bankruptcy Code; (b) with respect to any Talc Personal Injury Claim, all rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted; (c) any other claims, rights, defenses, or bases for claim reduction with respect to Talc Personal Injury Claims that the Debtors would have had under applicable law if the Chapter 11 Cases had not occurred and the holder of such Talc Personal Injury Claim had asserted it by initiating civil litigation against any such Debtor; (d) any claim, cause of action, or right of the Debtors or any one of them, under the laws of any jurisdiction, for reimbursement, indemnity, contribution, breach of contract, or otherwise arising from or relating to any payments made by the Debtors on account of Talc Personal Injury Claims prior to the Petition Date; and (e) any claim, cause of action, or right of the Debtors or any one of them to enforce the Imerys Settlement, the Cyprus Settlement, the J&J Settlement, and any Talc Insurance Settlement Agreement for the benefit of the Talc Personal Injury Trust.  For the avoidance of doubt, the Talc Personal Injury Trust Causes of Action shall not include (a) any defenses, cross-claims, offsets, or recoupments against any Protected Party or any Talc Insurance Company, (b) any retained causes of action as contemplated by Section 11.1 of the Plan, or (c) any Debtor J&J Released Claim and any J&J Related Rights; *provided*, *however*, if (i) the J&J Settlement Agreement is terminated, pursuant to Section 8.3 of the J&J Settlement Agreement, after the Effective Date, (ii) the Bankruptcy Court determines, after notice and hearing, that such termination requires that the Parties (as defined in the J&J Settlement Agreement) be returned to the status quo ante immediately preceding the Execution Date (as defined in the J&J Settlement Agreement), and (iii) each such Party is, in fact, returned to the status quo ante immediately preceding the Execution Date in all respects, including, for the avoidance of doubt, repayment in full of all J&J Payment Obligations made theretofore, then the Talc Personal Injury Trust Causes of Action shall include the Debtor J&J Released Claims and the J&J Related Rights. For the avoidance of doubt, nothing herein shall be interpreted as modifying the J&J Settlement Agreement, including with regard to what remedies may be available or are appropriate thereunder.

1.1.284    "**Talc Personal Injury Trust Documents**" means the Talc Personal Injury Trust Agreement, the Trust Distribution Procedures, the Cooperation Agreement, and all other agreements, instruments, and documents governing the establishment, administration, and operation of the Talc Personal Injury Trust, which shall be substantially in the form set forth as exhibits hereto or in the Plan Supplement, as they may be amended or modified from time to time in accordance with their terms and the Plan.  The Plan Proponents shall have consent rights over the Cooperation Agreement.  With respect to the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures, (i) prior to the Effective Date, the form and substance of such documents shall be acceptable to the Plan Proponents and the Cyprus Plan Proponents, and (ii) after the Effective Date, the Plan Proponents and the Cyprus Plan Proponents shall have consent rights over modifications to such documents to the extent such modifications will materially impact the scope and

the terms of the releases and injunctions included in Article XII of the Plan or Article XII of the Cyprus Mines Plan.

1.1.285    "**Talc Personal Injury Trust Expenses**" means any liabilities, costs, or expenses of, or imposed upon, or in respect of, the Talc Personal Injury Trust once established (except for payments to holders of Talc Personal Injury Claims on account of such Claims). Talc Personal Injury Trust Expenses shall also expressly include (a) any and all liabilities, costs, and expenses incurred subsequent to the Effective Date in connection with the Talc Personal Injury Trust Assets (including, without limitation, the prosecution of any Talc Personal Injury Trust Causes of Action and Talc Insurance Actions), in each case whether or not any such action results in a recovery for the Talc Personal Injury Trust and (b) the reasonable documented costs and expenses incurred by the Reorganized Debtors in taking any action on behalf of or at the direction of the Talc Personal Injury Trust, if any, including, without limitation, any costs and expenses incurred by the Reorganized Debtors in being named as a defendant in any Talc Insurance Action.

1.1.286    "**Talc Trust Advisory Committees**" means the Ovarian Cancer TAC and the Mesothelioma / Lung Cancer TAC, in each case, as appointed and serving in accordance with Section 4.5 of the Plan, and having the powers, duties and obligations set forth in the Talc Personal Injury Trust Agreement.

1.1.287    "**Talc Trust Advisory Committee Member**" means any member of the Talc Trust Advisory Committees.

1.1.288    "**Talc Trust Contribution**" is defined in accordance with Section 10.7.2.3 of the Plan.

1.1.289    "**Talc Trustee**" means an individual appointed by the Bankruptcy Court to serve as a trustee of the Talc Personal Injury Trust pursuant to the terms of the Plan and the Talc Personal Injury Trust Agreement or who subsequently may be appointed pursuant to the terms of the Talc Personal Injury Trust Agreement.

1.1.290    "**Tort Claimants' Committee**" means the official committee of tort claimants in the Debtors' Chapter 11 Cases appointed by the United States Trustee, as such committee is reconstituted from time to time.

1.1.291    "**Trust Distribution Procedures**" means the Talc Personal Injury Trust Distribution Procedures, substantially in the form attached hereto as Exhibit A.

1.1.292    "**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.1.293    "**Unimpaired**" means a Claim or Equity Interest, or a Class of Claims or Equity Interests, that is not Impaired under the Plan.

1.1.294    "**United States Trustee**" means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the District of Delaware.

1.1.295    "**Unsecured Claim**" means a Claim against one or more of the Debtors that is not an Administrative Claim, a Priority Non-Tax Claim, a Priority Tax Claim, a Secured Claim, a Talc Claim, or an Intercompany Claim.

1.1.296    "**Unsecured Claim Contribution**" is defined in accordance with Section 10.7.2.2 of the Plan.

1.1.297    "**US/Canada**" means the United States, Canada, and any of the territories and possessions of the United States (including Puerto Rico) and Canada.

1.1.298    "**Voting Procedures**" means those certain procedures and supplemental procedures approved by the Bankruptcy Court for soliciting and tabulating the votes to accept or reject the Plan cast by holders of Claims against and Equity Interests in the Debtors entitled to vote on the Plan.

1.1.299    "**Voting Procedures Order**" means, the order entered by the Bankruptcy Court, which, among other things, (i) fixes Talc Personal Injury Claims in the amounts designated in the Voting Procedures, solely for voting purposes and not for allowance or distribution purposes, and (ii) approves the Voting Procedures.

1.1.300    "**XL**" means XL Insurance America, Inc.

1.1.301    "**XL California Fire Claim Contribution**" means (a) $1 million, which XL will contribute, or cause to be contributed, to the Talc Personal Injury Trust, and (b) $1.25 million, which XL will pay to Imerys Filtration Minerals, Inc. (a Non-Debtor Covered Entity) in consideration for the release of claims for insurance coverage arising from the settlement of a lawsuit styled as *California Department of Forestry & Fire Protection v. Imerys Filtration Minerals, Inc., et al.*, Santa Barbara County Superior Court, Case No. 16CV02133.

1.1.302    "**XL Cash Contribution**" means $28.25 million, which XL will contribute, or cause to be contributed, to the Talc Personal Injury Trust.

1.1.303    "**XL Contribution**" means, collectively, (a) the XL Cash Contribution and (b) the XL California Fire Claim Contribution.

1.1.304    "**XL Corporate Parties**" means XL and all Persons listed on Schedule X hereto.  Schedule X is an exclusive list and does not include, among others, the Debtors, the Imerys Released Parties, the Rio Tinto Protected Parties, the Zurich Protected Parties, the Cyprus Protected Parties, and the J&J Corporate Parties.

1.1.305    "**XL Policies**" means any and all Talc Insurance Policies issued by the XL Corporate Parties, including the Talc Insurance Policies listed on Schedule XI.  For the avoidance of doubt, the XL Policies shall not include international insurance policies issued to Imerys S.A. by XL Insurance Company Ltd., including policy numbers FR00003071LI11A, FR00003071LI12A, and FR00003071LI13A.

1.1.306   "**XL Protected Parties**" means (a) the XL Corporate Parties; (b) the direct or indirect shareholders of the XL Corporate Parties; (c) current and former officers, directors, principals, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, insurers, consultants, representatives, experts, and other professionals of the XL Corporate Parties; and (d) with respect to each of the foregoing Persons in clauses (b) and (c), each such Person's respective heirs, executors, estates, and nominees, as applicable and, as to each Person listed in clauses (b), (c) and (d), solely in their capacity as such.  For the avoidance of doubt, the XL Protected Parties exclude the Debtors, the Imerys Protected Parties, the Rio Tinto Protected Parties, the Zurich Protected Parties, the Cyprus Protected Parties, and the J&J Corporate Parties.

1.1.307   "**XL Released Claims**" is defined in accordance with Section 12.2.1(e) of the Plan.

1.1.308   "**XL Settlement**" means that certain comprehensive settlement set forth in the Plan and the XL Settlement Agreement and implemented by the Plan by and among: (i) XL, on behalf of itself and for the benefit of the XL Protected Parties, (ii) the Debtors, and (iii) Imerys USA, on behalf of itself and the other Non-Debtor Covered Entities, and consented to by the Tort Claimants' Committee and the FCR, pursuant to which, in exchange for the XL Contribution, the XL Protected Parties receive the benefit of the Channeling Injunction and other protections set forth herein and in the XL Settlement Agreement.

1.1.309   "**XL Settlement Agreement**" means the XL Settlement Agreement among XL, the Debtors, and Imerys USA, providing for, *inter alia*, the free and clear sale, pursuant to section 363 of the Bankruptcy Code, of any and all rights and interests in the XL Policies, in substantially the form attached as Exhibit D to the Plan.

1.1.310   "**XL Trigger Date**" means, unless waived by the Debtors and XL, the date that the Tort Claimants' Committee or the FCR provides XL with notice that (a) the Confirmation Order and Affirmation Order have been entered and become Final Orders, and (b) the Effective Date has occurred; *provided* that all of the conditions precedent set forth in Section I.A of the XL Settlement Agreement shall have been satisfied to the extent not waived pursuant to the terms thereof.

1.1.311   "**Zurich**" means Zurich American Insurance Company, in its own capacity and as successor-in-interest to Zurich Insurance Company, U.S. Branch.

1.1.312   "**Zurich Cash Contribution**" means $260 million, which Zurich will contribute, or cause to be contributed, to the Talc Personal Injury Trust.

1.1.313   "**Zurich Corporate Parties**" means Zurich and all Persons listed on Schedule VI hereto, and the future successors and assigns of such Persons, solely in their capacity as such.  Schedule VI is an exclusive list and does not include, among others, the Debtors, the Imerys Released Parties, the Cyprus Protected Parties, and the J&J Corporate Parties.

1.1.314  "**Zurich Policies**" means any and all Talc Insurance Policies issued by the Zurich Corporate Parties, including the Talc Insurance Policies listed on <u>Schedule VII</u>. For the avoidance of doubt, the Zurich Policies shall not include any policy to the extent such policy provides reinsurance to any Rio Tinto Captive Insurer.

1.1.315  "**Zurich Protected Parties**" means (a) the Zurich Corporate Parties; (b) direct or indirect shareholders of Zurich; (c) current and former officers, directors, principals, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, insurers, consultants, representatives, experts, and other professionals of the Zurich Corporate Parties; and (d) with respect to each of the foregoing Persons in clauses (b) and (c), each such Persons' respective heirs, executors, estates, and nominees, as applicable and, as to each Person listed in clauses (b), (c), and (d), solely in their capacity as such.  For the avoidance of doubt, the Zurich Protected Parties exclude the Debtors, the Imerys Released Parties, the Cyprus Protected Parties, the XL Protected Parties, and the J&J Corporate Parties.

1.2  <u>Interpretation; Application of Definitions; Rules of Construction; and Computation of Time</u>.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender will include the masculine, feminine, and neuter.  Unless otherwise specified, all Article, Section, Schedule, or Exhibit references in the Plan are to the respective article or section of, or schedule or exhibit to, the Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.  The rules of construction contained in section 102 of the Bankruptcy Code will apply to the construction of the Plan.  Unless otherwise stated herein, all references to dollars mean U.S. dollars.  In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) will apply.  The words "including" or "includes" shall be without limitation.

1.3  <u>Exhibits</u>.  All exhibits and schedules to the Plan, to the extent not annexed hereto and any agreements referred to herein and therein will be available for review following their filing with the Bankruptcy Court on (a) the Court's website: www.deb.uscourts.gov, and (b) the website maintained by the Debtors' Claims Agent at https://cases.ra.kroll.com/imerystalc.

1.4  <u>Ancillary Documents</u>.  Each of the schedules and exhibits to the Plan (whether annexed hereto or included in the Plan Supplement) are an integral part of the Plan, and are hereby incorporated by reference and made a part of the Plan, including, without limitation, the Talc

US-DOCS\164401015.3RLF1 33881412v.1

Personal Injury Trust Agreement, the Trust Distribution Procedures, the Cooperation Agreement, the Amended Charter Documents, and the other Plan Documents.

## ARTICLE II
## TREATMENT OF ADMINISTRATIVE CLAIMS, FEE CLAIMS, AND PRIORITY TAX CLAIMS

2.1     Administrative Claims.

2.1.1     Allowed Administrative Claims.  Holders of Allowed Administrative Claims (other than Fee Claims, which are governed by Section 2.3 of the Plan) shall receive Cash equal to the unpaid portion of such Allowed Administrative Claims on the Distribution Date, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims, or such amounts and on such other terms as may be agreed to by the holders of such Claims and the Debtors or the Reorganized Debtors, as the case may be; *provided*, *however*, that Allowed Administrative Claims representing liabilities incurred on or after the Petition Date in the ordinary course of business by any of the Debtors shall be paid by the Debtors or the Reorganized Debtors, as the case may be, in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.  All Allowed Administrative Claims (other than Fee Claims) shall be paid from funds held in the Administrative Claim Reserve, which shall be funded from Cash on hand, the Sale Proceeds, and/or the Imerys Cash Contribution (excluding the Unsecured Claim Contribution).  The Reorganized Debtors will be entitled to transfer excess funds from the Fee Claim Reserve (after all Allowed Fee Claims have been satisfied in full) and the Reorganized Debtor Cash Reserve (excluding all funds attributable to the Unsecured Claim Contribution) to the Administrative Claim Reserve as they deem necessary or appropriate, on notice to the FCR and the Tort Claimants' Committee, to enable them to satisfy their obligations herein.

2.1.2     Administrative Claims Bar Date.  Except as otherwise provided in this Article II, requests for payment of Administrative Claims (other than Fee Claims and Claims against the Debtors arising under section 503(b)(9) of the Bankruptcy Code), must be filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than sixty (60) days after the Effective Date.  Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against, as applicable, the Debtors or the Reorganized Debtors, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be filed and served on the Reorganized Debtors and the requesting party, as applicable, no later than ninety (90) days after the Effective Date, unless otherwise authorized by the Bankruptcy Rules or Bankruptcy Court.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under the Plan.  For the avoidance of doubt and in accordance with, and furtherance of, the terms of the Professional Fee Stipulated Order, any ITC Stipulated Claim and ITV Stipulated Claim

shall be (i) automatically disallowed upon entry of the Confirmation Order and (ii) deemed discharged upon the Effective Date, without any further action required.

2.1.3    Disputed Administrative Claims.  If a Disputed Administrative Claim is thereafter Allowed in whole or in part, the Disbursing Agent shall (at such time as determined to be practicable by the Reorganized Debtors) distribute from the Administrative Claim Reserve, to the holder of such Administrative Claim, the Cash that such holder would have received on account of such Claim if such Administrative Claim had been an Allowed Administrative Claim on the Effective Date.  When (i) all Disputed Administrative Claims against the Reorganized Debtors have been resolved and (ii) Distributions required to be made by the Reorganized Debtors pursuant to this Section 2.1 and Section 2.3 have been made, all Cash remaining in the Administrative Claim Reserve shall be disbursed to the Talc Personal Injury Trust.

2.2    Allowed Priority Tax Claims.  On the Distribution Date, holders of Allowed Priority Tax Claims shall receive Cash equal to the amount of such Allowed Priority Tax Claims, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims unless the holder of such claim agrees to an alternative treatment.

2.3    Fee Claims.

2.3.1    All final fee requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code for services rendered to the Debtors, the Tort Claimants' Committee, or the FCR, all Fee Claims of members of the Tort Claimants' Committee for reimbursement of expenses, and all requests or Claims under section 503(b)(4) of the Bankruptcy Code, must be filed and served on the Reorganized Debtors and other parties required to be served by the Compensation Procedures Order by no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Any objections to a final Fee Claim or any requests or claims under section 503(b)(4) of the Bankruptcy Code must be filed by no later than twenty (20) days after the filing of such Claim.  The terms of the Compensation Procedures Order shall govern the allowance and payment of any final Fee Claims submitted in accordance with this Section 2.3 of the Plan.  The Fee Examiner appointed under the Fee Examiner Order shall continue to act in this appointed capacity unless and until all final Fee Claims have been approved by order of the Bankruptcy Court, and the Reorganized Debtors shall be responsible to pay the fees and expenses incurred by the Fee Examiner in rendering services after the Effective Date.

2.3.2    The amount of the Fee Claims owing to the Professionals on and after the Effective Date for work performed prior to the Effective Date shall be paid in Cash to such Professionals from funds held in the Fee Claim Reserve, which shall be funded from Cash on hand, the Sale Proceeds, and/or the Imerys Cash Contribution (excluding the Unsecured Claim Contribution), as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order.  The Reorganized Debtors will be entitled to transfer excess funds from the Administrative Claim Reserve (after all Allowed Administrative Claims have been satisfied in full) and the Reorganized Debtor Cash Reserve (excluding all funds attributable to the Unsecured Claim Contribution) to the Fee Claim Reserve as they deem

41

necessary or appropriate, on notice to the FCR and the Tort Claimants' Committee, to enable them to satisfy their obligations herein. When all Allowed Fee Claims and Allowed Administrative Claims have been paid in full, amounts remaining in the Fee Claim Reserve, if any, shall revert to the Talc Personal Injury Trust.

## ARTICLE III
## TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

3.1     <u>Grouping of the Debtors for Convenience</u>. The Plan groups the Debtors together solely for the purposes of describing treatment under the Plan, Confirmation of the Plan, and making Distributions. Unless set forth in the Plan, this grouping shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets. The Plan is not premised upon and shall not cause the substantive consolidation of the Debtors, and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

3.2     <u>Claims and Equity Interests Classified</u>. For purposes of organization, voting, and all Plan confirmation matters, and except as otherwise provided herein, all Claims (other than Administrative Claims, Fee Claims, and Priority Tax Claims) against and Equity Interests in the Debtors are classified as set forth in this Article III of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Fee Claims described in Article II of the Plan, have not been classified and are excluded from the following Classes. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest falls within the description of such Class, and is classified in another Class or Classes to the extent that any remainder of the Claim or Equity Interest falls within the description of such other Class or Classes. Notwithstanding anything to the contrary contained in the Plan, no Distribution shall be made on account of any Claim that is not an Allowed Claim for distribution purposes.

3.3     <u>Treatment and Classification of Claims and Equity Interests</u>. For purposes of all Plan confirmation matters, including, without limitation, voting on, Confirmation of, and Distributions under, the Plan, and except as otherwise provided herein, all Claims against (other than Administrative Claims, Fee Claims, and Priority Tax Claims, which are not classified) and Equity Interests in the Debtors shall be classified and treated in the manner set forth below.

| <u>Class</u> | <u>Designation</u> | <u>Treatment</u> | <u>Entitlement to Vote</u> | <u>Estimated Recovery</u> |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |

| Class | Designation | Treatment | Entitlement to Vote | Estimated Recovery |
|-------|-------------|-----------|---------------------|--------------------|
| 3 | Unsecured Claims against the Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 4a | Talc Claims – Fund A Claims | Impaired | Entitled to Vote | *See Treatment* |
| 4b | Talc Claims – Fund B Claims | Impaired | Entitled to Vote | *See Treatment* |
| 4c | Talc Claims – Foreign Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | *See Treatment* |
| 5a | Non-Debtor Intercompany Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | *See Treatment* |
| 5b | Debtor Intercompany Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 6a | Equity Interests in ITA and ITC | Unimpaired | Not Entitled to Vote (Presumed to Accept) | *See Treatment* |
| 6b | Equity Interests in ITV | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |

### 3.3.1 Class 1 – Priority Non-Tax Claims

(a) Classification: Class 1 consists of all Priority Non-Tax Claims against the Debtors.

(b) Treatment: Except to the extent that the holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, on the Distribution Date, each holder of an Allowed Class 1 Priority Non-Tax Claim shall receive Cash equal to the Allowed Amount of such Priority Non-Tax Claim.

(c) Voting: Class 1 is Unimpaired and each holder of an Allowed Claim in Class 1 is presumed to accept the Plan. Each holder of an Allowed Claim in Class 1 is not entitled to vote to accept or reject the Plan.

### 3.3.2 Class 2 – Secured Claims

(a) Classification: Class 2 consists of all Secured Claims against the Debtors.

(b)     Treatment: All Allowed Secured Claims in Class 2 will be treated pursuant to one of the following alternatives on the Distribution Date: (i) payment in full in Cash in accordance with section 506(a) of the Bankruptcy Code; (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code; (iii) such other treatment as the Debtor and the holder shall agree; or (iv) such other treatment as may be necessary to render such Claim Unimpaired.

(c)     Voting: Class 2 is Unimpaired and each holder of an Allowed Claim in Class 2 is presumed to accept the Plan.  Each holder of an Allowed Claim in Class 2 is not entitled to vote to accept or reject the Plan.

### 3.3.3     Class 3 – Unsecured Claims against the Debtors

(a)     Classification: Class 3 consists of all Unsecured Claims against the Debtors.

(b)     Treatment: Each holder of an Allowed Unsecured Claim against the Debtors shall be paid the Allowed Amount of its Unsecured Claim on the Distribution Date.  Such payment shall be (i) in full, in Cash, plus post-petition interest at the federal judgment rate in effect on the Petition Date, or (ii) upon such other less favorable terms as may be mutually agreed upon between the holder of such Unsecured Claim and the applicable Debtor or Reorganized Debtor.

(c)     Voting: Class 3 is Unimpaired and each holder of an Allowed Claim in Class 3 is presumed to accept the Plan.  Each holder of an Allowed Claim in Class 3 is not entitled to vote to accept or reject the Plan.

### 3.3.4     Class 4 – Talc Claims

(a)     Classification: Class 4a consists of all Fund A Claims.  Class 4b consists of all Fund B Claims.  Class 4c consists of all Foreign Claims.

(b)     Treatment of Class 4a and Class 4b:

(i)     On the Effective Date, liability for all Talc Personal Injury Claims shall be channeled to and assumed by the Talc Personal Injury Trust without further act or deed and shall be resolved in accordance with the Trust Distribution Procedures.  Pursuant to the Plan and Trust Distribution Procedures, each holder of a Talc Personal Injury Claim shall have its Claim permanently channeled to the Talc Personal Injury Trust, and such Claim shall thereafter be resolved in accordance with the Trust Distribution Procedures.

(ii)     Fund A Claims shall only be compensated from Fund A. Fund B Claims shall only be compensated from Fund B.

(iii)     The Trust Distribution Procedures include provisions that require the Talc Trustees to set the Initial Payment Percentage for each Fund

44

after the Effective Date and permit the Talc Trustees to subsequently modify the Payment Percentage for each Fund separately, with the consent of the applicable Talc Trust Advisory Committee and Post-Effective Date FCR for Fund A Claims and Fund B Claims. The Payment Percentages are subject to the Dual Estate Factor, which will increase recoveries for holders of Talc Personal Injury Claims as provided for in the Trust Distribution Procedures.

(c)     Treatment of Class 4c: On the Effective Date, Foreign Claims shall be Reinstated. As a result of their being Reinstated, the Debtors' liability (if any) for a Foreign Claim will rest solely with the Reorganized Debtors. Foreign Claims will not be channeled to or assumed by the Talc Personal Injury Trust. The Talc Personal Injury Trust shall not be responsible for resolving, and shall bear no costs or expenses related to resolving, a Claim determined to be a Foreign Claim.

(d)     Voting: Class 4a and Class 4b are Impaired and each holder of a Talc Personal Injury Claim in Class 4a and/or Class 4b is entitled to vote to accept or reject the Plan. Class 4c is Unimpaired and each holder of a Claim in Class 4c is presumed to accept the Plan. Each holder of a Claim in Class 4c is not entitled to vote to accept or reject the Plan.

### 3.3.5    Class 5a – Non-Debtor Intercompany Claims

(a)     Classification: Class 5a consists of all Non-Debtor Intercompany Claims.

(b)     Treatment: On the Effective Date, each holder of a Non-Debtor Intercompany Claim shall waive such Non-Debtor Intercompany Claim pursuant to the Imerys Settlement.

(c)     Voting: Class 5a is Unimpaired and each holder of an Allowed Claim in Class 5a is presumed to accept the Plan. Each holder of a Claim in Class 5a is not entitled to vote to accept or reject the Plan.

### 3.3.6    Class 5b – Debtor Intercompany Claims

(a)     Classification: Class 5b consists of all Debtor Intercompany Claims.

(b)     Treatment: At the election of the applicable Debtor, each Debtor Intercompany Claim shall (i) be Reinstated, (ii) remain in place, (iii) be modified or cancelled as of the Effective Date and/or (iv) with respect to certain Debtor Intercompany Claims in respect of goods, services, interest, and other amounts that would have been satisfied in Cash directly or indirectly in the ordinary course of business had they not been outstanding as of the Petition Date, be settled in Cash.

(c)     Voting: Class 5b is Unimpaired and each holder of an Allowed Claim in Class 5b is presumed to accept the Plan. Each holder of a Claim in Class 5b is not entitled to vote to accept or reject the Plan.

US-DOCS\164401015.3RLF1 33881412v.1

### 3.3.7 **Class 6a – Equity Interests in ITA and ITC**

(a)     Classification: Class 6a consists of all Equity Interests in ITA and ITC.

(b)     Treatment: On the Effective Date, all Equity Interests in ITA and ITC shall be Reinstated and transferred to the Talc Personal Injury Trust. Each holder of an Equity Interest in ITA or ITC has consented to such treatment in accordance with the Imerys Settlement.

(c)     Voting: Class 6a is Unimpaired and each holder of an Allowed Class 6a Equity Interest is presumed to accept the Plan. Each holder of an Allowed Equity Interest in Class 6a is not entitled to vote to accept or reject the Plan.

### 3.3.8 **Class 6b – Equity Interests in ITV**

(a)     Classification: Class 6b consists of all Equity Interests in ITV.

(b)     Treatment: On the Effective Date, all Equity Interests in ITV shall be Reinstated and the legal, equitable, and contractual rights to which holders of Equity Interests in ITV are entitled shall remain unaltered to the extent necessary to implement the Plan.

(c)     Voting: Class 6b is Unimpaired and each holder of an Allowed Class 6b Equity Interest is presumed to accept the Plan. Each holder of an Allowed Equity Interest in Class 6b is not entitled to vote to accept or reject the Plan.

3.4     Debtors' Rights with Respect to Unimpaired Claims. Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors with respect to any Unimpaired Claims, including all rights with respect to legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

## ARTICLE IV
## THE TALC PERSONAL INJURY TRUST

4.1     Establishment of the Talc Personal Injury Trust. On the Effective Date, the Talc Personal Injury Trust shall be created in accordance with the Plan Documents and the Cyprus Mines Plan. The Talc Personal Injury Trust shall be a "qualified settlement fund" within the meaning of the Treasury Regulations issued under Section 468B of the Tax Code.

4.2     Purpose and Trust Distribution Procedures.

4.2.1     The purposes of the Talc Personal Injury Trust shall be to assume all liability and responsibility for all Talc Personal Injury Claims and Cyprus Talc Personal Injury Claims and to use the Talc Personal Injury Trust Assets and, among other things: (a) to preserve, hold, manage, and maximize the assets of the Talc Personal Injury Trust; and (b) to direct the processing, liquidation, and payment of all compensable Talc Personal Injury Claims and Cyprus Talc Personal Injury Claims in accordance with the Talc

Personal Injury Trust Documents.  The Talc Personal Injury Trust will resolve Talc Personal Injury Claims and Cyprus Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents in such a way that holders of Talc Personal Injury Claims and Cyprus Talc Personal Injury Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such claims, and otherwise comply in all respects with the requirements of section 524(g)(2)(B)(i) and any other applicable provisions of the Bankruptcy Code.

4.2.2    Except as set forth in footnote 1 of the Trust Distribution Procedures, in the event of a conflict between the terms or provisions of the Plan and the Talc Personal Injury Trust Documents, the terms of the Plan shall control.

4.3    <u>Initial Talc Trustees</u>.  There shall be two (2) initial Talc Trustees.  The initial Talc Trustees of the Talc Personal Injury Trust are Ellen Pryor and Anne Ferazzi, who shall be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement.  All successor Talc Trustees shall be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement.  For purposes of performing their duties and fulfilling their obligations under the Talc Personal Injury Trust Agreement and the Plan, each Talc Trustee shall be deemed to be (and the Confirmation Order shall provide that it is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

4.4    <u>Delaware Trustee</u>.  The initial Delaware Trustee is Wilmington Trust, N.A. and will be appointed as such pursuant to the Confirmation Order.  All subsequent Delaware Trustees shall be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement.

4.5    <u>Advising the Talc Personal Injury Trust</u>.

4.5.1    <u>The Talc Trust Advisory Committees</u>.  The Talc Trust Advisory Committees shall be established pursuant to the Talc Personal Injury Trust Agreement. The initial Talc Trust Advisory Committees shall have the functions, duties, and rights provided in the Talc Personal Injury Trust Agreement.  The initial members of the Ovarian Cancer TAC and the initial members of the Mesothelioma / Lung Cancer TAC shall be those persons named in the Plan Supplement.  Each of the Talc Trust Advisory Committee Members shall serve in accordance with the terms and conditions contained in the Talc Personal Injury Trust Agreement.

4.5.2    <u>Successor Talc Trust Advisory Committee Members</u>.  Successor Talc Trust Advisory Committee Members shall be appointed as provided in, and pursuant to, the terms of the Talc Personal Injury Trust Agreement.

4.5.3    <u>Post-Effective Date FCRs</u>.  From and after the Effective Date, the Post-Effective Date FCRs shall serve in the capacity of future claimants' representatives and as advisors to the Talc Personal Injury Trust, and shall have the functions, duties and rights provided in the Talc Personal Injury Trust Agreement.  Any expenses incurred by the Post-Effective Date FCRs in this capacity shall constitute Talc Personal Injury Trust Expenses.

US-DOCS\164401015.3RLF1 33881412v.1

4.5.4    Successor Post-Effective Date FCRs.  Successor Post-Effective Date FCRs shall be appointed as provided in, and pursuant to, the terms of the Talc Personal Injury Trust Agreement.

4.6    Transfer of Talc Personal Injury Claims to the Talc Personal Injury Trust.

4.6.1    On the Effective Date, and without further action of any Entity, the Talc Personal Injury Trust shall assume the liabilities, obligations, and responsibilities of the Debtors and the other Protected Parties for all Talc Personal Injury Claims, financial or otherwise.  This assumption shall not affect (i) the application of the Discharge Injunction and the Channeling Injunction to the Debtors or any other Protected Party or (ii) any Talc Insurance Company's obligation under any Talc Insurance Policy.  Except to the extent the Talc Personal Injury Trust expressly assumes obligations under the Plan, the Talc Personal Injury Trust shall have no liability or responsibility for any Claims (including Foreign Claims) other than Talc Personal Injury Claims, and no liability or responsibility for any Claims (including Foreign Claims) other than Talc Personal Injury Claims shall be transferred or channeled to the Talc Personal Injury Trust.

4.6.2    Except as specifically provided in the Talc Personal Injury Trust Agreement or the Trust Distribution Procedures, the Talc Personal Injury Trust shall have control over the Talc Personal Injury Trust Causes of Action and the Talc Insurance Actions, and the Talc Personal Injury Trust shall thereby become the Estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with the exclusive right to enforce each Talc Personal Injury Trust Cause of Action and Talc Insurance Action, and the proceeds of the recoveries on any of the Talc Personal Injury Trust Causes of Action or the Talc Insurance Actions shall be deposited in and, when deposited, shall become the property of the Talc Personal Injury Trust, and the Talc Personal Injury Trust shall have the right to enforce the Plan and any of the other Plan Documents (including, but not limited to, the Cooperation Agreement) according to their respective terms, including the right to receive the Talc Personal Injury Trust Assets as provided in the Plan; *provided*, *however*, (a) the Talc Personal Injury Trust shall have no other rights against the Reorganized Debtors or the Protected Parties except to enforce the Plan and any of the other Plan Documents; (b) the Talc Personal Injury Trust Causes of Action and the Talc Insurance Actions shall not include any of the Talc Insurer Coverage Defenses; (c) the Talc Personal Injury Trust Causes of Action and the Talc Insurance Actions shall not include any claims fully and finally released, compromised, or settled pursuant to the Plan; (d) the Talc Personal Injury Trust shall comply with the Cyprus Insurance Protocol; and (e) for the avoidance of doubt, the Talc Personal Injury Trust Causes of Action and the Talc Insurance Actions do not include any rights of the Debtors, the Reorganized Debtors, or the other Protected Parties arising under the Channeling Injunction or any of the other injunctions, releases, or the discharge granted under the Plan and the Confirmation Order.

US-DOCS\164401015.3RLF1 33881412v.1

4.7     Transfer of Talc Personal Injury Trust Assets to the Talc Personal Injury Trust.

4.7.1     Transfers on the Effective Date.  To the fullest extent permissible under applicable law, on the Effective Date:

4.7.1.1     Subject to Sections 4.7.2 and 4.7.3, all right, title, and interest in and to the Talc Personal Injury Trust Assets (including the Sale Proceeds) and any proceeds thereof shall, by operation of the Plan and the Confirmation Order, be automatically, and without further act or deed, transferred to, vested in, and assumed by the Talc Personal Injury Trust free and clear of all Claims, Equity Interests, Encumbrances, and other interests of any Entity, subject to the Channeling Injunction and other provisions of the Plan.

4.7.1.2     [Reserved]

4.7.1.3     The Talc Personal Injury Trust shall assume all present and future obligations associated with recovering proceeds under the Talc Insurance Policies, subject to applicable law.

4.7.1.4     The rights of the Debtors under the J&J Settlement Agreement shall be assigned and transferred to the Talc Personal Injury Trust without need for further action by any J&J Settling Party or Person, and the Talc Personal Injury Trust shall be bound by all of the applicable provisions of the J&J Settlement Agreement.  Unless the J&J Settlement Agreement is validly terminated pursuant to the terms thereof, the Debtors, the Reorganized Debtors, and the Imerys Corporate Parties shall continue to be bound by the J&J Settlement Agreement and shall retain all of the obligations and benefits thereof notwithstanding the Debtors' assignment and transfer of rights under the J&J Settlement Agreement to the Talc Personal Injury Trust.

4.7.1.5     The Plan shall constitute a motion to assign the Debtors' rights under the J&J Settlement Agreement to the Talc Personal Injury Trust on the Effective Date.  Through such assignment, the Talc Personal Injury Trust will be assigned the rights to receive: (i) all amounts in the Imerys Designated Account, and (ii) any other amounts owed to the Debtors by the J&J Settling Parties pursuant to the terms of the J&J Settlement Agreement including any J&J Payment Obligations not yet paid by the J&J Settling Parties.

4.7.2     Transfers After the Effective Date.  To the extent any of the Talc Personal Injury Trust Assets are not transferred to the Talc Personal Injury Trust as of the Effective Date pursuant to the Plan, then when such assets accrue or become transferable subsequent to the Effective Date, they shall immediately be transferred to the Talc Personal Injury Trust.  To the extent that action of the Reorganized Debtors is required to effectuate such transfer, the Reorganized Debtors shall transfer, assign, and contribute, such remaining Talc Personal Injury Trust Assets to the Talc Personal Injury Trust as soon as reasonably practicable.  In the event the Reorganized Debtors breach any obligation contained in this

49

Section 4.7.2, the Talc Personal Injury Trust will have no adequate remedy at law and shall be entitled to preliminary and permanent declaratory and injunctive relief.

4.7.3    Cyprus Contributions.    Notwithstanding anything contained herein or otherwise, the Cyprus Contributions shall be made in accordance with Section 10.9.3 hereof and Section 4.7 of the Cyprus Mines Plan.

