## EXHIBIT E

**J&J Settlement Agreement**

## AMENDED AND RESTATED SETTLEMENT AGREEMENT AND RELEASE

This Amended and Restated Settlement Agreement and Release ("**Agreement**") is entered into by and between Imerys Talc America, Inc. ("**ITA**"), Imerys Talc Vermont, Inc. ("**ITV**"), Imerys Talc Canada Inc. ("**ITC**"), and Imerys Talc Italy S.p.A. ("**ITI**" and collectively with ITA, ITV and ITC, the "**Imerys Debtors**"), Imerys S.A. (collectively with the Imerys Debtors, the "**Imerys Parties**"), Cyprus Mines Corporation (the "**Cyprus Debtor**" and, together with the Imerys Debtors, the "**Debtors**"), Cyprus Amax Minerals Company ("**CAMC**," and together with the Cyprus Debtor, the "**Cyprus Parties**"), the TCCs and FCRs (defined below, and collectively, the "**Claimant Fiduciaries**") and, solely with respect to Sections 6.2, 6.3, 6.4 and 6.5 of this Agreement, Rio Tinto America Inc. ("**Rio Tinto**") and Zurich American Insurance Company, in its own capacity and as successor-in-interest to Zurich Insurance Company, U.S. Branch ("**Zurich**"), on the one hand, and Johnson & Johnson and any successor thereto, Johnson & Johnson Holdco (NA) Inc. (f/k/a J&J Intermediate Holding Corp.) ("**New Holdco**") and any successor thereto, Pecos River Talc LLC ("**Pecos River**") and any successor thereto, and Red River Talc LLC ("**Red River**") and any successor thereto (collectively, "**J&J**" and, collectively with the Debtors, Imerys S.A., CAMC, and the Claimant Fiduciaries, the "**Parties**"), on the other hand.  This Agreement amends and restates the Settlement Agreement and Release executed by certain of the Parties as of July 13, 2024 (the "**Original Agreement**").  Capitalized terms appearing in this Agreement have the meanings set out in Section 1, Additional Definitions, below or elsewhere in this Agreement.

## RECITALS

WHEREAS, from 1965 to 1989, Windsor Minerals, Inc. ("**Windsor**" n/k/a ITV) was a wholly-owned subsidiary of Johnson & Johnson and supplied talc to its corporate parent;

1

WHEREAS Johnson & Johnson sold Windsor to the Cyprus Debtor through a Stock Purchase Agreement dated as of January 6, 1989 (the "**1989 SPA**");

WHEREAS, in 1992, the Cyprus Debtor transferred talc-related assets and liabilities, including its stock in Windsor, to a subsidiary, Cyprus Talc Corporation ("**CTC**," n/k/a ITA), pursuant to an Agreement of Transfer and Assumption, dated June 5, 1992 (the "**1992 ATA**"), and the outstanding stock of CTC was purchased by Rio Tinto (which was then named RTZ America Inc.) through a Stock Purchase Agreement, dated June 5, 1992 (the "**1992 SPA**");

WHEREAS, in 2011, Mircal S.A. entered into an agreement with Rio Tinto to purchase the stock of the Rio Tinto Group's talc operations, including the stock of Luzenac America, Inc. (n/k/a ITA) and Windsor (n/k/a ITV).  The stock purchase agreement entitled Mircal S.A. to substitute other members of the Imerys Group[1] to acquire individual talc-related entities from the Rio Tinto Group and Mircal S.A. exercised that right to cause Imerys Minerals Holding Limited (UK) to acquire the outstanding shares of Luzenac America, Inc.;

WHEREAS, certain Debtors or their related entities supplied talc to certain J&J Corporate Parties (defined below) for use in products through several supply agreements—(i) that certain Talc Supply Agreement, between Windsor Minerals, Inc. and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc., dated as of January 6, 1989 (the "**1989 Supply Agreement**"), as amended (the "**1996 Amendment to the 1989 Supply Agreement**"); (ii) that certain Supply Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated April 15, 2001 (the "**2001 Supply Agreement**"), as amended (the "**2004 Amendment to the 2001 Supply Agreement**"); (iii) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc.

---

[1]  The Imerys Group is a French multinational corporation comprised of over 200 affiliated entities directly and indirectly owned by non-debtor affiliate Imerys S.A.

and Luzenac America, Inc., dated as of January 1, 2010 (the "**2010 Supply Agreement**"); and (iv) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2011 (the "**2011 Supply Agreement**");

WHEREAS, J&J asserts that (i) on October 12, 2021, Johnson & Johnson Consumer, Inc. ("**Old JJCI**") implemented a corporate restructuring pursuant to which Old JJCI ceased to exist and two new entities were created: (a) Johnson & Johnson Consumer Inc. (which subsequently changed its name to Johnson & Johnson Holdco (NA) Inc.) ("**Old Holdco**"), and (b) LTL Management LLC (which subsequently changed its name to LLT Management LLC) ("**LLT**"); (ii) as a result of such corporate restructuring of Old JJCI, LLT was allocated Old JJCI's liabilities for current and future talc Claims (as defined below) and certain assets; (iii) on August 19, 2024, Old Holdco and LLT implemented a corporate restructuring pursuant to which each such entity ceased to exist and three new entities were created:  (a) New Holdco; (b) Red River; and (iii) Pecos River; and (iv) as a result of such corporate restructuring of Old Holdco and LLT, Red River was allocated the J&J Agreements (as defined below) and the Original Agreement, and all of the rights and obligations of Old Holdco and LLT thereunder;

WHEREAS, J&J represents that the total limits of solvent remaining primary and excess insurance policies issued to J&J by third-party insurers that provide coverage for talc personal injury claims are approximately $1.5 billion;

WHEREAS, the Parties assert that some or all of the 1989 SPA, the 1989 Supply Agreement, the 1996 Amendment to the 1989 Supply Agreement, the 2001 Supply Agreement, the 2004 Amendment to the 2001 Supply Agreement, the 2010 Supply Agreement, and the 2011 Supply Agreement (collectively, the "**J&J Agreements**") contain various indemnification

3

provisions and the parties to, and third-party beneficiaries of, those agreements may have rights and Claims against each other, including, contractual indemnification, contribution, subrogation, equitable indemnification and other Claims, including under common law;

WHEREAS, numerous talc personal injury claims have been brought against one or more of the Parties seeking damages and other relief for injury allegedly caused by exposure to talc, and the Parties expect that such talc personal injury claims will continue to be made in the future;

WHEREAS, disputes have arisen as to (i) the existence and scope of any obligation of the J&J Corporate Parties to indemnify the Debtors and/or the Debtor Corporate Parties under the J&J Agreements, (ii) the existence and scope of any obligation of certain Debtors and/or Debtor Corporate Parties to indemnify the J&J Corporate Parties under the J&J Agreements, (iii) Claims the Parties may have against each other relating to the J&J Agreements or otherwise related to the supply of talc by the Debtors to any J&J Corporate Party, and (iv) other Claims the Parties may have against each other arising out of or relating to the Talc Personal Injury Claims, including Estate Causes of Action Against J&J and contribution, subrogation, equitable indemnification, and other Claims, including under common law;

WHEREAS, on February 13, 2019, ITA, ITV, and ITC each filed a voluntary petition for relief with the Bankruptcy Court under chapter 11 of the Bankruptcy Code, commencing the chapter 11 cases of ITA, ITV and ITC (jointly administered at Case No. 19-10289 (LSS)) (such cases, including to the extent ITI commences its own chapter 11 case, the "**Imerys Chapter 11 Cases**");[2]

WHEREAS, on February 11, 2021, the Cyprus Debtor filed a voluntary petition for relief with the Bankruptcy Court under chapter 11 of the Bankruptcy Code, commencing its chapter 11

---

[2] Unless otherwise noted, citations and references to documents filed in the Imerys Chapter 11 Cases are to filings made in the lead Imerys Chapter 11 Case and adhere to the following format: Imerys D.I. [___].

case (Case No. 21-10398 (LSS)) (such case, the "**Cyprus Chapter 11 Case**" and, together with the Imerys Chapter 11 Cases, the "**Chapter 11 Cases**");[3]

WHEREAS, on January 9, 2020, J&J filed proofs of claims in the Imerys Chapter 11 Cases (POC #915, #922, #926) (the "**J&J Proofs of Claim**"), asserting claims for indemnification, contribution, and otherwise;

WHEREAS, on June 15, 2020, the Cyprus Parties commenced Adversary Case No. 20-50626-LSS in the Bankruptcy Court against ITA, ITV, Johnson & Johnson, and Old JJCI seeking declaratory judgments regarding Johnson & Johnson and Old JJCI's obligations under certain of the J&J Agreements (the "**Cyprus Adversary Proceeding**");

WHEREAS, J&J sought to dismiss the Cyprus Adversary Proceeding by filing (i) on July 29, 2020, *Johnson & Johnson and Johnson & Johnson Consumer Inc.'s Motion to Dismiss the Claims against Them for Lack of Subject Matter Jurisdiction, or, in the Alternative, to Abstain, or to Sever and Transfer* (Cyprus Adv. Pro. D.I. 9) and an opening brief in support of such motion (Cyprus Adv. Pro. D.I. 10) and (ii) on September 16, 2020, *Johnson & Johnson and Johnson & Johnson Consumer Inc.'s Reply in Further Support of Its Motion to Dismiss the Claims Against Them for Lack of Subject Matter Jurisdiction, or, in the Alternative, to Abstain, or to Sever and Transfer* (Cyprus Adv. Pro. D.I. 23);

WHEREAS, the Cyprus Parties opposed J&J's motion to dismiss the Cyprus Adversary Proceeding by filing, on September 1, 2020, the *Cyprus Mines Corporation's and Cyprus Amax Minerals Company's Opposition to Johnson & Johnson and Johnson & Johnson Consumer Inc.'s Motion to Dismiss* (Cyprus Adv. Pro. D.I. 20);

---

[3] Unless otherwise noted, citations and references to documents filed in the Cyprus Chapter 11 Case adhere to the following format: Cyprus D.I. [__].

WHEREAS, on January 27, 2021, the Bankruptcy Court authorized the Imerys Debtors to solicit votes on the *Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (Imerys D.I. 2852) (the "**2021 Imerys Plan**");

WHEREAS, on March 2, 2021, J&J filed *Johnson & Johnson's Objection and Reservation of Rights Regarding Debtors' Notice of Assumption of Certain Johnson & Johnson Contracts* in the Imerys Chapter 11 Cases (Imerys D.I. 3022);

WHEREAS, J&J opposed the 2021 Imerys Plan, including the proposed trust distribution procedures (the "**2021 TDP**"), and sought both extensive discovery on and clarification of the Imerys Debtors' process, substance, and treatment of J&J under the 2021 Imerys Plan and 2021 TDP;

WHEREAS, the Imerys Debtors disagreed with J&J's objections to the 2021 Imerys Plan including the 2021 TDP;

WHEREAS, on July 27, 2021, ITA and ITV commenced Adversary Case No. 21-51006-LSS in the Bankruptcy Court against Johnson & Johnson and Old JJCI seeking declaratory judgments regarding Johnson & Johnson and Old JJCI's obligations under certain J&J Agreements (the "**Imerys Adversary Proceeding**" and, together with the Cyprus Adversary Proceeding, the "**Adversary Proceedings**");

WHEREAS, on September 21, 2021, J&J filed a motion to dismiss the Imerys Adversary Proceeding (Imerys Adv. Pro. D.I. 56) and an opening brief in support of such motion (Imerys Adv. Pro. D.I. 57);

WHEREAS, as of the Execution Date, the Bankruptcy Court has not yet ruled on the motions to dismiss filed in either of the Adversary Proceedings;

WHEREAS, on October 13, 2021, the Court issued an opinion in the Imerys Chapter 11 Cases excluding 15,719 votes (Imerys D.I. 4239), and also on October 13, 2021, the Imerys Debtors filed a notice cancelling their confirmation hearing and suspending all confirmation deadlines (Imerys D.I. 4243);

WHEREAS, on January 31, 2024, the Imerys Debtors and the Cyprus Debtor filed the Plans, new disclosure statements, and the *Ivory America/Cyprus Personal Injury Trust Distribution Procedures* (Imerys D.I. 6051-1; Cyprus D.I. 2132-2) (the "**2024 TDP**");

WHEREAS, J&J has stated that it opposes the Plans, including the 2024 TDP, and intends to object to their confirmation and approval absent the settlement embodied in this Agreement;

WHEREAS, the Imerys Parties have asserted they are additional insureds with respect to J&J Policies (as defined herein) for a period of time, and J&J believes that the Imerys Parties may be entitled, at most, to a *de minimis* percentage of the proceeds of such J&J Policies;

WHEREAS, the Imerys Parties, the Cyprus Parties, and the Claimant Fiduciaries, on the one hand, and the J&J Corporate Parties, on the other hand, wish to fully and finally resolve the disputes described above in these recitals, and to provide for the other consideration, promises, releases, and covenants set forth in this Agreement;

WHEREAS, in furtherance of the compromise and resolution of such disputes, the Debtors have agreed to sell, and J&J has agreed to purchase, all rights and claims against the J&J Corporate Parties, or any of them, under the J&J Agreements and in respect of the Debtor J&J Released Claims (defined below) pursuant to section 363 of the Bankruptcy Code, and to compromise and settle any and all such claims and disputes pursuant to Bankruptcy Rule 9019, subject to the terms and conditions set forth in this Agreement;

WHEREAS, the Claimant Fiduciaries have agreed to support such settlement, subject to the terms and conditions set forth in this Agreement;

WHEREAS, J&J is agreeing not to pursue its objections to the Plans, including the 2024 TDP, as each is revised to be consistent with this Agreement, in reliance on this Agreement and the compromises set forth herein, including that the 2024 TDP will not be used as a basis for the Debtors or the Talc Personal Injury Trust to assert claims against the J&J Corporate Parties, including, without limitation, under the J&J Agreements or otherwise; and

WHEREAS, the Imerys Debtors, the Cyprus Debtor, and each of the Claimant Fiduciaries believe the settlement reflected in this Agreement is in the best interests of the Debtors' estates and claimants.