4.7.4    Cyprus Talc Insurance Policies.    Solely to the extent that the Talc Personal Injury Trust asserts any claim as assignee of a Cyprus Protected Party bound by the PDC Agreement, the Talc Personal Injury Trust shall abide by the terms of the PDC Agreement.    For the avoidance of doubt, other than as set forth in this provision or otherwise stated in the Plan, the Cyprus Mines Plan, or the Cyprus Settlement, the Talc Personal Injury Trust is not assuming any obligations undertaken by the Debtors or any Cyprus Protected Party in any settlement agreement or other contract compromising or releasing any rights under any Cyprus Talc Insurance Policy.

4.8    Talc Personal Injury Trust Expenses.    The Talc Personal Injury Trust shall pay all Talc Personal Injury Trust Expenses from the Talc Personal Injury Trust Assets, including proceeds of applicable Talc Insurance Policies.    The Talc Personal Injury Trust shall bear sole responsibility with respect to the payment of the Talc Personal Injury Trust Expenses. Additionally, the Talc Personal Injury Trust shall promptly pay all reasonable and documented Talc Personal Injury Trust Expenses incurred by the Reorganized Debtors for any and all liabilities, costs or expenses as a result of taking action on behalf of or at the direction of the Talc Personal Injury Trust.

4.9    Excess Talc Personal Injury Trust Assets.    To the extent there are any Talc Personal Injury Trust Assets remaining at such time as the Talc Personal Injury Trust is dissolved, such excess Talc Personal Injury Trust Assets shall be transferred to a charity or charities for such charitable purposes as the Talc Trustees, in their reasonable discretion, shall determine.

4.10    Dissolution of the Talc Personal Injury Trust.    The Talc Personal Injury Trust shall be dissolved upon satisfaction of the purposes of the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents.    Upon dissolution of the Talc Personal Injury Trust: (a) the Talc Trustees, the Talc Trust Advisory Committee Members, and the Post-Effective Date FCRs shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Cases, and (b) the Talc Trust Advisory Committees shall be dissolved.

4.11    Funds and Investment Guidelines.    All monies held in the Talc Personal Injury Trust shall be invested, subject to the investment limitations and provisions enumerated in the Talc Personal Injury Trust Agreement.

4.12    Cooperation Agreement.    The Debtors, the Imerys Non-Debtors, the Talc Personal Injury Trust, Alston & Bird LLP, and Gordon Rees Scully Mansukhani LLP, shall enter into the Cooperation Agreement on the Effective Date in substantially the form contained in the Plan Supplement that provides for the transfer and assignment of certain documents of the Debtors to

the Talc Personal Injury Trust.  The parties to the Cooperation Agreement shall be bound by the terms thereof.

4.13    <u>Indemnification of the Protected Parties for Talc Personal Injury Claims</u>.  From and after the Effective Date, the Talc Personal Injury Trust shall, pursuant to the Talc Personal Injury Trust Agreement, indemnify, to the fullest extent permitted by applicable law, each of the Debtors, the Reorganized Debtors, and the other Protected Parties for reasonable documented out-of-pocket expenses (including, without limitation, attorney's fees and expenses) incurred after the Effective Date attributable to the defense of any Talc Personal Injury Claim asserted against the Debtors, Reorganized Debtors, or the other Protected Parties; *provided*, *however*, that the limit of the indemnification with respect to each of the Imerys Protected Parties, the Rio Tinto Protected Parties, the Cyprus Protected Parties, the Zurich Protected Parties, and any other Settling Talc Insurance Company will be the amount contributed by or on behalf of such party to the Talc Personal Injury Trust in Cash; *provided*, *further*, that the Talc Personal Injury Trust shall not indemnify any party for any alleged Foreign Claim.  For the avoidance of doubt, and for purposes of this <u>Section 4.13</u>, the amount so contributed by or on behalf of each of the Rio Tinto Protected Parties shall be deemed to be $340 million (the sum of the Rio Tinto Cash Contribution and the Zurich Cash Contribution) and the amount so contributed by or on behalf of each of the Zurich Protected Parties shall be deemed to be $260 million (the amount of the Zurich Cash Contribution); *provided* that the Rio Tinto Protected Parties and the Zurich Protected Parties shall be entitled to a total of $260 million, in combination, in indemnification in respect of the Zurich Cash Contribution (with any payments to be made on a first come, first served, basis to any Rio Tinto Protected Party or any Zurich Protected Party).  For the avoidance of doubt, this <u>Section 4.13</u> is intended to supplement and not supersede the Injunctions provided in the Plan including the Channeling Injunction.

4.14    <u>Post-Effective Date Liabilities</u>.  Notwithstanding anything to the contrary in the Plan Documents or the Confirmation Order, neither any claim against nor the liability of any Entity arising out of or relating to the alleged post-Effective Date acts or omissions of such Entity (each, a "**Post-Effective Date Liability**") shall be a Talc Personal Injury Claim.  No Post-Effective Date Liabilities are affected by the filing of the Chapter 11 Cases, Confirmation or effectiveness of the Plan, or any of the transactions effectuated in connection therewith. To the extent an individual has both a Talc Personal Injury Claim and a claim based on any Post-Effective Date Liability, that individual may seek recovery from the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents and will retain any and all rights under applicable law with respect to such Post-Effective Date Liabilities.

4.15    <u>Institution and Maintenance of Legal and Other Proceedings</u>.  From and after the Effective Date, the Talc Personal Injury Trust shall be empowered and entitled, in its sole and absolute discretion and at its own expense, to pursue, compromise or settle all legal actions and other proceedings related to any asset, liability, or responsibility of the Talc Personal Injury Trust that is not released pursuant to the Plan, subject to the Talc Personal Injury Trust Agreement.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1    General Treatment.

5.1.1    Subject to Section 5.7 hereof, except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts or Unexpired Leases of the Debtors, shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease (i) was assumed or rejected previously by the Debtor counterparty thereto, (ii) previously expired or terminated pursuant to its own terms, (iii) is the subject of a motion to assume filed on or before the Effective Date, (iv) is identified as an Executory Contract or Unexpired Lease assumed by the Debtors pursuant to the Sale Order; or (v) is identified as an Executory Contract or Unexpired Lease to be assumed by the Debtors in the Plan Supplement.

5.1.2    [Reserved]

5.1.3    Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumption or rejection of Executory Contracts and Unexpired Leases, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated herein or as provided for in the Sale Order, all assumptions or rejections of Executory Contracts and Unexpired Leases are effective as of the Effective Date.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party on or before the Effective Date shall (i) in the case of an Executory Contract or Unexpired Lease that is a Talc Personal Injury Trust Asset, be assigned to the Talc Personal Injury Trust on the date such trust is established or as soon as reasonably practicable thereafter, and shall vest in, and be fully enforceable by the Talc Personal Injury Trust in accordance with its terms, except as such terms may have been modified by such order, or (ii) revest in and be fully enforceable by the Reorganized Debtors, as applicable, in accordance with its terms, except as such terms may have been modified by such order.

5.1.4    Notwithstanding anything to the contrary in the Plan, but subject to the limitations provided in Section 5.3 of the Plan, the Debtors reserve the right to alter, amend, modify, or supplement the list of Executory Contracts and Unexpired Leases to be assumed by the Debtors identified in the Plan Supplement at any time before the date that is sixteen (16) days prior to the Confirmation Hearing in order to take into account Executory Contracts and Unexpired Leases to be assumed or rejected in advance of the Confirmation Hearing.  After the Effective Date, the Reorganized Debtors, or any assignee, as applicable, shall have the right to terminate, amend, or modify any intercompany contracts, leases or other agreements to which they are a party without approval of the Bankruptcy Court.

5.2    Claims Based on Rejection of Executory Contracts or Unexpired Leases.

5.2.1    If the rejection or deemed rejection of an Executory Contract or Unexpired Lease by any Debtor results in damages to the other party or parties to such

Executory Contract or Unexpired Lease, a Claim for such damages shall be forever barred and shall not be enforceable against any of the Debtors, the Reorganized Debtors, any assignee, or their properties, whether by way of setoff, recoupment, or otherwise unless a Proof of Claim is filed with the Claims Agent and served upon counsel for the Debtors or the Reorganized Debtors by the *earlier* of (i) thirty (30) days after service of notice of the Effective Date, and (ii) thirty (30) days after service of notice of entry of a Final Order rejecting such Executory Contract or Unexpired Lease pursuant to a motion filed by any Debtor, which notice, in each case, will set forth such deadline.

5.2.2    Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time period provided in Section 5.2.1 will be automatically disallowed, forever barred from assertion and shall not be enforceable, without the need for any objection, or further notice to, or action, order or approval of the Bankruptcy Court.  All Allowed Claims arising from the rejection of an Executory Contract or Unexpired Lease shall be classified as (i) a Class 3 Unsecured Claim against the relevant Debtor or (ii) a Class 4a, Class 4b, or Class 4c Talc Claim against the relevant Debtor, as applicable, and shall be treated in accordance with Article III of the Plan.

5.3    Cure of Defaults for Executory Contracts and Unexpired Leases.

5.3.1    Notwithstanding anything to the contrary contained herein, any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Distribution Date from the Administrative Claim Reserve (if assumed by one of the Debtors pursuant to the Plan and Plan Supplement, but for the avoidance of doubt, not if assumed by the Debtors pursuant to the Sale Order), subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments necessary to cure such a default, (2) the ability of the Debtors or any assignee to provide any "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

5.3.2    On or prior to November 8, 2024, and subject to Section 5.3.6, the Debtors shall distribute, or cause to be distributed, Plan Cure and Assumption Notices to the applicable counterparty or counterparties to each Executory Contract or Unexpired Lease that may be assumed by the Debtors.  Any objection to a proposed assumption by the Debtors pursuant to the Plan (including any objection as to adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code) or related Cure Amount by a counterparty to such Executory Contract or Unexpired Lease must be filed, served and actually received by counsel to the Debtors and the other parties specified in the Plan Cure and Assumption Notice by the date set forth in the applicable Plan Cure and Assumption Notice.  Any unresolved objections to a Plan Cure and Assumption Notice shall be heard

at the Confirmation Hearing, unless otherwise agreed by the parties or at such other date and time as may be fixed by the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to any proposed assumption and/or Cure Amount will be deemed to have assented to such assumption and/or Cure Amount.

5.3.3    Subject to <u>Section 5.3.6</u>, the Debtors will distribute Plan Cure and Assumption Notices to the applicable counterparty or counterparties to each subsequently identified Executory Contract or Unexpired Lease that may be assumed by a Debtor.  Any objection to a proposed assumption by any of the Debtors pursuant to the Plan (including any objection as to adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code) or related Cure Amount by a counterparty to an Executory Contract or Unexpired Lease must be filed, served and actually received by counsel to the Debtors and the other parties specified in the Plan Cure and Assumption Notice by a date that is fourteen (14) days after the Debtors serve such counterparty with the Plan Cure and Assumption Notice.  Any unresolved objections shall be heard at the Confirmation Hearing, unless otherwise agreed by the parties or at such other date and time as may be fixed by the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to any proposed assumption and/or Cure Amount will be deemed to have assented to such assumption and/or Cure Amount.

5.3.4    Notwithstanding <u>Sections 5.3.2</u> and <u>5.3.3</u> above, (i) any counterparty to an Executory Contract or Unexpired Lease that received a Sale Cure Notice and failed to timely object to any Cure Amount as provided in the applicable Sale Cure Notice is deemed to have consented to such Cure Amount, and (ii) any counterparty to an Executory Contract or Unexpired Lease that received a Prior Plan Cure and Assumption Notice and failed to timely object to any proposed assumption and/or Cure Amount as provided in the applicable Prior Plan Cure and Assumption Notice will be deemed to have assented to such assumption and/or Cure Amount; *provided* that any unresolved objections as related to a Prior Plan Cure and Assumption Notice shall be heard at the Confirmation Hearing, unless otherwise agreed by the parties or at such other date and time as may be fixed by the Bankruptcy Court.

5.3.5    [Reserved]

5.3.6    The Debtors shall serve copies of the lists of Executory Contracts and Unexpired Leases provided for in the Plan Supplement on the applicable counterparties.  In addition, the Debtors will serve any revised Executory Contract and Unexpired Lease list on affected counterparties within two (2) days of filing such lists.  Each counterparty to an Executory Contract or Unexpired Lease that (i) is included in the list or is later added to the list and that has not received a Prior Plan Cure and Assumption Notice or a Plan Cure and Assumption Notice and/or (ii) has its Cure Amount modified by the Debtors shall have until the date that is fourteen (14) days after the Debtors serve such counterparty with notice thereof to object to the assumption of its Executory Contract or Unexpired Lease pursuant to the Plan, including any objection as to adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code, and, if the proposed Cure Amount has been modified, exclusively to the proposed Cure Amount.

5.3.7    Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

5.4    <u>Modifications, Amendments, Supplements, Restatements or Other Agreement</u>.

5.4.1    Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated, or is rejected or repudiated under the Plan.

5.4.2    Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

5.5    <u>Reservation of Rights</u>.    Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on (i) the list of the Executory Contracts and Unexpired Leases to be assumed by the Debtors or (ii) anything contained in the Plan or Plan Supplement, shall constitute an admission by any of the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors, or any assignee has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, the Reorganized Debtors, or any assignee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

5.6    <u>Talc Insurance Policies, Cyprus Talc Insurance Policies, J&J Policies, and Talc Insurance CIP Agreements</u>.    Notwithstanding <u>Section 5.1</u> above, all Talc Insurance Policies, Cyprus Talc Insurance Policies, J&J Policies, and Talc Insurance CIP Agreements entered into prior to the Petition Date shall be considered non-executory contracts and shall neither be assumed nor rejected by the Debtors.    Other than the permissibility of the Assignment, which is to be determined by or in connection with Confirmation of the Plan, the rights and obligations of the parties under the Talc Insurance Policies, the Talc Insurance CIP Agreements, the Cyprus Talc Insurance Policies, and the J&J Policies, including the question of whether any breach has occurred, shall be determined under applicable law.    For the avoidance of doubt, the treatment of the Talc Insurance Policies, Cyprus Talc Insurance Policies, J&J Policies, and Talc Insurance CIP Agreements shall, in all respects, be subject to the terms of the J&J Settlement Agreement and the J&J Settlement Order.

5.7    Non-Talc Insurance Policies.    The Debtors do not believe that the Non-Talc Insurance Policies (or settlements related thereto) constitute executory contracts. However, to the extent such Non-Talc Insurance Policies are considered to be executory contracts, then, notwithstanding anything contained in Article V to the contrary, the Plan will constitute a motion to assume such Non-Talc Insurance Policies, and authorize the Reorganized Debtors, as applicable, to pay all future obligations, if any, in respect thereof.    Subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, their respective Estates and all parties in interest. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of any Debtor existing as of the Confirmation Date with respect to each such Non-Talc Insurance Policy. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption of the Non-Talc Insurance Assets, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.    Under no circumstances shall the Talc Personal Injury Trust be obligated to pay any indemnity or retrospective premium obligations arising out of Non-Talc Insurance Policies.

## ARTICLE VI
## DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF CLAIMS
## OTHER THAN TALC CLAIMS

6.1    Distributions.    Distributions on account of Allowed Non-Talc Claims shall be made on or after the Distribution Date as provided in the Plan.    All Talc Personal Injury Claims shall be liquidated and, as appropriate, paid, or resolved by the Talc Personal Injury Trust pursuant to and in accordance with the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures.

6.2    Timing and Calculation of Amounts to be Distributed.

6.2.1    Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Non-Talc Claim shall receive the full amount of the Distribution that the Plan provides for such Allowed Claim in the applicable Class and in the manner provided herein.    In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.2.2    If and to the extent that there are Disputed Non-Talc Claims, Distributions on account of any such Disputed Non-Talc Claims shall be made pursuant to the provisions set forth in this Article VI of the Plan.

56

6.3     <u>Disbursing Agent</u>.  Except as otherwise provided herein, all Distributions under the Plan shall be made by the Disbursing Agent.  The Reorganized Debtors, or any such other Entity or Entities designated by the Reorganized Debtors, shall serve as Disbursing Agent for all Non-Talc Claims.

6.4     <u>Rights and Powers of Disbursing Agent</u>.

6.4.1     The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all Distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions thereof.

6.4.2     Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors from the Reorganized Debtor Cash Reserve.

6.5     <u>Distributions on Account of Claims Allowed After the Effective Date</u>. Notwithstanding any other provision of the Plan, no Distributions shall be made under the Plan on account of any Disputed Non-Talc Claim, unless and until such Disputed Non-Talc Claim becomes an Allowed Non-Talc Claim.  Distributions made after the Effective Date to holders of Disputed Non-Talc Claims that are not Allowed Non-Talc Claims as of the Effective Date but which later become Allowed Non-Talc Claims shall be made as if such Claim had been an Allowed Claim on the Effective Date.  Except as otherwise may be agreed to by the Debtors or the Reorganized Debtors, on the one hand, and the holder of a Disputed Non-Talc Claim, on the other hand, and notwithstanding any provision otherwise in the Plan, no partial payments and no partial Distributions shall be made with respect to any Disputed Non-Talc Claim until all Disputed Non-Talc Claims held by the holder of such Disputed Non-Talc Claim have become Allowed Non-Talc Claims or have otherwise been resolved by settlement or Final Order.

6.6     <u>Delivery of Distributions and Undeliverable or Unclaimed Distributions</u>.

6.6.1     <u>Delivery of Distributions to Holders of Non-Talc Claims</u>.  Except as otherwise provided in the Plan, Distributions to holders of Allowed Non-Talc Claims shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent: (a) to the signatory set forth on any of the Proof of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address.

6.6.2    [Reserved]

6.6.3    <u>Full Benefit of Distributions</u>.  Distributions under the Plan on account of Non-Talc Claims shall not be subject to levy, garnishment, attachment or similar legal process, so that each holder of an Allowed Non-Talc Claim shall have and receive the benefit of the Distributions in the manner set forth in the Plan.  None of the Debtors, the Reorganized Debtors, or the applicable Disbursing Agent shall incur any liability whatsoever on account of any Distributions under the Plan except where such Distributions are found by Final Order to have been made with gross negligence, willful misconduct or fraud.

6.6.4    <u>Undeliverable Distributions and Unclaimed Property</u>.  In the event that any Distribution to any holder of an Allowed Non-Talc Claim is returned as undeliverable, no further Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such Distribution shall be made as soon as practicable after such Distribution has become deliverable to such holder without interest; *provided*, *however*, that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of three (3) months from the applicable Distribution Date.  After such date, all "unclaimed property" or interests in property in respect of the Reorganized Debtors shall revert to the applicable Reserve used to fund the Allowed Non-Talc Claim to be held and/or disbursed in accordance with the Plan, or, to the Reorganized Debtors to be used and/or disbursed in accordance with the Plan if the applicable Reserve is no longer in effect (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary).  The claim of any holder to such property or interest in property shall be discharged and forever barred.

6.7    <u>Time Bar to Cash Payments</u>.  Checks issued by the Disbursing Agent in respect of Allowed Non-Talc Claims shall be null and void if not cashed within one hundred and eighty (180) days of the date of issuance thereof.  The holder of the Allowed Non-Talc Claim with respect to which such check originally was issued may make a request for re-issuance of any check directly to the Disbursing Agent; *provided*, *however*, that any such request for re-issuance of a check shall be made on or before the twelve (12) month anniversary of the Distribution Date.  After such date, all Non-Talc Claims in respect of void checks shall be discharged and forever barred.

6.8    <u>Disbursing Agent's Obligation to Provide Periodic Reporting</u>.  The Disbursing Agent will provide quarterly reporting on the status of the claims process of the Reorganized Debtors including funds remaining in each of the Reserves to the Talc Personal Injury Trust, the Talc Trust Advisory Committees, the Post-Effective Date FCRs, and Imerys S.A.  The first quarterly report will encompass the first three (3) full months following the Effective Date (plus any partial month during which the Effective Date occurs).  Each report will be delivered within thirty (30) days of the conclusion of the preceding quarterly period.  These reports will not be filed with the Bankruptcy Court.

6.9    <u>Record Date for Holders of Claims</u>.  Except as otherwise provided in an order of the Bankruptcy Court that is not subject to any stay, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001, on or prior to the Distribution Record Date, shall be treated as

the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date. If there is any dispute regarding the identity of the Person entitled to receive a Distribution in respect of a Claim under the Plan, no Distribution need be made in respect of such Claim until such dispute has been resolved.

6.10    Compliance with Tax Requirements and Allocations.

6.10.1    In connection with the Plan and all Distributions hereunder, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state or local taxing authority, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions including tax certification forms, or establishing any other mechanisms it believes are reasonable and appropriate.

6.10.2    For tax purposes, Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

6.11    Transfers of Claims.  In the event that the holder of any Claim shall transfer such Claim after the Distribution Record Date, it shall immediately advise the applicable Reorganized Debtor(s) or the Talc Personal Injury Trust (to the extent it pertains to a Talc Personal Injury Claim), in writing of such transfer and file a notice of the transfer with the Bankruptcy Court.  The Reorganized Debtors or the Talc Personal Injury Trust, as the case may be, shall be entitled to assume that no transfer of any Claim has been made by any holder unless and until written notice of a transfer has been actually received by the applicable Reorganized Debtor(s) or the Talc Personal Injury Trust, as applicable.  Each transferee of any Claim shall take such Claim subject to the provisions of the Plan, and, except as provided in a notice of transfer, the Reorganized Debtors or the Talc Personal Injury Trust, as the case may be, shall be entitled to assume conclusively that the transferee named in any notice of transfer shall thereafter be vested with all rights and powers of the transferor of such Claim.

6.12    Interest on Impaired and Disputed Claims.  Except as specifically provided for herein or in the Talc Personal Injury Trust Documents (as related to Talc Personal Injury Claims), interest shall not accrue on Impaired Claims, and no holder of an Impaired Claim shall be entitled to interest accruing on or after the Petition Date on any such Impaired Claim.  Interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

6.13    Setoffs.  The Debtors and the Reorganized Debtors (or the Talc Personal Injury Trust to the extent it pertains to a Talc Personal Injury Claim) may, pursuant to the applicable provisions of the Bankruptcy Code, or applicable non-bankruptcy law, set off against any

applicable Allowed Claim (before any Distribution is made on account of such Claim) any and all claims, rights, causes of action, debts or liabilities of any nature that the Debtors or the Reorganized Debtors (or the Talc Personal Injury Trust (in its own right or as assignee of the Debtors) to the extent it pertains to a Talc Personal Injury Claim) may hold against the holder of such Allowed Claim; *provided*, *however*, that the failure to effect such a setoff shall not constitute a waiver or release of any such claims, rights, causes of action, debts or liabilities.

## ARTICLE VII
## RESOLUTION OF DISPUTED CLAIMS OTHER THAN TALC CLAIMS, ADMINISTRATIVE CLAIMS, AND FEE CLAIMS

7.1    <u>Disputed Claims</u>.  All Disputed Claims against the Debtors, other than Talc Claims, Administrative Claims, and Fee Claims, shall be subject to the provisions of this Article VII.  All Talc Personal Injury Claims shall be resolved by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents.  All Administrative Claims and Fee Claims shall be determined and, if Allowed, paid in accordance with Article II of the Plan.

7.2    <u>Prosecution of Claims Generally</u>.

7.2.1    Subject to the provisions contained herein, including as set forth in <u>Section 11.7.2</u> of the Plan, after the Effective Date, only the Reorganized Debtors may object to the allowance of any Non-Talc Claim, except that the United States Trustee, the FCR, the Tort Claimants' Committee, the other Notice Parties (as that term is defined in the Compensation Procedures Order), and the Imerys Non-Debtors, as applicable, shall also have standing and capacity to object to the Fee Claims of the Professionals.  After the Effective Date, the Reorganized Debtors shall be accorded the power and authority to allow or settle and compromise any Non-Talc Claim, except for Fee Claims, without notice to any other party or approval of or notice to the Bankruptcy Court.  For the avoidance of doubt, no fees incurred from and after the Effective Date resulting from objections to the Fee Claims, other than objections by the Reorganized Debtors and/or the Fee Examiner will be funded by the Reorganized Debtors.

7.2.2    Notwithstanding anything to the contrary in this Article VII, (i) resolution of Talc Personal Injury Claims shall be handled exclusively by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents, (ii) objections to Fee Claims shall be handled in accordance with the Compensation Procedures Order, subject to <u>Section 2.3</u>, and (iii) objections to Administrative Claims (excluding Fee Claims) shall be handled in accordance with <u>Section 2.1</u> of the Plan.

7.2.3    Notwithstanding anything to the contrary in this Article VII, objections to Non-Talc Claims against ITC shall be subject to review by the Information Officer.

7.3    <u>Prosecution of Disputed Non-Talc Claims and Claims Objection Deadline</u>.

7.3.1    Each Reorganized Debtor shall have the right, after the Effective Date, to file objections to the Non-Talc Claims that have not already been Allowed by Final Order, agreement, or the Plan, and litigate to judgment, settle, or withdraw such objections to Disputed Non-Talc Claims; *provided* that objections to and the prosecution of Non-Talc

Claims against ITC shall be subject to review by the Information Officer. Without limiting the foregoing, each Reorganized Debtor, as applicable, shall have the right to litigate any Disputed Non-Talc Claim either in the Bankruptcy Court or in any court of competent jurisdiction.

7.3.2    Unless otherwise ordered by the Bankruptcy Court, objections to Non-Talc Claims (other than Administrative Claims, Fee Claims, or late-filed Claims) shall be filed with the Bankruptcy Court and served upon the holders of each such Non-Talc Claim to which objections are made on or before the Claims Objection Bar Date, unless extended by order of the Bankruptcy Court prior to the expiration of such period. Objections to late-filed Claims against the Debtors shall be filed before the later of (i) six (6) months following the Effective Date, or (ii) ninety (90) days after the Reorganized Debtors receive actual notice of the filing of such Claim.

7.4    [Reserved]

7.5    <u>Distributions on Account of Disputed Claims</u>. At such time as determined to be practicable by the Reorganized Debtors, the Disbursing Agent will make Distributions on account of any Disputed Claim that has become Allowed. Such Distributions will be made pursuant to the applicable provisions of Article VI of the Plan.

7.6    <u>No Distributions Pending Allowance</u>. No Distributions or other consideration shall be paid with respect to any Claim that is a Disputed Claim unless and until all objections to such Disputed Claim are resolved by agreement or Final Order and such Disputed Claim becomes an Allowed Claim.

7.7    <u>Estimation of Claims</u>. The Debtors (before the Effective Date) or the Reorganized Debtors (on or after the Effective Date) may, at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors (before the Effective Date) or the Reorganized Debtors (on or after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

7.8    <u>Disputed Claims Reserve for the Debtors</u>.

7.8.1    On the Effective Date, the Debtors shall deposit in the Disputed Claims Reserve the Cash that would have been distributed to the holders of Disputed Non-Talc

Claims if such Disputed Non-Talc Claims had been Allowed Claims as of the Effective Date. The Disputed Claims Reserve shall be funded from Cash on hand of the Debtors on the Effective Date, the Sale Proceeds, and/or the Imerys Cash Contribution (excluding the Administrative Expense Contribution). The amount to be deposited shall be determined based on the lesser of (1) the asserted amount of the Non-Talc Claims in the applicable Proofs of Claim; (2) the amount, if any, estimated by the Bankruptcy Court pursuant to (i) section 502(c) of the Bankruptcy Code or (ii) Section 7.7 of the Plan if, after the Effective Date, a motion is filed by any Reorganized Debtor to estimate such Claim; (3) the amount otherwise agreed to by the Debtors (or the Reorganized Debtors, if after the Effective Date) and the holders of such Disputed Non-Talc Claims; or (4) any amount otherwise approved by the Bankruptcy Court.

7.8.2    If a Non-Talc Claim that remains a Disputed Claim as of the Effective Date is thereafter Allowed in whole or in part, the Disbursing Agent shall (at such time as determined to be practicable by the Reorganized Debtors) distribute from the Disputed Claims Reserve, to the holder of such Non-Talc Claim, the Cash that such holder would have received on account of such Claim if such Claim had been an Allowed Claim on the Effective Date.

7.8.3    The Reorganized Debtors shall determine, on each six (6) month anniversary of the Effective Date, whether the amounts available in the Reorganized Debtor Cash Reserve are in excess of the amount necessary to satisfy the purpose for which such reserve was established. If the Reorganized Debtors determine a surplus exists in the Reorganized Debtor Cash Reserve as of the date of such determination, such surplus Cash shall be allocated to the Disputed Claims Reserve to the extent such reserve is insufficiently funded to satisfy the purpose for which such reserve was established.

7.9    [Reserved]

7.10    <u>Distribution of Excess Amounts in the Disputed Claims Reserve for the Debtors</u>. When all Disputed Non-Talc Claims are resolved and either become Allowed or Disallowed, to the extent Cash remains in the Disputed Claims Reserve after all holders of such Claims have been paid the full amount they are entitled to pursuant to the treatment set forth for under the Plan, then such excess amounts will be transferred to the Talc Personal Injury Trust and become Talc Personal Injury Trust Assets, whereby such excess amounts will be made available to satisfy Talc Personal Injury Trust Expenses and for disbursement to holders of Claims in Class 4a and Class 4b pursuant to the Trust Distribution Procedures.

## ARTICLE VIII
## ACCEPTANCE OR REJECTION OF PLAN

8.1    <u>Classes Entitled to Vote</u>. Holders of Talc Personal Injury Claims in Classes 4a and 4b shall be entitled to vote to the extent and in the manner provided in the Voting Procedures Order and the Plan.

8.2    <u>Acceptance of Holders of Talc Personal Injury Claims</u>. Pursuant to sections 1126(c) and 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code, each of Class 4a and Class 4b shall

have accepted the Plan only if at least two-thirds (2/3) in amount and seventy-five percent (75%) of the members in each of Class 4a and Class 4b, respectively, actually voting on the Plan have voted to accept the Plan.

8.3     Acceptance by Unimpaired Classes.  Classes 1, 2, 3, 4c, 5b, and 6b are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Classes 5a and 6a are treated as Unimpaired under the Plan and are presumed to have accepted the Plan because all holders of Claims or Equity Interests (as applicable) in Classes 5a and 6a are Plan Proponents and have consented to their treatment under the Plan in accordance with the Imerys Settlement.

## ARTICLE IX
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

9.1     Conditions Precedent to the Confirmation of the Plan.  Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived pursuant to Section 9.3 of the Plan:

9.1.1     The Bankruptcy Court shall have entered an order, acceptable in form and substance to each of the Plan Proponents approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

9.1.2     Each of Class 4a and Class 4b shall have voted in requisite numbers and amounts in favor of the Plan as required by sections 524(g), 1126, and 1129 of the Bankruptcy Code.

9.1.3     The Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto, shall be consistent with (i) section 524(g) and other provisions of the Bankruptcy Code, as applicable, and (ii) the other provisions of the Plan.

9.1.4     The Reorganized Debtors shall have sufficient funds from Cash on hand (including the Sale Proceeds) and/or the Unsecured Claim Contribution to resolve all Allowed Class 3 Claims and to adequately fund the Disputed Claims Reserve as determined by each of the Plan Proponents.

9.1.5     The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order in conjunction therewith, in form and substance acceptable to each of the Plan Proponents. These findings and determinations, which are designed, among other things, to ensure that the Injunctions, releases and discharges set forth in Article XII shall be effective, binding and enforceable, and shall among other things, conclude:

(i)     Good Faith Compliance.  The Plan complies with all applicable provisions of the Bankruptcy Code including, without limitation, that the Plan be proposed in good faith and that the Confirmation Order not be procured by fraud.

63

(ii)    Voting.  Each of Class 4a and Class 4b have voted in requisite numbers and amounts in favor of the Plan as required by each of sections 524(g), 1126, and 1129 of the Bankruptcy Code.

(iii)    Injunctions.    The Channeling Injunction, the Insurance Entity Injunction, and the Supplemental Settlement Injunction Order are to be implemented in connection with the Talc Personal Injury Trust and do not enjoin or otherwise affect any claims or demands that any holder of a Talc Personal Injury Claim may have, whether presently or in the future, against J&J.

(iv)    Named Defendants.  As of the Petition Date, one or more of the Debtors had been named as a defendant in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos in talc or talc-containing products.

(v)    Assumption of Certain Liabilities.  Upon the Effective Date, the Talc Personal Injury Trust shall assume the liabilities of the Protected Parties with respect to Talc Personal Injury Claims and have exclusive authority as of the Effective Date to satisfy or defend such Talc Personal Injury Claims.

(vi)    Funding of Talc Personal Injury Trust.  The Talc Personal Injury Trust will be funded with the Talc Personal Injury Trust Assets.

(vii)    Stock Ownership.  The Talc Personal Injury Trust, on the Effective Date, by the exercise of rights granted under the Plan, will receive the Debtor Stock and shall maintain the rights to receive dividends or other distributions on account of such stock.

(viii)    Use of Talc Personal Injury Trust Assets.  The Talc Personal Injury Trust will use its assets and income to resolve Talc Personal Injury Claims.

(ix)    Likelihood of Talc Personal Injury Demands.  The Debtors are likely to be subject to substantial future Talc Personal Injury Demands for payment arising out of the same or similar conduct or events that gave rise to the Talc Personal Injury Claims that are addressed by the Channeling Injunction and the Insurance Entity Injunction.

(x)    Talc Personal Injury Demands Indeterminate.  The actual amounts, numbers, and timing of future Talc Personal Injury Demands cannot be determined.

(xi)    Likelihood of Threat to Plan's Purpose.  Pursuit of Talc Personal Injury Claims, including Talc Personal Injury Demands, outside of the procedures prescribed by the Plan and the Plan Documents, including the Trust Distribution Procedures, is likely to threaten the Plan's purpose to treat the Talc Personal Injury Claims and Talc Personal Injury Demands equitably.

(xii)    Injunctions Conspicuous.  The terms of the Discharge Injunction, the Channeling Injunction, the Supplemental Settlement Injunction Order, the

Release Injunction, and the Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in conspicuous language in the Plan and in the Disclosure Statement.

(xiii)   <u>Appropriate Trust Mechanisms</u>.   Pursuant to court orders or otherwise, the Talc Personal Injury Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Talc Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Talc Personal Injury Trust will value, and be in a financial position to pay, Talc Personal Injury Claims that involve similar Claims in substantially the same manner regardless of the timing of the assertion of such Talc Personal Injury Claims.

(xiv)   <u>Future Claimants' Representative</u>.   The FCR was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Channeling Injunction, the Insurance Entity Injunction, and the Supplemental Settlement Injunction Order, for the purpose of, among other things, protecting the rights of persons that might subsequently assert Talc Personal Injury Demands of the kind that are addressed in the Channeling Injunction, the Insurance Entity Injunction, and the Supplemental Settlement Injunction Order, and transferred to and assumed by the Talc Personal Injury Trust.

(xv)   <u>Fair and Equitable Inclusion</u>.   The inclusion of each Debtor or other Protected Party within the protection afforded by the Channeling Injunction and the Insurance Entity Injunction, as applicable, is fair and equitable with respect to the Persons that might subsequently assert Talc Personal Injury Demands against each such Debtor or other Protected Party in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by or on behalf of each such Debtor or other Protected Party.

(xvi)   <u>Sections 105(a) and 524(g) Compliance</u>.   The Plan complies with sections 105(a) and 524(g), to the extent applicable, and all other applicable provisions of the Bankruptcy Code.

(xvii)   <u>Injunctions Essential</u>.   The Discharge Injunction, the Channeling Injunction, the Supplemental Settlement Injunction Order, the Release Injunction, and the Insurance Entity Injunction are essential to the Plan and the Debtors' reorganization efforts.

(xviii)   <u>Insurance Assignment Authorized</u>.   The Assignment of the Talc Insurance Assets is authorized and permissible notwithstanding any terms of the foregoing or provisions of applicable law that may be argued to prohibit the Assignment.   The Bankruptcy Code authorizes the Assignment of the Talc Insurance Assets to the Talc Personal Injury Trust pursuant to <u>Section 4.7</u>, and from and after the Assignment of the Talc Insurance Assets to the Talc Personal Injury Trust pursuant to <u>Section 4.7</u>, no Talc Insurance Company may assert under any

65

Talc Insurance Policy, Talc Insurance Settlement Agreement, or Talc Insurance CIP Agreement (i) any defense that the Plan or any other Plan Document does not comply with the Bankruptcy Code or (ii) any defense that the Assignment of the Talc Insurance Assets to the Talc Personal Injury Trust pursuant to Section 4.7, or any other action contemplated by Section 4.7, is prohibited by any Talc Insurance Policy, Talc Insurance Settlement Agreement, Talc Insurance CIP Agreement, or by applicable non-bankruptcy law.