NOW THEREFORE, in consideration of the foregoing, and in consideration of the other mutual considerations, promises, releases, and covenants set forth below, the sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## 1. ADDITIONAL DEFINITIONS

The following additional definitions apply to this Agreement.  The singular form of a word includes the plural and vice versa; the disjunctive "or" is not exclusive and thus includes the conjunctive "and"; all pronouns apply to the male, female, and neutral genders; the word "any" includes the word "all" and vice versa; the words "includes" and "including" are without limitation; and the past tense of a word includes the present tense and vice versa.

1.1.    "**Bankruptcy Code**" shall refer to title 11 of the United States Code, 11 U.S.C. § 101 *et seq*. in effect on the Execution Date.

1.2.    "**Bankruptcy Court**" shall refer to the United States Bankruptcy Court for the District of Delaware.

1.3.    "**Bankruptcy Rules**" shall refer to Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any local rules of the Bankruptcy Court in effect on the Execution Date.

1.4.    "**Business Day**" shall refer to any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, NY are authorized or required by law or executive order to close.

1.5.    "**Claim**," when capitalized, shall have the meaning ascribed to such term in section 101(5) of the Bankruptcy Code.

1.6.    "**Closing Date**" means the date on or after the Trigger Date, on which the Designated Accounts (if prior to the Plans' Effective Date) or the Talc Personal Injury Trust (if after the Plans' Effective Date) receive the J&J Initial Payment, $167,000,000 of the J&J Insurance Payments, and any additional portion of the J&J Insurance Payments and Home Proceeds recovered prior to the Trigger Date.

1.7.    "**Cyprus Alternative Account**" means a bank account of the Cyprus Debtor other than the Cyprus Default Account or, by agreement of the Cyprus Parties, an escrow account or "qualified settlement fund" (within the meaning of Treasury Regulations Section 1.468B-1) with terms agreed between the Cyprus Parties and reasonably acceptable to the TCC and FCR appointed in the Cyprus Chapter 11 Case.

1.8.    "**Cyprus Default Account**" means the bank account of the Cyprus Debtor designated on Schedule IV.

1.9.    "**Cyprus Designated Account**" means (i) if, on or before the date that is two (2) Business Days after the Trigger Date, the Cyprus Debtor provides J&J a Form W-9 containing the applicable tax identification number and bank account information sufficient to make the required

9

wire transfer(s) to a Cyprus Alternative Account, such Cyprus Alternative Account, or (ii) if the Cyprus Debtor fails to provide such information on or before the date that is two (2) Business Days after the Trigger Date, the Cyprus Default Account.  In the event the Cyprus Designated Account is in the form of an escrow account or qualified settlement fund, the terms of any agreement governing such escrow account or qualified settlement fund shall provide that, in the event the Plans do not become effective, including if one of the Plans is withdrawn, the Bankruptcy Court or the District Court denies confirmation, or any confirmation order is reversed or vacated, the amounts held in or payable to such account or fund will revert to and be retained by the Cyprus Debtor.

1.10.    "**Cyprus Talc Insurance Policy**" shall have the meaning set forth in the Plans.

1.11.    "**Debtor Corporate Parties**" means Imerys S.A. and CAMC and each of their past and present parents, subsidiaries and affiliates, and, in their capacities as such, all of their respective agents and representatives, direct and indirect equity holders, and the successors and assigns of each.  For the avoidance of doubt, Debtor Corporate Parties includes each of the entities listed on <u>Schedule I</u> and <u>Schedule II</u>, and excludes (x) the Debtors and (y) the J&J Corporate Parties and their affiliates.

1.12.    "**Debtor J&J Released Claims**" shall have the meaning ascribed to such term in Section 6.1 hereof.

1.13.    "**Debtor/Non-Debtor Released Claims**" shall have the meaning ascribed to such term in Section 6.4 hereof.

1.14.    "**Debtor/Non-Debtor Released Parties**" shall have the meaning ascribed to such term in Section 6.4 hereof.

1.15.    "**Debtor Releasing Parties**" shall have the meaning ascribed to such term in Section 6.1 hereof.

1.16.    "**Debtors' Policies**" mean any Cyprus Talc Insurance Policy, except, for the purposes of this Agreement, Cyprus Talc Insurance Policy does not include any J&J Policies.

1.17.    "**Designated Accounts**" means each of the Cyprus Designated Account and the Imerys Designated Account.

1.18.    "**District Court**" shall refer to the United States District Court for the District of Delaware.

1.19.    "**Escrow Account**" shall have the meaning ascribed to such term in Section 5.5 hereof.

1.20.    "**Escrow Agent**" shall have the meaning ascribed to such term in Section 5.5 hereof.

1.21.    "**Escrow Agreement**" shall have the meaning ascribed to such term in Section 5.5 hereof.

1.22.    "**Estate**" means, as to each Debtor, the estate created in its Chapter 11 Case under section 541 of the Bankruptcy Code.

1.23.    "**Estate Causes of Action Against J&J**" shall refer to any and all of the actions, claims, rights, remedies, defenses, counterclaims, suits, and causes of action owned or held, or assertable by or on behalf of a Debtor or its Estate (including, without limitation, claims assertable by the TCCs or FCRs, or by any other creditors, on behalf of any Debtor or its Estate), whether or not asserted, whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction against any J&J Corporate Party.

1.24.    "**Execution Date**" means July 13, 2024.

1.25.   "**FCRs**" shall have the meanings set forth in the Plans.

1.26.   "**Final Order**" shall refer to, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

1.27.   "**Home**" means The Home Insurance Company in Liquidation.

1.28.   "**Home Proceeds**" means all payments made by Home's estate with respect to the full amount of the Home allowance for proofs of claims made by ITV and J&J under any policies issued by The Home Insurance Company and/or its affiliates, which assert claims of $111,381,494, whether an initial payment or any subsequent payments relating to such allowance.  For the avoidance of doubt, Home Proceeds refers to the claims and proceeds referenced in the April 3, 2024 letter on behalf of the New Hampshire Insurance Commissioner to J&J and ITV.

1.29.   "**Imerys Alternative Account**" means a bank account of an Imerys Debtor other than the Imerys Default Account or, by agreement of the Imerys Parties, an escrow account or "qualified settlement fund" (within the meaning of Treasury Regulations Section 1.468B-1) with terms agreed between the Imerys Parties and reasonably acceptable to the TCC and FCR appointed in the Imerys Chapter 11 Cases.

1.30.   "**Imerys Default Account**" means the bank account of an Imerys Debtor designated in Schedule IV.

12

1.31.    "**Imerys Designated Account**" means (i) if on or before the date that is two (2) Business Days after the Trigger Date the Imerys Debtors provide J&J a Form W-9 containing the applicable tax identification number and bank account information sufficient to make the required wire transfer(s) to an Imerys Alternative Account, such Imerys Alternative Account, or (ii) if the Imerys Debtors fail to provide such information on or before the date that is two (2) Business Days after the Trigger Date, the Imerys Default Account.  In the event the Imerys Designated Account is in the form of an escrow account or qualified settlement fund, the terms of any agreement governing such escrow account or qualified settlement fund shall provide that, in the event the Plans do not become effective, including if one of the Plans is withdrawn, the Bankruptcy Court or the District Court denies confirmation, or any confirmation order is reversed or vacated, the amounts held in or payable to such account or fund will revert to and be retained by the Imerys Debtors.

1.32.    "**Imerys Plan**" shall have the meaning ascribed to such term in Section 6.3 hereof.

1.33.    "**Imerys Share of Settlement Proceeds**" shall have the meaning ascribed to such term in Section 6.3 hereof.

1.34.    "**Indirect Talc Personal Injury Claim**" shall have the meaning set forth in the Plans as of the Execution Date.

1.35.    "**Insurance Recoveries**" means any funds received by any J&J Corporate Party arising out of or relating to coverage under the J&J Policies for talc claims against J&J, including the proceeds of any settlement agreements with any insurance carrier, any insurer's reimbursement of defense costs, payments, settlements, or judgments, and the proceeds of any judgment against any insurer or insurers.  Insurance Recoveries include any settlement or reimbursement received on or after April 29, 2024 relating to talc claims against J&J, including approximately

13

$167,000,000 J&J believes it will recover, as referenced in Section 5.2 below.  For the avoidance of doubt, Insurance Recoveries do not include (i) amounts recovered or received by J&J from Middlesex Assurance Company Limited ("**Middlesex**") or in connection with any insurance policy issued by Middlesex to another J&J Corporate Party, including defense cost recoveries paid to J&J Corporate Parties by Middlesex; and (ii) the Home Proceeds.

1.36.  "**Insurance Reporting Termination Date**" means the date on which the aggregate amount of two-hundred and eighty million U.S. dollars ($280,000,000) on account of the J&J Insurance Payments has been paid to the Designated Accounts or the Talc Personal Injury Trust (as applicable).

1.37.  "**J&J Buyback**" means the acquisition by J&J, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, of the rights of the Debtors and their Estates in the J&J Agreements and any and all of the Debtor J&J Released Claims held by the Debtors and/or their Estates (the "**Debtor J&J Rights**"), pursuant to the J&J Settlement Order, free and clear of any and all rights, claims, or interests of any other entity, including subrogation claims, except as provided in Section 3.1.

1.38.  "**J&J Corporate Parties**" shall refer to J&J, Johnson & Johnson Baby Products Company, Johnson & Johnson Consumer Inc., Johnson & Johnson Consumer Products, Inc., and each of their past and present parents, subsidiaries and affiliates, and, in their capacities as such, all of their respective agents and representatives, direct and indirect equity holders, and the successors and assigns of each.  For the avoidance of doubt, J&J Corporate Parties includes LLT (and any successor thereto); Red River (and any successor thereto); Pecos River; Kenvue, Inc.; Janssen Pharmaceuticals, Inc.; Old Holdco; New Holdco; and Middlesex, and the successors and

14

assigns of each, and each of the entities listed on <u>Schedule III</u>, and the successors and assigns of each, and excludes the Debtors and the Debtor Corporate Parties.

1.39.    "**J&J Initial Payment**" means two hundred twenty-five million U.S. dollars ($225,000,000).

1.40.    "**J&J Insurance Payments**" means the first two hundred million U.S. dollars ($200,000,000) of any Insurance Recoveries, and fifty-percent (50%) of the next one-hundred sixty million U.S. dollars ($160,000,000), to be paid by J&J from Insurance Recoveries in accordance with Section 5.6 (if before the Trigger Date) or Section 5.10 (if on or after the Trigger Date); <u>provided</u>, <u>however</u>, (i) J&J shall pay, or cause to be paid, one hundred and sixty-seven million U.S. dollars ($167,000,000), in immediately available funds in U.S. dollars via wire transfer, to the Escrow Account within five (5) Business Days following the later to occur of (a) the entry by the Bankruptcy Court of the J&J Settlement Order and (b) the opening of the Escrow Account, and (ii) if the full two hundred and eighty million U.S. dollars ($280,000,000) has not been paid by J&J before December 31, 2025, J&J shall pay the unpaid balance thereof using other sources on December 31, 2025, in accordance with the payment instructions in Section 4.1.

1.41.    "**J&J Payment Obligations**" shall have the meaning ascribed to such term in Section 4.2 hereof.

1.42.    "**J&J Policies**" means any general liability policy or other policy that previously did, does or may provide coverage for talc claims that was issued to any one or more of the J&J Corporate Parties from 1954 through 1989.  For the avoidance of doubt, J&J Policies do not include the Debtors' Policies or policies issued to any of the Rio Tinto Corporate Parties.