(xix)    The J&J Settlement.  The assignment of the Debtors' rights under the J&J Settlement Agreement to the Talc Personal Injury Trust on the Effective Date is authorized, including the assignment of the Debtors' rights to receive: (i) all amounts in the Imerys Designated Account and (ii) any other amounts owed to the Debtors by the J&J Settling Parties pursuant to the terms of the J&J Settlement Agreement including any J&J Payment Obligations not yet paid by the J&J Settling Parties.

(xx)    The Supplemental Settlement Injunction Order.  The Supplemental Settlement Injunction Order is fair, equitable, in the best interests of the Debtors' Estates, and shall be entered in connection with the Imerys Settlement, the Rio Tinto/Zurich Settlement, the Cyprus Settlement, and the XL Settlement.

(xxi)    The Imerys Settlement.  The Imerys Settlement represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' Estates, complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

(xxii)    The Rio Tinto/Zurich Settlement.  The Rio Tinto/Zurich Settlement (i) represents a sound exercise of the Debtors' business judgment, will yield a fair and reasonable price for the assets being sold, is in the best interest of the Debtors' Estates, and otherwise complies with section 363 of the Bankruptcy Code, (ii) meets the requirements for a sale of property free and clear of any interests of third parties in such property pursuant to section 363(f) of the Bankruptcy Code, and (iii) constitutes a purchase in good faith by Zurich and the Rio Tinto Captive Insurers pursuant to section 363(m) of the Bankruptcy Code, rendering the provisions of section 363(m) applicable.  The Rio Tinto/Zurich Settlement is accordingly approved pursuant to sections 363(b) and 105 of the Bankruptcy Code and Bankruptcy Rule 9019, and all the provisions set forth in Section 2.3 of the Rio Tinto/Zurich Settlement Agreement are appropriate, approved and entered.

(xxiii) The Cyprus Settlement.  The Cyprus Settlement (i) represents a sound exercise of the Debtors' business judgment, (ii) is in the best interest of the Debtors and their Estates, (iii) is fair, reasonable, and equitable, and the consideration exchanged under the Cyprus Settlement constitutes a fair and reasonable settlement of the settling parties' disputes, and (iv) is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

(xxiv) <u>The XL Settlement</u>.  The XL Settlement (i) represents a sound exercise of the Debtors' business judgment, will yield a fair and reasonable price for the assets being sold, is in the best interest of the Debtors' Estates, and otherwise complies with section 363 of the Bankruptcy Code, (ii) meets the requirements for a sale of property free and clear of any interests of third parties (including the Non-Debtor Covered Entities) in such property pursuant to section 363(f) of the Bankruptcy Code, and (iii) constitutes a purchase in good faith by XL pursuant to section 363(m) of the Bankruptcy Code, rendering the provisions of section 363(m) applicable.  The XL Settlement is accordingly approved pursuant to sections 363(b) and 105 of the Bankruptcy Code and Bankruptcy Rule 9019.

(xxv) <u>Adequate Notice</u>.  Adequate and sufficient notice of the Plan and the Confirmation Hearing, as well as all deadlines for objecting to the Plan, has been given to: (a) all known creditors and holders of Equity Interests, including all known holders of Talc Claims; (b) parties that requested notice in accordance with Bankruptcy Rule 2002 (including the Tort Claimants' Committee and the FCR); (c) all parties to Unexpired Leases and Executory Contracts with the Debtors; (d) all taxing authorities listed on the Schedules or in the Claims Register; (e) the Department of the Treasury by service upon the District Director of the Internal Revenue Service of the United States; (f) state attorneys general and state departments of revenue for states in which the Debtors have conducted business; and (g) holders of interests in the Talc Insurance Policies being sold free and clear of such interests under the Plan that have been identified by the Settling Talc Insurance Companies (as applicable) to the Debtors, in each case, (x) in accordance with the solicitation procedures governing such service and (y) in substantial compliance with Bankruptcy Rules 2002(b), 3017, and 3020(b).  In addition, notice of the Plan and the Confirmation Hearing, as well as all deadlines for objecting to the Plan, has been sufficiently publicized.  Such transmittal, service, and publication were adequate and sufficient to bind, among other parties, each holder of a Talc Claim, and each party represented by the FCR, and no other or further notice is or shall be required.

(xxvi) <u>Due Process</u>.  Each holder of a Talc Claim and each party represented by the Tort Claimants' Committee or the FCR has been afforded due process based on the notice referenced in clause (xxv) above, the appointment of the Tort Claimants' Committee and the FCR, and the Plan's compliance with section 524(g) of the Bankruptcy Code.

9.1.6    The J&J Settlement Agreement shall not have been terminated and is otherwise in effect, except pursuant to Section 8.3 of the J&J Settlement Agreement as a result of a material breach by J&J, as determined in accordance with Section 8.3 of the J&J Settlement Agreement.

9.2    <u>Conditions Precedent to the Effective Date of the Plan</u>.  Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall occur on the first Business Day on which each of the following conditions has been satisfied or waived pursuant to <u>Section 9.3</u>:

9.2.1    <u>Confirmation Order and Affirmation Order</u>.  The Confirmation Order shall have been submitted to the District Court for affirmation, and the Affirmation Order in form and substance acceptable to each of the Plan Proponents shall have been entered by the District Court, and the Confirmation Order and the Affirmation Order shall have become Final Orders.

9.2.2    <u>Cyprus Confirmation Order and Cyprus Affirmation Order</u>.  The Cyprus Mines Plan, in form and substance consistent with the Cyprus Settlement, shall have been confirmed by entry of the Cyprus Confirmation Order by the Bankruptcy Court, which shall have been affirmed by entry of the Cyprus Affirmation Order by the District Court, and the Cyprus Confirmation Order and the Cyprus Affirmation Order shall have become Final Orders.

9.2.3    <u>Talc Personal Injury Trust</u>.  The Talc Personal Injury Trust Assets shall, simultaneously with the occurrence of the Effective Date or as otherwise provided herein or in the Cyprus Mines Plan (only as related to the assets contributed pursuant to the Cyprus Mines Plan), be transferred to, vested in, and assumed by the Talc Personal Injury Trust in accordance with Article IV of the Plan.

9.2.4    <u>Plan Documents</u>.  The Talc Personal Injury Trust Agreement (and related documents), and the other applicable Plan Documents necessary or appropriate to implement the Plan shall have been executed, delivered and, where applicable, filed with the appropriate governmental authorities.

9.2.5    <u>Allowed Non-Talc Claims</u>.  The Reserves shall be adequately funded as determined by each of the Plan Proponents so as to permit the Debtors to make Distributions relating to Allowed Non-Talc Claims in accordance with the Plan.

9.2.6    <u>Imerys Contribution</u>.  Imerys S.A. shall have disbursed, or satisfied all conditions of, the Imerys Contribution to the Debtors, the Reorganized Debtors, or the Talc Personal Injury Trust, as applicable, in accordance with Article X hereof.

9.2.7    <u>Cyprus Contributions</u>.  Cyprus shall have disbursed, or satisfied all conditions of, the Cyprus Contributions to the Debtors, the Reorganized Debtors, or the Talc Personal Injury Trust, as applicable, in accordance with Article X hereof.

9.2.8    <u>United States Trustee's Fees</u>.  The fees of the United States Trustee then owing by the Debtors shall have been paid in full.

9.2.9    <u>Ancillary Proceeding in Canada</u>.  The Canadian Court shall have entered an order in the Canadian Proceeding recognizing the Confirmation Order in its entirety and ordering the Confirmation Order and the Plan to be implemented and effective in Canada in accordance with their terms.

9.2.10    <u>J&J Settlement Agreement</u>.  The J&J Settlement Agreement shall not have been terminated and is otherwise in effect, except pursuant to Section 8.3 of the J&J Settlement Agreement as a result of a material breach by J&J, as determined in accordance with Section 8.3 of the J&J Settlement Agreement.

9.3    Waiver of Conditions Precedent.  To the greatest extent permitted by law, each of the conditions precedent in this Article IX may be waived or modified by the Debtors, in whole or in part, but only with the unanimous written consent of each of the Plan Proponents; *provided*, *however*¸ that the conditions precedent in Sections 9.2.1 and 9.2.2 cannot be waived or modified other than the condition that the Confirmation Order, the Affirmation Order, the Cyprus Confirmation Order, and the Cyprus Affirmation Order shall have become Final Orders; *provided*, *further*, that the conditions precedent in Sections 9.1.6 and 9.2.10 may only be waived by J&J in its sole discretion.  Any waiver or modification of a condition precedent permitted under this Section 9.3 may be effected at any time, without notice, without leave or order of the Bankruptcy Court or District Court, and without any other formal action.

9.4    Notice of Effective Date.  The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within five (5) Business Days thereafter, which notice shall confirm that the foregoing conditions have been satisfied or waived.

9.5    Concurrent Effectiveness of the Plan and the Cyprus Mines Plan.  Subject to satisfaction of the conditions precedent in this Article IX and Article IX of the Cyprus Mines Plan, unless otherwise waived in accordance with Section 9.3 of the Plan or Section 9.3 of the Cyprus Mines Plan, the Effective Date of the Plan and the effective date of the Cyprus Mines Plan shall occur concurrently.

## ARTICLE X
## MEANS FOR IMPLEMENTATION OF THE PLAN

10.1    General.  On or after the Confirmation Date, each of the Plan Proponents shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable them to implement the provisions of the Plan on the Effective Date, including, without limitation, the creation of the Talc Personal Injury Trust and the preparations for the transfer of the Talc Personal Injury Trust Assets to the Talc Personal Injury Trust.

10.2    Operations of the Debtors Between Confirmation and the Effective Date.  The Debtors shall continue to operate as debtors and debtors-in-possession during the period from the Confirmation Date through and until the Effective Date.

10.3    Charter and Bylaws.  From and after the Effective Date, each of the Reorganized Debtors shall be governed pursuant to their respective Amended Charter Documents.  The Amended Bylaws and the Amended Certificates of Incorporation shall contain such provisions as are necessary to satisfy the provisions of the Plan and, to the extent necessary to prohibit the issuance of non-voting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the Amended Charter Documents after the Effective Date, as permitted by applicable law.  On or prior to the Effective Date, ITA will change its name to Ivory America, Inc. (or such other name as set forth in the Amended Charter Documents), ITV will change its name to Ivory Vermont, Inc. (or such other name as set forth in the Amended Charter Documents), and ITC will change its name to Ivory Canada, Inc. (or such other name as set forth in the Amended Charter Documents).

10.4    <u>Corporate Action</u>.  On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtors, including, but not limited to, actions requiring a vote of the boards of directors or shareholders and execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers or directors of the Debtors.

10.5    <u>Post-Effective Date Governance and Continued Existence of the Reorganized Debtors</u>.

10.5.1    On the Effective Date: (a) all Debtor Stock will be Reinstated, and (b) simultaneously with the reinstatement of such shares, the holders of such Equity Interests will transfer the Debtor Stock to the Talc Personal Injury Trust; *provided* that if the Reorganized Debtor Merger is effectuated, the ITV Stock and ITC Stock will be extinguished in connection with the Reorganized Debtor Merger.

10.5.2    On the Effective Date, and in conjunction with the events contemplated in <u>Section 10.5.1</u>, Reorganized ITA and Reorganized ITC will enter into the Share Purchase Agreement, pursuant to which Reorganized ITC will purchase 15% of the ITV Stock from Reorganized ITA, such that Reorganized ITA will own 85% of the ITV Stock and Reorganized ITC will own 15% of the ITV Stock.  For the avoidance of doubt, Reorganized ITA and Reorganized ITC will not enter into the Share Purchase Agreement if the Reorganized Debtor Merger is effectuated.

10.5.3    Except as otherwise provided herein or as may be provided in the Plan Supplement or the Confirmation Order, and in the event the Reorganized Debtor Merger does not occur, each of the Reorganized Debtors shall continue their existence as separate entities after the Effective Date, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which each Reorganized Debtor is incorporated and pursuant to the Amended Charter Documents and any other formation documents in effect following the Effective Date, and such documents are deemed to be adopted pursuant to the Plan and require no further action or approval.

10.5.4    On the Effective Date, the officers and directors of the Reorganized Debtors shall consist of the individuals identified in the Plan Supplement.

10.5.5    Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in the Reorganized Debtors' Estates other than property constituting Talc Personal Injury Trust Assets, including, but not limited to, all Debtor Causes of Action, the Purchased Properties, and any property acquired by the Debtors pursuant to the Plan, shall vest in the Reorganized Debtors, free and clear of all Claims, interests, Liens, other Encumbrances, and liabilities of any kind.  On and after the Effective Date, except as otherwise provided in the Plan, including <u>Section 10.6</u>, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, interests, or Debtor Causes of Action without supervision or approval

by the Bankruptcy Court, or notice to any other Entity, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

10.5.6    On the Effective Date, and if applicable, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, all assets of the Debtors that constitute Talc Personal Injury Trust Assets shall vest in the Talc Personal Injury Trust pursuant to the terms of the Plan.  The Talc Personal Injury Trust shall own such assets, as of the Effective Date, free and clear of all Claims, interests, Liens, other Encumbrances, and liabilities of any kind.

10.6    <u>Effective Date Merger</u>.

10.6.1    Notwithstanding anything to the contrary set forth in the Plan, in the event of the Merger Toggle, the Reorganized Debtors will enter into the Merger Agreement, pursuant to which Reorganized ITC and Reorganized ITV will be merged with and into Reorganized ITA on the Effective Date or as soon as reasonably practicable thereafter, with Reorganized ITA remaining as the surviving corporation.  In connection with the Reorganized Debtor Merger, the ITV Stock and the ITC Stock will be extinguished.

10.6.2    Subsequent to entry of the Confirmation Order and the Affirmation Order, each of the Debtors shall be, and hereby is, authorized to (i) enter into the Merger Agreement, (ii) file the requisite forms to effect the Reorganized Debtor Merger under applicable non-bankruptcy law, and (iii) take such other steps as may be necessary or advisable to effect the Reorganized Debtor Merger.

10.6.3    To the extent the Reorganized Debtor Merger is effectuated: (i) all Claims between and among the Debtors shall be deemed extinguished; (ii) Reorganized ITA, as the surviving Reorganized Debtor, shall perform or cause to be performed the Debtors' obligations under the Plan, including the satisfaction of all Claims against Reorganized ITV and Reorganized ITC (other than Talc Personal Injury Claims, which will be resolved in accordance with the Trust Distribution Procedures); (iii) all property in Reorganized ITV and Reorganized ITC, including, but not limited to, all Debtor Causes of Action, the Purchased Properties, and any property acquired by the Debtors pursuant to the Plan, shall vest in Reorganized ITA, free and clear of all Claims, interests, Liens, other Encumbrances, and liabilities of any kind; and (iv) all liabilities of or Claims against Reorganized ITV and Reorganized ITC will be assumed by and vest in Reorganized ITA.

10.6.4    Subsequent to consummation of the Reorganized Debtor Merger, Reorganized ITA shall operate in accordance with Reorganized ITA's Amended Charter Documents and may use, acquire, or dispose of property and compromise or settle any Claims, interests, or Debtor Causes of Action without supervision or approval by the Bankruptcy Court, or notice to any other Entity, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

10.6.5    The Debtors shall file a notice with the Bankruptcy Court fourteen (14) days prior to the deadline to object to Confirmation of the Plan to inform the Bankruptcy Court and parties in interest of the occurrence or nonoccurrence of the Merger Toggle.  To

the extent the Merger Toggle has occurred, the Debtors will file the Merger Agreement in an amendment to the Plan Supplement, which will be filed contemporaneously with the aforementioned notice.

10.7    Imerys Settlement.

10.7.1    Compromise and Settlement of Claims.

10.7.1.1    Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan effect a compromise and settlement of all Imerys Released Claims against the Imerys Released Parties, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Imerys Settlement, to release all of the Imerys Released Claims, including, without limitation, the Estate Causes of Action, against each of the Imerys Released Parties.

10.7.1.2    The provisions of the Plan (including the release and injunctive provisions contained in Article XII of the Plan) and the other documents entered into in connection with the Plan constitute a good faith compromise and settlement among the Plan Proponents of Claims and controversies among such parties.  The Plan, including the explanation set forth in the Disclosure Statement, shall be deemed a motion to approve the Imerys Settlement and the good faith compromise and settlement of all of the Claims and controversies described in the Plan pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Imerys Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Imerys Settlement is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Entry of the Confirmation Order shall confirm the Bankruptcy Court's approval, as of the Effective Date of the Plan, of all components of the Imerys Settlement and the Bankruptcy Court's finding that the Imerys Settlement is in the best interests of the Debtors and their respective Estates, and is fair, equitable and reasonable.

10.7.1.3    Upon (i) satisfaction of all conditions of the Imerys Contribution in accordance with the terms of the Plan, (ii) the funding of the Reserves from Cash on hand and/or the Imerys Cash Contribution, and (iii) the transfer of the Talc Personal Injury Trust Assets to the Talc Personal Injury Trust, the Plan shall be deemed to be substantially consummated, notwithstanding any contingent obligations arising from the foregoing.  For the avoidance of doubt, Imerys S.A.'s satisfaction of the Imerys Contribution is on behalf of itself and the other Imerys Released Parties.

10.7.2    Imerys Contribution.

10.7.2.1    Imerys Settlement Funds.  On, prior to, or as soon as reasonably practicable after the Effective Date, the Imerys Non-Debtors will

contribute, or cause to be contributed, the Imerys Settlement Funds to, at the election of the Imerys Non-Debtors, either the Debtors, the Reorganized Debtors, or the Talc Personal Injury Trust.  To the extent the Imerys Settlement Funds are contributed to the Debtors or the Reorganized Debtors, the Debtors or the Reorganized Debtors, as applicable, will contribute the Imerys Settlement Funds to the Talc Personal Injury Trust upon receipt.

10.7.2.2    Imerys Cash Contribution.  On, prior to, or as soon as reasonably practicable after the Effective Date, the Imerys Non-Debtors will contribute, or cause to be contributed, the following to the Debtors or the Reorganized Debtors, as applicable (the "**Imerys Cash Contribution**"):

a.    the balance of the Intercompany Loan to fund administrative expenses during the pendency of the Chapter 11 Cases, as well as certain of the Reserves (with any remaining balance of the Intercompany Loan not otherwise used to fund the Reserves or pay administrative expenses to be contributed to the Talc Personal Injury Trust on or as soon as reasonably practicable after the Effective Date);

b.    $5 million (less any amounts already paid and noted in an accounting to the Tort Claimants' Committee, the FCR, the Cyprus Tort Claimants' Committee, and the Cyprus FCR) for payment of Allowed Claims in Class 3 through inclusion in the Reorganized Debtor Cash Reserve or the Disputed Claims Reserve, as applicable (with any remaining balance of the $5 million not otherwise used to fund the Reorganized Debtor Cash Reserve or the Disputed Claims Reserve, as applicable, to be contributed to the Talc Personal Injury Trust on or as soon as reasonably practicable after the Effective Date) (the "**Unsecured Claim Contribution**"); and

c.    $15 million to fund the Debtors' administrative expenses (the "**Administrative Expense Contribution**").

10.7.2.3    Talc Trust Contribution.  On or prior to the Effective Date, the Imerys Non-Debtors have agreed to contribute, or cause to be contributed, the following to the Talc Personal Injury Trust (the "**Talc Trust Contribution**"):

a.    rights and interests of the Imerys Non-Debtors, if any, to the proceeds of the Shared Talc Insurance Policies and all rights against third parties held by the Imerys Non-Debtors relating to Talc Claims, each of which is to be identified in the Plan Supplement (the "**Contributed Indemnity and Insurance Interests**").

10.7.2.4    Additional Contribution.  On or prior to the Effective Date, the Imerys Non-Debtors have agreed to take the following actions (the "**Additional Contribution**," and together with the Imerys Settlement Funds, the Imerys Cash Contribution, and the Talc Trust Contribution, the "**Imerys Contribution**"):

US-DOCS\164401015.3RLF1 33881412v.1

a. waive all Non-Debtor Intercompany Claims against the Debtors;

b. unless otherwise assumed by the Buyer, assume any Pension Liabilities of the Debtors through and after the Effective Date of the Plan;

c. contribute, or cause to be contributed, their rights and interests to the XL Policies to the Debtors; and

d. on the Effective Date, Imerys USA shall enter an agreement with the Reorganized Debtors, in form and substance reasonably acceptable to Imerys USA, the Reorganized Debtors, the Tort Claimants' Committee and the FCR, pursuant to which Imerys USA will agree to fund up to an aggregate amount of $4,000,000.00 to reimburse amounts actually incurred by the Reorganized Debtors in connection with defending Foreign Claims, if any, asserted against the Reorganized Debtors solely upon receipt of a demand by the Reorganized Debtors (the "**Foreign Claim Funding Agreement**").

10.7.3    Cooperation Agreement.  The Debtors, the Imerys Non-Debtors, and the Talc Personal Injury Trust shall enter into the Cooperation Agreement, which shall be included in the Plan Supplement.

10.7.4    Releases and Injunctions.  Notwithstanding anything to the contrary set forth in the Plan or elsewhere, the Injunctions and the releases contained in Article XII of the Plan shall not be effective as to the Imerys Protected Parties and/or the Imerys Released Parties (as applicable) until the Imerys Contribution has been made in accordance with Section 10.7.2 of the Plan.

10.8    Rio Tinto/Zurich Settlement.

10.8.1    Compromise and Settlement of Claims.

10.8.1.1    Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the Rio Tinto/Zurich Contribution and other benefits provided pursuant to the Rio Tinto/Zurich Settlement, the provisions of the Plan effect a compromise and settlement of all Rio Tinto/Zurich Released Claims against the Rio Tinto Protected Parties and the Zurich Protected Parties as provided in Section 12.2.1(c) of the Plan, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Rio Tinto/Zurich Settlement and to release all of the Rio Tinto/Zurich Released Claims as provided in Section 12.2.1(c) of the Plan.

10.8.1.2    The provisions of the Plan (including the release and injunctive provisions contained in Article XII of the Plan) and the other documents entered into in connection with the Plan constitute a good faith compromise and settlement among: (i) Rio Tinto, on behalf of itself and the Rio Tinto Captive Insurers, and for the benefit of the Rio Tinto Protected Parties, and Zurich, on behalf

of itself and for the benefit of the Zurich Protected Parties, on the one hand, and (ii) the Debtors, on the other hand, and consented to by the Tort Claimants' Committee and the FCR, of claims and controversies among such parties. The Plan, including the explanation set forth in the Disclosure Statement, shall be deemed a motion to approve the Rio Tinto/Zurich Settlement, including the Rio Tinto/Zurich Settlement Agreement, and the good faith compromise and settlement of all of the claims and controversies described in the Plan pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Rio Tinto/Zurich Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Rio Tinto/Zurich Settlement is: (i) fair, equitable, reasonable, and in the best interests of the Debtors and their Estates; (ii) fair and equitable with respect to the holders of Talc Personal Injury Claims, in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by and on behalf of the Rio Tinto Protected Parties and the Zurich Protected Parties; and (iii) fair and equitable with respect to the Persons who might subsequently assert Talc Personal Injury Demands, in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by and on behalf of the Rio Tinto Protected Parties and the Zurich Protected Parties. Entry of the Confirmation Order shall confirm the Bankruptcy Court's approval, as of the Effective Date of the Plan, of all components of the Rio Tinto/Zurich Settlement and the Bankruptcy Court's finding that the Rio Tinto/Zurich Settlement is in the best interests of the Debtors and the Estates, and is fair, equitable, and reasonable.

10.8.2    <u>Rio Tinto/Zurich Settlement Contributions</u>.

10.8.2.1    <u>Rio Tinto/Zurich Contribution</u>.  Subject to the terms of the Rio Tinto/Zurich Settlement Agreement, Rio Tinto and Zurich will make the following contributions, on behalf of themselves and (in the case of Rio Tinto) on behalf of the Rio Tinto Captive Insurers and for the benefit of the Rio Tinto Protected Parties and (in the case of Zurich) for the benefit of the Zurich Protected Parties, to the Talc Personal Injury Trust, to be used for the payment of Talc Personal Injury Claims in accordance with the Trust Distribution Procedures and the Talc Personal Injury Trust Agreement:

a.    *Zurich Cash Contribution*.  On or prior to the date that is thirty (30) days after the Rio Tinto/Zurich Trigger Date, Zurich will contribute, or cause to be contributed, $260 million in Cash to the Talc Personal Injury Trust.

b.    *Rio Tinto Cash Contribution*.  On or prior to the date that is fourteen (14) days after the Rio Tinto/Zurich Trigger Date, Rio Tinto will contribute, or cause to be contributed, $80 million in Cash to the Talc Personal Injury Trust.

c.    *Rio Tinto/Zurich Credit Contribution*.  On the Rio Tinto/Zurich Trigger Date, or as soon as reasonably practicable thereafter

(not to exceed three (3) Business Days), the appropriate Rio Tinto Corporate Parties and the appropriate Zurich Corporate Parties shall each execute and deliver to the Talc Personal Injury Trust, in a form reasonably acceptable to the Talc Personal Injury Trust, an assignment to the Talc Personal Injury Trust of (i) all of their rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to the payment or defense of any Talc Personal Injury Claim or any past talc-related claim against the Debtors prior to the Effective Date (the "**Rio Tinto/Zurich Credits**"), and (ii) all of their other rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), or subrogation against any Person relating to any Talc Personal Injury Claim (the "**Rio Tinto/Zurich Future Credits**") (together, (i) and (ii), the "**Rio Tinto/Zurich Credit Contribution**"), *provided*, *however,* that any such claims for Rio Tinto/Zurich Credits or Rio Tinto/Zurich Future Credits against a Protected Party shall be subject to the Channeling Injunction, and nothing herein shall impact the injunctions and releases otherwise inuring to the benefit of the Protected Parties under the terms of the Plan.  Notwithstanding anything else contained in this Section 10.8.2.1(c), the Rio Tinto Corporate Parties and the Zurich Corporate Parties shall retain, and shall not transfer to the Talc Personal Injury Trust, all rights of the Rio Tinto Corporate Parties and the Zurich Corporate Parties against their reinsurers and/or retrocessionaires, in their capacity as such.

10.8.3    Rio Tinto/Zurich Settlement Agreement.

10.8.3.1    Pursuant to the Rio Tinto/Zurich Settlement Agreement, Zurich will acquire any and all rights of the Debtors in the Zurich Policies, free and clear of any right, title, or interest of any other Entity, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code.  Further, the Rio Tinto Captive Insurers will acquire any and all rights of the Debtors in the Rio Tinto Captive Insurer Policies, free and clear of any right, title, or interest of any other Entity, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code.

10.8.3.2    Confirmation of the Plan will constitute approval of the Rio Tinto/Zurich Settlement Agreement pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and a finding that the Rio Tinto Captive Insurers and Zurich are good-faith purchasers entitled to the protections of section 363(m) of the Bankruptcy Code.

10.8.3.3    For the avoidance of doubt, the Plan Proponents, on the one hand, and Rio Tinto and Zurich, on the other hand, acknowledge that the Zurich Policies in effect from May 2001 through May 2008 are exhausted.

10.8.4    Withdrawal of Claims.  On the Rio Tinto/Zurich Trigger Date, any and all Claims that the Rio Tinto Corporate Parties or the Zurich Corporate Parties have asserted or that have been asserted on their behalf in the Chapter 11 Cases shall be deemed

withdrawn with prejudice.  Further, the Rio Tinto Protected Parties and the Zurich Protected Parties shall not file or assert any additional Claims against any of the Debtors released under the Rio Tinto/Zurich Settlement Agreement.

10.8.5    Cooperation.  Rio Tinto and Zurich shall use reasonable efforts to assist and cooperate with the Talc Personal Injury Trust, Talc Trustees, Talc Trust Advisory Committees, and Post-Effective Date FCRs to pursue the Rio Tinto/Zurich Credits and Rio Tinto/Zurich Future Credits, as set forth in the Rio Tinto/Zurich Settlement Agreement.

10.8.6    Releases and Injunctions.  Notwithstanding anything to the contrary set forth in the Plan or elsewhere, the Injunctions and the releases contained in Article XII of the Plan shall not be effective as to the Rio Tinto Protected Parties, the Rio Tinto Captive Insurers, and the Zurich Protected Parties (as applicable) until the Rio Tinto/Zurich Contribution has been made to the Talc Personal Injury Trust in accordance with Section 10.8.2.1 of the Plan.

10.8.7    Form of Certain Documents.   The Confirmation Order and the Affirmation Order shall be in form and substance reasonably acceptable to Rio Tinto, the Rio Tinto Captive Insurers, and Zurich.

10.9    Cyprus Settlement.

10.9.1    Compromise and Settlement of Claims.

10.9.1.1        Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the Cyprus Contributions and other benefits provided pursuant to the Cyprus Settlement, the provisions of the Plan effect a compromise and settlement of all Cyprus Released Claims against the Cyprus Protected Parties as provided in Section 12.2.1(d) of the Plan, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Cyprus Settlement and to release all of the Cyprus Released Claims, including, without limitation, the Estate Causes of Action, against each of the Cyprus Protected Parties.

10.9.1.2        The provisions of the Plan (including the release and injunctive provisions contained in Article XII of the Plan) and the other documents entered into in connection with the Plan, constitute a good faith compromise and settlement among the Debtors, Cyprus Mines, CAMC, Freeport, the Tort Claimants' Committee, the FCR, the Cyprus Tort Claimants' Committee, and the Cyprus FCR.  The Plan, including the explanation set forth in the Disclosure Statement, shall be deemed a motion to approve the Cyprus Settlement, and the good faith compromise and settlement of all of the Claims and controversies described in the Plan, including without limitation all Estate Causes of Action against any Cyprus Protected Party, pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Cyprus Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Cyprus Settlement

is: (i) fair, equitable, reasonable, and in the best interests of the Debtors and their Estates; (ii) fair and equitable with respect to the holders of Talc Personal Injury Claims, in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by and on behalf of the Cyprus Protected Parties; and (iii) fair and equitable with respect to the Persons who might subsequently assert Talc Personal Injury Demands, in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by and on behalf of the Cyprus Protected Parties. Entry of the Confirmation Order shall confirm the Bankruptcy Court's approval, as of the Effective Date of the Plan, of all components of the Cyprus Settlement and the Bankruptcy Court's finding that the Cyprus Settlement is in the best interests of the Debtors and the Estates, and is fair, equitable, and reasonable.

10.9.2    <u>Cyprus Document Access Agreement and Cyprus Cooperation</u>.  As more fully described in the Cyprus Mines Plan, (i) on the Effective Date, Cyprus Mines, CAMC, and the Talc Personal Injury Trust shall enter into a document access agreement and (ii) the Cyprus Protected Parties shall assist and cooperate with the Talc Personal Injury Trust as may be reasonably necessary for the pursuit of coverage under the Cyprus Talc Insurance Policies, including with respect to the California Coverage Action.

10.9.3    <u>Cyprus Contributions</u>.  Subject to the terms of the Cyprus Settlement, and subject to the occurrence of the Effective Date, the Cyprus Protected Parties will make the following contributions (the "**Cyprus Contributions**") to the Talc Personal Injury Trust, to be used for the payment of Talc Personal Injury Claims and Cyprus Talc Personal Injury Claims in accordance with the Trust Distribution Procedures and the Talc Personal Injury Trust Agreement:

a.    *Cash Payments from CAMC*.  Pursuant to the Cyprus Mines Plan Note, CAMC and the Reorganized Cyprus Mines Debtor, jointly and severally, will pay, on behalf of themselves and the Cyprus Protected Parties, a total of $195 million to the Talc Personal Injury Trust via wire transfers in seven installments (the "**CAMC Cash Payments**").  The first three payments shall each consist of $32.5 million and shall total $97.5 million.  The next four payments shall each consist of $24.375 million and shall total $97.5 million.  Each payment shall be made no later than as set forth in the following schedule:

- Within thirty (30) days after the Effective Date: $32.5 million;

- 1 year anniversary of the initial payment: $32.5 million;

- 2 year anniversary of the initial payment: $32.5 million;

- 3 year anniversary of the initial payment: $24.375 million;

- 4 year anniversary of the initial payment: $24.375 million;

- 5 year anniversary of the initial payment: $24.375 million; and

- 6 year anniversary of the initial payment: $24.375 million.

In connection with the Cyprus Mines Plan Note, CAMC will issue the Cyprus Mines Plan Note Pledge Agreement.

b.      *Freeport Guarantee*.  Freeport shall issue and deliver the Freeport Plan Note Guarantee on the effective date of the Cyprus Mines Plan, which will guarantee the CAMC Cash Payments and be subject to a minimum liquidity covenant of not less than $500 million tested as of the end of each of its fiscal quarters.  The terms of the Freeport Plan Note Guarantee will be substantially in the form contained in the Cyprus Mines Plan Supplement.

c.      *Insurance and Other Rights*.  Upon the occurrence of the Effective Date, the Cyprus Protected Parties will assign the Cyprus Talc Insurance Policy Rights to the Talc Personal Injury Trust; *provided* that solely to the extent that the Talc Personal Injury Trust asserts any claim as assignee of a Cyprus Protected Party bound by the PDC Agreement, the Talc Personal Injury Trust shall abide by the terms of the PDC Agreement; *provided further* that unless otherwise stated in the Plan or the Cyprus Mines Plan, such obligations shall not include any obligations undertaken by any Cyprus Protected Party in any settlement agreement or other contract compromising or releasing any rights under any Cyprus Talc Insurance Policy.

d.      *Indemnification, Contribution, Subrogation, and Other Rights*.  Upon the occurrence of the Effective Date, the Cyprus Protected Parties will assign the following to the Talc Personal Injury Trust: (i) all of their rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), reimbursement, subrogation and/or breach of contract against any Person relating to the payment or defense of any Talc Personal Injury Claim or other past talc-related claims channeled to the Talc Personal Injury Trust prior to the Effective Date, and (ii) all of their rights to or claims for indemnification, contribution (whether via any "other insurance" clauses or otherwise), reimbursement, subrogation and/or breach of contract against any Person relating to any other Talc Personal Injury Claim or other claims channeled to the Talc Personal Injury Trust; *provided*, *however*, that the assertion of the foregoing rights against a Protected Party shall be subject to the Channeling Injunction, and nothing herein shall impact the injunctions and releases otherwise inuring to the benefit of the Cyprus Protected Parties under the terms of the Plan or the Cyprus Mines Plan.

10.9.4  <u>Dismissal of Actions, Stays of Proceedings, and Release of Claims</u>.

10.9.4.1      Upon occurrence of the Effective Date, (a) the Cyprus Protected Parties shall release, dismiss and withdraw all claims against the Debtors, the Tort Claimants' Committee, and the FCR directly or indirectly arising out of, with respect to, or in any way relating to any Talc Claim or Cyprus Talc Claim,

including without limitation all indemnity claims, and (b) the Debtors, the Tort Claimants' Committee, and the FCR shall release, dismiss and withdraw all claims against Cyprus Mines, the Cyprus Tort Claimants' Committee, the Cyprus FCR, and the Cyprus Protected Parties directly or indirectly arising out of, with respect to, or in any way relating to any Talc Claim or Cyprus Talc Claim, including without limitation all indemnity claims.

10.9.4.2    For the avoidance of doubt, the foregoing dismissals and withdrawals shall be without prejudice to re-filing, and all releases shall be void and all released claims may be reinstated, if and only if the Affirmation Order or the Cyprus Affirmation Order is successfully challenged on appeal by Final Order.

10.9.4.3    In no event shall any party be deemed to have released any other party for breach of agreements adopted pursuant to the Cyprus Settlement.

10.9.5    Releases and Injunctions.

10.9.5.1    Pursuant to the Cyprus Settlement, the Cyprus Mines Plan will protect the Debtors with releases and injunctions substantially equivalent to those received by the Cyprus Parties under the terms of the Plan, which shall be effective as of the Effective Date.

10.9.5.2    The releases and Injunctions contained in the Plan and the Confirmation Order with respect to the Cyprus Protected Parties shall dissolve immediately should any of the CAMC Cash Payments (or, pursuant to the Freeport Plan Note Guarantee, any payments from Freeport) not be received by the Talc Personal Injury Trust within thirty (30) days of a true and accurate written notice from the Talc Personal Injury Trust to CAMC and Freeport that such payment was due and not made by the deadline set forth above.

10.9.6    Form of Certain Documents.

10.9.6.1    The Plan shall be in form and substance reasonably acceptable to each of the Plan Proponents and each of the Cyprus Plan Proponents.