1.43.    "**J&J Related Bankruptcy Case**" means any chapter 11 case or other bankruptcy or insolvency proceeding of any J&J Corporate Party (including Red River).

15

1.44.   "**J&J Releasing Parties**" shall have the meaning ascribed to such term in Section 6.4 hereof.

1.45.   "**J&J Settlement Motion**" shall refer to a motion filed by the Imerys Debtors and the Cyprus Debtor in their respective Chapter 11 Cases supported by each of the Parties.  Such motion shall be in form and substance acceptable to each of the Parties and shall seek (i) approval of this Agreement and the J&J Buyback pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and (ii) entry of the J&J Settlement Order.

1.46.   "**J&J Settlement Order**" shall refer to an order issued by the Bankruptcy Court in form and substance acceptable to each of the Parties as well as to Rio Tinto and Zurich (but, as to Rio Tinto and Zurich, only with respect to any matter impacting their respective rights), approving this Agreement, the J&J Buyback, and the J&J Settlement Motion pursuant to sections 363 and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 and containing the following provisions:  (i) the J&J Buyback (a) represents a sound exercise of the Debtors' business judgment and is in the best interest of the Debtors and their Estates, and otherwise complies with section 363 of the Bankruptcy Code; (b) meets the requirements for a sale of the rights of the Debtors and their Estates under the J&J Agreements and the Debtor J&J Released Claims held by the Debtors and/or their Estates, free and clear of any interests and claims of third parties in such property, including any claim of any person or entity on account of, based upon, directly or indirectly arising from, or in any way relating to any alleged right, claim, or interest of the Debtors and/or their Estates, or any of them, in the J&J Agreements and/or the Debtor J&J Released Claims, including subrogation claims (except as provided in Section 6.1), pursuant to section 363(f) of the Bankruptcy Code; and (c) constitutes a purchase by J&J in good faith pursuant to section 363(m) of the Bankruptcy Code, rendering the provisions of section 363(m) applicable; (ii) the settlement and mutual releases

16

contained in this Agreement are in the best interests of the Estates; (iii) the Agreement and the J&J Buyback were negotiated at arm's length, without collusion or fraud, and in good faith; (iv) the total consideration provided by the J&J Corporate Parties constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable law, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law; (v) this Agreement and the J&J Buyback are not being entered into and consummated for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law; (vi) approval of the irrevocable and unconditional mutual releases as set forth herein, subject to the conditions precedent and subsequent set forth in this Agreement, including the making of the J&J Initial Payment and J&J's obligations with respect to the J&J Insurance Payments and Home Proceeds; (vii) J&J would not have entered into this Agreement and would not consummate the J&J Buyback if the J&J Agreements and Debtor J&J Released Claims held by the Debtors and/or their Estates were not free and clear of all liens, claims and encumbrances, including subrogation claims (except as provided for in Section 6.1); (viii) the Debtors are authorized to sell (a) their rights and claims against the J&J Corporate Parties under the J&J Agreements and under common law and (b) the Debtor J&J Released Claims, held by the Debtors and/or their Estates free and clear of all liens, claims, and encumbrances, including subrogation claims (except as provided for in Section 6.1), because, with respect to each person or entity asserting a lien, claim or encumbrance, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied; (ix) except as provided for in Section 6.1, each person or entity asserting a lien, claim, or encumbrance in the J&J Agreements and/or Debtor J&J Released Claims held by

17

the Debtors and/or their Estates (a) has consented to the J&J Buyback, (b) could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest, and/or (c) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code; (x) an injunction, consistent with Section 6.3 of this Agreement, enjoining the Debtors, the Reorganized Debtors, the Debtor Corporate Parties, and the Talc Personal Injury Trust from commencing, prosecuting, or otherwise pursuing any insurance coverage for J&J Talc Claims; and (xi) the J&J Settlement Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

1.47.  "**J&J Talc Claim**" means (i) any Talc Personal Injury Claim (including any Indirect Talc Personal Injury Claim) that alleges bodily injury exclusively due to talc or a talc-containing product mined, manufactured, processed, sold, marketed, and/or distributed by a J&J Corporate Party or (ii) for any Talc Personal Injury Claim (including any Indirect Talc Personal Injury Claim) that alleges bodily injury due to a product mined, manufactured, processed, sold, marketed, and/or distributed by more than one entity (in addition to the Debtors), that portion of the claim that alleges bodily injury due to talc or a talc-containing product mined, manufactured, processed, sold, marketed, and/or distributed by Debtors and a J&J Corporate Party. For the avoidance of doubt, (i) any Talc Personal Injury Claim (including any Indirect Talc Personal Injury Claim) that alleges bodily injury exclusively due to any talc or a talc-containing product mined, manufactured, processed, sold, marketed, and/or distributed by entities that are not J&J Corporate Parties are not J&J Talc Claims and (ii) for any Talc Personal Injury Claim (including any Indirect Talc Personal Injury Claim) that alleges bodily injury due to any talc or a talc-containing product mined, manufactured, processed, sold, marketed, and/or distributed by more than one entity (in addition to the Debtors), that portion of the claim that alleges bodily injury due to a talc or a talc-containing product mined, manufactured, processed, sold, marketed, and/or distributed entirely by

entities (other than the Debtors or in addition to the Debtors) that are not J&J Corporate Parties is not a J&J Talc Claim.

1.48.    "**Non-Debtor J&J Released Claims**" shall have the meaning ascribed to such term in Section 6.2 hereof.

1.49.    "**Non-Debtor Releasing Parties**" shall have the meaning ascribed to such term in Section 6.2 hereof.

1.50.    "**Person**" shall refer to an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other entity.

1.51.    "**Plan Settlement Agreements**" shall have the meaning ascribed to such term in Section 6.3 hereof.

1.52.    "**Plans**" means the *First Amended Plan of Reorganization of Cyprus Mines Corporation Under Chapter 11 of the Bankruptcy Code*, dated January 31, 2024 (Cyprus D.I. 2132) and the *Second Joint Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (Imerys D.I. 6051), as the same may be amended or modified from time to time; provided, however, where definitions in this Agreement state "Plans as of the Execution Date," such definitions shall not include amendments or modifications to such terms that are inconsistent with this Agreement.

1.53.    "**Plans' Effective Date**" means the date on which the Talc Personal Injury Trust is created.

1.54.    "**Protected Parties**" shall have the meaning set forth in the Plans.

1.55.    "**Releasing Parties**" shall have the meaning ascribed to such term in Section 6.5 hereof.

1.56.    "**Reorganized Debtors**" shall have the meaning set forth in the Plans.

1.57.    "**Rio Tinto Captive Insurers**" shall have the meaning set forth in the Imerys Plan as of the Execution Date.

1.58.    "**Rio Tinto Corporate Parties**" shall mean Rio Tinto and each of its past and present parents, subsidiaries and affiliates, and, in their capacities as such, all of their respective agents and representatives, direct and indirect equity holders, and the successors and assigns of each.  For the avoidance of doubt, the Rio Tinto Corporate Parties include the Rio Tinto Captive Insurers, and exclude the Debtors and the Debtor Corporate Parties.

1.59.    "**Settling Talc Insurance Company**" shall have the meaning set forth in the Plans as of the Execution Date.

1.60.    "**Talc Insurance Company**" shall have the meaning set forth in the Plans as of the Execution Date.

1.61.    "**Talc Personal Injury Claim**" shall have the meaning set forth in the Plans as of the Execution Date.

1.62.    "**Talc Personal Injury Trust**" shall have the meaning set forth in the Plans.

1.63.    "**Tort Claimants' Committees**" or "**TCCs**" shall refer to the official committees of tort claimants appointed in each of the Chapter 11 Cases, as such committees may be reconstituted from time to time.

1.64.    "**Trust Distribution Procedures**" shall have the meaning set forth in the Plans.

1.65.    "**Trigger Date**" shall have the meaning ascribed to such term in Section 2 of this Agreement.

1.66.    "**Voting Affirmation Date**" means the date after the Voting Certification has been filed with the Bankruptcy Court in the Chapter 11 Cases evidencing requisite claimant approval of the Plans on which either (i) the Voting Objection Deadline has expired without (a) any Voting Objection being filed or (b) Voting Objection(s) being filed before expiration of the Voting Objection Deadline that, in the reasonable discretion of each of the Imerys Parties, Cyprus Parties and the Claimant Fiduciaries, if granted, individually or collectively could result in one or both of the Plans not having received requisite claimant approval or (ii) if one or more Voting Objection(s) are filed before expiration of the Voting Objection Deadline that, in the reasonable discretion of each of the Imerys Parties, Cyprus Parties and the Claimant Fiduciaries, if granted, individually or collectively could result in one or both of the Plans not having received requisite claimant approval, such Voting Objection(s) are resolved by the applicable parties or the Bankruptcy Court in a manner that confirms both of the Plans have received requisite claimant approval.

1.67.    "**Voting Certification**" shall have the meaning set forth in the Debtors' joint solicitation procedures motion, as the same may be amended or modified.

1.68.    "**Voting Objection**" means (i) a request that the Bankruptcy Court designate an entity on the basis that its acceptance or rejection of either Plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code and (ii) any other objection to the Voting Certification or to any one or more vote(s) accepting or rejecting either Plan.

1.69.    "**Voting Objection Deadline**" means the last day upon which any party in interest may file a Voting Objection.

1.70.    "**Zurich Corporate Parties**" shall mean Zurich, and each of its past and present parents, subsidiaries and affiliates, and, in their capacities as such, all of their respective agents

21

and representatives, direct and indirect equity holders, and the successors and assigns of each. For the avoidance of doubt, the Zurich Corporate Parties exclude the Debtors and the Debtor Corporate Parties.

## 2.    EFFECTIVE DATE OF AGREEMENT AND CONDITIONS PRECEDENT

2.1.    This Agreement shall become binding on all Parties on the Execution Date and on Rio Tinto and Zurich upon their execution of this Agreement, subject to entry by the Bankruptcy Court of the J&J Settlement Order.

2.2.    The "**Trigger Date**" shall be the earliest date on which all of the following conditions precedent have occurred:

2.2.1.   The Imerys Debtors and the Cyprus Debtor each have filed the J&J Settlement Motion in their respective Chapter 11 Cases.

2.2.2.   The Bankruptcy Court has entered the J&J Settlement Order.

2.2.3.   The Voting Affirmation Date.

2.3.    Once the Talc Personal Injury Trust is established, the Talc Personal Injury Trust shall provide J&J with a Form W-9 containing the tax identification number and bank account information sufficient to make the required wire transfer(s) to the Talc Personal Injury Trust.  If the Talc Personal Injury Trust has been established and the Talc Personal Injury Trust has not provided such information concerning its accounts to J&J within two (2) Business Days prior to the date that any payment is required to be made to the Talc Personal Injury Trust, then J&J shall make the applicable payments to the Designated Accounts in satisfaction of its payment obligations to the Talc Personal Injury Trust until the Talc Personal Injury Trust provides such information, after which time J&J shall transfer any additional payments to the Talc Personal Injury Trust.

**3.     J&J BUYBACK**

3.1.    The J&J Settlement Motion shall constitute a request by the Debtors for the Bankruptcy Court to approve the J&J Buyback, which shall be effective as of the Closing Date and consistent with the terms as set out in this Agreement, pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, free and clear of all interests and claims, including any claim of any person or entity against the J&J Corporate Parties, or any of them, on account of, based upon, directly or indirectly arising from, or in any way relating to any alleged right, claim, or interest of the Debtors, or any of them, in the J&J Agreements or Debtor J&J Released Claims, including subrogation claims (except as provided for in section 6.1), and to find that J&J is a good-faith purchaser pursuant to section 363(m) of the Bankruptcy Code and approve the mutual releases and other compromises set forth in this Agreement pursuant to Bankruptcy Rule 9019.   For the avoidance of doubt, and notwithstanding the foregoing, the J&J Buyback does not include, and J&J is not purchasing, any rights or interests in Claims against the J&J Corporate Parties arising out of or in connection with pre-petition payments to any of the Imerys Parties or Cyprus Parties, by way of subrogation or otherwise, asserted by Truck Insurance Exchange ("**Truck**") or any insurer currently or previously managed by Resolute Management, Inc. ("**RMI Managed Insurers**"), including National Union Fire Insurance Company of Pittsburgh, PA ("**National Union**").

**4.     J&J INITIAL PAYMENT; JOINT AND SEVERAL LIABILITY**

4.1.    On or prior to the date that is five (5) Business Days after the Trigger Date, J&J shall pay, or cause to be paid, the J&J Initial Payment, in immediately available funds in U.S. dollars via wire transfer(s) to, if the Talc Personal Injury Trust has not been established, the Designated Accounts, and, if the Talc Personal Injury Trust has been established, the account of the Talc Personal Injury Trust or the Designated Accounts, as applicable.   Any payments to the

Designated Accounts under this provision shall be divided evenly (50%/50%) between the Cyprus Designated Account and the Imerys Designated Account.