10.9.6.2    The Affirmation Order and the Confirmation Order shall be in form and substance acceptable to each of the Plan Proponents and each of the Cyprus Plan Proponents.

10.9.7    <u>Allocation of the Cyprus Contributions</u>.  The Cyprus Contributions will be allocated among the Funds as set forth in the Trust Distribution Procedures.  For the avoidance of doubt, nothing in the Plan Documents shall be interpreted as an admission, or adjudication on the merits of any disputed issue related to the Cyprus Talc Insurance Policies, including, but not limited to, the disputed rights at issue in the Insurance Adversary Proceeding.

10.10    <u>XL Settlement</u>.

10.10.1    <u>Compromise and Settlement of Claims</u>.

10.10.1.1    Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the XL Contribution and other benefits provided pursuant to the XL Settlement, the provisions of the Plan effect a compromise and settlement of all XL Released Claims against the XL Protected Parties as provided in <u>Section 12.2.1(e)</u> of the Plan, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the XL Settlement and to release all of the XL Released Claims as provided in <u>Section 12.2.1(e)</u> of the Plan.

10.10.1.2    The provisions of the Plan (including the release and injunctive provisions contained in Article XII of the Plan) and the other documents entered into in connection with the Plan constitute a good faith compromise and settlement among: (i) XL, on behalf of itself and for the benefit of the XL Protected Parties, (ii) the Debtors, and (iii) Imerys USA, on behalf of itself and the other Non-Debtor Covered Entities, and consented to by the Tort Claimants' Committee and the FCR, of claims and controversies among such parties.  The Plan, including the explanation set forth in the Disclosure Statement, shall be deemed a motion to approve the XL Settlement, including the XL Settlement Agreement, and the good faith compromise and settlement of all of the claims and controversies described in the Plan pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the XL Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the XL Settlement is (i) fair, equitable, reasonable, and in the best interests of the Debtors and their Estates and (ii) fair and equitable with respect to the persons who might subsequently assert Talc Personal Injury Demands, in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by and on behalf of the XL Protected Parties.  Entry of the Confirmation Order shall confirm the Bankruptcy Court's approval, as of the Effective Date of the Plan, of all components of the XL Settlement and the Bankruptcy Court's finding that the XL Settlement is in the best interests of the Debtors and the Estates, and is fair, equitable, and reasonable.

10.10.2    <u>XL Settlement Contribution</u>.

10.10.2.1    <u>XL Contribution</u>.  Subject to the terms of the XL Settlement Agreement, XL will make the following contributions, on behalf of itself and for

the benefit of the XL Protected Parties, to (i) the Talc Personal Injury Trust, to be used for the payment of Talc Personal Injury Claims in accordance with the Trust Distribution Procedures and the Talc Personal Injury Trust Agreement and (ii) the Non-Debtor Covered Entities for the release of certain claims for insurance coverage:

> a. *XL Cash Contribution*. Within ten (10) days after the XL Trigger Date, XL will contribute, or cause to be contributed, $28.25 million in Cash to the Talc Personal Injury Trust.

> b. *XL California Fire Claim Contribution*. Within ten (10) days after the XL Trigger Date, XL will (a) contribute, or cause to be contributed, $1 million to the Talc Personal Injury Trust, and (b) pay $1.25 million to Imerys Filtration Minerals, Inc. (a Non-Debtor Covered Entity) in consideration for the release of claims for insurance coverage arising from the settlement of a lawsuit styled as *California Department of Forestry & Fire Protection v. Imerys Filtration Minerals, Inc., et al.*, Santa Barbara County Superior Court, Case No. 16CV02133.

10.10.3    <u>XL Settlement Agreement</u>.

> 10.10.3.1    Pursuant to the XL Settlement Agreement, XL will acquire any and all rights of the Debtors in the XL Policies, free and clear of any right, title, or interest of any other Entity, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code. For the avoidance of doubt, the XL Policies do not include the Shared Talc Insurance Policies.

> 10.10.3.2    Confirmation of the Plan will constitute approval of the XL Settlement Agreement pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and a finding that XL is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

10.10.4    <u>Withdrawal of Claims</u>. On the XL Trigger Date, any and all Claims that the XL Corporate Parties have asserted or that have been asserted on their behalf in the Chapter 11 Cases shall be deemed withdrawn with prejudice. Further, the XL Protected Parties shall not file or assert any additional Claims against any of the Debtors released under the XL Settlement Agreement.

10.10.5    <u>Releases and Injunctions</u>. Notwithstanding anything to the contrary set forth in the Plan or elsewhere, the Injunctions and the releases contained in Article XII of the Plan shall not be effective as to the XL Protected Parties (as applicable) until the XL Contribution has been made to the Talc Personal Injury Trust in accordance with <u>Section 10.10.2.1</u> of the Plan.

10.11    <u>Good Faith Compromise and Settlement</u>. The Plan (including its incorporation of the Imerys Settlement, the Rio Tinto/Zurich Settlement, the Cyprus Settlement, and the XL Settlement), the Plan Documents, and the Confirmation Order constitute a good faith compromise and settlement of Claims and controversies based upon the unique circumstances of these Chapter

11 Cases, and none of the foregoing documents, the Disclosure Statement, or any other papers filed in furtherance of Plan Confirmation, nor any drafts of such documents, may be offered into evidence or deemed as an admission in any context whatsoever beyond the purposes of the Plan, in any other litigation or proceeding, except as necessary, and as admissible in such context, to enforce their terms before the Bankruptcy Court or any other court of competent jurisdiction. The Plan, the Imerys Settlement, the Plan Documents, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors, the Reorganized Debtors, the Imerys Released Parties, or the Talc Personal Injury Trust is a party. The Plan, the Rio Tinto/Zurich Settlement, the Cyprus Settlement, the XL Settlement, the Plan Documents, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors, the Reorganized Debtors, the Rio Tinto Protected Parties, the Zurich Protected Parties, the Cyprus Protected Parties, the XL Protected Parties, or the Talc Personal Injury Trust is a party.

10.12   Resolution of Talc Personal Injury Claims. Talc Personal Injury Claims shall be channeled to and resolved by the Talc Personal Injury Trust in accordance with the Trust Distribution Procedures.

10.13   Sources of Consideration for Plan Distributions.

10.13.1   Non-Talc Claims. All Cash consideration necessary for payments or distributions on account of the Non-Talc Claims shall be obtained from (i) the Cash on hand of the Debtors on the Effective Date, including Cash derived from business operations, (ii) the Sale Proceeds, and (iii) the Imerys Cash Contribution.

10.13.2   Talc Personal Injury Claims. All Cash consideration necessary for payments or distributions on account of Talc Personal Injury Claims shall be obtained from (i) the Cash on hand of the Debtors on the Effective Date or the post-Effective Date proceeds from the business operations of the Reorganized Debtors or the sale of the Purchased Properties, other than the Cash placed in the Reserves, if any, (ii) the Imerys Settlement Funds, (iii) the amount of the Imerys Cash Contribution, after such funds have been disbursed in accordance with Section 10.7.2; (iv) all Cash remaining in the Reserves, if applicable, as set forth in Section 10.14 of the Plan; (v) all proceeds from the Talc Personal Injury Trust Assets; (vi) the Rio Tinto/Zurich Contribution; (vii) the Cyprus Contributions; (viii) the XL Contribution; and (ix) the J&J Settlement Proceeds.

10.13.3   [Reserved]

10.13.4   Transfer of Funds Between the Debtors. The Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable them to satisfy their obligations under the Plan; *provided* that any transfer of funds from ITC to another Debtor shall be subject to review by the Information Officer. Except as set forth therein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the

US-DOCS\164401015.3RLF1 33881412v.1

Debtors' historical intercompany account settlement practices and will not violate or otherwise be affected by the terms of the Plan.

10.13.5    Funding by the Talc Personal Injury Trust.  The Talc Personal Injury Trust shall have no obligation to fund costs and expenses other than those set forth in the Plan, the Cyprus Mines Plan, and/or the Talc Personal Injury Trust Documents, as applicable.

10.14    Transfer of Remaining Debtors' Assets to the Talc Personal Injury Trust.

10.14.1    After (i) all Disputed Claims against the Debtors have been resolved, and (ii) all Distributions required to be made by the Reorganized Debtors under the Plan have been made, all Cash remaining in the Disputed Claims Reserve shall be disbursed to the Talc Personal Injury Trust, in accordance with Section 7.10 of the Plan.

10.14.2    Upon the final resolution of all Claims against and obligations of the Reorganized Debtors, all Cash remaining in the Reorganized Debtor Cash Reserve shall be disbursed to the Talc Personal Injury Trust.  Upon the liquidation of any non-Cash assets held by the Reorganized Debtors, including the Purchased Properties, all proceeds thereof that are not necessary to fund the Reorganized Debtor Cash Reserve shall be disbursed to the Talc Personal Injury Trust.

10.14.3    Any remaining balance in the Fee Claim Reserve and the Administrative Claim Reserve shall be disbursed to the Talc Personal Injury Trust subject to and in accordance with Sections 2.1 and 2.3 of the Plan.

10.15    Modification of the Plan.  To the extent permissible under section 1127 of the Bankruptcy Code, any proposed amendments to or modifications of the Plan under section 1127 of the Bankruptcy Code or as otherwise permitted by law will be submitted jointly by the Plan Proponents, without additional disclosure pursuant to section 1125 of the Bankruptcy Code at any time prior to substantial consummation of the Plan, unless section 1127 of the Bankruptcy Code requires additional disclosure; *provided* that no such amendment or modification of the Plan that adversely affects the rights or obligations of the Cyprus Protected Parties or the Rio Tinto Protected Parties, as applicable, shall be permitted hereunder without the prior written consent of CAMC, Cyprus Mines, or Rio Tinto, as applicable.  To the extent permissible under section 1127(b) of the Bankruptcy Code, following substantial consummation of the Plan, the Reorganized Debtors may remedy any defects or omissions or reconcile any inconsistencies in the Plan Documents for the purpose of implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan, so long as (a) the interests of the holders of Allowed Claims are not adversely affected thereby; (b) any such modifications are non-material; (c) the Tort Claimants' Committee and the FCR or, following the Effective Date, the Talc Trust Advisory Committees and the Post-Effective Date FCRs consent; (d) Imerys S.A. consents; and (e) the United States Trustee does not object, unless such objection is overruled by the Bankruptcy Court.  On and after the Effective Date, the authority to amend, modify, or supplement the Plan Documents, other than the Plan, will be as provided in such Plan Documents.  Post-Effective Date, any holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified or supplemented pursuant to this Section 10.15.

84

10.16    Revocation or Withdrawal of the Plan.  The Debtors, with the consent of each of the other Plan Proponents, reserve the right to revoke and withdraw the Plan prior to entry of the Confirmation Order.  If the Debtors, with the consent of each of the other Plan Proponents, revoke or withdraw the Plan or if Confirmation of the Plan does not occur, then the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against such Debtor, or any other Entity (including the Plan Proponents), or to prejudice in any manner the rights of such Debtor, or such Entity (including the Plan Proponents) in any further proceedings involving such Debtor.  For the avoidance of doubt, unless and until the Plan is confirmed and the Effective Date occurs, the Plan will have no force or effect.

10.17    Certain Technical Modifications.  Prior to the Effective Date, the Plan Proponents collectively may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, to the extent permissible under section 1127 of the Bankruptcy Code; *provided*, *however*, that such technical adjustments and modifications do not adversely affect in a material way the rights or protections of the Protected Parties or the treatment of holders of Claims or Equity Interests under the Plan.

## ARTICLE XI
## EFFECT OF CONFIRMATION

11.1    Preservation of Certain Estate Causes of Action.

11.1.1    In accordance with section 1123(b) of the Bankruptcy Code, and except where such Estate Causes of Action have been expressly released, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Debtor Causes of Action, whether arising before or after the Petition Date.  Each Reorganized Debtor's right to commence, prosecute or settle such Debtor Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue the Debtor Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.

11.1.2    No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Debtor Cause of Action against them as any indication that the Reorganized Debtors will not pursue the Debtor Causes of Action.  The Reorganized Debtors expressly reserve all rights to prosecute any and all Debtor Causes of Action, except as otherwise expressly provided in the Plan.  Unless any of the Debtor Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all such Debtor Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Debtor Causes of Action upon, after or as a consequence of the Confirmation of the Plan.

11.1.3    Upon the Effective Date, the Reorganized Debtors shall retain and enforce all defenses and counterclaims to all Claims that were or could have been asserted against the Debtors, respectively, or their respective Estates, including, but not limited to,

setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code. On or after the Effective Date, the Reorganized Debtors may pursue, settle or withdraw, without Bankruptcy Court approval, such claims, rights, or causes of action (other than the Talc Personal Injury Trust Causes of Action and the Talc Insurance Actions) as they determine in accordance with their best interests.

11.2    <u>Preservation of Talc Personal Injury Trust Causes of Action</u>. On the Effective Date, all Talc Personal Injury Trust Causes of Action shall be transferred to and vested in the Talc Personal Injury Trust. The Talc Personal Injury Trust shall retain and enforce, as the appointed estate representative in accordance with section 1123(b) of the Bankruptcy Code, all Talc Personal Injury Trust Causes of Action, including, but not limited to, setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code. The transfer of the Talc Personal Injury Trust Causes of Action to the Talc Personal Injury Trust, insofar as they relate to the ability to defend against or reduce the amount of Talc Personal Injury Claims, shall be considered the transfer of a non-exclusive right enabling the Talc Personal Injury Trust to defend itself against asserted Talc Personal Injury Claims, which transfer shall not impair, affect, alter, or modify the right of any Person, including without limitation, the Imerys Protected Parties, the Rio Tinto Protected Parties, the Zurich Protected Parties, the Cyprus Protected Parties, the XL Protected Parties, an insurer or alleged insurer, or co-obligor or alleged co-obligor, sued on account of a Talc Personal Injury Claim, to assert each and every defense or basis for claim reduction such Person could have asserted had the Talc Personal Injury Trust Causes of Action not been assigned to the Talc Personal Injury Trust.

11.3    <u>Talc Insurance Actions</u>. Any Talc Insurance Action, or the claims and causes of action asserted or to be asserted therein, shall be preserved for the benefit of the Talc Personal Injury Trust, for prosecution by the applicable Debtor(s) until the Effective Date subject to the consent of the FCR and the Tort Claimants' Committee, which shall not be unreasonably withheld. As of the Effective Date, such Talc Insurance Actions along with the rights and obligations of the Debtors and the Reorganized Debtors, as applicable, and the Non-Debtor Affiliates with respect to the Talc Insurance Policies and claims thereunder shall exclusively vest in the Talc Personal Injury Trust in accordance with section 1123(a)(5)(B) of the Bankruptcy Code, and the Talc Personal Injury Trust shall retain and enforce as the appointed estate representative in accordance with section 1123(b)(3)(B) of the Bankruptcy Code all such Talc Insurance Actions. Such Talc Insurance Actions shall be free and clear of all Liens, security interests, and other Claims or causes of action, except for Talc Insurer Coverage Defenses. Upon vesting in the Talc Personal Injury Trust, the prosecution of the Talc Insurance Actions shall be governed by the Talc Personal Injury Trust Documents.

11.4    <u>Insurance Provisions</u>.

11.4.1    The provisions of this <u>Section 11.4</u> shall apply to all Entities (including, without limitation, all Talc Insurance Companies).

11.4.1.1    Except as provided in the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order, or the findings made by the District Court in the Affirmation Order, nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending, or

supplementing, the terms of any Talc Insurance Policy issued by a non-Settling Talc Insurance Company or rights or obligations under such Talc Insurance Policy to the extent such rights and obligations are otherwise available under provisions of titles 11 and 28 of the United States Code and other applicable law, and the rights and obligations, if any, shall be determined pursuant to the terms and provisions of the Talc Insurance Policies, the provisions of titles 11 and 28 of the United States Code, and other applicable law; *provided*, *however*, that the permissibility of the Assignment shall be binding on the Talc Insurance Companies.  For (i) all issues relating to insurance coverage allegedly provided by the Zurich Corporate Parties or the Rio Tinto Captive Insurers, the provisions, terms, conditions and limitations of the Rio Tinto/Zurich Settlement shall control, and (ii) all issues relating to insurance coverage allegedly provided by the XL Corporate Parties, the provisions, terms, conditions and limitations of the XL Settlement shall control.

11.4.1.2    No provision of the Plan, other than those provisions contained in the applicable Injunctions contained in Article XII of the Plan, shall be interpreted to affect or limit the protections afforded to any Settling Talc Insurance Company by the Channeling Injunction and the Insurance Entity Injunction.

11.4.1.3    Nothing in this Section 11.4 is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Person.

11.4.1.4    No provision of the Plan shall be interpreted to assign or transfer the rights of any Cyprus Protected Party, or to resolve disputes between Cyprus and the Debtors regarding ownership or control of rights to insurance or indemnity rights, absent occurrence of the Effective Date.

11.5    Institution and Maintenance of Legal and Other Proceedings.

11.5.1    As of the Effective Date, and subject to Section 4.6.2 of the Plan, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability or responsibility of the Talc Personal Injury Trust, including without limitation the Talc Insurance Actions, Talc Personal Injury Claims and the Talc Personal Injury Trust Causes of Action.  Without limiting the foregoing, on and after the Effective Date, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue and resolve all such actions, in the name of either of the Debtors or the Reorganized Debtors, if deemed necessary or appropriate by the Talc Personal Injury Trust.  The Talc Personal Injury Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the Effective Date arising from or associated with any legal action or other proceeding which is the subject of Article IV of the Plan and shall pay or reimburse all deductibles, self-insured retentions, retrospective premium adjustments, or other charges which may arise from the receipt of any insurance proceeds by the Talc Personal Injury Trust.  Furthermore, without limiting the foregoing, the Talc Personal

Injury Trust shall be empowered to maintain, administer, preserve, or pursue the Talc-In-Place Insurance Coverage and the Talc Insurance Actions.  Notwithstanding anything to the contrary herein, the Talc Personal Injury Trust shall comply with the Cyprus Insurance Protocol.

11.5.2    Without limiting <u>Section 11.5.1</u> of the Plan, the Talc Personal Injury Trust shall satisfy, to the extent required under the relevant policies and applicable law, any self-insured retentions and/or any retrospective premiums arising out of any Talc Claims under the Talc Insurance Policies.  In the event that a Talc Insurance Company pays such self-insured retention and is entitled to reimbursement from the Talc Personal Injury Trust under applicable law, such non-Settling Talc Insurance Company shall receive that reimbursement in the form of a set-off solely against any claim for coverage by the Talc Personal Injury Trust against that non-Settling Talc Insurance Company with respect to the relevant Talc Claim.

11.6    <u>Terms of Injunctions and Automatic Stay</u>.

11.6.1    All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Cases or any associated adversary proceeding, whether pursuant to sections 105, 362, or any other provision of the Bankruptcy Code, Bankruptcy Rules, or other applicable law in existence immediately prior to the Confirmation Date, shall remain in full force and effect until the Injunctions become effective pursuant to a Final Order, and shall continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms.  In addition, on and after Confirmation, the Debtors, with the consent of each of the other Plan Proponents, may collectively seek such further orders as they deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

11.6.2    Each of the Injunctions contained in the Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order.

11.7    <u>The FCR and the Tort Claimants' Committee</u>.

11.7.1    The FCR and the Tort Claimants' Committee shall continue in their official capacities until the Effective Date.  The Debtors shall pay the reasonable fees and expenses incurred by the FCR and the Tort Claimants' Committee through the Effective Date, in accordance with the Compensation Procedures Order, the Fee Examiner Order, and the terms of the Plan, including <u>Section 2.3</u> of the Plan.

11.7.2    After the Effective Date, the official capacities of the FCR and the Tort Claimants' Committee in the Chapter 11 Cases shall be limited to having standing and capacity to (i) prosecute their pre-Effective Date intervention in any adversary proceedings; (ii) object to any proposed modification of the Plan; (iii) object to or defend the Fee Claims of professionals employed by or on behalf of the Estate, or by or on behalf of members of the Tort Claimants' Committee; and (iv) participate in any pending appeals or appeals of

the Confirmation Order. Except for the foregoing, the FCR and the members of the Tort Claimants' Committee shall be released and discharged from all further authority, duties, responsibilities, liabilities, and obligations involving the Chapter 11 Cases. Upon the closing of the Chapter 11 Cases, the Tort Claimants' Committee shall be dissolved. The fees and expenses incurred by the FCR and the Tort Claimants' Committee relating to any post-Effective Date activities authorized in this Section 11.7 shall be payable from the Administrative Claim Reserve.

11.7.3    Nothing in this Section 11.7 of the Plan shall limit or otherwise affect the rights of the United States Trustee under section 502 of the Bankruptcy Code or otherwise to object to Claims or requests for allowance of Fee Claims and other Administrative Claims.

11.8    Lack of Precedential Value. The asset allocations, claim values, and claim qualification criteria applicable to holders of Talc Personal Injury Claims provided for in the Plan and the Plan Documents are based on the unique facts and circumstances of the Chapter 11 Cases and the Cyprus Mines Bankruptcy. The asset allocations, claim values, and claim qualification criteria shall have no precedential effect with respect to the allocation, claim values, or claim qualification criteria that are appropriate with respect to other tort claims against other Persons.

11.9    Expungement of Talc Claims from the Claims Register. On the Effective Date, all Talc Claims filed against the Debtors in the Chapter 11 Cases shall be expunged from the Claims Register.

11.10    Provisions Related to the J&J Settlement.

11.10.1    Nothing in the Plan or the Trust Distribution Procedures shall be binding on or used to impact, prejudice, or affect the J&J Corporate Parties (including, without limitation, LLT Management LLC (f/k/a LTL Management LLC), Johnson & Johnson, Red River Talc LLC and Pecos River Talc LLC) in the tort system or in a bankruptcy case.

11.10.2    Unless and until the J&J Settlement Agreement is terminated, the Debtors, Cyprus Mines, the Reorganized Debtors, the Reorganized Cyprus Mines Debtor, the Debtor Corporate Parties, the Talc Personal Injury Trust, the Debtor Releasing Parties, the Non-Debtor Releasing Parties and any other person that seeks to assert claims through any of the foregoing, or to otherwise recover from any Cyprus Talc Insurance Policies, are enjoined from commencing, prosecuting, accepting payment on account of (other than the J&J Payment Obligations), or otherwise pursuing insurance coverage for, J&J Talc Claims, including recovering any defense costs or for contribution; *provided*, *however*, for the avoidance of doubt, in accordance with Section 6.3 of the J&J Settlement Agreement, nothing in the J&J Settlement Order or the J&J Settlement Agreement shall enjoin or otherwise bar Rio Tinto, the Rio Tinto Captive Insurers and Zurich from seeking insurance coverage (including, without limitation, for defense costs or indemnity, whether for amounts to be paid under the Rio Tinto/Zurich Settlement or otherwise) from their insurers, reinsurers and retrocessionaires; and, *provided*, *further*, nothing in the J&J Settlement Order shall alter the rights and protections afforded Rio Tinto, the Rio Tinto Captive Insurers and Zurich as set forth in Sections 6.3.2 and 6.3.3 of the J&J Settlement

Agreement.  Unless and until the J&J Settlement Agreement is terminated, any settling insurer, any other party to the Plan Settlement Agreements, including Rio Tinto, the Rio Tinto Captive Insurers, and Zurich, and any person or entity claiming under or through any of the foregoing, including any reinsurers or retrocessionaires, shall not assert, or be able to assert, any subrogation rights against any J&J Corporate Party with respect to any payments made, to be made, or contemplated to be made pursuant to any Plan Settlement Agreement or otherwise on account of any Talc Personal Injury Claim (as defined in the J&J Settlement Agreement), but instead Rio Tinto, the Rio Tinto Captive Insurers and Zurich shall be able to assert such rights against, and shall have all such rights attach to, the Imerys Share of Settlement Proceeds until the Rio Tinto/Zurich Settlement is consummated.  Notwithstanding the above, subject to the other terms of the J&J Settlement Agreement, the J&J Settling Parties, on behalf of the Debtor Releasing Parties and Non-Debtor Releasing Parties, may pursue insurance coverage for J&J Talc Claims from only J&J Policies, except those policies under which the J&J Settling Parties entered into talc related settlements prior to the Execution Date.[2]

## ARTICLE XII
## RELEASES, INJUNCTION AND EXCULPATION

12.1    <u>Discharge and Injunctions</u>.

    12.1.1    <u>Discharge of Claims Against and Termination of Equity Interests in the Debtors</u>.  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, Confirmation of the Plan shall afford each Debtor a discharge to the fullest extent permitted by sections 524 and 1141(d)(1) of the Bankruptcy Code.

    **12.1.2    <u>Discharge Injunction</u>.  Except as specifically provided in the Plan or the Confirmation Order, from and after the Effective Date, to the maximum extent permitted under applicable law, all Persons that hold, have held, or may hold a Claim, demand or other debt or liability that is discharged, or an Equity Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan, are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, demands, debts or liabilities, or terminated Equity Interests or rights: (i) commencing or continuing any action or other proceeding of any kind against the Debtors, the Reorganized Debtors, or their respective property; (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, or their respective property; (iii) creating, perfecting, or enforcing any Lien or Encumbrance of any kind against the Debtors, the Reorganized Debtors, or their respective property; and (iv) commencing or continuing any judicial or administrative proceeding, in any forum and in any place in the world, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order (the "<u>Discharge Injunction</u>").  The foregoing injunction shall extend to the successors of the Debtors (including, without limitation, the Reorganized Debtors)**

---

[2]    Capitalized terms used but not defined in this <u>Section 11.10.2</u> and otherwise not defined in the Plan have the meanings ascribed to them in the J&J Settlement Agreement.

and their respective properties and interests in property. The discharge provided in this provision shall void any judgment obtained against any Debtor at any time, to the extent that such judgment relates to a discharged Claim or demand.

12.2    Releases.

12.2.1    **Releases by Debtors, their Estates, and Certain Protected Parties.**

(a)    **As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the implementation of the Talc Personal Injury Trust, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Debtors, the Reorganized Debtors and the Estates from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, causes of action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors or the Estates (including any Estate Causes of Action), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Reorganized Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such entities existed prior to or after the Petition Date), their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission (other than the rights and obligations under the Plan Documents and the contracts, instruments, releases and other agreements or documents delivered or to be delivered under any of the foregoing). The Debtors, the Reorganized Debtors, and any other newly-formed entities that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the releases set forth in this Section 12.2.1 of the Plan.**

US-DOCS\164401015.3RLF1 33881412v.1

(b)    **In furtherance of the Imerys Settlement, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Talc Personal Injury Trust, the Debtors, on their own behalf and as representatives of their respective Estates, the Reorganized Debtors, and the Tort Claimants' Committee and FCR, solely on their own behalf, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Imerys Released Parties of and from (a) all Estate Causes of Action and (b) any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including, without limitation, those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Talc Personal Injury Trust, the Debtors, their Estates, the Reorganized Debtors, the Tort Claimants' Committee, or the FCR, solely on his own behalf, have, had, may have, or may claim to have against any of the Imerys Released Parties including without limitation with respect to any Talc Claim (sub-clauses (a) and (b) collectively, the "<u>Imerys Released Claims</u>").**

(c)    **In furtherance of the Rio Tinto/Zurich Settlement, effective upon the Talc Personal Injury Trust's receipt of the Rio Tinto/Zurich Contribution, for good and valuable consideration, the adequacy of which is hereby confirmed, the Talc Personal Injury Trust, the Debtors, on their own behalf and as representatives of their respective Estates, the Reorganized Debtors, and the Tort Claimants' Committee and FCR, solely on their own behalf, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Rio Tinto Protected Parties and the Zurich Protected Parties of and from (a) all Estate Causes of Action and (b) any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Talc Personal Injury Trust, the Debtors, their Estates, the Reorganized Debtors, the Tort Claimants' Committee, or the FCR, solely on his own behalf, have, had, may have, or may claim to have against any of the Rio Tinto Protected Parties and/or the Zurich Protected Parties, directly or indirectly arising out of, with respect to, or in any way relating to any Talc Claim, the Rio Tinto Zurich Captive Insurance Policies, or the Zurich Policies (sub-clauses (a) and (b) collectively, the "<u>Rio Tinto/Zurich Released Claims</u>").**

(d)    **In furtherance of the Cyprus Settlement, for good and valuable consideration, the adequacy of which is hereby confirmed, the Talc Personal Injury Trust, the Debtors, on their own behalf and as representatives of their respective Estates, the Reorganized Debtors, the Tort Claimants' Committee and FCR, and any Cyprus Settling Talc Insurance Company (regardless of when it enters into any settlement with the Debtors, the Tort Claimants' Committee, the FCR, or the Talc Personal Injury Trust), each solely on its own behalf, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each**

and all of the Cyprus Protected Parties of and from (a) all Estate Causes of Action and (b) any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Talc Personal Injury Trust, the Debtors, their Estates, the Reorganized Debtors, the Tort Claimants' Committee, the FCR, solely in his own capacity, or any Cyprus Settling Talc Insurance Company have, had, may have, or may claim to have against any of the Cyprus Protected Parties, directly or indirectly arising out of, with respect to, or in any way relating to any Talc Claim (sub-clauses (a) and (b) collectively, the "<u>Cyprus Released Claims</u>").

(e)    In furtherance of the XL Settlement, effective upon the Talc Personal Injury Trust's receipt of the XL Contribution, for good and valuable consideration, the adequacy of which is hereby confirmed, the Talc Personal Injury Trust, the Debtors, on their own behalf and as representatives of their respective Estates, the Reorganized Debtors, and the Tort Claimants' Committee and FCR, solely on their own behalf, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the XL Protected Parties of and from (a) all Estate Causes of Action and (b) any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Talc Personal Injury Trust, the Debtors, their Estates, the Reorganized Debtors, the Tort Claimants' Committee, or the FCR, solely on his own behalf, have, had, may have, or may claim to have against any of the XL Protected Parties, directly or indirectly arising out of, with respect to, or in any way relating to any Talc Claim or the XL Policies (sub-clauses (a) and (b) collectively, the "<u>XL Released Claims</u>").  For the avoidance of doubt, the XL Released Claims shall not include any claims arising out of or relating to coverage under the international insurance policies issued to Imerys S.A. by XL Insurance Company Ltd, including Policy Numbers FR00003071LI11A, FR00003071LI12A, and FR00003071LI13A.

12.2.2    <u>Releases by Holders of Claims</u>.  As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the implementation of the Talc Personal Injury Trust, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Releasing Claim Holders from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, causes of action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever,

including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates (including any Estate Causes of Action and Talc Personal Injury Claims), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such entities existed prior to or after the Petition Date), their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission (other than the rights and obligations under the Plan Documents and the contracts, instruments, releases and other agreements or documents delivered or to be delivered under any of the foregoing), except to the extent that such act or omission of a Released Party is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act.  The releases set forth in this <u>Section 12.2.2</u> of the Plan are in addition to, and not in lieu of, the Acceptance and Release that every claimant must complete, execute and deliver to the Talc Personal Injury Trust as a condition precedent to its receipt of any payment or distribution from the Talc Personal Injury Trust.  Notwithstanding anything to the contrary in the Plan, the Plan Documents, or the Confirmation Order, the releases and injunctions set forth in this <u>Section 12.2.2</u> (and otherwise in this Article XII) shall not constitute a release of nor shall enjoin any claims or defenses that a Settling Talc Insurance Company may have against its reinsurers and/or retrocessionaires in their capacities as such or that any reinsurer or retrocessionaire of a Settling Talc Insurance Company may have against such Settling Talc Insurance Company in its capacity as a reinsured, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of any Settling Talc Insurance Company (or reinsurer or retrocessionaire) to assert any such claim or defense in any forum; *provided* that no such claim can be asserted against the Talc Personal Injury Trust unless otherwise provided in the Plan.

12.2.3    <u>Injunction Related to Releases</u>.  **Except as otherwise provided in the Plan, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities released pursuant to the Plan (the "<u>Release Injunction</u>").**

12.3    <u>The Channeling Injunction and the Insurance Entity Injunction</u>.  **In order to supplement the injunctive effect of the Discharge Injunction, and pursuant to sections 524(g) and 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following permanent injunctions to take effect as of the Effective Date.**

12.3.1    <u>Channeling Injunction</u>.

(a)    **Terms.  To preserve and promote the settlements contemplated by and provided for in the Plan and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and the District Court under sections 105(a) and 524(g) of the Bankruptcy Code, the sole recourse of any holder of a Talc Personal Injury Claim against a Protected Party (on account of such Talc Personal Injury Claim) shall be to the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents, and such holder (regardless of whether such holder is a Releasing Claim Holder) shall have no right whatsoever at any time to assert its Talc Personal Injury Claim against any Protected Party or any property or interest in property of any Protected Party.  On and after the Effective Date all holders of Talc Personal Injury Claims shall be permanently and forever stayed, restrained, barred, and enjoined from taking any action for the purpose of, directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Talc Personal Injury Claim against a Protected Party other than from the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents, including, but not limited to:**

(i)    **commencing, conducting, or continuing in any manner, directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;**

(ii)    **enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property or interests in property of any Protected Party;**

(iii)    **creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien of any kind against any Protected Party or any property or interests in property of any Protected Party;**

(iv)    asserting, implementing, or effectuating any setoff, right of reimbursement, subrogation, contribution, or recoupment of any kind, in any manner, directly or indirectly, against any obligation due to any Protected Party or against any property or interests in property of any Protected Party; and

(v)    taking any act in any manner, and in any place whatsoever with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Talc Personal Injury Trust, except in conformity and compliance with the Talc Personal Injury Trust Documents.

(b)    Reservations.  Notwithstanding anything to the contrary in Section 12.3.1(a) of the Plan, this Channeling Injunction shall not impair:

(i)    the rights of holders of Talc Personal Injury Claims to assert such Talc Personal Injury Claims solely against the Talc Personal Injury Trust or otherwise in accordance with the Trust Distribution Procedures;

(ii)    the rights of holders of Talc Personal Injury Claims to assert such claims against anyone other than a Protected Party;

(iii)    the rights of Persons to assert any Claim, debt, obligation or liability for payment of Talc Personal Injury Trust Expenses solely against the Talc Personal Injury Trust or otherwise in accordance with the Trust Distribution Procedures; or

(iv)    the Talc Personal Injury Trust from enforcing its rights explicitly provided to it under the Plan and the Talc Personal Injury Trust Documents.

(c)    Modifications.  There shall be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

(d)    Non-Limitation of Channeling Injunction.  Except as set forth in Section 12.3.1(b) of the Plan, nothing in the Plan or the Talc Personal Injury Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan, the releases provided in the Imerys Settlement, the Rio Tinto/Zurich Settlement, the Cyprus Settlement, and the XL Settlement, or the Talc Personal Injury Trust's assumption of all liability with respect to Talc Personal Injury Claims.

(e)    Bankruptcy Rule 3016 Compliance.  The Plan Proponents' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

96

(f)      **Any Protected Party may enforce the Channeling Injunction as a defense to any Claim brought against such Protected Party that is enjoined under the Plan as to such Protected Party and may seek to enforce such injunction in a court of competent jurisdiction, including the Bankruptcy Court.**

(g)      **If a non-Settling Talc Insurance Company asserts that it has rights, whether legal, equitable, contractual, or otherwise, of contribution, indemnity, reimbursement, subrogation or other similar claims directly or indirectly arising out of or in any way relating to such insurer's payment of loss or defense costs on behalf of one or more of the Debtors or any Protected Party in connection with any Talc Personal Injury Claim (collectively, "<u>Contribution Claims</u>") against a Settling Talc Insurance Company, (i) such Contribution Claims may be asserted as a defense or counterclaim against the Talc Personal Injury Trust in any Talc Insurance Action involving such non-Settling Talc Insurance Company, and the Talc Personal Injury Trust may assert the legal or equitable rights (if any) of the Settling Talc Insurance Company, and (ii) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such non-Settling Talc Insurance Company to the Talc Personal Injury Trust shall be reduced by the amount of such Contribution Claims.**

12.3.2      <u>**Insurance Entity Injunction.**</u>

(a)      **Purpose.  In order to protect the Talc Personal Injury Trust and to preserve the Talc Personal Injury Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court, the Bankruptcy Court shall issue the Insurance Entity Injunction; *provided*, *however*, that the Insurance Entity Injunction is not issued for the benefit of any Talc Insurance Company, and no Talc Insurance Company is a third-party beneficiary of the Insurance Entity Injunction, except as otherwise specifically provided in any Talc Insurance CIP Agreement or Talc Insurance Settlement Agreement.**

(b)      **Terms Regarding Claims Against Talc Insurance Companies. Subject to the provisions of <u>Sections 12.3.1</u> and <u>12.3.2</u> of the Plan, all Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any claim, demand or cause of action (including any Talc Claim or any claim or demand for or respecting any Talc Personal Injury Trust Expense) against any Talc Insurance Company based upon, attributable to, arising out of, or in any way connected with any such Talc Claim, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim, demand, or cause of action including, without limitation:**

(i)      **commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such claim, demand, or cause of action**

against any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action; *provided, however*, that to the extent any Talc Insurance Company asserts a claim against J&J, nothing in the Plan shall affect J&J's ability to assert any defense or counterclaim;

(ii)    enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;

(iii)    creating, perfecting, or enforcing in any manner, directly or indirectly, any Encumbrance against any Talc Insurance Company, or the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action; and

(iv)    except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand or cause of action;

*provided*, *however*, that (a) the injunction set forth in this Section 12.3.2(b) shall not impair in any way any actions brought by the Talc Personal Injury Trust against any Talc Insurance Company (other than a Settling Talc Insurance Company); and (b) the Talc Personal Injury Trust shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the injunction set forth in this Section 12.3.2(b) with respect to any Talc Insurance Company upon express written notice to such Talc Insurance Company, except that the Talc Personal Injury Trust shall not have any authority to terminate, reduce or limit the scope of the injunction herein with respect to any Settling Talc Insurance Company so long as, but only to the extent that, such Settling Talc Insurance Company complies fully with its obligations under any applicable Talc Insurance Settlement Agreement.