4.2.    Johnson & Johnson, and any successor thereto, and Red River, and any successor thereto, are jointly and severally liable for payment of the J&J Initial Payment, and the J&J Insurance Payments and any Home Proceeds received by any J&J Corporate Party as set forth in Section 5 below (the "**J&J Payment Obligations**"), and the commencement of a proceeding under the Bankruptcy Code by any such J&J Corporate Party will not operate as a stay of, or otherwise affect, the obligation of any of the others to make the J&J Payment Obligations.  If the payment of any of the J&J Payment Obligations is subsequently avoided for any reason, including through the exercise of a trustee's avoidance powers under the Bankruptcy Code, any of the Parties jointly and severally liable for the J&J Payment Obligations shall irrevocably and indefeasibly pay, or cause to be paid, the J&J Payment Obligations, via wire transfer(s), to the entity(ies) as set forth in Section 4.1 hereof within five (5) Business Days from the date of written notice of the avoidance of any J&J Payment Obligation.

4.3.    Johnson & Johnson hereby agrees not to assert and waives and releases whatever claims it may have had against LLT or may have against any successor to LLT, including Red River and Pecos River, for contractual, equitable, or common law indemnification, contribution, or reimbursement on account of it satisfying, whether in whole or in part, any J&J Payment Obligations as provided for hereunder, but solely if, and to the extent, such claim is the basis for an assertion by Johnson & Johnson or any other J&J Corporate Party that the Debtors are stayed or otherwise enjoined from enforcing their respective rights under this Agreement against Johnson & Johnson as a result of a J&J Related Bankruptcy Case.  For the avoidance of doubt, Johnson &

24

Johnson is not waiving or releasing such claims, or agreeing not to assert them, for any other purpose or to any other extent.

4.4.    J&J's payment obligations under this Agreement run solely to the Talc Personal Injury Trust or the Debtors, as set forth in Sections 4 and 5.  In no event shall any J&J entity or J&J Corporate Party pay or be obligated to pay directly any claimant or any representative of any claimant, on account of any obligation under this Agreement.

### 5.    J&J INSURANCE PAYMENTS AND HOME PROCEEDS

5.1.    J&J has sole discretion over pursuit and settlement of coverage under the J&J Policies, and the Debtor Releasing Parties shall have none, and J&J's method of pursuit and settlement of coverage shall not be a breach of J&J's obligations under this Agreement; provided that J&J shall diligently pursue Insurance Recoveries, employ best efforts to recover all potentially available insurance for talc claims, and may not abandon efforts to recover for talc claims under the J&J Policies, until the Insurance Reporting Termination Date.  J&J's discretion shall include strategic decisions concerning the presentation of claims and arguments in support thereof and resolution of those claims under the J&J Policies.  The Debtors and the Talc Personal Injury Trust shall reasonably cooperate with J&J in J&J's pursuit of Insurance Recoveries, at J&J's request and at J&J's sole expense.  If J&J fails to diligently pursue Insurance Recoveries, the Parties agree that such failure will be a breach of this Agreement.  In no event shall J&J be required to contribute any proceeds received from Middlesex or under Middlesex policies.

5.2.    J&J represents it has entered settlement agreements to recover approximately $167,000,000 of insurance proceeds on or about the time this Agreement is presented for approval, and such a recovery shall be included in Insurance Recoveries, as defined in this Agreement.  For the avoidance of doubt, J&J's obligation to pay J&J Insurance Payments pursuant to this Agreement terminates upon the Insurance Reporting Termination Date.

5.3.     Upon the occurrence of the Trigger Date, until the Insurance Reporting Termination Date, within five (5) Business Days after any receipt of Insurance Recoveries or Home Proceeds by any J&J Corporate Party, J&J shall deliver to the Claimant Fiduciaries, the Imerys Parties, and the Cyprus Parties (if prior to the Plans' Effective Date) or the Talc Personal Injury Trust (if after the Plans' Effective Date) a statement setting forth the date and source(s) of each such receipt of Insurance Recoveries or Home Proceeds and the aggregate amount of the J&J Insurance Payments paid to date pursuant to this Agreement.

5.4.     Effective upon the Closing Date, J&J irrevocably assigns and transfers all of its rights with respect to the Home Proceeds to the Debtors, as joint owners of an undivided interest (if prior to the Plans' Effective Date) or the Talc Personal Injury Trust (if after the Plans' Effective Date) without need for further action, and J&J will work cooperatively with the Debtors, the Claimant Fiduciaries, and/or the Talc Personal Injury Trust in any efforts necessary to effectuate this assignment and recovery of the Home Proceeds, including by notifying the New Hampshire Insurance Commissioner.  Any distributions of Home Proceeds to the Debtors following the assignment contemplated by this provision shall be divided evenly (50%/50%) between the Cyprus Designated Account and the Imerys Designated Account.

5.5.     The Parties shall cooperate in good faith to open an escrow account (the "**Escrow Account**") after the Execution Date.  The Escrow Account shall be held by an escrow agent (the "**Escrow Agent**") pursuant to an escrow agreement (the "**Escrow Agreement**").  The identity of the Escrow Agent and the terms of the Escrow Agreement shall be consistent with the terms of this Agreement and subject to approval by the Parties in each Party's sole discretion.  The Escrow Account may hold cash or U.S. Treasury securities.  Any interest or other income earned on funds in the Escrow Account shall be redeposited into the Escrow Account.

26

5.6.    Prior to the Trigger Date, within five (5) Business Days after receipt of any portion of any J&J Insurance Payments or Home Proceeds by any J&J Corporate Party, J&J shall pay, or cause to be paid, the J&J Insurance Payments or Home Proceeds received, in immediately available funds in U.S. dollars via wire transfer, to the Escrow Account.  For the avoidance of doubt, J&J shall have no obligation to pay, or cause to be paid, the J&J Insurance Payments or Home Proceeds to the Escrow Account until (i) the Escrow Account is opened and (ii) the Bankruptcy Court has entered the J&J Settlement Order.

5.7.    After occurrence of the Trigger Date, and after ten (10) Business Days prior written notice from the Debtors to J&J, the Debtors shall instruct the Escrow Agent to irrevocably and indefeasibly pay, or cause to be paid, the balance of the Escrow Account, in immediately available funds in U.S. dollars via wire transfer(s), as follows: (i) if after the Plans' Effective Date, to the Talc Personal Injury Trust; and (ii) if prior to the Plans' Effective Date, to the Designated Accounts.  Any payments to the Designated Accounts under this provision shall be divided evenly (50%/50%) between the Cyprus Designated Account and the Imerys Designated Account.

5.8.    In the event this Agreement is terminated prior to the Trigger Date pursuant to Section 8.1 below:  (i) the Parties agree the balance of the Escrow Account (less the Home Proceeds) shall be paid to J&J, and after ten (10) Business Days' prior written notice from J&J to the Debtors, J&J shall instruct the Escrow Agent to distribute such balance to J&J; and (ii) the Home Proceeds shall be deposited into or remain in the Escrow Account described above in Section 5.5, and the rights of the J&J Corporate Parties, the Imerys Parties, and the Cyprus Parties with respect to the Home Proceeds shall exist as they did prior to the execution of this Agreement.

5.9.    The Debtors agree that they will only direct the Escrow Agent to disburse funds from the Escrow Account pursuant to Section 5.7 above.  J&J agrees that it will only direct the

27

Escrow Agent to disburse funds from the Escrow Account pursuant to Section 5.8 above.  Each of the Debtors and J&J agree to certify that any direction to the Escrow Agent to disburse funds from the Escrow Account complies with this Agreement.

5.10.    As of the Trigger Date, within five (5) Business Days after receipt of any portion of any J&J Insurance Payments or Home Proceeds by any J&J Corporate Party, J&J shall irrevocably and indefeasibly pay, or cause to be paid, any unpaid portion of the J&J Insurance Payments or Home Proceeds received as set forth in the statement delivered in accordance with Section 5.3 hereof, in immediately available funds in U.S. dollars via wire transfer(s), as follows: (i) if after the Plans' Effective Date, to the Talc Personal Injury Trust or the Designated Accounts, as applicable; and (ii) if prior to the Plans' Effective Date, to the Designated Accounts.  Any payments to the Designated Accounts under this provision shall be divided evenly (50%/50%) between the Cyprus Designated Account and the Imerys Designated Account.

5.11.    The obligation of J&J and Red River to make J&J Insurance Payments to the Talc Personal Injury Trust, the Escrow Account, or the Designated Accounts as applicable, under this Agreement shall total $280,000,000 in the aggregate.

5.12.    Effective upon the Insurance Reporting Termination Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Debtor Corporate Parties, and the Talc Personal Injury Trust shall assign to J&J all rights, interests and remedies they may have under the J&J Policies.

6.    **RELEASES**

6.1.    **Release by Debtor Releasing Parties.**  Effective upon the Closing Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Estates, the Reorganized Debtors, and the Talc Personal Injury Trust, and any successors, assigns, or

28

representatives of each of the foregoing and any other persons claiming under or through them (collectively, the "**Debtor Releasing Parties**") shall be deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge the J&J Corporate Parties from any and all claims the Debtor Releasing Parties have against them, with the exception of "Potential Subrogated Claims," as defined below, including: (a) all Claims raised (or that any Debtor Releasing Party could have raised) in the Adversary Proceedings; and (b) any and all Claims, counterclaims, causes of action, Estate Causes of Action Against J&J, disputes, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether arising pre-petition or post-petition, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, in law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including Claims or causes of action based on a theory of contribution, subrogation, contractual and/or equitable indemnification, or common law, or insurance coverage claims against Middlesex, which the Debtor Releasing Parties have, had, may have, or may claim to have against any of the J&J Corporate Parties directly, derivatively, or indirectly arising out of, with respect to, or in any way relating to Talc Personal Injury Claims, the J&J Agreements, or otherwise to the supply of talc by the Debtors to any J&J Corporate Party ("**Debtor J&J Released Claims**").  For the avoidance of doubt, the Debtor J&J Released Claims shall include any Claim or right against a J&J Corporate Party held by a Protected Party or a Talc Insurance Company (including a Settling Talc Insurance Company) that is assigned

or otherwise transferred to the Talc Personal Injury Trust pursuant to the Plans (including the Contributed Indemnity and Insurance Interests, and the Rio Tinto/Zurich Credit Contribution, each as defined in the Plans). Notwithstanding the above, the Debtor J&J Released Claims shall not include any claims relating to J&J Talc Claims as to which, and in the amount as to which, any RMI Managed Insurer and/or Truck made pre-petition payments to or on behalf of the Imerys Parties or the Cyprus Parties (the "**Potential Subrogated Claims**"). Upon the Closing Date, any and all requests, demands, or tenders for defense or indemnity or payment previously submitted to the J&J Corporate Parties by any of the Debtor Releasing Parties with respect to a Debtor J&J Released Claim shall be deemed withdrawn, the Debtor Releasing Parties shall surrender, relinquish, and release any further right to tender or present any Debtor J&J Released Claims, and the J&J Corporate Parties shall have no duty to defend, indemnify, reimburse, or otherwise pay the Debtor Releasing Parties with respect to any Debtor J&J Released Claims. For the avoidance of doubt, this Agreement shall have no effect on any subrogation rights that any insurer (other than insurers party to a Plan Settlement Agreement) that has made pre-petition payments to or on behalf of any of the Imerys Parties or the Cyprus Parties, including Truck and the RMI Managed Insurers (including National Union) has asserted or may assert against J&J in connection with or as a result of such payments. Other than (i) insurers party to a Plan Settlement Agreement and (ii) the RMI Managed Insurers, including National Union, and Truck, and any affiliates thereof, the Imerys Parties and the Cyprus Parties represent that they are not aware of any insurers that have paid defense or indemnity costs to or on behalf of a Debtor Released Party in relation to J&J Talc Claims. From and after the Execution Date, unless and until this Agreement is terminated in accordance with Section 8 below, the Debtor Releasing Parties shall not pursue, and the Claimant Fiduciaries shall not seek standing to pursue, any Debtor J&J Released Claims; *provided, however*,

for the avoidance of doubt, the Imerys Parties and the Cyprus Parties may file proof(s) of claim in any J&J Related Bankruptcy Case to ensure that the Debtor J&J Released Claims are not waived or impaired pending the Closing Date.