(c)    Reservations.  Notwithstanding anything to the contrary above, this Insurance Entity Injunction shall not enjoin:

(i)    the rights of Entities to the treatment accorded them under the Plan, as applicable, including the rights of holders of Talc Personal Injury Claims to assert such Claims, as applicable, in accordance with the Trust Distribution Procedures;

US-DOCS\164401015.3RLF1 33881412v.1

(ii)     the rights of Entities to assert any claim, debt, obligation, cause of action or liability for payment of Talc Personal Injury Trust Expenses against the Talc Personal Injury Trust;

(iii)     the rights of the Talc Personal Injury Trust to prosecute any action based on or arising from the Talc Insurance Policies;

(iv)     the rights of the Talc Personal Injury Trust to assert any claim, debt, obligation, cause of action or liability for payment against a Talc Insurance Company based on or arising from the Talc Insurance Policies or Talc Insurance CIP Agreements; and

(v)     the rights of any Talc Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any other Talc Insurance Company that is not a Settling Talc Insurance Company, or as otherwise specifically provided in any Talc Insurance CIP Agreement.

(d)     Notwithstanding anything to the contrary above, nothing in the Plan will preclude J&J from pursuing any rights it has under any J&J Policy.

12.4    <u>Supplemental Settlement Injunction Order</u>.  In order to preserve and promote the (i) Imerys Settlement, (ii) the Rio Tinto/Zurich Settlement, (iii) the Cyprus Settlement, and (iv) the XL Settlement, each of which is incorporated herein, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date.

(a)     Terms.

(i)     All Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Imerys Released Claims directly or indirectly against the Imerys Released Parties (or any of them) shall be permanently stayed, restrained, and enjoined from pursuing now, or at any time in the future, any Imerys Released Claims.

(ii)     All Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Rio Tinto/Zurich Released Claims directly or indirectly against the Rio Tinto Protected Parties (or any of them) and/or the Zurich Protected Parties (or any of them) shall be permanently stayed, restrained, and enjoined from pursuing now, or at any time in the future, any Rio Tinto/Zurich Released Claims.

(iii)     All Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Cyprus Released Claims directly or indirectly against the Cyprus Protected Parties (or

99

**any of them) shall be permanently stayed, restrained, and enjoined from pursuing now, or at any time in the future, any Cyprus Released Claims.**

(iv) **All Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any XL Released Claims directly or indirectly against the XL Protected Parties (or any of them) shall be permanently stayed, restrained, and enjoined from pursuing now, or at any time in the future, any XL Released Claims.**

(b) **Any Imerys Released Party, Rio Tinto Protected Party, Zurich Protected Party, Cyprus Protected Party, or XL Protected Party may enforce the Supplemental Settlement Injunction Order as a defense to any Claim brought against such Imerys Released Party, Rio Tinto Protected Party, Zurich Protected Party, Cyprus Protected Party, or XL Protected Party that is enjoined under the Plan as to such Imerys Released Party, Rio Tinto Protected Party, Zurich Protected Party, Cyprus Protected Party, or XL Protected Party and may seek to enforce such injunction in a court of competent jurisdiction.**

12.5    <u>Reservation of Rights</u>.  Notwithstanding any other provision of the Plan to the contrary, the satisfaction, release and discharge and the Injunctions set forth in this Article XII shall not be deemed or construed to satisfy, discharge, release or enjoin claims by (a) the Reorganized Debtors or any other Entity, as the case may be, against the Talc Personal Injury Trust for payment of Talc Personal Injury Claims in accordance with the Trust Distribution Procedures or for the payment of Talc Personal Injury Trust Expenses, or (b) the Talc Personal Injury Trust or the Reorganized Debtors, as the case may be, against any Talc Insurance Company that has not performed under a Talc Insurance Policy, a Talc Insurance Settlement Agreement, or a Talc Insurance CIP Agreement.  Nothing in this <u>Section 12.5</u> is intended or shall be construed to limit the assertion, applicability, or effect of any Talc Insurer Coverage Defense.

12.6    <u>Disallowed Claims</u>.  On and after the Effective Date, the Debtors and the Reorganized Debtors shall have no liability or obligation on a Disallowed Claim, and any order disallowing a Claim which is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such Final Order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall, nevertheless, become and be deemed to be a Final Order on the Effective Date.  The Confirmation Order, except as otherwise provided herein, shall constitute a Final Order: (a) in relation to each Debtor disallowing all Claims (other than Talc Personal Injury Claims) to the extent such Claims are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims, and Claims for unmatured interest, and (b) in relation to each Debtor disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

12.7    **Exculpation.  None of (a) the Debtors, (b) the Imerys Released Parties, (c) the Tort Claimants' Committee, (d) the members of the Tort Claimants' Committee in their capacities as such, (e) the FCR, (f) the Information Officer, and (g) the Representatives of any of the foregoing, and in the case of (b) – (g), solely in their capacities as such and solely**

**with respect to conduct while acting as a fiduciary of the Debtors' Estates, shall have or incur any liability to any Person or Entity for any act or omission taken or to be taken on or after the Petition Date through and including the Effective Date in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation of the Plan, the Disclosure Statement, the releases and Injunctions, the pursuit of Confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be distributed under the Plan, or the management or operation of the Debtors (except for any liability that results primarily from such Person's or Entity's gross negligence, bad faith or willful misconduct); *provided, however*, that this exculpation shall not apply to Talc Insurer Coverage Defenses; *provided further* that for the purposes of this Section 12.7, any former officer or director of the Debtors that was an officer or director at any time during the Chapter 11 Cases but is no longer an officer or director shall be considered a Representative of the Debtors.  In all respects, each and all of such Persons, firms and Entities shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and the administration of each of them.**

12.8    No Successor Liability.  Except as otherwise expressly provided in the Plan, the Reorganized Debtors do not, pursuant to the Plan or otherwise, assume, agree to perform, pay or indemnify any Entity or Person, or otherwise have any responsibility for any liabilities or obligations of the Debtors relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on or after the Effective Date.  Neither the Plan Proponents, the Reorganized Debtors, nor the Talc Personal Injury Trust, the Talc Trust Advisory Committees, or the Post-Effective Date FCRs is, or shall be deemed to be, a successor to any of the Debtors by reason of any theory of law or equity (except as otherwise provided in Article IV of the Plan), and none shall have any successor or transferee liability of any kind or character; *provided, however*, the Reorganized Debtors and the Talc Personal Injury Trust shall assume and remain liable for their respective obligations specified in the Plan and the Confirmation Order.

12.9    Corporate Indemnities.

12.9.1    Prepetition Indemnification and Reimbursement Obligations.  The respective obligations of the Debtors to indemnify and reimburse Persons who are or were directors, officers or employees of the Debtors on the Petition Date or at any time thereafter through the Effective Date, against and for any obligations pursuant to the articles of incorporation, codes of regulation, bylaws, applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, (i) shall survive Confirmation of the Plan and remain unaffected thereby, (ii) are assumed by the Imerys Non-Debtors, and (iii) shall not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on or after the Petition Date.  In furtherance of, and to implement the foregoing, as of the Effective Date, the Imerys Non-Debtors shall obtain and maintain in full force insurance for the benefit of each and all of the above-indemnified directors, officers and employees, at levels no less favorable than those existing as of the date of entry of the Confirmation Order, and for a period of no less than three (3) years following the Effective Date.

12.9.2    <u>Plan Indemnity</u>.  In addition to the matters set forth above and not by way of limitation thereof, the Imerys Non-Debtors shall indemnify and hold harmless all Persons who are or were officers or directors of the Debtors on the Petition Date or at any time thereafter through the Effective Date on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost or expense (including attorney's fees) on account of claims or causes of action threatened or asserted by any third party against such officers or directors that seek contribution, indemnity, equitable indemnity, or any similar claim, based upon or as the result of the assertion of primary claims against such third party by any representative of the Debtors' Estates.

12.9.3    <u>Limitation on Indemnification</u>.  Notwithstanding anything to the contrary set forth in the Plan or elsewhere, the Debtors, the Reorganized Debtors, and the Imerys Non-Debtors, as applicable, shall not be obligated to indemnify and hold harmless any Entity for any claim, cause of action, liability, judgment, settlement, cost or expense that results primarily from (i) such Entity's bad faith, gross negligence or willful misconduct or (ii) a Talc Personal Injury Claim.

12.10    ERISA Pension Plans.

12.10.1    The Debtors are Affiliates of Imerys USA. and Imerys Refractory Minerals USA, Inc. (collectively "**ERISA Pension Plan Sponsors**"), and members of each of the ERISA Pension Plan Sponsors' controlled group.  Specifically, (i) Imerys USA is the contributing sponsor of the IMERYS USA Pension Plan, and the IMERYS USA, Inc. Retirement Growth Account Plan, and (ii) Imerys Refractory Minerals USA, Inc. is the contributing sponsor of the C-E Minerals Inc. Retiree Health Capital Accumulation Plan. These three pension plans ("**ERISA Pension Plans**") are covered by ERISA and are not modified or affected by any provision of the Plan.

12.10.2    Notwithstanding any provision to the contrary, no provision contained in the Plan, Confirmation Order, the Bankruptcy Code (including section 1141 of the Bankruptcy Code), or any other document filed in the Chapter 11 Cases shall be construed to exculpate, discharge, release or relieve the Debtors, or any other party (other than the Buyer, unless otherwise provided for in the Asset Purchase Agreement), in any capacity, from any liability or responsibility to PBGC with respect to the ERISA Pension Plans under any law, governmental policy, or regulatory provision.  PBGC and the ERISA Pension Plans shall not be enjoined or precluded from enforcing such liability or responsibility, as a result of any of the provisions of the Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims), the Confirmation Order, the Bankruptcy Code (including section 1141 of the Bankruptcy Code), or any other document filed in the Chapter 11 Cases.  Notwithstanding anything to the contrary herein, the Reorganized Debtors and the Talc Personal Injury Trust shall have no liability on account of the ERISA Pension Plans including but not limited to: (i)  any liability as a member of a "Controlled Group" as defined in 29 U.S.C. §1301(a)(14)(A); (ii) pursuant to the federal successor doctrine; or (iii) otherwise.

12.11    <u>Survival of Foreign Claims</u>.

12.11.1    Notwithstanding anything contained in the Plan or the other Plan Documents to the contrary, (a) nothing in the Plan or the other Plan Documents shall discharge, release, exculpate, impair, or otherwise preclude any Foreign Claim, and (b) Foreign Claims, if any, shall be Reinstated and liquidated, determined, or otherwise resolved consistent with applicable law in an appropriate non-bankruptcy forum, subject to any applicable legal or equitable rights or defenses under applicable non-bankruptcy law; *provided*, *however*, that nothing in the foregoing shall limit, derogate from, or otherwise affect the releases by the Debtors and the Estates contained in <u>Section 12.2.1</u> of the Plan or the Injunctions intended to preserve and protect such releases contained in <u>Sections 12.2.3</u> and <u>12.4</u> of the Plan.

12.11.2    Foreign Claims, if any, shall not be channeled to or assumed by the Talc Personal Injury Trust and liability, if any, of the Debtors for a Foreign Claim will be the responsibility of the Reorganized Debtors.  No Foreign Claim will be subject to the Claims allowance process set forth in the Plan or receive any distributions under the Trust Distribution Procedures from the Talc Personal Injury Trust, and the Talc Personal Injury Trust shall bear no cost or expenses arising from resolution of a Claim that is determined to be a Foreign Claim.

12.11.3    Solely with respect to Foreign Claims asserted or to be asserted against the Debtors or the Reorganized Debtors, the automatic stay imposed by section 362 of the Bankruptcy Code will be terminated as of the date that is 30 days after the Effective Date and, pursuant to section 108(c) of the Bankruptcy Code, the applicable statute of limitations with respect to any such Foreign Claim that did not expire prior to the Petition Date will cease to be tolled as of that date.

12.11.4    For the avoidance of doubt, nothing in this <u>Section 12.11</u> shall be deemed to modify, limit or otherwise override <u>Section 13.3(k)</u> of the Plan.

### ARTICLE XIII
### JURISDICTION OF BANKRUPTCY COURT

13.1    <u>Jurisdiction</u>.  Until the Chapter 11 Cases are closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction that is permissible, including the jurisdiction necessary to ensure that the purposes and intent of the Plan are carried out.  Except as otherwise provided in the Plan or the Talc Personal Injury Trust Agreement, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against and Equity Interests in the Debtors, and to adjudicate and enforce the Talc Insurance Actions, the Talc Personal Injury Trust Causes of Action and all other causes of action which may exist on behalf of the Debtors.  Nothing contained herein shall prevent the Reorganized Debtors or the Talc Personal Injury Trust, as applicable, from taking such action as may be necessary in the enforcement of any Estate Cause of Action (other than Estate Causes of Action released pursuant to <u>Section 12.2.1</u> of the Plan), Talc Insurance Action, Talc Personal Injury Trust Cause of Action, or other cause of action which the Debtors have or may have and which may not have been enforced or prosecuted by the Debtors, which actions or other causes of action shall survive Confirmation of the Plan and shall not be affected

thereby except as specifically provided herein.  Nothing contained herein concerning the retention of jurisdiction by the Bankruptcy Court shall be deemed to be a finding or conclusion that (i) the Bankruptcy Court in fact has jurisdiction with respect to any Talc Insurance Action, (ii) any such jurisdiction is exclusive with respect to any Talc Insurance Action, or (iii) abstention or dismissal of any Talc Insurance Action pending in the Bankruptcy Court or the District Court as an adversary proceeding is or is not advisable or warranted, so that another court can hear and determine such Talc Insurance Action(s).  Any court other than the Bankruptcy Court that has jurisdiction over a Talc Insurance Action shall have the right to exercise such jurisdiction.

13.2    <u>General Retention</u>.  Following Confirmation of the Plan, the administration of the Chapter 11 Cases will continue until the Chapter 11 Cases are closed by a Final Order of the Bankruptcy Court.

13.3    <u>Specific Purposes</u>.  In addition to the foregoing, the Bankruptcy Court shall retain jurisdiction for each of the following specific purposes after Confirmation of the Plan:

(a)    to modify the Plan after Confirmation, pursuant to the provisions of the Plan, the Bankruptcy Code and the Bankruptcy Rules;

(b)    to correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Plan, the Talc Personal Injury Trust Agreement, or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan and pursuant to the provisions of the Plan Documents;

(c)    to assure the performance by the Disbursing Agent of its obligations to make Distributions under the Plan;

(d)    to enforce and interpret the terms and conditions of the Plan, the Plan Documents and the Talc Personal Injury Trust Agreement; to enter such orders or judgments, including, but not limited to, injunctions (i) as are necessary to enforce the title, rights and powers of the Reorganized Debtors and the Talc Personal Injury Trust, and (ii) as are necessary to enable holders of Claims to pursue their rights against any Entity that may be liable therefor pursuant to applicable law or otherwise;

(e)    to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters, including without limitation contested matters arising on account of transactions contemplated by the Plan, or relating to the period of administration of the Chapter 11 Cases;

(f)    to hear and determine all applications for compensation of Professionals and reimbursement of expenses under sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code;

(g)    to hear and determine any causes of action arising during the period from the Petition Date through the Effective Date, or in any way related to the Plan or the transactions contemplated hereby, against the Debtors, the Reorganized Debtors, the other Plan Proponents, or the Talc Personal Injury Trust, and their respective current and former

officers, directors, stockholders, employees, members, attorneys, accountants, financial advisors, representatives and agents;

(h)    to determine any and all motions for the rejection, assumption or assignment of Executory Contracts or Unexpired Leases and the allowance of any Claims resulting therefrom;

(i)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(j)    to determine the allowance and/or disallowance of any Non-Talc Claims, including Administrative Claims, against or Equity Interests in the Debtors or their Estates, including, without limitation, any objections to any such Claims and/or Equity Interests, and the compromise and settlement of any Non-Talc Claim, including Administrative Claims, against or Equity Interest in the Debtors or their Estates;

(k)    to determine if a Claim is a Foreign Claim, *provided however*, that if such Claim is determined to be a Foreign Claim by Final Order, the Bankruptcy Court shall not adjudicate the merits of such Foreign Claim or make any other determination with respect to such Foreign Claim;

(l)    to hear and resolve disputes concerning any reserves under the Plan or the administration thereof;

(m)    to determine all questions and disputes regarding title to the assets of the Debtors or their Estates, or the Talc Personal Injury Trust;

(n)    to issue such orders as may be necessary for the addition of any Settling Talc Insurance Company as a Protected Party;

(o)    to determine all questions and disputes regarding, and to enforce, the Imerys Settlement;

(p)    to determine all questions and disputes regarding, and to enforce, the Rio Tinto/Zurich Settlement;

(q)    to determine all questions and disputes regarding, and to enforce, the Cyprus Settlement;

(r)    to determine all questions and disputes regarding, and to enforce, the XL Settlement;

(s)    to hear and determine the Talc Insurance Actions, any Talc Personal Injury Trust Cause of Action and any similar claims, causes of action or rights of the Talc Personal Injury Trust to construe and take any action to enforce any Talc Insurance Policy or Talc Insurance CIP Agreement, and to issue such orders as may be necessary for the execution, consummation and implementation of any Talc Insurance Policy or Talc Insurance CIP Agreement, and to determine all questions and issues arising thereunder;

(t)　　　to hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Cases;

(u)　　　to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Equity Interest is discharged hereunder or for any other purpose;

(v)　　　to enter in aid of implementation of the Plan such orders as are necessary, including, but not limited to, the implementation and enforcement of the releases and the Injunctions described herein; and

(w)　　　to enter and implement such orders as may be necessary or appropriate if any aspect of the Plan, the Talc Personal Injury Trust, or the Confirmation Order is, for any reason or in any respect, determined by a court to be inconsistent with, violative of, or insufficient to satisfy any of the terms, conditions, or other duties associated with any Talc Insurance Policies, *provided however*, (i) such orders shall not impair the Talc Insurer Coverage Defenses or the rights, claims, or defenses, if any, of any Talc Insurance Company that are set forth or provided for in the Plan, the Plan Documents, the Confirmation Order, or any other Final Orders entered in the Debtors' Chapter 11 Cases, (ii) this provision does not, in and of itself, grant this Court jurisdiction to hear and decide disputes arising out of or relating to the Talc Insurance Policies, and (iii) all interested parties, including any Talc Insurance Company, reserve the right to oppose or object to any such motion or order seeking such relief.

Notwithstanding anything herein to the contrary, however, such retention of jurisdiction by the Bankruptcy Court in this Section 13.3 shall not be deemed to be a retention of exclusive jurisdiction with respect to any matter described in this Section 13.3; rather, any court other than the Bankruptcy Court which has jurisdiction over any matter described in this Section 13.3 shall have the right to exercise such jurisdiction.  To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the foregoing matters, the reference to the "Bankruptcy Court" in this Article shall be deemed to be replaced by the "District Court."  Nothing contained in this Section shall expand the exclusive jurisdiction of the Bankruptcy Court beyond that provided by applicable law.

13.4　　Underlined District Court Jurisdiction.  The District Court shall, without regard to the amount in controversy, retain exclusive jurisdiction after entry of the Affirmation Order to hear and determine any motion to extend the Channeling Injunction to a Talc Insurance Company, and shall be deemed to have withdrawn the reference to the Bankruptcy Court for such purpose.

13.5　　Reservation of Rights.  Nothing contained in the Plan will (i) constitute a waiver of any claim, right or cause of action that a Debtor, the Reorganized Debtors, or the Talc Personal Injury Trust, as the case may be, may hold against the insurer under any policy of insurance or

insurance agreement, except to the extent the insurer is a Settling Talc Insurance Company; or (ii) limit the assertion, applicability or effect of any Talc Insurer Coverage Defense.

13.6    <u>Compromises of Controversies</u>.  From and after the Effective Date, the Reorganized Debtors and/or the Talc Personal Injury Trust, as appropriate based on assets and liabilities retained or owed by each respectively, shall be authorized to compromise controversies in their discretion in a manner not inconsistent with the terms of the Plan, without notice to any other party or approval of or notice to the Bankruptcy Court.

13.7    <u>Talc Personal Injury Claims</u>.  Notwithstanding anything in this Article XIII to the contrary, the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures shall govern the resolution of Talc Personal Injury Claims, including the forum in which such Talc Personal Injury Claims shall be determined.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

14.1    <u>Closing of Chapter 11 Cases</u>.  The Reorganized Debtors shall, promptly after the full administration of each Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close such Chapter 11 Case.

14.2    <u>Timing of Distributions or Actions</u>.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

14.3    <u>Governing Law</u>.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), or an instrument, agreement or other document executed under the Plan provides otherwise, the rights, duties and obligations arising under the Plan, and the instruments, agreements and other documents executed in connection with the Plan, shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Delaware without giving effect to the principles of conflicts of law thereof.

14.4    <u>Entire Agreement</u>.  The Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions, negotiations, understandings and documents.  No Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for in the Plan or the other Plan Documents or as may hereafter be agreed to by the affected parties in writing.

14.5    <u>Headings</u>.  Headings are utilized in the Plan for convenience and reference only and shall not constitute a part of the Plan for any other purpose.

14.6    <u>Severability</u>.  If, prior to entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the consent of Imerys S.A., the Tort Claimants' Committee, and the FCR, which consent shall not be unreasonably withheld), shall have the power

to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with this Section, is valid and enforceable pursuant to its terms.

14.7    <u>Notices</u>.  All notices, requests and demands required or permitted to be provided to the Debtors, the Reorganized Debtors, or the Plan Proponents under the Plan, in order to be effective, shall be in writing, and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, to the addresses set forth below, with a copy also furnished via email:

**THE DEBTORS:**

IMERYS TALC AMERICA, INC.,
Attention: Ryan Van Meter, Esq.
100 Mansell Court East, Suite 300
Roswell, Georgia 3007
Telephone:  (770) 645-3739
Facsimile:  (770) 645-3475
Email:  ryan.vanmeter@imerys.com

**COUNSEL FOR THE DEBTORS:**

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins, Esq.
Michael J. Merchant, Esq.
Amanda R. Steele, Esq.
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:  collins@rlf.com
        merchant@rlf.com
        steele@rlf.com

LATHAM & WATKINS LLP
Jeffrey E. Bjork, Esq.
Kimberly A. Posin, Esq.
Helena G. Tseregounis, Esq.
Shawn P. Hansen, Esq.
10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Telephone:  (424) 653-5500
Facsimile:  (424) 653-5501
E-mail:  jeff.bjork@lw.com
        kim.posin@lw.com
        helena.tseregounis@lw.com
        shawn.hansen@lw.com

**COUNSEL FOR THE TORT
CLAIMANTS' COMMITTEE:**

ROBINSON & COLE LLP
Natalie D. Ramsey, Esq.
Mark A. Fink, Esq.
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
E-mail:  nramsey@rc.com
       mfink@rc.com

ROBINSON & COLE LLP
Michael R. Enright, Esq.
280 Trumbull Street
Hartford, Connecticut 06103
Telephone: (860) 275-8290
Facsimile: (860) 275-8299
E-mail:  menright@rc.com

**COUNSEL FOR THE FCR:**

YOUNG CONAWAY STARGATT &
TAYLOR LLP
Robert S. Brady, Esq.
Edwin J. Harron, Esq.
Sharon M. Zieg, Esq.
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
E-mail:  rbrady@ycst.com
       eharron@ycst.com
       szieg@ycst.com

**COUNSEL FOR THE IMERYS PLAN PROPONENTS:**

HUGHES HUBBARD & REED LLP
Christopher Kiplok, Esq.
Erin Diers, Esq.
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
E-mail:  christopher.kiplok@hugheshubbard.com
       erin.diers@hugheshubbard.com

**CYPRUS MINES:**

CYPRUS MINES CORPORATION
Attention:  Corporate Secretary.
333 N. Central Ave.
Phoenix, AZ 85004
Email:  Mhughes2@fmi.com

**COUNSEL FOR CYPRUS MINES:**

REED SMITH LLP
Kurt F. Gwynne, Esq.
1201 Market Street - Suite 1500
Wilmington, DE  19801
Telephone:  (302) 778-7500
Facsimile:  (302) 778-7575
Email:  kgwynne@reedsmith.com

REED SMITH LLP
Paul M. Singer, Esq.
Luke A. Sizemore, Esq.
225 Fifth Avenue, Suite 1200
Pittsburgh, PA  15222
Telephone:  (412) 288-3131
Facsimile:  (412) 288-3006
Email:  psinger@reedsmith.com
           lsizemore@reedsmith.com

**COUNSEL FOR THE CYPRUS TORT CLAIMANTS' COMMITTEE:**

A.M. SACCULLO LEGAL, LLC
Mark T. Hurford
27 Crimson King Drive
Bear, DE 19701
Telephone:  (302) 836-8877
Facsimile:  (302) 836-8787
Email:  mark@saccullolegal.com

CAPLIN & DRYSDALE, CHARTERED
Kevin C. Maclay, Esq.
Todd E. Phillips, Esq.
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
Telephone:  (202) 862-5007
Facsimile:  (202) 429-3301
Email:  kmaclay@capdale.com
           tphillips@capdale.com

**THE CYPRUS FCR:**

Roger Frankel
c/o Frankel Wyron LLP
2101 L Street, NW, Suite 300
Washington, DC 20037
Telephone:  (202) 367-9128
Email:  rfrankel@frankelwryon.com

110

**COUNSEL FOR THE CYPRUS FCR:**

FRANKEL WYRON LLP
Richard H. Wyron
2101 L Street, NW, Suite 300
Washington, DC 20037
Telephone:  (202) 367-9127
Email:  rwyron@frankelwyron.com

TOGUT, SEGAL & SEGAL LLP
Albert Togut, Esq.
Frank A. Oswald, Esq.
One Penn Plaza, Suite 3335
New York, NY 10119
Telephone:  (212) 594-5000
Email:  altogut@teamtogut.com
   frankoswald@teamtogut.com

**COUNSEL FOR CAMC:**

WACHTELL, LIPTON, ROSEN &
KATZ
Emil A. Kleinhaus, Esq.
51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1332
Facsimile:  (212) 403-2332
Email:  eakleinhaus@wlrk.com

MORRIS NICHOLS ARSHT &
TUNNELL LLP
Robert J. Dehney, Esq.
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989
Email:  rdehney@mnat.com

14.8 <u>Notice to Other Entities</u>.  After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to entities providing that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that neither of: (i) the United States Trustee and (ii) counsel of record to Imerys S.A., need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to: (i) the United States Trustee; (ii) counsel of record to Imerys S.A.; (iii) counsel of record to CAMC; and (iv) those entities that have filed such renewed requests.

14.9 <u>Plan Supplement</u>.  Any and all exhibits, lists, or schedules referred to herein but not filed with the Plan shall be contained in the Plan Supplement to be filed with the Clerk of the Bankruptcy Court prior to the Confirmation Hearing on the Plan, and such Plan Supplement is incorporated into and is part of the Plan as if set forth in full herein.  The Plan Supplement will be available for inspection in the office of the Clerk of the Bankruptcy Court during normal court hours, at the website maintained by the Claims Agent (https://cases.ra.kroll.com/imerystalc), and at the Bankruptcy Court's website (ecf.deb.uscourts.gov).

14.10 <u>Inconsistencies</u>.  To the extent the Plan is inconsistent with the Disclosure Statement, the provisions of the Plan shall be controlling.  To the extent the Plan is inconsistent with the Confirmation Order on the Plan, the provisions of such Confirmation Order shall be controlling.

14.11  <u>Withholding of Taxes</u>.  The Disbursing Agent, the Talc Personal Injury Trust or any other applicable withholding agent, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property which must be withheld for foreign, federal, state and local taxes payable with respect thereto or payable by the Person entitled to such assets to the extent required by applicable law.

14.12  <u>Transfer Taxes</u>.  Pursuant to section 1146 of the Bankruptcy Code, and to the fullest extent permitted by law, no stamp tax, transfer tax, filing fee, sales or use tax or other similar tax shall be imposed or assessed by any taxing authority on account of (i) the transfer of any assets or property pursuant to the Plan; (ii) the making or delivery of an instrument of transfer under the Plan; (iii) the termination, extinguishment, or Reinstatement of any Equity Interests; or (iv) the Reorganized Debtor Merger (if applicable).  The appropriate state or local government officials or agents shall be directed to forego the collection of any such tax and to accept for filing or recordation of any of the foregoing instruments or other documents without the payment of any such tax.

14.13  <u>Binding Effect</u>.  The rights, duties and obligations of any Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Entity.  For the avoidance of doubt, the estates, executors and heirs of holders of Claims (whether such Claims are currently existing or arise in the future) shall be deemed successors of such holders, and the terms of the Plan shall inure to the benefit of and be binding on such holders' estates, executors and heirs, as applicable.

14.14  <u>Payment of Statutory Fees</u>.  All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.  The Reorganized Debtors shall pay all such fees that arise after the Effective Date, but before the closing of the Chapter 11 Cases, and shall comply with all applicable statutory reporting requirements.

14.15  <u>Effective Date Actions Simultaneous</u>.  Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

14.16  <u>Consent to Jurisdiction</u>.  Upon default under the Plan, the Reorganized Debtors, the Talc Personal Injury Trust, the Talc Trustees, the Tort Claimants' Committee, the FCR, and the Imerys Released Parties, respectively, consent to the jurisdiction of the Bankruptcy Court, or any successor thereto, and agree that it shall be the preferred forum for all proceedings relating to any such default.

14.17  <u>Further Assurances</u>.  Each of the Protected Parties (but only to the extent that each such Protected Party has the ability to bind one or more Protected Parties under applicable state law), the Talc Personal Injury Trust, all Entities receiving Distributions under the Plan, and all other parties in interest shall, and shall be authorized to, from time to time, prepare, execute, and deliver any agreements or documents and take any other action consistent with the terms of the Plan as may be reasonably necessary to effectuate the provisions and intent of the Plan, with each such Entity to bear its own costs incurred after the Effective Date in connection therewith.

112

Dated: September 28, 2025
Wilmington, Delaware

**IMERYS TALC AMERICA, INC.**
(On behalf of itself and each of the Debtors)

*/s/ Ryan Van Meter*
Ryan Van Meter
Secretary of Imerys Talc America, Inc., Imerys Talc
Vermont, Inc. and Imerys Talc Canada Inc.

**TORT CLAIMANTS' COMMITTEE**

*/s/ Maura Kolb, Esq. of The Lanier Law Firm*
As attorney for Robin Alander,
a member of the Official Committee of Tort Claimants

*/s/ Steven T. Baron, Esq. of Baron & Budd, P.C.*
As attorney for Lloyd Fadem,
as representative of the estate of Margaret Ferrell,
a member of the Official Committee of Tort Claimants

**FUTURE CLAIMANTS' REPRESENTATIVE**

*/s/ James L. Patton, Jr., Esq.*
James L. Patton Jr.
Legal Representative for Future Talc Personal Injury
Claimants

**IMERYS S.A.**
(On behalf of itself and each of the Imerys Plan
Proponents)

*/s/ Emmanuelle Vaudoyer*
Emmanuelle Vaudoyer
Group General Counsel & Company Secretary of
Imerys S.A.

## COUNSEL FOR THE PLAN PROPONENTS

**COUNSEL FOR THE DEBTORS:**

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins, Esq.
Michael J. Merchant, Esq.
Amanda R. Steele, Esq.
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:  collins@rlf.com
          merchant@rlf.com
          steele@rlf.com

LATHAM & WATKINS LLP
Jeffrey E. Bjork, Esq.
Kimberly A. Posin, Esq.
Helena G. Tseregounis, Esq.
Shawn P. Hansen, Esq.
10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Telephone:  (424) 653-5500
Facsimile:  (424) 653-5501
E-mail:  jeff.bjork@lw.com
          kim.posin@lw.com
          helena.tseregounis@lw.com
          shawn.hansen@lw.com

**COUNSEL FOR THE TORT CLAIMANTS' COMMITTEE:**

ROBINSON & COLE LLP
Natalie D. Ramsey, Esq.
Mark A. Fink, Esq.
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
E-mail:  nramsey@rc.com
          mfink@rc.com

- and -

Michael R. Enright, Esq.
280 Trumbull Street
Hartford, Connecticut 06103
Telephone: (860) 275-8290
Facsimile: (860) 275-8299
E-mail:  menright@rc.com

**COUNSEL FOR THE FCR:**

YOUNG CONAWAY STARGATT & TAYLOR LLP
Robert S. Brady, Esq.
Edwin J. Harron, Esq.
Sharon M. Zieg, Esq.
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
E-mail:  rbrady@ycst.com
          eharron@ycst.com
          szieg@ycst.com

114

**COUNSEL FOR THE IMERYS PLAN PROPONENTS:**

HUGHES HUBBARD & REED LLP
Christopher Kiplok, Esq.
Erin Diers, Esq.
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
E-mail:  christopher.kiplok@hugheshubbard.com
        erin.diers@hugheshubbard.com

## EXHIBIT A

**Trust Distribution Procedures**

*See* **Docket No. 7762**

**<u>EXHIBIT B</u>**

**Talc Personal Injury Trust Agreement**

***See* Docket No. 7762**

## EXHIBIT C

**Rio Tinto/Zurich Settlement Agreement**

*See* **Docket No. 7762**

## EXHIBIT D

**XL Settlement Agreement**

***See* Docket No. 7762**

## EXHIBIT E

**J&J Settlement Agreement**

***See* Docket No. 7762**

## SCHEDULE I

### Imerys Corporate Parties

## CURRENT AFFILIATES

- AKROTIRIO THAHILAS DYO S.A.
- ALMATECH MINERAL INTERNATIONAL LTD
- ALUMICA CANADA INC.
- ARDOISIERES D'ANGERS
- CALDERYS ALGERIE SPA
- CALDERYS REFRACTARIOS VENEZOLANOS SA
- CALDERYS REFRAKTER
- CEBO HOLLAND B.V.
- CEBO INTERNATIONAL B.V.
- CEBO MARINE B.V.
- CEBO UK LIMITED
- DONBASSKERAMIKA
- DONKAOLIN
- ECCA HOLDINGS (PTY) LTD
- ECCA MINERALS (PTY) LTD
- ECO-BOS DEVELOPMENT LIMITED
- GEORGIA PROPPANTS LLC (f.k.a. US CERAMICS LLC)
- GIMPEX-IMERYS INDIA PRIVATE LTD
- HARBORLITE AEGEAN ENDUSTRI MINERALLERI SANAYI A.S.
- IMERTECH
- IMERYS
- IMERYS (SHANGHAI) INVESTMENT MANAGEMENT CO., LTD
- IMERYS (TIANJIN) NEW MATERIAL TECHNOLOGY CO., LTD. (f.k.a. KERNEOS (CHINA) ALUMINATE TECHNOLOGIES CO., LTD)
- IMERYS (ZHENGZHOU) NEW MATERIAL TECHNOLOGY CO., LTD
- IMERYS ADMINISTRATIVE GERMANY GMBH
- IMERYS AL ZAYANI CO. W.L.L. (f.k.a. IMERYS AL ZAYANI FUSED MINERALS CO. W.L.L.)
- IMERYS ALMERIA, SA DE CV
- IMERYS ALMERIA DIATOMITA CONCESIONES ZACOALCO S.A. de C.V. (f.k.a. ZAPATOS DE MEXICALI, S.A. DE C.V.)
- IMERYS ALUMINATES CORPORATE (f.k.a. KERNEOS CORPORATE SAS)
- IMERYS ALUMINATES LIMITED
- IMERYS ALUMINATES SA
- IMERYS ASIA PACIFIC PTE LTD
- IMERYS BEAUVOIR (f.k.a. IMERYS GREENELLE TROIS)
- IMERYS BELGIUM SA
- IMERYS BENTONITE GEORGIA LTD

- IMERYS BENTONITE HUNGARY KFT
- IMERYS BEYREDE (f.k.a. IMERYS FUSED MINERALS BEYREDE SAS)
- IMERYS BRITISH LITHIUM LIMITED (f.k.a. RESEARCH BY BRITISH LITHIUM LIMITED)
- IMERYS CANADA INC.
- IMERYS CARBONATES (THAILAND), LTD
- IMERYS CARBONATES AUSTRIA GMBH
- IMERYS CARBONATES INDIA LIMITED
- IMERYS CARBONATES USA, INC.
- IMERYS CERAMICS (INDIA) PRIVATE LIMITED
- IMERYS CERAMICS (THAILAND) LTD
- IMERYS CERAMICS BRASIL MINERAIS PARA CERAMICAS LTDA
- IMERYS CERAMICS EGYPT
- IMERYS CERAMICS FRANCE
- IMERYS CERAMICS ITALY S.R.L.
- IMERYS CERAMICS MEXICO SA DE CV
- IMERYS CERAMICS NEW ZEALAND
- IMERYS CERAMICS PORTUGAL, SA
- IMERYS CLAYS, INC.
- IMERYS CLERAC (f.k.a. IMERYS REFRACTORY MINERALS CLERAC)
- IMERYS CZECH REPUBLIC S.R.O.
- IMERYS DIATOMITA ALICANTE, S.A.
- IMERYS DO BRASIL COMERCIO
- IMERYS DOMODOSSOLA S.P.A. (f.k.a. IMERYS FUSED MINERALS DOMODOSSOLA S.P.A.)
- IMERYS DORTMUND GMBH (f.k.a. S&B HOLDING GMBH)
- IMERYS FILTRATION FRANCE
- IMERYS FILTRATION MINERALS, INC.
- IMERYS FUSED MINERALS (YINGKOU) CO., LTD
- IMERYS FUSED MINERALS FRANCE SARL
- IMERYS FUSED MINERALS GUIZHOU CO. LTD
- IMERYS FUSED MINERALS SALTO LTDA
- IMERYS GLOMEL (f.k.a. IMERYS REFRACTORY MINERALS GLOMEL)
- IMERYS GRAPHITE & CARBON BELGIUM SA
- IMERYS GRAPHITE & CARBON CANADA INC.
- IMERYS GRAPHITE & CARBON JAPAN KK
- IMERYS GRAPHITE & CARBON KOREA
- IMERYS GRAPHITE & CARBON SWITZERLAND SA
- IMERYS GREENELLE ONE
- IMERYS GREENELLE TWO
- IMERYS GREENEVILLE, INC. (f.k.a. IMERYS FUSED MINERALS GREENEVILLE, INC.)
- IMERYS INDUSTRIAL MINERALS DENMARK A/S
- IMERYS INDUSTRIAL MINERALS GREECE S.A.