6.2. **Release by Non-Debtor Releasing Parties.** Effective upon the Closing Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor Corporate Parties, the Rio Tinto Corporate Parties, any successors, assigns, or representatives of any of the Debtor Corporate Parties or the Rio Tinto Corporate Parties, and any other persons claiming under or through any of them (collectively, the "**Non-Debtor Releasing Parties**") shall be deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge the J&J Corporate Parties from any and all claims the Non-Debtor Releasing Parties have against them relating to J&J Talc Claims, with the exception of Potential Subrogated Claims, including (a) all Claims raised (or that any Non-Debtor Releasing Party could have raised) in the Adversary Proceedings; and (b) any and all Claims, counterclaims, causes of action, disputes, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether pre-petition or post-petition, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, in law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including Claims or causes of action based on a theory of contribution, subrogation, contractual and/or equitable indemnification, or common law, or insurance coverage claims against Middlesex, which the Non-Debtor Releasing

31

Parties have, had, may have, or may claim to have against any of the J&J Corporate Parties directly, derivatively, or indirectly arising out of, with respect to, or in any way relating to Talc Personal Injury Claims, the J&J Agreements, or otherwise to the supply of talc by the Debtors to any J&J Corporate Party ("**Non-Debtor J&J Released Claims**").  Upon the Closing Date, any and all requests, demands, or tenders for defense or indemnity or payment previously submitted to the J&J Corporate Parties by any of the Non-Debtor Releasing Parties with respect to a Non-Debtor J&J Released Claim shall be deemed withdrawn, the Non-Debtor Releasing Parties shall surrender, relinquish, and release any further right to tender or present any Non-Debtor J&J Released Claims, and the J&J Corporate Parties shall have no duty to defend, indemnify, reimburse, or otherwise pay the Non-Debtor Releasing Parties with respect to any Non-Debtor J&J Released Claims.  From and after the Execution Date until this Agreement is terminated in accordance with Section 8 below, the Non-Debtor Releasing Parties shall not pursue any Non-Debtor J&J Released Claims; *provided, however*, for the avoidance of doubt, the Non-Debtor Releasing Parties may file proof(s) of claim in any J&J Related Bankruptcy Case to ensure that the Non-Debtor J&J Released Claims are not waived or impaired pending the Closing Date and, *provided, further*, nothing herein shall alter the provisions of Section 6.3 of this Agreement.

  6.3.  **Insurance and Rio Tinto Provisions.**

  6.3.1. Effective upon the Execution Date and, unless and until this Agreement is terminated in accordance with Section 8 below, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor Releasing Parties and Non-Debtor Releasing Parties covenant not to pursue insurance coverage, or accept any payment, under any insurance policy, for J&J Talc Claims, including to recover any defense costs or for contribution, and to the extent such claims have been made in the past and remain pending, the Debtor Releasing Parties and the

Non-Debtor Releasing Parties shall pause any pursuit of the claims, shall so advise the party from whom they are pursuing such coverage, and shall not accept any payment for or in connection with such J&J Talc Claims; *provided, however*, that, notwithstanding anything to the contrary contained in this Agreement, the foregoing shall not apply, and J&J (on behalf of itself and all other J&J Corporate Parties) expressly consents, to (i) the pursuit of coverage, and acceptance of payment, by Rio Tinto, the Rio Tinto Captive Insurers and Zurich from any of their insurers, reinsurers or retrocessionaires, whether with respect to amounts to be paid by Rio Tinto, the Rio Tinto Captive Insurers and Zurich under the Rio Tinto/Zurich Settlement or otherwise (and nothing in this Agreement shall constitute a waiver or release of any claims or rights that Rio Tinto, the Rio Tinto Captive Insurers or Zurich have against any of their insurers, reinsurers or retrocessionaires), and (ii) the Debtors' (and the Talc Personal Injury Trust's or the Debtors' bankruptcy estates') pursuing, and accepting payment resulting from, (a) the Imerys Settlement, Rio Tinto/Zurich Settlement, Cyprus Settlement, and XL Settlement (each as defined in the *Second Joint Plan of Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Imerys D.I. 6439] (the "**Imerys Plan**")), and (b) the settlement approved by the Bankruptcy Court pursuant to that certain *Order (I) Approving the Settlement Agreement Among the Imerys Debtors, the Cyprus Debtor, Cyprus Amax Minerals Corporation, and Old Republic Insurance Company and (II) Approving the Sale of Certain Insurance Policies* [Imerys D.I. 6262] ((a) and (b), collectively, the "**Plan Settlement Agreements**"); *provided, further*, that J&J's consent to the foregoing shall not impair or otherwise limit the effects of the J&J Buyback, and unless and until this Agreement is terminated, any settling insurer, any other party to such Plan Settlement Agreements (whether or not consummated), including Rio Tinto, the Rio Tinto Captive Insurers, and Zurich, and any person or entity claiming under or through any of the foregoing,

including any reinsurers or retrocessionaires, shall not assert, or be able to assert, any subrogation rights against any J&J Corporate Party with respect to any payments made, to be made, or contemplated to be made pursuant to any Plan Settlement Agreement or otherwise on account of any Talc Personal Injury Claim, but instead Rio Tinto, the Rio Tinto Captive Insurers and Zurich shall be able to assert such rights (the "**Rio Tinto/Zurich Rights**") against, and shall have all such rights attach to, the fifty-percent (50%) share of the J&J Initial Payment, the J&J Insurance Payments and any Home Proceeds that is paid into the Imerys Designated Account (or otherwise to or for the benefit of the Imerys Debtors and/or their Estates pursuant to this Agreement) (the "**Imerys Share of Settlement Proceeds**") until the Rio Tinto/Zurich Settlement is consummated; *provided, however*, that under no circumstance shall the Rio Tinto/Zurich Rights be assertable against or attach to any funds or other assets of the Talc Personal Injury Trust because in the event the Imerys Plan is confirmed but the Rio Tinto/Zurich Settlement is not consummated, then, notwithstanding anything to the contrary in this Agreement, the Imerys Share of Settlement Proceeds shall be paid into the Imerys Designated Account and the portion of the Imerys Share of Settlement Proceeds necessary to satisfy the full amount of any Rio Tinto/Zurich Rights as agreed to between the parties or determined pursuant to court order shall be held by the reorganized Imerys Debtors to satisfy such Rio Tinto/Zurich Rights, if any, until all such rights have been fully resolved.  Unless and until this Agreement is terminated, other than with respect to any claims addressed in the Plan Settlement Agreements, the Debtor Releasing Parties and the Non-Debtor Releasing Parties waive any claim under insurance policies other than J&J Policies for insurance coverage of J&J Talc Claims, including any defense costs; *provided, however,* that the forgoing shall not alter or diminish the other provisions of this Section 6.3.1 or of Sections 6.3.2 or 6.3.3 of this Agreement with respect to Rio Tinto, the Rio Tinto Captive Insurers and Zurich.  Nothing in

this Agreement shall alter the terms of the Rio Tinto/Zurich Settlement; *provided, however*, that nothing in the Rio Tinto/Zurich Settlement shall impair the J&J Buyback or the releases provided for herein.

6.3.2. If the J&J Buyback becomes effective in accordance with the terms of this Agreement, but the Rio Tinto/Zurich Settlement and/or the XL Settlement is for any reason not consummated pursuant to confirmation of the Imerys Plan (a "**Rio Tinto/Zurich Non-Settlement Event**"), then any of the Imerys Debtors, any trust created under the Imerys Plan (or any other plan of reorganization for Imerys), or any other successor to or assignee of the rights of the Imerys Debtors may assert J&J Talc Claims against Rio Tinto, the Rio Tinto Captive Insurers, Zurich or XL Insurance America, Inc. ("**XL**") (an "**Imerys Claim**"), provided:

    (1) Rio Tinto, the Rio Tinto Captive Insurers, Zurich, and XL, as applicable, may assert as a defense to any such Imerys Claim:

        a.   that, but for this Agreement, it or they would be able to seek contribution, indemnity, reimbursement, or subrogation from the Cyprus Parties or from insurers that issued one or more policies to the Cyprus Parties, or from Rio Tinto, the Rio Tinto Captive Insurers, Zurich or XL (or any affiliate thereof), in respect of such Imerys Claim (a "**Contribution Claim**"); and

        b.   any and all other defenses it or they may have, including any defenses arising by reason of this Agreement other than any argument that this Agreement constitutes a breach of any insurance policy provision requiring an insured not to waive or release any subrogation claims.

    (2) If and to the extent such Contribution Claim is determined by court order to be valid, the liability of Rio Tinto, the Rio Tinto Captive Insurers, Zurich or XL, as applicable,

on the Imerys Claim shall be reduced by the amount of the Contribution Claim.

6.3.3.  If a Rio Tinto/Zurich Non-Settlement Event occurs, to the extent that any holder of a Talc Personal Injury Claim or other plaintiff bringing suit against the Rio Tinto Corporate Parties for or in respect of an Imerys Claim cannot be bound to the reduction of judgment set forth above, Rio Tinto, the Rio Tinto Captive Insurers or Zurich shall be able to assert such judgment reduction rights against, and shall have all such rights attach only to, (i) $75 million of the J&J Initial Payment paid into the Imerys Designated Account (or otherwise to or for the benefit of the Imerys Debtors and/or their Estates pursuant to this Agreement) and (ii) $20 million of the J&J Initial Payment paid into the Cyprus Designated Account (or otherwise to or for the benefit of the Cyprus Debtor and/or its Estate pursuant to this Agreement) (together, the amounts in (i) and (ii) above are referred to herein as the "**Rio Attachment Amounts**"), on a pro rata basis as between the Imerys Estates and the Cyprus Estate, as if this provision were applicable to such plaintiff; *provided, however*, that under no circumstance shall Rio Tinto, the Rio Tinto Captive Insurers or Zurich have any Contribution Claim that attaches to or may be asserted against any funds or other assets of the Talc Personal Injury Trust because in the event the Imerys Plan is confirmed but the Rio Tinto/Zurich Settlement is not consummated, then, notwithstanding anything to the contrary in this Agreement, the Rio Attachment Amounts shall be paid into the Imerys Designated Account and Cyprus Designated Account, in the amounts specified above, and such Rio Attachment Amounts shall be held by the reorganized Imerys Debtors and the reorganized Cyprus Debtor, as applicable, until such Rio Contribution Claims have been fully resolved; *provided, further*, that each of the Debtors and the Claimant Fiduciaries reserves all rights to challenge whether any Contribution Claim exists as a legal matter, to challenge any specific claim that Rio Tinto, the Rio Tinto Captive Insurers or Zurich may assert, and to seek further relief from the Bankruptcy Court

(including, in the event a Debtor's case is dismissed, to reopen such case for the purpose of seeking relief from the Bankruptcy Court, or if the Bankruptcy Court declines to reopen a case, to seek further relief from a non-bankruptcy court of competent jurisdiction) with respect to the Debtors' use of the Rio Attachment Amounts.  For the avoidance of doubt, funds from the J&J Initial Payment in excess of the Rio Attachment Amounts are not subject to this Section 6.3.3.

6.3.4.  Rio Tinto, on behalf of the Rio Tinto Corporate Parties, acknowledges that none of the Rio Tinto Corporate Parties qualifies as an insured under any policies issued to Standard Oil Company (Indiana) between January 1, 1979 and July 1, 1985 or any Cyprus Talc Insurance Policy.

6.3.5. For the avoidance of doubt, J&J, on behalf of itself and all other J&J Corporate Parties, further acknowledges that nothing in this Agreement shall afford any J&J Corporate Party any rights to any settlement proceeds from the Plan Settlement Agreements or any other rights under any of the Plan Settlement Agreements.  Notwithstanding Section 13.8 of the Settlement Agreement, all parties to the Plan Settlement Agreements (including the Rio Tinto Captive Insurers and Rio Tinto) may rely on and enforce Sections 6.2, 6.3, 6.4 and 6.5 of this Agreement (and no other provisions of this Agreement).

6.3.6. Notwithstanding the above, and for the avoidance of doubt, nothing in this Agreement shall prohibit, restrict, preclude, or enjoin any person or entity from pursuing insurance coverage under the Debtors' Policies for Talc Personal Injury Claims or portions of Talc Personal Injury Claims that are not J&J Talc Claims.  Notwithstanding the above, subject to the other terms of this Agreement, J&J, on behalf of the Debtor Releasing Parties and Non-Debtor Releasing Parties, may pursue insurance coverage for J&J Talc Claims from only J&J Policies, except those policies under which J&J entered into talc-related settlements prior to the Execution Date.