- IMERYS JAPAN CO., LTD (f.k.a. IMERYS HIGH RESISTANCE MINERALS JAPAN KK)
- IMERYS KAOLIN, INC.
- IMERYS KILN FURNITURE (THAILAND) CO. LTD
- IMERYS KILN FURNITURE HUNGARY KFT.
- IMERYS KILN FURNITURE ESPAÑA, SA
- IMERYS LAUFENBURG GMBH (f.k.a. IMERYS FUSED MINERALS LAUFENBURG GMBH)
- IMERYS LITHIUM FRANCE (f.k.a. PARNASSE TRENTE DEUX)
- IMERYS MANUFACTURING KOREA LTD
- IMERYS MICA KINGS MOUTAIN, INC.
- IMERYS MIDDLE EAST HOLDING COMPANY W.L.L.
- IMERYS MINERAL ARABIA LLC
- IMERYS MINERALES ARGENTINA S.A.
- IMERYS MINERALES CHILE SPA
- IMERYS MINERALES PERU SAC
- IMERYS MINERALI CORSICO SRL
- IMERYS MINERALI SPA
- IMERYS MINERALS (THAILAND) LTD
- IMERYS MINERALS BULGARIA AD
- IMERYS MINERALS CHINA, INC.
- IMERYS MINERALS GMBH
- IMERYS MINERALS HOLDING LIMITED
- IMERYS MINERALS INTERNATIONAL SALES
- IMERYS MINERALS KOREA LTD
- IMERYS MINERALS LTD
- IMERYS MINERALS MALAYSIA SDN. BHD.
- IMERYS MINERALS NETHERLANDS B.V.
- IMERYS MINERALS VIETNAM LIMITED
- IMERYS MINERAUX BELGIQUE SA
- IMERYS MINÉRAUX FRANCE
- IMERYS MURG GMBH (f.k.a. IMERYS FUSED MINERALS MURG GMBH)
- IMERYS NIAGARA FALLS, INC. (f.k.a. IMERYS FUSED MINERALS NIAGARA FALLS, INC.)
- IMERYS NORFOLK, INC. (f.k.a. KERNEOS INC.)
- IMERYS OILFIELD MINERALS, INC.
- IMERYS PACIFIC LTD
- IMERYS PCC FRANCE
- IMERYS PCC UK
- IMERYS PERFORMANCE AND FILTRATION MINERALS PRIVATE LIMITED
- IMERYS PERFORMANCE MINERALS AMERICAS, INC. (f.k.a. IMERTECH USA, INC.)
- IMERYS PERLITA BARCELONA, S.A.
- IMERYS PERLITE SARDINIA S.R.L.

- IMERYS PERLITE USA, INC.
- IMERYS PIGMENTS (QINGYANG) CO., LTD
- IMERYS PIGMENTS (WUHU) CO., LTD
- IMERYS POLAND S.P. Z.O.O
- IMERYS RE
- IMERYS REFRACTORY MINERALS SOUTH AFRICA (PTY) LTD
- IMERYS REFRACTORY MINERALS USA, INC.
- IMERYS RICHARDS BAY (PTY) LTD (f.k.a. KERNEOS SOUTHERN AFRICA PTY LTD)
- IMERYS ROCA RODANDO CONCESIONES HMO, S.A. de C.V.
- IMERYS RUSE D.O.O. (f.k.a. IMERYS FUSED MINERALS RUSE D.O.O.)
- IMERYS SERAMIK HAMMADDELERI SANAYI VE TICARET LIMITED SIRKETI
- IMERYS SERVICES
- IMERYS SERVICES GERMANY GMBH & CO. KG
- IMERYS SERVICES GREECE
- IMERYS SOUTH AFRICA (PTY) LTD
- IMERYS SOUTH EUROPE, S.L.
- IMERYS SYDNEY PTY LTD (f.k.a. KERNEOS AUSTRALIA PTY LTD)
- IMERYS TABLEWARE DEUTSCHLAND GMBH
- IMERYS TABLEWARE FRANCE
- IMERYS TALC AUSTRALIA PTY LTD
- IMERYS TALC AUSTRIA GMBH
- IMERYS TALC BELGIUM
- IMERYS TALC EUROPE
- IMERYS TALC FINLAND OY
- IMERYS TALC GERMANY GMBH
- IMERYS TALC ITALY S.P.A.
- IMERYS TALC LUZENAC FRANCE
- IMERYS TALC MEXICO, SA DE CV
- IMERYS TALC UK HOLDING LTD
- IMERYS TEUTSCHENTAL (f.k.a. IMERYS FUSED MINERALS TEUTSCHENTHAL GMBH)
- IMERYS TRADING MINERALS EGYPT
- IMERYS TRUSTEES LTD
- IMERYS UK FINANCE LIMITED
- IMERYS UK LTD
- IMERYS UK PENSION FUND TRUSTEES LTD
- IMERYS USA, INC.
- IMERYS VILLACH GMBH (f.k.a. IMERYS FUSED MINERALS VILLACH GMBH)
- IMERYS VIZAG PRIVATE LIMITED (f.k.a. KERNEOS INDIA ALUMINATE TECHNOLOGIES PRIVATE LIMITED)
- IMERYS WOLLASTONITE USA, LLC
- IMERYS ZHEJIANG ZIRCONIA CO., LTD

- IMERYS ZSCHORNEWITZ GMBH (f.k.a. IMERYS FUSED MINERALS ZSCHORNEWITZ GMBH)
- INDUSTRIA MACINAZIONE MINERALI PER L'INDUSTRIA CERAMICA S.P.A
- INDUSTRIAL MINERALS OF GREECE
- INSTALACIONES REFRACTARIAS C.A.
- KENTUCKY-TENNESSEE CLAY COMPANY
- KERNEOS INDIA ALUMINATE PRIVATE LIMITED
- KINTA POWDERTEC SDN. BHD
- LATOMIA N. KORAKAS SA
- LAVIOSA CHIMICA MINERARIA SPA
- LINJIANG IMERYS DIATOMITE CO., LTD
- LIQUID QUIMICA MEXICANA, SA DE CV
- LLC IMERYS ALUMINATES
- MICRON-ITA MINERACAO LTDA
- MIKRO MINERAL ENDUSTRIYEL MINERALLER SANAYI VE TICARET A.S.
- MILOS INITIATIVE
- MILOS MINING MUSEUM
- MINERA ROCA RODANDO S. DE R.L. DE C.V.
- MINERAL RESOURCES DEVELOPMENT (M.R.D.) CO. LTD
- MINVEN - (C-E MINERALES DE VENEZUELA)
- MIRCAL
- MIRCAL DE MEXICO SA DE CV
- MIRCAL ITALIA SPA
- MONREFCO GMBH
- MRD-ECC CO. LTD
- MSL MINERAIS S.A.
- NIPPON POWER GRAPHITE CO., LTD
- NORTH AFRICAN INDUSTRIAL MINERAL EXPLORATION SARL - NAIMEX
- NYCO MINERALS, LLC
- PARIMETAL
- PPSA
- PT IMERYS CERAMICS INDONESIA
- PYRAMAX CERAMICS SOUTHEAST, LLC
- QUARTZ CORP (SHANGHAÏ) CO., LTD
- RECLAYM LIMITED
- REFRACTORY MINERALS (PTY) LTD
- S&B INDUSTRIAL MINERALS MOROCCO S.A.R.L.
- S&B MINERALS PARTICIPATIONS SARL
- SAMREC (PTY) LTD
- SEITISS IMERYS MINERAUX CIRCULAIRES (SIMC)
- SHANDONG IMERYS MOUNT TAI CO., LTD
- SIBIMIN OVERSEAS LTD
- THE QUARTZ CORP AS
- THE QUARTZ CORP SAS

- THE QUARTZ CORP USA
- TYGERKLOOF MINING (PTY) LTD
- VATUTINSKY KOMBINAT VOGNETRYVIV
- VERMICULITA Y DERIVADOS, SL
- VIOLET CACTUS, INC. (F.K.A. CALDERYS USA, INC.)
- VOUGIOUKLI QUARRIES AVEE
- XINYANG ATHENIAN MINING CO., LTD
- YBB CALCIUM PRODUCTS CO. LTD
- YUEYANG YINGYUE NEW MATERIALS CO., LTD

## FORMER AFFILIATES

- 000 CALDERYS
- 11656490 CANADA INC.
- ADVANCED MINERALS CORPORATION
- AFRICA REFRACTORY CONSULTANTS (PTY) LTD
- AKROTIRIO TRAHILAS TRIA S.A.
- AMERICAN TRIPOLI, INC.
- AMMIN HOLDINGS, INC.
- ANADOLU PERLIT MEDENCILIK SANAYI
- ANGANG STOLLBERG & SAMIL CO., LTD
- ARC FUSED ALUMINA
- ARDOISE ET JARDIN
- AREFCON B.V.
- AREFCON HISMA B.V.
- ARTEMYN
- ARTEMYN ARG S.A.
- ARTEMYN ASIA PACIFIC PTE. LTD.
- ARTEMYN BELGIUM
- ARTEMYN BRAZIL LTDA
- ARTEMYN CANADA, ULC (f.k.a. BERG MINERALS CANADA INC.)
- ARTEMYN USA, LLC (f.k.a. AMERICARB, INC.)
- ASSOS MERMER SANAYI VE TICARET LTD SIRKETI
- AUSTRALIAN VERMICULITE INDUSTRIES (PTY) LTD
- B & B REFRACTORY SERVICES PTY LTD
- BAOTOU JINGYUAN GRAPHITE CO., LTD
- BERG MINERALS TRADING (SHANGHAÏ) CO., LTD
- BERG MINERALS UK LIMITED
- BLX TRADING SAS
- CALDERYS ALGERIE SERVICES SPA
- CALDERYS AUSTRALIA PTY LTD
- CALDERYS AUSTRIA GMBH
- CALDERYS BELGIUM
- CALDERYS CHINA

- CALDERYS CHINA CO., LTD
- CALDERYS CZECH S.R.O
- CALDERYS DANMARK A/S
- CALDERYS DE MEXICO SA DE CV
- CALDERYS DEUTSCHLAND GMBH
- CALDERYS FINLAND OY
- CALDERYS FRANCE
- CALDERYS IBERICA REFRACTARIOS, SA
- CALDERYS INDIA REFRACTORIES LIMITED
- CALDERYS ITALIA SRL
- CALDERYS JAPAN CO., LTD
- CALDERYS KOREA CO. LTD
- CALDERYS MAGYARORSZAG K.F.T. (HUNGARY)
- CALDERYS NGJ LIMITED
- CALDERYS NORDIC AB
- CALDERYS NORWAY AS
- CALDERYS POLSKA SP. Z.O.O.
- CALDERYS SOUTH AFRICA (PTY) LTD
- CALDERYS TAÏWAN CO LTD
- CALDERYS THE NETHERLANDS B.V.
- CALDERYS UKRAINE LTD
- CALDERYS UK LTD
- CALDERYS USA, LLC
- CAPTELIA
- CARBONATOS ANDINOS SA
- C-E NEWELL, INC.
- CELITE MEXICANA, SA DE CV
- CHANGBAI CELITE DIATOMITE CO., LTD
- CHARGES MINERALES DU PERIGORD - CMP
- CHOICEWISE LIMITED
- CONDIMENTUM OY
- COVEO
- DALIAN JINSHENG FINE CHEMICAL INDUSTRY CO., LTD
- DAMOLIN ETRECHY
- DAMOLIN GMBH
- DAMOLIN INVESTMENT A/S
- DOLPHIN FELDSPAR PRIVATE LIMITED
- DOYET TERRE CUITE
- ECC OVERSEAS INVESTMENTS LTD
- ECC PACIFIC (AUSTRALIA) PTY LTD
- ECCA CALCIUM PRODUCTS, INC.
- EDWIN H. BRADLEY HOLDINGS LTD
- ELMIN BAUXITES S.R.L.
- ENGLISH CHINA CLAYS LTD

- EUROARGILLE
- EUROPE COMMERCE REFRACTORY
- FAGERSTA ELDFASTA AB
- FEL-MAC COMPANY LLC
- FIBERLEAN TECNOLOGIA E SOLUCOES EIRELI
- FIBERLEAN TECHNOLOGIE LIMITED
- FIBERLEAN TECHNOLOGIE NA INC.
- FOKIS MINING PARK
- GOONAMARRIS LIMITED
- GRAN BIANCO CARRARA SRL
- GUIYANG JIANAI SPECIAL ALUMINATES
- GUIZHOU S&B NEW-TYPE MATERIALS CO., LTD
- GUIZHOU STAR MINERALS CO., LTD
- GUNUNG IMBANGAN SDN. BHD
- HARBORLITE (UK) LTD
- HAZNEDAR DURER DIŞ TİCARET A.Ş (f.k.a. VENDER ENDÜSTRIYEL MALZEMELERI TICARET A.S.)
- HAZNEDAR DURER REFRAKTER MALZEMELERI SANAYI VE TICARET A.S.
- HAZNEDAR GMBH
- HJM INDUSTRIES SDN. BHD
- IGM FOR FIBRE GLASS
- IMERPLAST UK LIMITED
- IMERYS (SHANGHAÏ) FILTRATION MINERALS TRADING CO., LTD
- IMERYS ADVANCED MATERIALS (YINGKOU) CO., LTD
- IMERYS ALÜMINÄT DIS TICARET
- IMERYS ALUMINATES ASIA PACIFIC PTE LTD
- IMERYS ALUMINATES GMBH
- IMERYS ALUMINATES GROUPE (f.k.a. KERNEOS GROUP SAS)
- IMERYS ALUMINATES ITALIA S.R.L.
- IMERYS ALUMINATES NORDIC AB
- IMERYS ARGENTINA SRL
- IMERYS BAUXITE SA (f.k.a. ELMIN BAUXITES SA)
- IMERYS BENTONITE ITALY S.P.A.
- IMERYS BENTONITE USA, LLC
- IMERYS CALCIUM SOLUTIONS AUSTRIA GMBH
- IMERYS CANADA 2004, INC.
- IMERYS CANADA LP
- IMERYS CARBONATES LLC
- IMERYS CERAMICS ESPAÑA
- IMERYS CERAMICS ITALIA
- IMERYS CSI SWITZERLAND SAGL
- IMERYS DIATOMITA MEXICO, SA DE CV
- IMERYS FINE CHEMICAL (CHANGSHU) CO., LTD
- IMERYS FUSED MINERALS (TAICANG) CO., LTD

- IMERYS FUSED MINERALS (ZIBO) CO., LTD
- IMERYS FUSED MINERALS HULL LIMITED
- IMERYS GECKO GRAPHITE (NAMIBIA) (PTY) LTD
- IMERYS GECKO HOLDING (NAMIBIA) (PTY) LTD
- IMERYS GECKO OKANJANDE MINING (PTY) LTD
- IMERYS GRAPHITE & CARBON (CHANGZHOU) CO., LTD
- IMERYS GRAPHITE & CARBON GERMANY GMBH
- IMERYS GRAPHITE & CARBON USA, INC.
- IMERYS ITATEX SOLUCOES MINERAIS LTDA
- IMERYS KAOLIN BELGIUM
- IMERYS KILN FURNITURE FRANCE
- IMERYS METALCASTING FRANCE SARL
- IMERYS METALCASTING GERMANY GMBH
- IMERYS MICA SUZORITE INC.
- IMERYS MINERAL AB
- IMERYS MINERALES ESPANA, S.L.
- IMERYS MINERALES PERU S.A.C.
- IMERYS MINERALES SANTIAGO LIMITADA
- IMERYS MINERALI GAMALERO SRL
- IMERYS MINERALS (HEZHOU) CO., LTD
- IMERYS MINERALS (INDIA) PRIVATE LIMITED
- IMERYS MINERALS (TAIWAN) LTD
- IMERYS MINERALS AUSTRALIA PTY LTD
- IMERYS MINERALS CALIFORNIA, INC.
- IMERYS MINERALS HONG KONG LIMITED
- IMERYS MINERALS JAPAN KK
- IMERYS MINERALS OY
- IMERYS MINERALS USA, INC.
- IMERYS MINERAUX DE TUNISIE "IMT"
- IMERYS MINING DEVELOPMENT (QINGYANG) CO., LTD
- IMERYS NEWQUEST (INDIA) PRIVATE LIMITED
- IMERYS PAPER CARBONATES LLC
- IMERYS PARTICIPACOES LTDA
- IMERYS PERLITA PAULINIA MINERAIS LTDA
- IMERYS PIGMENTS TRADING (SHANGHAI) CO., LTD
- IMERYS PIGMENTS, INC.
- IMERYS REFRACTARIOS PARTICIPACOES MONTE DOURADO LTDA
- IMERYS REFRACTORY MINERALS INTERNATIONAL SALES
- IMERYS REFRACTORY MINERALS JAPAN KK
- IMERYS RIO CAPIM CAULIM SA
- IMERYS SPECIALITIES JAPAN CO., LTD
- IMERYS STEELCASTING DO BRASIL LTDA
- IMERYS STEELCASTING INDIA PRIVATE LIMITED
- IMERYS STEELCASTING USA, INC.

- IMERYS TABLEWARE BALKANS SRL
- IMERYS TABLEWARE CR S.R.O.
- IMERYS TABLEWARE GUANGZHOU CO., LTD
- IMERYS TABLEWARE NEW ZEALAND LTD
- IMERYS TALC CALIFORNIA, INC.
- IMERYS TALC DELAWARE, INC.
- IMERYS TALC OHIO, INC.
- IMERYS TALC SPAIN, S.A.
- IMERYS TC
- IMERYS TCSI SWITZERLAND SAGL
- IMERYS TECHNOLOGY CENTER AUSTRIA GMBH
- IMERYS TOITURE BELGIE N.V.
- IMERYS VOSTOK
- IMERYS WINDFARM PROJECT LTD
- IMERYS YILONG ANDALUSITE (XINJIANG) CO, LTD
- IMPALA ADMINCO LTD
- INDUSTRIALMIN
- ISOCON S.A.
- ITACA S.R.L.
- KAOLIN AUSTRALIA PTY LTD
- KAOLINS DE NOZAY (SOCIÉTÉ ANONYME DES)
- KAOPOLITE, INC.
- KERAPLAN GMBH
- KERN TECH 1
- KERN TECH 2
- KERN TECH 3
- KERNEOS DE MEXICO SA DE CV
- KERNEOS DO BRASIL COMERCIAL LTDA
- KERNEOS ESPANA SL
- KERNEOS HOLDING GROUP SAS
- KERNEOS HOLDING NORTH AMERICA, INC.
- KERNEOS HOLDING NORTHERN EUROPE LIMITED
- KERNEOS POLSKA SP. Z.O.O.
- KERNEOS SERVICIOS SA DE CV
- KILITEAM V
- KORUND D.O.O.
- KPCL K.V.S.
- LA FRANCAISE DES TUILES ET BRIQUES
- LAVIOSA PROMASA S.A.
- L-IMERYS INDUSTRIA E COMERCIO DE CAL LTDA
- LUXOL PHOTOVOLTAICS SN
- LUZENAC MICRO MILLING LIMITED
- MAGEMO SCI
- MASSA MINERALI SRL

- MATISCO DEVELOPPEMENT
- METALLEION METALLEYMATON
- METRAMCO (PTY) LTD
- MICRON-ITA INDUSTRIA E COMERCIO DE MINERAIS LTDA
- MINERAL HOLDINGS, INC.
- MINERALIEN SCHIFFAHRT SPEDITION UND TRANSPORT GMBH - MST
- MINERALS MILLING TUNISIA
- MINERALS TRADING, INC.
- MIRCAL ARGENTINA SRL
- MIRCAL ASIA
- MIRCAL AUSTRALIA PTY LTD
- MIRCAL BRESIL
- MIRCAL CHILI
- MIRCAL EUROPE
- MIRCAL TALC HOLDING
- MSL OVERSEAS LTD
- MULLITE COMPANY OF AMERICA – MULCOA
- N.G. JOHNSON (NORTHERN) HOLDINGS LIMITED
- N.G. JOHNSON LIMITED
- NIIGATA GCC LTD
- NIZEROLLES
- NYCO MINERALS CANADA, INC.
- ORGANIK MADENCILIK AS
- PABALK MADEN SANAYI VE TICARET A.S.
- PANSHI HUANYU WOLLASTONITE CO., LTD
- PARNASSE TRENTE ET UN
- PARNASSE TRENTE TROIS
- PARNASSE VINGT DEUX
- PERAMIN AB
- PERGEM MINERAL MADENCILIK SANAYI VE TICARET AS
- PERU MINERALS CORPORATION
- PERUCO, INC.
- PGB SA
- PLIBRICO INSTALLACIONES REFRACTARIAS
- PLIBRICO LTD
- PLR REFRACTAIRES SAS U
- PPSA OVERSEAS LTD
- PROFIMO
- PROPERTY COMPANY ONE
- PROPERTY COMPANY TWO
- PT BINAH SURINDAH CEMERLANG
- PT ESENSINDO CIPTA CEMERLANG
- PT INDOPORLEN
- PT INDOPORLEN SAKTI

- PT STOLLBERG - SAMIL INDONESIA
- PYRAMAX CERAMICS ARKANSAS, LLC
- PYRAMAX CERAMICS, LLC
- QA REFRACTORIES (PTY) LTD
- QINGDAO STOLLBERG & SAMIL CO., LTD
- QS ABRASIVI MARENGO SRL
- QUARTZ DE MAURITANIE SA
- RECURSOS MINERALES DEL NORTE, SA DE CV
- RT 043 MINERACAO LTDA
- RUMICO FEUERFESTE BAUSTOFFE GMBH
- S&B BENTONITE CHAOYANG CO., LTD
- S&B ENDUSTRIYEL MINERALLER A.S.
- S&B INDUSTRIAL MINERALS (HENAN) CO., LTD
- S&B INDUSTRIAL MINERALS (SHANGHAI) CO., LTD
- S&B INDUSTRIAL MINERALS (TIANJIN) CO., LTD
- S&B INDUSTRIAL MINERALS SPAIN S.L.U.
- S&B MINERALS FINANCE SARL
- S&B MINERALS LIMITED
- S&B MINERALS PARTICIPATIONS 2 SARL
- S&B MINERALS PARTICIPATIONS LLC
- S&B MINERALS US HOLDING GMBH
- S&B MINERALS VERWALTUNG GMBH
- S&B WINES S.A.
- SAMREC VERMICULITE (ZIMBABWE) (PRIVATE) LTD
- SCEA STE COLOMBE
- SCOVER PLUS
- SEG
- SERVICIOS PIEDRA TUMBANTE S.DE R.L. DE C.V.
- SET LININGS GMBH
- SIDEX MONOLITHIQUES SRL
- SILLA DE PAITA S.A.C.
- SLS BAUSTOFFE GESELLSCHAFT MBH
- SOCIEDAD MINERA CELITE DEL PERU SA
- SOCIETE DE VALORISATION DES MINERAUX INDUSTRIELS SAS
- SOTRIVAL
- SPRINDEALS SIX PTY LTD
- STOLLBERG & SAMI CO., LTD
- SUNWARD REFRACTORIES CO., Ltd
- TALIMMO
- TENNESSEE ELECTRO MINERALS, INC. – TECO
- TERMORAK AB
- TERMORAK OY
- TERMORAK (THAILAND) CO LTD
- TOKAI CERAMICS CO., LTD

- TREIBACHER SCHLEIFMITTEL ABRASIVES KAILI CO., LTD
- TREIBACHER SCHLEIFMITTEL ASIA LTD
- TREIBACHER SCHLEIFMITTEL INTERNATIONALE VERTRIEBS MBH
- TREIBACHER SCHLEIFMITTEL ITALIA P. MAROZZI & CO SAS
- UCM GROUP LTD
- UCM MAGNESIA, INC.
- UNITEC CERAMICS LIMITED
- VERMICULITE INTERNATIONAL SALES
- WORLD MINERALS AMERICA LATINA, SA
- WORLD MINERALS USD LLC
- WORLD MINERALS USD SARL
- YUEYANG IMERYS ANTAI MINERALS CO., LTD
- ZHENGZHOU JIANAI SPECIAL ALUMINATES CO., LTD
- ZHENGZHOU TREIBACHER SCHLEIFMITTEL TENGDA ABRASIVES CO., LTD

## SCHEDULE II

**Imerys Plan Proponents**

1. ALMATECH MINERAL INTERNATIONAL LIMITED
2. IMERTECH
3. IMERYS (SHANGHAI) INVESTMENT MANAGEMENT CO., LTD.
4. IMERYS CANADA INC.
5. IMERYS CARBONATES USA
6. IMERYS CLAYS, INC.
7. IMERYS DO BRASIL COMERCIO DE EXTRAÇAO DE MINÉRIOS
8. IMERYS FILTRATION MINERALS, INC.
9. IMERYS GRAPHITE & CARBON CANADA INC.
10. IMERYS JAPAN CO., LTD (f.k.a. IMERYS HIGH RESISTANCE MINERALS JAPAN KK)
11. IMERYS MICA KINGS MOUNTAIN INC.
12. IMERYS MINERALI SPA
13. IMERYS MINERALS INTERNATIONAL SALES S.A.
14. IMERYS MINERALS KOREA LTD
15. IMERYS PERFORMANCE AND FILTRATION MINERALS PRIVATE LIMITED
16. IMERYS RIO CAPIM CAULIM S.A.
17. IMERYS SERVICES
18. IMERYS SPECIALITIES JAPAN CO. LIMITED
19. IMERYS TALC AUSTRIA GMBH
20. IMERYS TALC BELGIUM
21. IMERYS TALC EUROPE
22. IMERYS TALC ITALY S.P.A.
23. IMERYS TALC LUZENAC FRANCE
24. IMERYS USA, INC.
25. IMERYS WOLLASTONITE USA, LLC
26. KENTUCKY-TENNESSEE CLAY COMPANY
27. MINERA ROCA RODANDO S. DE. R.L. DE C.V.
28. NYCO MINERALS, LLC

## SCHEDULE III

- ALMATECH MINERAL INTERNATIONAL LTD
- CEBO INTERNATIONAL B.V.
- ECCA MINERALS (PTY) LTD
- IMERTECH
- IMERYS
- IMERYS (SHANGHAI) INVESTMENT MANAGEMENT CO., LTD
- IMERYS ALMERIA, SA DE CV
- IMERYS ALUMINATES CORPORATE (f.k.a. KERNEOS CORPORATE SAS)
- IMERYS ALUMINATES SA
- IMERYS BEAUVOIR (f.k.a. IMERYS GREENELLE TROIS)
- IMERYS CANADA INC.
- IMERYS CARBONATES AUSTRIA GMBH
- IMERYS CARBONATES USA, INC.
- IMERYS CERAMICS (INDIA) PRIVATE LIMITED
- IMERYS CERAMICS (THAILAND) LTD
- IMERYS CERAMICS EGYPT
- IMERYS CERAMICS FRANCE
- IMERYS CLAYS, INC.
- IMERYS CLERAC (f.k.a. IMERYS REFRACTORY MINERALS CLERAC)
- IMERYS DO BRASIL COMERCIO
- IMERYS FILTRATION MINERALS, INC.
- IMERYS FUSED MINERALS (YINGKOU) CO., LTD
- IMERYS FUSED MINERALS SALTO LTDA
- IMERYS GRAPHITE & CARBON CANADA INC.
- IMERYS GRAPHITE & CARBON SWITZERLAND SA
- IMERYS INDUSTRIAL MINERALS GREECE S.A.
- IMERYS JAPAN CO., LTD (f/k/a IMERYS HIGH RESISTANCE MINERALS JAPAN KK)
- IMERYS LAUFENBURG GMBH (f.k.a. IMERYS FUSED MINERALS LAUFENBURG GMBH)
- IMERYS MICA KINGS MOUNTAIN, INC.
- IMERYS MIDDLE EAST HOLDING COMPANY W.L.L.
- IMERYS MINERALI SPA
- IMERYS MINERALS CHINA, INC.
- IMERYS MINERALS HOLDING LIMITED
- IMERYS MINERALS INTERNATIONAL SALES
- IMERYS MINERALS KOREA LTD
- IMERYS MINERALS LTD
- IMERYS MINERALS MALAYSIA SDN. BHD.
- IMERYS MINERAUX BELGIQUE SA
- IMERYS OILFIELD MINERALS, INC.
- IMERYS PACIFIC LTD

- IMERYS PERFORMANCE AND FILTRATION MINERALS PRIVATE LIMITED
- IMERYS PERLITA BARCELONA, S.A.
- IMERYS RE
- IMERYS REFRACTORY MINERALS USA, INC.
- IMERYS SERVICES
- IMERYS SERVICES GERMANY GMBH & CO. KG
- IMERYS SERVICES GREECE
- IMERYS SOUTH AFRICA (PTY) LTD
- IMERYS SOUTH EUROPE, S.L.
- IMERYS TABLEWARE FRANCE
- IMERYS TALC AUSTRALIA PTY LTD
- IMERYS TALC AUSTRIA GMBH
- IMERYS TALC BELGIUM
- IMERYS TALC EUROPE
- IMERYS TALC FINLAND OY
- IMERYS TALC GERMANY GMBH
- IMERYS TALC ITALY S.P.A.
- IMERYS TALC LUZENAC FRANCE
- IMERYS TALC UK HOLDING LTD
- IMERYS UK FINANCE LIMITED
- IMERYS UK LTD
- IMERYS UK PENSION FUND TRUSTEES LTD
- IMERYS USA, INC.
- IMERYS VILLACH GMBH (f.k.a. IMERYS FUSED MINERALS VILLACH GMBH)
- IMERYS WOLLASTONITE USA, LLC
- INDUSTRIA MACINAZIONE MINERALI PER L'INDUSTRIA CERAMICA S.P.A
- INDUSTRIAL MINERALS OF GREECE
- INSTALACIONES REFRACTARIAS C.A.
- KENTUCKY-TENNESSEE CLAY COMPANY
- LAVIOSA CHIMICA MINERARIA SPA
- MINERA ROCA RODANDO S. DE. R.L. DE C.V.
- MINERAL RESOURCES DEVELOPMENT (M.R.D.) CO. LTD
- MIRCAL
- MIRCAL DE MEXICO SA DE CV
- MIRCAL ITALIA SPA
- MONREFCO GMBH
- MRD-ECC CO. LTD
- NORTH AFRICAN INDUSTRIAL MINERAL EXPLORATION SARL - NAIMEX
- NYCO MINERALS, LLC
- PPSA
- PYRAMAX CERAMICS SOUTHEAST, LLC
- REFRACTORY MINERALS (PTY) LTD
- S&B MINERALS PARTICIPATIONS SARL
- SIBIMIN OVERSEAS LTD

- TYGERKLOOF MINING (PTY) LTD
- VIOLET CACTUS, INC. (F.K.A. CALDERYS USA, INC.)
- XINYANG ATHENIAN MINING CO., LTD
- FORMER AFFILIATES
- 11656490 CANADA INC.
- ADVANCED MINERALS CORPORATION
- AFRICA REFRACTORY CONSULTANTS (PTY) LTD
- AKROTIRIO TRAHILAS TRIA S.A.
- ANADOLU PERLIT MEDENCILIK SANAYI
- ANGANG STOLLBERG & SAMIL CO., LTD
- ARC FUSED ALUMINA
- AREFCON B.V.
- AREFCON HISMA B.V.
- ASSOS MERMER SANAYI VE TICARET LTD SIRKETI
- AUSTRALIAN VERMICULITE INDUSTRIES (PTY) LTD
- B & B REFRACTORY SERVICES PTY LTD
- BAOTOU JINGYUAN GRAPHITE CO., LTD
- BLX TRADING SAS
- CARBONATOS ANDINOS SA
- CELITE MEXICANA, SA DE CV
- CHANGBAI CELITE DIATOMITE CO., LTD
- CHOICEWISE LIMITED
- CONDIMENTUM OY
- DAMOLIN ETRECHY
- DAMOLIN GMBH
- DAMOLIN INVESTMENT A/S
- DOLPHIN FELDSPAR PRIVATE LIMITED
- ECC OVERSEAS INVESTMENTS LTD
- ECC PACIFIC (AUSTRALIA) PTY LTD
- ECCA CALCIUM PRODUCTS, INC.
- EDWIN H. BRADLEY HOLDINGS LTD
- ELMIN BAUXITES S.R.L.
- ENGLISH CHINA CLAYS LTD
- EUROPE COMMERCE REFRACTORY
- FAGERSTA ELDFASTA AB
- FEL-MAC COMPANY LLC
- FIBERLEAN TECNOLOGIA E SOLUCOES EIRELI
- FOKIS MINING PARK
- GOONAMARRIS LIMITED
- GRAN BIANCO CARRARA SRL
- GUIYANG JIANAI SPECIAL ALUMINATES
- GUIZHOU S&B NEW-TYPE MATERIALS CO., LTD
- GUIZHOU STAR MINERALS CO., LTD
- GUNUNG IMBANGAN SDN. BHD