37

6.3.7.  Unless and until this Agreement is terminated, no J&J Corporate Party may assign any right, title or interest it may have as an additional insured under any Rio Tinto Captive Insurer Policies and the Zurich Policies (each as defined in the Imerys Plan) to any party (including any other J&J Corporate Party) other than to the Rio Tinto Captive Insurers and Zurich (as appropriate). Unless and until this Agreement is terminated, the J&J Corporate Parties consent to the sale of the Rio Tinto Captive Insurer Policies and the Zurich Policies back to the Rio Tinto Captive Insurers and Zurich, pursuant to the terms of the Rio Tinto/Zurich Settlement, free and clear of any right, title or interest any of the J&J Corporate Parties may have as additional insureds (or otherwise) under the Rio Tinto Captive Insurer Policies and the Zurich Policies (the "**Free and Clear Sale**"); *provided*, that J&J's consent to the Free and Clear Sale shall not impair or otherwise limit the effects of the J&J Buyback, and unless and until this Agreement is terminated, Rio Tinto, the Rio Tinto Captive Insurers, and Zurich and any person or entity claiming under or through any of the foregoing, including any reinsurers or retrocessionaires, shall not assert, or be able to assert, any subrogation rights against any J&J Corporate Party with respect to any payments made, to be made, or contemplated to be made pursuant to the Rio Tinto/Zurich Settlement, the Free and Clear Sale, and/or otherwise on account of any Talc Personal Injury Claim, but instead shall be able to assert such rights against, and shall have all such rights attach to, the Imerys Share of Settlement Proceeds.

6.3.8.  The J&J Corporate Parties that are not debtors in any J&J Related Bankruptcy Case shall not oppose, or support any other person in opposing, the entry of an order in any J&J Related Bankruptcy Case granting relief from the automatic stay in any such J&J Related Bankruptcy Case to the extent necessary for the Bankruptcy Court presiding over the Imerys Debtors' Chapter 11 Cases to authorize and approve the Free and Clear Sale.

6.4.    **Release by J&J Corporate Parties.**  Effective upon the Closing Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the J&J Corporate Parties, any successors, assigns, or representatives of any of them, and any other persons claiming under or through any of them (collectively, the "**J&J Releasing Parties**"), shall be deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge the Debtor Releasing Parties, the Non-Debtor Releasing Parties, and the Claimant Fiduciaries (and their agents and representatives) (collectively, the "**Debtor/Non-Debtor Released Parties**") from any and all claims the J&J Corporate Parties have against them, including:  (a) all Claims raised (or that any J&J Corporate Party could have raised) in the Adversary Proceedings or in the Proofs of Claim; and (b) any and all Claims, counterclaims, causes of action, disputes, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether arising pre-petition or post-petition, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, in law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including Claims or causes of action based on a theory of contribution, subrogation, contractual and/or equitable indemnification, or common law, which the J&J Corporate Parties have, had, may have, or may claim to have against any of the Debtor/Non-Debtor Released Parties directly, derivatively, or indirectly arising out of, with respect to, or in any way relating to Talc Personal Injury Claims, the J&J Agreements, or otherwise to the supply of talc by the Debtors to any J&J Corporate Party (collectively, (a) and

(b), "**Debtor/Non-Debtor Released Claims**").   Upon the Closing Date, any and all requests, demands, or tenders for defense or indemnity previously submitted to the Debtor/Non-Debtor Released Parties by any of the J&J Corporate Parties with respect to a Debtor/Non-Debtor Released Claim shall be deemed withdrawn, and the J&J Corporate Parties shall surrender, relinquish, and release any further right to tender or present any Debtor/Non-Debtor Released Claims, and the Debtor/Non-Debtor Released Parties and the Estates shall have no duty to defend, indemnify, reimburse, or otherwise pay the J&J Corporate Parties with respect to any Debtor/Non-Debtor Released Claims.   Upon the Closing Date, any and all requests or demands for payment of any Debtor/Non-Debtor Released Claim by the J&J Corporate Parties against any Debtor or Debtor Corporate Party (or Non-Debtor Releasing Party) or the Estates shall be deemed withdrawn with prejudice and the J&J Corporate Parties agree to waive any claim against the Talc Personal Injury Trust for any reason, including, without limitation, indirect claims, contribution, or subrogation for any Talc Personal Injury Claim (as defined in the Plans) paid by a J&J Corporate Party.   From and after the Execution Date, unless and until this Agreement is terminated in accordance with Section 8 below, the J&J Corporate Parties shall not pursue any Debtor/Non-Debtor Released Claims.   In addition, effective upon the Closing Date, for good and valuable consideration, the adequacy of which is hereby confirmed, (i) the J&J Releasing Parties shall be deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge all claims the J&J Releasing Parties have or may have against the Zurich Corporate Parties, or any of them, in each case, solely under the policies set forth on Schedule VI to the Imerys Plan, and any other policy under which both (x) any J&J Releasing Party claims status as an additional insured with respect to talc supplied by the Imerys Debtors and (y) any Rio Tinto Captive Insurer has reinsured any Zurich Corporate Party (such policies that satisfy both conditions (x) and (y),

the "**Additional Zurich Policies**"), and (ii) the Zurich Corporate Parties shall be deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge all claims (including subrogation claims) the Zurich Corporate Parties have or may have against the J&J Releasing Parties, or any of them, in each case, solely under the policies set forth on Schedule VI to the Imerys Plan and any Additional Zurich Policy.

6.5.    **Unknown or Future Claims.**  The Parties, Rio Tinto and Zurich (collectively, the "**Releasing Parties**") expressly acknowledge that there may be changes in the law or the Releasing Parties may hereafter discover facts different from, or in addition to, those that they now believe to be true with respect to any and all of the Claims released in Sections 6.1, 6.2, and 6.4 above. Nevertheless, the Releasing Parties hereby agree that (subject to Section 8 of this Agreement) the releases set forth in Sections 6.1, 6.2, and 6.4 above shall be and remain effective in all respects, notwithstanding any changes in the law or the discovery of such additional or different facts.  In addition, the Releasing Parties acknowledge that they have been advised by their respective legal counsel regarding, and are familiar with, the provisions of section 1542 of the California Civil Code, which provides:

> **A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.**

The Releasing Parties expressly waive and relinquish any and all rights or benefits they have or may have under California Civil Code § 1542 and under any other federal or state statute, rule, law, or common law principle of similar effect, as to the releases given in this Agreement, to the full extent that such right or benefit may be lawfully waived.  In connection with the waiver and relinquishment of rights or benefits under California Civil Code § 1542, each Releasing Party

acknowledges that it fully understands that facts may later be discovered in addition to or different from those facts which are now known or believed to be true with respect to the subject matter of this Agreement, and that it is that Releasing Party's intention hereby to fully, finally and forever release all Claims and rights, known or unknown, suspected or unsuspected, which now exist, may exist in the future, and/or have ever existed in the past, as to the matters released in Sections 6.1, 6.2, and 6.4 of this Agreement.

### 7.    COOPERATION AND BANKRUPTCY-RELATED OBLIGATIONS

7.1.    The Debtors shall (i) amend each of their respective Plans to be consistent with this Agreement and thereafter cause each of their respective Plans to remain consistent with this Agreement, (ii) solicit votes on each of their respective Plans, (iii) file the Voting Certification with the Bankruptcy Court, (iv) request that the Bankruptcy Court enter an order setting a Voting Objection Deadline no later than thirty (30) days after the Voting Certification is filed with the Bankruptcy Court, and (v) if one or more Voting Objections(s) are filed with the Bankruptcy Court before expiration of the Voting Objection Deadline, seek to have the Bankruptcy Court decide such Voting Objection(s), in each case as expeditiously as reasonably practicable, taking into account the availability of the Bankruptcy Court, if applicable.  The Debtors acknowledge that the inclusion of this Section 7.1 is a material inducement to the willingness of J&J to enter into this Agreement.

7.2.    The Parties acknowledge that, pursuant to this Agreement, they share a common interest with respect to pursuit of insurance coverage described in Sections 5.1 and 5.4 above.

7.3.    Upon the Execution Date, no J&J Corporate Party shall be a party in interest in the Chapter 11 Cases, or participate in the Chapter 11 Cases, except (i) to enforce this Agreement, (ii) to fulfill its cooperation obligations under this Section 7, or (iii) in the event this Agreement is

terminated pursuant to Section 8 hereof.  Accordingly, except to contend that the Debtors have breached this Agreement or that such documents are otherwise inconsistent with this Agreement, no J&J Corporate Party shall object to the disclosure statements or Plans filed in the Chapter 11 Cases or seek discovery or disclosures from any other Party in the Chapter 11 Cases.

7.4.    Any chapter 11 plan filed in any J&J Related Bankruptcy Case shall be consistent with this Agreement.  Provided that any chapter 11 plan filed in any J&J Related Bankruptcy Case is consistent with the chapter 11 plan of reorganization of Red River released publicly on June 4, 2024, with respect to its treatment of the Imerys Parties and the Cyprus Parties and this Agreement, upon the Execution Date, no Imerys Party, Cyprus Party, or Claimant Fiduciary shall seek discovery or disclosures from any other Party in any J&J Related Bankruptcy Case, or participate in any J&J Related Bankruptcy Case, except (i) to enforce this Agreement, (ii) to fulfill its cooperation obligations under this Section 7, (iii) to file proofs of claim to the extent they deem it necessary or appropriate in the J&J Related Bankruptcy Case, (iv) to seek relief from the automatic stay, as and to the extent necessary, to authorize and obtain approval for the Free and Clear Sale (as defined in Section 6.3), or (v) in the event this Agreement is terminated pursuant to Section 8 hereof.  Accordingly, except to contend that a J&J Corporate Party has breached this Agreement or that such documents are otherwise inconsistent with this Agreement, no Imerys Party, Cyprus Party, or Claimant Fiduciary shall object to the disclosure statements or chapter 11 plans filed in any J&J Related Bankruptcy Case or seek discovery or disclosures from any other Party in any J&J Related Bankruptcy Case.  In the event that a J&J Related Bankruptcy Case is commenced prior to the earlier to occur of the Trigger Date and the date on which this Agreement is terminated pursuant to Section 8.1 or Section 8.3 below, J&J shall not, and shall cause the other J&J Corporate Parties, including any debtor in any J&J Related Bankruptcy Case, not to, seek a deadline for

objection to the confirmation of any chapter 11 plan of reorganization for such debtor that is prior to the Trigger Date or the date that is ten (10) days after this Agreement is terminated pursuant to Section 8.1 or Section 8.3 below, as applicable.

      7.5.    Each Party shall use its reasonable efforts, and take such steps and execute such documents as may be reasonably necessary and proper to effectuate the purpose and intent of, and obtain the outcomes sought by, this Agreement, including entry of the J&J Settlement Order, filing the Voting Certification, confirmation of the Plans, including the settlement agreements provided for therein, and the occurrence of the Plans' Effective Date, and to preserve the validity and enforceability of this Agreement.   In the event that any objection, action, or proceeding is commenced or prosecuted by any Person to invalidate, hinder, or prevent the approval, validation, enforcement, or carrying out of all or any provisions of this Agreement or to appeal the J&J Settlement Order, the Parties mutually agree to reasonably cooperate in good faith in opposing such objection, action, proceeding, or appeal.   Each of the Parties shall reasonably cooperate in good faith with each of the other Parties in responding to or opposing any motion, objection, claim, assertion, or argument by any third party that this Agreement is not binding, or should be avoided, or that valuable and fair consideration or reasonably equivalent value has not been exchanged pursuant to this Agreement.   For the avoidance of doubt, the obligations contained in this Section 7.5 shall survive and remain binding on the Parties until such time as the later of (i) the Plans' Effective Date has occurred and (ii) the Insurance Reporting Termination Date has occurred.   The J&J Corporate Parties acknowledge that the inclusion of this Section 7.5 is a material inducement to the Debtors entering into this Agreement in addition to payment in full of the J&J Payment Obligations.   Notwithstanding anything to the contrary contained in this Agreement, nothing in this Agreement is intended to prevent, or shall be construed to prevent, the implementation of the

Plan Settlement Agreements, or is intended to be, or shall be construed as, contrary to, modifying, or giving any J&J Corporate Party any rights under, any of the foregoing settlements.

7.6.    Upon the Closing Date, the Imerys Parties and Cyprus Parties, as applicable, shall dismiss the Adversary Proceedings with prejudice.  From the Execution Date, unless and until this Agreement is validly terminated in accordance with Section 8 hereof, the Imerys Parties and the Cyprus Parties shall not take any action to further prosecute the Adversary Proceedings.

7.7.    Upon the Closing Date, any and all Claims that the J&J Corporate Parties have asserted or that have been asserted on any of their behalf against any of the Debtor/Non-Debtor Released Parties shall be deemed withdrawn with prejudice, including dismissal with prejudice of any and all proofs of claim filed by any J&J Corporate Parties in the Chapter 11 Cases.  Further, no J&J Corporate Party shall file or assert any additional Debtor/Non-Debtor Released Claims against any of the Debtor/Non-Debtor Released Parties arising from any Debtor Released Party's conduct.  From the Execution Date until this Agreement is validly terminated in accordance with Section 8 hereof, the J&J Corporate Parties shall not take any action to initiate or further prosecute any Claims against the Debtor/Non-Debtor Released Parties.  For the avoidance of doubt, upon the Closing Date, any and all Claims that the Debtor Releasing Parties have asserted or that have been asserted on any of their behalf against any of the J&J Corporate Parties shall be deemed withdrawn with prejudice.