- HARBORLITE (UK) LTD
- HAZNEDAR DURER DIŞ TİCARET A.Ş (f.k.a. VENDER ENDÜSTRIYEL MALZEMELERI TICARET A.S.)
- HAZNEDAR DURER REFRAKTER MALZEMELERI SANAYI VE TICARET A.S.
- HAZNEDAR GMBH
- HJM INDUSTRIES SDN. BHD
- IGM FOR FIBRE GLASS
- IMERPLAST UK LIMITED
- IMERYS (SHANGHAÏ) FILTRATION MINERALS TRADING CO., LTD
- IMERYS ADVANCED MATERIALS (YINGKOU) CO., LTD
- IMERYS ALÜMİNÄT DIS TICARET
- IMERYS ALUMINATES ASIA PACIFIC PTE LTD
- IMERYS ALUMINATES GMBH
- IMERYS ALUMINATES GROUPE (f.k.a. KERNEOS GROUP SAS)
- IMERYS ALUMINATES ITALIA S.R.L.
- IMERYS ALUMINATES NORDIC AB
- IMERYS ARGENTINA SRL
- IMERYS BAUXITE SA (f.k.a. ELMIN BAUXITES SA)
- IMERYS BENTONITE ITALY S.P.A.
- IMERYS BENTONITE USA, LLC
- IMERYS CALCIUM SOLUTIONS AUSTRIA GMBH
- IMERYS CANADA 2004, INC.
- IMERYS CANADA LP
- IMERYS CARBONATES LLC
- IMERYS CERAMICS ESPAÑA
- IMERYS CERAMICS ITALIA
- IMERYS CSI SWITZERLAND SAGL
- IMERYS DIATOMITA MEXICO, SA DE CV
- IMERYS FINE CHEMICAL (CHANGSHU) CO., LTD
- IMERYS FUSED MINERALS (TAICANG) CO., LTD
- IMERYS FUSED MINERALS (ZIBO) CO., LTD
- IMERYS FUSED MINERALS HULL LIMITED
- IMERYS GRAPHITE & CARBON (CHANGZHOU) CO., LTD
- IMERYS GRAPHITE & CARBON GERMANY GMBH
- IMERYS GRAPHITE & CARBON USA, INC.
- IMERYS ITATEX SOLUCOES MINERAIS LTDA
- IMERYS KAOLIN BELGIUM
- IMERYS METALCASTING FRANCE SARL
- IMERYS METALCASTING GERMANY GMBH
- IMERYS MICA SUZORITE INC.
- IMERYS MINERAL AB
- IMERYS MINERALES ESPANA, S.L.
- IMERYS MINERALES SANTIAGO LIMITADA
- IMERYS MINERALI GAMALERO SRL

- IMERYS MINERALS (HEZHOU) CO., LTD
- IMERYS MINERALS (INDIA) PRIVATE LIMITED
- IMERYS MINERALS (TAIWAN) LTD
- IMERYS MINERALS AUSTRALIA PTY LTD
- IMERYS MINERALS CALIFORNIA, INC.
- IMERYS MINERALS HONG KONG LIMITED
- IMERYS MINERALS JAPAN KK
- IMERYS MINERALS OY
- IMERYS MINERALS USA, INC.
- IMERYS MINING DEVELOPMENT (QINGYANG) CO., LTD
- IMERYS PAPER CARBONATES LLC
- IMERYS PARTICIPACOES LTDA
- IMERYS PERLITA PAULINIA MINERAIS LTDA
- IMERYS PIGMENTS TRADING (SHANGHAI) CO., LTD
- IMERYS PIGMENTS, INC.
- IMERYS REFRACTARIOS PARTICIPACOES MONTE DOURADO LTDA
- IMERYS REFRACTORY MINERALS INTERNATIONAL SALES
- IMERYS REFRACTORY MINERALS JAPAN KK
- IMERYS RIO CAPIM CAULIM SA
- IMERYS SPECIALITIES JAPAN CO., LTD
- IMERYS STEELCASTING DO BRASIL LTDA
- IMERYS STEELCASTING INDIA PRIVATE LIMITED
- IMERYS STEELCASTING USA, INC.
- IMERYS TABLEWARE BALKANS SRL
- IMERYS TABLEWARE CR S.R.O.
- IMERYS TABLEWARE GUANGZHOU CO., LTD
- IMERYS TABLEWARE NEW ZEALAND LTD
- IMERYS TALC CALIFORNIA, INC.
- IMERYS TALC DELAWARE, INC.
- IMERYS TALC OHIO, INC.
- IMERYS TALC SPAIN, S.A.
- IMERYS TCSI SWITZERLAND SAGL
- IMERYS TECHNOLOGY CENTER AUSTRIA GMBH
- IMERYS WINDFARM PROJECT LTD
- IMERYS YILONG ANDALUSITE (XINJIANG) CO, LTD
- IMPALA ADMINCO LTD
- INDUSTRIALMIN
- ITACA S.R.L.
- KAOLIN AUSTRALIA PTY LTD
- KAOPOLITE, INC.
- KERAPLAN GMBH
- KERN TECH 1
- KERN TECH 2
- KERN TECH 3

- KERNEOS DE MEXICO SA DE CV
- KERNEOS DO BRASIL COMERCIAL LTDA
- KERNEOS ESPANA SL
- KERNEOS HOLDING GROUP SAS
- KERNEOS HOLDING NORTH AMERICA, INC.
- KERNEOS HOLDING NORTHERN EUROPE LIMITED
- KERNEOS POLSKA SP. Z.O.O.
- KERNEOS SERVICIOS SA DE CV
- KILITEAM V
- KORUND D.O.O.
- KPCL K.V.S.
- L-IMERYS INDUSTRIA E COMERCIO DE CAL LTDA
- LUZENAC MICRO MILLING LIMITED
- MASSA MINERALI SRL
- METALLEION METALLEYMATON
- METRAMCO (PTY) LTD
- MICRON-ITA INDUSTRIA E COMERCIO DE MINERAIS LTDA
- MINERAL HOLDINGS, INC.
- MINERALIEN SCHIFFAHRT SPEDITION UND TRANSPORT GMBH - MST
- MINERALS MILLING TUNISIA
- MINERALS TRADING, INC.
- MIRCAL ARGENTINA SRL
- MIRCAL ASIA
- MIRCAL AUSTRALIA PTY LTD
- MIRCAL BRESIL
- MIRCAL CHILI
- MIRCAL EUROPE
- MIRCAL TALC HOLDING
- MSL OVERSEAS LTD
- MULLITE COMPANY OF AMERICA – MULCOA
- N.G. JOHNSON (NORTHERN) HOLDINGS LIMITED
- N.G. JOHNSON LIMITED
- NIIGATA GCC LTD
- NYCO MINERALS CANADA, INC.
- ORGANIK MADENCILIK AS
- PABALK MADEN SANAYI VE TICARET A.S.
- PANSHI HUANYU WOLLASTONITE CO., LTD
- PERAMIN AB
- PERGEM MINERAL MADENCILIK SANAYI VE TICARET AS
- PERU MINERALS CORPORATION
- PERUCO, INC.
- PGB SA
- PLR REFRACTAIRES SAS U
- PPSA OVERSEAS LTD

- PROPERTY COMPANY ONE
- PROPERTY COMPANY TWO
- PT BINAH SURINDAH CEMERLANG
- PT ESENSINDO CIPTA CEMERLANG
- PT INDOPORLEN
- PT INDOPORLEN SAKTI
- PT STOLLBERG - SAMIL INDONESIA
- PYRAMAX CERAMICS ARKANSAS, LLC
- PYRAMAX CERAMICS, LLC
- QA REFRACTORIES (PTY) LTD
- QINGDAO STOLLBERG & SAMIL CO., LTD
- QS ABRASIVI MARENGO SRL
- QUARTZ DE MAURITANIE SA
- RECURSOS MINERALES DEL NORTE, SA DE CV
- RT 043 MINERACAO LTDA
- RUMICO FEUERFESTE BAUSTOFFE GMBH
- S&B BENTONITE CHAOYANG CO., LTD
- S&B ENDUSTRIYEL MINERALLER A.S.
- S&B INDUSTRIAL MINERALS (HENAN) CO., LTD
- S&B INDUSTRIAL MINERALS (SHANGHAI) CO., LTD
- S&B INDUSTRIAL MINERALS (TIANJIN) CO., LTD
- S&B INDUSTRIAL MINERALS SPAIN S.L.U.
- S&B MINERALS FINANCE SARL
- S&B MINERALS LIMITED
- S&B MINERALS PARTICIPATIONS 2 SARL
- S&B MINERALS PARTICIPATIONS LLC
- S&B MINERALS US HOLDING GMBH
- S&B MINERALS VERWALTUNG GMBH
- SAMREC VERMICULITE (ZIMBABWE) (PRIVATE) LTD
- SERVICIOS PIEDRA TUMBANTE S.DE R.L. DE C.V.
- SET LININGS GMBH
- SIDEX MONOLITHIQUES SRL
- SILLA DE PAITA S.A.C.
- SLS BAUSTOFFE GESELLSCHAFT MBH
- SOCIEDAD MINERA CELITE DEL PERU SA
- SOCIETE DE VALORISATION DES MINERAUX INDUSTRIELS SAS
- SPRINDEALS SIX PTY LTD
- STOLLBERG & SAMI CO., LTD
- SUNWARD REFRACTORIES CO., Ltd
- TENNESSEE ELECTRO MINERALS, INC. – TECO
- TERMORAK AB
- TERMORAK OY
- TERMORAK (THAILAND) CO LTD
- TOKAI CERAMICS CO., LTD

- TREIBACHER SCHLEIFMITTEL ABRASIVES KAILI CO., LTD
- TREIBACHER SCHLEIFMITTEL ASIA LTD
- TREIBACHER SCHLEIFMITTEL INTERNATIONALE VERTRIEBS MBH
- TREIBACHER SCHLEIFMITTEL ITALIA P. MAROZZI & CO SAS
- UCM GROUP LTD
- UCM MAGNESIA, INC.
- UNITEC CERAMICS LIMITED
- VERMICULITE INTERNATIONAL SALES
- WORLD MINERALS AMERICA LATINA, SA
- WORLD MINERALS USD LLC
- WORLD MINERALS USD SARL
- YUEYANG IMERYS ANTAI MINERALS CO., LTD
- ZHENGZHOU JIANAI SPECIAL ALUMINATES CO., LTD
- ZHENGZHOU TREIBACHER SCHLEIFMITTEL TENGDA ABRASIVES CO., LTD

### SCHEDULE IV

**Rio Tinto Captive Insurer Policies**

| Issuing Insurer | Policy No. | Policy Period |
|---|---|---|
| Metals and Minerals Insurance Pte. Limited | M&M GL/97-98/001 | 5/31/1997 - 5/31/1998 |
| Three Crowns Insurance Company Limited | 98162 | 5/31/1998 - 5/31/1999 |
| Three Crowns Insurance Company Limited | 98162 | 5/31/1999 - 5/31/2000 |
| Three Crowns Insurance Company Limited | 98162 | 5/31/2000 - 5/31/2001 |
| Three Crowns Insurance Company Limited | 98162/01 | 5/31/2001 - 5/31/2002 |
| Three Crowns Insurance Company Limited | 98162/02 | 5/31/2002 - 5/31/2003 |
| Three Crowns Insurance Company Limited | 98162/02A | 5/31/2002 - 5/31/2003 |
| Three Crowns Insurance Company Limited | 98162/02B | 5/31/2002 - 5/31/2003 |
| Three Crowns Insurance Company Limited | 98162/03 | 5/31/2003 - 5/31/2004 |
| Three Crowns Insurance Company Limited | 98162/04 | 5/31/2004 - 5/31/2005 |

| Issuing Insurer | Policy No. | Policy Period |
|---|---|---|
| Three Crowns Insurance Company Limited | 98162/05 | 5/31/2005 - 5/31/2006 |
| Three Crowns Insurance Company Limited | 98162/06/A | 5/31/2006 - 5/31/2007 |
| Falcon Insurance Ltd. | 98162/06/C | 5/31/2006 - 5/31/2007 |
| Metals and Minerals Insurance Pte. Limited | 98162/07/B | 5/31/2007 - 5/31/2008 |
| Falcon Insurance Ltd. | 98162/07/C | 5/31/2007 - 5/31/2008 |
| Metals and Minerals Insurance Pte. Limited | 98162/08/B | 5/31/2008 - 5/31/2009 |
| Falcon Insurance Ltd. | 98162/08/C | 5/31/2008 - 5/31/2009 |
| Metals and Minerals Insurance Pte. Limited | 98162/09/B | 5/31/2009 - 5/31/2010 |
| Falcon Insurance Ltd. | 98162/09/C | 5/31/2009 - 5/31/2010 |
| Metals and Minerals Insurance Pte. Limited | 98162/10/B | 5/31/2010 - 5/31/2011 |
| Falcon Insurance Ltd. | 98162/10/C | 5/31/2010 - 5/31/2011 |
| Metals and Minerals Insurance Pte. Limited | 98162/11/B | 5/31/2011 - 5/31/2012 |
| Falcon Insurance Ltd. | 98162/11/C | 5/31/2011 - 5/31/2012 |

## <u>SCHEDULE V</u>

### Rio Tinto Corporate Parties

- 1043802 Ontario Ltd
- 10676276 Canada Inc.
- 1109723 B.C. Ltd.
- 15304644 Canada Inc.
- 16140467 Canada Inc.
- 201 Logistics Center, LLC
- 7600 West Center, LLC
- 9519-2845 Quebec inc.
- AGM Holding Company Pte. Ltd.
- Alcan Asia Limited
- Alcan Betriebs- und Verwaltungsgesellschaft GmbH
- Alcan Chemicals Limited
- Alcan Composites Brasil Ltda
- Alcan Corporation
- Alcan Farms Limited
- Alcan Gove Development Pty Limited
- Alcan Holdings Australia Pty Limited
- Alcan Holdings Europe B.V.
- Alcan Holdings Nederland B.V.
- Alcan International Network U.S.A. Inc.
- Alcan Lebensmittelverpackungen GmbH
- Alcan Management Services Canada Limited / Societe de Services de Gestion Alcan Canada Limitee
- Alcan Northern Territory Alumina Pty Limited
- Alcan Packaging Mühltal Gmbh & Co. KG
- Alcan Primary Metal Australia Pty Ltd
- Alcan Primary Products Company LLC
- Alcan Primary Products Corporation
- Alcan Realty Limited / Societe Immobiliere Alcan Limitee
- Alcan South Pacific Pty Ltd
- Alufluor AB
- Aluminerie Alouette Inc.
- Aluminerie De Bécancour, Inc.
- Aluminium & Chemie Rotterdam B.V.
- AML Properties Pty Ltd
- Anglesey Aluminium Metal Limited
- AP Service
- Argyle Diamond Mines Pty Limited
- Argyle Diamonds Pty Limited
- Arizona Sonoran Copper Company Inc.

- Ashton Mining Pty Ltd
- Ashton Nominees Pty Limited
- Asia Gold Mongolia LLC
- Australia-Japan Innovation Fund
- Australian Coal Holdings Pty. Limited
- Australian Integrated Carbon Pty Ltd
- Australian Mining & Smelting Pty Ltd
- Bao-HI Ranges Joint Venture
- Beijing Iron Ore Trading Centre Corporation
- BetterIron - Texas Inc.
- Boké Investment Company
- Boké Services Company SA
- Boké Services Management, Inc.
- Boké Trading Inc.
- Borax España, S.A.
- Borax Europe Limited
- Borax Francais
- Borax Malaysia Sdn Bhd
- Borax Rotterdam BV
- Boyne Smelters Limited
- British Alcan Aluminium Limited
- C.V.G. Bauxilum C.A.
- Canning Resources Pty Limited
- CanPacific Potash Inc.
- Cape Bougainville Joint Venture
- Capricorn Diamonds Investments Pty Limited
- Carbon Capture, Inc.
- Cathjoh Holdings Pty Limited
- Channar Management Services Pty Limited
- Channar Mining Pty Ltd
- Chlor Alkali Unit Pte Ltd
- CIA. Inmobiliaria e Inversiones Cosmos S.A.C.
- ClearFlame Engines, Inc.
- Compagnie des Bauxites de Guinée
- Compania de Transmision Sierraoriente S.A.C.
- Consórcio de Alumínio do Maranhão
- CRA Investments Pty. Limited
- CRA Pty Ltd
- Cuprum Metals Pte. Ltd.
- Dampier Salt Limited
- Daybreak Development LLC
- Daybreak Property Holdings LLC
- Daybreak Secondary Water Distribution Company
- Daybreak Water Holding LLC

- DB Medical I LLC
- DBVC1 LLC
- Diavik Diamond Mines (2012) Inc.
- Donkerpoort Iron Ltd
- Dual Listed Company Structure
- Eastland Management Inc.
- Electralith Pty Ltd
- Electric Hydrogen Co.
- Electric Power Generation Limited
- Element North 21 GP Inc. / Element Nord 21 GP Inc.
- Element North 21 Limited Partnership / Elément Nord 21 Société en Commandite
- Elysis Limited Partnership / Elysis Societe en Commandite
- Empresa de Mineracao Finesa Ltda.
- Endurvinnslan Ltd.
- Energy Resources of Australia Ltd
- Entrée Resources Ltd.
- Evok Fund II (International) Limited Partnership
- Evolys Quebec inc.
- Excelsior-Nuton
- Exeltium
- Fabrica De Plasticos Mycsa, S.A.
- Flambeau Mining Company
- Fondation Rio Tinto
- France Aluminium Recyclage Sa
- Fundsprops Pty. Limited
- Giampaolo (Indiana) Realty, LLC
- Giampaolo W. Rapids Realty, LLC
- Gladstone Infrastructure Pty Ltd
- Gladstone Power Station Joint Venture
- Global Commodities Holdings Limited
- Global Hubco BV
- Globalore Pte. Ltd.
- Gobi Oyu Development Support Fund
- Gove Aluminium Ltd
- GPS Energy Pty Limited
- GPS Nominee Pty Limited
- GPS Power Pty. Limited
- Green Mountain Mining Venture
- Gulf Power Company / La Compagnie Gulf Power
- Halco (Mining) Inc.
- Hamersley Exploration Pty Limited
- Hamersley HMS Pty Ltd
- Hamersley Holdings Limited
- Hamersley Iron - Yandi Pty Limited

- Hamersley Iron Pty. Limited
- Hamersley Resources Limited
- Hamersley WA Pty Ltd
- Henlopen Manufacturing Co., Inc.
- Heruga Exploration LLC
- High Purity Iron Inc.
- HIsmelt Corporation Pty Limited
- Hope Downs Joint Venture
- Hope Downs Marketing Company Pty Ltd
- Hunter Valley Resources Pty Ltd
- IEA Coal Research Limited
- IEA Environmental Projects Limited
- Integrity Land and Cattle LLC
- InterEmballage
- IOC Sales Limited
- Iron Company of Texas LLC
- Iron Ore Company of Canada
- Jadar Free Zone Management Company DOO Beograd - Novi Beograd
- Johcath Holdings Pty Limited
- Juna Station Pty Ltd
- Kalimantan Gold Pty Limited
- Kelian Pty. Limited
- Kembla Coal & Coke Pty. Limited
- Kennecott Barneys Canyon Mining Company
- Kennecott Exploration Company
- Kennecott Holdings Corporation
- Kennecott Land Company
- Kennecott Land Investment Company LLC
- Kennecott Nevada Copper Company
- Kennecott Ridgeway Mining Company
- Kennecott Royalty Company
- Kennecott Services Company
- Kennecott Uranium Company
- Kennecott Utah Copper LLC
- Kennecott Water Distribution LLC
- Korgantas LLP
- Kutaibar Holdings Pty Ltd
- La Compagnie du Transguinéen S.A.
- La Granja Holdings Nominees Limited
- La Granja UK Holdings Limited
- Lao Sanxai Minerals Sole Company Limited
- Lawson Mardon Flexible Limited
- Lawson Mardon Smith Brothers Ltd.
- Lithium Extraction Technologies (Australia) Pty Ltd

- Lumo Analytics Oy
- Magma Arizona Railroad Company
- Matalco Bluffton LLC
- Matalco Canada Inc.
- Matalco Kentucky LLC
- Matalco Lordstown Realty LLC
- Matalco USA, LLC
- Matalco Wisconsin LLC
- McEwen Copper Inc.
- Metallwerke Refonda AG
- Metals & Minerals Insurance Pte. Limited
- Minera Escondida Ltda
- Minera IRL Limited
- Minera Kennecott, S.A. de C.V.
- Minera La Granja S.A.C.
- Mineração Rio do Norte S.A.
- Mineracao Tabuleiro Ltda
- MineSmith Australasia Pty Ltd
- Minmetals Rio Tinto Exploration Company Limited
- Mitchell Plateau Bauxite Co. Pty. Limited
- Mitchell Plateau Joint Venture
- M-Map Technologies Inc.
- Mount Bruce Mining Pty Limited
- Mutamba Mineral Sands S.A.
- Nano One Materials Corp.
- Natural Diamond Council Limited
- NBH Pty Ltd
- NCT Holdco, LLC (dba Aymium)
- New Zealand Aluminium Smelters Ltd
- Nhulunbuy Corporation Limited
- Norgold Pty Limited
- North Gold (W.A.) Pty Ltd
- North Insurances Pty. Ltd.
- North IOC (Bermuda) Holdings Limited
- North IOC (Bermuda) Limited
- North IOC Holdings Pty Ltd
- North Limited
- North Mining Limited
- Nuevo Cobre S.A.
- Nuton Holdings Limited
- Nuton LLC
- Nyabarongo Mining and Exploration Limited
- NZAS Retirement Fund Trustee Limited
- Ohio Valley Aluminum Company, LLC

- Ovaco LLC
- Oyu Tolgoi Catalyst Fund for Khanbogd Development
- Oyu Tolgoi LLC
- Oyu Tolgoi Netherlands BV
- Pacific Aluminium (New Zealand) Limited
- Pacific Aluminium Pty. Limited
- Pacific Coast Mines, Inc.
- Panguna Legacy Assessment Company Limited
- Pechiney Aviatube Limited
- Pechiney Bâtiment
- Pechiney Bécancour, Inc.
- Pechiney Cast Plate, Inc.
- Pechiney Consolidated Australia Pty Limited
- Pechiney Holdings, Inc.
- Pechiney Metals LLC
- Pechiney Plastic Packaging, Inc.
- Pechiney Reynolds Quebec, Inc.
- Pechiney Sales Corporation
- Peko Exploration Pty Ltd.
- Peko-Wallsend Pty Ltd
- Pilbara Iron Company (Services) Pty Ltd
- Pilbara Iron Pty Ltd
- Port d'Ehoala S.A.
- Procivis Savoie
- Project Generation Group Pty Ltd
- PT Hutan Lindung Kelian Lestari
- PT Kelian Equatorial Mining
- QIT Madagascar Minerals Ltd
- QIT Madagascar Minerals SA
- Quebec North Shore and Labrador Railway Company Inc. / Compagnie de Chemin de Fer du Littoral Nord de Quebec et du Labrador Inc.
- Queensland Alumina Limited
- Queensland Coal Pty. Limited
- Ranges Management Company Pty Ltd
- Ranges Mining Pty Ltd
- Regeneration Enterprises, Inc.
- Regulus Resources Inc.
- Resolution Copper Company
- Resolution Copper Mining LLC
- Rhodes Ridge Account Manager Pty Ltd
- Rhodes Ridge Joint Venture
- Rhodes Ridge Management Services Pty Ltd
- Richards Bay Mining (Proprietary) Limited
- Richards Bay Mining Holdings (Proprietary) Limited

- Richards Bay Titanium (Proprietary) Limited
- Richards Bay Titanium Holdings (Proprietary) Limited
- Rightship Pty Ltd
- Rincon Mining Pty Limited
- Rio de Contas Desenvolvimentos Minerais Ltda
- Rio Santa Rita Empreenimentos e-Particiacoes Ltda
- Rio Sava Exploration DOO
- Rio Tinto (Commercial Paper) Limited
- Rio Tinto Advisory Services Pty Limited
- Rio Tinto Alcan Fund Inc.
- Rio Tinto Alcan Inc.
- Rio Tinto Alcan International Ltd. / Rio Tinto Alcan International Ltee
- Rio Tinto Alcan Technology Pty Ltd
- Rio Tinto Aluminium (Bell Bay) Limited
- Rio Tinto Aluminium (Holdings) Limited
- Rio Tinto Aluminium Bell Bay Sales Pty Limited
- Rio Tinto Aluminium Limited
- Rio Tinto Aluminium Pechiney
- Rio Tinto Aluminium Services Pty Limited
- Rio Tinto America Holdings Inc.
- Rio Tinto America Inc.
- Rio Tinto Angola (SU), LDA.
- Rio Tinto Asia Ltd
- Rio Tinto Asia Pty. Limited
- Rio Tinto AuM Company
- Rio Tinto Australian Holdings Limited
- Rio Tinto Bahia Holdings Limited
- Rio Tinto Biofuels Pty Ltd
- Rio Tinto BM Limited
- Rio Tinto BM Subsidiary Limited
- Rio Tinto Canada Finance Limited
- Rio Tinto Canada Inc
- Rio Tinto Canada Management Inc./ Rio Tinto Gestion Canada Inc.
- Rio Tinto Chile SpA
- Rio Tinto Closure Pty Limited
- Rio Tinto Coal (Clermont) Pty Ltd
- Rio Tinto Coal Australia Pty Limited
- Rio Tinto Coal NSW Holdings Limited
- Rio Tinto Commercial Americas Inc.
- Rio Tinto Commercial GmbH
- Rio Tinto Commercial Pte. Ltd.
- Rio Tinto Copper Holdings Limited
- Rio Tinto Copper Limited
- Rio Tinto Desenvolvimentos Minerais Ltda.

- Rio Tinto Diamonds Netherlands B.V.
- Rio Tinto Diamonds NV
- Rio Tinto do Brasil Ltda.
- Rio Tinto Eastern Investments B.V.
- Rio Tinto EN21 Australia Pty Ltd
- Rio Tinto EN21 Op Co Pty Limited
- Rio Tinto Energy America Inc.
- Rio Tinto Energy and Climate Investments Australia Pty Ltd
- Rio Tinto Energy and Climate Investments Canada Inc./Rio Tinto Investissements Énergie et Climat Canada Inc.
- Rio Tinto Energy Development LLC
- Rio Tinto Energy Limited
- Rio Tinto Energy Services Inc.
- Rio Tinto Energy Services Pty Ltd
- Rio Tinto Escondida Limited
- Rio Tinto European Holdings Limited
- Rio Tinto Exploration (Asia) Holdings Pte. Ltd.
- Rio Tinto Exploration (PNG) Limited
- Rio Tinto Exploration Angola (SU), Limitada
- Rio Tinto Exploration Canada Inc.
- Rio Tinto Exploration Dunav d.o.o. Beograd - Novi Beograd
- Rio Tinto Exploration Finland OY
- Rio Tinto Exploration India Private Limited
- Rio Tinto Exploration Kazakhstan LLP
- Rio Tinto Exploration Pty Limited
- Rio Tinto Exploration Rwanda Limited
- Rio Tinto Exploration Zambia Limited
- Rio Tinto FalCon Diamonds Inc.
- Rio Tinto Fer et Titane inc.
- Rio Tinto Finance (Rhodes Ridge) Pty Ltd
- Rio Tinto Finance (USA) Inc.
- Rio Tinto Finance (USA) Limited
- Rio Tinto Finance (USA) plc
- Rio Tinto Finance Limited
- Rio Tinto Finance plc
- Rio Tinto France S.A.S.
- Rio Tinto Global Employment Company Pte. Ltd.
- Rio Tinto Guinée S.A.
- Rio Tinto Holding PNG Limited
- Rio Tinto Holdings LLC
- Rio Tinto Hydrogen Energy LLC
- Rio Tinto Iceland Ltd.
- Rio Tinto India Private Limited
- Rio Tinto Indonesian Holdings Limited

- Rio Tinto International Holdings Limited
- Rio Tinto Investments One Pty Limited
- Rio Tinto Investments Two Pty Limited
- Rio Tinto Iron & Titanium (Suzhou) Co., Ltd
- Rio Tinto Iron & Titanium GmbH
- Rio Tinto Iron & Titanium Holdings GmbH
- Rio Tinto Iron & Titanium Limited
- Rio Tinto Iron and Titanium Canada Inc. / Rio Tinto Fer et Titane Canada Inc.
- Rio Tinto Iron Ore (Pilbara) Sales Pty Ltd
- Rio Tinto Iron Ore Atlantic Limited
- Rio Tinto Iron Ore Europe S.A.S.
- Rio Tinto Iron Ore Trading China Limited
- Rio Tinto Japan Limited
- Rio Tinto Jersey Holdings 2010 Limited
- Rio Tinto Korea Ltd
- Rio Tinto Limited
- Rio Tinto London Limited
- Rio Tinto Management Services South Africa (Proprietary) Ltd
- Rio Tinto Marketing Pte. Ltd.
- Rio Tinto Medical Plan Trustees Limited
- Rio Tinto Metals Limited
- Rio Tinto Mineracao do Brasil Ltda
- Rio Tinto Minerals Asia Pte Ltd
- Rio Tinto Minerals Development (Lao) Sole Co., Ltd.
- Rio Tinto Minerals Development Limited
- Rio Tinto Minerals Exploration (Beijing) Co., Ltd
- Rio Tinto Minerals Inc.
- Rio Tinto Minerals Investments Africa Limited
- Rio Tinto Minerals Limited
- Rio Tinto Mining and Exploration Inc.
- Rio Tinto Mining and Exploration Limited
- Rio Tinto Mining and Exploration S.A.C.
- Rio Tinto Mining Commercial (Shanghai) Co., Ltd.
- Rio Tinto Mongolia LLC
- Rio Tinto Nominees Limited
- Rio Tinto Orissa Mining Private Ltd
- Rio Tinto OT Management Limited
- Rio Tinto Overseas Holdings Limited
- Rio Tinto PACE Australia Pty Limited
- Rio Tinto PACE Canada Inc. / Gestion Rio Tinto PACE Canada Inc.
- Rio Tinto Pension Fund Trustees Limited
- Rio Tinto plc
- Rio Tinto Potash Management Inc. / Rio Tinto Potasse Management Inc.
- Rio Tinto Procurement (Singapore) Pte Ltd

- Rio Tinto Pte Ltd
- Rio Tinto Saskatchewan Potash Holdings General Partner Inc.
- Rio Tinto Saskatchewan Potash Holdings Limited Partnership
- Rio Tinto Secretariat Limited
- Rio Tinto Services Inc.
- Rio Tinto Services Limited
- Rio Tinto Shared Services Pty Limited
- Rio Tinto Shipping (Asia) Pte. Ltd.
- Rio Tinto Shipping Pty. Limited.
- Rio Tinto Simfer UK Limited
- Rio Tinto Singapore Holdings Pte Ltd
- Rio Tinto South East Asia Limited
- Rio Tinto Staff Fund (Retired) Pty Limited
- Rio Tinto Sulawesi Holdings Limited
- Rio Tinto Switzerland AG (SA/Ltd.)
- Rio Tinto Technological Resources Inc.
- Rio Tinto Technological Resources UK Limited
- Rio Tinto Technology Holdings Corporation
- Rio Tinto Trading (Shanghai) Co., Ltd.
- Rio Tinto Western Holdings Limited
- Rio Tinto Winu Pty Limited
- Riversdale Connections (Proprietary) Ltd
- Robe River Iron Associates Joint Venture
- Robe River Limited
- Robe River Mining Co. Pty. Ltd.
- Robe River Ore Sales Pty. Ltd.
- Rocklea Station Pty Ltd
- Rondo Energy, Inc.
- RTA AAL Australia Limited
- RTA Boyne Limited
- RTA Gove Pty Limited
- RTA Holdco 1 Limited
- RTA Holdco 4 Limited
- RTA Holdco 8 Limited
- RTA Holdco Australia 1 Pty Ltd
- RTA Holdco Australia 3 Pty Ltd
- RTA Holdco Australia 5 Pty Ltd
- RTA Holdco Australia 6 Pty Ltd
- RTA HOLDCO FRANCE 1 S.A.S.
- RTA HOLDCO FRANCE 2 S.A.S.
- RTA Pacific Pty Limited
- RTA Sales Pty Ltd
- RTA Smelter Development Pty Limited
- RTA Weipa Pty Ltd

- RTA Yarwun Pty Ltd
- RTAlcan 2 LLC
- RTAlcan 3 LLC
- RTLDS Aus Pty Ltd
- RTLDS UK Limited
- RTPDS Aus Pty Ltd
- Saryarka B.V.
- Scheuch Unterstuetzungskasse GmbH
- Sharp Investment Holding Company Pte. Ltd.
- Simfer InfraCo Guinée S.A.
- Simfer InfraCo Ltd
- Simfer Jersey Limited
- Simfer Jersey Nominee Limited
- Simfer Marine Guinee S.A.
- SIMFER S.A.
- Simfer TSV Holdco Pte. Ltd
- Singapore Metals Pte. Ltd.
- Skymont Corporation
- Société Départementale De Développement 65
- Société Minière Et De Participations Guinée-Alusuisse
- Sohar Aluminium Co. L.L.C.
- Sohio Western Mining Company
- Solwezi Metals Exploration Limited
- Southern Copper Pty. Limited
- Sovereign Metals Limited
- Star Diamond Corporation
- Swift Current Land & Cattle LLC
- Swiss Aluminium Australia Limited
- Talon Nickel (USA) LLC
- TBAC Limited
- Technological Resources Pty. Limited
- Terra CO2 Technology Holdings, Inc.
- The Kelian Community and Forest Protection Trust
- The Pyrites Company, Inc.
- The Roberval and Saguenay Railway Company/ La Compagnie du Chemin de Fer Roberval Saguenay
- The Zinc Corporation Pty Ltd
- Thos. W. Ward Limited
- THR Aruba Holdings LLC A.V.V.
- THR Copper Limited
- THR Mines Services Co. Ltd.
- THR OYU TOLGOI LTD.
- Three Crowns Insurance Company
- Tinto Holdings Australia Pty. Limited

- Tomago Aluminium Company Pty Limited
- Tomago Aluminium Joint Venture
- Trans Territory Pipeline Pty Limited
- Turquoise Hill Resources Ltd.
- Turquoise Hill Resources Singapore Pte Ltd.
- U.S. Borax Inc.
- Uranium Energy Corp.
- Usine de démonstration de la Technologie ELYSIS S.E.C / ELYSIS Technology Demonstration Plant L.P.
- Victoria Technology Inc.
- Waste Solutions and Recycling LLC
- West Kutai Foundation Limited
- Western Copper and Gold Corporation
- Western Range Joint Venture
- Wimmera Industrial Minerals Pty. Limited
- Winchester South Development Company Proprietary Limited
- Winning Consortium Simandou Ports Pte. Ltd.
- Winning Consortium Simandou Railway Pte. Ltd.
- Winter Road Joint Venture
- Wyoming Coal Resources Company
- Yalleen Pastoral Co. Pty. Ltd.
- Yarraloola Pastoral Co

## <u>SCHEDULE VI</u>

### Zurich Corporate Parties

- Zurich American Insurance Company, in its own capacity and as successor-in-interest to Zurich Insurance Company, U.S. Branch
- American Guarantee and Liability Insurance Company
- American Zurich Insurance Company
- Colonial American Casualty & Surety Company
- Empire Fire and Marine Insurance Company
- Empire Indemnity Insurance Company
- Fidelity and Deposit Company of Maryland
- Hoplite Reinsurance Company of Vermont, Inc.
- Rural Community Insurance Company
- Steadfast Insurance Company
- Universal Underwriters Insurance Company
- Universal Underwriters of Texas Insurance Company
- Zurich American Insurance Company of Illinois
- Zurich Insurance Company Ltd (Canadian Branch)
- Zurich American Puerto Rico Insurance Company
- Zurich American Life Insurance Company
- Zurich American Insurance Company of New York
- Maryland Casualty Company
- Northern Insurance Company of New York
- Assurance Company of America

### SCHEDULE VII

**Zurich Policies**

| Issuing Insurer | Policy No. | Policy Period |
|---|---|---|
| Zurich Insurance Company, US Branch | GLC 8209842-00/01 | 5/1/1996–5/31/1997 |
| Zurich Insurance Company, US Branch | GLO 8210069-00 | 5/31/1997–5/31/1998 |
| Zurich Insurance Company, US Branch | GLO 8210069-01 | 5/31/1998–5/31/1999 |
| Zurich American Insurance Company | GLO 8210069-02 | 5/31/1999–5/31/2000 |
| Zurich American Insurance Company | GLO 8210069-03 | 5/31/2000–5/31/2001 |
| Zurich American Insurance Company | GLO 8210196-04 | 5/31/2001–5/31/2002 |
| Zurich American Insurance Company | GLO 8210196-05 | 5/31/2002–5/31/2003 |
| Zurich American Insurance Company | GLO 8210196-06 | 5/31/2003–5/31/2004 |
| Zurich American Insurance Company | GLO 8210196-07 | 5/31/2004–5/31/2005 |
| Zurich American Insurance Company | GLO 8210196-08 | 5/31/2005–5/31/2006 |
| Zurich American Insurance Company | GLO 8210196-09 | 5/31/2006–5/31/2007 |
| Zurich American Insurance Company | GLO 8210196-10 | 5/31/2007–5/31/2008 |
| Zurich American Insurance Company | GLO 8210196-11 | 5/31/2008–5/31/2009 |

| Issuing Insurer | Policy No. | Policy Period |
|---|---|---|
| Zurich American Insurance Company | GLO 8249662-00 | 5/31/2009–5/31/2010 |
| Zurich American Insurance Company | GLO 8249662-01 | 5/31/2010–5/31/2011 |
| Zurich American Insurance Company | GLO 8249662-02 | 5/31/2011–5/31/2012 |
| Zurich Insurance Company Ltd (Canadian Branch) | 8828308 | 5/31/1997-5/31/2007 |
| Zurich Insurance Company Ltd (Canadian Branch) | 8835547 | 5/31/2007-5/31/2009 |
| Zurich Insurance Company Ltd (Canadian Branch) | 8837911 | 5/31/2009-5/31/2011 |

**SCHEDULE VIII**

**Cyprus Corporate Parties**

**Cyprus Mines and Parent Companies**

- Cyprus Mines Corporation
- Cyprus Amax Minerals Company (including as successor to Cyprus Minerals Company)
- Freeport Minerals Corporation (including as successor to Phelps Dodge Corporation)
- Freeport-McMoRan Inc.