7.8.    The Plans shall provide that, on the Plans' Effective Date, the rights of the Debtors under this Agreement shall be deemed to have been assigned and transferred to the Talc Personal Injury Trust without need of further action by any Party or Person, and the Talc Personal Injury Trust shall be bound by all of the applicable provisions of this Agreement.  Unless this Agreement is validly terminated pursuant to the terms hereof, the Debtors, the Reorganized Debtors, and the

Debtor Corporate Parties shall continue to be bound by this Agreement and shall retain all of the obligations and benefits hereof, notwithstanding the Debtors' assignment and transfer of rights under this Agreement to the Talc Personal Injury Trust.

7.9.    The Parties agree, and the Plans shall include the following provision: "Nothing in the Plans or the Trust Distribution Procedures shall be binding on or used to impact, prejudice, or affect the J&J Corporate Parties (including, without limitation, LLT, Johnson & Johnson, Red River, and/or Pecos River), in the tort system or in a bankruptcy case."

7.10.   The Parties agree that nothing in this Agreement shall be binding on or used to impact, prejudice, or affect in any way the rights that any holder of a Talc Personal Injury Claim (or such holder's heirs, executors, and assigns) has directly against a J&J Corporate Party.  For the avoidance of doubt, the Parties acknowledge and agree that the immediately preceding sentence does not apply to rights to pursue Debtor J&J Released Claims or Non-Debtor J&J Released Claims.

## 8.    TERMINATION, BREACH, AND REMEDIES

8.1.    This Agreement shall terminate upon any of the following events:

i.      the Bankruptcy Court does not enter the J&J Settlement Order within 90 days of the Execution Date unless such deadline is extended in writing by each of the Parties;

ii.     the Trigger Date does not occur on or prior to March 31, 2025 unless such deadline is extended in writing by each of the Parties; or

iii.    prior to the Trigger Date, the Bankruptcy Court enters an order converting any of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases

8.2.    The Bankruptcy Court shall have the authority to determine whether a breach has occurred, whether a breach asserted by a Party amounts to a material breach of this Agreement (subject to Section 5.1 of this Agreement), and the appropriate remedy for any breach.

8.3.    In the event of a breach of this Agreement, Parties shall have all remedies available in law or equity, including specific performance; provided, however, no Party may exercise any remedies for breach hereunder until each of the following has occurred: (i) written notice to the other Parties setting forth with particularity the breach allegation, (ii) such breach remains uncured 10 days after receipt of such notice, and (iii) an order from the Bankruptcy Court after such cure period finding that such breach has occurred and the appropriate remedy therefor; provided further, however, that, notwithstanding the foregoing proviso, the Party alleging such breach may immediately seek an order from the Bankruptcy Court finding that such breach has occurred and the appropriate remedy therefor so long as such Party has first reasonably attempted to meet and confer with the other Parties' counsel regarding such breach and remedy.  Upon the Bankruptcy Court's determination that J&J has materially breached this Agreement, the Debtors, the Talc Personal Injury Trust, and/or Claimant Fiduciaries, as applicable, may, in their discretion, immediately terminate this Agreement, provided that none of the Debtors or the Claimant Fiduciaries have materially breached this Agreement.  Upon the Bankruptcy Court's determination that the Debtors, the Debtor Corporate Parties, or the Claimant Fiduciaries have materially breached this Agreement, J&J may, in its discretion, immediately terminate this Agreement, provided J&J has not materially breached this Agreement.

8.4.    No Party (other than any debtor in any J&J Related Bankruptcy Case) shall assert that the automatic stay in (i) any Chapter 11 Case precludes an action for breach or enforcement of this Agreement or (ii) any J&J Related Bankruptcy Case precludes an action for breach or

enforcement of this Agreement against any non-debtor. Johnson & Johnson shall not, and shall cause the other J&J Corporate Parties that are not debtors in any J&J Related Bankruptcy Case not to, assert that the automatic stay in any future J&J Related Bankruptcy Case would preclude, or should be extended to preclude, an action against Johnson & Johnson for breach or enforcement of this Agreement.

8.5.    In the event termination pursuant to Sections 8.1 or 8.3 above occurs and is not waived by each of the Parties in writing, (i) the Parties, Rio Tinto, the Rio Tinto Captive Insurers and Zurich shall be returned to the status quo ante immediately preceding the Execution Date, (ii) the Parties, the Debtor/Non-Debtor Released Parties, and the J&J Corporate Parties shall have all of the same claims, rights, defenses, and obligations under or with respect to any and all of the J&J Agreements or as may be available under applicable law that they would have had absent this Agreement, (iii) any and all otherwise applicable statutes of limitations or repose, or other time-related limitations, shall be deemed to have been tolled for the period from the Execution Date through the date on which this Agreement becomes null and void in accordance with Sections 8.1, 8.2, or 8.3 above, and no Releasing Party shall assert that any other Releasing Party's failure during said period to raise any Claim that would have been resolved by this Agreement, had this Agreement become effective or not been voided, as applicable, renders such claim time-barred;

8.6.    In the event that this Agreement is terminated or otherwise no longer in effect, except as a result of a material breach by J&J pursuant to Section 8.3:  the Debtors, the Debtor Corporate Parties, and the Claimant Fiduciaries shall not pursue solicitation or confirmation of the Plans unless they file new disclosure statements and new solicitation procedures, seek to resolicit the Plans, and provide J&J at least four (4) weeks after the filing of the new disclosure statements

and new solicitation procedures to file any objection to such disclosure statements and solicitation procedures.

8.7.    Remedies provided herein are cumulative and not exclusive of any remedies provided at law.

8.8.    Notwithstanding the foregoing, termination of this Agreement shall not affect the Parties' rights with respect to Section 8 (Termination, Breach, and Remedies), Section 9 (No Admissions or Waiver of Privilege), Section 10 (Retention of Jurisdiction), and Section 11 (Construction of Agreement) of this Agreement.

8.9.    The Parties agree and the J&J Settlement Order shall provide that damages, if any, payable by the Imerys Debtors or the Cyprus Debtor hereunder for breach of this Agreement shall be administrative expense claims against their estates.  In the event that Red River and/or Pecos River (or any respective successor(s) thereto) commence a J&J Related Bankruptcy Case, Red River and Pecos River, as applicable, shall not oppose any request to have any damages payable by such debtor(s) for breach of this Agreement be treated as administrative expense claims against its/their estate(s); provided that all of Red River's and Pecos River's defenses to such claims (other than with respect to priority) are fully preserved.

## 9.    NO ADMISSIONS OR WAIVER OF PRIVILEGE

9.1.    Nothing contained in this Agreement, or in any negotiations, discussions, correspondence, or other materials of any kind relating to this Agreement or relating to the negotiation of this Agreement, shall be deemed to be an admission by any Party with respect to any matter or any factual or legal issue of any kind.  Nothing in this Agreement waives or shall be deemed to waive any Party's work-product protection or right to claim the protections of any applicable privilege, including attorney-client privilege, common-interest privilege, or mediation privilege.

10.    **RETENTION OF JURISDICTION AND GOVERNING LAW**

10.1.    The Bankruptcy Court retains jurisdiction to hear and determine the terms of any and all matters arising from or related to the implementation, interpretation, and/or enforcement of this Agreement.

10.2.    This Agreement is to be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and to be performed in such State.

11.    **CONSTRUCTION OF AGREEMENT**

11.1.    The Parties represent and acknowledge that they have participated in the preparation and drafting of this Agreement or have each given their approval to all of the language contained in this Agreement, and it is expressly agreed and acknowledged that if any of the Parties later asserts that there is an ambiguity in the language of this Agreement, such asserted ambiguity shall not be presumptively construed for or against any Party on the basis that one Party drafted the language of this Agreement or played a greater role in the drafting of the language.

11.2.    The headings of this Agreement are included for convenience and are not part of the provisions hereof and shall have no force or effect.

11.3.    If any provision of this Agreement or application thereof is held to be invalid or unenforceable, the remainder of this Agreement shall remain in effect and be interpreted so as best to reasonably effect the intent of the Parties.  Notwithstanding the foregoing, Sections 2 through 8 and the definitions of the capitalized terms that appear in those Sections shall not be severable from this Agreement.

12.    **RIGHTS UNAFFECTED BY AGREEMENT**

12.1.    Notwithstanding any other provision of this Agreement, nothing contained herein shall affect the rights of an individual holder of a Talc Personal Injury Claim (as defined in the

50

Plans), or such individual holder's heirs, executors, and assigns, to prosecute such individual holder's claims against any J&J Corporate Party.

## 13. REPRESENTATIONS, WARRANTIES, AND OTHER MISCELLANEOUS PROVISIONS

13.1.    All of the Parties consent to personal jurisdiction in the Bankruptcy Court for purposes of resolving any dispute concerning the terms, meaning or implementation of this Agreement.

13.2.    Each Party represents and warrants that, subject to the conditions precedent set out in Section 2 of this Agreement (as applicable), it has taken all necessary corporate and legal action, as applicable, required to duly approve the making and performance of this Agreement and that no further action is necessary to make this Agreement binding and legally enforceable according to its terms.

13.3.    Each Party represents and warrants that, to the best of its knowledge and belief, the making and performance of this Agreement will not violate any provision of law or any of its respective articles of incorporation or bylaws or any contract or agreement by which it is bound.

13.4.    Each Debtor and J&J represents and warrants that (a) it is the owner of the rights and Claims to be compromised and released by it under this Agreement and (b) it has not assigned or transferred to any Person any such right or claim or other matter to be compromised and released hereunder.

13.5.    Each Party represents and warrants that this Agreement is supported by valid and lawful consideration sufficient to make all aspects of this Agreement legally binding and enforceable on and after the Execution Date.

13.6.    Each Party represents and warrants that this Agreement has been entered into in good faith, as a result of arm's-length negotiations, with advice of counsel, and that this Agreement

represents a fair, reasonable, proportionate, and good faith compromise and settlement of disputed Claims, disputed liabilities, and disputed issues.

13.7.    Each Releasing Party represents and warrants that it has read this Agreement in its entirety, fully understands all of its terms and the consequences thereof, and that the individual signing this Agreement on its behalf has full and complete authority and competency to legally bind it to all terms and consequences of this Agreement or any relevant portion thereof.

13.8.    Except as otherwise provided in and subject to the rights of the parties to the Plan Settlement Agreements in Sections 6.2, 6.3 and 6.4 or as otherwise expressly provided in this Agreement as to Rio Tinto, the Rio Tinto Captive Insurers and Zurich, no Talc Insurance Company shall be a third-party beneficiary of this Agreement and nothing in this Agreement, express or implied, is intended to confer upon any Talc Insurance Company, any rights, remedies, obligations, or liabilities.

13.9.    This Agreement (including the exhibits attached to it) sets forth the entire agreement among the Parties as to its subject matter, and supersedes the Original Agreement and any and all other prior or contemporaneous statements, agreements, negotiations, or understandings, whether written or oral.

13.10.  All notices, demands, or other communications to be provided pursuant to this Agreement shall be in writing and sent by electronic mail and also by overnight mail (or United States first-class mail, postage prepaid), to the other Releasing Parties at the addresses set forth below, or to such other persons or addresses as the Releasing Parties may designate in writing from time to time:

> For J&J:
>
> Erik Haas, John Kim, and Andrew White
> One Johnson & Johnson Plaza

New Brunswick, NJ 08933
AWhite23@ITS.JNJ.com
EHaas8@its.jnj.com
JKim8@its.jnj.com

<u>With a copy to:</u>

Ronit Berkovich, Esq. and Theodore Tsekerides, Esq.
Weil, Gotshal & Manges
767 Fifth Avenue
New York, NY 10153
Ronit.Berkovich@weil.com
Theodore.Tsekerides@weil.com

James Murdica, Esq.
Barnes & Thornburg LLP
One North Wacker Drive Suite 4400
Chicago, IL 60606
jmurdica@btlaw.com

Dan B. Prieto, Esq.
Jones Day
2727 North Harwood
Dallas, TX 75201
dbprieto@jonesday.com

<u>For the Imerys Parties:</u>

*Imerys Debtors*
Ryan Van Meter, Esq.
Imerys Talc America, Inc.
100 Mansell Court East, Suite 300
Roswell, Georgia 30076
ryan.vanmeter@imerys.com

<u>With a copy to:</u>

Kimberly A. Posin, Esq.
Jeffrey Bjork, Esq.
Latham & Watkins LLP
355 S. Grand Avenue, Suite 100
Los Angeles, CA 90071
kim.posin@lw.com
jeff.bjork@lw.com

Angela R. Elbert, Esq.