**Owners of Affiliates of Cyprus Mines**

- Amax Energy Inc.
- Ametalco Limited
- Ametalco, Inc.
- Arguello Inc.
- Byner Cattle Company
- Climax Molybdenum Company
- Cyprus Amax Indonesia Corporation
- Cyprus Climax Metals Company
- Cyprus El Abra Corporation
- Cyprus Exploration and Development Corporation
- Cyprus Gold Company
- Cyprus Metals Company
- Eastern Mining Company, Inc.
- FCX Oil & Gas LLC
- FM Services Company
- Freeport Sulphur Company
- Freeport-McMoRan Bagdad Inc.
- Freeport-McMoRan Chino Inc.
- Freeport-McMoRan Cobalt Holdings Limited
- Freeport-McMoRan Energy LLC
- Freeport-McMoRan Exploration Corporation
- Freeport-McMoRan Mineral Properties Inc.
- Freeport-McMoRan Oil & Gas LLC
- Freeport-McMoRan Spain Inc.
- Freeport-McMoRan Tyrone Mining LLC
- Hidalgo Mining, LLC
- McMoRan Exploration LLC
- McMoRan Oil & Gas LLC
- Mt. Emmons Mining Company
- Nabire Bakti L.L.C.
- PD Peru, Inc.

- PDRC Laurel Hill 9, LLC
- PDRC Laurel Hill Development, LLC
- Phelps Dodge Industries, Inc.
- Phelps Dodge Katanga Corporation
- Phelps Dodge of Africa, Ltd.
- Phelps Dodge Refining Corporation
- PT Freeport Indonesia
- PT Freeport Management Indonesia
- PXP Gulf Coast LLC
- PXP Louisiana L.L.C.
- PXP Producing Company LLC

## Other Cyprus Mines Affiliates

- Ajo Improvement Company
- Amax Arizona, Inc.
- Amax Exploration, Inc.
- Amax Metals Recovery, Inc.
- Amax Nickel Overseas Ventures, Inc.
- Amax Research & Development, Inc.
- Amax Specialty Coppers Corporation
- Amax Specialty Metals (Driver), Inc.
- Amax Zinc (Newfoundland) Limited
- American Metal Climax, Inc.
- Apache Nitrogen Products, Incorporated
- Atlantic Copper, S.L.U.
- AZ Big Sandy, LLC
- Bagdad Fire and Rescue, Inc.
- Bisbee Queen Mining Co.
- Blackwell Zinc Company, Inc.
- Capital Gestão de Negócios Ltda.
- Chino Acquisition LLC
- Climax Canada Ltd.
- Climax Molybdenum Asia Corporation
- Climax Molybdenum B.V.
- Climax Molybdenum China Corporation
- Climax Molybdenum GmbH
- Climax Molybdenum Marketing Corporation
- Climax Molybdenum U.K. Limited
- Compania Exploradora de la Isla, S.A.
- Copper Market, Inc.
- Copper Overseas Service Company
- Cyprus Copperstone Gold Corporation
- Cyprus Gold Exploration Corporation

- Cyprus Pinos Altos Corporation
- Cyprus Specialty Metals Company
- Cyprus Tohono Corporation
- Drum Mountains Mineral Properties LLC
- Exploraciones Antakana S.A.C.
- FCX Investment LLC
- FM Chile Holdings Inc.
- FNS Holdings, LLC
- Freeport Azufre Limitada
- Freeport Butte Valley LLC
- Freeport Canadian Exploration Company
- Freeport Copper Company
- Freeport International, Incorporated
- Freeport Overseas Service Company
- Freeport Research and Engineering Company
- Freeport Warim Inc.
- Freeport-McMoRan Chino Mines Company
- Freeport-McMoRan Copper & Gold China Corporation
- Freeport-McMoRan Copper & Gold Energy Services LLC
- Freeport-McMoRan Copper & Gold Investment Co., S.A.
- Freeport-McMoRan Exploration & Production LLC
- Freeport-McMoRan Exploration Colombia, S.A.S.
- Freeport-McMoRan Mercantile Company Inc.
- Freeport-McMoRan Miami Inc.
- Freeport-McMoRan Mineral Properties Canada Inc.
- Freeport-McMoRan Morenci Inc.
- Freeport-McMoRan Nevada LLC
- Freeport-McMoRan of Canada Limited
- Freeport-McMoRan Safford Inc.
- Freeport-McMoRan Sales Company Inc.
- Freeport-McMoRan Shelf Properties LLC
- Freeport-McMoRan Sierrita Inc.
- Freeport-McMoRan Tyrone Inc.
- Gaviota Gas Plant Company
- Grand Ecaille Land Company, Inc.
- Gulf Coast Ultra Deep Royalty Trust
- Habirshaw Cable and Wire Corporation
- International Administrative Services Company
- International Air Capital Inc.
- International ASAZ LLC
- International Mining Investments, LLC
- International Purveyors Inc.
- International Support LLC
- James Douglas Insurance Company, Ltd.

- JEX Technologies Corporation
- K-Mc Venture I LLC
- Koboltti Chemicals Holdings Limited
- LHD Ventures, LLC
- Main Pass Energy Hub LLC
- Midwest Land Acquisition Company LLC
- Minera Cuicuilco S.A. de C.V.
- Minera Freeport-McMoRan South America Limitada
- Minera Freeport-McMoRan South America S.A.C.
- Missouri Lead Smelting Company
- MSS Properties, LLC
- Nicaro Nickel Company
- Overseas Service Company
- Pacific Western Land Company
- PD Receivables LLC
- Phelps Dodge Ajo, Inc.
- Phelps Dodge Development Corporation
- Phelps Dodge Hidalgo, Inc.
- Phelps Dodge High Performance Conductors of NJ, Inc.
- Phelps Dodge Mining (Zambia) Limited
- Phelps Dodge Molybdenum Corporation
- Plains Acquisition Corporation
- Plains Vietnam Ltd.
- Pogo Partners, Inc.
- Point Arguello Natural Gas Line Company
- Point Arguello Pipeline Company
- PT Airfast Aviation Facilities Company
- PT Eksplorasi Nusa Jaya
- PT Irja Eastern Minerals
- PT Kencana Infra Nusakarya
- PT Kencana Wisata Nusakarya
- PT Mineserve International
- PT Nabire Bakti Mining
- PT Papua Utama Mitra
- PT Rio Tinto Indonesia
- PT Smelting
- PXP Louisiana Operations LLC
- Servicios Especiales Nacionales, S.A. de C.V.
- Silver Springs Ranch, Inc.
- Sociedad Contractual Minera El Abra
- Sociedad Minera Cerro Verde S.A.A.
- Southern Bayou Holdings LLC
- Southern Pearl Holdings LLC
- Tank Barge LLC

- The Morenci Water & Electric Company
- Timok Metals doo Bor, Cara Lazara bb, 19210 Bor
- Tucson, Cornelia and Gila Bend Railroad Company
- United States Metals Refining Company
- Verde Valley Tax Investments, LLC
- Warren Company
- Western Nuclear, Inc.

**SCHEDULE IX**

**Cyprus Talc Insurance Policies**

| Insurer | Policy Number | Policy Start | Policy End |
|---|---|---|---|
| **American Automobile Insurance Company** | CL 12750 | April 4, 1945 | April 4, 1946 |
| **American Automobile Insurance Company** | CL 130970 | April 4, 1946 | April 4, 1947 |
| **American Automobile Insurance Company** | CL 136508 | April 4, 1947 | April 4, 1948 |
| **American Automobile Insurance Company** | CL 139750 | April 4, 1948 | April 4, 1949 |
| **American Automobile Insurance Company** | K 2005760 | April 4, 1949 | April 4, 1950 |
| **American Automobile Insurance Company** | K 2021258 | April 4, 1950 | April 4, 1951 |
| **American Automobile Insurance Company** | K 204022 | April 4, 1951 | April 4, 1952 |
| **American Automobile Insurance Company** | K 2058632 | April 4, 1952 | April 4, 1953 |
| **American Automobile Insurance Company** | K 2068035 | April 4, 1953 | April 4, 1954 |
| **American Automobile Insurance Company** | K 2083794 | April 4, 1954 | April 4, 1955 |
| **American Automobile Insurance Company** | K 2108468 | April 4, 1955 | April 4, 1956 |
| **American Automobile Insurance Company** | K 2131954 | April 4, 1956 | April 4, 1957 |
| **American Automobile Insurance Company** | K 2144688 | April 4, 1957 | April 4, 1958 |
| **American Automobile Insurance Company** | K 2195086 | April 4, 1958 | April 4, 1959 |

| Insurer | Policy Number | Policy Start | Policy End |
|---|---|---|---|
| **American Automobile Insurance Company** | K 2206150 | April 4, 1959 | April 4, 1960 |
| **American Automobile Insurance Company** | K 2224359 | April 4, 1960 | April 4, 1961 |
| **American Insurance Company** | K2238871 | May 23, 1961 | May 23, 1962 |
| **American Insurance Company** | K2257131 | May 23, 1962 | May 23, 1963 |
| **American Insurance Company** | K2276210 | May 23, 1963 | May 23, 1964 |
| **American Insurance Company** | K2290639 | May 23, 1964 | October 15, 1964 |
| **Continental Casualty Company** | CL4234386 | October 15, 1964 | January 1, 1965 |
| **Continental Casualty Company** | RDX9946941 | October 15, 1964 | April 17, 1965 |
| **Employers Surplus Lines Insurance Company** | E504218 | December 31, 1962 | April 17, 1965 |
| **Employers Surplus Lines Insurance Company** | E504219 | April 17, 1962 | April 17, 1965 |
| **Continental Casualty Company** | 241319352 | January 1, 1965 | January 1, 1966 |
| **Employers Surplus Lines Insurance Company** | E509914 | April 17, 1965 | February 1, 1968 |
| **Harbor Insurance Company** | 102632 | April 17, 1965 | January 31, 1968 |
| **Continental Casualty Company** | 2402140673 | January 1, 1966 | January 1, 1969 |
| **Employers Surplus Lines Insurance Company** | E513910 | January 31, 1968 | March 1, 1971 |
| **Continental Casualty Company** | CCP2404125889 | January 1, 1969 | November 1, 1969 |
| **Continental Casualty Company** | CCP2405051090R | November 1, 1969 | November 1, 1972 |
| **Employers Surplus Lines Insurance Company** | E63850 | March 1, 1971 | March 1, 1972 |
| **CNA Casualty of California** | RDU9231389 | March 1, 1972 | March 1, 1973 |

| Insurer | Policy Number | Policy Start | Policy End |
|---|---|---|---|
| **Midland Insurance Company** | XL1952 | March 1, 1972 | March 1, 1973 |
| **Mission Insurance Company** | M74758 | March 1, 1972 | March 1, 1973 |
| **Fireman's Fund Insurance Company** | XLX1056187 | March 1, 1972 | March 1, 1973 |
| **Aetna Casualty & Surety Company** | 01XN244WCA | March 1, 1972 | March 1, 1973 |
| **Continental Casualty Company** | CCP9677215R | November 1, 1972 | November 1, 1974 |
| **Reserve Insurance Company** | UCP00067 | March 1, 1973 | April 2, 1975 |
| **Stonewall Insurance Company** | D11910 | March 1, 1973 | July 1, 1976 |
| **Truck Insurance Exchange** | 3504134 | October 1, 1974 | July 1, 1980 |
| **Central National Insurance Company of Omaha** | CNU122873 | April 2, 1975 | April 2, 1976 |
| **Mission Insurance Company** | M830271 | April 2, 1975 | April 2, 1976 |
| **Central National Insurance Company of Omaha** | CNU125306 | April 2, 1976 | July 1, 1977 |
| **Mission Insurance Company** | 83253 | April 2, 1976 | July 1, 1977 |
| **Stonewall Insurance Company** | 13584 | July 1, 1976 | July 1, 1977 |
| **Granite State Insurance Company** | SCLD 80-93902 | July 1, 1976 | July 1, 1977 |
| **Lexington Insurance Company** | LC0140 | July 1, 1977 | July 1, 1978 |
| **Pine Top Insurance Company** | MLP 100304 | July 1, 1977 | July 1, 1978 |
| **Columbia Casualty Company** | RDX3652421 | July 1, 1977 | July 1, 1978 |
| **Harbor Insurance Company** | 135171 | July 1, 1978 | July 1, 1979 |
| **Columbia Casualty Company** | RDX4169299 | July 1, 1978 | July 1, 1979 |
| **AIU Insurance Company** | 75100270 | July 1, 1978 | July 1, 1979 |

| Insurer | Policy Number | Policy Start | Policy End |
|---|---|---|---|
| **Mission Insurance Company** | M843870 | July 1, 1978 | July 1, 1979 |
| **Union Indemnity Insurance Company of New York** | UF11 00 128 | June 1, 1979 | June 1, 1980 |
| **National Union Fire Insurance Company of Pittsburgh, Pa.** | BE1326219 | July 1, 1979 | July 1, 1980 |
| **Insurance Company of North** | ISL 1083 | xx/xx/1978 | xx/xx/1981 |
| **America** | | | |
| **London Market** | 881/ULL0705 | June 1, 1979 | June 1, 1980 |
| **Employers Mutual Casualty** | MMO 70858 | June 1, 1979 | June 1, 1980 |
| **Lexington Insurance Company** | 5512603 | June 1, 1979 | June 1, 1980 |
| **Lexington Insurance Company** | 5512604 | June 1, 1979 | June 1, 1980 |
| **Gibraltar Casualty Company** | GMX 00143 | June 1, 1979 | June 1, 1980 |
| **Central National Insurance Company of Omaha (The)** | CNZ 14-16-28 | June 1, 1979 | June 1, 1980 |
| **Federal Insurance Company** | (80) 7922-6248 | June 1, 1979 | June 1, 1980 |
| **Landmark Insurance Co.** | FE4000188 | June 1, 1979 | June 1, 1980 |
| **Travelers Indemnity Company** | JEX 121T880-A-79 | June 1, 1979 | June 1, 1980 |
| **Employers Mutual Casualty Company** | MMO 70859 | June 1, 1979 | June 1, 1980 |
| **London Market Insurers** | ULL0706 | June 1, 1979 | June 1, 1980 |
| **London Market Insurers** | ULL0707 | June 1, 1979 | June 1, 1980 |
| **London Market Insurers** | ULL0708 | June 1, 1979 | June 1, 1980 |
| **London Market Insurers** | ULL0709 | June 1, 1979 | June 1, 1980 |
| **International Surplus Lines Insurance Company** | XSI 5586 | June 1, 1979 | June 1, 1980 |

| Insurer | Policy Number | Policy Start | Policy End |
|---|---|---|---|
| **Birmingham Fire Insurance Company of Pennsylvania** | 6073642 | June 1, 1979 | June 1, 1980 |
| **First State Insurance Company** | 928425 | June 1, 1979 | June 1, 1980 |
| **International Surplus Lines Insurance Company** | XSI 5587 | June 1, 1979 | June 1, 1980 |
| **Employers Mutual Casualty Company** | MMO 70860 | June 1, 1979 | June 1, 1980 |
| **International Surplus Lines Insurance Company** | XSI 5588 | June 1, 1979 | June 1, 1980 |
| **Granite State Insurance Company** | 6679-1363 | June 1, 1979 | June 1, 1980 |
| **AIU Insurance Company** | 75-100872 | June 1, 1979 | June 1, 1980 |
| **Allianz Insurance Company** | UMB599559 | June 1, 1979 | June 1, 1980 |
| **Fireman's Fund Insurance Company** | XLX1393749 | June 1, 1979 | June 1, 1980 |
| **Employers Mutual Casualty Company** | MMO71462 | June 1, 1980 | June 1, 1981 |
| **London market insurers** | WM22007 & UMH0287 | June 1, 1980 | June 1, 1981 |
| **Lexington Insurance Company** | 5512643 | June 1, 1980 | June 1, 1981 |
| **Employers Mutual Casualty Company** | MMO71463 | June 1, 1980 | June 1, 1981 |
| **International Surplus Lines Insurance Company** | XSI6996 | June 1, 1980 | June 1, 1981 |
| **London market insurers** | WM23004 & UMH0288 | June 1, 1980 | June 1, 1981 |
| **Employers Mutual Casualty Company** | MMO71464 | June 1, 1980 | June 1, 1981 |
| **Landmark Insurance Company** | FE40000337 | June 1, 1980 | June 1, 1981 |

| Insurer | Policy Number | Policy Start | Policy End |
|---|---|---|---|
| **International Surplus Lines Insurance Company** | XSI6997 | June 1, 1980 | June 1, 1981 |
| **London market insurers** | WM23006 & UMH0289 | June 1, 1980 | June 1, 1981 |
| **Central National Insurance Company of Omaha** | CNZ142075 | June 1, 1980 | June 1, 1981 |
| **Granite State Insurance Company** | 6680-2317 | June 1, 1980 | June 1, 1981 |
| **Union Indemnity Insurance Company** | UF1100193 | June 1, 1980 | June 1, 1981 |
| **Lexington Insurance Company** | 5512644 | June 1, 1980 | June 1, 1981 |
| **AIU Insurance Company** | 75-1010687 | June 1, 1980 | June 1, 1981 |
| **Travelers Indemnity Company** | TJEX121T880A80 | June 1, 1980 | June 1, 1981 |
| **Gibraltar Casualty Company** | GMX00619 | June 1, 1980 | June 1, 1981 |
| **First State Insurance Company** | 930527 | June 1, 1980 | June 1, 1981 |
| **Federal Insurance Company** | 81-79226248 | June 1, 1980 | June 1, 1981 |
| **Allianz Underwriters, Inc.** | AUX5200117 | June 1, 1980 | June 1, 1981 |
| **International Surplus Lines Insurance Company** | XSI6998 | June 1, 1980 | June 1, 1981 |
| **Integrity Insurance Company** | XL201671 | June 1, 1980 | June 1, 1981 |
| **Granite State Insurance Company** | 6680-2318 | June 1, 1980 | June 1, 1981 |
| **Birmingham Fire Insurance Company of Pennsylvania** | SE6073736 | June 1, 1980 | June 1, 1981 |
| **National Union Fire Insurance Company of Pittsburgh, Pa.** | 1226464 | June 1, 1980 | June 1, 1981 |
| **Gibraltar Casualty Company** | GMX00620 | June 1, 1980 | June 1, 1981 |

| Insurer | Policy Number | Policy Start | Policy End |
|---|---|---|---|
| **First State Insurance Company** | 930625 | June 1, 1980 | June 1, 1981 |
| **American Excess Insurance Company** | EUL5074786 | June 1, 1980 | June 1, 1981 |
| **Northbrook Excess and Surplus Insurance Company** | 63006816 | June 1, 1980 | June 1, 1981 |
| **Insurance Company of North America** | XCP143852 | June 1, 1980 | June 1, 1981 |
| **London Market** | UMH0450 | September 19, 1980 | June 1, 1981 |
| **London market insurers** | WM23009 & WMBA400 | September 19, 1980 | June 1, 1981 |
| **Midland Insurance Company** | XL152834 | October 1, 1980 | June 1, 1981 |
| **Protective National Insurance Company of Omaha** | XUB18068-62 | October 1, 1980 | June 1, 1981 |
| **International Surplus Lines Insurance Company** | XSI7184 | October 1, 1980 | June 1, 1981 |
| **First State Insurance Company** | 931168 | October 1, 1980 | June 1, 1981 |
| **Federal Insurance Company** | 7922-6337 | October 1, 1980 | June 1, 1981 |
| **American Excess Insurance Company** | EUL5075361 | October 1, 1980 | June 1, 1981 |
| **Lexington Insurance Company** | 5512663 | October 1, 1980 | June 1, 1981 |
| **International Surplus Lines Insurance Company** | XSI7138 | October 1, 1980 | June 1, 1981 |
| **London market insurers** | WN30027 & UNH0204 | June 1, 1981 | June 1, 1982 |
| **Lexington Insurance Company** | 5512677 | June 1, 1981 | June 1, 1982 |
| **International Insurance Company** | 5220293553 | June 1, 1981 | June 1, 1982 |

| Insurer | Policy Number | Policy Start | Policy End |
|---|---|---|---|
| **London market insurers** | WN31008, UNH0205 & UNH0206 | June 1, 1981 | June 1, 1982 |
| **Lexington Insurance Company** | 5512682 | June 1, 1981 | June 1, 1982 |
| **International Insurance Company** | 522293562 | June 1, 1981 | June 1, 1982 |
| **London Market** | 551/UNH0207 | June 1, 1981 | June 1, 1982 |
| **London Market** | UNH0237 | June 1, 1981 | June 1, 1982 |
| **London market insurers** | WN31009 | June 1, 1981 | June 1, 1982 |
| **London market insurers** | WNBK300 | June 1, 1981 | June 1, 1982 |
| **London market insurers** | WN31018 | June 1, 1981 | June 1, 1982 |
| **Birmingham Fire Insurance Company of Pennsylvania** | SE6073846 | June 1, 1981 | June 1, 1982 |
| **Travelers Indemnity Company** | TJEX121T880A81 | June 1, 1981 | June 1, 1982 |
| **Granite State Insurance Company** | 6681-2667 | June 1, 1981 | June 1, 1982 |
| **Allianz Underwriters, Inc.** | AUX5200359 | June 1, 1981 | June 1, 1982 |
| **Integrity Insurance Company** | XL203241 | June 1, 1981 | June 1, 1982 |
| **Northbrook Excess and Surplus Insurance Company** | 63008-019 | June 1, 1981 | June 1, 1982 |
| **Insurance Company of North America** | XCP144061 | June 1, 1981 | June 1, 1982 |
| **Gibraltar Casualty Company** | GMX01234 | June 1, 1981 | June 1, 1982 |
| **First State Insurance Company** | 932421 | June 1, 1981 | June 1, 1982 |
| **Federal Insurance Company** | 8207922 6248 | June 1, 1981 | June 1, 1982 |
| **Employers Mutual Casualty Company** | MMO71831 | June 1, 1981 | June 1, 1982 |

| Insurer | Policy Number | Policy Start | Policy End |
|---------|---------------|--------------|------------|
| **International Insurance Company** | 5220293571 | June 1, 1981 | June 1, 1982 |
| **Midland Insurance Company** | XL723954 | June 1, 1981 | June 1, 1982 |
| **Protective National Insurance Company of Omaha** | XUB1806914 | June 1, 1981 | June 1, 1982 |
| **First State Insurance Company** | 932422 | June 1, 1981 | June 1, 1982 |
| **American Excess Insurance Company** | EUL5081285 | June 1, 1981 | June 1, 1982 |
| **Lexington Insurance Company** | 5512678 | June 1, 1981 | June 1, 1982 |
| **International Insurance Company** | 5220293589 | June 1, 1981 | June 1, 1982 |
| **London market insurers** | UPH0171 | June 1, 1982 | June 1, 1983 |
| **London market insurers** | UPH0172 | June 1, 1982 | June 1, 1983 |
| **London market insurers** | UPH00336 | June 1, 1982 | June 1, 1983 |
| **Lexington Insurance Company** | 5523305 | June 1, 1982 | June 1, 1983 |
| **International Insurance Company** | 5220311256 | June 1, 1982 | June 1, 1983 |
| **London market insurers** | UPH0173 | June 1, 1982 | June 1, 1983 |
| **Lexington Insurance Company** | 5513306 | June 1, 1982 | June 1, 1983 |
| **International Insurance Company** | 5220311265 | June 1, 1982 | June 1, 1983 |
| **London market insurers** | UPH0337 & UPH0174 | June 1, 1982 | June 1, 1983 |
| **International Insurance Company** | 5220311274 | June 1, 1982 | June 1, 1983 |
| **London market insurers** | UPH0338 & UPH0175 | June 1, 1982 | June 1, 1983 |

| Insurer | Policy Number | Policy Start | Policy End |
|---|---|---|---|
| **Birmingham Fire Insurance Company of Pennsylvania** | SE6073951 | June 1, 1982 | June 1, 1983 |
| **Granite State Insurance Company** | 6682-3454 | June 1, 1982 | June 1, 1983 |
| **Allianz Underwriters, Inc.** | AUX5200755 | June 1, 1982 | June 1, 1983 |
| **Integrity Insurance Company** | XL204016 | June 1, 1982 | June 1, 1983 |
| **Northbrook Excess and Surplus Insurance Company** | 63008784 | June 1, 1982 | June 1, 1983 |
| **Insurance Company of North America** | XCP144433 | June 1, 1982 | June 1, 1983 |
| **Gibraltar Casualty Company** | GMX01702 | June 1, 1982 | June 1, 1983 |
| **First State Insurance Company** | 934444 | June 1, 1982 | June 1, 1983 |
| **Federal Insurance Company** | (83)7922-62-48 | June 1, 1982 | June 1, 1983 |
| **Employers Mutual Casualty Company** | MMO73174 | June 1, 1982 | June 1, 1983 |
| **International Insurance Company** | 5220311283 | June 1, 1982 | June 1, 1983 |
| **Midland Insurance Company** | XL724700 | June 1, 1982 | June 1, 1983 |
| **Protective National Insurance Company of Omaha** | XUB1807045 | June 1, 1982 | June 1, 1983 |
| **Northbrook Excess and Surplus Insurance Company** | 63008784 | June 1, 1982 | June 1, 1983 |
| **First State Insurance Company** | 934445 | June 1, 1982 | June 1, 1983 |
| **Lexington Insurance Company** | 5523307 | June 1, 1982 | June 1, 1983 |
| **International Insurance Company** | 5220311292 | June 1, 1982 | June 1, 1983 |
| **London market insurers** | UQH0180 | June 1, 1983 | June 1, 1984 |

| Insurer | Policy Number | Policy Start | Policy End |
|---|---|---|---|
| **London market insurers** | UQH0181, UQH0182 & UQH0186 | June 1, 1983 | June 1, 1984 |
| **Lexington Insurance Company** | 5523326 | June 1, 1983 | June 1, 1984 |
| **International Insurance Company** | 5220437094 | June 1, 1983 | June 1, 1984 |
| **Lexington Insurance Company** | 5523325 | June 1, 1983 | June 1, 1984 |
| **International Insurance Company** | 5220437103 | June 1, 1983 | June 1, 1984 |
| **London market insurers** | UQH0183 & UQH0187 | June 1, 1983 | June 1, 1984 |
| **International Insurance Company** | 5220437112 | June 1, 1983 | June 1, 1984 |
| **London market insurers** | UQH0188 & UQH0184 | June 1, 1983 | June 1, 1984 |
| **London market insurers** | UQH0185 & UQH0189 | June 1, 1983 | June 1, 1984 |
| **Birmingham Fire Insurance Company of Pennsylvania** | SE6074094 | June 1, 1983 | June 1, 1984 |
| **Granite State Insurance Company** | 6683-4116 | June 1, 1983 | June 1, 1984 |
| **Federal Insurance Company** | (84)7922-62-48 | June 1, 1983 | June 1, 1984 |
| **Allianz Underwriters, Inc.** | AUX5200953 | June 1, 1983 | June 1, 1984 |
| **Integrity Insurance Company** | XL207293 | June 1, 1983 | June 1, 1984 |
| **Insurance Company of North America** | XCP145342 | June 1, 1983 | June 1, 1984 |
| **First State Insurance Company** | 934636 | June 1, 1983 | June 1, 1984 |
| **Employers Mutual Casualty Company** | MMO73390 | June 1, 1983 | June 1, 1984 |

| Insurer | Policy Number | Policy Start | Policy End |
|---------|---------------|--------------|------------|
| **Gibraltar Casualty Company** | GMX03540 | June 1, 1983 | June 1, 1984 |
| **International Insurance Company** | 5220437121 | June 1, 1983 | June 1, 1984 |
| **Midland Insurance Company** | XL739224 | June 1, 1983 | June 1, 1984 |
| **Protective Mutual** | XUB1807046 | June 1, 1983 | June 1, 1984 |
| **Pine Top Insurance Company** | XL700011 | June 1, 1983 | June 1, 1984 |
| **Insurance Corporation of Ireland** | XL7-13000-0 | June 1, 1983 | June 1, 1984 |
| **Century Indemnity Company** | CIZ425524 | June 1, 1983 | June 1, 1984 |
| **Marine Office of America Corporation** | EXH101628 | June 1, 1983 | June 1, 1984 |
| **First State Insurance Company** | 934674 | June 1, 1983 | June 1, 1984 |
| **International Insurance Company** | 5220437139 | June 1, 1983 | June 1, 1984 |
| **Lexington Insurance Company** | 5523331 | June 1, 1983 | June 1, 1984 |
| **Zurich American Insurance Company** | 8129701 | June 1, 1983 | June 1, 1984 |
| **Century Indemnity Company** | CIZ 425525 | August 17, 1983 | June 1, 1984 |
| **Constitution State Insurance Company** | CCA841F403A | August 17, 1983 | June 1, 1984 |
| **Royal Insurance Company** | RED102107 | June 1, 1983 | June 1, 1984 |
| **Republic Insurance Company** | CDE0769 | August 17, 1983 | June 1, 1984 |
| **Home Insurance Company** | HEC1203840 | August 17, 1983 | June 1, 1984 |
| **London market insurers** | URH0093 | June 1, 1984 | June 1, 1985 |
| **London market insurers** | URH0098 & URH0162 | June 1, 1984 | June 1, 1985 |
| **Allianz Underwriters, Inc.** | AUX5203031 | June 1, 1984 | June 1, 1985 |

| Insurer | Policy Number | Policy Start | Policy End |
|---------|---------------|--------------|------------|
| International Surplus Lines Insurance Company | 5220473841 | June 1, 1984 | June 1, 1985 |
| London market insurers | URH0097 & URH0161 | June 1, 1984 | June 1, 1985 |
| International Insurance Company | 5220473832 | June 1, 1984 | June 1, 1985 |
| London market insurers | URH0096 & URH0160 | June 1, 1984 | June 1, 1985 |
| International Insurance Company | 5220473823 | June 1, 1984 | June 1, 1985 |
| International Insurance Company | 5220473814 | June 1, 1984 | June 1, 1985 |
| Integrity Insurance Company | XL208526 | June 1, 1984 | June 1, 1985 |
| Insurance Company of North America | XCP144196 | June 1, 1984 | June 1, 1985 |
| Granite State Insurance Company | 6684-4895 | June 1, 1984 | June 1, 1985 |
| Gibraltar Casualty Company | GMX03711 | June 1, 1984 | June 1, 1985 |
| First State Insurance Company | EU002200 | June 1, 1984 | June 1, 1985 |
| Federal Insurance Company | 85-79226248 | June 1, 1984 | June 1, 1985 |
| Allianz Underwriters, Inc. | AUX5203031 | June 1, 1984 | June 1, 1985 |
| Republic Insurance Company | CDE 1159 | June 1, 1984 | June 1, 1985 |
| Employers Mutual Casualty Company | MMMW 72162 | June 1, 1984 | June 1, 1985 |
| Fidelity & Casualty Company | LX 215 62 42 | June 1, 1984 | June 1, 1985 |
| London Guarantee & Accident Company of New York | LX 211 07 93 | June 1, 1984 | June 1, 1985 |

| Insurer | Policy Number | Policy Start | Policy End |
|---|---|---|---|
| **Birmingham Fire Insurance Company of Pennsylvania** | SE607 4337 | June 1, 1984 | June 1, 1985 |
| **London Market Insurers** | URH0094 | June 1, 1984 | June 1, 1985 |
| **London Market Insurers** | URH0095 | June 1, 1984 | June 1, 1985 |
| **London Market Insurers** | URH0159 | June 1, 1984 | June 1, 1985 |
| **Old Republic Insurance Company** | ZC46316 | July 1, 1985 | July 1, 1986 |
| **Lexington Insurance Company** | USA 0370 | July 1, 1985 | July 1, 1986 |
| **London Market** | USA 0371 | July 1, 1985 | July 1, 1986 |
| **Old Republic Insurance Company** | ZC46784 | July 1, 1986 | July 1, 1987 |
| **Lexington Insurance Company** | 5572150 | November 26, 1986 | July 1, 1987 |
| **Old Republic Insurance Company** | ZZ50105 | July 1, 1987 | July 1, 1988 |
| **Lexington Insurance Company** | 5521451 | July 1, 1987 | July 1, 1988 |
| **Lexington Insurance Company** | 5521482 | July 1, 1988 | July 1, 1989 |
| **Lexington Insurance Company** | 8641274 | July 1, 1988 | July 1, 1989 |
| **National Union Fire Insurance Company of Pittsburgh, Pa.** | RMGLCM 459-69-51 | July 1, 1989 | July 1, 1990 |
| **National Union Fire Insurance Company of Pittsburgh, Pa.** | RMGLCM 460-02-64 | July 1, 1989 | July 1, 1990 |
| **National Union Fire Insurance Company of Pittsburgh, Pa.** | RMGL 459-69-50 | July 1, 1989 | July 1, 1990 |
| **National Union Fire Insurance Company of Pittsburgh, Pa.** | GLA 459-69-56 | July 1, 1989 | July 1, 1990 |
| **Lexington Insurance Company** | 556-7598 | July 1, 1989 | July 1, 1990 |
| **XL Insurance Company** | XLUMB-00592 | July 1, 1989 | July 1, 1999 |

| Insurer | Policy Number | Policy Start | Policy End |
|---|---|---|---|
| **National Union Fire Insurance Company of Pittsburgh, Pa.** | CLM 308-33-90 | July 1, 1991 | July 1, 1992 |
| **National Union Fire Insurance Company of Pittsburgh, Pa.** | RMGLCM 325-28-26 | July 1, 1991 | July 1, 1992 |
| **National Union Fire Insurance Company of Pittsburgh, Pa.** | RMGL 325-28-27 | July 1, 1991 | July 1, 1992 |
| **National Union Fire Insurance Company of Pittsburgh, Pa.** | RMGL 325-28-28 | July 1, 1991 | July 1, 1992 |

## **SCHEDULE X**

XL Corporate Parties

- XL Insurance America, Inc.
- Greenwich Insurance Company
- XL Specialty Insurance Company
- X.L. America, Inc.

## SCHEDULE XI

XL Policies

| Issuing Insurer | Policy No. | Policy Period |
|---|---|---|
| XL Insurance America, Inc. | US00006616LI11A | 1/1/2011-1/1/2012 |
| XL Insurance America, Inc. | US00006617LI11A | 1/1/2011-1/1/2012 |
| XL Insurance America, Inc. | US00006616LI12A | 1/1/2012-1/1/2013 |
| XL Insurance America, Inc. | US00006617LI12A | 1/1/2012-1/1/2013 |
| XL Insurance America, Inc. | US00006616LI13A | 1/1/2013-1/1/2014 |
| XL Insurance America, Inc. | US00006617LI13A | 1/1/2013-1/1/2014 |
| XL Insurance America, Inc. | US00006616LI14A | 1/1/2014-1/1/2015 |
| XL Insurance America, Inc. | US00006617LI14A | 1/1/2014-1/1/2015 |