Neal, Gerber & Eisenberg LLP
Two North La Salle Street, Suite 1700
Chicago, IL 60602
aelbert@nge.com

*Imerys S.A.*
Emmanuelle Vaudoyer
Imerys S.A.
43 Quai de Grenelle
Paris 75015
France

<u>With a copy to</u>:

Christopher K. Kiplok, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
christopher.kiplok@hugheshubbard.com

<u>For the Cyprus Parties</u>:

*Cyprus Debtor*
D. J. Baker
266 Valley Ridge Road
Haverford, PA 19041
djbaker@djbaker.net

<u>With a copy to</u>:

Paul M. Singer, Esq.
Reed Smith LLP
225 Fifth Avenue
Pittsburgh, PA 15222
psinger@reedsmith.com

*CAMC*
Scott Statham
333 North Central Avenue
Phoenix, AZ 85004
sstatham@fmi.com

<u>With a copy to</u>:

Emil A. Kleinhaus, Esq.
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
EAKleinhaus@wlrk.com

<u>For the Tort Claimants' Committees</u>:

Natalie D. Ramsey, Esq.
Mark Fink, Esq.
Robinson & Cole LLP
1201 North Market Street Suite 1406
Wilmington, DE 19801
Direct 302.516.1702
nramsey@rc.com
mfink@rc.com

Kami E. Quinn, Esq.
Gilbert LLP
700 Pennsylvania Ave., SE
Suite 400
Washington, DC 20003
quinnk@gilbertlegal.com

Kevin C. Maclay, Esq. and Todd E. Phillips, Esq.
Caplin & Drysdale, Chartered
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
kmaclay@capdale.com
tphillips@capdale.com

Robert M. Horkovich, Esq.
Anderson Kill
1251 Avenue of the Americas
New York, NY 10020
(212) 278-1322
rhorkovich@andersonkill.com

For the FCRs:

Edwin J. Harron, Esq.
Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801
eharron@ycst.com

Richard H. Wyron, Esq.
Frankel Wyron LLP
2101 L Street, NW, Suite 300
Washington, DC 20037
rwyron@frankelwyron.com

Albert Togut, Esq.
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335
New York, NY 10119
altogut@teamtogut.com

For Rio Tinto:

Andrea Frost, Esq.
Regional Head of Litigation – Americas
Rio Tinto
4700 W. Daybreak Parkway
South Jordan, UT  84009
Andrea.frost@riotinto.com

With a copy to:

CompanySecretaryNotices@riotinto.com and the subject line must start
with the words: "RIO TINTO AMERICA INC."

John D. Green, Esq.
Erica Villanueva, Esq.
Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, CA  94104
jgreen@fbm.com
evillanueva@fbm.com

Philip D. Anker, Esq.
Lauren R. Lifland, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center

250 Greenwich Street
New York, NY  10007
philip.anker@wilmerhale.com
lauren.lifland@wilmerhale.com

For Zurich:

Robert Koscielniak
Director, Latent & Environmental Claims
Zurich North America
1299 Zurich Way
Schaumburg, IL 60196-1056
robert.koscielniak@zurichna.com

With a copy to:

Mark D. Plevin, Esq.
Plevin & Turner LLP
580 California Street, 12th Floor
San Francisco, CA  94104
mplevin@plevinturner.com

Karen Dixon, Esq.
Skarzynski Marick & Black LLP
353 N. Clark Street, Suite 3650
Chicago, IL 60654
kdixon@skarzynski.com

13.11.  The rights, duties, and obligations of any entity named or referred to in this Agreement shall be binding upon, and shall inure to the benefit of, the successors and assigns of such entity.

13.12.  This Agreement may be amended only by a writing signed by or on behalf of each Party.

13.13.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.  Execution of this Agreement may be effected by PDF or other electronic transmission of executed copies of the signature pages delivered to counsel for the Releasing Parties.

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the last date indicated below.

**IMERYS TALC AMERICA, INC. (on behalf of itself ITV and ITC)**

By: *Ryan Van Meter*
DocuSigned by:
FEF366B664B9476...

Name:  Ryan Van Meter

Title:  Secretary

Date:  September 20, 2024

**IMERYS TALC ITALY S.P.A.**

By:

Name:

Title:

Date:

**CYPRUS MINES CORPORATION**

By:

Name:

Title:

Date:

**CYPRUS AMAX MINERALS COMPANY**

By:

Name:

Title:

Date:

**JOHNSON & JOHNSON**

By:

Name:

Title:

Date:

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the last date indicated below.

**IMERYS TALC AMERICA, INC. (on behalf of itself ITV and ITC)**

By:

Name:

Title:

Date:

**CYPRUS AMAX MINERALS COMPANY**

By:

Name:

Title:

Date:

**IMERYS TALC ITALY S.P.A.**

By:

Name: KOSLAN RUOLTÉ

Title: MANAGING DIRECTOR

Date: 9/13/24

**JOHNSON & JOHNSON**

By:

Name:

Title:

Date:

**CYPRUS MINES CORPORATION**

By:

Name:

Title:

Date:

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the last date indicated below.

**IMERYS TALC AMERICA, INC. (on behalf of itself ITV and ITC)**

By:

Name:

Title:

Date:

**CYPRUS AMAX MINERALS COMPANY**

By:

Name:

Title:

Date:

**IMERYS TALC ITALY S.P.A.**

By:

Name:

Title:

Date:

**JOHNSON & JOHNSON**

By:

Name:

Title:

Date:

**CYPRUS MINES CORPORATION**

By: D. A. Baker

Name: D. J. BAKER

Title: DIRECTOR

Date: 9/20/24

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the last date indicated below.


**IMERYS TALC AMERICA, INC. (on behalf of itself ITV and ITC)**

By:

Name:

Title:

Date:

**IMERYS TALC ITALY S.P.A.**

By:

Name:

Title:

Date:

**CYPRUS MINES CORPORATION**

By:

Name:  Scott Statham

Title:  Vice President

Date:  09.12.24

**CYPRUS AMAX MINERALS COMPANY**

By:  Scott Statham

Digitally signed by Scott Statham
Date: 2024.09.12 16:00:18 -07'00'

Name:  Scott Statham

Title:  Vice President

Date:  09.12.24

**JOHNSON & JOHNSON**

By:

Name:

Title:

Date:

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the last date indicated below.

**IMERYS TALC AMERICA, INC. (on behalf of itself ITV and ITC)**

By:

Name:

Title:

Date:

**IMERYS TALC ITALY S.P.A.**

By:

Name:

Title:

Date:

**CYPRUS MINES CORPORATION**

By:

Name:

Title:

Date:

**CYPRUS AMAX MINERALS COMPANY**

By:

Name:

Title:

Date:

**JOHNSON & JOHNSON**

By:

Name: Andrew White

Title:

Date:

Digitally signed by Andrew White
DN: cn=Andrew White, o=Johnson & Johnson Services Inc., ou, email=awhite23@its.jnj.com, c=US
Reason: I agree to the terms defined by the placement of my signature on this document
Date: 2024.09.12 11:35:24 -04'00'
Adobe Acrobat Reader version: 2020.013.20064

[Signature Page to Amended and Restated Settlement Agreement and Release]

**IMERYS S.A.**

By: _____

Name:  Emmanuelle  Vaudoyer

Title:    General Counsel and Secretary

Date:    9/20/24

**RED RIVER TALC LLC**

By: _____

Name: _____

Title: _____

Date: _____

**IMERYS TORT CLAIMANTS'
COMMITTEE**

By: _____

Name: _____

Title: _____

Date: _____

**JAMES L. PATTON as IMERYS FCR**

By: _____

Name: _____

Title: _____

Date: _____

**CYPRUS MINES TORT CLAIMANTS'
COMMITTEE**

By: _____

Name: _____

Title: _____

Date: _____

**ROGER FRANKEL as CYPRUS
MINES FCR**

By: _____

Name: _____

Title: _____

Date: _____

**IMERYS S.A.**

By: _____

Name: _____

Title: _____

Date: _____

**RED RIVER TALC LLC**

By: _____

Name: _____

Title: _____

Date: _____

**IMERYS TORT CLAIMANTS' COMMITTEE**

By: *Maura Kolb*   Maura Kolb of The Lanier Law Firm on behalf of Robin Alander

Name: Maura Kolb of The Lanier Law Firm on behalf of Robin Alander

Title: Chair of the Imerys Tort Claimants' Committee

Date: 9/20/24

**JAMES L. PATTON as IMERYS FCR**

By: _____

Name: _____

Title: _____

Date: _____

**CYPRUS MINES TORT CLAIMANTS' COMMITTEE**

By: _____

Name: _____

Title: _____

Date: _____

**ROGER FRANKEL as CYPRUS MINES FCR**

By: _____

Name: _____

Title: _____

Date: _____

**IMERYS S.A.**

By: _____

Name: _____

Title: _____

Date: _____

**RED RIVER TALC LLC**

By: _____

Name: _____

Title: _____

Date: _____

**IMERYS TORT CLAIMANTS'
COMMITTEE**

By: _____

Name: _____

Title: _____

Date: _____

**JAMES L. PATTON as IMERYS FCR**

By: _____

Name: _____

Title: _____

Date: _____

**CYPRUS MINES TORT CLAIMANTS'
COMMITTEE**

By: *Shafequllah Syed*

Name: *Shafeqyllah Syed*

Title: Committee Member

Date: 9/20/2024

**ROGER FRANKEL as CYPRUS
MINES FCR**

By: _____

Name: _____

Title: _____

Date: _____

**IMERYS S.A.**

By: _____

Name: _____

Title: _____

Date: _____


**RED RIVER TALC LLC**

By: _John K. Kim_____

Name: _John K. Kim_____

Title: _Chief Legal Officer_____

Date: _9/12/24_____


**IMERYS TORT CLAIMANTS'
COMMITTEE**

By: _____

Name: _____

Title: _____

Date: _____


**JAMES L. PATTON as IMERYS FCR**

By: _____

Name: _____

Title: _____

Date: _____


**CYPRUS MINES TORT CLAIMANTS'
COMMITTEE**

By: _____

Name: _____

Title: _____

Date: _____


**ROGER FRANKEL as CYPRUS
MINES FCR**

By: _____

Name: _____

Title: _____

Date: _____

**IMERYS S.A.**

By: _____

Name: _____

Title: _____

Date: _____


**RED RIVER TALC LLC**

By: _____

Name: _____

Title: _____

Date: _____


**IMERYS TORT CLAIMANTS'
COMMITTEE**

By: _____

Name: _____

Title: _____

Date: _____


**JAMES L. PATTON as IMERYS FCR**

By: _____

Name: Robert S. Brady

Title: Counsel to the FCR

Date: 9/13/24


**CYPRUS MINES TORT CLAIMANTS'
COMMITTEE**

By: _____

Name: _____

Title: _____

Date: _____


**ROGER FRANKEL as CYPRUS
MINES FCR**

By: _____

Name: _____

Title: _____

Date: _____


[Signature Page to Amended and Restated Settlement Agreement and Release]

**IMERYS S.A.**

By: _____

Name: _____

Title: _____

Date: _____

**RED RIVER TALC LLC**

By: _____

Name: _____

Title: _____

Date: _____

**IMERYS TORT CLAIMANTS' COMMITTEE**

By: _____

Name: _____

Title: _____

Date: _____

**JAMES L. PATTON as IMERYS FCR**

By: _____

Name: _____

Title: _____

Date: _____

**CYPRUS MINES TORT CLAIMANTS' COMMITTEE**

By: _____

Name: _____

Title: _____

Date: _____

**ROGER FRANKEL as CYPRUS MINES FCR**

By: _____

Name: _Roger Frankel_

Title: _FCR_

Date: _9-13-24_

**JOHNSON & JOHNSON HOLDCO
(NA) INC.**

By: _____

Name:   Laura H. McFalls

Title:   President

Date:   9/20/24
_____


**PECOS RIVER TALC LLC**

By: _____

Name:   Laura H. McFalls

Title:   President

Date:   9/20/24
_____

Solely with respect to Sections 6.2, 6.3, 6.4 and 6.5 of this Agreement:

**RIO TINTO AMERICA INC.**                    **ZURICH AMERICAN INSURANCE COMPANY, in its own capacity and as successor-in-interest to ZURICH INSURANCE COMPANY, U.S. BRANCH**

By: _Jean-Francois Couture (signature)_____        By: _____

Name: Jean-Francois Couture                    Name: _____

Title: President and CEO                        Title: _____

Date: 20 September 2024                        Date: _____

Solely with respect to Sections 6.2, 6.3, 6.4 and 6.5 of this Agreement:

**RIO TINTO AMERICA INC.**                **ZURICH AMERICAN INSURANCE COMPANY, in its own capacity and as successor-in-interest to ZURICH INSURANCE COMPANY, U.S. BRANCH**

By: _____          By: _____

Name: _____          Name: Carrie Von Hoff

Title: _____          Title: AVP / Coverage Counsel Manager

Date: _____          Date: 9/20/2024